**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN SOCIETY FOR TESTING AND MATERIALS d/b/a/ ASTM INTERNATIONAL, 100 Barr Harbor Drive, West Conshohocken, PA  19428; <br><br> NATIONAL FIRE PROTECTION ASSOCIATION, INC., 1 Batterymarch Park, Quincy, MA 02169; and <br><br> AMERICAN SOCIETY OF HEATING, REFRIGERATING, AND AIR-CONDITIONING ENGINEERS, INC. 1791 Tullie Circle, N.E., Atlanta, GA  30329 <br><br><div align=center>Plaintiffs,</div><br> v. <br><br> PUBLIC.RESOURCE.ORG, INC., 1005 Gravenstein Hwy. North, Sebastopol, CA  95472 <br><br><div align=center>Defendant.</div> | Civil Action No. _____ <br><br> **COMPLAINT FOR INJUNCTIVE RELIEF** |

**COMPLAINT**

This is an action by three not-for-profit standards developing organizations: American Society for Testing and Materials d/b/a ASTM International; National Fire Protection Association, Inc.; and American Society of Heating, Refrigerating, and Air-Conditioning Engineers, Inc. (collectively "Plaintiffs").  This action seeks injunctive relief for copyright infringement, contributory copyright infringement and trademark infringement against Public.Resource.Org, Inc. ("Public Resource" or "Defendant"), an organization that seeks to

destroy clearly established copyright protection for Plaintiffs' standards that various governments have incorporated by reference into regulations.  Plaintiffs, by their attorneys, allege as follows:

## INTRODUCTION

1.      Standards are technical works that encourage consistent practices among private actors.  The goals of standards include advancing public safety, ensuring compatibility across products and services, facilitating training and spurring innovation.  In the United States, standards are typically developed by private organizations with expertise in the subject matter the standard addresses.  The resulting standards are original works containing creative content which are protected from infringement under the Copyright Act.  Government entities frequently incorporate these private standards by reference in statutes, regulations, or ordinances.

2.      This established system of private standards development in the United States yields great public benefits.  In the modern era, standards are necessary for a well-functioning economy and a safe society.  The development of standards by private organizations allows for private actors to bear the significant costs of creating standards, through processes and procedures that incorporate a diverse array of viewpoints and interests and draw on the knowledge of numerous experts.  Moreover, this system imposes virtually no costs on governments or taxpayers, while enabling government entities at every level to incorporate private standards into their regulations or statutes as they see fit—subject to the creators of the standards retaining the copyrights in the standards.  Plaintiffs underwrite—either entirely or in substantial part—the costs they incur in creating the standards through the revenues derived from the sales or licensing of their copyright-protected standards.  At the same time, as detailed herein, each Plaintiff has developed policies for providing interested members of the public access to standards known to have been incorporated by reference into statutes and regulations.

3.      The Defendant in this action, Public.Resource.Org, Inc. ("Public Resource"), has engaged in conduct that violates U.S. copyright and trademark law and threatens to undermine the many significant benefits of private standards development.  Public Resource has copied en masse Plaintiffs' copyrighted standards in their entirety, posted them to its public website, and encouraged the public to disregard Plaintiffs' copyrights and to copy, distribute, and create derivative works of those standards at will.  Public Resource's bulk copying of Plaintiffs' standards is not supported by, and in fact violates, the Copyright Act.  And Public Resource's actions threaten the substantial public benefits, including safety, efficiency and cost savings, that result from Plaintiffs' ownership and exploitation of their copyrights in the standards they create.

## THE PARTIES

4.      Plaintiff American Society for Testing and Materials d/b/a ASTM International ("ASTM") is a Pennsylvania not-for-profit corporation with its principal place of business at 100 Barr Harbor Drive, West Conshohocken, Pennsylvania.  ASTM maintains an office in Washington, DC, located at 1850 M Street, NW, Washington DC 20036.  ASTM's Washington office staff includes ASTM's Vice President of Global Policy and Industry Affairs and ASTM's Manager of Government and Industry Affairs.  The DC staff focuses on communicating with the federal government and industry to increase awareness about ASTM's standards and to encourage participation in ASTM's standard development activities.

5.      Plaintiff National Fire Protection Association, Inc. ("NFPA") is a Massachusetts not-for-profit corporation with its principal place of business located at One Batterymarch Park, Quincy, MA 02169.  NFPA maintains an office in Washington, DC, located at 1401 K Street, NW, Suite 500, Washington, DC 20005.  NFPA's Washington office staff includes its Director of Government Affairs.  The staff's primary responsibilities include monitoring federal activities

and facilitating outreach to the federal government concerning NFPA standards as well as other fire, electrical, building, and life safety issues related to NFPA's safety mission.

6.     Plaintiff American Society of Heating, Refrigerating and Air-Conditioning Engineers, Inc. ("ASHRAE") is a New York not-for-profit corporation with its principal place of business located at 1791 Tullie Circle, N.E., Atlanta, GA 30329.  ASHRAE maintains an office in Washington, DC, located at 1828 L St., NW, Washington, DC 20036, which was established approximately 33 years ago. ASHRAE's Washington office staff includes ASHRAE's Director of Government Affairs, a Senior Manager of Federal Government Affairs, a Manager of State and Local Government Affairs, and an office manager.  That DC staff is engaged in building relationships for ASHRAE with numerous government representatives, including members of Congress and their staffs, and with many international organization representatives.  They also facilitate the dissemination of technical information and assistance on matters affecting the public, the engineering profession and the ASHRAE professional community; they collect, digest and disseminate to ASHRAE members and staff relevant information regarding current or anticipated government actions; and they pursue technology transfer and government funding opportunities independently or jointly with other organizations.

7.     Defendant Public Resource is a California corporation with its principal place of business at 1005 Gravenstein Highway North, Sebastopol, CA 95472.

## NATURE OF ACTION, JURISDICTION, AND VENUE

8.     This is an action for infringement and contributory infringement of federally registered copyrights in violation of 17 U.S.C. § 501, infringement of trademarks in violation of Sections 32 and 43 of the Lanham Act, 15 U.S.C. §§ 1114 and 1125, and common law trademark infringement.

9.      This Court has jurisdiction over this action pursuant to 15 U.S.C. § 1121 and

pursuant to 28 U.S.C. §§ 1331, 1338(a) and 1400, because this is a civil action arising under an

Act of Congress relating to copyrights and trademarks.  This court has supplemental jurisdiction

over the common law trademark infringement claim asserted herein pursuant to 28 U.S.C. § 1367

because this claim is so related to the federal claims that they form part of the same case or

controversy and derive from a common nucleus of operative facts.

10.     Venue is proper in this court pursuant to 28 U.S.C. §§ 1391 and 1400:

because the claims alleged in the Complaint arose, in substantial part, in the District of

Columbia; because the Defendant may be found in this District; and because this Court has

personal jurisdiction over Defendant.  Among other things, Defendant has directed its infringing

activities to this District and, on information and belief, has materially contributed to the

infringing activities of third parties in this District.  Defendant has designed its website to attract

visitors from the District of Columbia who are encouraged to copy, to distribute to others in this

District and/or to create derivative works based on Plaintiffs' standards incorporated by reference

into the law of the District of Columbia.  Visitors also are solicited to submit financial donations

on Defendant's website through the Defendant's PayPal account.  Moreover, Defendant sells

various items on the Internet, including Public.Resource.Org stamps and stickers, amongst other

items.  *See* http://www.zazzle.com/carlmalamud/.

11.     Defendant also has participated in conferences, round tables, and meetings

in the District of Columbia. *See, e.g.,* http://news.cnet.com/8301-13512_3-10354324-23.html;

http://web.resourceshelf.com/go/resourceblog/58874; and

http://www.gov2expo.com/gov2expo2010/public/schedule/speaker/1824.  Defendant also

recently posted copyrighted material owned by a third party online and engaged in public

relations activities connected thereto that were directed toward the District of Columbia.  *See*

http://frrole.com/o/this-is-really-good-to-hear-washington--carlmalamud-washington-dc;

http://www.washingtontimes.com/news/2013/mar/31/ignorance-of-dcs-copyrighted-laws-can-be-

costly/; and http://frrole.com/o/this-is-really-good-to-hear-washington--carlmalamud-

washington-dc.

## **FACTS**

**I.      THE UNITED STATES STANDARDS DEVELOPMENT SYSTEM**

12.     The term "standards" comprises a wide variety of technical works ranging from

codes to compilations of rules, test methods, interoperability standards, product specifications,

installation standards, guidelines, and recommended practices.  Standards can range in length

from a few pages, such as ASTM E2877-12e1: Standard Guide for Digital Contact

Thermometers, promulgated by ASTM International, to hundreds of pages, such as NFPA 70,

*National Electrical Code* ("*National Electrical Code*" or "NEC"), promulgated by the NFPA.

13.     Standards sometimes may be developed by government entities.  Indeed, in most

other countries, standards are typically developed or overseen by the government, and are paid

for or heavily subsidized by government funds.

14.     In the United States, however, standards are typically developed by private

organizations with technical expertise in the relevant area.  In fact, the National Technology

Transfer and Advancement Act of 1995 requires federal agencies to use privately developed

standards wherever possible.  § 12, Pub. L. No. 104-113, 110 Stat. 775, 782-83 (1996) (codified

as part of 15 U.S.C. § 272 (2006)).  Privately developed standards are used by the private sector

for voluntary self-regulation and as a source of best practices.  Some privately developed

standards also are incorporated by reference by government entities in statutes, regulations, and ordinances.

15.     The United States standards development system has evolved over more than a century as a decentralized system of private organizations.  These organizations develop standards in different ways, and for myriad purposes.  Although this system of private organizations receives virtually no government funding, it yields substantial public benefits.  It provides the public sector with up-to-date, technically advanced, widely accepted standards— which may be used and adopted by reference, at no cost, by government entities at the local, state, and federal level—subject to the standards organizations retaining the copyright in the standards.

### A.  The Evolution of the United States Standards Development System

16.     Private-sector standards confer tremendous benefits on society.  The need for voluntary, uniform standards to deal with an increasingly technical society emerged during the Industrial Revolution.  As technology advanced at a breathtaking pace, and American industry grew exponentially, the absence of widely accepted standards created grave threats to public health and safety.

17.     For example, at the turn of the twentieth century, the size of the threads on fire hydrants and hoses varied across the major cities of the Atlantic seaboard.  When a large fire burned out of control in Baltimore in 1904, fire brigades from Washington, D.C., New York, Philadelphia, and elsewhere arrived to lend assistance.  But because the threads on their hoses did not match the Baltimore fire hydrants, they stood by helplessly as the conflagration consumed 70 blocks of downtown Baltimore.

18.     Similarly, a fire at the crowded Triangle Shirtwaist Company in New York City cost 146 garment workers their lives in 1911.  Locked exit doors, the lack of a fire alarm, unreliable fire escapes, and the absence of proper methods for extinguishing the fire all contributed to the devastation.

19.     As another example, there were no fewer than 20 different gauges of track in the early days of the railroad industry, making it difficult and costly to connect railroads and travel over long distances.

20.     In response to these types of problems, private organizations were founded to develop standards that would apply nationwide within a particular industry or field.  For example, ASTM Standard A1 provided uniform specifications for carbon steel tee rails that made it possible for manufacturers from different parts of the country to cooperate in building the national railroads.

21.     Over time, the number of organizations dedicated to the development of standards—and the breadth of their activities—expanded along with the evolution of existing technologies and the emergence of new ones.  Today, there are more than 600 organizations within the United States that develop voluntary standards.  These organizations have promulgated approximately 93,000 active standards.

22.     There are many different types of private-sector standards, including standards governing materials testing, systems design and installation, product testing and certification, and professional qualifications.  Private-sector standards are developed on a wide array of subjects, such as indoor air quality, building and electrical safety, welding procedures, and the design of manufacturing equipment.

23.     Standards preserve public safety, protect consumers, ensure compatibility and uniformity across products and services, facilitate training and education, and spur innovation. Standards usually are highly technical and specialized, and are written for audiences that have particular expertise in the relevant fields.

**B. The Standards Development Process**

24.     Private-sector standards are developed in a variety of ways.  Some are developed by ad hoc business groups or consortia that convene to create standards for a specific business purpose and do not provide for public review or broad participation.  The most widely used and accepted standards, however, are what are known as "voluntary consensus standards." Voluntary consensus standards are developed through published procedures that ensure broad participation of the affected interests, provide for public comment, and ensure due process through a mechanism for appeal.

25.     Not-for-profit organizations usually develop voluntary consensus standards. Some of these organizations are trade associations that fund their standards activities through membership or participation fees.  Others, particularly those that develop standards related to health, safety and the environment, sustain their standards development activities, in significant part, with revenues derived from the sales or licensing of their copyright-protected standards to the people and companies who use those standards in the course of their professional work.

26.     There are several different types of U.S.-based standards developing organizations that develop voluntary consensus standards (hereafter, "SDOs").  They include trade associations, professional societies, third-party organizations that test and certify products, and general membership organizations created to pursue public interest goals.  Some SDOs produce a single standard, while others produce hundreds.  For some SDOs, standards

development is an ancillary activity; for others, it is their main activity and the principal means by which they serve their missions.

27.     While SDOs function independently, many cooperate through the American National Standards Institute ("ANSI").  ANSI is a not-for-profit organization that coordinates voluntary consensus standards development in the United States.  ANSI is a federation that draws its members from SDOs and other professional, technical, trade, labor, academic, industry, and consumer organizations, as well as government agencies.  Among its principal functions, ANSI accredits SDOs whose procedures meet ANSI requirements governing openness, consensus and due process.

28.     All Plaintiffs in this case are ANSI-accredited SDOs that also are not-for-profit organizations, organized under their respective state laws, and recognized as tax exempt for federal purposes under Section 501(c)(3) of the Internal Revenue Code.

29.     Drafting effective standards requires wide-ranging creative input from a variety of concerned constituencies and sources of expertise.  Plaintiffs rely on committees to create and revise their standards.  As required by ANSI, these committees contain balanced membership, including experts within the particular field addressed by the standard, consumers, government representatives, industry representatives, and other interested stakeholders.

30.     Plaintiffs also comply with the other ANSI essential requirements governing the process for developing voluntary consensus standards.  Those requirements include: open proceedings; proceedings that are not dominated by any single interest; coordination and harmonization with existing standards; public notice of standards of activity; consideration of views and objections; consensus voting methods; opportunity for appeals; and written

procedures.  The federal government has recognized that these procedural protections are the hallmarks of a "voluntary consensus standards body."

31.    Plaintiffs regularly publish standards that they create through such processes, in both print and electronic form.  Plaintiffs' standards reflect the complex expression of a multitude of ideas, and contain original and highly creative content.

32.    Because technology and best practices continue to evolve, Plaintiffs' work is ongoing.  Plaintiffs publish revised versions of their standards on a regular basis, as required by ANSI, as well as ever-changing technology and marketplace demands.  New versions may add content that responds to changes in the industry, or may expand and improve the standards to make them more effective.

### C.  The Benefits of Plaintiffs' Standards

33.    Plaintiffs' standards confer significant public benefits.  Plaintiffs' standards promote public health and safety, in fields as diverse as consumer products, indoor air quality, building and electrical safety, welding procedures, construction materials, alarm systems, fire test methods, and the design of manufacturing equipment.  By identifying and embracing best practices, Plaintiffs' standards help protect the public from dangerous practices and products.  In addition to protecting the public, Plaintiffs' standards benefit consumers by helping to ensure the quality and consistency of goods and services.  For example, ASTM F977 Consumer Safety Specification for Infant Walkers addresses the quality and safety of a category of products used by young children.

34.    Plaintiffs' standards also help drive technological innovation.  A recent report by the National Science and Technology Council concluded that

> [s]tandards can play an important role in enabling technological innovation by defining and establishing common foundations upon which product differentiation, innovative

> technology development and other value-added services may be developed.  Standards
> are also essential for enabling seamless interoperability between and across products and
> systems.  In the United States private-sector-led standards development that is informed
> by market needs has played a foundational role in facilitating competition, innovation and
> global trade.

*See* Federal Engagement in Standards Activities to Address National Priorities 3 (Oct. 2011),

available at http://www.whitehouse.gov/sites/default/files/microsites/ostp/federal_engagement_

in_standards_activities_october12-final.pdf.

35.     Plaintiffs' standards also make markets more efficient.  Without building-related

standards, such as model building codes, Plaintiff NFPA's *Life Safety Code*, or Plaintiff

ASHRAE's *Ventilation for Acceptable Indoor Air Quality* standard, contractors, trades people

and manufacturers of building materials would be confronted with an extraordinarily complex

marketplace, where the practices governing their businesses vary widely from one town to the

next.  Building standards provide for consistency across jurisdictions, enabling the efficient

exchange of building materials and services.  Similarly, standards allow for the interoperability

of products.  For example, the nationwide use of Plaintiff NFPA's *National Electrical Code*, in

conjunction with other product standards, helps to ensure that wherever consumers go in the

United States, their electric appliances can be plugged in and will operate safely and effectively.

36.     Many of Plaintiffs' standards apply to and are referenced by professionals and

specialists—including manufacturers, installers, trades people, engineers, architects, and

technical experts—rather than members of the general public.  Hence, while Plaintiffs' standards

ultimately benefit members of the public, the vast majority of their standards are directed to

manufacturers, professionals, and other specialists and are highly technical in nature.

### D.  Government Incorporation of Private-Sector Standards

37.     In addition to their many private uses, a portion of these voluntary consensus standards also have been incorporated by reference into the laws of government entities, at little to no cost to taxpayers (beyond the minimal travel costs attendant to the participation of government representatives on SDO consensus bodies).  For well over a hundred years, government entities have used privately developed standards to provide health, safety, and other technical regulations for the benefit of the public, simply by incorporating the standards by reference into statutes, regulations, and ordinances.  When governments incorporate by reference the standards of Plaintiffs and other SDOs, it amplifies the public benefits of these standards, yielding tremendous efficiency gains and substantial savings for taxpayers.

38.     In the early part of the twentieth century, many state and local governments adopted model codes on such common subjects as construction, fire safety, and electrical work. For example, NFPA's *National Electrical Code* was first published in 1897.  By the 1930s, approximately 2,000 communities throughout the United States adopted the NEC, and many cities and states that previously followed unique electrical codes had revised them to conform to the national model.

39.     Federal policy strongly encourages the development of standards by private organizations and the incorporation of those standards by federal departments and agencies.  In 1982, the federal Office of Management and Budget promulgated OMB Circular No. A-119 ("the OMB Circular").  In its current iteration, the OMB Circular "directs agencies to use voluntary consensus standards in lieu of government-unique standards except where inconsistent with law or otherwise impractical."  The policy articulated in the OMB Circular is "intended to

reduce to a minimum the reliance by agencies on government-unique standards," in order "to achieve the following goals:"

    a. Eliminate the cost to the Government of developing its own standards and decrease the cost of goods procured and the burden of complying on agency regulation.

    b. Provide incentives and opportunities to establish standards that serve national needs.

    c. Encourage long-term growth for U.S. enterprises and promote efficiency and economic competition through harmonization of standards.

    d. Further the policy of reliance upon the private sector to supply Government needs for goods and services.

The OMB Circular is available at

https://www.google.com/#bav=on.2,or.r_qf.&fp=335c82eb2f3786ba&q=omb+circular+no+a+11 9.

    40.    In 1995, Congress enacted the National Technology Transfer and Advancement Act (the "NTTAA"). The NTTAA codifies the federal government's policy of adopting privately developed standards. With certain exceptions, the NTTAA provides that "all Federal agencies and departments shall use technical standards that are developed or adopted by voluntary consensus standards bodies, using such technical standards as a means to carry our policy objectives or activities determined by the agencies and departments." The NTTAA is available at http://www.gpo.gov/fdsys/pkg/PLAW-104publ113/pdf/PLAW-104publ113.pdf.

    41.    Today, literally thousands of private-sector standards are incorporated by reference in the Code of Federal Regulations. Thousands of standards are also adopted by state and local governments. Hundreds of Plaintiffs' standards have been incorporated by reference by various government entities.

    42.    Governments at all levels adopt standards developed by SDOs because they yield substantial benefits and efficiencies. Incorporating existing standards by reference allows

government agencies to develop a comprehensive regulatory scheme quickly and with limited

costs.  By comparison, government agencies and bodies at all levels would incur enormous

expenses if they were to engage in the lengthy and complicated process of developing their own

unique standards.  The cost of coordinating, updating, testing and the many other activities

required to keep standards up to date and to comply with the demanding and rigorous procedural

requirements that Plaintiffs and other SDOs follow would be enormous, and in many cases cost-

prohibitive, for government agencies and bodies at many levels.

      43.     Moreover, because standards created by SDOs reflect the collective experience,

knowledge, and judgment of industry representatives, practitioners, academics, and other

experts, incorporation by reference enables the government to capitalize on expertise from the

private sector that often does not exist within government bureaucracy—particularly with respect

to ever-evolving industries and technologies.  As the National Science and Technology Council

noted in its recent report, the "U.S. government has long recognized that the private-sector,

driven by innovators and market need, is ordinarily in the best position to drive standardization

in a technology area."  Federal Engagement in Standards Activities to Address National

Priorities 3 (Oct. 2011), available at

http://www.whitehouse.gov/sites/default/files/microsites/ostp/federal_engagement_in_standards_

activities_october12-final.pdf.  For this reason, the Administrative Conference of the United

States concluded that incorporation by reference "furthers important, substantive regulatory

policies, enabling agencies to draw on the expertise and resources of private-sector standard

developers to serve the public interest."  Administrative Conference of the United States,

Recommendation 2011-5, at 1, available at

http://www.acus.gov/sites/default/files/Recommendation-2011-5-Incorporation-by-Reference.pdf.

44.     For example, the Federal Energy Regulatory Commission ("FERC") has incorporated by reference standards created by the North American Energy Standards Board ("NAESB"), because of its view that the NAESB "process is [a] far more efficient and cost effective method of developing technical standards for the industries involved than the use of a notice and comment rulemaking process involving numerous technical conferences in Washington that all believe they have to attend."  Standards for Business Practices and Communication Protocols for Public Utilities, 74 Fed. Reg. 63,288, 63,302 (Dec. 3, 2009).

45.     Incorporating existing standards also decreases the burden of regulation on industry.  Plaintiffs' standards align with existing industry best practices, with which many regulated parties already comply.  Incorporation by reference, therefore, reduces gaps between government regulation and industry practice, and makes it easier and less expensive for industry to comply with regulations.

### E.  Costs of Developing Private-Sector Standards

46.     The development of high quality, up-to date, voluntary consensus standards is costly.  In addition to the value of the time and expertise contributed by the many volunteers who participate in the standards-development process, Plaintiffs expend substantial resources to provide the administrative, technical, and other support necessary to produce standards.  Plaintiffs must pay for salary and benefits for administrative and expert staff, office space, meeting facilities, outreach and education efforts, information technology, and the cost of publication of their standards, among other things.

47.     The robust and open process followed by Plaintiffs, which includes multiple levels of review, opportunity for notice and comment, and representation from a diverse array of interests, is particularly costly to administer and coordinate.  For example, NFPA has spent significant sums to build a computerized interface that allows for the online development and revision of standards.  It also has increased the participation of underrepresented groups on its technical committees, such as by creating an Enforcer Funding Program to raise the percentage of government enforcement officials on the committees, during a time of public-sector budget cuts.

## II.     PLAINTIFFS' STANDARDS

### A.     Plaintiff ASTM's Standards

48.     For more than 100 years, ASTM has provided a global forum for the development and publication of voluntary consensus standards for materials, products, systems, and services that are utilized by ninety industry sectors in the United States and in most geographic regions of the world.  ASTM is the developer and publisher of over 12,000 voluntary consensus standards in a wide range of fields, including, but not limited to, consumer products, iron and steel products, rubber, paints, plastics, textiles, medical services and devices, electronics, construction, aviation, energy, water, and petroleum products.

49.     Over 30,000 individuals representing 135 countries, including manufacturers, retailers, consumers, representatives from government agencies, academics, and researchers, serve on ASTM's 143 Technical Committees.  Each Technical Committee is further divided into more focused technical areas called subcommittees.

50.     The voting membership of each ASTM Technical Committee is constituted to include a balance of relevant interests.  For example, producers or sellers of materials, products,

systems or services covered within the scope of a given committee or subcommittee cannot exceed more than 50 percent of the voting membership of that committee or subcommittee. All standards actions, including new standards as well as revisions, withdrawals and reapprovals of existing standards, must be approved by at least 66.7 percent of the voting subcommittee members and 90% of the voting main committee members, with not less than 60 percent of the voting members returning ballots.

51. ASTM standards development activities are governed by a detailed set of written procedures that are accredited by ANSI as satisfying the essential requirements of a voluntary consensus standards development process. The process through which ASTM develops its standards includes multiple levels of review, and numerous opportunities for public review and comment. All ASTM standards are reviewed on a 5 year schedule and reapproved, revised or withdrawn in revision cycles that typically take 8-12 months to complete. Each revision cycle proceeds according to a published schedule that includes final dates for all major events in the process, including opportunities for input and comment, Technical Committee meetings, appeals, and final publication of the standard.

52. ASTM strives to enable broad stakeholder representation in the process and does everything possible to minimize barriers to entry. Individual participating ASTM members pay $75 annually for membership, which entitles them to full participation rights in the development of standards and free access to standards relevant to their interest. ASTM often waives the membership fee for interested consumers or participants from developing countries.

53. Each year ASTM incurs substantial costs for its standards development infrastructure and delivery platforms, including resources for collaboration, Technical Committee meetings, balloting, editorial, production, distribution, promotion and protection of

ASTM Standards.  ASTM also incurs significant costs related to achieving and maintaining

accreditation by ANSI and for engaging in policy-related activities within the global standards

community.

54.     Sales of ASTM's standards account for approximately 75% of ASTM's total

revenue.

55.     Many ASTM standards have been incorporated by reference by government

entities in statutes, regulations, and ordinances.

56.     For example, the U.S. Department of Agriculture (USDA) BioPreferred Program,

which is designed to increase the promotion and use of biobased products, incorporates by

reference ASTM D6866 -- Standard Test Methods for Determining the Biobased Content of

Solid, Liquid, and Gaseous Samples Using Radiocarbon Analysis – to calculate the biobased

content included in a given material. Over 9,000 products from nearly 90 product categories have

qualified for this USDA program.  According to USDA, the increased purchase of biobased

products will be expected to reduce petroleum consumption, increase the use of renewable

resources, better manage the carbon cycle, and may contribute to reducing adverse

environmental and health impacts.

57.     Over 1,200 ASTM standards, out of more than 12,000 total ASTM standards, are

referenced in the Code of Federal Regulations.  ASTM has not voluntarily transferred or licensed

any of its rights in these standards to any governmental agencies whose regulations incorporate

ASTM's standards.  Nor has ASTM been compensated by the federal government for any of its

safety standards.

58.     ASTM owns or controls the copyrights and/or the relevant exclusive rights in the

works at issue in this case ("ASTM Standards") under the United States copyright laws.  ASTM

has obtained Certificates of Copyright Registration from the Register of Copyrights for the

ASTM Standards.  Attached hereto as Exhibit A is a list of the ASTM Standards that Defendant

infringed by the acts complained of herein.  Exhibit A also identifies by number the Certificates

of Copyright Registration issued to ASTM.

59.     The ASTM standards are original works of authorship.  The content of the ASTM

Standards is original to ASTM and includes a high degree of creativity.

60.     ASTM expressed the concepts underlying its standards through particular words

and drawings that it selected from myriad options through which it could have expressed those

concepts.

61.     ASTM owns the exclusive trademark rights in the following registered trademarks

that refer to ASTM (the "ASTM Marks"):

     a.     U.S. Trademark Registration No. 2,679,320, which covers the ASTM word mark.

     b.     U.S. Trademark Registration No. 2,685,857, which covers the ASTM INTERNATIONAL word mark.

     c.     U.S. Trademark Registration No. 2,651,796, which covers the following logo:



      d.     U.S. Trademark Registration No. 4,079,772, which covers the following

logo:



62.     ASTM also owns common law rights in the ASTM Marks.

63.     Through ASTM's exclusive, continuous and widespread use of the ASTM Marks,

the ASTM Marks have acquired a substantial amount of goodwill, and consumers have come to

rely on the ASTM Marks to identify ASTM's high quality goods and services.  ASTM has spent

significant funds and resources marketing and promoting its goods and services in connection

with the ASTM Marks, and considers them to be important, valuable assets.  ASTM vigorously

and continuously enforces its ASTM Marks against infringers and counterfeiters.

**B.**     **Plaintiff NFPA's Standards**

64.     Founded in 1896, the NFPA is a not-for-profit organization incorporated as a

public charity under the laws of the Commonwealth of Massachusetts and recognized as a

Section 501(c)(3) organization under the Internal Revenue Code.  The NFPA's mission is to

reduce the dangers of fire and other hazards by providing and advocating for consensus

standards, research, training, and education.  The development of voluntary consensus standards

is NFPA's principal activity and the primary means through which it furthers its safety mission.

65.     NFPA develops and disseminates over 300 standards in the areas of fire,

electrical, and building safety.  These standards are designed to minimize damage to property

and to protect people from death and injury.  NFPA standards range from large, multi-chapter installation standards such the *National Electrical Code*, to standard test methods of only a few pages, such as NFPA 259, *Standard Test Method for Potential Heat of Building Materials*. There are many different types of NFPA standards, covering a broad range of subjects.  By way of example, NFPA has promulgated standards regarding fire protective clothing, fire service professional qualifications, firefighting equipment, firefighter training, incident management, and firefighter deployment.  NFPA standards also cover the installation of electrical systems, fuel gas piping, and other building systems and components, and offer guidance on emergency and disaster planning, explosion prevention, and fire investigation.  There are NFPA standards that apply to homes and hospitals, airports and coal mines, tunnels and historic structures, grain silos and nuclear power plants.

66.      NFPA's flagship work is the *National Electrical Code*, which is the world's most widely used and accepted standard for electrical installations.  The NEC was created in 1897 out of a desire to establish uniform standards regarding the installation of electrical systems.  Since 1959, the NEC has been revised every three years.  Other widely used NFPA standards include the NFPA 13, *Standard for the Installation of Sprinkler Systems*, which establishes standards for the installation of fire sprinklers, and NFPA 101, *Life Safety Code*, which establishes standards for the protection of human life from fire, smoke, and toxic fumes in buildings and other structures.

67.      NFPA's standards contain a variety of materials, including prescriptive rules, as well as explanatory material, such as informational notes and annexes, illustrations, charts, and diagrams.

68.     NFPA standards are advisory and are made available for a wide variety of private

and public uses.  The private sector relies heavily on NFPA standards.  Private actors use NFPA

standards for purposes including industry and professional best practices, insurance

underwriting, professional training and certification, worker protection, and product testing and

certification.

69.     NFPA standards are also widely incorporated by reference by government entities

in statutes, regulations, and ordinances.  Some NFPA standards, such as the NEC, are adopted by

one or more levels of government in every state in the country.  For example, the municipal

regulations of the District of Columbia incorporate the NEC by reference.  *See* 12 D.C. Mun.

Regs. tit. 12, § 101.A(101.1).  And virtually every NFPA standard is incorporated by reference

by one or more of the thousands of local and state governments within the United States.  The

federal government also relies on NFPA standards; the Code of Federal Regulations references

NFPA standards approximately 380 times.

70.     NFPA standards development activities are governed by a detailed set of written

procedures that are accredited by ANSI as satisfying the essential requirements of a voluntary

consensus standards development process.  The consensus bodies primarily responsible for the

drafting and updating of NFPA standards are known as "Technical Committees" (or, in the case

of the NEC, as "Panels").  Each Technical Committee is assigned a scope of activities that may

include a number of standards or just one portion of a single standard.

71.     NFPA's Technical Committees are comprised of volunteers from business,

industry, public interest groups, government, and academia, as well as other subject matter

experts and stakeholders.  An NFPA Technical Committee may include electricians, other

tradesman, government officials, and experts with advanced degrees in electrical engineering or

many other fields.  Although NFPA is a membership organization, individuals may serve on a Technical Committee without themselves being NFPA members.

72.     Each NFPA Technical Committee is constituted to include a balance of relevant interests, with no one interest occupying more than one-third of the Committee.  All new standard provisions, and any revision to an existing standard, must be approved by at least two-thirds of the Committee.

73.     The NFPA process includes multiple levels of review, and numerous opportunities for public review and comment.  All NFPA standards are revised and updated every three to five years, in revision cycles that typically take two years to complete.  Each revision cycle proceeds according to a published schedule that includes final dates for all major events in the process, including opportunities for input and comment, technical committee meetings, appeals, and final issuance of the standard.

74.     In addition to its standards development activities, NFPA works to protect lives and property through educational programs such as Fire Prevention Week in October—a national campaign for which NFPA has been the official sponsor since 1922—and by overseeing the operation of advocacy campaigns dedicated to increasing fire safety and awareness, including: the Fire Sprinkler Initiative, Bringing Safety Home, the Coalition for FireSafe Cigarettes, and the Alliance to Stop Consumer Fireworks.  NFPA also publishes dozens of texts, guides, and other safety information and materials, and offers training on the content and use of its standards for professionals, government regulators, fire service members, and other first responders.  And NFPA is the premier resource for fire data analysis and research (through its fire analysis department and the NFPA-affiliated Fire Protection Research Foundation).  Many of NFPA's publications and activities are costly, but generate little or no revenue.

75.     NFPA's day-to-day operations depend upon a reliable stream of revenue to cover the numerous expenses NFPA incurs in its activities.  These expenses include, but are not limited to, employing a full-time staff of technical experts who serve as liaisons to committees in the standards development process, employing publication staff and administrative personnel, publishing standards, funding the NFPA-affiliated research foundation and educational outreach efforts, and arranging and paying for meeting sites.   NFPA's revenues are approximately $70 million on an annual basis and approximately 70% of NFPA's annual revenue is derived from the sale of its copyrighted publications, with the remaining revenue derived from membership fees, professional development, and other sources.

76.     The standards created by NFPA are original works of authorship.  The content of NFPA's standards is original to NFPA and includes a high degree of creativity.

77.     The concepts underlying NFPA's standards are expressed through particular words and drawings that have been selected from myriad options through which these concepts could be expressed.

78.     NFPA owns or controls the copyrights and/or the relevant exclusive rights in the works at issue in this case ("NFPA Standards") under the United States copyright laws.  NFPA has obtained Certificates of Copyright Registration from the Register of Copyrights for its works. Attached hereto as Exhibit B is a list of certain of NFPA copyrighted works that Defendant has infringed by the acts complained of herein.  Exhibit B also identifies by number the Certificates of Copyright Registration issued to NFPA.

79.     NFPA owns or controls the exclusive trademark rights in the registered marks that refer to the NFPA organization and NFPA standards (the "NFPA Marks"), including:

a.  U.S. federal registration no. 2,834,633, which covers the following logo:



b.  U.S. federal registration no. 1,148,903, which covers the following logo:



c.  U.S. federal registration no. 1,094,460, which covers the NATIONAL

ELECTRICAL CODE word mark.

d.  U.S. federal registration no. 3,165,010, which covers the NATIONAL FIRE

PROTECTION ASSOCIATION word mark.

e.  U.S. federal registration no. 1,165,496, which covers the NEC word mark.

f.  U.S. federal registration no. 3,354,321, which covers the NFPA 70 word mark.

g.  U.S. federal registration no. 3,141,884, which covers the NFPA word mark.

h.  U.S. federal registration no. 1,924,881, which covers the NATIONAL FIRE

ALARM CODE word mark.

i.   U.S. federal registration no. 1,951,710, which covers the NFPA 72 word mark.

j.  U.S. federal registration no. 1,107,267 which covers the LIFE SAFETY CODE

word mark.

80.     NFPA also owns common law rights in the NFPA Marks.

81.     NFPA's use of the NFPA Marks, in publications, marketing materials, conferences and events, on its website, and in other contexts, has been substantially continuous and exclusive.  NFPA has attained strong name recognition in the NFPA Marks, which have come to be associated with NFPA and which identify NFPA as the source of the NFPA's products offered in connection with the NFPA Marks.  NFPA has developed substantial goodwill in the NFPA Marks.  NFPA has spent significant sums marketing and promoting its products in connection with the NFPA Marks, and considers them to be important, valuable assets.  NFPA has vigorously and continuously enforced its NFPA Marks against infringers and counterfeiters.

### C.     Plaintiff ASHRAE's Standards

82.     Founded in 1894, ASHRAE is a not-for-profit organization incorporated as a public charity under the laws of the State of New York.  ASHRAE's mission is to advance the arts and sciences associated with heating, ventilating, air-conditioning and refrigerating to serve humanity and promote a sustainable world.  It does so through research, standards writing, publishing and continuing education.  The development of voluntary consensus standards is ASHRAE's principal activity, and the primary means through which it furthers its safety mission.

83.     ASHRAE develops and disseminates many standards in the areas of heating, ventilating, air-conditioning and refrigerating ("HVAC&R").  ASHRAE develops standards for both its members and others professionally concerned with HVAC&R processes and the design and maintenance of indoor environments.

84.     ASHRAE writes standards for the purposes of establishing consensus for methods of HVAC&R-related testing for use in commerce, and establishing HVAC&R-related

performance criteria to facilitate guidance within the HVAC&R industry.  ASHRAE publishes the following three types of voluntary consensus standards: Method of Measurement or Test, Standard Design and Standard Practice.  ASHRAE does not write rating standards unless a suitable rating standard would not otherwise be available.

85.     Consensus standards are developed and published to define minimum values or acceptable performance, whereas other documents, such as design guides, may be developed and published to encourage enhanced performance.

86.     ASHRAE guidelines are developed through the participation of its national and international members, associated societies, and public review.

87.     By way of example, Standard 90.1-2010, Energy Standard for New Buildings Except Low Rise Residential Buildings, was first promulgated in 1989.  The 90.1 Standard was developed by a subcommittee whose mission was to balance the interest of all the members of the subcommittee as it relates to the insulation of all buildings, including metal buildings.  The membership of the 90.1 subcommittee includes various manufacturers, architects, builders, and members of federal and state agencies.

88.     In connection with the development and maintenance of the 90.1 Standard, ASHRAE provides for an ongoing review and revision of its Energy Standard through its Continuing Maintenance Procedures.  These procedures include a Public Review Process and an Emergency Interim Standards Action.  Although in practice ASHRAE issues revisions more frequently, ASHRAE typically publishes regular revisions to the 90.1 standard every 18 months.

89.     In addition to its standards development activities, ASHRAE offers courses in a variety of formats, including eLearning, professional development seminars (in locations around North America or online), short courses (seminars offered during ASHRAE meetings) and self-

directed learning courses (home study courses), all through the ASHRAE Learning Institute. ASHRAE also produces hundreds of publications, including the ASHRAE Handbook (the "bible" of the HVAC&R industry), books on specialized topics within the field, technology applications and various CDs and DVDs.  ASHRAE also publishes the peer-reviewed bimonthly HVAC&R Research—which is among the most prestigious archival research reporting resources in the field of environmental control for the HVAC&R industry.  Further, ASHRAE's research program, established in 1912, currently supports more than 70 active research projects with a combined value of more than $12 million.  Research focus includes: energy and resource efficiency, indoor environmental quality, alternative technologies, and materials and equipment. Through scholarships, grants and awards, ASHRAE supports engineering education for undergraduate students and research projects for graduate engineering students and new post-doctoral scholars.

90.     ASHRAE's day-to-day operations depend upon a reliable stream of revenue to cover the numerous expenses ASHRAE incurs in its activities, which amount to approximately $21 million annually.  Approximately 20-25% of ASHRAE's annual revenue is derived from the sale of its copyrighted publications, with the remaining revenue derived from membership fees, advertising income, and other sources.

91.     The standards created by ASHRAE are original works of authorship.  The content of ASHRAE's standards is original to ASHRAE and includes a high degree of creativity.

92.     ASHRAE expressed the concepts underlying ASHRAE's standards through particular words and drawings that it selected from myriad options through which it could have expressed those concepts.

93.     ASHRAE owns or controls the copyrights and/or the relevant exclusive rights in the works at issue in this case under the United States copyright laws (the "ASHRAE Standards").  ASHRAE has obtained Certificates of Copyright Registration from the Register of Copyrights for the ASHRAE Standards.  Attached hereto as Exhibit C is a list of ASHRAE Standards that Defendant has infringed by the acts complained of herein; the same Exhibit identifies by number the Certificates of Copyright Registration issued to ASHRAE for those works.

94.     ASHRAE owns or controls the exclusive trademark rights in the following registered marks that refer to the ASHRAE organization and ASHRAE Standards (the "ASHRAE Marks"):

(a) U.S. federal registration no. 1,503,000 covering the following logo:



(b) U.S. federal registration no. 4,262,297 covering the following logo:



95.     ASHRAE also owns common law rights in the ASHRAE Marks.

96.     ASHRAE's use of the ASHRAE Marks in publications, marketing materials, conferences and events, on its website, and in other contexts, has been substantially continuous

and exclusive.  ASHRAE has attained strong name recognition in the ASHRAE Marks, which have come to be associated with ASHRAE and which identify ASHRAE as the source of the ASHRAE's products offered in connection with the ASHRAE Marks.

97.     ASHRAE has developed substantial goodwill in the ASHRAE Marks.  ASHRAE has spent significant sums marketing and promoting its products in connection with the ASHRAE Marks, and considers them to be important, valuable assets.  ASHRAE has vigorously and continuously enforced its ASHRAE Marks against infringers and counterfeiters.

## III.     AVAILABILITY OF PLAINTIFFS' STANDARDS

98.     Plaintiffs make their standards available through multiple distribution channels, including Internet, catalog, telephone, and retail sales.  Plaintiffs' standards are generally offered in a number of different formats, including a variety of electronic formats, individual pamphlets, complete bound sets, and loose-leaf subscription services.

99.     ASTM strives to be flexible and reasonable when working with federal agencies and the regulated public to provide the public with reasonable access to its standards.  ASTM charges a modest fee to persons who want copies of the ASTM standards.  The most expensive ASTM standard costs $71 and most ASTM standards cost between $25 and $35.

100.     NFPA sells its standards at a reasonable cost to the professionals and tradespeople who use the standards.  For example, the hard copy edition of the NEC, an 800-page work, is offered for purchase for $75.  NFPA publishes its standards in a variety of hard copy and digital formats.  Those wishing to own a personal copy can purchase and download an electronic copy instantly, for example, or can purchase a subscription service that updates all NFPA standards and allows downloading, printing, and other functionalities.

101.    ASHRAE Standards and Guidelines are available for purchase to everyone as downloadable Digital Publications (PDFs), hard copy, or CD-ROMs.  For example, a hard copy of the complete ASHRAE Standard 90.1-2010 – Energy Standard for Buildings Except Low-Rise Residential Buildings – is typically sold for $125.  The ASHRAE online bookstore is updated each time a new publication from ASHRAE is available.

102.    It is also common for SDOs to provide access to their standards (or portions thereof) for free.  The specific details surrounding access to standards vary depending on the SDO at issue, the nature of the standard, and the audience that consumes it.

103.    ASTM has created a reading room on its website, available at http://www.astm.org/READINGLIBRARY/index.html, through which the public can access all ASTM standards that have been incorporated by reference into federal regulations at no cost on a read-only basis.  That is, members of the public may access the standards online and view them at no cost, but are not able to copy or modify them.  Additionally, when a federal agency proposes to incorporate by reference an ASTM standard in rulemaking, ASTM works with the relevant agency to provide the public with read-only access to the standard at no cost during the public comment period.

104.    As part of its commitment to enhancing public safety, NFPA began making the full text of NFPA standards available for free viewing on its website, in read-only form, more than a decade ago.  NFPA currently provides such access for all of its standards, including many older editions that are still referenced in laws.  *See* http://www.nfpa.org/aboutthecodes/list_of_codes_and_standards.asp.  This access allows any member of the public, including citizens of jurisdictions that have incorporated NFPA standards by reference, to review NFPA standards without cost.  NFPA also encourages jurisdictions that

incorporate its standards by reference to link their websites to its free, online version of the standards.

105.    ASHRAE strongly supports public access to its standards.  It currently provides free-to-the-public online read-only access, in non-downloadable format, to 28 standards, including every single standard referenced in laws or codes. This includes all the ASHRAE Standards listed on Exhibit C.  This access is provided through a service called RealRead®. ASHRAE incurs significant costs in order to provide such access.

106.    Government entities have adopted policies for providing public access to the standards they incorporate by reference.  For example, the Code of Federal Regulations states that any materials incorporated by reference at the federal level must be "reasonably available to and usable by the class of persons affected by the publication."  1 C.F.R. § 51.7(a)(4).  In particular, the Office of the Federal Register and the relevant agency each must maintain a hard copy of any material incorporated by reference that is available for public inspection.  *See* 1 C.F.R. §§ 5.2, 51.9(b)(4).  At the state and local levels, copies of standards incorporated by reference typically must be made available for inspection in government offices or designated depository libraries.

107.    The Code of Federal Regulations does not provide a precise definition of the term "reasonably available."  Neither the Office of the Federal Register nor any other governmental body has ever interpreted "reasonably available" to mean that the material must be available to the public without cost (let alone for free with the further ability to copy, distribute and modify).

108.    Government entities have expressly recognized the considerable benefits of the developer of standards retaining copyright protection for standards that are incorporated by reference.  For example, the National Science and Technology Council has taken the position

that "the text of standards and associated documents should be available to all interested parties on a reasonable basis, *which may include monetary compensation where appropriate*." Federal Engagement in Standards Activities to Address National Priorities 11 (Oct. 2011), available at http://www.whitehouse.gov/sites/default/files/microsites/ostp/federal_engagement_in_standards_activities_october12-final.pdf (emphasis added).

109.    OMB Circular 119-A also takes the position that incorporation by reference of a standard does not destroy the copyright in that standard. It states that "[i]f a voluntary standard is used and published in an agency document, your agency must observe and protect the rights of the copyright holder and any other similar obligations." *See* http://www.whitehouse.gov/omb/circulars_a119.

110.    A number of offices within the Executive branch are currently engaged in the process of evaluating the procedures for incorporating material by reference, in a manner that allows for reasonable access by the public and also respects the rights of copyright owners to protect their intellectual property.

111.    Although Public Resource participated in this process by submitting extensive comments and letters to these offices, both before and during this process it engaged in conduct that infringed on Plaintiffs' copyrights. In or around March 2012, for example, Public Resource launched a campaign designed to make an end-run around the Executive branch evaluation process by flagrantly copying and distributing certain standards that had been incorporated by reference into federal or state regulations.

**IV.      DEFENDANT'S UNLAWFUL CONDUCT**

   **A.  Copyright Infringement**

      112.    Public Resource has purchased paper copies of 73 standards created and owned

by SDOs, including standards created and owned by ASTM and NFPA, that have been

incorporated by reference in federal regulations.

      113.    Upon information and belief, although well aware that the SDOs owned

copyrights in the standards, Public Resource made 25 print copies of each of these standards,

placed them in boxes covered with American flag packing tape, and sent the packages to a

number of recipients, including the 10 SDOs that wrote the standards, the White House, United

States Senators and Congressmen, the National Archives, the Federal Trade Commission, the

Administrative Conference of the United States, the Copyright Office, several professors, and

members of the media.  Each package also included a packing slip informing the recipient of the

cost Public Resource expended to obtain the standards and requesting some manner of action.

      114.    Public Resource's statements to the media made it clear that it intended to begin

posting these 73 standards on the internet in HTML format.  Attached as Exhibit D is an article

by Public Resource's president discussing Public Resource's intentions.

      115.    In or about December 2012, without Plaintiffs' consent, Public Resource began

posting copies of those 73 standards and other standards that were created and owned by

Plaintiffs that are allegedly incorporated by reference in federal and state regulations ("Plaintiffs'

Standards") on its website, which is located at

https://law.resource.org/pub/us/cfr/manifest.us.html.

      116.    Public Resource also took steps to induce, promote, cause, and materially

contribute to the further copying and dissemination of Plaintiffs' Standards by members of the

public.  Public Resource posted Plaintiffs' Standards on its website in pdf format, which allows others not only to view but also to make further unauthorized copies of Plaintiffs' Standards and to distribute them to others.  Upon information and belief, Public Resource also has uploaded standards owned by Plaintiffs without authorization to the www.archive.org website.  The electronic nature of these documents, and their availability on the Internet, magnifies the ease and speed with which they may be reproduced and disseminated to others.

117.    Moreover, Public Resource "rekeyed" some of Plaintiffs' Standards and posted them on its website in html format.  Its stated purpose for doing this was to make it possible for members of the public to copy and manipulate the standards, thereby encouraging the creation of works that are derivative of Plaintiffs' copyrighted standards.  Public Resource also redrew graphics within some of Plaintiffs' Standards in the open Scalable Vector Graphics (SVG) format, which enables the images to be searched, indexed, scripted, and compressed.  Further, Public Resource reset mathematical formulas into the Math Markup Language application that integrates mathematical formulae into web pages and other documents to make it easier for members of the public to manipulate the standards.  And Public Resource added metadata to the document "headers," which made Plaintiffs' Standards more accessible and discoverable by Internet search engines, thereby increasing the number of people who might access the standards and disseminate them further.  *See* Exhibit E, a printout from Public Resource's website.

118.    Public Resource designed its website to attract visitors from states throughout the Nation, including by organizing Plaintiffs' Standards by jurisdiction so that visitors may download and copy the Standards adopted by their jurisdiction.  For example, the Public Resource website has a page dedicated to "Public Safety Codes Incorporated By Law," with a separate section linking to copies of standards incorporated by reference by the District of

Columbia, including the *National Electrical Code*.  Attached as Exhibit F hereto is a copy of the section of Public Resource's website that provides copies of standards incorporated by reference by each state and the District of Columbia.

119.    According to Public Resource's website, standards have the force of law when they are incorporated by reference and:

> [t]he law belongs to the people, and cannot become the private property of some governmental or non-governmental organization, no matter how seemingly well-deserved are the rents one could extract from winning a monopoly concession on a parcel of the law.  While standards bodies need money to carry out their valuable work, and while it is clear that these standards bodies create high-quality documents that are essential to our public safety, one cannot cordon off the public domain simply because of an institutional desire for funds.

Thus, Public Resource's website states that Public Resources has copied and posted standards created and owned by many SDOs, including Plaintiffs' Standards, "as it is the right of all humans to know and speak the laws that govern them."  *See* Exhibit E.

120.    Public Resource has represented that all of the standards it has copied and displayed on its website have been incorporated by reference into federal and state law. However, some Standards that Public Resource claims were incorporated by reference into federal law have not in fact been incorporated into the Code of Federal Regulations.

121.    Plaintiffs' Standards, which are original works of authorship that Plaintiffs developed at great cost and effort, unquestionably were afforded copyright protection the moment Plaintiffs fixed them in tangible forms of expression.

122.    If Public Resource were to prevail in its argument that Plaintiffs' Standards lost their copyright protection whenever incorporated by reference in any federal or state regulation, this would raise serious questions of government liability under the Takings Clause of the Fifth

Amendment to the United States Constitution, made applicable to state and local governments through the Fourteenth Amendment.

### B.  Trademark Infringement

123.    In copying and rekeying Plaintiffs' Standards, Public Resource has also used in commerce a reproduction or copy of Plaintiffs' registered trademarks in connection with the sale, offer for sale, distribution or advertising of goods or services.

124.    Public Resource has used reproductions or copies of ASTM's Marks in connection with the distribution of ASTM's Standards.  Attached as Exhibit G is an excerpt from an ASTM standard that Public Resource has posted on its website that contains a reproduction or copy of several of ASTM's Marks.

125.    Public Resource has used reproductions or copies of NFPA's Marks in connection with the distribution of NFPA's Standards.  For example, attached as Exhibit H is an excerpt from an NFPA standard that Public Resource has posted on its website that contains a reproduction or copy of several of NFPA's Marks.

126.    Public Resource has used reproductions or copies of ASHRAE's Marks in connection with the distribution of ASHRAE's Standards.  Attached as Exhibit I is an excerpt from an ASHRAE standard that Public Resource has posted on its website that contains a reproduction or copy of several of ASHRAE's Marks.

127.    Plaintiffs have not authorized Public Resource to use their trademarks, and use of Plaintiffs' trademarks by Public Resource is likely to lead consumers to believe mistakenly that the standards displayed on Public Resource's website are authentic, unaltered standards of each respective Plaintiff that meet Plaintiffs' quality control standards, and/or that Plaintiffs have endorsed, approved, or are otherwise affiliated with Public Resource and/or its activities.

128.    Public Resource has implied and/or suggested to the public that Plaintiffs sponsor or endorse Public Resource's posting of the standards by including a cover page before certain standards that states the name of the standards body that created the standard and contains an image of a seal of approval.  The first page of Exhibit G provides an example of the cover page that Public Resource has added to certain of Plaintiffs' Standards.

129.    Many of Plaintiffs' Standards that Public Resource has displayed and distributed on its website are not the current versions of the standards that have been published by the relevant Plaintiff.  The copies that Public Resource has displayed and distributed on its website do not contain any notation that indicates that these standards are out-of-date.  Absent a warning that a standard is not the most recent version, consumers are likely to be misled into believing that the versions of Plaintiffs' Standards that are displayed on its website constitute current industry standards and/or are currently endorsed by the organization that created the standard.

130.    Public Resource has retyped the text of some of Plaintiffs' Standards and redrawn many of the graphics so that it could convert Plaintiffs' Standards into different formats.  Upon information and belief, in retyping and redrawing the information, Public Resource did not undertake the same quality control procedures that Plaintiffs use before they publish their standards to ensure that the published standards reflect the actual standards that the technical committees approved.

131.    When posting unauthorized copies of Plaintiffs' Standards on its website, Public Resource has included the relevant Plaintiff's registered logo on each standard in addition to that Plaintiff's name, which is more than is necessary to identify the SDO that authored the standard.

132.    Public Resource's actions have damaged and will continue to harm Plaintiffs, consumers, and the public in general.

133.    Public Resource's continued unauthorized use of Plaintiffs' trademarks is depriving Plaintiffs of the ability to control the use of their trademarks, which has caused and will continue to cause Plaintiffs to lose control over their brand identities, their goodwill and their reputations.

134.    Mistakes Public Resource made in retyping or redrawing content from Plaintiffs' Standards could cause harm to consumers and/or the public in general, which would in turn cause harm to the reputation of the SDO that created that standard.

## V.    DEFENDANT'S DESIRED OUTCOME WOULD DESTROY THE VIABILITY OF A SYSTEM THAT IS OPERATING EFFECTIVELY.

135.    If Public Resource were to succeed in convincing the Court that the copyright covering a standard was destroyed when the government incorporates the standard by reference into regulations, the SDOs would lose their exclusive rights to copy and distribute their standards and create derivative works therefrom, and would be unable to charge fees to members of the industry or other interested persons who want copies of the standards.

136.    Plaintiffs are not-for-profit entities.  Plaintiffs underwrite the substantial costs of developing standards, in whole or in significant part, by relying on revenues made possible from the sales and licensing of their copyrighted standards to the audiences that consume them, primarily in the course of professional activities.  Revenue from the sale or licensing of Plaintiffs' copyrighted works yields a substantial part—and often the majority—of Plaintiffs ASTM's, NFPA's and ASHRAE's operating revenues, with revenues from membership dues, contributions, and other sources usually trailing far behind.

137.    Depriving Plaintiffs and other SDOs of this important, independent source of revenue would substantially diminish the quality of future standards, including those in the health and safety areas which are most suitable for use by government entities.  To the extent that

Plaintiffs were able to continue their standards development activities without copyright revenues, they could be forced to rely on funding from interested parties, or to charge fees to participate in the process of developing the standards, which would inhibit the participation of small businesses, consumers, academics, and other important stakeholders in the standards development process.

138.   If SDOs could no longer rely on the revenue derived from sales and licensing of their copyrighted standards to fund future standards work, they may also decrease the number of standards they develop, which would require the government to develop certain standards independently.  However, the government lacks, among other things, the funds, the experience, and the technical expertise that would be needed to create standards that are comparable to those the SDOs develop.

139.   As explained above, the development of standards is a complex and resource-intensive process that requires, among other things, a professional staff, the housing and administration of the process, planning and execution of committee meetings, and technology infrastructure that facilitates the collaboration and participation of a diverse membership.  If the federal government were to develop standards independently, it could cost tax payers hundreds of millions of dollars, which would be diverted away from other mission-critical programs (or require higher taxes).

140.   The government does not have experience and technical expertise that is comparable to those possessed by the SDOs and their members.  The government also does not have the flexibility to update and revise standards at any time as do the SDOs, which would make it difficult for the government to react quickly to advances in technology and respond to other industry changes.

141.    Public Resource's efforts to vitiate Plaintiffs' copyright protection in their standards threatens to destroy the open, cooperative system that has functioned effectively for over a century.  This system has allowed the government and the public to benefit from the adoption of high quality standards, which Plaintiffs make available to interested members of the public, while allowing SDOs to pay for their operating costs by charging reasonable fees to members of the public interested in downloading or obtaining hard copies of their standards.

<div align="center">

**COUNT I**
**COPYRIGHT INFRINGEMENT**

</div>

142.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 141 of the Complaint as if fully set forth herein.

143.    As alleged above, ASTM owns registered copyrights for the standards listed in Exhibit A.

144.    As alleged above, NFPA owns registered copyrights for the standards listed in Exhibit B.

145.    As alleged above, ASHRAE own registered copyrights for the standards listed in Exhibit C.

146.    Plaintiffs' Standards contain material that is wholly copyrightable subject matter under the laws of the United States.

147.    The content of each of Plaintiffs' Standards is original to the respective Plaintiff and includes a high degree of creativity.  Each Plaintiff selected the words and drawings that it used to express the concepts underlying its standards from myriad options through which it could have expressed these concepts.

148.    Notwithstanding Plaintiffs' ownership of the original content in Plaintiffs' Standards, Public Resource purchased copies of Plaintiffs' Standards and then made copies of

Plaintiffs' Standards and displayed copies of the Plaintiffs' Standards on its website without Plaintiffs' consent.  Public Resource also rekeyed some of Plaintiffs' Standards and displayed copies of these standards on its website.

149.    Public Resource had access to each of Plaintiffs' Standards, which it has displayed in a form identical, or nearly identical, to that in which they appear in Plaintiffs' publications of these standards.

150.    By copying the standards listed in Exhibits A, B, and C and displaying them online, Public Resource has infringed Plaintiffs' copyright in each of Plaintiffs' Standards, specifically the exclusive right of Plaintiffs to reproduce, distribute, display, and make derivative works of their copyrighted works under 17 U.S.C. §§ 106 (1), (2), (3) and (5).  The infringement of each of Plaintiffs' Standards constitutes a separate act of copyright infringement.

151.    Public Resource's conduct in copying, displaying, distributing, and creating derivative works of Plaintiffs' Standards has been knowing, willful and/or intentional.

152.    Public Resource has not added new expression, meaning, or insight to Plaintiff's Standards.  It has simply made unauthorized copies of Plaintiffs' Standards and posted them online, sometimes in different electronic file formats.

153.    Public Resource has copied, displayed, and distributed Plaintiffs' Standards in their entirety.

154.    Public Resource claims to be a non-profit corporation, but it stands to profit from the display and distribution of Plaintiffs' Standards by driving traffic to its website, where it solicits donations, and by increasing its own profile in the media.

155.    Public Resource's display and distribution of Plaintiffs' Standards on its website destroys the potential market for, and value of, Plaintiffs' Standards.  Members of the public will

not be willing to pay for Plaintiffs' publications of their standards if unauthorized copies are

available for free on Public Resource's website.  Moreover, by using Plaintiffs' standards to

drive traffic to its website, Public Resource diverts traffic away from Plaintiffs' websites,

depriving them not only of revenues related to web traffic but also of valuable opportunities to

inform and educate visitors concerning important safety and other mission-related issues.

156.     Public Resource's copyright infringement has caused and will continue to cause

irreparable harm to Plaintiffs for which there is no adequate remedy at law and Plaintiffs are

entitled to and seek injunctive relief as a result thereof pursuant to 17 U.S.C. § 502.

## COUNT II
## CONTRIBUTORY COPYRIGHT INFRINGEMENT

157.     Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 156

of the Complaint as if fully set forth herein.

158.     Public Resources' stated purpose of rekeying certain of Plaintiffs' Standards and

displaying them on its website in html format without Plaintiffs' consent was to allow for

members of the public to manipulate Plaintiffs' Standards, including resizing of drawings as well

as cutting and pasting formulas.

159.     Public Resource knowingly displayed and distributed unlawful copies of

Plaintiffs' Standards with the intent to induce, enable, facilitate and/or materially contribute to

others making unauthorized copies and derivative works of Plaintiffs' Standards, and continues

to do so.

160.     On information and belief, given the express purpose of Defendant's posting of

Plaintiffs' standards, it is likely that members of the public have accessed the copies of Plaintiffs'

Standards that Public Resource displayed on its website and made copies of and/or derivative

works based on Plaintiffs' Standards.

161.    Public Resource's contributory copyright infringement has caused and will continue to cause irreparable harm to Plaintiffs for which there is no adequate remedy at law.

**COUNT III**
**INFRINGEMENT OF REGISTERED TRADEMARKS UNDER 15 U.S.C. § 1114**

162.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 161 of the Complaint as if fully set forth herein.

163.    As alleged above, ASTM owns all rights, title and interest in the U.S. trademark registrations for the ASTM Marks.

164.    As alleged above, NFPA owns all rights, title and interest in the U.S. trademark registrations for the NFPA Marks.

165.    As alleged above, ASHRAE owns all rights, title and interest in the U.S. trademark registrations for the ASHRAE Marks.

166.    In copying and displaying Plaintiffs' Standards, Public Resource has used in commerce a reproduction or copy of Plaintiffs' registered trademarks in connection with the sale, offer for sale, distribution or advertising of goods or services without Plaintiffs' authorization or consent.

167.    Public Resource's use in commerce of trademarks that are confusingly similar, and indeed identical, to Plaintiffs' registered trademarks is likely to cause confusion, to cause mistake and/or to deceive consumers as to the source, sponsorship, or origin of the standards Public Resource has posted on its websites.

168.    The aforesaid acts of Public Resource constitute trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. §§ 1114.

169.    The aforesaid acts of Public Resource have been and continue to be intentional, willful and in bad faith.

170.     Plaintiffs have been and are likely to be damaged by Public Resource's infringing and unlawful acts.

171.     The acts of Public Resource have caused and, unless enjoined by this Court, are likely to continue to cause Plaintiffs to suffer irreparable harm to their business, reputation and goodwill.

172.     Plaintiffs have no adequate remedy at law and are entitled to and seek injunctive relief as a result thereof pursuant to 15 U.S.C. § 1116.

**COUNT IV**
**UNFAIR COMPETITION AND FALSE DESIGNATION OF ORIGIN UNDER 15 U.S.C.**
**§ 1125(A)(1)**

173.     Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 172 of the Complaint as if fully set forth herein.

174.     As alleged above, ASTM owns all rights, title and interest in the ASTM Marks.

175.     As alleged above, NFPA owns all rights, title and interest in the NFPA Marks.

176.     As alleged above, ASHRAE owns all rights, title and interest in the ASHRAE Marks.

177.     Each of the ASTM Marks, NFPA Marks, and ASHRAE Marks is distinctive and/or has acquired secondary meaning.

178.     Plaintiffs have used their marks in commerce continuously and extensively in the United States for many years. As a result, the public associates each of Plaintiffs' marks with the relevant Plaintiff and Plaintiffs have built up valuable goodwill in their respective trademarks.

179.     Public Resource has used and continues to use Plaintiffs' marks on its copies of and/or rekeyed versions of Plaintiffs' Standards, without license or authorization from Plaintiffs.

180.     Public Resource's use of the ASTM Marks, NFPA Marks, and ASHRAE Marks is likely to cause confusion, to cause mistake and/or to deceive consumers as to the affiliation, connection, or association of Public Resource with Plaintiffs and/or as to the origin, sponsorship or approval of the standards posted on Public Resource's website.

181.     The aforesaid acts of Public Resource have been and continue to be intentional, willful and in bad faith.

182.     Plaintiffs have been and are likely to be damaged by Public Resource's infringing and unlawful acts.

183.     The acts of Public Resource have caused and, unless enjoined by this Court, are likely to continue to cause Plaintiffs to suffer irreparable harm to their business, reputation and goodwill.

184.     Plaintiffs have no adequate remedy at law and are entitled to and seek injunctive relief as a result thereof.

## COUNT V
## TRADEMARK INFRINGEMENT UNDER COMMON LAW

185.     Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 184 of the Complaint as if fully set forth herein.

186.     As described above, ASTM owns all rights, title and interest in and to the ASTM Marks.

187.     As described above, NFPA owns all rights, title and interest in and to the NFPA Marks.

188.     As described above, ASHRAE owns all rights, title and interest in and to the ASHRAE Marks.

189.    The ASTM Marks, NFPA Marks, and ASHRAE Marks are distinctive and Plaintiffs have built up valuable goodwill in their respective trademarks.

190.    Public Resource's use of the ASTM Marks, NFPA Marks, and ASHRAE Marks infringes Plaintiffs' rights therein and is likely to cause confusion, to cause mistake and/or to deceive consumers as to the source, sponsorship and origin of the standards posted on Public Resource's website.

191.    The aforesaid acts of Public Resource constitute trademark infringement in violation of common law.

192.    The aforesaid acts of Public Resource have been and continue to be intentional, willful and in bad faith.

193.    Plaintiffs have been and are likely to be damaged by Public Resource's infringing and unlawful acts.

194.    The acts of Public Resource have caused and, unless enjoined by this Court, are likely to continue to cause Plaintiffs to suffer irreparable harm to their business, reputation and goodwill.

195.    Plaintiffs have no adequate remedy at law and are entitled to and seek injunctive relief as a result thereof.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray for judgment against Defendant as follows:

(1)    That Defendant, its officers, agents, servants, employees and attorneys, and all those in active concert with it or in participation with it, be permanently enjoined from all further unauthorized reproduction of any standards published by Plaintiffs, preparation of derivative

works based upon any standards published by Plaintiffs, and distribution of copies of any standards published by Plaintiffs by any means or method.

(2)     That Defendant, its officers, agents, servants, employees and attorneys, and all those in active concert with it or in participation with it, be permanently enjoined from the unauthorized use of the ASTM Marks, NFPA Marks, and/or ASHRAE Marks, as well as any colorable imitations thereof or confusingly similar marks.

(3)     That the Defendant be directed to file with the Court and serve upon Plaintiffs, within 30 days after entry of final judgment, a report in writing and under oath setting forth in detail the manner and form by which Defendant has complied with the provisions set forth in Paragraphs 1 and 2 of this Prayer for Relief.

(4)     That Plaintiffs be entitled to recover their reasonable attorneys' fees, costs of suit and interest.

(5)     That Plaintiffs be awarded any and all such other and further relief as this Court shall deem just and proper.

Dated: August 6, 2013                    Respectfully submitted,

                                         /s/ Michael F. Clayton

                                         Michael F. Clayton (D.C. Bar: 335307)
                                         J. Kevin Fee (D.C. Bar: 494016)
                                         Jordana S. Rubel (D.C. Bar: 988423)
                                         Morgan, Lewis & Bockius LLP
                                         1111 Pennsylvania Ave., N.W.
                                         Washington, D.C. 20004
                                         Telephone: 202.739.5215
                                         Email: mclayton@morganlewis.com
                                                jkfee@morganlewis.com
                                                jrubel@morganlewis.com

                                         *Counsel For American Society For Testing And Materials*
                                         *d/b/a/ ASTM International*

                                         /s/ Anjan Choudhury

                                         Anjan Choudhury (D.C. Bar: 497271)
                                         Munger, Tolles & Olson LLP
                                         355 South Grand Avenue, 35th Floor
                                         Los Angeles, CA  90071
                                         Tel: 213.683.9100
                                         Email:  Anjan.Choudhury@mto.com

                                         Kelly M. Klaus
                                         Jonathan H. Blavin
                                         Michael J. Mongan
                                         Munger, Tolles & Olson LLP
                                         560 Mission St., 27th Floor
                                         San Francisco, CA 94105
                                         Tel:  415.512.4000
                                         Email: Kelly.Klaus@mto.com
                                                Jonathan.Blavin@mto.com
                                                Michael.Mongan@mto.com

                                         *Counsel for National Fire Protection Association, Inc.*

                                         /s/ Jeffrey S. Bucholtz

                                         Jeffrey S. Bucholtz (D.C. Bar: 452385)
                                         King & Spalding LLP
                                         1700 Pennsylvania Avenue, NW, Ste. 200
                                         Washington, DC 20006-4707

Tel: 202.737.0500
Email: jbucholtz@kslaw.com

Kenneth L. Steinthal
Joseph R. Wetzel
King & Spalding LLP
101 Second Street, Ste. 2300
San Francisco, CA 94105
Tel: 415.318.1211
Email: ksteinthal@kslaw.com
     jwetzel@kslaw.com

*Counsel for American Society of Heating, Refrigerating,*
*and Air-Conditioning Engineers, Inc.*