# Exhibit 14



### Paradigm Shift

Three years ago the *ABA Journal* began a series of reports on the paradigm shift in how law is being practiced. Noting the changes brought on by a maturing market, disruptive technology, economic recession and the rise of legal services competing with law firms for parts of the legal dollar, this series has looked at how the legal business is responding—and the legal profession often not responding—to pressures never before placed on lawyers and law firms.

This article is the sixth in our series. The liberation of information that has come with computers and the Internet creates new doors of opportunity—and opens new areas of dispute—in the document-ruled profession of law. What's made available, who provides it how, where and when, and at what cost are now fundamental questions. This article looks at a debate going on in businesses, between different crafts and their regulators, and before judges: How public must public information be, and who absorbs the costs and earns the profits of providing it?

BY VICTOR LI



# Who Owns the Law?

Technology reignites the war over just how public documents should be

**These days** the smallest and most exclusive piece of real estate in Washington, D.C., is the sliver of common ground that exists between congressional Democrats and Republicans. But during a January hearing before the U.S. House of Representatives Judiciary Committee on the scope of copyright protection laws, Democrats and Republicans were in broad agreement on an issue that was seemingly settled long ago: No one can own the law.

But technology and a growing privatization of the law-making process have stirred up the debate once again. Huge amounts of formerly stored-in-print material—including laws, court and administrative rulings, and regulations from governments, standards bodies and myriad other organizations—are now digitized, which means printing costs and access issues should be minimal. Many of these documents are legally

PHOTO ILLUSTRATION BY STEPHEN WEBSTER





CARL MALAMUD
Founder of Public.Resource.org

enforceable; some are standards that are legally binding; and others provide information that would normally be publicly available, though in the past you might have had to go to a clerk's office or library and pay for copies.

But the end of print and ink does not mean the end of all costs. And the debate has divided those who call for free access for all in all cases and the legal research firms (established and startup) who say legal documents can be misleading or meaningless without the context, organization and analysis that someone has to be paid to provide.

These issues have set off battles between legal information giants like West and LexisNexis and upstart competitors seeking access to court records. And they have inspired lawsuits, including a fight between three professional standards organizations and one crusader for free access to public information.

**ACCESS CRUSADER** Sitting at the witness table at the House committee meeting was that crusader, Carl Malamud. He is an open-source activist and the founder of Public.Resource.org. His group is funded through donations and grants, and it recently turned to crowdfunding through Kickstarter to support the conversion of 28,040 public safety standards into HTML files. Malamud was on hand to detail the latest skirmishes in his 20-year fight for free and open access to the law.

Malamud certainly never envisioned this role for himself. After all, his initial foray into the world of the World Wide Web came in 1993 when he created an Internet radio station that broadcast, among other things, floor debates from both the U.S. House and Senate. That same year he gave a demonstration of the station to a group of Congress members, and then-Rep. Edward Markey of Massachusetts asked him whether the Internet could be used to post the Securities and Exchange Commission's EDGAR database (Electronic Data Gathering, Analysis and Retrieval), which contains filings and disclosures from public companies.

"He asked me why those documents weren't available to the public," recalls Malamud, "and I had no answer."

Malamud went to the SEC and was told there was no demand for it—and even if there were, it would be prohibitively expensive ($30 million). So he got a $600,000 grant from the National Science Foundation and bought filings from the SEC that he put online using a computer from his friend, future Google Chairman Eric Schmidt. Malamud estimates that nearly 50,000 people used his site every day, including investment clubs, students and reporters.

"The SEC fought us on EDGAR," Malamud says. "But two years later, they ended up taking over my system. Now it's one of the most popular sites on the Internet."

Malamud has moved on from clashing with government agencies that cite cost concerns and lack of public demand as reasons for their reluctance to repost their information. Instead, he's turned his attention to legal publishers, whom he accuses of trying to wring money out

PHOTOGRAPH BY TONY AVELAR

of an unsuspecting public by charging them for information that, by all rights, already belongs to them. In the last decade, he has clashed with legal publishing companies such as West and LexisNexis, which have objected to Malamud's habit of posting laws, statutes, regulations and codes online for free.

In 2007 Malamud alerted West that he wished to publish the company's federal case-law reporter on his website. He exchanged letters with the publisher, asking for guidance as to what he could and could not publish online without inviting a copyright infringement lawsuit. Malamud wrote that he would extract the public domain content and republish it on the Web while eliminating or redacting West's additions and annotations.

He also requested clean copies of the *Federal Reporter*, *Federal Supplement* and *Federal Appendix*, stripped of West's intellectual property, writing that "you have already received rich rewards for the initial publication of these documents, and releasing this data back into the public domain would significantly grow your market and thus be an investment in your future."

West responded by noting that it did not claim copyright in the portions of the judicial opinions issued by the court, but it did claim protection for its additions—including annotations, headnotes, summaries, updates and revisions, as well as the selection and arrangement of the opinions. "As you suggest in your letter, the copyrightability of this material, which is original to West, has never been seriously questioned," wrote Edward Friedland, then-deputy general counsel for West's parent company at the time, the Thomson Corp.

Malamud's approach allowed him to avoid being sued. In fact, he says, his actions have resulted in tons of cease-and-desist letters, but not a lot of lawsuits. "I try to make it a habit not to get sued," he says.

And his position is clear: If it was produced by the government, it belongs in the public domain.

**BATTLE LINES** When he was finished with EDGAR, Malamud decided to take on another challenge. He saw how difficult it was to use the U.S. Patent and Trademark Office's database, so he simply uploaded patent filings to his website with the goal of making it easier for users—and would-be inventors—to search through claims and applications to identify prior art.

"Before I put the patent database online, it cost $20 to $30 to read a patent, and that's not a good thing," Malamud says. "It puts a brake on innovation."

It's Malamud's call for innovation that puts him at odds with legal publishers and governmental entities, as well as private organizations that create model standards and safety regulations. After all, almost no one denies that the law is free, and that the general public has a right to access the law.

"The ability to know the law, to read the law, is essential to the functioning of our democracy," Malamud says. But he is adamant in his belief that it's not enough to merely have access to the law. It's every bit as important to him that people are able to do what he did and utilize legal information in new and innovative ways.

That's a bridge too far for some. During the January hearing, Malamud spoke about how, during the past year, he has been targeted by opponents that have blurred the distinction between government entity and private organization.

For example, state and local governments often contract private publishers like West or LexisNexis to produce and publish their official codes. In 2013, Georgia, Idaho and Mississippi asserted copyright protection after Malamud posted their laws on his website.

"While it is clear that the law has no copyright, a few states have evidently not received the memo," he says.

Idaho, for instance, claimed in its cease-and-desist letter that it owned a copyright in the "analyses, summaries and reference materials" contained in the annotated code. However, the state went one step further and claimed copyright protection for the native statutory content itself, stating that Malamud needed a license (which could be provided free of charge) if he wanted to use it on his website. Georgia also claimed copyright infringement, writing in its takedown letter that while "the state asserts no copyright in the statutory text itself," Malamud allegedly copied annotated text, which the state claimed was copyrighted. Mississippi made a similar claim, noting that LexisNexis, which published the code, had provided a clean, unannotated copy of the code that was available for free.

To Malamud, that's a false distinction. He says the codes are not independent endeavors by private companies but are, instead, clearly labeled as official state laws.

"The *Official Code of Georgia Annotated* is a publication of the state, and it is the definitive statement by the state of the law," said Malamud in his response to Georgia's cease-and-desist letter. "Any citizen wishing to read the *Official Code of Georgia Annotated* would have trouble distinguishing between the 'statutory text itself' and those materials outside the box. No matter how you slice that cheese, it all looks the same. The *Official Code of Georgia Annotated*, every component of it, is the official law."

**STANDARDS SUIT** Meanwhile, several standards-development organizations have taken Malamud and his organization to court. These SDOs propose model regulations and codes that cover everything from building inspections and fire safety to heating and refrigeration. And they work to get local, state and federal agencies to adopt them into laws.

Last August, three SDOs—the American Society of Heating, Refrigerating and Air-Conditioning Engineers, the American Society for Testing and Materials, and the National Fire Protection Association—sued Malamud for copyright violations after he refused to pull copies of their regulations from his website. The lawsuit, pending before the U.S. District Court for the District of Columbia, warns that "Public Resource's actions threaten the substantial public benefits, including

safety, efficiency and cost savings that result from [the standards organizations'] ownership and exploitation of their copyrights in the standards they create."

Sitting next to Malamud at the hearing was Patricia Griffin, vice president and general counsel for the American National Standards Institute, which oversees the development and standardization of professional standards. Griffin argued that it should be up to the standards-development organization to determine how it provides the public with access to its model regulations, noting that some had completely free access while others charged a price or restricted a user's ability to download the information.

"When the government references copyrighted works," said Griffin in her testimony, "those works should not lose their copyright. But the responsible government agency should collaborate with the SDOs to ensure that the public does have reasonable access to the referenced documents."

These arguments are all anathema to Malamud. "Equal protection of the laws and due process are jeopardized if some citizens can afford to purchase access to the laws that all of us are bound to obey—with potential criminal penalties for noncompliance—but others cannot," he said in his testimony. "Access to justice should not require a gold card."

Malamud, meanwhile, has retained noted tech law firm Fenwick & West to represent him. Attorneys from the digital rights group the Electronic Frontier Foundation have also signed on to represent Malamud.

"Public.Resource.org doesn't publish every version of every standard by these organizations—only the ones incorporated into the law," says Corynne McSherry, an EFF attorney in San Francisco who is representing Malamud. "It's not like all of their creative work suddenly goes away—just the stuff that is incorporated into the law."



V. DAVID ZVENYACH
General counsel at the Council of the District of Columbia

**INNOVATION VS. RELIABILITY** In the old days, if students or lawyers wanted to do legal research, they had to head to the nearest law library and navigate a seemingly never-ending sea of movable, space-saving bookshelves. Before the advent of the Internet, hardbound volumes (supplemented by any number of paperbound updates) of various federal and state registries published by West or LexisNexis were the sole means of performing legal research. More recently the CD-ROM came along and helped users perform searches more easily, but most researchers still had to go to the library to use the service.

These days, thanks to technology and the proliferation of mobile devices among lawyers, legal research can be done from anywhere in the world. Additionally, there are several companies and websites dedicated to providing free legal research.

"In the 1970s, there wasn't a better way of doing things since the publishers were the only ones who could publish the books," says Malamud. "Today there are much better ways of making this information available."

He points to several free legal research sites, including Justia, Fastcase and Cornell Law School's Legal Information Institute, as well as local governments in Chicago and Washington, D.C., that have done innovative things with publicly available information.

LexisNexis and West agree on this: The law belongs to the general public. But they also emphasize the value they add to the law and the services they provide for legal professionals—material that they maintain is copyrightable.

"Our customers look to us for a complete collection of the law, including all relevant analytical material," says John Shaughnessy, vice president of corporate communications for Thomson Reuters, current parent company of West. "And Westlaw is the only online service that provides the case-plus expert analysis, the creative work product of our attorney editors who write case summaries and headnotes for each point of law, and organize the law by applying the only taxonomy that is purpose-built for legal professionals."

LexisNexis stresses its reliability and points out that sites offering legal codes, statutes and regulations might not be current or entirely accurate.

"Our product is the most up-to-date and accurate representation of what the law is when it's being used," says Ian McDougall, executive vice president and general counsel at LexisNexis. "Some sites that put up the bare text might not have cross-linked it to pending lawsuits or secondary legislation. It's a much more difficult process to do that."

LexisNexis and West also point out that they have

PHOTOGRAPH BY ARNIE ADLER

complied whenever a state or local government has requested a clean copy of their codes without the add-ons. Last year the District of Columbia made a clean copy of its code available to the general public. Despite being a bare-bones version, there were some formatting and coding issues that had to be resolved before anyone could do anything with it. Once those issues were resolved, legal hackers were able to design various programs and computer language codes to help users better utilize the sprawling text.

For instance, at a one-day legal "hackathon" in April 2013 in D.C., computer-savvy individuals created a browser to allow users to search through the code, and converted it into a different computer language so that others could more easily work with it.

"The bottom line is that, until the last several years,



ED WALTERS
CEO of Fastcase

there hasn't been much of a demand for the code to be published in this way," says V. David Zvenyach, general counsel at the Council of the District of Columbia, who spearheaded the move to provide a clean copy of the D.C. code for the general public. "It's a recent issue, and I think it's related to new technology and new systems and structures that make them useful."

**VALUE ADDED** However, not all of these innovators agree with Malamud's positions. Ed Walters, chief executive officer of Fastcase, a newer legal research firm, fervently believes individuals must have free and open access to the law if American democracy is to work.

But he also believes those who supplement the legal documents they publish have a legitimate interest, too.

Like Malamud, Walters has had run-ins with state legislators who, citing copyright concerns, have demanded he remove state codes from his database. In a video presentation for a 2013 ReInvent Law conference, Walters recounted his experiences with the Georgia state legislature and LexisNexis, saying he became alarmed when he noticed a copyright notice on the state's official code. He said the legislature refused to let Fastcase use the code, claiming that LexisNexis owned it; and LexisNexis agreed, reasoning that because it had added headlines to every single section of the code, it essentially owned the code.

"Nobody thinks state statutes are copyrightable," Walters said. "There are hundreds of years of precedent that spell it out." Ultimately, Walters got around the issue by simply rewriting all the case headlines—nearly 30,000 of them.

Walters, who agrees with Malamud on most issues relating to who owns the law, could have simply ignored LexisNexis and published the code as is, like Malamud did. However, Walters parted ways with Malamud on this issue and refused to do so. Instead, he believes in a publisher's right to maintain copyright protection over its proprietary information.

"Publishers should have the right to protect the stuff they add in," says Walters. "We add in stuff too, and we would like to protect that. The point is that public law should be available to everyone so that anyone can create value on top of it. That way, people can create all kinds of wonderful products that are available to anyone. There will never be any innovation otherwise."

Zvenyach has tried to strike a balance between accommodating the open-source advocates who want all the data and protecting the interests of the code's publishers.

"I don't think anyone is elated," Zvenyach says. "The open-source folks want more information faster, and I concur with that. Meanwhile, publishers would like to be the primary and only source."

Zvenyach also says he disagrees with Malamud's position that annotations and other additions are fair game if they are part of the official code. "There's never been a question that if someone copied the code word for word but stripped out the annotations, case notes and whatnot, then there's no copyright violation," he says. "The annotations are original works, though."

Zvenyach acknowledges that utilizing sources beyond the official code brings up authenticity and reliability issues that lawyers must be cognizant of. "Frankly, the code that's available online does not meet UELMA requirements," he says, referring to the Uniform Electronic Legal Material Act. "Our goal is to be compliant by the end of the fiscal year, and we're working with open-source developers to make that happen."

Laura Orr, a law librarian at the Washington County Law Library in Hillsboro, Ore., cautions that relying on unofficial sources could have a deleterious effect on the practice of law.

PHOTOGRAPH BY ARNIE ADLER

"I'm all in favor of putting law in the public domain," she says. "However, the quality of the sites online that allow for legal research varies greatly. There are fabulous free resources online and it's great they're there. But imagine if everyone in court relied on different versions of a statute or case law. Without true authentication protocols, you can't for sure know if what you're looking at is accurate."

### STANDARDS ON THE LINE?

People on all sides of the issue are carefully watching to see what happens in *American Society for Testing and Materials v. Public.Resource.org*. The suit, which is about to enter the discovery phase, could have profound implications for all involved.

For SDOs in the United States, it could signal the end of their current business model. That model has benefits to the public, says Mel Oncu, general counsel at the International Code Council, because the private organizations fund the drafting and creation of the model codes themselves, rather than dip into taxpayer funds.

Meanwhile, there are more than 1,000 private standards organizations in the U.S., and these organizations develop codes for nearly everything under the sun, including electrical appliances, cement composition and toy safety.

"The impact of not protecting the intellectual property for the private organizations that create these codes and standards is significant," says Sara Yerkes, senior vice president of government relations at the ICC, which is not involved in the litigation against Malamud. "Holding copyright allows standards-developing organizations to fund the development of technical codes and standards. SDOs are providing a valuable service to the government at minimum cost to the taxpayers."

National Fire Protection Association President Jim Shannon calls the standards-development process "the original public-private partnership." According to Shannon, the NFPA, which is part of the Malamud lawsuit, has taken extraordinary steps toward making sure the public has access to its regulations. "Many organizations, especially the NFPA, have put regulations on the Internet so that anyone who wants to read it can access it," Shannon says. "They don't have to pay a nickel."

Shannon says the model allows organizations like the NFPA to act quickly and nimbly when there's an emergency. Referring to a 2010 power plant explosion in Middletown, Conn., Shannon says the NFPA was able to draft and enact a new safety standard in a little over a year, a fraction of the time it would take the government to do the same. Denying copyright protection to SDOs once their standards become law would have a disastrous effect on public safety, he adds.

"Our standards are being used by the government, and that relieves them from the burden of developing their own," notes Shannon. "There's also a benefit to interstate commerce because we promote national standardization." Shannon argues that without the funds to maintain their development process, organizations like his cannot stay on top of the latest developments in their industry and will be unable to maintain up-to-date safety standards.

But Malamud and others contend that if the SDOs intend for their guidelines to be adopted into law, then they cannot be copyrighted. "They're in the lawmaking business," he says. "When their guidelines are approved or adopted, they get the gold seal of approval. Not one of these standards bodies has ever begged for their standards not to become law."

Walters concurs: "It's well-established that when the government enacts a standard or building code into law, then it is in the public domain. Wishing won't make that any different."

Malamud also takes issue with the notion that the standards groups have met their obligations by providing free copies of their codes online. Even if the material is free, Malamud argues, by forcing people to go to their websites to read their codes, the organizations are restricting access to the information.

"I'd like to make these codes available on all mobile devices," Malamud says. "If one body wants to restrict their materials to their reading room, then it stifles innovation. My right as a small nonprofit is to take this information and make it better and more efficient for users."

The standards organizations are unsympathetic, and warn that relying on unofficial sources can be extremely dangerous.

"Anyone who needs the content of a code or standard for technical or professional reasons should access the code through an authorized source to ensure that the version being consulted is both accurate and complete," Oncu says.

### WAITING FOR CONGRESS

In the meantime, Malamud is hopeful Congress might resolve the issue once and for all. He notes that at least four U.S. representatives from both sides of the aisle, including powerful California Republican Rep. Darrell Issa, stood up and supported him during the January hearing.

"If the states of Georgia, Idaho and Mississippi produce a law, every single person who voted for it is an author," Issa said at the hearing. "It doesn't belong to some entity. In its rawest form, isn't every single person who participates in the creation of a law or the inclusion by association of the standard, in fact, an author?"

Issa went on to say that states like Idaho were "inherently wrong" if they believed any part of the law could be subject to copyright protection.

Words, however, will only go so far. There is no bill pending before the committee and most members of Congress are concentrating on their re-election campaigns. If the current Congress fails to act, then Malamud and other open-source activists will have to go back when the new Congress opens in 2015 and do it all over again.

Unlike with legal codes, Malamud says that's a price he is more than willing to pay. ■