## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN SOCIETY FOR TESTING AND MATERIALS d/b/a/ ASTM INTERNATIONAL; <br><br> NATIONAL FIRE PROTECTION ASSOCIATION, INC.; and <br><br> AMERICAN SOCIETY OF HEATING, REFRIGERATING, AND AIR CONDITIONING ENGINEERS, <br><br>           Plaintiffs/ <br>           Counter-Defendants, <br><br> v. <br><br> PUBLIC.RESOURCE.ORG, INC., <br><br>           Defendant/ <br>           Counter-Plaintiff. | Case No. 1:13-cv-01215-TSC |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND FOR A PERMANENT INJUNCTION

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................1

STATEMENT OF FACTS ........................................................................................3

I.      The Standards Development System and Plaintiffs' Standards Development
        Activities ......................................................................................................3

        A.      The Standards Development Process...................................................4

                1.      ASTM .......................................................................................4

                2.      NFPA ........................................................................................6

                3.      ASHRAE...................................................................................8

        B.      Incorporation by Reference.................................................................9

        C.      Plaintiffs' Standards Are Widely Available to the Public. ...............10

II.     Defendant's Unauthorized Copying and Distribution of Plaintiffs' Standards .................11

ARGUMENT ..........................................................................................................13

I.      Standard for Summary Judgment................................................................13

II.     Plaintiffs Are Entitled to Summary Judgment on Their Copyright Infringement
        Claims. .......................................................................................................13

        A.      Defendant Reproduced, Distributed and Displayed the Works and/or
                Created Derivative Works Based on the Works Without Authorization..............14

        B.      Plaintiffs Own Valid Copyrights in the Works...................................15

        C.      All of Defendant's Affirmative Defenses to Copyright Infringement Are
                Meritless...........................................................................................18

                1.      The Incorporation of Plaintiffs' Standards by Reference in Federal,
                        State and Local Statutes and Regulations Does Not Divest
                        Plaintiffs of Copyright in those Standards. .................................18

                        a.      The Copyright Act and Other Federal Statutes Indicate that
                                Congress Did Not Intend Incorporation by Reference to
                                Destroy Copyright.......................................................19

                        b.      The Case Law Does Not Support Defendant's Argument
                                that Incorporation by Reference Destroys Plaintiffs'
                                Copyrights....................................................................22

                        c.      Public Policy Strongly Favors Copyright Protection for
                                Plaintiffs' Standards....................................................30

                2.      The "Merger Doctrine" Does Not Excuse Defendant's Conduct. ...........32

**TABLE OF CONTENTS**
**(continued)**

3.  Defendant's Wholesale Copying of Plaintiffs' Standards and Making Them Available to the Public Is Not Fair Use. ...........................34

    a.  The Purpose and Character of the Use...........................................34

    b.  The Nature of the Copyrighted Work ............................................37

    c.  The Amount and Substantiality of the Work Taken ......................37

    d.  The Effect of the Use Upon the Potential Market..........................38

4.  Defendant's Other Affirmative Defenses are Meritless.............................40

III.  Plaintiffs Are Entitled to Summary Judgment On Their Claims Of Trademark Infringement and False Designation of Origin. ...................................................42

    A.  Plaintiffs Own Valid Trademarks that are Distinctive or Have Acquired Secondary Meaning. ...................................................................................42

    B.  Defendant's Use of Plaintiffs' Trademarks Creates a Likelihood of Confusion. ......................................................................................................43

        1.  Members of the Public Are Likely to Believe that the Materials Defendant Posted are Genuine Versions of Plaintiffs' Standards. ............44

        2.  The Materials Defendant Posted are Not Genuine Versions of Plaintiffs' Standards..........................................................................................45

            a.  The Materials Posted by Defendant Are Not Exact Copies of Plaintiffs' Works........................................................................45

            b.  The Materials Defendant Posted Did Not Undergo Plaintiffs' Quality Control. ...........................................................47

    C.  Defendant's Activities Satisfy the "Use in Commerce" Requirement. ................48

    D.  Defendant's Use of Plaintiffs' Marks is Not Fair Use. .........................................50

IV.  Plaintiffs are Entitled to a Permanent Injunction. ................................................52

    A.  Plaintiffs Have Suffered Irreparable Injury. ........................................................52

        1.  Economic Harm and Ramifications to Plaintiffs' Business Model ...........53

        2.  Harm to Plaintiffs' Right to Exclude .......................................................54

        3.  Harm to Plaintiffs' Reputations ...............................................................55

    B.  Remedies Available at Law Are Inadequate.........................................................55

    C.  The Balance of Hardships Favors Issuing an Injunction. .....................................57

    D.  The Public Interest Favors Issuing an Injunction. ................................................58

CONCLUSION.....................................................................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*A&M Records, Inc. v. Napster, Inc.*,
    239 F.3d 1004 (9th Cir. 2001) ............................................................................................14

*AAMC v. Princeton Review, Inc.*,
    332 F. Supp. 2d 11 (D.D.C. 2004) ......................................................................................41

*AARP v. Sycle*,
    991 F. Supp. 2d 224 (D.D.C. 2013) ....................................................................................42

*Adolph Coors Co. v. A. Genderson & Sons, Inc.*,
    486 F. Supp. 131 (D. Colo. 1980) .......................................................................................48

*Am. Ass'n for the Advancement of Science v. Hearst Corp.*,
    498 F. Supp. 244 (D.D.C. 1980) .........................................................................................43

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .............................................................................................................13

*Apple Computer, Inc. v. Formula Int'l Inc.*,
    725 F. 2d 521 (9th Cir. 1984) .............................................................................................32

*Apple Computer, Inc. v. Franklin Computer Corp.*,
    714 F.2d 1240 (3d Cir. 1983).............................................................................................58

*Atari Games Corp. v. Nintendo of Am., Inc.*,
    975 F.2d 832 (Fed. Cir. 1992).............................................................................................32

*Authors Guild, Inc. v. Google, Inc.*,
    954 F. Supp. 2d 282 (S.D.N.Y. 2013), aff'd, 804 F.3d 202 (2d Cir. 2015)............................14

*Authors Guild, Inc. v. Google, Inc.*,
    804 F.3d 202 (2d Cir. 2015)................................................................................... passim

*Authors Guild, Inc. v. HathiTrust*,
    755 F.3d 87 (2d Cir. 2014)..................................................................................................36

*Banks v. Manchester*,
    128 U.S. 244 (1888).............................................................................................................24

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
    448 F.3d 605 (2d Cir. 2006)................................................................................................39

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Billy-Bob Teeth v. Novelty, Inc.*,
  329 F.3d 586 (7th Cir. 2003) ................................................................................17

*Bldg. Officials & Code Adm. v. Code Tech., Inc.*,
  628 F.2d 730 (1st Cir. 1980).................................................................................25

*BMG Music v. Gonzalez*,
  430 F.3d 888 (7th Cir. 2005) ..........................................................................39, 40

*Breaking the Chain Found. v. Capital Educ. Support, Inc.*,
  589 F. Supp. 2d 25 (D.D.C. 2008)...................................................................54, 55

*Broad. Music, Inc. v. PAMDH Enters.*,
  No. 13 Civ. 2255 (KMW), 2014 WL 2781846 (S.D.N.Y. June 19, 2014)............................54

*Brownmark Films, LLC v. Comedy Partners*,
  800 F. Supp. 2d 991 (E.D. Wis. 2011)...................................................................17

*Cairns v. Franklin Mint Co.*,
  292 F.3d 1139 (9th Cir. 2002) ..............................................................................50

*Call of the Wild Movie, LLC v. Does*,
  770 F. Supp. 2d 332 (D.D.C. 2011) .......................................................................14

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994)...........................................................................29, 34, 37

*CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reports, Inc.*,
  44 F.3d 61 (2d Cir. 1994) ............................................................................ passim

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).............................................................................................13

*Century 21 Real Estate Corp. v. Lendingtree, Inc.*,
  425 F.3d 211 (3d Cir. 2005).............................................................................50, 51

*Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*,
  843 F.2d 600 (1st Cir. 1988)................................................................................57

*Coquico, Inc. v. Rodriguez-Miranda*,
  562 F.3d 62 (1st Cir. 2009).................................................................................32

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*David's Bridal, Inc. v House of Brides, Inc.*,
No. 06 Civ. 5660 (SRC), 2010 WL 323306 (D.N.J. Jan. 20, 2010) .......................................51

*Davis v. Blige*,
505 F.3d 90 (2d Cir. 2007)................................................................................................16, 17

*DSMC, Inc. v. Convera Corp.*,
479 F. Supp. 2d 68 (D.D.C. 2007) ..........................................................................................15

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006)..................................................................................................................52

*Eden Toys, Inc. v. Florelee Undergarment Co.*,
697 F.2d 27 (2d Cir. 1982).......................................................................................................18

*El Greco Leather Products Co. v. Shoe World, Inc.*,
806 F.2d 392 (2d Cir. 1986).....................................................................................................48

*Fox Television Stations, Inc. v. FilmOn X LLC*,
966 F. Supp. 2d 30 (D.D.C. 2013) ..............................................................................55, 57, 58

*Fox v. Washington*,
236 U.S. 273 (1915)..................................................................................................................28

*Franchised Stores of N.Y., Inc. v. Winter*,
394 F.2d 664 (2d Cir. 1968).....................................................................................................49

*Globalaw Ltd. v. Carmon & Carmon Law Office*,
452 F. Supp. 2d 1 (D.D.C. 2006) .............................................................................................43

*Hanley-Wood LLC v. Hanley Wood LLC*,
783 F. Supp. 2d 147 (D.D.C. 2011) ...................................................................................54, 55

*Harper & Row Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985)......................................................................................................36, 37, 38

*Hart v. Sampley*,
Civ. A. No. 91-3068 (CRR), 1992 WL 336496 (D.D.C. June 24, 1992) ................................18

*Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp.*,
34 U.S.P.Q.2d 1450 (N.D. Cal. 1995) .....................................................................................48

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Holcomb v. Powell*,
    433 F.3d 889 (D.C. Cir. 2006) ............................................................................. 13

*Infinity Broad. Corp. v. Kirkwood*,
    150 F.3d 104 (2d Cir. 1998) ................................................................................ 35

*Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.*,
    303 F.3d 1242 (11th Cir. 2002) ..................................................................... 43, 45

*Intermatic Inc. v. Toeppen*,
    947 F. Supp. 1227 (N.D. Ill. 1996) .................................................................... 49

*John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*,
    186 F. Supp. 2d 1 (D. Mass. 2002) ................................................................ 25, 26

*John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*,
    322 F.3d 26 (1st Cir. 2003) ................................................................................ 26

*Maxwood Music Ltd. v. Malakian*,
    713 F. Supp. 2d 327 (S.D.N.Y. 2010) ............................................................... 17

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
    518 F. Supp. 2d 1197 (C.D.Cal. 2007) .............................................................. 54

*Miller v. French*,
    530 U.S. 327 (2000) ........................................................................................... 28

*Mitchell Bros. Film Grp. v. Cinema Adult Theater*,
    604 F.2d 852 (5th Cir. 1979) .............................................................................. 41

*MOB Music Publ'g v. Zanzibar on the Waterfront, LLC*,
    698 F. Supp. 2d 197 (D.D.C. 2010) ................................................................... 13

*Nat'l Cable Television Ass'n, Inc. v. Broad. Music, Inc.*,
    772 F. Supp. 614 (D.D.C. 1991) ........................................................................ 41

*New Kids on the Block v. News Am. Publ'g, Inc.*,
    971 F.2d 302 (9th Cir. 1992) .............................................................................. 50

*North Jersey Media Grp. Inc. v. Pirro*,
    74 F. Supp. 3d 605 ............................................................................................. 39

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Oracle Am., Inc. v. Google Inc.*,
  750 F.3d 1339 (Fed. Cir. 2014)............................................................................32

*Park 'N Fly. Inc v. Dollar Park and Fly, Inc.*,
  469 U.S. 189 (1985).............................................................................................43

*Perkins Sch. for the Blind v. Maxi-Aids Inc.*,
  274 F. Supp. 2d 319 (E.D.N.Y. 2003) .................................................................47

*Planned Parenthood Federation of Am., Inc. v. Bucci*,
  No. 97 Civ. 0629 (KMW), 1997 WL 133313 (S.D.N.Y. Mar. 24, 1997)..............49

*Practice Mgmt. Info. v. American Med. Ass'n*,
  121 F. 3d 516 (9th Cir. 1997), amended on other grounds, 133 F.3d 1140
  (1998) ............................................................................................................ passim

*Roeslin v. District of Columbia*,
  921 F. Supp. 793 (D.D.C. 1995) ..........................................................................17

*Rosetta Stone Ltd. v. Google, Inc.*,
  676 F.3d 144 (4th Cir. 2012) ...............................................................................50

*Sara Lee Corp. v. Kayser-Roth Corp.*,
  81 F.3d 455 (4th Cir. 1996) .................................................................................44

*Satava v. Lowry*,
  323 F.3d 805 (9th Cir. 2003) ...............................................................................32

*Seltzer v. Green Day, Inc.*,
  725 F.3d 1170 (9th Cir. 2013) .............................................................................35

*Shell Oil Co. v. Commercial Petroleum, Inc.*,
  928 F.2d 104 (4th Cir. 1991) ...............................................................................47

*Slate v. Am. Broad. Cos.*,
  941 F. Supp. 2d 27 (D.D.C. 2013) .......................................................................41

*Steele v. Bulova Watch Co.*,
  344 U.S. 280 (1952).............................................................................................49

*Stenograph LLC v. Bossard Assocs., Inc.*,
  144 F.3d 96 (D.C. Cir. 1998) ..........................................................................14, 15

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Tech 7 Sys., Inc. v. Vacation Acquisition, LLC*,
   594 F. Supp. 2d 76 (D.D.C. 2009) ...........................................................41

*Toyota Motor Sales U.S.A., Inc. v. Tabari*,
   610 F.3d 1171 (9th Cir. 2010) ................................................................51

*Triad Sys. Corp. v. Southeastern Express Co.*,
   64 F.3d 1330 (9th Cir. 1995) ..................................................................57

*UMG Recordings, Inc. v. MP3.com, Inc.*,
   92 F. Supp. 2d 349 (S.D.N.Y. 2000)........................................................35

*United We Stand America, Inc. v. United We Stand, America New York, Inc.*,
   128 F.3d 86 (2d Cir. 1997)......................................................................49

*Veeck v. Southern Bldg. Code Cong. Int'l, Inc.*,
   49 F. Supp.2d 885 (E.D. Tex. 1999)........................................................26

*Veeck v. Southern Bldg. Code Cong. Int'l, Inc.*,
   293 F.3d 791 (5th Cir. 2003) (*en banc*) ........................................ passim

*Wall Data Inc. v. Los Angeles Cty. Sheriff's Dept.*,
   447 F.3d 769 (9th Cir. 2006) ..............................................................34, 35

*Walt Disney Co. v. Powell*,
   897 F.2d 565 (D.C. Cir. 1990)................................................................54

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
   227 F.3d 1110 (9th Cir. 2000) ............................................................35, 38

*Wynn Oil Co. v. Thomas*,
   839 F.2d 1183 (6th Cir. 1988) ................................................................44

*Zenith Elecs Corp. v. WH-TV Broad. Corp.*,
   395 F.3d 416 (7th Cir. 2005) ..................................................................40

*Zobmondo Entm't, LLC v. Falls Media, LLC*,
   602 F.3d 1108 (9th Cir. 2010) ................................................................43

**FEDERAL STATUTES**

5 U.S.C. § 552(a)(1)......................................................................................10

15 U.S.C. § 272..............................................................................................21

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

15 U.S.C. § 1114(1) ...................................................................................................48

15 U.S.C. § 1115(b) ..................................................................................................43

15 U.S.C. § 1116 ......................................................................................................52

15 U.S.C. § 1125(a)(1) ..............................................................................................48

15 U.S.C. § 1127 ......................................................................................................49

17 U.S.C. § 101 ...................................................................................................15, 16

17 U.S.C. § 105 ........................................................................................................20

17 U.S.C. § 106 ........................................................................................................14

17 U.S.C. § 106(1) ....................................................................................................14

17 U.S.C. § 106(2) ....................................................................................................15

17 U.S.C. § 106(3) ....................................................................................................14

17 U.S.C. § 106(3) and (5) .........................................................................................14

17 U.S.C. § 106(5) ....................................................................................................14

17 U.S.C. § 107 ...............................................................................................34, 37, 38

17 U.S.C. § 201(a) ....................................................................................................20

17 U.S.C. § 201(b) ....................................................................................................17

17 U.S.C. § 201(d)(2) ................................................................................................17

17 U.S.C. § 204 ........................................................................................................20

17 U.S.C. § 302 ........................................................................................................20

17 U.S.C. § 410(c) ....................................................................................................15

17 U.S.C. § 502(a) ....................................................................................................52

17 U.S.C § 504(c) .....................................................................................................56

# TABLE OF AUTHORITIES
## (continued)

Page(s)

National Technology Transfer and Advancement Act of 1995, Pub. L. No. 104-113 § 12(d), 110 Stat. 775..................................................................................3, 21, 22, 30

Pub. L. No. 104-113 § 12, 110 Stat. 775, 782-83 (1996) .......................................3, 4, 5

RULES

Fed. R. Civ. P. 56.................................................................................................13

FEDERAL REGULATIONS

1 C.F.R. §§ 51.3, 51.5.........................................................................................10

1 C.F.R. § 51.7(a)(3)...........................................................................................10

63 Fed. Reg. 8546, 8554-55, *available at* https://www.whitehouse.gov/omb/circulars_a119..........................................9, 21

77 Fed. Reg. 11414 (Feb. 27, 2012), *available at* https://federalregister.gov/a/2012-4399.................................................21

79 Fed. Reg. 66267, 66268 (Nov. 7, 2014), *available at* https://federalregister.gov/a/2014-26445.........................................22, 29

CONSTITUTIONAL PROVISIONS

U.S. Const. Article I, § 8, cl. 8............................................................................19

LEGISLATIVE MATERIALS

H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. (1976)...................................................20

H.R. Rep. No. 104-390, 104th Cong., 1st Sess., pt. VII, § 12 (1995) ...........................30

OTHER AUTHORITIES

Emily S. Bremer, *On the Cost of Private Standards in Public Law*, 63 U. Kan. L. Rev. 279, 293-94 (2015) ..................................................................................29

1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 5.06[C] (1996)....................24

1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 6.03 (Matthew Beneder & Co. 2015) ...............................................................................16, 17

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

National Research Council, *Standards, Conformity Assessment, and Trade into
the 21st Century* vii (National Academy Press 1995), *available at*
http://www.nap.edu/read/4921/chapter/1 ..........................................................................20, 21

1 *Nimmer on Copyright* § 5.12 (2015) ...........................................................................................29

4 *Nimmer on Copyright*, § 13.09[B] (2015) ................................................................................41

2 William F. Patry, *Patry on Copyright* § 4.84 (West 2015) ........................................................29

## INTRODUCTION

Without Plaintiffs' consent, Defendant posted on the internet copies of hundreds of Plaintiffs' standards and made them available for free downloading, printing, or any other use, in blatant violation of Plaintiffs' copyrights and trademarks.  Defendant took this brazen action with full awareness of and indifference to the detrimental effect its actions would have on Plaintiffs' non-profit missions.

Defendant's actions threaten to undo a public/private partnership that Congress and the executive branch carefully established.  This longstanding arrangement incentivizes private entities to assume the necessary burden of creating standards and codes while permitting government entities to incorporate those copyrighted works by reference in statutes and regulations.  The standard developers' retention of the copyright in the standards is an essential ingredient in creating this incentive.  Defendant implicitly acknowledged as much by appealing to Congress and the executive branch to amend the Copyright Act and to change the regulations and executive orders explicitly affirming standard developers' copyrights in the private standards they create.  Unsuccessful in those venues, Defendant engaged in self-help by disregarding Plaintiffs' copyrights and now asks the Court to undo a carefully considered arrangement that has worked well for over 100 years.

Defendant's asserted mission of making the standards widely available to the public is a solution to a nonexistent problem.  The public already had easy access to Plaintiffs' standards without Defendant's intervention.  There is no evidence that any member of the public has been unable to access Plaintiffs' standards.  It is undisputed that all of the standards that are the subject of this motion are available for purchase at reasonable costs, and Plaintiffs even make read-only versions of these standards available for free on their websites.  In addition, federal

law requires that the Office of the Federal Register maintain a copy of all standards incorporated by reference in federal law for inspection by the public.

From the outset, the crux of the parties' dispute has been whether a privately developed standard loses its copyright protection once a governmental authority incorporates the standard by reference.  Rather than focus on this question, Defendant seeks to distract the Court by throwing up every imaginable meritless defense to copyright and trademark infringement.  For example, Defendant now seeks to challenge Plaintiffs' ownership of their standards even though, before this lawsuit, no one had ever challenged Plaintiffs' ownership of the copyrights in their standards and Defendant had repeatedly acknowledged that Plaintiffs were the authors of the works.  This is hardly surprising given that Plaintiffs' employees play a critical role in the writing of the standards, and Plaintiffs' practice is to obtain written assignments of copyright from all other contributors to the standards as well.  Defendant's other defenses, such as copyright misuse, waiver, and estoppel, are equally baseless.

Plaintiffs seek summary judgment only with respect to their claims concerning the following works: ASTM D86-07, ASTM D975-07, ASTM D396-98, ASTM D1217-93(98), the 2011 and 2014 versions of NFPA's National Electrical Code, and the 2004, 2007 and 2010 versions of ASHRAE's Standard 90.1 (collectively, the "Works").[1]  Rather than move on each of the more than 200 works in suit, Plaintiffs have selected this subset of particularly important standards in an effort to streamline the issues presented to the Court and to allow for a determination of the core legal issue underlying this action — whether incorporation by reference of Plaintiffs' standards in statutes and regulations nullifies Plaintiffs' copyrights in those standards.

---

[1] Plaintiffs believe that, with the benefit of the Court's guidance on this motion, the parties will be able to resolve any remaining dispute with respect to the other works in suit.

The answer to this key question is that incorporation by reference does not invalidate Plaintiffs' copyrights, and, accordingly, the Court should grant summary judgment in favor of Plaintiffs. Plaintiffs also move for an injunction prohibiting Defendant from continuing to infringe Plaintiffs' copyrights and trademarks.

## STATEMENT OF FACTS

I.  **THE STANDARDS DEVELOPMENT SYSTEM AND PLAINTIFFS' STANDARDS DEVELOPMENT ACTIVITIES**

Plaintiffs are non-profit organizations that develop private-sector standards to advance public safety, ensure compatibility across products and services, facilitate training, and spur innovation. *See* Statement of Undisputed Material Facts ("SUMF") at ¶¶ 9, 13, 14, 86, 87, 129, 130. The term "standards" refers to a variety of technical works, including works that contain product specifications, installation methods, methods for manufacturing or testing materials, recommended practices to ensure safety or efficiency, or other guidelines or best practices. SUMF ¶ 1. An organization that develops standards is a "standards development organization" or "SDO." SUMF ¶ 2.

In the United States, standards are typically developed by private organizations that have technical expertise in the relevant areas. SUMF ¶ 3. Standards are usually highly technical and specialized, and are written for audiences that have particular expertise in the relevant fields. SUMF ¶ 4. Standards are used by industry actors as a form of self-regulation and as a source of best practices. SUMF ¶ 5. Government agencies also use standards, including by incorporating them by reference in statutes and regulations. SUMF ¶¶ 53, 90, 134. The National Technology Transfer and Advancement Act of 1995, for example, requires federal agencies to use privately developed standards whenever possible. Pub. L. No. 104-113 § 12, 110 Stat. 775, 782-83 (1996). This system of privately developed standards has developed over the course of a

century.  SUMF ¶¶ 10-11, 86.  It serves the country well by facilitating the development and updating of the highest quality standards covering a range of topics at little to no public expense. SUMF ¶ 265.

### A.     The Standards Development Process

The Works in this case are "voluntary consensus standards."  SUMF ¶¶ 12, 87, 97.  This means that Plaintiffs' standards development processes draw on a wide range of input from a variety of interests and sources of expertise.  SUMF ¶¶ 7, 29, 95, 135.  In accordance with the requirements of the American National Standards Institute, which coordinates voluntary consensus standards development in the United States, Plaintiffs utilize technical committees that contain a balanced membership, including industry representatives, government representatives, consumers, people with particular expertise in the subject matter, and others.  *Id.*  Plaintiffs' technical committees conduct open proceedings, consider a wide range of input and suggestions, and provide mechanisms for appeal.  SUMF ¶¶ 7, 12, 88.

#### 1.     ASTM

ASTM's mission is to be recognized as the premier developer and provider of voluntary consensus standards, related technical information and services that promote public health and safety, support the protection and sustainability of the environment, and improve the overall quality of life; contribute to the reliability of materials, products, systems, and services; and facilitate international, regional, and national commerce.  SUMF ¶ 9.  ASTM standards are used in a wide range of fields, including consumer products, iron and steel products, rubber, paints, plastics, textiles, medical services and devices, electronics, construction, energy, water, and petroleum products.  SUMF ¶ 13.  ASTM has over 140 technical committees made up of over 23,000 technical members representing producers, users, consumers, government, and academia from more than 150 countries.  SUMF ¶ 28.

ASTM's standards development process begins with an individual either registering a "work item," which describes the idea for a new standard that will be developed and owned by ASTM, or moving to draft a new standard at a subcommittee meeting.  SUMF ¶ 31.  If the chair of the relevant subcommittee approves the work item or the subcommittee approves the motion for a new standard, a task group will develop a draft of the standard.  SUMF ¶ 32.  The standard is drafted through an iterative process, in which many people on the task group share ideas, suggest wording and provide comments.  SUMF ¶ 33.  The draft standard is then edited by an ASTM staff member, who also adds certain language and components that are required by the ASTM form and style guide.  SUMF ¶ 34.  ASTM staff members drafted language that appears in each of the standards at issue in this litigation.  SUMF ¶ 35.  The draft standard is then voted on by first the entire subcommittee, followed by the entire main committee and the complete Society, and reviewed by the Committee on Standards to ensure that all procedures were followed.  SUMF ¶ 36.  At each level of balloting, voters can suggest edits or provide comments.  SUMF ¶ 39.  Each negative vote must be addressed to determine if it is persuasive.  *Id*.  At least 66.7% of the voting subcommittee members and 90% of the voting main committee members must approve all standard actions, with not less than 60% of the voting members returning ballots.  *Id*.

ASTM has developed over 12,000 standards through this exhaustive process.  SUMF ¶ 41.  All ASTM standards are reviewed on a five-year schedule and either reapproved, revised or withdrawn in revision cycles that typically take eight to twelve months to complete.  SUMF ¶ 42.  Approximately 10 percent of ASTM's standards are incorporated by reference into federal regulations.  SUMF ¶ 53.

ASTM incurs substantial costs for its standards development infrastructure and delivery platforms, including the resources it provides to encourage collaboration among members; expenses relating to technical committee meetings and balloting as the standards make their way through the development process; and editing, producing, distributing and promoting the completed standards.  SUMF ¶ 43.  In 2014, ASTM spent more than $9 million to cover the costs of technical committee operations and $19 million for publication of copyrighted materials. SUMF ¶ 44.  ASTM generates over two-thirds of its revenue from the sale of copyrighted materials.  SUMF ¶ 47.

### 2.     NFPA

NFPA's mission is to reduce the risk of death, injury, and property and economic loss due to fire, electrical, and related hazards.  SUMF ¶ 86.  NFPA's principal activity is the development and publication of over 300 standards in the areas of fire, electrical, and building safety.  SUMF ¶ 87, 92.  NFPA's flagship work is the National Electrical Code ("NEC"), which is the world's leading standard for electrical safety and provides the benchmark for safe electrical design, installation and inspection to protect people and property from electrical hazards.  SUMF ¶ 94.  The first NEC was published in 1897, and NFPA revises the NEC every three years. SUMF ¶ 93.  The 2014 edition of the NEC is over 900 pages long.  *Id.*  Other NFPA standards include NFPA 101, the Life Safety Code, and NFPA 13, the Standard for the Installation of Sprinkler Systems.  *Id.*

NFPA standards are developed and updated according to a multi-phase process that takes approximately two years.  The standards development process involves creative input from three primary groups of participants.  SUMF ¶ 109.  First, members of the public provide proposals and comments regarding changes or additions to the standard.  SUMF ¶ 110.  Second, NFPA Technical Committees meet to consider the public proposals and to suggest their own revisions

to the standards.  SUMF ¶ 114.  The Technical Committees are composed of volunteers from

business, industry, public interest groups, government, academia, and others.  *Id*.  Third, NFPA

staff participate in the process in multiple ways.  SUMF ¶¶ 117-18.  Each Technical Committee

has a NFPA staff liaison who facilitates and runs the meetings, provides advice to the committee,

and records the decisions made by the committee.  NFPA technical and editorial staff also work

with the Committees and with each other to craft appropriate wording that accurately captures

the intent of Technical Committee decisions, and to revise and finalize the language of the draft

standard in accordance with NFPA's style and editorial guidelines.  *Id*.  Each NFPA standard

goes through two full rounds of public and committee input, comments, review and drafts before

being issued.  SUMF ¶ 119.  The process results in the issuance of sophisticated and complex

original works that support NFPA's mission of promoting public safety.  *Id.*

NFPA incurs numerous expenses in the course of this standards development process.

Those expenses include employing NFPA's staff of technical experts who advise the Technical

Committees, funding research and data collection efforts, employing publications staff and

administrative personnel to assist in drafting the actual text of the standards, publishing the

various reports issued by the committees and collecting public input and comments, and

arranging and paying for meeting sites for the committees.  SUMF ¶ 104.  For instance,

developing a new edition of the NEC involves consideration of thousands of comments and

proposals from the public, the participation of hundreds of Technical Committee members in

multiple rounds of intensive multi-day meetings, and the active assistance of dozens of NFPA

staff.  SUMF ¶ 119.  In 2014, NFPA spent more than $13.5 million on standards development.

SUMF ¶ 105.  NFPA depends on revenue from the sale of its standards to fund this resource-

intensive process.  Over 70% of NFPA's revenue comes from the sale of its copyrighted

publications, and the vast majority of that publications revenue comes from the sale of NFPA

standards.  SUMF ¶ 106.

### 3.      ASHRAE

ASHRAE's mission is to advance the arts and sciences of heating, ventilating, air

conditioning and refrigerating in order to serve humanity and promote a sustainable world.

ASHRAE accomplishes this by leveraging its unparalleled expertise in HVAC/R systems to

develop consensus-based standards.  SUMF ¶ 129.  ASHRAE maintains over one hundred

standards and guidelines that apply to a variety of fields within the construction industry, such as

energy efficiency, indoor air quality, refrigeration, and sustainability.  SUMF ¶ 130.  The

primary ASHRAE standard at issue here, ASHRAE 90.1, provides minimum energy-efficiency

requirements for commercial buildings and high-rise residential buildings.  SUMF ¶ 132.  Due to

constant changes in the construction industry, ASHRAE considers ASHRAE 90.1 to be under

"continuous maintenance," which means that the standard is automatically supplemented and

updated every eighteen months and a new version of 90.1 is released every three years.  *Id.*

ASHRAE's voluntary consensus standards are developed and updated through a process

designed to ensure broad participation from all affected interest groups, including the public.

SUMF ¶¶ 135-36.  ASHRAE 90.1 is developed by a designated Project Committee whose

membership includes engineers, manufacturers, and architects representing varied interests.

SUMF ¶ 135.  Each ASHRAE Project Committee, including the 90.1 committee, works with one

or more staff liaisons who perform a variety of functions, including organizing committee

meetings, recording minutes, recording suggested changes in language, processing committee

voting ballots for approval of draft language, and reviewing drafts of standards to make sure they

are written consistently and in the proper format.  SUMF ¶¶ 137-39.  The development of

ASHRAE 90.1 is also subject to ASHRAE's public-review process, which is designed to allow

8

any member of the public to comment on proposed revisions to ASHRAE 90.1, and requires the

Project Committee to respond to comments received from members of the public.  SUMF ¶¶

136, 139, 141.  ASHRAE staff are also responsible for maintaining and updating several sections

of the ASHRAE standards, including a short policy statement at the outset of each standard and

guidelines for the public comment procedure on each standard.  SUMF ¶ 141.

ASHRAE spends substantial resources drafting and updating its standards.  ASHRAE's

expenses include employing staff liaisons and other employees who facilitate the standards-

creation process, including arranging and paying for committee meetings and collecting public

input on standards.  SUMF ¶ 152.  For ASHRAE 90.1 alone, the updating process involves tens

of thousands of man-hours, and ASHRAE spent more than $1 million to cover standards

development in fiscal year 2014.  *Id*.  ASHRAE relies on the sale of standards to defray the costs

of developing and updating its standards.  SUMF ¶¶ 153-154.

## B.    Incorporation by Reference

Governments at all levels — federal, state, and local — from time to time incorporate by

reference privately developed standards in statutes and regulations.  Each standard at issue here

has been incorporated by reference by at least one governmental entity.  Federal policy strongly

favors incorporation by reference of private sector standards.  As explained in the Office of

Management and Budget's Circular No. A-119 ("OMB Circular"), incorporation by reference,

*inter alia*, saves government the cost of developing standards on its own, provides incentives to

establish standards that serve national needs, promotes efficiency and economic competition

through harmonization of standards, and furthers the federal policy of relying on the private

sector to meet government needs for goods and services.  OMB Circular NO. A-119, 63 Fed.

Reg. 8546 (Revised Feb. 10, 1998), *available at*

https://www.whitehouse.gov/omb/circulars_a119/.  Federal law requires that materials

incorporated by reference in the Federal Register must be "reasonably available to the class of persons affected." 5 U.S.C. § 552(a)(1); 1 C.F.R. § 51.7(a)(3). The regulations specify that (i) a copy of the incorporated material must be on file with the Office of the Federal Register and (ii) the regulations incorporating such material must state the ways those incorporated materials are reasonably available to interested parties. 1 C.F.R. §§ 51.3, 51.5. The regulations do not require that such materials be available to the public at no cost.

State and local governments also incorporate by reference standards and reap similar benefits from this system, including achieving uniformity across state lines and avoiding the cost to governments of developing their own standards. No state or local government requires materials incorporated by reference to be available to the public at no cost.

### C.    Plaintiffs' Standards Are Widely Available to the Public.

All Plaintiffs make their standards available to the public in multiple formats and through multiple distribution channels. First, members of the public can purchase copies of the standards, in hard copy or digital format, and on one-off or subscription bases. SUMF ¶¶ 57, 99, 157. Plaintiffs sell copies of standards at reasonable cost. For example, individual NFPA standards sell in the range of $39-$105. SUMF ¶ 99. ASTM sells its standards individually in the range of $38-$89 per work. SUMF ¶ 58. ASTM provides discounts to its standards for students. SUMF ¶ 62. ASHRAE also sells hard-copy and digital versions of its standards. SUMF ¶ 157. ASHRAE standards are typically priced between $25 and $120, with none priced above $200. SUMF ¶ 158. ASHRAE discounts these prices for libraries, educational institutions, government entities, and individuals or entities that purchase the standards on a subscription basis. SUMF ¶ 160.

Second, Plaintiffs make the Works available for free viewing by the public on their websites — in a read-only format. SUMF ¶¶ 64, 100, 161. Hence, any member of the public

who wants *to read* Plaintiffs' incorporated standards can do so — at no cost — simply by going

to Plaintiffs' websites.  Persons that want *to copy* or *distribute copies* of the standards pay for

that right or obtain a license.  Each Plaintiff publicizes the fact that it provides free read-only

access to its standards.  SUMF ¶¶ 66, 101.  Each Plaintiff also ensures that the public can easily

search its website to find and review standards.  For example, NFPA has partnered with state

governments to create an online widget that can be linked from the relevant state agency's

website to the relevant standard when a standard is incorporated by reference.  SUMF ¶ 101.

During the notice and comment period for proposed federal regulations, upon request by the

applicable federal agency, Plaintiffs also provide free, read-only access to standards that are

incorporated by reference in proposed regulations. SUMF ¶ 67.

Plaintiffs also make their standards reasonably available to the public in other ways.

Plaintiffs routinely grant permission to researchers, academics and others to reproduce their

standards in part or in whole at no cost for non-commercial purposes.  SUMF ¶¶ 68, 103.

Additionally, ASTM will provide copies of its standards at reduced (or in some cases no) cost

upon request if the regular cost is a burden to the party making the request.  SUMF ¶ 61.

## II.   DEFENDANT'S UNAUTHORIZED COPYING AND DISTRIBUTION OF PLAINTIFFS' STANDARDS

Defendant is a corporation founded and run by Carl Malamud, who is its President and

sole employee.  SUMF ¶ 163.  It does not claim that it needs access to any of Plaintiffs'

standards in order to comply with government regulations that reference Plaintiffs' standards.

Instead, Defendant seeks the right to post copies of Plaintiffs' standards on its website so that

others can copy, distribute or make derivative works of Plaintiffs' standards for free.

Defendant has engaged in extensive public advocacy before Congress and various offices

of the executive branch, including the Office of the Federal Register and the Administrative

Conference of the United States, seeking either the passage of a statute or a change in federal regulations to mandate that standards lose their copyright protection when they are incorporated by reference.  SUMF ¶¶ 172-74.  Those efforts have been unsuccessful.  SUMF ¶ 175.

In December 2012, Defendant began posting copies of Plaintiffs' standards on its website.  Defendant made copies in two ways.  First, Mr. Malamud simply scanned the paper copies into PDFs, added a cover page, used optical character recognition software to convert the images of the scanned pages into text and posted the PDFs, including the text created by the optical character recognition software, on Defendant's website.  SUMF ¶¶ 182-87.  Defendant also posted many of these standards to the Internet Archive website.  SUMF ¶185.  Second, Defendant hired two companies, HTC Global and Point.B Studio, to reformat some of Plaintiffs' standards into HTML format.  SUMF ¶¶ 188, 189, 197, 198.  Although it had changed the documents without Plaintiffs' authorization, Defendant placed Plaintiffs' trademarks on its "re-keyed" versions of Plaintiffs' standards and posted them on Defendant's website.  SUMF ¶¶ 201, 210.  Any member of the public, without limitation, could freely download, copy, and print these versions of Plaintiffs' standards from Defendant's website and the Internet Archive website.  SUMF ¶¶ 202, 209.

Defendant also has openly attempted to compete with Plaintiffs' authorized distribution channels.  For example, Defendant attempted to drive traffic to its website, including by engaging in "search engine optimization" to appear higher in Google search results in an attempt to attract visitors.  SUMF ¶ 226.  Defendant also has engaged in fundraising efforts based on its posting of Plaintiffs' standards or its plans to post Plaintiffs' standards.  SUMF ¶¶ 225, 227-28. In one such solicitation, Mr. Malamud told a potential funder that one of Defendant's goals is to "have more users" than the "SDO-provided websites," and "to be No. 1 in the marketplace."

SUMF ¶ 225.  In contrast with its earlier efforts to promote legislation depriving Plaintiffs of their copyrights in their privately developed standards, Defendant also has publicly declared that Plaintiffs' standards are in the public domain and cannot be copyrighted, and has encouraged members of the public to download them from Defendant's website without paying for them. SUMF ¶ 224.  To date, as a direct result of Defendant's actions, Plaintiffs' standards have been downloaded tens of thousands of times from Public.Resource.Org and Internet Archive websites. SUMF ¶¶ 241-43.  The 2011 NEC alone was downloaded 30,350 times from the Internet Archive through February 2015. SUMF ¶242.

## ARGUMENT

### I.     STANDARD FOR SUMMARY JUDGMENT

A motion for summary judgment should be granted upon a showing "that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  The mere existence of some factual dispute between the parties does not defeat summary judgment; rather, the dispute must be both "material," meaning that "a dispute over it might affect the outcome of a suit," and "genuine," meaning that "a reasonable jury could return a verdict for the nonmoving party."  *Holcomb*, 433 F.3d at 895 (quoting *Anderson*, 477 U.S. at 248).  On a motion for summary judgment, each party has the burden "to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### II.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR COPYRIGHT INFRINGEMENT CLAIMS.

"A plaintiff seeking to establish copyright infringement must prove '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'"  *MOB*

*Music Publ'g v. Zanzibar on the Waterfront, LLC*, 698 F. Supp. 2d 197, 201-02 (D.D.C. 2010)

(quoting *Stenograph LLC v. Bossard Assocs., Inc.*, 144 F.3d 96, 99 (D.C. Cir. 1998)).  The

undisputed facts show that Plaintiffs satisfy both elements.  Defendant cannot carry its burden of

proof on any of its affirmative defenses.  Plaintiffs therefore are entitled to summary judgment.

### A.     Defendant Reproduced, Distributed and Displayed the Works and/or Created Derivative Works Based on the Works Without Authorization.

Defendant cannot and does not contest that it "copied" the Works.  For these purposes,

"copying" means exercising any of the exclusive rights that 17 U.S.C. § 106 vests in Plaintiffs as

owners of the copyright.  *See Call of the Wild Movie, LLC v. Does*, 770 F. Supp. 2d 332, 351

(D.D.C.  2011).  Here, Defendant infringed several of Plaintiffs' exclusive rights.

Defendant infringed Plaintiffs' exclusive rights of reproduction under § 106(1) when it

scanned Plaintiffs' Works into digital formats and when it created HTML versions of the Works.

*See Authors Guild, Inc. v. Google, Inc.*, 954 F. Supp. 2d 282, 289 (S.D.N.Y. 2013) (digitally

reproducing paper books constitutes reproducing under § 106(1)]), *aff'd*, 804 F.3d 202, (2d Cir.

2015).[2]

Defendant infringed Plaintiffs' exclusive rights to distribute copies of and to display the

Works under § 106(3) and (5), when it uploaded the Works to its own website and third-party

websites for members of the public to download at will — which they have done tens of

thousands of times.  *See A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1014 (9th Cir.

2001) (uploading digital files for others to copy violates distribution right); *Authors Guild*, 954 F.

Supp. 2d at 289 (making digital copies of books available for download constitutes distribution

under § 106(3) and displaying portions of the books to the public constitutes display under

§ 106(5)).

---

[2] Evidence establishing Defendant's infringement of the exclusive rights of copyright owners are listed in Plaintiffs' Statement of Undisputed Facts ¶¶ 178-209.

Defendant's uploading process also recast the Works into different forms, thereby infringing Plaintiffs' exclusive rights under § 106(2) to create derivative works based on the Works. *See* 17 U.S.C. § 101 ("derivative work" includes any form in which a work "may be recast, transformed, or adapted").

Defendant admittedly did not seek or obtain Plaintiffs' consent prior to exercising any of these exclusive rights. SUMF ¶ 203.

## B. Plaintiffs Own Valid Copyrights in the Works.

Because it does not, and cannot, dispute that it copied Plaintiffs' Works, Defendant seeks to avoid liability by challenging Plaintiffs' ownership of the copyrights in the Works. However, it is undisputed that Plaintiffs are the duly registered owners of the copyrights in the Works. SUMF ¶¶ 71-76, 120-21, 146. Plaintiffs' registration certificates create a presumption that Plaintiffs are the lawful owners of copyright in the Works. 17 U.S.C. § 410(c); *DSMC, Inc. v. Convera Corp.,* 479 F. Supp. 2d 68, 81-82 (D.D.C. 2007).[3] These registrations also create a presumption of the validity of the copyrights. *Stenograph,* 144 F.3d at 99. Defendant has the burden to overcome Plaintiffs' presumption of ownership.

Defendant cannot meet that burden. In discovery, Defendant undertook a quixotic campaign looking for holes in Plaintiffs' ownership claims. Defendant's theory — which Plaintiffs fully expect it to reprise in its responsive brief — was that, unless each Plaintiff could show iron-clad proof of ownership of the contributions of every one of the thousands of individuals who contributed in any way to the Works, Plaintiffs would have zero ability to sue Defendant for copyright infringement.

---

[3] NFPA and ASHRAE's registrations and two of ASTM's registrations were effective within five years of first publication of the Works. For the two ASTM Works that were registered more than five years after the date of first publication, the Court has discretion to determine how much weight to accord the certificates of registration. 17 U.S.C. § 410(c); *DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68, 81-82 (D.D.C. 2007).

Defendant's theory is flatly wrong, both on the facts and as a matter of basic copyright law.  There is no legitimate factual dispute that Plaintiffs own 100% of the Works as the organizational authors who oversee the development of the Works, *see Veeck v. Southern Bldg. Code Cong. Int'l, Inc.*, 293 F.3d 791, 794 (5th Cir. 2003) (*en banc*), and because all contributors are either employees of Plaintiffs or are required to assign the copyright in their contributions to Plaintiffs.  Prior to filing this lawsuit, Defendant itself had no quarrel with that proposition.  It readily and publicly admitted that Plaintiffs authored the Works.  SUMF ¶¶ 205-06.  What is more, neither Plaintiffs nor Defendant is aware of a single person or entity — anywhere — other than Plaintiffs that has ever claimed to have *any* ownership interest in any of the Works.  SUMF ¶¶ 26, 122, 145, 170.

For purposes of this case and this motion, however, Plaintiffs do not have to own the copyright in 100% of the Works.  Although Plaintiffs do in fact own 100%, as a matter of law each Plaintiff need only have a co-ownership of the copyright in order to sue Defendant for infringement.  *Davis v. Blige*, 505 F.3d 90, 98 (2d Cir. 2007).  In other words, to rebut the presumption of ownership the certificates create, Defendant cannot simply show that 1%, 50% or even 75 % of the copyright in a Work is owned by someone other than the Plaintiff listed in the certificate.  Defendant has to show that *100% of the copyright* is owned by other parties.

Defendant cannot come close to meeting that burden.  The undisputed evidence shows that each work is a "joint work," *i.e.*, "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101.  "The essence of joint authorship is a joint laboring in furtherance of a preconcerted common design."  1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 6.03 (Matthew Beneder & Co. 2015).  The authors to a single work can be joint authors even if

their contributions are unequal. *Id.* at § 6.07; *Maxwood Music Ltd. v. Malakian*, 713 F. Supp. 2d 327, 344 (S.D.N.Y. 2010). At a minimum, the Works are quintessential joint works, having been drafted, edited, and revised all for the common purpose of creating an integrated, unified standard. SUMF ¶¶ 30, 33, 34, 36, 109, 114, 117, 135-37.

Each of the co-authors of a joint work owns the copyright in the complete work and, in the absence of any assignment of those rights, can exercise any of the rights of ownership, including bringing a suit for infringement of the copyright by a third party and assigning its copyright to another person. *Davis*, 505 F.3d at 98 (likening co-ownership of copyright to tenancy in common); *Brownmark Films, LLC v. Comedy Partners*, 800 F. Supp. 2d 991, 997 (E.D. Wis. 2011) (assignee not required to have been assigned copyright by all co-owners of a copyright to have standing to sue for infringement). As noted, the undisputed evidence demonstrates that Plaintiffs own not just 1% but all or substantially all of the copyright in each of their respective Works. Some of the thousands of contributors of copyrighted expression to each Plaintiff's Works worked for that Plaintiff and made his/her contributions in the course and scope of his/her employment responsibilities, *i.e.*, that person's contribution was a "work made for hire." *See* 17 U.S.C. § 201(b); *Roeslin v. District of Columbia*, 921 F. Supp. 793, 797 (D.D.C. 1995); SUMF ¶¶ 34-35, 117, 137-39, 141. Additionally it is the policy of each Plaintiff to obtain written copyright assignments from each contributor to the Works, *see* 17 U.S.C. § 201(d)(2), and Plaintiffs in fact obtained these assignments from the contributors. SUMF ¶¶ 18-25; 112-15, 143-44. And, as a third-party challenger without any claim to ownership of the copyrights at issue, Defendant does not have standing to attack the validity of assignments from contributors to Plaintiffs. *See, e.g., Billy-Bob Teeth v. Novelty, Inc.*, 329 F.3d 586, 592-93 (7th Cir. 2003) (alleged infringer did not have standing to challenge the assignment of a copyright when the

alleged infringer did not claim to be the owner of the copyright); *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 32 (2d Cir. 1982) (same); *Hart v. Sampley*, Civ. A. No. 91-3068 (CRR), 1992 WL 336496, at *1 (D.D.C. June 24, 1992) (same).  Thus, Plaintiffs are indisputably at least co-owners of the copyrights in the Works and therefore have the requisite ownership interest to sue Defendant.

### C.    All of Defendant's Affirmative Defenses to Copyright Infringement Are Meritless.

#### 1.    The Incorporation of Plaintiffs' Standards by Reference in Federal, State and Local Statutes and Regulations Does Not Divest Plaintiffs of Copyright in those Standards.

It is undisputed that Plaintiffs' standards are copyrightable when they are created.  The standards at issue here are original works of expression.  Mr. Malamud himself has acknowledged that the standards "have a strong copyright interest" until they are "incorporated by reference in the Code of Federal Regulations."  SUMF ¶ 171.  In other words, Defendant's primary defense of its conduct in copying Plaintiffs' standards is that those standards somehow lost their copyright protection when federal, state or local government entities incorporated the standards by reference in regulations or statutes.  In Defendant's view, that incorporation by reference places them in the public domain because they become "the law."

Defendant's argument finds no support in the Copyright Act or in other federal statutes dealing with the incorporation of standards by reference, which manifest a clear congressional intent that standards incorporated by reference in statutes and regulations do not thereby lose their copyright.  In addition, both the Office of Management and Budget ("OMB") and the Office of the Federal Register ("OFR") have concluded that standards development organizations retain the copyright in their standards as a matter of law.

Nor does the case law support Defendant's position.  Both the Ninth Circuit and the Second Circuit have ruled that incorporation by reference of a work in government regulations does not cause that work to lose copyright protection.  *Practice Mgmt. Info. v. American Med. Ass'n*, 121 F. 3d 516, 520 (9th Cir. 1997) ("*Practice Management*"), *amended on other grounds*, 133 F.3d 1140 (1998); *CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reports, Inc.*, 44 F.3d 61, 74 (2d Cir. 1994) ("*CCC*").  Defendant primarily relies on the closely divided decision in *Veeck*, 293 F.3d 791, which held that model codes that had been adopted into law were not copyright-protected.  But the majority opinion in *Veeck* took pains to limit its holding to the facts of that case, which are readily distinguishable from the facts here.  And to the extent there is any tension in the case law, the Ninth Circuit and Second Circuit's opinions are far more persuasive than *Veeck*.

Finally, public policy weighs heavily in favor of Plaintiffs in this case.  The undisputed evidence shows that Plaintiffs depend on the revenue they receive from the sale of copyrighted standards to maintain their highly resource-intensive standards development processes, and that local, state and federal governments as well as industry rely on the continued development and updating of Plaintiffs' standards.  This case is a paradigmatic example of a situation in which protection of copyright is needed to fulfill the constitutional purpose of copyright, "to promote the progress of science and useful arts."  U.S. Const. art. I, § 8, cl. 8.

> ### a.   The Copyright Act and Other Federal Statutes Indicate that Congress Did Not Intend Incorporation by Reference to Destroy Copyright.

Deciding whether Plaintiffs' works lose copyright protection upon being incorporated by reference is first and foremost a matter of statutory interpretation.  Nothing in the Copyright Act itself suggests that copyrights in standards are terminated if the standards are incorporated by reference in a statute or regulation.  On the contrary, the Act provides that copyright in a work

"vests initially in the author or authors of the work."  17 U.S.C. § 201(a).  The Act contains various provisions regarding how copyright can be divested, such as provisions governing the transfer of copyrights, *e.g.*, § 204, and the expiration of copyrights, *e.g.*, § 302, but it contains no suggestion that a copyright is somehow terminated or divested by the work being incorporated by reference.

Other provisions of the Copyright Act and their legislative history further undermine Defendant's argument.  The Act addresses the relationship between action by the federal government and copyright protection, and in doing so it draws a distinction between works created by the government and works created by private authors.  It provides that copyright protection "is not available for any work of the United States Government, but the United States Government is not precluded from receiving and holding copyrights transferred to it by assignment, bequest, or otherwise."  17 U.S.C. § 105.  In commenting on this provision before the Act was passed, the House Committee on the Judiciary explained that "publication or other use by the Government of a private work ***would not affect its copyright protection in any way***."  H.R. Rep. No. 94-1476, 94th Cong., 2d Sess., at 60 (1976) (emphasis added).  Congress did not intend that federal regulatory incorporation by reference of copyrighted works would destroy the copyright in those works.

Subsequent federal statutes confirm that incorporation by reference does not destroy copyright.  For example, in 1991 Congress passed P.L. 102-245, requesting the National Research Council to conduct a study on standards development.  *See* National Research Council, *Standards, Conformity Assessment, and Trade into the 21st Century* vii (National Academy Press 1995), *available at* http://www.nap.edu/read/4921/chapter/1.  That study contained a detailed overview of the U.S. standards-development system, and specifically noted that many standards

developers "offset expenses and generate income through sales of standards documents, ***to which they hold the copyright***. For many SDOs, publishing is a significant source of operating revenue." *Id.* at 32 (emphasis added). The study concluded that the "U.S. standards development system serves the national interest well" by "support[ing] efficient and timely development of product and process standards that meet economic and public interests." *Id.* at 157. The study recommended that Congress pass a law to promote the use of privately developed voluntary consensus standards by federal agencies, and in response Congress passed the National Technology Transfer and Advancement Act of 1995 ("NTTAA"), Pub. L. No. 104-113 § 12(d), 110 Stat. 775, codified at 15 U.S.C. § 272. The Act declares that "all Federal agencies and departments shall use technical standards that are developed or adopted by voluntary consensus bodies, using such technical standards as a means to carry out policy objectives or activities." *Id.*

Pursuant to the NTTAA, the OMB has issued guidelines for the use of privately developed voluntary consensus standards, and those guidelines provide that when an agency incorporates a standard by reference, "your agency must observe and protect the rights of the copyright holder and any other similar obligations." OMB Circular NO. A-119, 63 Fed. Reg. 8546, 8554-55, *available at* https://www.whitehouse.gov/omb/circulars_a119.

Recently, OFR reaffirmed that federal law protects the copyrights of standards development organizations after incorporation by reference. OFR received a petition signed by Mr. Malamud, among others, asking OFR to require that all material incorporated by reference be made available for free online, and conducted a rulemaking on the proposal. *See* Incorporation by Reference, A Proposed Rule, Office of the Federal Register, 77 Fed. Reg. 11414 (Feb. 27, 2012), *available at* https://federalregister.gov/a/2012-4399 (setting out petition

signed by Carl Malamud and others).  Following notice and comment, OFR rejected Defendant's proposal as being bad policy and inconsistent with federal law:  "If we required that all materials IBR'd into the CFR be available for free, that requirement would compromise the ability of regulators to rely on voluntary consensus standards, possibly requiring them to create their own standards, which is contrary to the NTTAA and the OMB Circular A-119."  Incorporation by Reference, Announcement of Final Rule, Office of the Federal Register ("OFR Rule Announcement"), 79 Fed. Reg. 66267, 66268 (Nov. 7, 2014), *available at* https://federalregister.gov/a/2014-26445.  Likewise, numerous federal agencies have also recently taken the position in communications with Defendant that incorporation by reference of materials into regulations does not destroy the copyright in those materials.  *See* SUMF ¶ 177 (citing Sept. 8, 2015 Letter from U.S. Department of Interior; August 6, 2015 Letter from U.S. Department of Housing and Urban Development; and May 18, 2015 Letter from U.S. Consumer Product Safety Commission).

In summary, the plain text of the Copyright Act, its legislative history, and the long history of subsequent action by both Congress, including Congress's refusal to amend the Copyright Act and regulations as Defendant has recommended, and the pertinent federal agencies charged with implementing federal law in this area have uniformly concluded that incorporation of a standard by reference does not terminate the copyright-holder's rights in that standard.

> **b.     The Case Law Does Not Support Defendant's Argument that Incorporation by Reference Destroys Plaintiffs' Copyrights.**

In keeping with the statutory framework, the courts have generally rejected arguments that incorporation by reference terminates copyright protection.  The Ninth and Second Circuits have expressly held that incorporation by reference does not terminate copyright protection.  The

First Circuit has reserved judgment on the question, but a district court in the First Circuit persuasively held that copyright protection continues even after incorporation by reference.  The only case regarding incorporation by reference that Defendant relies upon is the Fifth Circuit's decision in *Veeck*.  *Veeck*, however, expressly stated that it did not apply to cases like this one, and its reasoning is unpersuasive in any event.

The Ninth Circuit's *Practice Management* decision contains the best discussion of copyright for standards incorporated by reference into regulations.  The American Medical Association ("AMA") had developed a copyrighted coding system to enable doctors and other health care workers to identify medical procedures through reference to the AMA's codes for those procedures.  *Practice Management*, 121 F.3d at 517.  The Health Care Financing Association, the federal agency charged with administering Medicaid reimbursements, incorporated the AMA coding system by reference into its regulations, and "adopted regulations requiring applicants for Medicaid reimbursement to use" the AMA's codes for each particular procedure.  *Id.* at 518.  An AMA competitor sought to publish those codes, and it made the same argument that Defendant makes in this case.  The defendant argued that the code "became uncopyrightable law when HCFA adopted the regulation mandating [its] use."  *Id.*  The court rejected that argument, however, and held that the code continued to be protected by copyright even after incorporation by reference.  *Id.* at 520.

The court grounded its reasoning first and foremost in the core constitutional purpose of copyright, which is to "promote the progress of science and the useful arts."  *See Practice Management*, 121 F.3d. at 518.  As the court recognized, that purpose is served by preserving the copyright in standards, which provides an important economic incentive for standards development organizations to create these standards in the first place.  "'To vitiate copyright, in

such circumstances, could, without adequate justification, prove destructive of the copyright

interest, in encouraging creativity,' a matter of particular significance in this context because of

'the increasing trend toward state and federal adoptions of model codes.'"  *Id.* (quoting 1

Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 5.06[C], at 5-92 (1996)).

The court also relied on the reasoning of *Banks v. Manchester*, 128 U.S. 244 (1888).  In

*Banks*, the Supreme Court held that a court reporter could not assert copyright in state judicial

opinions because the reporter "was not the author" of the opinions.  *Id.* at 252-53.  In the course

of reaching that decision, the court also considered whether the judges who authored the

opinions had a copyright interest, and recognized that "[t]he question is one of public policy."

*Id.* at 253.  As the Ninth Circuit recognized in *Practice Management*, the *Banks* Court identified

two reasons for concluding that it was against public policy to give judges a copyright interest in

their opinions, and neither reason applies to privately developed standards that are incorporated

by reference.  The first reason was that "the public owns the opinions because it pays the judges'

salaries."  *Practice Management*, 121 F.3d at 518 (citing *Banks*, 128 U.S. at 253).  This reason

clearly does not apply to privately developed codes and standards.  On the contrary, private

standards are a prime example of the need for copyright protection because "copyrightability of

the [code] provides the economic incentive for the [standards development organization] to

produce and maintain [it]."  *Id.*

The second reason for the Supreme Court's holding in *Banks*, the Ninth Circuit

recognized, was "the due process requirement of free access to the law."  *Id.* at 519.  But that

requirement would only become relevant if there were "evidence that anyone wishing to use the

[code] has any difficulty obtaining access to it."  *Id.*  Because anyone could easily access the

code at issue in *Practice Management* by purchasing it from the AMA, the court recognized that

there was no basis for refusing to recognize copyright.  *Id.*  In this case, Plaintiffs' standards are even more accessible to the public than the codes considered in *Practice Management*, because, in addition to selling the Works, Plaintiffs have voluntarily undertaken to provide the public with free internet access to the Works.  SUMF ¶¶ 63-67, 100-01, 161.

Likewise, in *CCC* the Second Circuit held that state regulations' incorporation by reference of the Red Book, which provides automobile valuations, did not destroy the copyright in that work.  44 F.3d at 73 ("We are not prepared to hold that a state's reference to a copyrighted work as a legal standard for valuation results in loss of the copyright.").  Several states' regulations referenced the Red Book as one source of determining the insurance payment for a total loss.  *Id.*  The court explicitly rejected the argument that the public must have "free access to the content of the laws that govern it," because this would require the elimination of copyright protection and would "prove destructive of the copyright interest in encouraging creativity."  *Id.* at 73-74 & n. 30 (quotation marks omitted).

In an earlier case, the First Circuit expressed uncertainty about whether codes and standards lose their copyright on being incorporated by reference, and remanded to the district court for full briefing on the question.  *Bldg. Officials & Code Adm. v. Code Tech., Inc.*, 628 F.2d 730, 736 (1st Cir. 1980) ("The question is not only of first impression but may be of importance in view of a possible trend towards state and federal adoption, either by means of incorporation by reference or otherwise, of model codes.").  More recently, however, a district court in the First Circuit concluded that the reasoning of *Practice Management* and *CCC* was convincing.  That court held that "the balance of competing interests at stake in such cases favors preserving copyright protection for works incorporated by reference into public enactments." *John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*, 186 F. Supp. 2d 1, 22 (D. Mass.

2002).  The First Circuit affirmed on other grounds and noted that the question of copyright

protection for works incorporated by reference remains open in that circuit.  *John G. Danielson,*

*Inc. v. Winchester-Conant Properties, Inc.*, 322 F.3d 26, 39 (1st Cir. 2003).

Defendant relies heavily — indeed, almost exclusively — on an opinion that embraced

neither the restraint of the First Circuit in *John G. Danielson* nor the careful reasoning of the

Second and Ninth Circuits in *CCC* and *Practice Management*.  Defendant's centerpiece

precedent is Judge Jones's majority opinion for a sharply divided Fifth Circuit in *Veeck*.  That

opinion, however is distinguishable on its own terms and is not persuasive in its extreme views.

The plaintiff in *Veeck* was SBCCI, an organization that created a set of five "model

building codes" known collectively as the Standard Building Codes.  *Veeck v. Southern Bldg.*

*Code Cong. Int'l, Inc.*, 49 F. Supp.2d 885, 887 (E.D. Tex. 1999).  Two small towns in Texas,

Anna and Savoy, "enacted ordinances adopting [these] model codes by reference."  *Id.*  The

operator of a website purchased copies of these codes and posted them on his website, and

SBCCI brought a copyright infringement claim.  *Id.*  By a 9-6 vote, the *en banc* Fifth Circuit held

that under the particular circumstances in that case, when the model codes were "adopted by a

legislative body and bec[a]me 'the law'," they "enter[ed] the public domain and [were] not

subject to the copyright holder's exclusive prerogatives."  *Veeck*, 293 F.3d at 793.

Defendant's reliance on *Veeck* is unavailing, however.  *Veeck* is distinguishable from this

case for at least two reasons.  First, in response to an amicus brief filed by a number of standard-

development organizations (including ASHRAE and NFPA), the *Veeck* majority explained that it

was not holding that "copyrights may be vitiated simply by the common practice of

governmental entities' incorporating their standards in laws and regulations."  *Id.* at 803-04.  The

court distinguished between extrinsic standards, which require citizens "to consult or use a

copyrighted work in the process of fulfilling their obligations" and "the wholesale adoption of a model code." *Id*. at 804-05. The court explicitly stated: "This case does not involve references to extrinsic standards" and "clarified that "[c]aselaw that derives from official incorporation of extrinsic standards is distinguishable in reasoning and result." *Id*. at 804 (citing *CCC* and *Practice Management*). Here, using the terminology of *Veeck,* Plaintiffs' standards at issue are "extrinsic standards" that are referenced in regulations as opposed to being adopted in whole as the law.

Second, the *Veeck* majority noted that the model codes at issue there served "no other purpose than to become law," and acknowledged that when standards also have other uses, such as being "used by insurance companies and other non-governmental uses," they do not lose their copyright when they are incorporated by reference. *Id.* at 805. In this case, Plaintiffs' standards at issue have a range of uses and applications regardless of whether they are incorporated by reference, as they are used by industry, insurance companies, and many others. Moreover, unlike the model codes at issue in *Veeck*, Plaintiffs' standards here were not developed for the purpose of being incorporated by reference in statutes or regulations. SUMF ¶¶ 54, 90, 134.

Finally, a ruling that standards lose copyright protection upon incorporation by reference in a statute or government regulation would create serious tensions with other areas of law and other provisions of the Copyright Act. Under Defendant's argument, the Works were protected by copyright prior to their incorporation by reference, but those copyrights somehow evanesced upon their incorporation by reference. The putative disappearance of Plaintiffs' rights would create several substantial legal issues. First, if Defendant were correct that incorporation by reference of a standard destroys the author's copyright in that standard, the government that incorporated the standard would have taken Plaintiffs' property without just compensation.

*CCC*, 44 F.3d at 74 ("[A] rule that the adoption of such a reference by a state legislature or administrative body deprived the copyright owner of its property would raise very substantial problems under the Takings Clause of the Constitution."); *Practice Management*, 121 F.3d at 520 (citing *CCC* for same concern). Any governmental entity that has incorporated a standard by reference could face significant takings liability. This is not a result that any of the federal, state and local governmental entities that have relied for decades on incorporation by reference have either contemplated or welcomed. Under the doctrine of constitutional avoidance, "constitutionally doubtful constructions should be avoided where fairly possible," *Miller v. French*, 530 U.S. 327, 336 (2000) (quotation marks and citation omitted). The Court should not interpret the Copyright Act as creating the constitutional problems that are implicit in Defendant's argument. *See, e.g., Fox v. Washington,* 236 U.S. 273, 277 (1915) ("So far as statutes fairly may be construed in such a way as to avoid doubtful constitutional questions they should be so construed.").

Similarly, the destruction of Plaintiffs' copyrights based on the incorporation by reference of the Works by a governmental body would constitute an involuntary transfer or divestment of Plaintiffs' ownership — a result that finds no support in the portions of the Copyright Act dealing with transfer and divestment, as discussed above.

Moreover, applying the rule that "the law" is in the public domain to any materials that are merely referred to in statutes or judicial opinions would undermine authors' rights in a wide variety of copyrighted materials. For example, many judicial opinions contain citations to treatises, law review articles, and other copyrighted materials. However, this cannot mean that all such materials have lost their copyright. Indeed, courts frequently include quotations of all or part of a copyrighted work in the course of recognizing a plaintiff's copyright interest in that

work.  *E.g., Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) (reprinting in full the copyrighted lyrics of "Pretty Woman" by Roy Orbison and "Pretty Woman" by 2 Live Crew). No one would suggest that this destroys the copyright in the works being quoted.  Or, as the Second Circuit noted in *CCC*, many states have a mandatory school curriculum requiring that students read certain copyrighted books, meaning that "one cannot comply with the legal requirements without using the copyrighted works."  44 F.3d at 74.  Such references do not vitiate the copyright in those works.  *Id.*

　　For these reasons, it is unsurprising that federal regulatory agencies, the leading copyright treatises, and scholarly commentators have either disagreed with *Veeck* or urged that it be read narrowly so as not to apply to other cases of incorporation by reference.  *See, e.g.,* OFR Rule Announcement, 79 Fed. Reg. at 66268 ("[W]e noted that recent developments in Federal law, including the *Veeck* decision … have not eliminated the availability of copyright protection for privately developed codes and standards referenced in or incorporated into federal regulations. Therefore, we agreed with commenters who said that when the Federal government references copyrighted works, those works should not lose their copyright."); 2 William F. Patry, *Patry on Copyright* §4.84 (West 2015) (arguing that the *Veeck* majority opinion is "deeply flawed" and "should be disapproved of"); 1 *Nimmer on Copyright* § 5.12 (2015) (noting that the *Veeck* majority "took pains to emphasize the limits of its holding," in order "to allay the fear of amici standards-writing organizations"); Emily S. Bremer, *On the Cost of Private Standards in Public Law*, 63 U. Kan. L. Rev. 279, 293-94 (2015) (noting that *Veeck* was "controversial" and arguing that  "[s]tripping copyright protection for incorporated materials is a poor solution to the public access problem").  In keeping with this broad consensus, the Court should recognize that *Veeck*

is not persuasive authority for the issues raised by this case and reject Defendant's arguments

about incorporation by reference.

### c. Public Policy Strongly Favors Copyright Protection for Plaintiffs' Standards.

The existing standards development system undoubtedly serves the public interest.  In its

report on the NTTAA, the House Science Committee explained this as follows:

> Standards play a crucial role in all facets of daily life and in the
> ability of the nation to compete in the global marketplace. The
> United States, unlike the federalized system of most other
> countries, relies heavily on a decentralized, private sector based,
> voluntary consensus standards system ….  This unique consensus-
> based voluntary system has served us well for over a century and
> has contributed significantly to United States competitiveness,
> health, public welfare, and safety.

H.R. Rep. No. 104-390, 104th Cong., 1st Sess., pt. VII, § 12, at 23-24 (1995).  As explained

above, this system of privately developed standards has evolved for over a century, and has been

built on the longstanding understanding that standards development organizations can assert

copyright in their standards and can fund their continued operations through the sale of those

copyrighted standards.  To dramatically upend that understanding by holding that a standards

development organization may not assert copyright would cause grave damage not only to the

standards development organizations themselves but also to the wide array of public and private

actors that rely on these standards.

Defendant admits that standards development organizations are essential to the public

interest, explaining in a video on its website that NFPA standards, for example, "protect the lives

of our volunteer fire fighters" and "protect the lives of our children," and "[i]t's important that

organizations like the National Fire Protection Association continue to survive."  SUMF ¶ 165.

But the undisputed evidence in this case shows that Plaintiffs depend on their copyrights to

conduct their operations and to continue to develop and update standards that protect public

safety and promote efficiency.  For example, the unrebutted expert economic opinion of John Jarosz concluded that "Plaintiffs require substantial resources to continue their standards development efforts.  Revenue generated from the sale of copyrighted standards and downstream products and services based on these copyrighted standards are a key contributor to the resources needed to carry out these functions."  SUMF ¶ 252.  Jarosz further concluded that the effect of a loss of copyright protection "will be a likely reduction in the number, quality, and acceptability of critical standards and a likely increase in costs for governments, and therefore, taxpayers.  This will cause harm to governments, the public, and industry actors that rely on the creation of these standards as well as to the Plaintiffs."  SUMF ¶ 271.

Jarosz's conclusions are supported by the undisputed record evidence, which shows that: (i) Plaintiffs' standards development processes are extremely resource-intensive, SUMF ¶¶ 43-44, 104-05, 152; (ii) Plaintiffs rely heavily on their copyrights to obtain needed revenue, SUMF ¶¶ 45-49, 106-08, 153; and (iii) government and other entities rely on Plaintiffs' standard development activities and could not replace those activities if Plaintiffs became unable to continue them.  SUMF ¶¶ 95-98.

Defendant has been unable to identify any plausible way that standards development could persist if unsupported by revenue obtained from sales of copyrighted standards.  SUMF ¶ 255.  Indeed, it is unsurprising that Mr. Malamud has privately admitted to his supporters that he avoids discussing how his conduct will affect the business model of standards development organizations, because he "can't win that discussion" and he instead must take "an absolutist position," which is "the only way we can possibly win this fight."  SUMF ¶ 256.

There is no reason for this Court to take the "absolutist position" that Defendant needs in order to prevail here.  Public policy is an important consideration in copyright law, and the need

to provide a continued incentive for standards development organizations to produce standards in the public interest is a powerful reason to recognize the copyright interests at stake in this case.

## 2.    The "Merger Doctrine" Does Not Excuse Defendant's Conduct.

Defendant also asserts "merger" as an affirmative defense.  The merger doctrine provides that "courts will not protect a copyrighted work from infringement if the idea underlying the copyrighted work can be expressed in only one way."  *Satava v. Lowry*, 323 F.3d 805, 812 n.5 (9th Cir. 2003); *Coquico, Inc. v. Rodriguez-Miranda*, 562 F.3d 62, 68 (1st Cir. 2009).  In other words, an author may not obtain copyright protection in a work if the author has merely identified the only way of expressing a particular idea, because that could interfere with the ability of future authors to create works involving the same idea.  The work is copyrightable, however, "so long as alternate expressions are available."  *Atari Games Corp. v. Nintendo of Am., Inc.*, 975 F.2d 832, 840 (Fed. Cir. 1992).

The relevant time period at which to assess whether the merger doctrine precludes copyright protection is at the time of original authorship.  *Apple Computer, Inc. v. Formula Int'l Inc.*, 725 F. 2d 521, 524 (9th Cir. 1984) (Copyright Act intended "to protect all works of authorship from the moment of their fixation" and "recognizes copyright protection for a work of authorship regardless of the uses to which it may be put.") (internal citations omitted); *see also Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1361 (Fed. Cir. 2014) ("copyrightability and the scope of protectable activity are to be evaluated at the time of creation, not at the time of infringement.").  Hence, if a work is originally copyrightable, the merger doctrine does not strip the work of copyright protection merely because of the work's widespread adoption as an industry standard.  *Oracle Am., Inc.* at 1372 ("[T]o the extent Google suggests that it was entitled to copy the Java API packages because they had become the effective industry standard, we are unpersuaded.").

Here, the merger doctrine does not apply because Plaintiffs' Works were original works of expression when they were created, and there is no question that other authors could create alternative expressions of electrical safety standards.  For example, NFPA's 2014 NEC is a 900-page standard containing comprehensive guidance for the safe installation of electrical equipment.  SUMF ¶¶ 93-94.  There are a myriad of other ways in which one could author an electrical safety standard, and NFPA's original authorship in no way interferes with the production of such competing standards.  In fact, there are standards written by other organizations that compete with Plaintiffs' Works, such as the International Energy Conservation Code developed by the International Code Council, which addresses similar building efficiency concerns as ASHRAE 90.1.  SUMF ¶¶ 38, 133.

Without citing any authority on point, the *Veeck* majority simply concluded that the merger doctrine applied because it was "obvious that for copyright purposes, laws are 'facts.'" *Id.*  *Veeck*'s conclusion was far from "obvious."  The *Veeck* majority gave no attention to the fact that at the time the plaintiff created the model codes — *i.e.*, at the time that counts for the merger doctrine — those codes were *not* the only way to express the underlying ideas.  The *Veeck* majority's analysis of merger is either *ipse dixit* or a recycling of its conclusions about the effect of incorporation by reference.  In any case, the majority's reasoning is not persuasive, and this Court should not follow it.  *See Veeck*, 293 F.3d at 807 (Higginbotham, J., dissenting) (explaining that majority opinion's discussion of the merger doctrine was "tautological" and "a restatement of the conclusion that adopting the codes invalidated the copyright, not an independent reason why that is so").

### 3. Defendant's Wholesale Copying of Plaintiffs' Standards and Making Them Available to the Public Is Not Fair Use.

Defendant has also raised the fair use defense to copyright infringement. In considering whether a use is a fair use, the Court should consider the four statutory factors set forth in 17 U.S.C. §107. The task "calls for case-by-case analysis," and the four statutory factors are "no[t] … to be treated in isolation, one from another. All are to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 577-78. In this case, the factors weigh strongly against a finding of fair use.

### a. The Purpose and Character of the Use

The first factor is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. §107. Here, Defendant has admitted that the character of its use of Plaintiffs' standards was to make "exact copies" of them. SUMF ¶ 198. Defendant did this in two ways, by scanning the works directly into PDF format and by paying to have them converted into an HTML format. SUMF ¶¶ 182-85, 188-201. Defendant then posted Plaintiffs' works on the internet where any member of the public can freely download them, print them, and make additional copies of them. SUMF ¶ 209. And Defendant's avowed purpose in doing so is to enable members of the public to obtain copies of the standards without buying or licensing them from Plaintiffs. SUMF ¶ 221-24.

When a defendant's use involves wholesale copying and making available copyrighted works to the public, in direct competition with the copyright holder's attempts to sell or license the works, this weighs overwhelmingly against a finding of fair use. *See, e.g., Wall Data Inc. v. Los Angeles Cty. Sheriff's Dept.*, 447 F.3d 769, 778 (9th Cir. 2006) ("In cases where 'use is for the same intrinsic purpose as [the copyright holder's] ... such use seriously weakens a claimed

fair use.'") (brackets and ellipsis in original, quoting *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1117 (9th Cir. 2000)).

Defendant has argued that its use is "transformative" because it converted some of Plaintiffs' standards into HTML format.  But Defendant admitted that its rekeying of the standards was "simply recover[ing] text," and that it would only "start adding true value" when it rekeyed mathematical formulas, added section ID headers, and converting the graphics to vector format.  SUMF ¶ 196.  Courts have uniformly rejected similar arguments and have held that the mere conversion of a work from one format to another does not support a finding of fair use. *See, e.g., Seltzer v. Green Day, Inc.,* 725 F.3d 1170, 1177 (9th Cir. 2013) ("In the typical 'non-transformative' case, the use is one which makes no alteration to the *expressive content or message* of the original work.") (emphasis in original); *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir. 1998) (concluding retransmission of radio broadcast over telephone lines is not transformative); *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000) (finding reproduction of audio CD into computer MP3 format does not transform the work).  And, to the extent that Defendant argues that its conduct is fair use because it is providing the public with access to "the law," that is simply a restatement of its meritless arguments that Plaintiffs' standards lost copyright protection when they were incorporated by reference.

To be sure, courts have occasionally recognized the fair-use defense when a defendant made exact copies of a work, but only if the defendant's use created a new product or service "without providing the public with a substantial substitute for matter protected by the Plaintiffs' copyrights in the original works."  *Authors Guild*, 804 F.3d at 207.  For example, the Second Circuit's recent decision in *Authors Guild* held that Google's digital copying of copyrighted

books, to enable the public to search and view snippets of the books, was a fair use.  But the court recognized the lengths to which Google went to ensure that the public could not download the books in their entirety, and noted that "[i]f Plaintiffs' claim were based on Google's converting their books into a digitized form and making that digitized version accessible to the public, their claim would be strong."  *Id.* at 225-26; *accord Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 97 (2d Cir. 2014) (upholding fair-use defense for book-search service after noting that "in providing this service, the [defendant] does not add into circulation any new, human-readable copies of any books").  Here, by contrast, Defendant did exactly what the Second Circuit said would make a plaintiff's claim "strong" — it created digitized copies of Plaintiffs' works, which Plaintiffs themselves also provide, and made its copies available to the public without any limitations.

The statute also directs the Court to consider whether the use is of a commercial nature, which weighs against a finding of fair use.  *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985).  This inquiry asks "whether the user stands to profit from exploitation of the copyrighted material without paying the customary price."  *Id.*  Here, there is ample evidence that Defendant's copying of Plaintiffs' standards enabled it to boost its fundraising efforts.  Mr. Malamud wrote in an email to his wife, whom he had hired to assist him in converting Plaintiffs' standards into HTML format, that she should "make sure we've done any NFPA docs … .  Also, we can do any ASTM or ASHRAE docs as well as those are helpful to me in my suit. … Definitely keep plowing away on that stuff … that's the kind of output that makes it much easier for me to try and raise money."  SUMF ¶ 230.  In another email, Mr. Malamud explained that he could continue paying Ms. Malamud as long as she continued making copies of Plaintiffs' standards, because "what the funders are going to be looking at is

our walking through the standards."  SUMF ¶ 231.  Defendant's President and only employee,

Carl Malamud, has received hundreds of thousands of dollars in salary for his posting of

Plaintiffs' standards, and paid hundreds of thousands of dollars more to his wife for assisting

Defendant in converting the standards.  SUMF ¶¶ 233-34.  In an email, he described his work

purchasing Plaintiffs' standards to post them on the internet as "what a way to make a living."

SUMF ¶ 232.  While Defendant is nominally a nonprofit organization, it clearly derives

significant financial benefit from its infringing activities, as has its founder and his wife,

weighing against a finding of fair use.

### b.        The Nature of the Copyrighted Work

The second factor is "the nature of the copyrighted work."  17 U.S.C. § 107.  This factor

asks whether the work at issue is "close[] to the core of intended copyright protection."

*Campbell*, 510 U.S. at 586.  While some courts have suggested that a finding of fair use is more

warranted when the work is fictional than factual, the Second Circuit recently disapproved that

suggestion, holding that "authors of factual works, like authors of fiction, should be entitled to

copyright protection of their protected expression."  *Authors Guild*, 804 F.3d at 220.  Here,

because Plaintiffs' works are original and complex works that take a high degree of resources to

produce, and because providing an incentive for Plaintiffs to develop and publish these works is

manifestly in the public interest, these works are at the core of copyright law, and so this factor

weighs in Plaintiffs' favor.  *See Harper & Row*, 471 U.S. at 546 ("It is evident that the monopoly

granted by copyright actively served its intended purpose of inducing the creation of new

material of potential historical value.").

### c.        The Amount and Substantiality of the Work Taken

The third factor is "the amount and substantiality of the work taken."  17 U.S.C. § 107.

This factor clearly weighs in Plaintiffs' favor, because Defendant admittedly copied and made

available to the public the entirety of Plaintiffs' copyrighted works.  "While wholesale copying

does not preclude fair use *per se*, copying an entire work militates against a finding of fair use."

*Worldwide Church of God*, 227 F.3d at 1118 (quotation marks and citation omitted).  And "the

fact that a substantial portion of the infringing work was copied verbatim is evidence of the

qualitative value of the copied material, both to the originator and to the plagiarist who seeks to

profit from marketing someone else's copyrighted expression."  *Harper & Row*, 471 U.S. at 565.

Here, of course, Defendant's infringing conduct consisted of verbatim copying of the entirety of

Plaintiffs' works.

In discussing this factor in *Authors Guild*, the Second Circuit upheld the "snippet view"

feature of Google books, but only after concluding that a user of Google's services "cannot

succeed, even after long extended effort … , in revealing through a snippet search what could

usefully serve as a competing substitute for the original."  *Authors Guild*, 804 F.3d at 222; *see

also id.* at 223 (noting that the third factor would have weighed against Google if the snippet

view feature enabled users to view "a coherent block amounting to 16% of a book").  Thus, in a

case such as the present one, where Defendant's conduct enables users to access, read, and make

copies of Plaintiffs' works in their entirety, the third fair use factor favors Plaintiffs.

#### d.      The Effect of the Use Upon the Potential Market

The fourth factor is the effect of the defendant's use on the potential market for or value

of the copyrighted work.  17 U.S.C. § 107.  This factor "is of great importance in making a fair

use assessment."  *Authors Guild*, 804 F.3d at 223.  Indeed, "[e]ven if the *purpose* of the copying

is for a valuably transformative purpose, such copying might nonetheless harm the value of the

copyrighted original if done in a manner that results in widespread revelation of sufficiently

significant portions of the original as to make available a significantly competing substitute."  *Id.*

(emphasis in original).  A copyright owner has no obligation to show any actual loss of revenues;

rather, "the court's role with respect to the fourth factor is to 'look at the impact on *potential* licensing revenues for traditional, reasonable, or likely to be developed markets.'" *North Jersey Media Grp. Inc. v. Pirro*, 74 F. Supp. 3d 605, 623 n. 20 (S.D.N.Y. 2015) (quoting *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614 (2d Cir. 2006)) (emphasis in original).

Because Defendant's use of Plaintiffs' works involves making entire copies of Plaintiffs' works available to the public on the internet for free, this factor clearly favors Plaintiffs. According to Defendant, Defendant's supposed copies of Plaintiffs' standards downloaded from the internet are extremely close substitutes for authorized copies of Plaintiffs' standards purchased from Plaintiffs. *See, e.g.,* SUMF ¶ 213 (citing Mr. Malamud's testimony characterizing PDFs on Defendant's website as a "scan of the exact standard" and stating that he expects viewers to believe that the text in the HTML versions is the same as the text in Plaintiff's standards). Thus, the availability of copies on the websites where Defendant posted them poses a clear potential negative effect on the market for the copyrighted works themselves. *See, e.g., BMG Music v. Gonzalez*, 430 F.3d 888, 890 (7th Cir. 2005) ("Music downloaded for free from the Internet is a close substitute for purchased music; many people are bound to keep the downloaded files without buying originals.").

Defendant admitted that it attempted to drive traffic to its website, including by engaging in "search engine optimization" in connection with its posting of Plaintiffs' standards to appear higher in Google search results to attract visitors. SUMF ¶ 226. Defendant also informed a potential funder that one of its goals was to "have more users" than the "SDO-provided websites," and further emphasized that Defendant would "like to be No. 1 in the marketplace." SUMF ¶ 225.

Defendant has argued that Plaintiffs might benefit from its infringing conduct because it supposedly raises public awareness of Plaintiffs' works, thereby creating a "tremendous market opportunity." SUMF ¶ 238. Defendant has offered no evidence for this theory aside from Mr. Malamud's own self-serving assertions. Plaintiff's expert economist John Jarosz analyzed this theory and concluded that it was entirely unsupported by the evidence. SUMF ¶ 238 (citing Jarosz Expert Rep. ¶¶ 139-41). On the contrary, Mr. Jarosz concluded that "Plaintiffs are likely to stand to lose a majority of their revenue and gross profits from the loss of copyright protection here." SUMF ¶ 156 (citing Jarosz Expert Rep. ¶ 138). And even if there were some evidence for Defendant's "market opportunity" theory, Defendant is not entitled to unilaterally infringe Plaintiffs' copyrights based on his views about what is in Plaintiffs' economic interest. "Copyright law lets authors make their own decisions about how best to promote their works; copiers … cannot ask courts (and juries) to second-guess the market and call wholesale copying 'fair use' if they think that authors err in understanding their own economic interests or that Congress erred in granting authors the rights in the copyright statute." *BMG*, 430 F.3d at 891. Clearly, Defendant's infringement undercuts the potential market for the sale of Plaintiffs' works and the Court should reject the fair use defense.

**4.      Defendant's Other Affirmative Defenses are Meritless**

Defendant's Answer and Counterclaim also asserts the affirmative defenses of unclean hands, copyright and trademark misuse, and waiver and estoppel. But Defendant has proffered no basis for asserting these defenses and even failed to provide evidence in support of the misuse and waiver defenses in response to Plaintiffs' contention interrogatories concerning these defenses. SUMF ¶ 237. This alone demonstrates that Defendant has forfeited these throw-away defenses. *See, e.g.*, *Zenith Elecs Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 420 (7th Cir. 2005) (affirming exclusion of damages theory based on party's "fail[ure] to respond to [the]

contentions interrogatory with a description of its damages theory and the proof to be

employed"). In addition, each of the three defenses is a particularly ill fit to the facts in this case.

**Unclean Hands:** This defense applies where a plaintiff commits a wrongful act that has

a strong factual nexus to the defendant's infringing conduct. *Nat'l Cable Television Ass'n, Inc.*

*v. Broad. Music, Inc.*, 772 F. Supp. 614, 652 (D.D.C. 1991); *Mitchell Bros. Film Grp. v. Cinema*

*Adult Theater*, 604 F.2d 852, 863 (5th Cir. 1979). Examples include when "plaintiff misused the

process of the courts by falsifying a court order, by falsifying evidence, or by misrepresenting

the scope of his copyright to the court and opposing party." 4 *Nimmer on Copyright*, § 13.09[B]

(2015). There is absolutely no evidence that such conduct occurred here.

**Misuse:** This defense applies where a plaintiff uses its copyright "to secure an exclusive

right or limited monopoly not granted by the Copyright office and which is contrary to public

policy to grant." *AAMC v. Princeton Review, Inc.*, 332 F. Supp. 2d 11, 17-19 (D.D.C. 2004).

Misuse typically arises due to some form of anticompetitive conduct, and "failure to show [a]

violation of the antitrust laws makes it more difficult for the court to find copyright misuse." *Id.*

at 19 (quotation marks omitted); *see also Nat'l Cable Television*, 772 F. Supp. at 652.

Defendant's failure to offer one iota of evidence of anticompetitive conduct dooms this defense.

**Waiver and Estoppel:** These defenses apply if a plaintiff expressly waives its rights or

intentionally acts in a manner that leads defendant to believe its conduct is acceptable or will not

be acted upon by plaintiff. *Tech 7 Sys., Inc. v. Vacation Acquisition, LLC*, 594 F. Supp. 2d 76,

85-86 (D.D.C. 2009); *Slate v. Am. Broad. Cos.*, 941 F. Supp. 2d 27, 40-41 (D.D.C. 2013). No

evidence of this exists here. In fact, each Plaintiff affixed its copyright notices on its standards to

indicate copyright protection, SUMF ¶ 40, 102, 147, and Mr. Malamud himself publicly stated

that the standards he is posting are "heavily copyrighted" and acknowledged that "the standards

bodies were very aggressive in claiming copyright on those documents." SUMF ¶ 171.

Defendant cannot credibly claim that Plaintiffs led him to believe his actions were acceptable to them.

### III.     PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR CLAIMS OF TRADEMARK INFRINGEMENT AND FALSE DESIGNATION OF ORIGIN.

In addition to its willful infringement of Plaintiffs' copyrights, Defendant also infringed Plaintiffs' trademarks.  Defendant started with genuine versions of Plaintiffs' standards and then added content and/or retyped the content to create new documents that Plaintiffs did not authorize and over which Plaintiffs did not exercise quality control.  SUMF ¶¶ 187-95.  In fact, Defendant made the decision to sacrifice the quality of the copies its agents made based on cost considerations.  SUMF ¶ 191.  Defendant then brazenly placed Plaintiffs' trademarks back on those documents and identified the documents as authentic versions of Plaintiffs' standards. SUMF ¶¶ 210-13.  These actions constitute trademark infringement and false designation of origin.

To prevail on their claim of trademark infringement, Plaintiffs must show (1) that they own valid trademarks; (2) their trademarks are distinctive or have acquired secondary meaning; and (3) that there is a substantial likelihood of confusion between the Plaintiffs' marks and the marks used by Defendant.  *AARP v. Sycle*, 991 F. Supp. 2d 224, 229 (D.D.C. 2013).  The standard for analyzing Plaintiffs' unfair competition and false designation of origin and common law trademark infringement claims is the same as that for the trademark infringement claim.  *Id.*

### A.     Plaintiffs Own Valid Trademarks that are Distinctive or Have Acquired Secondary Meaning.

Plaintiffs own valid trademarks in the trademarks they asserted in this action.  Plaintiffs have U.S. federal trademark registrations for each of the asserted marks.  SUMF ¶¶ 77-79, 123-26, 148-51.  Plaintiffs' federal registrations for the majority of the asserted marks are

incontestable and so constitute conclusive evidence of the validity of the marks (i.e., that the mark is either inherently distinctive or has acquired secondary meaning) and of the registrant's ownership of the mark.  15 U.S.C. § 1115(b); *Park 'N Fly. Inc v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 196 (1985).  The marks that are not incontestable are presumed to be inherently distinctive because they were registered without proof of secondary meaning.  *Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113-14 (9th Cir. 2010).

**B.     Defendant's Use of Plaintiffs' Trademarks Creates a Likelihood of Confusion.**

To determine whether there is a likelihood of confusion, the relevant question is whether "an appreciable number of ordinarily prudent customers are likely to be misled, or simply confused, as to the source" of the standards Defendant posted.  *See Globalaw Ltd. v. Carmon & Carmon Law Office*, 452 F. Supp. 2d 1, 47 (D.D.C. 2006) (quotation marks and citations omitted).  If use of the Plaintiffs' registered marks is likely to confuse consumers into believing that the standards Defendant posted are somehow associated with Plaintiffs or to cause consumers to mistake the standards Defendant posted for authentic standards published by Plaintiffs, the requirements for finding a likelihood of confusion are satisfied.  *See Am. Ass'n for the Advancement of Science v. Hearst Corp.*, 498 F. Supp. 244, 258 (D.D.C. 1980).

The factors the Court may consider in determining whether confusion is likely include: the similarity of the marks; the proximity of the parties' products; the strength of Plaintiffs' marks; the intent of Defendant in adopting its mark; and evidence of actual confusion. *Globalaw*, 425 F. Supp. 2d at 48.  Where the defendant uses an identical mark in connection with a similar product, it is not necessary to consider all factors to determine that confusion is inevitable.  *See, e.g., Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.*, 303 F.3d 1242, 1248-49 (11th Cir. 2002) (holding that use of identical mark on similar product was

sufficient to demonstrate a likelihood of confusion); *Wynn Oil Co. v. Thomas*, 839 F.2d 1183,

1190-91 (6th Cir. 1988) ("[S]ince both marks use absolutely identical language to sell a nearly

identical service, the likelihood of confusion must be considered great.").

### 1. Members of the Public Are Likely to Believe that the Materials Defendant Posted are Genuine Versions of Plaintiffs' Standards.

Members of the public are likely to be confused because Defendant uses word marks and

logos that are identical to Plaintiffs' word marks and logos in connection with standards that

Defendant purports to be exact copies of Plaintiffs' standards.  SUMF ¶¶ 210-13.  Specifically,

Defendant used Plaintiffs' marks on the copies of Plaintiffs' standards that Defendant created

and posted on its website and on the Internet Archive website.  *Id.*  Additionally, Defendant used

certain of Plaintiffs' marks within tables it created on its own website and within fields it created

on the Internet Archive website when identifying the authors and names of the standards.  SUMF

¶ 211.

Defendant's goal is to make the logos used on the standards and the contents of the

standards as close as possible to the actual standards published by Plaintiffs.  SUMF ¶ 212.

Defendant intends for people who view each standard posted on its website and/or the Internet

Archive to think it is "a scan of the exact standard" or an HTML version of the exact standard

published by Plaintiffs.  SUMF ¶ 213.  Defendant did everything that it could to make its copies

of Plaintiffs' standards appear as though they were genuine copies of Plaintiffs' standards,

including placing Plaintiffs' logos on each of the copies.  SUMF ¶ 210.  Defendant never

disclosed that the materials it posted were modified or rekeyed versions of Plaintiffs' standards

or that Plaintiffs were not associated with the creation or publication of the materials.  SUMF ¶¶

204-06, 211.  When there is intent to confuse consumers, confusion can be presumed.  *See, e.g.,*

*Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 466 (4th Cir. 1996) ("[W]e presume that the

44

person who sets out to infringe another's trademark has more brains than scruples, and will likely succeed."). As a result, members of the public are likely to believe mistakenly that the documents posted on Defendant's website are authentic versions of Plaintiffs' standards, or at a minimum, are associated with Plaintiffs. *See Int'l Cosmetics Exch.*, 303 F.3d at 1248-49.

## 2. The Materials Defendant Posted are Not Genuine Versions of Plaintiffs' Standards.

The materials Defendant posted are not genuine versions of Plaintiffs' standards for at least two reasons. First, the materials were not actually created by Plaintiffs, but instead were created by Defendant and its agents without a keen attention to detail. SUMF ¶¶ 191-201. Second, Defendant's materials did not go through Plaintiffs' quality control procedures. SUMF ¶¶ 214-20.

### a. The Materials Posted by Defendant Are Not Exact Copies of Plaintiffs' Works.

Although Defendant instructed its agents to reproduce exact copies of Plaintiffs' standards, Defendant failed in its efforts to reproduce Plaintiffs' standards exactly. SUMF ¶¶ 189-201, 214-16. With respect to the PDF materials, which Defendant contends are simply scanned versions of Plaintiffs' standards, Defendant added an introductory page to the beginning of each PDF and embedded text that was created by optical character recognition within each PDF. SUMF ¶¶ 183-84. The cover page does not appear in Plaintiffs' standards and Plaintiffs do not endorse the information included on the cover page. Plaintiffs also do not endorse the embedded text in the PDFs, which is likely to contain errors. SUMF ¶ 192 (citing Defendant's expert). Additionally, Defendant admits that it made mistakes in connection with the scanning of standards that it posted on its website, including skipping pages and scanning pages upside down. SUMF ¶ 214.

With respect to the HTML materials Defendant published, Defendant instructed HTC Global to "double-key" the standards, which means that two operators independently type the text and then compare the two versions, instead of using a more accurate, but more expensive, "triple-key" methodology in which three independent operators would have typed the text. SUMF ¶190.  By taking the cheaper route, Defendant knew that there could be up to 49 errors on a typical two and a half page document.  SUMF ¶ 191.[4]  Additionally, the rekeying was done by non-native English speakers in India with no technical expertise.  SUMF ¶ 194.  Similarly, Defendant hired Mr. Malamud's wife's company, Point.B Studio, which used unpaid children from a "mentoring program" whose target audience was 7-14 years old to convert formulas to MathML and drawings to SVG format for use on materials posted on Defendant's website. SUMF ¶¶ 199-200.

Not surprisingly, like the PDF versions, the HTML versions of Plaintiffs' standards that were posted on Defendant's website contain errors.  SUMF ¶ 215.  Mr. Malamud has no explanation for these mistakes and admits that they are not acceptable.  SUMF ¶ 216.  Plaintiffs' standards are technical documents that include important figures, detailed drawings, and precise measurements.  These standards relate to complex scientific and technical processes and procedures that promote public health and safety and ensure the quality and consistency of goods and services.  Even minor mistakes in the reproduction of Plaintiffs' standards could lead to the production of inconsistent or dangerous goods or services.  Defendant's HTML version of the 2011 NEC, for example, contains a number of errors that distort the meaning of safety features of

---

[4] HTC Global testified that what it described as "double-keying" would actually involve extracting text obtained using optical character recognition ("OCR"), unless the image quality of the original document was poor, in which case two operators entered the text.  SUMF ¶ 192. Even Defendant's expert admits that using OCR to capture the text from PDF versions of Plaintiffs' standards would result in errors, particularly because they are technical documents that contain diagrams and tables.  *Id.*

the standard.  SUMF ¶ 219.  Malamud claims that if he were notified of any mistakes, he would

do a rigorous quality assurance check and correct any mistakes.  SUMF ¶ 217.  But even after

being notified of specific errors at his deposition, Defendant did not correct these mistakes and

continued to maintain versions of standards with "unacceptable mistakes" that bear Plaintiffs'

trademarks on his website and on the Internet Archive until the Court recently suggested that

Defendant should take down Plaintiffs' standards pending the resolution of this motion.  SUMF ¶

218.  In any event, it is not Plaintiffs' responsibility to perform quality control for Defendant's

infringing website.

> **b.      The Materials Defendant Posted Did Not Undergo Plaintiffs' Quality Control.**

One function of a trademark is to indicate to consumers that the product has been

delivered according to all quality control guidelines of the trademark owner.  *Shell Oil Co. v.*

*Commercial Petroleum, Inc.*, 928 F.2d 104, 107 (4th Cir. 1991).  "Distribution of a product that

does not meet the trademark holder's quality control standards may result in the devaluation of

the mark by tarnishing its image.  If so, the non-conforming product is deemed for Lanham Act

purposes not to be the genuine product of the holder, and its distribution constitutes trademark

infringement."  *Perkins Sch. for the Blind v. Maxi-Aids Inc.*, 274 F. Supp. 2d 319, 323 (E.D.N.Y.

2003).

Defendant's actions threaten the quality assurance function of Plaintiffs' trademarks.  The

materials Defendant posted on its website and the Internet Archive did not undergo Plaintiffs'

quality control measures.  *See* SUMF ¶¶ 188-201.  Plaintiffs' longstanding use of the marks in

connection with their high quality standards has resulted in the public's association of Plaintiffs'

marks with a certain quality.  SUMF ¶¶ 81, 127, 151.  Malamud admitted that he did not know

what quality control procedures Plaintiffs use when publishing their standards.  SUMF ¶ 220.

Without this knowledge, Defendant could not have complied with these quality control procedures before publishing Plaintiffs' standards on its website.  Indeed, as discussed above, the materials posted by Defendant contain a variety of errors that are inconsistent with Plaintiffs' quality control standards.  *See Adolph Coors Co. v. A. Genderson & Sons, Inc.*, 486 F. Supp. 131, 136 (D. Colo. 1980) (holding that defendant's distribution of beer in manner that did not comply with trademark owner's quality control standards constituted trademark infringement).[5]

In summary, Defendant used exact copies of Plaintiffs' marks on what it purports to be exact replicas of Plaintiffs' standards and intended for the public to believe that the materials it posted on its website were authentic versions of standards that were developed and published by Plaintiffs.  Defendant's use of Plaintiffs' marks and logos in connection with materials that are not genuine versions of Plaintiffs' standards that have not undergone Plaintiffs' quality control procedures, and in fact contain mistakes, constitutes trademark infringement and false designation of origin.  *See Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp.*, 34 U.S.P.Q.2d 1450, 1454 (N.D. Cal. 1995) (granting summary judgment for trademark infringement against defendant who placed modified products back into original packaging containing plaintiff's logos).

### C.    Defendant's Activities Satisfy the "Use in Commerce" Requirement.

In addition to the requirements enumerated above, the Lanham Act includes a jurisdictional requirement that there be a "use in commerce" for the conduct to be considered infringing.  15 U.S.C. § 1114(1) and 1125(a)(1).  The "use in commerce" requirement "reflects

---

[5] Even if the standards Defendant posted were exactly the same authentic standards of the Plaintiffs, Plaintiffs' inability to exercise quality control over the standards Defendant posted using Plaintiffs' trademarks means that the materials were not genuine products.  "The actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain."  *El Greco Leather Products Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986) (holding that shoes imported by defendant that were made by same factory as genuine shoes were not "genuine" because they had not undergone quality inspection by plaintiff).

Congress's intent to legislate to the limits of its authority under the Commerce Clause, rather than to limit the Lanham Act to profit-seeking uses of a trademark." *United We Stand America, Inc. v. United We Stand, America New York, Inc.*, 128 F.3d 86, 92 (2d Cir. 1997).  The Lanham Act defines "commerce" to include "all commerce which may lawfully be regulated by Congress."  15 U.S.C. § 1127.

Defendant's activities fit within the Lanham Act's "broad jurisdictional grant" and "sweeping reach."  *See Steele v. Bulova Watch Co.*, 344 U.S. 280, 286-87 (1952).  Defendant posted Plaintiffs' standards on the internet, such that they are transmitted nationwide and even worldwide and are accessed by people in the United States through interstate cables and telephone lines.  This alone is sufficient to satisfy the "use in commerce" requirement.  *See Intermatic Inc. v. Toeppen*, 947 F. Supp. 1227, 1239 (N.D. Ill. 1996); *Planned Parenthood Federation of Am., Inc. v. Bucci*, No. 97 Civ. 0629 (KMW), 1997 WL 133313, at *3 (S.D.N.Y. Mar. 24, 1997).  Defendant also solicits donations in connection with the materials he has posted that feature Plaintiffs' marks.  SUMF ¶¶ 227-31.   Additionally, Defendant's activities adversely affect Plaintiffs' abilities to sell their standards, which they sell on a nationwide basis.  SUMF ¶¶ 238-40.  Activities that affect a plaintiff's ability to sell its goods also satisfy the "use in commerce" requirement.  *Franchised Stores of N.Y., Inc. v. Winter*, 394 F.2d 664, 669 (2d Cir. 1968); *Planned Parenthood*, 1997 WL 133313, at *3.  Thus, Defendant's defense that Defendant did not use Plaintiffs' marks in commerce is meritless.

### D.      Defendant's Use of Plaintiffs' Marks is Not Fair Use.

Defendant's use of Plaintiffs' trademarks is not a fair use.  The nominative fair use defense[6] only applies when the defendant demonstrates: (1) use of the plaintiff's mark is necessary to describe the plaintiff's product; (2) only so much of the mark is used as is reasonably necessary to identify plaintiff's product; and (3) the defendant has not done anything to suggest sponsorship or endorsement by the plaintiff or to inaccurately describe the relationship between the parties' products.  *See, e.g., Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 154 (4th Cir. 2012); *Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 222 (3d Cir. 2005); *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 308 (9th Cir. 1992).  Defendant cannot demonstrate any of these elements.

Defendant did not need to refer to Plaintiffs or use their marks to describe Plaintiffs' Works.  There was no need for Defendant to describe Plaintiffs' Works at all to fulfill its mission of providing the public with access to the content of government regulations.  Defendant could have posted only the specific information from Plaintiffs' Works that is referenced in the relevant government regulation, without identifying Plaintiffs as the source of that information or using Plaintiffs' trademarks.  For example, in *Veeck*, the declaratory judgment plaintiff cut and pasted the text of the codes at issue and pasted them on his website without specifying that the codes were written by the defendant, but instead merely identifying them as the building codes of the relevant jurisdictions.  *Veeck*, 293 F.3d at 793.

---

[6] In addition to the nominative fair use defense, there is another type of fair use defense to trademark infringement that is called classic fair use.  The classic fair use defense applies only when a plaintiff's mark is used not as a trademark but instead in its classic descriptive sense.  *See Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1151 (9th Cir. 2002).  This defense does not apply here because Defendant used Plaintiffs' marks to identify the supposed sources of the materials it posted, which constitutes a trademark use.

Additionally, Defendant used more of Plaintiffs' marks than necessary to identify Plaintiffs' Works.  Some of Plaintiffs' trademarks are logos with design elements.  *See* SUMF ¶¶ 78-79, 124, 126, 149, 151.  Use of these logos unquestionably goes beyond what is what would be necessary to identify Plaintiffs' Works.  *See, e.g., Toyota Motor Sales U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1181 (9th Cir. 2010) (use of a stylized mark and logo was more use of the mark than was necessary); *David's Bridal, Inc. v House of Brides, Inc.*, No. 06 Civ. 5660 (SRC), 2010 WL 323306, at *7 (D.N.J. Jan. 20, 2010) (use of design elements was unnecessary).  Defendant does not justify its use of Plaintiffs' logos on the basis that the logos are necessary to identify Plaintiffs' products.  Instead, Defendant argues the entire document is incorporated by reference and Defendant is "not in a position to decide which portions of that document are or [are] not the law."  SUMF ¶ 213.  Of course, Defendant has no support for its suggestion that incorporation by reference of a document brings all trademarks used in that document into the public domain. Tellingly, Defendant has posted HTML versions of certain ASTM standards since Plaintiffs filed their Complaint that do not use the ASTM logo marks.  SUMF ¶ 236.

Finally, the materials Defendant posted inaccurately suggest that Plaintiffs endorse the material Defendant posted online and inaccurately convey the impression that the posted materials are genuine versions of Plaintiffs' Works.  First, Defendant's use of Plaintiffs' logos in itself suggests that Plaintiffs sponsored Defendant's website and/or actions.  *See, e.g., Toyota Motor Sales*, 610 F.3d at 1181 (use of plaintiffs' logo suggested sponsorship by plaintiff). Additionally, Defendant's failure to include any disclaimer clarifying that Defendant and the materials it created based on Plaintiffs' Works are not sponsored by or affiliated with Plaintiffs also weighs against a finding of nominative fair use.  *See Century 21*, 425 F.3d at 231.  Indeed, Defendant intended to make the materials it posted look identical to Plaintiffs' Works by

including Plaintiffs' trademarks on the versions of the Works it posted online.  SUMF ¶ 212.

This reflects an effort to inaccurately portray the materials as genuine versions of Plaintiffs'

Works.

  If Defendant is unable to prove any one of the three elements of nominative fair use, then

this defense is unavailable.  In this case, Defendant cannot meet its burden on all three elements,

and therefore, summary judgment is appropriate.

**IV.**  PLAINTIFFS ARE ENTITLED TO A PERMANENT INJUNCTION.

  Plaintiffs request the Court permanently enjoin Public.Resource.Org from all

unauthorized reproduction of, display of, or distribution of any standards published by Plaintiffs,

preparation of derivative works based upon any standards published by Plaintiffs, and all

unauthorized use of Plaintiffs' trademarks.  Under the Copyright Act and the Lanham Act, this

Court has the authority to grant this relief.  17 U.S.C. § 502(a); 15 U.S.C. § 1116.

  The Supreme Court has clarified that, when assessing entitlement to a permanent

injunction, a court must look to a plaintiff's evidence "(1) that it has suffered an irreparable

injury; (2) that remedies available at law, such as monetary damages, are inadequate to

compensate for that injury; (3) that, considering the balance of hardships between the plaintiff

and defendant, a remedy in equity is warranted; and (4) that the public interest would not be

disserved by a permanent injunction."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391

(2006).  Here, each of these four factors weighs in favor of injunctive relief.

  **A.**  **Plaintiffs Have Suffered Irreparable Injury.**

  Plaintiffs have suffered — and will continue to suffer — irreparable injury as a result of

Defendant's infringement.  Defendant's unauthorized use of Plaintiffs' copyrights and

trademarks threatens harm to (i) Plaintiffs' business models and standard-setting processes; (ii)

Plaintiffs' rights to exclude others from the use of their copyrighted Works; and (iii) Plaintiffs' reputations.

### 1.    Economic Harm and Ramifications to Plaintiffs' Business Model

Plaintiffs' expert economist, Mr. Jarosz, offers an unrebutted opinion on the direct economic harm Plaintiffs have suffered and are likely to continue to suffer.  Plaintiffs generate significant revenue from sales of copyrighted standards or membership dues closely tied to their copyrighted standards.  SUMF ¶¶ 46-47, 106-08, 154.  And basic economic principles — as well as quantitative tracking of a substantial decline in NFPA's sales of the NEC since PRO began posting the NEC online  — indicate that Defendant's practice of making the standards available for free supplants these sources of revenue.  SUMF ¶¶ 238-39.  There is a significant risk that if Defendant's conduct goes unchecked, it will act as a signal to the market that the creation of unauthorized versions of the standards is acceptable and Plaintiffs' harm will be compounded over time as more people use the versions of the standards on Defendant's site or similar sites instead of purchasing authentic versions of the standards from Plaintiffs.  SUMF ¶ 254.

A continuation of Defendant's infringement could force Plaintiffs to significantly alter their business models.  Each of the Plaintiffs relies primarily on users of its standards to fund the development of the standards, rather than charging upfront fees before developing a standard. Plaintiffs' "back-loaded" business models feature extremely low barriers to participating in the standards creation process because the process is funded through sale of the resulting standards. Plaintiffs could be forced to significantly alter their business models to a more "front-loaded" system that charges for participation in the standard-creation process, which would preclude the participation of certain stakeholders and/or limit the quantity and subject matter of the standards Plaintiffs develop.  SUMF ¶¶ 258-62.  Plaintiffs will also likely lose revenue associated with

other ancillary activities that rely on or incorporate the copyrighted works, including training

courses and commentary on standards.  SUMF ¶¶ 263-64.

### 2.    Harm to Plaintiffs' Right to Exclude

One of the fundamental tenets of intellectual property law is the right to exclude others

from using the protected work.  Thus, "[h]arm can be irreparable . . . where a copyright holder

seeks to prevent the use of his or her work and, absent an injunction, the defendant is likely to

continue infringing the copyright."  *Broad. Music, Inc. v. PAMDH Enters.*, No. 13 Civ. 2255

(KMW), 2014 WL 2781846, at *4 (S.D.N.Y. June 19, 2014).  Indeed, this Court has repeatedly

recognized that a threat of continuing infringement justifies granting an injunction.  *Breaking the*

*Chain Found. v. Capital Educ. Support, Inc.*, 589 F. Supp. 2d 25, 30 (D.D.C. 2008) (citing *Walt*

*Disney Co. v. Powell*, 897 F.2d 565, 567 (D.C. Cir. 1990)); *Hanley-Wood LLC v. Hanley Wood*

*LLC*, 783 F. Supp. 2d 147, 151 (D.D.C. 2011).  Put simply, Plaintiffs have a right to exclude

future unauthorized use of their standards and trademarks, and the threat of continued

unauthorized use by Defendant justifies a finding that the harm to Plaintiffs is "irreparable."

Here, Defendant has consistently intruded on Plaintiffs' right to exclude others from

using their copyrighted works and will continue to do so based on Defendant's belief that

incorporated standards should be made publicly available "without restriction."  SUMF ¶ 222.

During the course of this litigation, Defendant has continued to post versions of additional

standards owned by Plaintiffs that use Plaintiffs trademarks on its website, including as recently

as October 2015.  SUMF ¶ 235.  Absent an injunction, Defendant will continue to cause

irreparable injury by disseminating Plaintiffs' copyrighted works and protected trademarks in

violation of Plaintiffs' rights.  *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F.

Supp. 2d 1197, 1217 (C.D.Cal. 2007) (finding irreparable harm where that defendant continued

to induce infringement by unknown third-parties and plaintiff's copyrights were vulnerable to continued infringement).

### 3.      Harm to Plaintiffs' Reputations

Plaintiffs also have a right to protect their reputations.  Indeed, courts have recognized that using another's trademark will result in irreparable harm because it causes the trademark owner to lose control of the goodwill associated with its mark.  *See Breaking the Chain Found*., 589 F. Supp. 2d at 30; *Hanley-Wood LLC,* 783 F. Supp. 2d at 151.  Here, "Plaintiffs have spent decades establishing the goodwill associated with their names and logos, which the public associates with their high quality work."  SUMF ¶ 245 (citing Jarosz Rept. ¶ 151).  And each Plaintiff is a non-profit with a mission statement directed at advancing the science in its area of focus (e.g., fire protection, heating and air-conditioning efficiency).  SUMF ¶¶ 9, 86, 129.  That goodwill and those mission statements are severely compromised if Defendant is allowed to publish versions of Plaintiffs' standards that are incomplete, contain transcription errors, or otherwise alter the content of Plaintiffs' standards.  Yet, as discussed above, Defendant does not utilize the same strict quality-control procedures as Plaintiffs and, as a result, Defendant posted versions of Plaintiffs' standards that contain errors.  SUMF ¶¶ 214-20.  Defendant's actions pose a risk to Plaintiffs' reputations as creators of high-quality technical standards.

### B.      Remedies Available at Law Are Inadequate.

In determining whether remedies at law are adequate, a court may look to both the difficulty of quantifying damages and a defendant's ability to pay.  *See Fox Television Stations, Inc. v. FilmOn X LLC*, 966 F. Supp. 2d 30, 50 (D.D.C. 2013) (granting an injunction where "[t]he damages [p]laintiffs face are neither easily calculable, nor easily compensable" and "[defendant] is a startup company that would likely be unable to pay statutory copyright damages

of $150,000 per work if Plaintiffs prevail") (quotation marks omitted).  Here, both considerations

weigh in favor of injunction.

As Plaintiffs' expert, Mr. Jarosz, has explained, the continuation of Defendant's

infringing activities could force Plaintiffs to shift their business models or reduce operations, and

it is exceedingly difficult to quantify or forecast the economic impact of these types of changes.

SUMF ¶¶ 258-62.  Additionally, much of the harm sustained by Plaintiffs — including the harm

to Plaintiff's goodwill — is by nature very difficult to quantify.  SUMF ¶ 245 (citing to Jarosz

Rept. ¶ 151).  Defendant posted Plaintiffs' Works in a manner that they can be copied,

downloaded, or printed by any member of the public.  Plaintiffs' standards that Defendant posted

on the Internet Archive were downloaded anywhere from tens to tens of thousands of times.

SUMF ¶ 241.  Plaintiffs' standards were also "accessed" thousands of times from Defendant's

website between April 2013 and February 2014 alone.  SUMF ¶ 244.  Defendant admits that it

does not have any information about how the Works accessed from its website are being used.  It

is thus impossible to assess the full scope of the infringement by third parties or the resulting

damages.  SUMF ¶¶ 247-48.  Copies of 43 of Defendant's versions of ASTM's standards at

issue, with Defendant's cover page, were uploaded by "dharlanuctcom" onto the Scribd

platform.  SUMF ¶¶ 249.  Moreover, multiple resellers and merchants have downloaded copies

of NFPA's standards posted by Defendant and attempted to resell or redistribute them on the

Internet, including as recently as October.  When NFPA asked these resellers to cease and desist,

they cited Defendant's campaign of misinformation about the copyright status of these standards

as justification for their unauthorized sales.  SUMF ¶ 240.

Moreover, any effort to recover statutory damages or Plaintiffs' actual damages would be

futile.  This case involves 257 distinct copyrighted works, and statutory damages can range up to

$150,000 per work.  17 U.S.C § 504(c).  But Defendant's financial documents reveal that in 2014 Defendant generated less than $100,000 in operating income and had $248,000 in total net assets.  SUMF ¶¶ 272-73 (citing Jarosz Rept. at ¶ 155, Tabs 6-7).  Even if the harm to Plaintiffs was quantifiable or statutory damages were in play, Defendant simply does not have the money.  For these reasons, money damages are not a viable option.

### C.     The Balance of Hardships Favors Issuing an Injunction.

Plaintiffs' expert, Mr. Jarosz, evaluated the potential hardships to Plaintiffs and to Defendant at length.  His unrebutted expert conclusion is that the overwhelming weight of evidence demonstrates that Plaintiffs will suffer a variety of harms while Defendant will not.

In contrast to the financial and reputational harms Plaintiffs face that are discussed above, an injunction would cause no recognizable harm to Defendant.  As an initial matter, Defendant cannot claim an equitable interest in continuing its unlawful, infringing activity.  *See Fox Television Stations*, 966 F. Supp. 2d at 51; *Triad Sys. Corp. v. Southeastern Express Co*., 64 F.3d 1330, 1338 (9th Cir. 1995) (Defendant "cannot complain of the harm that will befall it when properly forced to desist from its infringing activities."); *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 612 (1st Cir. 1988) (harm from ceasing infringement "merits little equitable consideration").

Even if the costs to Defendant of ceasing infringement are considered, there is still no discernable harm to Defendant.  Plaintiffs' standards are only a portion of the content on one of at least 10 websites operated by Defendant.  SUMF ¶ 276 (citing Jarosz Rept. ¶ 157).  And Defendant has admitted that there will be no long-term financial impact if Defendant's infringement is halted.  Specifically, Mr. Malamud testified:

> Q:  If Public Resource was unable to continue to post the standards
> incorporated by reference on its website, what impact, if any,

would that have on Public Resource's financial ability to survive
long term?

A:  Probably none.…

Q:  Can you identify any harm that would be suffered by Public
Resource if it was precluded from posting standards incorporated
by reference on its website?

A:  THE WITNESS: We put a tremendous amount of effort in –
into this and one hates to have wasted that – that effort.

Q:  Anything else that you can think of?

A:  No.

SUMF ¶ 277.  But even the claimed "tremendous effort" will not be lost.  Defendant wanted its

day in court to test the law.  That day has now arrived, and Defendant is receiving the very

opportunity it sought when posting the standards.  Barring Defendant's continued infringement

after ruling in Plaintiffs' favor will pose no harm to Defendant.

### D.      The Public Interest Favors Issuing an Injunction.

The public interest is served by upholding copyrights and protecting the creative work of

copyright holders like Plaintiffs.  *Fox Television Stations*, 966 F. Supp. 2d at 51 (finding public

interest favored an injunction because "the public interest can only be served by upholding

copyright protections and correspondingly, preventing the misappropriation of skills, creative

energies, and resources which are invested in the protected work") (citing *Apple Computer, Inc.*

*v. Franklin Computer Corp*., 714 F.2d 1240, 1255 (3d Cir. 1983)).  This is especially true in the

current case where it is not disputed that Plaintiffs, and other SDOs, provide myriad public

benefits through the publication of their standards.

Mr. Malamud has readily admitted that the NFPA "does amazing work and saves lives,"

that he is a "big fan of ASTM . . . and we need to continue to have standards in that area," and

that "ASHRAE Standard 90.1 is an important standard."  SUMF ¶¶ 164-67.  It is also widely

accepted that without the work of private SDOs, government agencies would not have the resources or technical expertise to fulfill their regulatory duties as well as they do currently. SUMF ¶ 266 (citing Jarosz Rept. at ¶¶ 52-56; 164).  Unfortunately, as Mr. Jarosz has explained in detail, the outcome of this litigation could negatively impact Plaintiffs' ability to provide that public good and may force Plaintiffs to alter their business models.

As Mr. Malamud has conceded, "making standards more freely available . . . potentially poses a challenge to the current business models of the standards development of some standards development organizations."  SUMF ¶ 255.  The public would suffer if Plaintiffs altered their business models to a "front loaded" model.  Standards developed under a front-loaded model are more likely to feature only the viewpoints of industry interests with the resources to participate in the process and are less likely to reflect the views and concerns of the general public.  SUMF ¶¶ 259-60 (citing Jarosz Rept. ¶¶ 106-11).  Another unfortunate option would be for Plaintiffs to simply reduce their activities in response to the financial losses that would occur in the absence of an injunction.  Plaintiffs could shift focus to developing only the most popular standards or release updated versions of standards less frequently.  SUMF ¶¶ 261-62 (citing Jarosz Rept. ¶¶ 126-29).  Overall, any scenario where Defendant's conduct is not enjoined will result in less robust or sub-optimal standard development.

If not enjoined, Defendant's actions threaten the ability of government at the federal, state and local levels to capitalize on the technical expertise and resources of the standards developing organizations and their members.  Government and other entities rely on Plaintiffs'

standards and do not have the resources or the technical expertise to develop their own standards if Plaintiffs were unable to develop them.[7]  SUMF ¶ 266.

Defendant maintains that its website also serves the public interest by allowing greater access to Plaintiffs' standards.  But this rings hollow.  There is no evidence actions serve the public good in any meaningful way beyond the services already provided by Plaintiffs. Plaintiffs already provide free online access to the Works through their own websites.  SUMF ¶¶ 63-64, 100, 161.  Plaintiffs also price their standards quite moderately, base prices primarily on the cost of publication, and in many instances provide discounts for educational users.  SUMF ¶¶ 58-62, 99, 158-60.  Tellingly, there is no evidence that any person who was attempting to comply with a regulation that incorporates by reference any of Plaintiffs' standards was unable to access the standard.  SUMF ¶ 168.  And Defendant readily agreed to remove Plaintiffs' standards from its website in order to obtain a longer briefing schedule on this motion, and there has been no indication of any resulting harm to the public from Defendant's ceasing of its infringing activity. SUMF ¶¶ 274-75.

## CONCLUSION

For all the foregoing reasons, the Court should grant summary judgment in favor of Plaintiffs' on their copyright infringement and trademark infringement claims and should permanently enjoin Defendant from infringing Plaintiffs' copyrights and trademarks.

---

[7] Defendant has suggested that another alternative is for the government to fund standards development.  However, there is no evidence that any government entity is willing to do this. And a government funding option would be economically inefficient, increase the tax burden on the public, and place SDOs at the mercy of funding that could be reduced or eliminated in yearly agency budgeting.  SUMF ¶ 268 (citing Jarosz Expert Rep. at ¶¶ 123-25).  State agencies are also unlikely to be able to replicate the broad national base of expertise from a variety of perspectives that goes into Plaintiffs' standards.

Dated: November 19, 2015        Respectfully submitted,

/s/ J. Kevin Fee

Michael F. Clayton (D.C. Bar: 335307)
J. Kevin Fee (D.C. Bar: 494016)
Jordana S. Rubel (D.C. Bar: 988423)
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Telephone: 202.739.5215
Email: mclayton@morganlewis.com
       jkfee@morganlewis.com
       jrubel@morganlewis.com

*Counsel For American Society For Testing And Materials
d/b/a/ ASTM International*

/s/ Kelly M. Klaus

Anjan Choudhury (D.C. Bar: 497271)
Munger, Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA  90071
Tel: 213.683.9100
Email:  Anjan.Choudhury@mto.com

Kelly M. Klaus
Jonathan H. Blavin
Nathan M. Rehn
Munger, Tolles & Olson LLP
560 Mission St., 27th Floor
San Francisco, CA 94105
Tel:  415.512.4000
Email: Kelly.Klaus@mto.com
       Jonathan.Blavin@mto.com
       Thane.Rehn@mto.com

*Counsel for National Fire Protection Association, Inc.*

/s/ Joseph R. Wetzel

Jeffrey S. Bucholtz (D.C. Bar: 452385)
King & Spalding LLP
1700 Pennsylvania Avenue, NW, Ste. 200
Washington, DC 20006-4707

Tel: 202.737.0500
Email: jbucholtz@kslaw.com

Kenneth L. Steinthal
Joseph R. Wetzel
King & Spalding LLP
101 Second Street, Ste. 2300
San Francisco, CA 94105
Tel: 415.318.1211
Email: ksteinthal@kslaw.com
          jwetzel@kslaw.com

*Counsel for American Society of Heating, Refrigerating, and Air Conditioning Engineers*

62