**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN SOCIETY FOR TESTING AND MATERIALS d/b/a/ ASTM INTERNATIONAL; <br><br> NATIONAL FIRE PROTECTION ASSOCIATION, INC.; and <br><br> AMERICAN SOCIETY OF HEATING, REFRIGERATING, AND AIR CONDITIONING ENGINEERS, <br><br>        Plaintiffs/ <br>        Counter-Defendants, <br><br> v. <br><br> PUBLIC.RESOURCE.ORG, INC., <br><br>        Defendant/ <br>        Counter-Plaintiff. | Case No. 1:13-cv-01215-TSC |

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Pursuant to the Local Rule 7(h), Plaintiffs American Society for Testing and Materials ("ASTM"), National Fire Protection Association, Inc. ("NFPA") and American Society of Heating, Refrigerating, and Air Conditioning Engineers ("ASHRAE") (collectively, "Plaintiffs") hereby submit, in support of their Motion for Summary Judgment, a statement of material facts as to which there is no genuine issue to be tried:

## I.    PLAINTIFFS AND THEIR INTELLECTUAL PROPERTY

1.    The term "standards" refers to a variety of technical works, including works that contain product specifications, installation methods, methods for manufacturing or testing materials, recommended practices to ensure safety or efficiency, or other guidelines or best practices.  Declaration of James Thomas ("Thomas Decl.") ¶ 6.

2.      An organization that develops standards is a "standards development organization" or "SDO."  Thomas Decl. ¶ 7.

3.      In the United States, standards are typically developed by private organizations that have technical expertise in the relevant area.  Thomas Decl. ¶ 8.

4.      Standards are usually highly technical and specialized, and are written for audiences that have particular expertise in the relevant fields.  Thomas Decl. ¶ 9.

5.      Standards are used by industry actors as a form of self-regulation and as a source of best practices.  Thomas Decl. ¶ 10.

6.      Private sector standards development in the United States is generally coordinated and accredited by the American National Standards Institute ("ANSI").  ANSI is a nonprofit membership organization that facilitates the development of private sector standards and promotes their integrity by accrediting standards development organizations whose procedures comply with ANSI requirements.  Declaration of James T. Pauley (Pauley Decl.) ¶ 14.

7.      The ANSI requirements include that standards development committees must contain balanced membership, conduct open proceedings, provide public notice of standards development activity and opportunity for public comment, give due consideration and response to public comments, and provide an opportunity to appeal committee decisions.  Pauley Decl. ¶ 15.

8.      Standards that are developed in accordance with ANSI requirements are known as voluntary consensus standards.  Pauley Decl. ¶ 15.

A.   **AMERICAN SOCIETY FOR TESTING AND MATERIALS**

**Background**

9.      American Society for Testing and Materials ("ASTM") is a not-for-profit organization whose mission is to be recognized as the premier developer and provider of voluntary consensus standards, related technical information and services that promote public health and safety, support the protection and sustainability of the environment, and improve the overall quality of life; contribute to the reliability of materials, products, systems and services; and facilitate international, regional, and national commerce.  Thomas Decl. ¶¶ 3, 11.

10.      ASTM was founded in 1898 when a group of railroad experts and engineers got together to respond to technical issues that had been identified in the early days of the railroad industry.  The very first ASTM standard, standard A1, provided uniform specifications for carbon steel rails.  This made it possible for manufacturers from different parts of the country to produce uniform rails that could be used in a national railroad.  Thomas Decl. ¶ 4.

11.      ASTM's activities have expanded over the past one hundred years.  Thomas Decl. ¶ 5.

12.      ASTM develops voluntary consensus standards and is accredited by ANSI. Thomas Decl. ¶ 12.

13.      ASTM standards are used in a wide range of fields, including consumer products, iron and steel products, rubber, paints, plastics, textiles, medical services and devices, electronics, construction, energy, water, and petroleum products.  Thomas Decl. ¶ 5.

14.      ASTM standards are developed based on public demands, industry needs, and public safety concerns and advancements in technology.  They address a technical issue or problem identified by a group of people in the relevant sector that can be addressed with a

standard-based solution.  Thomas Decl. ¶ 13; Declaration of Steven Cramer ("Cramer Decl.) ¶ 19; Declaration of Randy Jennings ("Jennings Decl.) ¶ 16.

15.     ASTM's standards are used by scientists and engineers in their laboratories, by architects and designers in their plans, and by industry in their business contracts.  Thomas Decl. ¶ 14.

**ASTM Membership and Members' Assignment of Copyrights to ASTM**

16.     Membership in ASTM costs $75 per year for an individual member and $400 per year for an organizational member.  Each member receives one free volume of the Annual Book of ASTM Standards as well as other membership benefits.  Thomas Decl. ¶ 19.

17.     ASTM has kept its membership fees at $75 for over fifteen years to permit the widest possible participation in the standard development process, so as to prevent its standards from being biased toward the interests of only stakeholders who can afford to pay higher membership fees.  ASTM's membership fees have never exceeded $75.  Thomas Decl. ¶ 20.

18.     Since 2005, new members and members renewing their memberships online to ASTM agree to the following language: "I agree, by my participation in ASTM and enjoyment of the benefits of my annual membership, to have transferred and assigned any and all interest I possess or may possess, including copyright, in the development or creation of ASTM standards or ASTM IP to ASTM."  Declaration of Thomas O'Brien, Jr. ("O'Brien Decl.") ¶ 41 and Ex. 11; Cramer Decl. ¶¶ 12-13 and Exs. 1 and 2; Jennings Decl. ¶ 10 and Ex. 1.

19.     Some members renew their memberships using paper forms that contain substantially the same language.  O'Brien Decl. ¶ 42 and Ex. 12.

20.     The technical contact is the leader of a task group, which develops a draft of a new standard or a revision to an existing standard.  Thomas Decl. ¶¶ 25-26.

21.     Michael Collier was the technical contact for ASTM D87-07.  Michael Collier renewed his ASTM membership every year between 2007-2014 using ASTM's online membership renewal form.  O'Brien Decl. ¶¶ 43-44.

22.     John Chandler was the technical contact for ASTM D975-07 and D398-98.  John Chandler renewed his ASTM membership every year between every year between 2007-2014 using the online membership renewal form.  O'Brien Decl. ¶¶ 45-46.

23.     Jimmy King was the technical contact for the 1998 reapproval of ASTM D1217.  Jimmy King renewed his ASTM membership in 2007.  O'Brien Decl. ¶¶ 47-48.

24.     Randy Jennings participated in the development of ASTM D975-07.  Randy Jennings renewed his ASTM membership every year between 2007-2014 using the online membership renewal form and understands that he has assigned any and all copyrights in standards he helped to develop from 1990 to the present to ASTM.  Jennings Decl. ¶¶ 10, 15.

25.     Each individual who registers a "work item," which starts the process of developing a new standard or amending an existing standard, must agree to the following language: "I hereby grant and assign to ASTM International all and full intellectual property rights, including copyright, in the proposed draft standard/text and any contributions I make to ASTM International in connection with this proposal" and "By submitting this form, I acknowledge that all copyrights to this document, as a draft and an approved ASTM standard, are the sole and exclusive property of ASTM, in accordance with the Intellectual Property policies of the Society."  O'Brien Decl. ¶ 49 and Ex. 13.

26.     ASTM knows of no individual or other person other than ASTM who claims to own any copyright interest in any ASTM standard.  O'Brien Decl. ¶ 12; Jennings Decl. ¶¶ 7, 11, 12; Cramer Decl. ¶¶ 6, 14, 15.

27.     ASTM has not licensed Defendant's use of ASTM's standards.  O'Brien Decl. ¶ 14.

**ASTM's Standard Development Process**

28.     ASTM has over 140 technical committees made up of over 23,000 technical members representing producers, users, consumers, government, and academia from more than 150 countries.  Thomas Decl. ¶ 21.

29.     Each technical committee contains a balanced voting membership, including industry representatives, government representatives, consumers, academics, people with particular expertise in the subject matter, and others.  This broad base of stakeholders leads to the highest possible quality of standards that are relevant in the marketplace.  Thomas Decl. ¶ 22.

30.     Throughout the standards development process, ASTM and its committees make it clear that all participants' contributions to any particular standard will be merged into a unitary standard.  Thomas Decl. ¶ 23; Jennings Decl. ¶¶ 18-19; Cramer Decl. ¶¶ 23-24.

31.     ASTM's standard development process begins with an individual registering a "work item," which describes the idea for a new standard that will be published and owned by ASTM, or moving to draft a new standard at a subcommittee meeting.  Thomas Decl. ¶ 24.

32.     The chair of the relevant subcommittee then reviews the work item request and considers, among other things, whether there is a need for the proposed standard and whether there will be sufficient interest from a balanced group necessary to develop the standard.  If the chair approves the work item or if the subcommittee approves the motion for a new standard, a task group will develop a draft of the standard.  Thomas Decl. ¶ 25.

33.     The process of drafting the standard is an iterative process.  The task group works collaboratively, with many people sharing ideas, suggesting wording and providing comments that contribute to the draft standard.  Cramer Decl. ¶ 17; Jennings Decl. ¶ 13.

34.     The draft standard is then edited by an ASTM staff member, who also adds certain language and components that are required by the ASTM form and style guide.  Thomas Decl. ¶ 27; Jennings Decl. ¶ 20; Cramer ¶ 25.

35.     ASTM staff members drafted language that appears in each of the standards at issue in this litigation, including the four ASTM standards for which ASTM is moving for summary judgment.  O'Brien Decl. ¶¶ 15-39 and Exs. 5-9.

36.     The draft standard is then voted on by first the entire subcommittee, followed by the entire main committee and the complete Society, and reviewed by the Committee on Standards to ensure that all procedures were followed.  Thomas Decl. ¶ 28.

37.     Technical committees make decisions about the appropriate content of the standards, including the relevant measurements, values, descriptions, and other specifications, as well as the language with which to express these standards.  Thomas Decl. ¶ 29; Jennings Decl. ¶ 17; Cramer Decl. ¶ 21.

38.     There are other standard developing organizations that create standards that cover the same or similar subject matter as the standards developed by ASTM, including, for example, the International Organization for Standards, SAE International, the American Association of State Highway and Transportation Officials, and the American Wood Council.  The content and language of these entities' standards differs from the content of the corresponding ASTM standards.  Thomas Decl. ¶ 30; Cramer Decl. ¶ 22.

7

39.     At each level of balloting, voters can suggest edits or provide comments.  Each negative vote must be addressed to determine if it is persuasive.  At least 66.7% of the voting subcommittee members and 90% of the voting main committee members must approve all standard actions, with not less than 60% of the voting members returning ballots.  Thomas Decl. ¶ 31.

40.     The published versions of ASTM"s standards include copyright notices alerting the public (including the individuals who participated in the creation of the standards) to the fact that the copyrights are owned by ASTM.  O'Brien Decl. ¶ 11.

41.     ASTM has developed over 12,000 standards through this exhaustive process. Thomas Decl. ¶ 32.

42.     All ASTM standards are required to be reviewed on a 5 year schedule and either reapproved, revised or withdrawn in revision cycles that typically take 8-12 months to complete. Thomas Decl. ¶ 33.

**Funding the Costs of Developing ASTM Standards**

43.     ASTM incurs substantial costs for its standards development infrastructure and delivery platforms, including the resources it provides to encourage collaboration among members; expenses relating to technical committee meetings and balloting as the standards make their way through the development process; and editing, producing, distributing and promoting the completed standards.  Thomas Decl. ¶ 34.

44.     In 2014, ASTM spent more than $9 million to cover the cost of technical committee operations and $19 million for publication of copyrighted materials.  Thomas Decl. ¶ 35.

45.     ASTM incurs the costs of developing its standards with the understanding that the standards will be protected by copyrights that provide ASTM with the exclusive right to sell, reproduce, display and create derivative works based on the standards.  Thomas Decl. ¶ 36.

46.     ASTM depends on the revenue it generates from sales of its copyrighted materials to conduct its operations and requires that revenue to be in a position to continue to develop its standards in the manner in which it currently operates.  Thomas Decl. ¶ 37.

47.     ASTM generates over two-thirds of its revenue from the sale of copyrighted materials.  Thomas Decl. ¶ 38.

48.     ASTM has devoted substantial efforts to develop and promote the sale of products and services that are related or complementary to ASTM's standards.  ASTM does not generate substantial income from these goods and services, despite decades of efforts.  Thomas Decl. ¶ 39.

49.     ASTM generated a net loss of $3 million in 2014 for non-standards related products and services.  Thomas Decl. ¶ 40.

50.     ASTM does not consider the likelihood and extent to which a standard will generate revenues when deciding whether to develop or maintain a standard.  Thomas Decl. ¶ 42.

51.     Sales of a limited number of standards drive the bulk of ASTM's revenues. Because of their relevance to smaller market audiences, many other standards generate very limited revenues, which do not cover the costs of the development process.  The sales of certain standards effectively subsidize the creation and maintenance of the remaining standards. Thomas Decl. ¶ 43.

52.     ASTM's copyrighted materials give ASTM a competitive advantage in selling ancillary or complementary products and services.  ASTM can include copies of its standards as

part of a package it provides to customers in training or certification programs.  Thomas Decl. ¶ 41.

## The Incorporation by Reference of ASTM Standards Into Government Regulations

53.     On occasion, government agencies incorporate ASTM's standards by reference into regulations.  Approximately 10 percent of ASTM's standards are incorporated by reference into federal regulations.  Thomas Decl. ¶ 15.

54.     ASTM standards are not developed for the purpose of being incorporated into regulations.  Thomas Decl. ¶ 16; Cramer Decl. ¶ 20.

55.     When it develops a new standard, ASTM does not know whether the standard will be incorporated by reference into government regulations.  Thomas Decl. ¶ 17.

56.     ASTM does not lobby government agencies to reference its standards.  Thomas Decl. ¶ 18.

## The Reasonable Availability of ASTM Standards

57.     ASTM publishes its standards in hard copy and digital formats, including PDFs, HTML and XML formats, which can be purchased from ASTM or its authorized resellers.  Thomas Decl. ¶ 44.

58.     When purchased individually, the price per ASTM standard is $38-$89.  Thomas Decl. ¶ 45.  The price of each new individual standard is calculated based on the number of pages in the standard.  Thomas Decl. ¶ 46.

59.     ASTM's standards are reasonably accessible and available to the public.  Rubel Decl. ¶ 4, Ex. 1 (Expert Report of John Jarosz ("Jarosz Rep.") ¶ 86).

60.     ASTM does not seek to obtain higher prices for standards that have been incorporated by reference.  Thomas Decl. ¶ 47; Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶ 87-88).

61.     ASTM provides copies of its standards at a reduced cost or at no cost when it is informed that the regular cost is a burden to the requester.  Thomas Decl. ¶ 48.

62.     For example, ASTM has a "10 Standards for Students" program through which professors can select any 10 ASTM standards and students can purchase a packet containing all 10 standards for just $10 per student.  Thomas Decl. ¶ 49.

63.     ASTM provides the public with free, read-only access to all ASTM standards that ASTM is aware have been incorporated by reference into federal regulations.  Thomas Decl. ¶ 50; O'Brien Decl. ¶ 60.

64.     ASTM provides the public with free, read-only access to all ASTM standards that are the subject of the Motion for Summary Judgment.  O'Brien Decl. ¶ 61 and Ex. 17.

65.     ASTM identifies standards that have been incorporated by reference into federal regulations from the database created by the National Institute of Standards and Technology.  Thomas Decl. ¶ 51; O'Brien Decl. ¶ 62.

66.     ASTM publicizes the free read-only access provided on its website.  Thomas Decl. ¶ 52; O'Brien Decl. ¶ 63.

67.     During the notice and comment period regarding proposed federal regulations, upon request by the relevant federal agency, ASTM provides free, read-only access to standards that are incorporated by reference in proposed regulations.  Thomas Decl. ¶ 53; O'Brien Decl. ¶ 64.

68.     ASTM routinely grants permission to researchers, academics and others to reproduce its standards at no cost for non-commercial purposes.  O'Brien Decl. ¶ 13.

69.     ASTM has not received any complaints about lack of accessibility of its standards other than from Defendant.  Thomas Decl. ¶ 54; O'Brien Decl. ¶ 65.

**ASTM's Copyright Registrations**

70.     ASTM has copyright registrations that cover each of the standards at issue in this litigation.  O'Brien Decl. ¶ 8.

71.     ASTM has a copyright registration for ASTM D86-07 (Standard Test Methods for Distillation of Petroleum Products at Atmospheric Pressure) that identifies ASTM as the owner. O'Brien Decl. ¶ 5 and Ex. 1.

72.     ASTM has a copyright registration for ASTM D975-07 (Standard Specification for Diesel Fuel Oils) that identifies ASTM as the owner.  O'Brien Decl. ¶ 6 and Ex. 2.

73.     ASTM publishes an Annual Book of ASTM Standards every year that is composed of a number of volumes and includes the current version of each of its standards. O'Brien Decl. ¶ 7.

74.     Between 1980 and 2011, ASTM obtained copyright registrations for each volume of its Book of Standards.  O'Brien Decl. ¶ 8.

75.     ASTM D396-98 and D1217-93(98) were published in Volume 5.01 of the 1999 Annual Book of ASTM Standards.  O'Brien Decl. ¶ 9 and Ex. 3.

76.     ASTM has a copyright registration for Volume 5.01 of the 1999 Annual Book of ASTM Standards that identifies ASTM as the owner.  The date of first publication for this work was February 22, 1999 and the effective date of registration is March 10, 1999.  O'Brien Decl. ¶ 10 and Ex. 4.

**ASTM's Trademarks**

77.     ASTM owns a U.S. federal trademark registration for the trademark ASTM (U.S. Trademark Reg. No. 2,679,320) in connection with books featuring information on standardization of specifications and the methods of testing for various materials and products;

promoting public awareness of the need for standards; educational services; and providing a website on global computer networks featuring information in the field of specifications and methods of testing for various materials and products. ASTM has used this trademark since 1962. ASTM filed a Section 15 declaration in support of the incontestability of this registration. O'Brien Decl. ¶ 55 and Ex. 14.

78.     ASTM owns U.S. federal trademark registrations for the trademarks ASTM INTERNATIONAL (U.S. Trademark Reg. No. 2,685,857) and the following logo:



(U.S. Reg. No. 2,651,796) in connection with similar goods and services. ASTM has used these trademarks since 2001. ASTM filed Section 15 declarations in support of the incontestability of these registrations. O'Brien Decl. ¶ 56 and Ex. 15.

79.     ASTM also owns a registration for the following logo:



(U.S. Reg. Nos. 4,079,772) in connection with publications relating to testing methods, specifications and standards in engineering, industrial and allied fields. ASTM has used this trademark since 1965. The application for this registration was filed on May 10, 2011. The

Examining Attorney who reviewed the application approved it for registration without requesting proof of secondary meaning.  O'Brien Decl. ¶ 57 and Ex. 16.

80.     ASTM expends considerable resources marketing and promoting its goods and services in connection with these trademarks every year.  For example, ASTM spent over $3 million marketing and promoting sales of its standards that feature its trademarks in catalogs, brochures, and in mail and email correspondence between 2010-2012, which were the three years immediately prior to Defendant's infringement.  O'Brien Decl. ¶ 58.

81.     ASTM's longstanding use of its trademarks in connection with its high quality standards has resulted in the public's association of ASTM's marks with a certain quality. O'Brien Decl. ¶ 59.

82.     The ASTM word mark and logo are well known.  Rubel Decl. ¶6, Ex. 3 (Deposition of Carl Malamud ("C. Malamud Dep.") at 14:12-23).

83.     ASTM engages in quality control procedures to ensure the quality and integrity of the content of the standards.  O'Brien Decl. ¶ 50.

84.     ASTM staff does the final edit of each of the standards prior to publication.  As part of this process, ASTM staff submits the final version to the technical committee for reviews to make sure it matches the content approved through the balloting process.  O'Brien Decl. ¶¶ 50-52; Cramer Decl. ¶ 26.

85.     ASTM staff proofreads the XML versions of standards before posting them on the internet to ensure that the conversion of the text and diagrams into XML format has not altered the content of the standard.  O'Brien Decl. ¶ 53.

B.    NATIONAL FIRE PROTECTION ASSOCIATION, INC.

**Background**

86.    The National Fire Protection Association, Inc. ("NFPA") is a nonprofit organization, based in Quincy, Massachusetts, devoted to eliminating death, injury, property and economic loss due to fire, electrical and related hazards. NFPA was founded in 1896, and has continuously developed standards since that time.  Pauley Decl. ¶ 4.

87.    NFPA delivers information and knowledge through more than 300 consensus codes and standards, research, training, education, outreach and advocacy.  NFPA's membership totals more than 65,000 individuals throughout the world.  Pauley Decl. ¶ 4.

88.    NFPA is periodically audited by ANSI and is accredited and classified as an Audited Designator by ANSI.  Pauley Decl. ¶ 16.

89.    The primary users of NFPA standards are professionals and tradespeople who use these standards in the course of their business, such as electricians, architects, and electrical equipment manufacturers.  The professionals who use NFPA standards are familiar with them and have reasonable access to them.  Pauley Decl. ¶ 13; Declaration of James Golinveaux ("Golinveaux Decl.") ¶ 10.

90.    Many NFPA standards are incorporated by reference in federal and state laws and regulations.  NFPA is aware that its standards are frequently incorporated by reference, but NFPA does not develop any standards solely for that purpose.  Pauley Decl. ¶ 10.

91.    All NFPA standards have a range of applications and uses even if they are not incorporated by reference in government laws or regulations.  Pauley Decl. ¶ 12.

92.    NFPA develops new standards based on a determination that developing a standard in a particular area would serve NFPA's mission of reducing the risk of loss from fire

and related hazards.  NFPA does not consider whether the standard will generate revenue when deciding whether to develop the standard.  Pauley Decl. ¶ 11.

93.     NFPA develops the National Electrical Code ("NEC"), and has done so since 1897.  NFPA updates and revises the NEC every three years.  The current edition of the NEC is the 2014 edition, which is over 900 pages long.  Pauley Decl. ¶ 7.  Additional NFPA standards include NFPA 101, the Life Safety Code, and NFPA 13, the Standard for the Installation of Sprinkler Systems.  Pauley Decl. ¶ 9; Golinveaux Decl. ¶ 4.

94.     The NEC addresses the installation of electrical conductors, equipment, and raceways; signaling and communications conductors, equipment, and raceways; and optical fiber cables and raceways in commercial, residential, and industrial occupancies.  The NEC is the world's leading standard for electrical safety and provides the benchmark for safe electrical design, installation and inspection to protect people and property from electrical hazards.  Pauley Decl. ¶ 8.

**Benefits of NFPA's Standards**

95.     State governments benefit greatly from the standards developed by NFPA through its voluntary consensus process.  The expertise and resources invested by NFPA in standards development enable state governments to incorporate standards that serve the public interest.  State governments rely on NFPA and other private sector standards developers to create the highest-quality standards that reflect a wide diversity of viewpoints.  Declaration of Kevin Reinertson ("Reinertson Decl.") ¶¶ 11-12.

96.     State government agencies would not have the funding or resources to create standards if NFPA were unable to develop them.  Reinertson Decl. ¶¶ 13-14.

97.     Fire safety professionals and the fire protection industry benefit greatly from the standards developed by NFPA through its voluntary consensus process, which develops standards that reflect the broadest possible consensus about fire safety techniques and that can be used widely throughout the country.  Golinveaux Decl. ¶¶ 5-6.

98.     NFPA's standards development process results in the creation of uniform industry-wide standards.  Professionals across the industry rely on the existence of these standards, and this industry-wide uniformity could not be achieved without NFPA or a similar organization with the resources to devote to standards development.  Golinveaux Decl. ¶ 7.

**The Reasonable Availability of NFPA's Standards**

99.     NFPA sells its standards in a variety of formats, including as PDFs, eBooks, and in softcover, looseleaf, or spiralbound versions.  The price for NFPA standards ranges from $39 to $105.  Pauley Decl. ¶ 44.

100.     NFPA provides the full text of NFPA standards for free viewing by any member of the public on its website.  All NFPA standards can currently be read in full and without cost on NFPA's website.  Pauley Decl. ¶ 45.

101.     NFPA also encourages jurisdictions that incorporate its standards by reference to link their websites to its free, online version of the standards, and provides a widget that easily enables such access. Pauley Decl. ¶ 45.

102.     The published versions of NFPA's standards include copyright notices alerting the public, including the people who participated in the standards development process, that the copyrights are owned by NFPA.  Pauley Decl. ¶ 25.

103.     NFPA routinely grants permission to researchers, educators, and others to use portions of NFPA standards for educational and other non-commercial purposes at no cost. Declaration of Dennis Berry ("Berry Decl.") ¶ 10.

**Funding the Costs of Developing NFPA's Standards**

104.     NFPA expends substantial resources on standards development, including salary and benefits for its own administrative and expert staff, office space, meeting facilities for the more than 250 Technical Committees who participate in the NFPA standards development processes, outreach and education efforts, and information technology.  Pauley Decl. ¶ 18.

105.     In 2014, NFPA spent more than $13.5 million on standards development and more than $27 million for publication of copyrighted materials.  Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶ 71, 91).

106.     NFPA funds its standards development and publications activities primarily with the revenue obtained from sales of its copyrighted standards.  In 2014 NFPA's publications sales accounted for over 70% of NFPA's total operating revenues.  The overwhelming majority of that publications revenue comes from the sale of codes and standards.  Pauley Decl. ¶ 46.

107.     To preserve the revenue from sales of publications, NFPA must be able to assert copyright in its standards to prevent unauthorized copying of NFPA standards, which threaten to substantially undermine NFPA's sales.  Pauley Decl. ¶ 49.

108.     NFPA depends on the revenue it generates from sales of its copyrighted materials to conduct its operations and needs that revenue to continue to develop its standards in the manner in which it currently operates.  Pauley Decl. ¶¶ 47-51; Rubel Decl. ¶ 49, Ex. 45 (Mullen Dep. at 224:14-229:5).

**NFPA's Standard Development Process and Copyright Assignment Policies**

109.     NFPA's standards development process incorporates significant creative input from three primary groups of participants.  These include (i) members of the public who provide input and comment; (ii) the members of the Technical Committees who consider and vote on proposed changes to the standards; and (iii) the NFPA staff who assist and advise the Technical Committees and who draft and finalize the wording of the actual document that becomes the standard.  Pauley Decl. ¶ 24.

110.     Members of the public participate in NFPA's standards development process by submitting public input, including proposed changes to NFPA standards and comments on proposed changes.  Pauley Decl. ¶ 27.

111.     Members of the public who make contributions to the standards development process understand and intend that NFPA will own the copyright in their contributions and in the standards.  Pauley Decl. ¶ 28.

112.     NFPA has a policy that all persons who submit public input must assign all rights, including copyright, in their contributions to NFPA.  NFPA does not accept public input without a signed copyright assignment, which is printed on the standard forms by which members of the public submit input.  Pauley Decl. ¶ 27; Rubel Decl. ¶ 9, Ex. 6 (Dubay Dep. at 212:17-21).

113.     NFPA staff check every public input that NFPA receives to ensure that the appropriate copyright assignment has been executed.  Rubel Decl. ¶ 9, Ex. 6 (Dubay Dep. at 144:8-145:15.)

114.     The NFPA Technical Committees are the principal consensus bodies responsible for the development and revision of NFPA standards.  The Technical Committees are composed of volunteers from business, industry, public interest groups, government and academia, and

others.  The Technical Committees meet to consider and vote on proposals submitted by the

public, and to reach consensus on appropriate revisions to the standards.  Pauley Decl. ¶¶ 32-33;

Rubel Decl. ¶ 9, Ex. 6 (Dubay Dep. at 52:1-15).

115.    NFPA has a policy that all members of the Technical Committees submit

Committee applications that include an agreement that all material authored by the Committee

will be works made for hire for NFPA, and additionally an assignment of all and full rights in

copyright in their work as a member of the Technical Committee to NFPA.  Pauley Decl. ¶¶ 34-

35; Golinveaux Decl. ¶ 11; Rubel Decl. ¶ 9, Ex. 6 (Dubay Dep. at 105:12-21).

116.    Members of Technical Committees who participate in the Standards Development

Process understand and intend that their contributions are owned by NFPA and that NFPA owns

the copyright in the final standards.  Pauley Decl. ¶¶ 36-37; Golinveaux Decl. ¶¶ 12-13.

117.    NFPA employees also participate in NFPA's standards development process in

the course of their employment.  Each Technical Committee has a NFPA staff liaison who

facilitates and runs the Committee meetings, provides advice to the Committee, and records the

decisions made by the Committee.  NFPA employees also work with the Committee and with

each other to craft appropriate wording that accurately captures the intent of Committee

decisions, and revise and finalize the wording of the actual document that becomes the standard.

Pauley Decl. ¶¶ 38-40; Rubel Decl. ¶ 9, Ex. 6 (Dubay Dep. at 54:19-56:12, 66:20-67:12, 69:2-

18).

118.    NFPA employees engage in multiple layers of quality control procedures to

ensure the quality and integrity of the content of the standards.  NFPA employees edit and revise

the language of the NEC to ensure that it conforms to the requirements in the NFPA style

manual, to ensure consistency across the different sections of the NEC, and to finalize the

language of the standard for balloting.  Pauley Decl. ¶ 41; Rubel Decl. ¶ 9, Ex. 6 (Dubay Dep. at

31:18-33:24, 59:19-62:5).

119.     Each NFPA standard goes through two full rounds of public input, comments,

review and drafts before being finalized.  The process results in the issuance of sophisticated and

complex works that support NFPA's mission of promoting public safety.  For example,

developing a new edition of the NEC involves consideration of thousands of comments and

proposals from the public, the participation of hundreds of Technical Committee members in

multiple rounds of intensive multi-day meetings, and the active assistance of dozens of NFPA

staff.  Pauley Decl. ¶¶ 19, 23, 42.

**NFPA's Copyright Registrations**

120.     NFPA has a copyright registration certificate (U.S. Copyright Reg. No. TX 7-297-

325) for the 2011 edition of the NEC, which identifies NFPA as the author and owner of the

work.  Berry Decl. ¶ 2 and Ex. A.

121.     NFPA has a copyright registration certificate (U.S. Copyright Reg. No. TX 7-935-

064) for the 2014 edition of the NEC, which identifies NFPA as the author and owner of the

work.  Berry Decl. ¶ 3 and Ex. B.

122.     NFPA is not aware of any other person who claims to have a copyright interest in

any NFPA standard.  Pauley Decl. ¶ 26.

**NFPA's Trademarks**

123.     NFPA owns incontestable U.S. federal trademark registrations for the trademarks

National Fire Protection Association (U.S. Trademark Reg. No. 3,165,010) and NFPA (U.S.

Trademark Reg. No. 3,141,884) in connection with books containing fire, electrical and building

safety codes and standards; electronic publications, namely books containing fire, electrical and

building safety codes and standards recorded on computer media; and certain other areas.  NFPA

has used the National Fire Protection Association trademark since 1896 and the NFPA trademark

since at least 1900.  Berry Decl. ¶¶ 4-5 and Exs. C-D.

124.    NFPA owns an incontestable U.S. federal trademark registration for the following

logo:



(U.S. Reg. No. 2,834,633) in connection with similar goods and services.  NFPA has used this

trademark since 1993.  Berry Decl. ¶ 6 and Ex. E.

125.    NFPA owns incontestable U.S. federal trademark registrations for the trademarks

National Electrical Code (U.S. Reg. No. 1,094,460), NFPA 70 (U.S. Reg. No. 3,354,321), and

NEC (U.S. Reg. No. 1,165,496) in connection with publications in the field of fire safety.  NFPA

has used the National Electrical Code trademark since at least 1911, the NFPA 70 trademark

since at least 1953, and the NEC trademark since at least 1973.  Berry Decl. ¶ 7-8 and Exs. F-H.

126.    NFPA owns an incontestable U.S. federal trademark registration for the

following logo:



(U.S. Reg. No. 1,148,903) in connection with similar goods and services.  NFPA has used this

trademark since at least 1978.  Berry Decl. ¶ 9 and Ex. I.

127.    NFPA's longstanding use of its trademarks in connection with its high quality

standards has resulted in the public's association of NFPA's marks with a certain quality.  Pauley

Decl. ¶ 53.

128.    Defendant admits that the NFPA word mark and logo are well known.  Rubel

Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 14:25-15:11).

C.    AMERICAN SOCIETY FOR HEATING, REFRIGERATING, AND AIR CONDITIONING ENGINEERS

129.    The American Society for Heating, Refrigerating and Air Conditioning Engineers

("ASHRAE") is a non-profit organization that operates with the mission of advancing the arts

and sciences of heating, ventilating, air conditioning and refrigerating to serve humanity and

promote a sustainable world.  Declaration of Stephanie Reiniche ("Reiniche Decl.") ¶ 2.

130.    ASHRAE has developed and maintains over 100 consensus based standards.

These standards, based on ASHRAE's expertise in HVAC/R systems, pertain to a variety of

fields within the building industry, such as energy efficiency, indoor air quality, refrigeration,

and sustainability.  Reiniche Decl. ¶ 2.

131.    The primary users of ASHRAE's standards include builders, architects, and

heating, air-conditioning, and refrigeration manufacturers who use the standards in their

businesses. Reiniche Decl. ¶ 17.

132.    The specific ASHRAE standard at issue here is ASHRAE 90.1 (in particular the

2004, 2007, and 2010 versions of 90.1).  ASHRAE 90.1 pertains to energy efficiency in

commercial and high-rise residential buildings.  It is a "continuous maintenance" standard,

meaning that it is supplemented with addenda every 18 months and a new version of the standard is released every three years.  Reiniche Decl. ¶¶ 3, 5.

133.    There are other organizations that develop standards that address the same or similar subjects as ASHRAE's standards and may compete with ASHRAE standards.  For instance, the International Code Council maintains a code addressing building efficiency, the International Energy Conservation Code, which addresses similar concerns to ASHRAE 90.1. *See* Rubel Decl. ¶ 10, Ex. 7 (Reiniche Dep. at 31:6-32:8).

134.    Some ASHRAE standards, including ASHRAE 90.1, have been incorporated by reference into laws and regulations.  However, ASHRAE does not develop its codes for the purpose of being incorporated by reference, and ASHRAE has developed and maintains numerous standards that have not been incorporated by reference.  Reiniche Decl. ¶ 3; *see also* Rubel Decl. ¶ 10, Ex. 7 (Reiniche Dep. 98:25-99:16).

### ASHRAE's Standard Development Process

135.    ASHRAE's standards, including ASHRAE 90.1, are developed with input from a project committee comprised of experts in the field, including utilities representatives, engineers, manufacturers, trade organization representatives, and architects.  The project committee members are selected to ensure a balanced representation of different interest groups.  Reiniche Decl. ¶ 6.

136.    The drafting of ASHRAE standards, including 90.1, involves input from the many participants in the development process, including members of the public who are provided an opportunity to comment on draft standards.  Changes to standards language, whether proposed by committee members or the public, are voted on, subject to extensive discussion, and often

altered by the committee so that the finished standard reflects a consensus of all involved parties rather than the work of any one individual.  Reiniche Decl. ¶¶ 6-8.

137.     For each ASHRAE standard, ASHRAE assigns one or more staff liaisons to work with that standard's project committee.  For ASHRAE 90.1, the liaison is Steve Ferguson, an engineer who has worked on Standard 90.1 for ten years.  Reiniche Decl. ¶ 9.

138.     ASHRAE staff liaisons have a variety of job responsibilities related to facilitating the creation of ASHRAE standards.  The liaisons responsibilities include attending and recording minutes of meetings of the project committee, recording changes to the standards that are proposed in committee meetings, and aiding the committees in crafting standards.  Reiniche Decl. ¶ 10-11.

139.     For instance, the staff liaisons review all proposed changes and drafts of the standards to make sure they are written in the proper format, comply with ANSI and ASHRAE guidelines, and are both technically and editorially consistent.  If a proposed change to the language of a standard is inconsistent with other aspects of the standard or improperly formatted, the liaison can suggest changes that would then be submitted to the project committee for further consideration and voting.  Additionally, the liaisons provides the project committee with the comments and proposals submitted by the public and reviews and edits the committees responses to these public comments.  Reiniche Decl. ¶ 10-11.; Rubel Decl. ¶ 10, Ex. 7 (Reiniche Dep. at 35:23-38:2; 97:13-98:19).

140.     Every three years, when ASHRAE performs a roll-up of all proposed changes and edits to a standard under continuous maintenance, like ASHRAE 90.1, the staff liaison and other ASHRAE staff will work with certain members of the project committee to perform a final

review and edit of the new version of each standard to make sure that all proposed changes have been properly incorporated.  Reiniche Decl. ¶ 11.

141.    ASHRAE staff are also responsible for maintaining and updating several sections of the ASHRAE standards, including a short policy statement at the outset of each standard and guidelines for the public comment procedure on each standard.  Reiniche Decl. ¶ 11.

**ASHRAE's Copyrights**

142.    ASHRAE members, project committee members, and public commenters on ASHRAE standards understand that they do not hold copyrights in the completed ASHRAE standards.  Reiniche Decl. at ¶ 12.

143.    Anyone who contributed to the ASHRAE standards at issue here, i.e. the 2004, 2007 and 2010 versions of ASHRAE 90.1, whether a project committee member or a member of the public submitting a comments, would have been required by ASHRAE to execute an Application for Membership on an ASHRAE Committee or a Form for Commenting on a Public Review Draft ASHRAE Standard.  Both forms contain the following language: "I understand that I acquire no rights in publication of such documents in which my contributions or other similar analogous form are used."  Reiniche Decl. ¶ 13 and Exs. 1-2.

144.    ASHRAE does not permit changes to its forms and is unaware of any instance where a commenter to Standards 90.1-2004, 90.1-2007, or 90.1-2010 altered the standard forms or refused to sign an acknowledgment that the individual acquired no rights in the ASHRAE standards.  Any comments made without first executing one of ASHRAE's standard forms would be an exception to ASHRAE's general practices and policies.  Reiniche Decl. ¶ 14.

145.    To ASHRAE's knowledge, no members of the 90.1 project committee or members of the public who commented on 90.1 have contested ASHRAE's copyright rights in the standard or claimed an ownership interest in any part of ASHRAE 90.1.  Reiniche Decl. ¶ 15.

146.    ASHRAE has valid copyright registrations for the 2004, 2007, and 2010 versions of ASHRAE 90.1.  Each registration specifically identifies ASHRAE as the owner of the copyright.  Reiniche Decl. Exs. 3-5.

147.    ASHRAE alerts members of the public (and everyone who participates in the creation of its standards) to its copyrights by conspicuously placing notice of its copyrights on each of these standards.  Reiniche Decl. ¶ 15.

**ASHRAE's Trademarks**

148.    ASHRAE also holds registered trademarks for the marks displayed in its Standards and used by ASHRAE.  Reiniche Decl. ¶ 16.

149.    ASHRAE owns a registration for the following logo:



(U.S. Registration No. 1,503,000).

150.    ASHRAE has used this mark in commerce since 1959 in connection with the sale and dissemination of its standards.  ASHRAE has also filed a Section 15 declaration in support of the incontestability of this mark.  Reiniche Decl. ¶ 16 and Ex. 6.

151.    ASHRAE also holds a registration for the following mark:



(U.S. Registration No. 4,262,297).  This mark is also used in conjunction with ASHRAE's standards and often prominently affixed on the standards.  ASHRAE considers these marks to be valuable assets that are associated with ASHRAE's standards as well as the organization's goodwill.  Reiniche Decl. ¶ 16 and Ex. 7; *see also* Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 151).

**Funding the Costs of Developing ASHRAE's Standards**

152.    ASHRAE spends substantial resources drafting and updating its standards. ASHRAE's expenses include employing staff who facilitate the standards-creation process, including arranging and paying for committee meetings and collecting public input on standards. For Standard 90.1 alone, the updating process involves tens of thousands of man-hours, and ASHRAE spent more than $1 million to cover standards-development.  Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 76); *see also* Rubel Decl. ¶ 10, Ex. 7  (Reiniche Dep. at 203:20-205:2).

153.    ASHRAE expends significant resources developing standards with an understanding that it can then sell copyrighted standards to support its operations.  However, that business model is threatened by Defendant's infringement.  *See* Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶ 6, 76, 107-111).

154.    ASHRAE depends on the sale of standards and revenue from membership dues to fund its operations.  For ASHRAE, membership revenue is associated with the revenue from dissemination of standards as membership benefits include receiving print copies and online

access to certain ASHRAE publications and significant discounts on purchasing ASHRAE

publication.  Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶ 22, 95, 134).

155.    ASHRAE also derives revenue from ancillary or complimentary products for

which its copyrighted standards give ASHRAE a competitive advantage.  For instance,

ASHRAE's training programs can freely use the text of ASHRAE standards and/or disseminate

course materials containing the standards while competitors cannot.  Rubel Decl. ¶ 4, Ex. 1

(Jarosz Rep. ¶¶ 143-49).

156.    If these sources of revenue are lost, it would seriously threaten ASHRAE's

current business model and ability to continue funding its standards creation and maintenance

operations at their current levels.  Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶ 6, 138).

**The Reasonable Availability of ASHRAE's Standards**

157.    ASHRAE publishes its standards in hard copy and digital PDF files, which can be

purchased from ASHRAE or its authorized resellers.  Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 99);

Rubel Decl. ¶ 11, Ex. 8 (Comstock Dep. at 104:21-106:23).

158.    ASHRAE offers its standards for sale at moderate prices that do not impose an

undue burden to those who wish to purchase the standards.  Prices typically range from $25 to

$120, with no standard costing more than $200.  Reiniche Decl. ¶ 18; Rubel Decl. ¶ 4, Ex. 1

(Jarosz Rept. ¶ 99); *see also* Rubel Decl. ¶ 11, Ex. 8 (Comstock Dep. at 29:9-17).

159.    The standards are priced moderately on the basis of ASHRAE's costs and

ASHRAE does not charge more for standards that have been incorporated into laws or

regulations.  Reiniche Decl. ¶ 18; Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rept. ¶ 101).

160.     ASHRAE also offers discounts for libraries, educational uses, government

entities, and individuals or entities who purchase the standards on a subscription basis.  Reiniche

Decl. ¶ 18; Rubel Decl. ¶ 11, Ex. 8 (Comstock Dep. at 106:19-22).

161.     ASHRAE provides the public with free read-only access to many ASHRAE

standards through the ASHRAE website.  In particular, access is provided to standards that have

been incorporated by reference into codes, including the versions of Standard 90.1 at issue here.

Reiniche Decl. ¶ 19-20.

162.     ASHRAE has not received complaints about the accessibility of its standards,

other than from the Defendant in this case.  Reiniche Decl. ¶ 19-20; Rubel Decl. ¶ 10, Ex. 7

(Reiniche Dep. at 124:17-125:7).

## II.      PUBLIC.RESOURCE.ORG, INC.'S INFRINGEMENT OF PLAINTIFFS' INTELLECTUAL PROPERTY

### A.      BACKGROUND

163.     Carl Malamud is the founder and only employee of Defendant

Public.Resource.Org, Inc. ("Public Resource" or "Defendant").  Rubel Decl. ¶ 5, Ex. 2 (30(b)(6)

Deposition of Public.Resource.Org ("PR Dep.") at 23:3-25, 30:12-14).

164.     Defendant admits that the NFPA "does amazing work and saves lives."  Rubel

Decl. ¶ 5, Ex. 2 (PR Dep. at 305:15-19).

165.     Defendant also admits that NFPA's standards protect the lives of volunteer

firefighters and children.  Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 306:3-20); Rubel Decl. ¶ 17, Ex. 13

(Ex. 55 to PR Dep.).

166.     Defendant claims to be a "big fan of ASTM" and recognizes that "the subject area

of the standards that ASTM works in is very important and we need to continue to have

standards in that area."  Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 307:9-15).

167.    Defendant admits that "ASHRAE Standard 90.1 is an important standard."  Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 307:24-308:4).

168.    There is no evidence that any person who was attempting to comply with a regulation that incorporates by reference any of Plaintiffs' standards was unable to access the standard.  Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 71:3-77:24).

**B.    DEFENDANT ADMITTED THAT PLAINTIFFS OWN COPYRIGHTS IN THE WORKS AND IT DOES NOT OWN THE COPYRIGHT IN THE WORKS**

169.    Neither Defendant nor Mr. Malamud claims to own the copyright in any of the standards at issue.  Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 108:25-109:11).

170.    Defendant is not aware of any evidence that any participants in the process of developing Plaintiffs' standards claim to be owners of the copyrights in any of the standards at issue.  Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 83:16-85:17).

171.    Malamud himself has acknowledged that the standards "have a strong copyright interest" until they are "incorporated by reference in the Code of Federal Regulations."  Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 89:8-18); Rubel Decl. ¶ 18, Ex. 14 (Ex. 33 to PR Dep.).  Malamud has also acknowledged that Plaintiffs' standards are "heavily copyrighted" and that "the standards bodies were very aggressive in claiming copyright on those documents."  Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 99:3-100:19).

**C.    DEFENDANT'S UNSUCCESSFUL EFFORTS TO FIND SUPPORT FOR ITS POSITION IN CONGRESS AND EXECUTIVE AGENCIES**

172.    Mr. Malamud testified before Congress in favor of amending the Copyright Act to reflect his belief that materials incorporated by reference into government regulations lose their copyright protection.  Congress has not amended the statute as Mr. Malamud requested.  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 232:14-19).

31

173.    Defendant also submitted comments to various executive agencies and offices requesting that policies and regulations be changed to state that materials incorporated by reference into government regulations must be available at no cost to the general public.  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 232:21-233:5).

174.    For example, Defendant submitted comments reflecting his beliefs in connection with proposed rulemaking regarding the procedures of the Office of the Federal Register and the National Archives and Records Administration, proposed amendments to the Office of Management and Budget's Circular A-119, and a study by the Administrative Conference of the United States.  O'Brien Decl. ¶ 66.

175.    Each of these agencies and offices considered and ultimately rejected Defendant's comments and proposals, reaffirming their positions that materials incorporated by reference in federal regulations do not lose their copyright protection and do not need to be made publicly available on the internet at no cost.  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 232:14-234:8).

176.    Defendant also submitted Freedom of Information Act ("FOIA") requests to a number of executive agencies requesting copies of standards that are incorporated by reference in federal regulations.  Rubel Decl. ¶ 12, Ex. 9.

177.    No agency has provided Defendant with copies of the standards it has requested through these FOIA requests.  Numerous federal agencies have explicitly taken the position in communications with Defendant that incorporation by reference of materials into regulations does not destroy the copyright in those materials.  Rubel Decl. ¶ 13, Ex. 10.

**D.   DEFENDANT'S COPYRIGHT INFRINGEMENT**

1.   **Defendant's Unauthorized Copying, Display and Distribution of Plaintiffs' Standards On Its Website**

178.   Defendant obtained hard copies of Plaintiffs' standards purposely so that it did not have to agree to the terms of use on Plaintiffs' websites.  Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 63:12-64:23).

179.   Defendant stated that ASTM's standards "can't be taken in violation of terms of use unless me and our legal folks have scrubbed the situation very carefully."  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 172:14-19); Rubel Decl. ¶ 19, Ex. 15 (Ex. 69 to C. Malamud Dep.).

180.   Nonetheless, Defendant asked a student to download copies of certain ASTM standards from ASTM's website on the condition that he do so secretly.  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 172:14-19, 177:1-178:11); Rubel Decl. ¶ 19, Ex. 15 (Ex. 69 to C. Malamud Dep.) ("You need to stay both anonymous and mum on this.  No bragging about it, talking about it.  And I'm not going to do that either.").

181.   Defendant next searched federal and state regulations for examples of standards that had been incorporated by reference and then tried to obtain paper copies of those standards. Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 156:21-157:1).

182.   Mr. Malamud scanned the paper copies he was able to buy into PDFs and used optical character recognition ("OCR") software to convert the images of the scanned pages into text.  Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 156:21-157:2, 224:8-13).

183.   Defendant added an introductory page to the beginning of each PDF.  Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 156:15-157:5).

184.   The introductory page was labeled as a "Certificate" with a border depicting stars and stripes, a stamp of approval, and a designation of the Executive Director of the Office of the

Federal Register as the "Official Incorporator."  The page states that the document has been

incorporated by reference and "shall be considered legally binding upon all citizens and

residents of the United States of America" and that "[c]riminal penalties may apply for non-

compliance."  *See, e.g.,* Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 224:14-17); Rubel Decl. ¶ 6, Ex. 3

(C. Malamud Dep. at 127:4-13); Rubel Decl. ¶ 20, Ex. 16 (Ex. 63 to C. Malamud Dep.).

185.    In December 2102, Defendant posted the PDFs, including the text created by the

OCR software, on Defendant's website and on the Internet Archive.  Rubel Decl. ¶ 5, Ex. 2 (PR

Dep. at 156:15-159:6).

186.    Defendant kept the standards posted on its website and the Internet Archive until

after the Complaint was filed, and Defendant did not remove the standards from its website or

the Internet Archive until on or about November 10, 2015, at the suggestion of the Court.

O'Brien Decl. ¶ 69; Reiniche Decl. ¶ 20; Berry Decl. ¶ 13.

187.    Defendant posted PDF versions of each of the standards at issue in this litigation

on its website.  Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 158:22-159:6).

188.    Defendant hired a firm called HTC Global Services to convert the text of some of

ASTM and NFPA's standards into HTML format and to convert the images in these standards

into JPG format.  Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 159:19-160:7, 162:13-163:17).

189.    Defendant instructed HTC Global to copy all of the text of the standards word for

word into HTML code.  Rubel Decl. ¶ 8, Ex. 5 (HTC Dep. at 24:16-25:5).

190.    Defendant instructed HTC Global to "double-key" the standards, which means

that two operators independently type the text and then compare the two versions, instead of

using a more accurate, but more expensive, "triple-key" methodology in which three

independent operators would have typed the text.  Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 165:2-

171:1); Rubel Decl. ¶ 8, Ex. 5 (HTC Dep. at 35:23-36:7); Rubel Decl. ¶ 21, Ex. 17 (Ex. 2 to HTC Global Dep.).

191.    By taking the cheaper route, Defendant knew that there could be up to 49 errors on a typical two and a half page document.  Rubel Decl. ¶ 8, Ex. 5 (HTC Dep. at 36:12-37:19, 105:16-106:11).

192.    HTC Global's representative testified that what it described as "double-keying" would actually involve extracting text obtained using OCR, unless the image quality of the original document was poor, in which case two operators entered the text.  Rubel Decl. ¶ 8, Ex. 5 (HTC Dep. at 34:23-35:6, 41:24-42:13).  This was done even though using OCR to capture the text from PDF versions of Plaintiffs' standards was likely to result in errors.  *See* Rubel Decl. ¶ 22, Ex. 18 (Fruchterman Dep. at 184:21-185:11) (explaining potential for OCR errors in technical documents).

193.    Defendant suspected that HTC Global may be using OCR instead of having two operators enter the text.  Defendant's CEO, Mr. Malamud, communicated to his wife that all of the documents had only been double-keyed "in theory" but that HTC "may cheat and do OCR first and then their QA."  Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 171:21-172:20); Rubel Decl. ¶ 23, Ex. 19 (Ex. 21 to Point.B Studio Dep.).

194.    HTC Global's rekeying of Plaintiffs' standards was done by non-native English speakers in India with no technical expertise.  Rubel Decl. ¶ 8, Ex. 5 (HTC Dep. at 30:24-32:16).

195.    Defendant posted on its website the HTML files derived from Plaintiffs' standards that were created by HTC Global.  Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 183:20-184:5).

196.     Defendant admitted that its rekeying of the standards was "simply recover[ing] text," and that it would not "start adding true value" until it rekeyed the mathematical formulas, adding section ID headers, and converting the graphics to vector format.  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 58:2-8, 60:17-61:7); Rubel Decl. ¶ 24, Ex. 20 (Ex. 57 to C. Malamud Dep.).

197.     Defendant hired Point.B Studio, which is a business name of Mr. Malamud's wife, Rebecca Malamud, to convert the diagrams, figures, graphs, illustrations and formulas from certain ASTM and NFPA standards from JPG format to SVG and/or MathML format. Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 184:22-185:4).

198.     Defendant instructed Point.B Studio to reproduce exact copies of the relevant materials within Plaintiffs' standards.  *See* Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 116:23-117:5 and 120:9-14); Rubel Decl. ¶ 25, Ex. 21 (Ex. 62 to C. Malamud Dep.) ("Exact copy has been the absolutely positively 100% important criteria the whole time…[if there is any question in my mind that you are not making exact copies, I have to fire you."]).

199.     Point.B Studio used children from a mentoring program whose target audience was 7-14 to convert formulas to MathML and drawings to SVG format for use on materials posted on Defendant's website.  Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 188:4-191:6); Rubel Decl. ¶ 7, Ex. 4 (Point.B Studio Dep. at 42:24- 43:10, 87:4-18); Rubel Decl. ¶ 26, Ex. 22 (Ex. 18 to Point.B Studio Dep.);

200.     The children were not paid for the work they did.  Rubel Decl. ¶ 7, Ex. 4 (Point.B Studio Dep. at 47:3-13).

201.     Defendant posted on its website versions of some of Plaintiffs' standards that contain the drawings, diagrams, figures and/or formulas that had been created by Point.B Studio.  Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 194:14-20).

202.     Anyone accessing the versions of Plaintiffs' standards from Defendant's website can save the materials onto their own devices, print them, or post them to another website.  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 68:25-69:19).

203.     Defendant did not obtain the consent of any of the Plaintiffs before posting copies of their standards on its website.  Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 204:7-12).

**2.      Defendant's Unauthorized Display and Distribution of Plaintiffs' Standards On the Internet Archive**

204.     In addition, Defendant posted many of the PDF versions of the standards to the Internet Archive website.  Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 195:25-196:18).

205.     In posting the standards on the Internet Archive, Defendant identified "author" as one type of metadata that he would provide for each standard.  Defendant identified NFPA as the author of each of the versions of the NFPA standards it posted on the Internet Archive.  Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 274:17-275:10, 280:14-282:11, 288:9-290:16); Rubel Decl. ¶ 27, Ex. 23 (Exs. 52 and 53 to PR Dep.).

206.      Defendant identified ASTM as the author of each of the versions of the ASTM standards it posted on the Internet Archive.  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 199:21-201:5); Rubel Decl. ¶ 48, Ex. 43 (Ex. 70. To C. Malamud Dep.).

207.     Defendant identified Creative Commons Universal license 1.0 as a license that applied to each of the standards it posted on the Internet Archive.  For each standard, Defendant included a link to the CCO 1.0 Universal license.  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 263:22-265:20).

208.    The CCO 1.0 Universal license states:  "The person who associated a work with this deed has dedicated the work to the public domain by waiving all of his or her rights to the work worldwide under copyright law . . . You can copy, modify, distribute and perform the work, even for commercial purposes, all without asking permission."  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 265:22-270:9); Rubel Decl. ¶ 28, Ex. 24 (Ex. 75 to C. Malamud Dep.).

209.    Members of the public can obtain PDF versions of the Plaintiffs' standards from the Internet Archive, save them and then use them in any manner, including by printing copies. Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 277:16-279:13).

### E.    DEFENDANT'S TRADEMARK INFRINGEMENT

#### 1.    Defendant Used Plaintiffs' Trademarks.

210.    Defendant used Plaintiffs' trademarks on the copies of Plaintiffs' standards that Defendant created and posted on its website and on the Internet Archive website.  *See, e.g.*, Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 127:4-13, 127:22-128:9); Rubel Decl. ¶ 20, Ex. 16 (Ex. 63 to C. Malamud Dep.) (using ASTM International logo, ASTM logo, and ASTM word mark); Rubel Decl. ¶ 29 , Ex. 25  (using ASHRAE logos – U.S. Reg. No. 4,262,297); Rubel Decl. ¶ 30, Ex. 26 (using National Electrical Code, National Fire Protection Association, and NEC word marks and NFPA and NEC logos).

211.    Additionally, Defendant used certain of Plaintiffs' marks within tables it created on its website and on the Internet Archive when identifying the authors and names of the standards.  Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 141:11-23, 151:6-22, 274:17-275:10, 288:9-14); Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 199:21-200:6); Rubel Decl. ¶ 31, Ex. 27 (Ex. 38 to PR Dep.) (using ASTM, American Society for Testing and Materials, NFPA, National Fire Protection Association, National Electrical Code, and ASHRAE marks), Rubel Decl. ¶ 32, Ex.

28 (Ex. 40 to PR Dep.) (using ASHRAE, NEC and ASTM marks); Rubel Decl. ¶ 27, Ex. 23

(Exs. 52 and 53 from PR Dep.) (using National Fire Protection Association, NFPA, National

Electrical Code, and NEC marks).

212.     Defendant's goal is to make the logos used on the standards and the contents of

the standards as close as possible to the actual standards published by the Plaintiffs.  Rubel Decl.

¶ 6, Ex. 3 (C. Malamud Dep. at 28:25-29:8).

213.     Defendant intends for people who view each standard posted on its website and/or

the Internet Archive to think it is "a scan of the exact standard" or an HTML version of the exact

standard published by the Plaintiffs.  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 46:14-47:9).

Defendant claims that he must post the entirety of each standard to his website because

"Defendant is "not in a position to decide which portions of that document are or [are] not the

law."  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 32:16-33:4).

### 2.      The Versions of Plaintiffs' Standards Posted by Defendant Contain Errors.

214.     The PDF versions of Plaintiffs' standards on Defendant's website contain errors,

including pages that are missing or that are upside down.  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud

Dep. at 127:8-13, 128:19-130:4, 147:19-148:1); Rubel Decl. ¶ 20, Ex. 16 (Ex. 63. to C. Malamud

Dep.)

215.     The HTML versions of Plaintiffs' standards on Defendant's website contain

errors, including text and numbers that differ from the information in the authentic versions of

Plaintiffs' standards.  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 127:4–139:8); Rubel Decl. ¶

20, Ex. 16 (Ex. 63 to C. Malamud Dep.); Rubel Decl. ¶ 33, Ex. 29 (Ex. 64 to C. Malamud Dep.).

216.     Mr. Malamud has no explanation for these mistakes and admits that they are not

acceptable.  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 140:19-141:6).

217.     Mr. Malamud claimed that if he were notified of any mistakes, he would do a rigorous quality assurance check and correct any mistakes.  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 140:19-25).

218.     However, even after being notified of specific errors at his deposition, Defendant never corrected these mistakes and continued to maintain versions of standards with "unacceptable mistakes" that bear Plaintiffs' trademarks on its website until it recently removed all of its copies of Plaintiffs' standards at issue in this case from its website at the Court's suggestion.  Rubel Decl. ¶ 16.

219.     The errors in the HTML version of the 2011 NEC that Defendant posted on the internet include numerous errors that distort the meaning of substantive provisions of the standard that were written to protect human safety and prevent property damage.  Pauley Decl. ¶ 54.

220.     Malamud admits that he does not know what quality control procedures Plaintiffs use when publishing their standards.  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 102:23-104:12, 109:7-110:4).

F.     **DEFENDANT  SEEKS TO USURP THE MARKET FOR PLAINTIFFS' STANDARDS.**

221.     Public Resource embarked on this project with the explicit purpose of encouraging the public to access Plaintiffs' Works and use them as they see fit, including downloading, printing, and making derivative works.  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 85:1-89:10).

222.     Defendant made a point of informing the public that its versions of Plaintiffs' Works were available in open access without restriction.  *See, e.g.*, Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 63:1-64:3, 66:13-68:4); Rubel Decl. ¶ 34, Ex. 30 (Ex. 58. to C. Malamud Dep.)

223.    Defendant also offers its website as an alternative to the platforms on which Plaintiffs provide free public access to their standards.  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 76:14-77:8, 80:20-86:15); Rubel Decl. ¶ 35, Ex. 31  (Ex. 59. to C. Malamud Dep.).

224.    Defendant has publicly declared that Plaintiffs' standards are in the public domain and cannot be copyrighted, and has encouraged members of the public to download them from Defendant's website without paying for them.  Rubel Decl. ¶ 36, Ex. 32.

225.    Mr. Malamud told a potential funder that one of Defendant's goals was to "have more users" of standards than the "SDO-provided websites," and further emphasized that Defendant would "like to be No. 1 in the marketplace."  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 297:25-298:11, 308:3-309:16); Rubel Decl. ¶ 37, Ex. 33 (Ex. 77 to C. Malamud Dep.).

226.    Defendant attempted to drive traffic to its website, including by engaging in "search engine optimization" to appear higher in Google search results in an attempt to attract visitors.  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 142:10-143:2); Rubel Decl. ¶ 38, Ex. 34 (Ex. 65 to C. Malamud Dep.).

### G.    DEFENDANT'S USE OF PLAINTIFFS' STANDARDS IN FUNDRAISING EFFORTS

227.    Defendant had an unsuccessful Kickstarter campaign to raise money for his double-keying of standards.  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 55:13-56:3).

228.    Defendant discussed his copying of Plaintiffs' standards in connection with his efforts to raise funds through this Kickstarter campaign, including the number of ASTM and NFPA standards it had copied.  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 56:4-58:17, 62:3-65:16, 76:14-77:16); Rubel Decl. ¶ 24, Ex. 20 (Ex. 57 to C. Malamud Dep.); Rubel Decl. ¶ 34, Ex. 30 (Ex. 58 to C. Malamud Dep.); Rubel Decl. ¶ 35, Ex. 31 (Ex. 59 to C. Malamud Dep.).

229.    Several supporters of Defendant's Kickstarter campaign donated money to Defendant after the Kickstarter campaign failed.  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 80:5-13).

230.    Mr. Malamud wrote in an email to his wife, whom he had hired to assist him in converting Plaintiffs' standards into HTML format, that she should "make sure we've done any NFPA docs … .  Also, we can do any ASTM or ASHRAE docs as well as those are helpful to me in my suit. … Definitely keep plowing away on that stuff … that's the kind of output that makes it much easier for me to try and raise money. to keep you going for the rest of the year." Rubel Decl. ¶ 7, Ex. 4 (Point.B Studio Dep. at 126:4-16); Rubel Decl. ¶ 23, Ex. 19 (Ex. 21 to Point.B Studio Dep.).

231.    In another email, Mr. Malamud explained that he could continue paying Ms. Malamud as long as she continued making copies of Plaintiffs' standards because "what the funders are going to be looking at is our walking through the standards."  Rubel Decl. ¶ 7, Ex. 4 (Point.B Studio Dep. at 186:8-187:2); Rubel Decl. ¶ 39, Ex. 35 (Ex. 27 to Point.B Studio Dep.).

232.    In an email Mr. Malamud described his work purchasing Plaintiffs' standards to post them on the internet as "what a way to make a living."  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 239:12-17, 240:5-243:4); Rubel Decl. ¶ 40, Ex. 36 (Ex. 73 to C. Malamud Dep.).

233.    Defendant's President and only employee, Carl Malamud, pays himself $180,000 per year for his work with Defendant.  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 243:21-244:4).

234.    Defendant also paid Point.B Studio, its founder's wife's unincorporated company, approximately $350,000 between 2010 and 2014.  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 245:15-246:13).

**H.   DEFENDANT'S ACTIONS SINCE THE FILING OF THIS CASE**

235.   During the course of this litigation, Defendant continued to post versions of additional standards owned by Plaintiffs that use Plaintiffs' trademarks on its website, including as recently as October 2015.  O'Brien Decl. ¶ 67; Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 268:20-269:8); Rubel Decl. ¶ 41, Ex. 37 (Ex. 49 to PR Dep.).

236.   Defendant has posted HTML versions of certain ASTM standards since Plaintiffs filed their Complaint that do not use the ASTM logo marks.  O'Brien Decl. ¶ 68 and Ex. 18.

237.   Defendant failed to provide any response to Plaintiffs' contention interrogatories to identify any evidence in support of its affirmative defenses.  Rubel Decl. ¶ 14 and Ex. 11 (never-supplemented responses to contention interrogatories).

**III.   CONSEQUENCES OF DEFENDANT'S INFRINGEMENT**

**A.   PLAINTIFFS HAVE BEEN INJURED BY DEFENDANT'S INFRINGEMENT**

238.   Although Defendant has claimed that its infringement creates a "tremendous market opportunity" for Plaintiffs, basic economic principles indicate that Defendant's making the standards available for free supplants these sources of revenue.  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 290:8-10; Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶ 131, 133, 139-41).

239.   Since Defendant started posting the NEC on its website and the Internet Archive website in 2012, NFPA's sales of that code and handbook have decreased noticeably. In 2009 and 2010, the first two full years after the 2008 edition of the NEC was published, NFPA sold a total of 144,312 copies of the 2008 NEC and 41,995 copies of the 2008 NEC handbook, which contains the 2008 NEC.  By contrast, in 2012 and 2013, the first two full years after the 2011 edition of the NEC was published, NFPA sold 92,631 copies of the 2011 NEC and 29,072 copies of the 2011 NEC handbook, which contains the 2011 NEC.  In other words, sales of the NEC

declined by 36%, and sales of the NEC handbook declined by 31% from one cycle to the next. Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 133).

240.    Multiple resellers and merchants have downloaded copies of NFPA's standards that were posted on the Internet and have attempted to resell them or package them with other products for sale.  These resellers have responded to cease-and-desist requests from NFPA by citing Defendant's statements that the standards are free for distribution by anyone.  Berry Decl. ¶¶ 11-12.

241.    Plaintiffs' standards Defendant posted on the Internet Archive were downloaded anywhere from tens to tens of thousands of times.  Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 206:13-207:22, 254:14-256:16); Rubel Decl. ¶ 42, Ex. 38 (Ex. 43 to PR Dep.), Rubel Decl. ¶ 43, Ex. 39 (Ex. 51 to PR Dep.).

242.    NFPA's 2011 NEC was downloaded 30,350 times from the Internet Archive website.  NFPA's 2014 NEC was downloaded 29,405 times from the Internet Archive website. Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 254:14-256:16); Rubel Decl. ¶ 43, Ex. 39 (Ex. 51 to PR Dep.).

243.    ASTM D975-07 was downloaded 159 times from the Internet Archive website. ASTM D86-07 was downloaded 75 times from the Internet Archive website.  Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 206:13-207:22); Rubel Decl. ¶ 42, Ex. 38 (Ex. 43 to PR Dep.).

244.    Plaintiffs' standards were also "accessed" thousands of times from Defendant's website between April 2013 and February 2014 alone.  Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 271:7-272:14 (defining "access" as complete or partial transfer of file from Defendant's server to another computer), 299:2-300:1 (describing relevant time period)); Rubel Decl. ¶ 44, Ex. 40 (Ex. 44 to PR Dep.); Rubel Decl. ¶ 45, Ex. 41, (Ex. 54 to PR Dep.); Rubel Decl. ¶ 46, Ex. 42 (Ex. 56

to PR Dep.) (showing 88,497 accesses of ASTM standards, 167,982 accesses of NFPA

standards, and 33,147 accesses of ASHRAE standards).

245.     Plaintiffs have also been injured by the loss of their ability to control

dissemination of their intellectual property.  Defendant's publication and distribution of versions

of Plaintiffs' standards that are incomplete, contain transcription errors, or otherwise alter the

content of Plaintiffs' standards severely compromise Plaintiffs' ability to protect their

reputations.  Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶ 150-51).

**B.     PLAINTIFFS' INJURIES ARE NOT QUANTIFIABLE.**

246.     It is exceedingly difficult to quantify or forecast the economic impact of

Defendant's activities.  Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶ 150-54).

247.     Defendant does not know what people do with the versions of Plaintiffs'

standards that are posted on Defendant's website.  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at

72:12-16).

248.     Defendant has no way to identify who downloaded, made additional copies of, or

printed the versions of Plaintiffs' standards from its website.  Rubel Decl. ¶ 6, Ex. 3 (C.

Malamud Dep. at 73:25-76:5).

249.     Copies of 43 of Defendant's versions of ASTM's standards at issue, with

Defendant's cover page, were uploaded by "dharlanuctcom" onto the Scribd platform.  *See*

https://www.scribd.com/dharlanuctcom.  Rubel Decl. ¶ 15 and Ex. 12.

250.     There is no evidence that Defendant's activities, which began in late 2012, have

generated additional demand for Plaintiffs' standards or raised public awareness of the standards

in a manner that would spur additional demand.  Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 140).

C.    CONSEQUENCES OF CONTINUED INFRINGEMENT

251.    Copyright protection provides an incentive for Plaintiffs to innovate and develop new works.  If a work can be copied or sold by another entity, there may not be sufficient incentives for the author to develop the work.  Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 102).

252.    "Plaintiffs require substantial resources to continue their standards development efforts.  Revenue generated from the sale of copyrighted standards and downstream products and services based on these copyrighted standards are a key contributor to the resources needed to carry out these functions."  Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 6).

253.    If the revenue from the sales of their copyrighted works and ancillary were in jeopardy, Defendants would be forced to change their behavior and their business models. Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 163).

254.    There is a significant risk that if Defendant's conduct goes unchecked, it will act as a signal to the market that the creation of unauthorized versions of the standards is acceptable and Plaintiffs' harm will be compounded over time as more people use the versions of the standards on Defendant's website or similar websites instead of purchasing authentic versions of the standards from Plaintiffs.  Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 153).

255.    Defendant acknowledges that "making standards more freely available . . . potentially poses a challenge to the current business models of the standards development of some standards development organizations."  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 211:5-19).

256.    Malamud has privately admitted to his supporters that he avoids discussing how his conduct will affect the business model of standards development organizations because he "can't win that discussion" and he instead must take "an absolutist position," which is "the only

way we can possibly win this fight."  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 272:14-19); Rubel Decl. ¶ 47, Ex. 43 (Ex. 76 to C. Malamud Dep.).

257.    Each of the Plaintiffs relies primarily on users of its standards to fund the development of the standards, rather than charging upfront fees before developing a standard. Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 80).

258.    Plaintiffs' "back-loaded" business models features extremely low barriers to participating in the standards creation process but then funds the process through sale of the resulting standards.  Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶ 81, 89, 94-96, 118-21).

259.    Plaintiffs could be forced to significantly alter their business models to a more "front-loaded" system that charges for participation in the standard-creation process, which would preclude the participation of certain key stakeholders and/or limit the quantity and subject matter of the standards Plaintiffs develop.  Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶106-11).

260.    Standards developed under a front-loaded model are more likely to feature only the viewpoints of industry interests with the resources to participate in the process and are less likely to reflect the views and concerns of the general public.  Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶106-11).

261.    Plaintiffs currently develop standards based on public demands, industry needs, and public safety concerns and advancements in technology and without concern for whether the standard will generate significant sales.  Thomas Decl.¶ 13; Reiniche Decl. ¶¶ 2, 18; Pauley Decl. ¶ 11.

262.    Defendant's activities could force Plaintiffs to develop only the most popular standards or release updated versions of standards less frequently.  Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶ 126-29); Pauley Decl. ¶ 51.

263.     Plaintiffs will also likely lose revenue associated with other ancillary activities that rely on or incorporate the copyrighted works, including training courses and commentary on standards.  Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶ 143, 147-48).

264.     Not only do Defendant's activities jeopardize Plaintiffs' sales of their copyrighted standards, the loss of copyright protection for standards incorporated by reference would remove the competitive advantage Plaintiffs have when marketing these ancillary goods and services and would make it easier for third parties to compete for this business.  Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶ 143, 147-49).

### D.  EFFECTS OF UNCHECKED INFRINGEMENT ON GOVERNMENT

265.     Government incorporation of privately developed standards is a cost-effective method through which government can capitalize directly on the expertise and resources available in the private sector that result in the highest quality standards covering a wide range of topics.  Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶ 51-53); Jennings Decl. ¶¶ 22-23.

266.     Government and other entities rely on Plaintiffs' standards and do not have the resources or the technical expertise to develop their own standards if Plaintiffs were unable to develop them.  Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶ 52-56,164); Jennings Decl. ¶ 24; Reinertson Decl. ¶¶ 11-14; Golinveaux Decl. ¶ 6.

267.     If the standards are to continue to be developed, someone will have to pay for their development.  *See* Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 123).

268.     Government could fund Plaintiffs' activities, but this would be economically inefficient, would increase the tax burden on the public, and place SDOs at the mercy of funding that could be reduced or eliminated in annual agency budgeting.  Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶ 123-25).

48

269.     The current method of charging members of the public who use a standard a reasonable price is more economically efficient than asking all members of the public to cover the costs of developing the standard through their taxes.  Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 124).

270.     If Plaintiffs are forced to change their business models, there will be less standard development because of reduced incentives, lower quality standards because of less participant involvement, less widespread adoption due to less incorporation by reference and less public buy-in.  Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 164).

271.     The effect of a loss of copyright protection "will be a likely reduction in the number, quality, and acceptability of critical standards and a likely increase in costs for governments, and therefore, taxpayers.  This will cause harm to governments, the public, and industry actors that rely on the creation of these standards as well as to the Plaintiffs."  Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 6).

**E.     DEFENDANT CANNOT COMPENSATE PLAINTIFFS FOR THE HARM CAUSED BY ITS PAST OR FUTURE INFRINGEMENT**

272.     Public Resource has extremely limited financial resources available to pay any damages award.  Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 155).

273.     In 2014, Defendant generated less than $100,000 in operating income and had $248,000 in total net assets.  Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 155, Tabs 6-7).

**F.     DEFENDANT WILL NOT BE UNFAIRLY HARMED BY A PERMANENT INJUNCTION**

274.     On or about November 10, 2015, Defendant removed its versions of the standards at issue in this case from its website at the suggestion of the Court.  O'Brien Decl. ¶ 68.

275.    Since the standards were taken down by Defendant, Plaintiffs have not received any complaints from persons regarding any alleged inability to access Plaintiffs' standards that have been incorporated by reference.  O'Brien Decl. ¶ 70; Reiniche Decl. ¶ 20; Berry Decl. ¶ 13.

276.    The standards at issue here are only a portion of the content on one of at least 10 websites operated by Defendant.  Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 157).

277.    Defendant admitted that there will be no long-term financial impact on Defendant if an injunction is entered. Specifically, when asked what impact Defendant's inability to continue to post standards incorporated by reference would have on Defendant's financial ability to survive long term, Mr. Malamud answered, "Probably none."  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 219:22-220:4).

278.    The only harm Mr. Malamud could identify that Defendant would suffer if an injunction were entered is that it "put a tremendous amount of effort" into this project and "one hates to have wasted" that effort.  Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 220:6-17).