**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN SOCIETY FOR TESTING AND MATERIALS d/b/a ASTM INTERNATIONAL; <br><br> NATIONAL FIRE PROTECTION ASSOCIATION, INC.; and <br><br> AMERICAN SOCIETY OF HEATING, REFRIGERATING, AND AIR CONDITIONING ENGINEERS, <br><br>        Plaintiffs-Counterdefendants, <br><br>        v. <br><br> PUBLIC.RESOURCE.ORG, INC., <br><br>        Defendant-Counterclaimant. | Case No. 1:13-cv-01215-TSC-DAR <br><br> **MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF DEFENDANT-COUNTERCLAIMANT PUBLIC.RESOURCE.ORG'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND PERMANENT INJUNCTION** <br><br> Action Filed:  August 6, 2014 |

**<u>REDACTED VERSION</u>**

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................1

FACTUAL BACKGROUND ...............................................................................................3

    A.    Public.Resource.org is a non-profit committed to educating the public
about the law. .................................................................................................3

    B.    Plaintiffs facilitate drafting by volunteers of technical standards, which
Plaintiffs then claim as their own copyrighted works and sell for profit.................3

    C.    Federal, state, and local Governments have incorporated by reference
many of Plaintiffs' standards into law. ....................................................4

    D.    Public Resource began making standards incorporated by reference
freely available online in accessible formats; Plaintiffs responded by
posting highly restricted versions of those standards in online "reading
rooms."...........................................................................................................5

    E.    Plaintiffs are unaffected by the availability of the incorporated
standards appearing freely on Public Resource's website. .....................7

    F.    Plaintiffs sue Public Resource for copyright and trademark
infringement for posting copies of standards incorporated by reference
into law...........................................................................................................7

ARGUMENT ......................................................................................................................8

I.    SUMMARY JUDGMENT STANDARD.................................................................8

II.    WHATEVER COPYRIGHT THE STANDARDS HAVE AS MERE
STANDARDS, PLAINTIFFS CANNOT ASSERT A STATUTORY
MONOPOLY OVER THE LAW. .........................................................................9

    A.    The Law Is Not Subject to Copyright Protection.......................................9

    B.    Incorporated Standards Are Laws and Cannot be Subject to a Statutory
Monopoly.....................................................................................................13

    C.    For Decades, Plaintiffs Have Actively Encouraged Transformation of
Their Standards into Law; They Cannot Now Complain of a "Taking." ..............20

    D.    Public Policy Favors Promoting Public Access to the Law...................22

    E.    Plaintiffs Misinterpret the Copyright Act. ...........................................29

III.   EVEN BEFORE INCORPORATION, THE STANDARDS ARE
       UNCOPYRIGHTABLE SYSTEMS AND *SCENES A FAIRE.* ........................................30

       A.    The Incorporated Standards Are Systems and Methods ......................................31

       B.    The Incorporated Standards are *Scènes à Faire.* ...................................................34

IV.    PUBLIC RESOURCE'S POSTING IS A LAWFUL FAIR USE. ...................................35

       A.    Public Resource's Use of Incorporated Standards is Transformative
             and Noncommercial. ..............................................................................................35

       B.    The Incorporated Standards Are Factual. ..............................................................40

       C.    Public Resource Uses No More of the Standards Than Necessary. ......................41

       D.    Public Resource's Use of the Incorporated Standards Has Not Caused,
             and Will Not Cause, Harm in Any Relevant Market. ............................................42

V.     PLAINTIFFS DO NOT OWN THE COPYRIGHT FOR MOST OF THE
       INCORPORATED STANDARDS.........................................................................................44

       A.    Plaintiffs Bear the Burden of Proving Copyright Ownership. ..............................45

       B.    Plaintiffs Cannot Meet Their Burden of Proving Ownership. ..............................47

VI.    THE COURT SHOULD GRANT SUMMARY JUDGMENT TO PUBLIC
       RESOURCE ON PLAINTIFFS' TRADEMARK CLAIMS BECAUSE
       DISPLAYING THE INCORPORATED STANDARDS IS NEITHER
       PROTECTED BY TRADEMARK LAW NOR LIKELY TO CONFUSE A
       REASONABLE MEMBER OF THE PUBLIC.................................................................57

       A.    Plaintiffs Cannot Control Use of the Incorporated Standards Under the
             Guise of Trademark Law. ......................................................................................58

       B.    Public Resource's Display of Plaintiffs' Marks Is Nominative Fair
             Use. ........................................................................................................................59

       C.    No Reasonable Jury Could Find that Public Resource's Display of the
             Incorporated Standards at Issue Could Create a Likelihood of
             Confusion................................................................................................................64

       D.    Plaintiffs' Claim That Inadvertent Copying Errors Make the
             Incorporated Standards at Issue Not Genuine for the Purposes of the
             Lanham Act Is Baseless. ........................................................................................66

VII.     PLAINTIFFS ARE NOT ENTITLED TO A PERMANENT INJUNCTION. .................71

    A.     Plaintiffs Have Experienced No Irreparable Injury To Any Valid Legal
        Interest..................................................................................................................72

    B.     The Balance of Hardships Does Not Favor Plaintiffs' Right To Control
        The Terms Of Access to the Law. ........................................................................74

    C.     The Public Interest Favors Maximum Access To Legal Texts, And
        Non-Profit Efforts To Expand Access. .................................................................75

CONCLUSION....................................................................................................................75

# TABLE OF AUTHORITIES

CASES

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
    562 F.3d 630 (2d Cir. 2009)......................................................................35, 37, 38

*Aalmuhammed v. Lee*,
    202 F.3d 1227 (9th Cir. 2000) ........................................................................55, 56

*Adolph Coors Co. v. A. Genderson & Sons, Inc.*,
    486 F. Supp. 131 (D. Colo. 1980).....................................................................66, 69

*Am. Inst. of Physics v. Schwegman, Lundberg & Woessner, P.A.*,
    No. 12-528, 2013 WL 4666330 (D. Minn. Aug. 30, 2013)....................................36

*Am. Inst. of Physics v. Winstead PC*,
    No. 3:12-CV-1230-M, 2013 WL 6242843 (N.D. Tex. Dec. 3, 2013) ....................36

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..............................................................................................8

*Apple Computer, Inc. v. Formula Int'l Inc.*,
    725 F.2d 521 (9th Cir. 1984) ...............................................................................15

*Apple, Inc. v. Samsung Electronics Co.*,
    678 F.3d 1314 (Fed. Cir. 2012)............................................................................72

Ashley, Kevin D. & Brüninghaus, Stefanie, *Computer Models for Legal
    Prediction*, 46 Jurimetrics J. 309, 312 (2006)........................................................38

*ATC Distrib. Grp. Inc. v. Whatever It Takes Transmission & Parts*,
    402 F.3d 700 (6th Cir. 2005) ...............................................................................33

*Atkins v. Fischer*,
    331 F.3d 988 (D.C. Cir. 2003).................................................................49, 52, 57

*Audi AG v. D'Amato*,
    469 F.3d 534 (6th Cir. 2006) ...............................................................................72

*Authors Guild, Inc. v. HathiTrust*,
    755 F.3d 87 (2d Cir. 2014).............................................................................37, 38

*Authors Guild v. Google, Inc.*,
    804 F.3d 202 (2d Cir. 2015).......................................................35, 37, 41, 42

*Banks v. Manchester*,
    128 U.S. 244 (1888)..........................................................................................9, 10

*BellSouth Advert. & Publ'g Corp. v. Donnelley Info. Publ'g, Inc*,
    999 F.2d 1436 (11th Cir. 1993) .......................................................................33

*Bikram's Yoga Coll. of India, L.P. v. Evolation Yoga, LLC*,
    803 F.3d 1032 (9th Cir. 2015) ..................................................................32, 33

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
    448 F.3d 605 (2d Cir. 2006)...........................................................................37

*Bond v. Blum*,
    317 F.3d 385 (4th Cir. 2003) .........................................................................36

*Bridgeport Music, Inc. v. DJ Yella Muzick*,
    99 F. App'x 686 (6th Cir. 2004) ....................................................................74

*Building Officials & Code Administrators v. Code Technology, Inc.*,
    628 F.2d 730 (1st Cir. 1980)............................................................13, 14, 16

*C.B. Fleet Co., Inc. v. Unico Holdings, Inc.*,
    510 F. Supp. 2d 1078 (S.D. Fla. 2007) ........................................................33

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994)......................................................35, 39, 41, 42

*CCC Information Services Inc. v. McLean Hunter Market Reports, Inc.*,
    44 F.3d 61 (2d Cir. 1994) ........................................................................17, 18

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..........................................................................................8

*Century 21 Real Estate Corp. v. Lendingtree, Inc.*,
    425 F.3d 211 (3d Cir. 2005)...........................................................................63

*Champion Spark Plug Co. v. Sanders*,
    331 U.S. 125 (1947)........................................................................................68

*Childress v. Taylor*,
    945 F.2d 500 (2d Cir. 1991)...........................................................................57

*Community for Creative Non-Violence, et al. v. Reid*,
    490 U.S. 730 (1989)........................................................................................54

*Comp. Assoc. Int'l v. Altai*,
    982 F.2d 693 (2d Cir. 1992)....................................................................17, 34

*Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*,
    843 F.2d 600 (1st Cir. 1988)..........................................................................11

*Consumers Union of U.S., Inc. v. Gen. Signal Corp.*,
  724 F.2d 1044 (2d Cir. 1983)......................................................................................40, 41

*\*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
  539 U.S. 23 (2003).....................................................................................................58, 59

*Davis v. Blige*,
  505 F.3d 90 (2d Cir. 2007)................................................................................................74

*Dosso v. U.S. Postal Serv.*,
  No. CIV.A. CCB-10-1703, 2010 WL 4900988 (D. Md. Nov. 24, 2010)..............................27

*Durham Industries, Inc. v. Tomy Corp.*,
  630 F.2d 905, 916 (2d Cir. 1980).....................................................................................16

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006)....................................................................................................73, 75

*Eden Toys, Inc. v. Florelee Undergarment Co.*,
  697 F.2d 27 (2d Cir. 1982). (Pls. Mem. 17–18.)..................................................................46

*El Greco Leather Products Co. v. Shoe World, Inc.*,
  806 F.2d 392 (2d Cir. 1986)...........................................................................................66, 69

*Enesco Corp. v. Price/Costco Inc.*,
  146 F.3d 1083 (9th Cir. 1998) .........................................................................................68

*Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*,
  122 F.3d 1211 (9th Cir. 1997) .........................................................................................45

*Family Dollar Stores, Inc. v. United Fabrics Intern., Inc.*,
  896 F. Supp. 2d 223 (S.D.N.Y. 2012)...............................................................................47

*\*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991)..............................................................................................30, 45, 49

*Fox News Network, LLC v. TVEyes, Inc.*,
  43 F. Supp. 3d 379 (S.D.N.Y. 2014)..................................................................................42

*Fox v. Washington*,
  236 U.S. 273 (1915).........................................................................................................12

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) (en banc) ............................................................................73

*Globalaw, Ltd. v. Carmon & Carmon Law Office*,
  452 F. Supp. 2d 1 (D.D.C. 2006).......................................................................................64

*Globe Newspaper Co. v. Superior Court for Norfolk Cty.*,
    457 U.S. 596 (1982).....................................................................................11

*Golan v. Holder*,
    132 S. Ct. 873 (2012)...................................................................................11

*Goldwyn Pictures Corp. v. Howells Sales Co.*,
    282 F. 9 (2d Cir. 1922)................................................................................45

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972).....................................................................................12

*Harper & Row Publ'rs., Inc. v. Nation Enters.*,
    471 U.S. 539 (1985)...............................................................................40, 44

*Healthcare Advocates Inc. v. Harding, Earley, Follmer & Frailey*,
    497 F. Supp. 2d 627 (E.D. Pa. 2007) ........................................................36

*Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp.*,
    34 U.S.P.Q.2d 1450 (N.D. Cal. 1995) .......................................................66

*Howell v. Miller*,
    91 F. 129 (6th Cir. 1898) (Harlan, J.) .......................................................10

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
    515 U.S. 557 (1995).....................................................................................72

*\*I.A.E. Inc. v. Shaver*,
    74 F.3d 768 (7th Cir. 1996) .......................................................................44

*Imperial Residential Design, Inc. v. Palms Dev. Group, Inc.*,
    29 F.3d 581 (11th Cir. 1994) .....................................................................49

*Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.*,
    303 F.3d 1242 (11th Cir. 2002) .................................................................65

*\*Interactive Products Corp. v. a2z Mobile Office Solutions, Inc.*,
    326 F.3d 687 (6th Cir. 2003) .....................................................................59

*\*International Code Council, Inc. v. National Fire Protection Association, Inc.*,
    No. 02 C 5610, 2006 WL 850879 (N.D. Ill. March 27, 2006) ...........49, 50

*John G. Danielson Inc. v. Winchester-Conant Properties, Inc.*
    186 F. Supp. 2d 1 (D. Mass. 2002) ............................................................20

*John G. Danielson Inc. v. Winchester-Conant Properties, Inc.*,
    322 F.3d 26 (1st Cir. 2003)........................................................................20

*John Wiley & Sons, Inc. v. DRK Photo*,
  998 F. Supp. 2d 262 (S.D.N.Y. 2014) ................................................................51

*Kern River Gas Transmission Co. v. Coastal Corp.*,
  899 F.2d 1458 (5th Cir. 1990) .....................................................................16, 17

*Kregos v Associated Press*,
  937 F.2d 700 (2d Cir 1991) ..........................................................................15, 16

*Lambing v. Godiva Chocolatier*,
  142 F.3d 434 (6th Cir. 1998) .............................................................................32

*\*Lexmark Int'l, Inv. v. Static Control Components, Inc.*,
  387 F.3d 522 (6th Cir. 2004) ................................................................34, 37, 41

*Lotus Development Corp. v. Borland Intern., Inc.*,
  49 F.3d 807 (1st Cir. 1995) ................................................................................17

*Lulirama Ltd., Inc. v. Axcess Broad. Servs.*,
  128 F.3d 872 (5th Cir. 1997) .............................................................................57

*\*Marya v. Warner/Chappell Music, Inc.*,
  No. CV13-04460, 2015 WL 5568497 (C.D. Cal. Sept. 22, 2015) ....................47

*Masquerade Novelty, Inc. v. Unique Industries, Inc.*,
  912 F.2d 663 (3d Cir. 1990) ..............................................................................47

*\*Matrix Essentials, Inc. v. Emporium Drug Mart, Inc., of Lafayette*,
  988 F.2d 587 (5th Cir. 1993) ........................................................................67, 69

*Mid America Title Co. v. Kirk*,
  59 F.3d 719 (7th Cir. 1995) ...............................................................................45

*Mills v. Alabama*,
  384 U.S. 214 (1966) ...........................................................................................11

*Musser v. Utah*,
  333 U.S. 95 (1948) .............................................................................................12

*New Kids on the Block v. News Am. Publ'g, Inc.*,
  971 F.2d 302 (9th Cir. 1992) .............................................................................60

*Nguyen v. Barnes & Noble Inc.*,
  763 F.3d 1171 (9th Cir. 2014) ...........................................................................52

*Nieman v. VersusLaw, Inc.*,
  512 Fed. App'x. 635, 2013 WL 1150277 (7th Cir. Mar. 19, 2013) ..................11

*Nuzzo v. FBI*,
  No. 95–cv–1708, 1996 WL 741587 (D.D.C. Oct. 8, 1996)....................................................8

*O'Shea v. Littleton*,
  414 U.S. 488 (1974)..................................................................................................72

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.*,
  762 F.2d 1374 (9th Cir. 1985) ....................................................................................73

*Online Policy Group v. Diebold, Inc.*,
  337 F. Supp. 2d 1195 (N.D. Cal. 2004) ........................................................................37

*Oracle America, Inc. v. Google Inc.*,
  750 F.3d 1339 (Fed. Cir. 2014)...................................................................................15

*Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*,
  69 F. Supp. 3d 175 (D.D.C. 2014) ..........................................................................64, 65

*Paramount Pictures Corp. v. Video Broadcasting Systems, Inc.*,
  724 F. Supp. 808 (D. Kan. 1989) ................................................................................69

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) ........................................................................35, 37, 38

*Perkins Sch. for the Blind v. Maxi-Aids Inc.*,
  274 F. Supp. 2d 319 (E.D.N.Y. 2003) ...........................................................................66

*Practice Management Information Corp. v. American Medical Ass'n*,
  121 F.3d 516 (9th Cir. 1997) ..........................................................................17, 18, 19

\*Prestonettes, Inc. v. Coty*,
  264 U.S. 359 (1924)........................................................................................66, 67, 68

*Prunte v. Universal Music Grp.*,
  484 F. Supp. 2d 32 (D.D.C. 2007) ..............................................................................59

*Pub. Warehousing Co. K.S.C. v. Def. Supply Ctr. Philadelphia*,
  489 F. Supp. 2d 30 (D.D.C. 2007) ..............................................................................71

*Publications Int'l v. Meredith Corp.*,
  88 F.3d 473 (7th Cir. 1996) .......................................................................................32

*R.W. Back v. E3 Consulting*,
  577 F.3d 1133 (10th Cir. 2009) .................................................................................10

*Radiance Foundation, Inc. v. NAACP*,
  786 F.3d 316 (4th Cir. 2015) .....................................................................................60

*Rains v. Cascade Indus., Inc.*,
  402 F.2d 241 (3d Cir. 1968).................................................................................8

*Religious Tech. Ctr. v. F.A.C.T.Net, Inc.*,
  901 F. Supp. 1519 (D. Colo. 1995).....................................................................40

*Righthaven, LCC v. Jama*,
  No. 2:10-CV-1322, 2011 WL 1541613 (D. Nev. April 22, 2011) .........................................40

*S. Bldg. Code Cong. Int'l, Inc. v. Veeck*,
  539 U.S. 969 (2003).......................................................................................21

*Salinger v. Colting*,
  607 F.3d 68 (2d Cir. 2010)................................................................................72

*Sara Lee Corp. v. Kayser-Roth Corp.*,
  81 F.3d 455 (4th Cir. 1996) ..............................................................................68

*Sassafras Enterprises, Inc. v. Roshco, Inc.*,
  889 F. Supp. 343 (N.D. Ill. 1995) .......................................................................32

*Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*,
  53 F.3d 1073 (9th Cir. 1995) .............................................................................66

*Shell Oil Co. v. Commercial Petroleum, Inc.*,
  928 F.2d 104 (4th Cir. 1991) .........................................................................66, 69

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984)...............................................................................38, 39, 41

*Specht v. Netscape Commc'ns Corp.*,
  306 F.3d 17 (2d Cir. 2002)................................................................................52

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
  756 F.3d 73(2d Cir. 2014).................................................................................41

*Thomas v. Powell*,
  247 F.3d 260 (D.C. Cir. 2001) ............................................................................71

*Tiffany (NJ) Inc. v. eBay Inc.*,
  600 F.3d 93 (2d Cir. 2010)...................................................................60, 61, 62, 74

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*,
  610 F.3d 1171 (9th Cir. 2010) ............................................................................63

*United States v. Myers*,
  553 F.3d 328 (4th Cir. 2009) ............................................................................15

*Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*,
   618 F.3d 417 (4th Cir. 2010), *as amended* (Aug. 24, 2010) .....................................45

*Urbont v. Sony Music Entm't*,
   100 F. Supp. 3d 342 (S.D.N.Y. 2015) ...................................................................46

*\*Veeck v. S. Bldg. Code Cong. Int'l, Inc.*,
   293 F.3d 791 (5th Cir. 2002) (*en banc*) ....................................................... *passim*

*Warren Pub., Inc. v. Microdos Data Corp.*,
   115 F.3d 1509 (11th Cir. 1997) ...........................................................................71

*Warren v. Fox Family Worldwide, Inc.*,
   328 F.3d 1136 (9th Cir. 2003) .............................................................................54

*\*Wheaton v. Peters*,
   33 U.S. (8 Pet.) 591 (1834) ...................................................................................9

*Whitehead v. CBS/Viacom, Inc.*,
   315 F. Supp. 2d 1 (D.D.C. 2004) .........................................................................64

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................................................75

*Wynn Oil Co. v. Thomas*,
   839 F.2d 1183 (6th Cir. 1988) .............................................................................65

### STATUTES

5 U.S.C. § 552(a) ......................................................................................................5, 27

17 U.S.C. § 102(b) ................................................................................................ *passim*

17 U.S.C. § 105 ........................................................................................10, 11, 29, 54

17 U.S.C. § 107 ...........................................................................................................35

17 U.S.C. § 201 .....................................................................................................29, 54

17 U.S.C. § 204 .............................................................................................49, 52, 53

Cal. Gov't Code § 6267 ..............................................................................................26

D.C. Code § 39-108 ....................................................................................................26

Electronic Freedom of Information Act Amendments of 1996 (E-FOIA), Public
   Law No. 104-231, 110 Stat. 3048 ........................................................................27

Freedom of Information Act ("FOIA") .......................................................................27

Mass. Gen. Laws Ann. ch. 78, § 7 ....................................................................................26

24 Pa. Cons. Stat. § 9375 ..........................................................................................26, 27

**REGULATIONS**

1 C.F.R. § 51.1(f) ........................................................................................................43

7 C.F.R § 1755.509 .......................................................................................................5

41 C.F.R. § 60.17 (2011) .....................................................................................5, 8, 60

46 C.F.R. § 39.1005 (2013) ...........................................................................................8

50 Fed. Reg. 40895, 40897 ..........................................................................................18

**RULES**

Fed. R. Civ. P. 30(b)(6)..................................................................................42, 43, 53, 54

Fed. R. Civ. P. 56(c) .......................................................................................................8

Fed. R. Evid.702 ..........................................................................................................44

**OTHER AUTHORITIES**

1 Goldstein, Paul, Goldstein on Copyright
    § 2.49 n.45.2.......................................................................................................14, 17
    § 2.5.2, at 2:51....................................................................................................28

6 Patry on Copyright § 22:77.........................................................................................71

Federal Register, *Where to Find Materials Incorporated by Reference at NARA
    Facilities*, http://www.archives.gov/federal-register/cfr/ibr-
    locations.html#why (last visited Dec. 16, 2015)....................................................23

McCarthy, J. Thomas, McCarthy on Trademarks and Unfair Competition § 23:11 ....................59

Nimmer on Copyright
    § 1.06........................................................................................................................49
    § 6.12........................................................................................................................56
    § 7.20[B][1].............................................................................................................47
    § 10.03[A][1][a]......................................................................................................49
    § 12.02[A]................................................................................................................45
    § 12.02[C]................................................................................................................44
    § 12.11......................................................................................................................45
    § 13.03......................................................................................................................34
    § 13.03[B][3]............................................................................................................16
    § 13.03[F][3]............................................................................................................34

Paine, Thomas Paine, Rights of Man 39 (1791) ........................................................................12

Samuelson, Pamela, *Questioning Copyrights in Standards*, 48 B.C. L. Rev 193,
    223–24 (2007)....................................................................................................................29

Slover George & Weintraub, Rachel, Comments of George Slover & Rachel
    Weintraub, Consumers Union and Consumers Federation of America, OFR
    2013-0001-0034 (Jan. 31, 2014) ......................................................................................24

Smith, Thomas A. Smith, *The Web of Law*, 44 San Diego L. Rev. 309, 312-14
    (2007) ................................................................................................................................38

Speidel, Jacob, Comments of Jacob Speidel, Senior Citizens Law Project,
    Vermont Legal Aid, OFR-2013-0001-0037 (Jan. 31, 2014), at 1...........................................24

Strauss, Peter L., *Private Standards Organizations and Public Law 16* (Columbia
    Pub. Law Research, Paper No. 13-334, 2013),
    http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2194210 ...............................................20

Tamanaha, Brian Z., On the Rule of Law: History, Politics, Theory 34
    (Cambridge Univ. Press 2004)...............................................................................23, 24

U.S. Const. Art. I, § 8, cl. 8..................................................................................................12, 44

U.S. Copyright Office, Compendium of Copyright Office Practices § 313.6(c)(2)
    (3d ed. 2014) ..............................................................................................................10, 46

Weissman, Robert, Comments of Robert Weissman, Public Citizen, OFR 2013-
    0001-0031 (Jan. 31, 2014), at 1 .......................................................................................24

William Li et al., *Law Is Code: A Software Engineering Approach to Analyzing
    the United States Code,* 10 J. Bus. & Tech. L. 297, 309 (2015)..............................................38

## <u>INTRODUCTION</u>

Public.Resource.Org deserves summary judgment in its favor on all claims in this case. It is a fundamental principle of our jurisprudence, and our democracy, that the people have a right to know and share the laws they must obey. Accordingly, for more than 200 years, our courts have recognized that it would be profoundly unjust to allow any entity to claim a property right in the law, whether that law takes the form of legal opinions, statutes, or regulations. Legislators, judges, and regulators are commonly identified as "authors" of those texts, but no one would imagine them to own a copyright as a result. No matter who holds the pen, as a matter of law and policy in our democratic system, the citizens are the true authors of, and owners of, the law.

That fundamental principle does not change just because our government has chosen partially to outsource the crafting of some regulations. The American Legislative Exchange Council ("ALEC"), the Uniform Law Commission, and lobbyists draft model laws all the time, and officials then cut and paste language from those model laws into legislation, sometimes verbatim. Once those laws are passed, no one would suggest that ALEC or the Uniform Law Commission had the ability to charge for access to them or enjoin others from publishing them.

The same is true here. Standards development organizations ("SDOs"), with the direct participation and blessing of government officials, oversee the development of standards. Government officials then expressly adopt some into government regulations, at which point these standards become as mandatory as any other law or regulation. If the Nation's electricians and building owners must obey the law as set forth in the National Electrical Code, any member

1

of the public has a right to read it, unimpeded by a toll or contract restrictions. The same holds

true for every other standard incorporated by reference into law at issue in this litigation.[1]

To be clear, this case does not concern Public Resource's right to speak or share

*standards as private standards*. It concerns the public's right to speak, share, and comment upon

*the law*. Plaintiffs spend a great deal of text describing their work developing codes and

standards of all kinds, and arguing the importance of copyright revenues to those operations. But

this case is not about the copyright status of the many *other* standards Plaintiffs develop, much

less annotations, guides, training and other ancillary products.

Instead, the question here is whether Public Resource may post the small proportion of

those standards *that governments have expressly made into law*. Public Resource has no interest

in other standards and documents that Plaintiffs organize, and it has no quarrel with SDOs'

claiming and enforcing copyrights on various supplemental materials they produce.

No one may claim a "right to exclude others from using" the law, and the Court should

grant summary judgment to Public Resource on Plaintiffs' copyright claims on this ground alone,

as to every incorporated standard listed in the Amended Complaint. But that issue, though

fundamental, is only the first flaw in Plaintiffs' case. The Plaintiffs' claims also fail, in whole or

in part, for several other distinct but related reasons: (1) the incorporated standards are primarily

systems, methods. processes, and ideas, which the Copyright Act specifically excludes from

copyright protection; (2) to the extent that they are not so excluded, Public Resource's use of the

incorporated standards is a lawful fair use (as is its use of the trademarks contained within those

---

[1] For avoidance of doubt: While Plaintiffs have cherry-picked a few standards and ask the Court to effectively resolve the case based on those alone, Public Resource does not believe the Court should rule on the important issues in this case based only on Plaintiffs' carefully curated collection. The legal protections for Public Resource's activities apply to all of the works in suit. Therefore, Public Resource requests summary judgment in its favor on all of the incorporated standards listed in the First Amended Complaint.

standards); and (3) to the extent that there are copyrights in the standards, those rights do not belong to the Plaintiffs because the standards were developed by a host of volunteers (including government employees), many of whom who did not, and often could not, validly assign copyrights in their contributions to the Plaintiffs. As Plaintiffs cannot prevail on their claims, the Court should also deny Plaintiffs' request for a permanent injunction.

## FACTUAL BACKGROUND

Public.Resource.org ("Public Resource") posts the law on its website. This includes statutes, regulations, and standards that have been incorporated by reference into law.

### A.   Public.Resource.org is a non-profit committed to educating the public about the law.

Public.Resource.org is a non-profit corporation whose mission is to maintain public works projects on the Internet, including the publication of statutes, regulations, and other material that constitutes the law. (Public Resource's Statement of Material Facts ("SMF") ¶ 1–2.) Public Resource maintains an archive of laws and other government authored materials on several domains under the public.resource.org website. (*Id.* ¶ 3.) Public Resource has made judicial opinions, Internal Revenue Service records, patent filings, and safety regulations accessible on the Internet. (*Id.* ¶ 4). It does not charge for access to this archive or accept donations or gifts that are tied to the posting of specific standards or groups of standards. (*Id.* ¶ 5–6.) Its operating income is not based on the amount of traffic its websites receive. (*Id.* ¶ 7.)

### B.   Plaintiffs facilitate drafting by volunteers of technical standards, which Plaintiffs then claim as their own copyrighted works and sell for profit.

Plaintiffs are standards development organizations ("SDOs") that publish voluntary consensus standards in various industries, such as ASTM D396 "Standard Specification for Fuel Oils" and NFPA 70 "National Electrical Code." (*Id.* ¶ 8.) According to Plaintiffs, ASTM has published approximately 12,000 standards, NFPA has published over 300 standards, and

ASHRAE has published over 50 standards. (*Id.* ¶ 9.) Many volunteers contribute to, and have final control over, these standards; hence they are called voluntary consensus standards. (*Id.* ¶ 132–36, 138.) The volunteers include industry experts, consumer advocates, and government workers. (*Id.* ¶ 132.) Generally, the volunteers draft the standards to achieve a consensus of minimally acceptable or best industry practices in the area covered by the standard, using the most precise and scientific language possible. (*Id.* ¶ 62–76.) The content of the standards results from external factors affecting the industry practice that is covered by the standard. (*Id.* ¶ 80–81.)

Each Plaintiff sought and obtained copyright registrations claiming to be the sole author of each respective standard (with the exception of ASTM D323-1958(1968)). (*Id.* ¶ 130–31.) Each now claims to be merely a "joint" author of the standards. (Plaintiffs' Memorandum of Points and Authorities, ECF 118 ("Pls. Mem.") at 16.) Plaintiffs' staffs provide facilitative and editorial functions, but they do not author the standards or control the final content. (*Id.* ¶ 137–8.) Plaintiffs have not obtained valid assignments from the authors for the majority of the incorporated standards at issue. Plaintiffs' sole ownership interest is as non-exclusive licensees. *See* Part V., below.

### C.   Federal, state, and local Governments have incorporated by reference many of Plaintiffs' standards into law.

Governments have incorporated into law, by reference, the standards at issue (the "incorporated standards at issue"). (*Id.* ¶ 13, 22.) Plaintiffs actively encourage—and indeed lobby—governments to adopt their standards as law. (*Id.* ¶ 30–42.) The federal government incorporates standards into law following a rigorous notice and comment period. Generally, an agency responsible for regulating an industry will publish a notice in the Federal Register concerning the agency's intent to incorporate a standard into law and will ask the public to submit comments. (*Id.* ¶ 14–15.)

4

At the end of the notice and comment process, the agency will determine whether to incorporate the standard by reference. (*Id.* ¶ 16.) If the agency incorporates the standard by reference, the Director of the Federal Register then approves the incorporation by reference. 5 U.S.C. § 552(a). The federal government expressly encourages agencies to incorporate standards by reference, as opposed to reprinting the entire text of the standards, to limit the length of the Code of Federal Regulations. (*Id.* ¶ 24.) The standard then becomes the law of the United States. Standards are also incorporated by reference into state and local laws (*Id.* ¶ 13.)

Plaintiffs admit to benefiting from the incorporation of their standards into law. (*Id.* ¶ 33, 35, 77–79.) When a standard is incorporated by reference into the Code of Federal Regulations, the code itself informs readers that they may obtain a copy of the standards from the Office of the Federal Register ("OFR") or from the SDO that published the standard. *E.g.*, 41 C.F.R. § 60.17 (2011); 7 C.F.R § 1755.509. The OFR directs people who want to read incorporated standards to "contact the standards organization that developed the material." (*Id.* ¶ 19) Alternatively, one may submit a written request to the OFR to inspect (and make limited photocopies of) an incorporated standard at an office in Washington, D.C. (*Id.*)

**D.**     **Public Resource began making standards incorporated by reference freely available online in accessible formats; Plaintiffs responded by posting highly restricted versions of those standards in online "reading rooms."**

Beginning in 2008, Public Resource began posting state safety regulations and statutes online, including portions of the incorporated standards in this case. (*Id.* ¶ 4.) Public Resource purchased paper copies of the codes and scanned them into PDF files. (*Id.* ¶ 173–74.) Public Resource then applied metadata and optical character recognition ("OCR") to the PDF files. (*Id.* ¶ 177–78.) Public Resource also placed a cover sheet on each document to make it clear that Public Resource was posting the document because it had been incorporated by reference into law. (*Id.* ¶ 176.) Public Resource improved this process over time and began posting some of the

standards in HTML format, which included converting formulas and graphics into appropriate

formats. (*Id.* ¶ 83, 175.) Over time, Public Resource used contractors to assist in transforming the

standards into HTML format. Two people independently type out most of the standards on

Public Resource's websites and compare any discrepancies between their versions to confirm the

accuracy of the transcription in a process called "double-keying." Public Resource's contractor

also worked with after-school educational programs to convert the diagrams into Scalable Vector

Graphics ("SVG") and the mathematical formulae into Mathematics Markup Language

("MathML"), a program that trains high-school and college students how to create Web pages

and educates them about democracy. (*Id.* ¶ 83.) The code that Public Resource applies to HTML

versions makes the incorporated standards easier to navigate, especially for people with print

disabilities. (*Id.* ¶ 84, 91–92, 97.) The HTML versions are accessible to people who are blind or

print-disabled: they can use screen reader software to read and navigate the standards. (*Id.* ¶ 91.)

In 2012, Public Resource began to post on its website copies of standards incorporated by

reference into law. Public Resource began by purchasing paper copies of 73 standards, copying

them and placing a cover sheet and notice of incorporation on each one, and sending the copies

and additional material to government officials and ten SDOs including Plaintiffs. (*Id.* ¶ 4.) Then

Public Resource president Carl Malamud began searching for copies of additional incorporated

standards, many of which were not available from the SDOs, often because the version

incorporated into law had been superseded by a later version of the standard. (*Id.*) Public

Resource makes the standards it posts freely available on its website. (*Id.* ¶ 5.)

After Public Resource began posting standards on its website, certain SDOs began also

posting copies of selected standards on their websites in highly restricted formats. (*Id.* ¶ 51–61.)

In the Plaintiffs' case, they created online reading rooms that display the text of the standards as

images, but the displays do not allow searching or software-based analysis. (*Id.* ¶ 52.) The

standards cannot be downloaded or printed. (*Id.* ¶ 61.) It is also not possible for screen-reading

software to convert the standards to speech for the print disabled. (*Id.* ¶ 53.) ASTM and NFPA

impose onerous end user license agreements as a condition of access. (*Id.* ¶ 57.) ASTM and

NFPA further require that visitors provide their name and email address to access the reading

rooms. (*Id.* ¶ 54, 55.) ███████████████████████████████████████

████████ (*Id.* ¶ 56.)

> **E.     Plaintiffs are unaffected by the availability of the incorporated standards
> appearing freely on Public Resource's website.**

None of the Plaintiffs has experienced any loss from Public Resource posting

incorporated standards on its website. For the seven years since Public Resource began posting

incorporated standards on its website, Plaintiffs have admitted that they are not aware of any

measurable loss from Public Resources' activities. (*Id.* ¶ 106–129.) Plaintiffs' purported expert

witness, John Jarosz, relied entirely on conversations with Plaintiffs' executives to opine that

some hypothetical harm to Plaintiffs' business could occur in the future. (*Id.* ¶ 113–19.) Mr.

Jarosz made no attempt to quantify the market harm he opines Plaintiffs would suffer. (*Id.* ¶ 112–

19.) All of the incorporated standards at issue, except the 2014 edition of the NEC, have been

superseded by newer versions or withdrawn. (*Id.* ¶ 27.) In addition, volunteers participate in

developing standards for reasons other than deriving revenue from sales of the standards. (*Id.* ¶

28.)

> **F.     Plaintiffs sue Public Resource for copyright and trademark infringement for
> posting copies of standards incorporated by reference into law.**

Plaintiffs sued Public Resource for posting on its websites 256 standards incorporated by

reference into law (the "incorporated standards at issue"). (Compl. Ex. A–C, ECF No. 1-1–1-3;

Am. Compl., ECF No. 74-1.) The standards at issue include 229 ASTM standards, 23 NFPA

standards, and 4 ASHRAE standards. (*Id.*) Each of the 256 standards is incorporated by reference into law. (SMF ¶ 22.) For example, ASTM D396-98 "Standard Specification for Fuel Oils" is incorporated into reference into law at 41 C.F.R. § 60.17 (2011), which states: "The materials listed below are incorporated by reference in the corresponding sections noted. These incorporations by reference were approved by the Director of the Federal Register on the date listed. . . . ASTM D396-78, 89, 90, 92, 96, 98, Standard Specification for Fuel Oils." Similarly, NFPA's National Electric Code (2011) (also known as "NFPA 70"), is incorporated by reference into law at 46 C.F.R. § 39.1005 (2013), which states "[c]ertain material is incorporated by reference (IBR) into this part with the approval of the Director of the FEDERAL REGISTER under 5 U.S.C. 552(a) and 1 CFR part 51. . . . NFPA 70—National Electrical Code, 2011, IBR approved for §39.2009(a)."

## ARGUMENT

### I.     Summary Judgment Standard

A court must grant summary judgment if it determines that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment on the undisputed facts as a matter of law." Fed. R. Civ. P. 56(c). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden is on the movant to make the initial showing of the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden is met, the movant is entitled to a judgment as a matter of law if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

Where, as here, parties file cross-motions for summary judgment, each must carry its own burden under the applicable legal standard. *See Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968); *Nuzzo v. FBI*, No. 95–cv–1708, 1996 WL 741587, at *1 (D.D.C. Oct. 8, 1996).

II.     **Whatever Copyright the Standards Have as Mere Standards, Plaintiffs Cannot Assert a Statutory Monopoly over the Law.**

No copyright exists in the law itself. This is true for the United States Code and the Code of Federal Regulations. It is true for each of the 50 states' codes and for local ordinances. It is equally true where the law was drafted by private citizens and then enacted by a legislature or agency as part of a "public-private partnership." In this case, every standard at issue has become a law through incorporation by reference into federal, state, or municipal statutes and regulations. These "incorporated standards" are outside the scope of the copyright statutory monopoly.

A.      **The Law Is Not Subject to Copyright Protection.**

1.      **An unbroken line of case law holds that the law is excluded from copyright, and the Copyright Office recognizes that exclusion.**

For nearly two centuries it has been a fundamental principle of American jurisprudence that the texts that make up the law reside in the public domain and cannot be under private control. Indeed, one of the first copyright cases, *Wheaton v. Peters*, 33 U.S. (8 Pet.) 591 (1834) established this principle. In that case, one of the Supreme Court's own official reporters claimed copyright in his annotated collections of the Court's opinions. The Court declared that it was "unanimously of the opinion that no reporter has or can have any copyright in the written opinions delivered by this Court." *Id.* at 668. Similarly, in *Banks v. Manchester*, 128 U.S. 244 (1888), the Court rejected a copyright claim by a court reporter for a collection of the opinions of the Ohio Supreme Court.  "The whole work done by the judges constitutes the authentic exposition and interpretation of the law, which, binding every citizen, is free for publication to all, whether it is a declaration of unwritten law, or an interpretation of a constitution or a statute." *Id.* at 253. In 1898, the Sixth Circuit observed that "any person desiring to publish the statutes of a state may use any copy of such statutes to be found in any printed book, whether such book be

9

the property of the state or the property of an individual." *Howell v. Miller*, 91 F. 129, 137 (6th

Cir. 1898) (Harlan, J.).

Decisions such as *Banks* "represent[] a continuous understanding that 'the law,' whether

articulated in judicial opinions or legislative acts or ordinances, is in the public domain and thus

not amenable to copyright." *Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 293 F.3d 791, 796 (5th Cir.

2002) (*en banc*). The U.S. Copyright Office has expanded on this fundamental principle with

respect to all forms of law from all sources, not merely U.S. Government works:

> As a matter of longstanding public policy, the U.S. Copyright Office will not
> register a government edict that has been issued by any state, local, or territorial
> government, including *legislative enactments, judicial decisions, administrative
> rulings, public ordinances, or similar types of official legal materials*. Likewise,
> the Office will not register a government edict issued by any foreign government.

U.S. Copyright Office, Compendium of Copyright Office Practices § 313.6(c)(2) (3d ed.

2014) (emphasis added).

### 2. The plain text of the Copyright Act reflects this understanding.

The Copyright Act codifies the non-copyrightability of the law in 17 U.S.C. § 102(b),

which prohibits copyright protection for "any "idea, procedure, process, system, method of

operation, concept, principle, or discovery, regardless of the form in which it is described,

explained, illustrated, or embodied in such work," and § 105, which excludes copyright

protection for U.S. government works.

Section 102(b) helps ensure that "courts do not unwittingly grant protection to an idea by

granting exclusive rights in the only, or one of only a few, means of expressing that idea. If

protection were granted to these expressions, it would so increase the cost of creation for others

who seek to build in the work that it would impede progress in the arts." *R.W. Back v. E3*

*Consulting*, 577 F.3d 1133, 1145 (10th Cir. 2009). It is reinforced by the merger doctrine, which

holds that "[w]hen there is essentially only one way to express an idea, the idea and expression

are inseparable, and copyright is no bar to copying that expression." *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 606 (1st Cir. 1988).

At the moment a government turns words into law, those words become "'facts' under copyright law. They are the unique, unalterable expression of the 'idea' that constitutes local law." *Veeck*, 293 F.3d at 801. The only way to express codified laws is to use the language of the law itself. Under Section 102(b) and the merger doctrine, they cannot be subject to copyright restrictions.

For the same reasons, 17 U.S.C. § 105 denies copyright protection for any work of the U.S. Government. When Congress or a federal agency enacts a law, and does so by incorporating by reference a pre-existing standard, the resulting law is still a U.S. Government work.

**3.      A statutory monopoly in the law would conflict with fundamental Constitutional protections.**

In *Golan v. Holder*, 132 S. Ct. 873, 890 (2012), the Supreme Court recognized that the potential tension between First Amendment and copyright, and it identified the idea/expression dichotomy codified in Section 102(b) as essential to balancing copyright and free speech protections. *Id.* at 889-91.

Section 102(b) does precisely that with respect to the law. Communication about the law is a core speech interest. *See, e.g.*, *Nieman v. VersusLaw, Inc.*, 512 Fed. App'x. 635, 2013 WL 1150277, at *2 (7th Cir. Mar. 19, 2013). As the Supreme Court noted in striking down a statute that would close criminal trials, "'a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs.' [This] serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government." *Globe Newspaper Co. v. Superior Court for Norfolk Cty.*, 457 U.S. 596, 604 (1982) (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)).

Accordingly, copyright restrictions on that speech could put the Copyright Clause of the Constitution (U.S. Const. Art. I, § 8, cl. 8) in conflict with the First Amendment. Section 102(b)'s exclusion of laws from copyrightability helps resolve that conflict, ensuring that copyright does not interfere with the public ability to access, share, and discuss the law.

Equal protection of the laws and due process are also jeopardized if only some citizens can afford to purchase convenient access to the laws that all of us are bound to obey (with potential criminal penalties for non-compliance), but others cannot. As Thomas Paine observed, "In the representative system, the reason for every thing must publicly appear. Every man is a proprietor in government, and considers it a necessary part of his business to understand. . . . The government of a free country, properly speaking, is not in the persons, but in the laws." Thomas Paine, Rights of Man 39 (1791). Thus, for example, law that is vague and ambiguous "may run afoul of the Due Process Clause because it fails to give adequate guidance to those who would be law-abiding, to advise defendants of the nature of the offense with which they are charged, or to guide courts in trying those who are accused." *Musser v. Utah*, 333 U.S. 95, 97 (1948).

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warnings.

*Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972).

The same principle holds here: The public must be able to review and understand the rules we live by, so that they do not become traps for the unwary. Allowing any entity to restrict that access thwarts that essential democratic requirement and raises constitutional questions. *See Fox v. Washington*, 236 U.S. 273, 277 (1915) (courts should avoid construing statutes in ways that raise constitutional concerns).

**B.      Incorporated Standards Are Laws and Cannot be Subject to a Statutory Monopoly.**

The fundamental right to access and share the law does not disappear when the law in question is a technical standard that has become law through incorporation by reference.

**1.      The leading cases recognize that SDOs cannot restrict access to the law.**

As the Fifth Circuit concluded in *Veeck*, once a standard is incorporated into the law, the people become the owner of that law. In that case, Peter Veeck, a Texas resident who hosted a noncommercial website collecting information about north Texas, purchased and then posted online model building codes that had been incorporated into the law of two Texas towns. 293 F.3d at 793. The private organization that initially developed the codes accused Veeck of copyright infringement. Sitting *en banc*, the Fifth Circuit rejected the claim:

> Lawmaking bodies in this country enact rules and regulations only with the consent of the governed. The very process of lawmaking demands and incorporates contributions by "the people," in an infinite variety of individual and organizational capacities. Even when a governmental body consciously decides to enact proposed model building codes, it does so based on various legislative considerations, the sum of which produce its version of "the law." In performing their function, the lawmakers represent the public will, and the public are the final "authors" of the law.
> . . .
> . . . [P]ublic ownership of the law means precisely that "the law" is in the "public domain" for whatever use the citizens choose to make of it. Citizens may reproduce copies of the law for many purposes, not only to guide their actions but to influence future legislation, educate their neighborhood association, or simply to amuse.

293 F.3d at 799.

The Fifth Circuit's reasoning in *Veeck* echoes that of the First Circuit in *Building Officials & Code Administrators v. Code Technology, Inc.*, 628 F.2d 730 (1st Cir. 1980) ("*BOCA*"). In *BOCA*, the court vacated a preliminary injunction obtained by the creator and

copyright holder of a model building code that Massachusetts had adopted into law. *Id.* at 731.

The Court remanded for further proceedings, observing:

> The citizens are the authors of the law, and therefore its owners, regardless of who actually drafts the provisions, because the law derives its authority from the consent of the public, expressed through the democratic process.
> . . . [C]itizens must have free access to the laws which govern them.
> . . . .
> [I]t is hard to see how the public's essential due process right of free access to the law (including a necessary right freely to copy and circulate all or part of a given law for various purposes), can be reconciled with the exclusivity afforded a private copyright holder . . . .

*Id.* at 734, 736.

To be clear, "copyrighted works do not 'become law' merely because a statute refers to them." *See Veeck*, 293 F.3d at 805 (citing 1 Paul Goldstein, Goldstein on Copyright § 2.49 n.45.2). In this case, however, the material in question has not simply been approved by a government agency. Rather, it has been expressly adopted as the law of the land through the incorporation by reference process. As much as landmark health care acts or Supreme Court civil rights decisions, codes for building, electrical, plumbing, transportation and other vital functions incorporated into law touch the lives of Americans every day. Violations of incorporated standards can carry criminal penalties. For example, the former chief executive of Massey Energy was recently convicted of conspiring to violate safety standards. (SMF ¶ 26.) That is why, as Plaintiff ASTM itself stresses, business owners, workers, and consumers need to know these directives to operate their businesses lawfully and to determine whether neighbors, contractors, or competitors are in compliance. (SMF ¶ 23.)

Plaintiffs try to distinguish *Veeck* by characterizing the incorporated standards at issue here as "extrinsic standards," rather than to texts that have been adopted into law. (Pls. Mem. 27.) That distinction does not hold because the standards at issue here *have* all been adopted into

law through the incorporation process. Once that process is complete, a standard becomes a law like any other. As the Office of the Federal Register has explained, such "material, like any other properly issued rule, has the force and effect of law." (SMF ¶ 24.) No one would dispute that if the OFR decided to cut and paste the standards into the Code of Federal Regulations, they would be understood to be "adopted law." The only reason the federal government instead incorporates some regulations by reference is to limit the (already considerable) length of the Code of Federal Regulations. (*Id.*) That goal, however laudable, cannot be read as a reason to grant a private entity ownership control over the regulations that bind the public. *See generally United States v. Myers*, 553 F.3d 328, 331 (4th Cir. 2009) (material incorporated by reference has the same force of law as the incorporating regulation itself).

### 2.      Incorporated standards, as law, are also uncopyrightable facts.

As the Fifth Circuit noted in *Veeck*, once adopted into law "codes are 'facts' under copyright law. They are the unique, unalterable expression of the 'idea' that constitutes local law." 293 F.3d at 801. The Fifth Circuit also expressly rejected the notion that some laws might be "less factual" than others: "It should be obvious that for copyright purposes, laws are 'facts': the U.S. Constitution is a fact; the Federal Tax Code and its regulations are facts; the Texas Uniform Commercial Code is a fact. Surely, in principle, the building codes of rural Texas hamlets are no less 'facts' than the products of more august legislative or regulatory bodies." *Id.*

Plaintiffs respond that the merger doctrine does not apply after creation of the work. (Pls. Mem. 33 (citing *Apple Computer, Inc. v. Formula Int'l Inc.*, 725 F.2d 521, 524 (9th Cir. 1984) and *Oracle America, Inc. v. Google Inc.*, 750 F.3d 1339 (Fed. Cir. 2014)).) There is no such universal rule. In *Kregos v Associated Press*, 937 F.2d 700 (2d Cir 1991), for example, the Second Circuit expressly rejected that notion, agreeing with the leading treatise that considering the merger doctrine "in determining whether actionable infringement has occurred" is "the better

15

view." *Id.* at 705 (citing *Durham Industries, Inc. v. Tomy Corp*., 630 F.2d 905, 916 (2d Cir.

1980) and 3 Nimmer on Copyright § 13.03[B][3] at 13–58 (1990)). That is because, as the court

put it, "assessing merger in the context of alleged infringement will normally provide a more

detailed and realistic basis for evaluating the claim that protection of expression would inevitably

accord protection to an idea." *Id.*

  That is true in this case as well. Here, it makes no sense to analyze merger solely at the

point of creation. Merger occurs precisely because the original text has been transformed by

operation of law. At that point the expression becomes and idea, and the citizens of the relevant

jurisdiction become the authors of the text, *see BOCA,* 628 F.2d at 734. That is the only point of

"creation" that matters in these circumstances.

  This case is more closely analogous to *Kern River Gas Transmission Co. v. Coastal

Corp.,* 899 F.2d 1458 (5th Cir. 1990), *cert. denied*, 498 U.S. 952 (1990). In that case, the plaintiff

took a United States Geographical Survey topographical map and added lines and mile markings

where it proposed to locate a natural gas pipeline. That route was approved by the Federal

Energy Regulatory Commission. The defendant copied that map in the process of preparing a

competing bid. The court concluded that "the idea of the location of the pipeline and its

expression embodied in [the map] are inseparable and not subject to protection." *Id*. at 1463–64.

"To extend protection to the lines would be to grant Kern River a monopoly of the idea for

locating a proposed pipeline in the chosen corridor, a foreclosure of competition that Congress

could not have intended to sanction through copyright law." *Id.*

  Merger exists "precisely to avoid such absurd results as conferring on the first planner of

a pipeline a 'copyright' over its proposed location in a given corridor . . . ." 4 Nimmer on

Copyright § 13.03[B][3]. Merger helped avoid similarly absurd results in *Veeck* (conferring the

drafters of a code copyright over that law), and it does the same here. As in *Kern*, after the initial

creation, government officials gave legal effect to a particular work. At that point, the idea (the

law) and the expression (the standards) became inseparable and therefore not subject to

copyright protection.

Finally, Plaintiffs' further claim that there might be other ways of expressing the

standards when they were initially developed is immaterial. In *Lotus Development Corp. v.

Borland Intern., Inc.,* 49 F.3d 807, 816 (1st Cir. 1995), for example, the First Circuit explained

that the existence of alternative means of expression does not turn a method of operation into

creative expression. *Id.* at 816 (the fact that [Plaintiffs] could have designed the work at issue

differently "is immaterial to the question of whether it is a 'method of operation'"); *see also

Comp. Assoc. Int'l v. Altai*, 982 F.2d 693, 708 (2d Cir. 1992) ("While, hypothetically, there

might be a myriad of ways in which a programmer may effectuate certain functions within a

program . . . efficiency concerns may so narrow the practical range of choice as to make only one

or two forms of expression workable options.").

### 3.     No court has ever found that government edicts are copyrightable.

Attempting to avoid the plain meaning of the Copyright Act, settled law, and the

Constitution, Plaintiffs look to *CCC Information Services Inc. v. McLean Hunter Market

Reports, Inc*., 44 F.3d 61, 74 (2d Cir. 1994) and *Practice Management Information Corp. v.

American Medical Ass'n*, 121 F.3d 516 (9th Cir. 1997). (Pls. Mem. 22–26.)

But those cases, unlike *Veeck,* did not address whether government edicts could be

copyrighted. Instead, as the *Veeck* court and a leading treatise notes, they 'involved compilations

of data that had received governmental approval, not content that had been enacted into positive

law'." *Id*., *citing* 1 Goldstein on Copyright **§** 2.49 n. 45.2. In *CCC*, for example, the defendant

argued that the Red Book, a compilation of automobile valuations, was not copyrightable

because state regulations included it as one possible metric for valuing cars. 44 F.3d at 64. The

Red Book was neither a government edict nor a set of rules; it was simply an approved reference.

     *Practice Management* also presented different circumstances. *See Veeck*, 293 F.3d at 804.

In that case, the American Medical Association ("AMA") had created and copyrighted a list of

code numbers, the Physician's Current Procedural Terminology ("CPT"), for physicians to report

their services. *Practice Mgmt.*, 121 F.3d at 517. The AMA granted the federal Health Care

Financing Administration ("HCFA") a non-exclusive, royalty-free license to use the CPT in

exchange for HFCA's promise that it would not use any other set of code numbers. *Id.* at 517–

18. HCFA later created its own coding system for Medicare and Medicaid claims, the HCFA

common procedure coding system ("HCPCS"), that included the AMA code numbers but added

new information that HFCA developed. *See Veeck*, 293 F.3d at 805 (citing 50 Fed. Reg. 40895,

40897). Practice Management ("PMI"), a publisher of medical books, sought from the AMA a

discount to use the AMA's code numbers (not the government's HCPCS system) and, when the

AMA refused to provide the discount, PMI sought a declaratory judgment that the AMA's

copyright was unenforceable. *Practice Mgmt.*, 121 F.3d at 518. Under these facts, the Ninth

Circuit concluded that the AMA's copyright in the CPT coding lists was, in theory, enforceable

against PMI.[2] *Id.* at 520, 521.

     The factual, legal and policy issues here are very different. *First*, the plaintiff in *Practice

Management*, PMI, was seeking to invalidate the copyright on the AMA coding lists only (the

CPT), not the government's own document (the HCPCS) and the two documents were not

identical. As the Fifth Circuit noted in *Veeck*:

---

[2] Nevertheless, the Court ultimately refused to enforce the AMA's copyright, concluding that the
AMA had abused its copyright by extracting HCFA's agreement not to adopt any coding system
besides the CPT. *Id.* at 521.

> [U]nlike Veeck, Practice Management Information Corporation, a commercial publisher of medical textbooks, was not trying to publish its own version of the HCPCS. Practice Management desired to sell a cheaper edition of the AMA's code, which was also used by insurance companies and had other non-governmental uses. *It is not clear how the Ninth Circuit would have decided the case if Practice Management had published a copy of the HCPCS.*

293 F.3d at 805 (emphasis added). In other words, what had become "the law" was quite distinct from the original coding lists, and it appeared that the PMI was not interested in publishing the law. In this case, by contrast, as in *Veeck*, Public Resource wishes to post online only what has been expressly adopted as law.

*Second*, in contrast to the coding lists (tables with descriptions of medical procedures matched to numbers) at issue in *Practice Management*, the incorporated standards here read and function as laws. In *Practice Management* the medical codes were not themselves law, even if regulations required persons to refer to the codes. Here, as with the text of the model building code in *Veeck*, the incorporated standards are part of the law itself, imposing numerous specific requirements and technical specifications.

*Third,* the concern expressed by the court in *Practice Management,* that depriving privately created materials of copyright protection might undermine the economic incentive to create them, 121 F.3d at 518–19, cannot apply to the incorporated standards in this case. With the sole exception of the 2014 NEC, every incorporated standard at issue here has been superseded by later versions and is therefore obsolete as an industry standard. (SMF ¶ 27.) Many,

such as ASHRAE's 1993 Handbook, are no longer even sold by the Plaintiffs. Thus, their only

continuing value now is *as law*. Any economic incentive for creating them has run its course.[3]

Equally unavailing is Plaintiffs' effort to rely on a district court case involving the

copyright status of a condominium plan that was included in a restrictive covenant approved in a

town meeting. *John G. Danielson Inc. v. Winchester-Conant Properties, Inc.* 186 F. Supp. 2d 1,

5 (D. Mass. 2002). Plaintiffs carefully sidestep the First Circuit's actual holding in that case,

which found that the covenant in question was simply a private agreement that "would not bind

the public at large, but only the parties and their successors in interest." *John G. Danielson Inc.*

*v. Winchester-Conant Properties, Inc.*, 322 F.3d 26, 39 (1st Cir. 2003). Acknowledging that the

arguments regarding the copyright status of law were "compelling," the court nonetheless

concluded that "contracts entered into by government entities do not raise these weighty issues."

*Id.* at 40. Standards incorporated into law, by contrast, do bind the public.

C.      **For Decades, Plaintiffs Have Actively Encouraged Transformation of Their Standards into Law; They Cannot Now Complain of a "Taking."**

Plaintiffs suggest that depriving them of a statutory monopoly in the law might qualify as

a taking and that the doctrine of constitutional avoidance counsels against it. (Pls. Mem. 28).

That claim fundamentally misconstrues that doctrine, which simply means that a statute should

be interpreted to avoid placing its constitutionality in doubt. If Plaintiffs were correct, then they

would be entitled to file takings claims against governments that incorporated their standards

into law. That is a far-fetched public policy argument. In any event, it does not create a

constitutional conflict.

---

[3] Even if the documents were available for purchase, to charge for access to them would be
inappropriate "monopoly pricing of the law, not copyright pricing to the market for voluntary
consensus standards." Peter L. Strauss, *Private Standards Organizations and Public Law 16*
(Columbia Pub. Law Research, Paper No. 13-334, 2013),
http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2194210.

Even on its own terms, however, Plaintiffs' takings argument fails. The Fifth Circuit's

decision in *Veeck* occurred over a decade ago. Some SDOs, including Plaintiffs here, sought to

overturn *it*. They were unsuccessful, in part because the U.S. Solicitor General took the position

that "[t]he court of appeals reached the correct result in this case." Brief for the United States as

Amicus Curiae at 1, *S. Bldg. Code Cong. Int'l, Inc. v. Veeck*, 539 U.S. 969 (2003) (No. 02-355),

http://www.justice.gov/osg/briefs/2002/2pet/6invit/2002-0355.pet.ami.inv.pdf. Accordingly,

SDOs have been on notice for many years that their copyright claims were not enforceable.

Having argued to the Supreme Court that the *Veeck* ruling would destroy their business,

SDOs might have thereafter opposed incorporation by reference in order to protect their

copyrights. Instead, however, they continued to promote their standards becoming law.

For example, ASHRAE has a Government Affairs office in Washington D.C. that works

to influence members of Congress and other policymakers on what standards to incorporate into

law, including encouraging legislators to adopt ASHRAE 90.1 into law. (SMF ¶ 30–32.)

Internally, ASHRAE refers to the citation of ASHRAE 90.1 in the Energy Policy Act as

ASHRAE's "EPAct advantage," because ASHRAE 90.1 is referenced over other energy

efficiency commercial building codes. *(Id. ¶ 33.)* ASHRAE has repeatedly entered into a

"Memorandum of Understanding" with the Department of Energy (DOE) that states that both

organizations are "committed to working together toward . . . [c]ooperating in promotion of

ANSI/ASHRAE standards adoption in building codes." (*Id.* ¶ 34.) In line with that goal,

ASHRAE circulates a detailed Manual to ensure that technical committees draft standards that

will be easily adopted as regulations. (*Id.* ¶ 81.)

ASTM, for its part, publicly celebrates incorporation by reference into law of its

standards. (*Id.* ¶ 35.). To make that happen, ASTM reaches out to congressional staffers and

government agencies to suggest use of particular editions of standards and particular language in legislation. (*Id.* ¶ 36–37, 39.) ASTM's Vice President of Global Policy and Industry Affairs was not aware of any instances where ASTM has requested that Congress or a federal agency not incorporate an ASTM standard by reference. (*Id.* ¶ 38.)

NFPA shares these views and commitments, acknowledging that the incorporation of NFPA standards into law "benefits NFPA because it furthers our mission of reducing the worldwide burden of fire through the adoption of codes and standards," and that it may also benefit NFPA financially because people then purchase NFPA standards. (*Id.* ¶ 40–42.) NFPA's representative stressed that he could not think of any situation where NFPA would oppose IBR, and admits that it promotes the adoption and incorporation by reference of NFPA codes and standards into law. (*Id.* ¶ 41.)

There is a good reason the Plaintiffs work to have the standards they help develop become law. As described in greater detail below, Part II.D.3, once that process is complete, SDOs can reap significant financial benefits from the sale of related materials, training, and so forth. In addition, as their own expert testified, the SDOs exist to solve industry problems. Transformation into law is a crucial way to ensure those "solutions" are widely embraced.

Having urged transformation of their work into law, and having benefitted from that choice, Plaintiffs' claim of harm from a "taking" is a cynical one at best.

**D.    Public Policy Favors Promoting Public Access to the Law.**

The principle that the law must be public and available to citizens to read and speak has its roots in the concept of the rule of law itself. "The law must be accessible . . . the successful conduct of trade, investment and business generally is promoted by a body of accessible legal rules governing commercial rights and obligations." *See* Thomas Henry Bingham, The Rule of Law 37–38 (Penguin Press 2011). Citizens are expected to obey the law, but they cannot do so

effectively if they do not know it. *See* Brian Z. Tamanaha, On the Rule of Law: History, Politics, Theory 34 (Cambridge Univ. Press 2004) ("Citizens are subject only to the law, not to the arbitrary will or judgment of another who wields coercive government power. This entails that the laws be declared publicly in clear terms in advance.").

Public Resource's mission is to help citizens know the law. Plaintiffs insist that the law is reasonably accessible without Public Resource's efforts. But they have a surprising view of what qualifies as "accessible."

### 1.      Plaintiffs do not make the law reasonably accessible.

Today, one can access and share judicial opinions, statutes, and most codified regulations online, almost instantly, for free. Absent Public Resource's database, the situation is strikingly different for just one category of law: incorporated standards. For example, the public can read standards incorporated by reference in federal laws freely only in the Washington, D.C. reading room of the Office of the Federal Register, and only by written request for an appointment.[4] (SMF ¶ 43.) If one is unable to afford travel to D.C. and to arrange an appointment, the alternative is to go to the SDO directly and pay a fee for access. As Plaintiffs admit, the fee can range from $25 to $200 per document. (Plaintiffs' Statement of Material Fact, ECF No. 118-2 ("Pls. SMF") at ¶ 58, 99, 158.)

The fees SDOs charge are a significant obstruction. For example, as the Modification and Replacement Parts Association observed, "The burden of paying high costs simply to know the requirements of regulations may have the effect of driving small businesses and competitors out of the market, or worse endanger the safety of the flying public by making adherence to

---

[4] *See* Office of the Federal Register, *Where to Find Materials Incorporated by Reference at NARA Facilities*, http://www.archives.gov/federal-register/cfr/ibr-locations.html#why (last visited Dec. 16, 2015).

regulations more difficult due to fees . . . ." (SMF ¶ 44.) A staff attorney at Vermont Legal Aid

suggested that the costs of accessing incorporated standards also interfered with the ability of

Medicare recipients to know their rights. (*Id.*) *See* Comments of Jacob Speidel, Senior Citizens

Law Project, Vermont Legal Aid, OFR-2013-0001-0037 (Jan. 31, 2014), at 1 (price precludes

"many Vermont seniors" from accessing materials). *See also* Comments of Robert Weissman,

Public Citizen, OFR 2013-0001-0031 (Jan. 31, 2014), at 1 (reporting on behalf of multiple non-

profit, public interest organizations that "free access . . . will strengthen the capacity of

organizations like ours to engage in rulemaking processes, analyze issues, and work for solutions

to public policy challenges . . .and strengthen citizen participation in our democracy");

Comments of George Slover & Rachel Weintraub, Consumers Union and Consumers Federation

of America, OFR 2013-0001-0034 (Jan. 31, 2014) (noting importance of transparent standards to

identify products that are not in compliance with applicable standards so as to notify the agency

and alert consumers).

Plaintiffs also use their licensing practices to ration access. ASTM gives government

bodies like the U.S. Geological Survey and the State of Georgia; fellow standards development

organizations like NFPA, IAPMO, and ICC; and favored corporations liberal permission to copy

standards in both paper and electronic format and to use excerpts from standards in other

publications.[5] (*Id.* ¶ 45.) Yet ASTM regularly refuses to give similar permissions to graduate

students, universities, libraries, and smaller businesses. (*Id.* ¶ 46.)

Under this discriminatory policy, ASTM gave the structural engineering firm SGH, "a

big supporter of ASTM," permission to excerpt a number of figures and tables from a standard,

*Id.* ¶ 47, while refusing to allow an engineering student at the University of Pennsylvania to use

---

[5] These standards are not incorporated by reference into law. However, ASTM does not alter its
sales policies for documents that are incorporated. *See* Jarosz Report, ECF No. 117-2, ¶ 93.

"photographs and figures" from another standard in a case study. (*Id.* ¶ 48.) When an ASTM employee wrote that "we typically do not provide figures [from standards] for reproduction purposes," John Pace, ASTM's Vice President of Publications and Marketing, responded that ASTM has a "'triple standard' here on considerations for such requests." He decided that the owner of a chemical company, Sheldon Dean, who was "platinum level" because of his "connection status" with ASTM committees, should be given permission to use excerpts from an ASTM standard in a forthcoming book. (*Id.* ¶ 49.) Yet ASTM refused to allow another company, Columbia Analytical, to reproduce several abstracts from an ASTM standard. (*Id.* ¶ 50.) When the ability to use the law depends on having a favored "connection status" with a private entity, the law is not reasonably accessible to all.

### 2. Plaintiffs' reading rooms are a pretext for minimizing access to incorporated standards.

Plaintiffs currently make some standards available for free viewing on their websites. (Pls. Mem. 10.) For the majority of the incorporated standards at issue, however, this particular concession did not occur until *after* Public Resource began to post incorporated standards itself, and there is no reason to suppose that Plaintiffs will not cut off that access once this litigation is over.

Moreover, Plaintiffs' "reading rooms" still fall far short of providing meaningful access. The reading rooms are entirely inaccessible to print-disabled people. (SMF ¶ 52–53.) If one can overcome that barrier, one faces other hurdles: readers must register, waive a variety of rights, and even agree to broad indemnification and forum selection clauses in order to see the text of the laws. (SMF ¶ 54, 57.) Because readers are forbidden from making "commercial use" of the text, construction contractors, manufacturers, and others are excluded. (SMF ¶ 57)

Readers must also give up their privacy. Those who access the law through a public library, including online access, are protected by law against disclosure of their "identity and intellectual pursuits." Mass. Gen. Laws Ann. ch. 78, § 7; *see also, e.g.,* Cal. Gov't Code § 6267; D.C. Code § 39-108; 24 Pa. Cons. Stat. § 9375. Those who access it through ASTM and NFPA's reading rooms, by contrast, must provide their names and email addresses, which means the Plaintiffs can identify and track those readers. (SMF ¶ 54.) NFPA admits it uses that information to send marketing materials. (SMF ¶ 55.)

If a citizen is willing to waive her rights and agree to the terms, then she faces a bewildering interface that makes the standards hard to locate and hard to read even if she is not print-disabled. Indeed, those Reading Rooms illustrate Plaintiffs' intention to *limit* access rather than expand it. The user will find the document in a small box on the screen, in text that is sometimes degraded, in a font size that is so small that it will be difficult for many people to read, even if magnification is increased, at which point the text can be blurry. (SMF ¶ 56.) In general only a small part of each page of the standard is visible at once, and with greater magnification even a single line cannot be viewed without scrolling. *(Id.)* Each page also is stamped over the text with a distracting repeat warning that the material is copyrighted. *(Id.)*

These practical impediments are intentional. ███████████████████ ██████████████████████████████████████████████████████████████ ███████SMF ¶ 56) ████████████████████████████████████ ███████████████████████████████████ *(Id.)* ████████████ ██████████████████████████████████████████████████ ████████████████████ *(Id.)* ██████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████ (*Id.*)

But there is an even more fundamental flaw in Plaintiffs' ████████ Plaintiffs focus

on the public's ability to *read* the standards. But due process requires that people must be able to

*speak the law,* to communicate these provisions of law to their fellow citizens. Plaintiffs warn

visitors to its read-only sites that they may take legal action against people who share the

standards. (SMF ¶ 56–57.)

In addition to violating due process and the First Amendment, Plaintiffs' monopoly over

"access" runs afoul of the Freedom of Information Act. FOIA allows the Director of the Federal

Register to deem as effectively published in the Federal Register material that is incorporated by

reference into a regulation, but only if such material is "reasonably available to the class of

persons affected thereby." 5 U.S.C. § 552(a)(1). The Electronic Freedom of Information Act

Amendments of 1996 (E-FOIA), Public Law No. 104-231, 110 Stat. 3048, which requires that

federal agency proposals, rules, and guidance be posted on federal agency websites, suggest that

government officials recognize that "reasonably available" in the digital age means "reasonably

available online." *See, e.g.*, *Dosso v. U.S. Postal Serv.*, No. CIV.A. CCB-10-1703, 2010 WL

4900988, at *4 (D. Md. Nov. 24, 2010) (International Mail Manual incorporated by reference

and available online gave reasonable notice of Post Office requirements).

When the Internet makes it possible to provide people across the country and world with

instant access to the law, where standards incorporated by reference could be easily linked, in

unencumbered form, to the regulations that incorporate them, and where technology allows full

access for persons with disabilities, reasonable access cannot mean access according to the

whims of a private entity like the plaintiffs or other SDOs.

### 3. SDOs have strong motives to develop standards independent of copyright incentives.

Contrary to Plaintiffs' hyperbole, the public policy favoring access does not conflict with the public policy favoring the development of technical standards. SDOs, and the thousands of volunteers and government officials upon whom they rely, have ample non-copyright incentives to continue that work.

First, the SDOs believe their standards are appropriate, carefully crafted guidelines for industry, and industry participants want their products and services to comply with the law. An efficient way to do that is to write the laws themselves, and convince government to adopt them. As the court in *Veeck* observed: "[I]t is difficult to imagine an area of creative endeavor in which the copyright incentive is needed less. Trade organizations have powerful reasons stemming from industry standardization, quality control, and self-regulation to produce these model codes; it is unlikely that, without copyright, they will cease producing them." 293 F.3d at 806 (quoting 1 Goldstein on Copyright § 2.5.2, at 2:51).

Indeed, the argument that SDOs require copyright incentives strains credulity. According to the SDOs themselves, their motives are protecting public safety, promoting energy efficiency and other public interests. (Pls. Mem. 5–8.) The committee members who develop the standards have the same motives as well as, in some cases, concern for their business interests, professional interest in garnering recognition or experience, their role as government officials and in service of the public interest, or personal reasons. (SMF ¶ 28, 136.) As one scholar has observed, copyrighting standards actually creates perverse incentives that conflict with those overarching goals:

> The long-term credibility of [SDOs] depends on their ability not only to produce sound standards but also to produce standards in which the [SDOs] do not have such a strong financial interest that they succumb to the temptation to abuse the

standards process by making their standards into a cash cow that must be
purchased by anyone affected by the standard.

Pamela Samuelson, *Questioning Copyrights in Standards*, 48 B.C. L. Rev 193, 223–24 (2007).

Second, these industry organizations have many other means of earning revenue,

including selling interpretive material related to incorporated standards, *id.* at 806, selling other

standards that are not incorporated into law, charging membership dues and conference fees,

marketing training programs and proficiency testing, and obtaining government research grants,

all of which are current sources of income for Plaintiffs. (SMF ¶ 29.) For reasons explained

below in Part IV.D, Plaintiffs have no evidence that an adverse ruling in this case would

significantly affect that revenue. Indeed, many publishers sell compilations of statutes and codes

without the benefit of copyright protection; people will still pay for the convenience of having a

physical book of codes on their shelf. Plaintiffs' gloomy prediction of the end of privately

developed standards is as grossly overstated now as it was in *Veeck*. Numerous other SDOs

function effectively without claiming copyright to standards incorporated into law. (SMF ¶ 29.)

### E.      Plaintiffs Misinterpret the Copyright Act.

Plaintiffs' remaining arguments against the public's right to access and share the law can

be dismissed quickly.

*First*, Plaintiffs wrongly claim that 17 U.S.C. § 201(a) and the absence of a specific

provision addressing incorporation by reference support their view of the law. (Pls. Mem. 20.)

The principle that the law cannot be copyrighted long predates the 1976 Copyright Act, and there

is nothing in the Act to suggest any intent to contravene it. But § 201(a) merely vests copyright

protection initially in the author; that section is consistent with Public Resource's interpretation.

*Second*, Plaintiffs misinterpret 17 U.S.C. § 105. As noted, that section precludes

copyright protection for government works, but allows the U.S. Government to receive and hold

copyrighted works. The accompanying legislative history also explains that use of a private work

by the government would not affect its copyright protection. However, given that Congress

would not pass the National Technology Transfer and Advancement Act of 1995, which called

for the use of standards incorporated by reference for another two decades, there is no reason to

imagine that Congress contemplated that that provision was in any way connected to standards

incorporated by reference into law, as opposed to research reports and other documents of that

nature. Indeed, the legislative history concerns exactly those types of documents.[6]

     *Second*, the various studies and statutes suggesting federal agencies should take

advantage of voluntary consensus standards say nothing about what happens when such

standards became laws. And the opinions of various agencies, including the OFR, are not the

conclusions of copyright or constitutional experts, much less legal precedents.

## III.    Even Before Incorporation, the Standards Are Uncopyrightable Systems and *Scenes a faire*.

     Plaintiffs repeatedly stress, and Public Resource does not dispute, that the consensus

process requires a substantial investment of time and effort. But investment and effort are not a

basis for copyright protection. Original creative expression is necessary. *Feist Publ'ns, Inc. v.

Rural Tel. Serv. Co.*, 499 U.S. 340, 346 (1991) (rejecting the argument that "sweat of the brow"

is sufficient to confer benefits of copyright). As the Supreme Court explained: "[t]he distinction

is between creation and discovery: the first person to find and report a particular fact has not

created the fact; he or she has merely discovered its existence." *Id.* at 347.

     The standards at issue here summarize of the "discoveries" of thousands of volunteers

and government employees who, through experience and research, have determined the optimal

---

[6] Plaintiffs also argue that Public Resource's interpretation would permit involuntary transfers of their alleged copyrights (Pls. Mem. 28), but no government can transfer a copyright in the law, because the law is not copyrightable.

solutions to industry problems and the optimal ways of expressing those solutions. Those

discoveries are no doubt valuable—but they are not creative expression.

### A.     The Incorporated Standards Are Systems and Methods

As noted, Section 102(b) excludes ideas, systems and methods from copyright protection.

The standards at issue here are precisely that: procedures, processes, systems, and methods of

operation for energy efficiency, fire safety, and other applications. ASTM defines the standards

they produce as documents comprising "specifications, test methods, practices, guides,

classification and terminology." (SMF ¶ 62–3.) NFPA refers to the standards as "procedures and

practices." (SMF ¶ 64.) ASHRAE, for its part, describes them as "tool[s] for engineers to use

when they're working with the topics covered in that [standard]." (SMF ¶ 65–6)

The design of those tools results from a technical committee's review of the relevant

research, public input, and committee expertise, all of which are intended to create the best rule

based on available evidence. (SMF ¶ 66–70.) For example, NFPA is committed to reducing "the

worldwide burden of fire and other hazards" by developing and disseminating codes that will

minimize fire risk. (SMF ¶ 67.) The procedures that will best reduce fire risk must be observable

facts, not products of anyone's creative imagination. Indeed, as NFPA Vice President Donald

Bliss testified, when he was a committee member, his motivation was to develop the "best"

standard, and "best" meant "understanding the problem based on past experience and events,

having as much scientifically based research to contribute to the development of the standard . . .

." (SMF ¶ 68.) That development process, in turn, is focused on vetting ideas and concepts as

much as actual language. (SMF ¶ 72.)

Similarly, ASHRAE says its standards define "the minimum acceptable performance for

the relevant products." (SMF ¶ 69.) Again, that minimum must be a matter of fact to be

discovered, not created. The main benefit of the consensus process, according to ASHRAE, is

that it relies on experts who understand "how to make that product or how to construct that building or how to make something more energy efficient." (SMF ¶ 70.) The standards are equivalent to recipes, though the product is an energy-efficient building rather than a cake. *See Publications Int'l v. Meredith Corp.*, 88 F.3d 473 (7th Cir. 1996) ("mere identification of ingredients necessary for the preparation of food is a statement of facts"); *Lambing v. Godiva Chocolatier*, 142 F.3d 434 (6th Cir. 1998) ("recipe for a chocolate truffle was a mere statement of facts, lacking any expressive content, and thus was not copyrightable"); *Sassafras Enterprises, Inc. v. Roshco, Inc.*, 889 F. Supp. 343, 346–47 (N.D. Ill. 1995) (recipes and writings designed only to instruct consumers on the proper use of a pizza stone are not copyrightable).

The volunteers who work on the standards do not view them as creative expression. Indeed, they debate wording in the standards so as to have the most precise and accurate description of the process, system, or methods that comprise the standards—not the most elegant or persuasive one. (SMF ¶ 72.) The exact wording matters, and it is not sufficient to try to paraphrase the facts and principles with different language that could introduce errors. (*Id.*) SDOs believe that very "technical excellence" is why the standards are ultimately incorporated by reference into law. (SMF ¶ 73.)

Neither do the incorporated standards qualify as creative compilations, because their organization is dictated by utility. Guidance on this point can be found in the recent Ninth Circuit decision in *Bikram's Yoga Coll. of India, L.P. v. Evolation Yoga, LLC*, 803 F.3d 1032 (9th Cir. 2015). In that case, the plaintiff claimed that the order and sequence of certain yoga poses (the "Sequence") was copyrightable. The court rejected that argument because "the medical and functional considerations at the heart of the Sequence compel the very selection and arrangement of poses and breathing exercises for which [plaintiff] claims copyright protection." *Id.* at 1042

(citations omitted). The court concluded: "The Sequence's composition renders it more effective as a process or system, but not any more suitable for copyright protection as an original work of authorship." *Id.*

The same is true here. The standards at issue fulfill the SDOs' missions of public safety, energy efficiency and so on. To fulfill that function, SDOs use standard, not creative, terminology and expression. As NFPA's Vice President and Chief Engineer put it, "we want to make it as easy as possible for users to understand the structure of the standard." (SMF ¶ 74.) Thus "standard developers converge around terminology and format that *works* for their constituents that utilize their standards." (*Id.* ¶ 75.) (emphasis added). Format may also flow from purely practical concerns. For example, ASHRAE rearranged 90.1 from one column to two columns, as well as the chapter organization, simply to make it shorter. (*Id.* ¶ 76.) None of these considerations reflect a whit of expressive creativity.

Plaintiffs argue that they (and/or the standards committees) made choices about how to organize the technical rules that comprise the standards at issue. But the relevant inquiry is not whether one could imagine some other, less useful, method of arrangement. *See Bikram's Yoga*, 803 F.3d at 1042; *BellSouth Advert. & Publ'g Corp. v. Donnelley Info. Publ'g, Inc*, 999 F.2d 1436, 1443 (11th Cir. 1993); *see also ATC Distrib. Grp. Inc. v. Whatever It Takes Transmission & Parts*, 402 F.3d 700, 712 (6th Cir. 2005) (fact that publisher "could have arranged the parts information in other ways that were potentially less clear or useful . . . is insufficient to demonstrate the creativity necessary for copyright protection"). Rather, it is whether, as here, the Plaintiffs made the optimal choice to render their *system* more *effective* as such. *See also C.B. Fleet Co., Inc. v. Unico Holdings, Inc.,* 510 F. Supp. 2d 1078, 1080–82 (S.D. Fla. 2007) (merger

doctrine applied to instructions for bowel cleansing kits where instructions were optimal and there was therefore no other effective way to convey them); 4 Nimmer on Copyright § 13.03.

## B.   The Incorporated Standards are *Scènes à Faire*.

The compilations are also uncopyrightable *scènes à faire*. The *scènes à faire* doctrine excludes from protection against infringement those elements of a work that necessarily result from factors "external to the author's creativity." 4 Nimmer on Copyright § 13.03[F][3]; *see also Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 711.

Here, Plaintiffs admit that their standards are dictated by external factors, including international principles and the desire to satisfy regulations and laws. (SMF ¶ 80.) NFPA's Style Manual for the NEC, for example, specifies that because the NEC is "intended to be suitable for adoption as a regulatory document, it is important that it contain clearly stated mandatory requirements in the code text" so as to "encourage uniform adoption . . . without alterations." (SMF ¶ 81.) Indeed, one reason government participants in the process are valuable is because they "bring knowledge of the regulatory agendas and regulatory needs of agencies" (SMF ¶ 80.) ASHRAE, for its part, produced a manual for committee members that carefully dictates how the standards should be structured expressly so they may be incorporated into law. (SMF ¶ 81.)

The standards are also dictated by practical requirements and industry demands, as the industry participants voice them in the development process. Thus, they are like the elements of a software program that are dictated by practical realities rather than creative design and therefore excluded form copyright protections. *See, e.g.*, *Lexmark Int'l, Inv. v. Static Control Components, Inc.*, 387 F.3d 522, 535 (6th Cir. 2004) (content primarily shaped by extrinsic factors such as hardware standards and mechanical specifications may not obtain copyright protection).

**IV.     Public Resource's Posting Is a Lawful Fair Use.**

Even if the Court were to find that Plaintiffs can claim copyright in binding U.S. and state

legal canons, Public Resource's use of those canons is a non-infringing fair use.

The fair use doctrine has four non-exclusive statutory factors: (1) the purpose and

character of the use, including whether such use is of a commercial nature or is for non-profit

educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of

the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon

the potential market for or value of the copyrighted work. 17 U.S.C. § 107. These factors are

weighed together "in light of the purposes of copyright," which are "[t]o promote the Progress of

Science and useful Arts and to serve the welfare of the public." *Perfect 10*, *Inc. v. Amazon.com,*

*Inc.*, 508 F.3d 1146, 1163 (9th Cir. 2007) (citations and internal quotations omitted).

All four factors favor Public Resource, as does the public interest.

**A.     Public Resource's Use of Incorporated Standards is Transformative and**
**Noncommercial.**

The first fair use factor considers whether the use in question is transformative, meaning

"one that communicates something new and different from the original or expands its utility,

thus serving copyright's overall objective of contributing to public knowledge." *Authors Guild v.*

*Google, Inc.*, 804 F.3d 202, 214 (2d Cir. 2015) (citing *Campbell v. Acuff-Rose Music, Inc.,* 510

U.S. 569, 579 (1994)); *see also A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639

(2d Cir. 2009).

The incorporation process itself transforms the standards before Public Resource touches

them, by turning them from mere technical specifications into the law of the land. Before

incorporation, the standards serve as "best practices" for their respective industries. After

incorporation, they have a new and different purpose: as legal mandates.

Public Resource's provision of access to those standards *as laws* builds on that initial transformation and is itself transformative in at least three ways. First, Public Resource improves access to the standards *as laws*. Second, Public Resource enables access to *facts about those laws* through software-based analysis. Finally, Public Resource makes the law available to print-disabled people.

### 1. Expanding access to the law is a transformative purpose.

Public Resource provides access only to standards incorporated into law as part of an archive of laws and other government documents. (SMF ¶ 22.) Plaintiffs sell access to their standards to help answer questions like *"How do I protect my building from fire risks?"* and *"Is this crib safe for children?"* The Public Resource websites are directed at researchers and engaged citizens. (SMF ¶ 95–96.) They help provide answers to different questions, such as: "*What is the law?*" and "*Does this building or product comply with the law?*"

Thus, Public Resource's use of the standards is largely "indifferent" to any copyrightable expression they allegedly contain. *See Am. Inst. of Physics v. Schwegman, Lundberg & Woessner, P.A.*, No. 12-528, 2013 WL 4666330, at *10 (D. Minn. Aug. 30, 2013). For Public Resource's purposes, it matters only that the standards are legal requirements that the public must obey. In this sense, Public Resource transforms an incorporated standard "from an item of expressive content to evidence of the facts within it." *Am. Inst. of Physics v. Winstead PC*, No. 3:12-CV-1230-M, 2013 WL 6242843, at *5 (N.D. Tex. Dec. 3, 2013). Public Resource's use of the standards is akin to copying and displaying documents in the process of fulfilling a legal requirement, or in the course of judicial and administrative proceedings. *Bond v. Blum*, 317 F.3d 385, 394–98 (4th Cir. 2003) (copying and submission of copyrighted manuscript in child custody proceeding as evidence of admissions it contained was fair use); *Healthcare Advocates Inc. v. Harding, Earley, Follmer & Frailey*, 497 F. Supp. 2d 627 (E.D. Pa. 2007) (copying images from

website to gather facts for the defense of an earlier copyright infringement suit was fair use). Like such uses, posting the incorporated standards to communicate the legal facts they embody does not "seek to exploit or unjustly benefit from any creative energy that [Plaintiffs] devoted to writing" the standards. *See Lexmark*, 387 F.3d at 544.

Even for source material other than legal texts, copying for any new and different purpose is transformative. *See Bill Graham Archives v. Dorling Kindersley Ltd.,* 448 F.3d 605, 608–09 (2d Cir. 2006) (use of concert poster images as "historical artifacts" on a timeline in a book rather than for "artistic expression and promotion" was transformative); *Online Policy Group v. Diebold, Inc*., 337 F. Supp. 2d 1195, 1203 (N.D. Cal. 2004) (posting internal work emails on the Internet to inform the public of defects in electronic voting machines was a transformative purpose); *Lexmark,* 387 F.3d at 544 (using a copyrighted computer program as a code that unlocked the functionality of a printer rather than for the program's intrinsic use was transformative). Public Resource's purpose of informing the public about the rules we must follow falls easily into that rubric.

### 2. Providing new information about incorporated standards by enabling software-based analysis is a transformative purpose.

Public Resource's use is also transformative because it enables users to engage with the incorporated standards in new ways that "provide otherwise unavailable information." *Authors Guild*, 804 F.3d at 215; *see also Authors Guild, Inc. v. HathiTrust,* 755 F.3d 87, 97–98 (2d Cir. 2014); *Vanderhye,* 562 F.3d at 638–640 (digital copying of student manuscripts in their entirety to detect plagiarism is transformative); *Perfect 10,* 508 F.3d at 1165 (reproducing small images of copyrighted photos to aid in finding them is transformative).

Unlike the Plaintiffs, Public Resource posted the incorporated standards at issue using standard Hypertext Markup Language (HTML), Mathematics Markup Language (MathML), and

Scalable Vector Graphics (SVG), formats that allow software-based searching and analysis. (SMF ¶ 83–84.)

Plaintiffs try to dismiss that work as "mere conversion of a work from one format to another." (Pls. Mem. 35.) Plaintiffs miss the point. As with search engines and plagiarism detection, once the legal texts are made available in new formats, software-based analysis can reveal new information about the source material. *See* Thomas A. Smith, *The Web of Law*, 44 San Diego L. Rev. 309, 312-14 (2007) (describing computer analysis of citations in judicial opinions to detect legal trends); Kevin D. Ashley & Stefanie Brüninghaus, *Computer Models for Legal Prediction*, 46 Jurimetrics J. 309, 312 (2006) ("To apply such prediction tools, the case data must be amenable to computer processing."); William Li et al., *Law Is Code: A Software Engineering Approach to Analyzing the United States Code,* 10 J. Bus. & Tech. L. 297, 309 (2015) (describing how comprehensive software analysis of the U.S. Code is made possible by the Code's availability in Extensible Markup Language format). As several courts have found, facilitating such analysis is highly transformative. *See HathiTrust*, 755 F.3d at 87; *Vanderhye*, 562 F.3d at 638–40; *Perfect 10*, 508 F.3d at 1165.

### 3. Providing access to legal materials for disabled individuals is transformative purpose.

Additionally, Public Resource enables blind and other print-disabled individuals to access the law. This is a well-established transformative use. *See HathiTrust,* 755 F.3d at 103; *see also Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 455 n.40 (1984).

Specifically, Public Resource makes the standards accessible to the blind and others with print disabilities by converting them into standard Hypertext Markup Language (HTML), which can be read by screen reader software and other assistive technologies of the reader's choosing. (SMF ¶ 84, 91–92.) James Fruchterman, Public Resource's expert on accessibility, concluded

that "a blind person using a screen reader" can "read the standard . . . navigate to a specific place in the document . . . and search for key terms.". (SMF ¶ 91.) Mr. Fruchterman also observed that "standard HTML" as used by Public Resource "is also highly accessible to people with other print disabilities and the assistive technology they use to access print," such as people with "vision impairment, dyslexia, brain injury and physical disabilities." (*Id.*)

None of the Plaintiffs provides free electronic access to standards incorporated into law for people with disabilities. For example, NFPA's website requires visitors to register before viewing the standards, and its registration process cannot be completed by blind users. (SMF ¶ 92.) None of the Plaintiffs provides machine-readable text of the incorporated standards through a free reading portal. (*Id.*) They provide only "a picture of the text," which causes screen-reading software to "stop working." (*Id.*) Nor do the Plaintiffs' websites provide any means for disabled visitors to search or navigate the documents. (*Id.*)

Thus, "Public.Resource.Org currently provides the only accessible option for people/citizens with print disabilities to access these standards." (*Id.*)

### 4.     Public Resource's use of the standards is non-commercial.

Public Resource's noncommercial purpose also favors fair use. *Cf. Campbell,* 510 U.S. at 580. Public Resource is a non-profit organization funded entirely by donations, contributions and grants. (SMF ¶ 1.) It does not charge for access to the incorporated standard, or to any other information on its website. (SMF ¶ 5.) Public Resource does not accept donations or gifts that are tied to the posting of specific documents. (SMF ¶ 6.)

Plaintiffs emphasize that Mr. Malamud draws a salary for his full-time work and that Public Resource pays contractors for other necessary work. (Pls. Mem 36–37.) These facts, common to many non-profits, are not evidence of commercial purpose. Whether Mr. Malamud works for free is irrelevant to the fair use analysis; the issue is whether his organization provides

the documents for free to the public, in order promote public understanding of the law.

*Righthaven, LCC v. Jama*, No. 2:10-CV-1322, 2011 WL 1541613 at *3 (D. Nev. April 22, 2011)

(solicitation of donations "immaterial" to a commercial use analysis); *Religious Tech. Ctr. v.*

*F.A.C.T.Net, Inc.*, 901 F. Supp. 1519, 1521, 1525 (D. Colo. 1995) (non-profit organization did

not engage in a commercial use when it posted plaintiff's documents in order to "advance

understanding of issues").

Plaintiffs' suggestion that Public Resource has a financial incentive to increase traffic to

its website is equally silly. The amount of traffic Public Resource receives is not important to its

donors. (SMF ¶ 7.) Public Resource's efforts to improve access to legal materials, including

making sure that the documents it posts are accurately "described on a search engine," are part of

its non-profit mission of expanding access, not a commercial activity to increase revenue. (*Id.*)

For all of these reasons, the first factor tilts strongly toward fair use.

### B.      The Incorporated Standards Are Factual.

"[T]he law of fair use 'recognizes a greater need to disseminate factual works than works

of fiction or fantasy.'" *Harper & Row Publ'rs., Inc. v. Nation Enters.*, 471 U.S. 539, 563 (1985).

"Since the risk of restraining the free flow of information is more significant with informational

work, the scope of permissible fair use is greater." *Consumers Union of U.S., Inc. v. Gen. Signal*

*Corp.*, 724 F.2d 1044, 1049 (2d Cir. 1983).

The incorporated standards fall squarely on the factual end of the spectrum. Not only are

they legal facts, but they are also largely if not completely excluded from copyright protection by

17 U.S.C. § 102(b) as systems and methods, making them "informational work[s]."[7] *Consumers Union*, 724 F.2d at 1049; *see* Part III.a., above.

### C.      Public Resource Uses No More of the Standards Than Necessary.

The third statutory factor favors fair use where the amount of the original work used is "reasonable in relation to the purpose of the copying." *Authors Guild*, 804 F.3d at 221; *see also Campbell*, 510 U.S. at 586–87. The copying of entire works is fair use when it reasonably fulfills the user's purpose. *See, e.g.*, *Sony*, 464 U.S. at 449-50 (copying of entire television programs for time-shifting is fair use); *Lexmark*, 387 F.3d at 544 (copying of entire computer program as required for compatibility with printer is fair use); *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.,* 756 F.3d 73, 90 (2d Cir. 2014) (copying and distribution of entire recordings of press conferences was "reasonable in light of its purpose of disseminating important financial information to investors and analysts.").

There can be no serious dispute that the purpose for which Public Resource posts the standards requires posting the complete documents that are incorporated into law. There is no portion or excerpt short of the entirety that would inform the public of its full obligations under the law. Partial access to incorporated standards may even be misleading, creating the impression that partial compliance with a standard would satisfy legal requirements when it would not.

In this sense, Public Resource's use of the standards differs from the use at issue in *Authors Guild v. Google.* That case involved the digitization and indexing of over 20 million books of all varieties, including fiction, to allow public searching and viewing of excerpts. 804 F.3d at 207–08. In contrast to Public Resource's mission, the functions of Google Books did not

---

[7] The Second Circuit's recent *Authors Guild* decision does not alter this conclusion. That court did not impose a different meaning on the second statutory factor but rather dismissed it as unimportant. 804 F.3d at 220.

require public access to the complete text of the books. Where a use is transformative, copying that is "literally necessary" or "reasonably appropriate" to that use tilts the third factor in favor of fair use. *Id.* at 221.

**D.     Public Resource's Use of the Incorporated Standards Has Not Caused, and Will Not Cause, Harm in Any Relevant Market.**

The fourth fair use factor concerns "meaningful or significant effect 'upon the potential market for or value of the copyrighted work.'" *Authors Guild*, 804 F.3d at 224. Any market effects that "occur in relation to interests that are not protected by the copyright" are not relevant. *Id.* Where a use is highly transformative, only a strong showing of harm will weigh against fair use. "Market harm is a matter of degree, and the importance of this factor will vary, not only with the amount of harm, but also with the relative strength of the showing on other factors." *Fox News Network, LLC v. TVEyes, Inc.*, 43 F. Supp. 3d 379, 395 (S.D.N.Y. 2014) (quoting *Campbell*, 510 U.S. at 590 n. 21).

The undisputable facts show that Public Resource's posting of the standards, which began seven years ago, has not caused Plaintiffs any economic harm. The harms that Plaintiffs claim will occur, such as losing the "right to exclude" citizens from reading and speaking the law, relate to interests that copyright does not protect.

**1.     Plaintiffs have experienced no financial harm from Public Resource's posting of the incorporated standards.**

Public Resource's activities have not caused and will not cause any significant loss of sales for Plaintiffs. According to Plaintiffs' own admissions, no such loss has occurred in over seven years since Public Resource began posting incorporated standards. ███████████████
████████████████████████████████████████████████████████████
██████████████████████████ (SMF ¶ 107) And ASTM's designated Rule 30(b)(6) witness, Jeffrey Grove, had no "direct knowledge" of any "measurable impact" on ASTM's

finances attributable to Public Resource's activities. (*Id.*) ASTM has no knowledge of any lost

sales, lost revenues, or reputational harm caused by Public Resource. (SMF ¶ 108) Likewise,

ASHRAE has not tracked any economic losses attributable to Public Resource's posting of the

standards. (SMF ¶ 120, 122)

Further, since the *Veeck* decision in 2002, standards incorporated into law have not been

protected by copyright in the Fifth Circuit. At the time, Plaintiffs NFPA and ASHRAE argued

that a lack of private monopoly to control the reproduction of mandatory building codes would

"destroy" the "ability of private standards developers to underwrite the development and

updating of their standards." Brief of American Medical Assoc. et al. as Amici Curiae at 12,

*Veeck v. Southern Building Code Congress International, Inc.*, 293 F.3d 791 (5th Cir. 2002) (No.

99-40632) (SMF ¶ 187.) Yet Plaintiffs have shown no harm arising from the Fifth Circuit's

decision. (SMF ¶ 129.)

In addition, all but one of the incorporated standards at issue have been superseded by

later versions, and many are no longer even sold by the Plaintiffs. (SMF ¶ 27.) The most recent

versions of the standards see the highest commercial demand. (SMF ¶123); But they are not law,

and Public Resource does not post them. *See* 1 C.F.R. § 51.1(f) ("Incorporation by reference of a

publication is limited to the edition of the publication that is approved."). Incorporation "freezes"

older versions of standards into law "for years to come," according to ASTM. (SMF ¶ 103.)

During the span of years before the government incorporates a newer version, the Plaintiffs

enjoy an undisputed period of legal control in which to assert copyright and maximize revenue

from each standard.

Plaintiffs' effort to use their purported expert John Jarosz to dispute these facts must fail.

Neither Mr. Jarosz's qualifications nor his work in this case meet the standard of reliability of

43

Federal Rule of Evidence 702, and the court should strike his report, as Public Resource requests in a separate motion. Mr. Jarosz's opinion that market harm will occur was based almost entirely on his conversations with Plaintiffs' top executives, and his report simply voices their legal arguments. (SMF ¶ 112–14.)

Moreover, Mr. Jarosz was not able to identify any financial losses to Plaintiffs as a result of Public Resource's activities. (SMF ¶ 115–19.) He made no correlation between Public Resource's posting of the incorporated standards at issue and any change in Plaintiffs' revenues. (SMF ¶ 116.) He did not compare the profitability of the standards posted by Public Resource to that of Plaintiffs' other standards. (SMF ¶ 117.)

### 2.      Losing the ability to control access to the law is not a harm recognized by copyright law.

Plaintiffs complain that they have lost the "right to exclude others from using" binding legal materials. (Pls. Mem. 54.) The Copyright Act confers no such right. In any event, Public Resource cannot "profit from exploitation of the copyrighted material without paying the customary price" because even if binding laws were subject to copyright, the "customary price" for the ability to access, reproduce, and transmit the law is zero. *Harper & Row*, 471 U.S. at 562.

Public Resource's use of the standards furthers the purpose of copyright law by improving access to vital knowledge, promoting the "Progress of Science." U.S. Const. art. I § 8 cl. 8. All four factors of the fair use analysis favor Public Resource, and the Court can grant summary judgment to Public Resource on this separate ground.

## V.      Plaintiffs Do Not Own the Copyright for Most of the Incorporated Standards.

Only the owners of copyrights or their exclusive licensees have standing to sue for copyright infringement. *I.A.E. Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996); 3 Nimmer on

Copyright § 12.02[C].[8] Having failed to stave off discovery into their faulty ownership claims, Plaintiffs have recast their ownership theory, arguing that they are at least joint authors (despite decades of objective manifestations to the contrary). Based on the undisputed record, Plaintiffs are not owners of any of the ASHRAE standards at issue, they are not owners of all but four of the ASTM standards at issue, and Plaintiffs have failed to prove ownership of the remaining four ASTM standards and all NFPA standards other than the 2014 NEC. At best Plaintiffs have only non-exclusive licenses to use those standards. That does not suffice to confer standing.

### A.      Plaintiffs Bear the Burden of Proving Copyright Ownership.

"A plaintiff seeking to establish copyright infringement must prove '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Feist*, 499 U.S. at 361. A copyright registration certificate merely creates a rebuttable presumption of validity. *See e.g.*, *Mid America Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995); 3 Nimmer on Copyright § 12.11. The effect of this presumption is limited, because the Copyright Office "will not conduct its own factual investigation to confirm the truth of the statements made in the application." *See* Compendium of U.S. Copyright Office Practices § 309.2 (3d ed. 2014). Accordingly, "the Copyright Office's practice of summarily issuing registrations . . . counsels against placing too much weight on registrations as proof of a valid copyright." *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 428 (4th Cir. 2010), *as amended* (Aug. 24, 2010).

To shift the burden of proof back to the copyright claimants, Public Resource must simply offer *some* evidence rebutting ownership. *See, e.g.*, *Entm't Research Grp., Inc. v. Genesis*

---

[8] The same rule applies to works governed by the 1909 Copyright Act. *Goldwyn Pictures Corp. v. Howells Sales Co.*, 282 F. 9, 11 (2d Cir. 1922); 3 Nimmer on Copyright § 12.02[A].

*Creative Grp., Inc.*, 122 F.3d 1211, 1217–18 (9th Cir. 1997).[9] As explained in detail below, the

undisputed facts offer ample evidence that Plaintiffs do not own the rights they claim. Public

Resource therefore has a right to challenge Plaintiffs' assertion of ownership.

Hoping to prevent judicial scrutiny of their assignment practices, Plaintiffs insist that,

where a copyright transfer is alleged, it cannot be challenged by a defendant who is not a party to

the transfer, trying to stretch a line of cases exemplified by *Eden Toys, Inc. v. Florelee*

*Undergarment Co.*, 697 F.2d 27 (2d Cir. 1982). (Pls. Mem. 17–18.)

That effort fails. *Eden Toys* simply held that, if there is evidence of a transfer that is

supported by both the transferee and transferor, the informality of the transfer does not prevent

the transferee from claiming ownership of the copyright. It did not hold that the evidence or the

very existence of such transfer cannot be challenged; indeed, the court remanded the case to

determine if there was in fact a valid underlying transfer of ownership. 697 F.2d at 36; *see also*

*Urbont v. Sony Music Entm't*, 100 F. Supp. 3d 342, 348-50 (S.D.N.Y. 2015) (discussing the

*Eden Toys* line of cases and concluding that it does not prevent a defendant from addressing the

fundamental question of a plaintiffs' ownership of copyright). When presented with a nearly

identical challenge in a case involving the copyright in the song "Happy Birthday," a court

similarly concluded that *Eden Toys* line of cases was narrow in scope and "do[es] not stand for

the proposition that so long as an alleged transferor and transferee say that a transfer occurred, a

---

[9] Plaintiffs' motion for summary judgment misconstrues the burden of proof for challenging copyright ownership. (*See* Pls. Mem. 15-16.) Public Resource is not required to "show that 100% of the copyright is owned by other parties," as Plaintiffs claim, and Plaintiffs cite no case law to support this claim. (Pls. Mem. 16 (italics omitted).) Moreover, Plaintiffs' citation to the *Veeck* opinion to support their claim to be "organizational authors" (Pls. Mem. 16) is probative of nothing.  In *Veeck* the issue of ownership was not in dispute, and the facts of that case concerned a different standards organization entirely. *Veeck*, 293 F.3d at 794.

third-party has no choice but to take them at their word." *Marya v. Warner/Chappell Music, Inc.*, No. CV13-04460, 2015 WL 5568497, at *19 (C.D. Cal. Sept. 22, 2015).

### B.     Plaintiffs Cannot Meet Their Burden of Proving Ownership.

All three Plaintiffs registered the standards at issue with the Copyright Office as "works made for hire."[10] In the Motion, Plaintiffs also attempt to claim that the developers of the standards assigned their copyrights to Plaintiffs. Both claims fail.

### 1.     Plaintiffs' copyright registrations are false and do not provide a presumption of ownership or validity.

Where there are material errors in an application for copyright registration, but no evidence of intent to defraud the Copyright Office, the plaintiff loses the prima facie presumption that the registration might otherwise provide. *See Masquerade Novelty, Inc. v. Unique Industries, Inc.*, 912 F.2d 663, 668 n.5 (3d Cir. 1990); *Family Dollar Stores, Inc. v. United Fabrics Intern., Inc.*, 896 F. Supp. 2d 223, 231 (S.D.N.Y. 2012); 2 Nimmer on Copyright § 7.20[B][1].

That principle applies here. Plaintiffs' claims that the standards at issue were "works made for hire" and that Plaintiffs were the authors of the "entire text" are demonstrably false. In their own briefing, Plaintiffs acknowledge that the works were developed by a large number of volunteers and members of the public (whom Plaintiffs now call joint authors). That admission flatly contradicts the assertions in their numerous copyright registrations. (Pls. Mem. 16–17.) That, in turn, is a falsehood that would have been material to the Copyright Office's

---

[10] NFPA is the only Plaintiff to allege that a work made for hire agreement was signed by developers of the standards at issue.  (Pls. SMF ¶ 115.)  This language attempting to classify the work of volunteers as "work made for hire" was added to NFPA forms only in 2007, after most of the standards at issue were already published, and was used inconsistently thereafter. (SMF ¶ 139.) As discussed below, to the extent these modified forms were signed after 2007 by employees of other companies and agencies, the employees were unable to grant copyright to NFPA because the authorship rights vested automatically in their employers.

determination on registration because the Copyright Office would have denied the copyright registration if it knew that Plaintiffs lacked ownership rights.

In light of the undisputed facts, Plaintiffs should lose whatever presumption these registrations would have provided on this ground alone.

> **2.     If the incorporated standards at issue were works of authorship, then unpaid volunteers created those works.**

Each of the incorporated standards at issue contains a pastiche of contributions from hundreds of people: government employees, employees of private entities with a professional interest, and ordinary citizens. (SMF ¶ 132.) Volunteers and members of the public proposed the creation of these standards. (SMF ¶ 133.) Volunteers drafted the language for these standards, with public input, and determined the inclusion and arrangement of proposed text. (SMF ¶ 134.) Volunteers, as part of technical committees and project committees, voted on the final content of these standards and made all authorial decisions, demonstrating control over the development of the standards at issue. (SMF ¶ 135.) These volunteers did not require a copyright incentive; they developed these standards in the course of their work as federal, state, and municipal employees, in support of their company or business as employees of private companies, or for personal reasons. (SMF ¶ 136.)

Plaintiffs' employees helped manage this work, such as setting up some of the meetings for discussion of the standards drafts at public locations, advising persons who authored the standards, and assisting with formatting. (SMF ¶ 137.) The Plaintiffs did not have control over the content of the standards, however, nor did they have control over what standards would be developed or updated. Plaintiffs left those decisions to the volunteers. (SMF ¶ 138.). As Plaintiff NFPA has admitted standards organizations' staff commonly serve as a "secretariat," and are "*not* members of the committees, [do] not select code language, and [do] not have a vote in any

committee decisions." *International Code Council, Inc. v. National Fire Protection Association, Inc.*, No. 02 C 5610, 2006 WL 850879 (N.D. Ill. March 27, 2006) (emphasis in original); M. Becker Decl. ¶ 146, Ex. 148. The same observation applies to ASHRAE, ASTM, and NFPA's staff involvement in the creation of the standards at issue.

Again, Public Resource does not dispute that Plaintiffs invested time and resources organizing meetings, recording minutes, providing advice, and collecting public input for review by the volunteers.[11] But hard work does not make one an author. *Feist*, 499 U.S. at 359–60 ("originality, not 'sweat of the brow,' is the touchstone of copyright protection"); 1 Nimmer on Copyright § 1.06.

### 3. For the majority of the incorporated standards at issue, Plaintiffs are, at best, non-exclusive licensees.

Plaintiffs seek to avoid *Feist* by claiming to be assignees of the volunteers' contributions. But they cannot prove that claim. A true copyright transfer requires either a written agreement granting exclusive rights, signed by the author/transferor, or affirmation from the author that she orally transferred copyright at an earlier time, accompanied by a written and signed nunc pro tunc assignment.[12] 17 U.S.C. § 204(a); *see Imperial Residential Design, Inc. v. Palms Dev. Group, Inc.,* 29 F.3d 581 (11th Cir. 1994); 3 Nimmer on Copyright § 10.03[A][1][a].

For the majority of the standards at issue, Plaintiffs have neither. At best, Plaintiffs have non-exclusive licenses, which do not confer standing to sue for infringement. *See Atkins v.*

---

[11] Plaintiffs inflate the figures of their costs that they submit to the court by failing to break out the costs attributable to the incorporated standards at issue versus all standards (or in some cases all publications) that Plaintiffs publish. Standards incorporated by reference into law are a small minority of the standards that Plaintiffs publish, and the standards at issue in this case are even fewer still.

[12] This means that there never was an agreement to transfer copyright in the first place, not simply a failure to comply with the formalities for transfer of copyright set out in 17 U.S.C. § 204 (which requires a written agreement to transfer copyright ownership, signed by the owner of the copyright).

*Fischer*, 331 F.3d 988, 991–92 (D.C. Cir. 2003) (unlike transfers of ownership, which require written instrument of conveyance, "[a] nonexclusive license may be granted orally or arise from the conduct of the parties").

At least one plaintiff is well aware of this problem. Ten years ago, faced with a copyright lawsuit over its copying of a standard of the International Code Council ("ICC"), Plaintiff NFPA argued that ICC members, and not ICC itself, owned copyright in the standard. *International Code Council*, 2006 WL 850879, at *1. Like Plaintiffs, ICC relied on individuals from industry and government to draft the language for the standards. Also like Plaintiffs, ICC had a practice of asking individual contributors to sign non-exclusive licenses to their contributions. Reviewing language virtually identical to that used by the Plaintiffs here, the court in that case found that the language did not assign the copyright, and therefore ICC lacked standing to sue NFPA on the basis of those agreements. *Id.* at *6, n.12.[13]

███████████████████████████████████████████████████████

██████████████████████████████████████████████ (SMF ¶ 141.) According to the evidence in this case, that was an understatement.

> **a.     ASHRAE entered into non-exclusive copyright releases, not copyright assignments, for all of ASHRAE's incorporated standards at issue.**

ASHRAE claims ownership of its standards by virtue of the copyright release forms that the people who draft the standards sign. (SMF ¶ 142.) ASHRAE requires standards contributors to sign a copyright release explicitly granting ASHRAE "non-exclusive" rights in those

---

[13] That language read: "I hereby grant the International Code Council the nonexclusive, royalty-free rights, including nonexclusive, royalty-free rights in copyright, in this proposal and I understand that I acquire no rights in any publication of the International Code Council in which this proposal in this or another similar analogous form is used. I hereby attest that I have the authority and I am empowered to grant this copyright release." *International Code Council*, 2006 WL 850879, at *6 n.12,

contributions. (SMF ¶ 143.) A representative example can be found in ASHRAE's "Application for Membership on ASHRAE Standard or Guideline Project Committee." Asked to identify what language, if any, qualifies as an assignment, ASHRAE pointed to the following:

> If elected as a member of any ASHRAE Standard or Guideline Project Committee or appointed as a consultant to such committee I hereby grant the American Society of Heating, Refrigerating and Air-Conditioning Engineers (ASHRAE) the *non-exclusive*, royalty-free rights, including *nonexclusive*, royalty rights in copyright, to any contributions I make to documents prepared by or for such committee for ASHRAE publication and I understand that I acquire no rights in publication of such documents in which my contributions or other similar analogous form are used. I hereby attest that I have the authority and I am empowered to grant this copyright release.

(SMF ¶ 144) (emphasis added). Every document that ASHRAE has produced to support its assignment claim similarly states in clear terms that it is a *non-exclusive* grant of rights. (SMF ¶ 145.)

"Considering the preeminence of exclusive rights in copyright cases, it is axiomatic that if the . . . [a]greement did not specify that exclusive rights were being transferred, no such rights were in fact transferred." *John Wiley & Sons, Inc. v. DRK Photo*, 998 F. Supp. 2d 262, 278 (S.D.N.Y. 2014). ASHRAE cannot dispute that is the case here.

        **b.**      **ASTM did not enter into any copyright assignments until 2003 at the earliest, lacks evidence of assignments for the incorporated standards at issue, and has failed to request assignments of copyright consistently through 2014.**

All but four of the 229 incorporated ASTM standards at issue in this case were developed and published before 2003. (SMF ¶ 146.) ASTM admits it did not request copyright assignments until approximately 2003, and it did not produce executed copyright assignments for any of the standards at issue. (SMF ¶ 147.) Indeed, ASTM "didn't feel like we needed any formal, any formal assignment paper." (SMF ¶ 149.) Instead, ASTM claims to have relied on a purported (and unspoken) "basic understanding" that volunteers intended to create standards that ASTM

would eventually own, and ASTM apparently inferred from that a secondary (unspoken) intention to assign the copyright. (SMF ¶ 150.)

Unspoken understandings do not suffice to assign exclusive rights. *See Atkins v. Fischer*, 331 F.3d 988, 991–92 (D.C. Cir. 2003) (only non-exclusive licenses, not transfers of copyright, can arise through implication). However, even if such an understanding would suffice to confer standing, which it does not, ASTM has not produced any evidence beyond a bare assertion that this understanding actually existed. (SMF ¶ 151.)

As partial support for its claims, ASTM apparently hopes to rely on the ASTM "IP Policy," approved on April 28, 1999. (SMF ¶ 152.) That effort fails. First, ASTM's IP Policy did not contain language approximating a copyright transfer until it was amended in 2010, years after all the ASTM standards at issue were created and published.[14] (SMF ¶ 153–55.) Second, ASTM cannot prove that the volunteers read, much less agreed to, the ASTM IP Policy, because there was no means for them affirmatively to do so. Courts routinely hold that terms set forth on a website are not enforceable where the user is not presented with the terms and required to manifest assent. *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17 (2d Cir. 2002); *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014). Therefore there was no agreement.[15]

As for the four incorporated ASTM standards named in the Amended Complaint that were published between 2003 and 2007, ASTM still cannot prove assignment. Although ASTM alleged that it introduced assignment language in membership forms and other documents starting in 2003, there is no proof that many contributors ever signed them. (SMF ¶ 157.) ASTM

---

[14] The language that was inserted in the 2010 amended IP Policy reads: "Each member agrees, by such participation and enjoyment of his/her annual membership benefits, to have transferred any and all ownership interest, including copyright, they possess or may possess in the ASTM IP to ASTM." (SMF ¶ 155.)

[15] Additionally, there was no means for volunteers to sign their names for any transfer. 17 U.S.C. § 204(a).

admits that it has failed to exercise control over the creation and enforcement of its copyright release forms; it also admits there are many members who renew their memberships through alternate channels or fill out membership forms on which the copyright release language is missing. (SMF ¶ 158.) Even the forms that included language asking for an assignment of copyright simply include this "assignment language" on a form that did not provide any means for the volunteers to show that they agreed to transfer their copyright (or even sign their name, as is required by 17 U.S.C. § 204). (SMF ¶ 159–161.) ASTM's online membership agreement process is similarly insufficient, because at no point does a member agree to transfer her copyright—although language discussing assignment appears on the web page, members actually click a button labeled "continue" that appears below the message: "[c]lick 'continue' to place your ASTM membership renewal in the shopping cart." (SMF ¶ 159.)

### c. NFPA entered into non-exclusive copyright releases until at least 2008.

NFPA's records show that it, too, requested non-exclusive licenses from the developers of the standards during the 1990s and at least as late as 2008. (SMF ¶ 162.) For example, a document soliciting proposed text for the 2011 edition of the National Electrical Code stated the following:



(SMF ¶ 163.) (emphasis added). Like ASTM, NFPA also failed to exercise control over the process by which people submitted proposals. NFPA's Rule 30(b)(6) corporate representative Christian Dubay, stated that "in past history over the years . . . there's many different versions of our forms and ways of submission." (SMF ¶ 164.) This is in part because NFPA would accept

retyped versions of the proposal forms, and it does not prohibit people from using any existing

standard form in place of the form that NFPA designated for the particular standard. (*Id.*)

**d.     The majority of the work was performed by employees who weren't authorized to assign anything.**

Most if not all of the contributions to the incorporated standards at issue were authored

either by federal government employees or by employees of third party companies or

organizations who were acting within the scope of their employment by those third parties. There

is no evidence that those employees were authorized to assign any rights of their employers in

those contributions.

By ASTM's calculation in 2012, for example, "[o]ver 1,400 individuals from federal

agencies [were] actively engaged in 90 percent of [ASTM] standards writing technical

committees." (SMF ¶ 166.) Their contributions are not copyrightable. 17 U.S.C. § 105. Other

contributors were individuals who are employed by third parties in industry, research, or state

and local government. Those people also participated in standards development in their capacity

as employees, typically doing the work while on the clock with their employer, with expenses

paid by their employer. (SMF ¶ 167.) As a result, their contributions were works made for hire

owned by their the employers, 17 U.S.C. § 201(b); *Community for Creative Non-Violence, et al.

v. Reid*, 490 U.S. 730, 750–52 (1989); s*ee also Warren v. Fox Family Worldwide, Inc.*, 328 F.3d

1136, 1142-43 (9th Cir. 2003) (creator of a work made for hire does not have a legal or

beneficial interest in the copyright). Plaintiffs had no procedures in place to ensure government

and industry contributors had authority to transfer their employers' rights to Plaintiffs. (SMF

¶ 168.) Nor do Plaintiffs request copyright assignments from the employers. (*Id.*)

These are not mere formal defects in a transfer, susceptible to cure. The undisputed facts

show that no valid transfer occurred at all. Therefore Plaintiffs cannot meet their burden of

54

proving ownership as to all or virtually all of the incorporated standards at issue. Plaintiffs are, at best, non-exclusive licensees and lack standing to sue.

### 4. The Plaintiffs are not joint authors of the incorporated standards at issue.

Recognizing the flaws in their assignment process, Plaintiffs now rely heavily on what was once a fallback position: claiming that they are at least joint authors.[16] There are numerous holes in this theory.

Joint authorship requires the intent of all joint authors of the work *at the time of authorship* that the work should be a joint work. *See Aalmuhammed v. Lee*, 202 F.3d 1227, 1231–32 (9th Cir. 2000). In light of decades of objective manifestations by Plaintiffs that they did *not* consider themselves co-authors with the volunteers who actually developed the standards, there is no reason to believe that intent ever existed.

First, Plaintiffs never before held themselves out as joint authors or described the standards as works of joint authorship. Plaintiffs' copyright registrations list Plaintiffs as the sole authors of the "entire text" of the standards, and they do not list any joint authors or mention joint authorship. Moreover, Plaintiffs include language in their alleged copyright assignment forms that explicitly precludes joint authorship, such as: "I understand and intend that I acquire no rights, including rights as a joint author . . . ." (SMF ¶ 165.) "The best objective manifestation of a shared intent [to be joint authors], of course, is a contract saying that the parties intend to be

---

[16] Just this past March, Plaintiffs stated in a footnote to a motion to prevent discovery into their ownership claims that "[i]n the event that Plaintiffs were unable to show writings to confirm past intended assignments from committee members," the standards at issue should be considered joint works. ECF No. 86 at 11 n.4 (Plaintiffs' motion for protective order). Eight months later, this fallback has moved from an alternative position to become Plaintiffs' primary position in an attempt to rescue their standing.

*or not to be* co-authors" *Aalmuhammed v. Lee*, 202 F.3d 1227, 1235 (9th Cir. 2000) (emphasis added).

Second, Plaintiffs have never acted like joint authors. Each co-owner of a copyright is due an accounting of an equal portion of the net revenue from the exploitation of a work, yet Plaintiffs have never shared revenues with the thousands of individuals they now allege to be co-authors. *See* 1 Nimmer on Copyright § 6.12. (SMF ¶ 132.) The implications of this failure are significant: having failed to pay the accountings that would be due to each alleged co-author (likely because Plaintiffs did not come upon this theory until now), Plaintiffs unwittingly expose themselves to significant financial liability. Moreover, any of these alleged co-authors could license or assign their rights to Public Resource at any time, ending Plaintiffs' quest for an injunction.

Plaintiffs face another hurdle. An author is the person who has control and direction over the creation of the work. For the standards at issue in this case, that job was performed by the volunteers, who cast the deciding vote. *C.f. Aalmuhammed v. Lee*, 202 F.3d 1227, 1234 (9th Cir. 2000) (evaluating authorship in the joint authorship context and determining that the most important factor to consider is control, the person who superintends the work). Votes of the volunteers controlled the content of the texts. For the most part, Plaintiffs' employees' simply edited drafts of the standards at the direction of the volunteers, subject to the oversight and vote of the volunteers on any edits. As anyone who has worked on a law review or journal knows, editing a work does not make one an author. Law review editors take drafts of law review articles and edit them heavily, conforming the articles to Bluebook guidelines and publication-specific guidelines (like Plaintiffs' style guides), making both substantive edits and clarifying edits, rearranging sections of the article, adding footnotes, and adding prefatory material and

clauses that the journal requires for every article (not unlike Plaintiffs' legal notices and miscellanea). The author of the article has the final say as to all of these edits—the authorial decision. *See Childress v. Taylor*, 945 F.2d 500, 507 (2d Cir. 1991) ("very few editors and even fewer writers would expect the editor to be accorded the status of joint author").

As for any prefatory text or other miscellanea that appears on the first and final pages of the standards that Plaintiffs claim their employees wrote, this text was included under the authorial direction of the volunteers who had final vote over the content of the standards. To the extent these short segments of text are copyrightable.[17] Plaintiffs have given the volunteers an implied license to use them in the standards. "[A]n implied license will arise where '(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work.'" *Atkins v. Fischer*, 331 F.3d 988, 991-92 (D.C. Cir. 2003) (quoting *Lulirama Ltd., Inc. v. Axcess Broad. Servs.*, 128 F.3d 872, 879 (5th Cir. 1997)). That license does not confer co-authorship status.

## VI. The Court Should Grant Summary Judgment to Public Resource on Plaintiffs' Trademark Claims Because Displaying the Incorporated Standards Is Neither Protected by Trademark Law Nor Likely to Confuse a Reasonable Member of the Public.

Public Resource does not infringe Plaintiffs' trademark rights by posting the incorporated standards. Public Resource does not dispute that it has posted copies of the incorporated standards on its websites and that they contain Plaintiffs' word and design marks. That posting is a lawful nominative use that is unlikely to confuse any consumer. Indeed, Plaintiffs have failed

---

[17] Much of the contributions that Plaintiffs attribute to their employees are short passages of functional text, such as legal notices and disclaimers, and are either *de minimis* or are not copyrightable under 17 U.S.C. 102(b).

to offer meaningful evidence concerning the likelihood of consumer confusion or to produce any evidence of actual confusion.

Lacking the ability to support a traditional trademark infringement claim, Plaintiffs instead allege that Public Resource's posting of the incorporated standards is confusing (in a trademark sense) because Public Resource's copies do not meet Plaintiffs' undisclosed "quality control standards." (Pls. Mem. 43–48) Plaintiffs' theory fails because Public Resource accurately represented the character of the incorporated standards, and there are no material differences between the documents.

Moreover, Plaintiffs' theory cannot justify the injunction they seek. An injunction against trademark infringement must be limited to curing consumer confusion, a goal that can be accomplished in numerous ways that do not involve Public Resource removing the incorporated standards from its websites. For example, Public Resource voluntarily applies notices to incorporated standards on its website describing the process it uses to copy standards and disclaiming affiliation with any SDOs. (SMF ¶ 169.). Although Public Resource is not obligated to provide such notices, it is not opposed to further educating the public about the incorporated standards published on Public Resource's sites.

### A.    Plaintiffs Cannot Control Use of the Incorporated Standards Under the Guise of Trademark Law.

As an initial matter, Plaintiffs are attempting to use trademark law as a substitute for their deficient copyright claims. The Supreme Court disapproved a similar attempt to expand trademark protection to cure copyright issues. In *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34 (2003), the Supreme Court stated: "in construing the Lanham Act, we have been 'careful to caution against misuse or over-extension' of trademark and related protections into areas traditionally occupied by patent or copyright." Similarly, this Court has

held that "concepts and communications are protected by copyright and patent laws, not by the Lanham Act." *Prunte v. Universal Music Grp.*, 484 F. Supp. 2d 32, 41 (D.D.C. 2007) (dismissing Lanham Act claims over song titles and songs under *Dastar*). This litigation is properly about the scope of copyright law. The Court should not accept Plaintiffs' invitation to misuse trademark law to restrict access to incorporated standards for which copyright protection is unavailable.

### B.    Public Resource's Display of Plaintiffs' Marks Is Nominative Fair Use.

This is not a typical trademark infringement case. Public Resource does not claim to be the source of any incorporated standards. Instead, it displays Plaintiffs' marks only to identify Plaintiffs' connection to the documents that have become incorporated standards. Accordingly, Public Resource's use is a "nominative use." Recognizing that traditional confusion factors make little sense for this type of use, courts have dispensed with the typical multifactor confusion analysis in favor of a more streamlined approach. *See* J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:11 (discussing various circuits' tests under the loose category of "nominative fair use").

The Sixth Circuit's version of this test goes straight to the heart of the matter: it asks whether the defendant is "using the challenged mark in a way identifies the source of [the defendants' own] goods." If not, the Lanham Act does not apply. *Interactive Products Corp. v. a2z Mobile Office Solutions, Inc.*, 326 F.3d 687, 695 (6th Cir. 2003) (affirming summary judgment for defendant, holding defendant did not infringe by using plaintiff's trademark in the postdomain path of defendant's URL). As the Sixth Circuit explained, it is unnecessary to evaluate the traditional confusion factors in this kind of case because no consumer would be confused by a defendant's display of a mark that did not signify that defendant was the source of the products. *Id.* Under the Sixth Circuit's test, no further analysis is necessary: Public Resource

is using Plaintiffs' marks to identify Plaintiffs as the initial source of the incorporated standards. It is implausible that consumers could be confused by this use of Plaintiffs' marks.

Other courts divide the nominative fair use test into two elements: whether the use in question is necessary to identify the plaintiff's product and whether it implies a false affiliation or endorsement by the plaintiff of the defendants. *See e.g.*, *Radiance Foundation, Inc. v. NAACP*, 786 F.3d 316 (4th Cir. 2015) (reversing injunction against using "NAACP" to identify the organization in a critical article); *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 102–103 (2d Cir. 2010) ("a defendant may lawfully use a plaintiff's trademark where doing so is necessary to describe the plaintiff's product and does not imply a false affiliation or endorsement by the plaintiff of the defendant."); *see also New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302 (9th Cir. 1992) (coining the term "nominative fair use" and requiring that the use of the marks be no more than reasonably necessary). Under this test, if the defendant can satisfy these two elements, then the trademark claim must be dismissed. If not, however, a plaintiff must still meet its burden to produce evidence showing a likelihood of consumer confusion.

### 1.   Public Resource's use of Plaintiffs' marks is necessary to identify the incorporated standards at issue.

Public Resource displays Plaintiffs' marks with the incorporated standards at issue because the marks are integral to the incorporated standards' identity. Each of the incorporated standards has a title that contains one of the Plaintiffs' names and is incorporated by reference into law by that title. (SMF ¶ 170.) For example, Public Resource displayed a link to ASTM D396-98, one of the standards at issue, referring to that standard by name. (SMF ¶ 171.) ASTM itself states that the citation format for this standard is: "ASTM D396-98, Standard Specification for Fuel Oils, ASTM International, West Conshohocken, PA, 2001, www.astm.org." (SMF ¶ 172.) The standard is incorporated into law by reference at 41 C.F.R. § 60.17 (2011), which

identifies the standard as "ASTM D396-78, 89, 90, 92, 96, 98, Standard Specification for Fuel Oils." It is therefore necessary to identify the standard by its full name, including the mark "ASTM."

Plaintiffs incorrectly contend that *Veeck* demonstrates Public Resource could have posted the text of the standards without referring to Plaintiffs at all. (Pls. Mem. 50.) In *Veeck*, the defendant posted the full text of enacted building codes without identifying the author of the identical model codes. 293 F.3d at 793. Here, the full text of the incorporated standards at issue does not appear in the relevant regulations; only references to the titles of the incorporated standards appear. The references contain Plaintiffs' names. Using the complete reference is therefore necessary to guide people to the correct incorporated law; referring just to "D396-98" or the text of the title would be confusing. Similarly, the names of parties in case citations are necessary to identify cases, even if one could locate the decision using only the reporter's citation.

### 2. Public Resource did not use Plaintiffs' marks more than was reasonably necessary.

Plaintiffs' challenge to Public Resource's display of Plaintiffs' design marks as exceeding what was reasonably necessary also fails. First, although the Ninth Circuit identified this as an element of the fair use defense, it has not been widely adopted by other Circuits. *See, e.g.*, *Tiffany*, 600 F.3d 102–03. And it should not be adopted by this Court, certainly not as interpreted by Plaintiffs. The fair use defense is meant to protect people's ability to identify goods and services in a reasonable manner. It is often reasonable for a defendant to use a design mark to identify goods and services, even if the trademark owner could imagine a manner of identifying the goods and services in some other way. A defendant that embedded gratuitous displays of another's marks in its own goods and services may be doing so to confuse

consumers. But such conduct is adequately addressed by analyzing whether the use of a mark falsely connotes sponsorship or affiliation. There is no need to look at the degree of defendant's use of a plaintiff's trademark for its communicative value alone.

Even if the Court adopts this element, Public Resource has not used more of Plaintiffs' marks than reasonably necessary. Public Resource merely displayed the design marks as they appeared in the documents containing the incorporated standards at issue. Unlike the defendants in cases cited by Plaintiffs, Public Resource is not gratuitously adding Plaintiffs' logos to its website or using Plaintiffs' logos differently from how they actually appear in the incorporated standards at issue. Public Resource does not contend, as Plaintiffs believe, that incorporation by reference of a standard puts Plaintiffs' marks in the public domain for any and all purposes. Instead, incorporation by reference puts a standard in the public domain. Posting that standard, complete with the design marks that signal it is the correct standard referenced by law, is reasonably necessary. Indeed, if Public Resource posted the incorporated standards at issue without including the Plaintiffs' logos, Plaintiffs would likely complain that Public Resource was posting "counterfeit" goods or depriving Plaintiffs of the credit due them for the incorporated standards.

### 3. Public Resource has not done anything to suggest an affiliation with Plaintiffs.

There is no reason to suspect that Public Resource's postings suggest an affiliation between the parties. Using the true name of a good or service does not imply affiliation to reasonable consumers.[18] *See e.g.*, *Tiffany*, 600 F.3d at 102–103 (eBay's use of Tiffany's name to identify Tiffany products did not imply affiliation). To hold otherwise, or even to find that doing

---

[18] Because Plaintiffs do not distinguish between sponsorship, endorsement, or affiliation, Public Resource will use the term "affiliation" to refer to all three categories.

so creates a genuine dispute of material fact, would eviscerate the nominative fair use defense and unnecessarily curtail free speech.

Plaintiffs incorrectly assert that any use of design marks suggests affiliation, Pls. Mem. 51, citing *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171 (9th Cir. 2010). *Tabari* does not stand for that proposition. In *Tabari*, the defendant operated a website selling used cars and used the stylized Lexus mark and the "Lexus L" logo. The Ninth Circuit found that "those visual cues might lead some consumers to believe they were dealing with an authorized Toyota affiliate," because "[i]magery, logos and other visual markers may be particularly significant in cyberspace, where anyone can convincingly recreate the look and feel of a luxury brand at minimal expense." 610 F.3d at 1181. Nothing about the look and feel of Public Resource's website, however, apes the look and feel of ASTM, NFPA, or ASHRAE's brands. Public Resource's display of Plaintiffs' design marks in the body of the incorporated standards at issue is more analogous to the display of photographs of Toyota vehicles with their hood emblems intact, which the Ninth Circuit did not forbid.

Plaintiffs contention that Public Resource's "failure" to post a disclaimer of affiliation weighs against a finding of nominative fair use, Pls. Mem. 51, is legally and factually incorrect. Legally, a disclaimer can support a finding of nominative fair use because it negates an implied affiliation. *Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 231 (3d Cir. 2005). But the absence of a disclaimer does not itself imply affiliation, and it therefore does not weigh against a finding of nominative fair use. Factually, Public Resource *has* placed disclaimers on incorporated standards posted on its website. (SMF ¶ 169.) The most recent version of the disclaimer states: "Public.Resource.org is not affiliated in any way with any of the organizations named herein." (*Id.*) That is sufficient to cure consumer confusion, if any actually existed.

63

Plaintiffs also note that Public Resource intended to make the standards appear identical to the original standards. (Pls. Mem. 51–52.) Public Resource's intent to display the law accurately is not probative of whether consumers are confused about the parties' affiliation or whether the nominative fair use defense bars Plaintiffs' trademark claims.

### C.  No Reasonable Jury Could Find that Public Resource's Display of the Incorporated Standards at Issue Could Create a Likelihood of Confusion.

Even if the Court applies traditional likelihood of confusion factors, Plaintiffs still lose as a matter of law. This Circuit's confusion analysis rests on the traditional *Globalaw* factors: "(1) the strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) evidence of actual confusion; (5) the defendant's purpose or reciprocal good faith in adopting its own mark; (6) the quality of defendant's product; and (7) the sophistication of the buyers." *Globalaw, Ltd. v. Carmon & Carmon Law Office*, 452 F. Supp. 2d 1, 48 (D.D.C. 2006). The factors are not individually determinative, exclusive, nor necessary for every case. *Id.*

Summary judgment under these factors is appropriate where no reasonable factfinder could conclude that there would be a likelihood of consumer confusion. *See Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*, 69 F. Supp. 3d 175, 198 (D.D.C. 2014) (holding no reasonable juror could find marks for competing frozen ice cream treats would create a likelihood of confusion); *Whitehead v. CBS/Viacom, Inc.*, 315 F. Supp. 2d 1, 14 (D.D.C. 2004) (granting summary judgment of non-infringement for play about Marilyn Monroe).

That is the case here. Plaintiffs have not offered a smidgen of proof for a factfinder to conclude that Public Resource's use of Plaintiffs' marks is likely to cause consumer confusion about the source of the incorporated standards at issue. Plaintiffs have offered no expert testimony on confusion, no survey evidence, and no evidence of instances of actual confusion.

Nor have Plaintiffs adduced evidence concerning the sophistication of the relevant consumers. That absence exposes about the weakness of Plaintiffs' trademark claims. *See Paleteria La Michoacana*, 69 F. Supp. 3d at 199 (emphasizing plaintiff's failure to offer a survey or evidence of actual confusion).

As for the remaining factors, Public Resource does not challenge the strength of Plaintiffs' marks, and admits they are identical to the marks displayed on Public Resource's website and that the products are identical (obviously and intentionally so). But those factors are neither individually determinative nor even probative of consumer confusion in this context. Plaintiffs' reliance on cases involving identical trademarks in typical infringement cases is misplaced. (Pls. Mem. 43–44 (citing *Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.*, 303 F.3d 1242 (11th Cir. 2002) and *Wynn Oil Co. v. Thomas*, 839 F.2d 1183 (6th Cir. 1988)).) In *Gapardis*, the court affirmed a preliminary injunction against a distributor that began selling counterfeit skin-whitening products after the manufacturer stopped supplying them the actual product. The court held that the UCC provisions allowing a buyer to "cover" a failure to supply product did not include selling counterfeit goods. Public Resource is not distributing counterfeit goods. In *Wynn*, the defendant applied an identical mark to identify the source of its own, competitive goods and services. Here, of course, Public Resource is not attempting to use an identical mark to signal that *Public Resource* is the source of the incorporated standards. Similarly, the quality of defendant's goods is usually relevant because consumers are less likely to be confused if there is a substantial difference in quality between a senior and junior user of similar marks. But here, Plaintiffs emphasize apparent differences in quality.

Taking the factors together, there does not appear to be any likelihood of confusion; consumers accessing Public Resource's website to view an incorporated law will think they are

obtaining a copy (with the imperfections inherent with copied text) of the referenced law. Those consumers will be correct, not confused.

### D. Plaintiffs' Claim That Inadvertent Copying Errors Make the Incorporated Standards at Issue Not Genuine for the Purposes of the Lanham Act Is Baseless.

Plaintiffs contend that the copies of the incorporated standards at issue on Public Resource's website are not "genuine" because they may contain transcription errors and are not subject to Plaintiffs' quality control standards. Public Resource purchased copies of each document. (SMF ¶ 173.) Generally, a trademark owner cannot control what happens to its products after the first sale. *See Prestonettes, Inc. v. Coty*, 264 U.S. 359, 369 (1924); *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1074 (9th Cir. 1995).

Plaintiffs rely on a line of cases, beginning with *El Greco Leather Products Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986), that create an exception to the first sale doctrine. This exception permits a trademark owner to enforce its trademark rights against a secondary distributor that sells physical goods bearing the owner's trademark but does not comply with the owner's quality control standards.[19] This "genuine goods" doctrine requires three key elements: (1) that consumers are not adequately informed that the accused goods were altered; (2) that "material differences" exist between the original and accused goods that are not readily detectable by a reasonable consumer. *See Coty*, 264 U.S. at 369 (failure to inform requirement);

---

[19] Not surprisingly, all of Plaintiffs' cited cases involve the sale of physical goods. Pls. Mem. 47–48 (citing *Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104 (4th Cir. 1991) (oil); *Perkins Sch. for the Blind v. Maxi-Aids Inc.*, 274 F. Supp. 2d 319 (E.D.N.Y. 2003) (braille readers); *Adolph Coors Co. v. A. Genderson & Sons, Inc.*, 486 F. Supp. 131 (D. Colo. 1980) (beer); *Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp.*, 34 U.S.P.Q.2d 1450 (N.D. Cal. 1995) (printer cartridges)). None of these cases involves the free display of written documents.

*Matrix Essentials, Inc. v. Emporium Drug Mart, Inc., of Lafayette*, 988 F.2d 587, 591 (5th Cir.

1993) ("material differences" requirement). Plaintiffs cannot satisfy these requirements.

> **1.   Consumers are adequately informed that the documents Public Resource posted are copies of the law as it incorporates Plaintiffs' standards.**

The touchstone of trademark law is consumer confusion. If consumers are not confused

about the goods they receive, then there is no trademark infringement. In *Coty*, for example, a

manufacturer sued a distributor for selling rebottled perfume under the manufacturer's "COTY"

mark. Although the district court had permitted defendant to sell the repackaged goods with a

disclaimer, the appellate court enjoined any sales because the "very delicate and volatile nature

of the perfume" created a risk that the repackaged perfume would be of an inferior quality. The

Supreme Court reversed, holding that "unquestionably the defendant has a right to

communicate . . . that the trademarked product is a constituent in the article now offered as new

and changed." 264 U.S. at 369. The Court further rejected the argument that differences in

quality between the original and repackaged goods would give rise to trademark liability: "It

seems to us that no new right can be evoked from the fact that the perfume or powder is delicate

and likely to be spoiled" *Id.* The Supreme Court further noted: "If the defendant's rebottling the

plaintiff's perfume deteriorates it and the public is adequately informed who does the rebottling,

the public, with or without the plaintiff's assistance, is likely to find it out." *Id.*

Public Resource displays electronic versions of the incorporated standards on its website.

Public Resource's website makes it abundantly clear that it is the entity displaying those

standards. Consumers seeking the standards on the Public Resource website encounter a table

with the names of hundreds of standards. (SMF ¶ 171.) The table explains that "In order to

promote public education and public safety, equal justice for all, a better informed citizenry, the

rule of law, world trade and world peace, this legal document is hereby made available on a

noncommercial basis, as it is the right of all humans to know and speak the laws that govern them." (*Id.*) From the table, consumers could access a PDF version of each standard at issue, which accurately appeared as a scan of a physical version of the standard. (SMF ¶ 174.) For some of the incorporated standards at issue, Public Resource also posted versions in other formats, such as HTML and SVG. (SMF ¶ 175.) Reasonable consumers understand that the freely available standards at issue are electronic versions of physical documents and that Public Resource performs the reproduction and transcription.

Even if the Court finds Public Resource's website does not adequately inform consumers, Public Resource's disclaimer suffices.[20] *See, e.g.*, *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 130 (1947) (injunction requiring defendants to stamp "repaired" on reconditioned and allegedly inferior spark plugs was adequate redress); *Enesco Corp. v. Price/Costco Inc.*, 146 F.3d 1083, 1086 n.4 (9th Cir. 1998). In *Enesco*, the Ninth Circuit held than an adequate disclaimer for repackaged goods must state only "(1) that the trademarked product has been . . . repacked; (2) that the . . . repacker is wholly separate and distinct from the original manufacturer; (3) the name of the . . . repacker. A fourth requirement is that the label not emphasize the original manufacturer's trademark by putting it in larger type, different color or size, etc." 146 F.3d at 1086 n.4. Here, Public Resource's disclaimer states that it is posting a copy of the standards, that Public Resource is not affiliated with Plaintiffs, and that Public Resource is the entity that copied the standard. (SMF ¶ 169.) Plaintiffs are not entitled to further relief.

---

[20] Plaintiffs argue that the lack of a disclaimer proves Public Resource's intent to confuse consumers. Plaintiffs rely on dicta from *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455 (4th Cir. 1996), a case where the Fourth Circuit declined to disturb the district court's finding that defendant acted in good faith. But *Sara Lee* merely states that intentional trademark infringement is likely to succeed. It does not state that a lack of disclaimer proves defendant's intent to infringe. And this Court should not infer such intent. It is not a reasonable inference, is contradicted by Public Resource's manifest intent to educate the public, and would be an inappropriate inference at summary judgment.

**2.     The differences between Public Resource's versions of the incorporated standards at issue and Plaintiffs' versions do not cause confusion.**

Plaintiffs must show that the differences between its versions of the incorporated standards at issue and the versions posted by Public Resource are material for the purposes of consumer's purchasing decisions. *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc., of Lafayette*, 988 F.2d 587, 591 (5th Cir. 1993) (finding no material difference between selling cosmetics with a "professional consultation" and without). The "material differences" rule further requires that the differences not be readily detectable to consumers. *Id.* (distinguishing *Shell*, *Coors*, and *Greco* as involving "latent product defect[s]"). Plaintiffs cannot show that the few scanning and transcription errors it has discovered are material under this doctrine.

Plaintiffs contend there are three characteristics of the PDF scans of the documents that make them not "genuine." These characteristics are: (1) a "cover page" created by Public Resource; (2) embedded text created by optical character recognition; and (3) skipped and upside down pages caused by scanning errors. (Pls. Mem. 45.) First, no reasonable consumer would believe that the Public Resource cover page was part of the original standard. The cover page precedes the official title page of the relevant standard and has a distinctive look and feel from the standards themselves. (SMF ¶ 176.) *See Paramount Pictures Corp. v. Video Broadcasting Systems, Inc.*, 724 F. Supp. 808 (D. Kan. 1989) (inserting advertisements at the beginning of video cassettes purchased for rental stores did not infringe). Second, Public Resource's addition of embedded text is not a material difference. It does not affect the appearance of the standard; instead it enables software based searching and text to speech functionality. (SMF ¶ 177.) Plaintiffs do not provide embedded text and thus consumers who want to search the standards or who are visually impaired must create their own embedded text. Plaintiffs have no evidence that there is any difference between Public Resource and consumers' embedded texts. Third, missing

and upside down pages are readily detectable defects that Public Resource has rapidly corrected in the rare cases where they have occurred, and that are not likely to confuse consumers.

Plaintiffs contend there are also transcription errors in the HTML versions of the incorporated standards at issue on Public Resource's website that make the HTML versions not "genuine." (Pls. Mem. 45–46.) Plaintiffs have apparently scoured the incorporated standards at issue on Public Resource's website and found a mere handful of such errors. Given the massive volume of text contained in those standards, the existence of a few errors is not significant. NFPA's CEO has, for example, identified six alleged errors in Public Resource's HTML copy of the original 2011 edition of the National Electrical Code ("NEC"), which spans 886 pages. (*See* ECF No. 118-8 "Pauley Decl." ¶ 54; SMF ¶ 179.) Many of these purported errors are not errors at all. For example, in ¶ 54(a), Pauley states that the HTML standard omits a key requirement that high-voltage cables be shielded. That requirement, however, does not appear in the original 2011 edition of the NEC, which is the version Public Resource posted in HTML format. (SMF ¶ 180.) NFPA added that requirement later by errata, meaning that NFPA committed its own error. (SMF ¶ 181.) Similarly, in ¶ 54(f), Pauley asserts that cross-references in the Public Resource copy were incorrect—but the Articles he identifies are the same ones identified in NFPA's errata, suggesting the error was NFPA's, not Public Resource's. (*Id.*) The other identified differences are readily apparent as transcription errors because the HTML version makes no sense. (ECF No. 118-8 "Pauley Decl." ¶ 54(b)–(e); ECF No. 118-2 "Pls. SMF" ¶ 215.) Such errors will drive consumers to check the PDF version to verify the correct text. Plaintiffs have simply offered no proof that reasonable consumers are likely to be misled by these errors in the HTML format.

Plaintiffs also contend that Public Resource failed to correct errors that were identified during Mr. Malamud's deposition. (Pls. Mem. 47.) This accusation lacks any legal significance. In any event, Public Resource did, in fact, correct those errors promptly after Mr. Malamud's deposition. (SMF ¶ 182.)

## VII.    Plaintiffs Are Not Entitled to a Permanent Injunction.

Granting Plaintiffs an injunction on the current record would be improper. Plaintiffs cannot satisfy the first indispensable requirement for a permanent injunction: actual success on the merits of their infringement claims. *Thomas v. Powell*, 247 F.3d 260, 267 (D.C. Cir. 2001); s*ee also Pub. Warehousing Co. K.S.C. v. Def. Supply Ctr. Philadelphia*, 489 F. Supp. 2d 30, 35 (D.D.C. 2007) ("If a plaintiff has no likelihood of success on the merits, inquiry into the remaining factors is unnecessary.").

Moreover, Plaintiffs have moved for summary judgment of infringement on only nine standards. (Pls. Mem. 2.) Even if Plaintiffs could establish liability as to those nine standards, which they cannot, the Court could not grant a permanent injunction against reproducing "any standards published by Plaintiffs." (Pls. Mem. 52.)[21]

Nor can Public Resource be compelled to post the injunction "at the top of the home page (www.law.resource.org) in 12-point type or larger." Plaintiffs' Proposed Order and Injunction (Dkt No. 118-17). Plaintiffs provide no justification for such an order. Forcing Public Resource to conceal the videos, speeches, and essays by Mr. Malamud on its home page below several pages of court-ordered text would amount to compelled speech in violation of the First

---

[21] This is particularly important here, given the Plaintiffs' inability to establish ownership as to the incorporated standards at issue in this case. *See Warren Pub., Inc. v. Microdos Data Corp.*, 115 F.3d 1509, 1511 (11th Cir. 1997); W. Patry, 6 Patry on Copyright § 22:77 (permanent injunctive relief can "certainly not [be granted] if there are questions about ownership or infringement of works whose provenance has not been examined by the court"). Yet Plaintiffs' claims of ownership suffer from serious defects. *See* Part V, *supra*.

Amendment to the Constitution. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995) ("[T]his general rule, that the speaker has the right to tailor the speech, applies . . . equally to statements of fact the speaker would rather avoid.").

While the Court need not consider the remaining injunction factors, those factors provide three independent reasons why the Court must deny Plaintiffs' request for a permanent injunction.

### A.    Plaintiffs Have Experienced No Irreparable Injury To Any Valid Legal Interest.

Irreparable injury cannot be presumed. Plaintiffs must prove it. This rule applies to both copyright and trademark claims. *See Salinger v. Colting,* 607 F.3d 68 (2d Cir. 2010) (copyright); *see also Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006) (trademark).

Plaintiffs cannot do so. To the contrary, Plaintiffs' inability to offer credible evidence that Public Resource has caused them any economic harm strongly suggests that no "likelihood of substantial and immediate irreparable injury" exists. *Apple, Inc. v. Samsung Electronics Co.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012) (*quoting O'Shea v. Littleton*, 414 U.S. 488, 502 (1974)). While Plaintiffs claim to derive a significant portion of their revenues from the sale of "publications," many or most of those publications are not incorporated standards. They are private standards, annotations, training materials, and other publications whose copyrights are unquestioned. Thus, even if Public Resource's posting of the standards caused a loss of revenues relating to the incorporated standards (the evidence shows it has not) the overall impact on Plaintiffs' finances would be minimal.

Moreover, Plaintiffs' own conduct contradicts their assertion of injury. Plaintiffs have discussed Public Resource's activities at the highest levels of their organizations since at least

2010, but they waited until August 2013 to file this lawsuit.[22] (SMF ¶ 21.) Plaintiffs have never requested a preliminary injunction against Public Resource. A "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm," and never seeking one is even stronger evidence. *Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (en banc) (quoting *Oakland Tribune, Inc. v. Chronicle Publ'g Co.,* 762 F.2d 1374, 1377 (9th Cir. 1985)). Also, in connection with their motion for summary judgment, *Plaintiffs filed complete versions of several standards on the Court's public docket, knowing that they would be available to the public* through the PACER system. ECF No. 118-7 (attaching several ASTM standards).

Nor have Plaintiffs shown that their "business model" requires the right to control access to and reproduction of standards incorporated into law. (Pls. Mem. 53.) The absence of such a right was confirmed by the Fifth Circuit in *Veeck* in 2002, and Plaintiffs have shown no loss of revenues since that time. (SMF ¶ 129.) Plaintiffs acknowledge that other standards development organizations operate without asserting a right to exclude. (SMF ¶ 29.) And neither Public Resource's activities nor the legal status of standards incorporated into law affects Plaintiffs' ability to control access to other publications, including annotations, training materials, private standards, and the most recent editions of all but one of the the incorporated standards at issue here, which are not law and have not been posted by Public Resource.

Plaintiffs also claim that losing a "right to exclude others from using" legally binding standards is itself an irreparable injury. (Pls. Mem. 54.) This position was foreclosed by the Supreme Court in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392-93 (2006). The Court

---

[22] ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ (SMF ¶ 21.)

overturned a ruling by the Court of Appeals that a "statutory right to exclude alone justifies [a] general rule in favor of permanent injunctive relief," because "the creation of a right is distinct from the provision of remedies for violations of that right," and the equitable remedy of injunction requires a full equitable analysis rather than "broad classifications." *Id.*

As for Plaintiffs' trademark claims, should the Court ultimately find in Plaintiffs' favor, a disclaimer would be more than adequate to remedy any possible harm. See Part VI, *supra*.

### B.   The Balance of Hardships Does Not Favor Plaintiffs' Right To Control The Terms Of Access to the Law.

Plaintiffs have not experienced, and have shown no likelihood of experiencing irreparable harm. By contrast, a permanent injunction will do significant harm to Public Resource's mission of providing the public with access to the full universe of government edicts.

Moreover, Plaintiffs now claim to be "joint authors" of the incorporated standards at issue along with thousands of volunteers from government and industry. (Pls. Mem. 16–17.) Every joint author of a work has a right to authorize copying. *Davis v. Blige*, 505 F.3d 90, 100 (2d Cir. 2007); *Bridgeport Music, Inc. v. DJ Yella Muzick*, 99 F. App'x 686, 691 (6th Cir. 2004). Plaintiffs have not shown that these thousands of volunteers, whom Plaintiffs now contend are co-owners of the copyright, would support or benefit from the broad injunction that Plaintiffs' seek. It is highly likely that many would not. The volunteers, who receive no revenue from Plaintiffs' sales of the standards, are motivated by a desire to promote public safety, improve energy efficiency, promote sales of their own products and services, and advance their careers. (SMF ¶ 28, 136). All of these goals are enhanced by Public Resource's work and would be impaired by an injunction giving Plaintiffs the sole ability to authorize copying. This tilts the balance of hardships even more firmly against an injunction.

### C.   The Public Interest Favors Maximum Access To Legal Texts, And Non-Profit Efforts To Expand Access.

Plaintiffs seek to collapse the public interest inquiry into the merits, suggesting that only "upholding copyrights" can satisfy the public interest test for an injunction. (Pls. Mem. 58.) The Supreme Court has long since rejected that approach. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 26, 32 (2008); *eBay*, 547 U.S. at 393 (forbidding "broad classifications" in place of equitable analysis).

Instead, the Court must consider broader public interests that will be harmed by granting an injunction. *See Winter*, 555 U.S. at 32. In seeking an injunction in this case, Plaintiffs are asking for the right to control access to the law: where, how, in what media, and at what price. They are claiming the right to set different prices and terms for different citizens—and they do this. (SMF ¶ 45–50.) Rationing access to the law means that an apartment dweller may not be able to verify the safety of her electrical and heating systems, or that a citizen journalist on a shoestring budget cannot afford to track changes to state safety codes. It means that an engineering firm with a favored relationship to ASTM can receive free print copies of key standards, while a graduate engineering student cannot excerpt those standards in a doctoral thesis. (SMF ¶ 47–48.)

The principle of universal access to the law is too important to entrust to anyone's unfettered discretion. An injunction forbidding Public Resource from facilitating public access to the law is not in the public interest.

## CONCLUSION

Standards incorporated by reference into law are an integral part of the law. By longstanding legal tradition and precedent, the law is not subject to copyright, no matter who writes the words. Nor does trademark law stand in for unenforceable copyrights. Plaintiffs' role

as conveners and facilitators of private standards development and as champions of incorporation by reference does not depend on the ability to control who may read, write, and speak the law. And Public Resource's efforts to make these important legal materials more accessible to all furthers the public interest and the aims of copyright law. For all of these reasons, the Court should grant summary judgment for Public Resource on all of the claims in this case.

Dated: December 21, 2015                Respectfully submitted,


                                        /s/   *Andrew P. Bridges*
                                        Andrew P. Bridges (admitted)
                                        abridges@fenwick.com
                                        Matthew Becker (admitted)
                                        mbecker@fenwick.com
                                        FENWICK & WEST LLP
                                        555 California Street, 12th Floor
                                        San Francisco, CA 94104
                                        Telephone: (415) 875-2300
                                        Facsimile:   (415) 281-1350

                                        Corynne McSherry (admitted *pro hac vice*)
                                        corynne@eff.org
                                        Mitchell L. Stoltz (D.C. Bar No. 978149)
                                        mitch@eff.org
                                        ELECTRONIC FRONTIER FOUNDATION
                                        815 Eddy Street
                                        San Francisco, CA 94109
                                        Telephone: (415) 436-9333
                                        Facsimile: (415) 436-9993

                                        David Halperin (D.C. Bar No. 426078)
                                        davidhalperindc@gmail.com
                                        1530 P Street NW
                                        Washington, DC 20005
                                        Telephone: (202) 905-3434

                                        *Attorneys for Defendant-Counterclaimant*
                                        Public.Resource.Org, Inc.