**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN SOCIETY FOR TESTING AND MATERIALS d/b/a ASTM INTERNATIONAL; <br><br> NATIONAL FIRE PROTECTION ASSOCIATION, INC.; and <br><br> AMERICAN SOCIETY OF HEATING, REFRIGERATING, AND AIR CONDITIONING ENGINEERS, <br><br> Plaintiffs/Counter-defendants, <br><br> v. <br><br> PUBLIC.RESOURCE.ORG, INC., <br><br> Defendant/Counterclaimant. | Case No. 1:13-cv-01215-TSC-DAR <br><br> **DEFNDANT-COUNTERCLAIMANT PUBLIC.RESOURCE.ORG, INC.'S STATEMENT OF DISPUTED FACTS IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND PERMANENT INJUNCTION** <br><br> Action Filed: August 6, 2013 |

Pursuant to Local Civil Rule 7(h), Public.Resource.Org ("Public Resource") submits in

support of its Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary

Judgment and Permanent Injunction a Statement of Disputed Facts to be tried:

| PLAINTIFF'S STATEMENT OF MATERIAL FACTS | PUBLIC.RESOURCE.ORG'S RESPONSE |
|---|---|
| 1. The term "standards" refers to a variety of technical works, including works that contain product specifications, installation methods, methods for manufacturing or testing materials, recommended practices to ensure safety or efficiency, or other guidelines or best practices. Declaration of James Thomas ("Thomas Decl.") ¶ 6. | |
| 2. An organization that develops standards is a "standards development organization" or "SDO." Thomas Decl. ¶ 7. | Disputed. The plaintiff organizations do not develop standards – volunteers and members of the public develop the standards that Plaintiffs publish. Public Resource's Statement of Material Facts ("SMF") ¶ 132–38. |
| 3. In the United States, standards are typically | Disputed. The plaintiff organizations do not |

| | |
|---|---|
| developed by private organizations that have technical expertise in the relevant area. Thomas Decl. ¶ 8. | develop standards – volunteers and members of the public develop the standards that Plaintiffs publish. SMF ¶ 132–38. |
| 4. Standards are usually highly technical and specialized, and are written for audiences that have particular expertise in the relevant fields. Thomas Decl. ¶ 9. | |
| 5. Standards are used by industry actors as a form of self-regulation and as a source of best practices. Thomas Decl. ¶ 10. | |
| 6. Private sector standards development in the United States is generally coordinated and accredited by the American National Standards Institute ("ANSI"). ANSI is a nonprofit membership organization that facilitates the development of private sector standards and promotes their integrity by accrediting standards development organizations whose procedures comply with ANSI requirements. Declaration of James T. Pauley (Pauley Decl.) ¶ 14. | |
| 7. The ANSI requirements include that standards development committees must contain balanced membership, conduct open proceedings, provide public notice of standards development activity and opportunity for public comment, give due consideration and response to public comments, and provide an opportunity to appeal committee decisions. Pauley Decl. ¶ 15. | |
| 8. Standards that are developed in accordance with ANSI requirements are known as voluntary consensus standards. Pauley Decl. ¶ 15. | |
| 9. American Society for Testing and Materials ("ASTM") is a not-for-profit organization whose mission is to be recognized as the premier developer and provider of voluntary consensus standards, related technical information and services that promote public health and safety, support the protection and sustainability of the environment, and improve the overall quality of life; contribute to the reliability of materials, products, systems and services; and facilitate international, regional, and national commerce. Thomas Decl. ¶¶ 3, 11. | |
| 10. ASTM was founded in 1898 when a group of railroad experts and engineers got together to | |

| | |
|---|---|
| respond to technical issues that had been identified in the early days of the railroad industry. The very first ASTM standard, standard A1, provided uniform specifications for carbon steel rails. This made it possible for manufacturers from different parts of the country to produce uniform rails that could be used in a national railroad. Thomas Decl. ¶ 4. | |
| 11. ASTM's activities have expanded over the past one hundred years. Thomas Decl. ¶ 5. | |
| 12. ASTM develops voluntary consensus standards and is accredited by ANSI. Thomas Decl. ¶ 12. | |
| 13. ASTM standards are used in a wide range of fields, including consumer products, iron and steel products, rubber, paints, plastics, textiles, medical services and devices, electronics, construction, energy, water, and petroleum products. Thomas Decl. ¶ 5. | |
| 14. ASTM standards are developed based on public demands, industry needs, and public safety concerns and advancements in technology. They address a technical issue or problem identified by a group of people in the relevant sector that can be addressed with a standard-based solution. Thomas Decl. ¶ 13; Declaration of Steven Cramer ("Cramer Decl.) ¶ 19; Declaration of Randy Jennings ("Jennings Decl.) ¶ 16. | |
| 15. ASTM's standards are used by scientists and engineers in their laboratories, by architects and designers in their plans, and by industry in their business contracts. Thomas Decl. ¶ 14. | |
| 16. Membership in ASTM costs $75 per year for an individual member and $400 per year for an organizational member. Each member receives one free volume of the Annual Book of ASTM Standards as well as other membership benefits. Thomas Decl. ¶ 19. | |
| 17. ASTM has kept its membership fees at $75 for over fifteen years to permit the widest possible participation in the standard development process, so as to prevent its standards from being biased toward the interests of only stakeholders who can afford to pay higher membership fees. ASTM's membership | Disputed as to the reason ASTM did not increase its membership fees. ASTM has not adduced admissible evidence to support the alleged reason. |

| | |
|---|---|
| fees have never exceeded $75. Thomas Decl. ¶ 20. | |
| 18. Since 2005, new members and members renewing their memberships online to ASTM agree to the following language: "I agree, by my participation in ASTM and enjoyment of the benefits of my annual membership, to have transferred and assigned any and all interest I possess or may possess, including copyright, in the development or creation of ASTM standards or ASTM IP to ASTM." Declaration of Thomas O'Brien, Jr. ("O'Brien Decl.") ¶ 41 and Ex. 11; Cramer Decl. ¶¶ 12-13 and Exs. 1 and 2; Jennings Decl. ¶ 10 and Ex. 1. | Disputed. Mr. O'Brien, Mr. Cramer, and Mr. Jennings have no personal knowledge of whether every member in fact agrees to the quoted language, and are not qualified as experts. The proffered exhibits are from 2013 or later, and bear notices stating "Copyright 2006-2013", suggesting the language in the contents of the exhibits are from no earlier than 2006 and may have been added as recently as after the start of this litigation in 2013. |
| 19. Some members renew their memberships using paper forms that contain substantially the same language. O'Brien Decl. ¶ 42 and Ex. 12. | Disputed. ASTM has not adduced admissible evidence to support this fact. |
| 20. The technical contact is the leader of a task group, which develops a draft of a new standard or a revision to an existing standard. Thomas Decl. ¶¶ 25-26. | |
| 21. Michael Collier was the technical contact for ASTM D87-07. Michael Collier renewed his ASTM membership every year between 2007-2014 using ASTM's online membership renewal form. O'Brien Decl. ¶¶ 43-44. | Disputed to the extent that ASTM D87-07 is not a standard at issue in this litigation and is not relevant.  Michael Collier was not an individual member of ASTM, he represented his employer Petroleum Analyzer Co. LP, which had an organizational membership. See [ASTM035595 (Excel database)] and [ASTM003807] (listing contact information for Michael Collier at Petroleum Analyzer Co. LP, including a work email address). |
| 22. John Chandler was the technical contact for ASTM D975-07 and D398-98. John Chandler renewed his ASTM membership every year between every year between 2007-2014 using the online membership renewal form. O'Brien Decl. ¶¶ 45-46. | Disputed to the extent that ASTM D398-98 is not a standard at issue in this litigation and is not relevant. |
| 23. Jimmy King was the technical contact for the 1998 reapproval of ASTM D1217. Jimmy King renewed his ASTM membership in 2007. O'Brien Decl. ¶¶ 47-48. | Disputed. There was no authoring of original copyrightable content with the reapproval of ASTM D1217 in 1998.  Plaintiffs do not allege that Jimmy King signed any copyright transfer when he allegedly renewed his ASTM membership in 2007, nor do Plaintiffs allege that he renewed online (unlike Plaintiffs' statements as to Michael Collier |

| | and John Chandler above). |
|---|---|
| 24. Randy Jennings participated in the development of ASTM D975-07. Randy Jennings renewed his ASTM membership every year between 2007-2014 using the online membership renewal form and understands that he has assigned any and all copyrights in standards he helped to develop from 1990 to the present to ASTM. Jennings Decl. ¶¶ 10, 15. | |
| 25. Each individual who registers a "work item," which starts the process of developing a new standard or amending an existing standard, must agree to the following language: "I hereby grant and assign to ASTM International all and full intellectual property rights, including copyright, in the proposed draft standard/text and any contributions I make to ASTM International in connection with this proposal" and "By submitting this form, I acknowledge that all copyrights to this document, as a draft and an approved ASTM standard, are the sole and exclusive property of ASTM, in accordance with the Intellectual Property policies of the Society." O'Brien Decl. ¶ 49 and Ex. 13. | Disputed. ASTM's online membership agreement process does not require a member to click "yes," or "I agree," or any other affirmation to the language discussing copyright assignment that appears on the web page. Instead, members click a button labeled "continue" that appears below the message: "[c]lick 'continue' to place your ASTM membership renewal in the shopping cart." SMF ¶ 159. Further, ASTM's Rule 30(b)(6) representative stated that language that ASTM alleges to provide assignment of rights was first introduced to the work item form no earlier than 2003. SMF ¶ 146. ASTM has not introduced any documentary evidence that this language appeared on work item forms at any time when the standards at issue were being developed. |
| 26. ASTM knows of no individual or other person other than ASTM who claims to own any copyright interest in any ASTM standard. O'Brien Decl. ¶ 12; Jennings Decl. ¶¶ 7, 11, 12; Cramer Decl. ¶¶ 6, 14, 15. | Disputed. ASTM states that the standards at issue were jointly authored with the members of the technical committees who developed them, and therefore anyone who has not assigned away their rights to those works would jointly hold copyright in them. Pls. Mem. at 16. ASTM's Rule 30(b)(6) representative stated that ASTM did not introduce assignment language in its forms until approximately 2003, long after most of the standards at issue had been developed. SMF ¶ 146. |
| 27. ASTM has not licensed Defendant's use of ASTM's standards. O'Brien Decl. ¶ 14. | |
| 28. ASTM has over 140 technical committees made up of over 23,000 technical members representing producers, users, consumers, government, and academia from more than 150 countries. Thomas Decl. ¶ 21. | |

| | |
|---|---|
| 29. Each technical committee contains a balanced voting membership, including industry representatives, government representatives, consumers, academics, people with particular expertise in the subject matter, and others. This broad base of stakeholders leads to the highest possible quality of standards that are relevant in the marketplace. Thomas Decl. ¶ 22. | Admitted that each technical committee includes industry representatives, government representatives, consumers, academics, people with particular expertise in the subject matter, and others.  Disputed that this broad base of stakeholders leads to the highest possible quality of standards that are relevant in the marketplace, because this is not a fact, it is an opinion, and Mr. Thomas lacks personal knowledge of this and is not qualified as an expert. |
| 30. Throughout the standards development process, ASTM and its committees make it clear that all participants' contributions to any particular standard will be merged into a unitary standard. Thomas Decl. ¶ 23; Jennings Decl. ¶¶ 18-19; Cramer Decl. ¶¶ 23-24. | Disputed. ASTM proffers no evidence other than a conclusory statement by Mr. Thomas on this point.  The identical declarations of Mr. Jennings and Mr. Cramer make clear that the volunteer members who compose the task group, subcommittee, and committee, *not ASTM itself*, "make[] it apparent to all participants that their contributions will be merged with the contributions of others and will result in a single standard." |
| 31. ASTM's standard development process begins with an individual registering a "work item," which describes the idea for a new standard that will be published and owned by ASTM, or moving to draft a new standard at a subcommittee meeting. Thomas Decl. ¶ 24. | Disputed. The work item does not describe an idea for a new standard that will be owned by ASTM, only a standard that will be published by ASTM. |
| 32. The chair of the relevant subcommittee then reviews the work item request and considers, among other things, whether there is a need for the proposed standard and whether there will be sufficient interest from a balanced group necessary to develop the standard. If the chair approves the work item or if the subcommittee approves the motion for a new standard, a task group will develop a draft of the standard. Thomas Decl. ¶ 25. | |
| 33. The process of drafting the standard is an iterative process. The task group works collaboratively, with many people sharing ideas, suggesting wording and providing comments that contribute to the draft standard. Cramer Decl. ¶ 17; Jennings Decl. ¶ 13. | |
| 34. The draft standard is then edited by an ASTM staff member, who also adds certain language and components that are required by | Disputed to the extent that the process described here is simply ASTM's current process as it exists today, and does not reflect |

6

| | |
|---|---|
| the ASTM form and style guide. Thomas Decl. ¶ 27; Jennings Decl. ¶ 20; Cramer ¶ 25. | ASTM's process over the many decades in which the standards at issue were developed. ASTM staff did not author the standards at issue. SMF ¶ 137. |
| 35. ASTM staff members drafted language that appears in each of the standards at issue in this litigation, including the four ASTM standards for which ASTM is moving for summary judgment. O'Brien Decl. ¶¶ 15-39 and Exs. 5-9. | Disputed. ASTM has not produced any evidence establishing that its staff contributed to the majority of ASTM standards at issue. ASTM has only described the processes that it currently uses, as opposed to the processes used as early as 1958 (the first publication date of the earliest standard at issue).  ASTM cites to its January 2015 Form and Style Guide, not the one in use at the time that any standards at issue were developed.  Moreover, ASTM has only made claims concerning staff contributions as to the four standards that it moves on in its motion, not as to "each standard at issue in this litigation." |
| 36. The draft standard is then voted on by first the entire subcommittee, followed by the entire main committee and the complete Society, and reviewed by the Committee on Standards to ensure that all procedures were followed. Thomas Decl. ¶ 28. | Disputed to the extent that is suggests that any ASTM staff vote on the standards. Draft standards are only voted on by volunteers (ASTM members).  SMF ¶ 135, 137. |
| 37. Technical committees make decisions about the appropriate content of the standards, including the relevant measurements, values, descriptions, and other specifications, as well as the language with which to express these standards. Thomas Decl. ¶ 29; Jennings Decl. ¶ 17; Cramer Decl. ¶ 21. | |
| 38. There are other standard developing organizations that create standards that cover the same or similar subject matter as the standards developed by ASTM, including, for example, the International Organization for Standards, SAE International, the American Association of State Highway and Transportation Officials, and the American Wood Council. The content and language of these entities' standards differs from the content of the corresponding ASTM standards. Thomas Decl. ¶ 30; Cramer Decl. ¶ 22. | |
| 39. At each level of balloting, voters can suggest edits or provide comments. Each negative vote must be addressed to determine if it is | |

| | |
|---|---|
| persuasive. At least 66.7% of the voting subcommittee members and 90% of the voting main committee members must approve all standard actions, with not less than 60% of the voting members returning ballots. Thomas Decl. ¶ 31. | |
| 40. The published versions of ASTM"s standards include copyright notices alerting the public (including the individuals who participated in the creation of the standards) to the fact that the copyrights are owned by ASTM. O'Brien Decl. ¶ 11. | Disputed. The majority of standards that ASTM published do not bear copyright notices on each standard.  See, e.g., ASTM A36-1977ae; ASTM D396-1998 (Exhibit 8 to the O'Brien Declaration, ECF No. 118-7); ASTM D4329-1999.  The exhibits attached to the O'Brien declaration appear to be more recent printings of previous ASTM standards that have subsequently had an ASTM copyright notice affixed, when no such copyright notice appeared on earlier publications of the standard.  Compare O'Brien Exhibit 9 (ASTM D1217-1993(1998)) with the version of ASTM D1217-1993(1998) that Public Resource purchased, scanned, and produced in discovery. M. Becker Decl. ¶ 149 Ex. 151.  Only in recent years has ASTM affixed a copyright notice to each ASTM standard.  This copyright notice does not alert the public (or individuals who participated in the creation of the standards) what content ASTM claims ownership over, such as the entire standard, versus component parts of the standard, or simply the formatting used for the final print version.  Moreover, this is not a fact, it is an opinion.  Mr. O'Brien lacks personal knowledge of what information the public derives from the existence of copyright notices on ASTM standards, and he is not qualified as an expert. |
| 41. ASTM has developed over 12,000 standards through this exhaustive process. Thomas Decl. ¶ 32. | Disputed. ASTM does not develop standards; volunteers develop standards that ASTM publishes. SMF ¶ 132–38. Furthermore, Mr. Thomas only states "ASTM has developed over 12,000 standards," not that the process described in the preceding paragraphs has been used to develop each of these 12,000 standards.  ASTM admitted that the standard development process has changed in recent |

| | years.  Smith Tx. 22:06-26:12. |
|---|---|
| 42. All ASTM standards are required to be reviewed on a 5 year schedule and either reapproved, revised or withdrawn in revision cycles that typically take 8-12 months to complete. Thomas Decl. ¶ 33. | |
| 43. ASTM incurs substantial costs for its standards development infrastructure and delivery platforms, including the resources it provides to encourage collaboration among members; expenses relating to technical committee meetings and balloting as the standards make their way through the development process; and editing, producing, distributing and promoting the completed standards. Thomas Decl. ¶ 34. | Disputed. ASTM has not adduced admissible evidence to support this fact. |
| 44. In 2014, ASTM spent more than $9 million to cover the cost of technical committee operations and $19 million for publication of copyrighted materials. Thomas Decl. ¶ 35. | Disputed. Plaintiffs provide no source other than Mr. Thomas' conjecture to support these figures.  Further, the figures are irrelevant to the extent that they concern costs for activities that did not pertain to the standards at issue in this litigation. |
| 45. ASTM incurs the costs of developing its standards with the understanding that the standards will be protected by copyrights that provide ASTM with the exclusive right to sell, reproduce, display and create derivative works based on the standards. Thomas Decl. ¶ 36. | Disputed. ASTM does not develop standards; volunteers develop standards that ASTM publishes. SMF ¶ 132–38. ASTM claims that the standards it publishes are jointly authored with the thousands of volunteers who develop the standards (Pls. Mem. at 16), and if that is taken as true, then ASTM must not have "the understanding that the standards will be protected by copyrights that provide ASTM with the exclusive right to sell, reproduce, display and create derivative works based on the standards," because any of the alleged co-authors of the standards would also have the same rights, which are therefore not exclusive.  Furthermore, ASTM was aware of the en banc decision in *Veeck v. Southern Building Code Congress* and has been on notice that any standards incorporated into law are in the public domain. |
| 46. ASTM depends on the revenue it generates from sales of its copyrighted materials to conduct its operations and requires that revenue to be in a position to continue to develop its standards in the manner in which it currently | Disputed. ASTM does not develop standards; volunteers develop standards that ASTM publishes. SMF ¶ 132–38. ASTM's alleged reliance on revenue from the sales of all allegedly copyrighted material generally is |

| | |
|---|---|
| operates. Thomas Decl. ¶ 37. | not relevant to the standards at issue. |
| 47. ASTM generates over two-thirds of its revenue from the sale of copyrighted materials. Thomas Decl. ¶ 38. | Disputed. ASTM's sales of products other than standards are not relevant, because the vast majority of ASTM standards are not incorporated by reference into the law, nor at issue in this litigation.  The question of whether much of ASTM's publications are properly copyrighted is in dispute.  Plaintiffs provide no source other than Mr. Thomas' conjecture to support these figures. |
| 48. ASTM has devoted substantial efforts to develop and promote the sale of products and services that are related or complementary to ASTM's standards. ASTM does not generate substantial income from these goods and services, despite decades of efforts. Thomas Decl. ¶ 39. | Disputed. This is not a fact, it is an opinion. Plaintiffs provide no source other than Mr. Thomas' conjecture to support these figures. Mr. Thomas is not qualified as an expert. |
| 49. ASTM generated a net loss of $3 million in 2014 for non-standards related products and services. Thomas Decl. ¶ 40. | Disputed. Plaintiffs provide no source other than Mr. Thomas' conjecture to support these figures. |
| 50. ASTM does not consider the likelihood and extent to which a standard will generate revenues when deciding whether to develop or maintain a standard. Thomas Decl. ¶ 42. | Disputed to the extent that ASTM does not develop standards; volunteers develop standards that ASTM publishes, and the decision as to whether to develop a standard is made by the volunteers. SMF ¶ 132–38. |
| 51. Sales of a limited number of standards drive the bulk of ASTM's revenues. Because of their relevance to smaller market audiences, many other standards generate very limited revenues, which do not cover the costs of the development process. The sales of certain standards effectively subsidize the creation and maintenance of the remaining standards. Thomas Decl. ¶ 43. | Disputed. This is not a fact, it is an opinion. Plaintiffs provide no source other than Mr. Thomas' conjecture to support these figures. Mr. Thomas is not qualified as an expert. |
| 52. ASTM's copyrighted materials give ASTM a competitive advantage in selling ancillary or complementary products and services. ASTM can include copies of its standards as part of a package it provides to customers in training or certification programs. Thomas Decl. ¶ 41. | |
| 53. On occasion, government agencies incorporate ASTM's standards by reference into regulations. Approximately 10 percent of ASTM's standards are incorporated by reference into federal regulations. Thomas Decl. | Disputed as to portion of incorporated standards. ASTM has not adduced admissible evidence to support this fact. Its witnesses have admitted they do not know the exact number and lack personal knowledge or |

| | |
|---|---|
| ¶ 15. | reasonable certainty of this estimate. |
| 54. ASTM standards are not developed for the purpose of being incorporated into regulations. Thomas Decl. ¶ 16; Cramer Decl. ¶ 20. | Disputed.  This is an opinion, not a fact, and Mr. Thomas and Mr. Cramer do not have personal knowledge of all the purposes for which the volunteers develop ASTM standards, nor are they qualified as experts to opine on this topic. Government employees and agencies participate in the development of most ASTM standards and may do so with the purpose of developing standards that could eventually be incorporated into law or regulations. SMF ¶ 132. |
| 55. When it develops a new standard, ASTM does not know whether the standard will be incorporated by reference into government regulations. Thomas Decl. ¶ 17. | |
| 56. ASTM does not lobby government agencies to reference its standards. Thomas Decl. ¶ 18. | Disputed.  ASTM reaches out to congressional staffers and government agencies to suggest use of particular editions of standards and particular language in legislation. SMF ¶ 36. |
| 57. ASTM publishes its standards in hard copy and digital formats, including PDFs, HTML and XML formats, which can be purchased from ASTM or its authorized resellers. Thomas Decl. ¶ 44. | |
| 58. When purchased individually, the price per ASTM standard is $38-$89. Thomas Decl. ¶ 45. The price of each new individual standard is calculated based on the number of pages in the standard. Thomas Decl. ¶ 46. | |
| 59. ASTM's standards are reasonably accessible and available to the public. Rubel Decl. ¶ 4, Ex. 1 (Expert Report of John Jarosz ("Jarosz Rep.") ¶ 86). | Disputed.  This is not a fact, it is an opinion. ASTM standards are not reasonably accessible and available to the public. ASTM only places a minority of ASTM standards on its online "Reading Room": those standards that it has identified as being incorporated by reference into federal regulations (therefore excluding ASTM standards that have been incorporated into state or municipal laws, as well as ASTM standards that are not incorporated into law). SMF ¶ 51.  Public Resource does not take a position on whether ASTM standards that are not incorporated into federal, state, or municipal law should be |

| | |
|---|---|
| | freely available to the public, but must clarify because Plaintiffs' statement of material facts does not differentiate between ASTM standards generally and ASTM standards at issue in this litigation. ASTM's Reading Room does not make standards "reasonably accessible and available to the public," because it requires users to agree to onerous contractual terms, it cannot be used by individuals who are visually disabled, and it uses a deliberately limited interface that makes it difficult for users to read the standards and impossible to print, save, or search the standards. SMF ¶ 52. The ability to read standards that have been incorporated by reference into federal regulations by traveling to the Office of the Federal Register in Washington D.C. after making a written request for an appointment likewise does not constitute "reasonably accessible and available to the public." SMF ¶ 19. |
| 60. ASTM does not seek to obtain higher prices for standards that have been incorporated by reference. Thomas Decl. ¶ 47; Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶ 87-88). | |
| 61. ASTM provides copies of its standards at a reduced cost or at no cost when it is informed that the regular cost is a burden to the requester. Thomas Decl. ¶ 48. | Disputed. ASTM has not adduced admissible evidence to support this fact. This appears to be an improper inference based on ¶ 62 of Plaintiffs' Statement of Material Fact. |
| 62. For example, ASTM has a "10 Standards for Students" program through which professors can select any 10 ASTM standards and students can purchase a packet containing all 10 standards for just $10 per student. Thomas Decl. ¶ 49. | |
| 63. ASTM provides the public with free, read-only access to all ASTM standards that ASTM is aware have been incorporated by reference into federal regulations. Thomas Decl. ¶ 50; O'Brien Decl. ¶ 60. | Disputed.  Not all members of the public can read the standards on ASTM's "free read-only" website, such as people with print disabilities. SMF ¶ 53. |
| 64. ASTM provides the public with free, read-only access to all ASTM standards that are the subject of the Motion for Summary Judgment. O'Brien Decl. ¶ 61 and Ex. 17. | Disputed.  Not all members of the public can read the standards on ASTM's "free read-only" website, such as people with print disabilities. SMF ¶ 53. |
| 65. ASTM identifies standards that have been | |

| | |
|---|---|
| incorporated by reference into federal regulations from the database created by the National Institute of Standards and Technology. Thomas Decl. ¶ 51; O'Brien Decl. ¶ 62. | |
| 66. ASTM publicizes the free read-only access provided on its website. Thomas Decl. ¶ 52; O'Brien Decl. ¶ 63. | Disputed. ASTM has not adduced admissible evidence to support this fact. *See* Public |
| 67. During the notice and comment period regarding proposed federal regulations, upon request by the relevant federal agency, ASTM provides free, read-only access to standards that are incorporated by reference in proposed regulations. Thomas Decl. ¶ 53; O'Brien Decl. ¶ 64. | Disputed. ASTM has not adduced admissible evidence to support this fact. |
| 68. ASTM routinely grants permission to researchers, academics and others to reproduce its standards at no cost for non-commercial purposes. O'Brien Decl. ¶ 13. | Disputed. ASTM has not adduced admissible evidence to support this fact. In fact, the contrary appears to be the case. (SMF ¶ 46–50.) |
| 69. ASTM has not received any complaints about lack of accessibility of its standards other than from Defendant. Thomas Decl. ¶ 54; O'Brien Decl. ¶ 65. | Disputed. ASTM has not adduced admissible evidence to support this fact. |
| 70. ASTM has copyright registrations that cover each of the standards at issue in this litigation. O'Brien Decl. ¶ 8. | Disputed. ASTM does not have a copyright registration for ASTM D323-1958(1968). (SMF ¶ 131.) |
| 71. ASTM has a copyright registration for ASTM D86-07 (Standard Test Methods for Distillation of Petroleum Products at Atmospheric Pressure) that identifies ASTM as the owner. O'Brien Decl. ¶ 5 and Ex. 1. | |
| 72. ASTM has a copyright registration for ASTM D975-07 (Standard Specification for Diesel Fuel Oils) that identifies ASTM as the owner. O'Brien Decl. ¶ 6 and Ex. 2. | |
| 73. ASTM publishes an Annual Book of ASTM Standards every year that is composed of a number of volumes and includes the current version of each of its standards. O'Brien Decl. ¶ 7. | |
| 74. Between 1980 and 2011, ASTM obtained copyright registrations for each volume of its Book of Standards. O'Brien Decl. ¶ 8. | Disputed. ASTM has not adduced admissible evidence to support this fact. The evidence in the O'Brien declaration is not based on personal knowledge and is inadmissible secondary evidence of a writing. |
| 75. ASTM D396-98 and D1217-93(98) were published in Volume 5.01 of the 1999 | |

| | |
|---|---|
| Annual Book of ASTM Standards. O'Brien Decl. ¶ 9 and Ex. 3. | |
| 76. ASTM has a copyright registration for Volume 5.01 of the 1999 Annual Book of ASTM Standards that identifies ASTM as the owner. The date of first publication for this work was February 22, 1999 and the effective date of registration is March 10, 1999. O'Brien Decl. ¶ 10 and Ex. 4. | Disputed. The fact that ASTM D396-1998 and D1217-1993(1998) were published in Volume 5.01 of the 1999 Annual Book of ASTM Standards does not mean that ASTM has a copyright over those standards. Instead it means that ASTM has, at best, a thin copyright over the compilation of all standards as arranged in the 1999 Annual Book of ASTM Standards. ASTM's copyright registration for Volume 5.01 of the 1999 Annual Book of ASTM Standards is materially false because it does dos not list the true authors of the standards (thousands of volunteers that ASTM alleges to be joint authors (Pls. Mem. at 16)), it lists the standards as a work made for hire (when no ASTM employees authored the standard nor does ASTM have any work made for hire agreements with the authors of the standards), and ASTM claims authorship over the "entire text," when in fact ASTM now admits that thousands of volunteers authored the standard. SMF ¶ 130, 132–38, 146–161. This copyright registration is a compilation or derivative work registration for an entire volume of standards, not an individual standard, and this registration therefore does not cover ASTM D396-1998 and D1217-1993(1998) but instead covers only Volume 5.01 of the 1999 Annual Book of ASTM Standards as a thin compilation copyright. |
| 77. ASTM owns a U.S. federal trademark registration for the trademark ASTM (U.S. Trademark Reg. No. 2,679,320) in connection with books featuring information on standardization of specifications and the methods of testing for various materials and products; promoting public awareness of the need for standards; educational services; and providing a website on global computer networks featuring information in the field of specifications and methods of testing for various materials and products. ASTM has used this trademark since 1962. ASTM filed a Section 15 | |

| | |
|---|---|
| declaration in support of the incontestability of this registration. O'Brien Decl. ¶ 55 and Ex. 14. | |
| 78. ASTM owns U.S. federal trademark registrations for the trademarks ASTM INTERNATIONAL (U.S. Trademark Reg. No. 2,685,857) and the following logo:<br><br><br><br>(U.S. Reg. No. 2,651,796) in connection with similar goods and services. ASTM has used these trademarks since 2001. ASTM filed Section 15 declarations in support of the incontestability of these registrations. O'Brien Decl. ¶ 56 and Ex. 15. | |
| 79. ASTM also owns a registration for the following logo:<br><br><br><br>(U.S. Reg. Nos. 4,079,772) in connection with publications relating to testing methods, specifications and standards in engineering, industrial and allied fields. ASTM has used this trademark since 1965. The application for this registration was filed on May 10, 2011. The Examining Attorney who reviewed the application approved it for registration without requesting proof of secondary meaning. O'Brien Decl. ¶ 57 and Ex. 16. | |

| | |
|---|---|
| 80. ASTM expends considerable resources marketing and promoting its goods and services in connection with these trademarks every year. For example, ASTM spent over $3 million marketing and promoting sales of its standards that feature its trademarks in catalogs, brochures, and in mail and email correspondence between 2010-2012, which were the three years immediately prior to Defendant's infringement. O'Brien Decl. ¶ 58. | Disputed. ASTM has not adduced admissible evidence to support this fact. The testimony in support of this fact is not based on personal knowledge. |
| 81. ASTM's longstanding use of its trademarks in connection with its high quality standards has resulted in the public's association of ASTM's marks with a certain quality. O'Brien Decl. ¶ 59. | Disputed. ASTM has not adduced admissible evidence to support this fact. The testimony in support of this fact is not based on personal knowledge. |
| 82. The ASTM word mark and logo are well known. Rubel Decl. ¶6, Ex. 3 (Deposition of Carl Malamud ("C. Malamud Dep.") at 14:12-23). | |
| 83. ASTM engages in quality control procedures to ensure the quality and integrity of the content of the standards. O'Brien Decl. ¶ 50. | Disputed. ASTM has not adduced admissible evidence to support this fact. The testimony in support of this fact is not based on personal knowledge and the quality control of the development process is not relevant. |
| 84. ASTM staff does the final edit of each of the standards prior to publication. As part of this process, ASTM staff submits the final version to the technical committee for reviews to make sure it matches the content approved through the balloting process. O'Brien Decl. ¶¶ 50-52; Cramer Decl. ¶ 26. | |
| 85. ASTM staff proofreads the XML versions of standards before posting them on the internet to ensure that the conversion of the text and diagrams into XML format has not altered the content of the standard. O'Brien Decl. ¶ 53. | Disputed. ASTM has not adduced admissible evidence to support this fact. The testimony in support of this fact is not based on personal knowledge. |
| 86. The National Fire Protection Association, Inc. ("NFPA") is a nonprofit organization, based in Quincy, Massachusetts, devoted to eliminating death, injury, property and economic loss due to fire, electrical and related hazards. NFPA was founded in 1896, and has continuously developed standards since that time. Pauley Decl. ¶ 4. | |
| 87. NFPA delivers information and knowledge through more than 300 consensus codes and | This fact is not material to the motion for summary judgment. |

| | |
|---|---|
| standards, research, training, education, outreach and advocacy. NFPA's membership totals more than 65,000 individuals throughout the world. Pauley Decl. ¶ 4. | |
| 88. NFPA is periodically audited by ANSI and is accredited and classified as an Audited Designator by ANSI. Pauley Decl. ¶ 16. | This fact is not material to the motion for summary judgment. |
| 89. The primary users of NFPA standards are professionals and tradespeople who use these standards in the course of their business, such as electricians, architects, and electrical equipment manufacturers. The professionals who use NFPA standards are familiar with them and have reasonable access to them. Pauley Decl. ¶ 13; Declaration of James Golinveaux ("Golinveaux Decl.") ¶ 10. | Disputed to the extent that NFPA's assertion that "[t]he professionals who use NFPA standards . . . have reasonable access to them" is not a fact, it is an opinion.  NFPA standards are not reasonably accessible.  NFPA's Reading Room does not provide "reasonable access," because it requires users to agree to onerous contractual terms, it cannot be used by individuals who are visually disabled, and it uses a deliberately limited interface that makes it difficult for users to read the standards and impossible to print, save, or search the standards.  SMF ¶ 52.  The ability to read standards that have been incorporated by reference into federal regulations by traveling to the Office of the Federal Register in Washington D.C. after making a written request for an appointment likewise does not constitute "reasonable access." SMF ¶ 19. |
| 90. Many NFPA standards are incorporated by reference in federal and state laws and regulations. NFPA is aware that its standards are frequently incorporated by reference, but NFPA does not develop any standards solely for that purpose. Pauley Decl. ¶ 10. | Disputed to the extent that NFPA does not develop standards; volunteers develop standards that NFPA publishes. SMF ¶ 132–38. Government employees and agencies participate in the development of most if not all NFPA standards and may do so with the purpose of developing standards that could eventually be incorporated into law or regulations. SMF ¶ 132. |
| 91. All NFPA standards have a range of applications and uses even if they are not incorporated by reference in government laws or regulations. Pauley Decl. ¶ 12. | This fact is not material to the motion for summary judgment. |
| 92. NFPA develops new standards based on a determination that developing a standard in a particular area would serve NFPA's mission of reducing the risk of loss from fire and related hazards. NFPA does not consider whether the standard will generate revenue when deciding whether to develop the standard. Pauley Decl. ¶ | Disputed to the extent that NFPA does not develop standards; volunteers develop standards that NFPA publishes, and volunteers determine what standards to develop, not NFPA. SMF ¶ 132–38. |

| | |
|---|---|
| 11. | |
| 93. NFPA develops the National Electrical Code ("NEC"), and has done so since 1897. NFPA updates and revises the NEC every three years. The current edition of the NEC is the 2014 edition, which is over 900 pages long. Pauley Decl. ¶ 7. Additional NFPA standards include NFPA 101, the Life Safety Code, and NFPA 13, the Standard for the Installation of Sprinkler Systems. Pauley Decl. ¶ 9; Golinveaux Decl. ¶ 4. | Disputed to the extent that NFPA does not develop the National Electrical Code ("NEC"), nor does it update or revise the NEC; volunteers develop, update, and revise the NEC that NFPA publishes. SMF ¶ 132–38. |
| 94. The NEC addresses the installation of electrical conductors, equipment, and raceways; signaling and communications conductors, equipment, and raceways; and optical fiber cables and raceways in commercial, residential, and industrial occupancies. The NEC is the world's leading standard for electrical safety and provides the benchmark for safe electrical design, installation and inspection to protect people and property from electrical hazards. Pauley Decl. ¶ 8. | This fact is not material to the motion for summary judgment. |
| 95. State governments benefit greatly from the standards developed by NFPA through its voluntary consensus process. The expertise and resources invested by NFPA in standards development enable state governments to incorporate standards that serve the public interest. State governments rely on NFPA and other private sector standards developers to create the highest-quality standards that reflect a wide diversity of viewpoints. Declaration of Kevin Reinertson ("Reinertson Decl.") ¶¶ 11-12. | Disputed. This is not a fact, it is an opinion. NFPA does not develop standards; volunteers develop standards that NFPA publishes. SMF ¶ 132–38. |
| 96. State government agencies would not have the funding or resources to create standards if NFPA were unable to develop them. Reinertson Decl. ¶¶ 13-14. | Disputed. This is not a fact, it is an opinion. Plaintiffs have not provided any evidence to support this, other than the opinion of Mr. Reinertson, who has no personal knowledge of all state government agencies' finances or abilities, and is not qualified as an expert. |
| 97. Fire safety professionals and the fire protection industry benefit greatly from the standards developed by NFPA through its voluntary consensus process, which develops standards that reflect the broadest possible consensus about fire safety techniques and that | Disputed to the extent that NFPA does not develop standards; volunteers develop standards that NFPA publishes. SMF ¶ 132–38. This fact is also not based on admissible evidence. |

| | |
|---|---|
| can be used widely throughout the country. Golinveaux Decl. ¶¶ 5-6. | |
| 98. NFPA's standards development process results in the creation of uniform industry-wide standards. Professionals across the industry rely on the existence of these standards, and this industry-wide uniformity could not be achieved without NFPA or a similar organization with the resources to devote to standards development. Golinveaux Decl. ¶ 7. | Disputed to the extent that Mr. Golinveaux is not qualified as an expert and lacks personal knowledge of whether industry-wide uniformity in fire prevention standards could be achieved without NFPA or a similar organization. |
| 99. NFPA sells its standards in a variety of formats, including as PDFs, eBooks, and in softcover, looseleaf, or spiralbound versions. The price for NFPA standards ranges from $39 to $105. Pauley Decl. ¶ 44. | |
| 100. NFPA provides the full text of NFPA standards for free viewing by any member of the public on its website. All NFPA standards can currently be read in full and without cost on NFPA's website. Pauley Decl. ¶ 45. | Disputed.  Not all members of the public can read the standards on NFPA's "free viewing" website, such as people with print disabilities. SMF ¶ 53. |
| 101. NFPA also encourages jurisdictions that incorporate its standards by reference to link their websites to its free, online version of the standards, and provides a widget that easily enables such access. Pauley Decl. ¶ 45. | |
| 102. The published versions of NFPA's standards include copyright notices alerting the public, including the people who participated in the standards development process, that the copyrights are owned by NFPA. Pauley Decl. ¶ 25. | Disputed to the extent that Plaintiffs assert that these "copyright notices alert[] the public, including the people who participated in the standards development process, that the copyrights are owned by NFPA."  These copyright notice does not alert the public (or individuals who participated in the creation of the standards) what content NFPA claims ownership over, such as the entire standard, versus component parts of the standard, or simply the formatting used for the final print version.  This is not a fact, it is an opinion.  Mr. Pauley lacks personal knowledge of what information the public derives from the existence of copyright notices on NFPA standards, and he is not qualified as an expert. |
| 103. NFPA routinely grants permission to researchers, educators, and others to use portions of NFPA standards for educational and other non-commercial purposes at no cost. Declaration of Dennis Berry ("Berry Decl.") ¶ | Disputed. ASTM has not adduced admissible evidence to support this fact. The testimony in support of this fact is not based on personal knowledge. |

| | |
|---|---|
| 10. | |
| 104. NFPA expends substantial resources on standards development, including salary and benefits for its own administrative and expert staff, office space, meeting facilities for the more than 250 Technical Committees who participate in the NFPA standards development processes, outreach and education efforts, and information technology. Pauley Decl. ¶ 18. | Disputed. ASTM has not adduced admissible evidence to support this fact. The testimony in support of this fact is not based on personal knowledge. |
| 105. In 2014, NFPA spent more than $13.5 million on standards development and more than $27 million for publication of copyrighted materials. Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶ 71, 91). | Disputed to the extent that these figures are irrelevant because they concern costs for activities that do not pertain to the standards at issue in this litigation (referring to "standards development" and "publication of copyrighted material" rather than the standards at issue, standards incorporated into the law, or even standards for that matter). The data on which Mr. Jarosz relied were not sufficiently detailed to allow him to determine how much was spent with regard to any standards at issue, or even standards incorporated into the law.  See Motion to Strike Jarosz Report. |
| 106. NFPA funds its standards development and publications activities primarily with the revenue obtained from sales of its copyrighted standards. In 2014 NFPA's publications sales accounted for over 70% of NFPA's total operating revenues. The overwhelming majority of that publications revenue comes from the sale of codes and standards. Pauley Decl. ¶ 46. | Disputed to the extent that these figures are irrelevant because they concern costs and revenue sources that do not pertain to the standards at issue in this litigation (referring to "standards development" and "publication sales" rather than sales of the standards at issue or even standards incorporated into the law). |
| 107. To preserve the revenue from sales of publications, NFPA must be able to assert copyright in its standards to prevent unauthorized copying of NFPA standards, which threaten to substantially undermine NFPA's sales. Pauley Decl. ¶ 49. | Disputed. This is not a fact, it is an opinion. Mr. Pauley is not qualified as an expert and has no personal knowledge of whether "unauthorized copying" threatens to "substantially undermine" NFPA's sales. These claims are irrelevant to the extent they concern standards or NFPA publications generally, and not the standards at issue. |
| 108. NFPA depends on the revenue it generates from sales of its copyrighted materials to conduct its operations and needs that revenue to continue to develop its standards in the manner in which it currently operates. Pauley Decl. ¶¶ 47-51; Rubel Decl. ¶ 49, Ex. 45 (Mullen Dep. at 224:14-229:5). | Disputed. NFPA does not develop standards; volunteers develop standards that NFPA publishes. SMF ¶ 132–38. These claims are irrelevant to the extent they concern NFPA "copyrighted materials" generally, and not the standards at issue.  This is an opinion, not a fact. Mr. Pauley and Mr. Mullen are not |

| | qualified as experts to opine on how changes in certain sources of revenue might affect NFPA's business model. |
|---|---|
| 109. NFPA's standards development process incorporates significant creative input from three primary groups of participants. These include (i) members of the public who provide input and comment; (ii) the members of the Technical Committees who consider and vote on proposed changes to the standards; and (iii) the NFPA staff who assist and advise the Technical Committees and who draft and finalize the wording of the actual document that becomes the standard. Pauley Decl. ¶ 24. | Disputed to the extent Plaintiffs assert that NFPA staff provided "significant creative input" for the standards at issue.  NFPA staff did not provide any copyrightable contributions to the standards at issue, they simply assisted the technical committees (volunteers) who drafted and finalized the standards. SMF ¶ 132–38. |
| 110. Members of the public participate in NFPA's standards development process by submitting public input, including proposed changes to NFPA standards and comments on proposed changes. Pauley Decl. ¶ 27. | This fact is not material to Plaintiffs' Motion for Summary Judgment. |
| 111. Members of the public who make contributions to the standards development process understand and intend that NFPA will own the copyright in their contributions and in the standards. Pauley Decl. ¶ 28. | Disputed.  This is not a fact, it is an opinion. Mr. Pauley lacks personal knowledge of what all members of the public "understand and intend" regarding ownership of the copyrights in their contributions, and he is not qualified as an expert.  To the extent that Plaintiffs' statement is in the present tense it is unclear what members of the public and what standards Plaintiffs reference, and therefore may be irrelevant. |
| 112. NFPA has a policy that all persons who submit public input must assign all rights, including copyright, in their contributions to NFPA. NFPA does not accept public input without a signed copyright assignment, which is printed on the standard forms by which members of the public submit input. Pauley Decl. ¶ 27; Rubel Decl. ¶ 9, Ex. 6 (Dubay Dep. at 212:17-21). | Disputed to the extent that Plaintiffs refer to any time period during which the standards at issue in this litigation were developed, and to the extent that Plaintiffs' statement gives the erroneous impression that any copyright assignment policy NFPA may have now was in effect prior to 2015, or was actually enforced by NFPA.  NFPA has admitted that it did not exercise control over what documents were submitted in the place of copyright assignment forms, and that it would accept retyped forms or incorrect forms. SMF ¶ 164–65. Until at least 2008, NFPA used copyright release forms that requested a non-exclusive license to volunteers' and members of the public's contributions, not an assignment of copyright. SMF ¶ 163. |

| | |
|---|---|
| 113. NFPA staff check every public input that NFPA receives to ensure that the appropriate copyright assignment has been executed. Rubel Decl. ¶ 9, Ex. 6 (Dubay Dep. At 144:8-145:15.) | Disputed to the extent that Plaintiffs refer to any time period during which the standards at issue in this litigation were developed, and to the extent that Plaintiffs' statement gives the erroneous impression that any copyright assignment policy NFPA may have now was in effect prior to 2015, or was actually enforced by NFPA.  NFPA has admitted that it did not exercise control over what documents were submitted in the place of copyright assignment forms, and that it would accept retyped forms or incorrect forms. SMF ¶ 164–65. Until at least 2008, NFPA used copyright release forms that requested a non-exclusive license to volunteers' and members of the public's contributions, not an assignment of copyright. SMF ¶ 163. |
| 114. The NFPA Technical Committees are the principal consensus bodies responsible for the development and revision of NFPA standards. The Technical Committees are composed of volunteers from business, industry, public interest groups, government and academia, and others. The Technical Committees meet to consider and vote on proposals submitted by the public, and to reach consensus on appropriate revisions to the standards. Pauley Decl. ¶¶ 32-33; Rubel Decl. ¶ 9, Ex. 6 (Dubay Dep. at 52:1-15). | This fact is not material to Plaintiffs' Motion for Summary Judgment. |
| 115. NFPA has a policy that all members of the Technical Committees submit Committee applications that include an agreement that all material authored by the Committee will be works made for hire for NFPA, and additionally an assignment of all and full rights in copyright in their work as a member of the Technical Committee to NFPA. Pauley Decl. ¶¶ 34- 35; Golinveaux Decl. ¶ 11; Rubel Decl. ¶ 9, Ex. 6 (Dubay Dep. at 105:12-21). | Disputed to the extent that Plaintiffs refer to any time period during which the standards at issue in this litigation were developed, and to the extent that Plaintiffs' statement gives the erroneous impression that any copyright assignment policy NFPA may have now was in effect prior to 2015, or was actually enforced by NFPA.  NFPA has admitted that it did not exercise control over what documents were submitted in the place of copyright assignment forms, and that it would accept retyped forms or incorrect forms. SMF ¶ 164–65. Until at least 2008, NFPA used copyright release forms that requested a non-exclusive license to volunteers' and members of the public's contributions, not an assignment of copyright. SMF ¶ 163. |

| | Language mentioning "work made for hire" was added to committee applications in 2007 at the earliest. SMF ¶ 139. |
|---|---|
| 116. Members of Technical Committees who participate in the Standards Development Process understand and intend that their contributions are owned by NFPA and that NFPA owns the copyright in the final standards. Pauley Decl. ¶¶ 36-37; Golinveaux Decl. ¶¶ 12-13. | Disputed.  This is not a fact, it is an opinion. Mr. Pauley and Mr. Golinveaux lack personal knowledge of what all members of technical committees "understand and intend" regarding ownership of the copyrights in their contributions, and they are not qualified as experts.  To the extent that Plaintiffs' statement is in the present tense it is unclear what members of technical committees and what standards Plaintiffs reference, and therefore may be irrelevant. |
| 117. NFPA employees also participate in NFPA's standards development process in the course of their employment. Each Technical Committee has a NFPA staff liaison who facilitates and runs the Committee meetings, provides advice to the Committee, and records the decisions made by the Committee. NFPA employees also work with the Committee and with each other to craft appropriate wording that accurately captures the intent of Committee decisions, and revise and finalize the wording of the actual document that becomes the standard. Pauley Decl. ¶¶ 38-40; Rubel Decl. ¶ 9, Ex. 6 (Dubay Dep. at 54:19-56:12, 66:20-67:12, 69:2-18). | Disputed to the extent that Plaintiffs allege that NFPA employees create any original copyrightable contributions to the standards. NFPA employees only assist the unpaid volunteers who actually develop the standards. SMF ¶ 132–38. |
| 118. NFPA employees engage in multiple layers of quality control procedures to ensure the quality and integrity of the content of the standards. NFPA employees edit and revise the language of the NEC to ensure that it conforms to the requirements in the NFPA style manual, to ensure consistency across the different sections of the NEC, and to finalize the language of the standard for balloting. Pauley Decl. ¶ 41; Rubel Decl. ¶ 9, Ex. 6 (Dubay Dep. At 31:18-33:24, 59:19-62:5). | Disputed to the extent that Plaintiffs allege that NFPA employees create any original copyrightable contributions to the standards. NFPA employees only assist the unpaid volunteers who actually develop the standards. SMF ¶ 132–38. |
| 119. Each NFPA standard goes through two full rounds of public input, comments, review and drafts before being finalized. The process results in the issuance of sophisticated and complex works that support NFPA's mission of promoting public safety. For example, | Disputed to the extent that Plaintiffs allege that NFPA employees create any original copyrightable contributions to the standards. NFPA employees only assist the unpaid volunteers who actually develop the standards.  SMF ¶ 132–38. |

| | |
|---|---|
| developing a new edition of the NEC involves consideration of thousands of comments and proposals from the public, the participation of hundreds of Technical Committee members in multiple rounds of intensive multi-day meetings, and the active assistance of dozens of NFPA staff. Pauley Decl. ¶¶ 19, 23, 42. | |
| 120. NFPA has a copyright registration certificate (U.S. Copyright Reg. No. TX 7-297-325) for the 2011 edition of the NEC, which identifies NFPA as the author and owner of the work. Berry Decl. ¶ 2 and Ex. A. | Disputed to the extent that NFPA is not the author of the 2011 edition of the NEC, but rather the unpaid volunteers are the authors. SMF ¶ 132–38. |
| 121. NFPA has a copyright registration certificate (U.S. Copyright Reg. No. TX 7-935-064) for the 2014 edition of the NEC, which identifies NFPA as the author and owner of the work. Berry Decl. ¶ 3 and Ex. B. | Disputed to the extent that NFPA is not the author of the 2014 edition of the NEC, but rather the unpaid volunteers are the authors. SMF ¶ 132–38. |
| 122. NFPA is not aware of any other person who claims to have a copyright interest in any NFPA standard. Pauley Decl. ¶ 26. | Disputed to the extent that Plaintiffs have alleged that the unpaid volunteers who created the NFPA standards are "joint authors," and therefore there are many thousands of individuals with copyright interests in NFPA standards. Pls. Mem. at 16. |
| 123. NFPA owns incontestable U.S. federal trademark registrations for the trademarks National Fire Protection Association (U.S. Trademark Reg. No. 3,165,010) and NFPA (U.S. Trademark Reg. No. 3,141,884) in connection with books containing fire, electrical and building safety codes and standards; electronic publications, namely books containing fire, electrical and building safety codes and standards recorded on computer media; and certain other areas. NFPA has used the National Fire Protection Association trademark since 1896 and the NFPA trademark since at least 1900. Berry Decl. ¶¶ 4-5 and Exs. C-D. | Disputed. NFPA has not adduced admissible evidence to support this fact. It has not produced an actual trademark registration, but secondary evidence that attempts to prove the contents of a trademark registration. |
| 124. NFPA owns an incontestable U.S. federal trademark registration for the following logo: | Disputed. NFPA has not adduced admissible evidence to support this fact. It has not produced an actual trademark registration, but secondary evidence that attempts to prove the contents of a trademark registration. |

| | |
|---|---|
|  (U.S. Reg. No. 2,834,633) in connection with similar goods and services. NFPA has used this trademark since 1993. Berry Decl. ¶ 6 and Ex. E. | |
| 125. NFPA owns incontestable U.S. federal trademark registrations for the trademarks National Electrical Code (U.S. Reg. No. 1,094,460), NFPA 70 (U.S. Reg. No. 3,354,321), and NEC (U.S. Reg. No. 1,165,496) in connection with publications in the field of fire safety. NFPA has used the National Electrical Code trademark since at least 1911, the NFPA 70 trademark since at least 1953, and the NEC trademark since at least 1973. Berry Decl. ¶ 7-8 and Exs. F-H. | Disputed. NFPA has not adduced admissible evidence to support this fact with respect to the NEC. It has not produced an actual trademark registration for the NEC, but secondary evidence that attempts to prove the contents of a trademark registration. |
| 126. NFPA owns an incontestable U.S. federal trademark registration for the following logo:  (U.S. Reg. No. 1,148,903) in connection with similar goods and services. NFPA has used this trademark since at least 1978. Berry Decl. ¶ 9 and Ex. I. | |
| 127. NFPA's longstanding use of its trademarks in connection with its high quality standards has resulted in the public's association of NFPA's marks with a certain quality. Pauley Decl. ¶ 53. | Disputed. NFPA has not adduced admissible evidence to support this fact. Pauley has not established personal knowledge of this fact. |

| | |
|---|---|
| 128. Defendant admits that the NFPA word mark and logo are well known. Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 14:25-15:11). | Disputed. Defendant was not asked, and did not say, that the NFPA name and logo were well-known generally. Plaintiffs' counsel asked Defendant, who is being sued by NFPA over trademark claims, "[i]s the NFPA name well-known to you?" and "[i]s the NFPA logo well-known to you?" to which Defendant responded "yes." |
| 129. The American Society for Heating, Refrigerating and Air Conditioning Engineers ("ASHRAE") is a non-profit organization that operates with the mission of advancing the arts and sciences of heating, ventilating, air conditioning and refrigerating to serve humanity and promote a sustainable world. Declaration of Stephanie Reiniche ("Reiniche Decl.") ¶ 2. | |
| 130. ASHRAE has developed and maintains over 100 consensus based standards. These standards, based on ASHRAE's expertise in HVAC/R systems, pertain to a variety of fields within the building industry, such as energy efficiency, indoor air quality, refrigeration, and sustainability. Reiniche Decl. ¶ 2. | Disputed to the extent that Plaintiffs allege that ASHRAE develops standards.  ASHRAE does not develop standards; unpaid volunteers develop standards that ASHRAE publishes. SMF ¶ 132–38. |
| 131. The primary users of ASHRAE's standards include builders, architects, and heating, air-conditioning, and refrigeration manufacturers who use the standards in their businesses. Reiniche Decl. ¶ 17. | Disputed to the extent that there are also many citizens, researchers, and legal professionals who must use ASHRAE standards that are incorporated by reference into law. |
| 132. The specific ASHRAE standard at issue here is ASHRAE 90.1 (in particular the 2004, 2007, and 2010 versions of 90.1). ASHRAE 90.1 pertains to energy efficiency in commercial and high-rise residential buildings. It is a "continuous maintenance" standard, meaning that it is supplemented with addenda every 18 months and a new version of the standard is released every three years. Reiniche Decl. ¶¶ 3, 5. | Disputed to the extent that there is also another ASHRAE standard at issue, the 1993 ASHRAE Handbook: Fundamentals.  Dkt. No. 1 (Plaintiffs' complaint), Ex. C. |
| 133. There are other organizations that develop standards that address the same or similar subjects as ASHRAE's standards and may compete with ASHRAE standards. For instance, the International Code Council maintains a code addressing building efficiency, the International Energy Conservation Code, which addresses | This is not a material fact to Plaintiffs' Motion for Summary Judgment. |

| | |
|---|---|
| similar concerns to ASHRAE 90.1. *See* Rubel Decl. ¶ 10, Ex. 7 (Reiniche Dep. at 31:6-32:8). | |
| 134. Some ASHRAE standards, including ASHRAE 90.1, have been incorporated by reference into laws and regulations. However, ASHRAE does not develop its codes for the purpose of being incorporated by reference, and ASHRAE has developed and maintains numerous standards that have not been incorporated by reference. Reiniche Decl. ¶ 3; *see also* Rubel Decl. ¶ 10, Ex. 7 (Reiniche Dep. 98:25-99:16). | Disputed to the extent that Plaintiffs allege that ASHRAE develops standards. ASHRAE does not develop standards; unpaid volunteers develop standards that ASHRAE publishes. SMF ¶ 132–38. Government employees and agencies participate in the development of most if not all ASHRAE standards and may do so with the purpose of developing standards that could eventually be incorporated into law or regulations. SMF ¶ 132. |
| 135. ASHRAE's standards, including ASHRAE 90.1, are developed with input from a project committee comprised of experts in the field, including utilities representatives, engineers, manufacturers, trade organization representatives, and architects. The project committee members are selected to ensure a balanced representation of different interest groups. Reiniche Decl. ¶ 6. | This fact is not material to Plaintiffs' Motion for Summary Judgment. |
| 136. The drafting of ASHRAE standards, including 90.1, involves input from the many participants in the development process, including members of the public who are provided an opportunity to comment on draft standards. Changes to standards language, whether proposed by committee members or the public, are voted on, subject to extensive discussion, and often altered by the committee so that the finished standard reflects a consensus of all involved parties rather than the work of any one individual. Reiniche Decl. ¶¶ 6-8. | Disputed to the extent that "the finished standard reflects a consensus of all involved parties rather than the work of any one individual" is not a fact, it is an opinion. Ms. Reiniche lacks personal knowledge of whether any of the ASHRAE standards at issue reflect the work of any one individual, and she is not qualified as an expert. |
| 137. For each ASHRAE standard, ASHRAE assigns one or more staff liaisons to work with that standard's project committee. For ASHRAE 90.1, the liaison is Steve Ferguson, an engineer who has worked on Standard 90.1 for ten years. Reiniche Decl. ¶ 9. | |
| 138. ASHRAE staff liaisons have a variety of job responsibilities related to facilitating the creation of ASHRAE standards. The liaisons responsibilities include attending and recording minutes of meetings of the project committee, recording changes to the standards that are | Disputed to the extent that Plaintiffs allege that ASHRAE staff contribute any original copyrightable content to ASHRAE standards. ASHRAE does not develop standards; unpaid volunteers develop standards that ASHRAE publishes. SMF ¶ 132–38. |

| | |
|---|---|
| proposed in committee meetings, and aiding the committees in crafting standards. Reiniche Decl. ¶ 10-11. | |
| 139. For instance, the staff liaisons review all proposed changes and drafts of the standards to make sure they are written in the proper format, comply with ANSI and ASHRAE guidelines, and are both technically and editorially consistent. If a proposed change to the language of a standard is inconsistent with other aspects of the standard or improperly formatted, the liaison can suggest changes that would then be submitted to the project committee for further consideration and voting. Additionally, the liaisons provides the project committee with the comments and proposals submitted by the public and reviews and edits the committees responses to these public comments. Reiniche Decl. ¶ 10-11.; Rubel Decl. ¶ 10, Ex. 7 (Reiniche Dep. At 35:23-38:2; 97:13-98:19). | Disputed to the extent that Plaintiffs allege that ASHRAE staff contribute any original copyrightable content to ASHRAE standards. ASHRAE does not develop standards; unpaid volunteers develop standards that ASHRAE publishes. SMF ¶ 132–38. |
| 140. Every three years, when ASHRAE performs a roll-up of all proposed changes and edits to a standard under continuous maintenance, like ASHRAE 90.1, the staff liaison and other ASHRAE staff will work with certain members of the project committee to perform a final review and edit of the new version of each standard to make sure that all proposed changes have been properly incorporated. Reiniche Decl. ¶ 11. | Disputed to the extent that Plaintiffs allege that ASHRAE staff contribute any original copyrightable content to ASHRAE standards. ASHRAE does not develop standards; unpaid volunteers develop standards that ASHRAE publishes. SMF ¶ 132–38. |
| 141. ASHRAE staff are also responsible for maintaining and updating several sections of the ASHRAE standards, including a short policy statement at the outset of each standard and guidelines for the public comment procedure on each standard. Reiniche Decl. ¶ 11. | Disputed to the extent that Plaintiffs allege that ASHRAE staff contribute any original copyrightable content to ASHRAE standards. ASHRAE does not develop standards; unpaid volunteers develop standards that ASHRAE publishes. SMF ¶ 132–38. |
| 142. ASHRAE members, project committee members, and public commenters on ASHRAE standards understand that they do not hold copyrights in the completed ASHRAE standards. Reiniche Decl. at ¶ 12. | Disputed.  This is not a fact, it is an opinion. Ms. Reiniche lacks personal knowledge of whether each of many thousands of project committee members and public commenters believe that they do not hold copyright in the completed standard that they developed, and Ms. Reiniche is not qualified as an expert to opine on this issue. |
| 143. Anyone who contributed to the ASHRAE standards at issue here, i.e. the 2004, | Disputed to the extent that Plaintiffs omit the full text of the copyright release language on |

| | |
|---|---|
| 2007 and 2010 versions of ASHRAE 90.1, whether a project committee member or a member of the public submitting a comments, would have been required by ASHRAE to execute an Application for Membership on an ASHRAE Committee or a Form for Commenting on a Public Review Draft ASHRAE Standard. Both forms contain the following language: "I understand that I acquire no rights in publication of such documents in which my contributions or other similar analogous form are used." Reiniche Decl. ¶ 13 and Exs. 1-2. | these forms, which when read in its entirety makes clear that ASHRAE requires its members to sign a *non-exclusive* copyright license, not a copyright assignment.  The full language reads:<br><br>If elected as a member of any ASHRAE Standard or Guideline Project Committee or appointed as a consultant to such committee I hereby grant the American Society of Heating, Refrigerating and Air-Conditioning Engineers (ASHRAE) the *non-exclusive,* royalty-free rights, including *nonexclusive*, royalty rights in copyright, to any contributions I make to documents prepared by or for such committee for ASHRAE publication and I understand that I acquire no rights in publication of such documents in which my contributions or other similar analogous form are used. I hereby attest that I have the authority and I am empowered to grant this copyright release.<br><br>SMF ¶ 144. |
| 144. ASHRAE does not permit changes to its forms and is unaware of any instance where a commenter to Standards 90.1-2004, 90.1-2007, or 90.1-2010 altered the standard forms or refused to sign an acknowledgment that the individual acquired no rights in the ASHRAE standards. Any comments made without first executing one of ASHRAE's standard forms would be an exception to ASHRAE's general practices and policies. Reiniche Decl. ¶ 14. | This fact is not material to Plaintiffs' Motion for Summary Judgment. |
| 145. To ASHRAE's knowledge, no members of the 90.1 project committee or members of the public who commented on 90.1 have contested ASHRAE's copyright rights in the standard or claimed an ownership interest in any part of ASHRAE 90.1. Reiniche Decl. ¶ 15. | Disputed to the extent that Plaintiffs have alleged that the unpaid volunteers who created the ASHRAE standards are "joint authors," and therefore there are many thousands of individuals with copyright interests in ASHRAE standards. Pls. Mem. at 16. |
| 146. ASHRAE has valid copyright registrations for the 2004, 2007, and 2010 versions of | Disputed to the extent that ASHRAE is not the author of the 2004, 2007, or 2010 editions |

| | |
|---|---|
| ASHRAE 90.1. Each registration specifically identifies ASHRAE as the owner of the copyright. Reiniche Decl. Exs. 3-5. | of ASHRAE 90.1, but rather the unpaid volunteers are the authors, and ASHRAE's copyright registrations for these standards are therefore invalid.  SMF ¶ 130, 132–38. |
| 147. ASHRAE alerts members of the public (and everyone who participates in the creation of its standards) to its copyrights by conspicuously placing notice of its copyrights on each of these standards. Reiniche Decl. ¶ 15. | Disputed. This copyright notice does not alert the public (or individuals who participated in the creation of the standards) what content ASHRAE claims ownership over, such as the entire standard, versus component parts of the standard, or simply the formatting used for the final print version.  Moreover, this is not a fact, it is an opinion.  Ms. Reiniche lacks personal knowledge of what information the public derives from the existence of copyright notices on ASHRAE standards, and she is not qualified as an expert on that issue. |
| 148. ASHRAE also holds registered trademarks for the marks displayed in its Standards and used by ASHRAE. Reiniche Decl. ¶ 16. | Disputed. NFPA has not adduced admissible evidence to support this fact. The supporting evidence is testimony from a witness who lacks personal knowledge as to the facts testified to and secondary evidence that does not include an actual trademark registration certificate. |
| 149. ASHRAE owns a registration for the following logo:  (U.S. Registration No. 1,503,000). | Disputed. NFPA has not adduced admissible evidence to support this fact. The supporting evidence is testimony from a witness who lacks personal knowledge as to the facts testified to and secondary evidence that does not include an actual trademark registration certificate. |
| 150. ASHRAE has used this mark in commerce since 1959 in connection with the sale and dissemination of its standards. ASHRAE has also filed a Section 15 declaration in support of the incontestability of this mark. Reiniche Decl. ¶ 16 and Ex. 6. | |
| 151. ASHRAE also holds a registration for the following mark: | Disputed. NFPA has not adduced admissible evidence to support this fact. The supporting evidence is testimony from a witness who lacks personal knowledge as to the facts |

| | |
|---|---|
| <br><br>(U.S. Registration No. 4,262,297). This mark is also used in conjunction with ASHRAE's standards and often prominently affixed on the standards. ASHRAE considers these marks to be valuable assets that are associated with ASHRAE's standards as well as the organization's goodwill. Reiniche Decl. ¶ 16 and Ex. 7; *see also* Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 151). | testified to and secondary evidence that does not include an actual trademark registration certificate. |
| 152. ASHRAE spends substantial resources drafting and updating its standards. ASHRAE's expenses include employing staff who facilitate the standards-creation process, including arranging and paying for committee meetings and collecting public input on standards. For Standard 90.1 alone, the updating process involves tens of thousands of man-hours, and ASHRAE spent more than $1 million to cover standards-development. Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 76); *see also* Rubel Decl. ¶ 10, Ex. 7 (Reiniche Dep. at 203:20-205:2). | Disputed to the extent that the tens of thousands of man-hours attributed to the updating of ASHRAE 90.1 is performed by unpaid volunteers, and ASHRAE does not therefore spend "substantial resources" on the work that volunteers perform for free. Disputed to the extent that Plaintiffs allege that ASHRAE develops standards. ASHRAE does not develop standards; unpaid volunteers develop standards that ASHRAE publishes. SMF ¶ 132–38. ASHRAE has further failed to adduce admissible evidence to support this fact. |
| 153. ASHRAE expends significant resources developing standards with an understanding that it can then sell copyrighted standards to support its operations. However, that business model is threatened by Defendant's infringement. *See* Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶ 6, 76, 107-111). | Disputed. ASHRAE does not develop standards; unpaid volunteers develop standards that ASHRAE publishes SMF ¶ 132–38. Moreover, this is not a fact, it is an opinion.  Mr. Jarosz is not qualified as an expert to opine on whether ASHRAE's business model is threatened by Public Resource's actions. ASHRAE has further failed to adduce admissible evidence to support this fact. |
| 154. ASHRAE depends on the sale of standards and revenue from membership dues to fund its operations. For ASHRAE, membership revenue is associated with the revenue from dissemination of standards as membership benefits include receiving print copies and online access to certain ASHRAE publications | Disputed. Plaintiffs have no evidence to establish that individuals will not obtain or renew ASHRAE memberships because three outdated editions of ASHRAE 90.1 are available on the Public Resource website. Moreover, this is not a fact, it is an opinion. Mr. Jarosz is not qualified as an expert to |

| | |
|---|---|
| and significant discounts on purchasing ASHRAE publication. Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶ 22, 95, 134). | opine on ASHRAE's business model, nor on whether individuals will still obtain or renew ASHRAE memberships because three outdated editions of ASHRAE 90.1 are available on the Public Resource website. ASHRAE has further failed to adduce admissible evidence to support this fact. |
| 155. ASHRAE also derives revenue from ancillary or complimentary products for which its copyrighted standards give ASHRAE a competitive advantage. For instance, ASHRAE's training programs can freely use the text of ASHRAE standards and/or disseminate course materials containing the standards while competitors cannot. Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶ 143-49). | Disputed. ASHRAE has failed to adduce admissible evidence to support this fact. |
| 156. If these sources of revenue are lost, it would seriously threaten ASHRAE's current business model and ability to continue funding its standards creation and maintenance operations at their current levels. Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶ 6, 138). | Disputed. This is not a fact, it is an opinion. Mr. Jarosz is not qualified as an expert to opine on ASHRAE's business model. |
| 157. ASHRAE publishes its standards in hard copy and digital PDF files, which can be purchased from ASHRAE or its authorized resellers. Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 99); Rubel Decl. ¶ 11, Ex. 8 (Comstock Dep. at 104:21-106:23). | |
| 158. ASHRAE offers its standards for sale at moderate prices that do not impose an undue burden to those who wish to purchase the standards. Prices typically range from $25 to $120, with no standard costing more than $200. Reiniche Decl. ¶ 18; Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rept. ¶ 99); *see also* Rubel Decl. ¶ 11, Ex. 8 (Comstock Dep. at 29:9-17). | Disputed. A cost of $120-$200 may be an undue burden for many people. Moreover, this is not a fact, it is an opinion. Mr. Jarosz is not qualified as an expert to opine on ASHRAE's business model. |
| 159. The standards are priced moderately on the basis of ASHRAE's costs and ASHRAE does not charge more for standards that have been incorporated into laws or regulations. Reiniche Decl. ¶ 18; Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rept. ¶ 101). | Disputed. A cost of $120-$200 may be more than a "moderate" cost for many people. Moreover, this is not a fact, it is an opinion. Ms. Reiniche and Mr. Jarosz lack personal knowledge of what is a moderate price to all people, and they are not qualified as experts to opine on this issue. |
| 160. ASHRAE also offers discounts for libraries, educational uses, government entities, and individuals or entities who purchase the | This fact is not material to Plaintiffs' Motion |

32

| | |
|---|---|
| standards on a subscription basis. Reiniche Decl. ¶ 18; Rubel Decl. ¶ 11, Ex. 8 (Comstock Dep. at 106:19-22). | for Summary Judgment. |
| 161. ASHRAE provides the public with free read-only access to many ASHRAE standards through the ASHRAE website. In particular, access is provided to standards that have been incorporated by reference into codes, including the versions of Standard 90.1 at issue here. Reiniche Decl. ¶ 19-20. | Disputed.  Not all members of the public can read the standards on ASHRAE's "free read-only access" website, such as people with print disabilities. SMF ¶ 53. |
| 162. ASHRAE has not received complaints about the accessibility of its standards, other than from the Defendant in this case. Reiniche Decl. ¶ 19-20; Rubel Decl. ¶ 10, Ex. 7 (Reiniche Dep. at 124:17-125:7). | This fact is not material to Plaintiffs' Motion for Summary Judgment. |
| 163. Carl Malamud is the founder and only employee of Defendant Public.Resource.Org, Inc. ("Public Resource" or "Defendant"). Rubel Decl. ¶ 5, Ex. 2 (30(b)(6) Deposition of Public.Resource.Org ("PR Dep.") at 23:3-25, 30:12-14). | |
| 164. Defendant admits that the NFPA "does amazing work and saves lives." Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 305:15-19). | |
| 165. Defendant also admits that NFPA's standards protect the lives of volunteer firefighters and children. Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 306:3-20); Rubel Decl. ¶ 17, Ex. 13 (Ex. 55 to PR Dep.). | |
| 166. Defendant claims to be a "big fan of ASTM" and recognizes that "the subject area of the standards that ASTM works in is very important and we need to continue to have standards in that area." Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 307:9-15). | |
| 167. Defendant admits that "ASHRAE Standard 90.1 is an important standard." Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 307:24-308:4). | This fact is not material to Plaintiffs' Motion for Summary Judgment. |
| 168. There is no evidence that any person who was attempting to comply with a regulation that incorporates by reference any of Plaintiffs' standards was unable to access the standard. Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 71:3-77:24). | Disputed.  Plaintiffs cite to seven pages of the Public Resource Rule 30(b)(6) deposition in which Mr. Malamud lists multiple individuals in various circumstances who said they were unable to access Plaintiffs' standards.  The cited deposition testimony directly refutes Plaintiffs' assertion that there is no evidence that individuals have been unable to access |

| | Plaintiffs' standards. |
|---|---|
| 169. Neither Defendant nor Mr. Malamud claims to own the copyright in any of the standards at issue. Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 108:25-109:11). | |
| 170. Defendant is not aware of any evidence that any participants in the process of developing Plaintiffs' standards claim to be owners of the copyrights in any of the standards at issue. Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 83:16-85:17). | Disputed. Plaintiffs have alleged that the unpaid volunteers who created the ASHRAE standards are "joint authors," and therefore there are many thousands of individuals with copyright interests in ASHRAE standards. Pls. Mem. at 16. |
| 171. Malamud himself has acknowledged that the standards "have a strong copyright interest" until they are "incorporated by reference in the Code of Federal Regulations." Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 89:8-18); Rubel Decl. ¶ 18, Ex. 14 (Ex. 33 to PR Dep.). Malamud has also acknowledged that Plaintiffs' standards are "heavily copyrighted" and that "the standards bodies were very aggressive in claiming copyright on those documents." Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 99:3-100:19). | Disputed. Mr. Malamud is not an attorney and any of his statements in private emails have no impact on the legal question of whether the incorporated standards are copyrighted and owned by Plaintiffs.  Mr. Malamud clarifies in both deposition transcript citations that his statements were being taken out of context and misconstrued, and that he was in fact referencing Plaintiffs aggressive policing of their claimed rights over the public's use of these segments of the law. |
| 172. Mr. Malamud testified before Congress in favor of amending the Copyright Act to reflect his belief that materials incorporated by reference into government regulations lose their copyright protection. Congress has not amended the statute as Mr. Malamud requested. Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 232:14-19). | Disputed to the extent that Plaintiffs imply that the Copyright Act requires amendment to support Public Resource's contention that standards incorporated by reference into the law are no longer subject to copyright monopoly. Public Resource sought to have the Copyright Act clarified to ensure that litigation such as the present case could not be brought against it or any other citizen or organization that wanted to read or speak the law. |
| 173. Defendant also submitted comments to various executive agencies and offices requesting that policies and regulations be changed to state that materials incorporated by reference into government regulations must be available at no cost to the general public. Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 232:21-233:5). | Disputed to the extent that Plaintiffs imply that executive agencies' policies require amendment to support Public Resource's contention that standards incorporated by reference into the law must be available to the public at no cost. |
| 174. For example, Defendant submitted comments reflecting his beliefs in connection with proposed rulemaking regarding the procedures of the Office of the Federal Register and the National Archives and Records | |

| | |
|---|---|
| Administration, proposed amendments to the Office of Management and Budget's Circular A 119, and a study by the Administrative Conference of the United States. O'Brien Decl. ¶ 66. | |
| 175. Each of these agencies and offices considered and ultimately rejected Defendant's comments and proposals, reaffirming their positions that materials incorporated by reference in federal regulations do not lose their copyright protection and do not need to be made publicly available on the internet at no cost. Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 232:14-234:8). | |
| 176. Defendant also submitted Freedom of Information Act ("FOIA") requests to a number of executive agencies requesting copies of standards that are incorporated by reference in federal regulations. Rubel Decl. ¶ 12, Ex. 9. | |
| 177. No agency has provided Defendant with copies of the standards it has requested through these FOIA requests. Numerous federal agencies have explicitly taken the position in communications with Defendant that incorporation by reference of materials into regulations does not destroy the copyright in those materials. Rubel Decl. ¶ 13, Ex. 10. | |
| 178. Defendant obtained hard copies of Plaintiffs' standards purposely so that it did not have to agree to the terms of use on Plaintiffs' websites. Rubel Decl. ¶ 5, Ex. 2 (PR Dep. At 63:12-64:23). | Disputed to the extent that Plaintiffs take Mr. Malamud's statement out of context. Mr. Malamud stated in the cited deposition transcript that Public Resource obtained hard copies because they were easier to work with. |
| 179. Defendant stated that ASTM's standards "can't be taken in violation of terms of use unless me and our legal folks have scrubbed the situation very carefully." Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 172:14-19); Rubel Decl. ¶ 19, Ex. 15 (Ex. 69 to C. Malamud Dep.). | This fact is not material to Plaintiffs' Motion for Summary Judgment. |
| 180. Nonetheless, Defendant asked a student to download copies of certain ASTM standards from ASTM's website on the condition that he do so secretly. Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 172:14-19, 177:1-178:11); Rubel Decl. ¶ 19, Ex. 15 (Ex. 69 to C. Malamud Dep.) ("You need to stay both anonymous and mum on this. No bragging about it, talking | Disputed to the extent that Plaintiffs take Mr. Malamud's statement out of context.  Mr. Malamud intended only to read the standards downloaded by the doctoral student, Mr. Hall, and stated in the email Plaintiffs cite that he did not plan to put those versions of the standards on his website. |

| | |
|---|---|
| about it. And I'm not going to do that either."). | |
| 181. Defendant next searched federal and state regulations for examples of standards that had been incorporated by reference and then tried to obtain paper copies of those standards. Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 156:21-157:1). | |
| 182. Mr. Malamud scanned the paper copies he was able to buy into PDFs and used optical character recognition ("OCR") software to convert the images of the scanned pages into text. Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 156:21-157:2, 224:8-13). | |
| 183. Defendant added an introductory page to the beginning of each PDF. Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 156:15-157:5). | |
| 184. The introductory page was labeled as a "Certificate" with a border depicting stars and stripes, a stamp of approval, and a designation of the Executive Director of the Office of the Federal Register as the "Official Incorporator." The page states that the document has been incorporated by reference and "shall be considered legally binding upon all citizens and residents of the United States of America" and that "[c]riminal penalties may apply for noncompliance." *See, e.g.,* Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 224:14-17); Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 127:4-13); Rubel Decl. ¶ 20, Ex. 16 (Ex. 63 to C. Malamud Dep.). | |
| 185. In December 2102, Defendant posted the PDFs, including the text created by the OCR software, on Defendant's website and on the Internet Archive. Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 156:15-159:6). | Disputed.  Public Resource posted the incorporated standards on its website between 2008 and 2014. SMF ¶ 4. |
| 186. Defendant kept the standards posted on its website and the Internet Archive until after the Complaint was filed, and Defendant did not remove the standards from its website or the Internet Archive until on or about November 10, 2015, at the suggestion of the Court. O'Brien Decl. ¶ 69; Reiniche Decl. ¶ 20; Berry Decl. ¶ 13. | |
| 187. Defendant posted PDF versions of each of the standards at issue in this litigation on its website. Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 158:22-159:6). | |

| | |
|---|---|
| 188. Defendant hired a firm called HTC Global Services to convert the text of some of ASTM and NFPA's standards into HTML format and to convert the images in these standards into JPG format. Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 159:19-160:7, 162:13-163:17). | |
| 189. Defendant instructed HTC Global to copy all of the text of the standards word for word into HTML code. Rubel Decl. ¶ 8, Ex. 5 (HTC Dep. at 24:16-25:5). | |
| 190. Defendant instructed HTC Global to "double-key" the standards, which means that two operators independently type the text and then compare the two versions, instead of using a more accurate, but more expensive, "triple-key" methodology in which three independent operators would have typed the text. Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 165:2-171:1); Rubel Decl. ¶ 8, Ex. 5 (HTC Dep. at 35:23-36:7); Rubel Decl. ¶ 21, Ex. 17 (Ex. 2 to HTC Global Dep.). | |
| 191. By taking the cheaper route, Defendant knew that there could be up to 49 errors on a typical two and a half page document. Rubel Decl. ¶ 8, Ex. 5 (HTC Dep. at 36:12-37:19, 105:16-106:11). | Disputed. HTC stated in the deposition transcript that the accuracy rate of 99.51% means that there could be up to 49 mistakes in 10,000 characters. Plaintiffs lack evidence of what Public Resource "knew," and Plaintiffs cite a deposition of a third party that is not probative of their claims as to Public Resource's knowledge. |
| 192. HTC Global's representative testified that what it described as "double-keying" would actually involve extracting text obtained using OCR, unless the image quality of the original document was poor, in which case two operators entered the text. Rubel Decl. ¶ 8, Ex. 5 (HTC Dep. at 34:23-35:6, 41:24-42:13). This was done even though using OCR to capture the text from PDF versions of Plaintiffs' standards was likely to result in errors. *See* Rubel Decl. ¶ 22, Ex. 18 (Fruchterman Dep. at 184:21-185:11) (explaining potential for OCR errors in technical documents). | |
| 193. Defendant suspected that HTC Global may be using OCR instead of having two operators enter the text. Defendant's CEO, Mr. Malamud, communicated to his wife that all of the | |

| | |
|---|---|
| documents had only been double-keyed "in theory" but that HTC "may cheat and do OCR first and then their QA." Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 171:21-172:20); Rubel Decl. ¶ 23, Ex. 19 (Ex. 21 to Point.B Studio Dep.). | |
| 194. HTC Global's rekeying of Plaintiffs' standards was done by non-native English speakers in India with no technical expertise. Rubel Decl. ¶ 8, Ex. 5 (HTC Dep. at 30:24-32:16). | |
| 195. Defendant posted on its website the HTML files derived from Plaintiffs' standards that were created by HTC Global. Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 183:20-184:5). | |
| 196. Defendant admitted that its rekeying of the standards was "simply recover[ing] text," and that it would not "start adding true value" until it rekeyed the mathematical formulas, adding section ID headers, and converting the graphics to vector format. Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 58:2-8, 60:17-61:7); Rubel Decl. ¶ 24, Ex. 20 (Ex. 57 to C. Malamud Dep.). | Disputed to the extent that Plaintiffs take Mr. Malamud's statements out of context, where his statements were not to downplay the value of making the text of the incorporated standards readable in HTML, but to go beyond that and add even more value by "rekeying mathematical formulas into MATHML, adding section ID headers so you can permalink not only the standard but a subsection of the standard, and converting the graphics to vector format."  Ex. 57 to C. Malamud Dep. |
| 197. Defendant hired Point.B Studio, which is a business name of Mr. Malamud's wife, Rebecca Malamud, to convert the diagrams, figures, graphs, illustrations and formulas from certain ASTM and NFPA standards from JPG format to SVG and/or MathML format. Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 184:22-185:4). | |
| 198. Defendant instructed Point.B Studio to reproduce exact copies of the relevant materials within Plaintiffs' standards. *See* Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 116:23- 117:5 and 120:9-14); Rubel Decl. ¶ 25, Ex. 21 (Ex. 62 to C. Malamud Dep.) ("Exact copy has been the absolutely positively 100% important criteria the whole time…[if there is any question in my mind that you are not making exact copies, I have to fire you."]). | |
| 199. Point.B Studio used children from a mentoring program whose target audience was 7-14 to convert formulas to MathML and | This fact is not material to Plaintiffs' Motion for Summary Judgment. |

| | |
|---|---|
| drawings to SVG format for use on materials posted on Defendant's website. Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 188:4-191:6); Rubel Decl. ¶ 7, Ex. 4 (Point.B Studio Dep. at 42:24- 43:10, 87:4-18); Rubel Decl. ¶ 26, Ex. 22 (Ex. 18 to Point.B Studio Dep.); | |
| 200. The children were not paid for the work they did. Rubel Decl. ¶ 7, Ex. 4 (Point.B Studio Dep. at 47:3-13). | This fact is not material to Plaintiffs' Motion for Summary Judgment. |
| 201. Defendant posted on its website versions of some of Plaintiffs' standards that contain the drawings, diagrams, figures and/or formulas that had been created by Point.B Studio. Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 194:14-20). | |
| 202. Anyone accessing the versions of Plaintiffs' standards from Defendant's website can save the materials onto their own devices, print them, or post them to another website. Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 68:25-69:19). | |
| 203. Defendant did not obtain the consent of any of the Plaintiffs before posting copies of their standards on its website. Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 204:7-12). | |
| 204. In addition, Defendant posted many of the PDF versions of the standards to the Internet Archive website. Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 195:25-196:18). | |
| 205. In posting the standards on the Internet Archive, Defendant identified "author" as one type of metadata that he would provide for each standard. Defendant identified NFPA as the author of each of the versions of the NFPA standards it posted on the Internet Archive. Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 274:17-275:10, 280:14-282:11, 288:9-290:16); Rubel Decl. ¶ 27, Ex. 23 (Exs. 52 and 53 to PR Dep.). | |
| 206. Defendant identified ASTM as the author of each of the versions of the ASTM standards it posted on the Internet Archive. Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 199:21- 201:5); Rubel Decl. ¶ 48, Ex. 43 (Ex. 70. To C. Malamud Dep.). | |
| 207. Defendant identified Creative Commons Universal license 1.0 as a license that applied to each of the standards it posted on the Internet | |

| | |
|---|---|
| Archive. For each standard, Defendant included a link to the CCO 1.0 Universal license. Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. At 263:22-265:20). | |
| 208. The CCO 1.0 Universal license states: "The person who associated a work with this deed has dedicated the work to the public domain by waiving all of his or her rights to the work worldwide under copyright law . . . You can copy, modify, distribute and perform the work, even for commercial purposes, all without asking permission." Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 265:22-270:9); Rubel Decl. ¶ 28, Ex. 24 (Ex. 75 to C. Malamud Dep.). | |
| 209. Members of the public can obtain PDF versions of the Plaintiffs' standards from the Internet Archive, save them and then use them in any manner, including by printing copies. Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 277:16-279:13). | |
| 210. Defendant used Plaintiffs' trademarks on the copies of Plaintiffs' standards that Defendant created and posted on its website and on the Internet Archive website. *See, e.g.*, Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 127:4-13, 127:22-128:9); Rubel Decl. ¶ 20, Ex. 16 (Ex. 63 to C. Malamud Dep.) (using ASTM International logo, ASTM logo, and ASTM word mark); Rubel Decl. ¶ 29 , Ex. 25 (using ASHRAE logos – U.S. Reg. No. 4,262,297); Rubel Decl. ¶ 30, Ex. 26 (using National Electrical Code, National Fire Protection Association, and NEC word marks and NFPA and NEC logos). | |
| 211. Additionally, Defendant used certain of Plaintiffs' marks within tables it created on its website and on the Internet Archive when identifying the authors and names of the standards. Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 141:11-23, 151:6-22, 274:17-275:10, 288:9-14); Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 199:21-200:6); Rubel Decl. ¶ 31, Ex. 27 (Ex. 38 to PR Dep.) (using ASTM, American Society for Testing and Materials, NFPA, National Fire Protection Association, National Electrical Code, and ASHRAE marks), Rubel Decl. ¶ 32, | |

| | |
|---|---|
| Ex. 28 (Ex. 40 to PR Dep.) (using ASHRAE, NEC and ASTM marks); Rubel Decl. ¶ 27, Ex. 23 (Exs. 52 and 53 from PR Dep.) (using National Fire Protection Association, NFPA, National Electrical Code, and NEC marks). | |
| 212. Defendant's goal is to make the logos used on the standards and the contents of the standards as close as possible to the actual standards published by the Plaintiffs. Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 28:25-29:8). | Disputed. Public Resource's goal is accessibility. Public Resource stated in the cited text: "Our goal is replication and transformation of that standard to make it accessible." |
| 213. Defendant intends for people who view each standard posted on its website and/or the Internet Archive to think it is "a scan of the exact standard" or an HTML version of the exact standard published by the Plaintiffs. Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 46:14-47:9). Defendant claims that he must post the entirety of each standard to his website because "Defendant is "not in a position to decide which portions of that document are or [are] not the law." Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 32:16-33:4). | |
| 214. The PDF versions of Plaintiffs' standards on Defendant's website contain errors, including pages that are missing or that are upside down. Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 127:8-13, 128:19-130:4, 147:19-148:1); Rubel Decl. ¶ 20, Ex. 16 (Ex. 63. to C. Malamud Dep.) | Disputed.  Public Resource corrected every error that Plaintiffs brought to its attention in the course of this litigation. C. Malamud Decl. ¶ 34. |
| 215. The HTML versions of Plaintiffs' standards on Defendant's website contain errors, including text and numbers that differ from the information in the authentic versions of Plaintiffs' standards. Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 127:4–139:8); Rubel Decl. ¶ 20, Ex. 16 (Ex. 63 to C. Malamud Dep.); Rubel Decl. ¶ 33, Ex. 29 (Ex. 64 to C. Malamud Dep.). | Disputed.  Public Resource corrected every error that Plaintiffs brought to its attention in the course of this litigation. C. Malamud Decl. ¶ 34. |
| 216. Mr. Malamud has no explanation for these mistakes and admits that they are not acceptable. Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 140:19-141:6). | |
| 217. Mr. Malamud claimed that if he were notified of any mistakes, he would do a rigorous quality assurance check and correct any mistakes. Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 140:19-25). | |

| | |
|---|---|
| 218. However, even after being notified of specific errors at his deposition, Defendant never corrected these mistakes and continued to maintain versions of standards with "unacceptable mistakes" that bear Plaintiffs' trademarks on its website until it recently removed all of its copies of Plaintiffs' standards at issue in this case from its website at the Court's suggestion. Rubel Decl. ¶ 16. | Disputed.  Public Resource corrected the errors that Plaintiffs brought to its attention in the course of this litigation.  C. Malamud Decl. ¶ 34. |
| 219. The errors in the HTML version of the 2011 NEC that Defendant posted on the internet include numerous errors that distort the meaning of substantive provisions of the standard that were written to protect human safety and prevent property damage. Pauley Decl. ¶ 54. | Disputed. Many of these purported errors are not errors at all. For example, in ¶ 54(a), Pauley states that the HTML standard omits a key requirement that high-voltage cables be shielded. That requirement, however, does not appear in the original 2011 edition of the NEC, which is the version Public Resource posted in HTML format. (SMF ¶ 180.) NFPA added that requirement later by errata. (SMF ¶ 181.) Similarly, in ¶ 54(f), Pauley asserts that cross-references in the Public Resource copy were incorrect—but the Articles he identifies are the same ones identified in NFPA's errata, suggesting the error was NFPA's, not Public Resource's. (*Id.*)   Public Resource corrected all of the errors that Plaintiffs brought to its attention in the course of this litigation.  C. Malamud Decl. ¶ 34. |
| 220. Malamud admits that he does not know what quality control procedures Plaintiffs use when publishing their standards. Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 102:23-104:12, 109:7-110:4). | |
| 221. Public Resource embarked on this project with the explicit purpose of encouraging the public to access Plaintiffs' Works and use them as they see fit, including downloading, printing, and making derivative works. Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 85:1-89:10). | Disputed.  Public Resource's explicit purpose is to provide the public with greater access to the law, saying in the cited text: "I think it's . . . important for citizens to be able to use the law without restriction as they see fit." C. Malamud Dep. at 85:04–06. |
| 222. Defendant made a point of informing the public that its versions of Plaintiffs' Works were available in open access without restriction. *See, e.g.*, Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 63:1-64:3, 66:13-68:4); Rubel Decl. ¶ 34, Ex. 30 (Ex. 58. to C. Malamud Dep.) | Disputed. Public Resource does not say this in the cited text. Public Resource says: "We have never charged for access to any information on our website." C. Malamud Dep. at 68:03–04. |
| 223. Defendant also offers its website as an alternative to the platforms on which Plaintiffs | |

| | |
|---|---|
| provide free public access to their standards. Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 76:14-77:8, 80:20-86:15); Rubel Decl. ¶ 35, Ex. 31 (Ex. 59. to C. Malamud Dep.). | |
| 224. Defendant has publicly declared that Plaintiffs' standards are in the public domain and cannot be copyrighted, and has encouraged members of the public to download them from Defendant's website without paying for them. Rubel Decl. ¶ 36, Ex. 32. | |
| 225. Mr. Malamud told a potential funder that one of Defendant's goals was to "have more users" of standards than the "SDO-provided websites," and further emphasized that Defendant would "like to be No. 1 in the marketplace." Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 297:25-298:11, 308:3 309:16); Rubel Decl. ¶ 37, Ex. 33 (Ex. 77 to C. Malamud Dep.). | Disputed. Public Resource was discussing its work improving the California Title 24, a state code put out by the state of California. The full quote makes this clear: "Our version of Title 24 should have more users than those that purchase the books and DVDs or use the state or SDO-provided web site. We'd like to be number one in the marketplace by the end of the year." |
| 226. Defendant attempted to drive traffic to its website, including by engaging in "search engine optimization" to appear higher in Google search results in an attempt to attract visitors. Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 142:10-143:2); Rubel Decl. ¶ 38, Ex. 34 (Ex. 65 to C. Malamud Dep.). | Disputed. Public Resource's efforts to improve access to legal materials, including making sure that the documents it posts are "accurately described on a search engine," are a key part of its non-profit mission of expanding access, not a commercial activity to increase revenue. (SMF ¶ 7.) |
| 227. Defendant had an unsuccessful Kickstarter campaign to raise money for his double-keying of standards. Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 55:13-56:3). | This fact is not material to Plaintiffs' Motion for Summary Judgment. |
| 228. Defendant discussed his copying of Plaintiffs' standards in connection with his efforts to raise funds through this Kickstarter campaign, including the number of ASTM and NFPA standards it had copied. Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 56:4-58:17, 62:3-65:16, 76:14-77:16); Rubel Decl. ¶ 24, Ex. 20 (Ex. 57 to C. Malamud Dep.); Rubel Decl. ¶ 34, Ex. 30 (Ex. 58 to C. Malamud Dep.); Rubel Decl. ¶ 35, Ex. 31 (Ex. 59 to C. Malamud Dep.). | This fact is not material to Plaintiffs' Motion for Summary Judgment. |
| 229. Several supporters of Defendant's Kickstarter campaign donated money to Defendant after the Kickstarter campaign failed. Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 80:5-13). | This fact is not material to Plaintiffs' Motion for Summary Judgment. |
| 230. Mr. Malamud wrote in an email to his wife, | This fact is not material to Plaintiffs' Motion |

| | |
|---|---|
| whom he had hired to assist him in converting Plaintiffs' standards into HTML format, that she should "make sure we've done any NFPA docs … . Also, we can do any ASTM or ASHRAE docs as well as those are helpful to me in my suit. … Definitely keep plowing away on that stuff … that's the kind of output that makes it much easier for me to try and raise money to keep you going for the rest of the year." Rubel Decl. ¶ 7, Ex. 4 (Point.B Studio Dep. at 126:4-16); Rubel Decl. ¶ 23, Ex. 19 (Ex. 21 to Point.B Studio Dep.). | for Summary Judgment. |
| 231. In another email, Mr. Malamud explained that he could continue paying Ms. Malamud as long as she continued making copies of Plaintiffs' standards because "what the funders are going to be looking at is our walking through the standards." Rubel Decl. ¶ 7, Ex. 4 (Point.B Studio Dep. at 186:8-187:2); Rubel Decl. ¶ 39, Ex. 35 (Ex. 27 to Point.B Studio Dep.). | This fact is not material to Plaintiffs' Motion for Summary Judgment. |
| 232. In an email Mr. Malamud described his work purchasing Plaintiffs' standards to post them on the internet as "what a way to make a living." Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 239:12-17, 240:5-243:4); Rubel Decl. ¶ 40, Ex. 36 (Ex. 73 to C. Malamud Dep.). | This fact is not material to Plaintiffs' Motion for Summary Judgment. |
| 233. Defendant's President and only employee, Carl Malamud, pays himself $180,000 per year for his work with Defendant. Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 243:21- 244:4). | This fact is not material to Plaintiffs' Motion for Summary Judgment. |
| 234. Defendant also paid Point.B Studio, its founder's wife's unincorporated company, approximately $350,000 between 2010 and 2014. Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. At 245:15-246:13). | This fact is not material to Plaintiffs' Motion for Summary Judgment. |
| 235. During the course of this litigation, Defendant continued to post versions of additional standards owned by Plaintiffs that use Plaintiffs' trademarks on its website, including as recently as October 2015. O'Brien Decl. ¶ 67; Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 268:20-269:8); Rubel Decl. ¶ 41, Ex. 37 (Ex. 49 to PR Dep.). | Disputed to the extent that the standards that Public Resource has posted on its website are not owned by Plaintiffs for the reasons described in Public Resource's Motion for Summary Judgment. |
| 236. Defendant has posted HTML versions of certain ASTM standards since Plaintiffs filed | |

| | |
|---|---|
| their Complaint that do not use the ASTM logo marks. O'Brien Decl. ¶ 68 and Ex. 18. | |
| 237. Defendant failed to provide any response to Plaintiffs' contention interrogatories to identify any evidence in support of its affirmative defenses. Rubel Decl. ¶ 14 and Ex. 11 (never-supplemented responses to contention interrogatories). | Disputed. Defendant did not fail to respond. It objected to the contention interrogatories. |
| 238. Although Defendant has claimed that its infringement creates a "tremendous market opportunity" for Plaintiffs, basic economic principles indicate that Defendant's making the standards available for free supplants these sources of revenue. Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 290:8-10; Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶ 131, 133, 139-41). | Disputed. This is not a fact, it is an opinion. Mr. Jarosz is not qualified as an expert to opine on Plaintiffs' business model, nor on the effects of making the standards available on the Public Resource website. See Public Resource's Motion to Strike Jarosz Report. |
| 239. Since Defendant started posting the NEC on its website and the Internet Archive website in 2012, NFPA's sales of that code and handbook have decreased noticeably. In 2009 and 2010, the first two full years after the 2008 edition of the NEC was published, NFPA sold a total of 144,312 copies of the 2008 NEC and 41,995 copies of the 2008 NEC handbook, which contains the 2008 NEC. By contrast, in 2012 and 2013, the first two full years after the 2011 edition of the NEC was published, NFPA sold 92,631 copies of the 2011 NEC and 29,072 copies of the 2011 NEC handbook, which contains the 2011 NEC. In other words, sales of the NEC declined by 36%, and sales of the NEC handbook declined by 31% from one cycle to the next. Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 133). | Disputed. This analysis is riddled with factual errors.  First, this assumes that NFPA first published NEC 2011 in 2011, but NFPA's own sales records show that sales of NEC 2011 began in 2010 and were substantially higher that year than in 2011.  *See* Public Resource's Motion to Strike Jarosz Report; Lu Decl. to Public Resource's Motion to Strike Jarosz Report, Exh. 14 at NFPA-PR0038555. The comparison to NEC 2008 is also full of errors.  First, NFPA's records omitted sales information for 2007-2008, the years relative to NEC 2008 that would have been appropriate to compare to the years 2010-2011 for NEC 2011.  *See id.*  Second, while Public Resource posted NEC 2011 in 2012, it posted the state-incorporated NEC 2008 *in 2008*.  *See* Lu Decl. Exh. 13 at 129:25-130:21.  Thus, the presence of Public Resource cannot explain the difference in numbers. Moreover, Mr. Jarosz is not qualified as an expert to opine on Plaintiffs' business model, nor on the effects of making the standards available on the Public Resource website. See Public Resource's Motion to Strike Jarosz Report. |
| 240. Multiple resellers and merchants have downloaded copies of NFPA's standards that were posted on the Internet and have attempted to resell them or package them with other | |

| | |
|---|---|
| products for sale. These resellers have responded to cease-and-desist requests from NFPA by citing Defendant's statements that the standards are free for distribution by anyone. Berry Decl. ¶¶ 11-12. | |
| 241. Plaintiffs' standards Defendant posted on the Internet Archive were downloaded anywhere from tens to tens of thousands of times. Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 206:13- 207:22, 254:14-256:16); Rubel Decl. ¶ 42, Ex. 38 (Ex. 43 to PR Dep.), Rubel Decl. ¶ 43, Ex. 39 (Ex. 51 to PR Dep.). | Disputed. The term "download" as used here by the Internet Archive does not mean downloads in the colloquial sense, but means the number of "accesses," the number of times one computer sent a request to the Internet Archive server. The computer sending such a request could be controlled by a human, or it could be operating automatically. Mr. Malamud corrected Plaintiffs repeatedly on this distinction. (Public Resource Dep. 254:14–263:21; 271:7-272:14.) Also disputed to the extent that the standards that Public Resource has posted on its website are not owned by Plaintiffs for the reasons described in Public Resource's Motion for Summary Judgment. |
| 242. NFPA's 2011 NEC was downloaded 30,350 times from the Internet Archive website. NFPA's 2014 NEC was downloaded 29,405 times from the Internet Archive website. Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 254:14 256:16); Rubel Decl. ¶ 43, Ex. 39 (Ex. 51 to PR Dep.). | Disputed. The term "download" as used here by the Internet Archive does not mean downloads in the colloquial sense, but means the number of "accesses," the number of times one computer sent a request to the Internet Archive server. The computer sending such a request could be controlled by a human, or it could be operating automatically. Mr. Malamud corrected Plaintiffs repeatedly on this distinction. (Public Resource Dep. 254:14–263:21; 271:7-272:14.) Also disputed to the extent that the standards that Public Resource has posted on its website are not owned by Plaintiffs for the reasons described in Public Resource's Motion for Summary Judgment. |
| 243. ASTM D975-07 was downloaded 159 times from the Internet Archive website. ASTM D86-07 was downloaded 75 times from the Internet Archive website. Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 206:13-207:22); Rubel Decl. ¶ 42, Ex. 38 (Ex. 43 to PR Dep.). | Disputed. The term "download" as used here by the Internet Archive does not mean downloads in the colloquial sense, but means the number of "accesses," the number of times one computer sent a request to the Internet Archive server. The computer sending such a request could be controlled by a human, or it could be operating automatically. Mr. Malamud corrected |

| | |
|---|---|
| | Plaintiffs repeatedly on this distinction. (Public Resource Dep. 254:14–263:21; 271:7-272:14.) Also disputed to the extent that the standards that Public Resource has posted on its website are not owned by Plaintiffs for the reasons described in Public Resource's Motion for Summary Judgment. |
| 244. Plaintiffs' standards were also "accessed" thousands of times from Defendant's website between April 2013 and February 2014 alone. Rubel Decl. ¶ 5, Ex. 2 (PR Dep. at 271:7-272:14 (defining "access" as complete or partial transfer of file from Defendant's server to another computer), 299:2-300:1 (describing relevant time period)); Rubel Decl. ¶ 44, Ex. 40 (Ex. 44 to PR Dep.); Rubel Decl. ¶ 45, Ex. 41, (Ex. 54 to PR Dep.); Rubel Decl. ¶ 46, Ex. 42 (Ex. 56 to PR Dep.) (showing 88,497 accesses of ASTM standards, 167,982 accesses of NFPA standards, and 33,147 accesses of ASHRAE standards). | Disputed to the extent that the standards that Public Resource has posted on its website are not owned by Plaintiffs for the reasons described in Public Resource's Motion for Summary Judgment. |
| 245. Plaintiffs have also been injured by the loss of their ability to control dissemination of their intellectual property. Defendant's publication and distribution of versions of Plaintiffs' standards that are incomplete, contain transcription errors, or otherwise alter the content of Plaintiffs' standards severely compromise Plaintiffs' ability to protect their reputations. Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶ 150-51). | Disputed.  Any loss of anticompetitive advantage in the sale of downstream materials is not a cognizable harm. (SMF ¶ 126.) This is an opinion, not a fact. Plaintiffs have not demonstrated any harm, and Mr. Jarosz is not qualified as an expert to opine on harm to the Plaintiffs, nor on the effects of making the standards available on the Public Resource website. See Public Resource's Motion to Strike Jarosz Report.  Disputed to the extent that the standards that Public Resource has posted on its website are not owned by Plaintiffs for the reasons described in Public Resource's Motion for Summary Judgment. |
| 246. It is exceedingly difficult to quantify or forecast the economic impact of Defendant's activities. Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶ 150-54). | Disputed.  This is an opinion, not a fact. Mr. Jarosz is not qualified as an expert to opine on harm to the Plaintiffs, nor on the effects of Public Resource's activities. See Public Resource's Motion to Strike Jarosz Report. |
| 247. Defendant does not know what people do with the versions of Plaintiffs' standards that are posted on Defendant's website. Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. At 72:12-16). | This fact is not material to Plaintiffs' Motion for Summary Judgment. |
| 248. Defendant has no way to identify who | This fact is not material to Plaintiffs' Motion |

| | |
|---|---|
| downloaded, made additional copies of, or printed the versions of Plaintiffs' standards from its website. Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 73:25-76:5). | for Summary Judgment. |
| 249. Copies of 43 of Defendant's versions of ASTM's standards at issue, with Defendant's cover page, were uploaded by "dharlanuctcom" onto the Scribd platform. *See* https://www.scribd.com/dharlanuctcom. Rubel Decl. ¶ 15 and Ex. 12. | |
| 250. There is no evidence that Defendant's activities, which began in late 2012, have generated additional demand for Plaintiffs' standards or raised public awareness of the standards in a manner that would spur additional demand. Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 140). | Disputed. Plaintiffs' own sales records show that the sales of some standards at issue increased after Public Resource posted the standard on its website. *See, e.g.*, Public Resource's Motion to Strike Jarosz Report; Lu Decl. to Public Resource's Motion to Strike Jarosz Report, Exh. 14 at NFPA-PR0038555. |
| 251. Copyright protection provides an incentive for Plaintiffs to innovate and develop new works. If a work can be copied or sold by another entity, there may not be sufficient incentives for the author to develop the work. Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 102). | Disputed. The persons who volunteer to create and develop voluntary consensus standards have incentives to do so that are independent of owning the copyright to the standards. SMF ¶ 28. Plaintiffs do not develop standards; the volunteers develop standards, and do not receive any proceeds from the sale of these standards in compensation for their authorship. SMF ¶ 132–38. |
| 252. "Plaintiffs require substantial resources to continue their standards development efforts. Revenue generated from the sale of copyrighted standards and downstream products and services based on these copyrighted standards are a key contributor to the resources needed to carry out these functions." Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 6). | Disputed. The persons who volunteer to create and develop voluntary consensus standards have incentives to do so that are independent of owning the copyright to the standards. SMF ¶ 28. Plaintiffs do not develop standards; the volunteers develop standards, and do not receive any proceeds from the sale of these standards in compensation for their authorship. SMF ¶ 132–38. This is an opinion, not a fact. Mr. Jarosz is not qualified as an expert to opine Plaintiffs' business model. See Public Resource's Motion to Strike Jarosz Report. |
| 253. If the revenue from the sales of their copyrighted works and ancillary were in jeopardy, Defendants would be forced to change their behavior and their business models. Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 163). | Disputed. This is an opinion, not a fact. Mr. Jarosz is not qualified as an expert to opine Plaintiffs' business model. See Public Resource's Motion to Strike Jarosz Report. |
| 254. There is a significant risk that if | Disputed. This is an opinion, not a fact. Mr. |

| | |
|---|---|
| Defendant's conduct goes unchecked, it will act as a signal to the market that the creation of unauthorized versions of the standards is acceptable and Plaintiffs' harm will be compounded over time as more people use the versions of the standards on Defendant's website or similar websites instead of purchasing authentic versions of the standards from Plaintiffs. Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 153). | Jarosz is not qualified as an expert to opine Plaintiffs' business model. See Public Resource's Motion to Strike Jarosz Report. |
| 255. Defendant acknowledges that "making standards more freely available . . . potentially poses a challenge to the current business models of the standards development of some standards development organizations." Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 211:5-19). | |
| 256. Malamud has privately admitted to his supporters that he avoids discussing how his conduct will affect the business model of standards development organizations because he "can't win that discussion" and he instead must take "an absolutist position," which is "the only way we can possibly win this fight." Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 272:14-19); Rubel Decl. ¶ 47, Ex. 43 (Ex. 76 to C. Malamud Dep.). | This fact is not material to Plaintiffs' Motion for Summary Judgment. Further, Plaintiffs distort Mr. Malamud's testimony beyond its actual meaning. |
| 257. Each of the Plaintiffs relies primarily on users of its standards to fund the development of the standards, rather than charging upfront fees before developing a standard. Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 80). | Disputed. This is an opinion, not a fact. Mr. Jarosz is not qualified as an expert to opine Plaintiffs' business model. See Public Resource's Motion to Strike Jarosz Report. |
| 258. Plaintiffs' "back-loaded" business models features extremely low barriers to participating in the standards creation process but then funds the process through sale of the resulting standards. Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶ 81, 89, 94-96, 118-21). | Disputed. This is an opinion, not a fact. Mr. Jarosz is not qualified as an expert to opine Plaintiffs' business model. See Public Resource's Motion to Strike Jarosz Report. |
| 259. Plaintiffs could be forced to significantly alter their business models to a more "front-loaded" system that charges for participation in the standard-creation process, which would preclude the participation of certain key stakeholders and/or limit the quantity and subject matter of the standards Plaintiffs develop. Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶106-11). | Disputed. This is an opinion, not a fact. Mr. Jarosz is not qualified as an expert to opine Plaintiffs' business model, nor the standard development model. See Public Resource's Motion to Strike Jarosz Report. Plaintiffs do not develop standards; the volunteers develop standards, and do not receive any proceeds from the sale of these standards in compensation for their authorship. SMF |

| | ¶ 132–38. |
|---|---|
| 260. Standards developed under a front-loaded model are more likely to feature only the viewpoints of industry interests with the resources to participate in the process and are less likely to reflect the views and concerns of the general public. Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶106-11). | Disputed. This is an opinion, not a fact. Mr. Jarosz is not qualified as an expert to opine standard development models. See Public Resource's Motion to Strike Jarosz Report. |
| 261. Plaintiffs currently develop standards based on public demands, industry needs, and public safety concerns and advancements in technology and without concern for whether the standard will generate significant sales. Thomas Decl.¶ 13; Reiniche Decl. ¶¶ 2, 18; Pauley Decl. ¶ 11. | Disputed to the extent that Plaintiffs do not develop standards; the volunteers develop standards, and do not receive any proceeds from the sale of these standards in compensation for their authorship. SMF ¶ 132–38. |
| 262. Defendant's activities could force Plaintiffs to develop only the most popular standards or release updated versions of standards less frequently. Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶ 126-29); Pauley Decl. ¶ 51. | Disputed. This is an opinion, not a fact. Mr. Jarosz is not qualified as an expert to opine Plaintiffs' business model. See Public Resource's Motion to Strike Jarosz Report. Plaintiffs do not develop standards; the volunteers develop standards, and do not receive any proceeds from the sale of these standards in compensation for their authorship. SMF ¶ 132–38. |
| 263. Plaintiffs will also likely lose revenue associated with other ancillary activities that rely on or incorporate the copyrighted works, including training courses and commentary on standards. Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶ 143, 147-48). | Disputed. This is an opinion, not a fact. Mr. Jarosz is not qualified as an expert to opine Plaintiffs' business model. See Public Resource's Motion to Strike Jarosz Report. |
| 264. Not only do Defendant's activities jeopardize Plaintiffs' sales of their copyrighted standards, the loss of copyright protection for standards incorporated by reference would remove the competitive advantage Plaintiffs have when marketing these ancillary goods and services and would make it easier for third parties to compete for this business. Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶ 143, 147-49). | Disputed. This is an opinion, not a fact. Mr. Jarosz is not qualified as an expert to opine Plaintiffs' business model. See Public Resource's Motion to Strike Jarosz Report. |
| 265. Government incorporation of privately developed standards is a cost-effective method through which government can capitalize directly on the expertise and resources available in the private sector that result in the highest quality standards covering a wide range of topics. Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶ | |

| | |
|---|---|
| 51-53); Jennings Decl. ¶¶ 22-23. | |
| 266. Government and other entities rely on Plaintiffs' standards and do not have the resources or the technical expertise to develop their own standards if Plaintiffs were unable to develop them. Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶ 52-56,164); Jennings Decl. ¶ 24; Reinertson Decl. ¶¶ 11-14; Golinveaux Decl. ¶ 6. | Disputed. This is an opinion, not a fact. Mr. Jarosz, Mr. Jennings, Mr. Reinertson, and Mr. Golinveaux are not qualified as experts to opine government and other unnamed entities' standard development capabilities. See Public Resource's Motion to Strike Jarosz Report. |
| 267. If the standards are to continue to be developed, someone will have to pay for their development. *See* Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 123). | Disputed. Unpaid volunteers developed standards at issue, and do not receive any proceeds from the sale of these standards in compensation for their authorship. SMF ¶ 132–38. |
| 268. Government could fund Plaintiffs' activities, but this would be economically inefficient, would increase the tax burden on the public, and place SDOs at the mercy of funding that could be reduced or eliminated in annual agency budgeting. Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶¶ 123-25). | Disputed. This is an opinion, not a fact. Mr. Jarosz is not qualified as an expert to opine Plaintiffs' business model. See Public Resource's Motion to Strike Jarosz Report. |
| 269. The current method of charging members of the public who use a standard a reasonable price is more economically efficient than asking all members of the public to cover the costs of developing the standard through their taxes. Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 124). | Disputed. This is an opinion, not a fact. Mr. Jarosz is not qualified as an expert to opine Plaintiffs' business model and his opinion relies entirely on self-serving statements by Plaintiffs. See Public Resource's Motion to Strike Jarosz Report. |
| 270. If Plaintiffs are forced to change their business models, there will be less standard development because of reduced incentives, lower quality standards because of less participant involvement, less widespread adoption due to less incorporation by reference and less public buy-in. Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 164). | Disputed. This is an opinion, not a fact. Mr. Jarosz is not qualified as an expert to opine Plaintiffs' business model and his opinion relies entirely on self-serving statements by Plaintiffs. See Public Resource's Motion to Strike Jarosz Report. |
| 271. The effect of a loss of copyright protection "will be a likely reduction in the number, quality, and acceptability of critical standards and a likely increase in costs for governments, and therefore, taxpayers. This will cause harm to governments, the public, and industry actors that rely on the creation of these standards as well as to the Plaintiffs." Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 6). | Disputed. This is an opinion, not a fact. Mr. Jarosz is not qualified as an expert to opine Plaintiffs' business model and his opinion relies entirely on self-serving statements by Plaintiffs. See Public Resource's Motion to Strike Jarosz Report. |
| 272. Public Resource has extremely limited | |

| | |
|---|---|
| financial resources available to pay any damages award. Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 155). | |
| 273. In 2014, Defendant generated less than $100,000 in operating income and had $248,000 in total net assets. Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 155, Tabs 6-7). | |
| 274. On or about November 10, 2015, Defendant removed its versions of the standards at issue in this case from its website at the suggestion of the Court. O'Brien Decl. ¶ 68. | This fact is not material to Plaintiffs' Motion for Summary Judgment. |
| 275. Since the standards were taken down by Defendant, Plaintiffs have not received any complaints from persons regarding any alleged inability to access Plaintiffs' standards that have been incorporated by reference. O'Brien Decl. ¶ 70; Reiniche Decl. ¶ 20; Berry Decl. ¶ 13. | This fact is not material to Plaintiffs' Motion for Summary Judgment. |
| 276. The standards at issue here are only a portion of the content on one of at least 10 websites operated by Defendant. Rubel Decl. ¶ 4, Ex. 1 (Jarosz Rep. ¶ 157). | |
| 277. Defendant admitted that there will be no long-term financial impact on Defendant if an injunction is entered. Specifically, when asked what impact Defendant's inability to continue to post standards incorporated by reference would have on Defendant's financial ability to survive long term, Mr. Malamud answered, "Probably none." Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 219:22-220:4) | |
| 278. The only harm Mr. Malamud could identify that Defendant would suffer if an injunction were entered is that it "put a tremendous amount of effort" into this project and "one hates to have wasted" that effort. Rubel Decl. ¶ 6, Ex. 3 (C. Malamud Dep. at 220:6-17). | |

Dated:  December 21, 2015                    Respectfully submitted,


                                             */s/ Andrew P. Bridges*
                                             Andrew P. Bridges (admitted)
                                             abridges@fenwick.com
                                             Kathleen Lu (pro hac vice)
                                             klu@fenwick.com
                                             Matthew B. Becker (pro hac vice)
                                             mbecker@fenwick.com
                                             FENWICK & WEST LLP
                                             555 California Street, 12th Floor
                                             San Francisco, CA 94104
                                             Telephone:  (415) 875-2300
                                             Facsimile:   (415) 281-1350

                                             David Halperin (D.C. Bar No. 426078)
                                             davidhalperindc@gmail.com
                                             1530 P Street NW
                                             Washington, DC 20005
                                             Telephone: (202) 905-3434

                                             Mitchell L. Stoltz (D.C. Bar No. 978149)
                                             mitch@eff.org
                                             Corynne McSherry (pro hac vice)
                                             corynne@eff.org
                                             ELECTRONIC FRONTIER FOUNDATION
                                             815 Eddy Street
                                             San Francisco, CA 94109
                                             Telephone: (415) 436-9333
                                             Facsimile:  (415) 436-9993

                                             *Attorneys for Defendant-Counterclaimant*
                                             *Public.Resource.Org, Inc.*