# EXHIBIT 1

# State of California
## Secretary of State



I, DEBRA BOWEN, Secretary of State of the State of California, hereby certify:

That the attached transcript of ___/___ page(s) has been compared with the record on file in this office, of which it purports to be a copy, and that it is full, true and correct.



**IN WITNESS WHEREOF,** I execute this certificate and affix the Great Seal of the State of California this day of

APR 1 3 2007

DEBRA BOWEN
Secretary of State

# ARTICLES OF INCORPORATION

ENDORSED - FILED
in the office of the Secretary of State
of the State of California

APR 1 3 2007

## I

A. The name of this corporation is **PUBLIC.RESOURCE.ORG, INC.**

## II

A. This corporation is a nonprofit **PUBLIC BENEFIT CORPORATION** and is not organized for the private gain of any person. It is organized under the **NONPROFIT PUBLIC BENEFIT CORPORATION LAW FOR PUBLIC AND CHARITABLE PURPOSES.**

B. The specific purpose of this corporation is to create, architect, design, implement, operate and maintain public works projects on the Internet for **EDUCATIONAL, CHARITABLE, AND SCIENTIFIC PURPOSES** to the benefit of the general public and the public interest; to increase and diffuse knowledge about the Internet in its broadest sense; to promote and facilitate the expansion, development, and growth of the public infrastructure of the Internet by any means consistent with the public interest through other activities, including, but not limited to, publications, meetings, conferences, training, educational seminars, and the issuance of grants and other financial support to educational institutions, foundations and other organizations exclusively for **EDUCATIONAL, CHARITABLE, AND SCIENTIFIC PURPOSES.**

## III

A. The name and address in the State of California of this corporation's initial agent for service of process is:

> Carl Malamud
> Public.Resource.Org, Inc.
> c/o O'Reilly Media
> 1005 Gravenstein Highway North
> Sebastopol, CA 95472

## IV

A. This corporation is organized and operated exclusively for **CHARITABLE PURPOSES** within the meaning of Section 501(c)(3), Internal Revenue Code.

B. **NO SUBSTANTIAL PART OF THE ACTIVITIES** of this corporation shall consist of carrying on propaganda, or otherwise attempting to influence legislation, and the corporation shall not participate or intervene in any political campaign (including the publishing or distribution of statements) on behalf of any candidate for public office.

## V

A. The property of this corporation is **IRREVOCABLY DEDICATED TO CHARITABLE PURPOSES** and no part of the net income or assets of this corporation shall ever inure to the benefit of any director, officer or member thereof or to the benefit of any private person. Upon the dissolution or winding up of the corporation, its assets remaining after payment, or provision for payment, of all debts and liabilities of this corporation shall be distributed to a nonprofit fund, foundation or corporation which is organized and operated **EXCLUSIVELY FOR CHARITABLE PURPOSES** and which has established its tax exempt status under Section 501(c)(3), Internal Revenue Code.



Carl Malamud, Incorporator

# EXHIBIT 2

Table of Codes ↑

# Public Safety Standards
# United States (Federal Government)

In order to promote public education and public safety, equal justice for all, a better informed citizenry, the rule of law, world trade and world peace, this legal document is hereby made available on a noncommercial basis, as it is the right of all humans to know and speak the laws that govern them. (See also State and Local codes.)

| STANDARD | YEAR | ORGANIZATION | TITLE | CFR AUTHORITY |
|---|---|---|---|---|
| 3M 0222 | 1995 | 3M Corporation | Organochlorine Pesticides and PCBs in Wastewater Using Empore Disk | 40 CFR 136.3(a) Table ID |
| AA CONSTRUCT | 1971 | Aluminum Association | Aluminum Construction Manual | 24 CFR 200, Subpart S |
| AA | 1967 | Aluminum Association | Aluminum Construction Manual | 24 CFR 200, Subpart S |
| AA DATA | 1982 | Aluminum Association | Aluminum Standards and Data, Seventh Edition | 49 CFR 178.65(b)(2) |
| AAMA 101-IS2 | 1997 | American Architectural Manufacturers Association | Voluntary Specifications for Aluminum, Vinyl (PVC) and Wood Windows and Glass Doors | 10 CFR 434.402.2.2.4 |
| AAMA 605 | 1998 | American Architectural Manufacturers Association | Voluntary Specification, Performance Requirements and Test Procedures for High Performance Organic Coatings on Aluminum Extrusions and Panels | 40 CFR 59.401 |
| AAMA 1002.10 | 1993 | American Architectural Manufacturers Association | Aluminum Insulating Products for Windows and Sliding Glass Doors | 24 CFR 200.938 |
| AAMA 1102.7 | 1989 | American Architectural Manufacturers Association | Voluntary Specifications for Aluminum Storm Doors | 10 CFR 440 Appendix A |
| AAMA 1503.1 | 1988 | American Architectural Manufacturers Association | Voluntary Test Method for Thermal Transmittance and Condensation Resistance of Windows, Doors and Glazed Wall Sections | 24 CFR 3280.508(e) |
| AAMA 1702.2 | 1995 | American Architectural Manufacturers Association | Swinging Exterior Passage Doors Voluntary Standard for Utilization in Manufactured-Housing | 24 CFR 3280.405(e)(2) |
| AAMA 1704 | 1985 | American Architectural Manufacturers Association | Voluntary Standard Egress Window Systems for Utilization in Manufactured-Housing | 24 CFR 3280.404(b) |
| AAMD | 1973 | American Association on Mental Deficiency | Classification in Mental Retardation | 42 CFR 483.102(b)(3)(i) |
| AAMVA CDLIS.2.0 | 1998 | American Association of Motor Vehicle Administrators | Commercial Driver License Information System (CDLIS) State Procedures | 49 CFR 384.231(d) |
| AASHTO | 1973 | American Association of State Highway and Transportation Officials | Standard Specifications for Highway Bridges | 24 CFR 200, Subpart S |
| AASHTO | 2001 | American Association | A Policy on Geometric Design of | 23 CFR 625.4 |

| | | of State Highway and Transportation Officials | Highways and Streets | |
|---|---|---|---|---|
| AASHTO | 2005 | American Association of State Highway and Transportation Officials | A Guide for Accommodating Utilities Within Highway Right-of-Way | 23 CFR 645.211 |
| AATCC 118 | 1997 | American Association of Textile Chemists and Colorists | Oil Repellency: Hydrocarbon Resistance Test | 10 CFR 430 Subpart B, App. J1, 2.6.4.5.1 |
| AATCC 124 | 1996 | American Association of Textile Chemists and Colorists | Appearance of Durable Press Fabrics After Repeated Home Laundering | 16 CFR 1615.32(a)(1) |
| ABYC A-01 | 1993 | American Boat and Yacht Council | Marine Liquified Petroleum Gas Systems | 46 CFR 184.240(a) |
| ABYC A-07 | 1973 | American Boat and Yacht Council | Boat Heating Systems | 46 CFR 184.200 |
| ABYC A-16 | 1997 | American Boat and Yacht Council | Electric Navigation Lights | 46 CFR 25.10-3(a)(2) |
| ABYC A-22 | 1993 | American Boat and Yacht Council | Marine Compressed Natural Gas Systems | 46 CFR 184.240(b) |
| ABYC E-01 | 1973 | American Boat and Yacht Council | Bonding of Direct Current Systems | 46 CFR 28.345(b) |
| ABYC E-09 | 1990 | American Boat and Yacht Council | Direct Current (DC) Electrical Systems on Boats | 46 CFR 183.340(b)(4) |
| ABYC H-02 | 1989 | American Boat and Yacht Council | Ventilation of Boats Using Gasoline | 46 CFR 28.340(c) |
| ABYC H-22 | 1986 | American Boat and Yacht Council | DC Electric Bilge Pumps Operating Under 50 Volts | 46 CFR 182.500(b) |
| ABYC H-24 | 1993 | American Boat and Yacht Council | Gasoline Fuel Systems | 46 CFR 182.455(c) |
| ABYC H-25 | 1994 | American Boat and Yacht Council | Portable Gasoline Fuel Systems for Flammable Liquids | 46 CFR 182.130 |
| ABYC H-32 | 1987 | American Boat and Yacht Council | Ventilation of Boats Using Diesel Fuel | 46 CFR 182.470(c) |
| ABYC H-33 | 1989 | American Boat and Yacht Council | Diesel Fuel Systems | 46 CFR 182.130 |
| ABYC P-01 | 1993 | American Boat and Yacht Council | Safe Installation of Exhaust Systems for Propulsion and Auxiliary Engines | 46 CFR 182.130 |
| ABYC P-04 | 1989 | American Boat and Yacht Council | Marine Inboard Engines | 46 CFR 182.420(b) |
| ACGIH | 1987 | American Conference of Governmental Industrial Hygienists | Guidelines for the Selection of Chemical Protective Clothing, Third Edition | 46 CFR 153.933(a) |
| ACGIH | 1998 | American Conference of Governmental Industrial Hygienists | Industrial Ventilation Manual | 40 CFR 63.2984(e) |
| ACI 318 | 1995 | American Concrete Institute | Building Code Requirements for Reinforced Concrete | 30 CFR 250.901(d)(1) |
| ACI | 1980 | American Concrete Institute | Manual of Concrete Practice, Part 1 | 24 CFR 200, Subpart S |

| ACRI 210-240 | 2003 | Air Conditioning and Refrigeration Institute | Unitary Air-Conditioning and Air-Source Heat Pump Equipment | 10 CFR 431.96 |
|---|---|---|---|---|
| ACRI 310/380 | 2004 | Air-Conditioning, Heating and Refrigeration Institute | Packaged Terminal Air-Conditioners and Heat Pumps | 10 CFR 431.96, Table 1 |
| ACRI 320 | 1998 | Air-Conditioning, Heating, and Refrigeration Institute | Water Source Heat Pumps | 10 CFR 434.403 |
| ACRI 325 | 1998 | Air-Conditioning, Heating, and Refrigeration Institute | Ground Water-Source Heat Pumps | 10 CFR 434.403 |
| ACRI 330 | 1998 | Air-Conditioning, Heating, and Refrigeration Institute | Ground-Source Closed-Loop Heat Pumps | 10 CFR 434.403 |
| ACRI 340-360 | 2004 | Air Conditioning and Refrigeration Institute | Commercial and Industrial Unitary Air-Conditioning and Heat Pump Equipment | 10 CFR 434.403 |
| ACRI 365 | 1994 | Air Conditioning and Refrigeration Institute | Commercial and Industrial Unitary Air-Conditioning Condensing Units | 10 CFR 434.403 |
| ACRI 1200 | 2006 | Air Conditioning and Refrigeration Institute | Performance Rating of Commercial Refrigerated Display Merchandisers and Storage Cabinets | 10 CFR 431.66(a)(3) |
| AERA | 1999 | American Educational Research Association | Standard for Educational and Psychological Testing | 34 CFR 668.148(a)(2)(iv) |
| AFPA | 2001 | American Forest and Paper Association | National Design Specification for Wood Construction With Supplemental Design Values for Wood Construction | 24 CFR 3280.304(b)(1) |
| AGA 3.1 | 1990 | American Gas Association | Orifice Metering of Natural Gas and Other Related Hydrocarbon Fluids: Part 1 | 40 CFR 75, Appendix D |
| AGA | 2001 | American Gas Association | Purging Principles and Practices | 49 CFR 193.2615 |
| AHA A135.4 | 1995 | American Hardboard Association | Basic Hardboard | 24 CFR 3280.304(b)(1) |
| AHA A135.5 | 1995 | American Hardboard Association | Prefinished Hardboard Paneling | 24 CFR 3280.304(b)(1) |
| AHA A135.6 | 1998 | American Hardboard Association | Hardboard Siding | 24 CFR 3280.304(b)(1) |
| AHAM DW-1 | 1992 | Association of Home Appliance Manufacturers | Household Electric Dishwashers | 10 CFR 430 Subpart B |
| AHAM HLD-1 | 1974 | Association of Home Appliance Manufacturers | Performance Evaluation Procedure for Household Tumble Type Clothes Dryers | 10 CFR 430 Subpart B |
| AHAM HRF-1 | 1979 | Association of Home Appliance Manufacturers | Household Refrigerators, Combination Refrigerator-Freezers, and Household Freezers | 10 CFR 430 Subpart B |
| AHPA | 1992 | American Herbal Products Association | Herbs of Commerce | 21 CFR 101.4(h) |
| AI MSI-1 | 1970 | Asphalt Institute | Thickness Design--Full Depth | 24 CFR 200, Subpart S |

| | | | Asphalt Pavement Structures for Highways and Streets | |
|---|---|---|---|---|
| AIHA | 1994 | American Industrial Hygiene Association | Laboratory Ventilation Workbook | 42 CFR 52b.12(c)(10) |
| AIMM MS41 | 1996 | Association for Information and Image Management | Dimensions of Unitized Microfilm Carriers and Apertures (Aperture, Camera, Copy and Image Cards) | 36 CFR 1238.10(a)(1) |
| AIMM IT2.18 | 1996 | Association for Information and Image Management | Photography--Density Measurements--Part 3: Spectral Conditions | 36 CFR 1238.14(d)(2) |
| AIMM/PIMA IT9.2 | 1998 | Association for Information and Image Management | Photographic Processed Films, Plates, and Papers--Filing Enclosures and Storage Containers | 36 CFR 1238.10(a)(1) |
| AIMM/PIMA IT9.11 | 1998 | Association for Information and Image Management | Imaging Materials--Processed Safety Photographic Film--Storage | 36 CFR 1234.14(b)(1) |
| AIMM IT9.23 | 1996 | Association for Information and Image Management | Imaging Materials--Polyester Based Magnetic Tape--Storage | 36 CFR 1234.14(b)(2) |
| AIMM/PIMA IT9.25 | 1998 | Association for Information and Image Management | Imaging Materials--Optical Disc Media--Storage | 36 CFR 1234.14(b)(3) |
| AIMM MS1 | 1996 | Association for Information and Image Management | Recommended Practice for Alphanumeric Computer-Output Microforms--Operational Practices for Inspection and Quality Control | 36 CFR 1238.14(c) |
| AIMM MS5 | 1992 | Association for Information and Image Management | Microfiche | 36 CFR 1238.10(b) |
| AIMM MS14 | 1996 | Association for Information and Image Management | Specifications for 16mm and 35mm Roll Microfilm | 36 CFR 1238.10(a)(1) |
| AIMM MS19 | 1993 | Association for Information and Image Management | Standard Recommended Practice-- Identification of Microforms | 36 CFR 1238.12(c) |
| AIMM MS23 | 1998 | Association for Information and Image Management | Standard Recommended Practice-- Production, Inspection, and Quality Assurance of First-Generation, Silver Microforms of Documents | 36 CFR 1238.14(d)(2) |
| AIMM MS32 | 1996 | Association for Information and Image Management | Microrecording of Engineering Source Documents on 35 mm Microfilm | 36 CFR 1238.10(a)(1) |
| AIMM MS43 | 1998 | Association for Information and Image Management | Standard Recommended Practice-- Operational Procedures--Inspection and Quality Control of Microfilms and Documents | 36 CFR 1238.14(d)(1)(i) |
| AIMM MS45 | 1990 | Association for Information and Image Management | Recommended Practice for Inspection of Stored Silver-Gelatin Microforms for Evidence of Deterioration | 36 CFR 1238.22(d)(1) |
| AIMM TR34 | 1996 | Association for Information and Image | Sampling Procedures for Inspection by Attributes of Images in Electronic | 36 CFR 1237.28(d)(2) |

| | | Management | Image Management and Micrographic Systems | |
|---|---|---|---|---|
| ALCIDE 980342EA | 1995 | Alcide Corporation | Determination of Sodium Chlorite: 50 ppm to 1500 ppm concentration | 21 CFR 173.325(g) |
| AMCA 210 | 1999 | Air Movement and Control Association | Laboratory Methods of Testing Fans for Ratings | 10 CFR 430 Subpart B, App. M |
| J-STD-102 | 2011 | Alliance for Telecommunications Industry Solutions | Joint ATIS/TIA CMAS Federal Alert Gateway to CMSP Gateway Interface Text Specification | Warning, Alert and Response Network (WARN) Act of 2006 |
| TELCO FAQ | 1891 | American Telephone and Telegraph | Practical Information for Telephonists | |
| ANSI A10.3 | 1970 | American National Standards Institute | Safety Requirements for Powder Actuated Fastening Systems | 29 CFR 1926 |
| ANSI A10.4 (pdf) ANSI A10.4 (html) | 1963 | American National Standards Institute | Safety Requirements for Workmens Hoists | 29 CFR 1926 |
| ANSI A10.5 (pdf) ANSI A10.5 (html) | 1969 | American National Standards Institute | Safety Requirements for Material Joists | 29 CFR 1926 |
| ANSI A14.1 (pdf) ANSI A14.1 (html) ANSI A14.1 (svg) | 1990 | American National Standards Institute | Ladders--Wood--Safety Requirements | 29 CFR 1917 |
| ANSI A14.2 (pdf) ANSI A14.2 (html) ANSI A14.2 (svg) | 1990 | American National Standards Institute | Ladders--Portable Metal--Safety | 29 CFR 1917 |
| ANSI A92.2 (pdf) ANSI A92.2 (html) | 1969 | American National Standards Institute | Vehicle Mounted Elevating and Rotating Work Platforms | 29 CFR 453 |
| ANSI B7.1 (pdf) ANSI B7.1 (html) | 1970 | American National Standards Institute | Safety Code for the Use, Care, and Protection of Abrasive Wheels | 29 CFR 1926 |
| ANSI B20.1 (pdf) ANSI B20.1 (html) ANSI B20.1 (svg) | 1957 | American National Standards Institute | Safety Code for Conveyors, Cableways, and Related Equipment | 29 CFR 1926 |
| ANSI B30.6 (pdf) ANSI B30.6 (html) ANSI B30.6 (svg) | 1969 | American National Standards Institute | Safety Code for Derricks | 29 CFR 1926 |
| ANSI B36.19 | 1979 | American National Standards Institute | Welded and Seamless Wrought Steel Pipe | 24 CFR 3280.705(b)(1) |
| ANSI B56.1 (pdf) ANSI B56.1 (html) ANSI B56.1 (svg) | 1969 | American National Standards Institute | Safety Standard for Powered Industrial Trucks | 29 CFR 1926 |
| ANSI N14.1 | 2001 | American National Standards Institute | Packaging of Uranium Hexafluoride for Transport | 49 CFR 173.420(a)(1) |
| ANSI O1.1 (pdf) ANSI O1.1 (html) | 1961 | American National Standards Institute | Safety Code for Woodworking Machinery | 29 CFR 1926 |
| ANSI S1.4 | 1983 | American National Standards Institute | Specifications for Sound Level Meters | 7 CFR 1755.522(s)(3)(v) |
| ANSI S1.11 | 2004 | American National Standards Institute | Specification for Octave, Half-Octave, and Third Octave Band Filter Sets | 49 CFR 227 |
| ANSI S1.25 | 1991 | American National Standards Institute | Specification for Personal Noise Dosimeters | 49 CFR 227.103(c)(2)(iii) |
| ANSI S1.40 | 1984 | American National | Specification for Acoustical | 49 CFR 229, Appendix I |

| | | Standards Institute | Calibrators | |
|---|---|---|---|---|
| ANSI S1.43 | 1997 | American National Standards Institute | Specifications for Integrating-Averaging Sound Level Meters | 49 CFR 227.103(c)(2)(ii) |
| ANSI S3.22 (pdf) ANSI S3.22 (html) | 2003 | American National Standards Institute | Specification of Hearing Aid Characteristics | 21 CFR 801 |
| ANSI Z35.1 (pdf) ANSI Z35.1 (html) ANSI Z35.1 (svg) | 1968 | American National Standards Institute | Specifications for Accident Prevention Signs | 29 CFR 1926 |
| ANSI Z35.2 (pdf) ANSI Z35.2 (html) ANSI Z35.2 (svg) | 1968 | American National Standards Institute | Specifications for Accident Prevention Tags | 29 CFR 1926 |
| ANSI Z49.1 (pdf) ANSI Z49.1 (html) | 1967 | American National Standards Institute | Safety in Welding and Cutting | 29 CFR 1926 |
| ANSI Z87.1 (pdf) ANSI Z87.1 (html) ANSI Z87.1 (svg) | 2003 | American National Standards Institute | Practice for Occupational and Educational Eye and Face Protection | 29 CFR 1910 |
| ANSI Z88.2 (pdf) ANSI Z88.2 (html) ANSI Z88.2 (svg) | 1992 | American National Standards Institute | American National Standard for Respiratory Protection | 30 CFR 250 |
| ANSI Z89.1 (pdf) ANSI Z89.1 (html) | 1969 | American National Standards Institute | Safety Requirements for Industrial Head Protection | 29 CFR 1926 |
| ANSI Z89.2 (pdf) ANSI Z89.2 (html) | 1971 | American National Standards Institute | Industrial Protective Helmets for Electrical Workers | 29 CFR 1926 |
| ANSI Z90.4 (pdf) ANSI Z90.4 (html) | 1984 | American National Standards Institute | Protective Headgear for Bicyclists | 16 CFR 1203 |
| ANSI Z245.1 (pdf) ANSI Z245.1 (html) ANSI Z245.1 (svg) | 1992 | American National Standards Institute | Mobile Refuse Collection and Compaction--Safety Requirements | 40 CFR 243 |
| ANSI Z245.2 (pdf) ANSI Z245.2 (html) | 1997 | American National Standards Institute | Stationary Compactors--Safety Requirements | 40 CFR 243 |
| AOAC | 1990 | AOAC International | Official Methods of Analysis (Volume 1) | 9 CFR 318.19(b) |
| AOAC | 1980 | AOAC International | Official Methods of Analysis, 1980 | 21 CFR 131.150(c) |
| APA 87-1 | 2001 | American Pyrotechnics Association | Standard for Construction and Approval for Transportation of Fireworks and Novelties | 49 CFR 173.56(j)(1) |
| APHA Method 2120 (pdf) APHA Method 2120 (html) | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 141.121 |
| APHA Method 2130 (pdf) APHA Method 2130 (html) | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 141.121 |
| APHA Method 2320 (pdf) APHA Method 2320 (html) | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 136.3(a) |

| APHA Method 2510 (pdf) APHA Method 2510 (html) | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 141.121 |
|---|---|---|---|---|
| APHA Method 2550 (pdf) APHA Method 2550 (html) | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 141.121 |
| APHA Method 2580 | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 141.121 |
| APHA Method 3111 (pdf) APHA Method 3111 (html) | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 444.12 |
| APHA Method 3112 (pdf) APHA Method 3112 (html) | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 444.12 |
| APHA Method 3113 (pdf) APHA Method 3113 (html) | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 444.12 |
| APHA Method 3114 | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 444.12 |
| APHA Method 3120 | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 444.12 |
| APHA Method 3500-AS | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 444.12 |
| APHA Method 3500-CA (pdf) APHA Method 3500-CA (html) | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 136.3(a) |
| APHA Method 3500-CD (pdf) APHA Method 3500-CD (html) | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 444.12 |
| APHA Method 3500-CR | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 63.404(a) |
| APHA Method 3500-CU | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 444.12 |
| APHA Method 3500-MG (pdf) APHA Method 3500-MG (html) | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 136.3(a) |
| APHA Method 3500-PB (pdf) APHA Method | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 444.12 |

| | | | | |
|---|---|---|---|---|
| 3500-PB (html) | | | | |
| APHA Method 3500-ZN (pdf) APHA Method 3500-ZN (html) | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 136.3(a) |
| APHA Method 4110 (pdf) APHA Method 4110 (html) | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 136.3(a) |
| APHA Method 4500-ClO2 (pdf) APHA Method 4500-ClO2 (html) | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 21 CFR 165.110(b)(4)(iii)(I)(7)(ii) |
| APHA Method 4500-CL | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 21 CFR 165.110(b)(4) |
| APHA Method 4500-CN | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 136.3(a) |
| APHA Method 4500-F | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 136.3(a) |
| APHA Method 4500-H | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 444.12 |
| APHA Method 4500-NO2 | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 136.3(a) |
| APHA Method 4500-NO3 | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 136.3(a) |
| APHA Method 4500-O3 | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 136.3(a) |
| APHA Method 4500-P | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 136.3(a) |
| APHA Method 4500-S2 | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 136.3(a) |
| APHA Method 4500-SI | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 141.121 |
| APHA Method 4500-SO42 | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 136.3(a) |
| APHA Method 5540 | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 141.121 |
| APHA Method 6651 | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 141.121 |

| APHA Method 9215 | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 141.121 |
|---|---|---|---|---|
| APHA Method 9221 | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 136.3(a) |
| APHA Method 9222 | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 136.3(a) |
| APHA Method 9223 | 1992 | American Public Health Association | Standard Methods for the Examination of Water and Wastewater | 40 CFR 136.3(a) |
| API 2INT-MET | 2007 | American Petroleum Institute | Interim Guidance on Hurricane Conditions in the Gulf of Mexico | 30 CFR 250.901(a)(6) |
| API 5L | 2004 | American Petroleum Institute | Specification for Line Pipe | 49 CFR 192.113 |
| API 5L1 | 2002 | American Petroleum Institute | Recommended Practice for Railroad Transportation of Line Pipe | 49 CFR 192.65(a) |
| API 6A | 2004 | American Petroleum Institute | Specification for Wellhead and Christmas Tree Equipment | 30 CFR 250.806(a)(3) |
| API 6D | 2008 | American Petroleum Institute | Specification for Pipeline Valves | 49 CFR 195.116(d) |
| API 12F | 1994 | American Petroleum Institute | Specification for Shop Welded Tanks for Storage of Production Liquids | 49 CFR 195.264(b)(1) |
| API RP 14C | 2001 | American Petroleum Institute | Recommended Practice for Analysis, Design, Installation, and Testing of Basic Surface Safety Systems for Offshore Production Platforms | 30 CFR 250.1628(c) |
| API RP 14F | 2008 | American Petroleum Institute | Recommended Practice for Design and Installation of Electrical Systems for Offshore Production Platforms | 30 CFR 250.114(c) |
| API 17J | 2008 | American Petroleum Institute | Specification for Unbonded Flexible Pipe | 30 CFR 250.1002(b)(4) |
| API 80 | 2000 | American Petroleum Institute | Guidelines for the Definition of Onshore Gas Gathering Lines | 49 CFR 192.8(a) |
| API 510 | 2006 | American Petroleum Institute | Pressure Vessel Inspection Code | 30 CFR 250.803(b)(1) |
| API 620 | 2002 | American Petroleum Institute | Design and Construction of Large Welded Low Pressure Storage Tanks | 49 CFR 195.264(e)(3) |
| API 650 | 2007 | American Petroleum Institute | Welded Steel Tanks for Oil Storage | 195.132(b)(3) |
| API 651 | 1997 | American Petroleum Institute | Cathodic Protection of Aboveground Petroleum Storage Tanks | 49 CFR 195.565 |
| API 652 | 1997 | American Petroleum Institute | Lining of Aboveground Petroleum Storage Tank Bottoms | 49 CFR 195.579(d) |
| API 653 | 2003 | American Petroleum Institute | Tank Inspection, Repair, Alteration, and Reconstruction | 49 CFR 195.432(b) |

| API 1104 | 1999 | American Petroleum Institute | Standard for Welding Pipelines and Related Facilities | 49 CFR 195.214(a) |
|---|---|---|---|---|
| API 1130 | 2002 | American Petroleum Institute | Computational Pipeline Monitoring | 49 CFR 195.444 |
| API 1162 | 2003 | American Petroleum Institute | Public Awareness Programs for Pipeline Operators | 49 CFR 192.616(a) |
| API 2000 | 1998 | American Petroleum Institute | Venting Atmospheric and Low-Pressure Storage Tanks | 49 CFR 195.264(e)(2) |
| API 2003 | 1998 | American Petroleum Institute | Protection Against Ignitions Arising Out of Static, Lightning, and Stray Currents | 49 CFR 195.405(a) |
| API 2350 | 2005 | American Petroleum Institute | Overfill Protection for Storage Tanks in Petroleum Facilities | 49 CFR 195.428(c) |
| API 2510 | 2001 | American Petroleum Institute | Design and Construction of LPG Installations | 49 CFR 195.205(b)(3) |
| API RP 14G | 2007 | American Petroleum Institute | Recommended Practice for Fire Prevention and Control on Open Type Offshore Production Platforms | 30 CFR 250.803(b)(9)(v) |
| APLIC | 1996 | Avian Power Line Interaction Committee | Suggested Practices for Raptor Protection on Power Lines: The State of the Art in 1996 | 7 CFR 1724.52(a)(1)(i) |
| APSP 16 | 2011 | Association of Pool and Spa Professionals | Standard Suction Fittings for Use in Swimming Pools, Wading Pools, Spas, and Hot Tubs | 16 CFR 1450.3 |
| ARMA | 1984 | Asphalt Roofing Manufacturers Association | Residential Asphalt Roofing Manual | 24 CFR 200, Subpart S |
| ASHRAE 15 | 1994 | American Society of Heating, Refrigerating and Air Conditioning Engineers | Safety Code for Mechanical Refrigeration | 49 CFR 173.306(e)(1)(i) |
| ASHRAE | 1993 | American Society of Heating, Refrigerating and Air Conditioning Engineers | Fundamentals | 10 CFR 434.402.2.2.5(a) |
| ASME B16.9 | 2003 | American Society of Mechnical Engineers | Factory Made Wrought Steel Buttwelding Fittings | 49 CFR 195.118(a) |
| ASME B30.2 (pdf) ASME B30.2 (html) ASME B30.2 (svg) | 2005 | American Society of Mechanical Engineers | Safety Requirements for Overhead and Gantry Cranes | 29 CFR 1926 |
| ASME B30.5 (pdf) ASME B30.5 (html) | 2004 | American Society of Mechanical Engineers | Safety Requirements for Mobile and Locomotive Cranes | 29 CFR 1926 |
| ASME B30.7 (pdf) ASME B30.7 (html) | 2001 | American Society of Mechanical Engineers | Safety Requirements for Base-Mounted Drum Hoists | 29 CFR 1926 |
| ASME B30.14 (pdf) ASME B30.14 (html) | 2004 | American Society of Mechanical Engineers | Safety Requirements for Side Boom Tractors | 29 CFR 1926 |

| | | | | |
|---|---|---|---|---|
| ASME B30.14 (svg) | | | | |
| ASME B31.4 | 2002 | American Society of Mechnical Engineers | Pipeline Transportation Systems for Liquid Hydrocarbons and Other Liquids | 49 CFR 195.110(a) |
| ASME B31.8 | 2003 | American Society of Mechnical Engineers | Gas Transmission and Distribution Piping Systems | 49 CFR 192.619(a)(1)(i) |
| ASME B318S | 2004 | American Society of Mechanical Engineers | Managing System Integrity of Gas Pipelines | 49 CFR 192.903(c) |
| ASME B31G | 1991 | American Society of Mechanical Engineers | Manual for Determining the Remaining Strength of Corroded Pipelines | 49 CFR 192.485(c) |
| ASME UPV | 1943 | American Society of Mechanical Engineers | Code for Unfired Pressure Vessels | 49 CFR 173.32(c)(4) |
| ASQC Q9001 | 1994 | American Society for Quality Control | Quality Assurance in Design, Development, Production, Installation, and Servicing | 33 CFR 96.430(a)(2)(ii) |
| ASQC Q9002 | 1994 | American Society for Quality Control | Quality Systems -- Model for Quality Assurance in Production, Installation, and Servicing | 24 CFR 200.935(d)(4)(ii)(A)(3) |
| ASQC Q9003 | 1994 | American Society for Quality Control | Quality Systems - Model for Quality Assurance in Final Inspection and Test | 24 CFR 200.935(d)(4)(ii)(A)(4) |
| ASQC Q9004-1 | 1994 | American Society for Quality Control | Quality Management and Quality Systems Elements-Guidelines | 24 CFR 200.935(d)(4)(ii)(A)(5) |
| ASSE 1001 | 1990 | American Society of Sanitary Engineering | Performance Requirements for Pipe Applied Atmospheric Type Vacuum Breakers | 24 CFR 3280.604(b)(2) |
| ASSE 1006 (pdf) ASSE 1006 (html) | 1986 | American Society of Sanitary Engineering | Plumbing Requirements for Residential Use (Household) Dishwashers | 24 CFR 3280.604(b)(2) |
| ASSE 1007 (pdf) ASSE 1007 (html) | 1986 | American Society of Sanitary Engineering | Performance Requirements for Home Laundry Equipment | 24 CFR 3280.604(b)(2) |
| ASSE 1008 (pdf) ASSE 1008 (html) | 1986 | American Society of Sanitary Engineering | Performance Requirements for Household Food Waste Disposer Units | 24 CFR 3280.604(b)(2) |
| ASSE 1016 | 1988 | American Society of Sanitary Engineering | Performance Requirements for Individual Thermostatic Pressure Balancing and Combination Control for Bathing Facilities | 24 CFR 3280.604(b)(2) |
| ASSE 1023 (pdf) ASSE 1023 (html) | 1979 | American Society of Sanitary Engineering | Hot Water Dispensers, Household Storage Type, Electrical | 24 CFR 3280.604(b)(2) |
| ASSE 1025 | 1978 | American Society of Sanitary Engineering | Diverters for Plumbing Faucets with Hose Spray, Anti-Siphon Type, Residential Applications | 24 CFR 3280.604(b)(2) |
| ASSE 1037 (pdf) ASSE 1037 (html) | 1990 | American Society of Sanitary Engineering | Performance Requirements for Pressurized Flushing Devices (Flushometers) for Plumbing Fixtures | 24 CFR 3280.604(b)(2) |
| ASCE 7 | 2002 | American Society of Civil Engineers | Minimum Design Loads for Buildings and Other Structures | 49 CFR 193.2013 |

| ASTM A36 | 1977 | American Society for Testing and Materials | Standard Specification for Carbon Structural Steel | 24 CFR Part 200 |
| ASTM A36 | 1997 | American Society for Testing and Materials | Standard Specification for Carbon Structural Steel | 46 CFR 160.035-3(b)(2) |
| ASTM A47 | 1968 | American Society for Testing and Materials | Standard Specification for Malleable Iron Castings | 29 CFR 1910.111(b)(7)(vi) |
| ASTM A82 | 1979 | American Society for Testing and Materials | Cold-Drawn Steel Wire for Concrete Reinforcement | 24 CFR 200, Subpart S |
| ASTM A100 | 1969 | American Society for Testing and Materials | Standard Specification for Ferrosilicon | 40 CFR 60.261(s) |
| ASTM A106 | 2004 | American Society for Testing and Materials | Standard Specification for Seamless Carbon Steel Pipe for High-Temperature Service | 49 CFR 192.113 |
| ASTM A134 | 1996 | American Society for Testing and Materials | Standard Specification for Pipe, Steel, Electric Fusion (Arc)-Welded (Sizes NPS 16 and Over) | 46 CFR 56.60-1(b) |
| ASTM A179 | 1990 | American Society for Testing and Materials | Standard Specification for Seamless Cold-Drawn Low-Carbon Steel Heat-Exchanger and Condenser Tubes | 46 CFR 56.60-1(b) |
| ASTM A184 | 1979 | American Society for Testing and Materials | Standard Specification for Fabricated Deformed Steel Bar Mats for Concrete Reinforcement | 24 CFR 200, Subpart S |
| ASTM A185 | 1979 | American Society for Testing and Materials | Steel Wire Fabric for Concrete Reinforcement | 24 CFR 200, Subpart S |
| ASTM A203 | 1997 | American Society for Testing and Materials | Standard Specification for Pressure Vessel Plates, Alloy Steel, Nickel | 46 CFR 54.05-20(b) |
| ASTM A214 | 1996 | American Society for Testing and Materials | Standard Specification for Electric-Resistance-Welded Carbon Steel Heat-Exchanger and Condenser Tubes | 46 CFR 56.60-1(b) |
| ASTM A242 | 1979 | American Society for Testing and Materials | Standard Specification for High-Strength Low-Alloy Structural Steel | 24 CFR 200, Subpart S |
| ASTM A285 | 1978 | American Society for Testing and Materials | Standard Specification for Pressure Vessel Plates, Carbon Steel, Low- and Intermediate-Tensile Strength | 49 CFR 179.300-7(a) |
| ASTM A307 | 1978 | American Society for Testing and Materials | Carbon Steel Bolts and Studs, 60,000 PSI Tensile Strength | 46 CFR 56.25-20(b) |
| ASTM A325 | 1979 | American Society for Testing and Materials | High-Strength Bolts for Structural Steel Joists | 24 CFR 200, Subpart S |
| ASTM A333 | 1994 | American Society for Testing and Materials | Standard Specification for Seamless and Welded Steel Pipe for Low-Temperature Service | 46 CFR 56.50-105 |
| ASTM A369 | 1992 | American Society for Testing and Materials | Standard Specification for Carbon and Ferritic Alloy Steel Forged and Bored Pipe for High-Temperature Service | 46 CFR 56.60-1(b) |
| ASTM A370 | 1977 | American Society for Testing and Materials | Standard Test Method and Definitions for Mechanical Testing of Steel Products | 49 CFR 179.102-1(a)(1) |
| ASTM A381 | 1996 | American Society for | Standard Specification for Metal-Arc- | 49 CFR 192.113 |

| | | Testing and Materials | Welded Steel Pipe for Use with High-Pressure Transmission Systems | |
|---|---|---|---|---|
| ASTM A391 | 1965 | American Society for Testing and Materials | Standard Specification for Alloy Steel Chain | 29 CFR 1910.184(e)(4) |
| ASTM A416 | 1974 | American Society for Testing and Materials | Uncoated Seven-Wire Stress-Relieved Strand for Prestressed Concrete | 24 CFR 200, Subpart S |
| ASTM A441 | 1979 | American Society for Testing and Materials | High-Strength Low-Alloy Structural Manganese Vanadium Steel | 24 CFR 200, Subpart S |
| ASTM A449 | 1978 | American Society for Testing and Materials | Quenched and Tempered Steel Bolts and Studs | 24 CFR 200, Subpart S |
| ASTM A475 | 1978 | American Society for Testing and Materials | Standard Specification for Zinc-Coated Steel Wire Strand | 7 CFR 1755.370(b) |
| ASTM A483 | 1964 | American Society for Testing and Materials | Standard Specification for Silicomanganese | 40 CFR 60.261(o) |
| ASTM A490 | 1979 | American Society for Testing and Materials | Quenched and Tempered Alloy Steel Bolts for Structural Steel Joints | 24 CFR 200, Subpart S |
| ASTM A496 | 1978 | American Society for Testing and Materials | Deformed Steel Wire for Concrete Reinforcement | 24 CFR 200, Subpart S |
| ASTM A497 | 1979 | American Society for Testing and Materials | Welded Deformed Steel Wire, Fabric for Concrete Reinforcement | 24 CFR 200, Subpart S |
| ASTM A500 | 1978 | American Society for Testing and Materials | Cold-Formed Welded and Seamless Carbon Steel Structural Tubing in Rounds and Shapes | 24 CFR 200, Subpart S |
| ASTM A501 | 1976 | American Society for Testing and Materials | Hot-Formed Welded and Seamless Carbon Steel Structural Tubing | 24 CFR 200, Subpart S |
| ASTM A502 | 1976 | American Society for Testing and Materials | Steel Structural Rivets | 24 CFR 200, Subpart S |
| ASTM A514 | 1977 | American Society for Testing and Materials | High-Yield Strength, Quenched and Tempered Alloy Steel Plate, Suitable for Welding | 24 CFR 200, Subpart S |
| ASTM A516 | 1990 | American Society for Testing and Materials | Standard Specification for Pressure Vessel Plates, Carbon Steel, for Moderate and Lower-Temperature Service | 49 CFR 178.337-2(b)(2)(i) |
| ASTM A522 | 1995 | American Society for Testing and Materials | Forged or Rolled 8 and 9% Nickel Alloy Steel Flanges, Fittings, Valves, and Parts for Low-Temperature Service | 46 CFR 56.50-105 |
| ASTM A529 | 1972 | American Society for Testing and Materials | Structural Steel with 42,000PSI (290 Mpa) Minimum Yield Point (1/2 in (12.7 mm) Maximum Thickness | 24 CFR 200, Subpart S |
| ASTM A529 | 1975 | American Society for Testing and Materials | Structural Steel with 42,000PSI (290 Mpa) Minimum Yield Point (1/2 in (12.7 mm) Maximum Thickness | 24 CFR 200, Subpart S |
| ASTM A539 | 1990 | American Society for Testing and Materials | Standard Specification for Electric-Resistance-Welded Coiled Steel Tubing for Gas and Fuel Oil Lines | 24 CFR 3280.705(b)(4) |
| ASTM A570 | 1979 | American Society for | Hot-Rolled Carbon Steel Sheet and | 24 CFR 200, Subpart S |

| | | Testing and Materials | Strip, Structural Quality | |
|---|---|---|---|---|
| ASTM A572 | 1979 | American Society for Testing and Materials | High-Strength Low-Alloy Columbium-Vanadium Steels of Structural Quality | 24 CFR 200, Subpart S |
| ASTM A588 | 1979 | American Society for Testing and Materials | High-Strength Low-Alloy Structural Steel with 50 ksi Minimum Yield Point to 4 inches Thick | 24 CFR 200, Subpart S |
| ASTM A611 | 1972 | American Society for Testing and Materials | Steel, Cold-rolled Sheet, Carbon, Structural | 24 CFR 200, Subpart S |
| ASTM A615 | 1979 | American Society for Testing and Materials | Deformed and Plain Billet-Steel Bars for Concrete Reinforcement | 24 CFR 200, Subpart S |
| ASTM A616 | 1979 | American Society for Testing and Materials | Rail-Steel Deformed and Plain Bars for Concrete Reinforcement | 24 CFR 200, Subpart S |
| ASTM A617 | 1979 | American Society for Testing and Materials | Axle-Steel Deformed and Plain Bars for Concrete Reinforcement | 24 CFR 200, Subpart S |
| ASTM A618 | 1974 | American Society for Testing and Materials | Hot-Formed Welded and Seamless High-Strength Low-Alloy Structural Tubing | 24 CFR 200, Subpart S |
| ASTM A633 | 1979 | American Society for Testing and Materials | Standard Specification for Normalized High-Strength Low Alloy Structural Steel | 49 CFR 178.338-2(a) |
| ASTM A671 | 2004 | American Society for Testing and Materials | Standard Specification for Electric-Fusion-Welded Steel Pipe for Atmospheric and Lower Temperatures | 49 CFR 192.113 |
| ASTM A672 | 1996 | American Society for Testing and Materials | Standard Specification for Electric-Fusion-Welded Steel Pipe for High-Pressure Service at Moderate Temperatures | 49 CFR 192.113 |
| ASTM A691 | 1998 | American Society for Testing and Materials | Standard Specification for Carbon and Alloy Steel Pipe, Electric-Fusion-Welded for High-Pressure Service at High Temperature | 49 CFR 192.113 |
| ASTM B16 | 1985 | American Society for Testing and Materials | Standard Specification for Free-Cutting Brass Rod, Bar, and Shapes for Use in Screw Machines | 46 CFR 56.60-2 |
| ASTM B16 | 1992 | American Society for Testing and Materials | Standard Specification for Free-Cutting Brass Rod, Bar, and Shapes for Use in Screw Machines | 46 CFR 56.60-2 |
| ASTM B21 | 1983 | American Society for Testing and Materials | Standard Specification for Naval Brass Rod, Bar, and Shapes | 46 CFR 56.60-2 |
| ASTM B21 | 1996 | American Society for Testing and Materials | Standard Specification for Naval Brass Rod, Bar, and Shapes | 46 CFR 56.60-2 |
| ASTM B42 | 1996 | American Society for Testing and Materials | Standard Specification for Seamless Copper Pipe, Standard Sizes | 46 CFR 56.60-1(b) |
| ASTM B68 | 1995 | American Society for Testing and Materials | Standard Specification for Seamless Copper Tube, Bright Annealed | 46 CFR 56.60-1(b) |
| ASTM B75 | 1997 | American Society for Testing and Materials | Standard Specification for Seamless Copper Tube | 46 CFR 56.60-1(b) |
| ASTM B85 | 1984 | American Society for Testing and Materials | Standard Specification for Aluminum-Alloy Die Castings | 46 CFR 56.60-2 |

| ASTM B88 | 1996 | American Society for Testing and Materials | Standard Specification for Seamless Copper Water Tube | 46 CFR 56.60-1(b) |
|---|---|---|---|---|
| ASTM B96 | 1993 | American Society for Testing and Materials | Standard Specification for Copper-Silicon Alloy Plate, Sheet, Strip, and Bolled Bar for General Purposes and Pressure Vessels | 46 CFR 119.440 |
| ASTM B111 | 1995 | American Society for Testing and Materials | Copper and Copper-Alloy Seamless Condenser Tubes and Ferrule Stock | 46 CFR 56.60-1(b) |
| ASTM B117 | 1973 | American Society for Testing and Materials | Standard Practice for Operating Salt Spray (Fog) Apparatus | 49 CFR 571.209 S5.2(a) |
| ASTM B122 | 1995 | American Society for Testing and Materials | Standard Specification for Copper-Nickel-Tin Alloy, Copper-Nickel-Zinc Alloy (Nickel Silver), and Copper-Nickel Alloy Plate, Sheet, Strip and Rolled Bar | 46 CFR 119.440 |
| ASTM B124 | 1996 | American Society for Testing and Materials | Standard Specification for Copper and Copper-Alloy Forging Rod, Bar, and Shapes | 46 CFR 56.60-2 |
| ASTM B152 | 1997 | American Society for Testing and Materials | Standard Specification for Copper, Sheet, Strip, Plate, and Rolled Bar | 46 CFR 58.50-5(a)(4) |
| ASTM B193 | 1987 | American Society for Testing and Materials | Standard Test Method for Resistivity of Electrical Conductor Materials | 7 CFR 1755.390(i)(5)(v)(A) |
| ASTM B209 | 1996 | American Society for Testing and Materials | Standard Specification for Aluminum and Aluminum Alloy Sheet and Plate | 46 CFR 58.50-5, Table 58.50-5(a) |
| ASTM B224 | 1980 | American Society for Testing and Materials | Standard Classification of Coppers | 7 CFR 1755.890(i)(5)(vi) |
| ASTM B227 | 1970 | American Society for Testing and Materials | Hard-Drawn Copper-Clad Steel Wire | 24 CFR 200, Subpart S |
| ASTM B280 | 1997 | American Society for Testing and Materials | Seamless Copper Tube for Air Conditioning and Refrigeration Field Service | 46 CFR 56.60-1(b) |
| ASTM B283 | 1996 | American Society for Testing and Materials | Standard Specification for Copper and Copper-Alloy Die Forgings (Hot-Pressed) | 46 CFR 56.60-2 |
| ASTM B315 | 1993 | American Society for Testing and Materials | Seamless Copper Alloy Pipe Tube | 46 CFR 56.60-1(b) |
| ASTM B557 | 1984 | American Society for Testing and Materials | Tension Testing Wrought and Cast Aluminum and Magnesium-Alloy Products | 49 CFR 178.46(i)(3)(i) |
| ASTM B580 | 1979 | American Society for Testing and Materials | Standard Specification for Anodized Oxide Coatings on Aluminum | 49 CFR 171.7 |
| ASTM B694 | 1986 | American Society for Testing and Materials | Standard Specification for Copper, Copper Alloy, and Copper-Clad Stainless Steel Sheet and Strip for Electrical Cable Shielding | 7 CFR 1755.390(i)(5)(v) |
| ASTM B858 | 1995 | American Society for Testing and Materials | Standard Test Method for Determination of Susceptibility to Stress Corrosion Cracking in Copper Alloys Using Ammonia Vapor Test | 46 CFR 56.60-2 |

| ASTM C4 | 1962 | American Society for Testing and Materials | Standard Specification for Clay Drain Tile and Perforated Clay Drain Tile | 24 CFR 200, Subpart S |
|---------|------|-------------------------------------------|---------------------------------------------------------------------------|------------------------|
| ASTM C5 | 1979 | American Society for Testing and Materials | Standard Specification for Quicklime for Structural Purposes | 24 CFR 200, Subpart S |
| ASTM C32 | 1973 | American Society for Testing and Materials | Standard Specification for Sewer and Manhole Brick | 24 CFR 200, Subpart S |
| ASTM C34 | 1962 | American Society for Testing and Materials | Standard Specification for Structural Clay Load-Bearing Wall Tile | 24 CFR 200, Subpart S |
| ASTM C52 | 1954 | American Society for Testing and Materials | Specification for Gypsum Partition Tile or Block | 24 CFR 200, Subpart S |
| ASTM C56 | 1971 | American Society for Testing and Materials | Standard Specification for Structural Clay Nonloadbearing Tile | 24 CFR 200, Subpart S |
| ASTM C64 | 1972 | American Society for Testing and Materials | Specification for Fireclay Brick Refractories for Heavy Duty Stationary Boiler Service | 24 CFR 200, Subpart S |
| ASTM C90 | 1970 | American Society for Testing and Materials | Standard Specification for Hollow Load-Bearing Concrete Masonry Units | 49 CFR 223 Appendix A (b)(10)(ii) |
| ASTM C126 | 1971 | American Society for Testing and Materials | Standard Specification for Ceramic Glazed Structural Clay Facing Tile, Facing Brick, and Solid Masonry Units | 24 CFR 200, Subpart S |
| ASTM C139 | 1973 | American Society for Testing and Materials | Standard Specification for Concrete Masonry Units for Construction of Catch Basins and Manholes | 24 CFR 200, Subpart S |
| ASTM C150 | 1917 | American Society for Testing and Materials | Standard Specification for Portland Cement | 49 CFR 571.108 |
| ASTM C150 | 1999 | American Society for Testing and Materials | Standard Specification for Portland Cement | 30 CFR 250.198 |
| ASTM C150 | 2007 | American Society for Testing and Materials | Standard Specification for Portland Cement | 30 CFR 250.901(d)(9) |
| ASTM C177 | 1997 | American Society for Testing and Materials | Standard Test Method for Steady-State Heat Flux Measurements and Thermal Transmission Properties by Means of the Guarded Hot-Plate Apparatus | 10 CFR 431.102 |
| ASTM C177 (pdf) ASTM C177 (html) | 2004 | American Society for Testing and Materials | Standard Test Method for Steady-State Heat Flux Measurements and Thermal Transmission Properties by Means of the Guarded Hot-Plate Apparatus | 16 CFR 460.5(a) |
| ASTM C236 | 1989 | American Society for Testing and Materials | Standard Test Method for Steady-State Thermal Performance of Building Assemblies by Means of a Guarded Hot Box | 10 CFR 434.402.1.2.1(a) |
| ASTM C330 | 1999 | American Society for Testing and Materials | Standard Specification for Lightweight Aggregates for Structural Concrete | 30 CFR 250.901(a)(18) |
| ASTM C476 | 1971 | American Society for Testing and Materials | Standard Specification for Grout for Masonry | 24 CFR 200, Subpart S |

| ASTM C509 | 1984 | American Society for Testing and Materials | Standard Specification for Elastomeric Cellular Preformed Gasket and Sealing Material | 24 CFR 200, Subpart S |
| --- | --- | --- | --- | --- |
| ASTM C516 | 1980 | American Society for Testing and Materials | Standard Specification for Vermiculite Loose Fill Thermal Insulation | 24 CFR 200, Subpart S |
| ASTM C518 | 1991 | American Society for Testing and Materials | Standard Test Method for Steady-State Heat Flux Measurements and Thermal Transmission Properties by Means of the Heat Flow Meter Apparatus | 46 CFR 160.174-17(f) |
| ASTM C518 | 2004 | American Society for Testing and Materials | Standard Test Method for Steady-State Heat Flux Measurements and Thermal Transmission Properties by Means of the Heat Flow Meter Apparatus | 16 CFR 460.5(a) |
| ASTM C549 | 1981 | American Society for Testing and Materials | Standard Specification for Perlite Loose Fill Insulation | 10 CFR 440 Appendix A |
| ASTM C564 | 1970 | American Society for Testing and Materials | Standard Specification for Rubber Gaskets for Cast Iron Soil Pipe and Fittings | 24 CFR 3280.611(d)(5)(iv) |
| ASTM C720 | 1989 | American Society for Testing and Materials | Spray Applied Fibrous Insulation for Elevated Temperature | 10 CFR 440 Appendix A |
| ASTM C1045 | 2001 | American Society for Testing and Materials | Standard Practice for Calculating Thermal Transmission Properties from Steady-State Heat Flux Measurements | 16 CFR 460.5(a) |
| ASTM C1114 | 2000 | American Society for Testing and Materials | Standard Test Method for Steady-State Thermal Transmission Properties by Means of the Thin-Heater Apparatus | 16 CFR 460.5(a) |
| ASTM C1149 | 2002 | American Society for Testing and Materials | Standard Specification for Self-Supported Spray Applied Cellulosic Thermal Insulation | 16 CFR 460.5(a)(4) |
| ASTM C1224 | 2003 | American Society for Testing and Materials | Standard Specification for Reflective Insulation for Building Applications | 16 CFR 460.5(c) |
| ASTM C1371 | 2004 | American Society for Testing and Materials | Standard Test Method for Determination of Emittance of Materials Near Room Temperature Using Portable Emissometers | 16 CFR 460.5(b) |
| ASTM C1374 | 2003 | American Society for Testing and Materials | Standard Test Method for Determination of Installed Thickness of Pneumatically Applied Loose-Fill Building Insulation | 16 CFR 460.5(a)(5) |
| ASTM D56 | 1970 | American Society for Testing and Materials | Standard Test Method for Flash Point by Tag Closed Cup Tester | 29 CFR 1910.106(a)(14)(i) |
| ASTM D86 | 2001 | American Society for Testing and Materials | Standard Test Method for Distillation of Petroleum Products at Atmospheric Pressure | 40 CFR 94.108(a)(1) Table B-5 |
| ASTM D86 | 2004 | American Society for Testing and Materials | Standard Test Method for Distillation of Petroleum Products at Atmospheric Pressure | 40 CFR 1065.710 |

| ASTM D86 (pdf)<br>ASTM D86 (html) | 2007 | American Society for Testing and Materials | Standard Test Method for Distillation of Petroleum Products at Atmospheric Pressure | 40 CFR 1065.710 |
|---|---|---|---|---|
| ASTM D88 | 1956 | American Society for Testing and Materials | Standard Test Method for Saybolt Viscosity | 29 CFR 1910.106(a)(37) |
| ASTM D93 | 2002 | American Society for Testing and Materials | Standard Test Method for Flash Point by Pensky-Martens Closed Cup Tester | 40 CFR 94.108(a)(1) Table B-5 |
| ASTM D129 | 1964 | American Society for Testing and Materials | Standard Test Method for Sulfur in Petroleum Products (General Bomb Method) | 40 CFR 60.106(j)(2) |
| ASTM D129 | 1995 | American Society for Testing and Materials | Standard Test Method for Sulfur in Petroleum Products (General Bomb Method) | 40 CFR 60.106(j)(2) |
| ASTM D129 (pdf)<br>ASTM D129 (html) | 2000 | American Society for Testing and Materials | Standard Test Method for Sulfur in Petroleum Products (General Bomb Method) | 40 CFR 60.335(b)(10)(i) |
| ASTM D257 | 1991 | American Society for Testing and Materials | Standard Test Method for DC Resistance of Conductance of Insulating Materials | 7 CFR 1755.860(e)(5) |
| ASTM D287 | 1992 | American Society for Testing and Materials | Standard Test Method for API Gravity of Crude Petroleum and Petroleum Products (Hydrometer Method) | 40 CFR 94.108(a)(1) Table B-5 |
| ASTM D323 | 1958 | American Society for Testing and Materials | Standard Test Method for Vapor Pressure of Petroleum Products (Reid Method) | 29 CFR 1910.106(a)(30) |
| ASTM D388 | 1998 | American Society for Testing and Materials | Standard Classification of Coals by Rank | 40 CFR 60.251(b) |
| ASTM D396 | 1998 | American Society for Testing and Materials | Standard Specification for Fuel Oils | 40 CFR 60.41b |
| ASTM D396 (pdf)<br>ASTM D396 (html) | 2002 | American Society for Testing and Materials | Standard Specification for Fuel Oils | 40 CFR 63.7575 |
| ASTM D412 | 1968 | American Society for Testing and Materials | Standard Test Methods for Vulcanized Rubber and Thermoplastic Elastomers-Tension | 21 CFR 801.410(d)(2) |
| ASTM D413 | 1982 | American Society for Testing and Materials | Standard Test Method for Rubber Property--Adhesion to Flexible Substrate | 46 CFR 160.055-3 Table 160-055-3(j) |
| ASTM D445 | 1965 | American Society for Testing and Materials | Standard Test Method for Kinematic Viscosity of Transparent and Opaque Liquids | 29 CFR 1910.106(a)(37) |
| ASTM D445 | 1972 | American Society for Testing and Materials | Standard Test Method for Kinematic Viscosity of Transparent and Opaque Liquids | 21 CFR 177.1430(c)(2) |
| ASTM D512 | 1989 | American Society for Testing and Materials | Standard Test Methods for Chloride Ion In Water | 40 CFR 136.3(a) |
| ASTM D611 | 1982 | American Society for Testing and Materials | Standard Test Method for Aniline Point and Mixed Aniline Point of Petroleum Products and Hydrocarbon Solvents | 21 CFR 177.1520(b) |

| ASTM D660 | 1944 | American Society for Testing and Materials | Evaluating Degree of Resistant to Checking of Exterior Paints | 24 CFR 200, Subpart S |
| ASTM D665 | 1998 | American Society for Testing and Materials | Standard Test Method for Rust-Preventing Characteristics of Inhibited Mineral Oil in the Presence of Water | 46 CFR 61.20-17(a) |
| ASTM D750 | 1968 | American Society for Testing and Materials | Recommended Practice for Rubber Deterioration in Carbon-Arc or Weathering Apparatus | 24 CFR 200, Subpart S |
| ASTM D756 | 1956 | American Society for Testing and Materials | Standard Practice for Determination of Weight and Shape Changes of Plastics Under Accelerated Service Conditions | 49 CFR 571.209 S5.2(b) |
| ASTM D781 | 1968 | American Society for Testing and Materials | Standard Test Methods for Puncture and Stiffness of Paperboard and Corrugated and Solid Fiberboard | 24 CFR 3280.304(b)(1) |
| ASTM D785 | 1965 | American Society for Testing and Materials | Standard Method of Test for Rockwell Hardness of Plastics and Electrical Insulating Materials | 16 CFR 1201.4 |
| ASTM D814 | 1995 | American Society for Testing and Materials | Standard Test Method for Rubber Property--Vapor Transmission of Volatile Liquids | 40 CFR 1051.245(e)(1) |
| ASTM D975 | 1998 | American Society for Testing and Materials | Standard Specification for Diesel Fuel Oils | 46 CFR 160.176-13(r) |
| ASTM D975 (pdf) ASTM D975 (html) | 2007 | American Society for Testing and Materials | Standard Specification for Diesel Fuel Oils | 40 CFR 1065.701 |
| ASTM D976 | 1991 | American Society for Testing and Materials | Standard Test Method for Calculated Cetane Index of Distillate Fuels | 40 CFR 92.113 |
| ASTM D1056 | 1973 | American Society for Testing and Materials | Standard Specification for Flexible Cellular Materials Sponge or Expanded Rubber | 49 CFR 571.213 |
| ASTM D1060 | 1965 | American Society for Testing and Materials | Standard Method of Core Sampling of Raw Wool Packages for Determination of Percentage of Clean Wool Fiber Present | 7 CFR 31.204 |
| ASTM D1067 | 2002 | American Society for Testing and Materials | Standard Test Method for Acidity or Alkalinity of Water | 40 CFR 141.21 |
| ASTM D1068 | 2003 | American Society for Testing and Materials | Standard Test Methods for Iron in Water | 40 CFR 136.3(a) |
| ASTM D1072 | 1990 | American Society for Testing and Materials | Standard Test Method for Total Sulfur in Fuel Gases | 40 CFR 60.335(b)(10)(ii) |
| ASTM D1081 | 1960 | American Society for Testing and Materials | Test for Evaluating Rubber Property--Sealing Pressure | 24 CFR 200, Subpart S |
| ASTM D1126 (pdf) ASTM D1126 (html) ASTM D1126 (svg) | 2002 | American Society for Testing and Materials | Standard Test Method for Hardness in Water | 40 CFR 136 |
| ASTM D1193 | 1977 | American Society for Testing and Materials | Standard Specification for Reagent Water | 40 CFR 60, Appendix A-3 |

| ASTM D1200 | 1970 | American Society for Testing and Materials | Viscosity of Paints, Varnishes and Lacquers by Ford Viscosity Cup | 49 CFR 171.8 |
|---|---|---|---|---|
| ASTM D1217 | 1993 | American Society for Testing and Materials | Standard Test Method for Density and Relative Density (Specific Gravity) of Liquids by Bingham Pycnometer | 40 CFR 75, Appendix D |
| ASTM D1246 | 1995 | American Society for Testing and Materials | Bromide - Titrimetric | 40 CFR 136.3(a) Table IB |
| ASTM D1253 | 1986 | American Society for Testing and Materials | Standard Test Method for Residual Chlorine in Water | 21 CFR 165.110(b)(4)(iii)(I)(5)(i) |
| ASTM D1253 (pdf) ASTM D1253 (html) | 2003 | American Society for Testing and Materials | Standard Test Method for Residual Chlorine in Water | 40 CFR 136.3(a) Table IB |
| ASTM D1266 | 1998 | American Society for Testing and Materials | Standard Test Method for Sulfur in Petroleum Products (Lamp Method) | 40 CFR 60.106(j)(2) |
| ASTM D1298 | 1999 | American Society for Testing and Materials | Standard Practice for Density, Relative Density (Specific Gravity), or API Gravity of Crude Petroleum and Liquid Petroleum Products | 40 CFR 75, Appendix D, Section 2.2.6 |
| ASTM D1303 | 1955 | American Society for Testing and Materials | Standard Method of Test for Total Chlorine in Vinyl Chloride Polymers and Copolymers | 21 CFR 177.1610(a) |
| ASTM D1319 (pdf) ASTM D1319 (html) | 2003 | American Society for Testing and Materials | Standard Test Method for Hydrocarbon Types in Liquid Petroleum Products by Fluorescent Indicator Adsorption | 40 CFR 80.2(z) |
| ASTM D1331 | 1989 | American Society for Testing and Materials | Standard Test Methods for Surface and Interfacial Tension of Solutions of Surface Active Agents | 40 CFR 63, Appendix A |
| ASTM D1335 | 1967 | American Society for Testing and Materials | Standard Test Method for Tuft Bind of Pile Floor Coverings | 24 CFR 200.945(a)(1)(ii) |
| ASTM D1412 | 1993 | American Society for Testing and Materials | Standard Test Method for Equilibrium Moisture of Coal at 96 to 97 Percent Relative Humidity and 30 Degrees Celsius | 30 CFR 870.19 |
| ASTM D1415 | 1968 | American Society for Testing and Materials | Tentative Method of Test for International Hardness of Vulcanized Natural and Synthetic Rubbers | 49 CFR 571.116 S7.4.1(b) |
| ASTM D1415 | 1988 | American Society for Testing and Materials | Standard Practice for Rubber and Rubber Latices--Nomenclature | 21 CFR 177.2600(c)(4)(i) |
| ASTM D1475 | 1960 | American Society for Testing and Materials | Standard Test Method for Density of Paint, Varnish, Lacquer, and Related Products | 40 CFR 60, Appendix A-7 |
| ASTM D1480 | 1993 | American Society for Testing and Materials | Standard Test Method for Density and Relative Density (Specific Gravity) of Viscous Materials by Bingham Pycnometer | 40 CFR 75, Appendix D |
| ASTM D1481 | 1993 | American Society for Testing and Materials | Standard Test Method for Density and Relative Density (Specific Gravity) of Viscous Materials by | 40 CFR 136.3(a) Table IC |

| | | | Lipkin Bicapillary Pycnometer | |
|---|---|---|---|---|
| ASTM D1505 | 1968 | American Society for Testing and Materials | Standard Test Method for Density of Plastics by the Density-Gradient Technique | 21 CFR 177.2480 |
| ASTM D1518 | 1985 | American Society for Testing and Materials | Standard Test Method for Thermal Transmittance of Textile Materials | 46 CFR 160.174-17(f) |
| ASTM D1535 | 1968 | American Society for Testing and Materials | Specifying Color by the Munsell System | 16 CFR 1402 |
| ASTM D1535 | 1968 | American Society for Testing and Materials | Specifying Color by the Munsell System | 16 CFR 1402.4(a)(1)(i)(E)(2) |
| ASTM D1535 | 1989 | American Society for Testing and Materials | Specifying Color by the Munsell System | 7 CFR 1755.860(c)(3) |
| ASTM D1552 | 1995 | American Society for Testing and Materials | Standard Test Method for Sulfur in Petroleum Products (High-Temperature Method) | 40 CFR 60, Appendix A-7 |
| ASTM D1564 | 1971 | American Society for Testing and Materials | Standard Method of Testing Flexible Cellular Materials--Slab Urethane Foam | 40 CFR 136.3(a) |
| ASTM D1687 | 1992 | American Society for Testing and Materials | Standard Test Methods for Chromium in Water | 40 CFR 444.12(b)(1) |
| ASTM D1688 | 1995 | American Society for Testing and Materials | Standard Test Method for Copper in Water | 40 CFR 141.23(k)(1) |
| ASTM D1692 | 1968 | American Society for Testing and Materials | Test for Flammability of Plastic Sheeting and Cellular Plastics | 29 CFR 1910.103(c)(1)(v)(D) |
| ASTM D1785 | 1986 | American Society for Testing and Materials | Standard Specification for Poly (Vinyl Chloride)(PVC) Plastic Pipe, Schedules 40, 80, and 120 | 46 CFR 56.01-2 |
| ASTM D1835 | 1997 | American Society for Testing and Materials | Standard Specification for Liquefied Petroleum (LP) Gases | 49 CFR 180.209(e) |
| ASTM D1890 | 1996 | American Society for Testing and Materials | Standard Test Method for Beta Particle Radioactivity of Water | 40 CFR 136.3(a) |
| ASTM D1943 | 1996 | American Society for Testing and Materials | Standard Test Method for Alpha Particle Radioactivity of Water | 40 CFR 136.3(a) |
| ASTM D1945 | 1996 | American Society for Testing and Materials | Standard Test Method for Analysis of Natural Gas By Gas Chromatography | 40 CFR 60.45(f)(5)(i) |
| ASTM D1946 | 1990 | American Society for Testing and Materials | Standard Method for Analysis of Reformed Gas by Gas Chromatography | 40 CFR 60.614(e)(4) |
| ASTM D1962 | 1967 | American Society for Testing and Materials | Standard Test Method for Saponification Value of Drying Oils, Fatty Acids, and Polymerized Fatty Acids | 21 CFR 178.2010(b) |
| ASTM D2013 | 1986 | American Society for Testing and Materials | Standard Method of Preparing Coal Samples for Analysis | 40 CFR 60, Appendix A-7 |
| ASTM D2015 | 1996 | American Society for Testing and Materials | Standard Test Method for Gross Calorific Value of Solid Fuel by the Adiabatic Bomb Calorimeter | 40 CFR 60.45(f)(5)(ii) |
| ASTM D2036 | 1998 | American Society for Testing and Materials | Standard Test Method for Cyanides in Water | 40 CFR 136.3(a) Table IB |

| ASTM D2099 | 2000 | American Society for Testing and Materials | Standard Test Method for Dynamic Water Resistance of Shoe Upper Maeser Water Penetration Tester | 40 CFR 63.5350(b) |
|---|---|---|---|---|
| ASTM D2156 | 1965 | American Society for Testing and Materials | Method of Tests for Smoke Density in Flue Gases from Distillate Fuels | 10 CFR 430 Subpart B |
| ASTM D2161 | 1966 | American Society for Testing and Materials | Standard Method of Conversion of Kinematic Viscosity to Saybolt Universal Viscosity or to Saybolt Furol Viscosity | 29 CFR 1910.106(a)(37) |
| ASTM D2163 | 1991 | American Society for Testing and Materials | Standard Test Method for Analysis of Liquefied Petroleum (LP) Gases and Propane Concentrates by Gas Chromatography | 40 CFR 86.1313-94(f)(3) |
| ASTM D2216 | 1998 | American Society for Testing and Materials | Standard Test Method for Laboratory Determination of Water (Moisture) Content of Soil and Rock by Mass | 40 CFR 258.41(a)(4)(iii) (A) |
| ASTM D2234 | 1998 | American Society for Testing and Materials | Standard Practice for Collection of a Gross Sample of Coal | 40 CFR 60, Appendix A-7 |
| ASTM D2236 | 1970 | American Society for Testing and Materials | Standard Method of Test for Dynamic Mechanical Properties of Plastics by Means of a Torsional Pendulum | 21 CFR 177.1810(c)(2) (i) |
| ASTM D2247 | 1968 | American Society for Testing and Materials | Standard Practice for Testing Water Resistance of Coatings in 100 Percent Relative Humidity | 24 CFR 200, Subpart S |
| ASTM D2267 | 1968 | American Society for Testing and Materials | Standard Test Method for Aromatics in Light Naphthas and Aviation Gasoline by Gas Chromatography | 40 CFR 61.67(h)(1) |
| ASTM D2460 | 1997 | American Society for Testing and Materials | Standard Test Method for Alpha-Particle-Emitting Isotopes of Radium in Water | 40 CFR 136.3(a) Table IE |
| ASTM D2502 | 1992 | American Society for Testing and Materials | Standard Test Method for Estimation of Molecular Weight (Relative Molecular Mass) of Petroleum Oils from Viscosity Measurements | 40 CFR 75, Appendix G |
| ASTM D2503 | 1992 | American Society for Testing and Materials | Standard Method of Test for Molecular Weight of Hydrocarbons by Thermoelectric Measurement of Vapor Pressure | 40 CFR 98.254 |
| ASTM D2505 | 1988 | American Society for Testing and Materials | Standard Test Method for Ethylene, Other Hydrocarbons, and Carbon Dioxide in High-Purity Ethylene by Gas Chromatography | 40 CFR 98.7 |
| ASTM D2515 | 1966 | American Society for Testing and Materials | Standard Specification for Kinematic Glass Viscosity | 49 CFR 571.116 S6.3.2(a) |
| ASTM D2565 | 1970 | American Society for Testing and Materials | Standard Practice for Operating Xenon Arc-Type Light-Exposure Apparatus With or Without Water for Exposure of Plastics | 16 CFR 1201.4(b)(3)(ii) |
| ASTM D2597 | 1994 | American Society for Testing and Materials | Standard Test Method for Analysis of Demethanized Hydrocarbon Liquid Mixtures Containing Nitrogen | 40 CFR 60.335(b)(9)(i) |

| | | | and Carbon Dioxide by Gas Chromatography | |
|---|---|---|---|---|
| ASTM D2622 | 1998 | American Society for Testing and Materials | Standard Test Method for Sulfur in Petroleum Products by Wavelength Dispersive X-ray Fluorescence Spectrometry | 40 CFR 80.46(a)(1) |
| ASTM D2724 | 1987 | American Society for Testing and Materials | Standard Test Method for Bonded, Fused, and Laminated Apparel Fabrics | 49 CFR 238 Appendix B(a)(1)(ii) |
| ASTM D2777 | 1998 | American Society for Testing and Materials | Standard Practice for Determination of Precision and Bias of Applicable Test Methods of Committee D-19 on Water | 46 CFR 162.050-15(f)(1) |
| ASTM D2857 | 1970 | American Society for Testing and Materials | Standard Method of Test for Dilute Solution Viscosity of Polymers | 21 CFR 177.2210(b)(3) |
| ASTM D2879 | 1997 | American Society for Testing and Materials | Standard Test Method for Vapor Pressure--Temperature Relationship and Initial Decomposition Temperature of Liquids by Isoteniscope | 40 CFR 60.116b(e)(3)(ii) |
| ASTM D2908 | 1974 | American Society for Testing and Materials | Standard Practice for Measuring Volatile Organic Matter in Water by Aqueous-Injection Gas Chromatography | 40 CFR 60.564(j)(1) |
| ASTM D2908 | 1991 | American Society for Testing and Materials | Standard Practice for Measuring Volatile Organic Matter in Water by Aqueous-Injection Gas Chromatography | 40 CFR 60.564(j)(1) |
| ASTM D2986 | 1995 | American Society for Testing and Materials | Standard Method for Evaluation of Air, Assay Media by the Monodisperse DOP (Dioctyl Phthalate) Smoke Test | 40 CFR 86.1310-2007(b)(7)(i)(A) |
| ASTM D3120 | 1996 | American Society for Testing and Materials | Standard Test Method for Trace Quantities of Sulfur in Light Liquid Petroleum Hydrocarbons by Oxidative Microcoulometry | 40 CFR 80.46(a)(3)(iii) |
| ASTM D3168 | 1973 | American Society for Testing and Materials | Standard Recommended Practices for Qualitative Identification of Polymers in Emulsion Paints | 21 CFR 200.946 |
| ASTM D3173 | 1987 | American Society for Testing and Materials | Standard Test Method for Moisture in the Analysis Sample of Coal and Coke | 40 CFR 60, Appendix A-7 |
| ASTM D3176 | 1989 | American Society for Testing and Materials | Standard Practice for Ultimate Analysis of Coal and Coke | 40 CFR 76.15(a)(1) |
| ASTM D3177 | 1989 | American Society for Testing and Materials | Standard Test Method for Total Sulfur in the Analysis Sample of Coal and Coke | 40 CFR 60, Appendix A-7 |
| ASTM D3178 | 1989 | American Society for Testing and Materials | Standard Test Method for Carbon and Hydrogen in the Analysis Sample of Coal and Coke | 40 CFR 60.45(f)(5)(i) |
| ASTM D3236 | 1988 | American Society for Testing and Materials | Standard Test Method for Apparent Viscosity of Hot Metal Adhesives and Coating Materials | 21 CFR 177.1520(b) |

| ASTM D3246 | 1996 | American Society for Testing and Materials | Standard Test Method for Sulfur in Petroleum Gas by Oxidative Microcoulometry | 40 CFR 60.335(b)(10)(ii) |
|---|---|---|---|---|
| ASTM D3286 | 1996 | American Society for Testing and Materials | Standard Test Method for Gross Calorific Value of Coal and Coke by the Isoperibol Bomb Calorimeter | 40 CFR 60.17 |
| ASTM D3371 | 1995 | American Society for Testing and Materials | Standard Test Method for Nitriles in Aqueous Solution by Gas-Liquid Chromatography | 40 CFR 136.3(a) Table IF |
| ASTM D3454 | 1997 | American Society for Testing and Materials | Standard Test Method for Radium-226 in Water | 40 CFR 136.3(a) Table IE |
| ASTM D3559 (pdf) ASTM D3559 (html) | 2003 | American Society for Testing and Materials | Standard Test Methods for Lead in Water | 40 CFR 136 |
| ASTM D3588 | 1998 | American Society for Testing and Materials | Standard Practice for Calculating Heat Value, Compressibility Factor, and Relative Density (Specific Gravity) of Gaseous Fuels | 40 CFR 75, Appendix F |
| ASTM D3695 | 1995 | American Society for Testing and Materials | Standard Test Method for Volatile Alcohols in Water by Direct Aqueous-Injection Gas Chromatography | 40 CFR 136.3(a) Table IF |
| ASTM D3697 | 1992 | American Society for Testing and Materials | Standard Test Method for Antimony in Water | 21 CFR 165.110(b)(4)(iii)(E)(1)(iv) |
| ASTM D4057 | 1995 | American Society for Testing and Materials | Standard Practice for Manual Sampling of Petroleum and Petroleum Products | 40 CFR 80.8(a) |
| ASTM D4084 | 1994 | American Society for Testing and Materials | Standard Test Method for Analysis of Hydrogen Sulfide in Gaseous Fuels (Lead Acetate Reaction Rate Method) | 40 CFR 60.334(h)(1) |
| ASTM D4177 | 1995 | American Society for Testing and Materials | Standard Practice for Automatic Sampling of Petroleum and Petroleum Products | 40 CFR 80.330(b)(2) |
| ASTM D4239 | 1997 | American Society for Testing and Materials | Standard Test Methods for Sulfur in the Analysis Sample of Coal and Coke Using High Temperature Tube Furnace Combustion Methods | 40 CFR 60, Appendix A-7 |
| ASTM D4268 | 1993 | American Society for Testing and Materials | Standard Test Method for Testing Fiber Ropes | 33 CFR 164.74(a)(3)(i) |
| ASTM D4294 | 1998 | American Society for Testing and Materials | Standard Test Method for Sulfur in Petroleum and Petroleum Products by Energy-Dispersive X-Ray Fluorescence Spectrometry | 40 CFR 75, Appendix A, Section 2.1.1.1(c) |
| ASTM D4329 | 1999 | American Society for Testing and Materials | Standard Practice for Fluorescent UV Exposure of Plastics | 49 CFR 571.106 |
| ASTM D4420 | 1994 | American Society for Testing and Materials | Standard Test Method for Determination of Aromatics in Finished Gasoline by Gas Chromatography | 40 CFR 61.67(h)(1) |
| ASTM D4442 | 1992 | American Society for | Standard Test Method for Direct | 40 CFR 60, Appendix A- |

| | | Testing and Materials | Moisture Content Measurement of Wood and Wood-Based Materials | 8 |
|---|---|---|---|---|
| ASTM D4444 | 1992 | American Society for Testing and Materials | Standard Test Method for Use and Calibration of Hand-Held Moisture Meters | 40 CFR 60, Appendix A-8 |
| ASTM D4763 | 1988 | American Society for Testing and Materials | Standard Practice for Identification of Chemicals in Water by Fluorescence Spectroscopy | 40 CFR 136.3(a) Table IF |
| ASTM D4809 | 1995 | American Society for Testing and Materials | Standard Test Method for Heat of Combustion of Liquid Hydrocarbon Fuels by Bomb Calorimeter (Precision Method) | 40 CFR 61.245(e)(3) |
| ASTM D4891 (pdf) ASTM D4891 (html) | 1989 | American Society for Testing and Materials | Standard Test Method for Heating Value of Gases in Natural Gas Range by Stolchiometric Combustion | 40 CFR 75, Appendix F, Section 5.5.2 |
| ASTM D4986 | 1998 | American Society for Testing and Materials | Standard Test Method for Horizontal Burning Characteristics of Cellular Polymeric Materials | 46 CFR 32.57-10(d)(7–a) |
| ASTM D5257 | 1997 | American Society for Testing and Materials | Standard Test Method for Dissolved Hexavalent Chromium in Water by Ion Chromatography | 40 CFR 136.3(a) |
| ASTM D5373 | 1993 | American Society for Testing and Materials | Standard Methods for Instrumental Determination of Carbon, Hydrogen, and Nitrogen in Laboratory Samples of Coal and Coke | 40 CFR 75, Appendix G |
| ASTM D5392 | 1993 | American Society for Testing and Materials | Standard Test Method for Isolation and Enumeration of Escherichia Coli in Water by the Two-Step Membrane Filter Procedure | 40 CFR 136.3(a) Table IH |
| ASTM D5489 | 1996 | American Society for Testing and Materials | Standard Guide for Care Symbols for Care Instructions on Textile Products | 16 CFR 423.8(g) |
| ASTM D5673 | 1996 | American Society for Testing and Materials | Standard Test Method for Elements in Water by Inductively Coupled Plasma | 40 CFR 444.12(b)(1) |
| ASTM D5865 | 1998 | American Society for Testing and Materials | Standard Test Method for Gross Calorific Value of Coal and Coke | 40 CFR 60.45(f)(5)(ii) |
| ASTM D6216 | 1998 | American Society for Testing and Materials | Standard Practice for Opacity Monitor Manufacturers to Certify Conformance with Design and Performance Specifications | 40 CFR 60, Appendix B |
| ASTM D6228 | 1998 | American Society for Testing and Materials | Standard Test Method for Determination of Sulfur Compounds in Natural Gas and Gaseous Fuels by Gas Chromatography and Flame Photometric Detection | 40 CFR 60.334(h)(1) |
| ASTM D6420 | 1999 | American Society for Testing and Materials | Standard Test Method for Determination of Gaseous Organic Compounds by Direct Interface Gas Chromatography-Mass Spectrometry | 40 CFR 63.5850(e)(4) |
| ASTM D6503 | 1999 | American Society for | Standard Test Method for | 40 CFR 136.3(a) Table |

| | | Testing and Materials | Enterococci in Water Using Enterolert | IH |
|---|---|---|---|---|
| ASTM D6522 | 2000 | American Society for Testing and Materials | Standard Test Method for Determination of Nitrogen Oxides, Carbon Monoxide, and Oxygen Concentrations in Emissions from Natural Gas-Fired Reciprocating Engines, Combustion Turbines, Boilers, and Process Heaters Using Portable Analyzers | 40 CFR 60.335(a)(2) |
| ASTM E11 | 1970 | American Society for Testing and Materials | Standard Specification for Wire Cloth and Sieves for Testing Purposes | 33 CFR 159.4 |
| ASTM E11 | 1995 | American Society for Testing and Materials | Standard Specification for Wire Cloth and Sieves for Testing Purposes | 33 CFR 159.125 |
| ASTM E23 | 1982 | American Society for Testing and Materials | Standard Test Methods for Notched Bar Impact Testing of Metallic Materials | 46 CFR 56.50-105(a)(1)(ii) |
| ASTM E23 | 1993 | American Society for Testing and Materials | Standard Test Method for Notched Bar Impact Testing of Metallic Materials | 46 CFR 56.50-105(a)(1)(ii) |
| ASTM E29 | 1967 | American Society for Testing and Materials | Standard Practice for Using Significant Digits in Test Data to Determine Conformance with Specifications | 40 CFR 86.609-98 |
| ASTM E29 | 1990 | American Society for Testing and Materials | Standard Practice for Using Significant Digits in Test Data to Determine Conformance with Specifications | 40 CFR 86.000-28(a)(4)(iii) |
| ASTM E29 (pdf) ASTM E29 (html) | 2002 | American Society for Testing and Materials | Standard Specification for Diesel Fuel Oils | 40 CFR 1065.701 Table 1 |
| ASTM E72 | 1980 | American Society for Testing and Materials | Standard Test Methods of Conducting Strength Tests of Panels for Building Construction | 30 CFR 75.333(e)(1)(i) |
| ASTM E84 (pdf) ASTM E84 (html) | 2001 | American Society for Testing and Materials | Standard Test Method for Surface Burning Characteristics of Building Materials | 24 CFR 3280.203(a) |
| ASTM E96 | 1995 | American Society for Testing and Materials | Standard Test Methods for Water Vapor Transmission of Materials | 24 CFR 3280.504(a) |
| ASTM E119 (pdf) ASTM E119 (html) | 2000 | American Society for Testing and Materials | Standard Test Methods for Fire Tests of Building Construction and Materials | 49 CFR 238 Appendix B(a)(1)(v) |
| ASTM E145 | 1994 | American Society for Testing and Materials | Standard Specification for Gravity-Convection and Forced- Ventilation Ovens | 40 CFR 63.14 |
| ASTM E145 | 1994 | American Society for Testing and Materials | Standard Specification for Gravity-Convection and Forced- Ventilation Ovens | 40 CFR 63.4581 |
| ASTM E154 | 1968 | American Society for Testing and Materials | Materials for Use as Vapor Barriers Under Concrete Slabs and as Ground Cover in Crawl Spaces | 24 CFR 200, Subpart S |

| | | | | |
|---|---|---|---|---|
| ASTM E163 | 1963 | American Society for Testing and Materials | Methods for Fire Tests of Window Assemblies | 24 CFR 200, Subpart S |
| ASTM E168 | 1967 | American Society for Testing and Materials | Standard Practices for General Techniques of Infrared Quantitative Analysis | 40 CFR 60.485(d)(1) |
| ASTM E168 | 1988 | American Society for Testing and Materials | Standard Practices for General Techniques of Infrared Quantitative Analysis | 40 CFR 264.1063(d)(1) |
| ASTM E169 | 1987 | American Society for Testing and Materials | Standard Practices for General Techniques of Ultraviolet-Visible Quantitative Analysis | 40 CFR 264.1063(d)(1) |
| ASTM E185 | 1982 | American Society for Testing and Materials | Standard Practice for Conducting Surveillance Tests for Light-Water Cooled Nuclear Power Reactor Vessels | 10 CFR 50 App. H, I |
| ASTM E258 | 1967 | American Society for Testing and Materials | Standard Test Method for Total Nitrogen Inorganic Material by Modified Kjeldahl Method | 40 CFR 761.71(b)(2)(vi) |
| ASTM E260 | 1996 | American Society for Testing and Materials | Standard Practice for Packed Column Gas Chromatography | 40 CFR 60.485(d)(1) |
| ASTM E283 | 1991 | American Society for Testing and Materials | Standard Test Method for Determining the Rate of Air Leakage Through Exterior Windows, Curtain Walls, and Doors | 10 CFR 434.402.2 |
| ASTM E298 | 1968 | American Society for Testing and Materials | Standard Methods for Assay of Organic Peroxides | 49 CFR 571.116 S6.11.3(a) |
| ASTM E408 | 1971 | American Society for Testing and Materials | Standard Test Methods for Total Normal Emittance of Surfaces Using Inspection-Meter Techniques | 16 CFR 460.5(b) |
| ASTM E424 | 1971 | American Society for Testing and Materials | Test for Solar Energy Transmittance and Reflectance (Terrestrial) of Sheet Materials | 24 CFR 200, Subpart S |
| ASTM E606 | 1980 | American Society for Testing and Materials | Standard Recommended Practice for Constant-Amplitude Low-Cycle Fatigue Testing | 24 CFR 200.946 |
| ASTM E681 | 1985 | American Society for Testing and Materials | Standard Test Method for Concentration Limits of Flammability of Chemicals | 49 CFR 173.115(a)(2) |
| ASTM E695 | 1979 | American Society for Testing and Materials | Standard Method of Measuring Relative Resistance of Wall, Floor and Roof Construction to Impact Loading | 24 CFR 200.946(a)(1) (viii) |
| ASTM E711 | 1987 | American Society for Testing and Materials | Standard Test Method for Gross Calorific Value of Refuse-Derived Fuel by the Bomb Calorimeter | 40 CFR 63, Subpart DDDDD, Table 6 |
| ASTM E773 | 1997 | American Society for Testing and Materials | Standard Test Method for Seal Durability of Sealed Insulating Glass Units | 4 CFR 3280.403(d)(2) |
| ASTM E774 | 1997 | American Society for Testing and Materials | Standard Specifications for Sealed Insulating Glass Units | 24 CFR 3280.403(d)(2) |
| ASTM E775 | 1987 | American Society for Testing and Materials | Standard Test Methods for Total Sulfur in the Analysis Sample of | 40 CFR 49.123(e) |

| | | | Refuse-Derived Fuel | |
|---|---|---|---|---|
| ASTM E776 | 1987 | American Society for Testing and Materials | Standard Test Method for Forms of Chlorine in Refuse-Derived Fuel | 40 CFR 63, Subpart DDDDD, Table 6 |
| ASTM E885 | 1988 | American Society for Testing and Materials | Standard Test Method for Analyses of Metals in Refuse-Derived Fuel by Atomic Absorption Spectroscopy | 40 CFR 63, Subpart DDDDD, Table 6 |
| ASTM E1333 | 1996 | American Society for Testing and Materials | Standard Test Method for Determining Formaldehyde Levels from Wood Products Under Defined Test Conditions Using a Large Chamber | 24 CFR 3280.406(b) |
| ASTM E1337 | 1990 | American Society for Testing and Materials | Standard Test Method for Determining Longitudinal Peak Braking Coefficient of Paved Surfaces Using Standard Reference Test Tire | 49 CFR 571.105 S6.9.2(a) |
| ASTM E1590 (pdf) ASTM E1590 (html) | 2001 | American Society for Testing and Materials | Standard Test Method for Fire Testing of Mattresses | 49 CFR 238 Appendix B(a)(1)(xi) |
| ASTM E1625 | 1994 | American Society for Testing and Materials | Standard Test Method for Determining Biodegradability of Organic Chemicals in Semi-Continuous Activated Sludge | 40 CFR 799.5085 |
| ASTM E1719 | 1997 | American Society for Testing and Materials | Standard Test Method for Vapor Pressure of Liquids by Ebulliometry | 40 CFR 799.5085 |
| ASTM F462 | 1979 | American Society for Testing and Materials | Slip-Resistant Bathing Facilities | 24 CFR 200, Subpart S |
| ASTM F476 | 1984 | American Society for Testing and Materials | Standard Test Method for Security of Swinging Door Assemblies | 24 CFR 200.949(a)(1)(ix) |
| ASTM F478 | 1992 | American Society for Testing and Materials | Standard Specification for In-Service Care of Insulating Line Hose and Covers | 29 CFR 1910.137(b)(2)(ix) |
| ASTM F631 | 1980 | American Society for Testing and Materials | Standard Guide for Collecting Skimmer Performance Data in Controlled Environments | 33 CFR 156.40 |
| ASTM F631 | 1993 | American Society for Testing and Materials | Standard Guide for Collecting Skimmer Performance Data in Controlled Environments | 33 CFR 154 Appendix C |
| ASTM F682 | 1982 | American Society for Testing and Materials | Standard Specification for Wrought Carbon Steel Sleeve-Type Pipe Couplings | 46 CFR 56.01-2 |
| ASTM F715 | 1981 | American Society for Testing and Materials | Standard Test Methods for Coated Fabrics Used for Oil Spill Control and Storage | 33 CFR 154.106 |
| ASTM F715 | 1995 | American Society for Testing and Materials | Standard Test Methods for Coated Fabrics Used for Oil Spill Control and Storage | 33 CFR 155, Appendix B, 2.4 |
| ASTM F722 | 1982 | American Society for Testing and Materials | Standard Specification for Welded Joints for Shipboard Piping Systems | 33 CFR 155.140 |
| ASTM F808 | 1983 | American Society for Testing and Materials | Guide for Collecting Skimmer Performance Data in Uncontrolled | 33 CFR 154, Appendix C |

| | | | Environments | |
|---|---|---|---|---|
| ASTM F808 | 1983 | American Society for Testing and Materials | Guide for Collecting Skimmer Performance Data in Uncontrolled Environments | 33 CFR 154, Appendix C, 6.3.1 |
| ASTM F1003 | 1986 | American Society for Testing and Materials | Standard Specification for Searchlights on Motor Lifeboats | 46 CFR 199.175(a)(28)(i) |
| ASTM F1006 | 1986 | American Society for Testing and Materials | Standard Specification for Entrainment Separators for Use in Marine Piping Applications | 46 CFR 56.60-1(b) |
| ASTM F1007 | 1986 | American Society for Testing and Materials | Standard Specification for Pipe-Line Expansion Joints of the Packed Slip Type for Marine Application | 46 CFR 56.60-1(b) |
| ASTM F1014 | 1992 | American Society for Testing and Materials | Standard Specification for Flashlights on Vessels | 46 CFR 35.30-20(c)(3) |
| ASTM F1020 | 1986 | American Society for Testing and Materials | Standard Specification for Line-Blind Valves for Marine Applications | 46 CFR 56.60-1(b) |
| ASTM F1120 | 1987 | American Society for Testing and Materials | Standard Specification for Circular Metallic Bellows Type Expansion Joints for Piping Applications | 46 CFR 56.60-1(b) |
| ASTM F1121 | 1987 | American Society for Testing and Materials | Standard Specification for International Shore Connections for Marine Fire Applications | 33 CFR 126.15(a)(5) |
| ASTM F1122 | 1987 | American Society for Testing and Materials | Standard Specification for Quick Disconnect Couplings | 33 CFR 154.500(d)(3) |
| ASTM F1123 | 1987 | American Society for Testing and Materials | Standard Specification for Non-Metallic Expansion Joints | 46 CFR 56.60-1(b) |
| ASTM F1139 | 1988 | American Society for Testing and Materials | Standard Specification for Steam Traps and Drains | 46 CFR 56.60-1(b) |
| ASTM F1155 | 1998 | American Society for Testing and Materials | Standard Practice for Selection and Application of Piping System Materials | 33 CFR 154 |
| ASTM F1172 | 1988 | American Society for Testing and Materials | Fuel Oil Meters of the Volumetric Positive Displacement Type | 46 CFR 56.60-1(b) |
| ASTM F1173 | 1995 | American Society for Testing and Materials | Standard Specification for Thermosetting Resin Fiberglass Pipe and Fittings to be Used for Marine Applications | 46 CFR 56.60-1(b) |
| ASTM F1196 | 1994 | American Society for Testing and Materials | Standard Specification for Sliding Watertight Door Assemblies | 46 CFR 170.270(c)(1) |
| ASTM F1197 | 1989 | American Society for Testing and Materials | Standard Specificatiion for Sliding Watertight Door Control Systems | 46 CFR 174.100(e)(2) |
| ASTM F1199 | 1988 | American Society for Testing and Materials | Cast (All Temperatures and Pressures) and Welded Pipe Line Strainers (150 psig and 150 Degrees F Maximum) | 46 CFR 56.60-1(b) |
| ASTM F1200 | 1988 | American Society for Testing and Materials | Standard Specification for Fabricated (Welded) Pipe Line Strainers (Above 150 psig and 150°F) | 46 CFR 56.60-1(b) |
| ASTM F1201 | 1988 | American Society for Testing and Materials | Standard Specification for Fluid Conditioner Fittings in Piping | 46 CFR 56.60-1(b) |

| | | | Applications Above Zero Degrees F | |
|---|---|---|---|---|
| ASTM F1271 | 1990 | American Society for Testing and Materials | Standard Specification for Spill Valves for Use in Marine Tank Liquid Overpressure Protection Applications | 46 CFR 39.20-9(c)(1) |
| ASTM F1273 | 1991 | American Society for Testing and Materials | Standard Specification for Tank Vent Flame Arresters | 46 CFR 32.20-10 |
| ASTM F1292 | 2004 | American Society for Testing and Materials | Standard Specification for Impact Attenuation of Surface Systems Under and Around Playground Equipment | 36 CFR 1191, App B, 105.2.3 |
| ASTM F1321 | 1992 | American Society for Testing and Materials | Standard Guide for Conducting a Stability Test (Lightweight Survey and Inclining Experiment) to Determine Light Ship Displacement and Centers of Gravity of a Vessel | 46 CFR 28.535(d) |
| ASTM F1323 | 1998 | American Society for Testing and Materials | Standard Specification for Shipboard Incinerators | 46 CFR 63.25-9 |
| ASTM F1471 | 1993 | American Society for Testing and Materials | Standard Test Method for Air Cleaning Performance of a High-Efficiency Particulate Air-Filter System | 40 CFR 86.1310-2007(b)(1)(iv)(B) |
| ASTM F1546 | 1996 | American Society for Testing and Materials | Standard Specification for Firehose Nozzles | 46 CFR 162.027-3(a) |
| ASTM F1548 | 1994 | American Society for Testing and Materials | Performance of Fittings for Use with Gasketed Mechanical Couplings Used in Piping Applications | 46 CFR 56.30-35(a) |
| ASTM F1951 | 1999 | American Society for Testing and Materials | Standard Specification for Determination of Accessibility of Surface Systems Under and Around Playground Equipment | 36 CFR 1191, App B, 1008.2.6.1 |
| ASTM F2412 (pdf) ASTM F2412 (html) ASTM F2412 (svg) | 2005 | American Society for Testing and Materials | Standard Test Methods for Foot Protection | 29 CFR 1910 |
| ASTM F2413 (pdf) ASTM F2413 (html) | 2005 | American Society for Testing and Materials | Performance Requirements for Protective Footware | 29 CFR 1910 |
| ASTM G21 | 1990 | American Society for Testing and Materials | Standard Practice for Determining Resistance of Synthetic Polymeric Materials to Fungi | 7 CFR 1755.910(d)(5)(iv) |
| ASTM G23 | 1969 | American Society for Testing and Materials | Standard Practice for Operating Light Exposure Apparatus (Carbon Arc Type) With and Without Water for Exposure of Nonmetallic Materials | 49 CFR 571.209 S5.1(e) |
| ASTM G26 | 1970 | American Society for Testing and Materials | Standard Recommended Practice for Light- and Water-Exposure Apparatus (Xenon-Arc Type) for Exposure of Non-metallic Materials | 16 CFR 1201.4(b)(3)(ii) |

| ASTM G151 | 1997 | American Society for Testing and Materials | Standard Practice for Exposing Nonmetallic Materials in Accelerated Test Devices that Use Laboratory Light Sources | 49 CFR 571.106 S12.7(b) |
|---|---|---|---|---|
| ASTM G154 | 2000 | American Society for Testing and Materials | Standard Practice for Operating Fluorescent Light Apparatus for UV Exposure of Nonmetallic Materials | 49 CFR 571.106 S12.7(b) |
| ATAA 300 | 1996 | Air Transport Association of America | Packaging of Airline Supplies, Revision 19 | 49 CFR 171.7 |
| AWPA A1 | 1991 | American Wood Preservers Association | Standard Methods for Analysis of Creosote and Oil-Type Preservatives | 7 CFR 1728.201(i)(1)(i) |
| AWPA A2 | 1991 | American Wood Preservers Association | Standard Methods for Analysis of Waterborne Preservatives and Fire-Retardant Formulations | 7 CFR 1728.201(i)(1)(iii)(A) |
| AWPA A3 | 1991 | American Wood Preservers Association | Standard Methods for Determining Penetration of Preservatives and Fire Retardants | 7 CFR 1728.201(k)(3) |
| AWPA A5 | 1991 | American Wood Preservers Association | Standard Methods for Analysis of Oil-Borne Preservatives | 7 CFR 1728.202(g)(1)(v)(B) |
| AWPA A6 | 1989 | American Wood Preservers Association | Method for the Determination of Oil-Type Preservatives and Water in Wood | 7 CFR 1728.202(g)(1)(v)(A) |
| AWPA A7 | 1975 | American Wood Preservers Association | Standard Wet Ashing Procedure for Preparing Wood for Chemical Analysis | 7 CFR 1728.202(g)(1)(v)(D) |
| AWPA A9 | 1990 | American Wood Preservers Association | Standard Method for Analysis of Treated Wood and Treating Solutions by X-ray Spectroscopy | 7 CFR 1728.202(g)(1)(v)(C) |
| AWPA A11 | 1983 | American Wood Preservers Association | Standard Method for Analysis of Treated Wood and Treating Solutions by Atomic Absorption Spectroscopy | 7 CFR 1728.201(i)(1)(iii)(B) |
| AWPA M3 | 1981 | American Wood Preservers Association | Standard Quality Control Procedures for Wood Preserving Plants | 7 CFR 1728.202(f)(1) |
| AWPA P1 | 1991 | American Wood Preservers Association | Standard for Coal Tar Creosote for Land and Fresh Water and Marine (Coastal) Water Use | 7 CFR 1728.201(i)(1)(i) |
| AWPA P5 | 1991 | American Wood Preservers Association | Standard for Waterborne Preservative | 7 CFR 1728.201(i)(1)(iii)(A) |
| AWPA P8 | 1991 | American Wood Preservers Association | Standard for Oil-Borne Preservatives | 7 CFR 1728.201(i)(1)(iv) |
| AWPA P9 | 1991 | American Wood Preservers Association | Standard for Solvents and Formulations for Organic Preservative Systems | 7 CFR 1728.201(i)(1)(iv) |
| AWS B3.0 | 1977 | American Welding Society | Standard Qualification Procedure | 49 CFR 178.356-2(e) |
| AWS D1.1 | 2000 | American Welding Society | Structural Welding Code--Steel | 30 CFR 250.901(a)(20) |
| BHMA A156.10 | 1999 | Builders Hardware Manufacturers | Power Operated Pedestrian Doors | 36 CFR 1191, App B, 105.2.1 |

| | | Association | | |
|---|---|---|---|---|
| BHMA A156.19 | 2002 | Builders Hardware Manufacturers Association | Power Assist and Low Energy Power Operated Doors | 36 CFR 1191, App B, 408.3.2.1 |
| BOCA | 1993 | Building Officials and Code Administrators International | Mechanical Code | 24 CFR 200.925c(a)(1)(i) |
| BOCA | 1993 | Building Officials and Code Administrators International | Plumbing Code | 24 CFR 200.925c(a)(1)(i) |
| BSI EN-13000 (pdf) BSI EN-13000 (html) | 2004 | British Standards Institute | Cranes--Safety--Mobile Cranes | 29 CFR 1926 |
| BSI EN-14439 (pdf) BSI EN-14439 (html) | 2006 | British Standards Institute | Cranes--Safety--Tower Cranes | 29 CFR 1926 |
| CEC Test Method | 2004 | California Energy Commission | Calculating the Energy Efficiency of Single-Voltage External Ac-Dc and Ac-Ac Power Supplies | 10 CFR 430 Subpart B |
| CABO | 1992 | Council of American Building Officials | One and Two Family Dwelling Code | 24 CFR 200.926b(c) |
| CABO | 1993 | Council of American Building Officials | One and Two Family Dwelling Code with Errata Package and 1993 Amendments | 24 CFR 200.926(d)(1)(ii)((B)(2)(ii) |
| CFTA | 1977 | Cosmetic, Toiletry, and Fragrance Association | Cosmetic Ingredient Dictionary | 21 CFR 701.3(c)(2)(i) |
| CGA C-5 | 1991 | Compressed Gas Association | Cylinder Service Life-Seamless Steel High Pressure Cylinders | 49 CFR 173.302a(b)(3)(i)(A) |
| CGA C-8 | 1985 | Compressed Gas Association | Standard for Requalification of DOT-3HT Cylinders | 49 CFR 180.205(f)(1) |
| CGA C-11 | 2001 | Compressed Gas Association | Recommended Practice for Inspection of Compressed Gas Cylinders at Time of Manufacture | 49 CFR 178.35(g) |
| CGA C-12 | 1994 | Compressed Gas Association | Qualification Procedure for Acetylene Cylinder Design | 49 CFR 173.303(a) |
| CGA C-13 | 2000 | Compressed Gas Association | Guidelines for Periodic Visual Inspection and Requalification of Acetylene Cylinders | 49 CFR 173.303(e) |
| CGA G-1 | 2009 | Compressed Gas Association | Acetylene | 29 CFR 1910.102(a) |
| CGA G-2.2 | 1985 | Compressed Gas Association | Guideline Method for Determining Minimum of 0.2% Water in Anhydrous Ammonia | 49 CFR 173.315(l)(5) |
| CGA G-4.1 | 1985 | Compressed Gas Association | Cleaning Equipment for Oxygen Service | 49 CFR 178.338-15 |
| CGA P-1 | 1965 | Compressed Gas Association | Safe Handling of Compressed Gases | 29 CFR 1910.101(b) |
| CGA P-20 | 2003 | Compressed Gas Association | Standard for the Classification of Toxic Gas Mixtures | 49 CFR 173.115 |

| | | | | |
|---|---|---|---|---|
| CGA S-1.1 | 2005 | Compressed Gas Association | Pressure Relief Device Standards | 49 CFR 173.301(c) |
| CGA S-1.2 | 1980 | Compressed Gas Association | Safety Release Device Standard--Cargo and Portable Tanks for Compressed Gases | 49 CFR 178.277(e)(4)(iv) |
| CGA S-7 (pdf) CGA S-7 (html) | 2005 | Compressed Gas Association | Method for Selecting Pressure Relief Devices for Compressed Gas Mixtures in Cylinders | 49 CFR 173.301(c) |
| CGA TB-2 | 1980 | Compressed Gas Association | Guidelines for Inspection and Repair of MC-330 and MC-331 Cargo Tanks | 49 CFR 180.407(g)(3) |
| CGA TB-25 | 2008 | Compressed Gas Association | Design Considerations for Tube Trailers | 49 CFR 173.301 |
| CGSB 43.147 | 2005 | Canadian General Standards Board | Construction, Modification, Qualification, Maintenance, and Selection and Use of Means of Containment for the Handling, Offering for Transport, or Transportation of Dangerous Goods by Rail | 49 CFR 171.12 |
| CGSB 43.147 | 2005 | Office des Normes Generales du Canada | Construction, Modification, Qualification, Entretien, Selection Et Utilisation Des Contenants Pour La Manutention, La Demande De Transport Ou La Transport Des Marchandises Dangereuses Par Chemin De Fer | 49 CFR 171.12 |
| CI 57 | 2009 | Chlorine Institute | Emergency Shut-Off Systems for Bulk Transfer of Chlorine | 49 CFR 177.840(u) |
| CI 101-7 | 1993 | Chlorine Institute | Excess Flow Valve with Removable Seat | 49 CFR 178.276(c)(7)(i) |
| CI 104-9 | 2002 | Chlorine Institute | Standard Chlorine Angle Valve Assembly | 49 CFR 178.337-9(b)(8) |
| CI 106-6 | 1993 | Chlorine Institute | Excess Flow Valve with Removable Baskets | 49 CFR 178.276(c)(7)(ii) |
| CI 166 | 2002 | Chlorine Institute | Angle Valve Guidelines for Chlorine Bulk Transportation | 49 CFR 178.337-9(b)(8) |
| CI H50155 | 1996 | Chlorine Institute | Pressure Relief Device for Chlorine Service | 49 CFR 173.315(i)(13) |
| CI H51970 | 1996 | Chlorine Institute | Safety Valve for Chlorine Service | 49 CFR 173.315(i)(13) |
| CI | 2009 | Chlorine Institute | Chlorine Institute Emergency Kit A for 100-lb. and 150-lb. Chlorine Cylinders | 49 CFR 173.3(e)(1) |
| CI | 2009 | Chlorine Institute | Chlorine Institute Emergency Kit B for Chlorine Ton Containers | 49 CFR 173.3(e)(1) |
| CIE 15 | 2004 | International Commission on Illumination | Technical Report: Colorimetry, 3rd edition | 10 CFR 430 Subpart B, App. R, 4.1.1 |
| CIE 15A (xls) | 2004 | International Commission on Illumination | Supplementary Spectra | 10 CFR 430 Subpart B, App. R, 4.1.1 |

| CIE 15B (xls) | 2004 | International Commission on Illumination | Supplementary Tables | 10 CFR 430 Subpart B, App. R, 4.1.1 |
|---|---|---|---|---|
| CRA A-20 | 1986 | Corn Refiners Association | Analysis for Starch in Corn | 7 CFR 801.7(a)(2) |
| CSA C390 | 1993 | Canadian Standards Association | Energy Efficiency Test Methods for Three-Phase Induction Motors | 10 CFR 431.19(b)(4) |
| CTIOA R8-103-62 | 1969 | Ceramic Tile Institute of America | Standard Specifications for the Installation of Tile Lined Shower Receptors | 24 CFR 200, Subpart S |
| CSVA | 2004 | Commercial Vehicle Safety Alliance | North American Standard Out-of-Service Criteria and Level VI Inspection Procedures and Out-of-Service Criteria for Commercial Highway Vehicles | 49 CFR 385.415(b)(1) |
| EI IP-501 | 2005 | Energy Institute | Determination of aluminum, silicon, vanadium, nickel, iron, sodium, calcium, zinc and phosphorus in residual fuel oil | 40 CFR 1065.705 Table 1 |
| FGMA | 1990 | Flat Glass Marketing Association | Glazing Manual | 24 CFR 200, Subpart S |
| GLI METHOD 2 | 2009 | Great Lakes Instruments | Turbidity | 40 CFR 141.74(a)(1) |
| GPA 2261 | 2000 | Gas Producers Association | Analysis of Natural Gas and Similar Gaseous Mixtures by Gas Chromatography | 40 CFR 75, Appendix F, Section 5.5.2 |
| GPA 2261 | 2000 | Gas Processors Association | Analysis of Natural Gas and Similar Gaseous Mixtures by Gas Chromatography | 40 CFR 75, Appendix F |
| GPA 2377 | 1986 | Gas Processors Association | Test for Hydrogen Sulfide and Carbon Dioxide in Natural Gas Using Length of Stain Tubes | 40 CFR 60.334(h)(1) |
| GRI 02-0057 | 2002 | Gas Research Institute | Internal Corrosion Direct Assessment of Gas Transmission Pipelines Methodology | 49 CFR 192.927(c)(2) |
| HACH 8000 | 2007 | Hach Chemical Company | Oxygen Demand, Chemical Using Reactor Digestion Method | 40 CFR 136.3(a) |
| HACH 8008 | 2007 | Hach Chemical Company | 1, 10--Phenanthroline Method Using FerroVer Iron Reagent for Water | 40 CFR 136.3(a) |
| HACH 8009 | 2007 | Hach Chemical Company | Zincon Method for Zinc, Hatch Handbook of Water Analysis | 40 CFR 444.12(b)(1) |
| HACH 8034 | 2007 | Hach Chemical Company | Periodate Oxidation Method for Manganese | 40 CFR 136.3(a) |
| HACH 8507 | 2007 | Hach Chemical Company | Nitrogen Nitrite--Low Range, Diazotization Method for Water and Wastewater | 40 CFR 136.3(a) |
| HI BTS-2000 | 2007 | Hydronics Institute | Method to Determine Efficiency of Commercial Space Heating Boilers | 10 CFR 431.86 |
| HPMA HP-SG-96 | 1996 | Hardwood Plywood Manufacturers Association | Structural Design Guide for Hardwood Plywood Wall Panels | 24 CFR 3280.304(b)(1) |

| IAPMO PS-2 | 1989 | International Association of Plumbing and Mechanical Officials | Material and Property Standard for Cast Brass and Tubing P-Traps | 24 CFR 3280.604(b)(2) |
|---|---|---|---|---|
| IAPMO PS-5 | 1984 | International Association of Plumbing and Mechanical Officials | Material and Property Standard for Special Cast Iron Fittings | 24 CFR 3280.604(b)(2) |
| IAPMO PS-9 | 1984 | International Association of Plumbing and Mechanical Officials | Material and Property Standard for Diversion Tees and Twin Waste Elbow | 24 CFR 3280.604(b)(2) |
| IAPMO PS-14 | 1989 | International Association of Plumbing and Mechanical Officials | Material and Property Standard for Flexible Metallic Water Connectors | 24 CFR 3280.604(b)(2) |
| IAPMO PS-23 | 1989 | International Association of Plumbing and Mechanical Officials | Material and Property Standard for Dishwasher Drain Airgaps | 24 CFR 3280.604(b)(2) |
| IAPMO PS-31 | 1977 | International Association of Plumbing and Mechanical Officials | Material and Property Standard for Backflow Prevention Devices | 24 CFR 3280.604(b)(2) |
| ICAO 9284 | 2011 | International Civil Aviation Organization | Technical Instructions for the Safe Transport of Dangerous Goods by Air | 49 CFR 171.7 |
| ICAO Annex 2 | 1990 | International Civil Aviation Organization | Convention on International Civil Aviation, Rules of the Air | 14 CFR 135.3(a)(2) |
| ICAO Annex 16 | 2008 | International Civil Aviation Organization | Environmental Protection, Volume II -- Aircraft Engine Emissions | 40 CFR 87.89 |
| ICBO | 1991 | International Conference of Building Officials | Uniform Building Code (1991) | 24 CFR 200.925c(a)(1)(iii) |
| ICBO | 1991 | International Conference of Building Officials | Uniform Mechanical Code (1991) | 24 CFR 200.925c(c)(3) |
| ICEA S-87-640 | 2006 | Insulated Cable Engineers Association | Standard for Optical Fiber Outside Plant Communications Cable | 7 CFR 901(c) |
| ICEA S-110-717 | 2003 | Insulated Cable Engineers Association | Standard for Optical Drop Cable | 7 CFR 901(c) |
| ICS | 1973 | International Chamber of Shipping | Clean Seas Guide for Oil Tankers | 33 CFR 157.23(b) |
| IEEE 45 | 2002 | Institute of Electrical and Electronics Engineers | Recommended Practice for Electrical Installations on Shipboard | 46 CFR 110.10-1 |
| IEEE 112 | 2004 | Institute of Electrical and Electronics Engineers | Test Procedure for Polyphase Induction Motors and Generators | 10 CFR 431.15 |
| IEEE 114 | 2010 | Institute of Electrical and Electronics Engineers | IEEE Standard Test Procedure for Single-Phase Induction Motors | 10 CFR 431 |

| IEEE 1202 (pdf)<br>IEEE 1202 (html) | 1991 | Institute of Electrical and Electronics Engineers | Standard for Flame Testing of Cables | 46 CFR 111 |
|---|---|---|---|---|
| IEEE C2 | 1997 | Institute of Electrical and Electronics Engineers | National Electrical Safety Code | 7 CFR 1755.503(d)(1) |
| IEEE C2 | 2007 | Institute of Electrical and Electronics Engineers | National Electrical Safety Code (2007) | 7 CFR 1755.901(b) |
| IEEE C37.14 | 2002 | Institute of Electrical and Electronics Engineers | Standard for Low-Voltage AC Power Circuit Breakers Used in Enclosures | 46 CFR 110.10-1 |
| IEEE P730.1 | 1989 | Institute of Electrical and Electronics Engineers | Standard for Software Quality Assurance Plans | 7 CFR 1755.522(n)(2) |
| IESNA LM-45 | 2000 | Illuminating Engineering Society of North America | Method for Electrical and Photometric Measurements of General Service Incandescent Filament Lamps | 10 CFR 430 Subpart B |
| IME 22 | 2011 | Institute of Makers of Explosives | Recommendations for the Safe Transportation of Detonators in a Vehicle with Certain Other Explosive Materials | 30 CFR 57.6133(b) |
| IME | 1940 | Institute of Makers of Explosives | Safety in the Handling and Use of Explosives | 29 CFR 1910.261(a)(4)(iii) |
| IMO IMDG.1 | 2006 | International Maritime Organization | International Maritime Dangerous Goods Code (Volume 1) | 49 CFR 172.519(f) |
| IMO IMDG.2 | 2006 | International Maritime Organization | International Maritime Dangerous Goods Code (Volume 2) | 49 CFR 172.519(f) |
| IMO ISPS | 2003 | International Maritime Organization | International Ship and Port Facility Security Code | 33 CFR 101.410(a) |
| AG ENG | 1965 | Interstate Printers and Publishers, Inc. | Agriculture Engineering | 29 CFR 570.71(b) |
| ISO 535 | 1991 | International Organization for Standardization | Paper and Board--Determination of Water Absorptivity--Cobb Method | 49 CFR 178.516(b)(1) |
| ISO 1496-1 | 1990 | International Organization for Standardization | Series 1 Freight Containers--Specification and Testing--Part 1, General Cargo Containers | 49 CFR 173.411(b)(6)(iii) |
| ISO 1496-3 | 1995 | International Organization for Standardization | Series 1 Freight Containers--Specification and Testing--Part 3, Tank containers for Liquids, Gases and Pressurized Dry Bulk | 49 CFR 178.74(c)(5)(ii) |
| ISO 3807-2 | 2000 | International Organization for Standardization | Cylinders for acetylene--Basic requirements--Part 2: Cylinders with fusible plugs | 49 CFR 173.303(f)(1) |
| ISO 6406 (pdf)<br>ISO 6406 (html) | 2005 | International Organization for Standardization | Seamless Steel Gas Cylinders--Inspection and Testing | 49 CFR 180 |
| ISO 7225 | 2005 | International Organization for Standardization | Gas Cylinders--Precautionary Labels | 49 CFR 178.71(r)(2) |

| ISO 7866 | 1999 | International Organization for Standardization | Gas Cylinders--Refillable Seamless Aluminum Alloy Gas Cylinders--Design, Construction and Testing | 49 CFR 178.71(h) |
|---|---|---|---|---|
| ISO 8115 | 1986 | International Organization for Standardization | Cotton bales—Dimensions and density | 49 CFR 171.7 |
| ISO 9809-1 | 1999 | International Organization for Standardization | Gas Cylinders--Refillable Seamless Steel Gas Cylinders--Design, Construction and Testing--Part 1: Quenched and Tempered Steel Cylinders with Tensile Strength less than 1 100 MPa | 49 CFR 178.71(g)(1) |
| ISO 9809-2 | 2000 | International Organization for Standardization | Gas Cylinders--Refillable Seamless Steel Gas Cylinders--Design, Construction and Testing--Part 2: Quenched and Tempered Steel Cylinders with Tensile Strength Greater than or Equal to 1 100 MPa | 49 CFR 178.71(g)(2) |
| ISO 9809-3 | 2000 | International Organization for Standardization | Gas Cylinders--Refillable Seamless Steel Gas Cylinders--Design, Construction and Testing--Part 3: Normalized Steel Cylinders | 49 CFR 178.71(g)(3) |
| ISO 9978 | 1992 | International Organization for Standardization | Sealed Radioactive Sources--Leak Test Methods | 49 CFR 173.469(a)(4)(ii) |
| ISO 10297 | 1999 | International Organization for Standardization | Gas cylinders--Refillable gas cylinder valves--Specification and type testing | 49 CFR 173.301b(c)(1) |
| ISO 10461 (pdf) ISO 10461 (html) | 2005 | International Organization for Standardization | Seamless Aluminum Alloy Gas Cylinders--Inspection and Testing | 49 CFR 180 |
| ISO 10462 (pdf) ISO 10462 (html) | 2005 | International Organization for Standardization | Transportable Cylinders for Dissolved Acetylene | 49 CFR 180 |
| ISO 11114-1 | 1997 | International Organization for Standardization | Transportable gas cylinders--Compatibility of cylinder and valve materials with gas contents--Part 1: Metallic materials | 49 CFR 173.301b(a)(2) |
| ISO 11114-2 | 2000 | International Organization for Standardization | Transportable gas cylinders--Compatibility of cylinder and valve materials with gas contents--Part 2: Non- metallic materials | 49 CFR 173.301b(a)(2) |
| ISO 11117 | 1998 | International Organization for Standardization | Gas cylinders--Valve protection caps and valve guards for industrial and medical gas cylinders--Design, construction and tests | 49 CFR 173.301b(c)(2)(ii) |
| ISO 11118 | 1999 | International Organization for Standardization | Gas cylinders--Non-refillable metallic gas cylinders--Specification and test methods | 49 CFR 178.71(i) |
| ISO 11119-1 | 2002 | International Organization for Standardization | Gas cylinders--Gas cylinders of composite construction--Specification and test methods--Part 1: Hoop-wrapped composite gas cylinders | 49 CFR 171.7 |

| ISO 11119-2 | 2002 | International Organization for Standardization | Gas cylinders—Gas cylinders of composite construction—Specification and test methods—Part 2: Fully wrapped fibre reinforced composite gas cylinders with load-sharing metal liners | 49 CFR 171.7 |
|---|---|---|---|---|
| ISO 11119-3 | 2002 | International Organization for Standardization | Gas cylinders of composite construction--Specification and test methods--Part 3: Fully wrapped fibre reinforced composite gas cylinders with non-load-sharing metallic or non-metallic liners | 49 CFR 171.7 |
| ISO 11120 | 1999 | International Organization for Standardization | Gas cylinders--Refillable seamless steel tubes of water capacity between 150 L and 3000 L--Design, construction and testing | 49 CFR 178.71(j) |
| ISO 11621 | 1997 | International Organization for Standardization | Gas cylinders--Procedures for change of gas service | 49 CFR 173.301b(a)(2) |
| ISO 11623 (pdf) ISO 11623 (html) | 2002 | International Organization for Standardization | Periodic Inspection and Testing of Composite Gas Cylinders | 49 CFR 180 |
| ISO 11660-1 (pdf) ISO 11660-1 (html) | 2008 | International Organization for Standardization | Cranes: Access, Guards and Restraints: General | 29 CFR 1926 |
| ISO 11660-2 (pdf) ISO 11660-2 (html) | 1994 | International Organization for Standardization | Cranes: Access, Guards and Restraints: Mobile Cranes | 29 CFR 1926 |
| ISO 11660-3 (pdf) ISO 11660-3 (html) | 2008 | International Organization for Standardization | Cranes: Access, Guards and Restraints: Tower Cranes | 29 CFR 1926 |
| ISO 14230-4 | 2000 | International Organization for Standardization | Road Vehicles--Diagnostic Systems | 40 CFR 1048.110(g)(2) |
| ISO 18902 (pdf) ISO 18902 (html) | 2001 | International Organization for Standardization | Photographic Processed Films, Plates, and Papers | 36 CFR 1237 |
| ISO 18906 (pdf) ISO 18906 (html) | 2000 | International Organization for Standardization | Photographic Films--Specifications for Safety Film | 36 CFR 1237 |
| ITU-R M-493-11 | 2004 | International Telecommunication Union | Digital Selective-calling System for Use in the Maritime Mobile Service, with Annexes 1 and 2 | 47 CFR 80.1101(c)(2)(ii) |
| ITU-R M-541-8 | 1997 | International Telecommunication Union | Operational Procedures for the Use of Digital Selective-Calling Equipment in the Maritime Mobile Service | 47 CFR 80.1101(c)(4)(iii) |
| ITU-R M-541-9 | 2004 | International Telecommunication Union | Operational Procedures for the Use of Digital Selective-Calling Equipment in the Maritime Mobile Service | 47 CFR 80.1101(c)(2)(iii) |
| ITU-R M-628-3 | 1994 | International Telecommunication | Technical Characteristics for Search and Rescue Radar Transponders | 47 CFR 80.1101(c)(6)(ii) |

| | | Union | | |
|---|---|---|---|---|
| ITU-R M-632-3 | 1997 | International Telecommunication Union | Transmission Characteristics of a Satellite Emergency Position Indicating Radio Beacon | 47 CFR 80.1101(c)(11)(iii) |
| ITU-R M-633-3 | 2004 | International Telecommunication Union | Transmission characteristics of a satellite emergency position-indicating radiobeacon system operating through a low polar-orbiting satellite system | 47 CFR 80.1101(c)(5)(iii) |
| ITU-R M-1371-1 | 2001 | International Telecommunication Union | Technical Characteristics for a Universal Shipborne Automatic Identification System Using Time Division Multiple Access | 47 CFR 80.1101(c)(12)(i) |
| ITU-T E.161 | 2001 | International Telecommunication Union | Arrangement of Digits, Letters and Symbols on Telephones and Other Devices that Can Be Used for Gaining Access to a Telephone Network | 47 CFR 80.1101(b)(2) |
| ITU-T E.164.1 | 2008 | International Telecommunication Union | Numbering Plan of the International Telephone Service | 47 CFR 80.1101(b)(3) |
| LACHAT 10-204 | 2008 | Lachat Instruments | Digestion and Distillation of Total Cyanide in Drinking and Wastewaters | 40 CFR 136.3(a) Table IB |
| STEAM | 1917 | Commonwealth of Massachusetts | District Police Steam Boiler Rules | |
| MSS SP-44 | 1996 | Manufacturers Standardization Society | Steel Pipe Line Flanges | 46 CFR 56.01-2 |
| MSS SP-75 | 2004 | Manufacturers Standardization Society | Specification for High-Test Wrought Butt Welding Fittings | 49 CFR 118(a) |
| NACE RP-0502 | 2002 | National Association of Corrosion Engineers | Pipeline External Corrosion Direct Assessment Methodology | 49 CFR 192.925(b)(3) |
| NACM | 2003 | National Association of Chain Manufacturers | Welded Steel Chain Specifications | 49 CFR 393.104(e)(2) |
| NAS | 1972 | National Academy of Sciences | Food Chemicals Codex (1972) | 21 CFR 701.3(c)(2)(iv) |
| NAS | 1996 | National Academy of Sciences | Food Chemicals Codex (1996) | 21 CFR 184 |
| NAS | 2011 | National Academy of Sciences | Prudent Practices in the Laboratory: Handling and Disposal of Chemicals | 42 CFR 52b.12(c)(6) |
| NCASI 98-01 | 1998 | National Council of the Paper Industry for Air and Stream Improvements | Chilled Impinger Method For Use At Wood Products Mills to Measure Formaldehyde, Methanol, and Phenol | 40 CFR 63, Subpart DDDD |
| NCASII 94-03 | 2002 | National Council of the Paper Industry for Air and Stream Improvements | Methanol in Process Liquids by Gas Chromatography/Flame Ionization Detection | 40 CFR 63.457(c)(3)(ii) |
| NCASI A105 | 2001 | National Council of the Paper Industry for Air | Impinger Source Sampling Method for Selected Aldehydes, Ketones, | 40 CFR 63, Subpart DDDD |

| | | | and Stream Improvements | and Polar Compounds | |
|---|---|---|---|---|---|
| NCASI 99-02 | 2002 | National Council of the Paper Industry for Air and Stream Improvements | Impinger/Canister Source Sampling Method For Selected HAPs and Other Compounds at Wood Products Facilities | 40 CFR 63, Subpart DDDD |
| NCCA | 2011 | National Cotton Council of America | Specifications for Cotton Bale Packaging Material | 7 CFR 1427.5(b)(10) |
| UCC | 2002 | National Conference of Commissioners on Uniform State Laws | 2002 Official Text and Comments, Sections 8–102 and 8-103 | 17 CFR 270.17f-4(c)(1) |
| UCC | 2002 | National Conference of Commissioners on Uniform State Laws | 2002 Official Text and Comments, Sections 8–501 through 8–511 | 17 CFR 270.17f-4(c)(1) |
| NCUTLO | 1969 | National Committee on Uniform Traffic Laws and Ordinances | Uniform Vehicle Code and Model Ordinance | 41 CFR 50-204.75 |
| NFPA 10 (pdf) NFPA 10 (html) NFPA 10 (svg) | 2002 | National Fire Protection Association | Standard for Portable Fire Extinguishers | 29 CFR 1915 |
| NFPA 11 (pdf) NFPA 11 (html) | 2005 | National Fire Protection Association | Standard for Foam | 29 CFR 1915 |
| NFPA 12 (pdf) NFPA 12 (html) | 2005 | National Fire Protection Association | Standard for Carbon Dioxide Extinguishing Systems | 29 CFR 1915 |
| NFPA 13 | 2002 | National Fire Protection Association | Standard for the Installation of Sprinkler Systems | 36 CFR 1234.12(i) |
| NFPA 25 (pdf) NFPA 25 (html) | 2002 | National Fire Protection Association | Standard for Water-Based Fire Protection Systems | 29 CFR 1915 |
| NFPA 30 (pdf) NFPA 30 (html) | 2003 | National Fire Protection Association | Flammable and Combustible Liquids Code | 49 CFR 192 |
| NFPA 54 (pdf) NFPA 54 (html) NFPA 54 (svg) | 2002 | National Fire Protection Association | National Fuel and Gas Code | 24 CFR 3280 |
| NFPA 58 (pdf) NFPA 58 (html) | 2001 | National Fire Protection Association | Standard for Liquefied Petroleum Gases | 49 CFR 173 |
| NFPA 58 | 2004 | National Fire Protection Association | Standard for the Storage and Handling of Liquefied Petroleum Gases | 49 CFR 192.11(b) |
| NFPA 59 | 2004 | National Fire Protection Association | Standard for the Storage and Handling of Liquefied Petroleum Gases at Utility Gas Plants | 49 CFR 192.11(b) |
| NFPA 72 (pdf) NFPA 72 (html) NFPA 72 (svg) | 2002 | National Fire Protection Association | National Fire Alarm Code | 29 CFR 1915 |
| NFPA 99 | 2005 | National Fire Protection Association | Standard for Health Care Facilities | 38 CFR 51.200(b)(4) |
| NFPA 101 (pdf) NFPA 101 (html) | 2000 | National Fire Protection Association | Life Safety Code | 59 CFR 130 |
| NFPA 704 | 2007 | National Fire Protection Association | Standard System for the Identification of the Hazards of Materials for Emergency Response | 6 CFR 27.204(a)(2) |

| NFPA DUST | 1957 | National Fire Protection Association | Report of Important Dust Explosions | |
| NFPA HOST | 1953 | National Fire Protection Association | Handling Hose and Ladders | |
| NFPA 70 | 2005 | National Fire Protection Association | National Electrical Code | 49 CFR 192.189(c) |
| NACHA | 2005 | National Automated Clearing House Association | A Complete Guide to the Rules Governing the ACH Network | 45 CFR 162.920 |
| ISS-MCB | 2011 | International Space Station Multilateral Coordination Board | International Docking Standard | 1 Code of Intergalactic Regulations 32 |
| NCRP 33 | 1968 | National Council on Radiation Protection and Measurement | Medical X-ray and Gamma-Ray Protection for Energies Up to 10 MeV--Equipment Design and Use | 42 CFR 37.43 |
| NCRP 48 | 1976 | National Council on Radiation Protection and Measurement | Medical Radiation Protection for Medical and Allied Health Personnel | 42 CFR 37.43 |
| NCRP 49 | 1976 | National Council on Radiation Protection and Measurement | Structural Shielding Design and Evaluation for Medical Use of X-Rays and Gamma-Rays up to 10 MeV | 42 CFR 37.43 |
| NEMA MG-1 | 2009 | National Electrical Manufacturers Association | Motors and Generators | 10 CFR 431 |
| NSF 61 (pdf) NSF 61 (html) | 2001 | National Sanitation Foundation | Drinking Water System Components--Health Effects | 24 CFR 3280 |
| OECD 404 | 2002 | Organization for Economic Cooperation and Development | Guideline for Testing of Chemicals, Acute Dermal Irritation/Corrosion | 49 CFR 173.137 |
| OECD C93 | 1974 | Organization for Economic Cooperation and Development | Green List of Wastes | 40 CFR 262.89(e) |
| OR REG | 1975 | State of Oregon | Oregon Grade Standards Hazelnuts in Shell | 7 CFR 982.45(a) |
| ORION | 1970 | ORION Research Incorporated | Residual Chlorine Electrode Model 97-70 | 40 CFR 136.3(a) Table IB |
| PCI MNL-121 | 1977 | Precast/Prestressed Concrete Institute | Manual for Structural Design of Architectural Precast Concrete | 24 CFR 200, Subpart S |
| PCI MNL-117-77 | 1977 | Precast/Prestressed Concrete Institute | Manual for Quality Control for Plants and Production of Architectural Precast Concrete Products | 24 CFR 200, Subpart S |
| PCSA 1 | 1968 | Power Crane and Shovel Association | Mobile Crane and Excavator Standards | 29 CFR 1926.602(b)(3) |
| PCSA 2 | 1968 | Power Crane and Shovel Association | Mobile Hydraulic Crane Standards | 29 CFR 1926.602(b)(3) |
| PCSA 3 | 1969 | Power Crane and Shovel Association | Mobile Hydraulic Excavator Standards | 29 CFR 1926.602(b)(3) |
| PPI TR-3 | 2004 | Plastics Pipe Institute | Policies and Procedures for Developing Hydrostatic Design Bases (HDB), Pressure Design | 49 CFR 192.121 |

| | | | Bases (PDB), and Minimum Required Thermoplastic Piping Materials | |
|---|---|---|---|---|
| RTCM C071 | 1995 | Radio Technical Commission for Maritime Services | Recommended Standards for Marine Radar Equipment Installed on Ships of Less Than 300 Tons Gross Tonnage | 33 CFR 164.72(a)(1)(i)(B) |
| RTCM C191 | 1993 | Radio Technical Commission for Maritime Services | Recommended Standards for Marine Radar Equipment Installed on Ships of 300 Tons Gross Tonnage and Upwards | 33 CFR 164.72(a)(1)(iii)(B) |
| SAE Paper 770141 | 1977 | Society of Automotive Engineers | Optimization of a Flame Ionization Detector for Determination of Hydrocarbon in Diluted Automotive Exhausts | 40 CFR 1065.360(c) |
| SAE J4C | 1965 | Society of Automotive Engineers | Motor Vehicle Seat Belt Assembly | 29 CFR 1928.51(b)(2)(ii) |
| SAE J30 | 1998 | Society of Automotive Engineers | Fuel and Oil Hoses | 40 CFR 1051.501(c)(2) |
| SAE J166 | 1971 | Society for Automotive Engineering | Minimum Performance Criteria for Brake Systems for Off-Highway Trucks and Wagons | 29 CFR 1926.602(a)(4) |
| SAE J166 | 1971 | Society of Automotive Engineers | Minimum Performance Criteria for Brake Systems for Off-Highway Trucks and Wagons | 29 CFR 1926.602(a)(4) |
| SAE J167 | 1970 | Society for Automotive Engineering | Protective Frame with Overhead Protection | 29 CFR 1926.1003(g) |
| SAE J167 | 1974 | Society of Automotive Engineers | Protective Frame with Overhead Protection | 30 CFR 77.403-1(d)(1)(v) |
| SAE J168 | 1970 | Society for Automotive Engineering | Protective Enclosures--Test Procedures and Performance Requirements | 29 CFR 1926.1002(a)(5)(i) |
| SAE J185 | 1988 | Society of Automotive Engineers | Recommended Practice for Access Systems for Off-Road Machines | 29 CFR 1910.266(f)(5)(i) |
| SAE J186A | 1977 | Society of Automotive Engineers | Supplemental High Mounted Stop and Rear Turn Signal Lamps | 49 CFR 571.108 |
| SAE J211-1 (pdf) SAE J211-1 (html) | 1995 | Society of Automotive Engineers | Instrumentation for Impact Test | 49 CFR 571 |
| SAE J211 | 1971 | Society of Automotive Engineers | Instrumentation for Impact Tests | 49 CFR 571.222 S6.6.2 |
| SAE J222 | 1970 | Society of Automotive Engineers | Parking Lamps (Position Lamps) | 49 CFR 571.108 S5.1.1.6 |
| SAE J231 | 1971 | Society for Automotive Engineering | Minimum Performance Criteria for Falling Object Protective Structures (FOPS) | 30 CFR 77.403(a) |
| SAE J231 | 1971 | Society of Automotive Engineers | Minimum Performance Criteria for Falling Object Protective Structures (FOPS) | 30 CFR 77.403(a) |
| SAE J231 | 1981 | Society of Automotive Engineers | Minimum Performance Criteria for Falling Object Protective Structures | 29 CFR 1910.266(f)(3)(iii) |

(FOPS)

| SAE J236 | 1971 | Society for Automotive Engineering | Minimum Performance Criteria for Brake Systems for Rubber Tire Self-Propelled Graders | 29 CFR 1926.602(a)(4) |
|----------|------|-----------------------------------|--------------------------------------------------------------------------------------|----------------------|
| SAE J237 | 1971 | Society for Automotive Engineering | Minimum Performance Criteria for Brake Systems for Off-Highway Rubber-Tired Front End Loaders and Dozers | 29 CFR 1926.602(a)(4) |
| SAE J244 | 1983 | Society for Automotive Engineering | Recommend Practice for Measurement of Intake Air or Exhaust Gas Flow of Diesel Engines | 40 CFR 92.108(a)(3) |
| SAE J319 | 1971 | Society of Automotive Engineers | Minimum Performance Criteria for Brake Systems for Off-Highway Rubber-Tired Self-Propelled Scrapers | 29 CFR 1926.602(a)(4) |
| SAE J320 | 1972 | Society for Automotive Engineering | Minimum Performance Criteria for Roll-Over Protective Structures for Rubber-Tired Self-Propelled Scrapers | 29 CFR 1926.1001(h) |
| SAE J320A | 1969 | Society of Automotive Engineers | Minimum Performance Criteria for Roll-Over Protective Structures for Rubber-Tired Self-Propelled Scrapers | 30 CFR 77.403-1(d)(1)(i) |
| SAE J321 | 1970 | Society of Automotive Engineers | Fenders for Pneumatic-Tired Earthmoving Haulage Equipment | 29 CFR 1926.602(a)(5) |
| SAE J333 | 1970 | Society for Automotive Engineering | Operation Protection for Wheel-Type Agricultural and Industry Tractors | 29 CFR 1926.602(a)(2) |
| SAE J334 | 1968 | Society of Automotive Engineers | Protective Frame Test Procedures and Performance Requirements | 30 CFR 77.403-1(d)(1)(vi) |
| SAE J334 | 1970 | Society for Automotive Engineering | Protective Frame Test Procedures and Performance Requirements | 30 CFR 77.403-1(d)(1)(vi) |
| SAE J386 | 1969 | Society of Automotive Engineers | Operator Restraint Systems for Off-Road Work Machines | 29 CFR 1926.602(a)(2) |
| SAE J386 | 1985 | Society for Automotive Engineering | Operator Restraint Systems for Off-Road Work Machines | 30 CFR 56.14130(h) |
| SAE J386 | 1993 | Society of Automotive Engineers | Operator Restraint Systems for Off-Road Work Machines | 30 CFR 56.14130(h) |
| SAE J386 | 1997 | Society of Automotive Engineers | Operator Restraint Systems for Off-Road Work Machines | 30 CFR 57.14131(c) |
| SAE J387 (pdf) SAE J387 (html) | 1987 | Society of Automotive Engineers | Terminology: Motor Vehicle Lighting | 49 CFR 571 |
| SAE J394 | 1969 | Society of Automotive Engineers | Minimum Performance Criteria for Roll-Over Protective Structures for Rubber-Tired Front End Loaders and Rubber-Tired Dozers | 30 CFR 77.403-1(d)(1)(ii) |
| SAE J394 | 1972 | Society of Automotive Engineers | Minimum Performance Criteria for Rollover Protective Structures for Wheeled Front-End Loaders and Wheeled Dozers | 30 CFR 77.403-1(d)(1)(ii) |
| SAE J395 | 1969 | Society of Automotive | Minimum Performance Criteria for | 30 CFR 77.403-1(d)(1) |

| | | Engineers | Roll-Over Protective Structures for Crawler Tractors and Crawler-Type Loaders | (iii) |
|---|---|---|---|---|
| SAE J396 | 1972 | Society for Automotive Engineering | Minimum Performance Criteria for Roll-Over Protective Structures for Motor Graders | 30 CFR 77.403-1(d)(1)(iv) |
| SAE J397 | 1969 | Society of Automotive Engineers | Deflection Limiting Volume-Protective Structures Laboratory Evaluation | 29 CFR 1926.1001(f)(1)(ii) |
| SAE J397 | 1988 | Society of Automotive Engineers | Deflection Limiting Volume-Protective Structures Laboratory Evaluation | 29 CFR 1910.266(f)(3)(iv) |
| SAE J429 | 1971 | Society for Automotive Engineering | Mechanical and Quality Requirements for Externally Threaded Fasteners | 30 CFR 77.403-1(d)(2)(iii)(B) |
| SAE J429 | 1983 | Society of Automotive Engineers | Mechanical and Quality Requirements for Externally Threaded Fasteners | 46 CFR 58.30-15(c) |
| SAE J429D | 1967 | Society of Automotive Engineers | Mechanical and Quality Requirements for Externally Threaded Fasteners | 30 CFR 77.403-1(d)(2)(iii)(B) |
| SAE J449a | 1963 | Society of Automotive Engineers | Surface Texture Control | 49 CFR 581.6(b)(1) |
| SAE J476a | 1961 | Society of Automotive Engineers | Dryseal Pipe Threads | 49 CFR 393.67(c)(3) |
| SAE J527 | 1967 | Society of Automotive Engineers | Brazed Double Wall Low Carbon Steel Tubing | 49 CFR 571.116 S6.13.3(b) |
| SAE J533 | 1972 | Society of Automotive Engineers | Flares for Tubing | 24 CFR 3280.703 |
| SAE J557 | 1968 | Society of Automotive Engineers | High Tension Ignition Cable | 33 CFR 183.440(a) |
| SAE J565 | 1969 | Society of Automotive Engineers | Semi-Automatic Headlamp Beam Switching Devices | 49 CFR 571.108 S5.5.1 |
| SAE J566 | 1960 | Society of Automotive Engineers | Headlamp Mountings | 49 CFR 571.108 |
| SAE J571 | 1976 | Society of Automotive Engineers | Dimensional Specification for Sealed Beam Headlamp Units | 49 CFR 571.108 |
| SAE J573d (pdf) SAE J573d (html) | 1968 | Society of Automotive Engineers | Requirements for Lamp Bulbs and Sealed Units | 49 CFR 571 |
| SAE J575 | 1970 | Society of Automotive Engineers | Test for Motor Vehicle Lighting Devices and Components | 49 CFR 571.108 S6.1 |
| SAE J575 | 1983 | Society for Automotive Engineering | Test for Motor Vehicle Lighting Devices and Components | 49 CFR 571.131 S6.2.3 |
| SAE J575 | 1988 | Society of Automotive Engineers | Test for Motor Vehicle Lighting Devices and Components | 49 CFR 571.108 S7.5.8.3(e) |
| SAE J576 | 1970 | Society of Automotive Engineers | Plastic Materials for Use in Optical Parts, such as Lenses and Reflectors, of Motor Vehicle Lighting Devices | 49 CFR 571.108 S6.2 |
| SAE J576 (pdf) | 1991 | Society of Automotive | Plastic Materials for Use in Optical | 49 CFR 571 |

| | | Engineers | Parts | |
|---|---|---|---|---|
| SAE J576 (html) | | | | |
| SAE J576B | 1966 | Society of Automotive Engineers | Plastic Materials for Use in Optical Parts, such as Lenses and Reflectors, of Motor Vehicle Lighting Devices | 49 CFR 571.108 S6.2 |
| SAE J578 (pdf) SAE J578 (html) | 1995 | Society of Automotive Engineers | Color Specifications for Electric Signal Lighting Devices | 49 CFR 571.403 |
| SAE J584 | 1964 | Society of Automotive Engineers | Motorcycle and Motor Driven Cycle Headlamps | 49 CFR 571.108 S7.9.1(a) |
| SAE J584 (pdf) SAE J584 (html) | 1993 | Society of Automotive Engineers | Requirements for Motorcycle Headlamps | 49 CFR 571 |
| SAE J585 | 1970 | Society for Automotive Engineering | Tail Lamps (Rear Position Lamps) for Use on Motor Vehicles Less Than 2032 mm in Overall Width | 49 CFR 571.108 S5.8.8 |
| SAE J585 | 1977 | Society for Automotive Engineering | Tail Lamps (Rear Position Lamps) for Use on Motor Vehicles Less Than 2032 mm in Overall Width | 49 CFR 571.108 S5.1.1.6 |
| SAE J585 | 2000 | Society of Automotive Engineers | Tail Lamps (Rear Position Light) | 49 CFR 571.108 S6.1 |
| SAE J586 | 1970 | Society of Automotive Engineers | Stop Lamps for Use on Motor Vehicles Less than 2032 mm in Overall Width | 49 CFR 571.108 S5.8.3(b) |
| SAE J586 | 1984 | Society for Automotive Engineering | Stop Lamps for Use on Motor Vehicles Less Than 2032 mm in Overall Width | 49 CFR 571.108 S6.1 |
| SAE J586 | 2000 | Society of Automotive Engineers | Stop Lamps for Use on Motor Vehicles Less than 2032 mm in Overall Width | 49 CFR 571.108 S6.1 |
| SAE J586B | 1966 | Society of Automotive Engineers | Stop Lamps for Use on Motor Vehicles Less than 2032 mm in Overall Width | 49 CFR 571.108 S5.8.3(a) |
| SAE J587 (pdf) SAE J587 (html) | 1981 | Society of Automotive Engineers | License Plate Lamps (Rear Registration Lamps) | 49 CFR 571 |
| SAE J588 | 1970 | Society for Automotive Engineering | Turn Signal Lamps for Use on Motor Vehicles Less Than 2032 mm in Overall Width | 49 CFR 571.108 S5.1.1.1 |
| SAE J588 | 1970 | Society of Automotive Engineers | Turn Signal Lamps for Use on Motor Vehicles Less Than 2032 mm in Overall Width | 49 CFR 571.108 S5.8.4(b) |
| SAE J588 (pdf) SAE J588 (html) | 1984 | Society of Automotive Engineers | Requirements for Turn Signal Lamps | 49 CFR 571 |
| SAE J588 | 2000 | Society of Automotive Engineers | Turn Signal Lamps for Use on Motor Vehicles Less Than 2032 mm in Overall Width | 49 CFR 393.25(c) |
| SAE J588D | 1966 | Society of Automotive Engineers | Turn Signal Lamps for Use on Motor Vehicles Less Than 2032 mm in Overall Width | 49 CFR 571.108 S5.8.4(a) |
| SAE J592 | 1972 | Society of Automotive Engineers | Clearance, Side Marker and Identification Lamps | 49 CFR 571.108 Table III |
| SAE J592 (pdf) SAE J592 (html) | 1992 | Society of Automotive Engineers | Clearance, Side Marker, and Identification Lamps | 49 CFR 571 |

| SAE J593C | 1968 | Society of Automotive Engineers | Back-up Lamps | 49 CFR 571.108 |
| SAE J594f (pdf) SAE J594f (html) | 1977 | Society of Automotive Engineers | Requirements for Reflex Reflectors | 49 CFR 571 |
| SAE J599 | 1997 | Society of Automotive Engineers | Lighting Inspection Code | 49 CFR 581.5(c)(1) |
| SAE J602 (pdf) SAE J602 (html) | 1980 | Society of Automotive Engineers | Mechanically Aimable Sealed Beam Headlamps | 49 CFR 571 |
| SAE J743A | 1964 | Society of Automotive Engineers | Tractor Mounted Side Boom | 29 CFR 1926.550(a)(18) |
| SAE J759 (pdf) SAE J759 (html) | 1995 | Society of Automotive Engineers | Lighting Identification Code | 49 CFR 571 |
| SAE J800C | 1973 | Society of Automotive Engineers | Recommended Practice, Motor Vehicle Seat Belt Installations | 49 CFR 571.209 |
| SAE J826 | 1962 | Society of Automotive Engineers | Devices for Use in Defining and Measuring Vehicle Seating Accommodations | 49 CFR 571.3(b) |
| SAE J826 | 1980 | Society for Automotive Engineering | Devices for Use in Defining and Measuring Vehicle Seating Accommodations | 49 CFR 571.214 S12.1.3(b)(1) |
| SAE J826 (pdf) SAE J826 (html) | 1995 | Society of Automotive Engineers | Defining and Measuring Vehicle Seating Accommodation | 49 CFR 571 |
| SAE J839 | 1991 | Society of Automotive Engineers | Passenger Car Side Door Latch System | 49 CFR 571.206 |
| SAE J839B | 1965 | Society of Automotive Engineers | Passenger Car Side Door Latch System | 49 CFR 571.201 |
| SAE J845 | 1997 | Society of Automotive Engineers | Optical Warning Devices for Authorized Emergency, Maintenance and Service Vehicles | 49 CFR 393.25(e) |
| SAE J887 | 1964 | Society of Automotive Engineers | School Bus Red Signal Lamps | 49 CFR 571.108 |
| SAE J902A | 1967 | Society of Automotive Engineers | Passenger Car Windshield Defrosting Systems | 49 CFR 571.103 |
| SAE J934 | 1965 | Society of Automotive Engineers | Recommended Practice for Vehicle Passenger Door Hinge Systems | 49 CFR 571.206 |
| SAE J942 | 1965 | Society of Automotive Engineers | Passenger Car Windshield Washer System | 49 CFR 571.104 |
| SAE J944 | 1980 | Society for Automotive Engineering | Steering Control System-Passenger Car-Laboratory Test Procedure | 49 CFR 571.203 S5.1(a) |
| SAE J945 | 1966 | Society of Automotive Engineers | Vehicular Hazard Warning Signal Flashers | 49 CFR 571.108 Table I |
| SAE J959 | 1966 | Society of Automotive Engineers | Lifting Crane Wire-Rope Strength Factors | 29 CFR 1926.550(a)(7) (vi) |
| SAE J964 | 1984 | Society for Automotive Engineering | Test Procedure for Determining Reflectivity of Rear View Mirrors | 49 CFR 571.111 |
| SAE J972 | 1966 | Society of Automotive Engineers | Moving Barrier Collision Test | 49 CFR 571.105 |
| SAE J995 | 1967 | Society of Automotive Engineers | Mechanical and Quality Requirements for Steel Nuts | 30 CFR 77.403-1(d)(2) (iii)(B) |

| SAE J995 | 1971 | Society of Automotive Engineers | Mechanical and Quality Requirements for Steel Nuts | 30 CFR 77.403-1(d)(2)(iii)(B) |
|---|---|---|---|---|
| SAE J1040 | 1994 | Society of Automotive Engineers | Performance Criteria for Rollover Protective Structures (ROPS) for Construction, Earthmoving, Forestry and Mining Machines | 30 CFR 56.14130(b)(1) |
| SAE J1063 | 1993 | Society of Automotive Engineers | Cantilevered Boom Crane Structures--Method of Test | 29 CFR 1926.1433(c) |
| SAE J1100 | 1984 | Society for Automotive Engineering | Motor Vehicle Dimensions | 49 CFR 571.3(b) |
| SAE J1100 (pdf) SAE J1100 (html) | 2001 | Society of Automotive Engineers | Motor Vehicle Dimensions | 49 CFR 571 |
| SAE J1127 | 1980 | Society for Automotive Engineering | Battery Cable | 33 CFR 183.430(a)(2)(ii) |
| SAE J1128 | 1975 | Society of Automotive Engineers | Low Tension Primary Cable | 33 CFR 183.430(a)(2)(ii) |
| SAE J1133 | 1984 | Society for Automotive Engineering | School Bus Stop Arm | 49 CFR 571.131 S6.2.3 |
| SAE J1151 | 1991 | Society of Automotive Engineers | Methane Measurement Using Gas Chromatography | 40 CFR 86.111-94(b)(3)(vii) |
| SAE J1194 | 1983 | Society for Automotive Engineering | Roll-Over Protective Structures for Wheeled Agricultural Tractors | 30 CFR 56.14130(h) |
| SAE J1194 | 1994 | Society of Automotive Engineers | Roll-Over Protective Structures for Wheeled Agricultural Tractors | 30 CFR 56.14130(h) |
| SAE J1194 | 1999 | Society of Automotive Engineers | Roll-Over Protective Structures for Wheeled Agricultural Tractors | 30 CFR 57.14130(h) |
| SAE J1228 | 1991 | Society of Automotive Engineers | Small Craft-Marine Propulsion Engine and Systems-Power Measurements and Declarations | 40 CFR 91.115(a) |
| SAE J1292 | 1981 | Society of Automotive Engineers | Automobile, Truck, Truck-Tractor, Trailer, and Motor Coach Wiring | 49 CFR 393.28 |
| SAE J1318 | 1986 | Society of Automotive Engineers | Gaseous Discharge Warning Lamp for Authorized Emergency, Maintenance, and Service Vehicles | 49 CFR 393.25(e) |
| SAE J1383 (pdf) SAE J1383 (html) | 1985 | Society of Automotive Engineers | Performance Requirements for Motor Vehicle Headlamps | 49 CFR 571 |
| SAE J1395 (pdf) SAE J1395 (html) | 1985 | Society of Automotive Engineers | Turn Signal Lamps for Use on Motor Vehicles | 49 CFR 571 |
| SAE J1398 (pdf) SAE J1398 (html) | 1985 | Society of Automotive Engineers | Stop Lamps for Use on Motor Vehicles | 49 CFR 571 |
| SAE J1475 | 1984 | Society for Automotive Engineering | Hydraulic Hose Fittings for Marine Applications | 46 CFR 27.211(e)(2)(v)(B) |
| SAE J1527 | 1993 | Society of Automotive Engineers | Marine Fuel Hoses | 33 CFR 183.540(a) |
| SAE J1703 | 1983 | Society for Automotive Engineering | Motor Vehicle Brake Fluid | 49 CFR 571.116 S6.5.4.1 |
| SAE J1703 (pdf) SAE J1703 (html) | 1995 | Society of Automotive Engineers | Motor Vehicle Brake Fluids | 49 CFR 571 |
| SAE J1733 (pdf) | 1994 | Society of Automotive | Sign Convention for Vehicle Crash | 49 CFR 572 |

| | | | | |
|---|---|---|---|---|
| SAE J1733 (html) | | Engineers | Testing | |
| SAE J1817 | 2001 | Society of Automotive Engineers | Long Stroke Air Brake Actuator Marking | 49 CFR 393.47(e) |
| SAE J1850 | 1995 | Society of Automotive Engineers | Class B Data Communication Network Interface | 40 CFR 86.099-17(h)(1)(i) |
| SAE J1850 | 2001 | Society of Automotive Engineers | Class B Data Communication Network Interface | 40 CFR 86.1806-05(h)(1)(i) |
| SAE J1877 | 1994 | Society of Automotive Engineers | Recommended Practice for Bar-Coded Vehicle Identification Number Label | 40 CFR 86.095-35(h)(2)(i) |
| SAE J1892 | 1993 | Society of Automotive Engineers | Recommended Practice for Bar-Coded Vehicle Emission Configuration Label | 40 CFR 86.095-35(h)(2)(i) |
| SAE J1930 | 1993 | Society of Automotive Engineers | Electrical/Electronic Systems Diagnostic Terms, Definitions, Abbreviations, and Acronyms | 40 CFR 1039.135(c)(8) |
| SAE J1930 | 2002 | Society of Automotive Engineers | Electrical/Electronic Systems Diagnostic Terms, Definitions, Abbreviations, and Acronyms | 40 CFR 86.1806-05(h)(1)(v) |
| SAE J1937 | 1989 | Society of Automotive Engineers | Recommended Practice for Engine Testing with Low Temperature Charge Air Cooler Systems in a Dynamometer Test Cell | 40 CFR 86.1330-90(b)(5) |
| SAE J1962 | 1995 | Society of Automotive Engineers | Diagnostic Connector Equivalent to ISO/DIS | 40 CFR 86.094-17(h)(4) |
| SAE J1962 | 2002 | Society of Automotive Engineers | Diagnostic Connector Equivalent to ISO/DIS 15031 | 40 CFR 86.1806-05(h)(1)(iv) |
| SAE J1978 | 2002 | Society of Automotive Engineers | OBD II Scan Tool Equivalent to ISO/DIS 15031-4 | 40 CFR 86.1806-05(h)(1)(vi) |
| SAE J1979 | 2002 | Society of Automotive Engineers | E/E Diagnostic Test Modes | 40 CFR 86.1806-05(h)(1)(ii) |
| SAE J2009 (pdf) SAE J2009 (html) | 1993 | Society of Automotive Engineers | Discharge Forward Lighting Systems | 49 CFR 571 |
| SAE J2012 | 2002 | Society of Automotive Engineers | Diagnostic Trouble Code Definitions | 40 CFR 86.1806-04(h)(1)(iii) |
| SAE J2040 | 2002 | Society of Automotive Engineers | Tail Lamps (Rear Position Lamps) for Use on Vehicles 2032 mm or More in Overall Width | 9 CFR 393.25(c) |
| SAE J2260 | 1996 | Society of Automotive Engineers | Non-metallic Fuel System Tubing with One or More Layers | 40 CFR 1048.105(a)(2) |
| SAE J2261 | 2002 | Society of Automotive Engineers | Stop Lamps and Front- and Rear-Turn Signal Lamps for Use on Motor Vehicles 2032 mm or More in Overall Width | 49 CFR 393.25(c) |
| SAE J2534 | 2002 | Society of Automotive Engineers | Recommended Practice for Pass-Thru Vehicle Programming | 40 CFR 86.096-38(g)(17)(iv) |
| SCTE 26 | 2010 | Society of Cable Telecommunications Engineers | Home Digital Network Interface Specification with Copy Protection | 47 CFR 76.640(b)(4)(iii) |
| SCTE 28 | 2007 | Society of Cable | Host-POD Interface Standard | 47 CFR 15.123(b)(4) |

| | | Telecommunications Engineers | | |
|---|---|---|---|---|
| SCTE 40 | 2004 | Society of Cable Telecommunications Engineers | Digital Cable Network Interface Standard (2004) | 47 CFR 15.123(b)(2) |
| SCTE 40 | 2011 | Society of Cable Telecommunications Engineers | Digital Cable Network Interface Standard (2011) | 47 CFR 15.123(b)(2) |
| SCTE 41 | 2011 | Society of Cable Telecommunications Engineers | POD Copy Protection System | 47 CFR 76.640(b)(2)(ii) |
| SCTE 54 | 2009 | Society of Cable Telecommunications Engineers | Digital Video Service Multiplex and Transport System Standard for Cable Television | 47 CFR 15.123(b)(3) |
| SCTE 65 | 2008 | Society of Cable Telecommunications Engineers | Service Information Delivered Out-of-Band for Digital Cable Television | 47 CFR 76.640(b)(1)(ii) |
| SEAC | 1996 | Structural Engineers Association of California | Recommended Lateral Force Requirements and Commentary including Errata | 42 CFR 52b.12(c)(5) |
| SJI | 1994 | Steel Joist Institute | Standard Specification Load Tables and Weight Tables for Steel Joists and Joist Girders | 24 CFR 3280.304(b)(1) |
| SMACCNA HVAC (pdf) SMACCNA HVAC (html) SMACCNA HVAC (svg) | 1985 | Sheet Metal and Air Conditioning Contractors National Association | SMACNA: HVAC Air Duct Leakage Test Manual | 10 CFR 434.403.2.9.3 |
| SMACCNA DUCT (pdf) SMACCNA DUCT (html) SMACCNA DUCT (svg) | 1995 | Sheet Metal and Air Conditioning Contractors National Association | SMACCNA: HVAC Duct Construction Standards -- Metal and Flexible (RS-34) | 10 CFR 434.403.2.9.3 |
| SMACCNA GLASS (pdf) | 1992 | Sheet Metal and Air Conditioning Contractors National Association | SMACCNA: Fibrous Glass Duct Construction Standards (RS-36) | 10 CFR 434.403.2.9.3 |
| SMACCNA AIR (pdf) | 1978 | Sheet Metal and Air Conditioning Contractors National Association | SMACCNA: Energy Recovery Equipment and Systems, Air-to-Air | 10 CFR 440 Appendix A |
| NIST Handbook H-28 | 1942 | Department of Commerce | Handbook of Screw-Thread Standards for Federal Service | 49 CFR 178.45(f)(5)(ii) |
| DOD AFTO 11A-1-47 | 1988 | Department of Defense | Explosive Hazard Classification Procedures | 49 CFR 173.56(b)(2)(i) |
| FedSpec RR-C-901D | 2003 | Department of Transportation | Cylinders, Compressed Gas: High Pressure, Steel DOT 3AA, and Aluminum Applications | 49 CFR 173.302(b)(3) |
| RTCA 23-63 | 1963 | Radio Technical Commission for Aeronautics | Standard Adjustment Criteria for Airborne Localizer and Glide Slope Receivers | 14 CFR 91 App. A, 3(a)(1) |

| SNELL B-90 | 1998 | Snell Memorial Foundation | Standard for Protective Headgear for Use in Bicycling | 16 CFR 1203.53(a)(4) |
| SNELL B-95 | 1998 | Snell Memorial Foundation | Standard for Protective Headgear for Use in Bicycling | 16 CFR 1203.53(a)(7) |
| SRCC OG-300 | 2008 | Solar Rating and Certification Corporation | Operating Guidelines and Minimum Standards for Certifying Solar Water Heating Systems | 24 CFR 200.950(a)(1) |
| TPI | 1985 | Truss Plate Institute | Design Specifications for Metal Plate Connected Wood Trusses | 24 CFR 3280.304(b)(1) |
| TTMA RP-61 | 1998 | Truck Trailer Manufacturers Association | Performance of Manhole and/or Fill Opening Assemblies | 49 CFR 180.405(g)(2)(i) |
| TTMA RP-81 | 1997 | Truck Trailer Manufacturers Association | Performance of Spring Loaded Pressure Relief Valves | 49 CFR 178.345-10(b)(3)(i) |
| TTMA RP-107 | 1998 | Truck Trailer Manufacturers Association | Procedure for Testing In-Service Unmarked and/or Uncertified MC 306 and Non-ASME MC 312 Type Cargo Tank Manhole | 49 CFR 180.405(g)(2)(i) |
| UL 17 | 1988 | Underwriters Laboratories | Vent or Chimney Connector Dampers for Oil-Fired Appliances | 10 CFR 440 Appendix A |
| UL 38 | 1993 | Underwriters Laboratories | Standard for Manually Actuated Signaling Boxes for Use with Fire-Protective Signaling Systems | 46 CFR 161.002-4(b)(1) |
| UL 44 | 2002 | Underwriters Laboratories | Standard for Thermoset-Insulated Wire and Cable | 46 CFR 110.10-1 |
| UL 50 | 1995 | Underwriters Laboratories | Standard for Enclosures for Electrical Equipment | 46 CFR 111.81-1(d) |
| UL 62 | 1997 | Underwriters Laboratories | Standard for Flexible Cord and Fixture Wire | 46 CFR 110.10-1 |
| UL 127 | 1996 | Underwriters Laboratories | Factory-Built Fireplaces | 24 CFR 3280 |
| UL 142 (pdf) UL 142 (html) | 1968 | Underwriters Laboratories | Steel Above Ground Tanks for Flammable and Combustible Liquids | 49 CFR 1910 |
| UL 174 | 1989 | Underwriters Laboratories | Household Electric Storage Tank Water Heaters | 46 CFR 63.25-3(a) |
| UL 217 | 1993 | Underwriters Laboratories | Single and Multiple Station Smoke Detectors | 46 CFR 181.450(a)(1) |
| UL 486A | 1990 | Underwriters Laboratories | Wire Connections and Soldering Lugs for Use With Copper Conductors | 46 CFR 175.600 |
| UL 521 | 1993 | Underwriters Laboratories | Heat Detectors for Fire Protective Signaling Systems | 46 CFR 161.002-4(b)(1) |
| UL 727 | 1994 | Underwriters Laboratories | Oil-Fired Central Furnaces | 10 CFR 431.76(c)(1) |
| UL 746C | 1995 | Underwriters Laboratories | Polymeric Material--Use in Electrical Equipment Evaluations | 16 CFR 1211.10(e)(2) |
| UL 913 | 1988 | Underwriters Laboratories | Intrinsically Safe Apparatus and Associated Apparatus for Use in | 46 CFR 111.105-11(a) |

| | | | Class I, II, and III Division 1, Hazardous (Classified) Locations | |
|---|---|---|---|---|
| UL 991 | 1995 | Underwriters Laboratories | Tests for Safety-Related Controls Employing Solid-State Devices | 16 CFR 1211.4(c) |
| UL 1042 | 1995 | Underwriters Laboratories | Electric Baseboard Heating Equipment | 24 CFR 3280.703 |
| UL 1072 | 1995 | Underwriters Laboratories | Standard for Medium-Voltage Power Cables | 46 CFR 111.60-1(e) |
| UL 1096 | 1986 | Underwriters Laboratories | Electrical Central Air Heating Equipment | 24 CFR 3280.703 |
| UL 1104 | 1983 | Underwriters Laboratories | Standard for Marine Navigation Lights | 46 CFR 120.420 |
| UL 1426 | 1986 | Underwriters Laboratories | Cables for Boats | 33 CFR 183.435(a)(4) |
| UL 1570 | 1995 | Underwriters Laboratories | Fluorescent Lighting Fixtures | 46 CFR 183.410(d) |
| UL 1571 | 1995 | Underwriters Laboratories | Incandescent Lighting Fixtures | 46 CFR 111.75-20(e) |
| UL 1572 | 1995 | Underwriters Laboratories | High Intensity Discharge Lighting Fixtures | 46 CFR 120.410(d) |
| UL 1574 | 1995 | Underwriters Laboratories | Track Lighting Systems | 46 CFR 111.75-20(e) |
| UL 1995 | 1995 | Underwriters Laboratories | Heating and Cooling Equipment, Second Edition, with 1999 revisions | 24 CFR 3280.4 |
| UN ECE | 1996 | United Nations Economic Commission of Europe | Uniform Provisions Concerning the Approval of Vehicles with Regard to the Installation of Lighting and Light-Signaling Devices | 49 CFR 571.108 |
| UN ESC | 2009 | United Nations Economic and Social Council | Recommendations on the Transport of Dangerous Goods, Manual of Tests and Criteria | 49 CFR 173.128(c)(3) |
| UN ESC | 2005 | United Nations Economic and Social Council | Recommendations on the Transport of Dangerous Goods | 49 CFR 173.40(d)(2) |
| FAO 4 | 1995 | UN Food and Agriculture Organization | Requirements for the Establishment of Pest-free Areas | 7 CFR 319.56 |
| IAEA Circular 225 | 1999 | International Atomic Energy Agency | Physical Protection of Nuclear Material and Nuclear Facilities | 10 CFR 110.44(b)(1) |
| IAEA TS-R-1 | 2009 | International Atomic Energy Agency | Regulations for the Safe Transport of Radioactive Material | 49 CFR 171.23 |
| IMO Resolution A.264 | 1960 | International Maritime Organization | Amendment to Chapter VI of the International Convention for the Safety of Life at Sea | 46 CFR 172.015(a)(2) |
| IMO Resolution A.265 | 1973 | International Maritime Organization | Carriage of Grain | 46 CFR 170.135(a) |
| IMO Resolution A.342 | 1975 | International Maritime Organization | Recommendations on Performance Standards for Automatic Pilots | 33 CFR 164.13(d)(1) |
| IMO Resolution A.414 | 1979 | International Maritime Organization | Code for Construction and Equipment of Mobile Offshore | 33 CFR 143.207(c) |

| | | | Drilling Units | |
|---|---|---|---|---|
| IMO Resolution A.520 | 1983 | International Maritime Organization | Code of Practice for the Evaluation, Testing and Acceptance of Prototype Novel Life-Saving Appliances and Arrangements | 46 CFR 108.105(c)(1) |
| IMO Resolution A.525 | 1983 | International Maritime Organization | Performance Standards for Narrow-band Direct Printing Telegraph Equipment for the Reception of Navigational and Meteorological Warnings | 47 CFR 80.1101(c)(1)(i) |
| IMO Resolution A.601 | 1987 | International Maritime Organization | Provision and Display of Manoeuvering Information on Board Ships | 33 CFR 157.450 |
| IMO Resolution A.649 | 1991 | International Maritime Organization | Code for the Construction and Equipment of Mobile Offshore Drilling Units (MODU Code) | 46 CFR 108.503 |
| IMO Resolution A.654 | 1989 | International Maritime Organization | Graphical Symbols for Fire Control Plans | 46 CFR 109.563(a)(6) |
| IMO Resolution A.657 | 1989 | International Maritime Organization | Instructions for Action in Survival Craft | 46 CFR 160.151-21(v)(3) |
| IMO Resolution A.658 | 1989 | International Maritime Organization | Use and Fitting of Retro-Reflective Materials on Life-Saving Appliances | 46 CFR 108.645(a)(4) |
| IMO Resolution A.662 | 1989 | International Maritime Organization | Performance Standards for Float-Free Release and Activation Arrangements for Emergency Radio Equipment | 47 CFR 80.1101(c)(11)(ii) |
| IMO Resolution A.664 | 1989 | International Maritime Organization | Performance Standards for Enhanced Group Call Equipment | 47 CFR 80.1101(c)(10) |
| IMO Resolution A.688 | 1991 | International Maritime Organization | Fire Test Procedures for Ignitability of Bedding Components | 46 CFR 116.405(j)(2) |
| IMO Resolution A.689 | 1996 | International Maritime Organization | Recommendation on Testing Life-Saving Appliances | 46 CFR 160.151-21(f) |
| IMO Resolution A.694 | 1991 | International Maritime Organization | General Requirements for Shipborne Radio Equipment Forming Part of the Global Maritime Distress and Safety System and for Electronic Navigational Aids | 47 CFR 80.1101(b)(1) |
| IMO Resolution A.700 | 1991 | International Maritime Organization | Performance Standards for Narrow-band Direct-printing Telegraph Equipment for the Reception of Navigational and Meteorological Warnings and Urgent Information to Ships | 47 CFR 80.1101(c)(4)(iv) |
| IMO Resolution A.739 | 1993 | International Maritime Organization | Guidelines for the Authorization of Organizations Acting on Behalf of the Administration | 33 CFR 96.440(a)(12) |
| IMO Resolution A.741 | 1993 | International Maritime Organization | International Management Code for the Safe Operation of Ships and for Pollution Prevention | 33 CFR 96.220(b) |
| IMO Resolution A.744 | 1993 | International Maritime Organization | Guidelines on the Enhanced Program of Inspections During Surveys of Bulk Carriers and Oil | 33 CFR 157.430(a) |

| | | | Tankers | |
|---|---|---|---|---|
| IMO Resolution A.751 | 1994 | International Maritime Organization | Interim Standards for Ship Manoeuverability | 33 CFR 157.445(a) |
| IMO Resolution A.753 | 1993 | International Maritime Organization | Guidelines for the Application of Plastic Pipe on Ships | 46 CFR 56.60-25(a) |
| IMO Resolution A.760 | 1993 | International Maritime Organization | Symbols Related to Life-Saving Appliances and Arrangements | 46 CFR 108.646(a) |
| IMO Resolution A.788 | 1995 | International Maritime Organization | Guidelines on Implementation of the International Safety Management (ISM) Code by Administrations | 33 CFR 96.320(c)(2) |
| IMO Resolution A.802 | 1995 | International Maritime Organization | Performance Standards for Survival Craft Radar Transponders for Use in Search and Rescue Operations | 47 CFR 80.1101(c)(6)(i) |
| IMO Resolution A.803 | 1995 | International Maritime Organization | Performance Standards for Shipborne VHF Radio Installations Capable of Voice Communication and Digital Selective Calling | 47 CFR 80.1101(c)(2)(i) |
| IMO Resolution A.804 | 1995 | International Maritime Organization | Performance Standards for Shipborne MF Radio Installations Capable of Voice Communication and Digital Selective Calling | 47 CFR 80.1101(c)(3)(i) |
| IMO Resolution A.806 | 1995 | International Maritime Organization | Performance Standards for Shipborne MF/HF Radio Installations Capable of Voice Communication, Narrow-Band Direct Printing and Digital Selective Calling | 47 CFR 80.1101(c)(4)(i) |
| IMO Resolution A.807 | 1995 | International Maritime Organization | Performance Standards for INMARSAT Standard-C Ship Earth Stations Capable of Transmitting and Receiving Direct-Printing Communications | 47 CFR 80.1101(c)(9) |
| IMO Resolution A.808 | 1995 | International Maritime Organization | Performance Standards for Ship Earth Stations Capable of Two-Way Communications | 47 CFR 80.1101(c)(8) |
| IMO Resolution A.809 | 1995 | International Maritime Organization | Performance Standards for Survival Craft Two-Way VHF Radiotelephone Apparatus | 47 CFR 80.1101(c)(7)(i) |
| IMO Resolution A.810 | 1995 | International Maritime Organization | Performance Standards for Float-free Satellite Emergency Position-Indicating Radio Beacons (EPIRBs) Operating on 406 MHz | 47 CFR 80.1101(c)(5)(i) |
| IMO Resolution A.812 | 1995 | International Maritime Organization | Performance Standards for Float-Free Satellite EPIRBs Operating Through the Geostationary INMARSAT Satellite System on 1.6 GHz | 47 CFR 80.1101(c)(11)(i) |
| USEC 651 | 1995 | United States Enrichment Corporation | Good Handling Practices for Uranium Hexafluoride | 49 CFR 173.417(a)(3)(i) |
| USPHS 934 | 1962 | U.S. Public Health Service | Food Service Sanitation Ordinance and Code | 29 CFR 1910.142(i)(1) |

| USPHS 956 | 1962 | U.S. Public Health Service | Drinking Water Standards | 46 CFR 160.026-4(a) |
| USPHS 934 | 1962 | U.S. Public Health Service | Food Service Sanitation Ordinance and Code | 29 CFR 1910.142(i)(1) |
| USPHS 9 | 2003 | U.S. Public Health Service | The Ships Medicine Chest and Medical Aid at Sea | 33 CFR 143.405(a)(15) |
| WCLIB R17 | 2004 | West Coast Lumber Inspection Bureau | Grading Rules for West Coast Lumber | 7 CFR 1728.201(f)(1)(i) |
| WHO | 1973 | World Health Organization | Laboratory Techniques in Rabies | 9 CFR 113.209(d)(3) |
| WIPO ST.25 | 2001 | World Intellectual Property Organization | Handbook on Industrial Property Information and Documentation | 37 CFR 1.821(a)(1) |
| WQA S-100 | 1985 | Water Quality Association | Water Softeners | 24 CFR 200, Subpart S |
| WQA S-200 | 1988 | Water Quality Association | Water Filters | 24 CFR 200, Subpart S |
| WQA S-300 | 1984 | Water Quality Association | Point-of-Use, Low Pressure Reverse Osmosis Drinking Water Systems | 24 CFR 200, Subpart S |
| WQA S-400 | 1986 | Water Quality Association | Point-of-Use Distillation Drinking Water Systems | 24 CFR 200, Subpart S |
| WSTDA T-1 | 2005 | Web Sling and Tiedown Association | Recommended Standard Specification for Synthetic Web Tiedowns | 49 CFR 393.104(e)(3) |

Last Updated: December 31, 2012

↑
Published by Public.Resource.Org

# EXHIBIT 3

## PREAMBLE—NOT PART OF THE SPECIFICATION

In order to promote public education and public safety, equal justice for all, a better informed citizenry, the rule of law, world trade and world peace, this legal document is hereby made available on a noncommercial basis, as it is the right of all humans to know and speak the laws that govern them.

The reader is advised:

- In this file, Public.Resource.Org has transformed this specification into the Hypertext Markup Language (HTML) for the purpose of informing citizens of their rights and obligations by making these provisions more accessible and more usable.

- This specification has been incorporated by reference into federal law by the Consumer Product Safety Commission as part of the Safety Standard for Toy Safety (15 USC 2056b).

- Public.Resource.Org has made no changes to this specification. Any errors in the transformation of this specification should be reported to Public.Resource.Org.

- All hyperlinks to named standards are to versions that have been incorporated by reference into law and may not be the latest version.

- This file is based on the HTML 5, MathML, SVG, and CSS specifications and may not be compatible with some older browsers.

- Users may wish to modify this file. In particular, the header section calls the MathJax library and users may wish to use native MathML instead. There are also two calls to Google Fonts and one to our own external style sheet.

- Internal IDs have been assigned to each clause and section (e.g., s3.1), figure ("f1"), table ("t1"), and equation ("eq1").

- Public.Resource.org is not affiliated in any way with any of the organizations named herein.

## END OF PREAMBLE—NOT PART OF THE SPECIFICATION

### Designation: F963 - 11 An American National Standard

# Standard Consumer Safety Specification for Toy Safety[1]

This standard is issued under the fixed designation F963; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

¹ This consumer safety specification is under the jurisdiction of ASTM Committee F15 on Consumer Products and is the direct responsibility of Subcommittee F15.22 on Toy Safety.

Current edition approved Dec. 1, 2011. Published December 2011. Originally approved in 1986. Last previous edition approved in 2008 as F963 – 08. DOI: 10.1520/F0963-11.

Copyright © ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States.

## Table of Contents

PREAMBLE—NOT PART OF THE SPECIFICATION

INTRODUCTION

1. Scope

2. Referenced Documents

3. Terminology

4. Safety Requirements

5. Labeling Requirements

6. Instructional Literature

7. Producer's Markings

8. Test Methods

9. Identification

10. Keywords

A1. AGE GRADING GUIDELINES +

A2. PACKAGING AND SHIPPING

A3. DESIGN GUIDELINES FOR TOYS ATTACHED TO CRIBS OR PLAYPENS

A4. DESIGN GUIDELINES FOR BATH TOY PROJECTIONS

A5. FLAMMABILITY TESTING PROCEDURE FOR SOLIDS AND SOFT TOYS

A6. FLAMMABILITY TESTING PROCEDURE FOR FABRICS

A7. COMPOSITING PROCEDURE FOR TOTAL HEAVY METAL ANALYSIS

A8. RATIONALE FOR 2007 REVISIONS

A9. RATIONALE FOR 2008 REVISIONS

A10. RATIONALE FOR 2011 REVISIONS

# INTRODUCTION

The purpose of this consumer safety specification is to establish nationally recognized safety requirements for toys. Although this specification will not eliminate the need for the exercise of parental responsibility in selecting toys appropriate to the age of a child, or parental supervision in situations in which children of various ages may have access to the same toys, its application will minimize accidents in the normal, intended use and reasonably foreseeable abuse of the toys covered by this specification. This specification was developed originally as a Voluntary Product Standard under the auspices of the National Bureau of Standards, Department of Commerce, and published in 1976 (PS 72–76). The present revision is intended to update the safety requirements to include the following by reference: published federal mandatory requirements, relevant voluntary standards, certain new requirements for addressing potential hazards, and several technical revisions based on producer experience with the original standard.

# 1. Scope

1.1 This specification[2] relates to possible hazards that may not be recognized readily by the public and that may be encountered in the normal use for which a toy is intended or after reasonably foreseeable abuse. It does not purport to cover every conceivable hazard of a particular toy. This specification does not cover product performance or quality, except as related to safety. Except for the labeling requirements pointing out the functional hazards and age range for which the toy is intended, this specification has no requirements for those aspects of a toy that present an inherent and recognized hazard as part of the function of the toy. Such an example is a sharp point necessary for the function of a needle. The needle is an inherent hazard that is well understood by the purchaser of a toy sewing kit, and this hazard is communicated to the user as part of the normal educational process.

[2] Toy Industry Association, Inc. (TIA) sometimes provides its interpretations of this specification through its counsel as a service to its members and others. The TIA's interpretations are not reviewed or

approved by ASTM and should be viewed as TIA's alone.

1.2 On the other hand, while a riding toy has inherent hazards associated with its use (for example, falling off onto the sidewalk), the possible hazards associated with its construction (sharp edges, exposed mechanisms, etc.) will be minimized by the application of this specification.

1.3 This specification covers requirements and contains test methods for toys intended for use by children under 14 years of age. Different age limits for various requirements will be found in this specification. These limits reflect the nature of the hazards and expected mental or physical ability, or both, of a child to cope with the hazards.

1.4 Articles not covered by this specification are as follows:

- Bicycles

- Tricycles

- Non-Powered Scooters (see Consumer Safety Specification F2264)

- Recreational Powered Scooters and Pocket Bikes (see Consumer Safety Specification F2641)

- Sling shots and sharp-pointed darts

- Playground equipment

- Non-powder guns

- Kites

- Hobby and craft items in which the finished item is not primarily of play value

- Model kits in which the finished item is not primarily of play value

- Crayons, paints, chalks, and other similar art materials in which the material itself or the finished item is not primarily of play value, except that all art materials, whether or not a component of a toy, must comply with LHAMA, in accordance with 4.29.1-4.29.3.

- Toy Chests

- Sporting goods, camping goods, athletic equipment, musical instruments, juvenile products, and furniture; however, toys that are their counterparts are covered. (It is recognized that there is often a

fine line between, for example, a musical instrument or a sporting item and its toy counterpart. The intention of the producer or distributor, as well as normal use and reasonably foreseeable abuse, determines whether the item is a toy counterpart.)

- Powered models of aircraft, rockets, boats, and land vehicles; however, toys that are their counterparts are covered.

- Constant air inflatables

1.5 General guidelines for age labeling toys and toy packaging are contained in Annex A1.

1.6 Information regarding packaging and shipping is contained in Annex A2.

1.7 This consumer safety specification includes the following sections:

[See Table of Contents]

1.8 The values stated first are to be regarded as the standard. The values given in parentheses are for information only.

1.9 The following precautionary statement pertains only to the test methods portion, Section 8, of this specification: *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

## 2. Referenced Documents

**2.1** *ASTM Standards:* [3]

- D374 Test Methods for Thickness of Solid Electrical Insulation

- D642 Test Method for Determining Compressive Resistance of Shipping Containers, Components, and Unit Loads

- D880 Test Method for Impact Testing for Shipping Containers and Systems

- D999 Test Methods for Vibration Testing of Shipping Containers

- D1193 Specification for Reagent Water

- D2240 Test Method for Rubber Property—Durometer Hardness

- D3421 Practice for Extraction and Determination of Plasticizer Mixtures from Vinyl Chloride Plastics4

- D4236 Practice for Labeling Art Materials for Chronic Health Hazards

2

- D5276 Test Method for Drop Test of Loaded Containers by Free Fall

- F404 Consumer Safety Specification for High Chairs

- F406 Consumer Safety Specification for Non-Full-Size Baby Cribs/Play Yards

- F834 Consumer Safety Specification for Toy Chests

- F1313 Specification for Volatile *N*-Nitrosamine Levels in Rubber Nipples on Pacifiers

- F1148 Consumer Safety Performance Specification for Home Playground Equipment

- F2264 Consumer Safety Specification for Non-Powered Scooters

- F2641 Consumer Safety Specification for Recreational Powered Scooters and Pocket Bikes

- F2853 Test Method for Determination of Lead in Paint Layers and Similar Coatings or in Substrates and Homogenous Materials by Energy Dispersive X-Ray Fluorescence Spectrometry Using Multiple Monochromatic Excitation Beams

- F2923 Specification for Consumer Product Safety for Children's Jewelry

[3] For referenced ASTM standards, visit the ASTM website, www.astm.org, or contact ASTM Customer Service at service@astm.org. For *Annual Book of ASTM Standards* volume information, refer to the standard's Document Summary page on the ASTM website.

   Withdrawn. The last approved version of this historical standard is referenced on www.astm.org.

## 2.2 *ANSI Standards:*

- C18.1 American National Standard for Dry Cells and Batteries— Specifications

- S1.4 Specification for Sound Level Meters

Electronic copy available from American National Standards Institute website: www.ansi.org; hard copies from Global Engineering Documents, 15 Inverness Way East, Englewood, CO 80112.

## 2.3 *European Standards:*

- EN 71-1 Safety of toys - Part 1: Mechanical and physical properties

- EN 71-3 Safety of toys - Part 3: Migration of certain elements

Available from European Committee for Standardization (CEN), Avenue Marnix 17, B-1000, Brussels, Belgium, http://www.cen.eu.

## 2.4 *Federal Standards:*

- 15 CFR 1150 Marking of Toys, Look-Alike and Imitation Firearms

- 16 CFR 1303 Ban of Lead-Containing Paint and Certain Consumer Products Bearing Lead Containing Paint

- 16 CFR 1500 Hazardous Substances Act Regulations, including the following sections:

  - 16 CFR 1500.3 (c) (6) (vi) Definition of "flammable solid"

  - 16 CFR 1500.14 Products requiring special labeling under section 3(b) of the act

  - 16 CFR 1500.18 Banned toys and other banned articles intended for use by children

  - 16 CFR 1500.19 Misbranded toys and other articles intended for use by children

  - 16 CFR 1500.44 Method for determining extremely flammable and flammable solids

  - 16 CFR 1500.47 Method for determining the sound pressure level produced by toy caps

  - 16 CFR 1500.48 Technical requirements for determining a sharp point in toys and other articles intended for use by children under 8 years of age

  - 16 CFR 1500.49 Technical requirements for determining a sharp metal or glass edge in toys and other articles intended for use

by children under 8 years of age

- - 16 CFR 1500.50-1500.53 Test method for simulating use and abuse of toys and other articles intended for use by children

- - 16 CFR 1500.83 Exemptions for small packages, minor hazards, and special circumstances

- - 16 CFR 1500.85 Exemptions from classification as banned hazardous substances

- - 16 CFR 1500.86 Exemptions from classification as a banned toy or other banned article for use by children

- - 16 CFR 1500.87 Children's products containing lead: inaccessible component parts

- - 16 CFR 1500.88 Exemptions from lead limits under section 101 of the Consumer Product Safety Improvement Act for certain electronic devices

- - 16 CFR 1500.91 Determinations regarding lead content for certain materials or products under section 101 of the Consumer Product Safety Improvement Act

- 16 CFR 1501 Method for Identifying Toys and Other Articles Intended for Use by Children Under 3 Years of Age which Present Choking, Aspiration, or Ingestion Hazards Because of Small Parts

- 16 CFR 1505 Requirements for Electrically Operated Toys or Other Electrically Operated Articles Intended for Use by Children

- 16 CFR 1510 Requirements for Rattles

- 16 CFR 1511 Requirements for Pacifiers

- 16 CFR 1610 Standard for Flammability of Clothing Textiles

- 21 CFR 110 Current Good Manufacturing Practice in Manufacturing, Processing, Packaging, or Holding Human Food

- 21 CFR 170-189 Food for Human Consumption

- 21 CFR 700-740 Requirements for Specific Cosmetic Products

- 21 CFR 73, 74, 81, 82 Color Additives

- 49 CFR 173.100, 109 Definition of Class C Explosives

- CPSC-CH-E1001-08.1 Standard Operating Procedure for Determining Total Lead (Pb) in Metal Children's Products (including Children's Metal Jewelry)

- CPSC-CH-E1002-08.1 Standard Operating Procedure for Determining Total Lead (Pb) in Non-Metal Children's Products

- CPSC-CH-E1003-09 Standard Operating Procedure for Determining Lead (Pb) in Paint and Other Similar Surface Coatings

- CPSC-CH-E1004-11 Standard Operating Procedure for Determining Cadmium (Cd) Extractability from Children's Metal Jewelry

- SS-T-312B Tile, Floor: Asphalt, Rubber, Vinyl, VinylAsbestos

- Voluntary Product Standard PS 72-76 Toy Safety[10]

Available from U.S. Consumer Product Safety Commission website: www.cpsc.gov or U.S. Government Printing Office, Superintendent of Documents; P.O. Box 371954, Pittsburgh, PA 15250-7954; website: www.gpo.gov

Available from U.S. Consumer Product Safety Commission (CPSC), 4330 East West Hwy., Bethesda, MD 20814, http://www.cpsc.gov.

Available from U.S. Government Printing Office Superintendent of Documents, 732 N. Capitol St., NW, Mail Stop: SDE, Washington, DC 20401, http:// www.access.gpo.gov.

[10] Available from U.S. Government Printing Office Superintendent of Documents, 732 N. Capitol St., NW, Mail Stop: SDE, Washington, DC 20401, http:// www.access.gpo.gov.

**2.5** *ISO and IEC Standards:* [11]

- ISO 3696 Water for analytical laboratory use — Specification and test methods

- ISO 3746:1995 Acoustics—Determination of Sound Power Levels of Noise Sources Using Sound Pressure—Survey Method Using an Enveloping Measurement Surface Over a Reflecting Plane

- ISO 7779 Acoustics-Measurement of Airborne Noise Emitted by Computer and Business Equipment

- ISO 8124-1 Safety of toys – Part 1: Safety aspects related to mechanical and physical properties

- ISO 8124-3 Safety of toys – Part 3: Migration of certain elements

- ISO 11202 Acoustics—Noise Emitted by Machinery and Equipment—Measurement of Emission Sound Pressure Levels at a Work Station and at Other Specified Positions—Survey Method in situ

- ISO 11204 Acoustics—Noise Emitted by Machinery and Equipment—Measurement of Emission Sound Pressure Levels at a Work Station and at Other Specified Positions—Method Requiring Environmental Corrections

- IEC 60086-2 Primary Batteries: Physical and Electrical Specifications

- IEC 61672-1 Electroacoustics—Sound Level Meters—Part 1: Specifications

- IEC 61672-2 Electroacoustics—Sound Level Meters—Part 2: Pattern Evaluation Tests

[11] Available from International Organization for Standardization (ISO), 1 rue de Varembé, Case postale 56, CH-1211, Geneva 20, Switzerland, http://www.iso.ch.

## 3. Terminology

### 3.1 Definitions of Terms Specific to This Standard:

3.1.1 *A-weighted sound pressure level ($L_{pA}$)*— the sound pressure level obtained by using standardized A-weighting.

Figure 1. Accessibility Probes This is an architectural diagram for the probe. It is in the shape of a cylinder with a handle on the right. There are two sets of dimensions. Probe A is for children 0-36 months. Probe B is for children 37-96 months. We start with probe A. The handle is (a) and has a spherical radius of 0.110 inches. The length of the handle is (e) and is 1.731 inches. The handle is marked in 3 equal lengths of .577 inches each marked (d). The Thickness of the handle is .220 inches and is (b). The diameter of the cylinder, the main part of the probe is (c) and is 1.020 inches. The bottom of the cylinder, where the handle connects, is called the collar. The overall length of the cylinder plus the handle is 24 inches typically. 4 inches up from the base of the cylinder (near the handle) is an embedded screw-like device with the label 3/8-16 NC - 2B THD (TYP). The distance from this point to the far end of the cylinder is g and is 18 9/32 inches. For Probe B, the same labels are used but the values are (a) .170 (b) .340 (c) 1.510 (d) .760 (e) 2.280 and (g) 17 25/32. The table of measures has a parameter (f) which is 1

for Probe A and 1 1/2 for Probe B, but there is no marking for (f) on the diagram. ~ 24 g d 4 (TYP) d d e c b f EXTENSION 3/8 - 16 NC-2B THD (TYP) (a) SPHERICALRADIUS COLLAR a b c d e f g 2.280 1.731 1 11/2 18 9/32 17 25/32 .577 .760 1.020 1.510 .220 .340 .110 .170 ALL DIMENSIONS IN INCHES PROBE A PROBE B (CHILDREN 0-36 MONTHS INCL) ( " 37-96 " " )

### FIG. 1 Accessibility Probes

3.1.2 *accessible*— (part or component) describing any area of the toy that can be contacted by any portion forward of the collar of the accessibility probe as described in 16 CFR 1500.48 and 16 CFR 1500.49. (See Fig. 1.)

> NOTE 1 —   Dimensions are provided in Fig. 1 for two probes corresponding to two age ranges of children.

3.1.3 *alkaline battery*— a non-rechargeable dry cell battery with an alkaline manganese electrochemistry.

3.1.4 *aquatic toy*— an article, whether inflatable or not, intended to bear the mass of a child and used as an instrument of play in shallow water. This does not include bath toys, beach balls, and United States Coast Guard-approved life saving devices.

3.1.5 *art material*— any substance marketed or represented by the producer or repackager as suitable for use in any phase of the creation of any work of visual or graphic art of any medium. This definition includes items that become a component of the work of art such as paint, canvas, inks, crayons, chalk, solder, brazing rods, flux, paper, clay, stone, thread, cloth, and photographic film. It also includes items that are associated closely with the creation of the final work of art such as brushes, brush cleaners, solvents, ceramic kilns, silk screens, molds, mold making material, and photographic developing chemicals.

**4**

3.1.6 *ball*— any spherical, ovoid, or ellipsoidal object that is designed or intended to be thrown, hit, kicked, rolled, dropped, or bounced. The term "ball" includes any spherical, ovoid, or ellipsoidal object that is attached to a toy or article by means of string, elastic cord, or similar tether. The term "ball" also includes any multisided object formed by connecting planes into a generally spherical ovoid, or ellipsoidal shape that is designated or intended to be used as a ball. The term "ball" does not include dice, or balls permanently enclosed inside pinball machines, mazes, or similar outer containers. A ball is permanently enclosed if, when tested in accordance with 16 CFR 1500.53, it is not removed from the outer container.

Standard Consumer Safety Specification for Toy Safety

3.1.7 *base material*— material upon which coatings may be formed or deposited.

3.1.8 *battery-operated toy*— toy having at least one function dependent on electricity and powered by batteries.

3.1.9 *burr*— a roughness that may be found at an edge or joint of a toy or component if the material is not severed or finished cleanly.

3.1.10 *button cell battery*— a battery having a diameter greater than its height.

3.1.11 *C-weighted peak sound pressure level ($L_{Cpeak}$)*— the peak sound pressure level obtained when using standardized C-weighting.

3.1.12 *close-to-the-ear toy*— a toy that is intended to be used close to the ear, that is, the sound emitting part of such a toy is normally put against the ear of a child (example—toy telephones that emit sounds from the earpiece).

3.1.13 *coating*— all layers of material formed or deposited on the base material or toy and includes paints, varnishes, lacquers, or other substances of a similar nature, whether they contain metallic particles or not, which can be removed by scraping with a sharp blade as defined under 16 CFR 1303, et seq.

3.1.14 *collapse*— sudden or unexpected folding of a structure.

3.1.15 *compression spring*— spring which essentially returns to its initial state after compression.

3.1.16 *constant air inflatables*— structure relying on a continuous supply of air pressure supplied from one or more electrical blowers to maintain its shape, typically made of flexible fabric and designed for children's use that may include but not be limited to the following activities: bounce, climb, slide, or interactive play.

3.1.17 *continuous sound*— any steady-state sound or group of variable sounds greater than one second in duration.

3.1.18 *cord*— a length of slender, flexible material including monofilaments, woven and twisted cord, rope, plastic textile tapes, ribbon, and those fibrous materials commonly called string.

3.1.19 *cosmetics*— any article intended or likely to be rubbed, sprinkled, or

sprayed on, introduced onto, or otherwise applied to the human body for cleansing, beautifying, promoting or enhancing attractiveness, or for altering appearance.

3.1.20 *crushing—* injury to part of the body resulting from compression between two rigid surfaces.

3.1.21 *curled edge—* an edge in which the portion of the sheet adjacent to the edge is bent into an arc and forms an angle of less than 90° with the base sheet, as shown in Fig. 2.

Figure 2. Curled Edge A line goes from the right to left. On the left, the line curls up and over to the right, forming a non-closed loop. A dotted line goes from the end of the loop down to the line, thus forming an angle, and it marked "Less than 90 degrees." LESS THAN 90°

### FIG. 2 Curled Edge

3.1.22 *detection limit of a method—* three times the standard deviation of the blank value.

3.1.23 *discharge mechanism—* an inanimate system for releasing and propelling a projectile.

3.1.24 *driving mechanism—* assembly of linked parts or components (for example, gears, belts, winding mechanisms), at least one of which moves, powered by a source (for example, electrical or mechanical means) independent of the child.

3.1.25 *edge, hazardous—* an accessible edge that presents an unreasonable risk of injury during the normal use and reasonably foreseeable abuse of a toy. Metal and glass edges on toys intended for children under the age of eight years are defined as potentially hazardous if they fail the sharp edge test described in 16 CFR 1500.49. Edges other than metal and glass are defined as potentially hazardous if they are sharp to the touch under casual handling conditions.

3.1.26 *elastic—* material that will recover its former size and shape essentially and instantaneously after being elongated at least 10 % at a testing speed of not less than 20 in. (510 mm)/min.

3.1.27 *equivalent sound pressure level ($L_{Aeq}$)—* the level of a steady-state sound which, in a stated time period and at a stated location, has the same A-weighted sound energy as the time-varying sound.

3.1.28 *explosive action*— the sudden release of energy characterized by the rapid expansion or bursting of a material.

3.1.29 *extension spring*— spring which essentially returns to its initial state after tension.

3.1.30 *fastener*— mechanical device which attaches two or more elements together (for example, screws, rivets, and staples).

3.1.31 *feathering*— the beveling of an edge (or decrease in thickness moving toward the edge) caused during the shearing or cutting of material.

3.1.32 *flash*— excess material that escapes between the mating parts of a mold assembly.

3.1.33 *folding mechanism*— an assembly of hinged, pivoted, folding, or sliding members that can produce a crushing, scissoring, pinching, or shearing action during operation.

3.1.34 *fuzz*— bits of fibrous-type material that can be readily removed from toys with a pile surface.

3.1.35 *hand-held toy*— a toy that is intended to be used or operated while being held in the hand. Examples include toy tools, small electronic games, stuffed animals, dolls, musical toys, and cap-firing toys.

3.1.36 *hazard*— any characteristic of a toy that presents an unreasonable risk of injury or illness during normal use or as a result of reasonably foreseeable abuse.

5

3.1.37 *hazardous magnet*— a magnet which has a flux index >50 (refer to test method in 8.24.1) and which is a small object (refer to 4.6 and Fig. 3).

Figure 3. Small Parts Cylinder Two perspectives of the hollow cylinder are shown. From the top, there is an inner diameter of 1.25 inches. From the side, there is an angled bottom. On the left side, the open part of cylinder goes down 1 inch. On the right side, it goes down 2.25 inches. 1.00 in25.4 mm 2.25 in57.1 mm 1.25 in31.7 mm A A

**FIG. 3 Small Parts Cylinder**

3.1.38 *hazardous magnet component*— any part of a toy that is a small object (refer to 4.6 and Fig. 3) and which contains an attached or imbedded magnet which has a flux index >50 as determined in accordance with the test method in 8.24.1.

3.1.39 *helical spring*— spring in the form of a coil.

3.1.40 *hemmed edge*— an edge in which the portion of the sheet adjacent to the edge is folded back on the sheet itself through an angle of approximately 180°, so that the portion of the sheet adjacent to the edge is approximately parallel to the main sheet, as shown in <span style="color:red">Fig. 4.</span>

Figure 4. Hemmed Edge A line goes from left to right. On the left side, it curls in half-circle and then heads back a little ways towards the right. It resembles a hook.

### FIG. 4 Hemmed Edge

3.1.41 *hinge-line clearance*— the distance between the stationary portion of a toy and the movable portion along, or adjacent to, a line projected through the axis of rotation, shown as Dimension A in <span style="color:red">Fig. 5.</span>

Figure 5. Changing Clearance at Hinge Line This diagram shows 3 views of a hinge. The first is the back of a toy, which has a width with label 1. The hinge is narrower than 1, connecting the top to the bottom. The two other diagrams are the hinge mechanism closed and open. The top part of the hinge and the part of the toy that is connected to the top part of the toy are all labelled 2. The bottom part of the hinge and the bottom part of the toy are all labeled 3. Key 1 Hinge line2 Lid3 Box l = Hinge-line clearance 1 2 l l 3

### FIG. 5 Changing Clearance at Hinge Line

3.1.42 *impulsive sound*— any sound that is characterized by a brief excursion of sound pressure significantly exceeding the ambient noise, typically less than one second in duration.

3.1.43 *juvenile products*— consumer products designed or intended primarily for use by children which are not used primarily for play. These include, but are not limited to, items such as bassinets/cradles, bath seats, infant bath tubs, carriages and strollers, changing tables, full size cribs, gates and enclosures, handheld infant carriers, high chairs, infant bouncers, infant swings, play yards/non-full size cribs, portable bed rails, portable hook-on chairs, soft infant carriers, stationary activity centers, toddler beds and walkers.

3.1.44 *lap joint*— a joint in which an edge overlaps a parallel surface but is not necessarily attached to it mechanically at all points along the length, as in the examples shown in <span style="color:red">Fig. 6.</span>

Figure 6. Typical Lap Joints There are four diagrams of typical lap joints. The first is two lines that are parallel and overlap. The second is two lines that

are at an angle and overlap at the end. The third is a square with a line and the two overlap a bit at the top. The third is a loop that overlaps at the ends.

### FIG. 6 Typical Lap Joints

3.1.45 *large and bulky toy*— toy that has a projected base area of more than 400 in.$^2$ (0.26 m$^2$) or a volume of more than 3 ft$^3$ (0.08 m$^3$) calculated without regard to minor appendages.

> NOTE 2 —   The base area for toys having permanently attached legs is measured by calculating the area enclosed by straight lines connecting the outermost edge of each leg of the perimeter.

3.1.46 *latex balloon*— any toy or decorative item consisting of a latex bag that is designed to be inflated by air or gas. The term does not include inflatable children's toys that are used in aquatic activities such as rafts, water wings, swim rings, or other similar items.

3.1.47 *marble*— a sphere made of a hard material, such as glass, agate, marble, or plastic, that is used in various children's games, generally as a playing piece or marker. The term "marble" does not include a marble permanently enclosed in a toy or game. A marble is permanently enclosed if, when tested in accordance with 16 CFR 1500.53, it is not removed from the toy or game.

3.1.48 *materials intended to leave a trace*— graphite material in pencils, liquid in pens, and similar substances.

3.1.49 *maximum A-weighted sound pressure level ($L_{AFmax}$)*— the maximum sound pressure level obtained when using standardized A-weighting and fast detector response (time-weighting).

3.1.50 *non-replaceable battery*— an electrochemical device that will not require user accessibility or user replacement for the expected life of the product or devices it is intended to power. Such batteries will not be accessible when tested in accordance with the normal use and, where appropriate, reasonably foreseeable abuse tests of 8.6 through 8.10.

3.1.51 *normal use*— play modes that conform to the instructions accompanying the toy, that have been established by tradition or custom, or that are evident from an examination of the toy.

3.1.52 *other materials, whether mass colored or not*— materials such as wood, leather, and other porous substances which may absorb coloring matter without forming a coating.

3.1.53 *packaging*— material accompanying the toy when purchased, but having no intended play function.

3.1.54 *peak sound pressure level ($L_{Cpk}$)*— the greatest C-weighted instantaneous sound pressure level within the period of observation.

3.1.55 *pinching*— created when two moving or one moving and one fixed surface come together in such a way that they could entrap and compress flesh, usually resulting in a contusion or laceration.

3.1.56 *point, hazardous*— an accessible point that presents an unreasonable risk of injury during normal use or reasonably foreseeable abuse. Points on toys intended for children under the age of 8 years are potentially hazardous if they fail the sharp point test described in 16 CFR 1500.48.

3.1.57 *pompom*— lengths or strands of fiber, yarns, or threads clamped or secured and tied in the center, and brushed up to form a spherical shape. Also included are sphericalshaped attachments made of stuffed material.

3.1.58 *principal display panel*— the display panel for a retail package or container, bin, or vending machine that is most likely to be displayed, shown, presented, or examined under normal or customary conditions of display for retail sale.

3.1.59 *projectile*— an object propelled by means of a discharge mechanism capable of storing and releasing energy under the control of the operator.

3.1.60 *projection, hazardous*— a projection that, because of its material or configuration, or both, may present a puncture hazard if a child should fall onto it. Excluded from this definition are puncture hazards to the eyes or mouth, or both, because of the impossibility of eliminating puncture hazards to those areas of the body by product design.

3.1.61 *protective cap or cover*— a component that is attached to a potentially hazardous edge or projection to reduce the possibility of injury.

3.1.62 *protective tip*— a component that is attached to the impacting end of a projectile to minimize injury if it should impact on the body, and also to prevent damage to the projectile upon striking a target, provide a means of attaching the projectile to the target as in the case of suction cups, or prevent damage to inanimate objects.

3.1.63 *rattle*— a toy that is clearly designed to emit sound when shaken

typically intended for children under 18 months.

3.1.64 *reasonably foreseeable abuse*— conditions to which a child may subject a toy that are not normal use conditions, such as deliberate disassembly, dropping, or using the toy for a purpose for which it was not intended. Simulated use and abuse tests for toys are given in 16 CFR 1500.50-16 CFR 1500.53 (excluding the bite test, Paragraph (c), of each section).

3.1.65 *reference box*— a hypothetical surface which is the smallest rectangular parallelepiped that encloses the toy without regard to minor appendages.

3.1.66 *rigid*— any material having a hardness exceeding 70 Shore A scale durometer, as measured by the latest revision of Test Method D2240.

3.1.67 *rolled edge*— an edge in which the portion of the sheet adjacent to the edge is bent into an arc and forms an angle between 90 and 120° with the main sheet, as shown in Fig. 7.

Figure 7. Rolled Edge A line goes from right to left and at the left curls over to the right and down. A label indicates that the angle is 90 degrees to 120 degrees. 90° - 120°

### FIG. 7 Rolled Edge

3.1.68 *scraping*— mechanical removal of coatings down to the base material without damaging the substrate material.

3.1.69 *simulated protective equipment*— toys designed to mimic products that infer some sort of physical protection to the wearer (for example, protective helmets and visors).

3.1.70 *soft-filled toy/stuffed toy*— toy, clothed or unclothed, with soft body surfaces and filled with soft materials, allowing compression of the torso readily with the hand.

3.1.71 *splinter*— sharp pointed fragment.

3.1.72 *spiral spring*— clockwork-type spring.

3.1.73 *squeeze toy*— a handheld pliable toy, intended for children under the age of 18 months, usually incorporating a noise-making feature activated by forcing air through an opening when flexed or squeezed, and which recovers to its original shape when released.

3.1.74 *steady-state sound (noise)—* noise in which there are negligibly small fluctuations of sound pressure level within the period of observation.

3.1.75 *strap—* a piece of flexible material in which the width is significantly greater than the thickness.

3.1.76 *substrate material—* all of the accessible materials present in toys, other than paint or similar surface coatings.

3.1.77 *tabletop, floor, and crib toy—* toys intended to be played with while attached to or resting on a table top, floor, or crib. Examples of such toys include, but are not limited to, toy vehicles, stacking toys, large and bulky toys, games, and activity toys that attach to crib rails.

3.1.78 *tangle or form a loop—* loops that are formed by reasonably foreseeable manipulation of the cord/strap/elastic. Loops that are formed by excessive or intricate manipulations, or both, of the cord/strap/elastic shall be considered as exempt.

3.1.79 *teether—* toy designed for oral use and intended primarily for symptomatic relief of teething discomfort.

3.1.80 *tool—* screwdriver, coin, or other object which may be used to operate a screw, clip, or similar fixing device.

3.1.81 *toy—* any object designed, manufactured, or marketed as a plaything for children under 14 years of age.

3.1.82 *toy chest—* toy boxes that are designed and marketed as storage containers for toys. The products subject to the requirements are those with a volume of 1.1 ft$^3$ (0.031 m$^3$) or more.

3.1.83 *toy seat—* a stationary toy product with a seat where the amusement of the child is a primary function of the product and the play pattern intends that the child be in a seated position.

3.1.83.1 *Discussion—* Play features may include, but are not limited to, sliding or rotating features, learning toys, manually actuated music etc. with which the seated child may interact. Children's furniture products without any interactive play features such as stools, chairs, patio sets, rocking chairs, picnic tables, storage units etc. are not considered toy seats. In addition, juvenile products such as bouncers, infant seats, stationary activity centers etc. are not considered toy seats.

3.1.84 *yo yo elastic tether toy*— a toy consisting of an elastic tether that usually contains a loop on one end to wear around the finger, and a flexible object on the other end intended to be thrown and returned to the hand.

## 4. Safety Requirements

4.1 *Material Quality*— Toys may be made from new or reprocessed materials and shall be visually clean and free from infestation. The materials shall be assessed visually by the unaided eye rather than under magnification. If reprocessed materials are used, they must be refined so that the level of hazardous substances conforms to the requirements of 4.3.1.

4.2 *Flammability*— Materials other than textiles (excluding paper) used in toys shall not be flammable, as defined under 3 (c) (6) (vi) under the Federal Hazardous Substances Act (FHSA) (see 16 CFR 1500). For testing purposes, any textile fabrics used in toys shall comply with 16 CFR 1610. A test procedure for testing flammability of toys, which is an interpretation of 16 CFR 1500.44, is contained in Annex A5. A procedure for testing the flammability of fabrics is contained in Annex A6.

### 4.3 Toxicology

4.3.1 *Hazardous Substances*— Toys or materials used in toys shall conform to the FHSA and to the regulations promulgated under that act. Exemptions to this act for certain types of toys are given in 16 CFR 1500.85. The regulations define limits for substances that are toxic, corrosive, an irritant, sensitizer or pressure generating, and radioactive, flammable, and combustible materials. Testing references for hazardous substance content are given in 8.2. It should be noted that specific states may have hazardous substances regulations that are more restrictive than the Federal regulations.

4.3.2 *Manufacturing and Packaging of Food*— All food products supplied with toys shall be manufactured and packaged in compliance with 21 CFR 110, which is concerned with the sanitation practices for the manufacture, processing, packaging, or holding of human food.

4.3.3 *Indirect Food Additives*— Toy components intended to be used in contact with food, such as toy cooking utensils, shall conform to the applicable requirements of the Food, Drug and Cosmetic Act (FDCA), specifically 21 CFR 170 through 189.

4.3.3.1 *Toys in Contact with Food*— Toys comprising components intended to be used in contact with food, such as toy cooking utensils and toy tableware

shall meet the requirements of 6.7 for instructional literature.

4.3.3.2 *Ceramicware, Lead, and Cadmium Contamination—* Ceramic toy components intended or likely to hold food, such as a porcelain tea set, shall conform to the applicable requirements of the FDCA, Section 402 (a) (2) (c), and FDA Compliance Policy Guides.

4.3.4 *Cosmetics—* Cosmetics shall conform to the requirements of the Federal FDCA as codified in 21 CFR. The regulations applicable to cosmetics are stated in 21 CFR 700 through 740. The color additive regulations applicable to cosmetics are found in 21 CFR 73, 74, 81, and 82.

4.3.4.1 In addition, cosmetics intended for use by children under 8 years of age shall meet all requirements of this specification and the FHSA regulations, notwithstanding the exclusions of 16 CFR 1500.81 and 16 CFR 1500.3 (b) (4) (ii).

4.3.4.2 The requirements from the Food and Drug Administration (FDA) will therefore be additive to those existing for children's products.

**4.3.5** *Heavy Elements*:

4.3.5.1 *Paint and Similar Surface-Coating Materials—* Paint and other similar surface-coating materials applied to toys shall comply with the lead content provisions of 16 CFR 1303, issued under the Consumer Product Safety Act (CPSA), as amended by the Consumer Product Safety Improvement Act of 2008 (CPSIA).

1. This regulation prohibits the use of paints or similar surface-coating materials that contain lead or lead compounds and in which the lead content (calculated as lead metal [Pb]) is in excess of 0.009 % (90 ppm) of the weight of the total nonvolatile content of the paint or the weight of the dried paint film.

2. In addition, surface-coating materials shall not contain compounds of antimony, arsenic, barium, cadmium, chromium. lead, mercury. or selenium, of which the metal content of the soluble material is in excess of the levels by weight of the contained solids (including pigments, film solids, and driers) given in Table 1. The analytical results obtained should be adjusted in accordance with the test method in 8.3.4.3 prior to comparing them to the values in Table 1. To determine conformance, the soluble level shall be determined by dissolving the contained solids (dried film including pigments, film solids, and driers) as specified in 8.3.2.

8

4.3.5.2 *Toy Substrate Materials—* These requirements are designed to reduce children's exposure to heavy elements contained in accessible toy substrate materials. (For requirements for surface coating materials, see 4.3.5.1.)

1. *Scope—*This section specifies requirements and test methods for total lead and the migration of antimony, arsenic, lead, barium, cadmium, chromium, mercury and selenium in accessible substrate materials. Accessible glass, metal and ceramic toys or parts of toys, that are small parts (that is, that fit into the test fixture specified at 16 CFR 1501 (see Fig. 3), are also subject to this requirement.

   a. Accessibility of parts shall be determined as defined in 3.1.2 before and after use and abuse testing described in 8.4-8.9.

   b. Toys and parts of toys which, due to their inaccessibility, size, mass, function, or other characteristics, cannot be sucked, mouthed or ingested are not subject to this requirement.

      NOTE 3 —For the purposes of this requirement, the following criteria are considered reasonably appropriate for the classification of toys or parts likely to be sucked, mouthed or ingested: *(1)* All toy parts intended to be mouthed or contact food or drink, components of toys which are cosmetics, and components of writing instruments categorized as toys; *(2)* Toys intended for children less than 6 years of age, that is, all accessible parts and components where there is a probability that those parts and components may come into contact with the mouth.

   c. Packaging materials are not subject to these requirements unless they are intended to be retained as part of the toy or are intended to provide play value.

   d. This requirement is not intended to apply to children's jewelry, which is addressed by Specification F2923.

   e. In addition, materials now or in future listed in the most current revision of 16 CFR 1500.88 or 16 CFR 1500.91 as exempt from testing and certification requirements are excluded from this requirement for the purposes of determining compliance.

2. Requirements:

a.  Accessible component parts of children's products (as defined in 3.1.2 and in 16 CFR 1500.87, before and after use and abuse testing described in 8.4-8.9 and in 16 CFR 1500.50-16 CFR 1500.53 and 16 CFR 1500.87) must not contain lead or lead compounds in which the lead content (calculated as lead metal [Pb]) is in excess of 100 ppm (300 ppm for products manufactured or imported prior to August 14, 2011) of the weight of the component, except as provided under 16 CFR 1500.88 and 16 CFR 1500.91.

b.  The migration of elements from toys and parts of toys as specified in 4.3.5.2(1) shall not exceed the limits specified in Table 1 when tested in accordance with the methods set forth in 8.3. Modeling clays included as part of a toy shall not exceed the limits specified in Table 2 when tested in accordance with the methods set forth in 8.3. Please note that the limits in Table 2 apply only to these materials as a component of a toy; in addition, please also note that if the primary purpose of the material is to create a tangible work of art, it may in addition be subject to the requirements of 16 CFR 1500.14.

c.  In addition, metallic toys or metallic toy components which are small parts may not exhibit extraction of more than 200 μg of cadmium when tested per 8.3.5.5(3). Compliance with all of the above requirements may be established by a screen of total element content as specified in 8.3.1.

4.3.6 *Cosmetics, Liquids, Pastes, Putties, Gels, and Powders—* The purpose of this requirement is to minimize the risk associated with the lack of cleanliness, shelf life, and contamination of cosmetics, liquids, pastes, putties, gels, and powders used in toys (excluding art materials). It sets standards for cleanliness and the ability to withstand extended shelf life or contamination, or both, during use without microbiological degradation.

4.3.6.1 Water used in the manufacturing and filling of toys shall be prepared according to the bacteriological standards for USP Purified Water. (**Warning** —The various methods for producing purified water each present different potentials for contaminating the final product. Purified water produced by distillation is sterile, provided that the production equipment is suitable and sterile. On the other hand, ion-exchange columns and reverse osmosis units require special attention in that they afford sites for microorganisms to foul the system and contaminate the effluent. Frequent monitoring may thus be

called for, particularly with the use of these units following periods of shutdown of more than a few hours.)

4.3.6.2 The formulations of these products used in toys shall be such that they are not subject to microbial degradation during shelf life or reasonably foreseeable use.

4.3.6.3 The cleanliness of these products used in toys and their ingredients shall be determined in accordance with 8.4.1. Formulations used to prevent microbial degradation shall be evaluated in accordance with 8.4.2.

4.3.6.4 Formulations of cosmetics shall be evaluated for potential microbiological degradation in accordance with 8.4.2.

4.3.7 *Stuffing Materials*— Loose fillers for stuffed toys shall be free of objectionable matter originating from insect, bird, rodent, or other animal infestation and of contaminants, such as splinters and metal chips to the extent possible in good manufacturing practice. The test methods that shall be used to determine objectionable material are in Chapter 16 of *Official Methods of Analysis of the Association of Official Analytical Chemists*.[12] In addition, fiber filling, whether natural or synthetic, should meet the requirements of Title 34, Chapter 47, Section 47.317, "Tolerances of the Commonwealth of Pennsylvania Regulation for Stuffed Toys."

[12]"Extraneous Materials: Isolation," *Official Methods of Analysis of the Association of Official Analytical Chemists*, 15 ed., Chapter 16, 1990.

TABLE 1 Maximum Soluble Migrated Element in ppm (mg/kg) for Surface Coatings and Substrates Other Than Modeling Clay Included as Part of a Toy

| Antimony, (Sb) | Arsenic, (As) | Barium, (Ba) | Cadmium, (Cd) | Chromium, (Cr) | Lead, (Pb) | Mercury, (Hg) | Selenium, (Se) |
|---|---|---|---|---|---|---|---|
| 60 | 25 | 1000 | 75 | 60 | 90 | 60 | 500 |

TABLE 2 Maximum Soluble Migrated Element in ppm (mg/kg) for Modeling Clays Included as Part of a Toy

| Antimony, (Sb) | Arsenic, (As) | Barium, (Ba) | Cadmium, (Cd) | Chromium, (Cr) | Lead, (Pb) | Mercury, (Hg) | Selenium, (Se) |
|---|---|---|---|---|---|---|---|
| 60 | 25 | 250 | 50 | 25 | 90 | 25 | 500 |

**9**

4.3.8 *DEHP (DOP)*— Pacifiers, rattles, and teethers shall not intentionally contain DI (2-ethylhexyl) phthalate (also known as dioctyl phthalate). To prevent trace amounts of DEHP (DOP) from affecting analysis, up to 3 % of total solid content will be accepted in the result, when tested in accordance with Practice D3421.

4.4 *Electrical/Thermal Energy—* Toys operating from nominal 120-V branch circuits shall conform to 16 CFR 1505, issued under the FHSA.

4.5 *Sound-Producing Toys—* These requirements are intended to minimize the possibility of hearing damage that might be caused by toys that are designed to produce sound. These requirements are applicable before and after testing in accordance with 8.5 through 8.10. These requirements do not apply to: (1) sounds produced by mouth-actuated toys where the sound pressure level is determined by the blowing action of the child; (2) child-actuated sounds such as those produced by xylophones, bells, drums, and squeeze toys where the sound pressure level is determined by the muscular action of the child. The continuous sound pressure requirements do not apply to rattles; however, rattles are covered by impulsive sound pressure requirements; (3) radios, tape players, CD players, and other similar electronic toys and toys where the sound output is dependent on the content of removable media (for example, game cartridge, flash cards, and so forth); (4) toys that are connected to or interfaced with external devices (for example, televisions, computers) where the sound pressure level is determined by the external device; and (5) sound emitted from earphones/headphones.

4.5.1 *Requirements—* When tested in accordance with 8.19, toys that are designed to emit sound shall conform to the following requirements:

4.5.1.1 The A-weighted equivalent sound pressure level, $L_{Aeq}$, of continuous sounds produced by close to the ear toys shall not exceed 65 dB.

4.5.1.2 The A-weighted equivalent sound pressure level, $L_{Aeq}$, of continuous sounds produced by all other toys except close-to-the-ear toys and push/pull toys shall not exceed 85 dB.

4.5.1.3 The C-weighted peak sound pressure level, $L_{Cpeak}$, of impulsive sounds produced by close to the ear toys shall not exceed 95 dB.

4.5.1.4 The C-weighted peak sound pressure level, $L_{Cpeak}$, of impulsive sounds produced by any type of toy excluding toys using explosive action (for example, percussion caps) shall not exceed 115 dB.

4.5.1.5 The C-weighted peak sound pressure level, $L_{Cpeak}$, of impulsive sounds produced by a toy using percussion caps or other explosive action shall not exceed 125 dB.

4.6 *Small Objects—* These requirements are intended to minimize the hazards from choking, ingestion, or inhalation to children under 36 months of age

created by small objects.

4.6.1 Toys that are intended for children under 36 months of age are subject to the requirements of 16 CFR 1501. Criteria for determining which toys are subject to these requirements are provided, in part, in 16 CFR 1500.50 and 1501 and also in Annex A1 of this specification. The requirements of 16 CFR 1501 state, in part, that no toy (including removable, liberated components, or fragments of toys) shall be small enough without being compressed to fit entirely within a cylinder of the specified dimensions as shown in Fig. 3. For the purposes of this specification, fragments of toys include, but are not limited to, pieces of flash, slivers of plastics, pieces of foam, or fine bits or shavings. Pieces of paper, fabric, yarn, fuzz, elastic, and string are excluded from this requirement.

4.6.1.1 The requirements are applicable before and after use and abuse testing in accordance with Section 8 to determine the accessibility of small objects such as small toys or components of toys including eyes, squeakers, or knobs, or pieces that break off or are removed from toys.

4.6.1.2 The following articles are exempt from the requirements: balloons; books and other paper articles; writing materials (crayons, chalk, pencils, and pens); phonograph records and compact discs (CDs); modeling clay and similar products; and fingerpaints, watercolors, and other paint sets. A listing of exempt articles is provided in 16 CFR 1501.3.

4.6.1.3 Toys that are intended to be assembled by an adult and contain potentially hazardous small objects in the unassembled state shall be labeled in accordance with 5.8.

4.6.2 *Mouth-Actuated Toys*— This requirement relates to toys, such as noisemakers, that are intended to be actuated repeatedly by blowing or sucking. Mouth-actuated toys that contain loose objects, such as spheres in a whistle, or inserts, such as reeds in a noisemaker, shall not release an object that will fit within the small parts test cylinder, as shown in Fig. 3, when air is alternately blown and sucked rapidly through the mouthpiece, according to the procedure described in 8.13. The procedure of 8.13 shall also be applied to the outlet if the air outlet is capable of being inserted into or covered by the mouth.

4.6.2.1 Small objects contained in an inflatable toy shall not be liberated during inflation or deflation.

4.6.3 Toys and games that are intended for use by children who are at least

three years old (36 months) but less than six years of age (72 months) are subject to the requirements of 16 CFR 1500.19. With the exception of products such as paper punch-out games and similar items, any toy or game that is intended for use by children who are at least three years old (36 months) but less than six years of age (72 months) and includes a small part is subject to the labeling requirements in accordance with 5.11.2.

4.7 *Accessible Edges*— Toys shall not have accessible, potentially hazardous sharp edges. Toys that are intended to be assembled by an adult, and may contain unprotected potentially hazardous sharp edges in the unassembled state, shall be labeled in accordance with 5.8.

4.7.1 Potentially hazardous sharp metal and glass edges are defined in 16 CFR 1500.49. Toys intended for use by children under 8 years of age are subject to this requirement before or after use and abuse testing, or both, as specified in 8.5-8.10. An illustration of a sharp edge tester is shown in Fig. 8.

Figure 8. Principle of Sharp Edge Test A rectangular block has a sharp handle (a mandrel) and attached to that is a flat device. The block is labelled "Any suitable device, protable or non-portable to apply known force and rotation to mandrel." During test, the mandrel rotates one full revolution. The test edge has a 90 degree plus or minue 0.5 degree relationship to the mandrel and is affixed with a single wrap of TFE tape. The angle can be varied to seek a worst case situation. 1.35 lbps is the max force applied normally to mandrel axis. 1.35 LBS (6.00 N) MAX FORCEAPPLIED NORMAL TO MANDREL AXIS ANY SUITABLE DEVICE, PORTABLE ORNON-PORTABLE TO APPLY KNOWNFORCE & ROTATION TO MANDREL DURING TEST, MANDREL ROTATESONE FULL REVOLUTION SINGLE WRAP OF TFE TAPE 90˚ ± 5˚ (TEST EDGE RELATIONSHIP TO MANDREL) VARY ANGLE TO SEEK"WORST CASE" SITUATION

**FIG. 8 Principle of Sharp Edge Test**

4.7.2 Toys containing potentially hazardous edges that are a necessary part of the function of a toy shall carry cautionary labeling as specified in 5.10 if the toy is intended for use by children from 48 to 96 months. Toys intended for children aged less than 48 months shall not have accessible hazardous functional sharp edges.

4.7.3 *Metal Toys*— Accessible metal edges, including holes and slots, shall be free of hazardous burrs and feathering, or shall be hemmed, rolled, or curled, or shall be covered with a permanently affixed device or finish.

NOTE 4 —   Regardless of the manner in which edges are finished, they are subject to the sharp edge technical requirements as described in 4.7.1. If a device is used to protect an edge, it shall not become

detached after being tested in accordance with the appropriate procedures described in 8.5-8.10.

4.7.4 *Molded Toys*— Accessible edges, corners, or mold parting areas of molded toys should be free of hazardous edges produced by burrs and flash or so protected that hazardous edges are not exposed.

4.7.5 *Exposed Bolts or Threaded Rods*— If the ends of bolts or threaded rods are accessible, the thread shall be free of exposed, hazardous sharp edges and burrs, or the ends shall be covered by smooth finish caps so that hazardous sharp edges and burrs will not be exposed. Any caps that are used shall be subjected to the compression test noted in 8.10, regardless of whether the cap is accessible to flat-surface contact during the appropriate impact test(s) described in 8.7. Protective caps shall also be subjected to the tension test in 8.9 and the torque test in 8.8.

4.8 *Projections*— This requirement relates to potentially hazardous projections in all toys intended for use by children under 8 years of age. This requirement is intended to minimize possible puncture hazards to the skin that might be caused if a child were to fall on a rigid projection, such as unprotected ends of axles, actuating levers, and decorative features. Due to the extremely sensitive nature of the eyes and interior of the mouth, this requirement will not, nor is it intended to, provide protection to those areas of the body. If a projection appears to present a potential skin puncture hazard, the projection shall be protected by suitable means, such as by turning back the end of a wire or by affixing a smoothly finished protective cap or cover, which effectively increases the surface area for potential contact with the skin. Toys shall meet this requirement both before and after testing in accordance with 8.5-8.10. Toys intended to be repeatedly assembled and taken apart shall have the individual pieces and fully assembled articles, as shown on packaging graphics, instructions or other advertising, evaluated separately. The requirements for the assembled toy do not apply to toys where the assembling makes up a significant part of the play value of the toy. Since this requirement relates to hazards arising from a child falling onto a toy, only vertical or nearly vertical projections are required to be evaluated. The toy shall be tested in its most onerous position. Corners of structures are excluded from this requirement.

4.8.1 *Bath Toy Projections*— Rigid projections on toys designed primarily for use in the bath tub may pose a specific hazard that can result in serious penetration and impalement injuries. Additional design guidelines specifically for bath toy projections are provided in Annex A4 of this specification. As there are no objective means for determining conformance with these

guidelines, they are not to be used to judge compliance with this specification.

4.9 *Accessible Points—* Toys shall not have accessible, potentially hazardous sharp points that may occur because of the following: configuration of the toy; assembly devices such as wires, pins, nails, and staples that are fastened poorly; poorly sheared sheet metal; burrs on screws; and splintered wood. Toys that are intended to be assembled by an adult and may contain potentially hazardous sharp points in the unassembled state shall be labeled in accordance with 5.8.

4.9.1 Potentially hazardous sharp points are defined by 16 CFR 1500.48. Toys intended for use by children under 8 years of age are subject to this requirement before or after use and abuse testing, or both, as specified in 8.5-8.10. An illustration of a sharp-point tester is shown in Fig. 9.

Figure 9. Sharp Point Tester The sharp point tester is a cylinder with a test point at the end. There is a gaging slot of 0.40 x 0.45, a set of micrometer divisions and a sensing head, and the device is powered by a AAA dry cell. The device has a gap that is closed upon insertion of a sufficiently sharp point to pass through the gaging slot and depress the sensing head 0.005 inches, thereby completing an electrical circuit and illuminating the indicator test lamp lights. GAP IS CLOSED UPON INSERTIONOF SUFFICIENTLY SHARP POINT TOPASS THRU GAGING SLOT & DEPRESSSENSING HEAD .005. ELECTRICAL CIRCUIT IS THEREBYCOMPLETED & INDICATOR TEST LAMPLIGHTS - SHARP POINT TEST. AAA DRY CELL SECTION A - A AAA DRY CELL TEST POINT GAGINGSLOT(".040x".045) GAGING CAP & MICROMETER LOADING SPRING LOCK RING INDICATOR LAMP ASSYADAPTER-NUT ELECTRICALCONTACTSPRING BARREL CALIBRATION REFERENCE MARK MICROMETER DIVISIONS SENSING HEAD A A

**FIG. 9 Sharp Point Tester**

4.9.2 Toys in which an accessible, potentially hazardous sharp point is a necessary function of the toy, such as a needle in a sewing kit, shall carry cautionary labeling as specified in 5.10, if the toy is intended for children from 48 to 96 months old. Toys intended for children less than 48 months old shall not have accessible hazardous functional points.

4.9.3 *Wood—* The accessible surfaces and edges of wood used in toys shall be free of splinters, both before and after being tested in accordance with the appropriate procedures described in 8.5-8.10.

4.10 *Wires or Rods—* Wires or rods used in the interior of toys shall have their

11

ends finished to avoid potentially hazardous points and burrs, shall be turned back, or shall be covered with smoothly finished protective caps or covers, if they can become accessible after use or reasonably foreseeable abuse. Metal wires or other metal materials used for stiffening or for retention of form in toys shall not fracture to produce a hazardous point, edge, or projection hazard when tested in accordance with 8.12, if the component can be bent through a 60˚ arc by the applicable maximum force. When applied perpendicularly to the major axis of the component at a point 2 ± 0.05 in. (50 ± 1.3 mm) from the intersection of the component with the main body of the toy or at the end of the component if the component is less than 2 in. (50 mm) long, the maximum force shall be as follows (within a tolerance of 60.5 lb (60.02 kg)):

| 10 lbf (45 N) | toys intended for use by children 18 months of age or less |
|---|---|
| 15 lbf (67 N) | toys intended for use by children over 18 but not over 96 months of age |

The ends of spokes on toy umbrellas shall be protected. If the protection is removed when tested according to 8.9 (tension test) the ends of the spokes shall be free from sharp edges and sharp points when tested in accordance with 4.7.1 (sharp edge test) and 4.9.1 (sharp point test). Furthermore, if the protective components are removed by the tension test, the spokes shall have a minimum diameter of 0.08 in. (2 mm) and the ends shall be smooth, rounded, and approximately spherical with no burrs.

4.11 *Nails and Fasteners*— Nails and fasteners shall not present a point, edge, ingestion, or projection hazard. Points of nails or fasteners shall not protrude so as to be accessible. Additional requirements for nails and fasteners used as axles are given in 4.17.

4.12 *Plastic Film*— This requirement is intended to minimize the possibility of asphyxiation hazards that might be caused by thin plastic films. Flexible plastic film bags and flexible plastic sheets used as packaging materials for shelf packages or used with or as part of toys shall be at least 0.00150 in. (0.03810 mm) in average thickness, but the actual thickness of any individual measure shall never be less than 0.00125 in. (0.03175 mm). Alternatively, sheeting with an average thickness of less than 0.00150 in. (0.03810 mm) shall be perforated with defined holes so that a minimum of 1 % of the area has been removed over any area of 1.18    1.18 in. (30    30 mm). The thickness shall be determined using the test method in 8.21. This requirement does not apply to the following:

4.12.1 Shrink film in the form of an over wrap that would normally be destroyed when the package is opened by a consumer.

4.12.2 Bags or plastic film with a minor dimension of 3.94 in. (100 mm) or less. Bag dimensions shall be measured while in the form of a bag, not cut open into a single thickness sheet.

4.13 *Folding Mechanisms and Hinges*— These requirements are intended to eliminate possible crushing, laceration, or pinching hazards that might occur in folding mechanisms and hinges. Examples are the sudden collapse or unexpected motion of a folding mechanism or hinge that produces a scissor action; and the changing clearances at the hinge line between two hinged portions, such that the gap will admit fingers at any one position of the hinge but not at all positions. These requirements do not relate to the recognized and familiar hazards associated with the changing clearances around the edges of doors or pivoted or hinged sections in toy truck bodies, toy earth moving machinery, and similar toys. Toys shall meet the requirements specified in 4.13.1 and 4.13.2 after they are tested in accordance with 8.5-8.10. Requirements for toy chests are contained in Consumer Safety Specification F834.

4.13.1 *Folding Mechanisms*— Toy furniture and other toys in which a folding mechanism, arm, or bracing is intended or likely to support the weight of a child in normal use shall have a locking device or other means to prevent unexpected or sudden movement or collapse of the product, or have adequate clearance to provide protection for the fingers, hands, and toes from crushing, laceration or pinching hazards in the event of sudden movement or collapse of the product. Examples of products to which these requirements would apply include, but are not limited to, folding mechanisms in toy strollers a child can sit in, toy chairs a child can sit in, or a child sized ironing board. One way to determine if a child can sit in a product is to verify that the seat width would accommodate the hip breadth of a child in the age range for which the product is intended. Examples of products to which these requirements would not apply include, but are not limited to, a doll house sized chair, a doll house sized bed, or an expandable/ collapsible sphere.

4.13.1.1 Locking devices or other means to prevent unexpected or sudden movement or collapse of the product shall engage automatically when the product is placed in the manufacturer's recommended use position. During and upon completion of the testing in 8.25.1, the unit shall remain in its recommended use position. The test in 8.25.1 shall not apply to locking devices or other means where the direction of force of the occupant load opposes the direction of collapse of the mechanism.

4.13.1.2 Locking devices shall comply with either of the following:

1. Each single action device shall require a minimum force of 10 lbf (45 N) to activate the release mechanism when tested in accordance with 8.25.2.

2. Each double action locking device shall require two distinct and separate actions to release. There are no force requirements for double action locking devices.

4.13.2 *Hinge-Line Clearance—* Toys having a gap or clearance along the hinge line between a stationary portion and a moveable portion that weighs more than ½ lb (0.2 kg) shall be so constructed that, if the accessible gap at the hinge line will admit a 3/16-in. (5-mm) diameter rod, it will also admit a ½-in. (13-mm) diameter rod at all positions of the hinge.

4.14 *Cords, Straps, and Elastics—* These requirements are intended to minimize the potential entanglement and strangulation hazards that might be caused by accessible cords, straps, and elastics. These requirements are applicable before and after use and abuse testing in accordance with 8.5-8.10.

4.14.1 *Cords, Straps, and Elastics in Toys—* Cords or elastics included with or attached to toys intended for children less than 18 months of age (excluding pull toys, see 4.14.3) shall be less than 12 in. (300 mm) long when measured to the maximum length in a free state and under a load of 5 lb (2.25 kg). If cords/straps/elastics or multiple cords/straps/elastics can tangle or form a loop in connection with any part of the toy, including beads or other attachments on the ends of cords/ straps/elastics, the loop shall not permit the passage of the head probe (Fig. 10) when tested in accordance with 8.22. Specifically, the loop shall not allow the head probe to be inserted so deep that it admits the base of the probe. The configuration of the loop shall be determined by using all components that make up the loop. For example, the configuration of the loop for the product illustrated in Fig. 11 is comprised of Cord 1, Cord 2, and the toy part.

Figure 10. Head Probe for Cords and Elastics This is the end view. The probe is shaped like a stadium oval with an outer edge and an inner edge. The outer edge has a length of 5.0 inches and width of 3.9 inches. The rounded ends of the stadium oval have a radius of 1.95 inches to the outer edge and 1.45 inchdes to the inner edge. The flat part of the inner edge is 1.1 inchdes across. 1.95 in. (49.5mm) radius 0.5 in. (13 mm) 3.9 in. (99 mm) 5.0 in. (130 mm) 1.1 in. (28 mm) 1.45 in. (37 mm) radius

End View

Figure 10b. Head Probe for Cords and Elastics (Side View) The side view has a handle, below which is a rectangle, below which is a trapezoid. Per figure 10a, the over length is 5.0 inches. The length of the bottom part of the trapezois is 4.0 inches. The height of the rectangle is 1.0 inches and the overall hieght from the bottom of the trapezoid to the top of the rectangle is 4.0 inchdes. 1.0 in. (25 mm) 4.0 in. (100 mm) 4.0 in. (100 mm)

Side View

### FIG. 10 Head Probe for Cords and Elastics

Figure 11. Loop Example A toy drum has a cord attached to each side. The left cord is Cord 1, the right is Cord 2. The two cords are tied together so the drum may be hung around the child's neck. The width of the drum from one side to the other is labelled Toy Part. Cord 1 Cord 2 Toy Part

### FIG. 11 Loop Example

4.14.1.1 *Cords, Straps, and Elastics Containing a Breakaway Feature*— Cords, straps, and elastics on toys that have loops that admit the base of the head probe shall contain a functional breakaway feature that prevents entanglement by releasing at a force less than 5.0 lbf (22.2 N) when tested in accordance with 8.22.3. The free length of the individual released cord, strap, or elastic should not exceed a maximum length of 12 in. (300 mm). The breakaway feature shall be capable of being reattached without altering the characteristics of the attachment.

4.14.2 *Self Retracting Pull Cords*— Accessible cords used in cord-activated mechanisms in toys intended for use by children under 18 months of age, except monofilament-type cords 1/16 in. (2 mm) or less in diameter, shall not retract more than ¼ in. (6 mm) when a weight of 2 lb (0.9 kg) is attached to the fully extended cord with the cord held vertical and the toy held firmly in the most favorable position for retraction. Monofilament cords, 1/16 in. (2 mm) or less in diameter, shall not retract under a load of 1 lb (0.45 kg) when tested in the manner described above.

4.14.3 *Pull Toys*— Cords, straps, and elastics greater than 12 in. (300 mm) long for pull toys intended for children under 36 months of age shall not be provided with beads or other attachments that could tangle to form a loop.

4.14.4 *Strings and Lines for Flying Devices*— Kite strings and handheld lines over 6 ft (1.8 m) long, attached to flying devices intended for use as playthings, shall have an electric resistance of more than 108 V/cm when tested at a relative humidity of not less than 45 % and a temperature of not greater than 75°F (24°C), when measured by a high-voltage, resistance

breakdown meter.

4.14.5 *Cords on Toy Bags Intended for Children Up to 18 Months*— Toy bags made of impermeable material with an opening perimeter greater than 14 in. (360 mm) shall not have a drawstring or cord as a means of closing.

## 4.15 Stability and Over-Load Requirements

4.15.1 *Stability of Ride-On Toys and Toy Seats*— These requirements are intended to minimize unexpected hazards that could be caused by a toy that can tip easily. They take into account the use of the child's legs as stabilizing means and recognize that a child learns instinctively to compensate for inclined positions. The requirements listed in 4.15.2 and 4.15.3 shall apply to the following classes of toys intended for use by children aged 60 months or less: ride-on toys, with three or more load bearing wheels, such as wagons; ride-on, action-type toys such as hobby horses, rocking toys (for example, horses, cars); and toy seats. Ride-on toys of spherical, cylindrical, or other shape that do not normally have a stable base are not covered by these requirements. The toy shall conform to these requirements after it is tested in accordance with 8.5-8.10.

4.15.2 *Sideways Stability Requirements*— These requirements recognize two types of possible stability hazards: those associated with ride-on toys or toy seats in which the feet can provide stabilization, and those situations in which the feet are restricted by an enclosing structure.

4.15.2.1 *Sideways Stability, Feet Available for Stabilization*— There shall be no sideways stability test for those ride-on toys or toy seats in which the height of the seat from the ground is one third, or less than one third, of the height indicated in Table 3 at the lowest age of the age range for which the ride-on toy or toy seat is intended, and in which the legs of the child are unrestricted in their sideways motion and thus are available for stabilization. (The values given in Table 3 represent the lower of the following two numbers: (1) the fifth percentile group of boys at each age from 1 up to and including 5 years; and (2) the fifth percentile group of girls at each age from 1 up to and including 5 years.) For those ride-on toys, or toy seats in which the height of the seat from the ground is greater than one third of the height indicated in Table 3 at the lowest age of the age range for which the ride-on toy or toy seat is intended, and in which the legs of the child are unrestricted in their sideways motion and thus are available for stabilization, the toy shall not tip when tested in accordance with 8.15. When the lowest age of the intended age range falls between two ages listed in Table 3, the lower of the two shall be chosen.

13

4.15.2.2 *Sideways Stability, Feet Unavailable for Stabilization*— If the sideways motion of the feet or legs, or both, is restricted, such as by the enclosed sides of a toy automobile, the ride-on toy or toy seat shall not tip when tested as specified in 8.15, except that the surface shall be inclined 15° to the horizontal.

4.15.3 *Fore and Aft Stability*— This requirement relates to the stability of ride-on toys or toy seats in the forward direction with respect to the child's position, where the child cannot easily use his/her legs for stabilization, and in the backward direction with respect to the child regardless of whether his/her legs are available for stabilization. All ride-on toys or toy seats falling within the scope of 4.15 shall not tip forward or backward when the toy, which shall be loaded with a simulated child's weight, is tested both facing down and up the slope using the test method of 8.15, except that the surface shall be inclined 15° to the horizontal. The stability of ride-on toys is to be tested not only with the steering wheels in a forward position, but also at an angle of 45° to the left and to the right of the forward position.

**TABLE 3 Height of Fifth Percentile Children (Values Given for Boys or Girls, Whichever is Lower)**

| Age, years | Height, in. (cm) |
|---|---|
| 1 | 27 (69.8) |
| 2 | 29 (74.4) |
| 3 | 33 (85.1) |
| 4 | 37 (93.8) |
| 5 | 40 (100.5) |

4.15.4 *Stability of Stationary Floor Toys*— This requirement is intended to minimize hazards that might be caused by a toy that tips when a door, drawer, or other movable portion is extended to its fullest travel. Stationary floor toys of greater than 30 in. (760 mm) in height and weighing more than 10 lb (4.5 kg) shall not tip when placed on a 10° incline with all movable portions extended to their fullest travel and facing in the direction of the downslope side. The toy shall conform to this requirement after it is tested in accordance with 8.5-8.10.

4.15.5 *Overload Requirements for Ride-On Toys and Toy Seats*— This requirement is intended to minimize unexpected hazards that could be caused by a toy that is not capable of withstanding an overload. All ride-on toys, toys intended for use as seats, or toys designed to support all or part of the weight of the child shall support a load applied to the seat, or to other

such intended load-bearing components, without collapsing to produce a hazardous condition when tested in accordance with 8.26. Examples of hazardous conditions if collapse occurs would include the following: exposure of hazardous edges, or points, projections, crushing or pinching hazards, and power-driven mechanisms. The toy shall conform to this requirement after being tested in accordance with 8.5 through 8.10.

4.15.6 *Wheeled Ride-on Toys*— Ride-on toys incorporating wheels intended for movement along the ground shall be tested in accordance with the Dynamic Strength Test for Wheeled Ride-ons in 8.20. Wheeled ride-on toys shall be tested after being tested in accordance with 8.5-8.10.

4.16 *Confined Spaces*— The purpose of these requirements is to minimize the possible entrapment of children in toys that form enclosures, such as toy refrigerators, and to prevent possible suffocation in head-enclosing toys such as space helmets. Toys shall meet the requirements listed in 4.16.1-4.16.3 after the toys are tested in accordance with 8.5-8.10. See Consumer Safety Specification F834 for requirements for toy chests.

4.16.1 *Ventilation*— The purpose of these requirements is to minimize the possible entrapment of children in toys that form enclosures, such as toy refrigerators, and to prevent possible suffocation in head-enclosing toys such as space helmets. Any toy made of impermeable material and having a door or lid, which encloses a continuous volume greater than 1.1 ft$^3$ (0.03 m$^3$) and in which all integral dimensions are 6 in. (150 mm) or more, shall provide one of the following unobstructed ventilation areas:

4.16.1.1 A minimum of two openings each having a total area of at least 1 in.$^2$ (650 mm$^2$) placed at least 6 in. (150 mm) apart (see Fig. 12(a)).

Figure 12. Openings Figure A shows two ciruclar holes, each of which is ≥ 1.0 in.$^2$ and they are separated by a distance of ≥ 6.0 inches. Diagram 12b is two ovals, also ≥ 1.0 in.$^2$ and also separated by a distance of ≥ 6.0 inches. ≥ 1.0 in.2(≥ 650 mm2) ≥ 1.0 in.2(≥ 650 mm2) ≥ 6.0 in.(≥ 150 mm) ≥ 1.0 in.2(≥ 650 mm2) ≥ 1.0 in.2(≥ 650 mm2) ≥ 6.0 in.(≥ 150 mm) (a) (b)

**FIG. 12**

4.16.1.2 One opening that is the equivalent of the two 1.0-in.$^2$ (650-mm$^2$) openings expanded to include the separation area provided this leaves opening areas of 1.0 in.$^2$ (650 mm) on either side of a 6-in. (150-mm) spacing (see Fig. 12(b)). The ventilation openings shall be unobstructed when the toy is placed on the floor in any position and adjacent to two vertical plane surfaces meeting at a 90˚ angle, so as to simulate the corner of a room. If a

permanent partition or bars (two or more), which effectively limit the continuous space by making the largest internal dimension less than 6 in. are used to subdivide a continuous space, the ventilation area shall not be required.

4.16.2 *Closures*— Closures (such as lids, covers, and doors) to enclosures falling within the scope of 4.16.1 shall not be fitted with automatic locking devices. Closures shall be of a type that can be opened with a force of 10 lbf (45 N) or less when treated as follows:

4.16.2.1 With the closure in a closed position, apply the force in an outward direction to the inside of the closure perpendicular to the plane of the closure and anywhere within 1 in. (25 mm) from the geometric center of the closure. The force measurement shall be made by means of a force gauge with a calibrated accuracy within 60.3 lb (0.1 kg) when measuring a force of 10 lb (45 N). The dial of the gauge shall be graduated with its finest division not exceeding 0.2 lb (0.9 N), and the full-scale range shall not exceed 30 lb (130 N).

4.16.3 *Toys that Enclose the Head*— Toys that enclose the head, such as space helmets, which are made of impermeable material, shall provide means for breathing by the incorporation of unobstructed ventilation areas. The ventilation areas shall consist of a minimum of two holes, with a total of at least 2 in.² (1300 mm²) of ventilation and at least 6 in. (150 mm) between holes.

4.17 *Wheels, Tires, and Axles*— These requirements are intended to eliminate the possibility of ingestion hazards (as described in 4.6) that might be caused by small wheels or tires that separate during normal use or reasonably foreseeable abuse, as well as laceration or puncture hazards from projecting axles, either on the toy or on wheel assemblies that may be removed from the toy during abuse. The requirements shall apply to transportation wheels on both preassembled and knocked-down toys intended for children aged 96 months or less, except for ingestion hazards from small wheels and axles, which apply to toys intended for children under 36 months of age, as covered in 4.6. In the case of knocked-down toys, the toy shall be tested in the form that it would be assembled by the purchaser, using simple household tools or special tools provided by the manufacturer, if any, or both. After being subjected to the use and abuse tests of 8.5-8.11, wheels, tires, or axles shall not present a laceration, puncture, or ingestion hazard as defined in 3.1.60 and 4.6.1, respectively.

4.18 *Holes, Clearance, and Accessibility of Mechanisms*— These requirements

16

are intended to eliminate possible hazards that may be caused by changing clearances. Toys shall meet these requirements after they are tested in accordance with 8.5-8.10. The different pinch clearance requirements listed in 4.18.1-4.18.6 reflect the different modes of entrapment or pinching that may be encountered.

4.18.1 *Accessible Clearances for Moveable Segments*— This requirement concerns clearances between movable segments on toys intended for children under 96 months only, where the potential for pinching or crushing fingers or other appendages exists. It includes, but is not limited to, wheels and rigid-wheel wells, fenders, or the radial clearance between the wheels and chassis of ride-on toys, or the driven wheels and other parts of toys powered by electrical, spring, or inertial energy. If such accessible clearances admit a 3/16-in. (5-mm) diameter rod, they shall also admit a ½-in. (13-mm) diameter rod in order to prevent the trapping of fingers.

4.18.2 *Circular Holes in Rigid Materials*— This requirement is intended to prevent finger entrapment (which may cut off blood circulation) in accessible holes in sheet metal and other rigid material in toys intended for children aged 60 months or less. (Noncircular holes are believed to present no significant hazard of cutting off blood circulation in entrapped fingers.) If an accessible, circular hole in any rigid material less than 0.062 in. (1.58 mm) in thickness can admit a ¼-in. (6-mm) diameter rod to a depth of ⅜ in. (10 mm) or greater, it shall also admit a ½-in. (13-mm) diameter rod.

4.18.3 *Chains and Belts*— These requirements are to prevent finger crushing through entrapment between links of supporting chains or between chains and sprockets or pulleys and belts.

Figure 13. Clearance for Chain Links A single chain link is shown and the inside of the link is labelled possible entrapment point. A mark indicates that the clearance should not admit a 3/16 inchd diameter rod on unshielded chains. Clearance not admit 3/16 - in. (5 mm)diameter rod on unshielded chains Possible EntrapmentPoint

### FIG. 13 Clearance for Chain Links

4.18.3.1 *Supporting Chains*— Chains in toys that support the weight of a child, such as hanging seats or similar indoor devices, intended for children 36 months or less in age, shall be shielded if the chain is accessible and if a 0.19-in. (5-mm) diameter rod can be inserted between two links, as in Fig. 13, with the chain in slack configuration.

4.18.3.2 *Chains or Belts for Ride-On Toys*— Power transmission chains and

belts in ride-on toys shall be shielded.

4.18.4 *Inaccessibility of Mechanisms*— Clockwork, batteryoperated, inertial, or other power-driven mechanisms in toys intended for children aged 60 months or less shall not have any accessible part of the mechanism present a pinch or laceration hazard. (For circular holes, also see the requirement under 4.18.2.)

4.18.5 *Winding Keys*— This requirement is to prevent the pinching or laceration of fingers by entrapment between the key and body of the toy. It applies to toys intended for children under 36 months of age that use winding keys that rotate as the mechanism unwinds. This requirement applies to keys with flat plates attached to the stem and that protrude from a rigid surface; the requirement does not apply to those circular knobs to which the torque is applied. If the clearance between the flukes of the key and body of the toy will admit a 0.25-in. (6-mm) diameter rod, it shall also admit a 0.5-in. (13-mm) diameter rod at all positions of the key. For keys covered by this requirement, there shall be no opening in the flukes of the key that can admit a 0.19-in. (5-mm) diameter rod.

4.18.6 *Coil Springs*— These requirements are intended to prevent the pinching or crushing of fingers or toes by toys containing springs. Coil springs (either compression or extension) that form part of a component that carries the weight of a child shall be shielded so as to prevent access during use or reasonably foreseeable abuse unless either of the following occurs:

4.18.6.1 A 0.12-in. (3-mm) diameter rod cannot be inserted freely; or

4.18.6.2 A 0.25-in. (6-mm) diameter rod can be inserted freely between the adjacent coils at all points in the action cycle when the spring is subjected first to a weight of 3 lb (1.4 kg) and then to a weight of 70 lb (32 kg).

4.19 *Simulated Protective Devices (such as helmets, hats, and goggles)*— These requirements are intended to minimize hazards that might be caused, for example, by goggles or space helmets if the material from which they are constructed fails; or by toys that simulate protective devices such as football helmets and pads, if the wearer uses the article as a real protective device rather than as a toy. The toy shall conform to the requirements listed in 4.19.1 and 4.19.2 after testing in accordance with 8.7.4 and 8.8 through 8.10.

4.19.1 *Eye Protection*— All rigid toys that cover the face, such as goggles, space helmets, or face shields, shall be constructed of impact-resistant

material that will not have sharp edges, sharp points, or loose parts that could enter the eye before or after being tested in accordance with 8.5-8.10. This applies to items with cutout eye holes as well as items that cover the eyes.

4.19.2 Toys that simulate safety protective devices (examples include, but are not limited to, construction helmets and sports helmets) and their packages shall be labeled clearly in accordance with 5.9 to warn the purchaser that they are not safety protective devices.

4.20 *Pacifiers*— Infant pacifiers shall conform to the safety requirements as specified in 16 CFR 1511. Illustrations of the pacifier test fixture are shown in Fig. 14.

Figure 14. Pacifier Test Fixture The pacifier test fixture is a flat device through the nipple of the pacifier is inserted. Diagram a is a top view and has a width of 76 mm and a length of 102 mm. The center opening is a trapezoid with the top part being wider and a width of 22.3mm and 45 degree angles . Below the trapezoid is a circle with a diameter of 42.7mm. Below that is another trapezoid, with the narrow part on top. The distance from the top of the opening is 3 inches. 22° 30′ 1.68"42.7 mm 4"102 mm 45° 3"76 mm 1.5"38.1 mm 3.0"76.2 mm 2 LBSOR8.6 N A A CenterOpening Material:1/4" Polytetrafluoroethylene SectionA-A PACIFIER FORCE 0.3"76 mm Rod (b) (a)

**FIG. 14 Pacifier Test Fixture**

4.20.1 Pacifiers with rubber nipples shall conform to the nitrosamine levels as specified in Specification F1313. This specification states that a test sample of nipples, drawn from a standard production lot, shall not contain more than 10 ppb in each of three aliquots of any one nitrosamine. In addition, the total nitrosamines of the sample shall not exceed 20 ppb.

4.20.2 Toy pacifiers attached to, or sold with, toys intended for children under 36 months of age shall comply with the requirements outlined in 4.6.1 of this specification (small objects), and either conform to the requirements of 16 CFR 1511 or have a nipple length no longer than 0.63 in. (16 mm). This measurement shall be taken from the nipple side of the shield to the end of the nipple.

4.21 *Projectile Toys*— These requirements relate to certain, but not all, potential, unexpected hazards that might be caused by projectile firing toys and by the firing of improvised projectiles from such toys. Certain well-recognized hazards that are inherent in traditional toys such as slingshots and darts are not covered by these requirements. The discharge mechanism as

well as the projectile shall conform to the requirements specified in this section after testing in accordance with the appropriate test methods described in 8.5-8.10 and 8.14.

4.21.1 These requirements apply to toys that are intended to launch projectiles into free flight by means of a discharge mechanism in which the kinetic energy of the projectile is determined by the toy and not by the user.

4.21.1.1 No projectile intended to be fired from a toy shall have any sharp edges, sharp points, or small parts that would fit within the cylinder shown in Fig. 3.

4.21.1.2 No rigid projectile fired from a toy shall have a tip radius less than 0.08 in. (2 mm).

4.21.1.3 Any rigid projectile fired from a toy that has a kinetic energy that exceeds 0.08 J (as determined by 8.14.1) shall have an impact surface(s) of a resilient material.

4.21.1.4 Any protective tip shall either (1) not be detached from the projectile when subjected to the torque and tension tests described in 8.8 and 8.9, or (2) if the protective tip does become detached during the test at less than the specified torque or tension, or both, the projectile shall not be able to be launched from the provided launcher. Additionally, the protective tip shall not produce or reveal hazardous points or edges when fired into a solid object, in accordance with the test methods described in 8.14.4.

4.21.1.5 The aforementioned requirements shall not apply to any discharge mechanism incapable of storing energy independent of the user, or intended to propel a ground-based vehicular toy along a track or other surface, or when the projectile is inaccessible to a child when it leaves the discharge mechanism, for example, bagatelle or pinball machines.

4.21.2 *Discharge Mechanisms*— Discharge mechanisms shall be unable to discharge potentially hazardous improvised projectiles such as pencils or pebbles without modification by the user.

4.21.3 Any arrow shall have a protective tip that complies with 4.21.1.4.

4.22 *Teethers and Teething Toys*— These requirements are intended to address a potential impaction hazard associated with teethers. These requirements are applicable before and after use and abuse testing in accordance with Section 8.

4.22.1 Teethers and teething toys shall conform to the dimensional requirements for infant rattles as specified in 16 CFR 1510. Illustrations of a rattle test fixture are shown in Fig. 15. A teether shall meet this requirement when tested under the force only of its own weight and in a noncompressed state.

Figure 15. Rattle Test Fixture The fixture is a rectangular block with a stadium oval cavity centered within the fixture. The stadium oval is 1.968 inchdes by 1.378 inches and the circles have a radius of .689 inches. The rectangle around the oval is 2 9/16 inches by 1.968 inches. From the side, the device is 1.181 inches high and 3 1/8 inches long. CAVITY CENTERED WITHIN FIXTURE .689 in (17.5 mm)RADIUS (REF) 2 9/16 in(65 mm) 1.378 in(35 mm) 1.968 in(50 mm) 1.181 in(30 mm) 3 1/8 in(80 mm)

### FIG. 15 Rattle Test Fixture

4.22.2 In addition, teethers and teething toys incorporating nearly spherical, hemispherical, or circular flared ends shall be designed so that such ends are not capable of entering and penetrating to the full depth of the cavity in the supplemental test fixture shown in Fig. 16. A teether shall meet this requirement when tested under the force only of its own weight and in a noncompressed state.

Figure 16. Supplemental Test Fixture for Rattles, Squeeze Toys and Teethers. The top diagram is a square of 2.86 inchdes per side with a circle inside of 1.68 inches in diameter. The side view shows the device is 1.18 inchdes high. 2.86 in(72.6 mm) 2.86 in(72.6 mm) 1.68 in(42.7 mm) 1.18 in(30.0 mm)

### FIG. 16 Supplemental Test Fixture for Rattles, Squeeze Toys, and Teethers

4.22.3 *Exclusion—* The requirements of 4.22.1 and 4.22.2 shall not apply to the following:

1. Teething toys that are composed of liquid-filled beads that are attached to form a ring or beads that are threaded on a flexible cord or string.

2. Soft-filled (stuffed) teething toys or soft-filled parts or parts of fabric.

3. Rigid components having a major dimension equal to or less than 1.2 in. (30 mm) contained within soft-filled teething toys.

4.23 *Rattles—* Infant rattles shall conform to the safety requirements as specified in 16 CFR 1510. Illustrations of a rattle test fixture are shown in Fig. 15.

18

4.23.1 In addition to meeting the requirements of 16 CFR 1510, rigid rattles incorporating nearly spherical, hemispherical, or circular flared ends shall be designed so that such ends are not capable of entering and penetrating to the full depth of the cavity in the supplemental test fixture illustrated in Fig. 16. A rattle shall meet this requirement when tested under the force only of its own weight and in a noncompressed state. These requirements are applicable before and after use and abuse testing in accordance with Section 8.

4.23.2 *Exclusion*— The requirements of 4.23 and 4.23.1 shall not apply to the following:

1. Soft-filled (stuffed) rattles or soft-filled parts or parts of fabric.

2. Rigid components having a major dimension equal to or less than 1.2 in. (30 mm) contained within soft-filled rattles.

4.24 *Squeeze Toys*— These requirements are intended to address a potential impaction hazard associated with squeeze toys intended for children under the age of 18 months. These requirements are applicable before and after use and abuse testing in accordance with Section 8.

4.24.1 Squeeze toys shall conform to the dimensional requirements for rattles as specified in 16 CFR 1510. Illustrations of a rattle test fixture are presented in Fig. 15. A squeeze toy shall meet these requirements when tested under the force only of its own weight and in a noncompressed state.

4.24.2 In addition, squeeze toys incorporating nearly spherical, hemispherical, or circular flared ends shall be designed so that such ends are not capable of entering and penetrating to the full depth of the cavity in the supplemental test fixture shown in Fig. 16. A squeeze toy shall meet these requirements when tested under the force only of its own weight and in a noncompressed state.

4.24.3 *Exclusion*— The requirements of 4.24.1 and 4.24.2 shall not apply to the following:

1. Soft-filled (stuffed) squeeze toys or soft-filled parts or parts of fabric.

2. Rigid components having a major dimension equal to or less than 1.2 in. (30 mm) contained within soft-filled squeeze toys.

4.25 *Battery-Operated Toys*— These requirements are intended to address potential risks of injury associated with battery usage in toys intended for use by children (for example, battery overheating, leakage, explosion and fire,

and choking on or swallowing batteries). Both non-rechargeable and rechargeable batteries are subject to these requirements. Batteryoperated toys shall conform to the requirements specified in this section after testing in accordance with the appropriate test methods described in 8.5-8.12. For purposes of ensuring compliance with these requirements, fresh alkaline batteries that meet the dimensional requirements of the latest revision of ANSI C18.1 or the latest revision of IEC 60086-2 shall be selected for test purposes. If another battery chemistry is specifically required for use in the toy by the manufacturer, testing shall be repeated using that type of battery. When rechargeable batteries are specified by the manufacturer, fully recharged batteries shall be used for testing purposes.

4.25.1 The toy shall be marked permanently on the battery compartment or on the area immediately adjacent to the battery compartment to show the correct battery polarity using the polarity symbols "+" and "−". Additional markings located on the toy or in the instructions must indicate the correct battery size and voltage. These markings are not required for nonreplaceable batteries or for rechargeable battery packs that, by design, can only be inserted in the correct orientation. Battery compartments for button cell batteries are not subject to this requirement.

> *NOTE 5 —* The battery compartment door is considered part of the battery compartment.

4.25.1.1 Toys containing non-replaceable batteries shall be labeled in accordance with 5.15.

4.25.2 The maximum allowable direct current potential between any two accessible electrical points is 24 V nominal.

4.25.3 Battery-operated toys shall be designed so that it is not possible to charge any non-rechargeable battery. This can be achieved through physical design of the battery compartment or through the use of an appropriate electrical circuit design. This applies to situations in which a battery may be installed incorrectly (reversed) or in which a battery charger may be applied to a toy containing non-rechargeable batteries, or both. This section does not apply to circuits having one or two non-rechargeable batteries as the only source of power.

4.25.3.1 Toys having a circuit powered only by button cell type batteries are not subject to this requirement.

4.25.4 For toys intended for children less than 3 years old, all batteries shall not be accessible before or after testing in accordance with 8.5-8.10, without

the use of a coin, screwdriver, or other common household tool. Testing is performed using the recommended batteries installed.

4.25.5 For all toys, batteries that fit completely within the small parts test cylinder shown in Fig. 3 shall not be accessible, before or after testing in accordance with 8.5-8.10, without the use of a coin, screwdriver, or other common household tool. Testing is performed using the recommended batteries installed.

4.25.6 Batteries of different types or capacities shall not be mixed within any single electrical circuit. In applications requiring more than one type or capacity of battery to provide different functions or in applications requiring the combination of alternating current and non-rechargeable batteries, each circuit shall be isolated electrically to prevent current from flowing between the individual circuits.

4.25.7 The surfaces of the batteries shall not achieve temperatures exceeding 71°C.

4.25.7.1 This requirement is applicable for all batteryoperated toys during normal use conditions. In addition, battery-operated toys intended for children 96 months or less shall meet this requirement after reasonably foreseeable abuse.

4.25.7.2 If external moving parts of the toy that are mechanically linked to the motor can be stalled by the user, test for a stalled motor condition according to the procedures of 8.17 to determine conformance with the temperature limits.

4.25.8 No condition shall occur that would cause the toy to fail the temperature requirements of 4.25.7 or present a combustion hazard as described in 4.25.

4.25.9 Battery-operated toys shall meet the requirements of 6.5 for instructions on safe battery usage. Toys which use non-replaceable batteries as the only source of power are not subject to 6.5.

4.25.10 *Battery-Powered Ride-On Toys*— These requirements cover wheeled ride-on toys, not intended for streets or roadways, using a battery power source that is capable of delivering at least 8 amps into any variable resistor load for at least one minute.

4.25.10.1 The maximum temperature measured on the insulation of any conductor shall not exceed the temperature rating of the material (third

party test laboratory rating) when tested in accordance with 8.18.2.

4.25.10.2 Battery-powered ride-on toys shall not present a risk of fire when tested in accordance with the stalled motor test of 8.18.3.

4.25.10.3 A battery-powered ride-on toy designed with a wiring system that has a user replaceable device (fuse type) for the primary circuit protection or a wiring system with user resetable primary circuit protection (manual reset fuse) shall not actuate (open or trip) when tested in accordance with the nuisance tripping test of 8.18.4.

4.25.10.4 Switches used in battery-powered ride-on toys.

1. Polymeric materials in switches used in batterypowered ride-on toys that are used to support current-carrying parts shall carry a minimum flame rating of UL-94 V-0 or have a glow wire ignition rating of 750°C. Note: This requirement does not apply to switches used in low-power circuits. A low-power circuit is defined as one using an effective battery power source that is not capable of delivering at least 8 amps into any variable resistor load for at least one minute.

2. The switch body shall not result in a short-circuit condition when subjected to the switch endurance test and overload tests of 8.18.5.

3. The switch shall not fail in a mode that could cause the vehicle to run continuously (switch stuck in the "on" position) when subjected to the endurance test and the overload test in 8.18.5.

4.25.10.5 User replaceable circuit protection devices in battery-powered ride-on toys.

1. User replaceable circuit protection devices used in battery-powered ride-on toys shall be listed, recognized or certified by an independent laboratory.

2. All circuit protection devices used in battery-powered ride-on toys intended to be replaced by the user shall be replaceable only with the use of a tool or by a design which does not easily allow tampering such as a design requiring excessive force to open.

4.25.10.6 Batteries, as described in 4.25.10, and battery chargers.

1. Battery connectors must be constructed of material with a V-0 flame rating or have a glow wire ignition rating of 750°C.

2. The battery charging system shall not present a risk of fire due to a short-circuit condition applied to any point in the length of a charger/battery interconnecting cable when tested in accordance with 8.18.7.

3. During charging, battery-charging voltages shall not exceed the recommended charging voltages when tested in accordance with 8.18.6.

4. Battery chargers must be certified to the appropriate current national standard, for example UL, CSA, or equivalent standards body.

**20**

4.25.10.7 Wiring connected to the main/motor battery shall be short-circuit protected and shall not present the risk of fire when tested in accordance with 8.18.7.

4.25.10.8 Strain relief shall be provided to prevent mechanical stress on wires entering a connector block during routine maintenance such as battery charging, and tested in accordance with 8.18.8.

4.25.10.9 Battery-powered ride-on toys shall comply with the requirements in 5.15.1 for safety labeling, 6.5.3 for additional instructional literature, and 7.2 for required producer's markings.

4.26 *Toys Intended to be Attached to a Crib or Playpen*— These requirements are intended to minimize entanglement or strangulation hazards that might be caused by toys intended to be attached to a crib or playpen (see also 4.14).

4.26.1 *Protrusions*— Toys attached to a crib or playpen in the manner prescribed by the manufacturer's instructions shall not have hazardous protrusions that could contribute to entanglement injury. This requirement is applicable before and after use and abuse testing in accordance with 8.5-8.10. Design guidelines are provided in Annex A3.

4.26.2 *Crib Mobiles*— Crib mobiles shall comply with the requirements listed in 5.6 for safety labeling and 6.3 for instructional literature.

4.26.3 *Crib Gyms*— Crib gyms, including crib exercisers and similar toys intended to be strung across a crib or playpen, shall comply with the requirements listed in 5.5 for safety labeling and 6.2 for instructional literature.

4.27 *Stuffed and Beanbag-Type Toys*— Stuffed and beanbagtype toys shall

meet the applicable requirements of this specification after being tested in accordance with 8.9.1.

4.28 *Stroller and Carriage Toys*— Stroller and carriage toys shall comply with the requirements for safety labeling in 5.7.

4.29 *Art Materials*— The purpose of this requirement is to minimize the potential risks associated with the use of art materials that present chronic health hazards.

4.29.1 Toys and components of toys that fall within the definition of art material as found in 16 CFR 1500.14 (b) (8) shall meet the requirements for toxicological review by a U.S. board-certified toxicologist. The protocol used to evaluate the art materials must be filed with the Consumer Product Safety Commission (CPSC), and the list of ingredients must also be filed with the commission if the material is or contains a chronically hazardous substance.

4.29.2 Toys and components of toys that are art materials and are determined to contain hazardous materials must have appropriate warnings as defined in the Federal regulations and as noted in 5.13 of this specification. Items that do not contain hazardous materials must also be labeled as to their conformity.

4.29.3 Toys and components of toys that have been determined to pose a chronic health hazard and require warnings are not suitable for use by children who are in pre-kindergarten, or grades one through six.

4.30 *Toy Gun Marking*— This requirement is intended to minimize the potential for a toy gun to be mistaken for a real firearm.

4.30.1 This requirement applies to all toy, look-alike, and imitation firearms which have the general appearance, shape, or configuration, or combination thereof, of a firearm. This includes, but is not limited to, nonfunctional guns, water guns, air soft guns, cap guns, light emitting guns, and guns with an opening to eject any nonmetallic projectile.

4.30.2 This requirement does not apply to the following types of guns:

4.30.2.1 Futuristic toy guns that do not have the general appearance, shape, or configuration, or combination thereof, of any firearm.

4.30.2.2 Nonfiring collector replica antique firearms that look authentic and may be a scale model but are not intended as toys.

4.30.2.3 Traditional B-B guns, paint ball guns, or pellet guns that expel a projectile through the force of compressed air, compressed gas, or mechanical spring action, or combination thereof.

4.30.2.4 Decorative, ornamental, and miniature objects having the appearance, shape, or configuration, or combination thereof, of a firearm provided that the objects measure no more than 1.50 in. (38 mm) in height by 2.75 in. (70 mm) in length, with the length measurement excluding any gun stock length measurement. This includes items intended to be displayed on a desk or worn on bracelets, necklaces, key chains, etc.

4.30.3 Items subject to this requirement must be marked or manufactured, or both, in any one of the following ways. The marking must be permanent and must remain in place after being tested in accordance with 8.5-8.10. The word "permanent" excludes the use of ordinary paint or labels for the purposes of this section. The "blaze orange" color referred to in 4.30.3.1 and 4.30.3.2 is Federal Standard 595a, Color 12199.

4.30.3.1 A blaze orange plug, or brighter orange colored plug, affixed into the muzzle end of the barrel as an integral part of the toy. The plug shall not be recessed more than 0.25 in. (6 mm) from the muzzle end of the barrel.

4.30.3.2 A blaze orange band, or brighter orange colored band, covering the circumference of the muzzle end of the barrel for a distance of at least 0.25 in. (6 mm).

4.30.3.3 Coloration of the entire exterior surface of the toy in white, bright red, bright orange, bright yellow, bright green, bright blue, bright pink, or bright purple, either individually or as the predominant color in combination with any other color in any pattern.

4.31 *Balloons*— Packages containing latex balloons and toys or games containing latex balloons shall comply with the labeling requirements of 16 CFR 1500.19. Labeling statements for balloons are contained in 5.11.5 of this specification.

4.32 *Certain Toys with Nearly Spherical Ends*— These requirements are intended to address a potential impaction hazard associated with nearly[13] spherical, hemispherical, circular flared or dome shaped ends on toys or components of toys.

[13] The term "nearly" is used here, consistent with the long standing and successful squeeze toy requirement.

4.32.1 Nearly spherical, hemispherical, circular flared, or dome-shaped ends of toys or components of toys must not be capable of penetrating the full depth of the cavity of the supplemental test fixture shown in Fig. 16 when tested under the force only of their own weight and in a noncompressed state. This requirement applies to toys if they meet all the following criteria:

21

4.32.1.1 The toy is intended for children up to the age of 18 months.

4.32.1.2 The toy or component containing the nearly spherical end weighs less than 1.1 lb (0.5 kg).

4.32.1.3 The nearly spherical, hemispherical, circular flared or dome shaped end adjoins a shaft, handle or support that has a smaller cross section.[14]

   1. *Exclusion*—The requirement of 4.32.1 does not apply to softfilled (stuffed) toys or softfilled parts of toys or parts entirely of fabric.

   [14] This sentence attempts to clarify that the requirements only apply to the nearly spherical end and not to nonspherical areas of the toy or component. In addition, the term "adjoins" replaces the term "attached" as the handle and spherical end may be all part of the same molded piece.

4.32.2 Nearly spherical, hemispherical, or dome-shaped ends of toy fasteners (for example, nails, bolts, screws, pegs) (see Fig. 17) must not be capable of penetrating the full depth of the cavity of the supplemental test fixture shown in Fig. 16 when tested under the force only of their own weight and in a noncompressed state. This requirement of 4.32.2 applies to toy fasteners if they meet all the following criteria:

4.32.2.1 They are intended for children aged at least 18 months but less than 48 months of age.

4.32.2.2 They have an overall length of 2.25 in. (57.1 mm) or greater.

Figure 17. Domed Ends 3 Domed ends are shown. One is a rod with a sphere on top. The second is a rod with a semi-sphere on top. The third is a rod with a small ring half-way up the rod and top of that is a cap that has a dome on the end.

Domed ends, with and without small flat in the center.

Figure 17b. Hemispherical Ends. Hemispherical ends are shaped like a nail with a slight curve to the top of the nail.

**FIG. 17 Examples of Hemispherical and Domed Ends**

4.32.2.3 Their nearly spherical, hemispherical or domed ends have a diameter equal to or greater than 0.6 in. (15 mm).

4.32.2.4 The distance from the apex of the fastener to the undercut is 1.75 in. (44.4 mm) or less as shown in Fig. 18.

1. *Exclusions*—The requirement of 4.32.2 does not apply to the following toy fasteners:

    a. Softfilled (stuffed) or fabric fasteners,

    b. Fasteners with nonrigid ends, and

    c. Fasteners tethered to a toy where the weight of the combined toy/fastener is more than 1.1 lb (0.5 kg) and the length of the tether is less than 12 in. (300 mm).

Figure 18. Undercut and Diameter A rod with with a domed end on top is shown. The domed end is wider than the rod. From one side of the cap (the domed end) is labelled "diameter of spherical or hemispherical or domed end." From the top of the cap to the bottom, where it attaches to the rod, is labelled "distance to undercut section from domed end." Diameter of spherical orhemispherical or domedend Distance to undercut sectionfrom domed end

### FIG. 18 Undercut and Diameter

4.32.3 *Preschool Play Figures*— This requirement is intended to address the potential choking/obstruction hazard associated with certain preschool figures intended for children under three years of age. The characteristics that distinguish toy figures falling within the scope of this requirement include: (1) a round, spherical, or hemispherical end with tapered neck attached to a simple cylindrical shape without appendages, and (2) an overall length not exceeding 2.5 in. (64 mm) (see examples in Fig. 19). This includes figures with added or molded features such as hats or hair, which retain the rounded shape of the end.

Figure 19. Examples of Preschool Play Figures The diagram has three examples of playschool figures. One has a baseball cap, one is bald, one has hair.

### FIG. 19 Examples of Preschool Play Figures

4.32.3.1 Preschool play figures intended for children under three years of age shall be designed so that their rounded ends are not capable of entering and penetrating to the full depth of the cavity in the supplemental test fixture

illustrated in Fig. 16. Test the play figure under the force of its own weight.

4.32.3.2 *Exclusion*— The requirement of 4.32.3.1 shall not apply to soft play figures made of textiles.

4.33 *Marbles*— Marbles shall comply with the labeling requirements of 16 CFR 1500.19. Labeling statements for marbles are contained in 5.11.4 of this specification.

4.33.1 Toys and games intended for children at least 3 years of age but less than 8 years of age that contain a marble shall comply with the labeling requirements 16 CFR 1500.19. Applicable labeling statements are contained in 5.11.4.1 of this specification.

## 4.34 Balls

4.34.1 Balls intended for children under 36 months of age are subject to the requirements of 16 CFR 1500.18 (a) (17). A loose ball in toys intended for children under 36 months of age shall not, under the influence of its own weight and without compression, pass entirely through the template shown in Fig. 20. A ball which does pass through the template is determined to be a "small ball."

Figure 20. Test Fixture for Small Balls The test fixture is a square of 2.86 inchdes per side with a 1.75 inch diameter circle inside. This is the top view. The size view indicates that the device is 0.25 inchdes high. 2.86 in.(72.6 mm) 2.86 in.(72.6 mm) 0.25 in.(6 mm) 1.75 in.(44.5 mm)

**FIG. 20 Test Fixture for Small Balls**

4.34.2 Toys intended for children at least 3 years old but less than 8 years of age that contain a loose small ball are subject to the requirements of 16 CFR 1500.19. Applicable labeling statements are contained in 5.11.3 of this specification.

4.35 *Pompoms*— These requirements are intended to address choking hazards associated with pompoms on toys intended for children under three years of age that detach during 8.16. Pompoms detached during 8.16 must not pass entirely through the 1.75-in. (44.5-mm) test fixture (see Fig. 20) under their own weight. Any components, pieces, or individual strands of the pompom that are liberated during the torque and tension tests should not be subject to this test. Test the pompoms by putting the free ends of fiber into the gauge.

4.36 *Hemispheric-Shaped Objects*— These requirements apply to toy cup-,

bowl-, or one-half egg-shaped objects having a nearly round, oval, or elliptical opening with the minor and major inner dimensions between 2.5 in. (64 mm) and 4.0 in. (102 mm), a volume of less than 6.0 oz (177 mL), a depth greater than 0.5 in. (13 mm), and intended for children under 3 years of age. The following are exempt from this requirement:

4.36.1 Objects intended for drinking (for example, tea cups).

4.36.2 Objects intended to hold liquids in products appropriate for children at least 2 years old (for example, pots and pans).

4.36.3 Containers that must be airtight so the contents can maintain their functional integrity (for example, modeling clay containers.)

4.36.4 Non-detachable (as determined by testing in accordance with 8.6-8.10 of this specification) components of larger products (for example, bowl-shaped smoke stack that is permanently attached to a toy train or a swimming pool that is molded into a larger toy playscape).

22

4.36.5 Containers that are part of the retail package intended to be discarded once the toy is removed from the package.

4.36.6 *Performance Requirements—* Cup/bowl/one-half egg-shaped objects must have, as a minimum, one of the following characteristics (*a, b, c, d,* or *e*). For purposes of these requirements, unless otherwise specified, an opening is defined as a hole of any shape with a minor dimension of 0.080 in. (2 mm). These requirements apply before and after testing in accordance with 8.6-8.10 of this specification.

    a.  Have at least two openings that are a minimum of 0.5 in. (13 mm) from the rim as measured along the outside contour.

          1.  If the openings are placed in the base of the object, at least two of the openings must be a minimum of 0.5 in. (13 mm) apart. (See Fig. 21.)

          2.  If the openings are not placed in the base of the object, at least two of the openings must be placed at least 30° but not more than 150° apart. (See Fig. 22.)

23

    b.  The plane of the open end of the cup shape shall be interrupted at the center by some type of divider that extends to 0.25 in. (6 mm) or less from the plane of the open end of the cup. (See Fig. 23 for an example.)

    c.  Have three openings that are at least 100° apart, located between 0.25 in. (6 mm) and 0.5 in. (13 mm) from the rim as measured along the outside contour.

    d.  Have a repeating scalloped edge pattern around the entire rim. The maximum distance between center lines of adjacent peaks shall be 1 in. (25 mm) and the minimum depth shall be 0.25 in. (6 mm). (See Fig. 24 for examples of scalloped edge patterns.)

    e.  Have an opening with a minor dimension of at least 0.66 in. (17 mm) located anywhere in the base or in the side wall of the object. If the opening is located in the sidewall of the object, the edge of the opening must be at least 0.5 in. (13 mm) from the rim as measured along the outside contour.

Figure 21. Openings in Base of Bowl On the left, a side view of a bowl shows two holes in the bottom. It is labelled "Section A-A". From the top, a circle is shown with the holes in the the bottom. Each hole is labelled A. There must be a minimum distance of 0.5 inchdes between the holes. SECTION A _ A 0 . 5 in. Min.(13 mm) A A

### FIG. 21 Openings in Base of Bowl

Figure 22. Opening Placement There are two diagrams. On the left is a cirlce with two small holes. One is on the far right of the bowl near the edge. The other is on the left near the edge but up a bit from the center. Arrows indicate that these wholes are to be 150 degrees maximum and 30 degrees minimum in separation. The right diagram shows a bow and indicates that a hole must be 0.5 inchdes minimum from the top. 150° Max. to 30° Min. 0 . 5 in. Min.(13 mm)

### FIG. 22 Opening Placement

Figure 23. Rib Through Cup Center. There are two diagrams. The left is a semi-circle representing a cup with a rib protruding from the botom. The rib must be 0.25 inchdes maximum from the top of the cup. The widest distance from one side to the other is labelled Section A-A. SECTION A - A 0 . 25 in. Max.( 6 mm ) A A

### FIG. 23 Rib Through Cup Center

Figure 24. Scalloped Edge Pattern Three examples of half-spheres with scalloped edges are shown. One is gently undulating edges. The other is a sharp set of scallops. The third is a set of notches.

### FIG. 24 Scalloped Edge Pattern

4.37 *Yo Yo Elastic Tether Toys—* These requirements are intended to address

potential strangulation hazards associated with yo yo elastic tether toys intended for children 36 months and over.

**24**

4.37.1 Toys with an end mass greater than 0.02 kg (0.044 lb) shall have a tether length less than 50 cm (20 in.) measured when the toy is rotating at any speed up to a maximum speed of 80 r/min. Testing shall be conducted in accordance with 8.23.

**4.37.2** *Exemptions*:

1. Paddle balls.

2. Sports balls with wrist or ankle straps longer than 70 cm (27.6 in.) intended to be kicked or thrown and returned to the user. The length of the strap shall be measured when the product is placed on a horizontal surface with no load.

4.38 *Magnets*— This requirement is intended to address ingestion hazards associated with toys intended for children up to 14 years of age that contain a hazardous magnet. This requirement does not apply to magnets used in motors, relays, speakers, electrical components, and similar devices where the magnetic properties are not part of the play pattern of the toy.

**25**

4.38.1 Toys must not contain a loose as-received hazardous magnet or a loose as-received hazardous magnetic component.

4.38.2 Toys shall not liberate a hazardous magnet or a hazardous magnetic component after being tested in accordance with 8.8 and 8.9 and magnet use and abuse testing as specified in 8.24.

4.38.3 Hobby, craft, and science kit-type items intended for children over 8 years of age, where the finished product is primarily of play value, that contain a loose as-received hazardous magnet or a loose as-received hazardous magnetic component, or both, are exempt from the requirements of 4.38.1 and 4.38.2 provided they comply with the requirements for safety labeling described in 5.17.

**4.39 Jaw Entrapment in Handles and Steering Wheels**

4.39.1 These requirements are intended to address potential jaw entrapment in handles and steering wheels that are located such that they are accessible for teething in the following categories of toys intended for children under 18 months of age: activity tables intended to be played with by a standing child, large bulky toys, stationary floor toys, push toys intended to be pushed by a

child walking upright, and ride-on toys.

4.39.2 Handles that are connected to the toy with a hinge and handles made from a pliable material (for example, straps and ropes) are exempt from this requirement.

4.39.3 Openings in handles and steering wheels that allow a 0.75 by 0.75 by 1 in. (1.9 by 1.9 cm by 2.5 cm) test fixture to pass completely through must also allow a 1.5 by 2.5 by 1 in. (3.8 by 6.35 by 2.5 cm) test fixture to pass completely through (see Fig. 25). Test fixtures can be made of any rigid material. The test fixture shall be oriented such that the 0.75-in. (1.9-cm) dimension and the 2.5-in. (6.35-cm) dimension is parallel with the major dimension of the handle or steering wheel opening.

Figure 25. Jaw Entrapment A rectangular block with a an arch connected to the top is shown in two views. On the left view, a block that is 2.5 x 1.5 inches and 1 inch deep is being inserted through the arch. On the second diagram, the block is 0.75 x 0.75 inches and one inch deep.

**FIG. 25 Jaw Entrapment**

# 5. Labeling Requirements

5.1 *Federal Government Requirements*— All toys that fall within the definitions and requirements of the U.S. FHSA shall conform to the labeling requirement of that act. For specific requirements, reference 16 CFR 1500.3, 1500.14, 1500.19, 1500.82, 1500.83, 1500.86, 1500.121, 1500.122, 1500.123, 1500.125, 1500.126, 1500.127, 1500.128, 1500.130, 1505.3, and 1511.7. In addition, state labeling requirements may exist.

26

5.2 *Age Grading Labeling*— Toys that are subject to any of the requirements of this specification should be labeled to indicate the minimum age for intended use or have such labeling on any retail packaging. If the toy or toy package is not age labeled in a clear and conspicuous manner or, based on such factors as marketing practices and the customary patterns of usage of the toy by children, is inappropriately age labeled, the toy shall be subjected to the most stringent applicable requirements within this specification. (Examples: (1) a tensile force of 15 lbf (67 N) shall be required instead of 10 lbf (45 N) when testing in accordance with 8.9 if no limiting age range is specified; (2) the "highest age of the age range" in 4.15 would be 14 years, the maximum age addressed in the scope of this specification.)

5.2.1 For certain toys, such as costumes and riding toys, it may also be appropriate to label the toy or its package, or both, in terms of height or

weight limitations.

5.2.2 Guidelines for determining the appropriate age grade for toys are provided in Annex A1 of this specification.

5.3 *Safety Labeling Requirements*— Certain toys, and in some cases their packages, are required to carry safety labeling to comply with this specification.

5.3.1 Required safety labeling shall consist of an alert symbol (an exclamation mark within an equilateral triangle), a signal word (CAUTION or WARNING), and text that describes the hazard that is present. Additionally, safety labeling may contain text about what to do or not to do to avoid injury (for example, "Keep out of baby's reach"). The signal word shall be in all upper case sans serif letters not less than ⅛ in. (3.2 mm) in height and shall be center or left aligned. The alert symbol shall directly precede the signal word. The height of the triangle shall be at least the same height as the signal word. The height of the exclamation point shall be at least half the height of the triangle and be centered vertically in the triangle. Text describing the hazard(s) and hazard avoidance behavior(s) shall appear in sans serif lettering and shall be either left aligned or center justified. Capital letters shall be no less than 1/16 in. (1.6 mm). Recognizing space constraints, it is recommended, that where possible, such text begin on the next line below the signal word, and that a new line be used for each subsequent statement or separate thought.

5.3.2 Sections 5.4, 5.5, 5.6, 5.7, 5.11, and 5.15 require the signal word WARNING. When no signal word is specified for safety labeling in accordance with 5.3, it is recommended that the signal word CAUTION be used to indicate a potentially hazardous situation which could result in minor or moderate injury, and that the signal word WARNING be used to indicate a potentially hazardous situation which could result in death or serious injury.

5.3.3 Sections 5.11 and 5.15 specify required text describing the hazard(s) and hazard avoidance behavior(s). When no required text is specified for safety labeling in accordance with 5.3, the text is left to the discretion of the manufacturer. Sections 5.4, 5.5, 5.6, 5.7, and 5.15.1.1 provide recommended text to describe the hazard(s) and hazard avoidance behavior(s).

5.3.4 The required safety labeling described throughout Section 5 shall be on the principal display panel.

5.3.5 For toy items packed as premiums in or on a package containing other

items, safety labeling shall be on the toy package, and similar labeling shall appear on the larger package.

5.3.6 All safety labeling shall be conspicuous and legible, shall be separated distinctively from any other wording or designs, and shall appear in the English language at a minimum. Such labeling shall be clearly visible to the intended audience and shall be in a color contrasting with the background on which it appears.

5.3.7 When safety labeling is printed onto the toy itself using a decoration process such as hot stamping, silk screening, or a similar process, it shall remain legible after normal use and reasonably foreseeable abuse when tested in accordance with 8.5-8.10.

5.3.8 When safety labeling is affixed to a toy in the form of an applied label, the label shall be applied so that it adheres firmly to the toy and none of its edges is lifted off the surface of the toy. Such label shall remain legible after normal use and reasonably foreseeable abuse when tested in accordance with 8.5-8.10.

5.4 *Aquatic Toys*— Aquatic toys and their packages shall carry safety labeling in accordance with 5.3, consisting of the signal word "WARNING" and contain, at a minimum, the following text or equivalent text which clearly conveys the same warning: *This is not a lifesaving device. Do not leave child unattended while device is in use.* In addition, no advertising copy or graphics shall state or imply that the child will be safe with such a toy if left unsupervised.

5.5 *Crib and Playpen Toys*— This requirement is applicable to toys intended to be strung across a crib or playpen by means of string, cord, elastic, or straps (including, but not limited to, crib exercisers, crib gyms, and activity toys).

5.5.1 *Age Grading*— Crib and playpen toys, as well as their packages, shall be labeled with the following text or equivalent information (text or graphic), which clearly conveys the age grade: *from birth to 5 months*.

5.5.2 *Safety Labeling*— Crib and playpen toys shall carry safety labeling, in accordance with 5.3, consisting of the signal word "WARNING" and contain, at a minimum, the following text or equivalent text which clearly conveys the same warning: *Possible entanglement or strangulation. Remove toy when baby begins to push up on hands and knees.*

5.6 *Mobiles*— This section addresses all mobiles intended to be attached to a crib, playpen, wall, or ceiling.

5.6.1 *Age Grading*— Mobiles intended to be attached to a crib or playpen, as well as their packages, shall be labeled with the following text or equivalent information (text or graphic), which clearly conveys the age grade: *from birth to 5 months*.

**5.6.2** *Safety Labeling*:

5.6.2.1 Mobiles intended to be attached to a crib or playpen, and mobiles intended to be attached to a crib or playpen and later moved to a wall or ceiling, as well as their packages, shall carry safety labeling in accordance with 5.3. The labeling shall consist of the signal word "WARNING" and contain, at a minimum, the following text or equivalent text which clearly conveys the same warning: *Possible entanglement injury. Keep out of baby's reach. Remove mobile from crib or playpen when baby begins to push up on hands and knees.*

27

5.6.2.2 Mobiles intended to be attached only to a wall or ceiling, as well as their packages, shall carry safety labeling in accordance with 5.3. The labeling shall consist of the signal word "WARNING" and contain, at a minimum, the following text or equivalent text which clearly conveys the same warning: *Possible entanglement injury. Keep toy out of baby's reach.*

5.7 *Stroller and Carriage Toys*— Toys intended exclusively to be strung across strollers or carriages by means of string, cords, elastic, or straps shall carry safety labeling in accordance with 5.3. The labeling shall consist of the signal word "WARNING" and contain, at a minimum, the following text or equivalent text which clearly conveys the same warning: *Possible entanglement or strangulation injury when attached to crib or playpen. Do not attach to crib or playpen.*

5.8 *Toys Intended to be Assembled By an Adult*— Packages of toys that are intended to be assembled by an adult and that in their unassembled state contain potentially hazardous sharp edges or points, or small parts if the toy is intended for children under 3 years of age, shall carry safety labeling in accordance with 5.3 stating that the toy is to be assembled by an adult.

5.9 *Simulated Protective Devices*— Toys that simulate safety protective devices (examples include, but are not limited to, construction helmets and sports helmets), as well as their packages, shall carry safety labeling as defined in 5.3, stating that these toys are not safety protective devices.

5.10 *Toys with Functional Sharp Edges or Points*— Toys that are intended for

use by children between the ages of 48 and 96 months, which contain accessible potentially hazardous sharp edges or sharp points that are a necessary part of the function of the toy, shall carry safety labeling on their packages as defined in 5.3, stating that a sharp edge or sharp point, or both, exists.

## 5.11 Small Objects, Small Balls, Marbles, and Balloons

5.11.1 The packages of small balls, marbles, balloons, and certain toys and games, any descriptive material that accompanies them, and, if unpackaged and unlabeled, any retail display container provided by manufacturers or importers shall carry safety labeling in accordance with 16 CFR 1500.19(b).

5.11.1.1 In accordance with 16 CFR 1500.19(d), all labeling statements required by 5.11 shall appear at least in the English language on the principal display panel (except under 5.11.7) and shall be blocked together within a square or rectangular area, with or without a border. The label design, the use of vignettes, or the proximity of other labeling or lettering shall not obscure or render inconspicuous any labeling statement.

5.11.1.2 The statements required by 5.11 must appear on at least two lines and appear on a solid background and be separated from all other graphic material by a space no smaller than the minimum allowable height of the type size for "other cautionary material" (for example the phrase "Not for children under 3 yrs."). If not separated by that distance, the labeling statements must be surrounded by a border line.

5.11.1.3 All labeling statements required by 5.11 shall comply with the following type size requirements based on the computed area of the principal display panel. For these purposes, Signal Word means the word "Warning" and the words "Safety Warning"; Statement of Hazard means "Choking Hazard"; Other Material means all other remaining statements.

| Area, in.² | 0-2 | +2-5 | +5-10 | +10-15 | +15-30 | +30-100 | +100-400 | +400 |
|---|---|---|---|---|---|---|---|---|
| Type Size—Signal Word | 3/64 in. | 1/16 in. | 3/32 in. | 7/64 in. | 1/8 in. | 5/32 in. | 1/4 in. | 1/2 in. |
| Type Size—Statement of Hazard | 3/64 in. | 3/64 in. | 1/16 in. | 3/32 in. | 3/32 in. | 7/64 in. | 5/32 in. | 1/4 in. |
| Type Size—Other Material | 1/32 in. | 3/64 in. | 1/16 in. | 1/16 in. | 5/64 in. | 3/32 in. | 7/64 in. | 5/32 in. |

5.11.1.4 An equilateral triangle with an exclamation point (shown in 5.11.2)

shall precede the signal word. The height of the triangle shall be equal to or exceed the height of the letters of the signal word "WARNING" and separated from it by a distance at least equal to the space occupied by the first letter of the signal word. The height of the exclamation point shall be at least half the height of the triangle, and be centered vertically in the triangle.

5.11.2 For toys and games intended for children at least 3 years old but less than 6 years of age, and which contain as-received small part(s), the labeling shall read:

> WARNING:
> CHOKING HAZARD—Small parts.
> Not for children under 3 yrs.

5.11.3 For any small ball intended for children 3 years of age or older the labeling shall read:

> WARNING:
> CHOKING HAZARD—Toy contains a small ball.
> Not for children under 3 yrs.

5.11.3.1 For any toy or game intended for children who are at least 3 years old but less than 8 years of age that contains a small ball the labeling shall read:

> WARNING:
> CHOKING HAZARD—Toy contains a small ball.
> Not for children under 3 yrs.

5.11.4 For any marble intended for children 3 years of age or older the labeling shall read:

> WARNING:
> CHOKING HAZARD—This toy is a marble.
> Not for children under 3 yrs.

5.11.4.1 For any toy or game intended for children who are at least 3 years of age but less than 8 years of age that contains a marble the labeling shall read:

> WARNING:
> CHOKING HAZARD—Toy contains a marble.
> Not for children under 3 yrs.

5.11.5 For any latex balloon or any toy or game that contains a latex balloon, the labeling shall read:

> WARNING:
>
> CHOKING HAZARD—Children under 8 yrs. can choke or suffocate on uninflated or broken balloons.
> Adult supervision required.
>
> Keep uninflated balloons from children.
> Discard broken balloons at once.

5.11.6 *Combination of Labeling Statements—* The labels of products that contain more than one item subject to the requirements of <u>5.11</u> may combine information, if the condensed statement contains all of the information necessary to describe the potential hazard associated with each product. For products that contain a balloon *and* a small ball, small object, or marble, only the signal word and statement of hazard may be combined.

5.11.7 *Alternative Labeling Statements for Items Subject to the Requirements of <u>5.11</u>—* Labeling statements on small packages of toys or balloons that have a principal display panel of 15 in.² or less and that display cautionary statements in three or more languages may appear on a display panel other than the principal display panel if the principal display panel bears the appropriate statement below and bears an arrow or other indicator pointing toward or directing the purchaser's attention to the display panel on the package where the full labeling statement appears.

5.11.7.1 For a toy or game that is or contains a small object, small ball, or marble:

> SAFETY WARNING

5.11.7.2 For a balloon or a toy or game that contains a balloon:

> WARNING—Choking Hazard

5.12 *Toy Caps—* Refer to <u>16 CFR 1500.86</u> for required labeling.

5.13 *Art Materials—* Toys and components of toys that fall within the definition of art material as found in <u>16 CFR 1500.14 (b) (8)</u> shall be labeled in accordance with the provisions of that section and Practice D4236.

5.14 *Electric Toys—* Refer to <u>16 CFR 1505.3</u> for required labeling.

5.15 *Battery-Operated Toys—* Toys with non-replaceable batteries that are accessible with the use of a coin, screwdriver, or other common household tool shall bear a statement that the battery is not replaceable. If the manufacturer determines that it is impractical to label the product, this

28

information shall be placed on the packaging or in the instructions.

**5.15.1** *Battery-Powered Ride-on Toys*:

5.15.1.1 Battery powered ride-on toys shall carry safety labeling in accordance with 5.3, consisting of the signal word "WARNING" and contain, at a minimum, text which clearly conveys the following:

    a.  To reduce the risk of injury, adult supervision is required. Never use in roadways, near motor vehicles, on or near steep inclines or steps, swimming pools or other bodies of water; always wear shoes, and never allow more than _____ rider(s)

    b.  RISK OF FIRE. Do not bypass. Replace only with _____. (Note: This warning must be placed at the location of any user replaceable fuse or circuit protection device. Manufacturer should state the part number or equivalent.

5.15.1.2 The packaging or point-of-sale literature of batterypowered ride-on toys shall state the manufacturer's recommended user age or weight limitations for use of the toy, or both.

5.15.1.3 The packaging or point-of-sale literature of batterypowered ride-on toys shall bear the warnings as specified in 5.15.1.

5.16 *Promotional Materials*— Packaging, literature accompanying toys, and point-of-sale presentations shall not use words, statements, or graphics that are inconsistent in any way with the safety labeling instructions for use or assembly or age grading of the toy.

5.17 *Magnets*— The packaging and instructions of hobby and crafts items and science kit-type items for children over 8 years of age which contain a loose as-received hazardous magnet or a loose as-received hazardous magnetic component shall carry safety labeling in accordance with 5.3. The labeling shall consist of the signal word "WARNING" and contain, at a minimum, the following text or equivalent text which clearly conveys the same warning:
*"This product contains (a) small magnets(s). Swallowed magnets can stick together across intestines causing serious infections and death. Seek immediate medical attention if magnet(s) are swallowed or inhaled."*

# 6. Instructional Literature

6.1 *Definition and Description*— Information and instructions that are provided

for the safe use or assembly, or both, of a toy, whether on the package or in leaflet form, shall be easy to read and understand by persons of the age level for whom the instructions and information are intended, including, if appropriate, children for whom the toy is intended. All such literature shall be shown in the English language at a minimum.

6.2 *Crib and Playpen Toys*— Toys intended to be strung across a crib or playpen by means of string, cords, elastic, or straps (including, but not limited to, crib exercisers, crib gyms, and activity toys) shall be provided with instructions for proper assembly, installation, and use to insure that the product does not present an entanglement or strangulation hazard. The instructions shall include at least the following information:

6.2.1 This toy is not intended to be "mouthed" by the baby and should be positioned clearly out of reach of the baby's face and mouth.

6.2.2 On cribs with adjustable mattress levels, the highest position may allow the toy to be too close to the baby. The second or lower position is more appropriate.

6.2.3 The drop side of the crib should never be lowered with the toy in place and the baby left unattended.

6.2.4 Always attach all provided fasteners (strings, straps, clamps, etc.) tightly to a crib or playpen according to the instructions. Check frequently.

6.2.5 Do not add additional strings or straps to attach to a crib or playpen.

6.3 *Mobiles*— Mobiles intended to be mounted on a crib, playpen, or wall or ceiling nearby shall be provided with instructions for proper assembly, installation, and use to insure that the product does not present an entanglement hazard. The instructions shall include at least the following information:

6.3.1 A crib mobile is intended for visual stimulation and is not intended to be grasped by the child.

6.3.2 If attached to the crib or playpen, remove when baby begins to push up on hands and knees. If so designed, mount on wall or ceiling clearly out of a standing baby's reach.

6.3.3 If mounted on a wall or ceiling, install the mobile clearly out of a standing baby's reach.

6.3.4 Always attach all provided fasteners (strings, straps, clamps, etc.) tightly to a crib or playpen according to the instructions. Check frequently.

6.3.5 Do not add additional strings or straps to attach to a crib or playpen.

6.4 *Toys Intended to be Assembled By an Adult*— Assembly instructions that accompany toys that are intended to be assembled by an adult and that in their unassembled state contain potentially hazardous sharp edges or sharp points, or small parts if the toy is intended for children under 3 years of age, shall carry safety labeling as defined in 5.3 and also state that the toy is to be assembled by an adult.

6.5 *Battery-Operated Toys*— For toys that use more than one battery in one circuit, the instructions or the toy shall be marked with the following (or equivalent) information.

6.5.1 Do not mix old and new batteries.

6.5.2 Do not mix alkaline, standard (carbon-zinc), or rechargeable (nickel-cadmium) batteries.

6.5.3 Instructions supplied with battery-powered ride-on toys shall contain guidance for safe use and maintenance of the toy. The instructions shall include at least the following:

6.5.3.1 Maximum weight or age limitations, or both, for safe use of the toy,

6.5.3.2 The kinds of surfaces which are appropriate for safe use of the toy,

6.5.3.3 The warning statements contained in 5.15.1.1,

6.5.3.4 Only use the battery(ies) specified by the manufacturer, and

6.5.3.5 Only use the charger(s) specified by the manufacturer.

6.6 *Toys in Contact with Food*— The packages or instructions, or both, for toys and their components intended to be used in contact with food shall be labeled to alert caregivers to wash the product thoroughly before use.

## 7. Producer's Markings

7.1 Either a principal component of a toy or the package of a toy shall be marked with the name and address of the producer or the distributor. In the case of toys sold in bulk, such as jacks or marbles, only the container need be

marked. All of these markings shall be legible and so positioned as to be seen easily by the customer and shall resist normal use conditions. Toys may carry a code that will enable the producer to identify model changes except for toys comprising many loose components, in which case the container may be so coded.

7.2 *Battery-Powered Ride-on Toys*— Battery-powered ride-on toys shall bear a permanent label or marking identifying the manufacturer or distributor, place of business, the model numbers, and a date of manufacture or date code that will allow determination of, at a minimum, the month and year of manufacture.

## 8. Test Methods

8.1 *General*— The inspection and test procedures contained herein are to be used to determine the conformance of products to the requirements of this specification. All types of toys covered by this specification must undergo the normal use and abuse tests in accordance with 8.5-8.10. The remaining tests in this section apply to types of toys as specified within the requirements of Section 4. The relevant tests for a type of toy can be performed in any order except where specified. Each test may be conducted on a different toy unless otherwise specified. The tests can be considered as qualification tests and not necessarily as quality control tests. These tests shall also be conducted when there is a design or material change in the toy. Each producer or distributor who represents his products as conforming to this specification may use statistically based sampling plans that are appropriate, but he shall keep such essential records as are necessary to document with a high degree of assurance his claim that all of the requirements of this specification have been met. Any test methods that are made mandatory by the CPSC shall supersede any applicable test methods in this section.

8.2 *Testing for Hazardous Substance Content*— The applicable sections of 16 CFR, issued under the FHSA to be used for determining the presence of hazardous substances, are given in Table 4. The references in Table 4 refer to the regulations issued on Sept. 27, 1973.

> NOTE 6 —   The latest issue of the regulation shall be used to determine compliance of the toy with the requirements of this specification. The requirements of the FHSA are mandatory by law.

**TABLE 4 Determination of Hazardous Substance Content**

| Hazardous Substance | Regulation (Title 16 CFR) |
|---|---|
|  |  |

| Toxic substance | 1500.3(b)5, 1500.3(c)2, and 1500.40 |
|---|---|
| Corrosive substance | 1500.3(b)7, 1500.3(c)3, and 1500.41 |
| Irritant substance | 1500.3(b)8, 1500.3(c)4, 1500.41, and 1500.42 |
| Strong sensitizer | 1500.3(b)9, 1500.3(c)5, and 1500.13 |
| Pressure-generating substance | 1500.3(c)7 |
| Radioactive substance | 1500.3(b)11 and 1500.3(c)8 |
| Flammability | 1500.3(b)10, 1500.3(c)6, 1500.43, and 1610. |

## 8.3 Test Methods for Determination of Heavy Element Content in Toys, Toy Components and Materials

### 8.3.1 *Total Element Content Screening*:

8.3.1.1 Toy material under test is to be digested per the appropriate CPSC Method:

1. CPSC-CH-E1001-08.1 (metal substrates)

2. CPSC-CH-E1002-08.1 (non-metal substrates)

3. CPSC-CH-E1003-09 (paint and similar surface-coating materials)

8.3.1.2 With the following modification: Concentrated $HNO$ digestant is to be replaced with aqua regia (three parts concentrated HCl to one part concentrated $HNO$ ). Glass and ceramic components shall be digested using three parts HF to one part $HNO$ . Certain polymeric materials such as PVC and CPVC may require use of three parts concentrated $HNO$ to one part 30 % $H$ $O$ for complete digestion; in all cases, knowledge-based adjustments to the above digestant mixtures on a case-by-case basis may be necessary for products made from certain materials, and are allowable so long as complete digestion is achieved and avoidance of formation of insoluble metal salts is taken into consideration. In all cases, the use of concentrated $H$ $SO_4$ is to be avoided to reduce the possibility of the formation of insoluble metal sulfates.

30

8.3.1.3 Resulting digested material is to be filtered and diluted as prescribed, then analyzed by atomic spectroscopy or other appropriate validated method for total content of all eight elements listed in Table 1 and Table 2; if results are below soluble limits for each element as prescribed in the appropriate table, the material can be considered to conform to requirements of 4.3.5 or 4.3.5.2, or both, without further testing. If soluble limits in the appropriate table are exceeded, additional testing per 8.3.2 (for paint and similar surface-coating materials) or 8.3.5 (substrate materials) will be required to confirm compliance. In addition, if the toy or toy component is a metallic small part, it is to be tested per 8.3.5.5(3). Composite samples of up to three

like materials (for example, three colors of polystyrene plastic) are acceptable (if performed in accordance with Annex A7) for total element screening, but not for soluble element testing if such is required.

> NOTE 7 —   With the exception of required total lead content testing (see 4.3.5.1), it may be elected to omit total element screening and perform only soluble element testing per 8.3.2-8.3.6.

8.3.2 *Method to Dissolve Soluble Matter for Surface Coatings—* Soluble elements are extracted from toys under conditions that simulate the situation in which the materials stay 4 h in the alimentary tract after swallowing. The content of soluble elements in the extract is determined.

8.3.2.1 *Apparatus—* Normal laboratory apparatus and the following:

1. *Metal Sieve,* plain weave wire mesh stainless steel metal sieve with a nominal opening of 0.5 mm and the following specifications: *(a)* Nominal wire diameter: 0.315 μm; *(b)* Maximum size deviation for an individual opening: ±0.090 μm; *(c)* Tolerance for average opening: ±0.018 mm; and *(d)* 6 % or fewer of the openings to exceed the nominal plus 0.054 mm.

2. *pH,* a means of measuring pH with a minimum accuracy of 0.2 pH units.

3. *Membrane Filter,* with a pore size of 0.45 μm.

4. *Centrifuge,* capable of centrifuging at 5000 ± 500 x *g* RCF (*g* = 9.80665 m/s$^2$)

5. A means to constantly agitate the mixture at a temperature of 37 ± 2°C.

6. Container, of gross volume between 1.6 and 5.0 times that of the volume of HCL extractant.

8.3.2.2 *Reagents—* Use only reagents of recognized analytical grade during the analysis.

1. Hydrochloric acid (HCl) solution; concentration = (0.07 ± 0.005) mol/l.

2. Hydrochloric acid (HCl) solution; concentration = (0.14 ± 0.010) mol/l.

3. Hydrochloric acid (HCl) solution; concentration = approximately 1 mol/l.

4. Hydrochloric acid (HCl) solution; concentration = 2 mol/l.

5. Hydrochloric acid (HCl) solution; concentration = approximately 6 mol/l.

6. n-heptane, (C $H_{16}$); 99 %.

7. Water, of at least grade 3 purity in accordance with Specification D1193 or ISO 3696.

8.3.3 *Preparation of Test Samples*— A laboratory sample for testing shall consist of a toy in the form in which it is marketed, excluding the package and packaging components.

8.3.3.1 The test sample shall be taken from the accessible portions of a single toy sample.

8.3.3.2 Identical materials in the sample may be combined and treated as a single sample. A single sample may not consist of more than one material or color (that is, composite testing is not allowed).

8.3.3.3 The test sample can alternatively be taken from materials in a form such that they are representative of the relevant material specified above.

8.3.3.4 When a toy is intended to be taken apart or can be taken apart without the use of tools, each piece shall be considered separately.

8.3.3.5 For reference purposes, the sample may be taken from the raw material rather than scraped from the sample.

8.3.3.6 Scrape the coating off the test sample, and grind it through the sieve. Obtain a portion of not less than 100 mg of the resulting material.

1. Where there is only between 10 and 100 mg of uniformly ground material available, test that quantity and calculate the results as if 100 mg of the sample had been available. The report should note this procedure and the actual sample amount.

2. If there is less than 10 mg of sample available, the test is not performed.

3. In the case of coatings that by their nature cannot be ground (for example, elastic, rubber, or plastic paint), test the sample as it was removed from the toy.

*NOTE 8* —   The methods and exclusions given in <u>8.3.3.1</u> do not apply to surface coatings being tested for total lead content as required by <u>16 CFR 1303</u>. Total lead determination under CPSC requirements at <u>16 CFR 1303</u> applies to any coating that can be scraped off, regardless of the amount, with results calculated based on the actual sample weight.

**8.3.4** *Test Procedures*:

8.3.4.1 Prepare a test portion in accordance with <u>8.3.3</u>.

8.3.4.2 Mix the test portion so prepared with 50 times its mass of an aqueous solution of 0.07 mol/L hydrochloric acid at $37 \pm 2°C$. In the case of a test portion of less than 100 mg, mix the test portion with 5.0 mL of this solution at the given temperature. Shake for 1 min.

1. Check the acidity of the mixture. If the pH is greater than 1.5, add dropwise while shaking an aqueous solution of 2 mol/L (7.3 % m/m) hydrochloric acid until the pH is between 1.0 and 1.5. Protect the mixture from light. Shake the mixture efficiently for 1 h continuously, and then allow the mixture to stand for 1 h at $37 \pm 2°C$.

2. Without delay, separate the solids from the mixture by filtration through a membrane filter with a pore size of 0.45 µm. If necessary, centrifuge at 5000 g for no longer than 10 min. Analyze the solution by atomic spectroscopy or other appropriate validated method to determine the concentration of the elements identified in <u>4.3.5.1</u>. If it is not possible to examine the sample within one working day, stabilize by the addition of hydrochloric acid so that the resulting solution HCl concentration is approximately 1 mol/L.

*NOTE 9* —   It has been shown that the extraction of soluble cadmium can reveal a two-fold to five-fold increase when extraction is conducted in the light rather than the dark.

8.3.4.3 The analytical results as determined in <u>8.3.4.2</u> shall be adjusted by subtracting the analytical correction factor in the following table using the following method. This is necessary to make statistical correction for interlaboratory error.

**Analytical Correction**

| Element | Sb | As | Ba | Cd | Cr | Pb | Hg | Se |
|---|---|---|---|---|---|---|---|---|
| Analytical correction, % | 60 | 60 | 30 | 30 | 30 | 30 | 50 | 60 |

1. Example of Calculations Using the Table:

Example 1—The analytical result for lead is 120 mg/kg; the correction factor from the table is 30 % (0.30). Adjusted analytical results = 120 – (120    0.30) = 120 – 36 = 84 mg/kg.

*The result does not exceed the allowed value for lead in the table and is therefore acceptable.*

Example 2—The analytical result for chromium is 90 ug/kg: the correction factor from the table is 30 % (0.30). Adjusted analytical results = 90 – (90     0.30) = 90 – 27 = 63 mg/kg.

The result exceeds the allowed value for chromium in the table and is therefore not acceptable.

8.3.5 *Soluble Element Test Method for Substrate Materials*— Soluble elements are extracted from toy materials under conditions which simulate the material remaining in contact with stomach acid for a period of time after swallowing. The concentrations of the soluble elements are determined quantitatively.

NOTE 10 —    Optional, alternate test methods are permitted, as described in 8.3.6.

8.3.5.1 *Apparatus*—As described in 8.3.2.1.

8.3.5.2 *Reagents*— As described in 8.3.2.2.

**8.3.5.3** *Selection of Test Portions*:

1. A laboratory sample for testing shall consist of a toy either in the form in which it is marketed, or in the form in which it is intended to be marketed. Test portions shall be taken from accessible parts of a single toy sample, that is, identical materials in the toy may be combined and treated as a single test portion but additional toy samples shall not be used. Test portions are only permitted to be composed of more than one material or color where physical separation (for example, dot printing), patterned textiles or mass limitation reasons, precludes the formation of discrete specimens.

2. Test portions where less than 10 mg of material available are not tested.

NOTE 11 —    The requirement does not preclude that test portions can be taken from materials in a form such that they are representative of the

relevant material specified above and the substrate upon which they are deposited.

8.3.5.4 Polymeric and similar materials including laminates, whether reinforced textile or not, but excluding other textiles.

1. Sample Removal/Preparation Procedure:

   a. Obtain a test portion of not less than 100 mg of the polymeric or similar materials, avoiding heating of the materials, according to the following directions.

   b. Cut out test portions from the areas having the thinnest material cross section in order to ensure a surface area of the test pieces as large as possible in proportion to their mass. Each test piece shall in the uncompressed condition have no dimension greater than 6 mm.

   c. If the laboratory sample is not uniform in its material, a test portion shall be obtained from each different material present in a mass greater than 10 mg. In the case where there is between 10 and 100 mg of uniform material the mass of the test portion shall be reported in the test report and the quantity of the appropriate elements shall be calculated and reported as if 100 mg of the test portion had been used.

2. *Test Procedure*—As described in 8.3.4.2 and 8.3.4.3.

## 8.3.5.5 *Glass/Ceramic/Metallic Materials*:

1. *Sample Removal/Preparation Procedure*—Toys and components shall be first subjected to the relevant tests in accordance with Section 8. If any accessible glass, ceramic or metallic materials of the toy fits entirely within the small parts cylinder (see Fig. 3) before or after use and abuse testing, it shall be tested in accordance with 8.3.5.5(2) after removal of any coating in accordance with CPSC method CPSC-CH-E1003-09 ; metallic materials are also to be tested in accordance with 8.3.5.5(3) after removal of any coating in accordance with CPSC method CPSC-CH-E1003-09 .

   NOTE 12 —   Toys and components that have no accessible glass, ceramic or metallic materials are not tested according to 8.3.5.5. If a toy or component that is subject to testing per 8.3.5.5 consists of a combination of metallic and non-metallic materials (for example, a steel nut with a nylon locking insert), the non-

metallic material is to be mechanically separated from the metallic material prior to the test, and only the metallic component is subjected to testing per 8.3.5.5; the non-metallic component is to be tested per the section of this standard applicable to the material type.

2. Test Procedure – Standard Soluble Elements:

   a. Place the toy or component in a 50 mL glass container with nominal dimensions: height 60 mm, diameter 40 mm. Add a sufficient volume of an aqueous solution of 0.07 M HCl at 37 ± 2°C to just cover the toy or component. Cover the container, protect the contents from light and allow the contents to stand for 2 h at 37 ± 2°C.

      NOTE 13 —  This type of container will accommodate all components/ toys that fit inside the small parts cylinder.

   b. Without delay, efficiently separate the solids from the solution, firstly by decantation followed by filtration using a membrane filter, and if necessary, by centrifuging at up to 5000 g.

   c. Separation shall be completed as soon as possible after the completion of the standing time; centrifuging shall take no longer than 10 min and shall be reported in the test report. If the resulting solutions are to kept for more than 24 h prior to analysis they shall be stabilized by addition of hydrochloric acid so that the HCl concentration of the stored solution is approximately 1.0 M.

   d. Analyze the solution for element content using atomic spectroscopy or other validated test methods.

3. Test Procedure-Special Soluble Cadmium (apply to metallic small parts only):

   a. Metal toys and toy components which, either before or after use-and-abuse testing per Section 8, fit entirely within the small parts cylinder (see Fig. 3) shall be tested per CPSC test method CPSC-CH-E1004-11 . At the conclusion of the prescribed 24-h extraction test, efficiently separate, without delay, the solids from the solution, firstly by decantation followed by filtration using a membrane filter, and if necessary, by centrifuging at up to 5000 g. Separation shall be

32

completed as soon as possible after the completion of the extraction time; centrifuging shall take no longer than 10 min and shall be reported in the test report. If the resulting solutions are to be kept for more than 24 h prior to analysis they shall be stabilized by addition of hydrochloric acid so that the HCl concentration of the stored solution is approximately 1.0 M. Stored solutions shall be protected from light to the extent practicable.

b. Analyze the solution for cadmium content using atomic spectroscopy or other validated test methods.

**8.3.5.6** *Other Materials, Whether Mass Colored or Not*:

1. Sample Removal/Preparation Procedures:

   a. Obtain a test portion of not less than 100 mg of the material according to 8.3.5.3 or 8.3.5.4, whichever is more appropriate.

   b. If the laboratory sample is not uniform in its material, a test portion shall be obtained from each different material present in a mass greater than 10 mg. Where there is between 10 and 100 mg of uniform material, the mass of the test portion shall be reported in the test report, and the quantity of the appropriate elements shall be calculated and reported as if 100 mg of the test portion had been used.

   c. If the material to be tested is coated with paint, varnish, lacquer, printing ink or similar material, remove this material per in accordance with CPSC method CPSC-CH-E1003-09 prior to testing per 8.3.5.6(2).

2. *Test Procedures*—The materials shall be tested by the most appropriate method under 8.3. The method used shall be reported in the test report.

**8.3.5.7** *Materials Intended to Leave a Trace*:

1. Sample Removal/Preparation Procedure for Materials in Solid Form:

   a. Obtain a test portion of not less than 100 mg of the material by cutting into test pieces, which in the uncompressed condition shall have no dimensions greater than 6 mm.

   b. A test portion shall be obtained from each different material

intended to leave a trace, present in the laboratory sample in a mass greater than 10 mg. Where there is between 10 and 100 mg of material, the mass of the test portion shall be reported in the test report and the quantity of the appropriate elements shall be calculated and reported as if 100 mg of the test portion had been used. If the material contains any grease, oil, wax or similar material, the test portion shall be enclosed in hardened filter-paper and these ingredients shall be removed with n-heptane using solvent extraction.

2. Sample Removal/Preparation Procedure for Materials in Liquid Form:

   a. Obtain a test portion of not less than 100 mg of the material from the laboratory sample. The use of an appropriate solvent to facilitate the obtaining of a test portion is permitted.

   b. A test portion shall be obtained from each different material intended to leave a trace, present in the laboratory sample in a mass greater than 10 mg. Where there is between 10 and 100 mg of material, the mass of the test portion shall be reported in the test report and the quantity of the appropriate elements shall be calculated and reported as if 100 mg of the test portion had been used. If the material is intended to solidify in normal use and contains grease, oil, wax or similar material, the test portion shall be allowed to solidify under normal use conditions and the resulting material shall be enclosed in hardened filter-paper and the grease, oil, wax or similar material shall be removed with n-heptane by using solvent extraction.

3. Test Procedure for Samples not Containing Grease, Oil, Wax or Similar Material:

   a. Using the appropriately sized container, mix the test portion so prepared with 50 times its mass of an aqueous solution at 37 ± 2°C of 0.07 M HCl (see 8.3.2.2). For a test portion mass of between 10 and 100 mg, mix the test portion with 5.0 mL of this solution at 37 ± 2°C. Shake for 1 min. Check the acidity of the mixture.

   b. If the ph of the resulting solution is greater than 1.5, adjust the pH to between 1.0 and 1.5. If the pH is 2.5 or less, add dropwise, while shaking the mixture, 2 M HCl until the pH is between 1.0 and 1.5; if the pH is greater than 2.5, add dropwise, while shaking the mixture, 6M HCl until the pH is

between 2.50 and 1.5, then add dropwise, while shaking the mixture, 2 M HCl until the pH is between 1.0 and 1.5. The amount of hydrochloric acid used in relation to the amount of solution shall be reported in the test report.

c. Protect the mixture from light. Agitate the mixture at 37 ± 2°C (see 8.3.4.2) for 1 h continuously and then allow to stand for 1 h at 37 ± 2°C.

d. Without delay, efficiently separate the solids from the solution, firstly by filtration using a membrane filter and, if necessary, by centrifuging at up to 5000 g. Separation shall be completed as soon as possible after the completion of the standing time; centrifuging shall take no longer than 10 min and shall be noted in the test report.

e. If the resulting solutions are to be kept for more than the working day prior to analysis they shall be stabilized by addition of hydrochloric acid so that the concentration of the stored solution is approximately 1.0M HCl.

f. Analyze the solution for element content using atomic spectroscopy or other validated test methods.

4. Test Procedure for Samples Containing Grease, Oil, Wax or Similar Material:

a. With the test portion remaining in the hardened filterpaper, macerate the test portion so prepared with 25 times the mass of the original material with water at 37 ± 2°C so that the resulting mixture is homogeneous. Quantitatively transfer the mixture to the appropriate sized container. Add to the mixture an aqueous solution of 0.14 M HCl at 37 ± 2°C in the proportion of 25 times the mass of the original test portion. In the case of a test portion mass between 10 and 100 mg macerate the test portion with 2.5 mL of water. Quantitatively transfer the mixture to the appropriate sized container. Add 2.5 ml of 0.14 M HCl at 37 ± 2°C to the mixture. Shake for 1 min.

b. Check the acidity of the mixture. The amount of hydrochloric acid used in relation to the amount of solution shall be reported in the test report. Protect the mixture from light. Agitate the mixture at 37 ± 2°C for 1 h continuously and then allow to stand for 1 h at 37 ± 2°C.

33

*NOTE 14 —* The volume of the solution 0.07 M HCl or 0.14 M HCl , as the case may be, is calculated based on the mass of the test portion prior to de-waxing.

c. Without delay, efficiently separate the solids from the solution, firstly by filtration using a membrane filter and, if necessary, by centrifuging at up to 5000 g. Separation shall be completed as soon as possible after the completion of the standing time; centrifuging shall take no longer than 10 min and shall be noted in the test report.

d. If the resulting solutions are to be kept for more than the working day prior to analysis they shall be stabilized by addition of hydrochloric acid so that the concentration of the stored solution is approximately 1.0 M HCl.

e. Analyze the solution for element content using atomic spectroscopy or other validated test methods.

8.3.6 *Alternative Methods—* For purposes of determining compliance with the requirements contained in 4.3.5, "reasonable and representative tests" shall be used. Reasonable and representative tests could be either the tests contained in 8.3.1, 8.3.2, or 8.3.3, or alternate tests which utilize apparatus or procedures, or both, other than those in 8.3. The following paragraphs set forth the conditions under which alternate tests with apparatus or procedures other than those described in 8.3, inclusive, will be considered reasonable and representative.

8.3.6.1 Persons and firms determining the compliance of materials subject to the requirements contained in 4.3.5 may base those determinations on any alternate test utilizing apparatus or procedures other than those in 8.3, inclusive, if such alternate test is as stringent as, or more stringent than, the tests in 8.3, inclusive. An alternate test is considered to be "as stringent as, or more stringent than" a test in 8.3 if, when testing identical specimens, the alternate test yields failing results as often as, or more often than, the test in 8.3, inclusive. Any person using such an alternate test must have data or information to demonstrate that the alternate test is as stringent as, or more stringent than, the test in 8.3, inclusive. For example XRF screening in accordance with Test Method F2853 protocol could be used if determined to be a more stringent test method to the extent applicable for the material tested.

8.3.6.2 The data or information required by paragraph 8.3.6.1 to demonstrate

equivalent or greater stringency of any alternate test using apparatus or procedures other than those in 8.3, inclusive, must be in the possession of the person or firm desiring to use such alternate test before the alternate test may be used to support a determination of compliance against the requirements contained in 4.3.5.

8.3.6.3 The data or information required by paragraph 8.3.6.1 to demonstrate equivalent or greater stringency of any alternate test using apparatus or procedures other than those in 8.3, inclusive, must be retained for as long as that alternate test is used to support determinations of compliance against the requirements contained in 4.3.5, and for one year thereafter.

1. Alternate method acceptability requires rigorous statistical analysis of limits of acceptability to show consistency of results of alternate methods to prescribed method results. This analysis must be performed separately for each substrate type and heavy element (for example, results for cadmium in metal may not be automatically assumed to apply to barium in plastic, etc.). Alternate methods, once validated, should be submitted to ASTM for inclusion in the standard to avoid inconsistency of results.

## 8.4 Tests for Cleanliness and Preservative Effectiveness

8.4.1 *Cleanliness of Materials—* The cleanliness of cosmetics, liquids, pastes, putties, gels, and powders used in toys (excluding art materials) shall be determined using the methods in USP 24 <61> Microbial Limits Tests or the most current edition of the U.S. Pharmacopeia.[15] Another method may be substituted provided it has been properly validated as giving equivalent or better results, as specified in USP 24 <61> or the most current edition of the U.S. Pharmacopeia. In conjunction with the chosen test method, the limits for determining the cleanliness of materials will consist of the most current guidelines for cosmetics set forth by the Cosmetic, Toiletry, and Fragrance Association (CTFA).

[15] *Reagent Chemicals, American Chemical Society Specifications* , American Chemical Society, Washington, DC. For Suggestions on the testing of reagents not listed by the American Chemical Society, see *Analar Standards for Laboratory Chemicals,* BDH Ltd., Poole, Dorset, U.K., and the *United States Pharmacopeia and National Formulary,* U.S. Pharmacopeial Convention, Inc. (USPC), Rockville, MD.

8.4.2 *Preservative Effectiveness—* The formulations of cosmetics used in toys shall be evaluated for the potential microbiological degradation, or they shall be tested for microbial control and preservative effectiveness using the

methods and limits in USP 24 <51> Antimicrobial Effectiveness Testing or the most current edition of the U.S. Pharmacopeia.

8.5 *Normal Use Testing*— These tests are intended to simulate normal use conditions so as to ensure that hazards are not generated through normal wear and deterioration. The object of these tests shall be to simulate the normal play mode of the toy, and the tests are therefore unrelated to the reasonably foreseeable abuse tests of 8.6-8.13. The tests are intended to uncover hazards rather than to demonstrate the reliability of the toy. The fact that a mechanism or material of a toy fails during testing is relevant only if the failure creates a potential hazard. Toys shall be subject to appropriate tests to simulate the expected mode of use of the particular toy. For example, levers, wheels, catches, triggers, strings, wires, chains, and so on, that are intended to be actuated by a child shall be operated repeatedly. Spring or power-operated devices shall be tested similarly. The tests shall be conducted in an expected use environment. For example, toys intended for use in the bathtub shall be tested in soapy water, and toys intended for use in the sandbox shall be exposed to sand during testing. It is recognized that no specific requirements are defined here; it would not be possible in view of the wide range of toys covered by this specification. However, the manufacturer or distributor must do enough testing to satisfy himself that normal use during the estimated lifetime of the toy is being simulated. The toy shall be inspected after such tests, and hazards such as points, sharp edges, and release of small parts shall be evaluated in accordance with the relevant requirements listed in Section 4.

8.5.1 *Washable Toys*— Toys described as machine washable on the toy, package, or instructions shall be subjected to six machine washing and tumble drying cycles, as described in 8.5.1.1, unless a different drying method is specified by the toy manufacturer by means of a permanent label. They shall then be inspected for compliance with this specification.

8.5.1.1 *Conditions for Machine Washing and Tumble Drying*— Any commercially available top-loading washer, dryer, or laundry detergent intended for use in the home may be used for this test. The weight of each toy is determined prior to the beginning of the test. The toys, plus a dummy load of clothes sufficient to bring the total dry weight to a minimum 4 lb (1.8 kg), are washed in an automatic washing machine using the warm water setting and a 12-min wash cycle at the normal setting. The toys and dummy load shall then be tumble dried in an automatic clothes dryer using the warm setting, or air dried, until the load is dried. The toy shall be deemed dry when the final weight does not exceed the original dry weight by more than 10 %.

34

8.6 *Abuse Testing*— The tests described in 8.7-8.13 are to simulate the exposure of a toy to mechanical damage through dropping, throwing, and other actions likely to be performed by a child, which are characterized as reasonably foreseeable abuse. After testing, the toy shall be examined for mechanical hazards, such as hazardous sharp edges and points, and ingestion hazards, such as small liberated components, chips, or fragments. The severity of the abuse tests described in 8.7, 8.8, 8.9, 8.10, and 8.12 shall be determined according to the age group for which the toy is intended. If the toy is intended for an age group that spans more than one age group according to Table 5, the toy shall be subjected to the most severe test. Unless otherwise specified, none of the abuse testing described in 8.7-8.12 applies to toys intended for children over 96 months of age. Toys reasonably intended to be assembled by an adult, and not intended to be taken apart by a child, shall be tested only in the assembled state if the shelf package and assembly instructions indicate prominently that the article is to be assembled by an adult. Individual parts of toys that are intended to be assembled by children shall be tested as well as the fully assembled toy; however, the assembled toy shall be made of components that have not been subjected to the abuse testing.

8.7 *Impact Tests*— These tests are intended to simulate situations in which possible damage can occur to a toy by reason of its falling from a crib, table, or counter top, or other impact situations that may occur as a result of reasonably foreseeable abuse. After undergoing the appropriate test, the toy shall be examined for possible hazards, such as points, edges, or ingestible objects, in accordance with the relevant requirement of Section 4.

8.7.1 *Drop Test*— Except for toys covered in 8.7.2, toys falling below the weight limit given below shall be dropped onto a specified impact area. The number of times the toy will be dropped, and the height from which it is dropped, is to be determined from Table 5. The toy shall be dropped in random orientation. The test sample shall be allowed to come to rest after each drop and shall be examined and evaluated before continuing. The impact medium shall consist of a ⅛-in. (3-mm) nominal thickness of Type IV vinyl composition tile, composition 1-asbestos free, as specified in Federal Specification SS-T-312B over at least a 2.5-in. (64-mm) thickness of concrete. The impact area shall be at least 3 ft² (0.3 m²). The recommended batteries shall be in place during the drop test for battery-operated toys. If no specific type of battery is recommended, the heaviest battery that is generally available shall be used.

| Age Group | Weight Criteria, lb (kg) |
|---|---|

| 18 months or less | less than 3 ± 0.01 (1.4) |
|---|---|
| over 18 months, not over 36 months | less than 4 ± 0.01 (1.8) |
| over 36 months, not over 96 months | less than 10 ± 0.01 (4.5) |

**8.7.2** *Tipover Test for Large, Bulky Toys—* Large, bulky toys shall not be subjected to the drop test of 8.7.1, but they shall be tipped over according to the following procedure:

**TABLE 5 Test Parameters for Use and Abuse Tests**

| Test | Age Category of Intended User, months | Numerical Value | |
|---|---|---|---|
| | | Stated by the Voluntary Standard | Recommended for Toy Manufacturers |
| Drop test | 0 to 18 | 10   4.5 ft ± 0.5 in. (137 cm) | 4 ft, 6.5 in.  (1.38 m) |
| | over 18 to 36 | 4   3.0 ft ± 0.5 in. (91 cm) | 3 ft, 0.5 in.  (0.93 m) |
| | over 36 to 96 | 4   3.0 ft ± 0.5 in. (91 cm) | 3 ft, 0.5 in.  (0.93 m) |
| Torque test | 0 to 18 | 2 ± 0.2 in.·lbf (0.23 N·m) | 2.2 in.·lbf (0.25 N·m) |
| | over 18 to 36 | 3 ± 0.2 in.·lbf (0.34 N·m) | 3.2 in.·lbf (0.36 N·m) |
| | over 36 to 96 | 4 ± 0.2 in.·lbf (0.45 N·m) | 4.2 in.·lbf (0.47 N·m) |
| Tension test | 0 to 18 | 10 ± 0.5 lbf (44.5 N) | 10.5 lbf (46.7 N) |
| | over 18 to 36 | 15 ± 0.5 lbf (66.8 N) | 15.5 lbf (69.0 N) |
| | over 36 to 96 | 15 ± 0.5 lbf (66.8 N) | 15.5 lbf (69.0 N) |
| Compression test | 0 to 18 | 20 ± 0.5 lbf (89.0 N) | 20.5 lbf (91.2 N) |
| | over 18 to 36 | 25 ± 0.5 lbf (111.3 N) | 25.5 lbf (113.5 N) |
| | over 36 to 96 | 30 ± 0.5 lbf (133.5 N) | 30.5 lbf (135.7 N) |
| Flexure test | 0 to 18 | 10 ± 0.5 lbf (44.5 N) | 10.5 lbf (46.7 N) |
| | over 18 to 36 | 15 ± 0.5 lbf (66.8 N) | 15.5 lbf (69.0 N) |
| | over 36 to 96 | 15 ± 0.5 lbf (66.8 N) | 15.5 lbf (69.0 N) |

**35**

**8.7.2.1** *Tipover Test for Large, Bulky Toys—* Large, bulky toys shall be tested for impact by tipping over three times, one of which is in the worst attitude by pushing the sample slowly past its center of balance onto the impact medium described in 8.7.1.

**8.7.3** *Tumble Test for Wheeled Toys—* Wheeled toys weighing more than 3 lb (1.4 kg) but not more than 10 lb (4.5 kg) shall be tumbled down a flight of six steps with risers not less than 7 in. (180 mm) high (see Fig. 26). The treads may be wood, cement, or metal. The toy, including accessories, where applicable, shall be caused to fall down the steps two times in each of four attitudes: tumbling forwardly end-over-end and tumbling rearwardly end-over-end from each side. The toy shall be pushed slowly over the edge of the top step in the appropriate attitude and released as soon as it begins to fall

of its own weight. The test shall be considered complete for an attitude even if the toy does not reach the bottom of the flight of steps.

Figure 26. Illustration of Step Construction. This is a diagram of a set of steps. The width of the steps is A and shall be not less than 3 feet. The riser, the elevation of the step, is B and shall be not less than 7 inchdes. The step itself is C and shall be not more than 9 inches. A PLATFORM C B RISER

Dimensions
"A" shall be not less than 3 ft (914 mm)
"B" shall be not less than 7 in. (180 mm)
"C" shall be not more than 9 in. (230 mm)

**FIG. 26 Illustration of Step Construction**

8.7.4 *Impact Test for Toys that Cover the Face—* The toy shall be held firmly in a suitable clamp with that portion that covers or surrounds the eyes (in the case of cutout eye holes) in a horizontal plane. Drop a ⅝-in. (16-mm) diameter steel ball weighing 0.56 oz. (15.8 g) (with a tolerance of +0.03 (0.8 g, −0 oz) from a height of 50 in. (1.3 m) upon the horizontal upper surface of the toy in the area that would cover the eyes in normal use. In the case of toys with cutout eye holes, impact the area that would be directly adjacent to the eyes in normal use. The ball may be guided, but not restricted, in its fall by being dropped through a perforated tube extending to within approximately 4 in. (100 mm) of the toy.

8.8 *Torque Tests for Removal of Components—* Any toy with a projection, part, or assembly that a child can grasp with at least the thumb and forefinger or the teeth shall be subject to this test. The amount of torque shall be determined from Table 5, according to the age group for which the toy is intended. The loading device used in the test shall be a torque gauge, torque wrench, or other appropriate device having an accuracy of 60.2 in.·lbf (60.02 N·m). A clamp capable of holding the test component firmly and transmitting a torsional force shall be used. The clamp is fastened to the test object or component with the toy fastened rigidly in any reasonable test position. The torque shall be applied evenly within a period of 5 s in a clockwise direction until either (1) a rotation of 180° from the original position has been attained, or (2) the required torque is exceeded. The maximum rotation or required torque shall be maintained for an additional 10 s. The torque shall then be removed and the test component permitted to return to a relaxed condition. This procedure shall then be repeated in a counterclockwise direction. Projections, parts, or assemblies that are mounted rigidly on an accessible rod or shaft designed to rotate along with the projections, parts, or assemblies shall be tested with the rod or shaft

clamped to prevent rotation. If a component that is attached by a screw thread that has been assembled by the manufacturer, or that has been assembled to the manufacturer's instructions, becomes loosened during application of the required torque, continue to apply the torque until either (1) the required torque is exceeded, or (2) the part disassembles. The test should be terminated if it becomes obvious that the part under test will continue to rotate at less than the required torque limit and will not disassemble.

8.8.1 If the part disassembles, evaluate it for compliance with the appropriate requirements. If the disassembly exposes an accessible component that can be grasped as noted above, repeat the torque test on that component.

8.9 *Tension Test for Removal of Components*— Any projection of a toy that a child can grasp with at least the thumb and forefinger or the teeth shall be subjected to this test. The tension test shall be performed on the same components of the toy subjected to the torque test described in 8.8. The amount of force used shall be determined from Table 5, according to the age group for which the toy is intended. A clamp capable of applying a tension load to the test component shall be applied in a manner that will not affect the structural integrity of the attachment between the component and the toy. The loading device shall be a self-indicating gauge or other appropriate means having an accuracy of 60.5 lb (62 N). With the test sample fastened in a convenient position, an appropriate clamp shall be attached to the test object or component. The required tensile force shall be applied evenly, within a period of 5 s, parallel to the major axis of the test component, and maintained for an additional 10 s. The tension clamp shall then be removed, and a second clamp suitable for applying a tension load perpendicularly to the major axis of the test component shall be attached to the test object component. The required tensile force shall be applied evenly, within a period of 5 s, perpendicularly to the major axis of the test component and maintained for an additional 10 s.

8.9.1 *Tension Test for Seams in Stuffed Toys and Beanbag-Type Toys*— A stuffed toy or beanbag constructed of pliable material having seams (including, but not limited to, seams that are stitched, glued, heat sealed, or ultrasonic welded) shall have the seams subjected to a separate tension test in any direction using the forces specified in 8.9 and determined from Table 5 according to the age group for which the toy is intended.

36

8.9.1.1 The clamps used to grip the material on either side of the seam to be tested shall have jaws to which are attached ¾-in. (19-mm) diameter washers (see Fig. 27). The clamps shall be attached to the cover material of a

completely assembled stuffed toy in a manner such that the outside diameter of the ¾-in. (19-mm) washers at a point nearest the seam shall be close to, but no closer than, ½ in. (13 mm) from the edge of the seam stitching thread. This seam test shall not be performed if the material adjacent to the seam cannot be grasped between the thumb and forefinger of the test personnel sufficient for full clamping by the ¾-in. (19-mm) diameter washer jaws. If such is the case, a torque and tension test shall be performed on an arm, leg, or other appendage of the toy instead of the seam test.

Figure 27. Seam Clamp The diagram shows a set of pliers. The pliers are labelled Lever Wrench, Mod L-B Leverage Tools, Inc., Glenvil, Nebraska, 66941. To the inside jaws of the pliers at the tips are attached Braze 3/4 inch diameter plain steel washers. BRAZE 3/4 Dia PLAIN S11 WASHERTO JAW TIPS LEVER WRENCH Mod L-8LEVERAGE TOOLS, Inc.GLENVIL, NEB - 66941

### FIG. 27 Seam Clamp

8.9.1.2 In performing a seam test, the force appropriate for the age category into which the toy falls (see Table 5) shall be applied evenly within 5 s and maintained for an additional 10 s.

8.10 *Compression Test*— Any area on the surface of a toy that is accessible to a child and inaccessible to flat surface contact during the impact test shall be subject to this test. The compression force shall be determined from Table 5 according to the age group for which the toy is intended.

8.10.1 The loading device shall be a rigid metal disk 1.125 ± 0.015 in. (0.380 mm) in diameter and 0.375 in. (9.52 mm) in thickness. The perimeter of the disk shall be rounded to a radius of 1/32 in. (0.8 mm) to eliminate irregular edge. The disk shall be attached to an appropriate compression scale having an accuracy of 60.5 lb (2 N). The disk shall be positioned so that the flat contact surface is parallel to the surface under test. The required force shall be applied evenly within 5 s through the disk. This load shall be maintained for an additional 10 s. The toy is to rest on a flat, hard surface in any convenient position during the test.

8.11 *Tests for Tire Removal and Snap-in Wheel and Axle Assembly Removal*— These tests relate to the requirements of 4.17.

8.11.1 *Removal of Tires*— The toy shall be clamped so that the wheel axle is vertical. A wire hook shaped as shown in Fig. 28 shall be positioned on the lower tire and attached to a dead weight of 10 ± 0.5 lb (4.5 kg) if the tire is on a toy intended for children aged 18 months or less, or to a dead weight of 15 ± 0.5 lb (6.8 kg) if the tire is on a toy intended for children aged over 18

months but not over 36 months. The load shall be applied gradually over a period of 5 s and maintained for 10 s.

Figure 28. Hook for Tire Removal A hook with a wire diameter of 1/16 inches (10-pound lead) or 1/18 inches (15-pound lead) and a 75 degree included angle is laying on top of a tire, which is in turn connected to a hube and axle. INCLUDED ANGLE 75° WIRE DIAMETER 1/16 in. [10-pound load]1/8 in. [15-pound load] TO LOAD TIRE HUB LENGTH TO BE ADJUSTED TO TIRE SIZE

**FIG. 28 Hook for Tire Removal**

8.11.2 *Toys Assembled With Snap-in Axles—* A15 ± 0.5-lb (6.8-kg) dead weight shall be applied perpendicularly to the axle and in the least favorable direction, adjacent to a bearing (but between the two bearings), for 10 s, using a hook and string for attachment to the toy. The toy shall be held horizontally in a test-convenient fixture, and the load shall be applied gradually over a 5-s period and then shall be maintained for 10 s. The toy shall be held horizontally if the axle cannot be hooked as described above, and a 10 ± 0.5-lb (4.5-kg) dead weight shall be attached to one wheel by means of a hook or clamp that acts perpendicular to the axle in the least favorable direction. The load shall be applied gradually over a 5-s period and then be maintained for 10 s.

8.11.3 *Compression Test for Snap-in Wheel and Axle Assemblies—* This test is for determining compliance with 4.17 if the axle and wheel are removed by the procedure described in 8.11.2. The wheel and axle assembly shall be positioned with the axle vertical over a hole in a rigid plate, as shown in Fig. 29. The hole shall be large enough in diameter to permit the axle to pass through. A load of 20 ± 0.5 lb (89 N) is applied to the upper wheel, using a suitable circular adaptor to prevent interference with the axle. The load shall be applied gradually over a 5-s period and then shall be maintained for 10 s. When applying the load, the upper wheel shall be guided, if necessary, in order to maintain the axle in a vertical position, but it shall not be restrained from moving downward. The axle shall not form a hazardous point or projection in those cases in which it is forced through either wheel.

37

Figure 29. Compression Test for Wheel Assemblies A board with a gap is shown. A wheel and axle assembly is lying on the board, with the wheel straddling the gap of the board and the end of the axle in the gap. A load is applied to a circular adaptor placed on the top wheel with the force pointing down. LOAD APPLIED TO ACIRCULAR ADAPTOR WHEEL AND AXLEASSEMBLY RIGID PLATE

**FIG. 29 Compression Test for Wheel Assemblies**

8.12 *Flexure Test—* This test is for determining compliance with 4.10, for wires or rods used as flexible skeletons. The toy shall be secured in a vise equipped with vise shields that are fabricated from 13-gauge thick cold-rolled steel or other similar material and that have a 0.375-in. (9.5-mm) inside radius as shown in Fig. 30. The component shall then be bent through a 60° arc by a force applied perpendicularly to the major axis of the component at a point 2 ± 0.05 in. (50 mm) from the intersection of the component with the main body of the toy or applied at the end of the component if the component is less than 2 in. (50 mm) long. The force shall be determined from Table 5. The component shall then be bent in the reverse direction through a 120° arc. This process shall be repeated for 30 cycles at a rate of 1 cycle/2 s, with a 60-s rest period occurring after each 10 cycles. Two 120° arc bends shall constitute one cycle.

Figure 30. Fixture Tester The diagram is a set of jaws, which are constructed of 12 gauge 0.0897 CR steel and each jaw is 60 degrees off from vertical, making the total angle 120 degrees. The rounded ends of the jaws have a radius of 0.375 inches. 120° 60° JAWS 13 Gauge 0.0897 in.(2.278 mm) C.R. Steel 0.375 in. Rad(9.52 mm)

**FIG. 30 Flexure Tester**

8.13 *Test for Mouth-Actuated Toys—* A piston pump capable of discharging and taking in more than 18 in³ (295 cm³) of air in less than 3 s shall be connected to the mouthpiece of the toy. A relief valve shall be so arranged that the pump will not generate a positive or negative pressure of more than 2 psig. The toy shall be subjected to 10 alternating blowing-andsucking cycles of at least 18 in³ (295 cm³) of air, including that volume that may be discharged through the relief valve. Any objects released as a result of this test shall be inspected for conformance with 4.6. The above procedure shall also be applied to the outlet if the air outlet of the toy is accessible as described in 4.6.2.

**8.14 Projectiles**

8.14.1 *Kinetic Energy Determination—* The kinetic energy of a projectile as defined in 3.1.51 shall be determined from the following equation:

$$\text{kinetic energy} = 1/2\,mv^2 \qquad\qquad (1)$$

where:

    *m* = mass of projectile, kg, and

    *v* = velocity of the projectile, m/s.

8.14.2 The mass of a projectile, *m,* shall be determined by weighing a sample on a laboratory balance. The velocity of a projectile, *v,* shall be determined by firing a sample from the discharge mechanism of the toy across ballistic screens placed a known distance apart (*s,* metres) and recording the time (*t,* seconds) to travel that distance. The velocity of the projectile shall be calculated from the expression $v = s/t$ m/s.

8.14.3 When performing the test to measure the velocity of a projectile, the second screen shall be placed a distance no more than 1 ft (300 mm) plus one projectile length from the point at which the entire projectile enters free flight (see Fig. 31). Due to the flight characteristics of certain projectiles and other factors that may influence the accuracy of the measurement of projectile velocity, the value of *v* in the equation for kinetic energy shall be the average of five measurements.

Figure 31. Diagram of Layout to Determine Projectile Velocity A launcher on the left has a projectile connected to it on the right edge. The projectile has a label that says Length of Projectile. From the end of the projectile going right towards a vertical line is an indicator of 12 inchdes. The line on the right is labelled 2nd ballistic screen. 2nd Ballistic Screen 12" Length ofProjectile Projectile Launcher End ofLauncher

    *NOTE 1 —*    First ballistic screen to be located between end of launcher and second screen.

### FIG. 31 Diagram of Layout to Determine Projectile Velocity

8.14.4 *Impact Test for Projectiles—* Projectiles, as defined in 3.1.59, shall be propelled by their discharge mechanism three times into a concrete block wall (or equivalent surface) located at a distance 1 ft (300 mm) plus the length of the projectile from the front end of the launcher. The discharge mechanism shall be aimed perpendicular to the wall.

8.15 *Test for Stability of Ride-On Toys or Toy Seats—* These tests relate to the requirements of 4.15.

8.15.1 Place the ride-on toy or toy seat across the slope of a smooth surface inclined 10° to the horizontal plane. (Some tests require a 15° slope; refer to 4.15.2.2 and 4.15.3.)

8.15.2 Turn the steering mechanism, if any, to a position at which the ride-on toy or toy seat is most likely to tip.

8.15.3 Chock any wheels to restrict rolling, but allow casters to assume their natural position before chocks are applied.

8.15.4 Apply to the seat a static load equal to the weight indicated in <u>Table 6</u> at the highest age of the age range for which the ride-on toy or toy seat is intended, but not exceeding 60 months. When the highest age of the intended age range falls between two ages listed in <u>Table 6</u>, the higher of the two shall be chosen.

8.15.5 The load shall be applied so that the major axis is perpendicular to the true horizontal while the ride-on toy or toy seat is on the incline specified.

8.15.6 The load shall be designed so that the height of its center of gravity is 8.7 ± 0.5 in. (220 ± 13 mm).

8.15.7 The center of gravity of the load for the sideways stability test shall be secured to the geometric center of the designated seating area.

   NOTE 15 —   Separate tests for each side.

8.15.8 If there is no designated seating area or if there is no designated sideways orientation, the load shall be placed 1.7 in. (43 mm) inward towards the geometric center of the ride-on toy or toy seat from the least favorable position that it is reasonable to anticipate that the child will choose to sit (note separate tests for each side).

38

**TABLE 6 Weight of 95th Percentile Children (Values Given for Boys or Girls, Whichever is Higher)**

| Age, years | Weight, lb (kg) |
|---|---|
| 1 | 28 (12.6) |
| 2 | 29 (13.2) |
| 3 | 42 (18.9) |
| 4 | 43 (19.7) |
| 5 | 50 (22.6) |
| 6 | 59 (26.6) |
| 7 | 69 (31.2) |
| 8 | 81 (37.0) |
| 9 | 89 (40.4) |
| 10 | 105 (47.9) |
| 11 | 121 (55.0) |
| 12 | 120 (54.7) |
| 13 | 140 (63.6) |

| 14 | 153 (69.6) |
|---|---|

*NOTE 16 —*   Separate tests for each side.

8.15.9 The center of gravity of the load for the fore and aft stability test shall be secured both 1.7 in. (43 mm) rearward of the front-most portion of the designated seating area and 1.7 in. (43 mm) forward of the rear-most portion of the designated seating area.

*NOTE 17 —*   Two separate tests.

8.15.10 If there is no designated seating area or if there is no designated fore and aft orientation, the load shall be placed 1.7 in. (43 mm) inward towards the geometric center of the ride-on toy or toy seat from the least favorable position that it is reasonable to anticipate that the child will choose to sit.

*NOTE 18 —*   Two separate tests.

8.16 Pompoms are subjected to the torque test as described in 8.8 and 8.8.1 and the tension test as described herein. The clamps used to grip the material to be tested shall have jaws to which ¾-in. (19-mm) diameter washers are attached (see Fig. 27). One clamp shall be attached to the pompom and a second clamp used to grip the base material. A force of 15 lbf (67 N) shall be applied evenly within 5 s and maintained for an additional 10 s.

## 8.17 Stalled Motor Test for Battery-Operated Toys

8.17.1 The test shall be conducted using a new toy. Each motor shall be tested separately using fresh alkaline batteries. If another battery chemistry is specifically recommended for use in the toy by the manufacturer, repeat the test using the batteries specified by the manufacturer. If the toy will not operate using alkaline batteries, test with the type of battery recommended by the manufacturer at the specified voltage. The test is to be carried out in a draft-free location at an ambient temperature of 20 ± 5°C.

8.17.2 Operate the toy with moving parts that are mechanically linked to a motor locked in a fixed position. Only lock moving parts which can be stalled external to the toy. Do not disable any mechanical or electrical protective device such as clutches or fuses. Monitor the temperatures with the toy fully assembled. If normal use allows the motor to run unattended or if the toy has a non-recessed switch allowing it to be kept in the "on" position, operate the toy continuously and record the maximum temperatures. The test may be discontinued 60 min after the peak temperature of each component being

tested is recorded. If the toy shuts off automatically or must be kept "on" by hand or foot, monitor temperatures for 30 s, resetting the toy as many times as necessary to complete the 30 s of operation. If the toy shuts off automatically after an operating time of greater than 30 s, continue the test until the toy shuts off. At the conclusion of the test, the stalled motor condition shall not cause temperatures to exceed the limits of 4.25.7, or cause battery leakage, an explosion, or a fire.

## 8.18 Tests for Battery-Powered Ride-on Toys

8.18.1 Components tested in accordance with the following sections are to be installed and operated in the toy, as they would be during normal use unless otherwise specified. Testing is to be conducted using fully charged batteries.[16]

> [16] Testing is to be conducted while the vehicle is operated on a hard level surface covered with 3M #610 General Purpose Safety Walk tape or equivalent surface with a coefficient of friction between 1.27 and 1.32 when measured in accordance with MIL-D-17951. Cheesecloth referenced in the following tests is #60 cotton gauze with a thread count of 32 by 28 threads per inch.

## 8.18.2 *Maximum Temperature Test*:

8.18.2.1 Mechanically precondition all electrical pressure connections used for charging or discharging the battery(ies). If a main harness connector is provided, the main harness connection must be connected and disconnected 600 times before the Maximum Temperature Test is performed. If a user replaceable fuse is provided, remove and insert the fuse 25 times before the Maximum Temperature test is performed.

8.18.2.2 Power the test sample using a fully charged battery as specified by the manufacturer. Operate the vehicle in the mode that results in the maximum continuous current draw. Determine the maximum continuous current draw by testing the vehicle on any intended surface as specified by the manufacturer, and by adjusting the weight, up to the manufacturer specified maximum. Several trials on different surfaces and with different weights may be necessary to determine the maximum continuous current draw.

8.18.2.3 Physically load the vehicle in any way necessary to obtain the maximum continuous current draw. Operate the vehicle continuously until the battery is exhausted or until thermal equilibrium is reached. If thermal

equilibrium is not reached, replace the battery with a fully charged battery and continue the test.

8.18.3 *Stalled Motor Test for Battery-Powered Ride-on Toys*— Mechanically lock any accessible motor driven parts. For toys having more than one motor, each motor shall be tested individually. For toys having more than one operating mode, a different toy shall be tested in each mode. The toy shall be entirely draped with a double layer of cheesecloth during the test. For motors or other electrical components that are accessible, the cheesecloth shall also be draped over the component.

8.18.3.1 Operate the toy, under the stalled condition, until a circuit protection device interrupts the current or until the battery is depleted.

8.18.3.2 If the circuit protection device interrupts the circuit, immediately reset the circuit protection device or replace it in the case of a fuse and repeat the test three more times. If the circuit protection device automatically resets, continue the stalled motor test until the battery is exhausted.

8.18.3.3 The test shall not result in ignition of the cheesecloth.

8.18.4 *Nuisance Tripping Test*— Conduct the tests on a level surface as specified in 8.18.1, loading the vehicle with the maximum weight specified by the manufacturer.

8.18.4.1 *Start/Stop Condition*— Start and stop the toy in 1-s cycles for 30 repetitions (0.5 s start followed by 0.5 s stop) in the mode that draws the greatest current.

8.18.4.2 *Forward/Reverse*— If the toy has a reverse direction feature, cycle the toy in the forward and reverse directions in 1-s cycles for 30 repetitions (0.5 s forward followed by 0.5 s reverse) in the mode that draws the greatest current.

8.18.5 *Switch Endurance and Overload Tests*— Precondition switches at 95 % relative humidity between 20°C and 32°C for 48 h. Conduct the Switch Endurance and Overload Tests at 40°C. A switch is to be operated by means of its actuating member either manually or by mechanical means making and breaking the test current. If a fuse or protective device operates (opens or trips) the device must be replaced or reset as many times as necessary to complete the required number of cycles. The test may be concluded at less than the prescribed number of cycles if the switch fails safe (switch stuck in the "off" position and no short-circuit condition results). Test 3 samples. All

39

samples must pass.

8.18.5.1 *Switch Endurance Test*— If a switch is relied upon for starting and stopping of the vehicle, conduct the endurance test for 100 000 cycles. Cycle (minimum 1 s on time and at least 6 cycles per minute) a switch in the toy using the maximum continuous current load as determined in the Maximum Temperature Test or in an equivalent simulated motor load circuit including the inrush and inductive characteristics. All other switches are to be subjected to 6000 cycles of endurance testing. Cycle (minimum 1 s on time and at least 6 cycles per minute) a switch in the toy using the maximum continuous current load as determined in the Maximum Temperature Test or in an equivalent simulated motor load circuit including the inrush and inductive characteristics.

8.18.5.2 *Switch Overload Test*— The overload test is to be conducted on a switch that is relied upon for starting and stopping of the vehicle. Stall the motor(s) of the toy. Operate the switch for 50 cycles of operation at a rate of 6 cycles per minute with 1 s on and 9 s off.

8.18.6 *Battery Overcharge Test*— Each battery shall be charged with its intended charger continuously for 336 h. The test shall not result in the release of electrolyte, or cause explosion or fire.

8.18.6.1 If the battery can be charged in the vehicle, place the battery in the vehicle and connect it to the charging circuit. Drape the charger, cable, and battery with a double layer of cheesecloth. The test shall not result in ignition of the cheesecloth or in the release of electrolyte.

8.18.7 *Short-Circuit Protection Test*— Entirely drape the toy with a double layer of cheesecloth. Short-circuit parts of opposite polarity. Any possible short-circuit condition shall not result in ignition of the cheesecloth.

8.18.8 *Strain Relief Test*— The electrical connections of the cord or harness are to be disconnected. Apply a 20 lbf (90 N) to the cord so that the strain relief will be stressed from any angle permitted by the construction of the toy. Maintain the specified force for 1 min. There shall be no movement of the cord to indicate stress on the connections.

## 8.19 Tests for Toys Which Produce Noise

**8.19.1** *Installation and Mounting Conditions*:

8.19.1.1 *General*— Carry out the measurements on a new toy not already

subjected to testing. Test battery toys using new primary batteries or fully charged secondary batteries. External power supplies should not be used as they will, in many cases, affect the performance of the toy.

8.19.1.2 *Test Environment*— Any environment that meets the qualification requirements of ISO 3746, Annex A.

> NOTE 19 —   In practice, this means that most normally furnished rooms with a volume exceeding 30 m³ will qualify at measurement distances of 50 cm provided that the largest dimension of the toy does not exceed 50 cm.

8.19.1.3 *Mounting*— Test rigs used for the mounting of toys and/or the operator of the toy shall not affect the sound emission of the toy under test nor cause sound reflections which will increase the sound pressure levels at the measuring points.

1. Mount close to the ear toys and hand-held toys in a proper test rig at least 100 cm above the reflecting plane or have them operated by an adult operator with the arm outstretched.

2. Place stationary table top, floor, and crib toys on a standard test table as described in ISO 11202. A table with a wooden top with a thickness of 4 cm or larger and leg construction providing a stable test surface is considered sufficient. The table top should be large enough such that, with the toy resting on and fully over the table top, the side of the measurement box from which the measurement is being made is also above the table top (see 8.19.2.3(5)).

3. Mount self propelled table top and floor toys on the standard test table described above in a test rig so that they can be operated with full power, but preventing them from moving around.

4. Place pull and push toys on the reflecting plane (for example, concrete, tile, or other hard surface) and fix them in a test rig which enables them to be moved with varying speed along a direct line which passes the measuring microphones ("passing by" test). Make sure that the friction of the reflecting plane prevents wheels from skidding.

5. Place hand-actuated wind-up toys, with the wind-up spring fully loaded, on the reflecting plane (for example, concrete, tile, or other hard surface) so that the front of the toy is 40 ± 1 cm along the *x*-axis from the microphones of the "passing by" test (see Fig. 32).

    6. Mount other types of toys in the most appropriate way using the principles described in previous paragraphs.

Figure 32. Microphone Positions for Measurements of Pull and Push Toys and for Hand-Actuated Spring-Propelled Toys ("Pass-by" Test) A square platform is shown. The toy is on the top of the platform. Going forward is direction x, going sideways is direction y, going up is direction z. The microphone begins at 40 (no units are mentioned in the diagram, but they are centimeters) in direction x, and then 40 plus width of toy (w) divided by 2 to the left of direction y. It has a height of 30. The microphone moves 20 in direction x away from the toy. z y 1 1 2 x 40+w/2 40+w/2 40 30 30 20 NOTE— Key: 2—End of measurement 1—Microphone w—width of toy

    *NOTE —*
    Key:
    1—Microphone
    2—End of measurement
    *w*—width of toy

### FIG. 32 Microphone Positions for Measurements of Pull and Push Toys and for Hand-Actuated Spring-Propelled Toys ("Pass-by" Test)

8.19.1.4 *Operating Conditions*— Operate the toy under test in that mode of its intended or foreseeable use that produces the highest sound pressure level to the microphone position, where the maximum noise level is observed. In particular:

40

    1. Operate a hand-actuated toy manually, excluding pull and push toys, by applying the force at the point and direction of its intended or foreseeable use giving the maximum sound pressure level. For a toy intended to be shaken, shake at a rate of three times per second. One cycle shall consist of an initial 15 cm stroke followed by a return to the starting point.

    2. Operate a rattle by grasping it where it is meant to be held or, if in doubt, where the longest lever between the hand and the sound emitting part of the rattle can be obtained. Make sure that the radiated sound is not affected by the grip of the hand. Strike downwards ten times with hard lashes in a slow tempo. Use the wrist and keep the forearm essentially horizontal. Endeavour to achieve the highest possible sound level. Stand side-face with the microphone and keep the rattle at the same height as the microphone at a distance of 50 cm.

    3. Operate a pull and push toy at a speed that yields the maximum sound

pressure level. Do not exceed 2 m/s.

   4. Operate a cap-firing toy using percussion caps recommended by the manufacturer and which are available on the market.

**8.19.2** *Measurement Procedure*:

**8.19.2.1** *Basic International Standards to be Used*— The minimum requirement is to determine sound pressure levels at the specified positions around the toy in accordance with ISO 11202 or ISO 11204.

Figure 33. Microphone Positions for Measurement of Sound Pressure Levels of Cap Firing Toys A toy is suspended in space inside of two circles, each at a 90 degree angle from the other. There are thus two points of intersection. The microphone positions are two points of intersection, plus the points 90 degrees away from those points on each circle. In other words, there are four points marked on each circle, and since the circles intersect, two of those points are in common, so there are 6 microphone positions. Each microphone is 50 cm from the center of the toy. z y x 1 1 1 1 1 1 50 50 50 50 50 50 NOTE— Key: 1—Microphone

**FIG. 33 Microphone Positions for Measurement of Sound Pressure Levels of Cap Firing Toys**

**8.19.2.2** *Instrumentation*— The instrumentation system, including the microphone and cable, shall meet the requirements of a class 1 or class 2 instrument specified in IEC 61672-1 and IEC 61672-2. When measuring high peak sound pressure levels, for example, from toys using percussion caps, the microphone and the entire instrumentation system shall have the capability of handling linear peak levels exceeding the C-weighted peak levels by at least 10 dB.

**8.19.2.3** *Microphone Positions*— *General*—Several microphone positions shall be used. In practice, this often means that one microphone is moved from position to position. Whenever it is practicable, it is always an alternative to rotate the test object instead. Attention must be paid to maintaining the correct measuring distance.

   1. *Close-to-the-Ear Toys*—To measure continuous sounds, face the earpiece of the toy at the microphone with the microphone 50 ± 0.5 cm from the earpiece. To measure continuous sounds on toys without earpieces, locate the microphone 50 ± 0.5 cm from the surface of the toy where the main sound source exists such that the sound pressure level at the microphone is maximized. To measure impulsive sounds, locate the microphone 50 ± 0.5 cm from the surface of the toy where

the main sound source exists such that the sound pressure level at the microphone is maximized.

2. *Cap-Firing Toys*—Use six microphone positions around the toy. Place the main sound emitting part of the toy at the origin of the measuring coordinate system in its normal operating orientation in such a way that the main axes of the toy coincide with the axes of the measuring coordinate system (see Fig. 33). If the length of the toy exceeds 50 cm, rotate the toy in the *xy*-plane 45° around the *z*-axis without changing the microphone positions. Select two microphone positions along each axis at a distance of 50 ± 1 cm to both directions from the origin as shown in Fig. 33.

3. *Rattles*—Mount the microphone 1.2 m above the floor and at a distance of 0.5 m from the sound source.

41

4. *Other Hand-Held Toys*—Select six microphone positions on a box-shaped measurement surface at the measuring distance of 50 cm from the reference box of the toy, as defined in ISO 3746, as specified in Fig. 34. The positions are at the centers of the sides of the measurement surface at the distance 50 cm from the reference box.

5. *Stationary and Self-Propelled Table-Top, Floor, and Crib Toys*—Select five, or if the length or width of the toy is larger than 100 cm, nine microphone positions on a box-shaped measurement surface at the measuring distance of 50 cm from the reference box of the toy as specified in Fig. 35. The sides of the measurement box with height *H* are always 50 cm from the sides of the reference box, except for the bottom of the boxes, which lie in the same plane. All microphone positions are on the measurement box.

6. *Pull and Push Toys and Hand-Activated Spring-Propelled Toys*—For toys with a width (*w*) of 25 cm or less, use two microphones at distances (*d*) 50 cm from the *x*-axis of the measuring coordinate system as shown in Fig. 32. For toys with a width (*w*) of more than 25 cm, use two microphone at distances (*d*) 40 cm plus half the width of the toy from the *x*-axis (40 + *w*/2) as shown in Fig. 32. Place the toy on a test rig or on the reflecting plane in its normal operating orientation in such a way that movement of the toy is possible along the *x*-axis passing the microphone positions.

Figure 34. Microphone Positions for All Other Hand-Held Toys A toy in the shape of a cube (the reference box) is inside a large cube, the measurement box. The clearance between the edges of the boxes is 50 centimeters. One

microphone is placed on a point in the center of each of the facets of the measurement box, so there are six points of measurement. 50 cm 1 2 NOTE— Key: 1—Measurement box 2—Reference box

**FIG. 34 Microphone Positions for All Other Hand-Held Toys**

Figure 35. Microphone Positions for Measurement of Stationary and Self-Propelled Table-Top, Floor, and Crib Toys This diagram is identical to Figure 34, however, in this case the inner box is labelled H/2 and the outer measurement box is labelled H. 1 2 H/2 H NOTE— Key: 1—Measurement box 2—Reference box

**FIG. 35 Microphone Positions for Measurement of Stationary and Self-Propelled Table-Top, Floor, and Crib Toys**

**8.19.2.4** *Measurements*:

1. *General*—Normal operating mode(s) shall be reached before the tests are performed.

2. *Measurements of Continuous Sounds*—If the toy under test has a clearly defined operating cycle, measure the equivalent sound pressure level in each microphone position during at least one whole cycle. Quiet periods longer than 15 s shall be excluded from the measurement period. Perform a total of three measurements. If the toy under test does not have a clearly defined operating cycle, measure the equivalent sound pressure level in each microphone position for at least 15 s during the operational mode where the noise level is highest. Perform a total of three measurements.

3. *Measurements of Impulsive Sounds*—Measure the C-weighted peak sound pressure level, $L_{Cpeak}$, of impulsive sounds in each microphone position. Perform a total of three measurements. For pass-by tests, measure the C-weighted peak sound pressure level. Measure twice on each side.

4. *Measurement for Rattles*— Measure the C-weighted peak sound pressure level, $L_{Cpeak}$, for ten cycles. Perform a total of three measurements.

5. *Measurement Results*—Sound measurement results shall be given as: (*a*) A-weighted equivalent sound pressure level at the specified position, $L_{Aeq}$, in decibels; (*b*) C-weighted peak sound pressure level at the specified position, $L_{Cpeak}$, in decibels.

6. The highest value of the applicable measurements ($L_{Aeq}$ and $L_{Cpeak}$) at any of the microphone positions is the measurement result.

8.20 *Dynamic Strength Test for Wheeled Ride-on Toys*— Load the toy for 5 min in the most onerous position with the appropriate mass in accordance with Table 6 on its standing or sitting surface. Secure the load to the toy in a position corresponding to the normal use of the toy. Drive the toy three times at a speed of 6.6 ft/s (2 m/s) ± 0.7 ft/s (0.2 m/s) into a nonresilient step with a height of 2 in. (50 mm). If the toy is intended to bear the mass of more than one child at a time, test each sitting or standing area simultaneously. Determine whether the toy continues to conform to the relevant requirements of this specification.

8.21 *Plastic Film Thickness*— Use a measuring device (dialtype thickness gauge or equivalent) capable of measuring thickness to an accuracy of 4 μm. Measurements shall be taken at 10 equidistant points across the diagonal of any 3.94 by 3.94-in. (100 by 100-mm) area. For plastic bags, prepare by cutting the sides, without stretching, into two single sheets.

## 8.22 Test for Loops and Cords

8.22.1 Anchor or secure the toy. Place the head probe (Fig. 10) in the loop/opening formed by the cord/s, tapered end first, with the plane of its base parallel to the plane of the opening. Rotate the probe to any orientation about its own axis while keeping its base parallel to the plane of the opening; apply 10 lbf (45 N) while attempting to push the probe through the opening.

8.22.2 Elastic materials or loops that are smaller than the tapered diameter of the head probe shall be stretched before applying the head probe test fixture using the hook test fixture illustrated in Fig. 36. To begin the evaluation, the elastic material is first looped around the left bottom hook, then hooking the elastic material with the hook attachment of the force gauge, pull the elastic material to the right bottom hook without exceeding a force of 5.0 lbf (22.2 N). The elastic material is then pulled to the left upper hook without exceeding a force of 5.0 lbf (22.2 N). Pull the elastic material to the right side so that the hook of the force gauge is adjacent to the left upper hook and parallel to the right bottom hook without exceeding a force of 5.0 lbf (22.2 N). The hook of the force gauge should remain in this position during testing. If the elastic material cannot be stretched and held in this position or if the force needed to stretch the elastic material exceeds 5.0 lbf (22.2 N), the elastic material complies with this requirement. The testing sequence is illustrated in Fig. 36 (a) through (e). If the body of the toy forms part of the loop, position the body of the toy so that it is on the open, right-hand side of

the hook test fixture. Apply the head probe in accordance with 8.22.1.

Figure 36. Hook Test Fixture for Cords and Loops There are 3 views, labeled top, front, and side. The scale is 1/1 inch and tere is a notation that the base is any suitable material and the height of all hooks shall be equal. From the top view, a rectangle with rounded corders is shown, there is a hook embeded with the base on the left of the rectangle and the hook protruding in. From the side view, there is a rounded rectangle with a hook screwed into the bottom. From the front view, two blocks form a 90 degree angle, with the vertical block on the left. There is one hook protruding out of that block a distance x. There are two hooks on the bottom block. The left-hook is at a distance of X from the left edge. The distance from the top of that hook to the hook embedded in the vertical block is 3. The distance between the two bottom hooks is 4.3. The hooks are not labelled but are used in subsequent diagrams, so we assign A as the hook on the vertical part, B as the leftmost bottom hook and C as the rightmost bottom hook. SCALE: 1/1 in. HEIGHT OF ALL HOOKS SHALL BE EQUAL BASE - ANY SUITABLE MATERIAL TOP VIEW FRONT VIEW SIDE VIEW 3.0 4.3 X X

**FIG. 36 Hook Test Fixture for Cords and Loops**

Figure 36a. Test Procedure for Cords and Loops, Step 1 (continued) A force gauge is connected to elastic material in the form of a loop. The loop is attached to the bottom hook on the left (B) of the fixture. FORCEGAUGE FRONT VIEW ELASTIC MATERIAL FORCE GAUGE KEY

**FIG. 36 (a) Test Procedure for Cords and Loops, Step 1** *(continued)*

Figure 36b Test Procedure for Cords and Loops, Step 2 (continued) A force gauge is connected to elastic material in the form of a loop. The loop is hooked to both of the bottom hooks (B and C). The force gauge is pulling towards the right, away from C. FORCEGAUGE FRONT VIEW ELASTIC MATERIAL FORCE GAUGE KEY

**FIG. 36 (b) Test Procedure for Cords and Loops, Step 2** *(continued)*

Figure 36c. Test Procedure for Cords and Loops, Step 3 (continued) A force gauge is connected to elastic material in the form of a loop. The loop is hooked to both of the bottom hooks (B and C) as well as the top hook (A). The force gauge is positioned above hook A, pulling up. FORCEGAUGE FRONT VIEW ELASTIC MATERIAL FORCE GAUGE KEY

**FIG. 36 (c) Test Procedure for Cords and Loops, Step 3** *(continued)*

Figure 36d. Test Procedure for Cords and Loops, Step 4 (continued) A force gauge is connected to elastic material in the form of a loop. The loop is hooked to both of the bottom hooks (B and C) as well as the top hook (A). The force gauge is positioned to the right of hook A and directly above Hook

C, forming a rectangle, and the gauge is pulling the rectangle out.
FORCEGAUGE FRONT VIEW ELASTIC MATERIAL FORCE GAUGE KEY

**FIG. 36 (d) Test Procedure for Cords and Loops, Step 4** *(continued)*

Figure 36e. Test Procedure for Cords and Loops, Step 5 (continued) This diagram is identical to Figure 36d, with the elastic material in the form of rectangle. Inside this rectangle is a notation that says Insert Probe Here.
FORCEGAUGE FRONT VIEW ELASTIC MATERIAL FORCE GAUGE KEY INSERT PROBEHERE

**FIG. 36 (e) Test Procedure for Cords and Loops, Step 5** *(continued)*

8.22.3 For cords, straps, and elastics that form loops and have a perimeter larger than the base diameter of the head probe and contain a breakaway feature, the following test is applied to determine release force. With the cord secured in a vertical fashion so that the breakaway feature is essentially in the center of the two clamping devices, apply a downward force and determine if the breakaway feature releases at a force less than 5.0 lbf (22.2 N).

## 8.23 Yo Yo Elastic Tether Toy Test Methods

8.23.1 The yo yo elastic tether toy is tested in its most onerous foreseeable use configuration. Hold the yo yo elastic tether toy by whatever holding means is supplied, typically a small loop. Rotate the toy in a horizontal or near-horizontal plane using any convenient means to achieve a constant rotational speed of 80 r/min or the maximum achievable speed up to 80 r/min.

> *NOTE 20 —*   The plane of rotation may not be horizontal given the physical characteristics of the toy, for example the size and mass of the object at the end of the tether.

> *NOTE 21 —*   Where a tether has no distinct holding means, such as a finger loop, the unloaded length of the tether that is held should be the minimal length required to prevent release of the tether during rotation.

8.23.1.1 A variable speed drill is one method of achieving a constant rotational speed. If such a drill is used, attach the holding means to a rigid cam as shown in Fig. 37. Use a cam of 3 cm (1.18 in.) in length as measured from the center of rotation to the edge of the clamping mechanism furthest from the center of rotation (see Fig. 38). If necessary, manually start the product rotating. A typical test set up is shown in Fig. 37.

Figure 37. Example of a Typical Setup This figure is two photographs. On the

left is a device that resembles a power drill affixed to a test set-up. To the right is a cluttered scene of a workshop with no labels or descriptions.

### FIG. 37 Example of Typical Test Set-Up

Figure 38. Close-Up of Clamp This photograph shows the end of what is presumably a power drill. At the end is a notation that says Center of Rotation. Connected to this end is a verticalbar that has a clamping mechanism affixed to it. A label says Edge of Clamping Mechanism.

### FIG. 38 Close-Up of Clamp

8.23.2 Measure the length of the tether when the tether is fully extended during rotation. There is no requirement to measure the exact length of a tether if its fully extended length during rotation is well below or well beyond 50 cm (20 in.) (for example, less than 40 cm (16 in.) or greater than 60 cm (24 in.)). The tether length does not include the length of the mass at the end, the holding means (if present), or the cam (if used).

8.23.2.1 To facilitate length measurement of the tether during rotation, if helpful, mark two points along its length when it is under no load: (1) the point where it joins the mass at the end and (2) the point where it joins the holding means, as shown in Fig. 39.

Figure 39. Marking Unloaded Tether A ball is connected to a chord. At the other end of the cord is a circle with a hole in it. The point where the ball meets the cord is labelled 2.

### FIG. 39 Marking Unloaded Tether

## 8.24 Magnet Test Methods

**8.24.1** *Flux Density Measurement.*:

8.24.1.1 *Test Equipment*— dc field gauss meter with a resolution of 5 gauss (G) and an axial type probe.

    1. An active area diameter of 0.76 ± 0.13 mm.

    2. A distance between the active area and probe tip of 0.38 ± 0.13 mm.

**8.24.1.2** *Test Method*:

    1. Place the probe's tip in contact with the pole surface of the magnet. For a magnetic component (where the magnet is fully or partially imbedded in part of the toy), place the probe's tip in contact with the surface of the component.

2.  Keep the gauss meter's probe perpendicular to the surface.

3.  Move the probe across the surface to locate the maximum absolute flux density.

4.  Record the maximum absolute flux density measurement.

**8.24.2** *Area Measurement of the Pole Surface*:

**8.24.2.1** *Test Equipment—*

Calipers or similar device with a resolution of 0.1 mm.

**8.24.2.2** *Test Method—* If the magnet is imbedded/attached as part of a magnetic component, extract the magnet from the component. If the pole surface of the magnet is flat, calculate the area using the appropriate geometric formula. If the pole is not flat (for example, hemispherical), the pole surface area is the maximum cross section of the magnet perpendicular to an axis through the magnet poles (see <span style="color:red">Fig. 40</span>).

> NOTE 22 —   On multi-pole magnets use the area of the largest single pole, which can be determined using magnetic field viewing film or equivalent.

Figure 40. Illustration of Pole Surface on a Magnet with Rounded Ends A cylinder with rounded ends is shown. A circle indicates the maximum cross-section perpendicular to axis. A line that is perpendicular through the center of that cross section is labelled axis through magnet poles. Maximumcross-sectionperpendicularto axis Axis throughmagnet poles

**<span style="color:red">FIG. 40 Illustration of Pole Surface on a Magnet with Rounded Ends</span>**

**8.24.3** *Calculation—* The flux index ($kG^2$ $mm^2$) is calculated by multiplying the area of the pole surface ($mm^2$) of the magnet by the square of the maximum flux density ($kG^2$).

**8.24.4** *Magnet Use and Abuse Testing—* Each unique component shall be tested per this section. A new toy shall be used that has not been subjected to other use and abuse testing. All the testing in this section must be performed in series on each unique component (that is, testing must follow <span style="color:red">8.24.4.1</span>-<span style="color:red">8.24.4.5</span> in sequential order).

**44**

**8.24.4.1** *Cycling as Received—* One thousand (1000) cycles of intended use shall be performed on the as-received magnetic parts or magnetic

assemblies. The magnetic parts shall be brought together to a distance that initiates magnetic attraction, released, and then pulled apart to the distance where magnetic attraction ceases. Each attachment and detachment shall count as 1 cycle. If no other magnets or magnetic parts are provided with the toy, then the mating metal part or surface, according to the toy's intended play pattern, should be used for cycling purposes. The testing may be automated or performed manually.

8.24.4.2 *Impact Test*— Place the magnetic part or magnetic component in an orientation that is most likely to result in breakage on a plane horizontal steel surface and drop a metallic weight with a mass of 2.2 lb (1.0 kg) distributed over an area with a diameter of 3.1 in. (78.7 mm) through a distance of 4.0 in. (101.6 mm) on to it. Determine if a hazardous magnet or a hazardous magnetic component is generated.

8.24.4.3 *Torque Test*— Test according to 8.8.

8.24.4.4 *Tension Test*— Test according to 8.9.

8.24.4.5 *Cycling – After Abuse Test*— Repeat the testing described in 8.24.4.1.

## 8.25 Test Methods for Locking Mechanisms or Other Means

**8.25.1** *Locking Mechanisms or Other Means*:

8.25.1.1 Erect the product in accordance with the manufacturer's instructions.

8.25.1.2 Secure the product so that the normal folding motion is not impeded.

8.25.1.3 Apply a force of 45 lbf (200 N) to the product, but not to the mechanism itself, in the direction normally associated with folding. Apply the force gradually over a 5 s period and maintain for an additional 10 s before releasing the force.

8.25.1.4 Perform this procedure five times within a 2 min period.

8.25.2 *Locking Test Method*— With the product in the manufacturer's recommended use position, gradually apply a force of 10 lbf (45 N) to the locking mechanism in the direction tending to unlock it. The locking mechanism shall not unlock until a minimum force of 10 lbf (45 N) has been achieved.

## 8.26 Test for Overload of Ride-On Toys and Toy Seats

8.26.1 Place the toy on a horizontal plane.

8.26.2 The test load(s) shall be three times the weight indicated in <u>Table 6</u> at the highest age of the age range for which the toy is intended. The test for overload requirements shall be conducted so that it will be consistent with the advertised weight capacity if that figure is higher than the minimum weight capacity in accordance with <u>Table 6</u>. When the highest age of the intended age range falls between two ages listed in <u>Table 6</u>, the higher of the two shall be chosen.

45

8.26.3 Where the toy is intended to bear the weight of more than one child at a time, test each sitting or standing area (33 the weight tested separately in each location).

8.26.4 Apply a static load(s) that is equal to the weight as determined by the criteria above. The load(s) shall be applied so that it is as close as possible to the geometric center of the designated seating or standing area(s). If there is no designated seating or standing area(s), the load shall be placed at the least favorable position that it is reasonable to anticipate that the child will choose to sit or stand.

8.26.5 Observe whether the toy collapses within 1 min after application of the static load(s).

# 9. Identification

9.1 So that purchasers may identify products conforming to all of the requirements of this specification on toy safety, producers, importers, and distributors may include a statement of compliance in conjunction with their name and address on product labels, invoices, and sales literature.

9.1.1 The following statements are suggested:

1. Conforms to the requirements of ASTM Standard Consumer Safety Specification on Toy Safety, F963 (name and address of producer, importer, or distributor).

2. Conforms to the safety requirements of Specification F963 (name and address of producer, importer, or distributor).

# 10. Keywords

battery-operated toys; children; safety labeling; safety testing; toy safety

**49**

ANNEXES
(Mandatory Information)

## A1. AGE GRADING GUIDELINES +

### A1.1 Purpose and Scope

A1.1.1 Good age-grading practices are important to ensure that a toy is appropriate and safe at particular stages of physical and mental development.

A1.1.2 Age labeling is intended to provide point-of-sale guidance to consumers for the selection of appropriate toys for children with respect to average abilities, interests of various age groups, and safety aspects of the toys themselves.

A1.1.3 This guideline is intended to provide thoughts and considerations necessary to establish meaningful age recommendations for toy products.

A1.1.4 "Guidelines for Relating Children's Ages to Toy Characteristics (1985)" is available from the Consumer Product Safety Commission, Washington, DC 20207.

### A1.2 Criteria for Establishing Age Grades

A1.2.1 The following criteria should be considered when establishing age grading for a toy. While all of these should be considered in total, each one may be weighted individually to arrive at the appropriate age grading.

A1.2.1.1 The physical ability of a child to manipulate and play with the specific features of a toy. This necessitates an understanding of the physical coordination, fine and gross motor capabilities, size, and strength generally available at a given age.

A1.2.1.2 The mental ability of a child to understand how to use the toy (that is, understand instructions, sequences of operations, objective of the toy). Consideration of the mental skills at a given age is important in order to provide a concept that will challenge abilities and stimulate further development, yet not frustrate. Accomplishment should be neither too easy nor too difficult to be satisfying to the child.

A1.2.1.3 The toy must meet play needs and interests at different levels of development. Understanding developmental levels and identifying play

materials and play environments to enhance each developmental stage is important for assigning appropriate age grades. Play interests and toy preferences change rapidly; there should be careful attention to a child's preference or aversion to specific toy subjects at certain stages. In order for a toy to enhance play, it obviously must be appealing to its user. In short, it must be fun.

## A1.3 Tools

A1.3.1 Use of the following tools can help guide the establishment of meaningful age grading for a toy. These tools are not arranged in a particular order of importance; all of them should be considered during the age grading process.

A1.3.1.1 Prior experience with the toy or a similar toy in the marketplace indicating suitability for a specific age group.

A1.3.1.2 Reference materials on comparative body measurements and human factors elements.

A1.3.1.3 Reference resources on child development norms to establish developmental mileposts.

A1.3.1.4 Identification of developmental features to be enhanced/stimulated within certain age spans.

A1.3.1.5 Expertise of outside consultants, child development specialists, physicians, and psychologists.

A1.3.1.6 Testing of models or prototypes with children.

A1.3.1.7 Observing skill levels in children at play.

A1.3.1.8 Seeking opinions of parents.

A1.3.1.9 Interacting with children and asking questions.

## A1.4 Safety Considerations of Age Grading

A1.4.1 The toy must be safe for the intended user. Once the skill level has been determined, the design must be tailored to satisfy the requirements of this specification associated with that age level.

A1.4.2 Age grades are indicators of average development, which does not

necessarily reflect suitability for the exceptional child. A parent remains the best judge of whether the child is at the appropriate development stage for safe play with a particular toy.

A1.4.3 A primary consideration should be potential choking and aspiration hazards associated with small parts. Children under the age of three are more prone to placing objects in their mouths. However, the propensity to put nonfood objects in the mouth does not disappear at the chronological age of three years. The following toys are appropriate for children under three years of age and are cited specifically as subject to the safety requirements of 16 CFR 1501 for small parts regulations:

A1.4.3.1 Squeeze toys, teethers, crib exercisers, crib gyms, crib mobiles, toys intended to be affixed to a crib, stroller, playpen, or baby carriage, pull and push toys, pounding toys, blocks and stacking sets, bathtub, wading pool and sand toys, rocking, spring, and stick horses and other figures, chime and musical balls and carousels, jack-in-the-boxes, stuffed, plush, and flocked animals and other figures, and those preschool toys, games and puzzles, riding toys, dolls and animal figures, cars, trucks, and other vehicles that are intended for use by children under the age of three years.

A1.4.4 Some of the characteristics of toys that describe those preschool toys that are appropriate for children under the age of three years are listed below by class of toy:

A1.4.4.1 *Dolls*— Soft-bodied baby dolls or character dolls that are for holding or cuddling, stuffed or "bean bag" dolls, rag or cloth dolls with simple features (including accessories), and lightweight plastic dolls with simple features and limited articulation at the limb joints.

A1.4.4.2 *Infant Toys*— Toys intended to be used in a crib or playpen, to be held easily by small hands, shaken, grasped, rattled, or cuddled.

A1.4.4.3 *Toy Vehicles*— Cars, trucks, boats, and trains of simple chunky shape, decorated in primary colors without extensive descriptive detail or representation of a particular make or model of vehicle and that require simple actions such as rolling, dumping, pushing, and releasing.

A1.4.4.4 *Action Toys*— Simple action toys for the identification of sounds or pictures and surprise action toys.

A1.4.4.5 *Early Learning Toys*— Toys, books, and puzzles for learning basics such as letters or numbers or shapes, and simple physical motions such as turning wheels or knobs, pulling and letting go, or sorting by size, etc.

A1.4.4.6 *Blocks and Stacking Toys—* Toys that do not require finger dexterity or fitting together of small intricate pieces.

A1.4.4.7 *Soft Balls and Similar Items—* Soft, lightweight balls or other shapes for squeezing, shaking, rolling, or tossing.

A1.4.5 Toys that should not be considered appropriate for very young children, and therefore not be age labeled as such, have the following characteristics:

A1.4.5.1 Toys that require intricate finger movements or controlled adjustments, fitting intricate pieces together.

A1.4.5.2 Toys, for example, games that require or incorporate elements of reading ability beyond the ABCs or 123s.

A1.4.5.3 Toys that simulate adult figures or characters and their associated accessories.

A1.4.5.4 Collecting sets (for example, figures and vehicles).

A1.4.5.5 Projectile-type toys, launched vehicles, planes, etc.

A1.4.5.6 Makeup sets.

A1.4.6 Another major development cutoff has been cited at approximately eight years of age, at which time reading ability has progressed so that a child can, on his own, read, understand, and heed instructions, caution statements, etc. Because the instructions and caution statements are necessary for the safe use of the product in some cases, those products should be labeled for use by children over the age of eight. Products that fall into this category include the following:

A1.4.6.1 Science and environmental kits or sets containing breakable glass components and complex instructions.

A1.4.6.2 Complex model and craft sets requiring precision assembly and finger dexterity or incorporating sharp tools or components.

A1.4.6.3 Electrically operated toys incorporating heating elements.

A1.4.6.4 Certain chemistry sets, fueled model vehicles, and rockets, etc. that contain chemicals that may be hazardous, cannot generally be handled safely by children unable to read and understand instructions and cautionary

statements. The minimum age for which any such product should be recommended is eight years and then *only* with adult supervision.

## A1.5 Descriptive Age Labeling

A1.5.1 Manufacturers can assist parents and other purchasers in the appropriate selection of toys by incorporating descriptive labeling to identify potential safety concerns if the toy is accessible to children outside the recommended age group.

A1.5.2 For example, if a toy contains small play pieces and is labeled for older children, such as an action figure set, the manufacturer should consider including a statement on the retail packaging that the toy contains small pieces.

A1.5.3 Factors to consider would include the appeal of the toy to young children, market experience, the design or construction of the toy, and whether the packaging provides visual indication of any small play pieces. In addition, a manufacturer should consider the probability that a purchaser may overestimate a child's physical or mental abilities and the child's understanding of a potential hazard related to the toy.

## A2. PACKAGING AND SHIPPING

### A2.1 Packaging

A2.1.1 Packages that are intended to be opened by adult purchasers should be constructed as to avoid hazards during the opening process from metal fasteners, particularly staples, and should not contain common pins used to position the toy within the package.

### A2.2 Shipping

A2.2.1 Packaged and unpackaged toys can be subjected to a wide variety of tests designed to test the ability of toys to withstand the destructive forces encountered in the distribution cycle. The tests used most widely include drop, vibration, compression, and incline impact. Limited testing may be sufficient for many toys, especially those that are of light weight and constructed of resilient materials, such as dolls and stuffed toys. Others, however, such as large plastic or heavy metal toys, may be damaged during shipment and should be subjected to appropriate tests. Guidance for useful tests can be obtained from the following ASTM sources: Test Methods D642, D5276, D880, and D999.

51

## A3. DESIGN GUIDELINES FOR TOYS ATTACHED TO CRIBS OR PLAYPENS

### A3.1 Purpose and Scope

A3.1.1 This annex provides guidance for design practices intended to encourage the careful examination of product characteristics and configurations with respect to safety. As there are no objective means for determining conformance with these design guidelines, they are not to be used to judge compliance with this specification.

### A3.2 Guidelines

A3.2.1 Designs for all products intended to be attached to cribs or playpens should be accomplished in a manner that minimizes the potential for strings, ribbons, elastic, or parts of clothing to become caught on the product, such that an infant is placed in a dangerous predicament in which possible strangulation could occur.

A3.2.2 Examples of the implementation of good design practices for crib and playpen environments include the following:

1. Rounded corners with the use of generous radii wherever possible.

2. Smooth contours that minimize abrupt changes in shape that could easily become a catch point for strings, ribbons, elastic, or loose clothing.

3. Isolation of fastening hardware using recesses, counterbores, or other similar methods.

4. Reduction of the potential for any mismatch of surfaces where a catch point could develop.

## A4. DESIGN GUIDELINES FOR BATH TOY PROJECTIONS

### A4.1 Purpose and Scope

A4.1.1 This annex provides guidance for design practices intended to result in bath toy projection characteristics and configurations that will minimize the risk of injury to the genital and anorectal area if a child were to sit or fall onto the bath toy projection while in an unclothed or minimally clothed state. Some examples of these potentially hazardous projections include but are not limited to rigid fins of fish, rigid hulls, funnels, and masts of boats.

## A4.2 Guidelines

A4.2.1 It is important that the design of a bath toy be developed with consideration of the shapes, dimensions and materials of any projections on the toy such that penetration and impalement hazards are minimized.

A4.2.2 Examples of good design practices include:

A4.2.2.1 *Non-Vertical Projections*— It is preferable to have projections designed such that they are always non-vertical when the toy is evaluated in all stable positions including consideration of the potential positions the toy can rest on the bottom of a bath tub, with or without water present in the bath tub, to produce a vertical or nearly vertical projection.

A4.2.2.2 *Stability*— If a toy topples over when force is applied to the end of the vertical projection, both when the bath toy is empty and filled with water, then the vertical projection is unlikely to be hazardous.

A4.2.2.3 *Accessibility*— Vertical projections can be protected by suitable means to minimize possible injury. A protected projection is one that has adequate adjacent structure (ribs, housings, or other permanent components) to render the projection unlikely to cause penetration or impalement hazards.

A4.2.2.4 *Flexibility*— Vertical projections can be designed to be flexible to minimize possible injury. This can be done through the choice of materials, a design which bends or compresses or the dimensions of the projection.

52

A4.2.2.5 *Diameter*— The diameter (or cross-sectional projected area) of a vertical projection can be sized large enough to minimize possible injury.

## A5. FLAMMABILITY TESTING PROCEDURE FOR SOLIDS AND SOFT TOYS

### A5.1 Purpose

A5.1.1 This annex establishes the protocol and general criteria for flammability testing of solids, and soft toys in conformance with the requirements of 16 CFR 1500.3(c)(6)(vi).

### A5.2 Definitions

A5.2.1 *major axis*— a straight line through the longest dimension of the product connecting the most distant parts or ends of the product. A product

can have more than one major axis (see Fig. A5.1), but they must be equal in length. For toys that pose or transform, position the product so that its major axis is the longest possible dimension.

Figure A5.1. Illustration for Determining Major Axis Two diagrams are shown. Each has 3 lines that intersect. Two of the lines are long and intersect at an angle. A vertical line which is shorter intersects at the same point. In one diagram the point of intersection is in the middle of the lines, in another, it is much higher up. Lines A-A and B-B are the long ones, C-C is the shorter one. A A C C B B A A C C B B

> NOTE —   Lines A-A and B-B are both major axes. Line C-C is *not* a major axis.

## FIG. A5.1 Illustration for Determining Major Axis

A5.2.2 *soft toy*— any stuffed or plush toy, that may or may not be parts or components of other toys.

A5.2.3 *solids*— toys or toy parts constructed of rigid, flexible, or pliable solids.

A5.2.4 *accessories*— an item intended to be removed to enhance the play pattern.

A5.2.5 *strings*— long slender flexible material usually consisting of several strands (as of thread or yarn) woven or twisted together, usually used to bind, fasten, tether, or tie. This does not include string when used, for example, for hair on a doll.

A5.2.6 *paper*— a thin, flat, single layer of material produced by the compression of fibers. The fibers are usually composed of cellulose. Examples of paper products are traditional playing cards, newspaper, magazines, and construction paper. Examples of products that are not paper are cardboard, and paperboard (multiple layers of paper bonded together).

## A5.3 Exemptions

A5.3.1 Strings, paper, and ping-pong balls. A5.3.2 Accessible components having a major dimension of 1 in. (25 mm) or less.

A5.3.3 Textile fabrics intended to be removed shall be tested separately and meet the requirements of A6.1. Fabrics not intended to be removed shall become subject to the test to the extent that it becomes a part of the test surface.

A5.3.4 Sleeping bags.

A5.3.5 Packaging materials intended to be discarded by the consumer. Components of packaging that are likely to be incorporated into the play pattern of the toy are not exempt.

## A5.4 Sample Preparation for Solids and Soft Toys

A5.4.1 Test product completely assembled as per manufacturer's instructions. If disassembly is required for storage purposes only, test when fully assembled as per manufacturer's instructions. If assembly or disassembly, or both, is part of the play pattern (that is, accessories, puzzles, construction toys, etc.) test each component separately.

A5.4.2 Remove all string or paper from the product as deemed necessary.

## A5.5 Procedure for Solids and Soft Toys

A5.5.1 Place the prepared sample in a draft-free area that can be ventilated and cleared after each test. The temperature of the sample at the time of testing shall be between 68 and 86°F (20 and 30°C) at a relative humidity of 20 to 70 %.

A5.5.2 The test fixture shall be corrected to a clean condition prior to the start of each test.

A5.5.3 Measure the dimensions of the sample, and support it by means of the test fixture (see Fig. A5.2) or equivalent, so that the ends of the major axis are oriented horizontally. Placing a scale along the major axis is a sufficient means for gauging the burn distance.

Figure A5.2. Suggested Flammability Test Fixture This is a square board which is 10 inches on each side. Nails are 1.25 inches apart in a grid, with the nails on the outside perimeter 0.62 inches in with the edge, thus 64 places. Number 10-32 tap screws are placed 0.31 inchdes in from each corner and in the middle of the board (thus 4.69 inches between the outer screws and the one in the middle of each edge. The nails protrude 2.4 inchdes out. The screws are item 1, the nailes are item 2, the board is item 3 and is made of stainless steel, the board underneath it is labelled 4 and is also stainles steel. .13 4.69 TYP .31 TYP .10 REF. 2.40 REF. .25 4.69 TYP .31 1.25 TYP .62 TYP 10.00 # 10-32 TAPTYP. 18) PLCS. Ø . 109 REF …002 S.F.FOR NAILS TYP (64) PLCS. .62 TYP 1.25 TYP .10.00 2 3 4 1
    *NOTE 1 —*   Tolerances (unless otherwise specified):
    3 Place DIMS ± 0.005

2 Place DIMS ± 0.015
Angles ± 1°

*NOTE 2 —*   Break all sharp edges and screw to suit unless otherwise specified.

### FIG. A5.2 Suggested Flammability Test Fixture

A5.5.3.1 *Orientation and Locations for Ignition of Specimens—* When orienting specimens, provide support over the entire length of the major axis without sagging, making sure the supporting device does not retard the spread of flame materially. Optional: for samples with long hair, it may be necessary to add fine wire (24 AWG or higher) between some nails to provide sufficient support for the hair. The addition of support for hair is not necessary unless the hair hangs down vertically while lying on the test fixture.

*NOTE A5.1—*   The CPSC does not test hair separately but rather tests hair as a normal part of the toy. The toy might be tested in a face-down position, with the hair in a horizontal position on top of the toy. The toy could also be tested lying on its back, with the hair lying beneath the toy. Hair that hangs vertically would not be used to calculate the burn rate.

1.  A sample that is so large that it becomes impractical to support its entire length must be arranged in such a manner that support at the end of a major axis is provided by the test fixture.

2.  One or more specimens shall be ignited at one end of the major axis, and when practical, one or more specimens shall be ignited at the opposite end of the major axis. Specimens shall be positioned in the worst case position, as dictated by experience.

A5.5.4 Trim the candle and wick as necessary to maintain a flame height of ⅝ to 1 in. (16 to 25 mm).

A5.5.4.1 Hold a burning paraffin candle whose diameter is at least 1 in. (25 mm) so that the flame is a minimum of ⅝ in. (16 mm) high, with the tip of the inner cone of the flame in contact with the surface of the sample at the end of the major axis for 5 s. Maintain contact of the candle with the sample for 5 s or until ignition occurs. If the sample melts away from the flame, move the candle and maintain contact for the full 5 s or until the sample ignites. If the ignition occurs immediately, hold the candle steady and allow the ignited flame to move away.

53

| Item | Required | Description | | Material |
|------|----------|-------------|--|----------|
| 1 | 9 | # 10-32   0.38 LG. | | S.H.C.S. |
| 2 | 64 | # 8d    2.50 LG. | | Common Nail |
| 3 | 1 | 0.13   10.00   10.00 LG. | | Stainless Steel |
| 4 | 1 | 0.25   10.00   10.00 LG. | | Stainless Steel |

**54**

A5.5.5 Remove the candle and allow the sample to burn for an additional 55 s (total burn time including ignition time is 60 s) or until the flames reach the opposite end of the major axis. Determine the time of combustion by means of a stop watch. Do not allow the total test time to exceed 60 s with a self-sustaining flame.

A5.5.6 Extinguish the flame with a CO or similar nondestructive extinguisher, if necessary, after the 60 s. The experienced application of water is an acceptable method for extinguishing the flame.

> NOTE A5.2—   Extinguishing the flame must be accomplished in a manner that preserves the accuracy of the burned distance.

A5.5.7 Measure the length of the burned area, and calculate the rate of burning along the major axis of the sample.

A5.5.8 Products that do not ignite are considered acceptable. No burn rate is calculated for these samples. The burn rate for products that self-extinguish in less than 60 s shall be computed by using the actual burning time as the denominator when calculating the burn rate. For example, ignited product burns 3 in. (76 mm) in 20 s and self-extinguishes. The burn rate is calculated as follows:

$$\frac{3 \text{in.}}{20 \text{s.}} = 0.15 \text{in.}/s \tag{A5.1}$$

A5.5.8.1 Burn-rate calculations for a product that selfextinguishes must be approached cautiously to avoid the introduction of measurement error since small measurement errors can become a significant portion of final calculations when the burn distance is short.

> NOTE A5.3—   It is unlikely that the CPSC would pursue an enforcement action that includes a burn rate calculation higher than 0.10 in. per second and yet consistently self-extinguishes during the test. However, the CPSC reserves the right to proceed with an action if such a burn rate may result in the product's causing substantial personal injury or substantial illness.

1. When the product does not self-extinguish, the flame shall be allowed to continue for a total time of 60 s. Calculate the rate of burning using the actual distance of flame spread during the full 60 s. For example, the product ignites and burns 9 in. (229 mm) in 60 s. The burn rate is calculated as follows:

$$\frac{9\text{in.}}{60\text{s.}} = 0.15\text{in.}/s \text{(a flammable solid)} \qquad\qquad (A5.2)$$

NOTE A5.4—   While testing, samples shall not be extinguished prematurely if such action will affect the burn rate. For example, if a stuffed rabbit is ignited at the tip of one ear and the flame is extinguished when the flame reaches the base of the ear, this may produce an inflated burn rate if the ear material burns at a faster rate than the rest of the product. Therefore, allow the sample to burn the full 60 s taking into account both the ear and the rest of the product.

2. There may be scenarios where the flame may need to be extinguished prematurely prior to reaching the full 60 s. For example, the major axis of a product is 6 in. in length. The product ignites and burns the total length of the major axis (6 in.) in 40 s but continues to flame. Once the flame travels the full length of the major axis, extinguish the flame immediately regardless of whether or not the full 60 s has been reached. The burn rate is calculated as follows:

$$\frac{6\text{in.}}{40\text{s.}} = 0.15\text{in.}/s \qquad\qquad (A5.3)$$

## A5.6 Requirements

A5.6.1 A toy shall be considered a flammable solid if it ignites and burns with a self-sustaining flame at a rate greater than 0.1 in./s (2.5 mm/s) along its major axis.

A5.6.2 If the burn rate of a composite product (that is, solid/fabric combined) exceeds 0.10 in./s in part due to the presence of a permanently attached fabric, then a secondary test shall be performed to determine compliance. The secondary test shall consist of removing the permanently attached fabric from the solid and retesting the solid component separately. When sold as part of a toy such that the permanently attached fabric cannot be removed without causing damage to the toy and the fabric (that is, fabric covered book, stuffed dolls/animals, etc.) or if the toy is an enclosure that a child can enter, the fabric shall become subject to the solids test to the extent that it becomes a part of the major axis.

*NOTE A5.5—*  The permanently attached fabric that was removed from the sample must now be subject to meeting the requirements of Annex A6.

### A5.6.3 *Criteria for Acceptance*:

A5.6.3.1 Sample size = four, whenever practical.

A5.6.3.2 A burn rate is not calculated for samples that do not ignite.

A5.6.3.3 Calculate the burn rate to two significant figures (to the nearest hundredth using conventional rounding rules, that is, for 5 or higher, round up).

A5.6.3.4 Round the burn rate to the nearest tenth (that is, round 0.15 up to 0.2).

A5.6.3.5 Level of acceptance = 0.1 in./s (2.5 mm/s), maximum, along the major axis.

A5.6.3.6 *Additional Guidance for Manufacturers—* Manufacturers' decisions on the performance of an item should be based on a minimum of four samples. This provides a reasonable opportunity for detecting undesirable variations in the product. Proceed as follows:

1. If the burn rate of all samples is less than 0.1 in./s (2.5 mm/s), accept.

2. If the burn rate of all samples is greater than 0.1 in./s (2.5 mm/s) but less than 0.15 in./s (3.75 mm/s), accept and consider further investigation for action to improve performance.

3. If the burn rate of one of the samples is 0.15 in./s (3.75 mm/s) or greater, reject and repeat the test with four additional samples (one time only). If the burn rate of any of the retested samples is 0.15 in./s. or greater, reject.

4. If the burn rate of more than one of the initial 4 samples is 0.15 in./s (3.75 mm/s) or greater, reject.

*NOTE A5.6—*  CPSC makes its decision on whether a product is a flammable solid based on the burn rate of each individual sample. It then determines whether the product may cause substantial personal injury or substantial illness during or as a proximate result of any customary or

reasonably foreseeable handling or use. CPSC has no objection to other laboratories rounding off to the nearest 0.1 in./s. It will calculate burn rates to two decimal places but does not envision enforcement action where the burn rate is greater than 0.10 in./s and less than 0.15 in./s. However, CPSC reserves the right to proceed if such burn rate may result in the product's causing substantial personal injury or substantial illness.

**55**

# A6. FLAMMABILITY TESTING PROCEDURE FOR FABRICS

## A6.1 Purpose

A6.1.1 This annex establishes the protocol and general criteria for flammability testing of fabrics in conformance with the requirements of 16 CFR 1500.3(c)(6)(vi).

## A6.2 Definitions

A6.2.1 *fabric—* any coated or uncoated material (except film and fabrics having a nitro-cellulose fiber, finish or coating) that is woven, knitted, felted, or otherwise produced from any natural or manmade fiber, or substitute therefore, or combination thereof.

A6.2.2 *plain surface fabric—* any textile fabric which does not have an intentionally raised fiber or yarn surface such as pile, nap, or tuft, but shall include those fabrics having fancy woven, knitted or flock printed surfaces.

A6.2.3 *raised surface fabric—* any textile fabric which has an intentionally raised fiber or yarn surface such as a pile, nap or tufting.

## A6.3 Exemptions

A6.3.1 Fabrics where a contiguous 2 by 6 in. piece cannot be extracted.

> *NOTE A6.1—* If a contiguous 2 by 6 in. piece of fabric cannot be obtained, but due to the existence of other fabrics adjacent to it a composite 2 by 6 in. sample can be obtained, and the fabrics in question are permanently attached to a common substrate, then it shall be tested. An example of this would be a doll's hula skirt made of thin strips of fabric 6 in. in length. Each individual strip is joined at the top by a common substrate (that is, plastic waistband) and when combined with the other strips immediately adjacent to it, a 2 by 6 in. sample can be extracted.

A6.3.2 Fabrics that are permanently attached to a solid must initially be

tested with the solid per Annex A5.

## A6.4 Sample Preparation

A6.4.1 Precondition all fabrics in a horizontal position for a minimum of 30 min at a temperature of 221 ± 10°F.

A6.4.2 Fabrics intended to be washed shall be subjected to AATCC Home Laundering Fabrics Prior to Flammability Testing to Differentiate Between Durable and Non-Durable Finishes - 2007.

A6.4.3 A total of 5 samples, whenever practical, shall be cut for each location. Samples may be obtained from more than one toy.

A6.4.4 Samples shall be tested in the manner in which they appear on the toy (that is, exposed side face-up).

A6.4.5 Use the most onerous orientation (for example, warp or fill).

A6.4.6 If it is necessary to use a sample that consists of more than one type of fabric, then take the sample from the most onerous location.

A6.4.7 If fabric is layered and the layers are permanently secured to one another (for example, stitched together) at any point, cut through as many materials necessary to obtain the sample and include all layers in a single sample. Orient layers in the sample holder in the same manner they appear on the toy. (See Fig. A6.1.)

Figure A6.1. Layered Fabric Sample This is a poor drawing of a doll with lots of hair and dress consisting of several layers.

### FIG. A6.1 Layered Fabric Sample

A6.4.8 For fabrics with finished ends made of a different material (that is, lace, ribbons, etc.) test the finished ends separately.

A6.4.9 If the finished ends consist of the same material as the sample being tested (that is, hemmed, folded, etc.) then attempt to exclude this from the 2 by 6 sample. In addition, if the fabric contains any seams or stitching, attempt to exclude them from the sample. If a sample cannot be extracted by excluding the finished ends or seams/stitching, then include them in the sample during testing, however, orient the sample in the fixture so that the finished ends or seams/stitching are at the top or side of the fixture to minimize any effect it may have on the burn rate.

A6.4.10 If the fabric requires support in order to be held in the fixture, then the use of thin gauge wire (24 AWG or higher) strung across the plate opening at equidistant points from each other is acceptable. (See Fig. A6.2.)

Figure A6.2. Fabric Requiring Support A rectangle is shown with a weave pattern and a set of diagonal lines that are thicker, which are presumably the support.

**FIG. A6.2 Fabric Requiring Support**

A6.4.11 Regardless of sample size, if the fabric has nonfabric components permanently attached to it (that is, buttons, sequins, beads, etc.) remove these components only if removal will not cause permanent damage to the fabric or to the non-fabric component. Then test each component separately as applicable. If permanent damage cannot be avoided during removal, then test with non-fabric components attached.

## A6.5 Test Procedure

A6.5.1 Test fabrics per the test method specified in 16 CFR 1610.4(g).

A6.5.2 Use the equipment as specified in 16 CFR 1610.4(b).

## A6.6 Requirements

### A6.6.1 *Plain Surface Fabrics*:

A6.6.1.1 Specimens are acceptable if:

1. All specimens either did not ignite, ignited but selfextinguished, or any combination thereof.

2. Average burn time is 3.5 s or greater.

A6.6.1.2 If only 1 of 5 specimens ignites and burns the stop cord with a time of 3.5 s or more, samples are acceptable.

A6.6.1.3 If only 1 of 5 specimens ignites and burns the stop cord in less than 3.5 seconds, test another set of 5 specimens. Compute the average time of flame spread for all 10 specimens. If 2 or more of these specimens ignite and burn the stop cord, average the results from those specimens. If only 1 of the 10 specimens ignites and burns the stop cord, samples are acceptable.

### A6.6.2 *Raised Surface Fabrics*:

56

A6.6.2.1 Specimens are acceptable if:

1. All specimens either did not ignite, ignited but selfextinguished, or any combination thereof.

2. Average burn time is 4 s or greater.

3. Average burn time is less than 4 s and all specimens burn with a surface flash where the intensity of the surface flame is insufficient to ignite, char, or melt the base fabric.

4. Only 1 of 5 specimens ignites and burns in less than 4 s and the base fabric does not ignite or fuse, the sample is acceptable.

5. Only 1 of 5 specimens ignites or burns in more than 4 s, regardless of whether the base fabric ignites or fuses, the sample is acceptable.

A6.6.2.2 To compute the average time of flame spread for each set of 5 specimens, at least 2 of the specimens must ignite and burn the stop cord.

A6.6.2.3 If only 1 of 5 specimens ignites and burns in less than 4 s where the base fabric ignites or fuses, test another set of 5 specimens. Compute the average time of flame spread for all 10 specimens. If 2 or more of the 10 specimens ignite and burn the stop cord, average the results from those specimens. If only 1 of the 10 specimens ignites and burns the stop cord, samples are acceptable.

## A7. COMPOSITING PROCEDURE FOR TOTAL HEAVY METAL ANALYSIS

### A7.1 Purpose

A7.1.1 Composite testing for a total digestion analysis may be conducted to potentially reduce the number of tests conducted. Combining different but like materials into a composite analysis must be done with adequate care and understanding of the limitations and potential propagations of error in measurement or the test may fail to detect excessive metals in one of the individual materials.

### A7.2 Definitions

A7.2.1 *Composite Testing – Different Materials*— Combining different but similar materials to reduce the number of digestions and instrumental metal analyses performed.

A7.2.2 *Similar or Like Materials*— Materials that have similar characteristics

may be combined into one composite sample. Glass may be composited together; and plastics composited together; however glass and plastic may not be composited together as they require different digestant mixtures to achieve complete digestion. Coatings on metal substrates should not be composited with coatings on non-metal substrates.

## A7.3 Exclusions

A7.3.1 Metal substrates with different compositions should not be composited together as one may interfere in the digestion process and cause re-precipitation or incomplete digestion, therefore affecting the actual result.

## A7.4 Sample Preparation

A7.4.1 Each individual component must be weighed individually with sufficient precision and sufficient safety factors to assure that no false negatives are reported.

A7.4.2 Sufficient materials must be used for each of the components giving proper consideration for the weighing capabilities of the balance used and the detection limits and necessary dilution for the subsequent instrumental analysis.

A7.4.3 The combined materials are digested according to the appropriate procedure, depending on the material, before analysis by atomic spectroscopy or other appropriate validated method.

A7.4.4 Appropriate weights of each of the individual materials composited depend on final dilution volumes, weighing accuracy, and detection limits.

57

A7.4.5 Equal weights (to the extent achievable by good laboratory practice) of each of the similar or like materials must be used in the composite sample.

## A7.5 Calculation

A7.5.1 As an example, results for the Arsenic (As) content are calculated and reported as follows:

$$\text{Total As concentration: \%As (wt./wt.)} = 0.10 \, cd/w \qquad (A7.1)$$

where:

$c$ = concentration of arsenic detected (µg/ml)

$d$ = dilution volume (mL)

$w$ = weight of aliquot digested (mg)

A7.5.1.1 One example of composite testing of different plastics would be as follows, and considers the case of weighing to the nearest 0.01 mg, digesting in acid, diluting to a final volume of 10 or 20 mL, and testing on an ICP-OES with an MDL of 0.04 µg/mL. A sample comprising red, green, and orange plastics is tested as a composite using 15.0 mg of red plastic, 16.0 mg of green plastic, and 17.0 mg of orange plastic. The resulting 48.0 mg of composite plastic from this example is digested in acid and diluted to 10 ml, and then the diluted digest is found to contain 0.0008 % arsenic. The combined 3 aliquots of plastic would have contributed to a total of 0.40 µg of arsenic for the composite sample. Although the average concentration in this case would be 8 ppm, the individual contributions are not known, and one must calculate the arsenic concentration of each plastic as if all of the arsenic originated from it. Thus, the red plastic could contain up to 0.4 µg / 0.0015 g = 27 ppm (µg/g), with similarly calculated results of 25 ppm and 24 ppm for the green and orange plastics. See Table A7.1.

A7.5.2 As another similar example, results for the arsenic (As) content are calculated and reported in Table A7.2. All of individual plastics (11 ppm, 11 ppm, 12 ppm) in the above composite do not exceed 0.0020 % (20 ppm) for arsenic (80 % of 0.0025 % arsenic limit). The composite passes and so do the individual plastics. Therefore the plastics do not need to be tested individually.

A7.5.3 Composite analysis by ICP-MS or another validated method of equivalent sensitivity or the use of a larger sample weight may be necessary when an element has a low regulatory limit and high detection limit (reporting limit), such as with arsenic.

## A7.6 Rationale

A7.6.1 Composite heavy element testing of several samples of slightly differing but essentially similar materials (for example, several colors of polyethylene plastic) is desirable to reduce testing cost if this can be accomplished without compromising in any way the achievement of the same attribute (that is, pass/fail) result which would have been reached had the samples been tested individually. Annex A7 outlines detailed procedures for accomplishing this end by specifying the conditions under which compositing is allowable, when a composite result may be relied upon without further testing, and when testing of individual samples must subsequently be performed. Composite testing has been limited to total digestion (vis-a-vis soluble) analyses primarily in order to align with the European Union

harmonized standard <u>EN 71-3</u>, which specifically forbids compositing for its required (soluble) analyses.

**TABLE A7.1 Total Arsenic (As) Analysis – Composite Testing**

| Item | (c) Analytical Results As (µg/ml) | (d) Dilution Volume (ml) | Total As (µg) | (w) Sample wt (mg) | Potential As (%) per Component | As (%) Composite |
|---|---|---|---|---|---|---|
| Red Plastic | 0.04A | 10 | 0.4A | 15.0 | 0.0027 | |
| Green Plastic | 0.04A | 10 | 0.4A | 16.0 | 0.0025 | |
| Orange Plastic | 0.04A | 10 | 0.4A | 17.0 | 0.0024 | |
| Total Composite | 0.04A | 10 | 0.4A | 48.0 | | 0.0008B |

[A] In a composite of different plastics, the analytical result for the total composite would be applied to each component part as if all the arsenic was in that component plastic.

[B] In this example, the arsenic concentration of the combined plastics is 0.0008 %, which is below the 0.002 % arsenic acceptable limit (80 % of the 0.0025 % arsenic limit), however any individual component having a result based on it's sample weight that is greater than 80 % of the heavy metal limit should be retested individually. For example, all of individual plastics in the above composite exceed 0.0020 % for arsenic (80 % of 0.0025 % arsenic limit) so all of the plastics should be tested individually. This calculation and data interpretation would be applied to the remaining heavy metals.

**58**

## A8. RATIONALE FOR 2007 REVISIONS

### A8.1 Definitions[17]

> [17] This rationale pertains only to those changes made in the 2007 edition of Consumer Safety Specification F963. Rationales for previous editions may be obtained from ASTM International Headquarters by requesting Research Report RR:F15-1000.

A8.1.1 *Section 3*— New definitions for terms used in this version of Consumer Safety Specification F963:

- hazardous magnet

- hazardous magnetic component

- impulsive sound

- maximum A-weighted sound pressure level

- rattle

- reference

- strap

- tangle or form a loop

- yo-yo elastic tether toy

## A8.2 Sound Producing Toys

A8.2.1 *Sections 4.5 and 8.19*— These sections have been totally replace by a new set of requirements and a new test procedure.

A8.2.1.1 These requirements have been developed after extensive review of known research on noise-related injury to hearing and existing published recommendations for noise limits. They are intended to reduce the risk of damage to hearing due to high continuous and impulse noise levels. They apply only to toys that are designed to emit sound, i.e., toys that have sound producing features such as electric or electronic devices, percussion caps, rattling components, etc.

A8.2.1.2 The requirements in 4.5.1.1 and 4.5.1.2 are intended to address those hazards presented by continuous sounds (e.g., speech, music). These hazards are chronic and typically manifest themselves after years of exposure. The Occupational Safety and Health Administration (OSHA) has set acceptable limits at 85 dB(A) for 8 h of exposure. An independent audiologist consulted by the ASTM work group recommended a similar exposure level. His recommendations for an 8 h exposure level, Leq, 8h, were 85 dB(A) for continuous sound, and 82 dB(A) for the continuous sound emitted from toys that produce both continuous and impulsive sound.

A8.2.1.3 Exposure to noise from toys is intermittent and integrated with other daily noises. It is unlikely that a toy would present 8 h continuous exposure to sound. These assumptions are consistent with the findings of European research conducted by ISVR Consultancy Services in Southampton U.K. and published as "Noise from Toys and its Effect on Hearing." Based on that study, the probable duration of play with a sound producing toy was determined by the ISVR to be 1.5 h per day.

A8.2.1.4 Using the recommended exposure levels from the audiologist, the

ISVR study's conclusion on the duration of play, and a 3 dB exchange rate, the equivalent recommended values are 92.3 dB(A) and 89.3 dB(A), respectively. Rounding each value to the nearest 5 dB(A) yields 90 dB(A) for both. The ISVR study referenced above also concluded that 25 cm was an average use distance for toys. However, a 50 cm distance is superior for measurement purposes. Therefore, the 25 cm, 90 dB(A) requirement was converted to its 50 cm equivalent. The 50 cm free-field equivalent of 90 dB(A) at 25 cm is 84 dB(A). This was rounded to 85 dB(A) to arrive at the final requirement.

A8.2.1.5 The ISVR study uses a distance for close-to-theear toys of 2.5 cm. Using the same reasoning applied above, the 50 cm free-field equivalent of 2.5 cm, 90 dB(A) is 64 dB(A). This was rounded to 65 dB(A) to arrive at the final close-to-the-ear-toy requirement.

A8.2.1.6 The requirements in 4.5.1.3-4.5.1.5 are intended to address those hazards presented by impulsive sounds (e.g., percussion caps), which can be especially hazardous. Permanent damage to hearing may occur after only one exposure to high impulsive sound levels.

A8.2.1.7 A technically accurate impulsive sound requirement would involve a combination of decibel levels and number of repetitions per day of the sound and also determining the potential for misuse (actuating close to the ear). This alternative would result in some subjective determinations regarding repetitions/day and the likelihood for actuating close to the ear. Therefore, a conservative approach was adopted that limits impulsive sounds to 120 dB (C-weighted peak). This requirement protects against misuse and allows up to 10 000 repetitions per day according to OHSA guidelines. The 50 cm free-field equivalent of 25 cm, 120 dB(C) is 114 dB(C). This was rounded to 115 dB(C) to arrive at the final requirement. This requirement only applies to impulsive sounds created by non-explosive means (e.g., two masses colliding).

A8.2.1.8 Impulsive sound level requirements for toys that produce sound from explosion (e.g., caps) have been treated separately. A higher decibel level (125 dB(C)) is allowed for these types of toys because of the human ear's inability to respond to waveforms with such rapid rise-times such as these.

**TABLE A7.2 Total Arsenic (As) Analysis – Composite Testing**

| Item | (c) Analytical Results As (µg/ml) | (d) Dilution Volume (ml) | Total As (µg) | (w) Sample wt (mg) | Potential As (%) per Component | As (%) Composite |
|------|-----------------------------------|--------------------------|---------------|--------------------|--------------------------------|------------------|
| Red Plastic | 0.04 | 20 | 0.8 | 72.0 | 0.0011 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Green Plastic | 0.04 | 20 | 0.8 | 70.0 | 0.0011 | |
| Orange Plastic | 0.04 | 20 | 0.8 | 66.0 | 0.0012 | |
| Total Composite | 0.04 | 20 | 0.8 | 208.0 | | 0.0004 |

**59**

## A8.3 Yo Yo Elastic Tether Toys

A8.3.1 *Sections 4.37 and 8.23—* The task group concluded that the mass on the end of the tether was significant in creating the strangulation potential of a yo yo elastic tether toy. That is why these yo yo products have been associated with near strangulations, and similar products with little mass on the end such as a "sticky" hand have no similar data. The mass was determined by weighing product known to be associated with wrapping around neck. Yo yo elastic tether samples evaluated weighed 0.1 kg (0.2 lb), 0.07 kg (.15 lb), and 0.07 kg (0 .15 lb). Estimated weight of sticky hand (hand portion only) is 0.0045 kg (0.01 lb). The appropriate value for the mass at the end of the tether was chosen to be between these two values, 0.02 kg (0.04 lb).

A8.3.1.1 The cord length is based on two times the neck circumference of a 5th-percentile 3-year-old from Childata, or 2     24.0 cm = 48 cm (18.9 in.). The age of 3 years was chosen based on the age of children involved in the incident data.

A8.3.1.2 The rotational speed of 80 RPM was determined by testing adults and determining the maximum RPM they can achieve rotating a product above their heads. The range of adult speed was 80 – 108 RPM, the average was 90 RPM and the standard deviation was 7 based on a sample size of 14. This was reduced to 80 RPM as an estimate for the speed children 3 to 6 years old can achieve. The incident data indicated that children 3 to 6 years old are most often involved in yo yo elastic tether incidents.

## A8.4 Magnets in Toys

A8.4.1 *Section 4.38—* These requirements address the recent incidents of magnet ingestion resulting in serious injury or death by identifying magnets or magnetic components that can be readily swallowed. It requires these hazardous magnets and hazardous magnetic components to be reliably contained in a product, or carry a warning. Hazardous magnets and hazardous magnetic components are identified by describing both a magnetic strength of concern, along with a size and shape that can be swallowed.

A8.4.1.1 The following areas were considered:

a. Data indicate that powerful magnets have been involved in all known ingestion incidents to date. The data also suggest that magnet ingestion was not a problem in toys until powerful magnets (such as NIB magnets) became cost effective and commonplace several years ago. Ceramic, rubberized, and ferrite magnets have substantially lower attractive forces and therefore must be made larger to provide sufficient magnetism, which makes them less likely to be swallowed.

b. The magnets/magnetic components involved in the ingestion incidents were small objects (see 4.6 and Fig. 3). Therefore, the requirements have indicated that hazardous magnets or hazardous magnetic components must not be small objects.

c. The exemptions represent magnets which are used in applications that are not obvious to the consumer. These are very common magnet uses and there are no data associated with these magnets.

d. Products intended for children under three are already subject to the small parts requirement which would include these magnets or magnetic components.

A8.4.2 *Section 5.17*— The warning specifically explains the hazard as "sticking across intestines." Studies of warnings show that when the audience can "picture it," even when there is no picture, then compliance with the warning increases. In the final analysis, the "intestines" statement makes this warning more effective than it would be without it.

A8.4.3 *Section 8.24*— If the play pattern of the toy includes repeated attaching and detaching of the magnet(s), the magnet(s) shall be subjected to repeated attachment and detachment that is expected over the life of the toy. Furthermore, if it is likely that other components included in the toy can attach to the magnet(s), then the magnet(s) and the other components shall be dropped/impacted together during use/abuse testing.

## A8.5 Hemispheric Shaped Objects

A8.5.1 *Section 4.36*— Data analysis of the "cupped" shaped objects involved in the fatal and non-fatal incidents, indicated that the wall thickness of the objects involved in the incidents ranged from approximately 0.04 in. (1 mm) to 0.12 in. (3 mm). Based on this data, it was believed that wall thickness was not a concern. It is also important to note that, wall thickness is not a relevant factor for objects with diameters at the upper end of the requirements as these sized objects may fit around/under the chin.

A8.5.1.1 However, since publication of this requirement, questions have been raised in the United States and Europe regarding objects with "thick" walls or rims—what is the appropriate measurement for these objects, inner or outer diameter? The work group has discussed the intent of the requirement and has concluded that the inner diameter measurement is the critical element in determining whether or not a "cupped" shaped object has the potential to fit a child's face and create a vacuum. Therefore, a change from outer diameter to inner diameter is recommended.

A8.5.2 *Section 4.36.6(e)*— The new option for a single large opening in the base includes the area that is defined by the original two small opening minimum dimensions (0.080 in./2 mm) and the minimum space in between these openings (0.5 in./13 mm). The 0.66 in./17 mm dimension is calculated as 0.080/2 mm + 0.080/2 mm + 0.5/13 mm. This approach is consistent with the option for ventilation in 4.16.1.1. Similarly, placement of this opening at least 0.5 in. (13 mm) from the rim of the object should ensure that facial features such as the nose or chin, or flesh, will not completely block the opening.

## A8.6 Miscellaneous Technical Issues

A8.6.1 *Section 4.12*— The purpose of this section is to minimize the potential of asphyxiation hazards that may be caused by thin packaging film, including sheets and bags. Plastic sheeting/bags may adhere to a child's mouth and nose making it impossible to breathe. Since the most frequent pattern of death is the covering of the face, the exemption is based on the size of the face and not whether the plastic is a bag or a sheet. CPSC anthropometry data for the face of a 4 to 6-month-old indicates a minimum head height of 125 mm (4.9 in.) and minimum face width of 85 mm (3.3 in.). This is the basis for the exemption, which is a minor dimension of <3.9 in. (100 mm). Plastic sheets or bags with a minor dimension less than 3.9 in. (100 mm) will not entirely cover the face of a 4 to 6-month-old infant.

A8.6.1.1 Both ISO 8124 and EN 71 allow for perforations of the sheeting if it does not meet the thickness requirements. There is no injury data from the EU to indicate that perforated film presents a hazard. The 1 % area for perforations is considered to be sufficient to sustain an air flow and prevent the adhering of the film to the face.

## A8.6.2 *Section 4.14*:

A8.6.2.1 *Section 3.1.75*— Definition of strap added to clarify and expound test method verbiage in 4.14. Children under the age of 18 months have

developed certain gross motor skills (e.g., can grasp and pick up objects). However, they lack fine motor skills such as those required to insert the end of cords/straps/elastics though a small opening or to wrap a cord/elastic multiple times around a wheel.

A8.6.2.2 *Section 4.14.1.1*— Details requirements for breakaway features on cords, straps, and elastics.

A8.6.2.3 *Section 4.14.2*— Clarifies scope of test method by adding "strap" as an additional type of cord/elastic covered by the requirement.

A8.6.2.4 *Section 8.22.2*— This section provides an additional testing method and supplemental diagrams (with details for additional equipment) that should be used for materials that have a loop perimeter smaller than the tapered end of the head probe.

A8.6.2.5 *Section 8.22.3*— Details testing method for determining the release force required for breakaway features on cords, straps, and elastics.

## A8.7 Miscellaneous Editorial Changes

A8.7.1 *Section 4.6*— The word "choking" has been added to the test to be consistent with the language of 16 CFR 1501.

A8.7.2 *Section 4.15.6*— This section references the dynamic strength test in 8.20. This reference had been omitted in the previous version of Consumer Safety Specification F963.

A8.7.3 *Section 4.17*— Reference to the wrong definition has been corrected to 3.1.60.

A8.7.4 *Section 4.25*— Abuse testing in 8.6-8.10 of the standard is not applied to toys intended for children over 96 months (this is laid out in Table 5). Therefore, it is redundant and unnecessary to break down the age group in this way in the requirement section.

A8.7.4.1 *Section 4.25.10.6(2)*— Corrected reference to test procedure to 8.18.7.

A8.7.5 *Section 8.6*— Explicitly states the age requirements as they pertain to abuse testing (for clarification). Also, the word "test" has been corrected to "toy" in the third sentence.

A8.7.6 *Section 8.18.6.1*— The text has been changed to correct errors in the

procedure contained in the previous version of this section.

# A9. RATIONALE FOR 2008 REVISIONS

## A9.1 Jaw Entrapment

A9.1.1 *Section 4.39*— There have been product recalls in past years to address incidents of jaw entrapment. There have been additional incidents of jaw entrapment in toy products that did not rise to the level of a recall. All but one incident involved entrapment in a handle or steering wheel. When a child's jaw becomes entrapped in a product, there is potential for damage to teeth and gums, long term orthodontic consequences and impairment of normal speech development. Most cases of jaw entrapment involve children less than 18 months of age. (See Fig. A9.1 and Table A9.1, and Table A9.2.) There is no incident data indicating handles that are connected to the toy with a hinge and handles made from a pliable material (for example, straps and ropes) pose a risk of jaw entrapment.

Figure A9.1. Facial Measurements (Figure 1) A man's face is shown from the side profile. Distances A, H, G, F, E, and R are marked. A is from eyebrow to back of head. E is nasion to base of nose. R is the depth of the nose. F is nasion to samion. G is nasion to depression in chin. H is nasion to bottom of chin. A H G F E R

Figure 1 (of A9.1). Locations of head and face measurements established by anatomical landmarks (side view).

Figure A9.1b. Facial Measurements (Figure 2) Distances B, I, J, K, L, M, N, D, and C are shown on this front view of a male head.B is the length across of the head (not counting ears). I is from the inner points of each eye. J and K are unmarked but are points on each side of the nose. L is the length across from the nose and is longer than J and K. M is the normal lip length, N is the extended lip length. D is not labelled but appears to be the length from the outside of each eye. C is the distance from the edge of the face where the ear is across to the other inner part of the ear. D C B I J K L M N

Figure 1 (of A9.1). Locations of head and face measurements established by anatomical landmarks (front view).

*NOTE —*
F. Nasion-Stomion Distance: The distance between the nasal root depression and the point of upper and lower lip intersection.
H: Nasion-Menton: This measurement, taken from the nasal root depression to the lower point on the chin, defines total face height.
M: Lip length, normal: A bilateral measurement (bichelion diameter) of distance between the external corners of the mouth. This measurement

is taken with all facial muscles relaxed.

N: Lip length, extended: A bilateral measurement (bichelion diameter) of maximum distance between the corners of the mouth in a condition of voluntary extension using muscles of facial expression.

<strong style="color:#a00">FIG. A9.1 Facial Measurements</strong>

A9.1.2 *Anthropometric Data*— The April 1966 study titled "Selected Facial Measurements of Children for Oxygen-Mask Design"[18] provides very useful anthropometric data.

> [18] Young, J. W., "Selected facial measurements of children for oxygen-mask design," AM 66-9, AM Rep., 1966, Apr: 1-11.

A9.1.2.1 To provide protection for children up to the age of 18 months:

*Width*—Using the maximum estimated stomion-menton dimension and rounding up, indicates the gauge should be 3.8 cm (1.5 inches) in width.

*Length*—The 95th percentile mouth breadth for 2 to 3.5 year olds (the youngest age available) is 3.8 cm (1.5 inches) from Childata (see Table A9.3 and Table A9.4). One inch was added resulting in the 2.5 inch length. A safety factor of 2.54 cm (1 inch) was used for mouth breath since the anthropometric data is based on a mouth at rest, and a mouth can be expected to stretch significantly from this position. Alternately, the lip length dimensions above can be used to arrive at the same estimate, rounding up, of 6.35 cm (2.5 inches).

A9.1.2.2 To provide protection against the youngest user becoming entrapped:

*Width*—A gauge width of 1.9 cm (0.75 inches) was chosen based on the minimum stomion menton distance for a 1 month old.

*Length*—The small jaw breadth of 1.9 cm (0.75 inches) is based on the 5th percentile 2 year old mouth breadth which is 2.54 cm (1.0 inch), so to be conservative 75 % of that was used.

A9.1.2.3 The task group considered adding a requirement as suggested at the meeting that the scope only cover handles and steering wheels that are able to be placed in the mouth, or would be teethable. The task group considered this suggestion and determined that this modification would not be made since incident data demonstrated that some products created jaw entrapment without the need for the child to place the product in his/her mouth (for example, the child's jaw was entrapped without the need for the

child to introduce the handle end of the push toy into the mouth).

**61**

### TABLE A9.1 Facial Measurements (in Inches)

| Age | # children[A] | Mean Nasion-menton distance[B] | Range Nasion-menton distance | Mean Nasion-stomion istance[C] | Range Nasion-stomion distance | Estimated mean stomion-menton distance | Estimated minimum stomion-menton distance | Estimated maximum stomion-menton distance |
|---|---|---|---|---|---|---|---|---|
| 1 mo | 20 | 2.36 | 2.28-2.72 | 1.58 | 1.46-1.69 | 0.78 | 0.82 | 1.03 |
| 6 mo | 20 | 2.77 | 2.56-2.95 | 1.61 | 1.54-1.73 | 1.16 | 1.02 | 1.22 |
| 1 yr | 20 | 2.85 | 2.68-3.03 | 1.76 | 1.69-2.13 | 1.09 | 0.99 | 0.90 |
| 2 yr | 20 | 3.14 | 3.03-3.27 | 1.98 | 1.81-2.17 | 1.16 | 1.22 | 1.10 |
| 3 yr | 20 | 3.37 | 3.15-3.66 | 2.05 | 1.89-2.20 | 1.32 | 1.26 | 1.46 |
| 4 yr | 20 | 3.41 | 3.19-3.58 | 2.08 | 1.57-2.20 | 1.33 | 1.62 | 1.38 |
| 5 yr | 31 | 3.49 | 3.23-3.78 | 2.16 | 2.05-2.40 | 1.33 | 1.18 | 1.38 |
| 6 yr | 91 | 3.6 | 3.11-3.98 | 2.23 | 2.01-2.56 | 1.37 | 1.10 | 1.42 |

[A] Per the author, sex distribution was reasonably constant across age groups; no sex distinction was made in groups 1 month through 4 years.

[B] From nasal root depression to the lower point on the chin (a measure of face height).

[C] From nasal root depression to the intersection of the lips.

**62**

A9.1.2.4 The task group considered adding simulated teeth to the gauge. The task group concluded that the addition of teeth was not advisable because the incidents being addressed involved entrapment of the child's jaw. The teeth of the child may have influenced the resulting entrapment, however, the proposed requirement accounts for the presence of the teeth. Also, for a very young child the dimensions of the teeth are variable, since the teeth are just erupting.

A9.1.2.5 The task group added a depth of greater than 1.3 cm (½ inch) to both gauges to clarify that this is a three dimensional test. The depth of 1.3 cm (½ inch) was chosen based on dimensions of products known to be associated with jaw entrapment and the need for only a small portion of the child's jaw to be introduced into the space of the incident products.

### TABLE A9.2 Lip Length, in Inches

| Age | # children[A] | Lip Length, Normal | | Lip Length, Extended, extrapolated base on percentage increase in lip length for older children, or 50 % increase over largest normal lip length |
|---|---|---|---|---|
| | | Mean | Range | Maximum |
| 1 mo | 20 | 1.08 | 0.98-1.26 | 1.89 |

| Age | | | | | |
|---|---|---|---|---|---|
| 6 mo | 20 | 1.09 | 0.95-1.34 | 2.01 | |
| 1 yr | 20 | 1.28 | 1.14-1.5 | 2.25 | |
| 2 yr | 20 | 1.18 | 0.98-1.5 | 2.25 | |
| 3 yr | 20 | 1.38 | 1.22-1.57 | 2.35 | |
| 4 yr | 20 | 1.49 | 1.26-1.69 | 2.54 | |

[A] Per the author, sex distribution was reasonably constant across age groups; no sex distinction was made in groups 1 month through 4 years.

TABLE A9.3 Mouth Breadth[A]

| Age | Sex | N | Mean (cm) | Sd | 5th%ile cm (inch) | 95th%ile cm (inch) |
|---|---|---|---|---|---|---|
| 2-3.5 | Mf | 75 | 3.30 | .40 | 2.70 (1.0) | 3.80 (1.5) |
| 3.5-4.5 | | 71 | 3.40 | .40 | 2.80 (1.1) | 3.90 (1.5) |

[A] From Appendix B, Childata, The Handbook of Child Measurements and Capabilities Data for Design Safety Department of Trade and Industry.

TABLE A9.4 Mouth Opening[A]

| Age | Sex | N | Mean (mm) | Sd | Min | max |
|---|---|---|---|---|---|---|
| 3 | M | 49 | 36.0 | 5.39 | 22 | 47 |
| 4 | M | 67 | 37.3 | 5.47 | 22 | 52 |
| 5 | M | 56 | 39.9 | 4.02 | 27 | 47 |

[A] From Appendix B, Childata, The Handbook of Child Measurements and Capabilities Data for Design Safety Department of Trade and Industry.

## A9.2 Folding Mechanisms and Hinges

A9.2.1 *Section 4.13*— The scope of this section has been modified such that the requirement is not limited to toys intended to support the weight of a child. Hinges can present potential pinch hazards regardless of whether the toy is intended to support the weight of a child. Examples and exclusions were reinstated from the previous version of this standard.

## A9.3 Locking Mechanisms

A9.3.1 *Sections 8.25.1 and 8.25.2*— The requirements for single- or double-action locking mechanisms are based on Consumer Safety Specification F406. This requirement is intended to ensure that children will not be able to unlock a locking device on their own—a caregiver will be required to unlock

the locking device. The requirement for a 45-lbf test on the locking mechanism is based on Consumer Safety Specification F404. An exemption for the 45-lbf test was added for products where the direction of the sitting load works against the direction of collapse of the folding mechanism. The requirement has also been modified to require that locking mechanisms or other means engage automatically to protect children who set up the product on their own. Reference to safety stops has been deleted because safety stop was not defined.

## A9.4 Yo Yo Elastic Tether Toys

A9.4.1 *Section 4.37.2*— Sports balls are exempt from the Yo Yo Ball requirements, since these requirements were not intended to address this type of product. The work group agreed it will clarify the standard if we specifically exempt them.

## A9.5 Impaction Hazards

**A9.5.1** *Section 4.32.2:*

A9.5.1.1 This section has been developed to address products intended for children under 48 months of age that meet specific dimension criteria such that they produce a fall-on impaction hazard. This revision is based on incident data provided by the CPSC involving objects that are long enough to be pushed into the mouth, probably past the uvula in a fall-on incident, and large enough to prevent or inhibit removal, even by an adult caregiver. Products less than 2.25 in. (the length of the small parts cylinder) in length are excluded as are products less than 15 mm in diameter. These exemptions are based on the dimensions of products in the incident data. Flexible items are exempt because the flexible end assures they will not create a fall-on impaction hazard.

A9.5.1.2 The impaction hazard addressed by 4.32.2 is different from the hazard associated with preschool play figures addressed in 4.32.3. The preschool play figures were associated with seven deaths by choking and one incident resulting in serious injury. The incidents involved children under the age of 2 with one exception which involved a developmentally delayed child. In addition there were other choking incidents with the preschool play figures that did not result in significant injury.

A9.5.1.3 The distance to the undercut is based on the dimensions of the small ball test fixture.

A9.5.1.4 The age grade of the product associated with the 2 most recent fatalities was 3+, so this requirement applies to products intended for children under 48 months of age to address the known incident data (ages of victims: 7 mo., 9 mo., 13 mo., 13 mo., 19 mo., 22 mo., 2 yr., 2 yr., 4 yr with severe developmental delay).

A9.5.1.5 There is no force associated with this test because the test is not intended to simulate an actual impaction incident. Rather, it is designed to identify the size and shape of products associated with these incidents.

A9.5.1.6 The supplemental gauge is used to identify the size and shape of objects associated with incident data and is not related to the size of the child for these incidents. Similarly, the 1.1 lb exemption is related to the weight of objects associated with this type of hazard, not the strength capabilities of children.

**A9.6 Sound Producing Toys**

A9.6.1 *Section 4.5.1.2*— This section contains acoustic requirements that are being interpreted by some laboratories is such a way to fail safe push/pull toys. The requirement needs to be changed for the following reasons:

1.  The standard states in 4.5 that the requirements apply to "toys that are designed to produce sound." Further to this, the intent of the section is to apply the sound pressure level requirements to those features of the toy designed to produce sound. During the pass-by test for push/pull toys, the contact between the wheels of the product and the test surface will produce a continuous sound that will significantly contribute to the overall sound pressure measurement. The tester will be unable to distinguish between the contributions to the overall sound level made by the wheels versus those made by the mechanism designed to produce sound. Therefore, a true measurement of the intended continuous sound producing mechanism cannot be achieved by the methodology given in the standard.

2.  Among other factors, the levels in the standard are based a use distance of 25 cm (do not confuse this with the measurement distances specified in the standard). The distance from the noise producing mechanism to the ear of the child on the push/pull toys discussed here would be much greater than 25 cm. Because the relationship between sound pressure level and distance follows the inverse square law, an increase in the distance from the sound mechanism to the ear of the child would reduce the sound pressure

**63**

level at the ear of the child dramatically. The risk of hearing loss would be reduced to such an extent as to make it insignificant.

3. It is implausible that a child could sustain the maximum speed at which the push/pull toy is tested (2 m/s). The speed represents a "worst-case" condition that would only be achievable momentarily at best. This supports regulating against immediate, acute hazards such as impulsive sounds versus chronic hazards that are presented by exposure to long-term, excessively loud continuous sounds.

A9.6.2 In addition, the proposed change would further harmonization between this standard and the European toy standard EN 71-1.

## A9.7 Magnets

A9.7.1 *Sections 4.38, 5.17, and 8.24—* These sections were revised to account for the incidents (ingestions) due to magnetic components that were small parts and to reflect the age of the children involved with the incidents. It also introduces the special use and abuse requirements to avoid magnets from detaching from magnetic components during play.

## A9.8 Toy Chests

A9.8.1 *Deletion of Sections 4.27, 6.2, 7.2, and 8.14—* Toy chests are considered as children's furniture and have their own set of safety requirements that are already covered in Consumer Safety Specification F834.

NOTE A9.1—   The section numbers above refer to the previous version of the standard; the subsequent sections have been renumbered in the current version.

# A10. RATIONALE FOR 2011 REVISIONS

## A10.1 Certain Toys with Nearly Spherical Ends

## A10.1.1 *Section 4.32:*

A10.1.1.1 The requirements of 4.32.2 do not apply to tethered components as specified in the exclusions because it is highly unlikely a child will have an impaction injury associated with such a tethered component given the weight of the product and the length of the tether. Also, there is no incident data associated with the tethered components being excluded.

A10.1.1.2 Following are examples provided and suggested interpretation as to whether these shapes fall within the scope of 4.32.2 of Consumer Safety Specification F963. These interpretations assume that the dimensions of the part and age grade of the product are such that it falls within the scope of 4.32.2.

**64**

Figure p65a. Domed Pegs This is a photograph of domed pegs, some in a pile and some in a peg board.

**Requirements of 4.32.2 apply to this domed peg, even if the very center of the head is flat or has a through hole.**

Figure p65b. Drum This is a photograph of a a mallet is hitting a drum.

**Requirements of 4.32.2 do not apply to this mallet since it is not a nail, screw, peg, or bolt.**

Figure p65c. A peg. A photograph of a peg with a domed cap.

**The requirements of 4.32.2 do apply to this item because the end is domed.**

Figure p65d Three photographs of plastic screws. One is apparently a torx, one has a slotted end, the third is perhaps a Phillips.

**Requirements of 4.32.2 do not apply to these toy fasteners because the end is not spherical, hemispherical or domed. The end is flat across the top.**

**65**

Figure p66 This is a diagram of two toy bolts with domed caps.

**The requirements of 4.32.2 do apply. These are toy bolts with domed tops.**

## A10.2 Test for Stability of Ride-On Toys or Toy Seats

A10.2.1 *Subsection 8.15.4*— To distinguish between the load placement for fore and aft stability and sideways stability. With the current test methodology, some laboratories and auditors have mistakenly taken the requirements in this subsection to mean both fore and aft stability and also sideways stability. Subsection 8.15.4 states, "The center of gravity of the load for all ride-ons shall be secured both 1.7 in. (43 mm) rearward of the front-most portion of the designated seating area and 1.7 in. (43 mm) forward of the rearmost portion of the designated seating area (note: two separate tests). If there is no designated seating area, the load shall be placed at the least favorable position that it is reasonable to anticipate that the child will choose to sit."

A10.2.1.1 As you can see, 8.15.4 only addresses fore and aft stability. Additional rationale can be found in the original test methods from the

Voluntary Product Standard PS 72-76. In Section 4.15.1.1 (d) it states, "The load shall be applied so that its center of gravity lies in a true vertical 6 inches above the center of the seat." In Section 4.15.2 it states, "The load shall be applied in the least favorable position on the seat for each direction."

## A10.3 Abuse Testing

A10.3.1 *Table 5*— Table 5 is specifically written to address the drop test, which is a subsection of impact testing. Table 5 is written to address the drop test. This is a technical correction to the table.

## A10.4 Test for Overload of Ride-On Toys and Toy Seats

A10.4.1 *Section 8.26*— There is no test method currently specified for overload therefore this test method is being proposed and it is consistent with the way independent test labs have been performing the test.

## A10.5 Stability and Over-Load Requirements

A10.5.1 *Section 4.15*— Wherever "seat" appears in this section, it has been changed to "toy seat" and a definition for toy seats has been developed. The issue is that furniture is exempt from Consumer Safety Specification F963, however, toys that are their counterparts are covered. It can be difficult to discern between a toy seat and a piece of children's furniture. Therefore, these changes are proposed to clarify that the scope of this standard only applies to toy counterparts of furniture and juvenile products.

## A10.6 Plastic Film

A10.6.1 *Section 4.12*— This section applies to "flexible plastic film bags and flexible plastic sheets used as packaging materials for shelf packages or used with toys." The title refers to packaging film but the requirement refers to plastic film used with toys. The wording was changed to clarify the scope of the requirement. Also deleted part of the test method section, which is already covered by the requirement section.

## A10.7 Teethers and Teething Toys, Rattles, and Squeeze Toys

A10.7.1 *Sections 4.22, 4.23, and 4.24*— The change to exempt soft-filled (stuffed) toys from the rattles, squeeze toys and teethers sections is being made to be consistent with exemptions found in: 16 CFR 1510, Rattles; EN-71, Clause 5.8, Shape and Size of Certain Toys; and with Consumer Safety Specification F963, Section 4.32, Certain Toys with Nearly Spherical Ends.

However, if a stuffed toy contains an internal rigid component (rigid is defined in Consumer Safety Specification F963 as material with a hardness >70 Shore A scale durometer) then the gauges would be applied. If the rigid internal component does not penetrate the full depth of the gauge(s), the toy would PASS. If the rigid internal component does penetrate the full depth of the gauge(s) the toy would FAIL if the major dimension of the rigid component is >1.2 in. (30 mm) or would PASS if the major dimension of the rigid component is <1.2 in. (30 mm). The rigid internal component requirements harmonize with the requirements of EN-71, Clause 5.8.

## A10.8 Jaw Entrapment in Handles and Steering Wheels

A10.8.1 *Section 4.39*— There have been product recalls in past years to address incidents of jaw entrapment. There have been additional incidents of jaw entrapment in toy products that did not rise to the level of a recall. All but one incident involved entrapment in a handle or steering wheel. When a child's jaw becomes entrapped in a product, there is potential for damage to teeth and gums, long term orthodontic consequences and impairment of normal speech development. Most cases of jaw entrapment involve children less than 18 months of age. (See Fig. A9.1, Table A9.1, and Table A9.2.) There is no incident data indicating handles that are connected to the toy with a hinge and handles made from a pliable material (for example, straps and ropes) pose a risk of jaw entrapment.

A10.8.2 *Anthropometric Data*— The April 1966 study titled "Selected Facial Measurements of Children for Oxygen-Mask Design"[18] provides very useful anthropometric data.

A10.8.2.1 To provide protection for children up to the age of 18 months:

*Width*—Using the maximum estimated stomion-menton dimension and rounding up, indicates the gauge should be 3.8 cm (1.5 in.) in width.

*Length*—The 95th percentile mouth breadth for 2 to 3.5 year olds (the youngest age available) is 3.8 cm (1.5 in.) from Childata (see Table A9.3 and Table A9.4). One inch was added resulting in the 2.5 in. length. A safety factor of 2.54 cm (1 in.) was used for mouth breath since the anthropometric data is based on a mouth at rest, and a mouth can be expected to stretch significantly from this position. Alternately, the lip length dimensions above can be used to arrive at the same estimate, rounding up, of 6.35 cm (2.5 in.).

A10.8.2.2 To provide protection against the youngest user becoming entrapped:

66

*Width*—A gauge width of 1.9 cm (0.75 in.) was chosen based on the minimum stomion menton distance for a 1 month old.

*Length*—The small jaw breadth of 1.9 cm (0.75 in.) is based on the 5th percentile 2 year old mouth breadth which is 2.54 cm (1.0 in.), so to be conservative 75 % of that was used.

A10.8.2.3 The task group considered adding a requirement as suggested at the meeting that the scope only cover handles and steering wheels that are able to be placed in the mouth, or would be teethable. The task group considered this suggestion and determined that this modification would not be made since incident data demonstrated that some products created jaw entrapment without the need for the child to place the product in his/her mouth (for example, the child's jaw was entrapped without the need for the child to introduce the handle end of the push toy into the mouth).

A10.8.2.4 The task group considered adding simulated teeth to the gauge. The task group concluded that the addition of teeth was not advisable because the incidents being addressed involved entrapment of the child's jaw. The teeth of the child may have influenced the resulting entrapment, however, the proposed requirement accounts for the presence of the teeth. Also, for a very young child the dimensions of the teeth are variable, since the teeth are just erupting.

A10.8.2.5 The requirement was modified to clarify the gauges must pass completely through the opening. The gauge depth was modified from the original requirement of greater than ½ in. to the present requirement of 1 in. When passing the gauge through the opening, a depth must be specified to assure the test results are consistent.

## A10.9 Strings and Lines for Flying Devices

A10.9.1 *Subsection 4.14.4*— EN 71-1 (Clause 4.13) and ISO 8124-1 (Clause 4.11.7) both use "resistance" instead of "resistivity." Resistance = resistivity length/area, therefore, this change is being made for consistency. Also, the units have been corrected to ohms per centimetre (V/cm).

## A10.10 Heavy Elements

### A10.10.1 *Subsections 4.3.5 and 8.3:*

A10.10.1.1 The soluble approach for determination of heavy elements in toys and toy components has been selected over total element limits as this has been demonstrated to be more closely correlated with the amount of

element which is bioavailable, and therefore with risk of toxicity.These requirements (and test methods) and this rationale have been based on requirements from European toy safety requirements found in EN 71-3 (and ISO 8124-3).

A10.10.1.2 The scope is intended to indicate an approach to the decision of what toys, or toy components are excluded from the standard because of characteristics that render them unlikely to present a risk of injury by the ingestion of materials containing the toxic elements.

A10.10.1.3 Toys and toy components that are accessible to the child during play are subject to these requirements unless otherwise indicated. Some materials such as metal, glass, and ceramic are exempted if they are not small parts.

A10.10.1.4 Unless included in a toy, modeling clays, which are covered in the EN 71-3 requirements for heavy metals are not covered in these heavy metals requirements because they are already exempt from Consumer Safety Specification F963 as indicated in 1.4 and subject to the federal requirements of LHAMA.

A10.10.1.5 The list of excluded materials is based on the regulatory exclusions provided by the U.S. Consumer Product Safety Commission (CPSC), specified at 16 CFR 1500.91, in implementation of the requirements for lead and lead paint under Section 101 of the Consumer Product Safety Improvement Act (CPSIA) of 2008. While EN 71-3 includes test methods for Paper and paperboard and Textiles (natural and synthetic), given the exemption for these products test methods for them have not been included here.

A10.10.1.6 Sections 8.3.2-8.3.6 provide a test procedure and manner of interpretation of results for solubility testing.

A10.10.1.7 As in EN 71, solubility testing is called for in the proposed ASTM standard. However, note that as described in 8.3.6, an alternative approach may be used if validated per specified requirements.

A10.10.1.8 Component parts and materials may be separately tested and certified.

**A10.11 Yo Yo Elastic Tether Toys**

A10.11.1 *Sections 4.37 and 8.23*— The task group concluded that the mass on the end of the tether was significant in creating the strangulation potential of a yo yo elastic tether toy. The risk of strangulation appears much lower for

67

products with very light ends compared to the yo-yo type balls as seen on the market in 2003 with end weights of 65 to 85 g (0.14 to 0.19 lb). The lightweight end results in very slow rotational speed when swung overhead and there is much less recoil capacity of the tether due to significantly lower loading during rotation. Additionally, the lightweight "sticky hand" variety of yo-yo elastic tether toy had market presence, prior to 2003, with no reports of near-miss strangulation or other similar incident. The mass was determined by weighing product known to be associated with wrapping around the neck incidents. Yo yo elastic tether toy samples evaluated weighed 0.10 kg (0.2 lb), 0.07 kg (0.15 lb), and 0.07 kg (0.15 lb). The weight of four "sticky hand" variety of yo-yo elastic tether toys (hand portion only) was 0.005 kg (0.01 lb) 0.008 kg (0.02 lb), 0.009 kg (0.02 lb) and 0.012 kg (0.03 lb). The appropriate value for the mass at the end of the tether was chosen to be between these values, 0.02 kg (0.04 lb).

A10.11.1.1 The cord length is based on two times the neck circumference of a 5th-percentile 3-year-old from Childata, or 2    24.0 cm = 48 cm (18.9 in.). The age of 36 months and over was chosen based on the age of children involved in the incident data.

A10.11.1.2 The rotational speed of 80 RPM was determined by testing adults and determining the maximum RPM they can achieve rotating a product above their heads. The range of adult speed was 80 – 108 RPM, the average was 90 RPM and the standard deviation was 7 based on a sample size of 14. This was reduced to 80 RPM as an estimate for the speed children 36 months and over but under 72 months of age can achieve. The incident data indicated that children 36 months and over but under 72 months of age are most often involved in yo yo elastic tether toy incidents.

A10.11.1.3 The use of a cam with a variable speed drill assists in spinning the toy in the air. Specification of a cam length is required in order to achieve consistent results across laboratories, given that the length affects the load on the tether during rotation. The objective was to employ as short a length as possible, but one that would facilitate clamping and rotation of the toy. A 3 cm (1.18 in.) cam length was identified as one that adequately met both objectives.

## A10.12 Miscellaneous

A10.12.1 *Sections 1.4 and 3*— For clarification, juvenile products, constant air inflatables, powered and no-powered scooters have been added to the list of products which are not covered by the toy standard. Definitions for juvenile products and constant air inflatables have been added to the terminology

section.

*ASTM International takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.*

*This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM International Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.*

*This standard is copyrighted by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax), or service@astm.org (e-mail); or through the ASTM website (www.astm.org). Permission rights to photocopy the standard may also be secured from the ASTM website (www.astm.org/COPYRIGHT/).*

68

# EXHIBIT 4
# (FILED UNDER SEAL)

# EXHIBIT 5

1        IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF COLUMBIA

3

4  AMERICAN SOCIETY FOR TESTING

5  AND MATERIALS d/b/a ASTM

6  INTERNATIONAL; NATIONAL FIRE

7  PROTECTION ASSOCIATION, INC.,;

8  and AMERICAN SOCIETY OF HEATING,

9  REFRIGERATING, AND AIR-CONDITIONING

10  ENGINEERS, INC.

11         Plaintiffs,   CIVIL ACTION FILE

12    vs.           NO. 1:13-CV-01215-EGS

13  PUBLIC.RESOURCE.ORG, INC.,

14        Defendant.

15

16      30(b)(6) VIDEOTAPED DEPOSITION OF

17          STEVEN COMSTOCK

18          March 5, 2015

19          10:20 a.m.

20        1075 Peachtree Street

21          Suite 3625

22       Atlanta, Georgia  30309

23     Lee Ann Barnes, CCR-1852, RPR, CRR

24

25  PAGES 1 - 199

Page 1

1   A.   Yeah, about 12 years ago I had one taken.
2   Q.   Is that the only deposition?
3   A.   That's the only one.
4   Q.   What kind of case did that involve?
5   A.   That was a personnel matter for our
6   organization.
7   Q.   Did you testify at trial?
8   A.   No, I did not.
9   Q.   Did you have a chance to meet with
10  Mr. Lewis or other counsel before this deposition to
11  prepare for the deposition?
12  A.   Yes, I did.
13  Q.   I'll ask you to look at Exhibit 1076 --
14      (Defendant's Exhibit 1076 was marked for
15      identification.)
16  Q.   (By Mr. Bridges)  -- which is Defendant's
17  Notice of 30(b)(6) deposition of ASHRAE.  Please take
18  a look at it, Mr. Comstock.
19      Do you understand that you are here today
20  testifying as a representative of ASHRAE on Topics 4,
21  5, 7, 8, 9, 10, 12, 13, 14, 18, 23, 24, 30, and 31?
22  A.   Yes, that's my understanding.
23  Q.   When did ASHRAE start providing a reading
24  room for public access to ASHRAE's standards?
25  A.   We made selected standards available for

Page 10

1   read-only access, and I believe that was about 15
2   years ago.  I don't have the exact date.  It was in
3   that -- that range of time.
4   Q.   How did ASHRAE select what standards to
5   make available?
6   A.   These are our -- our most popular
7   standards, the ones for which there was the greatest
8   demand.
9   Q.   How many standards -- strike that.
10      How many current standards does ASHRAE
11  publish?
12  A.   I don't have the exact number.  My
13  recollection would be in the neighborhood of -- of
14  75.
15  Q.   How many of those standards are on ASHRAE's
16  reading room available to the public now?
17  A.   At the current time, I believe there are 10
18  of those standards available.
19  Q.   Does ASHRAE also make available through its
20  reading room earlier versions of those 10 standards?
21  A.   We provide -- we provide the current
22  versions of those standards.
23  Q.   But not the earlier versions?
24  A.   I believe that's the case.
25  Q.   Do you know why ASHRAE began providing

Page 11

1   public access to some of its standards?
2   A.   We were actually hoping to increase our
3   sales of those standards.  It would be to the -- to
4   allow somebody to view those standards, but not be
5   able to download those standards or print those
6   standards.  So that would drive demand for those --
7   for those standards.
8   Q.   What was ASHRAE's experience in that
9   regard?
10  A.   It was -- our experience was that it was
11  relatively flat.  It didn't have -- seem to have much
12  of a positive impact, nor in -- in that case did it
13  seem to have a negative impact.
14  Q.   Does ASHRAE have information about how many
15  persons have accessed the standards in its reading
16  room?
17  A.   We did.  We changed the -- the -- the
18  software platform from which they were made available
19  for viewing.  We originally used -- we originally
20  used a RealRead vendor-supplied system and then we
21  went -- they went out of business, I believe, and
22  then we switched to iWrapper.
23      But I -- I know for certain when we were
24  with RealRead, we would track the views.  There was
25  no registration so we wouldn't know who those people

Page 12

1   were, but we did track views.
2       I think we do so with iWrapper, as well,
3   now, but I know for certain it was done with
4   RealRead.
5   Q.   Do you recall any statistics regarding the
6   number of accesses of various standards?
7   A.   I -- the -- the -- the most prominent of
8   those standards was 90.1, and I think if my
9   recollection is correct, I believe maybe 40-, 45,000
10  views of the 2010 version of that -- that -- that
11  standard over the course of the time it was made
12  available.
13  Q.   And was it ASHRAE's experience that the
14  effect of the public access to the 90.1 standard was
15  somewhere between nothing and minimal?
16  A.   That's --
17      MR. LEWIS:  Object to the form.
18  Q.   (By Mr. Bridges)  You can answer.
19  A.   I didn't see much of an impact one way or
20  the other.
21  Q.   Does ASHRAE still sell earlier versions of
22  its current standards?
23  A.   Yes.
24  Q.   How much -- strike that.
25      Roughly how much revenue per year does

Page 13

4 (Pages 10 - 13)

1 there's a relationship between sales or licenses of a
2 standard and incorporation of that standard into
3 law --
4        MR. LEWIS:  Objection.
5    Q.  (By Mr. Bridges)  -- or regulation?
6    A.  No.  We don't -- that's -- that's not a
7 metric that we use at all.  I mean, I imagine, you
8 know, perhaps you -- you look at where sales are
9 from, but we don't do that.  That's not part of our
10 business.
11        And I would think that the -- there's
12 people who do work in our industry do work across
13 states, across municipalities, but that's not a
14 metric that we -- we keep as part of our business
15 operation.
16    Q.  Apart from keeping a metric, do you have
17 any, let's say, anecdotal experience observing that
18 incorporation of a particular ASHRAE standard leads
19 to a jump in sales of that standard?
20        MR. LEWIS:  Objection.
21        THE WITNESS:  Really, no.  I have -- I
22 mean, there'll be times when somebody will say
23 to me, "Steve, how do I find an older version of
24 a standard in our bookstore," because we're --
25 we -- we have to put on education, training
Page 18

1 standard before the revision has been on the reading
2 room -- strike that.
3        Is "reading room" a term that you use at
4 ASHRAE?
5    A.  We do not.
6    Q.  What do you use -- what term do you use for
7 the facility by which the public can view ASHRAE
8 standards for free?
9    A.  I believe we call it free viewing.
10   Q.  Free viewing?
11   A.  Free viewing.
12   Q.  When ASHRAE revises a standard and the
13 standard before that revision has been available for
14 free viewing, does ASHRAE replace the older version
15 of the standard with the newer version of the
16 standard for free viewing as soon as ASHRAE issues
17 the standard?
18   A.  Yes, we do.
19   Q.  And does ASHRAE then take the older version
20 of the standard out of the free viewing facility when
21 that happens?
22   A.  Yes, we do.
23   Q.  Is there a reason why ASHRAE removes the
24 older standard from the free viewing?
25   A.  That's been our process going back to when
Page 20

1 related to that standard.
2        So I have anecdotal questions that are
3 asked or comments that are made to me along
4 those lines, but nothing that's -- that -- that
5 would, you know, trigger that back to specific
6 sales totals.
7    Q.  (By Mr. Bridges)  Is there anything that
8 can tie it to a general trend of sales, in your view?
9        MR. LEWIS:  Objection.
10        THE WITNESS:  I don't believe so.  I mean,
11 I -- we sell -- when a new standard -- a -- a
12 new version of a standard is -- is published,
13 there's interest in the market to buy that
14 standard, and if stan- -- if older versions of
15 standards are still relevant, we sell those
16 standards and continue to sell those.
17   Q.  (By Mr. Bridges)  In what circumstances
18 would an older version of an ASHRAE standard be
19 relevant in the marketplace?
20   A.  I assume that would be because it's -- it's
21 referenced in -- in legislation or regulation or --
22 or codes.  I think it would probably depend upon what
23 the owners of the -- the -- the -- the owner of a
24 building may have in their specifications.
25   Q.  When ASHRAE revises a standard and the
Page 19

1 we first started the free viewing, which is the -- 15
2 years ago or so.
3        And the -- the -- the reason for that is --
4 is we always wish to have the most current
5 application of the technology used.  So the -- the --
6 the notion is that as a standard is revised, it's
7 a -- it's a better application of the technology
8 that's current at the time.
9        So we -- it -- it -- it's always been
10 our -- our preference to -- to have -- to -- to move
11 the market towards the more current version of the
12 standard because of the application of technology.
13   Q.  Now, I think you mentioned a few minutes
14 ago -- and please correct me if I'm wrong because I
15 don't want to misquote you -- that there are some
16 times when people want older standards but they
17 aren't in stock and so there has to be a new print
18 order for those; is that correct?
19        MR. LEWIS:  Objection.
20        THE WITNESS:  Actually, our objective is to
21 never have them out of -- out of stock.  It's --
22 usually, I will be asked a question, "Steve, do
23 we have these in stock," and I will say, "Yes."
24        And we go through a process where we have
25 a -- a trigger -- this is what we do for all of
Page 21

1 Washington.
2    Q.  Who is ASHRAE's principal contact there?
3    A.  Riaz Ahmed.
4    Q.  R-I-A-Z A-H-M-E-D?
5    A.  Yes.  That's the first name and last name.
6    Q.  Who at ASHRAE supervises the relationship
7 with iENGINEERING?
8    A.  Well, at the -- approving the payment of
9 invoices and approving the initiation of work, it is
10 me, and -- and then there's a -- a gentleman in my
11 group who actually then works on a day-to-day basis
12 with vendor relationships.  David Soltis is his name.
13    Q.  How do you spell Soltis?
14    A.  S-O-L-T-I-S.
15    Q.  If a member of the public wanted to write
16 an article about the evolution of the 90.1 standard
17 over the last 20 years by showing a comparison
18 through, let's say, a redline, an electronic
19 comparison -- let me back up.
20       Do you understand what a redline is?
21    A.  I do.
22    Q.  If a member of the public wanted to write
23 an article about the evolution of the 90.1 standard
24 over the last 20 years by providing a redline of the
25 various changes from version to version, is there

Page 42

1    MR. LEWIS:  Objection.
2    THE WITNESS:  Yes.
3    Q.  (By Mr. Bridges)  And what would the
4 earlier versions be?
5    A.  PDFs.
6    MR. LEWIS:  Objection.
7    Q.  (By Mr. Bridges)  PDF.
8       And if one wanted to trace the evolution
9 across four versions to produce one document with
10 annotations showing, for example, when each provision
11 entered into the standard and when various provisions
12 disappeared from the standard, would the person need
13 to get permissions to reuse each of the four
14 versions, according to ASHRAE's practices?
15    A.  If they were doing this for their personal
16 use, then no, because that would be allowed for in
17 their purchase of the standards.
18       The permission would require -- would be
19 required for the extent to which that person would
20 want to make information available more widely other
21 than for personal use, and then there would be
22 considerations that would be given for amount of
23 content, so on.
24    Q.  Well, what -- what if somebody wanted to
25 write an article criticizing the evolution and saying

Page 44

1 a -- what would the -- I'm going to start the
2 question again.  Let me strike that.
3       If a member of the public wanted to write
4 an article about the evolution of the 90.1 standard
5 over the last 20 years by providing a redline of
6 various changes from version to version, what steps
7 would that person need to go through in order to
8 generate a comparison document?
9    MR. LEWIS:  Objection.
10    THE WITNESS:  We currently offer for the
11 current version of Standard 90.1 -- .1 a redline
12 version that's available for sale.  That's
13 something we only initiated a year ago, year and
14 a half.  So we would not be able to provide that
15 document, if that's a -- if that's -- if that's
16 the question.
17       If they wish to reuse our content, then we
18 have a process that we follow for reprint
19 permission or request for -- for -- for use.
20    Q.  (By Mr. Bridges)  Leaving aside the
21 permissions process, how, from a technical
22 standpoint, would one be able to generate that
23 redline?  Would one have access to earlier versions
24 in an electronic format that would be suitable for
25 applying a comparison tool to?

Page 43

1 that it had gotten off track and wanting to
2 illustrate the arguments by quoting substantial bits,
3 let's say two pages at a time for five different
4 instances.
5       According to ASHRAE's practices, what would
6 be required for the person -- for that person to be
7 able to do this?
8    MR. LEWIS:  Objection.
9    THE WITNESS:  Whether the article is
10 critical or not isn't part of our process of
11 granting permission for use of content.
12    Q.  (By Mr. Bridges)  Leaving that part aside,
13 then, what would the person need to do, according to
14 ASHRAE's practices, to get permission to provide,
15 let's say, four two-page excerpts showing the
16 changes?
17    MR. LEWIS:  Objection.
18    THE WITNESS:  They would need to specify
19 what content from the standard they wished to
20 use, what -- how much content, what type of
21 content, and what the use would be, say an
22 article.
23       We do not ask what that article is going to
24 say, nor do we review that article before it is
25 used.  That's not part of our process.

Page 45

12 (Pages 42 - 45)

1     So they would have to specify the amount of
2  content that they wish to use, what content, and
3  how and what that use would be.
4     Q.  (By Mr. Bridges)  Would ASHRAE give that
5  permission without charge?
6     A.  We always use a balance in -- in -- in how
7  we approach reprint requests.
8     If I do not feel there's going to be a
9  negative impact on the sales of -- of a standard,
10  typically I will grant reprint permission use,
11  because I think it also promotes awareness of a
12  standard.
13     I should say that we also have an on-line
14  system that we use, as well, RightsLink.  You can go
15  to our website and you can see that.  But that hasn't
16  worked very well.  That was my attempt at trying to
17  remove a little bit of the care and hand- -- well,
18  the time that has to go in with processing requests.
19     In -- in that system, it was a cookie
20  cutter, a certain amount of money for a certain --
21  for a certain number of figures and so on.  But
22  that's really not a very practical system and it's
23  just about -- we -- I think we still have the link
24  there, but it's really -- doesn't have very good
25  functionality.

Page 46

1     Q.  And it sounds to me as though the reason
2  for that is that it wasn't flexible enough to
3  accommodate different use cases?
4     A.  That -- that's correct.  And -- and it's
5  hard to keep it up to date.  We publish many
6  articles, we publish many standards, and so to try to
7  keep that database of permission -- so when somebody
8  goes in and they identify the -- the source of the
9  content, it was as much work for us to keep the
10  database up to date as it was to handle the
11  permissions personally.
12     Q.  Do you have a dedicated permission staff?
13     A.  My administrative assistant is the focal
14  point for permissions.
15     Q.  What is your assistant's name?
16     A.  Julie Harr, H-A-R-R.
17     MR. BRIDGES:  If it's all right with you, I
18  ask that we take a break.  We've gone just a
19  little bit over an hour.  Normally I'd like to
20  go longer, but I'm working on sleep deprivation.
21  I'll try and keep the breaks short, but I may
22  need them every hour.
23     VIDEOGRAPHER:  This is the end of Video 1.
24  We're going off the record at 11:26 a.m.
25     (Thereupon, there was an interruption in

Page 47

1  the proceedings.)
2     VIDEOGRAPHER:  This is the beginning of
3  Video 2.  We are going on the record at
4  11:46 a.m.
5     Q.  (By Mr. Bridges)  Do you know roughly what
6  percentage of publications income comes from
7  government sources for ASHRAE?
8     A.  I do not.
9     Q.  Do you know what government support ASHRAE
10  gets in the development or revision of standard --
11  standards?
12     A.  I am not aware of any funding received by
13  ASHRAE for development or the revision of -- of
14  standards.
15     Q.  You're aware that government employees
16  participate in the standard development process?
17     A.  I do.  And -- well, I -- what I am aware of
18  is that there -- there may be individuals with the
19  government who purchase copies of -- of standards.
20  I'm not exactly sure of their role on project
21  committees, but -- but they are -- would be included
22  in the -- the customer base for standards.
23     Q.  And you're aware that -- does the U.S.
24  government enter into any contracts with ASHRAE for
25  the sale or availability of standards?

Page 48

1     A.  We have had -- in -- in recent -- this is
2  in recent years, we've had three contracts I've been
3  engaged with related to the distribution of
4  standards, specifically 90.1.
5     Q.  What were the contracts for?
6     A.  Three -- first contract was for making
7  90.1 -- and I believe that was the 2010 version of
8  the standard -- available to ASHRAE members for --
9  well, I -- available from the ASHRAE website for free
10  download.
11     And then there were two subsequent
12  contracts that were done in conjunction with the
13  International Code Council where actually they did
14  the -- the distribution, but inclu- -- which -- which
15  the distribution included one of their documents,
16  the -- what is called the IECC, International Energy
17  Conservation Code.
18     So -- so that -- that document was
19  provided -- distributed by ICC and included in that
20  package ASHRAE Standard 90.1 2010.
21     And then the third contract added 90.1 2007
22  distribution, and that was to a distribution list
23  provided to ICC from, in this case, Pacific Northwest
24  Laboratories, which was a -- a laboratory under
25  contract at the Department of Energy.

Page 49

13 (Pages 46 - 49)

1    Q.  I'd like to go back to the beginning of
2 your answer, because I -- I didn't quite understand
3 it.
4        The first contract was for making the 2010
5 version of the standard available in some fashion and
6 I think first you said available to ASHRAE members
7 and then I think you said available from the ASHRAE
8 website for free download.
9        Is -- did you mean available not
10 specifically to ASHRAE members, but available from
11 the ASHRAE website for download?
12        MR. LEWIS:  Objection.
13        THE WITNESS:  I meant to say was available
14 for free download from the ASHRAE website.
15    Q.  (By Mr. Bridges)  Who -- and under that
16 contract, who had access to the free downloads?
17    A.  Anyone who logged into our website and
18 clicked on the option to complete that download.
19    Q.  Oh, any person --
20    A.  Anybody could --
21    Q.  -- any person, country?
22    A.  That's correct.  Actually, in the world.
23    Q.  In the world.
24    A.  That's my -- as I say that, that's my
25 recollection, is it was not rest- -- I know it was

Page 50

1    A.  So that was how we did the -- knew when it
2 ended.
3    Q.  How could you distinguish, let's say,
4 between a download and a simple view of the document
5 from ASHRAE's website?
6    A.  There was no viewing associated with this
7 particular functionality.  You just clicked on a box
8 that said "Download."
9    Q.  Got it.
10        With what government agency was the
11 contract?
12    A.  Our contract was with PNL, Pacific
13 Northwest Laboratory, which is a laboratory of the
14 U.S. Department of Energy.
15    Q.  Did ASHRAE ever come to have an
16 understanding as to why Pacific Northwest Laboratory
17 wished to have that facility available?
18    A.  This was part of the -- the time frame is
19 2011, and I believe this was part of the -- the
20 Recovery Acts, the National Recovery Acts that were
21 in place at that time.
22        And I was approached by somebody from PNL
23 as a -- to do that.  I do not know what their --
24 their motivations were except to make the standard
25 available.

Page 52

1 not restricted to members -- I misspoke at first --
2 and I think it was open to -- to anyone.
3    Q.  And that's what I was trying to figure out.
4    A.  Yeah.
5    Q.  Okay.  So the first contract -- just to
6 summarize again, the first contract was for ASHRAE to
7 make 90.1 available for free to the public by
8 download; correct?
9    A.  That is correct.
10    Q.  Was that contract for a limited period of
11 time or was it for -- what were the terms of that
12 contract?
13    A.  There was a contract that had a -- dollar
14 amount associated with it, and so there was a fee
15 that every -- every time a download was made, a fee
16 for that unit was charged.  So once that total
17 contract amount was met, then the downloads stopped.
18    Q.  Do you recall what the per-download fee
19 was?
20    A.  I believe it was $15 a -- a document.
21    Q.  Do you know how ASHRAE knew when a download
22 occurred?
23    A.  Yes, because we had a -- system that
24 would click -- keep track of the downloads.
25    Q.  How --

Page 51

1    Q.  Do you know how many downloads occurred
2 under that contract?
3    A.  I do not, but if -- if it was the 15 per
4 download and the contract was $322,000, it would be
5 that division.
6        (Defendant's Exhibit 1077 was marked for
7        identification.)
8    Q.  (By Mr. Bridges)  My brain is sitting next
9 to me and my brain hands me important things from
10 time to time.
11        Mr. Comstock, I ask you to look at
12 Exhibit 1077.
13        Could you identify it, please?
14    A.  This appears to be the -- the proposal that
15 I just -- I just spoke of.  I think I did say 2010.
16 This document says 2000 -- 2007 version of that --
17 oh, no, I'm sorry.  Yeah, it says --
18        MR. LEWIS:  I'll just note for the record
19        that the document is two sided.
20    Q.  (By Mr. Bridges)  Yes, always.  I think all
21 of our documents will be.
22    A.  So it's the 2007 version, yes.
23    Q.  Okay.  Was this free download facility
24 something that ASHRAE proposed?
25    A.  No.  The -- we -- we were approached by

Page 53

14 (Pages 50 - 53)

1 PNL, to my -- to my knowledge.

2 Q. The -- just the format, it's in response to
3 an RFP or request for proposals.

4 Do you know what the RFP No. 140008
5 specified?

6 A. I -- I do not.

7 Q. The proposal envisioned that ASHRAE would
8 promote the free download program through targeted
9 e-mails to members of ASHRAE; correct? I'm looking
10 rough-- just above the midpoint in that exhibit.

11 A. Correct.

12 Q. Do you know to what extent ASHRAE promoted
13 the free download program to the broader public,
14 apart from members of ASHRAE?

15 A. I -- we put notices on our website to -- is
16 my recollection. I believe we did news releases, but
17 I am -- that's an assumption on my part.

18 Q. And then you said there were two other
19 contracts; is that correct?

20 A. That's correct. Both of those also
21 involved versions of Standard 90.1 and then also
22 included a document, the -- the IECC that I
23 referenced.

24 Q. Were they on roughly the same terms as the
25 terms in Exhibit 1077?

Page 54

1 A. No. That -- that was a -- a different
2 arrangement. For that process, the documents were
3 sent in hard copy form to recipients who were
4 provided to us from the -- from PNL. And the
5 distribution was made by ICC, which is the publisher
6 of the IECC. ICC is International Code Council.

7 Q. Were the second and third contracts
8 contracts between PNL and ICC?

9 A. No. I believe they were contracts between
10 PNL and ASHRAE and then ICC was engaged to fulfill
11 the agreement.

12 Q. Do you recall the expected audience,
13 recipients, of the hard-copy publications in the
14 second and third contracts?

15 A. I believe the targeted audience for that
16 was code officials at state and municipalities.

17 Q. Do you recall quantities and financial
18 terms for the second and third contracts?

19 A. The -- the -- the -- the purchase price for
20 the 90.1 inclusion was the same as this, $15, if I
21 recall, and then there was a -- I believe ICC charge
22 for distribution of the IECC was also $15 and then
23 there was a $15 charge by ICC for printing, mailing,
24 inventory, distribution. So that was a total per
25 unit, that I recall, of $45.

Page 55

1 Now, the first agreement I believe was
2 $188,000, in that neighborhood. The second agreement
3 was $230,000. The -- the -- but the second
4 agreement, I think -- so the first one, it would be
5 dividing the 45,000 into that -- $45 into that total
6 amount. The second agreement actually included two
7 versions of 90.1, if I recall, and two different
8 versions of the IECC, so it could have been that cost
9 was $90 total in-- -- $90 per unit into that $230,000
10 number.

11 Q. And just to clarify one thing.

12 In the last couple of answers, you referred
13 to the first contract and the second contract. If we
14 put them in the context of the other contract, that
15 would make these the second and third contracts?

16 A. That's correct.

17 Q. Okay. In your answer just now, when you
18 were saying first and second, in the broader scope,
19 you were referring to the second and third contracts;
20 is that correct?

21 A. That is correct.

22 Q. As a result of these contracts, did ASHRAE
23 observe any effect on its other sales or licenses of
24 the 90.1 standard?

25 A. These -- these three contracts all involve

Page 56

1 distribution of not the current version of the ASHRAE
2 standard, but the previous version.

3 Did we see any noticeable change in the
4 distribution or the sales of the -- the current
5 version? Nothing seemed to jump out.

6 Q. Did ASHRAE observe any noticeable effect on
7 the distribution, even of the earlier versions, apart
8 from -- from these contracts?

9 A. Intuitively, I would think there would have
10 been some impact, but I can't say -- we didn't
11 monitor that, so I have no evidence one way or the
12 other.

13 Q. So you don't know one way or the other
14 whether these contracts cannibalized other types of
15 sales of the same versions?

16 A. Yeah, I have no -- no evidence one way or
17 the other.

18 Q. Has ASHRAE entered into any other
19 agreements for public access or distribu- -- public
20 access to or distribution of its -- strike that.

21 Has ASHRAE en-- -- entered into any other
22 agreements for broad public access to or distribution
23 of its standards, either for free or for reduced
24 price?

25 MR. LEWIS: Objection.

Page 57

15 (Pages 54 - 57)

1     THE WITNESS: Was your question by --
2 repeat the question, please?
3     Q. (By Mr. Bridges) Sure.
4     Has ASHRAE entered into any other
5 agreements to provide broad public access to or
6 distribution of its standards either for free or for
7 a reduced price?
8     A. At -- at times over the past -- not for
9 90.1, but for some other standards, a company may pay
10 a license fee to make a standard available if it
11 relates specifically to their products. That would
12 be a license agreement.
13     And that's very rare. I mean, it's --
14 it's -- perhaps one standard every three to five
15 years would -- would be the case. But nothing with
16 government like was done here.
17     Q. Okay. What proportion of ASHRAE's yearly
18 revenues comes from the monetization of its
19 publications? Do you understand that term?
20     A. When you say "publications," do you include
21 periodicals?
22     Q. Good point, so I'm going to withdraw my
23 question.
24     But I just want to make sure -- I think you
25 understand my -- my word "monetization" in this

Page 58

1 context. You nodded, but the court reporter can't
2 take nods down.
3     Do you understand, broadly speaking,
4 monetization of publications through revenue sources
5 like purchasing and licensing and the like?
6     A. Yes.
7     Q. And royalties?
8     A. Yes.
9     Q. What proportion of ASHRAE's yearly revenues
10 comes from the monetization of its standards as
11 publications?
12     A. I'm making sure I'm doing the math right.
13     Q. That's fair. That's fair.
14     A. Let's see. It would be -- directly
15 attributable to standards would be approximately
16 10 percent.
17     Q. How else does ASHRAE earn revenue, other
18 than through the monetization of its standards?
19     A. Membership dues, conference registrations,
20 advertising, subscription sales, educational course
21 registrations, certification, exposition income.
22     And when you said "publications," if -- so
23 in addition to publications, we have books. So
24 books, if -- if -- if -- if that's -- if you
25 distinguish between standards in your questions, then

Page 59

1 there would be books. And I believe that -- that --
2 that covers it.
3     Q. Roughly what percentage of ASHRAE's
4 expenses pertain to the organization and supervision
5 of the standards development process and the costs of
6 publication and the costs of administering the
7 permissions and distributions and the like?
8     MR. LEWIS: Objection.
9     THE WITNESS: I can speak to the side of
10 that process that deals with the -- the -- the
11 publications part. I do not know what the --
12 the costs would be to support the development of
13 the product. My role begins when we push that
14 standard out to the -- to -- to the marketplace.
15     What would be -- I -- I'd probably say
16 there are staff salaries that would be
17 attributable to standards activities from the
18 publication side of things, production, so on.
19 If you add portions of people's time together,
20 we're probably speaking of four people from the
21 publications side.
22     And then the -- the cost of the
23 infrastructure for the book- -- for the
24 bookstore, the on-line process, and warehousing,
25 and finally the -- the -- the work that may be

Page 60

1 involved in -- in -- in managing that on-line
2 bookstore.
3     Q. (By Mr. Bridges) Are you able to estimate
4 a percentage of ASHRAE's expenses involved in what
5 you've just described?
6     A. Boy, and I -- and I -- I left -- the
7 easiest numbers, the printing costs, I just left out.
8     Q. Right.
9     A. The cost to print --
10     Q. Right.
11     A. -- a unit would be included.
12     You know, if -- if we have a hundred -- I'm
13 just guessing now. If you have a -- I said those --
14 those individuals, you know, we have a hundred
15 employees, so -- with various activities.
16     So I'd say 5 percent of labor and then you
17 figure the -- the cost of that infrastructure,
18 standards amounts to a large portion of it. And
19 permissions, a lot of that is attributed to
20 standards. That's maybe -- that part, $200,000.
21     Q. 200,000 to the --
22     A. For the -- just the expenses of doing those
23 things. The bookstore, I mean, you know, processing
24 orders, apart from the -- the -- the labor.
25     Q. So you're saying 5 -- 5 percent of the

Page 61

16 (Pages 58 - 61)

1 staff count plus about 200,000 in expenses?
2     A.   That's correct, for the portion of the
3 standards work that is involved in what we do, which
4 is the distribution of those to the -- to the
5 marketplace.
6         I -- probably in terms of context, our
7 bookstore is actually -- we do that in partnership
8 with an outside group, so that is a -- we pay fees
9 associated with -- any time orders are taken through
10 our bookstore.  So there are -- are costs that we
11 have through the -- through the vendor for operation
12 of our bookstore.
13     Q.   And just to be clear, I think you either
14 said this or started to say it.  I think I didn't
15 hear it completely.
16         The expenses you just described were from
17 that point in the process where your part of the
18 organization takes over and pushes the standards out
19 to the public.  These numbers did not include the
20 costs and expenses and staffing that ASHRAE invests
21 in the creation and revision of the standards
22 themselves; correct?
23         MR. LEWIS:  Objection.
24         THE WITNESS:  That is correct.
25     Q.   (By Mr. Bridges)  Has -- do you understand

Page 62

1     Q.   Is that David Hollman?
2     A.   It was somebody with Carrier, Carrier
3 Corporation.
4     Q.   Carrier UTC?
5     A.   Yes.  Yeah, yeah.
6     Q.   Does the name David Hollman ring a bell to
7 you?
8     A.   I -- I think so.
9     Q.   Do you know whether he's an ASHRAE member?
10     A.   I do not know.  Carrier's -- there are many
11 employees with -- with -- from -- of Carrier who are
12 members of ASHRAE.
13     Q.   Do you recall any other information ASHRAE
14 has regarding any potential monetary loss as a
15 consequence of defendant's conduct?
16     A.   I have no firsthand knowledge of -- of
17 that.
18     Q.   Do you have any other information that you
19 might have acquired secondhand?
20     A.   With regard to --
21     Q.   Monetary losses.
22     A.   -- this -- this -- in this case?
23     Q.   Caused by defendants, yes.
24     A.   No, I do not have any -- any other
25 knowledge of that.

Page 64

1 what a subvention is of a publication?
2     A.   I do not.
3     Q.   Has ASHRAE ever received any grants to
4 support the publication of any particular standards?
5     A.   I have no knowledge of ASHRAE receiving
6 funds for that.
7     Q.   Is ASHRAE aware of any monetary losses that
8 it has suffered as a consequence of the defendant's
9 conduct in this case?
10     A.   I can't speak to any -- any tracking of --
11 of losses.  And anecdotally, people say if -- they've
12 asked me if a standard is available on the Internet,
13 is that -- is that allowed, is that permissible, so
14 we -- in those cases, we will seek to remove them.
15         But we don't -- we -- I don't have any
16 record of tracking such loss of -- of revenue.
17     Q.   Apart from tracking, does ASHRAE have
18 any information regarding monetary losses it has
19 suffered as a consequence of defendant's conduct?
20     A.   I -- I do recall there was one message we
21 got from somebody who refer- -- I think it was
22 somebody with Carrier Corporation, if I recall, who
23 referred to -- who referred to that.  I don't know if
24 they had intended to purchase or not, but that was
25 one specific case I do recall.

Page 63

1     Q.   Are you aware of any persons being misled
2 as to a relationship between the defendants and
3 ASHRAE?
4     A.   I'm not aware of that.
5     Q.   Are you aware of anybody being confused in
6 any way as a consequence -- strike that.
7         Are you aware of anyone being deceived in
8 any way by defendant?
9     A.   I am not aware --
10         MR. LEWIS:  Objection.
11         THE WITNESS:  -- of that.
12     Q.   (By Mr. Bridges)  Are you aware of anyone
13 being confused in any way by any conduct of the
14 defendant?
15         MR. LEWIS:  Objection.
16         THE WITNESS:  If I recall, I think that
17     was -- the fellow from Carrier was asking me a
18     question of whether that was an authorized use,
19     perhaps.  I can't remember the exact wording,
20     but there was a -- a question that I was asked
21     of that -- of that person.
22     Q.   (By Mr. Bridges)  Are you aware of any
23 other instances of anyone being confused in any way
24 by any conduct of the defendant?
25         MR. LEWIS:  Objection.

Page 65

17 (Pages 62 - 65)

1  ASHRAE.
2      Q.  What newspaper were you working for?
3      A.  Bergen News.
4      Q.  Bergen County, New Jersey?
5      A.  Bergen County, New Jersey, yes.
6      Q.  And you mentioned you graduated from a
7  school that had a very strong engineering program.
8          Which one was that?
9      A.  Lehigh University in Bethlehem,
10  Pennsylvania.
11     Q.  So you had come to -- you came to ASHRAE
12  from a publishing and -- from a publishing background
13  with a technology slant in the publishing?
14     A.  With a familiarity, to some degree, of
15  engineering, but it was mainly with an editorial
16  background.
17     Q.  To what extent -- strike that.
18         Earlier today when we were talking about
19  revenues, I think you were distinguishing between
20  revenues that ASHRAE receives directly from the sale
21  or licensing of publications and other revenues that
22  may in some way involve the publications, such as
23  training programs where a copy of a standard would be
24  furnished.
25         Do you recall that?

1      MR. LEWIS:  Objection.
2      THE WITNESS:  Yes, I do.
3      Q.  (By Mr. Bridges)  I'd like to explore for a
4  little bit what activities ASHRAE engages in that may
5  touch upon standards, apart from the sale or
6  licensing of standards.
7          So education is one; right?
8      A.  Correct.
9      Q.  What types of education offerings does
10  ASHRAE provide?
11     A.  We -- we offer a -- a varied program.  We
12  really take seriously trying to help with the
13  application of the standard, ensure the standards are
14  applied properly.
15         And so that consists of instructor-led
16  training that we will provide, either -- typically,
17  three-hour or six-hour courses for which there are
18  registration fees, and we also will have web-based
19  learning programs that are available, which would be
20  e-learning experiences that are available on demand.
21         And many of those courses deal with
22  applications of -- of standards, and specifically
23  there's -- there's quite a few courses that would
24  deal with topics related to 90.1.
25         And -- and we also offer a -- a -- a

1  five -- a total of five days of training, which is
2  a -- an intensive HVAC design training program, and
3  much of that content deals with Standard 90.1
4  content, Standard 62.1 content.
5      Q.  What other revenue-generating activities
6  does ASHRAE engage in, apart from the publication
7  sales and licensing and the education offerings you
8  just mentioned?
9      A.  Do you mean with a direct or indirect tie
10  to standards, for example?
11     Q.  Yes.
12     A.  The -- the magazine will -- our -- our
13  principal magazine, which is a -- a trade
14  publication, B-to-B publication, ASHRAE journal
15  will -- will have -- will be quite often articles
16  about ASHRAE standards there.
17         So that -- that is always -- when we have
18  topics related to standards, those are often articles
19  that we will promote to our -- to our advertising
20  base.
21     Q.  What other activities does -- strike that.
22         What other revenue-generating activities
23  does ASHRAE engage in relating to --
24     A.  We have --
25     Q.  -- standards?

1      A.  We have some electronic products, for
2  example, that are based on ASHRAE standards that --
3  that -- apps that are based on content and ASHRAE
4  standards specifically.  So we offer those types of
5  products for sale.
6      Q.  What are some of the apps?
7      A.  For -- related to 62.1, there would be a --
8  a ventilation rate effectiveness app that we have
9  available, a duct-fitting app and a duct-fitting
10  database.  However, that probably relates more to our
11  hand- -- that relates more to our handbook than to
12  standards.
13         Right now, we're developing an app for 90.1
14  compliance.
15     Q.  Anything else in terms of standards
16  relating to revenue-generating activities?
17     A.  Users manuals.
18     Q.  How are they organized?  In other words, is
19  there a user's manual for each standard?
20     A.  Not for all the standards, but the more
21  popular standards, the more complex standards, we
22  have users manuals to assist with their appropriate
23  and proper application.
24     Q.  I assume there's a user's manual for 90.1?
25     A.  There is.

1    Q.   What other rev- -- revenue-generating
2   activities does ASHRAE engage in pertaining to
3   standards?
4    A.   We've covered royalties.  We've covered the
5   sales of the documents.  We've covered the articles
6   that would impact the advertising, the courses, the
7   ancillary support documents.
8        I could imagine at one -- at -- some
9   extension of that could be either sessions that are
10  presented at our conferences that would deal with
11  90.1, for which -- for which there would be
12  attendance interests that would be generated for
13  that.
14       I believe that -- I believe that would
15  cover the -- the -- the potential for -- for revenue.
16   Q.   Does the sale of -- strike that.
17       Does the sale and licensing of standards
18  subsidize other ASHRAE activities apart from
19  standards development --
20       MR. LEWIS:  Objection.
21   Q.  (By Mr. Bridges)  -- and publication?
22   A.   All of the revenue flows into a single --
23  single source.  There's some standards that are --
24  are very low-selling standards, so there are -- so it
25  would be fair to say that some -- if a standard

Page 74

1   generates more revenue, that helps support those
2   activities that don't have revenue streams that would
3   cover them.
4    Q.   There's no requirement that each activity
5   fully self-support itself?
6        MR. LEWIS:  Objection.
7        THE WITNESS:  Our -- our obligation's to
8   advance the technology.  We -- we -- there are
9   some items that are needed, but they have a
10  difficult time finding the financial support to
11  carry them forward.
12   Q.  (By Mr. Bridges)  And in your last
13  statement, you said, "Our obligation is to advance
14  the technology."
15       Is that a summary or a reference to
16  ASHRAE's mission?
17   A.   In our bylaws, ASHRAE's organized to
18  advance the arts and sciences of heating,
19  refrigeration, air-conditioning, ventilation, and
20  their allied arts and sciences.
21   Q.   How does ASHRAE's development and
22  publication of its standards advance the technology?
23   A.   Because it sets a -- a standard for
24  practice.  It incorporates through user experiences
25  those solutions to technical applications that are --

Page 75

1   that are -- are -- are deemed by peers to have been
2   successful.  They're developed by people who are
3   recognized by their peer -- peers as being
4   knowledgeable in their respective fields.
5        So it provides standards.  And especially
6   the -- ASHRAE handbook really provide -- they
7   provide solutions.  They -- they -- they incorporate
8   new technology that's available in products and
9   equipment and assist designers as to what new design
10  options may be available because of new products in
11  the marketplace.
12   Q.   You use terminology that I hear frequently.
13  I often push back at it a little bit wherever I hear
14  it, so don't take this personally.
15       But I've never quite understood what
16  "solutions" means, because it's often a very vague
17  term.  Sometimes it's a liquid in a bottle; okay?
18  That's not what you meant here.
19       How else would you describe what you're
20  referring to as solutions here?
21       MR. LEWIS:  Objection.
22       THE WITNESS:  One of the things that I've
23  noticed in the industry as an editorial person
24  is that there's so many different technologies
25  that can be provided that are available to

Page 76

1   maintain air in a building, whether it be
2   conditioned air at a particular temperature or
3   air that's free of contaminants.  There's many,
4   many different methods of applying technology,
5   different types of technology, to provide a --
6   an air-conditioning -- HVAC system in a building
7   or a refrigeration system.
8        And so designers have more choices
9   available to them than ever before, so part of
10  the role that ASHRAE provides in offering
11  solutions is to help guide those engineers to --
12  to provide the appropriate -- the -- the
13  appropriate application of technology which best
14  solves the design problem that they face.
15   Q.  (By Mr. Bridges)  Thank you for that
16  explanation.
17       I spoke with ASHRAE counsel during a break
18  about your testimony earlier today about the reading
19  room.
20       Did you have any clarifications that you
21  wanted to make about the functionality of the reading
22  room?  I'm sorry, about the functionality of the free
23  viewing facility.
24   A.   Yes.  I -- in -- in -- in checking that
25  point, I understand now that there's search

Page 77

20 (Pages 74 - 77)

```
 1       C E R T I F I C A T E
 2
 3
    STATE OF GEORGIA:
 4
    COUNTY OF FULTON:
 5
 6
    I hereby certify that the foregoing transcript was
 7  taken down, as stated in the caption, and the
    questions and answers thereto were reduced to
 8  typewriting under my direction; that the foregoing
    pages represent a true, complete, and correct
 9  transcript of the evidence given upon said hearing,
    and I further certify that I am not of kin or counsel
10  to the parties in the case; am not in the regular
    employ of counsel for any of said parties; nor am I
11  in anywise interested in the result of said case.
12
13
14
15  Lee Ann Barnes
16  LEE ANN BARNES, CCR B-1852, RPR, CRR
17
18
19
20
21
22
23
24
25
                                            Page 198
```

```
 1      DEPOSITION ERRATA SHEET
 2
 3  Our Assignment No. 2023730
    Case Caption:  AMERICAN SOCIETY FOR TESTING
 4  AND MATERIALS d/b/a ASTM INTERNATIONAL, et al. vs.
    PUBLIC.RESOURCE.ORG, INC.
 5
        DECLARATION UNDER PENALTY OF PERJURY
 6      I declare under penalty of perjury
    that I have read the entire transcript of
 7  my Deposition taken in the captioned matter
    or the same has been read to me, and
 8  the same is true and accurate, save and
    except for changes and/or corrections, if
 9  any, as indicated by me on the DEPOSITION
    ERRATA SHEET hereof, with the understanding
10  that I offer these changes as if still under
    oath.
11      Signed on the _____ day of
    _____, 20___.
12
    _____
13      STEVEN COMSTOCK
14
15
16
17
18
19
20
21
22
23
24
25
                                            Page 199
```

# EXHIBIT 6

1              UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF COLUMBIA

3

  AMERICAN SOCIETY FOR              )

4 TESTING AND MATERIALS,            )

5 d/b/a ASTM INTERNATIONAL;         ) Civil Action No.

6 NATIONAL FIRE PROTECTION          ) 1:13-cv-01215-TSC

7 ASSOCIATION, INC.; and            )

  AMERICAN SOCIETY OF               )

8 HEATING, REFRIGERATION AND        )

9 AIR CONDITIONING ENGINEERS,       )

               Plaintiffs and       )

10 Counter-Defendants,              )

11 vs.                              )

12 PUBLIC.RESOURCE.ORG,INC.,        )

13             Defendant and        )

14 Counter-Plaintiff.

15

16  VIDEOTAPED 30(b)(6) DEPOSITION OF NATIONAL

17  FIRE PROTECTION ASSOCIATION, INC., BY

18  CHRISTIAN DUBAY, before Jeanette N. Maracas,

19  Registered Professional Reporter and Notary

20  Public in and for the Commonwealth of

21  Massachusetts, at 42 Chauncy Street, Boston,

22  Massachusetts, on Wednesday, April 1, 2015,

23  commencing at 10:00 a.m.

24

25  PAGES 1 - 250

                                        Page 1

Page 14

1  Q. In what forums do you speak as NFPA's primary   10:09:00
2     technical spokesman?                              10:09:12
3  A. One example is media interviews.                 10:09:15
4  Q. How else?                                         10:09:25
5  A. Another example is public forums around our      10:09:26
6     technical topics of expertise, our standards.    10:09:32
7  Q. What type of public forums do you mean?          10:09:36
8  A. One example is speaking at the conferences       10:09:40
9     and training seminars and such.                  10:09:47
10 Q. What types of conferences do you speak at        10:09:49
11    for NFPA?                                         10:09:52
12 A. In my current role primarily, I guess that's     10:09:52
13    a standards role, technically it could           10:09:57
14    involve the topic at hand.  It could be a        10:09:59
15    trade event or an association of, say, an        10:10:01
16    association of manufacturers or constituents     10:10:08
17    or government, like fire marshals.               10:10:11
18 Q. On what topics do you typically speak at         10:10:18
19    those conferences?                               10:10:23
20 A. As broad as our scope of NFPA.                   10:10:25
21 Q. And how broad is that scope?                     10:10:34
22 A. We -- our mission is based upon safety and       10:10:36
23    improving safety and reducing loss.  And that   10:10:42
24    covers approximately 300 codes and standards    10:10:44
25    on a multitude of topics.                        10:10:49

Page 15

1  Q. How do codes and standards improve safety        10:11:01
2     and reduce loss?                                 10:11:03
3  A. Codes and standards are designed -- part of      10:11:05
4     them is to learn from losses, learn from         10:11:13
5     incidents as such to ensure what protection      10:11:17
6     needs to be in place to account for that.        10:11:20
7     That's one of the ways.                          10:11:23
8  Q. How else do codes and standards improve          10:11:27
9     safety and reduce losses?                        10:11:30
10       MR. REHN:  I'll just object that              10:11:35
11    these questions are outside the scope of the     10:11:36
12    topics for which this witness was designated,    10:11:38
13    but you can answer.                              10:11:41
14       MR. BRIDGES:  I disagree, but we              10:11:42
15    don't need to argue it.                          10:11:44
16 A. Codes and standards, at least the NFPA           10:11:46
17    process, brings together a multitude of          10:11:48
18    interested parties which can determine,          10:11:51
19    through the consensus process, a best minimum    10:11:53
20    level of safety.                                 10:11:58
21 Q. Who determines what the best minimum level       10:12:14
22    of safety is in that process?                    10:12:50
23       MR. REHN:  Objection as to form.              10:12:55
24 Q. You may answer.                                  10:12:58
25 A. At NFPA our process relies upon our technical    10:12:59

Page 16

1     committee volunteers.                            10:13:04
2  Q. Is it the technical committee of volunteers      10:13:15
3     who determine what constitutes the best          10:13:22
4     minimum level of safety?                         10:13:24
5       MR. REHN:  Objection as to form.               10:13:26
6  A. It's a combination of -- our technical           10:13:29
7     committee members determine the final           10:13:32
8     technical requirements, however, that's          10:13:34
9     balanced with extensive public review and        10:13:37
10    comment.                                          10:13:39
11 Q. I'll come back to that in a minute.  How else    10:13:49
12    do you -- in what other forums do you speak      10:14:14
13    as primary technical spokesman for NFPA?  You    10:14:17
14    mentioned media interviews, certain public       10:14:24
15    forums.  You mentioned conferences and           10:14:27
16    training seminars.  Are there any other ways     10:14:29
17    in which you serve as the primary technical      10:14:32
18    spokesman for NFPA?                               10:14:34
19 A. I often give presentations relating to           10:14:35
20    awareness of our process and awareness of how   10:14:39
21    to get involved and how to be part of this       10:14:42
22    public codes and standards process.             10:14:46
23 Q. To whom do you make those presentations?         10:14:51
24 A. Various affected parties.  Again, really         10:14:55
25    depends on the breadth of topics.  So it         10:14:59

Page 17

1     varies.                                          10:15:04
2  Q. What are some examples of groups to which you    10:15:04
3     make these presentations?                        10:15:08
4  A. For example, if there's an emerging technical    10:15:09
5     topic of safety or concern to the                10:15:13
6     association, I may meet with fire marshals or   10:15:16
7     local safety officials in a given               10:15:19
8     jurisdiction or state to present what we know   10:15:22
9     at that time.                                    10:15:26
10 Q. To your knowledge, what use do they make of      10:15:30
11    the information that you present to them?        10:15:42
12       MR. REHN:  Objection as to form.              10:15:45
13    Calls for speculation.                           10:15:47
14 A. It would really depend on the group.             10:15:49
15 Q. Let's say fire marshals.                         10:15:56
16       MR. REHN:  Same objection.                    10:15:58
17 A. They often utilize that information as           10:16:01
18    information to make safety decisions within     10:16:05
19    their various jurisdictions or with the         10:16:07
20    situations that they're facing.                 10:16:11
21 Q. What kind of safety decisions are you           10:16:12
22    referring to?                                    10:16:14
23 A. It could be, for example, how to understand a   10:16:19
24    new technology or a new application of          10:16:27
25    safety, a new safety standard, a new adoption   10:16:34

5 (Pages 14 - 17)

| | |
|---|---|
| 1 | meetings are open to anyone who wishes to   10:30:44 |
| 2 | attend.                                           10:30:46 |
| 3 | Q.  Anything else?                            10:30:46 |
| 4 | A.  No.  I think that covers it.            10:30:49 |
| 5 | Q.  What do you mean by call the meeting, NFPA   10:30:55 |
| 6 | calls the meeting?                           10:31:06 |
| 7 | A.  We provide advance public notice when we call   10:31:08 |
| 8 | the meeting, including on our website, social   10:31:12 |
| 9 | media announcements to the committee members   10:31:16 |
| 10 | to make not only the committee but the public   10:31:20 |
| 11 | aware of the next meeting date, location,   10:31:22 |
| 12 | et cetera.                                      10:31:26 |
| 13 | Q.  How does NFPA book the meeting?   10:31:29 |
| 14 | A.  We have a meetings department whose   10:31:34 |
| 15 | responsibility is to book all of our       10:31:38 |
| 16 | meetings.                                       10:31:41 |
| 17 | Q.  Does that mean to arrange the logistics, like   10:31:42 |
| 18 | the hotels and conferences rooms and things   10:31:47 |
| 19 | like that?                                      10:31:50 |
| 20 | A.  The meetings department is responsible --   10:31:52 |
| 21 | MR. REHN:  Objection to form.   10:31:51 |
| 22 | A.  The meetings department is responsible for   10:31:56 |
| 23 | taking care of finding a proper hotel, large   10:32:02 |
| 24 | enough meeting rooms, things like that.   10:32:04 |
| 25 | Whatever the size of the logistics, they   10:32:07 |

Page 26

| | |
|---|---|
| 1 | handle all the logistics around that meeting   10:32:09 |
| 2 | space and any required hotels.             10:32:12 |
| 3 | Q.  How does NFPA host the meeting?   10:32:14 |
| 4 | MR. REHN:  Objection to form.   10:32:20 |
| 5 | Q.  I should say how does NFPA host the meetings?   10:32:24 |
| 6 | MR. REHN:  Same objection.   10:32:28 |
| 7 | A.  I think the best approach is that because   10:32:29 |
| 8 | it's an NFPA meeting, so it's -- we're   10:32:31 |
| 9 | calling -- when I say we're calling the   10:32:36 |
| 10 | meeting, so it's our committee meeting as an   10:32:37 |
| 11 | example.                                        10:32:41 |
| 12 | So NFPA staff is there, technical   10:32:41 |
| 13 | staff is there facilitating and running the   10:32:46 |
| 14 | meeting along with the actual volunteer   10:32:48 |
| 15 | technical committee chair.  So I think that   10:32:50 |
| 16 | should clarify what I'm implying by       10:32:54 |
| 17 | "hosting."                                      10:32:56 |
| 18 | Q.  How does the NFPA staff facilitate and run   10:32:57 |
| 19 | the meetings along with the technical      10:33:15 |
| 20 | committee chairs?                            10:33:17 |
| 21 | A.  Again, just to clarify, just focusing on   10:33:20 |
| 22 | technical committee meetings?              10:33:23 |
| 23 | Q.  Yes.                                         10:33:24 |
| 24 | A.  Okay.  We have a technical staff liaison   10:33:25 |
| 25 | who's assigned to each of our standards and a   10:33:30 |

Page 27

| | |
|---|---|
| 1 | portion of their job is to attend the      10:33:33 |
| 2 | technical committee meetings.             10:33:36 |
| 3 | Q.  What do the liaisons do at those meetings   10:33:39 |
| 4 | when they attend them?                    10:33:43 |
| 5 | MR. REHN:  Object to the form.   10:33:45 |
| 6 | A.  Their primary responsibility is to capture   10:33:46 |
| 7 | all of the technical changes that the      10:33:51 |
| 8 | committee is making to the document they're   10:33:54 |
| 9 | working on or standard they're working on.   10:33:57 |
| 10 | Q.  What do you mean by technical changes in that   10:34:02 |
| 11 | context?                                        10:34:24 |
| 12 | A.  Our technical committees are responsible for   10:34:27 |
| 13 | developing changes to our codes and      10:34:31 |
| 14 | standards.  And one of the primary        10:34:34 |
| 15 | responsibilities of the technical staff      10:34:37 |
| 16 | liaison is to capture those changes.        10:34:39 |
| 17 | Q.  In what respect are those changes technical   10:34:46 |
| 18 | changes?                                        10:34:50 |
| 19 | A.  Those changes are specific, technical being   10:34:53 |
| 20 | scientific or wording changes to our codes   10:34:57 |
| 21 | and standards which are technical documents.   10:35:01 |
| 22 | Q.  How do you distinguish between scientific   10:35:08 |
| 23 | changes and wording changes to the technical   10:35:11 |
| 24 | documents?                                    10:35:17 |
| 25 | MR. REHN:  Object to the form.   10:35:18 |

Page 28

| | |
|---|---|
| 1 | Lacks foundation.  Mischaracterizes the   10:35:19 |
| 2 | testimony.                                     10:35:22 |
| 3 | A.  A technical change, in my view, would be   10:35:22 |
| 4 | changing a specific requirement.  A wording   10:35:28 |
| 5 | change may be a change the committee could do   10:35:32 |
| 6 | if they have determined that the requirement   10:35:34 |
| 7 | is confusing or not clear what the specific   10:35:36 |
| 8 | requirement is, so they may adjust the      10:35:40 |
| 9 | wording to make it easier to interpret or   10:35:41 |
| 10 | understand what that actual technical       10:35:45 |
| 11 | requirement is.                                10:35:46 |
| 12 | Q.  Who determines what wording changes are   10:35:48 |
| 13 | appropriate in the technical committees?   10:35:52 |
| 14 | MR. REHN:  Object to the form.   10:35:55 |
| 15 | Ambiguous.                                    10:35:56 |
| 16 | A.  It's a combination of extensive public review   10:35:58 |
| 17 | and comment, the committee's review of that   10:36:02 |
| 18 | and their expertise and with the help of our   10:36:05 |
| 19 | technical staff to land on the final wording,   10:36:09 |
| 20 | which is ultimately decided by the technical   10:36:13 |
| 21 | committee.                                     10:36:15 |
| 22 | Q.  What criteria do the members of the technical   10:36:23 |
| 23 | committee use in choosing the wording of a   10:36:32 |
| 24 | code or standard?                            10:36:38 |
| 25 | MR. REHN:  Object to the form.   10:36:39 |

Page 29

8 (Pages 26 - 29)

| | | |
|---|---|---|
| 1 | Q. Is there anything about the development of | 11:16:19 |
| 2 | standards that the regulations do not cover? | 11:16:21 |
| 3 | A. Our regulations cover the specific accredited | 11:16:27 |
| 4 | rules and hence, its regulations. We also | 11:16:33 |
| 5 | have our committee officers guide which | 11:16:35 |
| 6 | provides guidance to our technical committee | 11:16:37 |
| 7 | members as well as our chairs and our manual | 11:16:41 |
| 8 | style. | 11:16:46 |
| 9 | Q. What other documents govern or regulate the | 11:16:46 |
| 10 | development of standards within NFPA? | 11:17:44 |
| 11 | A. Off the top of my head I can't think of | 11:17:56 |
| 12 | anything else. | 11:17:59 |
| 13 | Q. Who participates in -- strike that. | 11:18:09 |
| 14 | Who are the members, generally | 11:18:17 |
| 15 | speaking, the category of NFPA's technical | 11:18:20 |
| 16 | committees? | 11:18:26 |
| 17 | A. Just for clarification, the representation or | 11:18:29 |
| 18 | are they members of NFPA? We have | 11:18:36 |
| 19 | categories -- we have interest categories of | 11:18:39 |
| 20 | our committee members. | 11:18:43 |
| 21 | Q. Who -- what persons are entitled to be | 11:18:43 |
| 22 | members of NFPA's technical committees? | 11:18:48 |
| 23 | MR. REHN: Objection as to form. | 11:18:51 |
| 24 | A. Anyone can apply to be a member of an NFPA | 11:18:55 |
| 25 | technical committee, and based upon their | 11:18:59 |

Page 50

| | | |
|---|---|---|
| 1 | expertise and their background, they're | 11:19:01 |
| 2 | evaluated through a process that ultimately | 11:19:04 |
| 3 | involves standards council appointing them | 11:19:07 |
| 4 | to, or not appointing, depending on their | 11:19:10 |
| 5 | credentials, to the various technical | 11:19:12 |
| 6 | committees. | 11:19:14 |
| 7 | Q. So the standards council determines who gains | 11:19:17 |
| 8 | admission to membership in the technical | 11:19:21 |
| 9 | committees? | 11:19:23 |
| 10 | A. That's correct. | 11:19:24 |
| 11 | Q. What criteria does the standards council | 11:19:27 |
| 12 | apply in determining who should gain | 11:19:35 |
| 13 | membership to the technical committees? | 11:19:39 |
| 14 | MR. REHN: Objection as to form. | 11:19:42 |
| 15 | A. It's a multipart criteria. First is | 11:19:46 |
| 16 | technical expertise within that subject | 11:19:51 |
| 17 | matter. Second is balance; is the committee | 11:19:54 |
| 18 | an appropriate balance. And third is the | 11:20:01 |
| 19 | ability to participate. | 11:20:02 |
| 20 | Q. What do you mean by balance? | 11:20:06 |
| 21 | A. By our regulations, NFPA technical committees | 11:20:12 |
| 22 | are required to have a balance of interest | 11:20:16 |
| 23 | categories to ensure that no one party or one | 11:20:18 |
| 24 | interest category can dominate the process. | 11:20:21 |
| 25 | Q. What are the interest categories? | 11:20:24 |

Page 51

| | | |
|---|---|---|
| 1 | A. There are, I believe, nine interest | 11:20:27 |
| 2 | categories, including -- one example is | 11:20:31 |
| 3 | research and testing is an example. Another | 11:20:37 |
| 4 | example is enforcer, which includes | 11:20:40 |
| 5 | government officials, both, sometimes federal | 11:20:44 |
| 6 | but state and local jurisdictions, as well as | 11:20:48 |
| 7 | special expert, which is consultants as an | 11:20:52 |
| 8 | example. | 11:20:56 |
| 9 | Users, installer maintainers which | 11:20:56 |
| 10 | are those who install the systems, consumers, | 11:21:02 |
| 11 | and that's all I can think of. I'm not sure | 11:21:13 |
| 12 | if I said it, but consumer is another one | 11:21:30 |
| 13 | that can represent a special -- have a | 11:21:34 |
| 14 | specific slot. Oh, I'm sorry, one other slot | 11:21:35 |
| 15 | is labor, is another slot. | 11:21:38 |
| 16 | Q. Thank you. Are all NFPA employees members of | 11:21:51 |
| 17 | the technical committees? | 11:22:16 |
| 18 | MR. REHN: Objection as to form. | 11:22:20 |
| 19 | A. NFPA employees are not -- cannot be members | 11:22:23 |
| 20 | of our technical committees. However, as I | 11:22:27 |
| 21 | stated previously, it's important -- there's | 11:22:30 |
| 22 | an important role that NFPA staff plays in | 11:22:32 |
| 23 | guiding, advising the committee, coordinating | 11:22:35 |
| 24 | the activities and providing their technical | 11:22:37 |
| 25 | expertise, especially technical staff liaison | 11:22:40 |

Page 52

| | | |
|---|---|---|
| 1 | into this committee process. But they do not | 11:22:43 |
| 2 | have -- they're not members of the committee, | 11:22:46 |
| 3 | and they do not carry a vote in the decisions | 11:22:48 |
| 4 | of the committees. | 11:22:51 |
| 5 | Q. Who constitutes by category of employment | 11:23:01 |
| 6 | is -- strike that. | 11:23:08 |
| 7 | By category of employment, who | 11:23:09 |
| 8 | constitutes the members of the standards | 11:23:11 |
| 9 | council? | 11:23:15 |
| 10 | MR. REHN: Objection as to form. | 11:23:15 |
| 11 | It's vague. | 11:23:17 |
| 12 | A. I'd like to provide just a quick comment to | 11:23:19 |
| 13 | help you clarify the question from my | 11:23:26 |
| 14 | understanding. Oftentimes our council | 11:23:27 |
| 15 | members and our committee members are not | 11:23:29 |
| 16 | appointed based upon employment. It's based | 11:23:31 |
| 17 | upon the interest category they represent. | 11:23:33 |
| 18 | Q. Thank you, yes. By interest category -- | 11:23:37 |
| 19 | strike that. | 11:23:43 |
| 20 | You mentioned interest categories | 11:23:44 |
| 21 | for technical committee membership, correct? | 11:23:47 |
| 22 | A. Yes. | 11:23:49 |
| 23 | Q. Do the same interest categories apply for | 11:23:49 |
| 24 | appointments or election to -- strike that. | 11:23:53 |
| 25 | How is the standards council -- strike that. | 11:23:58 |

Page 53

14 (Pages 50 - 53)

1   How are persons chosen to serve on   11:24:06
2   the standards council?                     11:24:08
3        MR. REHN:  Object to the form.        11:24:12
4   A.  Because the standards council is the   11:24:15
5   overarching body over our entire standards 11:24:18
6   development process, they are appointed    11:24:21
7   through a process that involves the NFPA   11:24:24
8   president making recommendations to the NFPA 11:24:27
9   board of directors.  Ultimately the standards 11:24:29
10  council members are appointed by our board of 11:24:33
11  directors.                      11:24:35
12  Q.  Are any NFPA employees members of the  11:24:40
13  standards council?              11:24:43
14       MR. REHN:  Objection as to form.      11:24:45
15  A.  Specifically, no.  However, similar to the 11:24:49
16  technical committees, there is staff assigned 11:24:51
17  to support the standards council, their    11:24:55
18  activities and their decisions.            11:24:58
19  Q.  I'd like to go back for a moment to the 11:25:11
20  process after the technical committee has  11:25:19
21  decided on changes to a standard.          11:25:26
22       And you say that a staff               11:25:31
23  representative, NFPA staff representative   11:25:38
24  will capture those changes from the technical 11:25:41
25  committee, correct?             11:25:44

Page 54

1        MR. REHN:  Object to the form.        11:25:48
2   A.  The NFPA technical staff that serves as, the 11:25:50
3   term we use is a staff liaison to a technical 11:25:54
4   committee, they do more than just capture the 11:25:56
5   specific wordings.                     11:26:00
6        What they do is they are each          11:26:01
7   technical experts in their field and they not 11:26:03
8   only capture or record those changes, but  11:26:06
9   they provide their expertise to the        11:26:09
10  committee, their field experience, what they 11:26:11
11  have, the information that they're bringing 11:26:14
12  in through questions on the standards and  11:26:16
13  such.                      11:26:18
14       And they provide that technical        11:26:19
15  expertise to the committee so the committee 11:26:21
16  can utilize that, a complete combination with 11:26:24
17  all the public input or comments, to land on 11:26:27
18  a final set of proposed language.  In      11:26:32
19  summary, it's more than just recording.    11:26:37
20  They're not really recording secretaries, per 11:26:39
21  se.                      11:26:43
22  Q.  But who ultimately determines the language of 11:26:43
23  the technical committee's proposed changes to 11:26:47
24  a code or standard?             11:26:51
25       MR. REHN:  Objection as to form.      11:26:53

Page 55

1   It's ambiguous.                    11:26:54
2   A.  The final decision is accomplished through 11:26:56
3   that ballot of the technical committee, but 11:26:58
4   the wording itself is that combination of the 11:27:01
5   technical staff and the committee working to 11:27:05
6   capture the requirement and get it worded  11:27:07
7   properly in the right context, in the right 11:27:10
8   order within a document so that when the    11:27:12
9   final specific words are balloted, the     11:27:14
10  committee has it in context of the whole   11:27:18
11  standards and they can make that decision,  11:27:20
12  seeing it within the body of the standard.  11:27:22
13  Q.  When the text is balloted, is there any 11:27:24
14  indication to the members of the committee  11:27:27
15  what variations have occurred as a         11:27:32
16  consequence of staff input from the text that 11:27:38
17  the committee itself was proposing?        11:27:43
18       MR. REHN:  Objection as to form.      11:27:47
19  Vague.  Lacks foundation.  Assumes facts not 11:27:48
20  in evidence.                    11:27:51
21  A.  There are really two types of changes the 11:27:53
22  committee is balloted on.  One is the -- a  11:27:57
23  plain first revision or second revision,    11:28:01
24  which may have been edited to comply with our 11:28:04
25  manual style, get the wording right.  That is 11:28:07

Page 56

1   connected directly to the work of the     11:28:09
2   committee.  The second is a revision that's 11:28:11
3   tied to a pure editorial change.           11:28:15
4   Q.  Do either of these sets of revisions get 11:28:19
5   identified to technical committee members so 11:28:24
6   that you can understand what input or       11:28:28
7   changes, if any, the technical committee    11:28:31
8   staff contributed?              11:28:35
9        MR. REHN:  Objection as to form.       11:28:41
10  A.  Yes, they all do.  All changes are indicated 11:28:44
11  to the technical committees for balloting.  11:28:48
12  And if there is, in the sense of an editorial 11:28:50
13  revision, it's indicated that this was     11:28:54
14  identified by staff as a potential editorial 11:28:57
15  revision.  The committee can then, in their 11:29:01
16  voting, decide whether that change moves    11:29:05
17  forward or not.                 11:29:10
18  Q.  Where in the records of the development of 11:29:10
19  each standard does one find the indications 11:29:12
20  of those changes?               11:29:17
21       MR. REHN:  Objection to the form.      11:29:21
22  A.  They are part of the first draft report or, 11:29:25
23  and/or, depending, the second draft report. 11:29:29
24  Both those reports consolidate the whole    11:29:33
25  record.                      11:29:35

Page 57

15 (Pages 54 - 57)

| | |
|---|---|
| 1 | go -- strike that.                         11:40:50 |
| 2 |    If you needed to identify the        11:40:53 |
| 3 | language that NFPA employees contributed to   11:40:55 |
| 4 | NFPA codes and standards, how would you       11:41:05 |
| 5 | determine that language?                   11:41:07 |
| 6 |    MR. REHN: Objection as to form.       11:41:10 |
| 7 | It's vague and compound.                   11:41:11 |
| 8 | A. What we could determine is the language the   11:41:15 |
| 9 | technical committee at the end of the day     11:41:19 |
| 10 | approved. Into -- each individual word and   11:41:21 |
| 11 | such would be difficult, if not impossible,   11:41:25 |
| 12 | because of ultimately the technical staff     11:41:30 |
| 13 | provides that content to the committee which   11:41:33 |
| 14 | then approves those words.                 11:41:35 |
| 15 | Q. You said the technical staff provides the   11:41:37 |
| 16 | content to the committee? The technical     11:41:44 |
| 17 | staff doesn't draft the standards, correct?   11:41:47 |
| 18 |    MR. REHN: Objection as to form.       11:41:51 |
| 19 | Mischaracterizes.                         11:41:53 |
| 20 | A. In many cases the technical staff in the room  11:41:59 |
| 21 | is drafting the text.                     11:42:02 |
| 22 | Q. Is proposing new text?                   11:42:04 |
| 23 | A. In some cases yes, to accomplish what the   11:42:10 |
| 24 | committee is trying to accomplish. The     11:42:13 |
| 25 | technical staff of NFPA are experts in their   11:42:15 |

Page 66

| | |
|---|---|
| 1 | field, and the committee may want to       11:42:20 |
| 2 | establish a requirement for X and the       11:42:23 |
| 3 | technical staff is there saying, well, we can   11:42:24 |
| 4 | word it this way and that way, does this meet   11:42:27 |
| 5 | your intent, how about we do this, I can     11:42:29 |
| 6 | research some information, get back to you at   11:42:30 |
| 7 | the next meeting.                         11:42:32 |
| 8 |    The technical staff provides a vital   11:42:33 |
| 9 | role in helping the technical committee     11:42:35 |
| 10 | accomplish their mission of developing those   11:42:38 |
| 11 | words that become ultimately the final words   11:42:40 |
| 12 | of the standard.                         11:42:43 |
| 13 | Q. Who makes the decision about the words in a   11:42:44 |
| 14 | standard?                               11:42:46 |
| 15 |    MR. REHN: Objection as to form.       11:42:46 |
| 16 | Ambiguous.                             11:42:48 |
| 17 | A. The final decision is -- and to summarize,   11:42:49 |
| 18 | it's a two-part decision. A committee       11:42:54 |
| 19 | ballots on it, the ballot's on the final     11:42:55 |
| 20 | word, the committee approves it. At the     11:42:58 |
| 21 | end of the day our standards council issues   11:43:00 |
| 22 | that document, but the committee ballot     11:43:03 |
| 23 | establishes the position of the type of     11:43:03 |
| 24 | committee at that time.                   11:43:07 |
| 25 | Q. And how does the text evolve up to the point   11:43:07 |

Page 67

| | |
|---|---|
| 1 | that the text of the technical committee is   11:43:16 |
| 2 | balloted?                               11:43:19 |
| 3 |    MR. REHN: Objection as to form.       11:43:20 |
| 4 | Ambiguous. Compound.                     11:43:22 |
| 5 | A. The text can evolve and by evolve, you mean   11:43:25 |
| 6 | created and included? Is that what you're   11:43:28 |
| 7 | saying?                                 11:43:31 |
| 8 | Q. I think so.                             11:43:32 |
| 9 | A. So in a few ways. One is it can be submitted   11:43:33 |
| 10 | through a proposal form or public input form   11:43:37 |
| 11 | or a public comment form. The language can   11:43:45 |
| 12 | come from that. It can come from the       11:43:49 |
| 13 | expertise of the technical committee members   11:43:53 |
| 14 | who are sitting on the committee, or it can   11:43:55 |
| 15 | come from technical staff providing that to   11:43:58 |
| 16 | the committee as their work progresses along.  11:44:01 |
| 17 |    Ultimately that evolution is the     11:44:06 |
| 18 | staff liaison synthesizes all that with the   11:44:08 |
| 19 | direction of the committee to land on the   11:44:13 |
| 20 | final technical language that is balloted.   11:44:15 |
| 21 | Q. With the direction of the committee, meaning   11:44:18 |
| 22 | with the approval of the committee members?   11:44:29 |
| 23 |    MR. REHN: Objection as to form.       11:44:31 |
| 24 | Mischaracterizes the testimony.           11:44:34 |
| 25 | Q. What do you mean by with the direction of the  11:44:36 |

Page 68

| | |
|---|---|
| 1 | committee?                             11:44:38 |
| 2 | A. So a committee could want to establish a   11:44:40 |
| 3 | requirement again for X for something and   11:44:45 |
| 4 | they may say, we want the requirement to read   11:44:48 |
| 5 | 12 and the staff liaison would have to put   11:44:51 |
| 6 | text around that to get it to read in context   11:44:55 |
| 7 | of the document. Or they may say we want to   11:44:57 |
| 8 | have a draft chapter on something, technical   11:45:00 |
| 9 | staff can you do research, pull together     11:45:03 |
| 10 | drafting of documents to present to the     11:45:12 |
| 11 | committee to consider.                   11:45:14 |
| 12 |    In the end the committee will agree   11:45:16 |
| 13 | through a meeting vote what text is going to   11:45:19 |
| 14 | move forward towards ballot. Then the     11:45:21 |
| 15 | staff's job is to turn that into a ballot and   11:45:24 |
| 16 | make sure it fits to our manual style and   11:45:28 |
| 17 | ballot with the technical committee on the   11:45:28 |
| 18 | final language.                         11:45:31 |
| 19 | Q. What criteria do technical committees use   11:45:31 |
| 20 | to determine what text moves forward to a   11:45:34 |
| 21 | ballot?                                 11:45:37 |
| 22 |    MR. REHN: Objection as to form.       11:45:38 |
| 23 | A. It's their expertise. It's their         11:45:42 |
| 24 | professional opinion in a balanced way     11:45:46 |
| 25 | through a meeting vote of what they believe   11:45:48 |

Page 69

18 (Pages 66 - 69)

| | |
|---|---|
| 1  will move forward.  There's motions we          11:45:50 | 1  cheaper, easier to accomplish things,          11:48:04 |
| 2  follow, Robert's Rules of Order, and when        11:45:53 | 2  accomplishes a higher level of safety.  Those   11:48:07 |
| 3  there's a motion and it carries by a meeting     11:45:55 | 3  are a few examples.                            11:48:10 |
| 4  vote, which is 50 percent plus one, that         11:45:57 | 4  Q.  Please give me more examples of criteria that  11:48:12 |
| 5  proposed change is then approved to move         11:46:00 | 5  technical committee members would use in        11:48:16 |
| 6  forward to ballot, to letter ballot, excuse      11:46:02 | 6  deciding what text to move forward to ballot.   11:48:18 |
| 7  me.                                              11:46:08 | 7        MR. REHN:  Same objection.                11:48:20 |
| 8  Q.  Your answer focused on the process.  I'm     11:46:08 | 8  A.  Other the examples could include research,  11:48:23 |
| 9  asking what criteria the technical committee     11:46:10 | 9  data.  Such things -- another example could     11:48:30 |
| 10  members use to decide what text to move         11:46:15 | 10  be loss reports.  For example, there's been a  11:48:37 |
| 11  forward to a ballot.                            11:46:18 | 11  large fire somewhere, a large chemical hazard   11:48:40 |
| 12        MR. REHN:  Objection as to form.          11:46:20 | 12  or something.  There's often an investigative  11:48:43 |
| 13  A.  I would think the criteria would depend on  11:46:24 | 13  report that NTSB or CSB or local fire marshal  11:48:45 |
| 14  each individual member of the technical         11:46:26 | 14  has done.  And the committee would look at     11:48:50 |
| 15  committee and their expertise and what bar      11:46:28 | 15  that and say we may have a safety issue that   11:48:52 |
| 16  they believe needs to be crossed or what        11:46:31 | 16  needs to be addressed.                         11:48:54 |
| 17  things they need to have answered              11:46:32 | 17  Q.  So you've mentioned information that they  11:48:56 |
| 18  professionally to make a decision to modify     11:46:34 | 18  may -- that may motivate them, but I think     11:48:59 |
| 19  the standard.                                   11:46:36 | 19  your answers are focusing less on what         11:49:06 |
| 20  Q.  What criteria in your role as the person in 11:46:36 | 20  criteria they apply to determining what text   11:49:09 |
| 21  charge of standards development at NFPA --      11:46:42 | 21  would move forward.                            11:49:11 |
| 22  strike that.                                    11:46:46 | 22        I'd like for you to tell me the          11:49:12 |
| 23        In your role as the person in charge      11:46:46 | 23  different criteria that technical committee    11:49:14 |
| 24  of standards development at NFPA, what do you   11:46:49 | 24  members apply, to your knowledge, in deciding  11:49:17 |
| 25  understand the most typical criteria to be by   11:46:52 | 25  what text to move forward to a ballot.         11:49:20 |
| Page 70 | Page 72 |

| | |
|---|---|
| 1  which technical committees determine what       11:46:59 | 1        MR. REHN:  Same objection.                11:49:23 |
| 2  text to move forward to a ballot?                11:47:02 | 2  A.  Again, I think it would be difficult, without  11:49:25 |
| 3        MR. REHN:  Objection as to form.           11:47:04 | 3  speculating, I'm not sure what each person     11:49:29 |
| 4  It's vague.                                      11:47:06 | 4  would use for criteria, and that's why my      11:49:31 |
| 5  A.  I don't think there's a single answer to     11:47:09 | 5  answer previously focused on having a          11:49:34 |
| 6  that, and that's why we rely on a consensus      11:47:11 | 6  balanced committee of different experts,       11:49:36 |
| 7  ballot that requires two-thirds of our          11:47:14 | 7  topical experts in that area, will each bring  11:49:39 |
| 8  technical committee to move anything forward.    11:47:16 | 8  a different set of personal criteria,          11:49:39 |
| 9  That's part of the open consensus process in    11:47:20 | 9  personal decisionmaking that will decide       11:49:43 |
| 10  that you need two-thirds of a balanced         11:47:22 | 10  what's going to move forward.                  11:49:45 |
| 11  committee to agree on a technical change to    11:47:26 | 11  Q.  I'd like for you to tell me what some of   11:49:47 |
| 12  move it forward.                                11:47:28 | 12  those personal criteria are that you were      11:49:49 |
| 13        Each party is going to have a            11:47:29 | 13  aware of, based on your interactions with      11:49:52 |
| 14  different motivation for how they want to      11:47:31 | 14  technical committee members at NFPA.           11:49:55 |
| 15  vote or how they want things to go forward or  11:47:32 | 15        MR. REHN:  Objection as to form.         11:50:00 |
| 16  not.                                            11:47:35 | 16  A.  I think many of those things I stated, like  11:50:01 |
| 17  Q.  Tell me and enumerate for me some of the   11:47:35 | 17  data, research reports, information combined   11:50:03 |
| 18  criteria that you understand them to apply in  11:47:38 | 18  is one of the main reasons, information is     11:50:09 |
| 19  determining what text to move forward to a     11:47:42 | 19  one of the main things, data, facts are        11:50:11 |
| 20  ballot.                                         11:47:44 | 20  important criteria for our committee members.  11:50:14 |
| 21        MR. REHN:  Same objection.               11:47:44 | 21        I think the other thing that's very      11:50:17 |
| 22  A.  Some criteria could include what's the loss 11:47:49 | 22  important to our committee members and to our  11:50:18 |
| 23  data associated with this issue that we're     11:47:54 | 23  process is their extensive experience in the   11:50:20 |
| 24  facing, fire loss data, injuries, deaths and   11:47:57 | 24  field and seeing results of different          11:50:24 |
| 25  such.  Some can include economic gain.  It's   11:48:00 | 25  approaches.                                    11:50:27 |
| Page 71 | Page 73 |

19 (Pages 70 - 73)

| | |
|---|---|
| 1 Q. Let me rephrase it differently because I'm   11:50:27 | 1   we call them enforcers, to attend our   11:53:46 |
| 2   not sure you're responding to my question   11:50:29 | 2   committee meetings.   11:53:48 |
| 3   about criteria.  What are the different   11:50:31 | 3 Q. Do any -- does NFPA pay any persons for their   11:53:50 |
| 4   reasons, not what background information are   11:50:34 | 4   time in participation in the technical   11:53:57 |
| 5   they acting on, but what are the different   11:50:38 | 5   committee work?   11:54:02 |
| 6   goals that, to your knowledge, technical   11:50:40 | 6 A. NFPA does not pay for time, but what we do   11:54:06 |
| 7   committee members have in deciding whether to   11:50:45 | 7   for public sector officials who we classify   11:54:09 |
| 8   progress certain text to a ballot?   11:50:49 | 8   as enforcers, we have an enforcer fund which   11:54:12 |
| 9       MR. REHN:  Objection as to form.   11:50:54 | 9   we pay 80 percent of their associated travel   11:54:15 |
| 10 A. I think the biggest overarching goal is the   11:50:55 | 10   to a committee meeting, including hotel,   11:54:15 |
| 11   accomplishment of the NFPA mission.  They   11:51:03 | 11   airfare, et cetera.   11:54:20 |
| 12   want to ultimately reduce life loss, injury,   11:51:04 | 12 Q. What is the motivation of persons, as you   11:54:20 |
| 13   property loss, economic loss due to fire and   11:51:09 | 13   understand it, to participate in technical   11:54:23 |
| 14   other related hazards.   11:51:11 | 14   committees?   11:54:28 |
| 15 Q. How do decisions regarding progressing   11:51:13 | 15       MR. REHN:  Object to the form.   11:54:29 |
| 16   certain text to a ballot touch upon that   11:51:17 | 16 A. I think there's lots of motivations.  I think   11:54:32 |
| 17   mission?   11:51:24 | 17   overwhelmingly the number one motivation, in   11:54:35 |
| 18       MR. REHN:  Objection as to form.   11:51:26 | 18   my opinion and my years of service, is the   11:54:37 |
| 19 A. Fundamentally does it progress towards   11:51:30 | 19   overarching mission of NFPA.  Our mission of   11:54:40 |
| 20   accomplishing that mission?  Does the   11:51:33 | 20   safety is very attractive to many people.   11:54:44 |
| 21   institution of a new technology or a new   11:51:37 | 21       Many of our volunteers not only   11:54:47 |
| 22   requirement or modifying an existing   11:51:39 | 22   volunteer to participate in the NFPA process   11:54:49 |
| 23   requirement lead to better life safety,   11:51:42 | 23   but also volunteer their time to do so, and   11:54:51 |
| 24   better fire protection, better electrical   11:51:46 | 24   that's a strong indication to me that that's   11:54:54 |
| 25   safety, better protection of our nation's   11:51:48 | 25   the primary motivation.   11:54:56 |
| Page 74 | Page 76 |

| | |
|---|---|
| 1   first responders?  Does it accomplish the   11:51:51 | 1 Q. Are you aware of any person whose primary   11:55:02 |
| 2   mission?  So that's the best way.   11:51:53 | 2   motivation is to receive some financial   11:55:05 |
| 3 Q. Does it -- would you say that a general   11:51:59 | 3   reward for participation in the technical   11:55:10 |
| 4   question that technical committees address in   11:52:05 | 4   committee process?   11:55:13 |
| 5   deciding whether to progress certain text to   11:52:18 | 5 A. I'm not aware of an individual, per se, but I   11:55:21 |
| 6   a ballot is whether the proposed change will   11:52:22 | 6   would speculate that these people are experts   11:55:26 |
| 7   improve outcomes?   11:52:29 | 7   in their fields, and there's professional   11:55:28 |
| 8       MR. REHN:  Object to the form of the   11:52:34 | 8   recognition and acknowledgment for being on   11:55:32 |
| 9   question.   11:52:37 | 9   an NFPA technical committee.   11:55:36 |
| 10 A. I would speculate that each decision would be   11:52:41 | 10       MR. BRIDGES:  Why don't we take a   11:55:46 |
| 11   in guidance or in alignment with improving   11:52:47 | 11   break.  We've been going for a while.  What   11:55:47 |
| 12   safety.  And those would be the outcomes,   11:52:53 | 12   time is it?   11:55:51 |
| 13   improving safety, reducing loss, preventing   11:52:53 | 13       VIDEOGRAPHER:  11:55.   11:55:51 |
| 14   incidents from happening again that resulted   11:52:57 | 14       MR. BRIDGES:  We'll keep going.   11:55:52 |
| 15   in life loss injuries, property loss,   11:52:59 | 15       VIDEOGRAPHER:  There's another   11:55:54 |
| 16   et cetera.   11:53:04 | 16   15 minutes on the tape.   11:55:55 |
| 17 Q. Who pays for members of the technical   11:53:11 | 17       MR. BRIDGES:  We'll keep going   11:55:56 |
| 18   committees to participate in their work?   11:53:15 | 18   another 15 minutes.   11:55:58 |
| 19 A. Again, a lot of my answers are it depends.   11:53:23 | 19 Q. How can the public gain access without   11:56:15 |
| 20   In this case, you have everything from   11:53:26 | 20   payment to NFPA's codes and standards?   11:56:33 |
| 21   companies to people's own time, people taking   11:53:30 | 21 A. NFPA provides free read-only access to all of   11:56:37 |
| 22   vacation time and in some cases, NFPA   11:53:34 | 22   our codes and standards to ensure that   11:56:42 |
| 23   reimburses participation through our enforcer   11:53:37 | 23   anyone, public or private sector or citizen   11:56:46 |
| 24   fund to get public safety officials like fire   11:53:41 | 24   consumer, has the ability to read and   11:56:49 |
| 25   marshals, electrical inspectors, and other,   11:53:44 | 25   understand the requirements of any of our   11:56:52 |
| Page 75 | Page 77 |

20 (Pages 74 - 77)

```
 1    electrical style manual, which applies to our   02:50:24
 2    electrical documents.                 02:50:27
 3  Q. Do the terms "annex" and "appendix" coexist  02:50:37
 4    in NFPA's forms today?              02:50:45
 5        MR. REHN: Object to the form.      02:50:48
 6    Lacks foundation.                   02:50:54
 7  A. We updated our manual style in, I believe it  02:50:56
 8    was year 2000, and we changed the term     02:51:02
 9    "appendix" to "annex" at that time to       02:51:05
10    consistent with other standards developers   02:51:09
11    terminology.                        02:51:12
12        And so it's my opinion that most, if  02:51:14
13    not all, of our documents, many of our     02:51:17
14    documents have gone through the process of a  02:51:21
15    full revision where that is changed from    02:51:23
16    appendix to annex.                  02:51:26
17  Q. You said NFPA made the change to be        02:51:29
18    consistent with other standards development  02:51:33
19    organizations' terminology; is that correct?  02:51:35
20  A. That's correct.                    02:51:39
21  Q. Is there a general style manual for standards  02:51:41
22    developers terminology?             02:51:46
23  A. Not that I'm aware of.               02:51:53
24  Q. Do the different standards developers tend to  02:51:55
25    converge around using words in similar    02:51:58
                                        Page 138
```

```
 1  fashion?                            02:52:01
 2        MR. REHN: Object to the form.      02:52:03
 3  A. In my opinion I would say standard developers  02:52:08
 4    converge around terminology and format that  02:52:13
 5    works for their constituents that utilize   02:52:15
 6    their standards.                     02:52:18
 7  Q. Does that lead to some convergence among the  02:52:20
 8    practices of various standards development  02:52:23
 9    organizations?                      02:52:26
10        MR. REHN: Object to the form. May   02:52:33
11    call for speculation.                02:52:34
12  A. I would -- from my personal opinion, I view  02:52:37
13    it as a usability and we want to make it as  02:52:41
14    easy and as possible for users to understand  02:52:45
15    the structure of the standard and the       02:52:49
16    requirements and the layout of the documents,  02:52:51
17    so often those changes may end up in a common  02:52:53
18    format to make it easier to understand.      02:52:57
19  Q. A common format with some other standards  02:52:59
20    developers organizations?             02:53:01
21        MR. REHN: Object to the form.      02:53:05
22    Vague.                            02:53:06
23  A. In my view, yes. For example, a given set  02:53:06
24    chapter where all the definitions are      02:53:13
25    contained is a good example.          02:53:14
                                        Page 139
```

```
 1  Q. Another example is changing the word appendix  02:53:17
 2    to annex, correct?                  02:53:20
 3  A. To the best of my recollection, that's an   02:53:22
 4    example that I could think of why we shifted  02:53:25
 5    there, but the best example I can give you is  02:53:28
 6    a single chapter where all the definitions  02:53:30
 7    are included.                       02:53:33
 8  Q. Then you mentioned that there were updates to  02:53:36
 9    disclaimers and copyright releases; is that  02:53:40
10    correct?                           02:53:47
11  A. That is correct. Over my 20 years, I'm aware  02:53:48
12    that updates were added to the forms or just  02:53:51
13    to the forms on a -- not on a specific basis,  02:53:57
14    but as needed.                      02:54:00
15  Q. What updates were needed to the disclaimers  02:54:02
16    and copyright releases?              02:54:06
17        MR. REHN: Object to the form. May   02:54:08
18    call for a legal opinion. Ambiguous with   02:54:10
19    respect to the terms used in the question.  02:54:14
20  A. From my perspective, my team's perspective,  02:54:17
21    we never got into the details of those. It   02:54:22
22    was often our legal team would ask us to   02:54:24
23    update our forms, and we would accomplish   02:54:27
24    that through our process.             02:54:29
25  Q. What were some of the changes to the forms  02:54:31
                                        Page 140
```

```
 1  that you recall as part of those updates?    02:54:35
 2        MR. REHN: Objection. Documents       02:54:38
 3    speak for themselves.                02:54:40
 4  A. I think some of the major changes are       02:54:43
 5    consistent format. If you notice          02:54:46
 6    historically, there was lots of different   02:54:49
 7    formattings and layouts. Having consistent  02:54:49
 8    format, consistent titles, consistent look  02:54:51
 9    and feel is probably the biggest ones that I  02:54:55
10    was -- that I'm aware of and was involved in.  02:54:59
11  Q. My question was specifically to the updates  02:55:02
12    of disclaimers and copyright releases. What  02:55:05
13    updates do you recall to the text of the    02:55:09
14    disclaimers and copyright releases?        02:55:12
15        MR. REHN: Object to the form.       02:55:15
16  A. That was not, again, not part of my        02:55:18
17    responsibility. Oftentimes we were given a   02:55:21
18    set of text to insert as that part of the   02:55:23
19    form and we didn't do a line by line        02:55:26
20    comparison. That was -- our job was to      02:55:29
21    implement the appropriate disclaimers, which  02:55:31
22    was legal's responsibility to provide us   02:55:33
23    and ensure that it got in there.          02:55:35
24  Q. What are some of the changes that you recall?  02:55:37
25        MR. REHN: Objection. Asked and      02:55:40
                                        Page 141
```

Veritext Legal Solutions
866 299-5127

1    Electrical Code; is that correct?        03:04:18
2              MR. REHN:  Objection as to form.   03:04:21
3    A.  It appears based on Line Item 1A that the   03:04:26
4       document the person was submitting it on was   03:04:29
5       to the National Electrical Code.        03:04:32
6    Q.  There was normally -- didn't you say there   03:04:34
7       was normally a different type of form for   03:04:36
8       submissions for the National Electrical Code?   03:04:39
9    A.  If we look at some of the forms you've   03:04:45
10      submitted to me, some of them had the title.   03:04:47
11      The title was different, said form for the X   03:04:49
12      edition of the National Electrical Code, and   03:04:51
13      so we didn't prohibit you from using any   03:04:53
14      standard form.                          03:04:57
15              (Exhibit 1248 marked for        03:05:30
16      identification.)                        03:06:03
17              (Pause)                         03:06:05
18   Q.  Do you recognize Exhibit 1248 as a form for   03:06:05
19      proposal that NFPA has maintained in the   03:06:44
20      ordinary course of business as part of its   03:06:47
21      standards development process?           03:06:50
22   A.  Yes, Exhibit 1248 does look typical.    03:06:53
23              (Exhibit 1249 marked for        03:07:33
24      identification.)                        03:07:41
25   Q.  Do you recognize Exhibit 1249 as a form for   03:07:41
                                                Page 146

1    proposal that NFPA has maintained in the   03:07:53
2       ordinary course of business in its standards   03:07:58
3       development process?                    03:08:04
4    A.  Yes, Exhibit 1249 does look typical.    03:08:13
5    Q.  And some persons might suggest proposals with   03:08:21
6       attachments where they can't fit the text of   03:08:27
7       the proposal in the lines on the form.  And   03:08:33
8       this exhibit reflects an attachment on the   03:08:36
9       reverse page of Exhibit 1249; is that   03:08:42
10      correct?                                03:08:45
11   A.  Based upon my review of the statement of   03:08:47
12      Item 4 and the proposed text on the back, it   03:09:02
13      appears to be consistent that the two pages   03:09:06
14      were copied correctly.                  03:09:08
15              (Exhibit 1250 marked for        03:09:26
16      identification.)                        03:09:41
17   Q.  I've handed you Exhibit 1250.  Do you   03:09:46
18      recognize this as a form for proposals that   03:10:01
19      NFPA has maintained in the ordinary course of   03:10:09
20      business in its standards development   03:10:13
21      process?                                03:10:17
22   A.  (Witness examines document)  Based upon my   03:10:18
23      review, it appears that this is typical.   03:10:33
24   Q.  So that's a yes?                       03:10:36
25   A.  That's a yes.  It appears to be typical,   03:10:37
                                                Page 147

1    Exhibit 1250.                           03:10:40
2    Q.  Do you know Mr. Belke, James C. Belke?   03:10:41
3    A.  No, sir.                             03:10:46
4    Q.  Do you know whether he's a member of any   03:10:46
5       technical committee?                    03:10:50
6    A.  Not off the top of my head.            03:10:55
7    Q.  Do you know what the annotations in   03:10:56
8       handwriting various places in the form   03:11:05
9       indicate?  There's a checkmark in several   03:11:14
10      different places.  There's some asterisks,   03:11:21
11      there's a pound sign A, pound sign B, pound   03:11:32
12      sign C.                                 03:11:36
13              MR. REHN:  Is that the question?   03:11:46
14              MR. BRIDGES:  Yes.              03:11:48
15              MR. REHN:  Objection that it's   03:11:49
16      compound.                               03:11:50
17   A.  So let me first answer the first part and we   03:11:57
18      can follow up if we need to.  Each change   03:12:00
19      that came in was processed, again, by   03:12:03
20      full-time staff to verify signatures and   03:12:06
21      copyright concerns.  And if you notice on   03:12:09
22      the first page under Proposals, not original   03:12:11
23      material, there's supporting material which   03:12:15
24      has an attached CSB report.             03:12:16
25              And it appears that someone wrote   03:12:26
                                                Page 148

1    down that it was not being submitted as   03:12:29
2       change but as supporting material to support   03:12:31
3       a change.                               03:12:35
4    Q.  Go ahead.                             03:12:41
5    A.  The checkmarks, each of these changes had to   03:12:42
6       be keyed manually by the staff who verified   03:12:45
7       all the text, editorial and production staff,   03:12:47
8       and oftentimes they would check the forms as   03:12:51
9       they worked through them to ensure they had   03:12:53
10      captured everything.  That -- in this case it   03:12:55
11      would be speculation on my part that that's   03:12:57
12      what those checkmarks are there for.    03:12:59
13              (Exhibit 1251 marked for        03:13:22
14      identification.)                        03:13:30
15   Q.  Does Exhibit -- strike that.           03:13:30
16          Do you recognize 1251 as a document   03:13:46
17      that NFPA maintains in the ordinary course of   03:13:49
18      business in the standards development   03:13:52
19      process?                                03:13:53
20   A.  Exhibit 1251 does look typical for a proposal   03:13:54
21      form.                                   03:13:58
22   Q.  So the answer is yes?                  03:13:59
23              MR. REHN:  Object to the form.   03:14:01
24   A.  Yes, Exhibit 1251 does look typical.    03:14:05
25                                              03:14:30
                                                Page 149

38 (Pages 146 - 149)

| | |
|---|---|
| 1 | MR. REHN: Object to the form.   06:01:45 |
| 2 | Argumentative. Question has been asked and   06:01:46 |
| 3 | answered.   06:01:49 |
| 4 | A. And my response remains the same that I can't   06:01:50 |
| 5 | speculate specifically to that level of   06:01:52 |
| 6 | detail of their day-to-day tasks.   06:01:54 |
| 7 | Q. You can speculate as to specific detail about   06:01:57 |
| 8 | other tasks, but not about these tasks?   06:02:00 |
| 9 | MR. REHN: Objection.   06:02:02 |
| 10 | Argumentative. Mischaracterizes the   06:02:03 |
| 11 | testimony.   06:02:05 |
| 12 | Q. Why are you not answering the question I've   06:02:05 |
| 13 | asked, which is, what's your best estimate of   06:02:07 |
| 14 | the time, of the percentage of time those   06:02:10 |
| 15 | persons spent on checking for signatures and   06:02:12 |
| 16 | copyright information in the submissions?   06:02:17 |
| 17 | MR. REHN: Objection.   06:02:20 |
| 18 | Argumentative. Asked and answered.   06:02:21 |
| 19 | A. I can speculate on their total workload,   06:02:24 |
| 20 | their tasks they took --   06:02:27 |
| 21 | Q. That wasn't my question. My question is,   06:02:29 |
| 22 | what percentage applied to checking for   06:02:30 |
| 23 | signatures and copyright information? That's   06:02:33 |
| 24 | my question. Is it clear?   06:02:37 |
| 25 | MR. REHN: Objection.   06:02:39 |

Page 218

| | |
|---|---|
| 1 | Argumentative.   06:02:39 |
| 2 | Q. Is the question clear?   06:02:41 |
| 3 | A. No.   06:02:43 |
| 4 | Q. What's unclear about it? Do you understand   06:02:44 |
| 5 | what checking for signatures means in looking   06:02:47 |
| 6 | at the assignment for copyright forms? Do   06:02:51 |
| 7 | you understand?   06:02:58 |
| 8 | MR. REHN: Objection.   06:02:58 |
| 9 | Argumentative.   06:02:59 |
| 10 | A. I understand that we have a policy that each   06:03:00 |
| 11 | and every proposal and comment is checked for   06:03:02 |
| 12 | copyright and any associated submitted   06:03:04 |
| 13 | material is also checked. I have a team, a   06:03:07 |
| 14 | full-time staff that is one of their   06:03:09 |
| 15 | primary tasks to do each and every day.   06:03:11 |
| 16 | Q. Great. I'm glad to know about the policy.   06:03:14 |
| 17 | Now my question is, what percentage of their   06:03:18 |
| 18 | time do you estimate, your best estimate,   06:03:23 |
| 19 | that they spend carrying out that policy?   06:03:27 |
| 20 | MR. REHN: Objection. Asked and   06:03:30 |
| 21 | answered.   06:03:31 |
| 22 | A. I would restate that, due to all the   06:03:34 |
| 23 | variables and the amount of variations that   06:03:37 |
| 24 | happen each year, I cannot speculate on that   06:03:39 |
| 25 | specific singular task.   06:03:42 |

Page 219

| | |
|---|---|
| 1 | Q. You can't give any estimate at all?   06:03:44 |
| 2 | A. No.   06:03:46 |
| 3 | Q. Were you ever aware of how much time they   06:03:46 |
| 4 | spent on the task?   06:03:54 |
| 5 | A. I'm aware of the full-time resources that it   06:03:57 |
| 6 | takes to accomplish our process of supporting   06:04:00 |
| 7 | our technical committees.   06:04:03 |
| 8 | Q. But you're unaware of how much time they   06:04:08 |
| 9 | spend carrying out the policy that you   06:04:10 |
| 10 | described?   06:04:14 |
| 11 | MR. REHN: Objection.   06:04:14 |
| 12 | Argumentative.   06:04:14 |
| 13 | A. I believe I've answered your question.   06:04:17 |
| 14 | Q. What verification -- strike that.   06:04:19 |
| 15 | What efforts did NFPA make to obtain   06:04:34 |
| 16 | assignments from the companies that employed   06:04:38 |
| 17 | individuals who submitted proposals or   06:04:48 |
| 18 | comments for NFPA's codes and standards?   06:04:53 |
| 19 | MR. REHN: Object to the form. It's   06:04:58 |
| 20 | ambiguous. It assumes facts. There's some   06:05:00 |
| 21 | embedded legal conclusions.   06:05:04 |
| 22 | A. NFPA verifies through our policy the   06:05:07 |
| 23 | submission from the individual. We do not go   06:05:11 |
| 24 | to their companies to verify authority of   06:05:16 |
| 25 | their signature.   06:05:18 |

Page 220

| | |
|---|---|
| 1 | Q. And how does NFPA verify submissions from the   06:05:20 |
| 2 | individuals?   06:05:30 |
| 3 | MR. REHN: Objection. I think this   06:05:36 |
| 4 | topic has been extensively asked and answered   06:05:38 |
| 5 | at this point.   06:05:40 |
| 6 | A. Several ways, one of which includes verifying   06:05:43 |
| 7 | that the submitter has signed the release   06:05:46 |
| 8 | form indicating it is their right or their   06:05:48 |
| 9 | authority to release it.   06:05:53 |
| 10 | Q. What else does NFPA do to verify the   06:05:54 |
| 11 | submission from the individual?   06:06:06 |
| 12 | MR. REHN: Same objection.   06:06:08 |
| 13 | A. Another example is if we review the material   06:06:10 |
| 14 | and there's an obvious copyright statement   06:06:14 |
| 15 | that is not of that individual who submitted   06:06:18 |
| 16 | it, we then contact them and if possible, we   06:06:21 |
| 17 | contact the owner of the copyright of the   06:06:24 |
| 18 | statement that's within that attached   06:06:27 |
| 19 | material.   06:06:28 |
| 20 | Q. What else does NFPA do to verify the   06:06:31 |
| 21 | submission from the individual?   06:06:35 |
| 22 | MR. REHN: Same objection.   06:06:37 |
| 23 | A. That's -- to the best of my recollection,   06:06:44 |
| 24 | that's the direct way we do it to the person   06:06:48 |
| 25 | who submitted it.   06:06:50 |

Page 221

56 (Pages 218 - 221)

| | | |
|---|---|---|
| 1 | Q. Yes. | 06:51:42 |
| 2 | A. Top left-hand paragraph below the bold | 06:51:52 |
| 3 | discusses what we used to indicate changes | 06:51:57 |
| 4 | including shaded or bulleting, like a dot. | 06:51:59 |
| 5 | Q. It says, "Changes other than editorial are | 06:52:07 |
| 6 | highlighted with gray shading." Do you see | 06:52:13 |
| 7 | that? | 06:52:15 |
| 8 | A. Yes. | 06:52:15 |
| 9 | Q. What's an example of some editorial changes | 06:52:16 |
| 10 | that would have occurred between editions of | 06:52:19 |
| 11 | the NEC? | 06:52:22 |
| 12 | A. Sample could be a spelling error. | 06:52:23 |
| 13 | Q. Anything else? | 06:52:34 |
| 14 | A. The only thing I can think of is occasionally | 06:52:36 |
| 15 | documents, paragraphs roll into each other, | 06:52:46 |
| 16 | so spacing, things like that. | 06:52:50 |
| 17 | Q. The document contains lists of persons | 06:52:52 |
| 18 | starting at Page 17547 up through Page 17558, | 06:53:07 |
| 19 | correct? | 06:53:18 |
| 20 | MR. FEE: Could you repeat that. | 06:53:25 |
| 21 | What was the question? | 06:53:30 |
| 22 | Q. The document contains lists of persons | 06:53:31 |
| 23 | starting at Page 17547 up through Page 17558, | 06:53:34 |
| 24 | correct? | 06:53:39 |
| 25 | A. Just to make sure I understand your question, | 06:53:41 |

Page 238

| | | |
|---|---|---|
| 1 | you just indicated there is a list of | 06:53:49 |
| 2 | persons? | 06:53:50 |
| 3 | Q. Right. | 06:53:51 |
| 4 | A. Those pages appear to contain lists of | 06:53:54 |
| 5 | technical committee members as well as NFPA | 06:53:57 |
| 6 | staff, where appropriate. | 06:54:00 |
| 7 | Q. And I think you testified earlier but just | 06:54:02 |
| 8 | for the sake of clarification, committees | 06:54:04 |
| 9 | that are called technical committees for | 06:54:09 |
| 10 | other codes and standards are called | 06:54:11 |
| 11 | code-making panels when it comes to the | 06:54:13 |
| 12 | National Electrical Code; is that correct? | 06:54:15 |
| 13 | A. That is partially correct. There are two | 06:54:18 |
| 14 | ways we address the National Electrical Code. | 06:54:21 |
| 15 | There are code-making panels and their work | 06:54:24 |
| 16 | is overseen by a technical correlating | 06:54:26 |
| 17 | committee. | 06:54:30 |
| 18 | Q. What is the work of the technical correlating | 06:54:31 |
| 19 | committee? | 06:54:35 |
| 20 | A. The technical correlating committee is | 06:54:37 |
| 21 | responsible for correlation across the entire | 06:54:42 |
| 22 | document to ensure that the code-making | 06:54:45 |
| 23 | panels are aware of potential conflicting | 06:54:49 |
| 24 | requirements between their portions of the | 06:54:52 |
| 25 | document and also consistency. It's | 06:54:53 |

Page 239

| | | |
|---|---|---|
| 1 | correlation across the entire standard | 06:54:56 |
| 2 | itself. | 06:54:59 |
| 3 | Q. And these pages identify various code-making | 06:55:05 |
| 4 | panels and then they indicate which portions | 06:55:12 |
| 5 | of the National Electrical Code they were | 06:55:16 |
| 6 | responsible for; is that correct? | 06:55:18 |
| 7 | MR. REHN: Object to the form of the | 06:55:25 |
| 8 | question. | 06:55:26 |
| 9 | A. That is my understanding. | 06:55:27 |
| 10 | Q. And it indicates the -- and this list | 06:55:29 |
| 11 | indicates both the names and the affiliations | 06:55:34 |
| 12 | of those persons who participated in the work | 06:55:41 |
| 13 | that's reflected in this edition; is that | 06:55:45 |
| 14 | correct? | 06:55:50 |
| 15 | MR. REHN: Object to the form. | 06:55:50 |
| 16 | A. Our committee lists indicate the name of the | 06:55:51 |
| 17 | individual who holds the seat, whether | 06:55:56 |
| 18 | they're a principal or alternate, what | 06:55:59 |
| 19 | company they work for and, if any, | 06:56:01 |
| 20 | representation if they do have a | 06:56:03 |
| 21 | representation. | 06:56:05 |
| 22 | Q. So let's say in the case of Page 17551 -- | 06:56:08 |
| 23 | A. 551. | 06:56:20 |
| 24 | Q. There's a reference to John Ray of Duke | 06:56:22 |
| 25 | Energy Corporation and it says, "Rep, | 06:56:28 |

Page 240

| | | |
|---|---|---|
| 1 | Electric Light and Power Group." What does | 06:56:29 |
| 2 | that mean? | 06:56:33 |
| 3 | A. Before I answer the question, I'm just having | 06:56:38 |
| 4 | trouble finding John's name. Is he on the | 06:56:41 |
| 5 | one on Code-Making Panel 7? | 06:56:43 |
| 6 | Q. Panel 7, left column, four from the bottom. | 06:56:46 |
| 7 | A. So in that case it appears Mr. Ray, the | 06:56:55 |
| 8 | company he works for is Duke Engineering | 06:57:00 |
| 9 | Corporation. He represents a utility, and | 06:57:02 |
| 10 | his representation of the committee is | 06:57:04 |
| 11 | Electrical Light and Power Group, EEI. | 06:57:06 |
| 12 | Q. And the letters in brackets after the names, | 06:57:13 |
| 13 | employers and states indicate the -- what do | 06:57:23 |
| 14 | you call it? Not the interest group. The | 06:57:29 |
| 15 | interest section? | 06:57:32 |
| 16 | A. It's the interest category. | 06:57:34 |
| 17 | Q. The interest category. So the letters within | 06:57:37 |
| 18 | brackets at the end of the line on which the | 06:57:39 |
| 19 | names of the individuals are found is a code | 06:57:43 |
| 20 | for the interest category; is that correct? | 06:57:45 |
| 21 | A. That is correct. | 06:57:47 |
| 22 | Q. M is manufacturer; is that right? M stands | 06:57:48 |
| 23 | for manufacturer? | 06:58:00 |
| 24 | A. Yes, M is for manufacturer. | 06:58:00 |
| 25 | Q. E stands for enforcer; is that correct? | 06:58:02 |

Page 241

61 (Pages 238 - 241)

Page 242

```
 1  A.  Correct.  The Es could represent federal      06:58:05
 2      government, state and local government as      06:58:14
 3      well as state fire officials, local fire      06:58:17
 4      officials.                                     06:58:20
 5  Q.  I notice on the front page of this there's a   06:58:21
 6      section near the bottom right of the page      06:58:42
 7      that says "Order redline PDF."  Do you see     06:58:45
 8      that?                                          06:58:48
 9  A.  Yes.                                           06:58:48
10  Q.  That redline PDF is a different document.      06:58:49
11      This is not the redline, correct?             06:58:52
12  A.  Based upon my review here, it appears to be    06:58:57
13      the, quote, unquote, normal version with the  06:59:01
14      shading to track changes and not a full track 06:59:04
15      changes redline version.                      06:59:07
16  Q.  And if one orders the redline PDF, does that   06:59:08
17      show the text that was deleted which might     06:59:11
18      not appear in this version?                    06:59:14
19  A.  That is my understanding, but I have not seen  06:59:17
20      the redline version of this document.         06:59:21
21  Q.  Let me ask you to turn to Page 17538.          06:59:23
22  A.  17538.                                         06:59:53
23  Q.  Does the language on that page appear          06:59:57
24      correct, to your knowledge?                    07:00:02
25          MR. REHN:  You're referring to the        07:00:11
```

Page 243

```
 1      whole language on the page?                    07:00:13
 2          MR. BRIDGES:  Right.                        07:00:15
 3          MR. REHN:  Objection as to form.            07:00:15
 4  A.  To the best of my knowledge, it appears like   07:00:21
 5      our opening issuing statement, our history     07:00:23
 6      and development of the National Electrical     07:00:27
 7      Code as well as our copyright statements, to   07:00:29
 8      the best of my knowledge.                      07:00:34
 9  Q.  So it's correct, to the best of your           07:00:34
10      knowledge?                                     07:00:37
11  A.  It appears correct.                            07:00:37
12  Q.  What about the language on Page 17536?         07:00:40
13  A.  536.                                           07:00:45
14          MR. REHN:  Object to the form and          07:00:52
15      to the extent the question calls for the      07:00:53
16      witness to render a legal opinion.            07:00:55
17          MR. BRIDGES:  I'm just asking if           07:01:01
18      it's correct to the best of his knowledge.    07:01:03
19  A.  To the best of my knowledge, this appears     07:01:08
20      correct and typical of our front matter       07:01:11
21      within our standards.                          07:01:14
22  Q.  A couple broad questions:  Has the standards   07:01:20
23      development process changed in any material   07:01:23
24      way since you arrived at NFPA?                 07:01:25
25          MR. REHN:  Object to the form.             07:01:33
```

Page 244

```
 1      Vague and ambiguous.                           07:01:33
 2  A.  Yes.  We had a major rewrite of our            07:01:36
 3      regulations in approximately 2007, 2008 time  07:01:40
 4      frame we started that process.                07:01:48
 5  Q.  Has there been any significant change          07:01:50
 6      since -- strike that.                          07:01:53
 7          You said that's when the process          07:01:54
 8      started.  When did that process end?          07:01:56
 9  A.  The rewrite to our regulations ended, to the   07:01:57
10      best of my knowledge, in approximately 2009,  07:02:06
11      2010.                                          07:02:09
12  Q.  Have there been any other, in your mind,       07:02:13
13      significant changes to the standards          07:02:16
14      development process since 2010?               07:02:18
15  A.  No.                                            07:02:22
16  Q.  Do you, in preparing and overseeing the       07:02:22
17      development of codes and standards, strive to 07:02:48
18      make them suitable for governments to adopt   07:02:53
19      for purposes of enforcement?                  07:02:59
20          MR. REHN:  Object to the form.  It's      07:03:05
21      vague.  May call for a legal opinion.         07:03:07
22  A.  Part of our committee officers guide is a      07:03:15
23      guidance document that is to address          07:03:19
24      usability, adoptability and enforceability.   07:03:22
25          It's guidance to our committees to        07:03:27
```

Page 245

```
 1      ensure that they write clear and not vague     07:03:29
 2      requirements that are understandable and      07:03:31
 3      concise.                                       07:03:34
 4  Q.  You said usability, adoptability and          07:03:34
 5      enforceability; is that right?                07:03:38
 6  A.  Yes.                                           07:03:40
 7  Q.  Does adoptability include within that concept  07:03:41
 8      the ease of adoption by governments of codes  07:03:50
 9      as enforceable law?                           07:04:01
10          MR. REHN:  Object to the form.  May       07:04:03
11      call for a legal opinion.                     07:04:07
12  A.  I can't comment on the ease of the adoption.   07:04:11
13      What I can comment on is my view of that is   07:04:15
14      that our standards need to contain, for       07:04:19
15      example, mandatory language if they're going  07:04:22
16      to be a standard and enforceable and, I would 07:04:26
17      assume, adoptable.                            07:04:29
18  Q.  That makes -- the mandatory language makes     07:04:31
19      them suitable for a government to adopt the   07:04:34
20      codes and standards as law?                   07:04:35
21          MR. REHN:  Object to the form.            07:04:37
22      Assumes facts.  May call for a legal opinion. 07:04:40
23  A.  That's partly my understanding but also the    07:04:45
24      mandatory language ensures that private       07:04:50
25      entities, private organizations can also      07:04:52
```

62 (Pages 242 - 245)

| | | |
|---|---|---|
| 1 | utilize them in their facilities and | 07:04:54 |
| 2 | applications. | 07:04:57 |
| 3 | VIDEOGRAPHER: We've reached the | 07:04:59 |
| 4 | seven hours. | 07:05:01 |
| 5 | MR. BRIDGES: Thank you very much. | 07:05:01 |
| 6 | CROSS EXAMINATION | 07:05:01 |
| 7 | BY MR. REHN: | 07:05:01 |
| 8 | Q. Mr. Dubay, I have a couple of questions for | 07:05:05 |
| 9 | you just to clear up some issues that arose | 07:05:07 |
| 10 | earlier I think in response to my own perhaps | 07:05:10 |
| 11 | confusing instruction. | 07:05:14 |
| 12 | Do you recall being asked whether | 07:05:17 |
| 13 | you reviewed any documents in preparation for | 07:05:18 |
| 14 | this deposition? | 07:05:20 |
| 15 | A. Yes. | 07:05:21 |
| 16 | Q. Do you recall that before you answered | 07:05:21 |
| 17 | that question, I instructed you to answer to | 07:05:24 |
| 18 | the extent you remembered any specific | 07:05:26 |
| 19 | documents? | 07:05:27 |
| 20 | A. Yes. | 07:05:29 |
| 21 | Q. And do you recall that your answer to that | 07:05:29 |
| 22 | question was "no" after I've given you that | 07:05:31 |
| 23 | instruction? | 07:05:35 |
| 24 | A. Yes. | 07:05:35 |
| 25 | Q. So I'd like to just ask that question again. | 07:05:35 |

Page 246

| | | |
|---|---|---|
| 1 | This is the end of Tape No. 4 as well as | 07:06:35 |
| 2 | the deposition, and we are now off the | 07:06:37 |
| 3 | record. | 07:06:39 |
| 4 | (Whereupon the deposition was | 07:06:39 |
| 5 | concluded at 7:06 p.m.) | |

Page 248

| | | |
|---|---|---|
| 1 | In preparation for this deposition, did | 07:05:38 |
| 2 | you review any documents, excluding | 07:05:40 |
| 3 | identifying any specific documents, but | 07:05:43 |
| 4 | did you review any documents in preparation | 07:05:45 |
| 5 | for today? | 07:05:45 |
| 6 | A. The only documents I reviewed were the | 07:05:47 |
| 7 | several that I reviewed with counsel. | 07:05:49 |
| 8 | Q. Thank you. | 07:05:53 |
| 9 | MR. REHN: No further questions. | 07:05:53 |
| 10 | MR. BRIDGES: I have a follow-up. | 07:05:55 |
| 11 | What were the documents -- | 07:05:55 |
| 12 | MR. FEE: Hold on. I have no | 07:05:55 |
| 13 | questions. | 07:05:59 |
| 14 | REDIRECT EXAMINATION | 07:05:59 |
| 15 | BY MR. BRIDGES: | 07:05:59 |
| 16 | Q. What were the documents that you reviewed | 07:05:59 |
| 17 | with counsel? | 07:06:00 |
| 18 | MR. REHN: I will instruct the | 07:06:01 |
| 19 | witness not to answer that question on the | 07:06:02 |
| 20 | ground of attorney-client privilege. | 07:06:04 |
| 21 | Q. And do you intend to follow your counsel's | 07:06:17 |
| 22 | instruction? | 07:06:24 |
| 23 | A. Yes. | 07:06:27 |
| 24 | Q. Okay. | 07:06:29 |
| 25 | VIDEOGRAPHER: The time is 7:06. | 07:06:31 |

Page 247

| | |
|---|---|
| 1 | I declare under penalty of perjury |
| 2 | under the laws that the foregoing is |
| 3 | true and correct. |
| 4 | |
| 5 | Executed on _____ , 20___, |
| 6 | at _____, _____. |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | _____ |
| 12 | Christian Dubay |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 249

63 (Pages 246 - 249)

```
 1    COMMONWEALTH OF MASSACHUSETTS)
 2    SUFFOLK, SS. )
 3
 4
           I, Jeanette Maracas, Registered
 5    Professional Reporter and Notary Public in
      and for the Commonwealth of Massachusetts, do
 6    hereby certify that there came before me on
      the 1st day of April, 2015, at 10:00 a.m.,
 7    the person hereinbefore named, who was by me
      duly sworn to testify to the truth and
 8    nothing but the truth of his knowledge
      touching and concerning the matters in
 9    controversy in this cause; that he was
      thereupon examined upon his oath, and his
10    examination reduced to typewriting under my
      direction; and that the deposition is a true
11    record of the testimony given by the witness.
12
           I further certify that I am neither
13    attorney or counsel for, nor related to or
      employed by, any attorney or counsel employed
14    by the parties hereto or financially
      interested in the action.
15
16         In witness whereof, I have hereunto
      set my hand this 8th day of April, 2015.
17
18
19
20
21         Notary Public
           My commission expires 8/14/20
22
23
24
25
                                    Page 250
```

Veritext Legal Solutions
866 299-5127

# EXHIBIT 7

Case 1:13-cv-01215-TSC   Document 122-1   Filed 12/22/15   Page 235 of 298
Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


AMERICAN SOCIETY FOR
TESTING AND MATERIALS,
d/b/a ASTM INTERNATIONAL;
NATIONAL FIRE PROTECTION
ASSOCIATION, INC.; and
AMERICAN SOCIETY OF
HEATING, REFRIGERATION AND
AIR CONDITIONING ENGINEERS,

              Plaintiffs and
   Counter-Defendants,

        v.                    Civil Action No.
                              1:13-cv-01215-TSC

PUBLIC.RESOURCE.ORG, INC.,

              Defendant and
   Counter-Plaintiff.        PAGES 1 - 264
_____/



      Videotaped Deposition of: JAMES FRUCHTERMAN



DATE:        Friday, July 31, 2015



TIME:        9:34 a.m.



LOCATION:     Morgan, Lewis & Brockius, LLP
               Two Palo Alto Square, Suite 700
               Palo Alto, California



REPORTED BY:  Kelli Combs
               Certified Shorthand Reporter
               License 7705.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

42

1          THE WITNESS:  Yes.
2 BY MS. RUBEL:
3     Q   Have there been issues with technology
4 providers disabling access to eBooks for people with
5 print disabilities?
6          MR. KAPLAN:  Objection; vague, calls for
7 speculation.
8          THE WITNESS:  There have been issues with
9 technology providers providing the ability to
10 disable access and that capability being utilized.
11 Yes.
12 BY MS. RUBEL:
13    Q   What's your understanding of why the
14 technology providers were making it possible to
15 disable access to the eBooks for people with print
16 disabilities?
17    A   Public statements by different
18 stakeholders have mentioned concerns over rights.
19 Did they have the right to provide that, piracy, as
20 it's labeled by some, making of unauthorized copies?
21 Probably the top two issues that I've heard
22 discussed.
23    Q   Who do you mean by the "making of
24 unauthorized copies"?
25    A   I guess that's kind of a legal conclusion

43

1 whether it's authorized or not, but the Authors
2 Guild, for example, or authors would like to get
3 control of the making of copies.  That's, I think,
4 my understanding of what copyright is; the ability
5 to control who makes copies.
6     Q   So was there some concern that providing
7 access to eBooks for people with print disabilities
8 was somehow letting go of control over who was going
9 to be able to make copies of the material?
10         MR. KAPLAN:  Objection; vague, lacks
11 foundation and calls for speculation, argumentative.
12         THE WITNESS:  I would say that the
13 interests of people with disabilities was not the
14 primary reason for disabling or making it hard to
15 make copies of material.  I think the interests of
16 disabled people was a secondary issue or...
17 BY MS. RUBEL:
18    Q   So what were the primary issues?
19         MR. KAPLAN:  Objection; lacks foundation,
20 calls for speculation, vague.
21         THE WITNESS:  I think that authors and
22 publishers want to make it difficult for a consumer
23 to make copies to give away to other people.
24 BY MS. RUBEL:
25    Q   Do you think that's a valid concern?

44

1          MR. KAPLAN:  Objection; vague.
2          THE WITNESS:  In my opinion, I think it's
3 not a -- I don't think it's in their interests.
4 BY MS. RUBEL:
5     Q   You don't think what is in their
6 interests?
7     A   I think that the technical protection
8 mechanisms make their product less attractive to
9 consumers.
10    Q   Well, let me take a step back.
11    A   Uh-huh.
12    Q   My question was:  Do you think it's a
13 valid concern for publishers to be worried that
14 consumers may make copies to give away to other
15 people?  So I want to understand how your response
16 is responsive to my question.
17         MR. KAPLAN:  Is there a question, Counsel?
18 BY MS. RUBEL:
19    Q   Do you think it's a valid concern for
20 publishers that -- to want to prevent consumers from
21 making copies to give away?
22         MR. KAPLAN:  Objection; vague.
23         THE WITNESS:  I think that the way that
24 publishers try to prevent making of copies is not in
25 their interest; so no, I don't think it's a valid

45

1 concern because I think they -- their interests
2 would be better served if they didn't use those
3 technologies.
4 BY MS. RUBEL:
5     Q   Why do you think the use of those
6 technology -- technological mechanisms is not in
7 their interests?
8          MR. KAPLAN:  Objection; vague.
9          THE WITNESS:  To pick one particular
10 example, publishers who have taken off technical
11 protection mechanisms on titles sold more copies of
12 the books that didn't have those mechanisms on them
13 than the ones that did.  So the interpretation in
14 the industry is from people who advocate TPM-free
15 books is that it's in their interest because they
16 will sell more books.
17 BY MS. RUBEL:
18    Q   What publisher took off the technical
19 protections and sold more copies of the books after
20 making -- after taking that step?
21         MR. KAPLAN:  Objection; argumentative.
22         THE WITNESS:  I'm familiar that O'Reilley
23 Media, Baen, B-A-E-N, Books, and I'm also familiar
24 that this year all but one of Germany's major
25 publishers have all gone technical protection

Case 1:13-cv-01215-TSC   Document 122-1   Filed 12/22/15   Page 237 of 298
Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

98

1 BY MS. RUBEL:
2    Q   I'll give you an opportunity to take a
3 look at this and see if that refreshes your
4 recollection of how many total standards you
5 reviewed in the process of drafting your report.
6    A   NFPA 101-2000, ASHRAE 90.1-2010, five
7 other ASHRAE standards as outlined on page 12 of my
8 expert report, ASTM standard B57-84e1 of that
9 standard, as in Edward 1, ASTM A20, like Apple, 20A,
10 like Apple, 20M, like Mary, -93a, like Apple.  And I
11 also --
12        MR. KAPLAN:  I believe, for the court
13 reporter, the ASTM standard is B557, not B57.
14        THE WITNESS:  Correct.  I misread the
15 number.  In addition, I accessed the 2012 version of
16 the NPFA standards -- or NFPA standards.  It's NFPA,
17 right?
18        MR. REHN:  NFPA.
19        THE WITNESS:  Yeah.  So there's an error
20 where I flipped the letters there.  Now I'm
21 cross-referenced whether the ASHRAE standard is the
22 same one that I looked at here.  Let's see.  Yeah,
23 that looks like the same one.  So I wasn't keeping a
24 running count, but I think that's the complete list.
25 So it's in -- three, plus five, plus one, plus

99

1 another version of the same thing, so on the order
2 of 10.
3 BY MS. RUBEL:
4    Q   Do you know how many standards the
5 Plaintiffs have alleged that Public Resource has
6 infringed in this litigation?
7    A   No.
8    Q   If you'd turn to page 5 of your report,
9 the beginning of the last paragraph on page 5, you
10 indicated that:
11        "...approaches for 'free
12        access' that make it impossible to
13        copy text generally make it
14        impossible for the assistive
15        technology used by people with
16        print disabilities, especially
17        blind people, to read the text
18        aloud."
19        Is that correct?
20    A   Yes.
21    Q   You included the word "generally" there.
22 So I'd like to understand, are there ways to make it
23 impossible to copy text that do not make it
24 impossible for the assistive technology used by
25 people with print disabilities to operate?

100

1        MR. KAPLAN:  Objection; vague.
2        THE WITNESS:  Not in practice.
3 BY MS. RUBEL:
4    Q   Can you explain what you mean by that?
5    A   I could imagine a blind person trying to
6 take a picture of the screen, uploading that picture
7 into an OCR device and trying to see the text they
8 can't see on the screen.  That's really difficult to
9 do, but it's imaginable.
10    Q   So theoretically it could be possible for
11 a copyright owner to protect the text against
12 copying while also making it possible for someone
13 with a print disability to review the material; is
14 that what you were explaining?
15        MR. KAPLAN:  Objection; misstates the
16 testimony, incomplete hypothetical, vague,
17 argumentative.
18        THE WITNESS:  I believe that technology
19 that makes it impossible to access text as text but
20 instead presents a picture of the text is, for all
21 intents and purposes, inaccessible to a blind
22 person.
23 BY MS. RUBEL:
24    Q   Is there another way, other than
25 presenting the material as a picture, that a

101

1 copyright owner could provide -- could protect their
2 work against copying but at the same time still make
3 it available to be accessed by people with print
4 disabilities?
5        MR. KAPLAN:  Objection; incomplete
6 hypothetical, vague, argumentative and calls for a
7 legal conclusion.
8        THE WITNESS:  Yeah.  I don't know of a
9 technology solution that makes it impossible to
10 access the text by nondisabled people that doesn't
11 also make it impossible for disabled people to
12 access the text.  I don't think the technology is
13 smart enough to distinguish between those two
14 different groups.
15 BY MS. RUBEL:
16    Q   And you indicated in that same sentence on
17 page 5 that it's especially blind people who don't
18 have access to the material because of restrictions
19 on copying text.
20        Can you explain why is it especially blind
21 people?
22        MR. KAPLAN:  Objection; misstates the
23 document, misleading, vague.
24        THE WITNESS:  Elsewhere in my expert
25 report, I indicate that making material accessible

110

1 to certify the people and then represent that to us.
2 And so if a physician looks at someone's disability
3 and says, "I think they meet the standards of the
4 Chafee Amendment," we take that.
5 BY MS. RUBEL:
6     Q   You focus in your report on whether the
7 standards that you considered were accessible
8 specifically through use of a screen reader; is that
9 right?
10    A   Yes.  That was the primary mechanism I
11 used.
12    Q   Why did you select that as the primary
13 mechanism?
14    A   Because I outlined in my report, I looked
15 at the disability challenges of a blind person as
16 the most difficult to solve, and a screen reader is
17 the number one technology a blind person uses to
18 access online content, content on their personal
19 computer.
20    Q   What other types of tools do they use?
21       MR. KAPLAN:  Objection; vague.
22       THE WITNESS:  Common tools used by blind
23 people around accessibility include Braille
24 displays, as I mentioned before, screen readers,
25 screen enlargers for people with low vision, eBook

111

1 readers, audio cassette tape players, apps that
2 operate on tablets and smartphones.  I think most
3 other software applications that take inaccessible
4 material or digital material and make it talk or
5 larger or tactile.  Those are pretty much the ways
6 people do it.
7 BY MS. RUBEL:
8     Q   And did you consider for the purpose of
9 this -- of your report whether the Plaintiffs'
10 standards were accessible by blind people using any
11 of those other tools, other than the screen reader?
12       MR. KAPLAN:  Objection; vague.
13       THE WITNESS:  I believe that the problems
14 that they would run into with a screen reader were
15 similar to those that they would run into with other
16 technologies, if they could get the material.  I
17 think that's an accurate answer.
18 BY MS. RUBEL:
19    Q   So it's your belief that if they wouldn't
20 be able to access it through a screen reader, they
21 also wouldn't be able to access it through a Braille
22 display?
23       MR. KAPLAN:  Objection; misstates the
24 testimony.
25       THE WITNESS:  Yes.  A screen reader can

112

1 both talk what's on the screen as well as send it to
2 a Braille display so you can feel the same
3 characters.  And so the Braille display requires,
4 for online content, to have a screen reader or a
5 book reading program, but kind of most roads lead
6 through a screen reader unless you're handed the
7 digital file in an accessible format or someone
8 converts it for you.
9 BY MS. RUBEL:
10    Q   What about a screen enlarger; did you
11 consider whether any of the Plaintiffs' standards
12 that you reviewed, whether a person would be able to
13 use a screen enlarger on those standards?
14    A   I did not consider the use of a screen
15 enlarger.
16    Q   We'll talk a little more about your -- the
17 conclusions that you drew about screen readers, but
18 is it correct to summarize your opinion that the
19 versions of the Plaintiffs' standards on the free --
20 on the free access sections of their websites were
21 not accessible by screen readers?
22       MR. KAPLAN:  Objection; misstates
23 testimony, vague.
24       THE WITNESS:  Yes.
25

113

1 BY MS. RUBEL:
2     Q   Would it be possible for a blind person
3 who wanted access to those standards to have someone
4 read those standards aloud to them?
5       MR. KAPLAN:  Objection; incomplete
6 hypothetical.
7       THE WITNESS:  Yes.
8 BY MS. RUBEL:
9     Q   So there's some way that a blind person
10 would be able to know the content of those
11 standards, correct?
12       MR. KAPLAN:  Objection; incomplete
13 hypothetical, vague, argumentative.
14       THE WITNESS:  Yes.  As I mentioned
15 earlier, if they had someone else help them, they
16 could -- they could access the standards through a
17 variety of mechanisms.
18 BY MS. RUBEL:
19    Q   How else would having somebody else's
20 assistance -- sorry.  Strike that.
21       You mentioned that it would be possible if
22 the person was handed a digital copy to access the
23 content of the standards.  In what other ways, if
24 they had assistance, would a blind person be able to
25 access copies of the Plaintiffs' standards?

Case 1:13-cv-01215-TSC   Document 122-1   Filed 12/22/15   Page 239 of 298
Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

122

1 usage, only their accessibility.
2    Q   Do you know of any person who has ever
3 used any of the 10 standards that you reviewed?
4       MR. KAPLAN:  Objection; vague.
5       THE WITNESS:  I don't personally know of a
6 person who has shared with me that they've used
7 these standards.
8 BY MS. RUBEL:
9    Q   What percentage of people in the United
10 States are completely blind?
11    A   Less than 1 percent.
12    Q   What percentage of the population in the
13 United States has print disability?
14    A   We do not have a precise number, but our
15 estimate is in the 2 to 3 percent range that would
16 meet our qualifications.
17    Q   And that's including the 1 percent that's
18 blind?
19    A   Yeah.  All people with print disabilities
20 are in that range.
21    Q   Are you -- excuse me.
22       Are you aware of any individual who works
23 in the field of fire protection who's blind?
24       MR. KAPLAN:  Objection; vague.
25       THE WITNESS:  No.

123

1 BY MS. RUBEL:
2    Q   Are you aware of anyone who works in the
3 field of heating, air conditioning or refrigeration
4 who's blind?
5       MR. KAPLAN:  Objection; vague.
6       THE WITNESS:  No.
7 BY MS. RUBEL:
8    Q   Are you aware of any mechanical engineer
9 who is blind?
10       MR. KAPLAN:  Objection; vague.
11       THE WITNESS:  I don't think so.
12 BY MS. RUBEL:
13    Q   How about a civil engineer who's blind?
14       MR. KAPLAN:  Objection; vague.
15       THE WITNESS:  Nope.
16 BY MS. RUBEL:
17    Q   Are you aware of any other type of
18 engineer who's blind?
19    A   Yes.
20       MR. KAPLAN:  Objection; vague.
21 BY MS. RUBEL:
22    Q   What type of engineer?
23    A   Computer software engineers is one
24 professional category that I'm aware of personally,
25 knowing people who are blind who are in those

124

1 professions.
2    Q   Do any of the standards from Plaintiffs
3 that you reviewed relate to computer software
4 engineering?
5    A   No.
6    Q   Has anyone ever informed you that they
7 wanted to be able to access a standard that was
8 available on one of Plaintiffs' websites, but they
9 were unable to do so because of a print disability?
10    A   Nobody has personally asked me about the
11 accessibility of a document on one of the
12 Plaintiffs' sites.
13    Q   Are you aware that anyone with a print
14 disability has asked anyone else about the ability
15 to access a standard from one of the Plaintiffs'
16 websites?
17    A   Yes.
18       MR. KAPLAN:  You got to let me object.
19       THE WITNESS:  Sorry.
20       MR. KAPLAN:  It's okay.
21 BY MS. RUBEL:
22    Q   How many people are you aware of who have
23 indicated that they were unable to access a standard
24 from one of the Plaintiffs' websites because of a
25 print disability?

125

1       MR. KAPLAN:  Objection; misstates
2 testimony, misleading, vague.
3       THE WITNESS:  I don't know the number of
4 people who have requested the standards.  I simply
5 know that some of the standards have been requested
6 by print-disabled people.
7 BY MS. RUBEL:
8    Q   What standards have been requested by
9 print-disabled people?
10    A   I don't know the precise numbers, but at
11 least a couple from NFPA.
12    Q   And how do you know that?
13    A   They are in the Bookshare collection, and
14 the metadata associated with them is correlated with
15 a student request for that title.
16    Q   What NF -- do you know --
17       MR. KAPLAN:  Before we go any farther,
18 just in case, I'm going to designate the transcript
19 as provisionally confidential under the protective
20 order.
21       THE WITNESS:  Okay.
22 BY MS. RUBEL:
23    Q   Do you know what NFPA standards are
24 included in the Bookshare collection?
25    A   Not the one that I examined in this expert

Case 1:13-cv-01215-TSC  Document 122-1  Filed 12/22/15  Page 240 of 298
Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

130

1  priority based on our funding structure of which
2  titles we will do.  If it's for an educational
3  purpose by an American student, we're funded by the
4  Department Of Education to produce those.
5      If someone didn't have a school reason, we
6  could put it on a -- what we call a wish list, and
7  volunteers could produce the book or the person with
8  disability could cause it to be created themselves
9  and submit it to us to add to our library.
10  BY MS. RUBEL:
11    Q   Other than those several NFPA standards on
12  the Bookshare collection, are you aware of any other
13  standards of the Plaintiffs that anyone with a print
14  disability has indicated they were not able to
15  access because of their print disability?
16      MR. KAPLAN:  Objection; vague.
17      THE WITNESS:  I have no knowledge of that.
18  BY MS. RUBEL:
19    Q   The 10 specific standards that you
20  reviewed, are you aware of any person with a print
21  disability who attempted to access those standards
22  on the Plaintiffs' websites and was unable to do so?
23      MR. KAPLAN:  Objection; vague.
24      THE WITNESS:  No.  Sorry, I thought you
25  were finished.

131

1      MR. KAPLAN:  Yeah.  No.  No.
2  BY MS. RUBEL:
3    Q   Do you have any reason to believe that if
4  an individual approached any of the Plaintiffs to
5  request access of a standard due to their print
6  disability, that the Plaintiffs would not have
7  provided them access?
8    A   I'm having a hard time parsing the
9  question.  Can you ask it just a little bit more
10  simply.
11    Q   Sure.
12      Do you have any reason to believe that the
13  Plaintiffs would have said "no" if anybody said, "I
14  want to access one of your standards, but I can't
15  because I have a print disability"?
16      MR. KAPLAN:  Objection; incomplete
17  hypothetical, vague.
18      THE WITNESS:  I'm not aware either way.
19  BY MS. RUBEL:
20    Q   Did you ever investigate this?
21    A   The scope of my expert report was to
22  investigate the accessibility of the documents on
23  the Plaintiffs' site and not to investigate other
24  aspects of those questions.
25    Q   So you didn't investigate whether somebody

132

1  could have called the Plaintiffs, for example, and
2  asked for an electronic copy of the standard that
3  they would have been able to use to make it print --
4  accessible to someone with a print disability?
5      MR. KAPLAN:  Objection; incomplete
6  hypothetical, vague.
7      THE WITNESS:  Outside the scope of my
8  expert engagement.
9  BY MS. RUBEL:
10    Q   My question is:  Did you ever investigate
11  it?  So the answer may be "no" --
12    A   Okay.  No.
13    Q   Okay.
14      I'm just going to ask another short series
15  of questions, and then we can take another break.
16    A   Okay.  Sounds good.
17    Q   On page 7 of your report --
18    A   Yes.
19    Q   -- it's the first full -- the first
20  complete sentence on page 7, you indicated that it's
21  your opinion that people with other print
22  disabilities, such as vision impairment, dyslexia,
23  brain injury and physical disabilities, would find
24  the standards accessible with screen readers on
25  Public Resource's website but that the standards on

133

1  the free reading portions of the Plaintiffs'
2  websites would not be accessible to the great
3  majority of people with these types of disabilities;
4  is that correct?
5    A   Correct.
6      MR. KAPLAN:  Objection; misstates the
7  document.
8  BY MS. RUBEL:
9    Q   What's the basis of your conclusion that
10  the great majority of people with these types of
11  print disabilities would not be able to access the
12  standards from Plaintiffs' free websites?
13    A   Because the great majority of people in
14  that class rely on assistive technology to make
15  things accessible, and the free reading portions
16  basically interfere with almost all of those
17  assistive technology.
18      I felt that some people with low vision
19  might find it usable, and I base that on other
20  digital content like eBook readers.
21    Q   So some people with low vision would be
22  able to accessible -- sorry -- would be able to
23  access the standards from the free reading portions
24  of the Plaintiffs' websites?
25      MR. KAPLAN:  Objection; misstates

Case 1:13-cv-01215-TSC   Document 122-1   Filed 12/22/15   Page 241 of 298
Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

142

1    A   I think we focused on the website that
2 didn't have an accessible sign-up process, and I'm
3 happy to find out which one of the three standards
4 bodies had that problem, just so I correctly testify
5 to that.
6    Q   Sure.
7    A   So I'm looking at my expert report.  So we
8 focused our efforts on NFPA when we did our
9 in-person evaluation.
10   Q   Is Rob Turner blind?
11   A   Yes.
12   Q   What is his background?
13       MR. KAPLAN:  Objection; vague.
14       THE WITNESS:  He's a blind engineer for my
15 nonprofit organization.
16 BY MS. RUBEL:
17   Q   What -- what is his role --
18       Is he employed by Benetech?
19   A   Yes, he's employed by Benetech as a -- as
20 a Quality Assurance Engineer.
21   Q   So what does he do in that role?
22   A   He tests the quality of our products,
23 including our websites, evaluates accessibility, but
24 his focus is on our products.
25   Q   Why did you seek Rob Turner's assistance?

143

1    A   He's one of our blind employees who
2 happens to be in the office regularly as opposed to
3 being located in other locations; so I could go down
4 and talk to him.
5    Q   So you asked --
6        You asked Rob to try to access standards
7 from NFPA's website and see if he was able to do so?
8        MR. KAPLAN:  Objection; vague.
9        Go ahead.
10       THE WITNESS:  Correct.  First, I asked him
11 to look at the sign-up process to see if he could
12 sign up for a free reading account without needing
13 assistance from a sighted person, and he wasn't able
14 to do that.
15 BY MS. RUBEL:
16   Q   Was there anything else you asked him to
17 do?
18   A   After I pushed the "I Agree" button and
19 got him through that, that roadblock, I also asked
20 him to try to read the standard in question.
21   Q   Did you ask Rob to try to access any of
22 the Plaintiffs' standards that are posted on Public
23 Resource's website?
24   A   No, I did not.
25   Q   What are the Web content accessibility

144

1 guidelines?
2    A   They're the primary Web accessibility
3 standard promulgated by the World Wide Web
4 Consortium, which is the main standards body in Web
5 technology.
6    Q   Does Benetech participate in the World
7 Wide Web Consortium's standards development process?
8        MR. KAPLAN:  Objection; vague.
9        THE WITNESS:  Benetech staff have
10 participated in W3C standards efforts.
11 BY MS. RUBEL:
12   Q   In what capacity?
13   A   As a stakeholder with technical expertise
14 in the area.  So our focus is on accessibility
15 aspects of W3C standards.
16   Q   During what time period did Benetech
17 participate in the standards development process for
18 this organization?
19   A   In one form or another, we have
20 participated in the W3C standards process for
21 roughly 20 years.
22   Q   And does Benetech currently participate in
23 the standards development process?
24   A   I'm not aware of a current process that
25 we're actively involved with today, but we might

145

1 be -- we've been involved in the last couple of
2 years on an issue that may still be open.
3    Q   Did participants pay fees in order to
4 participate in the standard development process with
5 this Consortium?
6    A   I believe that there are people who are
7 members of the W3C and pay fees and people who do
8 not.
9    Q   How much do members pay?
10   A   I am not aware of that number.
11   Q   Do you have a ballpark?
12   A   No.  I wouldn't speculate.
13   Q   Are you familiar with the license that the
14 Consortium uses with respect to the standards that
15 it develops?
16       MR. KAPLAN:  Objection; argumentative,
17 vague, calls for a legal conclusion.
18       THE WITNESS:  Is the question about the
19 W3C?  I don't recall having read their license in
20 many years, if I ever have.
21 BY MS. RUBEL:
22   Q   Did you attach a copy of their license as
23 an exhibit to your report?
24   A   I specified the W3C standard that I used
25 and counsel attached the actual standard.

Case 1:13-cv-01215-TSC   Document 122-1   Filed 12/22/15   Page 242 of 298
Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

162

1 right?
2    A   Yes.
3    Q   Was this the entire screen that you saw or
4 just a portion of the screen?
5    A   A portion, but I'd say that, you know, you
6 can see the scroll bar, that there are multiple
7 scroll bars that I could access to scan down and see
8 more of it or to go forward.
9    Q   So you were able to scroll down to see
10 what was the entire page 1 on the screen of the
11 ASTM's Reading Room?
12    A   As a sighted person, I believe that I
13 could see all of page 1, yes.
14    Q   And you could click through -- and the
15 arrows, using the arrows to see page 2; is that
16 correct?
17    A   As a sighted person, yes, I believe I can.
18    Q   And all the way through up to page 11; is
19 that right?
20    A   I believe that I doubt that I actually
21 went page by page all the way to page 11.
22    Q   Was there an option on the ASTM's Reading
23 Room to make the text larger?
24    A   I didn't look for that feature.
25    Q   Did you believe that was relevant; that an

163

1 option to make the text larger would be relevant to
2 evaluating whether the standard is accessible to
3 people with print disabilities?
4        MR. KAPLAN:  Objection; argumentative,
5 vague.
6        THE WITNESS:  As we discussed before,
7 low-vision people, a chunk of low-vision people,
8 would be able to access a visually-presented
9 standard, and they could be using their own screen
10 magnifier, they could be using built-in browser
11 controls to make the text larger, they can --
12 sometimes people in the websites implement an
13 enlargement button to make the text larger, which is
14 an alternate way of accomplishing the same thing.
15        And so on the base website, I just assumed
16 those things would work because I don't feel like on
17 a text-based website I need to test them; they work.
18        The image-based window, I am less certain
19 about how easy it would be to make larger, because I
20 did not actually test it directly with a screen
21 magnifier.
22 BY MS. RUBEL:
23    Q   And, in fact, you didn't see if ASTM
24 actually provided any options within the Reading
25 Room that would help somebody make the text larger;

164

1 is that right?
2        MR. KAPLAN:  Objection; asked and
3 answered, argumentative, vague.
4        THE WITNESS:  Though I don't recall ASTM
5 particularly, a zoom function is quite common in an
6 image viewer, so I probably just assumed it was
7 there even though I didn't specifically look for it.
8 BY MS. RUBEL:
9    Q   If you look at the screenshot on page 14
10 in the top right-hand corner of where the -- of the
11 window in which the standard is shown, do you see
12 the icon that's all the way to the right?
13    A   The plus icon.
14    Q   Yes.  What -- what does that indicate to
15 you?
16    A   It's probably the zoom function that I
17 just referred to.
18    Q   And do you recall pushing that button
19 and --
20        Do you recall pushing that button?
21    A   Usually when these windows first come up,
22 the standards are illegible, so yeah, usually I
23 probably push the magnification button to make it
24 readable.  So it's quite typical in an image-based
25 window to have a zoom function, especially because

165

1 you have no idea how big a screen the person is
2 viewing this on.
3    Q   Do you know how much zoom capability the
4 ASTM's website provides a user with, how much larger
5 it can make the text?
6        MR. KAPLAN:  Objection; vague.
7        THE WITNESS:  No.  But I think I pretty
8 much already said earlier that I think that people
9 who are low vision can generally see these
10 standards, and so my testing really focused on
11 screen reader users and blind people as opposed to
12 getting in deeper to gradations of accessibility for
13 visually impaired people who I felt -- figured many
14 of which would already be able to access this
15 standard.
16 BY MS. RUBEL:
17    Q   Were you able to locate a text searching
18 function on ASTM's -- on the version of ASTM's
19 standard B557-84 in the Reading Room?
20    A   I was not.
21    Q   Do you know whether people without print
22 disabilities are able to search for the -- search
23 through the text of standards on ASTM's Reading
24 Room?
25    A   I assume because I wasn't able to locate a

Case 1:13-cv-01215-TSC   Document 122-1   Filed 12/22/15   Page 243 of 298
Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

166

1 text searching function, that's because it isn't
2 there unless it's well hidden.  Also, the page looks
3 like a picture of a standards page as opposed to a
4 text version.  So the fact that it was a picture of
5 the page, generally that means that text searching
6 tends to be unavailable unless they've done
7 something extra.
8     Q   In addition to ASTM standard B557, you
9 also evaluated one other ASTM standard.  What
10 standard was that?
11    A   ASTM A20/A20M, like Mary, -93a, like
12 Apple.
13    Q   Why did you evaluate that standard?  Why
14 did you choose that standard?
15    A   Because it was the first one listed, and I
16 just wanted to see, gee, the other standard's
17 presenting the same image-based interface.  Yes,
18 looks like it, and I think I had tested five of them
19 on another standards website, and so after you've
20 tested them, you got to say, "Well, gee, looks like
21 they're all presenting this image-based interface,"
22 but obviously I did not comprehensively go through
23 every standard to confirm that they all presented
24 the same inaccessible interface.
25    Q   Do you know if ASTM standard A20 is at

167

1 issue in this litigation?
2     A   No, I do not.
3     Q   Did you review Public Resource's website
4 in connection with this expert report?
5     A   Yes.
6     Q   Is the general public able to access
7 Public Resource's website?
8     A   Yes.  Sorry.
9     Q   Is there any mechanism within Public
10 Resource's website that allows only people with
11 print impairments to view copies of any of the
12 material on that website?
13    MR. KAPLAN:  Objection; vague.
14    THE WITNESS:  Not that I'm aware of.
15 BY MS. RUBEL:
16    Q   So Public Resource has not published the
17 standard -- the Plaintiffs' standards in a manner
18 that is exclusively available to people with print
19 disabilities, correct?
20    MR. KAPLAN:  Objection; misstates
21 testimony, calls for speculation.
22    THE WITNESS:  The standards that are on
23 the Public Resource website seem to work for people
24 with disabilities, and as a member of the general
25 public, I was able to look at the same standards.  I

168

1 didn't have to sign up for anything.
2 BY MS. RUBEL:
3     Q   So Public Resource is not providing access
4 to Plaintiffs' standards exclusively to people with
5 print disabilities, correct?
6     MR. KAPLAN:  Objection; vague, calls for a
7 legal conclusion.
8     THE WITNESS:  Yes.
9 BY MS. RUBEL:
10    Q   Does the material that Public Resource
11 posted on its website bear any notice that further
12 reproduction of the material could be an
13 infringement?
14    MR. KAPLAN:  Objection; vague, lacks
15 foundation.
16    THE WITNESS:  No.  At least it's been long
17 enough that -- let me reread the question.
18    MR. KAPLAN:  Can you restate the question.
19    (Record read as follows:
20    "Q   Does the material that
21    Public Resource posted on its
22    website bear any notice that
23    further reproduction of the
24    material could be an
25    infringement?")

169

1     MR. KAPLAN:  And I'll make the same
2 objections.
3     THE WITNESS:  Yeah.  No, not to my
4 knowledge, based on the parts that I examined.
5 BY MS. RUBEL:
6     Q   In what formats does Public Resource's
7 website provide Plaintiffs' standards in?
8     MR. KAPLAN:  Objection; lacks foundation.
9     THE WITNESS:  I believe multiple
10 standards.  The two formats that I particularly
11 examined were HTML and PDF.
12 BY MS. RUBEL:
13    Q   Do you know how many of Plaintiffs'
14 standards Public Resource has posted in HTML format?
15    A   No.
16    Q   Do you have a ballpark estimate?
17    A   No.
18    Q   Do you know how many standards that are at
19 issue in this case Public Resource has posted in
20 HTML format?
21    A   No.
22    Q   How can a screen reader --
23    How does a screen reader read the text of
24 content that is in HTML format?
25    MR. KAPLAN:  Objection; incomplete

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

202

1  documents, which is a different Adobe product
2  that -- yes.
3     Q   Are you aware that NFPA sells PDF versions
4  of its standards on its website?
5     A   Let's see if it has a Buy Now button on my
6  screenshot.  I see a cart on there, so I assume that
7  you guys sell things.  I -- I probably didn't check
8  to see whether you sell PDF versions of the
9  standard.
10    Q   Did anybody ask you to check whether any
11 of the Plaintiffs in this case sold PDF standards?
12       MR. KAPLAN:  Objection; calls for
13 privileged communications.
14       You can answer to the extent that you
15 don't divulge privileged communications.
16       THE WITNESS:  No.
17 BY MR. REHN:
18    Q   When you were asked to render an opinion
19 about the accessibility of Plaintiffs' standards,
20 did it occur to you to check whether those standards
21 were available in a PDF version or any other
22 electronic version?
23       MR. KAPLAN:  Objection; misleading,
24 misstates testimony, vague, argumentative.
25       THE WITNESS:  Privileged conversation.

203

1  BY MR. REHN:
2     Q   I'm asking what occurred to you, outside
3  of conversations you had with attorneys about this
4  project.
5        Did it ever occur to you that that was
6  something that might be necessary to check?
7        MR. KAPLAN:  Objection; vague.
8        THE WITNESS:  Go ahead.  I -- I -- I think
9  I stated my opinion.  I was asked to evaluate the
10 accessibility --
11       MR. KAPLAN:  Let's not get into privileged
12 communications.
13       THE WITNESS:  Okay.  All right.
14 BY MR. REHN:
15    Q   If you would turn to page 1 of your expert
16 report --
17    A   Yes.
18    Q   -- it says:
19       "I have been retained by
20       Public.Resource.Org to evaluate the
21       accessibility of certain online
22       content available on the websites
23       of the Plaintiffs and the Defendant
24       in this case."
25       Is that correct?

204

1     A   Yes.
2     Q   When you were retained to evaluate the
3  accessibility of content available on the websites
4  of the Plaintiffs, did you consider whether you
5  should check to see if there were PDF versions
6  available from the Plaintiffs?
7        MR. KAPLAN:  You can go ahead and answer.
8        THE WITNESS:  No.
9  BY MR. REHN:
10    Q   You just didn't think --
11       That didn't occur to you that that might
12 be a possibility?
13       MR. KAPLAN:  Objection; asked and
14 answered, argumentative.
15       THE WITNESS:  I'll just go back to my
16 expert report and that sentence.  I was asked to
17 evaluate the accessibility of certain online
18 content.
19 BY MR. REHN:
20    Q   Now, if I can ask you to turn to page 5 of
21 your report, where you say -- it says "Overview and
22 Summary of Opinions."
23    A   Uh-huh.
24    Q   If you could just read the first sentence
25 there, the first full sentence under that heading.

205

1     A   (Reading):
2        "Having reviewed the
3        accessibility of the same standards
4        content rendered by
5        Public.Resource.Org and those of
6        the free access options provided by
7        the NFPA, ASHRAE and ASTM, it is my
8        opinion that Public.Resource.Org
9        currently provides the only
10       accessible option for
11       people/citizens with print
12       disabilities to access these
13       standards."
14    Q   And in forming that opinion, you compared
15 the standards that were available on
16 Public.Resource.Org's website with the free access
17 options provided by Plaintiffs in forming that
18 opinion; is that correct?
19    A   Correct.
20    Q   Did you evaluate any PDFs being sold by
21 NFPA in forming that opinion?
22    A   No.
23    Q   Did you evaluate any PDFs being sold by
24 ASHRAE in forming that opinion?
25    A   No.

Case 1:13-cv-01215-TSC   Document 122-1   Filed 12/22/15   Page 245 of 298
Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

258

1  BY MR. REHN:
2      Q   Did you make any image-based PDFs of
3  documents from any of Plaintiffs' websites?
4      A   I didn't make any documents from
5  Plaintiffs' websites.  I downloaded whatever
6  document -- no, I downloaded -- I viewed the
7  document, yes.  So, no.
8      Q   After you sent him a document, it would
9  have been one from Public Resource's website?
10     A   That's correct.  Thank you.
11     Q   And if I could direct you to the last
12  sentence of the first paragraph of his e-mail, would
13  you read that sentence, please?
14     A   The one "I don't think..."?
15     Q   Yes.
16     A   Yes.
17         "I don't think this type of
18         document can be considered to be
19         accessible."
20     Q   So based on your prior testimony, is it
21  your understanding that he is saying that the
22  image-based PDF from Public Resource's website that
23  you sent to Mr. Turner, in his opinion, cannot be
24  considered to be accessible?
25         MR. KAPLAN:  Objection; misleading,

259

1  argumentative, vague.
2          THE WITNESS:  I think Rob Turner doesn't
3  believe it meets all our accessibility standards, which
4  is what his job is to primarily work on our library
5  for the blind.  We would not post an image-based PDF
6  and call it accessible.
7  BY MR. REHN:
8      Q   And do you agree with Mr. Turner's
9  assessment that this type of document cannot be
10  considered to be accessible?
11     A   I think it's less accessible than many of
12  the other documents and more than others, as I wrote
13  in my expert report.  I can probably quote from the
14  report.
15     Q   There's no question pending.  So...
16     A   Okay.  I would direct you to my last
17  sentence of my report --
18         MR. KAPLAN:  Jim, there's no question
19  pending.
20         THE WITNESS:  All right.
21         MR. REHN:  I have no further questions.
22  And I believe that concludes Plaintiffs' questioning
23  of this witness.
24         MR. KAPLAN:  I have no questions at this
25  time.

260

1          THE VIDEOGRAPHER:  This concludes today's
2  deposition.  We're going off the record at 7:09.
3          (Time noted:  7:09 p.m.)
4          (Signature waived.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

261

1          CERTIFICATION OF DEPOSITION OFFICER
2      I, the undersigned, a Certified Shorthand
3  Reporter of the State of California, do hereby certify:
4      That the foregoing proceedings were taken
5  before me at the time and place herein set forth; that
6  any witnesses in the foregoing proceedings, prior to
7  testifying, were administered an oath; that a record of
8  the proceedings was made by me using machine shorthand
9  which was thereafter transcribed under my direction;
10  that the foregoing transcript is a true record of the
11  testimony given.
12      Further, that the foregoing pertains to the
13  original transcript of a deposition in a Federal Case,
14  before completion of the proceedings, a review of the
15  transcript [ ] was [X] was not requested.
16      I further certify I am neither financially
17  interested in the action nor a relative or employee of
18  any attorney or any party to this action.
19
20
21
22
23    _____
      KELLI COMBS
24    CSR No. 7705
25

# EXHIBIT 8

```
 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLUMBIA
 3    ----------------------------------
      AMERICAN SOCIETY FOR TESTING AND   ) Case No.
 4    MATERIALS d/b/a ASTM INTERNATIONAL;) 1:13-cv-01215-EGS
                                         )
 5    NATIONAL FIRE PROTECTION           )
      ASSOCIATION, INC.; and             )
 6                                       )
      AMERICAN SOCIETY OF HEATING,       )
 7    REFRIGERATING, AND                 )
      AIR-CONDITIONING ENGINEERS, INC.,  )
 8                                       )
            Plaintiffs,                  )
 9         vs.                           )
                                         )
10    PUBLIC.RESOURCE.ORG, INC.,         )
                                         )
11            Defendant.                 )
      ----------------------------------)
12    AND RELATED COUNTERCLAIMS.         )
      ----------------------------------)
13
14
15      RULE 30(B)(6) VIDEOTAPED DEPOSITION OF AMERICAN
16     STANDARDS SOCIETY FOR TESTING AND MATERIALS, BY AND
17                  THROUGH ITS DESIGNEE,
18                     JEFFREY GROVE
19                    WASHINGTON, D.C.
20              WEDNESDAY, MARCH 4, 2015
21
22    Reported by:
23    NANCY J. MARTIN, CSR No. 9504, RMR
24    Job No. 2010158
25    PAGES 1 - 284
```

                                             Page 1

1 Nancy Martin, please swear in the witness, and we can 09:22:25
2 begin.                                              09:22:27
3          JEFFREY GROVE,                             09:22:36
4   having been first duly sworn,                     09:22:40
5     and testified as follows:                       09:22:40
6                                                     09:22:40
7          EXAMINATION                                09:22:40
8 BY MR. BRIDGES:                                      09:22:40
9   Q. Good morning, Mr. Grove.                        09:22:40
10  A. Good morning.                                   09:22:41
11  Q. Have you ever been deposed before?              09:22:45
12  A. I have not.                                     09:22:46
13  Q. Have you had a chance to meet with ASTM         09:22:49
14 attorneys to prepare you for this deposition?       09:22:51
15  A. I did.                                          09:22:57
16  Q. When did you meet with them?                    09:22:57
17  A. I met with our attorneys over a period of       09:22:58
18 three days. The last two days, and once in December. 09:23:01
19 A total of 15 hours.                                09:23:06
20  Q. With whom did you meet?                         09:23:12
21  A. I met with Kevin Fee and with Jordana Rubel,    09:23:13
22 and with our corporate attorney, Tom O'Brien.       09:23:19
23  Q. You understand that you are testifying today    09:23:32
24 as a representative of ASTM?                         09:23:34
25  A. Yes.                                            09:23:38
                                                    Page 14

1  Q. And you understand that you are testifying as   09:23:40
2 a representative of ASTM with respect to certain     09:23:46
3 subject matters?                                     09:23:48
4  A. Yes.                                             09:23:49
5  Q. What did you do to educate yourself about       09:23:49
6 those subjects?                                      09:23:52
7  A. In addition to the meetings, I reviewed a lot    09:23:53
8 of documents.                                        09:23:56
9  Q. And when did you review the documents?          09:24:01
10  A. Over the last few days and in my own personal  09:24:03
11 time before then.                                   09:24:07
12  Q. How much time did you spend reviewing          09:24:11
13 documents outside of meetings with attorneys?       09:24:13
14  A. Probably 8 to 10 hours.                         09:24:16
15  Q. Did you select those documents, or did the     09:24:23
16 lawyers select the documents?                       09:24:25
17  A. Personal knowledge, I selected them.            09:24:26
18  Q. What determined which documents you selected    09:24:38
19 to review?                                          09:24:41
20      MR. FEE: Objection. To the extent that        09:24:42
21 legal counsel or their guidance provided any basis for 09:24:43
22 your determination, I'm going to instruct you not to  09:24:48
23 disclose that. If you have some independent review   09:24:50
24 criteria that you can share with the other side,     09:24:53
25 that's fine.                                         09:24:55
                                                    Page 15

1       THE WITNESS: I don't have any criteria.        09:24:56
2 Just I thought it would be a good idea to review     09:24:58
3 annual reports and that type of publicly available    09:25:02
4 information about ASTM.                               09:25:04
5 BY MR. BRIDGES:                                       09:25:08
6   Q. What else did you review among the documents?  09:25:08
7       MR. FEE: Objection. Are you asking about       09:25:11
8 the ones he selected on his own or the ones --        09:25:12
9       MR. BRIDGES: No --                             09:25:14
10      MR. FEE: Well, I'm going to instruct you not   09:25:14
11 to disclose the documents that you reviewed at the   09:25:16
12 request or direction of counsel. You can disclose any 09:25:18
13 other documents you reviewed.                        09:25:21
14      MR. BRIDGES: I think I'm entitled to know      09:25:22
15 what documents he reviewed to prepare for the        09:25:23
16 deposition. It might reveal attorney work product if  09:25:27
17 he told us what documents were discussed with counsel, 09:25:31
18 but I'm entitled to know which documents he reviewed  09:25:36
19 in general.                                          09:25:39
20      MR. FEE: I disagree.                           09:25:41
21      You should follow my instruction.              09:25:43
22      THE WITNESS: I have no other documents that    09:25:44
23 I can recall to disclose.                            09:25:46
24 BY MR. BRIDGES:                                      09:25:47
25  Q. So you're saying that all the documents -- of   09:25:47
                                                    Page 16

1 all the documents you reviewed, only annual reports   09:25:52
2 are those that you thought to review on your own?     09:25:55
3  A. Right. I think the exception to that would       09:25:56
4 be standardization news. I contributed some articles  09:26:01
5 that I thought I should refresh my memory with.       09:26:03
6  Q. What did those articles concern?                 09:26:08
7  A. Discussed generally ASTM's mission and work      09:26:13
8 we do to promote ASTM's mission and its important role 09:26:20
9 in protecting everyday citizens due to the development 09:26:24
10 of standards that protect the environment, health, and 09:26:26
11 safety.                                             09:26:31
12      MR. BRIDGES: One thing occurred to me. We     09:26:35
13 may need a short break. I forgot, you know, I was    09:26:37
14 supposed to have real time. Can we get real time?    09:26:39
15      REPORTER MARTIN: Yes, sir. I'm working on     09:26:43
16 it right now.                                        09:26:43
17      MR. BRIDGES: Thanks.                           09:26:43
18      MR. BECKER: We also have an email from Thane  09:26:48
19 stating he'd like to listen in. So perhaps we should 09:26:49
20 take a break and set up real-time.                   09:26:51
21      MR. BRIDGES: I think we've got a separate      09:26:55
22 bridge. I think Carl dialed in directly. So we're    09:26:57
23 going to have to drop him and set up a bridge.       09:26:59
24      Sorry about this, but let's go off the record  09:27:01
25 for a few minutes.                                   09:27:03
                                                    Page 17

5 (Pages 14 - 17)

| | |
|---|---|
| 1    THE VIDEOGRAPHER: We're now going off the   09:27:05 | 1   Q. Did you attach any significance to that   09:41:21 |

---

1    THE VIDEOGRAPHER: We're now going off the  09:27:05
2 record at 9:26.  09:27:05
3    (A recess was taken from 9:26 a.m.  09:34:30
4    to 9:37 a.m.)  09:38:32
5    THE VIDEOGRAPHER: And we're back on the  09:38:33
6 record at 9:37.  09:38:34
7 BY MR. BRIDGES:  09:38:48
8   Q. Do you recall any other documents that you  09:38:48
9 reviewed on your own initiative apart from annual  09:38:50
10 reports and standardization news?  09:38:53
11   A. I do not.  09:38:59
12   Q. Apart from conversations specifically with  09:39:01
13 attorneys, did you discuss the topics of today's  09:39:06
14 conversation -- of today's deposition with anyone else  09:39:12
15 in preparation for your deposition today?  09:39:18
16   A. I made a phone call to our vice president of  09:39:21
17 sales and publications.  09:39:24
18   Q. Who is that?  09:39:28
19   A. John Pace.  09:39:31
20   Q. What did you discuss with him?  09:39:31
21   A. Wanted to review ASTM's financials and  09:39:38
22 revenues so I was prepared.  09:39:42
23   Q. What did you learn from him?  09:39:46
24   A. Not much. To be honest, I think I have a  09:39:47
25 good understanding.  09:39:52

Page 18

1   Q. What did you ask him about?  09:39:55
2   A. I wanted to review with him what I knew about  09:39:59
3 sources of ASTM's revenue from the sale publications.  09:40:07
4   Q. What else did you ask him about?  09:40:12
5   A. That's all I recall.  09:40:15
6   Q. Did you review -- did you discuss with him  09:40:20
7 any changes in revenue to ASTM from publications?  09:40:25
8    MR. FEE: Objection. Form.  09:40:30
9    THE WITNESS: Not that I recall.  09:40:34
10 BY MR. BRIDGES:  09:40:37
11   Q. And did you discuss with him any trends with  09:40:37
12 respect to revenue that ASTM gains from publications?  09:40:42
13    MR. FEE: Objection to form.  09:40:45
14    Go ahead.  09:40:47
15    THE WITNESS: I did ask -- I wanted to learn  09:40:48
16 over the last couple of years, roughly, what increase  09:40:53
17 in sales we've been experiencing.  09:40:56
18 BY MR. BRIDGES:  09:41:01
19   Q. What else?  09:41:01
20   A. That's all I recall.  09:41:02
21   Q. What did you learn about the increase in  09:41:05
22 sales that ASTM has been experiencing?  09:41:07
23   A. That there has been a very slight 2 to 3 to 5  09:41:10
24 percent increase over the last two to three years.  09:41:15
25 Revenue from sales of publications.  09:41:18

Page 19

1   Q. Did you attach any significance to that  09:41:21
2 figure?  09:41:23
3    MR. FEE: Objection. Vague.  09:41:25
4    THE WITNESS: No.  09:41:28
5 BY MR. BRIDGES:  09:41:30
6   Q. Did it strike you as unusual or unexpected in  09:41:30
7 any --  09:41:33
8    MR. FEE: Objection. Vague and compound.  09:41:34
9    THE WITNESS: It did not.  09:41:40
10 BY MR. BRIDGES:  09:41:43
11   Q. Did those figures he gave you accord with  09:41:43
12 your expectations?  09:41:45
13   A. Generally, yes.  09:41:51
14   Q. Did that revenue trend -- strike that.  09:41:56
15    Was that revenue trend consistent with  09:42:03
16 revenue trends over previous years?  09:42:05
17    MR. FEE: Objection. Vague.  09:42:09
18    THE WITNESS: I don't know.  09:42:14
19 BY MR. BRIDGES:  09:42:15
20   Q. Do you know anything about revenue trends  09:42:15
21 before three years ago?  09:42:17
22    MR. FEE: Same objection.  09:42:19
23    THE WITNESS: Not that I can produce or  09:42:26
24 recall.  09:42:27
25 BY MR. BRIDGES:  09:42:32

Page 20

1   Q. What else did you discuss with Mr. Pace?  09:42:32
2   A. That's all I recall.  09:42:39
3   Q. Did you have conversations with anyone else  09:42:40
4 to prepare for your testimony today?  09:42:43
5    MR. FEE: I assume you're excluding  09:42:49
6 conversations with counsel for purposes --  09:42:50
7    MR. BRIDGES: Yes.  09:42:52
8    MR. FEE: -- of that question?  09:42:52
9    MR. BRIDGES: Yes.  09:42:54
10    THE WITNESS: Not that I recall.  09:42:55
11 BY MR. BRIDGES:  09:43:04
12   Q. How long have you worked for ASTM?  09:43:04
13   A. Just over 10 years.  09:43:07
14   Q. What have your job titles been?  09:43:11
15   A. My original job title was Washington  09:43:13
16 representative. My second title was director of  09:43:15
17 government and industry affairs, and my current title  09:43:21
18 is vice president of global policy and industry  09:43:25
19 affairs.  09:43:29
20   Q. In that job title, what does the word  09:43:39
21 "industry" refer to?  09:43:41
22    MR. FEE: Objection. Vague.  09:43:43
23    THE WITNESS: Well, the majority of ASTM  09:43:48
24 members under our system of private sector led  09:43:51
25 public/private collaboration come from industry. So I  09:43:56

Page 21

1 something that I would speak about.                12:06:06
2 BY MR. BRIDGES:                                    12:06:08
3     Q.  So what factors should government agencies  12:06:08
4 take into consideration when examining industry    12:06:08
5 standards for regulatory purposes?                 12:06:10
6     A.  Well, one of the most important factors that  12:06:13
7 we believe is important to maintain the robust, viable  12:06:15
8 system of standardization that we have in the U.S. is  12:06:24
9 looking to see if standards development organizations  12:06:26
10 meet the world trade organizations, technical barriers  12:06:28
11 to trade agreement principles for international     12:06:31
12 standardization.  It's a message that we believe    12:06:34
13 strongly in at ASTM, we've invested heavily in, and we  12:06:37
14 promote it as widely as possible.                  12:06:41
15     Q.  What regulatory purposes do you anticipate  12:06:49
16 government agencies have that causes them to examine  12:06:54
17 industry standards?                                12:07:01
18     MR. FEE:  Read that back, please.              12:07:03
19     (Record read.)                                 12:07:13
20     MR. FEE:  Objection.  Calls for speculation.   12:07:14
21 It's beyond the scope of his designation.          12:07:15
22     THE WITNESS:  I don't have an answer for       12:07:23
23 that.  I think you could assume that government     12:07:24
24 participants in the standardization process bring   12:07:30
25 knowledge of regulatory agendas and regulatory needs  12:07:32
Page 94

1 of agencies to the voluntary consensus standards   12:07:37
2 community of which ASTM is one member amongst 225   12:07:40
3 others.                                            12:07:45
4 BY MR. BRIDGES:                                    12:07:50
5     Q.  This agenda item referred to government     12:07:50
6 agencies examining industry standards for regulatory  12:07:52
7 purposes.                                          12:07:56
8     MR. FEE:  Objection.  Vague.  What agenda --    12:07:57
9 I'm unclear as to what agenda you're referring.    12:08:00
10 There's no agenda in front of him.                 12:08:04
11     MR. BRIDGES:  That's all right.  It's so       12:08:07
12 short, I can read it to him.                       12:08:08
13     Q.  So my question is what regulatory purposes do  12:08:10
14 you understand government agencies to have when they  12:08:16
15 examine industry standards?                        12:08:20
16     MR. FEE:  Objection.  He's not been            12:08:22
17 designated as to speculation as to government       12:08:24
18 regulatory motivations, but to the extent you have an  12:08:26
19 understanding individually, you can try to answer   12:08:31
20 that.                                              12:08:34
21     THE WITNESS:  Sure.  And I'm not an attorney,  12:08:35
22 but my understanding is the National Technology    12:08:36
23 Transfer and Advancement Act of 1995 combined with the  12:08:38
24 OMB circular A119 lays out criteria or further     12:08:41
25 guidance for federal agencies for them to consider  12:08:50
Page 95

1 when they're looking at participating in standards  12:08:53
2 development activities and utilizing voluntary      12:08:57
3 consensus standards in support of their agency's    12:09:01
4 mission.                                           12:09:03
5 BY MR. BRIDGES:                                    12:09:11
6     Q.  So my question is what are the regulatory   12:09:11
7 purposes that in your interactions with government on  12:09:16
8 behalf of ASTM, you believe government agencies have  12:09:20
9 when they examine industry standards?  So I'm asking  12:09:25
10 what do you think the regulatory purposes are.      12:09:29
11     MR. FEE:  Same objections, plus compound.       12:09:31
12     THE WITNESS:  Yeah.  And I don't believe       12:09:33
13 there's any one answer to that.  Each agency that   12:09:34
14 we're aware of that we interact with or that        12:09:38
15 participate in our committees have different needs and  12:09:40
16 different expectations and different motivations for  12:09:42
17 participating in our process.                      12:09:46
18 BY MR. BRIDGES:                                    12:09:48
19     Q.  So beyond that, you can't give your testimony  12:09:48
20 as to what you think the government regulatory      12:09:51
21 purposes are on a general basis?                   12:09:54
22     MR. FEE:  Same objections.                     12:09:57
23 BY MR. BRIDGES:                                    12:10:00
24     Q.  In using or in examining ASTM's standards.  12:10:00
25     MR. FEE:  Same objections.                     12:10:05
Page 96

1     THE WITNESS:  Yeah.  I think we discussed       12:10:09
2 earlier federal agencies do incorporate, by reference,  12:10:11
3 standards from voluntary consensus standards bodies  12:10:16
4 like ASTM.  So that could be one potential -- one   12:10:19
5 potential factor.                                  12:10:24
6 BY MR. BRIDGES:                                    12:10:28
7     Q.  Do you understand what regulatory purposes  12:10:28
8 federal agencies may have in incorporating ASTM     12:10:33
9 standards by reference into CFR?                   12:10:36
10     MR. FEE:  Objection.  Calls for speculation.   12:10:41
11 It's also beyond the scope of his designation.     12:10:42
12     You can answer if you know.                    12:10:44
13     THE WITNESS:  Generally, I believe the EPA     12:10:46
14 would look to -- has a mission of helping to keep the  12:10:48
15 air we breathe, the water we drink and the ground that  12:10:53
16 we habitate on as safe and as clean and sustainable as  12:10:56
17 possible.  So they might look to organizations like  12:11:02
18 ASTM and many others to see what work we're doing in  12:11:05
19 many of these areas and ensure that their employees  12:11:08
20 are participating in our standards development process  12:11:10
21 to reflect the agency's mission.                   12:11:12
22 BY MR. BRIDGES:                                    12:11:17
23     Q.  How would the government employees affect --  12:11:17
24 strike that.                                       12:11:22
25     What effect does the presence of government     12:11:26
Page 97

25 (Pages 94 - 97)

1 employees have in the standards development process at   12:11:30
2 ASTM?   12:11:36
3      MR. FEE:  Objection.  Vague.   12:11:37
4      THE WITNESS:  In my experience, federal   12:11:43
5 government participation in standards development   12:11:45
6 helps to make a more effective public/private   12:11:47
7 collaboration in our process.   12:11:50
8 BY MR. BRIDGES:   12:11:51
9      Q.  How does it help in the drafting of   12:11:52
10 standards?   12:11:53
11      MR. FEE:  Objection.  Lack of foundation.   12:11:54
12      THE WITNESS:  In the area of drafting   12:11:58
13 standards, I wouldn't have specific knowledge.   12:11:59
14 BY MR. BRIDGES:   12:12:03
15      Q.  Who would?   12:12:03
16      MR. FEE:  Objection.  Calls for speculation.   12:12:04
17      THE WITNESS:  Right.  We have 140 different   12:12:07
18 technical committees and over 1,000 individual   12:12:09
19 subcommittees.  So each agency's participation and   12:12:12
20 what role they play in the drafting of standards, I   12:12:15
21 believe was your term, that would vary significantly.   12:12:20
22 BY MR. BRIDGES:   12:12:23
23      Q.  Who are two or three people at ASTM you think   12:12:23
24 would be in a best position to answer the question of   12:12:25
25 what effect the presence of government employees has   12:12:32
Page 98

1 in the creation of standards?   12:12:38
2      MR. FEE:  Objection.  Calls for speculation.   12:12:43
3 Vague.   12:12:44
4      THE WITNESS:  Well, other than me, I would   12:12:49
5 say I'm one.  Beyond that, you know, ASTM, it's a   12:12:50
6 decentralized process.  So it would really vary again   12:13:01
7 by the individual committees and the actions by the   12:13:05
8 committee officers.  So if I had to give you another   12:13:08
9 name, I would say probably Katherine Morgan, who   12:13:14
10 formerly led our Technical Committee Operations.   12:13:17
11 BY MR. BRIDGES:   12:13:23
12      Q.  What is her current post?   12:13:23
13      A.  She's the executive vice president.   12:13:25
14      Q.  What are her duties?   12:13:27
15      MR. FEE:  Objection.  Calls for speculation.   12:13:28
16 Beyond the scope of his designation.   12:13:31
17      THE WITNESS:  Actually, I'm not certain what   12:13:35
18 her new duties are.  She just assumed them in   12:13:36
19 February.  But I would assume she's serving as our --   12:13:39
20 she'll be serving as our president within the next two   12:13:48
21 to three years.  So she's broad supervisory   12:13:51
22 responsibility.   12:13:54
23      (Deposition Exhibit 1038 was marked for   12:14:54
24      identification.)   12:14:54
25 BY MR. BRIDGES:   12:14:55
Page 99

1      Q.  Have you seen Exhibit 1038 before?   12:14:55
2      (The witness reviewed Exhibit 1038.)   12:15:20
3      THE WITNESS:  Yes, I have.   12:15:20
4 BY MR. BRIDGES:   12:15:22
5      Q.  Is this an organizational chart as of   12:15:22
6 July 21, 2014?   12:15:23
7      A.  I believe it is, yes.   12:15:25
8      Q.  Have you seen a more recent organizational   12:15:27
9 chart of ASTM?   12:15:29
10      A.  I have not, but I believe that this is just   12:15:31
11 slightly out of date.   12:15:35
12      Q.  What changes are necessary to make it   12:15:36
13 current?   12:15:40
14      A.  Under the direct line from Jim Thomas, that   12:15:46
15 would be a new box that would say, "Kathie Morgan,   12:15:51
16 Executive Vice President," and then a number of   12:15:57
17 departments would be reporting up through Kathie.   12:16:01
18 This is as of just a few weeks ago.   12:16:04
19      Q.  I see that she is almost directly under   12:16:10
20 Mr. Thomas in what looks like a direct report as vice   12:16:11
21 president of Technical Committee Operations.  Would   12:16:16
22 that be simply changing the title in that box?   12:16:18
23      A.  It would be expanding her responsibilities.   12:16:23
24 For instance, now I report to Kathie Morgan, as does   12:16:25
25 Phil Lively, as does Teresa Cendrowska, as does Tim   12:16:30
Page 100

1 Brooke, and a new box would need to be created -- or   12:16:38
2 in the old box that said Kathie Morgan, I would put   12:16:48
3 Daniel G. Smith.   12:16:51
4      Q.  That's on Page 5 of 11 of the document?   12:16:53
5      A.  Page 6 of 11.  So Kathie has been promoted,   12:16:56
6 and Dan has taken Kathie's old job, if that helps.   12:17:12
7      Q.  All right.  In the standards development but   12:17:16
8 not Technical Committee Operations?  Page 5 of 11 is   12:17:17
9 Technical Committee Operations.  Page 6 of 11 is   12:17:24
10 standards development?   12:17:29
11      A.  Yeah.  I actually wouldn't be able to explain   12:17:30
12 the difference between Technical Committee Operations   12:17:32
13 and standards development, and in fact -- I would be   12:17:34
14 able to tell you why we have it displayed that way.   12:17:48
15 We think of them together.   12:17:48
16      Q.  Where is Ms. Morgan's office?   12:17:57
17      A.  Kathie is based at our corporate headquarters   12:17:59
18 in Conshohocken, Pennsylvania.   12:18:02
19      Q.  What offices does ASTM have apart from the   12:18:11
20 Pennsylvania office you just referred to and   12:18:14
21 Washington, D.C.?   12:18:18
22      A.  Well, we have an office in Ottawa, Canada,   12:18:24
23 but I believe the person that works for us there is a   12:18:26
24 contractor.   12:18:32
25      Q.  Any other offices?   12:18:33
Page 101

26 (Pages 98 - 101)

BY MR. BRIDGES:                                    12:48:17

Q.  How many ASTM standards do you understand are   12:48:17

listed at that location?                           12:48:21

MR. FEE:  Objection.  Vague as to time.            12:48:23

THE WITNESS:  So there's -- if I'm answering       12:48:34

your question exactly as you phrased it to me, how   12:48:35

many standards, I believe there's 885 or so ASTM   12:48:38

standards that are incorporated in the NIST database.   12:48:41

BY MR. BRIDGES:                                    12:48:50

Q.  How many of those standards are currently      12:48:50

available at ASTM's reading room?                  12:48:52

A.  Well, if it's in the NIST database, we built   12:48:55

the ASTM reading room using the NIST database as a   12:49:02

baseline, and we added in other versions of those same   12:49:06

885 ASTM standards that have been also incorporated by   12:49:10

reference, just an agency, for instance, might      12:49:17

reference the same ASTM standard but reference two   12:49:21

different versions of the standard.                12:49:25

So we counted them in the reading room as       12:49:27

well, and I believe our reading room has a volume of   12:49:30

13- to 1,400 ASTM standards that are available to the   12:49:32

public at no cost on our website for their review.   12:49:36

Q.  Are every one of the 885 standards from the   12:49:41

NIST database available in the reading room?       12:49:45

A.  I wouldn't be able to answer that            12:49:51

Page 122

specifically.  Using the NIST database as a guideline,   12:49:53

we've incorporated, you know, as much of that as   12:50:02

possible in the reading room.  At times I believe we   12:50:04

also tried to add a little bit more intelligence to it   12:50:06

to determine if an agency was undertaking a subsequent   12:50:09

rule-making, and we became aware that the agency had   12:50:18

published a final rule which either changed the       12:50:24

reference to an ASTM standard that we had placed in   12:50:27

the reading room or added a new ASTM standard to the   12:50:31

reading room.                                      12:50:38

Then we took steps to add that to the reading   12:50:39

room.  It's not an exact science.  We don't pay a   12:50:42

vendor to perform the service for us.  We rely either   12:50:48

exclusively on the NIST database or we -- it's based   12:50:55

on intelligence that we've gathered about new       12:50:58

rulemakings.                                       12:51:01

Q.  How do you gather intelligence about         12:51:03

incorporations of ASTM standards by reference?     12:51:08

A.  Well, as much as possible we read the federal   12:51:14

register.  I'd like to think we read it on a regular   12:51:17

basis, but sometimes it's more infrequent than that.   12:51:20

So we will search key terms in the federal register to   12:51:25

see if it's mentioning ASTM and if there's a rule that   12:51:30

has resulted in the publication of standards.  And   12:51:34

sometimes we're ahead of it because ASTM has a policy   12:51:38

Page 123

of working with agencies during the notice of proposed   12:51:41

rule-making process.                               12:51:45

Any agency that comes to us and asks us to      12:51:46

put a standard up for public review during the public   12:51:50

review period of a rule, we work with them to make   12:51:53

that possible.  So at times we know that a certain   12:51:57

number of ASTM standards have been in a notice to   12:52:01

proposed rulemaking and that the new rule's expected   12:52:04

to come out, so we can look for it.                12:52:08

Q.  Does ASTM provide assistance to the         12:52:16

government in any way when the government is        12:52:18

considering whether to incorporate an ASTM standard by   12:52:20

reference?                                         12:52:23

MR. FEE:  Objection.  Vague.                    12:52:24

THE WITNESS:  So we do -- I'm familiar with a   12:52:29

couple things that either I do or a member of my staff   12:52:31

does.  We look to see -- when we're aware that an ASTM   12:52:34

standard is going to be used and incorporated by    12:52:39

reference in some type of an action, we look to see   12:52:43

what version of the standard and what designation of   12:52:46

the standard is being used, and I believe on occasion   12:52:50

if they're using -- proposing to use an outdated   12:52:54

version of a standard, or, quite frankly, we've seen   12:52:59

errors where they've attempted to use an ASTM biofuel   12:53:02

standard, and rather than referencing D6751 they've   12:53:06

Page 124

referenced D56571, gotten the numbers wrong, we will   12:53:09

engage with an agency and either make them aware   12:53:14

there's a more recent version or make them aware that   12:53:16

what they are trying to reference doesn't make a lot   12:53:20

of sense.                                          12:53:22

BY MR. BRIDGES:                                    12:53:23

Q.  Does ASTM bring standards to the attention of   12:53:26

the federal government with some sort of           12:53:36

recommendation that the federal government incorporate   12:53:38

the standard by reference?                         12:53:41

MR. FEE:  Objection.  Vague.                    12:53:43

THE WITNESS:  That's not part of what we call   12:53:45

engaging federal agencies in Congress.  What we will   12:53:49

do is work with agencies and work with Congress to    12:53:53

make them aware of the voluntary consensus standards   12:53:56

that we're developing in any given area that they    12:53:59

might have an interest.  But the ultimate decision of   12:54:02

whether or not to utilize and reference those       12:54:07

standards we rarely take positions on, and I can't   12:54:08

give you a specific example of a time that we have   12:54:14

taken an example on -- taken a position on.        12:54:17

BY MR. BRIDGES:                                    12:54:23

Q.  Do any state governments or municipal        12:54:23

governments incorporate ASTM standards by reference?   12:54:26

MR. FEE:  Objection to form.                    12:54:30

Page 125

32 (Pages 122 - 125)

1 won't disclose privileged communications.          14:24:48
2          THE WITNESS:  I mean, once again, I'm not in   14:24:52
3 this communication chain between Jim and the executive   14:24:52
4 committee, and it's not a government relations issue   14:24:56
5 I'm working on.                              14:24:59
6 BY MR. BRIDGES:                              14:25:00
7     Q.  So you did not interpret the ASTM strategy   14:25:00
8 that's mentioned in that E-mail to be a government   14:25:03
9 relations strategy?                          14:25:06
10         MR. FEE:  Objection.  Calls for speculation.   14:25:08
11         THE WITNESS:  I don't.               14:25:10
12     (Deposition Exhibit 1046 was marked for   14:25:58
13     identification.)                        14:25:58
14         MR. BRIDGES:  I'll show you Exhibit 1046.   14:25:59
15     Q.  Have you seen this document before?   14:26:03
16     (The witness reviewed Exhibit 1046.)   14:26:25
17         THE WITNESS:  So the world justice project,   14:26:25
18 the origination of the E-mail, which I received, yes,   14:26:27
19 I believe I reviewed that document.  But from beyond   14:26:30
20 that point in the E-mail chain, I do not have   14:26:35
21 recollection of being involved in this.   14:26:38
22 BY MR. BRIDGES:                              14:26:41
23     Q.  Did you review this document in preparation   14:26:41
24 to testify today?                            14:26:44
25     A.  I did not.                          14:26:50
                                        Page 142

1     Q.  Who at ASTM would have the most knowledge   14:26:53
2 about the content on the front page of Exhibit 1046?   14:26:56
3         MR. FEE:  Objection.  Vague.  Calls for   14:27:01
4 speculation.                                14:27:04
5         THE WITNESS:  Well, my understanding is that   14:27:13
6 this mentions litigation and copyright.  I would think   14:27:15
7 it would be legal counsel, Tom O'Brien.   14:27:19
8 BY MR. BRIDGES:                              14:27:26
9     Q.  Who is the Steele, S-t-e-e-l-e, that the   14:27:26
10 first line refers to?                        14:27:30
11         MR. FEE:  Objection.  Calls for speculation.   14:27:32
12         THE WITNESS:  I would speculate that it would   14:27:35
13 be Rob Steele, who's the secretary general of ISO at   14:27:37
14 this time.                                   14:27:42
15 BY MR. BRIDGES:                              14:27:50
16     Q.  On the third line of Mr. Thomas' E-mail is   14:27:50
17 the sentence, "To date, all of Carl's posting have not   14:27:54
18 had a measurable impact on our finances."  Do you see   14:27:58
19 that?                                        14:28:04
20     A.  I do see that.                       14:28:04
21     Q.  Was that your understanding at the time?   14:28:05
22     A.  January 2013.  I'm not aware that we did an   14:28:14
23 analysis that I would be able to comment on based at   14:28:20
24 that point of time.                          14:28:26
25     Q.  What do you understand to have been the basis   14:28:30
                                        Page 143

1 of Mr. Thomas' statement in that sentence?   14:28:32
2         MR. FEE:  Objection.  Calls for speculation.   14:28:35
3         THE WITNESS:  I understand that there's been   14:28:37
4 an impact and a drag on ASTM's revenues due to   14:28:39
5 confusion in business execution issues due to the fact   14:28:44
6 that some of our standards are now available outside   14:28:49
7 of our licensed distributors and outside of being   14:28:53
8 directly available from ASTM.                14:28:58
9     Q.  So Mr. Thomas was lying in that statement?   14:29:02
10         MR. FEE:  Objection.  Mischaracterizes his   14:29:07
11 testimony.                                   14:29:07
12         MR. BRIDGES:  I'll withdraw it.         14:29:08
13     Q.  You didn't answer my question, Mr. Grove.   14:29:08
14     A.  Okay.                                14:29:10
15     Q.  My question is what do you understand to have   14:29:11
16 been the basis of Mr. Thomas' statement in that   14:29:14
17 sentence?                                    14:29:17
18         MR. FEE:  Objection.  Calls for speculation.   14:29:17
19         THE WITNESS:  I wouldn't be able to answer   14:29:20
20 that.  I apologize.                          14:29:20
21 BY MR. BRIDGES:                              14:29:24
22     Q.  When did ASTM first notice a measurable   14:29:24
23 impact on its finances from the activities of   14:29:27
24 Mr. Malamud and Public Resource?            14:29:30
25         MR. FEE:  Objection.  Vague.            14:29:32
                                        Page 144

1         THE WITNESS:  Again, I don't have direct   14:29:39
2 knowledge of such impact.                    14:29:42
3 BY MR. BRIDGES:                              14:29:48
4     Q.  What other knowledge do you have other than   14:29:48
5 direct knowledge?                            14:29:51
6         MR. FEE:  Same objection.              14:29:52
7         THE WITNESS:  So to date, I'm aware, based on   14:29:53
8 conversations with our vice president for sales and   14:29:57
9 publications, that the act of putting our standards   14:29:59
10 into the public domain has caused a drag on revenue   14:30:04
11 for ASTM, which has complicated business execution,   14:30:08
12 which has produced some harm to ASTM.   14:30:14
13 BY MR. BRIDGES:                              14:30:25
14     Q.  The vice president of sales and publications   14:30:25
15 is John Pace; is that correct?               14:30:26
16     A.  That's correct.                      14:30:28
17     Q.  Tell me everything you remember about those   14:30:28
18 conversations.  When did you have those conversations?   14:30:31
19     A.  Yesterday.                           14:30:37
20     Q.  Did you have any conversations before   14:30:43
21 yesterday on that topic?                     14:30:45
22     A.  Not that I recall.                    14:30:49
23     Q.  When is the first time you learned of a drag   14:30:54
24 on revenue for ASTM caused by either Mr. Malamud or a   14:30:58
25 Public Resource?  Was it yesterday?          14:31:05
                                        Page 145

37 (Pages 142 - 145)

1      THE WITNESS:  I don't have anything          14:36:33
2  additional.                        14:36:35
3  BY MR. BRIDGES:                    14:36:36
4      Q.  And you're here as a corporate representative  14:36:36
5  of ASTM to provide the information available to ASTM  14:36:37
6  on that topic; correct?                 14:36:37
7      MR. FEE:  Objection.  He's here to provide     14:36:39
8  testimony regarding all the topics we identified    14:36:42
9  earlier today.  Of course, we'll have expert testimony  14:36:42
10  on this subject as well.               14:36:45
11      You can answer.                 14:36:47
12      THE WITNESS:  Yes.               14:36:50
13  BY MR. BRIDGES:                    14:36:55
14      Q.  So I need to know every other fact you're   14:36:55
15  aware of that pertains to harms that ASTM has suffered  14:36:57
16  from the defendants.  So, please, I'll take as much   14:37:06
17  time as we need.  Tell me every other fact that you're  14:37:08
18  aware of that pertains to the harm that ASTM has     14:37:11
19  suffered as a consequence of the defendants.       14:37:15
20      MR. FEE:  Objection to form.  Objection.     14:37:18
21  Calls for expert testimony.  Objection to the extent  14:37:19
22  it calls for a narrative.  Objection as to vague.    14:37:21
23  Now, we're talking about harms as opposed to financial  14:37:28
24  harms?  That's how I understand the question.      14:37:30
25      Can you read that back just to make sure I    14:37:34

1  don't miss anything?                   14:37:34
2      (Record read.)                  14:37:34
3      MR. BRIDGES:  I'm sorry.  Why do we need     14:38:01
4  to -- just if you got objections, go ahead and state  14:38:02
5  them.                          14:38:02
6      MR. FEE:  Oh, I don't want to hear the       14:38:02
7  objections.                       14:38:02
8      (Record read.)                  14:38:02
9      MR. FEE:  I think that's it.  Okay.        14:38:02
10      THE WITNESS:  Well, ASTM is known globally    14:38:03
11  for the quality and technical excellence of its     14:38:05
12  documents because we have a very robust standards    14:38:08
13  development and quality control process.  My        14:38:14
14  understanding, and based on my direct knowledge of    14:38:19
15  viewing certain documents that have been put in the   14:38:21
16  public domain, these documents contain errors.  I've  14:38:22
17  seen standards where tables have been upside down.    14:38:29
18  I've seen tables and columns and rows that don't align  14:38:34
19  properly.                        14:38:39
20      So if there's a real risk to ASTM's        14:38:41
21  reputation and to ASTM's standing in the global     14:38:44
22  economy, if customers or the public or other       14:38:48
23  stakeholders utilize these documents with the       14:38:52
24  expectation and understanding that these were the    14:38:58
25  official ASTM documents, and products and materials   14:39:00

1  failed to perform the way that they expected them to.  14:39:04
2  BY MR. BRIDGES:                    14:39:12
3      Q.  What other harms?              14:39:12
4      MR. FEE:  Same objections.          14:39:15
5      THE WITNESS:  Well, I would be concerned -- I  14:39:19
6  know the important role our standards play in health,  14:39:21
7  life, and safety.  I would certainly be concerned if   14:39:23
8  some of these documents that contain factual and other  14:39:25
9  errors contributed in any way to property damage,    14:39:30
10  injury or loss of life because of the sensitive,     14:39:33
11  important role that our standards play in protecting   14:39:37
12  people in society.                   14:39:40
13  BY MR. BRIDGES:                    14:39:45
14      Q.  What other harms to ASTM?          14:39:45
15      MR. FEE:  Same objections.          14:39:47
16      THE WITNESS:  I can't think of additional    14:39:58
17  harms at this time.                   14:40:00
18  BY MR. BRIDGES:                    14:40:05
19      Q.  Has ASTM heard from any customers that said,  14:40:05
20  "I didn't buy the standard I was planning to buy    14:40:08
21  because I could find it for free on the Internet from  14:40:10
22  Public Resource or the Internet archive"?         14:40:13
23      MR. FEE:  Objection to form.          14:40:16
24      THE WITNESS:  I don't have knowledge of that.  14:40:20
25  BY MR. BRIDGES:                    14:40:22

1      Q.  Does anybody at ASTM have knowledge of that  14:40:22
2  type of communication?                 14:40:24
3      MR. FEE:  Objection.  Calls for speculation.  14:40:27
4      MR. BRIDGES:  I'm asking him as a corporate   14:40:31
5  representative.                     14:40:32
6      MR. FEE:  Same objection.           14:40:34
7      THE WITNESS:  So based on my conversations    14:40:35
8  with John Pace, he -- it's my understanding that there  14:40:36
9  is this confusion with certain customers and certain   14:40:43
10  members of the public that has caused this inability   14:40:47
11  to execute sales on a timely basis.            14:40:51
12  BY MR. BRIDGES:                    14:40:54
13      Q.  Well, what customers?             14:40:54
14      A.  I'm not able to answer that at this time.   14:40:59
15      Q.  What members of the public?          14:41:06
16      A.  I'm not able to answer that at this time.   14:41:09
17      Q.  Did Mr. Pace put a dollar amount on his    14:41:17
18  estimate of lost revenues to ASTM as a consequence of  14:41:19
19  the defendants' actions?                14:41:23
20      MR. FEE:  Objection to the extent that calls   14:41:25
21  for expert testimony.                  14:41:26
22      THE WITNESS:  In my communications with him,   14:41:29
23  no.                           14:41:31
24  BY MR. BRIDGES:                    14:41:33
25      Q.  As a representative of ASTM at this      14:41:33

1  deposition, does ASTM have any estimate of the dollar   14:41:37
2  amount of lost revenues to it as a consequence of the   14:41:42
3  defendants' actions?   14:41:45
4        MR. FEE: Objection. Calls for expert   14:41:46
5  testimony. Let me see if that's really a topic that   14:41:48
6  he's been designated on.   14:41:52
7        MR. BRIDGES: He may answer.   14:41:59
8        MR. FEE: Hold on. I'm waiting to see if   14:42:00
9  that's actually a topic he's been designated on.   14:42:01
10        MR. BRIDGES: Make the objections, and if   14:42:08
11  it's superfluous and he hasn't been designated on.   14:42:11
12  I'd like to go ahead and get an answer.   14:42:11
13        MR. FEE: No. If you want to take off the   14:42:12
14  prelude to your question there, then I'm happy to have   14:42:14
15  his answer without the prelude, but if you're going to   14:42:16
16  have --   14:42:16
17        MR. BRIDGES: Okay. Sure.   14:42:16
18    Q. Does ASTM have any estimate of the dollar   14:42:17
19  amount of lost revenues to it as a consequence of   14:42:20
20  defendants' actions?   14:42:23
21        MR. FEE: Objection. Calls for expert   14:42:25
22  testimony.   14:42:26
23        THE WITNESS: Not to my knowledge.   14:42:27
24  BY MR. BRIDGES:   14:42:30
25    Q. Does ASTM have any facts in its possession   14:42:30

Page 154

1  that suggest to ASTM that it has lost money as a   14:42:39
2  consequence of defendants' actions?   14:42:46
3        MR. FEE: Objection. Asked and answered.   14:42:50
4  Calls for expert testimony. Vague.   14:42:51
5        THE WITNESS: Not that I'm aware of.   14:42:57
6  BY MR. BRIDGES:   14:43:05
7    Q. Is ASTM aware of any property damage, injury,   14:43:05
8  or loss of life that has occurred because of the   14:43:10
9  defendants' actions?   14:43:15
10        MR. FEE: Objection. Calls for expert   14:43:17
11  testimony and speculation.   14:43:19
12        THE WITNESS: Fortunately, not at this time.   14:43:22
13  BY MR. BRIDGES:   14:43:26
14    Q. When did you first -- sorry.   14:43:26
15        When did ASTM first become aware of any   14:43:27
16  errors in connection with the posting of ASTM   14:43:31
17  standards by the defendant?   14:43:36
18    A. I'm just not able to give you a time line.   14:43:51
19  I'm not certain.   14:43:53
20    Q. How long ago was it, to your best estimate?   14:43:55
21        MR. FEE: Objection. Asked and answered.   14:43:57
22  Calls for speculation.   14:43:58
23        THE WITNESS: I'm not certain.   14:44:00
24  BY MR. BRIDGES:   14:44:02
25    Q. Was it more than a year ago?   14:44:02

Page 155

1        MR. FEE: Same objections.   14:44:04
2        THE WITNESS: I'm not sure.   14:44:08
3        MR. FEE: It's beyond the scope his   14:44:08
4  designation as well.   14:44:10
5        Go ahead.   14:44:11
6        THE WITNESS: I'm not sure, no.   14:44:12
7  BY MR. BRIDGES:   14:44:13
8    Q. Was it more than three years ago?   14:44:13
9        MR. FEE: Same objections.   14:44:16
10        THE WITNESS: I'm not sure.   14:44:17
11  BY MR. BRIDGES:   14:44:18
12    Q. Was it more than two weeks ago?   14:44:18
13        MR. FEE: Same objection.   14:44:21
14        THE WITNESS: I'm not sure.   14:44:22
15  BY MR. BRIDGES:   14:44:23
16    Q. Do you know whether ASTM had any knowledge of   14:44:23
17  errors in connection with defendants posting of ASTM   14:44:26
18  standards more than a week ago?   14:44:31
19        MR. FEE: Same objection -- objections, I   14:44:35
20  should say.   14:44:36
21        THE WITNESS: More than a week ago, I believe   14:44:38
22  so, yes.   14:44:39
23  BY MR. BRIDGES:   14:44:40
24    Q. When did you first learn of any errors in   14:44:40
25  defendants' posting of ASTM standards?   14:44:46

Page 156

1    A. I first learned of it by hearing of it in the   14:44:51
2  last year. I first viewed it yesterday.   14:44:53
3    Q. How many standards posted by defendants   14:44:56
4  contain errors?   14:45:00
5        MR. FEE: Objection. Beyond the scope of his   14:45:01
6  designation. Calls for speculation.   14:45:03
7        THE WITNESS: My understanding is that it   14:45:08
8  would be extremely difficult to do a complete   14:45:10
9  analysis, but based on quick analysis, we found   14:45:14
10  significant errors.   14:45:21
11  BY MR. BRIDGES:   14:45:28
12    Q. What are the significant ones?   14:45:28
13    A. To industries that rely on quality   14:45:30
14  information, yes, I would say so.   14:45:32
15    Q. Tell me some of the most significant ones.   14:45:34
16    A. Well, if a table and a chart don't align   14:45:38
17  correctly, the variables, it is displaying false   14:45:42
18  information. That seems like that could be an error.   14:45:44
19    Q. What other errors are really significant in   14:45:49
20  your mind?   14:45:52
21    A. I'm not certain.   14:45:53
22    Q. Can you think of any other significant errors   14:45:54
23  in defendants posting of standards?   14:45:56
24        MR. FEE: Objection. This is beyond the   14:45:58
25  scope of his designation.   14:45:59

Page 157

40 (Pages 154 - 157)

1 more than one error in the ASTM standards?          14:50:24
2      MR. FEE: Same objections.          14:50:28
3      THE WITNESS: I'd be speculating.          14:50:31
4 BY MR. BRIDGES:          14:50:34
5      Q. Well, you have testified as to what would          14:50:34
6 surprise you. I'd like to know what would surprise          14:50:34
7 you.          14:50:35
8      MR. FEE: Same objections.          14:50:37
9      THE WITNESS: I'm aware of ASTM's rigorous          14:50:37
10 quality control process and the value of bringing          14:50:40
11 people together under an open, transparent process and          14:50:42
12 the important role that ASTM staff plays in helping to          14:50:47
13 ensure the quality of our documents. And I would be          14:50:49
14 skeptical that that could be replicated if any steps          14:50:54
15 were bypassed. So --          14:50:59
16 BY MR. BRIDGES:          14:51:03
17      Q. Would it surprise you for an ASTM standard to          14:51:03
18 have three or more errors in it?          14:51:05
19      MR. FEE: Same objections.          14:51:08
20      THE WITNESS: Would it surprise me? Yes.          14:51:13
21 BY MR. BRIDGES:          14:51:16
22      Q. Are you aware of any ASTM standards with          14:51:16
23 three or more errors?          14:51:19
24      MR. FEE: Same objections. Just give me a          14:51:21
25 second to object.          14:51:23

Page 162

1      THE WITNESS: I'm not personally, no.          14:51:25
2 BY MR. BRIDGES:          14:51:27
3      Q. Are you aware of how ASTM standards are          14:51:27
4 proofread?          14:51:44
5      MR. FEE: Objection. Vague.          14:51:47
6      THE WITNESS: Yes, generally.          14:51:51
7 BY MR. BRIDGES:          14:51:53
8      Q. How?          14:51:53
9      A. There's a rigorous process under which at          14:51:54
10 every point in the standards development process          14:51:58
11 there's peer review of the standard and of the          14:52:00
12 document, and as it goes through the process, as it          14:52:05
13 works through the ASTM process, which involves many          14:52:09
14 steps, at the end there's an editor, an ASTM staff          14:52:13
15 that reviews the standard and insures that the          14:52:21
16 document purports to be what the committee intended it          14:52:26
17 for -- for it to be.          14:52:29
18      Q. And do ASTM editors catch every mistake?          14:52:32
19      MR. FEE: Objection. Calls for speculation.          14:52:36
20      THE WITNESS: I'm not aware of errors, but it          14:52:44
21 wouldn't surprise me if there were some.          14:52:47
22 BY MR. BRIDGES:          14:52:49
23      Q. Does ASTM ever issue errata to its standards?          14:52:49
24      MR. FEE: Objection. Vague. I think that's          14:52:55
25 also beyond the scope of his designation.          14:52:59

Page 163

1      THE WITNESS: I'm not familiar with the term          14:53:06
2 "errata."          14:53:07
3 BY MR. BRIDGES:          14:53:08
4      Q. Does ASTM ever issue corrigenda to its          14:53:08
5 standards?          14:53:13
6      MR. FEE: Objection. Vague. Beyond the          14:53:14
7 scope of his designation.          14:53:15
8      THE WITNESS: I'm not certain.          14:53:20
9 BY MR. BRIDGES:          14:53:21
10      Q. Does ASTM ever issue a notice of errors in          14:53:21
11 any of its standards?          14:53:28
12      MR. FEE: Same objections.          14:53:31
13      THE WITNESS: I'm not certain.          14:53:32
14 BY MR. BRIDGES:          14:53:34
15      Q. What happens if ASTM publishes and          14:53:34
16 distributes a standard that's widely held by persons          14:53:37
17 and then discovers that there is a mistake in the          14:53:40
18 standard? How does ASTM notify the public?          14:53:43
19      MR. FEE: Objection. Calls for speculation.          14:53:45
20 It's beyond the scope of his designation, and          14:53:47
21 compound.          14:53:50
22      THE WITNESS: I'm not able to explain that          14:53:52
23 process.          14:53:53
24 BY MR. BRIDGES:          14:53:55
25      Q. Would it harm ASTM's reputation to issue a          14:53:55

Page 164

1 standard with mistakes?          14:53:58
2      MR. FEE: Objection. Calls for expert          14:53:59
3 testimony. It's beyond the scope of his designation.          14:54:01
4      THE WITNESS: I'm not certain.          14:54:07
5 BY MR. BRIDGES:          14:54:09
6      Q. How has ASTM's reputation suffered from the          14:54:09
7 activities of the defendants?          14:54:15
8      MR. FEE: Objection. Calls for expert          14:54:24
9 testimony.          14:54:25
10      THE WITNESS: I'm not certain.          14:54:28
11 BY MR. BRIDGES:          14:54:29
12      Q. Have you noticed an effect on ASTM's          14:54:29
13 reputation as a consequence of the defendants'          14:54:32
14 activities?          14:54:35
15      A. I have not.          14:54:37
16      Q. What instances is ASTM aware of, of people          14:54:44
17 being confused about the relationship between ASTM and          14:54:50
18 the defendant?          14:54:57
19      MR. FEE: Objection. Vague. Asked and          14:54:59
20 answered.          14:55:02
21      THE WITNESS: Based on communications with          14:55:04
22 our sales and publications vice president.          14:55:06
23 BY MR. BRIDGES:          14:55:09
24      Q. What did those communications convey to you?          14:55:09
25      A. That there was some level of confusion in the          14:55:14

Page 165

42 (Pages 162 - 165)

1 by reference?                                    15:01:47
2         MR. FEE:  Objection.  Vague as to whether or  15:01:48
3 not that older version is authentic.              15:01:51
4         THE WITNESS:  Yeah.  I'm sorry.  Could you  15:01:54
5 just repeat that?                                 15:01:55
6 BY MR. BRIDGES:                                   15:01:57
7     Q.  Is it misleading, in your view, to have the  15:01:57
8 ASTM logo on an older version of an ASTM standard  15:02:01
9 where the older version has been incorporated by  15:02:07
10 reference?                                        15:02:09
11        MR. FEE:  Same objection as to the vagueness.  15:02:11
12        THE WITNESS:  My concern would be that to get  15:02:16
13 the most recent version of any document, you more than  15:02:19
14 likely need to come to ASTM or one of our licensed  15:02:27
15 distributors.                                     15:02:31
16 BY MR. BRIDGES:                                   15:02:32
17    Q.  But if somebody is interested in, let's say,  15:02:32
18 a 2008 standard because the 2008 standard has been  15:02:39
19 incorporated by reference but a more recent standard  15:02:42
20 has not been, what is the harm to ASTM from the  15:02:44
21 inclusion of the ASTM logo on that 2008 standard  15:02:49
22 posted by Public Resource?                        15:02:55
23        MR. FEE:  Objection.  Calls for speculation.  15:02:58
24        THE WITNESS:  Since I'm not an attorney and  15:03:01
25 I'm not familiar with the regulatory -- the connection  15:03:04

Page 170

1 between regulations and law, I will share my      15:03:09
2 observation --                                    15:03:12
3 BY MR. BRIDGES:                                   15:03:14
4    Q.  Please do.                                 15:03:14
5    A.  -- that just because a version of a standard  15:03:15
6 that's in the law might be outdated, that doesn't seem  15:03:18
7 to stop industry from wanting to use the most recent  15:03:26
8 version of the standard.                          15:03:30
9    Q.  And is it ASTM's view that it's misleading to  15:03:35
10 have the ASTM logo on anything that's currently  15:03:39
11 available -- strike that.                         15:03:43
12        Is it ASTM's view that it is misleading to  15:03:48
13 display the ASTM logo on standards currently available  15:03:54
14 on the Internet when the standards are not the most  15:04:03
15 recent versions?                                  15:04:09
16        MR. FEE:  Objection.  To the extent you're  15:04:11
17 using "misleading" as a legal term, I object on that  15:04:13
18 ground.  I also object to the vagueness of that  15:04:15
19 because it's not clear whether or not the standards  15:04:18
20 you're referencing are authentic or not.          15:04:21
21        MR. BRIDGES:  That's coaching the witness,  15:04:23
22 Mr. Fee.                                          15:04:24
23        THE WITNESS:  Well, that's exactly the point  15:04:25
24 I thought I was making.  I don't -- it's the      15:04:26
25 authenticity of the standard as much as the -- more  15:04:31

Page 171

1 than the dated issue.                             15:04:36
2 BY MR. BRIDGES:                                   15:04:38
3    Q.  The authenticity of the standard didn't come  15:04:38
4 into your answer until you heard counsel's objection.  15:04:41
5        MR. FEE:  That's absolutely false.  You      15:04:41
6 should read the transcript when you get done with  15:04:43
7 this.                                             15:04:47
8 BY MR. BRIDGES:                                   15:04:49
9    Q.  Would it harm ASTM less if defendant took the  15:04:49
10 ASTM logo off the standards that it -- sorry, that it  15:04:53
11 posts?                                            15:04:58
12        MR. FEE:  Objection.  Calls for speculation,  15:04:59
13 and a hypothetical.                               15:05:01
14        MR. BRIDGES:  I'd like to know what ASTM --  15:05:05
15        MR. FEE:  Calls for an expert opinion,       15:05:08
16 perhaps, as well.                                 15:05:09
17        THE WITNESS:  I'm not able to answer that    15:05:10
18 question.                                         15:05:12
19 BY MR. BRIDGES:                                   15:05:14
20    Q.  Would ASTM -- well, would you find it        15:05:14
21 problematic -- I'm just curious.  Which would you find  15:05:18
22 to be more of a problem to ASTM, for Public Resource  15:05:21
23 to public -- strike that.                         15:05:27
24        What would ASTM, in your view, find to be    15:05:37
25 more of a problem, for Public Resource to post the    15:05:41

Page 172

1 ASTM standards it posts with the ASTM logo or for  15:05:49
2 Public Resource to publish them without the ASTM logo?  15:05:56
3        MR. FEE:  Objection.  To the extent that     15:06:02
4 you're asking for what would be more problematic from  15:06:03
5 a legal perspective --                            15:06:06
6        MR. BRIDGES:  Just please state the basis for  15:06:08
7 your objection instead of --                      15:06:10
8        MR. FEE:  Andrew, do you forget how your     15:06:11
9 deposition objections went?  Do you remember your  15:06:12
10 deposition objections the other day?  They were much  15:06:14
11 more talkative than this.                         15:06:16
12        MR. BRIDGES:  Not so.                        15:06:18
13        MR. FEE:  I'm going to make my objections.   15:06:19
14        To the extent you're asking for a legal      15:06:21
15 conclusion with respect to "problematic," I object on  15:06:22
16 that basis.  I object because it calls for        15:06:25
17 speculation, and it's a hypothetical question.    15:06:28
18 BY MR. BRIDGES:                                   15:06:35
19    Q.  You may answer.                            15:06:35
20        MR. FEE:  Hold on.  I'm not done objecting   15:06:36
21 yet.  And objection to form.                      15:06:38
22        THE WITNESS:  And I'm not able to answer that  15:06:49
23 question.                                         15:06:50
24 BY MR. BRIDGES:                                   15:06:53
25    Q.  In your position at ASTM, does it make a     15:06:53

Page 173

44 (Pages 170 - 173)

| | |
|---|---|
| 1      THE WITNESS: It's a little out of context.   16:32:42 | 1      Q.  What were you suggesting in addition to a   16:36:38 |
| 2  BY MR. BRIDGES:                                    16:32:45 | 2  reading room?                                       16:36:40 |
| 3      Q.  What would be necessary to add to that   16:32:45 | 3      A.  I see that I was recommending that we   16:36:41 |
| 4  statement in order to supply the context?        16:32:50 | 4  consider beefing up -- excuse me -- making our   16:36:42 |
| 5      MR. FEE:  Same objections.                      16:32:55 | 5  summaries, which the abstracts which we provide to our   16:36:47 |
| 6      THE WITNESS:  Looking at standards on an   16:33:12 | 6  standards, considering whether those abstracts could   16:36:53 |
| 7  individual basis devalues the real value that ASTM   16:33:14 | 7  be converted to something that's more of a summary.   16:36:57 |
| 8  standards have as a collection as a whole.        16:33:14 | 8      Q.  Was that in addition to doing a reading room   16:37:08 |
| 9  BY MR. BRIDGES:                                    16:33:17 | 9  or instead of doing a reading room?                16:37:10 |
| 10     Q.  What is the real value that ASTM standards   16:33:17 | 10     A.  Obviously, John was thinking I was suggesting   16:37:20 |
| 11  have as a collection?                             16:33:19 | 11  it as an addition, and I'm not sure if I was or not.   16:37:21 |
| 12     A.  Customers in the public benefit from getting   16:33:25 | 12  I was explaining I'm not the IT guy.  So I didn't know   16:37:40 |
| 13  a collection of standards at a very affordable price   16:33:27 | 13  how difficult this task would be.                 16:37:45 |
| 14  point, which allows them to access numerous standards   16:33:32 | 14     Q.  Did you have in mind providing summaries as   16:37:48 |
| 15  rather than looking at them as individual standards   16:33:39 | 15  opposed to the standards themselves in the reading   16:37:53 |
| 16  purchased separately.                             16:33:42 | 16  room?                                             16:37:55 |
| 17     Q.  Is there anything else about the context --   16:33:48 | 17     MR. FEE:  Objection.  Are you asking him his   16:37:56 |
| 18  sorry.  Anything else necessary to supply an      16:33:52 | 18  personal opinion in this question?                16:37:59 |
| 19  appropriate context for that statement?           16:33:54 | 19     MR. BRIDGES:  I'm asking him what his state   16:38:02 |
| 20     MR. FEE:  Objection.  Lack of foundation.      16:33:56 | 20  of mind was at the time.                          16:38:03 |
| 21  Calls for speculation.  It's beyond the scope of his   16:33:59 | 21     MR. FEE:  It's beyond the scope of his         16:38:04 |
| 22  designation.                                      16:34:01 | 22  designation.                                      16:38:06 |
| 23     THE WITNESS:  No.                               16:34:14 | 23     But you can answer.                             16:38:07 |
| 24     (Deposition Exhibit 1056 was marked for        16:34:40 | 24     THE WITNESS:  In our efforts to strike the     16:38:08 |
| 25     identification.)                                16:34:40 | 25  right balance between providing the public with public   16:38:10 |
| Page 210 | Page 212 |

| | |
|---|---|
| 1  BY MR. BRIDGES:                                    16:34:41 | 1  access to standards incorporated by reference and   16:38:12 |
| 2      Q.  Exhibit 1056 consists of a series of E-mails   16:34:41 | 2  maintaining our viability of our standards development   16:38:14 |
| 3  in which you and John Pace were either authors or   16:34:54 | 3  enterprise, I was recommending that we review a lot of   16:38:18 |
| 4  recipients; correct?                               16:35:04 | 4  options.  One of which was this summaries idea.   16:38:22 |
| 5      (The witness reviewed Exhibit 1056.)           16:35:28 | 5  BY MR. BRIDGES:                                    16:38:26 |
| 6      THE WITNESS:  Yes, that's correct.             16:35:28 | 6      Q.  Was it the idea of providing summaries as   16:38:26 |
| 7  BY MR. BRIDGES:                                    16:35:29 | 7  opposed to the text of the standards themselves?   16:38:29 |
| 8      Q.  What did you understand Mr. Pace to mean in   16:35:29 | 8      MR. FEE:  Same objection.                       16:38:33 |
| 9  the first sentence about "sticking to our guns and   16:35:34 | 9      THE WITNESS:  I don't recall.                   16:38:36 |
| 10  doing the reading room exactly as how we have all   16:35:39 | 10  BY MR. BRIDGES:                                    16:38:41 |
| 11  agreed to date"?                                  16:35:43 | 11     Q.  Does someone -- are you familiar with the   16:38:41 |
| 12     A.  I'd be speculating.                         16:35:48 | 12  operation of the reading room for ASTM today?     16:38:44 |
| 13     Q.  Well, you were a recipient -- the sole     16:35:52 | 13     A.  Yes.                                         16:38:47 |
| 14  recipient of that E-mail.  So please tell me what your   16:35:56 | 14     Q.  Does one have to register to gain access to   16:38:47 |
| 15  understanding was.                                16:35:58 | 15  the reading room?                                 16:38:50 |
| 16     MR. FEE:  Objection.  Lack of foundation.      16:35:59 | 16     A.  Yes.                                         16:38:51 |
| 17  Beyond the scope of his designation as well.      16:36:07 | 17     Q.  What does one have to do to register to get   16:38:52 |
| 18     THE WITNESS:  I'd infer from this that John   16:36:10 | 18  access to the reading room?                       16:38:55 |
| 19  Pace was raising concerns that we had already     16:36:12 | 19     A.  Enter a name and E-mail address.            16:38:56 |
| 20  committed to building a reading room and committed   16:36:15 | 20     Q.  What's the purpose of that?                 16:39:00 |
| 21  extensive resources of his employees' time to help in   16:36:21 | 21     A.  Well, to ensure that it wasn't -- again, I'm   16:39:02 |
| 22  compiling the reading room, and now I was suggesting   16:36:26 | 22  not an IT person, but I believe there's some concerns   16:39:08 |
| 23  that, in addition to the reading room, we might want   16:36:28 | 23  that bots and other types of automatic -- that perhaps   16:39:10 |
| 24  to consider other things as well.                 16:36:32 | 24  machines could access our system and pull information   16:39:19 |
| 25  BY MR. BRIDGES:                                    16:36:38 | 25  in ways that perhaps we weren't intending by providing   16:39:22 |
| Page 211 | Page 213 |

54 (Pages 210 - 213)

1 that they must be -- they have to be referred to as   17:24:32
2 "musts," and this would have the voluntary consensus   17:24:35
3 standards process. This isn't the intention when   17:24:39
4 people come together to work in a voluntary consensus   17:24:43
5 standard environment. They want the words to mean   17:24:47
6 what they carefully craft them to mean in the process,   17:24:49
7 and when -- so I believe that's what I was referring   17:24:52
8 to in this.   17:24:55
9 BY MR. BRIDGES:   17:25:00
10   Q. Well, Mr. Miller was not saying that the   17:25:00
11 government was changing the standard. The government   17:25:02
12 was proposing to change the law; correct?   17:25:07
13   MR. FEE: Objection. The document speaks for   17:25:11
14 itself. Calls for speculation.   17:25:13
15   THE WITNESS: I guess I would be speculating,   17:25:22
16 but that was my interpretation of what this means.   17:25:24
17 BY MR. BRIDGES:   17:25:29
18   Q. That the government would be changing the law   17:25:29
19 as the law interprets the standard?   17:25:31
20   MR. FEE: Same objections. And vague.   17:25:36
21   THE WITNESS: Yeah. That the government was   17:25:41
22 interpreting a standard in a way that the voluntary   17:25:43
23 consensus standard group didn't necessarily intend it   17:25:46
24 to without coming back to the organization and working   17:25:50
25 with them.   17:25:57

Page 234

1 BY MR. BRIDGES:   17:27:38
2   Q. Mr. Grove, does ASTM encourage any   17:27:38
3 governments to incorporate its standards by reference?   17:27:46
4   MR. FEE: Objection. Vague.   17:27:49
5   THE WITNESS: As a matter of policy, we make   17:27:54
6 organizations -- sorry -- governments aware of our   17:27:58
7 standards and point out and connect with agency   17:28:04
8 missions. But in the end, we respect that agencies   17:28:07
9 should be the ones that determine whether or not our   17:28:09
10 standards are incorporated or not.   17:28:12
11 BY MR. BRIDGES:   17:28:13
12   Q. Is ASTM generally pleased when governments   17:28:13
13 incorporate its standards by reference?   17:28:20
14   MR. FEE: Objection. Vague.   17:28:26
15   THE WITNESS: So I think it speaks to the   17:28:28
16 significance of ASTM and to the breadth of ASTM when   17:28:29
17 you see ASTM standards become incorporated by   17:28:34
18 reference because it does signify that they are widely   17:28:37
19 respected for their technical excellence. I believe   17:28:42
20 that it signifies that the government -- it couldn't   17:28:46
21 do what we've done with the same effectiveness. So   17:28:52
22 they're looking to a voluntary consensus standards   17:28:54
23 group in utilizing those standards.   17:28:57
24   So in some ways I might take pride in the   17:29:00
25 fact that ASTM standards are relied upon by all of our   17:29:04

Page 235

1 stakeholders because the government is a very   17:29:07
2 important member.   17:29:09
3 BY MR. BRIDGES:   17:29:11
4   Q. So is the answer to my question "yes"?   17:29:11
5   MR. FEE: Objection.   17:29:13
6   You can answer it however you'd like.   17:29:14
7   MR. BRIDGES: He already has.   17:29:16
8   Q. I'm now asking him is the answer to my   17:29:18
9 question "yes."   17:29:20
10   MR. FEE: Same objection. Asked and   17:29:21
11 answered.   17:29:22
12   THE WITNESS: Speaking for Jeff Grove, yes.   17:29:23
13 BY MR. BRIDGES:   17:29:26
14   Q. What about speaking for ASTM?   17:29:26
15   MR. FEE: Objection. Asked and answered.   17:29:28
16   THE WITNESS: I don't believe ASTM would have   17:29:29
17 an official position.   17:29:31
18 BY MR. BRIDGES:   17:29:35
19   Q. You don't think that ASTM has a view as to   17:29:35
20 whether it is pleased when governments incorporate its   17:29:39
21 standards by reference?   17:29:43
22   MR. FEE: Objection. Vague and asked and   17:29:44
23 answered.   17:29:46
24   THE WITNESS: It's never been a performance   17:29:49
25 metric for me. So no.   17:29:50

Page 236

1 BY MR. BRIDGES:   17:29:58
2   Q. Does ASTM have views about things that are   17:29:58
3 not performance metrics?   17:30:01
4   MR. FEE: Objection. Beyond the scope of his   17:30:05
5 designation. Vague.   17:30:06
6   THE WITNESS: It could.   17:30:11
7 BY MR. BRIDGES:   17:30:14
8   Q. What performance metrics do you have?   17:30:14
9   MR. FEE: Objection. Beyond the scope of his   17:30:16
10 designation.   17:30:20
11   THE WITNESS: Generally, my performance is   17:30:23
12 based on the job I've done in removing worldwide   17:30:24
13 barriers to the acceptance and use of ASTM standards.   17:30:27
14 BY MR. BRIDGES:   17:30:36
15   Q. Is your -- do your performance reviews ever   17:30:36
16 mention the degree of adoption of ASTM standards by   17:30:39
17 reference -- strike that.   17:30:44
18   Do your performance reviews ever mention the   17:30:46
19 degree of incorporation of ASTM standards by   17:30:48
20 reference?   17:30:50
21   MR. FEE: Objection. Beyond the scope of his   17:30:51
22 designation.   17:30:55
23   THE WITNESS: I believe over the years I   17:30:56
24 might have pointed out to my superiors that a standard   17:30:57
25 has become incorporated as something significant.   17:31:00

Page 237

60 (Pages 234 - 237)

```
 1    A. Kathe Hooper is responsible for permissions     18:16:38
 2  at ASTM.                                        18:16:47
 3    Q. Who is Joe Koury?                          18:16:49
 4    A. Joe Koury is a staff manager that works with    18:16:51
 5  technical committees.                             18:16:53
 6      (Deposition Exhibit 1070 was marked for       18:17:06
 7  identification.)                                   18:17:06
 8      MR. BRIDGES: I'm showing you Exhibit 1070.    18:17:06
 9    Q. This is an E-mail from Ms. Hooper responding    18:17:12
10  to a permission request; is that correct?          18:17:17
11      (The witness reviewed Exhibit 1070.)          18:17:58
12      THE WITNESS: Yes.                           18:17:59
13      (Deposition Exhibit 1071 was marked for       18:18:11
14  identification.)                                   18:18:11
15  BY MR. BRIDGES:                                 18:18:12
16    Q. Exhibit 1071 is an E-mail from Sarah Petre to    18:18:12
17  you and others; is that correct?                   18:18:16
18      (The witness reviewed Exhibit 1071.)          18:18:26
19      MR. FEE: Objection. Lack of foundation --     18:18:26
20  strike that. No objection.                        18:18:27
21      THE WITNESS: So it's an E-mail between ASTM    18:18:42
22  and Congressional staff and then ASTM staff, correct.    18:18:44
23  BY MR. BRIDGES:                                 18:18:48
24    Q. And within the ASTM --                     18:18:48
25    A. Correct.                                  18:18:51
                                              Page 258
```

```
 1    Q. And it's discussing Congressional           18:18:51
 2  legislation; is that correct?                     18:18:54
 3      MR. FEE: Objection. The document speaks for    18:18:56
 4  itself.                                         18:18:57
 5      THE WITNESS: Legislation passed the House    18:19:10
 6  and now it's being referred to the Senate, and Sarah    18:19:11
 7  Petre recognized that there's references to ASTM    18:19:16
 8  standards which are out of date, and she wanted to    18:19:18
 9  contact the staffer to make him aware of that fact.    18:19:22
10  BY MR. BRIDGES:                                 18:19:26
11    Q. Was this a discussion about incorporation by    18:19:26
12  reference?                                      18:19:28
13      MR. FEE: Same objection.                    18:19:29
14      THE WITNESS: It's a discussion about         18:19:35
15  Congressional intent to use the most recent standard,    18:19:37
16  I believe.                                      18:19:40
17  BY MR. BRIDGES:                                 18:19:41
18    Q. Is that for Congress's use in making an      18:19:41
19  incorporation by reference into a federal law of an    18:19:48
20  ASTM standard?                                  18:19:52
21      MR. FEE: Same objection.                    18:19:54
22      THE WITNESS: It appears, yes.               18:19:55
23  BY MR. BRIDGES:                                 18:20:01
24    Q. Does ASTM have a view as to which versions of    18:20:01
25  its standard Congress should include in its          18:20:07
                                              Page 259
```

```
 1  legislation that causes an incorporation by reference?    18:20:11
 2      MR. FEE: Can you read that back to me,       18:20:19
 3  please.                                         18:20:20
 4      (Record read.)                             18:20:38
 5      MR. FEE: Objection to form. Beyond the       18:20:39
 6  scope of his designation. Calls for speculation.    18:20:40
 7  BY MR. BRIDGES:                                 18:20:48
 8    Q. You may answer.                           18:20:48
 9      MR. FEE: Hold on.                          18:20:49
10      Lack of foundation.                         18:20:53
11      Go ahead.                                  18:20:55
12      THE WITNESS: Yeah. So I think we think --    18:20:55
13  we want to make sure that Congress is aware of the    18:20:59
14  fact there may be a more recent version because    18:21:02
15  oftentimes it may be unintended that they're not using    18:21:05
16  the most recent version.                          18:21:08
17  BY MR. BRIDGES:                                 18:21:12
18    Q. Ms. Petre asked you whether ASTM should    18:21:12
19  request that Congress use the language. Does ASTM    18:21:17
20  ever request Congress to use particular language    18:21:21
21  regarding ASTM standards?                        18:21:25
22      MR. FEE: Objection. Beyond the scope of his    18:21:32
23  designation.                                    18:21:36
24      You can answer.                            18:21:36
25      THE WITNESS: Okay. I can think of instances    18:21:38
                                              Page 260
```

```
 1  like this where Congress -- what's happening here is    18:21:40
 2  this is incorporation by reference by Congress and not    18:21:45
 3  by an agency, and the concern that's expressed at    18:21:48
 4  times by our committee members is if Congress acts to    18:21:52
 5  designate a specific standard in legislation that    18:21:57
 6  freezes that piece of -- that reference in statute for    18:22:02
 7  years to come and agencies -- since it's something    18:22:06
 8  that Congress said, agencies will simply say, "Hey,    18:22:12
 9  talk to Congress, not to agencies about it."        18:22:16
10      So that's a concern that I'm familiar with,    18:22:19
11  and I can't tell if that -- I don't recall the        18:22:21
12  circumstances of this here, but that's the most        18:22:26
13  current version language. That's why we're interested    18:22:29
14  in making sure Congress is aware as a more current    18:22:32
15  version.                                        18:22:36
16  BY MR. BRIDGES:                                 18:22:38
17    Q. Mr. Grove, again, you didn't answer my      18:22:38
18  question. My question is does ASTM ever request    18:22:40
19  Congress to use particular language regarding ASTM    18:22:43
20  standards?                                      18:22:46
21      MR. FEE: Same objections. Plus asked and    18:22:47
22  answered.                                       18:22:50
23      THE WITNESS: Yes.                          18:22:52
24  BY MR. BRIDGES:                                 18:22:55
25    Q. To your knowledge, has ASTM ever asked    18:22:55
                                              Page 261
```

66 (Pages 258 - 261)

1 Congress or a federal agency not to incorporate any of   18:23:00

2 its standards by reference?                18:23:04

3        MR. FEE:  Objection.  Beyond the scope of his   18:23:07

4 designation.                    18:23:09

5        THE WITNESS:  To my knowledge, no.  I believe   18:23:15

6 it's possible that there's been reasons why committees   18:23:21

7 haven't wanted to see standards incorporated by   18:23:24

8 reference, but I can't recall an instance.        18:23:26

9 BY MR. BRIDGES:                  18:23:31

10    Q.  Has ASTM ever imposed conditions on whether   18:23:31

11 the federal government may incorporate its standards   18:23:37

12 by reference?                  18:23:42

13        MR. FEE:  Same objection.  Vague as well.   18:23:44

14        THE WITNESS:  I don't have direct knowledge.   18:23:52

15 It was before my time at ASTM, but I understand at one   18:23:54

16 point in time there was a concern that Congress was   18:23:58

17 perhaps taking ASTM -- taking key content from an ASTM   18:24:03

18 standard and placing it in a piece of legislation and   18:24:09

19 that ASTM would be concerned about that.        18:24:13

20 BY MR. BRIDGES:                  18:24:16

21    Q.  Why would ASTM be concerned about that?   18:24:16

22        MR. FEE:  Objection.  Beyond the scope of his   18:24:20

23 designation.  Calls for speculation.  Lack of      18:24:22

24 foundation.                    18:24:24

25        THE WITNESS:  It would be taking the standard   18:24:26

Page 262

1 out of context from what the voluntary consensus   18:24:27

2 process encompassed in ASTM standards development   18:24:31

3 enterprises wanted to see represented in the standard.   18:24:35

4 BY MR. BRIDGES:                  18:24:43

5    Q.  Has ASTM ever asked an agency to use specific   18:24:43

6 language in a regulation?               18:24:47

7        MR. FEE:  Objection.  Beyond the scope of his   18:24:50

8 designation.                    18:24:52

9        THE WITNESS:  It's possible that we have.   18:24:54

10 BY MR. BRIDGES:                  18:24:55

11    Q.  Do you recall a particular -- any instance?   18:24:55

12        MR. FEE:  Same objection.            18:24:57

13        THE WITNESS:  I don't recall a particular   18:24:59

14 time.                      18:24:59

15 BY MR. BRIDGES:                  18:25:01

16    Q.  Do you have an estimate as to the number of   18:25:01

17 times it's occurred?                 18:25:06

18        MR. FEE:  Objection.  Lack of foundation.   18:25:08

19 Beyond the scope of his designation.  Calls for   18:25:09

20 speculation.                    18:25:11

21        THE WITNESS:  It's -- there's a process that   18:25:13

22 our committees would have to follow.  They would have   18:25:17

23 to -- the executive committee of a committee would   18:25:19

24 have to reach a consensus that they want to see an   18:25:24

25 ASTM standard included in a regulation.  And so I   18:25:28

Page 263

1 don't think it happens very often, but I believe it   18:25:33

2 has happened in the last 10 years since I've been at   18:25:35

3 ASTM.                      18:25:38

4 BY MR. BRIDGES:                  18:25:40

5    Q.  Are you saying that there has to be a      18:25:40

6 consensus process in order to cooperate with a federal   18:25:42

7 government in incorporating standards by reference?   18:25:46

8        MR. FEE:  Objection.  Mischaracterizes his   18:25:52

9 testimony.  Vague.                18:25:54

10        You can answer.              18:25:58

11        THE WITNESS:  No, that's not what I'm saying.   18:26:00

12 BY MR. BRIDGES:                  18:26:14

13    Q.  Do you know whether any federal official has   18:26:14

14 taken advantage of the reading room that ASTM provides   18:26:17

15 the public?                    18:26:22

16        MR. FEE:  Objection.  Vague.         18:26:23

17        THE WITNESS:  I don't know specifically   18:26:30

18 whether they have.  I do know I've received accolades   18:26:31

19 from federal agencies, the fact that it exists.  So I   18:26:34

20 would presume that they have.            18:26:40

21 BY MR. BRIDGES:                  18:26:44

22    Q.  How much money has ASTM received from the   18:26:44

23 federal government in each of the last five years?   18:26:49

24        MR. FEE:  Objection.  Vague.         18:26:58

25        THE WITNESS:  Well, I believe we've received   18:27:00

Page 264

1 anywhere from $650,000 to $900,000 per year over the   18:27:04

2 last five years from the federal government.      18:27:11

3 BY MR. BRIDGES:                  18:27:17

4    Q.  Were some of that money provided by the      18:27:17

5 federal government in order to facilitate the      18:27:22

6 standards development process?            18:27:25

7        MR. FEE:  Objection.  Calls for speculation.   18:27:27

8 Vague.                      18:27:29

9        THE WITNESS:  To my knowledge, none of it   18:27:31

10 was.                      18:27:32

11 BY MR. BRIDGES:                  18:27:37

12    Q.  What were the main categories of payments by   18:27:37

13 the federal government to ASTM over the last five   18:27:41

14 years?                      18:27:46

15        MR. FEE:  Objection.  Vague.         18:27:47

16 BY MR. BRIDGES:                  18:27:48

17    Q.  In other words, what were the payments for   18:27:48

18 ASTM to do?                    18:27:50

19        MR. FEE:  Same objection, plus form.      18:27:52

20        THE WITNESS:  I can think of -- that we would   18:27:53

21 sell standards to federal agencies.  That would be one   18:27:56

22 source of revenue.                18:28:00

23 BY MR. BRIDGES:                  18:28:01

24    Q.  What other sources of revenue?         18:28:01

25    A.  I believe that we have a number of federal   18:28:03

Page 265

67 (Pages 262 - 265)

1 employees that participate in ASTM as full voting 18:28:06
2 members. So they would pay a $75-per-year fee to be a 18:28:09
3 member of ASTM. 18:28:14
4 Q. And you're counting that in the figures that 18:28:16
5 you gave me earlier? 18:28:18
6 A. Yes. 18:28:19
7 Q. What other sources of funds from the federal 18:28:20
8 government have there been for ASTM? 18:28:23
9 A. Right. That's all I'm aware of. That's all 18:28:27
10 I'm aware of. We also have certification and training 18:28:33
11 programs, which I don't believe the federal government 18:28:41
12 is too involved in, but we receive a small stipend 18:28:44
13 from the U.S. Department of Agriculture to assist them 18:28:49
14 in running a -- the U.S. bio preferred program. 18:28:53
15 Q. Anything else? 18:29:00
16 A. We run a proficiency testing program, which 18:29:06
17 the U.S. Department of Defense participates in. So 18:29:08
18 it's not related to standards, but it's another source 18:29:14
19 of revenue from the federal government. 18:29:18
20 Q. Does ASTM have any means of identifying who 18:29:22
21 the originator was of any particular language in its 18:29:26
22 standards? 18:29:33
23     MR. FEE: Objection. Vague. Compound. To 18:29:34
24 the extent it calls for a legal conclusion, I'd also 18:29:43
25 object on that basis. 18:29:46

Page 266

1 or edits to any version of ASTM standards where the 18:31:13
2 current ASTM standards have been incorporated by 18:31:25
3 reference? 18:31:33
4     MR. FEE: Objection. It's beyond the scope 18:31:34
5 of his designation. Compound. Vague. 18:31:35
6     THE WITNESS: Because of the openness and 18:31:45
7 transparency and iterative innovative process that 18:31:49
8 ASTM encapsulates, I wouldn't know how to answer that 18:31:53
9 question, give you a number. 18:31:56
10     MR. BRIDGES: There's one more exhibit I want 18:32:08
11 to find. 18:32:10
12     (Deposition Exhibit 1072 was marked for 18:32:35
13     identification.) 18:32:35
14     MR. BRIDGES: Mr. Grove, I've handed you 18:32:35
15 Exhibit 1072. 18:32:37
16 Q. What is this document? 18:32:39
17 A. It appears as if this is the ASTM form and 18:32:53
18 style book for how ASTM standards are displayed. 18:32:57
19 Q. Does that create standards that persons must 18:33:07
20 follow in participating in the drafting and revision 18:33:15
21 process of ASTM standards? 18:33:18
22     MR. FEE: Objection. Vague. Compound. 18:33:22
23     THE WITNESS: No. 18:33:31
24 BY MR. BRIDGES: 18:33:34
25 Q. Does that provide rules that persons must 18:33:34

Page 268

1     Go ahead. 18:29:47
2     THE WITNESS: To the extent those are legal 18:29:51
3 terms, I'm aware of an ASTM standards development 18:29:52
4 process. I'm not aware of a way to trace origins back 18:29:56
5 to a specific individual. 18:30:02
6 BY MR. BRIDGES: 18:30:06
7 Q. Is there any -- strike that. 18:30:06
8     How many individuals provide language or 18:30:11
9 edits to the ASTM standards that have been 18:30:19
10 incorporated by reference? 18:30:24
11     MR. FEE: Objection. Vague. Compound. 18:30:25
12     THE WITNESS: That would be very difficult to 18:30:37
13 calculate. I need to ask are you referring to 18:30:39
14 standards that have already been incorporated by 18:30:41
15 reference? 18:30:43
16 BY MR. BRIDGES: 18:30:44
17 Q. Yes. 18:30:44
18 A. Presumably, if those standards are being 18:30:47
19 revised by ASTM or re-approved for use, it will have 18:30:49
20 to go through a technical committee. It has to. 18:30:55
21 That's the process for re-approving or revising 18:30:58
22 standards at ASTM. So it would depend on how many 18:31:01
23 people are on that committee and what percentage 18:31:05
24 voted. 18:31:07
25 Q. How many individuals have provided language 18:31:11

Page 267

1 follow in participating in the drafting and revision 18:33:38
2 process of ASTM standards? 18:33:40
3     MR. FEE: Objection. Vague. 18:33:42
4     THE WITNESS: Generally, yes. 18:33:44
5     MR. BRIDGES: Where are we on time? 18:34:06
6     THE VIDEOGRAPHER: 18 minutes left. 18:34:10
7     MR. BRIDGES: 18 minutes left. 18:34:13
8     (Deposition Exhibit 1073 was marked for 18:35:00
9     identification.) 18:35:00
10 BY MR. BRIDGES: 18:35:00
11 Q. Mr. Grove, do you recognize Exhibit 1073? 18:35:00
12 A. I do. 18:35:13
13 Q. Does it represent the views of both ASTM and 18:35:16
14 ANSI? 18:35:20
15     MR. FEE: Objection. Compound. Calls for 18:35:23
16 speculation. Beyond the scope of his designation. 18:35:25
17     THE WITNESS: I believe this is an error. 18:35:30
18 No. I'm not familiar why this page would be stapled 18:35:32
19 to a presentation. This is a speaker that came before 18:35:36
20 me on a panel followed by -- who probably didn't 18:35:39
21 provide a written presentation, which happens to be 18:35:44
22 stapled to a presentation which begins with the title 18:35:47
23 page on a presentation that I gave. 18:35:51
24 BY MR. BRIDGES: 18:35:54
25 Q. Okay. So starting -- okay. So there's a 18:35:54

Page 269

68 (Pages 266 - 269)

| | |
|---|---|
| 1 general workshop. That's reflected on the first page. 18:35:56 | 1 MR. BRIDGES: I will check, but if we don't 18:41:09 |
| 2 And then there's a listing of Scott Cooper. Then 18:36:00 | 2 have them, we expect to get them. 18:41:10 |
| 3 there's your name, and then what follows in the 18:36:03 | 3 Q. Can you please explain to me what the purpose 18:41:16 |
| 4 exhibit is a presentation solely by you and not by 18:36:03 | 4 was or what you understood to be the purpose of the 18:41:20 |
| 5 Mr. Cooper; is that correct? 18:36:11 | 5 page with the Bates number ending in -3315? 18:41:23 |
| 6 A. That would be my recollection of events, yes. 18:36:13 | 6 MR. FEE: Objection. It's beyond the scope 18:41:33 |
| 7 Q. And then does that remaining portion learning 18:36:17 | 7 of the designation. Calls for speculation. 18:41:34 |
| 8 after your name reflect the views of ASTM at the time 18:36:20 | 8 THE WITNESS: This represents a project that 18:41:39 |
| 9 of your presentation? 18:36:22 | 9 ASTM staff is undertaking throughout the course of 18:41:42 |
| 10 MR. FEE: Objection. Calls for speculation. 18:36:24 | 10 2015 and -- I'm sorry. 2014 and 2015. These would be 18:41:47 |
| 11 Beyond the scope of his designation. Compound as 18:36:26 | 11 the items that are contained in the project. 18:41:53 |
| 12 well. 18:36:29 | 12 BY MR. BRIDGES: 18:41:58 |
| 13 You should read the whole thing if he's 18:36:38 | 13 Q. Has the project been approved? 18:41:58 |
| 14 asking you to verify all the use of ASTM. 18:36:39 | 14 MR. FEE: Objection. Vague. Beyond the 18:41:59 |
| 15 (The witness reviewed Exhibit 1073.) 18:37:01 | 15 scope of his designation. 18:42:03 |
| 16 THE WITNESS: Yes. I believe this, to the 18:37:01 | 16 THE WITNESS: Project been approved? 18:42:06 |
| 17 best of my recollection, was the general views that 18:37:05 | 17 MR. BRIDGES: Strike that. 18:42:08 |
| 18 ASTM would have on this issue at the time of this 18:37:07 | 18 Q. Is the project underway? 18:42:09 |
| 19 presentation. 18:37:09 | 19 MR. FEE: Objection. Beyond the scope of his 18:42:11 |
| 20 (Deposition Exhibit 1074 was marked for 18:38:01 | 20 designation. 18:42:13 |
| 21 identification.) 18:38:01 | 21 THE WITNESS: So some of these activities may 18:42:16 |
| 22 BY MR. BRIDGES: 18:38:01 | 22 be underway, but we don't believe that we are actively 18:42:18 |
| 23 Q. Mr. Grove, Exhibit 1074 is a series of 18:38:01 | 23 pursuing all of them. 18:42:21 |
| 24 E-mails among you and Katherine Morgan, Len Morrissey 18:38:07 | 24 BY MR. BRIDGES: 18:42:23 |
| 25 and John Pace; is that correct? 18:38:15 | 25 Q. Which ones is ASTM not actively pursuing? 18:42:26 |
| Page 270 | Page 272 |

| | |
|---|---|
| 1 A. Yes, it is. 18:38:26 | 1 MR. FEE: Same objection. 18:42:31 |
| 2 MR. FEE: While I'm thinking of it, I'm going 18:39:08 | 2 THE WITNESS: Well, we're taking an 18:42:38 |
| 3 to reserve the right to read and sign. 18:39:12 | 3 inventory. We don't have great information about the 18:42:40 |
| 4 (Deposition Exhibit 1075 was marked for 18:39:29 | 4 full extent of government participation. So we're 18:42:45 |
| 5 identification.) 18:39:29 | 5 taking an inventory of how many government reps are 18:42:50 |
| 6 MR. BRIDGES: I'm handing you an exhibit 18:39:29 | 6 participating in ASTM technical committees and where. 18:42:52 |
| 7 marked 1075 that consists of pages ASTM003314 to 18:39:31 | 7 We're trying to find out more about how federal 18:42:56 |
| 8 ASTM003315. 18:39:37 | 8 agencies use ASTM standards. 18:42:58 |
| 9 (The witness reviewed Exhibit 1075.) 18:40:02 | 9 MR. FEE: Can you read the question back. 18:43:03 |
| 10 BY MR. BRIDGES: 18:40:02 | 10 MR. BRIDGES: Not when he's in the middle of 18:43:08 |
| 11 Q. Do you recognize this document? 18:40:02 | 11 his answer, please. Afterwards, you can do that. 18:43:12 |
| 12 A. I do, yes. 18:40:22 | 12 MR. FEE: He's answering the wrong question. 18:43:14 |
| 13 Q. This is an E-mail from Maureen Houck to a 18:40:29 | 13 MR. BRIDGES: Well, let him finish. 18:43:16 |
| 14 number of senior staff at ASTM; is that correct? 18:40:32 | 14 MR. FEE: Read the question back. 18:43:19 |
| 15 A. It is correct. 18:40:37 | 15 MR. BRIDGES: No. No. 18:43:21 |
| 16 Q. What does ITC -- sorry. "ITMC" mean? 18:40:39 | 16 MR. FEE: Yes. 18:43:21 |
| 17 A. I believe it's short for the Information 18:40:45 | 17 MR. BRIDGES: You stopped your witness from 18:43:22 |
| 18 Technology Management Committee. 18:40:50 | 18 speaking. That's ridiculous. That's improper. 18:43:24 |
| 19 Q. And -- 18:40:54 | 19 MR. FEE: Wait until she reads the question 18:43:28 |
| 20 MR. FEE: I'm going to object. This appears 18:40:56 | 20 back. 18:43:30 |
| 21 to be just one of many attachments to Exhibit 1075. 18:40:58 | 21 (Record read.) 18:43:48 |
| 22 MR. BRIDGES: You know, I'm glad you 18:41:01 | 22 THE WITNESS: It's really hard to say because 18:43:48 |
| 23 mentioned that because I don't think we got the other 18:41:02 | 23 we're very early in the process of working on this, 18:43:49 |
| 24 attachments, and I'd like to get them, please. 18:41:04 | 24 but I can tell you it's been scaled back. This is a 18:43:53 |
| 25 MR. FEE: I don't know if that's true or not. 18:41:06 | 25 pretty ambitious activity. I believe the last two 18:43:55 |
| Page 271 | Page 273 |

69 (Pages 270 - 273)

| | |
|---|---|
| 1     THE VIDEOGRAPHER: This is the end of the     18:53:06 | 1          ACKNOWLEDGMENT OF DEPONENT |
| 2 deposition of Mr. Jeffrey Grove. We are off the     18:53:08 | 2 |
| 3 record at 18:52.                    18:53:13 | 3     I, JEFFREY GROVE, do hereby certify that I |
| 4     (Witness excused.)          18:53:16 | 4 have read the foregoing pages, _____ to _____, |
| 5     (Deposition concluded at 6:52 p.m.)     18:53:16 | 5 and that the same is a correct transcription of the |
| 6 | 6 answers given by me to the questions therein |
| 7 | 7 propounded, except for the corrections or changes in |
| 8 | 8 form or substance, if any, noted in the attached |
| 9 | 9 Errata Sheet. |
| 10 | 10 |
| 11 | 11 _____ |
| 12 | 12 DATE          SIGNATURE |
| 13 | 13 |
| 14 | 14 |
| 15 | 15 |
| 16 | 16 |
| 17 | 17 |
| 18 | 18 |
| 19 | 19 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22 |
| 23 | 23 |
| 24 | 24 |
| 25 | 25 |
| Page 282 | Page 284 |

```
 1        C E R T I F I C A T E
 2     I do hereby certify that the aforesaid
 3 testimony was taken before me, pursuant to
 4 notice, at the time and place indicated; that
 5 said deponent was by me duly sworn to tell
 6 the truth, the whole truth, and nothing but
 7 the truth; that the testimony of said
 8 deponent was correctly recorded in machine
 9 shorthand by me and thereafter transcribed
10 under my supervision with computer-aided
11 transcription; that the deposition is a true
12 and correct record of the testimony given by
13 the witness; and that I am neither of counsel
14 nor kin to any party in said action, nor
15 interested in the outcome thereof.
16
17
18
        %signature%
19      Nancy J. Martin, RMR, CSR
20
21
22 Dated: March 18, 2015
23
24
25
                              Page 283
```

72 (Pages 282 - 284)

# EXHIBIT 9

1          UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF COLUMBIA
3

   AMERICAN SOCIETY FOR   : NO.
4  TESTING AND MATERIALS  : 1:13-cv-01215-TSC-
5  d/b/a ASTM             : DAR
6  INTERNATIONAL;         :
7  NATIONAL FIRE          :
   PROTECTION             :
8  ASSOCIATION, INC.;     :
9  and AMERICAN SOCIETY   :
10 OF HEATING,            :
11 REFRIGERATION, AND     :
12 AIR CONDITIONING       :
13 ENGINEERS,             :
   Plaintiffs             :
14      vs.               :
   PUBLIC.RESOURCE.ORG,   :
15 INC.,                  :
16 Defendant              :
17

        Videotaped deposition of JOHN C.
18 JAROSZ taken at the law offices of Veritext
19 Legal Solutions, 1250 I Street NW,
20 Washington, DC, commencing at 10:09 a.m.
21 THURSDAY, AUGUST 27, 2015, before Debbie
22 Leonard, Registered Diplomate Reporter,
23 Certified Realtime Reporter.
24
25 PAGES 1 - 260

                                      Page 1

1    consulting career.
2  BY MR. BRIDGES:
3      Q.    In what context?
4      A.    There have been several matters
5  I've had, litigations, that have involved
6  standard setting organizations and the
7  outputs from those organizations.
8      Q.    What organizations?
9      A.    Well, some that come to mind
10 are ETSI, IEEE, the Blu-ray Association,
11 MPEG, MPEG L.A., the Philips 6C and Philips
12 3C organizations.  Those are among the ones
13 that come to mind.
14     Q.    And what types of litigation
15 did your work relating to those standard
16 setting organizations involve?
17         MR. FEE:  Objection to form.
18         THE WITNESS:  It was almost all
19     intellectual property litigation, with
20     probably the bulk of the analyses
21     undertaken with regard to patent
22     rights.
23 BY MR. BRIDGES:
24     Q.    Do you recall --
25     A.    I guess I should -- there were

Page 26

1  probably some breach of contract matters as
2  well.
3      Q.    Did you work on any matters
4  involving copyright law where you became
5  familiar with the work and outputs of
6  standards setting organizations before this
7  case?
8      A.    Probably, but I cannot say that
9  with absolute certainty.  I've been involved
10 in several matters over a course of many
11 years.
12     Q.    Can you name any copyright
13 matter involving a standards development
14 organization that you recall?
15     A.    Not now, without going back and
16 looking at my records.
17     Q.    Would they be listed in the
18 cases attached to Exhibit 1?
19     A.    That would summarize some of my
20 records.  The cases that are embodied in my
21 tab 1 are those that led to deposition or
22 trial testimony.  I've been involved in many
23 matters beyond those.
24     Q.    But sitting here, you cannot
25 recall any copyright case involving a

Page 27

1  standards development organization that
2  you've worked on?
3      A.    Again, I'd have to go back and
4  look at my records.  I can't right now recite
5  any, but there very well could be one or
6  more.
7      Q.    Did you review any of your work
8  in -- from earlier copyright cases involving
9  standards development organizations in
10 connection with your work in this case?
11     A.    Not to the best of my memory,
12 no.
13     Q.    What background do you have in
14 the creation of standards by standard
15 development organizations?
16         MR. FEE:  Objection to form.
17         THE WITNESS:  In the context of
18     some of my consulting assignments, I
19     have examined processes undertaken by
20     SDOs.
21 BY MR. BRIDGES:
22     Q.    Anything else?
23     A.    Nothing else comes to mind.
24 I've certainly looked at the output
25 associated with those processes, but there's

Page 28

1  nothing else that comes to mind.
2      Q.    What processes undertaken by
3  standards development organizations did you
4  examine?
5         MR. FEE:  Objection.  Are you
6     asking prior to the report still?
7         MR. BRIDGES:  Yes.
8         MR. FEE:  Okay.
9         THE WITNESS:  I'm not quite --
10        MR. BRIDGES:  Or other than in
11     this case.
12        MR. FEE:  Okay.
13        THE WITNESS:  I'm not quite
14     sure what you're asking.  I've seen
15     discussion of the some of the
16     processes of various organizations.
17     I'm not -- I'm not quite sure what
18     you're asking.  Perhaps you could ask
19     it somewhat differently.
20 BY MR. BRIDGES:
21     Q.    Well, no.  You said, quote, "I
22 have examined processes undertaken by SDOs."
23         So my question is, what
24 processes undertaken by standards development
25 organizations did you examine?

Page 29

8 (Pages 26 - 29)

1     A.    It sounds like the same
2  question to me.
3     Q.    Specifically, what processes
4  did you examine?
5     A.    That still sounds like the same
6  question, but let me try to answer it by
7  saying I've looked, for instance, at the
8  mechanisms that ETSI undertook in developing
9  standards.  So I am familiar generally with
10 the processes that it follows.  Similarly
11 with regard to other standard setting
12 organizations.
13    Q.    What other standard setting
14 organizations?
15    A.    Well, I think I identified
16 those a few moments ago.  Do you want me to
17 repeat those?
18    Q.    Well, if -- are you saying
19 that, for all of those organizations, you
20 examined their processes?
21    A.    In some dimension, probably for
22 most of the organizations, I had at least
23 some knowledge of the process.  I can't say
24 that I investigated in depth all of the
25 processes for all of the organizations that

1  have been involved in my consulting
2  assignments that are standards oriented.
3     Q.    What do you recall about your
4  investigation of the processes by which
5  standards development organizations create
6  their standards?
7     A.    I should say I -- SDO is
8  probably not the right term to use.  I should
9  probably say standards setting organizations.
10 There may be a distinction between an SSO and
11 an SDO.
12          But, generally, each SSO has a
13 process that's unique to its organization.
14 Some solicit input from a wide range of
15 constituents; some from a more narrow range.
16          The ones that I have examined
17 have all been fairly careful in the work that
18 they've done, seeking input at many steps
19 along the way.
20          Some organizations, like SDOs
21 at issue here, seek a broader array of inputs
22 than do others.
23          Some organizations, standards
24 setting organizations, include primarily or
25 only manufacturers and sometimes large

1  manufacturers only.  Others include a wider
2  array of companies.
3          In all instances, though, the
4  companies are trying to -- the standards
5  setting organizations are trying to develop
6  at least some form of consensus -- sometimes
7  it's very broad consensus; sometimes it's
8  more narrow consensus -- about what would be
9  good for that standards setting organization.
10         Sometimes the SSOs are
11 interested in what's best for the
12 manufacturers and the ability for them to
13 supply in an interoperable environment.  In
14 some cases, the SSOs are very alert to the
15 needs of consumers and users of products and
16 services that comply with standards.
17    Q.    You've distinguished between
18 standards setting organizations and standard
19 development organizations.  What is the
20 distinction that you -- that you identify
21 between the two?
22    A.    I think I said I didn't know if
23 there is for sure a distinction, but I think
24 an SSO is perhaps a broader concept than an
25 SDO, but I might be wrong on that.

1          I know the companies -- I --
2  the plaintiffs here are SDOs.  The
3  associations are, among other things, in the
4  business of creating and developing
5  standards.
6          There could be other SSOs that
7  have different constituents that are of
8  interest to them.  I don't know for sure that
9  an SSO is a broader concept than an SDO, but
10 it could be.
11    Q.    What do you understand to be
12 the constituents of the plaintiffs in this
13 case?
14         MR. FEE:  Objection to form.
15         THE WITNESS:  I laid that out
16     in my report.  In summary, I believe
17     they try to include in the process
18     both those -- both supply-side
19     entities and demand-side entities.
20 BY MR. BRIDGES:
21    Q.    Who else are plaintiffs'
22 constituents?
23         MR. FEE:  Same objection.
24         THE WITNESS:  I can't think of
25     anything that doesn't fall within

1  any harms that the plaintiffs have actually
2  suffered to date as a consequence of the
3  defendant's activities?
4        MR. FEE:  Objection to form.
5        THE WITNESS:  To the extent I
6    have, it's embodied in my report.
7    You'll see there's a little bit of
8    evidence of actual tangible harm to
9    date, and there's certainly more
10   discussion of harm.  The tangible
11   evidence I have is reflected in my
12   report.
13 BY MR. BRIDGES:
14   Q.    And what do you understand that
15 evidence to be?
16   A.    I believe the number of
17 downloads from the Public Resource
18 dissemination have been fairly substantial.
19 I believe that the purchase of publications
20 has declined some at the plaintiffs -- at the
21 various plaintiffs.  It certainly has not
22 risen.  Those are among the things that come
23 to mind.
24        I think I discuss the topic in
25 more depth in paragraph, among other thing --

1  you just said, quote, "I am not sure that the
2  impact from the past would be close to the
3  impact that will occur in the future if the
4  Court finds that there has been no copyright
5  or trademark infringement."
6    A.    It's everything laid out in my
7  report.  I -- it's really the -- at the heart
8  of what I did.
9    Q.    And please summarize for me
10 what data you base that statement on.
11   A.    That's identified in my report.
12   Q.    Okay.  Show me, please, in the
13 report.
14   A.    It's all of what's in
15 Exhibit 1.
16   Q.    No, I want -- I want the basis
17 for your statement that the impact from
18 conduct to date -- strike that -- that you're
19 not sure that the impact from the conduct to
20 date would be close to the impact that will
21 occur in the future if the Court find --
22 makes a certain finding, right?
23   A.    Correct.
24   Q.    So please identify for me
25 something specific that forms the basis of

1  among other places, in paragraph 133 of my
2  report.
3    Q.    Have you been able to quantify
4  any financial losses to plaintiffs as a
5  consequence of defendant's activities?
6    A.    No.
7    Q.    Why not?
8    A.    Not with any great certainty.
9    Q.    Why not?
10   A.    Well, I don't have the records
11 that would allow me to do that.  Moreover, I
12 am not sure that the impact from the past
13 will be close to the impact that will occur
14 in the future if the Court finds that there
15 has been no copyright or trademark
16 infringement.
17   Q.    Why do you make the statement
18 you just did?  What's your basis for it?
19        MR. FEE:  Objection to form.
20        THE WITNESS:  I think there
21    were a few things in my statement.
22    Which would you like me to expound on?
23 BY MR. BRIDGES:
24   Q.    Just that sentence.  I'd like
25 to know what the basis is for the sentence

1  that statement.
2        MR. FEE:  Objection.  Asked and
3    answered.
4        THE WITNESS:  Among other
5    things, paragraphs 112 through 155.
6  BY MR. BRIDGES:
7    Q.    So these are the "Costs of
8  Losing Copyright Protection"; is that
9  correct?
10   A.    That's the title of this
11 section, and then there's some discussion of
12 trademark protection as well.
13   Q.    And those would be the harms
14 that you identify that would flow from a
15 decision by the Court that the plaintiffs
16 cannot enforce their copyrights against the
17 defendant, correct?
18        MR. FEE:  Objection to form.
19        THE WITNESS:  What I can say --
20    I'm sorry.
21        MR. FEE:  I just objected to
22    form.
23        THE WITNESS:  What I can say
24    with a reasonable degree of certainty.
25 BY MR. BRIDGES:

1    that I've cited, and some of those
2    talk about the standard development
3    process and why participants are
4    active in the process.  So in that
5    regard, I've considered incentives.
6  BY MR. BRIDGES:
7       Q.    What do you understand the
8  incentives to be?
9       A.    Well, for the supply side
10  constituents, they're interested in effective
11  manufacturing and selling of products that
12  will -- and services that will be well
13  received in the marketplace; and on the
14  demand side, the constituents are interested
15  in products and services that address certain
16  quality and compatibility issues or problems
17  and help resolve those.
18      Q.    Do you know who actually
19  creates the text of the standards?
20          MR. FEE:  Objection to form.
21          THE WITNESS:  Are you talking
22      about who actually types in the words?
23  BY MR. BRIDGES:
24      Q.    No.
25      A.    Because I don't know what you

Page 82

1  mean by "creates the text."
2       Q.    Who actually suggests the
3  words?
4       A.    I think a number of
5  constituents do, typically.
6       Q.    What types of constituents
7  suggest the words of the standards?
8          MR. FEE:  Objection to form.
9          THE WITNESS:  I think it's
10      sometimes SDO employees.  I think,
11      more times than not, it's industry
12      participants, often supply-side
13      people, sometimes demand-side people.
14      Frequently those people are working
15      from preexisting standards or similar
16      standards and revising those as
17      appropriate.
18          So I think a number of people
19      have input to the words.
20  BY MR. BRIDGES:
21      Q.    Do you actually know of
22  instances where SDO employees have proposed
23  text as opposed to editing text?
24      A.    I can't --
25          MR. FEE:  Objection --

Page 83

1          THE WITNESS:  -- point to --
2          MR. FEE:  -- form.
3          THE WITNESS:  -- any particular
4      instances as I sit here now.
5  BY MR. BRIDGES:
6       Q.    Can you think of any other
7  motivations that the participants in the
8  standards writing process have?
9       A.    I'm sorry.  Other than what?
10      Q.    Other than the incentives you
11  referred to earlier of the supply-side
12  constituents and the demand-side
13  constituents.
14      A.    Nothing else comes to mind,
15  although I'm certainly open to the fact that
16  I haven't thought of or expressed all the
17  incentives.
18      Q.    Well, what other incentives can
19  you think of as you sit here?
20      A.    As I just said, nothing else
21  comes to mind.
22      Q.    What incentives do you
23  understand the plaintiffs to have in
24  developing standards?
25          MR. FEE:  Objection to form.

Page 84

1          THE WITNESS:  I think,
2      generally, they want consensus among
3      interested parties in how to address a
4      particular issue or problem that those
5      constituents face.
6          They are each non-profit
7      organizations, so they're not
8      intending to profit off their
9      activities, but they're certainly
10      intending to fund their activities
11      going forward.
12  BY MR. BRIDGES:
13      Q.    What do you understand the
14  activities of the standards development
15  organizations to be in creating the standards
16  at issue in this case?
17          MR. FEE:  Objection to form.
18          THE WITNESS:  At the very
19      least, they facilitate the process
20      through arranging logistics.  They do
21      other things, including participate in
22      discussions, and -- as I understand
23      it, and create versions of proposed
24      standards.
25          They also serve as a

Page 85

22 (Pages 82 - 85)

1   Web sites we gathered ourselves, and I think
2   the reports and articles, with the exception
3   of the Bremer articles, we gathered
4   ourselves.
5       Q.   Do you know why you got no
6   documents from NFPA, no Bates range documents
7   from NFPA?
8       MR. REHN:  Object to form --
9       THE WITNESS:  I don't know why
10  we did not receive Bates documents --
11      THE REPORTER:  Wait.
12      MR. REHN:  Sorry.  Object to
13  the form.  Lacks foundation.
14      THE WITNESS:  I don't know for
15  sure that we didn't receive
16  Bates-stamped documents, but I believe
17  some of the documents we received were
18  NFPA documents.
19  BY MR. BRIDGES:
20      Q.   Do you recall seeing any NFPA
21  documents that -- in which NFPA personnel
22  stated that they could not show any harm from
23  the defendant's activities?
24      A.   Received any documents that
25  said that?

Page 122

1       Q.   Uh-huh.
2       A.   Perhaps you would have
3   something that would refresh my memory.  I
4   don't recall, sitting here right now, but
5   it's possible.
6            Are you talking about
7   historical -- historically no harm, or are
8   you talking about prospectively?
9       Q.   Either one.  Did you -- do you
10  recall seeing any internal NFPA documents
11  that call into question where NF -- whether
12  NFPA has suffered any harm from the
13  defendant's activities?
14      A.   I don't recall documents on it.
15  There may have been some deposition testimony
16  about past activities, but I don't know if it
17  was activities prior to Public Resource
18  actions here or after.
19      Q.   Do you recall learning about
20  any litigation that NFPA had engaged in
21  pertaining to standards and copyright?
22      A.   I think I heard that there's
23  some overseas litigation involving Public
24  Resource.  Whether that involves NFPA, I
25  don't know.

Page 123

1       Q.   What did you hear about
2   overseas litigation involving Public
3   Resource?
4       A.   I think I heard that there was
5   a German -- or a suit in Germany, but I'm not
6   sure that I learned much more than that.  I
7   don't recall what status that suit -- what
8   the status of that suit is.
9       Q.   Do you recall anyone disclosing
10  to you litigation involving NFPA in the
11  United States that pertained to standards and
12  copyright?
13      A.   It's possible, but I don't
14  recall any, sitting here right now.
15      Q.   Do you recall inquiring about
16  public statements of fact that NFPA has made
17  regarding copyright and standards in
18  litigation other than this litigation in the
19  United States?
20      MR. FEE:  Objection to form.
21      THE WITNESS:  I do not.
22  BY MR. BRIDGES:
23      Q.   Are you familiar with a case
24  called Veeck, V-E-E-C-K?
25      A.   I'm familiar with an opinion in

Page 124

1   the Veeck case.
2       Q.   What do you know about that
3   opinion?
4       MR. FEE:  Objection.
5       I would instruct you not to
6   disclose anything you know about that
7   opinion that was a result of
8   communications with counsel and that
9   did not form the basis of any of the
10  opinions in your report or any of the
11  assumptions that you relied upon in
12  reaching your conclusions.
13      THE WITNESS:  I did talk with
14  counsel about that case, and that case
15  didn't form any basis for any of my
16  observations or conclusions here.
17  BY MR. BRIDGES:
18      Q.   Why did the Veeck case not form
19  any basis for any of your observations or
20  conclusions here?
21      A.   I don't know how to answer that
22  question.  I -- it didn't present any facts
23  that were specific to this case, as far as I
24  recall.
25      Q.   What do you recall of the facts

Page 125

32 (Pages 122 - 125)

1    answered.
2         THE WITNESS:  Again, I read the
3    case.  I didn't do any analysis beyond
4    that of that particular case.
5    BY MR. BRIDGES:
6         Q.    What steps did you take to
7    ascertain what public harms flowed from the
8    Court's decision in the Veeck case?
9         A.    Other than reading the case,
10   the opinion in the case, I didn't do anything
11   beyond that to understand the implications of
12   that holding.
13        Q.    You didn't do any investigation
14   as to the economic consequences to any
15   entity, industry, or person as a consequence
16   of the decision in the Veeck case, correct?
17        MR. FEE:  Objection to form.
18        THE WITNESS:  I think that's
19        correct, yes.
20   BY MR. BRIDGES:
21        Q.    How has the process of
22   standards development changed in the last 100
23   years, to your knowledge?
24        A.    I don't know the specifics, and
25   I don't know that there is one standards

Page 130

1    development process.  I think there are a
2    variety of processes pursued by a number of
3    SSOs or SDOs.  I'm sure that there have been
4    changes on the margin.  There may have been
5    larger changes.  I just don't know.  I have
6    not studied the trend in the standard
7    development process over time.
8         Q.    What changes are you aware of
9    in the standards development process of NFPA
10   over the past 100 years?
11        A.    I don't know.  I've not studied
12   that topic.
13        Q.    What changes are you aware of
14   in the standards development process of the
15   ASHRAE 90.1 standard?
16        A.    I don't know.  I've not studied
17   that.
18        Q.    How did ASHRAE come to develop
19   the 90.1 standard?
20        A.    I think, generally, a need was
21   identified and a group of constituents
22   convened to derive a standard, but I don't
23   know the specifics beyond that.
24        Q.    Do you know who identified the
25   need?

Page 131

1         A.    Not sitting here right now, I
2    don't.
3         Q.    Do you know whether ASHRAE took
4    over development of what became standard 90.1
5    from any other group or entity?
6         A.    No, I do not.
7         Q.    Have you ever quantified the
8    value of the contributions made by the
9    volunteers of the various organizations to
10   the standards at issue in this case?
11        MR. FEE:  Objection to form.
12        THE WITNESS:  Not other than
13        having some sense of hours or a
14        limited sense of dollars, but not
15        beyond that, no.
16   BY MR. BRIDGES:
17        Q.    Can you put a rough dollar
18   value on the time and expenses of the
19   volunteers with respect to any of the
20   standards in this case?
21        MR. FEE:  Objection to form.
22        THE WITNESS:  Not sitting here
23        right now.  That would entail a little
24        bit of a study.  I have not done that.
25   BY MR. BRIDGES:

Page 132

1         Q.    What -- what would be required?
2         A.    To understand basically the
3    out-of-pocket expenses incurred and the
4    opportunity costs incurred.  So among other
5    things, one would want to look at time
6    records, have an understanding of
7    compensation, have an understanding of the
8    activities of those individuals.  Those
9    are -- would be among the inputs.
10        Q.    What changes are you aware of
11   in the distribution of standards in the past
12   100 years by the plaintiffs?
13        MR. FEE:  Objection to form.
14        THE WITNESS:  I haven't
15        investigated that particular issue,
16        but I understand that some of the
17        standards today are distributed
18        through the Internet that certainly
19        didn't exist 100 years ago.
20        Some of the standards are
21        distributed for free with limitations.
22        I don't know if that was true 100
23        years ago, but it might have been.
24        I would expect some of the
25        copying and dissemination capabilities

Page 133

34 (Pages 130 - 133)

1  are much greater today than they were
2  in 1915, but I don't know that the
3  general methods of -- I don't know how
4  the general methods of distribution
5  have changed.
6  BY MR. BRIDGES:
7      Q.    What changes are you aware of
8  in sales trends over the past 20 years?
9          MR. FEE: Objection to form.
10         THE WITNESS:  I don't have data
11  going back as far as 20 years ago.  I
12  have some information on publication
13  sales, for instance, in tabs 3, 4, and
14  5.  They only -- that information only
15  goes back a few years, however.
16  BY MR. BRIDGES:
17     Q.    Did you review any information
18  earlier than the dates shown in the documents
19  at tabs 3, 4, and 5?
20         MR. FEE: Objection. Vague.
21         THE WITNESS:  It's possible
22  that some of the source documents had
23  earlier information, but I don't
24  recall that.  I would need to look at
25  those source documents.

Page 134

1      the right to reproduce, copy, or
2  disseminate those standards but can
3  look at them online.
4  BY MR. BRIDGES:
5      Q.    Have you used the reading rooms
6  of any of the plaintiffs?
7      A.    No, I have not.
8      Q.    Have you reviewed the interface
9  that the -- have you reviewed the interfaces
10  that the plaintiffs offer to persons wishing
11  to view materials for free online?
12     A.    No, I don't think so.
13     Q.    Do you know what effect, if
14  any, the presence of those free materials on
15  the plaintiffs' Web sites has had on the
16  plaintiffs' revenues?
17         MR. FEE:  Objection to form.
18         THE WITNESS:  No, I don't.
19  BY MR. BRIDGES:
20     Q.    Have you -- have you
21  investigated that?
22         MR. FEE:  Same objection.
23         THE WITNESS:  I've been
24  opening -- I've been open to learning
25  about that, but I haven't learned that

Page 136

1  BY MR. BRIDGES:
2      Q.    And those source documents
3  would be within the Bates ranges identified
4  in tab 2 of your report?
5      A.    Within the Bates ranges or
6  identified elsewhere in tab 2.  For instance,
7  the AS team -- ASTM audited -- audited
8  consolidated financial statements, I think,
9  may not all be Bates-stamped.  I could be
10  wrong on that.  But I would look in that set
11  of financial documents.
12     Q.    What do you know about what you
13  said -- strike that.
14         You said earlier that some
15  standards are distributed for free with some
16  limitations; is that correct?
17     A.    Yes, that's my understanding.
18     Q.    What do you know about that?
19         MR. FEE:  Objection. Vague.
20         THE WITNESS:  I've written
21  about that in my report.  I believe
22  that each one of the plaintiffs has
23  provided what is sometimes called a
24  "reading room" so that people can look
25  at those standards but are not given

Page 135

1      there's a direct or indirect effect.
2  There might be, but I haven't seen
3  evidence of that.
4  BY MR. BRIDGES:
5      Q.    My question was, have you
6  investigated that?
7          MR. FEE:  Same objection.
8          THE WITNESS:  Perhaps you could
9  read back my answer.
10  BY MR. BRIDGES:
11     Q.    I've heard the answer.  It was
12  not responsive to my question.  The -- you
13  said you did not know what effect, if any,
14  the presence of those free materials on the
15  plaintiffs' Web sites has had on the
16  plaintiffs' revenues.
17         And my question is, have you
18  investigated that?
19         MR. FEE:  Same objection.
20         THE WITNESS:  No, I've not
21  undertaken a separate investigation.
22  I've been alert to that topic, but I
23  haven't assigned myself that
24  investigation.
25  BY MR. BRIDGES:

Page 137

1 counsel. And then we finalized the report,
2 submitting it to counsel on June 5th, 2015.
3     Q.   Do you know how many standards
4 of each plaintiff are at issue in this case?
5     A.   How many -- I'm sorry --
6 standards are at issue?
7     Q.   Yes.
8     A.   I have that number written
9 down. It's in the hundreds, and I forget, as
10 I sit here right now, precisely the number.
11 I will look it up. And I was giving you an
12 answer that was a cumulation across the three
13 plaintiffs.
14        I am not seeing that number
15 right now. I'll keep looking.
16     Q.   Do you know what --
17     A.   You may be able to point me
18 quicker than I recall where it was.
19     Q.   Do you -- do you know what
20 proportion of plaintiffs -- of each
21 plaintiffs' standards is at issue in this
22 case?
23     A.   Are you asking me the ratio of
24 the standards at issue versus the total
25 standards developed by the organizations?
Page 154

1     Q.   Yes.
2     A.   I think it's less than a
3 majority for each organization. I'm fairly
4 certain of that with regard to ASTM. I think
5 that's true with regard to NFPA. I think
6 it's true with regard to ASHRAE.
7     Q.   Do you have any better
8 information than less than a majority --
9     A.   Well, I --
10     Q.   -- for each of them?
11     A.   The precise numbers are in the
12 report. Let's see here. One can figure that
13 out. You may remember where I summarized the
14 number of standards. I just don't remember.
15 It's easy to determine because the data are
16 all here.
17     Q.   Have you analyzed differences
18 in sales trends between standards that are at
19 issue in this case and plaintiffs' other
20 standards?
21     A.   No, I don't think I have those
22 data at my disposal.
23     Q.   Did you ever ask for those
24 data?
25     A.   I don't recall.
Page 155

1     Q.   Have you analyzed any
2 differences in sales trends between those of
3 plaintiffs' standards that have been
4 incorporated into law and those of
5 plaintiffs' standards that have not been
6 incorporated into law?
7     A.   I don't think so. I don't
8 think I have those data, and I'm not sure
9 that each plaintiff knows precisely how many
10 have been incorporated into law.
11     Q.   Did you ask for any data
12 regarding the distinction between standards
13 incorporated by reference and standards not
14 incorporated by reference in the law?
15     A.   I don't --
16        MR. FEE: Objection to form.
17        THE WITNESS: I'm sorry. I
18 don't recall.
19 BY MR. BRIDGES:
20     Q.   You made observations about
21 sales trends earlier in your deposition. I
22 think you said that there's been a reduction
23 in sales of certain of plaintiffs' standards;
24 is that correct?
25     A.   I'm not quite sure what the
Page 156

1 earlier testimony was, but I think I was
2 pointing you to paragraph 133 with regard to
3 downloads of -- and other measures of
4 activity, as I had at my disposal.
5     Q.   Well, I'm trying to find out
6 what changes you have studied in plaintiffs'
7 economics that you attribute to defendant's
8 activities.
9     A.   I'm not quite sure what your
10 question is.
11     Q.   Well, I'm trying to find out
12 what information you have studied to
13 determine what changes in the finances of
14 each of the plaintiffs have occurred as a
15 consequence of the defendant's activities.
16        MR. FEE: Objection to form.
17        THE WITNESS: I'm still not
18 sure that I'm hearing a question. But
19 to the extent that I had information
20 on changes in activity level, I
21 summarized that in paragraph 133.
22 BY MR. BRIDGES:
23     Q.   My question is, what
24 information did you study to determine any
25 changes in finances of each of the
Page 157

1  plaintiffs?
2        MR. FEE:  Same objection.
3        THE WITNESS:  It's reflected in
4    paragraph 133 and in the tabs,
5    particularly 3, 4, and 5.  But the
6    tabs are not at the granular level
7    that I think are of interest to you.
8  BY MR. BRIDGES:
9    Q.    What do you mean by the
10  "granular level" that would be of interest to
11  me?
12    A.    I don't think it breaks out
13  publications by standard, for instance.
14    Q.    Does it break out publications
15  by whether a standard has been incorporated
16  by reference or not?
17    A.    I don't think so.
18    Q.    Does it break out by whether a
19  standard has been publicly made available by
20  defendant or not?
21    A.    I don't think so.  Not in
22  tabs 3, 4, and 5.
23    Q.    How do you establish causation
24  between defendant's activities and any of the
25  data that you provide in section -- in

1  paragraph 133?
2        MR. FEE:  Objection.  Calls for
3    a legal conclusion.  Form.
4        THE WITNESS:  One can and
5    should look at all evidence available,
6    including circumstantial evidence.  I
7    don't have direct information about
8    the precise impact of defendant's
9    activities, but I have important
10    information that bears on that issue,
11    including information that's in
12    deposition transcripts.
13  BY MR. BRIDGES:
14    Q.    So my question is, how do
15  you -- do you -- strike that.
16        Are your conclusion -- are you
17  making conclusions in paragraph 133 about the
18  cause of changes in sales of the plaintiffs'
19  products?
20        MR. FEE:  Objection to form.
21        THE WITNESS:  Not definitively.
22    I have observations about the
23    magnitude and trend of the downloads
24    of -- through defendant's sites.  I
25    have some information on the downloads

1  of certain of the standards.  I've
2    presented that.
3        I don't have direct evidence of
4    the precise impact historically of
5    defendant's activities on plaintiffs'
6    financials.
7  BY MR. BRIDGES:
8    Q.    What evidence of any kind do
9  you have of any kind of impact historically
10  of the defendant's activities on plaintiffs'
11  financials?
12        MR. FEE:  Objection to form.
13        THE WITNESS:  That which is
14    reported in paragraph 133, that of
15    which is contained in deposition
16    testimony, and that of which I
17    summarized in other parts of the
18    report.
19  BY MR. BRIDGES:
20    Q.    So when you're referring to
21  deposition testimony, you're referring to the
22  citations to the footnotes in paragraph 133?
23    A.    No, I don't think it's just
24  limited to that.  I think there's some other
25  deposition transcripts that talk about the

1  impact or potential impact of defendant's
2  activities on each one of the plaintiffs.
3    Q.    Did you make any independent
4  assessment of causation of any financial
5  effects on plaintiffs by the defendant's
6  activities?
7        MR. FEE:  Objection to form.
8    Calls for a legal conclusion.
9        THE WITNESS:  What do you mean
10    by the term of "independent assessment
11    of causation"?
12  BY MR. BRIDGES:
13    Q.    You, as an expert, not relying
14  just on what other people have said or
15  speculated or thought.
16        MR. FEE:  Same objections.
17    Plus compound.
18        THE WITNESS:  We experts rely
19    on other information to draw the
20    conclusions that we do, and then we
21    bring our training to it.  So our
22    observations shouldn't be in a vacuum.
23  BY MR. BRIDGES:
24    Q.    But they should be objective,
25  correct?

41 (Pages 158 - 161)

1    A.   Yes.
2    Q.   And that means perhaps not
3  relying upon the views of the parties to the
4  lawsuit alone, but doing independent analysis
5  and research, correct?
6         MR. FEE:  Objection to form.
7         THE WITNESS:  I think one can
8    and should evaluate and consider the
9    views of the parties, but not limited
10   investigation to that.
11 BY MR. BRIDGES:
12   Q.   So what independent analysis
13 and research did you do other than reviewing
14 the views and statements of the parties in
15 this case?
16        MR. FEE:  Objection. Vague.
17        THE WITNESS:  I reviewed and
18   summarized the data, as you see in
19   133, that I had at my disposal.  I
20   reviewed writings about the impacts.
21   And I took important
22   information from the fact that the
23   plaintiffs have brought this lawsuit.
24   The plaintiffs don't want this
25   activity to continue.  That is

Page 162

1  revealed preference information that's
2  quite important.
3  BY MR. BRIDGES:
4    Q.   Tell me about what you mean by
5  repealed -- sorry.  Strike that.
6         Tell me what you mean by
7  "revealed preference."
8    A.   What people do often provides
9  information on what their preferences are.
10   Q.   And so the fact that plaintiffs
11 brought this lawsuit has revealed to you that
12 they prefer to bring the lawsuit, correct?
13        MR. FEE:  Objection. Vague.
14        THE WITNESS:  Given the cost,
15   they prefer to bring the lawsuit
16   rather than not bring it, yes.
17 BY MR. BRIDGES:
18   Q.   What else -- strike that.
19        What are the data you're
20 referring to in page -- strike that.
21        What are the data you're
22 referring to in paragraph 133 that you took
23 into account in discussing or analyzing
24 effects of defendant's activities on
25 plaintiffs?

Page 163

1    A.   I took all the data --
2         MR. FEE:  Objection.  Form.
3  Objection to form.
4         THE WITNESS:  I took all this
5    data into account.  That's why I
6    reported it here.
7  BY MR. BRIDGES:
8    Q.   And the data that you
9  identified in the footnotes in
10 paragraph 134 -- sorry -- 133?
11   A.   Yes, I considered that
12 information.
13   Q.   Do you know in what year the
14 defendant posted the 2008 version of the
15 National Electrical Code on its Web site?
16   A.   I don't know with absolute
17 certainty.  I do know a number of the alleged
18 activities occurred in late 2012.  I don't
19 know if it's specific to that code or not.
20   Q.   Does it matter to your analysis
21 exactly when the defendant posted the 2008
22 National Electrical Code on its Web site or
23 to Internet Archive?
24   A.   I would --
25        MR. FEE:  Objection to form.

Page 164

1         THE WITNESS:  I would consider
2    that information if I had it, but I
3    don't have any reason to think that it
4    would change any of the conclusions
5    that I drew.
6  BY MR. BRIDGES:
7    Q.   The timing of when the
8  defendant posted certain matters wouldn't
9  change your conclusions?
10   A.   Not based on what I know right
11 now.  My understanding is that much of the
12 activity occurred in 2012, the later half of
13 2012, and I still have the whole body of
14 evidence that I have considered.  So I'm not
15 sure if the precise timing would change, but
16 I certainly would consider that.
17   Q.   Do you know in what year
18 Public.Resource.Org posted the 2011 version
19 of the National Electrical Code?
20   A.   Same answer to the question
21 that you had with regard to the 2008 code.
22   Q.   Can you look at the data in
23 your -- the tables attached to your report
24 and see if that helps refresh your memory as
25 to when the defendant posted NEC 2008 and

Page 165

42 (Pages 162 - 165)

1    A.   I can't be any more specific
2  than that.
3    Q.   What aspect of your training
4  regarding aspects of industrial organization
5  have you brought to bear on this case?
6    A.   I can't be any more specific
7  than that.
8    Q.   But you did bring the theory of
9  reveal -- revealed preferences to bear on
10  this case, correct?
11   A.   Yes.
12   Q.   What other economic theories do
13  you recall bringing to bear on this case?
14       MR. FEE: Objection. Asked and
15   answered.
16       THE WITNESS: Everything that
17   I've --
18       MR. FEE: And vague.
19       Go ahead.
20       THE WITNESS: -- I've learned
21   in my training, both educational
22   training and career training.
23  BY MR. BRIDGES:
24   Q.   Can you be more specific than
25  that?

Page 174

1    A.   No.
2        * * *
3        (Jarosz Exhibit 4 marked for
4        identification.)
5        * * *
6  BY MR. BRIDGES:
7    Q.   Mr. Jarosz, do you recognize
8  Exhibit 4 as a document that you produced in
9  response to a subpoena in this case?
10   A.   Yes.
11   Q.   What is this document?
12   A.   It appears to be a summary over
13  the years 2009 through 2013 of dollars and
14  quantity of NFPA standards that were sold in
15  the marketplace.
16   Q.   Based upon the trends that you
17  see in this exhibit, can you estimate when
18  you believe it is most likely that the
19  defendant first published -- strike that.
20       Based upon the trends that you
21  see in this Exhibit 4, can you estimate when
22  you believe it is most likely that the
23  defendant first posted each of the standards
24  identified here?
25   A.   I don't think so, not based

Page 175

1  just on this information.
2    Q.   What else would you need?
3    A.   I don't know, because I think
4  it's probably a very easy factual question to
5  determine when the downloading first
6  occurred, so I don't know why one would need
7  to back into it.
8    Q.   Well, when -- would one be able
9  to use sales trends as a way of identifying
10  likely effects of a posting of each standard
11  by the defendant?
12       MR. FEE: Objection. Vague.
13   Compound.
14       THE WITNESS: Maybe; maybe not.
15  BY MR. BRIDGES:
16   Q.   Why do you say "maybe; maybe
17  not"?
18   A.   I just wouldn't think to do it
19  that way, so I don't know what you exactly
20  have in mind.
21   Q.   Do you associate the posting of
22  standards by defendant with changes in sales
23  volume of the standards that the defendant
24  has posted?
25       MR. FEE: Objection to form.

Page 176

1        THE WITNESS: I don't know what
2        you mean by that question.
3  BY MR. BRIDGES:
4    Q.   You don't understand the
5  question?
6    A.   I do not.
7    Q.   Can you correlate the posting
8  of standards by defendant with any changes in
9  sales volumes of the standards that the
10  defendant has posted?
11       MR. FEE: Objection to form.
12       THE WITNESS: I don't think
13   I've attempted to compute the
14   correlation coefficient here
15   associated with postings.
16  BY MR. BRIDGES:
17   Q.   I'm not asking for a specific
18  correlation coefficient. I'm just asking,
19  generally, can you correlate the posting of
20  standards by defendant with any changes in
21  sales volumes of the standards that
22  defendants has -- that the defendant has
23  posted with reference to Exhibit 4?
24   A.   I don't know --
25       MR. FEE: Objection. Form.

Page 177

45 (Pages 174 - 177)

1          THE WITNESS:  I don't recall
2     attempting to do that.  And I wouldn't
3     necessarily think that the historical
4     impact would -- is the end of the
5     story as to the harm here.
6  BY MR. BRIDGES:
7     Q.    Is historical impact part of
8  the story as to the harm here?
9     A.    Yes.
10    Q.    What -- what can you say by
11 looking at Exhibit 4 about the historical
12 impact of the posting of the defendant -- of
13 the plaintiffs' standards by the defendant?
14    A.    I don't know that I can say
15 much, because I believe the postings largely
16 occurred in late 2012, and I only have one
17 period after that.
18    Q.    If it turns out that
19 defendant's postings were well before 2012,
20 would that affect your analysis of the trends
21 in sales data of the plaintiffs'
22 publications?
23        MR. FEE:  Objection to form.
24    Compound.  Vague.
25        THE WITNESS:  Maybe.  I would
Page 178

1     consider that information in
2     conjunction with these data if you
3     wanted me to.
4  BY MR. BRIDGES:
5     Q.    How -- what -- what would
6     change?
7     A.    I don't know.  I haven't done
8  that analysis.
9     Q.    Have you verified the dates on
10 which plaintiffs -- strike that.
11        Have you verified the dates at
12 which defendant posted the various standards
13 to its Web site or to Internet Archive?
14    A.    I don't --
15        MR. FEE:  Objection.  Vague.
16        THE WITNESS:  I don't recall
17 verifying it.
18        And are you asking did I
19 separately go out and determine what
20 that date is and see if that was the
21 same as what was represented in the
22 Complaint, for instance?
23 BY MR. BRIDGES:
24    Q.    Yes.
25    A.    No, I don't recall doing that.
Page 179

1     Q.    Have you determined in any way
2  the dates at which defendant posted various
3  standards to its Web site or to the Internet
4  Archive?
5     A.    I don't recall doing a separate
6  analysis of that, no.
7     Q.    How did you learn about the
8  dates at which defendant posted various
9  standards to its Web site or to Internet
10 Archive?
11    A.    I had conversations with
12 counsel on that topic, and I may have seen
13 that information contained in certain
14 documents like the Complaint, but I don't
15 recall.
16    Q.    Did you rely upon information
17 regarding those dates from conversations with
18 counsel?
19        MR. FEE:  In arriving at his
20    opinions, you're asking?
21        MR. BRIDGES:  Arriving at his
22    understanding of the facts.
23        THE WITNESS:  I don't know that
24    I did, because I don't recall
25    reporting those specific dates
Page 180

1     anywhere in my report.
2  BY MR. BRIDGES:
3     Q.    Do you recall taking specific
4  dates into account in analyzing the effect of
5  defendant's actions?
6        MR. FEE:  Objection to form.
7     Vague.
8        THE WITNESS:  I don't recall
9     one way or the other.
10 BY MR. BRIDGES:
11    Q.    Do you know how -- strike that.
12        Do you know how much revenue
13 each plaintiff derives from the standards at
14 issue in this case?
15    A.    I don't think I know that
16 precise number.
17    Q.    Did you -- did you ever know
18 that number?
19    A.    I don't think so.
20    Q.    Did you ever know how much
21 revenue each plaintiff derives from standards
22 that have been incorporated into law?
23    A.    As opposed to those that have
24 not been incorporated?  Is that --
25    Q.    Well, I'm -- I'm asking about
Page 181

46 (Pages 178 - 181)

1 those standards that have been incorporated
2 in the law. I'm asking if you know how much
3 revenue each plaintiffs derives -- each
4 plaintiff derives from those standards.
5     A.   I don't --
6         MR. FEE: Objection. Form.
7         THE WITNESS: -- think I know
8     that number, and I'm not sure the
9     plaintiffs know that number.
10 BY MR. BRIDGES:
11     Q.   Do you know the percentage of
12 revenue that each plaintiff derives from
13 standards that have been incorporated into
14 law?
15         MR. FEE: Objection to form.
16         THE WITNESS: I don't think I
17     do, and I don't believe the plaintiffs
18     do.
19 BY MR. BRIDGES:
20     Q.   Are you aware of any difference
21 in profitability to plaintiffs between those
22 standards that have been incorporated into
23 law and those standards that have not been
24 incorporated into law?
25         MR. FEE: Objection to form.

Page 182

1         THE WITNESS: I don't believe
2     so.
3 BY MR. BRIDGES:
4     Q.   Do you know -- strike that.
5         Are you aware of any difference
6 in profitability to plaintiffs between those
7 standards that defendant has posted to the
8 Internet and those standards that defendant
9 has not posted to the Internet?
10         MR. FEE: Objection to form.
11         THE WITNESS: I don't believe
12     so. And as with the previous
13     question, I don't think the plaintiffs
14     have that information at their
15     disposal.
16 BY MR. BRIDGES:
17     Q.   For each plaintiff, what do you
18 understand to be the percentage of gross
19 revenue from the sale of standards?
20         MR. FEE: Objection to form.
21         THE WITNESS: I -- I've
22     reported that in my report. My memory
23     is that it's something on the order of
24     66 percent for ASTM and for NFPA. And
25     if you add in memberships, it's

Page 183

1     something just north of 50 percent for
2     ASHRAE.
3 BY MR. BRIDGES:
4     Q.   What do you mean by "if you add
5 in memberships"?
6     A.   I'm not -- I'm not quite sure
7 what you're asking me to define.
8     Q.   I'm asking you to explain the
9 phrase that you just used, "if you add in
10 memberships." What did that mean?
11     A.   I talked about that in my
12 report. Membership fees are a fairly good
13 recollect -- a fairly good reflection of
14 amount that would have been paid for
15 publications. In other words, publication
16 fees -- it -- let me start this over again.
17         It makes about as much sense to
18 become a member of ASHRAE as it is to buy
19 some of the individual publications. As a
20 result, many people choose to become members
21 rather than just buying the publication, as I
22 understand it.
23     Q.   How did you learn that?
24     A.   Having knowledge of the -- of
25 the price difference and through discussions

Page 184

1 with people at ASHRAE.
2     Q.   How did you learn about the
3 price difference?
4     A.   I don't recall how I learned
5 it, but I report it in my report based on
6 certain documents I've seen. Perhaps I
7 learned it from their Web site.
8     Q.   Did you do any surveys of
9 ASHRAE members to validate that assumption?
10     A.   I'm sorry. Validate what
11 assumption?
12     Q.   About purchase of a membership
13 instead of buying the publication.
14     A.   I'm not sure that there's an
15 assumption in there. My understanding is
16 that ASHRAE people are of the belief that
17 many people buy membership rather than
18 individual publications.
19     Q.   And in your work, did you
20 assume that?
21     A.   I didn't assume that. I worked
22 on that -- under that understanding.
23     Q.   Oh, it's an understanding, but
24 not an assumption?
25     A.   Yes.

Page 185

47 (Pages 182 - 185)

1      A.   I don't think I know that
2   number.
3      Q.   What percentage of plaintiffs'
4   operating expenses do you associate with the
5   plaintiffs' development of standards
6   generally?
7      A.   I don't think I know that
8   number.
9      Q.   Do you have any estimates of
10  any of those numbers that you just said you
11  don't think you know?
12      MR. FEE: Objection to form.
13      THE WITNESS:  Not sitting here
14   right now.
15  BY MR. BRIDGES:
16      Q.   Did you at one point ever
17  determine those numbers?
18      A.   Not that I recall.
19      Q.   Do you know what percentage of
20  the staff or employees of each plaintiff has
21  worked on the development of standards at
22  issue in this case?
23      MR. FEE: Objection to form.
24      THE WITNESS:  I don't think I
25   know that number.

1   BY MR. BRIDGES:
2      Q.   Do you know what percentage --
3   do you have an estimate?
4      A.   No.
5      MR. FEE: Objection to form.
6      THE WITNESS:  Not as I sit
7   here, no.
8   BY MR. BRIDGES:
9      Q.   Do you know what percentage of
10  the staff or employees of each plaintiff has
11  worked on the development of standards
12  incorporated into law?
13      MR. FEE: Objection to form.
14      THE WITNESS:  Not as I sit here
15   right now.
16  BY MR. BRIDGES:
17      Q.   Do you have an estimate?
18      A.   Not as I sit here right now.
19      Q.   Do you know what percentage of
20  the staff or employees of each plaintiff has
21  worked on the development of standards in
22  general?
23      A.   Not as I sit here right now.
24      Q.   Do you have an estimate?
25      A.   Not as I sit here right now.

1      Q.   Have you ever had access to any
2   information that I've asked in the last
3   several questions?
4      MR. FEE: Objection to form.
5      THE WITNESS:  I don't believe
6   so.
7   BY MR. BRIDGES:
8      Q.   Do you know whether plaintiffs
9   prepare standards through joint sponsorship
10  with any other organizations?
11      MR. FEE: Objection.  Vague.
12      THE WITNESS:  I think I may
13   have seen a reference to that.  I
14   don't know the extent to which it
15   occurs, but I wouldn't be surprised to
16   be reminded that it does occur.
17  BY MR. BRIDGES:
18      Q.   Are you aware of any, as you
19  sit here?
20      A.   Not as I sit here right now,
21  but I think I'm aware that it has occurred.
22      Q.   Do you know whether plaintiffs
23  receive grants, revenue, or stipends from
24  governments that use, reference, or adopt
25  their standards?

1      MR. FEE: Objection to form.
2      THE WITNESS:  There are grant
3   monies that go to NFPA.  I don't know
4   the source of those grants.  I don't
5   see a line for grant revenues for the
6   other two organizations.
7   BY MR. BRIDGES:
8      Q.   Did you ask any of the
9   plaintiffs about the revenues or expenses
10  they have specifically attributable to the
11  standards that defendant has posted to the
12  Internet?
13      MR. FEE: Objection to form.
14      THE WITNESS:  We generally
15   talked about that topic with each
16   plaintiff, and I don't think the
17   plaintiffs know that amount.  They
18   undertake activities that are
19   standards oriented.  They don't know
20   which of those standards will be
21   incorporated by reference.
22  BY MR. BRIDGES:
23      Q.   Did you --
24      A.   Or which have been.  I don't
25   think they systematically track those.

Veritext Legal Solutions
866 299-5127

1    foundation.
2        THE WITNESS:  I would like to
3    understand the facts that you're
4    positing right now.
5    BY MR. BRIDGES:
6        Q.    Well, we're not going to take
7    time to go look at a Web site right now, so
8    I'm asking you based on what you know.
9        Do you have an explanation as
10   to why the resource cited in footnote 95
11   actually shows that 44 state -- the 44 states
12   adopted the International Energy Conservation
13   Code?
14       MR. FEE:  Objection.  Lack of
15   foundation.
16       THE WITNESS:  I don't know if
17   your factual representation is
18   accurate or not, and I don't recall
19   investigating that particular issue.
20   BY MR. BRIDGES:
21       Q.    Have you made any effort to
22   determine what resources were expended,
23   incurred, or contributed by parties other
24   than ASHRAE in the development of standard
25   90.1?

Page 206

1        MR. FEE:  Objection to form.
2        THE WITNESS:  I generally
3    understand that there were many
4    members who participated in that.  I
5    think I reported earlier in the report
6    the number of hours and other
7    indications of activity undertaken by
8    members.
9    BY MR. BRIDGES:
10       Q.    My question is, have you made
11   any effort to determine what resources were
12   expended, incurred, or contributed by parties
13   other than ASHRAE and ASHRAE members in the
14   development of standard 90.1?
15       MR. FEE:  Same objection.
16       THE WITNESS:  I didn't realize
17   that you had in your original question
18   "and other than ASHRAE members."
19   BY MR. BRIDGES:
20       Q.    I didn't.  Now I -- now my
21   question does.
22       A.    Beyond that, I don't recall
23   undertaking that investigation, meaning
24   beyond ASHRAE and its members.
25       Q.    Have -- are you aware of any

Page 207

1    change in membership sales by ASHRAE over the
2    past ten years?
3        A.    I don't think I have data that
4    goes as far as ten years ago.  I do have
5    information on ASHRAE membership revenue back
6    to 2012.  That's summarized in tab 5.
7        Q.    And that membership figure has
8    risen each year since 2012, correct?
9        A.    Yes.  Slightly each year, it
10   has risen.
11       Q.    Do you draw any conclusions
12   with respect to this case from that trend?
13       A.    I don't think so.
14       Q.    Have you calculated the
15   effects -- the financial effect on the
16   plaintiffs of the incorporation into law of
17   their standards?
18       MR. FEE:  Objection to form.
19       THE WITNESS:  No, I don't think
20   I've independently -- I don't think
21   I've separately done that.
22   BY MR. BRIDGES:
23       Q.    Are you aware of any data
24   regarding the financial effect on the
25   plaintiffs of the incorporation into law of

Page 208

1    their standards?
2        MR. FEE:  Same objection.
3        THE WITNESS:  I'm aware that
4    the plaintiffs benefit greatly by
5    incorporation by reference, but I
6    don't know that I've seen a
7    quantitative study of that topic.
8    BY MR. BRIDGES:
9        Q.    What do you understand about
10   the benefits that accrue to plaintiffs by
11   incorporation by reference?
12       A.    Some of those are laid out in
13   my report on pages 19 through 26.  I have a
14   particular section called "Benefits of
15   Incorporation" that starts at page 20.
16       Q.    Well, I'm asking you, what
17   benefits accrue to the plaintiffs from
18   incorporation by reference?
19       A.    Generally, it allows each one
20   to satisfy its mandate of providing services
21   to the entirety of the industry that it
22   focuses its attention on.  And so it allows
23   for the collection and then dissemination of
24   standards that allow and achieve outcomes
25   that are good for the industry.

Page 209

53 (Pages 206 - 209)

1    Q.    What other benefits do
2 plaintiffs gain from incorporation by
3 reference of their standards?
4    A.    I think that generally covers
5 it. I may be forgetting things that are laid
6 out in my report, but that's what covers it,
7 to the best of my memory right now.
8         Are we at a good point for a
9 break?
10    Q.    If you want.  Sure.
11    A.    Thanks.
12         THE VIDEOGRAPHER:  Off the
13 record at 3:12.  This is the end of
14 media unit number 2.
15              *  *  *
16         (Recess from 3:12 p.m. to
17 3:41 p.m.)
18              *  *  *
19         THE VIDEOGRAPHER:  On the
20 record at 3:41.  This is the beginning
21 of media unit number 3 in the
22 deposition of John Jarosz.
23              *  *  *
24         (Jarosz Exhibit 5 marked for
25 identification.)

Page 210

1 a particular period.
2    Q.    And then you do the same for
3 NFPA documents, correct?
4    A.    Yes.
5    Q.    What do you calculate as the
6 dollar value of harm to the -- to ASTM from
7 the accesses and downloads that you refer to
8 in paragraph 133?
9    A.    I haven't calculated that harm.
10    Q.    Why not?
11    A.    I'm not sure if I can at this
12 stage.  One estimate would be those number of
13 downloads times the -- well, actually, no,
14 let me take that back.  I just don't know how
15 to do it.
16    Q.    Can you be certain that these
17 accesses or down -- and downloads referred to
18 in paragraph 133, in fact, resulted in
19 economic loss to ASTM?
20         MR. FEE:  Objection to form.
21         THE WITNESS:  Not with absolute
22    certainty, but with reasonable
23    certainty I can say some -- in some
24    number of these instances, it's likely
25    the case that the -- that the

Page 212

1              *  *  *
2 BY MR. BRIDGES:
3    Q.    Mr. Jarosz, I've handed you
4 Exhibit 5.  This is an article that you cited
5 in your report, correct?
6    A.    Yes, I believe so.
7    Q.    Do you recall how this article
8 came to your attention?
9    A.    I do not.
10    Q.    Is this an article that you
11 understand to have been published by
12 plaintiff ASHRAE in its journal?
13    A.    Yes, that's my understanding.
14    Q.    And this is an article you
15 relied upon with respect to the development
16 of standard 90, which became standard 90.1,
17 correct?
18    A.    Yes.
19    Q.    In paragraph 133 of your
20 report, you talk about a number of
21 downloads -- strike that -- you talk about a
22 number of documents accessed through Public
23 Resource's Web site.  Do you see that?
24    A.    I talk about the number of ASTM
25 documents that are -- that were accessed over

Page 211

1    information would have been obtained
2    from ASHRAE in -- or ASTM, rather,
3    in -- through legal means.
4 BY MR. BRIDGES:
5    Q.    Would that -- in those
6 instances where you say that the information
7 would have been obtained from ASTM through
8 legal means, can you put a dollar value on --
9 or even an estimate of the increased revenue
10 that ASTM would have gotten from those
11 instances where people obtained the
12 information from ASHRAE -- sorry -- from
13 AST --
14         MR. FEE:  Object --
15 BY MR. BRIDGES:
16    Q.    -- from ASTM?
17         MR. FEE:  Objection to form.
18         THE WITNESS:  No, not based on
19    the information I have.  I don't think
20    I have any indication of who was doing
21    the downloading and why.
22 BY MR. BRIDGES:
23    Q.    And do you know what
24 alternatives persons who were doing the
25 downloading may have had for obtaining the

Page 213

1 information?
2     A.    Not with certainty, because I
3 don't know who those persons were, but I
4 would expect one alternative would be to
5 obtain it properly, directly from ASTM.
6     Q.    Would that have resulted in
7 more revenue to ASTM?
8     A.    It may have.  If they're
9 materials that were taken improperly that
10 would have been paid for, then that would
11 represent a loss of revenue to ASTM.
12     Q.    Do you know whether any of the
13 persons who obtained this information from
14 defendant would have paid for the information
15 from ASTM?
16     A.    No, not with certainty, because
17 I don't know the identity of the downloaders
18 or the reasons for their downloading.
19     Q.    Moreover, those persons might
20 have accessed the standards from ASTM's
21 reading room for free and with no revenue to
22 ASTM, correct?
23     A.    You mean in a but-for world?
24 Had they not done what they actually did,
25 alternatively they could have gone to the

1 free reading room?
2     Q.    Right.
3     A.    That's a possibility, yes.
4     Q.    Do you have an understanding as
5 to why persons would want to download a file
6 of a standard instead of viewing it at one of
7 the plaintiffs' reading rooms?
8     A.    Not with absolute certainty,
9 but I would imagine downloading would allow
10 more flexibility in referring to the standard
11 and using it and sharing that information
12 with others, whereas reading it in -- through
13 an Internet site is somewhat less flexible,
14 provides less flexibility for the use of that
15 information.
16     Q.    What did -- what do you
17 understand to be the difference in
18 flexibility between possession of a download
19 and access to a standard through a reading
20 room?
21     A.    Well, I think that a download
22 typically has a document that's in hard-copy
23 form.  Copies can made -- be made of that and
24 distributed.  Reading things just online
25 doesn't allow for the wide distribution and

1 more extended use of that document.
2     Q.    Do you have any evidence about
3 wide distribution of plaintiffs' standards as
4 a consequence of defendant's actions?
5     A.    I do not.
6     Q.    Have you reviewed any studies
7 that would allow you to establish any
8 connection between the number of accesses or
9 downloads that Public Resource made possible
10 and any financial harms to the plaintiffs?
11         MR. FEE:  Objection to form.
12         THE WITNESS:  I don't think
13     I've seen any study on that, no.
14 BY MR. BRIDGES:
15     Q.    Have you conducted any studies
16 that would have allowed you to establish any
17 connection between the number of accesses or
18 downloads that Public Resource made possible
19 and any financial harms to the plaintiffs?
20         MR. FEE:  Objection to form.
21         THE WITNESS:  Not other than
22     what's contained in my report.
23 BY MR. BRIDGES:
24     Q.    Please turn to page 45,
25 paragraph 107, which spills into page 108.

1         MR. FEE:  Page 108?
2         THE WITNESS:  I'm sorry.
3     Page 108 or paragraph?
4 BY MR. BRIDGES:
5     Q.    I'm sorry.  Paragraph -- strike
6 that.
7         Let me ask you to turn
8 paragraph 107 on pages 45 to 46.
9     A.    Okay.  I'm there.
10     Q.    I just want to make sure I
11 understand your language correctly at the
12 bottom of page 45 and the top of page 46.
13         Is it your opinion that the
14 copyright that the plaintiffs assert in their
15 standards drives sales of other publications
16 other than the standards themselves?
17         MR. FEE:  Objection.  Form.
18     Vague.
19         THE WITNESS:  I think they're
20     important for driving sales of
21     publications that embody those
22     standards.  I don't know that I've
23     drawn a conclusion that it drives the
24     sale of other products, but that makes
25     some sense.

BY MR. BRIDGES:
1  Q.    Well, doesn't that sentence at
2  the bottom of 45 and going on to 46 say that
3  copyright on plaintiffs' standards drive
4  sales of "handbooks that provide commentary
5  on the standards by referring to them"?
6  A.    You haven't read --
7  MR. FEE:  Objection.
8  Mischaracterizes the document.
9  THE WITNESS:  You haven't read
10  the whole sentence.  I see that
11  sentence to which you refer.
12 BY MR. BRIDGES:
13  Q.    Right.  I know I haven't read
14  the whole sentence, but didn't I fairly
15  capture one part of it, which is the sales
16  of -- strike that -- that copyright on
17  plaintiffs' standards drives sales of, among
18  other things, "handbooks that provide
19  commentary on standards by referring to
20  them"?
21  MR. FEE:  Same objection.
22  THE WITNESS:  I think you have
23  generally paraphrased it accurately,
24  yes.

Page 218

BY MR. BRIDGES:
1  Q.    And that plaintiffs' copyright
2  protection -- this is the top of -- strike
3  that.
4  And turning to the top of
5  page 46, plaintiffs' copyright protection on
6  their standards provides plaintiff with a
7  competitive advantage with respect to what
8  you call value-added publications, correct?
9  A.    You've read part of a sentence,
10  but I do see that sentence, yes.
11  Q.    And I've fairly paraphrased it
12  correctly, correct?
13  MR. FEE:  Objection to form.
14  THE WITNESS:  I think,
15  generally, yes.
16 BY MR. BRIDGES:
17  Q.    Do plaintiffs, to your
18  understanding, have separate copyrights in
19  those value-added publications, such as
20  commentaries and handbooks?
21  A.    I don't know.
22  Q.    You don't know?
23  A.    Correct.  I do not know.
24  Q.    Is it important to you to know

Page 219

1  whether plaintiffs have copyright in --
2  rights in their value-added publications?
3  MR. FEE:  Objection.  Vague.
4  THE WITNESS:  I would be
5  curious to know that, but I'm not sure
6  of the significance.  I don't think it
7  would change my conclusions, but I
8  would be curious to know that.
9  BY MR. BRIDGES:
10  Q.    Do you know whether
11  incorporation into law drives -- strike that.
12  Do you know whether
13  incorporation into law of plaintiffs'
14  standards drives sales of plaintiffs'
15  standards?
16  MR. FEE:  Objection to form.
17  Vague.
18  THE WITNESS:  I don't know with
19  absolute certainty, but it would make
20  some sense to me.
21 BY MR. BRIDGES:
22  Q.    Is it your understanding that
23  it does?
24  MR. FEE:  Same objection.
25  THE WITNESS:  It would make

Page 220

1  some sense to me, yes.
2  BY MR. BRIDGES:
3  Q.    Are you aware that, in some
4  instances, at least one plaintiff uses the
5  legal status of its code to promote the sale
6  of handbooks?
7  MR. FEE:  Objection to form.
8  THE WITNESS:  I don't know one
9  way or the other.  I don't have reason
10  to dispute it, but there's not a
11  particular instance that comes to mind
12  right now.  Maybe you have something
13  to refresh my memory.
14 BY MR. BRIDGES:
15  Q.    Can you provide a dollar value
16  benefit that plaintiffs receive economically
17  from the incorporation of their standards by
18  reference?
19  MR. FEE:  Objection.  Vague.
20  Form.
21  THE WITNESS:  I want to make
22  sure that I'm understanding.  Could
23  you read that back, please?
24 BY MR. BRIDGES:
25  Q.    I'll restate it.

Page 221

56 (Pages 218 - 221)

1        Can you provide a -- can you
2    put a dollar value, even an estimate, on the
3    economic benefit that plaintiffs receive from
4    incorporation of their standards into law?
5        MR. FEE:  Objection to form.
6        THE WITNESS:  I have not.  And
7    I'm not sure how one would do that,
8        subject to thinking more about it.
9    BY MR. BRIDGES:
10       Q.    At the top of page 46, you say,
11   "The Plaintiffs' copyright protection on
12   their privately-developed standards provides
13   a competitive advantage with regard to the
14   sale of these value-added publications as the
15   copyright protection limits the ability of
16   others to sell those publications unless they
17   are unwilling [sic] to compensate the
18   Plaintiffs for such use."
19       MR. FEE:  Objection.
20       Mischaracterizes the statement.
21   BY MR. BRIDGES:
22       Q.    Is there something unfair about
23   my characterization of that statement?
24       A.    I think you read it wrong.  You
25   read "willing" to read "unwilling" for some

Page 222

1    reason.
2        Q.    Oh, I'm sorry.  Thank you.
3    I'll restate the sentence.
4        "In particular, the Plaintiffs'
5    copyright protection on their
6    privately-developed standards provides a
7    competitive advantage with regard to the sale
8    of these value-added publications as the
9    copyright protection limits the ability of
10   others to sell those publications unless they
11   are willing to compensate the Plaintiffs for
12   such use."
13       Do you see that statement?
14       A.    I do, yes.
15       Q.    And the competitive advantage
16   you've identified there, whom do you
17   understand to be the competition?
18       A.    Other potential providers of
19   these so-called value-added publications.
20       Q.    And what -- when you say
21   "value-added publications," please give me
22   more examples of what types of things fall
23   into that category, as you use the term.
24       A.    Examples would be handbooks
25   that provide commentary on the standards.

Page 223

1        Q.    What else?
2        A.    That's what comes to mind.
3        Q.    Anything else?
4        A.    Not this moment, no.  I guess,
5    potentially, when I think some more about it,
6    training and seminars, for instance.
7        Q.    Providers of training and
8    seminars?
9        A.    Yes.  So that's broader than
10   value-added publications, but there are
11   potentially alternative providers of training
12   and seminars.
13       Q.    In paragraph 109, you say, "In
14   addition to direct sales of copyrighted
15   materials, the Plaintiffs' materials
16   associated with their privately-developed
17   standards provide a competitive advantage
18   with regard to the sale of downstream
19   ancillary/complementary services and
20   products."
21       Do you see that?
22       A.    Yes.  That's what I had in
23   mind.
24       Q.    And who are the competitors you
25   have in mind in paragraph 109?

Page 224

1        A.    I don't know particular names,
2    but -- at least I don't recall any sitting
3    right now -- sitting here right now, but I
4    think there are other providers of these
5    downstream services and products.
6        Q.    And please give me examples of
7    what you're calling "downstream services and
8    products."
9        A.    Again, seminars and training,
10   for instance.
11       Q.    Anything else?
12       A.    That's what comes to mind right
13   now.
14       Q.    Turning to paragraph 110, you
15   state, "I understand that the ability to
16   control these downstream products and
17   services is particularly important to the
18   Plaintiffs here because the barriers to entry
19   in the marketplace for downstream products,
20   such as training and user manuals, are
21   relatively low.  For example, according to
22   Mr. Comstock of ASHRAE, it is relatively easy
23   for unauthorized instructors to read a
24   standard and become (or think that they have
25   become) qualified to provide training or

Page 225

57 (Pages 222 - 225)

1 guidance on that standard."
2      Do you see that?
3      A.   I do, yes.
4      Q.   What do you understand -- what
5 did you mean by "unauthorized instructors"?
6      A.   People that have provided or
7 trying to provide services to the marketplace
8 that have not been explicitly approved by,
9 for instance, ASHRAE.
10     Q.   What do you understand the --
11 the nature of -- strike that.
12     You called them "instructors,"
13 correct?
14     A.   Yes.
15     Q.   Does that mean that you
16 envision that these persons are providing
17 some kind of instruction?
18     A.   Yes.
19     Q.   What instruction do you
20 understand -- what instruction did you have
21 in mind when you referred to "unauthorized
22 instructors"?
23     A.   Generally, how best to
24 implement standards or provisions of certain
25 standards.

Page 226

1      Q.   What else?
2      A.   Nothing else comes to mind
3 right now.
4      Q.   Would your understanding of
5 "unauthorized instructors" include persons
6 who were instructing the public as to what
7 the standards require?
8      MR. FEE:  Objection to form.
9 Vague.
10     THE WITNESS:  I didn't have
11 that in mind.  I guess that's a
12 possibility.
13 BY MR. BRIDGES:
14     Q.   And would it be relatively easy
15 for unauthorized persons like that to read a
16 standard and think that they have become
17 qualified to provide training or guidance on
18 that standard?
19     MR. FEE:  Objection.  Vague.
20 BY MR. BRIDGES:
21     Q.   Is that your understanding?
22     A.   According to Mr. Comstock, I
23 believe that's correct.
24     Q.   What do you believe?
25     A.   I have no reason to doubt him.

Page 227

1      Q.   You're just parroting what
2 Mr. Comstock said, or did you have an
3 independent view?
4      A.   No, I heard what he said, and
5 it made sense to me.
6      Q.   So you put it in your report?
7      A.   Yes.
8      Q.   What independent thought or
9 investigation did you do before you put that
10 in your report?
11     MR. FEE:  Objection.  Vague.
12 Compound.
13     THE WITNESS:  I can't point to
14 anything in particular.
15 BY MR. BRIDGES:
16     Q.   Would a law-school course on
17 the law and regulation of building
18 construction provide instruction to law
19 students?
20     MR. FEE:  Objection.  Vague.
21 Calls for speculation.
22     THE WITNESS:  I guess it could.
23 I have a hard time imagining there
24 would be much demand for such a
25 course, but I'm in general agreement

Page 228

1 that that, in concept, could occur.
2 BY MR. BRIDGES:
3      Q.   Would it be possible to
4 envision that, in the course of such
5 teaching, a teacher may wish to analyze some
6 of plaintiffs' standards that have been
7 incorporated into law as law and as
8 regulation?
9      MR. FEE:  Objection.  Calls for
10 speculation.  Vague.  Form.
11     THE WITNESS:  I guess that's
12 possible, but I would expect a law
13 professor would be talking about legal
14 implications, not the technical
15 aspects of a standard.  I think they
16 might talk about the implication in a
17 business that's different from a
18 vendor business.
19 BY MR. BRIDGES:
20     Q.   Well, what about the legal
21 implications of a code for contractors?
22     MR. FEE:  Objection.
23 BY MR. BRIDGES:
24     Q.   Is that -- is that fair ground
25 for a law professor to discuss with law

Page 229

58 (Pages 226 - 229)

1  likely?
2      A.   I haven't quantified that, but
3  I would expect that it's -- more than
4  5 percent would be a reasonable definition of
5  "expected."
6      Q.   More than 10 percent?
7      A.   I don't know.  I've not
8  quantified that number.
9      Q.   And what amount of an effect on
10 plaintiffs' revenues have you identified as
11 "material"?
12     A.   I haven't --
13         MR. FEE:  Objection to form.
14         THE WITNESS:  -- been able to
15     quantify the specific effects, so I
16     don't know the amount.
17 BY MR. BRIDGES:
18     Q.   Well, what -- I'm not asking
19 for your quantification of a specific effect,
20 but how large would an effect have to be for
21 to you consider it "a material adverse effect
22 on Plaintiffs' remedies"?
23         MR. FEE:  Objection to form.
24         THE WITNESS:  I don't know that
25     I have a particular quantitative
Page 242

1      guideline in mind.
2  BY MR. BRIDGES:
3      Q.   Have you ever -- are you
4  familiar with audit inquiry letters regarding
5  litigation?
6      A.   Generally, yes.
7      Q.   And you're familiar with the
8  fact that auditors will often specify to
9  those they send the letters to what amounts
10 would be material for purposes of the audit
11 response?
12     A.   Yes.
13     Q.   So you understand the concept
14 of certain amounts being material to certain
15 companies or entities?
16     A.   Yes, for certain purposes.
17     Q.   So I'd like to know what amount
18 you have identified as being material as an
19 adverse effect on plaintiffs' revenues for
20 each of the three plaintiffs, please.
21         MR. FEE:  Objection.  Compound.
22     Asked and answered.
23         THE WITNESS:  I have not
24     considered a particular amount.
25 BY MR. BRIDGES:
Page 243

1      Q.   Do you consider $100,000 to be
2  material as an adverse effect on plaintiffs'
3  revenues?
4          MR. FEE:  Objection to form.
5      Compound.
6          THE WITNESS:  I haven't
7      considered that question.  I don't
8      know the answer to it.
9  BY MR. BRIDGES:
10     Q.   Have you considered whether
11 50,000 is a material amount as an adverse
12 effect on plaintiffs' revenues?
13         MR. FEE:  Same objections.
14         THE WITNESS:  Same answer.
15 BY MR. BRIDGES:
16     Q.   Starting at page -- sorry.
17 Strike that.
18         Starting at paragraph 139, you
19 make several references to Mr. Malamud's
20 theory.
21     A.   I'm sorry.  To -- I missed a
22 word that you said.  References to his what?
23     Q.   To Mr. Malamud's theory --
24     A.   Okay.
25     Q.   -- T-H-E-O-R-Y.  You refer to
Page 244

1  it in paragraph 139; 140; 144, with the word
2  "theorized"; 145, "theory"; 146, "theory."
3          What facts do you have that
4  have disproved the theory in paragraph 139?
5      A.   Perhaps most important is the
6  revealed preference information.  If the
7  plaintiffs believed they were better off by
8  lack of copyright protection, they would have
9  pursued such a model.
10         They don't believe they're
11 better off.  Moreover, they're expending
12 tremendous resources in bringing and pursuing
13 this litigation to halt the activity at
14 issue.
15     Q.   What other facts, if any, do
16 you have that have disproved Mr. Malamud's
17 theory in paragraph 139?
18     A.   That's what comes to mind right
19 now.
20     Q.   What facts do you have or are
21 you aware of that have disproved
22 Mr. Malamud's theory as you refer to it in
23 paragraph 140?
24     A.   That's the same theory that's
25 being referenced in 139, so there's nothing
Page 245

62 (Pages 242 - 245)

1  new in terms of a theory.
2      Q.    Do you have the same answer
3  with respect to -- strike that.
4          What facts do you have --
5  strike that.
6          What facts are you aware of to
7  disprove -- to disprove Mr. Malamud's theory
8  that you refer to in paragraph 144?
9      A.    Again, it's the same theory
10  that's being referenced, but there's
11  additional facts; and that is, the downstream
12  products and services aren't particularly
13  substantial to these plaintiffs and don't
14  appear to be enhanced by a lack of copyright
15  protection; that is, the plaintiffs have had
16  copyright protection and have said -- had
17  some downstream products and services.  It's
18  hard to imagine that elimination of that
19  copyright protection will enhance that
20  business.
21      Q.    It's hard to imagine, but are
22  you aware of any studies to disprove
23  Mr. Malamud's theory?
24      A.    No.
25          MR. FEE:  Objection.  Vague.

1      THE WITNESS:  I'm sorry.
2  BY MR. BRIDGES:
3      Q.    Have you conducted any studies
4  to disprove Mr. Malamud's theory?
5          MR. FEE:  Same objection.
6          THE WITNESS:  Not other than
7      what's reflected here in Exhibit 1.
8  BY MR. BRIDGES:
9      Q.    What academic literature have
10  you relied upon to criticize Mr. Malamud's
11  theory in paragraph 144?
12      A.    Nothing specific comes to mind.
13      Q.    In paragraph 145, you state
14  that, "Mr. Malamud's suggestion that the sale
15  of downstream products and services
16  represents an untapped and undeveloped
17  opportunity for the Plaintiffs is incorrect."
18          Do you see that?
19      A.    Yes, I do.
20      Q.    And then you go on and make
21  some statements for the rest of the
22  paragraph, correct?
23      A.    Yes.
24      Q.    What studies did you engage in
25  to determine the facts that you stated in the

1  rest of that paragraph?
2          MR. FEE:  Objection.  Vague.
3          THE WITNESS:  I looked at the
4      financial information, and I talked to
5      people at the various plaintiffs.
6  BY MR. BRIDGES:
7      Q.    You talked to people at the
8  various plaintiffs?
9      A.    Yes.
10      Q.    What did you do to verify the
11  truth and accuracy of the things that various
12  plaintiffs said to you in their
13  conversations?
14          MR. FEE:  Objection to form.
15          THE WITNESS:  I looked at the
16      financial information, and I kept my
17      eyes and mind open to the information
18      in the rest of the record to determine
19      if it conflicted with what I learned
20      from the company personnel.
21  BY MR. BRIDGES:
22      Q.    Whose financial information did
23  you look at?
24      A.    All three of the plaintiffs.
25  It's summarized in tabs 3, 4, and 5.

1      Q.    Did you look at the financial
2  information of any entities other than the
3  plaintiffs?
4      A.    I looked at Public Resource
5  financial information.
6      Q.    Apart from Public Resource and
7  the plaintiffs, did you look at the financial
8  information of any other entities in making
9  the assertions that you made in
10  paragraph 145?
11      A.    Not in undertaking my
12  assignment here.
13      Q.    Did you consider the business
14  models of any entities other than the
15  plaintiffs and the defendant in making the
16  statements criticizing Mr. Malamud's theory
17  in paragraph 145?
18      A.    Nothing in particular comes to
19  mind.  I understand that there are
20  front-loaded business models, but -- at DIN,
21  for instance, but I don't recall undertaking
22  an investigation of the downstream activities
23  that they have.
24      Q.    Did you undertake any
25  investigation of downstream activities of

1      A.    Yes. It's a different entity
2  than the SDOs here; but for its purposes, it
3  would appear that it's of the belief that
4  that's the optimal path to follow.
5             MR. BRIDGES:  I think -- I
6      think we may pause things now and
7      reserve the remainder of our time.
8             Just a second.  Oh, yes.
9  BY MR. BRIDGES:
10     Q.    Do you believe that the
11 plaintiffs are harmed when the defendant
12 posts a standard that has been incorporated
13 by reference -- let me strike that.
14            Do you believe that plaintiffs
15 suffer harm from defendant posting a standard
16 that is not the latest version of the
17 standard?
18            MR. FEE: Objection. Form.
19     Compound.
20            THE WITNESS:  Potentially, it
21     could cause confusion in the
22     marketplace as to what's the latest
23     standard, and there may be some
24     entities out there that are interested
25     in obtaining an earlier standard that

Page 254

1             MR. FEE: Objection. Lack of
2      foundation.  Vague.
3             THE WITNESS:  I'm not -- I'm
4      not sure that I understand the concept
5      of a standard being out of print, so
6      maybe you could help me with that.
7  BY MR. BRIDGES:
8      Q.    Do you know the term "out of
9  print"?
10     A.    Generally, I do, yes.
11     Q.    What do you understand it to
12 mean?
13     A.    That it's no longer provided in
14 print form.
15     Q.    All right.  So what harm do you
16 understand plaintiffs would suffer if
17 defendants posted a standard that is out of
18 print?
19            MR. FEE: Objection to form.
20            THE WITNESS:  Potentially, it
21     could be the harm similar to outdated
22     standards.
23 BY MR. BRIDGES:
24     Q.    In other words, confusion in
25 the marketplace?

Page 256

1  would be obtaining it free rather than
2      through the legal routes established
3      by the plaintiffs.
4  BY MR. BRIDGES:
5      Q.    Have you done any studies to
6  determine what confusion may be likely in the
7  marketplace in that regard?
8             MR. FEE: Objection to form.
9             THE WITNESS:  I have not done a
10     likelihood of confusion study, no.
11 BY MR. BRIDGES:
12     Q.    What research have you done as
13 to whether -- strike that.
14            What information do you have
15 about what market there is for earlier
16 versions of standards when there is a newer
17 version in the market?
18            MR. FEE: Objection to form.
19            THE WITNESS:  I don't recall
20     undertaking specific research on that
21     topic.
22 BY MR. BRIDGES:
23     Q.    What harm do you understand
24 plaintiffs would suffer if defendants post a
25 standard that is out of print?

Page 255

1      A.    Potential confusion in the
2  marketplace and potentially providing -- yes,
3  that -- that would be one form of it.
4      Q.    What other harms do -- would
5  you identify from the defendants posting a
6  standard that is out of print?
7      A.    Nothing else comes to mind this
8  moment, but there could be other things
9  that -- that I'm not thinking of right now.
10     Q.    What harms do you understand
11 plaintiffs would suffer if a condition of a
12 standard being incorporated into law is that
13 plaintiffs could not forbid other entities
14 from making that law available widely and
15 freely to the public?
16            MR. FEE: Objection to form.
17     Incomplete hypothetical.  Compound.
18     Calls for speculation.
19            THE WITNESS:  I don't know.
20     I've not undertaken that assignment.
21     I've not given that particular
22     question any thought.
23            It seems economically to be
24     quite similar to the actions that have
25     occurred here, but I don't know.  I've

Page 257

65 (Pages 254 - 257)

1  not thought about that particular
2  topic.
3      MR. BRIDGES:  Okay.  I think
4  we'll pause here and reserve the rest
5  of the time for a later visit with
6  you, Mr. Jarosz.
7      Kevin, this is in reliance on
8  an exchange of correspondence between
9  Matt and you, I believe.  If, for some
10  reason -- well, no.  I think that's
11  all.
12      Anything else?
13      MR. FEE:  Well, I don't have
14  any questions.
15      Do you guys have any questions?
16      MR. REHN:  Not at this time.
17      MR. CUNNINGHAM:  No.
18      MR. BRIDGES:  Great.  Thank
19  you.
20      THE WITNESS:  Thank you.
21      THE VIDEOGRAPHER:  All right.
22  Off the record at 4:31.  This ends
23  media unit number 3 and ends testimony
24  for August 27th, 2015.
25      *  *  *

Page 258

1          C E R T I F I C A T E
2
        I do hereby certify that I am a Notary
3  Public in good standing, that the aforesaid
   testimony was taken before me, pursuant to
4  notice, at the time and place indicated; that
   said deponent was by me duly sworn to tell
5  the truth, the whole truth, and nothing but
   the truth; that the testimony of said
6  deponent was correctly recorded in machine
   shorthand by me and thereafter transcribed
7  under my supervision with computer-aided
   transcription; that the deposition is a true
8  and correct record of the testimony given by
   the witness; and that I am neither of counsel
9  nor kin to any party in said action, nor
   interested in the outcome thereof.
10
        WITNESS my hand and official seal this
11  11th day of September, 2015.
12
13
14
        <%signature%>
15  Debbie Leonard, RDR, CRR
        Notary Public
16
17
18
19
20
21
22
23
24
25

Page 260

1      (Witness excused.)
2      *  *  *
3      (Off the record at 4:31 p.m.)
4      *  *  *
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 259

66 (Pages 258 - 260)

# EXHIBIT 10

1

```
               UNITED STATES DISTRICT COURT

             FOR THE DISTRICT OF COLUMBIA

----------------------------:
AMERICAN SOCIETY FOR TESTING :
AND MATERIALS dba ASTM       :
INTERNATIONAL,               :
NATIONAL FIRE PROTECTION     :
ASSOCIATION, INC., and       :
AMERICAN SOCIETY OF HEATING, :
REFRIGERATING AND AIR        :
CONDITIONING ENGINEERS,      :
                             :
     Plaintiffs/             :
     Counter-Defendants,     :
                             :
     v.                      : No. 1:13-cv-01215-EGS
                             :
PUBLIC.RESOURCE.ORG,         :
                             :
     Defendant/              :
     Counter-Plaintiff.      :
----------------------------:
```

                              Coos Bay, Oregon

                   Thursday, November 13, 2014

39(b)(6) DEPOSITION OF:


                   REBECCA MALAMUD,
                 PUBLIC.RESOURCE.ORG,

taken pursuant to notice, by counsel for Plaintiffs/

Counter-Defendants at Red Lion Inn, 1313 North

Bayshore Drive, Coos Bay, Oregon, before Jan R.

Duiven, CSR,  FCRR, CCP, Certified Shorthand Reporter

in and for the State of Oregon, beginning at 9:00

a.m., when were  present on behalf of the respective

parties:

Capital Reporting Company
Malamud, Rebecca  11-13-2014

62

1  of any other entities that employ Carl Malamud?
2      A.  No.
3      Q.  Besides Public.Resource, are you aware
4  of any entities on which Mr. Malamud sits on the
5  board?
6      A.  No.
7      Q.  Besides Public.Resource, are you aware
8  of any other entities from whom Mr. Malamud has
9  received any compensation in the last three years?
10     A.  No.
11     Q.  Are you on the board of directors of
12  Public.Resource?
13     A.  No.
14     Q.  Are you on the board of directors of
15  any entity?
16     A.  I don't want to be.  No.
17     Q.  All right.  So I want to talk to you
18  now a little bit about the instructions that you
19  received from Mr. Malamud regarding the work that
20  was done for Public.Resource.  Okay?
21     A.  (Nods.)
22     Q.  With respect to the work you did for
23  Public.Resource, you knew that Public.Resource
24  wanted Point B to make exact copies of everything
25  that it provided to Point B Studios.  Correct?

63

1      A.  Correct.
2      Q.  And Mr. Malamud himself asked you to
3  make exact copies of all the images that he
4  provided to you.  Right?
5      A.  Yes.
6      Q.  Did Mr. Malamud ever explain to you
7  why he wanted exact copies made of all the images
8  that were provided to you?
9      A.  To release it in the public domain.
10     Q.  Did he ever tell you anything else
11  about the importance of making the exact copies?
12     A.  He emphasized to be accurate.
13     Q.  And he told you to make exact copies
14  of every image that was provided to you.  Correct?
15     A.  Correct.
16     Q.  And that includes making exact copies
17  of ASTM images.  Correct?
18     A.  Yes.
19     Q.  And Mr. Malamud also instructed you to
20  make exact copies of NFPA images.  Right?
21     A.  Yes.
22     Q.  And you did in fact make exact copies
23  of ASTM images for Public.Resource?
24     A.  To the best of my ability.
25     Q.  And you also made exact copies of NFPA

64

1  images for Public Resources.  Correct?
2      A.  Yes.
3      Q.  Now, in your answer with regard to the
4  ASTM images, you said you made exact copies to the
5  best of your ability.  What do you mean by "to the
6  best of your ability"?
7      A.  When -- as we create the diagrams, we
8  have a proofreading -- you know, quality control
9  work flow, and I try to catch every mistake, so --
10     Q.  Would you describe to me how the
11  process actually worked starting with how you
12  received any images from Public.Resource and then
13  ending with how you delivered your work product to
14  Public.Resource?
15     A.  Well, the standards documents are
16  posted on Public.Resource.org as triple-keyed HTML
17  and CSS with low-resolution JPEGs.
18         And once it's decided what document is
19  set to work on, it's -- I download those to my
20  computer.  And then I separate them into MathML
21  and -- images that need to be coded in MathML and
22  images that need to be vectorized we call it.
23         And also on the diagram side,
24  especially for purposes of learning, I sort them
25  another level as to areas of difficulty, or if

65

1  there's a lot of repetition in an image that would
2  facilitate creating another graphic quickly, I do
3  that so it -- you know, it helps with the
4  production of the work flow.
5         And then the MathML images are coded
6  in MathML, mathematical markup language, and at
7  that point -- do you want me to go on?
8      Q.  Yes, please.
9      A.  It gets pretty technical.  Okay.  At
10  that point we use an open source tool called
11  Amaya.
12     Q.  Can you spell that, please?
13     A.  A-M-A-Y-A.  And so the image --
14  they're coded.  And then we have -- we have to
15  convert them using an open-source tool called
16  SVG/Math.  This is how we get it into the graphic
17  form.  And it was a program by Jacques Distler out
18  of University of Texas.  And we use that program.
19  It can interpret the MathML and produce a
20  scaleable vector graphic.
21         And then once we have that scaleable
22  vector graphic we open it up in Inkscape and we
23  convert it to outlines and save it as SVG1.1 to
24  make sure that it is compatible with the broadest
25  range of platforms.  And that's the math.  And

Capital Reporting Company
Malamud, Rebecca  11-13-2014

94

1  object.  Asked and answered.  Counsel, can we move
2  on?
3  BY MR. FEE:
4      Q.   No.  Answer the question.  Do you have
5  anything else?
6      A.   No.
7      Q.   Okay.  So it was your intention to
8  make sure that this file conversion process led to
9  files that the general public could use and make
10  copies of at their leisure.  Correct?
11     A.   Correct.
12     Q.   And did Mr. Malamud tell you that he
13  intended to make these files available so anybody
14  could copy them whenever they wanted to?
15     A.   He published them on the Internet.
16     Q.   In a way that was easily copyable.
17  Correct?
18     A.   Yes.
19     Q.   And his intention was to make it
20  available for free so people wouldn't have to
21  purchase them?
22         MR. STOLTZ:  Objection.  The
23  question lacks foundation.  You can answer if you
24  know.
25  BY MR. FEE:

95

1      Q.   Let me re-ask that question.  Did he
2  ever tell you that one of the benefits of his
3  project was that people will be able to get copies
4  of these standards for free and not have to
5  purchase them?
6      A.   That wouldn't be exactly what he would
7  say, so --
8      Q.   Well, what exactly do you recall?
9      A.   I wouldn't want to surmise what he
10  would say or think.
11     Q.   Did you ever have a discussion with
12  him about the benefits of making things such as
13  ASTM and NFPA standards available for free?
14     A.   Publicly accessible.  Right.
15     Q.   Publicly accessible and freely
16  copyable?
17     A.   To increase knowledge.
18     Q.   Did you ever have any discussions with
19  him about persons being able to access and copy
20  these files without having to buy them from the
21  authors?
22     A.   No.  Never had that.
23     Q.   But you knew that the work you were
24  doing was going to be posted in a way that persons
25  could make copies of the files --

96

1      A.   Yes.
2      Q.   -- without purchasing them from the
3  authors?  Correct?
4      A.   Correct.
5      Q.   Have you ever had any discussions with
6  Mr. Malamud regarding this lawsuit?
7      A.   Not -- no.
8      Q.   Have you ever had any written
9  communications with Mr. Malamud regarding this
10  lawsuit?
11     A.   Quite possible.
12     Q.   Do you recall any written
13  communications with Mr. Malamud regarding this
14  lawsuit?
15     A.   I don't recall any particular
16  conversation.
17         MR. FEE:  Would it be all right if
18  we take a quick break?
19         MR. STOLTZ:  It would.
20         THE VIDEOGRAPHER:  Okay.  Going off
21  the record 11:18 a.m.
22         (Recess:  11:18 a.m. to 11:26 a.m.)
23         THE VIDEOGRAPHER:  We're going back
24  on the record.  The time is 11:26 a.m.  Beginning
25  disc 3.

97

1          (Deposition Exhibit No. 19
2          marked for identification.)
3  BY MR. FEE:
4      Q.   Ms. Malamud, I'm going to hand you
5  what's been marked as Exhibit 19.  It's an email
6  from Carl Malamud to Rebecca Malamud dated
7  January 28th, 2014, at 2:30 p.m., and Bates
8  labeled PRO4234 -- hmm.
9          (Off-the-record discussion.)
10         MR. REHN:  It's 04234.
11         MR. FEE:  Oh, okay.  42340 through
12  41.
13  BY MR. FEE:
14     Q.   Do you recognize that as a series of
15  emails between you and Mr. Malamud?
16     A.   Yes.
17     Q.   We'll just start towards the bottom of
18  that email chain on the second page.  Do you see
19  it appears to be an email from you at 1:07 p.m. on
20  the 28th, just a couple lines?  You see, it says,
21  "Do you want us to redraw illustrations that look
22  like this?"  And there's a file name underneath it
23  that includes ASTM among other things.
24     A.   Right.
25     Q.   First of all, that file reference that

Capital Reporting Company
Malamud, Rebecca  11-13-2014

230

1   A.   No.
2   Q.   Do you know who made the decision not
3 to do any work on ASHRAE standards?
4   A.   I just -- it just didn't happen.
5 There was no formal decision.
6   Q.   Was there ever any discussion between
7 yourself and Mr. Malamud regarding work on ASHRAE
8 standards?
9   A.   References in email, but other than
10 that, no.
11   Q.   Did Public.Resource ever provide any
12 instructions regarding ASHRAE PDF for standard?
13   A.   No.
14   Q.   If you could, Mrs. Malamud, take a
15 look at what's been marked as Exhibit 31.
16   A.   Okay.
17   Q.   This is an email from Carl Malamud to
18 yourself dated January 4th, 2014, 2:30 p.m.  Do
19 you see that?
20   A.   Correct.
21   Q.   And the first line of that email says,
22 "Thinking about it, why don't you focus on ASTM
23 and ASHRAE standards for your next big batch."
24 Correct?
25   A.   Correct.

231

1   Q.   Do you know why Mr. Malamud is asking
2 you to focus on ASHRAE standards if --
3   A.   Because it was -- we were going to
4 work on it and we worked on ASTM, but did not get
5 into the ASHRAE standards.
6   Q.   Why did you not get into the ASHRAE
7 standards?
8   A.   For -- for me because the files
9 weren't there, the JPEG, the document hadn't been
10 converted to this point.
11   Q.   What was that?
12   A.   The document -- the PDF hadn't been
13 converted to the point where I -- I can begin
14 work.
15   Q.   So was the decision not to work on the
16 ASHRAE PDF your decision?
17     MR. STOLTZ:  Objection.  Asked and
18 answered.
19   A.   In the natural -- in the work flow, it
20 just didn't happen so --
21 BY MR. ZEE:
22   Q.   Are you aware of Point B ever asking
23 for permission from ASHRAE to make copies of its
24 standards?
25   A.   No.

232

1   Q.   Are you aware of Point B ever
2 receiving any permission from ASHRAE to make
3 copies of its standards?
4   A.   No.
5   Q.   And did Public.Resource ever inform
6 you that it had permission from ASHRAE to work on
7 its standards?
8   A.   No.
9     MR. ZEE:  Thank you.  That's all I
10 have.
11     MR. STOLTZ:  I have a few questions,
12 but, first, I think we need to take a break.
13     THE VIDEOGRAPHER:  Okay.  Going off
14 the record.  4:20 p.m.
15     (Recess:  4:20 p.m. to 4:33 p.m.)
16     THE VIDEOGRAPHER:  We're going back
17 on the record.  The time is 4:33 p.m.
18
19     EXAMINATION
20 BY MR. STOLTZ:
21   Q.   Okay.  Thanks, Ms. Malamud, for
22 your -- for coming today.  I just have a few
23 questions.  How often do you talk to Mr. Malamud
24 on the phone, say, in the past three years?
25   A.   Never.

233

1   Q.   Would you say that most of your
2 communication is by email?
3   A.   Yes.
4   Q.   You've testified earlier about the
5 steps that you went through to do quality
6 assurance on SVG images.
7   A.   Correct.
8   Q.   If, in the process of reviewing an SVG
9 image you happened to find a mistake, what would
10 you do?
11   A.   I would correct it.
12   Q.   And is that true for every SU -- SVG
13 image that you reviewed as part of the codes
14 project?
15   A.   Yes.
16   Q.   Can text to speech software read
17 MathML files?
18   A.   Yes.
19   Q.   Can text to speech software read JPEG
20 files?
21   A.   No.  There -- there is an ALT tag in
22 every image in an HTML document and the text is
23 put into this ALT tag, it could read that.  But
24 it's generally very minimal.
25   Q.   So would you say that MathML files are

Capital Reporting Company
Malamud, Rebecca  11-13-2014

234

1 easier to use than JPEG files for people with
2 disabilities?
3        MR. FEE:  Objection.  Lack of
4 foundation.  Leading.
5 BY MR. STOLTZ:
6    Q.   You can answer.
7    A.   Yes.
8    Q.   You testified about text that would
9 appear in diagrams in standards documents.
10 Typically how much text appeared in the diagrams
11 in the standards documents that Point B worked on?
12        MR. FEE:  Objection.  Vague.
13    A.   Usually it would be numbers and
14 captions, call-outs on the graphic, but sometimes
15 there would be notes underneath the graphic.
16 BY MR. STOLTZ:
17    Q.   What's the most number of characters
18 that were in those notes?
19    A.   I would say it's anywhere from 100 to
20 500 characters.  That's just a ballpark figure.
21    Q.   You testified that some older diagrams
22 contained flourishes.  In what part of the diagram
23 were those flourishes?
24    A.   In the -- usually it has hand-lettered
25 text.

236

1 those.
2    Q.   Other than at the very beginning of
3 the product, what did you do when you encountered
4 logos in the documents?
5    A.   I would leave in the original JPEG
6 scan.
7    Q.   If I could direct your attention to
8 the document marked Exhibit 28.  It will be the
9 second-to-the-last page of that document.  The
10 Bates number PRO24984.  At the very bottom of that
11 page, do you see the line that says, page 00201,
12 SVG logo, Wikimedia Commons?
13    A.   Yes.
14    Q.   Do you know what the word logo refers
15 to?
16    A.   I -- when I first saw it I thought it
17 might be a logo, but it could be a symbol.
18 Without seeing the picture, I don't know.
19        MR. STOLTZ:  Thank you.  I have no
20 more questions.
21
22            EXAMINATION
23 BY MR. FEE:
24    Q.   That file that you were just
25 referencing, page 0020.SVG-logo, do you still have

235

1    Q.   So was it your practice to where
2 hand-lettered text appeared in an original image,
3 that Point B would replace that text with text
4 rendered in a font?
5        MR. FEE:  Objection.  Form.
6    A.   Correct.
7 BY MR. STOLTZ:
8    Q.   You testified that some images would
9 have required interpretation.  In those cases,
10 what did Point B do with the image?
11    A.   I would file it in a folder called
12 "bad art" while we were working on the diagrams or
13 sometimes label them in red.  That came later
14 because by filing them in a folder called bad art
15 I would have to remove them in order that they
16 were still in the standard document.
17    Q.   So if you had placed a file in the
18 folder labeled bad art or you had marked that file
19 as red, would the file go into the final HTML
20 document that you gave to Public.Resource?
21    A.   The original JPEG --
22    Q.   What --
23    A.   -- would be an HTML document.
24    Q.   The SVG file would not?
25    A.   Right.  We didn't do an SVG file for

237

1 that file at Point B?
2    A.   I may.
3    Q.   Now, in response to the testimony you
4 gave to your counsel regarding your practice with
5 logos after some initial period, you, I think
6 testified that you would leave the original JPEG
7 scan in the HTML file.  Is that right?
8    A.   Correct.
9    Q.   And the HTML file was not the original
10 file as it was distributed by the standards
11 provider.  Correct?
12        MR. STOLTZ:  Objection to form.
13 Foundation.
14    A.   Correct.
15 BY MR. FEE:
16    Q.   So the files that were created by
17 Public.Resource -- or the files that were created
18 by Point B bore logos of ASTM and NFPA even though
19 those files were not authored by Point B or --
20 strike that question.
21        So the files that were created by
22 Point B bore the logos of ASTM or NFPA even though
23 ASTM and NFPA did not author those files?
24        MR. STOLTZ:  Objection to form.
25 It's asking for a legal conclusion.

Capital Reporting Company
Malamud, Rebecca  11-13-2014

242

1  beyond the scope of the redirect.
2      A.   It's not exactly my words.
3  BY MR. FEE:
4      Q.   Okay.  What were your exact words, can
5  you say you remember?
6          MR. STOLTZ:  Objection.  Asked and
7  answered.
8  BY MR. FEE:
9      Q.   How is my description wrong?
10     A.   Broader access to public safety
11 standards.
12     Q.   Are you aware that at least ASTM's
13 standards are available for free on the Internet
14 to the extent that they've been incorporated by
15 reference by any federal regulation?
16         MR. STOLTZ:  Objection.  Still
17 beyond the scope of the redirect.
18     A.   I am not a lawyer and it's outside a
19 bit of the scope of my expertise, but eventually
20 it's -- it's not free.
21 BY MR. FEE:
22     Q.   The ASTM standards in its reading room
23 are not free.  Is that your testimony?
24         MR. STOLTZ:  Same objection.
25     A.   I'm not familiar with the reading

243

1  room.
2          MR. FEE:  I have no other questions.
3          MR. REHN:  Nothing for me.
4          THE VIDEOGRAPHER:  Anything further?
5  Anything further on the phone?
6          MR. ZEE:  Nothing further.
7          THE VIDEOGRAPHER:  Okay.  We're
8  going off the record.
9          (The deposition concluded at
10         4:50 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

244

1  State of Oregon      )
2                       )  ss.
2  County of Lane       )
3
4          I, Jan R. Duiven, CSR, FCRR, CCP, a
5  Certified Shorthand Reporter for the State of Oregon,
6  certify that the witness was sworn and the transcript
7  is a true record of the testimony given by the witness;
8  that at said time and place I reported all testimony and
9  other oral proceedings in the matter; that the foregoing
10 transcript consisting of 243 pages, contains a full,
11 true and correct transcript of the proceedings reported
12 by me to the best of my ability on said date.
13         If any of the parties or the witness
14 requested review of the transcript at the time of the
15 proceedings, correction pages have been inserted.
16         IN WITNESS WHEREOF, I have set my hand and
17 CSR seal this 24th day of November, 2014, in the City
18 of Eugene, County of Lane, State of Oregon.
19
20
                    _____
21              Jan R. Duiven, CSR, FCRR, CCP
22
23 CSR No. 96-0327
24 Expiration Date:  September 14, 2017
25

245

1  A C K N O W L E D G E M E N T   O F   D E P O N E N T
2
3  I, REBECCA MALAMUD, do hereby acknowledge I
4  have read and examined the foregoing pages of
5  testimony, and the same is a true, correct and complete
6  transcription of the testimony given by me, and any
7  changes or corrections, if any, appear in the attached
8  errata sheet signed by me.
9
10
11
12
13
14
15
16
17
   _____
18 Date                 REBECCA MALAMUD
19
20
21
22
23
24
25

246

1  MR. MITCH STOLTZ
   ELECTRONIC FRONTIER FOUNDATION
2  815 Eddy Street
   San Francisco, California 94109
3  415/436-9333
4  In Re: ASTM International. v. Public.Resource.Org
5  Dear Mr. Stoltz,
6      Enclosed please find your copy of the
7  deposition of REBECCA MALAMUD, along with
8  the original signature page.  As agreed, you
9  will be responsible for contacting the witness
10 regarding signature.
11     Within 30 days of December 1, 2014,
12 please forward errata sheet and original signed
13 signature page to counsel present.
14     If you have any questions, please do not
15 hesitate to call.  Thank you.
16
17 Yours,
18 Jan R. Duiven, CSR, FCRR, CCP
   Reporter/Notary
19
20 cc:  Original transcript
        All Counsel
21
22
23
24
25

247

1  Capital Reporting Company
   1821 Jefferson Place, Northwest
2  Third Floor
   Washington, D.C.  20036
3  (202)857-3376
4        E R R A T A   S H E E T
5  Case Name:  ASTM International. v. Public.Resource.Org
6  Witness Name:  REBECCA MALAMUD
7  Deposition Date:  November 13, 2014
8  Page No.   Line No.    Change/Reason for Change
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
   _____  _____
25 Signature              Date