# EXHIBIT 101



# NATIONAL FIRE PROTECTION ASSOCIATION
The leading information and knowledge resource on fire, electrical and related hazards

Sign In  Cart (0)

**Search** [Search this site]  >

| Sign-In | Join / Renew | My Profile | Catalog | News & Publications | About NFPA | Careers | Press Room |

| CODES & STANDARDS | SAFETY INFORMATION | TRAINING | RESEARCH | MEMBER ACCESS |

**About NFPA**

NFPA overview
NFPA operations
NFPA leadership
International
Our initiatives
Offices
Directions
Contact Us

⌂ Home > About NFPA

## ABOUT NFPA

🖨 ✉ Facebook Twitter LinkedIn [ ] 2

LIVE HELP
×UNAVAILABLE
PLEASE TRY AGAIN LATER



Founded in 1896, NFPA is a global, nonprofit organization devoted to eliminating death, injury, property and economic loss due to fire, electrical and related hazards. The association delivers information and knowledge through more than 300 consensus codes and standards, research, training, education, outreach and advocacy; and by partnering with others who share an interest in furthering the NFPA mission.

All NFPA codes and standards can be viewed online for free.

NFPA's membership totals more than 65,000 individuals around the world.

**NFPA**
1 Batterymarch Park
Quincy, Massachusetts
USA  02169-7471

**Tel:** +1 617 770-3000

**Sales/Member Services**
+1 800 344-3555 or
+1 617 770-3000

**Fax:** +1 617 770-0700

Free access to all NFPA Codes & Standards

**In This Section**

> **NFPA overview**   The history of NFPA, its programs and initiatives
> **NFPA operations**   Bylaws, organization, regulations, and administrative committees
> **NFPA leadership**   President Jim Pauley, our Board of Directors, and management team
> **International**   Working to develop and increase global awareness of NFPA
> **Our initiatives**   Home fire sprinklers, wildland fires, training for first responders, and more
> **Offices**   NFPA has several regional offices and a Government Affairs office in Washington, DC
> **Directions**   Find NFPA headquarters and its distribution facility.
> **Contact Us**   Reach us by phone or e-mail.

---

**Customer Support:** Help

**Codes and Standards:** Complete list   Purchase   Free Access   National Fire Code Subscription Service (NFCSS)

**On the Web:** Blogs   Buyers' Guide   Electric Vehicle Safety Training   Fire Adapted Communities   Fire Prevention Week   Fire Sprinkler Initiative   Firewise

NEC® Buyers' Guide   nec connect   Sparky the Fire Dog®

        

Home | Terms of use | Privacy policy | © National Fire Protection Association (NFPA) 2015

# EXHIBIT 102

▸ About ASHRAE   ▸ Contact Us   ▸ News

Join or Login ▼


Shaping Tomorrow's
Built Environment Today

Search on Ashrae

Need technical info? Search ASHRAE's Bookstore >

| Resources & Publications | Standards, Research & Technology | Education & Certification | Government Affairs | Society Groups | Membership & Conferences |

Home |

Share this page

ASHRAE and Industry History

ASHRAE Foundation

ASHRAE en español

Policies and Procedures

Position Documents

Strategic Planning Documents

Support ASHRAE Research

## About ASHRAE

ASHRAE, founded in 1894, is a global society advancing human well-being through sustainable technology for the built environment. The Society and its members focus on building systems, energy efficiency, indoor air quality, refrigeration and sustainability within the industry. Through research, standards writing, publishing and continuing education, ASHRAE shapes tomorrow's built environment today. ASHRAE was formed as the American Society of Heating, Refrigerating and Air-Conditioning Engineers by the merger in 1959 of American Society of Heating and Air-Conditioning Engineers (ASHAE) founded in 1894 and The American Society of Refrigerating Engineers (ASRE) founded in 1904.

### ASHRAE's Mission and Vision

**Mission:**
To advance the arts and sciences of heating, ventilation, air conditioning and refrigeration to serve humanity and promote a sustainable world.

**Vision**
ASHRAE will be the global leader, the foremost source of technical and educational information, and the primary provider of opportunity for professional growth in the arts and sciences of heating, ventilating, air conditioning and refrigerating.

### ASHRAE's Core Values

**Excellence**
ASHRAE education, technical information and all other activities and products will always reflect the best practices that lead our industry. We strive for continuous improvement and innovation in all our practices and products.

**Commitment**
ASHRAE and its members are passionate about serving the built environment, creating value, and recognizing the accomplishments of others.

**Integrity**
ASHRAE is committed to the highest ethical standards. We work transparently, observing essential requirements for due process and peer reviews to assure our members and stakeholders that we do the right things the right way.

**Collaboration**




PB
Productivity redefined.
Try our new Project Builder app, the cloud-based productivity tool that will cut time, big time.


Active and Passive Beam Application Design Guide



ASHRAE seeks and embraces collaborative efforts with organizations, agencies, and individuals sharing our commitment to sustainable built environments.

**Volunteerism**
Members lead ASHRAE at every level, serving ASHRAE and helping ASHRAE serve society.

**Core Values Presentation.pptx**

## ASHRAE's Leadership

ASHRAE's Leadership is composed of a Board of Directors, Executive Council plus three other councils and numerous committees. Learn More about ASHRAE's Leadership >



## ASHRAE Governing Documents



**ASHRAE Code of Ethics**
*as approved by ASHRAE Board of Directors January 2007*
ASHRAE Code of Ethics

**ASHRAE Bylaws**
*as approved by ASHRAE Membership*
Read ASHRAE's Bylaws

## ASHRAE's Annual Reports

The 2012-2013 ASHRAE Annual Report is now available. The report highlights ASHRAE's successful initiatives from throughout the past year, including financial updates in the Treasurer's Report.

## Support ASHRAE Research

Help to support ASHRAE's mission, programs, and member services by making a contribution to ASHRAE Research. Contribute to ASHRAE Research >>

## Consumer Center

Though we don't always recognize it, all of us are touched by the activities of ASHRAE. Visit the Consumer Center to see how ASHRAE activities have an impact on your daily life and to gain access to valuable information such as  the Top Ten Things Consumers Should Know about Air Conditioning and more.

Visit the Consumer Center

## ASHRAE Today

Whether it's involvement with a chapter, the monthly ASHRAE Journal, the networking possibilities or the excellent learning opportunities, ASHRAE members all have different reasons for joining and staying in the Society. Find out what it means to be an ASHRAE member by watching brief interviews conducted during the Seattle Annual Conference 2014, and join the ranks of those shaping the future of the built environment today. Watch the interviews and learn more >>

## Headquarters Renovations

Nearly 200 members, chapters, sister organizations and companies joined in leaving a lasting impression of their contributions to our Society and the industry by purchasing a personalized paver.

## ASHRAE en Espanol

As a service to ASHRAE's Spanish-speaking members, we now provide a page with general information

Learn more about the renovation of ASHRAE's Headquarters.

www.ashrae.org/building

about ASHRAE in the Spanish language, as well as other information of interest. Learn More >

## Employment at ASHRAE

See a current list of openings at ASHRAE Headquarters in Atlanta, GA.

## Special Reports from ASHRAE on Environmental Security

After 9/11, ASHRAE published *Risk Management Guidance for Health and Safety under Extraordinary Incidents* on January 12, 2002. A year later an expanded version of the document was published to include Environmental Security.

**Risk Management Guidance for Health and Safety under Extraordinary Incidents (January 12, 2002):**

- Presidential Study Group: Final Report (PDF) (33.7 KB)

**Risk Management Guidance for Health, Safety and Environmental Security under Extraordinary Incidents (January 26, 2003):**

- Executive Summary (PDF) (61.9 KB)
- Full Document (419 KB)

| Resources & Publications | Standards, Research & Technology | Education & Certification | Government Affairs |
|---|---|---|---|
| Bookstore | Standards & Guidelines | Certification | Grassroots Government Advocacy |
| ASHRAExCHANGE | Standards Forms & Procedures | Online Learning | Coalitions and Programs |
| ASHRAE Journal | Standards Addenda | 2016 Orlando Winter Conference Courses | Public Policy Issue Briefs, Letters, & Testimony |
| Handbook | Standards Errata | Course Schedule | Government Affairs Updates |
| ASHRAE Transactions | Standards Interpretations | HVAC Design Training | Advocacy Toolkit |
| High Performing Buildings | Standards Actions | Self-Directed or Group Learning | Washington Office Staff |
| Science and Technology for the Built Environment | Public Review Drafts | Instructor-Led Courses | |
| Periodicals | Purchase Standards & Guidelines | ASHRAE Courses at Industry Events | |
| Supplier Directory & Sponsored White Papers | Research | ASHRAE Chapter Courses | |
| Free Resources | Purchase Research Reports | ASHRAE In-Company Courses | |
| Citation and Abstract Services | ASHRAE RP | Supplier Webinars | |
| Abstract Archive | Technical Committees | Job Board | |
| ASHRAE Indexes | Advanced Energy Design Guides | | |
| Publication Updates | Special Project Activities | | |
| Educators' Resources | Technical FAQs | | |

| Society Groups | Membership & Conferences | Student Zone | |
|---|---|---|---|
| Chapters | Join Now | Design Competition | |
| Regions | Renew My Membership | Solar Decathlon | |
| Committees | Benefits | Scholarships and Grants | |
| Councils | My Membership | New Faces of Engineering - College Edition | |
| Volunteer | Honors & Awards | | |

## Join ASHRAE

ASHRAE advances the arts and sciences of heating, ventilation, air conditioning and refrigeration to serve humanity and promote a sustainable

| | | | world. With more than 53,000 members |
|---|---|---|---|

Rules of the Board

Meet the Board

IAQA

Leadership Recall

College of Fellows

Life Members Club

ASHRAE Associate Society Alliance

ASHRAE Foundation

Student Zone

Conferences

Distinguished Lecturer Program

Webcasts

Young Engineers in ASHRAE

ASHRAE Merchandise

Job Board

K-12 Activities

Membership and Meetings

Educational Resources

Student Activities

Student News

Student Branches

world. With more than 53,000 members from over 132 nations, ASHRAE is a diverse organization representing building system design and industrial processes professionals around the world.

**Join Now!**



Contact Us    Permissions    Terms of Use    Privacy Policy    Careers    Advertising    Site Map

# EXHIBIT 103



# ASHRAE
# Writing Standards in Code-Intended Language

**Version 2**
**January 12, 2015**

This document may not be distributed in whole or in part in either paper or electronic form outside of ASHRAE membership without the express permission of the ASHRAE Manager of Standards.

# 1. INTRODUCTION

ASHRAE Rules of the Board (ROB) includes these rules:

> *1.201.004.5 All standards shall be written in definitive mandatory language.*

> *1.201.004.3 Standards that are intended for code use should be concise and written in appropriate code language with simple and direct prescriptive methods for compliance, with alternative performance paths.*

> *1.201.003.1 Write all new and revised standards and addenda that cover subjects addressed in building codes or regulations in such a way that those standards can be readily integrated into those codes and regulations and applied as an integral part of the resultant code or regulatory documents.*

The Procedures for ASHRAE Standards Actions (PASA) defines code-intended standard and a code language document as:

> **code-intended standard:** *A standard intended to be adopted as a code using code language.*

> **code language document**: *A document that presents a set of requirements related to the design, application, or use of HVAC&R and related technologies where all or portions of the document may be enacted as mandatory enforceable requirements by a political jurisdiction. Portions intended to be enforced (normative) are written in mandatory, enforceable language. Portions not intended to be enforced are identified as informative and are to be located in informative notes, in informative annexes (appendices) or in other advisory documents. See annex, informative annex, informative notes and normative annex.*

These rules and definitions support ASHRAE's objective to have code-intended ASHRAE Standards adopted by reference directly into laws, rules, regulations, and other documents that cover the built environment, or referenced as a component of other standards, model codes and documents that form the basis for those same laws, rules, and regulations. To achieve this objective:

- ASHRAE standards must be written entirely in mandatory language.

- ASHRAE standards intended for adoption within codes, rules, regulations, and other documents that cover the built environment must be written in code-intended language.

A companion guide, *ASHRAE Guide to Writing Standards in Mandatory Language,* provides steps for all Project Committees (PCs) to complete as a step toward compliance with the ROB's mandatory language requirement.

The nature of writing standards in code-intended language requires a basic understanding of how codes, rules, regulations and other documents must be written to clearly state specific requirements and desired outcomes that can be documented and verified for compliance within a legal framework. A code-intended standard must also align with other model codes and standards that are collectively used to regulate the built environment, and compliance with any path in the standard must be capable of being uniformly documented and verified.

## 2. GUIDANCE FOR WRITING STANDARDS IN CODE-INTENDED LANGUAGE

### 2.1  Responsibilities

### 2.1.1  Standard Project Committees

**2.1.1.1  Mandatory Language.**  Each standard project committee (SPC) and standing standard project committee (SSPC) must review its draft standard or addendum to identify the use of non-mandatory language, following the steps in *ASHRAE Guide to Writing Standards in Mandatory Language* Section 2.2.1 before submitting the draft for publication public review approval. If the SPC/SSPC is unable to make corrective revisions to eliminate non-mandatory language the SPC/SSPC is encouraged to request assistance from ASHRAE staff to assist with the development of revisions to meet the mandatory language requirement.

**2.1.1.2  Code-Intended Language.** Each SPC/SSPC must review and apply the guidance in Section 2.2 of this guide before submitting its draft for publication public review approval. To facilitate the development of appropriate code-intended language and reduce the need for and time associated with outside assistance, PCs are encouraged to establish a format and compliance subcommittee, comprised of one or more volunteers, focused on meeting the code-intended requirement. If the SPC/SSPC is unable to make corrective revisions to comply with the code-intended language requirement, the SPC/SSPC is encouraged to request assistance from ASHRAE staff to assist with the development of revisions to meet the code-intended language requirement.

**2.1.2 Standards Project Liaison Subcommittee (SPLS).**  SPLS, with support from ASHRAE Staff, (a) will review the normative portions of code-intended draft standards and addenda submitted for public review to determine if they are written in both mandatory and code-intended language, and (b) will assist the project committee (PC) Chair (or his/her designee such as a format and compliance subcommittee) with revisions that will result in the draft standard or addenda meeting the code-intended language requirements.

### 2.2  Code-Intended Language Format and Content

**2.2.1  General.** The criteria in Sections 2.2.2 through 2.2.6 must be followed by PCs writing code-intended standards and addenda. Informative Annex A provides examples of how to (and how not to) write standards in code-intended language and rationale behind the need for code-intended language.

**2.2.2  Conformity Assessment**.  Reference to third-party testing, certification, listing, labeling or other entities engaged in documenting or verifying compliance with any part of the standard or addenda must be referred to as an "approved agency" instead of including the name of the third-party. The following definition must be included in each standard.

> ***approved agency***: *an agency  engaged in conducting tests, furnishing inspection services, or commissioning services that has been approved by the entity responsible for validating compliance with this standard.*

**2.2.3 Coordination and Integration with Other Relevant Documents.**  Where the standard is intended to be used in conjunction with documents published by other standards or model code development organizations, the ASHRAE standard must be sensitive to "meshing" with those other documents so that the ASHRAE standard will be adoptable by reference into those documents to address the topic covered by the ASHRAE standard.

3

**2.2.4 Responsibility within Code-Intended Standards.** Where the standard requires something to be done, the standard needs to identify what is required to be done, who is required to do it, and, if relevant, who is required to receive the results.  More specifically, where the standard requires something to be done, a specific criterion and a metric must be provided as the basis for documenting and verifying compliance.

**2.2.5  Simple and Repeatable.** The standard will be more adoptable by reference where the criteria are stated simply and, where there are multiple paths to compliance with the standard, each path must be similarly repeatable and comparable.

**2.2.6 Administration and Compliance.** The standard will be more adoptable by reference and applied where the criteria related to administering, documenting, and verifying compliance are combined and located into one section in the standard titled "Administration and Compliance."

**2.2.7  Normative References**. The Project Committee Manual of Procedures (PC MOP) defines a normative reference as "a reference to a document that establishes a requirement necessary to comply with the referencing standard." For all standards, normative references must be specifically referenced by publication date, approval date, or version number.

**2.2.8 Informative Information in Normative Sections**. The PASA defines the use and limits of informative information within normative sections of ASHRAE Standards as:

> *informative notes: explanatory information, appearing in a standard, that does not contain requirements or any information considered indispensable for the use of the standard. Informative notes are to begin with the words "(Informative Note(s))" and be placed after the section of the standard to which the note applies. If the informative note is more than two sentences, the information must be placed in an informative annex and referred to by the informative note. Where there is more than one informative note, the notes must be numbered sequentially.*

4

INFORMATIVE ANNEX A
CODE-INTENDED STANDARDS: EXAMPLES AND RATIONAL

## A1. Conformity Assessment

Conformity assessment is the mechanism(s) by which documentation and verification that something required has been realized.  For the purposes of this document, conformity assessment means "any activity to determine, directly or indirectly, that a process, product, or service meets relevant technical standards and fulfills relevant requirements." Examples of conformity assessment activities include testing, surveillance, inspection, auditing, certification, registration, and accreditation.

For example, a test standard clearly establishes uniform provisions for conducting a test or other activity to verify an outcome.  Some ASHRAE standards are themselves test standards, while other ASHRAE standards refer to test standards developed by ASHRAE or others.

As stated in Section 2.2.6, normative portions of ASHRAE standards need to reference standards or other documents with a specific publication or approval date included in the reference.  Not doing this would amount to acceptance of future versions of the reference materials.

Examples from selected ASHRAE standards are provided below to highlight conformity assessment associated issues, why there are potential issues, and how to more appropriately present the information in the standard.

## A1.1 Approved Agency

*Fenestration and Doors. Air leakage for fenestration and doors shall be determined in accordance with NFRC 400. Air leakage shall be determined by a laboratory accredited by a nationally recognized accreditation organization, such as the National Fenestration Rating Council, and shall be labeled and certified by the manufacturer. Air leakage shall not exceed 1.0 $cfm/ft^2$ for glazed swinging entrance doors and for revolving doors and 0.4 $cfm/ft^2$ for all other products.*

As stated in Section 2.2.2, third-party testing, certification, listing, labeling or other entities engaged in documenting or verifying compliance with any part of the standard cannot be included in the standard by name but instead must be referred to as an "approved agency." Federal, state, and local agencies that formulate and implement associated laws and regulations based on or through adoption of the ASHRAE standard by reference have the authority to determine what third-parties are and are not acceptable by name or by reference to a nationally recognized accreditation program.  If not in a regulatory context, those that adopt and use the standard will determine who they consider suitable to conduct conformity assessment on their behalf.

Consider the suggested revision below of the existing standard provision shown above.  As revised, the issue of naming a particular conformity assessment organization is removed.  The reliance on the test standard is retained, and the decision as to who is an "approved agency" is left up to the entity adopting or requiring conformance with the standard. Note that a definition of approved agency is provided in Section 2.2.2 for inclusion in ASHRAE standards where the issue of conformity assessment arises.

*Fenestration and Doors. The air leakage rate of glazed swinging entrance doors and revolving doors shall not exceed 1.0 $cfm/ft^2$ and for all other products shall not exceed 0.4 $cfm/ft^2$. The air leakage rate shall be determined by an approved agency in accordance with NFRC 400 and the product labeled.*

5

**A1.2 Testing and Certification**

> ***Fenestration and Doors.*** *Procedures for determining fenestration and door performance are described in Section X. Product samples used for determining fenestration performance shall be production line units or representative of units purchased by the consumer or contractor.*

The conformity assessment issue in the example above is what product samples, how many, where they are from, etc., is within the purview of the third-party testing or certification agency. It is not appropriate to provide these in the standard unless the PC feels the standard needs to have a specific section on conformity assessment.  If so, then care must be taken to ensure that similar detail is provided for all other products and materials in the standard so that there is consistency on this issue where the standard has criteria applicable to multiple products.

**A1.3 Alternative Paths, Consistency, and Comparability**

> ***U-factor:*** *U-factors shall be determined in accordance with NFRC 100. U-factors for skylights shall be determined for a slope of 20 degrees above the horizontal.*

> ***Exceptions:***
>   a. *U-factors from Section X which applies to unlabeled skylights) shall be an acceptable alternative for determining compliance with the U-factor criteria for skylights. Where credit is being taken for a low-emissivity coating, the emissivity of the coating shall be determined in accordance with NFRC 300. Emissivity shall be verified and certified by the manufacturer.*

In the above example, the standard clearly states a reference test procedure for determining a thermal property of skylights and then provides an alternative source for skylights that are unlabeled.  For consistency, the standard has identified a test standard that must then be referenced as the only acceptable conformity assessment condition.  Where default values are to be used for untested products, there is a potentially inconsistent set of conditions: one being to test, but the other one indicating a test is not required.  With respect to the low-emissivity coating in the above example, the manufacturer can self-test and certify emissivity data for their products as stated in the last sentence.  This does not appear to be consistent with other sections of the standard where a more rigorous conformity assessment activity is required.  In referencing test standards to guide performance of products, systems, materials, or other components in an ASHRAE standard, the provisions in the standard must be sensitive to consistency on conformity assessment related issues throughout the standard.

Another potential conformity assessment issue is referencing computer programs, websites, or other sources of information that are not fixed in time by a publication date, approval date, or version number as required in Section 2.2.6.

**A2. Meshing with Other Codes and Standards**

If an ASHRAE code-intended standard is coordinated with other codes and standards then the ASHRAE standard can mesh with those other documents, and collectively they address the same or a broader scope than the ASHRAE standard addresses.  If the ASHRAE standard cannot mesh with other relevant documents, then it will either not be adopted by reference or will be adapted into those other documents so it can be used with them.  In either case, the criteria in the ASHRAE standard may not be what is ultimately adopted and required to be satisfied.  This would be less likely to occur with method of test standards, which in and of themselves, are generally designed to stand alone, or with standards associated

with measurement data or expression of performance. In addressing this issue, consider if the standard can stand alone where applied or, like one piece in a jigsaw puzzle, it is likely to be part of, or related to, a broader set of requirements comprised of multiple documents.  If the latter situation is envisioned, then the standard needs to be written so it can mesh with those other documents.

Consider the following examples from ASHRAE standards that highlight this issue.  It is important to emphasize that the wording presented is certainly acceptable if the ASHRAE standard is the only code or standard applied to the subject.  If not, then those other documents can conflict with the ASHRAE standard and preclude the ASHRAE standard being adopted by reference, cause it to be adapted or modified by another Standards Development Organization (SDO), or cause it to be adapted or modified by the entity adopting the ASHRAE standard.

## A2.1 Compatibility Regarding Building Types and Spaces

> **Commercial occupancy** *is a premise or that portion of a premise where people transact business, receive personal service, or purchase food and other goods. Commercial occupancies include, among others, office and professional buildings, markets (but not large mercantile occupancies), and work or storage areas that do not qualify as industrial occupancies.*

> **Large mercantile occupancy** *is a premise or that portion of a premise where more than 100 persons congregate on levels above or below street level to purchase personal merchandise.*

The terms "commercial occupancy" and "large mercantile occupancy," while usable within the context of a specific ASHRAE standard, are not correlated with other ASHRAE standards nor are they in line with the definition of building use groups as provided in other codes and standards.  This adversely affects the ability of those other codes and standards to adopt the ASHRAE standard by reference to address the subject covered.  Use of the language in the above example would not only prevent having the standard adopted by reference, but would also (a) necessitate the adaptation of parts of the ASHRAE standard within those other codes and standards, and (b) require some "guessing" on the part of those adapting the criteria in the ASHRAE standard as to how the criteria should be applied to the building types and spaces contained in their documents.

## A2.2 Compatibility Regarding Components of Buildings

> **building entrance:** *any doorway, set of doors, turnstile, vestibule, or other form of portal that is ordinarily used to gain access to the building by its users and occupants.*

The terms "entrance" and "main entrance" have specific meanings in building and fire codes.  If it is the intent of the ASHRAE standard using the above definition to address all building entrance doors without exception, the definition could be revised to be consistent with the terms used in building and fire codes. If the intent is to just address some entrances in a different way than currently addressed in building and fire codes (e.g., entrance, main entrance, or accessible entrance), then the standard could be revised to either refer to or use the definitions in those other documents.  Moreover, if there is a specific need for a difference, then the PC can develop new terms and definitions to address the issues that are unique to entrances covered by the ASHRAE standard.

## A2.3 Compatibility Regarding Building Systems

> **Exception: Commercial kitchen hoods used for collecting and removing grease vapors and smoke.**

7

Other codes and standards addressing this subject use the terms Type I and Type II hoods to describe the effluent conducted by the hood.  The example above from an ASHRAE standard can stand alone, but it is more likely that it would be applied with other codes and standards addressing this topic and additional topics associated with mechanical systems in buildings. In not being coordinated with other codes and standards, it will be difficult to claim the exception intended in the ASHRAE standard on a uniform basis. This issue could be addressed by changing the ASHRAE standard to exempt "Type I hoods" and then define Type I hoods in the definitions section of the ASHRAE standard.

## A2.4  Including Criteria Already in Other Standards

> *Feeders. Feeder conductors shall be sized for a maximum voltage drop of 2% at design load.*

> *Branch Circuits. Branch circuit conductors shall be sized for a maximum voltage drop of 3% at design load.*

The provisions shown in above example regulate the size of electrical system components in buildings. While these provisions can be applied using the ASHRAE standard alone, the ASHRAE standard must also be applied to buildings with a myriad of other codes and standards. One of those other codes and standards already contains such a provision, and that standard is widely adopted to regulate electrical system safety and performance. Including this provision in an ASHRAE standard where it is already contained and maintained in another creates a situation where two standards have criteria on the same topic and could diverge at any time.  A conflict with another code or standard that is clearly the authority on a subject can be avoided by simply referring to that other code or standard and the specific criteria therein.

## A2.5 Compatibility on Definitions of Terms

> *Exception: Lighting in spaces where patient care is rendered.*

The term "patient care" is not defined in the above example, but would be an appropriate definition in the ASHRAE standard.   However, that definition must be correlated with other codes and standards governing health care, although those definitions could cast a very wide net allowing this exception to possibly be used where it is not necessarily intended by the standard.  If it is determined in this case that the patient care definition intended by the standard is the same as that in other codes and standards, then the definition in the ASHRAE standard must be consistent with that definition.  On the other hand, if not the same as that in other codes and standards, then the ASHRAE standard could define another term that would represent a subset of patient care to eliminate any potential conflict between the ASHRAE standard and the other related codes and standards.

## A3. Identification of Responsible Parties

Identification of responsible parties is relevant to ensuring that if something is to be done that someone or some entity is named as having responsibility to do it, and if someone is to receive it, then that someone or entity is also named. This is an important issue because if something is required to be done but no responsible party is named, then there is no mechanism to ensure what is required by the standard actually takes place. Without specifying a responsible party, the standard leaves it to those adopting the ASHRAE standard to define the responsible party themselves.  If something is to be done and someone is supposed to do it or be involved in its development or delivery, then the ASHRAE standard is the place to establish

8

the applicable and governing criteria.  In addition, in establishing those criteria it is important to focus on a particular skill set as opposed to using specific names, titles, job descriptions, etc.

A related item associated with compliance verification is simply if compliance with the stated provisions can be verified, at what time in the process and by whom.  If the standard provides a requirement that is intended to be enforced at one point in time but there is no entity likely to be available to ensure compliance, then that provision may be unenforceable (e.g., a requirement that a system be operated in a particular manner where there is no one likely to be available to verify compliance). As such, it is a reason not to adopt the standard, a source of amendment, or something in the standard that is not followed.

### A3.1 Indicating Who Performs a Required Test

*Type II Hood Performance Test. A performance test shall be conducted upon the completion of — and before final approval of — installation of a ventilation system serving commercial cooking appliances. The test shall verify the rate of exhaust airflow required by Section X. The permit holder shall furnish the necessary test equipment and devices required to perform the tests.*

Who is responsible for conducting the test?  There are many entities (contractor, building owner, designer, hood manufacturer, inspector, etc.), who can conduct the required test, and, in not indicating the necessary qualifications of those considered appropriate to conduct the test, the standard is silent on that issue and provides no guidance to those adopting the ASHRAE standard.  The need for standardization might not be important for those that only have to deal with such a test one time and in one place. But for those who design, construct, operate, own, insure, and perform other duties associated with this topic, the failure of the standard to provide specific guidance as to the qualifications of the intended responsible party for conducting the tests means there are likely to be as many different sets of guidance or requirements on this issue as there are adopting entities.  Clearly, if practical, it is preferable for the ASHRAE standard to identify the responsible parties and their necessary qualifications where appropriate.  As the developing organization, ASHRAE is in the best position to address this issue.

The following is a potential revision of the example above that focuses on identification of the responsible party:

*Type II Hood Performance Test. A performance test shall be conducted by an approved third-party upon the completion of — and before final approval of — installation of a ventilation system serving commercial cooking appliances. The test shall verify the rate of exhaust airflow required by Section X and the test results provided by the approved third-party to the authority having jurisdiction over the final approval of the system. The permit holder shall furnish the necessary test equipment and devices required to perform the tests.*

### A3.2 Who Provides Required Information

*Supplemental Information. Supplemental information necessary to verify compliance with this standard, such as calculations, worksheets, compliance forms, vendor literature, or other data, shall be made available where required by the building official.*

Who is required to make the supplemental information available (owner, contractor, registered design professional, manufacturer, etc.) and what qualifications must they possess?  Without a designation of

9

responsibility and qualifications, the enforcement authority (code official) is placed into the position of making the selection, which could delay the approval of a project if the standard does not designate a responsible party. The PC is in the best position to list those responsible for providing this information.

### A3.3 Who Provides a Required Report

> **General.** *Construction documents shall require that all HVAC systems be balanced in accordance with generally accepted engineering standards (see Informative Appendix E). Construction documents shall require that a written balance report be provided to the building owner or the designated representative of the building owner for HVAC systems serving zones with a total conditioned area exceeding 5000 ft².*

Who is responsible for providing the written balance report?  Should the construction documents require that the balance report be provided and then be further required to designate the responsible party?  The PC is in the best position to make this decision and put it into the standard instead of leaving the decision up to those adopting the standard by reference or those using the standard.

### A3.4 Who Performs Required Calculations

> **Load Calculations.** *Service water heating system design loads for the purpose of sizing systems and equipment shall be determined in accordance with manufacturers' published sizing guidelines or generally accepted engineering standards and handbooks acceptable to the adopting authority (e.g., 2011 ASHRAE Handbook — HVAC Applications).*

Who is responsible for determining the design loads?  Again, the PC is in the best position to make the designation.  In addition, there is one additional aspect of the provision above; there are no sizing limitations in the standard for the system.  Once the loads are calculated, what would one do with them other than verify that they had been determined?  In this instance, the standard could establish some criterion that is based on the load calculations; otherwise, why make someone responsible for determining the loads?

### A3.5 Who Provides Required Construction Documents

> **Drawings.** *Construction documents shall require that within 30 days after the date of system acceptance, record drawings of the actual installation shall be provided to the building owner, including...*

> **Manuals.** *Construction documents shall require that an operating manual and maintenance manual be provided to the building owner. The manuals shall include, at a minimum, the following...*

Who is responsible for providing the required documents, or should the criterion be "….shall require that the registered design professional of record provide …."?

### A4.  Simple and Repeatable

Ensuring the criteria in a standard are simple and repeatable is important because this affects the ability to understand, apply, implement, or document or verify compliance with a standard.  In addition, the intent of a standard is to foster uniformity and consistency in the subject covered by the standard; this is adversely affected by the level of complexity in the standard.   Where there are multiple paths to

10

compliance with the standard, each path must be similarly repeatable and comparable. If not, users are more likely to take the path of least resistance and that path will become the singular path in the standard.

Examples of current standards provisions and suggestions for simplification are shown below.  Where considering this issue, first focus on what is to be required in the standard and produce a first draft of a provision that is in accordance with the other issues described in this Annex.  Once that is completed, determine if the text specifically communicates what is intended to be conveyed and that all involved will draw the same conclusion from reading the text. Then generate and evaluate alternative ways to further refine, simplify, and present the provision. As a final step, consider the need for consistency in the application and use of the text.  Continue this process until there is a clear and concise statement that conveys the requirement.

## A4.1 Simplification - First Example

*budget building design:* *a computer representation of a hypothetical design based on the actual proposed building design. This representation is used as the basis for calculating the energy cost budget.*

In the revision of this definition below, the second sentence has been combined with the first to simplify the definition.

*budget building design:* *a computer representation, used as the basis for calculating the energy cost budget, of a hypothetical design based on the actual design of the proposed building.*

Note also that it is not necessary to provide background, reasons, or informative statements for provisions in standards.  Focus on limiting the text in a standard to the provisions that are necessary to meet the purpose of the standard.  If  the need for informative text, commentary and other language to explain what is in the standard or how it is to be used continues to arise, this may be a self-admission that there is a need to continue reviewing the core provisions in the standard to ensure they have been crafted in a simple and repeatable manner.

## A4.2 Simplification - Second Example

*Inspections. All building construction, additions, or alterations subject to the provisions of this standard shall be subject to inspection by the building official, and all such work shall remain accessible and exposed for inspection purposes until approved in accordance with the procedures specified by the building official. Items for inspection include at least the following:*

a.  *wall insulation after the insulation and vapor retarder are in place but before concealment*
b.  *roof/ceiling insulation after roof/insulation is in place but before concealment*
c.  *slab/foundation wall after slab/foundation insulation is in place but before concealment*
d.  *fenestration after all glazing materials are in place*
e.  *mechanical systems and equipment and insulation after installation but before concealment*
f.  *electrical equipment and systems after installation but before concealment*

Consider this simplified revision:

*Inspections. Everything subject to the provisions of this standard shall be subject to inspection by the building official and shall remain accessible and exposed for inspection purposes until approved by the building official.*

11

The term "approved" has a specific meaning and definition in codes, so it would be advantageous to include it in the definitions section of the ASHRAE standard (*approved by the code official as a result of investigation and tests conducted by him or her, or by reason of accepted principles or tests by nationally recognized organizations*[1]), thereby allowing the text to be simplified as shown above.  Anytime a term or concept needs to be defined to facilitate understanding and use of the standard, it needs to be defined in the definitions section unless it is used only once, in which case, it can be addressed at the point in the standard where the term or concept is used.  Also, given that this related set of standards is focused on minimum requirements, there is no need to list anything other than the minimum, so the text listed below could be deleted.  Clearly, one need only read the standard to know that things are "subject to the provisions of the standard," which is another reason for not listing them in the standard.

### A4.3 Clarification - First Example

> *clerestory:* that part of a building that rises clear of the roofs or other parts and whose walls contain windows for lighting the interior.

What are "other parts?"  Will designers, specifers, and code officials all have a uniform interpretation and application of this definition?  Is the text "for lighting the interior" necessary?  Does this mean that if the wall has a window but it is not for lighting the interior, then it is not a clerestory, and if not, then what is it?

### A4.4 Clarification - Second Example

> *Space Control. Each space enclosed by ceiling-height partitions shall have at least one control device to independently control the general lighting within the space. Each manual device shall be readily accessible and located so the occupants can see the controlled lighting.*
>
> a.   *A control device shall be installed that automatically turns lighting off within 30 minutes of all occupants leaving a space, except spaces with multi-scene control, in*
>
> > 1.   *classrooms (not including shop classrooms, laboratory classrooms, and preschool through 12th grade classrooms),*
> > 2.   *conference/meeting rooms, and*
> > 3.   *employee lunch and break rooms.*
>
> *These spaces are not required to be connected to other automatic lighting shutoff controls.*

Is it clear to what "these spaces" is referring?  Is it the three listed spaces or the spaces enclosed by ceiling height partitions?   Is the second sentence addressing manual devices confusing since the provision requires some spaces to have automatic controls and the opening sentence requires at least one control?  Where composing provisions for a standard, it can be helpful to map out the intent and flow of the provisions via a diagram, and then, where that diagram matches the intent of those writing the standard, craft language to describe the diagram that then becomes the text for the standard.  Such a logic statement might read as follows, which could then be transferred into text for the standard.

---

[1] ICC International Energy Conservation Code, 2012

- Each space with ceiling height partitions must have  at least one control to control only  the lighting in that space
- Where that control is readily accessible and located so those in the space using the control can see the lighting that is controlled
- Where that space is a classroom, conference/meeting room, or employee lunch or break room that does not have multi-scene controls, then the control device must automatically turn off the lighting within 30 minutes of all occupants leaving the space and those spaces need not be connected to any other automatic lighting shutoff controls

## A4.5 Clarification for Consistency

*Foundation vents shall not interfere with the insulation.*

While the intent may be generally understood, any 10 different individuals would likely visualize the application of this text differently and apply it differently.  Recognize there are vents for ventilation but there may also be vents to reduce pressures of flooding on walls, so it is to some degree impossible to even verify this in the field unless those conditions exist.  If the standard cannot clearly state what is required so most everyone can understand and apply the provisions uniformly, then evaluate the need for the provision.  Alternative criteria such as "floor insulation must be installed so it is at least X in. above the top of any foundation wall vent" might be considered in this instance.

## A4.6 Clarification to Ensure Uniform Interpretation and Application

***Insulation Protection.*** *Exterior insulation shall be covered with a protective material to prevent damage from sunlight, moisture, landscaping operations, equipment maintenance, and wind.*

For a given application, is it likely that there will be a uniform understanding of what constitutes a protective material and what UV, moisture, landscaping operations, and wind impacts must be addressed by that protective material?  Would landscaping operations be known and capable of being evaluated at the time that compliance with this provision is conducted?  Are they well enough known where performing an inspection of the exterior insulation? Without some additional specifics as to methods of protection and how protection performance is to be measured and expressed, the inclusion of this provision, while well intended, could easily be disregarded or cited as an example why the standard cannot be adopted by reference.

It is also relevant to simplicity and repeatability that standards, by definition, are intended to provide for consistency and comparability on the issues addressed in the standard.  As discussed in the above examples, if there are multiple paths to compliance in a standard and the paths are not equal, then the path of least resistance becomes the standard.  In developing a standard, it is important to establish clear minimum requirements even if multiple paths to compliance are desired.  If the standard establishes criteria beyond specific minimums, this can adversely affect the simplicity of the standard and its adoptability by reference.

## A5.  Consolidate Administration and Compliance Criteria

Consolidation of administration and compliance criteria is simply the placement of all the provisions of a standard related to administration, compliance documentation and verification, and other matters not specific to the technical requirements in the standard in one place as stated in Section 2.2.5.  This is important because the location of these provisions in one place in makes the standard easier for users to

13

implement, apply and document or verify compliance with the standard compared to them being separately located throughout the standard, thereby increasing the chances that the standard will be adopted by reference.

Section A5.1 provided examples of provisions currently in an ASHRAE standard that relate to administration of the document within a building regulatory context.  These appear throughout the standard at the point where they are considered relevant, but could be more appropriately included in a section on administration and compliance documentation and verification; an example of which is shown in Section A5.2. This helps those having to comply with the document and those enforcing the document to have a clearer understanding of how the document is to be administered and applied, and what is needed to document and verify compliance.  Unless there is a unique and significant reason to keep one or more administrative provisions in a position adjacent to the technical requirement to which they apply, all provisions, such as those below, should be placed in the section in the standard on administration and compliance verification. Note that no attempt has been made to revise the actual text in these provisions.

**A5.1. Criteria Located Throughout A Standard**

> ***Motor Nameplate Horsepower.*** *For each fan, the selected fan motor shall be no larger than the first available motor size greater than the bhp. The fan bhp must be indicated on the design documents to allow for compliance verification by the code official.*

It is interesting to note that this is the first place in this particular standard where there is a specific requirement on the plans. It is advantageous to the application and use of a standard to list all those specific data requirements in one place in the administrative section of the standard.

> ***Drawings.*** *Construction documents shall require that, within 90 days after the date of system acceptance, record drawings of the actual installation provided to the building owner or the designated representative of the building owner. Record drawings shall include, as a minimum, the location and performance data on each piece of equipment, general configuration of duct and pipe distribution system including sizes, and the terminal air or water design flow rates.*

> ***Additions to Existing Buildings.*** *Service water heating systems and equipment shall comply with the requirements of this section.*

>> ***Exception:*** *Where the service water heating to an addition is provided by existing service water heating systems and equipment, such systems and equipment shall not be required to comply with this standard. However, any new systems or equipment installed must comply with specific requirements applicable to those systems and equipment. (This type of provision—applicability of various parts of the standard to additions, renovations, etc., would seem to be fairly uniform throughout the standard. As such, it may be more appropriate to locate these provisions collectively in an administrative section and then make them more generic so they clearly state that anything new added to an existing building that replace something that pre-existed (e.g., a new piece of equipment or new controls) must meet the standard as applicable for new construction.)*

> ***Drawings.*** *Construction documents shall require that within 30 days after the date of system acceptance, record drawings of the actual installation shall be provided to the building owner, including*

14

*a. a single-line diagram of the building electrical distribution system; and*
*b. floor plans indicating location and area served for all distribution.*

**Manuals.** *Construction documents shall require that an operating manual and maintenance manual be provided to the building owner. The manuals shall include, at a minimum, the following: (include a list of what is required).*

**Trade-Offs Limited to Building Permit.** *Where the building permit being sought applies to less than the whole building, only the calculation parameters related to the systems to which the permit applies shall be allowed to vary. Parameters relating to unmodified existing conditions or to future building components shall be identical for both the energy cost budget and the design energy cost calculations. Future building components shall meet the prescriptive requirements of Sections x, y, or z.*

**Envelope Limitation.** *For new buildings or additions, the building Energy Cost Budget Method results shall not be submitted for building permit approval to the authority having jurisdiction prior to submittal for approval of the building envelope design.*

## A5.2 Combining and Organizing to Create a Focus on Compliance

The example below is from a draft ASHRAE standard showing how the provisions associated with administration and compliance can be combined. Again, no attempt has been made to revise or change the wording to address any mandatory language or other code-intended language issues.

### *4. ADMINISTRATION AND ENFORCEMENT*

**4.1 General.** *Building projects shall comply with Sections x through y.*

**4.2. Application to Buildings**

**4.2.1 New Buildings.** *New buildings shall comply with the provisions of Sections x through y as applicable.*

**4.2.2 Additions to Existing Buildings.** *Additions to existing buildings shall comply with the provisions of Sections x through y as applicable.*

**4.2.3 Alterations of Existing Buildings.** *Alterations of existing buildings shall comply with the provisions of Sections x through y as applicable to the scope of work associated with the alteration. Nothing in this standard shall require that any portion of an existing building not associated with the alteration be brought into compliance with this standard. Nothing in this standard shall require compliance with a provision of this standard if such compliance will result in the increase of energy or water consumption of the building or production of increased emissions or effluent of waste.*

> *Exception: Any building or portion thereof that has been specifically designated as historic.*

**4.2.4 Changes in Occupancy or Space Use.** *Spaces in a building that are converted to a different occupancy or use to an occupancy or use within the scope of this standard as covered in Section x*

15

*and such conversion involves construction and approval by the authority having jurisdiction, those spaces shall be brought into compliance with all the applicable requirements of this standard.*

### 4.3 Compliance

**4.3.1 Administrative Requirements.** *Administrative requirements relating to permit requirements, enforcement by the authority having jurisdiction, interpretations, claims of exemption, and rights of appeal shall be those specified by the authority having jurisdiction.*

**4.3.2 Technical Requirements.** *The information shown in Table X shall be provided on the plans and specifications.*

Note that a Table X would be included based on the content of and requirements in the standard.

**4.3.3 Alternative Materials, Methods of Construction or Design.** *The provisions of this standard are not intended to prevent the use of any material, method of construction, design, equipment or building system not specifically prescribed herein, provided they have been approved by the authority having jurisdiction as meeting the intent of this standard.*

**4.3.4 Validity.** *If any term, part, provision, section, paragraph subdivision, table, chart or referenced standard of this standard shall be held unconstitutional, invalid or ineffective, in whole or in part, such determination shall not be deemed to invalidate any remaining term, part, provision, section, paragraph, subdivision, table, chart or referenced standard of this standard.*

**4.3.5 Other Laws.** *The provisions of this standard shall not be deemed to nullify any provisions of local, state or federal law. Where there is a conflict between a requirement of this standard and such other law affecting design, construction or operation of the building, precedence shall be determined by the authority having jurisdiction.*

**4.3.6 Referenced Standards.** *The standards reference in this standard and listed in Section x shall be considered part of the requirements of this standard to the prescribed extent of such reference. Where differences occur between the provision of this standard and referenced standards, the provisions of this standard shall apply.*

**4.3.7 Normative Appendices.** *The normative appendices to this standard are considered to be integral parts of the mandatory requirements of this standard, which, for reasons of convenience, are placed apart from all other normative elements.*

**4.3.8 Informative Appendices.** *The informative appendices to and the informative notes located within this standard contain additional information and are not mandatory or part of this standard.*

16

# EXHIBIT 104



| | | | |
|---|---|---|---|
| HOME | CONTACT US | HELP | FAQ |

**SEARCH**

Access Standards

About ANSI

Membership

Standards Activities

Accreditation Services

Consumer Affairs

Government Affairs

**News and Publications**

Latest Headlines
Media Center
Editorial Guidelines
Media Access to ANSI Events
Publications
Documents of Interest
Published Articles
Library of Speeches & Presentations

Meetings and Events

Education and Training

Other Services

Library

Internet Resources

Career Opportunities

Contact Us

Help

📃 Print this article

❮ Previous   Next ❯

## Capitol Hill Event to Feature Policy and Business Leader Insights on Voluntary Standards and Conformance

*12/03/2015*

The American National Standards Institute (ANSI) has teamed with the National Association of Manufacturers (NAM) to co-host an exclusive Shopfloor Series event on Capitol Hill entitled "*What Do Airplanes, Robots, Toys, Flat Screen TVs Amusement Parks & 3D Printing Have in Common*?" The event —on **December 4, 2015, from 12:00-1:30 p.m. EST**—will feature discussions between policy and business leaders who will highlight the importance of government participation in and the reliance on voluntary standards and conformance.



The session will be held in the Rayburn House Office Building 2123 and will be co-sponsored by ASTM International and Underwriters Laboratories (UL) and the American Bar Association. Featured experts will include Jeff Weiss, senior advisor for standards and global regulatory policy at the U.S. Department of Commerce, as well as representatives from the Toy Industry Association (TIA), ANSI, ASTM International, the National Electrical Manufacturers Association (NEMA), and UL.

To view the event flyer click here. To learn more or to RSVP, contact Scott Cooper, ANSI vice president of government relations (scooper@ansi.org; 202.331.3610).



TAKE YOUR SEAT AT THE TABLE
MY ANSI

STANDARDS ARE OUR BUSINESS
ANSI

| About ANSI | Domestic Programs | Government Affairs | Join ANSI |
| --- | --- | --- | --- |
| ANSI Structure and Management | Public Review: Standards Action | IBR Portal | Standards Store |
| Organization Chart | International and Regional Programs | IBR Resources | Site Licenses |
| Staff Directory | Standards Portal | Consumer Affairs | Contact Us |
| Standards Boost Business | USNC/IEC Programs | News | Help |
| Online Document Library | ISO Programs | Media Center | FAQ |
| Career | Accreditation Programs | Meetings and Events | Terms and conditions |
| Registration Services | Standards Panels and Collaboratives | Awards | Use of the ANSI Logo |
| | | Education and Training | Linking Policy |
| | | Key Documents of Interest | Copyright |

© 2015 American National Standards Institute (ANSI)

# EXHIBIT 105

# AMERICAN BAR ASSOCIATION

## SECTION OF ADMINISTRATIVE LAW AND REGULATORY PRACTICE

## REPORT TO THE HOUSE OF DELEGATES

## <u>RESOLUTION</u>

1   RESOLVED, That the American Bar Association urges Congress to amend 5 U.S.C.
2   552(a)(1) of the Freedom of Information Act (FOIA) by supplementing the obligation of
3   all federal administrative agencies to publish their substantive rules of general
4   applicability in the Federal Register.  Specifically, Congress should require that when a
5   standard drafted by a private organization is exempted from Federal Register publication
6   because it has been "incorporated by reference" (IBR) into a substantive rule of general
7   applicability, the rulemaking agency must ensure meaningful free public availability of
8   the incorporated text, such as through online access in a centralized online location or
9   access in all government depository libraries.
10
11  FURTHER RESOLVED, That Congress should amend 5 U.S.C. 553, the Administrative
12  Procedure Act's rulemaking provisions, to require meaningful free public availability of a
13  proposed IBR standard's text during the public comment period.
14
15  FURTHER RESOLVED, That Congress should ensure that private organizations**,** where
16  appropriate, have access to compensation for financial losses attributable to making their
17  standards publicly available.

# REPORT

## I.   INTRODUCTION AND BACKGROUND

For over two centuries, the United States has maintained a constitutive tradition of meaningful free access to our binding laws: that all citizens should be able to see the law is bedrock.  Since the 1800s, Congress has provided free public access to federal statutes and, since the1930s, to federal regulations as well, through a network of state and territorial libraries, followed by the creation of the Federal Depository Library System.[1] Congress further deepened the tradition by requiring the Government Printing Office to make available universal online access to statutes and regulations[2] and then requiring online public access to other government documents and materials in the Electronic Freedom of Information of Act Amendments in 1996 and the e-Government Act of 2002.[3]

For numerous federal rules, however, public access is far from assured; these rules can be difficult to find and costly to read.  The Freedom of Information Act generally requires Federal Register publication for all agency "substantive rules of general applicability" and "statements of general policy or interpretations of general applicability."[4]  However, it allows, in the so-called "incorporation by reference" provision of 5 U.S.C. 552(a)(1), that "matter reasonably available to the class of persons affected thereby [may be] deemed published in the Federal Register when incorporated by reference therein with the approval of the Director of the Federal Register."[5]

To save resources and build on private expertise, federal agencies have, on numerous occasions, worked with private organizations, incorporating privately drafted standards by reference into thousands of federal regulations. The Office of the Federal Register (OFR) must approve all agency incorporations by reference, but the Freedom of Information Act provides no further specifics on what level of access might be understood to make a particular standard "reasonably available" and thus eligible for incorporation by reference. Meanwhile, OFR has declined to define "reasonably available" in its regulations, despite its statutory responsibility to approve agency

---

[1]      *See* H.R. Journal, 3d Cong., 2d Sess. 328-39 (1795) (describing Act of Mar. 3, 1795), Act of Dec. 23, 1817, res. 2, 3 Stat. 473; Act of Feb. 5, 1859, ch. 22, § 10, 11 Stat. 379, 381.

[2]      44 U.S.C. § 4102(b)(2006) (capping recoverable costs as "incremental costs of dissemination" and requiring no-charge online access in government depository libraries).  The GPO charges no fee whatsoever for online access.

[3]      Electronic Freedom of Information Act Amendments of 1996, Pub. L. No. 104-231, § 4(7), 110 Stat. 3048, 3049 (1996); E-Government Act of 2002, Pub. L. No. 107-347, §§ 206(a)-(d), 207(f), 116 Stat. 2899, 2915-16, 2918-19 (codified as amended at 44 U.S.C. § 3501 note (2006)).

[4]      5 U.S.C. 552(a)(1).

[5]      *Id.*

incorporations.[6]   *See* 1 C.F.R. 51.7(a).  Research also has revealed no public consideration by OFR of access charges to incorporated standards.[7]

The Code of the Federal Register (C.F.R.) presently contains nearly 9,500 agency incorporations by reference of standards.  These "IBR rules" have the same legal force as any other government rule. Some IBR rules incorporate material from other federal agencies or state entities, but thousands of these rules are privately drafted standards prepared by so-called "standards development organizations," or "SDOs."[8]  Standards development organizations range from the Society of Automotive Engineers to the American Petroleum Institute.   As the Office of the Federal Register has explained, "[t]he legal effect of incorporation by references is that the material is treated as if it were published in the *Federal Register* and CFR.  This material, like any other properly issued rule, has the force and effect of law. . . mak[ing] privately developed technical standards Federally enforceable."[9]

Federal agencies seek to use privately-drafted IBR standards on subjects ranging from toy safety,[10] crib, toddler bed, and stroller safety, safety standards for vehicle windshields (so they withstand fracture),[11] placement requirements for cranes on oil drilling platforms on the Outer Continental Shelf,[12] and food additive standards, [13] to

---

[6]      *See* Incorporation by Reference, 79 Fed. Reg. 66,267, 66,270 (Nov., 7, 2014) (final rule).  Beyond that, the OFR Director is to assess whether incorporation would "substantially reduce the volume of material published in the Federal Register," and whether the material is "usable," considering "the completeness and ease of handling of the publication; and . . . [w]hether it is bound, numbered, and organized."  1 C.F.R. 51.7(a).  In the digital age, these requirements now would seem to serve little purpose.

[7]      *E.g.* Consumer Product Safety Commission, *Children's Gasoline Burn Prevention Act* Regulation, 80 Fed. Reg. 16,961, 16,962-63 (Mar. 31, 2015) (OFR approval of incorporation by reference of ASTM F2517-15 despite lack of free access); www.astm.org (charging $43 for standard; unavailable in reading room).  As of November, 2014, an agency requesting approval of incorporation by reference must itself discuss how the materials are "reasonably available to interested parties." 1 C.F.R. 51.5(a)(1), but it is unclear whether the OFR will make any independent determination on that question or simply defer to the agency.

[8]      Emily J. Bremer, *Incorporation by Reference in an Open-Government Age,* 36 Harv. J. L. & Pub. Pol'y 131 (2013); Nina Mendelson, *Private Control over Access to the Law*: *The Perplexing Federal Regulatory Use of Private Standards*, 112 Mich. L. Rev. 737 (2014); Peter Strauss, *Private Standards Organizations and Public Law*, 22 Wm. & Mary Bill Rts. J. 497 (2013).

[9]      http://www.archives.gov/federal-register/cfr/ibr-locations.html#why.  In some instances, as discussed below, a regulated entity might be able to argue that the lack of public access undermines notice sufficiently to prevent federal enforcement.

[10]     E.g., 16 C.F.R. §§ 1505.5, 1505.6 (CPSC requirements for electrically operated toys, including toys with heating elements, intended for children's use, incorporating by reference National Fire Protection Association and ANSI standards)

[11]     49 C.F.R. § 571.2015.

[12]     30 C.F.R. 250.108 (incorporating by reference American Petroleum Institute Recommended Practice 2D).

[13]     *See* 21 C.F.R. § 172.831 (sucralose regulation, incorporating by reference the Food Chemical Codex, 4th edition).

operating storage requirements for propane tanks, aimed at limiting the tank's potential to leak or explode.[14]  Executive policy, embodied in Circular A-119, now encourages agencies to contribute funds to private standards drafting as well as informal agency staff participation in the SDO process.

Meanwhile, public access to such standards can be extremely difficult, as it is typically impeded by privately set access charges.  Unlike the U.S. Code and the rest of the C.F.R., there is no assured free access to IBR rules either online or in the nearly 1800 government depository libraries.  Under OFR's approach, these standards can be freely read by the public in the Washington, D.C. reading room of the Office of the Federal Register, but only by written request for an appointment.[15]  Apart from this, OFR refers the public to the SDO.  These IBR standards accordingly are strewn across many individually-maintained private websites.  SDOs also can set a fee for access, typically one that far exceeds the transactions costs, such as copying costs, of making a standard available.

Membership in an SDO usually affords discounted access to its standards, but such memberships are costly; for example, the American National Standards Institute charges $ 750 per year.  Otherwise, access to an individual standard can range from $40 to upwards of $1000.  The incorporated safety standard for seat belts on earthmoving equipment such as bulldozers is currently priced at $72;[16] the incorporated safety standard for hand-held infant carriers is $43,[17] and the current edition of the Food Chemical Codex, which the FDA has incorporated by reference into food additive standards, is priced at $ 499.[18]  As Professor Emily Bremer has reported, the average price for just one incorporated pipeline safety standard is $150, while a complete set of IBR standards implementing the Pipeline and Hazardous Materials Safety Act cost nearly $10,000 as of September 2014.[19] The cost of reading the two newly-incorporated-by-reference standards for the packaging and transportation of radioactive material, to avoid radiation leakage in transit, is $ 213.[20]

---

[14]     26 C.F.R. 1910.110(b)(3)(i) (incorporating by reference American Society for Mechanical Engineers' Boiler and Pressure Vessel Code (1968 edition)).

[15]     *See* Office of the Federal Register, "Where to Find Materials Incorporated by Reference at NARA Facilities," available at http://www.archives.gov/federal-register/cfr/ibr-locations.html#why. Rulemaking agencies also sometimes make the text of IBR rules available for inspection in their own reading rooms, again, typically located in Washington, D.C.

[16]     *See* 29 CFR 1926.602(a)(2)(i) (incorporating Society of Automotive Engineers Standard J386-1969); standards.sae.org/j386_196903/.  The price of $72 is for the current revision of Standard J386.  It is unclear whether the 1969 version can be accessed at all on SAE's website.

[17]     *See* 16 C.F.R. 1225.2 (incorporating by reference ASTM F 2050-13a); *www.astm.org*.  The standard is inexplicably absent from the online reading room ASTM maintains for government-incorporated standards.

[18]     *See* 21 C.F.R. 172.185(a) (test methods standard for TBHQ in the food additive); https://store.usp.org/OA_HTML/ibeCCtpItmDspRte.jsp?item=344067.

[19]     Emily Bremer, On the Cost of Private Standards in Public Law, 63 U. Kansas L. Rev. 279 (2015).

[20]     *See* Nuclear Regulatory Commission, Revisions to Transportation Safety Requirements and Harmonization with International Atomic Energy Agency Transportation Requirements, 80

The SDOs have no obligation to make standards available at any price, and some standards, particularly older ones, are now simply unavailable from the SDOs. On the other hand, SDOs occasionally charge more for an older version that an agency has incorporated by reference into binding law—a reflection of the newly conferred monopoly value--than for the SDO's current version of those same standards.[21]

As publicly-filed comments and other public sources indicate, the fees charged for IBR rules significantly obstruct citizens and entities from seeing the text of this law. Regulated entities needing access to incorporated standards are often small businesses for whom the mass of necessary standards may be a significant cost.[22]  For example, as the Modification and Replacement Parts Association commented in response to the petition for rulemaking, "The burden of paying high costs simply to know the requirements of regulations may have the effect of driving small businesses and competitors out of the market, or worse endanger the safety of the flying public by making adherence to regulations more difficult due to fees . . . ."[23]

And given the access fees charged, members of the public affected by regulatory frameworks relying upon IBR rules likely cannot afford to read these standards.  For

---

Fed. Reg. 33,988, 34,010-11 (June 12, 2015) (reciting charges for incorporated by reference standards).

[21]     For example, the American Herbal Products Association charges $250 for a digital-rights-protected copy of the first edition of its Herbs of Commerce, use of which is a legal obligation under FDA regulations; the more recent second edition, a "must-have" for anyone in the business but not yet made legally obligatory, can be bought as a book for $99.  Peter Strauss, *Private Standards Organizations and Public Law*, 22 Wm. & Mary Bill Rts. J. 497 (2013).

[22]     Public comments filed with the Office of Federal Register made this problem clear.  The National Propane Gas Association, an organization whose members are overwhelmingly (over 90%) small businesses, commented in response to OFR's notice of proposed rule that the costs of acquiring access "can be significant for small businesses in a highly regulated environment, such as the propane industry."   *See* Comments of Robert Helminiak, National Propane Gas Ass'n, OFR 2013-0001-0019 (Dec. 30, 2013), at 1; Comments of Jerry Call, American Foundry Society, NARA-12-0002-0147 (June 1, 2012), at 1-2 ("Obtaining IBR material can add several thousands of dollars of expenses per year to a small business, particularly manufacturers . . . [T]he ASTM foundry safety standard alone cross references 35 other consensus standards and that is just the tip of the iceberg on safety standards."); Comments of National Tank Truck Carriers, NARA-2012-0002-0145 (small businesses "have no option but to purchase the material at whatever price is set by the body which develops and copyrights the information. ... [W]e cite the need for many years for the tank truck industry to purchase a full publication from the Compressed Gas Association just to find out what the definition of a 'dent' was. ... HM241 could impact up to 41,366 parties and ... there is no limit on how much the bodies could charge ... "); Comments of American Foundry Society, NARA-2012-0002-0147 ("$ 75 is not much for a standard, but a typical small manufacturer, including a foundry, may be subject to as many as 1000 standards.  The ASTM foundry safety standard alone cross-references 35 other consensus standards and that is just the tip of the iceberg ...").

[23]     *See* Comment of the Modification & Replacement Parts Ass'n 14 (Regulations.Gov, filed June 1, 2012), *available at* http://www.regulations.gov/contentStreamer?objectId=09000064810266b8&disposition=attachment&contentType=pdf

example, a staff attorney at Vermont Legal Aid filed a public comment indicating that the costs of accessing IBR rules interfered with the ability of Medicare recipients to know their rights.[24]

In a positive development, some of the many SDOs have begun to create online reading rooms in which IBR rules can be freely viewed. But standards are still very hard to locate, not consistently available, and readers must identify themselves, waive a variety of rights, and even agree to broad indemnification and forum selection clauses in order to see the text of the rules.  And SDOs uniformly reserve the right to revoke the access at will.

Agency use of IBR rules raises two particularly pressing issues. The first is the lack of consistent and meaningful public access to the text of these binding federal rules. While IBR rules are not formally secret, the financial obstacles that must be overcome to read the text undermine any notion of meaningful public availability.  Second, the lack of access to proposed IBR rules, as well as supporting data, undermines the public's right to comment on proposed agency rules under the Administrative Procedure Act.

The present resolution would put the ABA on record in support of the principle of meaningful public access to law, as well as public participation in federal regulation. The ABA should speak now for two reasons: First, as described below, the Office of the Federal Register has recently declined an opportunity to use its Freedom of Information Act implementation powers to effectuate these principles.  Second, agency use of privately-drafted rules is likely to increase, given continuing agency resource constraints, as well as executive and congressional policy favoring agency use of privately drafted rules in preference to "government-unique" rules.[25]  Unfortunately, neither policy has directly engaged the resulting public access problems.  Only Congressional action will remedy this unsatisfactory situation. A clear and strong statement by the ABA on the topic should help prompt such action.

---

[24]     *E.g.,* Comments of Jacob Speidel, Senior Citizens Law Project, Vermont Legal Aid, OFR-2013-0001-0037 (Jan. 31, 2014), at 1 (price precludes "many Vermont seniors" from accessing materials). *See also* Comments of Robert Weissman, Public Citizen, OFR 2013-0001-0031 (Jan. 31, 2014), at 1 (reporting on behalf of multiple nonprofit, public interest organizations that "free access . . . will strengthen the capacity of organizations like ours to engage in rulemaking processes, analyze issues, and work for solutions to public policy challenges . . .and strengthen citizen participation in our democracy"); Comments of George Slover and Rachel Weintraub, Consumers Union and Consumers Federation of America, OFR 2013-0001-0034 (Jan. 31, 2014) (noting importance of transparent standards to identify products that are not in compliance with applicable standards so as to notify the agency and alert consumers).

[25]     *See* National Technology Transfer and Advancement Act of 1995, sec. 12(d), 15 U.S.C. 272 note (2012); Office of Mgmt & Budget, Circular A-119 Revised; Federal Participation in the Development and Use of Voluntary Consensus Standards and in Conformity Assessment Activities para. 1 (1998), available at http://whitehouse.gov/omb/circulars_a119.

## II. DISCUSSION

### A.    The Bedrock Principle of Public Access to the Law Should Be Reaffirmed in the IBR Rules Setting

IBR rules are not formally "secret"—access is not prohibited outright.  Self-evidently, however, the cost of reading it, together with the difficulty of finding it, render these standards inaccessible to the public.  At root, there must be meaningful free access to all incorporated rules, if the evils of "secret law" that the Freedom of Information Act was established to resist are to be avoided.  In the words of Columbia Law Professor Peter Strauss, joined by numerous other professors:  "[I]n the age of information, secret law, that the public must pay for to know, is unacceptable."[26]   The ABA accordingly should resolve that the Freedom of Information Act be clarified to ensure meaningful levels of free public access to all binding law.

### 1.    As the authors and owners of the law, the public has a right to know it

First, free public access to the law is essential in a democratic society. As the 5th Circuit explained in *Veeck v. Southern Bldg. Code Cong. Int'l*, free public access to the law serves "the very important and practical policy that citizens must have free access to the laws which govern them" if they are to be able to conform their conduct to them.[27] *Veeck* relied principally on the Supreme Court's holding in *Banks v. Manchester* that "[i]t is against sound public policy to prevent [free access to judicial opinions], or to suppress and keep from the earliest knowledge of the public the statutes."[28] As explained in *Veeck*, these justifications are not simply "due process" arguments.  Rather, they rest on the idea that "public ownership of the law means precisely that 'the law' is in the 'public domain' for whatever use the citizens choose to make of it."[29]

This "right to know" accrues to *all* citizens, not just those who must conform their conduct to the law.  Broad public access to IBR material, is as important as access by directly regulated entities.  "Th[e] 'metaphorical concept of citizen authorship'" requires free public access to the law as a foundation to a legitimate democratic society.  "The citizens are the authors of the law, and therefore its owners, regardless of who actually drafts the provisions, because the law derives its authority from the consent of the public, expressed through the democratic process."[30] Thus, even those who need not conform their conduct to regulatory requirements have a right to know.  As public comments filed

---

[26]     Incorporation by Reference, 77 Fed. Reg. 11,414, 11,415 (Feb. 27, 2012) (posting of law professors' petition to revise IBR rules; seeking comment on same).

[27]     293 F.3d 791, 795-800 (5th Cir. 2002) (en banc).

[28]     *See* 128 U.S. 244, 253 (1888) (quoting *Nash v. Lathrop*, 142 Mass. 29, 6 N.E. 559 (1886)).

[29]     293 F.3d at 799.

[30]     *Veeck,* 293 F.3d at 799 (quoting *Building Officials & Code Adm. v. Code Technology*, 628 F.2d 730, 734 (1st Cir. 1980)).

to the Office of the Federal Register and the Office of Management and Budget make clear, the public has an interest in reading IBR material.[31]

Ready access to standards that have been incorporated by reference is necessary for citizens to know what their government is doing and to hold the government accountable for serving – or not serving – the public interest.   As President Obama stated in his Memorandum on Transparency and Open Government, on January 21, 2009: "Transparency promotes accountability and provides information for citizens about what their Government is doing."  This transparency, including public access to the content of regulations, is a critical safeguard against agency capture and other governance problems. Transparency regarding the content of IBR standards is particularly important when that material has been prepared, in the first instance, by private organizations rather than governmental agencies – as when, for example, natural gas pipeline safety rules and offshore oil drilling rules incorporate standards drafted by the American Petroleum Institute, and even when motor vehicle safety standards incorporate standards drafted by the Society of Automotive Engineers.  We note that regulatory standards created by industry associations such as the API, compared with professionally focused organizations such as ASME, the American Society of Mechanical Engineers, may raise particular concerns warranting public awareness.  Still, this is not to criticize any particular standard or organization, but to emphasize that transparency and ready access are critical to ensuring that the government makes proper use of *all* incorporated material and that adopted standards do, in fact, protect the public interest as required by statute. And as the 5th Circuit pointed out in *Veeck*, citizens need access to the law not only to guide their actions and to hold the government accountable, but "to influence future legislation" and to educate others.[32]

## 2.   Limits on public access raise constitutional difficulties

The current system may raise constitutional difficulties by allowing agencies to reference incorporated material, when the public must pay to see that material.  (Travel to a Washington, D.C., reading room will not, for most, be a viable alternative.) First, impediments to a regulated entity's ability to access government standards raises due process concerns.  As noted, small businesses have complained that the access fees charged to read the text of the law can be a significant obstacle to their ability to learn their legal obligations. In the context of whether to sustain a changed agency interpretation of a rule, the Supreme Court has endorsed "the principle that agencies

---

[31]      See supra note 24 (Vermont Legal Services comment); NARA-12-0002-0140 (Consumers Union, emphasizing the need for free access to standards to notify the CPSC and warn consumers regarding unsafe products);OMB-2012-0003-0074 (public interest organizations, including environmental, watchdog, and library organizations, emphasizing need for free access to engage government and public on range of public policy issues); NARA-12-0002 ("A concerned Citizen," noting that knowledge of airbag standards allows citizen to be "a more educated consumer").  Public comments on access issues were filed in an Office of the Federal Register rulemaking on whether to revise its criteria for revising IBR rules; comments also were filed in a 2012 Office of Management Budget proceeding on whether to revise Circular A-119. As of October 2015, Circular A-119 remains unrevised.

[32]      293 F.3d at 799.

should provide regulated parties 'fair warning of the conduct [a regulation] prohibits or requires,'" and that due process thus bars the imposition of sanctions upon someone who could not have received notice of his or her obligations.[33]

The current use by agencies of incorporated private material without meaningful public access is constitutionally suspect for a second reason as well. The public cannot discuss or criticize the government's decisions if the substance of those decisions is not available. As the Supreme Court noted in refusing to uphold a statute that would close criminal trials, "'a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs.' [This] serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government.'"[34] The potential significant charges to read IBR standards raises heightened constitutional concerns, because the thousands of IBR standards are wide-ranging in subject, affecting numerous industries, and quasi-legislative in character, with broad and prospective effect. An assurance of free access only in a Washington, D.C. reading room is insufficient. The obstacles to access that must be overcome -- the charges and travel impediments -- effectively deny the public's right to know and discuss government actions. Legislative history accompanying the Freedom of Information Act draws the same link: "'The right to speak and the right to print, without the right to know, are pretty empty.'" *See* H. Rept. No. 1497, 89th Cong., 2d Session 2 (1966) (quoting Dr. Harold Cross). Significant access charges for regulatory standards are a real obstacle to knowing their content, and indeed, the Supreme Court has invalidated much smaller charges as inconsistent with similar core principles of democratic government, such as the right to vote.[35]

---

[33]    *Christopher v. SmithKline Beecham*, 132 S. Ct. 2156, 2167-68 (2012) (alteration in original) (quoting *Gates & Fox Co. v. Occupational Safety & Health Review Comm'n*, 790 F.2d 154, 156 (D.C. Cir. 1986)(Scalia, J).

[34]    *Globe Newspaper Co. v. Superior Court for Norfolk County*, 457 U.S. 596, 604 (US 1982) (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)); see also *Press Enterprise v. Superior Court*, 478 U.S. 1 (1986) (refusing to approve closure of preliminary hearing). *Cf. In re Gitto Global Corp.*, 422 F.3d 1 (1st Cir. 2005) ("Only the most compelling reasons can justify non-disclosure of judicial records."); *Leigh v. Salazar,* 677 F.3d 892, 900 (9th Cir. 2012) ("[A] court cannot rubber-stamp an access restriction simply because the government says it is necessary. By reporting about the government, the media are 'surrogates for the public.'") (requiring consideration of public right of access to view Bureau of Land Management horse roundups).

[35]    *Cf. Harper v. Virginia Bd. Of Elections*, 383 U.S. 663, 666-68 (1966) (invalidating state $1.50 poll tax as effective denial of right to vote). OFR's approval of IBR rules under this system of private fees may also raise equal protection concerns, given the central importance, in a democracy, of public access to the law's text. In other settings, the courts have relied on equal protection grounds to invalidate comparable fees imposed upon participation in government. *Harper v. Virginia Bd. Of Elections*, *supra*; *Lubin v. Panish*, 415 U.S. 710, 717–18 (1974) (striking down $701 filing fee requirement for California election, given "our tradition . . . of hospitality toward all candidates without regard to their economic status."). For many rules, moreover, budget constraints may be connected with substantive interests; access constraints will distinctively, systematically disadvantage those interests. For example, consumers will likely

### 3.  IBR rules must be broadly available; assuring meaningful free access only to regulated entities is insufficient

The need for public notice of the contents of federal regulations goes well beyond the regulated entities tasked with complying with them.  Congress enacts regulatory statutes specifically to guard wide swaths of the public, and the public accordingly has a specific interest in the content of rules.  Consumers of food and toys, parents who wish to purchase infant carriers, strollers, walkers, or infant bath seats, those who rely on ocean fishing for their livelihood, or neighbors of a pipeline or propane tank – all of these individuals are obviously affected by these standards, and should be entitled to notice of them.  For one last example, the Department of Transportation Pipeline and Hazardous Materials Safety Administration requires natural gas pipeline operators to institute "public awareness programs" to provide public information and public communications regarding spills according to an IBR standard of the American Petroleum Institute.  49 C.F.R. § 192.616 (incorporating API Standard 1162).  Community members who reside near natural gas pipelines at risk from a spill are obviously affected by the scope of public communication requirements.  Standards such as these must be meaningfully available both to pipeline operators and to the community. The content of these standards can affect individual choices of which toys or infant carriers to buy, where to live, and whether to file public comments with the regulating agency or write one's member of Congress.  In short, regulatory beneficiaries have a cognizable stake in these standards, and the content of the standards can affect their conduct.  They therefore need notice of the text as well; meaningful public access without cost has to be understood as essential.

### 4.      The public must be able to locate the law.

Public access principles require not only the provision of meaningful free access to the text of the law, but that the law be reasonably easy to locate. IBR rules are referenced in the Code of Federal Regulations, but the text of the rules is often very hard to find.  IBR rules are distributed across a wide variety of differently-organized websites, and neither the online CFR nor Federal Register typically contains any sort of specific link to the IBR rule's text. The current distribution of IBR rules in numerous locations makes each obscure, raising the same sorts of concerns that prompted the passage of the Federal Register Act.[36]  Further, although agencies are required to "summarize" in the preamble to a final rule "the material it incorporates by reference,"[37] that summary does not include the full text, and in any event, preambles are published neither in the Code of Federal Regulations nor on agency websites containing regulations. The ABA

---

have smaller budgets than manufacturers; neighbors to a pipeline will likely have smaller budgets than the pipeline operator.

[36]      Erwin Griswold, *Government in Ignorance of the Law—A Plea for Better Publication of Executive Legislation*, 48 Harv. L. Rev. 198, 204, 205, 294 (1934) (distribution of federal rules among "pamphlets" or upon a "single sheet of paper" amounted to "chaos" and an "intolerable" situation).  *See* Federal Register Act of 1935, 74 Pub. L.  220, 49 Stat. 500-503 (H.R. 6323) July 26, 1935.

[37]      1 CFR 51.5(a)(2); 1 CFR 51.5(b)(3) (2015).

accordingly should resolve not only that meaningful levels of free access be provided to IBR rules, but that such access enable the public to readily find the text of those rules.

### 5.     Current law as implemented has failed to ensure sufficient public access to the law

One might think that these interests would already be protected under the Freedom of Information Act's Section 552, which requires, as a condition of Office of Federal Register approval of incorporation by reference, that incorporated material be "reasonably available" to the "class of persons affected thereby."  5 U.S.C. 552(a)(1). Indeed, the legislative history accompanying 5 U.S.C. § 552's incorporation by reference provisions made clear its concern with widespread public access, not simply that the IBR material would not be formally secret:  "*Any member of the public* must be able to familiarize himself with the enumerated items . . . by the use of the Federal Register, or the statutory standards mentioned above will not have been met."  S. Rep. No. 1219, 88th Cong., 2d Sess. 5 (1964) (emphasis added).

Arguments could be made that the Freedom of Information Act's "reasonably available" language, particularly in this age of information, already requires meaningful levels of free access to all incorporated standards not only to regulated entities, but to regulatory beneficiaries and the public at large.  Implementation, however, has fallen far short of this understanding.  In November 2013, the Office of the Federal Register began a rulemaking on its "incorporation by reference" approval procedures in response to a 2012 rulemaking petition led by Columbia Law School Professor Peter L. Strauss and joined by numerous law professors.  The petition had asked OFR to approve IBR rules only if free read-only access to the text were provided to the public.[38]  Despite embarking on a rulemaking, OFR ultimately declined to significantly revise its approach.[39]  The Office of Federal Register has continued to approve the incorporation by reference of standards that remain difficult to locate and expensive to read.

Accordingly, Congressional action to clarify the requirements of the Freedom of Information Act and the Administrative Procedure Act is now critical.

### 6.     Other concerns do not justify sacrificing the bedrock principle of ensuring meaningful public access to the law

SDOs typically favor and sometimes even seek having their privately drafted standards adopted as the law of the land, and agencies undoubtedly find it useful to draw upon this stock of standards. But SDOs also have raised concerns that agreeing to

---

[38]     *See* Office of the Federal Register, Incorporation by Reference (Partial Grant of Petition, Notice of Proposed Rulemaking), 78 Fed. Reg. 60,784 (Oct. 2, 2013).

[39]     Rather than requiring any greater public access to the text of incorporated standards, OFR essentially reaffirmed the status quo, adding only a requirement that the rulemaking agency seeking approval of an incorporation by reference explain "the ways that the materials it incorporates by reference are reasonably available to interested parties" and "summarize" the incorporated material. *See* 1 C.F.R. 51.5(b)(2), (3).

meaningful free public access will result in undercompensation for the cost of preparing these standards even if SDOs can still sell books of standards to the public.

These standards surely can be valuable, and SDOs consistently claim a copyright in them.   The ABA need not resolve that the considerations that mandate meaningful public availability of incorporated standards necessarily require invalidation of the SDOs' copyrights in those standards.  The doctrine governing whether copyright persists in text that is first developed by private-sector entities and subsequently adopted into law is complex and fact-specific, and accordingly is beyond the scope of the Resolution.[40] Moreover, legislation to implement this resolution could also address the issue, such as by clarifying the continuing validity of copyrights in IBR materials made publicly available as recommended here or by addressing compensation an agency could offer an SDO for the use of its privately drafted standards.[41] Some SDOs affirmatively seek incorporation by reference of their standards; others receive financial contributions from agencies specifically to finish a particular standard that the agency can then incorporate; some may benefit because there is a larger market for either their current or superseded standards.  Meanwhile some SDOs may object to incorporation of all or nearly all of a standard, particularly if incorporation significantly reduces their ability to sell standards.  However, the potential need in some cases to compensate the drafters of privately drafted standards should not defeat the obligation of government agencies to make legally binding regulations available to the public.

Providing some level of meaningful free public access to these standards, such as through online access or in government depository libraries, does seem unlikely to impair the future development of these standards or the ability of agencies to incorporate them.  As noted, some SDOs have recently set up free online reading rooms for their standards that have been incorporated by reference.  These actions blunt any concern that the supply of voluntary consensus standards on which agencies can draw will be significantly impacted if some level of free public access to the text is required.  In addition, there may be other solutions to this concern, whether through agency negotiation with SDOs or

---

[40]     *See Veeck v. Southern Building Code Cong. Int'l, Inc*., 293 F.3d 791 (5th Cir. en banc 2002), c*ert. denied,* 537 U.S. 1043 (2002); *Practice Management Info. Corp. v. American Medical Ass'n*, 121 F.3d 516 (9th Cir. 1997), *cert. denied,* 522 U.S. 933 (1997); *CCC Information Svc v. MacLean Hunter Market Reports, Inc.*, 44 F.3d 61 (2d Cir. 1994), *cert. denied*, 516 U.S. 817 (1995).

[41]      Though the law in this area is far from clear, an agency that republishes the text of a copyright-protected standard, over the drafting organization's objection and with harm to the standard's commercial value, could, under some circumstances, lose a "fair use" claim and instead face copyright infringement liability or even liability for taking property without just compensation.  28 U.S.C. 1498(b) (2006); *see generally* Office of Legal Counsel, U.S. Department of Justice, *Whether and Under What Circumstances Government Reproduction of Copyrighted Materials is a Noninfringing "Fair Use" Under Section 107 of the Copyright Act of 1976*, 1999 WL 3390240 (1999), at * 3-4 ("The case law provides very little guidance, [but] there is no basis for concluding that the photocopying . . . by the federal government automatically . . . constitutes a fair use."); *id.* at *11 (concluding that although government photocopying can be "nonfringing," there is no 'per se' rule protecting government reproduction of copyrighted material).

payments to them.  Agencies already can and do contribute funds to the SDO standards development process, and executive policy encourages agency staff participation in the SDO process.[42]  On the other hand, it is abundantly clear that requiring individuals to pay a significant fee, or to travel to Washington, D.C., to see the text of the binding law, substantially burdens public access.

The Resolution does not suggest any specific resolution of these concerns.  Instead, the ABA should simply resolve that Congress enact legislation that at its core bars the outcome that requires a reader to pay significant fees in order to read the binding law of the land.

**B.     To effectuate the statutory right to participate in rulemaking, the Administrative Procedure Act should be clarified to ensure that the public receives meaningful access to the substance of a proposed IBR rule.**

As well-established elements of the rulemaking process require, an agency's notice of proposed rule must be published in the Federal Register with the detail needed to facilitate a meaningful opportunity to comment.[43]  These procedural requirements, which are fundamental to ensuring the continued validity and legitimacy of agency rulemaking, require that "interested persons" must be able to participate in rulemaking by submitting "data, views, or arguments" -- public comments--to the agency.[44]  An "interested person" cannot meaningfully exercise his or her right to comment without access to the substance of the standard on which comment is to be filed.[45]  Requiring an "interested person" to pay a fee to learn the content of a proposed rule is a significant obstacle impeding that person's right to comment under Section 553(c).

---

[42]      Office of Mgmt. & Budget, Circular No. A-119 Revised: Federal Participation in the Development and Use of Voluntary Consensus Standards and in Conformity Assessment Activities para. 1 (1998), available at http://www.whitehouse.gov/omb/circulars_a119.
        Both the NTTAA and OMB Circular A-119 affirmatively encourage agency staff participation in the SDO processes that develop standards, *see* Pub. L. 104-113, sec. 12(d)(2) (Mar. 7, 1996), and Circular A-119 also contemplates financial contributions ot the SDO process. While this may be sensible, in the absence of public access to SDO materials, it can have two problematic consequences.  First, it leaves understanding of supporting science and rationales in private hands, thus evading the APA's public notice-and-comment rulemaking process not only by concealing what is being proposed, but also by hiding the support for it.  Second, it creates the appearance, and potentially the reality, of agency staff promoting a regulatory agenda in an effectively ex parte context.
[43]      5 U.S.C. 553(b)(3); *Long Island Care at Home v. Coke* 551 U.S. 158, 174 (2007) ("The object [of 553(b)], in short, is one of fair notice.").
[44]      5 U.S.C. 553(c).
[45]      Cf. Portland Cement v. Ruckelshaus, 486 F.2d 375 (D.C. Cir. 1973), cert. denied, 417 U.S. 921 (1974); United States v. Nova Scotia Food Products Corp., 568 F.2d 240 (2d Cir. 1977) (requiring agencies to disclose data to effectuate meaningful right to public comment).

### III. CONCLUSION

In short, the ABA should resolve—simply—three propositions.  First, the ABA should resolve that the Freedom of Information Act be clarified to require meaningful levels of free public access to the text of all binding law. That meaningful free public access could be provided online, for example, or in depository libraries.  To ensure that the public can readily locate IBR standards, the access ought to be in a centralized location.  If not the government depository library system or live online links in the Code of Federal Regulations, IBR standards at least should be available through links in a single federally-maintained website.  To the extent any disruption would be triggered by this Resolution—perhaps an agency might have to negotiate some level of public access as a condition of incorporating a particular standard by reference—the impact is worth bearing in order to bring FOIA's standard of "reasonabl[e] availabil[ity]" into the Information Age and to effectuate the bedrock principle that the law, in a democracy, must be meaningfully available to the public.

And second, no standard should become part of binding federal regulatory law without the public being assured of the full opportunity to participate normally afforded by section 553 of the Administrative Procedure Act.  Therefore, the ABA should resolve that section 553 be clarified to require meaningful free public availability, during the public comment period, of a proposed IBR standard's text.[46]

Finally, the ABA should resolve that, in order to effectuate these critical principles, Congress should ensure that private organizations will, where appropriate, have access to compensation for financial losses attributable to making their standards publicly available.

Respectfully submitted,

Jeff Rosen, Chair
Section of Administrative Law and Regulatory Practice

---

[46]     Although 5 U.S.C. 553(b)(3) formally authorizes an agency merely to give notice of a "description of subjects and issues involved," as a practical matter agency notices of proposed rule generally contain text the agency is proposing to promulgate.  (Advance notices of proposed rulemaking are more frequently phrased in general terms.)  The ABA accordingly should resolve that the text of proposed IBR rules also be made publicly available to make meaningful the right to comment.

## **GENERAL INFORMATION FORM**

Submitting Entity: Section of Administrative Law and Regulatory Practice

Submitted By: Jeff Rosen, Section Chair

1.   Summary of Resolution(s).

   To effectuate the bedrock principle of public access to the law, the resolution urges Congress to strengthen the Freedom of Information Act and Administrative Procedure Act to ensure meaningful free public access to all federal rules.

2.   Approval by Submitting Entity.

   The Council of the Section of Administrative Law and Regulatory Practice voted to approve the resolution on November 10, 2015.

3.   Has this or a similar resolution been submitted to the House or Board previously?

   No.

4.   What existing Association policies are relevant to this Resolution and how would they be affected by its adoption?

   None are directly relevant.

5.   If this is a late report, what urgency exists which requires action at this meeting of the House?

   N/A

6.   Status of Legislation.  (If applicable)

   N/A

7.   Brief explanation regarding plans for implementation of the policy, if adopted by the House of Delegates.

   Policy could be implemented by legislative action.

8.   Cost to the Association.  (Both direct and indirect costs)
   None.

9.  Disclosure of Interest.  (If applicable)
        N/A


10.  Referrals.

    Business Law Section
    Civil Rights and Social Justice Section
    Government and Public Sectors Lawyers Division
    Intellectual Property Law Section
    Science & Technology Law Section

11.  Contact Name and Address Information. (Prior to the meeting.  Please include name, address, telephone number and e-mail address)

    Professor Nina A. Mendelson
    University of Michigan Law School
    625 S. State St.
    Ann Arbor, MI 48109
    (734) 936-5071 (o)
    nmendel@umich.edu


12.  Contact Name and Address Information. (Who will present the report to the House? Please include name, address, telephone number, cell phone number and e-mail address.)

    H. Russell Frisby, Jr.
    Stinson Leonard Street
    1775 Pennsylvania Ave., NW
    Suite 800
    Washington, D.C. 20006
    (202) 572-9937
    (202) 255-4320
    russell.frisby@stinson.com

    Professor Ronald M. Levin
    Washington University School of Law
    Campus Box 1120
    St. Louis, MO 63130
    (314) 936-6490
    (314) 882-3039 (cell)
    levin@wulaw.wustl.edu

# EXECUTIVE SUMMARY

1.      Summary of the Resolution

To effectuate the bedrock principle of meaningful public access to the law, the resolution urges Congress to strengthen public availability to the text of all federal regulations both when agencies propose them and after promulgation as final rules.

2.      Summary of the Issue that the Resolution Addresses

Federal agencies currently "incorporate by reference" thousands of outside standards into binding federal regulations.  Free public access to the text is reliably provided only in the Office of the Federal Register's reading room in Washington, D.C. Otherwise a reader may be required to pay substantial access fees set by drafting organizations, significantly obstructing public access, particularly by individuals and small businesses.  The right to comment on an agency's proposed "incorporation by reference" of such standards into federal regulations is also impeded by the lack of public access to the text.

3.      Please Explain How the Proposed Policy Position will address the issue

The resolution urges Congress to amend the Freedom of Information Act to ensure meaningful levels of free public availability to all federal regulations, including text that is "incorporated by reference." Such public access could be afforded through centralized online access, for example, or in government depository libraries.  The resolution also urges Congress to amend the Administrative Procedure Act's rulemaking provisions to require meaningful free public availability of such text during the public comment period.

As a safeguard against the (probably remote) possibility that the prospect of free public access might induce a drafting organization to decline to make its standard available for incorporation, the resolution also recommends that Congress should ensure that such organizations have access to compensation where appropriate.

4.      Summary of Minority Views

None identified.

# EXHIBIT 106



**ASTM INTERNATIONAL**
Helping our world work better

# Public Policy & Corporate Outreach

Virtual Officers' Training Week
September 2015

Presenter: Sarah Shoemaker

# ASTM International

**About ASTM International**

– Non-governmental, not-for-profit organization

– Develops voluntary, consensus standards

– Provides certification programs

– Does not provide accreditation services

**ASTM's objectives**

– Promote public health and safety, and the overall quality of life

– Contribute to the reliability of materials, products, systems and services

– Facilitate national, regional, and international commerce



**Virtual Officers' Training Week**
September 21-24, 2015



# Role of Standards

**Standards in the Public and Private Sector**

– Impact global trade, innovation and competition

– Guide product design, development, market access

– Used by companies, research labs, government agencies

**ASTM International Standards**

– Voluntary consensus standards

– Regularly reviewed

– Meet World Trade Organization (WTO) principles for international standards



**Virtual Officers' Training Week**
September 21-24, 2015



3



ASTM INTERNATIONAL
Helping our world work better

# Public Policy



# ASTM in Washington, DC

**Government Affairs**

– Congress

– Federal government agencies

**Stakeholder Outreach**

– Companies

– Embassy officials based in Washington

– Industry associations

– International Non Governmental Organizations (NGOs)


ASTM INTERNATIONAL
Helping our world work better

**Virtual Officers' Training Week**
September 21-24, 2015



5

# U.S. Standards System

**Voluntary and led by the private sector**

**Requires cooperation among stakeholders**

– Standards organizations

– Industry, consumers, and users

– Government representatives

– Academia

**Meets stakeholders' needs**

– Protect safety, health, and environment

– Improve industry competitiveness

– Facilitate global trade and market access




ASTM INTERNATIONAL
Helping our world work better

**Virtual Officers' Training Week**
September 21-24, 2015

6

# Support and Mandate for Government Participation

**P.L. 104-113 National Technology Transfer and Advancement Act of 1995 (NTTAA)**

– "…*all Federal agencies and departments shall use technical standards that are developed or adopted by voluntary consensus standards bodies, ….and shall, …participate with such bodies in the development of technical standards.*"





**Virtual Officers' Training Week**
September 21-24, 2015

7

# U.S. Legal and Policy Framework

**National Technology Transfer and Advancement Act of 1995 (NTTAA)**

– Requires federal government agencies to use standards developed by voluntary consensus standards organization when possible

– Encourages federal government agencies to participate in standards development organizations

**OMB Circular No. A-119**

– Reinforces goals of National Technology Transfer and Advancement Act

– Discourages federal agencies from using government-unique standards



**Virtual Officers' Training Week**
September 21-24, 2015



# U.S. Government Use of
# Voluntary Consensus Standards

**Procurement and Contracts with the Federal Government**

– Standards are furnished to ensure that materials and services are obtained in an effective manner and in compliance with the provisions of applicable Federal statutes and executive orders

**Regulation that incorporates standard by reference**

– An agency may adopt a voluntary standard (without changes) by incorporating the standard in a regulation by listing (or referencing) the standard by title.

– This approach eliminates the cost to the agency of creating a new standard

**Regulation based on existing standard**

– An agency reviews an existing standard and makes changes to match its goal or need.

– Agency conducts rulemaking process to solicit public opinion and stakeholder input



ASTM INTERNATIONAL
Helping our world work better

**Virtual Officers' Training Week**
September 21-24, 2015



# Federal Agencies & ASTM Standards

## U.S. Code of Federal Regulations (CFR)

– 6,500 voluntary consensus standards
  incorporated by reference in federal law

– About 3,000 ASTM standards listed in CFR for
  regulations and procurement

## U.S. Federal Register

– Public notification of standards adoptions

– Instructions for public comments







# Top 10 Regulatory SDOs in US

| Standards Developing Organization | Acronym | Number |
|---|---|---|
| American Society for Testing and Materials | ASTM | 2566 |
| U.S. Environmental Protection Agency | EPA | 1471 |
| American Public Health Association | APHA | 816 |
| American Society of Mechanical Engineers | ASME | 768 |
| American National Standards Institute | ANSI | 677 |
| National Fire Protection Association | NFPA | 589 |
| International Maritime Organization | IMO | 579 |
| Society of Automotive Engineers | SAE | 437 |
| Reprographic Technologies | | 351 |
| National Highway Traffic Safety Administration, U.S. Department of Transportation | DOT/NHTSA | 344 |



ASTM INTERNATIONAL
Helping our world work better

**Virtual Officers' Training Week**
September 21-24, 2015



# Congress & ASTM Standards in Law

## One Hundred Tenth Congress
## of the
## United States of America

### AT THE SECOND SESSION

*Begun and held at the City of Washington on Thursday,*
*the third day of January, two thousand and eight*

## An Act

To establish consumer product safety standards and other safety requirements
for children's products and to reauthorize and modernize the Consumer Product
Safety Commission.

*Be it enacted by the Senate and House of Representatives of*
*the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

(a) SHORT TITLE.—This Act may be cited as the "Consumer
Product Safety Improvement Act of 2008".

(b) TABLE OF CONTENTS.—The table of contents for this Act
is as follows:



ASTM INTERNATIONAL
Helping our world work better

**Virtual Officers' Training Week**
September 21-24, 2015

12

# Product Safety through Laws and Regulations

## Statutes and Law

– Consumer Product Safety Act (CPSA)

– Consumer Product Safety Improvement Act (CPSIA)

– Virginia Graeme Baker Pool and Spa Safety Act

## Regulations and Mandatory Standards

– 15 CFR 1150  Marking of Toys, Look-Alike and Imitation Firearms

– 16 CFR 1500  Hazardous Substances Act Regulations



CFR

Code of Federal Regulations



ASTM INTERNATIONAL
Helping our world work better

**Virtual Officers' Training Week**
September 21-24, 2015

# ASTM Assists in Transparency in Rulemaking



ASTM standards IBR are provided in a read only format to the general public in the reading room.



# U.S. Government Membership in ASTM

| Agency Name | Members |
|---|---|
| Department of Agriculture | 40 |
| Department of Commerce (incl. NIST) | 165 |
| Consumer Product Safety Commission | 44 |
| Department of Defense | 257 |
| Department of Energy | 178 |
| Environmental Protection Agency | 79 |
| Federal Aviation Administration | 55 |
| Department of Health and Human Services (incl. FDA) | 120 |
| Housing and Urban Development | 3 |

| Agency Name | Members |
|---|---|
| Department of Interior | 3 |
| Department of Justice | 11 |
| NASA | 37 |
| Nuclear Regulatory Commission | 7 |
| Occupational Safety & Health Administration | 5 |
| Department of Transportation | 34 |
| Department of Veterans Affairs | 1 |



ASTM INTERNATIONAL
Helping our world work better

**Virtual Officers' Training Week**
September 21-24, 2015



15

# ASTM Initiatives with U.S. Government

**Ensure reference to current standards**

– Regular review of the *Code of Federal Regulations* and *Congressional Record*

– Coordinate technical committee communications to policymakers

**Understand procurement and regulatory standards needs**

– Review of Regulatory Plan and Agenda

– Encourage government liaison with and **participation in** committee activities





**Virtual Officers' Training Week**
September 21-24, 2015

16

# Proven Partnership

[Chairman Kaye's Congressional Testimony](#)



– Sworn in as the 10th Chairman of the U.S. Consumer Product Safety Commission (CPSC) on July 30, 2014. President Barack Obama nominated Mr. Kaye on March 31, 2014, and he was confirmed by the U.S. Senate on July 28, 2014, to a term that expires in October 2020 Elliot F. Kaye



**Virtual Officers' Training Week**
September 21-24, 2015



17



ASTM INTERNATIONAL
Helping our world work better

# II. Corporate Outreach



# ASTM Engages Decision-Makers

**Raise awareness of standards and ASTM**
- Standards facilitate trade and boost GDP
- No WTO list of international bodies

**Identify opportunities for collaboration on issues of mutual interest**
- Reduce internal company specifications

**Seek industry feedback on activities and challenges**
- ASTM supports industry needs to choose the best standard, regardless of the source

**Ensure ASTM is meeting stakeholder needs**
-Satisfy regulations and laws
- Facilitate global trade





**Virtual Officers' Training Week**
September 21-24, 2015

19

# ASTM Standards Impact the Global Economy

**ASTM standards meet World Trade Organization (WTO) criteria for "international standards"**

– No WTO list of international bodies

– WTO recognizes multiple approaches to international standardization

**ASTM makes it easy to participate in international standards development**

– Technology drives efficiency





**Virtual Officers' Training Week**
September 21-24, 2015



# ASTM's Global Reach



Both ASTM Members and MOU Partners

ASTM MOU Partners Only

ASTM Members Only

ASTM INTERNATIONAL
Helping our world work better

**Virtual Officers' Training Week**
September 21-24, 2015

21

# ASTM complies with WTO principles for international standards development

| WTO / TBT Principles | ASTM Principles |
| --- | --- |
| Transparency<br>Openness<br>Impartiality and consensus<br>Effectiveness and relevance<br>Coherence<br>Consideration of developing nations | Transparency<br>Openness<br>Impartiality and consensus<br>Effectiveness and relevance<br>Coherence<br>Consideration of developing nations |



ASTM INTERNATIONAL
Helping our world work better

**Virtual Officers' Training Week**
September 21-24, 2015



# Moving Forward

– ASTM seeks to enhance our level of cooperation and work with government and standards officials and industry to:

– Promote a global marketplace that is open, efficient, free of costly duplication, free of technical barriers, and free of national or regional limitations

– Produce high-quality and market relevant standards that advance R&D, product manufacturing, testing, quality assurance, marketing, and trade for both companies and SMEs

– Advance the ability of industries to choose the standards which best meet their needs

– Our global approach to standards development and use can help the world to work better through improved products, increased trade, and greater prosperity for the future.



**Virtual Officers' Training Week**
September 21-24, 2015



23



ASTM INTERNATIONAL
Helping our world work better

# III. Questions and Discussion

# Contact Information

**Anthony R. Quinn,**
Director, International Trade and Public Policy
aquinn@astm.org,  202 223-8484

**Sarah Shoemaker**,
Manager, Government and Industry Affairs
sshoemaker@astm.org,  202-223-8399

1850 M Street, NW, Suite 1030
Washington, DC 20036  USA



**Virtual Officers' Training Week**
September 21-24, 2015



# EXHIBIT 107

| **From:** | Morgan, Robert </O=ASTM/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=RMORGAN> |
|---|---|
| **Sent:** | Tuesday, May 26, 2009 3:20 PM |
| **To:** | Hooper, Kathe <khooper@astm.org> |
| **Subject:** | RE: New Standard |

Hi Kathe!

For the purposes of code recognition, I recommend that we grant approval.   Thanks for your help with this.

Best,

Bob

---

**From:** Hooper, Kathe
**Sent:** Tuesday, May 26, 2009 2:47 PM
**To:** Morgan, Robert
**Subject:** FW: New Standard

HI Bob!  I hope things are going well for you.

Regarding Larry Gill's email below, are you okay with me granting permission to make up to 41 copies of F2735 and F2769, as granted in my 1 December email (see 3rd email below)?  Usually, I only grant these types of licenses when the request comes through a staff manager.  Since Larry contacted me direct, I just want to make sure you are okay with this.  (I will also include a condition that the standards must first be published by ASTM.   I understand F2769 will be published by mid July at the latest.)

Please call or write with any questions.   Thank you. Kathe

**From:** Gill, Larry [mailto:largil@ipexinc.com]
**Sent:** Monday, May 25, 2009 10:18 AM
**To:** Hooper, Kathe
**Subject:** RE: New Standard

Kathe

I am completing my Code change proposals for ASTM F2735 and as it turns out I will be proposing this standard to 3 Codes, Plumbing, Mechanical and Residential.  These are due at the end of this week.

I therefore need permission to provide this standard to these three committees.

Plumbing Code - 15 members
Mechanical Code - 14 members
Residential Code - 12 members

Can you please let me know if this is ok?

I am also making a proposal for a new standard ASTM F2769 Polyethylene of Raised Temperature (PE-RT) Plastic Hot and Cold Water Tubing and Distribution Systems.  Do you know if this is printed yet?  I need the same number of copies for this as well.

Thanks.

ASTM095635

Larry

**From:** Hooper, Kathe [mailto:khooper@astm.org]
**Sent:** December 1, 2008 3:38 PM
**To:** Gill, Larry
**Subject:** RE: New Standard

Dear Larry:

ASTM International grants a limited, non-exclusive license to reproduce and distribute up to 17 copies of F2735-08a, in hardcopy format, for use by the ICC Code Committee provided the following conditions are met:

1.    The first page of each standard contains the following credit line:  "Copyright ASTM International, 100 Barr Harbor Drive, West Conshohocken, PA  19428.  This document may only be reproduced, in hardcopy format, for use by the ICC Code Committee for evaluation purposes and not for any other distribution, republication, or resale.  Any other reproduction or use of this document, in full or in part, without the expressed written permission of ASTM is strictly prohibited."

2.    All copies of the standard are destroyed after the ICC Committee is done the developmental work.

3.    ICC acknowledges that ASTM is the author and copyright owner of F2735-08a.   ICC agrees to reference F2735-08a, and that such reference will not transfer, modify, alter or effect ASTM's copyright in any way.

4.    Acknowledgement of the above conditions to Kathe Hooper, ASTM International (khooper@astm.org).

Attached is a PDF file of F2735-08a, including the caveat noted in item 1, for your use in making print copies in accordance with the above conditions.

Should you have any questions, please do not hesitate to contact me.  .

Kind regards, Kathe

*Kathe Hooper*
*ASTM International*
*100 Barr Harbor Drive, PO Box C700*
*West Conshohocken, PA  19428-2959*
*phone:  610-832-9634*
*fax:  610-832-9635*
*email:  khooper@astm.org*

**From:** Gill, Larry [mailto:largil@ipexinc.com]
**Sent:** Wednesday, November 26, 2008 1:19 PM
**To:** Hooper, Kathe
**Subject:** RE: New Standard

Kathe

I need to submit another new standard to the ICC and send them copies.  I need 2 copies for ICC staff and 15 copies for committee members.  The standard is ASTM F2735-08a.

Can you send me the info I need from ASTM to allow me to do this?

Thanks.

ASTM095636

Larry Gill, P.Eng.
Manager Codes and Standards
IPEX Inc.
2441 Royal Windsor Drive
Mississauga, ON L5J4C7
Phone:  1-800-463-9502 (or 905-403-0264, ext. 299); Fax:  905-403-1124

---

**From:** Hooper, Kathe [mailto:khooper@astm.org]
**Sent:** December 6, 2007 1:54 PM
**To:** Gill, Larry
**Subject:** RE: New Standard

Dear Larry,

We can give you a license to reproduce and distribute printed copies of the standards as in the past. Please confirm the total number of copies you wish to distribute is 17 (of each standard).  Thank you!

Kathe


*Kathe Hooper*
*ASTM International*
*100 Barr Harbor Drive, PO Box C700*
*West Conshohocken, PA  19428-2959*
*phone:  610-832-9634*
*fax:  610-832-9635*
*email:  khooper@astm.org*

---

**From:** Gill, Larry [mailto:largil@ipexinc.com]
**Sent:** Wednesday, December 05, 2007 9:36 AM
**To:** Hooper, Kathe
**Subject:** RE: New Standard

Kathe

I have submitted the same standard (F2623) for inclusion into the ICC code as well as ASTM F1282.

I need to send 16 ICC committee members copies and one to staff for both of these standards.

Can you please send me the documents for this?

Regards;


Larry Gill, P.Eng.
Manager Codes and Standards
IPEX Inc.
2441 Royal Windsor Drive
Mississauga, ON L5J4C7

ASTM095637

Phone:  1-800-463-9502 (or 905-403-0264, ext. 299); Fax:  905-403-1124

---

**From:** Hooper, Kathe [mailto:khooper@astm.org]
**Sent:** March 13, 2007 9:55 AM
**To:** Gill, Larry
**Subject:** RE: New Standard

Dear Mr. Gill:

You may obtain a license to reproduce and distribute copies of F 2623-07, in hardcopy format, to distribute to the IAPMO committee members.  Please advise us how many copies of the standards you wish to make and we will be happy to send an agreement outlining the conditions involved.

Thank you.  Should you have any questions, please contact me.

Kind regards,


*Kathe Hooper*
*ASTM International*
*100 Barr Harbor Drive, PO Box C700*
*West Conshohocken, PA  19428-2959*
*phone:  610-832-9634*
*fax:  610-832-9635*
*email:  khooper@astm.org*

---

**From:** Gill, Larry [mailto:largil@ipexinc.com]
**Sent:** Monday, March 12, 2007 9:05 AM
**To:** DiCicco, Jill
**Cc:** Hooper, Kathe
**Subject:** RE: New Standard

Kathe

Can you please help me with this?

Thanks.


Larry Gill, P.Eng.
Manager Codes and Standards
IPEX Inc.
2441 Royal Windsor Drive
Mississauga, ON L5J4C7
Phone:  1-800-463-9502 (or 905-403-0264, ext. 299); Fax:  905-403-1124

---

**From:** DiCicco, Jill [mailto:jdicicco@astm.org]
**Sent:** March 8, 2007 2:26 PM
**To:** Gill, Larry
**Cc:** Hooper, Kathe

ASTM095638

**Subject:** RE: New Standard

Larry
You will need permission to reprint.
Kathe Hooper will be able to assist you.
(Thank you Kathe)
Jill

---

**From:** Gill, Larry [mailto:largil@ipexinc.com]
**Sent:** Thursday, March 08, 2007 2:24 PM
**To:** DiCicco, Jill
**Subject:** RE: New Standard

Jill

I see that the standard is now published, ASTM F2623.

I need to submit this to IAPMO to support a Code change to add the standard to the Code.

Is it ok if I buy one original and then copy it for the IAPMO committee members?

Thanks.

Larry

---

**From:** DiCicco, Jill [mailto:jdicicco@astm.org]
**Sent:** January 29, 2007 11:47 AM
**To:** Gill, Larry
**Subject:** RE: New Standard

Hi Larry

still not completed the balloting process. It will not be approved until Feb 1 then the editor will then take over. about 4 weeks after approval.
Jill

---

**From:** Gill, Larry [mailto:largil@ipexinc.com]
**Sent:** Mon 1/29/2007 8:01 AM
**To:** DiCicco, Jill
**Subject:** New Standard

Hi Jill

I need a copy of a new standard to submit for an IAPMO code change.

It's F 2623 for PERT.

Do you know the soonest I can get a copy?

Larry

-----Original Message-----
From: DiCicco, Jill [mailto:jdicicco@astm.org]
Sent: May 3, 2006 1:24 PM
To: Gill, Larry
Subject: RE: A New ASTM Work Item Registration - WorkItem WK11309 F1412-01e1 - Standard Specification for Polyolefin Pipe

ASTM095639

and Fittings for Corrosive Waste Drainage Systems

 No problem Larry
Attached.
Jill

-----Original Message-----
From: Gill, Larry [mailto:largil@ipexinc.com]
Sent: Wednesday, May 03, 2006 12:26 PM
To: DiCicco, Jill
Subject: RE: A New ASTM Work Item Registration - WorkItem WK11309 F1412-01e1 - Standard Specification for Polyolefin Pipe
and Fittings for Corrosive Waste Drainage Systems

Jill

Thanks

Can I also have F1673?  It is part of the project as well.

Larry

-----Original Message-----
From: DiCicco, Jill [mailto:jdicicco@astm.org]
Sent: May 3, 2006 12:09 PM
To: Gill, Larry
Subject: RE: A New ASTM Work Item Registration - WorkItem WK11309 F1412-01e1 - Standard Specification for Polyolefin Pipe
and Fittings for Corrosive Waste Drainage Systems

Hi Larry
Attached is the word document for your work item.
Jill
-----Original Message-----
From: webmaster@astm.org [mailto:webmaster@astm.org]
Sent: Tuesday, May 02, 2006 2:59 PM
To: DiCicco, Jill
Subject: A New ASTM Work Item Registration - WorkItem WK11309 F1412-01e1 - Standard Specification for Polyolefin Pipe and
Fittings for Corrosive Waste Drainage Systems

This is an automated alert from ASTM International.
------------------------------------------------------------------------
To the Administrative Assistant of F17.63 Submitted by: LARRY GILL

Hello JILL DICICCO,

Please send a Word document of the current standard and the ballot item preparation instructions to the technical contact.

When referring to the Work Item please use the identifier: WK11309

Subcommittee Chairman: JAMES SHADE - email: jshade@contech-cpi.com

Technical Contact: LARRY GILL - email: largil@ipexinc.com

The following information was submitted for review.
========================================================================

Work Item Type: Revision

Revised Standard: F1412-01e1 - Standard Specification for Polyolefin Pipe and Fittings for Corrosive Waste Drainage Systems

Sponsoring Subcommittee: F17.63

Target Ballot Date: 10/2006

Target Completion Date: 12-18 months (5/2/2007-11/2/2007)

ASTM095640

Rationale: Harmonizing the chemical list in CSA B181.3 and ASTM F1412 and ASTM F1673.

Notify Other Committee:

Task Group Members:
ZIU, CHRISTOPH G
SAMPLE, GARY L
BAIER, SUSAN

--------------------------------------------------------------------------

ASTM International ÷ Standards Worldwide 100 Barr Harbor Dr., PO Box C700, W. Conshohocken, PA 19428-2959, USA
Phone:(610) 832-9500 ÷ Fax: (610) 832-9555 ÷ email: service@astm.org
Website: www.astm.org

ASTM095641

# EXHIBIT 108

| | |
|---|---|
| **From:** | Cote, Ron <rcote@NFPA.org> |
| **Sent:** | Monday, September 14, 2009 7:53 AM |
| **To:** | Hooper, Kathe <khooper@astm.org> |
| **Cc:** | Di Pilla, Steven <Steven.DiPilla@esis.com>; Matthews, Diane <DMatthews@NFPA.org>; Solomon, Robert <rsolomon@NFPA.org> |
| **Subject:** | RE: ASTM E2238 courtesy copies? |

Kathe, yes NFPA will abide by the guidelines you prescribed. Thank you for your cooperation and quick action in preparing the review copy of E 2238.

Steve, thanks for doing the background work to get permission to show the document to the committee. I'll distribute the paper copies at the meeting.


**Ron Coté, P.E.**
**Principal Life Safety Engineer**
**NFPA – Quincy, MA  USA**

**From:** Di Pilla, Steven [mailto:Steven.DiPilla@esis.com]
**Sent:** Thursday, September 10, 2009 2:42 PM
**To:** Cote, Ron
**Cc:** khooper@astm.org
**Subject:** FW: ASTM E2238 courtesy copies?

Ron:

Can you ok this and respond to Kathe – this is for the discussion on evacuation diagrams.  I'm working on getting the ISO standard to review as well.


Regards,


Steve...

**From:** Hooper, Kathe [mailto:khooper@astm.org]
**Sent:** Wednesday, September 09, 2009 2:41 PM
**To:** Di Pilla, Steven
**Cc:** Shanahan, Kevin
**Subject:** RE: ASTM E2238 courtesy copies?

Dear Steven:

This is in response to your email of 2 September to Kevin Shanahan.

ASTM International grants a limited, non-exclusive license to reproduce and distribute up to 40 copies of E2238-02, in hardcopy format, for use by attendees at the September 2009 NFPA 101 (Safety to Life) Committee on Means of Egress meeting provided the following conditions are met:

1.  The first page of each standard contains the following credit line: "Copyright ASTM International, 100 Barr Harbor Drive, West Conshohocken, PA 19428.  This document may only be reproduced, in hardcopy format, for use by the NFPA 101 (Safety to Life) Committee on Means of Egress for evaluation purposes and not for any other distribution, republication, or resale.  Any other reproduction or use of this document, in full or in part, without the expressed written permission of ASTM is strictly prohibited."

ASTM095718

2.   All copies of the standard are destroyed after the NFPA 101 (Safety to Life) Committee on Means of Egress members are done the developmental work.

3.   NFPA acknowledges that ASTM is the author and copyright owner of E2238-02.  NFPA agrees to reference E2238-02, and that such reference will not transfer, modify, alter or effect ASTM's copyright in any way.

4.   Acknowledgement of the above conditions is sent to Kathe Hooper, ASTM International (khooper@astm.org).

Attached is a PDF file of E2238-02, including the caveat noted in item 1, for your use in making print copies in accordance with the above conditions.

Should you have any questions, please do not hesitate to contact me.

Sincerely,

*Kathe Hooper*
*ASTM International*
*100 Barr Harbor Drive, PO Box C700*
*West Conshohocken, PA  19428-2959*
*phone:  610-832-9634*
*fax:  610-832-9635*
*email:  khooper@astm.org*

---

**From:** Di Pilla, Steven [mailto:Steven.DiPilla@esis.com]
**Sent:** Wednesday, September 02, 2009 12:25 PM
**To:** Shanahan, Kevin
**Subject:** ASTM E2238 courtesy copies?

Kevin:

I'm a member of E34, and actually wrote most of E2238.  Later this month, the NFPA 101 (Safety to Life) Committee on Means of Egress will be meeting.  One item on the agenda is evacuation route diagrams.  I would like to have permission to distribute courtesy copies of ASTM E2238-02 Standard Guide for Evacuation Route Diagrams so the committee can review it and hopefully recognize it in the code.  Can you provide permission to do so?

Regards,

Steve...

Steven Di Pilla, ARM, AIC, AMIM

*Director, Research and Development*

**ESIS, Inc. - Global Risk Control Services**

+1 856 673 0632 voice

+1 215 640 5470 fax

steven.dipilla@esis.com e-mail

This email is intended for the designated recipient(s) only, and may be confidential, non-public, proprietary, protected by the attorney/client or other privilege. Unauthorized reading, distribution, copying or other use of this communication is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) should not be deemed a waiver of any privilege or protection. If you are not the intended recipient or if you believe that you have received this email in error, please notify the sender immediately and delete all copies from your computer system without reading, saving, or using it in any manner. Although it has been checked for viruses and other malicious software ("malware"), we do not warrant, represent or guarantee in any way that this communication is free of malware or potentially damaging defects. All liability for any actual or alleged loss, damage, or injury arising out of or resulting in any way from the receipt, opening or use of this email is expressly disclaimed.

This email is intended for the designated recipient(s) only, and may be confidential, non-public, proprietary, protected by the attorney/client or other privilege. Unauthorized reading, distribution, copying or other use of this communication is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) should not be deemed a waiver of any privilege or protection. If you are not the intended recipient or if you believe that you have received this email in error, please notify the sender immediately and delete all copies from your computer system without reading, saving, or using it in any manner. Although it has been checked for viruses and other malicious software ("malware"), we do not warrant, represent or guarantee in any way that this communication is free of malware or potentially damaging defects. All liability for any actual or alleged loss, damage, or injury arising out of or resulting in any way from the receipt, opening or use of this email is expressly disclaimed.

ASTM095720

# EXHIBIT 109

| | |
|---|---|
| **From:** | Hooper, Kathe </O=ASTM/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=KHOOPER> |
| **Sent:** | Wednesday, September 16, 2009 2:53 PM |
| **To:** | 'Ritchey, Joseph' <ritcheyj@p2s.com> |
| **Cc:** | Morgan, Robert <rmorgan@astm.org>; DiCicco, Jill <jdicicco@astm.org> |
| **Subject:** | RE: Review by FGDC for teleconference |
| **Attach:** | D7534.09.pdf; D7384.09.pdf; D7443.09.pdf; D7533.09.pdf |

Dear Joe,

This is in response to your email correspondence today with Jill DiCicco and Bob Morgan.

Please note that ASTM International policy does not permit the electronic transfer of ASTM standards.

ASTM International is willing to grant the USGS a limited, non-exclusive license to reproduce and distribute up to 20 copies of D7384-09, D7533-09, D7534-09 and D7443-09, in hardcopy format, for review by members of Federal Geodetic Data Committee at the upcoming teleconference provided the following conditions are met:

1. D7384-09, D7533-09, D7534-09 and D7443-09 are reproduced and distributed in hardcopy format only. (The standards may be sent via fax provided they are faxed and received in hardcopy format only (i.e.: Fax to fax transmission only. No fax to email or email to fax transmission is permitted.)

2. The first page of each standard contains the following credit line: "Copyright ASTM International, 100 Barr Harbor Drive, West Conshohocken, PA 19428. This document may only be reproduced, in hardcopy format, for use by the Federal Geodetic Data Committee for evaluation purposes and not for any other distribution, republication, or resale. Any other reproduction or use of this document, in full or in part, without the expressed written permission of ASTM is strictly prohibited."

3. All copies of the standard are destroyed after the Federal Geodetic Data Committee members are done the developmental work.

4. The Federal Geodetic Data Committee acknowledges that ASTM is the author and copyright owner of D7384-09, D7533-09, D7534-09 and D7443-09. The Federal Geodetic Data Committee agrees to reference D7384-09, D7533-09, D7534-09 and D7443-09, and that such reference will not transfer, modify, alter or effect ASTM's copyright in any way.

5. Acknowledgement of the above conditions is sent to Kathe Hooper, ASTM International (khooper@astm.org).

Attached are PDF files of the four standards, including the caveat noted in item 1, for your use in making print copies in accordance with the above conditions.

Should you have any questions, please do not hesitate to contact me.

Sincerely,
Kathe

*Kathe Hooper*
*ASTM International*
*100 Barr Harbor Drive, PO Box C700*
*West Conshohocken, PA 19428-2959*
*phone: 610-832-9634*
*fax: 610-834-7018*
*email: khooper@astm.org*

ASTM095747

**From:** DiCicco, Jill
**Sent:** Wednesday, September 16, 2009 10:23 AM
**To:** Hooper, Kathe; 'Ritchey, Joseph'
**Cc:** Morgan, Robert
**Subject:** FW: Review by FGDC for teleconference

Hi Joe
Kathe Hooper will need to give permission to reprint any ASTM standard.
I have cc'd Kathe on this e-mail - thank you Kathe.
Jill

---

**From:** Ritchey, Joseph [mailto:ritcheyj@p2s.com]
**Sent:** Wednesday, September 16, 2009 12:32 AM
**To:** Morgan, Robert
**Cc:** DiCicco, Jill
**Subject:** Review by FGDC for teleconference

Bob,

Is your ok sufficient for me to send the following message to Julie at the USGS. She would be forwarding the PDF files of four recently approved standards under D18.01 to about 20 members of the Federal Geodetic Data Committee which is composed of US government agency representatives. I've added a watermark to the files. If you have an alternative watermark or other more formal way for me to request, please let me know.

The Office of Surface Mining is requesting FGDC endorsement of the ASTM standards.

FYI, these PDFs I received from Brendan as "galley proofs".

Thanks,

Joe.

Julie,

Thanks for taking time to meet with us.

Attached are the four standards we discussed.

Please look to see if they are readable and if the watermark is acceptable. If so, you may forward the PDFs to FGDC members for their review.

Thanks,

Joe.

ASTM095748

# EXHIBIT 110

| From: | Morgan, Robert </O=ASTM/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=RMORGAN> |
|---|---|
| Sent: | Tuesday, October 11, 2011 8:16 AM |
| To: | Hooper, Kathe <khooper@astm.org> |
| Subject: | FW: ASTM Review |
| Attach: | Scope of Services 10-11.doc |

Hi Kathe

The State of Georgia has prepared a document which references some D18 standards.  This is a good thing for us.  The have also lifted some information from a standard.  Could you please take a look and provide the appropriate caveats.  Please let me know if you have any questions.

Thanks for your help.

Bob

---

**From:** Lauren Zdunczyk
**Sent:** Thursday, October 06, 2011 11:05 AM
**To:** 'rmorgan@astm.org'
**Subject:** ASTM Review

Hi Bob,

We spoke last month regarding the Georgia Soil and Water Conservation Commission's (GSWCC) use of the working ASTM standard WK11340 "Standard Test Method for Determination of Sediment Retention Devices (SRDs) Performance in Reducing Soil Loss from Rainfall-Induced Erosion.

As I mentioned on the phone, we have received funding to develop a process for accepting new products/practices into the Manual for Erosion and Sediment Control in Georgia.  To do this we are testing currently approved products to set benchmark standards.

Please see attached document and let me know if this violates the ASTM copyright policy.  If there are any questions, I would like to set up a conference call with you and our Technical Advisory Committee chairman.

Thanks,
Lauren

Lauren Zdunczyk
Urban Program Manager
Phone: 706-552-4474 (New Number)
Fax: 706-552-4486 (New Number)
www.gaswcc.georgia.gov

ASTM091055

# EXHIBIT 111

| **From:** | Hooper, Kathe </O=ASTM/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=KHOOPER> |
|---|---|
| **Sent:** | Friday, October 12, 2012 12:47 PM |
| **To:** | Mawn, Steve <smawn@astm.org> |
| **Cc:** | West, Lesley <lwest@astm.org>; Pace, John <jpace@astm.org> |
| **Subject:** | RE: Standards to IAPMO for Their Review on CD |

Steve,

I believe Lesley West's department can help you with placing the standards on a CD.  I'll copy Lesley on this email. (Lesley, if this is not your area, please let me know.)

We should probably include a caveat on the CD as follows:
"The standards included on this CD-ROM are copyrighted by ASTM International, 100 Barr Harbor Drive, West Conshohocken, PA  19428.  The ASTM standards may only be reproduced, in hardcopy format, for use by IAPMO for evaluation purposes and not for any other distribution, republication, or resale.  Any other reproduction or use of this document, in full or in part, without the expressed written permission of ASTM is strictly prohibited."

Kathe
*Kathe Hooper*
*ASTM International*
*100 Barr Harbor Drive, PO Box C700*
*West Conshohocken, PA  19428-2959*
*phone:  610-832-9634*
*fax:  610-834-7018*
*email:  khooper@astm.org*

**From:** Mawn, Steve
**Sent:** Friday, October 12, 2012 11:54 AM
**To:** Hooper, Kathe
**Cc:** Mawn, Steve
**Subject:** Standards to IAPMO for Their Review on CD

Hi Kathe:

I have been in discussions with John Pace, Kathy Morgan, and Pat Picariello about providing standards to IAPMO that have been updated for them to review and continue to site in the codes.

Bottom line is they need an electronic copy as opposed to a view only site.  The will take precautions like destroy the CDs, etc  when done.

I am not sure the best way to get this done.  We have about 77 standards on the list.    If I give you the designations, can you or Micronics put on a CD(s).  They are looking for the latest approved versions.

We are trying to get this to them by October 19th or so.

Please advise, thanks.

**Steve Mawn**
Manager, TCO
ASTM International
smawn@astm.org
610-832-9726

ASTM096390

# EXHIBIT 112

| | |
|---|---|
| **From:** | Mawn, Steve </O=ASTM/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=SMAWN> |
| **Sent:** | Monday, February 2, 2009 1:55 PM |
| **To:** | Hooper, Kathe <khooper@astm.org> |
| **Subject:** | RE: E1300 Figures and Tables for Woodhead Publishing: Architectural glass to resist seismic and extreme climatic events (ed. Behr) |

I am ok with it, although he is coming close to the line.

His company is a big supporter of ASTM, so I am ok with this.

If he comes back for more, then we can consider charging him.

Thanks,

Steve Mawn
smawn@astm.org
610-832-9726

---

**From:** Hooper, Kathe
**Sent:** Monday, February 02, 2009 1:15 PM
**To:** Mawn, Steve
**Subject:** FW: E1300 Figures and Tables for Woodhead Publishing: Architectural glass to resist seismic and extreme climatic events (ed. Behr)

Steve,

Are you okay with them adding a couple more figures to their list (see below).  If so, I'll grant permission as we did previously.  If you think this is getting to be too much and we should charge, let me know.
Kathe

---

**From:** Russell H. Davies [mailto:rhdavies@sgh.com]
**Sent:** Friday, January 30, 2009 11:03 AM
**To:** Hooper, Kathe
**Cc:** Mawn, Steve
**Subject:** RE: E1300 Figures and Tables for Woodhead Publishing: Architectural glass to resist seismic and extreme climatic events (ed. Behr)

Kathe-

Following your email from 23 January 2009, we are also hoping to use the following figures and tables from E1300 for the book listed above.  Can you let us know if we may have permission?  We will provide the credit line you requested as part of the references at the end of chapter.

Figure A1.12

Figure X1.1
Figure X3.1

Table 4

Table X6.1

ASTM089102

Table X9.1

Thank you for your assistance,
**Russell H. Davies, P.E. (NY)**
**SIMPSON GUMPERTZ & HEGER**
212.271.7000 main
212.271.6950 direct
646.462.5899 mobile
212.271.0111 fax
www.sgh.com

---

**From:** Hooper, Kathe [mailto:khooper@astm.org]
**Sent:** Friday, January 23, 2009 11:48 AM
**To:** Russell H. Davies
**Cc:** Mawn, Steve
**Subject:** RE: E1300 Figures and Tables for Woodhead Publishing: Architectural glass to resist seismic and extreme climatic events (ed. Behr)

Dear Mr. Davies:

This is in response to your email of 20 January to Steve Mawn.

ASTM International grants a limited, non-exclusive license to reproduce figures A1.4, A1.6, A1.8, A1.20, A1.25, A1.28, A1.31, A1.33, A1.41; and tables 1, 2, 3, 5 and 6 from ASTM eE1300-07e1 in Chapter 7 of the book titled, Architectural Glass to Resist Seismic and Extreme Climatic Events, provided the following credit line is used:

> "Reprinted, with permission, from E1300 - 07$^{e1}$ Standard Practice for Determining Load Resistance of Glass in Buildings, copyright ASTM International, 100 Barr Harbor Drive, West Conshohocken, PA   19428. A copy of the complete standard may be obtained from ASTM, www.astm.org."

Thank you for your interest in ASTM standards.

Kind regards,


*Kathe Hooper*
*ASTM International*
*100 Barr Harbor Drive, PO Box C700*
*West Conshohocken, PA  19428-2959*
*phone:  610-832-9634*
*fax:  610-832-9635*
*email:  khooper@astm.org*

---

**From:** Russell H. Davies [mailto:rhdavies@sgh.com]
**Sent:** Tuesday, January 20, 2009 2:17 PM
**To:** Mawn, Steve
**Subject:** E1300 Figures and Tables for Woodhead Publishing: Architectural glass to resist seismic and extreme climatic events (ed. Behr)

Steve-

Here is a list of the E1300 figures and tables we need for our chapter 7 *"Glass to Resist Snow Loads"* in the above book.

ASTM089103

| Example | Figures and Tables |
|---------|--------------------|
| 7.1 | Fig A1.4 |
| 7.2 | Fig A1.20 |
| 7.3 | Fig A1.25 |
| 7.4 | Fig A1.31 |
| 7.5 | Fig A1.41<br>Table 1 |
| 7.6 | Fig A1.6<br>Fig A1.28<br>Tables 2-3,5-6 |
| 7.7 | Fig A1.6<br>Fig A1.28<br>Tables 2-3,5-6 |
| 7.8 | Fig A1.33<br>Table 1 |
| 7.9 | Fig A1.41<br>Table 1 |
| 7.10 | Fig A1.6<br>Fig A1.8<br>Table 1 |

There are some repeats of the tables and figures, so we hope that we can use permitted information more than once in the chapter.

Can we obtain permission and the files for the chapter?  Our deadline is January 30 for the final draft, so let us know if this is possible.

Best,
**Russell H. Davies, P.E. (NY)**
**SIMPSON GUMPERTZ & HEGER**

Engineering of Structures and Building Enclosures

19 W. 34th Street, Suite 1000
New York, NY 10001

212.271.7000 main
212.271.6950 direct
646.462.5899 mobile
212.271.0111 fax

ASTM089104

# EXHIBIT 113

| | |
|---|---|
| **From:** | Hooper, Kathe </O=ASTM/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=KHOOPER> |
| **Sent:** | Friday, June 5, 2009 8:44 AM |
| **To:** | 'sales@ninjapaintball.com' |
| **Cc:** | Sierk, Christine <csierk@astm.org> |
| **Subject:** | RE: ASTM Copyrights |

Dear Mr. Trimble,

This is in response to your emails to Christine Sierk.

Please be advised that ASTM policy does not permit the posting of our material on the public internet.

Should you have any questions, please contact me (phone:  610-832-9634, fax:  610-832-9635, e-mail:  khooper@astm.org).

Kind regards,


*Kathe Hooper*
*ASTM International*
*100 Barr Harbor Drive, PO Box C700*
*West Conshohocken, PA  19428-2959*
*phone:  610-832-9634*
*fax:  610-832-9635*
*email:  khooper@astm.org*

---

**From:** Sierk, Christine
**Sent:** Wednesday, June 03, 2009 2:07 PM
**To:** Hooper, Kathe
**Subject:** FW: ASTM Copyrights

Hi Kathe,
They just resent another email, please see below…
Many Thanks and feel better!
Christi

---

**From:** Ninja Paintball [mailto:sales@ninjapaintball.com]
**Sent:** Wednesday, June 03, 2009 1:09 PM
**To:** Sierk, Christine
**Subject:** ASTM Copyrights

Christine,

Sorry to bother you but tried to e-mail ASTM and never got a reply.

I am a member for F08-24 Paintball and am having a discussion with some people on a public forum about some standards. What is the policy of ASTM regarding copying parts of a standard for discussion on the internet? Do I need written permission and is there a fee involved?

Thank you for your time,

Ray Trimble
Sales Manager

ASTM095371

Ninja Paintball
186 Virginia Rd.
Crystal Lake, IL 60014
877-NinjaUSA (646-5287)
815-477-0007 ext 306
Fax 815-477-7395
www.ninjapaintball.com
Proudly Made in the USA

ASTM095372

# EXHIBIT 114
# (FILED UNDER SEAL)

# EXHIBIT 115

| From: | Hooper, Kathe </O=ASTM/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=KHOOPER> |
|---|---|
| Sent: | Wednesday, July 29, 2009 4:18 PM |
| To: | 'clk.wario@policja.gov.pl' |
| Subject: | RE: polygraph examination |

Dear Dominika Słapczyńska:

Thank you for your email today.

Please be advised that ASTM International does not permit the reproduction of the full text of ASTM standards in thesis papers.  You may reference the standards by designation number and title, and refer readers to ASTM (www.astm.org) where they may purchase a copy of the standard.

Thank you for your interest in ASTM standards.

Kind regards,


*Kathe Hooper*
*ASTM International*
*100 Barr Harbor Drive, PO Box C700*
*West Conshohocken, PA  19428-2959*
*phone:  610-832-9634*
*fax:  610-832-9635*
*email:  khooper@astm.org*

**From:** Custserv
**Sent:** Wednesday, July 29, 2009 8:47 AM
**To:** Naouri, Sarah
**Subject:** FW: polygraph examination


**From:** CLK WARIO [mailto:clk.wario@policja.gov.pl]
**Sent:** Wednesday, July 29, 2009 4:30 AM
**To:** Custserv
**Subject:** polygraph examination


Dear Sir/Madam

I am from Central Forensic Laboratory of the Polish Police. At the moment I am at the process of comleping a forensic expert course. My graduation thesis is titled "The methodology of polygraph examination  applied in thePolish justice system". It will be reffered to ASTM standards, which I have translated into Polish exclusively for internal use. I would like to ask for your kind permission to photocopy of ASTM standards related to the polygraph examination for the purpose of appending them to the text of my thesis. I would like to assure you that my thesis will be available only in three copies  to be presented to an examination board. The use of the ASTM standards is non-commecial.


Dominika Słapczyńska
**Central Forensic Laboratory of the Polish Police**

ASTM095396

# EXHIBIT 116

| | |
|---|---|
| **From:** | Hooper, Kathe </O=ASTM/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=KHOOPER> |
| **Sent:** | Friday, March 18, 2011 3:22 PM |
| **To:** | 'Patrick' <patrick@fsmdrawings.com> |
| **Subject:** | RE: Copyright & Permissions |

Dear Patrick:

Thank you for your email of 15 March.

ASTM International is unable to grant permission to modify ASTM Standard E1527, Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process, as requested.

Thank you for your interest in ASTM standards.

Kind regards,

*Kathe Hooper*
*ASTM International*
*100 Barr Harbor Drive, PO Box C700*
*West Conshohocken, PA  19428-2959*
*phone:  610-832-9634*
*fax:  610-834-7018*
*email:  khooper@astm.org*

**From:** Patrick [mailto:patrick@fsmdrawings.com]
**Sent:** Tuesday, March 15, 2011 3:39 PM
**To:** Hooper, Kathe
**Subject:** Copyright & Permissions

March 15, 2011

Ms. Kathe Hooper
Copyright & Permissions
 ASTM International
 100 Barr Harbor Drive
PO Box C700
West Conshohocken PA
19428-2959  USA

RE: Copyright & Permissions

Dear Ms. Hooper:

Our Drafting & Drafting Support Services firm performs field work and data collection services on a large project we produce existing conditions plans for.  The contractor we work for is now asking us to provide to collect and provide more historical information and including review and documentation of historical records for notes of significance.  In addition, we will be required to interview and document residents for source information.

In review of available standards or contracts available, we have found difficulty finding one that best fits our Historical Assessment Survey profile and find that the E 1527-05, that I purchased yesterday, most closely describes in detail the steps we standards required of the project – were this modified a bit.

ASTM095437

My question to you is, can I obtain permission to modify E 1527-05 to fir our particular project?

- Assuming ASTM will allow this, the modified version will be a derivative of E 1527-05 and therefore still belonging to ASTM for Copyright reasons
- We can reference the derivative as <u>Historical Assessment Survey, Phase-1</u> (HSA Phase-1)
- We will pay License to Use; we would intend to use such form as such:
  - Once on company hard drive to develop and store
  - Once per year to negotiate with contractor for contact
  - One copy to submit to City for pre-contract
  - One Copy to submit to contractor for pre-contract use
  - One copy to submit to State Agency for pre-contract use
  - One copy to submit to Federal Agency for pre-contract use
  - One copy to submit to City for Post-contract
  - One Copy to submit to contractor for Post-contract use
  - One copy to submit to State Agency for Post -contract use
  - One copy to submit to Federal Agency for Post-contract use
  - One copy for office records Post-contract use
  - Eleven (11) copies total

- We would defend and hold harmless ASTM from the any damages for using a modified version of the document
- We would provide ASTM a copy of the derivative document

Please do not hesitate contacting me with questions or concerns about this at the numbers below or by return email.  In advance, I want to extend my thanks to you for the time expended considering this matter.


Sincerely,

Patrick

Patrick Doherty, Managing Partner
patrick@fsmdrawings.com
FSM Drawings, LLC
Wellington Trade Center
27 Lowell Street, Suite 503
Manchester NH 03101
A Service Disabled Veteran Owned Company
p. 603-836-5660 f. 603-836-5661 Fax c.603.315.8158
DUNS 827730487     (SDVOSB)     CAGE 55JZ5

This communication & any attachments are confidential.  It is intended for only the recipient(s) indicated.  Except for professional engineering clients we are subcontracted to who may distribute as deemed necessary; all other use, dissemination, copying, or disclosure of this communication is strictly prohibited - .  This communication may be attorney-client communication and as such is privileged and confidential.  If you have received this communication in error, please notify us and destroy it immediately.  FSM Drawings LLC is not responsible for any undetectable alteration, transmission error, conversion, media degradation, software error, or interference with this transmission.

ASTM095438

# EXHIBIT 117

| From: | Hooper, Kathe </O=ASTM/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=KHOOPER> |
|---|---|
| Sent: | Friday, November 2, 2012 3:16 PM |
| To: | 'nleonard2013@gmail.com' |
| Cc: | Hugo, Joe <jhugo@astm.org> |
| Subject: | RE: Figure Permissions |

Dear Mr. Leonard,

This is in response to your email to Joe Hugo.

ASTM International is unable to grant permission to reproduce the photographs and figures from ASTM standards F2248-09 and E1300-12a in your online case study.  ASTM International policy does not permit the posting of ASTM standards, or large portions of the ASTM standards, online.  You may reference the ASTM standards by designation and title in your case study and refer readers to the ASTM website where they can purchase the ASTM standards.

Thank you for your interest in ASTM standards.  Should you have any questions, please contact me.

Kind regards,

Kathe

*Kathe Hooper*
*ASTM International*
*100 Barr Harbor Drive, PO Box C700*
*West Conshohocken, PA  19428-2959*
*phone:  610-832-9634*
*fax:  610-834-7018*
*email:  khooper@astm.org*

**From:** Nicholas Leonard [mailto:nleonard2013@gmail.com]
**Sent:** Thursday, November 01, 2012 12:12 PM
**To:** Hugo, Joe
**Subject:** Figure Permissions

Good Afternoon, Joseph,

My Name is Nick and am currently a 5th year senior at The Pennsylvania State University in the Architectural Engineering curriculum. For professor Kevin M. Parfitt's Forensics class, I am writing a case study about the effects of blast loading on laminated glass. To support my article, I am asking for permission to use photographs and figures from ASTM F2248-09 and ASTM 1300 - 12a. Beacuse this article will be posted online through wikispaces, the assignment is no longer an education paper, thus requires permission. I look forward to your response.

Thanks,

Nicholas Leonard

--
Nicholas Leonard
The Pennsylvania State University
Architectural Engineering, Class 2013
Alpha Rho Chi, Professional Architecture Fraternity

ASTM095485

484.919.8060



ASTM095486

# EXHIBIT 118

| | |
|---|---|
| **From:** | Mawn, Steve </O=ASTM/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=SMAWN> |
| **Sent:** | Monday, February 2, 2009 1:55 PM |
| **To:** | Hooper, Kathe <khooper@astm.org> |
| **Subject:** | RE: E1300 Figures and Tables for Woodhead Publishing: Architectural glass to resist seismic and extreme climatic events (ed. Behr) |

I am ok with it, although he is coming close to the line.

His company is a big supporter of ASTM, so I am ok with this.

If he comes back for more, then we can consider charging him.

Thanks,

Steve Mawn
smawn@astm.org
610-832-9726

---

**From:** Hooper, Kathe
**Sent:** Monday, February 02, 2009 1:15 PM
**To:** Mawn, Steve
**Subject:** FW: E1300 Figures and Tables for Woodhead Publishing: Architectural glass to resist seismic and extreme climatic events (ed. Behr)

Steve,

Are you okay with them adding a couple more figures to their list (see below).  If so, I'll grant permission as we did previously.  If you think this is getting to be too much and we should charge, let me know.
Kathe

---

**From:** Russell H. Davies [mailto:rhdavies@sgh.com]
**Sent:** Friday, January 30, 2009 11:03 AM
**To:** Hooper, Kathe
**Cc:** Mawn, Steve
**Subject:** RE: E1300 Figures and Tables for Woodhead Publishing: Architectural glass to resist seismic and extreme climatic events (ed. Behr)

Kathe-

Following your email from 23 January 2009, we are also hoping to use the following figures and tables from E1300 for the book listed above.  Can you let us know if we may have permission?  We will provide the credit line you requested as part of the references at the end of chapter.

Figure A1.12

Figure X1.1
Figure X3.1

Table 4

Table X6.1

ASTM089102

Table X9.1

Thank you for your assistance,
**Russell H. Davies, P.E. (NY)**
**SIMPSON GUMPERTZ & HEGER**
212.271.7000 main
212.271.6950 direct
646.462.5899 mobile
212.271.0111 fax
www.sgh.com

---

**From:** Hooper, Kathe [mailto:khooper@astm.org]
**Sent:** Friday, January 23, 2009 11:48 AM
**To:** Russell H. Davies
**Cc:** Mawn, Steve
**Subject:** RE: E1300 Figures and Tables for Woodhead Publishing: Architectural glass to resist seismic and extreme climatic events (ed. Behr)

Dear Mr. Davies:

This is in response to your email of 20 January to Steve Mawn.

ASTM International grants a limited, non-exclusive license to reproduce figures A1.4, A1.6, A1.8, A1.20, A1.25, A1.28, A1.31, A1.33, A1.41; and tables 1, 2, 3, 5 and 6 from ASTM eE1300-07e1 in Chapter 7 of the book titled, Architectural Glass to Resist Seismic and Extreme Climatic Events, provided the following credit line is used:

> "Reprinted, with permission, from E1300 - 07$^{e1}$ Standard Practice for Determining Load Resistance of Glass in Buildings, copyright ASTM International, 100 Barr Harbor Drive, West Conshohocken, PA   19428. A copy of the complete standard may be obtained from ASTM, www.astm.org."

Thank you for your interest in ASTM standards.

Kind regards,


*Kathe Hooper*
*ASTM International*
*100 Barr Harbor Drive, PO Box C700*
*West Conshohocken, PA  19428-2959*
*phone:  610-832-9634*
*fax:  610-832-9635*
*email:  khooper@astm.org*


---

**From:** Russell H. Davies [mailto:rhdavies@sgh.com]
**Sent:** Tuesday, January 20, 2009 2:17 PM
**To:** Mawn, Steve
**Subject:** E1300 Figures and Tables for Woodhead Publishing: Architectural glass to resist seismic and extreme climatic events (ed. Behr)

Steve-

Here is a list of the E1300 figures and tables we need for our chapter 7 *"Glass to Resist Snow Loads"* in the above book.

ASTM089103

| Example | Figures and Tables |
|---------|--------------------|
| 7.1 | Fig A1.4 |
| 7.2 | Fig A1.20 |
| 7.3 | Fig A1.25 |
| 7.4 | Fig A1.31 |
| 7.5 | Fig A1.41<br>Table 1 |
| 7.6 | Fig A1.6<br>Fig A1.28<br>Tables 2-3,5-6 |
| 7.7 | Fig A1.6<br>Fig A1.28<br>Tables 2-3,5-6 |
| 7.8 | Fig A1.33<br>Table 1 |
| 7.9 | Fig A1.41<br>Table 1 |
| 7.10 | Fig A1.6<br>Fig A1.8<br>Table 1 |

There are some repeats of the tables and figures, so we hope that we can use permitted information more than once in the chapter.

Can we obtain permission and the files for the chapter?  Our deadline is January 30 for the final draft, so let us know if this is possible.

Best,
**Russell H. Davies, P.E. (NY)**
**SIMPSON GUMPERTZ & HEGER**
Engineering of Structures and Building Enclosures

19 W. 34th Street, Suite 1000
New York, NY 10001

212.271.7000 main
212.271.6950 direct
646.462.5899 mobile
212.271.0111 fax

ASTM089104

# EXHIBIT 119

| From: | Pace, John </O=ASTM/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=JPACE> |
|---|---|
| Sent: | Wednesday, January 4, 2012 4:08 PM |
| To: | West, Lesley <lwest@astm.org>; Hooper, Kathe <khooper@astm.org> |
| Subject: | RE: Use of Figures from G-1 Standards in MTI Book |

Lesley/Kathe-

Given our "triple standard " here on considerations for such requests (Sheldon is "platinum level' because of member/committee leader/BOD/JAI/COP connection status), and the fact that such figures are extracted from various standards so the potential impact on any one is significantly reduced, let's help him out as much as possible, and the only thing needed would be to get the final numbers of figures and detailed # and document from where extracted in a final permission to cover all sides.

Thanks!
JP

---

**From:** West, Lesley
**Sent:** Wednesday, January 04, 2012 3:55 PM
**To:** Hooper, Kathe
**Cc:** Pace, John
**Subject:** Re: Use of Figures from G-1 Standards in MTI Book

 Dear Kathe,

We can easily gather these figures for you and Sheldon, if that is what you want. Please let us know if you wish us to proceed.

Thanks,
Lesley

---

**From:** "Hooper, Kathe" <khooper@astm.org>
**Date:** Wed, 4 Jan 2012 15:24:22 -0500
**To:** Lesley West <lwest@astm.org>
**Cc:** "Pace, John" <jpace@astm.org>
**Subject:** FW: Use of Figures from G-1 Standards in MTI Book

Hi Lesley.

Please see the email below from Sheldon Dean.  I realize that we typically do not provide figures for reproduction purposes.  Since Sheldon has done so much for ASTM (COP Chairman, Chairman of the Finance/Audit Committee, etc.), I was wondering if we would be able to provide him with copies of the figures as he requested?   (As he notes in his email, there may be several more figures than those noted below.) Please let me know.

Thank you. Kathe

**From:** Rodgers, Jen
**Sent:** Wednesday, December 28, 2011 2:51 PM

**To:** Hooper, Kathe
**Cc:** 'sheldondean@att.net'
**Subject:** FW: Use of Figures from G-1 Standards in MTI Book

Kathe,
I hope you had a wonderful Christmas holiday.

Please see the request below. Do you need to have the final version in order to determine permissions? If permission is granted, can we request better versions of the referenced images from Graphics or Editorial?

Thanks,
Jen

**Jennifer L. Rodgers** |Manager, Technical Committee Operations
ASTM International | 100 Barr Harbor Drive | West Conshohocken, PA 19428
Phone: +1-610-832-9694 | Fax: +1-610-834-7016
jrodgers@astm.org <mailto:jrodgers@astm.org> | www.astm.org <http://www.astm.org/>

⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯⋯

**From:** Sheldon Dean [mailto:sheldondean@att.net]
**Sent:** Monday, December 05, 2011 2:50 PM
**To:** Rodgers, Jen
**Cc:** Emory Ford
**Subject:** Use of Figures from G-1 Standards in MTI Book

Jen,

You may remember that I mentioned that I am currently writing a book for MTI (Materials Technology Institute) on laboratory corrosion testing.  I am now finishing up the second chapter draft in which I would like to include 5 figures from ASTM publications.  These are listed below.  At this point, I have scanned the figures and pasted them into the draft chapter.  The chapter will be sent to the project team for review shortly, so nothing is finalized yet.  My questions are: Is there anything I should do now regarding getting permission to use these figures?  I believe that there will be several more figures that I will want to use before the book is finished. (There are about 9 more chapters to go.)  My other question is whether there is any way that I could get a better copy than a scanned version?  It is not important now, but when the book is finished having a good copy would make the final product look more professional. Finally, if there is a recommended wording for permission to use these figures, I would like to have it.

Figures: G 31, Fig. 1; G 5, Fig. 3; G 36, Fig. X1.2 and Fig. X1.3; Manual 20, Second Ed. Chapter 79, p. 789, Fig. 9.

Thanks for your help on this.

Sheldon

Sheldon W. Dean
Dean Corrosion Technology, Inc.

ASTM091244

306 Marshall Landing
Glen Mills, PA 19342
Phone:610-558-1293
Cell phone: 610-428-5602
Email: sheldondean@att.net
Web page: www.deancorrtech.com <http://www.deancorrtech.com>

# EXHIBIT 120

| **From:** | Pace, John </O=ASTM/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=JPACE> |
| **Sent:** | Friday, September 5, 2008 10:15 AM |
| **To:** | Hooper, Kathe <khooper@astm.org> |
| **Subject:** | RE: Method info |

Kathe-

It appears they have extracted the summary information on the test method and included in their description or requirements section, so, yes, this is too much info taken and we can't allow as is.

Am okay with your proposed recommendation to them!

Thanks!
John Pace

**From:** Hooper, Kathe
**Sent:** Friday, September 05, 2008 9:46 AM
**To:** Pace, John
**Subject:** FW: Method info

Hi John.

When you get a minute, would you please take a look at this website, http://www.caslab.com/Test-Methods-Search/,
and the email below.  I don't think we should give them permission to use the material from the standard as presented on the website as they are taking various portions of the standard.  Are you okay with me giving them permission to reproduce the titles and scopes only, for a three year period, provided the usual credit line is used?

Thanks.  Kathe

**From:** Olshefsky, Jim
**Sent:** Thursday, August 28, 2008 1:17 PM
**To:** 'Trent Mueller'
**Cc:** Hooper, Kathe
**Subject:** RE: Method info

**From:** Trent Mueller [mailto:tmueller@caslab.com]
**Sent:** Thursday, August 28, 2008 1:10 PM
**To:** Olshefsky, Jim
**Subject:** Method info

Hello Jim,

I am a webmaster working for a laboratory, Columbia Analytical and saw you as the contact on the ASTM website. We have a new educational area of our website now in 'beta' where we are creating a database to help people find test methods they're looking for.

May we have your permission to use some ASTM method abstracts on our website?

http://www.caslab.com/Test-Methods-Search/

I have entered in some of your company's test method abstracts as a placeholder and I gave your company credit as the source. Would you like to be represented in this manner?

ASTM095342

If you are interested in getting as much exposure as possible, I am happy to add more of your method abstracts if you'd like. I would just need a .csv or Excel file with this information.

Thank you and I look forward to your response,


*Trent Mueller*
Webmaster

**Columbia Analytical Services, Inc.**
1317 S. 13th Ave
Kelso, WA 98626
360-577-7222 (office)
360-501-3320 (direct)
www.caslab.com

NOTICE: This communication (including any attachments) may contain privileged or confidential information intended for a specific individual and purpose, and is protected by law. If you are not the intended recipient, you should delete this communication and any attachments and are hereby notified that any disclosure, copying or distribution of this communication, or the taking of any action based on it, is strictly prohibited. Thank you.

ASTM095343