# EXHIBIT 141
# (FILED UNDER SEAL)

# EXHIBIT 142
# (FILED UNDER SEAL)

# EXHIBIT 143

Δ π EXHIBIT/56
Deponent Grove
Date 3|4|5 Rptr nm
WWW.DEPOBOOK.COM

ASTM License Agreement (Reading Room)

The purpose of this site is to provide the public with access to ASTM International standards ("ASTM Documents") which have been referenced or incorporated into federal regulation or laws. Please use this site to review these standards. The ASTM Documents are provided as a public service, and you represent that you will not make any commercial use of the ASTM Documents available here. These ASTM Documents are available for review only, and hardcopies and printable versions will continue to be available for purchase. By clicking on any ASTM Document, you agree to be bound by the terms of this agreement both as to this and each subsequent use you make of the ASTM Document, and you are responsible for ensuring that the terms of this agreement are met.

IMPORTANT- READ THESE TERMS CAREFULLY BEFORE ACCESSING ANY ASTM DOCUMENT.
By accessing any ASTM Document you are entering into a contract, and acknowledge that you have read this License Agreement, that you understand it and agree to be bound by its terms. If you do not agree to the terms of this License Agreement, promptly exit this site.

License:
ASTM grants you, the ASTM visitor, a nonexclusive and nontransferable license to view online the content of the ASTM Document(s). The ASTM Document is designed to be viewed online only - there are no "print," "save," or "cut and paste" options - and the license granted to you by this agreement does not include the right to download, reproduce, store in a retrieval system, modify, make available on a network, use to create derivative works, or transmit the content of the ASTM Document in any form or by any means, electronic, mechanical, photocopying, recording, scanning, or otherwise.

This license is specifically granted conditioned on your completion of the on-line registration form and you represent that the information you provided is truthful and accurate.

Copyright:
This site and all of its content are protected by copyright pursuant to U.S. and international copyright laws. You may not copy or download any of the material contained on this site in whole or in part without the express authorization of ASTM. You may not publish, modify, transmit, reproduce, create new works from, distribute, sell, loan, nor in anyway exploit any of the material contained on this site in whole or in part, without the express authorization of ASTM.

Trademark:
Except as indicated, ASTM owns all trademarks, service marks, certification marks, and logos featured on this site, including the terms "ASTM," ASTM International" and the "American Society for Testing and Materials." Use of these marks without the express written permission of ASTM is expressly prohibited.

Indemnification:
You agree to indemnify and hold ASTM, its directors, officers, members, and employees harmless from any claims, demands, or damages, including attorney fees, asserted by any third party due to or arising out of your use of or conduct on the site or of any ASTM Document.

Disclaimer of Warranty and Liability:
ASTM MAKES NO REPRESENTATION THAT THE DOCUMENTS ON THIS SITE ARE THE MOST RECENT OR UP-TO-DATE VERSION OF THE ASTM STANDARDS CURRENTLY AVAILABLE. IT IS THE VISITOR'S RESPONSIBILITY TO DETERMINE IF THE DOCUMENT MEETS THEIR REQUIREMENTS OR PURPOSES.

ASTM SHALL NOT BE LIABLE FOR ANY DIRECT, SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL, OR PUNITIVE DAMAGES, INCLUDING WITHOUT LIMITATION, LOST REVENUES OR LOST PROFITS, WHICH MAY RESULT FROM THE USE OF, ACCESS TO, OR INABILITY TO USE THESE MATERIALS. UNDER NO CIRCUMSTANCES WILL THE TOTAL LIABILITY OF ASTM TO YOU BASED ON ANY CAUSE OF ACTION EXCEED $100.

Miscellaneous:
As a condition of your use of this site, you agree not to use the site for any purpose that is unlawful or prohibited by this agreement.

Use of the site by you is unauthorized in any jurisdiction that does not give effect to all provisions contained in this agreement.

If any part of these terms and conditions is held to be invalid or unenforceable for any reason including, but not limited to, the warranty disclaimers and liability limitations specified above, then the invalid or unenforceable provision will be deemed superseded by a valid enforceable provision that most closely matches the intent of the original provision and the remainder of the agreement will remain in full force and effect.

A printed version of this agreement shall be admissible in judicial or administrative proceedings based upon or relating to this agreement to the same extent and subject to the same conditions as other business documents and records originally generated and maintained in printed form.

These terms and conditions constitute the entire agreement between you and ASTM with respect to your use of the site. You acknowledge that, in providing you access to and use of the site, ASTM has relied on your agreement to be legally bound by these terms and conditions.

This agreement shall be construed and interpreted pursuant to the laws of the Commonwealth of Pennsylvania applicable to agreements wholly entered into and performed in Pennsylvania, excluding that body of law dealing with conflict of laws. Any legal action, suit, or proceeding arising out of or relating to this agreement or the breach thereof shall be instituted in a court of competent jurisdiction in Pennsylvania, and each party hereby consents and submits to the personal jurisdiction of such court, waives any objection to venue in such court and consents to the service of process by registered or certified mail, return receipt requested, at the last known address of such party.

You may not assign or transfer your rights or obligations under this agreement.

ASTM001815

# EXHIBIT 144

| | |
|---|---|
| **From:** | Hooper, Kathe </O=ASTM/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=KHOOPER> |
| **Sent:** | Friday, June 5, 2009 8:44 AM |
| **To:** | 'sales@ninjapaintball.com' |
| **Cc:** | Sierk, Christine <csierk@astm.org> |
| **Subject:** | RE: ASTM Copyrights |



Δ π EXHIBIT 1068
Deponent Grove
Date 3/4/15 nm
WWW.DEPOBOOK.COM

Dear Mr. Trimble,

This is in response to your emails to Christine Sierk.

Please be advised that ASTM policy does not permit the posting of our material on the public internet.

Should you have any questions, please contact me (phone:  610-832-9634, fax:  610-832-9635, e-mail:  khooper@astm.org).

Kind regards,


*Kathe Hooper*
*ASTM International*
*100 Barr Harbor Drive, PO Box C700*
*West Conshohocken, PA  19428-2959*
*phone:  610-832-9634*
*fax:  610-832-9635*
*email:  khooper@astm.org*

---

**From:** Sierk, Christine
**Sent:** Wednesday, June 03, 2009 2:07 PM
**To:** Hooper, Kathe
**Subject:** FW: ASTM Copyrights

Hi Kathe,
They just resent another email, please see below…
Many Thanks and feel better!
Christi

**From:** Ninja Paintball [mailto:sales@ninjapaintball.com]
**Sent:** Wednesday, June 03, 2009 1:09 PM
**To:** Sierk, Christine
**Subject:** ASTM Copyrights

Christine,

Sorry to bother you but tried to e-mail ASTM and never got a reply.

I am a member for F08-24 Paintball and am having a discussion with some people on a public forum about some standards. What is the policy of ASTM regarding copying parts of a standard for discussion on the internet? Do I need written permission and is there a fee involved?

Thank you for your time,

Ray Trimble
Sales Manager

ASTM095371

Ninja Paintball
186 Virginia Rd.
Crystal Lake, IL 60014
877-NinjaUSA (646-5287)
815-477-0007 ext 306
Fax 815-477-7395
www.ninjapaintball.com
Proudly Made in the USA

ASTM095372

# EXHIBIT 145

| | |
|---|---|
| **From:** | Hooper, Kathe </O=ASTM/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=KHOOPER> |
| **Sent:** | Friday, January 11, 2013 9:48 AM |
| **To:** | Koury, Joe <jkoury@astm.org> |
| **Subject:** | RE: Information usage on the internet |

Thank so much, Joe!!!



*Kathe Hooper*
*ASTM International*
*100 Barr Harbor Drive, PO Box C700*
*West Conshohocken, PA  19428-2959*
*phone:  610-832-9634*
*fax:  610-834-7018*
*email:  khooper@astm.org*

**From:** Koury, Joe
**Sent:** Friday, January 11, 2013 9:28 AM
**To:** Hooper, Kathe
**Subject:** RE: Information usage on the internet

Kathe,

Just talked to the chair.  He pretty much said if ASTM is fine with this, then he's fine.  His only concern is this person lifting large chunks of info from D2000 and pasting it on the website.  I told him we have the same concerns, but there's nothing yet that indicates this person is going to that.

So I guess your response below is good to go.

Thanks
Joe

**From:** Hooper, Kathe
**Sent:** Thursday, January 10, 2013 3:17 PM
**To:** Koury, Joe
**Subject:** FW: Information usage on the internet

Hi Joe.

Hate to bug you... Have you had a chance to talk with your committee officers on the email request below?

Thanks.  Kathe

**From:** Hooper, Kathe
**Sent:** Thursday, December 20, 2012 9:53 AM
**To:** Koury, Joe
**Subject:** FW: Information usage on the internet

Hi Joe,

At John's request, I'll wait to hear from you before moving forward.

Have a great day.  If I don't see you tomorrow... Merry Christmas!

Kathe

**From:** Pace, John
**Sent:** Thursday, December 20, 2012 9:50 AM
**To:** Hooper, Kathe
**Subject:** RE: Information usage on the internet

OK by me after you get input back from Joe and he needs to touch base first with his committee heads. - JP

**From:** Hooper, Kathe
**Sent:** Thursday, December 20, 2012 9:27 AM
**To:** Pace, John; Koury, Joe
**Subject:** RE: Information usage on the internet

John/Joe,

Thanks for your comments on this request.  Unless I hear from you otherwise,  I will grant Richard Ludlam/Eriks UK permission  to build the guide on their website around the values and parameters in the standard and ask that they use the following credit line. "The values in this guide have been extracted, with permission, from ASTM D2000-12 Standard Classification System for Rubber Products in Automotive Applications.  A copy of the complete standard may be obtained from ASTM, www.astm.org."

I will also note that they may not lift any other text, figures or charts from the standard,  use our logo, or imply ASTM endorses or certifies his product.

Thanks again.  Have a good day. Kathe

**From:** Pace, John
**Sent:** Wednesday, December 19, 2012 6:36 PM
**To:** Koury, Joe
**Cc:** Hooper, Kathe
**Subject:** FW: Information usage on the internet

Joe-

Just for safety's sake, why don't you touch base with the committee chair of this particular standards activity and make him aware.  There are many many products out there like this in other areas....as long as they don't lift text, figures, charts, ver batim, and don't claim an official designation status, and don't use our logo, there isn't really too much we can do other than my recommendation.

Thanks!
John P.

**From:** Koury, Joe
**Sent:** Wednesday, December 19, 2012 4:18 PM
**To:** Hooper, Kathe
**Cc:** Pace, John
**Subject:** RE: Information usage on the internet

D2000 is a pretty important standard in the rubber industry, so I'm totally in favor of John's suggestion below regarding the disclaimer.

However, if you both think this doesn't warrant time and energy, then I'm fine with that as well.

D2000 is going to be a good seller regardless of what this person does on his website.

Thanks

ASTM092007

Joe

**From:** Hooper, Kathe
**Sent:** Tuesday, December 18, 2012 2:20 PM
**To:** Koury, Joe
**Cc:** Pace, John
**Subject:** RE: Information usage on the internet

Joe, Any comments before I respond?

Thank you.  Kathe

*Kathe Hooper*
*ASTM International*
*100 Barr Harbor Drive, PO Box C700*
*West Conshohocken, PA  19428-2959*
*phone:  610-832-9634*
*fax:  610-834-7018*
*email:  khooper@astm.org*

**From:** Pace, John
**Sent:** Wednesday, December 12, 2012 8:20 AM
**To:** Hooper, Kathe; Koury, Joe
**Subject:** RE: Information usage on the internet

Kathe/Joe-

I looked briefly but had troubles and didn't spend much time trying to navigate the site.  Botton line....he cannot use our logo and imply ASTM endorses or certifies his product.  He cannot use exact text lifted from the standard or replication of figures and tables as they may possibly reside in the standard (if such is the case).  If he has built a product based around the values and parameters included in the ASTM standard without any violations which I've briefly highlighted above, although this is a derivative type product and borderline as to stepping on our toes, there isn't much we can do to legally stop him.  We could possibly bluff him and ask him to put a disclaimer that "ASTM has granted him ERIKS permission to use values from D2000 but for legal and liability purposes, users should reference and confirm results with the originally published version of ASTM D2000"....but I'm not sure that is worth the time and energy.  Is the owner of this product an active member?

So let me know if you discover more that might push this over the edge into something for which we need to address and challenge more directly.  Otherwise, he has a mouse trap for which if we had the expertise, time, resources, etc, we possibly should have developed ourselves!!!

Thanks!
John Pace

**From:** Hooper, Kathe
**Sent:** Tuesday, December 11, 2012 3:40 PM
**To:** Pace, John; Koury, Joe
**Subject:** FW: Information usage on the internet

Hello, John and Joe.

Please see the request below.  It appears to me that they are creating a derivative work of the D2000 and that we should not allow this.

Let me know your thoughts.

ASTM092008

Thank you.
Kathe

*Kathe Hooper*
*ASTM International*
*100 Barr Harbor Drive, PO Box C700*
*West Conshohocken, PA  19428-2959*
*phone:  610-832-9634*
*fax:  610-834-7018*
*email:  khooper@astm.org*

**From:** Richard Ludlam [mailto:Richard.Ludlam@eriks.co.uk]
**Sent:** Tuesday, December 11, 2012 10:37 AM
**To:** Hooper, Kathe
**Subject:** Information usage on the internet

I'd just like to check with you what we need to do to use the information contained within your American Society for Testing and Materials D-2000 Line call-outs on a web site that guides our customers through the process, we have built a test area at http://oring-groove-wizard.eriks.co.uk/ASTMlookup.aspx, this simple screen is something our customers have asked for but uses your processes and data.

Can you advise if there is any licensing implication please.

**Richard Ludlam**
Marketing Manager

**ERIKS UK**
Amber Way | Halesowen | West Midlands | B62 8WG
t: 0121 508 6000 | f: 0121 508 6255
www.eriks.co.uk

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed.
If you are not the intended recipient, please notify us immediately and do not disclose, distribute, or retain this email or any part of it.
Unless expressly stated, opinions in this email are those of the individual sender, and not of ERIKS Group.
We believe, but do not warrant, that this email and any attachments are virus free. You must therefore take full responsibility for virus checking.
ERIKS Group and its subsidiaries reserve the right to monitor all email communications through their networks.

ERIKS Industrial Services Ltd
Company number 3142338 Registered in England and Wales
Registered office: Amber Way, Halesowen, West Midlands B62 8WG

ASTM092009

# EXHIBIT 146
# (FILED UNDER SEAL)

# EXHIBIT 147

 **ASTM INTERNATIONAL**
Helping our world work better

All | Search topic, title, author, A53 | 🔍 | **SIGN IN** 👤

PRODUCTS & SERVICES | GET INVOLVED | ABOUT | NEWS     Languages | Contact | Cart

Products and Services / Standards & Publications / Standards Products

**Standards & Publications**

All Standards & Publications

**Standards Products**

Symposia Papers & STPs

Manuals, Monographs, & Data Series

Journals

Reading Room

Authors

Book of Standards

Product Updates

Catalogs

Digital Library

Enterprise Solutions

Proficiency Testing

Training Courses

Certification & Declaration

Lab Directory

Cement & Concrete Reference Lab

**Recommended**

Standards Tracker

Standards Subscriptions

**Recommended**



ASTM Training: Apply standards more effectively

Train at our location or yours, and get instruction on the most important standards you use

ASTM D396 - 98 ⓘ

# Standard Specification for Fuel Oils

SUPERSEDED (click for Active standard)

| Format | Pages | Price | |
|--------|-------|-------|--|
| 📄 PDF | 5 | $52.80 | 🛒 ADD TO CART |

Active (view current version of standard)

Other Historical Standards

ASTM License Agreement

MORE D02.E0.01 STANDARDS | RELATED PRODUCTS

1. Scope

1.1 This specification (Note 1) covers grades of fuel oil intended for use in various types of fuel-oil-burning equipment under various climatic and operating conditions. These grades are described as follows:

1.1.1 Grades 1, 1 Low Sulfur, 2 and 2 Low Sulfur are middle distillate fuels for use in domestic and small industrial burners. Grades 1 and 1 Low Sulfur are particularly adapted to vaporizing type burners or where storage conditions require low pour point fuel.

1.1.2 Grades 4 (Light) and 4 are heavy distillate fuels or distillate/residual fuel blends used in commercial/industrial burners equipped for this viscosity range.

1.1.3 Grades 5 (Light), 5 (Heavy), and 6 are residual fuels of increasing viscosity and boiling range, used in industrial burners. Preheating is usually required for handling and proper atomization.

Note 1--For information on the significance of the terminology and test methods used in this specification, see Appendix X1.

Note 2--A more detailed description of the grades of fuel oils is given in X1.3.

1.2 This specification is for the use of purchasing agencies in formulating specifications to be included in contracts for purchases of fuel oils and for the guidance of consumers of fuel oils in the selection of the grades most suitable for their needs.

1.3 Nothing in this specification shall preclude observance of federal, state, or local regulations which can be more restrictive.

1.4 All values are stated in SI units and are regarded as standard.

Note 3--The generation and dissipation of static electricity can create problems in the handling of distillate burner fuel oils. For more information on the subject, see Guide D 4865.

2. Referenced Documents *(purchase separately)* ⓘ

ASTM Standards

D56 Test Method for Flash Point by Tag Closed Cup Tester

D86 Test Method for Distillation of Petroleum Products at Atmospheric Pressure

D93 Test Methods for Flash Point by Pensky-Martens Closed Cup Tester

D95 Test Method for Water in Petroleum Products and Bituminous Materials by Distillation

D97 Test Method for Pour Point of Petroleum Products

D445 Test Method for Kinematic Viscosity of Transparent and Opaque Liquids (and Calculation of Dynamic Viscosity)

D473 Test Method for Sediment in Crude Oils and Fuel Oils by the Extraction Method

D482 Test Method for Ash from Petroleum Products

D664 Test Method for Acid Number of Petroleum Products by Potentiometric Titration

D1266 Test Method for Sulfur in Petroleum Products (Lamp Method)

D1298 Test Method for Density, Relative Density, or API Gravity of Crude Petroleum and Liquid Petroleum Products by Hydrometer Method

D2500 Test Method for Cloud Point of Petroleum Products

D4294 Test Method for Sulfur in Petroleum and Petroleum Products by Energy Dispersive X-ray Fluorescence Spectrometry

D4306 Practice for Aviation Fuel Sample Containers for Tests Affected by Trace Contamination

D5854 Practice for Mixing and Handling of Liquid Samples of Petroleum and Petroleum Products

D6892 Test Method for Pour Point of Petroleum Products (Robotic Tilt Method)

D7039 Test Method for Sulfur in Gasoline, Diesel Fuel, Jet Fuel, Kerosine, Biodiesel, Biodiesel Blends, and Gasoline-Ethanol Blends by Monochromatic Wavelength Dispersive X-ray Fluorescence Spectrometry

D7094 Test Method for Flash Point by Modified Continuously Closed Cup (MCCCFP) Tester

D7220 Test Method for Sulfur in Automotive, Heating, and Jet Fuels by Monochromatic Energy Dispersive X-ray Fluorescence Spectrometry

D7371 Test Method for Determination of Biodiesel (Fatty Acid Methyl Esters) Content in Diesel Fuel Oil Using Mid Infrared Spectroscopy (FTIR-ATR-PLS Method)

Keywords

Burner Fuels - Fuel Oils - Heating And Lighting Fuel Oils - Heavy Distillate Fuels - Liquid Fuels - Middle Distillate Fuels - Residual Fuel Oils

ICS Code

ICS Number Code 75.160.20 (Liquid fuels)

UNSPSC Code

UNSPSC Code 15101700(Fuel Oils)

## Referencing This Standard

DOI: 10.1520/D0396-98

cross ref ASTM International is a member of CrossRef.

Citation Format

ASTM D396-98, Standard Specification for Fuel Oils, ASTM International, West Conshohocken, PA, 2001, www.astm.org

BACK TO TOP



Home   |   About ASTM   |   Site Map   |   Support   |   Contact   |   Policies   |   Copyright/Permissions

Copyright © 1996 - 2015 ASTM. All Rights Reserved. ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA, 19428-2959 USA

# EXHIBIT 148

*AE*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**FILED**

FEB 2 8 2005
FEB 28 2005
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

|  |  |  |
|---|---|---|
| INTERNATIONAL CODE COUNCIL, INC., and BUILDING OFFICIALS AND CODE ADMINISTRATORS INTERNATIONAL, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) ) ) | NO. 02C 5610<br><br>Judge Rebecca R. Pallmeyer |
| NATIONAL FIRE PROTECTION ASSOCIATION, INC., | ) ) ) ) | |
| Defendant. | ) | |

## NOTICE OF FILING and CERTIFICATE OF SERVICE

**TO:** Alan S. Wernick, Esq., Querrey & Harrow, 175 West Jackson Boulevard, Suite 1600, Chicago, IL   60604
James Hamilton, Esq., Swidler Berlin Shereff Friedman, 3000 K Street, NW, Suite 300, Washington DC   20007

**PLEASE TAKE NOTICE** that on February 28, 2005 there was filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, Defendant National Fire Protection Association's Memorandum in Support of Defendant's Motion for Summary Judgment, a copy of which is attached hereto and was served upon counsel.

Peter C. John, Esq.

Williams Montgomery & John Ltd.
2100 Civic Opera Building
Twenty North Wacker Drive
Chicago, IL 60606
(312) 443-3200

Thomas F. Holt, Jr.
Tara C. Clancy
Christopher Centurelli
Kirkpatrick & Lockhart LLP
75 State Street
Boston, MA 02109
(617) 261-3100

## CERTIFICATE OF SERVICE

Karen M. Begg being first duly sworn on oath states that on February 28, 2005 a true copy of the foregoing Notice of Filing and Memorandum were served on the following via hand delivery:

> Alan S. Wernick, Esq.
> Quarles & Brady LLC
> 500 West Madison Street
> Suite 3700
> Chicago, IL   60661-2511

and to the following via regular U.S. Mail

> kramer@swidlaw.com
> jhamilton@swidlaw.com
> Kevin R. Amer
> James Hamilton, Esq.
> Swidler Berlin Shereff Friedman
> 3000 K Street, NW
> Suite 300
> Washington, D.C.   20007

Karen M. Begg

Subscribed and sworn to before me
this 28th day of February, 2005.

NOTARY PUBLIC

"OFFICIAL SEAL"
DENISE E. MATHAUSER
Notary Public, State of Illinois
My Commission Expires 8/30/07



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**FILED**

FEB 9 2009

FEB 28 2005
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

INTERNATIONAL CODE COUNCIL,
INC.,

Plaintiff,

v.

NATIONAL FIRE PROTECTION
ASSOCIATION, INC.,

Defendant.

**CIVIL ACTION NO. 02C 5610**

Judge Rebecca R. Pallmeyer

## MEMORANDUM IN SUPPORT OF DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Both the plaintiff, International Code Council, Inc. ("ICC"), and the defendant, National

Fire Protection Association, Inc. ("NFPA"), produce model building codes for private self

regulation as well as government use and adoption. In this copyright infringement action, ICC

alleges that NFPA copied certain provisions from its model building code, the IBC 2000. ICC,

however, cannot prove any of the elements of copyright infringement.

First, ICC does not own the code language it asserts against NFPA. The ICC's model

code, like the accused NFPA code, was prepared by committees of volunteer public officials and

***not*** by employees of the ICC. The asserted code provisions were either drafted by the

committee members, extracted from pre-existing standards and code, or adopted from proposals

submitted by the public. ICC received no assignments from the committee members or from the

contributing public for the text they created. It therefore has no right to claim ownership of the

code provisions and assert them against NFPA.

Second, NFPA did not copy ICC's code. NFPA developed its own building code independently, and the works are not substantially similar. In fact, ICC recently reduced its allegations considerably, and now alleges that NFPA copied only portions of 5% of the provisions in its building code.

Finally, even if ICC could prove that it owned the asserted code provisions and that NFPA copied language from them, the allegedly copied material is not protectible subject matter. The allegedly copied language is merely statements of facts and ideas, following mandatory conventions, and is therefore precluded from copyright protection under the merger doctrine.

For each of these three reasons, NFPA is entitled to summary judgment.

## I.     FACTS

### A.     The Parties

Plaintiff ICC was formed in 1994 from three regional code-writing organizations: Building Officials and Code Administrators International, Inc. ("BOCA"), International Conference of Building Officials ("ICBO"), and Southern Building Code Congress International, Inc. ("SBCCI"). Each of these regional organizations had developed their own model building codes ("the legacy codes"), and these codes had grown similar over the decades due to development of common code formats. (Ex. A at 24.)[1] In 1994, the regional organizations formed the ICC to jointly prepare a single model code. (Ex. A at 24-25.) In 2000, ICC released the International Building Code 2000 ("IBC 2000"), its first joint model building code.

Defendant NFPA has been developing model fire codes and other building safety codes for more than 100 years. In 1999, NFPA began a project to integrate and expand its existing

_____

[1] Ex. ___ refers to the exhibits to the Declaration of Christopher Centurelli, filed herewith.

safety codes into a comprehensive set of building related codes. (Ex. B at Attachment A.) This project led to the NFPA's Building Construction and Safety Code ("NFPA 5000"), the code accused of infringement in this case.

## B.    The IBC 2000 Model Code

The IBC 2000 model code was developed between 1996 and 2000 in a complex iterative process involving a large number of people. The process was run by committees of volunteer public officials. The committees selected language for the code provisions by: (a) adopting language from existing legacy codes; (b) adopting language submitted by industry groups or other members of the public; or (c) drafting or revising language themselves. (*See* Ex. A at 36-37.) Staff employees of the ICC assisted the committees in a "secretariat" role, but did not author or select code language. (Ex. A at 65; Ex. C at 39, 49-50; Ex. D. at 67-68.)

### 1.    The Committees

The IBC 2000 was developed by six committees: a steering committee that set the procedures for creating the code and five technical subcommittees that developed the specific code language. (Ex. D at 33-34.) The technical subcommittees each had nine members, (Ex. P at vii.), all of whom were either public employees responsible for enforcement of building regulations in their jurisdiction or, in some cases, industry representatives. (Ex. D at 19-20; Ex. F at 37-38; Ex. A at 136.) None were employees of the ICC, (Ex. A at 16-17, 26-28; Ex. D at 19-20), and all volunteered their time (Ex. C at 43). The technical subcommittee members were selected to serve based on their expertise in an area, their familiarity with the code development process, and their willingness to devote time to the project. (Ex. C at 45-46.)

- 3 -

The committee members who developed the IBC 2000 did not assign their copyright

rights to ICC, nor did they enter into any work-for-hire contracts with ICC.[2] The only grant ICC

requested from the Committee members was a *nonexclusive license* to use the materials:

> I agree that ICC shall have nonexclusive, royalty-free license to use any material
> that I may provide to or develop for the Committee. I hereby grant ICC a
> nonexclusive, royalty-free license to all rights in copyright that I may have as an
> author of the materials produced by an ICC Committee.

(Ex. H at 4.)[3] Thus, ICC never acquired any ownership rights to the code language contributed

by the committees.[4]

### 2. The Code Drafting Procedure and Contributions from the Public

The IBC 2000 was developed through an iterative process to allow contributions from the

public. In each iteration, the subcommittees would prepare a draft of the code and release it to

the public for comment. Industry groups and other members of the public would then submit

suggested code revisions. After a hearing, the subcommittees would adopt or reject the

suggestions and prepare a revised draft for further public comment. (Ex. A at 36-37; Ex. J.)

---

[2] There was one exception. Three members of the fire safety subcommittee, William R. Bryant, Michael McReynolds, and Donald R. Mercer, signed explicit work for hire agreements with ICC in June and July 1997. (Ex. G.) However, these agreements were all signed after completion of the first working draft of the IBC 2000. (Ex. F at 190-92.) The agreements are therefore irrelevant unless the ICC can demonstrate that one of these individuals contributed code language after completion of the first working draft. *Respect Inc. v. Committee on Status of Women*, 815 F. Supp. 1112, 1117 n.10 (N.D. Ill. 1993). ICC's Rule 30(b)(6) witness could not identify any specific sections drafted by these three committee members. (Ex. F at 198.)

[3] Ex. H, which contains the nonexclusive license grant, is an ICC Committee Application dated May 31, 2001. (Ex. H, at 3.) One of ICC's Rule 30(b)(6) witnesses, Dominic Sims, testified that similar applications were likely used for the members of technical subcommittees which developed the IBC 2000. (Ex. A at 139-40.)

[4] After NFPA pointed out ICC's lack of ownership during this litigation, the ICC began asking all the volunteers to sign work for hire agreements as part of their application to serve on a committee. (Ex. I at 4.) This 2004 change, however, is too late to help ICC in this case.

There were a total of four iterations. A first Working Draft was published in May 1997. (Ex: D at 46.) Industry groups and other members of the public then submitted hundreds, perhaps thousands of comments and proposed code language. (Ex. F at 56-57.) The technical subcommittees held a public hearing at which they adopted, rejected, or took submissions under consideration for further review. (Ex. D at 47-49.) A subsequent "First Draft" was completed in November 1997, followed by another round of submissions of proposed code changes. (Ex. D at 51-54.) In this second round, more than 600 proposed changes were received by the fire safety subcommittee alone, and the other four subcommittees likely received a similar volume. (Ex. F at 139.) After a second public hearing, a "Final Draft" was published in July 1998. (Ex. D at 55-56.) The Final Draft was followed by another round of submissions and a final hearing. The resulting text was then approved by the constituent members of the ICC (BOCA, SBCCI, and ICBO) and published as the IBC 2000. (Ex. D at 57-61.)

When members of the public submitted proposed code language, they did *not* assign any copyright in the language to the ICC. Rather, like the committee membership application, the comment submission form granted the ICC only a nonexclusive license to use the proposed language in its model code:

> I hereby grant the International Code Council the nonexclusive, royalty-free rights, including nonexclusive, royalty-free rights in copyright, in this proposal and I understand that I acquire no rights in any publication of the International Code Council in which this proposal in this or another similar analogous form is used.

(Ex. J; Ex. K; Ex. L.) The purpose of this provision was simply to give the ICC "authority to utilize [the] material," not to gain full ownership rights. (Ex. F at 42.) Thus, ICC has no right to exclude others from using the code language submitted by the public.[5]

### 3.    The BCMC Reports

In addition to contributions from legacy codes, committee members, and the public, a fourth source of material for the IBC 2000 was reports created by the Board for the Coordination of Model Codes. During the 1980's and early 1990's, the four major model code organizations—the predecessors of ICC (BOCA, SBCCI, and ICBO) and the defendant, NFPA—participated in a program to harmonize provisions in their model codes. The four organizations sent representatives to meetings of a board, called the Board for the Coordination of Model Codes ("BCMC"). (Ex. N at 29.) The BCMC prepared reports which recommended model code provisions for all four member organizations. (Ex. O at 3.) Importantly, all four organizations agreed "to waive copyright protection for the benefit of the other participating organizations with respect to any code language developed from a code or standard copyright by such participating organization." (Ex. O at 2.) In other words, any model code language in the BCMC reports was fair game for all four organizations.

In preparing the IBC 2000 model code, the ICC committees used provisions from the BCMC reports "as often as possible." (Ex. F at 94.) Because the BCMC reports "included almost every subject addressed by a building code," (Ex. D at 115-16; Ex. N), BCMC language

---

[5] Notably, after this lawsuit began, ICC tried to change its comment submission form to require copyright assignments from members of the public submitting proposed code language. However, this change met with resistance from some industry groups, who wanted to retain their copyright rights. ICC backed off and presented an alternative form to submitters who objected to assignment. (*See* Ex. M.)

is found in a number of the code provisions ICC now accuses NFPA of infringing. (*See, e.g.*, Koffel Decl., ¶ 22.)

### 4. Role of ICC Staff in Preparing the IBC 2000

The ICC assigned three staff employees to assist each of the technical subcommittees. (Ex. P at 5.)  The staff served only in a supporting, "secretariat" role.  (Ex. C at 39; Ex. A at 65.) They were *not* members of the committees, did not select code language, and did not have a vote in any committee decisions.  (Ex. C at 39, 54; Ex. D at 22; Ex. A at 63, 76, 102.)  One of the ICC staff members described staff's role as follows:

> We were secretariats, took notes.  We facilitated the meetings again.  If there was a procedural question or some other type of question that they [the subcommittee members] felt staff could answer, they would ask us it seemed, that kind of thing. We had to maintain the temperature in the room, you know, all that fun stuff.

(Ex. C at 49-50.)

Most importantly for purposes of this motion, the ICC staff employees did *not* draft the asserted code language.  This fact is established by the ICC's Rules and Procedures documents, the Rule 30(b)(6) testimony of ICC witnesses, and ICC's interrogatory answers.

First, the ICC's Rules and Procedures define the role of "staff liaisons" in sections 2.2 and 3.1.  These duties do not include drafting of code provisions.  (Ex. Q at 1, 2.)  Similarly, an IBC Scope, Objectives and Process Statement from 1996 makes clear that "[s]taff serves only in a supporting capacity."  (Ex. R at 1.)  Dominic Sims, an ICC staff member and Rule 30(b)(6) witness confirmed that this was how the process worked in practice.  (Ex. A at 63.)

Second, in addition to the above Rule 30(b)(6) testimony of Mr. Sims and Mr. Armstrong, a third ICC 30(b)(6) witness, John Battles, testified explicitly that staff members did not draft any of the IBC 2000 chapters:

> Q.     In your support role on the occupancy subcommittee, did you write any chapters of the IBC 2000?

A.    No.

Q.    Did Mr. Frost [another staff member] write any chapters?

A.    Not that I'm aware of, no.

Q.    Did Mr. McCreary [another staff member] write any chapters?

A.    No.

Q.    Did any of the staff members listed on this technical subcommittee rosters, did any of the staff members write any chapters?

A.    No, sir, not that I'm aware of. We may have assisted in clarification, putting together the—the information that somebody had given us.

Q.    And who's that somebody that would have given it to you?

A.    It would be the—the subcommittee would have given us an assignment to do a certain thing for them.

Q.    And when you state subcommittee, you're referring to the code officials?

A.    The code officials, yes, sir.

(Ex. D at 67-68.)[6]

Finally, in its Supplemental Response to Interrogatory No. 3, ICC states explicitly that the "actual process of drafting the IBC was undertaken by several *committees*," and that "[e]ach *committee* drafted its assigned sections of the IBC." (Ex. S at 4, emphasis added.) As discussed above, staff were not members of the committees. (Ex. C at 39.)

Thus, the only sources of code language in the IBC 2000 were: (a) the government official committee members; (b) submissions from the public; (c) BCMC reports; and (d) the legacy codes. No employees of the ICC authored any of the asserted sections of the IBC 2000.

5.    Development of the Legacy Codes

At a December 10, 2004 hearing, ICC stipulated that its legacy codes (the codes of its predecessor organizations, BOCA, ICBO, and SBCCI) were developed using the same process as the IBC 2000. (Ex. T at 18.) ICC's counsel agreed that "the Court's ruling with respect to the IBC-2000 would have the same force and effect with respect to the legacy codes," and that "whatever findings the Court makes with respect to the IBC-2000 will cover the universe for

---

[6] A fourth ICC 30(b)(6) witness, Michael Pfeiffer, contradicted the testimony of the other three, and stated that staff did draft a few of the asserted provisions of the IBC 2000. (Ex. F at 89, 95-96, 100.) Mr. Pfeiffer's contentions are discussed in detail in the Argument section below.

legacy codes as well." (Ex. T at 17, 20.) ICC also stipulated that it would not identify any "authors" of the legacy codes other than the individuals it has already disclosed as authors of the IBC-2000. (Ex. T at 30-31.) The Court memorialized the stipulation as follows in its December 10, 2004 Minute Order:

> Plaintiff has stipulated in court that the process for creating the "legacy codes" was the same as the process for creating the IBC 2000 and its three preliminary drafts. Accordingly, the court will not require production by Plaintiff of the names of individuals involved in the drafting of the legacy codes or source documents, to the extent they have not already been identified.

(Ex. U.) This means that, for purposes of this motion, the legacy codes: (a) were drafted by committees of volunteer government officials; (b) the government officials and contributing members of the public did not assign or exclusively license their copyright rights to the ICC; and (c) ICC will not identify any previously undisclosed staff members as drafters of the legacy codes.

## C.    The Defendant's NFPA 5000 Code

In 1999, before the IBC 2000 was published, NFPA began working on developing a complete building code from existing NFPA codes and standards. (Koffel Decl. ¶ 10.) As its first step, NFPA hired a consultant, Wayne "Chip" Carson, to prepare a first draft using existing NFPA code and the EPCOT building code.[7] (Carson Decl. ¶¶ 1-2.) He did not base any of his draft on the IBC 2000 or any of the ICC legacy codes. (Carson Decl. ¶ 3.) Mr. Carson completed a first draft in January 2000 and a second draft in February 2000, and then turned it over to NFPA. (Carson Decl. ¶ 4. )

---

[7] Disney developed its own building code for the EPCOT center, which NFPA licensed. (Ex. V.)

In April 2000, NFPA began its formal process for developing and ratifying its building code. (Koffel Decl. ¶ 11.) Beginning from the Carson draft, NFPA developed the NFPA 5000 using the same time tested consensus process, accredited by the American National Standards Institute, that it has used to develop and maintain all of its approximately 300 model codes and standards. NFPA set up sixteen technical committees to develop code and a technical correlating committee to oversee the technical committees to ensure consistency. The committee members included some of the same code officials who served on the ICC's committees, as well as numerous other government officials, special experts, insurers, manufacturers, and other interested parties. (*Id.*)

Drafts of the NFPA code were twice released for public review, and many proposed revisions submitted by the public were incorporated into the working drafts. (Koffel Decl. ¶ 12.) NFPA released its final version, the NFPA 5000, in July 2002. (*Id.*)

## D.    ICC's Shrinking Copyright Infringement Allegations

The IBC 2000 has 5,290 numbered code sections, 246 tables, and 60 figures. (Koffel Decl. ¶ 19.) The NFPA 5000 has 8,532 code provisions, 128 tables, and 73 figures. (Koffel Decl. ¶ 13.)

In its original interrogatory answers, ICC recited 460 numbered allegations, accusing NFPA of copying roughly 560 code provisions, tables, and figures from the IBC 2000. At the December 10 hearing, NFPA pointed out that these allegedly infringed IBC code provisions included, e.g.: (a) language ICC (and NFPA) copied from the Code of Federal Regulations; (b) code provisions taken from third party sources, such as the American Society of Civil Engineers; and (c) language ICC adopted from pre-existing *NFPA* codes. In many cases, ICC's own code provisions identified these sources. (Ex. T at 6-13.)

On February 9, 2005, less than three weeks before the deadline for this motion, ICC served a new list of allegations, withdrawing about half of its previous contentions. And then on February 17, ICC served yet another revised list of allegations, deleting more code provisions and adding others. ICC's (presumably) final allegations, attached as Ex. W, accuse NFPA of infringing about 270 sections and 14 tables of the IBC 2000. This is roughly 5% of the provisions in the IBC 2000 code.

Notably, ICC has not accused NFPA of infringing the arrangement or presentation of the IBC 2000. Nor can it. The NFPA code is organized according to occupancy, rather than building structure, and therefore has a very different organizational format and numbering system. (Koffel Decl. ¶ 14; Ex. X at 98.) ICC accuses NFPA *only* of copying some language from 5% of its code provisions.

ICC did not reduce its allegations far enough. As demonstrated below, ICC has no ownership interest in these remaining provisions either, no evidence that NFPA copied from ICC materials, and the allegedly copied material, in any event, is not protectible subject matter. This lawsuit should never have been filed in the first place, and should now be dismissed on summary judgment.

## II.     ARGUMENT

### A.     Legal Standards

#### 1.     Summary Judgment

Summary judgment is warranted when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

bear the burden at trial." *Mid America Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995). The party that bears the burden of proof at trial "may not rest on the pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Pickett v. Prince*, 52 F. Supp.2d 893, 898 (N.D. Ill. 1999) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). On factual issues, the Court should view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

    2.    Copyright Infringement

To establish a claim of copyright infringement, ICC must prove two elements: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original. *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340, 361 (1991); *Publications Int'l, Inc. v. Meredith Corp.*, 88 F.3d 473, 479 (7th Cir. 1996).

    (a)    Ownership—The Work for Hire Doctrine

Copyright ownership vests initially in the author of a work. 17 U.S.C. § 201(a). An organization, like ICC, will own a copyright only if: (a) the author assigns his or her copyright to the organization; or (b) the work is made for hire. *See Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989); *Billy-Bob Teeth, Inc. v. Novelty, Inc.*, 329 F.3d 586, 591 (7th Cir. 2003).

Under 17 U.S.C. § 101, a work is "made for hire" if: (1) the work is "prepared by an employee within the scope of his or her employment;" or (2) "if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire," and the work falls within one of the categories set forth in 17 U.S.C. § 101(2). *Respect Inc. v. Committee on the Status of Women*, 815 F. Supp. 1112, 1116-17 (N.D. Ill. 1993).

- 12 -

Copyright ownership, including the question of whether an author is an "employee" under 17 U.S.C. § 101(1), is a question of law. *Kirk v. Harter*, 188 F.3d 1005, 1007 (8th Cir. 1999); *Nimmer on Copyright*, § 13.01(B) (2004).

### (b) Illicit Copying

The second element of copyright infringement requires that the defendant prove "copying of constituent elements of the work that are original." *Feist*, 499 U.S. at 361. This element, sometimes called "illicit copying," requires proof that: (a) the defendant actually copied the plaintiff's work; and (b) that the material copied was "original," i.e., protected, copyrightable subject matter. *Wallace Computer Services, Inc. v. Adams Business Forms, Inc.*, 837 F. Supp. 1413, 1416 & n.7 (N.D. Ill. 1993); *Pampered Chef, Ltd. v. Magic Kitchen, Inc.*, 12 F. Supp.2d 785, 790-91 (N.D. Ill. 1998).

Absent direct evidence, actual copying "may be inferred where the defendant had access to the copyrighted work and the accused work is substantially similar to the copyrighted work." *Theotokatos v. Sara Lee Personal Products*, 971 F. Supp. 332, 340 (N.D. Ill. 1997). "If the similarities between works are insufficient to prove copying, or if it is established that the accused work was independently created without copying, the plaintiff cannot prevail." *Id.* Whether the defendant actually copied the plaintiff, i.e., "used the plaintiff's material as a model," is a question of fact. *Wallace*, 837 F. Supp. at 1416.

Even if a defendant is found to have copied the plaintiff, the copying will only be "illicit" (i.e., unlawful) if the material appropriated was copyrightable. *Id.* at 1417; *Pampered Chef*, 12 F. Supp.2d at 791-92. Copyrightability is a question of law. *Wallace*, 837 F. Supp. at 1417; *Nimmer on Copyright*, § 13.01(B) (2004).

### 3.      Burden of Proof

The ICC, as plaintiff, has the burden of proof on both ownership and illicit copying. *See Feist*, 499 U.S. at 361.

The existence of a valid certificate of registration creates a prima facie presumption of the validity of a copyright. *Mid Atlantic Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995). However, "this is simply a rebuttable presumption." *Id.* Once the defendant introduces evidence that disputes or rebuts the plaintiff's prima facie case, the burden shifts back to the plaintiff to prove the elements of its case. *See id.* ("the burden of proof in the sense of the risk of nonpersuasion ... remains throughout the trial upon the party on whom it was originally cast" (citing Fed. R. Evid. 301)); *Pickett v. Prince*, 52 F. Supp.2d 893, 901 (N.D. Ill. 1999) ("Plaintiff's copyright registration will not be sufficient to demonstrate a valid copyright in light of contrary evidence.")

Here, ICC cannot meet its burden as to ownership, cannot prove that NFPA copied from the plaintiff, and cannot prove that the material allegedly copied was protectible expression.

### B.      ICC Does Not Own the Asserted Provisions of the IBC 2000

The authors of the asserted code language for the IBC 2000 were: (a) the members of the technical subcommittees; and (b) the members of the public who submitted proposed code language ultimately adopted into the code.

Here, ICC does not allege it has received any assignments for the asserted code language, or that it executed "work for hire" contracts with the authors of the IBC 2000. It received, at most, only nonexclusive licenses from the committee members and the public commentators. (Ex. H; Ex. A at 139-40; Ex. K; Ex. L.) Thus, ICC's ownership allegation turns entirely on whether the committee members and public commentators were "employees" of the ICC, acting

- 14 -

"within the scope of their employment," under 17 U.S.C. § 101(1). ICC's counsel conceded as much at the December 10 hearing, where he stated "our claim basically is going to rest upon provision 1 of 101, which is whether the people that created these codes were employees under the statutory interpretation." (Ex. T at 18-19.)

Neither the committee members nor the public commentators were "employees" of the ICC under 17 U.S.C. § 101(1), and consequently, ICC does not own the code.

       1.     The Committee Members Were Not Employees

To determine if an author is an "employee" within the scope of 17 U.S.C. § 101(1), the question is whether the hiring party has the "right to control the manner and means by which the product is accomplished." *Reid*, 490 U.S. at 751. In *Reid*, the Supreme Court identified twelve factors potentially relevant to this analysis: (1) the skill required; (2) the source of the instrumentalities and tools; (3) the location of the work; (4) the duration of the relationship between the parties; (5) whether the hiring party has the right to assign additional projects to the hired party; (6) the extent of the hired party's discretion over when and how long to work; (7) the method of payment; (8) the hired party's role in hiring and paying assistants; (9) whether the work is part of the regular business of the hiring party; (10) whether the hiring party is in business; (11) the provision of employee benefits; and (12) and the tax treatment of the hired party. *Id.* at 751-52. These factors are nonexhaustive, and no one factor is determinative. *Id.* at 752; *Respect*, 815 F. Supp. at 1117.

The Second Circuit has held that, while some of the *Reid* factors will often have minimal significance, others "will be significant in virtually every situation." *Aymes v. Bonelli*, 980 F.2d 857, 861 (2nd Cir. 1992). The most significant factors, according to *Aymes*, are factors (1), (5), (11), and (12) above. The *Aymes* decision was cited favorably by a court in this district in *Respect*, 815 F. Supp. at 1117.

The ICC did not dictate "the manner and means by which" the volunteer committee members prepared the IBC 2000. In fact, it was exactly the opposite. The members of the steering committee set the procedures for creating the code, and the members of the technical subcommittees voted upon the actual language for the code. (Ex. D at 33-34.) The ICC staff liaisons assigned to assist the committees could not vote on any of these decisions. (Ex. C at 54; Ex. D at 22; Ex. A at 63, 76, 102.)

Analysis of the twelve *Reid* factors bears this out. The four factors identified by *Aymes* as always significant—(1) the skill required; (5) whether the ICC had the right to assign additional projects; (11) the provision of employee benefits; and (12) and the tax treatment of the hired party—all demonstrate that the committee members were not employees. Regarding factor (1), the committee members were all highly skilled code officials. As explained by ICC's Rule 30(b)(6) witness, Paul Armstrong, the committee members were selected because they had "expertise," were "experienced in the code development process," and, for some of the technical subcommittees, "were…licensed engineers." (Ex. C at 45-46.) Regarding factors (5), (11), and (12), since the committee members were all unpaid volunteers, (Ex. C at 43), the ICC did not have the right to assign additional projects to them, did not provide employee benefits, and did not treat them as employees for tax purposes. At least one court in this District has found compensation and tax treatment to be the most important of all the *Reid* factors. *See Natkin v. Winfrey*, 111 F. Supp.2d 1003, 1008-09 (N.D. Ill. 2000) ("Most importantly, neither photographer was ever treated like an employee in terms of compensation, benefits, and taxes.")

The remaining eight *Reid* factors, to the extent they are relevant, also dictate that the committee members were not ICC employees. First, since the committee members were

volunteers, the ICC did not have "discretion over when and how long" the committee members would work.

Second, since the committee members continued to work for their government employers while serving on the committees, the "duration of the relationship between the parties" favors non-employee status. As explained in *Respect*, where an individual continues to work for others (or as an entrepreneur) while generating the disputed product, the relationship "lack[s] the hallmarks of common law employment." 815 F. Supp. at 1118. *See also Aymes*, 980 F.2d at 864 ("Although Aymes worked two years for Island, he did occasional work for others at the same time. Moreover, there were undisputed gaps in his employment, which suggests that he was not a full time employee.")

Third the "method of payment" factor favors non-employment, since the committee members were not paid.

Fourth, "the location of the work" also favors non-employment, since the committee meetings largely took place at public venues, such as hotels. (*See* Exhibits 2-4 to the Koffel Declaration.)

The remaining factors are of marginal relevance. There were no special "instrumentalities or tools" used for the work and no evidence that any assistants were hired. The fact that the ICC is "in business," and the work may have been part of the ICC's "regular business" is of little import, since nearly all work done by a company will generally be part of its "regular business." *See Aymes*, 980 F.2d at 863.

The facts of other cases from this District further confirm that the committee members were not "employees" of the ICC under § 101(1). In *Respect*, the Committee on Status of Women ("CSW") hired Coleen Mast to draft some educational workbooks on sexual abstinence.

815 F. Supp. at 1115. CSW paid Mast, paid for her typewriter, withheld payroll taxes from Mast's checks, and had some input into the workbooks, "for example, by suggesting revisions" *Id.* at 1118. Nevertheless, the Court found Mast to be an independent contractor, and not an employee, since Mast was "an experienced teacher" (i.e., high level of skill), continued to "act as an entrepreneur" while working for CSW, did not receive employee benefits, and worked from home using her own research materials. *Id.* at 1118-19.

In *Natkin*, photographers hired by Oprah Winfrey's company (Harpo) to photograph Ms. Winfrey at her television studio were held to be independent contractors, rather than employees, even though: (a) Harpo controlled the duration of the employment; (b) Harpo exercised some control over the manner and means of creating the disputed photographs; (c) "the location of the work" was Oprah's set; (d) the photographers were paid, and were identified as "staff photographers." 111 F. Supp.2d at 1008-10.

Numerous cases from other jurisdictions, with facts leaning considerably closer to employment than the facts of this case, have also found the hired party to be an independent contractor. *See Respect*, 815 F. Supp. at 1118, citing *Reid*, 490 U.S. 730, *Aymes*, 980 F.2d 857, and *Marco v. Accent Publishing Co.*, 969 F.2d 1547 (3rd Cir. 1992). *See also Kirk v. Harter*, 188 F.3d 1005, 1008-09 (8th Cir. 1999) (finding a computer programmer to be an independent contractor, since he received no employment benefits and was not treated as an employee for tax purposes, even though several of the *Reid* factors strongly favored employment).

Finally, ICC's contention that the committee members were employees is inconsistent with its own actions and the testimony of its own witnesses. First, at the time the IBC 2000 was drafted, ICC asked committee members to grant a ***nonexclusive license*** to use materials they created. (Ex. H; Ex. A at 139-40.) If they were employees, and ICC owned the rights under §

- 18 -

101(1), why would ICC need to request a nonexclusive license?  Second, two of ICC's 30(b)(6)

witnesses—in fact, the only two who were asked the question—both testified explicitly that the

committee members were *not* employees of ICC.  (Ex. A at 16; Ex. D at 20.)  Given this

testimony, given the request for a nonexclusive license, and given the above analysis of the *Reid*

factors, it is difficult to see how ICC can now argue otherwise.

### 2.      The Public Commentators Were Not Employees

In addition to the committee members, some industry representatives and other members

of the public drafted code language in the IBC 2000, pursuant to the public comment and review

procedures.  These members of the public, as should be clear, were also not "employees" of ICC

under § 101(1).  They submitted comments and proposed code language voluntarily, subject to

only a nonexclusive license, for their own purposes.  The ICC maintained no control over "the

manner and means" by which the third parties drafted the code language, and none of the twelve

*Reid* factors remotely suggest they were ICC employees, acting within the scope of ICC

employment.

### 3.      The ICC Staff Members Did Not Draft the Asserted Code

The only ICC employees remotely connected to the code preparation process were the

staff liaisons.  As discussed in detail in the Facts section, these staff members served only in a

supporting, "secretariat" role, and did not author the code.  This fact is confirmed by ICC's

interrogatory response, the ICC Rules and Procedures documents, and the testimony of three of

ICC's Rule 30(b)(6) witnesses, John Battles, Dominic Sims, and Paul Armstrong.  (See Part I.B.4

above.)

Despite this contrary evidence, late in discovery, a fourth ICC Rule 30(b)(6) witness,

Mike Pfeiffer, testified that staff did indeed draft portions of the IBC 2000.  (Ex. F at 89, 95-96,

100.)  However, at his deposition, Mr. Pfeiffer could only identify five of the currently asserted

- 19 -

IBC code provisions as having been drafted by staff: Table 503 and four subparts of section 903.[8] (Provisions attached as Ex. Y, pp. 71, 156.) Mr. Pfeiffer could not state which staff member drafted table 503, and testified that section 903 was drafted by a former staff member named Mark Chubb, who now lives in New Zealand. (Ex. F at 89, 95, 101.)

Even assuming that ICC is allowed to contradict its own interrogatory answers, documents, and other 30(b)(6) testimony, Mr. Pfeiffer's allegations are easily refuted. The IBC committee responsible for Table 503, the "Heights and Area Table," was the Occupancy Subcommittee. (Koffel Decl., ¶ 20.) A review of the meeting minutes of this subcommittee shows that Table 503 was based on legacy codes and a BCMC Report,[9] and *not* on any new staff expression. (Koffel Decl., ¶¶ 21-22.) The only role played by staff was to calculate values for inclusion in the table using methodologies from the legacy codes and the BCMC Report.[10] At all points in the process, staff was acting under the direction of the subcommittee. (Koffel Decl., ¶ 22.) Notably, according to the minutes, one of the staff members who assisted the subcommittee with calculations for Table 503 was John Battles, who testified in his own deposition that he did *not* draft any chapters of the IBC 2000 code. (Koffel Decl., ¶ 23; Ex. D at 67-68.)

Regarding section 903, in its latest list of allegations, ICC accuses NFPA of copying four subparts of the section: 903.2.2, 903.2.3, 903.2.5, and 903.2.10. (Ex. W at 3.) These subparts, which concern sprinkler systems, were all derived from either the legacy codes or public submissions. None were drafted by ICC staff. (Koffel Decl., ¶ 24.)

---

[8] Mr. Pfeiffer identified other portions of the IBC 2000 as allegedly drafted by staff, but these portions are not at issue.

[9] See Part I.B.3 above for a description of the BCMC code harmonization process from the 1980's and early 1990's.

[10] Calculated mathematical values are facts, and are therefore not copyrightable expression. *See Feist*, 499 U.S. at 344.

Thus, ICC's Procedure documents, ICC's interrogatory response, and the testimony of the ICC's other Rule 30(b)(6) witnesses were all correct: ICC staff employees did not author any of the asserted IBC 2000 code.

ICC, therefore, does not own any of the asserted code language, and has no right to assert the code against NFPA.

## C.  NFPA Did Not Copy the Asserted Provisions of the IBC 2000

To prove NFPA copied the asserted IBC 2000 code provisions, ICC must show:  (a) that the NFPA drafters had access to the allegedly copied IBC provisions; and (b) that the NFPA 5000 and IBC 2000 are substantially similar enough to infer copying. *Wallace*, 837 F. Supp. at 1416.

In the Seventh Circuit, substantial similarity is determined by the ordinary observer test: "whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value." *Atari, Inc. v. N. Am. Philips Consumer Electronics Corp.*, 672 F.2d 607, 614 (7th Cir. 1982).

Here, even applying the "ordinary observer" test in the light most favorable to ICC, it is impossible to conclude that the NFPA 5000 and the IBC 2000 are "substantially similar."  ICC has accused NFPA of copying from only 5% of its code provisions, and does not allege that NFPA copied the layout or presentation of the overall code.  And even within that 5%, the language of the two codes is far from identical.

Consider, for example, ICC's first allegation with respect to section 903, the sprinkler system code discussed above.  ICC alleges that NFPA's section 17.3.5.1 is copied from IBC 2000's section 903.2.2.  The two provisions are reproduced below:

| IBC 2000 Section 903.2.2 | NFPA 5000 Section 17.3.5.1 |
|---|---|
| **903.2.2 Group E.** An automatic sprinkler system shall be provided throughout all Group E fire areas greater than 20,000 square feet (1858 m$^2$) in area. An automatic sprinkler system shall also be provided for every portion of educational buildings below the level of exit discharge. **Exception:** Where each classroom has at least one exterior exit door at ground level. | **17.3.5.1** Educational occupancy buildings with a fire compartment exceeding 20,000 ft$^2$ (1860 m$^2$) shall be protected throughout by an approved, supervised automatic sprinkler system in accordance with Section 55.3. |

(Ex. Y at 156; Ex. Z at 179.) The only similarity between the two sections is the number 20,000 ft$^2$, which, as discussed below, is a fact, not copyrightable expression.

So that the Court can perform a complete "ordinary observer" test, we have submitted, with Exhibit 1 to Mr. Koffel's declaration, the text of each of the allegedly copied IBC 2000 code sections, next to the allegedly infringing sections of the NFPA 5000 code.

The two codes are dissimilar because NFPA did not use the IBC 2000 "as a starting point for" its own code, as required for infringement. *Stillman v. Leo Burnett Co., Inc.*, 720 F. Supp. 1353, 1357 (N.D. Ill. 1989). NFPA's consultant, Mr. Carson, prepared the first draft from existing NFPA codes and standards and from the EPCOT building code, which NFPA was licensed to use, without reviewing or considering the IBC or the legacy codes. (Carson Decl., ¶¶ 1-3; Ex. V.) After Mr. Carson finished his draft, the NFPA launched a committee/public review process to complete the code. If there are any similarities between specific code provisions, it is because: (a) both parties used language submitted by industry representatives during the comment processes (often the same industry representatives); (b) both parties used code officials on their drafting committees (in some cases, the same officials); (c) both parties made use of BCMC Reports, which were prepared jointly by the parties and cross-licensed; (d) both parties adopted code from pre-existing, third party codes and standards; and (e) as discussed in part D

below, the asserted code provisions are largely statements of facts, which can only be expressed in a limited number of ways.

As evidence of NFPA's independent development, Mr. Koffel's Declaration identifies the source of each of the accused NFPA code sections. These sources were: (i) The Code of Federal Regulations; (ii) pre-existing NFPA codes and standards; (iii) ASCE 7 (a third party standards document); (iv) the EPCOT Building Code; (v) other industry standards; (vi) the Uniform Fire Code; (vii) the BCMC Reports; (viii) public proposals and comments; and (ix) proposals from NFPA committee members. (Koffel Decl. ¶ 18 & Ex. 1.) NFPA did not copy code from the IBC 2000 or the asserted legacy codes for any of these provisions. This independent creation precludes any finding of infringement. *Theotokatos*, 971 F. Supp. at 340.

## D. The Asserted IBC Code Language Is Not Copyrightable

In addition to ownership and actual copying, ICC must show that any material appropriated is protectible under copyright law. *Wallace*, 837 F. Supp. at 1416. Here, the material ICC alleges NFPA copied is largely statements of facts, following mandatory code drafting conventions, and is therefore not protectible subject matter.

Two legal limitations on copyrightability apply here: (a) facts and ideas are not copyrightable, *Feist*, 499 U.S. at 344; and (b) the merger doctrine.

Much of the asserted language of the IBC 2000 code is recitations of numbers, limits, and data. (See, e.g., the 20,000 ft$^2$ data point in section 903, and the height and area data in the Heights and Area Table 503, attached as Ex. Y.) These data points are facts and ideas, and are therefore not copyrightable. Only original expression of the facts is protected by copyright. *Id.* at 1289.

One case from this circuit is particularly instructive. In *Publications International Limited v. Meredith Corp.*, 88 F.3d 473 (7th Cir. 1996), the Court held that a collection of recipes consisting of ingredients and basic instructions was not copyrightable. *Id.* at 480. The Court found that "there is no expressive element in each listing," and each author "was not giving literary expression to his individual creative labors. Instead he was writing down an idea...." *Id. See also Nash v. CBS*, 899 F.2d 1537, 1541 (7th Cir. 1990) (CBS's use of facts from a copyrighted book about John Dillinger was not infringement).

In the asserted IBC 2000, the standards and data are recited, not with "literary expression" or "creative labors." *Meredith*, 88 F.3d at 480. Rather, they are recited according to mandatory code drafting conventions. As explained by one of ICC's Rule 30(b)(6) witnesses, codes must be written "in enforceable, mandatory language":

> Q.      ...What's an example of mandatory language versus—would there be—
> A.      Yeah. Let's say, for example, it is preferred that the bottom of that window sill be not less than 12 inches in height. The word "preferred" does not make it mandatory. It makes it effectively a suggestion.
> Q.      Sure.
> A.      --versus a text that says the bottom of that sill height shall not be less than 12 inches. That's a definitive, enforceable statement.
> Q.      Okay. So codes are typically written in definitive, enforceable statements?
> A.      That's correct.
>
> * * *
>
> Q.      Okay. Is this—this mandatory language, is that language that's common throughout all codes, regardless of whether or not they are limited to building?
> A.      I believe so.

(Ex. F at 123-24.)

This "mandatory language" invokes the merger doctrine, which states that "where an idea is incapable of being expressed in more than one manner, there can be no copyright in the expression." *Mid America Title Co. v. Kirk*, 867 F. Supp 673, 683-684 (N.D. Ill. 1994), *aff'd*, 59

F.3d 719 (7th Cir. 1995). The doctrine also applies where there are only a limited number of ways to express a fact or idea. *See Morrissey v. Proctor & Gamble Co.*, 379 F.2d 675, 678 (1st Cir. 1967) ("When the uncopyrightable subject matter is very narrow, so that 'the topic necessarily requires,' if not only one form of expression, at best only a limited number, to permit copyrighting would mean that a party or parties, by copyrighting a mere handful of forms, could exhaust all possibilities of future use of the substance.") *See also Alberto-Culver Co. v. Andrew Dumon, Inc.*, 466 F.2d 705, 711 (7th Cir. 1972) (Stevens, J.) (descriptive "ordinary phrase" not subject to copyright protection). Here, given that the allegedly copied code language simply recites facts, following mandatory conventions, there is at best a limited number of ways to express the facts. The expression therefore "merges" into the idea, and the language is not copyrightable.

## III.   CONCLUSION

ICC cannot prove:  (a) that it owns the code language it asserts; (b) that NFPA copied the IBC 2000 code provisions as a factual matter; and (c) that the allegedly copied code language is protectible subject matter.  For the above reasons, the Court should grant summary judgment in favor of NFPA and dismiss ICC's complaint.

NATIONAL FIRE PROTECTION
ASSOCIATION, INC.,

By its attorneys,

Dated:    February 25, 2005

Thomas F. Holt, Jr., Esq.
Tara C. Clancy, Esq.
Christopher Centurelli, Esq.
Kirkpatrick & Lockhart Nicholson Graham LLP
75 State Street
Boston, MA 02109
(617) 261-3100

Peter C. John, Esq.
Williams Montgomery & John Ltd.
2100 Civic Opera Building
Twenty North Wacker Drive
Chicago, IL 60606
(312) 443-3200

# EXHIBIT 149

Membership Renewal



ASTM001792

PARTICIPATING MEMBER



ASTM001793

Note: Items will be added to the shopping cart after this screen.



▽ All | Search ASTM | GO    ▽ LANGUAGES · CONTACT · ☒ CART (2)

▽ PRODUCTS AND SERVICES    ▽ GET INVOLVED    ▽ ABOUT    ▽ NEWS



# Membership Renewal

Kara Leufer,

*Member Volume 01.01 Online Basic (Click here to change your selection) has been added to your shopping cart.*

*For $33 you can change your Member Online Basic Volume to the online premium Volume called Online Plus. The Online Plus Volume includes not only active standards, but also redlined, historical and withdrawn standards. Click here for more information on Online Plus.*

*Would you like to change your Online Basic Volume to the Online Plus Volume?*

*Yes, change my Basic Volume to the Plus Volume.*

*No, I prefer the Basic Volume.*

Home · About ASTM · Site Map · Support · Contact · Policies · Copyright/Permissions
Copyright © 2005 - 2013 ASTM. All Rights Reserved. ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA, 19428-2959 USA



▽ All | Search ASTM | GO    ▽ LANGUAGES · CONTACT · ☒ CART (2)

▽ PRODUCTS AND SERVICES    ▽ GET INVOLVED    ▽ ABOUT    ▽ NEWS

# Membership Renewal

Kara Leufer,

*Volume 01.01 (Click here to change your selection) has been added to your shopping cart.*

*Would you like to purchase any other Volumes from the Annual Book of ASTM Standards and add them to your cart?*

*Yes, please show me a list of available Volumes.*

*No, take me to my shopping cart.*



Home · About ASTM · Site Map · Support · Contact · Policies · Copyright/Permissions
Copyright © 2005 - 2013 ASTM. All Rights Reserved. ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA, 19428-2959 USA

ASTM001794



You might also consider:

Standards Tracker
Free

Your Shopping Cart:

| Description | Qty. | Price | Total | |
|---|---|---|---|---|
| Participating Membership | 1 | $75.00 | $75.00 | delete |
| Member Volume IRON AND STEEL PRODUCTS 0140 Steel-Piping, Tubing, Fitting-Online Book | 1 | $0.00 | $0.00 | delete |

Subtotal: $75.00

UPDATE CART

CONTINUE SHOPPING

Norton
SECURED
powered by VeriSign

ORGANIZATIONAL MEMBER



ISO MEMBERS

ASTM001796



▽ PRODUCTS AND SERVICES    ▽ GET INVOLVED    ▽ ABOUT    ▽ NEWS

Get Involved » Membership / Membership Renewal

Digital Library Home

MyAccount

Help

# Membership Renewal

*Welcome Gennaro Mazzulani*

*ISO members do not need to go through the membership renewal process. For questions regarding your membership, please contact your staff manager.*

ASTM001797

**SPECIAL MEMBERS**



| | |
|---|---|
| Digital Library Home | |
| My Account | |
| Help | |

## Membership Renewal

Welcome Les *[illegible]*

*Special members do not need to go through the membership renewal process; your membership type does not require a fee for renewal.*

Home   About ASTM   Site Map   Support   Contact   Policies   Copyright/Permissions

Copyright © 2006 - 2011 ASTM All Rights Reserved. ASTM International, 100 Barr Harbor Drive, P.O. Box C700, West Conshohocken, PA, 19428-2959 USA

---

**LIFETIME MEMBERS**



| | |
|---|---|
| My Chapter | |
| Digital Library Home | |
| My Account | |
| Help | |

## Membership Renewal

Welcome, Richard Pender

*Thank you for renewing your lifetime membership. Your 2011 Membership renewal fee is $0 U.S.*

You agreed, by your participation in ASTM and enjoyment of the benefits of your annual membership, to have transferred and assigned any and all interest you possess or may possess, including copyright, in the development or creation of ASTM standards or ASTM IP to ASTM. For additional information, please see the ASTM IP Policy.

Click "Continue" to place your membership renewal in the ASTM shopping cart.

Home   About ASTM   Site Map   Support   Contact   Policies   Copyright/Permissions

Copyright © 2006 - 2011 ASTM All Rights Reserved. ASTM International, 100 Barr Harbor Drive, P.O. Box C700, West Conshohocken, PA, 19428-2959 USA

ASTM001798



▽ All    Search ASTM    GO         ▽ LANGUAGES   CONTACT   ☒ CART [0]

▽ PRODUCTS AND SERVICES      ▽ GET INVOLVED      ▽ ABOUT      ▽ NEWS

Get Involved / Membership / Membership Renewal

MyChoices
Digital Library Home
MyAccount
Help

# Membership Renewal

Richard Pepper

*Your membership entitles you to a free basic Volume from the Annual Book of ASTM Standards.*

*Currently your Member Online Volume in your MyStandards collection gives you access to the following:*

- Member Online Volume.
  - 04.08 Basic (expiration March 30, 2014)

*Would you like to renew for the same Member Online Volume?*

Yes, please renew the above Online Volume.

No, I would like to renew for a different Member Volume.
(If you select a different online volume, it will replace your current online volume)

No, I'm not ready to pick my free Volume at this time.



                              Home   About ASTM   Site Map   Support   Contact   Policies   Copyright/Permissions
                Copyright © 2006 - 2013 ASTM. All Rights Reserved. ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959 USA



▽ All    Search ASTM    GO         ▽ LANGUAGES   CONTACT   ☒ CART [2]

▽ PRODUCTS AND SERVICES      ▽ GET INVOLVED      ▽ ABOUT      ▽ NEWS

Get Involved / Membership / Membership Renewal

MyChoices
Digital Library Home
MyAccount
Help

# Membership Renewal

Richard Pepper

*Member Volume 04.08 Online Basic (Click here to change your selection) has been added to your shopping cart.*

*For $43 you can change your Member Online Basic Volume to the online premium Volume called Online Plus. This Online Plus Volume includes not only active standards, but also redlined, historical and withdrawn standards. Click here for more information on Online Plus.*

*Would you like to change your Online Basic Volume to the Online Plus Volume?*

Yes, change my Basic volume to the Plus Volume.

No, I prefer the Basic Volume.



                              Home   About ASTM   Site Map   Support   Contact   Policies   Copyright/Permissions
                Copyright © 2006 - 2013 ASTM. All Rights Reserved. ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959 USA

ASTM001799



You might also consider:

Standards Tracker

Free

ADD TO CART

Your Shopping Cart

| Description | Qty. | Price | Total | |
|---|---|---|---|---|
| Lifetime Membership | 1 | $0.00 | $0.00 | delete |

UPDATE CART

Subtotal: $0.00

CONTINUE SHOPPING    CHECKOUT

Copyright © 2009 - 2015 ASTM. All Rights Reserved. ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959 USA

ASTM001800

# EXHIBIT 150
# (FILED UNDER SEAL)

# EXHIBIT 151



# CERTIFICATE

## By Authority Of
### THE UNITED STATES OF AMERICA
## Legally Binding Document

By the Authority Vested By Part 5 of the United States Code § 552(a) and Part 1 of the Code of Regulations § 51 the attached document has been duly INCORPORATED BY REFERENCE and shall be considered legally binding upon all citizens and residents of the United States of America. *HEED THIS NOTICE*: Criminal penalties may apply for noncompliance.

**Document Name:**

**CFR Section(s):**

**Standards Body:**

*Official Incorporator:*
THE EXECUTIVE DIRECTOR
OFFICE OF THE FEDERAL REGISTER
WASHINGTON, D.C.

PRO_00170512

 **Designation: D 1217 – 93 (Reapproved 1998)**

# Standard Test Method for
# Density and Relative Density (Specific Gravity) of Liquids by Bingham Pycnometer[1]

This standard is issued under the fixed designation D 1217; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

## 1. Scope

1.1 This test method covers the measurement of the density of pure hydrocarbons or petroleum distillates boiling between 90 and 110°C that can be handled in a normal fashion as a liquid at the specified test temperatures of 20 and 25°C.

1.2 This test method provides a calculation procedure for conversion of density to relative density (specific gravity).

1.3 The values stated in SI units are to be regarded as the standard.

1.4 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.* Specific precautionary statements are given in Note 1, Note 2, and Note 3.

## 2. Referenced Documents

2.1 *ASTM Standards:*
E 1 Specification for ASTM Thermometers[2]

## 3. Terminology

3.1 *Definitions:*

3.1.1 *density*—the weight in vacuo, (that is, the mass) of a unit volume of the material at any given temperature.

3.1.2 *relative density (specific gravity)*—the ratio of the mass (weight in vacuo) of a given volume of material at a temperature, $t_1$, to the mass of an equal volume of water at a reference temperature, $t_2$; or it is the ratio of the density of the material at $t_1$ to the density of water at $t_2$. When the reference temperature is 4.00°C, the temperature at which the relative density of water is unity, relative density (specific gravity) and density are numerically equal.

## 4. Summary of Test Method

4.1 The liquid sample is introduced into a pycnometer, equilibrated to the desired temperature, and weighed. The relative density (specific gravity) or density is then calculated from this weight and the previously determined weight of water that is required to fill the pycnometer at the same temperature, both weights being corrected for the buoyancy of air.

## 5. Significance and Use

5.1 Density is a fundamental physical property which can be used in conjunction with other properties to characterize pure hydrocarbons and their mixtures.

5.2 This test method was originally developed for the determination of the density of the ASTM Knock Test Reference Fuels *n*-heptane and *iso*octane, with an accuracy of 0.00003 g/mL. Although it is no longer employed extensively for this purpose, this test method is useful whenever accurate densities of pure hydrocarbons or petroleum fractions with boiling points between 90 and 110°C are required.

## 6. Apparatus

6.1 *Pycnometer*, Bingham-type,[3] conforming to the dimensions given in Fig. 1, constructed of borosilicate glass and having a total weight not exceeding 30 g.

6.2 *Constant-Temperature Bath*, provided with suitable pycnometer holders or clips and means for maintaining temperatures constant to ±0.01°C in the desired range.

6.3 *Bath Thermometer*, graduated in 0.1°C subdivisions and standardized for the ice point and the range of use to the nearest 0.01°C. ASTM Saybolt Viscosity Thermometer 17C as prescribed in Specification E 1, designed for tests at 21.1°C and 25°C, is recommended. A standardized platinum resistance thermometer may also be used, and offers the best means for observing minute temperature changes in the bath. Whichever means are available, it must be realized that for most hydrocarbons the density coefficient is about 0.0008 units/°C, and therefore an error of ±0.013°C would cause an error of ±0.00001 in density.

6.4 *Hypodermic Syringe*, 30-mL capacity, of chemically resistant glass, equipped with a 152-mm (6-in.) needle made of stainless steel tubing as shown in Fig. 2.

6.5 *Draw-Off Needle*, made of stainless steel tubing as shown in Fig. 2.

---

[1] This test method is under the jurisdiction of ASTM Committee D-2 on Petroleum Products and Lubricantsand is the direct responsibility of Subcommittee D02.04on Hydrocarbon Analysis.

Current edition approved Feb. 15, 1993. Published May 1993. Originally published as D 1217–52 T. Last previous edition D 1217–91.

[2] *Annual Book of ASTM Standards*, Vol 14.03.

[3] Pycnometer available from Reliance Glass Co., 220 Gateway Rd., Bensenville, IL 60106-0825, has been found satisfactory.

PRO_00170513



D 1217



S 7/15

6 mm ID Tubing

Very Fine Line Cut
with a Diamond Pencil

7-8 mm OD

Capillary:
1.0-1.1 mm

**FIG. 1 Bingham-Type Pycnometer, 25 mL**

6.6 *Solvent-Cleaning Assembly*, as shown in Fig. 3.

6.7 *Chromic Acid Cleaning Apparatus*, similar to that shown in Fig. 4.

6.8 *Balance*, capable of reproducing weighings within 0.1 mg. Mechanical balances should have sensitivity which causes the pointer to be deflected 2 or 3 scale divisions per 1 mg when carrying a load of 30 g or less on each pan. The balance should be located in a room shielded from drafts and fumes and in which the temperature changes between related weighings (empty and filled pycnometer) do not cause a significant change in the ratio of the balance arms. Otherwise weighings shall be made by the method of substitution, in which the calibrated weights and pycnometer are alternately weighed on the same balance pan. The same balance shall be used for all related weighings.

6.9 *Weights*, whose relative values are known to the nearest 0.05 mg or better. The same set of weights shall be used for the calibration of the pycnometer and the determination of densities.

## 7. Reagents and Materials

7.1 *Acetone*—(**Warning**—See Note 1).

Note 1—**Warning:** Extremely flammable. Use adequate ventilation.

7.2 *Isopentane*—(**Warning**—See Note 2).

Note 2—**Warning:** Extremely flammable. Avoid buildup of vapors and remove all sources of ignition, especially non-explosion proof electrical apparatus.

7.3 *Chromic Acid (Potassium Dichromate/Conc. Sulfuric Acid)*—(**Warning**—See Note 3).

Note 3—**Warning:** Causes severe burns. A recognized carcinogen. Do not get in eyes, or on skin or clothing.

## 8. Preparation of Apparatus

8.1 Thoroughly clean the pycnometer with hot chromic acid cleaning solution by means of the assembly shown in Fig. 4 (**Warning**—See Note 3). Chromic acid solution is the most effective cleaning agent. However, surfactant cleaning fluids have also been used successfully. Mount the apparatus firmly and connect the trap to the vacuum. Warm the necessary amount of cleaning acid in the beaker, place the pycnometer on the ground joint, and evacuate by opening the stopcock to vacuum. Fill the pycnometer with acid by turning the stopcock, repeat several times or remove the filled pycnometer, and allow it to stand for several hours at 50 to 60°C. Remove the acid from the pycnometer by evacuation, empty the acid from the trap, and flush the pycnometer with water. Cleaning should be made in this manner whenever the pycnometer is to be calibrated or whenever liquid fails to drain cleanly from the walls of the pycnometer or its capillary. Ordinarily, the pycnometer may be cleaned between determinations by washing with a suitable solvent, rinsing with pure, dry acetone, followed by isopentane, and vacuum drying.

8.2 Transfer the pycnometer to the cleaner assembly shown in Fig. 3, with vacuum line and trap attached to the side tube as indicated. Place the pycnometer on the cleaner with the upper hypodermic needle extending upward into the pycnometer, and press the edge of the ground joint on the rubber stopper until the vacuum holds it in place. Draw out all the liquid or sample. Immerse the lower end of the hypodermic tube in a suitable solvent and draw 20 to 25 mL through the pycnometer. Leaving the pycnometer in place, draw air through it until it is dry. Clean the hypodermic syringe with the same apparatus.

## 9. Calibration of Pycnometer

9.1 Proceeding as directed in Section 10, determine the weight of freshly-boiled and cooled distilled water (distilled from alkaline permanganate through a tin condenser) held by the pycnometer when equilibrated to volume at the bath temperature to be used in the determination. Repeat until at least three values agree to ±0.2 mg.

## 10. Procedure

10.1 Using another 25-mL pycnometer as a tare (Note 4), weigh the clean, dry pycnometer to 0.1 mg and record the weight.

Note 4—It is convenient to use the lightest of a set of pycnometers as a tare. For best results the treatment and environment of both pycnometer and tare should be identical for some time prior to weighing.

10.2 Cool the sample to 5 to 10°C below the test temperature, and fill the clean 30-mL hypodermic syringe. Transfer the sample to the pycnometer through the filling needle; avoid trapping air bubbles (Note 2) in the bulb or capillary of the pycnometer. If any are present, draw them into the syringe where possible. Also remove with the syringe or draw-off

442

D 1217



**FIG. 2 Accessories for Bingham-Type Pycnometer**

**FIG. 3 Cleaner Assembly for Bingham-Type Pycnometer**

needle any liquid above the calibration mark in the capillary or overflow reservoir. Dry the remainder with a cotton fiber pipe cleaner or cotton swab which has been dampened slightly with acetone.

NOTE 5—For work of highest accuracy on pure compounds, dissolved air may be removed from the sample by repeated freezing and remelting of the sample under vacuum in the pycnometer.

10.3 Close the pycnometer with the glass stopper and immerse it to a point above the calibration mark in the constant-temperature bath adjusted to a constancy of ±0.01°C

at the desired temperature. Periodically, or before the liquid expands into the overflow chamber, remove the stopper, raise the pycnometer sufficiently to expose the calibration mark to view, and readjust the liquid level to the mark by withdrawing liquid through the steel draw-off needle until expansion has stopped, indicating that the liquid has reached the temperature of the thermostat. Do not allow the liquid to expand more than 10 mm above the calibration mark at any time, to minimize errors caused by faulty drainage. Allow the contents to equilibrate an additional 10 min and draw the level down exactly to

443



**FIG. 4 All-Glass Pycnometer Cleaner Assembly for Use with Hot Chromic Acid Cleaning Solution**

the calibration line, avoiding parallax and using a magnifier, if necessary, to obtain good visibility. Remove any liquid adhering to the walls above the calibration mark, with the draw-off needle or pipe cleaner, depending upon the volatility of the sample. Portions in the overflow bulb may be removed with a cotton swab moistened with acetone.

10.4 Replace the glass stopper, remove the pycnometer from the bath, wash the outside surface with acetone, and dry thoroughly with a chemically clean, lint-free, slightly damp cloth. Place the pycnometer in or near the balance case for 20 min and weigh to the nearest 0.1 mg. In atmospheres of low humidity (60 % or lower), drying the pycnometer by rubbing with a dry cotton cloth will induce static charges equivalent to a loss of about 1 mg in the weight of the pycnometer. This charge need not be completely dissipated in less than 30 min. The use of about 0.1-mg radium bromide- or polonium-coated foil in the balance case, or maintaining the relative humidity at 60 % or higher, aids in reducing weighing difficulties due to static charges.

10.5 Record temperature of the balance, barometric pressure, and relative humidity.

## 11. Calculation

11.1 Calculate the true density of the sample as follows:

$$\text{Density, g/mL at °C} = W_s(1 + (d_s/d_s) - (d_a/d_{wt}))d_w/W_w(1 + (d_a/d_w) - (d_a/d_{wt}))$$  (1)

where:

$W_s$ = weight in air of sample contained in the pycnometer at the test temperature, g,

$W_w$ = weight in air of the water contained in the pycnometer at the calibration temperature, g,

$d_w$ = density of water at the calibration temperature, as obtained from Table 1,

$d_a$ = density of air in balance case at the time of weighing, as calculated from 10.3,

$d_{wt}$ = density of weights used in weighing the sample and water (brass = 10.4 g/mL, stainless steel = 7.75 g/mL), and

$d_s$ = approximate density of sample on

$$(W_s \times d)/W_w$$  (2)

11.2 The equation assumes that the weighings of the pycnometer empty and filled are made in such a short time interval

### TABLE 1 Density of Water[A]

| Temperature, °C | Density, g/mL | Temperature, °C | Density, g/mL | Temperature, °C | Density, g/mL |
|---|---|---|---|---|---|
| 0 | 0.999840 | 21 | 0.997991 | 40 | 0.992212 |
| 3 | 0.999964 | 22 | 0.997769 | 45 | 0.990208 |
| 4 | 0.999972 | 23 | 0.997537 | 50 | 0.988030 |
| 5 | 0.999964 | 24 | 0.997295 | 55 | 0.985688 |
| 10 | 0.999699 | 25 | 0.997043 | 60 | 0.983191 |
| 15 | 0.999099 | 26 | 0.996782 | 65 | 0.980546 |
| 15.56 | 0.999012 | 27 | 0.996511 | 70 | 0.977759 |
| 16 | 0.998943 | 28 | 0.996231 | 75 | 0.974837 |
| 17 | 0.998774 | 29 | 0.995943 | 80 | 0.971785 |
| 18 | 0.998595 | 30 | 0.995645 | 85 | 0.968606 |
| 19 | 0.998404 | 35 | 0.994029 | 90 | 0.965305 |
| 20 | 0.998203 | 37.78 | 0.993042 | 100 | 0.958345 |

[A] Densities conforming to the International Temperature Scale 1990 (ITS 90) were extracted from Appendix G, *Standard Methods for Analysis of Petroleum and Related Products 1991*, Institute of Petroleum, London.

that the air density has not changed. If significant change should occur, the calculated apparent weight of the sample, $W_s$, in this equation, must be corrected for the difference in air buoyancy exerted on the pycnometer as follows:

$$W_s = W^2_{FS} - W''_P(1 + (d'_a/2.2) - (d''_a/d_{wt}))/(1 + (d_a^2/2.2) - (d_a^2/d_{wt}))$$  (3)

where:

$W^2_{FS}$ = weight of pycnometer and contained sample under second or final air density,

$W''_P$ = weight of pycnometer in air of first density,

$d''_a$ = density of air when weighing empty pycnometer,

$d_a^2$ = density of air when weighing filled pycnometer, and

$d_{wt}$ and 2.2 = density of weights and borosilicate glass, respectively.

Likewise, if the pycnometer, empty and filled with water for calibration, is weighed under different air densities a similar correction for different air buoyancies shall be applied.

11.3 Calculate the relative density (specific gravity) of the sample by dividing the density as obtained in 11.1 by the relative density of water at the reference temperature obtained from Table 1.

11.4 Calculate the density of air in the balance room as follows:

Air density $(d_a)$, g/mL =

### ⬡ D 1217

$$= [(B - 0.3783\,Hp)(0.000465)]/(273 + t) \quad (4)$$

where:
$B$ = barometric pressure, mm Hg, corrected to 0°C,
$H$ = relative humidity, decimal fraction,
$p$ = vapor pressure of water at temperature t, mm Hg, and
$t$ = room temperature, °C.

NOTE 6—If this test method is to be used frequently, a considerable amount of calculation can be avoided by use of a gas density balance to determine the air density. Weigh a sealed 250-mL glass bulb at several different air densities and plot the weight against the air density. To determine the air density at some later time, weigh the bulb and read the air density from the point on the curve corresponding to the weight.

11.5 To calculate the density or relative density (specific gravity) at any test temperature, $t$, other than the calibration temperature, $t_c$ (to correct for the cubical coefficient of thermal expansion of borosilicate glass), divide the value obtained in 10.1 or 10.2 by the following expression:

$$1 + 9.6 \times 10^{-6}\,(t - t_c) \quad (5)$$

## 12. Report

12.1 In reporting density, give the test temperature and the units (for example, density, 20°C = x.xxxxx g/mL). In report-ing relative density (specific gravity), give both the test temperature and the reference temperature, but no units (for example, relative density (specific gravity), 20/4°C = x.xxxxx). Carry all calculations to one digit beyond the last significant figure, but report the final result to the fifth decimal place (0.00001).

## 13. Precision and Bias

13.1 *Precision*—Results, using the 25-mL Bingham-type pycnometer, should not differ from the mean by more than the following amounts:

| Repeatability One Operator and Apparatus | Reproducibility Different Operators and Apparatus |
|---|---|
| 0.00002 | 0.00003 |

NOTE 7—The precision for this method was not obtained in accordance with RR:D02-1007.

13.2 *Bias*—The difference of results from the established values when compared to pure reference materials is not expected to be more than ±0.00003 g/mL. Specific bias has not been established by cooperative testing.

## 14. Keywords

14.1 Density; pycnometer; relative density; specific gravity

The American Society for Testing and Materials takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.

This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, 100 Barr Harbor Drive, West Conshohocken, PA 19428.

PRO_00170517

# EXHIBIT 152

INTERNET ARCHIVE
WaybackMachine

http://www.astm.org/    Go

1,562 captures
29 Oct 96 - 29 Nov 15

APR    FEB
29
1999    2000

# Technical Standards for Industries Worldwide

American Society for
Testing and Materials

- ● ASTM Store
- ● Technical Committees/ Membership
- ● Training Courses
- ● Quality Assurance Programs
- ● News & Information

STANDARDIZATION    ASTM's
NEWS    Monthly
Magazine

- ● Search Lab Directory
- ● Search Consultants Directory
- ● Mission Statement
- ● Privacy Policy Statement

Copyright 1996-2000
American Society For Testing and Materials
All rights reserved
ASTM, 100 Barr Harbor Drive
West Conshohocken,
Pennsylvania, USA 19428-2959

Intellectual Property Policy

SITE MAP    CONTACT    FAQs

INTERNET ARCHIVE
WayBackMachine

http://www.astm.org/          Go

1,562 captures
29 Oct 96 - 29 Nov 15

FEB
27
APR
1999

1998

# Technical Standards for Industries Worldwide

**American Society for Testing and Materials**

- ASTM Store
- Technical Committees/ Membership
- Training Courses
- Quality Assurance Programs
- News & Information

- Search Lab Directory
- Search Consultants Directory
- Mission Statement
- Privacy Policy Statement

SITE MAP   CONTACT   FAQs

Copyright 1996-1999
American Society For Testing and Materials
All rights reserved
ASTM, 100 Barr Harbor Drive
West Conshohocken,
Pennsylvania, USA 19428-2959

# EXHIBIT 153
# (FILED UNDER SEAL)

# EXHIBIT 154

EXHIBIT 1230 4-1-15

PENGAD 800-631-6989

File Edit View History Bookmarks Yahoo! Tools Help

TerraView

submittals.nfpa.org/TerraViewWeb/ViewerPage.jsp

Most Visited Getting Started NFPA

YAHOO! Yahoo Search Search

# NFPA STANDARDS DEVELOPMENT SITE

## PUBLIC COMMENT STAGE

Public Comment Submission Closing Date: June 28, 2013

NOTE: All Public Comment must be received by 5:00 pm EST/EDST on the published Closing Date.

Welcome DEBRA BAIO!

*NFPA 70E®, Standard for Electrical Safety in the Workplace®*, 2012 Edition

NFPA Document Information Pages

FOR First Draft Report

My Public Input/Comments/NITMAMs

NFPA 70E Home

Search

Table of Contents: NFPA 70E

- Introduction
- Chapter 1 Safety-Related Work Practices
- Chapter 2 Safety-Related Maintenance Requirements
- Chapter 3 Safety Requirements for Special Equipment
- Informative Annex A Referenced Publications
- Informative Annex B Informational References
- Informative Annex C Limits of Approach
- Informative Annex D Incident Energy and Arc Flash Boundary Calculation Methods
- Informative Annex E Electrical Safety Program
- Informative Annex F Hazard Analysis, Risk Estimation, and Risk

**IMPORTANT NOTE:** Changes to browser software sometimes results in unexpected behavior. This site has known issues with specific releases of Google Chrome (ver. 34) and Internet Explorer 8 (ver. 8.0.7601.17514). If you received XSLT Forms Exceptions errors when using Chrome, or if you are having difficulty submitting Public Comments using Internet Explorer 8, please try using Firefox or a different version of your chosen browser.

**Welcome to the NFPA Standards Development Site**

This is the entry point for anyone who wants to participate in the NFPA Standards development process. The second stage of the development process is called the Comment stage, as described in the Regulations Governing the Development of NFPA Standards at Section 4.4. In this stage, you can propose changes to the First Draft NFPA Standard that the responsible Technical Committee (and, where applicable, Correlating Committee) will consider when developing the next edition of a standard. These proposed changes are called Public Comments, which you can create and submit electronically in this section of the site.

In this section, you can submit a Public Comment to:

Add New Section(s)

Revise First Draft Section(s)

Create a Global revision to add, modify, or delete a word or phrase throughout the entire document.

Click on the appropriate icon above to get instructions on how to begin submitting your Public Comment.

When you are ready to begin the Public Comment process, please utilize the Table of Contents on the left side of this screen to navigate to the portion of the Standard where you want to propose a change.

Once initiated all Public Comments are auto saved throughout the completion process. You will be given an opportunity to submit each Public Comment (proposed change) to NFPA once you have completed all the required sections. Additionally, you may delete your submitted Public Comment up until the Public Comment closing date, as displayed on the top of the screen.

You may also elect to leave a partially completed Public Comment in the system until you are ready to complete and submit it to NFPA. However, any un-submitted Public Comment will be automatically deleted from the system on the Public Comment closing date.

**What's Next?**

Once the Public Comment closing date has passed, your submitted Public Comment will be forwarded to the responsible Technical Committee to be addressed at a Second Draft meeting where the committee reviews all Public Comments and develops the Second Draft of the new or revised standard.

All Technical Committee meetings are open to the public. For more information on committee activities and other information related to the standard of interest to you, please visit the "Doc Info" pages at www.nfpa.org/aboutthecodes, and select the appropriate standard from the List of NFPA Codes & Standards.

After the completion of the Second Draft meeting and the balloting of the resulting Second Draft by the Technical Committee (and, where applicable, the Correlating Committee), a report on the committee work is published (the Second Draft Report), and you will receive notice and be given the opportunity, using this site, to submit a NITMAM on the Second Draft. For more information on the NFPA standards development process and to read the rules that govern that process – the Regulations

Select one or more sections to display options





File Edit View History Bookmarks Yahoo! Tools Help

TerraView™

submittals.nfpa.org/TerraView/Web/ViewerPage.jsp

Most Visited Getting Started NFPA

YAHOO! Yahoo Search Search

SF Dem-PC

NFPA STANDARDS DEVELOPMENT SITE

PUBLIC COMMENT STAGE

Public Comment Submission Closing Date: June 28, 2013 NOTE: All Public Comment must be received by 5:00 pm EST/EDST on the published Closing Date.

Welcome DEBRA BAIO!

*NFPA 70E®, Standard for Electrical Safety in the Workplace®*, 2012 Edition

+ Informative Annex B Informational References
+ Informative Annex C Limits of Approach
+ Informative Annex D Incident Energy and Arc Flash Boundary Calculation Methods
+ Informative Annex E Electrical Safety Program
+ Informative Annex F Hazard Analysis, Risk Estimation, and Risk Evaluation Procedure
+ Informative Annex G Sample Lockout/Tagout Procedure
+ Informative Annex H Guidance on Selection of Protective Clothing and Other Personal Protective Equipment
+ Informative Annex I Job Briefing and Planning Checklist
+ Informative Annex J Energized Electrical Work Permit
+ Informative Annex K General Categories of Electrical Hazards
+ Informative Annex L Typical Application of Safeguards in the Cell Line Working Zone
+ Informative Annex M Layering of Protective Clothing and Total System Arc Rating
+ Informative Annex N Example Industrial Procedures and Policies for Working Near Overhead Electrical Lines and Equipment

Edit Chapter Title

**Informative Annex K General Categories of Electrical Hazards**

*This informative annex is not a part of the requirements of this NFPA document but is included for informational purposes only.*

**K.1 General Categories.**

There are three general categories of electrical hazards: electrical shock, arc flash, and arc blast.

**K.2 Electric Shock.**

Approximately 30,000 nonfatal electrical shock accidents occur each year. The National Safety Council estimates that about 1000 fatalities each year are due to electrocution, more than half of them while servicing energized systems of less than 600 volts.

Electrocution is the fourth leading cause of industrial fatalities, after traffic, homicide, and construction accidents. The current required to light a 7½-watt, 120-volt lamp, if passed across the chest, is enough to cause a fatality. The most damaging paths through the body are through the lungs, heart, and brain.

**K.3 Arc Flash.**

When an electric current passes through air between ungrounded conductors or between ungrounded conductors and grounded conductors, the temperatures can reach 35,000°F. Exposure to these extreme temperatures both burns the skin directly and causes ignition of clothing, which adds to the burn injury. The majority of hospital admissions due to electrical accidents are from arc flash burns, not from shocks. Each year more than 2000 people are admitted to burn centers with severe arc flash burns. Arc flashes can and do kill at distances of 3 m (10 ft).

**K.4 Arc Blast.**

The tremendous temperatures of the arc cause the explosive expansion of both the surrounding air and the metal in the arc path. For example, copper expands by a factor of 67,000 times when it turns from a solid to a vapor. The danger associated with this expansion is one of high pressures, sound, and shrapnel. The high pressures can easily exceed hundreds or even thousands of pounds per square foot, knocking workers off ladders, rupturing eardrums, and collapsing lungs. The sounds associated with these pressures can exceed 160 dB. Finally, material and molten metal is expelled away from the arc at speeds exceeding 1600 km/hr (700 mph), fast enough for shrapnel to completely penetrate the human body.

Revise First Draft Section(s) | Add New Section | Clear All



File Edit View History Bookmarks Yahoo! Tools Help

TerraView™

submittals.nfpa.org/TerraViewWeb/ViewerPage.jsp

Most Visited Getting Started NFPA

YAHOO! Yahoo Search Search

Please make your proposed changes below. On the next screen you will see your changes highlighted in legislative text (i.e., track changes).

Notes: Some changes such as graphics, charts, tables, equations, or complex text may be difficult to accomplish on this screen. If that is the case, you will be given the opportunity on a later screen to upload these changes as text or graphics files.

K.2 Electric Shock

Approximately 30,000 nonfatal electrical shock accidents occur each year. The National Safety Council estimates that about 1000 fatalities each year are due to electrocution, more than half of them while servicing energized systems of less than 600 volts.

Electrocution is the fourth leading cause of industrial fatalities, after traffic, homicide, and construction accidents. The current required to light a 7 ½ -watt, 120-volt lamp, if passed across the chest, is enough to cause a fatality. The most damaging paths through the body are through the lungs, heart, and brain.

Next Close

Select one or more sections to display options

Public Comment No. 15-SF Drm-FO-2015

[Original]

**K2 Electric Shock.**

Approximately 34 [60,000 minimal electrical shock incidents occur each year. The National Safety Council estimates that about 1000 fatalities each year are due to electrocution, more than half of them while servicing energized systems of less than 600 volts.

Electrocution is the fourth leading cause of industrial fatalities, after traffic, homicide, and construction accidents. The current required to light a 7.5 watt, 120-volt lamp, if passed across the chest, is enough to cause a fatality. The most damaging point to pass through the body are through the lungs, heart, and brain.

NFPA-PR0038500



NFPA-PR0038501



NFPA-PR0038502



File Edit View History Bookmarks Yahoo! Tools Help

TerraView™

submittals.nfpa.org/TerraViewWeb/ViewerPage.jsp

Most Visited Getting Started NFPA

YAHOO! Yahoo Search Search

## Related Public Comments and Related Items from the Public Input Stage for This Document (Required)

**Add Related Comment** - This action allows the submittor of the Public Comment to provide a link between related Public Comments that they wish to submit. This link will bring to the attention of the Technical Committee that the recommendation(s) provided in the related Public Comments should be considered as a single concept.

**Add Related Item** - To ensure that the Public Comment is related to an issue or concept raised during the Public Input Stage the commenter should utilize this action to indicate which PI, FR, CR, CI, or CN that the Public Comment relates to. This action will help the Technical Committee to determine which issue from the Public Input Stage is related to the Public Comment.

**At least one Related Item is required.**

*No Public Comments are available*

Add Related Item

◄ Prev Next ► Save Close

Select one or more sections to display options



## Submitter Information Verification (Required)

Please review the following information and make any changes necessary to be associated with this specific proposed change.

Submitter Name:
DEBRA GATO

User ID (email address):
dbsio@nfpa.org

So that the Committee that considers your Public Comment can understand your interest and affiliations, please provide the following information. Note that the Company field may be prepopulated with information, if any, from your NFPA user profile. Fill in, or, if pre-populated, edit or revise the Company field as necessary.

Company:
NFPA
Company Name of your Employer or Business, if any.

Affiliation:
Affiliate Name of Group or Organization that are Representing, if any.

If you need to make a permanent change to your information, please update your user profile at www.nfpa.org.

NFPA-PR0038504



File Edit View History Bookmarks Yahoo! Tools Help

TerraView™

submittals.nfpa.org/TerraViewWeb/ViewerPage.jsp

Most Visited Getting Started NFPA

YAHOO! Yahoo Search Search

SF Dem-PC

## Related Public Comments and Related Items from the Public Input Stage for This Document (Required)

**Add Related Comment** - This action allows the submitter of the Public Comment to provide a link between related Public Comments that they wish to submit. This link will bring to the attention of the Technical Committee that the recommendation(s) provided in the related Public Comments should be considered as a single concept.

**Add Related Item** - To ensure that the Public Comment is related to an issue or concept raised during the Public Input Stage the commentar should utilize this action to indicate which PI, FR, CR, CI, or CN that the Public Comment relates to. This action will help the Technical Committee to determine which issue from the Public Input Stage is related to the Public Comment.

**At least one Related Item is required.**

*No Public Comments are available*

Add Related Item

List of Related Items from the Public Input Stage

X Open First Revision No. 1-SF Dem-PC-2013 [Section No. 200.1]

Prev Next Save Close

Select one or more sections to display options



## Copyright Assignment and Signature (Required)

**Copyright Assignment:**

I, DEBRA DAID, hereby irrevocably grant and assign to the National Fire Protection Association (NFPA) all and full rights in copyright in this Public Comment (including both the Proposed Change and the Statement of Problem and Substantiation), I understand and intend that I acquire no rights, including rights as a joint author, in any publication of the NFPA in which this Public Comment is or another similar or derivative form is used. I hereby warrant that I am the author of this Public Comment and that I have full power and authority to enter into this copyright assignment.

**Signature:**

☐ By checking this box I affirm that I am, DEBRA DAID, and I agree to be legally bound by the above Copyright Assignment and the terms and conditions contained therein. I understand and intend that, by checking this box, I am creating an electronic signature that will, upon my submission of this form, have the same legal force and effect as a handwritten signature.

*Special Notice: If you are not the author of some or all the content contained in your Public Comment, click here and you will be taken to an alternative copyright assignment and signature screen to complete your submission.*

To complete the submission of your Public Comment, click the Submit button

What is the alternation copyright assignment?

NFPA-PR0038506



## Alternative Copyright Assignment and Signature (Required)

**Copyright Assignment**

Your Public Comment should generally be expressed in your own words and should constitute your original expression as an author for copyright purposes. If so, go limit to the previous screen to complete your submission. If, however, you are not the author of some or all of the content contained in the Public Comment that you are about to submit, please check this box immediately below and provide the requested information, then proceed to sign the copyright assignment below and submit your Public Comment.

☐ Some or all of the content contained in this Public Comment was authored by me. Its source is as follows: (please identify which material and provide complete information on its source)

☐ I, _DEBRA BAIO_, hereby irrevocably grant and assign to the National Fire protection Association (NFPA) all and full rights in copyright in this Public Comment (including both the Proposed Change and the Statement of Problem and Substantiation). I understand and intend that I acquire no rights, including rights as a joint author, in any publication of the NFPA in which this Public Comment is the or another similar or derivative form is used. I hereby warrant that I am the author of this Public Comment and that I have full power and authority to enter into this copyright assignment.

**Signature**

☐ By checking this box I affirm that I am "DEBRA BAIO, and I agree to be legally bound by the above Copyright assignment and the terms and conditions contained therein. I understand and intend that, by checking this box, I am checking an electronic signature that will, upon my submission of this form, have the same legal force and effect as a handwritten signature.

_To complete the submission of your Public comment, click the Submit button._

# EXHIBIT 155



| Blogs | Bookmark/Share | Contact Us |

NATIONAL ARCHIVES

Search Archives.gov    GO

| Research Our Records | Veterans Service Records | Teachers' Resources | Our Locations | Shop Online |

## Federal Register

Home > Federal Register > Code of Federal Regulations > Code of Federal Regulations Incorporation by Reference

**Government Rules & Regulations**

Daily Updates

Print Versions

Updates to Print Versions

Participate in Rulemaking

**How to Read the CFR**

By Subject

By Indexing Term

**Learn More**

What is the CFR?

CFR Availability

Incorporation by Reference

**Public Workshops**

If you work with the *Federal Register* (FR) or the *Code of Federal Regulations* (CFR), you may find these free workshops especially valuable.

*You can also take the:*

 On-line Tutorial

**Learn why Democracy Starts Here**



# Incorporation by Reference

**This site does not link to or contain standards incorporated by reference into the CFR.**

If you are interested in obtaining a copy of a standard that has been incorporated by reference, contact the standards organization that developed the material.

## Who to Contact

For more information about a standard:

1. Use the contact information contained in the regulation to:

   - Contact the agency that issued the regulation containing the IBR standard.
   - Contact the standards organization that developed and published the material.
     Some standards organizations have online reading rooms that are free to the public, to registered users, or to organization members. Some of the standards incorporated by reference may be accessible at these standards organization web sites:

     - ASTM International free online reading room
     - ASHRAE free resources
     - NFPA free access to codes and standards
     - ANSI incorporated by reference (IBR) portal
     - Underwriters Laboratories standards incorporated by reference
     - International Code Council (ICC) free resources
     - Manufacturers Standardization Society (MSS) reading room

   - contact aircraft and aircraft parts manufacturers directly.
     Some service information incorporated by reference in airworthiness directives may be available online.

2. You can also find agency phone numbers and other contact information at:

   - USA.gov
   - United States Goverment Manual
   - Federal Citizen Information Center, National Contact Center

3. You may also use the NIST database, Regulatory Standards Incorporated by Reference, for information on the availability of IBR standards.

### About IBR

Incorporation by reference (IBR) allows Federal agencies to comply with the requirement to publish rules in the *Federal Register* and the Code of Federal Regulations (CFR) by referring to materials already published elsewhere. **Learn More ➡**

Generally, members of the public must pay a fee to receive a copy of the incorporated material. If you have difficulty locating the material, contact the regulatory agency that issued the regulation.

## Why is Incorporation by Reference Used?

Incorporation by reference is used primarily to make privately developed technical standards Federally enforceable. Agency generated documents are presumptively ineligible for incorporation by reference because that material can and should be published in full text in the *Federal Register* and CFR. Agencies are not authorized to incorporate by reference material on their web sites as a substitute for *Federal Register* publication.

The legal effect of incorporation by reference is that the material is treated as if it were published in the *Federal Register* and CFR. This material, like any other properly issued rule, has the force and effect of law. Congress authorized incorporation by reference in the Freedom of Information Act to reduce the volume of material published in the *Federal Register* and CFR. (*See* 5 U.S.C. 552(a) and 1 CFR part 51). Congress gave complete authority to the Director of the Federal Register to determine whether a proposed incorporation by reference serves the public interest.



## Where to Find Materials Incorporated by Reference at NARA Facilities

In most cases, materials incorporated by reference are made available through the standards organization that developed the standard. Contact the standards organization or other designated sources through the address listed in the *Federal Register* or CFR.

However, legal record copies of material incorporated by reference are also filed at the Office of the Federal Register (OFR) and other NARA facilities. **OFR does not distribute IBR materials.**

Legal record copies are available for public inspection and limited photo-copying. If you would like to inspect material incorporated by reference at OFR's downtown Washington, DC location, you must submit a written request and make an appointment for a specific day and time.

1. Submit your written request at least a day in advance.

2. Your request must include:

   - Your name and daytime contact information—so we can confirm your appointment and the availability of the material you are seeking or in case we have questions,

   - A detailed description of the material you wish to examine, and

   - The date and time you wish to examine the materials.

3. Submit your request by:

    **E-mail** fedreg.legal@nara.gov

    **U.S. Mail** addressed to:

   Office of the Federal Register (NF)
   The National Archives and Records Administration
   8601 Adelphi Road
   College Park, MD 20740-6001

   *\* Note that our mailing address differs from our physical location.*
   *If submitting your request by mail, we must receive your request at least a day in advance of your requested inspection date.*

The collection of materials incorporated by reference in Titles 1 through 50 of the CFR has grown to

the point that they are transferred from OFR to other NARA sites on a regular basis. See the
Disposition Schedule below for more information on where materials are housed and use the links for
these facilities to learn about researcher and information access policies at those locations.



## Disposition Schedule and Location

The following table is a listing of the disposition schedule and location of the materials incorporated by
reference:

- The dates and timeframes are approximate
- Addresses for each location are listed below the table

| Category of Records | Location of Records - Retention Period | | |
|---|---|---|---|
| | OFR | WNRC | NARA |
| Aircraft Service Bulletins for FAA Airworthiness Directives (14 CFR 39) | From Year 0-3 | From Year 3-10 | From Year 10 Forward (permanent storage) |
| State Implementation Plans and Amendments submitted to EPA (40 CFR part 52) | From Year 0-5 | From Year 5-15 | From Year 15 Forward (permanent storage) |
| All other materials incorporated by reference in the CFR | From Year 0-5 | From Year 5-15 | From Year 15 Forward (permanent storage) |



## Addresses

These are the addresses of the locations listed in the table above. Please call 202-741-6030 for help
in determining where the materials are housed:

**Office of the Federal Register** (OFR)
800 North Capitol Street NW, Suite 700
Washington, DC 20001

**Washington National Records Center** (WNRC)
4205 Suitland Road
Suitland, MD 20746-8001

**National Archives at College Park** (NARA)
8601 Adelphi Road
College Park, MD 20740-6001

If you are interested in obtaining a copy of a standard that
has been incorporated by reference, contact the
standards organization that developed the material or the
agency that incorporated it.

Contact the Standards
Organization or Agency



If you are interested in examining material that has been
incorporated by reference, submit a written request to the
Office of the Federal Register.

For more information about Incorporation by Reference,
please contact our Legal Affairs and Policy Staff:

Make an Appointment to

**☎ Telephone** (202) 741-6030

**☎ Fax** (202) 741-6012

**✉ E-mail** fedreg.legal@nara.gov

**🇺🇸 U.S. Mail** addressed to:

Office of the Federal Register (NF)
The National Archives and Records Administration
8601 Adelphi Road
College Park, MD 20740-6001

Inspect IBR Materials at OFR



---

**Federal Register >**

### Information For…
Citizen Archivists
Federal Employees
Genealogists
Members of Congress
Preservation
Records Managers
The Press

### Publications
Federal Register
Free Publications
Prologue Magazine
Purchase Publications
More…

### Orgs & Offices
Center for Legislative Archives
Federal Records Center
Office of the Inspector General
Presidential Libraries
More…

### About Us
What is the National Archives?
Doing Business with Us
Plans and Reports
Open Government
Our Plain Language Activities

### I Want To…
Get My Military Record
Plan a Research Visit
Visit the Museum
View Online Exhibits
Apply for a Grant

### Participate
Attend an Event
Donate to the Archives
Work at the Archives
Volunteer at the Archives

### Resources
A-Z Index
America's Founding Docs
Contact Us
En Español
FAQs
Forms

### Connect With Us
Blogs
Facebook
Flickr
RSS Feeds
Twitter
YouTube

More…

---

Contact Us  |  Accessibility  |  Privacy Policy  |  Freedom of Information Act  |  No FEAR Act  |  USA.gov

**The U.S. National Archives and Records Administration**
1-86-NARA-NARA or 1-866-272-6272

# EXHIBIT 156

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON GRAND JURY 2014
MARCH 10, 2015 SESSION

FILED

MAR 10 2015

TERESA L. DEPPNER, CLERK
U.S. District Court
Southern District of West Virginia

UNITED STATES OF AMERICA

v.                                          CRIMINAL NO. 5:14-cr-00244
                                            30 U.S.C. § 820(d)
                                            18 U.S.C. § 371
                                            18 U.S.C. § 1001
                                            18 U.S.C. § 2
                                            15 U.S.C. § 78ff
                                            17 C.F.R. § 240.10b-5

DONALD L. BLANKENSHIP

## S U P E R S E D I N G  I N D I C T M E N T

### Summary

1.  Beginning no later than January 1, 2008 and continuing through April 9, 2010 (the "Indictment Period"), defendant DONALD L. BLANKENSHIP ("BLANKENSHIP"), the Chief Executive Officer ("CEO") and Chairman of the Board of Directors of coal producer Massey Energy Company ("Massey"), conspired to commit and cause routine violations of mandatory federal mine safety standards at Massey's Upper Big Branch-South mine ("UBB").[*] Throughout the Indictment Period, BLANKENSHIP himself closely managed UBB, the coal from which was critical to Massey's financial performance. BLANKENSHIP knew that UBB was committing hundreds of safety-law violations every year and that he had the ability to prevent most of the violations that UBB was committing. Yet he fostered and participated in an understanding that

---

[*] Allegations herein are made with reference to the Indictment Period unless otherwise noted.

perpetuated UBB's practice of routine safety violations, in order to produce more coal, avoid the costs of following safety laws, and make more money.

2. Throughout the Indictment Period, BLANKENSHIP also conspired to defraud the United States by impeding the federal Mine Safety and Health Administration ("MSHA") in carrying out its duties at UBB.

3. Following a major, fatal explosion at UBB on April 5, 2010, BLANKENSHIP made, and caused to be made, materially false and misleading statements and representations, and omitted and caused to be omitted statements of material facts, regarding his and Massey's practice of willful violations of safety laws at that mine. These included materially false statements and representations made to the United States Securities and Exchange Commission ("SEC") and materially false statements and representations, and materially misleading omissions, made in connection with the purchase and sale of Massey stock.

### Background

4. At all relevant times, Massey was a corporation engaged in the business of mining and selling coal, including at numerous mines in the Southern District of West Virginia, where Massey maintained a regional headquarters. UBB was a coal mine that Massey, through various subsidiaries, wholly owned and controlled, and was located in and around Montcoal, Raleigh County, West Virginia, within the Southern District of West Virginia. UBB and all Massey's other mines and mining-related facilities produced products that entered commerce and had operations and products that affected commerce, rendering them subject to Title 30, United States Code, Chapter 22, concerning mine safety and health, and to rules and regulations promulgated thereunder, including mandatory federal mine safety and health standards codified in Title 30, Code of Federal Regulations, Chapter I. UBB was subject to regular federal mine

2

safety inspections conducted by MSHA, an agency of the United States Department of Labor (DOL), which was part of the executive branch of the government of the United States. UBB was also subject to monetary penalties imposed by MSHA for violations of mandatory federal mine safety and health standards that federal mine safety inspectors discovered during inspections of UBB.

5.   At all relevant times, Massey's Class A Common Stock was registered with the SEC and was publicly traded on the New York Stock Exchange. At all relevant times, in order to sell securities to members of the public and maintain public trading of its securities in the United States, Massey was required to comply with provisions of the federal securities laws, including the Securities Exchange Act of 1934, and rules and regulations promulgated thereunder.

6.   At all relevant times, the SEC was an agency of the executive branch of the government of the United States.

7.   At all relevant times, BLANKENSHIP, as CEO of Massey and Chairman of Massey's Board of Directors, was principally and ultimately responsible for the management of Massey's business. At all relevant times, the Restated Bylaws of Massey Energy Company provided that BLANKENSHIP, as CEO, had general supervision, direction, and control of the officers, employees, business, and affairs of Massey, including the UBB mine.

8.   During the Indictment Period, UBB was cited approximately 835 times for violations of mandatory federal mine safety and health standards. This was one of the highest levels of safety-law violations of any Massey mine. Approximately 319 of these violations were in an especially serious category of violations: those that could significantly and substantially contribute to the cause and effect of a safety or health hazard. Approximately 283 of UBB's safety-law violations during the Indictment Period were violations of the laws on mine ventilation, which operate to

3

prevent explosions and fires in coal mines and to minimize deaths and serious injuries in the event an explosion or fire does occur. Approximately 59 of UBB's safety-law violations during the Indictment Period resulted in shutdown orders closing all or part of the mine until the violation was abated, pursuant to Title 30, United States Code, Section 814(d). Violations resulting in such shutdown orders were among the most serious category of violations that can occur in a coal mine. UBB ranked among the worst mines in the United States in such shutdown orders during the Indictment Period.

9. During the Indictment Period, UBB was important to Massey's financial performance. UBB produced a type of coal called metallurgical coal, which was used for manufacturing steel. During the Indictment Period, metallurgical coal sold for substantially more per ton than Massey's other major product, which was steam coal used to generate electricity. Metallurgical coal from UBB was particularly important to Massey's sales of metallurgical coal, because it was an essential ingredient in a blend of metallurgical coal that also included coal from a group of other Massey mines near UBB. In 2009, this UBB-centered group of mines generated revenues of approximately $331 million, which represented approximately 14% of Massey's approximately $2.3 billion in revenue—more than any of Massey's numerous other mining groups. For 2010, Massey projected UBB-group revenue of approximately $432 million, approximately 16% of Massey's projected revenue of approximately $2.7 billion and more than the projected revenue for any other Massey mining group.

10. Beginning in 2009 and continuing through the rest of the Indictment Period, one operating section of UBB employed a mining technique known as longwall mining. (A coal mining "section" was an area of a mine where coal was being produced. A single mine may have had multiple mining sections. While the longwall section was operating at UBB, UBB had, at

4

various times, four or five total active mining sections, with the other sections using a mining technique different from the longwall method.) Longwall mining was the most productive method of underground coal mining; it uses equipment and a mining configuration that permit the extraction of large swaths of coal in a short period of time. When operating at full productivity, the UBB longwall mining section could produce more than $600,000 worth of coal every day, more than any of Massey's dozens of other underground mining sections. The equipment needed to run a longwall mining section was expensive, typically costing many tens of millions of dollars.

### Upper Big Branch Safety-Law Violations

*Mine Ventilation Laws*

11. Routine violations of mine-safety laws at UBB included violations of the laws on mine ventilation. Proper ventilation in a coal mine was essential to preventing explosions. The coal mining process inherently generates airborne coal dust, which was highly explosive. And in many coal mines, including UBB, the mining process also inherently releases methane gas into the mine air. Methane gas was explosive if it reaches certain atmospheric concentrations. A constant supply of clean air was necessary to dilute those airborne explosive substances and carry them away, preventing them from reaching dangerous concentrations.

12. *Minimum airflow requirements and mine ventilation plans.* At all relevant times, airflow in certain key areas of a coal mine was required, by mandatory federal mine safety standards, to be adequate to dilute, render harmless, and carry away explosive substances. At all relevant times, the operator of any coal mine was required to develop and follow a ventilation plan approved by federal mine-safety officials, also pursuant to a mandatory federal mine safety standard. This ventilation plan was required to be designed to control methane and coal dust, and

5

to mandate, in certain key locations, specific quantities of airflow that were adequate to dilute, render harmless, and carry away explosive substances. A violation of a mine's approved ventilation plan was a violation of a mandatory federal mine safety standard.

13. *Construction required for proper mine ventilation.* At all relevant times, coal mines were required to construct structures called ventilation controls and devices to manage the flow of air in a mine, pursuant to mandatory mine safety standards. These ventilation structures included permanent block walls and temporary walls made of heavy cloth or plastic to route mine air to locations where it was needed to carry away explosive substances. Maintaining this mandatory system of ventilation structures required continual construction, because as the mine's workings advanced deeper and deeper, new ventilation structures had to be built to route air through the most recently opened parts of the mine.

14. *Mine safety examinations.* At all relevant times, coal mines were required to conduct regular safety examinations to check for ventilation-related hazards, including the presence of potentially explosive methane gas in the mine air, illegally low levels of airflow, and air flowing in the wrong direction. In these safety examinations, mines were also required to check for the existence of any other hazardous conditions, including accumulations of explosive coal dust. Safety examinations in certain areas of a mine were required to be conducted within three hours before any working shift and at least once during each working shift. Wider ranging safety examinations were required to be conducted weekly. These requirements were established in mandatory mine safety and health standards.

15. The above-described mandatory federal mine safety standards concerning ventilation were basic, well-known principles of coal mining.

6

*UBB's Routine Violations of Mine-Ventilation Laws*

16. During the Indictment Period, BLANKENSHIP and Massey routinely violated the above-described and other mandatory safety standards on ventilation at UBB.

17. *Violations of airflow requirements and mine ventilation plan.* Examples of these violations included the following: On or around June 4, 2009, a federal mine safety inspector discovered airflow of 147 cubic feet per minute in an area of the mine where 9,000 cubic feet per minute was required. This legal minimum air quantity of 9,000 cubic feet per minute was established to ensure that airflow was sufficient to dilute and carry away explosive substances in the mine atmosphere. The inadequate air quantity violated a mandatory mine safety standard requiring the mine to follow its approved ventilation plan.

18. On or around June 3, 2009, a federal mine safety inspector discovered that UBB's section #1 was operating with less than half the minimum legal air quantity, which again violated the mandatory mine safety standard requiring the mine to follow its approved ventilation plan.

19. On or around October 21, 2009, a federal mine safety inspector discovered that UBB's section #2 was operating with less than the minimum legal air quantity. As a result of the illegally low air quantity, the federal mine-safety inspector observed visible airborne coal dust surrounding miners who were working on section #2. This illegally low air quantity again violated the mandatory federal mine safety standard requiring the mine to follow its approved ventilation plan.

20. On or around March 2, 2010, a federal mine safety inspector discovered that UBB's #1 section was operating with less than half the legal minimum air quantity, again violating the mandatory federal mine safety standard requiring the mine to follow its approved ventilation plan.

21. *Ventilation-plan violations regarding water sprays.* UBB also was cited repeatedly for violating another important component of its ventilation plan: its requirements for water sprays on equipment that cut coal from the coal seam. These water sprays suppressed coal dust and cooled the area where cutting occurred, the latter to diminish the possibility that frictional heat from cutting would ignite explosive substances in the mine air. On or around July 15, 2009, federal mine safety inspectors discovered that a continuous mining machine in UBB's section #2 was missing water sprays required by the mine's ventilation plan. On or around October 27, 2009, federal mine safety inspectors discovered that a continuous mining machine at UBB was running with less than the minimum level of water pressure for its sprays as required by the mine's ventilation plan. On or around March 23, 2010, federal mine safety inspectors discovered that a continuous mining machine at UBB was running with nearly half its required number of sprays in inoperable condition and with a water fitting for its spray system broken. Each of these discoveries represented a violation of the mandatory mine safety standard requiring compliance with the mine's approved ventilation plan, and each resulted in the issuance of a federal citation.

22. After the April 5, 2010 explosion at UBB, a federal investigation determined that at the time of the explosion, the longwall shearer in the mine's longwall section was operating with approximately seven of its required water sprays missing and with other sprays clogged. The missing sprays reduced the water pressure at the remaining sprays significantly below the minimum level required by the mine's approved ventilation plan and prevented the remaining sprays from counteracting frictional heat in the area where coal was being cut. Operating the longwall shearer with missing and clogged sprays and insufficient water pressure violated the mandatory federal mine safety standard requiring compliance with the mine's approved ventilation plan.

8

23. In total, UBB was cited approximately 61 times for violations of its approved ventilation plan during the Indictment Period. The cited violations occurred throughout the Indictment Period and ranged from in or around March 2008 through on or around April 5, 2010.

24. UBB's routine violation of its ventilation plan was the result of several causes, including the following: providing the mine with an inadequate number of coal miners focused on jobs important to safety-law compliance, including the maintenance of ventilation structures in airways away from the mine's active operating sections; BLANKENSHIP's imposition and aggressive enforcement of coal-production quotas that deprived UBB's coal miners of the time they needed to construct and maintain ventilation control structures, and that forced them to operate even where air quantities were below legal minimums; BLANKENSHIP's direction, addressed below, not to construct certain ventilation controls that would produce more reliable airflow because constructing them diverted time from coal production; and BLANKENSHIP's denial, also addressed below, of a request to construct an airshaft at UBB that would have increased airflow to areas of the mine where it was often below the legal minimum.

25. *Violations: Constructing and maintaining ventilation structures*. UBB also was routinely cited during the Indictment Period for violating mandatory federal mine safety standards on ventilation control structures and devices. For example, on or about November 19, 2009, and on or about December 1, 2009, federal mine safety inspectors discovered that legally mandated ventilation controls were missing in airways that were essential to airflow in at least two of the mine's operating sections, including the longwall mining section. Because of poor engineering, the roof and walls of the area of the mine in which these structures were located were collapsing, causing the structures to be crushed almost as quickly as they could be built. The president of UBB's mining group, whose identity is known to the Grand Jury (the "Known UBB Executive"),

9

along with other UBB officials known and unknown to the grand jury, knew that the ventilation control structures in this area of the mine were routinely being destroyed by the collapse of the area's roof and walls. They nonetheless caused the affected passageways to remain in use as part of the mine's ventilation system, thus willfully violating mandatory federal mine safety standards.

26. In total, UBB was cited for approximately 59 violations during the Indictment Period of mandatory federal mine safety standards regarding ventilation control structures and devices. The cited violations occurred throughout the Indictment Period and ranged from in or around January 2008 through in or around March 2010. Among the causes of these violations were an insufficient number of coal miners in jobs focused on the construction and maintenance of ventilation control structures and devices, and the imposition and aggressive enforcement of coal-production quotas that did not allow time to properly maintain ventilation control structures and devices.

27. *Violations: Mine-safety examinations.* UBB also was routinely cited during the Indictment Period for violating mandatory federal mine safety standards requiring regular safety examinations. For example, on or around March 9, 2009, federal mine safety inspectors discovered that, according to UBB's own records, one of the mine's aircourses that was required to be examined weekly had not been examined for more than a year. In total, UBB was cited for approximately 62 violations during the Indictment Period of mandatory federal mine safety standards requiring regular safety examinations, which were among the standards for ensuring proper mine ventilation. The cited violations occurred throughout the Indictment Period and ranged from in or around January 2008 through on or around April 5, 2010. Among the causes of these violations were the employment of an inadequate number of coal miners, and the

imposition and enforcement of coal-production quotas that did not allow time, to conduct required safety examinations in a mine the size of UBB.

28. *Violations: Support of the mine roof and walls.* During the Indictment Period, UBB also routinely violated mandatory federal mine safety standards concerning support of the mine's roof and ribs (walls). Because underground coal mining extracts a layer of coal that previously supported layers of earth and rock overhead, substitute support must be constructed to prevent the mine's roof and walls from collapsing into the resulting void. These supports included long bolts (as long as sixteen feet) that were installed in the mine roof and affixed to large plates that hold the stratum of rock above the mine in place, as well as timbers that helped bear the weight of overlying rock and earth. Just as with the mine's ventilation system, this construction process was a continual one: as mining advanced deeper and deeper, supports were required to be constructed in the mine's newly opened areas. The requirement to provide sufficient support to protect persons from falls of the mine's roof and walls was a basic, well-known principle of coal mining.

29. On or around September 23, 2009, for example, a federal mine safety examiner at UBB discovered that most of the mine roof had fallen out in an area of the mine more than 100 feet long and approximately twenty feet wide, leaving the remaining roof unstable in an area where miners were required to work and travel on a regular basis. UBB's own records of past safety examinations showed that mine officials had been aware of this danger for almost a month but failed to correct it. This knowing failure violated a mandatory federal mine safety standard that required the roof and walls of areas where persons work or travel to be supported or otherwise controlled to protect persons from hazards related to falls of the roof and walls.

30. In total, UBB was cited approximately 91 times for violations during the Indictment Period of mandatory federal mine safety standards regarding support of the mine's roof and walls. The cited violations occurred throughout the Indictment Period, ranging from in or around January 2008 through on or around April 5, 2010. Among the causes of these violations were the employment of an inadequate number of coal miners to perform work necessary to comply with the safety laws on support for the mine's roof and walls, as well as the imposition and aggressive enforcement of coal-production quotas that did not allow enough time to perform such work.

31. *Violations: Explosive coal dust and combustible loose coal and other materials.* During the Indictment Period, UBB also routinely violated mandatory mine safety standards concerning accumulations of coal dust, loose coal, and other combustible materials. As explained above, coal mining inherently produced large quantities of airborne coal dust. This coal dust eventually settled out of the mine air and collected on surfaces throughout the mine. After settling, however, coal dust still posed a risk of explosion. If an explosion ignited in one part of a mine, the blast of air from that explosion could force settled float coal dust back into the mine air. Once the previously settled dust became airborne again, heat and flame from the initial ignition could cause it to explode. In this way, previously settled coal dust could enlarge a relatively small initial explosion and cause it to propagate throughout a mine. Consequently, a mandatory federal mine safety standard required that float coal dust be cleaned up and not permitted to accumulate. Mandatory federal mine safety standards also required that loose coal, which was flammable, and other combustible materials be cleaned up and not permitted to accumulate; fires were a serious danger in underground coal mines in part because such mines featured tight spaces and limited air supply, and because miners in such mines often worked far away from the safety of the surface. The mandatory federal mine safety standard requiring that explosive coal dust,

12

combustible loose coal, and other combustible materials be cleaned up and not permitted to accumulate was a basic, well-known principle of coal mining.

32. Examples of UBB's violations of these standards include the following: On or around January 28, 2010, a federal mine safety inspector discovered float coal dust accumulated along the entire length of the conveyor belt that carried coal from UBB's section #1. This accumulation violated the mandatory federal mine safety standard requiring that explosive float cost dust be cleaned up and not permitted to accumulate.

33. On or around March 15, 2010, a federal mine safety inspector discovered fine, black coal dust deposited along substantially the entire length of the conveyor belt that carried coal from UBB's longwall section. This accumulation violated the mandatory federal mine safety standard requiring that coal dust be cleaned up and not permitted to accumulate.

34. In total, UBB was cited approximately 81 times for violations during the Indictment Period of the mandatory federal mine safety standard requiring that coal dust, loose coal, and combustible materials be cleaned up and not permitted to accumulate. These violations occurred throughout Indictment Period, from in or around January 2008 through on or around April 5, 2010.

35. UBB's own records of mine safety examinations also revealed near-constant violations of mandatory federal mine safety standards concerning accumulations of coal dust and other combustible materials, as well as the application of rock dust, an incombustible substance that was required, pursuant to mandatory federal mine safety standard that were a basic, well-known principle of coal mining, to be spread throughout a coal mine to stop the spread of any explosion or fire that might occur in the mine. In a span of little more than a month, from March 1, 2010, through April 5, 2010, UBB's records of on-shift examinations reflected approximately 937

13

hazardous conditions arising from accumulations of coal dust and coal and from inadequate application of rock dust. The same records reflected that the majority of these hazardous conditions were not properly corrected. These records were reviewed daily by UBB officials.

36. Among the causes of UBB's routine violations of the laws on explosive and combustible materials and rock dusting were the employment of an inadequate number of coal miners to perform work necessary to comply with these laws, as well as the imposition and aggressive enforcement of coal-production quotas that did not allow sufficient time to perform such work.

### Advance Warning of Federal Mine Inspection Activities

37. During the Indictment Period, a scheme existed at UBB to routinely warn underground workers when federal mine safety inspectors were on their way to inspect underground areas of the mine. At the entrance to the UBB mine property was a guardhouse. When federal mine safety inspectors passed this guardhouse on their way to the mine, it was standard practice for a guard to radio the UBB mine office, which sat just outside the entrance to the mine's underground areas, to warn employees in the mine office that the inspectors were on their way. It was standard practice for an employee in the mine office then to call underground (a telephone system connected the mine office to various areas of the mine's underground workings) to pass along this warning to underground personnel. Underground supervisors then would direct miners to quickly cover up violations of mandatory federal mine safety standards that the mine routinely committed, including missing ventilation control structures and devices, accumulations of float coal dust and loose coal, missing roof support, and failures to properly rock dust the mine. The purpose of this advance-warning scheme was to prevent federal mine safety inspectors from discovering and citing many of the violations of mandatory federal mine safety and health standards that were routinely committed at UBB. Because of the distance from the UBB

14

guardhouse to the mine office and the size of the mine's underground workings, the sections of the mine farthest from the mine entrance could be given as much as two hours' advance warning before federal mine safety inspectors arrived.

38. In order to avoid alerting federal mine safety inspectors that these warnings were being given, UBB employees frequently used code words and phrases when discussing imminent safety inspections on the mine telephone system.

39. UBB officials, including the Known UBB Executive and others known and unknown to the Grand Jury, frequently instructed and encouraged mine employees to provide advance warning whenever federal mine safety inspectors were on their way to inspect the mine's underground areas.

### BLANKENSHIP was fully aware of UBB's practice of routinely violating mandatory federal mine safety standards.

40. BLANKENSHIP was fully aware of UBB's practice of routinely violating mandatory federal mine safety standards. As early as in or around January 2008, BLANKENSHIP learned that federal mine safety regulators had designated UBB as a mine with a potential pattern of violations, a status that applied only to the worst mines in the country as measured by serious safety-law violations and other indicators of safety. In or around early 2009, BLANKENSHIP began to request and receive reports detailing the cost of fines that Massey was being assessed for federal safety-law violations. And in or around April 2009, BLANKENSHIP requested and began to receive a report every workday detailing Massey's violations of mandatory federal mine safety standards, including an estimate of the fines that Massey would owe for these violations.

41. Each of these daily safety-violation reports showed BLANKENSHIP a count of Massey's safety-law violations for the year to date, along with year-to-date violation totals for each of Massey's mining groups. Each daily safety-violation report also showed BLANKENSHIP more

detailed information on the company's violations of the mine safety laws: how often each of the company's mining groups had violated those laws year-to-date, the specific mandatory federal mine safety standard that each group of mines violated most often, and the areas of mandatory federal mine safety standards that the company's mines violated most as a whole.

42. For example, on or around July 1, 2009, BLANKENSHIP received a safety-violation report for the year through on or around June 30, 2009. This report showed BLANKENSHIP that in the first six months of 2009, the UBB group of mines was cited for approximately 596 violations of mandatory federal mine safety and health standards resulting in an estimated $918,401 in fines—more than any other Massey mining group. The report also showed BLANKENSHIP that the mandatory federal mine safety standard violated most often at the UBB group of mines was the standard requiring that accumulations of explosive float coal dust, combustible loose coal, and other combustible materials be cleaned up and not permitted to accumulate. The report further showed BLANKENSHIP that the area of mandatory federal mine safety standards violated most often at Massey's mines as a whole were the standards concerning mine ventilation, which were intended, among other things, to prevent mine explosions and fires and to minimize the risk to miners of death or serious injury if an explosion or fire occurs. The report showed BLANKENSHIP that Massey's mines violated mandatory federal mine safety standards on ventilation approximately 1002 times in the first half of 2009.

43. On or around August 6, 2009, the daily safety-law violation reports sent to BLANKENSHIP began to include a page showing BLANKENSHIP the number of safety-law violations at individual Massey mines, as distinct from mining groups. On or around August 6, 2009, BLANKENSHIP received a daily safety-violation report that showed him that in the year to date, UBB had been cited for approximately 292 violations of federal mine safety laws, fourth

16

most of any Massey mine in the year to date. That report also showed BLANKENSHIP that the mandatory federal mine safety standard violated most often by mines in the UBB group continued to be the standard requiring that accumulations of explosive coal dust, combustible loose coal, and other combustible materials be cleaned up and not permitted to accumulate in the mine. The same report showed BLANKENSHIP that the area of mandatory federal mine safety standards violated most often at Massey's mines continued to be the standards on mine ventilation.

44. From approximately April 3, 2009, through April 5, 2010, BLANKENSHIP received approximately 249 of these daily safety-violation reports. It was BLANKENSHIP's practice to review each of these reports when he received it. Substantially every one of these 249 reports showed BLANKENSHIP that the UBB mining group was committing hundreds of safety-law violations every year.

45. Beginning on or around June 2, 2009, the daily safety-law violation reports that BLANKENSHIP received showed him which of Massey's mining groups were committing the most safety-law violations, which mandatory federal mine safety standard each mining group was violating most often, and which area of the mine safety laws Massey as a whole was violating most. From on or around June 2, 2009, through on or around April 5, 2010, BLANKENSHIP received approximately 210 of these daily reports of safety-law violations. Nearly all of those reports showed him that UBB's mining group was one of Massey's worst mining groups for safety-law violations and that the worst area of safety-law violations for Massey mines as a whole was mine ventilation. Approximately 193 of these reports showed BLANKENSHIP that the mandatory federal mine safety standard that the UBB group violated

17

most often was the standard requiring explosive coal dust, combustible loose coal accumulations, and other combustible materials to be cleaned up and not permitted to accumulate.

46. From approximately August 6, 2009, through April 5, 2010, BLANKENSHIP received approximately 163 daily safety-violation reports that showed him year-to-date safety-violation totals for the UBB mine itself, as distinct from its associated group of mines. Nearly all of these reports showed BLANKENSHIP that UBB was committing hundreds of safety-law violations each year and was among Massey's worst mines for safety-law violations.

47. On or around October 7, 2009, BLANKENSHIP received a Massey-internal "Report Card" detailing mine safety violations for each of Massey's mines in the third quarter (July through September) of 2009. This internal Report Card showed BLANKENSHIP that UBB violated mandatory federal mine safety standards 168 times in that three-month period, compared to a target of fifty-nine safety-law violations that Massey had set for UBB in the third quarter of 2009. The Report Card, which was created internally by Massey personnel who tracked safety-law violations at the company's mines, showed BLANKENSHIP that Massey itself had assigned UBB a grade of "Failed" for its number of safety-law violations in the third quarter of 2009.

48. During the Indictment Period, BLANKENSHIP personally monitored the details of UBB's operations closely. After the longwall section began operation at UBB, BLANKENSHIP insisted on personally receiving a report every thirty minutes detailing the longwall section's coal production and the reasons for any production delays. BLANKENSHIP insisted on receiving this report via fax at his home on evenings and weekends. For the other mining sections at UBB, BLANKENSHIP insisted on personally receiving a report every two hours detailing each section's coal production and the reasons for any production delays.

BLANKENSHIP's practice was to regularly review these production reports from UBB's longwall and other sections. Throughout the Indictment Period, BLANKENSHIP insisted on personally reviewing and approving or denying every proposed hire at UBB, every proposal to give a UBB employee a raise, every capital expenditure at UBB, and every hiring of a contractor to perform work at UBB. Throughout much of the Indictment Period, BLANKENSHIP demanded daily phone calls with UBB management, in addition to the dozens of written production reports he received every day, so that he could further supervise activity at UBB. During the Indictment Period, BLANKENSHIP—the CEO and Chairman of a publicly traded corporation with more than $2 billion in annual revenue—routinely, personally reviewed details such as one of UBB's operating sections starting three hours late because of necessary maintenance, a request to give a small number of truck drivers working for the UBB mining group a raise from approximately $11.59 an hour to approximately $13.50 an hour, and a request to spend $750 to hire a contractor to check the freeze-proofing systems at a UBB-group mine before cold weather arrived.

### BLANKENSHIP could have drastically reduced violations of mandatory federal mine safety standards at UBB by taking reasonable steps to follow the law.

49. Blankenship could have drastically reduced violations of mandatory federal mine safety standards at UBB by taking reasonable steps to follow the law. A large majority of UBB's safety-law violations were preventable. For example, daily safety-law violation reports routinely showed BLANKENSHIP that the mandatory federal mine safety standard that the UBB mining group violated most often was the standard requiring that explosive coal dust, combustible loose coal, and other combustible materials be cleaned up and not permitted to accumulate in the mine. Following this safety law was a matter of basic housekeeping. BLANKENSHIP could have prevented the majority of these safety-law violations by hiring enough miners at UBB, and

giving them enough non-coal-production time, to clean up the explosive and combustible substances that collected in the mine. Similarly, most mine-ventilation violations—which BLANKENSHIP knew were the most common category of safety-law violations at Massey's mines—and roof-control violations at UBB could have been prevented by providing the mine with enough miners, and giving them enough non-coal-production time, to follow the safety laws. Yet throughout the Indictment Period, UBB regularly was staffed with too few miners and had too little non-coal-production time to reasonably be able to comply with mandatory federal mine safety and health standards on ventilation, combustible materials and rock dusting, and roof support, among other areas.

50. Throughout the Indictment Period, BLANKENSHIP possessed the authority to provide UBB with the resources necessary to prevent the majority of UBB's violations of mandatory federal mine safety standards. BLANKENSHIP was the highest-ranking official in the group of officials who approved each Massey mine's annual budget and production plan, which detailed how many miners each mine could hire in specific areas, including areas focused on safety-law compliance, and also set the amount of coal and profit that each mine was required to generate. BLANKENSHIP also exercised personal decision-making authority over every decision at UBB regarding hiring and the use of non-employee contractors, as well as capital expenditures for safety-compliance purposes. BLANKENSHIP possessed full authority to respond to UBB's hundreds of annual, preventable safety-law violations by providing the mine with more miners, particularly in areas focused on safety-law compliance, and to reduce the mine's requirements for coal production and profit so that miners would have more time to work on following the safety laws. Throughout the Indictment Period, BLANKENSHIP also possessed full authority to

discipline UBB executives for the mine's routine violations of mandatory mine safety and health standards, and to determine those managers' compensation.

51. Throughout the Indictment Period, Massey possessed, and BLANKENSHIP controlled, ample financial resources to provide UBB with the resources and reasonable production requirements that it needed to comply with mandatory federal mine safety standards. During the Indictment Period, Massey possessed cash and cash equivalents ranging from approximately $391 million to approximately $1.1 billion.

52. Throughout the Indictment Period, BLANKENSHIP closely managed the UBB mine and group of mines, routinely directing and making decisions on detailed matters of the mines' everyday operations. This elaborate level of involvement further enabled him to take action to reduce safety-law violations at UBB had he chosen to do so. During much of the Indictment Period, BLANKENSHIP received dozens of UBB coal-production reports every day, and had telephone conversations daily or even more frequently with the Known UBB Executive, in which BLANKENSHIP gave direction on UBB's operation. BLANKENSHIP also regularly managed UBB through handwritten messages to the Known UBB Executive, often written on reports regarding UBB's coal production or cost management with which BLANKENSHIP was dissatisfied. Examples of this practice include the following: on or around April 11, 2008, BLANKENSHIP sent the Known UBB Executive a handwritten note, written on a coal-production report from one shift in one operating section of the UBB mine, pressuring the Known UBB Executive to change the section's engineering plan to leave in place smaller coal pillars. Coal pillars were large blocks of coal left in place as a mine advances in order to help support the mine roof; smaller pillars generally provide less support but produce more coal and

21

thus more profit. The Known UBB Executive responded that the operating section that was the subject of the report would soon begin using smaller coal pillars.

53. Also on or around April 11, 2008, BLANKENSHIP sent the Known UBB Executive a handwritten note, written on a coal-production report from one shift in one operating section of one of the UBB-group mines, criticizing the placement of a specific piece of equipment in that section as it was depicted in a routine diagram on that report, demanding to know the details of the section's airflow configuration and the specific sequence in which the section cut coal from each of its passageways, and concluding, "It's easy to see why your mines don't run."

54. On or around May 15, 2008, the Known UBB Executive sent BLANKENSHIP a memo requesting to raise hourly pay for truckers at the UBB mining group from approximately $11.59 an hour to approximately $13.50 because the group could not find truckers willing to work for the rate of approximately $11.59 an hour. On or around that same day, BLANKENSHIP responded with a series of detailed, handwritten questions about the proposed raise to which he required answers before approving or denying the proposed raise.

55. On or around January 6, 2009, BLANKENSHIP received a regular report called a Lost Footage Report from one of UBB's operating sections. On or around that date, BLANKENSHIP, dissatisfied with the information shown on the report, sent the Known UBB Executive a handwritten note on a copy of the report itself. The note read, "Is this the Head or TailGate? Describe Roof Conditions? Why a late Belt move? I didn't see a report. Why? Did you call me yet [illegible]. TODAY? What do coreholes in mains say rider will do ahead of you?"

56. On or around March 19, 2009, BLANKENSHIP sent the Known UBB Executive a memorandum chastising him for not producing coal as quickly as BLANKENSHIP demanded at UBB. In this memorandum, BLANKENSHIP said that BLANKENSHIP would need to call

directly a subordinate of the Known UBB Executive so that BLANKENSHIP himself could figure out what to do to increase coal production at UBB.

57. On or around October 7, 2009, BLANKENSHIP sent the Known UBB Executive several handwritten notes written on a request from the Known UBB Executive to spend approximately $750 to have a contractor check and test the freeze-proofing systems at one of the UBB-group mines. Two of these handwritten notes read, "<u>Nonsense</u> Giving Money Away," and "What does this mean? It's yet another example of something I never recall having done by a contractor when I was a Group Pres."

**Blankenship chose to routinely violate and cause routine violations of mandatory federal mine safety standards at UBB.**

58. Despite having the ready ability to drastically reduce violations of mandatory federal mine safety standards at UBB, and even though he knew that UBB's practice of routinely violating such standards was unlawful, BLANKENSHIP purposely elected to continue that practice throughout the Indictment Period. Specifically, he chose to maximize profits by depriving UBB of the coal miners and non-coal-production time that it needed to comply with mandatory federal mine safety standards, concluding that it was less expensive to routinely pay fines for violating such standards than to allocate the necessary funds to following them.

59. During the Indictment Period, BLANKENSHIP instructed and encouraged UBB managers to violate mandatory mine safety standards. For example, on or around February 11, 2008, BLANKENSHIP sent the Known UBB Executive a memorandum that addressed work being done to permit UBB to follow mandatory federal mine safety standards on ventilation. This memorandum gave the following instructions: "You need to get low on UBB [sections] #1 and #2 and run some coal. We'll worry about ventilation or other issues at an appropriate time. Now is not the time." Throughout the Indictment Period, however, UBB was required to comply

with mandatory federal mine safety standards regarding ventilation, which were intended

primarily to prevent mine explosions and fires and to prevent death and serious injury to miners

if an explosion or fire occurs. Throughout the Indictment Period, UBB routinely violated those

standards.

60. On or around April 29, 2008, BLANKENSHIP sent the Known UBB Executive a

handwritten message chastising him because certain sections at UBB-group mines, including

UBB itself, were not producing coal as quickly as BLANKENSHIP wanted. In this message,

BLANKENSHIP instructed the Known UBB Executive to tell coal miners under his supervision

to "run this sections [sic] like coal mines not like construction jobs." Continual construction,

including construction of ventilation control structures and supports for a mine's roof and walls,

was required to comply with mandatory federal mine safety standards.

61. On or around February 8, 2008, BLANKENSHIP sent the Known UBB Executive a

handwritten message chastising him because certain sections at UBB-group mines, including

UBB itself, were not producing coal as quickly as BLANKENSHIP wanted. In this message,

BLANKENSHIP told the Known UBB Executive, referring to two mining sections at UBB,

"Acting like construction sections. Get as low as possible and run coal."

62. On or around April 29, 2008, BLANKENSHIP sent the Known UBB Executive another

handwritten message chastising him for not producing coal as quickly as BLANKENSHP

wanted at one of the mines in the UBB mining group. This message instructed the Known UBB

Executive, "Run coal. Don't bolt for the year 2525." This message was an instruction to increase

coal production by devoting less time to the installation of roof bolts, which were a form of roof

support. At all relevant times, mandatory federal mine safety standards and approved roof-

support plans at all the UBB-group mines determined the number of roof bolts that each of those

mines were required to install, as well as the manner in which they did so, in order to help prevent falls of the mine roof and walls. At all relevant times, any violation of a mine's approved roof support plan was a violation of a mandatory mine safety standard.

63. On or around March 7, 2008, BLANKENSHIP sent the Known UBB Executive a handwritten message pressuring the Known UBB Executive to produce coal more quickly. The message contained the following instruction: "Do not cut any overcasts." An overcast was a ventilation control structure that helps ensure the reliable flow of air through a coal mine such as UBB. As a result of BLANKENSHIP's instruction in this handwritten message and similar instructions that BLANKENSHIP gave to UBB management at other times during the Indictment Period, overcasts were not constructed during the Indictment Period in numerous locations at UBB where they were needed to ensure reliable airflow. This practice contributed to numerous violations of mandatory mine safety and health standards concerning ventilation during the Indictment Period.

64. In or around August 2009, coal miners at UBB were performing work in preparation for the startup of the mine's longwall section, which was projected to be highly profitable. One of the last tasks remaining before the longwall section could begin producing coal was to cut a drainage path in certain passageways around the longwall section. Massey officials expected that water would enter the area near UBB's longwall mining section after it began producing coal, and the purpose of the planned drainage path was to drain this water from the mine in order to prevent flooding. With the drainage project approximately one to two weeks from completion, a Massey Energy Company executive known to the Grand Jury (the "Known Massey Executive") ordered that it be abandoned so that the longwall section could start producing coal sooner. This decision was made in substantial part as a result of pressure from BLANKENSHIP to begin

25

operating the longwall section as soon as possible. In or around November 2009, when the expected inflow of water entered the area of the longwall section, there was no system in place to drain it, and airways that were necessary to ventilate the mine flooded, at least two of filling with water from floor to roof. On or around December 14, 2009, a federal mine safety inspector issued a shutdown order upon discovering that coal miners at UBB were being required to work and travel in dark and murky water measuring up to four feet in depth with invisible slipping and tripping hazards on the floor of the flooded area—conditions that the inspector found could result in drowning. This condition, which made it impossible to examine several of UBB's aircourses in their entirety, violated a mandatory federal mine safety standard requiring that all aircourses be examined in their entirety at least weekly. It was caused by the decision to abandon the project to drain the area around the longwall section.

65. In or around December 2009, UBB's section #1 was still idled because one of its return aircourses (an aircourse that carries away air potentially contaminated by explosive substances and removes it from the mine) was flooded and could not safely be traveled to conduct required safety examinations, and had not been examined in several weeks. While this return aircourse was still flooded and not capable of being examined for safety, BLANKENSHIP directed the Known UBB Executive to start producing coal again in UBB's section #1, in violation of the mandatory mine safety standard requiring that all aircourses be examined at least weekly. When the Known UBB Executive resisted, BLANKENSHIP chastised him for "letting MSHA run his mines."

66. In or around the summer of 2009, during a period when certain sections at UBB routinely were operating with inadequate airflow, BLANKENSHIP counseled the Known UBB Executive

to ensure that UBB's underground operations were warned ahead of time when federal mine safety inspectors were coming to inspect those operations.

67. During the Indictment Period, UBB management repeatedly requested, in the course of the annual mine budgeting process that BLANKENSHP oversaw, to hire more coal miners to work in jobs critical to safety-law compliance. BLANKENSHIP and other Massey officials carrying out BLANKENSHIP's instructions and policies, whose identities are known and unknown to the Grand Jury, denied these requests, knowing that these denials would cause routine, preventable violations of mandatory federal mine safety standards to continue at UBB.

68. During the Indictment Period, BLANKENSHIP, together with other Massey officials carrying out BLANKENSHIP's instructions and policies, whose identities are known and unknown to the Grand Jury, imposed coal-production requirements on UBB that they knew would, in combination with the inadequate staffing and other resources provided to UBB, cause routine, preventable violations of mandatory federal mine safety and health standards to continue at UBB.

69. During the Indictment Period, BLANKENSHIP consistently pressured UBB management to cut the number of coal miners in jobs critical to safety-law compliance, including conducting safety examinations and cleaning and rock dusting the mine's conveyor belts. (In part, because UBB's conveyor belts carried large quantities of coal at high speeds, they inevitably developed accumulations of explosive float coal dust and combustible loose coal that had to be promptly cleaned up to comply with mandatory federal mine safety standards.) For example, on or around March 10, 2008, BLANKENSHIP sent the Known UBB Executive a handwritten note chastising him for employing too many coal miners in jobs that focused on safety examinations, cleanup of

explosive and combustible substances on conveyor belts, and other safety-compliance work, calling the UBB group's employment of such miners "ridiculous" and "[l]iterally crazy."

70. On or around April 18, 2008, BLANKENSHIP sent the Known UBB Executive another handwritten note chastising him for employing too many coal miners in jobs involving safety examinations and cleanup of explosive and combustible substances along conveyor belts. In this handwritten note, BLANKENSHIP demanded to be sent the name and job description of every coal miner assigned to clean and maintain conveyor belts at the UBB group so that he could personally review them.

71. On or around February 25, 2009, BLANKENSHIP directed UBB and all other Massey mines to reduce their labor cost from $18 per ton of coal mined to $14 per ton of coal mined. BLANKENSHIP knew that the only way to carry out this directive at UBB was to further cut the number of coal miners employed in jobs that focused on safety-law compliance rather than the direct production of coal, including coal miners who conducted safety examinations, cleaned up and maintained conveyor belts, and maintained compliance with safety laws in the mine's aircourses. BLANKENSHIP further knew that this reduction in the number of UBB coal miners who were focused on these and other safety-law compliance tasks, as distinct from direct production of coal, would cause continued routine violations of mandatory federal mine safety standards at UBB.

72. Throughout the Indictment Period, BLANKENSHIP aggressively pressured UBB management to produce more coal and reduce costs while rarely if ever mentioning the mine's routine safety-law violations unless they threatened to affect coal production. UBB managers knew that BLANKENSHIP was aware of the mine's routine safety-law violations, so his near-exclusive emphasis on coal production and cost-cutting, compared with his near silence on

28

UBB's hundreds of safety-law violations, further clarified to them that he expected and accepted routine safety-law violations as long as they did not compromise coal production.

73. For example, on or around March 19, 2009, BLANKENSHIP sent the Known UBB Executive a memorandum chastising him for not producing as much coal at UBB as BLANKENSHIP wanted. The memorandum said, "UBB's miner sections are a mitigated [sic] disaster," and threatened to shut down UBB if it did not begin producing more coal. In this memorandum, BLANKENSHIP stated that BLANKENSHIP himself would need to personally intervene with the Known UBB Executive's subordinates at UBB to determine, in detail, how to increase coal production at the mine.

74. On or around March 10, 2009, BLANKENSHIP sent the Known UBB Executive a handwritten note chastising him for using two different forms for reports to BLANKENSHIP on an area of cost-cutting at UBB. In this note, BLANKENSHIP threatened the Known UBB Executive's job for what BLANKENSHIP regarded as insufficient attention to cost-cutting, writing, "You have a kid to feed. Do your job."

75. On or around March 13, 2009, BLANKENSHIP sent the Known UBB Executive a handwritten note chastising the Known UBB Executive for not producing as much coal as BLANKENSHIP wanted at a UBB-group mine. This note said, "Pitiful. You need to get focused. As I said at UBB, Marsh F [Marsh Fork, another UBB-group mine], etc I could Krushchev [sic] you. Do you understand?"

76. On or around August 5, 2008, BLANKENSHIP sent a memorandum to several Massey mining-group presidents, including the Known UBB Executive, with the subject "HIGH COSTS." The memorandum said, in part, "It seems to me that none of you are too concerned about your costs. Please let me know whether you are concerned. If you are and you happen to

be responsible for mines like . . . UBB . . ., please advise how you can run the kind of cost that you run." The memorandum went on to say, "In my opinion, children could run these mines better than you all do. Look at your cost and figure out what you are going to do to get it down because if we don't have a better August and September than we had July, you can be assured that the stock options are not going to look very attractive." This memorandum made no reference to compliance with federal mine safety laws.

77. On or around February 9, 2009, BLANKENSHIP sent a memorandum to Massey mining-group presidents, including the Known UBB Executive, which said, "Please be reminded that your core job is to make money. To do this, you have to run coal at a low cost, ship your orders and control your quality." The memorandum went on to say, "My suggestion is that you begin looking at your daily P&L's [profit and loss statements] everyday because I'm looking to make an example out of somebody and I don't mean embarrassment." This memorandum made no reference to compliance with federal mine safety laws.

78. Meanwhile, during the Indictment Period, in hundreds of calls with the Known UBB Executive in which BLANKENSHIP managed and supervised operations at UBB, BLANKENSHIP rarely if ever mentioned UBB's practice of routine safety-law violations, of which practice BLANKENSHIP was well aware.

79. During the Indictment Period, BLANKENSHIP and others known and unknown to the Grand Jury used compensation decisions to communicate an expectation and acceptance that UBB would routinely violate mandatory federal mine safety and health standards. During the Indictment Period, BLANKENSHIP personally made decisions on compensation for the presidents of Massey's mining groups. In 2009, for example, UBB was cited for approximately 517 violations of mandatory federal mine safety standards. For 2009, however, BLANKENSHIP

made the Known UBB Executive, the president of UBB's mining group, among the highest-paid mining group presidents at Massey, with total compensation of approximately $450,000. Also for 2009, a year in which Massey mines were cited, according to Massey's own count in the daily safety-law violation reports that BLANKENSHIP received, for approximately 8,900 violations of mandatory mine safety and health standards, persons known and unknown to the Grand Jury voted to award BLANKENSHIP bonuses and other compensation that brought his total compensation for the year to approximately $17.8 million.

**False and Misleading Statements and Omissions Following an Explosion at UBB**

80. On April 5, 2010, an explosion occurred at UBB. The explosion resulted in a substantial number of fatalities and, as a result, attracted national and international media attention. Some media outlets reported that Massey had engaged in a practice of routinely violating mandatory safety standards. By April 7, 2010, Massey's Class A Common Stock price dropped approximately $9.15 per share, or 16.8%, from its closing pricing on April 5, 2010. This decrease reduced BLANKENSHIP's net worth by approximately $3 million.

81. On or around April 7, 2010, BLANKENSHIP directed Massey officials known to the Grand Jury to draft a statement to Massey shareholders (the "UBB Shareholder Statement"). On or around April 7, 2010, Massey officials known to the Grand Jury prepared a draft of the UBB Shareholder Statement and provided it to BLANKENSHIP for his review and approval. Among other things, the draft UBB Shareholder Statement specifically responded to public reports that Massey had engaged in a practice of routinely violating mandatory mine safety and health standards.

82. On or around April 8, 2010, BLANKENSHIP reviewed and approved the UBB Shareholder Statement, and approved its release to the public and its filing with the SEC.

31

BLANKENSHIP did these acts in or around Julian, Boone County, West Virginia, within the

Southern District of West Virginia. The UBB Shareholder Statement that BLANKENSHIP

approved included the following statements: "Media reports suggesting that the UBB tragedy

was the result of a willful disregard for safety regulations are completely unfounded," and, "We

do not condone any violation of MSHA regulations, and we strive to be in compliance with all

regulations at all times." On or around April 8, 2010, as a result of BLANKENSHIP's approval,

Massey released the UBB Shareholder Statement to the public and filed it with the SEC, using

means and instrumentalities of interstate commerce.

83. On or around April 9, 2010, a public relations consultant retained by Massey and known

to the Grand Jury sent BLANKENSHIP a draft press release with a message asking him to

review the draft release and advising that the consultant wanted to issue the release that day. The

release consisted primarily of a list of five claims marked with bullet points. The second of these

items was this claim: "We do not condone any violation of Mine Safety and Health

Administration (MSHA) regulations, and we strive to be in compliance with all regulations at all

times." On or around April 9, 2010, in or around Julian, Boone County, West Virginia, in the

Southern District of West Virginia, BLANKENSHIP responded in writing, approving the

issuance of the release. On or around April 9, 2010, the public relations consultant issued the

release on Massey's behalf through means and instrumentalities of interstate commerce,

including commercial services intended to disseminate press releases to the financial and

investing communities.

84. At the time BLANKENSHIP approved the release and filing of the UBB Shareholder

Statement, he knew that the statements that "[w]e [Massey] do not condone any violation of

MSHA regulations" and "we [Massey] strive to be in compliance with all regulations at all

times" were materially false, fraudulent, fictitious, and misleading; that the UBB Shareholder Statement contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; that it employed devices, schemes, and artifices to defraud; and that it would operate as a fraud and deceit upon purchasers and sellers of Massey Class A Common Stock.

85. At the time the BLANKENSHIP approved the issuance of the press release described in Paragraph 83, he knew that the statements that "[w]e [Massey] do not condone any violation of Mine Safety and Health Administration (MSHA) regulations" and "we strive to be in compliance with all regulations at all times" were materially false, fraudulent, fictitious, and misleading; that the press release contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; that it employed devices, schemes, and artifices to defraud; and that it would operate as a fraud and deceit upon purchasers and sellers of Massey Class A Common Stock.

## Count One
### (Conspiracy)

86. The Grand Jury re-alleges Paragraphs 1 through 85 as if fully incorporated herein.

87. Throughout the Indictment Period, BLANKENSHIP, together with others known and unknown to the Grand Jury, unlawfully, willfully, and knowingly combined, conspired, confederated, and agreed together with each other:

    a.    for BLANKENSHIP and Massey, as operators of UBB, to willfully violate mandatory federal mine safety and health standards at UBB, in violation of Title 30, United States Code, Section 820(d), and Title 18, United States Code, Section 371; and

    b.    to defraud the United States and an agency thereof, to wit, 1) to hamper, hinder, impair, impede, and obstruct, by trickery, deceit, and dishonest means, the lawful and legitimate functions of DOL and its agency, MSHA, in the administration and enforcement of mine safety and health laws at UBB, and 2) to defraud and deprive, by trickery, deceit, and dishonest means, the United States of money that it otherwise would have received.

88. The purposes of this conspiracy included, among other purposes, unlawfully increasing Massey's profits and unlawfully enriching BLANKENSHIP.

### *Objects of the Conspiracy*

89. Among the objects of the conspiracy were to:

    a.    routinely violate mandatory federal mine safety and health standards;

    b.    hamper, hinder, impair, impede, and obstruct, by trickery, deceit, and dishonest means, the lawful and legitimate functions of DOL and its agency, MSHA, in the administration and enforcement of mine safety and health laws at UBB; and

    c.    defraud and deprive, by trickery, deceit, and dishonest means, the United States of money that it otherwise would have received.

34

*Manner and Means*

90. The manner and means of the conspiracy included, but were not limited to, the following:

91. It was a part of the conspiracy that BLANKENSHIP, together with others known and unknown to the Grand Jury, would and did instruct and counsel their subordinates to commit violations of mandatory federal mine safety and health standards, and to take actions that they knew would and did cause violations of those standards, and to engage in omissions to act that they knew would and did cause violations of those standards.

92. It was further a part of the conspiracy that BLANKENSHIP, together with others known and unknown to the Grand Jury, would and did refuse to provide UBB with enough coal miners, time to devote to safety-law compliance, and other resources to be reasonably able to comply with mandatory federal mine safety and health standards, knowing that this refusal would and did cause routine violations of federal mine safety and health standards at UBB.

93. It was further a part of the conspiracy that BLANKENSHIP, together with others known and unknown to the Grand Jury, would and did routinely pressure UBB management to increase coal production and cut costs, and specifically to cut the number of coal miners that UBB employed in jobs focused on safety-law compliance, knowing that these steps would cause UBB to continue routinely violating mandatory federal mine safety standards.

94. It was further a part of the conspiracy that BLANKENSHIP, together with others known and unknown to the Grand Jury, would and did routinely disregard UBB's practice of safety-law violations in communicating with UBB management, which served to inform UBB management that BLANKENSHIP and Massey expected and accepted routine violations of mandatory federal mine safety standards at UBB.

95. It was further a part of the conspiracy that BLANKENSHIP, together with others known and unknown to the Grand Jury, would and did reward with high levels of compensation, and declined to punish or discipline, officials who committed and caused routine violations of mandatory federal mine safety and health standards at UBB. These officials included BLANKENSHIP and the Known UBB Executive.

96. It was further a part of the conspiracy that persons known and unknown to the Grand Jury would and did routinely commit willful, readily preventable violations of mandatory federal mine safety and health standards at UBB.

97. It was a part of the conspiracy that BLANKENSHIP, together with others known and unknown, would and did cause and counsel to be given to persons at UBB advance warning of federal mine safety inspection activities, knowing and intending that the persons receiving this advance warning would conceal and cover up and cause to be concealed and covered up violations of mandatory federal mine safety and health standards that otherwise would result in citations and shutdown orders issued by federal mine safety inspectors, and in monetary penalties due to the United States.

98. It was further a part of the conspiracy that members of the conspiracy known and unknown, upon receiving advance warning of federal mine safety inspection activities at UBB, would and did conceal and cover up and cause to be concealed and covered up violations of mandatory federal mine safety standards that would otherwise result in citations and shutdown orders issued by federal mine safety inspectors, and in monetary penalties due to the United States.

99. It was further a part of the conspiracy that members of the conspiracy known and unknown falsified and caused to be falsified samples of respirable dust that were collected at

UBB pursuant to mandatory federal mine health standards, by falsely representing, and causing to be falsely represented, the locations at which dust sampling devices were placed for the collection of such samples.

*Overt Acts*

100.     Overt acts committed in furtherance of the conspiracy and to effect the illegal objects thereof included, but were not limited to, the following:

a.     The imposition of staffing levels and production requirements, by BLANKENSHIP and others known and unknown to the Grand Jury, that BLANKENSHIP and these others known and unknown to the Grand Jury knew would result in continued routine violations of mandatory federal mine safety and health standards at UBB, as alleged in Paragraphs 67 and 68;

b.     the instructions and counsel to perform acts, and to commit omissions, that would violate and cause violations of mandatory federal mine safety and health standards, alleged in Paragraphs 59 through 65;

c.     the counsel to provide advance warning of federal mine safety inspection activities in UBB's underground works, alleged in Paragraph 66;

d.     providing and causing to be provided advance warning of federal mine safety inspection activities in UBB's underground works, as alleged in Paragraphs 37 through 39;

e.     concealing and covering up, and causing to be concealed and covered up, routine violations of mandatory federal mine safety and health standards at UBB in response to warnings of federal mine safety inspection activities in UBB's underground works, as alleged in Paragraph 37;

f.      falsifying and causing to be falsified, during the Indictment Period, samples of respirable dust collected at UBB pursuant to mandatory federal mine health standards, by falsely representing and causing to be falsely represented the locations at which dust sampling devices were placed for the collection of such samples;

g.      regularly pressuring UBB management to increase coal production and reduce production costs while knowing that UBB was routinely failing to meet mandatory federal mine safety and health standards and that those steps would cause continued and increased violations of those standards at UBB, as alleged in Paragraphs 69 through 77;

h.      awarding high levels of compensation to, and declining to discipline or punish, officials who committed and caused routine and ongoing violations of mandatory federal mine safety and health standards at UBB, as alleged in Paragraph 79;

i.      making and causing to be made false and misleading statements and omissions intended to conceal the existence of, and thereby perpetuate, the conspiracy, as alleged in Paragraphs 80 through 85; and

j.      committing routine violations of mandatory federal mine safety and health standards at UBB, as alleged in Paragraphs 16 through 36.

In violation of Title 30, United States Code, Section 820(d), and Title 18, United States Code, Section 371.

**Count Two**

101.    The Grand Jury re-alleges Paragraphs 1 through 100 as if fully incorporated herein.

102.    On or around April 8, 2010, in the Southern District of West Virginia, BLANKENSHIP, aided and abetted by others known and unknown, knowingly and willfully made and caused to be made materially false, fictitious, and fraudulent statements and representations; and knowingly and willfully made and used, and caused to be made and used, a false writing and document knowing the same to contain materially false, fictitious, and fraudulent statements and entries, in a matter within the jurisdiction of the executive branch of the Government of the United States, to wit, by filing and causing to be filed with the SEC a document containing statements, entries, and representations including the following: "[w]e [Massey] do not condone any violation of MSHA regulations" and "we [Massey] strive to be in compliance with all regulations at all times," which statements BLANKENSHIP then and there well knew were false, fictitious and fraudulent.

In violation of Title 18, United States Code, Section 1001(a)(2) and (3), and Section 2.

39

## Count Three

103.     The Grand Jury re-alleges Paragraphs 1 through 102 as if fully incorporated herein.

104.     From on or around  April 7, 2010, through on or around April 9, 2010, BLANKENSHIP, aided and abetted by others known and unknown to the Grand Jury, did directly and indirectly, by means and instrumentalities of interstate commerce, and by means of the mails and of the facilities of national securities exchanges, did make and cause to be made untrue statements of material fact, and did omit to state, and cause to be omitted to state, material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, did engage in acts and practices and courses of business which operated and would operate as frauds and deceits upon persons, all in connection with the sale and purchase of securities, to wit, Massey Class A Common Stock, in that BLANKENSHIP, aided and abetted by others known and unknown to the Grand Jury, did directly and indirectly, make and cause to be made the statements, "[w]e [Massey] do not condone any violation of MSHA regulations," and "[w]e [Massey] do not condone any violation of Mine Safety and Health Administration (MSHA) regulations," and "we [Massey] strive to be in compliance with all regulations at all times," in a filing made with the SEC by means of interstate wire transmission, and in a press release distributed by means of interstate wire transmissions and companies engaged in the business of distributing press releases by means of interstate wire transmissions.

In violation of Title 15, United States Code, Section 78ff; Title 17, Code of Federal

Regulations, Section 240.10b-5; and Title 18 United States Code, Section 2.

_____
STEVEN R. RUBY
Assistant United States Attorney

# EXHIBIT 157

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## BECKLEY DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.                               CRIMINAL ACTION NO. 5:14-cr-00244

DONALD L. BLANKENSHIP,

      Defendant.


## ORDER

On October 1, 2015, came the United States by R. Booth Goodwin, United States Attorney for the Southern District of West Virginia, together with Assistant United States Attorneys Steven R. Ruby, R. Gregory McVey and Gabriele Wohl, and also came the Defendant, Donald L. Blankenship, in person and by his counsel, William W. Taylor, Blair Gerard Brown, James A. Walls and Eric R. Delinsky, for trial in the above-styled matter.

Jury selection concluded on October 7, 2015, and the parties presented opening statements and the United States presented evidence. The United States rested its case on November 16, 2015, at which time the Defendant submitted written and oral motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The Court held the Defendant's motion in abeyance. The Defendant rested his case on the same day. On November 17, 2015, the Court instructed the jury, and the parties presented their closing arguments. The jury began its deliberations on the same day and subsequently returned a verdict of guilty on December 3, 2015, as to Count One of the Superseding Indictment. The jury found the Defendant not guilty

1

as to Counts Two and Three of the Superseding Indictment. The verdict was filed on that date. By order entered on the 9th day of December, 2015, the Court denied the Defendant's *Rule 29 Motion for Judgment of Acquittal on all Counts.*

Based on the jury's verdict, the Court **ADJUDGES** the Defendant, Donald L. Blankenship, **GUILTY**, and he now stands convicted of the misdemeanor offense of ***Conspiracy***, in violation of 30 U.S.C. § 820(d) and 18 U.S.C. § 371, as charged in **Count One** of the Superseding Indictment. Further, the Court **ADJUDGES** the Defendant, Donald L. Blankenship, **NOT GUILTY** of the charges contained in **Count Two** and **Count Three** of the Superseding Indictment.

Pursuant to U.S.S.G. § 6A1 et seq., and subject to any post-trial motions, it is hereby **ORDERED** as follows:

1)      That the Probation Office prepare and forward a draft presentence report to the United States and counsel for the Defendant no later than **February 22, 2016**; that the United States Attorney and counsel for the Defendant file objections to the draft presentence report no later than **March 7, 2016**; that the Probation Office submit a final presentence report to the Court no later than **March 21, 2016**; and that the United States and counsel for the Defendant file a sentencing memorandum no later than **March 28, 2016**. **THE AFORESAID PRESENTENCE REPORT DEADLINES HAVE BEEN ESTABLISHED BY THE COURT AND MAY BE ALTERED <u>ONLY</u> BY THE COURT. REQUESTS TO EXTEND ANY DEADLINE SHALL BE SUBMITTED TO THE COURT IN WRITING IN ADVANCE OF THE ESTABLISHED DEADLINE. SUCH DEADLINES WILL BE EXTENDED ONLY UPON GOOD CAUSE SHOWN.**

2)       Pursuant to <u>United States v. Booker</u>, 543 U.S. 220 (2005) and <u>United States v. Hughes</u>, 401 F.3d 540 (4th Cir. 2005), the United States and the Defendant shall file a Sentencing Memorandum addressing the sentencing factors set forth in 18 U.S.C. § 3553(a) as may pertain to this case.  The Sentencing Memorandum may also address such other matters not previously addressed in the form of motions or objections to the Presentence Report and may include argument as to the appropriate sentence to be imposed.   Sentencing Memoranda shall be no more than ten (10) pages in length.

3)       That final disposition of this matter be scheduled for **April 6, 2016, at 10:00 a.m., in CHARLESTON, West Virginia**[1].

4)       That the Defendant be released upon the previously executed bond, subject to the conditions set forth in the Order Setting Conditions of Release previously filed herein and with the additional condition that the Defendant shall appear for sentencing on **April 6, 2016, at 10:00 a.m.**

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, to the United States Attorney, to the United States Probation Office, and to the Office of the United States Marshal.

ENTER:    December 10, 2015

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA

---

[1]The previously scheduled sentencing date of March 23, 2016, has been modified based on defense counsel's scheduling conflict for that date.