**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN SOCIETY FOR TESTING AND MATERIALS d/b/a ASTM INTERNATIONAL; | Case No. 1:13-cv-01215-TSC |
| NATIONAL FIRE PROTECTION ASSOCIATION, INC.; and | **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT-COUNTERCLAIMANT PUBLIC.RESOURCE.ORG'S MOTION TO STRIKE JAROSZ REPORT** |
| AMERICAN SOCIETY OF HEATING, REFRIGERATING, AND AIR CONDITIONING ENGINEERS, | |
| Plaintiffs-Counterdefendants, | **(EXHIBIT 1 TO DECLARATION OF JORDANA S. RUBEL)** |
| v. | |
| PUBLIC.RESOURCE.ORG, INC., | <u>**REDACTED VERSION**</u> |
| Defendant-Counterclaimant. | Action Filed:   August 6, 2013 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

ARGUMENT .........................................................................................................2

I.    Expert testimony must Meet the Standards of Rule 702 and *Daubert*. ...................2

II.    MR. Jarosz IS NOT QUALIFIED TO Opine on the Motivations of Standards Development Organizations or on the REGULATORY PROCESS. ........................................................................................4

III.   Jarosz Improperly Acts as a Mouthpiece for Plaintiffs, Their Counsel, and Their Outside Advocates. ..................................................................6

IV.   Jarosz's Opinions on the Law, Public Policy, AND PLAINTIFFS' MOTIVATIONS Invade the Province of the Court. ...............................................8

V.    Jarosz's Broad Conclusions Rest on Unsupported Assumptions. ..........................9

    A.    Jarosz Made No Attempt To Quantify The Effects He Predicted, Leaving His Conclusions of "Likely" Outcomes Without Foundation. ..................................................................10

    B.    Jarosz Assumes, Without Support, That Plaintiffs Cannot Profit From Sales of Publications Without A Monopoly On Selling Standards Incorporated Into Law. ...............................................11

    C.    Jarosz Incorrectly Equates the Incorporated Standards at Issue with All of Plaintiffs' Publications. ..........................................................11

    D.    Jarosz Blindly Relied on Unreliable and Misleading Statistics from Plaintiffs. ...........................................................................13

    E.    Jarosz Relied on Unreliable Sales "Data" and Failed to Consider All Relevant Information. ........................................................14

    F.    Jarosz's Opinion Is Unreliable Because It Considers Visits to Public Resource Equal to Lost Sales. .......................................................18

    G.    Jarosz's Methodology Is Not Reliable for the Conclusions He Draws. .......................................................................................18

CONCLUSION ......................................................................................................19

RULE 37(A)(2) CERTIFICATE .................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguilar v. Int'l Longshoremen's Union Local No. 10,*
    966 F.2d 443, 447 (9th Cir. 1992) ...........................................................................8

*Aventis Envt'l Science USA LP v. Scotts Co.,*
    383 F. Supp. 2d 488 (S.D.N.Y. 2005)........................................................................3

*Baker v. Urban Outfitters, Inc.,*
    254 F. Supp. 2d 346 (S.D.N.Y. 2003)......................................................................5, 6

*Brighton Collectibles, Inc. v. RK Texas Leather Mfg.,*
    923 F. Supp. 2d 1245 (S.D. Cal. 2013).................................................................18, 19

*Contractors Ass'n of E. Penn., Inc. v. City of Philadelphia,*
    893 F. Supp. 419 (E.D. Pa. 1995), *aff'd*, 91 F.3d 586 (3d Cir. 1996)...................14, 15, 16, 19

*Cooper v. Brown,*
    510 F.3d 870 (9th Cir. 2007) ...................................................................................3

*Daubert v. Merrell Dow Pharm., Inc.,*
    509 U.S. 579 (1993)..........................................................................................2, 3, 10

*Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.,*
    285 F.3d 609 (7th Cir. 2002) ...............................................................................7, 8, 14

*Gen. Elec. Co. v. Joiner,*
    522 U.S. 136 (1997)............................................................................................10

*Interplan Architects, Inc. v. C.L. Thomas, Inc.,*
    No. 4:08-CV-03181, 2010 WL 4065465 (S.D. Tex. Oct. 9, 2010) ..........................................5

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999)...........................................................................................3, 4

*LifeWise Master Funding v. Telebank,*
    374 F.3d 917 (10th Cir. 2004) ..................................................................................7

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.,*
    387 F. Supp. 2d 794 (N.D. Ill. 2005) ..........................................................................13

*Malletier v. Dooney & Bourke, Inc.,*
    525 F. Supp. 2d 558 (S.D.N.Y. 2007)..........................................................................19

*Meister v. Med. Eng'g Corp.*,
   267 F.3d 1123 ..................................................................................................................2

*Mukhtar v. Cal. State Univ.*,
   299 F.3d 1053 (9th Cir. 2002), *as amended* 319 F.3d 1073 (9th Cir. 2003),
   *overruled in irrelevant part by Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d
   457 (9th Cir. 2014) (en banc)..........................................................................................3

*Network Protection Sciences, LLC v. Fortinet, Inc.*,
   No. 3:12-cv-01106, 2013 WL 5402089 (N.D. Cal. Sept. 26, 2013).......................................12

*R.F.M.A.S., Inc.*,
   748 F. Supp. 2d at 259 ................................................................................................15, 17

*In re TMI Litig.*,
   193 F.3d 613 (3d Cir. 1999), *as amended*, 199 F.3d 158 (3d Cir. 2000)........................ *passim*

*In re TMI Litig.*,
   193 F.3d at 665–66 ......................................................................................................9, 14

*Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*,
   254 F.3d 706 (8th Cir. 2001) ...........................................................................................4

*Zaremba v. GMC*,
   360 F.3d 355 (2d Cir. 2004)..............................................................................................3

**Other Authorities**

Fed. R. Civ. P. Rule 26(a)(2) ...............................................................................................7

Fed. R. Civ. P. Rule 26(b)(4)(a)............................................................................................7

Fed. R. Civ. P. Rule 30(b)(6) ...............................................................................................6

Fed. R. Civ. P. 56(c) ...........................................................................................................2

Fed R. Evid. 701 ...............................................................................................................2, 7

Fed. R. Evid. 701(c) ...........................................................................................................2

Fed. R. Evid. 702 ......................................................................................................... *passim*

Fed. R. Evid. 703 ...............................................................................................................2

Fed. R. Evid. 802 ...............................................................................................................2

# <u>INTRODUCTION</u>

Public Resource moves to strike Exhibit 1 to the Rubel Declaration in support of Plaintiffs' motion for summary judgment (ECF No. 118.12, Exhibit 1), the expert report of John C. Jarosz (Jarosz Report), and the opinions and facts within it upon which Plaintiffs rely for their Motion for Summary Judgment and Permanent Injunction, or any other purpose in this action.[1]

Mr. Jarosz's report is based almost entirely on "facts" and conclusions provided to him by the Plaintiffs, rather than his own investigation and expertise. Mr. Jarosz's role in this litigation is to act as a mouthpiece for Plaintiffs, putting the gloss of expert testimony on Plaintiffs' own opinions. While Mr. Jarosz has experience valuing patent licenses and royalties, he has no education, training, or experience with standards development or drafting, standards development organizations (SDOs), or incorporation by reference (IBR) of standards into law. Consequently, he is not qualified to opine on those topics.

The Jarosz Report also makes a variety of public policy or legal arguments. The legal principles in this case concern the right of Public Resource and the public to publish and speak the law, including the subset of standards that, thanks to deliberate government action on behalf of the people and with Plaintiffs' encouragement, have become law. That legal issue is the province of the Court and not appropriate for expert testimony.

Further, Mr. Jarosz methodology is profoundly flawed. For example, the economic conclusions in the Jarosz Report conflate a variety of revenue streams, most of which relate to documents that are not at issue in this case. This case is concerned solely with the incorporated standards, not the many *other* standards Plaintiffs develop, much less their annotations, guides,

---

[1] Specifically: Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment (ECF No. 118-1) at pp. 31:2–15, 40:3–8, 53:3–54:2, 55:7–9; 56:3–7, 57:7–9, 59:1–5; 59:8–60:2, and n.7; Plaintiffs' Statement of Material Facts (ECF No. 118-2) ¶¶ 59–60, 105, 151–159, 238–239, 245–246, 250–254, 257–260, 262–273, 276.

training and other ancillary products. Public Resource has no interest in the other standards and documents Plaintiffs help develop, and has no quarrel with Plaintiffs' claiming and enforcing copyrights on the various supplemental materials they produce. Because the Jarosz Report does not distinguish between revenue generated from those products and revenue generated from the incorporated standards, it is impossible to examine the reliability of his conclusions with respect to the incorporated standards in this case.

Mr. Jarosz's report is not based on any expertise in the relevant fields. It is replete with methodological flaws, improper lay opinions and hearsay. Its conclusions are not based on valid data or reasonable assumptions, and constitute legal opinions that invade the province of the Court. Accordingly, the Court should strike the report before considering Plaintiffs' motion for summary judgment.

## ARGUMENT

### I.   EXPERT TESTIMONY MUST MEET THE STANDARDS OF RULE 702 AND *DAUBERT*.

On summary judgment, the Court considers *admissible* evidence. Fed. R. Civ. P. 56(c). Federal Rule of Evidence 701 precludes lay witnesses from expressing an opinion on "scientific, technical, or other specialized knowledge." Fed. R. Evid. 701(c). Rule 802 excludes hearsay, although Rule 703 allows an expert to base his opinion on hearsay. Fed. R. Evid. 703 & 802. Because the entirety of Mr. Jarosz's report consists of his opinion testimony or hearsay from others, it is not admissible unless: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. The party offering the expert's testimony must establish by a preponderance of the evidence that the expert testimony is admissible and that the expert is qualified." *Meister v. Med. Eng'g Corp.*, 267 F.3d

1123, 1127 n. 9; *Zaremba v. GMC*, 360 F.3d 355, 358 (2d Cir. 2004); *Aventis Envt'l Science USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 513 (S.D.N.Y. 2005).

To be admissible, expert testimony must "rest[] on a reliable foundation." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 580 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (applying the requirements of *Daubert* to all expert testimony). Among the factors to consider are "(1) whether a scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether the technique is generally accepted." *Cooper v. Brown*, 510 F.3d 870, 943 (9th Cir. 2007), citing *Daubert*, 509 U.S. at 593–94. "Maintaining *Daubert*'s standards is particularly important considering the aura of authority experts often exude[.]" *Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1063 (9th Cir. 2002), *as amended* 319 F.3d 1073 (9th Cir. 2003), *overruled in irrelevant part by Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 467 (9th Cir. 2014) (en banc)).

The expert's testimony must also be helpful. "Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier." Fed. R. Evid. 702, Adv. Comm. Notes. "The expert's testimony must 'fit,' and admissibility depends, in part, on a connection between the expert opinion offered and the particular disputed factual issues in the case. Fit is not always obvious, and scientific validity for one purpose is not necessarily validity for other unrelated purposes." *Id.* (internal quotation marks and citations omitted). *In re TMI Litig.*, 193 F.3d 613, 670 (3d Cir. 1999), *as amended*, 199 F.3d 158 (3d Cir. 2000).

Mr. Jarosz's report does not meet these standards because of his lack of expertise in the relevant fields, the lack of reliable foundation for his financial conclusions, and because the report is replete with improper opinions that invade the province of the Court.

## II.   MR. JAROSZ IS NOT QUALIFIED TO OPINE ON THE MOTIVATIONS OF STANDARDS DEVELOPMENT ORGANIZATIONS OR ON THE REGULATORY PROCESS.

An important part of a district court's "gatekeeping role" is "ensuring that the actual testimony does not exceed the scope of the expert's expertise, which if not done can render expert testimony unreliable under Rule 702, *Kumho Tire*, and related precedents." *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001). (finding trial court abused its discretion is allowing expert to opine outside his area of expertise).

While Mr. Jarosz may have a great deal of experience with patent royalties, he has *no* experience with standards development organizations; *no* independent familiarity with standards development processes; *no* independent knowledge of the motivations of SDOs, of volunteer members of standards drafting committees, or of public contributors to standards; and *no* independent knowledge of the process of government incorporation of standards by reference into law, government options and incentives, or SDOs' efforts to encourage governments to incorporate their standards into law. *See* Lu Declaration in Support of Public.Resource.Org, Inc.'s Motion to Strike Jarosz Report ("Lu Decl.") Ex. 1, at 25:10–29:1; 31:3–33:10; 110:12–112:3.; 130:21–132:6; 138:10–142:18; 238:15–240:5; 249:13–250:11.

Jarosz's deposition testimony shows that "his only knowledge of [the relevant fields] was obtained from literature he reviewed in connection with his retention as an expert in this litigation." *See In re TMI Litig.*, 193 F.3d at 680. Although he claims limited familiarity with standard-setting organizations by virtue of having them as clients for patent licensing or breach of contract issues, he also admitted that "SDO is probably not the right term to use" to describe

his past clients and "SSO is perhaps a broader concept than an SDO," and in any event he was not sure of how such organizations are characterized. *See* Lu Decl. Ex. 1 at 31:3–33:10. Jarosz's uncertainty about the membership of the field upon which he purports to opine demonstrates his lack of experience.

Furthermore, Mr. Jarosz did not review his work for his previous clients in connection with preparing his report for this case, *id.* at 28:7–12. He had only "vague recollections" of a past client's practices in relation to copyright, *id.* at 140:7–13, and "didn't undertake a separate investigation of the practices of any other SDOs for purposes of [his] assignment here." *Id.* at 138:18–21. Under these circumstances, "[h]e plainly does not meet Rule 702's 'Qualifications' requirement and cannot, therefore, offer an expert opinion as to [these fields]." *In re TMI Litig.*, 193 F.3d at 680.

Because Mr. Jarosz attempts to opine on the scope and motivations of all SDOs based only on his interviews with the three Plaintiffs, his limited past encounters in the patent licensing context (which Jarosz did not refer to in his work on this case), and his brief perusal of a handful of other organizations' websites, his opinion is not reliable. *See Interplan Architects, Inc. v. C.L. Thomas, Inc.*, No. 4:08-CV-03181, 2010 WL 4065465, at *13 (S.D. Tex. Oct. 9, 2010) (excluding opinion on industry custom based on experience with only two architects); *Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 354 (S.D.N.Y. 2003) (excluding agent as expert on licensing where agent's experience was primarily in commissions and agent had experience with only four licensing transactions).

Neither does Mr. Jarosz have expertise regarding the regulatory process (through incorporation by reference or otherwise), on government funding for standards development, nor on the lobbying and promotional efforts by Plaintiffs and other standards organizations to

encourage incorporation by reference. For example, Mr. Jarosz testified that he was unaware of whether Plaintiffs received "grants, revenue, or stipends from governments that use, reference, or adopt their standards." Lu Decl. Ex. 1 at 192:22–193:6. Yet ASTM's representative testified that ASTM has received between $650,000 and $900,000 from the federal government in the last five years. Lu Decl., Ex. 2 at 264:22–265:2. Mr. Jarosz was also unaware of any Plaintiff advertising the status of a standard as law in order to sell an ancillary handbook, although the Plaintiffs do so. *Compare* Lu Decl. Ex. 1 at 221:3–13 *to* Lu Decl., Ex. 3.

### III.  JAROSZ IMPROPERLY ACTS AS A MOUTHPIECE FOR PLAINTIFFS, THEIR COUNSEL, AND THEIR OUTSIDE ADVOCATES.

While Mr. Jarosz conceded at deposition that experts "should be objective" and that they should not limit their investigation to the views of the parties, he failed that test in this case, as he relied almost entirely on Plaintiffs' officers and counsel for the facts he relied on *and* his conclusions. Lu Decl. Ex. 1 at 161:24–162:10.

Mr. Jarosz relied almost entirely on Plaintiffs, their websites, and their counsel to supply him with information on different types of standards organizations, adding to that only what he read on a handful of other organizations' websites and in a few articles. *See id*. at 114:1–122:4 (describing categories of information reviewed and whether they came from Plaintiffs); Jarosz Report Tab 2 (listing documents reviewed). Regarding the motivations of various standards organizations to develop standards, he relied solely on interviews with Plaintiffs' executives and two law review articles by Emily Bremer, a researcher[2] on a first-name basis with ASTM executives. *See* Lu Decl. Ex. 2 at 103:25–104:1 (ASTM Rule 30(b)(6) representative Jeffrey

---

[2] *See* Jarosz Report at 38, describing Ms. Bremer as a "researcher analyzing ASTM publication prices" and citing her conclusions. At the time, Ms. Bremer worked for the Administrative Conference of the United States, but she noted the opinions in her articles were her personal views and not those of any entity. *See* Lu Decl. 1 at 117:22–118:5.

Grove identifying exhibit as "an interview with Emily that appeared in our magazine"). *See* Lu Decl. Ex. 1 at 92:19–93:4; 95:10–97:21.

Mr. Jarosz opined on the motivations of the persons who drafted and voted on the standards at issue, namely SDO volunteer members and the public. He conceded that those persons and their employers (not Plaintiffs) devoted an enormous amount of time and resources (tens of thousands of hours of time and expenditure for thousands of flights and hotel rooms) to the drafting process. *See* Lu Decl. Ex. 1 at 90:15–92:13. Yet he did not interview a single member of any of the Plaintiffs, any other standards organizations, or any member of the public. *Id*. at 110:12–112:3. The only bases for these opinions Mr. Jarosz identified were the opinions of Plaintiffs' executives and Ms. Bremer, not any standards participant or Mr. Jarosz's own knowledge. *Id*. at 112:4–114:11.

It appears that, lacking any training or expertise in the relevant fields of standard–setting, standards development and drafting, and incorporation by reference of standards into law, Mr. Jarosz simply relied instead on the conclusions of others, most of whom had an obvious interest in this case. But Mr. Jarosz "is not permitted to be the mouthpiece of [an expert] in a different specialty." *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 615 (7th Cir. 2002); *see also LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) (affirming exclusion of damages analysis by plaintiff's CEO under Rules 701 and 702 due to lack of expertise). Plaintiffs did not disclose their executives as putative expert witnesses during expert discovery and cannot now use Mr. Jarosz to transform their views into expert testimony. *See id.; see also* Rule 26(a)(2), Fed. R. Civ. P. (requiring disclosure of expert witnesses). Plaintiffs also did not name Ms. Bremer in their expert disclosures, which would have allowed Public Resource to depose her and explore the bases for her assumptions and conclusions. *See* Rule 26(b)(4)(a).

7

They cannot sneak her unvetted opinions in through the back door by having Mr. Jarosz repeat them. *Dura Auto.*, 285 F.3d at 614.

## IV.   JAROSZ'S OPINIONS ON THE LAW, PUBLIC POLICY, AND PLAINTIFFS' MOTIVATIONS INVADE THE PROVINCE OF THE COURT.

"[M]atters of law for the court's determination . . . [a]re inappropriate subjects for expert testimony." *Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992).  Whether a permanent injunction is appropriate, whether irreparable harm exists, whether an injunction would harm Public Resource, and whether an injunction would harm the public interest, are all matters of law for the Court's determination.

Mr. Jarosz's opinions are essentially Plaintiffs' own policy arguments on a matter of law. Mr. Jarosz summarized his "assignment" as follows: "I've, in essence, looked at the topic of the impact of copyright and trademark infringement here, and asked myself the question whether a permanent injunction would be appropriate from an economic perspective." *See* Lu Decl. Ex. 1 at 142:19–144:1. He viewed his policy arguments as relevant because "[e]conomists have a view and perspective at looking at issues that some courts have found to be useful" and "that, generally, economists like me are quite helpful in determining questions of harm, particularly harm as it relates to infringement of IP rights." *Id.* at 144:2–145:14. He claimed he was addressing "the issue of whether there should be a permanent injunction or not." *Id.* at 74:1–12.

But when questioned on whether "harms to plaintiffs would be different depending on the particular basis of the Court's ruling," he could not answer. *Id.* at 67:11–68:4. And when asked to "distinguish between harms that are caused by an infringement by the defendant versus harms that might be caused by a court decision that plaintiffs lack copyrights," he did not know how to do so. *Id.* at. 145:16–24; 149:11–152:17. Mr. Jarosz disclaimed any legal expertise. *Id* at. 80:11–12. But he summarized his opinion as: "If there's no permanent injunction, there will, in essence,

be a message sent to the marketplace that the standards that have already been disseminated are out there and can be used by others. . . . That is if there's no permanent injunction." *Id.* at 76:2–23.

Mr. Jarosz purported not to know (1) whether his testimony and opinions "have any bearing on whether plaintiffs' standards are copyrightable," (2) whether his testimony and opinions "are relevant to whether plaintiffs deserve copyright protection in this case," and (3) whether his analysis and opinions "suggest in any way that plaintiffs deserve copyright protection for these standards." *See* Lu Decl. Ex. 1 at 78:24–80:6. He stated that, to his knowledge, he had not "done any work in this case to quantify what harms plaintiffs would suffer if a court were to rule that they lacked copyright rights in the standards at issue in this case." *Id.* at 81:2–16.

Based on Mr. Jarosz's concessions, the Court should disregard all of his opinions concerning whether Plaintiffs deserve copyright protection for standards incorporated into law and whether irreparable harm would flow from not according Plaintiffs monopolies over incorporated standards.

## V.   JAROSZ'S BROAD CONCLUSIONS REST ON UNSUPPORTED ASSUMPTIONS.

One of Mr. Jarosz's central conclusions is that, if Plaintiffs cannot have a monopoly over the law, they would lose their ability to fund standards developments. This conclusion is speculation without foundation. To reach it, Mr. Jarosz makes assumption after assumption. But without factual bases for his assumptions, some of which are completely illogical, his methodology lacks the necessary reliability for an admissible expert opinion.

Reliable conclusions by an expert are those that "could reliably flow from the facts known to the expert and the methodology used." *In re TMI Litig.*, 193 F.3d at 665–66 (quotation

marks omitted). And an expert's assumption "must be sufficiently grounded in sound

methodology, and reasoning to allow the conclusion it supports[,] to clear the reliability hurdle."

*Id.* at 677 (affirming exclusion of testimony based on assumption with insufficient support).

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit

opinion evidence [which] is connected to existing data only by the *ipse dixit* of the expert. A

court may conclude that there is simply too great an analytical gap between the data and the

opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

### A.     Jarosz Made No Attempt To Quantify The Effects He Predicted, Leaving His Conclusions of "Likely" Outcomes Without Foundation.

At deposition, Mr. Jarosz admitted that he could not quantify the effects he predicted.

When asked to estimate the probability of his prediction that ███████████████████

████████████████████████████████████████████████████████

████████████████      he said: "I don't have a basis for that estimate." *See* Lu Decl. Ex. 1 at

234:11–238:11 (referring to Jarosz Rep. ¶ 119). Mr. Jarosz admitted that when he characterized

an outcome as "likely," he did not mean "more than 50 percent likely," and he could not give an

estimate. *Id.* at 235:8–236:12; 238:12–14. He could not even say whether his prediction that

Plaintiffs might shut down was more or less than *5 percent* likely. *Id.* at 237:22–238:4. In other

words, his conclusion as to what outcomes were "likely" had no basis. Asked about his core

conclusion that "freely-distributed, unrestricted versions of Plaintiffs' standards that are or could

be incorporated by reference can be *expected* to adversely impact the market for Plaintiffs'

standards that are incorporated by reference and to displace sales of these standards by the

Plaintiffs – which can be expected to have a material adverse effect on Plaintiffs' revenues," he

could not assign more than a *5 percent chance of likelihood* to this conclusion. *Id.* at 236:14–

241:17. This is sheer speculation.

**B.      Jarosz Assumes, Without Support, That Plaintiffs Cannot Profit From Sales of Publications Without A Monopoly On Selling Standards Incorporated Into Law.**

Mr. Jarosz's report does not account for sales revenue that Plaintiffs would receive *without* a copyright monopoly on the subset of standards that are incorporated by reference into law. This omission defies common sense. Book publishers still sell the works of Shakespeare, Dickens, and Twain, with and without additions such as annotations, commentary, or lesson plans, even though the underlying works are in the public domain. Attorneys and courts still purchase professionally published paper copies of the United States Code and the Federal Rules of Evidence as well as annotated versions with commentary or analysis, even though free online versions abound. *See, e.g.*, https://www.law.cornell.edu/rules/fre. Plaintiffs themselves make some of their publications available for free online, a fact Mr. Jarosz did not investigate or consider. *See* Lu Decl. Ex. 1 at 135:14–137:24. Conclusions that "fly in the face of reality" "must be rejected." *See In re TMI Litig.,* 193 F.3d at 683.

**C.      Jarosz Incorrectly Equates the Incorporated Standards at Issue with All of Plaintiffs' Publications.**

Mr. Jarosz's conclusions as to Plaintiffs' revenues also do not flow logically from the facts he purported to use. The financial records he reviewed and the analyses he performed pertained to "copyrighted publications" generally. *See* Lu Decl. Ex. 1 at 186:21–188:6. His analysis was not directed to the incorporated standards that Public Resource posted, incorporated standards generally, or even to standards. In his report, Mr. Jarosz stated that ASTM has published 12,000 standards, NFPA has published over 300 codes and standards, and ASHRAE currently publishes over 50 standards. *See* Jarosz Report at p. 5–7 (citing Plaintiffs' websites). And he noted that Plaintiffs also publish commentaries, training materials, and other non-standards documents. *See* Jarosz Report at ¶ 107. Yet this litigation concerns only the 257

incorporated standards that Public Resource posted. *See* Amended Complaint, Exs. A–C. Mr. Jarosz did not explain how he could reliably draw conclusions about the financial impact of Public Resource's posting of a relatively small number of standards incorporated into law based on an analysis relating to all of Plaintiffs' publications. *See Network Protection Sciences, LLC v. Fortinet, Inc.*, No. 3:12-cv-01106, 2013 WL 5402089, at *5 (N.D. Cal. Sept. 26, 2013) (striking expert report from Mr. Jarosz because he based his calculation on the entire value of the accused products instead of just the value attributable to allegedly infringing features).

The standards at issue in this litigation are not typical examples of Plaintiffs' "copyrighted publications." All but one are out of date from the perspective of many industry participants, having been superseded by later versions as *private standards*, while remaining binding law. *See* Declaration of M. Becker in support of Public Resource's Motion for Summary Judgment ¶¶ 95–97, Ex. 97–99. Some, such as the ASHRAE 1993 Handbook, are out of print and no longer sold by Plaintiffs. *See* Lu Decl. Ex. 4 at ASHRAE0029540. Mr. Jarosz did not account for this special case. He admitted that he had not researched what market existed for standards that are not the latest version. The only harm he could identify from postings of older versions and out of print standards was possible confusion between older versions and new, but he admitted that this conclusion was not based on any evidence or analysis. Lu Decl. Ex. 1 at 254:14–257:9.

Attempting to conflate standards incorporated into law with *all* of Plaintiffs' "copyrighted publications," Mr. Jarosz overestimated the number of standards actually incorporated into law, further undermining his conclusions. ████████████████████
████████████████████████████████████████
████████████████████████████████████

12

██████████████████████████████████████████████

████████████████ Jarosz Report ¶ 58. But at deposition, he conceded that he had counted the

total number of references to standards in federal law, not the number of standards incorporated

by reference. *See* Lu Decl. Ex. 1 at 199:23–202:6. As the same standard can be referenced

multiple times in regulations, and because not every mention of a standard is an incorporation by

reference, this methodology is unreliable. *See id.* at 199:23–202:16; Lu Decl. Ex. 5 at

JAROSZ03736–03764 (Jarosz production partially documenting his searches and the database,

showing at least one duplicate entry at bottom of page JAROSZ03750).

### D. Jarosz Blindly Relied on Unreliable and Misleading Statistics from Plaintiffs.

An expert "retained strictly for litigation purposes" who relies on "a plaintiff's self-

report" instead of personally examining records "d[oes] not have good grounds to rely on them

to arrive at her conclusion." *In re TMI Litig.,* 193 F.3d at 698. That is precisely what has

occurred here. Mr. Jarosz frequently took statements from Plaintiffs' executives at face value

without independent investigation and then repeats them. In other words, Mr. Jarosz "in effect

bec[a]me the mouthpiece of the witnesses on whose statements or opinions [he] purports to base

his opinion." *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.,* 387 F. Supp. 2d 794, 808 (N.D. Ill.

2005).

For example, Mr. Jarosz also opines that "sales of a limited number of specific standards

drive the bulk of the revenues, as many other standards actually generate very limited revenues,"

citing conversations with executives from each of the three Plaintiffs. In deposition, however,

Mr. Jarosz admitted he had never seen any financial breakdown of revenues by standard and he

did not believe Plaintiffs even possessed that information. *See* Lu Decl. Ex. 1 at 181:12–183:15.

"[U]nhesitating acceptance of" one party's data "violates the principles of the scientific method."

*Contractors Ass'n of E. Penn., Inc. v. City of Philadelphia*, 893 F. Supp. 419, 437 (E.D. Pa. 1995), *aff'd*, 91 F.3d 586 (3d Cir. 1996) (rejecting an expert's conclusions as a matter of law because he "never attempted to validate the City's availability figure" or "even examine the underlying document from which this figure was allegedly obtained.").

Similarly, Mr. Jarosz took ASHRAE executives at their word for the motivations of ASHRAE members in signing up for membership. Mr. Jarosz did not conduct any surveys, interview any ASHRAE members, review any membership records, or otherwise discern any factual foundation for his "understanding [] that ASHRAE people are of the belief that many people buy membership rather than individual publications." Lu Decl. Ex. 1 at 184:9–186:12. Because the "factual underpinning" to his conclusions regarding ASHRAE's revenue model was nothing more than a plaintiff's belief (or at best, hearsay within unidentified hearsay), it "rested on air" and is inadmissible. *See Dura Auto.*, 285 F.3d at 615; *In re TMI Litig.*, 193 F.3d at 673–4 (district court properly excluded opinion based on anecdotal and unconfirmed hearsay as unreliable).

### E.     Jarosz Relied on Unreliable Sales "Data" and Failed to Consider All Relevant Information.

Mr. Jarosz repeatedly offers second-hand information from the parties for the truth of what others told him, and he asserts it as true. Where the data comes from representatives of a party and were made for purposes of litigation, "[c]ommon sense alone suggests that such evidence is based on an unreliable source of information." *In re TMI Litig.*, 193 F.3d at 698 (internal quotation marks omitted) (excluding opinion based on plaintiffs' counsel's summaries of interviews with plaintiffs instead of review of records or personal examination). An expert who "simply never bothered to test the figures that were furnished to him" and performed

"calculations based on these figures result[s] in opinions that lack[] the necessary 'fit' deemed essential to the issue before the court." *Contractors Ass'n*, 893 F. Supp. at 436.

Regarding sales in particular, Jarosz conceded that he did not analyze "differences in sales trends between standards that are at issue in this case and plaintiffs' other standards," or "any differences in sales trends between those of plaintiffs' standards that have been incorporated into law and those of plaintiffs' standards that have not been incorporated into law," Lu Decl. Ex. 1 at 155:17–156:18. He conceded he did not have data at hand to conduct such an analysis, and that he did not recall asking for such data. *Id.*, *see also* 176:8–177:24.

Further, Mr. Jarosz used Plaintiffs' numbers for their expenditures on "standards development" both as a proxy for the role Plaintiffs play in standards development and as an indication of how much revenue Plaintiffs need to continue standards development work. But as ASTM's financial documents show, ███████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████         *See* Lu Decl. Ex. 6 at ASTM103230 ███████ ██████████████████████████████████████████████████ ). Thus, this data does not support the conclusions Jarosz attaches to them. *See R.F.M.A.S., Inc.*, 748 F. Supp. 2d at 259 (criticizing and excluding expert in part because "the table that [he] offered to support this assertion does not demonstrate what [he] claims it does").

Using Plaintiffs' numbers, Mr. Jarosz also lumps together the contributions of Plaintiffs' *volunteer* members, whom Plaintiffs claim have no IP rights to the standards, with those of Plaintiffs' employees. At deposition, however, he conceded that the *volunteer* members and their employers (*not* Plaintiffs) were "primarily" responsible for contributing the time and resources (tens of thousands of hours of time and expenditures for thousands of flights and hotel rooms) to

the drafting process. *See* Lu Decl. Ex. 1 at 90:15–92:13. Thus, Mr. Jarosz exaggerates Plaintiffs'

contributions to standards development and distorts the hypothetical effect of reduced spending

by Plaintiffs. *See Contractors Ass'n*, 893 F. Supp. at 434 (excluding expert testimony because "it

is impossible to evaluate, and misleading to speculate about" aggregate data without looking at

the relevant subsets).

Even when Mr. Jarosz was aware of pertinent information, he did not consider its effects.

For example, Mr. Jarosz was aware that Plaintiffs provided some of their publications online for

free. Nevertheless, he did not consider the effects that free online access had on Plaintiffs'

revenues, and he did not even attempt to investigate the question. *See* Lu Decl. Ex. 1 at 135:14–

137:24. Similarly, while Mr. Jarosz was aware that Plaintiffs had many publications (both

codified standards and private standards) other than the ones Public Resource had posted, he did

not compare revenue trends for the incorporated standards posted by Public Resource with those

for other publications to attempt to measure if Public Resource's activities had any effect. *Id*. at

134:7–135:11; 155:17–158:22.

Mr. Jarosz also made factual errors that skew his analysis and make it unreliable. He

highlighted in his report the example of sales of the 2011 edition of the National Electrical Code

that NFPA published ("NEC 2011"):



Jarosz Report at ¶ 133. This analysis contains many factual errors. ███████████████

████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████ *See* Lu Decl. Ex. 8 at NFPA-

PR0038555. ████████████████████████████████

███████████████████████████████████████

███████████████████████

The comparison to NEC 2008 is also full of errors. First, NFPA's records omitted sales

information for 2007–2008, the first year of that's standard's release, which would be the most

appropriate comparison to NEC 2011's debut year of 2010–2011. *See id.* Second, while Public

Resource posted NEC 2011 in 2012, it posted NEC 2008 *in 2008* when it was incorporated into

state regulations. *See* Lu Decl. Ex. 7 at 129:25–130:21. Thus, the presence of Public Resource

cannot explain the difference in the numbers the Jarosz Report cites. ████████████████

███████████████████████████████████████

███████████████████████████████████████

*See* Lu Decl. Ex. 8 at NFPA-PR0038555; *see R.F.M.A.S., Inc.*, 748 F. Supp. 2d at 259

(criticizing and excluding expert in part because "the table that [he] offered to support this

assertion does not demonstrate what [he] claims it does").

At deposition, Mr. Jarosz could not identify when Public Resource posted NEC 2008 and

NEC 2011. While he admitted he "would be curious about that information," he did not

reconsider his conclusions, thus undermining their reliability. *See* Lu Decl. Ex. 1 at 164:13–

167:13; *In re TMI Litig.*, 193 F.3d at 676 (expert's "failure to properly revise their attribution" of

source observed phenomenon "is the antithesis of good science and dramatically undermines

their proffered opinions").

**F.      Jarosz's Opinion Is Unreliable Because It Considers Visits to Public Resource Equal to Lost Sales.**

Mr. Jarosz's attempt to use Public Resource's hit count as a barometer for lost sales is equally suspect. (The "hit count" is the number of times the Public Resource's Web servers detected an attempt to access the standards at issue, whether by a person or by an automated program). There is no evidence that anyone used Public Resource's website instead of purchasing a copy from Plaintiffs. Mr. Jarosz conceded that he has no knowledge of why people visited Public Resource's website. *See* Lu Decl. Ex. 1 at 213:23–214:18. There is no evidence of how many hits were the result of human visitors as opposed to an automated program, or "bot," such as those that search engines use to index the Web. Nor is there evidence of how many hits each human visitor was responsible for.  Mr. Jarosz also conceded that there was no evidence as to how many visitors to Public Resource would have *purchased* a copy of an incorporated standard from Plaintiffs instead of merely visiting Plaintiffs' online "reading rooms" or abandoning their search. *Id*. at 214:19–216:22. His report makes no attempt to estimate these factors. Without a reliable basis for equating visits with lost sales, Mr. Jarosz's "speculation would not help the [factfinder] but could mislead them." *See Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*, 923 F. Supp. 2d 1245, 1255 (S.D. Cal. 2013) (excluding expert report due to lack of reliable method to determine whether purchasers of defendant's inexpensive product would have purchased plaintiff's much more expensive product).

**G.      Jarosz's Methodology Is Not Reliable for the Conclusions He Draws.**

Mr. Jarosz has no sound methodology to back up his conclusions. The sole economic theory Mr. Jarosz could specifically identify as a basis for concluding that Plaintiffs had suffered harm was "revealed preference." In other words, the mere fact that Plaintiffs have brought this litigation "reveals" their preference to maintain a copyright monopoly over standards

incorporated by reference into the law. Lu Decl. Ex. 1 at 163:6–16. While he could name other economic concepts in which he had training, he could not specify how they applied to the facts of this case. *Id.* at 171:10–175:1.

"Revealed preference" here reveals only that Plaintiffs *believe* they can earn more revenues by asserting a monopoly over legal texts. He applied no other economic concepts in reaching his conclusions.

## CONCLUSION

Even if, "standing alone," each logical flaw, unreliable data set, or foundationless assumption did not warrant excluding the Jarosz Report, "taken cumulatively, the methodological flaws . . . and the 'fundamentally flawed reasoning' . . . warrant its exclusion." *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 574–75 (S.D.N.Y. 2007) (excluding expert's report and testimony in their entirety). If "[t]he shortcomings in [the expert's] approach, including the development of the grounds for his opinions and his failure to include pivotal facts in arriving at his conclusions, causes the finder of fact to have no confidence in the scientific nature of [the expert's] opinions or in the validity of the factors as he crafted them to purportedly support his opinions on the questions to be decided," that is reason enough to reject an expert's conclusions. *Contractors Ass'n*, 893 F. Supp. at 437.

Because Mr. Jarosz acts as a mouthpiece for Plaintiffs and a third-party advocate not disclosed in expert discovery and because Mr. Jarosz's testimony lacks all reliability and helpfulness, the Court should strike the Jarosz Report and all citations to it in Plaintiffs' briefs.

Dated: December 21, 2015

Respectfully submitted,


*/s/   Kathleen Lu*
Andrew P. Bridges (admitted)
abridges@fenwick.com
Kathleen Lu (admitted)
klu@fenwick.com
Matthew Becker (admitted)
mbecker@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: (415) 875-2300
Facsimile:   (415) 281-1350

Corynne McSherry (admitted *pro hac vice*)
corynne@eff.org
Mitchell L. Stoltz (D.C. Bar No. 978149)
mitch@eff.org
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
Facsimile: (415) 436-9993

David Halperin (D.C. Bar No. 426078)
davidhalperindc@gmail.com
1530 P Street NW
Washington, DC 20005
Telephone: (202) 905-3434

*Attorneys for Defendant-Counterclaimant*
Public.Resource.Org, Inc.


## RULE 37(A)(2) CERTIFICATE

I hereby certify, pursuant to Fed. R. Civ. P. 37(a)(2), that Public Resource made a good

faith effort to confer with Plaintiffs in an attempt to resolve this dispute. Plaintiffs stated they

would oppose this motion.


*/s/ Kathleen Lu*
Kathleen Lu