# EXHIBIT 1

1              UNITED STATES DISTRICT COURT
2                FOR THE DISTRICT OF COLUMBIA
3

   AMERICAN SOCIETY FOR   : NO.
4  TESTING AND MATERIALS  : 1:13-cv-01215-TSC-
5  d/b/a ASTM             : DAR
6  INTERNATIONAL;         :
7  NATIONAL FIRE          :
   PROTECTION             :
8  ASSOCIATION, INC.;     :
9  and AMERICAN SOCIETY   :
10 OF HEATING,            :
11 REFRIGERATION, AND     :
12 AIR CONDITIONING       :
13 ENGINEERS,             :
   Plaintiffs             :
14        vs.             :
   PUBLIC.RESOURCE.ORG,   :
15 INC.,                  :
16 Defendant              :
17

          Videotaped deposition of JOHN C.
18 JAROSZ taken at the law offices of Veritext
19 Legal Solutions, 1250 I Street NW,
20 Washington, DC, commencing at 10:09 a.m.
21 THURSDAY, AUGUST 27, 2015, before Debbie
22 Leonard, Registered Diplomate Reporter,
23 Certified Realtime Reporter.
24
25 PAGES 1 - 260

                                        Page 1

1    it.
2         Objection to form.  You're
3    asking him to recall, without having
4    all the materials in front of him?
5         MR. BRIDGES:  Yeah.
6         MR. FEE:  Okay.
7         THE WITNESS:  It's all laid out
8    in my report, and the sources are
9    provided in my report.  I've not
10   memorized all those.
11   BY MR. BRIDGES:
12        Q.    But I don't think your report
13   refers to upside-down materials, does it?
14        A.    I don't recall for sure, but I
15   thought some of the documents that I cited
16   make reference to those materials.  I'm not
17   sure that I cited the, for instance,
18   upside-down materials, but I think I have
19   discussions about that phenomenon.
20        Q.    With whom?
21        A.    In written materials that I've
22   cited.
23        Q.    Have you had oral discussions
24   about what you have referred to as that
25   phenomenon?

1    beyond the document production to verify that
2    information.
3         Q.    But you don't recall seeing any
4    defective materials yourself, correct?
5         A.    That's correct.  I do not.
6         Q.    You just relied upon the word
7    of others, correct?
8         MR. FEE:  Objection.  Vague.
9    Mischaracterizes his testimony.
10        THE WITNESS:  I relied upon
11   written documents I saw and
12   conversations that I had.
13   BY MR. BRIDGES:
14        Q.    What written documents did you
15   see that discussed these issues?
16        MR. FEE:  Objection.  Asked and
17   answered.
18        THE WITNESS:  And I'm sorry.  I
19   can't point you to the particular
20   ones.  Perhaps, through the course of
21   the day, my memory will be refreshed
22   on that.
23   BY MR. BRIDGES:
24        Q.    If you relied upon those
25   written documents, would you have cited to

1         A.    Yes.
2         Q.    With whom?
3         A.    Counsel here.
4         Q.    With anybody else?
5         A.    I don't think so.  It's
6    possible, but I'm not recalling anything
7    else.
8         Q.    And when you say discussions
9    with "counsel here," you're referring to the
10   counsel at the table here today at the
11   deposition?
12        A.    Correct.
13        And we should add to that
14   Jordana Rubel, who's been a person that I've
15   had conversations with over the last several
16   months.
17        Q.    What did you do to verify any
18   of the statements to you from counsel about
19   these facts you've referred to about the
20   materials that the defendant has
21   disseminated?
22        A.    I don't think I did separate
23   verification.  I may have seen some documents
24   that provide or provided confirmation of that
25   fact, but I don't recall separately going out

1    those written documents in your report?
2         A.    Perhaps.
3         Q.    Why do you say "perhaps"?
4         A.    I can't say with absolute
5    certainty what I do.  But often, if something
6    is a direct support for a factual
7    observation, I will often cite that source,
8    but not always.
9         Q.    What previous -- strike that.
10        What training or education have
11   you ever received with respect to standards
12   development organizations?
13        MR. FEE:  Objection to form.
14        THE WITNESS:  I don't recall if
15   I've had a course in standard
16   development.  Probably it has been
17   part of some of the economics courses
18   that I've taken over the years.
19        In my profession and the work
20   that I've done in the last 30 years,
21   I've had occasion to look at and
22   evaluate standards organizations and
23   the output from those organizations.
24        So it is among the topics that
25   I've investigated in the course of my

1    consulting career.
2  BY MR. BRIDGES:
3       Q.    In what context?
4       A.    There have been several matters
5  I've had, litigations, that have involved
6  standard setting organizations and the
7  outputs from those organizations.
8       Q.    What organizations?
9       A.    Well, some that come to mind
10 are ETSI, IEEE, the Blu-ray Association,
11 MPEG, MPEG L.A., the Philips 6C and Philips
12 3C organizations.  Those are among the ones
13 that come to mind.
14      Q.    And what types of litigation
15 did your work relating to those standard
16 setting organizations involve?
17          MR. FEE:  Objection to form.
18          THE WITNESS:  It was almost all
19     intellectual property litigation, with
20     probably the bulk of the analyses
21     undertaken with regard to patent
22     rights.
23 BY MR. BRIDGES:
24      Q.    Do you recall --
25      A.    I guess I should -- there were

Page 26

1  probably some breach of contract matters as
2  well.
3       Q.    Did you work on any matters
4  involving copyright law where you became
5  familiar with the work and outputs of
6  standards setting organizations before this
7  case?
8       A.    Probably, but I cannot say that
9  with absolute certainty.  I've been involved
10 in several matters over a course of many
11 years.
12      Q.    Can you name any copyright
13 matter involving a standards development
14 organization that you recall?
15      A.    Not now, without going back and
16 looking at my records.
17      Q.    Would they be listed in the
18 cases attached to Exhibit 1?
19      A.    That would summarize some of my
20 records.  The cases that are embodied in my
21 tab 1 are those that led to deposition or
22 trial testimony.  I've been involved in many
23 matters beyond those.
24      Q.    But sitting here, you cannot
25 recall any copyright case involving a

Page 27

1  standards development organization that
2  you've worked on?
3       A.    Again, I'd have to go back and
4  look at my records.  I can't right now recite
5  any, but there very well could be one or
6  more.
7       Q.    Did you review any of your work
8  in -- from earlier copyright cases involving
9  standards development organizations in
10 connection with your work in this case?
11      A.    Not to the best of my memory,
12 no.
13      Q.    What background do you have in
14 the creation of standards by standard
15 development organizations?
16          MR. FEE:  Objection to form.
17          THE WITNESS:  In the context of
18     some of my consulting assignments, I
19     have examined processes undertaken by
20     SDOs.
21 BY MR. BRIDGES:
22      Q.    Anything else?
23      A.    Nothing else comes to mind.
24 I've certainly looked at the output
25 associated with those processes, but there's

Page 28

1  nothing else that comes to mind.
2       Q.    What processes undertaken by
3  standards development organizations did you
4  examine?
5          MR. FEE:  Objection.  Are you
6     asking prior to the report still?
7          MR. BRIDGES:  Yes.
8          MR. FEE:  Okay.
9          THE WITNESS:  I'm not quite --
10         MR. BRIDGES:  Or other than in
11    this case.
12         MR. FEE:  Okay.
13         THE WITNESS:  I'm not quite
14    sure what you're asking.  I've seen
15    discussion of the some of the
16    processes of various organizations.
17    I'm not -- I'm not quite sure what
18    you're asking.  Perhaps you could ask
19    it somewhat differently.
20 BY MR. BRIDGES:
21      Q.    Well, no.  You said, quote, "I
22 have examined processes undertaken by SDOs."
23         So my question is, what
24 processes undertaken by standards development
25 organizations did you examine?

Page 29

8 (Pages 26 - 29)

1      A.    It sounds like the same
2  question to me.
3      Q.    Specifically, what processes
4  did you examine?
5      A.    That still sounds like the same
6  question, but let me try to answer it by
7  saying I've looked, for instance, at the
8  mechanisms that ETSI undertook in developing
9  standards.  So I am familiar generally with
10  the processes that it follows.  Similarly
11  with regard to other standard setting
12  organizations.
13      Q.    What other standard setting
14  organizations?
15      A.    Well, I think I identified
16  those a few moments ago.  Do you want me to
17  repeat those?
18      Q.    Well, if -- are you saying
19  that, for all of those organizations, you
20  examined their processes?
21      A.    In some dimension, probably for
22  most of the organizations, I had at least
23  some knowledge of the process.  I can't say
24  that I investigated in depth all of the
25  processes for all of the organizations that

Page 30

1  have been involved in my consulting
2  assignments that are standards oriented.
3      Q.    What do you recall about your
4  investigation of the processes by which
5  standards development organizations create
6  their standards?
7      A.    I should say I -- SDO is
8  probably not the right term to use.  I should
9  probably say standards setting organizations.
10  There may be a distinction between an SSO and
11  an SDO.
12          But, generally, each SSO has a
13  process that's unique to its organization.
14  Some solicit input from a wide range of
15  constituents; some from a more narrow range.
16          The ones that I have examined
17  have all been fairly careful in the work that
18  they've done, seeking input at many steps
19  along the way.
20          Some organizations, like SDOs
21  at issue here, seek a broader array of inputs
22  than do others.
23          Some organizations, standards
24  setting organizations, include primarily or
25  only manufacturers and sometimes large

Page 31

1  manufacturers only.  Others include a wider
2  array of companies.
3          In all instances, though, the
4  companies are trying to -- the standards
5  setting organizations are trying to develop
6  at least some form of consensus -- sometimes
7  it's very broad consensus; sometimes it's
8  more narrow consensus -- about what would be
9  good for that standards setting organization.
10          Sometimes the SSOs are
11  interested in what's best for the
12  manufacturers and the ability for them to
13  supply in an interoperable environment.  In
14  some cases, the SSOs are very alert to the
15  needs of consumers and users of products and
16  services that comply with standards.
17      Q.    You've distinguished between
18  standards setting organizations and standard
19  development organizations.  What is the
20  distinction that you -- that you identify
21  between the two?
22      A.    I think I said I didn't know if
23  there is for sure a distinction, but I think
24  an SSO is perhaps a broader concept than an
25  SDO, but I might be wrong on that.

Page 32

1          I know the companies -- I --
2  the plaintiffs here are SDOs.  The
3  associations are, among other things, in the
4  business of creating and developing
5  standards.
6          There could be other SSOs that
7  have different constituents that are of
8  interest to them.  I don't know for sure that
9  an SSO is a broader concept than an SDO, but
10  it could be.
11      Q.    What do you understand to be
12  the constituents of the plaintiffs in this
13  case?
14          MR. FEE:  Objection to form.
15          THE WITNESS:  I laid that out
16      in my report.  In summary, I believe
17      they try to include in the process
18      both those -- both supply-side
19      entities and demand-side entities.
20  BY MR. BRIDGES:
21      Q.    Who else are plaintiffs'
22  constituents?
23          MR. FEE:  Same objection.
24          THE WITNESS:  I can't think of
25      anything that doesn't fall within

Page 33

9 (Pages 30 - 33)

1      Q.    So those would be harms caused
2  by a court decision?
3           MR. FEE:  Same objection.
4           THE WITNESS:  By continuing
5      activities by the defendant that are
6      not halted by the Court.
7  BY MR. BRIDGES:
8      Q.    Well, it comes across, frankly,
9  in your report as though you're identifying
10 harms that would flow from a court decision.
11          MR. FEE:  Objection.
12 BY MR. BRIDGES:
13     Q.    Is that correct or not?
14     A.    No, I think you --
15          MR. FEE:  Mischaracterizes the
16     report.
17          THE WITNESS:  -- you misread
18     it.  I don't think I said that or
19     meant to say that.
20 BY MR. BRIDGES:
21     Q.    So what harms have occurred
22 from the -- from the defendant's conduct to
23 date?
24     A.    At the risk of repeating
25 myself, some of that is summarized in

1  paragraph 133, with regard to tangible
2  evidence on harm.  With regard to other
3  evidence, it's throughout the report.
4      Q.    So why would it make a
5  difference to what the defendant's harms
6  are -- are -- strike that.
7           Why would it make a defendants
8  [sic] to the plaintiffs' harms if the
9  plaintiffs' harms were continue with --
10 strike that.
11          Is it your testimony that harms
12 to plaintiffs would be different depending on
13 the particular basis of the Court's ruling?
14          MR. FEE:  Objection.  Vague.
15          THE WITNESS:  I -- I don't
16     understand your question.
17 BY MR. BRIDGES:
18     Q.    It looks as though you're
19 stating what the harms would be if the Court
20 found that incorporation by reference would
21 cause the plaintiffs to lose copyright
22 protection; is that correct?
23     A.    I don't --
24          MR. FEE:  Objection.  Vague.
25          THE WITNESS:  -- think so.  I

1      think basically what I'm saying is
2      what would -- or addressing, is what
3      would be the harm to the plaintiffs if
4      there's no permanent injunction.
5  BY MR. BRIDGES:
6      Q.    Well, what did you mean by
7  "losing copyright protection" in the
8  paragraph -- in the heading VI on page 48?
9      A.    In essence, you can think of it
10 as what would happen if there's no permanent
11 injunction.  In other words, what the
12 defendant has done in the past and what it's
13 likely to do in the future is allowed to
14 continue.
15     Q.    And you immediately go into
16 paragraph 112 talking about Emily Bremer,
17 correct?
18     A.    I don't know what you mean by
19 "immediately."  It's the first paragraph in
20 Section VI.
21     Q.    Right.  Was Emily Bremer in the
22 passage you referred to referring to the
23 presence or absence of a permanent injunction
24 in this case?
25     A.    I don't think explicitly she

1  was addressing that issue, no.
2      Q.    Do you think implicitly she was
3  referring to this case?
4      A.    No.  I thought you were asking
5  about permanent injunction.  I don't think
6  she was addressing the -- an injunction
7  issue.  She was addressing the concept of
8  copyright protection.
9      Q.    And that's what you quoted her
10 for, right, was for the concept of copyright
11 protection for standards?
12          MR. FEE:  Objection.  You're
13     referring just to paragraph 112?
14 BY MR. BRIDGES:
15     Q.    You may answer.
16          MR. FEE:  Objection to form.
17          THE WITNESS:  I -- I don't
18     understand the question.
19 BY MR. BRIDGES:
20     Q.    You quoted her in
21 paragraph 112, correct?
22     A.    Yes.  From one of her two
23 articles, yes.
24     Q.    Right.  Regarding the concept
25 of copyright protection?

1        A.    Generally.  I think she's
2   talking about standards development and
3   incorporation by reference.  I don't remember
4   if she said at the very beginning of the
5   article that it was about copyright
6   protection, but she certainly talks about
7   copyright protection.
8        Q.    And you're quoting her about
9   losing copyright protection, and you're
10  placing it in the context of harms of the
11  loss of copyright protection, correct?
12            MR. FEE:  Objection to form.
13            THE WITNESS:  This excerpt
14        doesn't specifically talk about losing
15        copyright protection, but it talks
16        about the concept of it.  If there was
17        no longer copyright protection granted
18        to the SDOs, what would be the
19        repercussions.
20  BY MR. BRIDGES:
21        Q.    And that's the context that you
22  identified in the first line of
23  paragraph 112, correct?
24        A.    Yes.
25            MR. FEE:  Objection to form.

Page 70

1   BY MR. BRIDGES:
2        Q.    Let me direct your attention to
3   paragraph 35 of your report.  It says, "With
4   regard to expansion beyond the specific
5   actions of Public Resource here, the
6   'product' offerings of Public Resource -
7   scans of paper copies of standards with some
8   rekeying of text and some redrawing of
9   diagrams (with some containing errors) -
10  represent a rudimentary first step in the use
11  of Plaintiffs' standards that is likely to
12  become much more sophisticated if the Court
13  holds that third parties are free to use
14  Plaintiffs' standards with impunity after
15  they are incorporated by reference into law."
16            Do you see that?
17        A.    Yes, I do.
18        Q.    That is your statement,
19  correct?
20        A.    Yes.
21        Q.    What are the steps that you're
22  envisioning there beyond the rudimentary
23  first step that you identify?
24        A.    I think they're laid out in the
25  next sentence.

Page 71

1        Q.    "Such products" --
2        A.    And in the next two sentences.
3        Q.    And these are other products
4   that "could include more sophisticated
5   Web-based availability, published
6   compilations of incorporated standards, and
7   other ancillary products that incorporate the
8   standards"; isn't that correct?
9        A.    You didn't read that right.  It
10  starts "such products could include."
11        Q.    Okay.  Otherwise, that reading
12  is correct, correct?
13        A.    I think so.
14        Q.    You consider that to be harm to
15  the plaintiffs?
16            MR. FEE:  Objection.  Vague.
17            THE WITNESS:  It could be, yes.
18        It's likely to be, if the copyright
19        infringement or the assumption of a
20        copyright infringement continues.  It
21        could broaden.
22  BY MR. BRIDGES:
23        Q.    Right.  But the fact that these
24  other types of products would enter the
25  marketplace is part of the harm that you

Page 72

1   envision from the defendant in this case?
2            MR. FEE:  Objection to form.
3            THE WITNESS:  It's potential --
4        there's a potential that the defendant
5        could do that.  There's also the
6        potential that other parties could do
7        that.
8   BY MR. BRIDGES:
9        Q.    What --
10       A.    I don't know for sure what the
11  defendant has in mind.
12       Q.    Why did you take into account
13  harms caused by other parties in this case?
14       A.    Because --
15            MR. FEE:  Objection.  Lack of
16        foundation.
17            Go ahead.
18            THE WITNESS:  If no copyright
19        protection is allowed here, in other
20        words, there's no permanent
21        injunction, Public Resource and other
22        parties like it will have freedom to
23        do what the plaintiffs believe they
24        should not have freedom to do.
25  BY MR. BRIDGES:

Page 73

19 (Pages 70 - 73)

1     Q.    In other words, if the Court
2  makes a decision in a certain way, there will
3  be harms from persons or entities other than
4  Public.Resource.Org to the plaintiffs?  Is
5  that your testimony?
6         MR. FEE:  Objection to form.
7         THE WITNESS:  You used the
8      phrase "in a certain way."  I don't
9      know what you mean by that.  I'm
10     addressing the issue of whether there
11     should be a permanent injunction or
12     not.
13 BY MR. BRIDGES:
14     Q.    So your view is that, if the
15 Court does not enter a permanent injunction,
16 the plaintiffs will suffer harms from parties
17 other than Public.Resource.Org.  Is that your
18 testimony?
19     A.    That potential exists.  I don't
20 know for sure.  That's, in part, why the harm
21 is irreparable or very difficult to quantify.
22     Q.    The -- what harm?
23     A.    Continuing activity of Public
24 Resource and others.  I don't know exactly
25 what will happen, but the potential is that

Page 74

1  there could be very broad dissemination of
2  the standards, which would impact these SDOs
3  tremendously.
4      Q.    What harm would
5  Public.Resource.Org cause to plaintiffs if
6  there is no permanent injunction?
7      A.    A permanent injunction would --
8  lack of a permanent injunction would harm the
9  SDOs.
10     Q.    That wasn't my question.  My
11 question was, what harm would
12 Public.Resource.Org cause to plaintiffs if
13 there is no permanent injunction?
14     A.    At the very least, it's
15 associated with its historical dissemination
16 of these standards, and there would be, in
17 essence, a carte blanche for other
18 organizations or individuals to access those.
19        So my expectation is that the
20 dissemination of the materials that have
21 already been disseminated will expand.
22        It could also be the case that
23 Public Resource will undertake further
24 activities that would disseminate either
25 already disseminated standards or other

Page 75

1  standards.
2      Q.    What further harm would
3  Public.Resource.Org cause to plaintiffs with
4  respect to the standards at issue in this
5  case if no -- if the Court does not
6  permanently enjoin Public.Resource.Org?
7         MR. FEE:  Objection to form.
8         THE WITNESS:  If there's no
9      permanent injunction, there will, in
10     essence, be a message sent to the
11     marketplace that the standards that
12     have already been disseminated are out
13     there and can be used by others.
14        So right now my expectation is
15     that some number of consumers of the
16     standards have been reluctant or
17     unknowing as to the standards
18     disseminated by Public Resource.  Now
19     there will be more knowledge about
20     that and more approval of that
21     activity.  That is if there's no
22     permanent injunction.
23 BY MR. BRIDGES:
24     Q.    What harms will plaintiffs
25 suffer if the Court rules that the plaintiffs

Page 76

1  do not own the copyrights in this case?
2         MR. FEE:  Objection.  Calls for
3      speculation.
4         THE WITNESS:  In essence,
5      you're asking if there's no copyright
6      infringement?
7  BY MR. BRIDGES:
8      Q.    No.  What harms -- have you
9  identified what harms the plaintiffs would
10 suffer if the Court rules that the plaintiffs
11 do not own the copyrights at issue, that
12 there are no copyrights that the plaintiffs
13 own --
14        MR. FEE:  Objection to form.
15 BY MR. BRIDGES:
16     Q.    -- at issue in this case?
17     A.    I haven't addressed or thought
18 about that issue.  There are also, don't
19 forget, trademark issues.
20     Q.    I'm asking about copyright, so
21 I ask you to confine your answers to my
22 questions.
23        My question is, what -- you
24 assume for purposes of your analysis that
25 plaintiffs own valid copyrights, correct?

Page 77

20 (Pages 74 - 77)

1      A.    I assume that there's copyright
2  infringement.  I don't know that I've made an
3  explicit assumption with regard to ownership.
4      Q.    And you assume infringement
5  without assuming ownership of the copyrights?
6      A.    I haven't made any explicit
7  assumption with regard to ownership.  I know
8  that's an issue in this case, but it's well
9  beyond my expertise.
10      Q.    So if it turns out that -- do
11  you understand your testimony to have any
12  bearing on whether plaintiffs' standards are
13  copyrightable?
14          MR. FEE:  Objection.  Calls for
15      speculation.
16          I would instruct you to not
17      disclose any communications you had
18      with counsel that weren't the basis
19      for any of your opinions in this case.
20      You can otherwise answer.
21          THE WITNESS:  Could you read
22      that back or ask it again, please?
23  BY MR. BRIDGES:
24      Q.    Do you understand your
25  testimony and opinions in this case to have

Page 78

1  any bearing on whether plaintiffs' standards
2  are copyrightable?
3          MR. FEE:  Same objection and
4      instruction.  Plus objection, calls
5      for a legal conclusion.
6          THE WITNESS:  I don't know one
7      way or the other.  I've not taken on
8      that assignment.
9  BY MR. BRIDGES:
10      Q.    Do you understand whether your
11  testimony and opinions in this case are
12  relevant to whether plaintiffs deserve
13  copyright protection in this case?
14          MR. FEE:  Objection.  Calls for
15      a legal conclusion.
16          And same objection with respect
17      to communications between you and
18      counsel that were not the bases for
19      your opinions or your report.
20          THE WITNESS:  I don't know one
21      way or the other.  I did not take on
22      that assignment.
23  BY MR. BRIDGES:
24      Q.    Do you mean by your analysis
25  and opinions to suggest in any way that

Page 79

1  plaintiffs deserve copyright protection for
2  these standards?
3          MR. FEE:  Objection to form.
4          THE WITNESS:  I don't have an
5      opinion on that one way or the other.
6      I have not thought about that topic.
7  BY MR. BRIDGES:
8      Q.    Do you have any expertise in
9  copyright law as a field of law?
10          MR. FEE:  Objection.  Vague.
11          THE WITNESS:  No, I don't have
12      legal expertise.  I have expertise in
13      looking at harm associated with
14      copyright infringement.
15  BY MR. BRIDGES:
16      Q.    Do you have any expertise with
17  respect to harm caused by invalidation of
18  copyrights?
19          MR. FEE:  Same objection.
20          THE WITNESS:  I'm not quite
21      sure I'm fully appreciating your
22      question.  Again, I'm an expert in the
23      economics of IP protection.  One of
24      the areas in which I do work is harm
25      associated with copyright protection.

Page 80

1  BY MR. BRIDGES:
2      Q.    Have you done any work in this
3  case to quantify what harms plaintiffs would
4  suffer if a court were to rule that they
5  lacked copyright rights in the standards at
6  issue in this case?
7          MR. FEE:  Objection to form.
8          Go ahead.
9          THE WITNESS:  Not explicitly,
10      to my knowledge.
11  BY MR. BRIDGES:
12      Q.    Have you done anything
13  implicitly?
14          MR. FEE:  Same objection.
15          THE WITNESS:  Not to my
16      knowledge.
17  BY MR. BRIDGES:
18      Q.    Have you done any work in this
19  case to analyze the incentives that
20  participants have in the standards
21  development process?
22          MR. FEE:  Objection to form.
23      Vague.
24          THE WITNESS:  I have in the
25      sense that I've examined the materials

Page 81

21 (Pages 78 - 81)

1    Q.    Right.  Or approximately
2  $3 million?
3    A.    Are you limiting it just to
4  90.1 or all its standards?
5    Q.    Well, that's a good question.
6  What -- what's -- what did you intend the
7  last sentence in paragraph 76 to refer to?
8  All of its standards or 90.1?
9    A.    I think it's all of its
10  standards, but we could visit the screenshot
11  from the Web site to confirm that.
12    Q.    Okay.
13    A.    I -- I could be wrong.  I don't
14  think I am, but I could be.
15    Q.    Okay.  In the previous
16  sentence, you say, "ASHRAE and its volunteer
17  members devoted more than 86,400 man-hours,
18  3,600 hotel nights, and 1,200 round-trip
19  flights as part of the process."
20        And that -- "the process"
21  appears to refer to updating the ASHRAE 90.1
22  standard, correct?
23    A.    Yes.
24    Q.    When you say "ASHRAE and its
25  volunteer members," and then you give those

Page 90

1  statistics, those statistics refer primarily
2  to the man-hours, hotel nights, and
3  round-trip flights of the volunteer members?
4        MR. FEE:  Objection.  Vague.
5        THE WITNESS:  Probably.  As
6  opposed to ASHRAE-employed staff.
7  BY MR. BRIDGES:
8    Q.    Do you know how much ASHRAE's
9  volunteer members and their employers --
10  strike that.
11        Do you know how much ASHRAE's
12  volunteer members and their employers spent
13  in salaries and disbursements for the
14  man-hours, hotel nights, and round-trip
15  flights that were part of the process of
16  updating the ASHRAE 90.1 standard?
17    A.    I don't know, but it -- I would
18  imagine it's a noticeable amount, but I don't
19  know the amount.
20    Q.    What would be your best
21  estimate?
22    A.    I don't have a best estimate.
23    Q.    Would it be probably over
24  $10 million?
25        MR. FEE:  Objection to form.

Page 91

1        THE WITNESS:  Again, I don't
2  have an estimate.
3  BY MR. BRIDGES:
4    Q.    Do you know -- did ASHRAE pay
5  for the time, the hotel bills, and the plane
6  fares of its volunteer members in updating
7  the ASHRAE 90.1 standard?
8    A.    I would expect rarely.  It's
9  possible that there are certain instances in
10  which there was some set of out-of-pocket
11  expenses covered, but I would imagine the
12  bulk of the time it's the volunteer's
13  employer.
14        MR. BRIDGES:  Sorry.  How long
15  have we been going?  I didn't get when
16  we went back on.
17        MR. FEE:  34 minutes.
18  BY MR. BRIDGES:
19    Q.    Did you speak with Emily Bremer
20  at any point in this case?
21    A.    No.
22    Q.    How did you become acquainted
23  with her writings?
24    A.    I think Kevin Fee and/or
25  Jordana Rubel brought to my attention that

Page 92

1  she had written on this topic.  I don't
2  recall whether then we separately obtained
3  her two articles or Mr. Fee slash Ms. Rubel
4  provided those to us.
5    Q.    What independent work did you
6  do to research writings regarding the
7  economics of standards development?
8        MR. FEE:  Objection to form.
9        THE WITNESS:  We did
10  independent research in the sense that
11  people that work with me did a
12  literature search to determine what
13  writings had been done in the area.
14        I was previously aware of some
15  amount of the scholarship to begin
16  with.
17  BY MR. BRIDGES:
18    Q.    How is that literature search
19  reflected in any documents?
20    A.    The results are shown in my
21  tab 2, and in particular it is page 2 of my
22  tab 2, at the bottom.
23    Q.    And were these items found by
24  you or your team?
25        MR. FEE:  Objection to form.

Page 93

24 (Pages 90 - 93)

1          THE WITNESS:  Yes, with the
2     exception that, in the first instance,
3     lawyers at Morgan Lewis brought to our
4     attention the Bremer -- the existence
5     of Bremer articles.
6 BY MR. BRIDGES:
7     Q.    Did you study any of the
8 materials that Bremer -- strike that.
9          Bremer's articles are law
10 review articles, correct?
11    A.    Yes.
12    Q.    Did any plaintiff -- did your
13 team's research identify any articles that
14 you chose not to include in tab 2?
15    A.    I don't think so.
16    Q.    Did any plaintiff or its
17 counsel furnish you with correspondence
18 between the plaintiffs and Emily Bremer for
19 review?
20    A.    No, not to my knowledge.
21    Q.    How many conversations with
22 representatives of the plaintiffs did you
23 have?
24          MR. FEE:  Objection.
25          I would instruct you not to

Page 94

1     answer questions regarding
2     communications with counsel, unless
3     they formed the basis of your
4     opinions, in which case you can answer
5     questions with respect to those
6     conversations.
7 BY MR. BRIDGES:
8     Q.    So I -- I'll change my question
9 slightly.
10         How many -- how many
11 conversations did you have with non-lawyer
12 employees or former employees of the
13 plaintiffs?
14    A.    None that the -- that did not
15 include the lawyers.
16    Q.    Right.  I'm -- so I'm asking
17 you to tell me what they were.  If the
18 presence of lawyer -- if you had a
19 conversation with a -- with an employee or
20 former employee of the plaintiff, I'd like to
21 know what that was.  So the fact that lawyers
22 may have been present wouldn't excuse it from
23 the scope of the answer.
24    A.    I had somewhere between four
25 and six conversations with people who were at

Page 95

1 the various plaintiffs.
2     Q.    With whom?
3     A.    They are all identified in
4 paragraph 10 of my report.
5     Q.    Which of those did you
6 personally have conversations with?
7     A.    All of them, as I recall.  It's
8 possible there's someone I did not, but I'm
9 not remembering that being the case.
10    Q.    Approximately how long did you
11 spend with -- did you have conversations with
12 any of them together?
13    A.    Yes, several of them were
14 together.
15    Q.    Which ones?
16    A.    I don't recall all
17 combinations.  I can say with some confidence
18 that there was never more than one plaintiff
19 on a call.  In other words, there were
20 several people from a particular plaintiff on
21 a call, but not more than one plaintiff.
22         So I had various combinations
23 of calls with ASTM that may have occurred on
24 three occasions; with NFPA, one or two
25 occasions; and with ASHRAE, one or two

Page 96

1 occasions.
2     Q.    And approximately how long
3 total did you spend in conversations with
4 representatives of each plaintiff?
5          MR. FEE:  Objection to form.
6          THE WITNESS:  Cumulatively,
7     somewhere between three and five hours
8     is my best guess right now.
9 BY MR. BRIDGES:
10    Q.    When you say cumulative --
11 "cumulatively," you mean for all plaintiffs?
12    A.    Yes.  Meaning I'm -- I've added
13 up the conversations I had across all three
14 plaintiffs.
15    Q.    Right.  What's your best
16 estimate as to the period of time you spent
17 with each plaintiff?
18    A.    With ASTM, it may have been two
19 to three hours.  For NFPA, one to two hours.
20 For ASHRAE, one to two hours.  That's my best
21 guess right now.
22              * * *
23         (Jarosz Exhibit 2 and Jarosz-3
24     marked for identification.)
25              * * *

Page 97

25 (Pages 94 - 97)

1     record at 12:17.  This is the end of
2     media unit number 1.
3              *  *  *
4         (Recess from 12:17 p.m. to
5     12:32 p.m.)
6              *  *  *
7         THE VIDEOGRAPHER:  On the
8     record at 12:32.  This is the
9     beginning of media unit 2 in the
10    deposition of John Jarosz.
11    BY MR. BRIDGES:
12       Q.    Mr. Jarosz, your report, as I
13    referred to earlier, cites a number of
14    conversations with employees of the
15    plaintiffs.  For what purpose did you have
16    conversations with the plaintiffs' employees?
17       A.    To learn more about the
18    organization and their view as to the impact
19    of continued copyright protection --
20    continued copyright infringement and
21    trademark infringement.
22       Q.    What view did you learn from
23    them?
24         MR. FEE:  Objection to form.
25         THE WITNESS:  Well, I solicited

Page 110

1     and learned many facts about the
2     organizations.  I also learned that
3     each one of them viewed continued
4     copyright infringement and trademark
5     infringement as quite detrimental to
6     their organizations, detrimental to
7     the members, detrimental to the
8     public.
9          They viewed continued IP
10    infringement as potentially
11    devastating to their organizations.
12    BY MR. BRIDGES:
13       Q.    These were their views?
14       A.    Yes.  I'm just paraphrasing, of
15    course.
16       Q.    What members did you interview?
17       A.    None, other than the employees.
18    I don't know if you call those "members" or
19    not.  But the volunteer membership, I didn't
20    go to.
21         THE VIDEOGRAPHER:  Excuse me.
22    Counsel, could you move your
23    microphone to your lapel?  Thank you.
24    BY MR. BRIDGES:
25       Q.    What members of the public did

Page 111

1     you interview?
2        A.    I don't think I interviewed any
3     members of the public either.
4        Q.    What steps did you do to
5     ascertain the views of the members of the
6     organizations, other than the employees?
7        A.    I read the materials that were
8     produced here.  I read the deposition
9     testimony of the various individuals.  I read
10    the articles published by Ms. Bremer.  And I
11    read the other academic literature and
12    practical literature that I had.
13       Q.    Which of those sources stated
14    the views of the non-employee members of the
15    various organizations?
16       A.    I don't know that views of --
17    that their views were explicitly addressed in
18    my report or represented.  I understood what
19    the impacts of the lack of honoring the
20    copyrights and trademarks would have, but I
21    don't know that I saw non-employee member
22    views explicitly summarized.
23       Q.    So what steps did you do to
24    ascertain the views of the members of the
25    organizations --

Page 112

1         MR. FEE:  Objection.
2     BY MR. BRIDGES:
3        Q.    -- other than their employees?
4         MR. FEE:  Asked and answered.
5         THE WITNESS:  Well, I talked to
6     the employees, and they interact with
7     the members on a very regular basis,
8     so they gave me some sense of what the
9     views of the members were.
10         It also could be that some of
11    the perspectives of the members are
12    reflected in some of the documents I
13    identified in tab 2.
14    BY MR. BRIDGES:
15       Q.    Well, I'm just trying to find
16    out where -- it sounds as though -- strike
17    that.
18         It sounds as though a minute
19    ago you said you couldn't recall anything
20    specifically calling out views of
21    non-employee members, correct?
22       A.    Correct.  I think that's right.
23       Q.    What did you do to verify the
24    statements that employees of the plaintiffs
25    made about the views of the non-employee

Page 113

29 (Pages 110 - 113)

Page 114

1  members of their organizations?
2      A.   I did what I normally do in an
3  assignment like this and look at the produced
4  materials.
5      Q.   And the produced materials did
6  not call out specifically any views of
7  non-employee members of the plaintiff
8  organizations, correct?
9      A.   I don't recall any specific
10  views being summarized.  My memory may not be
11  perfect on that, though.
12     Q.   What research, if any, did you
13  do among members of the public about whether
14  lack of copyright protection for the
15  plaintiffs' standards would be detrimental to
16  the -- to the public?
17     A.   The information that I reviewed
18  is in tab 2.  I didn't have material beyond
19  what is identified in tab 2.
20     Q.   So what in tab 2 reflects your
21  steps to ascertain the views of members of
22  the public?
23         MR. FEE:  Objection to form.
24         THE WITNESS:  I think the
25     Bremer articles, in part, address

Page 115

1      that.  I think some of the federal
2      government's circulars that I
3      identify, in part, reflect the
4      reviews, in particular the NTTAA of
5      1995 and OMB Circular A-119.  I think
6      they, in part, reflect public views.
7      There are probably other things.
8  BY MR. BRIDGES:
9      Q.   Did you review OMB Circular
10  A-119 personally?
11     A.   Yes.  As I recall, I did.
12     Q.   Did you review any materials
13  pertaining to the discussions or
14  deliberations of the Administrative
15  Conference of the United States in connection
16  with your research or analysis?
17     A.   What particular materials or
18  meetings are you referring to?
19     Q.   Any.
20     A.   I don't recall, but it's
21  possible.
22     Q.   Does tab 2 refer you to any
23  documents that would provide you information
24  about the discussions or deliberations of the
25  Administrative Conference of the United

Page 116

1  States other than law review articles by
2  Emily Bremer?
3      A.   As I sit here right now, I'm
4  not aware of any documents that discuss the
5  deliberations, but my memory is not perfect.
6      Q.   Do you know if there was a
7  consensus in any relevant committee of the
8  Administrative Conference of the United
9  States regarding the conclusions that
10  Ms. Bremer states in her law review articles?
11     A.   I don't.
12         MR. FEE:  Objection.  Vague.
13  BY MR. BRIDGES:
14     Q.   Do you know whether there was
15  any dissent in any relevant committee of the
16  Administrative Conference of the United
17  States regarding the conclusions that
18  Ms. Bremer states in her law review articles?
19         MR. FEE:  Objection to form.
20         THE WITNESS:  I don't.
21  BY MR. BRIDGES:
22     Q.   Do you know why persons get
23  appointed to the Administrative Conference of
24  the United States?
25     A.   I may have known that, but I

Page 117

1  don't recall that sitting here now.
2      Q.   Do you know whether
3  Ms. Bremer's articles -- strike that.
4         Do you know whether
5  Ms. Bremer's law review articles reflect a
6  view of the Administrative Conference of the
7  United States --
8         MR. FEE:  Objection to form.
9  BY MR. BRIDGES:
10     Q.   -- or of any of its committees?
11         MR. FEE:  Objection to form.
12         THE WITNESS:  I'm not aware
13     that they officially reflect that.  I
14     believe she gathered information, and
15     they may, in fact, represent the views
16     of some or all members, but I don't
17     think that's -- that either article is
18     an official representation --
19  BY MR. BRIDGES:
20     Q.   Are you --
21     A.   -- of that body.
22     Q.   Are you aware of the fact that
23  her articles -- her law review articles
24  specifically disclaim her articles as the
25  views of any government entity and indicate

1  members of their organizations?
2      A.   I did what I normally do in an
3  assignment like this and look at the produced
4  materials.
5      Q.   And the produced materials did
6  not call out specifically any views of
7  non-employee members of the plaintiff
8  organizations, correct?
9      A.   I don't recall any specific
10 views being summarized.  My memory may not be
11 perfect on that, though.
12     Q.   What research, if any, did you
13 do among members of the public about whether
14 lack of copyright protection for the
15 plaintiffs' standards would be detrimental to
16 the -- to the public?
17     A.   The information that I reviewed
18 is in tab 2.  I didn't have material beyond
19 what is identified in tab 2.
20     Q.   So what in tab 2 reflects your
21 steps to ascertain the views of members of
22 the public?
23         MR. FEE:  Objection to form.
24         THE WITNESS:  I think the
25     Bremer articles, in part, address

1  States other than law review articles by
2  Emily Bremer?
3      A.   As I sit here right now, I'm
4  not aware of any documents that discuss the
5  deliberations, but my memory is not perfect.
6      Q.   Do you know if there was a
7  consensus in any relevant committee of the
8  Administrative Conference of the United
9  States regarding the conclusions that
10 Ms. Bremer states in her law review articles?
11     A.   I don't.
12         MR. FEE:  Objection.  Vague.
13 BY MR. BRIDGES:
14     Q.   Do you know whether there was
15 any dissent in any relevant committee of the
16 Administrative Conference of the United
17 States regarding the conclusions that
18 Ms. Bremer states in her law review articles?
19         MR. FEE:  Objection to form.
20         THE WITNESS:  I don't.
21 BY MR. BRIDGES:
22     Q.   Do you know why persons get
23 appointed to the Administrative Conference of
24 the United States?
25     A.   I may have known that, but I

1      that.  I think some of the federal
2      government's circulars that I
3      identify, in part, reflect the
4      reviews, in particular the NTTAA of
5      1995 and OMB Circular A-119.  I think
6      they, in part, reflect public views.
7      There are probably other things.
8  BY MR. BRIDGES:
9      Q.   Did you review OMB Circular
10 A-119 personally?
11     A.   Yes.  As I recall, I did.
12     Q.   Did you review any materials
13 pertaining to the discussions or
14 deliberations of the Administrative
15 Conference of the United States in connection
16 with your research or analysis?
17     A.   What particular materials or
18 meetings are you referring to?
19     Q.   Any.
20     A.   I don't recall, but it's
21 possible.
22     Q.   Does tab 2 refer you to any
23 documents that would provide you information
24 about the discussions or deliberations of the
25 Administrative Conference of the United

1  don't recall that sitting here now.
2      Q.   Do you know whether
3  Ms. Bremer's articles -- strike that.
4          Do you know whether
5  Ms. Bremer's law review articles reflect a
6  view of the Administrative Conference of the
7  United States --
8          MR. FEE:  Objection to form.
9  BY MR. BRIDGES:
10     Q.   -- or of any of its committees?
11         MR. FEE:  Objection to form.
12         THE WITNESS:  I'm not aware
13     that they officially reflect that.  I
14     believe she gathered information, and
15     they may, in fact, represent the views
16     of some or all members, but I don't
17     think that's -- that either article is
18     an official representation --
19 BY MR. BRIDGES:
20     Q.   Are you --
21     A.   -- of that body.
22     Q.   Are you aware of the fact that
23 her articles -- her law review articles
24 specifically disclaim her articles as the
25 views of any government entity and indicate

1  that they are her personal views?
2      A.   I wouldn't be surprised and
3  may -- I may have read that, but I would
4  expect that that would be in the first
5  footnote of one or both articles.
6      Q.   What did you do to examine the
7  alleged facts that the representatives of
8  plaintiffs stated to you in their
9  conversations with you?
10         MR. FEE:  Objection to form.
11         THE WITNESS:  I looked at --
12         MR. FEE:  Asked and answered.
13         THE WITNESS:  I'm sorry.  I
14      looked at the document production and
15      the other materials shown in tab 2.
16  BY MR. BRIDGES:
17      Q.   You looked at the document
18  production that the plaintiffs' counsel
19  furnished you?
20      A.   In part.  There were other
21  things in tab 2 that were not provided to me
22  by plaintiffs' counsel.
23      Q.   What other materials in
24  tab 2 -- strike that.
25         Please identify for me in tab 2

Page 118

1          I believe counsel did not
2  provide the Web site screenshots, but I might
3  be wrong on that.
4      Q.   And did you do anything --
5  what, if anything, did you do to test the
6  validity of the factual assertions that the
7  plaintiffs made to you in your conversations
8  with their employees?
9         MR. FEE:  Objection to form.
10     Asked and answered.
11         THE WITNESS:  Well, we looked
12     at materials.  If we found things that
13     conflicted with what we learned, that
14     would prompt us to investigate
15     further.  But I don't recall seeing
16     any documentary evidence that
17     conflicted with facts that were
18     provided by plaintiff personnel, but I
19     might be wrong.
20  BY MR. BRIDGES:
21     Q.   Did you investigate
22  independently whether documents existed that
23  contradicted plaintiffs' statements of facts?
24     A.   Not with that in mind.  We
25  looked at the documents and were mindful of

Page 120

1  the materials that plaintiffs' counsel
2  furnished you.
3      A.   I don't know with absolute
4  certainty, but let me give you my best guess.
5  I believe all the depositions that are shown
6  on page 1.  I believe the Bates ranges at the
7  very top of the page were provided by
8  counsel.
9          The deposition transcripts and
10  exhibits were provided by counsel.  I believe
11  the financial statements and plans were
12  provided by counsel.  I believe the legal
13  documents were provided by counsel.  I
14  believe the miscellaneous items were provided
15  by counsel.
16          I don't know about the cases
17  and laws.  I just don't remember if we
18  separately gathered those or were provided
19  those.
20          The analyst reports, articles,
21  books, and presentations, I think we gathered
22  all of those, with the possible exception of
23  the two Bremer articles.  I don't recall if
24  counsel provided that or we obtained those
25  separately.

Page 119

1  whether there were conflicts within documents
2  or conflicts between documents and other
3  information, but I don't recall that we saw
4  anything that gave us substantial pause.
5          There were probably some things
6  where there were some uncertainties whether
7  there was a conflict or not and some where
8  there were insignificant conflicts, but I
9  think mostly the information we saw did not
10  conflict with the information we learned from
11  plaintiff personnel.
12     Q.   Did you investigate
13  independently whether other documents, apart
14  from the documents plaintiffs furnished you,
15  existed that contradicted plaintiffs'
16  statements of facts --
17         MR. FEE:  Objection to form.
18  BY MR. BRIDGES:
19     Q.   -- in conversations with you?
20     A.   Yes, in the sense that we
21  gathered some information that we did not
22  receive from plaintiffs' counsel, but all of
23  that is identified in tab 2.
24     Q.   Which part of tab 2?
25     A.   Well, as I said, I think the

Page 121

31 (Pages 118 - 121)

1  Web sites we gathered ourselves, and I think
2  the reports and articles, with the exception
3  of the Bremer articles, we gathered
4  ourselves.
5      Q.   Do you know why you got no
6  documents from NFPA, no Bates range documents
7  from NFPA?
8      MR. REHN:  Object to form --
9      THE WITNESS:  I don't know why
10  we did not receive Bates documents --
11      THE REPORTER:  Wait.
12      MR. REHN:  Sorry.  Object to
13  the form.  Lacks foundation.
14      THE WITNESS:  I don't know for
15  sure that we didn't receive
16  Bates-stamped documents, but I believe
17  some of the documents we received were
18  NFPA documents.
19  BY MR. BRIDGES:
20      Q.   Do you recall seeing any NFPA
21  documents that -- in which NFPA personnel
22  stated that they could not show any harm from
23  the defendant's activities?
24      A.   Received any documents that
25  said that?

Page 122

1      Q.   Uh-huh.
2      A.   Perhaps you would have
3  something that would refresh my memory.  I
4  don't recall, sitting here right now, but
5  it's possible.
6          Are you talking about
7  historical -- historically no harm, or are
8  you talking about prospectively?
9      Q.   Either one.  Did you -- do you
10  recall seeing any internal NFPA documents
11  that call into question where NF -- whether
12  NFPA has suffered any harm from the
13  defendant's activities?
14      A.   I don't recall documents on it.
15  There may have been some deposition testimony
16  about past activities, but I don't know if it
17  was activities prior to Public Resource
18  actions here or after.
19      Q.   Do you recall learning about
20  any litigation that NFPA had engaged in
21  pertaining to standards and copyright?
22      A.   I think I heard that there's
23  some overseas litigation involving Public
24  Resource.  Whether that involves NFPA, I
25  don't know.

Page 123

1      Q.   What did you hear about
2  overseas litigation involving Public
3  Resource?
4      A.   I think I heard that there was
5  a German -- or a suit in Germany, but I'm not
6  sure that I learned much more than that.  I
7  don't recall what status that suit -- what
8  the status of that suit is.
9      Q.   Do you recall anyone disclosing
10  to you litigation involving NFPA in the
11  United States that pertained to standards and
12  copyright?
13      A.   It's possible, but I don't
14  recall any, sitting here right now.
15      Q.   Do you recall inquiring about
16  public statements of fact that NFPA has made
17  regarding copyright and standards in
18  litigation other than this litigation in the
19  United States?
20      MR. FEE:  Objection to form.
21      THE WITNESS:  I do not.
22  BY MR. BRIDGES:
23      Q.   Are you familiar with a case
24  called Veeck, V-E-E-C-K?
25      A.   I'm familiar with an opinion in

Page 124

1  the Veeck case.
2      Q.   What do you know about that
3  opinion?
4      MR. FEE:  Objection.
5          I would instruct you not to
6      disclose anything you know about that
7      opinion that was a result of
8      communications with counsel and that
9      did not form the basis of any of the
10      opinions in your report or any of the
11      assumptions that you relied upon in
12      reaching your conclusions.
13      THE WITNESS:  I did talk with
14      counsel about that case, and that case
15      didn't form any basis for any of my
16      observations or conclusions here.
17  BY MR. BRIDGES:
18      Q.   Why did the Veeck case not form
19  any basis for any of your observations or
20  conclusions here?
21      A.   I don't know how to answer that
22  question.  I -- it didn't present any facts
23  that were specific to this case, as far as I
24  recall.
25      Q.   What do you recall of the facts

Page 125

32 (Pages 122 - 125)

1      answered.
2           THE WITNESS: Again, I read the
3      case. I didn't do any analysis beyond
4      that of that particular case.
5 BY MR. BRIDGES:
6      Q.    What steps did you take to
7 ascertain what public harms flowed from the
8 Court's decision in the Veeck case?
9      A.    Other than reading the case,
10 the opinion in the case, I didn't do anything
11 beyond that to understand the implications of
12 that holding.
13      Q.    You didn't do any investigation
14 as to the economic consequences to any
15 entity, industry, or person as a consequence
16 of the decision in the Veeck case, correct?
17           MR. FEE: Objection to form.
18           THE WITNESS: I think that's
19      correct, yes.
20 BY MR. BRIDGES:
21      Q.    How has the process of
22 standards development changed in the last 100
23 years, to your knowledge?
24      A.    I don't know the specifics, and
25 I don't know that there is one standards

1 development process. I think there are a
2 variety of processes pursued by a number of
3 SSOs or SDOs. I'm sure that there have been
4 changes on the margin. There may have been
5 larger changes. I just don't know. I have
6 not studied the trend in the standard
7 development process over time.
8      Q.    What changes are you aware of
9 in the standards development process of NFPA
10 over the past 100 years?
11      A.    I don't know. I've not studied
12 that topic.
13      Q.    What changes are you aware of
14 in the standards development process of the
15 ASHRAE 90.1 standard?
16      A.    I don't know. I've not studied
17 that.
18      Q.    How did ASHRAE come to develop
19 the 90.1 standard?
20      A.    I think, generally, a need was
21 identified and a group of constituents
22 convened to derive a standard, but I don't
23 know the specifics beyond that.
24      Q.    Do you know who identified the
25 need?

1      A.    Not sitting here right now, I
2 don't.
3      Q.    Do you know whether ASHRAE took
4 over development of what became standard 90.1
5 from any other group or entity?
6      A.    No, I do not.
7      Q.    Have you ever quantified the
8 value of the contributions made by the
9 volunteers of the various organizations to
10 the standards at issue in this case?
11           MR. FEE: Objection to form.
12           THE WITNESS: Not other than
13      having some sense of hours or a
14      limited sense of dollars, but not
15      beyond that, no.
16 BY MR. BRIDGES:
17      Q.    Can you put a rough dollar
18 value on the time and expenses of the
19 volunteers with respect to any of the
20 standards in this case?
21           MR. FEE: Objection to form.
22           THE WITNESS: Not sitting here
23      right now. That would entail a little
24      bit of a study. I have not done that.
25 BY MR. BRIDGES:

1      Q.    What -- what would be required?
2      A.    To understand basically the
3 out-of-pocket expenses incurred and the
4 opportunity costs incurred. So among other
5 things, one would want to look at time
6 records, have an understanding of
7 compensation, have an understanding of the
8 activities of those individuals. Those
9 are -- would be among the inputs.
10      Q.    What changes are you aware of
11 in the distribution of standards in the past
12 100 years by the plaintiffs?
13           MR. FEE: Objection to form.
14           THE WITNESS: I haven't
15      investigated that particular issue,
16      but I understand that some of the
17      standards today are distributed
18      through the Internet that certainly
19      didn't exist 100 years ago.
20           Some of the standards are
21      distributed for free with limitations.
22      I don't know if that was true 100
23      years ago, but it might have been.
24           I would expect some of the
25      copying and dissemination capabilities

1  are much greater today than they were
2  in 1915, but I don't know that the
3  general methods of -- I don't know how
4  the general methods of distribution
5  have changed.
6  BY MR. BRIDGES:
7      Q.    What changes are you aware of
8  in sales trends over the past 20 years?
9          MR. FEE: Objection to form.
10         THE WITNESS:  I don't have data
11  going back as far as 20 years ago. I
12  have some information on publication
13  sales, for instance, in tabs 3, 4, and
14  5. They only -- that information only
15  goes back a few years, however.
16  BY MR. BRIDGES:
17     Q.    Did you review any information
18  earlier than the dates shown in the documents
19  at tabs 3, 4, and 5?
20         MR. FEE: Objection. Vague.
21         THE WITNESS:  It's possible
22  that some of the source documents had
23  earlier information, but I don't
24  recall that. I would need to look at
25  those source documents.

Page 134

1  BY MR. BRIDGES:
2      Q.    And those source documents
3  would be within the Bates ranges identified
4  in tab 2 of your report?
5      A.    Within the Bates ranges or
6  identified elsewhere in tab 2. For instance,
7  the AS team -- ASTM audited -- audited
8  consolidated financial statements, I think,
9  may not all be Bates-stamped. I could be
10  wrong on that. But I would look in that set
11  of financial documents.
12     Q.    What do you know about what you
13  said -- strike that.
14         You said earlier that some
15  standards are distributed for free with some
16  limitations; is that correct?
17     A.    Yes, that's my understanding.
18     Q.    What do you know about that?
19         MR. FEE: Objection. Vague.
20         THE WITNESS:  I've written
21  about that in my report. I believe
22  that each one of the plaintiffs has
23  provided what is sometimes called a
24  "reading room" so that people can look
25  at those standards but are not given

Page 135

1  the right to reproduce, copy, or
2  disseminate those standards but can
3  look at them online.
4  BY MR. BRIDGES:
5      Q.    Have you used the reading rooms
6  of any of the plaintiffs?
7      A.    No, I have not.
8      Q.    Have you reviewed the interface
9  that the -- have you reviewed the interfaces
10  that the plaintiffs offer to persons wishing
11  to view materials for free online?
12     A.    No, I don't think so.
13     Q.    Do you know what effect, if
14  any, the presence of those free materials on
15  the plaintiffs' Web sites has had on the
16  plaintiffs' revenues?
17         MR. FEE: Objection to form.
18         THE WITNESS:  No, I don't.
19  BY MR. BRIDGES:
20     Q.    Have you -- have you
21  investigated that?
22         MR. FEE: Same objection.
23         THE WITNESS:  I've been
24  opening -- I've been open to learning
25  about that, but I haven't learned that

Page 136

1  there's a direct or indirect effect.
2  There might be, but I haven't seen
3  evidence of that.
4  BY MR. BRIDGES:
5      Q.    My question was, have you
6  investigated that?
7          MR. FEE: Same objection.
8          THE WITNESS:  Perhaps you could
9  read back my answer.
10  BY MR. BRIDGES:
11     Q.    I've heard the answer. It was
12  not responsive to my question. The -- you
13  said you did not know what effect, if any,
14  the presence of those free materials on the
15  plaintiffs' Web sites has had on the
16  plaintiffs' revenues.
17         And my question is, have you
18  investigated that?
19         MR. FEE: Same objection.
20         THE WITNESS:  No, I've not
21  undertaken a separate investigation.
22  I've been alert to that topic, but I
23  haven't assigned myself that
24  investigation.
25  BY MR. BRIDGES:

Page 137

35 (Pages 134 - 137)

1      Q.    Was something that was --
2   remained pending at the time you wrote this
3   report as something that you expected to do
4   in the future?
5      A.    No.
6         MR. FEE: Objection. Vague.
7         THE WITNESS: I'm sorry.
8         No.
9   BY MR. BRIDGES:
10     Q.    Did you study the practices of
11  any standards development organizations,
12  other than the plaintiffs, for purposes of
13  your work in this case?
14        MR. FEE: Objection. Vague.
15        THE WITNESS: Not that I
16     recall. I saw reference to other SDOs
17     in the Bremer articles, for instance,
18     but I didn't undertake a separate
19     investigation of the practices of any
20     other SDOs for purposes of my
21     assignment here.
22  BY MR. BRIDGES:
23     Q.    Are you aware of practices or
24  policies of other SDOs with reference to
25  either copyright or free availability of

Page 138

1   SDOs, but the standard setting organizations
2   that are the candidates are the ones that I
3   identified earlier today.
4      Q.    Which SDOs do you recall
5   treating copyright protection of their
6   standards as very important?
7      A.    I just don't recall right now.
8   I -- I have some vague recollection that
9   copyright considerations are addressed by
10  ETSI, but I could be wrong on that.
11     Q.    What do you know about policies
12  or practices of the Blu-ray organization with
13  respect to copyright protection?
14     A.    I assume you're talking about
15  the Blu-ray Association? I may have known
16  when I was involved in that matter. I do not
17  remember, sitting here now.
18     Q.    Do you recall that your report
19  actually refers to the Blu-ray Association?
20     A.    I think I refer to Blu-ray
21  standards. I don't recall if I refer to the
22  Blu-ray Association, but perhaps you could
23  refresh my memory.
24     Q.    I believe you point it out at
25  the bottom of page 62. "While certain SDOs

Page 140

1   their materials?
2         MR. FEE: Objection to form.
3         THE WITNESS: I may have been
4      aware through other assignments I've
5      undertaken in the past, but I didn't
6      undertake any separate investigation
7      for purposes of this matter.
8   BY MR. BRIDGES:
9      Q.    What awareness do you have of
10  the practices or policies of other SDOs
11  through other assignments you've undertaken
12  in the past?
13        MR. FEE: Objection to form.
14        THE WITNESS: I can only recall
15     most generally that they view
16     intellectual property protection as
17     being very important, but I can't be
18     any more specific than that.
19  BY MR. BRIDGES:
20     Q.    Which SDOs you -- do you recall
21  treating intellectual property protection as
22  very important?
23     A.    Well, again, I've -- I've dealt
24  with standards setting organizations. I
25  don't know if any of those are technically

Page 139

1   (e.g., the Blu-ray disc association) provide
2   unrestricted access to their standard
3   publications for free, the Plaintiffs here do
4   not."
5         Do you recall that?
6      A.    Now I do. Thank you for
7   refreshing my memory.
8      Q.    What economic effects are you
9   aware of the fact that the Blu-ray Disc
10  Association provides unrestricted access to
11  its standard publications for free?
12     A.    I have not investigated that
13  issue, so I don't know.
14     Q.    What other SDOs have you
15  identified that provide unrestricted access
16  to their standards for free?
17     A.    I don't think I've identified
18  any others in my report.
19     Q.    Did you look for any others?
20     A.    Not that I recall.
21     Q.    Why not?
22     A.    I don't know how to answer
23  that. I was aware of the Blu-ray Disc
24  Association's policy in this regard, so I
25  wrote about it here.

Page 141

36 (Pages 138 - 141)

1     Q.    Why did you not consider the
2 economic effects of free distribution of
3 standards with respect to other
4 organizations?
5     A.    I didn't quite see the
6 relevance to this matter.
7     Q.    Why?
8     A.    I don't know how to prove a
9 negative.
10     Q.    What's the negative you were
11 thinking of that would need to be proved or
12 disproved?
13     A.    That something is not relevant.
14     Q.    You just didn't see the
15 relevance?
16     A.    I don't understand how that
17 would be helpful in the assignment that I had
18 here.
19     Q.    And what was the assignment you
20 had here?
21     A.    Well, I've laid it out --
22     Q.    I can read the report.  I'm not
23 asking you to read -- read the report.  I'd
24 like your own words now, sitting here.
25          MR. FEE:  Objection.

Page 142

1 BY MR. BRIDGES:
2     Q.    How do you -- how do you
3 view --
4     A.    I'd like to answer it by
5 looking at my report.
6     Q.    No, I'd like for you to give me
7 a straight answer, because if you're just
8 going to refer to the report, the report will
9 speak for itself, and I don't need you to
10 read it to me.
11          I'd like for you to tell me
12 what you understand, sitting here, to have
13 been your assignment in this case.
14          MR. FEE:  Objection.
15          You can answer the question
16     however you deem appropriate.
17          THE WITNESS:  I've aptly laid
18     it out in my report, so I defer to the
19     words in my report.
20          But I've, in essence, looked at
21     the topic of the impact of copyright
22     and trademark infringement here, and
23     asked myself the question whether a
24     permanent injunction would be
25     appropriate from an economic

Page 143

1     perspective.
2 BY MR. BRIDGES:
3     Q.    And what is the relevance of
4 economic analysis to that question, as you
5 understand it?
6          MR. FEE:  Objection to form.
7     Vague.  Might also be construed to
8     require a legal conclusion.
9          THE WITNESS:  Economists have a
10     view and perspective at looking at
11     issues that some courts have found to
12     be useful.
13 BY MR. BRIDGES:
14     Q.    Well, I'm asking, with specific
15 relevance to this case, what do you
16 understand the importance of economic
17 analysis to be in this case --
18          MR. FEE:  Objection.  Calls --
19 BY MR. BRIDGES:
20     Q.    -- as you have purported to
21 practice it?
22          MR. FEE:  Calls for a legal
23     conclusion.
24          Also, to the extent that
25     responding to that would require you

Page 144

1 to disclose communications with
2 counsel that did not form the basis
3 for any of your opinions or
4 conclusions and did not provide any
5 assumptions that were the basis for
6 your opinions or conclusions, you
7 should not answer that portion of the
8 question.
9          THE WITNESS:  I understand
10     that, generally, economists like me
11     are quite helpful in determining
12     questions of harm, particularly harm
13     as it relates to infringement of IP
14     rights.
15 BY MR. BRIDGES:
16     Q.    How do you distinguish between
17 harms that are caused by an infringement by
18 the defendant versus harms that might be
19 caused by a court decision that plaintiffs
20 lack copyrights?
21          MR. FEE:  Objection to the
22     extent it calls for a legal
23     conclusion.
24          THE WITNESS:  I don't know how
25     to answer that question.  I didn't ask

Page 145

37 (Pages 142 - 145)

1    Q.    Why did you not consider the
2  economic effects of free distribution of
3  standards with respect to other
4  organizations?
5    A.    I didn't quite see the
6  relevance to this matter.
7    Q.    Why?
8    A.    I don't know how to prove a
9  negative.
10    Q.    What's the negative you were
11  thinking of that would need to be proved or
12  disproved?
13    A.    That something is not relevant.
14    Q.    You just didn't see the
15  relevance?
16    A.    I don't understand how that
17  would be helpful in the assignment that I had
18  here.
19    Q.    And what was the assignment you
20  had here?
21    A.    Well, I've laid it out --
22    Q.    I can read the report. I'm not
23  asking you to read -- read the report. I'd
24  like your own words now, sitting here.
25        MR. FEE: Objection.

Page 142

1  BY MR. BRIDGES:
2    Q.    How do you -- how do you
3  view --
4    A.    I'd like to answer it by
5  looking at my report.
6    Q.    No, I'd like for you to give me
7  a straight answer, because if you're just
8  going to refer to the report, the report will
9  speak for itself, and I don't need you to
10  read it to me.
11        I'd like for you to tell me
12  what you understand, sitting here, to have
13  been your assignment in this case.
14        MR. FEE: Objection.
15        You can answer the question
16    however you deem appropriate.
17        THE WITNESS: I've aptly laid
18    it out in my report, so I defer to the
19    words in my report.
20        But I've, in essence, looked at
21    the topic of the impact of copyright
22    and trademark infringement here, and
23    asked myself the question whether a
24    permanent injunction would be
25    appropriate from an economic

Page 143

1    perspective.
2  BY MR. BRIDGES:
3    Q.    And what is the relevance of
4  economic analysis to that question, as you
5  understand it?
6        MR. FEE: Objection to form.
7    Vague. Might also be construed to
8    require a legal conclusion.
9        THE WITNESS: Economists have a
10    view and perspective at looking at
11    issues that some courts have found to
12    be useful.
13  BY MR. BRIDGES:
14    Q.    Well, I'm asking, with specific
15  relevance to this case, what do you
16  understand the importance of economic
17  analysis to be in this case --
18        MR. FEE: Objection. Calls --
19  BY MR. BRIDGES:
20    Q.    -- as you have purported to
21  practice it?
22        MR. FEE: Calls for a legal
23    conclusion.
24        Also, to the extent that
25    responding to that would require you

Page 144

1  to disclose communications with
2  counsel that did not form the basis
3  for any of your opinions or
4  conclusions and did not provide any
5  assumptions that were the basis for
6  your opinions or conclusions, you
7  should not answer that portion of the
8  question.
9        THE WITNESS: I understand
10    that, generally, economists like me
11    are quite helpful in determining
12    questions of harm, particularly harm
13    as it relates to infringement of IP
14    rights.
15  BY MR. BRIDGES:
16    Q.    How do you distinguish between
17  harms that are caused by an infringement by
18  the defendant versus harms that might be
19  caused by a court decision that plaintiffs
20  lack copyrights?
21        MR. FEE: Objection to the
22    extent it calls for a legal
23    conclusion.
24        THE WITNESS: I don't know how
25    to answer that question. I didn't ask

Page 145

37 (Pages 142 - 145)

1    myself the question of ownership or
2    impact of ownership.  I asked myself
3    the question here of impact of
4    infringement.
5    BY MR. BRIDGES:
6        Q.   If it turns out that the Court
7    rules that the plaintiff -- sorry.  Strike
8    that.
9            If it turns out the Court rules
10   here that the defendant has engaged in fair
11   use, is it your understanding that none of
12   your harms analysis is relevant --
13           MR. FEE:  Objection.
14   BY MR. BRIDGES:
15       Q.   -- because of a finding of
16   non-infringement?
17           MR. FEE:  Calls for a legal
18   conclusion.
19           To the extent answering that
20   question would require you to disclose
21   communications you had with counsel
22   that don't form the basis for any of
23   your opinions or conclusions and don't
24   provide any assumptions that you
25   relied upon, you shouldn't disclose

Page 146

1    under the assumption that the
2    activities violate the law.
3    BY MR. BRIDGES:
4        Q.   If the activities -- do you
5    believe -- do you understand that your
6    analysis is relevant to a determination of
7    whether the defendant has violated the law?
8            MR. FEE:  Objection.  Calls for
9    a legal conclusion.
10           To the extent that your
11   understanding is based upon
12   communications with counsel, you
13   shouldn't disclose them, unless they
14   formed the basis for your opinions or
15   conclusions or provided assumptions
16   that you relied upon in reaching your
17   conclusions.
18           THE WITNESS:  I don't know.
19   BY MR. BRIDGES:
20       Q.   Do you have any view as to
21   whether the defendant has violated copyright
22   law?
23           MR. FEE:  Objection.  Calls for
24   a legal conclusion.
25           THE WITNESS:  No, I've not

Page 148

1    those communications.
2            THE WITNESS:  You're asking for
3    a legal conclusion.  I'm not an expert
4    on that.
5    BY MR. BRIDGES:
6        Q.   I'm understanding your
7    understanding -- I'm asking for your
8    understanding of the relevance of your
9    contributions to this case.
10           MR. FEE:  Objection.  Asked and
11   answered.  Plus all the prior
12   objections and instructions.
13           THE WITNESS:  I believe my
14   testimony and report are relevant to
15   the issue of harm and potential harm.
16   BY MR. BRIDGES:
17       Q.   From what?
18       A.   From continuing -- the
19   continuing activities and possible expanded
20   activities of the defendant here.
21       Q.   From activities or from
22   violations of law?
23           MR. FEE:  Objection.  Vague.
24   Calls for a legal conclusion.
25           THE WITNESS:  I -- I'm working

Page 147

1    taken on that assignment.
2    BY MR. BRIDGES:
3        Q.   Do you have any view as to
4    whether the defendant's activities constitute
5    fair use?
6            MR. FEE:  Objection.  Calls for
7    a legal conclusion.
8            THE WITNESS:  No, I've not
9    taken on that assignment.
10   BY MR. BRIDGES:
11       Q.   If a court determines that the
12   defendant has not infringed upon plaintiffs'
13   copyrights, do you understand that the
14   decision would result in economic harm to the
15   plaintiffs?
16           MR. FEE:  Objection to the
17   extent it calls for a legal
18   conclusion.
19           THE WITNESS:  I'm not following
20   your question.  Could you ask it a
21   little bit differently, please?
22   BY MR. BRIDGES:
23       Q.   No, I'll restate it if you just
24   need to rehear it.
25       A.   No, I don't need to rehear it.

Page 149

38 (Pages 146 - 149)

1  If you could recast it, please.
2     Q.    No.  Then please answer my
3  question.
4          MR. FEE:  Objection.
5  BY MR. BRIDGES:
6     Q.    I get to ask the questions.
7          MR. FEE:  He just said he
8  couldn't answer it.
9          THE WITNESS:  I don't
10 understand the question.
11 BY MR. BRIDGES:
12    Q.    What is it you don't
13 understand?
14    A.    I understand each word but not
15 how you put them together.
16    Q.    If a court determines that the
17 defendant has not infringed upon the
18 plaintiffs' copyrights, do you believe that
19 that decision would result in economic harm
20 to the plaintiffs?
21         MR. FEE:  Objection to the
22         extent it calls for a legal
23         conclusion.  Plus asked and answered.
24         THE WITNESS:  It sounds like
25         exactly the same words, so I'm not

Page 150

1  that's fine.
2     A.    I want to, but I cannot.
3     Q.    Well --
4     A.    I do not understand the
5  question.
6     Q.    I'll say it again.
7          Would a decision by the Court
8  that the defendant has not infringed upon the
9  plaintiffs' copyrights result in economic
10 harm to the plaintiffs?
11         MR. FEE:  Objection.  Calls for
12         a legal conclusion.  Asked and
13         answered.
14         THE WITNESS:  I --
15         MR. FEE:  Vague.
16         THE WITNESS:  I cannot answer
17         it any differently.  I'm sorry.
18         Is this a good time for a
19         break, or do you want to keep going?
20         MR. BRIDGES:  Sure.  We can
21         take one if you want.
22         THE VIDEOGRAPHER:  Off the
23         record at 1:17.
24               *  *  *
25         (Recess from 1:17 p.m. to

Page 152

1     sure how to answer that question.
2  BY MR. BRIDGES:
3     Q.    Would a decision that the
4  defendant has not infringed upon plaintiffs'
5  copyrights result in economic harm to the
6  plaintiffs?
7          MR. FEE:  Objection.  Calls for
8          a legal conclusion.
9          THE WITNESS:  I'm just not
10         following.  I under -- I'm worked --
11         I'm working under the assumption that
12         the activity here represents a
13         copyright infringement.  I'm -- and
14         I'm being asked and answering the
15         question of the impact of that and
16         whether there would be harm and what
17         kind of harm and whether that's
18         reparable harm.
19         So I'm focusing on what has
20         been done and what may continue to be
21         done by the defendant.
22 BY MR. BRIDGES:
23    Q.    That's non-responsive.  I'll
24 ask you to answer my question.  And if you
25 just don't want to answer the question,

Page 151

1     2:12 p.m.)
2               *  *  *
3          THE VIDEOGRAPHER:  On the
4          record at 2:12.
5  BY MR. BRIDGES:
6     Q.    Good afternoon, Mr. Jarosz.
7     A.    Good afternoon.
8     Q.    Could you outline for me,
9  please, what steps you took in your
10 engagement in this case?  What are the
11 different activities you engaged in?
12    A.    Generally, I had a discussion
13 with counsel about the matter.  Then we
14 examined documents that would -- were
15 provided to us to give us background.  We
16 then proceeded to gather our own information
17 from third-party sources, primarily through
18 Internet searches.
19         We obtained information that
20 had been produced as part of discovery.  We
21 had conversations with people at the various
22 plaintiff organizations.
23         We outlined the report and
24 summarized some of the information that you
25 see in the tabs.  We had discussions with

Page 153

39 (Pages 150 - 153)

1  If you could recast it, please.
2      Q.   No.  Then please answer my
3  question.
4          MR. FEE:  Objection.
5  BY MR. BRIDGES:
6      Q.   I get to ask the questions.
7          MR. FEE:  He just said he
8  couldn't answer it.
9          THE WITNESS:  I don't
10 understand the question.
11 BY MR. BRIDGES:
12     Q.   What is it you don't
13 understand?
14     A.   I understand each word but not
15 how you put them together.
16     Q.   If a court determines that the
17 defendant has not infringed upon the
18 plaintiffs' copyrights, do you believe that
19 that decision would result in economic harm
20 to the plaintiffs?
21         MR. FEE:  Objection to the
22     extent it calls for a legal
23     conclusion.  Plus asked and answered.
24         THE WITNESS:  It sounds like
25     exactly the same words, so I'm not

Page 150

1      that's fine.
2      A.   I want to, but I cannot.
3      Q.   Well --
4      A.   I do not understand the
5  question.
6      Q.   I'll say it again.
7          Would a decision by the Court
8  that the defendant has not infringed upon the
9  plaintiffs' copyrights result in economic
10 harm to the plaintiffs?
11         MR. FEE:  Objection.  Calls for
12     a legal conclusion.  Asked and
13     answered.
14         THE WITNESS:  I --
15         MR. FEE:  Vague.
16         THE WITNESS:  I cannot answer
17     it any differently.  I'm sorry.
18         Is this a good time for a
19     break, or do you want to keep going?
20         MR. BRIDGES:  Sure.  We can
21     take one if you want.
22         THE VIDEOGRAPHER:  Off the
23     record at 1:17.
24             *  *  *
25         (Recess from 1:17 p.m. to

Page 152

1      sure how to answer that question.
2  BY MR. BRIDGES:
3      Q.   Would a decision that the
4  defendant has not infringed upon plaintiffs'
5  copyrights result in economic harm to the
6  plaintiffs?
7          MR. FEE:  Objection.  Calls for
8      a legal conclusion.
9          THE WITNESS:  I'm just not
10     following.  I under -- I'm worked --
11     I'm working under the assumption that
12     the activity here represents a
13     copyright infringement.  I'm -- and
14     I'm being asked and answering the
15     question of the impact of that and
16     whether there would be harm and what
17     kind of harm and whether that's
18     reparable harm.
19         So I'm focusing on what has
20     been done and what may continue to be
21     done by the defendant.
22 BY MR. BRIDGES:
23     Q.   That's non-responsive.  I'll
24 ask you to answer my question.  And if you
25 just don't want to answer the question,

Page 151

1      2:12 p.m.)
2             *  *  *
3          THE VIDEOGRAPHER:  On the
4      record at 2:12.
5  BY MR. BRIDGES:
6      Q.   Good afternoon, Mr. Jarosz.
7      A.   Good afternoon.
8      Q.   Could you outline for me,
9  please, what steps you took in your
10 engagement in this case?  What are the
11 different activities you engaged in?
12     A.   Generally, I had a discussion
13 with counsel about the matter.  Then we
14 examined documents that would -- were
15 provided to us to give us background.  We
16 then proceeded to gather our own information
17 from third-party sources, primarily through
18 Internet searches.
19         We obtained information that
20 had been produced as part of discovery.  We
21 had conversations with people at the various
22 plaintiff organizations.
23         We outlined the report and
24 summarized some of the information that you
25 see in the tabs.  We had discussions with

Page 153

39 (Pages 150 - 153)

1    counsel.  And then we finalized the report,
2    submitting it to counsel on June 5th, 2015.
3         Q.    Do you know how many standards
4    of each plaintiff are at issue in this case?
5         A.    How many -- I'm sorry --
6    standards are at issue?
7         Q.    Yes.
8         A.    I have that number written
9    down.  It's in the hundreds, and I forget, as
10   I sit here right now, precisely the number.
11   I will look it up.  And I was giving you an
12   answer that was a cumulation across the three
13   plaintiffs.
14              I am not seeing that number
15   right now.  I'll keep looking.
16        Q.    Do you know what --
17        A.    You may be able to point me
18   quicker than I recall where it was.
19        Q.    Do you -- do you know what
20   proportion of plaintiffs -- of each
21   plaintiffs' standards is at issue in this
22   case?
23        A.    Are you asking me the ratio of
24   the standards at issue versus the total
25   standards developed by the organizations?

Page 154

1         Q.    Have you analyzed any
2    differences in sales trends between those of
3    plaintiffs' standards that have been
4    incorporated into law and those of
5    plaintiffs' standards that have not been
6    incorporated into law?
7         A.    I don't think so.  I don't
8    think I have those data, and I'm not sure
9    that each plaintiff knows precisely how many
10   have been incorporated into law.
11        Q.    Did you ask for any data
12   regarding the distinction between standards
13   incorporated by reference and standards not
14   incorporated by reference in the law?
15        A.    I don't --
16              MR. FEE:  Objection to form.
17              THE WITNESS:  I'm sorry.  I
18   don't recall.
19   BY MR. BRIDGES:
20        Q.    You made observations about
21   sales trends earlier in your deposition.  I
22   think you said that there's been a reduction
23   in sales of certain of plaintiffs' standards;
24   is that correct?
25        A.    I'm not quite sure what the

Page 156

1         Q.    Yes.
2         A.    I think it's less than a
3    majority for each organization.  I'm fairly
4    certain of that with regard to ASTM.  I think
5    that's true with regard to NFPA.  I think
6    it's true with regard to ASHRAE.
7         Q.    Do you have any better
8    information than less than a majority --
9         A.    Well, I --
10        Q.    -- for each of them?
11        A.    The precise numbers are in the
12   report.  Let's see here.  One can figure that
13   out.  You may remember where I summarized the
14   number of standards.  I just don't remember.
15   It's easy to determine because the data are
16   all here.
17        Q.    Have you analyzed differences
18   in sales trends between standards that are at
19   issue in this case and plaintiffs' other
20   standards?
21        A.    No, I don't think I have those
22   data at my disposal.
23        Q.    Did you ever ask for those
24   data?
25        A.    I don't recall.

Page 155

1    earlier testimony was, but I think I was
2    pointing you to paragraph 133 with regard to
3    downloads of -- and other measures of
4    activity, as I had at my disposal.
5         Q.    Well, I'm trying to find out
6    what changes you have studied in plaintiffs'
7    economics that you attribute to defendant's
8    activities.
9         A.    I'm not quite sure what your
10   question is.
11        Q.    Well, I'm trying to find out
12   what information you have studied to
13   determine what changes in the finances of
14   each of the plaintiffs have occurred as a
15   consequence of the defendant's activities.
16              MR. FEE:  Objection to form.
17              THE WITNESS:  I'm still not
18   sure that I'm hearing a question.  But
19   to the extent that I had information
20   on changes in activity level, I
21   summarized that in paragraph 133.
22   BY MR. BRIDGES:
23        Q.    My question is, what
24   information did you study to determine any
25   changes in finances of each of the

Page 157

40 (Pages 154 - 157)

1  plaintiffs?
2          MR. FEE:  Same objection.
3          THE WITNESS:  It's reflected in
4      paragraph 133 and in the tabs,
5      particularly 3, 4, and 5.  But the
6      tabs are not at the granular level
7      that I think are of interest to you.
8  BY MR. BRIDGES:
9      Q.    What do you mean by the
10  "granular level" that would be of interest to
11  me?
12      A.    I don't think it breaks out
13  publications by standard, for instance.
14      Q.    Does it break out publications
15  by whether a standard has been incorporated
16  by reference or not?
17      A.    I don't think so.
18      Q.    Does it break out by whether a
19  standard has been publicly made available by
20  defendant or not?
21      A.    I don't think so.  Not in
22  tabs 3, 4, and 5.
23      Q.    How do you establish causation
24  between defendant's activities and any of the
25  data that you provide in section -- in
Page 158

1  paragraph 133?
2          MR. FEE:  Objection.  Calls for
3      a legal conclusion.  Form.
4          THE WITNESS:  One can and
5      should look at all evidence available,
6      including circumstantial evidence.  I
7      don't have direct information about
8      the precise impact of defendant's
9      activities, but I have important
10      information that bears on that issue,
11      including information that's in
12      deposition transcripts.
13  BY MR. BRIDGES:
14      Q.    So my question is, how do
15  you -- do you -- strike that.
16          Are your conclusion -- are you
17  making conclusions in paragraph 133 about the
18  cause of changes in sales of the plaintiffs'
19  products?
20          MR. FEE:  Objection to form.
21          THE WITNESS:  Not definitively.
22      I have observations about the
23      magnitude and trend of the downloads
24      of -- through defendant's sites.  I
25      have some information on the downloads
Page 159

1  of certain of the standards.  I've
2      presented that.
3          I don't have direct evidence of
4      the precise impact historically of
5      defendant's activities on plaintiffs'
6      financials.
7  BY MR. BRIDGES:
8      Q.    What evidence of any kind do
9  you have of any kind of impact historically
10  of the defendant's activities on plaintiffs'
11  financials?
12          MR. FEE:  Objection to form.
13          THE WITNESS:  That which is
14      reported in paragraph 133, that of
15      which is contained in deposition
16      testimony, and that of which I
17      summarized in other parts of the
18      report.
19  BY MR. BRIDGES:
20      Q.    So when you're referring to
21  deposition testimony, you're referring to the
22  citations to the footnotes in paragraph 133?
23      A.    No, I don't think it's just
24  limited to that.  I think there's some other
25  deposition transcripts that talk about the
Page 160

1  impact or potential impact of defendant's
2  activities on each one of the plaintiffs.
3      Q.    Did you make any independent
4  assessment of causation of any financial
5  effects on plaintiffs by the defendant's
6  activities?
7          MR. FEE:  Objection to form.
8      Calls for a legal conclusion.
9          THE WITNESS:  What do you mean
10      by the term of "independent assessment
11      of causation"?
12  BY MR. BRIDGES:
13      Q.    You, as an expert, not relying
14  just on what other people have said or
15  speculated or thought.
16          MR. FEE:  Same objections.
17      Plus compound.
18          THE WITNESS:  We experts rely
19      on other information to draw the
20      conclusions that we do, and then we
21      bring our training to it.  So our
22      observations shouldn't be in a vacuum.
23  BY MR. BRIDGES:
24      Q.    But they should be objective,
25  correct?
Page 161

41 (Pages 158 - 161)

1  plaintiffs?
2        MR. FEE:  Same objection.
3        THE WITNESS:  It's reflected in
4   paragraph 133 and in the tabs,
5   particularly 3, 4, and 5.  But the
6   tabs are not at the granular level
7   that I think are of interest to you.
8  BY MR. BRIDGES:
9     Q.    What do you mean by the
10  "granular level" that would be of interest to
11  me?
12    A.    I don't think it breaks out
13  publications by standard, for instance.
14    Q.    Does it break out publications
15  by whether a standard has been incorporated
16  by reference or not?
17    A.    I don't think so.
18    Q.    Does it break out by whether a
19  standard has been publicly made available by
20  defendant or not?
21    A.    I don't think so.  Not in
22  tabs 3, 4, and 5.
23    Q.    How do you establish causation
24  between defendant's activities and any of the
25  data that you provide in section -- in

1  paragraph 133?
2        MR. FEE:  Objection.  Calls for
3     a legal conclusion.  Form.
4        THE WITNESS:  One can and
5     should look at all evidence available,
6     including circumstantial evidence.  I
7     don't have direct information about
8     the precise impact of defendant's
9     activities, but I have important
10    information that bears on that issue,
11    including information that's in
12    deposition transcripts.
13  BY MR. BRIDGES:
14    Q.    So my question is, how do
15  you -- do you -- strike that.
16        Are your conclusion -- are you
17  making conclusions in paragraph 133 about the
18  cause of changes in sales of the plaintiffs'
19  products?
20        MR. FEE:  Objection to form.
21        THE WITNESS:  Not definitively.
22    I have observations about the
23    magnitude and trend of the downloads
24    of -- through defendant's sites.  I
25    have some information on the downloads

1   of certain of the standards.  I've
2   presented that.
3        I don't have direct evidence of
4     the precise impact historically of
5     defendant's activities on plaintiffs'
6     financials.
7  BY MR. BRIDGES:
8     Q.    What evidence of any kind do
9  you have of any kind of impact historically
10  of the defendant's activities on plaintiffs'
11  financials?
12        MR. FEE:  Objection to form.
13        THE WITNESS:  That which is
14    reported in paragraph 133, that of
15    which is contained in deposition
16    testimony, and that of which I
17    summarized in other parts of the
18    report.
19  BY MR. BRIDGES:
20    Q.    So when you're referring to
21  deposition testimony, you're referring to the
22  citations to the footnotes in paragraph 133?
23    A.    No, I don't think it's just
24  limited to that.  I think there's some other
25  deposition transcripts that talk about the

1   impact or potential impact of defendant's
2   activities on each one of the plaintiffs.
3     Q.    Did you make any independent
4   assessment of causation of any financial
5   effects on plaintiffs by the defendant's
6   activities?
7        MR. FEE:  Objection to form.
8     Calls for a legal conclusion.
9        THE WITNESS:  What do you mean
10    by the term of "independent assessment
11    of causation"?
12  BY MR. BRIDGES:
13    Q.    You, as an expert, not relying
14  just on what other people have said or
15  speculated or thought.
16        MR. FEE:  Same objections.
17    Plus compound.
18        THE WITNESS:  We experts rely
19    on other information to draw the
20    conclusions that we do, and then we
21    bring our training to it.  So our
22    observations shouldn't be in a vacuum.
23  BY MR. BRIDGES:
24    Q.    But they should be objective,
25  correct?

1      A.    Yes.
2      Q.    And that means perhaps not
3   relying upon the views of the parties to the
4   lawsuit alone, but doing independent analysis
5   and research, correct?
6          MR. FEE:  Objection to form.
7          THE WITNESS:  I think one can
8      and should evaluate and consider the
9      views of the parties, but not limited
10     investigation to that.
11  BY MR. BRIDGES:
12     Q.    So what independent analysis
13  and research did you do other than reviewing
14  the views and statements of the parties in
15  this case?
16         MR. FEE:  Objection.  Vague.
17         THE WITNESS:  I reviewed and
18     summarized the data, as you see in
19     133, that I had at my disposal.  I
20     reviewed writings about the impacts.
21     And I took important
22     information from the fact that the
23     plaintiffs have brought this lawsuit.
24     The plaintiffs don't want this
25     activity to continue.  That is

Page 162

1   revealed preference information that's
2   quite important.
3   BY MR. BRIDGES:
4      Q.    Tell me about what you mean by
5   repealed -- sorry.  Strike that.
6          Tell me what you mean by
7   "revealed preference."
8      A.    What people do often provides
9   information on what their preferences are.
10     Q.    And so the fact that plaintiffs
11  brought this lawsuit has revealed to you that
12  they prefer to bring the lawsuit, correct?
13         MR. FEE:  Objection.  Vague.
14         THE WITNESS:  Given the cost,
15     they prefer to bring the lawsuit
16     rather than not bring it, yes.
17  BY MR. BRIDGES:
18     Q.    What else -- strike that.
19         What are the data you're
20  referring to in page -- strike that.
21         What are the data you're
22  referring to in paragraph 133 that you took
23  into account in discussing or analyzing
24  effects of defendant's activities on
25  plaintiffs?

Page 163

1      A.    I took all the data --
2          MR. FEE:  Objection.  Form.
3      Objection to form.
4          THE WITNESS:  I took all this
5      data into account.  That's why I
6      reported it here.
7   BY MR. BRIDGES:
8      Q.    And the data that you
9   identified in the footnotes in
10  paragraph 134 -- sorry -- 133?
11     A.    Yes, I considered that
12  information.
13     Q.    Do you know in what year the
14  defendant posted the 2008 version of the
15  National Electrical Code on its Web site?
16     A.    I don't know with absolute
17  certainty.  I do know a number of the alleged
18  activities occurred in late 2012.  I don't
19  know if it's specific to that code or not.
20     Q.    Does it matter to your analysis
21  exactly when the defendant posted the 2008
22  National Electrical Code on its Web site or
23  to Internet Archive?
24     A.    I would --
25         MR. FEE:  Objection to form.

Page 164

1          THE WITNESS:  I would consider
2      that information if I had it, but I
3      don't have any reason to think that it
4      would change any of the conclusions
5      that I drew.
6   BY MR. BRIDGES:
7      Q.    The timing of when the
8   defendant posted certain matters wouldn't
9   change your conclusions?
10     A.    Not based on what I know right
11  now.  My understanding is that much of the
12  activity occurred in 2012, the later half of
13  2012, and I still have the whole body of
14  evidence that I have considered.  So I'm not
15  sure if the precise timing would change, but
16  I certainly would consider that.
17     Q.    Do you know in what year
18  Public.Resource.Org posted the 2011 version
19  of the National Electrical Code?
20     A.    Same answer to the question
21  that you had with regard to the 2008 code.
22     Q.    Can you look at the data in
23  your -- the tables attached to your report
24  and see if that helps refresh your memory as
25  to when the defendant posted NEC 2008 and

Page 165

42 (Pages 162 - 165)

1   NEC -- NEC 2011?
2       A.   I can look, and I will.
3           No, it doesn't answer that
4   question, I don't think.
5       Q.   Can you make a prediction as to
6   when the defendant posted NEC 2008 and
7   NEC 2011, based on the data attached to your
8   report in Exhibit 1?
9           MR. FEE:  Objection to form.
10          THE WITNESS:  No, I don't
11      think, based on just those data.
12  BY MR. BRIDGES:
13      Q.   Can you make -- give an
14  estimate as to when the defendant posted
15  NEC 2008 and NEC 2011, based on the data
16  attached to your report as Exhibit 1?
17          MR. FEE:  Same objection.
18          THE WITNESS:  No, I don't
19      think, based on just that information.
20  BY MR. BRIDGES:
21      Q.   Well, just looking at your
22  report, can you tell when defendant posted
23  NEC 2008 and NEC 2011?
24      A.   My answer hasn't changed.  I
25  still don't know precisely when those were

Page 166

1   appropriateness of a permanent
2   injunction here.
3   BY MR. BRIDGES:
4       Q.   Is the appropriate of -- is the
5   appropriateness of a permanent injunction an
6   economic question?
7       A.   I think, in part, economic
8   considerations can be and often are taken
9   into account in answering that question.
10      Q.   Is it an economic question?
11          MR. FEE:  Objection.
12  BY MR. BRIDGES:
13      Q.   That was my question.
14          MR. FEE:  Asked and answered.
15          THE WITNESS:  Again, in part.
16  BY MR. BRIDGES:
17      Q.   The propriety of
18  a preliminary -- of a -- strike that.
19          It's your testimony that the
20  propriety of a permanent injunction is, in
21  part, an economic question?
22          MR. FEE:  Objection.  Asked and
23      answered.  Form.  Calls for a legal
24      conclusion.
25          THE WITNESS:  Yes.  As I

Page 168

1   posted.
2       Q.   But that doesn't make a
3   difference to your economic analysis of the
4   effects of defendant's activities on the
5   plaintiffs?
6       A.   Well, I would be curious --
7           MR. FEE:  Objection to form.
8           THE WITNESS:  -- curious about
9       that information, but I don't have any
10      reason to think it would change the
11      conclusions that I drew, and that is
12      that a permanent injunction is
13      appropriate here.
14  BY MR. BRIDGES:
15      Q.   Is it your job to determine
16  whether a permanent injunction is
17  appropriate?  Is that what you were hired to
18  do?
19      A.   No.
20          MR. FEE:  Objection.  Calls for
21      a legal conclusion.  Form.  Compound.
22          THE WITNESS:  I think it's
23      ultimately the Court's decision to
24      make, but I've been asked what my
25      economic view is as to the

Page 167

1       understand it, one factor to consider
2       is the reparability or irreparability
3       of harm.  I believe, at its core,
4       that's an economic question.
5   BY MR. BRIDGES:
6       Q.   And what economic theories did
7   you rely upon to conclude that, as an
8   economic matter, a preliminary -- strike
9   that.
10          What economic theories did you
11  rely upon to conclude that, as an economic
12  matter, a permanent injunction is appropriate
13  in this case?
14          MR. FEE:  Same objections.
15          THE WITNESS:  I don't know what
16      candidates you have in mind for
17      economic theories.
18  BY MR. BRIDGES:
19      Q.   Whichever ones you relied upon.
20      A.   I --
21          MR. FEE:  Same objections.
22          THE WITNESS:  -- used all of my
23      training and applied it to the facts
24      of this case and drew the conclusions
25      that I did.

Page 169

43 (Pages 166 - 169)

BY MR. BRIDGES:
    Q.    And are there any particular
aspects of training that you have beyond what
a first-year college student would have
gotten in a first-year economics course that
you have brought to bear by applying
particular economic theories to this case?
    A.    I think my training makes me
who I am and has helped me in assignments
like this. I have beyond a first-year-in-
college understanding of basic economics, but
they're very important concepts that are
taught and learned in first-year economics.
    Q.    Well, I want to know if there
are any economic concepts beyond first-year
economics that you have brought to bear in
rendering your conclusions in this case?
    MR. FEE: Objection to form.
    Asked and answered.
    THE WITNESS:  Generally, there
are, yes.
BY MR. BRIDGES:
    Q.    What economic concepts have you
brought to bear in your report and analysis
in this case?

Page 170

    A.    I'm sorry, because I don't know
what you mean by "economic concepts." We get
trained in things like quantitative methods
and intermediate microeconomics, in price
theory, in econometrics, in consumer
behavior. All those things are beyond the
first year. I don't know if you're calling
those economic theories. Your -- your
questioning confuses me.
    Q.    Well, you referred to the
important concepts in response to my question
to you about particular aspects of training
that you have beyond what a first-year
college student would have gotten in a
first-year economics course that you brought
to bear by applying economic theories to this
case, and your answer refers to very
important concepts that are taught and
learned.
    And so I'm asking you, what
very important economic concepts have you
brought to bear in your analysis of this
case?
    MR. FEE: Objection to form.
    Lack of foundation.

Page 171

    THE WITNESS:  We learn about
price theory. We learn about consumer
behavior. We talk -- we learn about
manufacturer and supplier actions. We
learn about game theory. We learn
about econometrics. We learn more
broadly about quantitative methods.
We learn about a variety of aspects of
industrial organization. There are
many things that we learn beyond the
first year of economics training.
BY MR. BRIDGES:
    Q.    No, I'm asking what you brought
to bear in your analysis in this case.
    A.    All those.
    Q.    Okay. What aspect of price
theory did you bring to bear in this case?
    A.    I don't know how to answer that
question besides I understand basic price
theory and have researched it much and
applied that to the facts here.
    Q.    What was the specific
application of price theory that you brought
to bear in this case?
    A.    I can't be any more specific

Page 172

than that. I don't understand your question.
    Q.    What aspect of training about
consumer behavior did you bring to bear in
this case?
    A.    I can't be any more specific
than saying that.
    Q.    What aspects of your training
about game theory have you brought to bear in
your work on this case?
    A.    I can't be any more specific
than that.
    Q.    What aspects of econometrics in
your training have you brought to bear on
this case?
    A.    I can't be any more specific
than that.
    Q.    What inform -- what aspects of
training in qualitative methods have you
brought to bear on this case?
    A.    I didn't say "qualitative
methods," and so it may have been mis-keyed
in. I said "quantitative methods."
    Q.    All right. What aspects of
quantitative methods of your training did you
bring to bear on this case?

Page 173

44 (Pages 170 - 173)

1    A.    I can't be any more specific
2    than that.
3    Q.    What aspect of your training
4    regarding aspects of industrial organization
5    have you brought to bear on this case?
6    A.    I can't be any more specific
7    than that.
8    Q.    But you did bring the theory of
9    reveal -- revealed preferences to bear on
10   this case, correct?
11   A.    Yes.
12   Q.    What other economic theories do
13   you recall bringing to bear on this case?
14        MR. FEE:  Objection.  Asked and
15   answered.
16        THE WITNESS:  Everything that
17   I've --
18        MR. FEE:  And vague.
19        Go ahead.
20        THE WITNESS:  -- I've learned
21   in my training, both educational
22   training and career training.
23   BY MR. BRIDGES:
24   Q.    Can you be more specific than
25   that?

Page 174

1    just on this information.
2    Q.    What else would you need?
3    A.    I don't know, because I think
4    it's probably a very easy factual question to
5    determine when the downloading first
6    occurred, so I don't know why one would need
7    to back into it.
8    Q.    Well, when -- would one be able
9    to use sales trends as a way of identifying
10   likely effects of a posting of each standard
11   by the defendant?
12        MR. FEE:  Objection.  Vague.
13   Compound.
14        THE WITNESS:  Maybe; maybe not.
15   BY MR. BRIDGES:
16   Q.    Why do you say "maybe; maybe
17   not"?
18   A.    I just wouldn't think to do it
19   that way, so I don't know what you exactly
20   have in mind.
21   Q.    Do you associate the posting of
22   standards by defendant with changes in sales
23   volume of the standards that the defendant
24   has posted?
25        MR. FEE:  Objection to form.

Page 176

1    A.    No.
2         * * *
3         (Jarosz Exhibit 4 marked for
4         identification.)
5         * * *
6    BY MR. BRIDGES:
7    Q.    Mr. Jarosz, do you recognize
8    Exhibit 4 as a document that you produced in
9    response to a subpoena in this case?
10   A.    Yes.
11   Q.    What is this document?
12   A.    It appears to be a summary over
13   the years 2009 through 2013 of dollars and
14   quantity of NFPA standards that were sold in
15   the marketplace.
16   Q.    Based upon the trends that you
17   see in this exhibit, can you estimate when
18   you believe it is most likely that the
19   defendant first published -- strike that.
20        Based upon the trends that you
21   see in this Exhibit 4, can you estimate when
22   you believe it is most likely that the
23   defendant first posted each of the standards
24   identified here?
25   A.    I don't think so, not based

Page 175

1         THE WITNESS:  I don't know what
2         you mean by that question.
3    BY MR. BRIDGES:
4    Q.    You don't understand the
5    question?
6    A.    I do not.
7    Q.    Can you correlate the posting
8    of standards by defendant with any changes in
9    sales volumes of the standards that the
10   defendant has posted?
11        MR. FEE:  Objection to form.
12        THE WITNESS:  I don't think
13        I've attempted to compute the
14        correlation coefficient here
15        associated with postings.
16   BY MR. BRIDGES:
17   Q.    I'm not asking for a specific
18   correlation coefficient.  I'm just asking,
19   generally, can you correlate the posting of
20   standards by defendant with any changes in
21   sales volumes of the standards that
22   defendants has -- that the defendant has
23   posted with reference to Exhibit 4?
24   A.    I don't know --
25        MR. FEE:  Objection.  Form.

Page 177

45 (Pages 174 - 177)

1          THE WITNESS:  I don't recall
2     attempting to do that.  And I wouldn't
3     necessarily think that the historical
4     impact would -- is the end of the
5     story as to the harm here.
6  BY MR. BRIDGES:
7     Q.    Is historical impact part of
8  the story as to the harm here?
9     A.    Yes.
10     Q.    What -- what can you say by
11  looking at Exhibit 4 about the historical
12  impact of the posting of the defendant -- of
13  the plaintiffs' standards by the defendant?
14     A.    I don't know that I can say
15  much, because I believe the postings largely
16  occurred in late 2012, and I only have one
17  period after that.
18     Q.    If it turns out that
19  defendant's postings were well before 2012,
20  would that affect your analysis of the trends
21  in sales data of the plaintiffs'
22  publications?
23          MR. FEE:  Objection to form.
24     Compound.  Vague.
25          THE WITNESS:  Maybe.  I would

*Page 178*

1     consider that information in
2     conjunction with these data if you
3     wanted me to.
4  BY MR. BRIDGES:
5     Q.    How -- what -- what would
6     change?
7     A.    I don't know.  I haven't done
8  that analysis.
9     Q.    Have you verified the dates on
10  which plaintiffs -- strike that.
11          Have you verified the dates at
12  which defendant posted the various standards
13  to its Web site or to Internet Archive?
14     A.    I don't --
15          MR. FEE:  Objection.  Vague.
16          THE WITNESS:  I don't recall
17     verifying it.
18          And are you asking did I
19     separately go out and determine what
20     that date is and see if that was the
21     same as what was represented in the
22     Complaint, for instance?
23  BY MR. BRIDGES:
24     Q.    Yes.
25     A.    No, I don't recall doing that.

*Page 179*

1     Q.    Have you determined in any way
2  the dates at which defendant posted various
3  standards to its Web site or to the Internet
4  Archive?
5     A.    I don't recall doing a separate
6  analysis of that, no.
7     Q.    How did you learn about the
8  dates at which defendant posted various
9  standards to its Web site or to Internet
10  Archive?
11     A.    I had conversations with
12  counsel on that topic, and I may have seen
13  that information contained in certain
14  documents like the Complaint, but I don't
15  recall.
16     Q.    Did you rely upon information
17  regarding those dates from conversations with
18  counsel?
19          MR. FEE:  In arriving at his
20     opinions, you're asking?
21          MR. BRIDGES:  Arriving at his
22     understanding of the facts.
23          THE WITNESS:  I don't know that
24     I did, because I don't recall
25     reporting those specific dates

*Page 180*

1     anywhere in my report.
2  BY MR. BRIDGES:
3     Q.    Do you recall taking specific
4  dates into account in analyzing the effect of
5  defendant's actions?
6          MR. FEE:  Objection to form.
7     Vague.
8          THE WITNESS:  I don't recall
9     one way or the other.
10  BY MR. BRIDGES:
11     Q.    Do you know how -- strike that.
12          Do you know how much revenue
13  each plaintiff derives from the standards at
14  issue in this case?
15     A.    I don't think I know that
16  precise number.
17     Q.    Did you -- did you ever know
18  that number?
19     A.    I don't think so.
20     Q.    Did you ever know how much
21  revenue each plaintiff derives from standards
22  that have been incorporated into law?
23     A.    As opposed to those that have
24  not been incorporated?  Is that --
25     Q.    Well, I'm -- I'm asking about

*Page 181*

46 (Pages 178 - 181)

1    those standards that have been incorporated
2    in the law.  I'm asking if you know how much
3    revenue each plaintiffs derives -- each
4    plaintiff derives from those standards.
5        A.    I don't --
6            MR. FEE:  Objection.  Form.
7            THE WITNESS:  -- think I know
8        that number, and I'm not sure the
9        plaintiffs know that number.
10   BY MR. BRIDGES:
11       Q.    Do you know the percentage of
12   revenue that each plaintiff derives from
13   standards that have been incorporated into
14   law?
15           MR. FEE:  Objection to form.
16           THE WITNESS:  I don't think I
17       do, and I don't believe the plaintiffs
18       do.
19   BY MR. BRIDGES:
20       Q.    Are you aware of any difference
21   in profitability to plaintiffs between those
22   standards that have been incorporated into
23   law and those standards that have not been
24   incorporated into law?
25           MR. FEE:  Objection to form.

Page 182

1            THE WITNESS:  I don't believe
2        so.
3    BY MR. BRIDGES:
4        Q.    Do you know -- strike that.
5            Are you aware of any difference
6    in profitability to plaintiffs between those
7    standards that defendant has posted to the
8    Internet and those standards that defendant
9    has not posted to the Internet?
10           MR. FEE:  Objection to form.
11           THE WITNESS:  I don't believe
12       so.  And as with the previous
13       question, I don't think the plaintiffs
14       have that information at their
15       disposal.
16   BY MR. BRIDGES:
17       Q.    For each plaintiff, what do you
18   understand to be the percentage of gross
19   revenue from the sale of standards?
20           MR. FEE:  Objection to form.
21           THE WITNESS:  I -- I've
22       reported that in my report.  My memory
23       is that it's something on the order of
24       66 percent for ASTM and for NFPA.  And
25       if you add in memberships, it's

Page 183

1        something just north of 50 percent for
2        ASHRAE.
3    BY MR. BRIDGES:
4        Q.    What do you mean by "if you add
5    in memberships"?
6        A.    I'm not -- I'm not quite sure
7    what you're asking me to define.
8        Q.    I'm asking you to explain the
9    phrase that you just used, "if you add in
10   memberships."  What did that mean?
11       A.    I talked about that in my
12   report.  Membership fees are a fairly good
13   recollect -- a fairly good reflection of
14   amount that would have been paid for
15   publications.  In other words, publication
16   fees -- it -- let me start this over again.
17           It makes about as much sense to
18   become a member of ASHRAE as it is to buy
19   some of the individual publications.  As a
20   result, many people choose to become members
21   rather than just buying the publication, as I
22   understand it.
23       Q.    How did you learn that?
24       A.    Having knowledge of the -- of
25   the price difference and through discussions

Page 184

1    with people at ASHRAE.
2        Q.    How did you learn about the
3    price difference?
4        A.    I don't recall how I learned
5    it, but I report it in my report based on
6    certain documents I've seen.  Perhaps I
7    learned it from their Web site.
8        Q.    Did you do any surveys of
9    ASHRAE members to validate that assumption?
10       A.    I'm sorry.  Validate what
11   assumption?
12       Q.    About purchase of a membership
13   instead of buying the publication.
14       A.    I'm not sure that there's an
15   assumption in there.  My understanding is
16   that ASHRAE people are of the belief that
17   many people buy membership rather than
18   individual publications.
19       Q.    And in your work, did you
20   assume that?
21       A.    I didn't assume that.  I worked
22   on that -- under that understanding.
23       Q.    Oh, it's an understanding, but
24   not an assumption?
25       A.    Yes.

Page 185

47 (Pages 182 - 185)

1    Q.    Did that understanding make a
2  difference to your analysis?
3    A.    It was a factual underpinning.
4    Q.    An underpinning, but not an
5  assumption?
6    A.    It was not an explicit
7  assumption.
8    Q.    But it was an underpinning, not
9  an assumption, is your testimony?
10       MR. FEE: Objection. Asked and
11  answered.
12       THE WITNESS: Yes. I don't
13    know what or why you're arguing with
14    me on this.
15  BY MR. BRIDGES:
16    Q.    I'm not arguing.
17    A.    I don't understand.
18    Q.    I'm just trying to understand
19  your testimony. That's all. So I'm asking
20  some follow-up questions.
21       You stated earlier some
22  percentages of revenue from the sale of
23  standards. Did you mean to be identifying
24  what you thought were the percentages of
25  revenue from the sale of standards or from

1  the sale of all publications?
2    A.    Let me -- let me double-check
3  that.
4       Well, in the case of ASTM, for
5  instance, I believe it's copyrighted
6  publications.
7    Q.    What page are you referring to
8  in your report?
9    A.    Right now I'm looking at
10  page 36, but I think I talk about it at other
11  areas.
12    Q.    So page 36, you're talking
13  about which paragraph?
14    A.    Well, right now I was --
15    Q.    83?
16    A.    -- I was looking at 83, but I'm
17  turning back to, for more reliable
18  information, to paragraph 15, for instance,
19  which says in 2014, 67.1 percent of the
20  revenue was generated by the sale of
21  copyrighted publications. For NFPA, that
22  information is shown in paragraph 18. And
23  for ASHRAE, that information is shown in
24  paragraph 22.
25    Q.    All three of those references

1  are to copyrighted publications, correct?
2    A.    With the exception of number 3,
3  which refers to copyrighted publications and
4  memberships.
5    Q.    Okay. So my question wasn't
6  about copyrighted publications. My question
7  is, what percentage do you understand of
8  plaintiffs' revenues comes from the sale of
9  standards at issue in this case?
10    A.    Thank you for that reminder of
11  what the question is.
12       I don't think I know that
13  precise percentage.
14    Q.    What percentage of plaintiffs'
15  revenues, to your knowledge, comes from the
16  sale of standards incorporated into law?
17    A.    I don't know that number.
18    Q.    What percentage of plaintiffs'
19  revenues, to your understanding, comes from
20  the sale of all standards?
21    A.    I'm sorry. I thought you asked
22  that question. I thought the immediate one
23  before that was standards.
24    Q.    No. It was standards at issue
25  in this case. Then --

1    A.    The one before that.
2    Q.    -- standards incorporated into
3  law. And now it's all standards.
4    A.    Right. Thank you.
5       I don't know that number
6  either.
7    Q.    What percentage of
8  plaintiffs' -- strike that.
9       What dollar value do you
10  associate with the investments that each
11  plaintiff has made in the development of the
12  standards at issue in this case?
13    A.    I don't think I attributed a
14  dollar amount to that precise activity,
15  because I don't know that amount.
16    Q.    What percentage of plaintiffs'
17  operating expenses do you associate with the
18  plaintiffs' development of the standards at
19  issue in this case?
20    A.    I don't think I know that
21  number.
22    Q.    What percentage of plaintiffs'
23  operating expenses do you associate with the
24  plaintiffs' development of standards
25  incorporated into law?

48 (Pages 186 - 189)

1      A.    I don't think I know that
2  number.
3      Q.    What percentage of plaintiffs'
4  operating expenses do you associate with the
5  plaintiffs' development of standards
6  generally?
7      A.    I don't think I know that
8  number.
9      Q.    Do you have any estimates of
10 any of those numbers that you just said you
11 don't think you know?
12         MR. FEE:  Objection to form.
13         THE WITNESS:  Not sitting here
14      right now.
15 BY MR. BRIDGES:
16     Q.    Did you at one point ever
17 determine those numbers?
18     A.    Not that I recall.
19     Q.    Do you know what percentage of
20 the staff or employees of each plaintiff has
21 worked on the development of standards at
22 issue in this case?
23         MR. FEE:  Objection to form.
24         THE WITNESS:  I don't think I
25      know that number.

Page 190

1  BY MR. BRIDGES:
2      Q.    Do you know what percentage --
3  do you have an estimate?
4      A.    No.
5          MR. FEE:  Objection to form.
6          THE WITNESS:  Not as I sit
7      here, no.
8  BY MR. BRIDGES:
9      Q.    Do you know what percentage of
10 the staff or employees of each plaintiff has
11 worked on the development of standards
12 incorporated into law?
13         MR. FEE:  Objection to form.
14         THE WITNESS:  Not as I sit here
15      right now.
16 BY MR. BRIDGES:
17     Q.    Do you have an estimate?
18     A.    Not as I sit here right now.
19     Q.    Do you know what percentage of
20 the staff or employees of each plaintiff has
21 worked on the development of standards in
22 general?
23     A.    Not as I sit here right now.
24     Q.    Do you have an estimate?
25     A.    Not as I sit here right now.

Page 191

1      Q.    Have you ever had access to any
2  information that I've asked in the last
3  several questions?
4          MR. FEE:  Objection to form.
5          THE WITNESS:  I don't believe
6      so.
7  BY MR. BRIDGES:
8      Q.    Do you know whether plaintiffs
9  prepare standards through joint sponsorship
10 with any other organizations?
11         MR. FEE:  Objection.  Vague.
12         THE WITNESS:  I think I may
13      have seen a reference to that.  I
14      don't know the extent to which it
15      occurs, but I wouldn't be surprised to
16      be reminded that it does occur.
17 BY MR. BRIDGES:
18     Q.    Are you aware of any, as you
19 sit here?
20     A.    Not as I sit here right now,
21 but I think I'm aware that it has occurred.
22     Q.    Do you know whether plaintiffs
23 receive grants, revenue, or stipends from
24 governments that use, reference, or adopt
25 their standards?

Page 192

1          MR. FEE:  Objection to form.
2          THE WITNESS:  There are grant
3      monies that go to NFPA.  I don't know
4      the source of those grants.  I don't
5      see a line for grant revenues for the
6      other two organizations.
7  BY MR. BRIDGES:
8      Q.    Did you ask any of the
9  plaintiffs about the revenues or expenses
10 they have specifically attributable to the
11 standards that defendant has posted to the
12 Internet?
13         MR. FEE:  Objection to form.
14         THE WITNESS:  We generally
15      talked about that topic with each
16      plaintiff, and I don't think the
17      plaintiffs know that amount.  They
18      undertake activities that are
19      standards oriented.  They don't know
20      which of those standards will be
21      incorporated by reference.
22 BY MR. BRIDGES:
23     Q.    Did you --
24     A.    Or which have been.  I don't
25 think they systematically track those.

Page 193

49 (Pages 190 - 193)

1     documents, but they provided them as
2     part of the discovery process.
3  BY MR. BRIDGES:
4     Q.    Did you ask them for any
5  documents that they had not provided?
6     A.    I think we generally described
7  the kinds of information that we find useful
8  or typically find useful in matters like
9  this.
10    Q.    After you received documents
11 from plaintiffs' counsel, did you ask them
12 for any more?
13    A.    That -- that's possible.  I
14 don't recall that.
15    Q.    You don't recall.  Did you --
16 do you have any understanding as to the
17 dollar value of staff time and expenses that
18 the plaintiffs have incurred in promoting
19 incorporation of their standards into law?
20       MR. FEE:  Objection to form.
21    Lack of foundation.
22       THE WITNESS:  I don't think I
23    have that number, no.
24 BY MR. BRIDGES:
25    Q.    Do you have an estimate?

Page 198

1       MR. FEE:  Same objections.
2       THE WITNESS:  Not as I sit here
3    now, no.
4  BY MR. BRIDGES:
5     Q.    Did you discuss that issue with
6  anyone representing the plaintiffs?
7       MR. FEE:  Same objections.
8       THE WITNESS:  It's possible,
9    but I don't recall having that
10    discussion.
11 BY MR. BRIDGES:
12    Q.    In paragraph 57 of your report,
13 you refer to "thousands of private-sector
14 standards."  Was your sole support for the
15 statement in paragraph 57 the Bremer article
16 you cited in footnote 88?
17    A.    No.  You see I discuss and
18 provide support for that in subsequent
19 paragraphs in that section.
20    Q.    And that includes in
21 paragraph 58?
22    A.    Yes.
23    Q.    And did you review the
24 Standards Incorporated by Reference Database
25 that you refer to in paragraph 58?

Page 199

1     A.    I looked at some parts of it.
2  I don't recall that I looked at all aspects
3  of the database.
4     Q.    Did you verify how many
5  standards were incorporated by reference
6  according to that database?
7     A.    No, I did not.
8     Q.    What do you mean by, "This
9  database reports nearly 13,000 instances of
10 incorporation by reference"?
11    A.    I don't know what you're asking
12 me to define.
13    Q.    I'm not asking you to define
14 anything.  I'm asking you to explain what you
15 meant by that clause, "This database
16 reports" --
17    A.    I'm sorry.  I'm just -- I'm
18 going to be just rearranging words a little
19 bit.  There were 13,000 times that there was
20 incorporation by reference of a standard.
21    I -- I don't -- I'm sorry.  I
22 don't understand what your confusion is.
23    Q.    I'm not confused.  I'm just
24 asking you questions.  Okay?  So please don't
25 understand -- please don't assume that I'm

Page 200

1  confused.  I'm trying to understand what you
2  meant by that.
3       You mean separate instances?
4  You mean separate laws?  What do you mean?
5     A.    Yes.  Separate instances slash
6  separate laws.
7     Q.    What did you count as an
8  instance?
9     A.    Mention in a particular law of
10 a standard.
11    Q.    Did you or anybody working with
12 you attempt to determine the number of
13 standards that those 13,000 instances of
14 incorporation by reference referred to?
15    A.    Not entirely.  But if you read
16 on that -- in that same section, it talks
17 about the number of ASTM standards, the
18 numbers of -- the number of NFPA standards,
19 and the number of ASHRAE standards.
20    Q.    Well, please tell me where it
21 refers to the number of standards.
22    A.    It says, "Including more than
23 2,400 instances involving ASTM standards."
24    So you're right.  It doesn't
25 have the number of standards.  It just has

Page 201

51 (Pages 198 - 201)

1  mentions of standard.  You're absolutely
2  right.
3       Q.    And the same thing is true of
4  the NFPA standards and ASHRAE standards?
5       A.    You're absolutely right, yes.
6       Q.    Do you know how many standards
7  that database shows as having been
8  incorporated by reference?
9       A.    Not sitting here right now.
10 One could perhaps look at what I cited to
11 answer that question, but I don't know right
12 now.
13      Q.    Do you know whether anyone
14 working for you ever did that work to make
15 that determination?
16      A.    I don't recall that being done.
17      Q.    Paragraph 59, you say, "At the
18 state level, privately-developed standards
19 are incorporated by reference as part of the
20 exercise of a range of governmental
21 functions."
22           Do you see that?
23      A.    Yes.
24      Q.    What do you mean by
25 "governmental functions" in that statement?

Page 202

1       A.    Things that government agencies
2  do.
3       Q.    And you give a couple of
4  examples, but speaking broadly, what are
5  governmental functions that involve
6  incorporation by reference of privately
7  developed standards at the state level?
8           MR. FEE:  Objection to form.
9           THE WITNESS:  I can only answer
10          generally.  Health and human services,
11          things that are related to that,
12          safety, driving rules and regulation.
13          Those are among the things that come
14          to mind.
15 BY MR. BRIDGES:
16      Q.    What are the governmental
17 functions related to health and human
18 services that you have in mind?
19      A.    I don't have any particular
20 ones in mind.
21      Q.    What are the governmental
22 functions relating to safety that you have in
23 mind?
24      A.    I don't have any particular
25 ones in mind.

Page 203

1       Q.    What are the governmental
2  functions with respect to driving that you
3  have in mind?
4       A.    I don't have any particular
5  ones in mind.
6       Q.    In paragraph 59, you say, "At
7  least 44 states and territories have adopted
8  ASHRAE 90.1 as part of the commercial
9  building energy code."
10          Do you see that?
11      A.    Yes, I do.
12      Q.    And that also has footnote 95
13 associated with that as well, correct?
14      A.    Yes, that's correct.
15      Q.    How do you explain the fact
16 that that reference in footnote 95 shows that
17 those 44 states, in fact, adopted the
18 International Energy Conservation Code that
19 merely has a reference to an option to use
20 ASHRAE 90.1?
21          MR. FEE:  Objection.  Lack of
22          foundation.
23          THE WITNESS:  I don't have any
24          explanation for that.
25 BY MR. BRIDGES:

Page 204

1       Q.    Did you verify that?
2       A.    I did not, no.
3       Q.    Who did?
4       A.    I'm sorry.  Who verified what?
5       Q.    On what -- on what did you rely
6  to make that statement with that footnote?
7       A.    I may not understand your
8  question.  I relied on what's identified in
9  footnote 95.
10      Q.    But you didn't review foot --
11 what's in footnote 95, right?
12          MR. FEE:  Objection.  Lack of
13          foundation.
14          THE WITNESS:  I did.
15 BY MR. BRIDGES:
16      Q.    You -- you reviewed that Web
17 site?
18      A.    Yes.
19      Q.    Personally?
20      A.    Yes, I believe so.
21      Q.    Do you have an explanation as
22 to why the resource cited in footnote 95
23 actually shows that the 44 states adopted the
24 International Energy Conservation Code?
25          MR. FEE:  Objection.  Lack of

Page 205

52 (Pages 202 - 205)

1     Q.    What other benefits do
2 plaintiffs gain from incorporation by
3 reference of their standards?
4     A.    I think that generally covers
5 it. I may be forgetting things that are laid
6 out in my report, but that's what covers it,
7 to the best of my memory right now.
8          Are we at a good point for a
9 break?
10    Q.    If you want. Sure.
11    A.    Thanks.
12         THE VIDEOGRAPHER: Off the
13    record at 3:12. This is the end of
14    media unit number 2.
15              * * *
16         (Recess from 3:12 p.m. to
17    3:41 p.m.)
18              * * *
19         THE VIDEOGRAPHER: On the
20    record at 3:41. This is the beginning
21    of media unit number 3 in the
22    deposition of John Jarosz.
23              * * *
24         (Jarosz Exhibit 5 marked for
25    identification.)

Page 210

1              * * *
2 BY MR. BRIDGES:
3     Q.    Mr. Jarosz, I've handed you
4 Exhibit 5. This is an article that you cited
5 in your report, correct?
6     A.    Yes, I believe so.
7     Q.    Do you recall how this article
8 came to your attention?
9     A.    I do not.
10    Q.    Is this an article that you
11 understand to have been published by
12 plaintiff ASHRAE in its journal?
13    A.    Yes, that's my understanding.
14    Q.    And this is an article you
15 relied upon with respect to the development
16 of standard 90, which became standard 90.1,
17 correct?
18    A.    Yes.
19    Q.    In paragraph 133 of your
20 report, you talk about a number of
21 downloads -- strike that -- you talk about a
22 number of documents accessed through Public
23 Resource's Web site. Do you see that?
24    A.    I talk about the number of ASTM
25 documents that are -- that were accessed over

Page 211

1 a particular period.
2     Q.    And then you do the same for
3 NFPA documents, correct?
4     A.    Yes.
5     Q.    What do you calculate as the
6 dollar value of harm to the -- to ASTM from
7 the accesses and downloads that you refer to
8 in paragraph 133?
9     A.    I haven't calculated that harm.
10    Q.    Why not?
11    A.    I'm not sure if I can at this
12 stage. One estimate would be those number of
13 downloads times the -- well, actually, no,
14 let me take that back. I just don't know how
15 to do it.
16    Q.    Can you be certain that these
17 accesses or down -- and downloads referred to
18 in paragraph 133, in fact, resulted in
19 economic loss to ASTM?
20         MR. FEE: Objection to form.
21         THE WITNESS: Not with absolute
22    certainty, but with reasonable
23    certainty I can say some -- in some
24    number of these instances, it's likely
25    the case that the -- that the

Page 212

1         information would have been obtained
2         from ASHRAE in -- or ASTM, rather,
3         in -- through legal means.
4 BY MR. BRIDGES:
5     Q.    Would that -- in those
6 instances where you say that the information
7 would have been obtained from ASTM through
8 legal means, can you put a dollar value on --
9 or even an estimate of the increased revenue
10 that ASTM would have gotten from those
11 instances where people obtained the
12 information from ASHRAE -- sorry -- from
13 AST --
14         MR. FEE: Object --
15 BY MR. BRIDGES:
16    Q.    -- from ASTM?
17         MR. FEE: Objection to form.
18         THE WITNESS: No, not based on
19    the information I have. I don't think
20    I have any indication of who was doing
21    the downloading and why.
22 BY MR. BRIDGES:
23    Q.    And do you know what
24 alternatives persons who were doing the
25 downloading may have had for obtaining the

Page 213

54 (Pages 210 - 213)

1  information?
2      A.    Not with certainty, because I
3  don't know who those persons were, but I
4  would expect one alternative would be to
5  obtain it properly, directly from ASTM.
6      Q.    Would that have resulted in
7  more revenue to ASTM?
8      A.    It may have.  If they're
9  materials that were taken improperly that
10  would have been paid for, then that would
11  represent a loss of revenue to ASTM.
12      Q.    Do you know whether any of the
13  persons who obtained this information from
14  defendant would have paid for the information
15  from ASTM?
16      A.    No, not with certainty, because
17  I don't know the identity of the downloaders
18  or the reasons for their downloading.
19      Q.    Moreover, those persons might
20  have accessed the standards from ASTM's
21  reading room for free and with no revenue to
22  ASTM, correct?
23      A.    You mean in a but-for world?
24  Had they not done what they actually did,
25  alternatively they could have gone to the

Page 214

1  free reading room?
2      Q.    Right.
3      A.    That's a possibility, yes.
4      Q.    Do you have an understanding as
5  to why persons would want to download a file
6  of a standard instead of viewing it at one of
7  the plaintiffs' reading rooms?
8      A.    Not with absolute certainty,
9  but I would imagine downloading would allow
10  more flexibility in referring to the standard
11  and using it and sharing that information
12  with others, whereas reading it in -- through
13  an Internet site is somewhat less flexible,
14  provides less flexibility for the use of that
15  information.
16      Q.    What did -- what do you
17  understand to be the difference in
18  flexibility between possession of a download
19  and access to a standard through a reading
20  room?
21      A.    Well, I think that a download
22  typically has a document that's in hard-copy
23  form.  Copies can made -- be made of that and
24  distributed.  Reading things just online and
25  doesn't allow for the wide distribution and

Page 215

1  more extended use of that document.
2      Q.    Do you have any evidence about
3  wide distribution of plaintiffs' standards as
4  a consequence of defendant's actions?
5      A.    I do not.
6      Q.    Have you reviewed any studies
7  that would allow you to establish any
8  connection between the number of accesses or
9  downloads that Public Resource made possible
10  and any financial harms to the plaintiffs?
11          MR. FEE:  Objection to form.
12          THE WITNESS:  I don't think
13      I've seen any study on that, no.
14  BY MR. BRIDGES:
15      Q.    Have you conducted any studies
16  that would have allowed you to establish any
17  connection between the number of accesses or
18  downloads that Public Resource made possible
19  and any financial harms to the plaintiffs?
20          MR. FEE:  Objection to form.
21          THE WITNESS:  Not other than
22      what's contained in my report.
23  BY MR. BRIDGES:
24      Q.    Please turn to page 45,
25  paragraph 107, which spills into page 108.

Page 216

1          MR. FEE:  Page 108?
2          THE WITNESS:  I'm sorry.
3      Page 108 or paragraph?
4  BY MR. BRIDGES:
5      Q.    I'm sorry.  Paragraph -- strike
6  that.
7          Let me ask you to turn
8  paragraph 107 on pages 45 to 46.
9      A.    Okay.  I'm there.
10      Q.    I just want to make sure I
11  understand your language correctly at the
12  bottom of page 45 and the top of page 46.
13          Is it your opinion that the
14  copyright that the plaintiffs assert in their
15  standards drives sales of other publications
16  other than the standards themselves?
17          MR. FEE:  Objection.  Form.
18      Vague.
19          THE WITNESS:  I think they're
20      important for driving sales of
21      publications that embody those
22      standards.  I don't know that I've
23      drawn a conclusion that it drives the
24      sale of other products, but that makes
25      some sense.

Page 217

55 (Pages 214 - 217)

BY MR. BRIDGES:
1   Q.    Well, doesn't that sentence at
2   the bottom of 45 and going on to 46 say that
3   copyright on plaintiffs' standards drive
4   sales of "handbooks that provide commentary
5   on the standards by referring to them"?
6   A.    You haven't read --
7         MR. FEE:  Objection.
8   Mischaracterizes the document.
9         THE WITNESS:  You haven't read
10        the whole sentence.  I see that
11        sentence to which you refer.
12  BY MR. BRIDGES:
13  Q.    Right.  I know I haven't read
14  the whole sentence, but didn't I fairly
15  capture one part of it, which is the sales
16  of -- strike that -- that copyright on
17  plaintiffs' standards drives sales of, among
18  other things, "handbooks that provide
19  commentary on standards by referring to
20  them"?
21        MR. FEE:  Same objection.
22        THE WITNESS:  I think you have
23        generally paraphrased it accurately,
24        yes.

Page 218

BY MR. BRIDGES:
1   Q.    And that plaintiffs' copyright
2   protection -- this is the top of -- strike
3   that.
4         And turning to the top of
5   page 46, plaintiffs' copyright protection on
6   their standards provides plaintiff with a
7   competitive advantage with respect to what
8   you call value-added publications, correct?
9   A.    You've read part of a sentence,
10  but I do see that sentence, yes.
11  Q.    And I've fairly paraphrased it
12  correctly, correct?
13        MR. FEE:  Objection to form.
14        THE WITNESS:  I think,
15        generally, yes.
16  BY MR. BRIDGES:
17  Q.    Do plaintiffs, to your
18  understanding, have separate copyrights in
19  those value-added publications, such as
20  commentaries and handbooks?
21  A.    I don't know.
22  Q.    You don't know?
23  A.    Correct.  I do not know.
24  Q.    Is it important to you to know

Page 219

1   whether plaintiffs have copyright in --
2   rights in their value-added publications?
3         MR. FEE:  Objection.  Vague.
4         THE WITNESS:  I would be
5         curious to know that, but I'm not sure
6         of the significance.  I don't think it
7         would change my conclusions, but I
8         would be curious to know that.
9   BY MR. BRIDGES:
10  Q.    Do you know whether
11  incorporation into law drives -- strike that.
12        Do you know whether
13  incorporation into law of plaintiffs'
14  standards drives sales of plaintiffs'
15  standards?
16        MR. FEE:  Objection to form.
17        Vague.
18        THE WITNESS:  I don't know with
19        absolute certainty, but it would make
20        some sense to me.
21  BY MR. BRIDGES:
22  Q.    Is it your understanding that
23  it does?
24        MR. FEE:  Same objection.
25        THE WITNESS:  It would make

Page 220

1   some sense to me, yes.
2   BY MR. BRIDGES:
3   Q.    Are you aware that, in some
4   instances, at least one plaintiff uses the
5   legal status of its code to promote the sale
6   of handbooks?
7         MR. FEE:  Objection to form.
8         THE WITNESS:  I don't know one
9         way or the other.  I don't have reason
10        to dispute it, but there's not a
11        particular instance that comes to mind
12        right now.  Maybe you have something
13        to refresh my memory.
14  BY MR. BRIDGES:
15  Q.    Can you provide a dollar value
16  benefit that plaintiffs receive economically
17  from the incorporation of their standards by
18  reference?
19        MR. FEE:  Objection.  Vague.
20        Form.
21        THE WITNESS:  I want to make
22        sure that I'm understanding.  Could
23        you read that back, please?
24  BY MR. BRIDGES:
25  Q.    I'll restate it.

Page 221

56 (Pages 218 - 221)

1          Can you provide a -- can you
2    put a dollar value, even an estimate, on the
3    economic benefit that plaintiffs receive from
4    incorporation of their standards into law?
5          MR. FEE:  Objection to form.
6          THE WITNESS:  I have not.  And
7    I'm not sure how one would do that,
8          subject to thinking more about it.
9    BY MR. BRIDGES:
10        Q.    At the top of page 46, you say,
11   "The Plaintiffs' copyright protection on
12   their privately-developed standards provides
13   a competitive advantage with regard to the
14   sale of these value-added publications as the
15   copyright protection limits the ability of
16   others to sell those publications unless they
17   are unwilling [sic] to compensate the
18   Plaintiffs for such use."
19        MR. FEE:  Objection.
20        Mischaracterizes the statement.
21   BY MR. BRIDGES:
22        Q.    Is there something unfair about
23   my characterization of that statement?
24        A.    I think you read it wrong.  You
25   read "willing" to read "unwilling" for some

Page 222

1    reason.
2         Q.    Oh, I'm sorry.  Thank you.
3    I'll restate the sentence.
4          "In particular, the Plaintiffs'
5    copyright protection on their
6    privately-developed standards provides a
7    competitive advantage with regard to the sale
8    of these value-added publications as the
9    copyright protection limits the ability of
10   others to sell those publications unless they
11   are willing to compensate the Plaintiffs for
12   such use."
13        Do you see that statement?
14        A.    I do, yes.
15        Q.    And the competitive advantage
16   you've identified there, whom do you
17   understand to be the competition?
18        A.    Other potential providers of
19   these so-called value-added publications.
20        Q.    And what -- when you say
21   "value-added publications," please give me
22   more examples of what types of things fall
23   into that category, as you use the term.
24        A.    Examples would be handbooks
25   that provide commentary on the standards.

Page 223

1         Q.    What else?
2         A.    That's what comes to mind.
3         Q.    Anything else?
4         A.    Not this moment, no.  I guess,
5    potentially, when I think some more about it,
6    training and seminars, for instance.
7         Q.    Providers of training and
8    seminars?
9         A.    Yes.  So that's broader than
10   value-added publications, but there are
11   potentially alternative providers of training
12   and seminars.
13        Q.    In paragraph 109, you say, "In
14   addition to direct sales of copyrighted
15   materials, the Plaintiffs' materials
16   associated with their privately-developed
17   standards provide a competitive advantage
18   with regard to the sale of downstream
19   ancillary/complementary services and
20   products."
21        Do you see that?
22        A.    Yes.  That's what I had in
23   mind.
24        Q.    And who are the competitors you
25   have in mind in paragraph 109?

Page 224

1         A.    I don't know particular names,
2    but -- at least I don't recall any sitting
3    right now -- sitting here right now, but I
4    think there are other providers of these
5    downstream services and products.
6         Q.    And please give me examples of
7    what you're calling "downstream services and
8    products."
9         A.    Again, seminars and training,
10   for instance.
11        Q.    Anything else?
12        A.    That's what comes to mind right
13   now.
14        Q.    Turning to paragraph 110, you
15   state, "I understand that the ability to
16   control these downstream products and
17   services is particularly important to the
18   Plaintiffs here because the barriers to entry
19   in the marketplace for downstream products,
20   such as training and user manuals, are
21   relatively low.  For example, according to
22   Mr. Comstock of ASHRAE, it is relatively easy
23   for unauthorized instructors to read a
24   standard and become (or think that they have
25   become) qualified to provide training or

Page 225

57 (Pages 222 - 225)

1  guidance on that standard."
2         Do you see that?
3     A.   I do, yes.
4     Q.   What do you understand -- what
5  did you mean by "unauthorized instructors"?
6     A.   People that have provided or
7  trying to provide services to the marketplace
8  that have not been explicitly approved by,
9  for instance, ASHRAE.
10    Q.   What do you understand the --
11 the nature of -- strike that.
12        You called them "instructors,"
13 correct?
14    A.   Yes.
15    Q.   Does that mean that you
16 envision that these persons are providing
17 some kind of instruction?
18    A.   Yes.
19    Q.   What instruction do you
20 understand -- what instruction did you have
21 in mind when you referred to "unauthorized
22 instructors"?
23    A.   Generally, how best to
24 implement standards or provisions of certain
25 standards.

Page 226

1     Q.   What else?
2     A.   Nothing else comes to mind
3  right now.
4     Q.   Would your understanding of
5  "unauthorized instructors" include persons
6  who were instructing the public as to what
7  the standards require?
8         MR. FEE:  Objection to form.
9     Vague.
10        THE WITNESS:  I didn't have
11    that in mind.  I guess that's a
12    possibility.
13 BY MR. BRIDGES:
14    Q.   And would it be relatively easy
15 for unauthorized persons like that to read a
16 standard and think that they have become
17 qualified to provide training or guidance on
18 that standard?
19        MR. FEE:  Objection.  Vague.
20 BY MR. BRIDGES:
21    Q.   Is that your understanding?
22    A.   According to Mr. Comstock, I
23 believe that's correct.
24    Q.   What do you believe?
25    A.   I have no reason to doubt him.

Page 227

1     Q.   You're just parroting what
2  Mr. Comstock said, or did you have an
3  independent view?
4     A.   No, I heard what he said, and
5  it made sense to me.
6     Q.   So you put it in your report?
7     A.   Yes.
8     Q.   What independent thought or
9  investigation did you do before you put that
10 in your report?
11        MR. FEE:  Objection.  Vague.
12    Compound.
13        THE WITNESS:  I can't point to
14    anything in particular.
15 BY MR. BRIDGES:
16    Q.   Would a law-school course on
17 the law and regulation of building
18 construction provide instruction to law
19 students?
20        MR. FEE:  Objection.  Vague.
21    Calls for speculation.
22        THE WITNESS:  I guess it could.
23    I have a hard time imagining there
24    would be much demand for such a
25    course, but I'm in general agreement

Page 228

1     that that, in concept, could occur.
2  BY MR. BRIDGES:
3     Q.   Would it be possible to
4  envision that, in the course of such
5  teaching, a teacher may wish to analyze some
6  of plaintiffs' standards that have been
7  incorporated into law as law and as
8  regulation?
9         MR. FEE:  Objection.  Calls for
10    speculation.  Vague.  Form.
11        THE WITNESS:  I guess that's
12    possible, but I would expect a law
13    professor would be talking about legal
14    implications, not the technical
15    aspects of a standard.  I think they
16    might talk about the implication in a
17    business that's different from a
18    vendor business.
19 BY MR. BRIDGES:
20    Q.   Well, what about the legal
21 implications of a code for contractors?
22        MR. FEE:  Objection.
23 BY MR. BRIDGES:
24    Q.   Is that -- is that fair ground
25 for a law professor to discuss with law

Page 229

58 (Pages 226 - 229)

1    Q.    You can't point to any
2 particular investigation or fact that you're
3 relying on in paragraphs 117 to 119?
4         MR. FEE:  Objection to form.
5         Asked and answered.
6              THE WITNESS:  Everything that's
7         embedded in Exhibit 1 is, in part, a
8         basis for the observations that I draw
9         in those paragraphs.
10 BY MR. BRIDGES:
11    Q.    What probability do you assign
12 to your prediction in the first sentence of
13 paragraph 119?
14         MR. FEE:  Objection.  Form.
15         Lack of foundation.
16              THE WITNESS:  I'm not sure that
17         I've used the term "prediction," but I
18         wouldn't assign a particular
19         quantitative probability.
20 BY MR. BRIDGES:
21    Q.    Can you give an estimate?
22    A.    No.
23    Q.    Why not?
24    A.    I don't have a basis for that
25 estimate.  I have reasoning underlying it,

Page 234

1    Q.    What probability do you assign
2 to the likelihood that you refer to in the
3 first sentence of paragraph 121?
4         MR. FEE:  Objection to form.
5         Lack of foundation.
6              THE WITNESS:  I don't have a
7         particular quantitative likelihood
8         measure.
9 BY MR. BRIDGES:
10    Q.    Can you give an estimate?
11         MR. FEE:  Same objection.
12         THE WITNESS:  No.
13 BY MR. BRIDGES:
14    Q.    Turning to paragraph 126, you
15 refer to an "option available to Plaintiffs
16 to respond to the loss of protection for
17 incorporated standards."
18         Is it your belief that, if the
19 plaintiffs lose this case, they will shut
20 down their creation of new standards?
21    A.    I think that's a possibility.
22    Q.    What probability do you assign
23 to that?
24         MR. FEE:  Objection to form.
25         Lack of foundation.

Page 236

1 but I don't have a basis to provide a
2 quantitative estimate of my level of
3 confidence.
4    Q.    You refer to "uncertainties" in
5 the second sentence of paragraph 119,
6 correct?
7    A.    I do, yes.
8    Q.    What probability do you assign
9 to the likelihood that you refer to with the
10 word "likely" in the first sentence of
11 paragraph 120?
12         MR. FEE:  Objection.  Form.
13         Lack of foundation.
14              THE WITNESS:  I don't have a
15         particular quantitative measure of
16         that.  And are you referring to my use
17         of the term "likely"?
18 BY MR. BRIDGES:
19    Q.    Yes.
20    A.    Yes, I don't have a particular
21 quantification of that.
22    Q.    What particular facts are you
23 relying on for that paragraph?
24    A.    Everything that you see
25 reported in Exhibit 1.

Page 235

1              THE WITNESS:  I don't have a
2         particular quantitative measure of
3         probability for that.
4 BY MR. BRIDGES:
5    Q.    What's your best estimate?
6         MR. FEE:  Same objection.
7         THE WITNESS:  I don't have a
8         quantitative best estimate.
9 BY MR. BRIDGES:
10    Q.    Is it more or less than
11 50 percent?
12         MR. FEE:  Same objections.
13         THE WITNESS:  I still don't
14         have a quantitative estimate.
15 BY MR. BRIDGES:
16    Q.    Is it more or less than
17 80 percent?
18         MR. FEE:  Same objections.
19         THE WITNESS:  Still don't have
20         a quantitative estimate.
21 BY MR. BRIDGES:
22    Q.    Is it more or less than
23 5 percent?
24         MR. FEE:  Same objections.
25         THE WITNESS:  Still don't have

Page 237

60 (Pages 234 - 237)

1    a quantitative estimate.  I think that
2    there -- with reasonable probability I
3    can draw this conclusion, but I can't
4    be any more precise than that.
5  BY MR. BRIDGES:
6    Q.    What do you mean, "with
7  reasonable probability"?
8    A.    Based on the information that I
9  have and the training and logic I bring to
10 it, I think there is a -- I say with some
11 confidence what I have said here.
12   Q.    And when you say "likely," do
13 you mean more than 50 percent likely?
14   A.    Not necessarily, no.
15   Q.    Are you aware of other
16 standards development organizations active in
17 the same field as the plaintiffs?
18       MR. FEE:  Objection.  Vague.
19   Form.
20       THE WITNESS:  Perhaps you could
21   tell me what you have in mind with
22   your use of the term "fields."
23 BY MR. BRIDGES:
24   Q.    Well, are you familiar with
25 AHRI?

Page 238

1    A.    I have perhaps seen reference
2  to that.
3    Q.    Do you know with which of these
4  plaintiffs it -- do you -- do you know what
5  field it's in?
6    A.    I don't recall, sitting here
7  right now, no.
8    Q.    Are you familiar with NFRC?
9    A.    I may have seen reference to
10 that acronym.
11   Q.    Do you know what field it's in?
12   A.    Not sitting here right now.
13   Q.    Are you familiar with ICC?
14   A.    I have seen reference to that.
15 I don't recall what it is, sitting here now.
16   Q.    Do you know whether other
17 standards developments organizations would be
18 in a position to step forward and to continue
19 the maintenance and preservation and further
20 development of the standards of plaintiffs
21 here if plaintiffs lose this case?
22       MR. FEE:  Objection to form.
23       THE WITNESS:  I don't know.
24 BY MR. BRIDGES:
25   Q.    Have you done any investigation

Page 239

1  to see what alternatives there are among
2  standards development organizations currently
3  in existence to carry forward the work of
4  plaintiffs if plaintiffs chose to stop
5  standards development as a result of the loss
6  of this case?
7        MR. FEE:  Same objection.
8        THE WITNESS:  Not that I
9    recall, but I am of the understanding
10   that each SDO has a different charter,
11   so I don't know that any SDO has an
12   identical charter to that of any of
13   the three plaintiffs.
14 BY MR. BRIDGES:
15   Q.    Are you aware that these
16 plaintiffs compete with other SDOs in the
17 creation of standards in particular fields?
18       MR. FEE:  Objection to form.
19   Vague.
20       THE WITNESS:  What do you mean
21   by the term "compete with" in this
22   context?
23 BY MR. BRIDGES:
24   Q.    That they consider others
25 rivals for the same market, in part.

Page 240

1        MR. FEE:  Objection to form.
2    Vague.
3        THE WITNESS:  I don't recall
4    seeing reference to that, but my
5    memory is not perfect.
6  BY MR. BRIDGES:
7    Q.    The -- in paragraph 131, you
8  say, "Simply put, freely-distributed,
9  unrestricted versions of Plaintiffs'
10 standards that are or could be incorporated
11 by reference can be expected to adversely
12 impact the market for Plaintiffs' standards
13 that are incorporated by reference and to
14 displace sales of these standards by the
15 Plaintiffs - which can be expected to have a
16 material adverse effect on Plaintiffs'
17 revenues."
18       Do you see that?
19   A.    Yes.
20   Q.    By "expected," do you mean more
21 than 50 percent likely?
22   A.    Not necessarily.  I don't have
23 a quantitative assessment of what I mean by
24 "expected."
25   Q.    Do you mean more than 5 percent

Page 241

61 (Pages 238 - 241)

1 new in terms of a theory.
2      Q.   Do you have the same answer
3 with respect to -- strike that.
4           What facts do you have --
5 strike that.
6           What facts are you aware of to
7 disprove -- to disprove Mr. Malamud's theory
8 that you refer to in paragraph 144?
9      A.   Again, it's the same theory
10 that's being referenced, but there's
11 additional facts; and that is, the downstream
12 products and services aren't particularly
13 substantial to these plaintiffs and don't
14 appear to be enhanced by a lack of copyright
15 protection; that is, the plaintiffs have had
16 copyright protection and have said -- had
17 some downstream products and services.  It's
18 hard to imagine that elimination of that
19 copyright protection will enhance that
20 business.
21      Q.   It's hard to imagine, but are
22 you aware of any studies to disprove
23 Mr. Malamud's theory?
24      A.   No.
25           MR. FEE:  Objection.  Vague.

Page 246

1           THE WITNESS:  I'm sorry.
2 BY MR. BRIDGES:
3      Q.   Have you conducted any studies
4 to disprove Mr. Malamud's theory?
5           MR. FEE:  Same objection.
6           THE WITNESS:  Not other than
7      what's reflected here in Exhibit 1.
8 BY MR. BRIDGES:
9      Q.   What academic literature have
10 you relied upon to criticize Mr. Malamud's
11 theory in paragraph 144?
12      A.   Nothing specific comes to mind.
13      Q.   In paragraph 145, you state
14 that, "Mr. Malamud's suggestion that the sale
15 of downstream products and services
16 represents an untapped and undeveloped
17 opportunity for the Plaintiffs is incorrect."
18           Do you see that?
19      A.   Yes, I do.
20      Q.   And then you go on and make
21 some statements for the rest of the
22 paragraph, correct?
23      A.   Yes.
24      Q.   What studies did you engage in
25 to determine the facts that you stated in the

Page 247

1 rest of that paragraph?
2           MR. FEE:  Objection.  Vague.
3           THE WITNESS:  I looked at the
4      financial information, and I talked to
5      people at the various plaintiffs.
6 BY MR. BRIDGES:
7      Q.   You talked to people at the
8 various plaintiffs?
9      A.   Yes.
10      Q.   What did you do to verify the
11 truth and accuracy of the things that various
12 plaintiffs said to you in their
13 conversations?
14           MR. FEE:  Objection to form.
15           THE WITNESS:  I looked at the
16      financial information, and I kept my
17      eyes and mind open to the information
18      in the rest of the record to determine
19      if it conflicted with what I learned
20      from the company personnel.
21 BY MR. BRIDGES:
22      Q.   Whose financial information did
23 you look at?
24      A.   All three of the plaintiffs.
25 It's summarized in tabs 3, 4, and 5.

Page 248

1      Q.   Did you look at the financial
2 information of any entities other than the
3 plaintiffs?
4      A.   I looked at Public Resource
5 financial information.
6      Q.   Apart from Public Resource and
7 the plaintiffs, did you look at the financial
8 information of any other entities in making
9 the assertions that you made in
10 paragraph 145?
11      A.   Not in undertaking my
12 assignment here.
13      Q.   Did you consider the business
14 models of any entities other than the
15 plaintiffs and the defendant in making the
16 statements criticizing Mr. Malamud's theory
17 in paragraph 145?
18      A.   Nothing in particular comes to
19 mind.  I understand that there are
20 front-loaded business models, but -- at DIN,
21 for instance, but I don't recall undertaking
22 an investigation of the downstream activities
23 that they have.
24      Q.   Did you undertake any
25 investigation of downstream activities of

Page 249

63 (Pages 246 - 249)

1 other US-based standards development
2 organizations that make their standards
3 freely available to the public?
4    A.    Not that I recall.
5    Q.    Would that have been relevant
6 to your analysis?
7    A.    It wasn't necessary to do my
8 analysis, but I would be curious if I had
9 that information.  If I -- if I had the
10 ability to examine that information, I would
11 be curious as to what that shows.
12    Q.    In paragraph 146, you state,
13 "The loss of publications here will likely
14 reduce the Plaintiffs' sales of those
15 downstream products and services."
16        Do you see that?
17        MR. FEE:  That's in 146?
18        THE WITNESS:  Is that the last
19    sentence you were reading from?
20 BY MR. BRIDGES:
21    Q.    Yes.
22    A.    Yeah.
23    Q.    Paragraph 146.
24    A.    Yes, I do see that.
25    Q.    Did you mean the loss of

1 copyright in the publications here?
2    A.    Certainly the loss of
3 publications, but I believe it would probably
4 be better to put the loss of copyright in the
5 publications as more reflective of the
6 assignment that I undertook here.
7    Q.    What probability do you assign
8 to the likelihood that you refer to in that
9 sentence?
10        MR. FEE:  Objection to form.
11    Lack of foundation.
12        THE WITNESS:  I haven't
13    assigned a quantitative probability to
14    that.
15 BY MR. BRIDGES:
16    Q.    Have you any estimate?
17        MR. FEE:  Same objections.
18        THE WITNESS:  I do not.
19 BY MR. BRIDGES:
20    Q.    Have you any estimate as to the
21 magnitude of the likely reduction of
22 plaintiffs' sales of downstream products and
23 services?
24        MR. FEE:  Same objections.
25        THE WITNESS:  No, I have been

1    unable to quantify that with great
2    accuracy.
3 BY MR. BRIDGES:
4    Q.    Have you considered any
5 comparable circumstances apart from this case
6 that would provide guidance for your
7 prediction in the last sentence of
8 paragraph 146?
9        MR. FEE:  Objection to form.
10    Vague.
11        THE WITNESS:  I kept my mind
12    and eyes open to that, but I didn't
13    see information of a good comparator.
14 BY MR. BRIDGES:
15    Q.    Did you research whether there
16 might be good comparators?
17    A.    I --
18        MR. FEE:  Same objection.
19        THE WITNESS:  I did in the
20    sense of reading through the
21    literature and information to see if I
22    could learn of something that would be
23    a good comparator, but I didn't learn
24    of such comparator.
25 BY MR. BRIDGES:

1    Q.    You looked only at the
2 information shown in tab 2 to Exhibit 1?
3    A.    Yes, I think that's right.
4    Q.    What economic effect are you
5 aware of to the Blu-ray Disc Association from
6 its providing unrestricted access to its
7 standard publications for free?
8    A.    I don't know.  I thought you
9 had asked that earlier.  If not, I apologize.
10 Nonetheless, I don't recall knowing the
11 answer to that question or undertaking that
12 evaluation.
13    Q.    Did Blu-ray Disc Association go
14 out of business?
15    A.    I don't think it's out of
16 business, no.
17    Q.    Has it suffered material harm,
18 to your knowledge, because of unrestricted
19 access to its standard publications for free?
20    A.    I don't know.
21    Q.    Do you believe that, on the
22 theory of revealed preference, Blu-ray Disc
23 Association has determined that unrestricted
24 access to its standard publications for free
25 is in its interest?

1    A.    Yes.  It's a different entity
2 than the SDOs here; but for its purposes, it
3 would appear that it's of the belief that
4 that's the optimal path to follow.
5          MR. BRIDGES:  I think -- I
6    think we may pause things now and
7    reserve the remainder of our time.
8          Just a second.  Oh, yes.
9 BY MR. BRIDGES:
10   Q.    Do you believe that the
11 plaintiffs are harmed when the defendant
12 posts a standard that has been incorporated
13 by reference -- let me strike that.
14         Do you believe that plaintiffs
15 suffer harm from defendant posting a standard
16 that is not the latest version of the
17 standard?
18         MR. FEE:  Objection.  Form.
19   Compound.
20         THE WITNESS:  Potentially, it
21   could cause confusion in the
22   marketplace as to what's the latest
23   standard, and there may be some
24   entities out there that are interested
25   in obtaining an earlier standard that

Page 254

1          MR. FEE:  Objection.  Lack of
2    foundation.  Vague.
3          THE WITNESS:  I'm not -- I'm
4    not sure that I understand the concept
5    of a standard being out of print, so
6    maybe you could help me with that.
7 BY MR. BRIDGES:
8    Q.    Do you know the term "out of
9 print"?
10   A.    Generally, I do, yes.
11   Q.    What do you understand it to
12 mean?
13   A.    That it's no longer provided in
14 print form.
15   Q.    All right.  So what harm do you
16 understand plaintiffs would suffer if
17 defendants posted a standard that is out of
18 print?
19         MR. FEE:  Objection to form.
20         THE WITNESS:  Potentially, it
21   could be the harm similar to outdated
22   standards.
23 BY MR. BRIDGES:
24   Q.    In other words, confusion in
25 the marketplace?

Page 256

1    would be obtaining it free rather than
2    through the legal routes established
3    by the plaintiffs.
4 BY MR. BRIDGES:
5    Q.    Have you done any studies to
6 determine what confusion may be likely in the
7 marketplace in that regard?
8          MR. FEE:  Objection to form.
9          THE WITNESS:  I have not done a
10   likelihood of confusion study, no.
11 BY MR. BRIDGES:
12   Q.    What research have you done as
13 to whether -- strike that.
14         What information do you have
15 about what market there is for earlier
16 versions of standards when there is a newer
17 version in the market?
18         MR. FEE:  Objection to form.
19         THE WITNESS:  I don't recall
20   undertaking specific research on that
21   topic.
22 BY MR. BRIDGES:
23   Q.    What harm do you understand
24 plaintiffs would suffer if defendants post a
25 standard that is out of print?

Page 255

1    A.    Potential confusion in the
2 marketplace and potentially providing -- yes,
3 that -- that would be one form of it.
4    Q.    What other harms do -- would
5 you identify from the defendants posting a
6 standard that is out of print?
7    A.    Nothing else comes to mind this
8 moment, but there could be other things
9 that -- that I'm not thinking of right now.
10   Q.    What harms do you understand
11 plaintiffs would suffer if a condition of a
12 standard being incorporated into law is that
13 plaintiffs could not forbid other entities
14 from making that law available widely and
15 freely to the public?
16         MR. FEE:  Objection to form.
17   Incomplete hypothetical.  Compound.
18   Calls for speculation.
19         THE WITNESS:  I don't know.
20   I've not undertaken that assignment.
21   I've not given that particular
22   question any thought.
23         It seems economically to be
24   quite similar to the actions that have
25   occurred here, but I don't know.  I've

Page 257

65 (Pages 254 - 257)

| | |
|---|---|
| 1   not thought about that particular | 1     C E R T I F I C A T E |
| 2   topic. | 2 |
| 3         MR. BRIDGES:  Okay.  I think | I do hereby certify that I am a Notary |
| 4   we'll pause here and reserve the rest | 3   Public in good standing, that the aforesaid |
| 5   of the time for a later visit with | testimony was taken before me, pursuant to |
| 6   you, Mr. Jarosz. | 4   notice, at the time and place indicated; that |
| 7         Kevin, this is in reliance on | said deponent was by me duly sworn to tell |
| 8   an exchange of correspondence between | 5   the truth, the whole truth, and nothing but |
| 9   Matt and you, I believe.  If, for some | the truth; that the testimony of said |
| 10   reason -- well, no.  I think that's | 6   deponent was correctly recorded in machine |
| 11   all. | shorthand by me and thereafter transcribed |
| 12         Anything else? | 7   under my supervision with computer-aided |
| 13         MR. FEE:  Well, I don't have | transcription; that the deposition is a true |
| 14   any questions. | 8   and correct record of the testimony given by |
| 15         Do you guys have any questions? | the witness; and that I am neither of counsel |
| 16         MR. REHN:  Not at this time. | 9   nor kin to any party in said action, nor |
| 17         MR. CUNNINGHAM:  No. | interested in the outcome thereof. |
| 18         MR. BRIDGES:  Great.  Thank | 10 |
| 19   you. | WITNESS my hand and official seal this |
| 20         THE WITNESS:  Thank you. | 11   11th day of September, 2015. |
| 21         THE VIDEOGRAPHER:  All right. | 12 |
| 22   Off the record at 4:31.  This ends | 13 |
| 23   media unit number 3 and ends testimony | 14 |
| 24   for August 27th, 2015. | <%signature%> |
| 25         * * * | 15   Debbie Leonard, RDR, CRR |
|             Page 258 | Notary Public |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| | 25 |
| |             Page 260 |

| |
|---|
| 1         (Witness excused.) |
| 2         * * * |
| 3         (Off the record at 4:31 p.m.) |
| 4         * * * |
| 5 |
| 6 |
| 7 |
| 8 |
| 9 |
| 10 |
| 11 |
| 12 |
| 13 |
| 14 |
| 15 |
| 16 |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |
|             Page 259 |

66 (Pages 258 - 260)