# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN SOCIETY FOR TESTING
AND MATERIALS d/b/a ASTM
INTERNATIONAL, *et al.*,

      Plaintiffs,

      v.

PUBLIC.RESOURCE.ORG, INC.,

      Defendant.

**Civil Action No. 1:13-cv-01215-TSC**

**BRIEF OF LAW SCHOLARS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT-COUNTERCLAIMANT PUBLIC.RESOURCE.ORG'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND PERMANENT INJUNCTION**

Catherine R. Gellis
Bar I.D. # CA251927
P.O. Box 2477
Sausalito, CA 94966
Telephone:  202-642-2849
Email:  cathy@cgcounsel.com

Christopher T. Bavitz
Andrew F. Sellars
Cyberlaw Clinic, Harvard Law School
Wasserstein Hall, Suite 5018
1585 Massachusetts Avenue
Cambridge, MA 02138
Telephone: (617) 384-9125
Email: cbavitz@cyber.law.harvard.edu
Email: asellars@cyber.law.harvard.edu

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................... ii

PRELIMINARY STATEMENT .................................................................................................... 1

INTERESTS OF *AMICI* ............................................................................................................... 2

ARGUMENT .................................................................................................................................. 2

I.      THE LAW BELONGS TO THE PUBLIC, AND THE TEXT OF THE LAW THUS BELONGS IN THE PUBLIC
        DOMAIN. ............................................................................................................................... 2

II.     THE PROTECTIONS AFFORDED BY FEDERAL COPYRIGHT LAW DO NOT AND CANNOT APPLY
        TO THE TEXT OF ENACTED LAWS, REGARDLESS OF WHETHER THEY ARE DERIVED FROM OR
        BASED ON MODEL CODES. ..................................................................................................... 5

        A.      Copyright law's merger doctrine provides that expressions that "merge" with facts
                and ideas are not subject to copyright protection. ............................................... 5

        B.      Enacted law serves as the clearest possible example of merger, as one cannot convey
                the substance of law without using the precise language thereof. ...................... 6

        C.      A ruling in favor of Public Resource is consistent with holdings in the major federal
                circuit court cases that have addressed previous attempts to claim copyright in laws. ...... 9

III.    MAINTAINING THE PUBLIC DOMAIN STATUS OF LAW PROTECTS THE INTEGRITY OF THE
        LAWMAKING PROCESS. ........................................................................................................ 10

IV.     THE SDOs' CLAIMED NEED TO HAVE AN INCENTIVE TO DEVELOP MODEL TECHNICAL CODES
        DOES NOT OUTWEIGH THE HAZARD OF EXTENDING COPYRIGHT TO THE LEGISLATIVE PROCESS
        AND DOES NOT REFLECT REALITY. ...................................................................................... 15

CONCLUSION ............................................................................................................................. 18

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Academic Games League of Am., Inc.*, 89 F.3d 614 (9th Cir. 1996) ................................ 6

*Atari Games Corp. v. Oman*, 888 F.2d 878 (D.C. Cir. 1989) ........................................................ 5

*Atari Games Corp. v. Oman*, 979 F.2d 242 (D.C. Cir. 1992) ........................................................ 7

*Banks v. Manchester*, 128 U.S. 244 (1888) ................................................................... 4, 14

*Building Officials & Code Adm. v. Code Technology, Inc.* (*BOCA*),
    628 F.2d 730 (1st Cir. 1980) ........................................................................... 5, 11

*CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reports, Inc.*,
    44 F.3d 61 (2d Cir. 1994) ...................................................................................... 9

*Commonwealth v. Rezendes*, 37 N.E.3d 672 (Mass. App. Ct. 2015) ........................................... 7

*Girdler v. United States*, 923 F. Supp. 2d 168 (D.D.C. 2013) ......................................... 2, 6, 7, 10

*Howell v. Miller*, 91 F. 129 (6th Cir. 1898) (Harlan, Circuit Justice) ........................................... 4

*Legacy Emmanuel Hosp. & Health Ctr. v. Shalala*, 97 F.3d 1261 (9th Cir. 1996) ....................... 7

*Long v. Jordan*, 29 F. Supp. 287 (N.D. Cal. 1939) ..................................................................... 13

*Montclair v. Ramsdell*, 107 U.S. 147 (1883) ............................................................................... 6

*Morrissey v. Proctor & Gamble Co.*, 379 F.2d 675 (1st Cir. 1967) ............................................. 6

*Nash v. Lathrop*, 6 N.E. 559 (Mass. 1886) ................................................................................... 4

*Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516 (9th Cir. 1997) ....................... 9, 10

*United States v. Lanier*, 520 U.S. 259 (1997) .............................................................................. 4

*Veeck v. S. Bldg. Code Cong. Int'l*, 293 F.3d 791 (5th Cir. 2002) (en banc) ....................... passim

*Wheaton v. Peters*, 33 U.S. (8 Pet.) 591 (1834) .......................................................................... 4

**Statutes**

17 U.S.C. § 102 ............................................................................................................................. 5

17 U.S.C. § 106 ........................................................................................................................... 12

17 U.S.C. § 201 ........................................................................................................................... 12

17 U.S.C. § 203 ............................................................................................................ 13

**Other Authorities**

*Standards for the Global Marketplace*, ASTM Standardization News (May/June 2008),
    http://www.astm.org/SNEWS/MJ_2008/provocative_mj08.html ............................................ 13

Stephen Breyer, *The Uneasy Case for Copyright: A Study of the Copyright in Books,
    Photocopies, and Computer Programs*, 84 Harv. L. Rev. 281 (1970) ..................................... 16

P.R. Coleman-Norton, *Cicero's Contribution to the Text of the Twelve Tables*,
    46 Classical J. 51 (1950) .......................................................................................... 3

*Applicable DC Construction Codes*, D.C. Dep't of Consumer & Reg. Affairs,
    http://dcra.dc.gov/service/applicable-dc-construction-codes (last visited Jan. 11, 2016) .......... 3

Emmanuelle Fauchart & Eric von Hippel, *Norms-Based Intellectual Property Systems:
    The Case of the French Chefs*, 19(2) Organization Science 187 (2008) ................................. 16

Int'l Code Council, Int'l Property Maintenance Code,
    http://publicecodes.cyberregs.com/icod/ipmc/2012/index.htm (last visited Jan. 11, 2016) ....... 3

Jacob Loshin, *Secrets Revealed: Protecting Magicians' Intellectual Property without Law*,
    in *Law and Magic: A Collection of Essays*, 123 (Christine A. Corcos ed. 2010) ..................... 16

Mike McIntyre, *Conservative Nonprofit Acts as a Stealth Business Lobbyist*, N.Y. Times,
    Apr. 22, 2012, at A1 ................................................................................................... 14

NFPA Online Catalog, http://catalog.nfpa.org/NFPA-70-National-Electrical-Code-
    NEC-2014-Edition--P15728.aspx?icid=D531 (last visited Jan. 11, 2016) .............................. 18

*2014 NFPA Standards Directory*, NFPA (2014) *available at*
    http://nfpatoday.blog.nfpa.org/2014/01/download-a-free-copy-of-the-2014-nfpa-standards-
    directory.html .......................................................................................................... 17

*Incorporation by Reference*, Office of the Federal Register, http://www.archives.gov/federal-
    register/cfr/ibr-locations.html (last visited Jan. 11, 2015). ............................................... 1

Dotan Oliar & Christopher Sprigman, *There's No Free Laugh (Anymore): The Emergence of
    Intellectual Property Norms and the Transformation of Stand-Up Comedy*, 94 Va. L. Rev.
    1787 (2008) ............................................................................................................ 16

L. Ray Peterson & Craig Joyce, *Monopolizing the Law: The Scope of Copyright Protection
    for Law Reports and Statutory Compilations*, 36 UCLA L. Rev. 719 (1989) .......................... 8

Kal Raustiala & Christopher Sprigman, *The Piracy Paradox: Innovation and Intellectual
    Property in Fashion Design*, 92 Va. L. Rev. 1687 (2006) ................................................. 16

Nathalie Rioux, *Sixteenth Annual Report on Federal Agency Use of Voluntary Consensus Standards and Conformity Assessment*, NIST (April 2013), *available at* http://nvlpubs.nist.gov /nistpubs/ir/2013/NIST.IR.7930.pdf ..................................................... 17

Frederick Seaton Siebert, *Freedom of the Press in England 1476–1776* (2d ed. 1965)................ 4

Peter L. Strauss, *Private Standard Organizations and Public Law*, 22 Wm. & Mary Bill Rts. J. 497 (2013) ............................................................................... 18

**Treatises**

1 Paul Goldstein, Goldstein on Copyright § 2.5.2 (3d ed. 2014)................................................. 16

1 William Patry, Patry on Copyright § 1:19 (2015)...................................................................... 11

1-2 Nimmer on Copyright § 2.03 (D) (2015) ......................................................................... 8, 17

**Regulations**

D.C. Mun. Regs. tit. 14, § 105.1 ................................................................................................. 2

D.C. Mun. Regs. tit.12, § A113.4 ............................................................................................. 10

**Constitutional Provisions**

U.S. Const. Art. I § 8 cl. 8........................................................................................................ 16

## PRELIMINARY STATEMENT

Plaintiffs in this case are Standard Development Organizations ("SDOs"), pursuing claims for copyright infringement against Public.Resource.org ("Public Resource"). Public Resource is a nonprofit organization that made technical codes—originally developed by the SDOs but now incorporated by reference into state and local laws—freely accessible and downloadable online.

From the moment such a code is incorporated into the public law, all citizens of the relevant jurisdiction are under an obligation to follow the text of that code, to the letter. *See Incorporation by Reference*, Office of the Federal Register, http://www.archives.gov/federal-register/cfr/ibr-locations.html (last visited Jan. 11, 2015). Legislatures are under a duty to examine the effect of the materials they reference or incorporate into law, modify those materials as necessary to reflect changing realities or priorities, and borrow language from other sources in order to effectively develop the law. None of these activities is consistent with a theory of copyright law that affords monopoly power to the private organization that first penned a model code to control the law's reproduction, distribution, or modification.

Extending copyright protection to model codes incorporated into law would lead to extraordinary and untenable results. A ruling against such an extension and in favor of Public Resource, on the other hand, would be consistent with both sound precedent and wise public policy, safeguarding public access to the law and the integrity of the lawmaking process. For these reasons, the *amici* who submit this brief ("*Amici*") respectfully request that this Court grant defendant's motion for summary judgment and deny plaintiffs' motion for summary judgment and permanent injunction.

## INTERESTS OF *AMICI*[1]

*Amici* identified in the accompanying Appendix are scholars experienced in the study and development of copyright law. Each has an interest in the proper functioning of the copyright system and in the public's robust and unfettered access to laws with which they are required to comply. As set forth in their motion for leave to file this brief, *Amici* write to articulate the serious damage to access to law, copyright doctrine, and the democratic legislative process that would arise should plaintiffs' theory of copyright infringement prevail in this case.[2]

## ARGUMENT

### I.  THE LAW BELONGS TO THE PUBLIC, AND THE TEXT OF THE LAW THUS BELONGS IN THE PUBLIC DOMAIN.

If a resident of the District of Columbia wants to know whether the sidewalk outside her home is being appropriately maintained, she must read sections of the International Property Maintenance Code ("IPMC"). *See* D.C. Mun. Regs. tit. 14, § 105.1; *Girdler v. United States*, 923 F. Supp. 2d 168, 188–91 (D.D.C. 2013) (extensively reviewing the sidewalk provisions of the IPMC in a tort claim against the Smithsonian Air and Space Museum). Like the model codes at issue in this case, the IPMC is a set of guidelines created by a private organization, the International Code Council ("ICC"). The ICC, like the plaintiffs here, claims copyright in this section of operative law. And, while the ICC currently makes a low-quality version of the

---

[1] Pursuant to LCvR 7(o)(5) and Fed. R. App. P. 29(c)(5), *Amici* hereby certify that no party or party's counsel authored the brief in whole or part, that no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and that no person other than *Amici* or their counsel contributed money that was intended to fund preparing or submitting the brief.

[2] *Amici* Pamela Samuelson and Jonathan Zittrain are members of the Board of Directors of the Electronic Frontier Foundation ("EFF"), which represents defendant Public Resource in this case. Neither Professor Samuelson nor Professor Zittrain had any direct involvement in EFF's representation of defendant in the case. As noted in *Amici*'s motion for leave to submit an *amicus* brief, both Professor Samuelson and Professor Zittrain have joined this brief "solely as individuals and not on behalf of any institutions with which they are affiliated."

guidelines available online, *see* Int'l Code Council, Int'l Property Maintenance Code, http://publicecodes.cyberregs.com/icod/ipmc/2012/index.htm (last visited Jan. 11, 2016), an interpretation of copyright law that allows private parties to own the text of enacted laws would not require the ICC to do so. Indeed, if a private party owns copyright in the text of a code, that private owner might decide to take the code offline. Alternatively, its website may fail, as websites often do. In such circumstances, the public would lack substantial access to the laws that govern them.

Notably, the District itself does not make the IPMC available on its website because of copyright concerns. The District states on its own website that the code is "copyrighted by the [ICC] . . . and [is] therefore not republished here." *Applicable DC Construction Codes*, D.C. Dep't of Consumer & Reg. Affairs, http://dcra.dc.gov/service/applicable-dc-construction-codes (last visited Jan. 11, 2016). If residents of the District want to see the code that governs them, "[c]opies of the codes can . . . be purchased directly from these organizations." *Id.* Even if the cost were modest, in a democracy built on the principle of the rule of law, access to the law should not impose a financial burden. Nor should it  depend on the forbearance or generosity of private organizations, which may be beholden to market forces instead of the public interest.

The principle that members of the public have a right to know the law by which they are governed is as old as written laws themselves. Ancient Romans, frustrated by the aristocratic and priestly monopoly on the administration of justice, demanded that customary law be set down in written statutes and posted publicly. The result was the Twelve Tables, a set of laws inscribed on bronze in simple Latin, and posted in the Roman Forum for all to see. P.R. Coleman-Norton, *Cicero's Contribution to the Text of the Twelve Tables*, 46 Classical J. 51, 51 (1950). In 1770s England, the freedom to make legislators' writings and speeches available for public scrutiny

came to be seen as a critical bulwark against tyrannical government. In spite of overwhelming opposition by members of the House of Commons, John Wilkes—a radical politician celebrated in the American colonies as a champion of liberty—led a popular movement that secured the freedom of the press to publish transcripts of parliamentary debates. Frederick Seaton Siebert, *Freedom of the Press in England 1476–1776*, at 356–63 (2d ed. 1965).

In our own nation, from the earliest Supreme Court copyright decision to the present day, courts have repeatedly reaffirmed the basic principle that the law is free for publication to all. *See Banks v. Manchester*, 128 U.S. 244, 253 (1888) ("The whole work done by the judges constitutes the authentic exposition and interpretation of the law, which, binding every citizen, is free for publication to all . . . ."); *Wheaton v. Peters*, 33 U.S. (8 Pet.) 591, 668 (1834) ("[N]o reporter has or can have any copyright in the written opinions delivered by this court; and . . . the judges of the court cannot confer on any reporter any such right."); *Howell v. Miller*, 91 F. 129, 137 (6th Cir. 1898) (Harlan, Circuit Justice) (holding that "any person desiring to publish the statutes of a state may use any copy of such statutes to be found in any printed book"); *Nash v. Lathrop*, 6 N.E. 559, 560 (Mass. 1886) ("Every citizen is presumed to know the law thus declared, and it needs no argument to show that justice requires that all should have free access to the opinions, and that it is against sound public policy to prevent this, or to suppress and keep from the earliest knowledge of the public the statutes, or the decisions and opinions of the justices."). The public's right to fair notice of the law is motivated by justice: the people cannot be made to suffer for violations of law they could not have avoided. *United States v. Lanier*, 520 U.S. 259, 265 (1997) ("The . . . principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.") (citations omitted).

Modern public administration presents a new phenomenon: private code-drafting by organizations that seek to have their codes adopted by public entities. But, here as well, courts have drawn on age-old precedents to uphold the principle of free public access to the law. *See Veeck v. S. Bldg. Code Cong. Int'l*, 293 F.3d 791, 802 (5th Cir. 2002) (en banc) (holding that an SDO could not enforce its copyright in a model building code against an individual who published the code online as part of a compilation of local laws); *Building Officials & Code Adm. v. Code Technology, Inc.* (*BOCA*), 628 F.2d 730, 734 (1st Cir. 1980) (denying preliminary relief and summary judgment to an SDO who sued the publisher of an edition of the Massachusetts Building Code, which incorporated the SDO's model code). To hold otherwise would allow private companies to control how citizens, public officials, lobbyists, commentators, educators, litigants, and judges discuss, debate, cite, and revise the laws by which all are governed. Robust precedent, copyright doctrine, and practical necessity compel a result that preserves access to and unrestricted use of the law regardless of its original source.

II.  **THE PROTECTIONS AFFORDED BY FEDERAL COPYRIGHT LAW DO NOT AND CANNOT APPLY TO THE TEXT OF ENACTED LAWS, REGARDLESS OF WHETHER THEY ARE DERIVED FROM OR BASED ON MODEL CODES.**

A.  **Copyright law's merger doctrine provides that expressions that "merge" with facts and ideas are not subject to copyright protection.**

Copyright law recognizes that "when the subject matter allows for only a very limited manner of expression, the idea and its expression remain a unit, so that there is no copyrightable material." *Atari Games Corp. v. Oman*, 888 F.2d 878, 885 (D.C. Cir. 1989) (*citing Morrissey v. Proctor & Gamble Co.*, 379 F.2d 675, 678–79 (1st Cir. 1967)). This is reflected in the Copyright Act itself, which specifically states in Section 102(b) that copyright protection shall not extend "to any idea, procedure, process, system, method of operation, concept, principle, or discovery." 17 U.S.C. § 102(b). In accordance with Section 102(b), if there is a very limited set of

expressions that can express a particular idea, "the notions of idea and expression may merge

from such 'stock' concepts that even verbatim reproduction of a factual work may not constitute

infringement." *Allen v. Academic Games League of Am., Inc.*, 89 F.3d 614, 617 (9th Cir. 1996).

By way of example, courts have observed that rules—such as rules for games or

contests—tend to be both functional and abstract in a way that makes them particularly

susceptible to a merger of idea and expression. *See*, *e.g., id.* at 618 ("[Plaintiff] has not shown

that it is possible to distinguish the expression of the rules of his game manuals from the idea of

the rules themselves"); *Morrissey*, 379 F.2d at 678 (holding the language used to express the

rules of a sweepstakes contest uncopyrightable). Allowing copyright protection for such works

would impermissibly restrict future authors from expressing ideas that ought to remain in the

public domain.

**B.     Enacted law serves as the clearest possible example of merger, as one
         cannot convey the substance of law without using the precise language
         thereof.**

There is but one way to express what the law of a jurisdiction is, and that is the text of the

law itself. A fundamental canon of statutory interpretation instructs courts to "give effect, if

possible, to every clause and word of a statute." *Montclair v. Ramsdell*, 107 U.S. 147, 152

(1883). In a recent case before this Court, pages of an opinion were spent expounding on how the

precise language of the model code adopted into the District of Columbia's Property and

Maintenance Code contrasted with the language of another model code that had not been

adopted. *See Girdler*, 923 F. Supp. 2d at 188–91. The Court went to some length distinguishing

how the general word "usable" was employed in reference to sidewalks in the adopted code from

the more specific height deviation warning requirements for sidewalks in another model code. *Id.*

at 191–93. From this discussion, it is clear that, were a contractor or lawyer to use a word other

than "usable" when advising property owners as to how to maintain their sidewalks, he or she would be misstating the owners' obligations under the law (and perhaps materially so). *See id.*

Public Resource, therefore, has only a single choice when it comes to expressing the substance of the laws covered on its website: the only way to state the law is to quote the adopted model code verbatim. This is a classic example of an expression that affords "no opportunity for variation," *Atari Games Corp. v. Oman*, 979 F.2d 242, 246 (D.C. Cir. 1992) (internal quotation omitted), and therefore should not qualify for copyright protection, lest the SDOs here be able to control who is allowed to correctly state the law.

If no word of a statute is superfluous, then, to fully express the content of a given statute, nothing will suffice except the complete and unadulterated text of the law. In the case of a law that incorporates an SDO's model code, nothing will suffice except the text of the code itself. Even minor differences in terminology may be subject to vastly different interpretations. *See, e.g.*, *Commonwealth v. Rezendes*, 37 N.E.3d 672, 676–77 (Mass. App. Ct. 2015) (discussing the difference between "dangerous weapon" and "deadly weapon" under the state's Armed Career Criminal Act); *Legacy Emmanuel Hosp. & Health Ctr. v. Shalala*, 97 F.3d 1261, 1265 (9th Cir. 1996) ("Indeed, the use of different language by Congress creates a presumption that it intended the terms to have different meanings.").

At the moment a legislature adopts a model code into law, that code ceases to be a mere expression of industry norms or best practices. Instead, the provisions of that code immediately become external legal requirements mandated by a lawmaking body—mandatory obligations for all subjects of that jurisdiction. Their status as such, the result of an act of the legislature rather

than the creative efforts of the private drafters, decisively excludes a model code that has been incorporated in law from the realm of original expressive works that copyright protects.[3]

In light of the foregoing, it is not surprising that the *en banc* Fifth Circuit—faced with claims like those asserted by plaintiffs in this case—ruled squarely that the merger doctrine prevents an SDO from enforcing copyright in an enacted or adopted model code. *See Veeck*, 293 F.3d at 800–802. Laws, the court held, are facts that only permit a single expressive form. *Id.* at 802. Regardless of whether or not a model code begins its life as a work entitled to copyright, once adopted as law, the code becomes the only possible means of expressing the "fact" of applicable law. In these circumstances, expression that might otherwise be protectable merges with unprotectable fact and becomes uncopyrightable. *Id.; see also* L. Ray Peterson & Craig Joyce, *Monopolizing the Law: The Scope of Copyright Protection for Law Reports and Statutory Compilations*, 36 UCLA L. Rev. 719, 777 (1989) ("[W]ith respect to legal protection for the law, copyright is driven by a fundamental policy of ensuring maximum access to the law. . . . [T]he need of the public, the bench, and the bar for maximum access to the law requires that the courts weigh that consideration carefully in construing provisions of the new Act, such as sections 102 and 103, which otherwise might be utilized to impede access.").

---

[3] Professor Nimmer, in his widely-cited treatise, offers an instructive illustration of the distinction between protectable and unprotectable works. "[A] published article about physics can be subject to copyright—but protection does not extend to a '4-level 2-electron atomic model with Pauli exclusion principle.' Therefore, the copyright can prevent reproduction of the article's expression, in whole or substantial part, but affords no ability to prevent others from copying the diagram of the model." 1-2 Nimmer on Copyright § 2.03 (D) (2015) (quoting *Seng-Tiong Ho v. Taflove*, 648 F.3d 489, 498 (7th Cir. 2011)) (internal citations omitted). Just as a visual diagram that accurately and precisely conveys a real-world physical model is unprotectable, verbal expression that accurately and precisely convey the specific factual reality of the law of a particular jurisdiction is unprotectable.

**C.      A ruling in favor of Public Resource is consistent with holdings in the major federal circuit court cases that have addressed previous attempts to claim copyright in laws.**

The *BOCA* and *Veeck* cases addressed above (from the First and Fifth Circuits, respectively) clearly support *Amici*'s position. Further support is found in cases upon which SDOs often rely, from other federal circuits. In *CCC Information Services, Inc. v. Maclean Hunter Market Reports, Inc*., for example, the work underlying the plaintiff's copyright claim was not a model statute that became operative law, but instead a compilation of used car values similar to the well-known *Kelley Blue Book*. 44 F.3d 61, 66 (2d Cir. 1994). That compilation did not enter into law as a privately-drafted statute. Rather, it was "referenced" by state regulations as one of several methods available to insurance companies for establishing minimum payouts upon a "total loss" of a vehicle. *Id.* at 73. The compilation was not used to state exactly what the law was, and the court thus did not face the merger issue addressed in the instant case.

Similarly, in *Practice Management Information Corp. v. American Medical Association*, the federal Health Care Finance Administration ("HCFA") licensed from the American Medical Association ("AMA") a coding system for identifying medical procedures, and subsequently adopted regulations requiring healthcare providers to use the AMA's codes when submitting forms for reimbursement from Medicare and Medicaid. 121 F.3d 516 (9th Cir. 1997). The codes did not define the scope of what was lawful or unlawful practice of medicine, or what could or could not be claimed under Medicare and Medicaid; all the codes did was provide a reference that would be used in the actual practice of claims reimbursement. *Id.* at 517–18; *see Veeck*, 293 F.3d at 805 (noting that the codes at issue in *Practice Management* were "extrinsic standards," and not created "for incorporation into law"). And, even though the court in *Practice Management* declined to find that the referenced text in its entirety was unprotectable, it

nevertheless found in favor of the copier of the referenced text on the grounds that the HCFA agreed to use the AMA coding system at the exclusion of all other coding systems. 121 F.3d at 520–21. In other words, although the court chose not to use the term "merger" to describe its findings, it nonetheless based its ruling on an identical principle: because the AMA coding system had become the only way to state what was needed to process a claim under the HCFA, the AMA could not then use copyright to stop others from stating their claims correctly. *Id.* That result strongly suggests that the court in *Practice Management* would have ruled in favor of the defendant here, given that—for each relevant model code and jurisdiction at issue in the case at bar—a single model code was adopted as the law of that jurisdiction, to the exclusion of others.

Furthermore, unlike the materials at issue in *Practice Management* and *CCC* (but like the model code addressed by the *en banc* Fifth Circuit in *Veeck*) the expression at issue here was directly incorporated into law. *See Veeck,* 293 F.3d at 798-99. Once adopted, such codes become the laws by which liability, fault, and criminality are adjudicated in the relevant jurisdiction. *See. e.g.*, *Girdler*, 923 F. Supp. 2d at 187–93 (using the IPMC, incorporated by reference in the District, to assess tort liability); D.C. Mun. Regs. tit.12, § A113.4 (imposing criminal liability to anyone who violates a provision of construction codes). Even if a private entity can choose whether and how to exploit materials referenced in a statute, no entity can own the text of the statute itself.

### III.   MAINTAINING THE PUBLIC DOMAIN STATUS OF LAW PROTECTS THE INTEGRITY OF THE LAWMAKING PROCESS.

In explaining why the public's interest in accessing the law should supersede the private interests of copyright when a law was first drafted under a private pen, courts have repeatedly emphasized the importance of public authorship. As the First Circuit put it, "[t]he citizens are the authors of the law, and therefore its owners, regardless of who actually drafts the provisions,

because the law derives its authority from the consent of the public, expressed through the democratic process." *BOCA*, 628 F.2d at 734; *see also Veeck*, 293 F.3d at 799 ("The very process of lawmaking demands and incorporates contributions by 'the people' in an infinite variety of individual and organizational capacities . . . . In performing their function, the lawmakers represent the public will, and the public are the final 'authors' of the law."). This argument need not be read literally as a statement of copyright authorship. But it does serve to reflect how the law develops, and underscores the practical impossibility of imposing the doctrine of copyright law on the process of authoring, publishing, and republishing the law.

United States copyright law itself serves as an example. The first Copyright Act was based in part on a prior, foreign law (the British Statute of Anne). The initial draft was submitted by Rep. Benjamin Huntington, though it was likely written at least in part by prominent citizen Noah Webster. It was then reintroduced by Rep. Elias Boudinot in response to comments made by President Washington at his State of the Union address. Afterwards, the draft went through edits in a committee of three in the House, further edits in the Senate, and consideration of those edits again in the House, before the President signed off on a final version (no doubt with members of the public like Webster opining along the way). *See* 1 William Patry, Patry on Copyright § 1:19 (2015). The intervening centuries have seen dozens upon dozens of amendments and updates to the copyright law, with incremental changes punctuated by substantial edits every few decades. At every stage in its development, the Copyright Act has been the product of significant contributions from public and private actors alike. *See id.* § 1:20.[4]

---

[4] Patry emphasizes the involvement of private actors in the legislative process in a few cases, especially where private organization have led to the creation of highly detailed industry-specific amendments, "in form if not content private industry standards agreements dressed up in legislative garb." *Id.* at § 2.1 (pointing to Sections 114 and 115 of the Copyright Act).

As the story of the Copyright Act illustrates, the drafting of legislation involves perpetually borrowing and building upon precedents and diverse source materials. And the act of legislating, while executed in the halls of Congress, involves the input and contributions of many other people and organizations. Even in the late eighteenth century, private actors had a role in drafting the language that found its way into the final versions of statutes. This is certainly the case today, as individual citizens, NGOs and advocacy groups, lobbyists, industry organizations, and others remain actively engaged with their representatives at all levels of government to craft the laws that govern them. *See e.g.*, *Veeck* 293 F.3d at 798 ("The complexities of modern life and the breadth of problems addressed by government entities necessitate continuous participation by private experts and interest groups in all aspects of statutory and regulatory lawmaking.").

If plaintiffs are correct, and private contributions to governing law must still be considered protectable through copyright, a litany of untenable results would follow. First, an attempt to apply a copyright theory of authorship to legislation would result in a tangled mess of expressions of uncertain provenance, blended together in ways completely outside copyright's conceptions of joint authorship. *See* 17 U.S.C. § 201. Any revision or update to a law would undoubtedly create at least one unauthorized derivative work, if judged by the same standards as other literary property. *See* 17 U.S.C. § 106 (granting the owner of a copyright exclusive rights prepare or authorize derivative works—which, under 17 U.S.C. § 101, encompass "any… form in which a work may be recast, transformed, or adapted"). The notion that legislatures would need to verify changes with authors or their heirs for decades after a law was created flies in the face of logic, and seriously undermines the evolutionary nature of the legislative process.

Even worse, this position would raise the possibility that one contributor to a law could refuse to grant a license permitting an alteration to that law. Indeed, the contributor may have

every incentive to do so if the law was changing in a way the first contributor disagreed with for political reasons. A finding in favor of a copyright interest in materials incorporated into law would create a private veto power over future legislation in the hands of early contributors, stifling political debate and seriously jeopardizing the lawmaking process for a constitutional democracy. *See Long v. Jordan*, 29 F. Supp. 287, 289 (N.D. Cal. 1939) ("[P]laintiff advances a system requiring legislation . . . and now, under his copyright, seeks to prevent the submission to the voting power of the very legislation . . . . But a plan or system advanced for government adoption cannot be copyrighted so as to prevent the publication of that plan or system . . . .").

The absurdity of plaintiffs' proffered private authorship model is further underscored by the complexities that model would introduce to the text of SDOs' own model codes. The SDOs themselves state that their codes are frequently developed with the collaboration of volunteer experts. *See Standards for the Global Marketplace*, ASTM Standardization News (May/June 2008), http://www.astm.org/SNEWS/MJ_2008/provocative_mj08.html (noting contributions of volunteer experts "from more than 130 countries"). To the extent that an SDO relies on license agreements with individual contributors to their standards, those contributors could later exercise their termination rights under 17 U.S.C. § 203 and thereby rescind their transfers of rights to the SDO thirty-five years after the original license or assignment. Imagine a lone engineer who made a substantial individual contribution to a standard developed by an SDO in 1982; in 2017 she could reclaim her copyright in her contributions and withhold permission to use her work going forward. The SDO would no longer be able to license the model code for inclusion in future state or city codes, and future modification by the city that previously adopted the code would potentially expose the city to a copyright infringement lawsuit from the engineer, or any other contributors who terminated their license to the SDO. *See* 17 U.S.C. § 203(b). Rather than

needlessly face that unworkable tangle, the Supreme Court and others have instead opted for the straightforward view that the text of law is effectively in the public domain, regardless of its source: "the authentic exposition and interpretation of the law, which, binding every citizen, is *free for publication to all*." *Banks*, 128 U.S. at 253 (emphasis added); *see also Veeck*, 293 F.3d at 798 n.10 (describing the holding in *Banks* as a rule that "'the law' is in the public domain.")

Finally, a rule that would allow SDOs to control access to their original contributions to federal and state laws would also permit myriad other individuals and organizations—from NGOs to lobbyists—to do the same. The scope of legislation drafted by third parties is difficult to quantify, but it is vast. In 2011, for instance, a single organization—the American Legislative Exchange Council ("ALEC"), a conservative nonprofit that allows large corporations like Pfizer and ExxonMobil to help draft model legislation—boasted to its members that more than one thousand of its bills were introduced in state legislatures. About seventeen percent of those became law. Mike McIntyre, *Conservative Nonprofit Acts as a Stealth Business Lobbyist*, N.Y. Times, Apr. 22, 2012, at A1. Extending copyright protection to the text of laws as enacted would address not just SDOs but the much larger and broader category of private actors that contribute to the legislative process. Considering SDOs as part of a broader category of private actors who contribute to the drafting of laws makes clear that extending copyright protection to privately drafted laws is both unworkable and unnecessary as an incentive to participation in the legislative process.

In *Veeck*, the *en banc* Fifth Circuit recognized these concerns when it ruled that an SDO could not enforce its copyright after an individual who wished to make the building codes of two Texas towns available online scanned and published the SDO's model codes, which had been adopted by those towns. 293 F.3d at 800 ("[W]e hold that when Veeck copied *only* 'the law' of

14

Anna and Savoy, Texas, which he obtained from SBCCI's publication, and when he reprinted only 'the law' of those municipalities, he did not infringe SBCCI's copyrights in its model building codes"). "As *law*," the court held, "the model codes enter the public domain and are not subject to the copyright holder's exclusive prerogatives." *Id.* at 793 (emphasis in original).

Both the *Veeck* court and the Solicitor General, writing as *amicus curiae* when the case was on petition for writ of *certiorari*, emphasized the absurd consequences that would follow from a precedent extending copyright protection to private contributions to the law:

> If copyright protection [for technical codes adopted as law] were nonetheless recognized, there would be no outer limit on claims of copyright prerogatives by nongovernmental persons who contribute to writing "the law" such as lobbyists or law professors. An individual who drafted a statute or amendment later adopted by Congress could claim copyright in the text.

Brief for the United States as Amicus Curiae at 15, *Veeck v. SBCCI,* 293 F.3d 791 (5th Cir. 2002) (No. 02-355). *See also Veeck*, 293 F.3d at 799 (citing the example of three professors who drafted language for a new federal law and who "[u]nder [the SDO's] reasoning, . . . had they so desired, could have asserted a copyright in their 'model supplemental jurisdiction provision'"). This court should follow the *Veeck* court in acknowledging that the position advocated by plaintiffs is fundamentally incompatible with the realities of the legislative process.

## IV.   THE SDOS' CLAIMED NEED TO HAVE AN INCENTIVE TO DEVELOP MODEL TECHNICAL CODES DOES NOT OUTWEIGH THE HAZARD OF EXTENDING COPYRIGHT TO THE LEGISLATIVE PROCESS AND DOES NOT REFLECT REALITY.

SDOs often argue that they "need" copyright in their specific model code—as opposed to the annotations, companions, and other ancillary material that would not be subject to merger—because they require an incentive to create the works. *See, e.g.,* Pl.'s Mem. Law Supp. Mot. Summ. J., 31-32, ECF No. 118. Even if that were true, it would not be a reason to ignore the irrefutable hazards that would flow from introducing copyright law into the legislative process,

addressed above. But, the fact is that—while copyright does root itself in an incentives regime,
*see* U.S. Const. Art. I § 8 cl. 8 (authorizing the creation of copyright "to promote the progress of
Science")—legislative drafting is hardly the only area where Congress has correctly decided to
refuse copyright protection in favor of other interests. Indeed, many forms of creative output—
from comedy, to recipes, to magic tricks, to fashion, to the sale of works already in the public
domain—have still found prosperity in a world where copyright does not protect their literal
expression. *See* Stephen Breyer, *The Uneasy Case for Copyright: A Study of the Copyright in
Books, Photocopies, and Computer Programs*, 84 Harv. L. Rev. 281, 294–306 (1970); Jacob
Loshin, *Secrets Revealed: Protecting Magicians' Intellectual Property without Law*, in *Law and
Magic: A Collection of Essays* 134–41 (Christine A. Corcos ed. 2010); Dotan Oliar &
Christopher Sprigman, *There's No Free Laugh (Anymore): The Emergence of Intellectual
Property Norms and the Transformation of Stand-Up Comedy*, 94 Va. L. Rev. 1787, 1831–34
(2008); Emmanuelle Fauchart & Eric von Hippel, *Norms-Based Intellectual Property Systems:
The Case of the French Chefs*, 19(2) Organization Science 187, 188 (2008); Kal Raustiala &
Christopher Sprigman, *The Piracy Paradox: Innovation and Intellectual Property in Fashion
Design*, 92 Va. L. Rev. 1687, 1717–35 (2006).

Any suggestion that copyright offers the only incentive for a private entity to engage in
setting standards ignores significant other factors that go into SDOs' decisionmaking. First,
SDOs have obvious non-pecuniary incentives to engage in standard development: "[t]rade
organizations have powerful reasons stemming from industry standardization, quality control,
and self-regulation to produce these model codes; it is unlikely that, without copyright, they will
cease producing them." 1 Paul Goldstein, Goldstein on Copyright § 2.5.2 (3d ed. 2014). As
organizations devoted to creating standards, plaintiffs have every reason to continue doing so

even if standard development becomes less lucrative. Indeed, the actual writing of standards is generally accomplished through the volunteer efforts of professionals, industry representatives and, quite often, government employees: in fiscal year 2012, federal agency personnel participated in 552 SDOs. Nathalie Rioux, *Sixteenth Annual Report on Federal Agency Use of Voluntary Consensus Standards and Conformity Assessment*, NIST (April 2013), *available at* http://nvlpubs.nist.gov /nistpubs/ir/2013/NIST.IR.7930.pdf.

While it is true that the standard development process may require the SDOs to bear administrative costs, fears that the SDOs will have to discontinue the development of model codes for lack of resources are unfounded. Even absent a copyright interest in the text of codes adopted into law, SDOs would have many opportunities available to recoup the costs of standard development; they could subsidize the preparation of codes with supplementary written materials, educational workshops, expert testimony about the law and its impact, and other sources of ancillary revenue. As it stands, SDOs create a range of non-model code publications that will never be incorporated into law. For example, the NFPA publishes "handbooks, reference books, textbooks, videos, field guides, and training manuals." *2014 NFPA Standards Directory*, NFPA (2014) *available at* http://nfpatoday.blog.nfpa.org/2014/01/download-a-free-copy-of-the-2014-nfpa-standards-directory.html. SDOs also already profit from providing training and professional development, and from organizing conventions, none of which depend upon copyright interests of the sort at issue here.

A decision that no copyright exists in the actual model codes incorporated into law would not prohibit plaintiffs from protecting other, related materials under copyright law. *See* 1 Nimmer on Copyright §5.06[C] at 5–60 (1985) (noting that "headnotes and synopses of court opinions" may be copyrightable). The American Law Institute and the National Conference of

Commissioners on Uniform State Laws have long engaged in this practice, selling annotated editions of the Uniform Commercial Code. Indeed, in at least some cases, the plaintiff SDOs already follow their example.[5] The only commercial opportunity denied to SDOs by a ruling in favor of Public Resource is the ability to engage in monopoly control of the law itself. As it stands, SDOs routinely charge the same or even higher prices for old versions of their model codes that are technologically obsolete but still legally binding due to their incorporation into law. *See* Peter L. Strauss, *Private Standard Organizations and Public Law*, 22 Wm. & Mary Bill Rts. J. 497, 510 (2013) (citing a professional organization that charged $99.99 for a current edition of a standard and $250 for an earlier version that was less comprehensive but had been adopted into federal law by reference).

There is no evidence that Congress intended or envisaged that copyright would function as a subsidy for private entities that contribute to development of the law. Granting SDOs unlimited power to control the terms of use for enacted laws would work an abdication of legislative authority and undermine the public's interest in reading, discussing, debating, citing and revising the laws by which all are governed.

## CONCLUSION

A ruling in favor of plaintiffs in this case would place the private pecuniary interests of a few over the significant public good attendant to wide scale availability of and access to the text of enacted laws. This court should adopt the straightforward approach that prior courts have

---

[5] In its online catalog of standards, alongside the 2014 National Electrical Code ($95 for an electronic copy), the NFPA advertises an "NEC Handbook" ($180) that incorporates additional commentary: "2014 NEC Handbook from NFPA does much more than bring you up-to-code—it also explains the reasoning behind NFPA 70®: NEC concepts, provides real-world examples, and gives you the background behind Code revisions, so you can work with authority." NFPA Online Catalog, http://catalog.nfpa.org/NFPA-70-National-Electrical-Code-NEC-2014-Edition--P15728.aspx?icid=D531 (last visited Jan. 11, 2016).

adopted, holding that the text of the law is not subject to copyright protection and therefore

denying plaintiffs' motion for summary judgment and granting summary judgment in favor of

defendant Public Resource.

Respectfully submitted,


/s/ Catherine R. Gellis
Catherine R. Gellis
Bar I.D. # CA251927
P.O. Box 2477
Sausalito, CA 94966
Telephone:  202-642-2849
Email:  cathy@cgcounsel.com

Christopher T. Bavitz
Andrew F. Sellars
Cyberlaw Clinic, Harvard Law School[6]
Wasserstein Hall, Suite 5018
1585 Massachusetts Avenue
Cambridge, MA 02138
Telephone: (617) 384-9125
Email: cbavitz@cyber.law.harvard.edu
Email: asellars@cyber.law.harvard.edu

---

[6] *Amici* wish to thank fall 2015 Cyberlaw Clinic students Michael Gocksch and Joseph Posimato and winter 2016 Cyberlaw Clinic student Miranda Means for their valuable contributions to this brief.

# APPENDIX

David Ardia
Assistant Professor of Law, University of North Carolina School of Law
Co-Director, Center for Media Law and Policy, University of North Carolina School of Law

David Ardia is an assistant professor of law at the UNC School of Law and serves as the faculty co-director of the UNC Center for Media Law and Policy. He also holds a secondary appointment as an assistant professor at the UNC School of Media and Journalism. Before joining the UNC faculty, he was a fellow at the Berkman Center for Internet & Society at Harvard University where he founded and directed the Berkman Center's Digital Media Law Project. Prior to his time at Harvard, Professor Ardia was assistant counsel at The Washington Post, where he provided pre-publication review and legal advice on First Amendment, news gathering, privacy, intellectual property, and general business issues.

Professor Ardia's research focuses on examining the impact of new information technologies on law and society, particularly the role that government and private intermediaries play in shaping the environment for speech and how legal and social forces affect these actors. He is also an affiliated faculty member of the UNC Center for Law, Environment, Adaptation, and Resources. He teaches Torts, Media Law, Media and Internet Law Practicum, and Internet Law.

Stacey L. Dogan
Law Alumni Scholar, Boston University School of Law
Professor of Law, Boston University School of Law

Professor Stacey Dogan is a leading scholar in intellectual property and competition law. Her recent articles explore cutting-edge topics in trademark, copyright, and right of publicity law, including questions of intermediary liability, the rights of trademark parodists, and evolving norms underlying trademark law.

Professor Dogan has presented her research at numerous national and international conferences, and her writings have appeared in journals including the *Stanford Law Review*, *Emory Law Journal*, *Iowa Law Review* and *Texas Law Review*. She has served as chair of the Intellectual Property Section of the Association of American Law Schools, and was co-editor-in-chief of the *Journal of the Copyright Society* from 2008 to 2011. Dogan is an active participant in educational programs with the local bar, leading seminars and discussions for the Boston Bar Association, Massachusetts Continuing Legal Education and the Massachusetts Volunteer Lawyers for the Arts.

Before joining the Boston University faculty, Professor Dogan taught for more than a decade at Northeastern University School of Law, where she focused on intellectual property and antitrust law. She came to teaching after several years of practicing law with the Washington, DC law firm of Covington & Burling, where she specialized in antitrust, trademark, and copyright law. After law school, she practiced with Heller, Ehrman, White & McAuliffe in San Francisco and served as a law clerk to the Honorable Judith Rogers of the U.S. Court of Appeals for the District of Columbia Circuit.

Pamela Samuelson
Richard M. Sherman Distinguished Professor of Law, UC Berkeley School of Law
Professor, UC Berkeley School of Information
Co-Director, Berkeley Center for Law & Technology

Pamela Samuelson is the Richard M. Sherman Distinguished Professor of Law and Information at the University of California, Berkeley. She is recognized as a pioneer in digital copyright law, intellectual property, cyberlaw and information policy. Since 1996, she has held a joint appointment at UC Berkeley School of Law and UC Berkeley's School of Information.

Samuelson has written and published extensively in the areas of copyright, software protection and cyberlaw. Her recent publications include: *The Google Book Settlement as Copyright Reform*, 2011 Wisc. L. Rev. 478 (2011); *Statutory Damages in U.S. Copyright Law: A Remedy in Need of Reform*, 51 Wm. & Mary L. Rev. 439 (2009) (with Tara Wheatland); and *High Technology Entrepreneurs and the Patent System: Results of the 2008 Berkeley Patent Survey*, 24 Berkeley Technology L. J. 1255 (2010) (with Stuart J.H. Graham, Robert P. Merges, & Ted Sichelman). Other notable publications include: *Why Copyright Excludes Systems and Processes From the Scope of Its Protection*, 85 Tex. L. Rev. 1921 (2007); *Questioning Copyright in Standards*, 48 B.C. L. Rev. 193 (2007); *Unbundling Fair Uses*, 77 Fordham L. Rev. 2537 (2007); *Enriching Discourse on Public Domains*, 55 *Duke L. J. 783* (2006); *Privacy as Intellectual Property?*, 52 Stan. L. Rev. 1125 (2000); *Intellectual Property Rights in Data?*, 50 Vand. L. Rev. 51 (1997) (co-authored with J.H. Reichman); and *Benson Revisited: The Case Against Patent Protection for Algorithms and Other Computer Program-Related Inventions*, 39 Emory L. J. 1025 (1990).

Jessica M. Silbey
Professor of Law, Northeastern University School of Law

Jessica Silbey is a leading scholar and nationally recognized expert on intellectual property and the use of film to communicate about law. Silbey has altered the national conversation about creativity with her new book, The Eureka Myth (Stanford University Press). Based on a set of 50 interviews with authors, artists, inventors and lawyers, Silbey's work challenges the traditional notion of intellectual property as merely creating financial incentives necessary to spur innovation.

Silbey earned her undergraduate degree with honors from Stanford University and her J.D. *cum laude* from the University of Michigan, where she also earned a PhD in comparative literature. She served as law clerk to Judge Robert E. Keeton of the U.S. District Court for the District of Massachusetts and Judge Levin H. Campbell of the U.S. Court of Appeals for the First Circuit. She also spent three years in private law practice, focusing on intellectual property.

Rebecca L. Tushnet
Professor of Law, Georgetown Law

Professor Tushnet has taught at Georgetown since 2004. Previously, she was on the faculty at New York University School of Law. She also has worked at Debevoise & Plimpton in Washington, D.C., where she specialized in intellectual property. She clerked for Chief Judge Edward R. Becker of the United States Court of Appeals for the Third Circuit and Associate Justice David H. Souter of the U.S. Supreme Court.

Professor Tushnet graduated from Harvard University in 1995 and from Yale Law School in 1998. At Yale, Professor Tushnet served as an articles editor for the Yale Law Journal and as an editor of the Yale Journal of Law and Feminism. During her law school summers, she worked for the Center for Reproductive Law & Policy and for Bredhoff & Kaiser.

Professor Tushnet's publications include: *Worth a Thousand Words: The Images of Copyright Law*, 125 Harv. L. Rev. 683 (2012); *Gone in 60 Milliseconds: Trademark Law and Cognitive Science*, 86 Tex. L. Rev. 507 (2008); and *Copy This Essay: How Fair Use Doctrine Harms Free Speech and How Copying Serves It*, 114 Yale L. J. 535 (2004).

Jennifer Urban
Clinical Professor of Law, UC Berkeley School of Law
Director, Samuelson Law, Technology & Public Policy Clinic, UC Berkeley School of Law
Co-Director, Berkeley Center for Law & Technology

Jennifer M. Urban is a Clinical Professor of Law and Director of the Samuelson Law, Technology & Public Policy Clinic at the UC Berkeley School of Law. Broadly, her research considers how values such as free expression, freedom to innovate, and privacy are mediated by technology, the laws that govern technology, and private-ordering systems.

Her clinic students represent clients in numerous public interest cases and projects at the intersection of technological change and societal interests such as civil liberties, innovation, and creative expression. Recent Clinic projects include work on individual privacy rights, copyright and free expression, artists' rights, free and open source licensing, government surveillance, the "smart" electricity grid, biometrics, and defensive patent licensing.

Professor Urban comes to Berkeley Law from the University of Southern California's Gould School of Law, where she founded and directed the USC Intellectual Property & Technology Law Clinic. Prior to joining the USC faculty in 2004, she was the Samuelson Clinic's first fellow and visiting assistant professor. Prior to that, she was an attorney with the Venture Law Group in Silicon Valley. She graduated from Cornell University with a B.A. in biological science (concentration in neurobiology and behavior) and from UC Berkeley School of Law with a J.D. (intellectual property certificate). She was the *Annual Review of Law and Technology* editor while a student at Berkeley Law, and received the Berkeley Center for Law and Technology Distinguished Alumni Award in 2003.

Jonathan Zittrain
George Bemis Professor of International Law, Harvard Law School
Vice Dean for Library and Information Resources, Harvard Law School
Faculty Director, Berkman Center for Internet and Society
Professor of Computer Science, Harvard School of Engineering and Applied Sciences
Professor, Harvard John F. Kennedy School of Government

Jonathan Zittrain is the George Bemis Professor of International Law at Harvard Law School and the Harvard Kennedy School of Government, Professor of Computer Science at the Harvard School of Engineering and Applied Sciences, Director of the Harvard Law School Library, and Faculty Director of the Berkman Center for Internet & Society. His research interests include battles for control of digital property and content, cryptography, electronic privacy, the roles of intermediaries within Internet architecture, human computing, and the useful and unobtrusive deployment of technology in education.

He performed the first large-scale tests of Internet filtering in China and Saudi Arabia, and as part of the OpenNet Initiative co-edited a series of studies of Internet filtering by national governments: *Access Denied: The Practice and Policy of Global Internet Filtering* (2008); *Access Controlled: The Shaping of Power, Rights, and Rule in Cyberspace* (2010); and *Access Contested: Security, Identity, and Resistance in Asian Cyberspace* (2011).