# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

AMERICAN SOCIETY FOR TESTING
AND MATERIALS d/b/a/ ASTM
INTERNATIONAL,

NATIONAL FIRE PROTECTION
ASSOCIATION, INC., and

AMERICAN SOCIETY OF HEATING,
REFRIGERATING, AND AIR-
CONDITIONING ENGINEERS, INC.

       Plaintiffs/Counter-Defendants,

       v.

PUBLIC.RESOURCE.ORG, INC.,

       Defendant/Counter-Plaintiff.

Case No. 1:13-cv-01215-TSC

# BRIEF FOR AMICUS CURIAE THE AMERICAN NATIONAL STANDARDS INSTITUTE, INC., AMERICAN SOCIETY OF SAFETY ENGINEERS, THE INSTITUTE OF ELECTRICAL AND ELECTRONICS ENGINEERS, INCORPORATED, INTERNATIONAL ASSOCIATION OF PLUMBING & MECHANICAL OFFICIALS, NATIONAL ELECTRICAL MANUFACTURERS ASSOCIATION, NORTH AMERICAN ENERGY STANDARDS BOARD, <u>AND UNDERWRITERS LABORATORIES INC.</u>

## STATEMENT OF INTERESTED PARTIES

The undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case. These representations are made in order that the judgment of this Court may evaluate possible disqualification or recusal.

American National Standards Institute, Incorporated, Amicus Curiae
American Society of Safety Engineers, Amicus Curiae
The Institute of Electrical and Electronics Engineers, Incorporated, Amicus Curiae
International Association of Plumbing & Mechanical Officials, Amicus Curiae
National Electrical Manufacturers Association, Amicus Curiae
North American Energy Standards Board, Amicus Curiae
Underwriters Laboratories Inc., Amicus Curiae

Morris, Manning & Martin, LLP
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005

Carter Ledyard & Milburn LLP
Two Wall Street
New York, NY 10005

Attorneys of Record for Amici Curiae

i

# TABLE OF CONTENTS

CONCISE STATEMENT OF IDENTITY OF AMICI CURIAE, INTEREST IN THE CASE, AND SOURCE OF AUTHORITY TO FILE ....................................... 1

ARGUMENT ................................................................................................ 5

I. LOSS OF COPYRIGHT IN STANDARDS WOULD PROFOUNDLY HARM SDOs, FEDERAL, STATE AND LOCAL GOVERNMENTS AND THE PUBLIC ....................................................................................... 5

    A. SDOs Would Be Unable to Fund Standards Development If Deprived of Revenues from Standards Sales ................................................. 5

    B. Governments Would Lose the Ability to Adopt Standards Into Law or Utilize Standards Themselves ................................................. 8

    C. The Public Would Be Harmed By Lost Efficiencies And Lost Opportunity Costs .................................................................... 12

    D. United States Industry Would Be Diminished ......................... 14

II. THERE IS NO CONGRESSIONAL OR JUDICIALLY CREATED COPYRIGHT EXCEPTION FOR PRIVATELY AUTHORED WORKS THAT HAVE BEEN REFERENCED IN A LAW AND DUE PROCESS DOES NOT REQUIRE THE CREATION OF SUCH AN EXCEPTION ... 14

    A. The Copyright Act Supports the D.C. Circuit and Congress' Approach to Construing the Copyright Act When Privately Created Works are Used by the Government ..................................................................... 15

    B. Government Policy Supports Copyright Protection ................. 20

    C. Judicial Precedent Supports Copyright Protection .................. 21

    D. Recognizing Private and Public Interests Avoids A Substantial Constitutional Takings Question .............................................. 24

CONCLUSION ......................................................................................... 25

# TABLE OF AUTHORITIES

**Constitutional Provisions**

Article I, § 8, U.S. Constitution ...............................................................................15

**Cases**

*Building Off. & Code Amd. v. Code Technology, Inc.*, 628 F.2d 730
(1st Cir. 1980) ..........................................................................................................23

*CCC Info. Servs., Inc. v. Maclean Hunter Market Reports, Inc.,* 44 F.3d 61
(2d Cir. 1994)..................................................................................................... 21, 24

*M.B. Schnapper Pub. Affairs Press v. Foley*, 667 F.2d 102 (D.C. Cir. 1981).........18

*Oracle Am. Inc. v Google, Inc.*, 750 F.3d 1339 (Fed.Cir. 2014) ...............................6

*Practice Mgmt. Info. Corp. v. Am. Med. Ass'n,* 121 F.3d 516
(9th Cir. 1997)................................................................................................ 21, 23, 24

*Roth v. Pritikin*, 710 F.2d 934 (2nd Cir. 1983)......................................................25

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984)................15

*United Video, Inc. v. FCC*, 890 F.2d 1173 (D.C. Cir. 1989)............................ 16, 24

*Veeck v S.Bldg Code Cong., Intl, Inc.*, 293 F.3d 791 (5th Cir. 2002) .......... 6, 22, 24

*Walton v. United States*, 80 Fed. Cl. 251 (Ct. Fed. Cl. 2008) .................................16

**Statutes**

17 U.S.C. § 101 .......................................................................................................16

17 U.S.C. §105....................................................................................... 16, 17, 19

17 U.S.C. § 201(e) ...................................................................................................25

5 U.S.C. § 552(a)(1)..................................................................................................9

**Other Authorities**

H.R. Rep. No. 1476, 94th Cong., 2d Sess. 59 (1976)....................................... 18, 19

Proposed Revisions to OMB A-119 79 FR 8207 (February 11, 2014) ...................23

U.S. Code Cong. & Admin.News 1976, pp. 5659, 5672................................. 18, 19

Webster's New Collegiate Dictionary ....................................................................16

**Regulations**

79 Fed. Reg. 66267 ...............................................................................................10

OMB Circular A-119 ........................................................................................ 8, 10

Standards for Business Practices and Communication Protocols for
Public Utilities, Final Rule, 74 Fed. Reg. 63,287, 63,302 (Dec. 3, 2009)...............14

## CONCISE STATEMENT OF IDENTITY OF AMICI CURIAE, INTEREST IN THE CASE, AND SOURCE OF AUTHORITY TO FILE

The standards and codes involved in the present case are part of a large genre of creative works, including standards, model codes and other reference works (collectively referred to as "standards"), that are generally developed by private, not-for-profit organizations and may be selected, when appropriate, for use and adoption, in whole or in part, by government instrumentalities throughout the United States. Amici curiae are all organizations that are involved in the coordination, creation, or use of these socially important works.

American National Standards Institute, Incorporated ("ANSI") is a not-for-profit membership organization that, for more than 97 years, has administered and coordinated the voluntary standardization system in the United States. ANSI facilitates the development of American National Standards ("ANSs") by accrediting the procedures of standards developing organizations ("SDOs"). These SDOs work cooperatively to develop voluntary national consensus standards that are used in virtually every industry sector and in all aspects of daily life, from toys and food safety to IT and the built environment.  Accreditation by ANSI signifies that the procedures used by the standards developer in connection with the development of ANSs meet ANSI's essential requirements for openness, balance, consensus and due process.  Each of the Plaintiffs and each of the other amici are

among the 243 ANSI Accredited SDOs ("ASDs"), and they are representative of ANSI's broader ASD community.

American Society of Safety Engineers ("ASSE") was founded in 1911 and is the world's oldest professional safety society. ASSE is a global association of occupational safety professionals representing more than 36,000 members worldwide. The Society is an advocate for occupational safety and health professionals.

The Institute of Electrical and Electronics Engineers, Incorporated ("IEEE") is a not-for-profit professional organization dedicated to the advancement of technology for humanity with a 125-year history of technological innovation. The organization comprises more than 400,000 members who participate in its activities across the world in more than 160 countries.  IEEE is a leading developer of standards, with an active portfolio of over 1,700 standards and projects under development. These standards affect a wide range of industries including: power and energy, information technology, telecommunications, transportation, and nanotechnology, information assurance.

International Association of Plumbing & Mechanical Officials ("IAPMO") coordinates the development of plumbing and mechanical codes and standards to meet the specific needs of individual jurisdictions and industry both in the United

States and abroad. IAPMO is a not-for-profit membership organization that was founded in 1926.

National Electrical Manufacturers Association ("NEMA") is the association of electrical equipment manufacturers, founded in 1926. NEMA sponsors the development of and publishes over 500 standards relating to electrical products and their use. NEMA's member companies manufacture a diverse set of products including power transmission and distribution equipment, lighting systems, factory automation and control systems, building controls and electrical systems components, and medical diagnostic imaging systems.

North American Energy Standards Board ("NAESB") was formed in 1994. NAESB maintains a membership of over three hundred corporate members representing the wholesale gas, wholesale electric, retail gas and retail electric markets and has more than two-thousand participants active in standards development.

Underwriters Laboratories Inc. ("UL") is an independent, not-for-profit standards developer dedicated to promoting safe living and working environments since its founding in 1894.  UL's standards provide a critical foundation for the safety system in the United States and around the world, as well as promote innovation and environmental sustainability.  With over 120 years of experience

and the development of over 1,500 standards, UL advances safety science through careful research and investigation.

Amici Curiae represent a wide range of SDOs with varied purposes and different audiences that exist to benefit our society. The standards created and administered by SDOs are often later used and adopted by local and state governments and federal authorities throughout the United States who do not otherwise have the necessary facilities and resources to develop them independently. ASSE, IEEE, IAPMO, NEMA, NAESB and UL are just six of the hundreds of private SDOs that support their standards development activities through revenues derived from the publication, sale, and licensing of standards made possible by the protection of the copyright laws.

Amici believe that defendant Public.Rescource.Org, Inc.'s position and asserted justification for its infringing conduct, as described in Count I of its Counterclaim for Declaratory Judgment, ¶¶174-195 (filed September 27, 2013) and elsewhere, is an ill-advised departure from established principles of law and policy. The copyrighted standards at issue in this case are part of a large and important ecosystem of creative works developed by not-for-profit SDOs. SDOs create and maintain at their own substantial expense their copyrighted standards and make them available to interested parties, government regulators, and the public at large. Loss of copyright protection for these works would drastically undermine the

4

ability of SDOs to fund the ongoing creation and updating of these important works, and would therefore harm the governments and the public who benefit from and rely on the work of these SDOs.

## ARGUMENT

Defendant's primary position is that because plaintiffs' privately authored standards have been referenced in statutes and regulations, including the Code of Federal Regulations, those works have forever lost their copyright protection. If this sweeping contention were accepted, it would profoundly harm private SDOs, governments – state, local, and federal – who benefit from private standards development, and the public who benefit from standardization's efficiencies in hundreds of industries, including improvements in the way product components interoperate, and the avoided fiscal burden that would result from government authorship of standards.   Part I below addresses the policy considerations that weigh against defendant's position, and Part II addresses the legal considerations that support amici's position.

## I.   LOSS OF COPYRIGHT IN STANDARDS WOULD PROFOUNDLY HARM SDOs, FEDERAL, STATE AND LOCAL GOVERNMENTS AND THE PUBLIC

### A. SDOs Would Be Unable to Fund Standards Development If Deprived of Revenues from Standards Sales

Defendant's position that creative works such as those developed by the SDOs enter the public domain the moment any government instrumentality adopts

5

them by reference in a law has the largest implications for copyright holders like amici who develop standards that a government may elect to use and reference in law. SDOs rely on copyright protection and the ability it affords to generate revenue from the sale and licensing of the works they create to sustain their on-going standards creation, refinement, and updating.

The development of useful, high-quality, up-to-date, consensus-based standards is a costly, time consuming process. Drafting standards requires wide-ranging creative input from a variety of concerned constituencies and sources of expertise,[1] including representatives of the consuming public, industry, and the public safety and regulatory community. In addition, the standards drafting process draws heavily on the administrative, technical, and support services provided by the organizations that develop them.

---

[1] The defendants' assertion that technical standards are not copyrightable because they lack creativity or recite facts, *see* Defendants' Memorandum of Points and Authorities at 30-34 (Dkt. No. 121-1), is wrong. *Veeck v S.Bldg Code Cong., Intl, Inc*. 293 F.3d 791, 802 (5th Cir. 2002) ("We emphasize that in continuing to write and publish model building codes, SBCCI is creating copyrightable works of authorship."). The content of standards publications reflects technical and other judgments and opinions on matters of safety, economic and manufacturing efficiency, energy efficiency, best practices, and a variety of other subjects; standards development bodies consider the choice of words, the order in which content is presented, and make numerous other creative choices about the content, including whether content is appropriate for inclusion in a standard. *See* Plaintiffs' Memorandum of Law in Support of Their Motion for Summary Judgment at 5-7 (Dkt. No. 118-1); *see also Oracle Am. Inc. v Google, Inc.*, 750 F.3d 1339, 1361-1367 (Fed.Cir. 2014) (describing Oracle's creative choices).

NEMA and UL, for example, arrange for hundreds of standards-related meetings that take place yearly. They provide logistical, administrative, and editorial support to the hundreds of technical committees that draft and regularly update standards, and maintain a permanent staff of engineers, technical program managers, and administrative staff who support their standards activities.

These costs are commonly underwritten, in whole or significant part, by the revenues made possible from the copyright-protected sales and licensing of the standards themselves. For example, ASSE covers the costs of its development of occupational safety and health standards through the revenues derived from sales of those standards. For its part, NEMA allocates half of the royalties earned from the sale of standards developed by a given technical committee to the committee's next annual budget thereby reducing the participants' cost of supporting the committee's ongoing work. Similarly, IAPMO uses all sales of codes and standards to fund its not-for-profit mission and UL funds its standards-development activities from the licensing of its standards. Amicus ANSI, while not an SDO, similarly funds mission-related activities with revenues derived from the sale of standards under licensing agreements with the SDO copyright holders. Without copyright protection, others would be free to expropriate and sell or give away the works created or licensed by SDOs, and the ability of ANSI and these

SDOs to sustain their standards coordination and development activities, as well as other mission-related programs, would be seriously compromised.

### B. Governments Would Lose the Ability to Adopt Standards Into Law or Utilize Standards Themselves

The impact of copyright destruction, however, would be felt by more than just the SDOs whose copyrights would be lost. Private standards development provides federal, state, and local governments with valuable and high quality codes and standards that are created at no cost to taxpayers, and governments at all levels have recognized the importance of privately developed codes and standards by adopting them in great numbers.

In recognition of the benefits of private standards development, the federal government has long made it a policy to adopt such standards unless there is a valid reason for not doing so.   That policy is expressed by the Office of Management and Budget ("OMB") in Circular A-119, which directs all federal agencies to incorporate "in whole, in part, or by reference" privately developed standards for regulatory and other activities "whenever practicable and appropriate."  OMB Circular A-119, 63 Fed. Reg. 8546, 8554-55.  OMB Circular A-119 expressly acknowledges that doing so "[e]liminate[s] the cost to the government of developing its own standards." *Id.* at 8554.  For this policy to succeed, private authors must have an incentive to create works useful to the government. OMB thus requires agencies to "observe and protect the rights of the

copyright holder and any other similar obligations." *Id.* at 8555. This policy of federal government use of privately developed standards was codified and fortified in the *National Technology Transfer and Advancement Act of 1995* ("NTTAA").

Under defendant's position, however, government use or adoption of a private work as part of its regulatory scheme would, by definition, invalidate the author's copyright in contravention of OMB A-119 and the NTTAA. Importantly, the Freedom of Information Act ("FOIA") provides an effective mechanism to balance the rights of copyright holders in standards incorporated by reference with the public's right to access the law. Specifically, FOIA expressly authorizes reference by the Code of Federal Regulations ("CFR") to materials incorporated by reference, with the approval of the Office of Federal Register ("OFR"), that are "reasonably available to the class of persons affected thereby." 5 U.S.C. Section 552(a)(1). In other words, a standard is eligible for incorporation by reference only if the federal agency wishing to include the standard determines it is "reasonably available" to the class of persons affected by the anticipated public law.

The "reasonably available" approach was recently reaffirmed by the OFR in response to a petition signed by a number of petitioners, including defendant.[2] That petition asked the National Archives and Records Administration ("NARA")

---

[2]  *See* Petition submitted by Peter Strauss *et al*, February 21, 2012.
http://www.gpo.gov/fdsys/pkg/FR-2012-02-27/pdf/2012-4399.pdf

to define "reasonably available" in the regulations to require free access to standards incorporated by reference into the CFR.  The OFR rejected this request, reaffirming in its Final Rule on November 7, 2014, that "reasonably available" means that the standard is accessible to any potential user but does not require that the standard be available without a fee. 79 Fed. Reg. 66267 (November 7, 2014). Instead, the OFR announced non-confiscatory revisions to its rules, including clarifying that government agencies "should collaborate with the [SDOs] and other publishers of [incorporated by reference] materials, when necessary, to ensure that the public does have reasonable access to the referenced documents." *Id.* at 66268.[3]

As the federal policy reflected in OMB Circular A-119, the NTTAA, and the OFR's recent rulemaking makes clear, the U.S. government has important interests at stake and the destruction of copyright relating to standards incorporated by reference would have a damaging impact on the federal government. Indeed, according to the U.S. National Institute of Standards and Technology ("NIST"), federal government agencies engage in standardization in a wide range of mission-specific roles, including contributing to development of standards in the private sector, ensuring that standards are not used as technical barriers to trade by trading

---

[3]  OMB recently issued a Request for Comments on a Proposed Revision of OMB Circular No. A-119.
*See* https://www.whitehouse.gov/sites/default/files/omb/inforeg/revisions-to-a-119-for-public-comments.pdf.  An updated Circular is expected to be issued by OMB in the near future.

partners, using standards for procurement or regulatory actions, and addressing competition-related aspects of standards-setting activities.[4]

The federal government also itself relies heavily on privately developed standards to serve diverse regulatory objectives.  For example, the Federal Energy Regulatory Commission ("FERC") uses incorporation by reference to make standards developed by NAESB mandatory for participants in the wholesale energy markets.  The Occupational Safety and Health Administration ("OSHA") uses voluntary consensus standards developed by amicus ASSE in health and safety regulation. The use of consensus standards reduces the cost to agencies due to economies of scale resulting from using the same standards for government as are used for the commercial sector, and spurs innovation and greater product choice.

At the state and local level, as is the case at the Federal level, it is fair to say that governments could not effectively function without privately developed standards. Virtually all safety regulation requires expertise and experience that is beyond the resources of such governments alone to marshal.  A prime example of this reliance is in the regulation of buildings and their related systems such as

---

[4]  *See* Testimony of Mary H. Saunders, Director, Standards Coordination Office National Institute of Standards and Technology U.S. Department of Commerce Before the House Committee on Science, Space, and Technology, Subcommittee on Technology and Innovation, February 29, 2012, *available at* https://science.house.gov/sites/republicans.science.house.gov/files/documents/hearings/HHRG-112-SY19-WState-MSaunders-20120228.pdf

heating and cooling, plumbing, and electrical. Virtually all state and local plumbing and mechanical codes are based on a model building code. Amicus IAPMO has, since its inception in 1926, developed the Uniform Plumbing Code on a three-year cycle.  The 2015 edition is a prodigious work exceeding 400 pages and covering the entire plumbing system. The UPC has been adopted, in totality or with amendments, in 17 states and territories, as well as in numerous municipalities.

SDOs like amici, in furtherance of their not-for-profit safety and welfare purposes, make available the use of their works by governmental entities in setting safety and other regulations when those entities deem it in the public interest. They do so with the understanding that these works will retain their copyright and have to be made reasonably available to anyone who needs them in order to comply with the law or to participate in the government programs that incorporate those works. Indeed, for these works to have any utility for the governments that utilize them, they must be made generally and reasonably available, and it is in the interests of the SDOs to see that they are.

## C. The Public Would Be Harmed By Lost Efficiencies And Lost Opportunity Costs

The destruction of copyrights in standards ultimately would have the greatest negative impact on the very group that the defendant in this case purports to represent – citizens whose access to the law is allegedly compromised because

they may have to pay for a standard.  Indeed, the public has the most to lose if copyright is lost every time federal, state, or local governments incorporate standards into law.

If SDOs lose copyright in standards, they may be forced to increase stakeholder participation fees in order to offset the loss of revenues from the sale of standards.  This would, in turn, disenfranchise consumers, small businesses, and local governments and potentially result in a situation where those with money could have disproportionately increased influence over others. This could also result in fewer and lower quality standards for use by the consuming public. The lack of industry-wide contributions and fewer participants in the standards development process would result in less transparency, diminished inclusivity, and standards becoming less broad-based.

Equally significant, if SDOs lose copyright in their standards, governments may be compelled to develop more detailed regulations afresh, resulting in increased regulatory costs that would be passed on to consumers.  If for example NAESB could no longer afford to stay in the standards-writing space and FERC took over the task of writing standards, it probably would be done through a substantially less efficient and more costly process. FERC has explained that "[f]rom our experience, the NAESB process is a far more efficient and cost effective method of developing technical standards for the industries involved than

13

the use of a notice and comment rulemaking process involving numerous technical conferences in Washington that all believe they have to attend," concluding that "the benefits of having a well-established, consensus process outweigh whatever costs non-members may incur in having to obtain copies of the standards."[5]

### D. United States Industry Would Be Diminished

Finally, if SDOs were forced to withdraw from standards development because they could no longer fund their operations, some standards for new technologies could go undeveloped in the United States. The United States, as a leader in innovation, would be negatively impacted.  This could result in fewer opportunities for U.S. companies and workers in industries driven by standardization activities.   The issue extends beyond leadership in standards development work: standards are a tremendous part of market access issues that are being negotiated as part of the Trans-Pacific Partnership ("TPP") and Transatlantic Trade and Investment Partnership ("TTIP") trade agreements.

## II.    THERE IS NO CONGRESSIONAL OR JUDICIALLY CREATED COPYRIGHT EXCEPTION FOR PRIVATELY AUTHORED WORKS THAT HAVE BEEN REFERENCED IN A LAW AND DUE PROCESS DOES NOT REQUIRE THE CREATION OF SUCH AN EXCEPTION

In the face of statute, policy, and practice to the contrary, defendant invokes constitutional principles of due process, claiming that these principles require the

---

[5]    Standards for Business Practices and Communication Protocols for Public Utilities, Final Rule, 74 Fed. Reg. 63,287, 63,302 (Dec. 3, 2009).

destruction of a copyright owner's property rights in a privately developed standard the moment that any governmental authority adopts it, and that this is required in order to ensure the public's right to gain full access to and comment on the laws.  This Court must decide, therefore, whether as a matter of law it should establish a new principle to invalidate otherwise valid copyrights.  For the reasons that follow, it should not.

**A. The Copyright Act Supports the D.C. Circuit and Congress' Approach to Construing the Copyright Act When Privately Created Works are Used by the Government**

Copyright is statutory in nature. "The Congress shall have Power . . . To Promote the Sciences and Useful Arts, by securing for limited Times to Authors . . . the exclusive Right to their respective Writings . . ."  United States Constitution, Article I, Section 8.  "[T]he limited grant is a means by which an important public purpose may be achieved.  It is intended to motivate the creative activity of authors . . . by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984).

Statutory construction of the Copyright Act relies on traditional principles. "In determining the intent of Congress, we must look to the particular statutory language at issue, as well as the language and design of the statute as a whole, and we must employ traditional tools of statutory construction, including, where

appropriate, legislative history." *United Video, Inc. v. FCC*, 890 F.2d 1173, 1184 (D.C. Cir. 1989) (citations omitted).   The unambiguous text of the 1976 Copyright Act, Sections 101 and 105, confirms that the abridgement of copyright in "any work" of the United States Government --- whether in the form of judicial opinions, statutes, regulations, guidelines, reports, or any other form --- only occurs when the "work [is] prepared by an officer or employee of the United States Government as part of that person's official duties."

Section 105 of the Copyright Act states:  "Copyright protection under this title is not available for any work of the United States Government, . ." 17 U.S.C. §105.   And Section 101 of the Copyright Act defines a "work of the United States Government" as a "work prepared by an officer or employee of the United States Government as part of that person's official duties." 17 U.S.C. § 101. "[A]ccording to the well-established rules of statutory construction, the court must ascribe the 'ordinary, contemporary, common meaning' to the terms [in the Copyright Act]." *Walton v. United States*, 80 Fed. Cl. 251, 272 (Ct. Fed. Cl. 2008), *aff'd*, 551 F.3d 1367 (Fed. Cir. 2009).   In the context of this case, the ordinary and common meaning of the words "prepared by" in this sentence is obvious:  "to put into written form." *Webster's New Collegiate Dictionary* at 909 (1973).   Privately developed codes, standards and other reference works are not put into written form by government officers or employees; they were not "prepared by" officers or

employees of the United States Government as part of their official duties.  By the plain language of Section 101 of the Act, these works are not a "work of the United States Government," and accordingly these works are not something for which copyright protection is "unavailable" under Section 105. <u>Congress has clearly decided this question.</u>

Confirmation of this construction of the plain language of Section 105 of the Act can be found in Congress' explicit decision not to include within the scope of Section 105 works prepared by non-government employees and commissioned by the United States. Congress deliberately chose not to declare commissioned works "unavailable for copyright protection," and instead stated that the question of copyright in these cases could be left to the Congress enacting a statute, the agency enacting a regulation or the contract that commissioned the work from a private party after balancing the various interests.  Amici point out that this is precisely the approach taken by OMB and OFR recently during their respective regulatory reviews that addressed the defendant's legal proposition that is now before the Court. In those reviews, the two federal offices considered the implications of the concept of "reasonably available" and supported the long-standing policy of upholding the copyrights in standards incorporated by reference. *See* discussion *supra* at pages 8-10 and *infra* at page 20.

As explained by the House Judiciary Committee report on the 1976 revision to the Copyright Act:

> *The bill deliberately avoids making any sort of outright, unqualified prohibition against copyright in works prepared under Government contract or grant.* There may well be cases where it would be in the public interest to deny copyright in the writings generated by Government research contracts and the like; it can be assumed that, where a Government agency commissions a work for its own use merely as an alternative to having one of its own employees prepare the work, the right to secure a private copyright would be withheld. However, there are almost certainly many other cases where the denial of copyright protection would be unfair or would hamper the production and publication of important works. *Where, under the particular circumstances, Congress or the agency involved finds that the need to have a work freely available outweighs the need of the private author to secure copyright, the problem can be dealt with by specific legislation, agency regulations, or contractual restrictions.*

H.R. Rep. No. 1476, 94th Cong., 2d Sess. 59 (1976), U.S. Code Cong. & Admin.News 1976, pp. 5659, 5672 (emphasis supplied).

This is the law in this Circuit:  "It is readily observable, therefore, that the language of the new Copyright Act does not prohibit copyright protection for federally commissioned works." *M.B. Schnapper Pub. Affairs Press v. Foley*, 667 F.2d 102, 108-09 (D.C. Cir. 1981).   *Schnapper* expressly acknowledged the Copyright Act's ability to recognize both private and public interests when private works are used by the Government:

> Without laying down a broad rule, we are reluctant to cabin the discretion of government agencies to arrange ownership and publication rights with private contractors absent some reasonable showing of a congressional desire to do so. The legislative history

18

noted above indicates a desire to vest the government with some flexibility in making these arrangements.

*Schnapper*, 667 F.2d at 109.

Private standards referenced in federal statutes or federal agency regulations are an even more distinct species of works not "prepared by an officer or employee of the United States Government as part of that person's official duties" than a commissioned work. While they share a common attribute with a commissioned work because they are not prepared by an officer or employee of the United States Government, they are even more remote from a "work of the United States Government" than a commissioned work because they were prepared by non-governmental entities often well-before the government took an interest in the copyrighted codes, standards, and other reference works.[6] Privately developed, copyrighted codes, standards, and other reference works incorporated by reference in laws and regulations deserve the availability of copyright protection even more so than commissioned works. They do not lose copyright protection under the clear terms of Section 105 of the Copyright Act, and the judiciary should recognize that the government is vested with "some flexibility in making arrangements" to preserve the copyright of the standards development organizations for the works they prepared.

---

[6] Clearly, there is no "double subsidy" issue that Congress indicated might be a concern in the case of commissioned works. H.R. Rep. No. 1476, 94th Cong., 2d Sess. 59 (1976), U.S. Code Cong. & Admin.News 1976, pp. 5659, 5672.

**B. Government Policy Supports Copyright Protection**

As discussed above, government policy asks government agencies who decide to incorporate privately developed codes and standards in their regulations whether the codes and standards are "reasonably available." The holding sought by defendant from this Court would be contrary to this firmly established government policy, and to the wide practice of federal, state, and local governments throughout the United States in adopting and referencing, without controversy, copyright-protected, privately authored works.

In keeping with the "reasonably available" requirement, amici make their standards available through multiple distribution channels, including on-line "reading rooms" and retail sales sites, and they offer them in a variety of formats, including subscriptions, compilations, and various other electronic products. ANSI, for example, offers an IBR Portal that provides free, read-only, online access to a number of standards that have been incorporated by reference. NEMA relies upon the ANSI IBR Portal to host 24 of its standards that have been incorporated by reference in federal regulations. IEEE uses the ANSI IBR Portal to make available all of its standards that are referenced in the *U.S. Code of Federal Regulations*. IAPMO also uses the ANSI IBR Portal to make available all of its standards that have been incorporated by reference. UL hosts its own IBR portal that provides free, read-only, online access to its standards that have been

20

incorporated by reference. ASSE makes "tech briefs" freely available for each of its standards. NAESB provides free access to its standards through requests of waivers and requests for access through an electronic product that allows for electronic review for a limited period, at no fee. The plaintiffs make their standards available in this manner as well.  Complaint at ¶¶103 – 105.

There is no compelling policy reason to treat model codes developed by private SDOs differently than any other standard or reference work referenced in law or regulation if it is reasonably available to the public.

### C. Judicial Precedent Supports Copyright Protection

The weight of judicial precedent does not support invalidating copyright in this case.  As two circuit courts have observed, works under copyright do not enter the public domain when they are referenced by government bodies in law. *Practice Mgmt. Info. Corp. v. Am. Med. Ass'n,* 121 F.3d 516, 519-20 (9th Cir. 1997); *CCC Info. Servs., Inc. v. Maclean Hunter Market Reports, Inc.,* 44 F.3d 61, 73-74 (2d Cir. 1994).  Specifically, the Second and Ninth Circuits have held that referencing a standard in federal and state regulations does not extinguish the copyright interest in the adopted work. *Practice Mgmt.*, 121 F.3d at 518-20 (holding that an American Medical Association catalogue of medical procedures did not lose its copyright when it was incorporated into federal regulations governing Medicare and Medicaid reimbursement); *CCC Info. Servs.*, 44 F.3d at 73-74 (holding that a

privately-developed guide to used car valuation did not enter the public domain after it was incorporated into several states' insurance statutes and regulations).

Amici acknowledge that a closely divided *en banc* panel of the Fifth Circuit in *Veeck v S.Bldg Code Cong., Intl, Inc*., 293 F.3d 791, 803-05 (5th Cir. 2002) held that model codes incorporated into local law without modification results in the evisceration of copyright in those jurisdictions, but we respectfully submit for the reasons we have stated that if those model codes are reasonably available to the public for viewing there is no compelling policy reason to treat these model codes differently than any other referenced work and deny copyright protection in those jurisdictions. In any event, the Fifth Circuit held that other referenced works, including standards and other documents, were entitled to copyright protection as the First and Ninth Circuits have held. *Veeck,* 268 F.2d at 803-05.

Furthermore, as noted supra, the OFR considered in its Final Rule "the recent developments in Federal law, including the *Veeck* decision," and stated that the developments have not "eliminated the availability of copyright protection for privately developed codes and standards referenced in or incorporated into Federal Regulations." The OMB has stated that "the costs of standards development are substantial, and requiring that standards be made available 'free of charge' will have the effect of either shifting those costs onto others or else depriving standards developing bodies of the funding through which many of them now pay for the

22

development of these standards.   Such changes could have serious adverse consequences on important governmental objectives, including the ability of U.S. regulators to protect the environment and the health, welfare, and safety of U.S. workers and consumers." Proposed Revisions to OMB A-119 79 FR 8207 (February 11, 2014).

This case does not involve any attempt by Plaintiffs to withhold copyrighted standards or otherwise prevent discussion of these works nor is there any evidence of record that they have used copyright to do so. This is why the rule adopted by the Second and Ninth Circuits makes more sense than the rule advanced by Public.Resource.Org.   The due process concern that "citizens must have free access to the laws which govern them," *Building Off. & Code Amd. v. Code Technology, Inc.*, 628 F.2d 730, 734 (1st Cir. 1980), and that copyright protection for these types of works might constrict entirely citizens' access to the laws, *id*. at 734-35, ignores the critical fact that it would be contrary to the SDO copyright owner's interest to prevent broad dissemination of these standards. *See Practice Mgmt.*, 121 F.3d at 519.   Indeed, the standards are developed precisely for the purpose of being disseminated; the issue for the SDOs is that their copyrights be protected so that they can continue to afford to develop standards.

Finally, the balance of competing interests at stake in such cases favors preserving copyright protection for works incorporated by reference into public

enactments. The SDO community that develops standards serves an important public function and arguably does a better job than could the government alone in seeing that complex yet essential regulations are drafted, kept up to date and made available.  If the amici SDOs were forced to give up their copyright interests once a government entity enacted their works into law, there would be little incentive to create such works, or at least to offer them to the government. *Practice Mgmt.*, 121 F.3d at 518-19.[7]

### D. Recognizing Private and Public Interests Avoids A Substantial Constitutional Takings Question

Indeed, while addressing no actual due process notice problem, a rule that the adoption of a standard by a legislature or administrative body deprived the copyright owner of its property would, as one court observed, "raise very substantial problems under the Takings Clause of the Constitution." *CCC Info. Servs.*, 44 F.3d at 74, *cert. denied*, 516 U.S. 817 (1995); *Practice Mgmt.*, 121 F.3d at 520, *cert. denied*, 524 U.S. 952 (1998) (same concern).  When considering the construction of Sections 101 and 105 of the Copyright Act, this Court should consider "the language and design of the statute as a whole," *United Video*, *supra*

---

[7] Judge Wiener, joined by 5 other members of the Fifth Circuit's *en banc* panel in *Veeck*, recognized the importance of balancing interests and not adopting an inflexible *per se* rule, such as that advocated by PublicResource.Org. *Veeck.*, 293 F.3d at 826 (Wiener, J., dissenting).  Amici commend Judge Wiener's analysis to this honorable court.

at 1184, and render these sections consistent with Section 201(e)[8] to foreclose a

Takings Clause problem.

## CONCLUSION

For the forgoing reasons, amici respectfully ask this honorable Court to enter

judgment for Plaintiffs.

DATED: January 11, 2016                    Respectfully submitted,

MORRIS, MANNING & MARTIN,        CARTER LEDYARD & MILBURN
LLP                                                       LLP

*/s/ Bonnie Y. Hochman Rothell*          */s/ Gerald W. Griffin*
Bonnie Y. Hochman Rothell                   Gerald W. Griffin
D.C. Bar No.: 421606                            *Admitted Pro Hac Vice*
1401 Eye St., NW, Suite 600                 Two Wall Street
Washington, D.C. 20005                       New York, NY 10005
Phone: (202) 216-4801                         Phone: (212) 238-8672
Fax: (202) 408-5146                            Fax: (212) 732-3232
bhrothell@mmmlaw.com                      griffin@clm.com

*Local Counsel for Amicus Curiae*       *Counsel for Amicus Curiae*

---

[8] 17 U.S.C. §201(e) (". . . no action by any governmental body or other official or organization purporting to seize, expropriate, transfer, or exercise rights of ownership with respect to the copyright, or any of the exclusive rights under a copyright, shall be given effect under this title, except as provided under title 11."). *See also Roth v. Pritikin*, 710 F.2d 934, 939 (2nd Cir. 1983) (Plaintiff's interpretation of section of the Copyright Act raised serious Constitutional questions under Takings Clause).

## **CERTIFICATE OF SERVICE**

I HEREBY certify that on this 11th day of January 2016, a true and correct copy of the foregoing document was filed with the Clerk of Court using the Court's CM/ECF system, which will serve notice of such filing upon all counsel of record.

*/s/ Bonnie Y. Hochman Rothell*