**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN SOCIETY FOR TESTING AND MATERIALS d/b/a ASTM INTERNATIONAL; <br><br> NATIONAL FIRE PROTECTION ASSOCIATION, INC.; and <br><br> AMERICAN SOCIETY OF HEATING, REFRIGERATING, AND AIR CONDITIONING ENGINEERS, <br><br>       Plaintiffs-Counterdefendants, <br><br>            v. <br><br> PUBLIC.RESOURCE.ORG, INC., <br><br>       Defendant-Counterclaimant | Case No. 1:13-cv-01215-TSC-DAR <br><br><br> Action Filed: August 6, 2013 |

**BRIEF OF SINA BAHRAM AS AMICUS CURIAE
IN SUPPORT OF DEFENDANT**

Jeffrey T. Pearlman
   CA Bar #254759
   D.C. District Bar ID #CA00003
Phillip R. Malone (Admission Pending)
Juelsgaard IP And Innovation Clinic
Mills Legal Clinic at Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305
Telephone: (650) 497-9443
Fax: (650) 723-4426

*Attorneys for Amicus Curiae Sina Bahram*

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. ii

TABLE OF AUTHORITIES ..................................................................................................... iii

IDENTITY AND INTEREST OF AMICUS CURIAE ................................................................ 1

SUMMARY OF ARGUMENT .................................................................................................... 2

ARGUMENT ................................................................................................................................. 4

I.  Access by all persons to the law is a fundamental right and public policy. .................. 4

II.  Assistive technologies increasingly permit disabled persons to access the law and other important information and resources. ............................................................... 7

III.  Misapplying copyright to the law prevents vital access by persons with visual or print disabilities. ............................................................................................................... 10

    a.  Technical limitations on online access to the incorporated standards prevent visually impaired and print-disabled persons from using assistive technologies, effectively depriving them of access to the law. .................................................... 11

    b.  Public Resource's transformation of the incorporated standards into an accessible format provides the print-disabled access to the law they would not otherwise have. ......................................................................................................................... 12

CONCLUSION ............................................................................................................................ 14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Authors Guild, Inc. v. HathiTrust*,
  755 F.3d 87 (2d. Cir. 2014) .................................................................................... 13

*Banks v. Manchester*,
  128 U.S. 244 (1888) .............................................................................................. 4, 5

*The Use of Telecasts to Inform and Alert Viewers with Impaired Hearing*,
  26 F.C.C.2d 917 (1970) ............................................................................................ 7

*Veeck v. S. Bldg. Code Cong. Int'l, Inc.*,
  293 F.3d 791 (5th Cir. 2002) (en banc) ................................................................... 5

**Statutes**

Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12,101–12,213 (2012) ............ 7

*Rehabilitation Act Amendments of 1986*, Pub. L. No. 99-506 § 603(a), 100 Stat.
  1807 (codified as amended at Section 508 of the Rehabilitation Act of 1973,
  29 U.S.C. § 794d) .................................................................................................... 7

**Other Authorities**

28 C.F.R. § 36.303(b) (2015) ........................................................................................ 7

*The ADA and Entertainment Technologies: Improving Accessibility from the
  Movie Screen to Your Mobile Device: Hearing Before the S. Comm. On
  Health, Educ., Labor & Pensions*, 113th Cong. (2013) (statement of Karen
  Peltz Strauss, Deputy Chief, Consumer & Governmental Affairs Bureau, Fed.
  Commc'ns. Comm'n) ............................................................................................ 14

Ass'n of Research Libraries, *Report of the ARL Joint Task Force on Services to
  Patrons with Print Disabilities* 7 (2012) ................................................................ 11

Brian Wentz et al., *Retrofitting Accessibility: The Legal Inequality of After-the-
  Fact Online Access for Persons with Disabilities in the United States*, First
  Monday (Nov. 7, 2011) ........................................................................................... 6

Crista Earl, *Can CAPTCHAs Be Made Accessible*, Am. Found. for the Blind
  (Aug. 21, 2014) ...................................................................................................... 10

Ctrs. for Disease Control & Prevention, Nat'l Ctr. for Health Statistics, Pub. No.
  2014-1588, *Summary Health Statistics for U.S. Adults: National Health
  Interview Survey* 40 (2014) .................................................................................... 6

Daniel F. Goldstein & Matthias Niska, *Why Digital Accessibility Matters to the Legal Profession*, Law Prac. Today (June 2013) ................................................................. 6, 8

Daniel Goldstein & Gregory Care, *Disability Rights and Access to the Digital World*, The Fed. Lawyer (Dec. 2012) ................................................................................. 8, 9

L. Guarino Reid et al, *The Accessibility of Adobe Acrobat Software for People with Disabilities*, Am. Found. for the Blind ........................................................................ 9

Lainey Feingold, *Disability Rights Legal Advocacy Recent News*, Law Office of Lainey Feingold (Jan. 9, 2016) ..................................................................................... 10

Lainey Feingold, *Note to Retailers: Chip and Pin Upgrades Must Include Real Keypads*, Law Office of Lainey Feingold (Dec. 16, 2014) ............................................... 10

*Marrakesh Treaty to Facilitate Access to Published Works for Persons Who Are Blind, Visually Impaired, or Otherwise Print Disabled*, pmbl., June 27, 2013, WIPO Doc. VIP/DC/8 Rev ................................................................................................ 7

Matt Shipman, *White House Honors Sina Bahram as a "Champion of Change,"* CSC News (May 7, 2012) .............................................................................................. 1

*Proposed Information and Communication Technology (ICT) Standards and Guidelines*, 80 Fed. Reg. 10880, 10880 (proposed Feb. 27, 2015) (to be codified at 36 C.F.R. pts. 1193, 1194) .................................................................................. 8

Sarah Hilderley, *Accessible Publishing Best Practice Guidelines for Publishers* 8 (2013), http://www.accessiblebooksconsortium.org/export/sites/visionip/inclusive_publishing/en/pdf/accessible_best_practice_guidelines_for_publishers.pdf ...................................... 11

Sina Bahram, *Consulting*, SinaBahram.com ................................................................................ 1

Sina Bahram, *Publications*, SinaBahram.com ............................................................................. 1

U.S. Copyright Office, *Compendium of Copyright Office Practices* § 313.6(c)(2) (3d ed. 2014) ...................................................................................................................... 5

U.S. Equal Opportunity Employment Commission, *Reasonable Accommodations for Attorneys with Disabilities*, http://www.eeoc.gov/facts/accommodations-attorneys.html (last visited January 11, 2016) ............................................................... 6

United States Census Bureau, Press Release, *Nearly 1 in 5 People Have a Disability in the U.S., Census Bureau Reports* (July 25, 2012), https://www.census.gov/newsroom/releases/archives/miscellaneous/cb12-134.html .............................................................................................................................. 5

W3C, Web Accessibility Initiative, *Web Content Accessibility Guidelines
    (WCAG) 2.0 at a Glance* ................................................................................................... 9

The White House, *Champions of Change: Sina Bahram* ................................................................ 1

**IDENTITY AND INTEREST OF AMICUS CURIAE**

Amicus curiae Sina Bahram is a digital accessibility researcher and chief technology officer and co-founder of the International Association of Visually Impaired Technologists ("IAVIT").[1] In addition to researching human computer interaction, intelligent user interfaces, and artificial intelligence with the goal of helping users with disabilities, Mr. Bahram advocates on behalf of disabled individuals and organizations representing their interests. Mr. Bahram has authored numerous publications advocating for technical solutions to accessibility challenges, *see* Sina Bahram, *Publications*, SinaBahram.com, https://www.sinabahram.com/publications.php, and has been honored by the White House as a "Champion of Change" for his accessibility work. *See* Matt Shipman, *White House Honors Sina Bahram as a "Champion of Change,"* CSC News (May 7, 2012), http://www.csc.ncsu.edu/news/1322; The White House, *Champions of Change: Sina Bahram*, https://www.whitehouse.gov/champions/stem-equality-for-americans-with-disabilities/sina-bahram. Mr. Bahram serves on the boards of several accessibility-focused conferences and organizations in addition to working through his consultancy, Prime Access Consulting, to achieve his clients' digital accessibility goals. *See* Sina Bahram, *Consulting*, SinaBahram.com, https://www.sinabahram.com/consulting.php.

As a visually impaired individual himself, and in his capacity as an advocate for other disabled persons, Mr. Bahram has a substantial interest in the disposition of this case, the outcome of which is likely to have a profound effect on disabled persons' ability to access, understand, and participate in the development of the law. Disabled individuals like Mr. Bahram and those for whom he advocates are acutely affected by changes in public safety or accessibility

---

[1] No party or party's counsel authored any part of this brief or contributed money that was intended to fund its preparation or submission. No one other than amicus and his counsel contributed money that was intended to fund the preparation or submission of this brief.

law—changes that may, as in this case, incorporate standards crafted by standards development organizations ("SDOs"). Defendant's Statement of Material Facts ("DSMF") ¶¶ 13, 22. The issue has become even more pressing for disability advocates as the federal government has encouraged agencies to forego crafting standards themselves and incorporate those developed by SDOs. *Id.* ¶ 24. When SDOs erect technological barriers to accessing these standards, they prevent millions of disabled individuals from reading the laws that govern them. Given his history of expertise and advocacy in this issue area, and as a disabled individual himself, Mr. Bahram is particularly well-positioned to explain the details of how assistive technologies permit the disabled to access the law, how technological barriers thwart that access, and the potential impact of this case on disabled individuals.

Amicus Sina Bahram files this brief pursuant to the Court's Jan. 16, 2016. order granting the January 8, 2016 Motion for Leave, Docket No. 133.[2]

## SUMMARY OF ARGUMENT

Access to the law is a fundamental right. Such access is (i) essential to ensuring meaningful citizen participation in democratic processes and institutions and (ii) promotes comprehension of and compliance with the law. Without the ability to distribute, discuss, and meaningfully interact with the law, not only will members of society find it difficult or impossible to participate in the creation of the law, but they may unknowingly violate it, subjecting themselves to possible civil or criminal liability. This right to access is particularly important to disabled individuals, who may be especially vulnerable to disenfranchisement and exclusion from civic participation.

---

[2] Amicus wishes to thank Stanford Law School Juelsgaard Intellectual Property and Innovation certified law students Bethany Bengfort and Brian Quinn for their substantial assistance in drafting this brief.

To exercise their fundamental right to access the law, many disabled individuals must use technologies that translate text into more accessible media. Fortunately, there is a vast array of new and innovative digital assistive technology that significantly improves disabled persons' interaction with digital text. However, if the digital text of the law is not available in sufficiently open formats, or if that text is restricted by technical measures that block *all* forms of digital interaction (purportedly to prevent copying), assistive technology becomes impossible to use. In such situations, disabled individuals who rely on that technology are denied essential access to the law.

In this case, where Plaintiffs have made available only highly restricted copies of the standards that have been incorporated into law available for public viewing in constrained online "reading rooms," those standards (and thus the law) are not accessible to a significant portion of the public. Defendant Public.Resource.Org, Inc. has made the law available in formats that *are* accessible and therefore provide a vital service to the public interest. It is critical that copyright law not be misapplied to prevent full access and to allow private organizations to act as gatekeepers to the law, depriving millions of visually impaired or otherwise print-disabled people of access to it.[3]

---

[3] Amicus concurs with the arguments in Public Resource's memorandum in support of its summary judgment motion (Docket No. 121) that standards incorporated into the law are not copyrightable and that, in any event, posting of those standards to ensure accessibility by all is fair use. However, this brief does not focus on those legal arguments; rather, it seeks to provide a detailed explanation of the vital need for access by disabled individuals, the ways in which assistive technologies help provide that access, the ways in which technical restrictions block the access that assistive technologies would otherwise provide, and the highly transformative nature of Public Resource's postings of the standards (a critical part of the fair use analysis), which ensure the disabled are able to access them.

**ARGUMENT**

I.  **Access by all persons to the law is a fundamental right and public policy.**

Open and unimpeded access to the law is critical to public engagement in a democracy. The ability of the public to obtain, read, and understand the law is essential to both the effective administration of justice and to the core principles of democracy: participation, transparency and accountability.

Access to the law is critical to the effective administration of justice for many reasons. In our democratic system, many entities play a role in shaping, understanding, evaluating, and monitoring compliance with laws. At the highest level, government officials and agencies are responsible for creating, overseeing, and enforcing laws and regulations. In order to inform policy decisions, shape public opinion, and report on legislative processes and legal constrains, media institutions must be able to read and understand the law. Policy and advocacy organizations that represent persons affected by new laws must understand the scope and function of those laws to effectively convey information and advocate for changes. Academics and researchers need to examine laws before weighing their significance and warning against unintended consequences and interpretations.

Most importantly, individual persons in our society must know and understand the laws that affect them so that they can both ensure personal compliance and prevent others from violating their personal rights. This need to know and understand the law necessarily applies to standards that have been incorporated into law. Free availability and access to our laws is a vital right, and safeguarding that right is a critical public policy.

The Supreme Court recognized as much in *Banks v. Manchester*, 128 U.S. 244 (1888), when it held that a court reporter could not obtain copyright protection for its publication of the opinions of the Ohio Supreme Court. "[E]xposition and interpretation of the law," the Court

held, "is free for publication to all." *Id.* at 253. Citing a decision of the Massachusetts Supreme Judicial Court, the Court explained that "justice requires that all should have free access to the [court] opinions, and that it is against sound public policy to prevent this, or to . . . keep from the earliest knowledge of the public the statutes, or the decisions and opinions of the Justices." *Id.* (citing *Nash v. Lathrop,* 142 Mass. 29 (1886)).

An en banc panel of the Fifth Circuit applied this reasoning in a case analogous to the instant one, in which a citizen copied standards incorporated into law and posted them on his public website. In rejecting the SDO's argument that the citizen had infringed its copyright, the court held that "the law is in the public domain for whatever use the citizens choose to make of it." *Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 293 F.3d 791, 799 (5th Cir. 2002) (en banc), *cert. denied*, 539 U.S. 969 (2003). The court explained that citizens are entitled to reproduce copies of the law for many legitimate purposes "or simply to amuse," and that free access to the law cannot be conditioned upon an SDO's voluntary forbearance from filing suit. *See id.*

This well-established principle of free access to the law has also been recognized by the U.S. Copyright Office:

> As a matter of longstanding public policy, the U.S. Copyright Office will not register a government edict that has been issued by any state, local, or territorial government, including legislative enactments, judicial decisions, administrative rulings, public ordinances, or similar types of official legal materials. Likewise, the Office will not register a government edict issued by any foreign government.

U.S. Copyright Office, *Compendium of Copyright Office Practices* § 313.6(c)(2) (3d ed. 2014).

Full access to the law is especially important for disabled persons. In the 2010 U.S. Census, about 56.7 million people—19 percent of the population—reported having a disability. United States Census Bureau, Press Release, *Nearly 1 in 5 People Have a Disability in the U.S., Census Bureau Reports* (July 25, 2012), https://www.census.gov/newsroom/releases/archives/miscellaneous/cb12-134.html. In a 2012 survey conducted by the National Center for Health

5

Statistics, approximately 20.6 million people reported having impaired vision or trouble reading print. Ctrs. for Disease Control & Prevention, Nat'l Ctr. for Health Statistics, Pub. No. 2014-1588, *Summary Health Statistics for U.S. Adults: National Health Interview Survey* 40 (2014). Those with disabilities have unemployment levels three times higher than the rest of the population and significantly lower levels of educational attainment. Brian Wentz et al., *Retrofitting Accessibility: The Legal Inequality of After-the-Fact Online Access for Persons with Disabilities in the United States*, First Monday (Nov. 7, 2011), http://firstmonday.org/ ojs/index.php/fm/article/view/3666/3077. This gap in resources and education makes it even more difficult for people who are blind, visually impaired, or print-disabled to meaningfully participate in social and democratic dialogue. Furthermore, despite the substantial size of this population segment, disabled individuals report that they have significant difficulty accessing legal research tools. *See* Daniel F. Goldstein & Matthias Niska, *Why Digital Accessibility Matters to the Legal Profession*, Law Prac. Today (June 2013), https:// www.americanbar.org/content/newsletter/publications/law_practice_today_home/lpt-archives/ june13/why-digital-accessibility-matters-to-the-legal-profession.html. Access to legal tools is particularly important to disabled lawyers and legal professionals who require the use of these tools to perform their jobs. *See, e.g.*, U.S. Equal Opportunity Employment Commission, *Reasonable Accommodations for Attorneys with Disabilities*, http://www.eeoc.gov/facts/ accommodations-attorneys.html (last visited January 11, 2016).

Gaps in accessibility can have powerful disenfranchising effects for already vulnerable citizens. From voting ballots to statutes to court documents, resources and institutions that are accessible only to the non-disabled exclude disabled persons from participation. The importance

of full access by the disabled is emphasized in the Marrakesh Treaty, which recognizes that roadblocks to full accessibility are

> prejudicial to the complete development of persons with visual impairments or other print disabilities, [and] limit their freedom of expression, including the freedom to seek, receive and impart information and ideas of all kinds on equal basis with others, including through all forms of communication of their choice, their enjoyment of the right to education, and the opportunity to conduct research.

*Marrakesh Treaty to Facilitate Access to Published Works for Persons Who Are Blind, Visually Impaired, or Otherwise Print Disabled*, pmbl., June 27, 2013, WIPO Doc. VIP/DC/8 Rev [hereinafter Marrakesh Treaty].

Because of the significance of these roadblocks, Congress and the federal agencies have increasingly recognized the importance of ensuring that people with disabilities are able to access knowledge and information on equal terms. The Americans with Disabilities Act (originally passed in 1990) ("ADA"), for example, is one of a series of laws enacted to protect the rights of disabled persons; it expressly prohibits discrimination against people with disabilities, and requires places of public accommodation—both governmental and private—to provide disabled individuals with access to a wide variety of materials. *See* Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12,101–12,213 (2012).[4]

II.     **Assistive technologies increasingly permit disabled persons to access the law and other important information and resources.**

In order to access the law, including the standards incorporated into law at issue in this case, persons with different disabilities typically require assistive technology programs or

---

[4] Among many other provisions, ADA implementing regulations require public accommodations to supply "auxiliary aids and services" such as "[q]ualified readers; taped texts, . . . [and] Brailled materials" to visually impaired individuals who want to access written materials. 28 C.F.R. § 36.303(b) (2015). *See also Rehabilitation Act Amendments of 1986*, Pub. L. No. 99-506 § 603(a), 100 Stat. 1807 (codified as amended at Section 508 of the Rehabilitation Act of 1973, 29 U.S.C. § 794d); *The Use of Telecasts to Inform and Alert Viewers with Impaired Hearing*, 26 F.C.C.2d 917 (1970).

devices that operate in different ways. Innovative technologies are now available (and constantly being improved) that allow disabled persons a greater measure of independence and participation in various aspects of society. The U.S. Access Board noted in its update to Section 508 of the Rehabilitation Act that, "since the guidelines and standards were issued in 2000 and 1998 respectively, there has been a technological revolution, accompanied by an ever-expanding use of technology and a proliferation of accessibility standards globally." *Proposed Information and Communication Technology (ICT) Standards and Guidelines*, 80 Fed. Reg. 10880, 10880 (proposed Feb. 27, 2015) (to be codified at 36 C.F.R. pts. 1193, 1194). Because of the ever increasing availability of accessibility technology, "one of the primary purposes of the [] rule is to . . . ensure that accessibility for people with disabilities keeps pace with advances in electronic and information technology." *Id.*

One key example of rapidly developing modern accessibility technology is screen-reading software. A screen-reading program, such as Job Access with Speech (JAWS), enables visually impaired and print-disabled users to access digital content. *See* Goldstein & Niska, *supra*. Screen-reading technology converts the structural language underlying web pages, Hypertext Markup Language ("HTML"), into synthesized speech, which disabled individuals access via speakers, headphones, or a refreshable Braille display. *See id*; DSMF ¶ 84, 91–92. This screen-reading technology may be combined with a high-powered screen magnifier, helpful to users with dyslexia and other print disabilities. *See* Goldstein & Niska, *supra*. Individuals who have dexterity impairments or disabilities, however, may benefit more from voice command programs and tools that allow them to input speech without using a conventional keyboard or mouse. *See* Daniel Goldstein & Gregory Care, *Disability Rights and Access to the Digital World*, The Fed. Lawyer 54 (Dec. 2012).

For assistive technologies to operate effectively, the hardware, operating platform, software program, and data must be compatible. *See* Goldstein & Niska, *supra*. Such "digitally accessible" content is "designed to be aesthetic and usable to the greatest extent possible by everyone regardless of disability." *Id.* (internal quotation marks omitted). To ensure accessibility, online content must, among other things, provide text alternatives for non-text content, make it easier to see and hear content, help users navigate and find content, and maximize compatibility with current and future user tools. W3C, Web Accessibility Initiative, *Web Content Accessibility Guidelines (WCAG) 2.0 at a Glance*, http://www.w3.org/WAI/WCAG20/glance (last updated Dec. 6, 2011).

Accessibility technology—like screen-reading software—only functions effectively when used on websites and documents that contain manipulable characters and structural data, e.g., text that could be copied and pasted using conventional viewing software. Screen readers and other accessibility programs convert those characters and data into a usable format for disabled individuals. (DSMF ¶ 91-92) As Adobe and other industry specialists have recognized, screen readers generally cannot meaningfully interact with copy-restricted image-only files, such as PDFs, unless they are optimized for accessibility and are properly coded and tagged. *See* L. Guarino Reid et al, *The Accessibility of Adobe Acrobat Software for People with Disabilities*, Am. Found. for the Blind, http://www.afb.org/info/afb-consulting/publications-and-presentations/accessibility-of-adobe-acrobat/235As (last visited Jan. 6, 2016). Even PDFs that contain character data but have not been tagged are difficult for the screen-reading program to negotiate, as words often run together and the document's text may not be read in the correct order. *See* Goldstein & Niska, *supra*.

Accessibility technology has the potential to significantly improve the lives and abilities of disabled persons everywhere. Achieving these benefits, however, requires that content be formatted or optimized for digital accessibility by content creators or others, such as Public Resource.[5] Given the prevalence, low cost, and ease of modern accessibility technologies and the profound improvements they make in the lives of the disabled, the existence of technological and/or legal barriers to digital accessibility is increasingly difficult to justify.[6] In particular, there is no justification for barriers to full access to the law and legal regulations.

### III.   Misapplying copyright to the law prevents vital access by persons with visual or print disabilities.

While any restriction on public access to the law is impermissible, permitting erroneous assertions of copyright like those of Plaintiffs here to block open access to laws and standards is especially detrimental to persons with visual or print disabilities. Almost every use of accessible technology requires the creation of a copy or the manipulation of the text in the original document. Yet Plaintiffs in this case have made their standards available online only in highly restricted forms, employing technological measures that prevent copying and, as a result, severely limit or block the use of accessible technologies. Furthermore, Plaintiffs do not currently offer accessible versions to *anyone*. The result is to effectively prevent millions of

---

[5] For example, recent successful digital accessibility initiatives have enabled visually impaired and print-disabled persons to independently view and order food, participate in mobile banking, and manage prescriptions. Lainey Feingold, *Disability Rights Legal Advocacy Recent News*, Law Office of Lainey Feingold (Jan. 9, 2016), http://lflegal.com/. Ensuring accessibility can often be as simple as opting for keyboards over touch screens. Lainey Feingold, *Note to Retailers: Chip and Pin Upgrades Must Include Real Keypads*, Law Office of Lainey Feingold (Dec. 16, 2014), http://lflegal.com/2014/12/chip-and-pin/.

[6] Innovators have even adapted CAPTCHA technology, which uses machine-indecipherable "fuzzy characters" to differentiate pesky "bot" spammers from legitimate human users, for use by disabled individuals. *See* Crista Earl, *Can CAPTCHAs Be Made Accessible*, Am. Found. for the Blind (Aug. 21, 2014), http://www.afb.org/blog/afb-blog/can-captchas-be-made-accessible/ 12.

10

people with disabilities from accessing the incorporated standards. This is especially problematic because many subjects that standards address—fire safety and building codes, for example—directly and disproportionately impact disabled persons.

> a.   *Technical limitations on online access to the incorporated standards prevent visually impaired and print-disabled persons from using assistive technologies, effectively depriving them of access to the law.*

Plaintiffs, like many other content creators, employ technological protection measures ("TPMs") on their digital works. TPMs utilize methods that function to prevent copying, such as creating a "picture of the text" rather than interactive, computer-accessible characters, though they often go far beyond preventing copying to preventing any sort of user interaction with the underlying structural data. Although TPMs come in many forms, by their nature they all restrict the ways users can access and use works, "affect [accessibility] greatly," and, as applied to an otherwise completely accessible document, can often "render the content completely inaccessible." Sarah Hilderley, *Accessible Publishing Best Practice Guidelines for Publishers* 8 (2013), http://www.accessiblebooksconsortium.org/export/sites/visionip/inclusive_publishing/en/pdf/accessible_best_practice_guidelines_for_publishers.pdf.

TPMs, including the highly restricted ways in which Plaintiffs posted the online versions of their standards, hinder or outright thwart accessibility and therefore, for many, access. In order to prevent copying, they render text and underlying structural data either inaccessible or impossible to interact with. This means that assistive technologies that rely on reading a document's text and translating it into other media either cannot function at all or can only function in a limited capacity. Even if a TPM can be circumvented, the underlying text has almost certainly not been optimized for accessibility technologies and is thus also limited. The prevalence of TPMs on copyrighted digital content has thus been described as "the greatest barrier to making . . . digital resources accessible." Ass'n of Research Libraries, *Report of the*

*ARL Joint Task Force on Services to Patrons with Print Disabilities* 7 (2012), http://www.arl.org/storage/documents/publications/print-disabilities-tfreport02nov12.pdf. Thus, the barriers to access created by Plaintiffs' restrictive formats and TPMs prevent disabled individuals from accessing the law.

> b. *Public Resource's transformation of the incorporated standards into an accessible format provides the print-disabled access to the law they would not otherwise have.*

Plaintiffs assert that standards incorporated by reference into law are reasonably accessible to the public via free, read-only access "reading rooms" on their websites. Pls. Mem. Law Supp. Mot. Summ. J. and Permanent Inj. 10, ECF No. 118. However, these "free" versions of the incorporated standards are formatted in a way that defeats searching or software-based analysis—tools that are essential to proper functioning of screen readers. DSMF ¶ 52–53. Rather than provide the standards in a machine-readable format, the Plaintiffs offer users a limited "picture of the text" that causes screen-reading devices to "stop working." *Id.* ¶ 92. This screen reading failure is unsurprising, given the text in the "reading rooms" apparently appears in a small box on the screen, in text that is often of poor quality that deteriorates with further magnification. *Id*. ¶ 56.

The Plaintiffs do not offer print or download options, and in some cases users must sign up for accounts with the standard setting organization before they can even access the restricted content in the reading rooms. *Id.* ¶ 54–55, 61. Because of these technical barriers, the "free" standards offered by SDOs are inaccessible to many print-disabled and visually impaired persons.

Recognizing that disabled individuals would be functionally deprived of access to the law without a significant technical transformation, Public Resource responded by acquiring copies of incorporated standards and converting the text into HTML format. *Id.* ¶ 83, 175. As explained

12

earlier, screen reader software and other assistive technologies can convert HTML code into a format that is accessible for disabled individuals, such as speech or braille. *Id.* ¶ 84, 91–92. Public Resource posted the HTML-formatted standards on its website and made the text available for free, ensuring that people with print or vision disabilities could "read the standard . . . navigate to a specific place in the document . . . and search for key terms." *Id.* ¶ 91.

Public Resource is the only current source of this effective access to the law for print-disabled individuals. If these accessible copies of incorporated standards were not available, many citizens with disabilities would be precluded from accessing and understanding important areas of law that govern and disproportionately affect them. Copyright law should not be misread to prevent that access. And content creators cannot be relied upon to provide accessibility on their own. As the Second Circuit noted in *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 102 (2d. Cir. 2014), "[i]t is undisputed that the present-day market for books accessible to the handicapped is so insignificant that 'it is common practice in the publishing industry for authors to forgo royalties that are generated through the sale of books manufactured in specialized formats for the blind.'" Indeed, even though public pressure may have mounted for access in this case, it has not yet materialized into accessible copies of the standards for people with disabilities.[7]

---

[7] In other contexts where, unlike here, content was copyrightable, the federal government has recognized that, because copyright holders have often chosen not to serve the market for accessible formats or accessible features, accessibility must be facilitated through legislation. A senior FCC official recently explained this pattern before the U.S. Senate:

> Although the number of people with disabilities in the United States is said to hover around 50 million, each individual disability group—i.e., individuals who are deaf, blind, mobility disabled, etc.—typically has not been large or strong enough to exert the market pressures needed to incentivize industry to include accessibility features in their products and services. . . . Often, when market forces

## CONCLUSION

Access to the law by *all* persons—disabled or not—is a fundamental right. Misapplying copyright law to enable private organizations to control access to standards incorporated into law, effectively preventing the use of assistive technologies, would render the law inaccessible to persons with visual or print disabilities and would be against the strong public interest in and individual right of full access to the law.

DATED: January 11, 2016                            Respectfully Submitted,

                                                   _____
                                                   Jeffrey T. Pearlman
                                                      CA Bar #254759
                                                      D.C. District Bar ID #CA00003
                                                   Phillip R. Malone (Admission Pending)
                                                   Juelsgaard IP And Innovation Clinic
                                                   Mills Legal Clinic at Stanford Law School
                                                   559 Nathan Abbott Way
                                                   Stanford, CA 94305
                                                   Telephone: (650) 497-9443
                                                   Fax: (650) 723-4426

---

have failed in the past, the government has stepped in with regulatory measures to ensure that people with disabilities have the access that they need.

*The ADA and Entertainment Technologies: Improving Accessibility from the Movie Screen to Your Mobile Device: Hearing Before the S. Comm. On Health, Educ., Labor & Pensions*, 113th Cong. 3–4 (2013) (statement of Karen Peltz Strauss, Deputy Chief, Consumer & Governmental Affairs Bureau, Fed. Commc'ns. Comm'n).