**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN SOCIETY FOR TESTING AND MATERIALS d/b/a/ ASTM INTERNATIONAL;<br><br>NATIONAL FIRE PROTECTION ASSOCIATION, INC.; and<br><br>AMERICAN SOCIETY OF HEATING, REFRIGERATING, AND AIR CONDITIONING ENGINEERS,<br><br>　　　　　Plaintiffs/<br>　　　　　Counter-Defendants,<br><br>v.<br><br>PUBLIC.RESOURCE.ORG, INC.,<br><br>　　　　　Defendant/<br>　　　　　Counter-Plaintiff. | Case No. 1:13-cv-01215-TSC |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND FOR A PERMANENT INJUNCTION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................1

ARGUMENT ..........................................................................................................3

I.     PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR COPYRIGHT INFRINGEMENT CLAIMS.................................................3

     A.     Issue One:  Defendant Has Not Shown That the Copyright Act Barred Protection for the Works at Creation or That the Affirmative Defenses of Merger and *Scènes à Faire* Excuse Defendant's Copying. ....................3

          1.     Plaintiffs' Works Are Protected by Copyright Under § 102(a). .................3

          2.     Defendant Fails to Show That Copyright Protection for the Works Was Barred or Divested by § 102(b), Merger, or *Scènes à Faire*. ..............4

               a.     The Copyrighted Works Are Not "Systems" or "Methods of Operation" Under 17 U.S.C. §102(b). .........................................4

               b.     The Merger Doctrine Does Not Divest Plaintiffs' Works of Copyright Protection. .......................................................7

               c.     Plaintiffs Copyrighted Works Are Not Subject to the *Scènes à Faire* Defense. .................................................9

     B.     Issue Two:  Defendant Has Not Shown That the Copyright Act Divested Plaintiffs' Works of Copyright Protection the Moment a Governmental Body Incorporated the Standard by Reference. ...........................................10

          1.     The Copyright Act Extends Protection to Plaintiffs' Works, Even When They Are Incorporated by Reference. ..............................................10

          2.     The Case Law Supports Copyright Protection for Plaintiffs' Standards. .........................................................................................13

          3.     Public Policy Strongly Favors Copyright Protection for Plaintiffs' Standards. .........................................................................................17

          4.     Defendant's Argument That the Works Are Not Reasonably Accessible Fails. ............................................................................18

     C.     Issue Three:  Defendant Has Not Established a Triable Issue That Its Verbatim, Wholesale Copying and Distribution of Plaintiffs' Works Is Subject to the Fair Use Defense. ...........................................................20

          1.     The Purpose and Character of the Use .....................................................21

          2.     The Nature of the Copyrighted Work .......................................................24

          3.     The Amount and Substantiality of the Work Taken ................................25

          4.     The Effect of the Use Upon the Potential Market.....................................25

i

# TABLE OF CONTENTS
### (continued)

**Page**

D. Issue Four: No Evidence Creates a Triable Issue of Fact Showing That Plaintiffs Do Not Own the Copyright in Each Standard........................................27

    1. Plaintiffs' Copyright Registrations Create Presumptions of Plaintiffs' Ownership of the Copyrights....................................27

    2. Defendant Failed to Meet Its Burden of Proving That Plaintiffs Are Not, at Least, Joint Authors of the Works...................................29

    3. Defendant Failed to Meet Its Burden of Proving That Plaintiffs Are Not, at Least, Joint Owners Through Assignments....................................31

        a. Plaintiffs' Committee Members Intended to Assign Any Copyright Interests They Had to Plaintiffs.....................................31

        b. The Assignments Are Sufficient to Transfer Copyright Ownership to Plaintiffs.....................................32

II. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR TRADEMARK INFRINGEMENT CLAIMS....................................35

A. Plaintiffs' Trademark Claims Are Distinct from Their Copyright Claims...........35

B. Defendant's Use of Plaintiffs' Trademarks Is Not Nominative Fair Use.............36

C. The First Sale Doctrine Does Not Apply to Defendant's Use...........................38

D. Defendant's Use of Plaintiffs' Marks Creates a Likelihood of Confusion...........39

III. PLAINTIFFS ARE ENTITLED TO A PERMANENT INJUNCTION..........................41

A. Plaintiffs Will Suffer Irreparable Injury Without an Injunction..........................41

    1. Economic Harm to Plaintiffs....................................42

    2. Changing Business Models Would Harm Plaintiffs' Interests.................45

    3. Defendant's Actions Have Harmed Plaintiffs' Goodwill.........................45

    4. Plaintiffs Acted Swiftly in Bringing Suit....................................46

B. The Balance of Hardships Weighs in Favor of an Injunction...............................47

C. The Public Interest Will Be Served by an Injunction...........................................48

D. Remedies Available at Law Are Inadequate....................................49

E. The Scope of the Requested Injunction Is Appropriate.......................................49

CONCLUSION....................................50

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
    562 F.3d 630 (4th Cir. 2009) ...............................................23

*Aalmuhammed v. Lee*,
    202 F.3d 1227 (9th Cir. 2000) .............................................30

*Am. Inst. of Physics v. Schwegman, Lundberg & Woessner, P.A.*,
    No 12-528, 2013 WL 4666330 (D. Minn. Aug. 30, 2013) .....................22

*Am. Inst. of Physics v. Winstead PC*,
    No. 3:12-cv-1230, 2013 WL 6242843 (N.D. Tex. Dec. 3, 2013)..............22

*Apple Computer, Inc. v. Microsoft Corp.*,
    799 F. Supp. 1006 (N.D. Cal. 1992) ....................................10

*Arista Records LLC v. Lime Wire LLC*,
    No. 06 Civ. 05936, 2010 WL 10031251 (S.D.N.Y. Aug. 9, 2010) .........46

*Australian Gold, Inc. v. Hatfield*,
    436 F.3d 1228 (10th Cir. 2006) .........................................39

*Authors Guild, Inc. v. HathiTrust*,
    755 F.3d 87 (2d Cir. 2014)....................................21, 23, 24

*Authors Guild v. Google, Inc.*,
    804 F.3d 202 (2d Cir. 2015)...................................22, 25, 26

*Bach v. Forever Living Prods. U.S., Inc.*,
    473 F. Supp. 2d 1110 (W.D. Wash. 2007)................................37

*Baker v. Selden*,
    101 U.S. 99 (1879).....................................................4, 5

*Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*,
    750 F.2d 903 (Fed. Cir. 1984)..........................................41

*Banks v. Manchester*,
    128 U.S. 244 (1888).................................................13, 14

*Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*,
    550 F.3d 465 (5th Cir. 2008) ...........................................38

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Belford, Clarke & Co. v. Scribner*,
    144 U.S. 488 (1892).......................................................................................................6

*Bell Helicopter Textron, Inc. v. Airbus Helicopters*,
    78 F. Supp. 3d 253 (2015) ...........................................................................................43

*Bikram's Yoga Coll. of India, L.P. v. Evolation Yoga, LLC*,
    803 F.3d 1032 (9th Cir. 2015) ......................................................................................7

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
    448 F.3d 605 (2d Cir. 2006).................................................................................22, 26

*Bldg. Officials & Code Adm. v. Code Tech., Inc.*,
    628 F.2d 730 (1st Cir. 1980) ........................................................................................14

*Bond v. Blum*,
    317 F.3d 385 (4th Cir. 2003) .......................................................................................22

*Breaking the Chain Found., Inc. v. Capitol Educ. Support, Inc.*,
    589 F. Supp. 2d 25 (D.D.C. 2008) ........................................................................44, 46

*Burcham v. Expedia, Inc.*,
    No. 4:07CV1963, 2009 U.S. Dist. LEXIS 17104 (E.D. Mo. Mar. 6, 2009)...........................34

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994)........................................................................................21, 25, 26

*Capital Concepts, Inc. v. Mountain Corp.*,
    No. 3:11-cv-00036, 2012 U.S. Dist. LEXIS 182874 (W.D. Va. Dec. 30, 2012)..............34, 35

*Capitol Records, LLC v. ReDigi Inc.*,
    934 F. Supp. 2d 640 (S.D.N.Y 2013)...........................................................................39

*CCC Info. Servs., Inc. v. McLean Hunter Mkt. Reports, Inc.*,
    44 F.3d 61 (2d Cir. 1994)....................................................................9, 14, 15, 16

*Century 21 Real Estate Corp. v. Lendingtree, Inc.*,
    425 F.3d 211 (3d Cir. 2005)........................................................................................38

*CFE Racing Prods., Inc. v. BMF Wheels, Inc.*,
    793 F.3d 571 (6th Cir. 2015) .......................................................................................42

*Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*,
    269 F.3d 270 (3d Cir. 2001)........................................................................................40

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Churchill Livingstone, Inc. v. Williams & Wilkins*,
   949 F. Supp. 1045 (S.D.N.Y. 1996)...................................................................................7

*Cmty. TV of Utah, LLC v. Aereo, Inc.*,
   997 F. Supp. 2d 1191 (D. Utah 2014).............................................................................46

*Community for Creative Non-Violence v. Reid*,
   846 F.2d 1485 (D.C. Cir. 1988)......................................................................................31

*Cooper Notification, Inc. v. Twitter, Inc.*,
   No. 09-865-LPS, 2010 WL 5149351 (D. Del. Dec. 13, 2010)...............................48

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
   539 U.S. 23 (2003).................................................................................................36, 37

*David's Bridal, Inc. v. House of Brides, Inc.*,
   No. 06-5660, 2010 WL 323306 (D.N.J. Jan. 20, 2010)..........................................38

*Davidoff & CIE, S.A. v. PLD Int'l Corp.*,
   263 F.3d 1297 (11th Cir. 2001) .....................................................................................39

*Davis v. Blige*,
   505 F.3d 90 (2d Cir. 2007)..............................................................................................29

*Dosso v. U.S. Postal Service*,
   No. Civ. A. CCB-10-1703, 2010 WL 4900988 (D. Md. Nov. 24, 2010) ...............12

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006).................................................................................................42, 50

*Eldred v. Ashcroft*,
   537 U.S. 186 (2003).........................................................................................................16

*Family Dollar Stores, Inc. v. United Fabrics Int'l, Inc.*,
   896 F. Supp. 2d 223 (S.D.N.Y. 2012).........................................................................29

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
   499 U.S. 340 (1991).....................................................................................................4, 7

*Fox Television Stations, Inc. v. FilmOn X LLC*,
   966 F. Supp. 2d 30 (D.D.C. 2013)..........................................................................48, 50

*Garcia v. Google, Inc.*,
   786 F.3d 733 (9th Cir. 2015) .........................................................................................48

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Gennie Shifter, LLC v. Lokar, Inc.*,
No. 07-cv-01121, 2010 U.S. Dist. LEXIS 2176 (D. Colo. Jan. 12, 2010) ............................38

*Graf v. Match.com, LLC*,
No. CV 15-3911, 2015 U.S. Dist. LEXIS 90061 (C.D. Cal. July 10, 2015) ..........................34

*Hall v. United States*,
132 S. Ct. 1882 (2012) ....................................................................................................11

*Hanley-Wood LLC v. Hanley Wood LLC*,
783 F. Supp. 2d 147 (D.D.C. 2011) ...................................................................................44

*Healthcare Advocates Inc. v. Harding, Earley, Follmer & Frailey*,
497 F. Supp. 2d 627 (E.D. Pa. 2007) ................................................................................22

*Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.*,
832 F.2d 1311 (2d Cir. 1987)............................................................................................41

*Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*,
No. 3:10-cv-01238, 2014 U.S. Dist. LEXIS 108853 (D. Conn. Aug. 7, 2014).....................38

*Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.*,
846 F.2d 1079 (7th Cir. 1988) ..........................................................................................42

*Interactive Products Corp. v. a2z Mobile Office Solutions, Inc.*,
326 F.3d 687 (6th Cir. 2003) ............................................................................................38

*John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*,
186 F. Supp. 2d 1 (D. Mass. 2002) ...................................................................................14

*Kern River Gas Transmission Co. v. Coastal Corp.*,
899 F.2d 1458 (5th Cir. 1990) ............................................................................................9

*Kregos v. Associated Press*,
937 F.2d 700 (2d Cir. 1991)................................................................................................8

*Latin Am. Music Co. v. Archdiocese of San Juan*,
499 F.3d 32 (1st Cir. 2007).............................................................................................35

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
387 F.3d 522 (6th Cir. 2004) ...........................................................................................22

*Luxul Tech. Inc. v. Nectarlux, LLC*,
78 F. Supp. 3d 1156 (N.D. Cal. 2015) ...............................................................................37

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Marya v. Warner/Chappell Music, Inc.*,
No. CV 13-04460, 2015 WL 5568497 (C.D. Cal. Sept. 22, 2015)........................................36

*Masquerade Novelty, Inc. v. Unique Indus., Inc.*,
912 F.2d 663 (3d Cir. 1990)..................................................................................................29

*Metro. Regional Info. Sys. v. Am. Home Realty Network, Inc.*,
722 F.3d 591 (4th Cir. 2013) ...........................................................................................33, 36

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
518 F. Supp. 2d 1197 (C.D. Cal. 2007) ....................................................................45, 46, 50

*Mitel, Inc. v. Iqtel, Inc.*,
124 F.3d 1366 (10th Cir. 1997) ..............................................................................................9

*Monge v. Maya Magazines, Inc.*,
688 F.3d 1164 (9th Cir. 2012) ..............................................................................................22

*MyWebGrocer, LLC v. Hometown Info, Inc.*,
375 F.3d 190 (2d Cir. 2004)....................................................................................................9

*New Kids on the Block v. News Am. Publ'g, Inc.*,
971 F.2d 302 (9th Cir. 1992) ...........................................................................................37, 38

*Nintendo of Am., Inc. v. Dragon Pac. Int'l*,
40 F.3d 1007 (9th Cir. 1994) .................................................................................................36

*Olan Mills, Inc. v. Linn Photo Co.*,
23 F.3d 1345 (8th Cir. 1994) .................................................................................................51

*Online Policy Grp. v. Diebold, Inc.*,
337 F. Supp. 2d 1195 (N.D. Cal. 2004) .................................................................................22

*Oracle Am., Inc. v. Google Inc.*,
750 F.3d 1339 (Fed. Cir. 2014)................................................................................................8

*Oriental Fin. Grp., Inc. v. Cooperativa De Ahorro Crédito Oriental*,
698 F.3d 9 (1st Cir. 2012)......................................................................................................40

*Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*,
489 F. Supp. 174 (N.D. Ga. 1980) .........................................................................................29

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) ...............................................................................................23

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Portionpac Chem. Corp. v. Sanitech Sys., Inc.*,
   217 F. Supp. 2d 1238 (M.D. Fla. 2002) ...............................................................7

*Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*,
   121 F.3d 516 (9th Cir. 1997) ...............................................................8, 14, 15, 28

*Princeton Univ. Press v. Mich. Document Servs., Inc.*,
   99 F.3d 1381 (6th Cir. 1996) ...............................................................51

*Proctor & Gamble Co. v. Team Techs., Inc.*,
   No. 1:12-cv-552, 2013 WL 4830950 (S.D. Ohio Sept. 10, 2013) ...........................48

*Prunté v. Universal Music Grp.*,
   484 F. Supp. 2d 32 (D.D.C. 2007) .........................................................37

*Publ'ns Int'l, Ltd. v. Meredith Corp.*,
   88 F.3d 473 (7th Cir. 1996) ...............................................................6

*Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*,
   53 F.3d 1073 (9th Cir. 1995) ...............................................................39

*Shook v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*,
   132 F.3d 775 (D.C. Cir. 1998) ...............................................................11

*Slep-Tone Entm't Corp. v. Am.'s Bar & Grill, LLC*,
   No. 13 C 8526, 2014 U.S. Dist. LEXIS 113219 (N.D. Ill. Aug. 15, 2014) ...............39

*Slep-Tone Entm't Corp. v. Coyne*,
   41 F. Supp. 3d 707 (N.D. Ill. 2014) .......................................................37

*Soc'y of Holy Transfiguration Monastery, Inc. v. Archbishop Gregory*,
   689 F.3d 29 (1st Cir. 2012) ...............................................................27

*TechnoMarine SA v. Giftports, Inc.*,
   758 F.3d 493 (2d Cir. 2014) ...............................................................44

*U.S. Jaycees v. Phil. Jaycees*,
   639 F.2d 134 (3d Cir. 1981) ...............................................................41

*United Fabrics Int'l, Inc. v. C&J Wear, Inc.*,
   630 F.3d 1255 (9th Cir. 2011) ...............................................................35

*Urantia Found. v. Maaherra*,
   114 F.3d 955 (9th Cir. 1997) ...............................................................29

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Urbont v. Sony Music Entm't,*
   100 F. Supp. 3d 342 (S.D.N.Y. 2015)....................................................................36

*Veeck v. So. Bldg. Code Congress Int'l, Inc.,*
   293 F.3d 791 (5th Cir. 2002) ................................................................8, 15, 16, 28

*Verizon Servs. Corp. v. Vonage Holdings Corp.,*
   503 F.3d 1295 (Fed. Cir. 2007)............................................................................43

*Walt Disney Co. v. Powell,*
   897 F.2d 565 (D.C. Cir. 1990) ..............................................................................51

*Warner Bros. Records, Inc. v. Brown,*
   No. C 08-01040, 2008 U.S. Dist. LEXIS 95171 (N.D. Cal. Nov. 13, 2008).........51

*Wheaton v. Peters,*
   33 U.S. (8 Pet.) 591 (1834) .................................................................................13

*Winter v. Natural Res. Def. Council, Inc.,*
   555 U.S. 7 (2008)..................................................................................................50

*Wynn Oil Co. v. Thomas,*
   839 F.2d 1183 (6th Cir. 1988) ..............................................................................40

**FEDERAL STATUTES**

5 U.S.C. § 552(a)(1)......................................................................................................12

15 U.S.C. § 272..............................................................................................................11

17 U.S.C. § 101 ....................................................................................................... passim

17 U.S.C. § 102(a) .....................................................................................................3, 4

17 U.S.C. § 102(b) .............................................................................................3, 4, 5, 6

17 U.S.C. § 105........................................................................................................10, 11

17 U.S.C. § 106................................................................................................................3

17 U.S.C. § 121..............................................................................................................23

17 U.S.C. § 201(b)..........................................................................................................30

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

17 U.S.C. § 410 (c) ................................................................................................4, 28

17 U.S.C. § 502(a) ...................................................................................................50

**FEDERAL REGULATIONS**

1 C.F.R. §§ 51.3(a) & 51.7(a)(4) ..............................................................................12

Incorporation by Reference, Announcement of Final Rule, Office of the Federal
     Register, 79 Fed. Reg. 66267 (Nov. 7, 2014) ..................................................12, 21

OMB Circular No. A-119,
     63 Fed. Reg. 8546 (Feb. 19, 1998) .......................................................................12

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. (1976)...................................................11

National Technology Transfer and Advancement Act of 1995,
     Pub. L. No. 104-113, 110 Stat. 775 .........................................................................11

**OTHER AUTHORITIES**

Black's Law Dictionary (10th ed. 2014)......................................................................13

Comments of Jacob Speidel, Senior Citizens Law Project, Vermont Legal Aid,
     OFR-2013-0001-0037 (Jan. 31, 2014)......................................................................19

Compendium on Copyright Office Practices (3d ed. 2014) ..........................................13

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*
     (4th ed. 2011)..........................................................................................................40

National Research Council, *Standards, Conformity Assessment, and Trade: Into
     the 21st Century* (National Academies Press 1995), *available at*
     http://www.nap.edu/read/4921/chapter/1 ...............................................................11

2 *Nimmer on Copyright* § 7.20 ................................................................................29

4 *Nimmer on Copyright* § 13.03 ................................................................................9

# **INTRODUCTION**

Defendant's Opposition confirms the facts underlying Plaintiffs' Motion are undisputed: the written standards that Plaintiffs and other ANSI-accredited SDOs produce yield tremendous societal benefits; Congress and the Executive Branch for decades have recognized and encouraged this work, including the recognition that such SDOs can seek remuneration for distributing their Works under the copyright laws; the money Plaintiffs obtain from selling copies of their standards to businesses and contractors that use them for matters ranging from safety to engineering integrity constitutes a huge share of each Plaintiff's revenue; and there is not a shred of evidence, from either Defendant or its chorus of *amici*, that copyright protection has prevented even a single person from accessing, understanding, discussing, criticizing, writing about, or seeking to change even one standard.  Defendant's copying and mass distribution of its own versions of Plaintiffs' copyrighted Works using Plaintiffs' trademarks is as undisputed as it is unabashed.  Plaintiffs are entitled to judgment and an injunction.

*Defendant Infringes Plaintiffs' Copyrights*:  The question here is primarily one of whether Congress intended to allow Plaintiffs to secure and maintain copyright protection in the Works.  While Defendant and its *amici* suggest constitutional issues are at play, they have not even attempted to argue (much less prove) the elements of a Due Process or First Amendment claim.  The statutory construction question has a clear answer:  Plaintiffs' Works plainly qualify for copyright protection, and there is no merit to any of the myriad defenses to infringement that Defendant throws up.  The Works are not "systems," "methods of operation," or "ideas," but rather core original expression that describe their subject matter in tremendous detail, replete with discussion, diagrams and commentary.  Neither the merger nor *scènes à faire* doctrines, as consistently applied by the courts, deprives Plaintiffs of copyright protection.  Nor can

Defendant claim the protection of the fair use defense, which has never been applied to excuse 100% verbatim copying and mass public distribution of copyrighted works.

Ultimately, Defendant's case comes down to the extreme proposition that there is an uncodified principle that any privately-authored standard that any governmental body incorporates by reference instantaneously and forever is stripped of copyright protection. The text of the Copyright Act, which specifically addresses the government-related works that are not eligible for protection, contains no such rule. The Supreme Court cases on the subject do not by their terms or their reasoning adopt such a rule. The opinions of two Circuits reject Defendant's argument, which has neither statutory text, legislative history, on-point judicial precedent, administrative action, nor sound public policy to commend it. And the one judicial opinion that is the cornerstone of Defendant's case—a decision by a narrow majority of one Court of Appeals—expressly refused to adopt such an extreme position. Defendant and some of its *amici* have extensively lobbied to have the copyright law changed to accommodate Defendant's expressed public policy concerns, which is in itself an admission that the law, as it now exists, does not support Defendant's extreme argument on incorporation by reference.

*Defendant Infringes Plaintiffs' Trademarks*: This case presents a textbook example of trademark infringement. Defendant created imitations of Plaintiffs' products using sloppy procedures through which it introduced new content and errors into Plaintiffs' products, and then purposefully affixed Plaintiffs' logos and trademarks on its defective imitations. Under these circumstances people will inevitably confuse Defendant's defective imitations with Plaintiffs' products. Defendant's trademark violations are not excused by the fact of simultaneous copyright violations, or by the nominative fair use or first sale defenses.

***Plaintiffs Are Entitled to a Permanent Injunction***:  Defendant's unrestrained copying and mass distribution threatens irreparable harm.  On that and every other relevant equitable consideration, the facts all sharply favor an injunction to halt Defendant's illegal conduct.

## ARGUMENT

## I.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR COPYRIGHT INFRINGEMENT CLAIMS.

Defendant's exercise of Plaintiffs' exclusive rights of reproduction, distribution, and display of the "Works" is undisputed.  *See* 17 U.S.C. § 106.  The resolution of Plaintiffs' copyright claims therefore comes down to four issues:  (1) has Defendant established that § 102(b) of the Copyright Act, or the affirmative defenses of merger or *scènes à faire*, bar Plaintiffs from possessing valid copyrights in their original works of authorship?; (2) has Defendant shown that the Copyright Act otherwise divests each work of protection the moment that any governmental body incorporates the standard by reference?; (3) has Defendant created a triable factual issue that verbatim, wholesale copying and distribution of Plaintiffs' Works is subject to the fair use defense?; and (4) as to each Work, did Defendant submit evidence creating a triable issue of fact that the registered Plaintiff does not actually have an ownership interest sufficient to claim infringement?  The answer to each question is no.[1]

### A.   Issue One:  Defendant Has Not Shown That the Copyright Act Barred Protection for the Works at Creation or That the Affirmative Defenses of Merger and *Scènes à Faire* Excuse Defendant's Copying.

### 1.   Plaintiffs' Works Are Protected by Copyright Under § 102(a).

Defendant scatters a hodgepodge of copyright arguments across nearly 50 pages, claiming that the Works are ineligible for copyright protection because they are "systems,"

---

[1] Defendant does not dispute—and thus concedes—that its remaining defenses (unclean hands, misuse, waiver and estoppel) are meritless.  *See* Mot. 40-42.

"methods of operation," "facts," "ideas" "merged" with expression, or *scènes à faire*.  Opp. 10-11, 15-17, 30-34.[2]  None of these doctrines applies to Plaintiffs' Works.

At the outset, a few copyright basics are critical to understanding Defendant's flawed arguments.  "Copyright protection subsists … in original works of authorship fixed in any tangible medium of expression."  17 U.S.C. § 102(a); *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 355 (1991).  The Works satisfy these criteria.  They are "fixed," *i.e.*, they are written down.  17 U.S.C. § 101.  And they are "original works of authorship," *i.e.* they were not copied and "possess[] at least some minimal degree of creativity."  *Feist*, 499 U.S. at 345.  Defendant concedes this:  in claiming "merger," Defendant argues that, at the point of incorporation by reference, Plaintiffs' "*expression becomes* an[] idea"—meaning they were expressive to begin with.  Opp. 16 (emphasis added).[3]  The Works plainly qualify for copyright, Plaintiffs' registrations provide presumptions the copyrights are valid, 17 U.S.C. § 410 (c), and Defendant has the burden to show that one of its defenses precludes that protection.

    **2.**    **Defendant Fails to Show That Copyright Protection for the Works Was Barred or Divested by § 102(b), Merger, or *Scènes à Faire*.**

    **a.**    **The Copyrighted Works Are Not "Systems" or "Methods of Operation" Under 17 U.S.C. §102(b).**

Section 102(b) says:  "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery[.]"  The statute codifies the Supreme Court's decision in *Baker v. Selden*,

---

[2] Defendant's most ambitious argument is that copyright law does not protect the Works under the theory they are "law."  Defendant also raises the defense of fair use, and challenges Plaintiffs' ownership claims.  We discuss these issues in turn in Parts B-D.

[3] Defendant's assertion that Plaintiffs seek copyright protection as reward for the mere "sweat of the brow," *Feist*, 499 U.S. at 341, is flatly wrong.  Plaintiffs are not claiming protection for the equivalent of alphabetizing names in a phone book.

101 U.S. 99 (1879), and the more general rule that copyright protects expressions of ideas but not ideas themselves.  This distinction undermines Defendant's § 102(b) arguments.

In *Baker*, the plaintiff obtained a copyright for a book that described a "system of book-keeping," and included forms "illustrating the system and showing how it is to be used and carried out in practice."  *Id*. at 100.  The defendant used a system with very similar forms.  The Court held that plaintiff could copyright the book "as a book"—but not the practice of "the art described [therein]":  "whilst no one has a right to print or publish [plaintiff's] book, or any material part thereof, as a book intended to convey instruction in the art, any person may practice and use the art itself which he has described and illustrated therein.  The use of the art is a totally different thing from a publication of the book explaining it."  *Id*. at 102, 104.  In short, a party seeking to protect a novel system or method must seek patent protection; but an author may protect his or her original expression describing the system via copyright.  Defendant's § 102(b) arguments ignore this fundamental distinction.

First, Defendant is wrong that the Works themselves are "systems" and "methods of operation."  Opp. 31.  They are not that, as the Court can see from reviewing the Works.  To discuss just one example, ASTM Standard D86-07 (Decl. of Thomas O'Brien (Dkt. No. 118-7) ("O'Brien Decl.")), Ex. 6, is plainly original expressive work.  It reflects creativity, choice and judgment in how it describes its "Scope," how it describes terms listed under "Terminology," how it summarizes the test method, what it says about "Significance and Use," its various discussion points, the figures and illustrations and graphical choices made in creating those figures, and the stylistic narration and wording decisions that went into the crafting every sentence.  Consistent with *Baker* and § 102(b), ASTM's copyright does not bar anyone from practicing the Standard Test Method for Distillation of Petroleum Products at Atmospheric

Pressure (or any other similar test method).  It does not bar anyone from creating their own

original expression to describe the testing method it describes.  Consistent with § 102(b),

however, ASTM can and does enforce its copyright in the original expression in that Work, and

in all other Works in issue.  The analysis is the same for NFPA and ASHRAE and their Works.[4]

Defendant's analogizing the Works to a mere list of ingredients in a recipe, Opp. 32, is wishful

thinking.[5]  The Works include "instructive and valuable matter and information"—not "mere

identification of ingredients"—and therefore fall outside of § 102(b).  *Publ'ns Int'l, Ltd. v.*

*Meredith Corp.*, 88 F.3d 473, 481 (7th Cir. 1996); *Belford, Clarke & Co. v. Scribner*, 144 U.S.

488, 490 (1892) (finding infringement of around 170 recipes accompanied by "much other

instructive and valuable matter and information for household and family purposes").

   Second, Defendant is wrong that, because Plaintiffs strive for best practices, the Works

are the one and only discovered "systems" for the topics they cover.  Opp. 31.  The undisputed

evidence shows that numerous parties can and do write very different standards covering exactly

the same subject matter.  SUMF[6] ¶¶ 38, 133 (describing competitor SDOs that write different

standards on similar topics, which are also copyrighted).  Each Plaintiff's original expression

describing the standard is copyrightable.

   Third, Defendant is wrong that, because Plaintiffs aim for precision in describing

technical concepts, the Works lack "creative expression."  Opp. 32.  If that were correct, no

---

[4] As with this ASTM standard, the Court can and should review the 2011 National Electric Code and ASHRAE Standard 90.1-2004, both lodged with the Court, in evaluating Defendant's various arguments.  Declaration of Christian Dubay at Ex. A (NFPA 2011 NEC); Declaration of Steve Comstock at Ex. 1 (ASHRAE 90.1-2004).

[5] Defendant's assertion that Plaintiffs' witnesses admitted the Works were the "procedures," Opp. 31, is based on misleading characterizations of witness testimony.  *See* Pl's Statement of Disputed Facts in Opp. to Def's Mot. Summary Judgment ("PSDF") ¶¶ 62-64, 66.

[6] References to "SUMF"  are to Plaintiffs' Statement of Undisputed Material Facts (Dkt. No. 118-2).  References to "Suppl. SUMF" are to Plaintiffs' Supplemental Statement of Undisputed Material Facts field herewith.

science textbook or any other work whose authors tried to use precise language would be eligible for copyright protection.  That is not the law.  *Portionpac Chem. Corp. v. Sanitech Sys., Inc.*, 217 F. Supp. 2d 1238, 1246 (M.D. Fla. 2002) (finding reference manual copyrightable); *Churchill Livingstone, Inc. v. Williams & Wilkins*, 949 F. Supp. 1045, 1050 (S.D.N.Y. 1996) (medical textbook copyrightable).

Fourth, Defendant is wrong that Plaintiffs' works are mere "compilations"; and also wrong that, even if the Works were compilations, there would be no copyright because utility alone controls their structure, sequence and organization.  Opp. 32-34.  As to the first point, Plaintiffs' copyrights are ***not*** limited to "compilations."  There are some "preexisting materials" in some Works that Plaintiffs selected and arranged in original and creative ways.  *See* 17 U.S.C. § 101 (definition of "compilation").  But the copyrights include all original expression within the works—text, drawings, notes, etc.—which Defendant copies and distributes wholesale, and thereby infringes.  Even if Plaintiffs' copyrights covered only compilations—which they do not—Defendant would be wrong that only utilitarian, rather than expressive concerns, dictate the structure, sequence and organization of the Works.[7]

### b.   The Merger Doctrine Does Not Divest Plaintiffs' Works of Copyright Protection.

Defendant argues that at the moment of incorporation by reference, a Work's expression instantly merges with the "idea" or "fact" of a law.  Opp. 15-17.

---

[7] Proof of this can be seen in the fact that three different Plaintiffs organize their standards—individual and macro—in very different ways.  *See* PSDF ¶¶ 74-76.  The independent, creative choices made in organizing the standards is more than sufficient to qualify for copyright protection.  *Feist*, 499 U.S. at 348.  *Bikram's Yoga Coll. of India, L.P. v. Evolation Yoga, LLC*, 803 F.3d 1032 (9th Cir. 2015), is plainly inapposite.  The plaintiff there claimed copyright protection over the actual physical sequence of Yoga poses.  Following *Baker's* dichotomy, the Ninth Circuit held that "[c]opyright protects only the expression of this idea—the words and pictures used to describe the Sequence—and not the idea of the Sequence itself."  *Id.* at 1036.  Here, Plaintiffs' Works are not the practices but "the words and pictures used to describe" them.  *Id.;* SUMF ¶ 1.  Thus, *Bikram's Yoga* confirms the Works' copyrightability.

Defendant's merger argument fails because it is focused on events subsequent to creation. The question for merger is whether, at the time of creation, the author's expressive choices were so limited that ideas and expression merged. *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1372 (Fed. Cir. 2014); *Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 520 n.8 (9th Cir. 1997) (rejecting merger defense because copyright did not prevent "competitors from developing comparative or better coding systems"), *amended*, 133 F.3d 1140 (9th Cir. 1998). Plaintiffs were not constrained to write only one particular type of standard, as shown by the unrefuted fact that different SDOs write their own expressive standards in different ways. SUMF ¶¶ 33, 38.

Defendant misleadingly responds that *Oracle v. Google* does not cite a "universal rule" on when merger is evaluated—but tellingly Defendant cites no case other than *Veeck*[8] that has ever held that merger can arise based on events post-creation. Opp. 15. *Kregos v. Associated Press*, 937 F.2d 700 (2d Cir. 1991), does not so hold. The quotation that Defendant takes out of context simply makes clear that the Second Circuit treats merger as an affirmative defense to infringement, rather than a question of copyright validity. 937 F.2d at 705. This point of civil procedure does not purport to disturb the well-established rule that whether expression and idea merge must be determined with reference to the choices available at the point the original work was created. Subsequent Second Circuit cases make clear it is the point of creation that counts. *See MyWebGrocer, LLC v. Hometown Info, Inc.*, 375 F.3d 190, 194 (2d Cir. 2004); *CCC Info. Servs., Inc. v. McLean Hunter Mkt. Reports, Inc.*, 44 F.3d 61, 73 n.28 (2d Cir. 1994).

---

[8] *Veeck* is wrong on this issue for reasons Plaintiffs explained at length in their opening brief. *See* Mot. 33; *Veeck v. So. Bldg. Code Congress Int'l, Inc.*, 293 F.3d 791, 821 (5th Cir. 2002) (Wiener, J., dissenting) ("As there exist considerably more than a tiny, finite number of ways to express a building code, the merger doctrine is inapplicable and thus unavailable to insulate Veeck's infringement from copyright protection.").

*Kern River Gas Transmission Co. v. Coastal Corp.*, 899 F.2d 1458 (5th Cir. 1990), which Defendant also cites, Opp. 16-17, is likewise unavailing.  The plaintiff in that case planned to build a pipeline going on a particular route.  The plaintiff then obtained a U.S. Geographical Survey map, drew a line showing that exact route, and claimed that the map with the line was his copyrighted expression.  The court quite correctly rejected that claim, because at the moment of claimed creation there was only one way to draw that line—in accordance with the plaintiff's proposed plan.  899 F.2d at 1464-65.[9]

### c.   Plaintiffs Copyrighted Works Are Not Subject to the *Scènes à Faire* Defense.

Defendant argues that the *scènes à faire* defense bars copyright for the Works.  Opp. 34. *Scènes à faire*—literally, "scenes that must be done"—bars an infringement finding where the expressive elements of a work "are standard, stock, or common to a topic, or if they necessarily follow from a common theme or setting."  *Mitel, Inc. v. Iqtel, Inc.*, 124 F.3d 1366, 1374 (10th Cir. 1997).  The crux of *scènes à faire* is whether similarities claimed to be evidence of copying are the sorts of similarities that someone writing about the same general topic would be expected to use regardless of copying.  *See* 4 *Nimmer on Copyright* § 13.03[B][d][4] (describing *scènes à faire* as relevant to the question of infringement if two works are *similar*).  Here, of course, Defendant copied Plaintiffs' Works verbatim, so even if some elements within a Work were *scènes à faire*, many other elements that Defendant copied would not be.

---

[9] Defendant tells this Court that FERC had approved the *Kern River* plaintiff's route.  Opp. 16.  In fact, when Kern River drew its proposed line on the map, there had been no regulatory approval by FERC or its staff.  *Kern River*, 899 F.2d at 1460.  More important—and so there is no confusion from Defendant's reference to the regulatory proceeding—FERC's approving the route did not dictate the merger analysis.  There was no divestment of copyright because of regulatory approval of the route.  There was merger because at the moment the plaintiff drew map lines representing its proposed route, there was only one way for a competitor wanting to use plaintiff's route to draw its own line mirroring plaintiff's proposal.  *Id.* at 1464 ("the lines Kern River created express in the only effective manner the idea of the pipeline's location").

But Defendant's argument fails for a more fundamental reason.  To support its affirmative defense, Defendant has to point to specific elements that it claims are *scènes à faire*. *See, e.g.*, *Apple Computer, Inc. v. Microsoft Corp.*, 799 F. Supp. 1006, 1024 (N.D. Cal. 1992) (listing five specific features of program and identifying whether each was stock or commonplace).  Defendant does not attempt to identify a single word or sentence from any Work that is barred by *scènes à faire*, much less attempt to show that *the entirety* of Plaintiffs' Works are *scènes à faire*.

**B.      Issue Two:  Defendant Has Not Shown That the Copyright Act Divested Plaintiffs' Works of Copyright Protection the Moment a Governmental Body Incorporated the Standard by Reference.**

**1.      The Copyright Act Extends Protection to Plaintiffs' Works, Even When They Are Incorporated by Reference.**

The fundamental question in Defendant's "incorporated standards are not copyrightable" argument is whether Congress has said the Works are not copyrightable.  The Copyright Act says no such thing, and in fact the language and structure dictate exactly the opposite conclusion.  The Act specifies the narrow category of works related to the operation of government that are not subject to copyright:  "[c]opyright protection under this title is not available for any work of the United States Government."  17 U.S.C. § 105.  A "'work of the United States Government' is a work prepared by an officer or employee of the United States Government as part of that person's official duties."[10]  17 U.S.C. § 101.  Nowhere does the Act divest *private* organizations of protection because their works have been incorporated by reference.[11]  That is not an accidental oversight.

---

[10] Without support, Defendant asserts that § 105 encompasses works incorporated by reference into a federal statute or regulation.  Opp. 11.  This argument is belied by the definition itself.

[11] *Expressio unius est exclusio alterius*, "the mention of one thing implies the exclusion of another," applies here.  *Shook v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 132 F.3d 775, 782 (D.C. Cir. 1998).  Congress specifically *carves out* works authored by the government

The legislative history confirms that Congress intended for private entities, such as SDOs, to retain their copyrights following incorporation.  The history of § 105 explains that "use by the Government of a private work ***would not affect its copyright protection in any way***." H.R. Rep. No. 94-1476, 94th Cong., 2d Sess., at 60 (1976) (emphasis added).  Defendant is simply wrong in asserting that Congress was ignorant of incorporation by reference in 1976. Opp. 30.  Incorporation of copyrighted works by reference was well-established at the time.  *See, e.g.*, 39 Fed .Reg. 23502, 23538 (June 27, 1974) (incorporating by reference the 1971 edition of NFPA's NEC).  The Court should "assume that Congress is aware of existing law when it passes legislation."  *Hall v. United States*, 132 S. Ct. 1882, 1889 (2012).

Congress's post-1976 actions further confirm Plaintiffs' position.  In 1991, Congress commissioned a study of privately-developed standards.  That study reported that SDOs "offset expenses and generate income through sales of standards documents, ***to which they hold the copyright***."  National Research Council, *Standards, Conformity Assessment, and Trade: Into the 21st Century* 32 (National Academies Press 1995), *available at* http://www.nap.edu/read/4921/chapter/1 (emphasis added).  Relying on that study, Congress passed the National Technology Transfer and Advancement Act of 1995 ("NTTAA"), Pub. L. No. 104-113, § 12(d), 110 Stat. 775, 783, codified at 15 U.S.C. § 272, which encourages incorporation by reference.  Congress understood SDOs' business model and intended to expand incorporation by reference while preserving the ability of SDOs to assert copyright in their standards.  OMB reached exactly that conclusion, issuing guidelines that when an agency

---

as a category of works not protected under the Act and makes no such mention regarding works authored by non-governmental entities.  By not mentioning works authored by non-governmental entities—while expressly mentioning (and excluding) works authored by the government— Congress demonstrated its intent that works authored by non-governmental entities would be protected.

incorporates a standard by reference, the agency "must observe and protect the rights of the copyright holder."  OMB Circular No. A-119, 63 Fed. Reg. 8546, 8555 (Feb. 19, 1998).

Defendant's response is a red herring:  it argues that recognizing copyright in standards incorporated by reference would violate FOIA, which requires that standards incorporated by reference be "reasonably available to the class of persons affected thereby" to be deemed published in the Federal Register.  Opp. 27 (quoting 5 U.S.C. § 552(a)(1)).  That is wrong and certainly inapplicable here.[12]  The Office of the Federal Register, the agency charged with interpreting and implementing FOIA, expressly considered and rejected Defendant's interpretation that "reasonably available" means available at no cost:  "If we required that all materials IBR'd into the CFR be available for free, that requirement would compromise the ability of regulators to rely on voluntary consensus standards, possibly requiring them to create their own standards, which is contrary to the NTTAA and the OMB Circular A-119."  Incorporation by Reference, Announcement of Final Rule, Office of the Federal Register, 79 Fed. Reg. 66267, 66268 (Nov. 7, 2014).  Defendant's primary response is that OFR's rule is not a "legal precedent."  Opp. 30.[13]  This casual dismissal of OFR's considered opinion, without any analysis, should be rejected.  In keeping with its practice of ignoring inconvenient facts, Defendant also fails to respond to the fact that numerous federal agencies have responded to Defendant's own FOIA requests by expressly rejecting Defendant's reading of FOIA.  *See*

---

[12] The Director of the Federal Register approves each incorporation by reference, which requires a finding that the publication is reasonably available to and usable by the class of persons affected by the publication.  1 C.F.R. §§ 51.3(a) & 51.7(a)(4).  Precisely because these standards have been incorporated by reference, the Director has affirmatively determined that each of the Works is reasonably available—obviating Defendant's FOIA argument.

[13] Defendant also cites *Dosso v. U.S. Postal Service*, No. Civ. A. CCB-10-1703, 2010 WL 4900988, at *4 (D. Md. Nov. 24, 2010).  But *Dosso* merely held that the availability of a document online was *sufficient* to establish that it was available to a party.  The case in no way suggested that online availability was *necessary* under FOIA.

SUMF ¶ 177.  Finally, Defendant has produced no evidence that Plaintiffs' works have not been reasonably available to persons affected by them.

Finally, Defendant is wrong to rely on the U.S. Copyright Office's policy that it "will not register a government edict …, including legislative enactments, judicial decisions, administrative rulings, public ordinances, or similar types of official legal materials."  Opp. 10 (citing Compendium on Copyright Office Practices §313.6(c)(2) (3d ed. 2014)).  Plaintiffs' works are privately developed; unlike the examples given by the Copyright Office, they cannot be described as government "edicts."  *See* Black's Law Dictionary (10th ed. 2014) (defining "edict" as a statement "issued by the sovereign of a country").  And the Copyright Office ***does*** register Plaintiffs' standards, and makes no attempt to determine whether they are incorporated by reference when doing so.  SUMF ¶¶ 71-76, 120-21, 146.  Thus, the Office's own practices demonstrate that the "edicts" policy is not applicable to the Works.

### 2.  The Case Law Supports Copyright Protection for Plaintiffs' Standards.

Defendant's case law argument is largely based on a misreading of two nineteenth-century Supreme Court decisions that held that *judicial opinions* were not copyright protected. Opp. 9 (citing *Wheaton v. Peters*, 33 U.S. (8 Pet.) 591 (1834); *Banks v. Manchester*, 128 U.S. 244 (1888)).  The question here is how to apply the reasoning of those cases to *privately authored standards incorporated by reference*.

Defendant offers no substantive discussion of the Supreme Court's reasoning.  Instead, Defendant repeatedly asserts that *Banks* stands for a broad proposition that "the law" is in the public domain, and that this proposition must apply to the standards at issue here.  Opp. 9, 10, 13.  But as the Ninth Circuit explained in *Practice Management*, *Banks* supports copyright protection for privately authored standards.  *Banks* treated the copyrightability of judicial

opinions as a "question … of public policy," and reasoned that public policy did not support copyright protection in that case because (i) the public paid the judges' salaries and (ii) the public needed to be able to access judicial opinions.  128 U.S. at 253.  Because Plaintiffs pay for developing their standards and there is no evidence of public inaccessibility, *Banks* supports copyright protection for Plaintiffs' Works.  *Practice Mgmt.*, 121 F.3d at 518-19.

Both the Ninth and Second Circuits have concluded that standards incorporated by reference retain their copyright protection.  *Id.* at 520; *CCC*, 44 F.3d at 74.  The First Circuit has reserved decision, but a district court in that Circuit reached the same conclusion.  *John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, 186 F. Supp. 2d 1, 5 (D. Mass. 2002), *aff'd in part on other grounds*, 322 F.3d 26 (1st Cir. 2003).[14]

Defendant's arguments for distinguishing *Practice Management* and *CCC* do not hold water.  First, Defendant argues that the defendants in those cases were copying the standards created by the plaintiffs, rather than the "government's own document."  Opp. 18-19.  But that is exactly the case here, where Defendant admits to having purchased copies of Plaintiffs' own standards from Plaintiffs and posted copies of those documents on the internet.  Opp. 5-6 (citing Def.'s SMF ¶¶ 4, 173-74).  Second, Defendant argues that the works at issue in *CCC* and *Practice Management* did not "read and function as laws."  Opp. 19.  That is incorrect.  Both cases explained that regulated entities were legally required to use and comply with the referenced works.  In *Practice Management*, federal regulations "requir[ed]" all medical providers seeking Medicare reimbursement to use the copyrighted billing codes, and also

---

[14] Defendant accuses Plaintiffs of "sidestepping" the fact that the First Circuit affirmed *Danielson* on other grounds, Opp. 20, despite the fact that Plaintiffs' opening brief expressly acknowledged this, Mot. 26.  It is Defendant who "sidesteps" the law in the First Circuit by quoting at length from dicta in *Bldg. Officials & Code Adm. v. Code Tech., Inc.*, 628 F.2d 730, 736 (1st Cir. 1980) ("*BOCA*"), Opp. 13-14, while eliding that the First Circuit subsequently clarified that *BOCA* did not resolve the question.  *Danielson*, 322 F.3d at 40.

"require[d]" states to implement similar regulations for Medicaid, making the billing codes "the exclusive medical procedure coding system."  121 F.3d at 518.  In *CCC*, state regulations "require[ed]" all auto insurers to pay claims according to the valuations in the copyrighted work (or an average of the valuations in the work and another similar work).  44 F.3d at 73.

More fundamentally, both cases unambiguously hold that the incorporation of a document as "law" does not deprive that work of copyright protection.  *Practice Mgmt.*, 121 F.3d at 519 (plaintiff "asserted a proprietary interest in material adopted by the government as law"; court affirmed judgment for plaintiff); *CCC*, 44 F.3d at 73 (rejecting argument that "if a copyrighted work is incorporated into the laws, the public need for access to the content of the laws requires the elimination of the copyright protection").  By contrast, the majority opinion in *Veeck*, the case on which Defendant relies, expressly limits its holding to model codes and makes clear that it does not apply to standards incorporated by reference such as the Works here.  *See Veeck*, 293 F.3d at 803-04 (allaying concerns raised by *amicus* brief filed by several SDOs, including NFPA and ASHRAE, by explaining that "official incorporation of extrinsic standards is distinguishable in reasoning and result").[15]

Defendant also claims there is no need for copyright protection for any Work that has a later version.  Opp. 19.  That ignores the fact that Congress gets to set the copyright term, the copyrights at issue are in-term, and Defendant does not get to second-guess Congress's judgment about the correct term.  *Eldred v. Ashcroft*, 537 U.S. 186, 207 (2003).

Ultimately, Defendant's argument—frankly, almost the entirety of its defense—is the broad dicta in the *Veeck* majority opinion.  Defendant does not address the ways in which the

---

[15] Defendant criticizes Plaintiffs for referring to their Works as "extrinsic standards,"  Opp. 14, while ignoring the fact that it was the *Veeck* court that referred to the works at issue here as "extrinsic standards."

*Veeck* majority expressly limited its actual holding. *Veeck* first held that its holding did not apply to "extrinsic standards" that were incorporated by reference, using that phrase specifically when referring to an *amicus* brief filed by SDOs, including two of the Plaintiffs here. 293 F.3d at 803-04. *Veeck* also noted that the works at issue in that case had been developed for the "sole purpose" of becoming law, *id.* at 805, whereas in this case it is undisputed that Plaintiffs' works have many purposes other than becoming law. SUMF ¶¶ 13-15, 89, 91, 131, 134. Defendant does not even acknowledge this "purpose"-based distinction as articulated by the *Veeck* court.

The logic of the *Veeck* dicta on which Defendant relies does not withstand scrutiny. Judge Jones's majority opinion relied on the same simplified overreading of *Banks* that Defendant relies on in this case and failed to answer the significant objections raised by six Judges in dissent. The OFR, ACUS, leading treatises, and academic commentary have concluded that *Veeck* should not be interpreted as undercutting copyright protection for all standards incorporated by reference in statutes and regulations, such as the works at issue here. *See* Mot. 29. Defendant offers no persuasive reason for this Court to depart from that consensus.

Defendant's response to Plaintiffs' constitutional avoidance argument—a holding that incorporation by reference would amount to a compensable taking, *see CCC*, 44 F.3d at 74—is the non-sequitur that Plaintiffs could not complain because they encouraged incorporation. Opp. 20-22. First, it is unrefuted that ASTM does not lobby government agencies to reference its standards. SUMF ¶ 56. Second, Defendant cites no rule that, if a property owner supports government action, the owner cannot bring a takings claim. Government must compensate property owners whose property is taken for public use, regardless of whether those property owners voted or lobbied for the project. Third, Plaintiffs' support for incorporation was in accordance with the widely shared and repeatedly expressed understanding that this *would not*

16

result in a loss of copyright.  *See, e.g.*, OMB Circular No. A-119; Decl. of Kevin Reinertson

(Dkt. No. 118-9) ("Reinertson Decl.") ¶ 9.[16]

### 3.   Public Policy Strongly Favors Copyright Protection for Plaintiffs' Standards.

Defendant cannot—and so does not—challenge the point that the existing system of

private standards development is strongly in the national interest, and that Plaintiffs' continued

development of standards is of critical importance.  Instead, Defendant simply asserts that a

radical change it proposes for the Court to make in the copyright principles that undergird the

long-standing system carefully calibrated by Congress would not have any effect on that system.

Opp. 28-29.  That argument should be rejected.

The undisputed evidence demonstrates that Plaintiffs depend on copyright protection to

maintain their business models.  *See* Mot. 30-31; SUMF ¶¶ 252-54.  Defendant speculates that

Plaintiffs would continue to develop standards because "industry participants" would want to

"write the laws themselves."  Opp. 28.  But Plaintiffs are not industry groups.  It is essential to

Plaintiffs' mission that they receive input from a wide variety of participants.  Mot. 4.

Defendant's suggestion that industry groups would just develop standards instead of Plaintiffs is

starkly at odds with the public interest.  *See* Decl. of Jordana Rubel (Dkt. No. 118-12) ("Rubel

Decl."), Ex.  1 (Jarosz Rep.) ¶ 118; Decl. of James Golinveaux (Dkt. No. 118-5) ("Golinveaux

Decl.") ¶ 5.  Defendant also argues that Plaintiffs are motivated to develop standards due to their

public interest mission.  That fails to explain how Plaintiffs could pay for the costly process of

standards development without the revenue they receive from the sale of their Works.

---

[16] Defendant also ignores that a ruling for it would cast a cloud of uncertainty over the wide variety of other types of works referenced in regulations, statutes, and judicial opinions, including non-U.S. works, which would implicate international law and treaties.  *See* Mot. 28-29.

Defendant also speculates that Plaintiffs could raise revenue through membership revenue and training programs.  Opp. 29 (citing Def.'s SMF ¶ 29).  The evidence is to the contrary.  Defendant cites the deposition of Bruce Mullen, NFPA's CFO, but Mr. Mullen testified that relying solely on those other sources of revenue is not a "sustainable option" and that "if we lost copyright to all or a portion of those standards …, ultimately, the entire code development system would unravel … NFPA's business model would cease to exist."  Rubel Decl., Ex. 45 (Mullen Dep.) at 226:3-227:23.  Defendant also cites the expert report and deposition of John Jarosz, but Mr. Jarosz's unrebutted expert conclusion was that a loss of copyright protection would result in a reduction of the number, quality and acceptability of standards being developed and inflict "harm to governments, the public, and industry actors that rely on the creation of these standards."  SUMF ¶ 271.  The mere fact that Plaintiffs have some alternative, but inadequate, sources of revenue does not change the fact that sales of standards are a critical revenue source, the loss of which would undercut Plaintiffs' ability to continue to incur the costs of developing standards on the same level.  Decl. of James Pauley (Dkt. No. 118-8) ("Pauley Decl.") ¶¶ 47-48, 51.

### 4.    Defendant's Argument That the Works Are Not Reasonably Accessible Fails.

It is undisputed that Plaintiffs also offer the Works for sale at reasonable prices, which itself demonstrates that the Works are reasonably accessible.  NFPA and ASHRAE make all the Works at issue available for free read-only access on their websites, and ASTM makes all of its standards that it knows have been incorporated by reference in federal regulations available for free read-only access on its website.  Defendant falsely asserts (without citation) that all Plaintiffs failed to provide free, read-only access for the majority of the Works until after Defendant began its unauthorized posting.  Opp. 25.  Both NFPA and ASHRAE have provided

free read-only access for over a decade.  Suppl. SUMF ¶ 24.  While ASTM's reading room went

live in January 2013, ASTM had been planning the launch since at least 2011, before Defendant

began posting the standards in 2012.  *Id.* ¶ 23.

Defendant has not submitted any admissible evidence that any person has ever been

unable to access Plaintiffs' standards.  The hypothetical claims of inaccessibility by Defendant

and its *amici* are makeweight.  First, Defendant quotes from a few general public comments

about the supposed burden of high costs of access to standards.  Opp. 23-24.  These statements

are inadmissible hearsay.  And none of them made any complaint about Plaintiffs' Works.[17]

Second, Defendant claims that Plaintiffs' free websites are insufficient because users

must register to access the standards.  Opp. 25-26.  Defendant does not identify any actual person

who has had any difficulty in accessing Plaintiffs' standards because of the registration process.

The websites are freely available for access by anyone wishing to review Plaintiffs' standards,

with the only limitations being restrictions on unauthorized copying or distribution of the

standards to others.  Contrary to Defendant's assertion that the terms have blanket prohibition on

use by construction contractors, manufacturers and others who engage in commercial activity,

Opp. 25, these individuals are free to consult the standards in the reading room for informational

purposes.  The undisputed evidence is that the professionals and businesses that rely on the

---

[17] For example, Defendant quotes from a public comment from the Senior Citizens Law Project
about the price of accessing some SDOs' standards, Opp. 24, but Defendant fails to mention that
***the very same comment*** holds up ASTM's website as an example of free access.  *See* Comments
of Jacob Speidel, Senior Citizens Law Project, Vermont Legal Aid, OFR-2013-0001-0037 (Jan.
31, 2014) ("In fact, the ASTM standards are available for free at
http://www.astm.org/READINGLIBRARY.")  The complaints identified by Defendant about
fees charged by other SDOs do not support its claims that Plaintiffs' standards are not reasonably
accessible.  Defendant also criticizes ASTM's policies for granting permission for persons to
copy and distribute portions of its standards.  Opp. 24-25.  But that has nothing to do with access
to the standards by affected persons.  And, in any event, Plaintiffs routinely provide permission
for a wide variety of researchers, students, and others to use portions of the standards at no cost.
SUMF ¶¶ 68, 103.

standards for their work can obtain them with little difficulty.  Golinveaux Decl. ¶ 10.

Defendant's suggestion that the website registrations violate state laws on public release of

public library records, Opp. 26, fails.  The library laws that Defendant cites have nothing to do

with public access to laws (or standards), and they do not impose any restrictions on how

copyright owners distribute their works.

Third, Defendant makes much of the supposed difficulty of using Plaintiffs' websites.

Opp. 26-27.  These complaints are not evidence, and Defendant notably has failed to provide

evidence of even a single person who was unable to use the websites.[18]  The one screen capture

that Defendant submits is clearly readable without difficulty.  Decl. of Matthew Becker (Dkt. No.

122-8) ("Becker Decl."), Ex. 139.  Defendant made complaints along these lines to the OFR—

which rejected Defendant's arguments and "applaud[ed] all the efforts of these private

organizations to make their IBR'd standards available to the public."  OFR Rule, 79 Fed. Reg. at

66271.  To be sure, Plaintiffs' websites are not designed to operate as perfect substitutes for

purchasing the standards.  But Plaintiffs are well within their rights to design their sites this way.

### C.    Issue Three:  Defendant Has Not Established a Triable Issue That Its Verbatim, Wholesale Copying and Distribution of Plaintiffs' Works Is Subject to the Fair Use Defense.

Defendant fails to meet its burden to show that its conduct is fair use.  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994).  There is not a single case in which copying entire

works verbatim and distributing them online to the world and without restriction has been held to

be fair use.  Defendant fails to show why this case should be the first.

---

[18] Defendant also claims that Plaintiffs' standards are not accessible to print-disabled persons. As discussed below in the fair use section, that argument is meritless.

1.       **The Purpose and Character of the Use**

This factor inquires "whether the work adds something new, with a further purpose or different character, altering the first with new expression, meaning or message," *i.e.* is the secondary work one "that serves a new and different function from the original work and [] not a substitute for it." *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014) (citations and internal quotations omitted). Defendant adds no new meaning or expression but instead copies and distributes the Works verbatim. Defendant's post-hoc justifications for its wholesale taking fail to show transformation.

First, Defendant's argument that it supposedly distributes the Works for a different purpose—to "expand[] access to the law," Opp. 36, is just a reprise (in fair use garb) of Defendant's argument that the entirety of Plaintiffs' works lose copyright protection once incorporated by reference. The argument is no more persuasive just because Defendant calls its wholesale copying fair use. The argument also is factually unsupported: Defendant admits that it offers its website as an "alternative" to Plaintiffs' websites, and Defendant encourages members of the public to download standards from its website rather than either purchasing them from Plaintiffs or using Plaintiffs' own websites. SUMF ¶¶ 223-24 (unrebutted). None of Defendant's cited cases involved a defendant making complete copies of a work available to the public in a manner that could have substituted for the copyright owner's attempts to sell or distribute the same work.[19] On the contrary, courts have uniformly recognized that a fair use

---

[19] *See Am. Inst. of Physics v. Schwegman, Lundberg & Woessner, P.A.*, No 12-528, 2013 WL 4666330, at *10 (D. Minn. Aug. 30, 2013) (defendant made "internal copies of the Articles … to ultimately comply with the legal requirement to provide prior art to the USPTO"); *Am. Inst. of Physics v. Winstead PC*, No. 3:12-cv-1230, 2013 WL 6242843, at *5 (N.D. Tex. Dec. 3, 2013) (same); *Bond v. Blum*, 317 F.3d 385, 393 (4th Cir. 2003) ("defendants made copies of the manuscript to use its content as evidence in the child-custody litigation"); *Healthcare Advocates Inc. v. Harding, Earley, Follmer & Frailey*, 497 F. Supp. 2d 627, 637 (E.D. Pa. 2007) (defendant made copies of work for use in litigation and "did not make these images available to others on

defense should fail if the defendant's use results in "providing the public with a substantial substitute for matter protected by the Plaintiffs' copyright interests in the original works." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 207 (2d Cir. 2015); *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1176 (9th Cir. 2012) (rejecting fair use defense, even though defendant had a different "purpose" than plaintiff for reproducing plaintiff's pictures, when defendant "left the inherent character of the images unchanged").

Second, Defendant is wrong that its conversion of Plaintiffs' Works to HTML format qualifies as "transformative." Unlike in the cases Defendant cites, the purported "analysis" the conversion enables is conjectural. Defendant has no evidence that anyone performed any such analysis using its HTML versions, nor that such analysis could not be performed with the versions that Plaintiffs make available. Moreover, the cases have been clear that digital conversion may be fair use only so long as the converted works are not market substitutes for the copyrighted works.[20] Here, it is undisputed that anyone who otherwise would buy a copy from Plaintiffs can go to Defendant's website and get for free what Defendant calls an identical version.

---

any website"); *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 611 (2d Cir. 2006) (biographer reproduced concert posters in "significantly reduced" size that was "inadequate to offer more than a glimpse of their expressive value"); *Online Policy Grp. v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1203 n.13 (N.D. Cal. 2004) (publication of internal company emails was fair use where company "clearly has indicated that it never intended to publish the emails" itself); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 545 (6th Cir. 2004) (user of copyrighted computer program to enable printer functionality could raise fair use defense where there was no "independent market" for the copyrighted program).
[20] *HathiTrust*, 755 F.3d at 97 ("in providing this service, the [defendant] does not add into circulation any new, human-readable copies of any books"); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1155 (9th Cir. 2007) (search engine displayed "reduced, lower-resolution versions of full-sized images"); *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 635 (4th Cir. 2009) (plagiarism-detection software company only distributed plaintiffs' papers to "the instructor to whom plaintiffs submitted their own papers").

Third, Defendant asserts that its website makes Plaintiffs' standards accessible to visually disabled persons. This is a cynical, post-hoc attempt by Defendant to analogize its conduct to that of the libraries in the *HathiTrust* case. It fails:

(1)     The Chafee Amendment, 17 U.S.C. § 121, allows organizations that serve the visually impaired to make copies of works without permission from the copyright owner, as long as the copies are available exclusively for the use of the visually impaired. Yet, Defendant has not opted to comply with the Chafee Amendment and make Plaintiffs' Works available exclusively to the visually impaired. Defendant's expert, Mr. Fruchterman, explained that he runs an online library for the visually impaired, which already contains the 2014 edition of the NEC, and that nothing would prevent Carl Malamud or another volunteer from uploading the rest of Plaintiffs' standards to that library. Suppl. SUMF ¶ 3. In other words, if Defendant were actually concerned about accessibility of Plaintiffs' Works to the visually impaired, it would have an easy and lawful way of promoting such access that would not involve posting the standards on the internet for free distribution to anyone.

(2)     Moreover, *HathiTrust* held that "providing expanded access to the print disabled is not 'transformative.'" 755 F.3d at 101. Although the court ultimately found the copying there was a fair use, HathiTrust Digital Library operated under different principles than Defendant's website, including by limiting provision of full-text copies to users who submitted documentation of their print disabilities. *Id.* at 101. Defendant does not limit access to persons with print disabilities.

(3)     Defendant has no evidence that any disabled person has ever been unable to access Plaintiffs' standards from Plaintiffs. Plaintiffs either have or indisputably would (if

presented) honor any request from print-disabled persons for access to their standards.  *See* Suppl. SUMF ¶¶ 8-12.

(4)     Defendant has no evidence that its website actually makes the Works accessible to the visually disabled in any format.  Mr. Fruchterman, admitted that he had asked one visually disabled person to evaluate the scanned PDF versions of Plaintiffs' standards that were posted on Defendant's website, and that person informed him that those documents could not be considered to be accessible.  Suppl. SUMF ¶ 5.  Mr. Fruchterman decided not to ask any visually disabled persons to assess the accessibility of Defendant's HTML standards, and acknowledged that he could not opine that a visually disabled person would actually be able to use the HTML versions of Plaintiffs' standards posted on Defendant's website.  *Id.* ¶¶ 4, 6.

Defendant also argues that its use is non-commercial.  But Defendant elides the evidence that it directly tied its posting of Plaintiffs' standards to its ability to "raise money."  SUMF ¶ 230.  That makes this case different than the other cases involving nonprofit organizations that Defendant cites, which did not have such direct evidence that the infringement itself resulted in financial gains to the infringer.  Defendant's only answer is a self-serving declaration from its president, the same person who raised money by advertising his copyright infringement to potential donors, and then paid himself hundreds of thousands of dollars and funneled hundreds of thousands more to his wife, all while describing his copying of Plaintiffs' standards as "what a way to make a living."  SUMF ¶ 232.

## 2.     The Nature of the Copyrighted Work

Defendant argues that "factual works" deserve less protection than "works of fiction." Opp. 40.  Recent case law has reaffirmed the need to protect "authors of factual works."  *Authors Guild*, 804 F.3d at 220.  The primary focus of the second factor is on the author's "manner of expressing those facts and ideas."  *Id.*  Here, Plaintiffs' Works are complicated and sophisticated

technical works that require extensive resources and many creative decisions to develop.  Thus,

these Works are close to the "core of intended copyright protection."  *Campbell*, 510 U.S. at 586.

### 3.      The Amount and Substantiality of the Work Taken

Defendant admits that it copied the Works in their entirety, but argues that it did so only

because the entire works are incorporated by reference.  Opp. 41-42.  This, too, is just a

restatement of Defendant's argument that once the Works were incorporated by reference,

Defendant was free to copy and distribute them with impunity.  The third fair use factor,

however, focuses not only on "the amount and substantiality of the portion used ***in making a***

***copy***, but rather the amount and substantiality of ***what is thereby made accessible*** to a public for

which it may serve as a competing substitute."  *Authors Guild*, 804 F.3d at 222 (quotation marks

omitted and emphasis in original).  Because Defendant made all of Plaintiffs' Works fully

accessible to the public, this factor strongly weighs in Plaintiffs' favor.

### 4.      The Effect of the Use Upon the Potential Market

Because Defendant's copies "make available a significantly competing substitute" for

Plaintiffs' Works, the fourth factor would undermine the fair use defense "[e]ven if the purpose

of the copying is for a valuably transformative purpose," *Authors Guild*, 804 F.3d at 223.  This

factor, too, clearly favors Plaintiffs.  Defendant does not deny that it set out to make "exact

copies" of Plaintiffs' standards.  By definition, intended "exact copies" are competing substitutes

for the original works, and thus Defendant's conduct has a clear potential effect on the market

for Plaintiffs' Works.  Defendant argues that Plaintiffs have not yet experienced "any significant

loss of sales."  Opp. 42.  But, a court must "look at the impact on *potential* licensing revenues"

for the copyrighted works.  *Bill Graham Archives*, 448 F.3d at 614.  This includes taking into

account, "not only the extent of market harm caused by the particular actions of the alleged

infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the

defendant ... would result in a substantially adverse impact on the potential market.'" *Campbell*, 510 U.S. at 590 (citations omitted).

If Defendant's wholesale copying of the Works is fair use, then nothing stops *other* would-be-infringers from copying the Works and posting them on the internet, or even publishing them in print, and then distributing free or lower-cost copies of the standards than those that Plaintiffs sell. This would destroy the potential market for Plaintiffs' standards. As the First Circuit put it: "If anyone could freely access the Works, electronically or otherwise, the Monastery would have no market in which to try and publish, disseminate, or sell its translations. . . . Thus, the Monastery's translations of ancient texts (which the Archbishop does not contest were expensive to create) would have been toiled over, with no possible market in which to reap the fruits of its labor." *Soc'y of Holy Transfiguration Monastery, Inc. v. Archbishop Gregory*, 689 F.3d 29, 65 (1st Cir. 2012). Similarly here, if the public can freely access, download, and print Plaintiffs' standards (or even purchase unauthorized copies) it would result in a substantially adverse impact on the potential market for Plaintiffs' Works.

Although Defendant has to date only copied some of Plaintiffs' standards wholesale, there is still evidence that Defendant's conduct has already had a financial effect on Plaintiffs.[21] For example, NFPA's sales of the NEC declined by over 30% from the publication cycle before Defendant posted it to the cycle afterward. SUMF ¶ 239. Defendant's brief offers no response, instead arguing that the other two Plaintiffs, ASTM and ASHRAE have not tracked a measurable economic loss. Opp. 42-43. However, that hardly means that there has been no such loss. The

---

[21] In the fair use section of its brief, Defendant falsely states that it has been posting the works at issue for more than seven years, apparently in an effort to downplay the effect of its conduct on Plaintiffs' finances. Opp. 42. Elsewhere, however, Defendant acknowledges that it actually began posting copies of standards incorporated by reference in 2012, roughly three years ago. Opp. 6. In this context, Defendant's claim that its conduct had not had a direct impact on ASTM's finances as of January 2013 is hardly probative.

unrebutted expert economic testimony indicates that "Plaintiffs are likely to stand to lose a majority of their revenue and gross profits from the loss of copyright protection here."  SUMF ¶ 156 (quoting Rubel Decl., Ex. 1 (Jarosz Rep.) ¶ 138).  Defendant failed to submit any rebuttal expert testimony.[22]  And even if Plaintiffs had no evidence of current financial loss, such evidence is not required to establish harm under this factor.  *Soc'y of Holy Transfiguration Monastery*, 689 F.3d at 64.[23]

### D.     Issue Four:  No Evidence Creates a Triable Issue of Fact Showing That Plaintiffs Do Not Own the Copyright in Each Standard.

Plaintiffs are the registered copyright owners in each Work in issue.  Defendant presented no evidence—none—that anyone who contributed to the Works (or anyone they work for) has ever claimed ownership over any Work or purported to give Defendant a license to engage in its infringing conduct.  Notwithstanding the state of the record, Defendant has tried to create some issue—any issue—that Plaintiffs lack any ownership claim.  Plaintiffs have easily satisfied their burden, and Defendant has failed to discharge its burden to overcome Plaintiffs' presumptions.

### 1.     Plaintiffs' Copyright Registrations Create Presumptions of Plaintiffs' Ownership of the Copyrights.

All the registrations identify Plaintiffs as the copyright owners.  Defendant argues that the registrations were in error, and that the prima facie presumption, 17 U.S.C. § 410(c), disappears. This argument fails for two reasons.

---

[22] As detailed in Plaintiffs' response to Defendant's motion to strike Mr. Jarosz's testimony, Defendant's unfounded attacks on Mr. Jarosz's qualifications and testimony should be rejected.

[23] Defendant also argues that SDOs have not suffered as a result of the Fifth Circuit's *Veeck* decision.  Opp. 43.  As explained above, the Fifth Circuit in *Veeck* expressly did not purport to be resolving the question of whether Plaintiffs' standards retained their copyright protection, and OFR, the OMB, and the leading academic commentary have all interpreted *Veeck* as not depriving Plaintiffs of copyright protection in their standards.  It is not surprising that the (to-date) cabined *Veeck* decision has not resulted in the destruction of SDO copyright protections that Defendant hopes to achieve with this lawsuit.

First, there was no error in the registrations. The cases—even cases Defendant likes—hold that Plaintiffs are "organizational author[s]" because they oversee the development of the Works. *Veeck*, 293 F.3d at 794; *see also Practice Mgmt.*, 121 F.3d at 518 ("the AMA authored, owns, and maintains the CPT [coding system] and claims a copyright in it"). Moreover, the undisputed evidence shows that when one Plaintiff (ASTM) consulted with the Copyright Office, that Office instructed ASTM to fill out its copyright applications noting itself as the sole author.[24] Suppl. SUMF ¶ 13.

Second, even if there was error (which there was not), there was no fraud. As Professor Nimmer states: "a misstatement or clerical error in the registration application, if unaccompanied by fraud, should neither invalidate the copyright nor render the registration certificate incapable of supporting an infringement action," as long as the work in question would still have been eligible for copyright had the application been correct. 2 *Nimmer on Copyright* § 7.20[B][1]; *see also Urantia Found. v. Maaherra*, 114 F.3d 955, 963 (9th Cir. 1997). If Plaintiffs should have listed individual contributors as joint authors, that error would be immaterial, because there is no question but that the Copyright Office would have issued the certificate of registration. *See Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 489 F. Supp. 174, 177 (N.D. Ga. 1980). Defendant's cases do not hold otherwise. *See Masquerade Novelty, Inc. v. Unique Indus., Inc.*, 912 F.2d 663, 668 (3d Cir. 1990) (no opinion whether alleged omission in application deprived the copyright owner of presumptions because plaintiff did not omit any information); *Family Dollar Stores, Inc. v. United Fabrics Int'l, Inc.*, 896 F. Supp. 2d 223, 231 (S.D.N.Y. 2012) (defendant presented facts that rebutted presumption of

---

[24] Additionally, NFPA is the sole author of the Works under the work made for hire doctrine, 17 U.S.C. § 101, because its contributors expressly agree that the works "shall be considered to be works made for hire for the NFPA." Pauley Decl. § 34; *see also* Opp. 47 n.10 (no dispute from Defendant that NFPA's post-2007 forms contain requisite "work made for hire" language).

validity).  Thus, Plaintiffs' registration certificates create presumptions that Plaintiffs own the copyrights, which Defendant failed to rebut.

> **2.      Defendant Failed to Meet Its Burden of Proving That Plaintiffs Are Not, at Least, Joint Authors of the Works.**

The registrations discharge Plaintiffs' burden to show ownership, but even if they do not, Defendant's challenge fails because Plaintiffs have shown they would, at a minimum, have to be joint authors.  Each joint author owns the copyright in the complete Work and can bring a claim for infringement.  *Davis v. Blige*, 505 F.3d 90, 98 (2d Cir. 2007).  Defendant cites no contrary authority.

Plaintiffs would at least be co-authors because Plaintiffs' employees co-authored the Works in the course of their employment with Plaintiffs.  17 U.S.C. § 201(b).  Each Work was prepared with the input of multiple persons, including Plaintiffs' employees, and the collaborative process and the development procedures make it clear to all participants in the process that all contributions will be merged into a single standard.  SUMF ¶¶ 30, 33, 34, 36, 109, 112, 114, 117, 135-37.  Plaintiffs' employees actively edit and revise drafts of the standards that come from the committees; each Plaintiff also showed that its staff members drafted language that appears in the standards at issue.  *See* SUMF ¶ 35 (citing O'Brien Decl. ¶¶ 15-39 & Exs. 5-9 detailed explanation of the portions of ASTM standards at issue that ASTM staff members authored); SUMF ¶ 117 (citing Pauley Decl. ¶¶ 38-40 & Rubel Decl., Ex. 6 (Dubay Dep.) at 54:19-56:12; 66:20-67:12; 69:2-18, explaining that NFPA employees draft wording for the standards and finalize the wording of the documents that become the NFPA standards); SUMF ¶¶ 138-41 (citing Decl. of Stephanie Reiniche (Dkt. No. 118-10) ("Reiniche Decl.") ¶¶ 10-11 & Rubel Decl., Ex. 7 (Reiniche Dep.) at 35:23-38:2, 97:13-98:19), explaining role of

ASHRAE staff in suggesting language for standards and maintaining and updating sections of the standards). Defendant present no contrary evidence.

A "joint work" is one "prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. Defendant argues that there can be no joint authorship absent proof that every joint author intended the Work would be a joint work. The evidence of each Plaintiff's collaborative process indisputably shows that each contributor, at the time of creation, intended "that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. To the extent *Aalmuhammed v. Lee*, 202 F.3d 1227 (9th Cir. 2000), which Defendant cites, would require more, that is not the law in the D.C. Circuit.[25] In *Community for Creative Non-Violence v. Reid*, a non-profit association collaborated with a local artist to create a statue. 846 F.2d 1485, 1487 (D.C. Cir. 1988), *aff'd*, 490 U.S. 730 (1989). After the statue was completed, both the sculptor and the non-profit claimed to be the exclusive owners of the copyright. *Id.* at 1488. There was no evidence that the parties agreed at the time the statue was created that they would be joint owners. Nonetheless, the D.C. Circuit described this as "a textbook example of a jointly authored work in which the joint authors co-own the copyright" based on the parties' respective contributions to the work, as well as the various indicia of their intent to merge their contributions into a unitary whole. *Id.* at 1497.[26]

---

[25] Even if there were a requirement in this Circuit that co-authors must specifically intend for their work to be a joint work with the Plaintiffs, there is no dispute that the volunteer contributors had the necessary intent for Plaintiffs to have an ownership interest in the Works at the time of creation. SUMF ¶ 26 (citing Jennings Decl. ¶ 12; Cramer Decl. ¶ 15); *id.* ¶ 116 (citing Pauley Decl. ¶¶ 36-37; Golinveaux Decl. ¶¶ 12-13); *id.* ¶¶ 142-43. Defendant has not cited evidence of a single person, including any of Plaintiffs' volunteer members, who disputes Plaintiffs' ownership of the copyrights in the standards. SUMF ¶¶ 26, 122, 145.

[26] In its decision affirming the D.C. Circuit, the Supreme Court expressly agreed with the D.C. Circuit's assessment that the parties would be joint owners if they prepared the work with the

### 3. Defendant Failed to Meet Its Burden of Proving That Plaintiffs Are Not, at Least, Joint Owners Through Assignments.

#### a. Plaintiffs' Committee Members Intended to Assign Any Copyright Interests They Had to Plaintiffs.

Plaintiffs have also shown that they, in all events, are entitled to claim ownership because they obtained copyright assignments for contributions made to the Works.

NFPA provided several copies of assignment forms for the 2011 and 2014 editions of the NEC, which are the works for which NFPA moved for summary judgment.  Suppl. SUMF ¶ 20. Defendant makes no attempt to cast doubt on the assignments submitted by NFPA, instead introducing a few other forms with different assignment language that it claims is inadequate (and Defendant identifies no such forms for the 2014 NEC).  As discussed below, Defendant is wrong about the language on even the forms that it submits.  But regardless, Defendant would have to disprove *all* the assignments, not merely a small handful of them, to establish that NFPA lacks any copyright interest in these works.  It has manifestly failed to do so.  Further, the undisputed evidence shows that NFPA policy requires all members of its Technical Committees and all persons who submit public input to NFPA standards to submit copyright assignments to NFPA.  SUMF ¶ 115 (citing Pauley Decl. ¶¶ 34-35; Golinveaux Decl. ¶ 11; Rubel Decl., Ex. 6 (Dubay Dep.) at 105:12-21); SUMF ¶ 112 (citing Pauley Decl. ¶ 27; Rubel Decl., Ex. 6 (Dubay Dep.) at 212:17-21).  Notably, Defendant has no response to the unambiguous copyright assignment language in the NFPA Committee Application form, which is alone sufficient to establish NFPA's ownership by assignment.

Similarly, ASHRAE presented evidence that its members and individuals who submit proposals for ASHRAE standards complete forms in which they assign copyrights in the

---

intention that their contributions were merged into inseparable or interdependent parts of a unitary whole. *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 753 (1989).

language that will be used in an ASHRAE standard to ASHRAE.  SUMF ¶¶ 143-44 (citing

Reiniche Decl. ¶¶ 13-14, Exs. 1-2 (each ASHRAE form features a provision stating that the

member "understand[s] that I acquire no rights in publication of such documents"; the provision

is referred to in the document as a "copyright release")).

For the four standards for which ASTM moved for summary judgment, ASTM presented

evidence that the leader of the group that developed the standard and/or a member of the

committee that drafted the standard assigned any and all copyrights in their individual

contributions to ASTM.  SUMF ¶¶ 20-24.  With respect to the remaining ASTM standards at

issue, ASTM has produced evidence that over 25,000 members completed membership renewal

forms every year since 2007, which is as far back as ASTM maintains membership records,

mostly using the online membership form.  Suppl. SUMF ¶¶ 14-16.  Although ASTM did not

request copyright assignments from its members until approximately 2005, the language in the

assignments it obtained since then retroactively assigned any copyrights that individual

possessed in any ASTM standard to ASTM.  *See* SUMF ¶ 18.  Although Defendant searched

high and low to identify isolated examples of individuals who may have renewed their

memberships using other channels or whose membership forms did not include the assignment

language, Defendant has not identified even one individual who contributed any language that

appears in any ASTM standard at issue in this case who did not submit a membership form with

the assignment language.  And, as noted, even a single assignment suffices to give ASTM

sufficient copyright interest to sue.

### b.      The Assignments Are Sufficient to Transfer Copyright Ownership to Plaintiffs.

Defendant's nitpicking of the language of some of Plaintiffs' assignments is for naught.

A valid assignment need not "contain an elaborate explanation" or "'magic words,' but must

simply show an agreement to transfer the copyright." *Metro. Reg'l Info. Sys. v. Am. Home Realty Network, Inc.*, 722 F.3d 591, 600 (4th Cir. 2013) (citations omitted).

First, the language in ASTM's online renewal forms was sufficient for members to effectively assign their copyrights to ASTM.[27]   Contrary to Defendant's legally unsupported argument, a click-through button is a standard and enforceable method for indicating assent to a copyright assignment.  *See, e.g.*, *id.* at 601-02 (holding that e-signature by clicking "yes" was valid copyright assignment).[28]   Thus, members who completed ASTM's online membership renewal form assigned their copyrights to ASTM.

Second, while Defendant focuses exclusively on one provision of the ASHRAE forms in which a contributor grants non-exclusive rights, the ASHRAE forms also state that the individual "understand[s] that I acquire no rights in publication of such documents in which my contributions or other similar or analogous form are used."  Def.'s SUMF ¶¶ 143-44.  Thus, to the extent ASHRAE includes the proposed language in a standard that it publishes, the individual has disclaimed any copyright ownership in the final standard in favor of ASHRAE.  *See Capital Concepts, Inc. v. Mountain Corp.*, No. 3:11-cv-00036, 2012 U.S. Dist. LEXIS 182874, at *15 (W.D. Va. Dec. 30, 2012) (holding that a provision stating "I agree that I have no ownership, rights, title, or interest in the Creative Works" was clear evidence of intent to relinquish and transfer to the plaintiff all copyrights in the works).  The provision is also referred to in the

---

[27] ASTM's online membership renewal form states: "I agree … to have transferred and assigned any and all interest I possess or may possess, including copyright, in the development of creation of ASTM standards or ASTM IP to ASTM."  SUMF ¶ 18.  Members assent to this statement by clicking a button labeled "Continue" to complete their membership renewal.  *Id.*

[28] *See also Burcham v. Expedia, Inc.*, No. 4:07CV1963, 2009 U.S. Dist. LEXIS 17104, at *3-4 (E.D. Mo. Mar. 6, 2009) (users assented to and were bound by terms of use of website that required user to click button that said "continue" when next page stated "[b]y continuing on you agree to the following terms and conditions"); *Graf v. Match.com, LLC*, No. CV 15-3911, 2015 U.S. Dist. LEXIS 90061, at *11-12 (C.D. Cal. July 10, 2015) (same).

ASHRAE forms as a "copyright release" (Def.'s SUMF ¶ 143); the concept of a "release"—as opposed to a license—is not forward looking, which indicates the assignment language acts as a full relinquishment of rights.

Third, the language in NFPA's pre-2008 forms is substantially similar to ASHRAE's forms.[29] The language in these forms indicates the intent to transfer any rights that the individual could have in any publication that ultimately includes the proposal to the relevant Plaintiff. *See Capital Concepts, Inc.*, 2012 U.S. Dist. LEXIS 182874, at *22-23 (language evidencing intent to relinquish and transfer rights in the works is sufficient to show plaintiff's ownership).

Finally, Plaintiffs' assignments are not deficient due to lack of authority to assign the copyrights to the Plaintiffs.[30] Defendant has the burden of presenting evidence that the individuals who signed the forms were not the duly authorized agents of the copyright owners. *United Fabrics Int'l, Inc. v. C&J Wear, Inc.*, 630 F.3d 1255, 1258-59 (9th Cir. 2011) (defendant had the burden to present evidence that the person who assigned the copyright was not duly authorized agent); *Latin Am. Music Co. v. Archdiocese of San Juan*, 499 F.3d 32, 42 (1st Cir. 2007) (copyright assignment was valid where party challenging assignment failed to show that the person who assigned the copyright was not a duly authorized agent). Defendant presented no evidence that, even if the employer of any individual owned the copyright in the contributions of

---

[29] As noted, Defendant's failure to raise any objection to NFPA's post-2008 forms or its committee applications is alone sufficient to defeat its challenge to NFPA's ownership of the 2011 and 2014 editions of the NEC.

[30] Plaintiffs do not claim to own copyrights in the Works through assignment of individual contributions by employees of the federal government who participate in the standard development process "as part of that person's official duties." 17 U.S.C. § 101. Defendant presented no evidence that any of the Works at issue contain specific language that was drafted by federal government employees acting in their official duties, much less that all of the language in any of the Works at issue was drafted by federal employees in that capacity.

that individual, the employer did not authorize the individual to assign the copyrights to the

relevant Plaintiffs.  In fact, NFPA and ASHRAE's assignment forms require the person signing

to warrant that he/she has the authority to enter into the assignment.  Suppl. SUMF ¶ 21 (NFPA

assignment forms state: "I hereby warrant that … I have full power and authority to enter into

this assignment."); *Id.* ¶ 22 (ASHRAE forms state: "I hereby attest that I have the authority and I

am empowered to grant this copyright release.").

This and the preceding subsection assume that Defendant—the accused infringer—has

standing to challenge the assignments.  The weight of authority is to the contrary.  *See* Mot. 17-

18.  *See also Metro. Reg'l Info. Sys., Inc.*, 722 F.3d at 600-01 ("we nevertheless feel compelled

to note the anomaly of allowing [defendant] to fabricate for its own benefit a dispute between

[plaintiff] and its subscribers over copyright ownership in the photographs").  *Urbont v. Sony*

*Music Entm't*, 100 F. Supp. 3d 342 (S.D.N.Y. 2015), and *Marya v. Warner/Chappell Music, Inc.*,

No. CV 13-04460, 2015 WL 5568497, at *19 (C.D. Cal. Sept. 22, 2015), do not overcome the

weight of this authority.  Moreover, *Marya* is distinguishable, because the court there said there

was "no evidence a transfer occurred, whether by oral statement, by writing, or by conduct."

*Marya*, 2015 WL 5568497, at *19.  Here, there is extensive evidence that transfers occurred.

Defendant's only disagreement is with the formality of language.

## II.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR TRADEMARK INFRINGEMENT CLAIMS.

### A.    Plaintiffs' Trademark Claims Are Distinct from Their Copyright Claims.

Plaintiffs' trademark claims are cognizable separate and apart from their copyright

claims.  Defendant's copying and distribution of the Works constitute copyright infringement.

Defendant's representation that the materials it created and posted on the internet are Plaintiffs'

standards, when in fact they are not, constitutes trademark infringement.  Thus, distributing

Plaintiffs' standards while using Plaintiffs' trademarks may have been one act, but it was two wrongs. *See Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007 (9th Cir. 1994) (affirming district court's finding of liability and award of damages under both copyright and trademark law where defendant copied Nintendo games (copyright infringement) and then sold the games by advertising that they were Nintendo products (trademark violation)).

Contrary to Defendant's claim, *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 33-34 (2003), does not foreclose the possibility of a plaintiff bringing both copyright and trademark infringement claims in the same lawsuit. *See Luxul Tech. Inc. v. Nectarlux, LLC*, 78 F. Supp. 3d 1156, 1172 (N.D. Cal. 2015) (holding that *Dastar* did not preclude plaintiff from alleging both copyright and trademark claims); *Bach v. Forever Living Prods. U.S., Inc.*, 473 F. Supp. 2d 1110, 1118 (W.D. Wash. 2007) (same). *Dastar* held that where a work was in the public domain under copyright, the plaintiff could not repackage a copyright infringement claim as a claim for false designation of origin. In contrast, the Court made it clear that a trademark claim could be brought if it was based on a misrepresentation regarding the source of goods that are being sold. 539 U.S. at 31-32; *see also Prunté v. Universal Music Grp.*, 484 F. Supp. 2d 32, 41 (D.D.C. 2007). Consistent with *Dastar*, Plaintiffs' claims are based on the likelihood that people will believe that Plaintiffs are the source of, or are somehow affiliated with, the electronic files that Defendant created itself and posted online, when in fact they are not. *See Slep-Tone Entm't Corp. v. Coyne*, 41 F. Supp. 3d 707, 719 (N.D. Ill. 2014) (holding that plaintiff could bring trademark infringement claim based on allegations of use of plaintiff's trademark on defendant's karaoke jockeying services).

### B.     Defendant's Use of Plaintiffs' Trademarks Is Not Nominative Fair Use.

The nominative fair use permits a party in certain circumstances to use another's trademark to describe the *trademark owner's* product. *See New Kids on the Block v. News Am.*

*Publ'g, Inc.*, 971 F.2d 302, 308 (9th Cir. 1992) (providing examples of Chicago Bulls, Boston Marathon, and Volkswagen). Here, the undisputed evidence demonstrates that Defendant does not use Plaintiffs' trademarks for the purpose of describing works that Plaintiffs created, but instead uses them to signify falsely that Plaintiffs are the source of the electronic files that Defendant created. As a result, the nominative fair use defense does not apply here.[31]

In addition, a key requirement of the nominative fair use analysis is that the defendant use "only so much of the [plaintiff's] mark or marks . . . as is reasonably necessary" to describe the plaintiff's products or services. *NKOTB*, 971 F.2d at 308.[32] Use of a logo is the paradigmatic use of more than what is necessary to identify the plaintiff's product. *See David's Bridal, Inc. v. House of Brides, Inc.*, No. 06-5660, 2010 WL 323306, at *7 (D.N.J. Jan. 20, 2010) (use of design elements was unnecessary). Defendant provides no justifiable excuse for using Plaintiffs' logos on the electronic files it created. Defendant's claim that "[i]t is often reasonable for a defendant to use a design mark to identify goods and services," is unsurprisingly not supported by citation. Opp. 61

---

[31] Defendant's reliance on *Interactive Products Corp. v. a2z Mobile Office Solutions, Inc.*, 326 F.3d 687 (6th Cir. 2003), is misplaced. That was not a nominative fair use case and does not support Defendant on likely confusion. The court found that no consumer would be confused because post-domain paths do not typically signify source, *id*. at 698, an issue that is not raised here. Defendant's description of *Interactive Products* as hinging on whether the use of the mark could signify that defendant was the source of the product is completely backward. *See* Opp. 59. The question in any forward confusion trademark infringement case is whether the defendant's use of plaintiff's mark is likely to cause confusion that the *plaintiff* is the source of the product.
[32] Defendant's claim that this component of the nominative fair use test has not been widely adopted outside of the Ninth Circuit is wrong. *See, e.g., Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 488-89 (5th Cir. 2008); *Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 232 (3d Cir. 2005); *Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, No. 3:10-cv-01238, 2014 U.S. Dist. LEXIS 108853, at *13 (D. Conn. Aug. 7, 2014); *Gennie Shifter, LLC v. Lokar, Inc.*, No. 07-cv-01121, 2010 U.S. Dist. LEXIS 2176, at *40 (D. Colo. Jan. 12, 2010).

Defendant does not have to use Plaintiffs' logos to identify Plaintiffs as the source of the posted materials when Defendant also uses Plaintiffs' word marks. Defendant admits to using Plaintiffs' logos to signal that each of the Works is "the correct standard referenced by law." Opp. 62. That is, Defendant uses Plaintiffs' marks to give the impression that each of the supposed copies of Plaintiffs' Works is a genuine copy of one of Plaintiffs' standards. This implies falsely that Plaintiffs are affiliated with or have endorsed Defendant's copies. This is not a nominative fair use.

**C.      The First Sale Doctrine Does Not Apply to Defendant's Use.**

Defendant's use of Plaintiffs' trademarks is also not protected by the first sale doctrine. The first sale doctrine provides only that "[r]esale by the first purchaser *of the original article* under the producer's trademark is neither trademark infringement nor unfair competition." *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1074 (9th Cir. 1995) (emphasis added); *see also Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1301-02 (11th Cir. 2001) ("The *resale* of genuine trademarked goods generally does not constitute infringement") (emphasis added). The paradigm first sale scenario is where a purchaser "does no more than stock, display, and resell a producer's product under the producer's trademark." *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1241 (10th Cir. 2006). A reseller who does more than resell trademarked goods may be liable for infringement. *Sebastian Int'l.*, 53 F.3d at 1076.

Defendant has not simply resold, distributed, or repackaged the hard copies of Plaintiffs' Works that it purchased. Defendant undisputedly distributed electronic files that were not created or sold by Plaintiffs. SUMF ¶¶ 182-85; 188-201. The first sale doctrine does not apply in this context. *See Slep-Tone Entm't Corp. v. Am.'s Bar & Grill, LLC*, No. 13 C 8526, 2014 U.S. Dist. LEXIS 113219, at *11-12 (N.D. Ill. Aug. 15, 2014) (first sale doctrine did not apply to sale of "copied, unoriginal items" on which defendant placed plaintiff's trademark because

defendant's actions went beyond the mere resale of trademarked goods); *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 654-56 (S.D.N.Y 2013) (first sale doctrine is applicable only to material items and to the exact copy of a work purchased; refusing to expand first sale doctrine in context of distributing internet copies of digital works).

### D.    Defendant's Use of Plaintiffs' Marks Creates a Likelihood of Confusion.

Where, as here, Defendant uses a mark that is *identical* to Plaintiffs' marks in connection with related services, there is no need for further inquiry to find a likelihood of confusion. *See* Mot. 43-44.  The case is "open and shut."  *See* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 23:20 (4th ed. 2011).  Defendant's admission that Plaintiffs' marks are strong—and that Defendant uses the marks on "exact copies" of Plaintiffs' products— provides additional compelling evidence of likely consumer confusion.  Opp. 65.

Defendant's effort to distinguish *Wynn Oil Co. v. Thomas*, 839 F.2d 1183 (6th Cir. 1988), Mot. 44, is unavailing.  In *Wynn Oil*, the defendant opened a car wash using the identical name that the plaintiff had registered and used for its car washes.  839 F.2d at 1185.  The Sixth Circuit held that because "both marks use absolutely identical language to sell a nearly identical service, the likelihood of confusion must be considered great."  *Id.* at 1190-91.  Defendant's argument that its actions are distinguishable because it does not use Plaintiffs' marks to signal that Defendant is the source, Opp. 65, misses the point.  The relevant issue is whether the public is likely to be confused that the versions of the standards that were created by Defendant are either actually Plaintiffs' standards or are affiliated with or sponsored by Plaintiffs.  *Wynn Oil* and the other cases cited by Plaintiffs stand for the proposition that use of an identical mark on identical goods is likely to cause precisely that type of confusion.

Despite Defendant's suggestion to the contrary, Plaintiffs are not required to submit evidence of actual confusion.  *See, e.g.*, *Oriental Fin. Grp., Inc. v. Cooperativa De Ahorro*

*Crédito Oriental*, 698 F.3d 9, 17 (1st Cir. 2012); *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 291 (3d Cir. 2001).  This is true in part because evidence of actual confusion among consumers is notoriously difficult to find.  *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 914 (Fed. Cir. 1984).  Thus, the absence of evidence of actual confusion does not diminish from Plaintiffs' claims.

The purported "disclaimer" Defendant places on its website is insufficient to prevent confusion.[33]  There are numerous reasons why.  First, use of even a clear disclaimer would not necessarily prevent consumer confusion.  *See, e.g.*, *Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.*, 832 F.2d 1311, 1315-16 (2d Cir. 1987); *U.S. Jaycees v. Phil. Jaycees*, 639 F.2d 134, 142 (3d Cir. 1981).  Second, nothing in the statement on Defendant's website corrects the false impression that Plaintiffs have authorized Defendant's posting of the Works.  The statement does not even mention Plaintiffs, much less explain that Defendant performed unauthorized reproductions or transcriptions of the Works that have resulted in the content being different than Plaintiffs' genuine standards.

Defendant also points to another "disclaimer" that it added to certain standards it posted, stating that Defendant is not affiliated with Plaintiffs and that Defendant is the entity that copied the standards.  Opp. 68 (citing Def.'s SUMF ¶ 169).  Defendant omits, however, that it did not include this "disclaimer" language on any of the Works at issue here.  In addition, Mr. Malamud's declaration only claims to have included this language on HTML versions of standards he posted, not the PDF versions.  Decl. of Carl Malamud (Dkt. No. 122-8) ¶ 31.  The exhibit he submitted shows an ASTM standard that Defendant first posted in 2015, which is not

---

[33] The text of the statement, in a single place on Defendant's site, is: "'In order to promote public education and public safety, equal justice for all, a better informed citizenry, the rule of law, world trade and world peace, this legal document is hereby made available on noncommercial basis, as it is the right of all humans to know and speak the laws that govern them.'"  Opp. 67-68.

the subject of this litigation.  Def.'s Consol. Ex. 3.  The HTML versions of the standards at issue

in this litigation do not include this language.  *See* Rubel Decl., Ex. 29 (showing HTML version

of ASTM standard D86-07 posted on Defendant's website).  Defendant's use of disclaimers after

Plaintiffs initiated this action does not dispel the likelihood of confusion.  *See CFE Racing*

*Prods., Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 596, 599 (6th Cir. 2015) (finding that district

court abused its discretion in allowing defendant to continue using infringing mark with a

disclaimer); *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1093 (7th Cir.

1988) (upholding injunction despite defendants' use of a disclaimer, stating that "[e]specially

where the infringement in issue is a verbatim copying of the plaintiff's name, we are convinced

that the plaintiff's reputation and goodwill should not be rendered forever dependent on the

effectiveness of fineprint disclaimers often ignored by consumers").

## III.    PLAINTIFFS ARE ENTITLED TO A PERMANENT INJUNCTION.

A permanent injunction is the appropriate remedy here.  Each factor in *eBay Inc. v.*

*MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006), weighs in favor of an injunction.

### A.    Plaintiffs Will Suffer Irreparable Injury Without an Injunction.

Plaintiffs have presented unrebutted testimony concerning the dire impact Defendant's

actions will have on their business models, as well as potential reputational damage that may

arise from Defendant's continued infringement.  Mot. 52-55.  Plaintiffs' expert examined the

situation in detail and explained how a loss of revenue from selling standards would force

Plaintiffs to reduce their activities or switch to a less-desirable model in which standards must be

funded prior to their development, which will result in fewer standards developed by a less

balanced group of participants.  SUMF ¶¶ 251-54, 257-62.  Plaintiffs also presented evidence

that the extent of damage cannot be easily quantified because it is impossible to determine who

has made copies of the materials Defendant posted online and what those individuals have done

with such copies.  *Id.* ¶¶ 246-50, 254.  Additionally, Plaintiffs presented evidence and case law

concerning the irreparable injury that results from Plaintiffs losing the ability to prevent the

unwanted use and rampant dissemination of their works—a consideration that is particularly apt

where, as here, a defendant places works online for copying and redistribution by numerous third

parties.  Mot. 54; SUMF ¶¶ 240, 245.  Defendant failed to rebut this evidence.

### 1.    Economic Harm to Plaintiffs

Mr. Malamud himself admits that his conduct "potentially poses a challenge to the

current business models of the standards development of some standards development

organizations."  He has told his supporters that he avoids discussing how his conduct impacts

Plaintiffs because he "can't win that discussion."  SUMF ¶¶ 255-56; Rubel Decl., Ex. 3

(Malamud Dep.) at 211:5-19 & Ex. 43.  These admissions belie Defendant's current argument

that the impact of the infringement is insignificant.  Opp. 72.  There is no requirement that a

plaintiff be harmed so severely as to threaten its very survival for an injunction to be warranted;

instead, irreparable harm may be found where there is a likelihood of lost market share or lost

sales.  *See Bell Helicopter Textron, Inc. v. Airbus Helicopters*, 78 F. Supp. 3d 253, 272 (2015).

Moreover, Defendant's argument relies on the unsupported and vague representation that "most"

revenue from sales of Plaintiffs' "publications" is unrelated to incorporated standards.[34]  In fact,

the evidence shows that the standards at issue are particularly important to Plaintiffs' revenues,

and several of the standards—specifically ASHRAE 90.1 and the National Electrical Code—

have even been referred to by Plaintiffs as their organization's "crown jewels."  Rubel Decl., Ex.

1 ¶ 33; *see also* Suppl. SUMF ¶ 25 (Standard 90.1 is ASHRAE's "most popular standard" and

---

[34] Defendant's assertion also overlooks the fact that Defendant's infringement also impacts the
sale of related products, such as training materials.  SUMF ¶¶ 263-64.  The likelihood of lost
sales of related products may support findings of irreparable harm.  *Bell Helicopter*, 78 F. Supp.
3d at 272 (citing *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1310 (Fed. Cir.
2007)).

alone accounts for a significant portion of publications revenue); *id.* ¶ 26 (NEC is NFPA's

"flagship standard").  Plaintiffs' conduct also bolsters this point.  As Mr. Jarosz observed,

Plaintiffs' filing and pursuing this costly lawsuit points to the importance of these standards to

Plaintiffs and the threat posed by Defendant's infringement.  Rubel Decl., Ex. 1 ¶ 141.[35]

Plaintiffs also presented evidence of economic harm they will face if Defendant continues

its infringement.  Mot. 53-54.  Even after *eBay*, courts have consistently found that the harm is

irreparable, and adequate remedies at law lacking, where absent an injunction, the defendant is

likely to continue its infringement.  *See, e.g.*, *Breaking the Chain Found., Inc. v. Capitol Educ.*

*Support, Inc*., 589 F. Supp. 2d 25, 30 (D.D.C. 2008) ("The Court therefore agrees that

Defendant's continuing disregard for Plaintiff's rights demonstrates that it will continue to

infringe on Plaintiff's rights, absent an injunction."); *Hanley-Wood LLC v. Hanley Wood LLC*,

783 F. Supp. 2d 147, 151 (D.D.C. 2011) ("The Court further agrees that Defendants' continuing

disregard for Plaintiff's rights demonstrates that Defendants will continue to infringe on

Plaintiff's rights absent an injunction.  This finding alone entitles Plaintiff to a permanent

injunction."); *see also TechnoMarine SA v. Giftports, Inc*., 758 F.3d 493, 504 (2d Cir. 2014)

("[T]he critical question for a district court in deciding whether to issue a permanent injunction is

whether there is a reasonable likelihood that the wrong will be repeated.") (internal citations

omitted).  Hence, Defendant is wrong that protecting the copyright owner's core rights to

exclude is no longer relevant after *eBay*.  Opp. 73-74.

The consideration of widespread future infringement is particularly pressing in situations,

like this one, involving digital distribution of a plaintiff's works that can start a potential chain-

---

[35] ASTM's inclusion of pdf versions of some standards at issue as exhibits is not evidence that Defendant's infringement has not irreparably harmed ASTM.  The notion that submitting evidence of copyrighted works in an infringement case precludes an injunction prohibiting future infringement defies logic, and Defendant offers no legal support for this argument.

reaction of infringement.  "When digital works are distributed via the internet, every downloader who receives one of the copyrighted works is in turn capable of also transmitting perfect copies of the works.  Accordingly, the process is potentially exponential rather than linear, threatening virtually unstoppable infringement of the copyright."  *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1218 (C.D. Cal. 2007) (citations and internal alterations omitted) (issuing permanent injunction).  Defendant's publication of the Works on its website (and on the Internet Archive) enabled anyone with computer access to copy-paste and disseminate digitally (or even print, publish and resell) those standards.  SUMF ¶¶ 204-09, 240-44, 247-48.  As Plaintiffs established in their opening brief, this concern is not hypothetical.  Internet resellers have already taken NFPA standards from Defendant's website and marketed them for sale in direct contribution with NFPA's attempts to sell its standards.  SUMF ¶ 240.  Defendant does not dispute this fact, nor does it offer any response to the fact that its infringement enables limitless further infringement by third parties.

This constitutes a cognizable harm to Plaintiffs' businesses because "Plaintiffs' copyrighted works can be unstoppably and near-instantaneously infringed throughout the computer-literate world with the files obtained by [Public Resource's] endusers."  *Grokster*, 518 F. Supp. 2d at 1218-19.  Where the digital impact of infringement leads to an immeasurable level of copyright infringement and, therefore, immeasurable economic interference, it amounts to irreparable harm.  *Id.* at 1219; *see also Arista Records LLC v. Lime Wire LLC*, No. 06 Civ. 05936, 2010 WL 10031251, at *4 (S.D.N.Y. Aug. 9, 2010) (entering permanent injunction because "damages cannot address this continued vulnerability" of future dissemination).  An injunction is fully justified here.

## 2.      Changing Business Models Would Harm Plaintiffs' Interests.

Defendant contends that Plaintiffs have not demonstrated that their business models "require[] the right to control access to and reproduction of standards" because "other standards development organizations operate without asserting a right to exclude."  Opp. 73.  However, shifting to a "front-loaded" business model in which standards must be funded prior to their development would itself represents an irreparable injury by threatening to compromise the quality and impartiality of Plaintiffs' standards.  Mr. Jarosz explains standards developed under a front-loaded model are much more likely to feature only the viewpoints of industry interests who have the resources to participate in the process and are less likely to reflect the views and concerns of the general public.  SUMF ¶¶ 259-60.  Plaintiffs should not have to compromise their standards—which even Mr. Malamud has admitted serve important public functions—so Defendant can continue its infringement.

## 3.      Defendant's Actions Have Harmed Plaintiffs' Goodwill.

Defendant's actions have caused irreparable harm to Plaintiffs by causing them to lose control of the goodwill associated with their standards and trademarks.  *See Breaking the Chain Found.*, 589 F. Supp. 2d at 30; *Cmty. TV of Utah, LLC v. Aereo, Inc.*, 997 F. Supp. 2d 1191, 1203 (D. Utah 2014) (holding that defendant's infringement threatened to impair plaintiffs' control over their copyrighted programs, threatening plaintiffs' goodwill).  Defendant does not deny that its agent converted Plaintiffs' standards into HTML using a methodology that had an error tolerance of up to 49 errors on a typical two and a half page document; that the supposed "rekeying" of Plaintiffs' standards into HTML was done by non-native English speakers in India with no technical expertise and was actually performed through optical character recognition.  Mot. 46 (citing SUMF ¶¶ 191-94).  Defendant also does not deny that the conversion of formulas and drawings was outsourced to unpaid 7-14 year old children.  Mot. 58 (citing SUMF ¶¶ 199-

200).  Nor does Defendant deny that it failed to comply with Plaintiffs' quality control standards in posting its versions of the works online.

Defendant admits that there are differences between the documents it posted and Plaintiffs' Works, including the addition of a cover page and language that does not appear in Plaintiffs' Works; skipped and upside-down pages; and transcription errors that cause portions of the documents to "make[] no sense."  Opp. 70.  Despite evidence that Plaintiffs' Works contain complex scientific and technical processes that are used to promote public health and safety and ensure the quality and consistency of consumer goods and services, Defendant claims that "the existence of a few errors is not significant."  *Id.*  To the extent the errors cause the materials Defendant has posted to "make[] no sense," Defendant speculates that this will merely "drive consumers to check the PDF version to verify the correct text."  *Id.*  Plaintiffs strenuously disagree.  The use of Plaintiffs' trademarks on materials that admittedly contain errors poses a risk to public health and safety and tarnishes Plaintiffs' reputations for high quality standards.

### 4.    Plaintiffs Acted Swiftly in Bringing Suit.

Defendant's claims that Plaintiffs sat on their rights by delaying filing suit and not moving for a preliminary injunction are misleading.  Defendant did not post Plaintiffs' standards on its website until December 2012, and Plaintiffs responded by filing only eight months later.  SUMF ¶ 185; Compl. (Dkt. No. 1).  This is not an undue delay, particularly considering the time needed for the three Plaintiffs to coordinate their efforts.

Defendant is wrong that a permanent injunction should not be granted because Plaintiffs did not seek a preliminary injunction.  Opp. 73.  *Garcia v. Google, Inc.*, 786 F.3d 733 (9th Cir. 2015), which Defendant cites, is inapposite.  *Garcia* addresses a request for a *preliminary* injunction rather than a request for a permanent injunction; it does not address whether not seeking a preliminary injunction would prevent the later granting of a permanent injunction.  *Id.*

There are numerous reasons why parties may choose not to seek a preliminary injunction, including wanting to develop a factual record before asking the court to reach a decision on the likelihood of success on the merits. *See Cooper Notification, Inc. v. Twitter, Inc*., No. 09-865-LPS, 2010 WL 5149351, at *4 (D. Del. Dec. 13, 2010) (observing that the plaintiffs decision not to move for a preliminary injunction "tells one nothing ... about the potential irreparability of any harm from any infringement."); *see also Proctor & Gamble Co. v. Team Techs., Inc.*, No. 1:12-cv-552, 2013 WL 4830950, at *2 (S.D. Ohio Sept. 10, 2013) ("the fact that Plaintiff did not seek a preliminary injunction does not mean that it would not suffer prejudicial harm"). The fact that Plaintiffs wanted to have the full discovery record before seeking judgment and a permanent injunction does not preclude an injunction.

### B.    The Balance of Hardships Weighs in Favor of an Injunction.

In contrast to the hardship that will befall Plaintiffs as a result of continued infringement, Mr. Malamud has expressly admitted that Defendant will suffer no harm if an injunction issues. SUMF ¶ 277. Moreover, a defendant cannot claim an equitable interest in continuing to infringe a plaintiff's copyrights "and thus cannot complain of the harm it will suffer if ordered to cease doing so." *Fox Television Stations, Inc. v. FilmOn X LLC*, 966 F. Supp. 2d 30, 51 (D.D.C. 2013). The balance of hardships cannot weigh in Defendant's favor where Defendant admittedly will suffer no legally recognizable harm.

Defendant speculates that continued infringement of Plaintiffs' copyrights might be in the best interest of *Plaintiffs'* members because it provides increased access to Plaintiffs' works. Opp. 74. This is based on the *ipse dixit* of Defendant's attorneys rather than any proffered expert opinion, any discovery of Plaintiffs' members, or any other admissible evidence.

### C.       The Public Interest Will Be Served by an Injunction.

It is undisputed that Plaintiffs' Works serve an important public function.  The Works

encourage safety, energy efficiency, and other public goods.  Defendant readily admits the

importance of Plaintiffs' standards—even saying that NFPA "saves lives."  SUMF ¶¶ 164-67.

Without the standards created by Plaintiffs and other private SDOs, government agencies would

lose important tools that they lean on in fulfilling their regulatory duties, thus shifting the burden

to the public sector and taxpayers.  *Id.* ¶ 266.

Defendant can point to no adverse public impact that would arise if an injunction is

granted.  Defendant bemoans a theoretical loss of access; but Defendant points to no actual lack

of access to these standards, and Plaintiffs already provide *free* read-only access to the standards

on their websites.  SUMF ¶¶ 64, 100, 161.  Defendant's imagined parade of horribles, *e.g.*, that

"an apartment dweller may not be able to verify the safety of her electrical and heating systems,"

Opp. 75, are just that—imagined.  The hypothetical also rings hollow since the person in

Defendant's example would simply need to visit the NFPA website to view the standards

relevant to her query.  The adverse impact on Plaintiffs' ability to continue creating these

important standards outweighs an imagined access problem.

The public interest also is served through protecting and encouraging creativity by

"upholding copyright protections and correspondingly, preventing the misappropriation" of

Plaintiffs' work.  *Fox Television Stations*, 966 F. Supp. 2d at 51.  The court's analysis in *Fox*

confirms that the *Winter* and *eBay* cases did not foreclose judicial consideration of the impact of

infringement on fostering future creativity.  *See eBay*, 547 U.S. at 392-93; *Winter v. Natural Res.*

*Def. Council, Inc.*, 555 U.S. 7 (2008). This consideration is especially important here, where

fostering continued creation of standards by Plaintiffs unquestionably serves important public

functions.

**D.      Remedies Available at Law Are Inadequate.**

Defendant has conceded the inadequacy of money damages by wholly refusing to address the issue in its opposition brief.  Clearly, Defendant has neither the ability nor inclination to pay for its infringement.  Statutory damages for Defendant's infringement of 257 different works would be massive, and, as explained in Plaintiffs' opening brief, Defendant has limited resources (less than $100,000 in operating income in 2014).  SUMF ¶¶ 272-73.  Moreover, the damage that Defendant causes is difficult if not impossible to quantify.  *Id.* ¶¶ 246-48; 258-59.  Defendant's posting Plaintiffs' Works to the internet results in an immeasurable distribution of the Works, and thus an immeasurable amount of harm that cannot be adequately compensated through money damages.  *See Grokster*, 518 F. Supp. 2d at 1218-19.

**E.      The Scope of the Requested Injunction Is Appropriate.**

District Courts have discretion to grant injunctive relief of "reasonable terms" to prevent future infringement.  17 U.S.C. § 502(a).  Here, Plaintiffs moved on nine specific Works in an effort to simplify the issues before the Court.  At a minimum, an injunction should issue with regard to these Works.  However, for the sake of efficiency, and to avoid repeat infringement (and the need for repeat litigation), the injunction should be broad enough to prohibit Defendant from continuing its infringing conduct.  "Where … there has been a history of continuing infringement and a significant threat of future infringement remains, it is appropriate to permanently enjoin the future infringement of works owned by the plaintiff but not in suit." *Walt Disney Co. v. Powell*, 897 F.2d 565, 568 (D.C. Cir. 1990); *see also Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381, 1392-93 (6th Cir. 1996) ("The weight of authority supports the extension of injunctive relief to future works."); *Olan Mills, Inc. v. Linn Photo Co.*, 23 F.3d 1345, 1349 (8th Cir. 1994) (agreeing with D.C. Circuit's holding in *Walt Disney* case and holding that district court must consider issuing injunction against all future infringement of

plaintiff's photographs, even unregistered photographs not the subject of the suit); *Warner Bros. Records, Inc. v. Brown*, No. C 08-01040, 2008 U.S. Dist. LEXIS 95171, at *6-7 (N.D. Cal. Nov. 13, 2008) (issuing injunction against infringement of "any copyrighted sound recording, whether now in existence or later created, that is owned or controlled by plaintiffs").

## **<u>CONCLUSION</u>**

Plaintiffs' motion should be granted, and Defendant's denied.

Dated: January 21, 2016                  Respectfully submitted,

                                         /s/ J. Kevin Fee

                                         Michael F. Clayton (D.C. Bar: 335307)
                                         J. Kevin Fee (D.C. Bar: 494016)
                                         Jordana S. Rubel (D.C. Bar: 988423)
                                         Morgan, Lewis & Bockius LLP
                                         1111 Pennsylvania Ave., N.W.
                                         Washington, D.C. 20004
                                         Telephone: 202.739.5215
                                         Email: mclayton@morganlewis.com
                                                 jkfee@morganlewis.com
                                                 jrubel@morganlewis.com

                                         *Counsel For American Society For Testing And Materials*
                                         *d/b/a/ ASTM International*

                                         /s/ Kelly Klaus

                                         Anjan Choudhury (D.C. Bar: 497271)
                                         Munger, Tolles & Olson LLP
                                         355 South Grand Avenue, 35th Floor
                                         Los Angeles, CA  90071
                                         Tel: 213.683.9100
                                         Email:  Anjan.Choudhury@mto.com

                                         Kelly M. Klaus
                                         Jonathan H. Blavin
                                         Nathan M. Rehn
                                         Munger, Tolles & Olson LLP
                                         560 Mission St., 27th Floor
                                         San Francisco, CA 94105
                                         Tel:  415.512.4000
                                         Email: Kelly.Klaus@mto.com
                                                 Jonathan.Blavin@mto.com
                                                 Thane.Rehn@mto.com

                                         *Counsel for National Fire Protection Association, Inc.*

                                         /s/ Joseph R. Wetzel

                                         Jeffrey S. Bucholtz (D.C. Bar: 452385)
                                         King & Spalding LLP
                                         1700 Pennsylvania Avenue, NW, Ste. 200
                                         Washington, DC 20006-4707

Tel: 202.737.0500
Email: jbucholtz@kslaw.com

Kenneth L. Steinthal
Joseph R. Wetzel
King & Spalding LLP
101 Second Street, Ste. 2300
San Francisco, CA 94105
Tel: 415.318.1211
Email: ksteinthal@kslaw.com
      jwetzel@kslaw.com

*Counsel for American Society of Heating, Refrigerating, and Air Conditioning Engineers*