## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN SOCIETY FOR TESTING AND MATERIALS d/b/a/ ASTM INTERNATIONAL;<br><br>NATIONAL FIRE PROTECTION ASSOCIATION, INC.; and<br><br>AMERICAN SOCIETY OF HEATING, REFRIGERATING, AND AIR CONDITIONING ENGINEERS,<br><br>        Plaintiffs/<br>        Counter-Defendants,<br><br>v.<br><br>PUBLIC.RESOURCE.ORG, INC.,<br><br>        Defendant/<br>        Counter-Plaintiff. | Case No. 1:13-cv-01215-TSC |

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO STRIKE THE EXPERT REPORT OF JOHN JAROSZ

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ........................................................................................................... 1

LEGAL STANDARD..................................................................................................... 1

ARGUMENT ................................................................................................................. 3

I.   Mr. Jarosz is a Qualified Expert Economist. ......................................................... 3

II.   Mr. Jarosz Conducted Proper Fact Gathering and Did Not Serve
as a "Mouthpiece" for Others' Opinions. .............................................................. 7

III.   The Jarosz Report Addresses Proper Subject Matter for an Expert
and Does Not Invade the Province of the Court..................................................... 9

IV.   Mr. Jarosz's Conclusions Are Well Supported. .................................................. 11

    A.   There is No Requirement that an Expert Quantify Every Issue..................... 11

    B.   Mr. Jarosz Considered and Rejected Defendant's Argument
that Plaintiffs Do Not Need Copyrights........................................................ 12

    C.   Mr. Jarosz Correctly Weighs the Importance of the Incorporated
Standards at Issue.......................................................................................... 13

    D.   Defendant's Arguments Against Mr. Jarosz's Consideration
of Statements and Data Obtained from Plaintiffs is Unpersuasive............... 15

        1.   Statements made by Plaintiffs' employees ........................................... 15

        2.   Data provided by Plaintiffs ................................................................... 16

    E.   Defendant Cannot Claim That Mr. Jarosz Incorrectly Used the
Website Hit Count as a Proxy For Lost Sales Because He Did
Not Perform a Quantitative Measurement of Lost Sales ............................... 19

    F.   Defendant Cannot Critique Mr. Jarosz Based on a False
Requirement That He Identify Specific "Economic Theories"
Upon Which He Relied .................................................................................. 20

CONCLUSION............................................................................................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Ambrosini v. Labarraque*,
101 F.3d 129 (D.C. Cir. 1996) ................................................................. 2, 6, 11

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ....................................................................... 18

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) .................................................................................... 14

*Capitol Justice LLC v. Wachovia Bank*,
706 F. Supp. 2d 34 (D.D.C. 2009) ............................................................... 6

*Coleman v. Parkline Corp.*,
844 F.2d 863 (D.D.C. 1988) ......................................................................... 4

*Contractors Ass'n of E. Pennsylvania, Inc. v. City of Philadelphia*,
893 F. Supp. 419 (E.D. Pa. 1995) ............................................................... 15

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ............................................................................. 1, 2, 17

*Evans v. Washington Metro. Area Transit Auth.*,
674 F. Supp. 2d 175 (D.D.C. 2009) .............................................................. 2

*Exum v. General Elec. Co.*,
819 F.2d 1158 (D.C. Cir. 1987) .................................................................... 5

*Freeland v. Iridium World Communications Ltd.*,
545 F. Supp. 2d 59 (D.D.C. 2008) ................................................................ 9

*In re Salem*,
465 F.3d 767 (7th Cir. 2006) ........................................................................ 3

*In re TMI Litig.*,
193 F.3d 613 (3d Cir. 1999) .................................................................... 5, 15

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ........................................................................... 4, 11, 20

*Louis Vuitton Malletier S.A. v. Sunny Merchandise Corp.*,
97 F. Supp. 3d 485, 505 (S.D.N.Y. 2015) .................................................... 8

*Marx & Co. v. Diners' Club Inc.*,
  550 F.2d 505 (2d Cir. 1977)..................................................................................9

*Meister v. Med. Eng'g Corp.*,
  267 F.3d 1123 (D.C. Cir. 2001) ..........................................................................2

*MicroChemical, Inc. v. Lextron, Inc.*,
  317 F.3d 1387 (Fed. Cir. 2003)..........................................................................11

*Network Prot. Scis., LLC v. Fortinet, Inc.*,
  No. C 12-01106 WHA, 2013 WL 5402089 (N.D. Cal. Sept. 26, 2013)..................13

*S.E.C. v. Johnson*,
  525 F. Supp. 2d 70 (D.D.C. 2007) ..................................................................11, 15

*Schwab v. Philip Morris, U.S.A., Inc.*,
  449 F. Supp. 2d 992 (E.D.N.Y. 2006) ..................................................................6

*TFWS, Inc. v. Schaefer*,
  183 F. Supp. 2d 789 (D. Md. 2002) ......................................................................5

*Wechsler v. Hunt Health Sys.*,
  381 F. Supp. 2d 135 (S.D.N.Y. 2003)..................................................................11

*Window Specialists, Inc. v. Forney Enterprises, Inc.*,
  47 F. Supp. 3d 53, 59 (D.D.C. 2014) ............................................................2, 3, 9

### OTHER AUTHORITIES

Fed. R. Evid. 701 ...............................................................................................7

Fed. R. Evid. 702 ........................................................................................ passim

Fed. R. Evid. 703 ...............................................................................................8

Fed. R. Evid. 704(a) ..........................................................................................9

Fed. R. of Civ. Proc. 26 .....................................................................................7

# INTRODUCTION

Mr. John C. Jarosz, a highly qualified economist specializing in the economics of intellectual property, submitted a thoroughly researched and well-reasoned report explaining the economic benefits to extending copyright protection to Standard Development Organizations ("SDOs"), such as Plaintiffs, and irreparable harm that would be caused and economic costs to governments and the public if copyright protection were denied. Mr. Jarosz's opinions are reliable, relevant, and helpful to the fact finder in this case. Defendant could have, but chose not to, submit its own expert report to rebut Mr. Jarosz's and, as a result, Mr. Jarosz's conclusions stand unrebutted. Defendant cannot now get around this inconvenient situation by filing a meritless *Daubert* motion.[1]

Rather than identify any major flaw in Mr. Jarosz's methodology that would render it unreliable, Defendant has taken a scattershot approach by accusing Mr. Jarosz of lacking experience, considering "biased" sources, opining on ultimate issues, and employing "unsupported assumptions." None of these arguments has merit.

There is no reason to strike Mr. Jarosz's expert report, particularly in a bench trial. If anything, Defendant's arguments go to the weight that should be given to Mr. Jarosz's opinions, rather than their admissibility. Accordingly, the Court should deny Defendant's motion.

# LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert opinion testimony. It provides:

---

[1] Indeed, this is not Defendant's first attempt to block admission of the Jarosz report. In August, Defendant unsuccessfully moved to strike the Jarosz report. In her Order denying Defendant's motion, Magistrate Robinson provided Defendant with ample time to secure its own expert economist and submit a rebuttal report (Dkt. No. 111), which Defendant assured the Court it intended to do. But Defendant never proffered its own expert, leaving the Jarosz report unrebutted.

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under Rule 702 as interpreted by the Supreme Court in *Daubert*, "the district court is required to address two questions, first whether the expert's testimony is based on 'scientific knowledge' and second, whether the testimony 'will assist the trier of fact to understand or determine a fact in issue.'" *Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1126 (D.C. Cir. 2001). Regarding the meaning of "scientific knowledge," the D.C. Circuit has held that "'[s]cientific' implies a grounding in the methods and procedures of science, and 'knowledge' connotes more than subjective belief or unsupported speculation." *Ambrosini v. Labarraque*, 101 F.3d 129, 133 (D.C. Cir. 1996) (citing *Daubert*, 509 U.S. at 590). Regarding whether the testimony will assist the trier of fact, this is a question that "primarily concerns relevance." *Id.* at 134.

Furthermore, although the party offering an expert's testimony has the burden of establishing admissibility by a preponderance of the evidence, this is not a high threshold. "The presumption under the Federal Rules is that expert testimony is admissible." *Evans v. Washington Metro. Area Transit Auth.*, 674 F. Supp. 2d 175, 178 (D.D.C. 2009) (*citing Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588 (1993); *see also Window Specialists, Inc. v. Forney Enterprises, Inc.*, 47 F. Supp. 3d 53, 59 (D.D.C. 2014). Indeed, "[a] review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." *Id.* (*citing* Fed. R. Evid. 702 Advisory Committee Note (2000)). Once a proponent

has made the requisite threshold showing, "further disputes go to weight, not admissibility." *Window Specialist, Inc.*, 47 F. Supp. 3d at 59-60.

Important here—where the Judge and not a jury is the trier of fact— "[t]he Court's gatekeeper role is 'significantly diminished'" *Id.* (*quoting United States v. H & R Block, Inc.*, 831 F. Supp. 2d 27, 30 (D.D.C. 2011)). This is because "[w]here the gatekeeper and the factfinder are one and the same—that is, the judge—the need to make such decisions prior to hearing the testimony is lessened." *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006) (citing *United States v. Brown*, 415 F.3d 1257, 1268–69 (11th Cir. 2005)).

## ARGUMENT

### I. Mr. Jarosz is a Qualified Expert Economist.

Mr. Jarosz is an economist, specializing in applied microeconomics and industrial organization with undergraduate and M.A. in Economics as well as having completed most requirements toward a Ph.D. in Economics. 6.05.2015 Expert Rept. of John Jarosz ("Jarosz Rept.") (Dkt. No. 118-12, Exh. 1) at TAB 1. He also has decades of experience, routinely publishes and speaks on relevant topics, including intellectual property valuation, and he has provided testimony as an expert economist in hundreds of court cases. *Id.* Defendant admits that Mr. Jarosz has a "great deal of experience" in evaluating intellectual property damages issues. Def.'s Mem. of Law in Support of Motion to Strike ("Def.'s Br.") at 4. Defendant challenges Mr. Jarosz's qualification solely on the basis that he does not have extensive experience specifically relating to standard development organizations and the regulatory process that results in incorporation by reference. *Id.* at 4-6.

Defendant's challenge to Mr. Jarosz's qualifications rests on an unreasonably restrictive view of expert qualification that has no basis in the law. A witness may be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. In light of

these qualifications, courts assess whether a proffered expert has "sufficient specialized knowledge to assist the jurors in deciding the particular issues in this case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) (internal quotation marks omitted).  "The rule does not require the expert to have personal familiarity with the subject of his testimony"—here the specific subject of standards development—and requiring such prior experience would present an "overly pinched" view of Rule 702.  *See Coleman v. Parkline Corp.*, 844 F.2d 863, 866 (D.D.C. 1988) (*citing Exum v. General Elec. Co.*, 819 F.2d 1158, 1163 (D.C. Cir. 1987)).  For instance, in the *Coleman* case, the court found that an engineer's expertise in investigating accidents was sufficient to opine on an incident involving elevators even though the engineer had no prior experience specifically with elevators.  *Coleman*, 844 F.2d at 866.  Similarly, in *U.S. v. Wen Chyu Liu*, the court found that a lower court had abused its discretion by rejecting the testimony of a chemical engineer on the basis that he lacked experience specific to manufacturing chlorinated polyethylene, the chemical at issue in that case.  716 F.3d 159, 168-69 (5th Cir. 2013).  Defendant's position that Mr. Jarosz must have specialized experience with standards organizations — notwithstanding his extensive experience as an economist valuing intellectual property — has no legal basis.

When applying the actual legal standard of whether Mr. Jarosz's "knowledge, skill, experience, training, or education" qualify him as an expert, there can be no doubt.  Regarding knowledge, skill and experience, Mr. Jarosz has vast experience evaluating the economic impact of intellectual property infringement — the very task he undertook here — in a variety of industries.  *See* Jarosz Rept. at Tab 1.  In fact, economic experts commonly apply their knowledge, training, skill and experience in applying a broad set of economic principles and tools to the analysis of a wide range of industries and situations.  If extensive industry-specific

4

experience were required, as Defendant suggests, economic experts would rarely be permitted to offer testimony.

Even if Mr. Jarosz's experience were not sufficient, Mr. Jarosz's training and education in economics would be. *See Exum*, 819 F.2d 1163-64 (training enables the expert to assist the jury; "'experience' is only one among the five different ways to demonstrate an expert is qualified."). Mr. Jarosz's education qualified him to opine on the very questions he examined in this case, e.g., the causal relationship between Defendant's infringement and potential effects on Plaintiffs' businesses. Economists like Mr. Jarosz commonly serve as expert witnesses in a variety of more specific contexts regardless of prior experience in that industry because their training and experience as economist allow them to evaluate damages and other economic effects. *See TFWS, Inc. v. Schaefer*, 183 F. Supp. 2d 789, 793 (D. Md. 2002), vacated on other grounds, 325 F.3d 234 (4th Cir. 2003) (finding the proffered expert "qualifies as an expert economist in this case. Although he has no experience in the alcoholic beverage industry, his testimony as to general economic principles, as applied to the alcoholic beverage industry, is well within his asserted realm of expertise and is helpful.").

Defendant's ticky-tack critiques of Mr. Jarosz do nothing to dispel his qualifications as an economist specializing in intellectual property damages to opine on those damages here. First, Defendant claims that Mr. Jarosz is unqualified because his only knowledge of the "relevant field" came from literature he reviewed in connection with this litigation. Def. Br. at 4 (citing *In re TMI Litig.*, 193 F.3d 613, 680 (3d Cir. 1999)).[2] However, the relevant field is the economics of intellectual property—not the narrow example of SDOs—and Mr. Jarosz's education and

---

[2] The case Defendant cites is inapt as it deals with a biologist, who is not a doctor, opining on the medical diagnosis of individuals with radiation-induced erythema. *In re TMI Litig*, 193 F.3d at 680. While it is reasonable for a court to conclude that one needs medical training to be qualified to diagnose patients, that reasoning does not apply here. Economic principles apply across industries and Mr. Jarosz's experience and training qualify him to apply those principles here.

training qualify him to analyze and draw conclusions in this field.  Second, Defendant argues

that because Mr. Jarosz has had prior experience with SDOs but did not consult that work or

undertake substantial additional investigation of other SDOs to form him opinions here, he is not

qualified to opine on the industry or that opinion is not reliable.[3]  Def. Br. at 5.  However, Mr.

Jarosz's opinions were not based merely on his prior experience with SDOs, they were based on

his experience and training as an economist and his review of substantial evidence from both

within and external to this case.  Jarosz Rept. at Tab 2.  As Defendant acknowledge, Mr. Jarosz

did review "other organizations' websites" and additional articles.  Def. Br. at 6.  Finally,

Defendant, criticizes Mr. Jarosz's for lacking regulatory expertise and his inability to recall

certain specifics about government grants and Plaintiffs' advertising activities at his deposition.

Def.'s Br. at 6.  However, Mr. Jarosz's opinions do not turn on any knowledge regarding the

regulatory process, and there is no dispute that Mr. Jarosz reviewed and considered the relevant

information when preparing his report.  Jarosz Rept. at Tab 2.  The "knowledge" requirement for

Mr. Jarosz's report to be admissible is "more than subjective belief or unsupported speculation,"

and his expert testimony undoubtedly meets that threshold here.  *Ambrosini*, 101 F.3d at 133

(citing *Daubert*, 509 U.S. at 590).

Finally, even if there were any merit to Defendant's attacks on Mr. Jarosz's

qualifications, courts often consider an expert's particularized training or experience as relevant

to the weight of the testimony rather than admissibility — particularly in a bench trial.  *Capitol

Justice LLC v. Wachovia Bank*, 706 F. Supp. 2d 34, 41 (D.D.C. 2009); *Schwab v. Philip Morris,

U.S.A., Inc.*, 449 F. Supp. 2d 992, 1133 (E.D.N.Y. 2006), rev'd on other grounds, 522 F.3d 215

---

[3] Defendant also points to Mr. Jarosz's use of the phrase "SSO" (standards setting organization), rather than the more-prevalent "SDO," as supposed proof of his lack of expertise.  Def.'s Br. at 5.  If anything, the petty nature of these attacks demonstrates that Defendant lacks a substantive basis for challenging Mr. Jarosz's qualifications.

(2d Cir. 2008) ("Assertions that the witness lacks particular educational or experiential background go to the 'weight, not the admissibility, of the [testimony].'") (*quoting McCullock v. H.B. Fuller Co*., 61 F.3d 1038, 1044 (2d Cir. 1995)).

## II.    Mr. Jarosz Conducted Proper Fact Gathering and Did Not Serve as a "Mouthpiece" for Others' Opinions.

Defendant characterizes Mr. Jarosz's report as merely a "mouthpiece" for Plaintiffs, relying only on interviews with Plaintiffs' employees.  Defendant even accuses Plaintiffs of trying to bring in opinion testimony from Plaintiffs' executives and academics in an end-run around Federal Rule of Evidence 701 and Federal Rule of Civil Procedure 26.  Def.'s Br. at 6-7. Neither is true nor a reason to exclude Mr. Jarosz's report.

Defendant inaccurately portrays Mr. Jarosz's interviews with Plaintiffs' employees and executives as the primary bases for his opinions, claiming that Mr. Jarosz simply relayed the opinions of those employees in an effort to "transform their views into expert testimony."  Def.'s Br. at 6-7.  This is demonstrably wrong.  First, Defendant overlooks the wealth of sources considered by Mr. Jarosz, including deposition testimony, documents produced in this matter, Plaintiffs' financial records, and third-party websites and publications.  Jarosz Rept. at Tab 2. These types of documents—along with interviews of company representatives—are common and acceptable sources of information upon which economists rely.  Second, the citations to interviews of Plaintiffs' employees in the Jarosz report concern factual matters about Plaintiffs' operations rather than opinions about the case.  For example, Mr. Jarosz cites to a conversation with Jim Thomas, the President of ASTM, for the proposition that ASTM does not charge more for standards incorporated by reference *Id*. at ¶ 87.  Mr. Jarosz also cites to a conversation with Steve Comstock, Director of Publications and Education at ASHRAE, to support that "ASHRAE standards are published and sold in the form of printed copies or PDF files." *Id*. at ¶ 99.  These

are factual statements rather than opinions and Mr. Jarosz's consideration of facts provided by Plaintiffs' employees is well within the scope of materials an expert is allowed to rely on under Federal Rule of Evidence 703.  Fed. R. Evid. § 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.").  The implication that Mr. Jarosz is simply acting as a mouthpiece for Plaintiffs' executives is preposterous when considered in context with Mr. Jarosz's analysis.

Defendant's argument concerning Mr. Jarosz's consideration of articles written by Prof. Emily Bremer fairs no better.  While Defendant makes passing inferences that Prof. Bremer is somehow biased or working in concert with Plaintiffs, the allegations are baseless (Defendant's sole piece of evidence is that one deponent referred to her by her first name).  Def.'s Br. 6-7.  In reality, Ms. Bremer is a law professor who has authored multiple articles pertaining to SDOs. Prior to becoming a professor, Ms. Bremer was the Research Chief of the Administrative Conference of the United States (ACUS), the federal agency charged with improving government processes, procedures, and performance.  Rubel Suppl. Decl. Ex. 6.  Ms. Bremer's publications include articles in the Harvard Journal of Law and Public Policy and the Kansas Law Review, which Mr. Jarosz considered along with articles by other academics.  Jarosz Rept. nn. 38-39.  These articles broadly examine issues concerning standards organizations.  Moreover, published academic articles in respected journals are exactly the sort of materials experts commonly rely on; there can be no doubt that the Bremer articles pass muster under Federal Rule of Evidence 703.  *See, e.g., Louis Vuitton Malletier S.A. v. Sunny Merchandise Corp.*, 97 F. Supp. 3d 485, 505 (S.D.N.Y. 2015) (court refused to exclude expert opinion where expert relied

on "articles about brand value" because "[s]uch sources. . . are clearly within the universe of those on which [she] could permissibly rely").

As with Defendant's other complaints about the Jarosz report, this issue speaks only to weight rather than admissibility. *Freeland v. Iridium World Communications Ltd*., 545 F. Supp. 2d 59, 88 (D.D.C. 2008) ("Motorola may cross-examine Saunders about the factual basis of his opinions, but its disagreements with that factual basis does not affect the testimony's admissibility.").

**III.    The Jarosz Report Addresses Proper Subject Matter for an Expert and Does Not Invade the Province of the Court.**

Defendant's argument that the Jarosz report invades the province of the Court by testifying on ultimate issues upon which the Court must decide is both legally and factually wrong and legally irrelevant.

As a legal matter, testimony as to legal conclusions is excluded because it is unnecessary and not helpful. "The special legal knowledge of the judge makes the witness' testimony superfluous." *Marx & Co. v. Diners' Club Inc*., 550 F.2d 505, 510 (2d Cir. 1977). Mr. Jarosz does not merely testify to legal conclusions, rather, he does exactly what expert economists routinely do in intellectual property cases—provide the Court with analysis of the economic impact of infringement in order to aid the Court in reaching its ultimate decision regarding the appropriate form of relief. "An opinion is not objectionable just because it embraces an ultimate issue"—here, whether injunctive relief is appropriate because not issuing an injunction would cause irreparable harm. Fed. R. Evid. 704(a). And the sole risk of experts offering opinions on ultimate issues is the potential to improperly influence a jury. *Window Specialist, Inc*., 47 F. Supp. 3d at 60. But, because summary judgment is decided by the court "there is no danger of jury confusion." *Id*.

9

Mr. Jarosz explains his assignment in this case as follows:

> [T]o provide expert economic analysis and testimony, if necessary, about the likely economic effects of Public Resource's actions on the Plaintiffs, and how the Plaintiffs' potential loss of protection in standards that have been incorporated by reference into law would affect them and their incentives to incur the costs associated with developing voluntary consensus standards. I also have been asked to consider whether Public Resource and the public would suffer any harm in the event Public Resource is not permitted to continue copying or posting Plaintiffs' standards.

Jarosz Rept. at ¶ 4.  Not only are opinions concerning economic impacts of infringement well within the purview of economists, but these topics aid the fact-finder in determining the extent of harm and the possible impact of different remedies.  They do not purport to usurp the Judges' role in applying law to the facts.  Notably, while Defendant has cherry-picked a few deposition quotes that it uses to imply that Mr. Jarosz went beyond his original assignment and opined on the ultimate issue of whether Defendant should be enjoined, Defendant can point to no examples from Mr. Jarosz's report where that actually occurred.  *See* Def.'s Br. at 8.

Finally, Defendant puzzlingly points to alleged "concessions" by Mr. Jarosz regarding what he *did not* opine on in support of its argument that Mr. Jarosz's opinions reach too far.  For example, Defendant points out that Mr. Jarosz neither opined on whether "Plaintiffs' standards are copyrightable," addressed whether Plaintiffs "deserve copyright protection," or analyzed how "harms to plaintiffs would be different depending on the particular basis of the Court's ruling." Def.'s Br. 8-9.  Defendant suggests that these "concessions" somehow invalidate Mr. Jarosz's opinion, when, to the contrary, this testimony highlights how Mr. Jarosz constrained his opinions to weighing the potential harms to each party and declined to wade into legal issues or opine on the merits of copyrightability arguments.

**IV.     Mr. Jarosz's Conclusions Are Well Supported.**

Defendant makes a handful of miscellaneous arguments and assertions regarding alleged "unsupported assumptions" in Mr. Jarosz's report that they argue render the report unreliable. As an initial matter, these arguments have no bearing on admissibility unless they truly reflect a lack of "grounding in the methods and procedures" of economics or are based on "unsupported speculation." *Ambrosini*, 101 F.3d at 133.  Use of inaccurate or inapplicable sources of data would merely go to the weight to be afforded to this testimony.  "It is for the jury, not the Court, to determine whether [an expert's] opinions are suspect because facts upon which he relied were shown to be inaccurate or unproven."  *S.E.C. v. Johnson*, 525 F. Supp. 2d 70, 76 (D.D.C. 2007); *see also MicroChemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003); *Wechsler v. Hunt Health Sys.*, 381 F. Supp. 2d 135, 144-45 (S.D.N.Y. 2003) (declining to exclude an expert opinion based on his purported reliance on "the wrong documents").  This is merely a transparent attempt by Defendant to discredit Mr. Jarosz because Defendant was unable to secure its own expert to rebut the Jarosz report.  But Defendant fails in that task as well.

          A.     *There is No Requirement that an Expert Quantify Every Issue.*

In Section V.A., Defendant criticizes Mr. Jarosz for opining on "likely" outcomes without quantifying the probability that an outcome occurs. Def.'s Br. at 10.  Of course, there is no actual requirement that an expert quantify the likelihood of an outcome to establish that it is probable, and Courts in this Circuit have rejected the very argument Defendant now espouses. *Ambrosini*, 101 F.3d at 135 ("Dr. Strom's evidence does not warrant exclusion simply because it fails to establish the causal link to a specified degree of probability.").

Mr. Jarosz is free to rely on his extensive training and experience evaluating the economic impact of infringement to determine likelihood without building probability models. *See Kumho Tire Co.*, 526 U.S. 137 at 150 ("[N]o one denies that an expert might draw a

conclusion from a set of observations based on extensive and specialized experience."). And that is exactly what Mr. Jarosz has done here; his training and experience as an economist inform his opinion that Defendant's rampant infringement, if left unchecked, will likely have lasting impacts on Plaintiffs' business models. That conclusion hardly requires a statistical model. Moreover, it would be difficult, if not impossible, to construct such a model with the number of unknown variables present here, including that Plaintiffs have no control over which standards will be incorporated by reference in government regulations in the future, that Defendant keeps adding more standards to its site, and that Defendant distributes Plaintiffs' standards in such a way that they can be re-distributed to an unknown number of people. Jarosz Rept. ¶¶ 136-37, 153-54; Pls.' SUMF at ¶¶ 240, 246-49. The type of quantitative modeling Defendant proposes would be an ill fit.

   B.     *Mr. Jarosz Considered and Rejected Defendant's Argument that Plaintiffs Do Not Need Copyrights.*

   In Section V.B., Defendant next criticizes Mr. Jarosz for allegedly failing to consider that Plaintiffs could continue selling copies of their standards even without copyright protection. However, Mr. Jarosz looked extensively at potential impacts to Plaintiffs if copyright protection is lost, including by analyzing (and rejecting) Mr. Malamud's articulation of the same basic theory that Defendant now presents in its brief. Jarosz Rept. ¶¶ 139-149 (analyzing Mr. Malamud's suggestions that Plaintiffs should sell special "authorized" copies of their standards and that loss of copyright may actually increase market demand for Plaintiffs other down-stream products related to standards). Defendant's suggestion that Mr. Jarosz ignored the issue is mistaken.

12

C.     *Mr. Jarosz Correctly Weighs the Importance of the Incorporated Standards at Issue.*

In Section V.C., Defendant attacks Mr. Jarosz's conclusions on the basis that he "equates the incorporated standards at issue with all of the Plaintiffs' publications" and thereby cannot reasonably draw conclusions that would assist the trier of fact in determining the harm here. *See* Def.'s Br. at 11. In Defendant's view, Mr. Jarosz overstates the importance of the 257 total standards at issue in the case since Plaintiffs also have other publications. *Id.* This critique is misplaced. As an initial matter, Mr. Jarosz evaluates publications revenue as a whole because Plaintiffs do not all track revenue on a standard-by-standard basis in their ordinary course of business. Further, using revenue from all publications is neither misleading nor prejudicial.[4] Mr. Jarosz examines publications revenue simply to demonstrate that Plaintiffs' standards and associated publications are an important source of revenue to Plaintiffs. *See, e.g.,* Jarosz Rept. at ¶¶ 15, 18, 22. This is not a case where an expert used an over-inclusive data set and then plugged it into a quantitative formula; Mr. Jarosz used the "publications" information to demonstrate the relatively non-controversial, qualitative point that copyrighted publications are important to Plaintiffs.

Defendant's argument that Mr. Jarosz overstates the importance of Plaintiffs' standards lacks weight for several other reasons. First, Defendant overlooks that some of the standards at issue — specifically ASHRAE 90.1 and the National Electrical Code — are undisputedly among Plaintiffs' most popular (if not the most popular) standards. *See* Jarosz Rept. at ¶ 33 (noting that

---

[4] Defendant's citation to a patent case in which Mr. Jarosz's conclusions were excluded, *Network Prot. Scis., LLC v. Fortinet, Inc.*, No. C 12-01106 WHA, 2013 WL 5402089 (N.D. Cal. Sept. 26, 2013) has no bearing here. In *Network Protection Sciences*, Mr. Jarosz specifically calculated the monetary damages and, according to the court, failed to properly apply the entire market value rule as required by recent Federal Circuit precedent for patent royalty cases. *Id.* at *6. Here, Mr. Jarosz does not claim to be able to calculate the damages that flow specifically from the standards incorporated by reference at issue because as he explains, the "net harms from the loss of copyright protection" are "real" but "exceedingly difficult to measure." Jarosz Rept. at ¶ 168.

13

these standards are the "crown jewels" of the respective SDOs).  In fact, for each Plaintiff, the vast majority of revenue from standards sales comes from the sale of a limited number of standards, and those sales effectively subsidize the creation and maintenance of the SDO's other standards.  *Id*. at 108.

Second, Defendant overlooks that the impact of its infringement (and the potential impact of not obtaining an permanent injunction) goes far beyond the 257 standards at issue.  The law is clear that it is appropriate to consider not only the current infringement at issue, but also the effect if the complained of infringement became widely adopted.  This includes taking into account, "not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market.'"  *Campbell v. Acuff-Rose Music, Inc*., 510 U.S. 569, 590 (1994) (citations omitted).  As Mr. Jarosz points out, a court decision allowing Defendant's infringement to go on unfettered would have far reaching implications. *See* Jarosz Rept. at ¶¶ 134-135 ("the portion of the Plaintiffs' revenues that are potentially at risk if the Court determined that Plaintiffs enjoy no copyright on standards that have been incorporated by reference goes far beyond the sales of the specific standards that have already been appropriated and disseminated by Public Resources.").  Revenue related to all of Plaintiffs' standards is potentially at risk if there is a ruling that Defendant's actions do not constitute infringement because any of Plaintiffs' standards could be incorporated by reference in government regulations at any time.  If the Court denies an injunction and rules that incorporated standards lose protection, Defendant would also continue to add new standards to its website, new infringers could enter the market, and Plaintiffs' sales of various complementary products and publications (e.g., training materials and seminars) would likely be adversely impacted.

14

Jarosz Rept. at ¶¶ 134-37, 143-49.  These outcomes go far beyond just the standards at issue and were rightfully weighed by Mr. Jarosz.

       **D.**     *Defendant's Arguments Against Mr. Jarosz's Consideration of Statements and Data Obtained from Plaintiffs is Unpersuasive.*

In subsections D and E of Section V in Defendant's brief, Defendant criticizes Mr. Jarosz's reliance on statements from Plaintiffs' executives and "sales data" obtained from Plaintiffs, which Defendant contends is unreliable.  Def.'s Br. at 13.  This is merely a reiteration of the argument Defendant makes in Section III of its brief regarding the extent to which Mr. Jarosz's reliance on statements made by employees of Plaintiffs renders his report inadmissible. *See* Section C, *supra* (responding to this argument).  Even assuming that Defendant could show some lack of accuracy in this data (which is far from the case), this is not a reason to exclude Mr. Jarosz's testimony.  *See Johnson*, 525 F. Supp. 2d at 76 (whether the facts relied on by an expert are accurate is an issue for the jury).

        1.     <u>Statements made by Plaintiffs' employees</u>

Defendant critiques Mr. Jarosz's reliance on "statements from Plaintiffs' executives" to support the claim that "sales of a limited number of specific standards drive the bulk of the revenues." Def.'s Br.at 13.  Relying on *In re TMI Litigation*, 193 F.3d 613 (3d Cir. 1999) and *Contractors Ass'n of E. Pennsylvania, Inc. v. City of Philadelphia*, 893 F. Supp. 419, 437 (E.D. Pa. 1995), Defendant further argues that Mr. Jarosz should have independently investigated the reliability of these statements. *Id*. at 14-15.  Both cases are inapposite.[5] *TMI Litigation* arose from the nuclear reactor accident at Three Mile Island, and the opinion of the expert physician

---

[5]  In *Contractors Ass'n*, the expert accepted, without validating, "the City's assertion that 195 minority construction contractors were qualified, willing and able to perform."  893 F. Supp. at 437.  Not only was this figure proven wrong at trial, but the expert in had the figures available to him that would have invalidated this figure.  He just failed to look at them. *Id.*  Here, Defendant cannot point to evidence that undermines the evidence relied upon by Mr. Jarosz and, indeed, he relies on the most complete evidence available.

was excluded where she failed to examine a single patient to form her opinion on whether the nuclear exposure caused illness and instead relied on summaries of plaintiff health histories generated by employees of counsel.  *Id*. at 697-98.  The court in *TMI Litigation* found that, while usually "[t]here is nothing improper about a medical report prepared solely for litigation," it is improper to base "pathological causation . . . on nothing more than a plaintiff's self-report of an illness."  *Id*.  In contrast, here Mr. Jarosz spoke directly to the "patient" by interviewing employees of ASTM, NFPA, and ASHRAE; he did not rely on counsel's representations or summaries.  It is not unreasonable to rely on an executive's description of the economics of his or her business or organization.  If the facts are inconsistent with Plaintiffs' executives' accounts, Defendant undoubtedly will present such evidence at trial.[6]

### 2.   Data provided by Plaintiffs

Defendant objects to Mr. Jarosz's reliance upon sales data produced by Plaintiffs' suggesting that they were "made for the purposes of litigation" and are therefore unreliable. Def's . Br. at 14.  Defendant further chides Mr. Jarosz for not completing analyses that Defendant believes would be helpful, including a differences in sales trends, the impact of volunteer contributions, and sales trends between those posted online by Defendant and those online by Plaintiffs.  Notably, no data is available to conduct such analyses and, if there were, Defendant was free to retain an expert to do so.  None of these critiques goes to the relevance or reliability of the analyses that Mr. Jarosz did conduct utilizing the information that was available.

---

[6] Defendant specifically critiques Mr. Jarosz for taking "ASHRAE executives at their word for the motivations of ASHRAE members in signing up for memberships."  Def.'s Br. at 14.  But this is wrong. Mr. Jarosz found support for the fact that ASHRAE membership sales "are driven, in large part, by demand for ASHRAE's publications and standards" in a variety of other corroborating sources, including (i) the "ASHRAE Membership Justification Toolkit" which details membership benefits including "discounts and online access to ASHRAE publications," (ii) the fact that annual ASHRAE membership is $202 and comes with a copy of one of the volumes of the ASHRAE handbook (priced at $209) so that the included handbook covers the cost of the membership; and (iii) a review of ASHRAE's Statements of Revenues and Expenses.  *See* Jarosz Rept. at ¶¶ 95-98.

Rather, such attacks are more properly reserved for "[v]igorous cross-examination [and] presentation of contrary evidence" *See Daubert,* 509 U.S. at 596.

Defendant's lack of care in reviewing the contents of the Jarosz report is evident in its complaint regarding Mr. Jarosz's alleged misrepresentations of ASTM's expenditures on standards development activities by including in the expenses related to ASTM's Washington DC office, which only works on standard-related activities after the standards have been developed. *See* Motion at 15. Defendant's complaint relates to Mr. Jarosz's citation to ASTM103230, which is a document ASTM produced that contains information ASTM categorizes as a standard-related expense. That document shows a total of $36,204,639 in standard-related expenses, of which slightly over $2,614,000 of the expenses are in the Outreach category, made up of "International, Communications, DC and Academic Outreach." Far from misrepresenting the data in that document, Mr. Jarosz cited to this document in three places in his report and in each place provided figures regarding ASTM's expenses that related only to standards development and publication and did not include the Outreach expenses. In Paragraph 66, Mr. Jarosz identified only the costs associated with technical committee operations, which did not include Outreach costs. Jarosz Rept. at 66 (stating that ASTM spent more than $10 million to cover the costs of developing and updating standards). In Paragraph 83, Mr. Jarosz specifically stated that of the total of $36.2 million in expenses, $19 million was for publication costs and $9.4 million was for technical committee operations. And in paragraph 129, Mr. Jarosz stated that ASTM spent more than $30 million to develop and publish its standards. This statement is supported by ASTM103230 because ASTM expended over $33,500,000 in standard-related expense without considering the Outreach category of expenses. Thus, there is

no basis to Defendant's complaint that Mr. Jarosz included any improper expense figures from ASTM.

Defendant also purports to point out a factual flaw in Mr. Jarosz's analysis of the NEC sales data that skews his results.[7]  Specifically, Defendant takes issue with the fact that Mr. Jarosz did not analyze sales data from prior to 2012, the year in which Defendant began posting the 2011 NEC to its website because doing so "ignore[s] the three-fold drop in revenue" prior to Defendant's infringement.  Def.'s Br. at 17.  This is not an error and instead has an obvious explanation: one would expect sales of any new standard to be highest directly after publication and then drop in the years that follow.  Likewise, Defendant's assertion that it posted the 2008 NEC "*in 2008*" is misleading.  *Id.*  Defendant claims to have posted Title 24 to the California Code in 2008, a state code that includes the California Electric Code which *amends* the NEC rather than adopt it wholesale.  This attenuated link to the 2008 NEC is hardly the same as posting the NEC outright, which Defendant did in 2012.  Further, Mr. Jarosz's decision not to compare the first year of publication for the 2008 NEC and 2011 NEC is irrelevant because neither was posted on Defendant's website at the time.  None of this undermines Mr. Jarosz's conclusions that since Defendant started posting the NEC, sales of the code and handbook decreased noticeably based on the comparison between sales of the 2008 NEC and 2011 NEC one and two years after each was published, respectively.  Jarosz Rept. ¶ 133.  Finally, the very small increase in sales of the 2008 NEC in 2012 and 2013 is hardly significant and does nothing to refute the year-after and second-year-after publication comparisons that Mr. Jarosz cites.  *Id.*

---

[7] That Mr. Jarosz believed that the 2011 NEC was first published in 2011 is hardly a critical flaw.  A "minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible. The [J]udge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (citations omitted).

Once again, Defendant's quibbles are factually unfounded, but even if they were legitimate would go to weight rather than admissibility.

>    **E.**   *Defendant Cannot Claim That Mr. Jarosz Incorrectly Used the Website Hit Count as a Proxy For Lost Sales Because He Did Not Perform a Quantitative Measurement of Lost Sales*

Next, Defendant claims that there is a methodological flaw with "Mr. Jarosz's attempt to use Public Resource's hit count as a barometer for lost sales." Def.'s Br. at 18. This criticism is misplaced; nowhere does such a contention appear in the Jarosz report. While Mr. Jarosz points to the fact that Plaintiffs' standards have been accessed hundreds of thousands of times from Defendant's site, nowhere does Mr. Jarosz use those numbers to approximate lost sales. Jarosz Rept. at ¶ 133. In fact, Mr. Jarosz specifically declined an invitation to do so at his deposition. *See* Lu Decl. Ex. 1 at 212:5-15. When asked whether he could be certain whether the accesses and downloads on the website "resulted in economic loss," Mr. Jarosz replied that "with reasonable certainty I can say some — in some number of these instances, it's likely the case that the . . . information would have been obtained from [the organization] through legal means." *Id.* at 212:22-213:3.

Plaintiffs and Mr. Jarosz have consistently maintained that there is no precise way to calculate the damages involved in this case. *See* SUMF ¶¶ 246-48; 258-59; Jarosz Rept. at ¶ 7 ("Though the likely net harms from the loss of copyright protection to the Plaintiffs and the public are real, they will be exceedingly difficult to measure."). Defendant's critique of the methodology or precision of an exercise Mr. Jarosz never purported to undertake is a distraction and should be ignored.

F.      *Defendant Cannot Critique Mr. Jarosz Based on a False Requirement That He Identify Specific "Economic Theories" Upon Which He Relied*

Finally, in Section V.G., Defendant claims that the only "economic theory" employed by Mr. Jarosz in his report is "revealed preference." Def.'s Br. at 18-19. This ignores Mr. Jarosz's deposition testimony that his report utilizes "price theory" and that he has "researched it much and applied that to the facts here." Lu Decl. Ex. 1 at 172:19-21. Additionally, Mr. Jarosz explained in deposition that he "used all of [his] training and applied it to the facts of this case and drew the conclusions [he] did." *Id*. at 169:22-25. Mr. Jarosz is an expert in "the economics of intellectual property" with experience spanning more than 350 engagements primarily focused on "intellectual property, licensing, commercial damages, and antitrust matters." Jarosz Rept. at ¶ 9, Tab 1. Defendant's overly formalistic insistence that Mr. Jarosz name each of the foundational "economic theories" that he employed ignores that Mr. Jarosz is permitted to give expert testimony based on his wealth of experience assessing damages, specifically in the context of intellectual property. *See Kumho Tire Co.*, 526 US at 147 (the language of Rule 702 "makes no relevant distinction between 'scientific' knowledge and 'technical' or 'other specialized' knowledge. It makes clear that any such knowledge might become the subject of expert testimony."). Mr. Jarosz relies on his economic training as well as his specialized knowledge in the field of intellectual property damages.

Defendant's attempts to claim that Mr. Jarosz "applies no other economic concepts" is belied by his deposition testimony and creates a limitation on his acceptable experience that is at odds with the law. It is part and parcel of Defendant's overall effort to compensate for its lack of competing economic testimony by seeking to deprive the Court of helpful testimony from a recognized expert.

## CONCLUSION

For the foregoing reasons, Defendant's arguments should be rejected and the Motion to Strike should be denied.


Dated: January 21, 2016                Respectfully submitted,

                                       /s/ *J. Kevin Fee*

                                       Michael F. Clayton (D.C. Bar: 335307)
                                       J. Kevin Fee (D.C. Bar: 494016)
                                       Jordana S. Rubel (D.C. Bar: 988423)
                                       Morgan, Lewis & Bockius LLP
                                       1111 Pennsylvania Ave., N.W.
                                       Washington, D.C. 20004
                                       Telephone: 202.739.5215
                                       Email: mclayton@morganlewis.com
                                               jkfee@morganlewis.com
                                               jrubel@morganlewis.com

                                       *Counsel For American Society For Testing And Materials*
                                       *d/b/a/ ASTM International*

                                       /s/ *Kelly Klaus*

                                       Anjan Choudhury (D.C. Bar: 497271)
                                       Munger, Tolles & Olson LLP
                                       355 South Grand Avenue, 35th Floor
                                       Los Angeles, CA  90071
                                       Tel: 213.683.9100
                                       Email:  Anjan.Choudhury@mto.com

                                       Kelly M. Klaus
                                       Jonathan H. Blavin
                                       Nathan M. Rehn
                                       Munger, Tolles & Olson LLP
                                       560 Mission St., 27th Floor
                                       San Francisco, CA 94105
                                       Tel:  415.512.4000
                                       Email: Kelly.Klaus@mto.com
                                               Jonathan.Blavin@mto.com
                                               Thane.Rehn@mto.com

21

*Counsel for National Fire Protection Association, Inc.*


/s/ *Joseph R. Wetzel*                

Jeffrey S. Bucholtz (D.C. Bar: 452385)
King & Spalding LLP
1700 Pennsylvania Avenue, NW, Ste. 200
Washington, DC 20006-4707
Tel: 202.737.0500
Email: jbucholtz@kslaw.com

Kenneth L. Steinthal
Joseph R. Wetzel
King & Spalding LLP
101 Second Street, Ste. 2300
San Francisco, CA 94105
Tel: 415.318.1211
Email: ksteinthal@kslaw.com
          jwetzel@kslaw.com

*Counsel for American Society of Heating, Refrigerating, and Air Conditioning Engineers*