# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN SOCIETY FOR TESTING AND MATERIALS d/b/a ASTM INTERNATIONAL; <br><br> NATIONAL FIRE PROTECTION ASSOCIATION, INC.; and <br><br> AMERICAN SOCIETY OF HEATING, REFRIGERATING, AND AIR CONDITIONING ENGINEERS, <br><br>          Plaintiffs/Counter-defendants, <br><br>    v. <br><br> PUBLIC.RESOURCE.ORG, INC., <br><br>          Defendant/Counterclaimant. | Case No. 1:13-cv-01215-TSC-DAR <br><br> **REPLY MEMORANDUM IN SUPPORT OF DEFENDANT-COUNTERCLAIMANT PUBLIC.RESOURCE.ORG'S MOTION FOR SUMMARY JUDGMENT** <br><br> Action Filed:   August 6, 2013 |

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................1

ARGUMENT ..................................................................................................................2

I.  NEITHER CONGRESS NOR THE FOUNDERS INTENDED TO PROVIDE
    A PRIVATE STATUTORY COPYRIGHT MONOPOLY IN LAW,
    INCLUDING STANDARDS INCORPORATED BY REFERENCE INTO
    LAW. .................................................................................................................2

    A.  Congress Never Intended to Create A System of Privately Owned
        Law. ......................................................................................................2

    B.  A System of Privately Owned Law Would Thwart the Purposes of
        Copyright and Pit Copyright Against the First and Fifth Amendments. .................7

II. PLAINTIFFS CANNOT PLAUSIBLY DENY THAT THE
    INCORPORATED STANDARDS ARE PRIMARILY SYSTEMS AND
    PROCEDURES...................................................................................................11

III. THE STANDARDS DEVELOPMENT PROCESS DOES NOT DEPEND ON
    COPYRIGHT INCENTIVES. ............................................................................12

IV. PUBLIC RESOURCE'S USE OF THE STANDARDS INCORPORATED
    INTO LAW IS A FAIR USE...............................................................................13

    A.  Expanding Access To The Law Is A Transformative Purpose And A
        Favored Use Under The First Statutory Factor....................................................13

        1.  Public Resource has a transformative purpose ..........................................14

        2.  Public Resource makes legally incorporated standards
            accessible to print-disabled persons; Plaintiffs do not..............................15

        3.  Public Resource's use of legally incorporated standards is non-
            commercial................................................................................................17

    B.  The Public Needs Free Access to Standards That Constitute Legal
        Facts. ....................................................................................................18

    C.  The Amount Used By Public Resource Was Necessary and
        Reasonable. ...........................................................................................18

    D.  Plaintiffs' Conjectures About Future Harm Do Not Undermine Fair
        Use. .......................................................................................................19

**TABLE OF CONTENTS**
**(Continued)**

Page

V.    PLAINTIFFS HAVE NOT PROVEN THAT THEY OWN THE
COPYRIGHTS FOR THE STANDARDS AT ISSUE. ....................................................21

    A.    Ample Evidence Contradicts Plaintiffs' Claim of Ownership.............................21

    B.    Plaintiffs' Registrations Are Not Due Any Presumption of Validity. ...................21

    C.    Plaintiffs Are Not Joint Authors of the Standards .................................................22

    D.    Plaintiffs' Alleged "Assignments" Are Not Actual Assignments and
Do Not Transfer Ownership to Plaintiffs.............................................................24

    E.    Public Resource Has Standing to Challenge Plaintiffs' Ownership. ....................26

VI.    PLAINTIFFS TRADEMARK CLAIMS ARE BARRED AS A MATTER OF
LAW. ...............................................................................................................................27

    A.    Plaintiffs' Trademark Rights Cannot Protect Works in the Public
Domain..................................................................................................................27

    B.    Plaintiffs Ignore Binding Supreme Court Precedent Limiting
Trademark Owners From Controlling Downstream Modifications of
Their Products.......................................................................................................28

    C.    Public Resource's Use Is a Nominative Fair Use. ................................................29

    D.    Plaintiffs Lack Evidence of Likely Consumer Confusion or Loss of
Goodwill. .............................................................................................................30

CONCLUSION....................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aalmuhammed v. Lee,*
202 F.3d 1227 (9th Cir. 2000) ............................................................23

*Authors Guild v. Google,*
804 F.3d 202 (2d Cir. 2015) .........................................................13, 19

*Bandag, Inc. v. Al Bolser's Tire Stores, Inc.,*
750 F.2d 903 (Fed. Cir. 1984) ............................................................30

*Banks v. Manchester,*
128 U.S. 244 (1988) ..............................................................................9

*Bldg. Officials & Code Adm. v. Code Tech., Inc.,*
628 F.2d 730 (1st Cir. 1980) ................................................................9

*Burk v. Johnson,*
146 F. 209 (8th Cir. 1906) ..................................................................11

*Campbell v. Acuff-Rose Music, Inc.,*
510 U.S. 569 (1997) .......................................................................18, 19

*Capital Concepts, Inc. v. Mountain Corp.,*
No. 3:11-CV-00036, 2012 WL 6761880 (W.D. Va. Dec. 30, 2012) ........................25

*CCC Info. Servs., Inc. v. McLean Hunter Mkt. Reports, Inc.,*
44 F.3d 61 (2d Cir. 1994) ...............................................................3, 7

*CFE Racing Prods., Inc. v. BMF Wheels, Inc.,*
793 F.3d 571 (6th Cir. 2015) ..............................................................29

*Champion Spark Plug Co. v. Sanders,*
331 U.S. 125 (1947) ............................................................................29

*Charles of the Ritz Group, Ltd. v. Quality King Distribs., Inc.,*
832 F.2d 1317 (2d Cir. 1987) ..............................................................29

*Clark v. Martinez,*
543 U.S. 371 (2005) ..............................................................................7

*Cmty. for Creative Non-Violence, et al. v. Reid,*
490 U.S. 730 (1989) ............................................................................21

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*Cmty. for Creative Non-violence v. Reid*,
No. 86-1507, 1991 WL 415523 (D.D.C. Jan. 7, 1991)............................................23

\*Community for Creative Non-violence v. Reid,
846 F.2d 1485 (D.C. Cir. 1988)............................................23

*Consumers Union of U.S., Inc. v. Gen. Signal Corp.*,
724 F.2d 1044 (2d Cir. 1983)............................................18

*Crocker et al. v. General Drafting Co., Inc.*,
50 F. Supp. 634 (S.D.N.Y. 1943)............................................25

\*Dastar Corp. v. Twentieth Century Fox Film Corp.,
539 U.S. 23 (2003)............................................27

*David's Bridal, Inc. v. House of Brides, Inc.*,
No. 06-5660, 2010 WL 323306 (D.N.J. Jan. 20, 2010)............................................30

*Dream Team Collectibles, Inc. v. NBA Properties, Inc.*,
958 F. Supp. 1401 (E.D. Mo. 1997)............................................28

*Enesco Corp. v. Price/Costco Inc.*,
146 F.3d 1083 (9th Cir. 1998)............................................28

\*Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.,
122 F.3d 1211 (9th Cir. 1997)............................................21

\*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,
499 U.S. 340 (1991)............................................11, 12

*Greene v. Dalton*,
164 F.3d 671 (D.C. Cir. 1999)............................................13

*Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.*,
832 F.2d 1311 (2d Cir. 1987)............................................29

*Home Design Services, Inc. v. Hibiscus Homes of Florida, Inc.*,
No. 603cv1860ORL19KRS, 2005 WL 3445522
(M.D. Fla. Dec. 14, 2005)............................................25

*Hustler Magazine, Inc. v. Moral Majority, Inc.*,
796 F.2d 1148 (9th Cir. 1986)............................................19

iv

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Int'l Code Council v. National Fire Prot. Assoc.*,
No. 02 c 5610, 2006 WL 850879 (N.D. Ill. March 27, 2006) ................................................25

*Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*,
846 F.2d 1079 (7th Cir. 1988) ..........................................................................................29

*Katz v. Google Inc.*,
802 F.3d 1178 (11th Cir. 2015) ........................................................................................19

*Kepner-Tregoe, Inc. v. Carabio*,
203 U.S.P.Q. 124 (E.D. Mich. 1979) ................................................................................11

*Kern River Gas v. Coastal Corp*,
899 F.2d 1458 (5th Cir. 1990) ...........................................................................................4

*Landsberg v. Scrabble Crossword Game Players*,
736 F.2d 485 (9th Cir. 1984) ............................................................................................11

*Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*,
772 F.3d 591 (4th Cir. 2013) ...............................................................................24, 26, 27

*Mifflin v. Dutton*,
190 U.S. 265 (1903)............................................................................................................24

*Motion Picture Ass'n of America, Inc. v. F.C.C.*,
309 F.3d 796 (D.C. Cir. 2002)............................................................................................5

*MyWebGrocer, LLC v. Hometown Info, Inc.*,
375 F.3d 190 (2d Cir. 2004)................................................................................................3

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*,
166 F.3d 65 (2d Cir. 1999)................................................................................................11

*Online Policy Group v. Diebold*,
337 F. Supp. 2d at 1195 (N.D. Cal. 2004) ...................................................................14, 19

*Oracle Am. v. Google, Inc.*,
750 F.3d 1339 (Fed. Cir. 2014)...........................................................................................3

*Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*,
121 F.3d 516 (9th Cir. 1997) ..........................................................................................3, 7

*Prestonettes, Inc. v. Coty*,
264 U.S. 359 (1924)....................................................................................................28, 29

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Prunte v. Universal Music Grp.*,
   484 F. Supp. 2d 32 (D.D.C. 2007) .......................................................................27

*R.W. Beck v. E3 Consulting*,
   577 F.3d 1133 (10th Cir. 2009) ...........................................................................3

*Righthaven LLC v. Jama*,
   2:10–CV–1322 JCM LR, 2011 WL 1541613
   (D. Nev. Apr. 22, 2011) .................................................................................14, 19

*Shapiro & Son Bedspread Corp. v. Royal Mills Assocs.*,
   764 F.2d 69 (2d Cir. N.Y. 1985) .........................................................................24

*Solid Waste Agency v. U.S. Army Corp*,
   531 US 159 (2001) ...............................................................................................5

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984) ............................................................................................7

*Sturdza v. United Arab Emirates*,
   281 F.3d 1287 (D.C. Cir. 2002) .........................................................................11

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
   756 F.3d 73 (2d Cir. 2014)............................................................................18, 19

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*,
   610 F.3d 1171 (9th Cir. 2010) ...........................................................................30

*U.S. Jaycees v. Phil. Jaycees*,
   639 F.2d 134 (3d Cir. 1981)...............................................................................29

*United Fabrics Int'l, Inc. v. C&J Wear, Inc.*,
   630 F.3d 1255 (9th Cir. 2011) ...........................................................................26

*United States v. Myers*,
   553 F.3d 328 (4th Cir. 2009) ...........................................................................2, 7

*Veeck v. S. Bldg. Code Cong. Int'l, Inc.*,
   293 F.3d 791 (5th Cir. 2002) .................................................................3, 9, 10, 15

*Veeck v. S. Bldg. Code Cong. Int'l, Inc.*,
   49 F. Supp. 2d 885 (E.D. Tex. 1999).......................................................... *passim*

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*Warren Publishing Co. v. Spurlock d/b/a Vanguard Productions*,
645 F. Supp. 2d 402 (E.D. Pa. 2009) ...................................................................19

*\*Wheaton v. Peters*,
33 U.S. 591 (1888)........................................................................................9

*Whitehead v. CBS/Viacom, Inc.*,
315 F. Supp. 2d 1 (D.D.C. 2004) .......................................................................27

## STATUTES

36 C.F.R. § 1194.22 ................................................................................15, 16

5 U.S.C. § 552(a) ..........................................................................................6

17 U.S.C. § 101 ......................................................................................22, 23

17 U.S.C. § 102 ("Copyright Act")................................................................ *passim*

17 U.S.C. § 102(b) ...................................................................................2, 3, 10

17 U.S.C. § 105 ...........................................................................................4

17 U.S.C. § 121 ..........................................................................................16

H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. (1976)...................................................4

H.R. Rep. No. 94–1476, at 73 (1976), 1976 U.S.C.C.A.N. 5659 .................................16

H. R. Rep. No. 104–3802, 104th Cong., 2d Sess., at 1 (1996) ........................................6

N.Y. Comp. Codes R. & Regs. tit. 11, § 216.7(c)(1)(i) (1999) .....................................7

Pub. L. No. 60-349, 35 Stat. 1075 (1909), Sec. 9 ...................................................24

Pub L. No 104-231 § 4(7), 110 Stat 3048 ...........................................................5

Pub. Law. 104-113 Mar. 7, 1996 (H.R. 2196) 110 Stat. 775
("National Technology Transfer and Advancement Act") .................................4, 5

## RULES

Fed. R. Civ. P. 30(b)(6)..............................................................................21

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

OTHER AUTHORITIES

4 Nimmer on Copyright § 14.06[C][1][a].................................................................................11

AIM Commission Report at 49;
   http://www2.ed.gov/about/bdscomm/list/aim/meeting/aim-report.pdf ...................................16

*Browse Publications*, The U.S. Government Publishing Office (accessed
   Feb. 2, 2016), https://www.gpo.gov/fdsys/browse/collectiontab.action....................................5

Holdren, John P., Memorandum for the Heads of Executive Departments and
   Agencies from the Executive Office of the President, Office of Science and
   Technology Policy: Increasing Access to the Results of Federally Funded
   Scientific Research (Feb. 22, 2013), *available at*
   https://www.whitehouse.gov/sites/default/files/microsites/ostp/ostp_public_ac
   cess_memo_2013.pdf...............................................................................................................6

https://www.whitehouse.gov/sites/default/files/omb/inforeg/revised_circular_a-
   119_as_of_1_22.pdf................................................................................................................5

"Law," Oxford English Dictionary,
   https://www.oxford.com/us/definition/american_english/law...................................................2

McIntire, Mike, "Conservative Nonprofit Acts as a Stealth Business Lobbyist,"
   N.Y. Times (Apr. 22, 2012), *available at*
   http://www.nytimes.com/2012/04/22/us/alec-a-tax-exempt-group-mixes-
   legislators-and-lobbyists.html .................................................................................................9

*Oil Suit Dismissed in Supreme Court*,
   N.Y. Times (Oct 2, 1934) ....................................................................................................8, 9

*Public Safety Standards – United States (Federal Government)*,
   Public.Resource.Org (accessed Feb. 3, 2016),
   https://law.resource.org/pub/us/cfr/manifest.us.html...............................................................1

*Registry of Activities of Public.Resource.Org (2015-2016): 2. Comments on
   Notices of Proposed Rulemaking*, Public.Resource.Org (Feb. 2, 2016),
   https://public.resource.org/pro.docket.2015.html#s2................................................................1

Scalia, Antonin, *The Rule of Law as a Law of Rules*,
   56 U. Chi. L. Rev. 1175, 1179 (1989) ....................................................................................8

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

Seidenfeld, Mark , *A Big Picture Approach to Presidential Influence on Agency Policy-making*,
80 Iowa L. Rev. 1, 9-10 (1994)................................................................................................8

Short, Jodi L., *The Political Turn in American Administrative Law: Power, Rationality, and Reasons*, 61 Duke L.J. 1811, 1821 (2012) ......................................................8

U.S. Copyright Office, Compendium of Copyright Office Practices
§ 313.6(c)(2) (3d ed. 2014) ......................................................................................................6

Webster's Third New International Dictionary of the English Language at 2322
(Merriam-Webster 2002) ........................................................................................................11

## INTRODUCTION

To state the obvious, this is not an ordinary copyright case. The public has core due process and First Amendment rights to access, to know, and to share the law, without financial or practical barriers, or its consent to be governed by that law cannot be meaningful. A copyright in the law runs afoul of those rights, because it necessarily gives the rights-holder the ability to charge for, impede, and even cut off access to the law. There is no way to square the circle: either the law is outside of copyright, owned by no one and accessible to all; or it is not, and those who own it can decide who will access it, and on what terms.

Judicial opinions, the Copyright Office, and the Copyright Act itself support the correct view that the law is outside of copyright. But Plaintiffs insist that there is an exception: standards that lawmakers have incorporated into the law by reference. Standards incorporated into law by reference cover nearly every aspect of government power and societal activity, including the safety of buildings, highways, vehicles, gas pipelines, oil drilling, garage doors, food and drinking water, children's cribs, and toys; energy efficiency requirements; the accessibility to technology for people with disabilities; and much more.[1] If Plaintiffs are correct, the public (or at least the part of the public that can't afford to pay for reasonable access) can be subjected to these rules, and to penalties including imprisonment, but cannot have free and unfettered access to the contents of those rules. And the public must buy access to law in order to hold others, including government officials, accountable to those rules.

But Plaintiffs are not correct. Plaintiffs cannot seriously dispute that the standards at issue have the force and effect of law. *See United States v. Myers*, 553 F.3d 328, 331 (4th Cir. 2009).

---

[1] *Public Safety Standards – United States (Federal Government)*, Public.Resource.Org (accessed Feb. 3, 2016), https://law.resource.org/pub/us/cfr/manifest.us.html; *Registry of Activities of Public.Resource.Org (2015-2016): 2. Comments on Notices of Proposed Rulemaking*, Public.Resource.Org (Feb. 2, 2016), https://public.resource.org/pro.docket.2015.html#s2.

They *are* law.  Neither the Constitution nor the Copyright Act tolerates private control over access to them.

The Court should grant summary judgment to Public Resource.

## ARGUMENT

## I.    NEITHER CONGRESS NOR THE FOUNDERS INTENDED TO CREATE STATUTORY MONOPOLY IN LAW.

Plaintiffs' Opposition largely restates the arguments in their opening brief.  Public Resource has explained why those claims are wrong in its opposition brief and will not belabor them here. But Public Resource must correct Plaintiffs' mischaracterization of the central issue of this case. The fundamental question is not "whether Congress has said the Works are not copyrightable," Pls. Opp. 10, even though, as explained below, Congress has done just that. The fundamental question is whether copyright law, consistent with the Constitution, permits a private entity to own the law and control access to it. The answer to that question is "no."

### A.    Congress Never Intended to Create A System of Privately Owned Law.

Congress has codified the principle that law is not subject to copyright protection in several ways. First, Section 102(b) of the Copyright Act precludes copyright for "any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." Law is a "system of rules that a particular country or community recognizes as regulating the actions of its members and may enforce by the imposition of penalties."[2] As a system, the law is outside the scope of copyright pursuant to the Copyright Act itself.

---

[2] *See* "Law," Oxford English Dictionary, https://www.oxforddictionaries.com/us/definition/ american_english/law.

Section 102(b) helps ensure that "courts do not unwittingly grant protection to an idea by granting exclusive rights in the only, or one of only a few, means of expressing that idea." *R.W. Beck v. E3 Consulting*, 577 F.3d 1133, 1145 (10th Cir. 2009) (citation omitted). The only way to express codified laws, or law that is incorporated by reference from other sources, is to use the language of the law itself. Once incorporated in to law, standards become "the unique, unalterable expression of the 'idea' that constitutes local law." *Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 293 F.3d 791, 801 (5th Cir. 2002).  Under Section 102(b), they cannot be subject to copyright restrictions. There was no need for Congress to make special provision for *law* in Section 102(b) since the law falls squarely in the existing categories of things that Section 102(b) declares outside the scope of copyright.

Plaintiffs try to avoid the closely related merger doctrine – the principle that an idea and its expression may be so closely related that they must be deemed to have effectively "merged" – by insisting that merger cannot apply after the initial point of creation. But Plaintiffs find little judicial support for that position, much less a sensible rationale where, as here, an intervening act of lawmaking transforms the text of a standard into a legal fact and its incorporation a political fact. Pls. Opp. 8. For the most part Plaintiffs' cases state only that mere reference in a statute or regulation, or a document becoming an "industry standard," do not cause a merger. *See Oracle Am. v. Google, Inc.*, 750 F.3d 1339, 1372 (Fed. Cir. 2014); *Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 520 n.8 (9th Cir. 1997); *CCC Info. Servs., Inc. v. McLean Hunter Mkt. Reports, Inc.*, 44 F.3d 61, 73 (2d Cir. 1994). And contrary to Plaintiffs' claim, Pls. Opp. 8, *MyWebGrocer, LLC v. Hometown Info, Inc*., 375 F.3d 190, 194 (2d Cir. 2004), does not hold that merger can only be analyzed at the point of creation. *MyWebGrocer* does indeed apply a merger analysis to initial expression, but it had nothing to say about whether such an analysis at a

later stage would be appropriate where, as here, a standard is transformed into something more than a private standard:  it has become law. Plaintiffs may not agree with the *Veeck* holding, but it is the only case that squarely addresses the facts at hand.

Plaintiffs also misrepresent *Kern River Gas v. Coastal Corp,* 899 F.2d 1458 (5th Cir. 1990), suggesting that a regulatory commission's approval of the pipeline route that was reproduced in a later proposal had nothing to do with the merger analysis. Pls. Opp. 9. In fact, as the court found, "[s]taff approval was significant because any proposed pipeline constructed within the mile-wide corridor would require no further environmental study, whereas any route falling outside the corridor would be subject to further inquiry. . . *To extend copyright protection to the quad maps would grant Kern River a monopoly over the only approved pipeline route*." *Id.* at 1460, 1465 (emphasis added)

Moreover, as Public Resource explained in its earlier briefing, section 105 of the Copyright Act, 17 U.S.C. § 105, denies copyright for any work of the U.S. Government. A law drafted by a lobbyist, passed by Congress, and signed by the President becomes a U.S. Government work, as does a regulation that an agency enacts by incorporating by reference a pre-existing standard. Although Plaintiffs quote legislative history of the 1976 Act to the effect that works "commissioned" by the Government may not be government works, that history concerned "Government research contracts and the like." H.R. Rep. No. 94-1476, 94th Cong., 2d Sess., at 59 (1976). Nothing suggests that members of Congress who wrote that analysis meant to exclude laws and regulations from § 105.

Plaintiffs find no more support in the collection of non-statutory authorities upon which they rely. Pls. Opp. 11–13. Neither the text nor legislative history of the National Technology Transfer and Advancement Act speak to the issue of copyright in standards *after they have been*

4

*transformed into law through incorporation by reference.* Congress could have opined on the matter in the NTTAA, but it did not, and that absence is telling.

Likewise, OMB Circular A-119 does not purport to determine the copyright status of standards incorporated by reference.[3] And while the Office of the Federal Register declined to "require[] that all materials [incorporated by reference] into the CFR be available for free," it did not purport to bar organizations like Public Resource from doing so as a public service.

Moreover, neither the Office of Management and Budget nor the Office of the Federal Register has the responsibility or authority of determining whether something is copyrightable or not. *See Motion Picture Ass'n of America, Inc. v. F.C.C.,* 309 F.3d 796, 801 (D.C. Cir. 2002) (an agency's statutory interpretation is not entitled to deference absent a delegation of authority from Congress to regulate in the area at issue). Any agency interpretation that raises constitutional concerns, as this one does, must be clearly authorized by Congress. *Solid Waste Agency v. U.S. Army Corp*, 531 US 159, 172 (2001).

Moreover, for decades federal policy and practice have tended to favor more access, not less, to laws and governmental facts. Courts, Congress, and the executive branch have consistently underscored the importance of improving access to all kinds of government activities because they are *facts* that the public is entitled to access and communicate. Court documents – including briefs by private parties in litigation – are available on PACER, and there is no charge to access judicial opinions. The U.S. Code and the CFR are freely available online.[4] In 1996, Congress passed the Electronic Freedom of Information Act Amendments in order to "foster democracy by ensuring public access to agency records and information." Pub L. No 104-

---

[3] https://www.whitehouse.gov/sites/default/files/omb/inforeg/revised_circular_a-119_as_of_1_22.pdf.

[4] *See Browse Publications*, The U.S. Government Publishing Office (accessed Feb. 2, 2016), https://www.gpo.gov/fdsys/browse/collectiontab.action.

231 § 4(7), 110 Stat 3048. Six years later, it passed the e-Government Act, requiring agencies to create electronic rulemaking dockets, in order to increase "access, accountability and transparency" and "enhance public participation in Government." H. R. Rep. No. 104–3802, 104th Cong., 2d Sess., at 1 (1996).  In February 2013, the White House Office of Science and Technology Policy announced a policy requiring agencies to make the fruits of federally funded research available within twelve months of publication, including ensuring that "the public can read, download, and analyze in digital form final peer-reviewed manuscripts or final published documents within a timeframe that is appropriate for each type of research conducted or sponsored by the agency."[5]

Meanwhile, the Copyright Office, which, unlike the OMB and OFR, is charged with administering copyright law, has stated explicitly that edicts of government cannot be registered as copyrighted works. U.S. Copyright Office, Compendium of Copyright Office Practices § 313.6(c)(2) (3d ed. 2014). That the Copyright Office registers *standards* is immaterial: when they are registered, they are presumably not yet incorporated into law.

Plaintiffs' insistence that the legally incorporated standards at issue here are not edicts of government is nonsense. Pls. Opp. 13. The only distinction between an incorporated standard and any other statute or regulation is the process by which it enters into force, namely incorporation by reference. Once incorporated into law, standards are "deemed published in the Federal Register" and have the same legal effect as any other law or regulation. 5

---

[5] John P. Holdren, Memorandum for the Heads of Executive Departments and Agencies from the Executive Office of the President, Office of Science and Technology Policy: Increasing Access to the Results of Federally Funded Scientific Research (Feb. 22, 2013), *available at* https://www.whitehouse.gov/sites/default/files/microsites/ostp/ostp_public_access_memo_2013.pdf.

U.S.C. § 552(a); *see Myers*, 553 F.3d at 331 (material incorporated by reference has the same force of law as the incorporating regulation itself).

Plaintiffs' attempt to distinguish *Veeck* on the same ground fails. The building codes at issue in that case were enacted as laws in the same manner as the standards at issue here: "by reference." *Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 49 F. Supp. 2d 885, 887 (E.D. Tex. 1999). When the Fifth Circuit distinguished the building codes at issue in *Veeck* from "references to extrinsic standards," the court was differentiating the "wholesale adoption" of formerly private standards into law from external documents merely referred to in regulations, as in *CCC* and *Practice Management, Veeck*, 293 F.3d at 803. Contrary to the regulations at issue in *Veeck* and this case, those at issue in *CCC* merely stated "[m]anuals approved for use are . . . The Redbook. . . .," without any mention of incorporation. N.Y. Comp. Codes R. & Regs. tit. 11, § 216.7(c)(1)(i) (1999). A government agency's explicit intent, or lack thereof, to transform a private document into a law is what distinguishes these cases, not the manner in which that intent is effectuated.

## B. A System of Privately Owned Law Would Thwart the Purposes of Copyright and Pit Copyright Against the First and Fifth Amendments.

Public Resource believes that the Copyright Act is clear in excluding law from its scope. To the extent there is any ambiguity in the Copyright Act, however, constitutional avoidance favors an interpretation that best reconciles the statute with the Constitution. *See Clark v. Martinez*, 543 U.S. 371, 380–381 (2005). Public Resource's interpretation reconciles the Copyright Act with the Constitution; Plaintiffs' interpretation does not. Allowing a copyright interest in laws, with all of the exclusive private power to suppress and control dissemination that copyright entails, would run contrary to the very purposes of copyright. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984). Recognizing that texts of the law

embodies ideas, expressible in only one accurate and authoritative way (just as the Constitution

is expressible only in one way), respects both the Copyright Act and the Constitution.

"Rudimentary justice requires that those subject to the law must have a means of

knowing what it prescribes." Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L.

Rev. 1175, 1179 (1989). There are at least two reasons for this. The first and most familiar one is

simple notice: anyone subject to a law, including administrative rules, must be able to know his

obligations. Indeed, one of the principal events leading to the Federal Register Act was a

government action to enforce an administrative oil quota rule that, it turned out, did not exist. *See*

*Oil Suit Dismissed in Supreme Court*, N.Y. Times Oct 2, 1934, at 6. Further, anyone affected by

a law, such as a person who lives near a pipeline, or a parent choosing a car seat, must have free

access to the standards for evaluating their safety if they wish so they can make informed

decisions and understand the regulatory framework that lawmakers have constructed.

The other reason for the public to know the law is accountability. For citizens to

participate in a democracy, from the electoral process to discussions of public affairs, they must

be able to learn what the government is up to. Indeed, that right is especially important when it

comes to standards. The public cannot blindly rely on the federal or state agencies that adopt

private standards into law to ensure that those standards serve the public interest. Therefore, as in

every other area of law, the public must have the ability to do that work itself and register

concerns with the legislatures that can provide a check on those agencies' actions. *See* Jodi L.

Short, *The Political Turn in American Administrative Law: Power, Rationality, and Reasons*, 61

Duke L.J. 1811, 1821 (2012); Mark Seidenfeld, *A Big Picture Approach to Presidential*

*Influence on Agency Policy-making*, 80 Iowa L. Rev. 1, 9-10 (1994).

As the First Circuit observed, the public has an "essential due process right of free access to the law"—not just judicial opinions, and not just law that has been "paid for" by taxpayers.[6] *Bldg. Officials & Code Adm. v. Code Tech., Inc.*, 628 F.2d 730, 736 (1st Cir. 1980). Copyright restrictions on the law necessarily impede that access. That fundamental contradiction animates the Supreme Court's ruling in *Banks v. Manchester*, 128 U.S. 244 (1988), which did not, as Plaintiffs cynically suggest, turn primarily on the fact that judges are paid by taxpayers. Instead, the Court held that judicial opinions are free of copyright restrictions because "the authentic exposition and interpretation of the law which, *binding on every citizen*, is free for publication to all, whether it is a declaration of unwritten law, or an interpretation of a statute." *Id.* at 253 (emphasis added).

That principle is also integral to the Fifth Circuit's opinion in *Veeck*. The court quoted, at length, the briefing in *Wheaton v. Peters*, in which counsel for both sides offered some of the earliest thinking in the U.S. on just this issue. 33 U.S. 591 (1888). Wheaton's own counsel conceded that "statutes could never be copyrighted" because they were enacted by legislatures. *Veeck*, 293 F.3d at 795 n.3. Peters' counsel, for his part, observed that "[i]t is . . . the true policy, influenced by the essential spirit of government, that laws of every description should be universally diffused. To fetter or restrain their dissemination must be to counteract this policy; to limit, or even to regulate it would, in fact, produce the same effect. If either statutes or decisions could be made private property, it would be in the power of an individual to shout out the light be which we guide our actions." *Id.*

---

[6] While tax dollars may pay Congressional salaries for lawmakers to pass laws, private dollars often pay lobbyists and influential organizations (including nonprofit organizations) to author those laws. *See* Mike McIntire, "Conservative Nonprofit Acts as a Stealth Business Lobbyist," N.Y. Times at A1 (Apr. 22, 2012), *available at* http://www.nytimes.com/2012/04/22/us/alec-a-tax-exempt-group-mixes-legislators-and-lobbyists.html.

Allowing organizations to own exclusive rights to the law, through the guise of copyright, would necessarily mean that those copyright claimants could dictate the terms of public access to the law, without care for those due process rights. As ten states noted in an amicus brief filed in support of Peter Veeck, one of the cornerstones of copyright is the ability to refuse to publish the law at all or, as we have seen in this case, to limit access and give preferential access to friends. Brief of Amicus Curiae State of Ohio and Ten Other States and Territories 14-16, *Veeck*, 293 F.3d 791 (SSMF ¶ 1, M. Becker Supp. Decl. ¶ 6, Ex. 5); SMF ¶¶ 45–50. In practice, access limitations systematically exclude those with budgetary constraints from holding both agencies and the entities they regulate accountable for the rules the agencies adopt and from studying those rules closely in order to comply with them. Even a small fee is a charge to participate in civic affairs, analogous to a poll tax. Contract-of-adhesion requirements for the public to access a restricted and downgraded online reading room that Plaintiffs offer exact a similar toll, requiring the public to trade away personal information and legal rights (consenting to venue and waiving certain rights, for example, SMF¶¶ 54–57), in order to exercise the right to know the law. What is worse, Plaintiffs cannot dispute their reading rooms exclude visually-challenged people – again, placing an unfair burden on the ability of hundreds of thousands of citizens to know the law to which they are subject.

"Copyright, while authorized by the Constitution, is essentially a statutory right. On the other hand, due process is a constitutional right of the first order." States' Amicus at 4 (SSMF ¶ 1, M. Becker Supp. Decl. ¶ 6, Ex. 5). If Congress has intended to create a system of privately owned public law, which it did not, such a system could not pass constitutional muster. Plaintiffs' own actions confirm that it would place an impermissible burden on a fundamental Constitutional right. Properly interpreting Section 102(b), and the related merger doctrine, as

applying to laws, including standards transformed into law through incorporation by reference, avoids that Constitutional tension altogether.

## II.     PLAINTIFFS CANNOT PLAUSIBLY DENY THAT THE INCORPORATED STANDARDS ARE PRIMARILY SYSTEMS AND PROCEDURES.

Webster's Dictionary defines a "system" as "a complex unity formed of many often diverse parts subject to a common plan or serving a common purpose." Webster's Third New International Dictionary of the English Language at 2322 (Merriam-Webster 2002). As explained in Public Resource's opening brief, the standards at issue are just that: a complex unity of diverse procedures serving a common purpose of promoting public health and safety. Like teaching methods, strategies for playing games, and mathematical formulas, they may be complex and thoughtfully arranged, but they are not copyrightable under 102(b). *See Burk v. Johnson*, 146 F. 209 (8th Cir. 1906); *Kepner-Tregoe, Inc. v. Carabio*, 203 U.S.P.Q. 124, (E.D. Mich. 1979); *Landsberg v. Scrabble Crossword Game Players*, 736 F.2d 485 (9th Cir. 1984).

Plaintiffs cannot seriously dispute that fact, so they focus instead on insisting that *some* aspect of the standards must be creative. Pls. Opp. 6. But Plaintiffs have challenged, and seek an injunction against, Public Resource's posting of the standards at issue. A claim of infringement, and any relief, must be confined to the use of copyrightable expression. "To prevail on a copyright claim, a plaintiff must prove both ownership of a valid copyright and that the defendant copied original or 'protectable' aspects of the copyrighted work." *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1295 (D.C. Cir. 2002) (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348, 361 (1991)). "The scope of [an] injunction . . . should generally be no broader than the infringement; courts should modify injunctions that impinge on non-copyrightable expression." 4 Nimmer on Copyright § 14.06[C][1][a] (citations omitted). *See also Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 75 (2d Cir. 1999).

As the Supreme Court explained: "the first person to find and report a particular fact has not created the fact; he or she has merely discovered its existence." *Feist,* 499 U.S. at 347. The standards at issue here summarize of the "discoveries" of thousands of volunteers and government employees who, through experience and research, have determined the optimal principles, practices, and procedures for testing. Those discoveries are no doubt valuable. But together they constitute systems that are not copyrightable. For example, ASHRAE standards take the form of specific requirements that "provide methods of testing equipment so that the equipment can be measured [and] compared with similar levels of performance." SSMF ¶ 2. ASTM standards are "[s]pecifications, test methods, practices, guides, classifications and terminology." SSMF ¶ 3. An NFPA standard provides a "consistent process" for fire investigation. SSMF¶ 4.

## III.   THE STANDARDS DEVELOPMENT PROCESS DOES NOT DEPEND ON COPYRIGHT INCENTIVES.

Plaintiffs continue to complain that depriving them of a statutory monopoly in the law will undermine their standards-development work. As Public Resource and the Fifth Circuit have already explained, the Court should discount that  because incentives and rewards already exist for Plaintiffs (and the thousands of volunteers who actually draft the standards). *See Veeck*, 293 F.3d at 806; P.R.O. Mem. 28-29. Plaintiffs' only response is a set of self-serving assertions and an "expert" opinion based on nothing more than those assertions.  *See* Pls. Opp. 17-18; *see also* Motion to Strike Jarosz Report (Dkt. No. 123).

Plaintiffs' own actions give the lie to their argument. After the *Veeck* decision, plaintiffs and many other SDOs filed briefs seeking Supreme Court review. In those briefs, they insisted, at length, that if that decision stood it would destroy the standards development process; that is precisely the argument they advance here. SSMF ¶ 5. Nonetheless, a decade later, *Veeck* still

stands.  The standards development process is alive and well. Plaintiffs' purported fears are not

credible. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (non-moving party's

conclusory statements need not be taken as true for summary judgment purposes).

## IV.   PUBLIC RESOURCE'S USE OF THE STANDARDS INCORPORATED INTO LAW IS A FAIR USE.

In addition to the due process concerns outline above, Plaintiffs' approach creates an

unnecessary tension between the Copyright Act and the First Amendment. As explained in

Public Resource's opening brief, the right to share the law is fundamental to free speech on

matters of public import. Plaintiffs claim a right to restrain that speech.

As the Supreme Court has recognized, tensions like these are often resolved by operation

of the fair use doctrine. That is precisely the case here. Public Resource's posting of legally

incorporated standards is a fair use according to every factor of the statutory analysis. Public

Resource enhances public access to factual materials of the utmost public concern in a field

where the need for copyright-based incentives for creation is at its weakest. Even if the Court

were to find, contrary to precedent and due process, that Plaintiffs can hold copyright in portions

of binding state and federal law, it should still find that Public Resource's posting of legally

incorporated standards is a fair use.

### A.   Expanding Access To The Law Is A Transformative Purpose And A Favored Use Under The First Statutory Factor.

The first factor favors fair use when the use in question "communicates something new

and different from the original or *expands its utility*, thus serving copyright's overall goal of

contributing to public knowledge." *Authors Guild v. Google*, 804 F.3d 202, 214 (2d Cir. 2015)

(emphasis added). Undisputed evidence shows that Public Resource expands the utility of legally

incorporated standards. See P.R.O. Mem. 37-40.

### 1.      Public Resource has a transformative purpose.

The Plaintiffs emphasize that they have created "voluntary consensus standards" to serve as "best practices" that may inform a variety of professionals, companies, and officials. They suggest that incorporation by reference, and enforceability of those standards as *laws*, was not their goal. Even taking that statement at face value, it remains undisputed that Public Resource's purpose is different from Plaintiffs'.

Public Resource's purpose is in providing wide public access to *law,* and only to standards that have become *enforceable law.* That is a transformative purpose when compared to the Plaintiffs' purposes in creating *private voluntary* standards, whether the transformation occurs through Public Resource's action or through the governmental actions that turned those private standards into enforceable public laws. Public Resource's public communications, and Mr. Malamud's testimony, evoke no goal other than expanding access to legally incorporated standards as laws. Public Resource did not refer to its website as an "alternative" to Plaintiffs' websites. And to the extent Public Resource's communications, such as the explanatory text of its unsuccessful Kickstarter fundraising campaign, implicitly "encourage[] members of the public to download standards from its website," Pls. Opp. 21, the single pervasive theme of those communications and that encouragement was that "we should all have the right to read, know, and speak the law." Rubel Decl. Ex. 31 (Dkt. No. 118-12).

Several courts have found that posting material on the Internet to educate the public on a matter of great public concern is a transformative purpose. *See Online Policy Grp. v. Diebold*, 337 F. Supp. 2d 1195, 1203 (N.D. Cal. 2004) (integrity of state elections); *Righthaven LLC v. Jama*, 2:10–CV–1322 JCM LR, 2011 WL 1541613, at *3 (D. Nev. Apr. 22, 2011) (alleged police misconduct). That someone could theoretically make further copies of the works in question and use them for other purposes, creating a "market substitute," did not defeat fair use

in these cases. Even the dissenting opinions in *Veeck*, on which Plaintiffs rely, relied in turn on

the assumption "that the copyright doctrines of fair use and implied license or waiver are more

than adequate to preserve the ability of residents and construction industry participants to copy

any portions of the code that they want or need to view." 293 F.3d at 817; *see also id.* at 807.

> **2.      Public Resource makes legally incorporated standards accessible to print-disabled persons; Plaintiffs do not.**

Public Resource alone makes legally incorporated standards accessible to persons with

print disabilities in a way that complies with federal law and widely recognized best practices.

This public service is one of the canonical examples of a purpose that favors a finding of fair use,

and it explains the care and expense that Public Resource has invested in reformatting standards

incorporated by reference. Plaintiffs, by contrast, do not seem to take seriously the exclusion of

persons with disabilities from access to the laws they claim to control. They have been aware of

Public Resource's service to the disability community for years, but have apparently done

nothing (and intend to do nothing) to provide a comparable service.

The Internet is fast becoming the primary means of obtaining information about

government operations and policies. SSMF ¶ 6. And federal regulations under the Rehabilitation

Act require the information on government websites to be presented in accessible format.

36 C.F.R. § 1194.22. The primary requirement of these regulations is that "[a] text equivalent for

every non-text element shall be provided." *Id.*, § 1194.22(a).

Moreover, accessibility best practices follow the principle of universal design, which

states that the best accommodations for people with disabilities are those that benefit everyone:

> When accessible features are built into web pages, websites are more convenient and more available to everyone—including users with disabilities. Web designers can follow techniques developed by private and government organizations to make even complex web pages usable by everyone including people with disabilities.

SSMF ¶ 6. Public Resource follows those best practices, making legally incorporated standards available in formats that meet the federal requirements for accessibility, including non-text elements such as diagrams. SMF ¶ 84, 91–92; *see* 36 C.F.R. § 1194.22. Thus, Public Resource's work makes the law more accessible, not only to people with a diagnosed disability such as blindness, but also to those with mobility issues or low vision, without having to expose themselves as disabled or seek out special accommodations. SMF ¶ 91.

That work continues to be essential. Standards incorporated by reference are not available through government agency websites, and Plaintiffs' websites do not meet legal or practical standards for accessibility. SMF ¶ 92; *see* 36 C.F.R. § 1194.22. Plaintiffs, for their part, assert that "they are well within their rights to design their sites this way," Pls. Opp. 20. They suggest that people who need accommodations to view federal regulations should identify contact information for the correct standards development organization, contact the organization, and disclose their qualifying medical information in order to request such an accommodation. Pls. Opp. 23-24; Pls. SSMF ¶¶ 8-12. As a special commission of the Department of Education concluded in the analogous field of accessibility for higher education, this type of approach is disfavored. "Rather, the ideal is for . . . instructional materials to be available in accessible forms in the same manner that and at the same time as traditional materials."[7]

The drafters of the 1976 Copyright Act identified accessibility for those with disabilities as a "special instance illustrating the application of the fair use doctrine." H.R. Rep. No. 94–1476, at 73 (1976), 1976 U.S.C.C.A.N. 5659, 5686. Thus, fair use was copyright law's primary means of promoting accessibility long before the Chafee Amendment was passed in 1997. That amendment, codified at 17 U.S.C. § 121, has never been the Copyright Act's sole means of

---

[7] AIM Commission Report at 49; http://www2.ed.gov/about/bdscomm/list/aim/meeting/aim-report.pdf (SSMF ¶ 7) ("AIM Report").

promoting accessibility, and federal officials now consider it outdated and in need of reform.[8]

Fair use remains the primary mechanism for promoting access to vital knowledge for persons

with disabilities, and a finding of fair use in this case furthers that goal.

### 3.   Public Resource's use of legally incorporated standards is non-commercial.

The evidence does not show that Public Resource's use of legally incorporated standards

has any commercial purpose. Plaintiffs rely on emails from Mr. Malamud to his wife Rebecca,

whom he contracted to help make the standards more accessible by converting diagrams and

formulas. Rubel Decl. Ex. 19 (Dkt. No. 118-12). The emails show only that Public Resource

raised money to carry out its public interest mission by demonstrating that it was, in fact,

carrying out its mission. Contrary to Plaintiffs' suggestion, there is no "direct evidence" that the

posting of the standards at issue "resulted in financial gains" to Public Resource. Pls. Opp. 24.

Nor does Mr. Malamud's collecting a salary for his full-time work as Public Resource's

sole employee, or his payment for labor-intensive design and formatting work by Rebecca

Malamud's design studio, transform a public interest project into a "commercial" operation. No

doubt the Salvation Army's publicizing of its mission to render services to the poor draws

contributions ("financial gain," as Plaintiffs characterize it) and helps fund employees' salaries.

That does not make that publicity commercial. Plaintiffs take a single line of an email from Mr.

Malamud to mean the exact opposite of what the email conveyed, which was that obtaining

legally incorporated standards was difficult and costly. The entire message reads:

> Btw, this is why I'm going a little batty by this time on a Friday. I spent the entire
> week buying standards. Shopping is tough work in this case . . . lots of double-
> checking to find the exact version. Took me the entire week and over $10k, and
> this is what I have to show for it. What a way to make a living. Much harder than
> assembling the paper copies.

---

[8] *See* AIM Report 43-44.

Malamud Dep. Ex. 73 (ECF No. 118-13, Ex. 36). Later in the email thread, Mr. Malamud stated

the reason for his exertions: "Amazingly important trove of information that will see the light of

day for the first time." *Id.* These are not the words of a person and organization seeking

commercial gain.

In any event a vast number of fair uses are commercial. Indeed, the worldwide sale of a

popular rap album was not sufficiently "commercial" to overcome a finding of fair use in

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1997). The fundraising of a frugal

nonprofit does not remotely jeopardize fair use in this case.

### B.        The Public Needs Free Access to Standards That Constitute Legal Facts.

The second fair use factor, the "nature of the copyrighted work," does not turn on the

whether the work is "complicated and sophisticated," Pls. Opp. 24-25. It turns on whether the

work is of a type for which "the risk of restraining the free flow of information is more

significant." *Consumers Union of U.S., Inc. v. Gen. Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir.

1983). As the standards at issue have become laws that carry potential penalties for

noncompliance, the risk of restraining information about them is great. Indeed, laws are as far

from the "core of intended copyright protection" that the Supreme Court identified in *Campbell*

as any written work can be. *Campbell*, 510 U.S. at 586; *see generally* P.R.O. Mem. 10-21.

Moreover, Plaintiffs cannot dispute that the incorporated standards are highly factual in

nature, even apart from their status as regulations. *See* pp 9-11, above.

### C.        The Amount Used By Public Resource Was Necessary and Reasonable.

Under the third factor, copying and disseminating entire works is fair where the copying

is "reasonable in light of its purpose of disseminating important . . . information." *Bloomberg*,

756 F.3d 73 at 90. Plaintiffs have not disputed that partial access to incorporated standards would

not inform the public of the law's requirements and could be misleading. P.R.O. Mem. 41.

Plaintiffs' claim that no case has found fair use where a defendant posted entire works "online to the world and without restriction," Pls. Opp. 20, is wrong. Numerous courts have so held. *See, e.g., Katz v. Google Inc.*, 802 F.3d 1178, 1181 (11th Cir. 2015) (posting of photo on Internet blog "in its unaltered, original state" was fair use); *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 84 (2d Cir. 2014) (posting recording and transcript of presentation online was fair use); *Righthaven*, 2011 WL 1541613, at *3 (posting entire newspaper article on website of nonprofit group was fair use); *Online Policy Group v. Diebold*, 337 F. Supp. 2d at 1195, 1203 (N.D. Cal. 2004) (posting archive of company's emails online was fair use); *Warren Publishing Co. v. Spurlock d/b/a Vanguard Productions*, 645 F. Supp. 2d 402, (E.D. Pa. 2009) (reproduction of magazine cover artworks at "virtually the same size" in a book was fair use); *see also Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1152-56 (9th Cir. 1986) (disseminating "hundreds of thousands of copies" of magazine page was fair use). The Second Circuit's opinion in *Authors Guild v. Google* placed no such categorical limitation on fair use. 804 F.3d at 221.

### D.    Plaintiffs' Conjectures About Future Harm Do Not Undermine Fair Use.

The importance of the fourth factor, market effect, "will vary . . . with the relative strength of the showing on other factors." *Campbell*, 510 U.S. at 590 n.21. Just as "when a lethal parody . . . kills demand for the original, it does not produce a harm cognizable under the Copyright Act," nor does copying and dissemination in order to inform the public about the law. *Id.* at 591. Both are uses that copyright law encourages. *See Veeck*, 293 F.3d at 806. In light of this legally favored purpose, only strong evidence of market harm could defeat fair use.

No such evidence exists here. The absence of any evidence linking Public Resource's posting of the legally incorporated standards to any loss of sales by Plaintiffs speaks volumes, given that Public Resource began posting the standards in 2008. Supp. Decl. of Carl Malamud

¶¶ 5–7; SSMF ¶ 8. Plaintiffs presented sales data for only one standard, cherry-picked from 257 standards at issue in this case. Pls. Opp. 26. And Plaintiffs can show no causal link between the decline in sales of that one standard—the National Electrical Code—and its posting by Public Resource except that Plaintiffs *mistakenly* thought they occurred in the same year, 2012. ECF No. 118, Rubel Decl. Ex. 1 (Jarosz Report) ¶ 133; ECF No. 124-3 (Jarosz Dep. 164:13–167:13). As Public Resource first posted a version of that standard on its website in 2008, a decline in sales in 2012 shows nothing about the effect of its having been available through Public Resource. Supp. Decl. of Carl Malamud ¶¶ 5–7; SMF ¶ 4; SSMF ¶ 8.

The remainder of Plaintiffs' market harm argument is mere self-serving speculation that Public Resource's posting of the legally incorporated standards will at some future date "destroy the potential market" for standards. Pls. Opp. 26. But Plaintiffs do not dispute that the standards they publish are not incorporated into law immediately and thus enjoy an undisputed period of copyright exclusivity. P.R.O. Mem. 44. Nor do they dispute that all but one of the standards at issue have been superseded *as private statements of best practices* by later versions, such that the standards' only significant current use is *as law. Id.* While Plaintiffs cite cases concerning music and translations of ancient monastic texts, the market for access to legal materials is very different. *See* Pls. Mem. 39, Pls. Opp. 26. For example, courts regularly purchase bound volumes and electronic access to statutes and case law even though they can be downloaded for free. SSMF ¶ 9. Plaintiffs are not entitled to presume that online availability of legal materials "destroys" the potential market.

## V.     PLAINTIFFS HAVE NOT PROVEN THAT THEY OWN THE COPYRIGHTS FOR THE STANDARDS AT ISSUE.

### A.     Ample Evidence Contradicts Plaintiffs' Claim of Ownership.

Plaintiffs do not dispute that the presumption arising from copyright registration is limited. Public Resource need offer only *some* evidence to rebut it. *See, e.g.*, *Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1217–18 (9th Cir. 1997).

Public Resource has provided ample evidence that Plaintiffs do not own most of the standards at issue. ASTM now admits that it only started asking for copyright assignments from members in 2005,[9] long after 226 of the 229 ASTM standards at issue had been developed. SSMF ¶ 10. ASHRAE's alleged "assignment" forms explicitly request a non-exclusive grant of rights (not an assignment), and NFPA admits that its pre-2008 forms are substantially similar to ASHRAE's and therefore contained the same deficiency (affecting the 2011 NEC and prior standards). Opp. at 33-34. As for the four remaining ASTM and NFPA standards, Plaintiffs cannot confirm that the alleged assignors had authority to assign the copyrights in question. P.R.O. Mem. at 54–55. It is evident that many volunteers who drafted language for the standards did so in the course of their employment and, therefore, lacked authority to assign rights. *See Cmty. for Creative Non-Violence, et al. v. Reid*, 490 U.S. 730, 750–52 (1989).

### B.     Plaintiffs' Registrations Are Not Due Any Presumption of Validity.

Plaintiffs do not contest that, where there are material errors in an application for copyright registration, statements in the registration are not entitled to any presumption. Instead, Plaintiffs contest a different point, saying that the higher standard of fraud on the Copyright

---

[9] At deposition, ASTM's Rule 30(b)(6) representative stated that ASTM had not sought assignments prior to 2003. SMF ¶ 147. Accordingly, Public Resource believed that ASTM could claim rights in only four of the incorporated standards at issue here. ASTM now admits that it had not sought assignments until 2005, Opp. at 32, and therefore has rights, if any, in only three of the incorporated standards at issue (ASTM A106/106M 2004b). ECF No. 1-1 (Compl.).

Office has not been met. Opp. at 28. This is immaterial. The Plaintiffs would not have been eligible to register the standards at issue if their application had correctly listed the true authors—the volunteers— because Plaintiffs could not have registered a work that they neither authored nor owned. Their registrations rested on material misstatements and do not enjoy a presumption of validity.

Plaintiffs' statement that there are no errors in the copyright registrations appears to be an attempt to create a factual dispute where there is none. Plaintiffs listed themselves as the sole authors of the "entire work[s]" but now concede that third parties authored the works. Plaintiffs' reliance on the term "organizational authors," Pls. Opp. 28, is misplaced, because it has no legal meaning and is not in the Copyright Act. It was simply a descriptive dictum in a case where ownership of the works at issue was not in dispute. *See Veeck*, 293 F.3d at 794.

Plaintiffs also claim that there was no error because an unidentified employee of one party, ASTM, supposedly consulted with an unnamed individual at the Copyright Office at some unknown date before 1980 and was told to list ASTM as the sole author. Opp. at 28; SSMF ¶ 11. This statement is inadmissible double hearsay, undocumented, and self-serving. SSMF ¶ 11. It does not show that the applications were truthful; it merely allows one party, ASTM, to argue that it did not intentionally lie to the Copyright Office.

### C.  Plaintiffs Are Not Joint Authors of the Standards

Plaintiffs recognize that joint authorship requires the intention by two or more authors at the time of creation that their contributions be merged into a unitary work. Opp. at 30 (citing 17 U.S.C. § 101). But Plaintiffs still cannot show that the drafters of the standards at issue had such an intention.

Undisputed evidence demonstrates that Plaintiffs expressly rejected joint authorship before this litigation. Mot. at 55–56. Plaintiffs' late-stage argument that they didn't have to

explicitly agree to be joint authors when the standards were drafted is beside the point as well as incorrect. Plaintiffs did more than fail to agree on joint authorship, they actively disavowed it. And Plaintiffs misquoted[10] dicta from *Community for Creative Non-violence v. Reid*, which did not find that the work in question was a joint work. 846 F.2d 1485, 1497 (D.C. Cir. 1988). The court remanded this question, and the parties later consented to judgment that the work was of sole authorship. *Cmty. for Creative Non-violence v. Reid*, No. 86-1507, 1991 WL 415523, at *1 (D.D.C. Jan. 7, 1991).

Moreover, Plaintiffs have not established that they were authors. The requirement of "authorship" by each party claiming to be a joint author is implicit in the statute. 17 U.S.C. § 101 (a "joint work" is one "prepared by two or more *authors* . . .") (emphasis added). "[A]n author superintends the work by exercising control." *Aalmuhammed v. Lee*, 202 F.3d 1227, 1234 (9th Cir. 2000). Simply providing some copyrightable material, without exercising control, does not make one joint author. *Id.* at 1229–36 (holding that consultant was not a joint author of the film *Malcolm X*, despite his valuable and otherwise copyrightable contributions to the film). Plaintiffs made administrative and secretarial contributions of their employees, but volunteers made the ultimate decisions as to the content of the standards. SMF ¶ 135, 137–38. Even the inclusion of small segments of prefatory text or legal disclaimers, which Plaintiffs claim to have created, was

---

[10] The correct quotation is: "this case—once more taking the record in its current state—*might* qualify as a textbook example of a jointly-authored work . . . ." 846 F.2d 1485, 1497 (D.C. Cir. 1988) (emphasis added to indicate word missing from Plaintiffs' brief).

done under the authority of the volunteers, who had the final vote on the content of the standards.[11] That contribution did not make Plaintiffs co-authors.

### D.     Plaintiffs' Alleged "Assignments" Do Not Transfer Ownership to Plaintiffs.

Public Resource does not disagree with Plaintiffs' assertion that "[a] valid assignment need not 'contain an elaborate explanation' or 'magic words, but *must simply show an agreement to transfer the copyright*.'" Pls. Opp. at 32–33 (quoting *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 772 F.3d 591, 600–02 (4th Cir. 2013)) (emphasis added). The problem with Plaintiffs' ownership claims is that they cannot show such an agreement. Plaintiffs either obtained something different, like a non-exclusive license, or they obtained no agreement at all.

For example, all of the documents ASHRAE claims as "assignments," and many of NFPA's alleged "assignments" from before 2008, explicitly state that Plaintiffs request non-exclusive *licenses* (not copyright assignments, which by their nature are exclusive grants of rights). In their Opposition, Plaintiffs ignore this "non-exclusive" language and instead try to twist the meaning of a clause at the end of the sentence. Pls. Opp. at 33. This clause must be understood in the context of the full sentence, which states twice for emphasis that it is a grant of "non-exclusive, royalty-free rights." Read plainly, it means that because the contributor does not expect to receive royalties in exchange for granting ASHRAE or NFPA a non-exclusive license to use the segments of the standards that she developed.

Plaintiffs' claim that this language constituted a copyright assignment directly contradicts Plaintiff NFPA's position in earlier copyright litigation with another standards organization. *See*

---

[11] Moreover, ASTM's 1961 Form and Style Guide (ECF No. 155-7, Ex. 4) lacks a copyright notice, and therefore entered the public domain upon publication. *See* Pub. L. No. 60-349, 35 Stat. 1075 (1909), Sec. 9 (requiring copyright notices on each copy); *Shapiro & Son Bedspread Corp. v. Royal Mills Assocs.*, 764 F.2d 69 (2d Cir. N.Y. 1985) (finding that an absence of copyright notice resulted in loss of copyright); *Mifflin v. Dutton*, 190 U.S. 265 (1903) (same).

Mot. at 50. The court in that case held this language created merely a non-exclusive license. *Int'l Code Council v. National Fire Prot. Assoc.*, No. 02 c 5610, 2006 WL 850879, at *6 (N.D. Ill. March 27, 2006). Notably the Plaintiffs have tried to sweep that earlier argument, and the court's ruling, under the rug. There is no relevant distinction between the cases other than the fact that NFPA now sits on the other side of the courtroom. This Court should accept the argument that NFPA made in its earlier case, the same argument Public Resource makes now.

Plaintiffs do not explain why they take the opposite position now. Instead, Plaintiffs cite to *Capital Concepts, Inc. v. Mountain Corp.*, a case with starkly different assignment language coupled with a work-made-for-hire provision and that did not involve a non-exclusive grant. No. 3:11-CV-00036, 2012 WL 6761880 *15 (W.D. Va. Dec. 30, 2012). Plaintiffs also argue that their use of the term "copyright release" supports their contention. Pls. Opp. at 34. Plaintiffs offer no support for that assertion, for good reason: "copyright release" is typically a synonym for "non-exclusive license." *See, e.g.*, *Home Design Services, Inc. v. Hibiscus Homes of Florida, Inc.*, No. 603cv1860ORL19KRS, 2005 WL 3445522 at *8 (M.D. Fla. Dec. 14, 2005); *Crocker et al. v. General Drafting Co., Inc.*, 50 F. Supp. 634, 635 (S.D.N.Y. 1943).

ASTM's alleged assignment process had numerous deficiencies, many of which ASTM does not contest.[12] ASTM had no assignment process before 2005, and ASTM has failed to show that any of the 25,000 people who allegedly completed a renewal form in later years owned any copyright in the standards at issue, many of which were created in the 1950s and 1960s.[13]

---

[12] Plaintiffs did not respond to the deficiencies that Public Resource raised in its opening memorandum of law concerning ASTM's IP Policy, or to the deficiencies in ASTM's paper forms, and they therefore concede those issues.

[13] Plaintiffs don't even know the few individuals they cited in their opening motion actually contributed copyrightable text to the standards at issue. Plaintiffs allege Jimmy King was the technical contact for the "reapproval" of ASTM D1217-1993 in 1998 (Pls. SMF ¶ 23), but that means only that an older standard is republished without any changes to content. SSMF ¶ 12.

Moreover, ASTM's online assignment process makes no provision for actual agreement. P.R.O. Mem. at 53. Plaintiffs attempt to sidestep this requirement by invoking *Metro. Reg'l Info. Sys.*, 772 F.3d at 600–02. But that case simply states that, whether the agreement is made electronically or on paper, what matters is that *an agreement must be shown*. Here, ASTM's website is constructed in a way that prevents persons from indicating whether or not they assent to ASTM's terms: there is no way to show agreement.[14]

Public Resource has also shown that Plaintiffs failed to show that the individuals who executed alleged assignments had ownership and authority to transfer copyright to Plaintiffs. Plaintiffs argue that Public Resource must prove that these individuals lacked authority, but the case they cite simply says that a copyright defendant must show "some evidence" to rebut the presumption of validity, and then the burden shifts to the Plaintiffs to prove ownership. *United Fabrics Int'l, Inc. v. C&J Wear, Inc.*, 630 F.3d 1255, 1257–59 (9th Cir. 2011).[15] The evidence comes from the employee status of many signatories that was evident in the Plaintiffs' forms. *See, e.g.*, SSMF ¶ 13. Employers, not employees, own copyright rights in works the employees write, so the employers, not the employees, needed to assign any rights to the employees' work.

**E.    Public Resource Has Standing to Challenge Plaintiffs' Ownership.**

Plaintiffs argue that, regardless of the fatal deficiencies in that claim, no one whom they sue can expose those deficiencies. While Plaintiffs claim that "transfers occurred," and "Defendant's only disagreement is with the formality of the language," the truth is just the

---

[14] In contrast, ASTM's "new member registration" process requires someone to click a check-box next to assignment language, indicating consent. ECF No. 155-7 (O'Brien Decl.) Ex. 1, p. 11. But copyright assignments by new members do not apply to the standards at issue here.

[15] Plaintiffs claim that NFPA and ASHRAE's assignments include language that requires the person executing the document to attest that he or she has authority to do so. Opp. at 35. It does not make a difference. A person cannot sell the U.S. Capitol Building, even if she signs a document attesting that she has authority to do so.

opposite: the evidence shows that, for most of the standards at issue, there never was a transfer of

copyright in the first place, and Plaintiffs have not made their *prima facie* case for ownership.

*See* P.R.O. Mem. 46-47. The only additional case Plaintiffs cite actually supports summary

judgment for Public Resource: the court considered but then disregarded the line of cases that

cast doubt on inquiry into assignment formalities, and went on to analyze whether the copyright

assignments in that case were valid. *See Metro. Reg'l Info. Sys.*, 772 F.3d at 600–02.

## VI.   PLAINTIFFS TRADEMARK CLAIMS ARE BARRED AS A MATTER OF LAW.

### A.   Plaintiffs' Trademark Rights Cannot Protect Works in the Public Domain.

In *Dastar Corp. v. Twentieth Century Fox Film Corp.*, the Supreme Court thwarted the

use of trademark claims to circumvent limitations of copyright law. 539 U.S. 23, 37–38 (2003).

As explained above, pp 2-10, the incorporated standards are not protected by copyright. Under

*Dastar*, Plaintiffs cannot pivot to trademark to prevent use of content of the standards, including

the names and logos that are in the incorporated standards. *See id.*; *Prunte v. Universal Music

Grp.*, 484 F. Supp. 2d 32, 41 (D.D.C. 2007) (dismissing trademark claims based on use of song

titles) *Whitehead v. CBS/Viacom, Inc.*, 315 F. Supp. 2d 1, 13 (D.D.C. 2004) (granting summary

judgment on trademark claims where gravamen of complaint was based in copyright

infringement of plaintiff's play).

Plaintiffs' contention that a party can bring "both copyright and trademark claims in the

same lawsuit" is a non-sequitur. *See* Pls. Opp. 36. The relevant question is what happens to

Plaintiffs' trademark claims when the Court confirms that Plaintiffs cannot assert copyright

ownership over the standards. *Dastar* answers that question: the standards enter the public

domain, despite any purported trademark claims. None of Plaintiffs' cited cases involve a

*conflict* between copyright and trademark law. *See* Pls. Opp. 36. Here, as in *Dastar,* the Plaintiffs

are trying to use trademark law to curtail uses that copyright law permits.

**B.     Plaintiffs Ignore Binding Supreme Court Precedent Limiting Trademark Owners From Controlling Downstream Modifications of Their Products.**

Supreme Court precedent establishes that purchasers of trademarked goods may modify those goods and distribute them with the trademarks intact, so long as consumers are adequately informed that the accused goods were altered. *Prestonettes, Inc. v. Coty*, 264 U.S. 359 (1924); *accord Enesco Corp. v. Price/Costco Inc.*, 146 F.3d 1083, 1084–85 (9th Cir. 1998). Consumers may be adequately informed that the accused goods were altered without an explicit disclaimer. *Dream Team Collectibles, Inc. v. NBA Properties, Inc.*, 958 F. Supp. 1401, 1420 (E.D. Mo. 1997) (denying summary judgment for trademark claimant because a reasonable jury could find there was no confusion that NBA endorsed basketball card collage even without a disclaimer).

Plaintiffs cannot avoid *Coty*'s clear holding. Public Resource adequately informed consumers about its handling of the incorporated standards. Public Resource's cover page for each .pdf standard is so distinct that no reasonable consumer would mistake it as part of the original document (*e.g.*, Rubel Decl. Ex. 16, Dkt. No. 118-12); Public Resource's original preamble for the .html standards informs reasonable consumers that Public Resource has provided the transcription (*e.g.*, Rubel Decl. Ex. 26, Dkt. No. 118-13); and the .pdf versions look like scans of physical documents (*e.g.*, Rubel Decl. Ex. 25, Dkt. No. 118-13).

For the same reasons, Plaintiffs have not met, and cannot meet, their burden of offering evidence of likely consumer confusion as to source, sponsorship, or affiliation. The look and feel of public.resource.org is distinct from Plaintiffs' sites; Public Resource clearly states its mission to promoting public access to the law, in terms that no reasonable consumer would attribute to an industry organization; and Public Resource makes hundreds of standards from dozens of organizations incorporated in the Code of Federal Regulations available via a single table on its site, which dispels the notion that Public Resource has any affiliation with Plaintiffs. *See* Rubel

Decl. Ex. 27 (Dkt. No. 118-13). Tellingly, Plaintiffs do not object to Public Resource's *current* prefatory statements, but they complain that the current language did not originally appear on the standards at issue. Pls. Opp. 40–41. Public Resource could easily add substantially similar prefatory language to the incorporated standards on its website if the Court believes that is necessary. Plaintiffs nonetheless claim any post-litigation disclaimer would be ineffective, citing cases disapproving fine-print disclaimers. Pls. Opp. 40. The Supreme Court disagrees, and has explicitly approved "disclaimers" in this context. *Coty*, 264 U.S. at 369 (1924); *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 130 (1947).

Attempting to sidestep the Supreme Court's clear guidance, Plaintiffs look to a series of cases involving disclaimers in fine-print on packaging, advertisements, or in trade names. *See* Pls. Opp. 40–41 (citing *Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.*, 832 F.2d 1311, 1315–16 (2d Cir. 1987) (advertisements); *U.S. Jaycees v. Phil. Jaycees*, 639 F.2d 134, 142 (3d Cir. 1981) (trade names); *CFE Racing Prods., Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 596, 599 (6th Cir. 2015) (packaging); *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1093 (7th Cir. 1988) (advertisements). Those cases are inapposite, because Public Resource's disclaimer is clear and prominent. It is precisely the kind of disclaimer that courts have found effective to cure even substantial confusion. *See, e.g., Charles of the Ritz Group, Ltd. v. Quality King Distribs., Inc.,* 832 F.2d 1317, 1324 (2d Cir. 1987).

## C.   Public Resource's Use Is a Nominative Fair Use.

Plaintiffs do not dispute that Plaintiffs' names are part of the incorporated standards' titles and are therefore necessary to identify the standards. Instead, Plaintiffs insist that the use of the logo "implies falsely that Plaintiffs are affiliated with or have endorsed Defendant's copies." Pls. Opp. 49. Plaintiffs have no evidence to support that claim. Courts rejecting a nominative fair use claim were generally presented with websites using markholder's logos as part of the site

design or in advertising. *See, e.g.*, *Toyota Motor Sales, U.S.A., Inc. v. Tabari,* 610 F.3d 1171 (9th Cir. 2010); *David's Bridal, Inc. v. House of Brides, Inc.*, No. 06-5660, 2010 WL 323306, at *7 (D.N.J. Jan. 20, 2010). These courts have found that use of logos in that context could confuse consumers as to affiliation or endorsement. Public Resource did not gratuitously use Plaintiffs' logos; it displayed the logos only *as they appear in* the incorporated standards. No court has required a defendant to scrub design marks from images truthfully showing a plaintiff's work.

### D.    Plaintiffs Lack Evidence of Likely Consumer Confusion or Loss of Goodwill.

Finally, summary judgment for Public Resource is appropriate because Plaintiffs have no evidence of likely confusion or loss of goodwill. Plaintiffs invoke a legal presumption that can apply when parties use identical marks for "related services." Pls. Opp. 39. But this is not a typical trademark dispute, where both parties are using identical marks to compete in a commercial enterprise. A presumption that visitors will believe the parties are affiliated merely because Public Resource posts the standards is very different.

Further, while Plaintiffs insist that are that they need not to produce confusion evidence, they incorrectly suggest that its absence is immaterial. The very case they cite, *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, states that where evidence of actual confusion "should have been available" if it existed, its absence weighs against a finding of confusion. 750 F.2d 903, 914 (Fed. Cir. 1984). Here, Public Resource posted the incorporated standards on its website for years before suit, more than enough time for evidence of actual confusion to emerge.

Finally, as discussed above, Plaintiffs' supposed fear that minor errors have or will cause Plaintiffs to lose goodwill is entirely speculative.

### CONCLUSION

For the foregoing reasons, the Court should grant summary judgment for Public Resource on all of the claims in this case.

Dated: February 4, 2016

Respectfully submitted,

/s/   Andrew P. Bridges
Andrew P. Bridges (admitted)
abridges@fenwick.com
Sebastian E. Kaplan (*pro hac vice* pending)
skaplan@fenwick.com
Matthew Becker (admitted)
mbecker@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone:   (415) 875-2300
Facsimile:   (415) 281-1350

Corynne McSherry (admitted *pro hac vice*)
corynne@eff.org
Mitchell L. Stoltz (D.C. Bar No. 978149)
mitch@eff.org
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone:   (415) 436-9333
Facsimile:   (415) 436-9993

David Halperin (D.C. Bar No. 426078)
davidhalperindc@gmail.com
1530 P Street NW
Washington, DC 20005
Telephone: (202) 905-3434

*Attorneys for Defendant-Counterclaimant*
Public.Resource.Org, Inc.