# **EXHIBIT 17**

FILE COPY

Supreme Court, U.S.
FILED
OCT 21 2002
CLERK

No. 02-355

IN THE
Supreme Court of the United States

SOUTHERN BUILDING CODE CONGRESS INTERNATIONAL, INC.,
*Petitioner,*

v.

PETER VEECK D/B/A REGIONAL WEB,
*Respondent.*

On Petition for a Writ of Certiorari to the
United States Court of Appeals for the Fifth Circuit

BRIEF OF *AMICI CURIAE* TEXAS MUNICIPAL LEAGUE, AMERICAN NATIONAL STANDARDS INSTITUTE, NATIONAL FIRE PROTECTION ASSOCIATION, AMERICAN SOCIETY OF HEATING, REFRIGERATING AND AIR-CONDITIONING ENGINEERS, NSF INTERNATIONAL, INSTITUTE OF ELECTRICAL AND ELECTRONICS ENGINEERS, AMERICAN INSTITUTE OF STEEL CONSTRUCTION, AMERICAN SOCIETY OF CIVIL ENGINEERS, AND INTERNATIONAL ASSOCIATION OF PLUMBING AND MECHANICAL OFFICIALS IN SUPPORT OF PETITIONER

MAUREEN BRODOFF
VICE PRESIDENT AND
 GENERAL COUNSEL
NATIONAL FIRE PROTECTION
 ASSOCIATION
1 Batterymarch Park
Quincy, MA 02269
(617) 770-3000

CLAIRE LAPORTE
 *(Counsel of Record)*
THOMAS M.S. HEMNES
VICKIE L. HENRY
JESSICA M. SILBEY
JULIET S. SORENSEN
FOLEY HOAG LLP
 155 Seaport Boulevard
 Boston, MA 02110-2600
 (617) 832-1000
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

                                                      **Page**

TABLE OF AUTHORITIES ......................................................... iii

STATEMENT OF INTEREST OF *AMICI CURIAE* ....................... 1

SUMMARY OF THE ARGUMENT ............................................... 2

ARGUMENT ................................................................................ 3

I. THE COPYRIGHT LAWS HAVE ENABLED THE CREATION AND GROWTH OF A NATIONWIDE SYSTEM OF MODEL STANDARDS THAT GREATLY BENEFITS THE PUBLIC. ........................................................ 3

    A. Standards Drafting ........................................................ 4

    B. Government Adoption of Standards .............................. 4

    C. The Role of Copyright .................................................. 6

II. THE DECISION BELOW, IF ALLOWED TO STAND, THREATENS TO DESTROY THE SYSTEM OF PRIVATE, CONSENSUS-BASED STANDARDS DEVELOPMENT AND IS CONTRARY TO THE PUBLIC INTEREST. .................... 6

    A. The Decision Creates a Split Between Circuits That Causes a Quandary for Standards Developers. ................................................... 6

        1. The Decision Below Cannot Be Reconciled With the Decisions of Other Circuits. .................................................................. 6

        2. The Conflict Between the Circuits Causes a Host of Practical Problems for Standards Developers. ................................................ 9

    B. The Decision Below Threatens to Destroy the Beneficial Relationship Between Standards Developers and Governments. ............. 10

III. THE DECISION BELOW IS WRONG ON THE MERITS............ 12

    A. The Fifth Circuit Misinterpreted This Court's Cases. ................................................................. 12

    B. The Fifth Circuit's Application of the Merger Doctrine Is Illogical and Unsupported in Law............................................................................ 15

    C. The Fifth Circuit Overreaches by Addressing an Illusory Problem of Access. ............................ 17

CONCLUSION................................................................ 20

APPENDIX .................................................................. A-1

TABLE OF AUTHORITIES

CASES

*Baker v. Selden*, 101 U.S. 99 (1879)..................................15, 17

*Banks v. Manchester*, 128 U.S. 244 (1888)..................7, 12, 13

*Bldg. Officials and Code Adm'rs v. Code Technology, Inc.*, 628 F.2d 730 (1st Cir. 1980) ............14, 17

*CCC Information Srvs., Inc. v. Maclean Hunter Mkt. Reports*, 44 F.3d 61 (2d Cir. 1994).............7, 10, 20

*Harper & Row v. Nation Enters.*, 471 U.S. 539 (1985).........................................................................15, 17

*Nichols v. Universal Pictures Corp.*, 45 F.2d 119 (2d Cir. 1930)..........................................................................15

*Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516 (9th Cir.), cert. denied, 522 U.S. 933 (1997) ............................................................ 6, 7, 15-17, 19

*Sony Corp. v. Universal City Studios*, 464 U.S. 417 (1984)............................................................................3

*Texaco, Inc. v. Short*, 454 U.S. 516 (1982)...........................19

*Veeck v. S. Bldg. Code Congress Int'l*, 293 F.3d 791 (5th Cir. 2002).................................................... passim

*Veeck v. S. Bldg. Code Congress Int'l*, 49 F. Supp. 2d 885 (E.D. Tex. 1999) ........................10, 17, 19

*Wheaton v. Peters*, 33 U.S. 591 (1834)..................................12

**STATUTES**

U.S. Const. art. I, § 8, cl. 8 ..................................................3

17 U.S.C. § 107 (1992) .......................................................19

17 U.S.C. § 201(e) (1995) ...................................................11

65 ILL. COMP. STAT. ANN. 5/1-3-1 to 5/1-3-6
(West 2001)............................................................................5

Ky. Rev. Stat. Ann. § 61.874 (6) (2000) ..............................18

WASH. REV. CODE § 19.27.031 (1999) ..................................5

**LEGISLATIVE MATERIALS**

H.R. REP. No. 104-390, pt. VII (1995) ..................................5

National Technology Transfer and Advancement
Act of 1995, Pub. L. No. 104-113, § 12(d),
110 Stat. 775 (1996) ..............................................................5

**REGULATIONS**

Index to the Code of Federal Regulations, 3 C.F.R. at
2090-2091 (1999) ..................................................................4

Federal Participation in the Development
and Use of Voluntary Consensus Standards
and in Conformity Assessment Activities,
63 Fed. Reg. 8546 (Feb. 19, 1998) ....................................4, 5

**OTHER AUTHORITIES**

BUREAU OF ECONOMICS, FEDERAL TRADE COMMISSION,
LOCAL BUILDING CODES AND THE USE OF COST SAVING
METHODS 11 (Jan. 1989) ........................................................5

NATIONAL CONFERENCE OF STATES ON BUILDING CODES
AND STANDARDS, INC., DIRECTORY OF BUILDING CODES
& REGULATIONS (1998) ..........................................................6

NATIONAL INSTITUTE OF STANDARDS & TECHNOLOGY,
U.S. DEPARTMENT OF COMMERCE, STANDARDS
ACTIVITIES OF ORGANIZATIONS IN THE UNITED
STATES, SPECIAL PUBLICATION 806 (Feb. 1991) ......................4

1 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER
ON COPYRIGHT, § 5.06[C] (2001) ....................................14, 19

4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON
COPYRIGHT, § 13.03[A][1][a]-[d] (2001) ...............................16

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

The model codes at issue in this case are part of a large genre of copyrighted codes and standards that are developed by private, not-for-profit organizations and made available for adoption by government bodies throughout the United States and for other purposes.[2]

*Amicus* Texas Municipal League ("TML") is a nonprofit association that represents the interests of its 1,060 member cities. It accomplishes its mission by providing legislative services, legal advice, educational training, and publications to the governing bodies, officials, and employees of those cities. The TML's member cities routinely adopt copyrighted model codes and standards by reference in their laws.

*Amicus* American National Standards Institute ("ANSI") is a nonprofit membership organization which, for almost 85 years, has administered and coordinated the voluntary standardization system in the United States. ANSI is a partnership of some 30 government agencies, approximately 400 companies, and 250 professional, technical, trade, labor, academic, and consumer organizations. ANSI accredits over 200 standards developers and provides a forum for addressing policy issues related to standardization.

All other *amici* are not-for-profit or nonprofit organizations that develop copyrighted codes and standards for adoption by government entities and for other purposes.[3]

---

[1] No counsel for any party authored this brief in whole or in part. No person or entity other than *amici*, their members, or their counsel made any monetary contribution to the preparation or submission of this brief.
Both parties have consented to the filing of this brief. Evidence of the written consent of the parties has been filed separately herewith.

[2] For convenience, this brief uses the terms "standards" or "codes and standards" for works ranging from model codes to other compilations of rules, standards, specifications, and other works created by private organizations for use by the private sector and government.

[3] These *amici* are listed and described in the Appendix to this brief.

1

These *amici* use the revenue generated from the sales and licensing of their copyrighted standards to support the creation and updating of their standards.

If the decision below is allowed to stand, the consequent nullification of copyright protection for the works of standards developers will result in a devastating loss of licensing and sales revenue. This, in turn, will seriously undercut the ability of standards developers to fund the ongoing creation and updating of their codes and standards and will harm the public and governments, such as those represented by *amicus* TML, who benefit from and depend on these codes and standards.

For these reasons, *amici* have a direct and vital interest in the issues presented to this Court by the petition of Southern Building Code Congress International, Inc. ("SBCCI") and believe that they can provide the Court with additional perspective on these issues.

## SUMMARY OF THE ARGUMENT

1. Over more than a century, the copyright laws have nurtured a nationwide system of privately developed model codes and standards that greatly benefits the public. These standards are drafted by nonprofit organizations with the participation of government, academia, business, and the public. Government bodies at all levels adopt these standards, thus providing, at no taxpayer expense, timely, high quality safety, health and other technical regulations for their citizens. The Fifth Circuit's nullification of copyright protection for these codes and standards jeopardizes this valuable work by compromising the sales and licensing revenue that supports it.

2. The decision below, which was rendered by a sharply divided court, conflicts with the decisions of the Second and Ninth Circuits, creating a host of practical problems for standards developers concerning the enforceability of their copyrights within and without the Fifth Circuit. The decision also effects a massive expropriation of the valuable intellectual property rights of the standards developers, thus destroying the longstanding, mutually beneficial relationship between standards developers and governments.

3. The court below erred in its legal analysis. The decision misinterprets this Court's cases, misapplies the merger doctrine, and creates a draconian remedy for a problem – restricted access to the law – that does not exist.

## ARGUMENT

### I. THE COPYRIGHT LAWS HAVE ENABLED THE CREATION AND GROWTH OF A NATIONWIDE SYSTEM OF MODEL STANDARDS THAT GREATLY BENEFITS THE PUBLIC.

The paramount purpose of copyright protection is "To Promote the Progress of Science and useful Arts." U.S. CONST. art. I, § 8, cl. 8. The immediate effect of copyright law is to secure a fair return for an author's creative labor. But the ultimate aim of the copyright system lies in the benefits derived by the public from the work of authors. *See Sony Corp. v. Universal City Studios*, 464 U.S. 417, 429 (1984). Private standards developers exemplify these benefits. Supported by the funds made possible through copyright protection, the system of standards development that has evolved in the United States is one of the most effective in the world and exemplifies the American tradition of public-private partnership.

To appreciate why the copyright system is so critical to the continued availability of model codes and standards, one must understand that the creation of high quality, up-to-date standards is very costly and that private standards developers rely on copyright protection, and the sales and licensing revenue it makes possible, to sustain their work.

## A. Standards Drafting

The drafting of standards requires wide-ranging creative input from a variety of constituencies and experts. Under ANSI principles, standards drafting committees must seek to include representatives of a variety of affected interests, including the public, academia, business, and the public safety and regulatory community. Procedural protections must be accorded to all participants, and an appeal process must be available through the standards developer. The process must be open and involve opportunity for public comment.

The finished products of the standards development process are model codes and standards, some of which are concise sets of rules or methods covering a narrow technical subject, others of which are lengthy compendia such as model building codes.

## B. Government Adoption of Standards

Over the past century, governments have taken full advantage of this valuable private sector resource. The federal government has been estimated to be the single largest user of privately developed codes and standards. *See* NATIONAL INSTITUTE OF STANDARDS & TECHNOLOGY, U.S. DEPARTMENT OF COMMERCE, STANDARDS ACTIVITIES OF ORGANIZATIONS IN THE UNITED STATES, SPECIAL PUBLICATION 806 (Feb. 1991); *see, e.g.,* Index to the Code of Federal Regulations, 3 C.F.R at 2090-91 (1999) (indexing over 200 citations in the Code of Federal Regulations to copyrighted NFPA standards). In recognition of the benefits of private standards development, the Office of Management and Budget ("OMB") has for nearly two decades directed all federal agencies to incorporate privately developed standards "whenever practicable and appropriate," thereby "[e]liminat[ing] the cost to the Government of developing its own standards." Federal Participation in the Development and Use of Voluntary Consensus Standards and in Conformity Assessment Activities, 63 Fed. Reg. 8546, 8554-55 (Feb. 19, 1998) (revising 1983 OMB Circular A-119). Recognizing that the standards system depends on the maintenance of copyright, OMB requires agencies to "observe and protect the rights of the copyright holder ...." *Id.* at 8555.

In 1996, Congress codified the OMB policy of adopting privately developed codes and standards in the National Technology Transfer and Advancement Act of 1995, Pub. L. No. 104-113, § 12(d), 110 Stat. 775, 783 (1996). As the House Science Committee Report concerning the Act stated:

> The United States ... relies heavily on a decentralized, private sector based, voluntary consensus standards system.... This unique consensus-based voluntary system has served us well for over a century and has contributed significantly to United States competitiveness, health, public welfare, and safety.

H.R. REP. No. 104-390, pt. VII at 23-24 (1995).

As to state and local governments, it is fair to say that they could not function effectively without privately developed standards. Virtually all safety and other technical regulation requires expertise that is beyond the resources of such governments. By as early as 1981, 97% of United States cities had adopted model building codes, up from 47% in 1964.[4] BUREAU OF ECONOMICS, FEDERAL TRADE COMMISSION, LOCAL BUILDING CODES AND THE USE OF

---

[4] Many states adopt or mandate the regulatory adoption of privately authored works. *See, e.g.,* WASH. REV. CODE § 19.27.031 (1999) (adopting the model Uniform Building Code and related standards). Many states, moreover, have enacted express legislative approval of and methods for state and municipal adoption of privately developed works through incorporation by reference. *See, e.g.,* 65 ILL. COMP. STAT. ANN. 5/1-3-1 to 5/1-3-6 (West 2001).

COST SAVING METHODS 11, 16 (Jan. 1989). *See also* NATIONAL CONFERENCE OF STATES ON BUILDING CODES AND STANDARDS, INC., DIRECTORY OF BUILDING CODES & REGULATIONS (1998 ed.) (listing adoptions of building-related model codes and standards).

### C. The Role of Copyright

The costs of developing standards are commonly underwritten, in whole or significant part, by the revenues made possible from the copyright-protected sales and licensing of the standards themselves. *See Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 518 (9th Cir.) (copyright provides the economic incentive to standards developers to continue to create their works), *cert. denied*, 522 U.S. 933 (1997).

Without copyright protection, others could copy and sell the works created by standards developers without making any contribution to the development costs. The standards developers would lose the main source of revenue that sustains their standards development activities, impairing their ability to continue this work. The consequent diminishment of private standards development would be a severe loss to the public.

## II. THE DECISION BELOW, IF ALLOWED TO STAND, THREATENS TO DESTROY THE SYSTEM OF PRIVATE, CONSENSUS-BASED STANDARDS DEVELOPMENT AND IS CONTRARY TO THE PUBLIC INTEREST.

### A. The Decision Creates a Split Between Circuits That Causes a Quandary for Standards Developers.

#### 1. The Decision Below Cannot Be Reconciled With the Decisions of Other Circuits.

In holding that a copyright-protected model code loses its protection when it is adopted by government, the Fifth Circuit created a direct conflict with decisions of two other circuits. *See Practice Mgmt.*, 121 F.3d at 516; *CCC Info. Servs. v. Maclean Hunter Mkt. Reports*, 44 F.3d 61 (2d Cir. 1994).

In *Practice Management*, the Ninth Circuit ruled that a federal agency's adoption of the American Medical Association's ("AMA") copyrighted medical procedure code as the required standard for preparation of Medicare and Medicaid claims did not invalidate the code's copyright. The Ninth Circuit specifically rejected the argument, persuasive to the Fifth Circuit in this case, that because the use of the copyrighted code was mandated, the code as an expression had merged with the fact of the industry standard. The Ninth Circuit ruled that there was no merger because the AMA's copyright did not "prevent ... the AMA's competitors from developing comparative or better coding systems and lobbying the federal government ... to adopt them." 121 F.3d at 520 n.8. There could be no starker conflict with the Fifth Circuit's holding below that SBCCI's model code merged with the "'idea' that constitutes local law." *Veeck v. S. Bldg. Code Congress Int'l*, 293 F.3d 791, 801 (5th Cir. 2002). The Ninth Circuit also rejected the defendant's argument, parallel to the argument made by Mr. Veeck, that *Banks v. Manchester*, 128 U.S. 244 (1888) (*see* pp. 12-15 below) required the invalidation of the AMA's copyright when its code became law. 121 F.3d at 518-19.

The Ninth Circuit's holding in *Practice Management* followed an earlier Second Circuit case, *CCC*, that had also rejected the very merger and public domain arguments that prevailed before the Fifth Circuit in this case. In *CCC*, the Second Circuit ruled that a state's adoption of a copyrighted compilation of used car valuations as a required standard for insurance valuation purposes did not cause the compilation to lose its copyright. 44 F.3d 61.

The Fifth Circuit's majority opinion ostentatiously disclaims any conflict with the decisions of the Second and Ninth Circuits, but the court's reasoning is murky and unpersuasive. The court nowhere explains how the distinctions it perceives actually affect the analysis under either *Banks* or the merger doctrine.

The first asserted difference, between "wholesale adoption of a model code" (the Fifth Circuit's description of this case) and "official incorporation of extrinsic standards" (its characterization of *Practice Management* and *CCC*), is inscrutable. If the court intended to suggest that Anna and Savoy, Texas, adopted SBCCI's code by republishing it in its entirety as a government work, it was incorrect. As the undisputed record shows and as the court elsewhere acknowledged, this case – as well as the Ninth and Second Circuit cases – involved copyrighted works that were incorporated by reference, and not republished as a whole by the government entity. *See* 293 F.3d at 794.

The Fifth Circuit also attempted to distinguish *Practice Management* and *CCC* in a second way, by asserting that they involved works that had a variety of purposes, while SBCCI's code was drafted for the sole purpose of being adopted as law. The opinion remarked, with regard to private groups that create standards for "reasons other than incorporation into law," that "[t]o the extent incentives are relevant to the existence of copyright protection, the authors in these cases [where incorporation into law was not the sole intended use] deserve incentives." 293 F.3d at 805. Presumably, according to the court's reasoning, SBCCI did not "deserve" the copyright incentive because it *wanted* its model codes to be adopted as law.

This distinction is nonsensical. The Copyright Act does not distinguish between deserving and undeserving authors. Surely entities that subsist on copyright revenues and promote public safety are as deserving as any of the copyright incentive. Moreover, the distinction between entities that may intend their works to be used only as legislation and those whose works are intended for a variety of purposes is not recognized in copyright law. Copyright protection does not hinge on the author's subjective purpose in creating a work. The Constitutional basis of copyright law is to "promote the progress of science and useful arts," not to encourage works dedicated to particular purposes.

### 2. The Conflict Between the Circuits Causes a Host of Practical Problems for Standards Developers.

The conflict between the decision below and the decisions of the Second and Ninth Circuits leaves standards developers in serious doubt as to the copyright status of their model codes and standards. The consequence of this uncertainty is to throw the operations of standards developers throughout the nation into turmoil.

The negative effects of the Fifth Circuit's decision are clear given the contrary rulings in other circuits. In future disputes about the copyright status of enacted model codes and standards, the parties will race each other to file suit in a jurisdiction that is sympathetic to their respective positions. *Amici* that reside in the Fifth Circuit may need to enforce their copyrights outside the Fifth Circuit, while those who seek to copy codes and standards developed outside the Fifth Circuit may seek refuge in that circuit's courts. The risk of inconsistent and contradictory holdings with respect to the same codes and standards is great. The decision may also subject standards developers to the risk of being accused of copyright misuse if they continue to enforce copyright in model codes and standards that have been adopted by government bodies.[5]

---

[5] The opinion below distinguishes between "codes" and something it calls "extrinsic standards" without defining either term, although it

This Court should grant certiorari in order to resolve the critical uncertainty that has resulted from the split between the circuits.

## B. The Decision Below Threatens to Destroy the Beneficial Relationship Between Standards Developers and Governments.

As discussed above, governments at all levels have benefited from the work of private, nonprofit standards developers for more than a century. The decision below threatens to replace this beneficial relationship with an adversarial one because the Fifth Circuit's ruling, in effect, retrospectively declares that governments across the country have effected a massive, unintended taking of the model codes and standards they have adopted. *See CCC*, 44 F.3d at 74 ("a rule that the adoption of such a reference by a state legislature or administrative body deprived the copyright owner of its property would raise very substantial problems under the Takings Clause of the Constitution"); *Veeck v. S. Bldg. Code Congress Int'l*, 49 F. Supp. 2d 885, 889 n. 1 (E.D. Tex. 1999) (policy considerations that disfavor Mr. Veeck's position include "substantial problems under the Takings Clause of the Constitution"). With a single stroke, the Fifth Circuit has divested standards developers of an important and valuable property interest and has effectively deprived governments of the option to use copyrighted works to provide high quality safety and other regulations for their citizens.

---

appears to rule that the two types of works, both privately developed and adopted as law by governments, should be treated in diametrically opposite ways. The opinion does not give standards developers, many of which denominate some of their works for practical, historical, and other reasons as "codes," sufficient information to understand which of their works fall into which category. This, in turn, creates further confusion and difficulty for standards developers.

The judicial expropriation of the standards developers' copyrights is unfair to both the standards developers and the government bodies that have come to rely on their work. The unfairness to the standards developers is obvious, but the decision has damaging consequences for government entities as well. It transforms a government's adoption by reference – an act undertaken to provide high quality regulation at no taxpayer expense – into an unintended and unwanted taking. As Judge Higginbotham observed in dissent below (293 F.3d at 806), the municipalities made an entirely rational decision in adopting SBCCI's code:

> The cities could have hired counsel and engineers to draft a code, recouping its expense either from all taxpayers or by charging a fee to users for a copy of its ordinance. A city could also decide, on behalf of the citizens, to license a finished copyrighted work. Either is a decision by elected representatives.

The opinion below dismisses the takings problem as follows: "This is not, however, a 'takings' case, not least because SBCCI urged localities to adopt its model codes." *Veeck*, 293 F.3d at 803. This dismissive statement does not withstand analysis. The fact that SBCCI made its model codes available for adoption by government in no way amounts to SBCCI's consent to the nullification of its copyright. Indeed, it is undisputed that SBCCI unfailingly and expressly asserted its copyright in its model codes.

Lastly, to compound the takings problem, the majority opinion below rides roughshod over 17 U.S.C. § 201(e), which provides that "no action by any governmental body or other official or organization purporting to seize, expropriate, transfer, or exercise rights of ownership with respect to the copyright ... shall be given effect under this title." Although the opinion ignores this provision of the Copyright Act, it implies that no expropriation has occurred because SBCCI voluntarily offered up its model codes for adoption by local

government. This reasoning suffers from an insuperable logical flaw: SBCCI offered its model codes for adoption by reference, not copyright invalidation.

## III. THE DECISION BELOW IS WRONG ON THE MERITS.

### A. The Fifth Circuit Misinterpreted This Court's Cases.

In holding that two small Texas towns had, by adopting SBCCI's model code, destroyed SBCCI's copyright in that work, the court below grossly misconstrued two nineteenth century cases of this Court, *Wheaton v. Peters*, 33 U.S. 591 (1834), and *Banks v. Manchester*, 128 U.S. 244 (1888). Those cases, at most, stand for the proposition that a private individual may not, by publishing judicial opinions, acquire a copyright in them. The Fifth Circuit's sweeping interpretation of these cases as holding that "the law," regardless of its source, "is not subject to federal copyright law," 293 F.3d at 800, is erroneous. As shown below, this Court has never addressed the important questions presented by this case. It should do so now and reverse the incorrect and harmful decision below.

Although the Fifth Circuit relied on *Wheaton* in arriving at its decision, this Court's narrow holding in that case has little relevance here. In *Wheaton*, the reporter of this Court's decisions asserted copyright in the compiled volumes. The principal question before the Court was whether the reporter's copyright claim, if any, arose from common law as well as under the copyright statutes. The Court held that it did not. 33 U.S. at 661-62. The Court further remarked that "no reporter has or can have any copyright in the written opinions delivered by this court; and ... the judges thereof cannot confer on any reporter any such right." *Id.* at 667.

This dictum in *Wheaton* became the foundation for *Banks*. In *Banks*, the plaintiff, which enjoyed an exclusive contract to publish decisions of the Ohio Supreme Court, sued a competing publisher that reprinted decisions the plaintiff had purported to copyright. This Court held that the defendant could not be liable for copyright infringement because the plaintiff was not the author of the decisions. 128 U.S. at 252-53. Indeed, this Court continued, even the judges themselves could not claim copyright: "In no proper sense can the judge who, *in his judicial capacity*, prepares the opinion or decision ... be regarded as their author or their proprietor ... so as to be able to confer any title by assignment on the state sufficient to authorize it to take a copyright for such matter." 128 U.S. at 253 (emphasis added).

The reasoning underlying this holding was that judges "can have no pecuniary interest or proprietorship, as against the public at large, in the fruits of their judicial labors. This extends to whatever work they perform in their *capacity as judges* ...." *Id.* (emphasis added). Because judges are public servants, their work product is inextricably part of the public domain. Thus, "[t]he whole work done by the judges constitutes the authentic exposition and interpretation of the law, which, binding every citizen, is free for publication to all." 128 U.S. at 253.

The holdings of both *Wheaton* and *Banks* rest primarily on the *public* nature and authorship of judicial opinions. *Wheaton* and *Banks* have no applicability to the present case, in which a *private* organization, not a public servant, has created an indisputably copyrighted work that has subsequently been incorporated into law. The fact that a municipality adopts a privately authored work does not change the fact that it was privately authored. *Banks* and *Wheaton* simply do not address the question whether a municipality's adoption of a privately authored, copyrighted work as its ordinance vitiates the copyright.

In relying on *Wheaton* and *Banks* as authority for the sweeping rule announced in the decision below, the Fifth

Circuit employed the "metaphorical concept of citizen authorship,"[6] 293 F.3d at 798, to eviscerate the copyrights of thousands of privately authored works nationwide. Yet by invoking the "metaphorical" concept of "citizen authorship," the court below sidestepped the real and undeniable fact of *private* authorship of model standards and codes. Unlike the judicial opinions at issue in *Wheaton* and *Banks*, the SBCCI code at issue here did not originate in the public domain. There simply is no "citizen author" in the case now before this Court.

Moreover, this Court decided *Banks* and *Wheaton* before the system of private development of standards was even in its infancy. The First Circuit recognized this fact in *Building Officials and Code Administrators International, Inc. v. Code Technology, Inc.*, 628 F.2d 730, 736 (1st Cir. 1980) ("*BOCA*"), in remarking that "the rule denying copyright protection to judicial opinions and statutes grew out of a much different set of circumstances ...." See also *Veeck*, 293 F.3d at 808 (Wiener, J., dissenting) ("Technical codes and standards have become necessary, pervasive, and indispensable ingredients of Twenty-First Century life in this country."); 1 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 5.06[C] at 5-94 (2001) (in view of the "increasing trend toward state and federal adoptions of model codes," the refusal to recognize the copyright in a model code when it has been adopted as law "could ... prove destructive of the copyright interest in encouraging creativity").[7]

---

[6] This phrase derives from *Building Officials and Code Administrators International, Inc. v. Code Technology, Inc.*, 628 F.2d 730, 734 (1st Cir. 1980), not any decision of this Court.

[7] As discussed above at pp. 4-6, Congress and the executive branch also have recognized the increasing importance to government of privately developed model standards and codes in the century since this Court decided *Banks*.

The Fifth Circuit's mistaken reliance on *Wheaton* and *Banks* to destroy a well-functioning system of private standards development that has benefited the public in increasing measure for over a century and is recognized in federal law is a grievous error. This Court should grant the writ and restore the standards development system, which is critical to our nation's safety and health.

### B. The Fifth Circuit's Application of the Merger Doctrine Is Illogical and Unsupported in Law.

In relying on the "merger" doctrine to justify its invalidation of SBCCI's copyright, the Fifth Circuit stretches that limited doctrine far past its breaking point.

Until the decision below, "merger" was thought to occur when the expression sought to be copyrighted was inseparable from the idea or fact that it expressed. In such a case, the only way to keep the idea or fact circulating freely was to preclude copyright in the expression. *See, e.g., Harper & Row v. Nation Enters.*, 471 U.S. 539, 556 (1985); *Baker v. Selden*, 101 U.S. 99 (1879).

Whether or not a "fact" or "idea" is inseparable from its expression is generally a context-driven determination, not something that can simply be declared, as a matter of law, without analysis. *See, e.g., Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930) (L. Hand, J.) (describing this analysis in what has become known as the "abstractions" test). The Ninth Circuit in *Practice Management* well understood this point when it rejected the argument that a medical code "merged" with the law when a federal agency mandated the code's use as part of its Medicaid regulations. The court pointed out that the code at issue was not the only way to express the facts and ideas involved and that the code's copyright "does not stifle independent creative expression in the medical coding industry." *Practice Management*, 121 F.3d at 520 n. 8. Maintaining the owner's copyright in a government-adopted

work, said the court, "does not prevent competitors from developing better coding systems and lobbying the federal government and private actors to adopt them. It simply prevents wholesale copying of an existing system." *Id.*

The opinion below utterly fails to engage in the sort of reasoned examination of merger undertaken in *Practice Management*. It does not examine any of the other current model building codes, which exemplify the variety of expressive possibilities for the "idea" or "fact" of a building code. Nor does it even assert that the only way to express the underlying "facts" or "ideas" of SBCCI's model code is as SBCCI actually expressed them in the 900 pages of its model code. These missing analyses are necessary prerequisites for a finding of merger. *See, e.g.,* 4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 13.03[A][1][a]-[d] at 13-31 – 13-44 (2001) and cases cited (describing the various parameters of the complex inquiries necessary to determine whether merger has occurred).

The *en banc* court did not engage in these traditional analyses at all. Instead, it created a wholly new species of merger doctrine in which a previously copyrighted expression *instantaneously* loses its copyright status upon "merger" with an enacted local ordinance. Thus, the court below simply declared that SBCCI's codes "are 'facts' under copyright law. They are the unique, unalterable expression of the 'idea' that constitutes local law." 293 F.3d at 801. The *en banc* court held, in effect, that because it is a fact that Anna and Savoy have adopted SBCCI's model code as law, that model code loses its copyright and may be copied in its entirety. This logic is entirely circular.

The error lies in conflating the adoption of the model code with the model code itself. While adoption of the code is a fact, the code itself is a complex and copyright-protected expression of a multitude of ideas. The Fifth Circuit's shaky logic could apply to subvert the copyright in any number of works that are unquestionably not "merged" with the ideas they express, as demonstrated in SBCCI's petition at p. 21.

Had the *en banc* majority properly considered the variety of model building codes, the court would have agreed with the district court that SBCCI's model code is only one example of many possible expressions of a building code. *See Veeck v. SBBCI,* 49 F. Supp. 2d 885, 890 (E.D. Tex. 1999). Other codes with the same prescriptive effect might use different terminology and could be organized in different ways. *See Practice Management,* 121 F.3d at 520 n.8. Thus, the Fifth Circuit's unwarranted extension of merger doctrine to destroy SBCCI's copyright has nothing to do with the doctrine of merger as it has developed over the years since *Baker v. Selden.* This Court should grant the writ to address this important issue of copyright law.

### C. The Fifth Circuit Overreaches by Addressing an Illusory Problem of Access.

Underlying the decision of the court below is a misplaced concern that copyright protection is likely to limit or restrict access to copyrighted material. 293 F.3d at 800. This concern stems from the so-called "public domain doctrine," *see BOCA,* 628 F.2d at 734, under which, as a matter of due process, citizens must "have notice of what the law requires of them." The *en banc* court's concern is unjustified; if anything, the copyrighted status of model codes makes them more, rather than less, freely available to citizens who desire to have notice of what the law requires.

As a preliminary matter, the protections afforded by copyright encourage access to and dissemination of copyrighted expression. "[I]t should not be forgotten that the Framers intended copyright itself to be the engine of free expression. By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and *disseminate* ideas." *Harper & Row,* 471 U.S. at 577 (emphasis added). Thus, the Fifth Circuit's anxiety that

a copyright holder would monopolize the protected expression to the public's detriment is not only misplaced, but contrary to the foundational assumptions that underlie the copyright system. Built into the copyright system and the case law interpreting it is every incentive for SBCCI to make its codes widely available to the public. Copyright law also includes safeguards, discussed below, that make it impossible for SBCCI to limit access in the way the Fifth Circuit evidently feared.

As an empirical matter, it is true that SBCCI does not provide copies of its codes free of charge. As the record shows, Mr. Veeck paid $72.00, or eight cents per page, for an electronic version of SBCCI's 900-page model code. Had he retrieved a copy of the code from the clerk's office in Anna or Savoy, however, he would have had to spend many hours – and many quarters – at a photocopier. Obtaining a copy of a lengthy document is never cost-free, and the Fifth Circuit's abstract pronouncements about "free" access do not change these practical realities.[8]

The critical question is not whether copies may be obtained free of charge, but whether citizens are free to consult them. The answer is clear: they are, and neither SBCCI nor any other standards drafting organization known to *amici* has ever contended otherwise. Had Mr. Veeck merely wanted to read the building codes of Anna and Savoy, instead of obtaining personal copies of the code in its entirety, he could have consulted the towns' clerk's office, where they were available, and read them free of charge, as he would have had to do with any other ordinance enacted by Anna or Savoy. SBCCI's copyright in no way prevents that kind of use.

In choosing to adopt copyrighted model codes and standards as law, government bodies have exercised their judgment that the use of such works is the best, most cost-effective way to obtain high quality standards and make them available to their citizens. Courts should defer to their judgments. *See Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982) ("A legislative body is in a far better position than a court to form a correct judgment concerning ... the means by which information concerning the law is disseminated in the community, and the likelihood that innocent persons may be harmed by the failure to receive adequate notice."). Indeed, the district court, which heard evidence on this point, found that "the citizens of the communities wherein these codes have been adopted do have access to them." 49 F. Supp. 2d at 889.

Thus, the Fifth Circuit has fashioned a remedy for a non-existent problem. It is a remedy that is breathtaking in its extremity, for under the majority holding, any town in the United States that references a copyrighted work in its laws unwittingly destroys the copyright protection in that work.

There is no need to go that far. Were some hypothetical standards development organization to behave so irrationally as to restrict access, reasonable use, or copying by citizens affected by particular codes, the Copyright Act would guarantee the public's access to the enacted codes under the doctrine of fair use. *See* 17 U.S.C. § 107 (1992). Moreover, as Professor Nimmer has additionally proposed, "failure to observe ... due process notice requirements could readily constitute a defense for one charged with violation of the non-publicized law." *See* 1 NIMMER, § 5.06[C], at 5-94. Compulsory licensing could also serve as a remedy should an appropriate case ever arise. *See Practice Management*, 121 F.3d at 519 (suggesting remedies for unavailability,

---

[8] State agencies around the country charge for on-line access to their states' electronic records, which include statutory and legislative text. *See, e.g.*, Ky. Rev. Stat. Ann. § 61.874 (6) (2000). Nothing in the Due Process Clause or *Banks* entitles citizens to free personal copies of a 900-page building code.

including fair use and due process defenses and mandatory licensing). S*ee also CCC Info. Servs.*, 44 F.3d at 73-74 & n.30.

The problem of access is illusory. This Court should grant certiorari in order to correct the Fifth Circuit's ruling, which needlessly destroyed SBCCI's copyright in the name of preserving access.

## CONCLUSION

For the reasons set forth above, *amici* respectfully request that the Court grant the writ of certiorari.

Respectfully submitted,

MAUREEN BRODOFF
VICE PRESIDENT AND
 GENERAL COUNSEL
NATIONAL FIRE PROTECTION
 ASSOCIATION
1 Batterymarch Park
Quincy, MA 02269
(617) 770-3000

CLAIRE LAPORTE
THOMAS M.S. HEMNES
VICKIE L. HENRY
JESSICA M. SILBEY
JULIET S. SORENSEN
FOLEY HOAG LLP
  155 Seaport Boulevard
  Boston, MA 02210
  (617) 832-1000
*Counsel for Amici Curiae*

Dated:  October 2002

20