**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN SOCIETY FOR TESTING AND MATERIALS d/b/a ASTM INTERNATIONAL;<br><br>NATIONAL FIRE PROTECTION ASSOCIATION, INC.; and<br><br>AMERICAN SOCIETY OF HEATING, REFRIGERATING, AND AIR CONDITIONING ENGINEERS,<br><br>   Plaintiffs/<br>   Counter-Defendants,<br><br>v.<br><br>PUBLIC.RESOURCE.ORG, INC.,<br><br>   Defendant/<br>   Counter-Plaintiff. | Case No. 1:13-cv-01215-TSC |

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR SECOND MOTION FOR**
**SUMMARY JUDGMENT AND FOR A PERMANENT INJUNCTION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................3

    A.    Prior Proceedings In This Court ..................................................................3

        1.    Factual Background .............................................................................3

        2.    This Court's Summary Judgment Decision And Permanent Injunction ...................................................................................5

    B.    The D.C. Circuit's Holdings And Directions For Remand......................7

    C.    Proceedings And Facts Developed On Remand ......................................8

ARGUMENT ....................................................................................................................10

I.    Plaintiffs Are Entitled To Summary Judgment On Their Copyright Claims....................10

    A.    Plaintiffs Own Valid Copyrights In The Works .....................................10

    B.    PRO Cannot Meet Its Burden To Show That Its Indiscriminate, Wholesale Copying Of Plaintiffs' Works Is Fair Use ............................................12

        1.    Factor 1:  PRO's Use Is Not Transformative, Its Purpose Is The Same Purpose That Plaintiffs Already Serve, And PRO Fails To Satisfy The D.C. Circuit's "Essential To Comply With Any Legal Duty" Test ...................................................................................13

            a.    PRO's alleged goal of facilitating access is not transformative because Plaintiffs already serve this purpose. .......................................................................14

            b.    PRO cannot meet its burden to show that its postings of Plaintiffs' standards are essential to complying with a legal duty. ............................................................................16

        2.    Factor 2:  Plaintiffs' Copyrighted Works Are Important To Advance The Progress Of Science And The Useful Arts .........................24

        3.    Factor 3:  PRO Copies The Entirety Of The Works—It Does Not Even Attempt To Limit Its Copying And Distribution To Portions Of Standards That Are Essential To Complying With The Law .............24

        4.    Factor 4:  PRO's Substitutional Use Undermines The Actual And Potential Markets for Plaintiffs' Works ....................................25

II.    Plaintiffs Are Entitled To Summary Judgment On Their Claims Of Trademark Infringement And False Designation Of Origin ..............................................................31

# TABLE OF CONTENTS
## (continued)

**Page**

A.    Nominative Fair Use Is An Affirmative Defense ...................................................32

B.    PRO Cannot Meet Its Burden To Establish Any Of The Three Nominative Fair Use Factors ...............................................................................................33

III.   Plaintiffs Are Entitled To A Permanent Injunction ..........................................38

A.    Plaintiffs Will Suffer Irreparable Harm Without An Injunction...........................38

    1.    Economic Harm And Ramifications To Plaintiffs' Business Model.........38

    2.    Harm To Plaintiffs' Right To Exclude Caused By Repeat Infringement.................................................................................................40

    3.    Harm To Plaintiffs' Reputations .................................................................41

B.    Remedies Available At Law Are Inadequate.........................................................42

C.    The Balance Of Hardships Favors Issuing An Injunction ....................................43

D.    The Public Interest Favors Issuing An Injunction. ...............................................44

CONCLUSION....................................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*Am. Geophysical Union v. Texaco Inc.*,
  60 F.3d 913 ................................................................................................................14

*Am. Soc'y for Testing & Materials, et al. v. Public.Resource.Org, Inc.*,
  896 F.3d 437 (D.C. Cir. 2018) ......................................................................... *passim*

*Am. Soc'y for Testing & Materials v. Public.Resource.org, Inc.*,
  No. 13-CV-1215 (TSC), 2017 WL 473822 (D.D.C. Feb. 2, 2017) ................................. *passim*

*Australian Gold, Inc. v. Hatfield*,
  436 F.3d 1228 (10th Cir. 2006) ......................................................................................35

*Authors Guild, Inc. v. HathiTrust*,
  755 F.3d 87 (2d Cir. 2014).............................................................................14, 16, 20

*Authors Guild v. Google, Inc.*,
  804 F.3d 202 (2d Cir. 2015)...........................................................................20, 25, 27

*Bell Hellicopter Textron Inc. v. Airbus Helicopters*,
  78 F. Supp. 3d 253 (D.D.C. 2015) ..................................................................................42

*BMG Music v. Gonzalez*,
  430 F.3d 888 (7th Cir. 2005) ..........................................................................................29

*Breaking the Chain Found. v. Capitol Educ. Support, Inc.*,
  589 F. Supp. 2d 25 (D.D.C. 2008) ..........................................................................40, 41

*Cambridge Univ. Press v. Patton*,
  769 F.3d 1232 (11th Cir. 2014) .....................................................................................26

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994)......................................................................................... *passim*

*Capitol Records, LLC v. ReDigi Inc.*,
  910 F.3d 649 (2d Cir. 2018)............................................................................................31

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).........................................................................................................12

*Century 21 Real Estate Corp. v. Lendingtree, Inc.*,
  425 F.3d 211 (3d Cir. 2005)......................................................................................32, 33

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Chrysler Corp. v. Newfield Publ'ns*,
  880 F. Supp. 504 (E.D. Mich. 1995) ................................................................................33

*Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*,
  843 F.2d 600 (1st Cir. 1988) .........................................................................................44

*David's Bridal, Inc. v. House of Brides, Inc.*,
  No. 06 Civ. 5660 (SRC), 2010 WL 323306 (D.N.J. Jan. 20, 2010) ........................................34

*eBay Inc. v. MercExchange, LLC*,
  547 U.S. 388 (2006) ..................................................................................................6, 38

*Fox News Network, LLC v. TVEyes, Inc.*,
  883 F.3d 169 (2d Cir. 2018) ..........................................................................12, 13, 14, 16

*Fox Television Stations, Inc. v. Filmon X LLC*,
  966 F. Supp. 2d 30 (D.D.C. 2013) ...........................................................................42, 44, 45

*Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*,
  774 F.3d 192 (3d Cir. 2014) ..........................................................................................40

*Hanley-Wood LLC v. Hanley Wood LLC*,
  783 F. Supp. 2d 147 (D.D.C. 2011) ..................................................................................41

*Harper & Row Publishers, Inc. v. Nation Enters.*,
  471 U.S. 539 (1985) ...............................................................................................25, 26

*Home Box Office, Inc. v. Showtime/The Movie Channel Inc.*,
  832 F.2d 1311 (2d Cir. 1987) .........................................................................................35

*Infinity Broad. Corp. v. Kirkwood*,
  150 F.3d 104 (2d Cir. 1998) ......................................................................................14, 16

*Int'l Info. Sys. Sec. Certification Consortium v. Sec. Univ., LLC*,
  823 F.3d 153 (2d Cir. 2016) ..........................................................................................32

*Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.*,
  846 F.2d 1079 (7th Cir. 1988) ........................................................................................36

*Kizas v. Webster*,
  492 F. Supp. 1135 (D.D.C. 1980), *aff'd*, 770 F.2d 524 (D.C. Cir. 1983) ...............................17

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
543 U.S. 111 (2004)...........................................................................................32

*Mary Kay, Inc. v. Weber*,
601 F. Supp. 2d 839 (N.D. Tex. 2009) ..............................................................32

*Mazer v. Stein*,
347 U.S. 201 (1954)...........................................................................................31

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster*,
518 F. Supp. 2d 1197 (C.D. Cal. 2007) ............................................................40

*MOB Music Publ'g. v. Zanzibar on the Waterfront, LLC*,
698 F. Supp. 2d 197 (D.D.C. 2010)...................................................................11

*New Kids on the Block v. News Am. Publ'g, Inc.*,
971 F.2d 302 (9th Cir. 1992) .............................................................................33

*Presidio Components, Inc. v. Am. Technical Ceramics. Corp.*,
702 F.3d 1351 (Fed. Cir. 2012)..........................................................................38

*Roeslin v. District of Columbia*,
921 F. Supp. 793 (D.D.C. 1995) ........................................................................11

*S & R Corp. v. Jiffy Lube Int'l, Inc.*,
968 F.2d 371 (3d Cir. 1992)................................................................................40

*Soc'y of the Holy Transfiguration Monastery, Inc. v. Archbishop Gregory of
Denver, Colorado*,
685 F. Supp. 2d 217 (D. Mass. 2010), *aff'd* 689 F.3d 29 (1st Cir. 2012)...............14

*TechnoMarine SA v. Giftports, Inc.*,
758 F.3d 493 (2d Cir. 2014)...............................................................................40

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*,
610 F.3d 1171 (9th Cir. 2010) .....................................................................32, 34

*TrafficSchool.com, Inc. v. Edriver Inc.*,
653 F.3d 820 (9th Cir. 2011) .............................................................................36

*Triad Sys. Corp. v. Se. Express Co.*,
64 F.3d 1330 (9th Cir. 1995) .............................................................................44

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Trout v. Garrett*,
  780 F. Supp. 1396 (D.D.C. 1991) ..............................................................11, 31, 33

*Veeck v. S. Bldg. Code Cong. Int'l*,
  293 F.3d 791 (5th Cir. 2002) ............................................................................33, 34

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*,
  342 F.3d 191 (3d Cir. 2003).....................................................................................16

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
  227 F.3d 1110 (9th Cir. 2000) .........................................................12, 13, 14, 25

**FEDERAL STATUTES**

5 U.S.C. § 552.............................................................................................................3, 4

5 U.S.C. § 552(a)(1)........................................................................................................6

15 U.S.C. § 1051............................................................................................................32

15 U.S.C. § 1116............................................................................................................38

17 U.S.C. § 101..............................................................................................................42

17 U.S.C. § 102(b)....................................................................................................6, 12

17 U.S.C. § 105................................................................................................................6

17 U.S.C. § 107........................................................................................................12, 31

17 U.S.C. § 107(1).........................................................................................................13

17 U.S.C. § 107(2).........................................................................................................24

17 U.S.C. § 107(3).........................................................................................................24

17 U.S.C. § 107(4).........................................................................................................25

17 U.S.C. § 410(c).........................................................................................................11

17 U.S.C. § 502(a).........................................................................................................38

17 U.S.C. § 504(c).........................................................................................................43

**TABLE OF AUTHORITIES**
(continued)

Page(s)

42 U.S.C. § 6833(b)(2)(A) ..............................................................................19

42 U.S.C. § 6833(b)(2)(B)(i) ...........................................................................19

**STATE STATUTES**

Alaska Stat. Ann. § 44.42.067(b)-(c) ..............................................................30

Md. Public Safety Code § 9-303 ......................................................................30

Tex. Agric. Code Ann. § 17.072 ......................................................................30

**FEDERAL REGULATIONS**

10 C.F.R. § 433.4 .............................................................................................20

40 C.F.R. § 2.2.4.3(d) ......................................................................................18

40 C.F.R. § 2.2.6 ..............................................................................................18

40 C.F.R. § 63.14 .............................................................................................21

40 C.F.R. § 86.113-04(a)(1) .............................................................................17

40 C.F.R. § 1065.710 .......................................................................................18

46 C.F.R. § 56.50-105(a)(1)(ii) ........................................................................15

46 C.F.R. § 56.01-2 ..........................................................................................19

46 C.F.R. § 56.25-20(b) ....................................................................................19

46 C.F.R. § 56.60-2 ..........................................................................................21

46 C.F.R. § 119.440 ..........................................................................................21

59 C.F.R. 130 ...................................................................................................15

**STATE REGULATIONS**

30 Tex. Admin. Code § 217.326 .......................................................................30

vii

**TABLE OF AUTHORITIES**
(continued)

Page(s)

CONSTITUTIONAL PROVISIONS

U.S. Const. Article I, § 8, cl. 8.....................................................................................................24

OTHER AUTHORITIES

3 M. Nimmer & D. Nimmer,
    Nimmer on Copyright § 13.05[A][4] (1993) ..........................................................................26

Pierre N. Leval, *Toward a Fair Use Standard*,
    103 Harv. L. Rev. 1105 (1990) ..............................................................................................14

## INTRODUCTION

The D.C. Circuit remanded for this Court to consider Public.Resource.Org's ("PRO") affirmative defenses of copyright and trademark fair use on a standard-by-standard basis.[1]  The D.C. Circuit did not decide whether PRO's defenses would apply to any or all of the standards that had been incorporated by reference.  Indeed, the court recognized "it may . . . turn out that PRO . . . use[s] incorporated standards in a manner not encompassed by the fair use doctrine." *Am. Soc'y for Testing & Materials, et al.  v. Public.Resource.Org, Inc.*, 896 F.3d 437, 447 (D.C. Cir. 2018) ("*ASTM II*").  That is exactly how it has turned out.  Under the fair use framework that the D.C. Circuit said must apply in this case,[2] PRO's fair use defense fails as a matter of law.

The D.C. Circuit's opinion makes clear that the key question on copyright fair use is whether the specific text PRO copied and distributed is "*essential* to complying with [a] legal duty," as compared to just "help[ing] inform one's understanding of the law."  *ASTM II*, 896 F.3d at 450 (emphasis added).  If PRO cannot show that everything it copied and distributed imposes "legally binding requirements" or "legal obligations," then PRO cannot meet its burden to prove that its use was fair.  *Id.* at 442-43.  PRO has not done the work the D.C. Circuit said it must.  Plaintiffs asked PRO to identify, *inter alia*, which portions of each incorporated standard are alleged to impose binding legal obligations on individuals or entities.  2d Supp. SMF ¶¶ 30.

---

[1] Plaintiffs move for summary judgment on 217 of their copyrighted standards ("Works"), identified in Appendix A, all of which PRO copied and freely distributed online.

Plaintiffs cite to their previously filed Statements of Material Fact, Dkt. 118-2 Plaintiffs' Statement of Material Facts ("SMF"), Supplemental Statements of Material Fact, Dkt. 155-1 ("Supp. SMF"), and supporting evidence.  Plaintiffs have supplemented those statements of material facts with additional facts cited in Plaintiffs' Second Supplemental Statement of Material Facts ("2d Supp. SMF"), filed concurrently herewith.

[2] Plaintiffs respectfully disagree with the D.C. Circuit's bases for reversing this Court's prior fair use ruling.  Regardless, PRO cannot meet its burden under the fair use framework articulated by the D.C. Circuit.

PRO's response makes clear it will not be concerned with the D.C. Circuit's direction.   PRO would say only that, if "[t]he entirety of [a] standard . . . is incorporated by reference," then PRO can copy and distribute en masse everything between the covers without concerning itself with what, if anything, between those covers imposes a legal duty.   *Id.* ¶¶ 31-32 (quoting PRO Interrog. Resp. No. 19 at p. 14, *id.* No. 21, at p. 25).   PRO cannot so shirk its obligations under the D.C. Circuit's opinion.   That court could not have been clearer in rejecting PRO's contention that all standards incorporated by reference and all parts of those standards can be treated "*interchangeably*."   *ASTM II*, 896 F.3d at 449 (emphasis added).

PRO cannot meet its burden to show fair use under the D.C. Circuit's legal test for *any* of the Works in issue here.   For many of the Works, PRO has not identified authority (in the cover sheets that it places in front of its copies of the standards, or anywhere else) that incorporates the specific Work by reference *at all*.   2d Supp. SMF ¶¶ 36 (a), (c), (e)-(f), (k), (n), (p)-(u), (aa)-(dd), (hh), (qq), (vv), (iii), (nnn), (ppp).   These are a subset of 95 (92 ASTM, 1 NFPA, 2 ASHRAE) Works for which PRO identifies inaccurate citations, including to regulations that do not exist and citations to authorities which incorporate a different or later version of the standard (*i.e.*, a different Work).   *Id.* ¶¶ 36, 37, 41, 42.   PRO cannot claim fair use as to these standards when it has not even identified an incorporation by reference.   Moreover, PRO cites to authorities that incorporate standards in a manner that the D.C. Circuit said was unlikely to give rise to fair use, including as "discretionary reference procedure[s]" and as an obligation for public not private actors.   *Id.* ¶¶ 43, 45-48; *ASTM II*, 896 F.3d at 443.   Beyond that PRO's copying and posting is over-inclusive for each and every one of the Works, which all contain a mix of material, including portions that impose no legally binding obligation and thus are "not essential to complying with any legal duty."   *Id.* at 450.   Many portions—including background information

on the history of Plaintiffs or the standard, informational notes, diagrams, and explicitly nonbinding appendixes—impose no legal duties (or were not incorporated at all).  2d Supp. SMF ¶¶ 49, 50-56, 59-68.  PRO cannot justify its indiscriminate copying as fair use.

PRO also cannot meet its burden to show that its mass use of Plaintiffs' logos and word marks qualifies for the affirmative trademark defense of nominative fair use, and PRO should be enjoined from doing so.  If, as it says, PRO's goal is to tell the public what "the law" is in various jurisdictions, PRO could simply provide the name of the jurisdiction and how that jurisdiction names its codes without using Plaintiffs' logos and word marks.

PRO has no new facts and no new law to change or challenge this Court's prior conclusions as to ownership, copyright validity, or any of the other issues this Court decided in *Am. Soc'y for Testing & Materials v. Public.Resource.org, Inc.*, No. 13-CV-1215 (TSC), 2017 WL 473822 (D.D.C. Feb. 2, 2017) ("*ASTM I*").  Plaintiffs are entitled to summary judgment and a permanent injunction to stop PRO's mass exploitation of their copyrights and trademarks.

## BACKGROUND

A.     **Prior Proceedings In This Court**

1.     **Factual Background**

Plaintiffs filed this action in August 2013, seeking to enjoin PRO's mass copying and distribution of Plaintiffs' Works and PRO's infringement of Plaintiffs' trademarks.

Plaintiffs are self-funded nonprofit 501(c)(3) organizations that are part of a "complex public-private partnership" for the development of voluntary consensus standards in fields like public safety, building and construction, and product testing.  *ASTM I*, 2017 WL 473822, at *2; *see also* SMF ¶¶ 9, 86, 130.  The standards Plaintiffs create are technical documents designed to be used by industry professionals.  Congress has recognized and preserved this partnership through statute, encouraging federal agencies to incorporate by reference, pursuant to 5 U.S.C.

§ 552.  *ASTM I*, 2017 WL 473822, at *3.  The creation of voluntary consensus standards and their incorporation by governmental entities "achieve several goals, including eliminating the cost to the federal [and state] government[s] of developing [their] own standards, encouraging long-term growth for U.S. enterprises, promoting efficiency, competition, and trade, and furthering the reliance upon private sector expertise."  *Id.* (citing OMB Revised Circular, at 14); *see also, e.g.*, SMF ¶¶ 95-98, 265-69.

Plaintiffs support their overall mission-driving activities and recoup the substantial cost (often in the millions or tens of millions of dollars) of creating their standards the way that copyright owners generally do.  They sell copies of the standards, including revised and updated versions, to members of the public who use them—typically, people in the affected industries who use the Works in their professional trade.  *See ASTM I*, 2017 WL 473822, at *4, 10-11; SMF ¶¶ 45-47, 106-08, 153-54.  Without copyright protection, Plaintiffs "will face significant difficulty raising the necessary revenue to continue producing high-quality voluntary consensus standards."  *ASTM I*, 2017 WL 473822, at *13 (citing Plaintiffs' and amici's arguments).  In addition to their sales and licensing activities, Plaintiffs make all of the Works available for free to the public on read-only websites they administer.  2d Supp. SMF ¶ 85.

PRO says it is devoted to "mak[ing] the law and other government materials more widely available so that people, businesses, and organizations can easily read and discuss [the] laws and the operations of government."  *ASTM I*, 2017 WL 473822, at *2 (quoting Dkt. 120-3, DSMF ¶¶ 1-2).  Yet, as is clear from its conduct, PRO serves an ideological function much more than a practical one.[3]  Before this litigation started, PRO copied the Works en masse, introducing errors

---

[3] While PRO claims its goal is to disseminate "the law," PRO has engaged in a campaign to copy and publish copyrighted materials that are not government authored and impose no legal obligations, including annotations of decisions interpreting statutes (a matter now before the

in the process, either by scanning them and using optical character recognition software to convert images of the scanned pages into text; or by having untrained individuals retype and reformat the text into HTML, SMF ¶¶ 182, 185, 188-91, 195, 214-216.  PRO posted its error-ridden copies of Plaintiffs' Works—which still bear Plaintiffs' word marks (and in some instances logos too)—on its website and on the Internet Archive, where any user could download, copy, or print them for free, without any restrictions on use of the standards or further dissemination.  *ASTM I*, 2017 WL 473822, at *3; SMF ¶¶ 23, 185, 201, 204.  Plaintiffs' Works have been downloaded tens of thousands of times (or more) from the PRO and Internet Archive sites.  SMF ¶¶ 241, 242; 2d Supp. SMF ¶¶ 98, 102.

### 2. This Court's Summary Judgment Decision And Permanent Injunction

Following nearly two years of intensive discovery, both sides moved for summary judgment on Plaintiffs' copyright and trademark infringement claims,[4] and Plaintiffs moved for a permanent injunction.  This Court granted Plaintiffs' motion (as well as the Plaintiffs' summary judgment motion in the AERA case, *see* No. 14-cv-0857) and denied PRO's motion. The Court's opinion resolved numerous issues, the vast majority of which the D.C. Circuit did not disturb.

*First*, the Court rejected PRO's challenge to Plaintiffs' ownership of the Works.  The Court held that Plaintiffs' production of registration certificates for the Works established a prima facie claim of copyright ownership, and that PRO failed to raise a triable issue on ownership.  *ASTM I*, 2017 WL 473822, at *6.

---

Supreme Court in *Georgia v. Public.Resource.Org, Inc.*, Case No. 18-1150 (to be argued December 2, 2019), and the Bluebook guide to legal citations, which Mr. Malamud purchased, rekeyed, and converted to XHTML, encouraging others to distribute it, *see* C. Malamud Ltr. to Dean M. Minow, Harvard Law School, *available at* https://law.resource.org/pub/us/code/blue/harvard.letter.pdf.

[4] Plaintiffs moved for summary judgment on nine representative Works.  PRO moved for summary judgment on all of Plaintiffs' Works.

*Second*, the Court found no merit in PRO's claim that the standards were noncopyrightable "system[s]" or "method[s] of operation" under 17 U.S.C. § 102(b).  The Court held that the standards "contain expression that is certainly technical but that still bears markings of creativity," and that "there are many possible forms of expression"—including competing standards—"through which the technical material in the standards could be conveyed."  *ASTM I*, 2017 WL 473822, at *9 (citations omitted).

*Third*, the Court rejected PRO's constellation of arguments that the copyrights in Plaintiffs' Works were "stripped upon the incorporation by reference."  *Id*. at *15.  The Court found nothing in the Copyright Act (including 17 U.S.C. § 105, which says that "work[s] of the United States Government" may not be copyrighted) supporting that result.  *Id*. at *10.  The Court further concluded that federal policy and legislation enacted against the backdrop of incorporation by reference embraced, and even encouraged, SDOs' copyrights while simultaneously ensuring the standards are "reasonably available to the class of persons affected thereby," 5 U.S.C. § 552(a)(1).  *Id*.  The Court rejected PRO's argument that common-law cases holding legal edicts authored by government officers in their capacities as such divested Plaintiffs' copyrights in their privately authored standards.  *Id.* at *11-14.  And the Court further rejected PRO's arguments for divestiture based on merger and *scènes à faire*.  *Id.* at *15.

*Fourth*, the Court rejected PRO's affirmative defenses of fair use under copyright and trademark law.  *Id.* at *15-18, 20-24.  These issues were the subject of the D.C. Circuit's opinion, which we discuss in the next section (and below in the argument section).

*Fifth*, the Court concluded that Plaintiffs had demonstrated that each of the permanent injunction factors favored that relief.  *Id.* at *24-25 (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)).  There was no doubt that PRO's ongoing threat of continued copyright

infringement posed an irreparable injury and that money damages would be an inadequate remedy. *Id.* at *24 (citing cases). The Court also concluded that the balance of harms and public interest favored an injunction. *Id.* at *25.

**B.      The D.C. Circuit's Holdings And Directions For Remand**

The D.C. Circuit reversed this Court's summary judgment order on the ground that the Court should reconsider PRO's copyright and nominative trademark fair use defenses under standards the D.C. Circuit articulated.

PRO's sole ground of appeal on copyright ownership was that the participation of federal government employees in the creation of certain standards rendered them noncopyrightable works of the U.S. Government. The D.C. Circuit rejected this argument on the ground that it was either "forfeited" (because PRO had not adequately presented it in the motions before this Court) or "meritless." *ASTM II*, 896 F.3d at 446.

On copyright validity, the D.C. Circuit declined to reach PRO's argument that incorporation stripped Plaintiffs' Works of copyright protection. The D.C. Circuit instead directed that this Court reconsider PRO's fair use defense. The D.C. Circuit faulted the parties for "treating the standards interchangeably," and directed reconsideration of PRO's defense on "a fuller record regarding the nature of each of the standards at issue, the way in which they are incorporated, and the manner and extent to which they were copied by PRO." *Id.* at 449.

On the first fair use factor—whether PRO's copying and distribution of Plaintiffs' Works is "transformative"—the D.C. Circuit set forth a sliding scale test:  with respect to each portion of each Work that PRO used, the pertinent question is whether the copied material merely "help[ed] inform one's understanding of the law" or whether it was "essential to complying with [a] legal duty." *Id*. at 450. If the former, PRO's use would be "less transformative" and not supportive of "wholesale copying"; if the latter, the factor would support PRO's fair use defense.

*Id.* The D.C. Circuit provided further direction with respect to the remaining fair use factors, including directing this Court to answer three specific questions about the harm to Plaintiffs' potential markets and the value of the Works. *Id*. at 453.

On Plaintiffs' trademark infringement claims, the D.C. Circuit directed this Court to reconsider PRO's affirmative defense of nominative fair use. The D.C. Circuit said that "it may well be that PRO overstepped when it reproduced both ASTM's logo and its word marks," but that this Court's analysis of that defense would "provide valuable insight both into whether trademark infringement has occurred and, if so, how broad a remedy is needed to address the injury." *Id.* at 456-57.

### C.      Proceedings And Facts Developed On Remand

Following the D.C. Circuit's decision, PRO reposted its versions of Plaintiffs' Works to the Internet Archive website. 2d Supp. SMF ¶ 11.

PRO did not do the standard-by-standard analysis that the D.C. Circuit instructed.

First, PRO has not produced any analysis of *how* the standards are incorporated by reference. For example, PRO did nothing to confirm that the Works in fact *are* incorporated by reference in the jurisdictions to which PRO cites on its cover pages and in its interrogatory responses (let alone whether they are *currently* incorporated by reference in the relevant jurisdiction). *See* 2d Supp. SMF ¶¶ 30-32. Nor has PRO analyzed how any incorporated by reference Work actually does (or does not) impose binding legal obligations on anyone. *See id.* Instead, PRO says that it "does not provide legal advice, and cannot provide advice regarding what legal obligations an individual or entity may face as a result of hundreds of different federal, state, and local laws," and it therefore does not engage in any analysis of which parts of standards have a legally binding effect. *Id.* ¶ 31 (PRO Interrog. Resp. No. 19 at p. 14).

Second, PRO has not shown that it is unable to paraphrase any (or any portions) of the standards or limit its postings to those portions of the standards actually essential to complying with a binding legal duty.   Instead, PRO states, without analysis, that "[t]he entirety of each standard" at issue here, "is incorporated by reference into the law, and it is therefore necessary to reproduce the entire standard verbatim in order to accurately state what the law is."   *Id.* ¶ 32 (quoting PRO Interrog. Resp. No. 21 at p. 25).

Instead of undertaking the prescribed standard-by-standard analysis and adjusting its activities accordingly, PRO responded to the D.C. Circuit's opinion by reposting wholesale copies of Plaintiffs' Works to the Internet Archive website.   2d Supp. SMF ¶ 11.   Today, anyone can freely download, copy, print, edit, and redistribute PRO's copies of Plaintiffs' standards from the Internet Archive website, regardless of whether those standards merely "help inform one's understanding" or whether they are "essential to complying with" the law.   *ASTM II*, 896 F.3d at 450; SMF ¶¶ 202, 209; 2d Supp. SMF ¶ 92.   PRO has done nothing to ensure that individuals will not download Plaintiffs' Works and use them for commercial purposes.   For instance, PRO does not use the Internet Archive's offerings that restrict access to content, *i.e.*, "borrowing" offered through Internet Archive's Open Library initiative, whereby "registered users can borrow books for two weeks, after which the loaned item expires and is removed from the user's device," or *encrypted* access to Digital Accessible Information SYstem (DAISY) for eligible blind or print-disabled individuals.   2d Supp. SMF ¶¶ 108-09; *see also* Supp. SMF ¶¶ 1-3 (regarding the Chafee Amendment and libraries for the visually impaired).   It is thus unsurprising that PRO's unauthorized copies of Plaintiffs' Works are available for purchase on the third-party website scribd.com.   *See* 2d Supp. SMF ¶¶ 105-06.

Moreover, notwithstanding PRO's claimed ignorance regarding *who* downloads the Works or how they use the copies they have made, 2d Supp. SMF ¶ 104 (quoting PRO Interrog. Resp. No. 23 at p. 34), PRO's documents show that numerous industry professionals and tradespeople have contacted PRO about the standards it copies and posts, *id.* ¶ 93 (PRO_00267293, engineer asking after remand from the D.C. Circuit, "Does Friday's decision mean you can update the site?"; PRO_00267241, engineering firm saying it heard about PRO from a "colleague" and asking "How might we access the documents you offer?"); PRO Interrog. Resp. No. 22 at p. 29).   Of course, these are the same people who use Plaintiffs' standards as part of their professional work—and who otherwise would either purchase a copy or access the relevant standard through Plaintiffs' free access websites. *Id.* ¶¶ 77, 93-94.

Other evidence confirms that PRO's postings of Plaintiffs' Works compete with and substitute for Plaintiffs' sales and offering of standards on their free access websites, harm that will increase if PRO is not enjoined. *Id.* ¶¶ 91-104.  Internet Archive's website is ranked in the top 300 websites around the world and reaches millions of people.  *Id.* ¶ 103.  As just one example, when Plaintiffs last moved for summary judgment, the 2011 NEC had been downloaded 30,350 times from the Internet Archive through February 2015.  SMF ¶ 242.  As of October 4, 2019 (approximately 13 months since PRO reposted the NEC to the Internet Archive website), the number is 40,151 and counting—meaning in just over a year, there have been nearly 10,000 *additional* downloads. 2d Supp. SMF ¶ 102.  The harm to Plaintiffs is growing.

## ARGUMENT

II.   **PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR COPYRIGHT CLAIMS**

A.   **Plaintiffs Own Valid Copyrights In The Works**

This Court already has ruled that Plaintiffs own copyrights in nine Works that were the subject of Plaintiffs' previous motion for summary judgment. *See ASTM I*, 2017 WL 473822, at

*7 ("Plaintiffs are the owners of the copyrights at issue and have standing to bring their claims."). Plaintiffs' registration certificates create a presumption of validity and ownership with respect to both Plaintiffs' individually registered works and to the original works that comprise Plaintiffs' registered compilations.[5]  *Id.* at *6-7; 17 U.S.C. § 410(c); *MOB Music Publ'g. v. Zanzibar on the Waterfront, LLC*, 698 F. Supp. 2d 197, 202 (D.D.C. 2010). Plaintiffs have registration certificates for each of the Works. 2d Supp. SMF ¶¶ 1-10. PRO's sole challenge to the ownership ruling was that the participation of government employees on some technical committees for developing standards rendered the Works noncopyrightable. The D.C. Circuit rejected that argument as either "forfeited" or "meritless." *ASTM II*, 896 F.3d at 446. This Court's prior ownership rulings are therefore law of the case for the nine Works on which Plaintiffs previously moved. *Trout v. Garrett*, 780 F. Supp. 1396, 1425 & n.71 (D.D.C. 1991).

The reasoning of the Court's prior decision applies with equal force to the other 208 standards in this motion. As with the previous standards, PRO has not and cannot come forward with any "evidence *disproving* Plaintiffs' authorship." *ASTM I*, 2017 WL 473822, at *7; *see also Zanzibar*, 698 F. Supp. 2d at 202; *Roeslin v. District of Columbia*, 921 F. Supp. 793, 797 (D.D.C. 1995) (finding that because the copyright registration listed plaintiff as the author, the "burden is thus on the defendant to establish" that plaintiff was not the author).[6] And this Court

---

[5] NFPA and ASHRAE's registrations and certain of ASTM's registrations were effective within five years of first publication of the Works. 2d Supp. SMF ¶¶ 7, 9, 10. As to the ASTM Works that were registered more than five years after the date of first publication, the Court already correctly determined that it will "accord[] these [registrations] the same evidentiary weight as if they had been registered within five years." *ASTM I*, 2017 WL 473822, at *7 (citing 17 U.S.C. § 410(c)).

[6] To the extent PRO's challenges to copyrightability were not forfeited, the D.C. Circuit reserved those questions for a future panel on "another day" and they are not the subject of this remand. *ASTM II*, 896 F.3d at 441 ("Because the district court erred in its application of both fair use doctrines, we reverse and remand, leaving for another day the far thornier question of whether standards retain their copyright after they are incorporated by reference into law.").

has already thoroughly considered and rejected PRO's arguments regarding copyrightability under § 102(b) and the effect of incorporation by reference on copyright. *See ASTM I*, 2017 WL 473822, at *7. There is no basis for reconsidering the Court's prior rulings now.

### B.   PRO Cannot Meet Its Burden To Show That Its Indiscriminate, Wholesale Copying Of Plaintiffs' Works Is Fair Use

The D.C. Circuit remanded for consideration of whether PRO's use—on a standard-by-standard basis—qualifies as "fair" under 17 U.S.C. § 107[7] as the D.C. Circuit construed that provision in this case. To be clear, Plaintiffs respectfully disagree that this Court's prior fair use determination was incorrect, or that the D.C. Circuit's delineation of the fair use factors is correct under the law of fair use as articulated by the Supreme Court and other courts around the country. Recognizing that the D.C. Circuit's opinion is the law of the case and must be followed on remand, Plaintiffs respectfully reserve their disagreements for further appellate proceedings.

But even under the D.C. Circuit's test, PRO's fair use defense cannot succeed. As the party claiming the affirmative defense of fair use, PRO carries both the evidentiary burden and ultimate burden of proof here. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994); *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 176 (2d Cir. 2018). At summary judgment, PRO must "make a sufficient showing" to establish its fair use defense. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If PRO cannot meet its burden on the balance of factors, its defense fails at summary judgment. *See Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1120 (9th Cir. 2000) (no fair use when first three factors weighed

---

[7] Fair use has four statutory considerations: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107.

against fair use and fourth was, at best, neutral); *TVEyes*, 883 F.3d at 181 (no fair use when first

factor "slightly" favored fair use, second was neutral, and remaining two weighed against it).

> **1.     Factor 1:  PRO's Use Is Not Transformative, Its Purpose Is The Same Purpose That Plaintiffs Already Serve, And PRO Fails To Satisfy The D.C. Circuit's "Essential To Comply With Any Legal Duty" Test**

The first fair use factor requires courts to consider "the purpose and character of the use."

17 U.S.C. § 107(1).[8]   The D.C. Circuit remanded for consideration of "whether, in certain

circumstances, distributing copies of the law for purposes of *facilitating public access* could

constitute transformative use."  *ASTM II*, 896 F.3d at 450 (emphasis added).

PRO's wholesale copying and public distribution is not a transformative use.  First, PRO

"merely repackages or republishes the [Works]," *TVEyes*, 883 F.3d at 177 (citations omitted);

and PRO's alleged purpose of "facilitating public access" does not render that repackaging

transformative because Plaintiffs have the same informative purpose—and, indeed, achieve that

end more accurately than PRO does.  Second, PRO cannot meet its burden to show that what it

has copied and distributed is essential to complying with a legal duty.  For 95 (93 ASTM, 1

NFPA, 2 ASHRAE) of the standards, the regulation on which PRO relies *does not* incorporate by

reference the specific Work PRO posted.   2d Supp. SMF ¶¶ 36, 37, 41-42.   PRO has done

nothing to determine the effect of the incorporation by reference authority and whether it is of a

kind that the D.C. Circuit said was unlikely to give rise to fair use.  *ASTM II*, 896 F.3d at 442-43,

447 (describing, e.g., "discretionary reference procedure[s]").   Even where PRO can show that

an incorporation by reference imposes some legal obligation to comply with portions of a

---

[8] Although the D.C. Circuit reversed this Court's ruling on the commercial nature of PRO's use, the fact that it is a nonprofit does not make its use transformative:  "the absence of a commercial use merely eliminates the presumption of unfairness."  *See Worldwide Church of God*, 227 F.3d at 1117 (citing *Campbell*, 510 U.S. at 584, "[T]he mere fact that a use is educational and not for profit does not insulate it from a finding of infringement . . . .").

standard, PRO copied the standards wholesale, including portions that have *not* been incorporated by reference or that are *not* "essential to complying with any legal duty." *Id.* at 450.

> a.   *PRO's alleged goal of facilitating access is not transformative because Plaintiffs already serve this purpose.*

A transformative use "adds something new, with a further purpose or different character" from the original work. *Campbell*, 510 U.S. at 579. It is not enough that the use "add[s] value or utility." *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014). The question instead is whether a defendant's use of a work "serves a new and different function from the original work and is not a substitute for it." *Id.*; *see also Worldwide Church of God*, 227 F.3d at 1120 (translation not fair use). "[A] use of copyrighted material that 'merely repackages or republishes the original' is unlikely to be deemed a fair use." *TVEyes*, 883 F.3d at 177 (quoting *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir. 1998) (quoting Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990)).

The D.C. Circuit affirmed this Court's rejection of PRO's argument that its use of Plaintiffs' Works was transformative because PRO provides them to the public in a centralized collection or in different formats, *e.g.*, making copies more accessible to the visually impaired. *See ASTM II*, 896 F.3d at 450 (citing *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 923-24; *see also Soc'y of the Holy Transfiguration Monastery, Inc. v. Archbishop Gregory of Denver, Colorado*, 685 F. Supp. 2d 217, 227 (D. Mass. 2010), *aff'd* 689 F.3d 29 (1st Cir. 2012) ("A simple repackaging of a work in a new format . . . is not transformative when the result is simply a mirror image reflected on a new mirror.").

PRO must therefore show its purpose—"to make the law and other government materials more widely available," *ASTM II*, 896 F.3d at 444 (quoting Dkt. 121-5, Malamud Decl. ¶ 4)— transforms the Work by "add[ing] something new," *TVEyes*, 883 F.3d at 176 (citing *HathiTrust*,

755 F.3d at 96). It cannot. PRO does not serve a purpose that is meaningfully different from Plaintiffs' purpose in providing free, read-only access to the same incorporated Works. *See* 2d Supp. SMF ¶ 86. Plaintiffs' offerings allow anyone to easily view incorporated by reference standards online for free. 2d Supp. SMF ¶ 85. Their dissemination of the information goes beyond that, including NFPA's "Free Access Widget," that allows organizations—such as government entities that have incorporated by reference NFPA standards—to embed an imaged link on their websites, directing visitors to the free copies of NFPA standards on the NFPA website. *See* SMF ¶ 101. Plaintiffs view this provision of information as educational and central to their overall mission.[9] 2d Supp. SMF ¶¶ 86-87.

Moreover, Plaintiffs better serve PRO's professed purpose of informing the public about "the law" because Plaintiffs' versions (a) are authentic copies, which reflect rigorous quality assurance review, whereas PRO's versions *still* contain errors; and (b) provide (as PRO admits) more accurate information regarding the incorporation status of each posted standard.[10] The principal difference between the way Plaintiffs make the standards freely accessible and the way PRO does is one of formatting: Plaintiffs make the standards available for online access in read-

---

[9] NFPA also created the CodeFinder™ tool, which is designed to "creat[e] general public awareness of some of the jurisdictions" that "may require the use of NFPA codes and/or standards." 2d Supp. SMF ¶ 90.

[10] PRO's versions of Plaintiffs' standards *still* contain errors resulting from its scanning and rekeying techniques. *See* 2d Supp. SMF ¶¶ 13-18. PRO postings include other inaccuracies, such as citations to federal regulations that do not exist, *see* 2d Supp. SMF ¶ 37 (PRO's Internet Archive posting of the 2000 edition of NFPA 101, states that it has been posted "By Authority of the Code of Federal Regulations: 59 CFR 130," but there is no title 59 to the C.F.R.), and to superseded and incorrect standards, 2d Supp. SMF ¶¶ 36, 38-40 (*e.g.*, PRO posted the 1982 version of ASTM E23, where 46 C.F.R. § 56.50-105(a)(1)(ii) incorporates the 1996 version, 2d Supp. SMF ¶ 36(fff)). PRO has expressly acknowledged that it is Plaintiffs—and not PRO's postings—that provide the best source for authoritative standards, "urg[ing]" visitors to consult "with the standards organizations" to access "definitive versions of these important laws." 2d Supp. SMF ¶ 20. PRO's implicit recognition that its postings are not accurate undermines its claim of transformative use. Its postings are an inferior substitute for the versions of the standards that Plaintiffs already make available to the public on their websites.

only format.   PRO, in contrast, makes the entire published standard available for printing and copying, without restrictions on further redistribution.   *See* 2d Supp. SMF ¶ 92.   PRO "essentially republishes [Plaintiffs'] content unaltered from its original form, with no 'new expression, meaning or message'"—a use that is substitutional and not transformative.   *TVEyes*, 883 F.3d at 178 (quoting *HathiTrust*, 755 F.3d at 96 (quoting *Campbell*, 510 U.S. at 579)) (citing *Kirkwood*, 150 F.3d at 106 (transmitting unaltered radio broadcasts in real time over telephone lines not transformative); *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 342 F.3d 191, 199-200 (3d Cir. 2003) (streaming previews of movies without commentary not transformative)).

> **b.      *PRO cannot meet its burden to show that its postings of Plaintiffs' standards are essential to complying with a legal duty.***

In remanding for this Court to make standard-by-standard determinations, the D.C. Circuit recognized that the incorporation by reference process varies and incorporation *per se* does not justify copying and distribution as fair use.   *ASTM II*, 896 F.3d at 442.   The D.C. Circuit drew a distinction between whether the specific portions of the standard PRO copied and distributed is "*essential* to complying with [one's] legal duty," as compared to just "*help[ing] inform* one's understanding of the law."   *Id.* at 450 (emphasis added).   Despite the D.C. Circuit's clear mandate, PRO refused to do any standard-by-standard or grouping-of-standards (let alone portion-by-portion) analysis.   It has, instead, insisted that *all* standards incorporated by reference are "the law" and it is entitled to post *all* of those standards verbatim.[11]   2d Supp. SMF ¶¶ 31-32

---

[11] Indeed, PRO's absolutist position may be even more extreme than it appears on its face.   Many standards incorporate other standards by reference, which may in turn reference other standards.   2d Supp. SMF ¶ 69.   The logical conclusion of PRO's position is that *any* jurisdiction's incorporation of *any* portion of a standard would lead to an unrestricted fair use to copy and distribute dozens of other standards that are cross-referenced in their entirety.   That result cannot be squared with the D.C. Circuit's standard-by-standard approach and insistence that the standards could not be treated "interchangeably."   *ASTM II*, 896 F.3d at 449.   Such a "fair use" result also would put the United States out of compliance with its international obligations under Art. 13 of the WTO TRIPS Agreement, which requires that the United States

(PRO Interrog. Resp. No. 19 at p. 14, Resp. No. 21 at p. 25).[12]   Based on the undisputed evidence, PRO cannot meet its burden of proving that everything PRO copied and distributed is "*essential* to complying with any legal duty." *ASTM II*, 896 F.3d at 450 (emphasis added).

    1.   As a threshold matter, many of the Works are not incorporated by the regulation(s) PRO identifies in the cover sheets that it places in front of its copies, and PRO has failed to identify any other incorporating reference.   2d Supp. SMF ¶¶ 36 (a), (c), (e)-(f), (k), (n), (p)-(u), (aa)-(dd), (hh), (qq), (vv), (iii), (nnn), (ppp).   These are a subset of the 95 (92 ASTM, 1 NFPA, 2 ASHRAE) of PRO's cover sheets that include inaccurate citations, also including when PRO's cited authority actually incorporates a different or later version of the standard at issue.   *Id.* ¶¶ 36, 37, 41-42.   PRO cannot claim fair use as to these standards when it has not even met its burden to identify an incorporation by reference.

    Even those Works where PRO has identified some incorporation by reference, many are similar to those that the D.C. Circuit specifically identified as unlikely to give rise to fair use. This set includes "discretionary reference procedure[s]" that are incorporated in such a manner as to be optional or references—*i.e.*, "*helpful*" but not "*essential*," *ASTM II*, 896 F.3d at 447, 450 (emphasis added), as well as optional standards and standards that do not govern private conduct.

    For example, 40 C.F.R. § 86.113-04(a)(1)[13] incorporates ASTM D86-07, the "Standard Test Method for Distillation of Petroleum Products and Liquid Fuels at Atmospheric Pressure."

---

"shall confine limitations or exceptions to exclusive rights to certain special cases which do not conflict with a normal exploitation of the works and do not unreasonably prejudice the legitimate interest of the right holder."

    [12] PRO cannot attempt to backtrack from this sworn admission now through belated analysis. *See Kizas v. Webster*, 492 F. Supp. 1135, 1147 (D.D.C. 1980), *aff'd*, 770 F.2d 524 (D.C. Cir. 1983) (rejecting contradictory evidence as "last-minute effort by the defendants to raise an issue of material fact precluding summary judgment").

2d Supp. SMF ¶ 45.   But as the D.C. Circuit explained, this standard is incorporated "as a '[r]eference procedure' used by the Environmental Protection Agency and regulated motor-vehicle manufacturers."  *ASTM II*, 896 F.3d at 450.  It "merely tells the regulated entity how it can ensure that the gasoline it uses in fact satisfies the codified requirements."  *Id*.

As another example, PRO identifies 40 C.F.R. Appendix D to Part 75, the "Optional S02 Emmissional Data Protocol for Gas-Fired and Oil-Fired Units" as the regulation incorporating ASTM standard D1217-93, the "Standard Test Method for Density and Relative Density (Specific Gravity) of Liquids by Bingham Pycnometer."  2d Supp. SMF ¶ 46.  This regulation incorporates the standard to be exactly what it says—*optional*.  Subsection 2.2.4.3(d) provides an alternative procedure for sampling oil from shipment tanks or containers and testing samples for density, of which D1217-93 is just one.  *See* 40 C.F.R. §§ 2.2.4.3(d), 2.2.6 (cross-referencing other standards in Part 60).  Each of these is an option, provided as a reference point, but none of the many options is itself legally binding.  This is true for other ASTM Works as well.  *See* 2d Supp. SMF ¶ 47 (listing examples).

In the same manner as the discretionary or optional incorporations by reference, each of the NFPA Works contain explicitly "Permissive [R]ules," which are "those that identify actions that are allowed but not required," and "are normally used to *describe options or alternative methods*."  2d Supp. SMF ¶ 57 (2014 NEC at art. 90-5(B)).  Such optional rules are delineated "by the use of the terms *shall be permitted* or *shall not be required*."  *Id*.  An example of such an optional rule is article 324.56(A) of the 2014 NEC regarding FCC Systems Alterations, which

---

[13] Notably, PRO identifies only 40 C.F.R. § 1065.710 as incorporating D86-07.  *See* 2d Supp. SMF ¶ 36(oo).  This identification is incorrect; 40 C.F.R. § 1065.710 incorporates the 2012 version of D86, not the 2007 version PRO posted.  *See* 40 C.F.R. §§ 1065.710; 1065.1010.

states "Alterations to FCC systems shall be permitted."[14]   *Id.* at art. 324.56(A).   There is no binding legal obligation in telling the installer of electrical equipment they can make alterations.

Further, some of the incorporations by reference "have no direct legal effect on any private party's conduct."   *ASTM II*, 896 F.3d at 443.   As just one example, ASTM A 307 is incorporated by reference in 46 C.F.R. § 56.25-20(b), which governs the design, construction, and installation of marine vessel piping systems.   2d Supp. SMF ¶ 49.   The regulation provides that, with respect to bolts used in ships' and barges' piping systems, "[w]hen class 250 cast iron flanges are used or when class 125 cast iron flanges are used with ring gaskets, the bolting material must be carbon steel conforming to ASTM A 307 (incorporated by reference, *see* 46 CFR § 56.01-2), Grade B."   46 C.F.R. § 56.25-20(b).   The persons governed by that regulation—those who design, construct and install piping systems in marine vessels—do not need access to ASTM A 307 to comply with this regulation.   They simply have to purchase bolt that are designated as A 307, Grade B; they do not need to know how to manufacture such bolts.

Likewise, the D.C. Circuit recognized that the case for fair use was lessened where a standard was incorporated in such a way to only trigger *public* and not *private* obligations. *ASTM II*, 896 F.3d at 443 (these standards are "incorporated for the purpose of triggering agency obligations," *see, e.g.*, 42 U.S.C. § 6833(b)(2)(A) ("Whenever . . . [ASHRAE] Standard 90.1-1989 . . . [is] revised, the Secretary [of Energy] shall . . . determine whether such revision will improve energy efficiency in commercial buildings."), or establishing regulatory floors, *see, e.g.*, *id.* § 6833(b)(2)(B)(i) ("If the Secretary makes an affirmative determination," each state shall

---

[14] Likewise, NFPA standards include provisions that explicitly provide for discretion and dictate that there are alternative options for compliance.   For example, the National Fuel Gas Code (2006 ed.) states:   "The provisions of this code are not intended to prevent the use of any material, method of construction, or installation procedure not specifically prescribed by this code, provided any such alternative is acceptable to the authority having jurisdiction."   2d Supp. SMF ¶ 58.   It is the authorities, not Plaintiffs, who decide what is ultimately required.

have two years to "certify that it has reviewed and updated the provisions of its commercial building code regarding energy efficiency" such that its code "meet[s] or exceed[s] [the] revised standard."). Here, PRO's proffered evidence of ASHRAE 90.1 being incorporated by reference (*i.e.*, the cover sheets) points to incorporation of Standard 90.1 into 10 C.F.R. § 433.4, which states "[a]ll Federal agencies shall design new Federal buildings" that meet the ASHRAE standards, but does not impose a similar requirement on private actors. 2d Supp. SMF ¶ 43.

PRO's wholesale copying of these nonbinding standards is not at all tailored to that which is *essential* to complying with private legal duties, nor does PRO limit its dissemination in any other relevant respect, such as to those individuals who are governed by even these optional references. *Cf. Authors Guild v. Google, Inc.*, 804 F.3d 202, 222 (2d Cir. 2015) ("*Google Books*") (limiting features of use "substantially protects against its serving as an effectively competing substitute"); *HathiTrust*, 755 F.3d at 91 (print-disabled "patron[s] must obtain certification of [their] disability from a qualified expert"). Its conduct therefore does not fall within the limited circumstances the D.C. Circuit posited could be a transformative purpose.

2. Under the D.C. Circuit's holding, even where there is some incorporation by reference that imposes a legal obligation on some individual, PRO cannot show a transformative use for publishing the *entire* standard. The D.C. Circuit explained that PRO might be able to show a transformative use *only if* it limited its posting to "the relevant portions of that particular standard."[15] *ASTM II*, 896 F.3d at 450. PRO has posted entire standards indiscriminately, stating (incorrectly) that "[t]he entirety of each standard . . . is incorporated by reference into the law, and it is therefore necessary to reproduce the entire standard verbatim in order to accurately state what the law is." 2d Supp. SMF ¶¶ 31, 32 (PRO Resp. to Interrogs. 19, 21.). PRO cannot

_____

[15] Even then, the D.C. Circuit required "[f]aithfully reproducing the relevant text." *ASTM II*, 896 F.3d at 451. PRO's versions are not accurately reproduced. 2d Supp. SMF ¶¶ 13-19.

meet its burden under the D.C. Circuit's test.  Here are just a few examples where the regulation cited by PRO only incorporates a portion of a standard:

- **ASTM B122/B122M:**  PRO Identifies 46 C.F.R. § 119.440 as the incorporating by reference regulation, but that regulation only incorporates B122/B122M with respect to copper alloy C71500, one of eleven copper alloys addressed in the standard.  The portions of the standard related to the other ten copper alloys are unnecessary to understand the minimum thickness for copper alloy C71500.

- **ASTM B85-96:**  PRO identifies 46 C.F.R. § 56.60-2 as the incorporating by reference regulation, but that regulation only incorporates one table within ASTM B85-96—table X-2—and states that "[t]ension tests shall be performed to determine tensile strength, yield strength, and elongation" in accordance with the minimum value in X-2.  The remainder of the standard is unnecessary to determine the minimum value in X-2.  Table X-2 also contains values for sheer strength and fatigue strength that are unnecessary to understand the minimum value for the required tension tests.

- **ASTM E145-94 (2001):**  PRO identifies 40 C.F.R. § 63.14 as the incorporating by reference regulation, but Appendix A to Subpart PPPP of 40 C.F.R. § 63.14 references only forced draft oven types IIA or IIB.  The ASTM E145-94 (2001) standard addresses other types of forced draft ovens.

These examples are representative of other Works where PRO posted the entire standard, but only a portion is actually incorporated by reference into law.  2d Supp. SMF ¶ 48.

Likewise, the D.C. Circuit said fair use was not likely for material that merely "help[s] inform one's understanding of the law [without being] essential to complying with any legal duty."  *ASTM II*, 896 F.3d at 450.  That is exactly the case for PRO's wholesale copying of Works, all of which include substantial material that either has nothing to do with compliance or is certainly not "essential" to complying with a legal obligation.  2d Supp. SMF ¶¶ 48-56 (ASTM), 59-68 (NFPA), 70-76 (ASHRAE).

As just one example, NFPA 70 includes at least the following material that decidedly does not impose any legal obligation:

- **Prefatory Notices and Background Information:**  NFPA 70 includes notices and disclaimers, as well as an introductory note that gives information on the

21

background and history of the standard.  2d Supp. SMF ¶¶ 62, 63 (e.g., Supp. Pauley Decl. Ex. P (NFPA 70, 2014 ed.) at NFPA-PR0098062-64).

- **Reference and Informational Notes:**  NFPA 70 includes hundreds of "Informational Notes" that provide context, background, cross-references, and other explanatory material.  The NEC expressly states that these Notes "are *informational only and are not enforceable as requirements of this Code*."  *Id.* ¶ 64 ((*e.g.*, Supp. Pauley Decl. Ex. P (NFPA 70, 2014 ed.) at art. 90.5(C)).  Examples include Informational Note No. 2:  "Some cleaning and lubricating compounds can cause severe deterioration of many plastic materials used for insulating and structural applications in equipment." *Id.* at art. 300.20(B) (Note).

- **Diagrams, Figures, and Illustrations:**  NFPA 70 includes figures that illustrate concepts in the text, but that do not dictate any legal duty.  For example, 2011 NEC, Figure 220.1 provides a graphical overview of the organization of Article 220. *Id.* ¶ 65 (e.g. Dubay Decl. Ex. A (NFPA 70, 2011 ed.) at 70-61).  PRO could explain that organizational structure in its own words or offer a different way of visualizing the Article's structure.  The Figure may be "help[ful]" in "inform[ing] one's understanding" of the text, but the Figure itself does not dictate any independent requirements.  *ASTM II*, 896 F.3d at 450.

- **Examples:**  NFPA 70 includes numerous examples, such as art. 550.4(A), which is a list of examples of a mobile home not intended as a dwelling unit:  "those equipped for sleeping purposes only, contractor's on-site offices, construction job dormitories, mobile studio dressing rooms, banks, clinics, mobile stores, or intended for the display or demonstration of merchandise or machinery."  2d Supp. SMF ¶ 66  (e.g. Dubay Decl. Ex. A (NFPA 70, 2011 ed.) at art. 550.4(A); *see also id.* art. 552.47(A)).  These illustrative examples do not impose any requirement.

- **Informational Annexes:**  NFPA 70's informational annexes contain material that "is not a part of the requirements of this NFPA document but is included for informational purposes only."  2d Supp. SMF ¶ 67 (e.g., Supp. Pauley Decl. Ex. P at Annex A).  Some informational annexes contain information that is not binding unless "*specifically adopted*." *Id.* at Annex H.

All of NFPA's Works contain some or all of these nonbinding portions.  2d Supp. SMF ¶¶ 59-68 (listing examples for all NFPA standards).

ASTM's standards also contain numerous nonbinding portions.  Many of ASTM's standards contain appendices that are expressly labeled "Non-mandatory Information."  2d Supp. SMF ¶¶ 51(a), 52.  Such appendices contain explanatory information that is not required to

perform the standard's requirements. *Id.* Additionally, ASTM standards contain supplemental sections including: explanatory notes, summaries, significance and use sections, keywords, definitions, terminology, classification, cited references, and metric conversions. *Id.* ¶¶ 51(e), 55. These resources are nonbinding aids. *Id.* A number of ASTM's standards contain a Supplemental Requirements section that states: "The following supplementary requirements shall apply only when specified by the purchaser in the inquiry, contract or order, for agencies of the U.S. Government." *Id.* ¶¶ 51(e), 56. Additionally, as ASTM's committees are frequently updating and revising its standards, many of ASTM's standards include a summary of changes, and those summaries are nonbinding. *Id.* ¶¶ 51(b)-(c), 53-54. In many instances, ASTM publishes a metric version of its standards. In numerous instances, PRO copied and distributed the entire metric version in addition to the nonmetric version, where the metric version was not referenced by the regulation. *Id.* ¶ 35.

Similarly, all three of the ASHRAE Standards at issue in this case contain forewords, information about ASHRAE and its Standards-creation process, ASHRAE policy statements, and other information that could impose no legal obligation. 2d Supp. SMF ¶¶ 70-76. The ASHRAE Standards even contain multiple "Informative Appendices," which are expressly labeled as not being part of the Standards and just for informational purposes. *Id*. ¶¶ 72-74. PRO copied and posted those too.

PRO's wholesale copying of these non-mandatory portions takes far more than necessary under the D.C. Circuit's test and is therefore not fair use. PRO could have written its own paraphrased material, drawn its own figures, or omitted nonbinding portions. PRO has shown itself fully capable of excising portions of Plaintiffs' Works, as it has done in removing many of

Plaintiffs' logos.  But PRO did none of these things when it came to copying Plaintiffs' Works. It instead copied and distributed the entirety of the text verbatim.

> ### 2.    Factor 2:  Plaintiffs' Copyrighted Works Are Important To Advance The Progress Of Science And The Useful Arts

The second factor considers "the nature of the copyrighted work."  17 U.S.C. § 107(2). While often framed as a dichotomy between fictional vs. factual expression, the ultimate goal of copyright is to "promote the Progress of Science and the useful Arts."  U.S. Const. art. I, § 8, cl. 8.  Copyright in each of Plaintiffs' Works serves the end of advancing the progress of science, technical and technological advancement, as well as public safety.  *See ASTM I*, 2017 WL 473822, at \*17 (D.D.C. 2017).

The D.C. Circuit agreed, *ASTM II*, 896 F.3d at 451, but added that this factor may vary with the extent to which the particular copyrighted Work imposes a legally binding obligation, *id.* at 452.  On this factor, PRO must justify its copying by demonstrating the legally binding nature of each standard (or portion of standard) PRO has copied.  PRO does not and cannot satisfy this burden.  As explained above, PRO fails to meet its burden by not citing or citing incorrect authorities to even make a threshold showing that 96 Works were incorporated by reference.  2d Supp. SMF ¶¶ 36, 37.  Even then, PRO copied standards that are incorporated in a discretionary or optional manner.  *Id.*  PRO also copied the entirety of the Works verbatim, including portions not incorporated by reference, and portions that impose no legal duty.  *Id.* ¶¶ 48-56, 59-68, 70-76.  The second fair use factor weighs against a finding of fair use.

> ### 3.    Factor 3:  PRO Copies The Entirety Of The Works—It Does Not Even Attempt To Limit Its Copying And Distribution To Portions Of Standards That Are Essential To Complying With The Law

The third fair use factor looks to "the amount and substantiality of the portion used in relation to the copyrighted work as a whole."  17 U.S.C. § 107(3).  "While 'wholesale copying'"

like PRO's "'does not preclude fair use *per se*,' copying an entire work 'militates against a finding of fair use.'"  *Worldwide Church of God*, 227 F.3d at 1118 (emphasis added); *see also Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 565 (1985) ("the fact that a substantial portion of the infringing work was copied verbatim is evidence of the qualitative value of the copied material").  "[T]he extent of permissible copying varies with the purpose and character of the use," *Campbell*, 510 U.S. at 586-87; but "[t]he larger the quantity of the copyrighted text the [user] can see and the more control the [user] can exercise over what part of the text she sees, the greater the likelihood that those revelations could serve her as an effective, free substitute for the purchase," *Google Books*, 804 F.3d at 222.  The D.C. Circuit therefore instructed this Court to consider whether PRO had "limit[ed] its copying to only what is required to fairly describe the standard's legal import."  *ASTM II*, 896 F.3d at 452.

PRO has not even attempted to so limit its copying, either in what it posts online or to whom it disseminates the Works.  As explained above, PRO's wholesale, indiscriminate copying sweeps in provisions not incorporated by reference, provisions that do not impose legal obligations on individuals, and simply informative portions.  *See,* Section I.B.1.b *supra*.  PRO's copying and distribution of large quantities of material that "does not govern any conduct" makes this factor lean decidedly in Plaintiffs' favor.  *ASTM II*, 896 F.3d at 452; *see also Google Books*, 804 F.3d at 222 (third factor turned on fact that defendant "does not reveal matter that offers the marketplace a significantly competing substitute for the copyrighted work").

### 4.   Factor 4:  PRO's Substitutional Use Undermines The Actual And Potential Markets for Plaintiffs' Works

The fourth fair use factor—harm to the copyright owner's "potential market[s]" or the "value of the copyrighted work," 17 U.S.C. § 107(4)—requires the Court to consider "'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a

substantially adverse impact on the potential market'" for both the original and derivative works. *Campbell*, 510 U.S. at 590 (quoting 3 M. Nimmer & D. Nimmer, Nimmer on Copyright § 13.05[A][4] (1993)); *Harper & Row Publishers*, 471 U.S. at 568.  It is "[PRO's] burden to affirmatively establish that [its] conduct could not even 'potentially' harm the Plaintiffs' market."  *ASTM I*, 2017 WL 473822, at *18; *see also Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1276 (11th Cir. 2014) ("The central question . . . is not whether Defendants' use of Plaintiffs' Works caused Plaintiffs to lose some potential revenue.  Rather, it is whether Defendants' use—taking into account the damage that might occur if 'everybody did it'—would cause substantial economic harm such that allowing it would frustrate the purposes of copyright by materially impairing Defendants' incentive to publish the work.").  It is "difficult[]" for a defendant like PRO to meet its burden of proving fair use if it does not present "favorable evidence about relevant markets."  *Campbell*, 510 U.S. at 590.  PRO cannot meet its burden because the undisputed expert testimony, and an application of the D.C. Circuit's guidance, demonstrate that PRO's conduct harms Plaintiffs' potential market.

In addition to this traditional fair use analysis, the D.C. Circuit said this Court should consider three questions relating to this factor.  Addressing each question in turn demonstrates that, as the Supreme Court contemplated in *Campbell*, PRO cannot meet its burden of demonstrating this factor weighs in its favor.

First, the D.C. Circuit urged consideration of whether PRO's activities could lead to "additional [market] harm" where Plaintiffs themselves offer free access online "presumably . . . without entirely cannibalizing sales of their standards."  *ASTM II*, 896 F.3d at 453.  Plaintiffs' provision of free online access *furthers* their market for disseminating their Works, both as a matter of logic and evidence.  Plaintiffs offer their standards in a read-only

format:  this carefully controlled environment, designed to be educational and informational, does not substitute or compete in the commercial marketplace for the sale of less restricted versions of Plaintiffs' Works.   2d Supp. SMF ¶¶ 85, 88.   Those industry professionals and tradespeople who purchase the Works to use in the course of their work might reference the free access websites, but these websites would not be a substitute for purchasing a copy that can be downloaded and searched from Plaintiffs.  *Id.* ¶¶ 88, 89.  Indeed, Plaintiffs view the provision of free access as furthering their overall mission by encouraging more users to visit Plaintiffs' websites, and to do so more frequently, creating opportunities for them to learn about Plaintiffs' other mission-driven activities, including by potentially deciding to purchase the materials so they can have a copy to download.  *Id.* ¶¶ 86, 87.

PRO's postings, by contrast, are substitutional and cannibalistic for each of Plaintiffs' sales, licensing efforts, and free access distribution.   PRO intentionally makes its versions of Plaintiffs' Works—which are widely viewed, *see, e.g.*, 2d Supp. SMF ¶ 98 (accesses to PRO's postings dwarf visits to ASTM's Reading Room); *id.* ¶ 102 (10,000 views of 2011 NEC in 13 months)—available on an anonymous and unrestricted basis.  *Id.* ¶¶ 92, 104.  This means its users include those individuals and entities who would otherwise purchase or license copies of Plaintiffs' standards.  *Id.* ¶ 93.  Its users may also include *further* would-be infringers who, by virtue of the anonymity PRO and the Internet Archive, offer and easily profit unlawfully from selling PRO's copies.   Indeed, PRO's efforts to make available Plaintiffs' Works in rekeyed formats mean that down-the-line infringers can capitalize on that work, distributing counterfeit copies of PRO's downloadable PDFs.  *See id.* ¶¶ 105-06.  Regardless of whether PRO intends that result, the fair use inquiry requires consideration of the natural consequences of its activities. *See Authors Guild*, 804 F.3d at 223 (even if copying done for "valuably transformative purpose,"

copying can lead to harm "if done in a manner that results in widespread revelation of sufficiently significant portions of the original as to make available a significantly competing substitute").  Notably, PRO *could*, but does not, utilize the technical features—such "borrowing" and encrypted access for those with print disabilities—that Internet Archive employs to restrict access to other copyrighted material on its website.  2d Supp. SMF ¶¶ 108-09.

The unrebutted economic evidence—not to mention common sense—dictate that the answer to the D.C. Circuit's first question is that PRO's activities threaten substantial market harm even where Plaintiffs also provide access to their standards.  Plaintiffs have already shown a "substantial[] adverse impact on the potential market." *Campbell*, 510 U.S. at 590.  The expert report of John Jarosz recognized Plaintiffs' provision of freely accessible copies but concluded that, nonetheless, PRO's activities would threaten the market both for Plaintiffs' standards and for derivative works.  2d Supp. SMF ¶ 91 (Jarosz Rep. ¶¶ 85, 92, 100, 130-49).  That makes sense.  As explained above, the principal difference between Plaintiffs' online copies and PRO's postings (beyond the errors in PRO's versions) is that Plaintiffs' sell physical copies and digital copies in a variety of formats and offer more limited read-only access for free, whereas PRO offers no-cost, unrestricted access to Plaintiffs' Works in formats that can be readily downloaded or used to develop derivative works.  "[P]arties that are interested in or affected by [Plaintiffs' standards], but who do not necessarily need a digital or hardcopy of the standards" are well served by Plaintiffs' online versions.  *Id.* ¶¶ 86, 88 (Jarosz Rep. ¶ 86).  Parties who are, instead, regularly using Plaintiffs' standards during the course of their work, interested in reselling copies of Plaintiffs' standards, or planning to develop unlicensed derivative works are likely to use PRO's versions of the standards.  *See, e.g.*, SMF ¶ 240 ("Multiple resellers and merchants have downloaded copies of NFPA's standards that were posted on the Internet and have attempted to

resell them or package them with other products for sale."); *see also BMG Music v. Gonzalez*, 430 F.3d 888, 890 (7th Cir. 2005) (noting that because "[m]usic downloaded for free from the Internet is a close substitute for purchased music[,] many people are bound to keep the downloaded files without buying originals").

Second, the D.C. Circuit asked this Court to consider whether there would continue to be a market for Plaintiffs' standards if PRO limited its copying to only those parts of Plaintiffs' standards that "provide[] information essential to comprehending one's legal duties." *ASTM II*, 896 F.3d at 450. PRO has no supporting evidence to answer this question because, as demonstrated, PRO does *not* so limit its copying and has maintained that position since the D.C. Circuit's remand, despite that court's clear direction that PRO should revisit its wholesale copying. *See supra* at Section I.B.1.b.; 2d Supp. SMF ¶¶ 31-32 (Resp. to Interrog. Nos. 19, 21). Accordingly, PRO has failed to meet its burden on this question.

Third, the D.C. Circuit instructed this Court to consider whether PRO's copying and distribution of Plaintiffs' Works would harm any markets for derivative works, *e.g.*, if PRO's posting of out-of-date standards would help or harm the market for the current versions of the same standards. *See ASTM II*, 896 F.3d at 453. The evidence is undisputed that PRO's use harms the market for the current and most up-to-date works. ASTM frequently reapproves the identical standard in an updated version, and in those circumstances, the old version is a perfect substitute for the up-to-date version. 2d Supp. SMF ¶ 96. For example, ASTM's B580 issued in 1979 has been reapproved and reissued in its original form every five years. Even when ASTM standards, are revised in subsequent versions, the latest version frequently retains substantial portions of the prior version. *Id.* ¶ 35. As a result, for many users, the availability of a free and unrestricted copying of the prior version may be a perfect or near-perfect substitute for the

current version of the standard, such that the unrestricted download and distribution of the Works at issue will interfere with the market for these derivative Works. *Id.* ¶ 96.

The evidence also shows that PRO does not limit its copying to out-of-date standards. Many jurisdictions expressly incorporate—and PRO promptly posts—the most recently published versions of Plaintiffs' standards. *See, e.g.*, Tex. Agric. Code Ann. § 17.072 (West) (incorporating most recent versions of ASTM D4177); Md. Public Safety Code § 9-303 (West) (same for NFPA 101); 30 Tex. Admin. Code § 217.326 (same for NFPA 1 and NFPA 70); Alaska Stat. Ann. § 44.42.067(b)-(c) (same for ASHRAE 90.1). For example, after the parties filed their initial summary judgment motions, NFPA published the 2017 NEC. PRO has now copied and distributed that version. 2d Supp. SMF ¶ 110.

Further, new editions are not the only derivative product Plaintiffs make. Plaintiffs develop and sell products and services, such as commentaries and trainings. SMF ¶¶ 155, 263. "[A] significant driver of the Plaintiffs' sale" of such items "is the provision of the protected publications in, for example, trainings and seminars." 2d Supp. SMF ¶¶ 83, 84 (Jarosz Rep. ¶ 146). If the standards were freely available for download online, as PRO has made them, Plaintiffs' sales of these products and services would likely decrease. *Id.* ¶ 95. Moreover, if third parties were able to quote freely from these standards to, like PRO claims to, inform the public about "the law," Plaintiffs would lose their competitive advantage in marketing such services and products. *Id.*; *see also* SMF ¶ 264.

In sum, the undisputed evidence shows that none of the answers to the D.C. Circuit's three questions supports PRO's fair use defense. Plaintiffs invest substantial resources in developing their standards in everything from salaries and benefits for Plaintiffs' staff, to expenses for technical committee meetings, to costs associated with editing, producing,

distributing, and promoting the standards.  SMF ¶¶ 43-44, 104-05, 152.  PRO's systematic, mass copying and distribution of the Works undermine Plaintiffs' resource investment, "imped[ing] the purpose of copyright to incentivize new creative works by enabling their creators to profit from them."  *Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649, 662 (2d Cir. 2018); *see also Mazer v. Stein*, 347 U.S. 201, 219 (1954) ("The economic philosophy behind the clause empowering Congress to grant patents and copyrights is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors in 'Science and useful Arts.' Sacrificial days devoted to such creative activities deserve rewards commensurate with the services rendered.").  There is no evidence that this factor, or any of the other § 107 factors, supports PRO's affirmative defense.

III.   **PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR CLAIMS OF TRADEMARK INFRINGEMENT AND FALSE DESIGNATION OF ORIGIN**

In addition to infringing Plaintiffs' copyrights, PRO infringed Plaintiffs' trademarks and continues to do so.  It is undisputed that PRO acquired genuine versions of Plaintiffs' standards and retyped their content to create new documents that Plaintiffs neither authorized nor quality controlled.  SMF ¶¶ 187-95.  PRO did not appeal the Court's ruling that Plaintiffs own valid trademarks or the Court's analysis of the ordinary likelihood of confusion factors.  *ASTM II*, 896 F.3d at 456.  This Court's prior ruling on these issues is "law of the case" as to the standards at issue in Plaintiffs' prior motions.  *See, e.g., Trout*, 780 F. Supp. at 1425 & n.71.  PRO has no evidence warranting a different result as to any of the other Works.  The question on remand, therefore, is whether PRO can raise a triable issue on its affirmative defense of nominative fair use.  PRO cannot make this showing, and Plaintiffs are entitled to a permanent injunction preventing PRO from resuming its use of Plaintiffs' marks.

### A.      Nominative Fair Use Is An Affirmative Defense

Nominative fair use is an affirmative defense, not an element of Plaintiffs' trademark claim.  Once a Lanham Act "plaintiff has met its burden of proving that confusion is likely, the burden then shifts to the defendant to show that its nominative use of plaintiff's mark is nonetheless fair."  *Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 232 (3d Cir. 2005).  Treating nominative fair use as an affirmative defense (as opposed to yet another factor in the already unwieldy likelihood of confusion calculus, as some circuits do[16]) respects the Supreme Court's existing jurisprudence on trademark fair use.  Specifically, the Supreme Court has ruled that classic fair use—use of a mark in its descriptive sense and not as a designation of source—is an affirmative defense to trademark infringement, in part because "some possibility of consumer confusion must be compatible with fair use."  *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 121 (2004).  In other words, the Supreme Court treats confusion and fairness as separate and distinct concepts.  An approach that blends these concepts together into a single test—a test in which fairness must *negate* instead of coexist with confusion—is untenable.[17]  Instead, if a plaintiff proves that confusion is likely, consideration of the fair use defense should follow.  *Century 21*, 425 F.3d at 222; *see also, e.g., Mary Kay, Inc. v.*

---

[16] *See Int'l Info. Sys. Sec. Certification Consortium v. Sec. Univ., LLC*, 823 F.3d 153, 168 (2d Cir. 2016); *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1175 (9th Cir. 2010). *But see ASTM II*, 896 F.3d at 457 (recognizing that circuits are divided on correct analysis and declining to resolve which approach is correct).

[17] Demonstrating that the approach is unworkable, circuits that treat nominative fair use as part of the likelihood of confusion analysis cannot even agree on the correct way to do so. The Second Circuit has directed "district courts . . . to consider the Ninth Circuit and Third Circuit's nominative fair use factors, *in addition to* the [traditional likelihood of confusion] factors." *Int'l Info. Sys.*, 823 F.3d at 168 (emphasis added).  In the Ninth Circuit, by contrast, the nominative fair use factors supplant the multi-factor test that courts typically employ to determine consumer confusion.  *See Tabari*, 610 F.3d at 1175.

*Weber*, 601 F. Supp. 2d 839, 854 (N.D. Tex. 2009) (treating nominative fair use as an affirmative defense); *Chrysler Corp. v. Newfield Publ'ns*, 880 F. Supp. 504, 512 (E.D. Mich. 1995) (same).

Here, the Plaintiffs have demonstrated a likelihood of confusion. *ASTM I*, 2017 WL 473822, at *23; *see also ASTM II*, 896 F.3d at 456 ("PRO [does not] contest[] . . . the district court's analysis of the ordinary likelihood of confusion factors").[18]   Accordingly, it is PRO's burden to prove that its use is fair.

### B.   PRO Cannot Meet Its Burden To Establish Any Of The Three Nominative Fair Use Factors

To succeed on its nominative fair use defense, PRO must show that:  (1) its use of Plaintiffs' trademarks is necessary to describe Plaintiffs' Works; (2) PRO used only so much of Plaintiffs' marks as is reasonably necessary to identify Plaintiffs' Works; *and* (3) PRO has not done anything to suggest sponsorship or endorsement by Plaintiffs or to inaccurately describe the relationship between the parties or their Works. *Century 21*, 425 F.3d at 222; *see also New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 308 (9th Cir. 1992).  PRO's original use of Plaintiffs' marks certainly does not satisfy and cannot satisfy any (let alone all three) of these elements and neither does its current practice.

*First*, PRO does not need to use *any* of Plaintiffs' marks—their logos, organizational names, or even the names they give their standards—in furtherance of its claimed mission of educating the public about legally binding obligations.  PRO could fulfill this mission by posting the legally binding obligations without identifying Plaintiffs as the source of that information and without using their word marks.  This is exactly what the party posting building codes in *Veeck* did.  He posted the codes and identified them as building codes of the relevant jurisdictions; he

---

[18] Again, PRO's failure to challenge this Court's previous analysis of the likelihood-of-confusion factors means it is bound by that holding.  *See Trout*, 780 F. Supp. at 1425 & n.71.

did not identify the institutional author, Southern Building Code Congress International, by name, let alone display its logos. *Veeck v. S. Bldg. Code Cong. Int'l*, 293 F.3d 791, 793 (5th Cir. 2002). Here, PRO could similarly identify Plaintiffs' Works merely as works incorporated by reference into the relevant federal regulations, without identifying Plaintiffs or using their marks. For instance, PRO could have identified ASTM's Standard Specification for Structural Steel as the "standard adopted by 24 C.F.R. Part 200" rather than ASTM A36. But it did not.

*Second*, as this Court, the D.C. Circuit, and even PRO have acknowledged, PRO's use of Plaintiffs' trademark logos goes beyond what is reasonably necessary to identify Plaintiffs' Works. *See ASTM II*, 896 F.3d at 457 ("it may well be that PRO overstepped when it reproduced both ASTM's logo and its word marks but, as it told the district court, it is not wedded to using the logo" (citation omitted); *see also, e.g.*, *Tabari*, 610 F.3d at 1181 (use of a stylized mark and logo was more use of the mark than necessary); *David's Bridal, Inc. v. House of Brides, Inc.*, No. 06 Civ. 5660 (SRC), 2010 WL 323306, at *7 (D.N.J. Jan. 20, 2010) (use of design elements unnecessary). After remand, PRO claims to have redacted Plaintiffs' logos from the materials it posted. 2d Supp. SMF ¶ 21. This is not entirely true. PRO's postings of the NEC still use NFPA's trademarked NEC logo, *id.* ¶ 23, as does PRO's posting of ASTM D86-07, *id.* ¶ 24. Plaintiffs have a right to permanent injunctive relief to ensure PRO does not resume this practice.

*Third*, irrespective of any past, present, or future disclaimers, PRO's use of Plaintiffs' marks suggests that Plaintiffs endorse PRO's posted copies and that those copies are genuine versions of Plaintiffs' Works. PRO's disclaimers have been woefully insufficient. PRO originally posted the Works without any disclaimer; then, in response to this lawsuit, PRO posted text that this Court said "c[ould] hardly be called disclaimers at all." *ASTM I*, 2017 WL 473822, at *23. While PRO has since revised its "disclaimers" on several occasions, litigation-driven

revisions are not a reason to deny summary judgment on liability for trademark infringement or to deny a permanent injunction.  *See id.* (rejecting PRO's trademark fair use argument based in part on the finding that PRO "did not begin using the disclaimer until 2015, after the start of this litigation")).  In any event, as the D.C. Circuit noted, "the disclaimers PRO appends to many of its copies of the standards may well fail to adequately eliminate the possibility a consumer would assume sponsorship or endorsement by ASTM."  *ASTM II*, 896 F.3d at 457.  And PRO "bears a 'heavy burden to come forward with evidence sufficient to demonstrate that any [disclaimer] would significantly reduce the likelihood of consumer confusion.'"  *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1243 (10th Cir. 2006) (quoting *Home Box Office, Inc. v. Showtime/The Movie Channel Inc.*, 832 F.2d 1311, 1316 (2d Cir. 1987)).  PRO cannot meet this burden.

PROs' current disclaimers take three forms.  The first appears on the cover page of PDF copies of Plaintiffs' Works posted by PRO, as depicted below.



2d Supp. SMF ¶ 26.  Considered in its star-spangled entirety, this cover page conveys a clear message—the document that follows is, "By Authority of the United States of America," a

"Legally Binding Document," and is "APPROVED" by at least the Executive Director of the Office of the Federal Register. The contradictory disclaimer—that the document is "Not Affiliated Or Authorized by ASTM or by the Government of the United States"—is barely perceptible amidst the surrounding regalia. Even if this disclaimer was somehow adequate (it is not), it resides only on the first page of PRO's copies of Plaintiffs' Works. *See id.* Anyone who downloads PRO's pirated PDFs can delete this page—and thus the disclaimer—with a single click, and further disseminate disclaimer-less copies of Plaintiffs' Works. Any disclaimer is insufficient to dispel confusion in these circumstances. *See, e.g.*, *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1093 (7th Cir. 1988) (affirming finding of inadequate disclaimer; "it would be difficult to ensure the use of disclaimers by [defendant's] distributors since the defendants had no direct control over the distributors' advertising. . . . Especially where the infringement in issue is a verbatim copying of the plaintiff's name, we are convinced that that plaintiff's reputation and goodwill should not be rendered forever dependent on the effectiveness of fineprint disclaimers often ignored by consumers.").

The second disclaimer appears "below the fold" of the Internet Archive webpage; a reader must scroll past the PDF copy of the standard—the material the reader came for—to see the disclaimer at all. *See* 2d Supp. SMF ¶ 27. This is insufficient. *See, e.g.*, *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 828 (9th Cir. 2011) (affirming ruling that disclaimer was insufficient to dispel confusion when consumers had to scroll to view).

Finally, PRO's HTML-format copies of Plaintiffs' standards—which are available for download on the Internet Archive Website—contain the following "disclaimer," in the form of a "PREAMBLE (NOT PART OF THE STANDARD)."

PREAMBLE (NOT PART OF THE STANDARD)

In order to promote public education and public safety, equal justice for all, a better informed citizenry, the rule of law, world trade and world peace, this legal document is hereby made available on a noncommercial basis, as it is the right of all humans to know and speak the laws that govern them.

This document was prepared and posted by Public.Resource.Org (Public Resource), a U.S.-based charity certified under section 501(c)(3) of the Internal Revenue Code. Public Resource is not affiliated with, nor has it received authorization from, any standards development organization, for the posting of this document. Please note that the posting of this document has been subject to litigation in U.S. federal courts and was done so by Public Resource for the non-commercial purpose of informing our fellow citizens about their rights and obligations under the laws of the United States.

END OF PREAMBLE (NOT PART OF THE STANDARD)

2d Supp. SMF 28.  This "disclaimer"—which appears in approximately the same typeface and size as the rest of the document—is also inadequate.  Indeed, anyone who downloads this document *to read the standard* is likely to ignore the section expressly labeled "NOT PART OF THE STANDARD."

PRO's redaction of Plaintiffs' logos—and to be clear, PRO has not in all cases redacted Plaintiffs' logos, *see* 2d Supp. SMF ¶¶ 23, 24—also fails to dispel confusion.  As depicted below, PRO has, in some instances, "blacked out" Plaintiffs' logos, but has typed Plaintiffs' word marks, combined with the phrase "Logo Removed," over the redacted area.



2d Supp. SMF ¶ 22.  This technique only draws additional attention to the fact that Plaintiffs' logos—which suggest that PRO's substandard copies originate with Plaintiffs—appear on the standards PRO posts.

PRO intended to make the materials it posts look identical to Plaintiffs' Works by applying Plaintiffs' trademarks to the substandard versions of the Works PRO posted online. SMF ¶ 212.  This is not fair use.  Because PRO cannot meet its burden on any of the three required elements of nominative fair use, Plaintiffs are entitled to summary judgment on their claims for trademark infringement and false designation of origin.

## IV.     PLAINTIFFS ARE ENTITLED TO A PERMANENT INJUNCTION

The Court should permanently enjoin PRO from all reproduction, display, or distribution of Plaintiffs' standards and all use of Plaintiffs' trademarks.   17 U.S.C. § 502(a); 15 U.S.C. § 1116.   This Court already granted an injunction once before, and it should do so again. Nothing in the D.C. Circuit's Order, which was aimed at fair use, bears on this Court's consideration of the four *eBay* factors, and no facts have changed that would counsel for a different result.   An injunction is warranted because Plaintiffs will otherwise suffer irreparable harm, no other adequate remedy is available to compensate Plaintiffs, the harm to Plaintiffs outweighs any potential harm to PRO, and the public interest favors an injunction.   *See eBay*, 547 U.S. at 391.

### A.     Plaintiffs Will Suffer Irreparable Harm Without An Injunction

PRO's unauthorized use of Plaintiffs' copyrights and trademarks threatens harm to (i) Plaintiffs' business model and standard-setting process; (ii) Plaintiffs' rights to exclude others from the use of their copyrighted Works; and (iii) Plaintiffs' reputations.   Each of these three injuries is real yet hard to quantify—exactly the type of injury an injunction is meant to address.

### 1.     Economic Harm And Ramifications To Plaintiffs' Business Model

Plaintiffs' expert economist, Mr. Jarosz, offered an unrebutted opinion on the direct economic harm Plaintiffs have suffered and are likely to continue to suffer.   Plaintiffs generate significant revenue from sales of copyrighted standards or membership dues closely tied to their copyrighted standards.   SMF ¶¶ 46-47, 106-08, 154.   It is almost axiomatic that another party providing the same product to consumers will impact Plaintiffs' business—especially when provided for free.   *See Presidio Components, Inc. v. Am. Technical Ceramics. Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012) ("Direct competition in the same market is certainly one factor

suggesting strongly the potential for irreparable harm without enforcement of the right to exclude.").

But the magnitude of harm suffered to date is not the biggest risk.  PRO has had the standards posted only on-and-off over recent years, and only while engaged in litigation that signals to the market that PRO's provision of the standards may not be legal.  The more significant risk is that, if PRO's conduct goes unchecked, it will act as a signal to the market that the creation of unauthorized versions of standards is acceptable, which will lead to the proliferation of new versions of the Works on other sites, thereby compounding Plaintiffs' harm over time as more people use the versions of the standards on PRO's site or similar sites instead of purchasing authentic versions.  SMF ¶ 254.  Plaintiffs have already seen the impact of PRO's infringement, as third parties have downloaded PRO's infringing copies of ASTM's Works and posted them on third-party websites:  The online publisher Scribd.com currently hosts dozens of ASTM standards obtained from PRO.  2d Supp. SMF ¶ 106; SMF ¶ 249.

Further, as Mr. Jarosz explained in his expert report, a continuation of PRO's infringement could force Plaintiffs to significantly alter their business models.  Each of the Plaintiffs relies primarily on users of its standards to fund the development of the standards, rather than charging up-front fees to participate in the development process.  Plaintiffs' "back-loaded" business model means more stakeholders can participate in the standard-creation process so that the standards are balanced and represent a diversity of voices.  SMF ¶¶ 257-58.  Plaintiffs could be forced to significantly alter their business models to a more "front-loaded" system that charges for participation in the standard-creation process, which would preclude the participation of other stakeholders and impact the substance of the resulting standards.  SMF ¶¶ 259-62.

## 2.       Harm To Plaintiffs' Right To Exclude Caused By Repeat Infringement

Another harm is to the Plaintiffs' right to exclude others from use of their protected Works and trademarks, which is one of the fundamental tenets of intellectual property law. Repeated infringement threatens that right and justifies an injunction. *Breaking the Chain Found. v. Capitol Educ. Support, Inc.*, 589 F. Supp. 2d 25, 30 (D.D.C. 2008) ("Defendant's continuing disregard for Plaintiff's rights demonstrates that it will continue to infringe on Plaintiff's rights, absent an injunction. This finding further justifies granting Plaintiff's request for a permanent injunction."); *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 504 (2d Cir. 2014) ("[T]he critical question for a district court in deciding whether to issue a permanent injunction is whether there is a reasonable likelihood that the wrong will be repeated." (citations omitted)).

When infringement is allowed to continue unchecked, a copyright owner essentially loses control of its intellectual property.  And courts have found that this loss of control due to rampant infringement is irreparable—especially in an online environment where an infringing file can be shared ad nauseam with other users, thus compounding the harm.  *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster*, 518 F. Supp. 2d 1197, 1218 (C.D. Cal. 2007) ("When digital works are distributed via the internet, every downloader who receives one of the copyrighted works is in turn capable of also transmitting perfect copies of the works.  Accordingly, the process is potentially exponential rather than linear, threatening virtually unstoppable infringement of the copyright."); *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 204–05 (3d Cir. 2014) ("'Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill.'") (quoting S & R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 378–79 (3d Cir. 1992)).

Here, PRO distributes downloadable, printable copies of the standards, which can then be taken from the Internet Archive and further shared anonymously and without any ability to trace the individuals or entities using the Works or their purpose in doing so.   2d Supp. SMF ¶ 104; SMF ¶¶ 247-48.   And, as the Court noted in its earlier ruling granting an injunction in this case, there is no sign this conduct will end absent an injunction.   *See ASTM I*, 2017 WL 473822, at *24.   During the course of this litigation, PRO has continued to post additional standards owned by Plaintiffs, and PRO has indicated that it has no intention of stopping its conduct absent intervention from the Court.   2d Supp. SMF ¶ 110.   These facts warrant an injunction so that Plaintiffs can regain control of their copyrights and trademarks and do not need to bring a damages lawsuit for each and every standard that is posted.

### 3.      Harm To Plaintiffs' Reputations

Plaintiffs also have a right to protect their reputations.   Indeed, courts have recognized that using another's trademark will result in irreparable harm because it causes the trademark owner to lose control of the goodwill associated with its mark.   *Hanley-Wood LLC v. Hanley Wood LLC*, 783 F. Supp. 2d 147, 151 (D.D.C. 2011); *Breaking the Chain Found.*, 589 F. Supp. 2d at 30.   Here, "Plaintiffs have spent decades establishing the goodwill associated with their names and logos, which the public associates with their high quality work."   SMF ¶ 245 (citing Jarosz Rep. ¶ 151).   Allowing PRO to publish inferior versions compromises that goodwill.

This risk is not just theoretical.   PRO's lax quality control standards, SMF ¶¶ 199-200, resulted in PRO postings with errors that significantly altered the utility of standards, including an error in an NFPA standard which mistook the letter "M" (an abbreviation for meters) to the letters "I" and "N" (an abbreviation for inches), SMF ¶¶ 219 (Pauley Decl. 118-8 at ¶ 54).   These errors are still in the versions PRO posts.   2d Supp. SMF ¶¶ 14-18.   Such carelessness poses a serious risk to Plaintiffs' reputations as creators of high-quality technical standards.

**B.      Remedies Available At Law Are Inadequate**

A permanent injunction should also be granted because there is no other appropriate remedy.  In cases where money damages are difficult to quantify or a defendant is unable to pay money damages, the lack of alternative remedy makes an injunction appropriate.  *Fox Television Stations, Inc. v. Filmon X LLC*, 966 F. Supp. 2d 30, 50 (D.D.C. 2013).  For instance, in *Fox Television*, the Court found an injunction warranted where damages were "neither easily calculable, nor easily compensable," and the Court made particular note that the defendant "would likely be unable to pay statutory copyright damages of $150,000 per work if Plaintiffs prevail."  *Id*.  The same considerations apply here.

The harms caused by PRO cannot be readily quantified.  First, the types of harm sustained by Plaintiffs—including harm to Plaintiffs' goodwill and impact on Plaintiffs' business models—are inherently difficult to quantify.  *See Bell Hellicopter Textron Inc. v. Airbus Helicopters*, 78 F. Supp. 3d 253, 274-75 (D.D.C. 2015) ("losses to . . . customer base and reputation defy attempts at valuation, and are unlikely to be remedied through a simple damages calculation" (internal citations omitted)).  Second, the amount of harm cannot be determined.  Because PRO posted Plaintiffs' Works in a manner that allows them to be easily copied, shared, downloaded, or printed by any member of the public, it is impossible to know how many infringing copies or illegal distributions have been made.  2d Supp. SMF ¶ 92.  PRO's posted versions of Plaintiffs' standards, on its own site and, again, on the Internet Archive, have been downloaded tens of thousands of times.  *Id.* ¶ 99; SMF ¶¶ 241-44.  PRO admits it generally has no idea how the Works accessed from its website are ultimately used or by whom.  SMF ¶¶ 247-48; 2d Supp. SMF ¶ 104.  Under these facts, actual monetary damages are impossible to assess.

In the absence of calculable damages, a copyright plaintiff could elect to receive statutory damages available under the Copyright Act.  However, any effort to recover statutory damages

would be futile since the damages award would far outweigh PRO's assets.  This case involves

hundreds of copyrighted works, and statutory damages can range up to $150,000 *per work* in

cases of willful infringement.  17 U.S.C. § 504(c).  But PRO's financial documents reveal that

PRO has limited assets and, as a self-described "charity," is dependent on fundraising.  SMF

¶ 272-73; 2d Supp. SMF ¶ 111.  PRO simply does not have the ability to pay damages.

Notably, PRO does not dispute that monetary damages are inadequate in this case.

Instead, PRO's position appears to be that there should be no remedy at all, irrespective of how

the copyright and trademarks issues are resolved.  When asked at the initial summary judgment

hearing what would be an appropriate remedy, counsel for PRO responded:  "I am not able to

say."  2d Supp. SMF ¶ 112.  Put simply, there is no adequate remedy but an injunction.

### C.      The Balance Of Hardships Favors Issuing An Injunction

In contrast to the financial and reputational harms Plaintiffs face, an injunction would

cause no recognizable harm to PRO, so there is nothing to balance against the harms caused to

Plaintiffs.

PRO has admitted that there will be no financial harm if PRO's posting of standards is

halted.  Specifically, Mr. Malamud testified:

> Q: If Public Resource was unable to continue to post the standards
> incorporated by reference on its website, what impact, if any,
> [would] that have on Public Resource's financial ability to survive
> long term?
>
> A:  Probably none.
>
> Q:  Can you identify any harm that would be suffered by Public
> Resource if it was precluded [from] posting standards incorporated
> by reference on its website?
>
> A:  THE WITNESS: We put a tremendous amount of effort in—
> into this and one hates to [have] wasted that—that effort.
>
> Q:  Anything else that you can think of?

A:  No.

SMF ¶ 277 (C. Malamud Dep. at 219:22-220:17).

PRO's "wasted" effort expended in committing infringement is not a legally cognizable harm.  The law is clear that PRO cannot claim an equitable interest in its ability to undertake infringing activity.  *Fox Television Stations*, 966 F. Supp. 2d at 51; *Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995) (defendant "cannot complain of the harm that will befall it when properly forced to desist from its infringing activities."); *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 612 (1st Cir. 1988) (harm from ceasing infringement "'merits little equitable consideration'").

### D.    The Public Interest Favors Issuing An Injunction.

It is undisputed that Plaintiffs do important work that serves the public good.  The standards at issue are devoted to issues of great importance to the public, including fire safety and energy efficiency.  In fact, Mr. Malamud readily admits that the NFPA "does amazing work and saves lives," that he is a "big fan of ASTM . . . and we need to continue to have standards in that area," and that "ASHRAE Standard 90.1 is an important standard."  SMF ¶¶ 164-67.  It is also widely accepted that these standards serve the public good by aiding government agencies that would not otherwise have the resources or technical expertise to fulfill their regulatory duties as well as they do currently.  SMF ¶ 266 (citing Jarosz Rep. at ¶¶ 52-56; 164).

Unfortunately, as Mr. Malamud concedes, "making standards more freely available . . . potentially poses a challenge to the current business models of the standards development of some standards development organizations."  SMF ¶ 255.  Indeed, Mr. Jarosz explained in detail in his unrebutted expert report the various ways that Plaintiffs' business models (and the quality of their standards) are likely to change in the face of unfettered infringement.  SMF ¶¶ 259-62.  That result is not surprising or unique to this case.  Courts in this

circuit have recognized that the very policy considerations underpinning our copyright system mandate that the public interest is best served by protecting the creative work of copyright holders like Plaintiffs so that they will continue to create such works. *See Fox Television Stations*, 966 F. Supp. 2d at 51 ("the public interest can only be served by . . . preventing the misappropriation of skills, creative energies, and resources which are invested in the protected work") (internal citations omitted).

In contrast to the undisputed public interest served by Plaintiffs' standards, PRO cannot identify any adverse public impact that would arise if an injunction is granted. PRO can point to no actual lack of access to Plaintiffs' Works at issue in this litigation because Plaintiffs already provide free read-only access to the standards on their websites. 2d Supp. SMF ¶ 85. Finally, due to rulings in this case, PRO removed its public postings of Plaintiffs' standards from the internet in late 2015 and did not repost them until after the D.C. Circuit's July 2018 ruling remanding the case. *Id.* ¶¶ 11-12. PRO can point to no harm that befell the public as a result of PRO's postings being offline for more than two and a half years.

All available evidence suggests that the public's interest is best served by granting Plaintiffs' request for an injunction.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of Plaintiffs on their copyright infringement and trademark infringement claims and should permanently enjoin PRO from infringing Plaintiffs' copyrights and trademarks.

Dated: October 7, 2019                    Respectfully submitted,


                                          */s/ J. Kevin Fee*

                                          J. Kevin Fee (D.C. Bar: 494016)
                                          Jane W. Wise (D.C. Bar: 1027769)
                                          Morgan, Lewis & Bockius LLP
                                          1111 Pennsylvania Ave., N.W.
                                          Washington, D.C. 20004
                                          Tel: 202.739.5353
                                          Email: kevin.fee@morganlewis.com
                                                  jane.wise@morganlewis.com

                                          *Counsel For American Society For Testing And*
                                          *Materials d/b/a ASTM International*


                                          */s/ Kelly M. Klaus*

                                          Kelly M. Klaus (*pro hac vice*)
                                          MUNGER, TOLLES & OLSON LLP
                                          560 Mission St., 27th Floor
                                          San Francisco, CA 94105
                                          Tel: 415.512.4000
                                          Email: Kelly.Klaus@mto.com

                                          Rose L. Ehler (*pro hac vice*)
                                          MUNGER, TOLLES & OLSON LLP
                                          350 South Grand Ave., 50th Floor
                                          Los Angeles, CA 90071
                                          Tel: 213.683.9100
                                          Email: Rose.Ehler@mto.com

                                          Rachel G. Miller-Ziegler
                                          MUNGER, TOLLES & OLSON LLP
                                          1155 F St. NW, 7th Floor
                                          Washington, DC 20004
                                          Tel: 202.220.1100
                                          Email: Rachel.Miller-Ziegler@mto.com

                                          *Counsel for National Fire Protection Association, Inc.*


                                          46

*/s/ J. Blake Cunningham*

Jeffrey S. Bucholtz (D.C. Bar: 452385)
David Mattern
King & Spalding LLP
1700 Pennsylvania Avenue, NW, Ste. 200
Washington, DC 20006-4707
Tel: 202.737.0500
Email: jbucholtz@kslaw.com

J. Blake Cunningham
King & Spalding LLP
101 Second Street, Ste. 2300
San Francisco, CA 94105
Tel: 415.318.1211
Email: bcunningham@kslaw.com

*Counsel for American Society of Heating, Refrigerating, and Air Conditioning Engineers*

## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2019, the foregoing document was filed with the clerk

of this Court via the CM/ECF system and served on counsel of record via email, including:

*Counsel for National Fire Protection Association, Inc.*

Anjan Choudhury (Anjan.Choudhury@mto.com)
Kelly M. Klaus (Kelly.Klaus@mto.com)
Rose L. Ehler (Rose.Ehler@mto.com)
Jonathan H. Blavin (Jonathan.Blavin@mto.com)

*Counsel for American Society of Heating, Refrigerating, and Air Conditioning Engineers*

Jeffrey S. Bucholtz (jbucholtz@kslaw.com)
Kenneth L. Steinthal (ksteinthal@kslaw.com)
J. Blake Cunningham (bcunningham@kslaw.com)

*Counsel for Public.Resource.Org, Inc.*

Matthew B. Becker (mbecker@fenwick.com)
Andrew Bridges (abridges@fenwick.com)
David Halperin (davidhalperindc@gmail.com)
Mitchell L. Stoltz (mitch@eff.org)
Corynne McSherry (corynne@eff.org)

Respectfully submitted,

*/s/ J. Kevin Fee*
J. Kevin Fee