# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN SOCIETY FOR TESTING AND MATERIALS d/b/a ASTM INTERNATIONAL;<br><br>NATIONAL FIRE PROTECTION ASSOCIATION, INC.; and<br><br>AMERICAN SOCIETY OF HEATING, REFRIGERATING, AND AIR CONDITIONING ENGINEERS,<br><br>        Plaintiffs/Counter-defendants,<br><br>   v.<br><br>PUBLIC.RESOURCE.ORG, INC.,<br><br>        Defendant/Counterclaimant. | Case No. 1:13-cv-01215-TSC |

**PUBLIC RESOURCE'S
SECOND SUPPLEMENTAL STATEMENT OF MATERIAL FACTS IN OPPOSITION
TO [198] PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND PERMANENT
INJUNCTION, AND IN SUPPORT OF PUBLIC RESOURCE'S SECOND MOTION FOR
SUMMARY JUDGMENT**


**[REDACTED VERSION OF DOCUMENT FILED UNDER SEAL]**

## TABLE OF CONTENTS

Page

SECOND SUPPLEMENTAL STATEMENT OF MATERIAL FACTS ......................................1

I.     INCORPORATION BY REFERENCE ......................................................................1

    A.    The Nature of Incorporation by Reference ...................................................1

    B.    The Process of Incorporation by Reference.................................................3

    C.    Objects of Incorporation ..............................................................................5

    D.    Incorporation of Parts of Documents Versus Incorporation of Complete Documents...................................................................................6

    E.    Incorporation by Reference Versus Extrinsic Unincorporated Standards......................................................................................................7

II.    STANDARDS THAT HAVE BECOME LAW ARE NOT GENERALLY AND FREELY ACCESSIBLE........................................................8

III.    THE STANDARDS ARE DESIGNED TO BE FOLLOWED AS LAW .............10

IV.    PLAINTIFFS LOBBY TO HAVE THEIR STANDARDS MADE LAW............11

V.    PUBLIC RESOURCE AND CARL MALAMUD ...............................................14

    A.    Carl Malamud's Record of Public Service .................................................14

    B.    Public Resource's Mission..........................................................................16

    C.    Public Resource's Litigation and Other Disputes......................................17

VI.    PUBLIC RESOURCE'S POSTING OF STANDARDS AT ISSUE ...................19

VII.    PLAINTIFFS' LIMIT USE OF THE STANDARDS ..........................................23

VIII.    PLAINTIFFS' MISSIONS AND PURPOSES FOR PUBLISHING STANDARDS DIFFERS FROM PUBLIC RESOURCE'S MISSION AND PURPOSE ........................................................................................................24

IX.    EVEN BEFORE BECOMING LAW, THE STANDARDS WERE FACTUAL WORKS........................................................................................25

X.    PLAINTIFFS HAVE NO EVIDENCE OF HARM .............................................27

# TABLE OF CONTENTS
## (Continued)

Page

XI.    PUBLIC RESOURCE'S NOMINATIVE FAIR USE AND ABSENCE OF CONSUMER CONFUSION ...........................................................32

      A.    The Standards that Plaintiffs Publish Already Have Errors......................33

XII.    PUBLIC INTEREST CONSIDERATIONS..........................................................34

XIII.    DRAFTING OF THE STANDARDS AT ISSUE ................................................35

      A.    Copyright is not One of the Incentives for Drafting the Standards....................................................................................................39

XIV.    COPYRIGHT REGISTRATION AND ASSIGNMENT .....................................39

XV.    INCORPORATION OF THE NATIONAL ELECTRICAL CODE INTO CALIFORNIA TITLE 24 ......................................................................................46

**SECOND SUPPLEMENTAL STATEMENT OF MATERIAL FACTS**[2]

Pursuant to Local Rule 7(h), Public.Resource.org ("Public Resource") contends that there are no genuine disputes as to the following facts.  Each of the following facts supports Public Resource's Second Motion for Summary Judgment.

## I. INCORPORATION BY REFERENCE

### A. The Nature of Incorporation by Reference

1.      Incorporation by reference is an alternative to direct inclusion of language into a government's published laws or regulations.  *See* 5 U.S.C. §552(a)(1); 1 C.F.R. §§ 51.1-51.11.

2.      The Office of the Federal Register has explained that material incorporated by reference is "like any other properly issued rule, has the force and effect of law."  Dkt. 122-9 at 86.

3.      The federal government initiated the practice of incorporating some materials by reference instead of reproducing them to limit the bulk of the Code of Federal Regulations ("CFR").  Dkt. 122-9 at 86.

4.      States and municipalities also turn standards into law, through incorporation by reference and in other instances by reproducing an entire standard verbatim in the text of the law.  *See, e.g.*, Minn. Admin.  Rule 4761.2460, Subp. 2(C); California Code of Regulations, Title 24, Part 3.

---

[2] Public Resource filed an earlier Statement of Material Facts (Dkt. 121-2) ("SMF") and Supplemental Statement of Material Facts (Dkt. 164-3) ("SSMF").  Public Resource hereby incorporates by reference those two documents and the evidence of record that they cited. This Supplemental Statement of Material Facts ("SSSMF") complements those two earlier filings and their associated exhibits and supplements the earlier record.  Public Resource files with this document only the most frequently-cited and informational exhibits from its earlier summary judgment motion for the Court's handy reference without unduly burdening the case file with duplicate filings. At the Court's request, Public Resource will refile any document it previously filed but has not included in the new filing.

5.      Governments may prosecute and punish persons for failing to obey standards that have become law.  To take just two examples: The Supreme Court of Virginia treated violation of the National Electrical Code as equivalent to a violation of the Virginia Building Code, which incorporated the NEC by reference, and subject to criminal sanctions.  *Virginia Elec. & Power Co. v. Savoy Const. Co.*, 294 S.E.2d 811, 816-17 (Va. 1982).

6.      After the deadly "Ghost Ship" fire in Oakland, California, prosecutors charged principal tenant and alleged manager of the building with manslaughter for violation of fire safety codes that are incorporated by reference.  Supplemental Declaration of Matthew Becker in support of Public Resource's Opposition to Plaintiffs' Second Motion for Summary Judgment and in Support of Public Resource's Second Motion for Summary Judgment ("Becker Decl.") ¶ 59, Ex. 93 (Declaration in Support of Probable Cause, *California v. Harris*, No. 17-CR-017349A (Cal. Super. Ct. June 5, 2017), *available at* https://www.scribd.com/document/350446988/Ghost-Ship-fire-criminal-charges; Becker Decl. ¶ 60, Ex. 94 (Criminal Complaint, *California v. Harris*, No. 17-CR-017349A (Cal. Super. Ct. June 5, 2017)), *available at* https://web.archive.org/web/20170729051241/https://cbssanfran.files.wordpress.com/2017/06/almena-and-harris-complaint.pdf.).

7.      ASTM has publicly stated that "[k]nowledge of ASTM standards is important for complying with U.S. regulations and procurement requirements" Dkt. 122-3 (Grove Ex. 1032 "ASTM Standards Regulations & Trade, Power Point") at 21.

8.      NFPA acknowledges that failure to comply with the standards incorporated by law may result in penalties. Becker Decl., ¶ 13, Ex. 46 (Bliss Depo.) at 37:1–19.

9.      The former head of Massey Energy was convicted of conspiring to violate safety standards. Dkt. 122-9, Ex. 156-157.

**B.      The Process of Incorporation by Reference**

10.      The process of incorporation by reference is careful and deliberate. At the federal level, it starts when an agency responsible for regulating an industry publishes a notice in the Federal Register concerning the agency's intent to incorporate a standard into law and asks the public to submit comments.  5 U.S.C. §553.

11.      A federal agency must publish proposed rule changes in the Federal Register, including changes to a standard incorporated by reference into the Code of Federal Regulations. 5 U.S.C. §553(b); 1 C.F.R. § 51.11(a) (2015).

12.      A standard incorporated by reference into the Code of Federal Regulations must be a "proposed rule" or "final rule" of a federal agency.  1 C.F.R. §51.5(a)-(b) (2019).  Before the federal government incorporates a standard by reference into law as a final rule, the Director of the Federal Register must approve the incorporation.  1 C.F.R. § 51.3 (2019).

13.      Standards are incorporated by reference—as opposed to reprinting the entire text of the standards—to limit the length of the Code of Federal Regulations. Dkt. 122-9 at 86 ("Incorporation by Reference" webpage of the Office of the Federal Register, http://www.archives.gov/federal-register/cfr/ibr-locations.html).

14.      Standards are also incorporated by reference into state and local laws.  *See, e.g.*, Md. Admin. Rule 09.12.26.06(E)(1)(c)(i); Minn. Admin. Rule 4761.2460, Subp. 2(C).

15.      State adoptions are equally rigorous. For example, the State of California incorporates model codes into Title 24 of the California Code of Regulations on a triennial cycle, with a 45-day public-comment period, a six-month publication requirement, and a three-month delay to allow local governments to implement them.  The California Building Standards Law precisely defines this process.  *See* Cal. Dep't of Gen. Servs., *2015 Triennial Code Adoption Cycle* (Dec.  2014),  https://web.archive.org/web/20170207201000/https://www.documents.dgs.ca.gov/

BSC/2015TriCycle/2015TricycleTimeline.pdf; *18-Month Code Adoption Cycle*, Cal. Bldg. Standards Comm'n, https://www.dgs.ca.gov/BSC/Rulemaking (last visited Nov. 8, 2019).

16.     The Office of the Federal Register (OFR) states: "The legal effect of incorporation by reference is that the material is treated as if it were published in the Federal Register and CFR. This material, like any other properly issued rule, has the force and effect of law. Congress authorized incorporation by reference in the Freedom of Information Act to reduce the volume of material published in the Federal Register and CFR."  Dkt. 122-9 at 86.

17.     In addition, when the Code of Federal Regulations incorporates a standard, the code itself informs readers that they may obtain a copy of the standards from the Office of the Federal Register ("OFR") or from the SDO that published the standard, effectively promoting sales of the standard.  Dkt. 122-9 at 86.

18.     In order to enact rules, a federal agency must follow minimum procedures to guarantee adequate public notice and opportunity to comment. 5 U.S.C. §553.

19.     A federal agency must publish proposed rule changes in the Federal Register, including changes to a standard incorporated by reference into the Code of Federal Regulations. 5 U.S.C. §553(b); 1 C.F.R. § 51.11(a) (2015).

20.     Standards incorporated by reference into the Code of Federal Regulations are made available in the Washington D.C. reading room of the Office of the Federal Register, or for purchase from the Plaintiffs. The OFR directs people who want to read incorporated standards to "contact the standards organization that developed the material." Alternatively, one may submit a written request to the OFR to inspect (and make limited photocopies of) an incorporated standard in Washington, D.C.  Dkt. 122-9 at 86; Becker Decl. ¶ 58, Ex. 92 (printout of National Archives website on incorporation by reference).

21.     The Office of the Federal Register is required to maintain a copy of each incorporated standard. It makes a copy of each standard available for public viewing, upon written request for an appointment, at its Washington, D.C. reading room. Dkt. 122-9 at 86.

### C.     Objects of Incorporation

22.     According to the Office of the Federal Register's Incorporation by Reference ("IBR") Handbook, any time a federal agency refers to material when it is developing regulations, it must consider two questions:  First, "does it have a legal citation?"  If yes, the agency must use the legal citation.  If not, the agency then must consider the second question: "Is it required to understand or comply with the regulations? Do your regulations require that a party "resort to" material that is not published in the *Federal Register*?"  If the material is necessary to understand or comply with the regulation, the agency must seek IBR approval from the Director of the Federal Register. Becker Decl., ¶ 25, Ex. 58 (IBR Handbook) at p. 2 (citing 5 U.S.C. § 552(a)).

23.     Only the Director of the Federal Register can approve IBR requests, and "[p]ublication in the *Federal Register* of a document containing reference(s) to incorporated material does not in itself constitute an approval of the IBR by the Director."  Becker Decl., ¶ 25, Ex. 58 (IBR Handbook) at 6.

24.     Similarly, the Federal Register may contain references to incorporated material, but the referenced material is not actually incorporated by reference when it has not received the Director's formal approval.  Becker Decl., ¶ 25, Ex. 58 (IBR Handbook) at 11.

25.     To be eligible for incorporation by reference, the material must be *published* and "impossible or impractical" to print in the C.F.R.  Becker Decl., ¶ 25, Ex. 58 (IBR Handbook) at 6.  This means it is typically documents, or portions of documents, that are incorporated by reference—not mere text, which could otherwise be printed in the C.F.R.  *See* Becker Decl., ¶ 25, Ex. 58 (IBR Handbook) at 11-12.

26.     According to the Director of Legal Affairs and Policy at the Office of the Federal Register, if an agency identifies a document in its IBR language and does not specify a specific section of that document, the entire document is incorporated by reference.  Malamud Decl. ¶ 40, Ex. 34.

**D.     Incorporation of Parts of Documents Versus Incorporation of Complete Documents**

27.     Where a federal agency seeks to incorporate only parts of a standards document, it is explicit.  For example, 24 CFR § 3280.4(aa)(4) (2019) states that only specific parts of the 2005 edition of the National Electrical Code, NFPA 70, are incorporated into law:

> (a) The specifications, standards, and codes of the following organizations are incorporated by reference in 24 CFR part 3280 (this Standard) pursuant to 5 U.S.C. 552(a) and 1 CFR part 51 as though set forth in full.
>
> …
>
> (aa) National Fire Protection Association (NFPA), 1 Batterymarch Park, Quincy, MA 02269, phone number 617-770-3000, fax number 617-770-0700, Web site: http://www.nfpa.org.
>
> …
>
> (4) NFPA No. 70-2005, National Electrical Code, IBR approved as follows:
>
> (i) Article 110.22, IBR approved for §§ 3280.803(k) and 3280.804(k).
>
> (ii) Article 210.12(A) and (B), IBR approved for § 3280.801(b).
>
> (iii) Article 220.61, IBR approved for § 3280.811(b).
>
> (iv) Article 230, IBR approved for §§ 3280.803(k) and 3280.804(k).
>
> …

24 CFR § 3280.4(aa)(4)(i)-(iv).

28. In contrast, the full 2005 edition of the National Electrical Code, NFPA 70, is incorporated by reference at 49 C.F.R. § 192.7 (2009):

> § 192.7 What documents are incorporated by reference partly or wholly in this part?
>
> (a) Any documents or portions thereof incorporated by reference in this part are included in this part as though set out in full. When only a portion of a document is referenced, the remainder is not incorporated in this part.
>
> (b) . . . These materials have been approved for incorporation by reference by the Director of the Federal Register in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. . . .
>
> F. National Fire Protection Association (NFPA): . . .
>
> (4) NFPA 70 (2005) ''National Electrical Code.''

### E.  Incorporation by Reference Versus Extrinsic Unincorporated Standards

29.     Sometimes external documents are referred to in the C.F.R. or in other government edicts but not formally incorporated into law.  When a document is referenced but not formally incorporated, it serves as only an "extrinsic standard".  *See, e.g.*, *Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516 (9th Cir. 1997) (regulations required Medicare and Medicaid claimants to use a private medical coding system but did not incorporate the medical coding system into law).  Likewise, *CCC Information Services, Inc. v. Maclean Hunter Market Reports, Inc.*, concerned a document that was one of several automobile valuation references that regulations approved for use in insurance adjusting.  44 F.3d 61 (2d Cir. 1994).  The regulation stated "[m]anuals approved for use are…The Redbook….," without any mention of incorporating those manuals into enforceable laws. *See* N.Y. Comp. Codes, R. & Regs. tit. 11, § 216.7(c)(1)(i) (West 1999), *cited in CCC*, 44 F.3d at 73 n.29.

## II.   STANDARDS THAT HAVE BECOME LAW ARE NOT GENERALLY AND FREELY ACCESSIBLE

30.     Without the database that Public Resource provides, citizens have few options for accessing laws and regulations by incorporation.  First, one may make an appointment to visit the National Archives in Washington, D.C., to read a paper version of a federally incorporated standard.  *See, e.g.*, 10 C.F.R. § 433.3.  This option does not provide meaningful access for persons without the means to travel to Washington, or persons with visual disabilities, and it does not allow computer-aided analysis.

31.     Second, one can sometimes purchase copies.  This can be not only expensive but also difficult, because where, as here, the standards are currently effective as law, but are obsolete as standards, at least some publishers apparently see little reason to make them widely available.  Some standards are available only on paper because the sponsoring standards development organization (SDO) has not authorized electronic versions, and thus they are unavailable to persons with visual disabilities or for computer-aided analysis. Becker Decl. ¶ 62, Ex. 96 (Fruchterman expert report). Even when available, the standards can cost hundreds of dollars, plus shipping and handling.  See Plaintiffs Second Supplemental Statement of Material Facts ("Plf. SSSMF") ¶ 78.  And many older standards are not available for purchase.  *See, e.g.*, *Getty Petroleum Mktg., Inc.*, 391 F.3d at 320-21, 330 (1st Cir. 2004) (court and parties unable to locate NFPA standard).

32.     Third, one can search libraries for standards.  Contrary to the SDOs' suggestion, library availability is poor; libraries typically carry current standards but not earlier standards that still function as law, and library copies are typically only on paper.  *See, e.g.*, *Getty Petroleum Mktg., Inc.*, 391 F.3d at 320-21, 330 (1st Cir. 2004).

33.     Finally, one can access some standards through online "reading rooms"—all but one of which standards publishers established only after Public Resource embarrassed them by

highlighting the lack of public access.  But many standards that are part of the law are not available in any online reading room.  *See, e.g.*, Becker Decl., ¶ 11, Ex. 44 (Comstock Depo.) at 20:19–22.

34.     Plaintiffs provide "reading rooms" for some of the incorporated standards. Dkt. 118-11, ¶ 50; Dkt. 118-7, ¶ 60; Dkt. 118-8, ¶ 45; Dkt. 188-10, ¶¶ 19–20; Dkt. 198-53, ¶ 3; Dkt. 198-52, ¶ 41

35.     Plaintiffs' "reading rooms" do not permit software-based searching and analysis of the incorporated standards. Becker Decl. ¶ 62, Ex. 96 (Fruchterman Rep.) at 6.

36.     Plaintiffs online "Reading Rooms" do not allow people with print disabilities to use software based screen readers to access the legally mandated standards. Becker Decl. ¶ 62, Ex. 96 (Fruchterman Rep.) at 7–13.

37.     People must register to access the reading rooms established by ASTM and NFPA. The registration process requires a visitor to provide ASTM and NFPA with their names and email address. ASTM also requires visitors to provide additional information, including the visitors address and phone number. Becker Decl., ¶ 12, Ex. 45(Grove Depo.) at 213:14–19; Becker Decl., ¶ 13, Ex. 46 (Bliss Depo.) at 79:4–7; Becker Decl., ¶ 9, Ex. 42 (Mullen Depo.) at 50:4–18; Dkt. 122-8, Ex. 132 (ASTM Reading Library Registration Screen, Page) at 1; Dkt. 122-8, Ex. 133 (ASTM Reading Library Registration Screen) at 2; Dkt. 122-8, Ex. 138 (NFPA Sign In Webpage).

38.     NFPA uses the information gathered from visitors to its online Reading Room to send marketing materials. Becker Decl., ¶ 9, Ex. 42(Mullen Depo.) at 51:17–52:2.

39.     The visitor to Plaintiffs' reading rooms will find the standard displayed in a small box on the visitor's screen, in text that is sometimes degraded, in a small font size that is difficult for many people to read. Magnification of the text makes the text appear blurry. In general, only a small part of each page of the standard is visible at once, and with greater magnification even a

single line cannot be viewed without scrolling. Each page of each standard is stamped over the text with a warning that the material is copyrighted. Becker Decl., ¶ 12, Ex. 45(Grove Depo.) at 217:1–19; Dkt. 122-8, Ex. 140; Dkt. 122-9, Ex. 141; Dkt. 122-9, Ex. 142; Dkt. 122-9, Ex. 143; Becker Decl., ¶ 13, Ex. 46 (Bliss Depo.) at 219:18-221:05; Dkt. 122-8, Ex. 139 (ASHRAE Reading Room Screenshot); Dkt. 118-7. ████████████████████████████████

████████████ Becker Decl. ¶ 61, Ex. 95. ██████████████████████████████

████████████████████████████████████████████████████ Becker Decl. ¶ 63, Ex. 97.

40.     A user of ASTM's reading room must click a box that states the user agrees to ASTM's end user license agreement before accessing the reading room. NFPA's reading room also contains terms of service. Dkt. 122-8 Ex. 35 (ASTM License Agreement Webpage); Dkt. 122-8 Ex. 135 (ASTM Reading Room Terms); Dkt. 122-8 Ex. 137 (NFPA Free Access Terms).

41.     ASHRAE posted some of its standards for public viewing in a format that restricted downloading. Becker Decl., ¶ 11, Ex. 44 (Comstock Depo.) at 11:25–12:7.

42.     ASHRAE posted its standards for public viewing with the intent of increasing demand for the posted standards. Becker Decl., ¶ 11, Ex. 44(Comstock Depo.) at 11:25–12:7.

43.     ASHRAE removes older standards incorporated by reference from its reading room. Becker Decl., ¶ 11, Ex. 44 (Comstock Depo.) at 20:19–22.

44.     Plaintiffs do not allow people to print or download the standards on their reading rooms. Dkt. 122-8, Ex. 134 (ASTM Reading Room Disclaimer); Dkt. 198-52, ¶ 42.

## III.     THE STANDARDS ARE DESIGNED TO BE FOLLOWED AS LAW

45.     Plaintiffs monitor whether people follow the requirements of standards incorporated into law. Becker Decl., ¶ 13, Ex. 46 (Bliss Depo.) at 30:1–37:25.

46.     Plaintiffs enforce whether people follow the requirements of standards incorporated into law. Becker Decl., ¶ 13, Ex. 46 (Bliss Depo.) at 30:1–37:25.

47.     The standards at issue are dictated by external factors, including international principles and the desire to satisfy regulations and laws. Dkt. 122-7, Ex. 106 (Public Policy & Corporate Outreach Presentation, Sep. 2015); Becker Decl., ¶ 12, Ex. 45 (Grove Depo.) at 94:24–95:01.

48.     NFPA's Style Manual for the NEC, for example, specifies that because the NEC is "intended to be suitable for adoption as a regulatory document, it is important that it contain clearly stated mandatory requirements in the code text" so as to "encourage uniform adoption . . . without alterations." Additionally, ASHRAE circulates a detailed Manual designed to ensure that technical committees draft standards that will be easily adopted as regulations. Dkt. 122-8, Ex. 122 (Style Manual for the NEC) at 4; Dkt. 122-7, Ex. 103 (ASHRAE Guide to Writing Standards in Code Intended Language).

## IV.     PLAINTIFFS LOBBY TO HAVE THEIR STANDARDS MADE LAW

49.     ASTM seeks to get Congress to incorporate the most recent version of any particular standard because incorporation "freezes … that reference in statute for years to come." Becker Decl., ¶ 12, Ex. 45 (Grove Depo.) at 260:25–261:15.

50.     The adoption or incorporation of NFPA codes and standards into law may benefit NFPA financially because it encourages industries to purchase the standard. Becker Decl., ¶ 13, Ex. 46 (Bliss Depo.) at 118:23–119:1; Becker Decl., ¶ 5, Ex. 38 (Jarosz Depo.) at 209:16–210:7.

51.     ASHRAE has a Government Affairs office in Washington D.C. Dkt. 122-4, , Ex. 52.

52.     ASHRAE's Government Affairs office has encouraged members of congress and other policy makers to incorporate ASHRAE standards into law. Becker Decl., ¶ 10, Ex. 43 (Reiniche Depo.) at 136:11–21; 138:24–140:10; 210:19–211:09.

53.     ASHRAE started a grassroots program to advocate for adoption of building codes into law, including the standard known as ASHRAE 90.1. Becker Decl., ¶ 10, Ex. 43 (Reiniche Depo.) at 144:06–145:23.

54.     ASHRAE refers to the citation of ASHRAE 90.1 in the Energy Policy Act ("EPAct") as ASHRAE's "EPAct advantage," because ASHRAE 90.1 is referenced over other energy efficiency commercial building codes. Dkt. 122-4, Ex. 50; Becker Decl., ¶ 10, Ex. 43 (Reiniche Depo.) at 127:13–127:18, 128:07–130:21.

55.     ASHRAE has repeatedly entered into a "Memorandum of Understanding" with the Department of Energy (DOE) that states that both organizations are "committed to working together toward . . . [c]ooperating in promotion of ANSI/ASHRAE standards adoption in building codes."  Dkt. 122-4, Ex. 49; Becker Decl., ¶ 10, Ex. 43 (Reiniche Depo.) at 110:20–111:16; 113:13–114:01.

56.     ASTM makes governments aware of ASTM standards, and takes pride in the incorporation by reference of its standards. Becker Decl., ¶ 12, Ex. 45 (Grove Depo.) at 235:02–236:02.

57.     ASTM reaches out to congressional staffers and government agencies to suggest the use of particular editions of standards and particular language in legislation. Dkt. 122-3, Ex. 24; Becker Decl., ¶ 12, Ex. 45 (Grove Depo.) at 124:10–125:05; 258:16–261:23; 263:05–263:09.

58. ASTM participated in an "Incorporation by Reference Public Workshop" with the U.S. Department of Transportation on July 13, 2012. Becker Decl., ¶ 12, Ex. 45 (Grove Depo.) at 270:7–19.

59. ASTM has never requested that Congress or a federal agency not incorporate an ASTM standard by reference into law. Becker Decl., ¶ 12, Ex. 45 (Grove Depo.) at 261:25–262:08.

60. On December 3, 2015, ASTM co-sponsored an event in Washington D.C. entitled "What Do Airplanes, Robots, Toys, Flat Screen TVs Amusement Parks & 3D Printing Have in Common?" The promotional literature for the event states that the event "will highlight the importance of government participation in and the reliance on voluntary standards and conformance." Dkt. 122-7, Ex. 104 ("Capitol Hill Event to Feature Policy and Business Leader Insights on Voluntary Standards and Conformance").

61. NFPA engages in activities to promote the adoption and incorporation by reference of NFPA codes and standards into law. Becker Decl., ¶ 13, Ex. 46 (Bliss Depo.) at 46:19–48:20; 62:20–63:08; 82:09–18.

62. NFPA is not aware of any situation where it would discourage the adoption of a standard into law. Becker Decl., ¶ 13, Ex. 46 (Bliss Depo.) at 48:21–49:04.

63. NFPA is "advocating for fire safety" through the adoption and use of its standards by governments and industries. Becker Decl., ¶ 13, Ex. 46 (Bliss Depo.) at 82:13–25.

64. According to a statement by the Modification and Replacement Parts Association: "The burden of paying high costs simply to know the requirements of regulations may have the effect of driving small businesses and competitors out of the market, or worse endanger the safety of the flying public by making adherence to regulations more difficult due to fees . . . ." Dkt. 122-

7, Ex. 105 (ABA Section of Administrative Law and Regulatory Practice Resolution, submitted November 17, 2015).

## V.      PUBLIC RESOURCE AND CARL MALAMUD

### A.      Carl Malamud's Record of Public Service

65.      Carl Malamud is the President and Founder of Public Resource.  Since the 1980's, Mr. Malamud has dedicated his career to matters of public interest with a focus on Internet connectivity and public access.  Mr. Malamud's career began as a Senior Systems Analyst at Indiana University.  After completing his doctoral coursework with a focus on antitrust and regulation at the Indiana University School of Business, Mr. Malamud left the program to work on early relational database programs and computer networking. Declaration of Carl Malamud in Support of Public Resource's Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment ("Malamud Decl") ¶ 3.  In 1984, Mr. Malamud assisted the Board of Governors of the Federal Reserve System in using computer and network technology to improve key indicators such as forecasts of the money supply.  Malamud Decl. ¶ 4.  Throughout the rest of the 1980's Mr. Malamud continued his public service as a computer consultant to the Argonne and Lawrence Livermore National Laboratories and the Department of Defense as well as teaching advanced seminars in relational databases and computer networks. Malamud Decl. ¶ 5. In 1993, Mr. Malamud founded the first radio station on the Internet, which he ran as a 501(c)(3) nonprofit public station. Malamud Decl. ¶ 6.

66.      In January 1994, Mr. Malamud began to make government and legal materials more widely available to the public.  Using a National Science Foundation grant, he purchased all electronic filings corporations submitted to the Securities and Exchange Commission (SEC) and created the Electronic Data Gathering and Retrieval (EDGAR) service, which he made available for free on the Internet. Malamud Decl. ¶ 7. In August 1995, he donated computers and software

to the SEC so the Commission could take over this service. *Id*. The SEC continues to operate this popular service, and reports that the system processes about 3,000 filings per day and 3,000 terabytes of data annually. *See* "About EDGAR," https://www.sec.gov/edgar/aboutedgar.htm.

67.    Also in 1994, Mr. Malamud obtained the first "new media" credentials from the Radio-TV Gallery of the U.S. House of Representatives and started live-streaming all proceedings from the floors of the House and Senate. Malamud Decl. ¶ 9. He later assisted the Joint Economic Committee in hosting the first congressional hearing on the Internet. Malamud Decl. ¶ 10. That year, Mr. Malamud also purchased feeds of all U.S. patents and made them available for free on the Internet, and later convinced the U.S. Patent and Trademark Office to provide this service to the public itself. Malamud Decl. ¶ 12.

68.    Throughout the 2000s, Mr. Malamud continued his mission of making government information more accessible to the public.  In 2005 and 2006, Mr. Malamud was the Chief Technology Officer for the non-profit education organization Center for American Progress. While there, he focused on developing a plan to make all congressional hearing available to the public as high-resolution video. Malamud Decl. ¶ 13. And, in 2007, Mr. Malamud founded Public Resource.  Through Public Resource, Mr. Malamud has spearheaded successful efforts to make government records and information publicly accessible. Malamud Decl. ¶ 14.

69.    In January 2009, President Barack Obama's transition effort recruited Mr. Malamud to develop plans and assist with transforming the Federal Register.  The resulting program won the first-ever Walter Gellhorn Award for innovation in government services by the Administrative Conference of the United States. The Archivist of the United States, Hon. David Ferriero, recognized Mr. Malamud's efforts in a letter dated April 2, 2019, stating: "Our Founding

Fathers believed that an informed and involved citizenry was key to our democracy and Public Resource helps us make[] this true." Malamud Decl. ¶ 22.

70.     Mr. Malamud has been recognized by numerous government officials for his efforts to make government information freely accessible on the Internet.  For example, Hon. Nancy Pelosi, Speaker of the House of Representatives, wrote to Mr. Malamud on April 17, 2008, stating: "I thank you for your work to increase public discourse on technology, public domain, and transparency issues and look forward to continuing to work with you." Malamud Decl. ¶ 13. Hon. John Boehner, then Speaker of the House of Representatives, together with Representative Darrell Issa, Chair of the House Committee on Oversight and Government Reform, wrote to Mr. Malamud on January 5, 2011, stating: "We're writing today to thank you for your nearly two decades of work to increase the availability of public data, and more recently your efforts to publish proceedings of the House Oversight and Government Reform Committee in their entirety," and later recognized Public Resource from the floor of the House. Malamud Decl. ¶ 15. Mr. Malamud has also received commendations from Hon. Lee H. Rosenthal, Chair of the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States, and many others. Malamud Decl. ¶ 18.

71.     In addition to recognition from government officials, organizations have routinely recognized Mr. Malamud's efforts to make government information more accessible, including awards from Harvard University, the Society of Professional Journalists, the First Amendment Coalition, and the American Association of Law Libraries. Malamud Decl. ¶ 23.

**B.     Public Resource's Mission**

72.     Public Resource is a non-profit charitable organization that provides online access to many kinds of government materials, from judicial opinions to video recordings of congressional hearings.  Malamud Decl. ¶ 1.  As part of this mission, Public Resource operates a

website providing public access to the law, including statutes, judicial opinions, and public safety and other standards that federal and state governments have incorporated into law by reference. Dkt. 121-5.  Public Resource also contributes its materials to the Internet Archive.  *Id.*  Public Resource aims to create a public collection of *government edicts*.  Malamud Decl. ¶ 38; *see generally* http://www.public.resource.org/.  Public Resource does not limit, or charge for, access to its platform.  Dkt. 121-5 ¶ 24.  It does not display, or derive any revenue from, advertising.  It relies entirely on contributions and grants.  Dkt. 121-5 ¶ 30.

73.     Public Resource promotes public discourse by making laws and regulations, including those incorporated by reference, more accessible.  For example, by reformatting documents, Public Resource allows persons with visual disabilities to enlarge the text or use electronic text-to-speech readers to hear the text.  Dkt. 121-5 ¶ 26.  Similarly, Public Resource often translates images into scalable vector graphics for better enlargement.  Malamud Decl. ¶ 27..  It uses optical character recognition and often painstakingly retypes documents into Hypertext Markup Language ("HTML") and converts formulas to Mathematics Markup Language ("MML").  *Id.*  This makes documents newly word-searchable and allows researchers to analyze them at large scale with techniques such as machine learning.  *Id*.

74.     Public Resource endeavors to post on its website only standards that have become a federal or state law or regulation through incorporation by reference.  Malamud Decl. ¶ 38.

**C.     Public Resource's Litigation and Other Disputes**

75.     In January 2013, the Sheet Metal and Air Conditioning Contractors National Association (SMACNA) threatened Public Resource with litigation for posting the "HVAC Air Duct Leakage Test Manual," which was incorporated by reference into 10 CFR § 434.403 as well as incorporated into state regulations.  Malamud Decl., ¶ 33.

76.    Public Resource sued for declaratory relief in the U.S. District Court for the Northern District of California, Case 3:13-cv-00815. Malamud Decl., ¶ 34.  On July 9, 2013 SMACNA agreed to a stipulated judgment in which it agreed no longer to threaten Public Resource or other parties for the posting of the four standards explicitly incorporated into the CFR, not to assert copyright in those documents, and to pay Public Resource a token one dollar. *See* Malamud Decl., ¶ 34, Ex. 27.

77.    When the State of Oregon objected to Public Resource's posting of the Oregon Revised Statutes, Carl Malamud spoke to the Legislative Counsel Committee, a joint committee of the Oregon Legislature chaired by the Speaker of the House and the Senate President. After hearing him and other witnesses, including the Legislative Counsel, the committee voted to abandon assertions of copyright over the Oregon Revised Statutes.  *See* Malamud Decl., ¶ 24, Ex. 23.

78.    Similarly, in 2012, after Public Resource posted the official Code of the District of Columbia, the General Counsel of the District of Columbia studied the situation and decided to produce a better web site for public access to the laws of the District of Columbia. The software is maintained by the non-profit Open Law Library and available at https://code.dccouncil.us/.  *See* Malamud Decl., ¶ 25.

79.    The State of Georgia sued Public Resource for posting online the Official Code of Georgia Annotated.  Malamud Decl., ¶ 26.  That case concerns Georgia's only official law, which the state publishes as the "Official Code of Georgia Annotated" with annotations that the state has designated as "official."  The Eleventh Circuit held that Public Resource's actions were lawful: it ruled the entire Code, with annotations, is a government edict not subject to copyright. *See Code Revision Commission v. Public.Resource.Org*, 906 F.3d 1229, 1233, 1244 (11th Cir. 2018).  That

case is now before the U.S. Supreme Court. *See State of Georgia v. Public.Resource.Org, Inc.*, U.S. Supreme Court Docket 18-1150.  Malamud Decl., ¶ 26.

80.     Mr. Malamud and Public Resource posted to the Internet Archive the version of the 2002 version of the National Electrical Safety Code (NESC) that the Indiana Supreme Court reviewed in *Bellwether Properties, LLC, v. Duke Energy Indiana, Inc.*, 87 N.E.3d 462, 468–69 (Ind. 2017), which is located at https://ia600704.us.archive.org/16/items/gov.law.ieee.c2.2002/ ieee.c2.2002.pdf.  Malamud Decl. ¶ 42. The metadata page for the 2002 version of the NESC indicates that it was "Uploaded by Public.Resource.Org," *see* https://archive.org/details/gov.law. ieee.c2.2002  and  https://ia600704.us.archive.org/16/items/gov.law.ieee.c2.2002/ieee.c2.2002. pdf_meta.txt. *Id*.

## VI.    PUBLIC RESOURCE'S POSTING OF STANDARDS AT ISSUE

81.     Public Resource has posted the incorporated standards at issue online. Dkt. 121-5 ¶ 15–19.

82.     A "reapproval" of an ASTM standard means that an older standard is re-evaluated and republished without any changes to its content. Becker Decl., ¶ 7, Ex. 40 (Smith Depo.) at 151:01–152:02.

83.     As a public officer (but not as an NFPA employee), NFPA Vice President Donald Bliss has experienced confusion as to which version or edition of the code is in force in a jurisdiction because NFPA produces a number of different editions. Becker Decl., ¶ 13, Ex. 46 (Bliss Depo.) at 215:13–23.

84.     Each standard at issue on Public Resource's websites was incorporated by reference into law. Dkt. 121-5 ¶ 23; Pls. Mem. 9. A small minority of the ASTM standards that Public Resource posted were not the precise edition that is mentioned in the C.F.R.  Often this is because Public Resource posted an identical reissue of the standard where it could not obtain the precise

edition that was cited. But in several instances, the editions Public Resource posted may have minor editorial differences, or rarely a substantive difference. For a complete listing of the standards at issue, citations to the incorporation, and excerpts of the incorporating language, see the IBR Reference Tables at Becker Decl. ¶¶ 56-58, Exs. 89-91.

85.     Nearly all of the standards at issue were promulgated as private industry standards several years before being incorporated into law by government agencies. *See, e.g.*, ASTM D396-1998 "Standard Specification for Fuel Oils", incorporated into reference into law at 41 C.F.R. § 60.17 (2011); Dkt. 120, Ex. 153 ████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████

86.     Public Resource posted some of the incorporated standards at issue in standard Web formats. Dkt. 121-5 ¶ 24–27; ECF No. 117-1 (Jarosz Rep.) ¶ 35.

87.     Public Resource posted the incorporated standards at issue using Hypertext Markup Language (HTML), Mathematics Markup Language (MathML), and Scalable Vector Graphics (SVG). Over time, Public Resource used contractors to assist in transforming the standards into HTML format. Two people independently type out most of the standards on Public Resource's websites and compare any discrepancies between their versions to confirm the accuracy of the transcription in a process called "double-keying." Public Resource's contractor also worked to convert the diagrams into Scalable Vector Graphics ("SVG") and the mathematical formulae into Mathematics Markup Language ("MathML"). Dkt. 121-5 ¶ 25.

88.     Hypertext Markup Language (HTML), Mathematics Markup Language (MathML), and Scalable Vector Graphics (SVG) permit users to perform software-based searching and analysis. Dkt. 121-5 ¶ 25.

89.     Public Resource does not restrict the public from viewing any of the incorporated standards at issue on its websites. Dkt. 121-5 ¶ 23.

90.     Public Resource does not require people to log in to its website before viewing any of the incorporated standards at issue on its websites. Dkt. 121-5 ¶ 23.

91.     Public Resource does not require people to pay Public Resource before viewing any of the incorporated standards at issue on its websites. Dkt. 121-5 ¶ 23.

92.     The Public Resource websites are directed at researchers and engaged citizens. Dkt. 121-5 ¶ 4, 26.

93.     Public Resource's stated purpose for providing an archive or laws and other government documents on its websites is to bolster the public's ability "to know and speak the law." Dkt. 121-5 ¶ 28 (https://law.resource.org/pub/12tables.html).

94.     Plaintiffs sell copies of the incorporated standards at issue. Thomas Decl. ¶ 44, ECF No. 118-11; Pauley Decl. ¶ 44, ECF No. 118-8; Becker Decl., ¶ 11, Ex. 44 (Comstock Depo.) at 104:21–106:23.

95.     Public Resource's versions of the incorporated standards at issue are accessible to the print-disabled. People who are print-disabled can use screen reader software to read and navigate the HTML versions of the standards. James Fruchterman, Public Resource's expert on accessibility, concluded that "a blind person using a screen reader" can "read the standard . . . navigate to a specific place in the document . . . and search for key terms."). Mr. Fruchterman also observed that "standard HTML" as used by Public Resource "is also highly accessible to people with other print disabilities and the assistive technology they use to access print," such as people with "vision impairment, dyslexia, brain injury and physical disabilities." Becker Decl. ¶ 62, Ex.

96 (Fruchterman Rep. 5–7); ¶ 17, Ex. 50 (R. Malamud Dep. 233:15–234:7); Becker Decl., ¶ 6, Ex. 39 (Fruchterman Depo.) at 125:10–11.

96.     Plaintiffs' versions of the incorporated standards at issue online are not as accessible to the print-disabled as Public Resource's versions of those standards. None of the Plaintiffs provide free electronic access to standards incorporated into law for people with disabilities. For example, NFPA's website requires visitors to register before viewing the standards, and its registration process cannot be completed by blind users. None of the Plaintiffs provides machine-readable text of the incorporated standards through their free reading portals. They provide only "a picture of the text," which causes screen-reading software to "stop working." Nor do the Plaintiffs' websites provide any means for disabled visitors to search or navigate the documents. Thus, "Public.Resource.Org currently provides the only accessible option for people/citizens with print disabilities to access these standards."   Becker Decl., ¶ 6, Ex. 39 (Fruchterman Depo.) at 43:21–23; 112:1–8; 133:5; 143:10–14; 165:17–166:7; 167:8; 205:2–13; Becker Decl. ¶ 62, Ex. 96 (Fruchterman Rep. 5–13); Becker Decl., ¶ 13, Ex. 46 (Bliss Depo.) at 220:1–221:25; ¶ 2, Ex. 4 (Bliss Ex. 1003); Becker Decl., ¶ 11, Ex. 44 (Comstock Depo.) at 20:22; 44:1–46:25.

97.     Downloading an incorporated standard allows more flexibility for using and sharing that standard. Becker Decl., ¶ 11, Ex. 44 (Jarosz Depo.) at 215:9–15; 215:21–216:1.

98.     It is not Public Resource's intention to make copies that are similar to the standards actually sold by ASTM available on its website because they post standards that have been explicitly and specifically incorporated by reference into federal or state law. Dkt. 121-5 ¶ 4–15.

99.     Public Resource posted the incorporated standards at issue to inform citizens about the content of the law. Dkt. 121-5 ¶ 4.

100.    Public Resource posted the incorporated standards at issue on its website in formats meant to increase citizen access to the law. Dkt. 121-5 ¶ 26.

101.    Public Resource posted the incorporated standards at issue for the purpose of transforming the information in the standards by making that information accessible to people who did not necessarily have access to that information before. Dkt. 121-5 ¶ 35.

102.    Public Resource does search engine optimization so that the standards are accurately described in search engine results. Dkt. 121-5 ¶ 29.

## VII.    PLAINTIFFS' LIMIT USE OF THE STANDARDS

103.    ASTM gives government bodies like the U.S. Geological Survey and the State of Georgia, fellow standards development organizations like NFPA, IAPMO, and ICC, and favored corporations liberal permission to copy standards in both paper and electronic format, and to use excerpts from standards in other documents. Dkt. 122-7, Exs. 107, 108, 109; 110, 111, and 112.

104.    ASTM regularly refuses to give similar permissions to graduate students, universities, libraries, and smaller businesses. Dkt. 122-7 Exs. 113, 115, 116, 117, 120; Dkt. 122-8 Exs. 130, 131.

105.    ASTM gave the structural engineering firm SGH, "a big supporter of ASTM," permission to excerpt a number of figures and tables from a standard. Dkt. 122-7, Ex. 112.

106.    ASTM refused to allow an engineering student at the University of Pennsylvania to use "photographs and figures" from another standard in a case study. Dkt. 122-7, Ex. 117.

107.    When an ASTM employee wrote that "we typically do not provide figures [from standards] for reproduction purposes," John Pace, ASTM's Vice President of Publications and Marketing, responded that ASTM has a "'triple standard' here on considerations for such requests," and that the owner of a chemical company, Sheldon Dean, who was "platinum level"

because of his "connection status" with ASTM committees, should be given permission to use excerpts from an ASTM standard in a forthcoming book. Dkt. 122-7, Ex. 119.

108.    ASTM refused to allow Columbia Analytical to reproduce several abstracts from an ASTM standard. Dkt. 122-7, Ex. 120.

109.    ASTM has a policy against permitting the posting of ASTM standards on the public internet. Dkt. 122-9, Ex. 144.

110.    ASTM did not permit a person in the UK to post the information in the ASTM D2000-12 standard. Dkt. 122-9, Ex. 145.

111.    Plaintiffs' assertion of copyright in incorporated standards makes it more difficult for others to produce materials such as training and user manuals. Becker Decl., ¶ 11, Ex. 44 (Jarosz Depo.) at 217–224.

## VIII.   PLAINTIFFS' MISSIONS AND PURPOSES FOR PUBLISHING STANDARDS DIFFERS FROM PUBLIC RESOURCE'S MISSION AND PURPOSE

112.    Plaintiffs are three standards development organizations ("SDOs") that publish voluntary consensus standards. Dkt. 118-1 at 4–9; Compl. Ex. A–C.

113.    According to Plaintiffs, ASTM has published approximately 12,000 standards, NFPA has published over 300 standards, and ASHRAE has published over 100 standards. ECF No. 117-1 (Jarosz Rep.) ¶ 13 (ASTM); ¶ 17 (NFPA); ECF No. 118-10 (Reiniche Decl.) ¶ 2, (ASHRAE).

114.    ASTM's Mission Statement reads: "To be recognized globally as the premier developer and provider of voluntary consensus standards, related technical information, and services that promote public health and safety, support the protection and sustainability of the environment, and the overall quality of life; contribute to the reliability of materials, products,

systems and services; and facilitate international, regional, and national commerce." Dkt. 122-6, Ex. 100.

115.    NFPA's "About NFPA" webpage states: "Founded in 1896, NFPA is a global, nonprofit organization devoted to eliminating death, injury, property and economic loss due to fire, electrical and related hazards. The association delivers information and knowledge through more than 300 consensus codes and standards, research, training, education, outreach and advocacy; and by partnering with others who share an interest in furthering the NFPA mission." Dkt. 122-6, Ex. 101.

116.    ASHRAE's Mission is "To advance the arts and sciences of heating, ventilation, air conditioning and refrigeration to serve humanity and promote a sustainable world." Dkt. 122-6, Ex. 102.

## IX.    EVEN BEFORE BECOMING LAW, THE STANDARDS WERE FACTUAL WORKS

117.    ASTM defines the standards they produce as documents comprising "specifications, test methods, practices, guides, classification and terminology." Becker Decl., ¶ 12, Ex. 45 (Grove Depo.) at 14:22–15:6.

118.    ASTM has a form and style guide that sets forth the rules that persons generally must follow in participating in the drafting and revision process of ASTM standards. Dkt. 122-1, Ex. 8; Becker Decl., ¶ 12, Ex. 45 (Grove Depo.) at 268:14–269:4.

119.    According to NFPA's corporate designee, Donald Bliss, codes and standards are procedures and practices. Becker Decl., ¶ 13, Ex. 46 (Bliss Depo.) at 21:18–22:11.

120.    ASHRAE described one of the standards at issue, the 1993 ASHRAE Handbook: Fundamentals, as "a tool for engineers to use when they're working with the topics covered in that book." Becker Decl., ¶ 10, Ex. 43 (Reiniche Depo.) at 158:20–24.

121.     The content of the ASHRAE standards-at-issue is based on a technical committee's review of the relevant research, public input and committee expertise, all of which is intended to determine the best rule—the consensus standard—for the relevant industry. Becker Decl., ¶ 13, Ex. 46 (Bliss Depo.) at 140:1–41:4; Becker Decl., ¶ 8, Ex. 41 (Dubay Depo.) at 29:12–21, 68:9–20, 73:16–25; Becker Decl., ¶ 10, Ex. 43 (Reiniche Depo.) at 94–95; Dkt. 117-1 (Jarosz Rep.) 26–30.

122.     NFPA is committed to reducing "the worldwide burden of fire and other hazards" by developing and disseminating codes that will minimize fire risk. Dkt. 117-1 (Jarosz Rep. 29).

123.     Bliss testified that, when he was a committee member, his motivation was to develop the "best" standard, and "best" meant "understanding the problem based on past experience and events, having as much scientifically based research to contribute to the development of the standard and then a very, very open and transparent consensus process." After that:

> There's a tremendous amount of public input and vetting of the concepts and the actual language which in reality mirrors a government adoption of legislative process.

Becker Decl., ¶ 13, Ex. 46 (Bliss Depo.) at 139:07–140:10.

124.     ASHRAE says its standards define "the minimum acceptable performance for the relevant products." Dkt. 117-1 (Jarosz Rep.) at 33.

125.     The main benefit of the consensus process, according to ASHRAE, is that it relies on experts who understand "how to make that product or how to construct that building or how to make something more energy efficient." Becker Decl., ¶ 10, Ex. 43 (Reiniche Depo.) at 102:23–25.

126.     As NFPA puts it, there are two types of changes: technical changes, which are "scientific" and wording changes, which involve making potentially confusing language more clear "to make it easier to interpret of understand what that actual technical requirement is." Becker Decl., ¶ 8, Ex. 41 (Dubay Depo.) at 28:22–30:4.

127.     The volunteers who draft the standards do not view them as creative expression. Volunteers debate wording in the standards so as to have the most precise and accurate description of the process, system, or methods that comprise the standards. The exact wording matters, and it is not sufficient to try to rephrase this language as rephrasing could introduce errors. Becker Decl., ¶ 13, Ex. 46 (Bliss Depo.) at 140:1–140:10.

128.     Plaintiffs believe that technical excellence is why their standards are ultimately incorporated by reference. M Becker Decl., ¶ 12, Ex. 45 (Grove Depo.) at 235:2–23.

129.     NFPA asserted that "standard developers converge around terminology and format that works for their constituents that utilize their standards." Becker Decl., ¶ 8, Ex. 41 (Dubay Depo.) at 139:03–06.

130.     ASHRAE standards take the form of specific requirements that "provide methods of testing equipment so that equipment can be measured [and] compared with similar levels of performance." Becker Decl., ¶ 11, Ex. 44 (Comstock Depo.) at 96:01–22.

131.     ASTM standards are "[s]pecifications, test methods, practices, guides, classifications and terminology." Becker Decl., ¶ 7, Ex. 40 (Smith Depo.) at 14:22–15:18.

132.     An NFPA standard provides a consistent process for fire investigation. Becker Decl., ¶ 13, Ex. 46 (Bliss Depo.) at 106:09–24.

## X.     PLAINTIFFS HAVE NO EVIDENCE OF HARM

133.     Public Resource first posted the 2008 National Electric Code on its website in 2008. Dkt. 164-8 (Supp. Decl. of Carl Malamud) ¶¶ 5–7.

134.     Plaintiffs have discussed Public Resource's activities at the highest levels of their organizations since at least 2010, but waited until August 2013 to file this lawsuit. ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ Dkt. 120, Ex. 150.

135.     All of the standards at issue have been superseded or withdrawn. Becker Decl. ¶¶ 56-58, Exs. 89-91 (IBR Reference Tables); Dkt. 122, Exs. 97–99.

136.     Public Resource's posting of the incorporated standards at issue has not caused Plaintiffs any measurable harm. Becker Decl., ¶ 11, Ex. 44 (Jarosz Depo.) at 63:3–10; 123:14–18; 136:5–137:24; 155–158; 160:3–6; 177:17–178:5; 212:11–213:3; 214:13–215:3; 245:2–250:11; Becker Decl., ¶ 11, Ex. 44 (Comstock Depo.) at 12:2-11; 63:10-16; 64:20–25; *see generally* Becker Decl. ¶¶ 22-23, Exs. 55-56; Becker Decl. ¶¶ 39-47, Exs. 72-80.

137.     ████████████████████████████████████████████████████

████████████████████ Dkt. 120, Ex. 146; Becker Decl., ¶ 12, Ex. 45 (Grove Depo.) at 144:22–145:2.

138.     ASTM has no evidence that it has lost sales of any of the incorporated standards at issue because Public Resource made the incorporated standards at issue publicly available. Becker Decl., ¶ 12, Ex. 45 (Grove Depo.) at 152:19–24.

139.     ASTM has no evidence that Public Resource caused ASTM to lose money. Becker Decl., ¶ 12, Ex. 45 (Grove Depo.) at 154:25–155:5.

140.     ASTM has no knowledge of any evidence that Public Resource caused ASTM any property damage or injury. Becker Decl., ¶ 12, Ex. 45 (Grove Depo.) at 155:7–12.

141.    ASTM has no evidence that Public Resource caused ASTM any damage to ASTM's reputation. Becker Decl., ¶ 12, Ex. 45 (Grove Depo.) at 165:12–15.

142.    Plaintiffs' expert Jarosz was unable to quantify any financial losses to Plaintiffs as a consequence of Public Resource's activities. Becker Decl., ¶ 11, Ex. 44 (Jarosz Depo.) at 63:3–10.

143.    Plaintiffs' expert Jarosz was not aware of any documents showing NFPA suffered harm from Public Resource's activities.  Becker Decl., ¶ 11, Ex. 44 (Jarosz Depo.) at 123:9–18.

144.    Plaintiffs' expert Jarosz's only evidence of harm is statements by plaintiffs' officers. Becker Decl., ¶ 11, Ex. 44 (Jarosz Depo.) at 155–163.

145.    Plaintiffs' expert Jarosz was not aware of any direct evidence of the impact of Public Resource's activities on Plaintiffs' financials. Becker Decl., ¶ 11, Ex. 44 (Jarosz Depo.) at 160:3–6.

146.    Plaintiffs' expert Jarosz did not correlate Public Resource's posting of the standards at issue with Plaintiffs' revenues from the sale of the standards at issue. Becker Decl., ¶ 11, Ex. 44 (Jarosz Depo.) at 177:17–178:5.

147.    Plaintiffs' expert Jarosz did no analysis to distinguish the profitability of the standards at issue from the profitability of standards that have not been incorporated by reference into law. Becker Decl., ¶ 11, Ex. 44 (Jarosz Depo.) at 183:4–15.

148.    Plaintiffs' expert Jarosz lacks certainty that Public Resource's posting of the standards at issue caused any economic loss to Plaintiffs. Becker Decl., ¶ 11, Ex. 44 (Jarosz Depo.) at 212:11–213:3.

149.    Plaintiffs' expert Jarosz did not evaluate the extent of distribution of the standards at issue via Public Resource's website. Becker Decl., ¶ 11, Ex. 44 (Jarosz Depo.) at 214:13–215:3; 216:2–5; 245–49.

150.    ASHRAE is not aware of any revenue lost from the free availability of ASHRAE standards online. Becker Decl., ¶ 11, Ex. 44 (Comstock Depo.) at 12:2–11; 63:10–16; 64:20–25.

151.    
Dkt. 163, Ex. 10.

152.    Dkt. 163, Ex. 11.

153.    ASTM's sales from publications have increased 2% during the three years Public Resource was first posting ASTM Standards. This was in accord with Grove's expectations. Becker Decl., ¶ 12, Ex. 45 (Grove Depo.) at 19:21–20:13.

154.    ASHRAE has not attempted to track losses due to Public Resource's conduct. Becker Decl., ¶ 11, Ex. 44 (Comstock Depo.) at 63:10–16.

155.    NFPA has not identified "any direct correlation" between adoption of an edition and an increase in sales. "The only general correlation is that once a new version of the code is out, we will sell more of the new edition and less of the old edition, but nothing – no general correlation to adoption or specific spikes." Becker Decl., ¶ 9, Ex. 42 (Mullen Depo.) at 95:3–25.

156.    NFPA does not have a number on any balance sheet that corresponds to the value of the copyrights it holds because NFPA does not "attempt to place any value on any intangible asset." Becker Decl., ¶ 9, Ex. 42 (Mullen Depo.) at 140:11–18.

157.    According to NFPA's Bruce Mullen, "If I had to guess, the non-business or government purchases is probably less than 1 percent of the total sales." Becker Decl., ¶ 9, Ex. 42 (Mullen Depo.) at 187:14–23.

158.    Allowing "unauthorized persons" to use standards without training is not a cognizable harm. Becker Decl., ¶ 11, Ex. 44 (Jarosz Depo.) at 227:14–228:14.

159.    "Confusion" between incorporated standards and newer versions of Plaintiffs' standards does not harm Plaintiffs.  Becker Decl., ¶ 11, Ex. 44 (Jarosz Depo.) at 254:14–257:9.

160.    In 2002, Plaintiffs NFPA and ASHRAE argued that a lack of private monopoly to control the reproduction of mandatory building codes would "destroy" the "ability of private standards developers to underwrite the development and updating of their standards." Dkt. 122-8, Ex. 121 (Brief of American Medical Assoc. et al. as Amici Curiae at 12, *Veeck v. Southern Building Code Congress International, Inc.*, 293 F.3d 791 (5th Cir. 2002) (No. 99-40632)).

161.    After the *Veeck* decision, ASTM International and many other SDOs filed briefs seeking Supreme Court review. In those briefs, they insisted, at length, that if that decision stood it would destroy the standards development process. Dkt. 164-14.  Yet certiorari was not granted.

162.    Plaintiffs have no evidence that they suffered any loss of revenues in Texas, Louisiana, or Mississippi since 2002, when the Fifth Circuit Court of Appeals decided *Veeck v. S. Bldg. Code Cong. Int'l, Inc*., 293 F.3d 791, 796 (5th Cir. 2002) (*en banc*). Becker Decl., ¶ 11, Ex. 44 (Jarosz Depo.) at 130:6–19.

163.    Eleven states and United States territories jointly filed an amicus brief in support of Peter Veeck in the case *Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 293 F.3d 791, 801 (5th Cir. 2002), in which they asserted that "[c]opyright, while permitted by the Constitution, is at base

only a statutory right . . . . On the other hand, due process is a constitutional right of the first

order." Dkt. 164-13 at 4.

164.    People want to use the most recent version of ASTM's standards, even if an older

version is incorporated by reference into law. Becker Decl., ¶ 12, Ex. 45 (Grove Depo.) at 171:5–

8.

165.    People may want to read older versions of standards because the older version may

be the version that is incorporated by reference in a code or regulation. Becker Decl., ¶ 11, Ex. 44

(Comstock Depo.) at 19:20–24.

## XI.    PUBLIC RESOURCE'S NOMINATIVE FAIR USE AND ABSENCE OF CONSUMER CONFUSION

166.    Public Resource voluntarily applies notices to the incorporated standards at issue

on its website describing the process it uses to copy standards and disclaiming affiliation with any

SDOs. *See, e.g.*, an example of one of the standards posted on the Internet Archive, at

https://archive.org/details/gov.law.nfpa.13.2002; *see also* Dkt. 121-5 ¶ 30, Ex. 3.

167.    Each of the incorporated laws at issue has a title that contains one of the Plaintiffs'

names. Compl. Exs. A–C, ECF No. 1.

168.    Public Resource displays links to standards incorporated by reference into the Code

of Federal Regulations in a table that identifies the standards by their alphanumeric code, e.g.,

ASTM D396-98, its year, the developing organization, the title of the standard, and the C.F.R.

section that incorporated the standard by reference. Dkt. 121-5 ¶ 28, Ex. 2.

169.    Planintiffs' names must be used in order to refer to the standards at issue.  For

example, ASTM states that the citation format for this standard is: "ASTM D396-98, Standard

Specification for Fuel Oils, ASTM International, West Conshohocken, PA, 2001, www.astm.org."

Dkt. 122-9, Ex. 147.

170.   Public Resource purchased a physical copy of each of the incorporated laws at issue. Dkt. 121-5 ¶ 24.

171.   Public Resource posted on its website a PDF version of each incorporated law at issue. The PDF version accurately appeared as a scan of a physical version of the incorporated law. Dkt. 121-5 ¶ 24.

172.   For some of the incorporated laws at issue, Public Resource posted versions in HTML and SVG formats. Dkt. 121-5 ¶ 25–26.

173.   For some of the PDF versions of the incorporated laws, Public Resource attached its own cover page, which indicated where the law was incorporated by reference. Dkt. 121-5 ¶ 20–22; Compl. Ex. G, ECF No. 1-7.

174.   Public Resource's addition of embedded text and metadata in the PDF versions of incorporated laws on its website did not change the appearance of the PDF versions. Dkt. 121-5 ¶ 25.

175.   The embedded text in the PDF versions of incorporated laws on Public Resource's website enabled software based searching and text to speech functionality. Dkt. 121-5 ¶ 25.

A.   **The Standards that Plaintiffs Publish Already Have Errors**

176.   Public Resource purchased a physical copy of the 2011 NEC, which did not include a requirement that high-voltage cables be shielded. Public Resource posted an electronic version of that physical copy on its website in PDF and HTML formats. Dkt. 121-5 ¶ 34.

177.   NFPA issued two errata to the 2011 NEC.  The errata included the addition of a requirement that high-voltage cables be shielded as well as changes to cross-references in various sections. Dkt. 122-8, Exs. 123–24.

178.   Public Resource promptly corrected the errors to certain HTML versions of incorporated laws that Plaintiffs' counsel identified during the course of the deposition of Carl Malamud. Dkt. 121-5 ¶ 33.

## XII.   PUBLIC INTEREST CONSIDERATIONS

179.   It is in the public interest for people to be educated about the NFPA standards. Becker Decl., ¶ 13, Ex. 46 (Bliss Depo.) at 121:22–122:4 ("NFPA's standards establish ways to make buildings safer and processes to be safer and for people to act or react in a more safe manner when it comes to fire, electrical safety and other hazards.  It's in the public interest that people be educated about those requirements or those standards.").

180.   It is in the public interest for people to use the ASTM standards. M. Becker Decl. ¶ 20, Ex. 22 ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████

181.   Public.Resource.org seeks to inform the public about the content of the law. Dkt. 122-2, Ex. 17 (C. Malamud Ex. 33) (Public Resource "tries to put more government information online. We've had a big impact on putting more judicial information on the Internet, but also do fiche and a variety of other documents such as IRS nonprofit tax returns.").

182.   The Internet is fast becoming the primary means of obtaining information about government operations and policies. *See* U.S. Department of Justice, Civil Rights Division, "Accessibility of State and Local Government Websites to People with Disabilities," http://www.ada.gov/websites2.htm. Accessibility best practices follow the principle of universal design, which states that the best accommodations for people with disabilities are those that benefit everyone:

> When accessible features are built into web pages, websites are more convenient and more available to everyone—including users with disabilities. Web designers can follow techniques developed by private and government organizations to make even complex web pages usable by everyone including people with disabilities.

*Id.*

183.    A special commission of the Department of Education concluded in the field of accessibility for higher education that requiring people with disabilities to use special accommodations from the providers of instructional material is disfavored. "Rather, the ideal is for . . . instructional materials to be available in accessible forms in the same manner that and at the same time as traditional materials." Advisory Commission on Accessible Instructional Materials, Report of the Advisory Commission on Accessible Instructional Materials in Postsecondary Education for Students with Disabilities at 49 (December 6, 2011), http://www2.ed.gov/about/bdscomm/list/aim/meeting/aim-report.pdf. The Chafee Amendment, codified at 17 U.S.C. § 121, has never been the Copyright Act's sole means of promoting accessibility, and federal officials now consider it outdated and in need of reform. *See id.* at 43-44.

## XIII.   DRAFTING OF THE STANDARDS AT ISSUE

184.    Each standard at issue was developed by a large number of unpaid volunteers, including federal government employees, state and municipal government employees, employees of private companies and organizations, and ordinary citizens. Becker Decl., ¶ 7, Ex. 40 (Smith Depo.) at 56:03–57:06; ¶ 79, Ex. 81; Becker Decl., ¶ 12, Ex. 45 (Grove Depo.) at 97:25–98:07; ¶ 20, Ex.22; ¶ 22, Ex. 24; Becker Decl., ¶ 8, Ex. 41 (Dubay Depo.) at 15:16–16:10, 51:20–52:15, 75:17–76:11, 240:22–242:04; Becker Decl., ¶ 9, Ex. 42 (Mullen Depo.) at 114:22–115:23; Becker Decl., ¶ 10, Ex. 43 (Reiniche Depo.) at 21:01–23:21, 105:08–106:18 194:04–194:07; ¶ 42, Ex. 44; ¶ 46, Ex. 48.

185.    Volunteers or members of the public proposed the creation or revision of the standards at issue. Becker Decl., ¶ 7, Ex. 40 (Smith Depo.) at 18:05–18:19, 280:10–280:20; ¶ 93, Ex. 95; ¶ 123, Ex. 125, p. 4; Becker Decl., ¶ 10, Ex. 43 (Reiniche Depo.) at 94:20–98:24; ¶ 124, Ex. 126, p. 5 (discussing ASHRAE membership categories).

186.    Volunteers drafted the language for the standards at issue, with public input, and determine the arrangement and inclusion of proposed text.  Becker Decl., ¶ 7, Ex. 40 (Smith Depo.) at 18:05–18:23, 20:04–20:11; ¶ 93, Ex. 95; Becker Decl., ¶ 13, Ex. 46 (Bliss Depo.) at 45:12– 46:02 ("We use a system of volunteers to serve on committees to develop the standard.  It's volunteers that serve on the standards council.  It's volunteers that serve as our membership to make the final voting."); Becker Decl., ¶ 13, Ex. 46 (Bliss Depo.) at 46:03–46:13; Becker Decl., ¶ 8, Ex. 41 (Dubay Depo.) at 29:12–29:21; Becker Decl., ¶ 10, Ex. 43 (Reiniche Depo.) at 49:08– 50:11; Becker Decl., ¶ 10, Ex. 43 (Reiniche Depo.) at 60:05–60:12 ("[ASHRAE] Standard 90.1 is on continuous maintenance, so anyone at any time can propose a change to the standard.  It could be a project committee member or the public.").

187.    Volunteers voted on the final content of the standards at issue at the end of the development or revision process. Becker Decl., ¶ 7, Ex. 40 (Smith Depo.) at 15:25–16:10, 17:14– 17:24, 98:07–98:25, 186:21–186:25, 274:23–276:12; Becker Decl., ¶ 13, Ex. 46 (Bliss Depo.) at 45:12–46:13; Becker Decl., ¶ 8, Ex. 41 (Dubay Depo.) at 55:22–57:17; Becker Decl., ¶ 10, Ex. 43 (Reiniche Depo.) at 94:20–96:02 (describing the volunteer committee resolution process that votes on drafts and revisions of ASHRAE standards).

188.    The volunteers who developed the standards at issue did so out of service to their country as federal, state, or municipal employees, in furtherance of the business interests of the private companies or organizations they worked for, or because of personal interest.  Becker Decl.,

¶ 7, Ex. 40   (Smith Depo.) at 45:16–46:04 (stating that volunteers develop ASTM standards because "a company or an individual would be interested in having an ASTM standard that they could say their product or service is in compliance with"); Becker Decl., ¶ 13, Ex. 46 (Bliss Depo.) at 138:22139:12 (as a public official, Mr. Bliss participated in NFPA standard development because his "motivation was to try and establish the best possible fire safety standards that could be developed"); Becker Decl., ¶ 10, Ex. 43 (Reiniche Depo.) at 50:12-51:06 (volunteers or members of the public participate because it affects their business interests and they want to write the language that is adopted into code, or because of personal interest).

189.    Plaintiffs' employees set up meetings to discuss drafts of the standards at issue at public locations, advised the volunteers who drafted the standards, and assisted with formatting. Becker Decl., ¶ 7, Ex. 40 (Smith Depo.) at 268:13–272:25 (listing the ways in which ASTM staff assist the people who actually draft the standards); Becker Decl., ¶ 8, Ex. 41 (Dubay Depo.) at 52:16–53:04 ("NFPA employees are not -- cannot be members of our technical committees. However, as I stated previously, it's important -- there's an important role that NFPA staff plays in guiding, advising the committee, coordinating the activities and providing their technical expertise, especially technical staff liaison into this committee process.  But they do not have -- they're not members of the committee, and they do not carry a vote in the decisions of the committees."); Becker Decl., ¶ 10, Ex. 43 (Reiniche Depo.) at 97:13–98:19 (involvement of ASHRAE staff in development and updating of standard 90.1 is limited to reviewing and making suggestions to the volunteers who draft and vote on the text of the standard).

190.    Plaintiffs did not have control over the content of the standards at issue during the development and revision of those standards. The decision to develop or revise the standards at issue was made by volunteers, not by the Plaintiffs. Becker Decl., ¶ 7, Ex. 40 (Smith Depo.) at

15:25–16:10, 17:14–17:24, 98:07–98:25, 186:21–186:25, 274:23–276:12; Becker Decl., ¶ 13, Ex. 46 (Bliss Depo.) at 45:12–46:02, 46:03–46:13 (NFPA employees assist the volunteers, but the volunteers have the "ultimate decision . . . as to what the language will actually say"); Becker Decl., ¶ 8, Ex. 41 (Dubay Depo.) at 55:22–57:17; Becker Decl., ¶ 10, Ex. 43 (Reiniche Depo.) at 94:20–96:02.

191.    Federal government employees authored parts of the standards at issue. M. Becker Decl. ¶ 20, Ex. 20 at 1; ¶ 21, Ex. 23 at 9.  See also Table 6 of "Comment on Safety Standard for Automatic Residential Garage Door Operators", Public.Resource.Org, Nov. 16, 2015, at https://law.resource.org/pub/us/cfr/regulations.gov.docket.15/cpsc.gov.20151116.html#t6   (cata-loguing nineteen textual contributions to the National Electrical Code from Consumer Product Safety Commission staff).

192.    Employees of third party companies, organizations, or government entities authored parts of the standards at issue in their capacity as employees of those third party companies, organizations, or government entities. Becker Decl., ¶ 13, Ex. 46 (Bliss Depo.) at 163:04–164:19.

193.    Plaintiffs have no procedures to ensure that employees of third party companies, organizations, or government entities are capable of transferring any copyright in the standards at issue to Plaintiffs, and that such copyright is not instead held by the employer. Plaintiffs do not have any procedures in place to ensure that governmental and private company employees who participate in the development of standards have the authority or ability to transfer copyright to the Plaintiff organizations, and Plaintiffs did not request copyright assignments from the employers of the individuals who authored components of the standards at issue.  Becker Decl., ¶ 7, Ex. 40 (Smith Depo.) at 46:12–49:25, 166:17-170:19; Dkt. 120, Ex. 74; Becker Decl., ¶ 8, Ex. 41 (Dubay

Depo.) at 220:15–220:25 ("NFPA verifies through our policy the submission from the individual. We do not go to their companies to verify authority of their signature."); Becker Decl., ¶ 10, Ex. 43 (Reiniche Depo.) at 92:13–93:07.

### A. Copyright is not One of the Incentives for Drafting the Standards.

194.    Persons who volunteer to create and develop voluntary consensus standards have incentives to do so that are independent of owning the copyright to the standards or earning revenue from the sale of the standards. Becker Decl., ¶ 11, Ex. 44 (Jarosz Depo.) at 82:9–17; Becker Decl., ¶ 7, Ex. 40 (Smith Depo.) at 45:16–46:10; Becker Decl., ¶ 13, Ex. 46 (Bliss Depo.) at 21:1–3; 15–17; Becker Decl., ¶ 10, Ex. 43 (Reiniche Depo.) at 50:12–51:6; Becker Decl., ¶ 13, Ex. 46 (Bliss Depo.) at 118:09–119:01.

195.    Plaintiffs have earned revenue from sources other than selling copies of the standards. These sources include revenue from selling interpretative material related to incorporated standards; standards that have not been incorporated into law; membership dues; conference fees; training services; and public grants and contracts. Becker Decl., ¶ 9, Ex. 42 (Mullen Depo.) at 130:21–133:03; 228:11–229:23; Becker Decl., ¶ 11, Ex. 44 (Jarosz Depo.) at 192:22–193:6; Becker Decl., ¶ 13, Ex. 46 (Bliss Depo.) at 199:23–201:12; 158:06–159:15; Becker Decl., ¶ 12, Ex. 45 (Grove Depo.) at 264:22–266:19; Becker Decl., ¶ 11, Ex. 44 (Comstock Depo.) at 48:23–56:21; 59:03–60:02; 72:5–74:15. Plaintiffs acknowledge that other standards development organizations operate without asserting a right to exclude. ECF No. 117-1 (Jarosz Rep.) ¶ 81.

## XIV.  COPYRIGHT REGISTRATION AND ASSIGNMENT

196.    Almost all of the standards at issue that Plaintiffs registered with the Copyright Office are registered as "works made for hire" (with the exception of one NFPA standard, NFPA 54 National Fuel Gas Code 2006). Dkt. 122-2 Ex. 13 (ASTM Certificates of Registration); Dkt.

122-2 Ex. 15 (NFPA Certificates of Registration ); ¶ 14, Ex. 16 (ASRAE Certificates of Registration).

197.    Plaintiffs have not provided evidence that one standard at issue, ASTM D323 1958 (1968), was ever registered with the copyright office. Complaint, Ex. A at 4, ECF No. 1-1.

198.    NFPA is the only Plaintiff to allege that a work made for hire agreement was signed by developers of the standards at issue.  Plaintiffs' Statement of Material Facts ¶ 115, ECF No. 118-2.  This language attempting to classify the work of volunteers as "work made for hire" was added to NFPA forms only in 2007, after most of the standards at issue were already published, and used inconsistently thereafter.  Dkt. 122-8 Exs. 127, 128, 129 (compare NEC proposal forms from 2005, 2007, and 2008).

199.    Plaintiffs claim to be assignees of any copyright that the volunteers or members of the public who authored the standards at issue might have had in the standards at issue. Dkt. 118-1 at 16.

200.    ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████  Dkt. 120, Ex. 53 at p. 6, fn. 4.

201.    ASHRAE claims ownership of its Standards at Issue by virtue of copyright release forms that the people who drafted the standards allegedly signed. Becker Decl., ¶ 10, Ex. 43 (Reiniche Depo.) at 192:17–194:03 (stating that ASHRAE claims authorship of the standards at issue "[a]s a basis of the signed copyright assignments that all the members sign when they apply for membership, that the commenters sign when they submit a comment and that the members that submit change – or the public that submits change proposals sign when they submit a change

proposal"); Becker Decl., ¶ 10, Ex. 43 (Reiniche Depo.) at 193:08–17 (stating that the people who authored the standards are not employees of ASHRAE).

202.    ASHRAE requires volunteers who contribute to standard development to sign a copyright release explicitly granting ASHRAE "non-exclusive" rights in those contributions. Becker Decl., ¶ 10, Ex. 43  (Reiniche Depo.) at 70:02-70:11.

203.    ASHRAE indicated the following language from one of its alleged "assignment" forms when asked to indicate what language from that form it believes serves as an assignment of copyright rights:

> If elected as a member of any ASHRAE Standard or Guideline Project Committee or appointed as a consultant to such committee I hereby grant the American Society of Heating, Refrigerating and Air-Conditioning Engineers (ASHRAE) the *non-exclusive, royalty-free rights, including nonexclusive, royalty rights in copyright*, to any contributions I make to documents prepared by or for such committee for ASHRAE publication and I understand that I acquire no rights in publication of such documents in which my contributions or other similar analogous form are used.  I hereby attest that I have the authority and I am empowered to grant this copyright release.

M. Becker Decl. ¶ 46, Ex. 48 (Reiniche Ex. 1155) (emphasis added); Becker Decl., ¶ 10, Ex. 43 (Reiniche Depo.) at 94:12–94:14.

204.    Every document that ASHRAE has produced to support its claim that the people who drafted the ASHRAE standards at issue assigned their copyrights to ASHRAE states explicitly that the grant of rights is non-exclusive. Becker Decl., ¶ 10, Ex. 43 (Reiniche Depo.) at 69:19–94:19; Dkt. 122-3, Exs. 27–48.

205.    All but four of the 229 ASTM standards at issue in this case were developed and published prior to 2003. ECF No. 1-1 (Complaint) Ex. A.

206.    ASTM admits that it did not request copyright assignments from the people who drafted ASTM standards until approximately 2003. Becker Decl., ¶ 7, Ex. 40 (Smith Depo.) at 24:18–26:12; 27:07–27:14; 40:22–41:15; 214:24–215:06.

207.    ASTM has not produced signed copyright assignments for any of the standards at issue. Becker Decl., ¶ 7, Ex. 40 (Smith Depo.) at 24:18–26:12; 27:07–27:14; 40:22–41:15; 214:24–215:06.

208.    Prior to 2003, ASTM did not believe that it needed formal assignment agreements. Becker Decl., ¶ 7, Ex. 40 (Smith Depo.) at 42:15–42:16 ("[ASTM] didn't feel like we needed any formal, any formal assignment paper.").

209.    ASTM now admits that it only started asking for copyright assignments in 2005, Opp. at 32, which is years after 226 of the 229 ASTM standards at issue had been developed. *See* ECF No. 1-1 (Complaint Exhibit A, listing ASTM standards at issue and their date of publication).

210.    ASTM alleges that it relied on an unspoken "basic understanding" that the volunteers who drafted the standards at issue intended to create standards that ASTM would eventually distribute. Becker Decl., ¶ 7, Ex. 40 (Smith Depo.) at 42:18–44:01; 94:01–94:20.

211.    ASTM has not produced any evidence of the existence of an alleged "basic understanding" between the creators of the standards at issue and ASTM, nor any evidence of what the contours of this "basic understanding" were. Becker Decl., ¶ 7, Ex. 40 (Smith Depo.) at 44:03–45:14; 104:21–105:24 ("Q: Did Mr. Lively provide any basis for his statement that there was an understanding in the early '80s that ASTM would copyright the material provided by individuals that was incorporated into the standards drafts?  A:  No.  I think it was just his belief just as it was my belief."); Becker Decl., ¶ 7, Ex. 40 (Smith Depo.) at 44:03–45:14 (stating that ASTM "didn't think that documentation [of the alleged 'basic understanding'] was needed").

212.    ASTM claimed that the ASTM "IP Policy" somehow confirms the existence of this alleged "basic understanding." Becker Decl., ¶ 7, Ex. 40 (Smith Depo.) at 57:23–59:25.

213.    The earliest IP Policy document that ASTM produced in this litigation was approved by ASTM on April 28, 1999 and put into effect thereafter. ASTM had no IP Policy prior to April 28, 1999. Dkt. 122-5, Ex. 77, ¶ 77; Dkt. 122-5 Ex. 79; Dkt. 122-9, Ex. 152 (Internet Archive capture of the ASTM home page the day before the ASTM IP Policy was approved, and a capture after the ASTM Policy was approved, showing that the link to the IP Policy in the lower-right corner of the page was not present on April 27, 1999).

214.    In 2010, approximately three years after the publishing of the most recent ASTM standard at issue, the ASTM IP Policy was amended to include the following language: "Each member agrees, by such participation and enjoyment of his/her annual membership benefits, to have transferred any and all ownership interest, including copyright, they possess or may possess in the ASTM IP to ASTM." Dkt. 122-5, Ex. 77 and Ex. 79 (Compare Section V.D. in both documents).

215.    There was no means that ASTM imposed for the volunteers who drafted the ASTM standards at issue to signify that they had read and agreed to the ASTM IP Policy. Becker Decl., ¶ 7, Ex. 40  (Smith Depo.) at 173:10–181:12 (admitting that ASTM does not know if members read or understood the assignment clause, nor whether they assented to transfer their copyright to ASTM).

216.    ASTM has not retained or produced in this litigation completed membership forms pertaining to any of the standards at issue. The membership forms that ASTM has produced date from 2008 and later, with only one membership form from 2007. M. Becker Decl. ¶ 90, Ex. 92; Becker Decl., ¶ 7, Ex. 40 (Smith Depo.) at 258:11–258:23.

217.    ASTM has failed to exercise control over the creation and enforcement of its membership and participation forms (that it terms copyright "assignments"), resulting in a

multiplicity of forms that either have no assignment language at all, or have various iterations of language that ASTM claims grants it copyright assignments.  Becker Decl., ¶ 7, Ex. 40 (Smith Depo.) at 216:01–217:12, 225:05–225:19 (membership forms were prepared ad hoc by any number of people, and he does not know if anyone knows how many different variations of ASTM membership form were used from 2007 to 2014, because his "experience as being a staff manager is I don't think people think about the version of an application that's being used.   I think it's viewed as a tool that enables an individual to join a technical committee."),

218.    Many individuals renew their ASTM memberships through alternate channels other than using ASTM membership renewal forms or renewing through ASTM's online portal, and thereby do not encounter or formally assent to any copyright assignment language. Becker Decl., ¶ 7, Ex. 40 (Smith Depo.) at 278:04–278:18 (ASTM members can renew their membership by phone or by email, without using the online portal or using ASTM's mail-in forms); Dkt. 120, Ex. 94 (example of an ASTM member renewing by email). ASTM's online membership agreement process does not require a member to click "yes," or "I agree," or any other affirmation to the language discussing copyright assignment that appears on the web page. Instead, members click a button labeled "continue" that appears below the message: "[c]lick 'continue' to place your ASTM membership renewal in the shopping cart." Dkt. 122-9, Ex. 149.

219.    The membership forms that ASTM has produced usually do not include language asking for an assignment of copyright rights. Becker Decl., ¶ 7, Ex. 40 (Smith Depo.) at 211:24-212:12 (acknowledging ASTM forms that did not have assignment language.  Dkt. 120, Exs. 91 and 93 (examples of ASTM forms without any assignment language).

220.    Of the ASTM forms that do include what ASTM alleges to be assignment language, there is no means for a person filling out the form to sign her name or show that she agrees to

44

assign her copyright rights to ASTM. Dkt. 120, Exs. 87-91, 80 (ASTM forms with alleged assignment language); Becker Decl., ¶ 7, Ex. 40 (Smith Depo.) at 173:10–181:12 (admitting that there is nowhere on the alleged copyright assignment for a member to check a box, sign her name, or otherwise indicate that she understands and assents to transfer her copyright to ASTM, and admitting that ASTM does not know if a member who completes the form has read the assignment clause or assents to transfer her copyright to ASTM).

221.    Through at least 2008, NFPA used copyright release language for the creators of the NFPA standards at issue that referred to a grant of non-exclusive rights. MDkt. 122-4 Exs. 54–76; Dkt. 120 Ex. 129.

222.    For example, an NFPA document soliciting proposed text for the 2011 edition of the National Electrical Code, includes the following text:



M. Becker Decl. ¶ 127, Ex. 129 (emphasis added).

223.    NFPA did not exercise control over the process by which people submitted proposals. NFPA's Rule 30(b)(6) corporate representative Christian Dubay, stated that "in past history over the years . . . there's many different versions of our forms and ways of submission." Becker Decl., ¶ 8, Ex. 41 (Dubay Depo.) at 134:21–134:24. NFPA would accept retyped versions of the forms that people used when contributing text to a standard draft. M. Becker Decl. ¶ 61, Ex. 63; Becker Decl., ¶ 8, Ex. 41 (Dubay Depo.) at 146:06–146:14. NFPA allowed volunteers to use any existing standard draft contribution form in place of the form that NFPA designated for use for the particular standard. Becker Decl., ¶ 8, Ex. 41 (Dubay Depo.) at 146:06–146:14.

224. NFPA's online public comment portal includes the following language under the "Copyright Assignment and Signature" page: "I understand and intend that I acquire no rights, including rights as a joint author, in any publication of the NFPA in which this Public Comment in this or another similar or derivative form is used." Dkt. 122-9, Ex. 154 at 10. In earlier copyright releases, NFPA used similar language that would also effectively bar joint ownership: "I understand that I acquire no rights in any publication of NFPA in which this comment in this or another similar or analogous form is used." Dkt. 122-5, Ex. 73. ASHRAE uses almost identical language in its copyright releases: "I understand that I acquire no rights in publication of such documents in which my contributions or other similar analogous form are used." Dkt. 122-4, Ex. 48.

## XV. INCORPORATION OF THE NATIONAL ELECTRICAL CODE INTO CALIFORNIA TITLE 24

225. The California Building Standards Commission ("CBSC") generally issues a new California Building Standards Code Title 24 every three years. The current effective California Building Standards Code is a 2016 edition. The rulemaking processes for the next edition (the 2019 edition) is complete; the new code was published on or around July 1, 2019, and it will become effective January 1, 2020. Becker Decl. ¶ 3, Ex. 36 (Marvelli Depo.) at 22:21-23:6, 35:6-25.

226. The California Building Code includes three categories of building standards—namely, (1) reference standards that have been adopted without change; (2) those that have been adopted and adapted from national model code, with amendments; and (3) those authorized by the California legislature but which are not covered by the national model codes. Becker Decl. ¶ 3, Ex. 36 (Marvelli Depo.) at 40:6-41:16, Ex. 3.

227.    The CBSC incorporates by reference certain reference standards by making them "part of the model code."  In some cases, the incorporation involves referring to the reference standard, such that a reader might have to refer to a separate reference standard.  In other instances, the reference code may itself be reprinted in the model code.  Becker Decl. ¶ 3, Ex. 36 (Marvelli Depo.) at 30:23-31:25, 32:7-15.

228.    California Building Standards law requires California to adopt the most recent version of model codes that refer to reference standards.  Becker Decl. ¶ 3, Ex. 36 (Marvelli Depo.) at 27:17-28:16, 44:14-46:14.

229.    Until the 2019 edition of the California Building Standards Code goes into effect, the 2016 edition is the law. The national model codes adopted into Title 24 apply to all occupancies in California, including residences, office buildings, schools, hospitals, government buildings, etc. Becker Decl. ¶ 3, Ex. 36 (Marvelli Depo.) at 36:1-8, 41:17-43:2, Ex. 3.

230.    In a previous role as an architectural associate for the California Department of General Services, Ms. Marvelli developed construction drawings for state building so they complied with the California Building Standards Code.  Multiple state and local agencies enforce compliance with the California Building Codes.  Becker Decl. ¶ 3, Ex. 36 (Marvelli Depo.) at 23:7-24:5, 118:6-119:15, 124:3-125:8, 127:15-130:3.

231.    Title 24 contains multiple parts; for example, the 2019 triennial edition of the code has thirteen parts.  Each part of Title 24 pertains to a different subject matter.  For instance, Part 1 of Title 24 is the California Administrative Code.  The most relevant one for this case is Part 3, which is the California Electrical Code.  The California Electrical Code has two sources—namely, (1) NFPA 70, also known as the National Electrical Code; and (2) the California amendments.  For instance, the 2019 California Electrical Code is based on the 2017 version of the National Electrical

Code; the 2016 California Electrical Code is based on the 2014 version of the National Electrical Code; the 2013 California Electrical Code is based on the 2011 version of the National Electrical Code.  Becker Decl. ¶ 3, Ex. 36 (Marvelli Depo.) at 36:1-25, 43:4-44:12, 78:25-79:5.

232.    Adoption of the code is a deliberative process. Mia Marvelli is Executive Director of the California Building Standards Commission (CBSC), a state commission that administers the California Building Standards process.  The California Building Standards law is found in the California Health and Safety Code, and the CBSC uses the processes under the Administrative Procedure Act to administer the rulemaking process for Title 24 (also known as the California Building Standards Code) of the California Code of Regulations.  The CBSC receives rulemaking documents from State agencies, and then conducts public hearings and public comment periods on the documents.  The CBSC ultimately takes one of four actions on those rulemaking document: (1) approve; (2) approve as amended; (3) disapprove; or (4) further action.  Becker Decl. ¶ 3, Ex. 36 (Marvelli Depo.) at 9:25-10:1, 13:14-15:10, 44:14-47:11.

233.    There are ten commissioners that conduct the rulemakings.  The Governor of California appoints the commissioners under the authority of the California Building Standards law.  Each commissioner represents a different type of interest (e.g., building officials, construction industry), and all the commissioners participate together in a public hearing on the the rulemaking.  If the commission approves the regulations, they are assembled for the publisher to the develop the next edition of the California Building Standards Code.  Becker Decl. ¶ 3, Ex. 36 (Marvelli Depo.) at 15:13-19, 16:13-19, 16:24-20:3, 22:17-20.

234.    The "Acknowledgements" section of the California Electrical Code states that "the California Electrical Code was developed through the outstanding collaborative efforts of" a number of State agencies, such as the Department of Housing and Community Development.  Ms.

Marvelli was not aware of any State agencies that have sought a copyright in their contributions to any version of the California Electrical Code.  Becker Decl. ¶ 3, Ex. 36 (Marvelli Depo.) at 74:12-79:25, Ex. 4.

235.    State agencies apply the nine-point criteria in Section 18930 of the Health and Safety Code in deciding whether to adopt a reference standard into the California Building Code. If all the criteria are met, the commission generally approves the package.  If one of the criteria is not met, the commission may still approve adoption of the reference standards, as amended.  The nine criteria that state agencies consider are (1) whether the proposed building standards do not conflict with, overlap or duplicate other building standards; (2) whether the proposed building standards are within the parameters established by enabling legislation and are not expressly within the exclusive jurisdiction of another agency; (3) whether the public interest requires the adoption of the building standards; (4) whether the proposed building standards are not unreasonable, arbitrary, unfair or capricious in whole or in part; (5) whether the cost to the public is reasonable, based on the overall benefit to be derived from the building standards; (6) whether the proposed building standard is not unnecessarily ambiguous or vague, in whole or in part; (7) whether the applicable national specifications, published standards, and model codes have been incorporated; (8) whether the format of the proposed building standards is consistent with that adopted by the commission; and (9) whether the proposed building standards, if they promote fire and panic safety as determined by the State Fire Marshal, have the written approval of the State Fire Marshall. Becker Decl. ¶ 3, Ex. 36 (Marvelli Depo.) at 29:6-30:14, 103:22-106:22.

236.    Portions of California Electrical Code are reproduced with permission from the National Electrical Code, and the California Electrical Code states that "no portions of NEC material may be reproduced except with permission of the National Fire Protection Association."

The California Electrical Code includes a legend that tells the reader how to distinguish between model code portions and California amendments.   Aside from appearing in the California Electrical Code itself, California amendments "may or may not" appear in a document called the Final Statement of Reasons that state agencies issue during the rulemaking process; if a California amendment does not appear in the Final Statement of Reasons, Ms. Marvelli did not know how a person would access the amendment without going to the California Electrical Code itself.   Becker Decl. ¶ 3, Ex. 36 (Marvelli Depo.) at 61:20-64:12, 65:18-67:25, 68:16-69:8, Ex. 4.

237.    The NFPA and CBSC has a "zero dollar" contract under which NFPA grants CBSC a nonexclusive license to use and copy the National Electrical Code solely to create and publish the California Electrical Code.   In exchange, CBSC grants NFPA "an exclusive, worldwide license to copy, print, publish, distribute and sell the Code and all Code Supplements . . . ."   When asked at her deposition, Ms. Marvelli did not recall whether the NFPA established any method for distribution of the 2016 California Electrical Code in consultation with NFPA.   Becker Decl. ¶ 3, Ex. 36 (Marvelli Depo.) at 107:11-23, 108:18-109:12, 134:19-135:17, Ex. 7 (agreement for 2016 triennial edition of California Electrical Code) at § 4.

238.    The contract with NFPA is subject to a noncompetitive bid coordination process. Becker Decl. ¶ 3, Ex. 36 (Marvelli Depo.) at 141:21-142:11, Ex. 9 (forms for 2016 triennial edition).

239.    The CBSC administers a web page with information about the part of Title 24 at the following URL: https://www.dgs.ca.gov/BSC/Codes.   But CBSC does not store an accessible version of the 2013, 2016, or 2019 triennial edition of the California Building Standards Code on the webpage.   The CBSC webpage instead points to model code publisher in a section titles "Purchase the Codes", listing the parts that are available through each publisher.   The publisher of

the 2016 edition of the California Electrical Code is BNi; for the 2019, it is NFPA.  Becker Decl.

¶ 3, Ex. 36 (Marvelli Depo.) at 34:18-35:22, 37:1-23, 38:2-19, 51:16-52:2, 53:3-6, 54:9-12, 70:23-

74:1, Ex. 84.

240.   CBSC has the practical ability to post a searchable PDF version of the 2016

California Electrical Code on its website, and it has done so in the past by "mistake."  Becker Decl.

¶ 3, Ex. 36 (Marvelli Depo.) at 99:22-102:4.

241.   The CBSC does not know whether the publisher provides full access to the text of

the California Electrical Code without payment, or whether the publisher is a commercial actor or

not.  In addition, Ms. Marvelli did not know whether the online NFPA viewer could print, copy,

or search the text of the 2019 version of the California Electrical Code.  Nor did she know how

many screenshots would be necessary to reproduce the entire California Electrical Code from the

NFPA viewer.  The CBSC has received calls where people have been unable to access the

California Electrical Code, but it has no ability to fix the access issues and notifies the publisher

of the issue.  Ms. Marvelli had no knowledge of whether the NFPA had made any efforts to make

the California Electrical Code available to print-disabled individuals, mobility-impaired

individuals, or individuals who lack eyesight, and the CBSC has not taken steps to make the

California Electrical Code available to these persons.  Becker Decl. ¶ 3, Ex. 36 (Marvelli Depo.)

at 56:8-57:20, 57:22-58:7, 58:24-61:19, 70:23-74:1, 82:10-17, 91:10-23, 136:23-138:2, Ex. 4; *see*

*also id.* at 93:17-94:2, 95:14-98:1 (similarly, no knowledge of whether a person can print, copy,

or search the text of the California Residential Code, Part 2.5 of Title 24, from the website of the

publisher, International Code Council (ICC)).

242.   CBSC operates under a legal mandate requiring the publication of codes 180 days

prior to the effective.  For instance, for the 2016 California Electrical Code, the publication date

was required to be July 1, 2016.  But, as of August 2, 2016, the California Electrical Code published by NFPA was not available for online access.  Becker Decl. ¶ 3, Ex. 36 (Marvelli Depo.) at 131:3-134:8, Ex. 87.

Dated: November 12, 2019                    Respectfully submitted,


                                            /s/   Andrew P. Bridges
                                            Andrew P. Bridges (USDC-DC AR0002)
                                            abridges@fenwick.com
                                            Matthew B. Becker (admitted *pro hac vice*)
                                            mbecker@fenwick.com
                                            Armen N. Nercessian (pending *pro hac vice*)
                                            anercessian@fenwick.com
                                            Shannon E. Turner (pending *pro hac vice*)
                                            sturner@fenwick.com
                                            FENWICK & WEST LLP
                                            801 California Street
                                            Mountain View, CA 94041
                                            Telephone:   (650) 988-8500
                                            Facsimile:   (650) 938-5200

                                            Corynne McSherry (admitted *pro hac vice*)
                                            corynne@eff.org
                                            Mitchell L. Stoltz (D.C. Bar No. 978149)
                                            mitch@eff.org
                                            ELECTRONIC FRONTIER FOUNDATION
                                            815 Eddy Street
                                            San Francisco, CA 94109
                                            Telephone:   (415) 436-9333
                                            Facsimile:   (415) 436-9993

                                            David Halperin (D.C. Bar No. 426078)
                                            davidhalperindc@gmail.com
                                            1530 P Street NW 2nd Floor
                                            Washington, DC 20005
                                            Telephone: (202) 905-3434

                                            Attorneys for Defendant-Counterclaimant
                                            PUBLIC RESOURCE, INC.