# EXHIBIT 36

```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3

 4   AMERICAN SOCIETY FOR

     TESTING AND MATERIALS

 5   d/b/a ASTM INTERNATIONAL;

 6   NATIONAL FIRE PROTECTION

     ASSOCIATION, INC. and        CASE NO.

 7   AMERICAN SOCIETY OF           1:13-cv-01215-TSC-DAR

 8   HEATING, REFRIGERATING,

     AND AIR CONDITIONING

 9   ENGINEERS,

10   Plaintiffs-

11   Counterdefendants,

12              vs.

13   PUBLIC.RESOURCE.ORG, INC.,

14   Defendant-Counterclaimant.

15   _____

16

17       VIDEOTAPED DEPOSITION OF MIA D. MARVELLI

18              Sacramento, California

19              Monday, August 19, 2019

20                   Volume I

21   Reported by:

22   Carrie Pederson

23   CSR No. 4373, RMR, CRR

24   Job No. 3465980

25   Pages 1 - 202
```

Page 1

**Page 2**

```
1        UNITED STATES DISTRICT COURT
2        FOR THE DISTRICT OF COLUMBIA
3
4  AMERICAN SOCIETY FOR
   TESTING AND MATERIALS
5  d/b/a ASTM INTERNATIONAL;,
6  NATIONAL FIRE PROTECTION
   ASSOCIATION, INC. and      CASE NO.
7  AMERICAN SOCIETY OF        1:13-cv-01215-TSC-DAR
8  HEATING, REFRIGERATING,
   AND AIR CONDITIONING
9  ENGINEERS,
10 Plaintiffs-
11 Counterdefendants,
12      vs.
13 PUBLIC.RESOURCE.ORG, INC.,
14 Defendant-Counterclaimant.
15 _____
16
17
18
19      Videotaped Deposition of MIA D. MARVELLI,
20 Volume I, taken on behalf of the defendants, at One
21 Capitol Mall, Suite 240, Sacramento, California,
22 beginning at 10:04 a.m. and ending at 4:22 p.m. on
23 Monday, August 19, 2019, before Carrie Pederson,
24 Certified Shorthand Reporter No. 4373.
25
```

**Page 4**

```
1  APPEARANCES: (Continued)
2
3  For Plaintiff American Society of Testing and
4  Materials d/b/a ASTM International:
5       MORGAN, LEWIS & BOCKIUS LLP
6       BY:  J. KEVIN FEE
7       Attorney at Law
8       1111 Pennsylvania Avenue, NW
9       Washington, D.C.  20004-2541
10      202-739-5353
11      kevin.fee@morganlewis.com
12
13 For Defendant(s):
14      FENWICK & WEST LLP
15      BY:  ARMEN NERCESSIAN
16         ANDREW BRIDGES
17      Attorneys at Law
18      555 California Street
19      12th Floor
20      San Francisco, California 94104
21      650-335-7281
22      anercessian@fenwick.com
23
24
25
```

**Page 3**

```
1  APPEARANCES:
2
3  For Plaintiff National Fire Protection Association:
4       MUNGER, TOLLES & OLSON LLP
5       BY:  RACHEL G. MILLER-ZIEGLER
6       Attorney at Law
7       1155 F. Street, N.W.
8       7th Floor
9       Washington, D.C.  20004-1361
10      202-220-1115
11      Rachel.Miller-Ziegler@mto.com
12          And
13      MUNGER, TOLLES & OLSON LLP
14      BY:  ROSE LEDA EHLER
15      Attorney at Law
16      350 South Grand Avenue
17      50th Floor
18      Los Angeles, California  90071-3426
19      213-683-9240
20      rose.ehler@mto.com
21
22
23
24
25
```

**Page 5**

```
1  APPEARANCES: (Continued):
2
3  For California Building Standards Commission and the
4  Witness:
5       STATE OF CALIFORNIA
6       DEPARTMENT OF JUSTICE
7       OFFICE OF THE ATTORNEY GENERAL
8       BY:  JERRY YEN
9       Attorney at Law
10      1300 I Street
11      Sacramento, California  95814
12      916-210-7836
13      Jerry.Yen@doj.ca.gov
14
15 Also Present:
16      Viana Barbu, Attorney at Law
17      State of California
18      Department of General Services
19      Legal Division
20
21 Videographer:  John Macdonell
22
23
24
25
```

1          INDEX
2 WITNESS:
3   MIA D. MARVELLI
4   Volume I
5
6                    PAGE
7     Examination By Mr. Nercessian          8
8     Examination By Ms. Miller-Ziegler    160
9     Examination By Mr. Nercessian        186
10    Examination By Ms. Miller-Ziegler    197
11    Examination By Mr. Nercessian        199
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

1            EXHIBITS
2 DEFENDANT'S
3     DESCRIPTION              PAGE
4 Exhibit 1   July 19, 2019 letter to Mia      24
5           Marvelli from Fenwick & West LLP
6 Exhibit 2   Marvelli Depo Prep               33
7 Exhibit 3   Codes                            34
8 Exhibit 4   2019 California Electrical Code   57
9 Exhibit 5   Subpoena to Testify at a         83
10          Deposition in a Civil Action
11 Exhibit 6   March 10, 2016 email to Michael   85
12          Nearman from Pamela Maeda
13 Exhibit 7   State of California Standard     107
14          Agreement
15 Exhibit 8   August 1, 2016 email to DGS      132
16          CBSC-Sacramento Staff from Alexander Hunter
17 Exhibit 9   NCB Coordination Sheet,         141
18          Department of General Services
19 Exhibit 10  California Electrical Code       150
20          Agreement Between and Among BNi
21          Publications, Inc., Department
22          of General Services Procurement
23          Division For California Building
24          Standards Commission And The
25          National Fire Protection
            Association, Inc.

Page 7

1     Sacramento, California, Monday, August 19, 2019
2         10:04 a.m. - 4:22 p.m.
3
4         MIA D. MARVELLI,
5 having been administered an oath, was examined and
6 testified as follows:
7         EXAMINATION
8     THE REPORTER:  Good morning, counsel.  Do
9 you want realtime also?
10    MS. EHLER:  Yes.
11    MR. FEE:  No.                      10:01
12    VIDEO OPERATOR:  Okay.  We're on the       10:01
13 record.  It's 10:04 a.m. on August 19th, 2019.   10:04
14    This is the deposition of Mia Marvelli.   10:04
15    We're here in the matter of American Society   10:04
16 for Testing and Materials, et al. versus         10:04
17 Public.Resource.Org.                         10:04
18    We're located at One Capitol Mall in       10:04
19 Sacramento, California.                      10:04
20    I'm John Macdonell, the videographer, with   10:04
21 Veritext.  I'm not related to any party in this   10:04
22 action, nor am I a notary public or financially   10:04
23 interested.                              10:04
24    Before the reporter swears the witness,     10:04
25 would counsel please identify themselves.    10:04

Page 8

1     MR. NERCESSIAN:  Yes.  I'm Armen Nercessian   10:04
2 of Fenwick & West representing Defendant
3 Public.Resource.Org.                         10:04
4     MR. BRIDGES:  Andrew Bridges of           10:04
5 Fenwick & West also representing Public.Resource.Org.  10:04
6     MR. YEN:  Jerry Yen with the California      10:05
7 Attorney General's Office representing the witness   10:05
8 and the California Building Standards Commission.   10:05
9     MS. BARBU:  Viana Barbu with the Department   10:05
10 of General Services Legal Division representing Mia   10:05
11 Marvelli as Executive Director of Building Standards   10:05
12 Commission.                              10:05
13    MS. MILLER-ZIEGLER:  Rachel Miller-Ziegler   10:05
14 with Munger, Tolles & Olson here on behalf of the   10:05
15 National Fire Protection Association.         10:05
16    MS. EHLER:  And Rose Ehler, also from       10:05
17 Munger, Tolles & Olson, and on behalf of the National   10:05
18 Fire Protection Association.                 10:05
19    MR. FEE:  Kevin Fee from Morgan Lewis on     10:05
20 behalf of ASTM.                          10:05
21    (Witness sworn)                    10:05
22 BY MR. NERCESSIAN:                      10:05
23 Q.  Good morning.                     10:05
24 A.  Good morning.                     10:05
25 Q.  Please state your name for the record.   10:05

Page 9

3 (Pages 6 - 9)

**Page 10**

1  A. Mia Marvelli.                     10:05
2  Q. Good morning, Ms. Marvelli. Have you ever   10:05
3 had your deposition taken before?            10:05
4  A. No.                          10:05
5  Q. Have you ever been involved in any lawsuits   10:05
6 before?                             10:06
7  A. Yes.                          10:06
8  Q. What was your involvement in previous      10:06
9 lawsuits?                           10:06
10  A. Respondent.                     10:06
11  Q. In your capacity as a representative of the   10:06
12 State?                              10:06
13  A. Yes.                          10:06
14  Q. Did you furnish any testimony in any of     10:06
15 those matters?                       10:06
16  A. A declaration.                  10:06
17  Q. Did you furnish any live testimony?       10:06
18  A. No.                          10:06
19  Q. So I'll lay out a few preliminaries of how   10:06
20 today is going to go: I will ask you a series of   10:06
21 questions. Do you understand that you are giving   10:06
22 testimony under oath today?                10:06
23  A. Yes.                          10:06
24  Q. Just as you would in a court of law?      10:06
25  A. Yes.                          10:06

**Page 11**

1  Q. Do you understand that the court reporter is   10:06
2 taking down everything you say?             10:06
3  A. Yes.                          10:06
4  Q. Because to establish a record, do you      10:06
5 understand that we need only audible responses such   10:06
6 as a verbal "yes" or "no"?                  10:06
7  A. Yes.                          10:07
8  Q. If at any point you don't understand a     10:07
9 question, will you please let me know? And I will   10:07
10 try to rephrase.                       10:07
11  A. Yes.                          10:07
12  Q. If you answer my question without asking for   10:07
13 clarification, I'm going to take it to mean that you   10:07
14 understood it. Is that understood?          10:07
15  A. Yes.                          10:07
16  Q. Because the court reporter's taking down   10:07
17 what everyone says, let's not try to talk -- let's   10:07
18 try not to talk over one another. So if I'm asking a   10:07
19 question, please wait for me to finish before you   10:07
20 answer. Do you understand?               10:07
21  A. Yes.                          10:07
22  Q. Likewise, if I start to ask you a question   10:07
23 and you weren't allowed to finish, please tell me,   10:07
24 and I'll allow you to finish. If I go on to another   10:07
25 question and you don't say you need more time, I'll   10:07

**Page 12**

1 take it to mean you were finished. Do you understand  10:07
2 that?                              10:07
3  A. Yes.                          10:07
4  Q. If you come to realize that any of your     10:07
5 answers that you previously provided is not       10:07
6 completely correct, just let me know, and we'll     10:07
7 address it; okay?                       10:07
8  A. Yes.                          10:07
9  Q. And if you need a break at any time over the  10:07
10 course of the day, just let me know, and if there is   10:08
11 a question pending, we can give you the break. Does   10:08
12 that make sense?                        10:08
13  A. Yes.                          10:08
14  Q. Have you spoken with anyone about your      10:08
15 testimony today?                        10:08
16  A. No. Just my representation.          10:08
17  Q. Have you been asked to limit your testimony   10:08
18 today in any way?                       10:08
19  A. No.                          10:08
20  Q. Is there any reason you would not be able to   10:08
21 give complete and accurate answers to my questions   10:08
22 today?                              10:08
23  A. No.                          10:08
24  Q. What did you do to prepare for today's      10:08
25 deposition?                          10:08

**Page 13**

1  A. Read the documents that were provided me.   10:08
2  Q. Did you review any other documents?       10:08
3  A. No.                          10:08
4  Q. Did you conduct any research on your own     10:08
5 into the case?                         10:08
6  A. No.                          10:08
7  Q. Did you conduct any research on your own     10:08
8 into the subject matter of the documents?         10:08
9  A. No.                          10:08
10  Q. Did you have any conversations to prepare   10:08
11 your testimony other than those with your        10:09
12 representation?                         10:09
13  A. No.                          10:09
14  Q. Are you currently employed?            10:09
15  A. Yes.                          10:09
16  Q. What's your current employment?          10:09
17  A. Executive Director of the Building Standards   10:09
18 Commission.                           10:09
19  Q. And what is the Building Standards        10:09
20 Commission?                           10:09
21  A. It's a state commission that administers the   10:09
22 California Building Standards process, and there's 14   10:09
23 staff, and there's ten commissioners that we support.   10:09
24  Q. Okay. And when you say you administer the   10:09
25 process, what does that process entail?          10:09

4 (Pages 10 - 13)

1   A.  We utilize the California Building Standards   10:09
2  law, which is found in the Health and Safety Code,   10:09
3  and we also use the Administrative Procedures Act,   10:09
4  which is in the Government Code, to administer the   10:09
5  rulemaking process for -- it's also known as   10:09
6  Title 24.   10:10
7   Q.  Title 24.  Does Title 24 go by any other   10:10
8  names?   10:10
9   A.  California Building Standards Code.   10:10
10   Q.  And it's Title 24.  What law is the Title 24   10:10
11  of?   10:10
12   A.  It's the 24th title in 28 regulations for   10:10
13  California known as the California Code of   10:10
14  Regulations, is the whole 28 titles.   10:10
15   Q.  And when you say you're responsible for   10:10
16  administering the process, what stages does that   10:10
17  process entail?   10:10
18   A.  We receive rulemaking documents from various   10:10
19  State agencies, and we conduct public hearings and   10:10
20  meetings, public comment periods, and then ultimately   10:10
21  commission reviews and approves -- I shouldn't say   10:10
22  approve.  Takes action on those rulemakings.   10:10
23   Q.  How does it take action on those   10:10
24  rulemakings?   10:11
25   A.  They either approve, disapprove, further   10:11

Page 14

1  study or -- sorry.  There's four actions they can   10:11
2  take.   10:11
3   Q.  And it's approve, disapprove, further study   10:11
4  and --   10:11
5   A.  Or approve as amend.  Sorry.  I apologize   10:11
6  for talking over you.   10:11
7   Q.  Oh.  No worries.  So the four actions are   10:11
8  approve, amend, disapprove, further action?   10:11
9   A.  Approve, approve as amend, further study or   10:11
10  disapprove.   10:11
11   Q.  Okay.  Oh.  I understand.  Thank you.   10:11
12   A.  Uh-huh.   10:11
13   Q.  And you say you interface with ten   10:11
14  commissioners?   10:11
15   A.  Uh-huh.   10:11
16   Q.  What's the nature of those interactions?   10:11
17   A.  Our office supplies them the rulemaking   10:11
18  materials so they can make a determination on the   10:12
19  rulemakings that they're provided.   10:12
20   Q.  And who are these commissioners?   10:12
21   A.  Do I need to name them all, or how --   10:12
22   Q.  Functionally, who are they?  Are they   10:12
23  commissioners of different State agencies, or are   10:12
24  they all commissioners of one agency and an agency   10:12
25  that has multiple commissioners?   10:12

Page 15

1   MS. MILLER-ZIEGLER:  Objection to form.   10:12
2   THE WITNESS:  So they're appointed by the   10:12
3  governor.   10:12
4   (Discussion off the record)   10:12
5   MS. MILLER-ZIEGLER:  Objection to form.   10:12
6   I'll be objecting sometimes throughout the   10:12
7  questioning.  If you could just pause before   10:12
8  answering so that I can have a chance to object.   10:12
9   THE WITNESS:  Certainly.   10:12
10   MS. MILLER-ZIEGLER:  Thank you.   10:12
11   MR. NERCESSIAN:  I can rephrase.   10:12
12  BY MR. NERCESSIAN:   10:12
13   Q.  So what role do these commissioners play?   10:12
14   A.  They're appointed by the governor, and they   10:12
15  make up the different requirements that is in   10:12
16  building standards law.  There's ten different types   10:12
17  of commissioners that are required to be appointed by   10:12
18  the governor.  For example, one represents building   10:13
19  officials.   10:13
20   Q.  Are there any that represent officials that   10:13
21  administer electrical systems?   10:13
22   A.  I'm not sure what you mean.   10:13
23   Q.  I can strike that.   10:13
24   Can you provide another example of a type of   10:13
25  commissioner that is appointed by the governor that   10:13

Page 16

1  you interface with?   10:13
2   A.  Sure.  Another representative is from the   10:13
3  construction industry, so they're a licensed   10:13
4  contractor.   10:13
5   Q.  Okay.  So -- and that's still a role   10:13
6  appointed by the governor?   10:13
7   A.  Correct.   10:13
8   Q.  What authority does the governor make these   10:13
9  appointments under?   10:14
10   A.  California Building Standards law, which is   10:14
11  found in Health and Safety Code, and I don't know the   10:14
12  exact section number.   10:14
13   Q.  Okay.  You referred earlier to rulemaking   10:14
14  materials that you provide to these commissioners.   10:14
15  What do those rulemaking materials consist of?   10:14
16   A.  Express Terms, Initial Statement of Reasons.   10:14
17  That's all I can think of right now.   10:14
18   Q.  Okay.  So what are Express Terms?   10:14
19   A.  They're the code language and strikeout and   10:14
20  underline format so that the people can see and the   10:14
21  commissioners can see what is being proposed by a   10:14
22  State agency.   10:14
23   Q.  And what do the commissioners do with those   10:14
24  Express Terms?   10:15
25   A.  Review them for their technical merit.   10:15

Page 17

5 (Pages 14 - 17)

1  Q.  And what action do they take with respect to  10:15
2  those Express Terms?                             10:15
3  A.  The four that I spoke of earlier.            10:15
4  Q.  Okay.  Do they open up those Express Terms   10:15
5  for notice and comment with the public?          10:15
6  A.  They're presented at a public meeting, so    10:15
7  there's an opportunity at that time for the public to  10:15
8  comment.                                         10:15
9  Q.  And do each of these ten commissioners       10:15
10  conduct separate hearings on the Express Terms that  10:15
11  they've been provided with?                      10:15
12  A.  No.                                          10:15
13  Q.  Is it just one public hearing that all the   10:15
14  commissioners participate in?                    10:15
15  A.  Yes.                                         10:15
16  Q.  You also referred to Initial Statement of    10:15
17  Reasons.                                         10:15
18  A.  Uh-huh.                                      10:15
19  Q.  And what is that?                            10:16
20  A.  It's several statements that are from the    10:16
21  Government Code specific to the Administrative   10:16
22  Procedures Act that discuss the rationale, the   10:16
23  purpose and the reason for a code change, and then  10:16
24  there's a variety of other statements that talk about  10:16
25  the benefit to the State, cost to the State, and  10:16

Page 18

1  that's all I can remember specifically right now  10:16
2  without looking at the document.                 10:16
3  Q.  Okay.  So the Building Standards Commission  10:16
4  is also known as the CBSC; correct?              10:16
5  A.  Yes.                                         10:16
6  Q.  Or the BSC?                                  10:16
7  A.  Correct.                                      10:16
8  Q.  What's the relationship between the Building  10:16
9  Standards Commission and the California Department of  10:16
10  General Services?                                10:16
11  A.  We are a commission within DGS.              10:16
12  Q.  Does DGS play any independent role in this   10:16
13  rulemaking process?                              10:16
14  A.  No.                                          10:17
15  Q.  Do any other State agencies play a role?     10:17
16  MS. MILLER-ZIEGLER:  Objection as vague.         10:17
17  BY MR. NERCESSIAN:                               10:17
18  Q.  Do any State agencies play a role in the     10:17
19  process of administering Title 24?               10:17
20  A.  No.                                          10:17
21  Q.  What are your responsibilities as executive  10:17
22  director of BCS -- BSC?                          10:17
23  A.  Oversee staff and the budget, ensure that    10:17
24  the process is followed, specifically that meeting  10:17
25  notices are supplied according to the Government  10:17

Page 19

1  Code.  We conduct the public merit meetings, and the  10:18
2  staff reviews the materials and assembles them for  10:18
3  the public meetings that we conduct.             10:18
4  Q.  All right.  How long have you served in that  10:18
5  role as executive director?                      10:18
6  A.  Approximately three and a half years.        10:18
7  Q.  Since roughly February 2016?                 10:18
8  A.  Correct.                                      10:18
9  Q.  Have you performed any other roles at the    10:18
10  BSC?                                             10:18
11  A.  Yes.                                         10:18
12  Q.  What were those roles?                       10:18
13  A.  I was an architectural associate and an      10:18
14  associate architect, and I was employed with them  10:18
15  since spring of 2012.                            10:18
16  Q.  And what did you do as an architectural      10:18
17  associate?                                       10:18
18  A.  Reviewed rulemaking documents, prepared them  10:18
19  for meetings and the public comment phase.       10:19
20  Q.  And when did you serve in that role?  Was    10:19
21  that earlier or after you were an associate      10:19
22  architect?                                       10:19
23  A.  I did that while I was an associate          10:19
24  architect and an architectural associate.        10:19
25  Q.  Oh.  You held those positions                10:19

Page 20

1  simultaneously?                                  10:19
2  A.  Well, I can't remember the exact time I      10:19
3  got -- I received a promotion during that time.  10:19
4  Q.  Did your role change at all after the        10:19
5  promotion?                                       10:19
6  A.  No.                                          10:19
7  Q.  Did your responsibilities change at all      10:19
8  after the promotion?                             10:19
9  A.  No.                                          10:19
10  Q.  In that associate role, what role did you    10:19
11  play, if any, in administering the processes related  10:19
12  to the adoption, approval, publication and/or    10:20
13  implementation of the California Building Codes?  10:20
14  MS. MILLER-ZIEGLER:  Objection to form.          10:20
15  MR. NERCESSIAN:  I can rephrase.                 10:20
16  BY MR. NERCESSIAN:                               10:20
17  Q.  In that role as an architectural associate   10:20
18  and associate architect, did you play any role in  10:20
19  administering the processes related to the adoption  10:20
20  of the California Building Codes?                10:20
21  A.  Yes.                                         10:20
22  Q.  What was that involvement?                   10:20
23  A.  Reviewed documents from State agencies,      10:20
24  prepared meeting materials so that they could be  10:20
25  publicly viewed.                                 10:20

Page 21

6 (Pages 18 - 21)

1   Q.  And did you play any role in the processes   10:20
2   related to the approval of California's Building   10:20
3   Codes?   10:20
4   A.  I'm not sure I understand that question.   10:20
5   Q.  Do you understand there to be any difference   10:20
6   between the processes related to the adoption of   10:21
7   California's Building Codes and their approval?   10:21
8   A.  I would just say that the process sets up   10:21
9   the end game, if you will, for the commission to take   10:21
10  action.   10:21
11  Q.  Okay.  And when the building commission   10:21
12  takes action, what is the output of this process?   10:21
13  A.  If the standard --   10:21
14       MS. MILLER-ZIEGLER:  Objection to form.   10:21
15  BY MR. NERCESSIAN:   10:21
16  Q.  You can answer the question.   10:21
17  A.  Okay.  Thanks.  If the regulations are   10:21
18  approved by the commission, they're assembled for the   10:21
19  publisher so the publisher can develop the next   10:21
20  edition of the code.   10:22
21  Q.  And what's the latest edition of the code?   10:22
22  A.  The current effective code is a 2016   10:22
23  edition.   10:22
24  Q.  And have the rulemaking processes for   10:22
25  revision after the 2016 edition taken place?   10:22

Page 22

1   A.  Yes.   10:22
2   Q.  And what edition of the code do those   10:22
3   processes relate to?   10:22
4   A.  The 2019 edition.   10:22
5   Q.  And when does that become effective?   10:22
6   A.  January 1st of 2020.   10:22
7   Q.  Before you were employed by the California   10:22
8   Building Standards Commission, did you have any   10:22
9   experience with the California Building Codes in   10:22
10  previous roles?   10:23
11  A.  Yes.   10:23
12  Q.  What was that involvement?   10:23
13  A.  Utilizing them for the design of state   10:23
14  buildings.   10:23
15  Q.  And what position did you utilize them in?   10:23
16  A.  I was an architectural associate for the   10:23
17  Department of General Services.   10:23
18  Q.  And as an architectural associate at the   10:23
19  Department of General Services, how did you utilize   10:23
20  the California Building Codes?   10:23
21       MS. MILLER-ZIEGLER:  Objection as outside   10:23
22  the scope of the subpoena.   10:23
23  BY MR. NERCESSIAN:   10:23
24  Q.  You can answer the question.   10:23
25  A.  For the design and construction of state   10:23

Page 23

1   buildings.   10:23
2   Q.  And by that, do you mean you developed   10:23
3   construction drawings so that they complied with the   10:23
4   California Building Standards Code?   10:23
5   A.  Yes.   10:23
6       MS. MILLER-ZIEGLER:  Objection to form.   10:23
7   BY MR. NERCESSIAN:   10:24
8   Q.  Show you a document.  We can mark this as   10:24
9   Exhibit 1.   10:24
10      (Exhibit 1 marked)   10:24
11  BY MR. NERCESSIAN:   10:24
12  Q.  All right.  You've been handed a document   10:24
13  marked as Exhibit 1.  Ms. Marvelli, do you recognize   10:24
14  this document?   10:25
15  A.  Yes.   10:25
16  Q.  And what is this document?   10:25
17  A.  It's what I was sent a couple weeks ago to   10:25
18  the office.   10:25
19  Q.  And this is a letter with respect to the   10:25
20  subpoena for this deposition; correct?   10:25
21  A.  Yes.   10:25
22  Q.  The letter includes as Exhibit A the opinion   10:25
23  of the U.S. Court of Appeals for the District of   10:25
24  Columbia with respect to this dispute.   10:25
25      MS. MILLER-ZIEGLER:  Objection.  This hasn't   10:25

Page 24

1   been provided to us in the past.   10:25
2       MR. NERCESSIAN:  Okay.  Your objection is   10:25
3   noted.   10:25
4   BY MR. NERCESSIAN:   10:25
5   Q.  Have you read this opinion?   10:25
6   A.  Not the whole thing.   10:25
7   Q.  When did you read this opinion?   10:25
8   A.  I read part of it when I first received it.   10:26
9   Q.  Were you aware of this opinion at any point   10:26
10  before you received this letter?   10:26
11  A.  No.   10:26
12  Q.  Do you have any knowledge of the dispute   10:26
13  between Public.Resource and the plaintiffs in this   10:26
14  lawsuit?   10:26
15  A.  I have some knowledge.   10:26
16  Q.  And what is that knowledge?   10:26
17  A.  Just information that is on the Internet   10:26
18  about this particular --   10:26
19  Q.  And so what do you know about the case?   10:26
20  A.  Just that there's a dispute between the two   10:26
21  groups.   10:26
22  Q.  Have you had any discussions about this case   10:26
23  at any point?   10:26
24  A.  No.   10:26
25  Q.  One of the issues in this case is what   10:26

Page 25

7 (Pages 22 - 25)

1 copyright protection there is and standards that are   10:26
2 incorporated into other law. Are you familiar with   10:26
3 standards that standard development organizations put   10:26
4 out?                                          10:27
5        MR. FEE: Objection to form.             10:27
6 BY MR. NERCESSIAN:                             10:27
7    Q. Have you had any involvement with standard   10:27
8 in -- over the course of your employment at the   10:27
9 Building Standards Commission?                  10:27
10   A. I'm sorry, I'm not following that question.   10:27
11   Q. In your role at the Building Standards   10:27
12 Commission, have you interacted with any industry   10:27
13 standards?                                    10:27
14       MS. MILLER-ZIEGLER: Objection to form.   10:27
15 BY MR. NERCESSIAN:                             10:27
16   Q. You can answer the question.             10:27
17   A. I don't know what you mean by "interacted."   10:27
18   Q. Have you taken any actions with -- have you   10:27
19 reviewed any industry standards in your role?   10:27
20       MR. FEE: Objection to form.             10:27
21       THE WITNESS: I guess I don't know what you   10:27
22 mean by "reviewed."                           10:27
23 BY MR. NERCESSIAN:                             10:27
24   Q. Have you read any industry standards in your   10:27
25 role at the Building Standards Commission?      10:28
                                        Page 26

1        MR. FEE: Objection to form.             10:28
2 BY MR. NERCESSIAN:                             10:28
3    Q. You can answer.                         10:28
4    A. I'm not following that.                  10:28
5    Q. So what is it about my question that you   10:28
6 don't understand? I can rephrase.              10:28
7    A. I guess I'm trying to understand if it's   10:28
8 specific about a certain standard or just the   10:28
9 standards in general.                         10:28
10   Q. Just standards in general. Have you ever   10:28
11 reviewed any industry standards over the course of   10:28
12 your employment at the Building Standards Commission?   10:28
13       MR. FEE: Objection to form.             10:28
14       THE WITNESS: I suppose I have, but I   10:28
15 couldn't tell you specifics on what that would be.   10:28
16 BY MR. NERCESSIAN:                             10:28
17   Q. Have you had any interactions with standard   10:29
18 development organizations over the course of your   10:29
19 employment at the Building Standards Commission?   10:29
20   A. Can you repeat the question? I'm sorry.   10:29
21   Q. Have you had any interactions with standard   10:29
22 development organizations over the course of your   10:29
23 employment at the Building Standards Commission?   10:29
24   A. I think I'm trying to understand the      10:29
25 difference between standards and the code developers.   10:29
                                        Page 27

1    Q. What do you understand the difference to be?   10:29
2    A. Well, there's the reference standards, which   10:29
3 are very detail-oriented, and then there is the code   10:30
4 developers where the reference standards are referred   10:30
5 to.                                           10:30
6    Q. So do you have any familiarity with      10:30
7 reference standards from your employment at the   10:30
8 Building Standards Commission?                  10:30
9    A. I have familiarity.                      10:30
10   Q. And what's that experience with the       10:30
11 reference standards that you have?              10:30
12   A. That they're referenced in the model codes   10:30
13 that California is required to adopt.           10:30
14   Q. And why is California required to adopt   10:30
15 those model codes?                            10:30
16   A. That's part of our building standards law.   10:30
17   Q. What does the Building Standards Commission   10:30
18 do with those reference codes?                  10:30
19       MS. MILLER-ZIEGLER: Objection to form.   10:30
20 BY MR. NERCESSIAN:                             10:31
21   Q. What -- I can rephrase.                  10:31
22   A. Okay.                                   10:31
23   Q. What actions does the Building Standards   10:31
24 Commission take, if any, with respect to those   10:31
25 reference codes?                              10:31
                                        Page 28

1    A. They take the same action that they do with   10:31
2 the model codes, the four we spoke of earlier.   10:31
3    Q. Okay. So then I'd like to discuss one of   10:31
4 those four actions, approve as amended.         10:31
5    A. Okay.                                   10:31
6    Q. When the Building Standards Commission   10:31
7 approves as amend a reference code, what does that   10:31
8 mean?                                         10:31
9    A. They may be approving a change from what was   10:31
10 proposed.                                     10:32
11   Q. And why might it take those actions?      10:32
12   A. There could be a reason based on the      10:32
13 nine-point criteria that they need to take a   10:32
14 different action, then approve.                10:32
15   Q. What is this nine-point criteria you're   10:32
16 referring to?                                 10:32
17   A. It's the basis in which the State agencies   10:32
18 state that they're -- the building standards may be   10:32
19 approved, and it's in 18930, I believe, of the Health   10:32
20 and Safety Code.                              10:32
21   Q. And what are those nine criteria?        10:32
22   A. I'll do my best. There's -- one of them is   10:32
23 they cannot conflict, overlap or duplicate another   10:33
24 code, arbitrary and capricious, they have to meet --   10:33
25 they can't violate fire life safety as prescribed --   10:33
                                        Page 29

8 (Pages 26 - 29)

| | |
|---|---|

**Page 30**

1  or as determined by the State Fire Marshal. I can't  10:33
2  think of them all at the moment.  10:33
3    Q.  And if one of these criteria is met, then  10:33
4  the California Building Standards Commission may  10:33
5  recommend amending a reference standard in its  10:33
6  adoption; is that correct?  10:33
7    A.  If one of the criteria is not met, yes.  10:33
8    Q.  If one of the criteria is not met?  10:33
9    A.  Yeah.  10:33
10   Q.  What happens if all of the criteria are met?  10:33
11   A.  I didn't hear you.  10:33
12   Q.  What happens if all of the criteria are met?  10:33
13   A.  Generally the commission approves the  10:34
14  package.  10:34
15   Q.  And where the commission chooses to amend a  10:34
16  reference standard in its adoption, how does the  10:34
17  commission accomplish that incorporation?  10:34
18      MR. FEE:  Objection. Form.  10:34
19      MS. MILLER-ZIEGLER:  Objection to form.  10:34
20  BY MR. NERCESSIAN:  10:34
21   Q.  Do you understand the question?  10:34
22   A.  No.  10:34
23   Q.  Does the commission incorporate by reference  10:34
24  any reference standards?  10:34
25   A.  Yes.  10:34

**Page 31**

1    Q.  What does that mean?  What -- strike that.  10:34
2      So the way you're using "incorporate by  10:35
3  reference," what does it mean to you?  10:35
4    A.  It would be part of the model code.  10:35
5    Q.  So that's the incorporation.  10:35
6    A.  Uh-huh.  10:35
7    Q.  But does the code incorporate the standard  10:35
8  by referencing a reference standard?  10:35
9      MS. MILLER-ZIEGLER:  Objection to form.  10:35
10      THE WITNESS:  Can you repeat the question?  10:35
11  BY MR. NERCESSIAN:  10:35
12   Q.  Yes.  Does the code incorporate a reference  10:35
13  standard by referencing that standard?  10:35
14   A.  Yes.  10:35
15   Q.  How does it reference it?  10:35
16      MR. FEE:  Object to the form.  10:36
17  BY MR. NERCESSIAN:  10:36
18   Q.  You can answer.  10:36
19   A.  There's a number that is referenced in the  10:36
20  model code to the reference standard.  10:36
21   Q.  So if somebody is reading the California  10:36
22  Building Standards Code, do they have to refer to  10:36
23  another reference code to understand it?  10:36
24      MR. FEE:  Objection to form.  10:36
25      THE WITNESS:  In some cases, yes.  10:36

**Page 32**

1  BY MR. NERCESSIAN:  10:36
2    Q.  In what cases?  10:36
3      MR. FEE:  Objection to form.  10:36
4      THE WITNESS:  That's too broad of a  10:36
5  question.  I don't --  10:36
6  BY MR. NERCESSIAN:  10:36
7    Q.  In what cases would a person not have to  10:36
8  refer to separate reference standard?  10:36
9      MR. FEE:  Objection to form.  10:36
10      MR. YEN:  You can answer --  10:36
11      THE WITNESS:  Okay.  10:36
12      MR. YEN:  -- if you understand the question.  10:36
13      THE WITNESS:  There's instances where part  10:36
14  of the reference standard is in -- reprinted or in  10:37
15  the code, but I couldn't give you specifics.  10:37
16  BY MR. NERCESSIAN:  10:37
17   Q.  When you say that there are instances that  10:37
18  parts of a reference standard are reprinted within  10:37
19  the code, do you mean that they appear within the  10:37
20  body of the California code as printed?  10:37
21      MS. MILLER-ZIEGLER:  Objection as leading.  10:37
22  BY MR. NERCESSIAN:  10:37
23   Q.  You can answer.  10:37
24   A.  Again, I don't have the code in front of me  10:37
25  to be able to give you that answer.  10:37

**Page 33**

1    Q.  Okay.  In that case, we can mark this next  10:37
2  in order.  10:38
3      (Exhibit 2 marked)  10:38
4      MS. MILLER-ZIEGLER:  Where is this from?  10:38
5      MR. NERCESSIAN:  This is from the Internet  10:39
6  archive.  10:39
7      MS. MILLER-ZIEGLER:  Generally the Internet  10:39
8  archive versions have some annotation indicating that  10:39
9  they're from the Internet archive which this doesn't  10:39
10  have.  Has this been modified?  10:39
11      MR. NERCESSIAN:  It's just the PDF that's  10:39
12  available on the Internet archive.  10:39
13      MS. MILLER-ZIEGLER:  There's no other front  10:39
14  matter that's associated with it?  10:39
15      MR. NERCESSIAN:  No.  There was a PDF linked  10:39
16  directly there.  There is the notation that appears  10:39
17  on the front that you see.  10:39
18      MS. MILLER-ZIEGLER:  We'll object to the  10:39
19  unauthorized copy then.  10:39
20      MR. FEE:  You obviously put cover sheets on  10:39
21  this, too?  You're not claiming that this cover sheet  10:39
22  was part of the archive?  10:39
23      MR. NERCESSIAN:  No, not claiming the cover  10:39
24  sheet was part of it.  That's just to break it up.  10:39
25      MR. FEE:  I object to that as well.  10:39

9 (Pages 30 - 33)

1     MS. MILLER-ZIEGLER:  We'll also object to     10:40
2 the authenticity of this.                          10:40
3 BY MR. NERCESSIAN:                                 10:40
4    Q.  All right.  Ms. Marvelli, are you familiar  10:40
5 with this document?                                10:40
6     MR. FEE:  Objection to form.                   10:40
7     THE WITNESS:  Nope.                            10:40
8 BY MR. NERCESSIAN:                                 10:40
9    Q.  Does it appear to -- well, what makes you   10:40
10 say that?                                         10:40
11   A.  Well, there's information that is not part  10:40
12 of what we publish as a California Electrical Code on  10:40
13 the cover.                                        10:40
14   Q.  I represent -- okay.  So this is deposition  10:40
15 Exhibit Number 2, and what's the information on the  10:41
16 cover that you -- the annotations -- strike that.  10:42
17     We can mark this next in order.              10:42
18     (Exhibit 3 marked)                           10:42
19 BY MR. NERCESSIAN:                                10:42
20   Q.  All right.  You have been handed an exhibit  10:42
21 marked for identification as Deposition Exhibit 3.  10:43
22 Do you recognize this document?                   10:43
23   A.  It appears as though it's a print of our web  10:43
24 page -- or code's web page.                       10:43
25   Q.  And what does the California Building        10:43
                                            Page 34

1    Q.  And previously, you testified that it goes  10:45
2 into effect January 1st, 2020?                     10:45
3    A.  Correct.                                    10:45
4    Q.  Until the 2019 edition goes into effect, the  10:45
5 2016 California Building Standards Code will be the  10:45
6 law; correct?                                      10:45
7     MR. FEE:  Objection to form.                   10:45
8     THE WITNESS:  Yes.                             10:45
9 BY MR. NERCESSIAN:                                 10:45
10   Q.  And the 2016 California Building Code will   10:45
11 be effective until the 2019 edition goes into effect;  10:45
12 correct?                                          10:45
13   A.  Yes.                                        10:46
14   Q.  How many parts does the 2019 triennial      10:46
15 edition of Title 24 have?                         10:46
16   A.  Thirteen.                                   10:46
17   Q.  Does each part pertain to a different       10:46
18 subject matter?                                   10:46
19   A.  Yes.                                        10:46
20   Q.  So, for instance, Part 1 is the California  10:46
21 Administrative Code; correct?                     10:46
22   A.  Yes.                                        10:46
23   Q.  And Part 3 is the California Electrical      10:46
24 Code; correct?                                    10:46
25   A.  Correct.                                    10:46
                                            Page 36

1 Commission display on the code's web page on its   10:43
2 site?                                             10:43
3     MS. MILLER-ZIEGLER:  Objection to form.        10:43
4     THE WITNESS:  The 12 parts of Title 24.        10:43
5 BY MR. NERCESSIAN:                                 10:43
6    Q.  How often does CBSC issue a new Title 24?   10:43
7    A.  Triennially, every three years, but we also  10:43
8 could have emergencies change without regulatory   10:43
9 effect or an intervening supplement which would amend  10:44
10 any edition of the code.                          10:44
11   Q.  And you'll note, if you look at the bottom  10:44
12 of the page, there's a URL there.  Can you read that  10:44
13 URL, please?                                      10:44
14   A.  Sure.  Https://www.dgs.ca.gov/BSC/Codes.    10:44
15   Q.  Thank you.  And that's a website that's     10:44
16 administered by the State; is that correct?       10:45
17   A.  Yes.                                        10:45
18   Q.  And the "DGS" in that subdomain stands for  10:45
19 the Department of General Services; correct?      10:45
20   A.  Yes.                                        10:45
21   Q.  And what does the "BSC" stand for?          10:45
22   A.  Building Standards Commission.              10:45
23   Q.  When was the 2019 edition of Title 24       10:45
24 published?                                        10:45
25   A.  On or around July 1st of this year.         10:45
                                            Page 35

1    Q.  Does CBSC currently host any parts of the   10:46
2 2016 triennial edition of the California Building  10:46
3 Standards Code on the BSC website?                 10:46
4    A.  I don't know what you mean by "host."       10:46
5    Q.  By "host," I mean does it store an          10:46
6 accessible version of the code on the BSC website?  10:47
7    A.  No.  I believe it's all -- points to the   10:47
8 model code publisher.                             10:47
9    Q.  And CBSC does not currently host any parts  10:47
10 for any edition of the California Building Standards  10:47
11 Code on the BSC website; correct?                 10:47
12   A.  I'm not certain of that.                    10:47
13   Q.  On the second page of this exhibit, there's  10:47
14 a heading that reads "2016 Triennial Edition of   10:47
15 Title 24."                                        10:47
16   A.  Uh-huh.                                     10:47
17   Q.  Does CBSC currently host a complete edition  10:47
18 of the 2016 version of Title 24 on the BSC website?  10:47
19   A.  It points to the model code developers much  10:48
20 like the '19 code.                                10:48
21   Q.  And that's the same for the 2013 edition;   10:48
22 correct?                                          10:48
23   A.  Correct.                                    10:48
24   Q.  This web page also, in a section marked     10:48
25 "Purchase the Codes," directs the user to public  10:48
                                            Page 37

10 (Pages 34 - 37)

1   code -- strike that.                          10:48
2       In a section called "Purchase the Codes,"   10:48
3   similarly, the website directs the user to the   10:48
4   publisher's websites; correct?                 10:48
5       MS. MILLER-ZIEGLER:  Objection as leading.   10:48
6       THE WITNESS:  Yes.                          10:48
7   BY MR. NERCESSIAN:                              10:48
8   Q.  One of those publishers is the International   10:48
9   Code Council?                                   10:48
10  A.  Yes.                                        10:49
11  Q.  And what parts is the International Code   10:49
12  Council responsible for publishing?            10:49
13  A.  It's listed here on the web page.  Would you   10:49
14  like me to read them all or --                 10:49
15  Q.  No.                                         10:49
16  A.  Okay.                                       10:49
17  Q.  And the web page lists the parts that are   10:49
18  available through each publisher; correct?     10:49
19  A.  Yes.                                        10:49
20  Q.  Does the State of California, to your      10:49
21  knowledge, make the full text of the California   10:49
22  Building Standards Code available to the public?   10:49
23      MR. FEE:  Objection to form.                10:49
24      THE WITNESS:  Yes.                          10:49
25  BY MR. NERCESSIAN:                              10:49

Page 38

1   Q.  How?                                        10:49
2       MR. FEE:  Same objection.                   10:49
3       THE WITNESS:  It's viewable on our website   10:49
4   through the publisher.                          10:49
5   BY MR. NERCESSIAN:                              10:49
6   Q.  Linked at pages hosted by the publisher --   10:49
7       MS. MILLER-ZIEGLER:  Objection.             10:50
8   BY MR. NERCESSIAN:                              10:50
9   Q.  -- correct?                                 10:50
10      MS. MILLER-ZIEGLER:  Objection as leading.   10:50
11      THE WITNESS:  Correct.                      10:50
12      MR. YEN:  Armen, I just want to clarify     10:50
13  something.  When you're referring to the State of   10:50
14  California, are you referring to the entire State of   10:50
15  California government, or are you just referring to   10:50
16  the Building Standards Commission?  Because --   10:50
17      MR. NERCESSIAN:  I was asking to her        10:50
18  knowledge, is she aware that the State of California   10:50
19  publishes.                                      10:50
20      MR. YEN:  So the entire State of California,   10:50
21  not just the Building Standards Commission?  So --   10:50
22      MR. NERCESSIAN:  Not just the Building      10:50
23  Standards Commission.                           10:50
24      MR. YEN:  All right.                        10:50
25      MR. NERCESSIAN:  But just to her knowledge.   10:50

Page 39

1       MR. YEN:  I just wanted to clarify that you   10:50
2   weren't just referring to the commission.       10:50
3       MR. NERCESSIAN:  No.                        10:50
4       MR. YEN:  Okay.                             10:50
5   BY MR. NERCESSIAN:                              10:50
6   Q.  All right.  On the third page of the       10:50
7   exhibit, there's a -- under a heading that says   10:50
8   "California Building Standards Code," there's a   10:50
9   description that reads "The California Building   10:50
10  Standards Code is a compilation of three types of   10:50
11  building standards from different origins."     10:50
12      What are the sources of the California      10:51
13  Building Standards Code?                        10:51
14  A.  California amendments which are proposed by   10:51
15  State agencies, the model codes that California is   10:51
16  required by law to adopt.  That's two kinds.  It's a   10:51
17  blend.                                          10:52
18  Q.  So this statement identifies three.         10:52
19  A.  Uh-huh.                                      10:52
20  Q.  What makes you -- so -- and we discussed two   10:52
21  kinds.  Is there not a third?                   10:52
22  A.  I'd have to read this because I'm not       10:52
23  understanding what -- that have been adopted by State   10:52
24  without change.  Okay, I get it.  We recently went   10:52
25  through a web page change, so I needed to read this   10:52

Page 40

1   because I haven't read this yet.                10:52
2   Q.  Okay.                                        10:53
3   A.  So I guess I understand why they're saying   10:53
4   three.  So there's building standards that have been   10:53
5   adopted by the State without change, and they contain   10:53
6   model codes, and then there's building standards --   10:53
7   standard, excuse me, that have been adopted and   10:53
8   adapted from national model codes to address      10:53
9   California's needs, which is what I talked about,   10:53
10  California amendments, and then there's building   10:53
11  standards authorized by California legislature that   10:53
12  constitutes amendments not covered by national model   10:53
13  codes.                                          10:53
14  Q.  Got it.  So you think these three categories   10:53
15  referred to here in this blurb are accurate?    10:53
16  A.  Yes.                                         10:53
17  Q.  It goes on to read that "All occupancies in   10:53
18  California are subject to national model codes   10:54
19  adopted into Title 24."  Do you see that language?   10:54
20  A.  Yes.                                         10:54
21  Q.  When the website says that Title -- the     10:54
22  national model codes adopted into Title 24 adopt --   10:54
23  strike that.                                     10:54
24      When the website says that the national     10:54
25  model codes adopted into Title 24 apply to all   10:54

Page 41

11 (Pages 38 - 41)

1 occupancies in California, do they apply to          10:54
2 residences?          10:54
3          MS. MILLER-ZIEGLER: Objection to form.          10:54
4          THE WITNESS: Yes.          10:54
5 BY MR. NERCESSIAN:          10:54
6    Q.  Do they apply to office buildings?          10:54
7    A.  Yes.          10:54
8    Q.  Do they apply to schools?          10:54
9    A.  Yes.          10:54
10    Q.  Do the national model codes adopted into          10:54
11 Title 24 apply to hospitals?          10:54
12    A.  Yes.          10:54
13          MS. MILLER-ZIEGLER: Objection to form.          10:54
14 BY MR. NERCESSIAN:          10:55
15    Q.  Do they apply to government buildings?          10:55
16    A.  Yes.          10:55
17    Q.  Are there any occupancies in California that  10:55
18 the national model codes adopted into Title 24 do not  10:55
19 apply to?          10:55
20          MS. MILLER-ZIEGLER: Objection to form.          10:55
21          THE WITNESS: I don't have an answer for          10:55
22 that.          10:55
23 BY MR. NERCESSIAN:          10:55
24    Q.  Because it applies to all occupancies in          10:55
25 California; correct?          10:55

Page 42

1          MS. MILLER-ZIEGLER: Objection to form.          10:55
2          THE WITNESS: Yes.          10:55
3 BY MR. NERCESSIAN:          10:55
4    Q.  So we established earlier that Part 3 of          10:55
5 Title 24 is the California Electrical Code. What          10:55
6 sources is the California Electrical Code based on?          10:55
7    A.  NFPA 70 --          10:55
8    Q.  NFPA 70.          10:55
9    A.  -- and California amendments.          10:56
10    Q.  And NFPA 70 is also known as the National          10:56
11 Electrical Code?          10:56
12    A.  Yes.          10:56
13    Q.  What version of the National Electrical Code  10:56
14 are the 2019 -- strike that.          10:56
15          What version of the National Electrical Code  10:56
16 is the 2019 version of the California Electrical Code  10:56
17 based on?          10:56
18          MS. MILLER-ZIEGLER: Objection to form.          10:56
19          MR. YEN: You can answer if you know.          10:56
20          THE WITNESS: Okay. Sorry.          10:56
21          MR. YEN: If you understand.          10:56
22          THE WITNESS: The 2017 National Electrical  10:56
23 Code.          10:56
24 BY MR. NERCESSIAN:          10:56
25    Q.  And what version of the National Electrical  10:56

Page 43

1 Code was the 2016 version of the California          10:56
2 Electrical Code based on?          10:56
3          MS. MILLER-ZIEGLER: Objection to form.          10:56
4          THE WITNESS: The 2014 electrical code.          10:56
5 BY MR. NERCESSIAN:          10:56
6    Q.  So you described that standard as NFPA 70.  10:57
7 What does "NFPA" stand for?          10:57
8    A.  National Fire Protection Association.          10:57
9    Q.  Is that the same National Fire Protection  10:57
10 Association that is a named plaintiff in this case?  10:57
11          MR. FEE: Objection to form.          10:57
12          THE WITNESS: Yes.          10:57
13 BY MR. NERCESSIAN:          10:57
14    Q.  Can you describe how the CBSC developed the  10:57
15 2019 edition of the California Electrical Code?          10:57
16    A.  Yes.          10:57
17    Q.  Please do.          10:57
18    A.  Okay. Again, state law requires the State  10:57
19 agencies to adopt the most recent edition of model  10:57
20 codes, and in the case of the electrical code, it  10:57
21 would be the 2017 National Electrical Code. The  10:57
22 State agencies carry forward existing amendments in  10:58
23 some cases from the previous edition.          10:58
24          They may make amendments to the new edition  10:58
25 that they're looking at. They may have pre-cycle  10:58

Page 44

1 workshops to vet any changes that are necessary.          10:58
2 Then their rulemaking documents are submitted to the  10:58
3 Building Standards Commission staff, and they are --  10:58
4 those files are reviewed for compliance with the          10:58
5 Administrative Procedures Act and the building          10:58
6 standards law.          10:58
7          They're then assembled for what's called a  10:58
8 code advisory committee, and that committee is made  10:58
9 up of technical experts in the field. They're not  10:59
10 paid by the State other than their per diem to          10:59
11 participate in the technical review of the proposed  10:59
12 changes and adoption of the code.          10:59
13          They provide a recommendation at a public  10:59
14 meeting to the State agency and also the public, and  10:59
15 that recommendation is considered by the State          10:59
16 agency, and the State agency may make additional          10:59
17 changes to their proposed code changes.          10:59
18          The Building Standards Commission then          10:59
19 assembles that material and puts it out for a 45-day  10:59
20 comment period which is noticed in the Office of          10:59
21 Administrative Law's notice registry. There may be  10:59
22 additional comments if necessary.          10:59
23          The State agencies respond to any comments  10:59
24 in their Final Statement of Reasons, and the Final  11:00
25 Statement of Reason and the Final Express Terms and  11:00

Page 45

12 (Pages 42 - 45)

1 other rulemaking documents are presented to the 11:00
2 commission at a public meeting where the commission 11:00
3 takes action on the rulemaking package. 11:00
4 Q. Got it. And it is the commission that has 11:00
5 the final say on what language ultimately makes it 11:00
6 into the version of the California Electrical Code? 11:00
7 MS. MILLER-ZIEGLER: Objection. Form. 11:00
8 THE WITNESS: The commission looks at all of 11:00
9 the public comments that were considered, the 11:00
10 Statement of Reasons, and they rely on the 11:00
11 determination of the State agency as well, and that 11:00
12 is all weighed, and as long as it meets the 11:00
13 nine-point criteria, the commission may take action 11:00
14 on the package to approve it. 11:00
15 BY MR. NERCESSIAN: 11:01
16 Q. And that's the nine-point criteria you 11:01
17 referred to earlier where if one of the criteria is 11:01
18 not met, there might be reason for an amendment; 11:01
19 correct? 11:01
20 A. Possibly, yes. 11:01
21 Q. You referred to -- in this to there being a 11:01
22 code advisory committee. 11:01
23 A. Uh-huh. Yes. Sorry. 11:01
24 Q. Where does that advisory committee reside? 11:01
25 A. It's assembled every two years for each 11:01

Page 46

1 triennial coded option, and a call for application 11:01
2 goes out by the Building Standards Commission staff, 11:01
3 and it's very specific in the member makeup of each 11:01
4 code advisory committee, and that's laid out in the 11:01
5 California Administrative Code, which is Part 1 of 11:01
6 Title 24, and each of -- each committee has 11:01
7 approximately nine members, and they are selected by 11:01
8 the commission every two years, and then those code 11:02
9 advisory committees serve for the three-year term, 11:02
10 and so they're a mix of technical experts in the 11:02
11 field. 11:02
12 Q. Okay. And Part 1 of Title 24 which 11:02
13 constitutes the California Administrative Code then 11:02
14 lays out the rules that the agencies must follow for 11:02
15 the rulemaking process? 11:02
16 MS. MILLER-ZIEGLER: Objection. Leading. 11:02
17 MR. FEE: Objection to form. 11:02
18 BY MR. NERCESSIAN: 11:02
19 Q. So you testified earlier that Part 1 of 11:02
20 Title 24 constitutes the California Administrative 11:02
21 Code; correct? 11:02
22 A. Uh-huh. 11:02
23 Q. What procedures does the California 11:02
24 Administrative Code govern? 11:03
25 A. Appeals and petitions, pre-cycle activities 11:03

Page 47

1 by State agencies, the timing -- strike that. Not 11:03
2 the timing. The initial submittal rulemaking 11:03
3 documents that are required to be submitted, the 11:03
4 actions that can be taken by the commission. That's 11:03
5 what I can remember off the top of my head. 11:03
6 Q. And all those rules are directed at 11:03
7 governing California state administrative processes; 11:03
8 correct? 11:03
9 MS. MILLER-ZIEGLER: Objection to form. 11:03
10 MR. FEE: Object to form. 11:03
11 THE WITNESS: Not sure I follow that 11:03
12 question. 11:03
13 BY MR. NERCESSIAN: 11:03
14 Q. I can rephrase. Who is the audience for 11:03
15 Part 1 of Title 24? 11:04
16 MR. FEE: Objection to form. 11:04
17 THE WITNESS: That code, administrative code 11:04
18 is available for anybody, so it's the public, it 11:04
19 could be State agencies, it could be code advisory 11:04
20 committee members, it could be the commission. 11:04
21 BY MR. NERCESSIAN: 11:04
22 Q. Got it. 11:04
23 A. Uh-huh. Could we take a break for a couple 11:04
24 minutes? Would that be okay? 11:04
25 Q. There's no question pending, so okay. 11:04

Page 48

1 A. Okay. Pause for a minute. 11:04
2 VIDEO OPERATOR: We're off the record. It's 11:04
3 11:04 3 .
11:04
4 (Recess) 11:04
5 VIDEO OPERATOR: Okay. We're back on the 11:21
6 record. It's 11:22. 11:21
7 BY MR. NERCESSIAN: 11:21
8 Q. Ms. Marvelli, have you heard of the term 11:22
9 "incorporation by adoption"? 11:22
10 A. Yes. 11:22
11 Q. And what does that term mean? 11:22
12 A. I don't know. 11:22
13 Q. In what context have you heard the term, 11:22
14 "incorporation by adoption"? 11:22
15 A. Through local ordinances and through the 11:22
16 codes. 11:22
17 Q. How were they used through the codes when 11:22
18 you heard the term "incorporation by adoption"? 11:22
19 MS. MILLER-ZIEGLER: Objection to form. 11:22
20 THE WITNESS: Just referenced in the code. 11:22
21 BY MR. NERCESSIAN: 11:22
22 Q. Do you have any understanding of what the 11:22
23 term "incorporation by adoption," as used in the 11:22
24 codes, means? 11:22
25 MR. FEE: Objection to form. 11:23

Page 49

13 (Pages 46 - 49)

1      THE WITNESS:  Just referenced in the code    11:23
2  that's adopted by California.  That's all.    11:23
3  BY MR. NERCESSIAN:    11:23
4      Q.  In what context does the code use it?    11:23
5      A.  I don't know.    11:23
6      Q.  Are you familiar with the term    11:23
7  "incorporation by reference"?    11:23
8      A.  Yes.    11:23
9      Q.  And what's your understanding of that term?    11:23
10     A.  Referenced in the code.    11:23
11     Q.  So do you understand that "incorporation by    11:23
12 adoption" and "incorporation by reference" have the    11:23
13 same meaning?    11:23
14     MS. MILLER-ZIEGLER:  Objection.  Leading.    11:23
15     THE WITNESS:  I don't know.    11:23
16 BY MR. NERCESSIAN:    11:24
17     Q.  Do you understand -- do you have any    11:24
18 understanding of how the meaning of "incorporation by    11:24
19 reference" may differ from "incorporation by    11:24
20 adoption"?    11:24
21     MS. MILLER-ZIEGLER:  Objection.  This calls    11:24
22 for a legal conclusion.  It's also outside the scope    11:24
23 of the subpoena.    11:24
24     THE WITNESS:  Yeah.  I don't have an answer    11:24
25 for you.  I don't know.    11:24

Page 50

1  BY MR. NERCESSIAN:    11:24
2      Q.  But your understanding is that incorporation    11:24
3  by reference has been used in the codes in -- strike    11:24
4  that.    11:24
5      Is it your understanding that incorporation    11:24
6  by reference applies when California law references    11:24
7  reference standards such as the National Electrical    11:24
8  Code?    11:25
9      MR. FEE:  Objection to form.    11:25
10     MS. MILLER-ZIEGLER:  Objection.  Calls for a    11:25
11 legal conclusion.    11:25
12     THE WITNESS:  Yeah.  I don't know.    11:25
13 BY MR. NERCESSIAN:    11:25
14     Q.  You said that the State of California makes    11:25
15 California build the -- strike that.    11:25
16     You testified earlier that the Building    11:25
17 Standards Commission makes the California Building    11:25
18 Standards Code available to the public by referring    11:25
19 the public to the publisher; is that correct?  Do you    11:25
20 recall that testimony?    11:25
21     A.  Yes.    11:25
22     MR. FEE:  Objection.  Form.    11:25
23 BY MR. NERCESSIAN:    11:25
24     Q.  Is the same true for the California    11:25
25 Electrical Code?    11:25

Page 51

1      MR. FEE:  Objection to form.    11:25
2      THE WITNESS:  Yes.    11:25
3  BY MR. NERCESSIAN:    11:25
4      Q.  Does the State make, to your knowledge --    11:25
5  strike that.    11:25
6      To your knowledge, does the State of    11:25
7  California make the text of the California Electrical    11:25
8  Code available to the public in any way other than by    11:26
9  referring it to the publisher?    11:26
10     MS. MILLER-ZIEGLER:  Object to form.    11:26
11     MR. YEN:  Again, you keep using the "State    11:26
12 of California," so you're saying the entire State of    11:26
13 California, not just the commission; right?  I just    11:26
14 want to be clear when you --    11:26
15     MR. NERCESSIAN:  I'm asking to her    11:26
16 knowledge.    11:26
17     MR. YEN:  Okay.  For the entire state?    11:26
18     MR. NERCESSIAN:  For the entire state.    11:26
19     MR. YEN:  Okay.    11:26
20     THE WITNESS:  The Building Standards    11:26
21 Commission makes available on its website a link to    11:26
22 the model code.  The State of California, there's a    11:26
23 reference in building standards law that says local    11:26
24 jurisdictions need to make available the building    11:26
25 codes, all of the building codes publicly at their    11:26

Page 52

1  office as well, a printed version if you will.    11:26
2  BY MR. NERCESSIAN:    11:26
3      Q.  And who is the publisher in the case of the    11:26
4  California Electrical Code?    11:27
5      A.  The 2016 edition, the publisher was BNi, and    11:27
6  for the 2019 edition, the publisher was NFPA.    11:27
7      Q.  With respect to the 2016 edition, was --    11:27
8  strike that.    11:27
9      Did the NFPA serve any role with respect to    11:27
10 the 2016 edition of the California Electrical Code?    11:27
11     MR. FEE:  Objection.  Form.    11:27
12     MS. MILLER-ZIEGLER:  Objection.  It's vague.    11:27
13     THE WITNESS:  I don't know.    11:27
14 BY MR. NERCESSIAN:    11:27
15     Q.  What is BNi?    11:27
16     A.  I don't know the full name.  I know them as    11:27
17 BNi, is the publisher for the 2016 electrical code.    11:27
18     Q.  Do you know anything about the entity BNi if    11:28
19 not the full name?    11:28
20     A.  No, I don't.    11:28
21     Q.  You understand that they publish the 2016    11:28
22 California Electrical Code?    11:28
23     A.  Yes.    11:28
24     Q.  Did anybody else, any other entity publish    11:28
25 the 2016 electrical code, California Electrical Code?    11:28

Page 53

14 (Pages 50 - 53)

```
 1    A.  Not that I -- I don't know.          11:28
 2    Q.  To your knowledge, there is no other      11:28
 3  publisher of the California Electrical Code, the 2016  11:28
 4  edition, other than BNi?                  11:28
 5       MS. MILLER-ZIEGLER:  Objection.  That    11:28
 6  misstates her testimony.                 11:28
 7       THE WITNESS:  I don't know.           11:28
 8  BY MR. NERCESSIAN:
 9    Q.  Okay.  So you're not aware of any other   11:28
10  publisher of the 2016 California Electrical Code   11:28
11  other than BNi?                        11:28
12    A.  Correct.                         11:29
13    Q.  Do you know how BNi makes the 2016     11:29
14  electrical code available to the public?       11:29
15    A.  Via the website or by purchasing.      11:29
16    Q.  When you say it makes it available via the  11:29
17  website, what website is that?            11:29
18    A.  The one I'm aware of is the California   11:29
19  Building Standards Commission's link on their website  11:29
20  to their website.                      11:29
21    Q.  And for the 2016 edition that we're     11:29
22  discussing, that links to a BNi website?       11:29
23    A.  I don't know.                     11:29
24    Q.  Do you know of any restrictions that appear  11:29
25  on the website access through the link for the 2016  11:30
```
Page 54

```
 1  California Electrical Code?                11:30
 2       MR. FEE:  Objection to form.          11:30
 3       THE WITNESS:  Can you repeat the question?  11:30
 4  BY MR. NERCESSIAN:                       11:30
 5    Q.  Are you aware of any restrictions on the  11:30
 6  website accessible through the link for the 2016   11:30
 7  electrical code as it appears on the BSC website?  11:30
 8       MR. FEE:  Objection to form.          11:30
 9       THE WITNESS:  No.                   11:30
10  BY MR. NERCESSIAN:                       11:30
11    Q.  Is it possible that there are restrictions   11:30
12  on the website access through the link that appears  11:30
13  on the BSC website for the 2016 electrical code?  11:30
14       MR. YEN:  Objection.  Calls for speculation.  11:30
15       MS. MILLER-ZIEGLER:  Objection.  Lacks   11:30
16  foundation as well.                     11:30
17  BY MR. NERCESSIAN:                       11:31
18    Q.  Do you know whether the public has full   11:31
19  access to the text of the 2016 California Electrical  11:31
20  Code without payment?                    11:31
21       MR. FEE:  Objection to form.          11:31
22       MS. MILLER-ZIEGLER:  Objection.  Vague.  11:31
23       THE WITNESS:  I'm sorry.  Repeat the     11:31
24  question again.                        11:31
25  BY MR. NERCESSIAN:                       11:31
```
Page 55

```
 1    Q.  Do you know whether the public has full   11:31
 2  access to the text of the 2016 California Electrical  11:31
 3  Code without payment?                    11:31
 4       MR. FEE:  Objection to form.          11:31
 5       MS. MILLER-ZIEGLER:  Objection.  Vague.  11:31
 6  BY MR. NERCESSIAN:                       11:31
 7    Q.  I can rephrase.  Do you know whether BNi  11:31
 8  provides the public with full access to the text of  11:31
 9  the 2016 California Electrical Code without payment?  11:32
10       MR. FEE:  Objection to form.          11:32
11       MS. MILLER-ZIEGLER:  Objection.  Vague.  11:32
12       THE WITNESS:  I don't know that.        11:32
13  BY MR. NERCESSIAN:                       11:32
14    Q.  You don't know one way or the other?    11:32
15    A.  Huh-uh.                         11:32
16       MR. YEN:  So just when you're answering   11:32
17  questions, verbal, not --                 11:32
18       THE WITNESS:  Okay.  Sorry.           11:32
19       MR. YEN:  -- not just nodding the head.   11:32
20       THE WITNESS:  Sorry.                 11:32
21  BY MR. NERCESSIAN:                       11:32
22    Q.  All right.  So when I asked, "You don't know  11:32
23  one way or another?" your answer was confirming that  11:32
24  you don't know one way or another; correct?     11:32
25    A.  I don't know what BNi offers.          11:32
```
Page 56

```
 1    Q.  Does anybody in your office know what BNi  11:32
 2  offers?                              11:32
 3       MR. FEE:  Objection to form, calls for     11:32
 4  speculation.                          11:32
 5       THE WITNESS:  I don't know that.  I wouldn't  11:32
 6  know that.                            11:32
 7  BY MR. NERCESSIAN:                       11:32
 8    Q.  Do you know whether BNi is a commercial for  11:33
 9  profit publisher?                      11:33
10       MR. FEE:  Objection to form.          11:33
11       THE WITNESS:  I don't know that.        11:33
12  BY MR. NERCESSIAN:                       11:33
13    Q.  Do you know one way or another?        11:33
14       MR. FEE:  Same objection.            11:33
15       MS. MILLER-ZIEGLER:  Object to form.     11:33
16       THE WITNESS:  I'll change my answer to no.  11:33
17  BY MR. NERCESSIAN:                       11:33
18    Q.  So you don't know whether BNi is a       11:33
19  commercial for profit publisher?           11:33
20    A.  I don't know that.                 11:33
21    Q.  We can mark this next in order.        11:34
22       (Exhibit 4 marked)                  11:34
23  BY MR. NERCESSIAN:                       11:34
24    Q.  Ms. Marvelli, I've handed you a document   11:34
25  that's been marked for identification as Exhibit 4.  11:34
```
Page 57

15 (Pages 54 - 57)

1 Do you recognize this document?        11:34
2    A.   I've not seen this print before, but it   11:34
3 appears to be the California Electrical Code, the '19   11:35
4 edition.                              11:35
5    Q.   And the URL for this link has the domain   11:35
6 nfpa.org; correct?                    11:35
7    A.   Yes.                          11:35
8    Q.   Is that NFPA the same as the named   11:35
9 plaintiffs in this lawsuit, the named plaintiff?   11:35
10       MR. FEE:   Object to form.        11:35
11       MR. YEN:   Hold on a second.      11:35
12       If you need clarification, you can ask him   11:35
13 for clarification.                     11:35
14       THE WITNESS:   Okay.  Sorry.  Yeah.  Yeah, I   11:35
15 guess I need clarification.             11:35
16 BY MR. NERCESSIAN:                    11:35
17    Q.   Do you know what the domain nfpa.org -- who   11:35
18 owns it, who runs it?                  11:35
19       MR. FEE:   Objection to form.     11:35
20       THE WITNESS:   NFPA, so --        11:35
21       MR. YEN:   Objection.  Calls for speculation.   11:36
22       THE WITNESS:   Yeah, it does, yeah.   11:36
23 BY MR. NERCESSIAN:                    11:36
24    Q.   Do you have any experience with accessing   11:36
25 any web pages at nfpa.org?             11:36

Page 58

1    A.   Yes.                          11:36
2    Q.   Have you accessed the 2019 California   11:36
3 Electrical Code through nfpa.org?       11:36
4    A.   Yes.                          11:36
5    Q.   Do you have any familiarity with the NFPA   11:36
6 viewer that the NFPA supplies for viewing the 2019   11:36
7 electrical code?                      11:36
8       MS. MILLER-ZIEGLER:   Objection to form.   11:36
9       THE WITNESS:   I have familiarity, yes.   11:36
10 BY MR. NERCESSIAN:                    11:36
11    Q.   In light of that experience, are the   11:36
12 screenshots you see reflected in this exhibit   11:36
13 familiar to you?                      11:36
14       MR. FEE:   Objection to form.     11:36
15       THE WITNESS:   No.               11:36
16 BY MR. NERCESSIAN:                    11:36
17    Q.   Have you yourself accessed the 2019   11:36
18 California Electrical Code on the NFPA viewer?   11:37
19    A.   Yes.                          11:37
20    Q.   Are you aware whether you can print the code   11:37
21 from the NFPA viewer?                  11:37
22       MR. FEE:   Objection to form.     11:37
23       THE WITNESS:   I'm not aware, no.   11:37
24 BY MR. NERCESSIAN:                    11:37
25    Q.   Can you?  Are you aware one way or the   11:37

Page 59

1 other?                              11:37
2    A.   No, I'm not aware.  I'm not aware.  I don't   11:37
3 know.                               11:37
4    Q.   Have you ever attempted to print the   11:37
5 California Electrical Code from the NFPA viewer?   11:37
6    A.   I have not attempted to print the '19   11:37
7 electrical code from the viewer.        11:37
8    Q.   Are you aware whether anyone can copy text   11:37
9 from the NFPA viewer for the 2019 California   11:37
10 Electrical Code?                      11:37
11       MR. FEE:   Objection to form.     11:37
12       THE WITNESS:   I don't know.      11:37
13 BY MR. NERCESSIAN:                    11:37
14    Q.   Do you know whether someone can search the   11:38
15 text of the 2019 California Electrical Code on the   11:38
16 NFPA viewer?                         11:38
17       MR. FEE:   Objection to form.     11:38
18       THE WITNESS:   I don't know actually.  I   11:38
19 don't know.                          11:38
20 BY MR. NERCESSIAN:                    11:38
21    Q.   And the BSC website links to a version of   11:38
22 the California Electrical Code for the year 2019 on   11:38
23 the NFPA viewer; correct?              11:38
24    A.   Yes.                          11:38
25    Q.   It links to this, the website reflected in   11:38

Page 60

1 this document; correct?                11:38
2       MS. MILLER-ZIEGLER:   Objection.  Lack of   11:38
3 foundation.                          11:38
4       MR. FEE:   Object to form.  Mischaracterizes   11:38
5 her testimony.                        11:38
6       THE WITNESS:   I don't know if it links   11:38
7 directly to what I'm looking at today.   11:38
8 BY MR. NERCESSIAN:                    11:38
9    Q.   Do you have any reason to believe it doesn't   11:38
10 link to this web page in the NFPA viewer reflected   11:38
11 here?                               11:38
12       MS. MILLER-ZIEGLER:   Objection.  Lack of   11:38
13 foundation.                          11:39
14       THE WITNESS:   I don't have a way to confirm   11:39
15 that.                               11:39
16 BY MR. NERCESSIAN:                    11:39
17    Q.   Have you ever tried copying text from the   11:39
18 California Electrical Code on the NFPA viewer?   11:39
19    A.   No.                          11:39
20    Q.   I'd like to refer you to the second page,   11:39
21 and here on the second page, there's language stating   11:39
22 that "Portions of this publication are reproduced   11:39
23 with permission from the National Electrical Code."   11:39
24 Do you see that here?                  11:39
25    A.   Yes.                          11:39

Page 61

16 (Pages 58 - 61)

| | |
|---|---|
| 1  Q.  And this also identifies that no portions of  11:39 | 1  page which the public can access.          11:43 |
| 2  NEC material may be reproduced except with permission  11:40 | 2   Q.  I'd like to refer you -- call your attention  11:43 |
| 3  of the National Fire Protection Association."  Do you  11:40 | 3  to this next page as well.  It's noted as page 49 of  11:43 |
| 4  see that text?          11:40 | 4  1034.  Have you -- at the top of the -- strike that.  11:43 |
| 5  A.  Yes.          11:40 | 5     At the top of the page, it reads "Chapter 1  11:44 |
| 6  Q.  What portions of the publication here did  11:40 | 6  California Matrix Adoption Tables."  Do you see that?  11:44 |
| 7  NFPA contribute?  11:40 | 7  A.  Yes.          11:44 |
| 8     MR. YEN:  Objection.  Calls for speculation.  11:40 | 8  Q.  What is a Matrix Adoption Table?          11:44 |
| 9     MS. MILLER-ZIEGLER:  Object to form.          11:40 | 9  A.  It's a guide for the code reader to see  11:44 |
| 10     MR. NERCESSIAN:  I can rephrase.          11:40 | 10  which State agencies amend or adopt an entire article  11:44 |
| 11  BY MR. NERCESSIAN:          11:40 | 11  of the electrical code or only specific sections from  11:44 |
| 12  Q.  How can a reader of the California          11:40 | 12  the articles.          11:44 |
| 13  Electrical Code distinguish which portions of the  11:40 | 13  Q.  And what information do these tables reflect  11:44 |
| 14  California Electrical Code NFPA contributed?  11:40 | 14  that allows a reader to distinguish whether a code is  11:44 |
| 15     MR. YEN:  Same objection.          11:40 | 15  accepted as amended or adopted in its entirety?  11:44 |
| 16     THE WITNESS:  So on page -- and I don't  11:40 | 16     MR. FEE:  Objection.  Form.          11:44 |
| 17  know -- the pages aren't numbered, so on the top  11:41 | 17     MS. MILLER-ZIEGLER:  Objection.  Misstates  11:44 |
| 18  right corner, it says 11 of 1034.  There's a legend  11:41 | 18  her testimony.          11:44 |
| 19  that tells the reader how to distinguish between  11:41 | 19     MR. FEE:  Also object, you're asking these  11:44 |
| 20  model code and California amendments.          11:41 | 20  questions without the full California Electrical Code  11:45 |
| 21  BY MR. NERCESSIAN:          11:41 | 21  in front of her, so she can't answer the question in  11:45 |
| 22  Q.  And that legend indicates that if in the  11:41 | 22  the context of the entire document.          11:45 |
| 23  margin there is this "CA" notation vertically, that  11:41 | 23  BY MR. NERCESSIAN:          11:45 |
| 24  indicates that a California amendment has been made  11:41 | 24  Q.  You may answer if you understand the          11:45 |
| 25  to the model code; correct?          11:41 | 25  question.          11:45 |
| Page 62 | Page 64 |

| | |
|---|---|
| 1  A.  Yes.          11:41 | 1  A.  This table represents what was approved by  11:45 |
| 2     MR. FEE:  I'm going to object to the use of  11:41 | 2  the commission for publication in this edition of the  11:45 |
| 3  this exhibit in its entirety.  Have you excerpted  11:41 | 3  code.          11:45 |
| 4  pages of this?          11:41 | 4  Q.  So, for instance, it reflects on the top  11:45 |
| 5     MR. NERCESSIAN:  Yes.  These are screenshots  11:41 | 5  line those portions that were adopted in their  11:45 |
| 6  of what's available in the NFPA viewer.          11:41 | 6  entirety?          11:45 |
| 7     MR. FEE:  Selected by you?          11:41 | 7     MS. MILLER-ZIEGLER:  Objection.  It's vague.  11:45 |
| 8     MR. NERCESSIAN:  Selected by me, yes.          11:41 | 8     THE WITNESS:  Yeah.          11:45 |
| 9     MR. FEE:  Okay.  I object to that.          11:41 | 9  BY MR. NERCESSIAN:          11:45 |
| 10     MS. MILLER-ZIEGLER:  Objection as          11:42 | 10  Q.  So how would code reader understand whether  11:45 |
| 11  incomplete.          11:42 | 11  portion of the reference code, reference standard was  11:45 |
| 12  BY MR. NERCESSIAN:          11:42 | 12  adopted in its entirety?          11:45 |
| 13  Q.  All right.  Does the Building Standards  11:42 | 13     MR. FEE:  Object as to form.  Object to the  11:45 |
| 14  Commission make any of these California amendments  11:42 | 14  exhibit again.          11:45 |
| 15  available to the public separately from the  11:42 | 15     THE WITNESS:  Yeah.  I'm not sure I'm  11:45 |
| 16  publication of the California Electrical Code?  11:42 | 16  understanding the question.          11:46 |
| 17     MS. MILLER-ZIEGLER:  Objection.  Form.  11:42 | 17  BY MR. NERCESSIAN:          11:46 |
| 18     THE WITNESS:  Yes.  The Final Statement of  11:42 | 18  Q.  So let's look at this table that -- just for  11:46 |
| 19  Reasons may contain those amendments.          11:42 | 19  "Article 110 - Requirements of Electrical          11:46 |
| 20  BY MR. NERCESSIAN:          11:42 | 20  Installations."  How would a code reader interpret  11:46 |
| 21  Q.  After the rulemaking process is over, does,  11:42 | 21  this table?          11:46 |
| 22  to your knowledge, the State of California publish  11:42 | 22     MR. FEE:  Objection.          11:46 |
| 23  any California amendments separately?          11:42 | 23     MS. MILLER-ZIEGLER:  Objection.          11:46 |
| 24  A.  The Building Standards Commission makes  11:43 | 24  Speculation.          11:46 |
| 25  available the Final Statement of Reasons on its web  11:43 | 25     THE WITNESS:  I can't answer how a code  11:46 |
| Page 63 | Page 65 |

17 (Pages 62 - 65)

1 reader would interpret it.                              11:46
2 BY MR. NERCESSIAN:                                      11:46
3     Q.   What information is this table intend --       11:46
4 strike that.                                            11:46
5         What information does this table for Article    11:46
6 110 provide that may be helpful to a code reader in     11:46
7 interpreting the relevant portion of the California     11:47
8 Electrical Code?                                        11:47
9         MS. MILLER-ZIEGLER:  Objection to form.         11:47
10        THE WITNESS:  This table, for example,          11:47
11 represents that DSA, the acronym SS adopts the entire  11:47
12 Article 110.                                            11:47
13 BY MR. NERCESSIAN:                                      11:47
14    Q.   And what is DSA?                               11:47
15    A.   The Division of the State Architect.  And      11:47
16 the SS is -- represents further structural safety      11:47
17 program.                                                11:47
18    Q.   And then we have -- two columns over, do you   11:47
19 see there's this column that reads "HCD"?              11:47
20    A.   Yes.                                           11:47
21    Q.   What does that acronym refer to?              11:47
22    A.   That's Department of Housing and Community     11:47
23 Development.                                            11:47
24    Q.   And if you go down just to the second row      11:47
25 within that column, there are X's here under sub       11:48

Page 66

1 column one and a sub column two.                        11:48
2     A.   Uh-huh.                                        11:48
3     Q.   What do those X's reflect?                    11:48
4     A.   That HCD's authority for one and two is        11:48
5 adopt the entire article as amended and that the        11:48
6 amended sections are listed below.                      11:48
7     Q.   And to access those articles that are          11:48
8 adopted in their entirety as amended -- strike that.    11:48
9         How would a code reader access those           11:48
10 articles that had been adopted in their entirety as     11:48
11 amended by HCD?                                         11:48
12        MR. FEE:  Objection.  Calls for speculation.    11:48
13        MR. NERCESSIAN:  I can rephrase.                11:48
14 BY MR. NERCESSIAN:                                      11:49
15    Q.   What means of access does the Building         11:49
16 Standards Commission provide to a code reader seeking  11:49
17 to access those articles adopted in their entirety as  11:49
18 amended by HCD?                                         11:49
19    A.   They are made available on the link to the    11:49
20 website, and those may or may not be in the Final       11:49
21 Statement of Reasons that were amended by HCD.         11:49
22    Q.   Why may they not be present in the Final       11:49
23 Statement of Reasons that were amended by HCD?         11:49
24    A.   They could have been carried forward from a    11:49
25 previous code cycle.                                    11:49

Page 67

1     Q.   And if that was the case, how would a person   11:49
2 access -- strike that.                                  11:49
3         If it was the case that they were carried       11:49
4 forward from a previous code cycle, how would a         11:49
5 person seeking to access those provisions know?        11:50
6     A.   I'm not following the question.  Sorry.        11:50
7     Q.   So earlier we established that -- strike       11:50
8 that.                                                   11:50
9         It's possible that a State agency such as       11:50
10 HCD may adopt an entire article as amended into its    11:50
11 rules while -- strike that.                            11:50
12        It's possible that a State agency such as       11:50
13 HCD may adopt an entire article as amended into its    11:50
14 rules; correct?                                         11:50
15    A.   I'm sorry.  Repeat the question.               11:50
16    Q.   Is it possible that a State agency such as     11:50
17 HCD can adopt an entire article as amended into its    11:51
18 rules?                                                  11:51
19    A.   Yes.                                           11:51
20    Q.   And in the case that it does that, is it       11:51
21 possible that that provision does not appear in their  11:51
22 Final Statement of Reasons?                            11:51
23    A.   It's possible.                                 11:51
24    Q.   One reason it might not appear is in --        11:51
25 strike that.                                           11:51

Page 68

1         One reason such a provision might not appear   11:51
2 in the Final Statement of Rules is if it was carried    11:51
3 forward from a previous cycle; correct?                11:51
4     A.   Yes.                                           11:51
5     Q.   In such a case, how would a person know        11:51
6 where to look to find the relevant code provision?     11:51
7         MR. FEE:  Objection.  Calls for speculation.   11:52
8         THE WITNESS:  Yeah.  I don't know.             11:52
9 BY MR. NERCESSIAN:                                      11:52
10    Q.   All right.  In such a case, does, to your     11:52
11 knowledge, the State of California -- strike that.      11:52
12        In such a case, would -- strike that.          11:53
13        In such a case, is it possible that the        11:53
14 entire code provision as amended appears in a Final    11:53
15 Statement of Reasons from the State agency from an     11:53
16 earlier cycle?                                          11:53
17    A.   It's possible.                                 11:53
18    Q.   Is there any way a person seeking to find     11:53
19 the relevant provision that was adopted in its         11:53
20 entirety as amended would know where to look to        11:53
21 access that provision?                                  11:53
22        MR. FEE:  Objection to form, calls for         11:53
23 speculation.                                            11:53
24        THE WITNESS:  Yeah.  Yeah.  I can't -- I        11:53
25 don't know how to answer that question.  I don't have  11:54

Page 69

18 (Pages 66 - 69)

1 an answer for that question actually.          11:54
2 BY MR. NERCESSIAN:                             11:54
3    Q.  And why don't you have an answer for that   11:54
4 question?                                      11:54
5    A.  I don't think I'm fully understanding what   11:54
6 you're trying to ask.  I apologize.            11:54
7    Q.  All right.  I can rephrase.             11:54
8    A.  Okay.                                   11:54
9    Q.  I'm trying to ask with respect to these code   11:54
10 provisions that are part of the California      11:54
11 amendments, how can a person seeking to find them   11:54
12 access them?                                   11:54
13      MR. FEE:  Objection.  Calls for speculation.   11:54
14      THE WITNESS:  They're made available on the   11:54
15 website in previous editions of the code.       11:54
16 BY MR. NERCESSIAN:                             11:54
17    Q.  And to access those -- strike that.      11:54
18      To access those previous editions, would the   11:54
19 person have to go through the publisher such as BNi?   11:55
20      MR. FEE:  Objection.  Calls for speculation.   11:55
21      THE WITNESS:  I don't know.               11:55
22 BY MR. NERCESSIAN:                             11:55
23    Q.  And when -- you testified earlier that    11:55
24 they're available on the website in previous editions   11:55
25 of the code; correct?  Do you recall that testimony?   11:55
                                              Page 70

1    A.  Yes.                                   11:55
2    Q.  On whose website?                       11:55
3    A.  The link provided on our website.        11:55
4    Q.  The link is provided on the BSC website?   11:55
5    A.  Yes.                                   11:56
6      MS. MILLER-ZIEGLER:  Objection.  Asked and   11:56
7 answered.                                      11:56
8 BY MR. NERCESSIAN:                             11:56
9    Q.  Where is the code provided?             11:56
10      MR. FEE:  Objection.  Form.               11:56
11      THE WITNESS:  I'm having -- I can't -- I    11:56
12 don't know -- I don't understand the question that   11:56
13 you're asking.                                 11:56
14 BY MR. NERCESSIAN:                             11:56
15    Q.  The link that's available on the BSC website   11:56
16 is to text elsewhere; correct?                 11:56
17    A.  Yes.                                   11:56
18    Q.  Text on, for instance, with respect to the   11:56
19 2016 version of the code, to a website service by   11:56
20 BNi; correct?                                  11:57
21      MR. FEE:  Objection.  Calls for speculation.   11:57
22      THE WITNESS:  The 2016 from our website does   11:57
23 reference the model code publisher.            11:57
24 BY MR. NERCESSIAN:                             11:57
25    Q.  Which you testified previously for 2016 was   11:57
                                              Page 71

1 BNi; correct?                                  11:57
2    A.  That was the publisher, yes.  I don't know   11:57
3 the exact website link.                        11:57
4    Q.  That text is not on the BSC site; correct?   11:57
5      MR. FEE:  Objection.  Mischaracterizes her   11:57
6 testimony.                                     11:57
7      THE WITNESS:  That text is not on our       11:57
8 website.  It links to the publisher's website.   11:57
9 BY MR. NERCESSIAN:                             11:57
10    Q.  And you're not aware of what restrictions   11:57
11 the publisher places on access to that text?     11:57
12      MS. MILLER-ZIEGLER:  Objection.  Asked and   11:57
13 answered.                                      11:57
14      THE WITNESS:  No.                         11:57
15 BY MR. NERCESSIAN:                             11:58
16    Q.  Do you have to register with NFPA to see the   11:58
17 California Electrical Code at its site?         11:58
18      MS. MILLER-ZIEGLER:  Objection.  Calls for   11:58
19 speculation.                                   11:58
20      THE WITNESS:  I don't know.               11:58
21 BY MR. NERCESSIAN:                             11:58
22    Q.  So you have no awareness whether one has to   11:58
23 register within NFPA to see the California Electrical   11:58
24 Code on their site?                            11:58
25    A.  I only am familiar with how it's accessed   11:58
                                              Page 72

1 through the BSC website to the NFPA website.     11:58
2    Q.  And that, as we established earlier, is by a   11:58
3 link on the BSC website?                       11:58
4    A.  Correct.                               11:58
5      MS. MILLER-ZIEGLER:  Objection.  Asked and   11:58
6 answered.                                      11:58
7 BY MR. NERCESSIAN:                             11:58
8    Q.  Do you know whether a person needs to agree   11:58
9 to terms and conditions to access the California   11:58
10 Electrical Code on a publisher's website?        11:58
11      MS. MILLER-ZIEGLER:  Objection.  Lacks      11:58
12 foundation.                                    11:58
13      THE WITNESS:  I don't know.               11:59
14 BY MR. NERCESSIAN:                             11:59
15    Q.  Do you know with -- strike that.        11:59
16      With respect to the 2016 code, do you know   11:59
17 whether BNi had to obtain permission from any other   11:59
18 entity to publish the California Electrical Code?   11:59
19      MR. FEE:  Objection to form.              11:59
20      THE WITNESS:  I don't know.               11:59
21 BY MR. NERCESSIAN:                             11:59
22    Q.  Do you know whether the State of California   11:59
23 receives any revenue from BNi with respect to its   11:59
24 application of the California Electrical Code?     11:59
25    A.  The Building Standards Commission does not   11:59
                                              Page 73

19 (Pages 70 - 73)

**Page 74**

1 receive revenue from BNi.                    11:59
2    Q.   Do you know whether any other agency of the   11:59
3 State of California does?                     11:59
4    A.   I have -- I do not know, no.          11:59
5    Q.   I'd like to refer your attention to the   12:00
6 page marked 7 of 1034 of this same document.  That   12:00
7 starts with the heading "Acknowledgments."    12:00
8    A.   7?                                    12:00
9    Q.   7, correct.                           12:00
10   A.   Okay.                                 12:00
11   Q.   And so you see in this first paragraph that   12:00
12 it states "The California Electrical Code was   12:00
13 developed through the outstanding collaborative   12:00
14 efforts of," a number of State agencies here?  Do you   12:01
15 see that paragraph?                           12:01
16   A.   Yes.                                  12:01
17   Q.   Going down the list, what contributions --   12:01
18 strike that.                                  12:01
19      Are you aware of -- strike that.        12:01
20      So each of these State agencies contributed   12:01
21 to the development of the California Electrical Code;   12:01
22 correct?                                      12:01
23      MR. FEE:  Objection to form.            12:01
24      MS. MILLER-ZIEGLER:  Objection.  Misstates   12:01
25 what the document says.                       12:01

**Page 75**

1      THE WITNESS:  I don't know that every State   12:01
2 agency contributed to the -- contributed to   12:01
3 amendments to the California Electrical Code that's   12:01
4 listed here.                                  12:01
5 BY MR. NERCESSIAN:                            12:01
6    Q.   Each of these State agencies collaborated in   12:01
7 the process of developing the California Electrical   12:02
8 Code, however, did they not?                  12:02
9      MR. FEE:  Objection.  Calls for speculation.   12:02
10      THE WITNESS:  I don't know that every one   12:02
11 collaborated for the electrical code.         12:02
12 BY MR. NERCESSIAN:                            12:02
13   Q.   And what definition of "collaborated" are   12:02
14 you using?                                    12:02
15   A.   I know that these State agencies contributed   12:02
16 to amendments, but not all of them did.  These are a   12:02
17 list of common State agencies that contribute to all   12:02
18 of the California Building Standards Code.     12:02
19   Q.   All right.                           12:02
20   A.   So, for example, the Department of Public   12:02
21 Health, I wouldn't know unless I researched to see if   12:02
22 they actually specifically amended something in the   12:02
23 California Electrical Code.                    12:02
24   Q.   All right.  Are you aware whether the   12:02
25 Department of Housing and Community Development made   12:02

**Page 76**

1 any contributions?                            12:02
2    A.   I do believe they amend the California   12:02
3 Electrical Code, yes.                         12:03
4    Q.   So you're defining -- just to I understand   12:03
5 the terminology you're using, you're defining   12:03
6 "contribution" as whether they propose an amendment?   12:03
7    A.   A California amendment.               12:03
8    Q.   That's understood.  Did the Department of   12:03
9 Housing and Community Development seek to copyright   12:03
10 any of their contributions to the California   12:03
11 Electrical Code?                              12:03
12   A.   I don't know.                         12:03
13      MR. FEE:  Objection.  Calls for speculation.   12:03
14 BY MR. NERCESSIAN:                            12:03
15   Q.   Are you aware of whether any of these   12:03
16 agencies -- strike that.                      12:03
17      Are you aware of whether any of these State   12:03
18 agencies that made contributions to the 2019   12:03
19 California Electrical Code sought a copyright in   12:03
20 their contributions?                          12:03
21      MS. MILLER-ZIEGLER:  Objection.  Calls for   12:03
22 speculation.                                  12:03
23      THE WITNESS:  I don't know.             12:03
24 BY MR. NERCESSIAN:                            12:03
25   Q.   The only organization you're aware of that   12:04

**Page 77**

1 has asserted a copyright in the California Electrical   12:04
2 Code is the -- strike that.                   12:04
3      What organizations are you aware of that   12:04
4 have asserted a copyright in the 2019 California   12:04
5 Electrical Code?                              12:04
6    A.   The model code publisher.             12:04
7    Q.   And who is that?                      12:04
8    A.   In the case of the '19, it's NFPA.     12:04
9    Q.   And what about the 2016 California   12:04
10 Electrical Code?  I can elaborate.            12:04
11      With respect to the 2016 California   12:04
12 Electrical Code, are you aware of any organizations   12:05
13 that have asserted a copyright in that version?   12:05
14      MS. MILLER-ZIEGLER:  Objection.  Calls for a   12:05
15 legal conclusion.                             12:05
16      THE WITNESS:  Yeah.  I'd have to research   12:05
17 that.  I don't know.                          12:05
18 BY MR. NERCESSIAN:                            12:05
19   Q.   I'm asking for your awareness.         12:05
20   A.   That would be BNi.                     12:05
21   Q.   And anybody else you're aware of?       12:05
22   A.   It could possibly be NFPA, but that's --   12:05
23 yeah.  I'd have to research that.             12:05
24   Q.   Are you aware of whether any of the State   12:05
25 agencies that made contributions to the 2016   12:05

Veritext Legal Solutions
866 299-5127

1 California Electrical Code have sought a copyright   12:05
2 interest in those contributions?                    12:05
3   A.  No.                                           12:05
4   Q.  So you have no awareness of State agencies     12:05
5 seeking a copyright in their contributions to the   12:05
6 2016 California Electrical Code?                     12:06
7   A.  No.                                           12:06
8   Q.  Do you have -- strike that.                    12:06
9       Do you have any awareness of -- strike that.   12:06
10      Did you have any involvement in the           12:06
11 development of the 2013 version of the California   12:06
12 Electrical Code?                                    12:06
13   A.  No.  Can you repeat the question?  I'm        12:06
14 sorry.                                              12:06
15   Q.  Yes.  Did you have any involvement in the     12:06
16 development of the 2013 version of the California   12:06
17 Electrical Code?                                    12:06
18   A.  Yes.                                          12:06
19   Q.  What was your involvement?                    12:06
20   A.  When I worked as an architectural associate,  12:07
21 like I spoke to earlier, I would have been involved 12:07
22 in receiving documents from State agencies that     12:07
23 possibly amend the California Electrical Code and   12:07
24 review those documents for the public process.      12:07
25   Q.  And what sources was the 2013 version of the  12:07

1 California Electrical Code based on?                 12:07
2   A.  I believe it was the 2011 edition of the       12:07
3 NEC.                                                 12:07
4   Q.  That's the National Electrical Code?           12:07
5   A.  Yes.                                           12:07
6   Q.  Are you aware of any organization that has     12:07
7 asserted a copyright interest in the 2013 version of 12:07
8 the California Electrical Code?                       12:07
9   A.  No.                                            12:07
10   Q.  Is it your understanding that no              12:07
11 organization has asserted a copyright interest in the 12:08
12 2013 version of the California Electrical Code?      12:08
13   A.  No.                                           12:08
14   Q.  You just have no understanding one way or     12:08
15 another?                                            12:08
16   A.  Correct.                                      12:08
17   Q.  Are you aware of any State agencies that      12:08
18 have asserted a copyright interest in the 2013      12:08
19 version of the California Electrical Code?           12:08
20   A.  No.                                           12:08
21   Q.  Are you aware of any State agencies that      12:08
22 have asserted a copyright interest in their         12:08
23 contributions for any version of the California      12:08
24 Electrical Code?                                     12:08
25   A.  No.                                           12:08

1   Q.  What organizations are you aware of that       12:08
2 have asserted a copyright interest in any version of 12:08
3 the California Electrical Code?                       12:09
4       MS. MILLER-ZIEGLER:  Objection.  That's       12:09
5 vague.                                               12:09
6       THE WITNESS:  I think I already answered       12:09
7 that question.                                       12:09
8 BY MR. NERCESSIAN:                                   12:09
9   Q.  That was specific to a particular triennial    12:09
10 version.  I'm asking more broadly.  So I can restate 12:09
11 the question.                                        12:09
12   A.  Okay.                                          12:09
13   Q.  What organizations are you aware of that      12:09
14 have asserted a copyright interest in any version of 12:09
15 the California Electrical Code?                       12:09
16   A.  That's too broad of a question.                12:09
17       MS. MILLER-ZIEGLER:  Objection.  Vague.  Not  12:09
18 clear what you're talking about, the California --   12:09
19       MR. NERCESSIAN:  I said California            12:09
20 Electrical Code.                                     12:09
21       MS. MILLER-ZIEGLER:  Okay.  And the           12:09
22 California amendments --                             12:09
23       (Discussion off the record)                   12:09
24       MS. MILLER-ZIEGLER:  Just wanting to clarify  12:09
25 what exactly it is that you're talking about that's  12:09

1 being copyrighted.                                   12:09
2 BY MR. NERCESSIAN:                                   12:10
3   Q.  The question is are you aware of any           12:10
4 organizations that have asserted a copyright interest 12:10
5 in any version, that's any triennial version of the  12:10
6 California Electrical Code including the California   12:10
7 amendments?                                          12:10
8       MS. MILLER-ZIEGLER:  We'll keep the           12:10
9 objection as vague.                                  12:10
10       THE WITNESS:  No.                             12:10
11 BY MR. NERCESSIAN:                                   12:10
12   Q.  Other than BNi and NFPA --                    12:10
13       MR. YEN:  Objection.  Vague.                  12:10
14       MS. MILLER-ZIEGLER:  We think this is an      12:10
15 unfair question.  You're being pretty vague about   12:11
16 what you're talking about being copyrighted or not.  12:11
17       MR. NERCESSIAN:  I'm simply asking about      12:11
18 whether Ms. Marvelli has any awareness of any       12:11
19 organizations that have asserted an interest.       12:11
20       MS. MILLER-ZIEGLER:  In the California        12:11
21 amendments or in the NEC?                           12:11
22       MR. NERCESSIAN:  In the California            12:11
23 Electrical Code.  The objection is noted.           12:11
24 BY MR. NERCESSIAN:                                   12:11
25   Q.  All right.  I can move on.  Before we move    12:11

21 (Pages 78 - 81)

1  on from this exhibit, just a few more questions.     12:11
2      You heard NFPA's counsel's objection to     12:11
3  Exhibit Number 4 containing screenshots from the     12:12
4  NFPA's website.  Does page one of the exhibit fairly   12:12
5  represent what a user would see on the screen in     12:12
6  reviewing the California Electrical Code on the NFPA   12:12
7  website?     12:12
8      MR. FEE:  Objection.  Calls for speculation.   12:12
9      THE WITNESS:  I would say yes.     12:12
10  BY MR. NERCESSIAN:     12:12
11  Q.  How many screenshots would be necessary to     12:12
12  reproduce the entire California Electrical Code?     12:12
13  A.  I don't know.     12:12
14  Q.  Are you aware whether one can reproduce the   12:12
15  whole California Electrical Code from the NFPA     12:12
16  website without printing over a thousand screenshots?  12:12
17  A.  I don't know.     12:13
18      MR. YEN:  Are you doing okay?     12:13
19      THE WITNESS:  Yeah.  Little while longer,     12:13
20  and then we'll take a break?     12:13
21      MR. YEN:  Yeah.     12:13
22      MR. NERCESSIAN:  Can we go off the record a   12:13
23  sec?     12:13
24      VIDEO OPERATOR:  Sure.  We're off the     12:13
        12:13  25  record.  It's    .
    12:13
25
                                                    Page 82

1  1      (Recess)     12:13
    2      VIDEO OPERATOR:  We're back on the record.   12:14
2      12:14  3  It's    .
3  12:14
4  4      MR. NERCESSIAN:  Can we please mark this   12:14
5  5  next in order?     12:14
6  6      (Exhibit 5 marked)     12:14
7  7  BY MR. NERCESSIAN:     12:14
8  8  Q.  Please take a moment to look at the     12:15
9  9  document, and, Ms. Marvelli, do you recognize this   12:15
10  10  document?     12:15
11  11  A.  Yes.     12:15
12  12  Q.  What is it?     12:15
13  13  A.  It was what was served to me a couple weeks   12:15
14  14  ago.     12:15
15  15  Q.  And it's the subpoena to testify at today's   12:15
16  16  deposition; is that correct?     12:15
17  17  A.  Yes.     12:15
18  18  Q.  The document contains a number of     12:15
19  19  attachments, and I'd like to ask you some questions   12:15
20  20  about some of them.     12:15
21  21  Q.  Okay.     12:15
22  22  Q.  So if we could go to Attachment A.  Do you   12:15
23  23  recognize this document?     12:16
24  24  A.  Yes.     12:16
25  25  Q.  What is this document?     12:16
                                                    Page 83

1  A.  It's a PRA request.     12:16
2  Q.  And had you seen this document prior to     12:16
3  receiving the subpoena?     12:16
4  A.  Yes, back in 2016 when it was received at     12:16
5  our office.     12:16
6  Q.  And it's a public records request of     12:16
7  October 28th, 2016; correct?     12:16
8  A.  Yes.     12:16
9  Q.  What documents does this request seek?     12:16
10      MR. FEE:  Objection to form.     12:16
11      MR. YEN:  Also object to calls for     12:16
12  speculation.     12:16
13      THE WITNESS:  Yeah.  I'd have to review the   12:16
14  whole document again.     12:16
15  BY MR. NERCESSIAN:     12:16
16  Q.  Well, you can -- strike that.     12:16
17      This letter was addressed to you; correct?   12:17
18  A.  Yes.     12:17
19  Q.  And did you review this document in 2016?   12:17
20  A.  Yes.     12:17
21  Q.  What action did you or the Building     12:17
22  Standards Commission take in response to this     12:17
23  document?     12:17
24      MR. YEN:  I would just caution you not to     12:17
25  reveal any attorney-client communications you had     12:17
                                                    Page 84

1  with respect to this.     12:17
2      THE WITNESS:  Okay.  We responded to the PRA  12:17
3  and provided any responsive documents.     12:17
4  BY MR. NERCESSIAN:     12:17
5  Q.  Did you review the documents that were     12:17
6  provided pursuant to this request?     12:17
7  A.  Yes.     12:17
8  Q.  I have a document I'd like to show you now   12:17
9  that I understand was part of that production.     12:18
10      (Exhibit 6 marked)     12:19
11  BY MR. NERCESSIAN:     12:19
12  Q.  You've been passed a document marked for     12:19
13  identification as Exhibit 6.  You can take a moment   12:19
14  to review this document.  Have you seen this document  12:19
15  before?     12:19
16  A.  I've not seen this document before.     12:19
17  Q.  Do you see the date at the bottom of the     12:19
18  page that reads 12-16-2016?     12:19
19  A.  Yes.     12:19
20  Q.  What does the document appear to be?     12:19
21  A.  A series of emails.     12:19
22  Q.  Emails from who?     12:20
23  A.  Looks like some of them are CBSC staff.     12:20
24  Q.  Which CBSC staff?     12:20
25  A.  So there's Pam Maeda, Mike Nearman.     12:20
                                                    Page 85

22 (Pages 82 - 85)

1   Q.   And before we move on, what role does Pam   12:20
2   Maeda have at CBSC?                      12:20
3   A.   At the time, in 2016, she was either an   12:20
4   issue -- I believe she was an office technician.   12:20
5   Q.   And Michael Nearman?                 12:20
6   A.   Deputy executive director.           12:20
7   Q.   Do you have any reason to believe that these   12:20
8   documents were not produced by CBSC in response to   12:21
9   the public records request, Public.Resource?   12:21
10      MR. FEE:   Objection.  Calls for speculation.   12:21
11      THE WITNESS:   I don't know because I don't   12:21
12   have a copy of what we responded to in our PRA.  Are   12:21
13   you stating that this is the PRA request that we sent   12:21
14   back to them?  I have no way to know that.   12:21
15   BY MR. NERCESSIAN:                        12:21
16   Q.   What information would you need to know   12:21
17   that?                                     12:21
18   A.   Well, I would want to look at what we   12:21
19   responded to the PRA from our office.  That wasn't   12:21
20   included in the documents that you provided me in the   12:21
21   subpoena.                                 12:21
22   Q.   Yes.  These were other -- well, strike that.   12:21
23      The subpoena did not include the full   12:22
24   universe of documents that -- strike that.   12:22
25      Did the subpoena attach the full universe of   12:22

Page 86

1   documents that CBSC provided in response to the   12:22
2   public records request from Public.Resource?   12:22
3   A.   No.                                  12:22
4   Q.   Did CBSC produce documents in response to   12:22
5   the public records request from Public.Resource?   12:22
6   A.   Yes.                                 12:22
7   Q.   Did those documents include internal emails   12:22
8   from CBSC staff?                          12:22
9   A.   I don't know.                        12:22
10   Q.   Did you review the documents that CBSC   12:22
11   produced in response to this public records request?   12:22
12   A.   No.                                 12:22
13   Q.   I'd like to call your attention to the last   12:22
14   page of this compilation document.       12:23
15      MR. YEN:   Exhibit 6?                  12:23
16      MR. NERCESSIAN:   Exhibit 6, correct.   12:23
17   BY MR. NERCESSIAN:                        12:23
18   Q.   Do you recognize this document?      12:23
19   A.   Yes.                                 12:23
20   Q.   And what is this document?           12:23
21   A.   It's an email from me to Alex and Michael   12:23
22   Nearman back in 2016.                     12:23
23   Q.   And what prompted you to write this   12:23
24   document?                                 12:23
25   A.   I don't recall.                      12:23

Page 87

1   Q.   I want to call your attention to the first   12:23
2   sentence within the body.                 12:23
3   A.   Okay.                                12:23
4   Q.   That says "In our future response to   12:23
5   Mr. Malamud, please keep this info.  It may be   12:23
6   useful."  Do you see that?                12:23
7   A.   Yes.                                 12:23
8   Q.   Do you recall why the information reflected   12:23
9   in this document may be useful?           12:23
10   A.   No.  I haven't read this in two years, so,   12:24
11   no, I don't recall.                      12:24
12   Q.   I want to call your attention to this --   12:24
13   further down on the document, there's a heading that   12:24
14   reads "Caution Regarding Official Code."  Do you see   12:24
15   that?                                     12:24
16   A.   Yes.                                 12:24
17   Q.   And that caution includes information about   12:24
18   a Government Code section.                12:24
19   A.   Uh-huh.                              12:24
20   Q.   Do you see that?                     12:24
21   A.   Uh-huh.  Yes.  Sorry.                12:24
22   Q.   What does the relevant section of the code   12:24
23   cited here require?                      12:24
24      MR. FEE:   Objection.  Calls for a legal   12:24
25   conclusion.                               12:24

Page 88

1      THE WITNESS:   Yeah.  I would just offer what   12:24
2   it states here.                           12:24
3   BY MR. NERCESSIAN:                        12:25
4   Q.   And what is that?                    12:25
5   A.   It appears to state "Government Code   12:25
6   Section 11344 requires the" -- "OLA" is the   12:25
7   abbreviation for the Office of Administrative Law --   12:25
8   "to provide for the official compilation, printing   12:25
9   and publication of State regulations in the   12:25
10   California Code of Regulations."          12:25
11   Q.   Now we've been discussing Title 24.   12:25
12   A.   Uh-huh.                              12:25
13   Q.   And is Title 24 part of the Code of   12:25
14   Regulations?                             12:25
15   A.   It's the 24th title in the California Code   12:25
16   of Regulations, yes.                     12:25
17   Q.   Is it your understanding that the Office of   12:25
18   Administrative Law provides a compilation of the   12:25
19   entire California Code of Regulations including   12:25
20   Title 24?                                 12:25
21   A.   The Office of Administrative Law links to   12:25
22   our website for Title 24.                12:25
23   Q.   Does the Office of Administrative Law   12:25
24   provide access to the other titles within the   12:26
25   California Code of Regulations?           12:26

Page 89

23 (Pages 86 - 89)

1    MR. FEE: Objection to form.    12:26
2    THE WITNESS: I don't know.    12:26
3 BY MR. NERCESSIAN:    12:26
4    Q. Are you aware of whether Title 24 of the    12:26
5 California Code of Regulations is treated any    12:26
6 differently than other titles within the California    12:26
7 Code of Regulations?    12:26
8    MS. MILLER-ZIEGLER: Objection to form.    12:26
9    THE WITNESS: I just know that it points to    12:26
10 our website, the CBSC website.    12:26
11 BY MR. NERCESSIAN:    12:26
12    Q. Do any of the other titles of the California    12:26
13 Code of Regulations point to the CBSC website?    12:26
14    MR. YEN: Objection. Calls for speculation.    12:26
15    THE WITNESS: Yeah. I don't know.    12:26
16 BY MR. NERCESSIAN:    12:26
17    Q. Are you aware of any other titles that point    12:26
18 to the CBSC website?    12:26
19    A. I don't know.    12:27
20    Q. So you're not aware of any other titles of    12:27
21 the California Code of Regulations that point to the    12:27
22 CBSC website?    12:27
23    A. I don't have any knowledge of that. I don't    12:27
24 know.    12:27
25    Q. Are you aware of any issues persons seeking    12:27

Page 90

1 to read the code have encountered in accessing the    12:27
2 California Electrical Code?    12:27
3    MR. FEE: Objection. Calls for speculation.    12:27
4    MS. MILLER-ZIEGLER: Vague.    12:27
5    THE WITNESS: You'll have to repeat the    12:28
6 question. I'm sorry.    12:28
7 BY MR. NERCESSIAN:    12:28
8    Q. Okay. I can rephrase.    12:28
9    A. Uh-huh.    12:28
10    Q. Has the CBSC ever been informed of issues    12:28
11 persons seeking to read the California Electrical    12:28
12 Code have encountered in accessing the code?    12:28
13    MS. MILLER-ZIEGLER: Objection. Calls for    12:28
14 speculation.    12:28
15    MR. FEE: Objection to form.    12:28
16    THE WITNESS: We've received calls where the    12:28
17 code might not be online, and we notify the publisher    12:28
18 to put it online if there's a link that's broken.    12:28
19 BY MR. NERCESSIAN:    12:28
20    Q. And in those situations, does the CBSC have    12:29
21 any ability to itself fix the access issue with the    12:29
22 broken link?    12:29
23    A. No.    12:29
24    MR. FEE: Objection to form.    12:29
25    THE WITNESS: We -- sorry. We contact the    12:29

Page 91

1 publisher and let them know that the link is broken,    12:29
2 and then we have it fixed.    12:29
3 BY MR. NERCESSIAN:    12:29
4    Q. Because it's the publisher that furnishes    12:29
5 the text of the California Electrical Code to people    12:29
6 seeking to access it online; correct?    12:29
7    A. The link is provided through our website to    12:29
8 the publisher.    12:29
9    Q. Any other difficulties that you have been    12:29
10 aware of at the CBSC in gaining access to the    12:29
11 California Electrical Code?    12:29
12    MS. MILLER-ZIEGLER: Objection.    12:29
13 Mischaracterizes her testimony.    12:29
14    THE WITNESS: No.    12:29
15 BY MR. NERCESSIAN:    12:29
16    Q. In situations where -- in the cases --    12:30
17 strike that.    12:30
18    In those cases where you've received calls    12:30
19 with problems accessing the code, who was it that had    12:30
20 the issue?    12:30
21    A. I don't know. I don't recall.    12:30
22    Q. Was it BSC staff?    12:30
23    A. I don't recall.    12:30
24    Q. Would it have been members of the public?    12:30
25    A. I don't recall.    12:30

Page 92

1    Q. So is it your testimony there -- strike    12:30
2 that.    12:30
3    So is it your testimony that -- strike that.    12:30
4    Like to refer you to the first page of this    12:30
5 compilation document. So we discussed previously    12:31
6 this exchange between Pam Maeda and Mike Nearman. Do    12:31
7 you recall that?    12:31
8    A. Yes.    12:31
9    Q. And do you see there's this first paragraph    12:31
10 that reads "Just received a phone call from Suren    12:31
11 at," and it provides a phone number, "and he tried to    12:31
12 view the code on the BSC website, and it came up with    12:31
13 the ICC page wanting him to pay for the premium    12:31
14 access in order to view the code"? Do you see that    12:31
15 paragraph?    12:32
16    A. Uh-huh.    12:32
17    Q. Here, the reference it makes to Part 2.5, do    12:32
18 you understand that to mean Part 2.5 of Title 24?    12:32
19    A. Yes.    12:32
20    Q. And Part 2.5 is the residential code?    12:32
21    A. That's the California Residential Code, yes.    12:32
22    Q. And who is the publisher for the California    12:32
23 Residential Code?    12:32
24    A. The International Code Council.    12:32
25    Q. And that's the ICC you referred to in this    12:32

Page 93

24 (Pages 90 - 93)

1 sentence?                              12:32
2    A.  Yes.                            12:32
3    Q.  Have you been aware of any instances --   12:32
4 strike that.                           12:32
5       Are you aware of any instances where CBSC   12:32
6 has received word from a member of the public that a   12:32
7 publisher required that person to pay for premium   12:32
8 access to view the code?               12:33
9       MR. FEE:  Objection.  To the extent it   12:33
10 purports to characterize this document,   12:33
11 mischaracterizes it.                  12:33
12      THE WITNESS:  I think it's taken out of   12:33
13 context.  This is one instance, but this isn't   12:33
14 accurate.                             12:33
15 BY MR. NERCESSIAN:                     12:33
16   Q.  Oh.  You don't believe that -- strike that.   12:33
17      When this report came in March of 2016, were   12:33
18 you made aware of it?                  12:33
19   A.  This, I don't know.  I don't recall.   12:33
20   Q.  Have you ever heard of -- strike that.   12:33
21      Has CBSC, in the past, ever received reports   12:33
22 of people seeking to access the code and being made   12:33
23 to pay for a premium access?           12:34
24      MR. FEE:  Objection to form.    12:34
25      THE WITNESS:  No.                12:34
                                        Page 94

1 BY MR. NERCESSIAN:                      12:34
2    Q.  Are you aware of anybody in -- strike that.   12:34
3       Are you aware of any other members of your   12:34
4 team at CBSC receiving reports from people seeking to   12:34
5 access the code that they met a demand to pay for   12:34
6 premium access to view the code?      12:34
7       MR. FEE:  Objection to form.   12:34
8       THE WITNESS:  I don't know.     12:34
9 BY MR. NERCESSIAN:                      12:34
10   Q.  Are you aware of whether the ICC web   12:34
11 page requires premium access in order to view the   12:34
12 California Residential Code?           12:35
13   A.  It does not.                   12:35
14   Q.  Are you aware of whether the ICC website   12:35
15 places any restrictions on a person's access to the   12:35
16 California Residential Code?           12:35
17   A.  I don't know what you mean by "restriction."  12:35
18   Q.  Do you know whether a person can print the   12:35
19 California Residential Code from the ICC website?   12:35
20      MR. FEE:  Objection.  Calls for speculation.   12:35
21      THE WITNESS:  Not aware.        12:35
22 BY MR. NERCESSIAN:                     12:35
23   Q.  One way or another?             12:35
24   A.  No.                          12:35
25   Q.  Do you know whether a person can search the   12:35
                                        Page 95

1 California Residential Code from the ICC website?   12:35
2       MR. FEE:  Objection.  Calls for speculation.  12:35
3       THE WITNESS:  I don't -- I can't answer the   12:35
4 question the way you're asking it.  That's the   12:35
5 difficulty.                           12:36
6 BY MR. NERCESSIAN:                      12:36
7    Q.  So what's the nature of the difficulty?   12:36
8 Maybe I can clarify.                   12:36
9    A.  Well, to view the California codes, you can   12:36
10 access the codes via our website, which points to ICC  12:36
11 similarly to how we just discussed the BNi and the   12:36
12 NFPA, so that's how you can view the codes online.   12:36
13 If you want to purchase the codes, you have other   12:36
14 access to those codes.                 12:36
15   Q.  But if you want to view the codes, do you   12:36
16 know whether they're -- strike that.   12:36
17      Short of purchasing the codes, do you know   12:36
18 whether a person can receive -- strike that.   12:36
19      Short of purchasing the codes, do you know   12:36
20 whether a person can search the California   12:36
21 Residential Code on the ICC website?   12:37
22      MR. FEE:  Objection.  Calls for speculation.   12:37
23      THE WITNESS:  I don't know.      12:37
24 BY MR. NERCESSIAN:                     12:37
25   Q.  Have you viewed the California Residential   12:37
                                        Page 96

1 Code on the ICC website?               12:37
2    A.  Yes.                          12:37
3    Q.  Have you tried to print the California   12:37
4 Residential Code from the ICC website?   12:37
5    A.  No.                          12:37
6    Q.  Do you know whether one can print the   12:37
7 California Residential Code from the ICC website?   12:37
8       MR. FEE:  Objection.  Calls for speculation.   12:37
9       THE WITNESS:  I don't know.      12:37
10 BY MR. NERCESSIAN:                     12:37
11   Q.  Have you tried to search the California   12:37
12 Residential Code from the ICC website?   12:37
13   A.  No.                          12:37
14   Q.  Do you know whether one can search the   12:37
15 California Residential Code from the ICC website?   12:37
16      MR. FEE:  Objection.  Calls for speculation.   12:37
17      THE WITNESS:  I don't know.      12:37
18 BY MR. NERCESSIAN:                     12:37
19   Q.  Have you tried to extract tests from the   12:37
20 California Residential Code from the ICC website?   12:37
21   A.  No.                          12:37
22   Q.  Do you know whether one can extract text   12:38
23 from the California Residential Code from the ICC   12:38
24 website?                              12:38
25      MR. FEE:  Objection.  Calls for speculation.   12:38
                                        Page 97

25 (Pages 94 - 97)

1      THE WITNESS:  I don't know.          12:38
2 BY MR. NERCESSIAN:                        12:38
3    Q.   Other than viewing the California     12:38
4 Residential Code from the ICC website, have you taken  12:38
5 any other actions with respect to the California  12:38
6 Residential Code on the ICC website?       12:38
7      MS. MILLER-ZIEGLER:  Objection.  Vague.   12:38
8      THE WITNESS:  Yeah.  I'm not sure what  12:38
9 you're asking.                             12:38
10 BY MR. NERCESSIAN:                        12:38
11   Q.   Have you done anything other than view the  12:38
12 code -- strike that.                      12:38
13      With respect to the California Residential  12:38
14 Code on the ICC website -- okay.  Strike that.  12:38
15   A.   Which one?                        12:39
16   Q.   We're just starting with a blank slate.  12:39
17   A.   Great.                           12:39
18   Q.   All right.  With respect to the California  12:39
19 Residential Code that appears on the ICC website,  12:39
20 have you done anything other than view that code?  12:39
21   A.   No.                             12:39
22      MS. MILLER-ZIEGLER:  Objection.  Vague.   12:39
23 BY MR. NERCESSIAN:                        12:39
24   Q.   I'd like to go back to another attachment of  12:39
25 Exhibit 5, and this is Attachment B, and I just have  12:39

Page 98

1 a few preliminary questions, and then we can go on  12:39
2 our lunch break.                          12:40
3      All right.  So do you recognize this    12:40
4 document, Attachment B?                    12:40
5   A.   Yes.                            12:40
6   Q.   And what is this document?          12:40
7   A.   It appears to be another PRA request dated  12:40
8 December 9th, 2016.                        12:40
9   Q.   And do you see that the second to last  12:40
10 sentence of the first paragraph reads "On or around  12:40
11 October 27th and until on or around November 7th, the  12:40
12 Building Standards Commission displayed on its  12:40
13 website a searchable PDF file of the California  12:40
14 Electric Code 2016 triennial edition"?  Do you see  12:41
15 that sentence?                            12:41
16   A.   Yes.                            12:41
17   Q.   Is that sentence accurate?          12:41
18      MR. FEE:  Objection.  Calls for speculation.  12:41
19      THE WITNESS:  It was a long time ago, so I  12:41
20 don't recall the specifics.                12:41
21 BY MR. NERCESSIAN:                        12:41
22   Q.   Are you aware whether the Building Standards  12:41
23 Commission has ever displayed a searchable PDF file  12:41
24 of the California Electrical Code on its website?  12:41
25   A.   Yes.                            12:41

Page 99

1   Q.   When did it do so?                  12:41
2   A.   I don't have the specific dates.     12:41
3   Q.   What do you recall of that instance?  12:41
4      MR. FEE:  Objection to form.          12:41
5      THE WITNESS:  It was a -- sorry.  Okay?   12:41
6 BY MR. NERCESSIAN:                        12:41
7   Q.   Okay.                           12:41
8   A.   It was displayed on our website, and when  12:41
9 staff realized that that version was displayed on our  12:41
10 website, we removed it and posted the appropriate  12:41
11 link to the California Electrical Code, the 2016  12:41
12 edition.                                  12:42
13   Q.   And the link it was replaced with was this  12:42
14 nfpa.org URL; is that correct?            12:42
15      MS. MILLER-ZIEGLER:  Objection to form.   12:42
16      THE WITNESS:  I --                  12:42
17 BY MR. NERCESSIAN:                        12:42
18   Q.   You don't know one way or --        12:42
19   A.   I don't know.  Yeah.  Was long time ago.   12:42
20   Q.   Why did the Building Standards Commission  12:42
21 make the decision to place a searchable PDF file of  12:42
22 the California Electrical Code 2016 edition on its  12:42
23 website?                                  12:42
24      MS. MILLER-ZIEGLER:  Objection.  Calls for  12:42
25 speculation.                              12:42

Page 100

1      THE WITNESS:  It was a mistake by staff.   12:42
2 BY MR. NERCESSIAN:                        12:42
3   Q.   How did the Building Standards Commission  12:42
4 obtain a searchable PDF file of the California  12:42
5 Electrical Code?                          12:43
6      MS. MILLER-ZIEGLER:  Objection to form.   12:43
7      THE WITNESS:  We have a contract with NFPA  12:43
8 and BNi, and we receive a searchable version for  12:43
9 staff only for the production of the next edition of  12:43
10 the code.                                 12:43
11 BY MR. NERCESSIAN:                        12:43
12   Q.   Do you know why the BSC does not keep the  12:43
13 text of the California Electrical Code on its own  12:43
14 website?                                  12:43
15      MR. YEN:  Objection.  Calls for speculation.  12:43
16      THE WITNESS:  I don't know.           12:43
17 BY MR. NERCESSIAN:                        12:43
18   Q.   So you have no idea why the Building  12:43
19 Standards Commission does not itself keep the text of  12:43
20 the California Electrical Code on its website?  12:43
21      MS. MILLER-ZIEGLER:  Objection.  Form.   12:43
22      THE WITNESS:  It's in our contract that we  12:43
23 are provided a link to the publisher's website to put  12:44
24 on our website.                           12:44
25 BY MR. NERCESSIAN:                        12:44

Page 101

26 (Pages 98 - 101)

**Page 102**

1  Q.  But the BSC itself has a text searchable   12:44
2  version in the form of a PDF file of the California   12:44
3  Electrical Code; correct?   12:44
4  A.  Yes.   12:44
5  Q.  How does the BSC use that file?   12:44
6  A.  Internally for code development.   12:44
7  Q.  And what does that mean?   12:44
8  A.  We are able to clip copy information out if   12:44
9  we need to make amendments to the code during the   12:44
10  code development process.   12:44
11  Q.  And what is clip copy information?   12:44
12  A.  If there's a specific section that   12:44
13  California wants to amend -- or not California -- I   12:44
14  should say the Building Standards Commission, we can   12:44
15  copy that information and make our amendments to it.   12:45
16  Q.  And just one more question, and then we can   12:45
17  take our lunch break.   12:45
18  A.  Uh-huh.   12:45
19  Q.  You stated earlier that it's in BSC's   12:45
20  contract that BSC are provided a link to the   12:45
21  publisher's website.  What contract does that refer   12:45
22  to?   12:45
23  A.  That's the contract that the Building   12:45
24  Standards Commission has with the publisher for the   12:45
25  code development.   12:45

**Page 103**

1  Q.  And is there a separate contract for each   12:45
2  edition of the California Electrical Code that the   12:45
3  BSC develops?   12:45
4  A.  Yes.  Every two years or four years, we   12:45
5  enter into a new contract with the publishers.   12:45
6  Q.  So does that contract prohibit California or   12:45
7  the BSC from providing the text of the California   12:46
8  Electrical Code to the public on its website?   12:46
9  MS. MILLER-ZIEGLER:  Objection.  Calls for a   12:46
10  legal conclusion.   12:46
11  THE WITNESS:  That, I don't know.   12:46
12  MR. YEN:  Same objection.   12:46
13  MR. NERCESSIAN:  All right.  We can call it   12:46
14  lunch.   12:46
15  THE WITNESS:  Okay.   12:46
16  VIDEO OPERATOR:  Okay.  We're off the   12:46
12:46  17  record.  It's   .
17  12:46
18  (Noon recess taken)   12:46
19  VIDEO OPERATOR:  We're back on the record.   01:47
20  It's 1:47.   01:47
21  BY MR. NERCESSIAN:   01:47
22  Q.  So earlier in the day, we were discussing   01:47
23  the nine-point criteria analysis that CBSC and State   01:47
24  agencies used to determine whether to adopt the   01:47
25  language of a model code provision.  Do you recall   01:47

**Page 104**

1  that?   01:47
2  MR. YEN:  Objection.  Mischaracterizes   01:47
3  testimony.   01:47
4  THE WITNESS:  I recall a conversation about   01:47
5  the nine-point criteria, yes.   01:47
6  BY MR. NERCESSIAN:   01:47
7  Q.  I think that we have come across -- and what   01:47
8  are the criteria for?   01:47
9  A.  It's the criteria that the State agencies   01:48
10  develop the building standards on -- they must be met   01:48
11  in order for them -- well, I'm not articulating well.   01:48
12  Sorry.  It's in building standards law, and it must   01:48
13  be met prior to the commission, bringing it to the   01:48
14  commission for the commission to take action on.   01:48
15  Q.  And do each of the State agencies apply the   01:48
16  same nine-point criteria?   01:48
17  A.  Yes.   01:48
18  Q.  I believe that we came across the nine-point   01:48
19  criteria over the break, and I'd just like to talk   01:48
20  through them and see if you could confirm the   01:48
21  accuracy of the findings.  Is one of the criteria   01:48
22  whether the proposed building standards do not   01:48
23  conflict with, overlap or duplicate other building   01:48
24  standards?   01:48
25  A.  That sounds accurate, yes.   01:48

**Page 105**

1  Q.  Is another one of the nine-point criteria   01:49
2  whether the proposed building standards are within   01:49
3  the parameters established by enabling legislation   01:49
4  and are not expressly within the exclusive   01:49
5  jurisdiction of another agency?   01:49
6  A.  Yes.   01:49
7  Q.  Is another one of the criteria whether the   01:49
8  public interest requires the adoption of the building   01:49
9  standards?   01:49
10  A.  I'm sorry, you'd have to repeat that one.   01:49
11  Q.  Yes.   01:49
12  A.  I didn't hear it.  I'm sorry.   01:49
13  Q.  Is another of the nine-point criteria   01:49
14  whether the public interest requires the adoption of   01:49
15  the building standards?   01:49
16  A.  It's in the best public interest, yes.   01:49
17  Q.  Is another of the criteria whether the   01:49
18  proposed building standards are not unreasonable,   01:49
19  arbitrary, unfair or capricious in whole or in part?   01:49
20  A.  Yes.   01:49
21  Q.  Is another one of the nine-point criteria   01:49
22  whether the cost to the public is reasonable based on   01:50
23  the overall benefit to be derived from the building   01:50
24  standards?   01:50
25  A.  Yes.   01:50

27 (Pages 102 - 105)

1   Q.  Is one of the criteria whether the proposed   01:50
2  building standards are not unnecessarily vague or   01:50
3  ambiguous in whole or in part?   01:50
4   A.  Yes.   01:50
5   Q.  Is another of the criteria whether the   01:50
6  applicable national specifications, public standards   01:50
7  and model codes have been incorporated therein as   01:50
8  provided in this part where appropriate?   01:50
9   A.  Yes.   01:50
10   Q.  Is another of the criteria whether the   01:50
11  format of the proposed building standards is   01:50
12  consistent with that adopted by the commission?   01:50
13   A.  Yes.   01:50
14   Q.  Is another of the criteria whether the   01:50
15  proposed building standards, if they promote fire and   01:50
16  panic safety as determined by the State Fire Marshal,   01:51
17  have the written approval of the State Fire Marshal?   01:51
18   A.  Yes.   01:51
19   Q.  Can you think of any criteria other than   01:51
20  these that I went through that comprise the   01:51
21  nine-point criteria we were discussing previously?   01:51
22   A.  I can't think of any others, no.   01:51
23   Q.  Do you recognize -- do any of the criteria   01:51
24  apply to the adoption of the NEC into the CEC?   01:51
25      MS. MILLER-ZIEGLER:  Objection.  Calls for a   01:51

Page 106

1  legal conclusion.   01:51
2      THE WITNESS:  I don't know.   01:51
3  BY MR. NERCESSIAN:   01:51
4   Q.  All right.  So we were previously discussing   01:51
5  contracts that the California Building Standards   01:52
6  Commission has with various publishers; do you recall   01:52
7  that?   01:52
8   A.  Yes.   01:52
9   Q.  Let's mark this exhibit next in order.  I   01:52
10  believe we're at 7.   01:52
11      (Exhibit 7 marked)   01:52
12  BY MR. NERCESSIAN:   01:52
13   Q.  You have been handed Exhibit 7.  Do you   01:52
14  recognize this document?   01:52
15   A.  Yes.   01:52
16   Q.  And what is this document?   01:52
17   A.  Appears to be a Standard Agreement between   01:52
18  the Division of -- excuse me -- Department of General   01:53
19  Services, California Building Standards Commission,   01:53
20  and NFPA, National Fire Protection Association.   01:53
21   Q.  And here at the bottom of the page, there's   01:53
22  a signature.  Is that yours?   01:53
23   A.  Yes.   01:53
24   Q.  What do you recall about the negotiation of   01:53
25  this document?   01:53

Page 107

1   A.  That's kind of a broad question.   01:53
2   Q.  I can rephrase it.  What was your role in   01:53
3  negotiating this agreement?   01:53
4   A.  Reviewing the document.   01:53
5   Q.  Did you participate in the negotiations of   01:53
6  this agreement in any other way?   01:53
7   A.  I don't know what you mean by "negotiation."   01:53
8  I reviewed the document.   01:53
9   Q.  Did you propose edits to the document?   01:53
10   A.  Yes, some.   01:54
11   Q.  Which ones?  Strike that.   01:54
12      Which edits did you propose to the document?   01:54
13      MR. YEN:  Caution you not to reveal any   01:54
14  communications you had with your attorney.   01:54
15      THE WITNESS:  Yeah.  And, well, I can't   01:54
16  recall because it was quite some time ago.   01:54
17  BY MR. NERCESSIAN:   01:54
18   Q.  What is the maximum amount of this   01:54
19  agreement?   01:54
20   A.  I don't know off the top of my head.  It's a   01:54
21  zero dollar contract as far as I know.   01:54
22   Q.  And why is it a zero dollar contract?   01:54
23   A.  It's how we enter into a contract with the   01:54
24  publishers.   01:54
25   Q.  What does it mean that it's a zero dollar   01:54

Page 108

1  contract?   01:54
2      MR. YEN:  Objection.  Calls for a legal   01:54
3  conclusion.   01:54
4      THE WITNESS:  Thank you.   01:54
5      I'm sorry, I can't answer that.  I don't   01:54
6  know.   01:54
7  BY MR. NERCESSIAN:   01:55
8   Q.  Does the contract itself state anywhere that   01:55
9  it's a zero dollar contract?   01:55
10   A.  I don't know.  The front page does.   01:55
11   Q.  And where is that?   01:55
12   A.  On item three.   01:55
13   Q.  Like to call your attention to Section 4-A   01:55
14  of the contract.  4-A of Exhibit A.  My apologies.   01:55
15  Do you see that section?   01:55
16   A.  Is that about the third page in?   01:55
17   Q.  Yes.   01:55
18   A.  Okay.   01:55
19   Q.  This provision reflects a license grant from   01:55
20  NFPA to CBSC; is that correct?   01:55
21      MR. YEN:  Objection.  Calls for a legal   01:56
22  conclusion.   01:56
23      THE WITNESS:  I'd have to read the whole   01:56
24  thing.   01:56
25  BY MR. NERCESSIAN:   01:56

Page 109

28 (Pages 106 - 109)

1   Q.  I'd like to just focus on the language that   01:56
2   states "NFPA hereby grants CBSC a nonexclusive,   01:56
3   nontransferrable sublicense to use and copy all or   01:56
4   any portion of the 2014 NEC, NFPA supplements and   01:56
5   revisions to the 2014 NEC (hereinafter referred to as   01:56
6   'licensed property'), solely to create and publish   01:56
7   the 2016 CEC."  Do you see that language?   01:56
8   A.  I see it.   01:56
9   Q.  What do you understand that language to   01:56
10  allow CBSC to do?   01:56
11      MR. YEN:  Objection.  Calls for a legal   01:56
12  conclusion.   01:56
13      MS. MILLER-ZIEGLER:  Objection.  It's also   01:56
14  incomplete.  You left out the rest of the sentence.   01:56
15  BY MR. NERCESSIAN:   01:57
16  Q.  "Hereinafter" -- do you have any   01:57
17  understanding of what this language in the contract   01:57
18  means?   01:57
19      MR. YEN:  Same objection.   01:57
20      MS. MILLER-ZIEGLER:  Same objection as well.   01:57
21      THE WITNESS:  Yeah.  It was a long time ago,   01:57
22  so I don't recall.   01:57
23  BY MR. NERCESSIAN:   01:57
24  Q.  Do you have any understanding of what CBSC   01:57
25  does to effectuate the commitments of this contract?   01:57

Page 110

1       MR. YEN:  Objection.  Vague.   01:57
2       MS. MILLER-ZIEGLER:  Calls for a legal   01:57
3   conclusion.   01:57
4       THE WITNESS:  Yeah.  I'd have to review it.   01:57
5   I don't know off the top of my head.   01:57
6   BY MR. NERCESSIAN:   01:57
7   Q.  Why does CBSC negotiate these contracts for   01:57
8   each triennial edition of the code?   01:57
9       MS. MILLER-ZIEGLER:  Objection.  Calls for a   01:57
10  legal conclusion.   01:57
11      THE WITNESS:  In order to use the model code   01:57
12  every two years.   01:57
13  BY MR. NERCESSIAN:   01:58
14  Q.  And how does CBSC use the code every two   01:58
15  years pursuant to a contract like this?   01:58
16  A.  We use it per the building standards law to   01:58
17  adopt -- for the State agencies to review and adopt   01:58
18  the most recent model code on a triennial basis.   01:58
19  Q.  What is your understanding of what NFPA   01:58
20  receives in return to allowing CBSC to use the model   01:58
21  code to create a triennial version of its code?   01:58
22      MR. YEN:  Objection.  Calls for a legal   01:58
23  conclusion.   01:58
24      THE WITNESS:  Yeah.  I don't have an answer   01:58
25  for you on that one.   01:59

Page 111

1   BY MR. NERCESSIAN:   01:59
2   Q.  Do you have any understanding of what this   01:59
3   contract allows the NFPA to do?   01:59
4       MR. YEN:  Same objection.   01:59
5       THE WITNESS:  It's just a broad   01:59
6   understanding that we are allowed to utilize the most   01:59
7   recent edition of the model code to level the next   01:59
8   edition of the California codes.   01:59
9   BY MR. NERCESSIAN:   01:59
10  Q.  And do you have any understanding of what   01:59
11  the contract allows the NFPA to do with respect to   01:59
12  the 2016 California Electrical Code?   01:59
13      MR. YEN:  Objection.  Calls for a legal   01:59
14  conclusion.   01:59
15      THE WITNESS:  Yeah.  I'm not sure I follow   01:59
16  your question.   01:59
17  BY MR. NERCESSIAN:   02:00
18  Q.  So you have no understanding of what the   02:00
19  contract allows the NFPA to do concerning the 2016   02:00
20  California Electrical Code?   02:00
21      MS. MILLER-ZIEGLER:  Objection.  That   02:00
22  mischaracterizes her testimony.   02:00
23      MR. YEN:  Same objection and calls for a   02:00
24  legal conclusion.   02:00
25      THE WITNESS:  Yeah.  I don't know.   02:00

Page 112

1   BY MR. NERCESSIAN:   02:00
2   Q.  Here on Section 5, paragraph two, I want to   02:00
3   call your attention to this sentence that reads   02:00
4   "Special supplements for minor or inconsequential   02:00
5   errors and/or changes shall be posted to the NFPA   02:00
6   website and shall be provided to CBSC for posting on   02:00
7   CBSC's website in a read-only format."  Do you see   02:00
8   that language?   02:00
9   A.  I actually didn't follow where you're   02:00
10  pointing to.   02:00
11  Q.  Section 5-A-2.  And I can read the language   02:00
12  again if it will help.   02:01
13  A.  I see the language, yes.   02:01
14  Q.  To your knowledge, has the NFPA ever   02:01
15  provided to CBSC a special supplement for minor or   02:01
16  inconsequential errors?   02:01
17  A.  I don't recall.   02:01
18  Q.  To your knowledge, has CBSC ever posted in   02:01
19  read-only format on its website a special supplement   02:01
20  for minor or inconsequential errors?   02:01
21  A.  Yes.   02:01
22  Q.  Under what circumstances?   02:01
23  A.  There are what's called an errata so if   02:02
24  there are minor or inconsequential changes to the   02:02
25  code that are nonregulatory, there are supplement   02:02

Page 113

29 (Pages 110 - 113)

1 pages -- I'm sorry -- there are errata pages        02:02
2 provided, and those help the code user know that this 02:02
3 is a minor error in the code, and it's published on a 02:02
4 different piece of paper, a color buff paper, and      02:02
5 that tells the code user there's, you know, like a      02:02
6 numbering error or grammatical error.             02:02
7    Q.   What are other examples of minor or         02:02
8 inconsequential errors that CBSC has corrected in the 02:02
9 past?                           02:02
10     MS. MILLER-ZIEGLER: Objection to form.      02:02
11     THE WITNESS: That it might not be a CBSC     02:02
12 error, it might be -- it could be a model code error,   02:02
13 it could be a printing error, it could be -- yeah.       02:02
14 BY MR. NERCESSIAN:                     02:03
15    Q.   Any other examples?                  02:03
16    A.   Not that I can think of.               02:03
17    Q.   And these errata are posted to the CBSC    02:03
18 website itself?                        02:03
19    A.   I couldn't tell you.  I don't know if it's    02:03
20 from the NFPA website or the BNi website or our      02:03
21 website.  I don't know off the top of my head.       02:03
22    Q.   Where on the CBSC website does CBSC provide 02:03
23 information about this errata?                02:03
24     MS. MILLER-ZIEGLER: Objection to form.      02:03
25     THE WITNESS: On the codes page that you      02:03

Page 114

1 referred to.                        02:03
2 BY MR. NERCESSIAN:                     02:03
3    Q.   The codes page that we previously        02:03
4 reviewed --                         02:03
5    A.   Yes.                         02:03
6    Q.   -- in this case?  I want to call your       02:03
7 attention to Section 6-B of this contract, and do you 02:04
8 see this language which states "All those portions of 02:04
9 the licensed property, be it chapters, sections,      02:04
10 provisions, tables, appendices, reference, etc.,       02:04
11 which CBSC or any authorized agency does not adopt as 02:04
12 part of Title 24, shall be shown with a strike        02:04
13 through the language in the code.  NFPA will show      02:04
14 non-adoptive language in legislated (strike through)   02:05
15 text and will note as not adopted by the State on     02:05
16 each page."  Do you see that language?           02:05
17    A.   Uh-huh.  Yes.  Sorry.                02:05
18    Q.   Why not just omit deleted language --      02:05
19     MS. MILLER-ZIEGLER: Objection to form.      02:05
20 BY MR. NERCESSIAN:                     02:05
21    Q.   -- from a model code?                02:05
22    A.   That's just the agreement that we have with  02:05
23 NFPA.                           02:05
24    Q.   Do you understand any reason for that      02:05
25 agreement?                         02:05

Page 115

1    A.   No.                          02:05
2    Q.   And how does CBSC effectuate that agreement? 02:05
3    A.   I'm not following the question.           02:05
4    Q.   I can rephrase it.  What steps does CBSC     02:06
5 take, when developing the California Electrical Code,  02:06
6 to track whether language is adopted or not?        02:06
7     MS. MILLER-ZIEGLER: Objection to form.      02:06
8     THE WITNESS: Well, we spoke to the code      02:06
9 adoption process earlier.  So if a State agency       02:06
10 doesn't adopt a specific section, it's shown in       02:06
11 strikeout, and that information is forwarded to the    02:06
12 publisher, and then the publisher publishes it based   02:06
13 on the agreement that we have with them in the       02:06
14 contract.                          02:06
15 BY MR. NERCESSIAN:                     02:06
16    Q.   When a State agency is considering whether   02:06
17 to adopt a specific section of the model code, does   02:06
18 it always start with the model code itself?         02:06
19     MR. YEN: Objection.  Calls for speculation. 02:07
20     THE WITNESS: I can't -- I don't have an      02:07
21 answer for you on that one.                 02:07
22 BY MR. NERCESSIAN:                     02:07
23    Q.   I want to call your attention to Section 6-G 02:07
24 at the bottom of the page, and I just want to        02:07
25 highlight this language that states "NFPA and/or      02:07

Page 116

1 authorized agency and licensee shall thereafter      02:07
2 publish and make available for sale to the State of    02:07
3 California."  Do you see that language?           02:07
4    A.   Yes.                          02:07
5    Q.   Is it accurate that the NFPA makes available  02:07
6 copies of the code for sale to the State of         02:07
7 California?                         02:08
8     MS. MILLER-ZIEGLER: Objection.  Form.       02:08
9     THE WITNESS: The Building Standards       02:08
10 Commission can also purchase the code, if they so     02:08
11 choose, as can other State agencies that need to use   02:08
12 the electrical code if they so choose.           02:08
13 BY MR. NERCESSIAN:                     02:08
14    Q.   So if a State agency needs to use the       02:08
15 California Electrical Code, they need to purchase the  02:08
16 California Electrical Code from the NFPA?         02:08
17     MS. MILLER-ZIEGLER: Objection to form.      02:08
18     THE WITNESS: It's a choice.             02:08
19 BY MR. NERCESSIAN:                     02:08
20    Q.   What other choices are available to a State   02:08
21 agency that needs to use the code?             02:08
22    A.   It's available online through our website to  02:08
23 the publisher's website for free.  There are local    02:08
24 law libraries that have copies of the code, and local  02:08
25 jurisdictions also make available the code for free.   02:09

Page 117

30 (Pages 114 - 117)

1    Q.  Why might a State agency need to use a code   02:09
2  such as the California Electrical Code?           02:09
3        MR. YEN:  Objection.  Calls for speculation.   02:09
4        MR. NERCESSIAN:  I can rephrase.            02:09
5  BY MR. NERCESSIAN:                                02:09
6    Q.  Are you aware of any reason why a State     02:09
7  agency might need to use a code such as the       02:09
8  California Electrical Code?                        02:09
9        MS. MILLER-ZIEGLER:  Objection.  It's vague.   02:09
10       THE WITNESS:  When I worked at the          02:09
11 Department of General Services, in my architectural   02:09
12 associate capacity, we had to use the codes to design   02:09
13 and construct state buildings or leased facilities,   02:09
14 and we would use the codes, and the Department of   02:09
15 General Services would purchase the codes for the   02:09
16 staff members to use.                             02:09
17 BY MR. NERCESSIAN:                                02:09
18   Q.  And is it possible to design and construct   02:09
19 those State buildings or leased facilities without   02:09
20 reviewing the code?                               02:10
21       MS. MILLER-ZIEGLER:  Objection.  Calls for   02:10
22 speculation.                                      02:10
23       THE WITNESS:  Well, a licensed professional   02:10
24 would not do that because you have to follow the   02:10
25 code.  It's possible not to purchase it.  It's    02:10

Page 118

1  possible to go online and use the code.          02:10
2  BY MR. NERCESSIAN:                                02:10
3    Q.  But a licensed professional working in an   02:10
4  architectural capacity needs to consult the code   02:10
5  before they can design and construct a building?   02:10
6        MS. MILLER-ZIEGLER:  Objection.  Calls for   02:10
7  speculation.                                      02:10
8  BY MR. NERCESSIAN:                                02:10
9    Q.  Is that true?                               02:10
10   A.  I can't speak for all licensed             02:10
11 professionals.  I can only speak for myself.      02:10
12   Q.  In your experience as a licensed           02:10
13 professional, you reviewed the code in designing and   02:10
14 constructing the buildings you built?             02:10
15   A.  Yes.                                        02:10
16   Q.  Why did General Services purchase the code   02:10
17 instead of seeing it online?                      02:11
18       MS. MILLER-ZIEGLER:  Objection.  Calls for   02:11
19 speculation.                                      02:11
20       THE WITNESS:  I can't answer that.  I don't   02:11
21 know.                                             02:11
22 BY MR. NERCESSIAN:                                02:11
23   Q.  In your past experience reviewing the code,   02:11
24 did you purchase a copy, or did you review it online?   02:11
25       MS. MILLER-ZIEGLER:  Objection to form.    02:11

Page 119

1        THE WITNESS:  I did both.                   02:11
2  BY MR. NERCESSIAN:                                02:11
3    Q.  And when accessing it online -- strike that.   02:11
4    A.  Can I correct my last statement?           02:12
5    Q.  Sure.                                       02:12
6    A.  I personally did not purchase the code.    02:12
7    Q.  When you purchased the code, did you receive   02:12
8  any additional access privileges online?         02:12
9        MS. MILLER-ZIEGLER:  Objection.            02:12
10 Mischaracterizes.                                 02:12
11       THE WITNESS:  I personally didn't access the   02:12
12 code.  I mean -- I'm sorry.                        02:12
13       And I apologize.                            02:12
14       MS. MILLER-ZIEGLER:  Oh, no.  That's all    02:12
15 right.                                            02:12
16       THE WITNESS:  I personally didn't purchase   02:12
17 the code.  That's what I corrected in my earlier   02:12
18 statement.  I apologize.                          02:12
19 BY MR. NERCESSIAN:                                02:12
20   Q.  Yes.  Who did purchase the code?           02:12
21   A.  The company that I worked for.             02:12
22   Q.  And what was that?                          02:12
23   A.  It was Department of General Services.     02:12
24   Q.  And with the department's purchase of the   02:12
25 code, were there any additional online access     02:12

Page 120

1  privileges that you received?                     02:12
2        MS. MILLER-ZIEGLER:  Objection.  It's vague.   02:12
3        THE WITNESS:  I'm not aware that they       02:12
4  purchased an online access version.  I review it   02:12
5  online through what was available online.         02:12
6  BY MR. NERCESSIAN:                                02:13
7    Q.  To your knowledge, what local jurisdictions   02:13
8  make the California Electrical Code available for   02:13
9  free?                                             02:13
10       MR. YEN:  Objection.  Calls for speculation.   02:13
11       THE WITNESS:  I don't know.                 02:13
12 BY MR. NERCESSIAN:                                02:13
13   Q.  Your previous testimony stated that local   02:13
14 jurisdictions also make available the code for free.   02:13
15 Do you know of any?                               02:13
16   A.  I can't speak to any off the top of my head,   02:13
17 but that is part of building standards law.       02:13
18   Q.  Can you identify one?                       02:13
19   A.  I've personally not gone to a local        02:13
20 jurisdiction and asked for it, so I can't verify   02:14
21 that.                                             02:14
22   Q.  Have you ever gone to a law library that    02:14
23 maintains the code?                               02:14
24   A.  I have not.                                 02:14
25   Q.  Are you aware, off the top of your head, of   02:14

Page 121

31 (Pages 118 - 121)

1 the closest law library that would maintain a version 02:14
2 of the code?                                  02:14
3    A.  I don't know.                          02:14
4    Q.  When you say that local jurisdictions may   02:14
5 make available versions of the code for free, what   02:14
6 types of jurisdictions are you referring to?   02:14
7       MR. YEN:  Objection.  Mischaracterizes   02:14
8 previous testimony.                            02:14
9 BY MR. NERCESSIAN:                             02:14
10   Q.  Do local -- I can rephrase it.         02:14
11      Do local jurisdictions include cities?   02:14
12   A.  My reference was to -- and this is a broad   02:15
13 statement because they're called different things in   02:15
14 different local jurisdictions, would be a local   02:15
15 building department, if you will, but that could be a   02:15
16 broad statement.                              02:15
17   Q.  Is that because a local building department   02:15
18 might be for a county or a city or subdivision, and   02:15
19 it just depends?                              02:15
20   A.  That's correct.                        02:15
21   Q.  Are you aware whether any of those local   02:15
22 building departments get the code for free?   02:15
23   A.  Not aware.  I don't know.              02:15
24   Q.  Don't know one way or another?          02:15
25   A.  I do not know.                         02:15

                                          Page 122

1    Q.  Does CBSC take any steps to give those local   02:15
2 building departments access to the code?      02:16
3    A.  I don't know what you mean by "access."  We   02:16
4 have the viewable format on our website.  They can   02:16
5 view it like anyone else.                      02:16
6    Q.  By clicking through on the links to the   02:16
7 publishers' websites?                          02:16
8    A.  Correct.  Uh-huh.                       02:16
9    Q.  I want to call your attention to Section   02:16
10 H-1, and this one contains the heading "Time is of   02:16
11 the Essence" and contains the statement "Because the   02:16
12 code may have significant effects on the safety of   02:16
13 the state's built environment and its citizens, time   02:16
14 is of the essence in performing the herein duties."   02:16
15 Would you agree with that statement?          02:16
16      MS. MILLER-ZIEGLER:  Objection.  Vague.   02:17
17      THE WITNESS:  Yeah.  I mean I agree with it,   02:17
18 yes.                                          02:17
19 BY MR. NERCESSIAN:                             02:17
20   Q.  What significant effects does the code have   02:17
21 on the safety of the state's built environment and   02:17
22 its citizens?                                 02:17
23      MS. MILLER-ZIEGLER:  Objection.  Lack of   02:17
24 foundation.                                   02:17
25      THE WITNESS:  I'm sorry.  I think it's too   02:17

                                          Page 123

1 broad of a question for me to be able to answer.   02:17
2 BY MR. NERCESSIAN:                             02:17
3    Q.  Can you name one significant effect that the   02:17
4 code has on the state's built environment and its   02:17
5 citizens?                                     02:17
6    A.  I would say fire issues.               02:17
7    Q.  Because the code addresses fire issues?   02:17
8    A.  Correct.                               02:18
9    Q.  Does the code address any other safety   02:18
10 issues?                                       02:18
11   A.  Yes.                                   02:18
12   Q.  What's another safety issue that the code   02:18
13 addresses?                                    02:18
14   A.  Structural, mechanical performance,     02:18
15 accessibility, concrete strength.             02:18
16   Q.  Anything else?                         02:18
17   A.  There's probably too many for -- I mean   02:18
18 that's all I can think of at the time.        02:18
19   Q.  What do you mean by "fire issues"?      02:18
20   A.  So fire safety issues, so egress of     02:18
21 buildings, combustibility of products.        02:18
22   Q.  With respect to egress of buildings, does   02:19
23 the code require that certain types of buildings be   02:19
24 built in certain ways with respect to means of exit?   02:19
25      MS. MILLER-ZIEGLER:  Objection to form.   02:19

                                          Page 124

1      THE WITNESS:  That's a very broad question.   02:19
2 BY MR. NERCESSIAN:                             02:19
3    Q.  Does the code contain any requirements with   02:19
4 respect to egress of buildings?               02:19
5    A.  Yes.                                   02:19
6    Q.  What might be one example of such a       02:19
7 requirement?                                  02:19
8    A.  The width of exit corridors.            02:19
9    Q.  Any others?                           02:19
10   A.  Fire sprinkler issues, installation of fire   02:19
11 sprinklers.                                   02:20
12   Q.  Are you aware of any consequences that might   02:20
13 flow from not having an exit corridor that is as wide   02:20
14 as the code prescribes?                       02:20
15      MS. MILLER-ZIEGLER:  Objection to form.   02:20
16      THE WITNESS:  That's a broad question.   02:20
17 Sorry.                                        02:20
18 BY MR. NERCESSIAN:                             02:20
19   Q.  What might happen if -- strike that.    02:20
20      What might happen if an exit corridor is not   02:20
21 as -- strike that.                           02:20
22      What consequences might a builder see if the   02:20
23 width of an exit corridor is not compliant with what   02:21
24 the code prescribes?                          02:21
25      MR. YEN:  Objection.  Calls for speculation.   02:21

                                          Page 125

                                          32 (Pages 122 - 125)

1       MS. MILLER-ZIEGLER:  Objection.  Form.       02:21
2       THE WITNESS:  Yeah.  That's too broad of a    02:21
3 question for me.  Sorry.                           02:21
4 BY MR. NERCESSIAN:                                 02:21
5    Q.  You can still answer the question, though.  02:21
6    A.  I don't have an answer for you, though.  I  02:21
7 don't -- I don't know.                             02:21
8    Q.  Are you aware of what any consequences might 02:21
9 be if the width of an exit corridor is not compliant 02:21
10 with what the code prescribes?                    02:21
11      MR. FEE:  Objection.  Calls for speculation. 02:21
12      MS. MILLER-ZIEGLER:  Calls for a legal       02:21
13 conclusion.  Objection.                           02:21
14      THE WITNESS:  All I'm familiar with is that  02:21
15 you have to have a certain amount of distance in a 02:21
16 corridor for a certain amount of occupant load.  I 02:21
17 can't speculate on what would happen if it wasn't  02:22
18 there, if it wasn't available.                     02:22
19 BY MR. NERCESSIAN:                                 02:22
20    Q.  So you have no knowledge or awareness of    02:22
21 what might happen if a building design didn't comply? 02:22
22      MR. FEE:  Objection.  Calls for speculation   02:22
23 and form.                                          02:22
24      MS. MILLER-ZIEGLER:  And calls for a legal    02:22
25 conclusion.                                        02:22
                                              Page 126

1       THE WITNESS:  It's a broad question that I    02:22
2 don't have an answer for.                          02:22
3 BY MR. NERCESSIAN:                                 02:22
4    Q.  What consequences could happen to a         02:22
5 contractor for failure to meet the California      02:22
6 Electrical Code requirements?                      02:22
7       MS. MILLER-ZIEGLER:  Objection.  Calls for a 02:22
8 speculation and a legal conclusion.                02:22
9       THE WITNESS:  Yeah.  I don't work for the     02:22
10 California license bureau, so I don't know the     02:22
11 consequences of that.                             02:23
12 BY MR. NERCESSIAN:                                 02:23
13    Q.  You can't name one possible consequence?    02:23
14    A.  No.                                         02:23
15    Q.  Does the California Building Standards       02:23
16 Commission play any role in monitoring compliance  02:23
17 with the California Building Codes?                02:23
18    A.  No.  We are not an enforcement agency.      02:23
19    Q.  What enforcement agencies are you aware of  02:23
20 that monitor compliance with the California Building 02:23
21 Codes?                                             02:23
22      MS. MILLER-ZIEGLER:  Objection to form.       02:23
23      THE WITNESS:  There's various State agencies  02:23
24 that have authority to enforce the codes, and then 02:23
25 there are the local jurisdictions that enforce the 02:23
                                              Page 127

1 codes.                                      02:23
2 BY MR. NERCESSIAN:                          02:23
3    Q.  Do those agencies include, for instance, the 02:23
4 Department of Housing and Community Development?    02:24
5    A.  They may have for some, but as far as I      02:24
6 know, they delegate that to the local jurisdictions 02:24
7 for enforcement of housing.                 02:24
8    Q.  And when you say "local jurisdictions," you  02:24
9 mean local building departments as we previously    02:24
10 discussed?                                  02:24
11    A.  Yes, the broad definition of a local        02:24
12 building department, yes.                   02:24
13    Q.  Do you know whether the Division of the      02:24
14 State Architect plays any role in enforcing         02:24
15 compliance with the California Building Codes?      02:24
16    A.  For State buildings, they do.        02:24
17    Q.  Do you know what kind of enforcement actions 02:24
18 they might take?                            02:24
19    A.  I do not.                           02:24
20    Q.  Do you know whether the office of the State  02:24
21 Fire Marshal takes any actions to enforce compliance 02:24
22 with the California Building Codes?         02:25
23    A.  I apologize.  What was the last State agency 02:25
24 you requested?  I thought that was what we were     02:25
25 talking about.                             02:25
                                              Page 128

1    Q.  It was the Division of State Architect.      02:25
2    A.  Oh.  Yes.  I'm sorry, I misspoke.  The       02:25
3 Division of the State Architect does for school     02:25
4 construction and essential service buildings.      02:25
5    Q.  So it's your testimony that the Division of  02:25
6 the State Architect enforces compliance with the    02:25
7 California Building Codes for school constructions   02:25
8 and essential service buildings?            02:25
9    A.  Yes.                                 02:25
10    Q.  And are you aware of what actions the        02:25
11 Division of the State Architect takes when enforcing 02:25
12 with respect to school construction and essential   02:25
13 service buildings?                         02:25
14    A.  No.                                 02:25
15    Q.  Do you know whether the Office of the State  02:25
16 Fire Marshal takes any actions to enforce compliance 02:25
17 with the California Building Codes?         02:25
18    A.  I don't know what they do.  I don't know     02:26
19 what they do in terms of enforcement, but they do -- 02:26
20    Q.  Do you know whether they enforce?            02:26
21    A.  Yes, for State building.            02:26
22    Q.  For State buildings?               02:26
23    A.  Yes.                              02:26
24    Q.  Do you know whether the Office of Statewide  02:26
25 Health Planning and Development takes any actions to 02:26
                                              Page 129

33 (Pages 126 - 129)

1 enforce compliance with the California Building    02:26
2 Codes?                                              02:26
3    A.  Yes.  For hospital safety, yes.             02:26
4    Q.  Do you know what actions they take?         02:26
5    A.  I do not.                                    02:26
6    Q.  Do you know whether the California Energy    02:26
7 Commission takes any actions to enforce compliance 02:26
8 with the California Building Codes?                 02:26
9    A.  I do not know.                               02:26
10    Q.  Do you know whether the California          02:26
11 Department of Public Health takes any actions to   02:26
12 enforce compliance with the California Building    02:26
13 Codes?                                             02:26
14    A.  I do not know that.                         02:26
15    Q.  Do you know whether the California State    02:26
16 Lands Commission takes any action to enforce with  02:26
17 respect to California Building Codes?              02:27
18    A.  I do not know.                              02:27
19    Q.  Do you know whether the Board of State and  02:27
20 Community Corrections takes any actions to enforce 02:27
21 compliance with California Building Codes?         02:27
22    A.  I do not.                                   02:27
23    Q.  How about -- the last one is the Building   02:27
24 Standards Commission, so strike that.             02:27
25        Want to call your attention back to         02:27

Page 130

1 Section H of Exhibit 7.                            02:27
2    A.  Uh-huh.                                      02:27
3    Q.  Looking at sentence two now that says "The  02:27
4 July 1st, 2016, date to publish the code is of     02:27
5 critical importance."  Do you see that language?   02:27
6    A.  Yes.                                         02:27
7    Q.  Why is it important that the code gets       02:27
8 published at that date?                             02:27
9    A.  The commission sets the effective date,     02:27
10 which is 180 days beyond that date, and so the     02:28
11 publication must occur 180 days prior to the       02:28
12 effective date.  That's part of building standards 02:28
13 law.                                               02:28
14    Q.  So that's a legal mandate?                  02:28
15    A.  Yes.                                        02:28
16    Q.  Are you aware whether that -- strike that.  02:28
17        Do you know whether the 2016 California     02:28
18 Electrical Code met that July 1st, 2016, publication 02:28
19 date?                                              02:28
20    A.  Yes.                                        02:28
21    Q.  Do you know whether the California          02:28
22 Electrical Code was available on the NFPA reading  02:28
23 room as of that date?                              02:28
24    A.  I do not know.                              02:28
25    Q.  Do you know whether any free access was --  02:28

Page 131

1 strike that.                                        02:29
2    Do you know whether any free public access       02:29
3 to the 2016 California Electrical Code was available 02:29
4 as of July 1st, 2016?                               02:29
5        MR. FEE:  Objection to form, calls for       02:29
6 speculation.                                        02:29
7        THE WITNESS:  Yeah.  I don't know.           02:29
8 BY MR. NERCESSIAN:                                  02:29
9    Q.  Pass you a document I'd like marked next in  02:30
10 order.  Should be 8.                               02:30
11        (Exhibit 8 marked)                          02:30
12 BY MR. NERCESSIAN:                                 02:30
13    Q.  You've been passed a document marked for    02:30
14 identification as Exhibit 8.  Do you recognize this 02:30
15 document?                                          02:30
16    A.  Uh-huh.  Yes.                               02:30
17    Q.  And would you have received this document?  02:30
18    A.  I am a member of the DGS Sacramento staff   02:30
19 email, so it's possible that I received this, yes. 02:30
20    Q.  What is this document?                      02:30
21    A.  That's an email from Alex Hunter who was our 02:30
22 web person at the time.                            02:31
23    Q.  And when is this document dated?            02:31
24    A.  8-1-2016.                                   02:31
25    Q.  I want to call your attention to the first  02:31

Page 132

1 sentence of this document which says "Online portions 02:31
2 of the 2016 Building Standards Code published/printed 02:31
3 by ICC are now linked on our code's web page."  Do  02:31
4 you see that?                                        02:31
5    A.  I do.                                        02:31
6    Q.  Are you aware whether the links were in      02:31
7 working order at any point before August 1st, 2016? 02:31
8    A.  I don't recall.                              02:31
9    Q.  And according to this email, the California  02:31
10 Electrical Code, as of August 1st, 2016 -- strike  02:31
11 that.                                              02:31
12        Was the California Electrical Code published 02:32
13 by the NFPA available for online access at that time? 02:32
14    A.  I don't recall.                             02:32
15    Q.  According to the email, does it appear that 02:32
16 there was online access available at that time?    02:32
17        MR. YEN:  Objection.  Calls for speculation. 02:32
18        THE WITNESS:  I don't recall.               02:32
19 BY MR. NERCESSIAN:                                 02:32
20    Q.  Do you have any reason to doubt the         02:32
21 statement in this email that says "the California  02:32
22 Electrical Code published by NFPA and the California 02:32
23 Mechanical and Plumbing Codes published by IAPMO are 02:32
24 not yet available for online access"?              02:32
25    A.  That would be online access from our        02:32

Page 133

34 (Pages 130 - 133)

1  website. I can't state whether or not the model code  02:32
2  developers had it on their website yet.          02:32
3    Q.  So you read this to say just the link wasn't  02:32
4  up?                    02:32
5    A.  Correct.                02:32
6    Q.  And you don't know whether the electrical  02:32
7  code was accessible on the NFPA website?        02:33
8    A.  I don't know that.            02:33
9    Q.  And what is IAPMO?            02:33
10    A.  IAPMO.                02:33
11    Q.  IAPMO.                02:33
12    A.  Is the International Association of Plumbing  02:33
13  Mechanical Officials. It's another publisher that we  02:33
14  use.                    02:33
15    Q.  And what part of Title 24 does IAPMO deliver  02:33
16  model codes with respect to?            02:33
17    A.  The Uniform Mechanical Code and the Uniform  02:33
18  Plumbing Code which are adopted by State agencies.  02:33
19    Q.  Want to call your attention back to        02:34
20  Exhibit 7 and want to call your attention to Section  02:34
21  K-1 of the agreement. K-1, it's on page seven of   02:34
22  seven of Exhibit A.              02:34
23    A.  Seven of seven. Okay.          02:34
24    Q.  All right. Section K-1 states "NFPA shall  02:34
25  establish a distribution method in consultation with  02:34

Page 134

1    Q.  So those are the depository libraries        02:37
2  identified as Exhibit A, Attachment A, and Exhibit A,  02:37
3  Attachment B, of this document?          02:37
4    A.  Yes.                  02:37
5    Q.  Do those complimentary copies go to any      02:37
6  organization or person not identified on these      02:37
7  attachments?                02:37
8    A.  I don't know.              02:37
9    Q.  I see on these attachments there are some    02:37
10  libraries that are called Complete Depository      02:38
11  Libraries and other libraries called Selective      02:38
12  Depository Libraries. Do you see that?        02:38
13    A.  I do.                  02:38
14    Q.  What's the difference between those        02:38
15  designations?                02:38
16    A.  I don't know.              02:38
17    Q.  Another line down in Section K, it says      02:38
18  "NFPA may wholesale the code to other resellers in  02:38
19  California." Do you see that?            02:38
20    A.  I do see that.              02:38
21    Q.  Do you know whether NFPA has?          02:38
22    A.  I do not know.              02:38
23    Q.  Do you know whether NFPA has made any      02:38
24  efforts to deliver the code to print disabled      02:38
25  individuals?                02:38

Page 136

1  the CBSC." Do you see that language?        02:34
2    A.  Yes.                  02:35
3    Q.  What distribution method has NFPA        02:35
4  established in consulting with the CBSC?        02:35
5    A.  I don't recall.              02:35
6    Q.  Are you aware of any distribution method?    02:35
7    A.  In context with this item? I don't know in  02:35
8  what context this is referring, so --        02:36
9    Q.  Do you recall any discussions you have had  02:36
10  with NFPA regarding any distribution method for the  02:36
11  2016 California Electrical Code?          02:36
12    A.  Well, it would be how it applies with the  02:36
13  rest of the contract statement. So, for example, one  02:36
14  distribution method would be linked to our website.  02:36
15    Q.  And you're not aware of any distribution    02:36
16  method aside from that?            02:36
17    A.  No, not right now, no.          02:36
18    Q.  The next line down says "The NFPA shall    02:36
19  distribute a minimum of 200 complimentary copies of  02:36
20  the code as per list provided by CBSC on or before  02:37
21  July 1st, 2016." Do you see that?          02:37
22    A.  I do.                  02:37
23    Q.  For whom are those 200 complimentary copies?  02:37
24    A.  The depository libraries that are listed in  02:37
25  the contract.                02:37

Page 135

1      MS. MILLER-ZIEGLER: Objection. Lacks      02:38
2  foundation and calls for speculation.        02:38
3      THE WITNESS: I don't know that.        02:38
4  BY MR. NERCESSIAN:              02:39
5    Q.  Do you know whether NFPA has made any      02:39
6  efforts to deliver the code to mobility impaired    02:39
7  individuals?                02:39
8      MS. MILLER-ZIEGLER: Objection. Lack of      02:39
9  foundation.                02:39
10      THE WITNESS: I don't know that.        02:39
11  BY MR. NERCESSIAN:              02:39
12    Q.  Do you know whether NFPA has made any      02:39
13  efforts to deliver the code to individuals that lack  02:39
14  sight?                    02:39
15      MS. MILLER-ZIEGLER: Objection. Lack of      02:39
16  foundation.                02:39
17      THE WITNESS: I do not know that.        02:39
18  BY MR. NERCESSIAN:              02:39
19    Q.  Has the CBSC taken any steps to deliver the  02:39
20  code to those who are print disabled?        02:39
21    A.  We've not received a request for that, no.  02:39
22    Q.  Has CBSC taken any steps to deliver the code  02:39
23  to individuals who are mobility impaired?      02:40
24    A.  No.                  02:40
25    Q.  Has the CBSC made any effort to make      02:40

Page 137

35 (Pages 134 - 137)

| | |
|---|---|
| 1   Q.  And that's -- 1-1-17 is the effective date   02:43 | |

1  available the code to those who lack sight?   02:40
2  A.  We've not been requested that, no.   02:40
3  Q.  To your knowledge, has the State of   02:40
4  California taken any efforts to make the code   02:40
5  available to those who have accessibility issues?   02:40
6  MS. MILLER-ZIEGLER:  Objection.  Lack of   02:40
7  foundation.   02:40
8  THE WITNESS:  Yeah.  I can't answer for the   02:40
9  State of California.   02:40
10  BY MR. NERCESSIAN:   02:40
11  Q.  But you're not aware of any efforts that the   02:40
12  State has taken to make the code available to those   02:40
13  who do have accessibility issues?   02:40
14  A.  I don't know.   02:40
15  MS. MILLER-ZIEGLER:  Mischaracterizes her   02:40
16  testimony.   02:40
17  THE WITNESS:  I don't know.   02:40
18  BY MR. NERCESSIAN:   02:40
19  Q.  Just have a few more questions about this   02:41
20  document.  Like to call your attention to Exhibit A,   02:41
21  Attachment C, and this page, you'll see, has the   02:41
22  heading -- the heading reads "2016 Intervening Code   02:41
23  Adoption Cycle Timeline."  Do you see that?   02:41
24  A.  I do.   02:41
25  Q.  What is depicted in this chart?   02:41

Page 138

1  A.  Actually, what's depicted is the 2015   02:42
2  Triennial Code Adoption Cycle Timeline that we make   02:42
3  available -- that the BSC makes available on its   02:42
4  website for interested parties, and it talks about   02:42
5  the timing, that's a rough outline of the timing of   02:42
6  the cycle, from pre-cycle all the way to publication   02:42
7  and effective date.  It's pretty blurry, so I can't   02:42
8  tell you the details.   02:42
9  Q.  So what occurs after the publication has   02:42
10  been placed of the 2016?   02:42
11  MS. MILLER-ZIEGLER:  Objection.  Vague.   02:42
12  THE WITNESS:  What occurs?   02:42
13  BY MR. NERCESSIAN:   02:42
14  Q.  It looks like -- if I'm reading this   02:42
15  correctly, it looks like there is a timeline leading   02:42
16  up to July 1st, 2016.  Do you see that?   02:43
17  A.  Uh-huh.   02:43
18  Q.  And then there's activity afterwards leading   02:43
19  up through January 1st, 2017.  What occurs during   02:43
20  that intervening period?   02:43
21  A.  I can't read what the graphic says, and it's   02:43
22  not what occurs in the intervening period.  It is the   02:43
23  wait period from the publication date to the   02:43
24  effective date, which is, as I can barely read, 1-1   02:43
25  of '17 on the far right side.   02:43

Page 139

1  Q.  And that's -- 1-1-17 is the effective date   02:43
2  of the 2016 edition of the California Electrical   02:43
3  Code?   02:43
4  A.  It's the effective date of all of the codes,   02:43
5  yes, that's correct.   02:43
6  Q.  Want to call your attention to Exhibit B of   02:43
7  this agreement.  It's almost at the end.   02:44
8  A.  Okay.  Before C?   02:44
9  Q.  No.  It's the second to last and the last   02:44
10  page.   02:44
11  A.  Oh, sorry.  Okay.  Got it.  I was going in   02:44
12  alphabetical order there.  All right.   02:44
13  Q.  Yeah.  So I want to call your attention to   02:44
14  Section B-1 --   02:44
15  A.  Uh-huh.   02:44
16  Q.  -- which states that "NFPA shall make the   02:44
17  code," and I'm excerpting language here, "available   02:44
18  to the State, local governmental agencies and the   02:44
19  general public at a price established by NFPA."  Do   02:44
20  you see that language?   02:45
21  A.  I see the language.   02:45
22  Q.  Is there any statement anywhere in this   02:45
23  agreement that specifies what that price is?   02:45
24  A.  I don't know without reading the whole   02:45
25  agreement.   02:45

Page 140

1  Q.  Are you aware of the price that NFPA makes   02:45
2  the quote available for?   02:45
3  A.  I am not.   02:45
4  Q.  Do you know whether the code -- strike that.   02:45
5  Do you know whether the NFPA makes the code   02:45
6  available to the State for the same price that it   02:45
7  makes it available to the general public?   02:45
8  A.  I don't know.   02:45
9  Q.  Do you know whether the NFPA charges local   02:45
10  government agencies the same price as it charges to   02:45
11  the general public for access to the code?   02:46
12  A.  I do not know.   02:46
13  MS. MILLER-ZIEGLER:  I'm going to object to   02:46
14  that as vague.   02:46
15  MR. NERCESSIAN:  What was that?   02:46
16  MS. MILLER-ZIEGLER:  Just preserving   02:46
17  objection that that was vague.   02:46
18  BY MR. NERCESSIAN:   02:46
19  Q.  Going to hand you one document.  We can mark   02:46
20  this next in order.  I believe it's 9.   02:46
21  (Exhibit 9 marked)   02:46
22  BY MR. NERCESSIAN:   02:46
23  Q.  You've been handed a document marked for   02:46
24  identification as Exhibit 9.  Do you recognize this   02:46
25  document?   02:46

Page 141

36 (Pages 138 - 141)

1    A.  No.                                02:46
2    Q.  Do you know what the NCB coordination      02:47
3  process is?                              02:47
4    A.  Vaguely.                           02:47
5    Q.  What do you know of the NCB coordination    02:47
6  process?                                 02:47
7    A.  It's conducted by DGS prior to entering a    02:47
8  contract for a noncompetitive bid with a outside    02:47
9  entity.                                  02:47
10   Q.  And so "NCB" stands for noncompetitive bid?   02:47
11   A.  Yes.                              02:47
12   Q.  Why is there a specific process for         02:47
13 noncompetitive bids with outside entities?        02:47
14      MR. FEE:  Objection.  Calls for speculation.   02:47
15      THE WITNESS:  Yeah.  I don't know.         02:47
16 BY MR. NERCESSIAN:                        02:47
17   Q.  Do you know what the process entails?       02:47
18   A.  No.                              02:47
19      MR. FEE:  Same objection.              02:47
20      THE WITNESS:  No.                    02:47
21 BY MR. NERCESSIAN:                        02:47
22   Q.  Have you had to go through a noncompetitive   02:47
23 bid process with respect to your work on the 2019    02:47
24 triennial edition of the California Building       02:48
25 Standards Codes?                          02:48

Page 142

1    A.  Yes.                              02:48
2    Q.  Did you fill out forms similar to this as a    02:48
3  part of that process?                      02:48
4    A.  Yes.                              02:48
5    Q.  Did you fill out the same forms that you're    02:48
6  seeing here?                             02:48
7    A.  I don't know if they're the exact same       02:48
8  forms.  I don't know.                      02:48
9    Q.  When going through this process in the 2019    02:48
10 cycle, what disclosures needed to be made as part of   02:48
11 the process?                             02:48
12      MS. MILLER-ZIEGLER:  Objection.  Lack of     02:48
13 foundation.                              02:48
14      THE WITNESS:  I don't recall.            02:48
15 BY MR. NERCESSIAN:                        02:48
16   Q.  What did you need to show in going through    02:48
17 the noncompetitive bid process during the 2019 cycle?  02:49
18      MS. MILLER-ZIEGLER:  Objection.  Lack of     02:49
19 foundation.                              02:49
20      THE WITNESS:  I don't recall.            02:49
21 BY MR. NERCESSIAN:                        02:49
22   Q.  Did you have to provide any information to    02:49
23 the Department of General Services in going through    02:49
24 the noncompetitive bid process during the 2019 cycle?  02:49
25   A.  I don't recall.  It was quite awhile ago.    02:49

Page 143

1    Q.  How long ago was it?                  02:49
2    A.  At least a couple years.              02:49
3    Q.  Would it have been before 2018?           02:49
4    A.  I don't know.                       02:49
5    Q.  And did you go through the noncompetitive    02:49
6  bid process successfully for the 2019 cycle?       02:50
7    A.  Yes.                              02:50
8    Q.  Did the California Building Standards        02:50
9  Commission always go through a process by -- strike    02:51
10 that.                                   02:51
11      To your knowledge, did the State of        02:51
12 California always rely on model codes in developing    02:51
13 its building standards?                    02:51
14      MS. MILLER-ZIEGLER:  Objection.  Form.       02:51
15      MR. FEE:  Objection.  Calls for speculation.   02:51
16      THE WITNESS:  That's a very broad question.    02:51
17 BY MR. NERCESSIAN:                        02:51
18   Q.  Is it one that you have any knowledge of?    02:51
19      MR. FEE:  Objection.  Calls for speculation.   02:51
20      THE WITNESS:  Only in the recent history,    02:51
21 we've used model codes.  I couldn't go back years and   02:51
22 years and years.                         02:51
23 BY MR. NERCESSIAN:                        02:51
24   Q.  Are you aware of any time when California    02:51
25 would separately publish California amendments from   02:51

Page 144

1  model codes?                             02:51
2    A.  Yeah.  It was a number of years ago.       02:51
3    Q.  Do you recall when that was?             02:51
4    A.  No.                              02:51
5    Q.  Do you have any knowledge of why a switch    02:51
6  was made to create single incorporated volumes?     02:51
7      MR. FEE:  Objection.                   02:52
8      MS. MILLER-ZIEGLER:  Objection to form.       02:52
9      THE WITNESS:  No.                     02:52
10     Quick question.  If we're going to go on for    02:52
11 another 10, 15 minutes, can we take a quick break?    02:52
12     MR. NERCESSIAN:  Yeah.  There's no question    02:52
13 pending, so --                           02:52
14     THE WITNESS:  Okay.                    02:52
15     VIDEO OPERATOR:  Off the record.  It's 2:52.   02:52
16     (Recess)                           02:52
17     VIDEO OPERATOR:  Okay.  We're back on the      03:07
18 record.  It's 3:08.                       03:07
19 BY MR. NERCESSIAN:                        03:08
20   Q.  Ms. Marvelli, I'd like to return back to    03:08
21 Exhibit 7 a moment.  Who at CBSC had principal roles   03:08
22 in approving the terms of this contract?          03:08
23   A.  Well, I signed off on it, and then also, I    03:08
24 believe DGS Executive Office saw the contract.      03:08
25   Q.  Did anybody else have a role in reviewing    03:08

Page 145

37 (Pages 142 - 145)

Page 146

```
 1  the terms?                            03:08
 2       MS. MILLER-ZIEGLER:  Objection.  Calls for  03:08
 3  speculation.                          03:08
 4       THE WITNESS:  The only other staff member at  03:08
 5  CBSC was our staff services manager.          03:08
 6  BY MR. NERCESSIAN:                    03:08
 7   Q.  And who was that?                03:08
 8   A.  Katrina Benny.                   03:09
 9   Q.  What role did she play?          03:09
10   A.  Drafting the information.        03:09
11   Q.  Drafting what information?       03:09
12   A.  The 2000 -- the information that you see in  03:09
13  the exhibit.                          03:09
14   Q.  Did the information in this exhibit  03:09
15  originate from CBSC?                  03:09
16   A.  I don't know.  It was similar to what was in  03:09
17  the last edition of the contract, so it wasn't  03:09
18  originated.  Not sure where it was originated from.  03:09
19   Q.  Did Katrina Benny do the first draft of this  03:09
20  contract?                             03:10
21   A.  I don't recall.                  03:10
22   Q.  Was this the first contract you had worked  03:10
23  on?                                   03:10
24   A.  Yes.                             03:10
25   Q.  Who at DGS played a role in approving the  03:10
```

Page 147

```
 1  terms of the contract?                03:10
 2   A.  I don't have that.  I don't know.  03:10
 3   Q.  Did you have any conversations with anybody  03:10
 4  at DGS regarding the terms of this contract?  03:10
 5       MR. YEN:  It's a "yes" or "no" question.  03:10
 6       THE WITNESS:  Yes.               03:10
 7  BY MR. NERCESSIAN:                    03:10
 8   Q.  Who at DGS did you have conversations with  03:10
 9  regarding the terms of this contract?  03:10
10   A.  It would have been reviewed by Legal as  03:10
11  well.                                 03:11
12   Q.  In addition to any other persons at DGS?  03:11
13   A.  The contract staff at DGS, but I don't know  03:11
14  who by name.                          03:11
15   Q.  Anybody else at DGS?             03:11
16   A.  Not that I'm aware of.           03:11
17   Q.  Did you have any discussions with Katrina  03:11
18  Benny regarding the terms in this contract?  03:11
19   A.  Yes.                             03:11
20   Q.  What were those conversations?   03:11
21   A.  Just edits to the contract.      03:11
22   Q.  What edits did you prescribe to Ms. Benny  03:11
23  concerning the contract?              03:11
24       MS. MILLER-ZIEGLER:  Objection.  Form.  03:11
25       THE WITNESS:  Just -- that's a broad  03:11
```

Page 148

```
 1  question.  It would be just clarity.  03:11
 2  BY MR. NERCESSIAN:                    03:11
 3   Q.  I know.                          03:11
 4   A.  Yeah.                            03:11
 5   Q.  But you can still answer it.      03:11
 6   A.  I don't know the specifics.  It was just  03:11
 7  clarity for how the contract read and certain wording  03:11
 8  of the codes and -- yeah.  That's about it.  03:12
 9   Q.  Did you instruct Ms. Benny to make any  03:12
10  substantive changes to the contract terms?  03:12
11   A.  I don't recall.                  03:12
12   Q.  Did anyone tell you that any particular  03:12
13  terms of the contract were important to the State?  03:12
14   A.  That's --                        03:12
15       MR. YEN:  You can exclude communications  03:12
16  with lawyers --                       03:12
17       THE WITNESS:  Okay.              03:12
18       MR. YEN:  -- in answering your question.  03:12
19       THE WITNESS:  Yeah.  So it would just be the  03:12
20  discussions we had with the contracts unit.  03:12
21  BY MR. NERCESSIAN:                    03:12
22   Q.  And what were the substance of those  03:12
23  discussions?                          03:12
24   A.  Just the contents of the contract and the  03:12
25  way it's written.                     03:13
```

Page 149

```
 1   Q.  Did they call out any particular terms of  03:13
 2  the contract that were important to the State?  03:13
 3       MR. YEN:  Objection.  Vague.      03:13
 4       THE WITNESS:  Yeah.  I don't know how to  03:13
 5  answer that.  It's sort of a standard contract that  03:13
 6  is modified for a specific year.  There isn't really  03:13
 7  a negotiation back and forth between BSC and the  03:13
 8  contracts unit on what is good or bad.  It's more of  03:13
 9  just the contents of it for this particular cycle.  03:13
10  BY MR. NERCESSIAN:                    03:13
11   Q.  Do you recall how long the contract took to  03:13
12  finalize?                             03:13
13   A.  I do not recall that.            03:13
14   Q.  Was it more than a month?         03:13
15   A.  Yes, it was more than a month.    03:13
16   Q.  Was it more than two months?      03:13
17   A.  I don't recall.                  03:13
18   Q.  Could it have been more than two months?  03:13
19       MR. YEN:  Objection.  Calls for speculation.  03:14
20       THE WITNESS:  Yeah.              03:14
21  BY MR. NERCESSIAN:                    03:14
22   Q.  You can still answer.            03:14
23   A.  I don't recall.                  03:14
24   Q.  Could it have been more than six months?  03:14
25       MR. YEN:  Objection.  Calls for speculation.  03:14
```

| | |
|---|---|
| 1     THE WITNESS:  I honestly don't recall.    03:14 | 1  was consistent with contracts with other model code    03:18 |
| 2  BY MR. NERCESSIAN:                     03:14 | 2  providers?                          03:18 |
| 3     Q.  Were you aware of any flexibility in       03:14 | 3     MS. MILLER-ZIEGLER:  Objection.  That    03:18 |
| 4  particular terms of the contract?            03:14 | 4  mischaracterizes her testimony.              03:18 |
| 5     MR. YEN:  Objection.  Vague.          03:14 | 5     THE WITNESS:  When we develop the contracts  03:18 |
| 6     THE WITNESS:  I don't know.            03:14 | 6  with the other model, the contracts are generally    03:18 |
| 7  BY MR. NERCESSIAN:                     03:14 | 7  developed in the same amount of -- same timeframe    03:18 |
| 8     Q.  Does that mean you weren't aware of any    03:14 | 8  because we're adopting the codes at the same cycle,    03:18 |
| 9  flexibility that existed in the terms of the       03:15 | 9  so the contract with IAPMO and the contract with ICC   03:19 |
| 10  contract?                         03:15 | 10  are developed the similar time, and so they're    03:19 |
| 11     MR. YEN:  Objection.  Vague.          03:15 | 11  similar in nature.  When I review them, I can see    03:19 |
| 12     THE WITNESS:  I don't know.  I'm not aware.   03:15 | 12  that they're similar in nature.            03:19 |
| 13  BY MR. NERCESSIAN:                     03:15 | 13  BY MR. NERCESSIAN:                     03:19 |
| 14     Q.  And it's your testimony that you modelled    03:15 | 14     Q.  What do you understand that this lawsuit is    03:19 |
| 15  this contract for the 2016 edition on past contracts?  03:15 | 15  about?                          03:19 |
| 16     A.  Yes.                         03:15 | 16     MS. MILLER-ZIEGLER:  Objection.  It's       03:19 |
| 17     Q.  Past contracts with NFPA?          03:15 | 17  outside the scope of the subpoena.           03:19 |
| 18     A.  With other model code developers as well.   03:15 | 18     THE WITNESS:  I wish I knew.            03:19 |
| 19     Q.  Like this document marked next in order.    03:15 | 19  BY MR. NERCESSIAN:                     03:19 |
| 20     (Exhibit 10 marked)               03:16 | 20     Q.  Well, what do you know about          03:19 |
| 21  BY MR. NERCESSIAN:                     03:16 | 21  Public.Resource?                     03:19 |
| 22     Q.  You have been handed a document marked for   03:16 | 22     A.  They're a company that has codes online.    03:19 |
| 23  identification as Exhibit 10.  What is this document?  03:16 | 23  That's all I know.                    03:19 |
| 24     A.  I don't know.                  03:16 | 24     Q.  What do you know about Carl Malamud?    03:19 |
| 25     Q.  Have you seen this document?         03:16 | 25     A.  They submitted -- he submitted a PRA request  03:19 |
| Page 150 | Page 152 |

| | |
|---|---|
| 1     A.  Not prior to today, no.          03:16 | 1  through Public.Resource.                  03:19 |
| 2     Q.  Do you recall consulting this document or   03:16 | 2     Q.  Have you had any communications regarding    03:19 |
| 3  any other similar documents in developing the terms   03:16 | 3  Public.Resource with anyone?              03:19 |
| 4  of the 2016 contract?                 03:17 | 4     A.  No.  Just in regards to answering the PRAs    03:20 |
| 5     MR. YEN:  Objection.  Vague.          03:17 | 5  and just staff and coordinating the PRA requests.    03:20 |
| 6     THE WITNESS:  I have not seen this document   03:17 | 6     Q.  No communications outside of the context of   03:20 |
| 7  before.                          03:17 | 7  the PRA requests?                    03:20 |
| 8  BY MR. NERCESSIAN:                     03:17 | 8     A.  No, not that I'm aware of, no.         03:20 |
| 9     Q.  This document identifies an agreement      03:17 | 9     Q.  Have you had any communications about Carl    03:20 |
| 10  between BNi, NFPA and CBSC, does it not?      03:17 | 10  Malamud?                          03:20 |
| 11     A.  That's what the top reads, yes.        03:17 | 11     A.  No.                         03:20 |
| 12     Q.  Want to call your attention to page 10 of    03:17 | 12     Q.  Have you spoken to anyone at DGS about this   03:20 |
| 13  the document, to the signature page.           03:17 | 13  lawsuit?                         03:20 |
| 14     A.  Uh-huh.                      03:17 | 14     MR. YEN:  Again, excluding communications    03:20 |
| 15     Q.  And underneath "Department of General       03:17 | 15  with any lawyers.                    03:20 |
| 16  Services Procurement Division for the California | 16     THE WITNESS:  No.                 03:20 |
| 17  Building Standards Commission," there's a signature.   03:17 | 17  BY MR. NERCESSIAN:                     03:20 |
| 18  Can you read the name of the individual signing?    03:18 | 18     Q.  Like to return back to Exhibit 2 a moment,   03:21 |
| 19     A.  It says "Marnell Voss, Manager of the      03:18 | 19  and I'd like to call your attention again to the    03:21 |
| 20  Contracts and Acquisitions."              03:18 | 20  front page of the exhibit.  Aside from those       03:21 |
| 21     Q.  Do you know Marnell Voss?          03:18 | 21  notations on the cover page of the exhibit, do you    03:21 |
| 22     A.  No.                        03:18 | 22  recognize this document?               03:21 |
| 23     Q.  Do you know of Marnell Voss?         03:18 | 23     MS. MILLER-ZIEGLER:  Objection.          03:21 |
| 24     A.  No.                        03:18 | 24  Authenticity.                      03:21 |
| 25     Q.  How do you know that the 2016 NFPA contract  03:18 | 25     MR. FEE:  What are you calling the cover    03:21 |
| Page 151 | Page 153 |

39 (Pages 150 - 153)

1 page?                                          03:21
2       MR. NERCESSIAN:  Aside -- okay.  Strike       03:21
3 that.                                          03:21
4 BY MR. NERCESSIAN:                              03:21
5    Q.  I want to direct your attention to the      03:21
6 page that reads "2016 California Electrical Code,    03:22
7 California Code of Regulations, Title 24, Part 3."   03:22
8 Do you see that?                                03:22
9    A.  I see that.                             03:22
10   Q.  Aside from the notations on this page, do     03:22
11 you recognize this document?                    03:22
12      MR. FEE:  Objection to form.               03:22
13      MS. MILLER-ZIEGLER:  Objection.            03:22
14      MR. FEE:  You're asking him to review every    03:22
15 page of both of these binders and tell you if she    03:22
16 recognizes it?  What's the question?            03:22
17      MR. NERCESSIAN:  That's the question, does     03:22
18 she recognize this document.                    03:22
19      MS. MILLER-ZIEGLER:  Objection.            03:22
20 Authenticity.                                  03:22
21      THE WITNESS:  Yeah.  It appears that it's     03:22
22 the California Electrical Code, but, again, it's a    03:22
23 huge document to take a look at.                03:22
24 BY MR. NERCESSIAN:                              03:22
25   Q.  Any reason why, leaving aside the notations   03:22

Page 154

1 on the cover page, that includes the title -- strike   03:22
2 that.                                          03:23
3       Leaving aside the notations on the title     03:23
4 page, anything apart from the cover that does not    03:23
5 look consistent with the 2016 California Electrical   03:23
6 Code?                                          03:23
7       MR. YEN:  And if you need to look through it   03:23
8 to make sure that you can answer his question,       03:23
9 then --                                        03:23
10      THE WITNESS:  Okay.  And --               03:23
11      MR. YEN:  -- go ahead.                    03:23
12      THE WITNESS:  -- what do you mean by         03:23
13 "consistent"?                                  03:23
14 BY MR. NERCESSIAN:                              03:23
15   Q.  By "consistent," I mean is there anything    03:23
16 that looks out of -- strike that.               03:23
17      Is there anything apart from those notations   03:23
18 on the cover page that cause you to believe this     03:24
19 isn't the California Electrical Code?           03:24
20      MS. MILLER-ZIEGLER:  Objection.  She can't    03:24
21 possibly look through all thousand pages of this     03:24
22 right now.                                     03:24
23      THE WITNESS:  I can't verify that.  It       03:24
24 appears to be an enormous amount of material.       03:24
25 BY MR. NERCESSIAN:                              03:24

Page 155

1    Q.  So is there anything you can point to apart    03:24
2 from the cover that makes you doubt that this is the   03:24
3 California Electrical Code?                     03:24
4       MS. MILLER-ZIEGLER:  Same objection.        03:24
5 BY MR. NERCESSIAN:                              03:24
6    Q.  You can take time to skim it.            03:24
7       MS. MILLER-ZIEGLER:  The document's a        03:24
8 thousand pages.                                03:24
9       THE WITNESS:  I understand that you want me   03:24
10 to say that it's consistent, but I can't tell you     03:24
11 exactly if it's the code.  It's similar in nature,   03:24
12 but I can't say that it is exactly the code.        03:24
13 BY MR. NERCESSIAN:                              03:25
14   Q.  Do you recognize anything that suggests it    03:25
15 isn't?  And you can take five to ten minutes to skim  03:25
16 through and look for something.                 03:25
17   A.  Well, I'm not --                        03:25
18      MS. MILLER-ZIEGLER:  Same objection.        03:25
19      THE WITNESS:  Yeah.  I'm not an expert on     03:25
20 everything that's in the California Electrical Code,  03:25
21 so for me to see something that is inconsistent, I   03:25
22 couldn't -- I'd have to look at every page, and I'm   03:25
23 not an expert on the California Electrical Code.     03:25
24 BY MR. NERCESSIAN:                              03:26
25   Q.  I'm just looking for something, one thing     03:26

Page 156

1 other than those notations that makes you doubt that   03:26
2 this is the 2016 California Electrical Code.  Can you  03:26
3 do that?                                       03:26
4       MS. MILLER-ZIEGLER:  Objection.  You haven't  03:26
5 given her a copy of the California Electrical Code.   03:26
6 I'm not sure how she's supposed to make that        03:26
7 determination right now.                        03:26
8       THE WITNESS:  I don't -- sorry.  Repeat the   03:26
9 question again.                                03:26
10 BY MR. NERCESSIAN:                              03:26
11   Q.  Is there anything, one thing other than the    03:26
12 notations on the cover page that reads "2016          03:27
13 California Electrical Code" that makes you doubt that  03:27
14 this is the 2016 California Electrical Code?         03:27
15      MS. MILLER-ZIEGLER:  Objection.  You're      03:27
16 asking her to authenticate a document, and you       03:27
17 haven't given her an actual copy of that document to  03:27
18 do so.                                         03:27
19      THE WITNESS:  Yeah.  Again, I'm not an        03:27
20 expert on the California Electrical Code, so I       03:27
21 wouldn't know where to look to authenticate or not   03:27
22 authenticate.                                  03:27
23 BY MR. NERCESSIAN:                              03:27
24   Q.  Yeah.  And I'm not asking for you to         03:27
25 authenticate it.  I'm asking whether you see         03:27

Page 157

40 (Pages 154 - 157)

1 anything, aside from those notations, that makes you  03:27
2 doubt its authenticity.                              03:27
3        MS. MILLER-ZIEGLER: I'll renew my             03:28
4 objection.                                           03:28
5        THE WITNESS: Again, I don't know. I'd         03:28
6 have -- I don't know the whole code. It's similar.   03:28
7 BY MR. NERCESSIAN:                                   03:28
8    Q.  So there's nothing that you see aside from    03:28
9 those two notations on the cover page that makes you 03:28
10 doubt the authenticity of this document as the 2016  03:28
11 California Electrical Code?                           03:28
12       MS. MILLER-ZIEGLER: Objection. That           03:28
13 mischaracterizes what she said.                      03:28
14       THE WITNESS: Yeah. That's not what I said.     03:28
15 There's nothing I can find either way, so I don't    03:28
16 have an answer.                                      03:28
17 BY MR. NERCESSIAN:                                   03:28
18    Q.  And do you recognize any part of this         03:28
19 document as including a portion that you recognize to 03:28
20 be the California Electrical Code?                    03:28
21       MS. MILLER-ZIEGLER: Objection.                03:28
22 Authenticity.                                        03:28
23       THE WITNESS: There's one section I             03:28
24 recognize because the Building Standards Commission   03:29
25 proposed regulations, so I do see one section that is 03:29
                                              Page 158

1 in the code.                                 03:29
2 BY MR. NERCESSIAN:                           03:29
3    Q.  And what section is that?             03:29
4    A.  It's Article 625. It's in the second  03:29
5 volume. It's on page 70-567. It's Article 625, and  03:29
6 it's Section 625.1.1, and where you see the "BSC-CG" 03:29
7 banner, the Building Standards Commission proposed   03:29
8 that amendment with HCD.                     03:29
9    Q.  And this provision has, along the side, a 03:29
10 notation that reads vertically "CACACAC." Is that to 03:30
11 indicate that this is a California amendment?        03:30
12    A.  Yes.                                 03:30
13    Q.  Who handles the advertising for the  03:30
14 California Electrical Code?                  03:30
15       MS. MILLER-ZIEGLER: Objection. Lacks  03:30
16 foundation.                                 03:30
17       THE WITNESS: Not the Building Standards 03:30
18 Commission.                                 03:30
19 BY MR. NERCESSIAN:                          03:30
20    Q.  Are you aware what entity does the    03:30
21 advertising for the California Electrical Code? 03:30
22    A.  I don't want to speculate. I don't know. 03:30
23    Q.  Are you aware of whether any other State 03:30
24 agencies advertise the California Electrical Code? 03:31
25    A.  I don't know.                         03:31
                                              Page 159

1    Q.  Are you aware whether any other State   03:31
2 agencies sell the California Electrical Code? 03:31
3    A.  I don't know that either.             03:31
4    Q.  No further questions.                 03:31
5    A.  You're done-done?                     03:31
6    Q.  I'm done-done.                        03:31
7    A.  Okay. Sorry.                         03:31
8       No, I know, I know. I'm not done, he's  03:31
9 done.                                       03:31
10       MR. YEN: You want to go off the record? 03:31
11       VIDEO OPERATOR: We're off the record. It's 03:31
12 3:31.                                       03:31
13       (Recess)                             03:31
14       VIDEO OPERATOR: Okay. We're back on the 03:35
15 record. It's 3:35.                          03:35
16            EXAMINATION                      03:35
17 BY MS. MILLER-ZIEGLER:                      03:35
18    Q.  Ms. Marvelli, my name is Rachel      03:35
19 Miller-Ziegler. I represent National Fire Protection 03:35
20 Association, and we just have few areas that we want 03:35
21 to follow up on or ask additional questions on. 03:35
22       So the first question is have the two of us 03:35
23 ever met before today?                      03:35
24    A.  No.                                 03:35
25    Q.  Have we ever spoken before today?    03:35
                                              Page 160

1    A.  No.                                  03:35
2    Q.  Thanks. As we've talked some today about 03:35
3 the standards that CBSC uses to develop the 03:35
4 California Building Standards Code, I'd like to talk 03:35
5 to you a little bit more about those to start. 03:36
6       Earlier in your testimony, you described 03:36
7 these standards as very detail-oriented. Do you 03:36
8 remember saying that?                       03:36
9    A.  No.                                 03:36
10       MR. NERCESSIAN: Objection.            03:36
11 Mischaracterizes testimony.                 03:36
12 BY MS. MILLER-ZIEGLER:                      03:36
13    Q.  It's at minute 22:15. I think you said 03:36
14 these are reference stats that are very detail 03:36
15 oriented. Would you say that the standards that CBSC 03:36
16 relies on are detailed?                     03:36
17    A.  Yes.                                03:36
18    Q.  They tend to be rather long documents? 03:36
19    A.  The reference standards in the various codes 03:36
20 are detailed, yes.                         03:36
21    Q.  And are you familiar with the process that 03:36
22 goes into developing those standards?       03:36
23    A.  Not completely.                     03:36
24    Q.  Do you have some vague level of familiarity 03:36
25 with that?                                 03:36
                                              Page 161

41 (Pages 158 - 161)

1   A.  Vague level, yes.          03:36
2   Q.  I want to talk -- wet, let's talk generally.   03:36
3  Could you tell me what you know about that process?   03:36
4      MR. NERCESSIAN:  Objection.  Calls for   03:37
5  speculation.               03:37
6      THE WITNESS:  All I know is that it's -- the   03:37
7  amendments, at a national level, to any model code,   03:37
8  are done through a national vetting.  The reference   03:37
9  standards within those, I'm not familiar with that   03:37
10  process.               03:37
11  BY MS. MILLER-ZIEGLER:          03:37
12   Q.  When you say that -- the amendments at a   03:37
13  national level, are you talking about, for example,   03:37
14  amendments to the National Electrical Code?   03:37
15      MR. NERCESSIAN:  Objection.   03:37
16      THE WITNESS:  Yes.        03:37
17  BY MS. MILLER-ZIEGLER:          03:37
18   Q.  Okay.  Let's talk a little bit about the   03:37
19  process to develop something like the electrical   03:37
20  code.  Are you familiar with what that process looks   03:37
21  like?               03:37
22      MR. NERCESSIAN:  Objection.     03:37
23      THE WITNESS:  Less familiar with the   03:37
24  electrical code and more familiar with the   03:37
25  International Code Council's process for the various   03:37

Page 162

1  codes that they develop.          03:37
2  BY MS. MILLER-ZIEGLER:          03:37
3   Q.  Could you tell me what your understanding of   03:37
4  that process is?            03:37
5      MR. NERCESSIAN:  Objection.  Vague, calls   03:37
6  for speculation.           03:38
7      THE WITNESS:  The process for the   03:38
8  International Building Code, for example, is there   03:38
9  are entities out there that propose code changes, and   03:38
10  they go through a code development process, they're   03:38
11  voted on at a national level, and then they're   03:38
12  correlated and published into the next edition of   03:38
13  the -- for example, the International Building Code.   03:38
14  BY MS. MILLER-ZIEGLER:          03:38
15   Q.  Is it your understanding that there's   03:38
16  technical experts involved in that process?   03:38
17   A.  Yes.             03:38
18      MR. NERCESSIAN:  Objection.   03:38
19  BY MS. MILLER-ZIEGLER:          03:38
20   Q.  Is it your understanding that there is some   03:38
21  industry participation in that process?   03:38
22   A.  Yes.           03:38
23      MR. NERCESSIAN:  Objection.   03:38
24  BY MS. MILLER-ZIEGLER:          03:38
25   Q.  Is it your understanding that the public is   03:38

Page 163

1  allowed to participate in that process?     03:38
2   A.  I don't know.          03:38
3   Q.  Okay.  Let's assume for a moment that the   03:38
4  CBSC couldn't rely on something like the National   03:38
5  Electrical Code to develop the California Electrical   03:38
6  Code.  How would the Building Standards Commission go   03:39
7  about developing the CEC if it didn't have the NEC?   03:39
8      MR. NERCESSIAN:  Objection.   03:39
9      THE WITNESS:  I don't know how that would   03:39
10  happen.               03:39
11  BY MS. MILLER-ZIEGLER:          03:39
12   Q.  Would it be an incredibly resource-intensive   03:39
13  process?             03:39
14      MR. NERCESSIAN:  Same objection.   03:39
15      THE WITNESS:  I don't know.  I don't want to   03:39
16  speculate.             03:39
17  BY MS. MILLER-ZIEGLER:          03:39
18   Q.  Would you agree that it would be more   03:39
19  difficult for the CBSC to make the California   03:39
20  Electrical Code if it couldn't incorporate elements   03:39
21  of the National Electrical Code?     03:39
22      MR. NERCESSIAN:  Same objection.   03:39
23      THE WITNESS:  I would agree that it would be   03:39
24  more difficult, yes.         03:39
25  BY MS. MILLER-ZIEGLER:          03:39

Page 164

1   Q.  You said, I think, earlier that your office   03:39
2  has 14 staff; is that correct?      03:39
3   A.  Yes.           03:39
4   Q.  Do you think it would be possible for that   03:39
5  14 staff office to write the California Electrical   03:39
6  Code from scratch?          03:40
7      MR. NERCESSIAN:  Objection.   03:40
8      THE WITNESS:  No, would not be possible.   03:40
9  BY MS. MILLER-ZIEGLER:          03:40
10   Q.  Do you think it would be possible for your   03:40
11  office and the commissioners to write the code from   03:40
12  scratch?             03:40
13      MR. NERCESSIAN:  Same objection.   03:40
14      THE WITNESS:  No.        03:40
15  BY MS. MILLER-ZIEGLER:          03:40
16   Q.  Would it be fair to say that the California   03:40
17  Building Codes Commission relies a great deal on the   03:40
18  National Electrical Code?       03:40
19      MR. NERCESSIAN:  Objection.   03:40
20      THE WITNESS:  We're required by law to adopt   03:40
21  the National Electrical Code, so that's where we rely   03:40
22  on, yeah.             03:40
23  BY MS. MILLER-ZIEGLER:          03:40
24   Q.  Does your office view the codes that you --   03:40
25  excuse me -- the standards that you adopt as   03:40

Page 165

42 (Pages 162 - 165)

```
1 high-quality standards?                    03:41
2      MR. NERCESSIAN: Objection.            03:41
3      THE WITNESS: Well, they're the minimum 03:41
4 building standards for the State of California to 03:41
5 use.                                       03:41
6 BY MS. MILLER-ZIEGLER:                      03:41
7   Q. I think earlier you talked about these 03:41
8 standards, or at least some of these standards are 03:41
9 important for health and safety in the State; is that 03:41
10 correct?                                   03:41
11   A. That is correct.                      03:41
12   Q. Would CBSC rely on codes that -- would CBSC 03:41
13 rely on inferior or poor-quality codes to regulate 03:41
14 health and safety in the State?            03:41
15   A. I'm not sure ow to answer. I don't have an 03:41
16 answer for that question. Sorry. It's vague. 03:41
17   Q. Sure. Earlier, I think you said that one of 03:41
18 the nine-point criteria is that California codes are 03:41
19 supposed to protect public health and safety; is that 03:42
20 right?                                     03:42
21   A. Yes.                                  03:42
22   Q. So something like the CEC, that incorporates 03:42
23 parts of the NEC. In doing so, do you think that 03:42
24 reflects a judgment that the NEC adequately protects 03:42
25 health and safety?                          03:42
```
Page 166

```
1      MR. NERCESSIAN: Objection.            03:42
2      THE WITNESS: That the nine-point criteria 03:42
3 is met, then yes.                           03:42
4 BY MS. MILLER-ZIEGLER:                      03:42
5   Q. So in relying on the NEC as part of the CEC, 03:42
6 the commissioners are making a judgment that those 03:42
7 parts of the NEC that they incorporate are methods of 03:42
8 protecting public health and safety in the State; is 03:42
9 that right?                                 03:42
10      MR. NERCESSIAN: Objection.            03:42
11      THE WITNESS: That's the determination that 03:42
12 the commissions have made if they so choose to adopt 03:42
13 those codes.                               03:42
14 BY MS. MILLER-ZIEGLER:                     03:42
15   Q. I want to talk to you some about your 03:42
16 agreements with NFPA in particular. If you could 03:43
17 turn to Exhibit 7 in the stack.            03:43
18   A. Uh-huh. Okay.                         03:43
19   Q. Do you remember talking about this earlier? 03:43
20   A. Yes.                                  03:43
21   Q. And this was the 2016 agreement for the 2016 03:43
22 CEC; is that right?                        03:43
23   A. Yes.                                  03:43
24   Q. If I could have you turn to the second 03:43
25 page of the exhibit. So in that first paragraph, the 03:43
```
Page 167

```
1 final sentence, it reads "The National Fire 03:43
2 Protection Association, Inc. (NFPA) owns a copyright 03:43
3 to the National Electrical Code and the acronym 03:43
4 (NEC)." Is that what it says?              03:43
5   A. Yes.                                   03:43
6   Q. And then if I could have you look at just a 03:43
7 little farther down, section one, paragraph A. So 03:43
8 that says "NFPA is the sole owner of the copyright to 03:44
9 the NFPA 70 National Electrical Code 2014 Edition." 03:44
10 Is that what that says?                     03:44
11   A. Yes.                                  03:44
12   Q. So earlier today, you got asked some 03:44
13 questions about whether publishers of the code 03:44
14 claimed copyright in the California Electrical Code, 03:44
15 and I just want to clarify for the record that based 03:44
16 on these paragraphs, what NFPA is claiming copyright 03:44
17 in is the National Electrical Code, not the 03:44
18 California Electrical Code; is that right? 03:44
19      MR. NERCESSIAN: Objection.            03:44
20      THE WITNESS: That's what this contract 03:44
21 says, yes.                                 03:44
22 BY MS. MILLER-ZIEGLER:                     03:44
23   Q. Do you see any -- did anything I just read 03:44
24 say anything about NFPA claiming copyright in the 03:44
25 California Electrical Code?                 03:44
```
Page 168

```
1   A. Not in these, no.                      03:44
2   Q. Did anything in what I just read say 03:44
3 anything about the NFPA claiming copyright in the 03:44
4 California amendments?                      03:44
5   A. No.                                    03:44
6   Q. You also spoke some today about the process 03:44
7 that goes into developing the California Electrical 03:45
8 Code. I won't try to summarize the entire thing, but 03:45
9 is it fair to say that at a high level, various State 03:45
10 agencies and the commissioners, among others, are 03:45
11 involved in developing the California Electrical 03:45
12 Code?                                      03:45
13   A. Yes.                                  03:45
14      MR. NERCESSIAN: Objection.            03:45
15 BY MS. MILLER-ZIEGLER:                     03:45
16   Q. State agencies sometimes draft amendments 03:45
17 for the California Electrical Code; is that right? 03:45
18   A. Yes.                                  03:45
19   Q. And the commission is the one that's 03:45
20 ultimately responsible for taking one of those four 03:45
21 actions that you spoke about earlier with respect to 03:45
22 the code; is that right?                    03:45
23   A. Yes.                                  03:45
24   Q. If I could have you look back at Exhibit 7. 03:45
25 Let's see. It looks like the fourth page of 03:45
```
Page 169

43 (Pages 166 - 169)

1 Exhibit A. It begins, paragraph six, "Work Details." 03:45
2 So if you look in the first few lines of paragraph A, 03:45
3 it says "NFPA shall, in accordance with the specific 03:46
4 formatting requirements and editorial and education 03:46
5 timetable set forth herein, print, publish and make 03:46
6 available for sale to the State of California, local 03:46
7 government agencies and to the general public, on or 03:46
8 before July 1st, 2016, or at a later date as set by 03:46
9 CBSC, copies of the 2016 CEC"; is that right? 03:46
10    A.   Yes. 03:46
11    Q.   So would it be correct to say that what I 03:46
12 just read indicates that NFPA is responsible for 03:46
13 printing and publishing the 2016 CEC? 03:46
14       MR. NERCESSIAN:   Objection. 03:46
15       THE WITNESS:   Yes, that's accurate. 03:46
16 BY MS. MILLER-ZIEGLER: 03:46
17    Q.   Does the portion of the sentence I read say 03:46
18 anything about NFPA being responsible for determining 03:46
19 the content of the 2016 CEC? 03:46
20    A.   No, not here no, not what you just read. 03:46
21    Q.   Did what I just read say anything about NFPA 03:46
22 drafting California amendment for the CEC? 03:46
23    A.   No. 03:47
24    Q.   Did what I just read say anything about NFPA 03:47
25 approving or taking any of those four actions that 03:47
Page 170

1 the commission takes with respect to the California 03:47
2 Electrical Code? 03:47
3    A.   No. 03:47
4    Q.   Are you aware of any way in which NFPA is 03:47
5 involved in dictating the content of the California 03:47
6 Electrical Code? 03:47
7       MR. NERCESSIAN:   Objection. 03:47
8       THE WITNESS:   I don't know what you mean by 03:47
9 "dictating the content." 03:47
10 BY MS. MILLER-ZIEGLER: 03:47
11    Q.   Sure. So are you aware of any way in which 03:47
12 NFPA drafts amendments -- excuse me -- drafts 03:47
13 California amendments for the California Electrical 03:47
14 Code? 03:47
15    A.   Not California amendments, no. 03:47
16    Q.   Are you aware of any way in which NFPA 03:47
17 approves the California Electrical Code? 03:47
18    A.   No. 03:47
19       MR. NERCESSIAN:   Objection. 03:47
20 BY MS. MILLER-ZIEGLER: 03:47
21    Q.   I want to talk to you about the other side 03:47
22 of things, California's role in determining the 03:47
23 content of the National Electrical Code. If you keep 03:47
24 looking at this 2016 agreement as an example, if you 03:47
25 could flip back to the first page. When was this 03:47
Page 171

1 agreement signed? When was your signature on this 03:47
2 agreement? 03:48
3    A.   May 16th, 2016. 03:48
4    Q.   And if you look at the second page, that top 03:48
5 paragraph under "Scope of Work," what version of the 03:48
6 NEC does the 2016 CEC incorporate? 03:48
7    A.   The 2014 National Electrical Code. 03:48
8    Q.   Is it your understanding that the 2014 NEC 03:48
9 was already completed in 2016? 03:48
10    A.   Yes. 03:48
11    Q.   In fact, wasn't the 2014 NEC already 03:48
12 copyrighted in 2016? 03:48
13       MR. NERCESSIAN:   Objection. 03:48
14       THE WITNESS:   Yeah. I don't know the answer 03:48
15 to that. 03:48
16 BY MS. MILLER-ZIEGLER: 03:48
17    Q.   Sure. So if you look at that top 03:48
18 paragraph -- sorry. Actually, if you look at 03:48
19 paragraph 1-A where it says "NFPA is the sole owner 03:48
20 of the copyright to the NFPA 70 National Electrical 03:48
21 Code 2014 Edition," that sentence would seem to 03:48
22 suggest that at the time this agreement was signed, 03:49
23 the NFPA held copyright in the 2014 Edition of the 03:49
24 NEC. Does that sound right? 03:49
25       MR. NERCESSIAN:   Objection. 03:49
Page 172

1       THE WITNESS:   That's what this reads, yes. 03:49
2 BY MS. MILLER-ZIEGLER: 03:49
3    Q.   So if the 2014 NEC was already completely 03:49
4 drafted at the time that you signed this agreement, 03:49
5 could this agreement have dictated the content of the 03:49
6 2014 NEC? 03:49
7       MR. NERCESSIAN:   Objection. 03:49
8       THE WITNESS:   I don't believe so. 03:49
9 BY MS. MILLER-ZIEGLER: 03:49
10    Q.   I want to move to talking a little bit about 03:49
11 how people get access to the CEC. Are there ways 03:49
12 that somebody could view the CEC for free? 03:49
13    A.   Yes. 03:49
14    Q.   Could you tell me what those ways include? 03:49
15    A.   Through our website, there's a link to the 03:49
16 publisher, and they could view the code, the CEC for 03:49
17 free there. 03:50
18    Q.   So it doesn't cost any money to view the CEC 03:50
19 online in that method? 03:50
20    A.   In that method, correct. 03:50
21       MR. NERCESSIAN:   Objection. 03:50
22 BY MR. NERCESSIAN: 03:50
23    Q.   Do you know if the NEC is available online? 03:50
24    A.   I don't know. 03:50
25    Q.   You got asked some questions today about 03:50
Page 173

44 (Pages 170 - 173)

1 whether you had ever viewed the CEC online. Do you    03:50
2 remember that?                                          03:50
3   A.  Yes.                                              03:50
4   Q.  You were asked whether you had tried to           03:50
5 print or extract text from the CEC?                     03:50
6   A.  Yes.                                              03:50
7   Q.  And you said you hadn't attempted to do           03:50
8 that; right?                                            03:50
9   A.  Correct.                                          03:50
10   Q.  You were, however, able to view the CEC          03:50
11 online; correct?                                        03:50
12   A.  Yes.                                              03:50
13      MR. NERCESSIAN:  Objection.                        03:50
14 BY MS. MILLER-ZIEGLER:                                  03:50
15   Q.  You were able to read the code online            03:50
16 through free access; is that right?                     03:50
17   A.  Yes.                                              03:50
18      MR. NERCESSIAN:  Objection.                        03:50
19 BY MS. MILLER-ZIEGLER:                                  03:50
20   Q.  So is there another way that somebody could      03:50
21 read the CEC for free?  Are there print copies          03:50
22 available for free anywhere?                            03:50
23   A.  Yes.                                              03:50
24   Q.  Where are those print copies available?          03:50
25   A.  I spoke earlier about local --                    03:50

Page 174

1      MR. NERCESSIAN:  Objection.                         03:50
2 BY MS. MILLER-ZIEGLER:                                   03:51
3   Q.  Go ahead.                                          03:51
4   A.  Okay.  I spoke earlier about local                03:51
5 jurisdictions make available the code and also the       03:51
6 repository libraries and law libraries that were in      03:51
7 the back of the exhibit.  They're made available         03:51
8 there.                                                   03:51
9   Q.  Great.  And so if we could look at -- let's        03:51
10 see.  If you could look at the very last page of        03:51
11 Exhibit 7.  So on that top paragraph, the first full    03:51
12 sentence, it reads "During the term of this             03:51
13 agreement, NFPA shall deliver complimentary copies of   03:51
14 the 2016 CEC and automatically any 2016 CEC             03:51
15 supplements, supplements to the 2016 CEC in response    03:51
16 to emergency regulations, and all related errata        03:51
17 sheets, directly to the deposit libraries listed in     03:52
18 Attachment A hereto in the quantities set forth         03:52
19 therein, and one copy each to the Selective             03:52
20 Depository Libraries listed in Attachment B hereto,
21 and copies to the State agencies as directed by         03:52
22 CBSC."  Do you see that on that page?                    03:52
23   A.  Yes.                                              03:52
24   Q.  So am I correct in saying that based on this      03:52
25 sentence I read, NFPA is required to deliver copies     03:52

Page 175

1 to the deposit libraries in Attachment A, selected      03:52
2 deposit libraries in Attachment B, and copies to        03:52
3 State agencies?                                          03:52
4   A.  Yes.                                              03:52
5   Q.  Okay.  If I could have you take a look at         03:52
6 Attachment A.  It's numbered 263332 in the bottom if    03:52
7 that helps.                                              03:52
8   A.  I'm sorry.  Which one?                             03:52
9   Q.  Exhibit A, Attachment A.                          03:52
10   A.  Attachment -- Exhibit A, Attachment A.           03:52
11 Okay.  Hold on here.  Okay.  Ending in 32?             03:53
12   Q.  Yes.  Exactly.                                    03:53
13   A.  Okay.                                             03:53
14   Q.  So could you tell me what's listed on this       03:53
15 page?                                                   03:53
16   A.  It appears it's a complete depository            03:53
17 library list that we provided NFPA.                     03:53
18   Q.  So under the agreement with NFPA, NFPA is        03:53
19 required to deliver copies of the CEC to each of        03:53
20 these; is that right?                                   03:53
21   A.  That's requirement, yes.                          03:53
22   Q.  And if you could flip two pages forward to       03:53
23 Exhibit A, Attachment B.                                03:53
24   A.  Yes.                                              03:53
25   Q.  Could you tell me what's on this page?           03:53

Page 176

1   A.  Selective Depository Libraries, a list.           03:53
2   Q.  And under the agreement with CBSC, NEC would     03:53
3 be required to deliver copies to each of these          03:53
4 libraries; is that right?                                03:54
5   A.  Yes.                                              03:54
6   Q.  Not going to make you count all the              03:54
7 libraries on this page or in this attachment, but       03:54
8 could you just tell me how many pages the attachment    03:54
9 is?                                                     03:54
10   A.  Are you referring to Attachment B?               03:54
11   Q.  Yes.  Exhibit A, Attachment B.                   03:54
12   A.  Four pages.                                       03:54
13   Q.  Can you flip back to Exhibit A,                  03:54
14 Attachment A?                                            03:54
15   A.  Okay.                                             03:54
16   Q.  So you were asked earlier today whether you     03:54
17 knew where the closest law library was that you could  03:54
18 view a copy of the California Electrical Code.  Do     03:54
19 you remember that?                                      03:54
20   A.  Yes.                                             03:54
21   Q.  So if you can look at the complete              03:54
22 depository list.  What city is the first item in the   03:54
23 list?                                                  03:54
24   A.  Sacramento.                                      03:54
25   Q.  And what city is the second item in the         03:54

Page 177

45 (Pages 174 - 177)

1 list?                              03:54
2    A.  Sacramento.                 03:54
3    Q.  If I can have you turn to Exhibit A,    03:54
4 Attachment B, the first page.  If you look at that   03:54
5 list, third from the bottom, what city is that    03:55
6 library?                            03:55
7    A.  Sacramento.                 03:55
8    Q.  If I can have you turn to the next page.    03:55
9 Second library down, what city is that?    03:55
10    A.  Sacramento.                03:55
11    Q.  If you look near the bottom, the McGeorge    03:55
12 School of Law, what city is that library?    03:55
13    A.  Sacramento.                03:55
14    Q.  If I can have you flip to the next page.    03:55
15 Looks like sixth one down.  Sixth one down, what city   03:55
16 is that library?                    03:55
17    A.  Sacramento.                03:55
18    Q.  And the one underneath that, what city is    03:55
19 that library there?                  03:55
20    A.  Sacramento.                03:55
21    Q.  So there would be at least seven different    03:55
22 places within the Sacramento area that you could view   03:55
23 a copy of the California Electrical Code for free; is   03:55
24 that right?                         03:55
25       MR. NERCESSIAN:  Objection.      03:55

Page 178

1       THE WITNESS:  That's what this document    03:55
2 states, yes.                         03:55
3 BY MS. MILLER-ZIEGLER:                03:55
4    Q.  Would it be fair to say that there's a    03:55
5 number of places that somebody in this area could    03:56
6 view the CEC for free then?             03:56
7    A.  Yes.                        03:56
8       MR. NERCESSIAN:  Objection.      03:56
9 BY MS. MILLER-ZIEGLER:                03:56
10    Q.  Are you aware of anyone who wanted to access   03:56
11 the California Electrical Code who was unable to do    03:56
12 so?                               03:56
13       MR. NERCESSIAN:  Objection.      03:56
14       THE WITNESS:  I'm not aware of that.    03:56
15 BY MS. MILLER-ZIEGLER:                03:56
16    Q.  You said earlier that sometimes CBSC would   03:56
17 get calls about broken links.  Do you recall if any   03:56
18 of those calls were about the California Electrical   03:56
19 Code specifically?                   03:56
20    A.  Yes.                        03:56
21    Q.  And you got asked some questions about    03:56
22 whether CBSC has taken efforts to make the California   03:56
23 Electrical Code available to certain populations    03:56
24 including the print disabled.  Are you aware of any   03:56
25 requests CBSC has received about making its codes    03:56

Page 179

1 available to print disabled individuals?    03:56
2       MR. NERCESSIAN:  Objection.      03:56
3       THE WITNESS:  Not for the electrical code,    03:56
4 I'm not aware of any questions.          03:56
5 BY MS. MILLER-ZIEGLER:                03:56
6    Q.  Are you aware of any requests that CBSC has   03:56
7 received about making the California Electrical Code   03:57
8 available to mobility impaired individuals?    03:57
9    A.  No.                         03:57
10    Q.  Are you aware of any requests CBSC has    03:57
11 received about making the California Electrical Code   03:57
12 available to those who lack sight?       03:57
13    A.  No.                        03:57
14    Q.  Are you aware of any requests CBSC has    03:57
15 received about making California Electrical Code    03:57
16 available to those with accessibility issues?    03:57
17    A.  No.                        03:57
18    Q.  If I could have you take a look at    03:57
19 Exhibit 6.  We talked some earlier today -- you    03:57
20 talked some earlier today about this first email in   03:57
21 this stack.                         03:57
22    A.  Uh-huh.                     03:57
23    Q.  So I'll read that first sentence.  "Just    03:57
24 received a phone call from Suren at (818) 506-6671,    03:57
25 and he tried to review the code, Part 2.5, on the BSC   03:57

Page 180

1 website, and it came up with screen print below the   03:58
2 ICC page and wanting him to pay for the premium    03:58
3 access in order to view the code."  Do you see that   03:58
4 written there?                       03:58
5    A.  I see that written there.        03:58
6    Q.  So that refers to Part 2.5 of the code; is   03:58
7 that right?                         03:58
8    A.  Yes.                        03:58
9    Q.  So that's not the California Electrical    03:58
10 Code; right?                        03:58
11    A.  That's correct.               03:58
12    Q.  And it refers to the ICC; is that right?    03:58
13    A.  That's correct.               03:58
14    Q.  It's not the NFPA; is that correct?    03:58
15    A.  Correct.                     03:58
16    Q.  So this email is not about any issues with    03:58
17 the California Electrical Code; is that correct?    03:58
18    A.  That is correct.              03:58
19    Q.  Sorry to make you go through all these    03:58
20 exhibits, but if you can turn to Exhibit 3.  So if    03:58
21 you could turn to page three of this exhibit.  This    03:58
22 has some language from the CBSC website; is that    03:59
23 right?                              03:59
24    A.  Yes.                        03:59
25    Q.  You talked some about that final paragraph    03:59

Page 181

46 (Pages 178 - 181)

1 on page three that begins "All occupancies." Do you   03:59
2 remember talking about that?                03:59
3    A.  Yes.                      03:59
4    Q.  The first part of that sentence reads "All   03:59
5 occupancies in California are subject to national   03:59
6 model codes adopted into Title 24."  Do you see that?  03:59
7    A.  Yes.                      03:59
8    Q.  And you were asked whether this meant that   03:59
9 this applied to all office buildings and schools and   03:59
10 hospitals.  Do you remember being asked those   03:59
11 questions?                     03:59
12    A.  Yes.                     03:59
13    Q.  So you weren't asked about the second part   03:59
14 of that sentence, though, which I'll read now:  Says   03:59
15 "and occupancies are further subject to amendments   03:59
16 adopted by State agencies and ordinances implemented   03:59
17 by local jurisdictions' governing bodies."  Do you   03:59
18 see that on the page?               03:59
19    A.  Yes.                     03:59
20    Q.  So this means that something like a hospital   03:59
21 in California would be subject to whatever local   03:59
22 amendments State agencies or other local   04:00
23 jurisdictions made; is that right?         04:00
24       MR. NERCESSIAN:  Objection.         04:00
25       THE WITNESS:  I'm sorry.  Could you repeat  04:00

Page 182

1 the question?  Sorry.                04:00
2 BY MS. MILLER-ZIEGLER:               04:00
3    Q.  Sure.  So the second part of the sentence   04:00
4 indicates that, for example, a hospital in the State   04:00
5 would be subject to -- could be subject to amendments  04:00
6 adopted by State agencies and ordinances implemented  04:00
7 by local jurisdictions; is that right?       04:00
8    A.  Hospitals.                  04:00
9       MR. NERCESSIAN:  Objection.         04:00
10       THE WITNESS:  Hospitals would be subject to  04:00
11 State agency amendments.  I can't speak to whether   04:00
12 they would be subject to local jurisdiction governing  04:00
13 bodies because OSHPD determines the building   04:00
14 standards for hospitals.              04:00
15 BY MS. MILLER-ZIEGLER:               04:00
16    Q.  Okay.  And so those State agencies that   04:00
17 might make amendments, they could make an amendment   04:00
18 that added language, added a requirement; is that   04:00
19 correct?                      04:00
20       MR. NERCESSIAN:  Objection.         04:01
21       THE WITNESS:  They can make amendments to   04:01
22 the model codes that add a requirement or take away a  04:01
23 requirement from the model code, yes.        04:01
24 BY MS. MILLER-ZIEGLER:               04:01
25    Q.  So when -- if I -- so a hospital in the   04:01

Page 183

1 State, it wouldn't be fully accurate to say that it's  04:01
2 just governed by the national model codes; is that   04:01
3 right?                       04:01
4    A.  That's correct.               04:01
5       MR. NERCESSIAN:  Objection.         04:01
6       THE WITNESS:  It's the California Electrical  04:01
7 Code.                       04:01
8 BY MS. MILLER-ZIEGLER:               04:01
9    Q.  The California Electrical Code and any other  04:01
10 local jurisdiction's amendments; right?       04:01
11    A.  Well, if we're speaking specifically about   04:01
12 hospitals, I'm not the expert on that, so that would  04:01
13 be OSHPD.                     04:01
14    Q.  Let's say buildings generally within the   04:01
15 State might be regulated by local jurisdiction's   04:01
16 amendments that they would make?          04:01
17    A.  Local jurisdictions can amend the code on   04:01
18 top of what California publishes as well.      04:01
19    Q.  And that would really determine what rules a  04:01
20 building in California would have to follow; does   04:02
21 that sound right?                 04:02
22       MR. NERCESSIAN:  Objection.         04:02
23       THE WITNESS:  That's a little vague.  Sorry.  04:02
24 BY MS. MILLER-ZIEGLER:               04:02
25    Q.  No problem.  That set of           04:02

Page 184

1 jurisdiction-specific rules would determine what   04:02
2 governed a building in California; is that correct?   04:02
3    A.  Not -- no.                  04:02
4    Q.  So let's -- any given building within the   04:02
5 State, what would it have to look to to determine how  04:02
6 to comply with governing regulations?        04:02
7       MR. NERCESSIAN:  Objection.         04:02
8       THE WITNESS:  That's kind of a broad      04:02
9 question.                     04:02
10 BY MS. MILLER-ZIEGLER:               04:02
11    Q.  Sure.  I'll rephrase.            04:02
12    A.  Okay.                     04:02
13    Q.  A building in the State would have to look   04:02
14 to both the California Electrical Code and any local  04:02
15 jurisdiction's rules to determine whether it was   04:02
16 complying with the law; is that right?       04:03
17    A.  Potentially.                 04:03
18       MR. NERCESSIAN:  Same objection.      04:03
19       THE WITNESS:  Potentially, yes.       04:03
20 BY MS. MILLER-ZIEGLER:               04:03
21    Q.  No further questions from us.        04:03
22       MR. FEE:  I don't have any questions.    04:03
23       MR. NERCESSIAN:  I have a few.       04:03
24       MR. YEN:  Do we want to go off the record  04:03
25 or --                       04:03

Page 185

47 (Pages 182 - 185)

1    MR. NERCESSIAN: Yeah, we should go off the    04:03
2 record while we're switching.    04:03
3    VIDEO OPERATOR: Okay. We're off the record    04:03
4 at 4:03.    04:03
5    (Recess)    04:03
6    VIDEO OPERATOR: Okay. We're back on the    04:04
7 record. It's 4:05.    04:05
8    EXAMINATION    04:05
9 BY MR. NERCESSIAN:    04:05
10    Q. All right. I have just a few more questions    04:05
11 regarding this contract, so that's Exhibit 7, and if    04:05
12 you could flip to the last page of that exhibit.    04:05
13 During the past round of examination, you looked at    04:05
14 language that said that the NFPA shall deliver copies    04:05
15 to the State agencies as directed by CBSC. Do you    04:05
16 see that language?    04:05
17    A. Is that item one or item two or in the first    04:06
18 paragraph?    04:06
19    Q. It's in the first paragraph.    04:06
20    A. Okay.    04:06
21    Q. It lists that there's the deposit libraries    04:06
22 in Attachment A --    04:06
23    A. Sorry.    04:06
24    Q. -- and Attachment B and copies to the State    04:06
25 agencies as directed by CBSC. Do you see that    04:06

Page 186

1 language?    04:06
2    A. Copies to the State agencies. I know it's    04:06
3 here, but I'm looking. During the term of the    04:06
4 agreement, deliver complimentary copies of the 2016    04:06
5 and -- what line is it in the first paragraph? I'm    04:06
6 sorry.    04:06
7    Q. It is -- starts six lines down.    04:06
8    A. One, two, three, four, five, six. "Selected    04:06
9 depositories and copies to the State agencies as    04:06
10 directed." Yes, I see that. I'm sorry.    04:06
11    Q. No. No worries. Are you aware of any State    04:06
12 agencies that CBSC has directed NFPA to deliver    04:06
13 complimentary copies of the 2016 California    04:07
14 Electrical Code to?    04:07
15    A. I don't recall which State agencies.    04:07
16    Q. Do you recall whether there were any State    04:07
17 agencies that CBSC directed NFPA to deliver    04:07
18 complimentary copies of the 2016 California    04:07
19 Electrical Code to?    04:07
20    A. Yes. Yes. And I would have thought that    04:07
21 would have been one of the attachments in here that    04:07
22 listed the State agencies, but maybe that comes    04:07
23 later.    04:07
24    Q. Do you recall how many State agencies CBSC    04:07
25 directed NFPA to deliver complimentary copies to?    04:07

Page 187

1    A. I don't recall how many State agencies, no.    04:07
2    Q. Was it more than one?    04:07
3    A. Yes, it was more than one.    04:08
4    Q. More than three?    04:08
5    A. Yes.    04:08
6    Q. More than six?    04:08
7    A. Yes.    04:08
8    Q. More than ten?    04:08
9    A. I would say less than twenty, more than one.    04:08
10    Q. On the last round of examination, you    04:08
11 referred to -- again to local jurisdictions that make    04:08
12 available copies of the California Electrical Code    04:08
13 for free. To be clear, are you aware of any local    04:08
14 jurisdictions that do so?    04:08
15    A. I've not utilized that service, so I    04:08
16 couldn't tell you which jurisdictions make it    04:08
17 available.    04:08
18    Q. So that's a no, you're not aware of any    04:08
19 local jurisdictions that furnish freely available    04:08
20 copies of the California Electrical Code?    04:09
21    MS. MILLER-ZIEGLER: Objection.    04:09
22 Mischaracterizes her testimony.    04:09
23    THE WITNESS: I don't know of a    04:09
24 jurisdiction.    04:09
25 BY MR. NERCESSIAN:    04:09

Page 188

1    Q. Do you have any understanding whether a    04:09
2 California citizen is free to make a copy of the    04:09
3 California Electrical Code without seeking permission    04:09
4 from the NFPA or paying a fee?    04:09
5    MR. FEE: Objection.    04:09
6    MS. MILLER-ZIEGLER: Objection. Calls for a    04:09
7 legal conclusion.    04:09
8    THE WITNESS: I don't know that. I don't    04:09
9 have an answer for you.    04:09
10 BY MR. NERCESSIAN:    04:09
11    Q. Do you have any understanding?    04:09
12    MS. MILLER-ZIEGLER: Objection.    04:09
13    MR. FEE: Objection.    04:09
14    MS. MILLER-ZIEGLER: Calls for a legal    04:09
15 conclusion.    04:09
16    THE WITNESS: No.    04:09
17 BY MR. NERCESSIAN:    04:09
18    Q. Are you aware of any request made to the    04:09
19 CBSC to make another part of the California Building    04:09
20 Standards Code, not the California Electrical Code,    04:10
21 available to the print disabled?    04:10
22    A. I know of one other occurrence.    04:10
23    Q. What happened there?    04:10
24    A. We referred that person to the model code    04:10
25 developer, and they helped the person requesting.    04:10

Page 189

48 (Pages 186 - 189)

1  Q.  And who was the model code developer in that  04:10
2  instance?                           04:10
3  A.  The International Code Council.        04:10
4  Q.  And how did they help the person requesting  04:10
5  access?                              04:10
6  A.  I don't know.                    04:10
7  Q.  Do you know whether the International Code  04:10
8  Council required payment from the person requesting  04:10
9  print disabled access?                04:10
10  A.  I do not know that.               04:10
11  Q.  Are you aware of any request made to the  04:10
12  CBSC to make another part of the California Building  04:10
13  Standards Code, again, not the California Electrical  04:10
14  Code, available to the mobility impaired?  04:10
15  A.  I'm not aware of that, no.        04:11
16  Q.  Are you aware of a request -- strike that.  04:11
17     Are you aware of a similar request made to  04:11
18  the CBSC by any person requesting access who lacked  04:11
19  sight?                               04:11
20  A.  No, I'm not aware of that.        04:11
21  Q.  Are you aware of a similar request made to  04:11
22  the CBSC by any person requesting access for any  04:11
23  other accessibility related issue?    04:11
24  A.  No, I'm not aware of that.        04:11
25  Q.  During the last round of examination, do you  04:11

Page 190

1  Q.  So the NFPA publishes the California  04:13
2  Electrical Code only in an edition that contains the  04:13
3  National Electrical Code with additions and  04:13
4  strikeouts showing the California amendments; is that  04:13
5  correct?                             04:13
6     MS. MILLER-ZIEGLER:  Objection.  Calls for  04:13
7  speculation.                         04:13
8     THE WITNESS:  That's all I'm aware of.  04:13
9  BY MR. NERCESSIAN:                    04:13
10  Q.  The NFPA does not publish the text that  04:13
11  consists purely of the California Electrical Code; is  04:13
12  that right?                          04:13
13     MS. MILLER-ZIEGLER:  Objection.  Form.  04:13
14     THE WITNESS:  I don't know whether they do  04:13
15  or they don't.                       04:13
16  BY MR. NERCESSIAN:                    04:13
17  Q.  Would you know if they did publish the  04:13
18  California supplement as a standalone?  04:13
19     MR. FEE:  Objection.  Calls for speculation.  04:13
20     THE WITNESS:  I don't know that.  I would  04:13
21  not know that.                       04:13
22  BY MR. NERCESSIAN:                    04:13
23  Q.  Are you aware of any way someone can read  04:13
24  the entire California Electrical Code without the  04:14
25  strikeouts from the National Electrical Code that  04:14

Page 192

1  recall the distinctions raised between the National  04:11
2  Electrical Code and the California Electrical Code?  04:12
3  A.  Yes, I remember the conversation, yes.  04:12
4  Q.  The NFPA, however, publishes the California  04:12
5  Electrical Code only in an edition that contains the  04:12
6  National Electrical Code with additions and  04:12
7  strikeouts showing the California amendments; is that  04:12
8  correct?                             04:12
9     MS. MILLER-ZIEGLER:  Objection to form.  04:12
10     THE WITNESS:  That's not entirely a correct  04:12
11  statement.                           04:12
12  BY MR. NERCESSIAN:                    04:12
13  Q.  To what extent is it correct?     04:12
14     MS. MILLER-ZIEGLER:  Objection.     04:12
15     THE WITNESS:  The publisher publishes the  04:12
16  California Electrical Code with -- you stated that  04:12
17  with California amendments and strikeout, and that's  04:12
18  not accurate.                        04:12
19  BY MR. NERCESSIAN:                    04:12
20  Q.  Not "in strikeout."  "And strikeouts."  04:12
21  A.  And strikeout, yes.              04:12
22  Q.  So I can rephrase.               04:12
23  A.  Okay.                           04:12
24  Q.  I can restate the question.       04:12
25  A.  Okay.                           04:13

Page 191

1  aren't in the California code?         04:14
2     MS. MILLER-ZIEGLER:  Objection.   04:14
3     THE WITNESS:  I don't know.  I'm not aware  04:14
4  BY MR. NERCESSIAN:                    04:14
5  Q.  So you don't know of any way you can just  04:14
6  see a clean copy of the California Electrical Code  04:14
7  without red lines?                   04:14
8  A.  I'm not aware of that.           04:14
9  Q.  Have you had any discussions with any  04:14
10  representatives of NFPA?              04:14
11  A.  It's a broad question.           04:14
12  Q.  You can still answer it.          04:14
13  A.  Okay.                           04:14
14  Q.  I'm asking for a broad answer.    04:14
15  A.  Yes.                            04:14
16  Q.  And what types of discussions have you had  04:14
17  with the representatives of the NFPA?  04:14
18  A.  One is about the periodical they mail out  04:15
19  monthly that is their NFPA magazine, and it has  04:15
20  articles in there that contain a variety of  04:15
21  information about the NFPA standards, and I've spoken  04:15
22  to the representative about specific articles that  04:15
23  are in there.                        04:15
24  Q.  What other conversations have you had with  04:15
25  NFPA?                                04:15

Page 193

49 (Pages 190 - 193)

1  A.  Just about the contract negotiations.  04:15
2  Q.  And what was the substance of those  04:15
3  conversations?  04:15
4  A.  Just the wording of the contract.  04:15
5  Q.  Did you propose any edits to the NFPA that  04:15
6  they accepted to the contract?  04:15
7  A.  Yes.  04:15
8  MS. MILLER-ZIEGLER: Objection. Asked and  04:15
9  answered.  04:15
10  THE WITNESS: But I don't know what they are  04:15
11  specifically.  04:15
12  BY MR. NERCESSIAN:  04:15
13  Q.  Do you recall the subject matter areas you  04:15
14  proposed that as to the NFPA on?  04:15
15  MS. MILLER-ZIEGLER: Objection. Asked and  04:16
16  answered.  04:16
17  THE WITNESS: No, I don't recall.  04:16
18  BY MR. NERCESSIAN:  04:16
19  Q.  Do you recall any other discussions with  04:16
20  representatives of the NFPA?  04:16
21  A.  No.  04:16
22  Q.  So other than discussions about the  04:16
23  newsletter and conversations consisting of contract  04:16
24  negotiations, you don't recall any other  04:16
25  conversations with the NFPA?  04:16
Page 194

1  A.  Training. I have had conversations with  04:16
2  them about training that they make available  04:16
3  throughout the State.  04:16
4  Q.  And what sort of training?  04:16
5  A.  They make available training for the  04:16
6  California Electrical Code and also the NEC  04:16
7  throughout California.  04:16
8  Q.  All right. What kind of trainings does the  04:16
9  NFPA hold with respect to the California Electrical  04:17
10  Code?  04:17
11  MR. FEE: Objection. This is beyond the  04:17
12  scope of cross.  04:17
13  THE WITNESS: Yeah. Just they offer  04:17
14  training, and they put a notice out there in local  04:17
15  jurisdictions, and people interested in the code  04:17
16  changes can attend that training, and they let our  04:17
17  office know about it.  04:17
18  BY MR. NERCESSIAN:  04:17
19  Q.  Does CBSC provide any advice to the NFPA  04:17
20  with respect to the trainings regarding the  04:17
21  California Electrical Code?  04:17
22  A.  No.  04:17
23  MR. FEE: Objection. Beyond the scope of  04:17
24  the cross.  04:17
25  BY MR. NERCESSIAN:  04:17
Page 195

1  Q.  How do the -- are the trainings with respect  04:17
2  to the National Electrical Code -- strike that.  04:18
3  What kind of information does the NFPA  04:18
4  provide to the CBSC with respect to training  04:18
5  concerning the National Electrical Code?  04:18
6  MR. FEE: Objection. Beyond the scope of  04:18
7  the cross.  04:18
8  THE WITNESS: We're invited to the training.  04:18
9  BY MR. NERCESSIAN:  04:18
10  Q.  Have you ever attended one of those  04:18
11  trainings?  04:18
12  MR. FEE: Same objection.  04:18
13  THE WITNESS: Years ago, I attended  04:18
14  training.  04:18
15  BY MR. NERCESSIAN:  04:18
16  Q.  And for what purpose?  04:18
17  MR. FEE: Same objection.  04:18
18  THE WITNESS: Just to learn about the  04:18
19  National Electrical Code.  04:18
20  BY MR. NERCESSIAN:  04:19
21  Q.  We discussed earlier about your knowledge or  04:19
22  awareness of the code development process among the  04:19
23  standards development organizations. Do you recall  04:19
24  that?  04:19
25  A.  Yes.  04:19
Page 196

1  MS. MILLER-ZIEGLER: Outside the scope of  04:19
2  cross. Objection.  04:19
3  BY MR. NERCESSIAN:  04:19
4  Q.  Are you aware that governments authorize  04:19
5  employees to participate in writing model codes?  04:19
6  MS. MILLER-ZIEGLER: Objection. That's  04:19
7  outside the scope of the cross.  04:19
8  THE WITNESS: I'm not aware of that.  04:19
9  BY MR. NERCESSIAN:  04:19
10  Q.  Are you aware that government pays expenses  04:19
11  of those employees who participate in writing model  04:19
12  codes?  04:19
13  MS. MILLER-ZIEGLER: Objection. It's  04:19
14  outside the scope of the cross.  04:19
15  MR. FEE: Also calls for speculation.  04:19
16  THE WITNESS: I don't know. I'm not sure.  04:19
17  BY MR. NERCESSIAN:  04:19
18  Q.  No further questions.  04:19
19  A.  Okay.  04:20
20  MS. MILLER-ZIEGLER: We just have a few more  04:20
21  questions. We can probably just ask them from here.  04:20
22  MR. NERCESSIAN: Okay.  04:20
23  EXAMINATION  04:20
24  BY MS. MILLER-ZIEGLER:  04:20
25  Q.  Just a couple more questions.  04:20
Page 197

50 (Pages 194 - 197)

1     Does the California Building Standards      04:20
2 Commission offer any education and outreach?      04:20
3     A.  Yes, we do.      04:20
4     Q.  Do you offer trainings related to the      04:20
5 Building Standards Code?      04:20
6     A.  We offer trainings more specifically to the      04:20
7 process and then also for the California Green      04:20
8 Building Standards Code because we have authority to      04:20
9 amend that for nonresidential occupancies.      04:20
10     Q.  You were asked about whether the NFPA holds      04:20
11 trainings related to the California Electrical Code.      04:20
12 Is there any reason -- are you aware of any other      04:20
13 organizations that hold trainings related to the      04:20
14 California Electrical Code?      04:20
15     MR. NERCESSIAN:  Objection.      04:20
16     THE WITNESS:  I don't know.      04:21
17 BY MS. MILLER-ZIEGLER:      04:21
18     Q.  Can you think of any reason another      04:21
19 organization couldn't hold its own training about the      04:21
20 California Electrical Code?      04:21
21     MR. NERCESSIAN:  Objection.      04:21
22     THE WITNESS:  I'm not aware, no.      04:21
23 BY MS. MILLER-ZIEGLER:      04:21
24     Q.  That's all we have.  Thank you.      04:21
25     A.  Okay.      04:21

Page 198

1     MR. FEE:  I have no questions.      04:21
2     MR. NERCESSIAN:  I have one followup      04:21
3 question within the scope of that.      04:21
4         EXAMINATION      04:21
5 BY MR. NERCESSIAN:      04:21
6     Q.  What course materials, if any, does CBSC use  04:21
7 or provide in its trainings regarding the California  04:21
8 Electrical Code?      04:21
9     A.  Well, we don't do training for the      04:21
10 California Electrical Code.  It's just for the      04:21
11 process, the California Building Standards Code      04:21
12 process.      04:21
13     Q.  So there are no course materials that CBSC      04:21
14 provides with respect to the California Electrical      04:21
15 Code?      04:21
16     A.  No.      04:21
17     Q.  Thank you.      04:21
18     A.  Uh-huh.      04:21
19     MR. FEE:  Done; right?      04:21
20     MS. MILLER-ZIEGLER:  Yes.      04:21
21     MR. FEE:  I have no other questions.      04:21
22     VIDEO OPERATOR:  Off the record then.      04:22
23     THE REPORTER:  What counsel want copies?      04:22
24     MR. FEE:  Yes.      04:22
25     MS. MILLER-ZIEGLER:  Yes.      04:22

Page 199

1     MR. YEN:  No.      04:22
2     THE REPORTER:  And do you want roughs?      04:22
3     MR. FEE:  I don't need one.      04:22
4     MR. YEN:  Actually, can you give me one      04:22
5 minute?      04:22
6     MS. EHLER:  When would your rough be      04:22
7 available?      04:22
8     THE REPORTER:  Tonight.      04:22
9     MS. EHLER:  We'll take a rough.      04:22
10     MR. NERCESSIAN:  We'll take a rough.      04:22
11     MR. YEN:  We don't need it.      04:22
12     VIDEO OPERATOR:  We're off the record.  It's  04:22
13 4:22.      04:22
14 (Discussion off the record)      04:22
15     MR. YEN:  We're fine.      04:23
16
17
18
19
20
21
22
23
24
25

Page 200

1
2
3
4
5
6
7
8
9
10     I, MIA D. MARVELLI, do hereby declare under
11 penalty of perjury that I have read the foregoing
12 transcript; that I have made any corrections as
13 appear noted, in ink, initialed by me, or attached
14 hereto; that my testimony as contained herein, as
15 corrected, is true and correct.
16     EXECUTED this _____ day of _____,
17 20_____, at _____ _____,_____.
18         (City)        (State)
19
20
21     _____
22     MIA D. MARVELLI
23
24
25

Page 201

1      I, the undersigned, a Certified Shorthand
2 Reporter of the State of California, do hereby
3 certify:
4      That the foregoing proceedings were taken
5 before me at the time and place herein set forth;
6 that any witnesses in the foregoing proceedings,
7 prior to testifying, were duly sworn; that a record
8 of the proceedings was made by me using machine
9 shorthand which was thereafter transcribed under my
10 direction; that the foregoing transcript is a true
11 record of the testimony given.
12      Further, that if the foregoing pertains to
13 the original transcript of a deposition in a Federal
14 Case, before completion of the proceedings, review of
15 the transcript [ ] was [ ] was not requested.
16      I further certify I am neither financially
17 interested in the action nor a relative or employee
18 of any attorney or party to this action.
19      IN WITNESS WHEREOF, I have this date
20 subscribed my name.
21      Dated: August 24, 2019
22
23
24      *Carrie Pederson*
25      CARRIE PEDERSON, CSR No. 4373

Page 202

52 (Page 202)

[& - 3]

| & |
| --- |
| **&**   3:4,13 4:5,14<br>7:5 9:2,5,14,17 |

| 0 |
| --- |
| **01215**   1:7 2:7 |

| 1 |
| --- |
| **1**   1:25 7:4,15 24:9<br>24:10,13 36:20<br>47:5,12,19 48:15<br>49:1 64:5 83:1<br>103:1 123:10<br>134:21,21,24<br>140:14 172:19 |
| **1-1**   139:24 |
| **1-1-17**   140:1 |
| **10**   7:11,19 49:10<br>83:10 103:9<br>145:11 150:20,23<br>151:12 |
| **1034**   62:18 64:4<br>74:6 |
| **107**   7:13 |
| **11**   49:11 62:18<br>83:11 103:10 |
| **110**   65:19 66:6,12 |
| **1111**   4:8 |
| **11344**   89:6 |
| **1155**   3:7 |
| **12**   35:4 49:12<br>83:12 103:11 |
| **12-16-2016**   85:18 |
| **12th**   4:19 |
| **13**   49:13 83:13<br>103:12 |
| **1300**   5:10 |
| **132**   7:15 |
| **14**   13:22 49:14<br>83:14 103:13<br>165:2,5 |

**141**   7:17
**15**   49:15 83:15<br>103:14 145:11
**150**   7:19
**16**   49:16 83:16<br>103:15
**160**   6:8
**16th**   172:3
**17**   49:17 83:17<br>103:16 139:25
**18**   49:18 83:18<br>103:18
**180**   131:10,11
**186**   6:9
**18930**   29:19
**19**   1:19 2:23 7:4<br>8:1 37:20 49:19<br>58:3 60:6 77:8<br>83:19 103:19
**197**   6:10
**199**   6:11
**19th**   8:13
**1:13**   1:7 2:7
**1st**   23:6 35:25 36:2<br>131:4,18 132:4<br>133:7,10 135:21<br>139:16,19 170:8

| 2 |
| --- |
| **2**   7:6 33:3 34:15<br>49:1 83:1 103:1<br>113:11 153:18 |
| **2.5**   93:17,18,20<br>180:25 181:6 |
| **20**   49:20 83:20<br>103:20 201:17 |
| **200**   135:19,23 |
| **2000**   146:12 |
| **20004-1361**   3:9 |
| **20004-2541**   4:9 |
| **2011**   79:2 |

**2012**   20:15
**2013**   37:21 78:11<br>78:16,25 79:7,12<br>79:18
**2014**   44:4 110:4,5<br>168:9 172:7,8,11<br>172:21,23 173:3,6
**2015**   139:1
**2016**   7:11,15 20:7<br>22:22,25 36:5,10<br>37:2,14,18 44:1<br>53:5,7,10,17,21,25<br>54:3,10,13,21,25<br>55:6,13,19 56:2,9<br>71:19,22,25 73:16<br>77:9,11,25 78:6<br>84:4,7,19 86:3<br>87:22 94:17 99:8<br>99:14 100:11,22<br>110:7 112:12,19<br>131:4,17,18 132:3<br>132:4 133:2,7,10<br>135:11,21 138:22<br>139:10,16 140:2<br>150:15 151:4,25<br>154:6 155:5 157:2<br>157:12,14 158:10<br>167:21,21 170:8,9<br>170:13,19 171:24<br>172:3,6,9,12<br>175:14,14,15<br>187:4,13,18
**2017**   43:22 44:21<br>139:19
**2018**   144:3
**2019**   1:19 2:23 7:4<br>7:8 8:1,13 23:4<br>35:23 36:4,11,14<br>43:14,16 44:15<br>53:6 59:2,6,17<br>60:9,15,22 76:18

**77:4** 142:23 143:9<br>143:17,24 144:6<br>202:21
**202**   1:25
**202-220-1115**   3:10
**202-739-5353**   4:10
**2020**   23:6 36:2
**21**   49:21 83:21<br>103:21
**213-683-9240**   3:19
**22**   49:22 83:22<br>103:22
**22:15**   161:13
**23**   49:23 83:23<br>103:23
**24**   7:4 14:6,7,7,10<br>14:10 19:19 35:4<br>35:6,23 36:15<br>37:15,18 41:19,22<br>41:25 42:11,18<br>43:5 47:6,12,20<br>48:15 49:24 83:24<br>89:11,13,20,22<br>90:4 93:18 103:24<br>115:12 134:15<br>154:7 182:6<br>202:21
**240**   2:21
**24th**   14:12 89:15
**25**   49:25 82:24<br>83:25 103:25
**263332**   176:6
**27th**   99:11
**28**   14:12,14
**28th**   84:7

| 3 |
| --- |
| **3**   7:7 34:18,21<br>36:23 43:4 49:2<br>83:2 103:2 154:7<br>181:20 |

**[32 - adopt]**

**32**   176:11
**33**   7:6
**34**   7:7
**3465980**   1:24
**350**   3:16
**3:08**   145:18

**4**

**4**   7:8 49:4 57:22
   57:25 82:3 83:4
   103:3 109:13,14
**4373**   1:23 2:24
   202:25
**45**   45:19
**49**   64:3

**5**

**5**   7:9 49:5 83:5,6
   98:25 103:4 113:2
   113:11
**506-6671**   180:24
**50th**   3:17
**555**   4:18
**57**   7:8

**6**

**6**   7:11 49:6 83:6
   85:10,13 87:15,16
   103:5 115:7
   116:23 180:19
**625**   159:4,5
**625.1.1**   159:6
**650-335-7281**   4:21
**6995**   202:24

**7**

**7**   7:13 49:7 74:6,8
   74:9 83:7 103:6
   107:10,11,13
   131:1 134:20
   145:21 167:17
   169:24 175:11
   186:11

**70**   43:7,8,10 44:6
   168:9 172:20
**70-567**   159:5
**7th**   3:8 99:11

**8**

**8**   6:7 7:15 49:8
   83:8 103:7 132:10
   132:11,14
**8-1-2016**   132:24
**818**   180:24
**83**   7:9
**85**   7:11

**9**

**9**   7:17 49:9 83:9
   103:8 141:20,21
   141:24
**90071-3426**   3:18
**916-210-7836**   5:12
**94104**   4:20
**95814**   5:11
**9th**   99:8

**a**

**a.m.**   2:22 8:2,13
**abbreviation**   89:7
**ability**   91:21
**able**   12:20 32:25
   102:8 124:1
   174:10,15
**accepted**   64:15
   194:6
**access**   54:25 55:12
   55:19 56:2,8 64:1
   67:7,9,15,17 68:2
   68:5 69:21 70:12
   70:17,18 72:11
   73:9 89:24 91:21
   92:6,10 93:14
   94:8,22,23 95:5,6
   95:11,15 96:10,14
   120:8,11,25 121:4

123:2,3 131:25
   132:2 133:13,16
   133:24,25 141:11
   173:11 174:16
   179:10 181:3
   190:5,9,18,22
**accessed**   59:2,17
   72:25
**accessibility**
   124:15 138:5,13
   180:16 190:23
**accessible**   37:6
   55:6 134:7
**accessing**   58:24
   91:1,12 92:19
   120:3
**accomplish**   30:17
**accuracy**   104:21
**accurate**   12:21
   41:15 94:14 99:17
   104:25 117:5
   170:15 184:1
   191:18
**acknowledgments**
   74:7
**acquisitions**
   151:20
**acronym**   66:11,21
   168:3
**act**   14:3 18:22
   45:5
**action**   7:10 8:22
   14:22,23 15:8
   18:1 22:10,12
   29:1,14 46:3,13
   84:21 104:14
   130:16 202:17,18
**actions**   15:1,7
   26:18 28:23 29:4
   29:11 48:4 98:5
   128:17,21 129:10

129:16,25 130:4,7
   130:11,20 169:21
   170:25
**activities**   47:25
**activity**   139:18
**actual**   157:17
**adapted**   41:8
**add**   183:22
**added**   183:18,18
**addition**   147:12
**additional**   45:16
   45:22 120:8,25
   160:21
**additions**   191:6
   192:3
**address**   12:7 41:8
   124:9
**addressed**   84:17
**addresses**   124:7
   124:13
**adequately**   166:24
**administer**   13:24
   14:4 16:21
**administered**   8:5
   35:16
**administering**
   14:16 19:19 21:11
   21:19
**administers**   13:21
**administrative**
   14:3 18:21 36:21
   45:5,21 47:5,13,20
   47:24 48:7,17
   89:7,18,21,23
**adopt**   28:13,14
   40:16 41:22 44:19
   64:10 67:5 68:10
   68:13,17 103:24
   111:17,17 115:11
   116:10,17 165:20
   165:25 167:12

[adopted - appeals]

**adopted** 40:23
41:5,7,19,22,25
42:10,18 50:2
64:15 65:5,12
67:8,10,17 69:19
106:12 115:15
116:6 134:18
182:6,16 183:6
**adopting** 152:8
**adoption** 21:12,19
22:6 30:6,16
45:12 49:9,14,18
49:23 50:12,20
64:6,8 105:8,14
106:24 116:9
138:23 139:2
**adoptive** 115:14
**adopts** 66:11
**advertise** 159:24
**advertising** 159:13
159:21
**advice** 195:19
**advisory** 45:8
46:22,24 47:4,9
48:19
**agencies** 14:19
15:23 19:15,18
21:23 29:17 40:15
44:19,22 45:23
47:14 48:1,19
64:10 74:14,20
75:6,15,17 76:16
76:18 77:25 78:4
78:22 79:17,21
103:24 104:9,15
111:17 117:11
127:19,23 128:3
134:18 140:18
141:10 159:24
160:2 169:10,16
170:7 175:21

176:3 182:16,22
183:6,16 186:15
186:25 187:2,9,12
187:15,17,22,24
188:1
**agency** 15:24,24
17:22 45:14,16,16
46:11 68:9,12,16
69:15 74:2 75:2
105:5 115:11
116:9,16 117:1,14
117:21 118:1,7
127:18 128:23
183:11
**ago** 24:17 83:14
99:19 100:19
108:16 110:21
143:25 144:1
145:2 196:13
**agree** 73:8 123:15
123:17 164:18,23
**agreement** 7:14,20
107:17 108:3,6,19
115:22,25 116:2
116:13 134:21
140:7,23,25 151:9
167:21 171:24
172:1,2,22 173:4,5
175:13 176:18
177:2 187:4
**agreements**
167:16
**ahead** 155:11
175:3
**air** 1:8 2:8
**al** 8:16
**alex** 87:21 132:21
**alexander** 7:16
**allow** 11:24
110:10

**allowed** 11:23
112:6 164:1
**allowing** 111:20
**allows** 64:14 112:3
112:11,19
**alphabetical**
140:12
**ambiguous** 106:3
**amend** 15:5,8,9
29:7 30:15 35:9
64:10 76:2 78:23
102:13 184:17
198:9
**amended** 29:4
64:15 67:5,6,8,11
67:18,21,23 68:10
68:13,17 69:14,20
75:22
**amending** 30:5
**amendment** 46:18
62:24 76:6,7
159:8,11 170:22
183:17
**amendments**
40:14 41:10,12
43:9 44:22,24
62:20 63:14,19,23
70:11 75:3,16
80:22 81:7,21
102:9,15 144:25
162:7,12,14 169:4
169:16 171:12,13
171:15 182:15,22
183:5,11,17,21
184:10,16 191:7
191:17 192:4
**american** 1:4,7 2:4
2:7 4:3 8:15
**amount** 108:18
126:15,16 152:7
155:24

**analysis** 103:23
**andrew** 4:16 9:4
**anercession** 4:22
**angeles** 3:18
**annotation** 33:8
**annotations** 34:16
**answer** 11:12,20
22:16 23:24 26:16
27:3 31:18 32:10
32:23,25 42:21
43:19 50:24 56:23
57:16 64:21,24
65:25 69:25 70:1
70:3 96:3 109:5
111:24 116:21
119:20 124:1
126:5,6 127:2
138:8 148:5 149:5
149:22 155:8
158:16 166:15,16
172:14 189:9
193:12,14
**answered** 71:7
72:13 73:6 80:6
194:9,16
**answering** 16:8
56:16 148:18
153:4
**answers** 12:5,21
**anybody** 48:18
53:24 57:1 77:21
95:2 145:25 147:3
147:15
**apart** 155:4,17
156:1
**apologies** 109:14
**apologize** 15:5
70:6 120:13,18
128:23
**appeals** 24:23
47:25

[appear - available]

**appear** 32:19 34:9
54:24 68:21,24
69:1 85:20 133:15
201:13
**appearances** 3:1
4:1 5:1
**appears** 33:16
34:23 55:7,12
58:3 69:14 89:5
98:19 99:7 107:17
154:21 155:24
176:16
**appendices** 115:10
**applicable** 106:6
**application** 47:1
73:24
**applied** 182:9
**applies** 42:24 51:6
135:12
**apply** 41:25 42:1,6
42:8,11,15,19
104:15 106:24
**appointed** 16:2,14
16:17,25 17:6
**appointments**
17:9
**appropriate**
100:10 106:8
**approval** 21:12
22:2,7 106:17
**approve** 14:22,25
15:3,5,8,9,9 29:4
29:14 46:14
**approved** 22:18
29:19 65:1
**approves** 14:21
29:7 30:13 171:17
**approving** 29:9
145:22 146:25
170:25

**approximately**
20:6 47:7
**arbitrary** 29:24
105:19
**architect** 20:14,22
20:24 21:18 66:15
128:14 129:1,3,6
129:11
**architectural**
20:13,16,24 21:17
23:16,18 78:20
118:11 119:4
**archive** 33:6,8,9
33:12,22
**area** 178:22 179:5
**areas** 160:20
194:13
**armen** 4:15 9:1
39:12
**article** 64:10 65:19
66:5,12 67:5
68:10,13,17 159:4
159:5
**articles** 64:12 67:7
67:10,17 193:20
193:22
**articulating**
104:11
**aside** 135:16
153:20 154:2,10
154:25 155:3
158:1,8
**asked** 12:17 56:22
71:6 72:12 73:5
121:20 168:12
173:25 174:4
177:16 179:21
182:8,10,13 194:8
194:15 198:10
**asking** 11:12,18
39:17 52:15 64:19

71:13 77:19 80:10
81:17 96:4 98:9
154:14 157:16,24
157:25 193:14
**assembled** 22:18
45:7 46:25
**assembles** 20:2
45:19
**asserted** 77:1,4,13
79:7,11,18,22 80:2
80:14 81:4,19
**associate** 20:13,14
20:17,21,23,24
21:10,17,18 23:16
23:18 78:20
118:12
**associated** 33:14
**association** 1:6 2:6
3:3 7:25 9:15,18
44:8,10 62:3
107:20 134:12
160:20 168:2
**assume** 164:3
**astm** 1:5 2:5 4:4
9:20
**attach** 86:25
**attached** 201:13
**attachment** 83:22
98:24,25 99:4
136:2,3 138:21
175:18,20 176:1,2
176:6,9,10,10,23
177:7,8,10,11,14
178:4 186:22,24
**attachments** 83:19
136:7,9 187:21
**attempted** 60:4,6
174:7
**attend** 195:16
**attended** 196:10
196:13

**attention** 64:2
74:5 87:13 88:1
88:12 109:13
113:3 115:7
116:23 123:9
130:25 132:25
134:19,20 138:20
140:6,13 151:12
153:19 154:5
**attorney** 3:6,15
4:7 5:7,9,16 9:7
84:25 108:14
202:18
**attorneys** 4:17
**audible** 11:5
**audience** 48:14
**august** 1:19 2:23
7:15 8:1,13 133:7
133:10 202:21
**authenticate**
157:16,21,22,25
**authenticity** 34:2
153:24 154:20
158:2,10,22
**authority** 17:8
67:4 127:24 198:8
**authorize** 197:4
**authorized** 41:11
115:11 117:1
**automatically**
175:14
**available** 33:12
38:18,22 48:18
51:18 52:8,21,24
54:14,16 63:6,15
63:25 67:19 70:14
70:24 71:15 117:2
117:5,20,22,25
121:5,8,14 122:5
126:18 131:22
132:3 133:13,16

[available - building]

133:24 138:1,5,12
139:3,3 140:17
141:2,6,7 170:6
173:23 174:22,24
175:5,7 179:23
180:1,8,12,16
188:12,17,19
189:21 190:14
195:2,5 200:7
**avenue**   3:16 4:8
**aware**   25:9 39:18
54:9,18 55:5
59:20,23,25 60:2,2
60:8 72:10 74:19
75:24 76:15,17,25
77:3,12,21,24 79:6
79:17,21 80:1,13
81:3 82:14 90:4
90:17,20,25 92:10
94:3,5,18 95:2,3
95:10,14,21 99:22
118:6 121:3,25
122:21,23 125:12
126:8 127:19
129:10 131:16
133:6 135:6,15
138:11 141:1
144:24 147:16
150:3,8,12 153:8
159:20,23 160:1
171:4,11,16
179:10,14,24
180:4,6,10,14
187:11 188:13,18
189:18 190:11,15
190:16,17,20,21
190:24 192:8,23
193:3,8 197:4,8,10
198:12,22
**awareness**   72:22
77:19 78:4,9

81:18 126:20
196:22
**awhile**   143:25

**b**

**b**   1:5 2:5 4:4 98:25
99:4 115:7 136:3
140:6,14 175:20
176:2,23 177:10
177:11 178:4
186:24
**back**   49:5 83:1
84:4 86:14 87:22
98:24 103:19
130:25 134:19
144:21 145:17,20
149:7 153:18
160:14 169:24
171:25 175:7
177:13 186:6
**bad**   149:8
**banner**   159:7
**barbu**   5:16 9:9,9
**barely**   139:24
**based**   29:12 43:6
43:17 44:2 79:1
105:22 116:12
168:15 175:24
**basis**   29:17 111:18
**bcs**   19:22
**beginning**   2:22
**begins**   170:1 182:1
**behalf**   2:20 9:14
9:17,20
**believe**   29:19 37:7
61:9 76:2 79:2
86:4,7 94:16
104:18 107:10
141:20 145:24
155:18 173:8
**benefit**   18:25
105:23

**benny**   146:8,19
147:18,22 148:9
**best**   29:22 105:16
**beyond**   131:10
195:11,23 196:6
**bid**   142:8,10,23
143:17,24 144:6
**bids**   142:13
**binders**   154:15
**bit**   161:5 162:18
173:10
**blank**   98:16
**blend**   40:17
**blurb**   41:15
**blurry**   139:7
**bni**   7:20 53:5,15
53:17,18 54:4,11
54:13,22 56:7,25
57:1,8,18 70:19
71:20 72:1 73:17
73:23 74:1 77:20
81:12 96:11 101:8
114:20 151:10
**board**   130:19
**bockius**   4:5
**bodies**   182:17
183:13
**body**   32:20 88:2
**bottom**   35:11
85:17 107:21
116:24 176:6
178:5,11
**break**   12:9,11
33:24 48:23 82:20
99:2 102:17
104:19 145:11
**bridges**   4:16 9:4,4
**bringing**   104:13
**broad**   32:4 80:16
108:1 112:5
122:12,16 124:1

125:1,16 126:2
127:1 128:11
144:16 147:25
185:8 193:11,14
**broadly**   80:10
**broken**   91:18,22
92:1 179:17
**bsc**   19:6,22 20:10
35:14,21 37:3,6,11
37:18 55:7,13
60:21 71:4,15
72:4 73:1,3 92:22
93:12 101:12
102:1,5,20 103:2,6
139:3 149:7 159:6
180:25
**bsc's**   102:19
**budget**   19:23
**buff**   114:4
**build**   51:15
**builder**   125:22
**building**   5:3 7:23
9:8,11 13:17,19,22
14:1,9 16:16,18
17:10 19:3,8
21:13,20 22:2,7,11
23:8,9,20 24:4
26:9,11,25 27:12
27:19,23 28:8,16
28:17,23 29:6,18
30:4 31:22 34:25
35:22 36:5,10
37:2,10 38:22
39:16,21,22 40:8,9
40:11,13 41:4,6,10
45:3,5,18 47:2
51:16,17 52:20,23
52:24,25 54:19
63:13,24 67:15
73:25 75:18 84:21
99:12,22 100:20

[building - calls]

101:3,18 102:14
102:23 104:10,12
104:22,23 105:2,8
105:15,18,23
106:2,11,15 107:5
107:19 111:16
117:9 119:5
121:17 122:15,17
122:22 123:2
126:21 127:15,17
127:20 128:9,12
128:15,22 129:7
129:17,21 130:1,8
130:12,17,21,23
131:12 133:2
142:24 144:8,13
151:17 158:24
159:7,17 161:4
163:8,13 164:6
165:17 166:4
183:13 184:20
185:2,4,13 189:19
190:12 198:1,5,8
199:11
**buildings** 23:14
24:1 42:6,15
118:13,19 119:14
124:21,22,23
125:4 128:16
129:4,8,13,22
182:9 184:14
**built** 119:14
123:13,21 124:4
124:24
**bureau** 127:10

**c**

**c** 138:21 140:8
**ca** 62:23
**cacacac** 159:10
**california** 1:18
2:21 3:18 4:18,20

5:3,5,11,17 7:8,13
7:19,23 8:1,19 9:6
9:8 13:22 14:1,9
14:13,13 17:10
19:9 21:13,20
23:7,9,20 24:4
28:13,14 30:4
31:21 32:20 34:12
34:25 36:5,10,20
36:23 37:2,10
38:20,21 39:14,15
39:18,20 40:8,9,12
40:14,15 41:10,11
41:18 42:1,17,25
43:5,6,9,16 44:1
44:15 46:6 47:5
47:13,20,23 48:7
50:2 51:6,14,15,17
51:24 52:7,7,12,13
52:22 53:4,10,22
53:25 54:3,10,18
55:1,19 56:2,9
58:3 59:2,18 60:5
60:9,15,22 61:18
62:12,14,20,24
63:14,16,22,23
64:6,20 66:7
69:11 70:10 72:17
72:23 73:9,18,22
73:24 74:3,12,21
75:3,7,18,23 76:2
76:7,10,19 77:1,4
77:9,11 78:1,6,11
78:16,23 79:1,8,12
79:19,23 80:3,15
80:18,19,22 81:6,6
81:20,22 82:6,12
82:15 89:10,15,19
89:25 90:5,6,12,21
91:2,11 92:5,11
93:21,22 95:12,16

95:19 96:1,9,20,25
97:3,7,11,15,20,23
98:3,5,13,18 99:13
99:24 100:11,22
101:4,13,20 102:2
102:13,13 103:1,5
103:6 107:5,19
112:8,12,20 116:5
117:3,7,15,16
118:2,8 121:8
127:5,10,15,17,20
128:15,22 129:7
129:17 130:1,6,8
130:10,12,15,17
130:21 131:17,21
132:3 133:9,12,21
133:22 135:11
136:19 138:4,9
140:2 142:24
144:8,12,24,25
151:16 154:6,7,22
155:5,19 156:3,20
156:23 157:2,5,13
157:14,20 158:11
158:20 159:11,14
159:21,24 160:2
161:4 164:5,19
165:5,16 166:4,18
168:14,18,25
169:4,7,11,17
170:6,22 171:1,5
171:13,13,15,17
177:18 178:23
179:11,18,22
180:7,11,15 181:9
181:17 182:5,21
184:6,9,18,20
185:2,14 187:13
187:18 188:12,20
189:2,3,19,20
190:12,13 191:2,4

191:7,16,17 192:1
192:4,11,18,24
193:1,6 195:6,7,9
195:21 198:1,7,11
198:14,20 199:7
199:10,11,14
202:2
**california's** 22:2,7
41:9 171:22
**call** 47:1 64:2
87:13 88:1,12
93:10 103:12
109:13 113:3
115:6 116:23
123:9 130:25
132:25 134:19,20
138:20 140:6,13
149:1 151:12
153:19 180:24
**called** 38:2 45:7
113:23 122:13
136:10,11
**calling** 153:25
**calls** 50:21 51:10
55:14 57:3 58:21
62:8 67:12 69:7
69:22 70:13,20
71:21 72:18 75:9
76:13,21 77:14
82:8 84:11 86:10
88:24 90:14 91:3
91:13,16 92:18
95:20 96:2,22
97:8,16,25 99:18
100:24 101:15
103:8 106:25
109:2,21 110:11
111:2,9,22 112:13
112:23 116:19
118:3,21 119:6,18
121:10 125:25

Veritext Legal Solutions
866 299-5127

[calls - code]

126:11,12,22,24
127:7 132:5
133:17 137:2
142:14 144:15,19
146:2 149:19,25
162:4 163:5
179:17,18 189:6
189:14 192:6,19
197:15
**capacity** 10:11
118:12 119:4
**capitol** 2:21 8:18
**capricious** 29:24
105:19
**carl** 152:24 153:9
**carrie** 1:22 2:23
202:25
**carried** 67:24 68:3
69:2
**carry** 44:22
**case** 1:6 2:6 13:5
25:19,22,25 33:1
44:10,20 53:3
68:1,3,20 69:5,10
69:12,13 77:8
115:6 202:14
**cases** 31:25 32:2,7
44:23 92:16,18
**categories** 41:14
**cause** 155:18
**caution** 84:24
88:14,17 108:13
**cbsc** 7:16 19:4
35:6 37:1,9,17
44:14 85:23,24
86:2,8 87:1,4,8,10
90:10,13,18,22
91:10,20 92:10
94:5,21 95:4
103:23 109:20
110:2,10,24 111:7

111:14,20 113:6
113:15,18 114:8
114:11,17,22,22
115:11 116:2,4
123:1 135:1,4,20
137:19,22,25
145:21 146:5,15
151:10 161:3,15
164:4,19 166:12
166:12 170:9
175:22 177:2
179:16,22,25
180:6,10,14
181:22 186:15,25
187:12,17,24
189:19 190:12,18
190:22 195:19
196:4 199:6,13
**cbsc's** 113:7
**cec** 106:24 110:7
164:7 166:22
167:5,22 170:9,13
170:19,22 172:6
173:11,12,16,18
174:1,5,10,21
175:14,14,15
176:19 179:6
**certain** 27:8 37:12
124:23,24 126:15
126:16 148:7
179:23
**certainly** 16:9
**certified** 2:24
202:1
**certify** 202:3,16
**cg** 159:6
**chance** 16:8
**change** 18:23 21:4
21:7 29:9 35:8
40:24,25 41:5
57:16

**changes** 45:1,12
45:17,17 113:5,24
148:10 163:9
195:16
**chapter** 64:5
**chapters** 115:9
**characterize** 94:10
**charges** 141:9,10
**chart** 138:25
**choice** 117:18
**choices** 117:20
**choose** 117:11,12
167:12
**chooses** 30:15
**circumstances**
113:22
**cited** 88:23
**cities** 122:11
**citizen** 189:2
**citizens** 123:13,22
124:5
**city** 122:18 177:22
177:25 178:5,9,12
178:15,18 201:18
**civil** 7:10
**claimed** 168:14
**claiming** 33:21,23
168:16,24 169:3
**clarification** 11:13
58:12,13,15
**clarify** 39:12 40:1
80:24 96:8 168:15
**clarity** 148:1,7
**clean** 193:6
**clear** 52:14 80:18
188:13
**clicking** 123:6
**client** 84:25
**clip** 102:8,11
**closest** 122:1
177:17

**code** 7:8,19 14:2,4
14:9,13 17:11,19
18:21,23 20:1
22:20,21,22 23:2
24:4 27:25 28:3
29:7,20,24 31:4,7
31:12,20,22,23
32:15,19,20,24
34:12 35:10 36:5
36:10,21,24 37:3,6
37:8,11,19,20 38:1
38:9,11,22 40:8,10
40:13 43:5,6,11,13
43:15,16,23 44:1,2
44:4,15,20,21 45:8
45:12,17 46:6,22
47:4,5,8,13,21,24
48:17,17,19 49:20
50:1,4,10 51:8,18
51:25 52:8,22
53:4,10,17,22,25
53:25 54:3,10,14
55:1,7,13,20 56:3
56:9 58:3 59:3,7
59:18,20 60:5,7,10
60:15,22 61:18,23
62:13,14,20,25
63:16 64:9,11,14
64:20 65:3,10,11
65:20,25 66:6,8
67:9,16,25 68:4
69:6,14 70:9,15,25
71:9,19,23 72:17
72:24 73:10,16,18
73:24 74:12,21
75:3,8,11,18,23
76:3,11,19 77:2,5
77:6,10,12 78:1,6
78:12,17,23 79:1,4
79:8,12,19,24 80:3
80:15,20 81:6,23

[code - commissions]

82:6,12,15 88:14
88:18,22 89:5,10
89:13,15,19,25
90:5,7,13,21 91:1
91:2,12,12,17 92:5
92:11,19 93:12,14
93:20,21,23,24
94:8,22 95:5,6,12
95:16,19 96:1,21
97:1,4,7,12,15,20
97:23 98:4,6,12,14
98:19,20 99:14,24
100:11,22 101:5
101:10,13,20
102:3,6,9,10,25
103:1,7,25 111:8
111:11,14,18,21
111:21 112:7,12
112:20 113:25
114:2,3,5,12
115:13,21 116:5,8
116:17,18 117:6
117:10,12,15,16
117:21,24,25
118:1,2,7,8,20,25
119:1,4,13,16,23
120:6,7,12,17,20
120:25 121:8,14
121:23 122:2,5,22
123:2,12,20 124:4
124:7,9,12,23
125:3,14,24
126:10 127:6
131:4,7,18,22
132:3 133:2,10,12
133:22 134:1,7,17
134:18 135:11,20
136:18,24 137:6
137:13,20,22
138:1,4,12,22
139:2 140:3,17

141:4,5,11 150:18
152:1 154:6,7,22
155:6,19 156:3,11
156:12,20,23
157:2,5,13,14,20
158:6,11,20 159:1
159:14,21,24
160:2 161:4 162:7
162:14,20,24,25
163:8,9,10,13
164:5,6,20,21
165:6,11,18,21
168:3,9,13,14,17
168:18,25 169:8
169:12,17,22
171:2,6,14,17,23
172:7,21 173:16
174:15 175:5
177:18 178:23
179:11,19,23
180:3,7,11,15,25
181:3,6,10,17
183:23 184:7,9,17
185:14 187:14,19
188:12,20 189:3
189:20,20,24
190:1,3,7,13,14
191:2,2,5,6,16
192:2,3,11,24,25
193:1,6 195:6,10
195:15,21 196:2,5
196:19,22 198:5,8
198:11,14,20
199:8,10,11,15
**code's** 34:24 35:1
133:3
**coded** 47:1
**codes** 7:7 21:13,20
22:3,7 23:9,20
28:12,15,18,25
29:2 35:14 37:25

38:2 40:15 41:6,8
41:13,18,22,25
42:10,18 44:20
49:16,17,24 51:3
52:25,25 96:9,10
96:12,13,14,15,17
96:19 106:7 112:8
114:25 115:3
118:12,14,15
127:17,21,24
128:1,15,22 129:7
129:17 130:2,8,13
130:17,21 133:23
134:16 140:4
142:25 144:12,21
145:1 148:8 152:8
152:22 161:19
163:1 165:17,24
166:12,13,18
167:13 179:25
182:6 183:22
184:2 197:5,12
**collaborated** 75:6
75:11,13
**collaborative**
74:13
**color** 114:4
**columbia** 1:2 2:2
24:24
**column** 66:19,25
67:1,1
**columns** 66:18
**combustibility**
124:21
**come** 12:4 104:7
**comes** 187:22
**comment** 14:20
18:5,8 20:19
45:20
**comments** 45:22
45:23 46:9

**commercial** 57:8
57:19
**commission** 5:3
7:24 9:8,12 13:18
13:20,21 14:21
19:3,9,11 22:9,11
22:18 23:8 26:9
26:12,25 27:12,19
27:23 28:8,17,24
29:6 30:4,13,15,17
30:23 35:1,22
39:16,21,23 40:2
45:3,18 46:2,2,4,8
46:13 47:2,8 48:4
48:20 51:17 52:13
52:21 63:14,24
65:2 67:16 73:25
84:22 99:12,23
100:20 101:3,19
102:14,24 104:13
104:14,14 106:12
107:6,19 117:10
127:16 130:7,16
130:24 131:9
144:9 151:17
158:24 159:7,18
164:6 165:17
169:19 171:1
198:2
**commission's**
54:19
**commissioner**
16:25
**commissioners**
13:23 15:14,20,23
15:24,25 16:13,17
17:14,21,23 18:9
18:14 165:11
167:6 169:10
**commissions**
167:12

Veritext Legal Solutions
866 299-5127

[commitments - copies]

commitments
  110:25
committee  45:8,8
  46:22,24 47:4,6
  48:20
committees  47:9
common  75:17
communications
  84:25 108:14
  148:15 153:2,6,9
  153:14
community  66:22
  75:25 76:9 128:4
  130:20
company  120:21
  152:22
compilation  40:10
  87:14 89:8,18
  93:5
complete  12:21
  37:17 136:10
  176:16 177:21
completed  172:9
completely  12:6
  161:23 173:3
completion  202:14
compliance  45:4
  127:16,20 128:15
  128:21 129:6,16
  130:1,7,12,21
compliant  125:23
  126:9
complied  24:3
complimentary
  135:19,23 136:5
  175:13 187:4,13
  187:18,25
comply  126:21
  185:6
complying  185:16

comprise  106:20
concerning  112:19
  147:23 196:5
conclusion  50:22
  51:11 77:15 88:25
  103:9 107:1 109:3
  109:22 110:12
  111:3,10,23
  112:14,24 126:13
  126:25 127:8
  189:7,15
concrete  124:15
conditioning  1:8
  2:8
conditions  73:9
conduct  13:4,7
  14:19 18:10 20:1
  20:3
conducted  142:7
confirm  61:14
  104:20
confirming  56:23
conflict  29:23
  104:23
consequence
  127:13
consequences
  125:12,22 126:8
  127:4,11
considered  45:15
  46:9
considering
  116:16
consist  17:15
consistent  106:12
  152:1 155:5,13,15
  156:10
consisting  194:23
consists  192:11
constitutes  41:12
  47:13,20

construct  118:13
  118:18 119:5
constructing
  119:14
construction  17:3
  23:25 24:3 129:4
  129:12
constructions
  129:7
consult  119:4
consultation
  134:25
consulting  135:4
  151:2
contact  91:25
contain  41:5 63:19
  125:3 193:20
contained  201:14
containing  82:3
contains  83:18
  123:10,11 191:5
  192:2
content  170:19
  171:5,9,23 173:5
contents  148:24
  149:9
context  49:13 50:4
  64:22 94:13 135:7
  135:8 153:6
continued  4:1 5:1
contract  101:7,22
  102:20,21,23
  103:1,4,5 108:21
  108:22,23 109:1,8
  109:9,14 110:17
  110:25 111:15
  112:3,11,19 115:7
  116:14 135:13,25
  142:8 145:22,24
  146:17,20,22
  147:1,4,9,13,18,21

147:23 148:7,10
  148:13,24 149:2,5
  149:11 150:4,10
  150:15 151:4,25
  152:9,9 168:20
  186:11 194:1,4,6
  194:23
contractor  17:4
  127:5
contracts  107:5
  111:7 148:20
  149:8 150:15,17
  151:20 152:1,5,6
contribute  62:7
  75:17
contributed  62:14
  74:20 75:2,2,15
contribution  76:6
contributions
  74:17 76:1,10,18
  76:20 77:25 78:2
  78:5 79:23
conversation
  104:4 191:3
conversations
  13:10 147:3,8,20
  193:24 194:3,23
  194:25 195:1
coordinating
  153:5
coordination  7:17
  142:2,5
copies  117:6,24
  135:19,23 136:5
  170:9 174:21,24
  175:13,21,25
  176:2,19 177:3
  186:14,24 187:2,4
  187:9,13,18,25
  188:12,20 199:23

Veritext Legal Solutions
866 299-5127

[copy - depends]

copy 33:19 60:8
86:12 102:8,11,15
110:3 119:24
157:5,17 175:19
177:18 178:23
189:2 193:6
copying 61:17
copyright 26:1
76:9,19 77:1,4,13
78:1,5 79:7,11,18
79:22 80:2,14
81:4 168:2,8,14,16
168:24 169:3
172:20,23
copyrighted 81:1
81:16 172:12
corner 62:18
correct 12:6 17:7
19:4,7 20:8 24:20
30:6 35:16,19
36:3,6,12,21,24,25
37:11,22,23 38:4
38:18 39:9,11
42:25 46:19 47:21
48:8 51:19 54:12
56:24 58:6 60:23
61:1 62:25 68:14
69:3 70:25 71:16
71:20 72:1,4 73:4
74:9,22 79:16
83:16 84:7,17
87:16 92:6 100:14
102:3 109:20
120:4 122:20
123:8 124:8 134:5
140:5 165:2
166:10,11 170:11
173:20 174:9,11
175:24 181:11,13
181:14,15,17,18
183:19 184:4

185:2 191:8,10,13
192:5 201:15
corrected 114:8
120:17 201:15
corrections 130:20
201:12
correctly 139:15
correlated 163:12
corridor 125:13
125:20,23 126:9
126:16
corridors 125:8
cost 18:25 105:22
173:18
council 38:9,12
93:24 190:3,8
council's 162:25
counsel 8:8,25
199:23
counsel's 82:2
count 177:6
counterclaimant
1:14 2:14
counterdefendants
1:11 2:11
county 122:18
couple 24:17
48:23 83:13 144:2
197:25
course 12:10 26:8
27:11,18,22 199:6
199:13
court 1:1 2:1
10:24 11:1,16
24:23
cover 33:20,21,23
34:13,16 153:21
153:25 155:1,4,18
156:2 157:12
158:9

covered 41:12
create 110:6
111:21 145:6
criteria 29:13,15
29:21 30:3,7,8,10
30:12 46:13,16,17
103:23 104:5,8,9
104:16,19,21
105:1,7,13,17,21
106:1,5,10,14,19
106:21,23 166:18
167:2
critical 131:5
cross 195:12,24
196:7 197:2,7,14
crr 1:23
csr 1:23 202:25
current 13:16
22:22
currently 13:14
37:1,9,17
cv 1:7 2:7
cycle 44:25 47:25
67:25 68:4 69:3
69:16 138:23
139:2,6,6 143:10
143:17,24 144:6
149:9 152:8

**d**

d 1:5,17 2:5,19 4:4
6:3 8:4 201:10,22
d.c. 3:9 4:9
dar 1:7 2:7
date 85:17 131:4,8
131:9,10,12,19,23
139:7,23,24 140:1
140:4 170:8
202:19
dated 99:7 132:23
202:21

dates 100:2
day 12:10 45:19
103:22 201:16
days 131:10,11
deal 165:17
december 99:8
decision 100:21
declaration 10:16
declare 201:10
defendant 1:14
2:14 4:13 9:2
defendant's 7:2
defendants 2:20
defining 76:4,5
definition 75:13
128:11
delegate 128:6
deleted 115:18
deliver 134:15
136:24 137:6,13
137:19,22 175:13
175:25 176:19
177:3 186:14
187:4,12,17,25
demand 95:5
department 5:6,18
7:18,21 9:9 19:9
23:17,19 35:19
66:22 75:20,25
76:8 107:18
118:11,14 120:23
122:15,17 128:4
128:12 130:11
143:23 151:15
department's
120:24
departments
122:22 123:2
128:9
depends 122:19

Veritext Legal Solutions
866 299-5127

[depicted - documents]

depicted 138:25
139:1
depo 7:6
deposit 175:17
176:1,2 186:21
deposition 1:17
2:19 7:10 8:14
10:3 12:25 24:20
34:14,21 83:16
202:13
depositories 187:9
depository 135:24
136:1,10,12
175:20 176:16
177:1,22
deputy 86:6
derived 105:23
describe 44:14
described 44:6
161:6
description 7:3
40:9
design 23:13,25
118:12,18 119:5
126:21
designations
136:15
designing 119:13
detail 28:3 161:7
161:14
detailed 161:16,20
details 139:8
170:1
determination
15:18 46:11 157:7
167:11
determine 103:24
184:19 185:1,5,15
determined 30:1
106:16

determines 183:13
determining
170:18 171:22
develop 22:19
104:10 152:5
161:3 162:19
163:1 164:5
developed 24:2
44:14 74:13 152:7
152:10
developer 189:25
190:1
developers 27:25
28:4 37:19 134:2
150:18
developing 75:7
116:5 144:12
151:3 161:22
164:7 169:7,11
development 26:3
27:18,22 66:23
74:21 75:25 76:9
78:11,16 102:6,10
102:25 128:4
129:25 163:10
196:22,23
develops 103:2
dgs 7:15 19:11,12
35:18 132:18
142:7 145:24
146:25 147:4,8,12
147:13,15 153:12
dictated 173:5
dictating 171:5,9
diem 45:10
differ 50:19
difference 22:5
27:25 28:1 136:14
different 15:23
16:15,16 29:14
36:17 40:11 114:4

122:13,14 178:21
differently 90:6
difficult 164:19,24
difficulties 92:9
difficulty 96:5,7
direct 154:5
directed 48:6
175:21 186:15,25
187:10,12,17,25
direction 202:10
directly 33:16
61:7 175:17
director 9:11
13:17 19:22 20:5
86:6
directs 37:25 38:3
disabled 136:24
137:20 179:24
180:1 189:21
190:9
disapprove 14:25
15:3,8,10
disclosures 143:10
discuss 18:22 29:3
discussed 40:20
93:5 96:11 128:10
196:21
discussing 54:22
89:11 103:22
106:21 107:4
discussion 16:4
80:23 200:14
discussions 25:22
135:9 147:17
148:20,23 193:9
193:16 194:19,22
display 35:1
displayed 99:12
99:23 100:8,9
dispute 24:24
25:12,20

distance 126:15
distinctions 191:1
distinguish 62:13
62:19 64:14
distribute 135:19
distribution
134:25 135:3,6,10
135:14,15
district 1:1,2 2:1,2
24:23
division 5:19 7:23
9:10 66:15 107:18
128:13 129:1,3,5
129:11 151:16
document 19:2
24:8,12,14,16 34:5
34:22 57:24 58:1
61:1 64:22 74:6
74:25 83:9,10,18
83:23,25 84:2,14
84:19,23 85:8,12
85:14,14,16,20
87:14,18,20,24
88:9,13 93:5
94:10 99:4,6
107:14,16,25
108:4,8,9,12 132:9
132:13,15,17,20
132:23 133:1
136:3 138:20
141:19,23,25
150:19,22,23,25
151:2,6,9,13
153:22 154:11,18
154:23 157:16,17
158:10,19 179:1
document's 156:7
documents 13:1,2
13:8 14:18 20:18
21:23 45:2 46:1
48:3 78:22,24

Veritext Legal Solutions
866 299-5127

[documents - enforce]

84:9 85:3,5 86:8
86:20,24 87:1,4,7
87:10 151:3
161:18
**doing** 82:18
166:23
**doj.ca.gov** 5:13
**dollar** 108:21,22
108:25 109:9
**domain** 58:5,17
**doubt** 133:20
156:2 157:1,13
158:2,10
**draft** 146:19
169:16
**drafted** 173:4
**drafting** 146:10,11
170:22
**drafts** 171:12,12
**drawings** 24:3
**dsa** 66:11,14
**duly** 202:7
**duplicate** 29:23
104:23
**duties** 123:14

**e**

**earlier** 17:13 18:3
20:21 29:2 43:4
46:17 47:19 51:16
68:7 69:16 70:23
73:2 78:21 102:19
103:22 116:9
120:17 161:6
165:1 166:7,17
167:19 168:12
169:21 174:25
175:4 177:16
179:16 180:19,20
196:21
**edition** 22:20,21
22:23,25 23:2,4

35:10,23 36:4,11
36:15 37:2,10,14
37:17,21 44:15,19
44:23,24 53:5,6,7
53:10 54:4,21
58:4 65:2 79:2
99:14 100:12,22
101:9 103:1 111:8
112:7,8 140:2
142:24 146:17
150:15 163:12
168:9 172:21,23
191:5 192:2
**editions** 70:15,18
70:24
**editorial** 170:4
**edits** 108:9,12
147:21,22 194:5
**education** 170:4
198:2
**effect** 35:9 36:2,4
36:11 124:3
**effective** 22:22
23:5 36:11 131:9
131:12 139:7,24
140:1,4
**effects** 123:12,20
**effectuate** 110:25
116:2
**effort** 137:25
**efforts** 74:14
136:24 137:6,13
138:4,11 179:22
**egress** 124:20,22
125:4
**ehler** 3:14 8:10
9:16,16 200:6,9
**either** 14:25 86:3
158:15 160:3
**elaborate** 77:10

**electric** 99:14
**electrical** 7:8,19
16:21 34:12 36:23
43:5,6,11,13,15,16
43:22,25 44:2,4,15
44:20,21 46:6
51:7,25 52:7 53:4
53:10,17,22,25,25
54:3,10,14 55:1,7
55:13,19 56:2,9
58:3 59:3,7,18
60:5,7,10,15,22
61:18,23 62:13,14
63:16 64:11,20
65:19 66:8 72:17
72:23 73:10,18,24
74:12,21 75:3,7,11
75:23 76:3,11,19
77:1,5,10,12 78:1
78:6,12,17,23 79:1
79:4,8,12,19,24
80:3,15,20 81:6,23
82:6,12,15 91:2,11
92:5,11 99:24
100:11,22 101:5
101:13,20 102:3
103:1,7 112:12,20
116:5 117:12,15
117:16 118:2,8
121:8 127:6
131:18,22 132:3
133:10,12,22
134:6 135:11
140:2 154:6,22
155:5,19 156:3,20
156:23 157:2,5,13
157:14,20 158:11
158:20 159:14,21
159:24 160:2
162:14,19,24
164:5,5,20,21

165:5,18,21 168:3
168:9,14,17,18,25
169:7,11,17 171:2
171:6,13,17,23
172:7,20 177:18
178:23 179:11,18
179:23 180:3,7,11
180:15 181:9,17
184:6,9 185:14
187:14,19 188:12
188:20 189:3,20
190:13 191:2,2,5,6
191:16 192:2,3,11
192:24,25 193:6
195:6,9,21 196:2,5
196:19 198:11,14
198:20 199:8,10
199:14
**elements** 164:20
**email** 7:11,15
87:21 132:19,21
133:9,15,21
180:20 181:16
**emails** 85:21,22
87:7
**emergencies** 35:8
**emergency** 175:16
**employed** 13:14
20:14 23:7
**employee** 202:17
**employees** 197:5
197:11
**employment** 13:16
26:8 27:12,19,23
28:7
**enabling** 105:3
**encountered** 91:1
91:12
**energy** 130:6
**enforce** 127:24,25
128:21 129:16,20

Veritext Legal Solutions
866 299-5127

**[enforce - fee]**

130:1,7,12,16,20
**enforcement**
  127:18,19 128:7
  128:17 129:19
**enforces** 129:6
**enforcing** 128:14
  129:11
**engineers** 1:9 2:9
**enormous** 155:24
**ensure** 19:23
**entail** 13:25 14:17
**entails** 142:17
**enter** 103:4 108:23
**entering** 142:7
**entire** 39:14,20
  52:12,17,18 64:10
  64:22 66:11 67:5
  68:10,13,17 69:14
  82:12 89:19 169:8
  192:24
**entirely** 191:10
**entirety** 63:3
  64:15 65:6,12
  67:8,10,17 69:20
**entities** 142:13
  163:9
**entity** 53:18,24
  73:18 142:9
  159:20
**environment**
  123:13,21 124:4
**errata** 113:23
  114:1,17,23
  175:16
**error** 114:3,6,6,12
  114:12,13
**errors** 113:5,16,20
  114:8
**essence** 123:11,14
**essential** 129:4,8
  129:12

**establish** 11:4
  134:25
**established** 43:4
  68:7 73:2 105:3
  135:4 140:19
**et** 8:16
**exact** 17:12 21:2
  72:3 143:7
**exactly** 80:25
  156:11,12 176:12
**examination** 6:7,8
  6:9,10,11 8:7
  160:16 186:8,13
  188:10 190:25
  197:23 199:4
**examined** 8:5
**example** 16:18,24
  66:10 75:20 125:6
  135:13 162:13
  163:8,13 171:24
  183:4
**examples** 114:7,15
**excerpted** 63:3
**excerpting** 140:17
**exchange** 93:6
**exclude** 148:15
**excluding** 153:14
**exclusive** 105:4
**excuse** 41:7
  107:18 165:25
  171:12
**executed** 201:16
**executive** 9:11
  13:17 19:21 20:5
  86:6 145:24
**exhibit** 7:4,6,7,8,9
  7:11,13,15,17,19
  24:9,10,13,22 33:3
  34:15,18,20,21
  37:13 40:7 57:22
  57:25 59:12 63:3

65:14 82:1,3,4
  83:6 85:10,13
  87:15,16 98:25
  107:9,11,13
  109:14 131:1
  132:11,14 134:20
  134:22 136:2,2
  138:20 140:6
  141:21,24 145:21
  146:13,14 150:20
  150:23 153:18,20
  153:21 167:17,25
  169:24 170:1
  175:7,11 176:9,10
  176:23 177:11,13
  178:3 180:19
  181:20,21 186:11
  186:12
**exhibits** 7:1
  181:20
**existed** 150:9
**existing** 44:22
**exit** 124:24 125:8
  125:13,20,23
  126:9
**expenses** 197:10
**experience** 23:9
  28:10 58:24 59:11
  119:12,23
**expert** 156:19,23
  157:20 184:12
**experts** 45:9 47:10
  163:16
**express** 17:16,18
  17:24 18:2,4,10
  45:25
**expressly** 105:4
**extent** 94:9 191:13
**extract** 97:19,22
  174:5

**f**

**f** 3:7
**facilities** 118:13
  118:19
**fact** 172:11
**failure** 127:5
**fair** 165:16 169:9
  179:4
**fairly** 82:4
**familiar** 26:2 34:4
  50:6 59:13 72:25
  126:14 161:21
  162:9,20,23,24
**familiarity** 28:6,9
  59:5,9 161:24
**far** 108:21 128:5
  139:25
**farther** 168:7
**february** 20:7
**federal** 202:13
**fee** 4:6 8:11 9:19
  9:19 26:5,20 27:1
  27:13 30:18 31:16
  31:24 32:3,9
  33:20,25 34:6
  36:7 38:23 39:2
  44:11 47:17 48:10
  48:16 49:25 51:9
  51:22 52:1 53:11
  55:2,8,21 56:4,10
  57:3,10,14 58:10
  58:19 59:14,22
  60:11,17 61:4
  63:2,7,9 64:16,19
  65:13,22 67:12
  69:7,22 70:13,20
  71:10,21 72:5
  73:19 74:23 75:9
  76:13 82:8 84:10
  86:10 88:24 90:1
  91:3,15,24 94:9,24

[fee - general]

95:7,20 96:2,22
97:8,16,25 99:18
100:4 126:11,22
132:5 142:14,19
144:15,19 145:7
153:25 154:12,14
185:22 189:4,5,13
192:19 195:11,23
196:6,12,17
197:15 199:1,19
199:21,24 200:3
**fenwick**  4:14 7:5
9:2,5
**fenwick.com**  4:22
**field**  45:9 47:11
**file**  99:13,23
100:21 101:4
102:2,5
**files**  45:4
**fill**  143:2,5
**final**  45:24,24,25
46:5 63:18,25
67:20,22 68:22
69:2,14 168:1
181:25
**finalize**  149:12
**financially**  8:22
202:16
**find**  69:6,18 70:11
158:15
**findings**  104:21
**fine**  200:15
**finish**  11:19,23,24
**finished**  12:1
**fire**  1:6 2:6 3:3
7:24 9:15,18
29:25 30:1 44:8,9
62:3 106:15,16,17
107:20 124:6,7,19
124:20 125:10,10
128:21 129:16

160:19 168:1
**first**  25:8 74:11
88:1 93:4,9 99:10
132:25 146:19,22
160:22 167:25
170:2 171:25
175:11 177:22
178:4 180:20,23
182:4 186:17,19
187:5
**five**  156:15 187:8
**fix**  91:21
**fixed**  92:2
**flexibility**  150:3,9
**flip**  171:25 176:22
177:13 178:14
186:12
**floor**  3:8,17 4:19
**flow**  125:13
**focus**  110:1
**follow**  47:14 48:11
112:15 113:9
118:24 160:21
184:20
**followed**  19:24
**following**  26:10
27:4 68:6 116:3
**follows**  8:6
**followup**  199:2
**foregoing**  201:11
202:4,6,10,12
**form**  16:1,5 21:14
22:14 24:6 26:5
26:14,20 27:1,13
28:19 30:18,19
31:9,16,24 32:3,9
34:6 35:3 36:7
38:23 42:3,13,20
43:1,18 44:3,11
46:7 47:17 48:9
48:10,16 49:19,25

51:9,22 52:1,10
53:11 55:2,8,21
56:4,10 57:3,10,15
58:10,19 59:8,14
59:22 60:11,17
61:4 62:9 63:17
64:16 65:13 66:9
69:22 71:10 73:19
74:23 84:10 90:1
90:8 91:15,24
94:24 95:7 100:4
100:15 101:6,21
102:2 114:10,24
115:19 116:7
117:8,17 119:25
124:25 125:15
126:1,23 127:22
132:5 144:14
145:8 147:24
154:12 191:9
192:13
**format**  17:20
106:11 113:7,19
123:4
**formatting**  170:4
**forms**  143:2,5,8
**forth**  149:7 170:5
175:18 202:5
**forward**  44:22
67:24 68:4 69:3
176:22
**forwarded**  116:11
**found**  14:2 17:11
**foundation**  55:16
61:3,13 73:12
123:24 137:2,9,16
138:7 143:13,19
159:16
**four**  15:1,7 18:3
29:2,4 103:3
169:20 170:25

177:12 187:8
**fourth**  169:25
**francisco**  4:20
**free**  117:23,25
121:9,14 122:5,22
131:25 132:2
173:12,17 174:16
174:21,22 178:23
179:6 188:13
189:2
**freely**  188:19
**front**  32:24 33:13
33:17 64:21
109:10 153:20
**full**  38:21 53:16,19
55:18 56:1,8
64:20 86:23,25
175:11
**fully**  70:5 184:1
**functionally**  15:22
**furnish**  10:14,17
188:19
**furnishes**  92:4
**further**  14:25 15:3
15:8,9 66:16
88:13 160:4
182:15 185:21
197:18 202:12,16
**future**  88:4

g

**g**  3:5 116:23
**gaining**  92:10
**game**  22:9
**general**  5:7,18
7:18,22 9:10
19:10 23:17,19
27:9,10 35:19
107:18 118:11,15
119:16 120:23
140:19 141:7,11
143:23 151:15

Page 14

[general - implementation]

170:7
**general's** 9:7
**generally** 30:13
33:7 152:6 162:2
184:14
**give** 12:11,21
32:15,25 123:1
200:4
**given** 157:5,17
185:4 202:11
**giving** 10:21
**go** 10:20 11:24
14:7 66:24 70:19
82:22 83:22 98:24
99:1 119:1 136:5
142:22 144:5,9,21
145:10 155:11
160:10 163:10
164:6 175:3
181:19 185:24
186:1
**goes** 36:1,4,11
41:17 47:2 161:22
169:7
**going** 10:20 11:13
63:2 74:17 140:11
141:13,19 143:9
143:16,23 145:10
177:6
**good** 8:8 9:23,24
10:2 149:8
**govern** 47:24
**governed** 184:2
185:2
**governing** 48:7
182:17 183:12
185:6
**government** 14:4
18:21 19:25 39:15
42:15 88:18 89:5
141:10 170:7

197:10
**governmental**
140:18
**governments**
197:4
**governor** 16:3,14
16:18,25 17:6,8
**grammatical**
114:6
**grand** 3:16
**grant** 109:19
**grants** 110:2
**graphic** 139:21
**great** 98:17 165:17
175:9
**green** 198:7
**groups** 25:21
**guess** 26:21 27:7
41:3 58:15
**guide** 64:9

**h**

**h** 123:10 131:1
**half** 20:6
**hand** 141:19
**handed** 24:12
34:20 57:24
107:13 141:23
150:22
**handles** 159:13
**happen** 125:19,20
126:17,21 127:4
164:10
**happened** 189:23
**happens** 30:10,12
**hcd** 66:19 67:11
67:18,21,23 68:10
68:13,17 159:8
**hcd's** 67:4
**head** 48:5 56:19
108:20 111:5
114:21 121:16,25

**heading** 37:14
40:7 74:7 88:13
123:10 138:22,22
**health** 14:2 17:11
29:19 75:21
129:25 130:11
166:9,14,19,25
167:8
**hear** 30:11 105:12
**heard** 49:8,13,18
82:2 94:20
**hearing** 18:13
**hearings** 14:19
18:10
**heating** 1:8 2:8
**held** 20:25 172:23
**help** 113:12 114:2
190:4
**helped** 189:25
**helpful** 66:6
**helps** 176:7
**hereinafter** 110:5
110:16
**hereto** 175:18,20
201:14
**high** 166:1 169:9
**highlight** 116:25
**history** 144:20
**hold** 58:11 176:11
195:9 198:13,19
**holds** 198:10
**honestly** 150:1
**hospital** 130:3
182:20 183:4,25
**hospitals** 42:11
182:10 183:8,10
183:14 184:12
**host** 37:1,4,5,9,17
**hosted** 39:6
**housing** 66:22
75:25 76:9 128:4

128:7
**https** 35:14
**huge** 154:23
**huh** 15:12,15
18:18 31:6 37:16
40:19 46:23 47:22
48:23 56:15 67:2
88:19,21 89:12
91:9 93:16 102:18
115:17 123:8
131:2 132:16
139:17 140:15
151:14 167:18
180:22 199:18
**hunter** 7:16
132:21

**i**

**iapmo** 133:23
134:9,10,11,15
152:9
**icc** 93:13,25 95:10
95:14,19 96:1,10
96:21 97:1,4,7,12
97:15,20,23 98:4,6
98:14,19 133:3
152:9 181:2,12
**idea** 101:18
**identification**
34:21 57:25 85:13
132:14 141:24
150:23
**identified** 136:2,6
**identifies** 40:18
62:1 151:9
**identify** 8:25
121:18
**impaired** 137:6,23
180:8 190:14
**implementation**
21:13

[implemented - know]

**implemented**
182:16 183:6
**importance** 131:5
**important** 131:7
148:13 149:2
166:9
**include** 86:23 87:7
122:11 128:3
173:14
**included** 86:20
**includes** 24:22
88:17 155:1
**including** 81:6
89:19 158:19
179:24
**incomplete** 63:11
110:14
**inconsequential**
113:4,16,20,24
114:8
**inconsistent**
156:21
**incorporate** 30:23
31:2,7,12 164:20
167:7 172:6
**incorporated** 26:2
106:7 145:6
**incorporates**
166:22
**incorporation**
30:17 31:5 49:9
49:14,18,23 50:7
50:11,12,18,19
51:2,5
**incredibly** 164:12
**independent** 19:12
**index** 6:1
**indicate** 159:11
**indicates** 62:22,24
170:12 183:4

**indicating** 33:8
**individual** 151:18
**individuals** 136:25
137:7,13,23 180:1
180:8
**industry** 17:3
26:12,19,24 27:11
163:21
**inferior** 166:13
**info** 88:5
**information** 25:17
34:11,15 64:13
66:3,5 86:16 88:8
88:17 102:8,11,15
114:23 116:11
143:22 146:10,11
146:12,14 193:21
196:3
**informed** 91:10
**initial** 17:16 18:16
48:2
**initialed** 201:13
**ink** 201:13
**installation** 125:10
**installations** 65:20
**instance** 36:20
65:4 71:18 94:13
100:3 128:3 190:2
**instances** 32:13,17
94:3,5
**instruct** 148:9
**intend** 66:3
**intensive** 164:12
**interacted** 26:12
26:17
**interactions** 15:16
27:17,21
**interest** 78:2 79:7
79:11,18,22 80:2
80:14 81:4,19
105:8,14,16

**interested** 8:23
139:4 195:15
202:17
**interface** 15:13
17:1
**internal** 87:7
**internally** 102:6
**international** 1:5
2:5 4:4 38:8,11
93:24 134:12
162:25 163:8,13
190:3,7
**internet** 25:17
33:5,7,9,12
**interpret** 65:20
66:1
**interpreting** 66:7
**intervening** 35:9
138:22 139:20,22
**invited** 196:8
**involved** 10:5
78:21 163:16
169:11 171:5
**involvement** 10:8
21:22 23:12 26:7
78:10,15,19
**issue** 35:6 86:4
91:21 92:20
124:12 190:23
**issues** 25:25 90:25
91:10 124:6,7,10
124:19,20 125:10
138:5,13 180:16
181:16
**item** 109:12 135:7
177:22,25 186:17
186:17

**j**

**j** 4:6
**january** 23:6 36:2
139:19

**jerry** 5:8 9:6
**jerry.yen** 5:13
**job** 1:24
**john** 5:21 8:20
**judgment** 166:24
167:6
**july** 7:4 35:25
131:4,18 132:4
135:21 139:16
170:8
**jurisdiction** 105:5
121:20 183:12
185:1 188:24
**jurisdiction's**
184:10,15 185:15
**jurisdictions**
52:24 117:25
121:7,14 122:4,6
122:11,14 127:25
128:6,8 175:5
182:17,23 183:7
184:17 188:11,14
188:16,19 195:15
**justice** 5:6

**k**

**k** 134:21,21,24
136:17
**katrina** 146:8,19
147:17
**keep** 52:11 81:8
88:5 101:12,19
171:23
**kevin** 4:6 9:19
**kevin.fee** 4:11
**kind** 108:1 128:17
185:8 195:8 196:3
**kinds** 40:16,21
**knew** 152:18
177:17
**know** 11:9 12:6,10
17:11 25:19 26:17

Page 16

[know - licensee]

| | | | |
|---|---|---|---|
| 26:21 37:4 43:19 | 136:22,23 137:3,5 | laid 47:4 | leaving 154:25 |
| 49:12 50:5,15,25 | 137:10,12,17 | lands 130:16 | 155:3 |
| 51:12 53:13,16,16 | 138:14,17 140:24 | language 17:19 | leda 3:14 |
| 53:18 54:1,7,13,23 | 141:4,5,8,9,12 | 41:19 46:5 61:21 | left 110:14 |
| 54:24 55:18 56:1 | 142:2,5,15,17 | 103:25 110:1,7,9 | legal 5:19 9:10 |
| 56:7,12,14,22,24 | 143:7,8 144:4 | 110:17 113:8,11 | 50:22 51:11 77:15 |
| 56:25 57:1,5,6,8 | 146:16 147:2,13 | 113:13 115:8,13 | 88:24 103:9 107:1 |
| 57:11,13,18,20 | 148:3,6 149:4 | 115:14,16,18 | 109:2,21 110:11 |
| 58:17 60:3,12,14 | 150:6,12,24 | 116:6,25 117:3 | 111:2,10,22 |
| 60:18,19 61:6 | 151:21,23,25 | 131:5 135:1 | 112:13,24 126:12 |
| 62:17 68:5 69:5,8 | 152:20,23,24 | 140:17,20,21 | 126:24 127:8 |
| 69:20,25 70:21 | 157:21 158:5,6 | 181:22 183:18 | 131:14 147:10 |
| 71:12 72:2,20 | 159:22,25 160:3,8 | 186:14,16 187:1 | 189:7,14 |
| 73:8,13,15,16,20 | 160:8 162:3,6 | latest 22:21 | legend 62:18,22 |
| 73:22 74:2,4 75:1 | 164:2,9,15 171:8 | law 3:6,15 4:7,17 | legislated 115:14 |
| 75:10,15,21 76:12 | 172:14 173:23,24 | 5:9,16 10:24 14:2 | legislation 105:3 |
| 76:23 77:17 82:13 | 187:2 188:23 | 14:10 16:16 17:10 | legislature 41:11 |
| 82:17 86:11,14,16 | 189:8,22 190:6,7 | 26:2 28:16 36:6 | letter 7:4 24:19,22 |
| 87:9 90:2,9,15,19 | 190:10 192:14,17 | 40:16 44:18 45:6 | 25:10 84:17 |
| 90:24 92:1,21 | 192:20,21 193:3,5 | 51:6 52:23 89:7 | level 112:7 161:24 |
| 94:19 95:8,17,18 | 194:10 195:17 | 89:18,21,23 | 162:1,7,13 163:11 |
| 95:25 96:16,17,19 | 197:16 198:16 | 104:12 111:16 | 169:9 |
| 96:23 97:6,9,14,17 | knowledge 25:12 | 117:24 121:17,22 | lewis 4:5 9:19 |
| 97:22 98:1 100:18 | 25:15,16 38:21 | 122:1 131:13 | libraries 117:24 |
| 100:19 101:12,16 | 39:18,25 52:4,6,16 | 165:20 175:6 | 135:24 136:1,10 |
| 103:10 107:2 | 54:2 63:22 69:11 | 177:17 178:12 | 136:11,11,12 |
| 108:7,20,21 109:6 | 90:23 113:14,18 | 185:16 | 175:6,6,17,20 |
| 109:10 111:5 | 121:7 126:20 | law's 45:21 | 176:1,2 177:1,4,7 |
| 112:25 114:2,5,19 | 138:3 144:11,18 | lawsuit 25:14 58:9 | 186:21 |
| 114:21 119:21 | 145:5 196:21 | 152:14 153:13 | library 121:22 |
| 121:11,15 122:3 | known 14:5,13 | lawsuits 10:5,9 | 122:1 176:17 |
| 122:23,24,25 | 19:4 43:10 | lawyers 148:16 | 177:17 178:6,9,12 |
| 123:3 126:7 | **l** | 153:15 | 178:16,19 |
| 127:10 128:6,13 | lack 61:2,12 | lay 10:19 | license 109:19 |
| 128:17,20 129:15 | 123:23 137:8,13 | lays 47:14 | 127:10 |
| 129:18,18,20,24 | 137:15 138:1,6 | leading 32:21 38:5 | licensed 17:3 |
| 130:4,6,9,10,14,15 | 143:12,18 180:12 | 39:10 47:16 50:14 | 110:6 115:9 |
| 130:18,19 131:17 | lacked 190:18 | 139:15,18 | 118:23 119:3,10 |
| 131:21,24,25 | lacks 55:15 73:11 | learn 196:18 | 119:12 |
| 132:2,7 134:6,8 | 137:1 159:15 | leased 118:13,19 | licensee 117:1 |
| 135:7 136:8,16,21 | | | |

**[life - meetings]**

| | | | |
|---|---|---|---|
| life 29:25 | 122:10,11,14,14 | **m** | 34:4 49:8 57:24 |
| light 59:11 | 122:17,21 123:1 | | 81:18 83:9 145:20 |
| likewise 11:22 | 127:25 128:6,8,9 | macdonell 5:21 | 160:18 201:10,22 |
| limit 12:17 | 128:11 140:18 | 8:20 | material 45:19 |
| line 65:5 135:18 | 141:9 170:6 | machine 202:8 | 62:2 155:24 |
| 136:17 187:5 | 174:25 175:4 | maeda 7:12 85:25 | materials 1:4 2:4 |
| lines 170:2 187:7 | 182:17,21,22 | 86:2 93:6 | 4:4 8:16 15:18 |
| 193:7 | 183:7,12 184:10 | magazine 193:19 | 17:14,15 20:2 |
| link 52:21 54:19 | 184:15,17 185:14 | mail 193:18 | 21:24 199:6,13 |
| 54:25 55:6,12 | 188:11,13,19 | maintain 122:1 | matrix 64:6,8 |
| 58:5 61:10 67:19 | 195:14 | maintains 121:23 | matter 8:15 13:8 |
| 71:3,4,15 72:3 | located 8:18 | makeup 47:3 | 33:14 36:18 |
| 73:3 91:18,22 | long 20:4 46:12 | making 167:6 | 194:13 |
| 92:1,7 100:11,13 | 99:19 100:19 | 179:25 180:7,11 | matters 10:15 |
| 101:23 102:20 | 110:21 144:1 | 180:15 | maximum 108:18 |
| 134:3 173:15 | 149:11 161:18 | malamud 88:5 | mcgeorge 178:11 |
| linked 33:15 39:6 | longer 82:19 | 152:24 153:10 | mean 11:13 12:1 |
| 133:3 135:14 | look 35:11 65:18 | mall 2:21 8:18 | 16:22 24:2 26:17 |
| links 54:22 60:21 | 69:6,20 83:8 | manager 146:5 | 26:22 29:8 31:1,3 |
| 60:25 61:6 72:8 | 86:18 154:23 | 151:19 | 32:19 37:4,5 |
| 89:21 123:6 133:6 | 155:5,7,21 156:16 | mandate 131:14 | 49:11 93:18 95:17 |
| 179:17 | 156:22 157:21 | march 7:11 94:17 | 102:7 108:7,25 |
| list 74:17 75:17 | 168:6 169:24 | margin 62:23 | 120:12 123:3,17 |
| 135:20 176:17 | 170:2 172:4,17,18 | mark 24:8 33:1 | 124:17,19 128:9 |
| 177:1,22,23 178:1 | 175:9,10 176:5 | 34:17 57:21 83:4 | 150:8 155:12,15 |
| 178:5 | 177:21 178:4,11 | 107:9 141:19 | 171:8 |
| listed 38:13 67:6 | 180:18 185:5,13 | marked 24:10,13 | meaning 50:13,18 |
| 75:4 135:24 | looked 186:13 | 33:3 34:18,21 | means 49:24 67:15 |
| 175:17,20 176:14 | looking 19:2 44:25 | 37:24 57:22,25 | 110:18 124:24 |
| 187:22 | 61:7 131:3 156:25 | 74:6 83:6 85:10 | 182:20 |
| lists 38:17 186:21 | 171:24 187:3 | 85:12 107:11 | meant 182:8 |
| little 82:19 161:5 | looks 46:8 85:23 | 132:9,11,13 | mechanical |
| 162:18 168:7 | 139:14,15 155:16 | 141:21,23 150:19 | 124:14 133:23 |
| 173:10 184:23 | 162:20 169:25 | 150:20,22 | 134:13,17 |
| live 10:17 | 178:15 | marnell 151:19,21 | meet 29:24 127:5 |
| llp 3:4,13 4:5,14 | los 3:18 | 151:23 | meeting 18:6 |
| 7:5 | lunch 99:2 102:17 | marshal 30:1 | 19:24 21:24 45:14 |
| load 126:16 | 103:13 | 106:16,17 128:21 | 46:2 |
| local 49:15 52:23 | | 129:16 | meetings 14:20 |
| 117:23,24 121:7 | | marvelli 1:17 2:19 | 20:1,3,19 |
| 121:13,19 122:4 | | 6:3 7:5,6 8:4,14 | |
| | | 9:11 10:1,2 24:13 | |

Veritext Legal Solutions
866 299-5127

[meets - national]

| | | | |
|---|---|---|---|
| **meets** 46:12 | 80:4,17,21,24 81:8 | 198:17,23 199:20 | **modelled** 150:14 |
| **member** 47:3 94:6 | 81:14,20 90:8 | 199:25 | **modified** 33:10 |
| 132:18 146:4 | 91:4,13 92:12 | **minimum** 135:19 | 149:6 |
| **members** 47:7 | 98:7,22 100:15,24 | 166:3 | **moment** 30:2 83:8 |
| 48:20 92:24 95:3 | 101:6,21 103:8 | **minor** 113:4,15,20 | 85:13 145:21 |
| 118:16 | 106:25 110:13,20 | 113:24 114:3,7 | 153:18 164:3 |
| **merit** 17:25 20:1 | 111:2,9 112:21 | **minute** 49:1 | **monday** 1:19 2:23 |
| **met** 30:3,7,8,10,12 | 114:10,24 115:19 | 161:13 200:5 | 8:1 |
| 46:18 95:5 104:10 | 116:7 117:8,17 | **minutes** 48:24 | **money** 173:18 |
| 104:13 131:18 | 118:9,21 119:6,18 | 145:11 156:15 | **monitor** 127:20 |
| 160:23 167:3 | 119:25 120:9,14 | **mischaracterizes** | **monitoring** 127:16 |
| **method** 134:25 | 121:2 123:16,23 | 61:4 72:5 92:13 | **month** 149:14,15 |
| 135:3,6,10,14,16 | 124:25 125:15 | 94:11 104:2 | **monthly** 193:19 |
| 173:19,20 | 126:1,12,24 127:7 | 112:22 120:10 | **months** 149:16,18 |
| **methods** 167:7 | 127:22 137:1,8,15 | 122:7 138:15 | 149:24 |
| **mia** 1:17 2:19 6:3 | 138:6,15 139:11 | 152:4 158:13 | **morgan** 4:5 9:19 |
| 7:4 8:4,14 9:10 | 141:13,16 143:12 | 161:11 188:22 | **morganlewis.com** |
| 10:1 201:10,22 | 143:18 144:14 | **misspoke** 129:2 | 4:11 |
| **michael** 7:11 86:5 | 145:8 146:2 | **misstates** 54:6 | **morning** 8:8 9:23 |
| 87:21 | 147:24 152:3,16 | 64:17 74:24 | 9:24 10:2 |
| **mike** 85:25 93:6 | 153:23 154:13,19 | **mistake** 101:1 | **move** 81:25,25 |
| **miller** 3:5 6:8,10 | 155:20 156:4,7,18 | **mix** 47:10 | 86:1 173:10 |
| 9:13,13 16:1,5,10 | 157:4,15 158:3,12 | **mobility** 137:6,23 | **mto.com** 3:11,20 |
| 19:16 21:14 22:14 | 158:21 159:15 | 180:8 190:14 | **multiple** 15:25 |
| 23:21 24:6,25 | 160:17,19 161:12 | **model** 28:12,15 | **munger** 3:4,13 |
| 26:14 28:19 30:19 | 162:11,17 163:2 | 29:2 31:4,20 37:8 | 9:14,17 |
| 31:9 32:21 33:4,7 | 163:14,19,24 | 37:19 40:15 41:6 | |
| 33:13,18 34:1 | 164:11,17,25 | 41:8,12,18,22,25 | **n** |
| 35:3 38:5 39:7,10 | 165:9,15,23 166:6 | 42:10,18 44:19 | **n.w.** 3:7 |
| 42:3,13,20 43:1,18 | 167:4,14 168:22 | 52:22 62:20,25 | **name** 9:25 15:21 |
| 44:3 46:7 47:16 | 169:15 170:16 | 71:23 77:6 103:25 | 53:16,19 124:3 |
| 48:9 49:19 50:14 | 171:10,20 172:16 | 106:7 111:11,18 | 127:13 147:14 |
| 50:21 51:10 52:10 | 173:2,9 174:14,19 | 111:20 112:7 | 151:18 160:18 |
| 53:12 54:5 55:15 | 175:2 179:3,9,15 | 114:12 115:21 | 202:20 |
| 55:22 56:5,11 | 180:5 183:2,15,24 | 116:17,18 134:1 | **named** 44:10 58:8 |
| 57:15 59:8 61:2 | 184:8,24 185:10 | 134:16 144:12,21 | 58:9 |
| 61:12 62:9 63:10 | 185:20 188:21 | 145:1 150:18 | **names** 14:8 |
| 63:17 64:17 65:7 | 189:6,12,14 191:9 | 152:1,6 162:7 | **national** 1:6 2:6 |
| 65:23 66:9 71:6 | 191:14 192:6,13 | 182:6 183:22,23 | 3:3 7:24 9:15,17 |
| 72:12,18 73:5,11 | 193:2 194:8,15 | 184:2 189:24 | 41:8,12,18,22,24 |
| 74:24 76:21 77:14 | 197:1,6,13,20,24 | 190:1 197:5,11 | 42:10,18 43:10,13 |
| | | | 43:15,22,25 44:8,9 |

[national - nfpa]

44:21 51:7 61:23
62:3 79:4 106:6
107:20 160:19
162:7,8,13,14
163:11 164:4,21
165:18,21 168:1,3
168:9,17 171:23
172:7,20 182:5
184:2 191:1,6
192:3,25 196:2,5
196:19
**nature** 15:16 96:7
152:11,12 156:11
**ncb** 7:17 142:2,5
142:10
**near** 178:11
**nearman** 7:12
85:25 86:5 87:22
93:6
**nec** 62:2 79:3
81:21 106:24
110:4,5 164:7
166:23,24 167:5,7
168:4 172:6,8,11
172:24 173:3,6,23
177:2 195:6
**necessary** 45:1,22
82:11
**need** 11:5,25 12:9
15:21 29:13 52:24
58:12,15 86:16
102:9 117:11,15
118:1,7 143:16
155:7 200:3,11
**needed** 40:25
143:10
**needs** 41:9 73:8
117:14,21 119:4
**negotiate** 111:7
**negotiating** 108:3

**negotiation** 107:24
108:7 149:7
**negotiations** 108:5
194:1,24
**neither** 202:16
**nercessian** 4:15
6:7,9,11 9:1,1,22
16:11,12 19:17
21:15,16 22:15
23:23 24:7,11
25:2,4 26:6,15,23
27:2,16 28:20
30:20 31:11,17
32:1,6,16,22 33:5
33:11,15,23 34:3,8
34:19 35:5 36:9
38:7,25 39:5,8,17
39:22,25 40:3,5
42:5,14,23 43:3,24
44:5,13 46:15
47:18 48:13,21
49:7,21 50:3,16
51:1,13,23 52:3,15
52:18 53:2,14
54:8 55:4,10,17,25
56:6,13,21 57:7,12
57:17,23 58:16,23
59:10,16,24 60:13
60:20 61:8,16
62:10,11,21 63:5,8
63:12,20 64:23
65:9,17 66:2,13
67:13,14 69:9
70:2,16,22 71:8,14
71:24 72:9,15,21
73:7,14,21 75:5,12
76:14,24 77:18
80:8,19 81:2,11,17
81:22,24 82:10,22
83:4,7 84:15 85:4
85:11 86:15 87:16

87:17 89:3 90:3
90:11,16 91:7,19
92:3,15 94:15
95:1,9,22 96:6,24
97:10,18 98:2,10
98:23 99:21 100:6
100:17 101:2,11
101:17,25 103:12
103:21 104:6
107:3,12 108:17
109:7,25 110:15
110:23 111:6,13
112:1,9,17 113:1
114:14 115:2,20
116:15,22 117:13
117:19 118:4,5,17
119:2,8,22 120:2
120:19 121:6,12
122:9 123:19
124:2 125:2,18
126:4,19 127:3,12
128:2 132:8,12
133:19 137:4,11
137:18 138:10,18
139:13 141:15,18
141:22 142:16,21
143:15,21 144:17
144:23 145:12,19
146:6 147:7 148:2
148:21 149:10,21
150:2,7,13,21
151:8 152:13,19
153:17 154:2,4,17
154:24 155:14,25
156:5,13,24
157:10,23 158:7
158:17 159:2,19
161:10 162:4,15
162:22 163:5,18
163:23 164:8,14
164:22 165:7,13

165:19 166:2
167:1,10 168:19
169:14 170:14
171:7,19 172:13
172:25 173:7,21
173:22 174:13,18
175:1 178:25
179:8,13 180:2
182:24 183:9,20
184:5,22 185:7,18
185:23 186:1,9
188:25 189:10,17
191:12,19 192:9
192:16,22 193:4
194:12,18 195:18
195:25 196:9,15
196:20 197:3,9,17
197:22 198:15,21
199:2,5 200:10
**new** 35:6 44:24
103:4
**newsletter** 194:23
**nfpa** 43:7,8,10
44:6,7 53:6,9 58:8
58:20 59:5,6,18,21
60:5,9,16,23 61:10
61:18 62:7,14
63:6 72:16,23
73:1 77:8,22
81:12 82:6,15
96:12 101:7
107:20 109:20
110:2,4 111:19
112:3,11,19 113:5
113:14 114:20
115:13,23 116:25
117:5,16 131:22
133:13,22 134:7
134:24 135:3,10
135:18 136:18,21
136:23 137:5,12

Veritext Legal Solutions
866 299-5127

[nfpa - objection]

140:16,19 141:1,5
141:9 150:17
151:10,25 167:16
168:2,8,9,16,24
169:3 170:3,12,18
170:21,24 171:4
171:12,16 172:19
172:20,23 175:13
175:25 176:17,18
176:18 181:14
186:14 187:12,17
187:25 189:4
191:4 192:1,10
193:10,17,19,21
193:25 194:5,14
194:20,25 195:9
195:19 196:3
198:10
**nfpa's**  82:2,4
**nfpa.org**  58:6,17
58:25 59:3 100:14
**nine**  29:13,15,21
46:13,16 47:7
103:23 104:5,16
104:18 105:1,13
105:21 106:21
166:18 167:2
**nodding**  56:19
**non**  115:14
**noncompetitive**
142:8,10,13,22
143:17,24 144:5
**nonexclusive**
110:2
**nonregulatory**
113:25
**nonresidential**
198:9
**nontransferrable**
110:3

**noon**  103:18
**nope**  34:7
**notary**  8:22
**notation**  33:16
62:23 159:10
**notations**  153:21
154:10,25 155:3
155:17 157:1,12
158:1,9
**note**  35:11 115:15
**noted**  25:3 64:3
81:23 201:13
**notice**  18:5 45:21
195:14
**noticed**  45:20
**notices**  19:25
**notify**  91:17
**november**  99:11
**number**  17:12
31:19 34:15 74:14
82:3 83:18 93:11
145:2 179:5
**numbered**  62:17
176:6
**numbering**  114:6
**nw**  4:8

**o**

**oath**  8:5 10:22
**object**  16:8 31:16
33:18,25 34:1
48:10 52:10 57:15
58:10 61:4 62:9
63:2,9 64:19
65:13,13 84:11
141:13
**objecting**  16:6
**objection**  16:1,5
19:16 21:14 22:14
23:21 24:6,25
25:2 26:5,14,20
27:1,13 28:19

30:18,19 31:9,24
32:3,9,21 34:6
35:3 36:7 38:5,23
39:2,7,10 42:3,13
42:20 43:1,18
44:3,11 46:7
47:16,17 48:9,16
49:19,25 50:14,21
51:9,10,22 52:1
53:11,12 54:5
55:2,8,14,15,21,22
56:4,5,10,11 57:3
57:10,14 58:19,21
59:8,14,22 60:11
60:17 61:2,12
62:8,15 63:10,17
64:16,17 65:7,22
65:23 66:9 67:12
69:7,22 70:13,20
71:6,10,21 72:5,12
72:18 73:5,11,19
74:23,24 75:9
76:13,21 77:14
80:4,17 81:9,13,23
82:2,8 84:10
86:10 88:24 90:1
90:8,14 91:3,13,15
91:24 92:12 94:9
94:24 95:7,20
96:2,22 97:8,16,25
98:7,22 99:18
100:4,15,24 101:6
101:15,21 103:8
103:11 104:2
106:25 109:2,21
110:11,13,19,20
111:1,9,22 112:4
112:13,21,23
114:10,24 115:19
116:7,19 117:8,17
118:3,9,21 119:6

119:18,25 120:9
121:2,10 122:7
123:16,23 124:25
125:15,25 126:1
126:11,13,22
127:7,22 132:5
133:17 137:1,8,15
138:6 139:11
141:17 142:14,19
143:12,18 144:14
144:15,19 145:7,8
146:2 147:24
149:3,19,25 150:5
150:11 151:5
152:3,16 153:23
154:12,13,19
155:20 156:4,18
157:4,15 158:4,12
158:21 159:15
161:10 162:4,15
162:22 163:5,18
163:23 164:8,14
164:22 165:7,13
165:19 166:2
167:1,10 168:19
169:14 170:14
171:7,19 172:13
172:25 173:7,21
174:13,18 175:1
178:25 179:8,13
180:2 182:24
183:9,20 184:5,22
185:7,18 188:21
189:5,6,12,13
191:9,14 192:6,13
192:19 193:2
194:8,15 195:11
195:23 196:6,12
196:17 197:2,6,13
198:15,21

Veritext Legal Solutions
866 299-5127

[obtain - paragraph]

**obtain** 73:17 101:4
**obviously** 33:20
**occupancies** 41:17
    42:1,17,24 182:1,5
    182:15 198:9
**occupant** 126:16
**occur** 131:11
**occurrence** 189:22
**occurs** 139:9,12,19
    139:22
**october** 84:7 99:11
**offer** 89:1 195:13
    198:2,4,6
**offers** 56:25 57:2
**office** 5:7 9:7
    15:17 24:18 42:6
    45:20 53:1 57:1
    84:5 86:4,19 89:7
    89:17,21,23
    128:20 129:15,24
    145:24 165:1,5,11
    165:24 182:9
    195:17
**official** 88:14 89:8
**officials** 16:19,20
    134:13
**oh** 15:7,11 20:25
    94:16 120:14
    129:2 140:11
**okay** 8:12 12:7
    13:24 15:11 17:5
    17:13,18 18:4
    19:3 22:11,17
    25:2 28:22 29:3,5
    32:11 33:1 34:14
    38:16 40:4,24
    41:2 43:20 44:18
    47:12 48:24,25
    49:1,5 52:17,19
    54:9 56:18 58:14
    63:9 70:8 74:10

80:12,21 82:18
    83:21 85:2 88:3
    91:8 98:14 100:5
    100:7 103:14,15
    109:18 134:23
    140:8,11 145:14
    145:17 148:17
    154:2 155:10
    160:7,14 162:18
    164:3 167:18
    175:4 176:5,11,11
    176:13 177:15
    183:16 185:12
    186:3,6,20 191:23
    191:25 193:13
    197:19,22 198:25
**ola** 89:6
**olson** 3:4,13 9:14
    9:17
**omit** 115:18
**ones** 108:11
**online** 91:17,18
    92:6 96:12 117:22
    119:1,17,24 120:3
    120:8,25 121:4,5,5
    133:1,13,16,24,25
    152:22 173:19,23
    174:1,11,15
**open** 18:4
**operator** 8:12 49:1
    49:5 82:24 83:1
    103:15,19 145:15
    145:17 160:11,14
    186:3,6 199:22
    200:12
**opinion** 24:22 25:5
    25:7,9
**opportunity** 18:7
**option** 47:1
**order** 33:2 34:17
    57:21 83:5 93:14

95:11 104:11
    107:9 111:11
    132:10 133:7
    140:12 141:20
    150:19 181:3
**ordinances** 49:15
    182:16 183:6
**organization**
    76:25 79:6,11
    136:6 198:19
**organizations** 26:3
    27:18,22 77:3,12
    80:1,13 81:4,19
    196:23 198:13
**oriented** 28:3
    161:7,15
**original** 202:13
**originate** 146:15
**originated** 146:18
    146:18
**origins** 40:11
**oshpd** 183:13
    184:13
**outline** 139:5
**output** 22:12
**outreach** 198:2
**outside** 23:21
    50:22 142:8,13
    152:17 153:6
    197:1,7,14
**outstanding** 74:13
**overall** 105:23
**overlap** 29:23
    104:23
**oversee** 19:23
**ow** 166:15
**owner** 168:8
    172:19
**owns** 58:18 168:2

## p

**p.m.** 2:22 8:2
**package** 30:14
    46:3,14
**page** 6:6 7:3 34:24
    34:24 35:1,12
    37:13,24 38:13,17
    40:6,25 61:10,20
    61:21 62:16 64:1
    64:3,3,5 74:6 82:4
    85:18 87:14 93:4
    93:13 95:11
    107:21 109:10,16
    114:25 115:3,16
    116:24 133:3
    134:21 138:21
    140:10 151:12,13
    153:20,21 154:1,6
    154:10,15 155:1,4
    155:18 156:22
    157:12 158:9
    159:5 167:25
    169:25 171:25
    172:4 175:10,22
    176:15,25 177:7
    178:4,8,14 181:2
    181:21 182:1,18
    186:12
**pages** 1:25 39:6
    58:25 62:17 63:4
    114:1,1 155:21
    156:8 176:22
    177:8,12
**paid** 45:10
**pam** 85:25 86:1
    93:6
**pamela** 7:12
**panic** 106:16
**paper** 114:4,4
**paragraph** 74:11
    74:15 93:9,15

Veritext Legal Solutions
866 299-5127

[paragraph - premium]

99:10 113:2
167:25 168:7
170:1,2 172:5,18
172:19 175:11
181:25 186:18,19
187:5
**paragraphs**
168:16
**parameters**  105:3
**part**  25:8 28:16
31:4 32:13 33:22
33:24 34:11 36:17
36:20,23 43:4
47:5,12,19 48:15
70:10 85:9 89:13
93:17,18,20
105:19 106:3,8
115:12 121:17
131:12 134:15
143:3,10 154:7
158:18 167:5
180:25 181:6
182:4,13 183:3
189:19 190:12
**participate**  18:14
45:11 108:5 164:1
197:5,11
**participation**
163:21
**particular**  25:18
80:9 148:12 149:1
149:9 150:4
167:16
**parties**  139:4
**parts**  32:18 35:4
36:14 37:1,9
38:11,17 166:23
167:7
**party**  8:21 202:18
**pass**  132:9

**passed**  85:12
132:13
**pause**  16:7 49:1
**pay**  93:13 94:7,23
95:5 181:2
**paying**  189:4
**payment**  55:20
56:3,9 190:8
**pays**  197:10
**pdf**  33:11,15 99:13
99:23 100:21
101:4 102:2
**pederson**  1:22
2:23 202:25
**penalty**  201:11
**pending**  12:11
48:25 145:13
**pennsylvania**  4:8
**people**  17:20 92:5
94:22 95:4 173:11
195:15
**performance**
124:14
**performed**  20:9
**performing**
123:14
**period**  45:20
139:20,22,23
**periodical**  193:18
**periods**  14:20
**perjury**  201:11
**permission**  61:23
62:2 73:17 189:3
**person**  32:7 68:1,5
69:5,18 70:11,19
73:8 94:7 95:18
95:25 96:18,20
132:22 136:6
189:24,25 190:4,8
190:18,22

**person's**  95:15
**personally**  120:6
120:11,16 121:19
**persons**  90:25
91:11 147:12
**pertain**  36:17
**pertains**  202:12
**petitions**  47:25
**phase**  20:19
**phone**  93:10,11
180:24
**piece**  114:4
**place**  22:25 100:21
202:5
**placed**  139:10
**places**  72:11 95:15
178:22 179:5
**plaintiff**  3:3 4:3
44:10 58:9
**plaintiffs**  1:10
2:10 25:13 58:9
**planning**  129:25
**play**  16:13 19:12
19:15,18 21:11,18
22:1 127:16 146:9
**played**  146:25
**plays**  128:14
**please**  8:25 9:25
11:9,19,23 35:13
44:17 83:4,8 88:5
**plumbing**  133:23
134:12,18
**point**  11:8 25:9,23
29:13,15 46:13,16
90:13,17,21
103:23 104:5,16
104:18 105:1,13
105:21 106:21
133:7 156:1
166:18 167:2

**pointing**  113:10
**points**  37:7,19
90:9 96:10
**poor**  166:13
**populations**
179:23
**portion**  65:11 66:7
110:4 158:19
170:17
**portions**  61:22
62:1,6,13 65:5
115:8 133:1
**position**  23:15
**positions**  20:25
**possible**  55:11
68:9,12,16,21,23
69:13,17 118:18
118:25 119:1
127:13 132:19
165:4,8,10
**possibly**  46:20
77:22 78:23
155:21
**posted**  100:10
113:5,18 114:17
**posting**  113:6
**potentially**  185:17
185:19
**pra**  84:1 85:2
86:12,13,19 99:7
152:25 153:5,7
**pras**  153:4
**pre**  44:25 47:25
139:6
**preliminaries**
10:19
**preliminary**  99:1
**premium**  93:13
94:7,23 95:6,11
181:2

Veritext Legal Solutions
866 299-5127

[prep - publication]

prep 7:6
prepare 12:24
    13:10
prepared 20:18
    21:24
prescribe 147:22
prescribed 29:25
prescribes 125:14
    125:24 126:10
present 5:15 67:22
presented 18:6
    46:1
preserving 141:16
pretty 81:15 139:7
previous 10:8
    23:10 44:23 67:25
    68:4 69:3 70:15
    70:18,24 121:13
    122:8
previously 12:5
    36:1 71:25 93:5
    106:21 107:4
    115:3 128:9
price 140:19,23
    141:1,6,10
principal 145:21
print 34:23 58:2
    59:20 60:4,6
    95:18 97:3,6
    136:24 137:20
    170:5 174:5,21,24
    179:24 180:1
    181:1 189:21
    190:9
printed 32:20 53:1
    133:2
printing 82:16
    89:8 114:13
    170:13
prior 84:2 104:13
    131:11 142:7

151:1 202:7
privileges 120:8
    121:1
probably 124:17
    197:21
problem 184:25
problems 92:19
procedures 14:3
    18:22 45:5 47:23
proceedings 202:4
    202:6,8,14
process 13:22,25
    13:25 14:5,16,17
    19:13,19,24 22:8
    22:12 47:15 63:21
    75:7 78:24 102:10
    116:9 142:3,6,12
    142:17,23 143:3,9
    143:11,17,24
    144:6,9 161:21
    162:3,10,19,20,25
    163:4,7,10,16,21
    164:1,13 169:6
    196:22 198:7
    199:11,12
processes 21:11,19
    22:1,6,24 23:3
    48:7
procurement 7:22
    151:16
produce 87:4
produced 86:8
    87:11
production 85:9
    101:9
products 124:21
professional
    118:23 119:3,13
professionals
    119:11

profit 57:9,19
program 66:17
prohibit 103:5
promote 106:15
promotion 21:3,5
    21:8
prompted 87:23
property 110:6
    115:9
propose 76:6
    108:9,12 163:9
    194:5
proposed 17:21
    29:10 40:14 45:11
    45:17 104:22
    105:2,18 106:1,11
    106:15 158:25
    159:7 194:14
protect 166:19
protecting 167:8
protection 1:6 2:6
    3:3 7:24 9:15,18
    26:1 44:8,9 62:3
    107:20 160:19
    168:2
protects 166:24
provide 16:24
    17:14 45:13 66:6
    67:16 89:8,24
    114:22 143:22
    195:19 196:4
    199:7
provided 12:5
    13:1 15:19 18:11
    25:1 71:3,4,9 85:3
    85:6 86:20 87:1
    92:7 101:23
    102:20 106:8
    113:6,15 114:2
    135:20 176:17

providers 152:2
provides 56:8
    89:18 93:11
    199:14
providing 103:6
provision 68:21
    69:1,6,14,19,21
    103:25 109:19
    159:9
provisions 68:5
    70:10 115:10
public 8:22 14:19
    14:20 18:5,6,7,13
    20:1,3,19 37:25
    38:22 45:13,14
    46:2,9 48:18
    51:18,19 52:8
    54:14 55:18 56:1
    56:8 63:15 64:1
    75:20 78:24 84:6
    86:9 87:2,5,11
    92:24 94:6 103:7
    105:8,14,16,22
    106:6 130:11
    132:2 140:19
    141:7,11 163:25
    166:19 167:8
    170:7
public.resource
    25:13 86:9 87:2,5
    152:21 153:3
public.resource.
    153:1
public.resource....
    1:13 2:13
public.resource....
    8:17 9:3,5
publication 21:12
    61:22 62:6 63:16
    65:2 89:9 131:11
    131:18 139:6,9,23

[publications - receive]

| | | | |
|---|---|---|---|
| **publications** 7:21 | **purchased** 120:7 | **questioning** 16:7 | 88:14 93:10 99:10 |
| **publicly** 21:25 | 121:4 | **questions** 10:21 | 113:3 138:22 |
| 52:25 | **purchasing** 54:15 | 12:21 56:17 64:20 | 151:11 154:6 |
| **publish** 34:12 | 96:17,19 | 82:1 83:19 99:1 | 157:12 159:10 |
| 53:21,24 63:22 | **purely** 192:11 | 138:19 160:4,21 | 168:1 173:1 |
| 73:18 110:6 117:2 | **purports** 94:10 | 168:13 173:25 | 175:12 182:4 |
| 131:4 144:25 | **purpose** 18:23 | 179:21 180:4 | **realize** 12:4 |
| 170:5 192:10,17 | 196:16 | 182:11 185:21,22 | **realized** 100:9 |
| **published** 35:24 | **pursuant** 85:6 | 186:10 197:18,21 | **really** 149:6 |
| 114:3 131:8 133:2 | 111:15 | 197:25 199:1,21 | 184:19 |
| 133:12,22,23 | **put** 26:3 33:20 | **quick** 145:10,11 | **realtime** 8:9 |
| 163:12 | 91:18 101:23 | **quite** 108:16 | **reason** 12:20 |
| **publisher** 22:19 | 195:14 | 143:25 | 18:23 29:12 45:25 |
| 22:19 37:8 38:18 | **puts** 45:19 | **quote** 141:2 | 46:18 61:9 68:24 |
| 39:4,6 51:19 52:9 | | | 69:1 86:7 115:24 |
| 53:3,5,6,17 54:3 | **q** | **r** | 118:6 133:20 |
| 54:10 57:9,19 | **quality** 166:1,13 | **rachel** 3:5 9:13 | 154:25 198:12,18 |
| 70:19 71:23 72:2 | **quantities** 175:18 | 160:18 | **reasonable** 105:22 |
| 72:11 77:6 91:17 | **question** 11:9,12 | **rachel.miller** 3:11 | **reasons** 17:16 |
| 92:1,4,8 93:22 | 11:19,22,25 12:11 | **raised** 191:1 | 18:17 45:24 46:10 |
| 94:7 102:24 | 22:4,16 23:24 | **rationale** 18:22 | 63:19,25 67:21,23 |
| 116:12,12 134:13 | 26:10,16 27:5,20 | **read** 13:1 25:5,7,8 | 68:22 69:15 |
| 173:16 191:15 | 30:21 31:10 32:5 | 26:24 35:12 38:14 | **recall** 51:20 70:25 |
| **publisher's** 38:4 | 32:12 48:12,25 | 40:22,25 41:1,17 | 87:25 88:8,11 |
| 72:8 73:10 101:23 | 55:3,24 64:21,25 | 88:10 91:1,11 | 92:21,23,25 93:7 |
| 102:21 117:23 | 65:16 68:6,15 | 109:23 113:7,11 | 94:19 99:20 100:3 |
| **publishers** 38:8 | 69:25 70:1,4 | 113:19 134:3 | 103:25 104:4 |
| 103:4 107:6 | 71:12 78:13 80:7 | 139:21,24 148:7 | 107:6,24 108:16 |
| 108:24 123:7 | 80:11,16 81:3,15 | 151:18 168:23 | 110:22 113:17 |
| 168:13 | 91:6 96:4 102:16 | 169:2 170:12,17 | 133:8,14,18 135:5 |
| **publishes** 39:19 | 108:1 112:16 | 170:20,21,24 | 135:9 143:14,20 |
| 116:12 184:18 | 116:3 124:1 125:1 | 174:15,21 175:25 | 143:25 145:3 |
| 191:4,15 192:1 | 125:16 126:3,5 | 180:23 182:14 | 146:21 148:11 |
| **publishing** 38:12 | 127:1 144:16 | 192:23 201:11 | 149:11,13,17,23 |
| 170:13 | 145:10,12 147:5 | **reader** 62:12,19 | 150:1 151:2 |
| **purchase** 37:25 | 148:1,18 154:16 | 64:9,14 65:10,20 | 179:17 187:15,16 |
| 38:2 96:13 117:10 | 154:17 155:8 | 66:1,6 67:9,16 | 187:24 188:1 |
| 117:15 118:15,25 | 157:9 160:22 | **reading** 31:21 | 191:1 194:13,17 |
| 119:16,24 120:6 | 166:16 183:1 | 131:22 139:14 | 194:19,24 196:23 |
| 120:16,20,24 | 185:9 191:24 | 140:24 | **receive** 14:18 74:1 |
| | 193:11 199:3 | **reads** 37:14 40:9 | 96:18 101:8 120:7 |
| | | 64:5 66:19 85:18 | |

Veritext Legal Solutions
866 299-5127

[received - requests]

**received** 21:3 25:8 25:10 84:4 91:16 92:18 93:10 94:6 94:21 121:1 132:17,19 137:21 179:25 180:7,11 180:15,24
**receives** 73:23 111:20
**receiving** 78:22 84:3 95:4
**recess** 49:4 83:1 103:18 145:16 160:13 186:5
**recognize** 24:13 34:22 58:1 83:9 83:23 87:18 99:3 106:23 107:14 132:14 141:24 153:22 154:11,18 156:14 158:18,19 158:24
**recognizes** 154:16
**recommend** 30:5
**recommendation** 45:13,15
**record** 8:13 9:25 11:4 16:4 49:1,6 80:23 82:22,24 83:1 103:16,19 145:15,18 160:10 160:11,15 168:15 185:24 186:2,3,7 199:22 200:12,14 202:7,11
**records** 84:6 86:9 87:2,5,11
**red** 193:7
**refer** 31:22 32:8 61:20 64:2 66:21 74:5 93:4 102:21

**reference** 28:2,4,7 28:11,18,25 29:7 30:5,16,23,24 31:3 31:8,12,15,20,23 32:8,14,18 50:7,12 50:19 51:3,6,7 52:23 65:11,11 71:23 93:17 115:10 122:12 161:14,19 162:8
**referenced** 28:12 31:19 49:20 50:1 50:10
**references** 51:6
**referencing** 31:8 31:13
**referred** 17:13 18:16 28:4 41:15 46:17,21 93:25 110:5 115:1 188:11 189:24
**referring** 29:16 39:13,14,15 40:2 51:18 52:9 122:6 135:8 177:10
**refers** 181:6,12
**reflect** 64:13 67:3
**reflected** 59:12 60:25 61:10 88:8
**reflects** 65:4 109:19 166:24
**refrigerating** 1:8 2:8
**regarding** 88:14 135:10 147:4,9,18 153:2 186:11 195:20 199:7
**regards** 153:4
**register** 72:16,23
**registry** 45:21

**regulate** 166:13
**regulated** 184:15
**regulations** 14:12 14:14 22:17 89:9 89:10,14,16,19,25 90:5,7,13,21 154:7 158:25 175:16 185:6
**regulatory** 35:8
**relate** 23:3
**related** 8:21 21:11 21:19 22:2,6 175:16 190:23 198:4,11,13
**relationship** 19:8
**relative** 202:17
**relevant** 66:7 69:6 69:19 88:22
**relies** 161:16 165:17
**rely** 46:10 144:12 164:4 165:21 166:12,13
**relying** 167:5
**remember** 19:1 21:2 48:5 161:8 167:19 174:2 177:19 182:2,10 191:3
**removed** 100:10
**renew** 158:3
**repeat** 27:20 31:10 55:3,23 68:15 78:13 91:5 105:10 157:8 182:25
**rephrase** 11:10 16:11 21:15 27:6 28:21 48:14 56:7 62:10 67:13 70:7 91:8 108:2 116:4 118:4 122:10

185:11 191:22
**replaced** 100:13
**report** 94:17
**reported** 1:21
**reporter** 2:24 8:8 8:24 11:1 199:23 200:2,8 202:2
**reporter's** 11:16
**reports** 94:21 95:4
**repository** 175:6
**represent** 16:20 34:14 82:5 160:19
**representation** 12:16 13:12
**representative** 10:11 17:2 193:22
**representatives** 193:10,17 194:20
**representing** 9:2,5 9:7,10
**represents** 16:18 65:1 66:11,16
**reprinted** 32:14 32:18
**reproduce** 82:12 82:14
**reproduced** 61:22 62:2
**request** 84:1,6,9 85:6 86:9,13 87:2 87:5,11 99:7 137:21 152:25 189:18 190:11,16 190:17,21
**requested** 128:24 138:2 202:15
**requesting** 189:25 190:4,8,18,22
**requests** 153:5,7 179:25 180:6,10 180:14

Page 26

[require - says]

| require 88:23 124:23 | responded 85:2 86:12,19 | reviews 14:21 20:2 | roughly 20:7 |

require 88:23
124:23
required 16:17
28:13,14 40:16
48:3 94:7 165:20
175:25 176:19
177:3 190:8
requirement
125:7 176:21
183:18,22,23
requirements
16:15 65:19 125:3
127:6 170:4
requires 44:18
89:6 95:11 105:8
105:14
research 13:4,7
77:16,23
researched 75:21
resellers 136:18
reside 46:24
residences 42:2
residential 93:20
93:21,23 95:12,16
95:19 96:1,21,25
97:4,7,12,15,20,23
98:4,6,13,19
resource 164:12
respect 18:1 24:19
24:24 28:24 53:7
53:9 70:9 71:18
73:16,23 77:11
85:1 98:5,13,18
112:11 124:22,24
125:4 129:12
130:17 134:16
142:23 169:21
171:1 195:9,20
196:1,4 199:14
respond 45:23

responded 85:2
86:12,19
respondent 10:10
response 84:22
86:8 87:1,4,11
88:4 175:15
responses 11:5
responsibilities
19:21 21:7
responsible 14:15
38:12 169:20
170:12,18
responsive 85:3
rest 110:14 135:13
restate 80:10
191:24
restriction 95:17
restrictions 54:24
55:5,11 72:10
95:15
return 111:20
145:20 153:18
reveal 84:25
108:13
revenue 73:23
74:1
review 13:2 17:25
45:11 78:24 84:13
84:19 85:5,14
87:10 111:4,17
119:24 121:4
152:11 154:14
180:25 202:14
reviewed 20:18
21:23 26:19,22
27:11 45:4 108:8
115:4 119:13
147:10
reviewing 82:6
108:4 118:20
119:23 145:25

reviews 14:21 20:2
revision 22:25
revisions 110:5
right 17:17 19:1
20:4 24:12 34:4
34:20 39:24 40:6
52:13 56:22 62:18
63:13 69:10 70:7
75:19,24 81:25
98:18 99:3 103:12
107:4 120:15
134:24 135:17
139:25 140:12
155:22 157:7
166:20 167:9,22
168:18 169:17,22
170:9 172:24
174:8,16 176:20
177:4 178:24
181:7,10,12,23
182:23 183:7
184:3,10,21
185:16 186:10
192:12 195:8
199:19
rmr 1:23
role 16:13 17:5
19:12,15,18 20:5
20:20 21:4,10,10
21:17,18 22:1
26:11,19,25 53:9
86:1 108:2 127:16
128:14 145:25
146:9,25 171:22
roles 20:9,12
23:10 145:21
room 131:23
rose 3:14 9:16
rose.ehler 3:20
rough 139:5 200:6
200:9,10

roughly 20:7
roughs 200:2
round 186:13
188:10 190:25
row 66:24
rulemaking 14:5
14:18 15:17 17:13
17:15 19:13 20:18
22:24 45:2 46:1,3
47:15 48:2 63:21
rulemakings
14:22,24 15:19
rules 47:14 48:6
68:11,14,18 69:2
184:19 185:1,15
runs 58:18

s

s 4:13
sacramento 1:18
2:21 5:11 7:16 8:1
8:19 132:18
177:24 178:2,7,10
178:13,17,20,22
safety 14:2 17:11
29:20,25 66:16
106:16 123:12,21
124:9,12,20 130:3
166:9,14,19,25
167:8
sale 117:2,6 170:6
san 4:20
saw 145:24
saying 41:3 52:12
161:8 175:24
says 11:17 40:7
41:21,24 52:23
62:18 74:25 88:4
131:3 133:1,21
135:18 136:17
139:21 151:19
168:4,8,10,21

Veritext Legal Solutions
866 299-5127

[says - sorry]

170:3 172:19
182:14
**school** 129:3,7,12
178:12
**schools** 42:8 182:9
**scope** 23:22 50:22
152:17 172:5
195:12,23 196:6
197:1,7,14 199:3
**scratch** 165:6,12
**screen** 82:5 181:1
**screenshots** 59:12
63:5 82:3,11,16
**search** 60:14
95:25 96:20 97:11
97:14
**searchable** 99:13
99:23 100:21
101:4,8 102:1
**sec** 82:23
**second** 37:13
58:11 61:20,21
66:24 99:9 140:9
159:4 167:24
172:4 177:25
178:9 182:13
183:3
**section** 17:12
37:24 38:2 88:18
88:22 89:6 102:12
109:13,15 113:2
113:11 115:7
116:10,17,23
123:9 131:1
134:20,24 136:17
140:14 158:23,25
159:3,6 168:7
**sections** 64:11
67:6 115:9
**see** 17:20,21 33:17
41:19 59:12 61:24

62:4 64:6,9 66:19
72:16,23 74:11,15
75:21 82:5 85:17
88:6,14,20 93:9,14
99:9,14 104:20
109:15 110:7,8
113:7,13 115:8,16
117:3 125:22
131:5 133:4 135:1
135:21 136:9,12
136:19,20 138:21
138:23 139:16
140:20,21 146:12
152:11 154:8,9
156:21 157:25
158:8,25 159:6
168:23 169:25
175:10,22 181:3,5
182:6,18 186:16
186:25 187:10
193:6
**seeing** 119:17
143:6
**seek** 76:9 84:9
**seeking** 67:16 68:5
69:18 70:11 78:5
90:25 91:11 92:6
94:22 95:4 189:3
**seen** 58:2 84:2
85:14,16 150:25
151:6
**selected** 47:7 63:7
63:8 176:1 187:8
**selective** 136:11
175:19 177:1
**sell** 160:2
**sense** 12:12
**sent** 24:17 86:13
**sentence** 88:2 94:1
99:10,15,17
110:14 113:3

131:3 133:1 168:1
170:17 172:21
175:12,25 180:23
182:4,14 183:3
**separate** 18:10
32:8 103:1
**separately** 63:15
63:23 144:25
**series** 10:20 85:21
**serve** 20:20 47:9
53:9
**served** 20:4 83:13
**service** 71:19
129:4,8,13 188:15
**services** 5:18 7:18
7:22 9:10 19:10
23:17,19 35:19
107:19 118:11,15
119:16 120:23
143:23 146:5
151:16
**set** 170:5,8 175:18
184:25 202:5
**sets** 22:8 131:9
**seven** 134:21,22
134:23,23 178:21
**sheet** 7:17 33:21
33:24
**sheets** 33:20
175:17
**short** 96:17,19
**shorthand** 2:24
202:1,9
**show** 24:8 85:8
115:13 143:16
**showing** 191:7
192:4
**shown** 115:12
116:10
**side** 139:25 159:9
171:21

**sight** 137:14 138:1
180:12 190:19
**signature** 107:22
151:13,17 172:1
202:24
**signed** 145:23
172:1,22 173:4
**significant** 123:12
123:20 124:3
**signing** 151:18
**similar** 143:2
146:16 151:3
152:10,11,12
156:11 158:6
190:17,21
**similarly** 38:3
96:11
**simply** 81:17
**simultaneously**
21:1
**single** 145:6
**site** 35:2 72:4,17
72:24
**situations** 91:20
92:16
**six** 149:24 170:1
187:7,8 188:6
**sixth** 178:15,15
**skim** 156:6,15
**slate** 98:16
**society** 1:4,7 2:4,7
4:3 8:15
**sole** 168:8 172:19
**solely** 110:6
**somebody** 31:21
173:12 174:20
179:5
**sorry** 15:1,5 26:10
27:20 43:20 46:23
55:23 56:18,20
58:14 68:6,15

Page 28

[sorry - state]

78:14 88:21 91:6
91:25 100:5
104:12 105:10,12
109:5 114:1
115:17 120:12
123:25 125:17
126:3 129:2
140:11 157:8
160:7 166:16
172:18 176:8
181:19 182:25
183:1 184:23
186:23 187:6,10
**sort**  149:5 195:4
**sought**  76:19 78:1
**sound**  172:24
184:21
**sounds**  104:25
**sources**  40:12 43:6
78:25
**south**  3:16
**speak**  119:10,11
121:16 183:11
**speaking**  184:11
**special**  113:4,15
113:19
**specific**  18:21 27:8
47:3 64:11 80:9
100:2 102:12
116:10,17 142:12
149:6 170:3 185:1
193:22
**specifically**  19:1
19:24 75:22
179:19 184:11
194:11 198:6
**specifications**
106:6
**specifics**  27:15
32:15 99:20 148:6

**specifies**  140:23
**speculate**  126:17
159:22 164:16
**speculation**  55:14
57:4 58:21 62:8
65:24 67:12 69:7
69:23 70:13,20
71:21 72:19 75:9
76:13,22 82:8
84:12 86:10 90:14
91:3,14 95:20
96:2,22 97:8,16,25
99:18 100:25
101:15 116:19
118:3,22 119:7,19
121:10 125:25
126:11,22 127:8
132:6 133:17
137:2 142:14
144:15,19 146:3
149:19,25 162:5
163:6 192:7,19
197:15
**spoke**  18:3 29:2
78:21 116:8 169:6
169:21 174:25
175:4
**spoken**  12:14
153:12 160:25
193:21
**spring**  20:15
**sprinkler**  125:10
**sprinklers**  125:11
**ss**  66:11,16
**stack**  167:17
180:21
**staff**  7:16 13:23
19:23 20:2 45:3
47:2 85:23,24
87:8 92:22 100:9
101:1,9 118:16

132:18 146:4,5
147:13 153:5
165:2,5
**stages**  14:16
**stand**  35:21 44:7
**standalone**  192:18
**standard**  7:13
22:13 26:3 27:8
27:17,21 30:5,16
31:7,8,13,13,20
32:8,14,18 41:7
44:6 65:11 107:17
149:5
**standards**  5:3 7:24
9:8,11 13:17,19,22
14:1,9 16:16
17:10 19:3,9 23:8
24:4 26:1,3,7,9,11
26:13,19,24,25
27:9,10,11,12,19
27:23,25 28:2,4,7
28:8,11,16,17,23
29:6,18 30:4,24
31:22 35:22 36:5
37:3,10 38:22
39:16,21,23 40:8
40:10,11,13 41:4,6
41:11 45:3,6,18
47:2 51:7,17,18
52:20,23 54:19
63:13,24 67:16
73:25 75:18 84:22
99:12,22 100:20
101:3,19 102:14
102:24 104:10,12
104:22,24 105:2,9
105:15,18,24
106:2,6,11,15
107:5,19 111:16
117:9 121:17
127:15 130:24

131:12 133:2
142:25 144:8,13
151:17 158:24
159:7,17 161:3,4,7
161:15,19,22
162:9 164:6
165:25 166:1,4,8,8
183:14 189:20
190:13 193:21
196:23 198:1,5,8
199:11
**stands**  35:18
142:10
**start**  11:22 116:18
161:5
**starting**  98:16
**starts**  74:7 187:7
**state**  5:5,17 7:13
9:25 10:12 13:21
14:19 15:23 17:22
18:25,25 19:15,18
21:23 23:13,25
29:17,18 30:1
35:16 38:20 39:13
39:14,18,20 40:15
40:23 41:5 44:18
44:18,22 45:10,14
45:15,16,23 46:11
48:1,7,19 51:14
52:4,6,11,12,17,18
52:22 63:22 64:10
66:15 68:9,12,16
69:11,15 73:22
74:3,14,20 75:1,6
75:15,17 76:17
77:24 78:4,22
79:17,21 89:5,9
103:23 104:9,15
106:16,17 109:8
111:17 115:15
116:9,16 117:2,6

Veritext Legal Solutions
866 299-5127

[state - takes]

117:11,14,20
118:1,6,13,19
127:23 128:14,16
128:20,23 129:1,3
129:6,11,15,21,22
130:15,19 134:1
134:18 138:3,9,12
140:18 141:6
144:11 148:13
149:2 159:23
160:1 166:4,9,14
167:8 169:9,16
170:6 175:21
176:3 182:16,22
183:4,6,11,16
184:1,15 185:5,13
186:15,24 187:2,9
187:11,15,16,22
187:24 188:1
195:3 201:18
202:2
**state's** 123:13,21
124:4
**stated** 102:19
121:13 191:16
**statement** 17:16
18:16 40:18 45:24
45:25 46:10 63:18
63:25 67:21,23
68:22 69:2,15
120:4,18 122:13
122:16 123:11,15
133:21 135:13
140:22 191:11
**statements** 18:20
18:24
**states** 1:1 2:1
74:12 89:2 110:2
115:8 116:25
134:24 140:16
179:2

**statewide** 129:24
**stating** 61:21
86:13
**stats** 161:14
**steps** 116:4 123:1
137:19,22
**store** 37:5
**street** 3:7 4:18
5:10
**strength** 124:15
**strike** 16:23 31:1
34:16 38:1 41:23
43:14 48:1 51:3
51:15 52:5 53:8
64:4 66:4 67:8
68:2,7,11,25 69:11
69:12 70:17 73:15
74:18,19 76:16
77:2 78:8,9 84:16
86:22,24 92:17
93:1,3 94:4,16,20
95:2 96:16,18
98:12,14 108:11
115:12,14 120:3
125:19,21 130:24
131:16 132:1
133:10 141:4
144:9 154:2 155:1
155:16 190:16
196:2
**strikeout** 17:19
116:11 191:17,20
191:21
**strikeouts** 191:7
191:20 192:4,25
**structural** 66:16
124:14
**study** 15:1,3,9
**sub** 66:25 67:1
**subdivision**
122:18

**subdomain** 35:18
**subject** 13:8 36:18
41:18 182:5,15,21
183:5,5,10,12
194:13
**sublicense** 110:3
**submittal** 48:2
**submitted** 45:2
48:3 152:25,25
**subpoena** 7:9
23:22 24:20 50:23
83:15 84:3 86:21
86:23,25 152:17
**subscribed** 202:20
**substance** 148:22
194:2
**substantive**
148:10
**successfully** 144:6
**suggest** 172:22
**suggests** 156:14
**suite** 2:21
**summarize** 169:8
**supplement** 35:9
113:15,19,25
192:18
**supplements**
110:4 113:4
175:15,15
**supplied** 19:25
**supplies** 15:17
59:6
**support** 13:23
**suppose** 27:14
**supposed** 157:6
166:19
**sure** 16:22 17:2
22:4 35:14 48:11
65:15 82:24 98:8
112:15 120:5
146:18 155:8

157:6 166:15,17
171:11 172:17
183:3 185:11
197:16
**suren** 93:10
180:24
**swears** 8:24
**switch** 145:5
**switching** 186:2
**sworn** 9:21 202:7
**systems** 16:21

**t**

**table** 64:8 65:1,18
65:21 66:3,5,10
**tables** 64:6,13
115:10
**take** 11:13 12:1
14:23 15:2 18:1
22:9 28:24 29:1
29:11,13 46:13
48:23 82:20 83:8
84:22 85:13
102:17 104:14
116:5 123:1
128:18 130:4
145:11 154:23
156:6,15 176:5
180:18 183:22
200:9,10
**taken** 2:20 10:3
22:25 26:18 48:4
94:12 98:4 103:18
137:19,22 138:4
138:12 179:22
202:4
**takes** 14:22 22:12
46:3 128:21
129:11,16,25
130:7,11,16,20
171:1

Veritext Legal Solutions
866 299-5127

**[talk - triennial]**

| | | | |
|---|---|---|---|
| **talk** 11:17,18 18:24 104:19 161:4 162:2,2,18 167:15 171:21 | **testified** 8:6 36:1 47:19 51:16 70:23 71:25 | 114:16 123:25 124:18 161:13 165:1,4,10 166:7 166:17,23 198:18 | 155:1,3 182:6 |
| | | | **titles** 14:14 89:24 90:6,12,17,20 |
| **talked** 41:9 161:2 166:7 180:19,20 181:25 | **testify** 7:9 83:15 | **third** 40:6,21 109:16 178:5 | **today** 10:20,22 12:15,18,22 61:7 151:1 160:23,25 161:2 168:12 169:6 173:25 177:16 180:19,20 |
| | **testifying** 202:7 | | |
| | **testimony** 10:14 10:17,22 12:15,17 13:11 51:20 54:6 61:5 64:18 70:25 72:6 92:13 93:1,3 104:3 112:22 121:13 122:8 129:5 138:16 150:14 152:4 161:6,11 188:22 201:14 202:11 | **thirteen** 36:16 | |
| **talking** 15:6 80:18 80:25 81:16 128:25 162:13 167:19 173:10 182:2 | | **thought** 128:24 187:20 | |
| | | **thousand** 82:16 155:21 156:8 | |
| | | **three** 20:6 35:7 40:10,18 41:4,14 47:9 109:12 181:21 182:1 187:8 188:4 | **today's** 12:24 83:15 |
| **talks** 139:4 | | | **tolles** 3:4,13 9:14 9:17 |
| **team** 95:4 | | | |
| **technical** 17:25 45:9,11 47:10 163:16 | **testing** 1:4 2:4 4:3 8:16 | **time** 11:25 12:9 18:7 21:2,3 86:3 99:19 100:19 108:16 110:21 123:10,13 124:18 132:22 133:13,16 144:24 152:10 156:6 172:22 173:4 202:5 | **tonight** 200:8 |
| | **tests** 97:19 | | **top** 48:5 62:17 64:4,5 65:4 108:20 111:5 114:21 121:16,25 151:11 172:4,17 175:11 184:18 |
| **technician** 86:4 | **text** 38:21 52:7 55:19 56:2,8 60:8 60:15 61:17 62:4 71:16,18 72:4,7,11 92:5 97:22 101:13 101:19 102:1 103:6 115:15 174:5 192:10 | | |
| **tell** 11:23 27:15 114:19 139:8 148:12 154:15 156:10 162:3 163:3 173:14 176:14,25 177:8 188:16 | | | |
| | | | **track** 116:6 |
| | | **timeframe** 152:7 | **training** 195:1,2,4 195:5,14,16 196:4 196:8,14 198:19 199:9 |
| **tells** 62:19 114:5 | **thank** 15:11 16:10 35:15 109:4 198:24 199:17 | **timeline** 138:23 139:2,15 | |
| **ten** 13:23 15:13 16:16 18:9 156:15 188:8 | | **timetable** 170:5 | **trainings** 195:8,20 196:1,11 198:4,6 198:11,13 199:7 |
| | **thanks** 22:17 161:2 | **timing** 48:1,2 139:5,5 | |
| **tend** 161:18 | **thing** 25:6 109:24 156:25 157:11 169:8 | **title** 14:6,7,7,10,10 14:12 19:19 35:4 35:6,23 36:15 37:15,18 41:19,21 41:22,25 42:11,18 43:5 47:6,12,20 48:15 89:11,13,15 89:20,22 90:4 93:18 115:12 134:15 154:7 | **transcribed** 202:9 |
| **term** 47:9 49:8,11 49:13,18,23 50:6,9 175:12 187:3 | | | **transcript** 201:12 202:10,13,15 |
| | | | **treated** 90:5 |
| **terminology** 76:5 | **things** 122:13 171:22 | | **tried** 61:17 93:11 97:3,11,19 174:4 180:25 |
| **terms** 17:16,18,24 18:2,4,10 45:25 73:9 129:19 145:22 146:1 147:1,4,9,18 148:10,13 149:1 150:4,9 151:3 | **think** 17:17 27:24 30:2 41:14 70:5 80:6 81:14 94:12 104:7 106:19,22 | | **triennial** 36:14 37:2,14 47:1 80:9 81:5 99:14 111:8 111:18,21 139:2 142:24 |

Veritext Legal Solutions
866 299-5127

[triennially - viewing]

| | | | |
|---|---|---|---|
| **triennially** 35:7 | **unauthorized** | **use** 14:3 50:4 63:2 | 44:1 46:6 53:1 |
| **true** 51:24 119:9 | 33:19 | 102:5 110:3 | 60:21 71:19 77:13 |
| 201:15 202:10 | **underline** 17:20 | 111:11,14,16,20 | 78:11,16,25 79:7 |
| **try** 11:10,17,18 | **underneath** | 117:11,14,21 | 79:12,19,23 80:2 |
| 169:8 | 151:15 178:18 | 118:1,7,12,14,16 | 80:10,14 81:5,5 |
| **trying** 27:7,24 | **undersigned** 202:1 | 119:1 134:14 | 100:9 101:8 102:2 |
| 70:6,9 | **understand** 10:21 | 166:5 199:6 | 111:21 121:4 |
| **tsc** 1:7 2:7 | 11:1,5,8,20 12:1 | **useful** 88:6,9 | 122:1 172:5 |
| **turn** 167:17,24 | 15:11 22:4,5 27:6 | **user** 37:25 38:3 | **versions** 33:8 |
| 178:3,8 181:20,21 | 27:7,24 28:1 | 82:5 114:2,5 | 122:5 |
| **twenty** 188:9 | 30:21 31:23 32:12 | **uses** 161:3 | **versus** 8:16 |
| **two** 25:20 40:16 | 41:3 43:21 50:11 | **utilize** 14:1 23:15 | **vertically** 62:23 |
| 40:20 46:25 47:8 | 50:17 53:21 64:24 | 23:19 112:6 | 159:10 |
| 66:18 67:1,4 | 65:10 71:12 76:4 | **utilized** 188:15 | **vet** 45:1 |
| 88:10 103:3 | 85:9 93:18 110:9 | **utilizing** 23:13 | **vetting** 162:8 |
| 111:12,14 113:2 | 115:24 152:14 | | **viana** 5:16 9:9 |
| 131:3 149:16,18 | 156:9 | **v** | **video** 8:12 49:1,5 |
| 158:9 160:22 | **understanding** | **vague** 19:16 53:12 | 82:24 83:1 103:15 |
| 176:22 186:17 | 40:23 49:22 50:9 | 55:22 56:5,11 | 103:19 145:15,17 |
| 187:8 | 50:18 51:2,5 | 65:7 80:5,17 81:9 | 160:11,14 186:3,6 |
| **type** 16:24 | 65:16 70:5 79:10 | 81:13,15 91:4 | 199:22 200:12 |
| **types** 16:16 40:10 | 79:14 89:17 | 98:7,22 106:2 | **videographer** 5:21 |
| 122:6 124:23 | 110:17,24 111:19 | 111:1 118:9 121:2 | 8:20 |
| 193:16 | 112:2,6,10,18 | 123:16 139:11 | **videotaped** 1:17 |
| | 163:3,15,20,25 | 141:14,17 149:3 | 2:19 |
| **u** | 172:8 189:1,11 | 150:5,11 151:5 | **view** 93:12,14 94:8 |
| | **understood** 11:14 | 161:24 162:1 | 95:6,11 96:9,12,15 |
| **u.s.** 24:23 | 11:14 76:8 | 163:5 166:16 | 98:11,20 123:5 |
| **uh** 15:12,15 18:18 | **unfair** 81:15 | 184:23 | 165:24 173:12,16 |
| 31:6 37:16 40:19 | 105:19 | **vaguely** 142:4 | 173:18 174:10 |
| 46:23 47:22 48:23 | **uniform** 134:17,17 | **variety** 18:24 | 177:18 178:22 |
| 56:15 67:2 88:19 | **unit** 148:20 149:8 | 193:20 | 179:6 181:3 |
| 88:21 89:12 91:9 | **united** 1:1 2:1 | **various** 14:18 | **viewable** 39:3 |
| 93:16 102:18 | **universe** 86:24,25 | 107:6 127:23 | 123:4 |
| 115:17 123:8 | **unnecessarily** | 161:19 162:25 | **viewed** 21:25 |
| 131:2 132:16 | 106:2 | 169:9 | 96:25 174:1 |
| 139:17 140:15 | **unreasonable** | **verbal** 11:6 56:17 | **viewer** 59:6,18,21 |
| 151:14 167:18 | 105:18 | **verify** 121:20 | 60:5,7,9,16,23 |
| 180:22 199:18 | **url** 35:12,13 58:5 | 155:23 | 61:10,18 63:6 |
| **ultimately** 14:20 | 100:14 | **veritext** 8:21 | **viewing** 59:6 98:3 |
| 46:5 169:20 | | **version** 37:6,18 | |
| **unable** 179:11 | | 43:13,15,16,25 | |

Veritext Legal Solutions
866 299-5127

[violate - witness]

| | | | |
|---|---|---|---|
| **violate** 29:25 | **ways** 124:24 | **west** 4:14 7:5 9:2,5 | 107:2 108:15 |
| **volume** 1:20 2:20 | 173:11,14 | **wet** 162:2 | 109:4,23 110:21 |
| 6:4 159:5 | **we've** 89:11 91:16 | **whereof** 202:19 | 111:4,11,24 112:5 |
| **volumes** 145:6 | 137:21 138:2 | **wholesale** 136:18 | 112:15,25 114:11 |
| **voss** 151:19,21,23 | 144:21 161:2 | **wide** 125:13 | 114:25 116:8,20 |
| **voted** 163:11 | **web** 34:23,24 35:1 | **width** 125:8,23 | 117:9,18 118:10 |
| **vs** 1:12 2:12 | 37:24 38:13,17 | 126:9 | 118:23 119:20 |
| | 40:25 58:25 61:10 | **wish** 152:18 | 120:1,11,16 121:3 |
| **w** | 63:25 95:10 | **witness** 5:4 6:2 | 121:11 123:17,25 |
| **wait** 11:19 139:23 | 132:22 133:3 | 8:24 9:7,21 16:2,9 | 125:1,16 126:2,14 |
| **want** 8:9 39:12 | **website** 35:15 37:3 | 26:21 27:14 31:10 | 127:1,9,23 132:7 |
| 52:14 86:18 88:1 | 37:6,11,18 38:3 | 31:25 32:4,11,13 | 133:18 137:3,10 |
| 88:12 96:13,15 | 39:3 41:21,24 | 34:7 35:4 36:8 | 137:17 138:8,17 |
| 113:2 115:6 | 52:21 54:15,17,17 | 38:6,24 39:3,11 | 139:12 142:15,20 |
| 116:23,24 123:9 | 54:19,20,22,25 | 42:4,21 43:2,20,22 | 143:14,20 144:16 |
| 130:25 132:25 | 55:6,7,12,13 60:21 | 44:4,12 46:8 | 144:20 145:9,14 |
| 134:19,20 140:6 | 60:25 67:20 70:15 | 48:11,17 49:20 | 146:4 147:6,25 |
| 140:13 151:12 | 70:24 71:2,3,4,15 | 50:1,15,24 51:12 | 148:17,19 149:4 |
| 154:5 156:9 | 71:19,22 72:3,8,8 | 52:2,20 53:13 | 149:20 150:1,6,12 |
| 159:22 160:10,20 | 73:1,1,3,10 82:4,7 | 54:7 55:3,9,23 | 151:6 152:5,18 |
| 162:2 164:15 | 82:16 89:22 90:10 | 56:12,18,20 57:5 | 153:16 154:21 |
| 167:15 168:15 | 90:10,13,18,22 | 57:11,16 58:14,20 | 155:10,12,23 |
| 171:21 173:10 | 92:7 93:12 95:14 | 58:22 59:9,15,23 | 156:9,19 157:8,19 |
| 185:24 199:23 | 95:19 96:1,10,21 | 60:12,18 61:6,14 | 158:5,14,23 |
| 200:2 | 97:1,4,7,12,15,20 | 62:16 63:18 65:8 | 159:17 162:6,16 |
| **wanted** 40:1 | 97:24 98:4,6,14,19 | 65:15,25 66:10 | 162:23 163:7 |
| 179:10 | 99:13,24 100:8,10 | 69:8,24 70:14,21 | 164:9,15,23 165:8 |
| **wanting** 80:24 | 100:23 101:14,20 | 71:11,22 72:7,14 | 165:14,20 166:3 |
| 93:13 181:2 | 101:23,24 102:21 | 72:20 73:13,20 | 167:2,11 168:20 |
| **wants** 102:13 | 103:7 113:6,7,19 | 75:1,10 76:23 | 170:15 171:8 |
| **washington** 3:9 | 114:18,20,20,21 | 77:16 80:6 81:10 | 172:14 173:1,8 |
| 4:9 | 114:22 117:22,23 | 82:9,19 84:13 | 179:1,14 180:3 |
| **way** 12:18 31:2 | 123:4 134:1,2,7 | 85:2 86:11 89:1 | 182:25 183:10,21 |
| 52:8 56:14,23,24 | 135:14 139:4 | 90:2,9,15 91:5,16 | 184:6,23 185:8,19 |
| 57:13 59:25 61:14 | 173:15 181:1,22 | 91:25 92:14 94:12 | 188:23 189:8,16 |
| 69:18 79:14 86:14 | **websites** 38:4 | 94:25 95:8,21 | 191:10,15 192:8 |
| 95:23 96:4 100:18 | 123:7 | 96:3,23 97:9,17 | 192:14,20 193:3 |
| 108:6 122:24 | **weeks** 24:17 83:13 | 98:1,8 99:19 | 194:10,17 195:13 |
| 139:6 148:25 | **weighed** 46:12 | 100:5,16 101:1,7 | 196:8,13,18 197:8 |
| 158:15 171:4,11 | **went** 40:24 106:20 | 101:16,22 103:10 | 197:16 198:16,22 |
| 171:16 174:20 | | 103:14 104:4 | 202:19 |
| 192:23 193:5 | | | |

Veritext Legal Solutions
866 299-5127

[witnesses - ziegler]

**witnesses**  202:6
**word**  94:6
**wording**  148:7
  194:4
**work**  127:9 142:23
  170:1 172:5
**worked**  78:20
  118:10 120:21
  146:22
**working**  119:3
  133:7
**workshops**  45:1
**worries**  15:7
  187:11
**write**  87:23 165:5
  165:11
**writing**  197:5,11
**written**  106:17
  148:25 181:4,5
**www.dgs.ca.gov**
  35:14

| x |
| --- |

**x's**  66:25 67:3

| y |
| --- |

**yeah**  30:9 50:24
  51:12 58:14,14,22
  58:22 65:8,15
  69:8,24,24 77:16
  77:23 82:19,21
  84:13 89:1 90:15
  98:8 100:19
  108:15 110:21
  111:4,24 112:15
  112:25 114:13
  123:17 126:2
  127:9 132:7 138:8
  140:13 142:15
  145:2,12 148:4,8
  148:19 149:4,20
  154:21 156:19

  157:19,24 158:14
  165:22 172:14
  186:1 195:13
**year**  35:25 47:9
  60:22 149:6
**years**  20:6 35:7
  46:25 47:8 88:10
  103:3,3 111:12,15
  144:2,21,22,22
  145:2 196:13
**yen**  5:8 9:6,6
  32:10,12 39:12,20
  39:24 40:1,4
  43:19,21 52:11,17
  52:19 55:14 56:16
  56:19 58:11,21
  62:8,15 81:13
  82:18,21 84:11,24
  87:15 90:14
  101:15 103:11
  104:2 108:13
  109:2,21 110:11
  110:19 111:1,22
  112:4,13,23
  116:19 118:3
  121:10 122:7
  125:25 133:17
  147:5 148:15,18
  149:3,19,25 150:5
  150:11 151:5
  153:14 155:7,11
  160:10 185:24
  200:1,4,11,15

| z |
| --- |

**zero**  108:21,22,25
  109:9
**ziegler**  3:5,11 6:8
  6:10 9:13,13 16:1
  16:5,10 19:16
  21:14 22:14 23:21
  24:6,25 26:14

Veritext Legal Solutions
866 299-5127

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.