# EXHIBIT 38

```
 1              UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF COLUMBIA
 3
      AMERICAN SOCIETY FOR    : NO.
 4    TESTING AND MATERIALS  : 1:13-cv-01215-TSC-
 5    d/b/a ASTM             : DAR
 6    INTERNATIONAL;         :
 7    NATIONAL FIRE          :
      PROTECTION             :
 8    ASSOCIATION, INC.;     :
 9    and AMERICAN SOCIETY   :
10    OF HEATING,            :
11    REFRIGERATION, AND     :
12    AIR CONDITIONING       :
13    ENGINEERS,             :
      Plaintiffs             :
14        vs.                :
      PUBLIC.RESOURCE.ORG,   :
15    INC.,                  :
16    Defendant             :
17
             Videotaped deposition of JOHN C.
18    JAROSZ taken at the law offices of Veritext
19    Legal Solutions, 1250 I Street NW,
20    Washington, DC, commencing at 10:09 a.m.
21    THURSDAY, AUGUST 27, 2015, before Debbie
22    Leonard, Registered Diplomate Reporter,
23    Certified Realtime Reporter.
24
25    PAGES 1 - 260
```

                                              Page 1

1  APPEARANCES:
2
    KING & SPALDING
3  By:  J  BLAKE CUNNINGHAM, ESQ
    101 Second Street
4  Suite 2300
    San Francisco, California 94105
5  (415) 318-1200
    bcunningham@kslaw com
6  Representing the Plaintiff American
    Society For Testing and Materials d/b/a
7  ASTM International
8
    MUNGER, TOLLES & OLSON LLP
9  By:  THANE REHN, ESQ
    560 Mission Street
10  27th Floor
    San Francisco, California 94105
11  (415) 512-4000
    thane rehn@mto com
12  Representing the Plaintiff National Fire
    Protection Association, Inc
13
14  MORGAN LEWIS & BOCKIUS LLP
    By:  J  KEVIN FEE, ESQ
15  1111 Pennsylvania Avenue NW
    Washington, DC 20004
16  (202) 739-3000
    jkfee@morganlewis com
17  Representing the Plaintiff American
    Society of Heating, Refrigeration, and Air
18  Conditioning Engineers
19
    (continued)
20
21
22
23
24
25
                                                    Page 2

1        INDEX TO WITNESSES
2
3  WITNESS:   JOHN C. JAROSZ        PAGE
4
      BY MR. BRIDGES           8
5
6
7
8
9        INDEX TO EXHIBITS
10                   PAGE
    EXHIBIT     DESCRIPTION       MARKED
11
12  Exhibit 1 Expert Report of John C.    6
          Jarosz
13          June 5, 2015
14  Exhibit 2 Handwritten notes     97
15  Exhibit 3 Handwritten notes     97
16  Exhibit 4 Spreadsheet          175
          "NFPA Publication Sales
17          2009 to 2013"
          JAROSZ02443
18
    Exhibit 5 Article           210
19          "ASHRAE Takes on Energy
          Standard"
20
21
22
23
24
25
                                                    Page 4

1  APPEARANCES (continued):
2
    FENWICK & WEST LLP
3  By:  ANDREW P. BRIDGES, ESQ.
    555 California Street
4  12th Floor
    San Francisco, California 94104
5  (415) 875-2300
    abridges@fenwick.com
6  Representing the Defendant
7
    FENWICK & WEST LLP
8  By:  MATTHEW BECKER, ESQ.
    801 California Street
9  Mountain View, California 94041
    (650) 988-8500
10  mbecker@fenwick.com
    Representing the Defendant
11
12  ALSO PRESENT:
13
    Carl Malamud, Public Resource
14
15  Jonathan Perry, Videographer
16
17
18
19
20
21
22
23
24
25
                                                    Page 3

1        DEPOSITION SUPPORT INDEX
2
    INSTRUCTION NOT TO ANSWER:
3
    Page    Line
4
    NONE
5
6
    REQUEST FOR PRODUCTION OF DOCUMENTS:
7
    Page    Line
8
    NONE
9
10
11  STIPULATIONS:
12  Page    Line
13
      9    16
14
15  QUESTIONS MARKED:
16  Page    Line
17  NONE
18
19
20
21
22
23
24
25
                                                    Page 5

2 (Pages 2 - 5)

1          * * *
2          (Jarosz Exhibit 1 marked for
3     identification.)
4          * * *
5          THE VIDEOGRAPHER:  We are now
6     on the record.
7          Please note that the
8     microphones are sensitive and may pick
9     up whispering and private
10    conversations.
11         Please turn off all cell phones
12    or place them away from the
13    microphones, as they can interfere
14    with the deposition audio.
15         Recording will continue until
16    all parties agree to go off the
17    record.
18         My name is Jonathan Perry.  I'm
19    here representing Veritext.  Today's
20    date is August 27th, 2015.  The time
21    is approximately 10:09 a.m.
22         We are at the offices of
23    Veritext, located at 1250 I Street
24    Northwest in Washington, D.C.
25         The caption on the case is the

1          Air-Conditioning Engineers.
2          THE VIDEOGRAPHER:  Today our
3     court reporter is Debbie Leonard with
4     Veritext.  Would you please swear in
5     the witness.
6          * * *
7          JOHN C. JAROSZ,
8     having been first duly sworn, testified as
9     follows:
10         * * *
11         EXAMINATION
12         * * *
13    BY MR. BRIDGES:
14    Q.   Good morning, Mr. Jarosz.
15    A.   Good morning, Mr. Bridges.
16    Q.   What do you do for a living?
17    A.   I'm an economist.
18    Q.   What types of work do you do as
19    an economist?
20    A.   I'm not exactly sure what
21    you're asking.  I am employed at an economic
22    consulting firm, and I am involved in applied
23    microeconomics and industrial organization,
24    among other things.
25         I apply much of my expertise to

1     American Society for Testing and
2     Materials, et al., versus
3     Public.Resource.Org, Incorporated,
4     case filed in the US District Court
5     for the District of Columbia, Case
6     Number 1:13-cv-0215 [sic] TSC-DAR.
7          The name of the witness is
8     John C. Jarosz.
9          Would counsel present please
10    introduce themselves and state whom
11    they represent.
12         MR. BRIDGES:  This is Andrew
13    Bridges of Fenwick & West for the
14    defendant, and with me is Matthew
15    Becker.
16         MR. FEE:  Kevin Fee from Morgan
17    Lewis on behalf of ASTM.
18         MR. REHN:  Thane Rehn from
19    Munger, Tolles & Olson on behalf of
20    the National Fire Protection
21    Association.
22         MR. CUNNINGHAM:  Blake
23    Cunningham of King & Spalding on
24    behalf of the American Society for
25    Heating, Refrigerating, and

1     the valuation and evaluation of intellectual
2     property rights.  Some of that work is in the
3     context of damages assessments.  Some of it
4     outside such contexts.  Some of my work is in
5     litigation, and some of my work is not.
6     Q.   Have you valued any of the
7     intellectual property at issue in this case?
8          MR. FEE: Objection.  Form.
9          MR. REHN:  And --
10         MR. FEE:  Wait.  Before we go
11    any further, should -- do you want to
12    get into a stipulation that they don't
13    have to join every objection that one
14    or the other plaintiffs makes, or do
15    you want us to make them all seriatim?
16         MR. BRIDGES:  I'll stipulate to
17    that.
18         MR. FEE:  Okay.
19         THE WITNESS:  I'm not exactly
20    sure what you mean by "value," but I
21    haven't done a formal valuation of any
22    of the IP.  I have evaluated the
23    intellectual property rights, and I
24    have done the assessment that you see
25    in my expert report.

3 (Pages 6 - 9)

1  BY MR. BRIDGES:
2      Q.    Have you made any attempt to
3  put a value on any of the intellectual
4  property rights claimed by the plaintiffs in
5  this case?
6          MR. FEE:  Objection to form.
7          THE WITNESS:  What do you mean
8      by "value"?
9  BY MR. BRIDGES:
10     Q.    I mean by "value" what you
11 referred to earlier when you stated that
12 among your activities is the valuation of
13 intellectual property rights.
14     A.    I have not done a formal
15 valuation, and I have not assigned a dollar
16 amount to any of the intellectual property
17 rights at issue here.
18         I have evaluated the rights and
19 determined issues associated with harm and
20 irreparable harm.  You see my results
21 contained in my report.
22     Q.    What do you mean by "evaluating
23 the intellectual property rights"?
24     A.    I have looked at, from an
25 economist's perspective, the rights and the

Page 10

1      A.    I don't know that there -- I --
2  let me start this over again.
3          I believe there are fights
4  about whether the plaintiffs are entitled to
5  these copyrights.  I don't know that there's
6  been a conclusion by this Court that they are
7  valid rights.  I'm working under the
8  assumption that they are, but I believe the
9  defendant is disputing those rights.
10     Q.    What did you do to evaluate
11 trademark rights in this case?
12     A.    What I've done is summarized in
13 my report.  I have an understanding that
14 there are marks and logos at issue that are
15 important to the plaintiffs and that Public
16 Resource activities impair the rights of the
17 plaintiffs in those trademarks and may
18 possibly cause confusion in the marketplace.
19     Q.    What work did you do to
20 determine whether any activities of the
21 defendant does or may cause confusion in the
22 marketplace?
23     A.    The work that you see is
24 summarized in my report.  I haven't done
25 anything beyond that which is summarized

Page 12

1  impact of having IP protection or not having
2  IP protection for the subject matter at
3  issue.
4      Q.    Have you done anything else to
5  evaluate the intellectual property rights of
6  the plaintiffs?
7          MR. FEE:  Objection to form.
8          THE WITNESS:  I've done the
9      analyses underlying my report, but the
10     summary of the work that I've done and
11     the conclusions that I've drawn are
12     contained in my report.  I don't have
13     other conclusions that are not
14     contained in those -- in that report.
15 BY MR. BRIDGES:
16     Q.    What intellectual property
17 rights of plaintiffs have you evaluated?
18     A.    The copyrights at issue here.
19         I'm sorry.  Let me be -- let me
20 alter that by saying I have evaluated the
21 alleged copyrights at issue here, and I have
22 evaluated the trademark rights at issue here.
23     Q.    Why did you change your
24 testimony to refer to "alleged copyrights"
25 instead of "copyrights"?

Page 11

1  here.
2      Q.    And by the "report," you're
3  referring to Exhibit 1 that I've marked and
4  placed before you?
5      A.    Yes.
6      Q.    Where did you state your
7  conclusions in your report regarding
8  trademark rights of the plaintiff -- of the
9  plaintiffs?
10     A.    In part, I think it's covered
11 in paragraphs 150 and 151.  It may be covered
12 in other sections.
13     Q.    Take the time and let me know
14 what other sections trademark rights are
15 covered in.
16         MR. FEE:  Objection.  Are you
17     asking him to read the whole report
18     and answer that now?
19         MR. BRIDGES:  No.  Presumably
20     he's relatively familiar with it, so
21     it wouldn't require him to read it and
22     spend a great deal of time.  I
23     don't -- he's referred to his report
24     in his answer, so I just want to make
25     sure that I have a complete

Page 13

4 (Pages 10 - 13)

1 understanding.
2     MR. FEE: All right. Well,
3 take as long as you need to answer
4 that, then.
5     THE WITNESS: In part, you see
6 it addressed in paragraph 30.
7     Right now, those are the
8 sections that I see that touch on that
9 topic. There may be others that I'm
10 overlooking right now.
11 BY MR. BRIDGES:
12     Q. And do you need more time?
13     MR. FEE: Objection. Asked and
14 answered.
15     THE WITNESS: I don't think so.
16 I've looked through at a fairly
17 cursory level. If you want me to read
18 the whole report to make absolutely
19 sure, I will, but I'm not sure if
20 you're asking me to do that, but --
21 BY MR. BRIDGES:
22     Q. No, I wouldn't want to take the
23 time, unless counsel is willing to give me
24 lots of extra time or if you want to do it
25 during a break. But if you're confident that
Page 14

1 those are the paragraphs that cover the
2 evaluation of trademark rights, then we can
3 proceed.
4     A. I'm not sure if there's a
5 pending question, but I didn't say I was
6 confident that those are the only places.
7     Q. Oh, then take more time,
8 please.
9     A. I think --
10     Q. Then please --
11     A. -- that those are the three
12 that address it.
13     Q. Well, what else reflects your
14 evaluation of trademark rights in this case?
15     A. Okay. If you'd like, I'll take
16 a little bit more time looking at the report.
17 I think in paragraph 2, I
18 believe part of the copying is the marks
19 and/or logos.
20     Q. And that paragraph 2 reflects
21 your evaluation?
22     MR. FEE: Objection to form.
23     THE WITNESS: Yes. My
24 evaluation includes understanding the
25 issues and then drawing conclusions
Page 15

1     from the facts.
2 BY MR. BRIDGES:
3     Q. All right. I would like to
4 know where in the report your report reveals
5 any observations or conclusions by you about
6 the evaluation of the trademark rights.
7     MR. FEE: Just so the record is
8 clear, you're withdrawing the previous
9 question now?
10     MR. BRIDGES: No. It's a new
11 question.
12     MR. FEE: Okay. Well, he
13 didn't --
14     Are you finished going through
15 the entire report and identifying
16 everywhere where you've evaluated the
17 trademarks?
18     Or do you not want him to keep
19 doing that?
20     MR. BRIDGES: I just -- I just
21 asked him a question. I'd like an
22 answer to the question.
23     MR. FEE: Okay.
24 BY MR. BRIDGES:
25     Q. I'd like to know where in
Page 16

1 the -- in the report your report reveals any
2 observations or conclusions by you about your
3 evaluation of the trademark rights of the
4 plaintiffs.
5     MR. FEE: Objection. And I
6 think it would be misleading if it's
7 not stated for the record that he has
8 not gotten past paragraph 2 in
9 responding to the prior question, and
10 you've instructed him not to further
11 proceed with respect to that question.
12     You can go ahead and answer the
13 current question.
14     THE WITNESS: So right now, I'm
15 working under the assumption that
16 there's only one pending question, and
17 that is your most recent question.
18 BY MR. BRIDGES:
19     Q. Yes.
20     A. Part of the implications of
21 loss -- I'm sorry.
22     Part of the implications of
23 trademark infringement are reflected in
24 paragraph 6, though they're not stated there.
25 That is when I address harm. That
Page 17

5 (Pages 14 - 17)

1  encompasses both the harm of loss of
2  copyright protection and the repercussions of
3  trademark infringement.
4         Same answer with regard to
5  paragraph 7.
6         There are also counterpart
7  paragraphs at the end of the report that I
8  think are identical to 6 and 7, so I won't
9  identify those numbers.
10        Though I didn't say it in a
11 number of paragraphs, I make reference to
12 conclusions with regard to the copyright
13 infringement.
14        I understand that the copyright
15 infringement is associated with certain
16 actions that, in part, encompass trademark
17 infringement, though I don't think I
18 explicitly said that in every section in
19 which I discover -- in which I discussed the
20 copyright protection and the conclusions
21 flowing from that.
22        I don't think I have anything
23 else to add besides what I have discussed
24 already.
25    Q.    What conclusions do you see

1  about a likelihood of confusion in the
2  marketplace arising from the defendant's use
3  of the marks?
4     A.    I haven't drawn any conclusions
5  with regard to that topic.
6     Q.    And what conclusions have you
7  drawn about the economic value or dollar
8  value of the plaintiffs' trademarks?
9     A.    I have not assigned a dollar
10 value to the plaintiffs' trademarks.
11    Q.    What conclusions have you drawn
12 about any harm to the plaintiffs arising from
13 the defendant's alleged use of the
14 plaintiffs' marks?
15    A.    I've drawn the conclusion that
16 there could be harm if the materials, in
17 fact, are inaccurate use -- inaccurate
18 copies, therefore impacting the reputation of
19 either the materials or the organizations in
20 the marketplace.
21    Q.    What studies did you rely upon
22 for that conclusion?
23        MR. FEE: Objection. Vague.
24        THE WITNESS: Nothing other
25    than what you see reflected in my

1     report.
2  BY MR. BRIDGES:
3     Q.    What facts did you rely upon
4  for that conclusion?
5     A.    Well, I understand that there
6  has been some inaccurate copying and
7  dissemination of plaintiff materials. I
8  don't recall exactly where I got that
9  information from, but I believe that there's
10 some materials, for instance, that have been
11 copied and disseminated that are upside-down.
12 There are other materials that are difficult
13 to read. There may be materials that are
14 disseminated with the thought that those are
15 the most recent standards when, in fact, they
16 may not be.
17    Q.    You have no idea how you
18 learned that information?
19    A.    I don't recall --
20        MR. FEE: Objection. Vague.
21    And form.
22        THE WITNESS: I don't recall,
23    sitting here right now. I may have
24    seen representations in some of the
25    written materials, but I don't recall

1     what those written materials are.
2  BY MR. BRIDGES:
3     Q.    Have you seen any upside-down
4  pages in any of the defendant's materials?
5     A.    I don't recall seeing that
6  personally, no.
7     Q.    Have you seen any
8  difficult-to-read materials produced by the
9  defendant?
10    A.    I don't recall that right now.
11    Q.    Do you know what rationale the
12 defendant has for disseminating materials
13 that are not the most recent standards?
14        MR. FEE: Objection. Form.
15        THE WITNESS: I'm not sure that
16    I know, no.
17 BY MR. BRIDGES:
18    Q.    On what information -- I'd like
19 for you to recall all the information on
20 which you relied for the determination that
21 the defendant may have engaged in activities
22 that may have caused any harms to the
23 plaintiffs' reputation.
24        MR. FEE: Could you read that
25    back -- oh, I have it here. Forget

6 (Pages 18 - 21)

1     it.
2           Objection to form.  You're
3     asking him to recall, without having
4     all the materials in front of him?
5           MR. BRIDGES:  Yeah.
6           MR. FEE:  Okay.
7           THE WITNESS:  It's all laid out
8     in my report, and the sources are
9     provided in my report.  I've not
10    memorized all those.
11 BY MR. BRIDGES:
12    Q.    But I don't think your report
13 refers to upside-down materials, does it?
14    A.    I don't recall for sure, but I
15 thought some of the documents that I cited
16 make reference to those materials.  I'm not
17 sure that I cited the, for instance,
18 upside-down materials, but I think I have
19 discussions about that phenomenon.
20    Q.    With whom?
21    A.    In written materials that I've
22 cited.
23    Q.    Have you had oral discussions
24 about what you have referred to as that
25 phenomenon?
                                        Page 22

1     A.    Yes.
2     Q.    With whom?
3     A.    Counsel here.
4     Q.    With anybody else?
5     A.    I don't think so.  It's
6 possible, but I'm not recalling anything
7 else.
8     Q.    And when you say discussions
9 with "counsel here," you're referring to the
10 counsel at the table here today at the
11 deposition?
12    A.    Correct.
13          And we should add to that
14 Jordana Rubel, who's been a person that I've
15 had conversations with over the last several
16 months.
17    Q.    What did you do to verify any
18 of the statements to you from counsel about
19 these facts you've referred to about the
20 materials that the defendant has
21 disseminated?
22    A.    I don't think I did separate
23 verification.  I may have seen some documents
24 that provide or provided confirmation of that
25 fact, but I don't recall separately going out
                                        Page 23

1 beyond the document production to verify that
2 information.
3     Q.    But you don't recall seeing any
4 defective materials yourself, correct?
5     A.    That's correct.  I do not.
6     Q.    You just relied upon the word
7 of others, correct?
8           MR. FEE:  Objection.  Vague.
9     Mischaracterizes his testimony.
10          THE WITNESS:  I relied upon
11    written documents I saw and
12    conversations that I had.
13 BY MR. BRIDGES:
14    Q.    What written documents did you
15 see that discussed these issues?
16          MR. FEE:  Objection.  Asked and
17    answered.
18          THE WITNESS:  And I'm sorry.  I
19    can't point you to the particular
20    ones.  Perhaps, through the course of
21    the day, my memory will be refreshed
22    on that.
23 BY MR. BRIDGES:
24    Q.    If you relied upon those
25 written documents, would you have cited to
                                        Page 24

1 those written documents in your report?
2     A.    Perhaps.
3     Q.    Why do you say "perhaps"?
4     A.    I can't say with absolute
5 certainty what I do.  But often, if something
6 is a direct support for a factual
7 observation, I will often cite that source,
8 but not always.
9     Q.    What previous -- strike that.
10          What training or education have
11 you ever received with respect to standards
12 development organizations?
13          MR. FEE:  Objection to form.
14          THE WITNESS:  I don't recall if
15    I've had a course in standard
16    development.  Probably it has been
17    part of some of the economics courses
18    that I've taken over the years.
19          In my profession and the work
20    that I've done in the last 30 years,
21    I've had occasion to look at and
22    evaluate standards organizations and
23    the output from those organizations.
24          So it is among the topics that
25    I've investigated in the course of my
                                        Page 25

7 (Pages 22 - 25)

1      consulting career.
2  BY MR. BRIDGES:
3      Q.    In what context?
4      A.    There have been several matters
5  I've had, litigations, that have involved
6  standard setting organizations and the
7  outputs from those organizations.
8      Q.    What organizations?
9      A.    Well, some that come to mind
10  are ETSI, IEEE, the Blu-ray Association,
11  MPEG, MPEG L.A., the Philips 6C and Philips
12  3C organizations.  Those are among the ones
13  that come to mind.
14      Q.    And what types of litigation
15  did your work relating to those standard
16  setting organizations involve?
17          MR. FEE:  Objection to form.
18          THE WITNESS:  It was almost all
19      intellectual property litigation, with
20      probably the bulk of the analyses
21      undertaken with regard to patent
22      rights.
23  BY MR. BRIDGES:
24      Q.    Do you recall --
25      A.    I guess I should -- there were

Page 26

1  probably some breach of contract matters as
2  well.
3      Q.    Did you work on any matters
4  involving copyright law where you became
5  familiar with the work and outputs of
6  standards setting organizations before this
7  case?
8      A.    Probably, but I cannot say that
9  with absolute certainty.  I've been involved
10  in several matters over a course of many
11  years.
12      Q.    Can you name any copyright
13  matter involving a standards development
14  organization that you recall?
15      A.    Not now, without going back and
16  looking at my records.
17      Q.    Would they be listed in the
18  cases attached to Exhibit 1?
19      A.    That would summarize some of my
20  records.  The cases that are embodied in my
21  tab 1 are those that led to deposition or
22  trial testimony.  I've been involved in many
23  matters beyond those.
24      Q.    But sitting here, you cannot
25  recall any copyright case involving a

Page 27

1  standards development organization that
2  you've worked on?
3      A.    Again, I'd have to go back and
4  look at my records.  I can't right now recite
5  any, but there very well could be one or
6  more.
7      Q.    Did you review any of your work
8  in -- from earlier copyright cases involving
9  standards development organizations in
10  connection with your work in this case?
11      A.    Not to the best of my memory,
12  no.
13      Q.    What background do you have in
14  the creation of standards by standard
15  development organizations?
16          MR. FEE:  Objection to form.
17          THE WITNESS:  In the context of
18      some of my consulting assignments, I
19      have examined processes undertaken by
20      SDOs.
21  BY MR. BRIDGES:
22      Q.    Anything else?
23      A.    Nothing else comes to mind.
24  I've certainly looked at the output
25  associated with those processes, but there's

Page 28

1  nothing else that comes to mind.
2      Q.    What processes undertaken by
3  standards development organizations did you
4  examine?
5          MR. FEE:  Objection.  Are you
6      asking prior to the report still?
7          MR. BRIDGES:  Yes.
8          MR. FEE:  Okay.
9          THE WITNESS:  I'm not quite --
10          MR. BRIDGES:  Or other than in
11      this case.
12          MR. FEE:  Okay.
13          THE WITNESS:  I'm not quite
14      sure what you're asking.  I've seen
15      discussion of the some of the
16      processes of various organizations.
17      I'm not -- I'm not quite sure what
18      you're asking.  Perhaps you could ask
19      it somewhat differently.
20  BY MR. BRIDGES:
21      Q.    Well, no.  You said, quote, "I
22  have examined processes undertaken by SDOs."
23          So my question is, what
24  processes undertaken by standards development
25  organizations did you examine?

Page 29

8 (Pages 26 - 29)

1     A.    It sounds like the same
2  question to me.
3     Q.    Specifically, what processes
4  did you examine?
5     A.    That still sounds like the same
6  question, but let me try to answer it by
7  saying I've looked, for instance, at the
8  mechanisms that ETSI undertook in developing
9  standards.  So I am familiar generally with
10 the processes that it follows.  Similarly
11 with regard to other standard setting
12 organizations.
13    Q.    What other standard setting
14 organizations?
15    A.    Well, I think I identified
16 those a few moments ago.  Do you want me to
17 repeat those?
18    Q.    Well, if -- are you saying
19 that, for all of those organizations, you
20 examined their processes?
21    A.    In some dimension, probably for
22 most of the organizations, I had at least
23 some knowledge of the process.  I can't say
24 that I investigated in depth all of the
25 processes for all of the organizations that

Page 30

1  have been involved in my consulting
2  assignments that are standards oriented.
3     Q.    What do you recall about your
4  investigation of the processes by which
5  standards development organizations create
6  their standards?
7     A.    I should say I -- SDO is
8  probably not the right term to use.  I should
9  probably say standards setting organizations.
10 There may be a distinction between an SSO and
11 an SDO.
12          But, generally, each SSO has a
13 process that's unique to its organization.
14 Some solicit input from a wide range of
15 constituents; some from a more narrow range.
16          The ones that I have examined
17 have all been fairly careful in the work that
18 they've done, seeking input at many steps
19 along the way.
20          Some organizations, like SDOs
21 at issue here, seek a broader array of inputs
22 than do others.
23          Some organizations, standards
24 setting organizations, include primarily or
25 only manufacturers and sometimes large

Page 31

1  manufacturers only.  Others include a wider
2  array of companies.
3          In all instances, though, the
4  companies are trying to -- the standards
5  setting organizations are trying to develop
6  at least some form of consensus -- sometimes
7  it's very broad consensus; sometimes it's
8  more narrow consensus -- about what would be
9  good for that standards setting organization.
10         Sometimes the SSOs are
11 interested in what's best for the
12 manufacturers and the ability for them to
13 supply in an interoperable environment.  In
14 some cases, the SSOs are very alert to the
15 needs of consumers and users of products and
16 services that comply with standards.
17    Q.    You've distinguished between
18 standards setting organizations and standard
19 development organizations.  What is the
20 distinction that you -- that you identify
21 between the two?
22    A.    I think I said I didn't know if
23 there is for sure a distinction, but I think
24 an SSO is perhaps a broader concept than an
25 SDO, but I might be wrong on that.

Page 32

1          I know the companies -- I --
2  the plaintiffs here are SDOs.  The
3  associations are, among other things, in the
4  business of creating and developing
5  standards.
6          There could be other SSOs that
7  have different constituents that are of
8  interest to them.  I don't know for sure that
9  an SSO is a broader concept than an SDO, but
10 it could be.
11    Q.    What do you understand to be
12 the constituents of the plaintiffs in this
13 case?
14         MR. FEE:  Objection to form.
15         THE WITNESS:  I laid that out
16    in my report.  In summary, I believe
17    they try to include in the process
18    both those -- both supply-side
19    entities and demand-side entities.
20 BY MR. BRIDGES:
21    Q.    Who else are plaintiffs'
22 constituents?
23         MR. FEE:  Same objection.
24         THE WITNESS:  I can't think of
25    anything that doesn't fall within

Page 33

9 (Pages 30 - 33)

1     those two categories as the
2     constituents of the plaintiffs.
3   BY MR. BRIDGES:
4       Q.    Only entities are constituents
5   of the plaintiffs?
6           MR. FEE: Objection. Vague.
7           THE WITNESS:  An individual can
8       be an entity, in my mind.  It's not
9       necessarily a company.
10  BY MR. BRIDGES:
11      Q.    And what do you mean by a
12  supply-side entity or person?
13      A.    Those companies or individuals
14  that provide products or services that, among
15  other things, comply with the standards.
16      Q.    Do you mean anything else by
17  supply-side entities or individuals?
18          MR. FEE: Objection to form.
19          THE WITNESS:  I don't think so.
20  BY MR. BRIDGES:
21      Q.    What do you mean by demand-side
22  entities or individuals?
23          MR. FEE:  Same objection.
24          THE WITNESS:  Just so that
25      there's no confusion between us, I

Page 34

1   constituents of the plaintiffs?
2           MR. FEE: Objection to form.
3           THE WITNESS:  Nothing else
4       comes to mind, although I'm certainly
5       open to learning that I have not
6       included something that I should
7       include.
8   BY MR. BRIDGES:
9       Q.    What about regulators?
10      A.    I'm sorry.  What's the
11  question?
12      Q.    What about regulators?
13          MR. FEE: Objection to form.
14          THE WITNESS:  I heard those
15      words.  I don't understand the
16      question.
17  BY MR. BRIDGES:
18      Q.    You don't understand the
19  question?
20      A.    Correct.
21      Q.    You've referred to supply-side
22  entities.  You've referred to demand-side
23  entities.  I'm saying now what about
24  government -- what about regulators?  You
25  don't understand that question --

Page 36

1       believe an entity can encompass an
2       individual.
3   BY MR. BRIDGES:
4       Q.    I understand, but I want the
5   record to be clear.  And since "entity" tends
6   to suggest a non-breathing person, I would
7   like to include both breathing persons and
8   non-breathing legal persons in my question.
9       A.    I'm not sure if that's a
10  question.
11      Q.    The pending question was, what
12  do you mean by demand-side entities or
13  individuals?
14          MR. FEE: Objection to form.
15          THE WITNESS:  Okay.  I'm not --
16      I'm not sure I used the phrase
17      "entities or individuals" when I
18      talked about demand side.
19          Regardless, it's companies or
20      individuals that are the users or
21      potential users of products or
22      services that, in part, comply with
23      the standards.
24  BY MR. BRIDGES:
25      Q.    Are you aware of any other

Page 35

1       A.    I don't.
2       Q.    -- in this context?
3       A.    Are you asking whether a
4   regulator is on the demand side or supply
5   side?
6       Q.    I'm asking whether regulators
7   are constituents of the plaintiffs.
8           MR. FEE: Objection to form.
9   BY MR. BRIDGES:
10      Q.    Have you ever given that any
11  thought?
12      A.    Which question --
13          MR. FEE: Objection.  Compound.
14          THE WITNESS:  -- should I
15      answer?
16  BY MR. BRIDGES:
17      Q.    Both.
18          MR. FEE: Objection to form.
19          THE WITNESS:  The question of
20      have I given that any thought,
21      perhaps.
22          To the question of are they a
23      constituent of the plaintiffs here, I
24      guess in some dimension they are.
25      They are interested parties because

Page 37

Veritext Legal Solutions
866 299-5127

1    they have both supply-side and
2    demand-side interests that they
3    consider.
4  BY MR. BRIDGES:
5      Q.    Don't they also have regulatory
6  interests aside from being supply side or
7  demand side?
8          MR. FEE: Objection to form.
9          THE WITNESS:  What do you mean
10    by "regulatory interests"?
11  BY MR. BRIDGES:
12      Q.    You don't understand the term?
13      A.    No, I don't know what you mean
14  by that term.
15      Q.    Do they have public interests
16  other than supply or demand side interests?
17          MR. FEE: Objection to form.
18          THE WITNESS:  I don't know that
19    it would be "other than," because I
20    think of the public interest as being
21    either demand or supply side.  I don't
22    know what might not be included.
23  BY MR. BRIDGES:
24      Q.    What about somebody that has a
25  safety interest?  How do you classify them as

1  a constituent of the plaintiffs?
2          MR. FEE: Objection to form.
3          THE WITNESS:  It depends on who
4    that is.  I have an interest in my
5    house being safe, for instance, and I
6    consider myself as part of the
7    demand-side constituency.
8          I think that there could be
9    companies that are in the business of
10    manufacturing smoke detectors, for
11    instance.  I would think of them
12    primarily as being on the supply side,
13    although they're certainly alert to
14    the demand-side considerations.
15  BY MR. BRIDGES:
16      Q.    How do you understand the
17  plaintiffs here -- strike that.
18          What do you understand to be
19  the process by which the plaintiffs develop
20  standards?
21          MR. FEE: Objection to form.
22          THE WITNESS:  I don't know all
23    the steps.  I've summarized some of
24    the steps that I understand in the
25    report.

1          The Web sites and information
2    that I looked at for each of the
3    plaintiffs certainly give more detail.
4          But, in essence, a need for a
5    standard is brought to the attention
6    of the group.  That need can be
7    identified from any number of places.
8          And then a group is chartered
9    with assessing what that need is and
10    how best to respond to that need.
11          That group often comes up with
12    proposals to respond to the issue and
13    adjusts that proposal as it gets more
14    input and gives more thought.
15          Ultimately consensus is arrived
16    at for each of the organizations, and
17    a standard is developed and published.
18          The processes are slightly
19    different for each of the
20    organizations but generally follow
21    that route.
22  BY MR. BRIDGES:
23      Q.    How do the processes differ
24  among the three plaintiff organizations?
25          MR. FEE: Objection to form.

1          THE WITNESS:  I don't know all
2    of the differences.  They may have, in
3    part, been summarized in my report.  I
4    see, for instance, on page 29,
5    paragraph 70, I have identified the
6    four steps that I saw that NFPA
7    follows in developing standards.
8  BY MR. BRIDGES:
9      Q.    I'm just asking you -- you
10  don't need to spend time going through the
11  report.  I just want to know, sitting here
12  today, how you understand the processes
13  differ.
14          MR. FEE: Object to form, to
15    the extent you are asking him not to
16    look at his report.  I think he should
17    be permitted to do that.
18          THE WITNESS:  Just by -- just
19    going by memory, I don't recall
20    substantial differences in the
21    processes.  I understand each one to
22    follow the general scheme that I
23    identified a few moments ago.  I'm
24    quite sure that there are differences
25    in each plaintiff's implementation of

1     that scheme.
2  BY MR. BRIDGES:
3     Q.    You used the word "group"
4  several times in discussing the process by
5  which the standards -- the plaintiffs develop
6  standards.  What did you mean by "group"?
7     A.    I don't recall exactly what
8  context I used it in, but I think of a set of
9  individuals representing either themselves or
10 companies that have interest in the topic and
11 might have some thoughts as to how best to
12 address that topic and develop a standard.
13           The groups can be wide
14 assortments.  Sometimes they're individual
15 users.  Sometimes they're large company
16 representatives.  Sometimes they're small
17 company representatives.  Sometimes there
18 are -- they are employees of the SDO.
19           But each one of the SDOs tends
20 to have a fairly wide and diverse set of
21 groups that addresses these topics.
22    Q.    You say some members of the
23 groups may be individuals, correct, and their
24 own -- acting on their own interest; is that
25 correct?

Page 42

1     A.    That's my understanding, yes.
2     Q.    Why is that your understanding?
3  How -- what -- what's the basis of your
4  understanding?
5     A.    I think I've probably seen that
6  in some of the written materials, but I can't
7  point you to particular materials that --
8  that I relied on for that.
9     Q.    And you said that some
10 individuals may participate in groups as
11 representatives of large companies; is that
12 correct?
13    A.    Yes.
14    Q.    Some individuals may
15 participate as -- participate as
16 representatives of small companies, correct?
17    A.    Yes.
18    Q.    And I don't think you mentioned
19 that any individuals participate as
20 representatives of government?
21    A.    That's probably also the case.
22    Q.    What types of governments?
23           MR. FEE:  Objection.  Vague.
24 Form.
25           THE WITNESS:  I don't know in

Page 43

1     particular, but the -- the options are
2     federal, state, and local.
3  BY MR. BRIDGES:
4     Q.    Have you --
5     A.    But I don't know that each
6  group assessing the need for a standard
7  always has representations at each level of
8  government.
9     Q.    What do you know about
10 participation by employees of standards
11 development organizations in what you call
12 the "groups"?
13           MR. FEE:  Objection to form.
14           THE WITNESS:  My memory is that
15    each one of the standard development
16    organizations that are at issue here
17    have at least one employee that's --
18    that's involved in the process.
19           Sometimes those employees are
20    facilitators.  Often that's the case.
21    Sometimes they have substantive input.
22    But they often help the process along.
23 BY MR. BRIDGES:
24    Q.    And what do you mean by
25 "substantive input"?

Page 44

1     A.    Some people may have particular
2  knowledge about a particular industry or
3  topic.  They all have some knowledge about
4  the standards development process.
5     Q.    Do you have any understanding
6  as to why the various individuals in the
7  groups participate in the standards
8  development process?
9           MR. FEE:  Objection to form.
10           THE WITNESS:  Generally,
11    they're interested in addressing a
12    topic of some concern and coming to a
13    resolution, one that's acceptable to,
14    at the very least, the party that
15    they're representing and one that
16    is of -- has sufficient consensus
17    support to be a practical and
18    acceptable solution to a pending
19    problem.
20 BY MR. BRIDGES:
21    Q.    What do you mean by "a pending
22 problem"?
23    A.    Typically, there's a need
24 identified, and the SDO has decided a
25 standard may help address that need.  For

Page 45

12 (Pages 42 - 45)

1  instance, the fire at the shirt factory in
2  New York a hundred years ago, it was
3  identified that we didn't want those
4  disasters to occur in the future and that we
5  would like to investigate avenues to minimize
6  such risks.
7      Q.    What do you mean by "avenues to
8  minimize such risks"?
9      A.    Well, consideration is given to
10 determining whether there should be quality
11 standards that manufacturers should comply
12 with in order to reduce the disastrous
13 outcomes that occur because of fires, for
14 instance.
15     Q.    And what do you mean by
16 "quality standards"?
17     A.    Just by way of example, to have
18 more ingress and egress available to
19 employees and to have that as a requirement
20 or have a standard that may eventually be
21 incorporated into law so that buildings are
22 erected in such a way to allow employees to
23 leave the building rather than be engulfed in
24 flames.
25     Q.    And what do you mean by

Page 46

1  do have a JD.
2      Q.    You don't have a Ph.D. in
3  economics, correct?
4      A.    Correct.  I was in the Ph.D.
5  program and have completed most of the
6  requirements for my Ph.D. but not all.
7      Q.    What interests do you
8  understand the plaintiffs to have -- strike
9  that.
10         What interests do you
11 understand the plaintiffs to have in having
12 standards incorporated into law?
13         MR. FEE:  Objection to form.
14         THE WITNESS:  I think that's
15     laid out in my report in a variety of
16     ways; but generally, the plaintiffs
17     are interested in effectuating their
18     charters, and that is they want to
19     address certain problems in an
20     effective way.  And if those solutions
21     get incorporated into standards and
22     those standards get incorporated by
23     reference into law, that can be an
24     effective way for dissemination of a
25     solution.

Page 48

1  "incorporated into law"?
2          MR. FEE:  Objection.  Calls for
3      a legal conclusion.  Form.
4          THE WITNESS:  As an economist,
5      I generally understand it to be that
6      there's some federal, state, and local
7      laws that make reference to certain
8      standards and have that reference as
9      part of the law.
10         The legal implications I am
11     certainly not an expert in, and I
12     hesitate to characterize any more than
13     I have.
14 BY MR. BRIDGES:
15     Q.    Well, you, in fact, have a law
16 degree, correct?
17     A.    I have a law degree.  I am not
18 now, nor have I ever been a practicing
19 attorney.
20     Q.    Okay.  But you have a juris
21 doctor degree, correct?
22     A.    Is that different from a law
23 degree?
24     Q.    It's a type of law degree.
25     A.    I -- I didn't know that, but I

Page 47

1  BY MR. BRIDGES:
2      Q.    What do you mean by
3  "effectuating" the plaintiffs' charters?
4      A.    Well, each plaintiff has a goal
5  or set of goals it would like to achieve,
6  whether that's safety or interoperability.
7  But generally, they want to achieve a
8  socially good purpose and one that is good
9  for members of the industry.
10     Q.    In your answer, you're
11 referring specifically to these plaintiffs?
12     A.    Yes.
13     Q.    Do these plaintiffs have an
14 interoperability goal?
15     A.    I don't think explicitly, but I
16 think -- I don't think as part of the charter
17 for the plaintiff, but I think with regard to
18 certain topics that they address
19 interoperability helps achieve some of those
20 goals of the individual topics that help
21 achieve the overall goals of the
22 organization.
23     Q.    What are some of the goals of
24 interoperability that you've identified for
25 plaintiffs?

Page 49

13 (Pages 46 - 49)

1      A.    That I've identified in my
2  report?
3      Q.    In your work on -- in your work
4  on this matter for the plaintiffs.
5      A.    I'm not exactly sure what
6  you're asking, but I talked about the merits
7  of interoperability and why these
8  organizations -- why certain standards are
9  oriented toward interoperability.
10          I think one of the specific
11  illustrations is -- of the need for and the
12  achieving of interoperability goals is the
13  NEC.  That allows one to safely and
14  effectively receive power across the world.
15  That's good for manufacturers, and it's good
16  for consumers.
17      Q.    You said that plaintiffs are
18  interested, I believe, in addressing certain
19  problems in an effective way.  Do you recall
20  that?
21      A.    Generally I recall that, yes.
22      Q.    And, generally speaking,
23  referring to these plaintiffs, what are the
24  problems you understand them to be trying to
25  address?

Page 50

1          MR. FEE:  Objection to form.
2          THE WITNESS:  I've laid that
3      out in my report.  In page 64 I've
4      laid out, in essence, the ASTM
5      mission, as I understand it.
6          In paragraph 68 I've laid out
7      the NFPA mission, as I understand it.
8          And in paragraph 73 I've laid
9      out the ASHRAE mission, as I
10      understand it.
11  BY MR. BRIDGES:
12      Q.    So now my question is, what are
13  the problems that you understand the
14  plaintiffs are trying to address in an
15  effective way?
16          MR. FEE:  Objection to form.
17          THE WITNESS:  Well, generally,
18      they're addressing the mission that
19      they have here and their individual
20      problems that are brought to the SDOs'
21      attention that, if addressed
22      effectively, would help each
23      organization fulfill its mission.
24  BY MR. BRIDGES:
25      Q.    So generally speaking, what are

Page 51

1  the problems that they are trying to address?
2          MR. FEE:  Same objection.
3          THE WITNESS:  Generally, ASTM
4      is addressing problems associated with
5      public health and safety; support --
6      protection and sustainability of the
7      environment; overall quality of life;
8      the reliability of materials, product
9      systems, and services; and
10      facilitating international, regional,
11      and national commerce.
12  BY MR. BRIDGES:
13      Q.    Now, those are problems?
14      A.    They are trying to achieve
15  their mission by addressing problems that may
16  stand in the way of achieving those missions.
17      Q.    So please give me an example of
18  some problems that the plaintiffs are trying
19  to address.  My questioning has been focused
20  on problems.  You've been responding about
21  mission, but I -- I'd like for you to
22  identify some of the problems, generally
23  speaking, that you understand the plaintiffs
24  are trying to address.
25          MR. FEE:  Objection to form.

Page 52

1      Compound.
2          THE WITNESS:  I thought I did,
3      so I'll try with some different words.
4  BY MR. BRIDGES:
5      Q.    Can you answer without
6  reference to your report --
7      A.    I'd rather --
8      Q.    -- based on your general
9  knowledge?
10      A.    I'd rather not.
11      Q.    Well, I'd rather that you tell
12  us what you can recall about the -- about the
13  problems that plaintiffs are trying to
14  address.
15      A.    So you don't --
16          MR. FEE:  Objection.
17          THE WITNESS:  -- want me to
18      look at my report?  This is just a
19      memory contest?
20  BY MR. BRIDGES:
21      Q.    No, it's not a memory contest.
22  I'd like to know what you happen to know,
23  sitting here.
24      A.    I'd like to do that by looking
25  at my report.

Page 53

14 (Pages 50 - 53)

1    Q.    You may after I get your answer
2 first.
3    A.    Okay.
4          MR. FEE:  Objection to making
5    this a memory test and not allowing
6    him to review materials he's indicated
7    he needs to review to fully and
8    accurately respond to the question.
9          If you can answer without
10   looking at your report, go ahead.
11         THE WITNESS:  By way of
12   example, ASTM has addressed problems
13   associated with the safety of
14   amusement rides.
15         By way of example, NFP [sic]
16   has addressed problems associated with
17   electrical fires in buildings.
18         By way of example, ASHRAE is
19   addressing -- but I'm not thinking of
20   a good example for ASHRAE right now.
21   I apologize.  I'd have to look at my
22   report.
23 BY MR. BRIDGES:
24   Q.    Okay.  And I believe that you
25 testified -- bear with me just a second.  Let

1 me get the exact testimony.
2          You said earlier that the
3 plaintiffs are interested in effectuating
4 their charters, and that is they want to
5 address certain problems in an effective way.
6 And if those solutions get incorporated into
7 standards and those standards get
8 incorporated into law, that can be an
9 effective way for dissemination of a
10 solution.
11         Do you recall that testimony?
12   A.    Yes, I do.
13   Q.    What did you mean by
14 "solutions" in that context?
15   A.    Standards are a form of
16 solution.
17   Q.    In what respect?
18   A.    They provide definition around
19 what is a best practice, an advisable
20 practice, and that practice is intended to
21 address existing and potential problems.
22   Q.    And what do you mean by
23 "practices" in that -- in your answer?
24   A.    Perhaps you could read it back,
25 and that will help me answer the question.

1    Q.    You said standards "provide
2 definition around what is a best practice, an
3 advisable practice, and that practice is
4 intended to address existing and potential
5 problems."
6          What did you mean by "practice"
7 in that answer?
8    A.    It was an example of what
9 somebody should do.
10   Q.    And what do you mean by "what
11 somebody should do"?
12         MR. FEE:  Objection.  Vague.
13         THE WITNESS:  I don't know how
14   to define it any more than that.  I'm
15   sorry.
16 BY MR. BRIDGES:
17   Q.    Is it a course of action that
18 somebody should take?
19   A.    That would be another way to
20 say it.  I don't think that's a definition.
21 It's -- it's another presentation of what I
22 said.
23   Q.    Is -- a suitable method for
24 accomplishing a goal?
25         MR. FEE:  Objection to form.

1          THE WITNESS:  That -- that
2    could be an example, yes.
3 BY MR. BRIDGES:
4    Q.    And would it be in terms of
5 some of plaintiffs' standards?
6          MR. FEE:  Same objection.
7          THE WITNESS:  I think so.
8 BY MR. BRIDGES:
9    Q.    Would it be optimal or best
10 procedures for accomplishing a result?
11         MR. FEE:  Objection to form.
12         THE WITNESS:  That could be.
13   I'm not sure that that's a definition,
14   but it -- that's a possibility.
15 BY MR. BRIDGES:
16   Q.    And does that apply to
17 plaintiffs' standards?
18         MR. FEE:  Same objection.
19         THE WITNESS:  I'm sorry.  What
20   is the question?
21 BY MR. BRIDGES:
22   Q.    That plaintiffs' standards
23 articulate optimal procedures for
24 accomplishing certain results.
25         MR. FEE:  Objection to form.

1       THE WITNESS: I don't know that
2   I've seen that. I think that they are
3   consensus based, and what one party
4   may define as optimum may be different
5   from what another party defines as
6   optimal.
7       But I think they're the result
8   of a variety of parties coming
9   together and sometimes balancing
10  interests and opinions.
11  BY MR. BRIDGES:
12      Q.   And recommending certain
13  procedures for accomplishing certain
14  outcomes?
15      A.   By way --
16      MR. FEE: Objection to form.
17      THE WITNESS: By way of
18  example, yes.
19      Are we at a point for a break?
20  We've been going a little over an
21  hour.
22  BY MR. BRIDGES:
23      Q.   I'd like to go a little bit
24  further to conclude a line of questioning.
25  It will be about ten more minutes.

Page 58

1       MR. FEE: Are you okay with
2   that?
3       THE WITNESS: I'm okay with
4   that. I don't know what you mean by
5   "a little bit further."
6   BY MR. BRIDGES:
7       Q.   About ten more -- about ten
8   more minutes.
9       A.   I'd rather keep it closer to
10  now than ten minutes from now.
11      Q.   Well, let me just finish a
12  couple of things here.
13      MR. FEE: Well, you take a
14  break whenever you want to take a
15  break.
16      MR. BRIDGES: Well, I -- I'm in
17  the middle of a line of questioning.
18      MR. FEE: There's no question
19  pending. He can take a break now if
20  he wants. If he's willing to give you
21  a couple more minutes, then that's
22  great, too.
23  BY MR. BRIDGES:
24      Q.   You said that if solutions get
25  incorporated into standards and standards get

Page 59

1   incorporated into law, that can be an
2   effective way for dissemination of a
3   solution.
4       What makes incorporation into
5   law an effective way for dissemination of a
6   solution with respect to the plaintiffs'
7   activities?
8       MR. FEE: Objection to form.
9       THE WITNESS: I -- I'm
10  certainly not --
11      MR. FEE: It mischaracterizes
12  his prior testimony.
13      THE WITNESS: I -- I'm not a
14  legal expert, and I'm not an expert of
15  an -- on the topic of incorporation by
16  reference into law.
17      But if a particular statute
18  lays out that legally someone must
19  follow what's laid out in certain
20  standards, I would expect that,
21  because most people are interested in
22  lawful rather than unlawful activity,
23  that people would follow that dictate.
24  BY MR. BRIDGES:
25      Q.   And that incorporation into law

Page 60

1   would be effective for dissemination of a
2   standard?
3       MR. FEE: Same objections.
4   BY MR. BRIDGES:
5       Q.   Is that your testimony?
6       A.   It's not necessarily the most
7   effective way, but it -- as -- as far as I
8   know, it would be an effective way.
9       Q.   What are other effective ways
10  for dissemination of a standard?
11      A.   I -- I haven't given that any
12  thought. I would just be speculating.
13      MR. BRIDGES: Okay. We can
14  take a break.
15      THE WITNESS: Thank you.
16      THE VIDEOGRAPHER: Off the
17  record at 11:12.
18          *  *  *
19      (Recess from 11:12 a.m. to
20  11:23 a.m.)
21          *  *  *
22      THE VIDEOGRAPHER: On the
23  record at 11:23.
24  BY MR. BRIDGES:
25      Q.   Mr. Jarosz, have you evaluated

Page 61

16 (Pages 58 - 61)

1  any harms that the plaintiffs have actually
2  suffered to date as a consequence of the
3  defendant's activities?
4        MR. FEE:  Objection to form.
5        THE WITNESS:  To the extent I
6    have, it's embodied in my report.
7    You'll see there's a little bit of
8    evidence of actual tangible harm to
9    date, and there's certainly more
10   discussion of harm.  The tangible
11   evidence I have is reflected in my
12   report.
13 BY MR. BRIDGES:
14   Q.    And what do you understand that
15 evidence to be?
16   A.    I believe the number of
17 downloads from the Public Resource
18 dissemination have been fairly substantial.
19 I believe that the purchase of publications
20 has declined some at the plaintiffs -- at the
21 various plaintiffs.  It certainly has not
22 risen.  Those are among the things that come
23 to mind.
24        I think I discuss the topic in
25 more depth in paragraph, among other thing --

Page 62

1  among other places, in paragraph 133 of my
2  report.
3    Q.    Have you been able to quantify
4  any financial losses to plaintiffs as a
5  consequence of defendant's activities?
6    A.    No.
7    Q.    Why not?
8    A.    Not with any great certainty.
9    Q.    Why not?
10   A.    Well, I don't have the records
11 that would allow me to do that.  Moreover, I
12 am not sure that the impact from the past
13 will be close to the impact that will occur
14 in the future if the Court finds that there
15 has been no copyright or trademark
16 infringement.
17   Q.    Why do you make the statement
18 you just did?  What's your basis for it?
19        MR. FEE:  Objection to form.
20        THE WITNESS:  I think there
21   were a few things in my statement.
22   Which would you like me to expound on?
23 BY MR. BRIDGES:
24   Q.    Just that sentence.  I'd like
25 to know what the basis is for the sentence

Page 63

1  you just said, quote, "I am not sure that the
2  impact from the past would be close to the
3  impact that will occur in the future if the
4  Court finds that there has been no copyright
5  or trademark infringement."
6    A.    It's everything laid out in my
7  report.  I -- it's really the -- at the heart
8  of what I did.
9    Q.    And please summarize for me
10 what data you base that statement on.
11   A.    That's identified in my report.
12   Q.    Okay.  Show me, please, in the
13 report.
14   A.    It's all of what's in
15 Exhibit 1.
16   Q.    No, I want -- I want the basis
17 for your statement that the impact from
18 conduct to date -- strike that -- that you're
19 not sure that the impact from the conduct to
20 date would be close to the impact that will
21 occur in the future if the Court find --
22 makes a certain finding, right?
23   A.    Correct.
24   Q.    So please identify for me
25 something specific that forms the basis of

Page 64

1  that statement.
2        MR. FEE:  Objection.  Asked and
3    answered.
4        THE WITNESS:  Among other
5    things, paragraphs 112 through 155.
6  BY MR. BRIDGES:
7    Q.    So these are the "Costs of
8  Losing Copyright Protection"; is that
9  correct?
10   A.    That's the title of this
11 section, and then there's some discussion of
12 trademark protection as well.
13   Q.    And those would be the harms
14 that you identify that would flow from a
15 decision by the Court that the plaintiffs
16 cannot enforce their copyrights against the
17 defendant, correct?
18        MR. FEE:  Objection to form.
19        THE WITNESS:  What I can say --
20   I'm sorry.
21        MR. FEE:  I just objected to
22   form.
23        THE WITNESS:  What I can say
24   with a reasonable degree of certainty.
25 BY MR. BRIDGES:

Page 65

17 (Pages 62 - 65)

1      Q.    So those would be harms caused
2   by a court decision?
3            MR. FEE:  Same objection.
4            THE WITNESS:  By continuing
5      activities by the defendant that are
6      not halted by the Court.
7   BY MR. BRIDGES:
8      Q.    Well, it comes across, frankly,
9   in your report as though you're identifying
10  harms that would flow from a court decision.
11           MR. FEE:  Objection.
12  BY MR. BRIDGES:
13     Q.    Is that correct or not?
14     A.    No, I think you --
15           MR. FEE:  Mischaracterizes the
16     report.
17           THE WITNESS:  -- you misread
18     it.  I don't think I said that or
19     meant to say that.
20  BY MR. BRIDGES:
21     Q.    So what harms have occurred
22  from the -- from the defendant's conduct to
23  date?
24     A.    At the risk of repeating
25  myself, some of that is summarized in

Page 66

1   paragraph 133, with regard to tangible
2   evidence on harm.  With regard to other
3   evidence, it's throughout the report.
4      Q.    So why would it make a
5   difference to what the defendant's harms
6   are -- strike -- strike that.
7            Why would it make a defendants
8   [sic] to the plaintiffs' harms if the
9   plaintiffs' harms were continue with --
10  strike that.
11           Is it your testimony that harms
12  to plaintiffs would be different depending on
13  the particular basis of the Court's ruling?
14           MR. FEE:  Objection.  Vague.
15           THE WITNESS:  I -- I don't
16     understand your question.
17  BY MR. BRIDGES:
18     Q.    It looks as though you're
19  stating what the harms would be if the Court
20  found that incorporation by reference would
21  cause the plaintiffs to lose copyright
22  protection; is that correct?
23     A.    I don't --
24           MR. FEE:  Objection.  Vague.
25           THE WITNESS:  -- think so.  I

Page 67

1      think basically what I'm saying is
2      what would -- or addressing, is what
3      would be the harm to the plaintiffs if
4      there's no permanent injunction.
5   BY MR. BRIDGES:
6      Q.    Well, what did you mean by
7   "losing copyright protection" in the
8   paragraph -- in the heading VI on page 48?
9      A.    In essence, you can think of it
10  as what would happen if there's no permanent
11  injunction.  In other words, what the
12  defendant has done in the past and what it's
13  likely to do in the future is allowed to
14  continue.
15     Q.    And you immediately go into
16  paragraph 112 talking about Emily Bremer,
17  correct?
18     A.    I don't know what you mean by
19  "immediately."  It's the first paragraph in
20  Section VI.
21     Q.    Right.  Was Emily Bremer in the
22  passage you referred to referring to the
23  presence or absence of a permanent injunction
24  in this case?
25     A.    I don't think explicitly she

Page 68

1   was addressing that issue, no.
2      Q.    Do you think implicitly she was
3   referring to this case?
4      A.    No.  I thought you were asking
5   about permanent injunction.  I don't think
6   she was addressing the -- an injunction
7   issue.  She was addressing the concept of
8   copyright protection.
9      Q.    And that's what you quoted her
10  for, right, was for the concept of copyright
11  protection for standards?
12           MR. FEE:  Objection.  You're
13     referring just to paragraph 112?
14  BY MR. BRIDGES:
15     Q.    You may answer.
16           MR. FEE:  Objection to form.
17           THE WITNESS:  I -- I don't
18     understand the question.
19  BY MR. BRIDGES:
20     Q.    You quoted her in
21  paragraph 112, correct?
22     A.    Yes.  From one of her two
23  articles, yes.
24     Q.    Right.  Regarding the concept
25  of copyright protection?

Page 69

18 (Pages 66 - 69)

1      A.    Generally.  I think she's
2  talking about standards development and
3  incorporation by reference.  I don't remember
4  if she said at the very beginning of the
5  article that it was about copyright
6  protection, but she certainly talks about
7  copyright protection.
8      Q.    And you're quoting her about
9  losing copyright protection, and you're
10 placing it in the context of harms of the
11 loss of copyright protection, correct?
12        MR. FEE:  Objection to form.
13        THE WITNESS:  This excerpt
14        doesn't specifically talk about losing
15        copyright protection, but it talks
16        about the concept of it.  If there was
17        no longer copyright protection granted
18        to the SDOs, what would be the
19        repercussions.
20 BY MR. BRIDGES:
21     Q.    And that's the context that you
22 identified in the first line of
23 paragraph 112, correct?
24     A.    Yes.
25        MR. FEE:  Objection to form.

1  BY MR. BRIDGES:
2      Q.    Let me direct your attention to
3  paragraph 35 of your report.  It says, "With
4  regard to expansion beyond the specific
5  actions of Public Resource here, the
6  'product' offerings of Public Resource -
7  scans of paper copies of standards with some
8  rekeying of text and some redrawing of
9  diagrams (with some containing errors) -
10 represent a rudimentary first step in the use
11 of Plaintiffs' standards that is likely to
12 become much more sophisticated if the Court
13 holds that third parties are free to use
14 Plaintiffs' standards with impunity after
15 they are incorporated by reference into law."
16        Do you see that?
17     A.    Yes, I do.
18     Q.    That is your statement,
19 correct?
20     A.    Yes.
21     Q.    What are the steps that you're
22 envisioning there beyond the rudimentary
23 first step that you identify?
24     A.    I think they're laid out in the
25 next sentence.

1      Q.    "Such products" --
2      A.    And in the next two sentences.
3      Q.    And these are other products
4  that "could include more sophisticated
5  Web-based availability, published
6  compilations of incorporated standards, and
7  other ancillary products that incorporate the
8  standards"; isn't that correct?
9      A.    You didn't read that right.  It
10 starts "such products could include."
11     Q.    Okay.  Otherwise, that reading
12 is correct, correct?
13     A.    I think so.
14     Q.    You consider that to be harm to
15 the plaintiffs?
16        MR. FEE:  Objection.  Vague.
17        THE WITNESS:  It could be, yes.
18        It's likely to be, if the copyright
19        infringement or the assumption of a
20        copyright infringement continues.  It
21        could broaden.
22 BY MR. BRIDGES:
23     Q.    Right.  But the fact that these
24 other types of products would enter the
25 marketplace is part of the harm that you

1  envision from the defendant in this case?
2        MR. FEE:  Objection to form.
3        THE WITNESS:  It's potential --
4        there's a potential that the defendant
5        could do that.  There's also the
6        potential that other parties could do
7        that.
8  BY MR. BRIDGES:
9      Q.    What --
10     A.    I don't know for sure what the
11 defendant has in mind.
12     Q.    Why did you take into account
13 harms caused by other parties in this case?
14     A.    Because --
15        MR. FEE:  Objection.  Lack of
16        foundation.
17        Go ahead.
18        THE WITNESS:  If no copyright
19        protection is allowed here, in other
20        words, there's no permanent
21        injunction, Public Resource and other
22        parties like it will have freedom to
23        do what the plaintiffs believe they
24        should not have freedom to do.
25 BY MR. BRIDGES:

1    Q.    In other words, if the Court
2  makes a decision in a certain way, there will
3  be harms from persons or entities other than
4  Public.Resource.Org to the plaintiffs?  Is
5  that your testimony?
6        MR. FEE:  Objection to form.
7        THE WITNESS:  You used the
8    phrase "in a certain way."  I don't
9    know what you mean by that.  I'm
10    addressing the issue of whether there
11    should be a permanent injunction or
12    not.
13  BY MR. BRIDGES:
14    Q.    So your view is that, if the
15  Court does not enter a permanent injunction,
16  the plaintiffs will suffer harms from parties
17  other than Public.Resource.Org.  Is that your
18  testimony?
19    A.    That potential exists.  I don't
20  know for sure.  That's, in part, why the harm
21  is irreparable or very difficult to quantify.
22    Q.    The -- what harm?
23    A.    Continuing activity of Public
24  Resource and others.  I don't know exactly
25  what will happen, but the potential is that

1  there could be very broad dissemination of
2  the standards, which would impact these SDOs
3  tremendously.
4    Q.    What harm would
5  Public.Resource.Org cause to plaintiffs if
6  there is no permanent injunction?
7    A.    A permanent injunction would --
8  lack of a permanent injunction would harm the
9  SDOs.
10    Q.    That wasn't my question.  My
11  question was, what harm would
12  Public.Resource.Org cause to plaintiffs if
13  there is no permanent injunction?
14    A.    At the very least, it's
15  associated with its historical dissemination
16  of these standards, and there would be, in
17  essence, a carte blanche for other
18  organizations or individuals to access those.
19        So my expectation is that the
20  dissemination of the materials that have
21  already been disseminated will expand.
22        It could also be the case that
23  Public Resource will undertake further
24  activities that would disseminate either
25  already disseminated standards or other

1  standards.
2    Q.    What further harm would
3  Public.Resource.Org cause to plaintiffs with
4  respect to the standards at issue in this
5  case if no -- if the Court does not
6  permanently enjoin Public.Resource.Org?
7        MR. FEE:  Objection to form.
8        THE WITNESS:  If there's no
9    permanent injunction, there will, in
10    essence, be a message sent to the
11    marketplace that the standards that
12    have already been disseminated are out
13    there and can be used by others.
14        So right now my expectation is
15    that some number of consumers of the
16    standards have been reluctant or
17    unknowing as to the standards
18    disseminated by Public Resource.  Now
19    there will be more knowledge about
20    that and more approval of that
21    activity.  That is if there's no
22    permanent injunction.
23  BY MR. BRIDGES:
24    Q.    What harms will plaintiffs
25  suffer if the Court rules that the plaintiffs

1  do not own the copyrights in this case?
2        MR. FEE:  Objection.  Calls for
3    speculation.
4        THE WITNESS:  In essence,
5    you're asking if there's no copyright
6    infringement?
7  BY MR. BRIDGES:
8    Q.    No.  What harms -- have you
9  identified what harms the plaintiffs would
10  suffer if the Court rules that the plaintiffs
11  do not own the copyrights at issue, that
12  there are no copyrights that the plaintiffs
13  own --
14        MR. FEE:  Objection to form.
15  BY MR. BRIDGES:
16    Q.    -- at issue in this case?
17    A.    I haven't addressed or thought
18  about that issue.  There are also, don't
19  forget, trademark issues.
20    Q.    I'm asking about copyright, so
21  I ask you to confine your answers to my
22  questions.
23        My question is, what -- you
24  assume for purposes of your analysis that
25  plaintiffs own valid copyrights, correct?

1    A.   I assume that there's copyright
2  infringement.  I don't know that I've made an
3  explicit assumption with regard to ownership.
4    Q.   And you assume infringement
5  without assuming ownership of the copyrights?
6    A.   I haven't made any explicit
7  assumption with regard to ownership.  I know
8  that's an issue in this case, but it's well
9  beyond my expertise.
10    Q.   So if it turns out that -- do
11  you understand your testimony to have any
12  bearing on whether plaintiffs' standards are
13  copyrightable?
14        MR. FEE:  Objection.  Calls for
15    speculation.
16        I would instruct you to not
17    disclose any communications you had
18    with counsel that weren't the basis
19    for any of your opinions in this case.
20    You can otherwise answer.
21        THE WITNESS:  Could you read
22    that back or ask it again, please?
23  BY MR. BRIDGES:
24    Q.   Do you understand your
25  testimony and opinions in this case to have

Page 78

1  any bearing on whether plaintiffs' standards
2  are copyrightable?
3        MR. FEE:  Same objection and
4    instruction.  Plus objection, calls
5    for a legal conclusion.
6        THE WITNESS:  I don't know one
7    way or the other.  I've not taken on
8    that assignment.
9  BY MR. BRIDGES:
10    Q.   Do you understand whether your
11  testimony and opinions in this case are
12  relevant to whether plaintiffs deserve
13  copyright protection in this case?
14        MR. FEE:  Objection.  Calls for
15    a legal conclusion.
16        And same objection with respect
17    to communications between you and
18    counsel that were not the bases for
19    your opinions or your report.
20        THE WITNESS:  I don't know one
21    way or the other.  I did not take on
22    that assignment.
23  BY MR. BRIDGES:
24    Q.   Do you mean by your analysis
25  and opinions to suggest in any way that

Page 79

1  plaintiffs deserve copyright protection for
2  these standards?
3        MR. FEE:  Objection to form.
4        THE WITNESS:  I don't have an
5    opinion on that one way or the other.
6    I have not thought about that topic.
7  BY MR. BRIDGES:
8    Q.   Do you have any expertise in
9  copyright law as a field of law?
10        MR. FEE:  Objection.  Vague.
11        THE WITNESS:  No, I don't have
12    legal expertise.  I have expertise in
13    looking at harm associated with
14    copyright infringement.
15  BY MR. BRIDGES:
16    Q.   Do you have any expertise with
17  respect to harm caused by invalidation of
18  copyrights?
19        MR. FEE:  Same objection.
20        THE WITNESS:  I'm not quite
21    sure I'm fully appreciating your
22    question.  Again, I'm an expert in the
23    economics of IP protection.  One of
24    the areas in which I do work is harm
25    associated with copyright protection.

Page 80

1  BY MR. BRIDGES:
2    Q.   Have you done any work in this
3  case to quantify what harms plaintiffs would
4  suffer if a court were to rule that they
5  lacked copyright rights in the standards at
6  issue in this case?
7        MR. FEE:  Objection to form.
8        Go ahead.
9        THE WITNESS:  Not explicitly,
10    to my knowledge.
11  BY MR. BRIDGES:
12    Q.   Have you done anything
13  implicitly?
14        MR. FEE:  Same objection.
15        THE WITNESS:  Not to my
16    knowledge.
17  BY MR. BRIDGES:
18    Q.   Have you done any work in this
19  case to analyze the incentives that
20  participants have in the standards
21  development process?
22        MR. FEE:  Objection to form.
23    Vague.
24        THE WITNESS:  I have in the
25    sense that I've examined the materials

Page 81

21 (Pages 78 - 81)

1    that I've cited, and some of those
2    talk about the standard development
3    process and why participants are
4    active in the process.  So in that
5    regard, I've considered incentives.
6   BY MR. BRIDGES:
7        Q.    What do you understand the
8   incentives to be?
9        A.    Well, for the supply side
10  constituents, they're interested in effective
11  manufacturing and selling of products that
12  will -- and services that will be well
13  received in the marketplace; and on the
14  demand side, the constituents are interested
15  in products and services that address certain
16  quality and compatibility issues or problems
17  and help resolve those.
18       Q.    Do you know who actually
19  creates the text of the standards?
20       MR. FEE:  Objection to form.
21       THE WITNESS:  Are you talking
22       about who actually types in the words?
23  BY MR. BRIDGES:
24       Q.    No.
25       A.    Because I don't know what you

Page 82

1   mean by "creates the text."
2        Q.    Who actually suggests the
3   words?
4        A.    I think a number of
5   constituents do, typically.
6        Q.    What types of constituents
7   suggest the words of the standards?
8        MR. FEE:  Objection to form.
9        THE WITNESS:  I think it's
10       sometimes SDO employees.  I think,
11       more times than not, it's industry
12       participants, often supply-side
13       people, sometimes demand-side people.
14       Frequently those people are working
15       from preexisting standards or similar
16       standards and revising those as
17       appropriate.
18       So I think a number of people
19       have input to the words.
20  BY MR. BRIDGES:
21       Q.    Do you actually know of
22  instances where SDO employees have proposed
23  text as opposed to editing text?
24       A.    I can't --
25       MR. FEE:  Objection --

Page 83

1        THE WITNESS:  -- point to --
2        MR. FEE:  -- form.
3        THE WITNESS:  -- any particular
4        instances as I sit here now.
5   BY MR. BRIDGES:
6        Q.    Can you think of any other
7   motivations that the participants in the
8   standards writing process have?
9        A.    I'm sorry.  Other than what?
10       Q.    Other than the incentives you
11  referred to earlier of the supply-side
12  constituents and the demand-side
13  constituents.
14       A.    Nothing else comes to mind,
15  although I'm certainly open to the fact that
16  I haven't thought of or expressed all the
17  incentives.
18       Q.    Well, what other incentives can
19  you think of as you sit here?
20       A.    As I just said, nothing else
21  comes to mind.
22       Q.    What incentives do you
23  understand the plaintiffs to have in
24  developing standards?
25       MR. FEE:  Objection to form.

Page 84

1        THE WITNESS:  I think,
2        generally, they want consensus among
3        interested parties in how to address a
4        particular issue or problem that those
5        constituents face.
6        They are each non-profit
7        organizations, so they're not
8        intending to profit off their
9        activities, but they're certainly
10       intending to fund their activities
11       going forward.
12  BY MR. BRIDGES:
13       Q.    What do you understand the
14  activities of the standards development
15  organizations to be in creating the standards
16  at issue in this case?
17       MR. FEE:  Objection to form.
18       THE WITNESS:  At the very
19       least, they facilitate the process
20       through arranging logistics.  They do
21       other things, including participate in
22       discussions, and -- as I understand
23       it, and create versions of proposed
24       standards.
25       They also serve as a

Page 85

22 (Pages 82 - 85)

1    clearinghouse for resources.
2  BY MR. BRIDGES:
3      Q.    When you say they "create
4  versions of the proposed standards," it's, in
5  fact, the various groups, as you call them,
6  that create versions, perhaps with a staff
7  member from the organizations themselves,
8  correct?
9          MR. FEE:  Objection to form.
10  Vague.
11         THE WITNESS:  I think that's
12  sometimes correct.
13  BY MR. BRIDGES:
14     Q.    Do you know that --
15     A.    Perhaps often.
16     Q.    Or perhaps always?
17     A.    Perhaps always.
18         MR. FEE:  Objection.
19  BY MR. BRIDGES:
20     Q.    How do the plaintiffs serve as
21  clearinghouses for resources?
22     A.    They allow a forum for the
23  various constituents to identify and address
24  issues that those constituents face in a
25  particular subject area.

Page 86

1      Q.    What investments do you
2  understand the plaintiffs to make in the
3  standards development process?
4          MR. FEE:  Objection to form.
5          THE WITNESS:  Are you asking
6  for dollar amounts, or are you asking
7  for types of activities?
8  BY MR. BRIDGES:
9      Q.    Types of -- types of
10  expenditures.
11         MR. FEE:  Same objection.
12         THE WITNESS:  There are many
13  types, as I understand it.  One type
14  is simply providing people to be
15  involved in the process and paying the
16  salaries of those people.
17         I think they probably provide
18  computing resources to help produce
19  the standards.
20         I think they probably provide
21  meeting resources.
22         I think they probably provide
23  an e-mail exchange mechanism by which
24  information is shared.
25         I think they create copies of

Page 87

1      standards, print copies of standards,
2      and disseminate copies of standards.
3          They are involved in teaching
4      and training sometimes associated with
5      standards.
6          They participate in advertising
7      campaigns about the output of the SDO.
8          Those are among the things that
9      they contribute.
10  BY MR. BRIDGES:
11     Q.    And when you say "providing
12  people to be involved and pay salaries,"
13  you're talking about the -- generally
14  speaking, the staff members who may functions
15  as liaisons to various committees and groups
16  that draft the standards?
17         MR. FEE:  Objection to form.
18         Lack of foundation.
19  BY MR. BRIDGES:
20     Q.    Is that what you understand?
21     A.    Staff people that help
22  facilitate.  Some are purely helping in a
23  logistics front.  Others are helping on a
24  more substantive front.  They pay their
25  salaries.  They pay taxes, provide benefits.

Page 88

1  They provide travel expenses.  Those are some
2  of the things that are done.
3      Q.    On page 76 -- sorry -- page 33.
4  Let me ask you to turn to paragraph 76 of
5  your report.  Are you there?
6      A.    I am, yes.
7      Q.    In the final sentence, it says,
8  "In fiscal year 2014, ASHRAE spent more than
9  $1 million to cover the costs of developing
10  or updating its standards."
11         Do you see that?
12     A.    I do, yes.
13     Q.    Are -- on -- how many years is
14  the typical cycle for revision of ASHRAE's
15  90.1 standard?
16     A.    That is under continuous
17  maintenance, and I think that's -- it's
18  supplemented and updated automatically every
19  three years.  Perhaps they address it more
20  frequently, but at least every three years.
21     Q.    So it would be fair to assume
22  that, during one cycle, ASHRAE spent
23  something over $3 million to cover the costs
24  of developing or updating its standards?
25     A.    You said at least $3 million?

Page 89

23 (Pages 86 - 89)

1     Q.    Right.  Or approximately
2  $3 million?
3     A.    Are you limiting it just to
4  90.1 or all its standards?
5     Q.    Well, that's a good question.
6  What -- what's -- what did you intend the
7  last sentence in paragraph 76 to refer to?
8  All of its standards or 90.1?
9     A.    I think it's all of its
10  standards, but we could visit the screenshot
11  from the Web site to confirm that.
12     Q.    Okay.
13     A.    I -- I could be wrong.  I don't
14  think I am, but I could be.
15     Q.    Okay.  In the previous
16  sentence, you say, "ASHRAE and its volunteer
17  members devoted more than 86,400 man-hours,
18  3,600 hotel nights, and 1,200 round-trip
19  flights as part of the process."
20          And that -- "the process"
21  appears to refer to updating the ASHRAE 90.1
22  standard, correct?
23     A.    Yes.
24     Q.    When you say "ASHRAE and its
25  volunteer members," and then you give those

1  statistics, those statistics refer primarily
2  to the man-hours, hotel nights, and
3  round-trip flights of the volunteer members?
4          MR. FEE:  Objection.  Vague.
5          THE WITNESS:  Probably.  As
6  opposed to ASHRAE-employed staff.
7  BY MR. BRIDGES:
8     Q.    Do you know how much ASHRAE's
9  volunteer members and their employers --
10  strike that.
11          Do you know how much ASHRAE's
12  volunteer members and their employers spent
13  in salaries and disbursements for the
14  man-hours, hotel nights, and round-trip
15  flights that were part of the process of
16  updating the ASHRAE 90.1 standard?
17     A.    I don't know, but it -- I would
18  imagine it's a noticeable amount, but I don't
19  know the amount.
20     Q.    What would be your best
21  estimate?
22     A.    I don't have a best estimate.
23     Q.    Would it be probably over
24  $10 million?
25          MR. FEE:  Objection to form.

1          THE WITNESS:  Again, I don't
2      have an estimate.
3  BY MR. BRIDGES:
4     Q.    Do you know -- did ASHRAE pay
5  for the time, the hotel bills, and the plane
6  fares of its volunteer members in updating
7  the ASHRAE 90.1 standard?
8     A.    I would expect rarely.  It's
9  possible that there are certain instances in
10  which there was some set of out-of-pocket
11  expenses covered, but I would imagine the
12  bulk of the time it's the volunteer's
13  employer.
14          MR. BRIDGES:  Sorry.  How long
15      have we been going?  I didn't get when
16      we went back on.
17          MR. FEE:  34 minutes.
18  BY MR. BRIDGES:
19     Q.    Did you speak with Emily Bremer
20  at any point in this case?
21     A.    No.
22     Q.    How did you become acquainted
23  with her writings?
24     A.    I think Kevin Fee and/or
25  Jordana Rubel brought to my attention that

1  she had written on this topic.  I don't
2  recall whether then we separately obtained
3  her two articles or Mr. Fee slash Ms. Rubel
4  provided those to us.
5     Q.    What independent work did you
6  do to research writings regarding the
7  economics of standards development?
8          MR. FEE:  Objection to form.
9          THE WITNESS:  We did
10      independent research in the sense that
11      people that work with me did a
12      literature search to determine what
13      writings had been done in the area.
14          I was previously aware of some
15      amount of the scholarship to begin
16      with.
17  BY MR. BRIDGES:
18     Q.    How is that literature search
19  reflected in any documents?
20     A.    The results are shown in my
21  tab 2, and in particular it is page 2 of my
22  tab 2, at the bottom.
23     Q.    And were these items found by
24  you or your team?
25          MR. FEE:  Objection to form.

24 (Pages 90 - 93)

1        THE WITNESS: Yes, with the
2    exception that, in the first instance,
3    lawyers at Morgan Lewis brought to our
4    attention the Bremer -- the existence
5    of Bremer articles.
6 BY MR. BRIDGES:
7    Q.    Did you study any of the
8 materials that Bremer -- strike that.
9        Bremer's articles are law
10 review articles, correct?
11    A.    Yes.
12    Q.    Did any plaintiff -- did your
13 team's research identify any articles that
14 you chose not to include in tab 2?
15    A.    I don't think so.
16    Q.    Did any plaintiff or its
17 counsel furnish you with correspondence
18 between the plaintiffs and Emily Bremer for
19 review?
20    A.    No, not to my knowledge.
21    Q.    How many conversations with
22 representatives of the plaintiffs did you
23 have?
24        MR. FEE: Objection.
25        I would instruct you not to

Page 94

1 answer questions regarding
2    communications with counsel, unless
3    they formed the basis of your
4    opinions, in which case you can answer
5    questions with respect to those
6    conversations.
7 BY MR. BRIDGES:
8    Q.    So I -- I'll change my question
9 slightly.
10        How many -- how many
11 conversations did you have with non-lawyer
12 employees or former employees of the
13 plaintiffs?
14    A.    None that the -- that did not
15 include the lawyers.
16    Q.    Right. I'm -- so I'm asking
17 you to tell me what they were. If the
18 presence of lawyer -- if you had a
19 conversation with a -- with an employee or
20 former employee of the plaintiff, I'd like to
21 know what that was. So the fact that lawyers
22 may have been present wouldn't excuse it from
23 the scope of the answer.
24    A.    I had somewhere between four
25 and six conversations with people who were at

Page 95

1 the various plaintiffs.
2    Q.    With whom?
3    A.    They are all identified in
4 paragraph 10 of my report.
5    Q.    Which of those did you
6 personally have conversations with?
7    A.    All of them, as I recall. It's
8 possible there's someone I did not, but I'm
9 not remembering that being the case.
10    Q.    Approximately how long did you
11 spend with -- did you have conversations with
12 any of them together?
13    A.    Yes, several of them were
14 together.
15    Q.    Which ones?
16    A.    I don't recall all
17 combinations. I can say with some confidence
18 that there was never more than one plaintiff
19 on a call. In other words, there were
20 several people from a particular plaintiff on
21 a call, but not more than one plaintiff.
22        So I had various combinations
23 of calls with ASTM that may have occurred on
24 three occasions; with NFPA, one or two
25 occasions; and with ASHRAE, one or two

Page 96

1 occasions.
2    Q.    And approximately how long
3 total did you spend in conversations with
4 representatives of each plaintiff?
5        MR. FEE: Objection to form.
6        THE WITNESS: Cumulatively,
7    somewhere between three and five hours
8    is my best guess right now.
9 BY MR. BRIDGES:
10    Q.    When you say cumulative --
11 "cumulatively," you mean for all plaintiffs?
12    A.    Yes. Meaning I'm -- I've added
13 up the conversations I had across all three
14 plaintiffs.
15    Q.    Right. What's your best
16 estimate as to the period of time you spent
17 with each plaintiff?
18    A.    With ASTM, it may have been two
19 to three hours. For NFPA, one to two hours.
20 For ASHRAE, one to two hours. That's my best
21 guess right now.
22        * * *
23        (Jarosz Exhibit 2 and Jarosz-3
24    marked for identification.)
25        * * *

Page 97

25 (Pages 94 - 97)

BY MR. BRIDGES:
1   Q.   Mr. Jarosz, I'm handing you
3  Exhibits 2 and 3.  I'll represent that these
4  were furnished to us by e-mail last night, I
5  think around 6 p.m. Eastern or thereabouts.
6        Can you please identify
7  Exhibits 2 and 3?
8        MR. FEE:  Objection to form.
9        THE WITNESS:  To the best of my
10       knowledge, Exhibit 2 is notes that
11       Mr. Chapman took in conversations that
12       we had with various people, and
13       Exhibit 3 is notes that Mr. Hamasaki
14       took in conversations with plaintiff
15       personnel.
16  BY MR. BRIDGES:
17    Q.   Did you take any notes of
18  conversations with plaintiffs' personnel?
19    A.   I believe I did, but I did not
20  keep those notes.  Those were -- I followed
21  my normal procedure.  And by the time we got
22  to the report, I had not kept those notes.
23    Q.   Did you have those -- did you
24  refer to those notes in drafting your report?
25        MR. FEE:  Objection.  Vague.

*Page 98*

1        THE WITNESS:  Not that I
2     recall.
3  BY MR. BRIDGES:
4    Q.   In your report --
5    A.   Well, I guess I should say, I
6  looked back at the notes at some time, and
7  the report was done over a period of time.
8  So I guess in some dimension I did, but as it
9  came toward the final stages, I did not.
10   Q.   Well, I'm just curious, because
11  your report indicates, among a number of the
12  footnotes, there's citations to conversations
13  with various persons.  And I'm trying to
14  figure out how -- on what you drew to cite
15  specifically to various conversations in your
16  report.  And I'll give you examples.
17  Footnotes 193, 194, and 196 through 200.
18        On what were you relying in
19  referring to those conversations?
20        MR. FEE:  Objection to form.
21        THE WITNESS:  Conversations
22     with Mr. Chapman and/or Mr. Hamasaki.
23  BY MR. BRIDGES:
24   Q.   So you were relying on
25  conversations with Messrs. Chapman and

*Page 99*

Hamasaki?
2        MR. FEE:  Objection.  Vague.
3        THE WITNESS:  Yes, in part.
4  BY MR. BRIDGES:
5    Q.   What else, other than relying
6  upon conversations with them?
7    A.   And the memory that I had of
8  the conversations with the individuals.
9    Q.   And you -- but you didn't rely
10  upon your own notes?
11    A.   Not at the point that I was
12  drafting up footnotes, no.
13    Q.   Why would you take notes and
14  then dispose of them before you wrote your
15  report?
16    A.   Well, I find it -- I find it
17  useful to follow along in a conversation by
18  taking notes so that I can follow up with
19  certain points.  I find it useful to write
20  things down.  It helps in the memory process.
21  But I did not keep those notes in the final
22  drafting of the report.
23    Q.   Why would you -- when you had
24  those conversations, did you anticipate that
25  you were going to prepare a report?

*Page 100*

1    A.   I thought that there was a very
2  good possibility, yes.
3    Q.   Why did you not retain notes of
4  conversations to have on hand for the
5  preparation of your report?
6    A.   I followed my normal procedure.
7  I don't typically take notes.  I'm not a
8  great note-taker, and my handwriting leaves
9  much to be desired.  So I tend to find my
10  notes themselves to be of limited assistance.
11    Q.   And that's your normal
12  procedure, is to throw away notes that
13  reflect conversations that you rely on?
14    A.   No.  My normal procedure is to
15  keep materials that I do rely upon and not
16  keep materials that I don't need to rely
17  upon.
18    Q.   And you didn't need to rely
19  upon any of your notes to recall your
20  conversations, so you went and discussed the
21  conversations with two other persons?
22    A.   Yes.
23    Q.   Did -- I see -- it's my
24  understanding that your report sites
25  conversations with Stephen Comstock 17 times,

*Page 101*

26 (Pages 98 - 101)

1 conversations with Jim Thomas 11 times,
2 conversations with Jim Pauley seven times,
3 conversations with John Pace four times,
4 conversations with Stephanie Reiniche four
5 times, and conversations with Mark Owen three
6 times.
7          Did you make the citations to
8 those conversations in the report based on
9 your memory?
10         MR. FEE: Objection. Lack of
11   foundation.
12         THE WITNESS: In part, and I
13   think in part the citations were put
14   there based on the memory and
15   knowledge of Mr. Chapman and
16   Mr. Hamasaki.
17 BY MR. BRIDGES:
18   Q.   Did you get any materials from
19 Mr. Chapman and Mr. Hamasaki other than
20 Exhibits 2 and 3 on which you relied in
21 preparing this report?
22         MR. FEE: Objection. Lack of
23   foundation. Mischaracterizes his
24   testimony.
25         THE WITNESS: Actually, as a

Page 102

1    factual matter, this is the very first
2    time I've seen these notes. I've
3    never seen these before.
4 BY MR. BRIDGES:
5    Q.   What did you rely upon in
6 making all of the detailed references to
7 conversations in the report?
8    A.   My --
9         MR. FEE: Objection. Asked and
10   answered.
11        THE WITNESS: My memory of
12   conversations with those individuals
13   and conversations that I had with
14   Mr. Hamasaki and Mr. Chapman.
15 BY MR. BRIDGES:
16   Q.   Did anyone else prepare the
17 language regarding that -- the information
18 from those conversations that you relied upon
19 in creating your report?
20   A.   No, not to my knowledge. Now,
21 lawyers did look at draft of the report,
22 although we're not going into the substance
23 of it. But that was -- we could, in part, be
24 refreshed if we were wrong as to any cite,
25 but I don't think we were.

Page 103

1    Q.   Did you rely upon the writing
2 of the language by other people in deciding
3 to include language regarding information
4 learned from conversations in your report?
5         MR. FEE: Objection. Vague.
6         THE WITNESS: I can answer that
7   by saying Mr. Hamasaki, Mr. Chapman,
8   and I were all involved in this
9   project and the report. It was the
10   case that we all had some input in the
11   writing of the words, though I was
12   responsible for and directly
13   supervised all of it.
14 BY MR. BRIDGES:
15   Q.   And did you rely upon input
16 from Mr. Hamasaki and Mr. Chapman in the form
17 of written input, such as drafts?
18        MR. FEE: Objection.
19        THE WITNESS: As I --
20        MR. FEE: Hold on a second.
21   I don't believe that you're
22   entitled to discovery regarding his
23   drafts, and I'll instruct him not to
24   answer that --
25        MR. BRIDGES: I --

Page 104

1         MR. FEE: -- unless you have --
2   unless there's something in there that
3   makes this subject to an exception of
4   Rule 26, as limitation on discovery
5   from experts, which I'm not aware of.
6         MR. BRIDGES: I am entitled to
7   discovery about materials he relied
8   upon --
9         MR. FEE: Okay. That's fair.
10        MR. BRIDGES: -- and that is my
11   question.
12        MR. FEE: Okay.
13 BY MR. BRIDGES:
14   Q.   And I'd like to know if you
15 relied upon drafts prepared by other persons
16 regarding the statements and facts for which
17 conversations are mentioned in the citations.
18        MR. FEE: Objection to form.
19        THE WITNESS: I don't know how
20   to answer that besides what I said a
21   moment ago, and let me perhaps say it
22   a little bit differently and see if
23   that's responsive.
24        Mr. Hamasaki, Mr. Chapman, and
25   I were all involved in this project

Page 105

27 (Pages 102 - 105)

1     and in this report.  We were all
2     involved in writing and rewriting and
3     talking and questioning one another.
4  BY MR. BRIDGES:
5     Q.    And were you relying, in part,
6  upon the memories or recorded memories of
7  Mr. Hamasaki and Mr. Chapman?
8          MR. FEE: Objection.  Vague as
9     to "relying."
10         And if you're asking him if
11    he's relied upon those conversations
12    as the basis for facts or assumptions,
13    you can answer it.  If you mean relied
14    in any other context, you shouldn't
15    answer it.
16         THE WITNESS:  I certainly
17    didn't rely on any recordings of
18    conversations.  I had not seen any
19    notes.  This is the first I've seen
20    notes from Mr. Chapman and
21    Mr. Hamasaki.
22         We talked about virtually all
23    of these topics.  I don't know if you
24    would call that "relying" or not.  But
25    we worked together on this project.

Page 106

1  BY MR. BRIDGES:
2     Q.    Did they prepare draft language
3  referring to information from those
4  conversations with citations to those
5  conversations that you relied upon in
6  completing the report?
7          MR. FEE: Objection.  Vague as
8     to "relied."
9          To the extent that should be
10    interpreted as meaning relied upon for
11    reaching any conclusions in your
12    report or relied upon for assumptions,
13    you can answer it.  You shouldn't
14    answer it otherwise.
15         THE WITNESS:  I just don't know
16    how to answer that question besides
17    saying, at various points in time, one
18    or the other -- others of us were
19    involved in the Word document that we
20    created.  So it was almost never the
21    case that the three of us were in the
22    Word document at the same time.
23         So there were times that, for
24    instance, Mr. Hamasaki was doing some
25    work in the document and then I would

Page 107

1     go behind him or vice versa.
2          So I don't know if that answers
3     your question, but that's the process
4     that we followed.
5  BY MR. BRIDGES:
6     Q.    And did the process include
7  their writing the facts that corresponded to
8  the conversations with plaintiffs' employees
9  and your reviewing and revising what they had
10 written?
11         MR. FEE: Objection.
12         To the extent that question
13    calls for responsive information that
14    is unrelated to bases that form your
15    opinions or conclusions or assumptions
16    that you made, I would instruct you
17    not to answer that portion of the
18    question.  You can otherwise respond.
19         THE WITNESS:  We all reviewed
20    and revised the document.  I don't
21    think that there were any facts that
22    came only from one of them that I
23    wasn't aware of.
24 BY MR. BRIDGES:
25    Q.    Were there recollections that

Page 108

1  came from them that you relied upon in
2  creating your report?
3          MR. FEE: Same objection and
4     same instruction.
5          THE WITNESS:  There may have
6     been confirmations of things that I
7     recalled or knew, but I don't think
8     that they brought to my attention
9     things that I didn't previously know.
10 BY MR. BRIDGES:
11    Q.    And what types of confirmations
12 were there things that you relied upon in
13 approving this report?
14         MR. FEE: Same objection and
15    instruction.
16         THE WITNESS:  Virtually
17    everything you see in the report, all
18    three of us were involved in it, and
19    all three of us were confirming and
20    denying things or evaluating things
21    along the way.
22         MR. BRIDGES:  I think we have
23    to pause for a change of media, so why
24    don't we take a break.
25         THE VIDEOGRAPHER:  Off the

Page 109

28 (Pages 106 - 109)

1    record at 12:17.  This is the end of
2    media unit number 1.
3        * * *
4        (Recess from 12:17 p.m. to
5    12:32 p.m.)
6        * * *
7        THE VIDEOGRAPHER:  On the
8    record at 12:32.  This is the
9    beginning of media unit 2 in the
10   deposition of John Jarosz.
11   BY MR. BRIDGES:
12       Q.    Mr. Jarosz, your report, as I
13   referred to earlier, cites a number of
14   conversations with employees of the
15   plaintiffs.  For what purpose did you have
16   conversations with the plaintiffs' employees?
17       A.    To learn more about the
18   organization and their view as to the impact
19   of continued copyright protection --
20   continued copyright infringement and
21   trademark infringement.
22       Q.    What view did you learn from
23   them?
24       MR. FEE:  Objection to form.
25       THE WITNESS:  Well, I solicited

1    and learned many facts about the
2    organizations.  I also learned that
3    each one of them viewed continued
4    copyright infringement and trademark
5    infringement as quite detrimental to
6    their organizations, detrimental to
7    the members, detrimental to the
8    public.
9        They viewed continued IP
10   infringement as potentially
11   devastating to their organizations.
12   BY MR. BRIDGES:
13       Q.    These were their views?
14       A.    Yes.  I'm just paraphrasing, of
15   course.
16       Q.    What members did you interview?
17       A.    None, other than the employees.
18   I don't know if you call those "members" or
19   not.  But the volunteer membership, I didn't
20   go to.
21       THE VIDEOGRAPHER:  Excuse me.
22   Counsel, could you move your
23   microphone to your lapel?  Thank you.
24   BY MR. BRIDGES:
25       Q.    What members of the public did

1    you interview?
2        A.    I don't think I interviewed any
3    members of the public either.
4        Q.    What steps did you do to
5    ascertain the views of the members of the
6    organizations, other than the employees?
7        A.    I read the materials that were
8    produced here.  I read the deposition
9    testimony of the various individuals.  I read
10   the articles published by Ms. Bremer.  And I
11   read the other academic literature and
12   practical literature that I had.
13       Q.    Which of those sources stated
14   the views of the non-employee members of the
15   various organizations?
16       A.    I don't know that views of --
17   that their views were explicitly addressed in
18   my report or represented.  I understood what
19   the impacts of the lack of honoring the
20   copyrights and trademarks would have, but I
21   don't know that I saw non-employee member
22   views explicitly summarized.
23       Q.    So what steps did you do to
24   ascertain the views of the members of the
25   organizations --

1        MR. FEE:  Objection.
2    BY MR. BRIDGES:
3        Q.    -- other than their employees?
4        MR. FEE:  Asked and answered.
5        THE WITNESS:  Well, I talked to
6    the employees, and they interact with
7    the members on a very regular basis,
8    so they gave me some sense of what the
9    views of the members were.
10       It also could be that some of
11   the perspectives of the members are
12   reflected in some of the documents I
13   identified in tab 2.
14   BY MR. BRIDGES:
15       Q.    Well, I'm just trying to find
16   out where -- it sounds as though -- strike
17   that.
18       It sounds as though a minute
19   ago you said you couldn't recall anything
20   specifically calling out views of
21   non-employee members, correct?
22       A.    Correct.  I think that's right.
23       Q.    What did you do to verify the
24   statements that employees of the plaintiffs
25   made about the views of the non-employee

1  members of their organizations?
2      A.   I did what I normally do in an
3  assignment like this and look at the produced
4  materials.
5      Q.   And the produced materials did
6  not call out specifically any views of
7  non-employee members of the plaintiff
8  organizations, correct?
9      A.   I don't recall any specific
10 views being summarized.  My memory may not be
11 perfect on that, though.
12     Q.   What research, if any, did you
13 do among members of the public about whether
14 lack of copyright protection for the
15 plaintiffs' standards would be detrimental to
16 the -- to the public?
17     A.   The information that I reviewed
18 is in tab 2.  I didn't have material beyond
19 what is identified in tab 2.
20     Q.   So what in tab 2 reflects your
21 steps to ascertain the views of members of
22 the public?
23         MR. FEE:  Objection to form.
24         THE WITNESS:  I think the
25     Bremer articles, in part, address

Page 114

1  States other than law review articles by
2  Emily Bremer?
3      A.   As I sit here right now, I'm
4  not aware of any documents that discuss the
5  deliberations, but my memory is not perfect.
6      Q.   Do you know if there was a
7  consensus in any relevant committee of the
8  Administrative Conference of the United
9  States regarding the conclusions that
10 Ms. Bremer states in her law review articles?
11     A.   I don't.
12         MR. FEE:  Objection.  Vague.
13 BY MR. BRIDGES:
14     Q.   Do you know whether there was
15 any dissent in any relevant committee of the
16 Administrative Conference of the United
17 States regarding the conclusions that
18 Ms. Bremer states in her law review articles?
19         MR. FEE:  Objection to form.
20         THE WITNESS:  I don't.
21 BY MR. BRIDGES:
22     Q.   Do you know why persons get
23 appointed to the Administrative Conference of
24 the United States?
25     A.   I may have known that, but I

Page 116

1     that.  I think some of the federal
2     government's circulars that I
3     identify, in part, reflect the
4     reviews, in particular the NTTAA of
5     1995 and OMB Circular A-119.  I think
6     they, in part, reflect public views.
7     There are probably other things.
8  BY MR. BRIDGES:
9      Q.   Did you review OMB Circular
10 A-119 personally?
11     A.   Yes.  As I recall, I did.
12     Q.   Did you review any materials
13 pertaining to the discussions or
14 deliberations of the Administrative
15 Conference of the United States in connection
16 with your research or analysis?
17     A.   What particular materials or
18 meetings are you referring to?
19     Q.   Any.
20     A.   I don't recall, but it's
21 possible.
22     Q.   Does tab 2 refer you to any
23 documents that would provide you information
24 about the discussions or deliberations of the
25 Administrative Conference of the United

Page 115

1  don't recall that sitting here now.
2      Q.   Do you know whether
3  Ms. Bremer's articles -- strike that.
4         Do you know whether
5  Ms. Bremer's law review articles reflect a
6  view of the Administrative Conference of the
7  United States --
8         MR. FEE:  Objection to form.
9  BY MR. BRIDGES:
10     Q.   -- or of any of its committees?
11         MR. FEE:  Objection to form.
12         THE WITNESS:  I'm not aware
13     that they officially reflect that.  I
14     believe she gathered information, and
15     they may, in fact, represent the views
16     of some or all members, but I don't
17     think that's -- that either article is
18     an official representation --
19 BY MR. BRIDGES:
20     Q.   Are you --
21     A.   -- of that body.
22     Q.   Are you aware of the fact that
23 her articles -- her law review articles
24 specifically disclaim her articles as the
25 views of any government entity and indicate

Page 117

30 (Pages 114 - 117)

1 that they are her personal views?
2     A.   I wouldn't be surprised and
3 may -- I may have read that, but I would
4 expect that that would be in the first
5 footnote of one or both articles.
6     Q.   What did you do to examine the
7 alleged facts that the representatives of
8 plaintiffs stated to you in their
9 conversations with you?
10        MR. FEE:  Objection to form.
11        THE WITNESS:  I looked at --
12        MR. FEE:  Asked and answered.
13        THE WITNESS:  I'm sorry.  I
14     looked at the document production and
15     the other materials shown in tab 2.
16 BY MR. BRIDGES:
17     Q.   You looked at the document
18 production that the plaintiffs' counsel
19 furnished you?
20     A.   In part.  There were other
21 things in tab 2 that were not provided to me
22 by plaintiffs' counsel.
23     Q.   What other materials in
24 tab 2 -- strike that.
25        Please identify for me in tab 2

1 the materials that plaintiffs' counsel
2 furnished you.
3     A.   I don't know with absolute
4 certainty, but let me give you my best guess.
5 I believe all the depositions that are shown
6 on page 1.  I believe the Bates ranges at the
7 very top of the page were provided by
8 counsel.
9        The deposition transcripts and
10 exhibits were provided by counsel.  I believe
11 the financial statements and plans were
12 provided by counsel.  I believe the legal
13 documents were provided by counsel.  I
14 believe the miscellaneous items were provided
15 by counsel.
16        I don't know about the cases
17 and laws.  I just don't remember if we
18 separately gathered those or were provided
19 those.
20        The analyst reports, articles,
21 books, and presentations, I think we gathered
22 all of those, with the possible exception of
23 the two Bremer articles.  I don't recall if
24 counsel provided that or we obtained those
25 separately.

1        I believe counsel did not
2 provide the Web site screenshots, but I might
3 be wrong on that.
4     Q.   And did you do anything --
5 what, if anything, did you do to test the
6 validity of the factual assertions that the
7 plaintiffs made to you in your conversations
8 with their employees?
9        MR. FEE:  Objection to form.
10 Asked and answered.
11        THE WITNESS:  Well, we looked
12     at materials.  If we found things that
13     conflicted with what we learned, that
14     would prompt us to investigate
15     further.  But I don't recall seeing
16     any documentary evidence that
17     conflicted with facts that were
18     provided by plaintiff personnel, but I
19     might be wrong.
20 BY MR. BRIDGES:
21     Q.   Did you investigate
22 independently whether documents existed that
23 contradicted plaintiffs' statements of facts?
24     A.   Not with that in mind.  We
25 looked at the documents and were mindful of

1 whether there were conflicts within documents
2 or conflicts between documents and other
3 information, but I don't recall that we saw
4 anything that gave us substantial pause.
5        There were probably some things
6 where there were some uncertainties whether
7 there was a conflict or not and some where
8 there were insignificant conflicts, but I
9 think mostly the information we saw did not
10 conflict with the information we learned from
11 plaintiff personnel.
12     Q.   Did you investigate
13 independently whether other documents, apart
14 from the documents plaintiffs furnished you,
15 existed that contradicted plaintiffs'
16 statements of facts --
17        MR. FEE:  Objection to form.
18 BY MR. BRIDGES:
19     Q.   -- in conversations with you?
20     A.   Yes, in the sense that we
21 gathered some information that we did not
22 receive from plaintiffs' counsel, but all of
23 that is identified in tab 2.
24     Q.   Which part of tab 2?
25     A.   Well, as I said, I think the

1    Web sites we gathered ourselves, and I think
2    the reports and articles, with the exception
3    of the Bremer articles, we gathered
4    ourselves.
5        Q.    Do you know why you got no
6    documents from NFPA, no Bates range documents
7    from NFPA?
8        MR. REHN:  Object to form --
9        THE WITNESS:  I don't know why
10    we did not receive Bates documents --
11        THE REPORTER:  Wait.
12        MR. REHN:  Sorry.  Object to
13    the form.  Lacks foundation.
14        THE WITNESS:  I don't know for
15    sure that we didn't receive
16    Bates-stamped documents, but I believe
17    some of the documents we received were
18    NFPA documents.
19 BY MR. BRIDGES:
20        Q.    Do you recall seeing any NFPA
21    documents that -- in which NFPA personnel
22    stated that they could not show any harm from
23    the defendant's activities?
24        A.    Received any documents that
25    said that?

1        Q.    Uh-huh.
2        A.    Perhaps you would have
3    something that would refresh my memory.  I
4    don't recall, sitting here right now, but
5    it's possible.
6        Are you talking about
7    historical -- historically no harm, or are
8    you talking about prospectively?
9        Q.    Either one.  Did you -- do you
10    recall seeing any internal NFPA documents
11    that call into question where NF -- whether
12    NFPA has suffered any harm from the
13    defendant's activities?
14        A.    I don't recall documents on it.
15    There may have been some deposition testimony
16    about past activities, but I don't know if it
17    was activities prior to Public Resource
18    actions here or after.
19        Q.    Do you recall learning about
20    any litigation that NFPA had engaged in
21    pertaining to standards and copyright?
22        A.    I think I heard that there's
23    some overseas litigation involving Public
24    Resource.  Whether that involves NFPA, I
25    don't know.

1        Q.    What did you hear about
2    overseas litigation involving Public
3    Resource?
4        A.    I think I heard that there was
5    a German -- or a suit in Germany, but I'm not
6    sure that I learned much more than that.  I
7    don't recall what status that suit -- what
8    the status of that suit is.
9        Q.    Do you recall anyone disclosing
10    to you litigation involving NFPA in the
11    United States that pertained to standards and
12    copyright?
13        A.    It's possible, but I don't
14    recall any, sitting here right now.
15        Q.    Do you recall inquiring about
16    public statements of fact that NFPA has made
17    regarding copyright and standards in
18    litigation other than this litigation in the
19    United States?
20        MR. FEE:  Objection to form.
21        THE WITNESS:  I do not.
22 BY MR. BRIDGES:
23        Q.    Are you familiar with a case
24    called Veeck, V-E-E-C-K?
25        A.    I'm familiar with an opinion in

1    the Veeck case.
2        Q.    What do you know about that
3    opinion?
4        MR. FEE:  Objection.
5        I would instruct you not to
6    disclose anything you know about that
7    opinion that was a result of
8    communications with counsel and that
9    did not form the basis of any of the
10    opinions in your report or any of the
11    assumptions that you relied upon in
12    reaching your conclusions.
13        THE WITNESS:  I did talk with
14    counsel about that case, and that case
15    didn't form any basis for any of my
16    observations or conclusions here.
17 BY MR. BRIDGES:
18        Q.    Why did the Veeck case not form
19    any basis for any of your observations or
20    conclusions here?
21        A.    I don't know how to answer that
22    question.  I -- it didn't present any facts
23    that were specific to this case, as far as I
24    recall.
25        Q.    What do you recall of the facts

32 (Pages 122 - 125)

1  of that case?
2      A.   I recall generally it had to do
3  with activities of certain municipalities
4  using what was copyrighted or what was
5  claimed to be copyrighted material by a group
6  that developed materials explicitly to be put
7  into the law.
8      Q.   Do you recall what the decision
9  was in the opinion you seem to be familiar
10  with?
11          MR. FEE: Objection to form.
12          THE WITNESS: I think,
13      generally, that copyright protection
14      was not available. I'm sure there was
15      more to it, but that's my general
16      opinion, my general memory.
17  BY MR. BRIDGES:
18      Q.   And copyright protection was
19  not available for what?
20      A.   Well, the asserted copyrights
21  in that matter.
22      Q.   And do you recall what the
23  matter was that was at issue in Veeck?
24      A.   Well, as I said, I think it was
25  certain municipalities were using certain

Page 126

1  standards and using the materials from
2  certain standards and perhaps disseminating
3  it. I -- I forget the facts.
4      Q.   Do you recall what kind of
5  standards they were?
6          MR. FEE: Objection. Vague.
7          THE WITNESS: They may
8      generally have had to deal with
9      building codes, but I could be wrong
10      on that.
11  BY MR. BRIDGES:
12      Q.   What analysis did you do of
13  harms suffered by the code developers of
14  those building codes as a consequence of the
15  Veeck decision?
16      A.   I didn't do any analysis
17  associated with the facts of that case.
18      Q.   Why not?
19      A.   Because those facts are
20  different than the facts here, including what
21  the organization was.
22      Q.   Are the facts -- what -- what
23  case studies are you familiar of -- are you
24  familiar with regarding measurements of harms
25  suffered by entities that develop codes when

Page 127

1  a court rules that those codes are not
2  subject to copyright?
3          MR. FEE: Objection to form.
4      Vague. Lack of foundation.
5          THE WITNESS: What case
6      studies? Are you talking about
7      something akin to a business school
8      case study? I don't know what you
9      mean by that term.
10  BY MR. BRIDGES:
11      Q.   I'm just -- what opportunities
12  do you -- have you identified for finding
13  comparable circumstances where a court has
14  made a ruling that building codes are not
15  subject to copyright in order to study what
16  the consequences were --
17          MR. FEE: Objection.
18  BY MR. BRIDGES:
19      Q.   -- what the economic
20  consequences were of the Court's decision?
21          MR. FEE: Objection to form.
22      Vague as to "comparable." Lack of
23      foundation.
24      You can answer.
25          THE WITNESS: I don't know that

Page 128

1      I can answer. I don't -- I don't
2      under -- I don't know how to answer
3      your question. I read that court
4      case.
5  BY MR. BRIDGES:
6      Q.   And did you stop to say at some
7  point -- strike that.
8          Why did you read the court
9  case?
10      A.   Because I understand that
11  Public Resource believes it's of some
12  significance to this case.
13      Q.   Do you believe that that -- do
14  you have an understanding as to whether the
15  Veeck case is of any significance to this
16  case?
17          MR. FEE: Objection. Calls for
18      a legal conclusion.
19          THE WITNESS: I don't know.
20      I'm not a legal expert.
21  BY MR. BRIDGES:
22      Q.   What steps did you take to
23  ascertain what economic harms flowed from the
24  Court's decision in the Veeck case?
25          MR. FEE: Objection. Asked and

Page 129

33 (Pages 126 - 129)

1    answered.
2         THE WITNESS:  Again, I read the
3    case.  I didn't do any analysis beyond
4    that of that particular case.
5    BY MR. BRIDGES:
6         Q.    What steps did you take to
7    ascertain what public harms flowed from the
8    Court's decision in the Veeck case?
9         A.    Other than reading the case,
10   the opinion in the case, I didn't do anything
11   beyond that to understand the implications of
12   that holding.
13        Q.    You didn't do any investigation
14   as to the economic consequences to any
15   entity, industry, or person as a consequence
16   of the decision in the Veeck case, correct?
17        MR. FEE:  Objection to form.
18        THE WITNESS:  I think that's
19        correct, yes.
20   BY MR. BRIDGES:
21        Q.    How has the process of
22   standards development changed in the last 100
23   years, to your knowledge?
24        A.    I don't know the specifics, and
25   I don't know that there is one standards

1    development process.  I think there are a
2    variety of processes pursued by a number of
3    SSOs or SDOs.  I'm sure that there have been
4    changes on the margin.  There may have been
5    larger changes.  I just don't know.  I have
6    not studied the trend in the standard
7    development process over time.
8         Q.    What changes are you aware of
9    in the standards development process of NFPA
10   over the past 100 years?
11        A.    I don't know.  I've not studied
12   that topic.
13        Q.    What changes are you aware of
14   in the standards development process of the
15   ASHRAE 90.1 standard?
16        A.    I don't know.  I've not studied
17   that.
18        Q.    How did ASHRAE come to develop
19   the 90.1 standard?
20        A.    I think, generally, a need was
21   identified and a group of constituents
22   convened to derive a standard, but I don't
23   know the specifics beyond that.
24        Q.    Do you know who identified the
25   need?

1         A.    Not sitting here right now, I
2    don't.
3         Q.    Do you know whether ASHRAE took
4    over development of what became standard 90.1
5    from any other group or entity?
6         A.    No, I do not.
7         Q.    Have you ever quantified the
8    value of the contributions made by the
9    volunteers of the various organizations to
10   the standards at issue in this case?
11        MR. FEE:  Objection to form.
12        THE WITNESS:  Not other than
13        having some sense of hours or a
14        limited sense of dollars, but not
15        beyond that, no.
16   BY MR. BRIDGES:
17        Q.    Can you put a rough dollar
18   value on the time and expenses of the
19   volunteers with respect to any of the
20   standards in this case?
21        MR. FEE:  Objection to form.
22        THE WITNESS:  Not sitting here
23        right now.  That would entail a little
24        bit of a study.  I have not done that.
25   BY MR. BRIDGES:

1         Q.    What -- what would be required?
2         A.    To understand basically the
3    out-of-pocket expenses incurred and the
4    opportunity costs incurred.  So among other
5    things, one would want to look at time
6    records, have an understanding of
7    compensation, have an understanding of the
8    activities of those individuals.  Those
9    are -- would be among the inputs.
10        Q.    What changes are you aware of
11   in the distribution of standards in the past
12   100 years by the plaintiffs?
13        MR. FEE:  Objection to form.
14        THE WITNESS:  I haven't
15        investigated that particular issue,
16        but I understand that some of the
17        standards today are distributed
18        through the Internet that certainly
19        didn't exist 100 years ago.
20        Some of the standards are
21        distributed for free with limitations.
22        I don't know if that was true 100
23        years ago, but it might have been.
24        I would expect some of the
25        copying and dissemination capabilities

1    are much greater today than they were
2    in 1915, but I don't know that the
3    general methods of -- I don't know how
4    the general methods of distribution
5    have changed.
6  BY MR. BRIDGES:
7        Q.    What changes are you aware of
8  in sales trends over the past 20 years?
9        MR. FEE: Objection to form.
10       THE WITNESS:  I don't have data
11   going back as far as 20 years ago.  I
12   have some information on publication
13   sales, for instance, in tabs 3, 4, and
14   5.  They only -- that information only
15   goes back a few years, however.
16 BY MR. BRIDGES:
17       Q.    Did you review any information
18 earlier than the dates shown in the documents
19 at tabs 3, 4, and 5?
20       MR. FEE: Objection. Vague.
21       THE WITNESS:  It's possible
22   that some of the source documents had
23   earlier information, but I don't
24   recall that.  I would need to look at
25   those source documents.

Page 134

1  BY MR. BRIDGES:
2        Q.    And those source documents
3  would be within the Bates ranges identified
4  in tab 2 of your report?
5        A.    Within the Bates ranges or
6  identified elsewhere in tab 2.  For instance,
7  the AS team -- ASTM audited -- audited
8  consolidated financial statements, I think,
9  may not all be Bates-stamped.  I could be
10 wrong on that.  But I would look in that set
11 of financial documents.
12       Q.    What do you know about what you
13 said -- strike that.
14       You said earlier that some
15 standards are distributed for free with some
16 limitations; is that correct?
17       A.    Yes, that's my understanding.
18       Q.    What do you know about that?
19       MR. FEE: Objection. Vague.
20       THE WITNESS:  I've written
21   about that in my report.  I believe
22   that each one of the plaintiffs has
23   provided what is sometimes called a
24   "reading room" so that people can look
25   at those standards but are not given

Page 135

1    the right to reproduce, copy, or
2    disseminate those standards but can
3    look at them online.
4  BY MR. BRIDGES:
5        Q.    Have you used the reading rooms
6  of any of the plaintiffs?
7        A.    No, I have not.
8        Q.    Have you reviewed the interface
9  that the -- have you reviewed the interfaces
10 that the plaintiffs offer to persons wishing
11 to view materials for free online?
12       A.    No, I don't think so.
13       Q.    Do you know what effect, if
14 any, the presence of those free materials on
15 the plaintiffs' Web sites has had on the
16 plaintiffs' revenues?
17       MR. FEE:  Objection to form.
18       THE WITNESS:  No, I don't.
19 BY MR. BRIDGES:
20       Q.    Have you -- have you
21 investigated that?
22       MR. FEE:  Same objection.
23       THE WITNESS:  I've been
24   opening -- I've been open to learning
25   about that, but I haven't learned that

Page 136

1    there's a direct or indirect effect.
2    There might be, but I haven't seen
3    evidence of that.
4  BY MR. BRIDGES:
5        Q.    My question was, have you
6  investigated that?
7        MR. FEE:  Same objection.
8        THE WITNESS:  Perhaps you could
9    read back my answer.
10 BY MR. BRIDGES:
11       Q.    I've heard the answer.  It was
12 not responsive to my question.  The -- you
13 said you did not know what effect, if any,
14 the presence of those free materials on the
15 plaintiffs' Web sites has had on the
16 plaintiffs' revenues.
17       And my question is, have you
18 investigated that?
19       MR. FEE:  Same objection.
20       THE WITNESS:  No, I've not
21   undertaken a separate investigation.
22   I've been alert to that topic, but I
23   haven't assigned myself that
24   investigation.
25 BY MR. BRIDGES:

Page 137

35 (Pages 134 - 137)

1    Q.    Was something that was --
2 remained pending at the time you wrote this
3 report as something that you expected to do
4 in the future?
5    A.    No.
6        MR. FEE: Objection. Vague.
7        THE WITNESS: I'm sorry.
8        No.
9 BY MR. BRIDGES:
10    Q.    Did you study the practices of
11 any standards development organizations,
12 other than the plaintiffs, for purposes of
13 your work in this case?
14        MR. FEE: Objection. Vague.
15        THE WITNESS: Not that I
16    recall. I saw reference to other SDOs
17    in the Bremer articles, for instance,
18    but I didn't undertake a separate
19    investigation of the practices of any
20    other SDOs for purposes of my
21    assignment here.
22 BY MR. BRIDGES:
23    Q.    Are you aware of practices or
24 policies of other SDOs with reference to
25 either copyright or free availability of

1 SDOs, but the standard setting organizations
2 that are the candidates are the ones that I
3 identified earlier today.
4    Q.    Which SDOs do you recall
5 treating copyright protection of their
6 standards as very important?
7    A.    I just don't recall right now.
8 I -- I have some vague recollection that
9 copyright considerations are addressed by
10 ETSI, but I could be wrong on that.
11    Q.    What do you know about policies
12 or practices of the Blu-ray organization with
13 respect to copyright protection?
14    A.    I assume you're talking about
15 the Blu-ray Association? I may have known
16 when I was involved in that matter. I do not
17 remember, sitting here now.
18    Q.    Do you recall that your report
19 actually refers to the Blu-ray Association?
20    A.    I think I refer to Blu-ray
21 standards. I don't recall if I refer to the
22 Blu-ray Association, but perhaps you could
23 refresh my memory.
24    Q.    I believe you point it out at
25 the bottom of page 62. "While certain SDOs

1 their materials?
2        MR. FEE: Objection to form.
3        THE WITNESS: I may have been
4    aware through other assignments I've
5    undertaken in the past, but I didn't
6    undertake any separate investigation
7    for purposes of this matter.
8 BY MR. BRIDGES:
9    Q.    What awareness do you have of
10 the practices or policies of other SDOs
11 through other assignments you've undertaken
12 in the past?
13        MR. FEE: Objection to form.
14        THE WITNESS: I can only recall
15    most generally that they view
16    intellectual property protection as
17    being very important, but I can't be
18    any more specific than that.
19 BY MR. BRIDGES:
20    Q.    Which SDOs you -- do you recall
21 treating intellectual property protection as
22 very important?
23    A.    Well, again, I've -- I've dealt
24 with standards setting organizations. I
25 don't know if any of those are technically

1 (e.g., the Blu-ray disc association) provide
2 unrestricted access to their standard
3 publications for free, the Plaintiffs here do
4 not."
5        Do you recall that?
6    A.    Now I do. Thank you for
7 refreshing my memory.
8    Q.    What economic effects are you
9 aware of the fact that the Blu-ray Disc
10 Association provides unrestricted access to
11 its standard publications for free?
12    A.    I have not investigated that
13 issue, so I don't know.
14    Q.    What other SDOs have you
15 identified that provide unrestricted access
16 to their standards for free?
17    A.    I don't think I've identified
18 any others in my report.
19    Q.    Did you look for any others?
20    A.    Not that I recall.
21    Q.    Why not?
22    A.    I don't know how to answer
23 that. I was aware of the Blu-ray Disc
24 Association's policy in this regard, so I
25 wrote about it here.

1     Q.    Why did you not consider the
2  economic effects of free distribution of
3  standards with respect to other
4  organizations?
5     A.    I didn't quite see the
6  relevance to this matter.
7     Q.    Why?
8     A.    I don't know how to prove a
9  negative.
10     Q.    What's the negative you were
11  thinking of that would need to be proved or
12  disproved?
13     A.    That something is not relevant.
14     Q.    You just didn't see the
15  relevance?
16     A.    I don't understand how that
17  would be helpful in the assignment that I had
18  here.
19     Q.    And what was the assignment you
20  had here?
21     A.    Well, I've laid it out --
22     Q.    I can read the report.  I'm not
23  asking you to read -- read the report.  I'd
24  like your own words now, sitting here.
25          MR. FEE:  Objection.

Page 142

1  BY MR. BRIDGES:
2     Q.    How do you -- how do you
3  view --
4     A.    I'd like to answer it by
5  looking at my report.
6     Q.    No, I'd like for you to give me
7  a straight answer, because if you're just
8  going to refer to the report, the report will
9  speak for itself, and I don't need you to
10  read it to me.
11          I'd like for you to tell me
12  what you understand, sitting here, to have
13  been your assignment in this case.
14          MR. FEE:  Objection.
15          You can answer the question
16     however you deem appropriate.
17          THE WITNESS:  I've aptly laid
18     it out in my report, so I defer to the
19     words in my report.
20          But I've, in essence, looked at
21     the topic of the impact of copyright
22     and trademark infringement here, and
23     asked myself the question whether a
24     permanent injunction would be
25     appropriate from an economic

Page 143

1     perspective.
2  BY MR. BRIDGES:
3     Q.    And what is the relevance of
4  economic analysis to that question, as you
5  understand it?
6          MR. FEE:  Objection to form.
7     Vague.  Might also be construed to
8     require a legal conclusion.
9          THE WITNESS:  Economists have a
10     view and perspective at looking at
11     issues that some courts have found to
12     be useful.
13  BY MR. BRIDGES:
14     Q.    Well, I'm asking, with specific
15  relevance to this case, what do you
16  understand the importance of economic
17  analysis to be in this case --
18          MR. FEE:  Objection.  Calls --
19  BY MR. BRIDGES:
20     Q.    -- as you have purported to
21  practice it?
22          MR. FEE:  Calls for a legal
23     conclusion.
24          Also, to the extent that
25     responding to that would require you

Page 144

1     to disclose communications with
2     counsel that did not form the basis
3     for any of your opinions or
4     conclusions and did not provide any
5     assumptions that were the basis for
6     your opinions or conclusions, you
7     should not answer that portion of the
8     question.
9          THE WITNESS:  I understand
10     that, generally, economists like me
11     are quite helpful in determining
12     questions of harm, particularly harm
13     as it relates to infringement of IP
14     rights.
15  BY MR. BRIDGES:
16     Q.    How do you distinguish between
17  harms that are caused by an infringement by
18  the defendant versus harms that might be
19  caused by a court decision that plaintiffs
20  lack copyrights?
21          MR. FEE:  Objection to the
22     extent it calls for a legal
23     conclusion.
24          THE WITNESS:  I don't know how
25     to answer that question.  I didn't ask

Page 145

37 (Pages 142 - 145)

1     myself the question of ownership or
2     impact of ownership.  I asked myself
3     the question here of impact of
4     infringement.
5   BY MR. BRIDGES:
6        Q.    If it turns out that the Court
7   rules that the plaintiff -- sorry.  Strike
8   that.
9            If it turns out the Court rules
10  here that the defendant has engaged in fair
11  use, is it your understanding that none of
12  your harms analysis is relevant --
13          MR. FEE:  Objection.
14  BY MR. BRIDGES:
15       Q.    -- because of a finding of
16  non-infringement?
17          MR. FEE:  Calls for a legal
18      conclusion.
19          To the extent answering that
20      question would require you to disclose
21      communications you had with counsel
22      that don't form the basis for any of
23      your opinions or conclusions and don't
24      provide any assumptions that you
25      relied upon, you shouldn't disclose

1     under the assumption that the
2     activities violate the law.
3   BY MR. BRIDGES:
4        Q.    If the activities -- do you
5   believe -- do you understand that your
6   analysis is relevant to a determination of
7   whether the defendant has violated the law?
8          MR. FEE:  Objection.  Calls for
9      a legal conclusion.
10         To the extent that your
11      understanding is based upon
12      communications with counsel, you
13      shouldn't disclose them, unless they
14      formed the basis for your opinions or
15      conclusions or provided assumptions
16      that you relied upon in reaching your
17      conclusions.
18         THE WITNESS:  I don't know.
19  BY MR. BRIDGES:
20       Q.    Do you have any view as to
21  whether the defendant has violated copyright
22  law?
23         MR. FEE:  Objection.  Calls for
24      a legal conclusion.
25         THE WITNESS:  No, I've not

1     those communications.
2          THE WITNESS:  You're asking for
3      a legal conclusion.  I'm not an expert
4      on that.
5   BY MR. BRIDGES:
6        Q.    I'm understanding your
7   understanding -- I'm asking for your
8   understanding of the relevance of your
9   contributions to this case.
10         MR. FEE:  Objection.  Asked and
11      answered.  Plus all the prior
12      objections and instructions.
13         THE WITNESS:  I believe my
14      testimony and report are relevant to
15      the issue of harm and potential harm.
16  BY MR. BRIDGES:
17       Q.    From what?
18       A.    From continuing -- the
19  continuing activities and possible expanded
20  activities of the defendant here.
21       Q.    From activities or from
22  violations of law?
23         MR. FEE:  Objection.  Vague.
24      Calls for a legal conclusion.
25         THE WITNESS:  I -- I'm working

1     taken on that assignment.
2   BY MR. BRIDGES:
3        Q.    Do you have any view as to
4   whether the defendant's activities constitute
5   fair use?
6          MR. FEE:  Objection.  Calls for
7      a legal conclusion.
8          THE WITNESS:  No, I've not
9      taken on that assignment.
10  BY MR. BRIDGES:
11       Q.    If a court determines that the
12  defendant has not infringed upon plaintiffs'
13  copyrights, do you understand that the
14  decision would result in economic harm to the
15  plaintiffs?
16         MR. FEE:  Objection to the
17      extent it calls for a legal
18      conclusion.
19         THE WITNESS:  I'm not following
20      your question.  Could you ask it a
21      little bit differently, please?
22  BY MR. BRIDGES:
23       Q.    No, I'll restate it if you just
24  need to rehear it.
25       A.    No, I don't need to rehear it.

1  If you could recast it, please.
2      Q.   No.  Then please answer my
3  question.
4          MR. FEE:  Objection.
5  BY MR. BRIDGES:
6      Q.   I get to ask the questions.
7          MR. FEE:  He just said he
8  couldn't answer it.
9          THE WITNESS:  I don't
10 understand the question.
11 BY MR. BRIDGES:
12     Q.   What is it you don't
13 understand?
14     A.   I understand each word but not
15 how you put them together.
16     Q.   If a court determines that the
17 defendant has not infringed upon the
18 plaintiffs' copyrights, do you believe that
19 that decision would result in economic harm
20 to the plaintiffs?
21         MR. FEE:  Objection to the
22         extent it calls for a legal
23         conclusion.  Plus asked and answered.
24         THE WITNESS:  It sounds like
25         exactly the same words, so I'm not

Page 150

1  that's fine.
2      A.   I want to, but I cannot.
3      Q.   Well --
4      A.   I do not understand the
5  question.
6      Q.   I'll say it again.
7          Would a decision by the Court
8  that the defendant has not infringed upon the
9  plaintiffs' copyrights result in economic
10 harm to the plaintiffs?
11         MR. FEE:  Objection.  Calls for
12         a legal conclusion.  Asked and
13         answered.
14         THE WITNESS:  I --
15         MR. FEE:  Vague.
16         THE WITNESS:  I cannot answer
17 it any differently.  I'm sorry.
18         Is this a good time for a
19 break, or do you want to keep going?
20         MR. BRIDGES:  Sure.  We can
21 take one if you want.
22         THE VIDEOGRAPHER:  Off the
23 record at 1:17.
24              *  *  *
25         (Recess from 1:17 p.m. to

Page 152

1      sure how to answer that question.
2  BY MR. BRIDGES:
3      Q.   Would a decision that the
4  defendant has not infringed upon plaintiffs'
5  copyrights result in economic harm to the
6  plaintiffs?
7          MR. FEE:  Objection.  Calls for
8          a legal conclusion.
9          THE WITNESS:  I'm just not
10 following.  I under -- I'm worked --
11 I'm working under the assumption that
12 the activity here represents a
13 copyright infringement.  I'm -- and
14 I'm being asked and answering the
15 question of the impact of that and
16 whether there would be harm and what
17 kind of harm and whether that's
18 reparable harm.
19         So I'm focusing on what has
20 been done and what may continue to be
21 done by the defendant.
22 BY MR. BRIDGES:
23     Q.   That's non-responsive.  I'll
24 ask you to answer my question.  And if you
25 just don't want to answer the question,

Page 151

1      2:12 p.m.)
2              *  *  *
3          THE VIDEOGRAPHER:  On the
4          record at 2:12.
5  BY MR. BRIDGES:
6      Q.   Good afternoon, Mr. Jarosz.
7      A.   Good afternoon.
8      Q.   Could you outline for me,
9  please, what steps you took in your
10 engagement in this case?  What are the
11 different activities you engaged in?
12     A.   Generally, I had a discussion
13 with counsel about the matter.  Then we
14 examined documents that would -- were
15 provided to us to give us background.  We
16 then proceeded to gather our own information
17 from third-party sources, primarily through
18 Internet searches.
19         We obtained information that
20 had been produced as part of discovery.  We
21 had conversations with people at the various
22 plaintiff organizations.
23         We outlined the report and
24 summarized some of the information that you
25 see in the tabs.  We had discussions with

Page 153

39 (Pages 150 - 153)

1    counsel.  And then we finalized the report,
2    submitting it to counsel on June 5th, 2015.
3        Q.    Do you know how many standards
4    of each plaintiff are at issue in this case?
5        A.    How many -- I'm sorry --
6    standards are at issue?
7        Q.    Yes.
8        A.    I have that number written
9    down.  It's in the hundreds, and I forget, as
10   I sit here right now, precisely the number.
11   I will look it up.  And I was giving you an
12   answer that was a cumulation across the three
13   plaintiffs.
14             I am not seeing that number
15   right now.  I'll keep looking.
16       Q.    Do you know what --
17       A.    You may be able to point me
18   quicker than I recall where it was.
19       Q.    Do you -- do you know what
20   proportion of plaintiffs -- of each
21   plaintiffs' standards is at issue in this
22   case?
23       A.    Are you asking me the ratio of
24   the standards at issue versus the total
25   standards developed by the organizations?

1        Q.    Have you analyzed any
2    differences in sales trends between those of
3    plaintiffs' standards that have been
4    incorporated into law and those of
5    plaintiffs' standards that have not been
6    incorporated into law?
7        A.    I don't think so.  I don't
8    think I have those data, and I'm not sure
9    that each plaintiff knows precisely how many
10   have been incorporated into law.
11       Q.    Did you ask for any data
12   regarding the distinction between standards
13   incorporated by reference and standards not
14   incorporated by reference in the law?
15       A.    I don't --
16             MR. FEE:  Objection to form.
17             THE WITNESS:  I'm sorry.  I
18       don't recall.
19   BY MR. BRIDGES:
20       Q.    You made observations about
21   sales trends earlier in your deposition.  I
22   think you said that there's been a reduction
23   in sales of certain of plaintiffs' standards;
24   is that correct?
25       A.    I'm not quite sure what the

1        Q.    Yes.
2        A.    I think it's less than a
3    majority for each organization.  I'm fairly
4    certain of that with regard to ASTM.  I think
5    that's true with regard to NFPA.  I think
6    it's true with regard to ASHRAE.
7        Q.    Do you have any better
8    information than less than a majority --
9        A.    Well, I --
10       Q.    -- for each of them?
11       A.    The precise numbers are in the
12   report.  Let's see here.  One can figure that
13   out.  You may remember where I summarized the
14   number of standards.  I just don't remember.
15   It's easy to determine because the data are
16   all here.
17       Q.    Have you analyzed differences
18   in sales trends between standards that are at
19   issue in this case and plaintiffs' other
20   standards?
21       A.    No, I don't think I have those
22   data at my disposal.
23       Q.    Did you ever ask for those
24   data?
25       A.    I don't recall.

1    earlier testimony was, but I think I was
2    pointing you to paragraph 133 with regard to
3    downloads of -- and other measures of
4    activity, as I had at my disposal.
5        Q.    Well, I'm trying to find out
6    what changes you have studied in plaintiffs'
7    economics that you attribute to defendant's
8    activities.
9        A.    I'm not quite sure what your
10   question is.
11       Q.    Well, I'm trying to find out
12   what information you have studied to
13   determine what changes in the finances of
14   each of the plaintiffs have occurred as a
15   consequence of the defendant's activities.
16             MR. FEE:  Objection to form.
17             THE WITNESS:  I'm still not
18       sure that I'm hearing a question.  But
19       to the extent that I had information
20       on changes in activity level, I
21       summarized that in paragraph 133.
22   BY MR. BRIDGES:
23       Q.    My question is, what
24   information did you study to determine any
25   changes in finances of each of the

1  plaintiffs?
2        MR. FEE:  Same objection.
3        THE WITNESS:  It's reflected in
4     paragraph 133 and in the tabs,
5     particularly 3, 4, and 5.  But the
6     tabs are not at the granular level
7     that I think are of interest to you.
8  BY MR. BRIDGES:
9     Q.    What do you mean by the
10 "granular level" that would be of interest to
11 me?
12    A.    I don't think it breaks out
13 publications by standard, for instance.
14    Q.    Does it break out publications
15 by whether a standard has been incorporated
16 by reference or not?
17    A.    I don't think so.
18    Q.    Does it break out by whether a
19 standard has been publicly made available by
20 defendant or not?
21    A.    I don't think so.  Not in
22 tabs 3, 4, and 5.
23    Q.    How do you establish causation
24 between defendant's activities and any of the
25 data that you provide in section -- in

1     of certain of the standards.  I've
2     presented that.
3        I don't have direct evidence of
4     the precise impact historically of
5     defendant's activities on plaintiffs'
6     financials.
7  BY MR. BRIDGES:
8     Q.    What evidence of any kind do
9  you have of any kind of impact historically
10 of the defendant's activities on plaintiffs'
11 financials?
12       MR. FEE:  Objection to form.
13       THE WITNESS:  That which is
14    reported in paragraph 133, that of
15    which is contained in deposition
16    testimony, and that of which I
17    summarized in other parts of the
18    report.
19 BY MR. BRIDGES:
20    Q.    So when you're referring to
21 deposition testimony, you're referring to the
22 citations to the footnotes in paragraph 133?
23    A.    No, I don't think it's just
24 limited to that.  I think there's some other
25 deposition transcripts that talk about the

1  paragraph 133?
2        MR. FEE:  Objection.  Calls for
3     a legal conclusion.  Form.
4        THE WITNESS:  One can and
5     should look at all evidence available,
6     including circumstantial evidence.  I
7     don't have direct information about
8     the precise impact of defendant's
9     activities, but I have important
10    information that bears on that issue,
11    including information that's in
12    deposition transcripts.
13 BY MR. BRIDGES:
14    Q.    So my question is, how do
15 you -- do you -- strike that.
16       Are your conclusion -- are you
17 making conclusions in paragraph 133 about the
18 cause of changes in sales of the plaintiffs'
19 products?
20       MR. FEE:  Objection to form.
21       THE WITNESS:  Not definitively.
22    I have observations about the
23    magnitude and trend of the downloads
24    of -- through defendant's sites.  I
25    have some information on the downloads

1  impact or potential impact of defendant's
2  activities on each one of the plaintiffs.
3     Q.    Did you make any independent
4  assessment of causation of any financial
5  effects on plaintiffs by the defendant's
6  activities?
7        MR. FEE:  Objection to form.
8     Calls for a legal conclusion.
9        THE WITNESS:  What do you mean
10    by the term of "independent assessment
11    of causation"?
12 BY MR. BRIDGES:
13    Q.    You, as an expert, not relying
14 just on what other people have said or
15 speculated or thought.
16       MR. FEE:  Same objections.
17    Plus compound.
18       THE WITNESS:  We experts rely
19    on other information to draw the
20    conclusions that we do, and then we
21    bring our training to it.  So our
22    observations shouldn't be in a vacuum.
23 BY MR. BRIDGES:
24    Q.    But they should be objective,
25 correct?

1      A.    Yes.
2      Q.    And that means perhaps not
3  relying upon the views of the parties to the
4  lawsuit alone, but doing independent analysis
5  and research, correct?
6           MR. FEE:  Objection to form.
7           THE WITNESS:  I think one can
8      and should evaluate and consider the
9      views of the parties, but not limited
10     investigation to that.
11 BY MR. BRIDGES:
12     Q.    So what independent analysis
13 and research did you do other than reviewing
14 the views and statements of the parties in
15 this case?
16          MR. FEE:  Objection.  Vague.
17          THE WITNESS:  I reviewed and
18     summarized the data, as you see in
19     133, that I had at my disposal.  I
20     reviewed writings about the impacts.
21     And I took important
22     information from the fact that the
23     plaintiffs have brought this lawsuit.
24     The plaintiffs don't want this
25     activity to continue.  That is

1      revealed preference information that's
2      quite important.
3  BY MR. BRIDGES:
4      Q.    Tell me about what you mean by
5  repealed -- sorry.  Strike that.
6      Tell me what you mean by
7  "revealed preference."
8      A.    What people do often provides
9  information on what their preferences are.
10     Q.    And so the fact that plaintiffs
11 brought this lawsuit has revealed to you that
12 they prefer to bring the lawsuit, correct?
13          MR. FEE:  Objection.  Vague.
14          THE WITNESS:  Given the cost,
15     they prefer to bring the lawsuit
16     rather than not bring it, yes.
17 BY MR. BRIDGES:
18     Q.    What else -- strike that.
19     What are the data you're
20 referring to in page 133 that.
21     What are the data you're
22 referring to in paragraph 133 that you took
23 into account in discussing or analyzing
24 effects of defendant's activities on
25 plaintiffs?

1      A.    I took all the data --
2           MR. FEE:  Objection.  Form.
3      Objection to form.
4           THE WITNESS:  I took all this
5      data into account.  That's why I
6      reported it here.
7  BY MR. BRIDGES:
8      Q.    And the data that you
9  identified in the footnotes in
10 paragraph 134 -- sorry -- 133?
11     A.    Yes, I considered that
12 information.
13     Q.    Do you know in what year the
14 defendant posted the 2008 version of the
15 National Electrical Code on its Web site?
16     A.    I don't know with absolute
17 certainty.  I do know a number of the alleged
18 activities occurred in late 2012.  I don't
19 know if it's specific to that code or not.
20     Q.    Does it matter to your analysis
21 exactly when the defendant posted the 2008
22 National Electrical Code on its Web site or
23 to Internet Archive?
24     A.    I would --
25          MR. FEE:  Objection to form.

1           THE WITNESS:  I would consider
2      that information if I had it, but I
3      don't have any reason to think that it
4      would change any of the conclusions
5      that I drew.
6  BY MR. BRIDGES:
7      Q.    The timing of when the
8  defendant posted certain matters wouldn't
9  change your conclusions?
10     A.    Not based on what I know right
11 now.  My understanding is that much of the
12 activity occurred in 2012, the later half of
13 2012, and I still have the whole body of
14 evidence that I have considered.  So I'm not
15 sure if the precise timing would change, but
16 I certainly would consider that.
17     Q.    Do you know in what year
18 Public.Resource.Org posted the 2011 version
19 of the National Electrical Code?
20     A.    Same answer to the question
21 that you had with regard to the 2008 code.
22     Q.    Can you look at the data in
23 your -- the tables attached to your report
24 and see if that helps refresh your memory as
25 to when the defendant posted NEC 2008 and

1  NEC -- NEC 2011?
2      A.   I can look, and I will.
3      No, it doesn't answer that
4  question, I don't think.
5      Q.   Can you make a prediction as to
6  when the defendant posted NEC 2008 and
7  NEC 2011, based on the data attached to your
8  report in Exhibit 1?
9          MR. FEE:  Objection to form.
10         THE WITNESS:  No, I don't
11     think, based on just those data.
12 BY MR. BRIDGES:
13     Q.   Can you make -- give an
14 estimate as to when the defendant posted
15 NEC 2008 and NEC 2011, based on the data
16 attached to your report as Exhibit 1?
17         MR. FEE:  Same objection.
18         THE WITNESS:  No, I don't
19     think, based on just that information.
20 BY MR. BRIDGES:
21     Q.   Well, just looking at your
22 report, can you tell when defendant posted
23 NEC 2008 and NEC 2011?
24     A.   My answer hasn't changed.  I
25 still don't know precisely when those were

Page 166

1  posted.
2      Q.   But that doesn't make a
3  difference to your economic analysis of the
4  effects of defendant's activities on the
5  plaintiffs?
6      A.   Well, I would be curious --
7          MR. FEE:  Objection to form.
8          THE WITNESS:  -- curious about
9      that information, but I don't have any
10     reason to think it would change the
11     conclusions that I drew, and that is
12     that a permanent injunction is
13     appropriate here.
14 BY MR. BRIDGES:
15     Q.   Is it your job to determine
16 whether a permanent injunction is
17 appropriate?  Is that what you were hired to
18 do?
19     A.   No.
20         MR. FEE:  Objection.  Calls for
21     a legal conclusion.  Form.  Compound.
22         THE WITNESS:  I think it's
23     ultimately the Court's decision to
24     make, but I've been asked what my
25     economic view is as to the

Page 167

1      appropriateness of a permanent
2      injunction here.
3  BY MR. BRIDGES:
4      Q.   Is the appropriate of -- is the
5  appropriateness of a permanent injunction an
6  economic question?
7      A.   I think, in part, economic
8  considerations can be and often are taken
9  into account in answering that question.
10     Q.   Is it an economic question?
11         MR. FEE:  Objection.
12 BY MR. BRIDGES:
13     Q.   That was my question.
14         MR. FEE:  Asked and answered.
15         THE WITNESS:  Again, in part.
16 BY MR. BRIDGES:
17     Q.   The propriety of
18 a preliminary -- of a -- strike that.
19         It's your testimony that the
20 propriety of a permanent injunction is, in
21 part, an economic question?
22         MR. FEE:  Objection.  Asked and
23     answered.  Form.  Calls for a legal
24     conclusion.
25         THE WITNESS:  Yes.  As I

Page 168

1      understand it, one factor to consider
2      is the reparability or irreparability
3      of harm.  I believe, at its core,
4      that's an economic question.
5  BY MR. BRIDGES:
6      Q.   And what economic theories did
7  you rely upon to conclude that, as an
8  economic matter, a preliminary -- strike
9  that.
10         What economic theories did you
11 rely upon to conclude that, as an economic
12 matter, a permanent injunction is appropriate
13 in this case?
14         MR. FEE:  Same objections.
15         THE WITNESS:  I don't know what
16     candidates you have in mind for
17     economic theories.
18 BY MR. BRIDGES:
19     Q.   Whichever ones you relied upon.
20     A.   I --
21         MR. FEE:  Same objections.
22         THE WITNESS:  -- used all of my
23     training and applied it to the facts
24     of this case and drew the conclusions
25     that I did.

Page 169

43 (Pages 166 - 169)

BY MR. BRIDGES:

Q.    And are there any particular aspects of training that you have beyond what a first-year college student would have gotten in a first-year economics course that you have brought to bear by applying particular economic theories to this case?

A.    I think my training makes me who I am and has helped me in assignments like this. I have beyond a first-year-in-college understanding of basic economics, but they're very important concepts that are taught and learned in first-year economics.

Q.    Well, I want to know if there are any economic concepts beyond first-year economics that you have brought to bear in rendering your conclusions in this case.

MR. FEE: Objection to form. Asked and answered.

THE WITNESS: Generally, there are, yes.

BY MR. BRIDGES:

Q.    What economic concepts have you brought to bear in your report and analysis in this case?

Page 170

A.    I'm sorry, because I don't know what you mean by "economic concepts." We get trained in things like quantitative methods and intermediate microeconomics, in price theory, in econometrics, in consumer behavior. All those things are beyond the first year. I don't know if you're calling those economic theories. Your -- your questioning confuses me.

Q.    Well, you referred to the important concepts in response to my question to you about particular aspects of training that you have beyond what a first-year college student would have gotten in a first-year economics course that you brought to bear by applying economic theories to this case, and your answer refers to very important concepts that are taught and learned.

And so I'm asking you, what very important economic concepts have you brought to bear in your analysis of this case?

MR. FEE: Objection to form. Lack of foundation.

Page 171

THE WITNESS: We learn about price theory. We learn about consumer behavior. We talk -- we learn about manufacturer and supplier actions. We learn about game theory. We learn about econometrics. We learn more broadly about quantitative methods. We learn about a variety of aspects of industrial organization. There are many things that we learn beyond the first year of economics training.

BY MR. BRIDGES:

Q.    No, I'm asking what you brought to bear in your analysis in this case.

A.    All those.

Q.    Okay. What aspect of price theory did you bring to bear in this case?

A.    I don't know how to answer that question besides I understand basic price theory and have researched it much and applied that to the facts here.

Q.    What was the specific application of price theory that you brought to bear in this case?

A.    I can't be any more specific

Page 172

than that. I don't understand your question.

Q.    What aspect of training about consumer behavior did you bring to bear in this case?

A.    I can't be any more specific than saying that.

Q.    What aspects of your training about game theory have you brought to bear in your work on this case?

A.    I can't be any more specific than that.

Q.    What aspects of econometrics in your training have you brought to bear on this case?

A.    I can't be any more specific than that.

Q.    What inform -- what aspects of training in qualitative methods have you brought to bear on this case?

A.    I didn't say "qualitative methods," and so it may have been mis-keyed in. I said "quantitative methods."

Q.    All right. What aspects of quantitative methods of your training did you bring to bear on this case?

Page 173

44 (Pages 170 - 173)

1    A.    I can't be any more specific
2  than that.
3    Q.    What aspect of your training
4  regarding aspects of industrial organization
5  have you brought to bear on this case?
6    A.    I can't be any more specific
7  than that.
8    Q.    But you did bring the theory of
9  reveal -- revealed preferences to bear on
10  this case, correct?
11    A.    Yes.
12    Q.    What other economic theories do
13  you recall bringing to bear on this case?
14        MR. FEE:  Objection.  Asked and
15    answered.
16        THE WITNESS:  Everything that
17    I've --
18        MR. FEE:  And vague.
19        Go ahead.
20        THE WITNESS:  -- I've learned
21    in my training, both educational
22    training and career training.
23  BY MR. BRIDGES:
24    Q.    Can you be more specific than
25  that?

Page 174

1    A.    No.
2            *  *  *
3        (Jarosz Exhibit 4 marked for
4    identification.)
5            *  *  *
6  BY MR. BRIDGES:
7    Q.    Mr. Jarosz, do you recognize
8  Exhibit 4 as a document that you produced in
9  response to a subpoena in this case?
10    A.    Yes.
11    Q.    What is this document?
12    A.    It appears to be a summary over
13  the years 2009 through 2013 of dollars and
14  quantity of NFPA standards that were sold in
15  the marketplace.
16    Q.    Based upon the trends that you
17  see in this exhibit, can you estimate when
18  you believe it is most likely that the
19  defendant first published -- strike that.
20        Based upon the trends that you
21  see in this Exhibit 4, can you estimate when
22  you believe it is most likely that the
23  defendant first posted each of the standards
24  identified here?
25    A.    I don't think so, not based

Page 175

1  just on this information.
2    Q.    What else would you need?
3    A.    I don't know, because I think
4  it's probably a very easy factual question to
5  determine when the downloading first
6  occurred, so I don't know why one would need
7  to back into it.
8    Q.    Well, when -- would one be able
9  to use sales trends as a way of identifying
10  likely effects of a posting of each standard
11  by the defendant?
12        MR. FEE:  Objection.  Vague.
13    Compound.
14        THE WITNESS:  Maybe; maybe not.
15  BY MR. BRIDGES:
16    Q.    Why do you say "maybe; maybe
17  not"?
18    A.    I just wouldn't think to do it
19  that way, so I don't know what you exactly
20  have in mind.
21    Q.    Do you associate the posting of
22  standards by defendant with changes in sales
23  volume of the standards that the defendant
24  has posted?
25        MR. FEE:  Objection to form.

Page 176

1        THE WITNESS:  I don't know what
2    you mean by that question.
3  BY MR. BRIDGES:
4    Q.    You don't understand the
5  question?
6    A.    I do not.
7    Q.    Can you correlate the posting
8  of standards by defendant with any changes in
9  sales volumes of the standards that the
10  defendant has posted?
11        MR. FEE:  Objection to form.
12        THE WITNESS:  I don't think
13    I've attempted to compute the
14    correlation coefficient here
15    associated with postings.
16  BY MR. BRIDGES:
17    Q.    I'm not asking for a specific
18  correlation coefficient.  I'm just asking,
19  generally, can you correlate the posting of
20  standards by defendant with any changes in
21  sales volumes of the standards that
22  defendants has -- that the defendant has
23  posted with reference to Exhibit 4?
24    A.    I don't know --
25        MR. FEE:  Objection.  Form.

Page 177

45 (Pages 174 - 177)

1        THE WITNESS:  I don't recall
2    attempting to do that.  And I wouldn't
3    necessarily think that the historical
4    impact would -- is the end of the
5    story as to the harm here.
6  BY MR. BRIDGES:
7        Q.    Is historical impact part of
8    the story as to the harm here?
9        A.    Yes.
10       Q.    What -- what can you say by
11   looking at Exhibit 4 about the historical
12   impact of the posting of the defendant -- of
13   the plaintiffs' standards by the defendant?
14       A.    I don't know that I can say
15   much, because I believe the postings largely
16   occurred in late 2012, and I only have one
17   period after that.
18       Q.    If it turns out that
19   defendant's postings were well before 2012,
20   would that affect your analysis of the trends
21   in sales data of the plaintiffs'
22   publications?
23       MR. FEE:  Objection to form.
24   Compound.  Vague.
25       THE WITNESS:  Maybe.  I would
Page 178

1    consider that information in
2    conjunction with these data if you
3    wanted me to.
4  BY MR. BRIDGES:
5        Q.    How -- what -- what would
6    change?
7        A.    I don't know.  I haven't done
8    that analysis.
9        Q.    Have you verified the dates on
10   which plaintiffs -- strike that.
11       Have you verified the dates at
12   which defendant posted the various standards
13   to its Web site or to Internet Archive?
14       A.    I don't --
15       MR. FEE:  Objection.  Vague.
16       THE WITNESS:  I don't recall
17   verifying it.
18       And are you asking did I
19   separately go out and determine what
20   that date is and see if that was the
21   same as what was represented in the
22   Complaint, for instance?
23  BY MR. BRIDGES:
24       Q.    Yes.
25       A.    No, I don't recall doing that.
Page 179

1        Q.    Have you determined in any way
2    the dates at which defendant posted various
3    standards to its Web site or to the Internet
4    Archive?
5        A.    I don't recall doing a separate
6    analysis of that, no.
7        Q.    How did you learn about the
8    dates at which defendant posted various
9    standards to its Web site or to Internet
10   Archive?
11       A.    I had conversations with
12   counsel on that topic, and I may have seen
13   that information contained in certain
14   documents like the Complaint, but I don't
15   recall.
16       Q.    Did you rely upon information
17   regarding those dates from conversations with
18   counsel?
19       MR. FEE:  In arriving at his
20   opinions, you're asking?
21       MR. BRIDGES:  Arriving at his
22   understanding of the facts.
23       THE WITNESS:  I don't know that
24   I did, because I don't recall
25   reporting those specific dates
Page 180

1    anywhere in my report.
2  BY MR. BRIDGES:
3        Q.    Do you recall taking specific
4    dates into account in analyzing the effect of
5    defendant's actions?
6        MR. FEE:  Objection to form.
7    Vague.
8        THE WITNESS:  I don't recall
9    one way or the other.
10  BY MR. BRIDGES:
11       Q.    Do you know how -- strike that.
12       Do you know how much revenue
13   each plaintiff derives from the standards at
14   issue in this case?
15       A.    I don't think I know that
16   precise number.
17       Q.    Did you -- did you ever know
18   that number?
19       A.    I don't think so.
20       Q.    Did you ever know how much
21   revenue each plaintiff derives from standards
22   that have been incorporated into law?
23       A.    As opposed to those that have
24   not been incorporated?  Is that --
25       Q.    Well, I'm -- I'm asking about
Page 181

46 (Pages 178 - 181)

1   those standards that have been incorporated
2   in the law.  I'm asking if you know how much
3   revenue each plaintiffs derives -- each
4   plaintiff derives from those standards.
5        A.   I don't --
6           MR. FEE:  Objection.  Form.
7           THE WITNESS:  -- think I know
8       that number, and I'm not sure the
9       plaintiffs know that number.
10  BY MR. BRIDGES:
11       Q.   Do you know the percentage of
12  revenue that each plaintiff derives from
13  standards that have been incorporated into
14  law?
15           MR. FEE:  Objection to form.
16           THE WITNESS:  I don't think I
17       do, and I don't believe the plaintiffs
18       do.
19  BY MR. BRIDGES:
20       Q.   Are you aware of any difference
21  in profitability to plaintiffs between those
22  standards that have been incorporated into
23  law and those standards that have not been
24  incorporated into law?
25           MR. FEE:  Objection to form.

Page 182

1           THE WITNESS:  I don't believe
2       so.
3   BY MR. BRIDGES:
4        Q.   Do you know -- strike that.
5           Are you aware of any difference
6   in profitability to plaintiffs between those
7   standards that defendant has posted to the
8   Internet and those standards that defendant
9   has not posted to the Internet?
10           MR. FEE:  Objection to form.
11           THE WITNESS:  I don't believe
12       so.  And as with the previous
13       question, I don't think the plaintiffs
14       have that information at their
15       disposal.
16  BY MR. BRIDGES:
17       Q.   For each plaintiff, what do you
18  understand to be the percentage of gross
19  revenue from the sale of standards?
20           MR. FEE:  Objection to form.
21           THE WITNESS:  I -- I've
22       reported that in my report.  My memory
23       is that it's something on the order of
24       66 percent for ASTM and for NFPA.  And
25       if you add in memberships, it's

Page 183

1       something just north of 50 percent for
2       ASHRAE.
3   BY MR. BRIDGES:
4        Q.   What do you mean by "if you add
5   in memberships"?
6        A.   I'm not -- I'm not quite sure
7   what you're asking me to define.
8        Q.   I'm asking you to explain the
9   phrase that you just used, "if you add in
10  memberships."  What did that mean?
11       A.   I talked about that in my
12  report.  Membership fees are a fairly good
13  recollect -- a fairly good reflection of
14  amount that would have been paid for
15  publications.  In other words, publication
16  fees -- it -- let me start this over again.
17           It makes about as much sense to
18  become a member of ASHRAE as it is to buy
19  some of the individual publications.  As a
20  result, many people choose to become members
21  rather than just buying the publication, as I
22  understand it.
23       Q.   How did you learn that?
24       A.   Having knowledge of the -- of
25  the price difference and through discussions

Page 184

1   with people at ASHRAE.
2        Q.   How did you learn about the
3   price difference?
4        A.   I don't recall how I learned
5   it, but I report it in my report based on
6   certain documents I've seen.  Perhaps I
7   learned it from their Web site.
8        Q.   Did you do any surveys of
9   ASHRAE members to validate that assumption?
10       A.   I'm sorry.  Validate what
11  assumption?
12       Q.   About purchase of a membership
13  instead of buying the publication.
14       A.   I'm not sure that there's an
15  assumption in there.  My understanding is
16  that ASHRAE people are of the belief that
17  many people buy membership rather than
18  individual publications.
19       Q.   And in your work, did you
20  assume that?
21       A.   I didn't assume that.  I worked
22  on that -- under that understanding.
23       Q.   Oh, it's an understanding, but
24  not an assumption?
25       A.   Yes.

Page 185

47 (Pages 182 - 185)

1      Q.    Did that understanding make a
2  difference to your analysis?
3      A.    It was a factual underpinning.
4      Q.    An underpinning, but not an
5  assumption?
6      A.    It was not an explicit
7  assumption.
8      Q.    But it was an underpinning, not
9  an assumption, is your testimony?
10         MR. FEE:  Objection.  Asked and
11      answered.
12         THE WITNESS:  Yes.  I don't
13      know what or why you're arguing with
14      me on this.
15  BY MR. BRIDGES:
16      Q.    I'm not arguing.
17      A.    I don't understand.
18      Q.    I'm just trying to understand
19  your testimony.  That's all.  So I'm asking
20  some follow-up questions.
21         You stated earlier some
22  percentages of revenue from the sale of
23  standards.  Did you mean to be identifying
24  what you thought were the percentages of
25  revenue from the sale of standards or from

*Page 186*

1  the sale of all publications?
2      A.    Let me -- let me double-check
3  that.
4         Well, in the case of ASTM, for
5  instance, I believe it's copyrighted
6  publications.
7      Q.    What page are you referring to
8  in your report?
9      A.    Right now I'm looking at
10  page 36, but I think I talk about it at other
11  areas.
12      Q.    So page 36, you're talking
13  about which paragraph?
14      A.    Well, right now I was --
15      Q.    83?
16      A.    -- I was looking at 83, but I'm
17  turning back to, for more reliable
18  information, to paragraph 15, for instance,
19  which says in 2014, 67.1 percent of the
20  revenue was generated by the sale of
21  copyrighted publications.  For NFPA, that
22  information is shown in paragraph 18.  And
23  for ASHRAE, that information is shown in
24  paragraph 22.
25      Q.    All three of those references

*Page 187*

1  are to copyrighted publications, correct?
2      A.    With the exception of number 3,
3  which refers to copyrighted publications and
4  memberships.
5      Q.    Okay.  So my question wasn't
6  about copyrighted publications.  My question
7  is, what percentage do you understand of
8  plaintiffs' revenues comes from the sale of
9  standards at issue in this case?
10      A.    Thank you for that reminder of
11  what the question is.
12         I don't think I know that
13  precise percentage.
14      Q.    What percentage of plaintiffs'
15  revenues, to your knowledge, comes from the
16  sale of standards incorporated into law?
17      A.    I don't know that number.
18      Q.    What percentage of plaintiffs'
19  revenues, to your understanding, comes from
20  the sale of all standards?
21      A.    I'm sorry.  I thought you asked
22  that question.  I thought the immediate one
23  before that was standards.
24      Q.    No.  It was standards at issue
25  in this case.  Then --

*Page 188*

1      A.    The one before that.
2      Q.    -- standards incorporated into
3  law.  And now it's all standards.
4      A.    Right.  Thank you.
5         I don't know that number
6  either.
7      Q.    What percentage of
8  plaintiffs' -- strike that.
9         What dollar value do you
10  associate with the investments that each
11  plaintiff has made in the development of the
12  standards at issue in this case?
13      A.    I don't think I attributed a
14  dollar amount to that precise activity,
15  because I don't know that amount.
16      Q.    What percentage of plaintiffs'
17  operating expenses do you associate with the
18  plaintiffs' development of the standards at
19  issue in this case?
20      A.    I don't think I know that
21  number.
22      Q.    What percentage of plaintiffs'
23  operating expenses do you associate with the
24  plaintiffs' development of standards
25  incorporated into law?

*Page 189*

48 (Pages 186 - 189)

1     A.    I don't think I know that
2   number.
3     Q.    What percentage of plaintiffs'
4   operating expenses do you associate with the
5   plaintiffs' development of standards
6   generally?
7     A.    I don't think I know that
8   number.
9     Q.    Do you have any estimates of
10  any of those numbers that you just said you
11  don't think you know?
12        MR. FEE:  Objection to form.
13        THE WITNESS:  Not sitting here
14      right now.
15  BY MR. BRIDGES:
16    Q.    Did you at one point ever
17  determine those numbers?
18    A.    Not that I recall.
19    Q.    Do you know what percentage of
20  the staff or employees of each plaintiff has
21  worked on the development of standards at
22  issue in this case?
23        MR. FEE:  Objection to form.
24        THE WITNESS:  I don't think I
25      know that number.

Page 190

1   BY MR. BRIDGES:
2     Q.    Do you know what percentage --
3   do you have an estimate?
4     A.    No.
5         MR. FEE:  Objection to form.
6         THE WITNESS:  Not as I sit
7       here, no.
8   BY MR. BRIDGES:
9     Q.    Do you know what percentage of
10  the staff or employees of each plaintiff has
11  worked on the development of standards
12  incorporated into law?
13        MR. FEE:  Objection to form.
14        THE WITNESS:  Not as I sit here
15      right now.
16  BY MR. BRIDGES:
17    Q.    Do you have an estimate?
18    A.    Not as I sit here right now.
19    Q.    Do you know what percentage of
20  the staff or employees of each plaintiff has
21  worked on the development of standards in
22  general?
23    A.    Not as I sit here right now.
24    Q.    Do you have an estimate?
25    A.    Not as I sit here right now.

Page 191

1     Q.    Have you ever had access to any
2   information that I've asked in the last
3   several questions?
4         MR. FEE:  Objection to form.
5         THE WITNESS:  I don't believe
6       so.
7   BY MR. BRIDGES:
8     Q.    Do you know whether plaintiffs
9   prepare standards through joint sponsorship
10  with any other organizations?
11        MR. FEE:  Objection.  Vague.
12        THE WITNESS:  I think I may
13      have seen a reference to that.  I
14      don't know the extent to which it
15      occurs, but I wouldn't be surprised to
16      be reminded that it does occur.
17  BY MR. BRIDGES:
18    Q.    Are you aware of any, as you
19  sit here?
20    A.    Not as I sit here right now,
21  but I think I'm aware that it has occurred.
22    Q.    Do you know whether plaintiffs
23  receive grants, revenue, or stipends from
24  governments that use, reference, or adopt
25  their standards?

Page 192

1         MR. FEE:  Objection to form.
2         THE WITNESS:  There are grant
3       monies that go to NFPA.  I don't know
4       the source of those grants.  I don't
5       see a line for grant revenues for the
6       other two organizations.
7   BY MR. BRIDGES:
8     Q.    Did you ask any of the
9   plaintiffs about the revenues or expenses
10  they have specifically attributable to the
11  standards that defendant has posted to the
12  Internet?
13        MR. FEE:  Objection to form.
14        THE WITNESS:  We generally
15      talked about that topic with each
16      plaintiff, and I don't think the
17      plaintiffs know that amount.  They
18      undertake activities that are
19      standards oriented.  They don't know
20      which of those standards will be
21      incorporated by reference.
22  BY MR. BRIDGES:
23    Q.    Did you --
24    A.    Or which have been.  I don't
25  think they systematically track those.

Page 193

49 (Pages 190 - 193)

1     Q.   I guess my question didn't have
2  anything to do with incorporated by
3  reference.  My question is, did you ask any
4  of the plaintiffs about the revenues or
5  expenses that they have had that are
6  specifically attributable to the standards
7  that the defendant has posted to the
8  Internet?
9          MR. FEE:  Objection to form.
10         THE WITNESS:  I think we
11     generally talked about that topic, and
12     I don't believe they have information
13     at that level.
14  BY MR. BRIDGES:
15     Q.   Did you ask the plaintiffs to
16  estimate revenues or expenses specifically
17  attributable to the standards at issue in
18  this case?
19         MR. FEE:  Objection to form.
20         THE WITNESS:  Not that I
21     recall.  We may have asked whether
22     they are collected, but we didn't ask
23     for the plaintiffs to separately
24     estimate those numbers, as I recall.
25  BY MR. BRIDGES:

Page 194

1     Q.   In paragraph 49, you state that
2  ASHRAE standard 90.1 was first published in
3  1974.  What's your basis for that statement?
4     A.   I don't recall.  It may have
5  been in a produced document.  It may have
6  been in conversations.  I just don't recall.
7     Q.   Did you attempt to verify that
8  information independently?
9     A.   Not that I recall.
10     Q.   Do you know if ASHRAE standard
11  90-75 was first published in 1975?
12     A.   I don't happen to know, sitting
13  here now.
14     Q.   You cite to an article in
15  footnotes 73, 74 of your report.  Did you
16  review that article?
17     A.   Yes.
18     Q.   Did you independently verify
19  the information in it?
20     A.   Not that I recall.
21     Q.   You just took it at face value?
22     A.   I think so.  I didn't have
23  reason to question any of the facts there.
24     Q.   Did you ever have reason to
25  question any of the facts that anybody from

Page 195

1  the plaintiffs told you in this case?
2          MR. FEE:  Objection to form.
3          THE WITNESS:  Well, I kept an
4      open mind to the facts that I was
5      given over the phone and sought to
6      determine if I learned things that
7      conflicted or not with that
8      information.
9  BY MR. BRIDGES:
10     Q.   Where did you --
11     A.   But --
12     Q.   I'm sorry.  I didn't realize
13  you were still --
14     A.   But I didn't separately go out
15  and write down the facts and attempt to get
16  separate verification of each fact.
17     Q.   So you were looking for
18  internal inconsistencies in the
19  communications that plaintiffs had with you
20  in order to determine whether to question any
21  of the facts that the plaintiffs' employees
22  related to you?
23         MR. FEE:  Objection to form.
24  BY MR. BRIDGES:
25     Q.   Is that your testimony?

Page 196

1          MR. FEE:  Mischaracterizes the
2      testimony.
3          THE WITNESS:  I'm not sure if
4      it is.  Let me try and answer and see
5      if that's responsive.
6          I was aware of the information
7      we received over the telephone, and in
8      the process of looking through the
9      documents that we had, I kept an open
10     eye toward learning things that
11     conflicted with those oral
12     conversations.
13  BY MR. BRIDGES:
14     Q.   And the documents -- what
15  are -- what were the documents that you're
16  saying you had?
17     A.   Everything that's in tab 2.
18     Q.   Most of which, apart from the
19  Web-based resources and the articles other
20  than Ms. Bremer's law review articles, the
21  plaintiffs' counsel furnished to you,
22  correct?
23         MR. FEE:  Objection to form.
24         THE WITNESS:  I think that's
25     right.  They didn't author those

Page 197

50 (Pages 194 - 197)

1     documents, but they provided them as
2     part of the discovery process.
3  BY MR. BRIDGES:
4     Q.    Did you ask them for any
5  documents that they had not provided?
6     A.    I think we generally described
7  the kinds of information that we find useful
8  or typically find useful in matters like
9  this.
10     Q.    After you received documents
11  from plaintiffs' counsel, did you ask them
12  for any more?
13     A.    That -- that's possible.  I
14  don't recall that.
15     Q.    You don't recall.  Did you --
16  do you have any understanding as to the
17  dollar value of staff time and expenses that
18  the plaintiffs have incurred in promoting
19  incorporation of their standards into law?
20        MR. FEE:  Objection to form.
21     Lack of foundation.
22        THE WITNESS:  I don't think I
23     have that number, no.
24  BY MR. BRIDGES:
25     Q.    Do you have an estimate?
Page 198

1        MR. FEE:  Same objections.
2        THE WITNESS:  Not as I sit here
3     now, no.
4  BY MR. BRIDGES:
5     Q.    Did you discuss that issue with
6  anyone representing the plaintiffs?
7        MR. FEE:  Same objections.
8        THE WITNESS:  It's possible,
9     but I don't recall having that
10     discussion.
11  BY MR. BRIDGES:
12     Q.    In paragraph 57 of your report,
13  you refer to "thousands of private-sector
14  standards."  Was your sole support for the
15  statement in paragraph 57 the Bremer article
16  you cited in footnote 88?
17     A.    No.  You see I discuss and
18  provide support for that in subsequent
19  paragraphs in that section.
20     Q.    And that includes in
21  paragraph 58?
22     A.    Yes.
23     Q.    And did you review the
24  Standards Incorporated by Reference Database
25  that you refer to in paragraph 58?
Page 199

1     A.    I looked at some parts of it.
2  I don't recall that I looked at all aspects
3  of the database.
4     Q.    Did you verify how many
5  standards were incorporated by reference
6  according to that database?
7     A.    No, I did not.
8     Q.    What do you mean by, "This
9  database reports nearly 13,000 instances of
10  incorporation by reference"?
11     A.    I don't know what you're asking
12  me to define.
13     Q.    I'm not asking you to define
14  anything.  I'm asking you to explain what you
15  meant by that clause, "This database
16  reports" --
17     A.    I'm sorry.  I'm just -- I'm
18  going to be just rearranging words a little
19  bit.  There were 13,000 times that there was
20  incorporation by reference of a standard.
21     I -- I don't -- I'm sorry.  I
22  don't understand what your confusion is.
23     Q.    I'm not confused.  I'm just
24  asking you questions.  Okay?  So please don't
25  understand -- please don't assume that I'm
Page 200

1  confused.  I'm trying to understand what you
2  meant by that.
3        You mean separate instances?
4  You mean separate laws?  What do you mean?
5     A.    Yes.  Separate instances slash
6  separate laws.
7     Q.    What did you count as an
8  instance?
9     A.    Mention in a particular law of
10  a standard.
11     Q.    Did you or anybody working with
12  you attempt to determine the number of
13  standards that those 13,000 instances of
14  incorporation by reference referred to?
15     A.    Not entirely.  But if you read
16  on that -- in that same section, it talks
17  about the number of ASTM standards, the
18  numbers of -- the number of NFPA standards,
19  and the number of ASHRAE standards.
20     Q.    Well, please tell me where it
21  refers to the number of standards.
22     A.    It says, "Including more than
23  2,400 instances involving ASTM standards."
24        So you're right.  It doesn't
25  have the number of standards.  It just has
Page 201

51 (Pages 198 - 201)

1    mentions of standard.  You're absolutely
2    right.
3        Q.    And the same thing is true of
4    the NFPA standards and ASHRAE standards?
5        A.    You're absolutely right, yes.
6        Q.    Do you know how many standards
7    that database shows as having been
8    incorporated by reference?
9        A.    Not sitting here right now.
10   One could perhaps look at what I cited to
11   answer that question, but I don't know right
12   now.
13       Q.    Do you know whether anyone
14   working for you ever did that work to make
15   that determination?
16       A.    I don't recall that being done.
17       Q.    Paragraph 59, you say, "At the
18   state level, privately-developed standards
19   are incorporated by reference as part of the
20   exercise of a range of governmental
21   functions."
22            Do you see that?
23       A.    Yes.
24       Q.    What do you mean by
25   "governmental functions" in that statement?

Page 202

1        Q.    What are the governmental
2    functions with respect to driving that you
3    have in mind?
4        A.    I don't have any particular
5    ones in mind.
6        Q.    In paragraph 59, you say, "At
7    least 44 states and territories have adopted
8    ASHRAE 90.1 as part of the commercial
9    building energy code."
10           Do you see that?
11       A.    Yes, I do.
12       Q.    And that also has footnote 95
13   associated with that as well, correct?
14       A.    Yes, that's correct.
15       Q.    How do you explain the fact
16   that that reference in footnote 95 shows that
17   those 44 states, in fact, adopted the
18   International Energy Conservation Code that
19   merely has a reference to an option to use
20   ASHRAE 90.1?
21            MR. FEE:  Objection.  Lack of
22       foundation.
23            THE WITNESS:  I don't have any
24       explanation for that.
25   BY MR. BRIDGES:

Page 204

1        A.    Things that government agencies
2    do.
3        Q.    And you give a couple of
4    examples, but speaking broadly, what are
5    governmental functions that involve
6    incorporation by reference of privately
7    developed standards at the state level?
8            MR. FEE:  Objection to form.
9            THE WITNESS:  I can only answer
10       generally.  Health and human services,
11       things that are related to that,
12       safety, driving rules and regulation.
13       Those are among the things that come
14       to mind.
15   BY MR. BRIDGES:
16       Q.    What are the governmental
17   functions related to health and human
18   services that you have in mind?
19       A.    I don't have any particular
20   ones in mind.
21       Q.    What are the governmental
22   functions relating to safety that you have in
23   mind?
24       A.    I don't have any particular
25   ones in mind.

Page 203

1        Q.    Did you verify that?
2        A.    I did not, no.
3        Q.    Who did?
4        A.    I'm sorry.  Who verified what?
5        Q.    On what -- on what did you rely
6    to make that statement with that footnote?
7        A.    I may not understand your
8    question.  I relied on what's identified in
9    footnote 95.
10       Q.    But you didn't review foot --
11   what's in footnote 95, right?
12            MR. FEE:  Objection.  Lack of
13       foundation.
14            THE WITNESS:  I did.
15   BY MR. BRIDGES:
16       Q.    You -- you reviewed that Web
17   site?
18       A.    Yes.
19       Q.    Personally?
20       A.    Yes, I believe so.
21       Q.    Do you have an explanation as
22   to why the resource cited in footnote 95
23   actually shows that the 44 states adopted the
24   International Energy Conservation Code?
25            MR. FEE:  Objection.  Lack of

Page 205

52 (Pages 202 - 205)

1    foundation.
2        THE WITNESS:  I would like to
3    understand the facts that you're
4    positing right now.
5    BY MR. BRIDGES:
6        Q.    Well, we're not going to take
7    time to go look at a Web site right now, so
8    I'm asking you based on what you know.
9        Do you have an explanation as
10   to why the resource cited in footnote 95
11   actually shows that 44 state -- the 44 states
12   adopted the International Energy Conservation
13   Code?
14       MR. FEE:  Objection.  Lack of
15       foundation.
16       THE WITNESS:  I don't know if
17       your factual representation is
18       accurate or not, and I don't recall
19       investigating that particular issue.
20   BY MR. BRIDGES:
21       Q.    Have you made any effort to
22   determine what resources were expended,
23   incurred, or contributed by parties other
24   than ASHRAE in the development of standard
25   90.1?

Page 206

1    change in membership sales by ASHRAE over the
2    past ten years?
3        A.    I don't think I have data that
4    goes as far as ten years ago.  I do have
5    information on ASHRAE membership revenue back
6    to 2012.  That's summarized in tab 5.
7        Q.    And that membership figure has
8    risen each year since 2012, correct?
9        A.    Yes.  Slightly each year, it
10   has risen.
11       Q.    Do you draw any conclusions
12   with respect to this case from that trend?
13       A.    I don't think so.
14       Q.    Have you calculated the
15   effects -- the financial effect on the
16   plaintiffs of the incorporation into law of
17   their standards?
18       MR. FEE:  Objection to form.
19       THE WITNESS:  No, I don't think
20       I've independently -- I don't think
21       I've separately done that.
22   BY MR. BRIDGES:
23       Q.    Are you aware of any data
24   regarding the financial effect on the
25   plaintiffs of the incorporation into law of

Page 208

1        MR. FEE:  Objection to form.
2        THE WITNESS:  I generally
3        understand that there were many
4        members who participated in that.  I
5        think I reported earlier in the report
6        the number of hours and other
7        indications of activity undertaken by
8        members.
9    BY MR. BRIDGES:
10       Q.    My question is, have you made
11   any effort to determine what resources were
12   expended, incurred, or contributed by parties
13   other than ASHRAE and ASHRAE members in the
14   development of standard 90.1?
15       MR. FEE:  Same objection.
16       THE WITNESS:  I didn't realize
17       that you had in your original question
18       "and other than ASHRAE members."
19   BY MR. BRIDGES:
20       Q.    I didn't.  Now I -- now my
21   question does.
22       A.    Beyond that, I don't recall
23   undertaking that investigation, meaning
24   beyond ASHRAE and its members.
25       Q.    Have -- are you aware of any

Page 207

1    their standards?
2        MR. FEE:  Same objection.
3        THE WITNESS:  I'm aware that
4        the plaintiffs benefit greatly by
5        incorporation by reference, but I
6        don't know that I've seen a
7        quantitative study of that topic.
8    BY MR. BRIDGES:
9        Q.    What do you understand about
10   the benefits that accrue to plaintiffs by
11   incorporation by reference?
12       A.    Some of those are laid out in
13   my report on pages 19 through 26.  I have a
14   particular section called "Benefits of
15   Incorporation" that starts at page 20.
16       Q.    Well, I'm asking you, what
17   benefits accrue to the plaintiffs from
18   incorporation by reference?
19       A.    Generally, it allows each one
20   to satisfy its mandate of providing services
21   to the entirety of the industry that it
22   focuses its attention on.  And so it allows
23   for the collection and then dissemination of
24   standards that allow and achieve outcomes
25   that are good for the industry.

Page 209

53 (Pages 206 - 209)

1      Q.    What other benefits do
2  plaintiffs gain from incorporation by
3  reference of their standards?
4      A.    I think that generally covers
5  it. I may be forgetting things that are laid
6  out in my report, but that's what covers it,
7  to the best of my memory right now.
8           Are we at a good point for a
9  break?
10     Q.    If you want.  Sure.
11     A.    Thanks.
12          THE VIDEOGRAPHER:  Off the
13     record at 3:12.  This is the end of
14     media unit number 2.
15          *  *  *
16          (Recess from 3:12 p.m. to
17     3:41 p.m.)
18          *  *  *
19          THE VIDEOGRAPHER:  On the
20     record at 3:41.  This is the beginning
21     of media unit number 3 in the
22     deposition of John Jarosz.
23          *  *  *
24          (Jarosz Exhibit 5 marked for
25     identification.)

Page 210

1           *  *  *
2  BY MR. BRIDGES:
3      Q.    Mr. Jarosz, I've handed you
4  Exhibit 5.  This is an article that you cited
5  in your report, correct?
6      A.    Yes, I believe so.
7      Q.    Do you recall how this article
8  came to your attention?
9      A.    I do not.
10     Q.    Is this an article that you
11  understand to have been published by
12  plaintiff ASHRAE in its journal?
13     A.    Yes, that's my understanding.
14     Q.    And this is an article you
15  relied upon with respect to the development
16  of standard 90, which became standard 90.1,
17  correct?
18     A.    Yes.
19     Q.    In paragraph 133 of your
20  report, you talk about a number of
21  downloads -- strike that -- you talk about a
22  number of documents accessed through Public
23  Resource's Web site.  Do you see that?
24     A.    I talk about the number of ASTM
25  documents that are -- that were accessed over

Page 211

1  a particular period.
2      Q.    And then you do the same for
3  NFPA documents, correct?
4      A.    Yes.
5      Q.    What do you calculate as the
6  dollar value of harm to the -- to ASTM from
7  the accesses and downloads that you refer to
8  in paragraph 133?
9      A.    I haven't calculated that harm.
10     Q.    Why not?
11     A.    I'm not sure if I can at this
12  stage.  One estimate would be those number of
13  downloads times the -- well, actually, no,
14  let me take that back.  I just don't know how
15  to do it.
16     Q.    Can you be certain that these
17  accesses or down -- and downloads referred to
18  in paragraph 133, in fact, resulted in
19  economic loss to ASTM?
20          MR. FEE:  Objection to form.
21          THE WITNESS:  Not with absolute
22     certainty, but with reasonable
23     certainty I can say some -- in some
24     number of these instances, it's likely
25     the case that the -- that the

Page 212

1          information would have been obtained
2     from ASHRAE in -- or ASTM, rather,
3     in -- through legal means.
4  BY MR. BRIDGES:
5      Q.    Would that -- in those
6  instances where you say that the information
7  would have been obtained from ASTM through
8  legal means, can you put a dollar value on --
9  or even an estimate of the increased revenue
10  that ASTM would have gotten from those
11  instances where people obtained the
12  information from ASHRAE -- sorry -- from
13  AST --
14          MR. FEE:  Object --
15  BY MR. BRIDGES:
16     Q.    -- from ASTM?
17          MR. FEE:  Objection to form.
18          THE WITNESS:  No, not based on
19     the information I have.  I don't think
20     I have any indication of who was doing
21     the downloading and why.
22  BY MR. BRIDGES:
23     Q.    And do you know what
24  alternatives persons who were doing the
25  downloading may have had for obtaining the

Page 213

54 (Pages 210 - 213)

1   information?
2       A.   Not with certainty, because I
3   don't know who those persons were, but I
4   would expect one alternative would be to
5   obtain it properly, directly from ASTM.
6       Q.   Would that have resulted in
7   more revenue to ASTM?
8       A.   It may have.  If they're
9   materials that were taken improperly that
10  would have been paid for, then that would
11  represent a loss of revenue to ASTM.
12      Q.   Do you know whether any of the
13  persons who obtained this information from
14  defendant would have paid for the information
15  from ASTM?
16      A.   No, not with certainty, because
17  I don't know the identity of the downloaders
18  or the reasons for their downloading.
19      Q.   Moreover, those persons might
20  have accessed the standards from ASTM's
21  reading room for free and with no revenue to
22  ASTM, correct?
23      A.   You mean in a but-for world?
24  Had they not done what they actually did,
25  alternatively they could have gone to the

1   free reading room?
2       Q.   Right.
3       A.   That's a possibility, yes.
4       Q.   Do you have an understanding as
5   to why persons would want to download a file
6   of a standard instead of viewing it at one of
7   the plaintiffs' reading rooms?
8       A.   Not with absolute certainty,
9   but I would imagine downloading would allow
10  more flexibility in referring to the standard
11  and using it and sharing that information
12  with others, whereas reading it in -- through
13  an Internet site is somewhat less flexible,
14  provides less flexibility for the use of that
15  information.
16      Q.   What did -- what do you
17  understand to be the difference in
18  flexibility between possession of a download
19  and access to a standard through a reading
20  room?
21      A.   Well, I think that a download
22  typically has a document that's in hard-copy
23  form.  Copies can made -- be made of that and
24  distributed.  Reading things just online
25  doesn't allow for the wide distribution and

1   more extended use of that document.
2       Q.   Do you have any evidence about
3   wide distribution of plaintiffs' standards as
4   a consequence of defendant's actions?
5       A.   I do not.
6       Q.   Have you reviewed any studies
7   that would allow you to establish any
8   connection between the number of accesses or
9   downloads that Public Resource made possible
10  and any financial harms to the plaintiffs?
11          MR. FEE:  Objection to form.
12          THE WITNESS:  I don't think
13      I've seen any study on that, no.
14  BY MR. BRIDGES:
15      Q.   Have you conducted any studies
16  that would have allowed you to establish any
17  connection between the number of accesses or
18  downloads that Public Resource made possible
19  and any financial harms to the plaintiffs?
20          MR. FEE:  Objection to form.
21          THE WITNESS:  Not other than
22      what's contained in my report.
23  BY MR. BRIDGES:
24      Q.   Please turn to page 45,
25  paragraph 107, which spills into page 108.

1           MR. FEE:  Page 108?
2           THE WITNESS:  I'm sorry.
3       Page 108 or paragraph?
4   BY MR. BRIDGES:
5       Q.   I'm sorry.  Paragraph -- strike
6   that.
7           Let me ask you to turn
8   paragraph 107 on pages 45 to 46.
9       A.   Okay.  I'm there.
10      Q.   I just want to make sure I
11  understand your language correctly at the
12  bottom of page 45 and the top of page 46.
13          Is it your opinion that the
14  copyright that the plaintiffs assert in their
15  standards drives sales of other publications
16  other than the standards themselves?
17          MR. FEE:  Objection.  Form.
18      Vague.
19          THE WITNESS:  I think they're
20      important for driving sales of
21      publications that embody those
22      standards.  I don't know that I've
23      drawn a conclusion that it drives the
24      sale of other products, but that makes
25      some sense.

BY MR. BRIDGES:
    Q.    Well, doesn't that sentence at
the bottom of 45 and going on to 46 say that
copyright on plaintiffs' standards drive
sales of "handbooks that provide commentary
on the standards by referring to them"?
    A.    You haven't read --
        MR. FEE:  Objection.
    Mischaracterizes the document.
        THE WITNESS:  You haven't read
    the whole sentence.  I see that
    sentence to which you refer.
BY MR. BRIDGES:
    Q.    Right.  I know I haven't read
the whole sentence, but didn't I fairly
capture one part of it, which is the sales
of -- strike that -- that copyright on
plaintiffs' standards drives sales of, among
other things, "handbooks that provide
commentary on standards by referring to
them"?
        MR. FEE:  Same objection.
        THE WITNESS:  I think you have
    generally paraphrased it accurately,
    yes.

Page 218

BY MR. BRIDGES:
    Q.    And that plaintiffs' copyright
protection -- this is the top of -- strike
that.
        And turning to the top of
page 46, plaintiffs' copyright protection on
their standards provides plaintiff with a
competitive advantage with respect to what
you call value-added publications, correct?
    A.    You've read part of a sentence,
but I do see that sentence, yes.
    Q.    And I've fairly paraphrased it
correctly, correct?
        MR. FEE:  Objection to form.
        THE WITNESS:  I think,
    generally, yes.
BY MR. BRIDGES:
    Q.    Do plaintiffs, to your
understanding, have separate copyrights in
those value-added publications, such as
commentaries and handbooks?
    A.    I don't know.
    Q.    You don't know?
    A.    Correct.  I do not know.
    Q.    Is it important to you to know

Page 219

whether plaintiffs have copyright in --
rights in their value-added publications?
        MR. FEE:  Objection.  Vague.
        THE WITNESS:  I would be
    curious to know that, but I'm not sure
    of the significance.  I don't think it
    would change my conclusions, but I
    would be curious to know that.
BY MR. BRIDGES:
    Q.    Do you know whether
incorporation into law drives -- strike that.
        Do you know whether
incorporation into law of plaintiffs'
standards drives sales of plaintiffs'
standards?
        MR. FEE:  Objection to form.
    Vague.
        THE WITNESS:  I don't know with
    absolute certainty, but it would make
    some sense to me.
BY MR. BRIDGES:
    Q.    Is it your understanding that
it does?
        MR. FEE:  Same objection.
        THE WITNESS:  It would make

Page 220

some sense to me, yes.
BY MR. BRIDGES:
    Q.    Are you aware that, in some
instances, at least one plaintiff uses the
legal status of its code to promote the sale
of handbooks?
        MR. FEE:  Objection to form.
        THE WITNESS:  I don't know one
    way or the other.  I don't have reason
    to dispute it, but there's not a
    particular instance that comes to mind
    right now.  Maybe you have something
    to refresh my memory.
BY MR. BRIDGES:
    Q.    Can you provide a dollar value
benefit that plaintiffs receive economically
from the incorporation of their standards by
reference?
        MR. FEE:  Objection.  Vague.
    Form.
        THE WITNESS:  I want to make
    sure that I'm understanding.  Could
    you read that back, please?
BY MR. BRIDGES:
    Q.    I'll restate it.

Page 221

56 (Pages 218 - 221)

1      Can you provide a -- can you
2  put a dollar value, even an estimate, on the
3  economic benefit that plaintiffs receive from
4  incorporation of their standards into law?
5      MR. FEE:  Objection to form.
6      THE WITNESS:  I have not.  And
7  I'm not sure how one would do that,
8      subject to thinking more about it.
9  BY MR. BRIDGES:
10     Q.    At the top of page 46, you say,
11  "The Plaintiffs' copyright protection on
12  their privately-developed standards provides
13  a competitive advantage with regard to the
14  sale of these value-added publications as the
15  copyright protection limits the ability of
16  others to sell those publications unless they
17  are unwilling [sic] to compensate the
18  Plaintiffs for such use."
19     MR. FEE:  Objection.
20     Mischaracterizes the statement.
21  BY MR. BRIDGES:
22     Q.    Is there something unfair about
23  my characterization of that statement?
24     A.    I think you read it wrong.  You
25  read "willing" to read "unwilling" for some

1  reason.
2      Q.    Oh, I'm sorry.  Thank you.
3  I'll restate the sentence.
4      "In particular, the Plaintiffs'
5  copyright protection on their
6  privately-developed standards provides a
7  competitive advantage with regard to the sale
8  of these value-added publications as the
9  copyright protection limits the ability of
10  others to sell those publications unless they
11  are willing to compensate the Plaintiffs for
12  such use."
13     Do you see that statement?
14     A.    I do, yes.
15     Q.    And the competitive advantage
16  you've identified there, whom do you
17  understand to be the competition?
18     A.    Other potential providers of
19  these so-called value-added publications.
20     Q.    And what -- when you say
21  "value-added publications," please give me
22  more examples of what types of things fall
23  into that category, as you use the term.
24     A.    Examples would be handbooks
25  that provide commentary on the standards.

1      Q.    What else?
2      A.    That's what comes to mind.
3      Q.    Anything else?
4      A.    Not this moment, no.  I guess,
5  potentially, when I think some more about it,
6  training and seminars, for instance.
7      Q.    Providers of training and
8  seminars?
9      A.    Yes.  So that's broader than
10  value-added publications, but there are
11  potentially alternative providers of training
12  and seminars.
13     Q.    In paragraph 109, you say, "In
14  addition to direct sales of copyrighted
15  materials, the Plaintiffs' materials
16  associated with their privately-developed
17  standards provide a competitive advantage
18  with regard to the sale of downstream
19  ancillary/complementary services and
20  products."
21     Do you see that?
22     A.    Yes.  That's what I had in
23  mind.
24     Q.    And who are the competitors you
25  have in mind in paragraph 109?

1      A.    I don't know particular names,
2  but -- at least I don't recall any sitting
3  right now -- sitting here right now, but I
4  think there are other providers of these
5  downstream services and products.
6      Q.    And please give me examples of
7  what you're calling "downstream services and
8  products."
9      A.    Again, seminars and training,
10  for instance.
11     Q.    Anything else?
12     A.    That's what comes to mind right
13  now.
14     Q.    Turning to paragraph 110, you
15  state, "I understand that the ability to
16  control these downstream products and
17  services is particularly important to the
18  Plaintiffs here because the barriers to entry
19  in the marketplace for downstream products,
20  such as training and user manuals, are
21  relatively low.  For example, according to
22  Mr. Comstock of ASHRAE, it is relatively easy
23  for unauthorized instructors to read a
24  standard and become (or think that they have
25  become) qualified to provide training or

1     guidance on that standard."
2           Do you see that?
3     A.    I do, yes.
4     Q.    What do you understand -- what
5     did you mean by "unauthorized instructors"?
6     A.    People that have provided or
7     trying to provide services to the marketplace
8     that have not been explicitly approved by,
9     for instance, ASHRAE.
10    Q.    What do you understand the --
11    the nature of -- strike that.
12          You called them "instructors,"
13    correct?
14    A.    Yes.
15    Q.    Does that mean that you
16    envision that these persons are providing
17    some kind of instruction?
18    A.    Yes.
19    Q.    What instruction do you
20    understand -- what instruction did you have
21    in mind when you referred to "unauthorized
22    instructors"?
23    A.    Generally, how best to
24    implement standards or provisions of certain
25    standards.

Page 226

1     Q.    What else?
2     A.    Nothing else comes to mind
3     right now.
4     Q.    Would your understanding of
5     "unauthorized instructors" include persons
6     who are instructing the public as to what
7     the standards require?
8           MR. FEE:  Objection to form.
9     Vague.
10          THE WITNESS:  I didn't have
11          that in mind.  I guess that's a
12          possibility.
13    BY MR. BRIDGES:
14    Q.    And would it be relatively easy
15    for unauthorized persons like that to read a
16    standard and think that they have become
17    qualified to provide training or guidance on
18    that standard?
19          MR. FEE:  Objection.  Vague.
20    BY MR. BRIDGES:
21    Q.    Is that your understanding?
22    A.    According to Mr. Comstock, I
23    believe that's correct.
24    Q.    What do you believe?
25    A.    I have no reason to doubt him.

Page 227

1     Q.    You're just parroting what
2     Mr. Comstock said, or did you have an
3     independent view?
4     A.    No, I heard what he said, and
5     it made sense to me.
6     Q.    So you put it in your report?
7     A.    Yes.
8     Q.    What independent thought or
9     investigation did you do before you put that
10    in your report?
11          MR. FEE:  Objection.  Vague.
12          Compound.
13          THE WITNESS:  I can't point to
14          anything in particular.
15    BY MR. BRIDGES:
16    Q.    Would a law-school course on
17    the law and regulation of building
18    construction provide instruction to law
19    students?
20          MR. FEE:  Objection.  Vague.
21          Calls for speculation.
22          THE WITNESS:  I guess it could.
23          I have a hard time imagining there
24          would be much demand for such a
25          course, but I'm in general agreement

Page 228

1     that that, in concept, could occur.
2     BY MR. BRIDGES:
3     Q.    Would it be possible to
4     envision that, in the course of such
5     teaching, a teacher may wish to analyze some
6     of plaintiffs' standards that have been
7     incorporated into law as law and as
8     regulation?
9           MR. FEE:  Objection.  Calls for
10          speculation.  Vague.  Form.
11          THE WITNESS:  I guess that's
12          possible, but I would expect a law
13          professor would be talking about legal
14          implications, not the technical
15          aspects of a standard.  I think they
16          might talk about the implication in a
17          business that's different from a
18          vendor business.
19    BY MR. BRIDGES:
20    Q.    Well, what about the legal
21    implications of a code for contractors?
22          MR. FEE:  Objection.
23    BY MR. BRIDGES:
24    Q.    Is that -- is that fair ground
25    for a law professor to discuss with law

Page 229

58 (Pages 226 - 229)

1  students?
2        MR. FEE: Objection. Compound.
3  Form. Vague.
4        THE WITNESS: I guess, in -- in
5  concept. I'm having a hard time
6  imagining that that would, in fact,
7  occur at any law school, but it might.
8  I somehow doubt that the law professor
9  would be talking about the substance
10  of the standard as opposed to the
11  process or implications of a standard.
12  BY MR. BRIDGES:
13      Q.   You're not familiar with
14  courses in construction law?
15      A.   I'm generally aware that there
16  are courses in construction law.
17      Q.   Is it your view that, for a law
18  professor to provide a copy of, let's say,
19  the National Electrical Code to students for
20  their study would require permission of the
21  National Fire Protection Association?
22        MR. FEE: Objection. Calls for
23      a legal conclusion.
24        THE WITNESS: I don't know.
25      That seems to be a legal question. I

Page 230

1      do not know.
2  BY MR. BRIDGES:
3      Q.   Is it your view that a law
4  professor who does not get any permission
5  from NFPA or who does not purchase a copy of
6  the National Electrical Code would be an
7  unauthorized instructor --
8        MR. FEE: Objection.
9  BY MR. BRIDGES:
10      Q.   -- by using that code with his
11  or her students as part of a law-school
12  course?
13        MR. FEE: Objection to form.
14      Compound. Calls for a legal
15      conclusion.
16        THE WITNESS: Again, that seems
17      to be a legal question. I'm not sure
18      it would be authorized, but I'm also
19      not sure that it would be improper.
20  BY MR. BRIDGES:
21      Q.   Well, you've used the term
22  "unauthorized" in your report, so I'm asking
23  you, given the term "unauthorized" as used --
24  you have used it in the report, would the
25  scenario I have described mean that the law

Page 231

1  professor was an unauthorized instructor?
2        MR. FEE: Objection. Form.
3      Compound. Calls for a legal
4      conclusion. Vague.
5        THE WITNESS: That seems to be
6      a legal question. Just as an economic
7      proposition or just as a matter of the
8      English language, I would think that
9      they might be an unauthorized user but
10      not an improper user.
11        I don't think they've gotten
12      explicit authorization; therefore,
13      they're unauthorized. But I'm not
14      sure if it's illegal for them to refer
15      to a standard.
16  BY MR. BRIDGES:
17      Q.   What about making copies of the
18  standard and furnishing it to students?
19        MR. FEE: Same objections.
20        THE WITNESS: Same answer.
21  BY MR. BRIDGES:
22      Q.   Do you have any opinion about
23  the economic harms that plaintiffs would
24  suffer if a law professor were to provide
25  an -- a copy of the National Electrical Code

Page 232

1  to each student in a construction law class
2  without having purchased those copies?
3        MR. FEE: Objection.
4      Incomplete hypothetical. Form.
5        You can answer, if you know.
6        THE WITNESS: I don't know. I
7      have not investigated or even thought
8      about that issue.
9  BY MR. BRIDGES:
10      Q.   In paragraphs 117 through 119,
11  I see no footnotes referencing sources of
12  your conclusions or referencing facts on
13  which your conclusions are based.
14        What studies, if any, did you
15  rely on for your assertions in paragraphs 117
16  to 119?
17        MR. FEE: Objection to form.
18      Lack of foundation.
19        THE WITNESS: The study that's
20      summarized in Exhibit 1.
21  BY MR. BRIDGES:
22      Q.   I'm referring specifically to
23  paragraphs 117 to 119.
24      A.   I thought you were. I was
25  answering that question.

Page 233

59 (Pages 230 - 233)

1      Q.    You can't point to any
2   particular investigation or fact that you're
3   relying on in paragraphs 117 to 119?
4          MR. FEE: Objection to form.
5          Asked and answered.
6             THE WITNESS:  Everything that's
7       embedded in Exhibit 1 is, in part, a
8       basis for the observations that I draw
9       in those paragraphs.
10  BY MR. BRIDGES:
11     Q.    What probability do you assign
12  to your prediction in the first sentence of
13  paragraph 119?
14         MR. FEE: Objection. Form.
15         Lack of foundation.
16            THE WITNESS:  I'm not sure that
17      I've used the term "prediction," but I
18      wouldn't assign a particular
19      quantitative probability.
20  BY MR. BRIDGES:
21     Q.    Can you give an estimate?
22     A.    No.
23     Q.    Why not?
24     A.    I don't have a basis for that
25  estimate.  I have reasoning underlying it,

1      Q.    What probability do you assign
2   to the likelihood that you refer to in the
3   first sentence of paragraph 121?
4          MR. FEE: Objection to form.
5          Lack of foundation.
6             THE WITNESS:  I don't have a
7       particular quantitative likelihood
8       measure.
9   BY MR. BRIDGES:
10     Q.    Can you give an estimate?
11         MR. FEE:  Same objection.
12            THE WITNESS:  No.
13  BY MR. BRIDGES:
14     Q.    Turning to paragraph 126, you
15  refer to an "option available to Plaintiffs
16  to respond to the loss of protection for
17  incorporated standards."
18            Is it your belief that, if the
19  plaintiffs lose this case, they will shut
20  down their creation of new standards?
21     A.    I think that's a possibility.
22     Q.    What probability do you assign
23  to that?
24         MR. FEE:  Objection to form.
25         Lack of foundation.

1   but I don't have a basis to provide a
2   quantitative estimate of my level of
3   confidence.
4      Q.    You refer to "uncertainties" in
5   the second sentence of paragraph 119,
6   correct?
7      A.    I do, yes.
8      Q.    What probability do you assign
9   to the likelihood that you refer to with the
10  word "likely" in the first sentence of
11  paragraph 120?
12         MR. FEE: Objection. Form.
13         Lack of foundation.
14            THE WITNESS:  I don't have a
15      particular quantitative measure of
16      that.  And are you referring to my use
17      of the term "likely"?
18  BY MR. BRIDGES:
19     Q.    Yes.
20     A.    Yes, I don't have a particular
21  quantification of that.
22     Q.    What particular facts are you
23  relying on for that paragraph?
24     A.    Everything that you see
25  reported in Exhibit 1.

1             THE WITNESS:  I don't have a
2       particular quantitative measure of
3       probability for that.
4   BY MR. BRIDGES:
5      Q.    What's your best estimate?
6          MR. FEE:  Same objection.
7             THE WITNESS:  I don't have a
8       quantitative best estimate.
9   BY MR. BRIDGES:
10     Q.    Is it more or less than
11  50 percent?
12         MR. FEE:  Same objections.
13            THE WITNESS:  I still don't
14      have a quantitative estimate.
15  BY MR. BRIDGES:
16     Q.    Is it more or less than
17  80 percent?
18         MR. FEE:  Same objections.
19            THE WITNESS:  Still don't have
20      a quantitative estimate.
21  BY MR. BRIDGES:
22     Q.    Is it more or less than
23  5 percent?
24         MR. FEE:  Same objections.
25            THE WITNESS:  Still don't have

1    a quantitative estimate.  I think that
2    there -- with reasonable probability I
3    can draw this conclusion, but I can't
4    be any more precise than that.
5  BY MR. BRIDGES:
6        Q.    What do you mean, "with
7  reasonable probability"?
8        A.    Based on the information that I
9  have and the training and logic I bring to
10  it, I think there is a -- I say with some
11  confidence what I have said here.
12       Q.    And when you say "likely," do
13  you mean more than 50 percent likely?
14       A.    Not necessarily, no.
15       Q.    Are you aware of other
16  standards development organizations active in
17  the same field as the plaintiffs?
18           MR. FEE:  Objection.  Vague.
19       Form.
20           THE WITNESS:  Perhaps you could
21       tell me what you have in mind with
22       your use of the term "fields."
23  BY MR. BRIDGES:
24       Q.    Well, are you familiar with
25  AHRI?

Page 238

1  to see what alternatives there are among
2  standards development organizations currently
3  in existence to carry forward the work of
4  plaintiffs if plaintiffs chose to stop
5  standards development as a result of the loss
6  of this case?
7           MR. FEE:  Same objection.
8           THE WITNESS:  Not that I
9       recall, but I am of the understanding
10       that each SDO has a different charter,
11       so I don't know that any SDO has an
12       identical charter to that of any of
13       the three plaintiffs.
14  BY MR. BRIDGES:
15       Q.    Are you aware that these
16  plaintiffs compete with other SDOs in the
17  creation of standards in particular fields?
18           MR. FEE:  Objection to form.
19       Vague.
20           THE WITNESS:  What do you mean
21       by the term "compete with" in this
22       context?
23  BY MR. BRIDGES:
24       Q.    That they consider others
25  rivals for the same market, in part.

Page 240

1        A.    I have perhaps seen reference
2  to that.
3        Q.    Do you know with which of these
4  plaintiffs it -- do you -- do you know what
5  field it's in?
6        A.    I don't recall, sitting here
7  right now, no.
8        Q.    Are you familiar with NFRC?
9        A.    I may have seen reference to
10  that acronym.
11       Q.    Do you know what field it's in?
12       A.    Not sitting here right now.
13       Q.    Are you familiar with ICC?
14       A.    I have seen reference to that.
15  I don't recall what it is, sitting here now.
16       Q.    Do you know whether other
17  standards developments organizations would be
18  in a position to step forward and to continue
19  the maintenance and preservation and further
20  development of the standards of plaintiffs
21  here if plaintiffs lose this case?
22           MR. FEE:  Objection to form.
23           THE WITNESS:  I don't know.
24  BY MR. BRIDGES:
25       Q.    Have you done any investigation

Page 239

1           MR. FEE:  Objection to form.
2       Vague.
3           THE WITNESS:  I don't recall
4       seeing reference to that, but my
5       memory is not perfect.
6  BY MR. BRIDGES:
7        Q.    The -- in paragraph 131, you
8  say, "Simply put, freely-distributed,
9  unrestricted versions of Plaintiffs'
10  standards that are or could be incorporated
11  by reference can be expected to adversely
12  impact the market for Plaintiffs' standards
13  that are incorporated by reference and to
14  displace sales of these standards by the
15  Plaintiffs - which can be expected to have a
16  material adverse effect on Plaintiffs'
17  revenues."
18           Do you see that?
19       A.    Yes.
20       Q.    By "expected," do you mean more
21  than 50 percent likely?
22       A.    Not necessarily.  I don't have
23  a quantitative assessment of what I mean by
24  "expected."
25       Q.    Do you mean more than 5 percent

Page 241

61 (Pages 238 - 241)

1  likely?
2      A.   I haven't quantified that, but
3  I would expect that it's -- more than
4  5 percent would be a reasonable definition of
5  "expected."
6      Q.   More than 10 percent?
7      A.   I don't know.  I've not
8  quantified that number.
9      Q.   And what amount of an effect on
10  plaintiffs' revenues have you identified as
11  "material"?
12     A.   I haven't --
13         MR. FEE:  Objection to form.
14         THE WITNESS:  -- been able to
15     quantify the specific effects, so I
16     don't know the amount.
17  BY MR. BRIDGES:
18     Q.   Well, what -- I'm not asking
19  for your quantification of a specific effect,
20  but how large would an effect have to be for
21  to you consider it "a material adverse effect
22  on Plaintiffs' remedies"?
23         MR. FEE:  Objection to form.
24         THE WITNESS:  I don't know that
25     I have a particular quantitative
Page 242

1      Q.   Do you consider $100,000 to be
2  material as an adverse effect on plaintiffs'
3  revenues?
4         MR. FEE:  Objection to form.
5         Compound.
6         THE WITNESS:  I haven't
7      considered that question.  I don't
8      know the answer to it.
9  BY MR. BRIDGES:
10     Q.   Have you considered whether
11  50,000 is a material amount as an adverse
12  effect on plaintiffs' revenues?
13         MR. FEE:  Same objections.
14         THE WITNESS:  Same answer.
15  BY MR. BRIDGES:
16     Q.   Starting at page -- sorry.
17  Strike that.
18         Starting at paragraph 139, you
19  make several references to Mr. Malamud's
20  theory.
21     A.   I'm sorry.  To -- I missed a
22  word that you said.  References to his what?
23     Q.   To Mr. Malamud's theory --
24     A.   Okay.
25     Q.   -- T-H-E-O-R-Y.  You refer to
Page 244

1      guideline in mind.
2  BY MR. BRIDGES:
3      Q.   Have you ever -- are you
4  familiar with audit inquiry letters regarding
5  litigation?
6      A.   Generally, yes.
7      Q.   And you're familiar with the
8  fact that auditors will often specify to
9  those they send the letters to what amounts
10  would be material for purposes of the audit
11  response?
12     A.   Yes.
13     Q.   So you understand the concept
14  of certain amounts being material to certain
15  companies or entities?
16     A.   Yes, for certain purposes.
17     Q.   So I'd like to know what amount
18  you have identified as being material as an
19  adverse effect on plaintiffs' revenues for
20  each of the three plaintiffs, please.
21         MR. FEE:  Objection.  Compound.
22     Asked and answered.
23         THE WITNESS:  I have not
24     considered a particular amount.
25  BY MR. BRIDGES:
Page 243

1  it in paragraph 139; 140; 144, with the word
2  "theorized"; 145, "theory"; 146, "theory."
3         What facts do you have that
4  have disproved the theory in paragraph 139?
5      A.   Perhaps most important is the
6  revealed preference information.  If the
7  plaintiffs believed they were better off by
8  lack of copyright protection, they would have
9  pursued such a model.
10         They don't believe they're
11  better off.  Moreover, they're expending
12  tremendous resources in bringing and pursuing
13  this litigation to halt the activity at
14  issue.
15     Q.   What other facts, if any, do
16  you have that have disproved Mr. Malamud's
17  theory in paragraph 139?
18     A.   That's what comes to mind right
19  now.
20     Q.   What facts do you have or are
21  you aware of that have disproved
22  Mr. Malamud's theory as you refer to it in
23  paragraph 140?
24     A.   That's the same theory that's
25  being referenced in 139, so there's nothing
Page 245

62 (Pages 242 - 245)

1  new in terms of a theory.
2      Q.   Do you have the same answer
3  with respect to -- strike that.
4          What facts do you have --
5  strike that.
6          What facts are you aware of to
7  disprove -- to disprove Mr. Malamud's theory
8  that you refer to in paragraph 144?
9      A.   Again, it's the same theory
10 that's being referenced, but there's
11 additional facts; and that is, the downstream
12 products and services aren't particularly
13 substantial to these plaintiffs and don't
14 appear to be enhanced by a lack of copyright
15 protection; that is, the plaintiffs have had
16 copyright protection and have said -- had
17 some downstream products and services.  It's
18 hard to imagine that elimination of that
19 copyright protection will enhance that
20 business.
21     Q.   It's hard to imagine, but are
22 you aware of any studies to disprove
23 Mr. Malamud's theory?
24     A.   No.
25          MR. FEE: Objection.  Vague.

1  rest of that paragraph?
2          MR. FEE: Objection.  Vague.
3          THE WITNESS:  I looked at the
4      financial information, and I talked to
5      people at the various plaintiffs.
6  BY MR. BRIDGES:
7      Q.   You talked to people at the
8  various plaintiffs?
9      A.   Yes.
10     Q.   What did you do to verify the
11 truth and accuracy of the things that various
12 plaintiffs said to you in their
13 conversations?
14         MR. FEE: Objection to form.
15         THE WITNESS:  I looked at the
16     financial information, and I kept my
17     eyes and mind open to the information
18     in the rest of the record to determine
19     if it conflicted with what I learned
20     from the company personnel.
21 BY MR. BRIDGES:
22     Q.   Whose financial information did
23 you look at?
24     A.   All three of the plaintiffs.
25 It's summarized in tabs 3, 4, and 5.

1          THE WITNESS:  I'm sorry.
2  BY MR. BRIDGES:
3      Q.   Have you conducted any studies
4  to disprove Mr. Malamud's theory?
5          MR. FEE:  Same objection.
6          THE WITNESS:  Not other than
7      what's reflected here in Exhibit 1.
8  BY MR. BRIDGES:
9      Q.   What academic literature have
10 you relied upon to criticize Mr. Malamud's
11 theory in paragraph 144?
12     A.   Nothing specific comes to mind.
13     Q.   In paragraph 145, you state
14 that, "Mr. Malamud's suggestion that the sale
15 of downstream products and services
16 represents an untapped and undeveloped
17 opportunity for the Plaintiffs is incorrect."
18         Do you see that?
19     A.   Yes, I do.
20     Q.   And then you go on and make
21 some statements for the rest of the
22 paragraph, correct?
23     A.   Yes.
24     Q.   What studies did you engage in
25 to determine the facts that you stated in the

1      Q.   Did you look at the financial
2  information of any entities other than the
3  plaintiffs?
4      A.   I looked at Public Resource
5  financial information.
6      Q.   Apart from Public Resource and
7  the plaintiffs, did you look at the financial
8  information of any other entities in making
9  the assertions that you made in
10 paragraph 145?
11     A.   Not in undertaking my
12 assignment here.
13     Q.   Did you consider the business
14 models of any entities other than the
15 plaintiffs and the defendant in making the
16 statements criticizing Mr. Malamud's theory
17 in paragraph 145?
18     A.   Nothing in particular comes to
19 mind.  I understand that there are
20 front-loaded business models, but -- at DIN,
21 for instance, but I don't recall undertaking
22 an investigation of the downstream activities
23 that they have.
24     Q.   Did you undertake any
25 investigation of downstream activities of

Veritext Legal Solutions
866 299-5127

1    other US-based standards development
2    organizations that make their standards
3    freely available to the public?
4        A.    Not that I recall.
5        Q.    Would that have been relevant
6    to your analysis?
7        A.    It wasn't necessary to do my
8    analysis, but I would be curious if I had
9    that information.  If I -- if I had the
10   ability to examine that information, I would
11   be curious as to what that shows.
12       Q.    In paragraph 146, you state,
13   "The loss of publications here will likely
14   reduce the Plaintiffs' sales of those
15   downstream products and services."
16       Do you see that?
17       MR. FEE:  That's in 146?
18       THE WITNESS:  Is that the last
19       sentence you were reading from?
20   BY MR. BRIDGES:
21       Q.    Yes.
22       A.    Yeah.
23       Q.    Paragraph 146.
24       A.    Yes, I do see that.
25       Q.    Did you mean the loss of

1    copyright in the publications here?
2        A.    Certainly the loss of
3    publications, but I believe it would probably
4    be better to put the loss of copyright in the
5    publications as more reflective of the
6    assignment that I undertook here.
7        Q.    What probability do you assign
8    to the likelihood that you refer to in that
9    sentence?
10       MR. FEE:  Objection to form.
11       Lack of foundation.
12       THE WITNESS:  I haven't
13       assigned a quantitative probability to
14       that.
15   BY MR. BRIDGES:
16       Q.    Have you any estimate?
17       MR. FEE:  Same objections.
18       THE WITNESS:  I do not.
19   BY MR. BRIDGES:
20       Q.    Have you any estimate as to the
21   magnitude of the likely reduction of
22   plaintiffs' sales of downstream products and
23   services?
24       MR. FEE:  Same objections.
25       THE WITNESS:  No, I have been

1        unable to quantify that with great
2        accuracy.
3    BY MR. BRIDGES:
4        Q.    Have you considered any
5    comparable circumstances apart from this case
6    that would provide guidance for your
7    prediction in the last sentence of
8    paragraph 146?
9        MR. FEE:  Objection to form.
10       Vague.
11       THE WITNESS:  I kept my mind
12       and eyes open to that, but I didn't
13       see information of a good comparator.
14   BY MR. BRIDGES:
15       Q.    Did you research whether there
16   might be good comparators?
17       A.    I --
18       MR. FEE:  Same objection.
19       THE WITNESS:  I did in the
20       sense of reading through the
21       literature and information to see if I
22       could learn of something that would be
23       a good comparator, but I didn't learn
24       of such comparator.
25   BY MR. BRIDGES:

1        Q.    You looked only at the
2    information shown in tab 2 to Exhibit 1?
3        A.    Yes, I think that's right.
4        Q.    What economic effect are you
5    aware of to the Blu-ray Disc Association from
6    its providing unrestricted access to its
7    standard publications for free?
8        A.    I don't know.  I thought you
9    had asked that earlier.  If not, I apologize.
10   Nonetheless, I don't recall knowing the
11   answer to that question or undertaking that
12   evaluation.
13       Q.    Did Blu-ray Disc Association go
14   out of business?
15       A.    I don't think it's out of
16   business, no.
17       Q.    Has it suffered material harm,
18   to your knowledge, because of unrestricted
19   access to its standard publications for free?
20       A.    I don't know.
21       Q.    Do you believe that, on the
22   theory of revealed preference, Blu-ray Disc
23   Association has determined that unrestricted
24   access to its standard publications for free
25   is in its interest?

1       A.    Yes.  It's a different entity
2   than the SDOs here; but for its purposes, it
3   would appear that it's of the belief that
4   that's the optimal path to follow.
5           MR. BRIDGES:  I think -- I
6       think we may pause things now and
7       reserve the remainder of our time.
8           Just a second.  Oh, yes.
9   BY MR. BRIDGES:
10      Q.    Do you believe that the
11  plaintiffs are harmed when the defendant
12  posts a standard that has been incorporated
13  by reference -- let me strike that.
14          Do you believe that plaintiffs
15  suffer harm from defendant posting a standard
16  that is not the latest version of the
17  standard?
18          MR. FEE:  Objection.  Form.
19      Compound.
20          THE WITNESS:  Potentially, it
21      could cause confusion in the
22      marketplace as to what's the latest
23      standard, and there may be some
24      entities out there that are interested
25      in obtaining an earlier standard that
                                    Page 254

1           MR. FEE:  Objection.  Lack of
2       foundation.  Vague.
3           THE WITNESS:  I'm not -- I'm
4       not sure that I understand the concept
5       of a standard being out of print, so
6       maybe you could help me with that.
7   BY MR. BRIDGES:
8       Q.    Do you know the term "out of
9   print"?
10      A.    Generally, I do, yes.
11      Q.    What do you understand it to
12  mean?
13      A.    That it's no longer provided in
14  print form.
15      Q.    All right.  So what harm do you
16  understand plaintiffs would suffer if
17  defendants posted a standard that is out of
18  print?
19          MR. FEE:  Objection to form.
20          THE WITNESS:  Potentially, it
21      could be the harm similar to outdated
22      standards.
23  BY MR. BRIDGES:
24      Q.    In other words, confusion in
25  the marketplace?
                                    Page 256

1   would be obtaining it free rather than
2       through the legal routes established
3       by the plaintiffs.
4   BY MR. BRIDGES:
5       Q.    Have you done any studies to
6   determine what confusion may be likely in the
7   marketplace in that regard?
8           MR. FEE:  Objection to form.
9           THE WITNESS:  I have not done a
10      likelihood of confusion study, no.
11  BY MR. BRIDGES:
12      Q.    What research have you done as
13  to whether -- strike that.
14          What information do you have
15  about what market there is for earlier
16  versions of standards when there is a newer
17  version in the market?
18          MR. FEE:  Objection to form.
19          THE WITNESS:  I don't recall
20      undertaking specific research on that
21      topic.
22  BY MR. BRIDGES:
23      Q.    What harm do you understand
24  plaintiffs would suffer if defendants post a
25  standard that is out of print?
                                    Page 255

1       A.    Potential confusion in the
2   marketplace and potentially providing -- yes,
3   that -- that would be one form of it.
4       Q.    What other harms do -- would
5   you identify from the defendants posting a
6   standard that is out of print?
7       A.    Nothing else comes to mind this
8   moment, but there could be other things
9   that -- that I'm not thinking of right now.
10      Q.    What harms do you understand
11  plaintiffs would suffer if a condition of a
12  standard being incorporated into law is that
13  plaintiffs could not forbid other entities
14  from making that law available widely and
15  freely to the public?
16          MR. FEE:  Objection to form.
17      Incomplete hypothetical.  Compound.
18      Calls for speculation.
19          THE WITNESS:  I don't know.
20      I've not undertaken that assignment.
21      I've not given that particular
22      question any thought.
23          It seems economically to be
24      quite similar to the actions that have
25      occurred here, but I don't know.  I've
                                    Page 257

65 (Pages 254 - 257)

| | |
|---|---|
| 1　not thought about that particular | 1　C E R T I F I C A T E |
| 2　topic. | 2 |
| 3　　　MR. BRIDGES:  Okay.  I think | 　　I do hereby certify that I am a Notary |
| 4　we'll pause here and reserve the rest | 3　Public in good standing, that the aforesaid |
| 5　of the time for a later visit with | 　　testimony was taken before me, pursuant to |
| 6　you, Mr. Jarosz. | 4　notice, at the time and place indicated; that |
| 7　　　Kevin, this is in reliance on | 　　said deponent was by me duly sworn to tell |
| 8　an exchange of correspondence between | 5　the truth, the whole truth, and nothing but |
| 9　Matt and you, I believe.  If, for some | 　　the truth; that the testimony of said |
| 10　reason -- well, no.  I think that's | 6　deponent was correctly recorded in machine |
| 11　all. | 　　shorthand by me and thereafter transcribed |
| 12　　　Anything else? | 7　under my supervision with computer-aided |
| 13　　　MR. FEE:  Well, I don't have | 　　transcription; that the deposition is a true |
| 14　any questions. | 8　and correct record of the testimony given by |
| 15　　　Do you guys have any questions? | 　　the witness; and that I am neither of counsel |
| 16　　　MR. REHN:  Not at this time. | 9　nor kin to any party in said action, nor |
| 17　　　MR. CUNNINGHAM:  No. | 　　interested in the outcome thereof |
| 18　　　MR. BRIDGES:  Great.  Thank | 10 |
| 19　you. | 　　　WITNESS my hand and official seal this |
| 20　　　THE WITNESS:  Thank you. | 11　11th day of September, 2015 |
| 21　　　THE VIDEOGRAPHER:  All right. | 12 |
| 22　Off the record at 4:31.  This ends | 13 |
| 23　media unit number 3 and ends testimony | 14 |
| 24　for August 27th, 2015. | 　　　　<%signature%> |
| 25　　　　* * * | 15　　Devorie Leonard, RDR, CRR |
| 　　　　　　　　　Page 258 | 　　　Notary Public |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| | 25 |
| | 　　　　　　　　　Page 260 |
| 1　　(Witness excused.) | |
| 2　　　　* * * | |
| 3　　(Off the record at 4:31 p.m.) | |
| 4　　　　* * * | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 　　　　　　　　　Page 259 | |

66 (Pages 258 - 260)

[& - 6]

**&**

**&**   2:2,8,14 3:2,7
  7:13,19,23

**0**

**01215**   1:4
**0215**   7:6

**1**

**1**   1:25 4:12 6:2 13:3
  27:18,21 64:15 89:9
  110:2 119:6 166:8
  166:16 233:20
  234:7 235:25 247:7
  253:2
**1,200**   90:18
**10**   91:24 96:4 242:6
**100**   130:22 131:10
  133:12,19,22
**100,000**   244:1
**101**   2:3
**107**   216:25 217:8
**108**   216:25 217:1,3
**109**   224:13,25
**10:09**   1:20 6:21
**11**   102:1
**110**   225:14
**1111**   2:15
**112**   65:5 68:16
  69:13,21 70:23
**117**   233:10,15,23
  234:3
**119**   115:5,10 233:10
  233:16,23 234:3,13
  235:5
**11:12**   61:17,19
**11:23**   61:20,23
**11th**   260:11
**120**   235:11
**121**   236:3
**1250**   1:19 6:23
**126**   236:14
**12:17**   110:1,4
**12:32**   110:5,8

**12th**   3:4
**13,000**   200:9,19
  201:13
**131**   241:7
**133**   63:1 67:1 157:2
  157:21 158:4 159:1
  159:17 160:14,22
  162:19 163:22
  164:10 211:19
  212:8,18
**134**   164:10
**139**   244:18 245:1,4
  245:17,25
**140**   245:1,23
**144**   245:1 246:8
  247:11
**145**   245:2 247:13
  249:10,17
**146**   245:2 250:12,17
  250:23 252:8
**15**   187:18
**150**   13:11
**151**   13:11
**155**   65:5
**16**   5:13
**17**   101:25
**175**   4:16
**18**   187:22
**19**   209:13
**1915**   134:2
**193**   99:17
**194**   99:17
**196**   99:17
**1974**   195:3
**1975**   195:11
**1995**   115:5
**1:13**   1:4 7:6
**1:17**   152:23,25

**2**

**2**   4:14 15:17,20 17:8
  93:21,21,22 94:14
  97:23 98:3,7,10
  102:20 110:9
  113:13 114:18,19

114:20 115:22
  118:15,21,24,25
  121:23,24 135:4,6
  197:17 210:14
  253:2
**2,400**   201:23
**20**   134:8,11 209:15
**200**   99:17
**20004**   2:15
**2008**   164:14,21
  165:21,25 166:6,15
  166:23
**2009**   4:17 175:13
**2011**   165:18 166:1,7
  166:15,23
**2012**   164:18 165:12
  165:13 178:16,19
  208:6,8
**2013**   4:17 175:13
**2014**   89:8 187:19
**2015**   1:21 4:13 6:20
  154:2 258:24
  260:11
**202**   2:16
**210**   4:18
**22**   187:24
**2300**   2:4
**26**   105:4 209:13
**260**   1:25
**27**   1:21
**27th**   2:10 6:20
  258:24
**29**   41:4
**2:12**   153:1,4

**3**

**3**   4:15 89:23,25 90:2
  97:23 98:3,7,13
  102:20 134:13,19
  158:5,22 188:2
  210:21 248:25
  258:23
**3,600**   90:18
**30**   14:6 25:20

**318-1200**   2:5
**33**   89:3
**34**   92:17
**35**   71:3
**36**   187:10,12
**3:12**   210:13,16
**3:41**   210:17,20
**3c**   26:12

**4**

**4**   4:16 134:13,19
  158:5,22 175:3,8,21
  177:23 178:11
  248:25
**415**   2:5,11 3:5
**44**   204:7,17 205:23
  206:11,11
**45**   216:24 217:8,12
  218:3
**46**   217:8,12 218:3
  219:6 222:10
**48**   68:8
**49**   195:1
**4:31**   258:22 259:3

**5**

**5**   4:13,18 134:14,19
  158:5,22 208:6
  210:24 211:4
  237:23 241:25
  242:4 248:25
**50**   184:1 237:11
  238:13 241:21
**50,000**   244:11
**512-4000**   2:11
**555**   3:3
**560**   2:9
**57**   199:12,15
**58**   199:21,25
**59**   202:17 204:6
**5th**   154:2

**6**

**6**   4:12 17:24 18:8
  98:5

**[62 - allowing]**

| | | | |
|---|---|---|---|
| **62** 140:25 | 250:10 | **active** 82:4 238:16 | **adjusts** 40:13 |
| **64** 51:3 | **able** 63:3 154:17 | **activities** 10:12 | **administrative** |
| **650** 3:9 | 176:8 242:14 | 12:16,20 21:21 60:7 | 115:14,25 116:8,16 |
| **66** 183:24 | **abridges** 3:5 | 62:3 63:5 66:5 | 116:23 117:6 |
| **67.1** 187:19 | **absence** 68:23 | 75:24 85:9,10,14 | **adopt** 192:24 |
| **68** 51:6 | **absolute** 25:4 27:9 | 87:7 122:23 123:13 | **adopted** 204:7,17 |
| **6c** 26:11 | 119:3 164:16 | 123:16,17 126:3 | 205:23 206:12 |
| **7** | 212:21 215:8 | 133:8 147:19,20,21 | **advantage** 219:8 |
| **7** 18:5,8 | 220:19 | 148:2,4 149:4 | 222:13 223:7,15 |
| **70** 41:5 | **absolutely** 14:18 | 153:11 157:8,15 | 224:17 |
| **73** 51:8 195:15 | 202:1,5 | 158:24 159:9 160:5 | **adverse** 241:16 |
| **739-3000** 2:16 | **academic** 112:11 | 160:10 161:2,6 | 242:21 243:19 |
| **74** 195:15 | 247:9 | 163:24 164:18 | 244:2,11 |
| **76** 89:3,4 90:7 | **acceptable** 45:13,18 | 167:4 193:18 | **adversely** 241:11 |
| **8** | **access** 75:18 141:2 | 249:22,25 | **advertising** 88:6 |
| **8** 4:4 | 141:10,15 192:1 | **activity** 60:22 74:23 | **advisable** 55:19 |
| **80** 237:17 | 215:19 253:6,19,24 | 76:21 151:12 157:4 | 56:3 |
| **801** 3:8 | **accessed** 211:22,25 | 157:20 162:25 | **affect** 178:20 |
| **83** 187:15,16 | 214:20 | 165:12 189:14 | **aforesaid** 260:3 |
| **86,400** 90:17 | **accesses** 212:7,17 | 207:7 245:13 | **afternoon** 153:6,7 |
| **875-2300** 3:5 | 216:8,17 | **actual** 62:8 | **agencies** 203:1 |
| **88** 199:16 | **accomplishing** | **add** 18:23 23:13 | **ago** 30:16 41:23 |
| **9** | 56:24 57:10,24 | 183:25 184:4,9 | 46:2 105:21 113:19 |
| **9** 5:13 | 58:13 | **added** 97:12 219:9 | 133:19,23 134:11 |
| **90** 211:16 | **account** 73:12 | 219:20 220:2 | 208:4 |
| **90-75** 195:11 | 163:23 164:5 168:9 | 222:14 223:8,19,21 | **agree** 6:16 |
| **90.1** 89:15 90:4,8,21 | 181:4 | 224:10 | **agreement** 228:25 |
| 91:16 92:7 131:15 | **accrue** 209:10,17 | **addition** 224:14 | **ahead** 17:12 54:10 |
| 131:19 132:4 195:2 | **accuracy** 248:11 | **additional** 246:11 | 73:17 81:8 174:19 |
| 204:8,20 206:25 | 252:2 | **address** 15:12 17:25 | **ahri** 238:25 |
| 207:14 211:16 | **accurate** 206:18 | 42:12 45:25 48:19 | **aided** 260:7 |
| **94041** 3:9 | **accurately** 54:8 | 49:18 50:25 51:14 | **air** 1:12 2:17 8:1 |
| **94104** 3:4 | 218:24 | 52:1,19,24 53:14 | **akin** 128:7 |
| **94105** 2:4,10 | **achieve** 49:5,7,19,21 | 55:5,21 56:4 82:15 | **al** 7:2 |
| **95** 204:12,16 205:9 | 52:14 209:24 | 85:3 86:23 89:19 | **alert** 32:14 39:13 |
| 205:11,22 206:10 | **achieving** 50:12 | 114:25 | 137:22 |
| **97** 4:14,15 | 52:16 | **addressed** 14:6 | **alleged** 11:21,24 |
| **988-8500** 3:9 | **acquainted** 92:22 | 51:21 54:12,16 | 19:13 118:7 164:17 |
| **a** | **acronym** 239:10 | 77:17 112:17 140:9 | **allow** 46:22 63:11 |
| **a.m.** 1:20 6:21 61:19 | **acting** 42:24 | **addresses** 42:21 | 86:22 209:24 215:9 |
| 61:20 | **action** 56:17 260:9 | **addressing** 45:11 | 215:25 216:7 |
| **ability** 32:12 222:15 | **actions** 18:16 71:5 | 50:18 51:18 52:4,15 | **allowed** 68:13 73:19 |
| 223:9 225:15 | 123:18 172:4 181:5 | 54:19 68:2 69:1,6,7 | 216:16 |
| | 216:4 257:24 | 74:10 | **allowing** 54:5 |

[allows - aspects]

**allows**  50:13 209:19
  209:22
**alter**  11:20
**alternative**  214:4
  224:11
**alternatively**  214:25
**alternatives**  213:24
  240:1
**american**  1:3,9 2:6
  2:17 7:1,24
**amount**  10:16 91:18
  91:19 93:15 184:14
  189:14,15 193:17
  242:9,16 243:17,24
  244:11
**amounts**  87:6 243:9
  243:14
**amusement**  54:14
**analyses**  11:9 26:20
**analysis**  77:24 79:24
  115:16 127:12,16
  130:3 144:4,17
  146:12 148:6 162:4
  162:12 164:20
  167:3 170:24
  171:22 172:14
  178:20 179:8 180:6
  186:2 250:6,8
**analyst**  119:20
**analyze**  81:19 229:5
**analyzed**  155:17
  156:1
**analyzing**  163:23
  181:4
**ancillary**  72:7
  224:19
**andrew**  3:3 7:12
**answer**  5:2 13:18,24
  14:3 16:22 17:12
  18:4 30:6 37:15
  49:10 53:5 54:1,9
  55:23,25 56:7 69:15
  78:20 95:1,4,23
  104:6,24 105:20
  106:13,15 107:13

107:14,16 108:17
  125:21 128:24
  129:1,2 137:9,11
  141:22 143:4,7,15
  145:7,25 150:2,8
  151:1,24,25 152:16
  154:12 165:20
  166:3,24 171:17
  172:18 197:4
  202:11 203:9
  232:20 233:5 244:8
  244:14 246:2
  253:11
**answered**  14:14
  24:17 65:3 103:10
  113:4 118:12
  120:10 130:1
  147:11 150:23
  152:13 168:14,23
  170:19 174:15
  186:11 234:5
  243:22
**answering**  146:19
  151:14 168:9
  233:25
**answers**  77:21 108:2
**anticipate**  100:24
**anybody**  23:4
  195:25 201:11
**apart**  121:13 197:18
  249:6 252:5
**apologize**  54:21
  253:9
**appear**  246:14
  254:3
**appearances**  2:1 3:1
**appears**  90:21
  175:12
**application**  172:23
**applied**  8:22 169:23
  172:21
**apply**  8:25 57:16
**applying**  170:6
  171:16

**appointed**  116:23
**appreciating**  80:21
**appropriate**  83:17
  143:16,25 167:13
  167:17 168:4
  169:12
**appropriateness**
  168:1,5
**approval**  76:20
**approved**  226:8
**approving**  109:13
**approximately**  6:21
  90:1 96:10 97:2
**aptly**  143:17
**archive**  164:23
  179:13 180:4,10
**area**  86:25 93:13
**areas**  80:24 187:11
**arguing**  186:13,16
**arising**  19:2,12
**arranging**  85:20
**array**  31:21 32:2
**arrived**  40:15
**arriving**  180:19,21
**article**  4:18 70:5
  117:17 195:14,16
  199:15 211:4,7,10
  211:14
**articles**  69:23 93:3
  94:5,9,10,13 112:10
  114:25 116:1,10,18
  117:3,5,23,23,24
  118:5 119:20,23
  122:2,3 138:17
  197:19,20
**articulate**  57:23
**ascertain**  112:5,24
  114:21 129:23
  130:7
**ashrae**  4:19 51:9
  54:18,20 89:8,22
  90:16,21,24 91:6,16
  92:4,7 96:25 97:20
  131:15,18 132:3
  155:6 184:2,18

185:1,9,16 187:23
  195:2,10 201:19
  202:4 204:8,20
  206:24 207:13,13
  207:18,24 208:1,5
  211:12 213:2,12
  225:22 226:9
**ashrae's**  89:14 91:8
  91:11
**aside**  38:6
**asked**  14:13 16:21
  24:16 65:2 103:9
  113:4 118:12
  120:10 129:25
  143:23 146:2
  147:10 150:23
  151:14 152:12
  167:24 168:14,22
  170:19 174:14
  186:10 188:21
  192:2 194:21 234:5
  243:22 253:9
**asking**  8:21 13:17
  14:20 22:3 29:6,14
  29:18 37:3,6 41:9
  41:15 50:6 69:4
  77:5,20 87:5,6
  95:16 106:10
  142:23 144:14
  147:2,7 154:23
  171:20 172:13
  177:17,18 179:18
  180:20 181:25
  182:2 184:7,8
  186:19 200:11,13
  200:14,24 206:8
  209:16 231:22
  242:18
**aspect**  172:16 173:2
  174:3
**aspects**  170:3
  171:12 172:8 173:7
  173:12,17,23 174:4
  200:2 229:15

[assert - best]

**assert** 217:14
**asserted** 126:20
**assertions** 120:6
  233:15 249:9
**assessing** 40:9 44:6
**assessment** 9:24
  161:4,10 241:23
**assessments** 9:3
**assign** 234:11,18
  235:8 236:1,22
  251:7
**assigned** 10:15 19:9
  137:23 251:13
**assignment** 79:8,22
  114:3 138:21
  142:17,19 143:13
  149:1,9 249:12
  251:6 257:20
**assignments** 28:18
  31:2 139:4,11 170:9
**assistance** 101:10
**associate** 176:21
  189:10,17,23 190:4
**associated** 10:19
  18:15 28:25 52:4
  54:13,16 75:15
  80:13,25 88:4
  127:17 177:15
  204:13 224:16
**association** 1:8 2:12
  7:21 26:10 140:15
  140:19,22 141:1,10
  230:21 253:5,13,23
**association's** 141:24
**associations** 33:3
**assortments** 42:14
**assume** 77:24 78:1,4
  89:21 140:14
  185:20,21 200:25
**assuming** 78:5
**assumption** 12:8
  17:15 72:19 78:3,7
  148:1 151:11 185:9
  185:11,15,24 186:5
  186:7,9

**assumptions** 106:12
  107:12 108:15
  125:11 145:5
  146:24 148:15
**ast** 213:13
**astm** 1:5 2:7 7:17
  51:4 52:3 54:12
  96:23 97:18 135:7
  155:4 183:24 187:4
  201:17,23 211:24
  212:6,19 213:2,7,10
  213:16 214:5,7,11
  214:15,22
**astm's** 214:20
**attached** 27:18
  165:23 166:7,16
**attempt** 10:2 195:7
  196:15 201:12
**attempted** 177:13
**attempting** 178:2
**attention** 40:5 51:21
  71:2 92:25 94:4
  109:8 209:22 211:8
**attorney** 47:19
**attributable** 193:10
  194:6,17
**attribute** 157:7
**attributed** 189:13
**audio** 6:14
**audit** 243:4,10
**audited** 135:7,7
**auditors** 243:8
**august** 1:21 6:20
  258:24
**author** 197:25
**authorization**
  232:12
**authorized** 231:18
**automatically** 89:18
**availability** 72:5
  138:25
**available** 46:18
  126:14,19 158:19
  159:5 236:15 250:3
  257:14

**avenue** 2:15
**avenues** 46:5,7
**aware** 35:25 93:14
  105:5 108:23 116:4
  117:12,22 131:8,13
  133:10 134:7
  138:23 139:4 141:9
  141:23 182:20
  183:5 192:18,21
  197:6 207:25
  208:23 209:3 221:3
  230:15 238:15
  240:15 245:21
  246:6,22 253:5
**awareness** 139:9

**b**

**b** 1:5 2:6
**back** 21:25 27:15
  28:3 55:24 78:22
  92:16 99:6 134:11
  134:15 137:9 176:7
  187:17 208:5
  212:14 221:23
**background** 28:13
  153:15
**balancing** 58:9
**barriers** 225:18
**base** 64:10
**based** 53:8 58:3
  72:5 102:8,14
  148:11 165:10
  166:7,11,15,19
  175:16,20,25 185:5
  197:19 206:8
  213:18 233:13
  238:8 250:1
**bases** 79:18 108:14
**basic** 170:11 172:19
**basically** 68:1 133:2
**basis** 43:3 63:18,25
  64:16,25 67:13
  78:18 95:3 106:12
  113:7 125:9,15,19
  145:2,5 146:22

  148:14 195:3 234:8
  234:24 235:1
**bates** 119:6 122:6,10
  122:16 135:3,5,9
**bcunningham** 2:5
**bear** 54:25 170:6,16
  170:24 171:16,22
  172:14,17,24 173:3
  173:8,13,19,25
  174:5,9,13
**bearing** 78:12 79:1
**bears** 159:10
**becker** 3:8 7:15
**beginning** 70:4
  110:9 210:20
**behalf** 7:17,19,24
**behavior** 171:6
  172:3 173:3
**belief** 185:16 236:18
  254:3
**believe** 12:3,8 15:18
  20:9 33:16 35:1
  50:18 54:24 62:16
  62:19 73:23 98:19
  104:21 117:14
  119:5,6,10,12,14
  120:1 122:16
  129:13 135:21
  140:24 147:13
  148:5 150:18 169:3
  175:18,22 178:15
  182:17 183:1,11
  187:5 192:5 194:12
  205:20 211:6
  227:23,24 245:10
  251:3 253:21
  254:10,14 258:9
**believed** 245:7
**believes** 129:11
**benefit** 209:4 221:16
  222:3
**benefits** 88:25
  209:10,14,17 210:1
**best** 28:11 32:11
  40:10 42:11 55:19

[best - california]

56:2 57:9 91:20,22
97:8,15,20 98:9
119:4 210:7 226:23
237:5,8
**better**   155:7 245:7
245:11 251:4
**beyond**   12:25 24:1
27:23 71:4,22 78:9
114:18 130:3,11
131:23 132:15
170:3,10,15 171:6
171:13 172:10
207:22,24
**bills**   92:5
**bit**   15:16 58:23 59:5
62:7 105:22 132:24
149:21 200:19
**blake**   2:3 7:22
**blanche**   75:17
**blu**   26:10 140:12,15
140:19,20,22 141:1
141:9,23 253:5,13
253:22
**bockius**   2:14
**body**   117:21 165:13
**books**   119:21
**bottom**   93:22
140:25 217:12
218:3
**breach**   27:1
**break**   14:25 58:19
59:14,15,19 61:14
109:24 152:19
158:14,18 210:9
**breaks**   158:12
**breathing**   35:6,7,8
**bremer**   68:16,21
92:19 94:4,5,8,18
112:10 114:25
116:2,10,18 119:23
122:3 138:17
199:15
**bremer's**   94:9 117:3
117:5 197:20

**bridges**   3:3 4:4 7:12
7:13 8:13,15 9:16
10:1,9 11:15 13:19
14:11,21 16:2,10,20
16:24 17:18 20:2
21:2,17 22:5,11
24:13,23 26:2,23
28:21 29:7,10,20
33:20 34:3,10,20
35:3,24 36:8,17
37:9,16 38:4,11,23
39:15 40:22 41:8
42:2 44:3,23 45:20
47:14 49:1 51:11,24
52:12 53:4,20 54:23
56:16 57:3,8,15,21
58:11,22 59:6,16,23
60:24 61:4,13,24
62:13 63:23 65:6,25
66:7,12,20 67:17
68:5 69:14,19 70:20
71:1 72:22 73:8,25
74:13 76:23 77:7,15
78:23 79:9,23 80:7
80:15 81:1,11,17
82:6,23 83:20 84:5
85:12 86:2,13,19
87:8 88:10,19 91:7
92:3,14,18 93:17
94:6 95:7 97:9 98:1
98:16 99:3,23 100:4
102:17 103:4,15
104:14,25 105:6,10
105:13 106:4 107:1
108:5,24 109:10,22
110:11 111:12,24
113:2,14 115:8
116:13,21 117:9,19
118:16 120:20
121:18 122:19
124:22 125:17
126:17 127:11
128:10,18 129:5,21
130:5,20 132:16,25
134:6,16 135:1

136:4,19 137:4,10
137:25 138:9,22
139:8,19 143:1
144:2,13,19 145:15
146:5,14 147:5,16
148:3,19 149:2,10
149:22 150:5,11
151:2,22 152:20
153:5 156:19
157:22 158:8
159:13 160:7,19
161:12,23 162:11
163:3,17 164:7
165:6 166:12,20
167:14 168:3,12,16
169:5,18 170:1,22
172:12 174:23
175:6 176:15 177:3
177:16 178:6 179:4
179:23 180:21
181:2,10 182:10,19
183:3,16 184:3
186:15 190:15
191:1,8,16 192:7,17
193:7,22 194:14,25
196:9,24 197:13
198:3,24 199:4,11
203:15 204:25
205:15 206:5,20
207:9,19 208:22
209:8 211:2 213:4
213:15,22 216:14
216:23 217:4 218:1
218:13 219:1,17
220:9,21 221:2,14
221:24 222:9,21
227:13,20 228:15
229:2,19,23 230:12
231:2,9,20 232:16
232:21 233:9,21
234:10,20 235:18
236:9,13 237:4,9,15
237:21 238:5,23
239:24 240:14,23
241:6 242:17 243:2

243:25 244:9,15
247:2,8 248:6,21
250:20 251:15,19
252:3,14,25 254:5,9
255:4,11,22 256:7
256:23 258:3,18
**bring**   161:21 163:12
163:15,16 172:17
173:3,25 174:8
238:9
**bringing**   174:13
245:12
**broad**   32:7 75:1
**broaden**   72:21
**broader**   31:21 32:24
33:9 224:9
**broadly**   172:7 203:4
**brought**   40:5 51:20
92:25 94:3 109:8
162:23 163:11
170:6,16,24 171:15
171:22 172:13,23
173:8,13,19 174:5
**building**   46:23
127:9,14 128:14
204:9 228:17
**buildings**   46:21
54:17
**bulk**   26:20 92:12
**business**   33:4 39:9
128:7 229:17,18
246:20 249:13,20
253:14,16
**buy**   184:18 185:17
**buying**   184:21
185:13

| c |
| --- |

**c**   1:17 4:3,12 7:8 8:7
124:24 260:1,1
**calculate**   212:5
**calculated**   208:14
212:9
**california**   2:4,10 3:3
3:4,8,9

[call - comes]

**call**  44:11 86:5
96:19,21 106:24
111:18 114:6
123:11 219:9
**called**  124:24
135:23 209:14
223:19 226:12
**calling**  113:20 171:7
225:7
**calls**  47:2 77:2 78:14
79:4,14 96:23
108:13 129:17
144:18,22 145:22
146:17 147:24
148:8,23 149:6,17
150:22 151:7
152:11 159:2 161:8
167:20 168:23
228:21 229:9
230:22 231:14
232:3 257:18
**campaigns**  88:7
**candidates**  140:2
169:16
**capabilities**  133:25
**caption**  6:25
**capture**  218:16
**career**  26:1 174:22
**careful**  31:17
**carl**  3:13
**carry**  240:3
**carte**  75:17
**case**  6:25 7:4,5 9:7
10:5 12:11 15:14
27:7,25 28:10 29:11
33:13 43:21 44:20
68:24 69:3 73:1,13
75:22 76:5 77:1,16
78:8,19,25 79:11,13
81:3,6,19 85:16
92:20 95:4 96:9
104:10 107:21
124:23 125:1,14,14
125:18,23 126:1
127:17,23 128:5,8

129:4,9,12,15,16,24
130:3,4,8,9,10,16
132:10,20 138:13
143:13 144:15,17
147:9 153:10 154:4
154:22 155:19
162:15 169:13,24
170:7,17,25 171:17
171:23 172:14,17
172:24 173:4,9,14
173:19,25 174:5,10
174:13 175:9
181:14 187:4 188:9
188:25 189:12,19
190:22 194:18
196:1 208:12
212:25 236:19
239:21 240:6 252:5
**cases**  27:18,20 28:8
32:14 119:16
**categories**  34:1
**category**  223:23
**causation**  158:23
161:4,11
**cause**  12:18,21
67:21 75:5,12 76:3
159:18 254:21
**caused**  21:22 66:1
73:13 80:17 145:17
145:19
**cell**  6:11
**certain**  18:15 47:7
48:19 49:18 50:8,18
55:5 57:24 58:12,13
60:19 64:22 74:2,8
82:15 92:9 100:19
126:3,25,25 127:2
140:25 155:4
156:23 160:1 165:8
180:13 185:6
212:16 226:24
243:14,14,16
**certainly**  28:24 36:4
39:13 40:3 47:11
60:10 62:9,21 70:6

84:15 85:9 106:16
133:18 165:16
251:2
**certainty**  25:5 27:9
63:8 65:24 119:4
164:17 212:22,23
214:2,16 215:8
220:19
**certified**  1:23
**certify**  260:2
**change**  11:23 95:8
109:23 165:4,9,15
167:10 179:6 208:1
220:7
**changed**  130:22
134:5 166:24
**changes**  131:4,5,8
131:13 133:10
134:7 157:6,13,20
157:25 159:18
176:22 177:8,20
**chapman**  98:11
99:22,25 102:15,19
103:14 104:7,16
105:24 106:7,20
**characterization**
222:23
**characterize**  47:12
**charter**  49:16
240:10,12
**chartered**  40:8
**charters**  48:18 49:3
55:4
**check**  187:2
**choose**  184:20
**chose**  94:14 240:4
**circular**  115:5,9
**circulars**  115:2
**circumstances**
128:13 252:5
**circumstantial**
159:6
**citations**  99:12
102:7,13 105:17
107:4 160:22

**cite**  25:7 99:14
103:24 195:14
**cited**  22:15,17,22
24:25 82:1 199:16
202:10 205:22
206:10 211:4
**cites**  110:13
**claimed**  10:4 126:5
**class**  233:1
**classify**  38:25
**clause**  200:15
**clear**  16:8 35:5
**clearinghouse**  86:1
**clearinghouses**
86:21
**close**  63:13 64:2,20
**closer**  59:9
**code**  127:13 164:15
164:19,22 165:19
165:21 204:9,18
205:24 206:13
221:5 229:21
230:19 231:6,10
232:25
**codes**  127:9,14,25
128:1,14
**coefficient**  177:14
177:18
**collected**  194:22
**collection**  209:23
**college**  170:4,11
171:14
**columbia**  1:2 7:5
**combinations**  96:17
96:22
**come**  26:9,13 62:22
131:18 203:13
**comes**  28:23 29:1
36:4 40:11 66:8
84:14,21 188:8,15
188:19 221:11
224:2 225:12 227:2
245:18 247:12
249:18 257:7

Veritext Legal Solutions
866 299-5127

[coming - containing]

coming  45:12 58:8
commencing  1:20
commentaries
  219:21
commentary  218:5
  218:20 223:25
commerce  52:11
commercial  204:8
committee  116:7,15
committees  88:15
  117:10
communications
  78:17 79:17 95:2
  125:8 145:1 146:21
  147:1 148:12
  196:19
companies  32:2,4
  33:1 34:13 35:19
  39:9 42:10 43:11,16
  243:15
company  34:9 42:15
  42:17 248:20
comparable  128:13
  128:22 252:5
comparator  252:13
  252:23,24
comparators  252:16
compatibility  82:16
compensate  222:17
  223:11
compensation  133:7
compete  240:16,21
competition  223:17
competitive  219:8
  222:13 223:7,15
  224:17
competitors  224:24
compilations  72:6
complaint  179:22
  180:14
complementary
  224:19
complete  13:25
completed  48:5

completing  107:6
comply  32:16 34:15
  35:22 46:11
compound  37:13
  53:1 161:17 167:21
  176:13 178:24
  228:12 230:2
  231:14 232:3
  243:21 244:5
  254:19 257:17
compute  177:13
computer  260:7
computing  87:18
comstock  101:25
  225:22 227:22
  228:2
concept  32:24 33:9
  69:7,10,24 70:16
  229:1 230:5 243:13
  256:4
concepts  170:12,15
  170:23 171:2,11,18
  171:21
concern  45:12
conclude  58:24
  169:7,11
conclusion  12:6
  19:15,22 20:4 47:3
  79:5,15 129:18
  144:8,23 145:23
  146:18 147:3,24
  148:9,24 149:7,18
  150:23 151:8
  152:12 159:3,16
  161:8 167:21
  168:24 217:23
  230:23 231:15
  232:4 238:3
conclusions  11:11
  11:13 13:7 15:25
  16:5 17:2 18:12,20
  18:25 19:4,6,11
  107:11 108:15
  116:9,17 125:12,16
  125:20 145:4,6

146:23 148:15,17
  159:17 161:20
  165:4,9 167:11
  169:24 170:17
  208:11 220:7
  233:12,13
condition  257:11
conditioning  1:12
  2:18 8:1
conduct  64:18,19
  66:22
conducted  216:15
  247:3
conference  115:15
  115:25 116:8,16,23
  117:6
confidence  96:17
  235:3 238:11
confident  14:25
  15:6
confine  77:21
confirm  90:11
confirmation  23:24
confirmations  109:6
  109:11
confirming  109:19
conflict  121:7,10
conflicted  120:13,17
  196:7 197:11
  248:19
conflicts  121:1,2,8
confused  200:23
  201:1
confuses  171:9
confusion  12:18,21
  19:1 34:25 200:22
  254:21 255:6,10
  256:24 257:1
conjunction  179:2
connection  28:10
  115:15 216:8,17
consensus  32:6,7,8
  40:15 45:16 58:3
  85:2 116:7

consequence  62:2
  63:5 127:14 130:15
  157:15 216:4
consequences
  128:16,20 130:14
conservation  204:18
  205:24 206:12
consider  38:3 39:6
  72:14 142:1 162:8
  165:1,16 169:1
  179:1 240:24
  242:21 244:1
  249:13
consideration  46:9
considerations
  39:14 140:9 168:8
considered  82:5
  164:11 165:14
  243:24 244:7,10
  252:4
consolidated  135:8
constituency  39:7
constituent  37:23
  39:1
constituents  31:15
  33:7,12,22 34:2,4
  36:1 37:7 82:10,14
  83:5,6 84:12,13
  85:5 86:23,24
  131:21
constitute  149:4
construction  228:18
  230:14,16 233:1
construed  144:7
consulting  8:22 26:1
  28:18 31:1
consumer  171:5
  172:2 173:3
consumers  32:15
  50:16 76:15
contained  10:21
  11:12,14 160:15
  180:13 216:22
containing  71:9

[contest - curious]

contest 53:19,21
context 9:3 26:3
28:17 37:2 42:8
55:14 70:10,21
106:14 240:22
contexts 9:4
continue 6:15 67:9
68:14 151:20
162:25 239:18
continued 2:19 3:1
110:19,20 111:3,9
continues 72:20
continuing 66:4
74:23 147:18,19
continuous 89:16
contract 27:1
contractors 229:21
contradicted 120:23
121:15
contribute 88:9
contributed 206:23
207:12
contributions 132:8
147:9
control 225:16
convened 131:22
conversation 95:19
100:17
conversations 6:10
23:15 24:12 94:21
95:6,11,25 96:6,11
97:3,13 98:11,14,18
99:12,15,19,21,25
100:6,8,24 101:4,13
101:20,21,25 102:1
102:2,3,4,5,8 103:7
103:12,13,18 104:4
105:17 106:11,18
107:4,5 108:8
110:14,16 118:9
120:7 121:19
153:21 180:11,17
195:6 197:12
248:13

copied 20:11
copies 19:18 71:7
87:25 88:1,2 215:23
232:17 233:2
copy 136:1 215:22
230:18 231:5
232:25
copying 15:18 20:6
133:25
copyright 18:2,12
18:14,20 27:4,12,25
28:8 63:15 64:4
65:8 67:21 68:7
69:8,10,25 70:5,7,9
70:11,15,17 72:18
72:20 73:18 77:5,20
78:1 79:13 80:1,9
80:14,25 81:5
110:19,20 111:4
114:14 123:21
124:12,17 126:13
126:18 128:2,15
138:25 140:5,9,13
143:21 148:21
151:13 217:14
218:4,17 219:2,6
220:1 222:11,15
223:5,9 245:8
246:14,16,19 251:1
251:4
copyrightable 78:13
79:2
copyrighted 126:4,5
187:5,21 188:1,3,6
224:14
copyrights 11:18,21
11:24,25 12:5 65:16
77:1,11,12,25 78:5
80:18 112:20
126:20 145:20
149:13 150:18
151:5 152:9 219:19
core 169:3
correct 23:12 24:4,5
24:7 36:20 42:23,25

43:12,16 47:16,21
48:3,4 64:23 65:9
65:17 66:13 67:22
68:17 69:21 70:11
70:23 71:19 72:8,12
72:12 77:25 86:8,12
90:22 94:10 113:21
113:22 114:8
130:16,19 135:16
156:24 161:25
162:5 163:12
174:10 188:1
197:22 204:13,14
208:8 211:5,17
212:3 214:22 219:9
219:13,24 226:13
227:23 235:6
247:22 260:8
correctly 217:11
219:13 260:6
correlate 177:7,19
correlation 177:14
177:18
corresponded 108:7
correspondence
94:17 258:8
cost 163:14
costs 65:7 89:9,23
133:4
counsel 7:9 14:23
23:3,9,10,18 78:18
79:18 94:17 95:2
111:22 118:18,22
119:1,8,10,12,13,15
119:24 120:1
121:22 125:8,14
145:2 146:21
148:12 153:13
154:1,2 180:12,18
197:21 198:11
258:17
count 201:7
counterpart 18:6
couple 59:12,21
203:3

course 24:20 25:15
25:25 27:10 56:17
111:15 170:5
171:15 228:16,25
229:4 231:12
courses 25:17
230:14,16
court 1:1 7:4 8:3
12:6 63:14 64:4,21
65:15 66:2,6,10
67:19 71:12 74:1,15
76:5,25 77:10 81:4
128:1,13 129:3,8
145:19 146:6,9
149:11 150:16
152:7
court's 67:13 128:20
129:24 130:8
167:23
courts 144:11
cover 15:1 89:9,23
covered 13:10,11,15
92:11
covers 210:4,6
create 31:5 85:23
86:3,6 87:25
created 107:20
creates 82:19 83:1
creating 33:4 85:15
103:19 109:2
creation 28:14
236:20 240:17
criticize 247:10
criticizing 249:16
crr 260:15
cumulation 154:12
cumulative 97:10
cumulatively 97:6
97:11
cunningham 2:3
7:22,23 258:17
curious 99:10 167:6
167:8 220:5,8 250:8
250:11

Veritext Legal Solutions
866 299-5127

[current - differently]

| | | | |
|---|---|---|---|
| **current**  17:13 | **defendant**  1:16 3:6 | 84:12 228:24 | **develop**  32:5 39:19 |
| **currently**  240:2 | 3:10 7:14 12:9,21 | **denying**  109:20 | 42:5,12 127:25 |
| **cursory**  14:17 | 21:9,12,21 23:20 | **depending**  67:12 | 131:18 |
| **cv**  1:4 7:6 | 65:17 66:5 68:12 | **depends**  39:3 | **developed**  40:17 |
| **cycle**  89:14,22 | 73:1,4,11 145:18 | **deponent**  260:4,6 | 126:6 154:25 |

**d**

**d**  1:5 2:6
**d.c.**  6:24
**damages**  9:3
**dar**  1:5 7:6
**data**  64:10 134:10
  155:15,22,24 156:8
  156:11 158:25
  162:18 163:19,21
  164:1,5,8 165:22
  166:7,11,15 178:21
  179:2 208:3,23
**database**  199:24
  200:3,6,9,15 202:7
**date**  6:20 62:2,9
  64:18,20 66:23
  179:20
**dates**  134:18 179:9
  179:11 180:2,8,17
  180:25 181:4
**day**  24:21 260:11
**dc**  1:20 2:15
**deal**  13:22 127:8
**dealt**  139:23
**debbie**  1:21 8:3
  260:15
**decided**  45:24
**deciding**  104:2
**decision**  65:15 66:2
  66:10 74:2 126:8
  127:15 128:20
  129:24 130:8,16
  145:19 149:14
  150:19 151:3 152:7
  167:23
**declined**  62:20
**deem**  143:16
**defective**  24:4

146:10 147:20
148:7,21 149:12
150:17 151:4,21
152:8 158:20
164:14,21 165:8,25
166:6,14,22 175:19
175:23 176:11,22
176:23 177:8,10,20
177:22 178:12,13
179:12 180:2,8
183:7,8 193:11
194:7 214:14
249:15 254:11,15
**defendant's**  19:2,13
21:4 62:3 63:5
66:22 67:5 122:23
123:13 149:4 157:7
157:15 158:24
159:8,24 160:5,10
161:1,5 163:24
167:4 178:19 181:5
216:4
**defendants**  67:7
177:22 255:24
256:17 257:5
**defer**  143:18
**define**  56:14 58:4
184:7 200:12,13
**defines**  58:5
**definition**  55:18
56:2,20 57:13 242:4
**definitively**  159:21
**degree**  47:16,17,21
47:23,24 65:24
**deliberations**
115:14,24 116:5
**demand**  33:19 34:21
35:12,18 36:22 37:4
38:2,7,16,21 39:7
39:14 82:14 83:13

**deposition**  1:17 5:1
6:14 23:11 27:21
110:10 112:8 119:9
123:15 156:21
159:12 160:15,21
160:25 210:22
260:7
**depositions**  119:5
**depth**  30:24 62:25
**derive**  131:22
**derives**  181:13,21
182:3,4,12
**described**  198:6
231:25
**description**  4:10
**deserve**  79:12 80:1
**desired**  101:9
**detail**  40:3
**detailed**  103:6
**detectors**  39:10
**determination**
21:20 148:6 202:15
**determine**  12:20
93:12 155:15
157:13,24 167:15
176:5 179:19
190:17 196:6,20
201:12 206:22
207:11 247:25
248:18 255:6
**determined**  10:19
180:1 253:23
**determines**  149:11
150:16
**determining**  46:10
145:11
**detrimental**  111:5,6
111:7 114:15
**devastating**  111:11

202:18 203:7
222:12 223:6
224:16
**developers**  127:13
**developing**  30:8
33:4 41:7 84:24
89:9,24
**development**  25:12
25:16 27:13 28:1,9
28:15 29:3,24 31:5
32:19 44:11,15 45:4
45:8 70:2 81:21
82:2 85:14 87:3
93:7 130:22 131:1,7
131:9,14 132:4
138:11 189:11,18
189:24 190:5,21
191:11,21 206:24
207:14 211:15
238:16 239:20
240:2,5 250:1
**developments**
239:17
**devoted**  90:17
**diagrams**  71:9
**dictate**  60:23
**differ**  40:23 41:13
**difference**  67:5
167:3 182:20 183:5
184:25 185:3 186:2
215:17
**differences**  41:2,20
41:24 155:17 156:2
**different**  33:7 40:19
47:22 53:3 58:4
67:12 127:20
153:11 229:17
240:10 254:1
**differently**  29:19
105:22 149:21

[differently - economics]

152:17
**difficult**   20:12 21:8
74:21
**dimension**   30:21
37:24 99:8
**din**   249:20
**diplomate**   1:22
**direct**   25:6 71:2
137:1 159:7 160:3
224:14
**directly**   104:12
214:5
**disasters**   46:4
**disastrous**   46:12
**disbursements**
91:13
**disc**   141:1,9,23
253:5,13,22
**disclaim**   117:24
**disclose**   78:17 125:6
145:1 146:20,25
148:13
**disclosing**   124:9
**discover**   18:19
**discovery**   104:22
105:4,7 153:20
198:2
**discuss**   62:24 116:4
199:5,17 229:25
**discussed**   18:19,23
24:15 101:20
**discussing**   42:4
163:23
**discussion**   29:15
62:10 65:11 153:12
199:10
**discussions**   22:19,23
23:8 85:22 115:13
115:24 153:25
184:25
**displace**   241:14
**disposal**   155:22
157:4 162:19
183:15

**dispose**   100:14
**disprove**   246:7,7,22
247:4
**disproved**   142:12
245:4,16,21
**dispute**   221:10
**disputing**   12:9
**disseminate**   75:24
88:2 136:2
**disseminated**   20:11
20:14 23:21 75:21
75:25 76:12,18
**disseminating**   21:12
127:2
**dissemination**   20:7
48:24 55:9 60:2,5
61:1,10 62:18 75:1
75:15,20 133:25
209:23
**dissent**   116:15
**distinction**   31:10
32:20,23 156:12
**distinguish**   145:16
**distinguished**   32:17
**distributed**   133:17
133:21 135:15
215:24 241:8
**distribution**   133:11
134:4 142:2 215:25
216:3
**district**   1:1,2 7:4,5
**diverse**   42:20
**doctor**   47:21
**document**   24:1
107:19,22,25
108:20 118:14,17
175:8,11 195:5
215:22 216:1 218:9
**documentary**
120:16
**documents**   5:6
22:15 23:23 24:11
24:14,25 25:1 93:19
113:12 115:23
116:4 119:13

120:22,25 121:1,2
121:13,14 122:6,6
122:10,16,17,18,21
122:24 123:10,14
134:18,22,25 135:2
135:11 153:14
180:14 185:6 197:9
197:14,15 198:1,5
198:10 211:22,25
212:3
**doing**   16:19 107:24
162:4 179:25 180:5
213:20,24
**dollar**   10:15 19:7,9
87:6 132:17 189:9
189:14 198:17
212:6 213:8 221:15
222:2
**dollars**   132:14
175:13
**double**   187:2
**doubt**   227:25 230:8
**download**   215:5,18
215:21
**downloaders**   214:17
**downloading**   176:5
213:21,25 214:18
215:9
**downloads**   62:17
157:3 159:23,25
211:21 212:7,13,17
216:9,18
**downstream**   224:18
225:5,7,16,19
246:11,17 247:15
249:22,25 250:15
251:22
**draft**   88:16 103:21
107:2
**drafting**   98:24
100:12,22
**drafts**   104:17,23
105:15
**draw**   161:19 208:11
234:8 238:3

**drawing**   15:25
**drawn**   11:11 19:4,7
19:11,15 217:23
**drew**   99:14 165:5
167:11 169:24
**drive**   218:4
**drives**   217:15,23
218:18 220:11,14
**driving**   203:12
204:2 217:20
**duly**   8:8 260:4

## e

**e**   87:23 98:4 124:24
124:24 244:25
260:1,1
**e.g.**   141:1
**earlier**   10:11 28:8
55:2 84:11 110:13
134:18,23 135:14
140:3 156:21 157:1
186:21 207:5 253:9
254:25 255:15
**eastern**   98:5
**easy**   155:15 176:4
225:22 227:14
**econometrics**   171:5
172:6 173:12
**economic**   8:21 19:7
128:19 129:23
130:14 141:8 142:2
143:25 144:4,16
149:14 150:19
151:5 152:9 167:3
167:25 168:6,7,10
168:21 169:4,6,8,10
169:11,17 170:7,15
170:23 171:2,8,16
171:21 174:12
212:19 222:3 232:6
232:23 253:4
**economically**
221:16 257:23
**economics**   25:17
48:3 80:23 93:7

[economics - exhibits]

157:7 170:5,11,13
170:16 171:15
172:11
**economist**  8:17,19
47:4
**economist's**  10:25
**economists**  144:9
145:10
**editing**  83:23
**education**  25:10
**educational**  174:21
**effect**  136:13 137:1
137:13 181:4
208:15,24 241:16
242:9,19,20,21
243:19 244:2,12
253:4
**effective**  48:20,24
50:19 51:15 55:5,9
60:2,5 61:1,7,8,9
82:10
**effectively**  50:14
51:22
**effects**  141:8 142:2
161:5 163:24 167:4
176:10 208:15
242:15
**effectuating**  48:17
49:3 55:3
**effort**  206:21 207:11
**egress**  46:18
**either**  19:19 38:21
42:9 75:24 112:3
117:17 123:9
138:25 189:6
**electrical**  54:17
164:15,22 165:19
230:19 231:6
232:25
**elimination**  246:18
**embedded**  234:7
**embodied**  27:20
62:6
**embody**  217:21

**emily**  68:16,21
92:19 94:18 116:2
**employed**  8:21 91:6
**employee**  44:17
95:19,20 112:14,21
113:21,25 114:7
**employees**  42:18
44:10,19 46:19,22
83:10,22 95:12,12
108:8 110:14,16
111:17 112:6 113:3
113:6,24 120:8
190:20 191:10,20
196:21
**employer**  92:13
**employers**  91:9,12
**encompass**  18:16
35:1
**encompasses**  18:1
**ends**  258:22,23
**energy**  4:19 204:9
204:18 205:24
206:12
**enforce**  65:16
**engage**  247:24
**engaged**  21:21
123:20 146:10
153:11
**engagement**  153:10
**engineers**  1:13 2:18
8:1
**english**  232:8
**engulfed**  46:23
**enhance**  246:19
**enhanced**  246:14
**enjoin**  76:6
**entail**  132:23
**enter**  72:24 74:15
**entire**  16:15
**entirely**  201:15
**entirety**  209:21
**entities**  33:19,19
34:4,17,22 35:12,17
36:22,23 74:3
127:25 243:15

249:2,8,14 254:24
257:13
**entitled**  12:4 104:22
105:6
**entity**  34:8,12 35:1,5
117:25 130:15
132:5 254:1
**entry**  225:18
**environment**  32:13
52:7
**envision**  73:1
226:16 229:4
**envisioning**  71:22
**erected**  46:22
**errors**  71:9
**esq**  2:3,9,14 3:3,8
**essence**  40:4 51:4
68:9 75:17 76:10
77:4 143:20
**establish**  158:23
216:7,16
**established**  255:2
**estimate**  91:21,22
92:2 97:16 166:14
175:17,21 191:3,17
191:24 194:16,24
198:25 212:12
213:9 222:2 234:21
234:25 235:2
236:10 237:5,8,14
237:20 238:1
251:16,20
**estimates**  190:9
**et**  7:2
**etsi**  26:10 30:8
140:10
**evaluate**  11:5 12:10
25:22 162:8
**evaluated**  9:22
10:18 11:17,20,22
16:16 61:25
**evaluating**  10:22
109:20
**evaluation**  9:1 15:2
15:14,21,24 16:6

17:3 253:12
**eventually**  46:20
**evidence**  62:8,11,15
67:2,3 120:16 137:3
159:5,6 160:3,8
165:14 216:2
**exact**  55:1
**exactly**  8:20 9:19
20:8 42:7 50:5
74:24 150:25
164:21 176:19
**examination**  8:11
**examine**  29:4,25
30:4 118:6 250:10
**examined**  28:19
29:22 30:20 31:16
81:25 153:14
**example**  46:17
52:17 54:12,15,18
54:20 56:8 57:2
58:18 225:21
**examples**  99:16
203:4 223:22,24
225:6
**exception**  94:2
105:3 119:22 122:2
188:2
**excerpt**  70:13
**exchange**  87:23
258:8
**excuse**  95:22 111:21
**excused**  259:1
**exercise**  202:20
**exhibit**  4:10,12,14
4:15,16,18 6:2 13:3
27:18 64:15 97:23
98:10,13 166:8,16
175:3,8,17,21
177:23 178:11
210:24 211:4
233:20 234:7
235:25 247:7 253:2
**exhibits**  4:9 98:3,7
102:20 119:10

Veritext Legal Solutions
866 299-5127

[exist - fee]

exist  133:19
existed  120:22
  121:15
existence  94:4 240:3
existing  55:21 56:4
exists  74:19
expand  75:21
expanded  147:19
expansion  71:4
expect  60:20 92:8
  118:4 133:24 214:4
  229:12 242:3
expectation  75:19
  76:14
expected  138:3
  241:11,15,20,24
  242:5
expended  206:22
  207:12
expending  245:11
expenditures  87:10
expenses  89:1 92:11
  132:18 133:3
  189:17,23 190:4
  193:9 194:5,16
  198:17
expert  4:12 9:25
  47:11 60:14,14
  80:22 129:20 147:3
  161:13
expertise  8:25 78:9
  80:8,12,12,16
experts  105:5
  161:18
explain  184:8
  200:14 204:15
explanation  204:24
  205:21 206:9
explicit  78:3,6 186:6
  232:12
explicitly  18:18
  49:15 68:25 81:9
  112:17,22 126:6
  226:8

expound  63:22
expressed  84:16
extended  216:1
extent  41:15 62:5
  107:9 108:12
  144:24 145:22
  146:19 148:10
  149:17 150:22
  157:19 192:14
extra  14:24
eye  197:10
eyes  248:17 252:12

f

f  260:1
face  85:5 86:24
  195:21
facilitate  85:19
  88:22
facilitating  52:10
facilitators  44:20
fact  19:17 20:15
  23:25 47:15 72:23
  84:15 86:5 95:21
  117:15,22 124:16
  141:9 162:22
  163:10 196:16
  204:15,17 212:18
  230:6 234:2 243:8
factor  169:1
factory  46:1
facts  16:1 20:3
  23:19 105:16
  106:12 108:7,21
  111:1 118:7 120:17
  120:23 121:16
  125:22,25 127:3,17
  127:19,20,22
  169:23 172:21
  180:22 195:23,25
  196:4,15,21 206:3
  233:12 235:22
  245:3,15,20 246:4,6
  246:11 247:25

factual  25:6 103:1
  120:6 176:4 186:3
  206:17
fair  89:21 105:9
  146:10 149:5
  229:24
fairly  14:16 31:17
  42:20 62:18 155:3
  184:12,13 218:15
  219:12
fall  33:25 223:22
familiar  13:20 27:5
  30:9 124:23,25
  126:9 127:23,24
  230:13 238:24
  239:8,13 243:4,7
far  61:7 125:23
  134:11 208:4
fares  92:6
federal  44:2 47:6
  115:1
fee  2:14 7:16,16 9:8
  9:10,18 10:6 11:7
  13:16 14:2,13 15:22
  16:7,12,23 17:5
  19:23 20:20 21:14
  21:24 22:6 24:8,16
  25:13 26:17 28:16
  29:5,8,12 33:14,23
  34:6,18,23 35:14
  36:2,13 37:8,13,18
  38:8,17 39:2,21
  40:25 41:14 43:23
  44:13 45:9 47:2
  48:13 51:1,16 52:2
  52:25 53:16 54:4
  56:12,25 57:6,11,18
  57:25 58:16 59:1,13
  59:18 60:8,11 61:3
  62:4 63:19 65:2,18
  65:21 66:3,11,15
  67:14,24 69:12,16
  70:12,25 72:16 73:2
  73:15 74:6 76:7
  77:2,14 78:14 79:3

79:14 80:3,10,19
  81:7,14,22 82:20
  83:8,25 84:2,25
  85:17 86:9,18 87:4
  87:11 88:17 91:4,25
  92:17,24 93:3,8,25
  94:24 97:5 98:8,25
  99:20 100:2 102:10
  102:22 103:9 104:5
  104:18,20 105:1,9
  105:12,18 106:8
  107:7 108:11 109:3
  109:14 110:24
  113:1,4 114:23
  116:12,19 117:8,11
  118:10,12 120:9
  121:17 124:20
  125:4 126:11 127:6
  128:3,17,21 129:17
  129:25 130:17
  132:11,21 133:13
  134:9,20 135:19
  136:17,22 137:7,19
  138:6,14 139:2,13
  142:25 143:14
  144:6,18,22 145:21
  146:13,17 147:10
  147:23 148:8,23
  149:6,16 150:4,7,21
  151:7 152:11,15
  156:16 157:16
  158:2 159:2,20
  160:12 161:7,16
  162:6,16 163:13
  164:2,25 166:9,17
  167:7,20 168:11,14
  168:22 169:14,21
  170:18 171:24
  174:14,18 176:12
  176:25 177:11,25
  178:23 179:15
  180:19 181:6 182:6
  182:15,25 183:10
  183:20 186:10
  190:12,23 191:5,13

Veritext Legal Solutions
866 299-5127

[fee - foundation]

192:4,11 193:1,13
194:9,19 196:2,23
197:1,23 198:20
199:1,7 203:8
204:21 205:12,25
206:14 207:1,15
208:18 209:2
212:20 213:14,17
216:11,20 217:1,17
218:8,22 219:14
220:3,16,24 221:7
221:19 222:5,19
227:8,19 228:11,20
229:9,22 230:2,22
231:8,13 232:2,19
233:3,17 234:4,14
235:12 236:4,11,24
237:6,12,18,24
238:18 239:22
240:7,18 241:1
242:13,23 243:21
244:4,13 246:25
247:5 248:2,14
250:17 251:10,17
251:24 252:9,18
254:18 255:8,18
256:1,19 257:16
258:13
**fees**   184:12,16
**fenwick**   3:2,7 7:13
**fenwick.com**   3:5,10
**field**   80:9 238:17
239:5,11
**fields**   238:22 240:17
**fights**   12:3
**figure**   99:14 155:12
208:7
**file**   215:5
**filed**   7:4
**final**   89:7 99:9
100:21
**finalized**   154:1
**finances**   157:13,25
**financial**   63:4
119:11 135:8,11

161:4 208:15,24
216:10,19 248:4,16
248:22 249:1,5,7
**financials**   160:6,11
**find**   64:21 100:16
100:16,19 101:9
113:15 157:5,11
198:7,8
**finding**   64:22
128:12 146:15
**finds**   63:14 64:4
**fine**   152:1
**finish**   59:11
**finished**   16:14
**fire**   1:7 2:12 7:20
46:1 230:21
**fires**   46:13 54:17
**firm**   8:22
**first**   8:8 54:2 68:19
70:22 71:10,23 94:2
103:1 106:19 118:4
170:4,5,10,13,15
171:7,13,15 172:11
175:19,23 176:5
195:2,11 234:12
235:10 236:3
**fiscal**   89:8
**five**   97:7
**flames**   46:24
**flexibility**   215:10,14
215:18
**flexible**   215:13
**flights**   90:19 91:3,15
**floor**   2:10 3:4
**flow**   65:14 66:10
**flowed**   129:23 130:7
**flowing**   18:21
**focused**   52:19
**focuses**   209:22
**focusing**   151:19
**follow**   40:20 41:22
60:19,23 100:17,18
186:20 254:4
**followed**   98:20
101:6 108:4

**following**   149:19
151:10
**follows**   8:9 30:10
41:7
**foot**   205:10
**footnote**   118:5
199:16 204:12,16
205:6,9,11,22
206:10
**footnotes**   99:12,17
100:12 160:22
164:9 195:15
233:11
**forbid**   257:13
**forget**   21:25 77:19
127:3 154:9
**forgetting**   210:5
**form**   9:8 10:6 11:7
15:22 20:21 21:14
22:2 25:13 26:17
28:16 32:6 33:14
34:18 35:14 36:2,13
37:8,18 38:8,17
39:2,21 40:25 41:14
43:24 44:13 45:9
47:3 48:13 51:1,16
52:25 55:15 56:25
57:11,25 58:16 60:8
62:4 63:19 65:18,22
69:16 70:12,25 73:2
74:6 76:7 77:14
80:3 81:7,22 82:20
83:8 84:2,25 85:17
86:9 87:4 88:17
91:25 93:8,25 97:5
98:8 99:20 104:16
105:18 108:14
110:24 114:23
116:19 117:8,11
118:10 120:9
121:17 122:8,13
124:20 125:9,15,18
126:11 128:3,21
130:17 132:11,21
133:13 134:9

136:17 139:2,13
144:6 145:2 146:22
156:16 157:16
159:3,20 160:12
161:7 162:6 164:2,3
164:25 166:9 167:7
167:21 168:23
170:18 171:24
176:25 177:11,25
178:23 181:6 182:6
182:15,25 183:10
183:20 190:12,23
191:5,13 192:4
193:1,13 194:9,19
196:2,23 197:23
198:20 203:8 207:1
208:18 212:20
213:17 215:23
216:11,20 217:17
219:14 220:16
221:7,20 222:5
227:8 229:10 230:3
231:13 232:2 233:4
233:17 234:4,14
235:12 236:4,24
238:19 239:22
240:18 241:1
242:13,23 244:4
248:14 251:10
252:9 254:18 255:8
255:18 256:14,19
257:3,16
**formal**   9:21 10:14
**formed**   95:3 148:14
**former**   95:12,20
**forms**   64:25
**forum**   86:22
**forward**   85:11
239:18 240:3
**found**   67:20 93:23
120:12 144:11
**foundation**   73:16
88:18 102:11,23
122:13 128:4,23
171:25 198:21

Veritext Legal Solutions
866 299-5127

[foundation - harm]

204:22 205:13
206:1,15 233:18
234:15 235:13
236:5,25 251:11
256:2
**four**  41:6 95:24
102:3,4
**francisco**  2:4,10 3:4
**frankly**  66:8
**free**  71:13 133:21
135:15 136:11,14
137:14 138:25
141:3,11,16 142:2
214:21 215:1 253:7
253:19,24 255:1
**freedom**  73:22,24
**freely**  241:8 250:3
257:15
**frequently**  83:14
89:20
**front**  22:4 88:23,24
249:20
**fulfill**  51:23
**fully**  54:7 80:21
**functions**  88:14
202:21,25 203:5,17
203:22 204:2
**fund**  85:10
**furnish**  94:17
**furnished**  98:4
118:19 119:2
121:14 197:21
**furnishing**  232:18
**further**  9:11 17:10
58:24 59:5 75:23
76:2 120:15 239:19
**future**  46:4 63:14
64:3,21 68:13 138:4

**g**

**gain**  210:2
**game**  172:5 173:8
**gather**  153:16
**gathered**  117:14
119:18,21 121:21

122:1,3
**general**  41:22 53:8
126:15,16 134:3,4
191:22 228:25
**generally**  30:9 31:12
40:20 45:10 47:5
48:16 49:7 50:21,22
51:17,25 52:3,22
70:1 85:2 88:13
126:2,13 127:8
131:20 139:15
145:10 153:12
170:20 177:19
190:6 193:14
194:11 198:6
203:10 207:2
209:19 210:4
218:24 219:16
226:23 230:15
243:6 256:10
**generated**  187:20
**german**  124:5
**germany**  124:5
**give**  14:23 40:3
52:17 59:20 90:25
99:16 119:4 143:6
153:15 166:13
203:3 223:21 225:6
234:21 236:10
**given**  37:10,20 46:9
61:11 135:25
163:14 196:5
231:23 257:21
260:8
**gives**  40:14
**giving**  154:11
**go**  6:16 9:10 17:12
28:3 54:10 58:23
68:15 73:17 81:8
108:1 111:20
174:19 179:19
193:3 196:14 206:7
247:20 253:13
**goal**  49:4,14 56:24

**goals**  49:5,20,21,23
50:12
**goes**  134:15 208:4
**going**  16:14 23:25
27:15 41:10,19
58:20 85:11 92:15
100:25 103:22
134:11 143:8
152:19 200:18
206:6 218:3
**good**  8:14,15 32:9
49:8,8 50:15,15
54:20 90:5 101:2
152:18 153:6,7
184:12,13 209:25
210:8 252:13,16,23
260:3
**gotten**  17:8 170:5
171:14 213:10
232:11
**government**  36:24
43:20 44:8 117:25
203:1
**government's**  115:2
**governmental**
202:20,25 203:5,16
203:21 204:1
**governments**  43:22
192:24
**grant**  193:2,5
**granted**  70:17
**grants**  192:23 193:4
**granular**  158:6,10
**great**  13:22 59:22
63:8 101:8 252:1
258:18
**greater**  134:1
**greatly**  209:4
**gross**  183:18
**ground**  229:24
**group**  40:6,8,11
42:3,6 44:6 126:5
131:21 132:5
**groups**  42:13,21,23
43:10 44:12 45:7

86:5 88:15
**guess**  26:25 37:24
97:8,21 99:5,8
119:4 194:1 224:4
227:11 228:22
229:11 230:4
**guidance**  226:1
227:17 252:6
**guideline**  243:1
**guys**  258:15

**h**

**h**  244:25
**half**  165:12
**halt**  245:13
**halted**  66:6
**hamasaki**  98:13
99:22 100:1 102:16
102:19 103:14
104:7,16 105:24
106:7,21 107:24
**hand**  101:4 260:10
**handbooks**  218:5,19
219:21 221:6
223:24
**handed**  211:3
**handing**  98:2
**handwriting**  101:8
**handwritten**  4:14
4:15
**happen**  53:22 68:10
74:25 195:12
**hard**  215:22 228:23
230:5 246:18,21
**harm**  10:19,20
17:25 18:1 19:12,16
62:8,10 67:2 68:3
72:14,25 74:20,22
75:4,8,11 76:2
80:13,17,24 122:22
123:7,12 145:12,12
147:15,15 149:14
150:19 151:5,16,17
151:18 152:10
169:3 178:5,8 212:6

[harm - index]

212:9 253:17
254:15 255:23
256:15,21
**harmed** 254:11
**harms** 21:22 62:1
65:13 66:1,10,21
67:5,8,9,11,19
70:10 73:13 74:3,16
76:24 77:8,9 81:3
127:13,24 129:23
130:7 145:17,18
146:12 216:10,19
232:23 257:4,10
**heading** 68:8
**health** 52:5 203:10
203:17
**hear** 124:1
**heard** 36:14 123:22
124:4 137:11 228:4
**hearing** 157:18
**heart** 64:7
**heating** 1:10 2:17
7:25
**help** 44:22 45:25
49:20 51:22 55:25
82:17 87:18 88:21
256:6
**helped** 170:9
**helpful** 142:17
145:11
**helping** 88:22,23
**helps** 49:19 100:20
165:24
**hesitate** 47:12
**hired** 167:17
**historical** 75:15
123:7 178:3,7,11
**historically** 123:7
160:4,9
**hold** 104:20
**holding** 130:12
**holds** 71:13
**honoring** 112:19
**hotel** 90:18 91:2,14
92:5

**hour** 58:21
**hours** 90:17 91:2,14
97:7,19,19,20
132:13 207:6
**house** 39:5
**huh** 123:1
**human** 203:10,17
**hundred** 46:2
**hundreds** 154:9
**hypothetical** 233:4
257:17

**i**

**icc** 239:13
**idea** 20:17
**identical** 18:8
240:12
**identification** 6:3
97:24 175:4 210:25
**identified** 30:15
40:7 41:5,23 45:24
46:3 49:24 50:1
64:11 70:22 77:9
96:3 113:13 114:19
121:23 128:12
131:21,24 135:3,6
140:3 141:15,17
164:9 175:24 205:8
223:16 242:10
243:18
**identify** 18:9 32:20
52:22 64:24 65:14
71:23 86:23 94:13
98:6 115:3 118:25
257:5
**identifying** 16:15
66:9 176:9 186:23
**identity** 214:17
**ieee** 26:10
**illegal** 232:14
**illustrations** 50:11
**imagine** 91:18 92:11
215:9 246:18,21
**imagining** 228:23
230:6

**immediate** 188:22
**immediately** 68:15
68:19
**impact** 11:1 63:12
63:13 64:2,3,17,19
64:20 75:2 110:18
143:21 146:2,3
151:15 159:8 160:4
160:9 161:1,1 178:4
178:7,12 241:12
**impacting** 19:18
**impacts** 112:19
162:20
**impair** 12:16
**implement** 226:24
**implementation**
41:25
**implication** 229:16
**implications** 17:20
17:22 47:10 130:11
229:14,21 230:11
**implicitly** 69:2
81:13
**importance** 144:16
**important** 12:15
139:17,22 140:6
159:9 162:21 163:2
170:12 171:11,18
171:21 217:20
219:25 225:17
245:5
**improper** 231:19
232:10
**improperly** 214:9
**impunity** 71:14
**inaccurate** 19:17,17
20:6
**incentives** 81:19
82:5,8 84:10,17,18
84:22
**include** 31:24 32:1
33:17 35:7 36:7
72:4,10 94:14 95:15
104:3 108:6 227:5

**included** 36:6 38:22
**includes** 15:24
199:20
**including** 85:21
127:20 159:6,11
201:22
**incomplete** 233:4
257:17
**inconsistencies**
196:18
**incorporate** 72:7
**incorporated** 7:3
46:21 47:1 48:12,21
48:22 55:6,8 59:25
60:1 71:15 72:6
156:4,6,10,13,14
158:15 181:22,24
182:1,13,22,24
188:16 189:2,25
191:12 193:21
194:2 199:24 200:5
202:8,19 229:7
236:17 241:10,13
254:12 257:12
**incorporation** 60:4
60:15,25 67:20 70:3
198:19 200:10,20
201:14 203:6
208:16,25 209:5,11
209:15,18 210:2
220:11,13 221:17
222:4
**incorrect** 247:17
**increased** 213:9
**incurred** 133:3,4
198:18 206:23
207:12
**independent** 93:5
93:10 161:3,10
162:4,12 228:3,8
**independently**
120:22 121:13
195:8,18 208:20
**index** 4:1,9 5:1

[indicate - issue]

**indicate**  117:25
**indicated**  54:6 260:4
**indicates**  99:11
**indication**  213:20
**indications**  207:7
**indirect**  137:1
**individual**  34:7 35:2
  42:14 49:20 51:19
  184:19 185:18
**individuals**  34:13,17
  34:22 35:13,17,20
  42:9,23 43:10,14,19
  45:6 75:18 100:8
  103:12 112:9 133:8
**industrial**  8:23
  172:9 174:4
**industry**  45:2 49:9
  83:11 130:15
  209:21,25
**inform**  173:17
**information**  20:9,18
  21:18,19 24:2 40:1
  87:24 103:17 104:3
  107:3 108:13
  114:17 115:23
  117:14 121:3,9,10
  121:21 134:12,14
  134:17,23 153:16
  153:19,24 155:8
  157:12,19,24 159:7
  159:10,11,25
  161:19 162:22
  163:1,9 164:12
  165:2 166:19 167:9
  176:1 179:1 180:13
  180:16 183:14
  187:18,22,23 192:2
  194:12 195:8,19
  196:8 197:6 198:7
  208:5 213:1,6,12,19
  214:1,13,14 215:11
  215:15 238:8 245:6
  248:4,16,17,22
  249:2,5,8 250:9,10
  252:13,21 253:2

255:14
**infringed**  149:12
  150:17 151:4 152:8
**infringement**  17:23
  18:3,13,15,17 63:16
  64:5 72:19,20 77:6
  78:2,4 80:14 110:20
  110:21 111:4,5,10
  143:22 145:13,17
  146:4,16 151:13
**ingress**  46:18
**injunction**  68:4,11
  68:23 69:5,6 73:21
  74:11,15 75:6,7,8
  75:13 76:9,22
  143:24 167:12,16
  168:2,5,20 169:12
**input**  31:14,18
  40:14 44:21,25
  83:19 104:10,15,17
**inputs**  31:21 133:9
**inquiring**  124:15
**inquiry**  243:4
**insignificant**  121:8
**instance**  20:10
  22:17 30:7 39:5,11
  41:4 46:1,14 94:2
  107:24 134:13
  135:6 138:17
  158:13 179:22
  187:5,18 201:8
  221:11 224:6
  225:10 226:9
  249:21
**instances**  32:3 83:22
  84:4 92:9 200:9
  201:3,5,13,23
  212:24 213:6,11
  221:4
**instruct**  78:16 94:25
  104:23 108:16
  125:5
**instructed**  17:10
**instructing**  227:6

**instruction**  5:2 79:4
  109:4,15 226:17,19
  226:20 228:18
**instructions**  147:12
**instructor**  231:7
  232:1
**instructors**  225:23
  226:5,12,22 227:5
**intellectual**  9:1,7,23
  10:3,13,16,23 11:5
  11:16 26:19 139:16
  139:21
**intend**  90:6
**intended**  55:20 56:4
**intending**  85:8,10
**interact**  113:6
**interest**  33:8 38:20
  38:25 39:4 42:10,24
  158:7,10 253:25
**interested**  32:11
  37:25 45:11 48:17
  50:18 55:3 60:21
  82:10,14 85:3
  254:24 260:9
**interests**  38:2,6,10
  38:15,16 48:7,10
  58:10
**interface**  136:8
**interfaces**  136:9
**interfere**  6:13
**intermediate**  171:4
**internal**  123:10
  196:18
**international**  1:6
  2:7 52:10 204:18
  205:24 206:12
**internet**  133:18
  153:18 164:23
  179:13 180:3,9
  183:8,9 193:12
  194:8 215:13
**interoperability**
  49:6,14,19,24 50:7
  50:9,12

**interoperable**  32:13
**interpreted**  107:10
**interview**  111:16
  112:1
**interviewed**  112:2
**introduce**  7:10
**invalidation**  80:17
**investigate**  46:5
  120:14,21 121:12
**investigated**  25:25
  30:24 133:15
  136:21 137:6,18
  141:12 233:7
**investigating**  206:19
**investigation**  31:4
  130:13 137:21,24
  138:19 139:6
  162:10 207:23
  228:9 234:2 239:25
  249:22,25
**investments**  87:1
  189:10
**involve**  26:16 203:5
**involved**  8:22 26:5
  27:9,22 31:1 44:18
  87:15 88:3,12 104:8
  105:25 106:2
  107:19 109:18
  140:16
**involves**  123:24
**involving**  27:4,13,25
  28:8 123:23 124:2
  124:10 201:23
**ip**  9:22 11:1,2 80:23
  111:9 145:13
**irreparability**  169:2
**irreparable**  10:20
  74:21
**issue**  9:7 10:17 11:3
  11:18,21,22 12:14
  31:21 40:12 44:16
  69:1,7 74:10 76:4
  77:11,16,18 78:8
  81:6 85:4,16 126:23
  132:10 133:15

[issue - lawsuit]

141:13 147:15
154:4,6,21,24
155:19 159:10
181:14 188:9,24
189:12,19 190:22
194:17 199:5
206:19 233:8
245:14
**issues**   10:19 15:25
24:15 77:19 82:16
86:24 144:11
**items**   93:23 119:14

**j**

**j**   2:3,14
**jarosz**   1:18 4:3,12
6:2 7:8 8:7,14 61:25
97:23,23 98:2
110:10,12 153:6
175:3,7 210:22,24
211:3 258:6
**jarosz02443**   4:17
**jd**   48:1
**jim**   102:1,2
**jkfee**   2:16
**job**   167:15
**john**   1:17 4:3,12 7:8
8:7 102:3 110:10
210:22
**join**   9:13
**joint**   192:9
**jonathan**   3:15 6:18
**jordana**   23:14 92:25
**journal**   211:12
**june**   4:13 154:2
**juris**   47:20

**k**

**k**   124:24
**keep**   16:18 59:9
98:20 100:21
101:15,16 152:19
154:15
**kept**   98:22 196:3
197:9 248:16
252:11

**kevin**   2:14 7:16
92:24 258:7
**keyed**   173:21
**kin**   260:9
**kind**   127:4 151:17
160:8,9 226:17
**kinds**   198:7
**king**   2:2 7:23
**knew**   109:7
**know**   12:1,5 13:13
16:4,25 21:11,16
32:22 33:1,8 38:13
38:18,22 39:22 41:1
41:11 43:25 44:5,9
47:25 53:22,22
56:13 58:1 59:4
61:8 63:25 68:18
73:10 74:9,20,24
78:2,7 79:6,20
82:18,25 83:21
86:14 91:8,11,17,19
92:4 95:21 105:14
105:19 106:23
107:15 108:2 109:9
111:18 112:16,21
116:6,14,22 117:2,4
119:3,16 122:5,9,14
123:16,25 125:2,6
125:21 128:8,25
129:2,19 130:24,25
131:5,11,16,23,24
132:3 133:22 134:2
134:3 135:12,18
136:13 137:13
139:25 140:11
141:13,22 142:8
145:24 148:18
154:3,16,19 164:13
164:16,17,19
165:10,17 166:25
169:15 170:14
171:1,7 172:18
176:3,6,19 177:1,24
178:14 179:7
180:23 181:11,12

181:15,17,20 182:2
182:7,9,11 183:4
186:13 188:12,17
189:5,15,20 190:1,7
190:11,19,25 191:2
191:9,19 192:8,14
192:22 193:3,17,19
195:10,12 200:11
202:6,11,13 206:8
206:16 209:6
212:14 213:23
214:3,12,17 217:22
218:14 219:22,23
219:24,25 220:5,8
220:10,12,18 221:8
225:1 230:24 231:1
233:5,6 239:3,4,11
239:16,23 240:11
242:7,16,24 243:17
244:8 253:8,20
256:8 257:19,25
**knowing**   253:10
**knowledge**   30:23
45:2,3 53:9 76:19
81:10,16 94:20
98:10 102:15
103:20 130:23
184:24 188:15
253:18
**known**   116:25
140:15
**knows**   156:9
**kslaw.com**   2:5

**l**

**l.a.**   26:11
**lack**   73:15 75:8
88:18 102:10,22
112:19 114:14
128:4,22 145:20
171:25 198:21
204:21 205:12,25
206:14 233:18
234:15 235:13
236:5,25 245:8

246:14 251:11
256:1
**lacked**   81:5
**lacks**   122:13
**laid**   22:7 33:15
48:15 51:2,4,6,8
60:19 64:6 71:24
142:21 143:17
209:12 210:5
**language**   103:17
104:2,3 107:2
217:11 232:8
**lapel**   111:23
**large**   31:25 42:15
43:11 242:20
**largely**   178:15
**larger**   131:5
**late**   164:18 178:16
**latest**   254:16,22
**law**   1:18 27:4 46:21
47:1,9,15,17,22,24
48:12,23 55:8 60:1
60:5,16,25 71:15
80:9,9 94:9 116:1
116:10,18 117:5,23
126:7 147:22 148:2
148:7,22 156:4,6,10
156:14 181:22
182:2,14,23,24
188:16 189:3,25
191:12 197:20
198:19 201:9
208:16,25 220:11
220:13 222:4
228:16,17,18 229:7
229:7,12,25,25
230:7,8,14,16,17
231:3,11,25 232:24
233:1 257:12,14
**lawful**   60:22
**laws**   47:7 119:17
201:4,6
**lawsuit**   162:4,23
163:11,12,15

[lawyer - materials]

**lawyer** 95:11,18
**lawyers** 94:3 95:15
95:21 103:21
**lays** 60:18
**learn** 110:17,22
172:1,2,3,5,6,8,10
180:7 184:23 185:2
252:22,23
**learned** 20:18 104:4
111:1,2 120:13
121:10 124:6
136:25 170:13
171:19 174:20
185:4,7 196:6
248:19
**learning** 36:5
123:19 136:24
197:10
**leave** 46:23
**leaves** 101:8
**led** 27:21
**legal** 1:19 35:8 47:3
47:10 60:14 79:5,15
80:12 119:12
129:18,20 144:8,22
145:22 146:17
147:3,24 148:9,24
149:7,17 150:22
151:8 152:12 159:3
161:8 167:21
168:23 213:3,8
221:5 229:13,20
230:23,25 231:14
231:17 232:3,6
255:2
**legally** 60:18
**leonard** 1:22 8:3
260:15
**letters** 243:4,9
**level** 14:17 44:7
157:20 158:6,10
194:13 202:18
203:7 235:2
**lewis** 2:14 7:17 94:3

**liaisons** 88:15
**life** 52:7
**likelihood** 19:1
235:9 236:2,7 251:8
255:10
**limitation** 105:4
**limitations** 133:21
135:16
**limited** 101:10
132:14 160:24
162:9
**limiting** 90:3
**limits** 222:15 223:9
**line** 5:3,7,12,16
58:24 59:17 70:22
193:5
**listed** 27:17
**literature** 93:12,18
112:11,12 247:9
252:21
**litigation** 9:5 26:14
26:19 123:20,23
124:2,10,18,18
243:5 245:13
**litigations** 26:5
**little** 15:16 58:20,23
59:5 62:7 105:22
132:23 149:21
200:18
**living** 8:16
**llp** 2:8,14 3:2,7
**loaded** 249:20
**local** 44:2 47:6
**located** 6:23
**logic** 238:9
**logistics** 85:20 88:23
**logos** 12:14 15:19
**long** 14:3 92:14
96:10 97:2
**longer** 70:17 256:13
**look** 25:21 28:4
41:16 53:18 54:21
103:21 114:3 133:5
134:24 135:10,24
136:3 141:19

154:11 159:5
165:22 166:2
202:10 206:7
248:23 249:1,7
**looked** 10:24 14:16
28:24 30:7 40:2
99:6 118:11,14,17
120:11,25 143:20
200:1,2 248:3,15
249:4 253:1
**looking** 15:16 27:16
53:24 54:10 80:13
143:5 144:10
154:15 166:21
178:11 187:9,16
196:17 197:8
**looks** 67:18
**lose** 67:21 236:19
239:21
**losing** 65:8 68:7
70:9,14
**loss** 17:21 18:1
70:11 212:19
214:11 236:16
240:5 250:13,25
251:2,4
**losses** 63:4
**lots** 14:24
**low** 225:21

| m |
| --- |

**machine** 260:6
**magnitude** 159:23
251:21
**mail** 87:23 98:4
**maintenance** 89:17
239:19
**majority** 155:3,8
**making** 54:4 103:6
159:17 232:17
249:8,15 257:14
**malamud** 3:13
**malamud's** 244:19
244:23 245:16,22
246:7,23 247:4,10

247:14 249:16
**man** 90:17 91:2,14
**mandate** 209:20
**manuals** 225:20
**manufacturer** 172:4
**manufacturers**
31:25 32:1,12 46:11
50:15
**manufacturing**
39:10 82:11
**margin** 131:4
**mark** 102:5
**marked** 4:10 5:15
6:2 13:3 97:24
175:3 210:24
**market** 240:25
241:12 255:15,17
**marketplace** 12:18
12:22 19:2,20 72:25
76:11 82:13 175:15
225:19 226:7
254:22 255:7
256:25 257:2
**marks** 12:14 15:18
19:3,14
**material** 114:18
126:5 241:16
242:11,21 243:10
243:14,18 244:2,11
253:17
**materials** 1:4 2:6
7:2 19:16,19 20:7
20:10,12,13,25 21:1
21:4,8,12 22:4,13
22:16,18,21 23:20
24:4 43:6,7 52:8
54:6 75:20 81:25
94:8 101:15,16
102:18 105:7 112:7
114:4,5 115:12,17
118:15,23 119:1
120:12 126:6 127:1
136:11,14 137:14
139:1 214:9 224:15
224:15

Veritext Legal Solutions
866 299-5127

[matt - never]

matt 258:9
matter 11:2 27:13
  50:4 103:1 126:21
  126:23 139:7
  140:16 142:6
  153:13 164:20
  169:8,12 232:7
matters 26:4 27:1,3
  27:10,23 165:8
  198:8
matthew 3:8 7:14
mbecker 3:10
mean 9:20 10:7,10
  10:22 34:11,16,21
  35:12 38:9,13 42:6
  44:24 45:21 46:7,15
  46:25 49:2 55:13,22
  56:6,10 59:4 68:6
  68:18 74:9 79:24
  83:1 97:11 106:13
  128:9 158:9 161:9
  163:4,6 171:2 177:2
  184:4,10 186:23
  200:8 201:3,4,4
  202:24 214:23
  226:5,15 231:25
  238:6,13 240:20
  241:20,23,25
  250:25 256:12
meaning 97:12
  107:10 207:23
means 162:2 213:3,8
meant 66:19 200:15
  201:2
measure 235:15
  236:8 237:2
measurements
  127:24
measures 157:3
mechanism 87:23
mechanisms 30:8
media 109:23 110:2
  110:9 210:14,21
  258:23

meeting 87:21
meetings 115:18
member 86:7
  112:21 184:18
members 42:22 49:9
  88:14 90:17,25 91:3
  91:9,12 92:6 111:7
  111:16,18,25 112:3
  112:5,14,24 113:7,9
  113:11,21 114:1,7
  114:13,21 117:16
  184:20 185:9 207:4
  207:8,13,18,24
membership 111:19
  184:12 185:12,17
  208:1,5,7
memberships
  183:25 184:5,10
  188:4
memories 106:6,6
memorized 22:10
memory 24:21
  28:11 41:19 44:14
  53:19,21 54:5 100:7
  100:20 102:9,14
  103:11 114:10
  116:5 123:3 126:16
  140:23 141:7
  165:24 183:22
  210:7 221:13 241:5
mention 201:9
mentioned 43:18
  105:17
mentions 202:1
merely 204:19
merits 50:6
message 76:10
messrs 99:25
method 56:23
methods 134:3,4
  171:3 172:7 173:18
  173:21,22,24
microeconomics
  8:23 171:4

microphone 111:23
microphones 6:8,13
middle 59:17
million 89:9,23,25
  90:2 91:24
mind 26:9,13 28:23
  29:1 34:8 36:4
  62:23 73:11 84:14
  84:21 120:24
  169:16 176:20
  196:4 203:14,18,20
  203:23,25 204:3,5
  221:11 224:2,23,25
  225:12 226:21
  227:2,11 238:21
  243:1 245:18
  247:12 248:17
  249:19 252:11
  257:7
mindful 120:25
minimize 46:5,8
minute 113:18
minutes 58:25 59:8
  59:10,21 92:17
mis 173:21
miscellaneous
  119:14
mischaracterizes
  24:9 60:11 66:15
  102:23 197:1 218:9
  222:20
misleading 17:6
misread 66:17
missed 244:21
mission 2:9 51:5,7,9
  51:18,23 52:15,21
missions 52:16
model 245:9
models 249:14,20
moment 105:21
  224:4 257:8
moments 30:16
  41:23
monies 193:3

months 23:16
morgan 2:14 7:16
  94:3
morganlewis.com
  2:16
morning 8:14,15
motivations 84:7
mountain 3:9
move 111:22
mpeg 26:11,11
mto.com 2:11
munger 2:8 7:19
municipalities 126:3
  126:25

n

name 6:18 7:7 27:12
names 225:1
narrow 31:15 32:8
national 1:7 2:12
  7:20 52:11 164:15
  164:22 165:19
  230:19,21 231:6
  232:25
nature 226:11
nearly 200:9
nec 50:13 165:25
  166:1,1,6,7,15,15,23
  166:23
necessarily 34:9
  61:6 178:3 238:14
  241:22
necessary 250:7
need 14:3,12 40:4,6
  40:9,10 41:10 44:6
  45:23,25 50:11
  101:16,18 131:20
  131:25 134:24
  142:11 143:9
  149:24,25 176:2,6
needs 32:15 54:7
negative 142:9,10
neither 260:8
never 96:18 103:3
  107:20

Veritext Legal Solutions
866 299-5127

[new - offerings]

new   16:10 46:2
  236:20 246:1
newer   255:16
nf   123:11
nfp   54:15
nfpa   4:16 41:6 51:7
  96:24 97:19 122:6,7
  122:18,20,21
  123:10,12,20,24
  124:10,16 131:9
  155:5 175:14
  183:24 187:21
  193:3 201:18 202:4
  212:3 231:5
nfrc   239:8
night   98:4
nights   90:18 91:2,14
non   35:6,8 85:6
  95:11 112:14,21
  113:21,25 114:7
  146:16 151:23
normal   98:21 101:6
  101:11,14
normally   114:2
north   184:1
northwest   6:24
notary   260:2,15
note   6:7 101:8
notes   4:14,15 98:10
  98:13,17,20,22,24
  99:6 100:10,13,18
  100:21 101:3,7,10
  101:12,19 103:2
  106:19,20
notice   260:4
noticeable   91:18
nttaa   115:4
number   7:6 18:11
  40:7 62:16 76:15
  83:4,18 99:11 110:2
  110:13 131:2 154:8
  154:10,14 155:14
  164:17 181:16,18
  182:8,9 188:2,17
  189:5,21 190:2,8,25

198:23 201:12,17
  201:18,19,21,25
  207:6 210:14,21
  211:20,22,24
  212:12,24 216:8,17
  242:8 258:23
numbers   18:9
  155:11 190:10,17
  194:24 201:18
nw   1:19 2:15

**o**

o   244:25
object   41:14 122:8
  122:12 213:14
objected   65:21
objection   9:8,13
  10:6 11:7 13:16
  14:13 15:22 17:5
  19:23 20:20 21:14
  22:2 24:8,16 25:13
  26:17 28:16 29:5
  33:14,23 34:6,18,23
  35:14 36:2,13 37:8
  37:13,18 38:8,17
  39:2,21 40:25 43:23
  44:13 45:9 47:2
  48:13 51:1,16 52:2
  52:25 53:16 54:4
  56:12,25 57:6,11,18
  57:25 58:16 60:8
  62:4 63:19 65:2,18
  66:3,11 67:14,24
  69:12,16 70:12,25
  72:16 73:2,15 74:6
  76:7 77:2,14 78:14
  79:3,4,14,16 80:3
  80:10,19 81:7,14,22
  82:20 83:8,25 84:25
  85:17 86:9,18 87:4
  87:11 88:17 91:4,25
  93:8,25 94:24 97:5
  98:8,25 99:20 100:2
  102:10,22 103:9
  104:5,18 105:18

106:8 107:7 108:11
  109:3,14 110:24
  113:1 114:23
  116:12,19 117:8,11
  118:10 120:9
  121:17 124:20
  125:4 126:11 127:6
  128:3,17,21 129:17
  129:25 130:17
  132:11,21 133:13
  134:9,20 135:19
  136:17,22 137:7,19
  138:6,14 139:2,13
  142:25 143:14
  144:6,18 145:21
  146:13 147:10,23
  148:8,23 149:6,16
  150:4,21 151:7
  152:11 156:16
  157:16 158:2 159:2
  159:20 160:12
  161:7 162:6,16
  163:13 164:2,3,25
  166:9,17 167:7,20
  168:11,22 170:18
  171:24 174:14
  176:12,25 177:11
  177:25 178:23
  179:15 181:6 182:6
  182:15,25 183:10
  183:20 186:10
  190:12,23 191:5,13
  192:4,11 193:1,13
  194:9,19 196:2,23
  197:23 198:20
  203:8 204:21
  205:12,25 206:14
  207:1,15 208:18
  209:2 212:20
  213:17 216:11,20
  217:17 218:8,22
  219:14 220:3,16,24
  221:7,19 222:5,19
  227:8,19 228:11,20
  229:9,22 230:2,22

231:8,13 232:2
  233:3,17 234:4,14
  235:12 236:4,11,24
  237:6 238:18
  239:22 240:7,18
  241:1 242:13,23
  243:21 244:4
  246:25 247:5 248:2
  248:14 251:10
  252:9,18 254:18
  255:8,18 256:1,19
  257:16
objections   61:3
  147:12 161:16
  169:14,21 199:1,7
  232:19 237:12,18
  237:24 244:13
  251:17,24
objective   161:24
observation   25:7
observations   16:5
  17:2 125:16,19
  156:20 159:22
  161:22 234:8
obtain   214:5
obtained   93:2
  119:24 153:19
  213:1,7,11 214:13
obtaining   213:25
  254:25 255:1
occasion   25:21
occasions   96:24,25
  97:1
occur   46:4,13 63:13
  64:3,21 192:16
  229:1 230:7
occurred   66:21
  96:23 157:14
  164:18 165:12
  176:6 178:16
  192:21 257:25
occurs   192:15
offer   136:10
offerings   71:6

Veritext Legal Solutions
866 299-5127

[offices - particular]

**offices** 1:18 6:22
**official** 117:18
  260:10
**officially** 117:13
**oh** 15:7 21:25
  185:23 223:2 254:8
**okay** 9:18 15:15
  16:12,23 22:6 29:8
  29:12 35:15 47:20
  54:3,24 59:1,3
  61:13 64:12 72:11
  90:12,15 105:9,12
  172:16 188:5
  200:24 217:9
  244:24 258:3
**olson** 2:8 7:19
**omb** 115:5,9
**ones** 24:20 26:12
  31:16 96:15 140:2
  169:19 203:20,25
  204:5
**online** 136:3,11
  215:24
**open** 36:5 84:15
  136:24 196:4 197:9
  248:17 252:12
**opening** 136:24
**operating** 189:17,23
  190:4
**opinion** 80:5 124:25
  125:3,7 126:9,16
  130:10 217:13
  232:22
**opinions** 58:10
  78:19,25 79:11,19
  79:25 95:4 108:15
  125:10 145:3,6
  146:23 148:14
  180:20
**opportunities**
  128:11
**opportunity** 133:4
  247:17
**opposed** 83:23 91:6
  181:23 230:10

**optimal** 57:9,23
  58:6 254:4
**optimum** 58:4
**option** 204:19
  236:15
**options** 44:1
**oral** 22:23 197:11
**order** 46:12 128:15
  183:23 196:20
**organization** 8:23
  27:14 28:1 31:13
  32:9 49:22 51:23
  110:18 127:21
  140:12 155:3 172:9
  174:4
**organizations** 19:19
  25:12,22,23 26:6,7
  26:8,12,16 27:6
  28:9,15 29:3,16,25
  30:12,14,19,22,25
  31:5,9,20,23,24
  32:5,18,19 40:16,20
  40:24 44:11,16 50:8
  75:18 85:7,15 86:7
  111:2,6,11 112:6,15
  112:25 114:1,8
  132:9 138:11
  139:24 140:1 142:4
  153:22 154:25
  192:10 193:6
  238:16 239:17
  240:2 250:2
**oriented** 31:2 50:9
  193:19
**original** 207:17
**outcome** 260:9
**outcomes** 46:13
  58:14 209:24
**outdated** 256:21
**outline** 153:8
**outlined** 153:23
**output** 25:23 28:24
  88:7
**outputs** 26:7 27:5

**outside** 9:4
**overall** 49:21 52:7
**overlooking** 14:10
**overseas** 123:23
  124:2
**owen** 102:5
**ownership** 78:3,5,7
  146:1,2

**p**

**p** 3:3
**p.m.** 98:5 110:4,5
  152:25 153:1
  210:16,17 259:3
**pace** 102:3
**page** 4:3,10 5:3,7,12
  5:16 41:4 51:3 68:8
  89:3,3 93:21 119:6
  119:7 140:25
  163:20 187:7,10,12
  209:15 216:24,25
  217:1,3,12,12 219:6
  222:10 244:16
**pages** 1:25 21:4
  209:13 217:8
**paid** 184:14 214:10
  214:14
**paper** 71:7
**paragraph** 14:6
  15:17,20 17:8,24
  18:5 41:5 51:6,8
  62:25 63:1 67:1
  68:8,16,19 69:13,21
  70:23 71:3 89:4
  90:7 96:4 157:2,21
  158:4 159:1,17
  160:14,22 163:22
  164:10 187:13,18
  187:22,24 195:1
  199:12,15,21,25
  202:17 204:6
  211:19 212:8,18
  216:25 217:3,5,8
  224:13,25 225:14
  234:13 235:5,11,23

236:3,14 241:7
  244:18 245:1,4,17
  245:23 246:8
  247:11,13,22 248:1
  249:10,17 250:12
  250:23 252:8
**paragraphs** 13:11
  15:1 18:7,11 65:5
  199:19 233:10,15
  233:23 234:3,9
**paraphrased** 218:24
  219:12
**paraphrasing**
  111:14
**parroting** 228:1
**part** 13:10 14:5
  15:18 17:20,22
  18:16 25:17 35:22
  39:6 41:3 47:9
  49:16 72:25 74:20
  90:19 91:15 100:3
  102:12,13 103:23
  106:5 114:25 115:3
  115:6 118:20
  121:24 153:20
  168:7,15,21 178:7
  198:2 202:19 204:8
  218:16 219:10
  231:11 234:7
  240:25
**participants** 81:20
  82:3 83:12 84:7
**participate** 43:10,15
  43:15,19 45:7 85:21
  88:6
**participated** 207:4
**participation** 44:10
**particular** 24:19
  43:7 44:1 45:1,2
  60:17 67:13 84:3
  85:4 86:25 93:21
  96:20 115:4,17
  130:4 133:15 170:2
  170:7 171:12 201:9
  203:19,24 204:4

Veritext Legal Solutions
866 299-5127

[particular - plaintiffs]

206:19 209:14
212:1 221:11 223:4
225:1 228:14 234:2
234:18 235:15,20
235:22 236:7 237:2
240:17 242:25
243:24 249:18
257:21 258:1
**particularly**  145:12
158:5 225:17
246:12
**parties**  6:16 37:25
58:8 71:13 73:6,13
73:22 74:16 85:3
162:3,9,14 206:23
207:12
**parts**  160:17 200:1
**party**  45:14 58:3,5
153:17 260:9
**passage**  68:22
**patent**  26:21
**path**  254:4
**pauley**  102:2
**pause**  109:23 121:4
254:6 258:4
**pay**  88:12,24,25
92:4
**paying**  87:15
**pending**  15:5 17:16
35:11 45:18,21
59:19 138:2
**pennsylvania**  2:15
**people**  45:1 60:21
60:23 83:13,13,14
83:18 87:14,16
88:12,21 93:11
95:25 96:20 98:12
104:2 135:24
153:21 161:14
163:8 184:20 185:1
185:16,17 213:11
226:6 248:5,7
**percent**  183:24
184:1 187:19
237:11,17,23

238:13 241:21,25
242:4,6
**percentage**  182:11
183:18 188:7,13,14
188:18 189:7,16,22
190:3,19 191:2,9,19
**percentages**  186:22
186:24
**perfect**  114:11
116:5 241:5
**period**  97:16 99:7
178:17 212:1
**permanent**  68:4,10
68:23 69:5 73:20
74:11,15 75:6,7,8
75:13 76:9,22
143:24 167:12,16
168:1,5,20 169:12
**permanently**  76:6
**permission**  230:20
231:4
**permitted**  41:17
**perry**  3:15 6:18
**person**  23:14 34:12
35:6 130:15
**personal**  118:1
**personally**  21:6 96:6
115:10 205:19
**personnel**  98:15,18
120:18 121:11
122:21 248:20
**persons**  35:7,8 74:3
99:13 101:21
105:15 116:22
136:10 213:24
214:3,13,19 215:5
226:16 227:5,15
**perspective**  10:25
144:1,10
**perspectives**  113:11
**pertained**  124:11
**pertaining**  115:13
123:21
**ph.d.**  48:2,4,6

**phenomenon**  22:19
22:25
**philips**  26:11,11
**phone**  196:5
**phones**  6:11
**phrase**  35:16 74:8
184:9
**pick**  6:8
**place**  6:12 260:4
**placed**  13:4
**places**  15:6 40:7
63:1
**placing**  70:10
**plaintiff**  2:6,12,17
13:8 20:7 40:24
49:4,17 94:12,16
95:20 96:18,20,21
97:4,17 98:14 114:7
120:18 121:11
146:7 153:22 154:4
156:9 181:13,21
182:4,12 183:17
189:11 190:20
191:10,20 193:16
211:12 219:7 221:4
**plaintiff's**  41:25
**plaintiffs**  1:13 9:14
10:4 11:6,17 12:4
12:15,17 13:9 17:4
19:8,10,12,14 21:23
33:2,12,21 34:2,5
36:1 37:7,23 39:1
39:17,19 40:3 42:5
48:8,11,16 49:3,11
49:13,25 50:4,17,23
51:14 52:18,23
53:13 55:3 57:5,17
57:22 60:6 62:1,20
62:21 63:4 65:15
67:8,9,12,21 68:3
71:11,14 72:15
73:23 74:4,16 75:5
75:12 76:3,24,25
77:9,10,12,25 78:12
79:1,12 80:1 81:3

84:23 86:20 87:2
94:18,22 95:13 96:1
97:11,14 98:18
108:8 110:15,16
113:24 114:15
118:8,18,22 119:1
120:7,23 121:14,15
121:22 133:12
135:22 136:6,10,15
136:16 137:15,16
138:12 141:3
145:19 149:12,15
150:18,20 151:4,6
152:9,10 154:13,20
154:21 155:19
156:3,5,23 157:6,14
158:1 159:18 160:5
160:10 161:2,5
162:23,24 163:10
163:25 167:5
178:13,21 179:10
182:3,9,17,21 183:6
183:13 188:8,14,18
189:8,16,18,22,24
190:3,5 192:8,22
193:9,17 194:4,15
194:23 196:1,19,21
197:21 198:11,18
199:6 208:16,25
209:4,10,17 210:2
215:7 216:3,10,19
217:14 218:4,18
219:2,6,18 220:1,13
220:14 221:16
222:3,11,18 223:4
223:11 224:15
225:18 229:6
232:23 236:15,19
238:17 239:4,20,21
240:4,4,13,16 241:9
241:12,15,16
242:10,22 243:19
243:20 244:2,12
245:7 246:13,15
247:17 248:5,8,12

Veritext Legal Solutions
866 299-5127

[plaintiffs - products]

248:24 249:3,7,15
250:14 251:22
254:11,14 255:3,24
256:16 257:11,13
**plane** 92:5
**plans** 119:11
**please** 6:7,11 7:9 8:4
15:8,10 52:17 64:9
64:12,24 78:22 98:6
118:25 149:21
150:1,2 153:9
200:24,25 201:20
216:24 221:23
223:21 225:6
243:20
**plus** 79:4 147:11
150:23 161:17
**pocket** 92:10 133:3
**point** 24:19 43:7
58:19 84:1 92:20
100:11 129:7
140:24 154:17
190:16 210:8
228:13 234:1
**pointing** 157:2
**points** 100:19
107:17
**policies** 138:24
139:10 140:11
**policy** 141:24
**portion** 108:17
145:7
**positing** 206:4
**position** 239:18
**possession** 215:18
**possibility** 57:14
101:2 215:3 227:12
236:21
**possible** 23:6 92:9
96:8 115:21 119:22
123:5 124:13
134:21 147:19
198:13 199:8 216:9
216:18 229:3,12

**possibly** 12:18
**post** 255:24
**posted** 164:14,21
165:8,18,25 166:6
166:14,22 167:1
175:23 176:24
177:10,23 179:12
180:2,8 183:7,9
193:11 194:7
256:17
**posting** 176:10,21
177:7,19 178:12
254:15 257:5
**postings** 177:15
178:15,19
**posts** 254:12
**potential** 35:21
55:21 56:4 73:3,4,6
74:19,25 147:15
161:1 223:18 257:1
**potentially** 111:10
224:5,11 254:20
256:20 257:2
**power** 50:14
**practical** 45:17
112:12
**practice** 55:19,20,20
56:2,3,3,6 144:21
**practices** 55:23
138:10,19,23
139:10 140:12
**practicing** 47:18
**precise** 155:11
159:8 160:4 165:15
181:16 188:13
189:14 238:4
**precisely** 154:10
156:9 166:25
**prediction** 166:5
234:12,17 252:7
**preexisting** 83:15
**prefer** 163:12,15
**preference** 163:1,7
245:6 253:22

**preferences** 163:9
174:9
**preliminary** 168:18
169:8
**preparation** 101:5
**prepare** 100:25
103:16 107:2 192:9
**prepared** 105:15
**preparing** 102:21
**presence** 68:23
95:18 136:14
137:14
**present** 3:12 7:9
95:22 125:22
**presentation** 56:21
**presentations**
119:21
**presented** 160:2
**preservation** 239:19
**presumably** 13:19
**previous** 16:8 25:9
90:15 183:12
**previously** 93:14
109:9
**price** 171:4 172:2,16
172:19,23 184:25
185:3
**primarily** 31:24
39:12 91:1 153:17
**print** 88:1 255:25
256:5,9,14,18 257:6
**prior** 17:9 29:6
60:12 123:17
147:11
**private** 6:9 199:13
**privately** 202:18
203:6 222:12 223:6
224:16
**probability** 234:11
234:19 235:8 236:1
236:22 237:3 238:2
238:7 251:7,13
**probably** 25:16
26:20 27:1,8 30:21
31:8,9 43:5,21

87:17,20,22 91:5,23
115:7 121:5 176:4
251:3
**problem** 45:19,22
85:4
**problems** 48:19
50:19,24 51:13,20
52:1,4,13,15,18,20
52:22 53:13 54:12
54:16 55:5,21 56:5
82:16
**procedure** 98:21
101:6,12,14
**procedures** 57:10
57:23 58:13
**proceed** 15:3 17:11
**proceeded** 153:16
**process** 30:23 31:13
33:17 39:19 42:4
44:18,22 45:4,8
81:21 82:3,4 84:8
85:19 87:3,15 90:19
90:20 91:15 100:20
108:3,6 130:21
131:1,7,9,14 197:8
198:2 230:11
**processes** 28:19,25
29:2,16,22,24 30:3
30:10,20,25 31:4
40:18,23 41:12,21
131:2
**produce** 87:18
**produced** 21:8
112:8 114:3,5
153:20 175:8 195:5
**product** 52:8 71:6
**production** 5:6 24:1
118:14,18
**products** 32:15
34:14 35:21 72:1,3
72:7,10,24 82:11,15
159:19 217:24
224:20 225:5,8,16
225:19 246:12,17
247:15 250:15

Veritext Legal Solutions
866 299-5127

251:22
**profession**  25:19
**professor**  229:13,25
  230:8,18 231:4
  232:1,24
**profit**  85:6,8
**profitability**  182:21
  183:6
**program**  48:5
**project**  104:9
  105:25 106:25
**promote**  221:5
**promoting**  198:18
**prompt**  120:14
**properly**  214:5
**property**  9:2,7,23
  10:4,13,16,23 11:5
  11:16 26:19 139:16
  139:21
**proportion**  154:20
**proposal**  40:13
**proposals**  40:12
**proposed**  83:22
  85:23 86:4
**proposition**  232:7
**propriety**  168:17,20
**prospectively**  123:8
**protection**  1:7 2:12
  7:20 11:1,2 18:2,20
  52:6 65:8,12 67:22
  68:7 69:8,11,25
  70:6,7,9,11,15,17
  73:19 79:13 80:1,23
  80:25 110:19
  114:14 126:13,18
  139:16,21 140:5,13
  219:3,6 222:11,15
  223:5,9 230:21
  236:16 245:8
  246:15,16,19
**prove**  142:8
**proved**  142:11
**provide**  23:24 34:14
  55:18 56:1 87:17,20
  87:22 88:25 89:1

115:23 120:2 141:1
  141:15 145:4
  146:24 158:25
  199:18 218:5,19
  221:15 222:1
  223:25 224:17
  225:25 226:7
  227:17 228:18
  230:18 232:24
  235:1 252:6
**provided**  22:9 23:24
  93:4 118:21 119:7
  119:10,12,13,14,18
  119:24 120:18
  135:23 148:15
  153:15 198:1,5
  226:6 256:13
**providers**  223:18
  224:7,11 225:4
**provides**  141:10
  163:8 215:14 219:7
  222:12 223:6
**providing**  87:14
  88:11 209:20
  226:16 253:6 257:2
**provisions**  226:24
**public**  3:13 12:15
  38:15,20 52:5 62:17
  71:5,6 73:21 74:23
  75:23 76:18 111:8
  111:25 112:3
  114:13,16,22 115:6
  123:17,23 124:2,16
  129:11 130:7
  211:22 216:9,18
  227:6 249:4,6 250:3
  257:15 260:3,15
**public.resource.org**
  1:14 7:3 74:4 75:5
  75:12 76:3,6 165:18
**public.resource.org.**
  74:17
**publication**  4:16
  134:12 184:15,21
  185:13

**publications**  62:19
  141:3,11 158:13,14
  178:22 184:15,19
  185:18 187:1,6,21
  188:1,3,6 217:15,21
  219:9,20 220:2
  222:14,16 223:8,10
  223:19,21 224:10
  250:13 251:1,3,5
  253:7,19,24
**publicly**  158:19
**published**  40:17
  72:5 112:10 175:19
  195:2,11 211:11
**purchase**  62:19
  185:12 231:5
**purchased**  233:2
**purely**  88:22
**purported**  144:20
**purpose**  49:8 110:15
**purposes**  77:24
  138:12,20 139:7
  243:10,16 254:2
**pursuant**  260:3
**pursued**  131:2
  245:9
**pursuing**  245:12
**put**  10:3 102:13
  126:6 132:17
  150:15 213:8 222:2
  228:6,9 241:8 251:4

**q**

**qualified**  225:25
  227:17
**qualitative**  173:18
  173:20
**quality**  46:10,16
  52:7 82:16
**quantification**
  235:21 242:19
**quantified**  132:7
  242:2,8
**quantify**  63:3 74:21
  81:3 242:15 252:1

**quantitative**  171:3
  172:7 173:22,24
  209:7 234:19 235:2
  235:15 236:7 237:2
  237:8,14,20 238:1
  241:23 242:25
  251:13
**quantity**  175:14
**question**  15:5 16:9
  16:11,21,22 17:9,11
  17:13,16,17 29:23
  30:2,6 35:8,10,11
  36:11,16,19,25
  37:12,19,22 51:12
  54:8 55:25 57:20
  59:18 67:16 69:18
  75:10,11 77:23
  80:22 90:5 95:8
  105:11 107:16
  108:3,12,18 123:11
  125:22 129:3 137:5
  137:12,17 143:15
  143:23 144:4 145:8
  145:25 146:1,3,20
  149:20 150:3,10
  151:1,15,24,25
  152:5 157:10,18,23
  159:14 165:20
  166:4 168:6,9,10,13
  168:21 169:4
  171:11 172:19
  173:1 176:4 177:2,5
  183:13 188:5,6,11
  188:22 194:1,3
  195:23,25 196:20
  202:11 205:8
  207:10,17,21
  230:25 231:17
  232:6 233:25 244:7
  253:11 257:22
**questioning**  52:19
  58:24 59:17 106:3
  171:9
**questions**  5:15
  77:22 95:1,5 145:12

[questions - refresh]

150:6 186:20 192:3
200:24 258:14,15
**quicker**  154:18
**quite**  29:9,13,17
41:24 80:20 111:5
142:5 145:11
156:25 157:9 163:2
184:6 257:24
**quote**  29:21 64:1
**quoted**  69:9,20
**quoting**  70:8

**r**

**r**  244:25 260:1
**range**  31:14,15
122:6 202:20
**ranges**  119:6 135:3
135:5
**rarely**  92:8
**ratio**  154:23
**rationale**  21:11
**ray**  26:10 140:12,15
140:19,20,22 141:1
141:9,23 253:5,13
253:22
**rdr**  260:15
**reaching**  107:11
125:12 148:16
**read**  13:17,21 14:17
20:13 21:8,24 55:24
72:9 78:21 112:7,8
112:9,11 118:3
129:3,8 130:2 137:9
142:22,23,23
143:10 201:15
218:7,10,14 219:10
221:23 222:24,25
222:25 225:23
227:15
**reading**  72:11 130:9
135:24 136:5
214:21 215:1,7,12
215:19,24 250:19
252:20

**realize**  196:12
207:16
**really**  64:7
**realtime**  1:23
**rearranging**  200:18
**reason**  165:3 167:10
195:23,24 221:9
223:1 227:25
258:10
**reasonable**  65:24
212:22 238:2,7
242:4
**reasoning**  234:25
**reasons**  214:18
**recall**  20:8,19,22,25
21:5,10,19 22:3,14
23:25 24:3 25:14
26:24 27:14,25 31:3
41:19 42:7 50:19,21
53:12 55:11 93:2
96:7,16 99:2 101:19
113:19 114:9
115:11,20 117:1
119:23 120:15
121:3 122:20 123:4
123:10,14,19 124:7
124:9,14,15 125:24
125:25 126:2,8,22
127:4 134:24
138:16 139:14,20
140:4,7,18,21 141:5
141:20 154:18
155:25 156:18
174:13 178:1
179:16,25 180:5,15
180:24 181:3,8
185:4 190:18
194:21,24 195:4,6,9
195:20 198:14,15
199:9 200:2 202:16
206:18 207:22
211:7 225:2 239:6
239:15 240:9 241:3
249:21 250:4
253:10 255:19

**recalled**  109:7
**recalling**  23:6
**recast**  150:1
**receive**  50:14
121:22 122:10,15
192:23 221:16
222:3
**received**  25:11
82:13 122:17,24
197:7 198:10
**recess**  61:19 110:4
152:25 210:16
**recite**  28:4
**recognize**  175:7
**recollect**  184:13
**recollection**  140:8
**recollections**  108:25
**recommending**
58:12
**record**  6:6,17 16:7
17:7 35:5 61:17,23
110:1,8 152:23
153:4 210:13,20
248:18 258:22
259:3 260:8
**recorded**  106:6
260:6
**recording**  6:15
**recordings**  106:17
**records**  27:16,20
28:4 63:10 133:6
**redrawing**  71:8
**reduce**  46:12 250:14
**reduction**  156:22
251:21
**refer**  11:24 90:7,21
91:1 98:24 115:22
140:20,21 143:8
199:13,25 212:7
218:12 232:14
235:4,9 236:2,15
244:25 245:22
246:8 251:8
**reference**  18:11
22:16 47:7,8 48:23

53:6 60:16 67:20
70:3 71:15 138:16
138:24 156:13,14
158:16 177:23
192:13,24 193:21
194:3 199:24 200:5
200:10,20 201:14
202:8,19 203:6
204:16,19 209:5,11
209:18 210:3
221:18 239:1,9,14
241:4,11,13 254:13
**referenced**  245:25
246:10
**references**  103:6
187:25 244:19,22
**referencing**  233:11
233:12
**referred**  10:11
13:23 22:24 23:19
36:21,22 68:22
84:11 110:13
171:10 201:14
212:17 226:21
**referring**  13:3 23:9
49:11 50:23 68:22
69:3,13 99:19 107:3
115:18 160:20,21
163:20,22 187:7
215:10 218:6,20
233:22 235:16
**refers**  22:13 140:19
171:17 188:3
201:21
**reflect**  101:13 115:3
115:6 117:5,13
**reflected**  17:23
19:25 62:11 93:19
113:12 158:3 247:7
**reflection**  184:13
**reflective**  251:5
**reflects**  15:13,20
114:20
**refresh**  123:3
140:23 165:24

Veritext Legal Solutions
866 299-5127

[refresh - resource]

221:13
**refreshed**  24:21
103:24
**refreshing**  141:7
**refrigerating**  7:25
**refrigeration**  1:11
2:17
**regard**  18:4,12 19:5
26:21 30:11 49:17
67:1,2 71:4 78:3,7
82:5 141:24 155:4,5
155:6 157:2 165:21
222:13 223:7
224:18 255:7
**regarding**  13:7
69:24 93:6 95:1
103:17 104:3,22
105:16 116:9,17
124:17 127:24
156:12 174:4
180:17 208:24
243:4
**regardless**  35:19
**regional**  52:10
**registered**  1:22
**regular**  113:7
**regulation**  203:12
228:17 229:8
**regulator**  37:4
**regulators**  36:9,12
36:24 37:6
**regulatory**  38:5,10
**rehear**  149:24,25
**rehn**  2:9 7:18,18 9:9
122:8,12 258:16
**reiniche**  102:4
**rekeying**  71:8
**related**  196:22
203:11,17
**relates**  145:13
**relating**  26:15
203:22
**relatively**  13:20
225:21,22 227:14

**relevance**  142:6,15
144:3,15 147:8
**relevant**  79:12
116:7,15 142:13
146:12 147:14
148:6 250:5
**reliability**  52:8
**reliable**  187:17
**reliance**  258:7
**relied**  21:20 24:6,10
24:24 43:8 102:20
103:18 105:7,15
106:11,13 107:5,8
107:10,12 109:1,12
125:11 146:25
148:16 169:19
205:8 211:15
247:10
**reluctant**  76:16
**rely**  19:21 20:3
100:9 101:13,15,16
101:18 103:5 104:1
104:15 106:17
161:18 169:7,11
180:16 205:5
233:15
**relying**  99:18,24
100:5 106:5,9,24
161:13 162:3 234:3
235:23
**remainder**  254:7
**remained**  138:2
**remedies**  242:22
**remember**  70:3
119:17 140:17
155:13,14
**remembering**  96:9
**reminded**  192:16
**reminder**  188:10
**rendering**  170:17
**reparability**  169:2
**reparable**  151:18
**repealed**  163:5
**repeat**  30:17

**repeating**  66:24
**repercussions**  18:2
70:19
**report**  4:12 9:25
10:21 11:9,12,14
12:13,24 13:2,7,17
13:23 14:18 15:16
16:4,4,15 17:1,1
18:7 20:1 22:8,9,12
25:1 29:6 33:16
39:25 41:3,11,16
48:15 50:2 51:3
53:6,18,25 54:10,22
62:6,12 63:2 64:7
64:11,13 66:9,16
67:3 71:3 79:19
89:5 96:4 98:22,24
99:4,7,11,16 100:15
100:22,25 101:5,24
102:8,21 103:7,19
103:21 104:4,9
106:1 107:6,12
109:2,13,17 110:12
112:18 125:10
135:4,21 138:3
140:18 141:18
142:22,23 143:5,8,8
143:18,19 147:14
153:23 154:1
155:12 160:18
165:23 166:8,16,22
170:24 181:1
183:22 184:12
185:5,5 187:8
195:15 199:12
207:5 209:13 210:6
211:5,20 216:22
228:6,10 231:22,24
**reported**  160:14
164:6 183:22 207:5
235:25
**reporter**  1:22,23 8:3
122:11
**reporting**  180:25

**reports**  119:20
122:2 200:9,16
**represent**  7:11
71:10 98:3 117:15
214:11
**representation**
117:18 206:17
**representations**
20:24 44:7
**representatives**
42:16,17 43:11,16
43:20 94:22 97:4
118:7
**represented**  112:18
179:21
**representing**  2:6,12
2:17 3:6,10 6:19
42:9 45:15 199:6
**represents**  151:12
247:16
**reproduce**  136:1
**reputation**  19:18
21:23
**request**  5:6
**require**  13:21 144:8
144:25 146:20
227:7 230:20
**required**  133:1
**requirement**  46:19
**requirements**  48:6
**research**  93:6,10
94:13 114:12
115:16 162:5,13
252:15 255:12,20
**researched**  172:20
**reserve**  254:7 258:4
**resolution**  45:13
**resolve**  82:17
**resource**  3:13 12:16
62:17 71:5,6 73:21
74:24 75:23 76:18
123:17,24 124:3
129:11 205:22
206:10 216:9,18
249:4,6

Page 26

[resource's - sections]

resource's 211:23
resources 86:1,21
 87:18,21 197:19
 206:22 207:11
 245:12
respect 17:11 25:11
 55:17 60:6 76:4
 79:16 80:17 95:5
 132:19 140:13
 142:3 204:2 208:12
 211:15 219:8 246:3
respond 40:10,12
 54:8 108:18 236:16
responding 17:9
 52:20 144:25
response 171:11
 175:9 243:11
responsible 104:12
responsive 105:23
 108:13 137:12
 151:23 197:5
rest 247:21 248:1,18
 258:4
restate 149:23
 221:25 223:3
result 57:10 58:7
 125:7 149:14
 150:19 151:5 152:9
 184:20 240:5
resulted 212:18
 214:6
results 10:20 57:24
 93:20
retain 101:3
reveal 174:9
revealed 163:1,7,11
 174:9 245:6 253:22
reveals 16:4 17:1
revenue 181:12,21
 182:3,12 183:19
 186:22,25 187:20
 192:23 208:5 213:9
 214:7,11,21
revenues 136:16
 137:16 188:8,15,19

193:5,9 194:4,16
 241:17 242:10
 243:19 244:3,12
review 28:7 54:6,7
 94:10,19 115:9,12
 116:1,10,18 117:5
 117:23 134:17
 195:16 197:20
 199:23 205:10
reviewed 108:19
 114:17 136:8,9
 162:17,20 205:16
 216:6
reviewing 108:9
 162:13
reviews 115:4
revised 108:20
revising 83:16 108:9
revision 89:14
rewriting 106:2
rides 54:14
right 14:2,7,10 16:3
 17:14 20:23 21:10
 28:4 31:8 54:20
 64:22 68:21 69:10
 69:24 72:9,23 76:14
 90:1 95:16 97:8,15
 97:21 113:22 116:3
 123:4 124:14 132:1
 132:23 136:1 140:7
 154:10,15 165:10
 173:23 187:9,14
 189:4 190:14
 191:15,18,23,25
 192:20 197:25
 201:24 202:2,5,9,11
 205:11 206:4,7
 210:7 215:2 218:14
 221:12 225:3,3,12
 227:3 239:7,12
 245:18 253:3
 256:15 257:9
 258:21
rights 9:2,23 10:4
 10:13,17,18,23,25

11:5,17,22 12:7,9
 12:11,16 13:8,14
 15:2,14 16:6 17:3
 26:22 81:5 145:14
 220:2
risen 62:22 208:8,10
risk 66:24
risks 46:6,8
rivals 240:25
room 135:24 214:21
 215:1,20
rooms 136:5 215:7
rough 132:17
round 90:18 91:3,14
route 40:21
routes 255:2
rubel 23:14 92:25
 93:3
rudimentary 71:10
 71:22
rule 81:4 105:4
rules 76:25 77:10
 128:1 146:7,9
 203:12
ruling 67:13 128:14

**s**

safe 39:5
safely 50:13
safety 38:25 49:6
 52:5 54:13 203:12
 203:22
salaries 87:16 88:12
 88:25 91:13
sale 183:19 186:22
 186:25 187:1,20
 188:8,16,20 217:24
 221:5 222:14 223:7
 224:18 247:14
sales 4:16 134:8,13
 155:18 156:2,21,23
 159:18 176:9,22
 177:9,21 178:21
 208:1 217:15,20
 218:5,16,18 220:14

224:14 241:14
 250:14 251:22
san 2:4,10 3:4
satisfy 209:20
saw 24:11 41:6
 112:21 121:3,9
 138:16
saying 11:20 30:7
 30:18 36:23 68:1
 104:7 107:17 173:6
 197:16
says 71:3 89:7
 187:19 201:22
scans 71:7
scenario 231:25
scheme 41:22 42:1
scholarship 93:15
school 128:7 228:16
 230:7 231:11
scope 95:23
screenshot 90:10
screenshots 120:2
sdo 31:7,11 32:25
 33:9 42:18 45:24
 83:10,22 88:7
 240:10,11
sdos 28:20 29:22
 31:20 33:2 42:19
 51:20 70:18 75:2,9
 131:3 138:16,20,24
 139:10,20 140:1,4
 140:25 141:14
 240:16 254:2
seal 260:10
search 93:12,18
searches 153:18
second 2:3 54:25
 104:20 235:5 254:8
section 18:18 65:11
 68:20 158:25
 199:19 201:16
 209:14
sections 13:12,14
 14:8

[sector - specific]

**sector** 199:13
**see** 9:24 10:20 12:23
  14:5,8 18:25 19:25
  24:15 41:4 62:7
  71:16 89:11 101:23
  105:22 109:17
  142:5,14 153:25
  155:12 162:18
  165:24 175:17,21
  179:20 193:5 197:4
  199:17 202:22
  204:10 211:23
  218:11 219:11
  223:13 224:21
  226:2 233:11
  235:24 240:1
  241:18 247:18
  250:16,24 252:13
  252:21
**seeing** 21:5 24:3
  120:15 122:20
  123:10 154:14
  241:4
**seek** 31:21
**seeking** 31:18
**seen** 20:24 21:3,7
  23:23 29:14 43:5
  58:2 103:2,3 106:18
  106:19 137:2
  180:12 185:6
  192:13 209:6
  216:13 239:1,9,14
**sell** 222:16 223:10
**selling** 82:11
**seminars** 224:6,8,12
  225:9
**send** 243:9
**sense** 81:25 93:10
  113:8 121:20
  132:13,14 184:17
  217:25 220:20
  221:1 228:5 252:20
**sensitive** 6:8
**sent** 76:10

**sentence** 63:24,25
  71:25 89:7 90:7,16
  218:2,11,12,15
  219:10,11 223:3
  234:12 235:5,10
  236:3 250:19 251:9
  252:7
**sentences** 72:2
**separate** 23:22
  137:21 138:18
  139:6 180:5 196:16
  201:3,4,5,6 219:19
**separately** 23:25
  93:2 119:18,25
  179:19 194:23
  196:14 208:21
**september** 260:11
**seriatim** 9:15
**serve** 85:25 86:20
**services** 32:16 34:14
  35:22 52:9 82:12,15
  203:10,18 209:20
  224:19 225:5,7,17
  226:7 246:12,17
  247:15 250:15
  251:23
**set** 42:8,20 49:5
  92:10 135:10
**setting** 26:6,16 27:6
  30:11,13 31:9,24
  32:5,9,18 139:24
  140:1
**seven** 102:2
**shared** 87:24
**sharing** 215:11
**shirt** 46:1
**shorthand** 260:6
**show** 64:12 122:22
**shown** 93:20 118:15
  119:5 134:18
  187:22,23 253:2
**shows** 202:7 204:16
  205:23 206:11
  250:11

**shut** 236:19
**sic** 7:6 54:15 67:8
  222:17
**side** 33:18,19 34:12
  34:17,21 35:12,18
  36:21,22 37:4,5
  38:1,2,6,7,16,21
  39:7,12,14 82:9,14
  83:12,13 84:11,12
**signature** 260:14
**significance** 129:12
  129:15 220:6
**similar** 83:15
  256:21 257:24
**similarly** 30:10
**simply** 87:14 241:8
**sit** 84:4,19 116:3
  154:10 191:6,14,18
  191:23,25 192:19
  192:20 199:2
**site** 90:11 120:2
  164:15,22 179:13
  180:3,9 185:7
  205:17 206:7
  211:23 215:13
**sites** 40:1 101:24
  122:1 136:15
  137:15 159:24
**sitting** 20:23 27:24
  41:11 53:23 117:1
  123:4 124:14 132:1
  132:22 140:17
  142:24 143:12
  190:13 195:12
  202:9 225:2,3 239:6
  239:12,15
**six** 95:25
**slash** 93:3 201:5
**slightly** 40:18 95:9
  208:9
**small** 42:16 43:16
**smoke** 39:10
**socially** 49:8
**society** 1:3,9 2:6,17
  7:1,24

**sold** 175:14
**sole** 199:14
**solicit** 31:14
**solicited** 110:25
**solution** 45:18 48:25
  55:10,16 60:3,6
**solutions** 1:19 48:20
  55:6,14 59:24
**somebody** 38:24
  56:9,11,18
**somewhat** 29:19
  215:13
**sophisticated** 71:12
  72:4
**sorry** 11:19 17:21
  24:18 36:10 56:15
  57:19 65:20 84:9
  89:3 92:14 118:13
  122:12 138:7 146:7
  152:17 154:5
  156:17 163:5
  164:10 171:1
  185:10 188:21
  196:12 200:17,21
  205:4 213:12 217:2
  217:5 223:2 244:16
  244:21 247:1
**sought** 196:5
**sounds** 30:1,5
  113:16,18 150:24
**source** 25:7 134:22
  134:25 135:2 193:4
**sources** 22:8 112:13
  153:17 233:11
**spalding** 2:2 7:23
**speak** 92:19 143:9
**speaking** 50:22
  51:25 52:23 88:14
  203:4
**specific** 50:10 64:25
  71:4 114:9 125:23
  139:18 144:14
  164:19 172:22,25
  173:5,10,15 174:1,6
  174:24 177:17

[specific - strike]

| | | | |
|---|---|---|---|
| 180:25 181:3 | 195:2,10 200:20 | 156:13,23 160:1 | 195:3 199:15 |
| 242:15,19 247:12 | 201:10 202:1 | 175:14,23 176:22 | 202:25 205:6 |
| 255:20 | 206:24 207:14 | 176:23 177:8,9,20 | 222:20,23 223:13 |
| **specifically** 30:3 | 211:16,16 215:6,10 | 177:21 178:13 | **statements** 23:18 |
| 49:11 70:14 99:15 | 215:19 225:24 | 179:12 180:3,9 | 105:16 113:24 |
| 113:20 114:6 | 226:1 227:16,18 | 181:13,21 182:1,4 | 119:11 120:23 |
| 117:24 193:10 | 229:15 230:10,11 | 182:13,22,23 183:7 | 121:16 124:16 |
| 194:6,16 233:22 | 232:15,18 253:7,19 | 183:8,19 186:23,25 | 135:8 162:14 |
| **specifics** 130:24 | 253:24 254:12,15 | 188:9,16,20,23,24 | 247:21 249:16 |
| 131:23 | 254:17,23,25 | 189:2,3,12,18,24 | **states** 1:1 115:15 |
| **specify** 243:8 | 255:25 256:5,17 | 190:5,21 191:11,21 | 116:1,9,10,17,18,24 |
| **speculated** 161:15 | 257:6,12 | 192:9,25 193:11,19 | 117:7 124:11,19 |
| **speculating** 61:12 | **standards** 20:15 | 193:20 194:6,17 | 204:7,17 205:23 |
| **speculation** 77:3 | 21:13 25:11,22 27:6 | 198:19 199:14,24 | 206:11 |
| 78:15 228:21 | 27:13 28:1,9,14 | 200:5 201:13,17,18 | **stating** 67:19 |
| 229:10 257:18 | 29:3,24 30:9 31:2,5 | 201:19,21,23,25 | **statistics** 91:1,1 |
| **spend** 13:22 41:10 | 31:6,9,23 32:4,9,16 | 202:4,4,6,18 203:7 | **status** 124:7,8 221:5 |
| 96:11 97:3 | 32:18 33:5 34:15 | 208:17 209:1,24 | **statute** 60:17 |
| **spent** 89:8,22 91:12 | 35:23 39:20 41:7 | 210:3 214:20 216:3 | **step** 71:10,23 239:18 |
| 97:16 | 42:5,6 44:10 45:4,7 | 217:15,16,22 218:4 | **stephanie** 102:4 |
| **spills** 216:25 | 46:11,16 47:8 48:12 | 218:6,18,20 219:7 | **stephen** 101:25 |
| **sponsorship** 192:9 | 48:21,22 50:8 55:7 | 220:14,15 221:17 | **steps** 31:18 39:23,24 |
| **spreadsheet** 4:16 | 55:7,15 56:1 57:5 | 222:4,12 223:6,25 | 41:6 71:21 112:4,23 |
| **sso** 31:10,12 32:24 | 57:17,22 59:25,25 | 224:17 226:24,25 | 114:21 129:22 |
| 33:9 | 60:20 69:11 70:2 | 227:7 229:6 236:17 | 130:6 153:9 |
| **ssos** 32:10,14 33:6 | 71:7,11,14 72:6,8 | 236:20 238:16 | **stipends** 192:23 |
| 131:3 | 75:2,16,25 76:1,4 | 239:17,20 240:2,5 | **stipulate** 9:16 |
| **staff** 86:6 88:14,21 | 76:11,16,17 78:12 | 240:17 241:10,12 | **stipulation** 9:12 |
| 91:6 190:20 191:10 | 79:1 80:2 81:5,20 | 241:14 250:1,2 | **stipulations** 5:11 |
| 191:20 198:17 | 82:19 83:7,15,16 | 255:16 256:22 | **stop** 129:6 240:4 |
| **stage** 212:12 | 84:8,24 85:14,15,24 | **standing** 260:3 | **story** 178:5,8 |
| **stages** 99:9 | 86:4 87:3,19 88:1,1 | **start** 12:2 184:16 | **straight** 143:7 |
| **stamped** 122:16 | 88:2,5,16 89:10,24 | **starting** 244:16,18 | **street** 1:19 2:3,9 3:3 |
| 135:9 | 90:4,8,10 93:7 | **starts** 72:10 209:15 | 3:8 6:23 |
| **stand** 52:16 | 114:15 123:21 | **state** 7:10 13:6 44:2 | **strike** 25:9 39:17 |
| **standard** 4:19 25:15 | 124:11,17 127:1,2,5 | 47:6 195:1 202:18 | 48:8 64:18 67:6,6 |
| 26:6,15 28:14 30:11 | 130:22,25 131:9,14 | 203:7 206:11 | 67:10 91:10 94:8 |
| 30:13 32:18 40:5,17 | 132:10,20 133:11 | 225:15 247:13 | 113:16 117:3 |
| 42:12 44:6,15 45:25 | 133:17,20 135:15 | 250:12 | 118:24 129:7 |
| 46:20 61:2,10 82:2 | 135:25 136:2 | **stated** 10:11 17:7,24 | 135:13 146:7 |
| 89:15 90:22 91:16 | 138:11 139:24 | 112:13 118:8 | 159:15 163:5,18,20 |
| 92:7 131:6,15,19,22 | 140:6,21 141:16 | 122:22 186:21 | 168:18 169:8 |
| 132:4 140:1 141:2 | 142:3 154:3,6,21,24 | 247:25 | 175:19 179:10 |
| 141:11 158:13,15 | 154:25 155:14,18 | **statement** 63:17,21 | 181:11 183:4 189:8 |
| 158:19 176:10 | 155:20 156:3,5,12 | 64:10,17 65:1 71:18 | 211:21 217:5 |

[strike - testimony]

218:17 219:3
220:11 226:11
244:17 246:3,5
254:13 255:13
**student** 170:4
171:14 233:1
**students** 228:19
230:1,19 231:11
232:18
**studied** 131:6,11,16
157:6,12
**studies** 19:21 127:23
128:6 216:6,15
233:14 246:22
247:3,24 255:5
**study** 94:7 128:8,15
132:24 138:10
157:24 209:7
216:13 230:20
233:19 255:10
**subject** 11:2 86:25
105:3 128:2,15
222:8
**submitting** 154:2
**subpoena** 175:9
**subsequent** 199:18
**substance** 103:22
230:9
**substantial** 41:20
62:18 121:4 246:13
**substantive** 44:21
44:25 88:24
**suffer** 74:16 76:25
77:10 81:4 232:24
254:15 255:24
256:16 257:11
**suffered** 62:2
123:12 127:13,25
253:17
**sufficient** 45:16
**suggest** 35:6 79:25
83:7
**suggestion** 247:14
**suggests** 83:2

**suit** 124:5,7,8
**suitable** 56:23
**suite** 2:4
**summarize** 27:19
64:9
**summarized** 12:12
12:24,25 39:23 41:3
66:25 112:22
114:10 153:24
155:13 157:21
160:17 162:18
208:6 233:20
248:25
**summary** 11:10
33:16 175:12
**supervised** 104:13
**supervision** 260:7
**supplemented** 89:18
**supplier** 172:4
**supply** 32:13 33:18
34:12,17 36:21 37:4
38:1,6,16,21 39:12
82:9 83:12 84:11
**support** 5:1 25:6
45:17 52:5 199:14
199:18
**sure** 8:20 9:20 13:25
14:19,19 15:4 21:15
22:14,17 29:14,17
32:23 33:8 35:9,16
41:24 50:5 57:13
63:12 64:1,19 73:10
74:20 80:21 122:15
124:6 126:14 131:3
151:1 152:20 156:8
156:25 157:9,18
165:15 182:8 184:6
185:14 197:3
210:10 212:11
217:10 220:5
221:22 222:7
231:17,19 232:14
234:16 256:4
**surprised** 118:2
192:15

**surveys** 185:8
**sustainability** 52:6
**swear** 8:4
**sworn** 8:8 260:4
**systematically**
193:25
**systems** 52:9

**t**

**t** 244:25 260:1,1
**tab** 27:21 93:21,22
94:14 113:13
114:18,19,20
115:22 118:15,21
118:24,25 121:23
121:24 135:4,6
197:17 208:6 253:2
**table** 23:10
**tables** 165:23
**tabs** 134:13,19
153:25 158:4,6,22
248:25
**take** 13:13 14:3,22
15:7,15 56:18 59:13
59:14,19 61:14
73:12 79:21 98:17
100:13 101:7
109:24 129:22
130:6 152:21 206:6
212:14
**taken** 1:18 25:18
79:7 149:1,9 168:8
214:9 260:3
**taker** 101:8
**takes** 4:19
**talk** 70:14 82:2
125:13 160:25
172:3 187:10
211:20,21,24
229:16
**talked** 35:18 50:6
106:22 113:5
184:11 193:15
194:11 248:4,7

**talking** 68:16 70:2
82:21 88:13 106:3
123:6,8 128:6
140:14 187:12
229:13 230:9
**talks** 70:6,15 201:16
**tangible** 62:8,10
67:1
**taught** 170:13
171:18
**taxes** 88:25
**teacher** 229:5
**teaching** 88:3 229:5
**team** 93:24 135:7
**team's** 94:13
**technical** 229:14
**technically** 139:25
**telephone** 197:7
**tell** 53:11 95:17
143:11 163:4,6
166:22 201:20
238:21 260:4
**ten** 58:25 59:7,7,10
208:2,4
**tend** 101:9
**tends** 35:5 42:19
**term** 31:8 38:12,14
128:9 161:10
223:23 231:21,23
234:17 235:17
238:22 240:21
256:8
**terms** 57:4 246:1
**territories** 204:7
**test** 54:5 120:5
**testified** 8:8 54:25
**testimony** 11:24
24:9 27:22 55:1,11
60:12 61:5 67:11
74:5,18 78:11,25
79:11 102:24 112:9
123:15 147:14
157:1 160:16,21
168:19 186:9,19
196:25 197:2

[testimony - trend]

258:23 260:3,5,8
**testing**  1:4 2:6 7:1
**text**  71:8 82:19 83:1
83:23,23
**thane**  2:9 7:18
**thane.rehn**  2:11
**thank**  61:15 111:23
141:6 188:10 189:4
223:2 258:18,20
**thanks**  210:11
**theories**  169:6,10,17
170:7 171:8,16
174:12
**theorized**  245:2
**theory**  171:5 172:2
172:5,17,20,23
173:8 174:8 244:20
244:23 245:2,2,4,17
245:22,24 246:1,7,9
246:23 247:4,11
249:16 253:22
**thereabouts**  98:5
**thereof**  260:9
**thing**  62:25 202:3
**things**  8:24 33:3
34:15 59:12 62:22
63:21 65:5 85:21
88:8 89:2 100:20
109:6,9,12,20,20
115:7 118:21
120:12 121:5 133:5
171:3,6 172:10
196:6 197:10 203:1
203:11,13 210:5
215:24 218:19
223:22 248:11
254:6 257:8
**think**  13:10 14:15
15:9,17 17:6 18:8
18:17,22 22:12,18
23:5,22 30:15 32:22
32:23 33:24 34:19
38:20 39:8,11 41:16
42:8 43:5,18 48:14
49:15,16,16,17

50:10 56:20 57:7
58:2,7 62:24 63:20
66:14,18 67:25 68:1
68:9,25 69:2,5 70:1
71:24 72:13 83:4,9
83:10,18 84:6,19
85:1 86:11 87:17,20
87:22,25 89:17 90:9
90:14 92:24 94:15
98:5 102:13 103:25
108:21 109:7,22
112:2 113:22
114:24 115:1,5
117:17 119:21
121:9,25 122:1
123:22 124:4
126:12,24 130:18
131:1,20 135:8
136:12 140:20
141:17 155:2,4,5,21
156:7,8,22 157:1
158:7,12,17,21
160:23,24 162:7
165:3 166:4,11,19
167:10,22 168:7
170:8 175:25 176:3
176:18 177:12
178:3 181:15,19
182:7,16 183:13
187:10 188:12
189:13,20 190:1,7
190:11,24 192:12
192:21 193:16,25
194:10 195:22
197:24 198:6,22
207:5 208:3,13,19
208:20 210:4
213:19 215:21
216:12 217:19
218:23 219:15
220:6 222:24 224:5
225:4,24 227:16
229:15 232:8,11
236:21 238:1,10
253:3,15 254:5,6

258:3,10
**thinking**  54:19
142:11 222:8 257:9
**third**  71:13 153:17
**thomas**  102:1
**thought**  20:14 22:15
37:11,20 40:14 53:2
61:12 69:4 77:17
80:6 84:16 101:1
161:15 186:24
188:21,22 228:8
233:7,24 253:8
257:22 258:1
**thoughts**  42:11
**thousands**  199:13
**three**  15:11 40:24
89:19,20 96:24 97:7
97:13,19 102:5
107:21 109:18,19
154:12 187:25
240:13 243:20
248:24
**throw**  101:12
**thursday**  1:21
**time**  6:20 13:13,22
14:12,23,24 15:7,16
41:10 92:5,12 97:16
98:21 99:6,7 103:2
107:17,22 131:7
132:18 133:5 138:2
152:18 198:17
206:7 228:23 230:5
254:7 258:5,16
260:4
**times**  42:4 83:11
101:25 102:1,2,3,5
102:6 107:23
200:19 212:13
**timing**  165:7,15
**title**  65:10
**today**  8:2 23:10
41:12 133:17 134:1
140:3
**today's**  6:19

**told**  196:1
**tolles**  2:8 7:19
**top**  119:7 217:12
219:3,5 222:10
**topic**  14:9 19:5
42:10,12 45:3,12
60:15 62:24 80:6
93:1 131:12 137:22
143:21 180:12
193:15 194:11
209:7 255:21 258:2
**topics**  25:24 42:21
49:18,20 106:23
**total**  97:3 154:24
**touch**  14:8
**track**  193:25
**trademark**  11:22
12:11 13:8,14 15:2
15:14 16:6 17:3,23
18:3,16 63:15 64:5
65:12 77:19 110:21
111:4 143:22
**trademarks**  12:17
16:17 19:8,10
112:20
**trained**  171:3
**training**  25:10 88:4
161:21 169:23
170:3,8 171:12
172:11 173:2,7,13
173:18,24 174:3,21
174:22,22 224:6,7
224:11 225:9,20,25
227:17 238:9
**transcribed**  260:6
**transcription**  260:7
**transcripts**  119:9
159:12 160:25
**travel**  89:1
**treating**  139:21
140:5
**tremendous**  245:12
**tremendously**  75:3
**trend**  131:6 159:23
208:12

Veritext Legal Solutions
866 299-5127

[trends - value]

**trends**   134:8 155:18
  156:2,21 175:16,20
  176:9 178:20
**trial**   27:22
**trip**   90:18 91:3,14
**true**   133:22 155:5,6
  202:3 260:7
**truth**   248:11 260:5,5
  260:5
**try**   30:6 33:17 53:3
  197:4
**trying**   32:4,5 50:24
  51:14 52:1,14,18,24
  53:13 99:13 113:15
  157:5,11 186:18
  201:1 226:7
**tsc**   1:4 7:6
**turn**   6:11 89:4
  216:24 217:7
**turning**   187:17
  219:5 225:14
  236:14
**turns**   78:10 146:6,9
  178:18
**two**   32:21 34:1
  69:22 72:2 93:3
  96:24,25 97:18,19
  97:20 101:21
  119:23 193:6
**type**   47:24 87:13
**types**   8:18 26:14
  43:22 72:24 82:22
  83:6 87:7,9,9,13
  109:11 223:22
**typical**   89:14
**typically**   45:23 83:5
  101:7 198:8 215:22

**u**

**uh**   123:1
**ultimately**   40:15
  167:23
**unable**   252:1
**unauthorized**
  225:23 226:5,21

227:5,15 231:7,22
  231:23 232:1,9,13
**uncertainties**   121:6
  235:4
**underlying**   11:9
  234:25
**underpinning**   186:3
  186:4,8
**understand**   18:14
  20:5 33:11 35:4
  36:15,18,25 38:12
  39:16,18,24 41:12
  41:21 47:5 48:8,11
  50:24 51:5,7,10,13
  52:23 62:14 67:16
  69:18 78:11,24
  79:10 82:7 84:23
  85:13,22 87:2,13
  88:20 129:10
  130:11 133:2,16
  142:16 143:12
  144:5,16 145:9
  148:5 149:13
  150:10,13,14 152:4
  169:1 172:19 173:1
  177:4 183:18
  184:22 186:17,18
  188:7 200:22,25
  201:1 205:7 206:3
  207:3 209:9 211:11
  215:17 217:11
  223:17 225:15
  226:4,10,20 243:13
  249:19 255:23
  256:4,11,16 257:10
**understanding**
  12:13 14:1 15:24
  43:1,2,4 45:5
  101:24 129:14
  133:6,7 135:17
  146:11 147:6,7,8
  148:11 165:11
  170:11 180:22
  185:15,22,23 186:1
  188:19 198:16

211:13 215:4
  219:19 220:22
  221:22 227:4,21
  240:9
**understood**   112:18
**undertake**   75:23
  138:18 139:6
  193:18 249:24
**undertaken**   26:21
  28:19 29:2,22,24
  137:21 139:5,11
  207:7 257:20
**undertaking**   207:23
  249:11,21 253:11
  255:20
**undertook**   30:8
  251:6
**undeveloped**   247:16
**unfair**   222:22
**unique**   31:13
**unit**   110:2,9 210:14
  210:21 258:23
**united**   1:1 115:15
  115:25 116:8,16,24
  117:7 124:11,19
**unknowing**   76:17
**unlawful**   60:22
**unrelated**   108:14
**unrestricted**   141:2
  141:10,15 241:9
  253:6,18,23
**untapped**   247:16
**unwilling**   222:17,25
**updated**   89:18
**updating**   89:10,24
  90:21 91:16 92:6
**upside**   20:11 21:3
  22:13,18
**use**   19:2,13,17 31:8
  71:10,13 146:11
  149:5 176:9 192:24
  204:19 215:14
  216:1 222:18
  223:12,23 235:16
  238:22

**useful**   100:17,19
  144:12 198:7,8
**user**   225:20 232:9
  232:10
**users**   32:15 35:20,21
  42:15
**uses**   221:4

**v**

**v**   124:24
**vacuum**   161:22
**vague**   19:23 20:20
  24:8 34:6 43:23
  56:12 67:14,24
  72:16 80:10 81:23
  86:10 91:4 98:25
  100:2 104:5 106:8
  107:7 116:12 127:6
  128:4,22 134:20
  135:19 138:6,14
  140:8 144:7 147:23
  152:15 162:16
  163:13 174:18
  176:12 178:24
  179:15 181:7
  192:11 217:18
  220:3,17 221:19
  227:9,19 228:11,20
  229:10 230:3 232:4
  238:18 240:19
  241:2 246:25 248:2
  252:10 256:2
**valid**   12:7 77:25
**validate**   185:9,10
**validity**   120:6
**valuation**   9:1,21
  10:12,15
**value**   9:20 10:3,8,10
  19:7,8,10 132:8,18
  189:9 195:21
  198:17 212:6 213:8
  219:9,20 220:2
  221:15 222:2,14
  223:8,19,21 224:10

[valued - witness]

| | | | |
|---|---|---|---|
| **valued** 9:6 | 143:3 144:10 | 51:15 52:16 54:11 | 65:4,19,23 66:4,17 |
| **variety** 48:15 58:8 | 148:20 149:3 | 54:15,18 55:5,9 | 67:15,25 69:17 |
| 131:2 172:8 | 167:25 228:3 | 56:19 58:15,17 60:2 | 70:13 72:17 73:3,18 |
| **various** 29:16 45:6 | 230:17 231:3 | 60:5 61:7,8 74:2,8 | 74:7 76:8 77:4 |
| 62:21 86:5,23 88:15 | **viewed** 111:3,9 | 79:7,21,25 80:5 | 78:21 79:6,20 80:4 |
| 96:1,22 98:12 99:13 | **viewing** 215:6 | 109:21 176:9,19 | 80:11,20 81:9,15,24 |
| 99:15 107:17 112:9 | **views** 111:13 112:5 | 180:1 181:9 221:9 | 82:21 83:9 84:1,3 |
| 112:15 132:9 | 112:14,16,17,22,24 | **ways** 48:16 61:9 | 85:1,18 86:11 87:5 |
| 153:21 179:12 | 113:9,20,25 114:6 | **we've** 58:20 | 87:12 91:5 92:1 |
| 180:2,8 248:5,8,11 | 114:10,21 115:6 | **web** 40:1 72:5 90:11 | 93:9 94:1 97:6 98:9 |
| **veeck** 124:24 125:1 | 117:15,25 118:1 | 120:2 122:1 136:15 | 99:1,21 100:3 |
| 125:18 126:23 | 162:3,9,14 | 137:15 164:15,22 | 102:12,25 103:11 |
| 127:15 129:15,24 | **violate** 148:2 | 179:13 180:3,9 | 104:6,19 105:19 |
| 130:8,16 | **violated** 148:7,21 | 185:7 197:19 | 106:16 107:15 |
| **vendor** 229:18 | **violations** 147:22 | 205:16 206:7 | 108:19 109:5,16 |
| **verification** 23:23 | **virtually** 106:22 | 211:23 | 110:25 113:5 |
| 196:16 | 109:16 | **went** 92:16 101:20 | 114:24 116:20 |
| **verified** 179:9,11 | **visit** 90:10 258:5 | **west** 3:2,7 7:13 | 117:12 118:11,13 |
| 205:4 | **volume** 176:23 | **whichever** 169:19 | 120:11 122:9,14 |
| **verify** 23:17 24:1 | **volumes** 177:9,21 | **whispering** 6:9 | 124:21 125:13 |
| 113:23 195:7,18 | **volunteer** 90:16,25 | **wide** 31:14 42:13,20 | 126:12 127:7 128:5 |
| 200:4 205:1 248:10 | 91:3,9,12 92:6 | 215:25 216:3 | 128:25 129:19 |
| **verifying** 179:17 | 111:19 | **widely** 257:14 | 130:2,18 132:12,22 |
| **veritext** 1:18 6:19 | **volunteer's** 92:12 | **wider** 32:1 | 133:14 134:10,21 |
| 6:23 8:4 | **volunteers** 132:9,19 | **willing** 14:23 59:20 | 135:20 136:18,23 |
| **versa** 108:1 | **vs** 1:14 | 222:25 223:11 | 137:8,20 138:7,15 |
| **version** 164:14 | | **wish** 229:5 | 139:3,14 143:17 |
| 165:18 254:16 | **w** | **wishing** 136:10 | 144:9 145:9,24 |
| 255:17 | | **withdrawing** 16:8 | 147:2,13,25 148:18 |
| **versions** 85:23 86:4 | **wait** 9:10 122:11 | **witness** 4:3 7:7 8:5 | 148:25 149:8,19 |
| 86:6 241:9 255:16 | **want** 9:11,15 13:24 | 9:19 10:7 11:8 14:5 | 150:9,24 151:9 |
| **versus** 7:2 145:18 | 14:17,22,24 16:18 | 14:15 15:23 17:14 | 152:14,16 156:17 |
| 154:24 | 30:16 35:4 41:11 | 19:24 20:22 21:15 | 157:17 158:3 159:4 |
| **vi** 68:8,20 | 46:3 48:18 49:7 | 22:7 24:10,18 25:14 | 159:21 160:13 |
| **vice** 108:1 | 53:17 55:4 59:14 | 26:18 28:17 29:9,13 | 161:9,18 162:7,17 |
| **videographer** 3:15 | 64:16,16 85:2 133:5 | 33:15,24 34:7,19,24 | 163:14 164:4 165:1 |
| 6:5 8:2 61:16,22 | 151:25 152:2,19,21 | 35:15 36:3,14 37:14 | 166:10,18 167:8,22 |
| 109:25 110:7 | 162:24 170:14 | 37:19 38:9,18 39:3 | 168:15,25 169:15 |
| 111:21 152:22 | 210:10 215:5 | 39:22 41:1,18 43:25 | 169:22 170:20 |
| 153:3 210:12,19 | 217:10 221:21 | 44:14 45:10 47:4 | 172:1 174:16,20 |
| 258:21 | **wanted** 179:3 | 48:14 51:2,17 52:3 | 176:14 177:1,12 |
| **videotaped** 1:17 | **wants** 59:20 | 53:2,17 54:11 56:13 | 178:1,25 179:16 |
| **view** 3:9 74:14 | **washington** 1:20 | 57:1,7,12,19 58:1 | 180:23 181:8 182:7 |
| 110:18,22 117:6 | 2:15 6:24 | 58:17 59:3 60:9,13 | 182:16 183:1,11,21 |
| 136:11 139:15 | **way** 31:19 46:17,22 | 61:15 62:5 63:20 | 186:12 190:13,24 |
| | 48:20,24 50:19 | | |

Veritext Legal Solutions
866 299-5127

[witness - york]

191:6,14 192:5,12
193:2,14 194:10,20
196:3 197:3,24
198:22 199:2,8
203:9 204:23
205:14 206:2,16
207:2,16 208:19
209:3 212:21
213:18 216:12,21
217:2,19 218:10,23
219:15 220:4,18,25
221:8,21 222:6
227:10 228:13,22
229:11 230:4,24
231:16 232:5,20
233:6,19 234:6,16
235:14 236:6,12
237:1,7,13,19,25
238:20 239:23
240:8,20 241:3
242:14,24 243:23
244:6,14 247:1,6
248:3,15 250:18
251:12,18,25
252:11,19 254:20
255:9,19 256:3,20
257:19 258:20
259:1 260:8,10
**witnesses**  4:1
**word**  24:6 42:3
107:19,22 150:14
235:10 244:22
245:1
**words**  36:15 53:3
68:11 73:20 74:1
82:22 83:3,7,19
96:19 104:11
142:24 143:19
150:25 184:15
200:18 256:24
**work**  8:18 9:2,4,5
11:10 12:19,23
25:19 26:15 27:3,5
28:7,10 31:17 50:3
50:3 80:24 81:2,18

93:5,11 107:25
138:13 173:9
185:19 202:14
240:3
**worked**  28:2 106:25
151:10 185:21
190:21 191:11,21
**working**  12:7 17:15
83:14 147:25
151:11 201:11
202:14
**world**  50:14 214:23
**write**  100:19 196:15
**writing**  84:8 104:1
104:11 106:2 108:7
**writings**  92:23 93:6
93:13 162:20
**written**  20:25 21:1
22:21 24:11,14,25
25:1 43:6 93:1
104:17 108:10
135:20 154:8
**wrong**  32:25 90:13
103:24 120:3,19
127:9 135:10
140:10 222:24
**wrote**  100:14 138:2
141:25

### y

**y**  244:25
**yeah**  22:5 250:22
**year**  89:8 164:13
165:17 170:4,5,10
170:13,15 171:7,13
171:15 172:11
208:8,9
**years**  25:18,20
27:11 46:2 89:13,19
89:20 130:23
131:10 133:12,19
133:23 134:8,11,15
175:13 208:2,4
**york**  46:2

Veritext Legal Solutions
866 299-5127

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2014.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.