# EXHIBIT 39

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


AMERICAN SOCIETY FOR
TESTING AND MATERIALS,
d/b/a ASTM INTERNATIONAL;
NATIONAL FIRE PROTECTION
ASSOCIATION, INC.; and
AMERICAN SOCIETY OF
HEATING, REFRIGERATION AND
AIR CONDITIONING ENGINEERS,

    Plaintiffs and
 Counter-Defendants,

    v.       Civil Action No.
            1:13-cv-01215-TSC
PUBLIC.RESOURCE.ORG, INC.,

    Defendant and
 Counter-Plaintiff.   PAGES 1 - 264
_____/



   Videotaped Deposition of: JAMES FRUCHTERMAN



DATE:   Friday, July 31, 2015



TIME:   9:34 a.m.



LOCATION:  Morgan, Lewis & Brockius, LLP
      Two Palo Alto Square, Suite 700
      Palo Alto, California



REPORTED BY: Kelli Combs
      Certified Shorthand Reporter
      License 7705.

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

2

```
1              A P P E A R A N C E S
2   FOR THE PLAINTIFF, ASTM:
3     By: JORDANA S. RUBEL, ESQ
        MORGAN, LEWIS & BOCKIUS, LLP
4     1111 Pennsylvania Avenue, NW
        Washington, DC 20004
5     202 739 5118
        E-mail: jrubel@morganlewis.com
6
7   FOR PLAINTIFF, ASHRAE:
8     BY:  KATHERINE MERK, ESQ
        KING & SPALDING
9     JOSEPH R WETZEL, ESQ
        101 Second Street, Suite 2300
10    San Francisco, California 94105
        415 318 1263
11      E-mail: kmerk@kslaw.com
        jwetzel@kslaw.com
12
13  For PLAINTIFF, NFPA:
14    By: THANE REHN, ESQ
        MUNGER, TOLLES & OLSON, LLP
15    560 Mission Street, 27th Floor
        San Francisco, California 94105
16    415 512 4073
        E-mail: Thane.rehn@mto.com
17
18  For DEFENDANT PUBLIC RESOURCE ORG, INC :
19    By: SEBASTIAN KAPLAN, ESQ
        FENWICK & WEST, LLP
20    MATTHEW BECKER, ESQ  (Mountain View office)
        555 California Street
21    San Francisco, California 94104
        415 875 2300
22      E-mail: skaplan@fenwick.com
23
24  ALSO PRESENT:
25  Cyril Suszckiewicz, Videographer
```

4

```
1              EXHIBITS FOR IDENTIFICATION
2   PLAINTIFFS'                          PAGE
3   Exhibit 4000  Journal article authored by      64
        James Fruchterman and
4       Allison Lingane published
        in 2003
5
6   Exhibit 4001  Expert report of James           97
        Fruchterman
7
8   Exhibit 4002  Printout of the Bookshare        209
        Web page
9
10  Exhibit 4003  A few pages from the PDF         219
        version of NFPA 101-2012
11      edition taken from the
        Public Resource website
12
13  Exhibit 4004  The first 25 pages of            234
        ASHRAE standard 90 1-2010
14      as they appear in the PDF
        version available on
15      Public Resource Org's
        website
16
17  Exhibit 4005  OCR version of ASHRAE            235
        standard 90 1-2010 copied
18      into a Word processing
        program
19
20  Exhibit 4006  E-mail from Rob Turner to        256
        James Fruchterman dated
21      April 10, 2015
22
23  (Exhibits attached to transcript )
24
25
```

3

## C O N T E N T S

```
2
3   JAMES FRUCHTERMAN
4   EXAMINATION                 PAGE
5
6     (BY MS. RUBEL)             7
7     (BY MR. REHN)          192, 256
8     (BY MS. MERK)            227
9
10
11
12  QUESTIONS NOT ANSWERED:  PAGE    LINE
13            59         4
14           121        19
15           202        18
16           203         5
17           215         1
18           215         8
19           218        25
20           228         9
21           247         5
22           250        18
23
24
25
```

5

```
1              P R O C E E D I N G S
2       Friday, July 31, 2015; Palo Alto, California
3              ---o0o---
4
5       THE VIDEOGRAPHER:  Good morning.  We're on
6   video record on July 31st, 2015, and the time is
7   9:34 a.m.  This is the video-recorded deposition of
8   James Fruchterman.  My name is Cyril Suszckiewicz.
9   I'm here with the court reporter, Kelli Combs.
10  We're both here representing Veritext Legal
11  Solutions at the request of the Plaintiffs.  This
12  deposition is being held today at Morgan Lewis in
13  Palo Alto, California.
14      The caption of the case is ASTM versus
15  Public Resource.
16      Please note that the audio and the video
17  recordings will take place unless all parties agree
18  to go off the record.  Microphones are very
19  sensitive, and they will pick up your private
20  whispers, conversations and cellular interference.
21      Counsel, would you please identify
22  yourself for the record.
23      MS. RUBEL:  Jordana Rubel for American
24  Society for Testing and Materials.
25      MR. REHN:  Thane Rehn from Munger, Tolles
```

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

6

1  & Olson for the Plaintiff, National Fire Protection
2  Association.
3  MS. MERK:  Katherine Merk for American
4  Society of Heating, Refrigerating and Air
5  Conditioning Engineers, Incorporated.
6  MR. KAPLAN:  Sebastian Kaplan for
7  Defendant, Public.Resource.Org, Inc.
8  MR. BECKER:  Matthew Becker for Defendant,
9  Public.Resource.Org, Inc.
10  MR. KAPLAN:  Two quick things, first I
11  have a cough; I'm sorry, I'll try to minimize any
12  disturbance, and second, I just wanted the record to
13  reflect that we produced to Plaintiffs Fruchterman
14  documents 1 through 5,399 this morning prior to the
15  deposition.
16
17
18
19
20
21
22
23
24
25

7

1  JAMES FRUCHTERMAN,
2  after having been duly sworn, testified as follows:
3  ---o0o---
4
5  EXAMINATION
6  BY MS. RUBEL:
7  Q   Good morning.  Can you please state your
8  full name.
9  A   James Robert Fruchterman, Jr.
10  Q   And have you ever been deposed before,
11  Mr. Fruchterman?
12  A   No.
13  Q   Very first time?
14  A   Yes.
15  Q   Okay.
16  Are you familiar with the process of a
17  deposition?
18  A   Yes.
19  Q   I guess I'll just give you some of the
20  basics.  I'll be starting off asking you some
21  questions and Mr. Rehn and Ms. Merk may have some
22  additional questions once I'm finished.  It's pretty
23  simple.  I ask a question and you provide an answer.
24  If you don't understand a question, just let me know
25  and I'll try to clarify that for you.

8

1  If you do answer the question, then I'm
2  going to assume that you understood it and you're
3  answering based on your understanding of the
4  question.
5  A   Yes.
6  Q   The court reporter is going to be
7  capturing everything that anybody says while we're
8  on the record.  So it's important for you to respond
9  with audible responses as opposed to shaking your
10  head or nodding your head.
11  Is that okay?
12  A   Yes.
13  Q   And please try to let me finish my
14  questions before you begin your answers so that she
15  can get a clean record.
16  A   Okay.
17  Q   I'll do the same; I'll give you a chance
18  to finish your answers before I ask an additional
19  question.
20  Is there any reason why you can't give
21  truthful and accurate testimony today?
22  A   No.
23  Q   Are you taking any medications that could
24  impact your ability to give truthful and accurate
25  testimony today?

9

1  A   No.
2  Q   Great.
3  Are you represented by counsel?
4  A   I think so.
5  Q   When did you retain that counsel?
6  A   I'm not sure I understand the question.
7  So I mean, I believe I signed an agreement to be an
8  expert witness and so -- with Defendant's attorneys.
9  Q   And did they actually indicate in that
10  agreement that they would be representing you?
11  A   I believe so.
12  Q   And who is that counsel?
13  A   Fenwick & West.
14  Q   Okay.
15  And that's the two attorneys who are here
16  with you today?
17  A   That's my understanding.
18  Q   What steps did you take to prepare for
19  today's deposition?
20  A   I reread my expert report, referred to
21  some of the standards, both accessibility standards
22  and the standards in question in my expert report.
23  I think that's...
24  Q   Did you talk with anybody?
25  MR. KAPLAN:  I'm going to object to the

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

10

1 extent that it calls for privileged communications.
2 I just advise and instruct the witness not to
3 respond.  But anything else is fair game.
4        THE WITNESS:  No, I didn't consult with
5 anybody else beyond the qualification just
6 expressed.
7 BY MS. RUBEL:
8    Q   So did you speak with your counsel prior
9 to today's deposition?
10       MR. KAPLAN:  You can answer that.
11       THE WITNESS:  Yes.
12 BY MS. RUBEL:
13    Q   And when did those discussions take place?
14    A   Last week and this week.
15    Q   Approximately how long did you discuss the
16 deposition with them for?
17    A   Less than a total of eight hours.
18    Q   And your counsel indicated that you
19 produced a number of documents this morning just
20 prior to the start of the deposition; is that
21 correct?
22    A   I produced documents to counsel and they
23 produced them to you guys.
24    Q   Okay.
25       And are those documents that you searched

11

1 for?
2    A   Yes.
3    Q   What did you do to search for those
4 documents?
5    A   My computer has an index program, and so I
6 typed in keywords that were relevant to my expert
7 work for the Defendants.
8    Q   Did you review the subpoena that you
9 received in this case?
10    A   I did.
11    Q   And did you search for documents related
12 to the topics that were listed in that subpoena?
13    A   Yes.
14    Q   Do you recall what words -- what keywords
15 you used in your searches?
16    A   The Plaintiffs, the attorneys in the case,
17 Public Resource, Carl Malamud certainly would have
18 been the primary keywords.
19    Q   Did you search for paper documents?
20    A   I maintain notebooks using a digital pen,
21 and I did go through my notebooks during the periods
22 and provided those in electronic form to counsel.  I
23 think those are the only things that resemble paper
24 documents.
25    Q   Okay.

12

1        You indicated that you -- in preparation
2 for today's deposition, you reread your report and
3 you also reviewed some accessibility standards and
4 also some of the Plaintiffs' standards.
5        Did you do anything else --
6        Did you review any other documents in
7 preparation for today's deposition?
8    A   Not that I recall.
9    Q   Where do you work?
10    A   Benetech.
11    Q   What is Benetech?
12    A   It's 501(c)3 nonprofit located in
13 Palo Alto, California.
14    Q   What kind of 501(c)3 nonprofit is
15 Benetech?  What is its mission?
16    A   To use technology to advance social good.
17    Q   And how does it go about doing that?
18    A   By developing software and services for
19 disadvantaged communities and the nonprofits that
20 serve them.
21    Q   Are there any specific types of
22 disadvantaged communities that Benetech tries to
23 serve?
24    A   We certainly serve a wide range.  I'd say
25 the primary communities we serve are people with

13

1 disabilities, especially students with disabilities,
2 especially print disabilities, and the human rights
3 movement; we develop software for human rights
4 groups.  Those are our two biggest areas of work.
5    Q   And how does Benetech go about trying to
6 serve students with print disability?
7    A   At present, our largest project is
8 Bookshare, the digital library for blind and
9 dyslexic people, that provides accessible eBooks and
10 related technology so that people with disabilities,
11 especially students, can access books and
12 periodicals.
13    Q   How many employees does Benetech have?
14    A   Approximately 80.
15    Q   How long have you worked there?
16    A   At Benetech and its predecessor nonprofit,
17 26 years.
18    Q   What was its predecessor nonprofit?
19    A   Arkenstone, Inc., A-R-K-E-N-S-T-O-N-E.
20    Q   And what -- did Arkenstone do similar work
21 to the work that Benetech does?
22    A   Similar.  Its primary product was reading
23 systems for blind and dyslexic people that allowed
24 them to scan documents and books into accessible
25 formats.

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

14

1   Q   Can you explain what you mean by that?
2   A   Is the question about what Arkenstone did?
3   Q   No. About how does scanning materials to
4   allow -- scanning documents and books into
5   accessible formats, how does that work?
6   A   So --
7       MR. KAPLAN: Objection; vague.
8       THE WITNESS: Okay. I just keep going,
9   right?
10      MR. KAPLAN: Yes.
11      THE WITNESS: So if you have a printed
12  document or a book and, let's say, a blind person
13  wants to have access to it, one option is to scan
14  that using a -- generally a desktop scanner which
15  takes the picture of each page of interest. Then
16  you use optical character recognition software to
17  convert the image into a text equivalent.
18      Once the contents of a page or a longer
19  document is in a text file, it can then be accessed
20  by a blind person through Braille technology and
21  large mirror, large print technology or audio
22  technology such as synthetic text to speech.
23  BY MS. RUBEL:
24  Q   So you just described three ways -- three
25  different ways that a person with a print disability

15

1   may be able to access the text equivalent, Braille,
2   enlargement and text to speech.
3   A   Uh-huh.
4   Q   Can you explain how the Braille system
5   works; how converting it to the Braille would work?
6   A   So if you have a document in text form,
7   there are two primary ways that you can create
8   Braille from that. One is you can have a Braille
9   embosser, which is the equivalent of a printer, so
10  you send the file to the embosser and the Braille
11  dots are pressed into the paper, and so it comes
12  out. So it's the equivalent of a desktop printer
13  except it creates tactile versions of the document.
14      And then the other way is that many blind
15  people have Braille displays that pop up the Braille
16  characters with plastic pins, say, with 20 Braille
17  characters. The blind person runs their finger
18  along the 20 characters, gets to the end, hits the
19  advance bar and the next 20 characters pop up.
20      So those are the two ways that blind
21  people access Braille from a digital form.
22  Q   Okay.
23      And how does the enlargement process work?
24  A   Similar to Braille, there are two ways of
25  doing that. One is you take the text document and

16

1   you can create a large print document. For example,
2   you can take Microsoft Word, select all of the text
3   and put it in 24-point or 72-point -- whatever you
4   need for your particular disability -- hit "print"
5   and then you have a large-print version of that
6   document where all the characters are larger.
7       More commonly today, visually impaired
8   people, because large print is really aimed at
9   people who can see a little bit, are not completely
10  blind, would have a v-screen, a digital screen.
11  That could be a tablet, like an iPad, even a
12  smartphone or PC or a Mac, and then they will
13  enlarge the print.
14      And beyond enlarging the print, there's
15  other things that you might do with it. For
16  example, you might reverse the contrast. That's
17  good for some visual impairments. If you have white
18  characters on a black background, you can see that
19  better than black characters on a white background.
20      And there's a variety of programs and
21  built-in tools and these devices to see text
22  enlarged.
23  Q   And is the size of the characters, does
24  that vary by individual what -- what size characters
25  the person will be able to read?

17

1   A   Yes. As your vision progressively gets
2   worse, the -- you might need larger and larger
3   characters to actually be able to read the document.
4   And it's also possible that people become fatigued
5   and might want to enlarge the characters or switch
6   to another way if they get tired.
7   Q   Is there any way to generalize what's a
8   common character size that people with print
9   disabilities would be able to read?
10      MR. KAPLAN: Objection; vague.
11      THE WITNESS: The -- there is a small
12  segment of the publishing industry that produces
13  large-print books, and they tend to pick a single
14  standard point size as meeting the needs of a
15  significant slice of visually impaired people. It's
16  not practical to produce 10 different sizes in text,
17  so...
18  BY MS. RUBEL:
19  Q   Do you know what size characters those
20  publishers use when they're printing large-print
21  text?
22  A   I don't have the exact knowledge.
23  Q   And the third method you described earlier
24  was use of a screen reader. Can you explain how
25  that works?

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

18

1     A   Actually, I described using synthetic
2  speech, and the screen reader is just one of the
3  ways that you use synthetic speech.
4         Would you like me to talk about synthetic
5  speech or screen readers?
6     Q   Let's talk about synthetic speech
7  generally first, and I appreciate the -- the
8  clarification.
9     A   So synthetic speech is a technology that
10 will take a text stream and turn it into an audio
11 stream, and it can be done sort of on the fly, and
12 it can also be done in a separate process.
13        So, for example, a separate process would
14 be I could take a chapter from a book and create an
15 MP3 of that book where a synthetic voice is
16 narrating that -- that chapter.  And then I could
17 hand a person an MP3 file of that chapter or the
18 entire book.
19        It's also possible to have a program that
20 does synthetic speech reading.  There are dedicated
21 reading programs.  Its primary goal is to help you
22 read a digital book, and you can turn on the
23 text-to-speech, and it will read the text aloud.
24 There are screen readers for blind people that are
25 generally how blind people and people with other

19

1  print disabilities access whatever information shows
2  up on a screen that they can access.
3         So, for example, if I am a blind person
4  using Microsoft Word, I have an ability to say,
5  "Read me the text that's on the screen," or "Say
6  each word after I type it" as it's typed.
7         And there's-- there's a wide variety of
8  different programs that use text-to-speech.  I could
9  go on at length, but I'll let you ask follow-ups.
10    Q   Okay.
11        So you've -- you've described several
12 different types of synthetic speech processes, I
13 guess we could call them.
14        And I believe the last one that you were
15 discussing specifically was screen readers?
16    A   Uh-huh.
17    Q   Okay.
18        Let's go back to your employment history.
19 We've talked about Benetech and then Arkenstone.
20    A   Uh-huh.
21    Q   Where did you work before that?
22    A   Quite a number of places.  Immediately
23 before Arkenstone, I had full-time employment at
24 Calera Recognition Systems, Inc.
25    Q   And what kind of company was Calera

20

1  Recognition Systems, Inc.?
2     A   A for-profit developer of optical
3  character recognition technology.
4     Q   And what was your position there?
5     A   At the time when I separated, Vice
6  President of Marketing.
7     Q   How long were you employed at Calera?
8     A   Seven years.
9     Q   What other positions did you hold, other
10 than Vice President of Marketing?
11    A   I was also the Vice President of Finance,
12 Chief Financial Officer.
13    Q   Any others?
14    A   I think I was briefly Executive Vice
15 President.
16    Q   And prior to your work at Calera, where
17 did you work?
18    A   I was a co-founder of a startup that never
19 got funded, so I worked there without significant
20 compensation, named Phoenix Engineering, Inc.
21    Q   And what was your position there?
22    A   I -- Vice President, but I don't remember
23 more details than that.
24    Q   And I know we're stretching back many
25 years at this point.  Approximately what was the

21

1  time frame that you worked there?
2     A   1981.  1981.
3     Q   And I think we'll do just maybe one job
4  before then; if you recall, what was your position
5  before that?
6     A   I was at GCH Incorporated as an electrical
7  engineer.
8     Q   And what type of work did you do there?
9     A   I worked on a private rocket project.
10    Q   What is your educational background?
11    A   I have degrees from the California
12 Institute of Technology, also known as Caltech, in
13 engineering and applied physics.
14    Q   What type of degree do you have in
15 engineering?
16    A   My concentration was in electrical
17 engineering.
18    Q   And is that a master's degree?
19    A   It's a bachelor's.
20    Q   And applied physics?
21    A   A master's degree.
22    Q   Have you ever taken a legal class?
23    A   No.
24    Q   So you're not a lawyer?
25    A   I am not a lawyer.

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

22

1    Q   Do you claim any expertise on any legal
2  issues?
3        MR. KAPLAN:  Objection; vague.
4        THE WITNESS:  Not beyond being the Chief
5  Financial Officer or Chief Executive Officer of
6  corporations where part of my job was to engage
7  attorneys to represent our organizations.
8  BY MS. RUBEL:
9    Q   Do you have any expertise in any legal
10 issues that relate to copyright?
11       MR. KAPLAN:  Objection; vague.
12       THE WITNESS:  I am not a lawyer, but as a
13 leading practitioner creating a library for the
14 blind and dyslexic, I need to be familiar with
15 copyright law to the extent to operate our
16 institution.
17 BY MS. RUBEL:
18   Q   So you would describe yourself as familiar
19 with some legal issues related to copyright?
20       MR. KAPLAN:  Objection; misstates
21 testimony, vague.
22       THE WITNESS:  I seek advice from counsel
23 on issues that I believe touch on copyright law.
24       MR. KAPLAN:  I'll remind the witness that
25 you don't have to get into the content of your

23

1  privileged communications with counsel.
2        THE WITNESS:  Thank you.
3  BY MS. RUBEL:
4    Q   You stated just a moment ago that you need
5  to be familiar with copyright law to the extent
6  necessary to operate your institution.
7    A   Correct.
8    Q   So you have some familiarity with legal
9  issues related to copyright; is that right?
10       MR. KAPLAN:  Objection; vague.
11       THE WITNESS:  I am an engineer that builds
12 tools and services that operate in the copyright
13 regime, and I try to familiarize myself with
14 requirements so that I can build the products so
15 that our organization is compliant as advised by our
16 counsel.
17 BY MS. RUBEL:
18   Q   But you don't claim to be an expert on
19 copyright law?
20       MR. KAPLAN:  Objection; calls for a legal
21 conclusion, vague.
22       THE WITNESS:  I operate one of the leading
23 libraries for the blind and dyslexic, and we operate
24 in the copyright regime, and I consider myself
25 familiar with the constraints that we operate under

24

1  as advised by legal experts.
2  BY MS. RUBEL:
3    Q   I'm not trying to ask a tricky question.
4  I'm trying to understand if you're -- if you're
5  representing that you have expertise on copyright
6  law.  So I think it should be a simple answer.
7        MR. KAPLAN:  Objection; vague, calls for a
8  legal conclusion, and I'm not sure that counsel's
9  testimony regarding the nature of her question is an
10 appropriate part of a question.
11       THE WITNESS:  I go to some lengths to say
12 that I'm not a lawyer when people ask me about legal
13 matters.  I'm happy to tell my peers, "If you're
14 talking to your lawyer, be sure to ask these
15 questions."  So -- but I don't think I represent
16 myself as a legal expert.  I think I'd be very
17 careful about that.
18 BY MS. RUBEL:
19   Q   In connection with this case --
20   A   This case, yes.
21   Q   -- are you representing yourself as
22 someone who has expertise in copyright law?
23   A   No --
24       MR. KAPLAN:  Objection; vague, calls for a
25 legal conclusion, but go ahead and answer.

25

1        THE WITNESS:  No.  Apologies for jumping
2  to an answer.
3        No.  In this case, I'm expressing
4  accessibility conclusions and not legal conclusions,
5  and I'm not representing myself as a legal expert in
6  the matters in this case.
7  BY MS. RUBEL:
8    Q   Are you representing yourself in this case
9  as an expert on licensing issues?
10       MR. KAPLAN:  Objection; calls for a legal
11 conclusion, vague.
12       THE WITNESS:  No.
13 BY MS. RUBEL:
14   Q   Are you an expert on the development of
15 standards?
16       MR. KAPLAN:  Objection; vague, calls for a
17 legal conclusion.
18       THE WITNESS:  My organization is actively
19 involved in standards development, and so I oversee
20 people who have been involved in standards efforts.
21 BY MS. RUBEL:
22   Q   What standards is your organization
23 involved in developing standard -- in developing?
24 Excuse me.
25   A   We have been involved in standards that

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

26

1 involve accessibility, specifically the DAISY
2 standard, the EPUB standard and the Accessibility
3 Metadata standard.
4    Q   Are those three standards that you just
5 mentioned all developed by the same entity or under
6 the auspices of the same entity?
7    A   No.
8    Q   Okay.
9        Then let's take them one at a time.  The
10 DAISY Standard, how is that standard developed?
11    A   The DAISY Consortium is the consortium of
12 most of the libraries for the blind and dyslexic in
13 the world, and they create a standard for accessible
14 content that our libraries create.
15    Q   So is there an entity that convenes the
16 participants in the development process?
17        MR. KAPLAN:  Objection; foundation, vague,
18 relevance.
19        THE WITNESS:  The DAISY Consortium is a
20 nonprofit with members, with working groups, and I
21 believe that there's a working group that focuses on
22 the standard as opposed to other elements of the
23 DAISY Consortium's work.
24 BY MS. RUBEL:
25    Q   And the DAISY Consortium convenes groups

27

1 of volunteers to work on developing their standards?
2        MR. KAPLAN:  Objection; lacks foundation,
3 vague, relevance.
4        THE WITNESS:  Generally, the people
5 working on the standards are employed by member
6 libraries, so I wouldn't characterize them as
7 volunteers.
8 BY MS. RUBEL:
9    Q   They don't work for the DAISY Consortium?
10    A   No.  They work for the member libraries,
11 though there are a few people who work for the DAISY
12 Consortium that are involved in the standards
13 practice, like the Chief Technology Officer of the
14 Consortium.
15    Q   Does the DAISY Consortium own the
16 standards that the employees of the member libraries
17 help to develop?
18        MR. KAPLAN:  Objection; lacks foundation,
19 calls for a legal conclusion, vague.
20        THE WITNESS:  I'm not certain, but I would
21 expect the DAISY Consortium owns the copyright but
22 makes the standard freely available.
23 BY MS. RUBEL:
24    Q   Do you know how the DAISY Consortium is
25 funded?

28

1    A   The DAISY Consortium is primarily funded
2 by membership dues as well as grants and -- I think
3 that's probably most of it.
4    Q   Do you know how much the membership dues
5 are every year?
6    A   My organization pays somewhere in the
7 range between 15 and $30,000 a year.  I'm not
8 precisely aware of what our current dues level is.
9    Q   Do you have a sense of whether the other
10 members of the -- or the other participants in the
11 development of the -- of standards for the DAISY
12 Consortium are also paying approximately 15 to
13 $30,000 per year?
14        MR. KAPLAN:  Objection; vague.
15        THE WITNESS:  The DAISY Consortium has
16 membership tiers, so full members pay a certain
17 amount, associate members pay a different amount.
18 There are friends of the DAISY Consortium, and I'm
19 not familiar with the pricing tiers, but I'm sure
20 the majority of the people involved in the standards
21 have some sort of membership affiliation with the
22 Consortium.
23 BY MS. RUBEL:
24    Q   What type of member is Benetech?
25    A   A full member.  Sorry.

29

1    Q   And you mentioned that the DAISY
2 Consortium also receives grants.  Who do they
3 receive grants from?
4        MR. KAPLAN:  Objection; lacks foundation,
5 relevance.
6        THE WITNESS:  I know, for example, that my
7 organization provides a grant to the DAISY
8 Consortium to work on projects around accessibility,
9 and that funding comes from the U.S. Federal
10 Government.
11 BY MS. RUBEL:
12    Q   Are you aware of any other organizations
13 or entities that provide grants to the DAISY
14 Consortium?
15    A   I am relatively certain that there are
16 similar funders like ours, but I'm not familiar with
17 who exactly those organizations are.
18    Q   You mentioned that Benetech also helps to
19 develop the EPUB standard.  Can you explain what
20 that is?
21    A   The International Digital Publishing Forum
22 is the body that creates the EPUB standard, which is
23 the leading digital eBook commercial standard.
24    Q   What do you mean by the "digital eBook
25 commercial standard"?

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

30

1    A   So if a publisher creates a book today in
2  the United States, it's highly likely that they will
3  sell it in eBook form.  It's likely that at some
4  point during the production process, they will
5  create an EPUB version of that title, and there are
6  automated conversion technologies to turn that EPUB
7  book into an Apple format eBook or an Amazon Kindle
8  format eBook or many other formats.  So it's a
9  common format for eBooks that a lot of proprietary
10 formats are designed to incorporate.
11   Q   Okay.
12       I think we'll come back to this general
13 topic a little bit later, but can you describe how
14 the International Digital Publishing Forum develops
15 the EPUB standard?
16   A   They have a standards effort, again, where
17 members of the IDPF play a leading role.  I'm less
18 familiar with the details of how that works, but,
19 you know, please ask more questions and I can try to
20 help.
21   Q   The third standard you mentioned before
22 was the Accessibility Metadata standard.  Can you
23 explain what that is?
24   A   The goal of this standard is to make it
25 easier for disabled people when using search engines

31

1  to find content that will be accessible to them.
2    Q   And how do they do that?
3    A   I'm going to try to remember.  There is --
4  the name is eluding me at the moment, but there is a
5  standards body that is dominated by the major search
6  engine vendors, and they come up with standards for
7  metadata for search engines, and my organization
8  proposed this particular metadata standard around
9  accessibility, and it was accepted by this body.
10       Let's see, trying to remember what the
11 name is, but...
12   Q   Does that body own the copyright in the
13 Accessibility Metadata standard?
14       MR. KAPLAN:  Objection; calls for a legal
15 conclusion, lacks foundation, vague.
16       THE WITNESS:  I'm not familiar with the
17 ownership or licensing provisions, other than I
18 assume it's open because we're closely involved.
19 BY MS. RUBEL:
20   Q   What do you mean by that?
21   A   I -- I believe that anyone can get a copy
22 of this standard and implement it, and certainly
23 we're encouraging people to make accessible
24 material.
25   Q   I guess it would be helpful to get a

32

1  little more clarification.
2        You said, "I assume it's open because
3  we're closely involved."  Do you mean you assume
4  that it's open because Benetech is closely involved?
5    A   I -- I think the -- our goal in being
6  involved in proposing the standard was to encourage
7  all publishers, especially of educational material,
8  to label their books or educational videos on
9  whether it was accessible, and so I'm 90 percent --
10 99 percent certain that the standard is openly
11 available so that we can encourage maximum adoption
12 of this standard so that as many works are made
13 accessible to our disabled community as possible.
14   Q   Do you know if any of the three entities
15 that you mentioned develops voluntary consensus
16 standards?
17       MR. KAPLAN:  Objection; vague.
18       THE WITNESS:  I'm not familiar with the
19 meaning of that as a term of art.
20 BY MS. RUBEL:
21   Q   Do you have any understanding of what that
22 phrase means?
23   A   Well, the common understanding is, is it
24 voluntary and is it developed through consensus?  I
25 think that certainly the standards process we are

33

1  involved with has a process of, you know, presenting
2  a standard, getting feedback on the standard,
3  responding to the comments on the standard.  There's
4  processes in that that involve engaging the
5  community.  I'm familiar with those processes and
6  certainly they characterize the process that my team
7  has been involved with.
8    Q   I'll represent to you that voluntary
9  consensus standards as a term of art also includes a
10 requirement that there be a balance of membership in
11 the committees that are developing the standards so
12 that many different groups are represented:
13 Manufacturers, consumers, government regulators,
14 academics.
15       Do you know if any of the organizations
16 that develop the three standards you mentioned focus
17 on that type of balance of membership making up the
18 committees?
19   A   I'm not familiar --
20       MR. KAPLAN:  Objection; vague.
21       THE WITNESS:  Sorry.  I'm not familiar
22 with their membership constituency policies.
23 BY MS. RUBEL:
24   Q   So you're not --
25       You don't know that that's something that

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

34

1  they prioritize?
2       MR. KAPLAN:  Objection; asked and
3  answered, vague.
4       THE WITNESS:  I'm not aware of it.
5  BY MS. RUBEL:
6    Q   In your experience on the committees, did
7  you notice any sort of balance?
8       MR. KAPLAN:  Objection; assumes facts not
9  in evidence, vague.
10      THE WITNESS:  I'm not actually on the
11 committees, so please ask the question again.
12 BY MS. RUBEL:
13   Q   From what you've heard from others at
14 Benetech who have participated in the development of
15 the standards, are you able to -- do you have any
16 information about whether they've observed any kind
17 of balance of membership?
18      MR. KAPLAN:  Objection; assumes facts not
19 in evidence, vague.
20      THE WITNESS:  I guess I'm familiar with
21 the fact that members -- that people involved in the
22 standards process do represent different interests.
23 I mean, I'm aware of sort of who's at the -- around
24 the table at the different standards bodies, so I'm
25 aware that not all of them are the same.

35

1  BY MS. RUBEL:
2    Q   For the DAISY Consortium, you mentioned
3  that a full member pays 15 to $30,000 per year.  Do
4  you think that might be a barrier to participation
5  for any -- for anybody?
6       MR. KAPLAN:  Objection; argumentative,
7  calls for speculation, misstates testimony.
8       THE WITNESS:  I'm aware that developing
9  world libraries get a special deal so that it's more
10 accessible for them.
11 BY MS. RUBEL:
12   Q   Do you know how much they have to pay?
13   A   No.
14   Q   Are you familiar with the process through
15 which any of the Plaintiffs' standards are
16 developed?
17      MR. KAPLAN:  Objection; vague.
18      THE WITNESS:  I'm not actively involved
19 with the fields where they are active, so I'm not
20 familiar with their particular standards development
21 processes.
22 BY MS. RUBEL:
23   Q   Do you consider yourself an expert on
24 blindness?
25      MR. KAPLAN:  Objection; vague, calls for a

36

1  legal conclusion.
2       THE WITNESS:  No.
3  BY MS. RUBEL:
4    Q   How about limited vision?
5       MR. KAPLAN:  Same objections; vague and
6  calls for a legal conclusion.
7       THE WITNESS:  No.
8  BY MS. RUBEL:
9    Q   Do you consider -- excuse me.
10      Do you consider yourself an expert on
11 people with learning disabilities?
12      MR. KAPLAN:  Objection; vague, calls for a
13 legal conclusion.
14      THE WITNESS:  No.
15 BY MS. RUBEL:
16   Q   Are you an expert on people with dyslexia?
17      MR. KAPLAN:  Objection; vague calls for a
18 legal conclusion.
19      THE WITNESS:  No.
20 BY MS. RUBEL:
21   Q   Are you an expert on people with brain
22 injuries?
23      MR. KAPLAN:  Objection; vague, calls for a
24 legal conclusion.
25      THE WITNESS:  No.

37

1  BY MS. RUBEL:
2    Q   Are you an expert on people with physical
3  disabilities?
4       MR. KAPLAN:  Objection; vague, calls for a
5  legal conclusion.
6       THE WITNESS:  No.
7  BY MS. RUBEL:
8    Q   So -- excuse me, your expertise --
9       Is your expertise limited to accessibility
10 of print and online materials to people with print
11 disabilities?
12      MR. KAPLAN:  Objection; vague, calls for a
13 legal conclusion, argumentative.
14      THE WITNESS:  No.  That's asked very
15 narrowly.
16 BY MS. RUBEL:
17   Q   So what do you consider yourself an expert
18 on?
19      MR. KAPLAN:  Objection; vague, calls for a
20 legal conclusion.
21      THE WITNESS:  I'm not an MD -- medical
22 doctor.  I am an engineer who has expertise in the
23 application of technology to the needs of people
24 with disabilities and other disadvantaged
25 communities.

Case 1:13-cv-01215-TSC   Document 204-45   Filed 11/13/19   Page 12 of 110
Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

38

1    Can we take a brief break so I can have a
2 little bit of liquid?
3        MS. RUBEL:  Sure.  I meant to actually
4 instruct you at the beginning that you can ask for a
5 break at any time.  If it's just to take a sip of
6 water, we don't need to go off the record.
7        THE WITNESS:  Okay.  That's good.  Thank
8 you.
9        MR. KAPLAN:  Counsel, do you intend to
10 take a break, like, at the hour mark or do you have
11 a --
12        MS. RUBEL:  Yeah, that's fine.  How long
13 have we been going?
14        THE VIDEOGRAPHER:  44 minutes.
15        MS. RUBEL:  Okay.  Let's try to go another
16 15 minutes.  If at any time you need a break, just
17 let me know and I'll try to get to the end of a
18 series of questions to allow you to have a break.
19        THE WITNESS:  I'm good with another 15, 20
20 minutes, no problem.
21        MS. RUBEL:  Great.
22 BY MS. RUBEL:
23    Q   Have you ever served as an expert in a
24 litigation matter before?
25    A   I'm not an expert in the technical term,

39

1 but I don't believe that I've served as an expert
2 witness in a legal matter.
3    Q   Have you ever provided a declaration in a
4 legal matter?
5    A   I understand that I have provided a
6 declaration.
7    Q   And what matter was that?
8    A   HathiTrust, H-A-T-H-I-T-R-U-S-T.  I think
9 actually it's -- I think it's Authors Guild v.
10 HathiTrust or HathiTrust (pronounced differently).
11    Q   But you were not deposed in connection
12 with that matter?
13    A   Correct.
14    Q   Was your declaration cited in any court
15 decision in that case?
16        MR. KAPLAN:  Objection; argumentative,
17 lacks foundation.
18        THE WITNESS:  I believe that materials I
19 provided in that case were cited in -- by the Court.
20 That's my understanding.
21 BY MS. RUBEL:
22    Q   And is it your belief that they were cited
23 in the district court opinion related to that case?
24        MR. KAPLAN:  Objection; argumentative,
25 lacks foundation.

40

1        THE WITNESS:  I'm more certain that it was
2 cited at the appellate level.
3 BY MS. RUBEL:
4    Q   Okay.
5        So there was a district court decision and
6 that was appealed and there was also a -- an
7 appellate decision?
8    A   Correct.
9    Q   Did that case actually go to trial at the
10 district court level?
11    A   That's not my understanding.
12    Q   Is it your understanding that it was
13 decided on Summary Judgment?
14        MR. KAPLAN:  Objection; lacks foundation.
15        You can answer.
16        THE WITNESS:  Correct.  That's my
17 understanding.
18 BY MS. RUBEL:
19    Q   How did you first become interested in the
20 issue of making technology accessible to the needs
21 of people with disabilities?
22        MR. KAPLAN:  Objection; argumentative and
23 vague.
24        THE WITNESS:  In college.
25

41

1 BY MS. RUBEL:
2    Q   How did that come about?
3    A   I was in a class at Caltech learning about
4 a certain kind of technology, and I thought it could
5 help disabled people, and I was excited about that
6 prospect.
7    Q   And has the issue of accessibility of
8 Internet content to people with print disabilities
9 been an issue in the publishing industry generally?
10        MR. KAPLAN:  Objection; vague, lacks
11 foundation.
12        THE WITNESS:  I believe so.
13 BY MS. RUBEL:
14    Q   And I know you mentioned before your
15 organization's involvement in standards related to
16 eBooks; is that right?
17    A   Correct.  My apologies.
18        MR. KAPLAN:  That's okay.
19 BY MS. RUBEL:
20    Q   So is it your understanding that the
21 accessibility of eBooks for people with print
22 disabilities is -- is generally a topic that's
23 discussed in the publishing industry?
24        MR. KAPLAN:  Objection; lacks foundation,
25 calls for speculation, vague.

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

42

1      THE WITNESS: Yes.
2  BY MS. RUBEL:
3      Q   Have there been issues with technology
4  providers disabling access to eBooks for people with
5  print disabilities?
6      MR. KAPLAN: Objection; vague, calls for
7  speculation.
8      THE WITNESS: There have been issues with
9  technology providers providing the ability to
10  disable access and that capability being utilized.
11  Yes.
12  BY MS. RUBEL:
13     Q   What's your understanding of why the
14  technology providers were making it possible to
15  disable access to the eBooks for people with print
16  disabilities?
17     A   Public statements by different
18  stakeholders have mentioned concerns over rights.
19  Did they have the right to provide that, piracy, as
20  it's labeled by some, making of unauthorized copies?
21  Probably the top two issues that I've heard
22  discussed.
23     Q   Who do you mean by the "making of
24  unauthorized copies"?
25     A   I guess that's kind of a legal conclusion

43

1  whether it's authorized or not, but the Authors
2  Guild, for example, or authors would like to get
3  control of the making of copies. That's, I think,
4  my understanding of what copyright is; the ability
5  to control who makes copies.
6      Q   So was there some concern that providing
7  access to eBooks for people with print disabilities
8  was somehow letting go of control over who was going
9  to be able to make copies of the material?
10     MR. KAPLAN: Objection; vague, lacks
11  foundation and calls for speculation, argumentative.
12     THE WITNESS: I would say that the
13  interests of people with disabilities was not the
14  primary reason for disabling or making it hard to
15  make copies of material. I think the interests of
16  disabled people was a secondary issue or...
17  BY MS. RUBEL:
18     Q   So what were the primary issues?
19     MR. KAPLAN: Objection; lacks foundation,
20  calls for speculation, vague.
21     THE WITNESS: I think that authors and
22  publishers want to make it difficult for a consumer
23  to make copies to give away to other people.
24  BY MS. RUBEL:
25     Q   Do you think that's a valid concern?

44

1      MR. KAPLAN: Objection; vague.
2      THE WITNESS: In my opinion, I think it's
3  not a -- I don't think it's in their interests.
4  BY MS. RUBEL:
5      Q   You don't think what is in their
6  interests?
7      A   I think that the technical protection
8  mechanisms make their product less attractive to
9  consumers.
10     Q   Well, let me take a step back.
11     A   Uh-huh.
12     Q   My question was: Do you think it's a
13  valid concern for publishers to be worried that
14  consumers may make copies to give away to other
15  people?  So I want to understand how your response
16  is responsive to my question.
17     MR. KAPLAN: Is there a question, Counsel?
18  BY MS. RUBEL:
19     Q   Do you think it's a valid concern for
20  publishers that -- to want to prevent consumers from
21  making copies to give away?
22     MR. KAPLAN: Objection; vague.
23     THE WITNESS: I think that the way that
24  publishers try to prevent making of copies is not in
25  their interest; so no, I don't think it's a valid

45

1  concern because I think they -- their interests
2  would be better served if they didn't use those
3  technologies.
4  BY MS. RUBEL:
5      Q   Why do you think the use of those
6  technology -- technological mechanisms is not in
7  their interests?
8      MR. KAPLAN: Objection; vague.
9      THE WITNESS: To pick one particular
10  example, publishers who have taken off technical
11  protection mechanisms on titles sold more copies of
12  the books that didn't have those mechanisms on them
13  than the ones that did.  So the interpretation in
14  the industry is from people who advocate TPM-free
15  books is that it's in their interest because they
16  will sell more books.
17  BY MS. RUBEL:
18     Q   What publisher took off the technical
19  protections and sold more copies of the books after
20  making -- after taking that step?
21     MR. KAPLAN: Objection; argumentative.
22     THE WITNESS: I'm familiar that O'Reilley
23  Media, Baen, B-A-E-N, Books, and I'm also familiar
24  that this year all but one of Germany's major
25  publishers have all gone technical protection

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

46

1  mechanism free, as reported in industry
2  publications.
3  BY MS. RUBEL:
4      Q   It's your understanding that when those --
5          Let's focus on just the American
6  publishers for now.
7          When those -- when O'Reilley Media and
8  Baen Books removed the technical protections, they
9  actually sold more copies of the materials?
10     A   That was their expressed experience as
11 communicated to the publishing industry.
12     Q   And how did they communicate that to the
13 publishing industry?
14     A   I don't know.  Writing blog posts on their
15 experience.
16     Q   Any other way?
17     A   It gets discussed at conferences.  It gets
18 discussed in the industry media.  It's a major topic
19 in the field.
20     Q   Are you aware of any other publishers who
21 have removed those technical protection mechanisms
22 who have then reported that they've not sold more
23 copies?
24         MR. KAPLAN:  Objection; vague.
25         THE WITNESS:  I haven't read those

47

1  articles, if they do exist.
2  BY MS. RUBEL:
3      Q   Do publishers generally agree that if they
4  remove the protection mechanisms, they will sell
5  more copies?
6          MR. KAPLAN:  Objection; calls for
7  speculation, vague, lacks foundation, relevance.
8          THE WITNESS:  My sense is that more and
9  more publishers have shifted their position over
10 time.  I can't characterize the precise percentages.
11 BY MS. RUBEL:
12     Q   Are you aware of any publishers, other
13 than O'Reilley Media and Baen Books, in the United
14 States who have removed the technical protection
15 mechanisms from their publications?
16     A   I'm certain they exist.  I don't have
17 precise names.
18     Q   Would you describe O'Reilley Media and
19 Baen Books as major publishers?
20         MR. KAPLAN:  Objection; vague.
21         THE WITNESS:  In the technical field, I'd
22 consider O'Reilley one of the top publishers and
23 Baen Books one of the top publishers of science
24 fiction.
25

48

1  BY MS. RUBEL:
2      Q   So it's your belief that the technical
3  protection mechanisms that publishers use are not
4  actually in their self-interest economically?
5          MR. KAPLAN:  Objection; vague,
6  argumentative.
7          THE WITNESS:  I've certainly made that
8  case to them.
9  BY MS. RUBEL:
10     Q   Have you had any resistance when you've
11 tried to make that case to them?
12         MR. KAPLAN:  Objection; vague.
13         THE WITNESS:  Publishers don't tend to
14 resist my organization.
15 BY MS. RUBEL:
16     Q   Why is that?
17     A   Because we're the leading library for
18 blind and dyslexic people in the country, and most
19 publishers find that a worthwhile endeavor.
20     Q   But my understanding of your responses
21 before was that you're encouraging the publishers to
22 remove their technical protection mechanisms not
23 only for people who have print disabilities but
24 generally; is that correct?
25         MR. KAPLAN:  Objection; vague, misleading.

49

1          THE WITNESS:  That's correct.
2  BY MS. RUBEL:
3      Q   Are you aware of any publisher to whom
4  you've made that recommendation who has followed
5  your advice?
6          MR. KAPLAN:  Objection; vague.
7          THE WITNESS:  Yes.  We believe that we
8  have made good progress with publishers around our
9  advice to make their works more accessible to people
10 with disabilities.
11 BY MS. RUBEL:
12     Q   Let me clarify my question a little bit.
13         My understanding is that what you've
14 recommended to publishers is to remove their --
15 their technical protections for the public in
16 general; is that correct?
17         MR. KAPLAN:  Objection; vague, misstates
18 testimony.
19         THE WITNESS:  That's correct.
20 BY MS. RUBEL:
21     Q   And are you aware of any publisher who,
22 after receiving that advice from you, removed the
23 technical protections for the public in general?
24         MR. KAPLAN:  Objection; vague, asked and
25 answered.

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

50

1      THE WITNESS:  My primary role at Benetech
2  is as a public spokesman.  We have other people who
3  deal directly with the publishing industry, and I am
4  aware that we have a handful of major publishers
5  working to make their works more -- their mainstream
6  works more accessible, and -- which includes getting
7  rid of technical protection mechanisms that prohibit
8  the access by people with disabilities and making
9  the materials they create more accessible to people
10  with disabilities.
11      That's a area of effort for my team.
12  BY MS. RUBEL:
13      Q   And -- and I understand that piece.  I
14  guess what I'm trying to understand is, are you
15  aware of any publishing company that has removed the
16  technical protections as to the public in general,
17  not just people with print disabilities?
18      MR. KAPLAN:  Objection; vague, lacks
19  foundation.
20      THE WITNESS:  I'm certain if I research
21  that, I'd come up with more names.  I don't have the
22  names here today.
23  BY MS. RUBEL:
24      Q   Is it the general practice in the
25  publishing industry to use technical protection

51

1  mechanisms in connection with eBooks?
2      MR. KAPLAN:  Objection; competence, lacks
3  foundation, vague.
4      THE WITNESS:  As I've noted, I believe
5  more and more publishers are getting rid of them, so
6  it has gone from being a general practice to being
7  one where there are significant publishers on both
8  sides, and the trends are in favor of getting rid of
9  technical protection mechanisms.
10      MS. RUBEL:  This, I think, might be a good
11  time for us to take our first break.
12      THE VIDEOGRAPHER:  We're going off the
13  record.  The time is 10:37.
14      (Recess taken.)
15      THE VIDEOGRAPHER:  Okay.  We're back on
16  the record at 10:55.
17  BY MS. RUBEL:
18      Q   Are you familiar with the Chafee
19  Amendment?
20      A   I am.
21      Q   Can you tell me what your understanding of
22  the Chafee Amendment is?
23      A   It's a copyright exception in U.S. law.
24      Q   And who does it provide an exception for?
25      A   Authorized entities.

52

1      Q   And what type of entities are authorized
2  entities?
3      A   I don't have the precise code cite, but
4  authorized entities have to meet some
5  qualifications, nonprofit or government agency,
6  primary mission to serve people with disabilities.
7  It has to be one of their -- one of their primary
8  missions.  There may be some other qualifications,
9  but those are the big ones I think of.
10      Q   So if you meet those two qualifications,
11  what exception are you provided?
12      MR. KAPLAN:  Objection; vague, incomplete
13  hypothetical, calls for a legal conclusion.
14      THE WITNESS:  So some of the provisions of
15  Chafee, as I recall, are that you can make an
16  accessible copy of a literary work with some
17  exceptions for people with qualifying print
18  disabilities.
19  BY MS. RUBEL:
20      Q   And you're permitted to make accessible
21  copies exclusively for people with disabilities; is
22  that right?
23      MR. KAPLAN:  Objection; argumentative,
24  calls for a legal conclusion, incomplete
25  hypothetical, vague.

53

1      THE WITNESS:  The word "exclusively"
2  probably appears in the statute, but I'm not
3  100 percent sure.
4  BY MS. RUBEL:
5      Q   Well, is it your understanding that under
6  the Chafee Amendment if you meet certain
7  requirements, you're permitted to make copies of the
8  literary work and distribute them to anyone?
9      MR. KAPLAN:  Objection; calls for a legal
10  conclusion, argumentative, incomplete hypothetical,
11  vague.
12      THE WITNESS:  As an organization that is
13  availing itself of the Chafee Amendment, among other
14  things, we go to some length to make sure that
15  people with print disabilities are the only people
16  that are eligible for our service.
17  BY MS. RUBEL:
18      Q   And do you go to those lengths because
19  it's your understanding that the Chafee Amendment
20  requires you to only make the materials accessible
21  to people with print disabilities?
22      MR. KAPLAN:  Objection; calls for a legal
23  conclusion, vague.
24      THE WITNESS:  As someone who operates
25  under the Chafee Amendment to support that, we need

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

54

1 to ensure that we only distribute them to people who
2 have qualifying disabilities.  Yes.
3 BY MS. RUBEL:
4    Q   Why is that?
5    A   Because --
6        MR. KAPLAN:  Objection; calls for a legal
7 conclusion, calls for speculation, vague.
8        THE WITNESS:  I -- I believe that's the
9 language of the statute, that it's -- that it's
10 making the materials available for people with
11 disabilities.
12 BY MS. RUBEL:
13    Q   And I think you mentioned that Benetech
14 operates as a nonprofit that you would consider an
15 authorized entity under the Chafee Amendment?
16        MR. KAPLAN:  Objection; misstates
17 testimony, calls for a legal conclusion, vague.
18        THE WITNESS:  Yes.
19 BY MS. RUBEL:
20    Q   Are there any other requirements that
21 Benetech must meet in order to provide copies of
22 literary works to people with print disabilities
23 under the Chafee Amendment?
24        MR. KAPLAN:  Objection; calls for a legal
25 conclusion, vague.

55

1        THE WITNESS:  As stated earlier, I believe
2 the two primary requirements is that we be a
3 nonprofit or a government agency and that we have a
4 primary mission to serve people with disabilities.
5 Those -- those are the ones that stick in my mind
6 from the statute.
7 BY MS. RUBEL:
8    Q   Are there any notices that Benetech places
9 on the material that it copies?
10        MR. KAPLAN:  Objection; argumentative,
11 vague.
12        THE WITNESS:  Yes, we place a notice.
13 BY MS. RUBEL:
14    Q   What does the notice say?
15    A   Our notice says that this is copyrighted
16 material being made available under copyright
17 exceptions and other provisions, should only be
18 available to people with print disabilities, and I
19 believe the Chafee Amendment stipulates that we have
20 to specify the title, the author and the copyright
21 date.
22    Q   And you indicated that one of the
23 requirements under the Chafee Amendment is that the
24 entity who seeks to make copies of the works
25 available must have as one of its primary missions a

56

1 goal of serving people with disabilities; is that
2 right?
3        MR. KAPLAN:  Objection; misstates the
4 testimony.
5        THE WITNESS:  I don't think the word
6 "goal" appears in the statute, but that's the sense
7 of it, yes.
8 BY MS. RUBEL:
9    Q   And how -- do you advise people on whether
10 they would qualify as an authorized entity under the
11 Chafee Amendment?
12        MR. KAPLAN:  Objection; vague.
13        THE WITNESS:  Are you done?
14        MR. KAPLAN:  No.
15        Counsel, I need to take a break to discuss
16 privilege issues with my client.  Is that okay?
17        MS. RUBEL:  Sure.
18        THE VIDEOGRAPHER:  Off the record at
19 11:01.
20        (Whereupon, the witness and counsel
21        left the conference room and
22        returned.)
23        THE VIDEOGRAPHER:  We're back on the
24 record at 11:04.
25

57

1 BY MS. RUBEL:
2    Q   The question that was pending was:  Do you
3 advise people on whether they would qualify as an
4 authorized entity under the Chafee Amendment?
5        MR. KAPLAN:  Objection; vague, calls for a
6 legal conclusion.
7        THE WITNESS:  I don't provide legal advice
8 to people on these topics.  I'm not a lawyer.
9 BY MS. RUBEL:
10    Q   Has anybody ever --
11        Has any entity ever asked you your
12 nonlegal opinion on whether they could be considered
13 an authorized entity under the Chafee Amendment?
14        MR. KAPLAN:  Objection; vague, calls for a
15 legal conclusion.
16        If you understand the question, you can
17 answer.
18        THE WITNESS:  I have discussed with people
19 the Chafee Amendment and advised them to consult a
20 lawyer but discussed how we implement the Chafee
21 Amendment as a library for the blind.
22 BY MS. RUBEL:
23    Q   Have you discussed your thoughts on how an
24 entity would determine if one of its primary
25 missions was to serve people with disabilities?

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

58

1     MR. KAPLAN:  Objection; vague, calls for a
2  legal conclusion.
3     And I'll instruct the witness not to
4  discuss any privileged communications.
5     THE WITNESS:  I mentioned the
6  qualifications, much as I have in my earlier
7  testimony, and suggest they consult with a lawyer.
8  I do not advise them on whether or not they have
9  done the things that trigger that provision or not.
10  That's just not something I can do for them.
11  BY MS. RUBEL:
12    Q   What is your understanding of how it would
13  be determined whether an entity -- one of an
14  entity's primary missions is to serve people with
15  disabilities?
16    MR. KAPLAN:  Objection; calls for a legal
17  conclusion, competence, vague.
18    THE WITNESS:  Yeah.  That really seems
19  like a legal question.
20  BY MS. RUBEL:
21    Q   Do you have an understanding of how that
22  determination would be made?
23    MR. KAPLAN:  Objection; vague.
24    THE WITNESS:  If the question is whether
25  there's a formal process for applying to become an

59

1  authorized entity in the United States, my
2  understanding is the answer is no.
3  BY MS. RUBEL:
4     Q   So what is your understanding of how that
5  would be determined?
6     MR. KAPLAN:  Objection; vague.
7     THE WITNESS:  I think that's privileged,
8  talking to our lawyer.
9  BY MS. RUBEL:
10    Q   So your understanding is based on
11  conversations with your lawyer?
12    A   Yes.
13    Q   Do you have any independent understanding
14  of how it would be determined if an entity had a
15  primary mission of serving people with disabilities?
16    MR. KAPLAN:  Objection; vague.
17    THE WITNESS:  I'm not sure I understand
18  the question.
19  BY MS. RUBEL:
20    Q   Prior to your discussions with counsel,
21  did you have any understanding of how that
22  determination would be made?
23    MR. KAPLAN:  Objection; very vague.
24    THE WITNESS:  No.
25

60

1  BY MS. RUBEL:
2     Q   Did Carl Malamud ever discuss with you
3  whether Public Resource could qualify as an
4  authorized entity under the Chafee Amendment?
5     MR. KAPLAN:  Objection; vague and calls
6  for a legal conclusion.
7     THE WITNESS:  No.
8  BY MS. RUBEL:
9     Q   Have you ever had any discussions with
10  Carl Malamud about the Chafee Amendment?
11    A   No.
12    Q   Do you believe that Public Resource would
13  qualify as an authorized entity under the Chafee
14  Amendment?
15    MR. KAPLAN:  Objection; you're asking my
16  witness to provide a legal opinion?
17    MS. RUBEL:  I'm asking whether he has an
18  opinion about whether Public Resource would qualify
19  as an authorized entity.
20    MR. KAPLAN:  I'll object as lacks
21  foundation, competence, calls for speculation,
22  vague, calls for various legal conclusion.
23    Say it again.
24    THE WITNESS:  I haven't thought about
25  evaluating them on -- on those bases.

61

1  BY MS. RUBEL:
2     Q   Well, I'm asking you to think about it
3  right now.
4     Do you have an opinion on whether they
5  would qualify as an authorized entity under the
6  Chafee Amendment?
7     MR. KAPLAN:  Objection; lacks foundation,
8  incomplete hypothetical, calls for a legal
9  conclusion.
10    Counsel, this seems like a really
11  inappropriate question.
12    THE WITNESS:  I don't know enough about
13  how Public Resource operates to know whether or not
14  they qualify.  I'm not aware of those facts.  All I
15  believe is that they're a nonprofit.
16  BY MS. RUBEL:
17    Q   Do you know whether they have a primary
18  mission of serving people with disabilities?
19    MR. KAPLAN:  Objection; calls for a legal
20  conclusion, calls for speculation, lacks foundation.
21    THE WITNESS:  I'm not aware.
22  BY MS. RUBEL:
23    Q   Do you know the history of the Chafee
24  Amendment?
25    MR. KAPLAN:  Objection; vague.

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

62

1       THE WITNESS:  Yes.
2  BY MS. RUBEL:
3      Q   Can you describe it?
4      A   In 1996 Senator Chafee of Rhode Island
5  proposed an amendment in copyright that would create
6  this exception.
7      Q   And that was subsequently passed by
8  Congress?
9      A   My understanding is in 1996 they did.
10     Q   Okay.
11         And is it your understanding that is now
12  part of the Copyright Act?
13     A   Yes.
14     Q   Would you describe the Chafee Amendment as
15  a social bargain between publishers and the
16  disability community?
17     A   Yes.
18     Q   How -- how -- what makes it a social
19  bargain?
20     A   I wasn't part of the negotiations around
21  the Chafee Amendment, but my understanding was that
22  prior to the Chafee Amendment, organizations helping
23  the disabled had to get permission from a publisher
24  to make an accessible copy and that many of those
25  permissions requests were not responded to, and it's

63

1  my understanding that the publishing industry and
2  the disability community participated in the
3  drafting of the Chafee Amendment; that it was
4  supported by both publishers and the disability
5  community, the terms of the -- well, I don't know.
6  I wasn't there.
7      Q   And how does the Chafee Amendment protect
8  the economic interests of the publishers?
9          MR. KAPLAN:  Objection; lacks foundation,
10  calls for speculation, vague.
11         THE WITNESS:  I don't think Chafee talks
12  about economics.  I think it's more about helping
13  disabled people.
14  BY MS. RUBEL:
15     Q   But in -- in categorizing it or
16  characterizing it as a social bargain, that suggests
17  that each side got something.
18         So I guess my question is:  What did the
19  publishers get?
20         MR. KAPLAN:  Objection; argumentative,
21  vague, calls for speculation, lacks foundation.
22         THE WITNESS:  I think that the publishing
23  industry had a tradition of helping disabled people
24  and that the benefit they got -- one of the major
25  benefits is that they didn't have to deal with

64

1  essentially royalty-free permissions that -- they
2  didn't have -- they didn't have to incur that
3  transaction cost, which many of them did out of
4  social responsibility.  So if they had a copyright
5  exception, you didn't have to bother with the
6  permissions department and take their time.
7  BY MS. RUBEL:
8      Q   Are there any other ways that -- that
9  economic interests of publishers were served by the
10  Chafee Amendment?
11         MR. KAPLAN:  Objection; vague, calls for
12  speculation, lacks foundation.
13         THE WITNESS:  People with disabilities
14  couldn't use print books, so the publishers didn't
15  have a product for them.  So I believe that it
16  wasn't so much economics -- because a blind person
17  couldn't use a print book -- it was more about
18  helping the blind person actually get the book at
19  the time in Braille, audio or -- or digital formats.
20         So that's my best answer on that.
21         MS. RUBEL:  I'm going to mark an article.
22  We're going to start with Exhibit 4000.
23         (Plaintiffs' Exhibit 4000 marked
24             for identification.)
25

65

1  BY MS. RUBEL:
2      Q   Do you recognize what I have just had
3  marked as Exhibit 1 -- sorry, Exhibit 4000?
4      A   Yes, I do.
5      Q   What is it?
6      A   It's an article from a journal that I was
7  a co-author on.
8      Q   When was this written?
9      A   2003, according to the caption.
10     Q   You mentioned you were a co-author; who
11  was your co-author?
12     A   Allison Lingane.
13     Q   Did you actually do any of the drafting of
14  this article?
15     A   I don't recall, but I would assume that I
16  read it and edited it as part of the publication.
17     Q   So the final product represents your
18  thoughts and understanding at the time?
19         MR. KAPLAN:  Objection; argumentative.
20         THE WITNESS:  Yes.
21  BY MS. RUBEL:
22     Q   On the first page, the last paragraph of
23  that first page --
24     A   Yep.
25     Q   -- the very first sentence, can you read

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

66

1 that out loud, please.
2    A   (Reading):
3        "The essence of the social
4    bargain between the publishers and
5    the disability community was to
6    provide easier access to people
7    with disabilities while protecting
8    the economic interests of
9    publishers.  Chafee was drawn
10   narrowly to seal this bargain."
11   Q   That was the first two sentences of that
12 third paragraph.  So in that paragraph, you did
13 mention the economic interests of publishers; is
14 that right?
15   A   That is correct.
16   Q   What do you mean by providing easier
17 access to people with disabilities while protecting
18 the economic interests of publishers?
19       MR. KAPLAN:  Lacks foundation.
20       If you recall.
21       THE WITNESS:  So at this point in time,
22 we, in starting Bookshare, had had conversations
23 with the publishers where they had asserted that
24 concern.
25

67

1 BY MS. RUBEL:
2    Q   What concern were they asserting?
3    A   The economic interests, the concern about
4 illegal copies or unauthorized copies.
5    Q   And what was the concern that they were
6 articulating about illegal copies?
7    A   The publishing industry is very disparate,
8 so different parts of the publishing industry had
9 different opinions.  I'd say the post-secondary
10 textbook providers expressed a concern about
11 unauthorized copies having an impact on their
12 revenues in higher education.
13   Q   And how does that interact with the goal
14 of providing easier access to people with
15 disabilities?
16       MR. KAPLAN:  Objection; vague.
17       THE WITNESS:  Trying to figure out if I
18 can -- so -- can you repeat the question so I make
19 sure I'm on point.
20 BY MS. RUBEL:
21   Q   How does that interact with the goal of
22 providing easier access to people with disabilities?
23       MR. KAPLAN:  Objection; vague.
24       THE WITNESS:  When we spoke with the
25 publishers, we were initially, I'd say, threatened

68

1 by the textbook publishers, and though they admitted
2 there was no exception for textbooks in Chafee, they
3 would prefer that we didn't focus on textbooks.
4        And so in order to actually help blind
5 people in the initial days of Bookshare, initial
6 years, we focused on trade books rather than
7 textbooks.
8        I can talk about that because they
9 threatened me even though they didn't talk to my
10 counsel, right?
11       MR. KAPLAN:  Yeah. I mean --
12       THE WITNESS:  Okay.  Okay.  I can talk
13 about those threats.  Okay.  I just want to make
14 sure, because they did threaten us.
15       MR. KAPLAN:  Yeah.  But generally if you
16 aren't certain about whether or not something
17 intrudes into privileged communications, you can
18 always ask for a break and we can go discuss that.
19       THE WITNESS:  Okay.  Thanks.  Okay.
20 BY MS. RUBEL:
21   Q   This article that was marked as
22 Exhibit 4000, is that discussing the experiences of
23 Benetech and Bookshare?
24   A   It certainly was --
25       MR. KAPLAN:  Objection; vague.

69

1        THE WITNESS:  It certainly was informed by
2 our experiences starting Bookshare.
3 BY MS. RUBEL:
4    Q   Okay.
5        So in this paragraph that you read aloud,
6 it talks about the Chafee Amendment being a:
7        "...social bargain between
8    publishers and the disability
9    community to provide easier access
10   to people with disabilities while
11   protecting the economic interests
12   of publishers."
13       I'm trying to understand the connection
14 between that and the threats that Benetech received
15 from publishers.
16       MR. KAPLAN:  Counsel, is there a question?
17 BY MS. RUBEL:
18   Q   Can you explain to me what the connection
19 is between --
20   A   In the authoring of this article --
21       MR. KAPLAN:  You got to let her finish the
22 question first.  Don't -- don't worry about it.
23 BY MS. RUBEL:
24   Q   Can you explain to me what the connection
25 is between the threats that Benetech received and

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

70

1  the two sentences at the bottom of the first page of
2  this exhibit?
3        MR. KAPLAN:  Objection; vague,
4  argumentative.
5        THE WITNESS:  Yes.  Earlier you asked me
6  about when Chafee was passed and what the
7  motivations were, and in the prior paragraph to the
8  one that you're citing in this exhibit, I talk about
9  a lot of the issues that I recall were part of it,
10 which was a few publishers objecting conceptually to
11 providing permission, making it easier, moving
12 paperwork and legal work, and so the connection that
13 I'm making is subsequent to the Chafee Amendment
14 being passed, I created a library that was going to
15 utilize the Chafee Amendment, and the publishers put
16 express pressure on us citing economic interests,
17 which at the time in this article would have been
18 quite fresh in my mind.
19 BY MS. RUBEL:
20    Q   Okay.
21        So they were citing economic interests
22 related to the publishing of post-secondary
23 textbooks?
24    A   Correct.
25    Q   And they were maintaining that providing

71

1  easier access to people with disabilities would harm
2  their economic interests in the textbook industry;
3  is that correct?
4        MR. KAPLAN:  Objection; lacks foundation,
5  vague.
6        THE WITNESS:  They wouldn't have expressed
7  it that way.
8  BY MS. RUBEL:
9     Q   But that's how you understood it?
10        MR. KAPLAN:  Objection; argumentative,
11 vague.
12        THE WITNESS:  I -- I -- I think the higher
13 ed publishers expressed concerns that copies created
14 for students with disabilities might be provided to
15 students without disabilities, and cited their
16 economic interests.
17        I don't think they expressed an objection,
18 per se, to people with disabilities getting access.
19 They just created a hypothetical that said, We're
20 worried about that.
21 BY MS. RUBEL:
22    Q   I understand.  So I think I understand.
23        So they were concerned that in the process
24 of making it easier for people with disabilities to
25 have access, some of the safeguards that were in

72

1  place might be removed and, therefore, would also
2  become easier to make copies for people who didn't
3  have print disabilities?
4        MR. KAPLAN:  Objection; misstates
5  testimony --
6        Well, sorry, were you finished with your
7  question?
8        MS. RUBEL:  Yes.
9        MR. KAPLAN:  Okay.  Objection; misstates
10 testimony, vague.
11        THE WITNESS:  I think their concerns were
12 incorrect, but they were expressed to us that way.
13 BY MS. RUBEL:
14    Q   Okay.
15        And you say in the last sentence that you
16 also read aloud that Chafee was drawn narrowly to
17 seal this bargain.
18        What do you mean by it having been drawn
19 narrowly?
20        MR. KAPLAN:  Objection; argumentative.
21        THE WITNESS:  Chafee is pretty specific in
22 its provisions.
23 BY MS. RUBEL:
24    Q   What do you mean by that?
25    A   I think there's-- Chafee has a list of

73

1  things that you need to do that's relatively
2  specific, and so -- and I'm not a legal expert, but
3  I got the impression that it was more narrowly drawn
4  than most copyright exceptions, but I don't know if
5  I really have studied other copyright exceptions.
6     Q   If you turn to the next page of that
7  exhibit, can you read the very next sentence at the
8  top of page 2?
9     A   (Reading):
10        "It is, of course, extremely
11        important that organizations
12        operating under Chafee do so with
13        the utmost integrity and within the
14        strict letter of the law to protect
15        this important amendment that has
16        provided such a big leap forward
17        for access."
18    Q   What do you mean by that sentence?
19        MR. KAPLAN:  Objection; argumentative.
20        THE WITNESS:  I think it's an expression
21 that Chafee is a great thing for people with
22 disabilities and that organizations that use it
23 should respect its provisions.
24 BY MS. RUBEL:
25    Q   What do you mean by "operating with the

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

74

1  utmost integrity"?
2      MR. KAPLAN:  Objection; argumentative.
3      THE WITNESS:  My organization is committed
4  to ethical operation, and we try to do the right
5  things right.
6  BY MS. RUBEL:
7      Q   Can you think of an example of somebody
8  who would not be operating with the utmost integrity
9  as they're trying to act under the Chafee Amendment?
10     MR. KAPLAN:  Objection; vague, calls for
11 speculation.
12     THE WITNESS:  I'm trying to parse all of
13 the parts of that question.  Is the question, do I
14 know of an organization --
15 BY MS. RUBEL:
16     Q   I can try to rephrase.
17     A   Okay.
18     Q   So I see that you're recommending that
19 organizations operating under Chafee should operate
20 with the utmost integrity.
21     A   Uh-huh.
22     MR. KAPLAN:  Objections; misstates the
23 document, misleading.
24     THE WITNESS:  Okay.
25

75

1  BY MS. RUBEL:
2      Q   What is it that you're trying to caution
3  entities not to do?
4      MR. KAPLAN:  Objection; vague.
5      THE WITNESS:  I think not follow the
6  rules.
7  BY MS. RUBEL:
8      Q   If you'll turn to page 5 of -- which is
9  the last page -- sorry, it's the second-to-last page
10 of the exhibit in the "Conclusion" section, the
11 second-to-last sentence says:
12         "The nonprofit and government
13         agencies providing books under
14         Chafee have gone to some lengths to
15         treat copyrighted materials with
16         care."
17     A   Uh-huh.
18     Q   What have those agencies done to treat
19 copyrighted materials with care?
20     MR. KAPLAN:  Objection; vague, calls for
21 speculation.
22     THE WITNESS:  I think we read the law, we
23 consult with counsel and we try to implement our
24 operations to follow the advice we get on what we
25 can and can't do.

76

1  BY MS. RUBEL:
2      Q   And one of the requirements of the Chafee
3  Amendment is that copies of the materials that are
4  made are supposed to be provided only to people with
5  print disabilities; is that right?
6      MR. KAPLAN:  Objection; calls for a legal
7  conclusion, lacks foundation, calls for speculation,
8  vague.
9      THE WITNESS:  My interpretation of Chafee
10 is that copies are provided for the benefit of
11 people with print disabilities.  So a teacher of a
12 blind student can download a book for the use of
13 that blind student, or a parent can download a book
14 for the use of their disabled student.
15     But that -- our interpretation is that
16 these are books for people with disabilities, and
17 that's why they should be downloaded as well as an
18 individual with disabilities can download it for
19 themselves.
20 BY MS. RUBEL:
21     Q   Are you aware of any entity that has
22 copied materials and made them available to the
23 public generally when the purpose was to make them
24 available to people with print disabilities?
25     MR. KAPLAN:  Objection; incomprehensible,

77

1  lacks foundation, calls for speculation.
2      THE WITNESS:  Yeah.  I'm -- I'm having a
3  hard time understanding.  Are you asking about
4  organizations that cite Chafee and don't follow it?
5  BY MS. RUBEL:
6      Q   I can ask a new question.
7      A   Okay.
8      Q   When Benetech makes copies of materials
9  for the purpose of providing access to people with
10 print disabilities, does it make those copies
11 available to the public generally, or does it
12 somehow make them available only to people with
13 print disabilities?
14     MR. KAPLAN:  Objection; vague, incomplete
15 hypothetical, calls for speculation.
16     THE WITNESS:  Let -- let me give this a
17 try.  If we are --
18     MR. KAPLAN:  Jim, if you don't understand
19 the question, you should say you don't understand
20 the question.  But if you think you can answer it
21 fairly, then please go ahead, but you don't have to
22 give it a try.
23     THE WITNESS:  Bookshare provides
24 accessible books.  The basis that we provide those
25 books varies by the title.  If it's public domain,

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

78

1  we make it available to everybody.  If it's creative
2  comments, we make it available to everybody but let
3  people know that it's creative comments licensed.
4       If it's under a license, we try to follow
5  the terms of the license.  And if we're making it
6  available under the Chafee Amendment, there has to
7  be a person who's on record as having a qualifying
8  disability or a group that is serving that person to
9  download that particular title.
10 BY MS. RUBEL:
11     Q   Do you keep records of people who have a
12 qualifying disability who want to access materials
13 through Bookshare?
14     MR. KAPLAN:  Objection; vague.
15     THE WITNESS:  Bookshare has a membership
16 database, and different people have different roles
17 in that database, including individuals with
18 disabilities being labeled as people with qualifying
19 print-disabled disabilities.
20 BY MS. RUBEL:
21     Q   Do they have to submit any kind of
22 paperwork to support their claim that they're
23 somebody with a print disability?
24     MR. KAPLAN:  Objection; vague.
25     THE WITNESS:  Do you have more?

79

1      MR. KAPLAN:  Lacks foundation.
2      THE WITNESS:  There are multiple
3  mechanisms for people to provide proof of
4  disability.
5  BY MS. RUBEL:
6      Q   What are those methods?
7      A   If they've already submitted proof of
8  disability to another one of the major libraries for
9  the blind and dyslexic, we have cooperative
10 agreements to accept that proof of disability.
11 That's one mechanism.
12     Q   What else?
13     A   If the person is enrolled in special
14 education, the school can assert that they have
15 proof of disability on file as part of the special
16 education services they're providing the student.
17     Q   Any special education services?
18     A   Special education systems that -- services
19 that align with the Chafee Amendment.
20     Q   Okay.
21         Any other methods of showing disability?
22     A   It's possible to submit a form from a
23 competent authority, I believe is the term,
24 indicating that this person has a qualifying
25 disability.

80

1      Those are the three major ways that people
2  provide proof of disability.
3      Q   Would that be some kind of doctor?
4      MR. KAPLAN:  Objection; vague.
5      THE WITNESS:  It varies by disability what
6  professional credential someone needs to have to
7  provide a certification of disability.
8  BY MS. RUBEL:
9      Q   So to access materials from Bookshare that
10 are made pursuant to the Chafee Amendment, an
11 individual would have had to show some proof of
12 disability by one of the methods that you just
13 described; is that correct?
14     MR. KAPLAN:  Objection; misstates
15 testimony, vague.
16     THE WITNESS:  If the Chafee Amendment is
17 one of the mechanisms we're using to deliver the
18 book, then there has to be an association with a
19 person with a qualifying disability under the Chafee
20 Amendment to obtain a copyrighted work.  Yes.
21 BY MS. RUBEL:
22     Q   And you have that configured into the
23 software so that the person clicks to open that
24 work, you will have ensured that you have proof of
25 disability on file?

81

1      MR. KAPLAN:  Objection; argumentative,
2  vague, lacks foundation.
3      THE WITNESS:  A user who's logged in who
4  chooses to download a copyrighted work where we're
5  using the Chafee Amendment as one of our
6  justifications for doing so, there is an electronic
7  indication in -- that that is something they're
8  permitted to do.
9      So someone who has not provided proof of
10 disability is not allowed to download a copyrighted
11 work under the Chafee Amendment, but they could
12 download a public domain or creative comments work.
13 BY MS. RUBEL:
14     Q   If it was a copyrighted work and they
15 attempted to download it, they did not have proof of
16 disability on file, what would happen?
17     MR. KAPLAN:  Objection; incomplete
18 hypothetical, lacks foundation.
19     THE WITNESS:  My understanding is if they
20 have not provided proof of disability, the
21 "Download" button does not appear on the title page,
22 so they can find out that we have the work, but they
23 can't download it unless their account has that
24 enabled, and then there's a button that shows up
25 that says, How do you want to download it?

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

82

1 BY MS. RUBEL:
2    Q   You mentioned the Authors Guild versus
3 HathiTrust case that you were involved in that you
4 submitted a declaration for previously, correct?
5       MR. KAPLAN:  Objection; misstates
6 testimony.
7       THE WITNESS:  I -- we did talk about that
8 case earlier, and I do believe I submitted a
9 declaration.
10 BY MS. RUBEL:
11    Q   And what was your understanding of the
12 issues in that case as they related to people with
13 print disabilities?
14       MR. KAPLAN:  Objection; vague and
15 privileged.
16       I'll instruct you not to divulge the
17 contents of attorney/client communications or expert
18 privileged communications.
19       THE WITNESS:  I was asked by the National
20 Federation of the Blind to submit a declaration as
21 they were -- my understanding is that they legally
22 became involved in the case alongside the
23 HathiTrust.
24 BY MS. RUBEL:
25    Q   And do you have an understanding of what

83

1 the dispute was between the Plaintiff and the
2 Defendant in that case that related to print
3 disabilities?
4       MR. KAPLAN:  Objection; vague.
5       THE WITNESS:  Separating privileged
6 conversations, I have certainly read articles about
7 the HathiTrust case that talk about the issues that
8 were involved in the case and the decisions that
9 were made as they were done, because they were
10 covered widely in the publishing industry press.
11 BY MS. RUBEL:
12    Q   And what is your understanding of what the
13 issues were that related to people with print
14 disabilities?
15    A   The overall circumstances of the case were
16 that the Authors Guild sued a consortium of research
17 libraries that had cooperated with Google to scan
18 their libraries, and the blind community felt this
19 benefited them because now there were 10 or 15 books
20 that have been scanned that previously weren't
21 accessible to blind people, and so that's, I think,
22 why they were interested in the case.
23    Q   And is it correct that the consortium of
24 libraries was making copies of certain books
25 accessible to people with print disabilities?

84

1       MR. KAPLAN:  Objection; calls for
2 speculation, lacks foundation, vague.
3       THE WITNESS:  My understanding was that
4 one of the uses of the scanned books was to make
5 books accessible to people with disabilities.
6 BY MS. RUBEL:
7    Q   Do you know if that consortium had any
8 safeguards in place that ensured that only people
9 with print disabilities would be able to access the
10 copies of those books?
11       MR. KAPLAN:  Objection; vague, lacks
12 foundation, calls for speculation.
13       THE WITNESS:  I believe that only faculty,
14 students and staff of the research universities were
15 able to access information about the books so that
16 that access control was the primary access control.
17       I know less about the details of
18 disability-specific access, but I do believe that
19 there was some difference between regular,
20 nondisabled faculty, staff and students and disabled
21 faculty, staff and students.
22 BY MS. RUBEL:
23    Q   Do you believe there was some sort of
24 certification required to show that the person had a
25 print disability to get access to certain of the --

85

1 of the books?
2       MR. KAPLAN:  Objection; vague.
3       THE WITNESS:  There are a lot of research
4 libraries that were involved in the case, and I
5 don't know what their process was beyond saying
6 these people have print disabilities they'll get
7 more extensive access to the works than regular
8 faculty and staff and students.
9 BY MS. RUBEL:
10    Q   Are you familiar with --
11       Aside from the consortium and the
12 HathiTrust and Benetech, are you familiar with other
13 organizations that provide access to copies of
14 copyrighted works under the Chafee Amendment?
15       MR. KAPLAN:  Objection; vague.
16       THE WITNESS:  There are some national
17 organizations that are well-known in the field:  The
18 National Library Service for the Blind, Visually
19 Impaired and Physically Disabled of the Library of
20 Congress; NLS is the largest, Learning Ally,
21 formerly known as Recording for the Blind and
22 Dyslexic; the American Printing House for the Blind,
23 National Braille Press.
24       Those would probably be the four
25 organizations most often cited, along with -- sorry,

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

86

1 including Bookshare, which is the library that my
2 nonprofit, Benetech, operates.
3         But there are other organizations, many
4 other organizations, that I believe would assert
5 that they operate under the Chafee Amendment.
6 BY MS. RUBEL:
7     Q   NLS, do they have some sort of requirement
8 that an individual provide proof of disability
9 before being able to access copyrighted materials
10 under the Chafee Amendment?
11    A   Yes.
12        MR. KAPLAN:  Objection; lacks foundation.
13 BY MS. RUBEL:
14    Q   What are their requirements?
15    A   They are stated on the NLS website, and
16 they're similar to those that we use, and we have a
17 agreement with NLS that if someone has submitted NLS
18 their qualifications, we accept that as proof of
19 disability for Bookshare services.
20    Q   What about Learning Ally; do they have a
21 requirement that the person certify that they have a
22 print disability before being able to access the
23 materials?
24        MR. KAPLAN:  Objection; vague, lacks
25 foundation.

87

1        THE WITNESS:  Yes.
2 BY MS. RUBEL:
3     Q   How about the American Printing House for
4 the Blind; do they have the same requirement?
5        MR. KAPLAN:  Objection; vague, lacks
6 foundation.
7        THE WITNESS:  Their requirement is
8 different because they're more narrowly focused on
9 blind and visually impaired students, and I'm not
10 sure that if they're providing a Braille copy of a
11 book, that they require people to prove that they're
12 disabled, because Braille is not -- hard copy
13 Braille is not easy to make copies of.
14 BY MS. RUBEL:
15    Q   So they're not providing something, for
16 example, that could be read by a screen reader?
17        MR. KAPLAN:  Objection; misstates the
18 testimony, argumentative, lacks foundation, vague.
19        THE WITNESS:  They do.  They have some
20 kind of registration system for students who have
21 the visual impairments that their organization
22 serves, and I believe that the visually impaired
23 students they serve would generally be understood as
24 qualifying under Chafee.
25

88

1 BY MS. RUBEL:
2     Q   So they may not have a certification
3 requirement for people who are blind; is that your
4 understanding?
5        MR. KAPLAN:  Objection; argumentative,
6 misstates testimony, vague.
7        THE WITNESS:  I don't understand all of
8 their process, but I would say that their
9 identification of visually impaired students through
10 school systems and state education agencies is
11 comparable to our seeking a proof of disability from
12 the school systems, because the school systems are
13 legally obligated to serve blind and visually
14 impaired students.
15        But I did provide proviso that I could
16 imagine they might serve up Braille without a proof
17 of disability.  It's not uncommon in our field that
18 hard copy Braille is circulated more broadly, and no
19 publisher has ever objected to that.
20 BY MS. RUBEL:
21    Q   Okay.  I understand.
22        And what about the National Braille Press;
23 are they providing things only in Braille?
24        MR. KAPLAN:  Objection; lacks foundation,
25 vague.

89

1        THE WITNESS:  It's my understanding they
2 primarily provide Braille books, but they may
3 provide other things.  I think of them as The
4 Braille Press, so...
5 BY MS. RUBEL:
6     Q   Do you know if they have a certification
7 requirement to show that you have a print
8 disability?
9        MR. KAPLAN:  Objection; vague.
10        THE WITNESS:  I don't -- sorry.
11            (Reporter clarification)
12        THE WITNESS:  They might.
13 BY MS. RUBEL:
14    Q   Prior to this case --
15        Prior to being retained as an expert in
16 this case, were you familiar with
17 Public.Resource.Org?
18        MR. KAPLAN:  Objection; vague.
19        THE WITNESS:  I had heard of them.
20 BY MS. RUBEL:
21    Q   In what context had you heard of them?
22    A   I had probably met Carl Malamud at some
23 point.  I don't recall meeting him, but I was aware
24 of his organization and that he had done different
25 things around making things accessible, and this is

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

90

1  accessible in a broader sense than just disability.
2      Q   Since being retained as an expert, have
3  you met Mr. Malamud?
4      A   No.
5      Q   So you're not sure if you've ever met him,
6  but you know you haven't met him since you were
7  retained?
8      A   Correct.
9      Q   Have you ever discussed this litigation
10  with Mr. Malamud?
11      A   Yes.
12      Q   On more than one occasion?
13      A   I think it was primarily on one occasion
14  that we talked about this litigation specifically.
15      Q   And when was that?
16      A   Early this year.  I'd say somewhere in the
17  February to April zone, but it might have been a
18  little earlier.
19      Q   And what did you discuss?
20      A   He asked me if I would help as an expert
21  witness in a case that Public Resource was a
22  Defendant in.
23      Q   What else did he say?
24      A   I think he may have mentioned either the
25  Plaintiffs or the fact that the Plaintiffs were

91

1  standards organizations.  And after I agreed to be
2  helpful, he said that I should then talk to counsel
3  instead of continue to speak with him.
4      Q   Did you discuss what your expert report --
5  what the topic of your expert report would be?
6      MR. KAPLAN:  Objection; vague.
7      THE WITNESS:  I don't recall, but probably
8  he asked if I'd be an expert around accessibility
9  for people with disabilities.
10  BY MS. RUBEL:
11      Q   Do you know why he identified you as a
12  potential expert witness in this case?
13      MR. KAPLAN:  Objection; argumentative.
14      You can answer, if you know.
15      THE WITNESS:  Probably because --
16      MR. KAPLAN:  It's a "yes" or "no"
17  question.
18      THE WITNESS:  Okay.  Yes.
19  BY MS. RUBEL:
20      Q   Why do you think he identified you as a
21  possible expert for this litigation?
22      A   Because I'm a nationally known
23  technologist working in the field of accessibility.
24      Q   What specifically was your assignment in
25  this case?

92

1      A   As outlined in my expert report, I was
2  asked to assess the accessibility of accessing and
3  using certain standards documents.
4      Q   How much time did you spend working on the
5  report?
6      A   I've tracked my time even though I'm
7  serving pro bono, but I haven't added up the hours.
8  Less than 100, more than 20 or 40, but I -- I have
9  the records.  I just don't have them with me.
10      Q   And you mentioned that you're serving as
11  an expert on a pro bono basis.  Why are you serving
12  on a pro bono basis?
13      A   Because I'm an accessibility expert, and
14  that's my goal is to promote accessibility.
15      MS. RUBEL:  I know we're running out of
16  time on this tape, so why don't we go ahead and take
17  another break.
18      THE VIDEOGRAPHER:  This is the end of Disk
19  1.  We're off the record at 11:55.
20      (Recess taken.)
21      THE VIDEOGRAPHER:  This is the beginning
22  of Disk 2.  We're back on the record at 12:09.
23  BY MS. RUBEL:
24      Q   Prior to this case, were you familiar with
25  ASTM?

93

1      A   I had heard of it.
2      Q   In your background as an engineer, did you
3  ever have the occasion to use an ASTM standard?
4      A   Not that I recall.
5      Q   Prior to this case, were you familiar with
6  the NFPA?
7      A   Yes.
8      Q   How were you familiar with them?
9      A   I was familiar that they had something to
10  do with fire standards, and I probably have
11  talked -- I probably talked once to an NFPA person.
12      Q   Do you recall about what the substance of
13  that conversation was?
14      A   I think we talked about accessibility.
15  Because I probably -- I don't go to NFPA events, so
16  it was probably going to be an accessibility event,
17  so...
18      Q   Do you recall what you talked about
19  accessibility of?
20      A   I don't think so.  This was a couple of
21  years ago at least, so...
22      Q   Do you remember who you spoke with?
23      A   No.
24      Q   Prior to this case, were you familiar with
25  ASHRAE?

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

94

1    A   No.
2    Q   Do you have an understanding of the claims
3  that have been brought by the Plaintiffs against
4  Public Resource in this case?
5        MR. KAPLAN:  Objection; vague, calls for a
6  legal conclusion.
7        THE WITNESS:  I am familiar with the broad
8  outlines of what the case is about.
9  BY MS. RUBEL:
10   Q   What is your understanding of what the
11 case is about?
12   A   I believe it's a copyright infringement
13 case.
14   Q   Do you have any additional understanding
15 of the issues in the case?
16       MR. KAPLAN:  Objection; vague, calls for a
17 legal conclusion.
18       THE WITNESS:  Not beyond privileged
19 conversations.
20 BY MS. RUBEL:
21   Q   Have you reviewed the Complaint?
22   A   Probably, but -- or maybe.  I don't know.
23 I don't recall anything about the Complaint.
24   Q   Have you reviewed Public Resource's answer
25 and counterclaims?

95

1    A   Don't think so.
2    Q   Is the entirety of your understanding of
3  this litigation based on discussions that you've had
4  with Public Resource's counsel?
5        MR. KAPLAN:  Objection; vague.
6        THE WITNESS:  I have a privilege question.
7        MR. KAPLAN:  Let's take a break.
8        THE WITNESS:  Okay.  Great.
9        THE VIDEOGRAPHER:  Going off the record at
10 12:12.
11       (Whereupon, the witness and counsel
12        left the conference room and
13        returned.)
14       THE VIDEOGRAPHER:  We're back on the
15 record at 12:16.
16 BY MS. RUBEL:
17   Q   The question that was pending was:  Is the
18 entirety of your understanding of this litigation
19 based on discussions that you've had with Public
20 Resource's counsel?
21       MR. KAPLAN:  And I'm going to object as
22 vague and instruct the witness not to disclose any
23 privileged communications.
24       THE WITNESS:  Beyond the things I've
25 listed in my expert report as having consulted about

96

1  the case and reading something about the case when
2  Carl asked me to serve -- I don't remember if that
3  was the Complaint or a Web article -- I didn't
4  consult any other material about this case beyond
5  those excluded as directed by counsel.
6  BY MS. RUBEL:
7    Q   You mentioned that it is your
8  understanding that this is a copyright infringement
9  case; is that right?
10   A   Correct.
11   Q   Do you have an understanding of what
12 copyrights Plaintiffs have alleged that Public
13 Resource has infringed?
14       MR. KAPLAN:  Objection; vague, calls for a
15 legal conclusion.
16       THE WITNESS:  In my expert report, I was
17 directed to look at some standards by counsel, and
18 so I assume that those standards were at issue in
19 the case.
20 BY MS. RUBEL:
21   Q   How many specific standards did you look
22 at?
23   A   Counsel --
24       MR. KAPLAN:  Objection; vague.
25       THE WITNESS:  Okay.  Counsel directed me

97

1  to --
2        MR. KAPLAN:  And I'm going to instruct --
3        THE WITNESS:  Okay.
4        MR. KAPLAN:  -- not to get into privileged
5  communications.
6        THE WITNESS:  Okay.  But I think if it's
7  in my expert report --
8        MR. KAPLAN:  Yeah.
9        THE WITNESS:  Okay.  So as I outlined in
10 my expert report, I looked at three specific
11 standards:  One from each of the Plaintiffs'
12 standards organizations, plus I looked at additional
13 ones but not in the same depth.
14 BY MS. RUBEL:
15   Q   How many additional standards did you look
16 at?
17   A   I'd consult my expert report, and the
18 number is -- can be added up by what's in the expert
19 report.  I don't know the number.
20       MS. RUBEL:  I'm going to ask that we now
21 mark as Exhibit 4001 the expert report that you
22 submitted in this case.
23       (Plaintiffs' Exhibit 4001 marked
24        for identification.)
25

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

98

1  BY MS. RUBEL:
2      Q   I'll give you an opportunity to take a
3  look at this and see if that refreshes your
4  recollection of how many total standards you
5  reviewed in the process of drafting your report.
6      A   NFPA 101-2000, ASHRAE 90.1-2010, five
7  other ASHRAE standards as outlined on page 12 of my
8  expert report, ASTM standard B57-84e1 of that
9  standard, as in Edward 1, ASTM A20, like Apple, 20A,
10  like Apple, 20M, like Mary, -93a, like Apple.  And I
11  also --
12      MR. KAPLAN:  I believe, for the court
13  reporter, the ASTM standard is B557, not B57.
14      THE WITNESS:  Correct.  I misread the
15  number.  In addition, I accessed the 2012 version of
16  the NPFA standards -- or NFPA standards.  It's NFPA,
17  right?
18      MR. REHN:  NFPA.
19      THE WITNESS:  Yeah.  So there's an error
20  where I flipped the letters there.  Now I'm
21  cross-referenced whether the ASHRAE standard is the
22  same one that I looked at here.  Let's see.  Yeah,
23  that looks like the same one.  So I wasn't keeping a
24  running count, but I think that's the complete list.
25  So it's in -- three, plus five, plus one, plus

99

1  another version of the same thing, so on the order
2  of 10.
3  BY MS. RUBEL:
4      Q   Do you know how many standards the
5  Plaintiffs have alleged that Public Resource has
6  infringed in this litigation?
7      A   No.
8      Q   If you'd turn to page 5 of your report,
9  the beginning of the last paragraph on page 5, you
10  indicated that:
11          "...approaches for 'free
12          access' that make it impossible to
13          copy text generally make it
14          impossible for the assistive
15          technology used by people with
16          print disabilities, especially
17          blind people, to read the text
18          aloud."
19          Is that correct?
20      A   Yes.
21      Q   You included the word "generally" there.
22  So I'd like to understand, are there ways to make it
23  impossible to copy text that do not make it
24  impossible for the assistive technology used by
25  people with print disabilities to operate?

100

1      MR. KAPLAN:  Objection; vague.
2      THE WITNESS:  Not in practice.
3  BY MS. RUBEL:
4      Q   Can you explain what you mean by that?
5      A   I could imagine a blind person trying to
6  take a picture of the screen, uploading that picture
7  into an OCR device and trying to see the text they
8  can't see on the screen.  That's really difficult to
9  do, but it's imaginable.
10      Q   So theoretically it could be possible for
11  a copyright owner to protect the text against
12  copying while also making it possible for someone
13  with a print disability to review the material; is
14  that what you were explaining?
15      MR. KAPLAN:  Objection; misstates the
16  testimony, incomplete hypothetical, vague,
17  argumentative.
18      THE WITNESS:  I believe that technology
19  that makes it impossible to access text as text but
20  instead presents a picture of the text is, for all
21  intents and purposes, inaccessible to a blind
22  person.
23  BY MS. RUBEL:
24      Q   Is there another way, other than
25  presenting the material as a picture, that a

101

1  copyright owner could provide -- could protect their
2  work against copying but at the same time still make
3  it available to be accessed by people with print
4  disabilities?
5      MR. KAPLAN:  Objection; incomplete
6  hypothetical, vague, argumentative and calls for a
7  legal conclusion.
8      THE WITNESS:  Yeah.  I don't know of a
9  technology solution that makes it impossible to
10  access the text by nondisabled people that doesn't
11  also make it impossible for disabled people to
12  access the text.  I don't think the technology is
13  smart enough to distinguish between those two
14  different groups.
15  BY MS. RUBEL:
16      Q   And you indicated in that same sentence on
17  page 5 that it's especially blind people who don't
18  have access to the material because of restrictions
19  on copying text.
20          Can you explain why is it especially blind
21  people?
22      MR. KAPLAN:  Objection; misstates the
23  document, misleading, vague.
24      THE WITNESS:  Elsewhere in my expert
25  report, I indicate that making material accessible

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

102

1  to blind people is generally the hardest because
2  they can't see at all.  It is possible that a
3  low-vision person, for example, would be able to --
4  some low-vision people would be able to pull out a
5  magnifying glass and look at the screen and find it
6  accessible.
7       So I tend to focus on blind people because
8  they have the biggest challenge when it comes to
9  accessibility, and then depending on certain subsets
10 of print-disabled people, might find certain things
11 accessible whereas the blind would not.
12 BY MS. RUBEL:
13     Q   Is it fair to say that there are certain
14 tools that people with low vision can use that a
15 blind person can't use that make additional
16 materials accessible?
17     A   Yes.
18     Q   And what about people with learning
19 disabilities; are there additional tools that people
20 with learning disabilities can use that make
21 materials more accessible to them than to people who
22 are blind?
23     MR. KAPLAN:  Objection; vague.
24     THE WITNESS:  People with learning
25 disabilities have a wide array of problems when it

103

1  comes to accessing text, and so it's difficult to
2  generalize, but there are tools that dyslexic people
3  use that some dyslexic people find especially
4  useful.
5       An example of that is what I call
6  karaoke-style presentation where the word is
7  highlighted visually and spoken aloud at the same
8  time.  That tends to be a very useful feature for
9  dyslexic people.
10 BY MS. RUBEL:
11     Q   What other kinds of tools do dyslexic
12 people use?
13     MR. KAPLAN:  Objection; vague.
14     THE WITNESS:  Many people with learning
15 disabilities, including dyslexia, get benefits from
16 a wide array of visual presentation options, audio,
17 aloud reading options and other reading supports, a
18 talking dictionary.
19 BY MS. RUBEL:
20     Q   Does the size of the text impact the
21 ability of a dyslexic person to read the material?
22     A   Many people with dyslexia find text
23 enlargement and other visual presentation options
24 helpful.
25     Q   What about -- I think you mentioned before

104

1  contrast; is that something that also -- if you
2  change the contrast of the material, might that make
3  it easier for a person with dyslexia to read the
4  content?
5       MR. KAPLAN:  Objection; calls for
6  speculation.
7       THE WITNESS:  Yes, for some.
8  BY MS. RUBEL:
9      Q   Are there other types of learning
10 disabilities that you would classify as print
11 disabilities, other than dyslexia?
12     A   Yes.
13     Q   What are they?
14     A   I'm not a expert in learning disabilities,
15 and so I can't name specific diagnoses.  I can
16 describe some functional problems that I've heard
17 about in our user base.
18     Q   Will you please describe those problems?
19     A   Inability to track text visually,
20 inability to go to the correct line and the next
21 line of text, inability to recall material that
22 you've read or to comprehend it.  That's a selection
23 of things that wouldn't necessarily have a dyslexia
24 diagnosis but is a learning disability that affects
25 the ability to read print.

105

1      Q   And the types of tools that you described
2  that assist people with dyslexia, would those same
3  tools be useful for people who have those other
4  types of learning disabilities?
5      A   Yes, some of them.
6      MR. KAPLAN:  Objection; vague, calls for
7  speculation.
8      THE WITNESS:  Yes, some of them.
9  BY MS. RUBEL:
10     Q   Which ones would be helpful?
11     MR. KAPLAN:  Objection; vague.
12     THE WITNESS:  My experience is that every
13 person's disability is unique, and so I can say
14 generally karaoke-style reading helps people with
15 dyslexia and also doesn't help others.  So each one
16 of these might be something that I would suggest
17 someone try, and if it benefits them, they should
18 use it.  If it doesn't benefit them, they should try
19 something else.
20 BY MS. RUBEL:
21     Q   Are there any additional tools, other than
22 the ones you've already mentioned, that might help
23 someone with dyslexia that could help people that
24 have those other types of learning disabilities?
25     MR. KAPLAN:  Objection; vague, calls for

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

106

1  speculation.
2       THE WITNESS:  I'm having a hard time
3  parsing where we're going.  I don't really
4  understand the difference.
5  BY MS. RUBEL:
6     Q   I can ask again.
7     A   Okay.
8     Q   You mentioned a few different types of
9  tools that might be useful for someone with
10 dyslexia.
11    A   Right.
12    Q   And my question is:  If we're talking
13 about someone with a different type of learning
14 disability, are there any additional tools that you
15 can think of that might be helpful for those people?
16    A   Yes.
17       MR. KAPLAN:  Objection; incomplete
18 hypothetical, vague.
19       THE WITNESS:  Yes.
20 BY MS. RUBEL:
21    Q   What -- what other tools?
22    A   People who serve people with disabilities
23 or their parents or people with disabilities
24 themselves will try a lot of things.  I have heard
25 of people with learning disabilities saying that

107

1  Braille helped them.  If it does, great.  I find
2  that unusual, but I have no objection to it.
3     Q   Can you think of any other --
4        Have you heard of any other tools that
5  have been useful for people with learning
6  disabilities?
7     A   I think the great majority of tools that
8  help people with learning disabilities resemble the
9  same set of technologies that we've already covered.
10    Q   Okay.
11       You mention in your report several other
12 categories of people who might have -- who might be
13 described as having print disabilities.  Can you
14 think of any other categories of people, other than
15 the ones we've already discussed that -- the blind
16 and people with learning disabilities?
17    A   Yes.  People --
18       MR. KAPLAN:  Objection; vague, misstates
19 testimony.
20       THE WITNESS:  Yes.  People with physical
21 disabilities that interfere with reading print is
22 another class of disability that is relevant to our
23 work.
24 BY MS. RUBEL:
25    Q   And can you give me an example of someone

108

1  with that type of physical disability?
2     A   Someone with cerebral palsy, someone with
3  a fine motor control disease where they can't hold a
4  book or turn a page, person with a brain injury,
5  like many of our returning veterans, quadraplegic
6  and variations on those sort of themes where there
7  is a physical limitation or an injury that
8  interferes with the reading process.
9     Q   With people with that type -- and I
10 understand it's hard to generalize.
11       People with those types of physical
12 disabilities, do they have difficulty reading text
13 from a screen, or is the problem with holding the
14 book to be able to see the text?
15    A   It varies.
16       MR. KAPLAN:  Objection.
17       THE WITNESS:  It varies by the disability.
18 All of the above.
19 BY MS. RUBEL:
20    Q   So in what --
21       So if there's some category of people that
22 the issue might be that they can't hold the book but
23 they can see the screen; is that correct?
24    A   There are some people in that category
25 that fit that, yes.

109

1     Q   Are there any other categories --
2        So we've talked about the learning
3  disabilities, physical disabilities, people who are
4  blind.
5        Are there any other categories of people
6  you would describe as print disabled?
7     A   There are people whose primary disability
8  or medical problem would not by itself qualify under
9  the print disability, but they also have a print
10 disability; someone who is deaf and blind, someone
11 who has Down syndrome and dyslexia or a vision
12 impairment.
13    Q   And in that type of scenario, it may be
14 the combination of different impairments that are
15 making it difficult for the person to read?
16       MR. KAPLAN:  Objection; incomplete
17 hypothetical, calls for speculation.
18       THE WITNESS:  It can be.  I mean, some
19 professional has assessed this person's disability
20 and said that they have a disability that gets in
21 the way of print --
22       (Reporter clarification)
23       THE WITNESS:  -- that affects reading
24 print, and so my organization actually doesn't
25 certify people ourselves.  We rely on professionals

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

110

1  to certify the people and then represent that to us.
2  And so if a physician looks at someone's disability
3  and says, "I think they meet the standards of the
4  Chafee Amendment," we take that.
5  BY MS. RUBEL:
6      Q   You focus in your report on whether the
7  standards that you considered were accessible
8  specifically through use of a screen reader; is that
9  right?
10     A   Yes.  That was the primary mechanism I
11  used.
12     Q   Why did you select that as the primary
13  mechanism?
14     A   Because I outlined in my report, I looked
15  at the disability challenges of a blind person as
16  the most difficult to solve, and a screen reader is
17  the number one technology a blind person uses to
18  access online content, content on their personal
19  computer.
20     Q   What other types of tools do they use?
21         MR. KAPLAN:  Objection; vague.
22         THE WITNESS:  Common tools used by blind
23  people around accessibility include Braille
24  displays, as I mentioned before, screen readers,
25  screen enlargers for people with low vision, eBook

111

1  readers, audio cassette tape players, apps that
2  operate on tablets and smartphones.  I think most
3  other software applications that take inaccessible
4  material or digital material and make it talk or
5  larger or tactile.  Those are pretty much the ways
6  people do it.
7  BY MS. RUBEL:
8      Q   And did you consider for the purpose of
9  this -- of your report whether the Plaintiffs'
10  standards were accessible by blind people using any
11  of those other tools, other than the screen reader?
12         MR. KAPLAN:  Objection; vague.
13         THE WITNESS:  I believe that the problems
14  that they would run into with a screen reader were
15  similar to those that they would run into with other
16  technologies, if they could get the material.  I
17  think that's an accurate answer.
18  BY MS. RUBEL:
19     Q   So it's your belief that if they wouldn't
20  be able to access it through a screen reader, they
21  also wouldn't be able to access it through a Braille
22  display?
23         MR. KAPLAN:  Objection; misstates
24  testimony.
25         THE WITNESS:  Yes.  A screen reader can

112

1  both talk what's on the screen as well as send it to
2  a Braille display so you can feel the same
3  characters.  And so the Braille display requires,
4  for online content, to have a screen reader or a
5  book reading program, but kind of most roads lead
6  through a screen reader unless you're handed the
7  digital file in an accessible format or someone
8  converts it for you.
9  BY MS. RUBEL:
10     Q   What about a screen enlarger; did you
11  consider whether any of the Plaintiffs' standards
12  that you reviewed, whether a person would be able to
13  use a screen enlarger on those standards?
14     A   I did not consider the use of a screen
15  enlarger.
16     Q   We'll talk a little more about your --
17  conclusions that you drew about screen readers, but
18  is it correct to summarize your opinion that the
19  versions of the Plaintiffs' standards on the free --
20  on the free access sections of their websites were
21  not accessible by screen readers?
22         MR. KAPLAN:  Objection; misstates
23  testimony, vague.
24         THE WITNESS:  Yes.
25

113

1  BY MS. RUBEL:
2      Q   Would it be possible for a blind person
3  who wanted access to those standards to have someone
4  read those standards aloud to them?
5         MR. KAPLAN:  Objection; incomplete
6  hypothetical.
7         THE WITNESS:  Yes.
8  BY MS. RUBEL:
9      Q   So there's some way that a blind person
10  would be able to know the content of those
11  standards, correct?
12         MR. KAPLAN:  Objection; incomplete
13  hypothetical, vague, argumentative.
14         THE WITNESS:  Yes.  As I mentioned
15  earlier, if they had someone else help them, they
16  could -- they could access the standards through a
17  variety of mechanisms.
18  BY MS. RUBEL:
19     Q   How else would having somebody else's
20  assistance -- sorry.  Strike that.
21         You mentioned that it would be possible if
22  the person was handed a digital copy to access the
23  content of the standards.  In what other ways, if
24  they had assistance, would a blind person be able to
25  access copies of the Plaintiffs' standards?

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

114

1        MR. KAPLAN:  Objection; argumentative,
2    misstates testimony, vague.
3        THE WITNESS:  In addition to having a
4    sighted person read it aloud, they could have a
5    sighted person type the standard out into a
6    accessible document.  They could have a sighted
7    person obtain a copy of the printed standard and
8    type it in from that or try to scan it in from that,
9    and then all the other things you would do to
10   produce a successful version.
11       Once you have an accessible digital copy,
12   you could then do -- you could produce a Braille
13   copy, a large-print copy, an audio copy.  The whole
14   idea would be to try to create a text file that you
15   could then turn into these other formats.
16   BY MS. RUBEL:
17       Q   So if somebody assisted them with creating
18   the text version, they would then have many options?
19       MR. KAPLAN:  Objection; incomplete
20   hypothetical, vague.
21       THE WITNESS:  Yes.
22   BY MS. RUBEL:
23       Q   Do you recall how long each of the
24   standards that you reviewed -- each of the
25   Plaintiffs' standards that you reviewed is?

115

1        MR. KAPLAN:  Objection; vague.
2        THE WITNESS:  Some were short and some
3    were long.
4    BY MS. RUBEL:
5        Q   How short was the shortest standard that
6    you reviewed?
7        A   I didn't measure precisely.  A few pages.
8        Q   And the longest standard?
9        A   Hundreds of pages.
10       Q   The standards on the websites that you
11   reviewed of the Plaintiffs, were they accessible to
12   any person who has access to a computer and an
13   Internet connection, other than persons who have
14   print disabilities?
15       MR. KAPLAN:  Objection; vague.
16       THE WITNESS:  My understanding was if you
17   signed up for a free reading account, you would then
18   be able to view the standards through this viewing
19   window.
20   BY MS. RUBEL:
21       Q   And when you say "you," does that refer to
22   any person who can access a computer with an
23   Internet connection?
24       A   I was able to do so.
25       Q   Did you have any difficulty accessing any

116

1    of the standards?
2        A   It wasn't always easy to find where to go
3    to get that, but I eventually was able or was told
4    by counsel where to find the free access.
5        Q   Where you have --
6            Can you explain what you were -- what part
7    of the website you were having difficulty finding?
8        MR. KAPLAN:  Objection; misstates
9    testimony.
10       THE WITNESS:  Yeah.  I was engaged to look
11   at the accessibility of the process of getting a
12   standard and the standard itself.  And the first
13   thing you have to do is find how to get a standard
14   on that website.  And I believe that in one of the
15   three standards bodies, I spent 10 minutes without
16   being able to find out where you got a free copy,
17   and so later on, counsel gave me a link.  I'm sure I
18   would have found it eventually.  But it was just
19   hard to locate by navigating around the website
20   where that spot was.  I think that may have been the
21   ASHRAE site, but I'm not -- I'm not sure which one
22   of the three it was.
23   BY MS. RUBEL:
24       Q   Okay.
25           Were you able to eventually access all of

117

1    the standards from the Plaintiffs' website that you
2    tried to access?
3        MR. KAPLAN:  Objection; vague.
4        THE WITNESS:  Yes.  The ones that I listed
5    in my report, I was able to look at the standard on
6    their website.
7    BY MS. RUBEL:
8        Q   And did you have to make any sort of
9    payment to get access?
10       A   No.
11       Q   Did you review any standards that are
12   offered for sale on any of the Plaintiffs' websites?
13       A   No.  I did not buy any standards and
14   assess them.
15       Q   Did you review any standards that are
16   posted on any website, other than the websites of
17   the Plaintiffs and Public Resource?
18       MR. KAPLAN:  Objection; vague.
19       THE WITNESS:  I didn't find any others.
20   BY MS. RUBEL:
21       Q   Did you look for Plaintiffs' standards
22   posted on any other websites?
23       A   I did Web searches.
24       Q   What did you do Web searches for?
25       A   Say the -- the name of the standard.

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

118

1    Q   Why did you do that?
2    A   I was interested in finding the -- for
3  example, the Public.Resource.Org version of that
4  standard --
5    Q   So in --
6    A   -- because in my expert report, I talk
7  about actually searching for them on Google, so...
8    Q   So you did Google searches for the names
9  of the standards to see if you could find them on
10  Public Resource's website; is that right?
11       MR. KAPLAN:  Objection; mischaracterizes
12  testimony.
13       THE WITNESS:  I searched for the --
14  basically the numbers of the standards, yes.  If you
15  give me a minute to actually take a quick look at
16  my --
17  BY MS. RUBEL:
18    Q   Sure.
19    A   -- expert report just to make sure.
20       Yes.  So, for example, in my expert report
21  I noted that I had searched the term "NFPA 101
22  Resource.Org" and it showed, for example, Public
23  Resource's standard on that list, and I didn't see
24  any other place beyond where I could go get the
25  standard.  If I had, I probably would have clicked

119

1  on it and said -- but I don't recall seeing it
2  available anywhere else.
3    Q   Did you review standards that are posted
4  on Internet Archive?
5       MR. KAPLAN:  Objection; vague.
6       THE WITNESS:  Not in connection with this
7  case.
8  BY MS. RUBEL:
9    Q   Did you review the standards posted on the
10  Internet Archive for any other reason?
11       MR. KAPLAN:  Objection; relevance.
12  Go ahead.
13       THE WITNESS:  I was asked to by counsel
14  for another case --
15       MR. KAPLAN:  Don't get into privileged
16  communications.
17       THE WITNESS:  Okay.  Sorry.  Sorry.  I
18  thought --
19       MR. KAPLAN:  If it raises a privileged
20  concern --
21       THE WITNESS:  I can't talk about that
22  because it's privileged.
23       But in the preparation of my report, I did
24  not look at the Internet Archive for these
25  standards.

120

1  BY MS. RUBEL:
2    Q   Did you review copies of Plaintiffs'
3  standards --
4       Have you ever reviewed copies of
5  Plaintiffs' standards that are posted on the
6  Internet Archive?
7    A   No.
8    Q   You've testified that counsel referred you
9  to the specific standards that they wanted you to
10  evaluate; is that correct?
11       MR. KAPLAN:  Objection; misstates
12  testimony.
13       THE WITNESS:  Yes.
14  BY MS. RUBEL:
15    Q   Did you do anything to confirm whether the
16  standards they referred you to are the subject of
17  this litigation?
18       MR. KAPLAN:  Objection; vague, calls for a
19  legal conclusion, argumentative.
20       THE WITNESS:  No.
21  BY MS. RUBEL:
22    Q   So you don't know if the standards that
23  they referred you to are actually the subject of
24  this litigation; is that right?
25       MR. KAPLAN:  Objection; argumentative,

121

1  calls for a legal conclusion, vague.
2       THE WITNESS:  As I've said earlier, I made
3  the assumption that if counsel directed me to
4  examine certain standards, they were somehow
5  relevant to this case, but I didn't independently
6  investigate.
7  BY MS. RUBEL:
8    Q   Have you ever seen any of the Plaintiffs'
9  standards that you reviewed before you were retained
10  as an expert in this case?
11       MR. KAPLAN:  Objection; vague.
12       THE WITNESS:  No, I don't recall.
13  BY MS. RUBEL:
14    Q   On page 1 of your report, the last
15  sentence of the first paragraph, you refer to these
16  standards as "commonly used standard documents."
17       Do you see that?
18    A   Yes.
19    Q   What is the basis for your statement that
20  these are commonly used standard documents?
21    A   It's a privileged question.
22    Q   Do you have any personal knowledge
23  regarding how commonly the standards that you
24  reviewed are used?
25    A   I did not independently evaluate their

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

122

1  usage, only their accessibility.
2      Q   Do you know of any person who has ever
3  used any of the 10 standards that you reviewed?
4      MR. KAPLAN:  Objection; vague.
5      THE WITNESS:  I don't personally know of a
6  person who has shared with me that they've used
7  these standards.
8  BY MS. RUBEL:
9      Q   What percentage of people in the United
10  States are completely blind?
11     A   Less than 1 percent.
12     Q   What percentage of the population in the
13  United States has print disability?
14     A   We do not have a precise number, but our
15  estimate is in the 2 to 3 percent range that would
16  meet our qualifications.
17     Q   And that's including the 1 percent that's
18  blind?
19     A   Yeah.  All people with print disabilities
20  are in that range.
21     Q   Are you -- excuse me.
22         Are you aware of any individual who works
23  in the field of fire protection who's blind?
24     MR. KAPLAN:  Objection; vague.
25     THE WITNESS:  No.

123

1  BY MS. RUBEL:
2      Q   Are you aware of anyone who works in the
3  field of heating, air conditioning or refrigeration
4  who's blind?
5      MR. KAPLAN:  Objection; vague.
6      THE WITNESS:  No.
7  BY MS. RUBEL:
8      Q   Are you aware of any mechanical engineer
9  who is blind?
10     MR. KAPLAN:  Objection; vague.
11     THE WITNESS:  I don't think so.
12  BY MS. RUBEL:
13     Q   How about a civil engineer who's blind?
14     MR. KAPLAN:  Objection; vague.
15     THE WITNESS:  Nope.
16  BY MS. RUBEL:
17     Q   Are you aware of any other type of
18  engineer who's blind?
19     A   Yes.
20     MR. KAPLAN:  Objection; vague.
21  BY MS. RUBEL:
22     Q   What type of engineer?
23     A   Computer software engineers is one
24  professional category that I'm aware of personally,
25  knowing people who are blind who are in those

124

1  professions.
2      Q   Do any of the standards from Plaintiffs
3  that you reviewed relate to computer software
4  engineering?
5      A   No.
6      Q   Has anyone ever informed you that they
7  wanted to be able to access a standard that was
8  available on one of Plaintiffs' websites, but they
9  were unable to do so because of a print disability?
10     A   Nobody has personally asked me about the
11  accessibility of a document on one of the
12  Plaintiffs' sites.
13     Q   Are you aware that anyone with a print
14  disability has asked anyone else about the ability
15  to access a standard from one of the Plaintiffs'
16  websites?
17     A   Yes.
18     MR. KAPLAN:  You got to let me object.
19     THE WITNESS:  Sorry.
20     MR. KAPLAN:  It's okay.
21  BY MS. RUBEL:
22     Q   How many people are you aware of who have
23  indicated that they were unable to access a standard
24  from one of the Plaintiffs' websites because of a
25  print disability?

125

1      MR. KAPLAN:  Objection; misstates
2  testimony, misleading, vague.
3      THE WITNESS:  I don't know the number of
4  people who have requested the standards.  I simply
5  know that some of the standards have been requested
6  by print-disabled people.
7  BY MS. RUBEL:
8      Q   What standards have been requested by
9  print-disabled people?
10     A   I don't know the precise numbers, but at
11  least a couple from NFPA.
12     Q   And how do you know that?
13     A   They are in the Bookshare collection, and
14  the metadata associated with them is correlated with
15  a student request for that title.
16     Q   What NF -- do you know --
17     MR. KAPLAN:  Before we go any farther,
18  just in case, I'm going to designate the transcript
19  as provisionally confidential under the protective
20  order.
21     THE WITNESS:  Okay.
22  BY MS. RUBEL:
23     Q   Do you know what NFPA standards are
24  included in the Bookshare collection?
25     A   Not the one that I examined in this expert

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

126

1 report, but I don't have the standard number. Less
2 than 10 standards, at least 1.
3     Q   How do you know it's not the one you
4 examined in this report?
5     A   Because I looked at the list and 101
6 wasn't on the -- in the list.
7     Q   So --
8     A   I can search our website.
9     Q   Did you produce documents that relate to
10 which NFPA standards are included in the Bookshare
11 collection today?
12     A   I have no such document.
13     Q   So you -- did you review the Bookshare
14 website to determine which NFPA standards are
15 included in the Bookshare collection?
16     A   Not in preparation of my expert report.
17     Q   In what context did you review the
18 Bookshare website to determine if there are any NFPA
19 standards in the Bookshare collection?
20     A   I did a search this week but did not
21 create any document, notes as a result of that Web
22 search.
23     Q   Would it be possible to recreate your
24 search?
25     A   Yes.

127

1     Q   How would an NFPA standard have come to be
2 a part of the Bookshare collection?
3         MR. KAPLAN:  Objection; calls for
4 speculation, lacks foundation, vague --
5         THE WITNESS:  As mentioned earlier --
6         MR. KAPLAN:  -- and incomplete
7 hypothetical.
8         THE WITNESS:  Okay.  As mentioned earlier,
9 I looked at the details on one standard, and it
10 listed it as "adult ed" and also listed which one of
11 our scanning and proofreading partners had converted
12 the work, which were indicative to me that an adult
13 ed student had requested that title.  That would be
14 the likely explanation of why it would be in our
15 collection.  It would be in reaction to a request
16 for a print-disabled person for an accessible copy
17 of that specific title.
18 BY MS. RUBEL:
19     Q   Do you know if that individual who made
20 that request to Bookshare contacted NFPA to request
21 access of the standard?
22     A   I wouldn't know that.
23     Q   So it's possible that they did contact
24 NFPA?
25         MR. KAPLAN:  Objection; calls for

128

1 speculation.
2         THE WITNESS:  Perhaps.
3 BY MS. RUBEL:
4     Q   And it's also possible that they never
5 contacted NFPA?
6     A   All I know is they asked us to do it.
7     Q   Is it your understanding that NFPA's
8 standards are protected by copyright?
9         MR. KAPLAN:  Objection; calls for a legal
10 conclusion, vague.
11         THE WITNESS:  As far as I'm aware, any
12 document created since a certain date is probably
13 copyrighted.  I'm sort of vaguely aware that that's
14 the case in the U.S.
15 BY MS. RUBEL:
16     Q   So if you --
17         If Bookshare made a copy of an NFPA
18 standard available on Bookshare, would that be
19 pursuant to the Chafee Amendment?
20         MR. KAPLAN:  Objection; incomplete
21 hypothetical, calls for speculation, lacks
22 foundation and vague.
23         THE WITNESS:  That would be the most
24 probable conclusion I'd draw.
25

129

1 BY MS. RUBEL:
2     Q   So the individual who wanted access to the
3 NFPA standard and who is print disabled has access
4 to that standard now; is that correct?
5         MR. KAPLAN:  Objection; calls for
6 speculation.
7         THE WITNESS:  If they're still a Bookshare
8 member, yes, they would now be able to access that
9 standard.
10 BY MS. RUBEL:
11     Q   And if that individual wanted access to
12 additional NFPA standards, they could submit a
13 request to Bookshare, and Bookshare would make that
14 standard accessible to them; is that correct?
15         MR. KAPLAN:  Objection; incomplete
16 hypothetical, calls for speculation, vague.
17         THE WITNESS:  If they represented they
18 needed it for an educational purpose, we would
19 probably do it.
20 BY MS. RUBEL:
21     Q   What if they had a reason to access the
22 NFPA standard for a professional purpose?
23         MR. KAPLAN:  Objection; incomplete
24 hypothetical, vague.
25         THE WITNESS:  Bookshare has a hierarchy of

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

130

1 priority based on our funding structure of which
2 titles we will do.  If it's for an educational
3 purpose by an American student, we're funded by the
4 Department Of Education to produce those.
5        If someone didn't have a school reason, we
6 could put it on a -- what we call a wish list, and
7 volunteers could produce the book or the person with
8 disability could cause it to be created themselves
9 and submit it to us to add to our library.
10 BY MS. RUBEL:
11     Q   Other than those several NFPA standards on
12 the Bookshare collection, are you aware of any other
13 standards of the Plaintiffs that anyone with a print
14 disability has indicated they were not able to
15 access because of their print disability?
16        MR. KAPLAN:  Objection; vague.
17        THE WITNESS:  I have no knowledge of that.
18 BY MS. RUBEL:
19     Q   The 10 specific standards that you
20 reviewed, are you aware of any person with a print
21 disability who attempted to access those standards
22 on the Plaintiffs' websites and was unable to do so?
23        MR. KAPLAN:  Objection; vague.
24        THE WITNESS:  No.  Sorry, I thought you
25 were finished.

131

1        MR. KAPLAN:  Yeah.  No.  No.
2 BY MS. RUBEL:
3     Q   Do you have any reason to believe that if
4 an individual approached any of the Plaintiffs to
5 request access of a standard due to their print
6 disability, that the Plaintiffs would not have
7 provided them access?
8     A   I'm having a hard time parsing the
9 question.  Can you ask it just a little bit more
10 simply.
11     Q   Sure.
12        Do you have any reason to believe that the
13 Plaintiffs would have said "no" if anybody said, "I
14 want to access one of your standards, but I can't
15 because I have a print disability"?
16        MR. KAPLAN:  Objection; incomplete
17 hypothetical, vague.
18        THE WITNESS:  I'm not aware either way.
19 BY MS. RUBEL:
20     Q   Did you ever investigate this?
21     A   The scope of my expert report was to
22 investigate the accessibility of the documents on
23 the Plaintiffs' site and not to investigate other
24 aspects of those questions.
25     Q   So you didn't investigate whether somebody

132

1 could have called the Plaintiffs, for example, and
2 asked for an electronic copy of the standard that
3 they would have been able to use to make it print --
4 accessible to someone with a print disability?
5        MR. KAPLAN:  Objection; incomplete
6 hypothetical, vague.
7        THE WITNESS:  Outside the scope of my
8 expert engagement.
9 BY MS. RUBEL:
10     Q   My question is:  Did you ever investigate
11 it?  So the answer may be "no" --
12     A   Okay.  No.
13     Q   Okay.
14        I'm just going to ask another short series
15 of questions, and then we can take another break.
16     A   Okay.  Sounds good.
17     Q   On page 7 of your report --
18     A   Yes.
19     Q   -- it's the first full -- the first
20 complete sentence on page 7, you indicated that it's
21 your opinion that people with other print
22 disabilities, such as vision impairment, dyslexia,
23 brain injury and physical disabilities, would find
24 the standards accessible with screen readers on
25 Public Resource's website but that the standards on

133

1 the free reading portions of the Plaintiffs'
2 websites would not be accessible to the great
3 majority of people with these types of disabilities;
4 is that correct?
5     A   Correct.
6        MR. KAPLAN:  Objection; misstates the
7 document.
8 BY MS. RUBEL:
9     Q   What's the basis of your conclusion that
10 the great majority of people with these types of
11 print disabilities would not be able to access the
12 standards from Plaintiffs' free websites?
13     A   Because the great majority of people in
14 that class rely on assistive technology to make
15 things accessible, and the free reading portions
16 basically interfere with almost all of those
17 assistive technology.
18        I felt that some people with low vision
19 might find it usable, and I base that on other
20 digital content like eBook readers.
21     Q   So some people with low vision would be
22 able to accessible -- sorry -- would be able to
23 access the standards from the free reading portions
24 of the Plaintiffs' websites?
25        MR. KAPLAN:  Objection; misstates

134

1  testimony, argumentative, vague.
2      THE WITNESS:  I believe that some people,
3  as I think I mentioned earlier, could pull out a
4  magnifying glass and be able to use the standards.
5  They may prefer to have a better technical solution,
6  but they would find it somewhat usable.
7  BY MS. RUBEL:
8      Q   You said the great majority of people you
9  do not think would find them accessible.  Can you
10  quantify that?
11     A   Well, there's a list of people with
12  disabilities that I tend to track:  Blind, visual
13  impairment, dyslexia, brain injury and physical
14  disabilities.  And I consider some subset of people
15  who are low vision but not blind to be much less
16  than half of that combined population.
17     Q   Much less than half?  Is that a quarter?
18     A   I don't have a precise number, but less
19  than a quarter, potentially less than 10 percent.
20  But these aren't numbers that I have a precise
21  number.  I just think of what size these different
22  groups are, and then I take a subset of that, and I
23  can kind of do the math, that a great majority is
24  something that I can stand behind.
25     Q   Do you know what portion of people who

135

1  have dyslexia in the United States use screen
2  readers?
3      A   I do not have a precise number for that.
4      Q   Do you have a general sense of what
5  percentage of people with dyslexia use screen
6  readers in the United States?
7      A   Like other disabilities, it's a matter of
8  degree.  So few people with mild dyslexia would use
9  a screen reader, but some would.
10     Q   I'm sorry, I just want to make sure I
11  heard.  You said "few people"?
12     A   Few people with mild dyslexia would do
13  that.  Those people generally wouldn't qualify for
14  Bookshare.  If we're talking about what percentage
15  of the people, the 2 or 3 percent of the population,
16  that we think qualify for our services use or have
17  used a screen reader, less than half, more than 10
18  or 20 percent.
19     Q   Let me make sure I'm following.
20         You estimated before that 2 to 3 percent
21  of the general population would qualify as having a
22  print disability?
23     A   Correct.
24         MR. KAPLAN:  No.  That misstates
25  testimony.

136

1      THE WITNESS:  I'm sorry.  Okay.
2  BY MS. RUBEL:
3      Q   You need to just answer my questions.
4      MR. KAPLAN:  But I will object to the
5  question as misstating testimony.
6      THE WITNESS:  Okay.  We believe that 2 to
7  3 percent of the general population is likely to
8  qualify for Bookshare.
9  BY MS. RUBEL:
10     Q   And is that based on your understanding
11  that 2 to 3 percent of the general population has a
12  print disability as you define it?
13     A   That would be my assumption, but the
14  source of my number is primarily what percentage of
15  general student populations, say, in K-12 or in
16  higher ed, get signed up for Bookshare and so -- and
17  we see numbers in the 2 to 3 percent range of, say,
18  a school district in Palo Alto might be signed up
19  for us, so that's kind of the basis of that number.
20     Q   And then you said that less than half of
21  that 2 to 3 percent use -- has ever used a screen
22  reader; is that correct?
23     MR. KAPLAN:  Objection; misstates
24  testimony.
25     THE WITNESS:  I estimated that -- I would

137

1  probably say less than half of that general
2  population is using a screen reader, and because
3  dyslexia is more commonly diagnosed in people who
4  went through school in the last 20 years in the
5  general population, that's why it's a small number.
6  Numbers would be different if I was talking about
7  current students.
8  BY MS. RUBEL:
9      Q   I want to just make sure I understand,
10  because I'm still a little unclear.
11         You're referring to the general
12  population.  Is that the 2 to 3 percent?
13     MR. KAPLAN:  Objection; vague.
14     THE WITNESS:  We're talking about the
15  proportion of the 2 to 3 percent that might be using
16  this kind of technology, and I estimated that less
17  than half of the 2 to 3 percent of the general
18  population is currently using these technologies,
19  and probably since we're talking about seniors and
20  people who grew up a long time ago, it's probably
21  also less than half of that population has probably
22  ever used a screen reader.
23         So I'm comfortable with saying I believe
24  that less than 1 percent of Americans have ever used
25  a screen reader.

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

138

1      MS. RUBEL:  I think this is a good time to
2  take our lunch break.
3      THE VIDEOGRAPHER:  We're going off the
4  record at 1:20.
5          (Lunch recess taken.)
6      THE VIDEOGRAPHER:  We're back on the
7  record at 2:42.
8  BY MS. RUBEL:
9      Q    There were four aspects of each of the
10  Plaintiffs' websites that you evaluated; is that
11  correct?
12      MR. KAPLAN:  Objection; vague.
13      THE WITNESS:  There were four factors that
14  I investigated in terms of the websites and the
15  standards content.
16  BY MS. RUBEL:
17      Q    And what were those four factors or
18  aspects?
19      A    Well, I -- I focused on functional aspects
20  such as could a person with a disability access the
21  actual standard?  Could they read it in its
22  entirety?  Could they go to a specific spot in the
23  standard and could they do a keyword search on the
24  standard?
25      I think those are the four factors that I

139

1  used.
2      Q    How did you come up with those four
3  factors?
4      A    Through a functional analysis on what
5  people generally do when they're reading information
6  for content.  It's like -- it's sort of a functional
7  description of can I do what other people would do
8  with that?  And if you can do those four things, the
9  assumption is you can probably do most other things
10  that people would do with some content.
11      Q    Did you determine whether the general
12  population accessing the standards through the
13  Plaintiffs' websites would be able to form -- would
14  be able to perform each of those four functions?
15      MR. KAPLAN:  Objection; vague.
16      THE WITNESS:  I viewed this through
17  accessibility standards rather than, say, assessing
18  how well designed the websites were for sighted
19  people.  I didn't focus on that.  I based it on sort
20  of accessibility standards rather than evaluating it
21  for the general public.
22  BY MS. RUBEL:
23      Q    So you weren't comparing whether a person
24  with a print disability would be able to do the same
25  things that a person without a print disability

140

1  would be able to do?
2      MR. KAPLAN:  Objection; misstates
3  testimony, argumentative, vague.
4      THE WITNESS:  I was -- I chose the
5  functional tests based on accessibility standards
6  and the ability for a person with a disability to do
7  similar things to people without disabilities, but I
8  didn't evaluate the general usability of the website
9  for people without disabilities.  I chose to focus
10  on those elements.
11  BY MS. RUBEL:
12      Q    So maybe I'll give you an example.
13      Did you -- did you evaluate whether a
14  person without a print disability using the
15  Plaintiffs' websites would be able to do a full-text
16  search of the standards?
17      MR. KAPLAN:  Objection; vague.
18      THE WITNESS:  I did not evaluate that.  I
19  did evaluate, for example -- actually, no, I think I
20  did do some checks on full-text searches.  My expert
21  report mentions where I did those checks.
22  BY MS. RUBEL:
23      Q    When you were doing the searches for
24  full-text searches, was that -- I'm sorry.  I guess
25  we'll get to that when we discuss that portion of

141

1  your report.
2      A    Uh-huh.
3      Q    Were you assisted by anybody else in the
4  drafting of your report?
5      MR. KAPLAN:  Objection; vague.
6      THE WITNESS:  Excluding privileged answers
7  to that question, nobody else helped me draft the
8  text of the report.
9  BY MS. RUBEL:
10      Q    Did anybody else assist you in evaluating
11  the accessibility of Plaintiffs' websites?
12      A    One person, Rob Turner.
13      Q    What did Rob Turner do to assist you?
14      A    He reproduced a couple problems that I had
15  encountered during my investigation; that was what I
16  asked him to focus on.
17      Q    What do you mean by "reproduced a couple
18  problems"?
19      A    So in doing my functional evaluation, I
20  ran into difficulties with a blind person being able
21  to do the things that I listed, and I asked Rob
22  whether he ran into the same difficulties that I
23  did, and he did.
24      Q    Do you know which standards Rob Turner
25  tried to access?

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

142

1     A   I think we focused on the website that
2  didn't have an accessible sign-up process, and I'm
3  happy to find out which one of the three standards
4  bodies had that problem, just so I correctly testify
5  to that.
6     Q   Sure.
7     A   So I'm looking at my expert report.  So we
8  focused our efforts on NFPA when we did our
9  in-person evaluation.
10    Q   Is Rob Turner blind?
11    A   Yes.
12    Q   What is his background?
13       MR. KAPLAN:  Objection; vague.
14       THE WITNESS:  He's a blind engineer for my
15  nonprofit organization.
16  BY MS. RUBEL:
17    Q   What -- what is his role --
18       Is he employed by Benetech?
19    A   Yes, he's employed by Benetech as a -- as
20  a Quality Assurance Engineer.
21    Q   So what does he do in that role?
22    A   He tests the quality of our products,
23  including our websites, evaluates accessibility, but
24  his focus is on our products.
25    Q   Why did you seek Rob Turner's assistance?

143

1     A   He's one of our blind employees who
2  happens to be in the office regularly as opposed to
3  being located in other locations; so I could go down
4  and talk to him.
5     Q   So you asked --
6        You asked Rob to try to access standards
7  from NFPA's website and see if he was able to do so?
8        MR. KAPLAN:  Objection; vague.
9        Go ahead.
10       THE WITNESS:  Correct.  First, I asked him
11  to look at the sign-up process to see if he could
12  sign up for a free reading account without needing
13  assistance from a sighted person, and he wasn't able
14  to do that.
15  BY MS. RUBEL:
16    Q   Was there anything else you asked him to
17  do?
18    A   After I pushed the "I Agree" button and
19  got him through that, that roadblock, I also asked
20  him to try to read the standard in question.
21    Q   Did you ask Rob to try to access any of
22  the Plaintiffs' standards that are posted on Public
23  Resource's website?
24    A   No, I did not.
25    Q   What are the Web content accessibility

144

1  guidelines?
2     A   They're the primary Web accessibility
3  standard promulgated by the World Wide Web
4  Consortium, which is the main standards body in Web
5  technology.
6     Q   Does Benetech participate in the World
7  Wide Web Consortium's standards development process?
8        MR. KAPLAN:  Objection; vague.
9        THE WITNESS:  Benetech staff have
10  participated in W3C standards efforts.
11  BY MS. RUBEL:
12    Q   In what capacity?
13    A   As a stakeholder with technical expertise
14  in the area.  So our focus is on accessibility
15  aspects of W3C standards.
16    Q   During what time period did Benetech
17  participate in the standards development process for
18  this organization?
19    A   In one form or another, we have
20  participated in the W3C standards process for
21  roughly 20 years.
22    Q   And does Benetech currently participate in
23  the standards development process?
24    A   I'm not aware of a current process that
25  we're actively involved with today, but we might

145

1  be -- we've been involved in the last couple of
2  years on an issue that may still be open.
3     Q   Did participants pay fees in order to
4  participate in the standard development process with
5  this Consortium?
6     A   I believe that there are people who are
7  members of the W3C and pay fees and people who do
8  not.
9     Q   How much do members pay?
10    A   I am not aware of that number.
11    Q   Do you have a ballpark?
12    A   No.  I wouldn't speculate.
13    Q   Are you familiar with the license that the
14  Consortium uses with respect to the standards that
15  it develops?
16       MR. KAPLAN:  Objection; argumentative,
17  vague, calls for a legal conclusion.
18       THE WITNESS:  Is the question about the
19  W3C?  I don't recall having read their license in
20  many years, if I ever have.
21  BY MS. RUBEL:
22    Q   Did you attach a copy of their license as
23  an exhibit to your report?
24    A   I specified the W3C standard that I used
25  and counsel attached the actual standard.

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

146

1    Q   So it was counsel's decision to make
2  reference to the license?
3        MR. KAPLAN:  Objection; misstates
4  testimony and calls for privileged communications.
5        THE WITNESS:  Okay.  So I'm going to go
6  back to my expert report and try and find the
7  mention that you're referring to and --
8  BY MS. RUBEL:
9    Q   Sure.  I can refer you to page 7 of your
10 report.
11   A   Okay.  Great.
12       Yes.  I guess -- yes, that was
13 counsel's -- it was based on privileged
14 conversations about the license.
15   Q   And you don't recall having read that
16 license for many years; is that correct?
17   A   I think I'm aware that the W3C licensed
18 their standards freely.  I was aware of that.
19   Q   When you say license it freely, do you
20 mean at no cost?
21   A   Yes.
22   Q   And so they're -- they're referred to as
23 WC3 [sic]; is that correct?
24   A   W3C is the most common designation.
25   Q   W3C?

147

1    A   Yep.  And WCAG is the Web Content
2  Accessibility Guidelines.
3    Q   WCAG?
4    A   Yeah.  W-C-A-G, Web Content Accessibility
5  Guidelines.
6        W-C-A-G for short, WCAG.
7  BY MS. RUBEL:
8    Q   Are the WCAG guidelines mandatory?
9        MR. KAPLAN:  Objection; vague.
10       THE WITNESS:  They're complex standards.
11 I'm sure there are places where meeting a certain
12 level of that standard is a requirement, but they're
13 not -- they don't have the force of law worldwide or
14 anything like that.
15 BY MS. RUBEL:
16   Q   Would you describe them as
17 recommendations?
18       MR. KAPLAN:  Objection; vague,
19 argumentative.
20       THE WITNESS:  They are accessibility
21 standards.  They incorporate functional goals,
22 measures of accessibility, how to abide by them,
23 different levels of compliance with accessibility.
24       There are generally three levels of
25 accessibility in the standards.  I know that there

148

1  are government agencies that specify that vendors
2  have to meet a certain level of compliance with the
3  WCAG standards.  They're commonly referenced when
4  accessibility requirements are -- are raised.
5  BY MS. RUBEL:
6    Q   What are the three levels of
7  accessibility?
8    A   They're generally designated as A, AA and
9  AAA.
10   Q   What does -- what does level A signify?
11   A   In common understanding in the field,
12 "should" or no, "must."  A is "must" or the
13 equivalent of must.
14   Q   What do you mean by that?
15   A   If you're accessible, you must do this;
16 otherwise, you're not accessible.
17   Q   And what about a double A; what does that
18 signify?
19   A   "Should."  If you're accessible, you
20 should do these as well as the must requirements.
21   Q   And a triple A?
22   A   "Could," "might" if it's easy.  It would
23 be overkill to require people to do everything in
24 AAA, and it also varies on what your functional
25 objective is, and so, you know, certain things just

149

1  don't apply to certain kinds of content.
2    Q   If we could turn in Exhibit C to your
3  report, this is a copy of the WCAG guidelines.
4    A   Uh-huh.
5    Q   On page 1, the very first sentence under
6  "Abstract," it says:
7            "The WCAG 2.0 covers a wide
8        range of recommendations for making
9        Web content more accessible."
10       Is that correct?
11   A   Yes, that's what it says.
12   Q   Does everybody who posts content on the
13 Internet comply with the WCAG guidelines?
14       MR. KAPLAN:  Objection; vague.
15       THE WITNESS:  It's a very complex question
16 to answer because we have multiple levels of
17 accessibility.  I mean, do most people who put up
18 websites make the text of their websites perceivable
19 as outlined in the standard?  Yeah, most do.
20       But depending on what the content is, the
21 type of website it is, what legal regime it operates
22 in, the question -- the answer varies widely.
23 BY MS. RUBEL:
24   Q   So let's focus just on the level A, that
25 "must" characteristics.

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

150

1  A  Yes.  Uh-huh.
2  Q  Does everyone who posts content on the
3  Internet comply with all of the level A
4  recommendations?
5  A  No.
6  Q  Do you have any estimate of what
7  percentage of the content on the Internet complies
8  with those level A recommendations?
9  A  No.
10  Q  Any ballpark range?
11  MR. KAPLAN:  Objection; asked and
12  answered.
13  THE WITNESS:  The Web's a really big place
14  and I don't know all about it.
15  BY MS. RUBEL:
16  Q  Is there a lot of content on the Internet
17  that does not comply with the level A
18  recommendations?
19  MR. KAPLAN:  Objection; vague.
20  THE WITNESS:  If you got more specific, it
21  would be easier for me to answer questions.  But
22  anything like, tell me about what World Wide Web is
23  like is like tell me about every human being on the
24  planet and generally the characteristics of them.
25  I -- I -- it's really hard to be specific.

151

1  BY MS. RUBEL:
2  Q  Are you familiar with any content, any
3  specific content, on the Internet that does not
4  follow the level A recommendations?
5  A  Sure.  I bet there are a bunch of videos
6  on the Internet that don't have captioning for the
7  deaf, which would be a level A requirement of video
8  content.
9  Q  What about the specific recommendation
10  that relates to providing text alternatives for any
11  non-text content; are you familiar with any content
12  on the Internet that does not comply with that
13  recommendation?
14  MR. KAPLAN:  Objection; argumentative,
15  vague.
16  THE WITNESS:  The NFPA sign-up process is
17  an example I use in my report.  That's one example.
18  BY MS. RUBEL:
19  Q  Other than the Plaintiffs' websites, is it
20  a common issue that there -- that there are websites
21  that do not provide text alternatives for non-text
22  content?
23  MR. KAPLAN:  Objection; vague.
24  THE WITNESS:  I'm aware of a number of
25  lawsuits over the accessibility of websites where

152

1  that recommendation was not followed and blind
2  people couldn't use those e-Commerce websites.
3  BY MS. RUBEL:
4  Q  Do you -- do you have in mind a specific
5  website, e-Commerce website, that people weren't
6  able to use for that reason?
7  A  Oh, you know, Amazon has been sued or
8  hassled.  There have been airlines.  I think Target
9  was the subject of a major suit.  Yeah.  I mean,
10  those are -- those are some examples, and I believe
11  they fixed them because they kind of had to.
12  Q  Do you -- do you believe that when people
13  are not compliant with those recommendations,
14  they're generally purposely trying to prevent people
15  with print disabilities from accessing the website
16  content?
17  MR. KAPLAN:  Objection; vague, incomplete
18  hypothetical.
19  THE WITNESS:  I believe the number of Web
20  designers that deliberately exclude disabled people
21  while designing websites are in the minority.
22  BY MS. RUBEL:
23  Q  So how does that exclusion of people with
24  print disabilities come about if it's not
25  deliberate?

153

1  MR. KAPLAN:  Objection; misstates
2  testimony, argumentative, vague.
3  THE WITNESS:  The client designing the
4  website did not specify "Display accessibility" as a
5  requirement in the product design is a common cause.
6  The website designer was failed in their training to
7  be educated by accessibility.  That's much more
8  common of, I'd say, people who aren't professionally
9  trained, because I think in the field, accessibility
10  is a topic that's taught as part of a standard
11  curriculum in a university sort of setting for that
12  kind of expertise.  They copied an inaccessible
13  website is quite common in the Web.  "I like the
14  looks of that; I'll just borrow that and change the
15  text to be my own."
16  I'm sure there are other reasons, but, you
17  know, lack of a spec or ignorance of how to do it
18  are probably the top couple.
19  BY MS. RUBEL:
20  Q  Was another possibility that there are
21  concerns about how copyright protected works may be
22  used if they are made accessible to the print
23  disabled?
24  MR. KAPLAN:  Objection; argumentative,
25  vague.

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

154

1       THE WITNESS:  I think we've gotten very
2   narrow as opposed to very broad, so up to this
3   moment we've been talking about websites in general.
4   And I think websites in general, when they are
5   inaccessible to the disabled, it generally doesn't
6   have anything to do with copyright or any copyright
7   concerns.  It's an incredibly narrow group of people
8   who are publishing content where copyright issues
9   might be brought up, but that's kind of more
10  hypothetical.
11  BY MS. RUBEL:
12      Q   I want to ask some questions about ASTM's
13  public website, which it refers to as the Reading
14  Room.
15      A   Right.
16      Q   Did you see that notations of it being
17  referred to as the Reading Room when you were
18  reviewing ASTM's website?
19      A   That rings a bell.  As a matter of fact,
20  yes.
21      Q   What ASTM standard did you evaluate the
22  accessibility of, specifically?
23      A   ASTM B557-84e, like Edward, 1.
24      Q   Was that counsel that suggested that you
25  investigate and evaluate that specific standard?

155

1       A   Counsel suggested that I evaluate ASTM
2   B557-84, and I found e1, which, I guess, is probably
3   a specific version under that standard.
4       Q   Do you have any understanding of why they
5   suggested that specific ASTM standard?
6       MR. KAPLAN:  Objection; calls for
7   privileged communications.
8       THE WITNESS:  Not other than I've already
9   said.
10  BY MS. RUBEL:
11      Q   Do you know what the ASTM standard
12  B557-84e1 is?  What is it a standard for?
13      A   Metal products.
14      Q   Anything specific about metal products?
15      A   Well, the title of the standard is
16  "Wrought and Cast Aluminum- and Magnesium-Alloy
17  Products."
18      Q   The title is actually "Standard Methods of
19  Tension Testing Wrought and Case Aluminum- and
20  Magnesium-Alloy Products."
21      A   Okay.  So I grabbed a subset of the full
22  formal title, but I think it deals with metal
23  products.
24      Q   Based on that title, do you have any
25  understanding of what this test method is used for?

156

1       MR. KAPLAN:  Objection; misleading, vague.
2       THE WITNESS:  I was evaluating the
3   functional accessibility test as opposed to trying
4   to delve into the technical area it was talking
5   about.
6   BY MS. RUBEL:
7       Q   Did you review any of the text of the
8   standard?
9       A   I skimmed it and attempted to have a
10  screen reader read it aloud, and it wouldn't.  I
11  could visually see the content of the standard.  I
12  could read it.  I didn't.
13      Q   How many pages is ASTM's standard B557-84?
14      A   I did not do a page count.
15      Q   Are you aware of any blind person who has
16  a need to access ASTM Standard B557-84?
17      MR. KAPLAN:  Objection; asked and
18  answered, vague, argumentative.
19      THE WITNESS:  I have not been asked
20  personally by a blind person about this particular
21  standard.
22  BY MS. RUBEL:
23      Q   What about a person with another type of
24  print disability?
25      MR. KAPLAN:  Objection; asked and

157

1   answered, vague, argumentative.
2       THE WITNESS:  I have not been asked
3   personally by any person with print disability about
4   this standard.
5   BY MS. RUBEL:
6       Q   Are you otherwise aware of any person with
7   a print disability who wanted to access ASTM
8   Standard B557-84?
9       MR. KAPLAN:  Objection; vague and --
10  that's fine.
11      THE WITNESS:  We make cultural and
12  educational material accessible to people with print
13  disabilities.  I am asked frequently for scientific
14  and technical materials by people with print
15  disabilities.  I can imagine that there are multiple
16  people with disabilities in the United States who
17  might want to access this standard because of
18  professional or personal interest.
19  BY MS. RUBEL:
20      Q   But none of them have ever made that
21  request of you?
22      A   We have 350,000 people with disabilities
23  and 350,000 books at present, and I'm not personally
24  familiar with the details of their personal reading
25  needs or the titles, other than in a aggregate basis

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

158

1  or in the rare cases where I become personally
2  acquainted with a particular person or issue, which
3  is a tiny fraction of both our members and our
4  content.
5      Q   You're not aware of any person with a
6  print disability asking anyone at Benetech to
7  provide them access with ASTM Standard B557-84, are
8  you?
9      A   I am not.
10     Q   Would a blind person be able to perform
11 the tension testing that is described in ASTM
12 Standard B557-84?
13         MR. KAPLAN:  Objection; lacks foundation,
14 calls for speculation, vague.
15         THE WITNESS:  I am not personally aware of
16 the requirements to utilize this standard
17 technically, but in general, when someone says, "Can
18 a blind person do this technical task?" I see the
19 answer is quite likely.  Let's try to figure out how
20 to do that as opposed to assuming that they can't do
21 it.
22 BY MS. RUBEL:
23     Q   If -- if the method of testing tension of
24 certain materials requires precise measurement, is
25 that -- is that something that a blind person can

159

1  typically do without assistance?
2          MR. KAPLAN:  Objection; vague,
3  argumentative, lacks foundation, calls for
4  speculation.
5          THE WITNESS:  I am aware of blind
6  machinists and blind engineers and blind scientists
7  who conduct measurement tasks frequently, and so it
8  seems quite possible to me, not having read the
9  detailed provisions of the standard with an eye to
10 evaluating whether a blind person could conduct
11 those measurements.
12 BY MS. RUBEL:
13     Q   Let me be clear, I am not casting
14 aspersions on anyone's abilities.  I'm simply asking
15 the question whether it is possible for somebody to
16 do that without assistance.
17         MR. KAPLAN:  Seems like that's exactly
18 what you're doing, but you get to ask your
19 questions.
20         THE WITNESS:  Yeah.  I'm trying to answer
21 them as well as I can.
22 BY MS. RUBEL:
23     Q   How -- how can a blind --
24         How can a person who is blind perform
25 precise measurements without assistance?

160

1          MR. KAPLAN:  Objection; vague, incomplete
2  hypothetical.
3          THE WITNESS:  Picking an example, there
4  are precision measurement calipers in mechanical
5  engineering and machining.  They have a visual
6  indication showing that this is 17 mils thick.
7  They're talking versions of those instruments; I
8  know blind people use them.
9          So I assume that if we're talking about
10 pieces of metal where a blind person would have to
11 measure a piece of metal, that they have that
12 instrument already.  And now we could start walking
13 through any technical measurement device where the
14 answer can be rendered digitally, we can make it
15 talk.
16 BY MS. RUBEL:
17     Q   Were you able to set up a free account on
18 ASTM's Reading Room?
19     A   Yes.
20     Q   Did you read any terms in order to set up
21 the free account?
22     A   I probably remember a click-through
23 license on that account.
24     Q   Do you remember what the terms of the
25 click-through license were?

161

1      A   No.  But I skimmed it to make sure that I
2  didn't think that what I was doing violated the
3  license, but I didn't spend more than two minutes
4  thinking about that.
5      Q   So you didn't see any terms that you had
6  any problem with when you were setting up the
7  account?
8      A   Nothing that made me think that I was
9  violating the terms.
10     Q   And what's your opinion about whether a
11 blind person would be able to set up a free account
12 on ASTM's Reading Room independently?
13     A   I believe they can.
14     Q   And could a blind person navigate to the
15 place on ASTM's Reading Room where free versions of
16 certain standards are located?
17     A   I believe they could get to the link to
18 the standard.  Yes.
19     Q   Did you try to access ASTM's standard
20 B557-84 from ASTM's Reading Room?
21     A   Yes.
22     Q   And were you able to see the standard?
23     A   Visually, yes.
24     Q   Page 14 of your report you have what looks
25 like a screenshot from ASTM's Reading Room; is that

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

162

1 right?
2     A    Yes.
3     Q    Was this the entire screen that you saw or
4 just a portion of the screen?
5     A    A portion, but I'd say that, you know, you
6 can see the scroll bar, that there are multiple
7 scroll bars that I could access to scan down and see
8 more of it or to go forward.
9     Q    So you were able to scroll down to see
10 what was the entire page 1 on the screen of the
11 ASTM's Reading Room?
12    A    As a sighted person, I believe that I
13 could see all of page 1, yes.
14    Q    And you could click through -- and the
15 arrows, using the arrows to see page 2; is that
16 correct?
17    A    As a sighted person, yes, I believe I can.
18    Q    And all the way through up to page 11; is
19 that right?
20    A    I believe that I doubt that I actually
21 went page by page all the way to page 11.
22    Q    Was there an option on the ASTM's Reading
23 Room to make the text larger?
24    A    I didn't look for that feature.
25    Q    Did you believe that was relevant; that an

163

1 option to make the text larger would be relevant to
2 evaluating whether the standard is accessible to
3 people with print disabilities?
4         MR. KAPLAN:  Objection; argumentative,
5 vague.
6         THE WITNESS:  As we discussed before,
7 low-vision people, a chunk of low-vision people,
8 would be able to access a visually-presented
9 standard, and they could be using their own screen
10 magnifier, they could be using built-in browser
11 controls to make the text larger, they can --
12 sometimes people in the websites implement an
13 enlargement button to make the text larger, which is
14 an alternate way of accomplishing the same thing.
15         And so on the base website, I just assumed
16 those things would work because I don't feel like on
17 a text-based website I need to test them; they work.
18         The image-based window, I am less certain
19 about how easy it would be to make larger, because I
20 did not actually test it directly with a screen
21 magnifier.
22 BY MS. RUBEL:
23    Q    And, in fact, you didn't see if ASTM
24 actually provided any options within the Reading
25 Room that would help somebody make the text larger;

164

1 is that right?
2         MR. KAPLAN:  Objection; asked and
3 answered, argumentative, vague.
4         THE WITNESS:  Though I don't recall ASTM
5 particularly, a zoom function is quite common in an
6 image viewer, so I probably just assumed it was
7 there even though I didn't specifically look for it.
8 BY MS. RUBEL:
9     Q    If you look at the screenshot on page 14
10 in the top right-hand corner of where the -- of the
11 window in which the standard is shown, do you see
12 the icon that's all the way to the right?
13    A    The plus icon.
14    Q    Yes.  What -- what does that indicate to
15 you?
16    A    It's probably the zoom function that I
17 just referred to.
18    Q    And do you recall pushing that button
19 and --
20         Do you recall pushing that button?
21    A    Usually when these windows first come up,
22 the standards are illegible, so yeah, usually I
23 probably push the magnification button to make it
24 readable.  So it's quite typical in an image-based
25 window to have a zoom function, especially because

165

1 you have no idea how big a screen the person is
2 viewing this on.
3     Q    Do you know how much zoom capability the
4 ASTM's website provides a user with, how much larger
5 it can make the text?
6         MR. KAPLAN:  Objection; vague.
7         THE WITNESS:  No.  But I think I pretty
8 much already said earlier that I think that people
9 who are low vision can generally see these
10 standards, and so my testing really focused on
11 screen reader users and blind people as opposed to
12 getting in deeper to gradations of accessibility for
13 visually impaired people who I felt -- figured many
14 of which would already be able to access this
15 standard.
16 BY MS. RUBEL:
17    Q    Were you able to locate a text searching
18 function on ASTM's -- on the version of ASTM's
19 standard B557-84 in the Reading Room?
20    A    I was not.
21    Q    Do you know whether people without print
22 disabilities are able to search for the -- search
23 through the text of standards on ASTM's Reading
24 Room?
25    A    I assume because I wasn't able to locate a

Case 1:13-cv-01215-TSC   Document 204-45   Filed 11/13/19   Page 44 of 110
Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

166

1 text searching function, that's because it isn't
2 there unless it's well hidden.  Also, the page looks
3 like a picture of a standards page as opposed to a
4 text version.  So the fact that it was a picture of
5 the page, generally that means that text searching
6 tends to be unavailable unless they've done
7 something extra.
8     Q   In addition to ASTM standard B557, you
9 also evaluated one other ASTM standard.  What
10 standard was that?
11    A   ASTM A20/A20M, like Mary, -93a, like
12 Apple.
13    Q   Why did you evaluate that standard?  Why
14 did you choose that standard?
15    A   Because it was the first one listed, and I
16 just wanted to see, gee, the other standard's
17 presenting the same image-based interface.  Yes,
18 looks like it, and I think I had tested five of them
19 on another standards website, and so after you've
20 tested them, you got to say, "Well, gee, looks like
21 they're all presenting this image-based interface,"
22 but obviously I did not comprehensively go through
23 every standard to confirm that they all presented
24 the same inaccessible interface.
25    Q   Do you know if ASTM standard A20 is at

167

1 issue in this litigation?
2    A   No, I do not.
3    Q   Did you review Public Resource's website
4 in connection with this expert report?
5    A   Yes.
6    Q   Is the general public able to access
7 Public Resource's website?
8    A   Yes.  Sorry.
9    Q   Is there any mechanism within Public
10 Resource's website that allows only people with
11 print impairments to view copies of any of the
12 material on that website?
13    MR. KAPLAN:  Objection; vague.
14    THE WITNESS:  Not that I'm aware of.
15 BY MS. RUBEL:
16    Q   So Public Resource has not published the
17 standard -- the Plaintiffs' standards in a manner
18 that is exclusively available to people with print
19 disabilities, correct?
20    MR. KAPLAN:  Objection; misstates
21 testimony, calls for speculation.
22    THE WITNESS:  The standards that are on
23 the Public Resource website seem to work for people
24 with disabilities, and as a member of the general
25 public, I was able to look at the same standards.  I

168

1 didn't have to sign up for anything.
2 BY MS. RUBEL:
3    Q   So Public Resource is not providing access
4 to Plaintiffs' standards exclusively to people with
5 print disabilities, correct?
6    MR. KAPLAN:  Objection; vague, calls for a
7 legal conclusion.
8    THE WITNESS:  Yes.
9 BY MS. RUBEL:
10    Q   Does the material that Public Resource
11 posted on its website bear any notice that further
12 reproduction of the material could be an
13 infringement?
14    MR. KAPLAN:  Objection; vague, lacks
15 foundation.
16    THE WITNESS:  No.  At least it's been long
17 enough that -- let me reread the question.
18    MR. KAPLAN:  Can you restate the question.
19    (Record read as follows:
20    "Q   Does the material that
21    Public Resource posted on its
22    website bear any notice that
23    further reproduction of the
24    material could be an
25    infringement?")

169

1    MR. KAPLAN:  And I'll make the same
2 objections.
3    THE WITNESS:  Yeah.  No, not to my
4 knowledge, based on the parts that I examined.
5 BY MS. RUBEL:
6    Q   In what formats does Public Resource's
7 website provide Plaintiffs' standards in?
8    MR. KAPLAN:  Objection; lacks foundation.
9    THE WITNESS:  I believe multiple
10 standards.  The two formats that I particularly
11 examined were HTML and PDF.
12 BY MS. RUBEL:
13    Q   Do you know how many of Plaintiffs'
14 standards Public Resource has posted in HTML format?
15    A   No.
16    Q   Do you have a ballpark estimate?
17    A   No.
18    Q   Do you know how many standards that are at
19 issue in this case Public Resource has posted in
20 HTML format?
21    A   No.
22    Q   How can a screen reader --
23    How does a screen reader read the text of
24 content that is in HTML format?
25    MR. KAPLAN:  Objection; incomplete

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

170

1  hypothetical, vague.
2        THE WITNESS:  So screen readers tend to
3  optimize for the most common formats and
4  applications that blind people are likely to use.
5  Web browsers, Microsoft Word are very common
6  formats, so they do extra things to make them
7  accessible.  And so the screen reader is looking at
8  the operation of the software itself; its controls,
9  its commands and the content that the software is
10 presenting.
11       Focusing on a Web browser using a screen
12 reader with a Web browser is viewing a Web page,
13 there's multiple kinds of content that the blind
14 person is trying to access, and it's kind of like
15 textual content, plus structure and sometimes
16 multimedia content like videos or audio or pictures.
17       So what the screen reader is trying to do
18 is help the blind person access the information on
19 the Web page and reproduce as much of the
20 functionality that's available to a sighted person
21 as technically possible by analyzing that page and
22 then offering the blind person a bunch of different
23 ways to interact with that content.
24       I can go into more depth on different
25 parts of that.

171

1  BY MS. RUBEL:
2     Q    So, for example, if there's a graphic --
3  let's start with a table first.
4     A    Okay.
5     Q    Let's say there's a table that's included
6  in the -- on the Web page.
7     A    Right.
8     Q    How would the screen reader read that
9  table?
10       MR. KAPLAN:  Objection; incomplete
11 hypothetical.
12       THE WITNESS:  So in HTML there are tags
13 for building a table.  So let's say it's a
14 two-by-two table.  The screen reader could probably
15 tell you that it's a two-by-two table and what the
16 labels are on the top and what the labels are on the
17 side, much like a screen reader operating in a
18 spreadsheet.  It can tell you what information about
19 a particular place in the table, if I were to search
20 for it so -- and, you know, it would probably -- if
21 you just said, "Read it to me," it would probably
22 pick a logical order to read it in.
23 BY MS. RUBEL:
24    Q    So it might tell you Column Header A is
25 size, Column Header B is --

172

1     A    You can set up screen readers to do that.
2        MR. KAPLAN:  Hold it.  You got to let her
3  finish the question and let me object.
4        THE WITNESS:  Sorry.
5        MR. KAPLAN:  Do you want to finish your
6  question?
7  BY MS. RUBEL:
8     Q    It might tell you Column Header A is size,
9  Column Header B is width, Column Header C is length
10 and -- to describe the full contents of the table;
11 is that right?
12       MR. KAPLAN:  It's your question, but I'll
13 object as an incomplete hypothetical.
14       THE WITNESS:  Okay.  There are a lot of
15 ways to access the same content, so the most common
16 thing would just be, you know, size, width, length,
17 Box A, 7, 3, 4, Box B.  You know, it would just read
18 the text as if you said to a human reader, "Just
19 read me the table."
20       And then if you want to say, "Tell me
21 what's at, the head" -- I'm on this particular cell
22 that says "7."  "What's the column header?  What's
23 the left-hand label?"  You can also do things like
24 that.  Those would probably be the most common
25 things since a blind person might not remember what

173

1  row and column they're in when they're looking at a
2  particular cell, especially in a large table.
3  BY MS. RUBEL:
4     Q    How does it work for a screen reader
5  trying to read a graphic?
6        MR. KAPLAN:  Objection; incomplete
7  hypothetical.
8        THE WITNESS:  To make a graphic
9  accessible, you add accessibility content about the
10 graphic, and there are a number of standards about
11 how you do that.
12       In the Web standard, the most common
13 accessibility is the Alt Text tag, which describes
14 generally -- what's supposed to describe what's in
15 the picture.  So if you have a picture of an
16 elephant, it should say -- if you ask what's the Alt
17 Text for this, if it does have one, it should say
18 something like elephant or elephant in trees or
19 whatever the -- a description of the graphic might
20 be.
21 BY MS. RUBEL:
22    Q    Can that be difficult to create the Alt
23 Text tag if it's a very technical drawing, for
24 example?
25       MR. KAPLAN:  Objection; argumentative,

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

174

1  incomplete hypothetical, vague, calls for
2  speculation.
3       THE WITNESS:  Yes, and there's an
4  additional standard for a longer description if it
5  doesn't fit into the length of an Alt Text tag.
6  BY MS. RUBEL:
7     Q   And in that case, what would you do if it
8  doesn't fit into the Alt Text tag?
9       MR. KAPLAN:  Objection; incomplete
10 hypothetical, vague, calls for speculation.
11      THE WITNESS:  There are a number of
12 different other standards, but the most common one
13 is Long Desc, just short for long description, and
14 you can attach a long description to that -- that
15 table that's longer.
16      For example, if you're looking at a pie
17 chart, you might have a link to the underlying data,
18 spreadsheet that created that; that might be a
19 common way of providing an alternate way of seeing
20 the same information.
21 BY MS. RUBEL:
22    Q   Did you analyze whether the HTML versions
23 that Public Resource provides of Plaintiffs'
24 standards are accessible to blind people?
25    A   Yes.  Sorry.

175

1       MR. KAPLAN:  It's okay.  Got to give me a
2  breath here.
3       THE WITNESS:  Okay.  I will.  I'll try.
4  BY MS. RUBEL:
5     Q   As part of your analysis, did you analyze
6  whether the tables in the HTML were accessible --
7  the tables in HTML from Public Resource's website
8  were accessible to blind people?
9     A   I don't recall evaluating tables in
10 detail.
11    Q   Did you evaluate whether the graphics in
12 the standards -- in Plaintiffs' standards were
13 accessible to blind people from Public Resource's
14 website?
15    A   No.
16      THE VIDEOGRAPHER:  Is this a good place?
17      MS. RUBEL:  Sure.  We can take a break.
18 We ran out of tape.
19      THE VIDEOGRAPHER:  This is end of Disk 2.
20 We're off the record at 3:37.
21      (Recess taken.)
22      THE VIDEOGRAPHER:  This is beginning of
23 Disk 3.  We're back on the record at 3:48.
24 BY MS. RUBEL:
25    Q   Based on your analysis of the Plaintiffs'

176

1  standards that are available on Public Resource's
2  website in HTML format, do you have enough
3  information to determine whether an engineer who
4  wanted access to that standard would be able to
5  obtain all the necessary information from the
6  standard?
7       MR. KAPLAN:  Objection; incomplete
8  hypothetical.
9       THE WITNESS:  No.
10 BY MS. RUBEL:
11    Q   Do you know how many of the standards on
12 Public Resource's website -- how many of Plaintiff's
13 standards that are available on Public Resource's
14 website are only available in PDF format?
15    A   No.
16    Q   Do you know how many of the standards that
17 are at issue in this case are only available on
18 Public Resource's website in PDF format?
19    A   No.
20    Q   Do you know if the number that is
21 available in PDF format is greater than the number
22 available in HTML format?
23      MR. KAPLAN:  Objection; vague.
24      THE WITNESS:  It would be likely from my
25 inspection of the directories that there would be

177

1  more PDFs than -- because I believe that every
2  document that had HTML also had PDF, but I don't
3  think the converse was true.
4  BY MS. RUBEL:
5     Q   So you believe there were more that are
6  available only in PDF format?
7     A   That's my best guess on a cursory
8  examination of the structure and the patterns that I
9  noticed in the parts I looked at.
10    Q   In your report you describe a process that
11 you use for converting Plaintiffs' standards that
12 were available on Public Resource's website in PDF
13 format into a format where it could be accessed by a
14 blind person; is that right?
15      MR. KAPLAN:  Objection; argumentative.
16      THE WITNESS:  Yes.
17 BY MS. RUBEL:
18    Q   What process did you use to convert the
19 PDF standards into a version that could be accessed
20 by blind people?
21      MR. KAPLAN:  Objection; argumentative.
22      THE WITNESS:  There are a couple of
23 mechanisms for accessing a PDF of a document for a
24 disabled person, and it goes along a hierarchy from
25 least accessible to most accessible.  So the least

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

178

1  accessible might be -- have a lock on it so you
2  can't look at it, the technical protection
3  mechanism, that doesn't let you get into it.
4         The next step up might be just the image.
5  The next step up might be a text version of the
6  document where Adobe's document reads the text aloud
7  as part of its function.
8         I found at least -- well, the standard I
9  particularly recall had the image and had the
10  underlying text, but Adobe's normal functionality
11  didn't read the text even though it was there, and
12  that I was able to access that by doing a Control A
13  and pasting that into Microsoft Word and reading it
14  there.
15  BY MS. RUBEL:
16     Q   You were able to access the underlying
17  text from the PDF; is that right?
18     A   That's right.
19     Q   And you just hit Control A and then copied
20  that content into a Word document; is that right?
21     A   Right.
22     Q   Did you save a copy of the Word document
23  that you created?
24     A   I don't -- I'm not sure.
25     Q   Did you create --

179

1         We've discussed that -- that you reviewed
2  approximately 10 of Plaintiffs' standards.  Did you
3  create a different Word document for each one of
4  those standards that you obtained from Public
5  Resource's website?
6         MR. KAPLAN:  Objection; misleading, vague.
7         THE WITNESS:  I didn't say I did those
8  things.
9  BY MS. RUBEL:
10     Q   Okay.  Let's take a step back, then.
11         How many of Plaintiffs' standards that you
12  reviewed from Public Resource's website did you copy
13  the text and paste into a Word document?
14     A   One.
15     Q   Which standard was that?
16     A   NPFA [sic] 101, the more recent date.  I
17  think it's 2010.
18         MR. KAPLAN:  You can review your expert
19  report, if you want.
20         THE WITNESS:  Okay.
21         MR. REHN:  I think it says 2012.
22         THE WITNESS:  Okay.  Thank you.  Yes, that
23  was the 2012 version of NPFA [sic] 101.
24  BY MS. RUBEL:
25     Q   Did you access any of ASTM's standards in

180

1  PDF format from Public Resource's website?
2     A   No.
3     Q   You indicated in your report that a blind
4  person probably would not use the process that you
5  used for converting the PDF versions of Plaintiffs'
6  standards; is that right?
7         MR. KAPLAN:  Objection; vague.
8         THE WITNESS:  Yes.
9  BY MS. RUBEL:
10     Q   Why is that?
11     A   It's kind of a technical trick that isn't
12  documented in Adobe that you would try that, but
13  there's something that made me feel like the text
14  was there.  I always try to highlight stuff with the
15  mouse, and I said, "The text is there, and Adobe's
16  not finding it.  What's going on?"  So I tried that
17  and it worked, but I didn't think that I could
18  accurately state that that would occur to the
19  average blind person.
20     Q   And when you copied the text into a Word
21  document, were there any errors in the transcription
22  in the text in the Word document?
23     A   Yes.
24     Q   What were those errors?
25     A   They were errors that are typical of

181

1  optical character recognition processes.
2     Q   Can you give me some examples?
3     A   I worked in the OCR field for 30 years,
4  and so the kinds of mistakes that OCR makes, I don't
5  remember the specific ones but, you know, if you
6  have a stylized font on the title page, it's far
7  more likely the OCR will mash up the title, that it
8  will say the copyright statement that's in normal
9  point size.  Words that have a dash in the middle of
10  them that in Microsoft Word would be reassembled as
11  complete words, show up as the first half of the
12  word, a dash, a line feed and then the beginning --
13  the rest of the word.
14         And, you know -- and then just character
15  recognition errors; you know, r and N next to each
16  other showing up as an M.  I don't remember seeing
17  that particular one, but that's a signature OCR
18  error.
19     Q   What about issues with numbers?  Are there
20  any common OCR errors that have to do with numbers?
21     A   It depends on the context.  So if
22  something is like 10, is it capital I, capital O or
23  is it 10?  So that's a common OCR error because it
24  does have a context, whereas if it had 107, the OCR
25  would probably go, Oh, it's a 7 in there, and it's

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

182

1  probably 1 and zero and not I and O.
2      And, you know, OCR also misrecognizes
3  symbols, might occasionally drop a small dot or
4  specialized characters.
5      Q   Do you know if Plaintiffs' standards use
6  specialized symbols?
7      A   I don't recall.  I would not be surprised
8  if they did.
9      Q   You described -- you used the phrase
10  before "mashing up the title."  What do you mean by
11  that?
12      A   Usually when you're looking at, let's say,
13  a paragraph and the OCR makes an error, it's usually
14  pretty limited.  You can probably figure out from
15  context what it is.  A stand-alone title, what if --
16  I don't know -- only 6 of the 10 letters actually
17  showed up and they're spaced apart from each other
18  because it expanded an entire area.  That's the sort
19  of thing I think of as mashing up.
20      Q   So the entire title in that example
21  wouldn't be -- wouldn't be legible or
22  understandable?
23      A   Yeah.  I mean, often books have -- or
24  documents have a stylized or a logo or a fancy
25  title, and the OCR tends to choke on that, but then

183

1  when you get to the copyright notice, it's got it
2  right.  It's just because this fancy, big, you know,
3  one word span the entire page, and it thought maybe
4  this is a picture or -- I don't know.  These --
5  these things happen.
6      Q   And it could be important content,
7  actually, where there's an OCR error about, right?
8      MR. KAPLAN:  Objection; vague, incomplete
9  hypothetical, argumentative.
10      THE WITNESS:  OCR errors aren't connected
11  to semantic meaning.  They just happen in the
12  transcription process, so it could be important, it
13  could be not important.
14  BY MS. RUBEL:
15      Q   The more complex the content of a written
16  work is -- strike that.
17      When the content of a written record is
18  very complex, does that make character recognition
19  more difficult?
20      MR. KAPLAN:  Objection; vague, incomplete
21  hypothetical.
22      THE WITNESS:  Yes.
23  BY MS. RUBEL:
24      Q   Is character recognition technology
25  sometimes unusable because of the complex content of

184

1  a writing?
2      MR. KAPLAN:  Objection; vague, incomplete
3  hypothetical.
4      THE WITNESS:  There are -- there is
5  content where the OCR does not do a great job.
6  That's very unusual but it happens.
7  BY MS. RUBEL:
8      Q   Does it happen in the context of technical
9  writings frequently?
10      MR. KAPLAN:  Objection; vague, incomplete
11  hypothetical.
12      THE WITNESS:  It can.  You might have a
13  very detailed graphic that has text that overlays a
14  picture.  It's hard for the OCR to separate.
15  BY MS. RUBEL:
16      Q   Are the Plaintiffs' standards technical
17  documents?
18      MR. KAPLAN:  Objection; vague.
19      THE WITNESS:  Generally, yes.
20  BY MS. RUBEL:
21      Q   Would you anticipate that there might be
22  problems with the OCR of Plaintiffs' standards?
23      MR. KAPLAN:  Objection; vague, incomplete
24  hypothetical.
25      THE WITNESS:  OCR usually makes errors in

185

1  scanning documents generally, so I'm sure that a raw
2  OCR scan of those documents would also have errors.
3  BY MS. RUBEL:
4      Q   And, in particular, because they're
5  technical documents, do you think the likelihood of
6  errors is greater?
7      MR. KAPLAN:  Objection; incomplete
8  hypothetical, vague.
9      THE WITNESS:  Yes, because of diagrams;
10  diagrams and tables are more difficult than
11  paragraphs or text.
12  BY MS. RUBEL:
13      Q   And, in particular, with diagrams and
14  tables, would you anticipate that some of the
15  character recognition might actually create content
16  that's incomprehensible?
17      MR. KAPLAN:  Objection; vague, incomplete
18  hypothetical.
19      THE WITNESS:  Yes.  I could imagine a
20  table that was constructed visually in such a way to
21  make the OCR not be successful on it.
22  BY MS. RUBEL:
23      Q   You indicated in your report that there
24  was an additional way, other than the process that
25  you used, to extract the text from the PDFs, that

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

186

1 there was an additional way that some users may be
2 able to make PDF standards accessible.
3        Can you explain what that method is?
4    A   To do optical character recognition on the
5 page images.
6    Q   And how would they do that?
7    A   Well, blind people often own an OCR
8 product that primarily is used to take images from a
9 scanner that might scan a document and turn it into
10 a Word processor document but can also be used to do
11 OCR and images that come from a -- from an already
12 scanned document like a PDF, and also some screen
13 readers have some of that OCR capability built into
14 them.  And those tend to focus on online or document
15 content that show up as pictures that you might want
16 to OCR.
17    Q   And you described that as a process that
18 advanced computer users might be willing to use; is
19 that right?
20    A   Let's see, did I use the term "advanced"?
21    Q   Page 17.
22    A   Yeah.  I would say, you know, a capable,
23 you know, blind computer user would be aware of the
24 ability to do image-based OCR on a PDF that was
25 otherwise accessible.

187

1    Q   What is an advanced computer user?
2    A   Well, an eight-year-old blind student
3 would probably not know how to do this.  A college
4 student or employed blind person who is using screen
5 readers on a day-to-day basis, a great majority of
6 them would know how to use this.  So a senior
7 citizen who's trying to read the Web and e-mail from
8 their kids may not use -- so it's a -- sort of it's
9 the -- how experienced are they using their
10 accessibility technology.
11        MS. RUBEL:  I don't believe I have any
12 more questions.  I do want to just say on the record
13 we've been unable to access in any meaningful way
14 the thousands of pages of documents that you
15 produced today, so we want to leave this -- I want
16 to give my co-counsel a chance to ask additional
17 questions, but we also want to leave the record open
18 in case there are additional questions that we feel
19 like we need to have answered based on those
20 documents once we have a chance to review them.
21        MR. KAPLAN:  Obviously we object.  We told
22 you that we'd be producing those documents today.
23 If you needed them earlier, you could have asked for
24 it; you didn't.  And I don't know what it means that
25 you can't access them in any meaningful way, but I'm

188

1 sure we can fight that out at some point.
2        MR. REHN:  I can clarify.  You guys gave
3 them to us on a CD today, and we don't -- we don't
4 have computers here that have CD drives.  There was
5 one computer, but most of us don't have access to
6 them.
7        MR. BECKER:  You said there was one
8 computer --
9        MR. KAPLAN:  So we -- we gave them to you
10 in a standard format and you're not capable of
11 dealing with them.  That's -- that's your argument.
12 That's fine.  We'll deal with that.
13        If you want to take a break so that you
14 can try to access a CD, which you should be capable
15 of doing, and then return to questioning, we're also
16 happy to wait a few minutes while you do that.
17        MR. REHN:  Well, we -- we tried over the
18 lunch break.  We spent quite a bit of time on it.
19 We were unable to copy the files from the one
20 computer that has a CD drive on to other computers
21 for purpose of reviewing them.  We don't yet know if
22 that's the problem with the CD or what the issue is.
23 We just need to reserve time to review those at an
24 appropriate time.
25        MR. KAPLAN:  I cannot imagine this is a

189

1 problem that is going to take that much time.
2        MR. REHN:  We spent, like, a significant
3 amount of time on it already today.  We can attempt
4 further later this afternoon, if you guys want to
5 wait around until we're finished.  But even then --
6        MR. KAPLAN:  I don't.  I mean, you guys
7 have seven hours.  If you want to wait out the clock
8 so that you can try to access the documents, then
9 we'll do that, if necessary.
10        MR. REHN:  We have seven hours on the
11 clock.  That wouldn't count against the time.
12        MR. KAPLAN:  Yeah, it would.
13        MR. REHN:  We'll agree to disagree on that
14 for now.
15        MS. RUBEL:  I don't have any more
16 questions at this time.
17        MR. KAPLAN:  So the deposition is not
18 over.  It's just one of the Plaintiffs' counsel has
19 finished her line of questioning, so now we have the
20 next one.
21        THE WITNESS:  Okay.
22        MR. KAPLAN:  Okay?
23        THE WITNESS:  I have to resist temptation.
24        MR. KAPLAN:  Counsel, if we set up an FTP
25 account for the documents, would that assist you?

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

190

1      MR. REHN:  We asked for an additional way
2  to get them a while ago this morning.  I asked Matt
3  this morning if he had any other way of getting us
4  the documents.
5      MR. BECKER:  I have no recollection of
6  that.
7      THE WITNESS:  I think he asked you if you
8  had a thumb drive, and you said no.
9      MR. BECKER:  The question was, do I have a
10 thumb drive to get the files, and I said no.  You
11 didn't ask me --
12     MR. REHN:  Well, I also said we didn't
13 have access -- we didn't have the ability to get
14 that CD back.
15     MR. BECKER:  You said you had one computer
16 that had -- that had a CD drive and that you had
17 brought thumb drives to remedy the situation.  This
18 is the first that we've heard since this morning
19 that there was any complication in that matter.
20     MS. RUBEL:  If you guys prefer to sit here
21 and wait after we're off the record and give us a
22 chance to review the documents, we will be off the
23 record, and it won't count towards our seven hours,
24 but we can do that.
25     MR. KAPLAN:  No.  Counsel, we're obligated

191

1  to make our witness available for a full day of
2  deposition, and we are prepared to do that, and if
3  you have technical difficulties on your side that
4  are preventing you from accessing documents you knew
5  you were going to be receiving today, that's not our
6  responsibility, and we don't think that it's fair or
7  necessary to reproduce our witness because you're
8  experiencing technical difficulties that were
9  certainly reasonably foreseeable and should have
10 been foreseeable.
11     MS. RUBEL:  All I suggested is that you
12 guys sit here and wait while we spend time reviewing
13 them later.
14     MR. KAPLAN:  And I'm saying that I'm not
15 going to wait until late in the evening when you
16 have a full day to review documents.
17     THE WITNESS:  You don't have an IT guy who
18 can copy files off a PC?
19     MS. RUBEL:  We have just tried --
20     THE REPORTER:  I can't get all of you at
21 the same time writing.
22     THE WITNESS:  We probably shouldn't be on
23 the record arguing about tech problems.  But I'm
24 amazed.  Okay.
25     Let's -- let's move on to your questions.

192

1              EXAMINATION
2  BY MR. REHN:
3    Q   Good afternoon, Mr. Fruchterman.
4    A   Thane -- I'm sorry, I don't remember your
5  last name.
6    Q   I'm Thane Rehn and I represent the NFPA in
7  this matter.
8    A   Good to meet you, Mr. Rehn.
9    Q   And you understand you're still under
10 oath?
11   A   Yes.
12   Q   And nothing has changed since this morning
13 that would make you unable to render truthful
14 testimony in response to my questions?
15   A   No.
16   Q   So I would like to start with your expert
17 report, Exhibit -- I believe it's 4001.
18     MR. REHN:  Is that right?
19     THE REPORTER:  Yes.
20 BY MR. REHN:
21   Q   If you could turn to pages 16 and 17 of
22 that report.
23   A   Okay.  I'm there.
24   Q   And on page 16 you say that you accessed
25 the 2012 version of the NFPA 101 standard and found

193

1  that it was an imaged-based PDF.
2       Do you see that?
3    A   Correct.  Yes.
4    Q   What is the difference between an
5  imaged-based PDF and a text-based PDF?
6    A   If it was a text-based PDF and I press the
7  "Read" button in Adobe, it would read or my screen
8  reader would be able to read it, if I was a blind
9  person.
10   Q   So you have a screen reader; that's a
11 separate software program that you would -- that
12 plugs into Adobe in some way?
13   A   Yes.  In the second case, a screen reader
14 would be able to get the text from Adobe and read it
15 aloud.
16   Q   And is there a way for a user without a
17 screen reader to determine whether a PDF is an
18 image-based or text-based PDF?
19   A   Yes.  A sighted user, like me, who knows a
20 lot about Adobe PDF can inspect the document and
21 tell the Adobe PDF whether it's got -- it's text
22 based or image based.
23   Q   And how do you do that?
24   A   I blow it up really big and see if the
25 characters are pixelated; that's a usual give-away

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

194

1 that it's an image. I try to select some text, and
2 if it doesn't allow me, that's a give-away that it's
3 an image and it's not text. I do a Control A and
4 try to paste the results into Microsoft Word and I
5 get nothing. Those would all be indicators that it
6 was an image-based PDF instead of text-based PDF.
7    Q   Well, for these documents you were able to
8 do Control A and paste into Microsoft.
9    A   Yes, but that's, like, the third technique
10 I would have used to get there.
11   Q   If you blow a PDF up to a very large size
12 and the letters maintain their resolution, is that a
13 pretty strong indicator that it's a text-based PDF?
14       MR. KAPLAN: Objection; incomplete
15 hypothetical.
16       THE WITNESS: Generally, that would mean
17 that the program is scaling it up inside itself as
18 opposed to just magnifying a picture of a letter,
19 and because OCR tends to scan at 300 dots per inch,
20 that's most typical resolution. If you blow it up
21 large, you'll see the jaggies as it were on that --
22       (Reporter clarification)
23       THE WITNESS: Jaggies, J-A-G-G-I-E-S, one
24 of those great technical terms.
25

195

1 BY MR. REHN:
2    Q   And in your experience, if it is a
3 text-based PDF, in your experience, a screen reader
4 will be able to read that document?
5    A   That's right.
6    Q   Now, you said a couple of things that I
7 didn't fully understand when you were talking about
8 the PDF at issue here. You said -- and I believe
9 this is a quote. You testified earlier that
10 "Adobe's normal functionality did not read the
11 text"?
12   A   Correct.
13       MR. KAPLAN: Objection.
14 BY MR. REHN:
15   Q   What did that mean?
16       MR. KAPLAN: Objection; misstates
17 testimony.
18       You can continue.
19       THE WITNESS: Okay. Adobe Reader has a
20 Read Aloud button that you can press, and it should
21 read the text aloud. It's not as good as a screen
22 reader, but it's a built-in function of the Adobe
23 product, and it didn't think that there was text in
24 there even though there sort of was.
25

196

1 BY MR. REHN:
2    Q   And you subsequently said, "The text was
3 there and Adobe did not find it." Were you
4 referring to the same problem there?
5    A   Yeah. Yeah.
6    Q   But in some documents, the Adobe function
7 may not be able to read the text, but a screen
8 reader would be able to? Is that what I understand
9 you to be saying?
10       MR. KAPLAN: Objection; incomplete
11 hypothetical.
12       THE WITNESS: Generally, if Adobe can't
13 find it, the screen reader can't find it because the
14 screen reader is asking Adobe to give it to it to
15 speak. That's how the -- technically, it says,
16 Adobe, what's here?
17       And if Adobe says, Uh-huh, the screen
18 reader is going to go Uh, so...
19 BY MR. REHN:
20   Q   Have you ever had a situation where the
21 Adobe function would not read the document but a
22 screen reader was able to read the document?
23   A   No, but it's not a functionality I've done
24 a lot of extensive testing on.
25   Q   How much time have you spent attempting to

197

1 read text on PDFs with screen readers or with Adobe?
2       MR. KAPLAN: Objection; compound and
3 vague.
4       THE WITNESS: The challenge of Adobe
5 accessibility is a longstanding one in the field,
6 and so I've been involved in many conversations
7 around this accessibility issue, many conversations.
8 BY MR. REHN:
9    Q   Now, you say later in your report that you
10 were able to copy the text in that NFPA 101 and then
11 paste it into Microsoft Word.
12   A   Yes.
13   Q   And then a screen reader was able to read
14 that.
15   A   Correct.
16   Q   In your experience, if one can copy text
17 from a PDF and paste it into a Word document, a
18 screen reader would generally be able to read that
19 text?
20       MR. KAPLAN: Objection; incomplete
21 hypothetical.
22       THE WITNESS: Yes.
23 BY MR. REHN:
24   Q   Have you ever experienced a situation
25 where you were able to copy text from a PDF, paste

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

198

1  that text into a Word document and then unable to
2  read the resulting Word document with a screen
3  reader?
4     A   Yes.
5     Q   Do you remember why that was the case?
6     A   It was an earlier version of Adobe's
7  product that Adobe tried to make their own optical
8  character recognition solution, and when they were
9  uncertain of a character, they inserted a picture of
10 the character rather than the actual letter, and so
11 when you did a Select, you got the letters that were
12 represented as letters but not the ones represented
13 as pictures, so you're, like, sometimes missing
14 letters in the middle of words that visually look
15 like they were there in the Adobe product, but when
16 you did a search, a Control A and pasted it, it
17 didn't work.  This is something that I observed
18 years ago, many years ago, and it's not -- I don't
19 believe this is currently a problem.
20    Q   More than 10 years ago, would you say?
21    A   Probably.
22    Q   And you haven't seen that problem since
23 that time --
24    A   Correct.
25    Q   -- with current versions of Adobe?

199

1     A   Correct.
2     Q   What happens with current versions of
3  Adobe if they can't read a particular letter through
4  the OCR system and then you try to paste that
5  letter?  Would that work?
6        MR. KAPLAN:  Objection; incomplete
7  hypothetical.
8        THE WITNESS:  Yeah.  That's -- that's not
9  quite the way it works.  So maybe ask the question a
10 different way.  Maybe I'll get -- I'll figure out
11 what --
12 BY MR. REHN:
13    Q   Well, I understood you to say that in the
14 past there were times where Adobe couldn't recognize
15 a character, and so it would instead copy a picture
16 of that character; is that correct?
17    A   Okay.  This more-than-10-year-ago product
18 tried to recognize -- has an optical character
19 recognition feature.  I think that's -- you asked me
20 a question of have I ever, and I gave you an
21 example.  I don't think that particular example is
22 at all relevant to the things we're talking about
23 because I think you wanted to switch to more modern
24 Adobe products.
25    Q   Right.

200

1        So what I'm saying is with a modern Adobe
2  product --
3     A   Yeah.
4     Q   -- is there ever an occasion where that
5  Adobe product cannot recognize a character in a --
6     A   The modern Adobe products don't try to
7  recognize characters.  So that's -- that's where we
8  start.
9        It was only when Adobe tried to make an
10 optical character recognition product that we ran
11 into this problem.  Adobe doesn't, as far as I know,
12 make an OCR product anymore, and so I could probably
13 go in a different direction depending where you want
14 to take that, but they don't do OCR anymore.  I
15 don't think it's -- okay.
16       Sorry.
17       MR. KAPLAN:  I wanted you to finish your
18 answer, but it is getting late in the day, and I
19 just wanted to remind you, you want to focus on his
20 questions and answer what he's asking.
21       THE WITNESS:  Okay.
22 BY MR. REHN:
23    Q   When I opened my Adobe Reader on my
24 computer, there is an OCR option that I have.  Is
25 that not an Adobe feature?

201

1     A   I -- I don't think it's --
2        (Reporter clarification)
3  BY MR. REHN:
4     Q   So if I open an Adobe PDF in Adobe Reader,
5  is Adobe Reader an Adobe product?
6     A   Yes.
7     Q   And my version of Adobe Reader, at least,
8  has recognized text using OCR feature of some sort
9  that I have used.  Is that an Adobe product?
10       MR. KAPLAN:  Objection; calls for
11 speculation.
12       THE WITNESS:  Okay.  I believe we're
13 talking about different Adobe products.
14 BY MR. REHN:
15    Q   Okay.
16    A   So go ahead.
17    Q   So does the standard Adobe Reader have an
18 OCR recognition feature?
19    A   I don't believe so.
20    Q   Okay.
21       Is that the commercial version or the
22 professional version?
23    A   The Adobe Reader version I'm talking about
24 is the one that everyone can download for free to
25 read Adobe documents, but not the one that creates

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

202

1 documents, which is a different Adobe product
2 that -- yes.
3     Q   Are you aware that NFPA sells PDF versions
4 of its standards on its website?
5     A   Let's see if it has a Buy Now button on my
6 screenshot.  I see a cart on there, so I assume that
7 you guys sell things.  I -- I probably didn't check
8 to see whether you sell PDF versions of the
9 standard.
10     Q   Did anybody ask you to check whether any
11 of the Plaintiffs in this case sold PDF standards?
12         MR. KAPLAN:  Objection; calls for
13 privileged communications.
14         You can answer to the extent that you
15 don't divulge privileged communications.
16         THE WITNESS:  No.
17 BY MR. REHN:
18     Q   When you were asked to render an opinion
19 about the accessibility of Plaintiffs' standards,
20 did it occur to you to check whether those standards
21 were available in a PDF version or any other
22 electronic version?
23         MR. KAPLAN:  Objection; misleading,
24 misstates testimony, vague, argumentative.
25         THE WITNESS:  Privileged conversation.

203

1 BY MR. REHN:
2     Q   I'm asking what occurred to you, outside
3 of conversations you had with attorneys about this
4 project.
5         Did it ever occur to you that that was
6 something that might be necessary to check?
7         MR. KAPLAN:  Objection; vague.
8         THE WITNESS:  Go ahead.  I -- I -- I think
9 I stated my opinion.  I was asked to evaluate the
10 accessibility --
11         MR. KAPLAN:  Let's not get into privileged
12 communications.
13         THE WITNESS:  Okay.  All right.
14 BY MR. REHN:
15     Q   If you would turn to page 1 of your expert
16 report --
17     A   Yes.
18     Q   -- it says:
19         "I have been retained by
20         Public.Resource.Org to evaluate the
21         accessibility of certain online
22         content available on the websites
23         of the Plaintiffs and the Defendant
24         in this case."
25         Is that correct?

204

1     A   Yes.
2     Q   When you were retained to evaluate the
3 accessibility of content available on the websites
4 of the Plaintiffs, did you consider whether you
5 should check to see if there were PDF versions
6 available from the Plaintiffs?
7         MR. KAPLAN:  You can go ahead and answer.
8         THE WITNESS:  No.
9 BY MR. REHN:
10     Q   You just didn't think --
11         That didn't occur to you that that might
12 be a possibility?
13         MR. KAPLAN:  Objection; asked and
14 answered, argumentative.
15         THE WITNESS:  I'll just go back to my
16 expert report and that sentence.  I was asked to
17 evaluate the accessibility of certain online
18 content.
19 BY MR. REHN:
20     Q   Now, if I can ask you to turn to page 5 of
21 your report, where you say -- it says "Overview and
22 Summary of Opinions."
23     A   Uh-huh.
24     Q   If you could just read the first sentence
25 there, the first full sentence under that heading.

205

1     A   (Reading):
2         "Having reviewed the
3         accessibility of the same standards
4         content rendered by
5         Public.Resource.Org and those of
6         the free access options provided by
7         the NFPA, ASHRAE and ASTM, it is my
8         opinion that Public.Resource.Org
9         currently provides the only
10         accessible option for
11         people/citizens with print
12         disabilities to access these
13         standards."
14     Q   And in forming that opinion, you compared
15 the standards that were available on
16 Public.Resource.Org's website with the free access
17 options provided by Plaintiffs in forming that
18 opinion; is that correct?
19     A   Correct.
20     Q   Did you evaluate any PDFs being sold by
21 NFPA in forming that opinion?
22     A   No.
23     Q   Did you evaluate any PDFs being sold by
24 ASHRAE in forming that opinion?
25     A   No.

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

206

1    Q   Did you evaluate any PDFs sold by ASTM in
2  forming that opinion?
3    A   No.
4    Q   So when you say that Public.Resource.Org
5  currently provides the only accessible option for
6  people/citizens with print disabilities to access
7  these standards, you're excluding from that opinion
8  any PDFs that are being offered by the Plaintiffs?
9        MR. KAPLAN:  Objection; misstates the
10 document and testimony, misleading and vague.
11       THE WITNESS:  In that sentence I refer to
12 "free access options."
13 BY MR. REHN:
14   Q   So when you said the only accessible
15 options, what you actually meant to say was the only
16 freely accessible options without charge?
17       MR. KAPLAN:  Objection.  Thane, you're
18 getting a little badgering here, but you can answer
19 the question.
20       THE WITNESS:  Yes.
21 BY MR. REHN:
22   Q   Is it possible that documents being sold
23 can be described as accessible to people with print
24 disabilities?
25       MR. KAPLAN:  Objection; vague.

207

1        THE WITNESS:  Yes.
2  BY MR. REHN:
3    Q   Have you ever described a PDF for sale as
4  being accessible to someone with print disabilities?
5    A   Let's see.  I'm not sure I've described --
6  I'm sure I've described paid products in other
7  formats as accessible, and I'm sure that I've
8  described PDFs as accessible.  I'm not sure I've
9  described a paid PDF product as accessible.
10   Q   But it's fair to say that if the PDFs
11 being sold by Plaintiffs are accessible to people
12 with print disabilities, this sentence would be
13 potentially inaccurate?
14       MR. KAPLAN:  Objection; misleading, vague,
15 argumentative.
16       THE WITNESS:  I think it's accurate as I
17 wrote it, but I'm happy, as we have, to clarify what
18 I meant by that sentence.
19 BY MR. REHN:
20   Q   Sure.
21       And to clarify what you meant was you were
22 comparing just the free access options provided by
23 the Plaintiffs on their websites with the content
24 rendered by Public.Resource.Org?
25   A   Those were the content that I evaluated,

208

1  yes.
2    Q   Are you aware that NFPA sells eBook
3  versions of some of its standards?
4    A   I'm -- I'm not sure I'm aware of that.
5    Q   And did you evaluate any eBook versions of
6  standards sold by NFPA or the other two Plaintiffs
7  in this case?
8    A   No.  I was not asked to.
9    Q   So do you have an opinion on whether the
10 eBook versions sold by NFPA and the other two
11 Plaintiffs are accessible to persons with print
12 disabilities?
13   A   I can't express an opinion without looking
14 at them.
15   Q   Do you have opinion on whether the PDFs
16 being sold by NFPA and the other two Plaintiffs in
17 this case are accessible to persons with print
18 disabilities?
19   A   No.  But in my experience, most PDFs are
20 not accessible or are not -- let me correct that.
21 Not as accessible as, say, HTML versions of those
22 would be since accessibility is on a spectrum.
23   Q   But you don't have an opinion as to these
24 specific PDFs that are sold by NFPA?
25   A   I haven't examined them.

209

1        MR. KAPLAN:  Do you want to take a break?
2        THE WITNESS:  No, I'll keep going.  I'll
3  get water next time.
4        MR. REHN:  You can take a break whenever
5  you want.
6        THE WITNESS:  No problem.
7  BY MR. REHN:
8    Q   So you mentioned earlier that you were
9  aware of an NFPA standard that was available on
10 Bookshare?
11   A   Uh-huh.
12   Q   If I could just show you a document.
13       MR. REHN:  What number are we up to?
14       THE REPORTER:  We're at 4002.
15       (Plaintiffs' Exhibit 4002 marked
16       for identification.)
17 BY MR. REHN:
18   Q   Do you recognize this as a printout of the
19 Bookshare Web page?
20   A   Yes.
21   Q   And you'll see here that this says "NFPA
22 70-2014 Electrical Code Book"?
23   A   Yes.
24   Q   And I believe you said earlier that your
25 understanding was that a partner of Bookshare had

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

210

1  submitted this to Bookshare?
2      A    Correct.
3      Q    Is that on the second page of this
4  exhibit, you see it says "Submitted by Daproim
5  Africa"?
6      A    Yes.
7      Q    Is that who you understand submitted this
8  document?
9      A    Yes.
10     Q    How does Bookshare enable certain persons
11 to share documents with Bookshare?
12     A    So we're talking about essentially the
13 content intake mechanisms at Benetech, and you'd
14 like me to enumerate those different mechanisms?
15     Q    Well, let's start with this Daproim
16 Africa.  They're an adult educator; is that what you
17 said earlier?
18     A    No.
19     Q    What's your understanding --
20          Do you know who this submitter is?
21     A    Yes.
22     Q    And who are they?
23     A    They're a subcontractor to Benetech for
24 books -- they do the proofreading services on books
25 we've been asked for by a student.

211

1      Q    So a student would have submitted a
2  request and because it was educational, you would
3  have approved that request; is that what you
4  testified to earlier?
5          MR. KAPLAN:  Objection; misstates
6  testimony, calls for speculation.
7          THE WITNESS:  Yes.
8  BY MR. REHN:
9      Q    And after you approved that request, you
10 would have had a subcontractor proofread the
11 document and then upload it to Bookshare?
12         MR. KAPLAN:  Objection; vague, calls for
13 speculation.
14         THE WITNESS:  Yes.
15 BY MR. REHN:
16     Q    Do you allow anybody to submit documents,
17 other than subcontractors?
18     A    Yes.
19     Q    Do you engage in any quality control on
20 documents that persons, other than subcontractors,
21 submit?
22     A    Yes.
23     Q    And what is that quality control process?
24     A    We run an automated quality evaluator that
25 scores the document on, for example, looking for OCR

212

1  errors, looking for swear words, looking for length;
2  it's supposed to be 100-page document and it's a
3  1-page document that's submitted or a thousand-page
4  document.
5          And we also have a human being take a
6  brief look at the document, kind of just do a check
7  also to make sure that it makes -- that it makes
8  sense.
9      Q    Are those documents that are submitted
10 generally PDFs or Word documents or HTML?  What
11 format do they usually come in?
12         MR. KAPLAN:  Objection; lacks foundation,
13 calls for speculation, vague.
14         THE WITNESS:  Bookshare has a detailed
15 description of how we want documents submitted to
16 us.  In general, we prefer documents that are --
17 when they're coming from volunteers that are
18 scanning that are more Microsoft Word or RTF, which
19 is a related format.  For those books that are
20 scanned, that's our preferred format, and we
21 wouldn't accept a PDF.
22 BY MR. REHN:
23     Q    So you accept documents or books that are
24 scanned by volunteers?
25         MR. KAPLAN:  Objection; misstates

213

1  testimony.
2          THE WITNESS:  We accept books from quite a
3  number of sources of which volunteers is one source.
4  BY MR. REHN:
5      Q    Can anybody sign up to be a volunteer to
6  submit books or documents?
7      A    I think right now you have to be a U.S.
8  resident or organization.
9      Q    So any U.S. resident could sign up to
10 submit books or documents to Bookshare?
11     A    Yes, and they must agree to our volunteer
12 agreement that specifies the limitations on what
13 they can do and what they can't do.
14     Q    So if a concerned citizen wanted to get
15 books or documents accessible to the visually
16 impaired, they could volunteer to scan those
17 documents, proofread them, ensure that they're free
18 of errors and then submit them to Bookshare, and if
19 they passed your quality control process, you would
20 make them available on your website?
21         MR. KAPLAN:  Objection; incomplete
22 hypothetical, vague.
23         THE WITNESS:  Yes.
24 BY MR. REHN:
25     Q    Do you try to encourage volunteers to

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

214

1 submit such documents?
2     MR. KAPLAN:  Objection; vague.
3     THE WITNESS:  Yes.
4 BY MR. REHN:
5     Q   Have you ever encouraged Carl Malamud to
6 submit any documents?
7     A   No.
8     Q   Have you ever discussed that topic with
9 him?
10     A   No.
11     Q   Have you ever told somebody that instead
12 of volunteering and submitting a document to
13 Bookshare, they should post it on the Internet where
14 it can be accessed by anybody in the public?
15     MR. KAPLAN:  Objection; vague.
16     THE WITNESS:  Not that I recall.
17 BY MR. REHN:
18     Q   Now, your expert report says that you
19 considered the accessibility of NFPA 101; is that
20 right?
21     A   I think that's underspecified, but yes.  I
22 was asked to evaluate NPFA -- sorry, NFPA 101-2000.
23     Q   And then you were asked to evaluate that
24 specific standard?
25     A   Correct.

215

1     Q   Did anybody tell you why you should focus
2 on that standard and not some other standard?
3     MR. KAPLAN:  Objection to the extent it
4 calls for privileged communications, I instruct the
5 witness not to answer.
6     THE WITNESS:  I can't answer.
7 BY MR. REHN:
8     Q   Do you have any understanding of why that
9 was a especially important document to check?
10     MR. KAPLAN:  Objection; argumentative and
11 calls for -- to the extent it calls for privileged
12 communications, I instruct the witness not to
13 answer.
14     THE WITNESS:  I cannot answer.
15 BY MR. REHN:
16     Q   And if you look at page 9 of your expert
17 report, there is a screenshot from the free access
18 portion of the NFPA website.
19     A   Yes.
20     Q   Do you remember how many pages you
21 evaluated on that code, that Life Safety Code?
22     A   No, but I remember it as being longer than
23 some of the other standards I looked at.
24     Q   Do you think you evaluated more than 10
25 pages?

216

1     A   No.
2     Q   Do you think you evaluated more than 5
3 pages?
4     A   Probably in that range.
5     Q   Do you have any familiarity with the
6 purpose of the Life Safety Code?
7     MR. KAPLAN:  Objection; vague.
8     THE WITNESS:  No, other than some of the
9 content that I read.
10 BY MR. REHN:
11     Q   Do you know what the average user of the
12 Life Safety Code uses it for?
13     MR. KAPLAN:  Objection; vague.
14     THE WITNESS:  No.
15 BY MR. REHN:
16     Q   And then in addition to the NFPA free
17 access version, you looked at a PDF of this code
18 that was available on Public Resource's website; is
19 that right?
20     MR. KAPLAN:  Objection; misleading.
21     THE WITNESS:  I looked at the 2000 version
22 on the NFPA site and the 2000 version on
23 Public.Resource.Org's site, I looked at the 2012
24 version as well on the Public.Resource.Org website.
25

217

1 BY MR. REHN:
2     Q   For the 2000 version, your report says
3 that you looked at the HTML version of that on
4 Public Resource's website?
5     A   Yes.
6     Q   Did you notice any tabular or graphical
7 material when you were reviewing that?
8     A   I believe so.
9     Q   And did you evaluate whether a screen
10 reader would accurately convey that tabular material
11 from the HTML version on the Public Resource
12 website?
13     A   I saw tabular material in the HTML, but I
14 didn't sample "View Source" --
15     (Reporter clarification)
16     THE WITNESS:  I saw tabular material in
17 the HTML, but I didn't "View Source."  Quotes on
18 "View Source."
19 BY MR. REHN:
20     Q   Did you use a screen reader to read that
21 tabular material?
22     A   I'm not sure I actually read the tabular
23 material out loud with my screen reader.
24     Q   So do you have an assessment of the
25 importance of that tabular material to understanding

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

218

1 and implementing the standard?
2     A   No.
3     Q   Did you see any graphical material in that
4 standard?
5     A   I recall seeing graphical material in the
6 standards I evaluated.
7     Q   Did you assess whether that graphical
8 material was accessible via a screen reader in the
9 HTML version of the Public Resource website?
10         MR. KAPLAN: Objection; vague.
11         THE WITNESS:  I didn't check for
12 additional accessible metadata on the images.
13 BY MR. REHN:
14     Q   So do you have an opinion on --
15         Do you have enough information to know
16 whether a visually impaired fire safety professional
17 could use the HTML version of NFPA 101 that is
18 available on Public Resource's website and safely
19 rely on that for professional purposes?
20         MR. KAPLAN: Objection; vague.
21         THE WITNESS:  I am not a fire professional
22 expert, so I can't evaluate how this applies
23 specifically to that profession.
24 BY MR. REHN:
25     Q   So the answer to my question is "no"?

219

1         MR. KAPLAN:  I think he gave you an answer
2 to your question.
3 BY MR. REHN:
4     Q   And did you also look at the PDF version
5 of the 2012 edition of the NFPA Life Safety Code
6 that is available on the Public Resource website?
7     A   I did look at that version, yes.
8         MR. REHN: I'm going to mark as
9 Exhibit 4003 just a few pages of this.
10         (Plaintiffs' Exhibit 4003 marked
11             for identification.)
12         THE WITNESS:  Am I supposed to look at
13 this?
14         MR. REHN:  Sure.  I can represent to you
15 that this is a few pages --
16         MR. KAPLAN:  Courtesy copy?
17         MR. REHN:  Oh, yeah, sorry.
18 BY MS. RUBEL:
19     Q   -- a few pages from the PDF version of
20 NFPA 101-2012 edition taken from the Public Resource
21 website.
22         Does that look like an accurate
23 description?
24     A   So this is the PDF version from the Public
25 Resource website?

220

1     Q   That's correct.
2     A   Okay.
3         MR. KAPLAN:  That's excerpts you're
4 representing it to be.
5         MR. REHN:  Excerpts, yes.
6 BY MR. REHN:
7     Q   Then you say that you --
8         You said that you copied the text from
9 this document, and then you pasted it into a Word
10 document, and you used a screen reader to evaluate
11 that content?
12     A   According to the three functional tasks
13 that I described as checking on my report.
14     Q   And if you'll look at this material, for
15 example, on the second page of the exhibit, you see
16 on the bottom left -- the bottom right column, there
17 is some tabular material?
18     A   Uh-huh.
19     Q   Do you recall whether you evaluated
20 whether the screen reader could accurately convey
21 that tabular material?
22         MR. KAPLAN: Objection; vague.
23         THE WITNESS:  I tested the things I
24 outlined as wanting to test, so, for example, could
25 I navigate to a specific point, let's say, Section

221

1 7.2.1.15.6.  Could I read the text, started reading,
2 listen to the standard, and could I search on a
3 keyword like "egress" and --
4 BY MR. REHN:
5     Q   You did not --
6     A   So those are the things that I tested.
7     Q   So you did not evaluate whether the screen
8 reader could capture that tabular material?
9     A   I did not.
10     Q   Do you have any opinion -- I think I
11 already asked you that, so scratch that.
12         Do you have enough information to know
13 whether a visually impaired fire safety professional
14 could access the PDF version of NFPA 101 on Public
15 Resource's website and safely rely on that for
16 professional purposes?
17         MR. KAPLAN:  Objection; vague,
18 argumentative and incomplete hypothetical.
19         THE WITNESS:  And your predicate presumes
20 stuff that I know that I don't know.  I have already
21 said I don't know much about fire safety
22 professionals, so answering questions depends on
23 making a value judgment about fire safety
24 professionals.  I'm not an expert on fire safety.
25 I'm more of an expert on accessibility.

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

222

1  BY MR. REHN:
2     Q   Do you have any information to know
3  whether a visually impaired architect could access
4  the PDF version of the NFPA 101 that's on Public
5  Resource's website and safely rely on that for
6  professional purposes?
7        MR. KAPLAN:  Objection; incomplete
8  hypothetical, vague.
9        THE WITNESS:  I do know of an awful lot of
10  professionals that are delighted to get the kind of
11  content that is available there, whether it's from
12  my organization or other places, and so -- but I
13  don't know about architects in particular.
14  BY MR. REHN:
15     Q   And, in particular, whether they could
16  safely rely on the standard as it's available on
17  Public Resource's website?
18        MR. KAPLAN:  Objection; asked and
19  answered, vague, incomplete hypothetical.
20        THE WITNESS:  I believe that any person
21  with a disability who gets a after-the-fact -- well,
22  actually I would say if it gets any content, needs
23  to blend their professional judgment if they don't
24  feel like they can rely on a document, to ask for
25  help from a sighted person if they need it.  And,

223

1  you know, accessibility is on a spectrum, and
2  perfection is normally not something that people can
3  expect today.
4  BY MR. REHN:
5     Q   And your report says that it's your
6  opinion that the text that you were able to copy
7  from this PDF was rendered by an OCR of some sort.
8     A   Uh-huh.
9     Q   Is it your opinion that technical
10  documents are generally unusable when they're
11  rendered with an OCR mechanism?
12        MR. KAPLAN:  Objection; vague.
13        THE WITNESS:  No.
14  BY MR. REHN:
15     Q   Is it your opinion that technical books
16  are often unusable when scanned with an OCR
17  technology?
18        MR. KAPLAN:  Objection -- sorry, go ahead.
19  Objection; vague.
20        THE WITNESS:  You know, it's a -- it
21  depends on where on the accessibility spectrum it
22  falls.  So we've discussed a raw OCR is not as good
23  as a proofread OCR, which is not as good as getting
24  the original publisher document digitally, and as
25  you march through those things, they are often at

224

1  some level usable and they become more useful the
2  more -- the higher the quality is.
3  BY MR. REHN:
4     Q   So the -- the higher quality is generally
5  content available from the publisher?
6     A   Generally, publisher supply content is the
7  highest quality you can get unless you have invested
8  significant additional time, say, in doing image
9  descriptions or other additional markup beyond what
10  the publisher would do.
11     Q   And I think you testified earlier you
12  didn't consider whether any of the Plaintiffs makes
13  the original publisher content available to visually
14  impaired people in any way, aside from the free
15  access sections of their website?
16        MR. KAPLAN:  Objection; misstates
17  testimony.
18        THE WITNESS:  Correct.
19  BY MR. REHN:
20     Q   Do you know whether any of the Plaintiffs,
21  for example, responds to requests from visually
22  impaired persons for the publisher version of their
23  standards?
24     A   No.
25     Q   Did you analyze whether the content of the

225

1  standard that you obtained on Public Resource's
2  website in HTML format accurately reflected the
3  content of the standard that originated from the
4  publisher or whether there was inaccurate or missing
5  content?
6        MR. KAPLAN:  Objection; compound and
7  vague.
8        THE WITNESS:  So, for example, when I
9  searched for a certain section, I then read the
10  section and didn't see OCR errors in the section
11  that I read.
12  BY MR. REHN:
13     Q   And did you compare that to the publisher
14  content version?
15     A   I did not.
16     Q   So there may have been additional errors
17  beyond the OCR errors that you didn't capture by
18  this analysis?
19        MR. KAPLAN:  Objection; vague, incomplete
20  hypothetical.
21        THE WITNESS:  It -- if there were
22  errors -- well, actually, I don't know how the HTML
23  version of the standard on the Public.Resource.Org
24  website was generated, so I can't give you an
25  opinion on whether OCR errors were missed because

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

226

1 they might not have produced it using optical
2 character recognition.
3 BY MR. REHN:
4    Q   And did you analyze whether the content of
5 the standard obtained through the PDF version on
6 Public Resource's website was accurate?
7       MR. KAPLAN:  Objection; vague.
8       THE WITNESS:  I've previously observed
9 that it had OCR errors in it that I spotted.
10 BY MR. REHN:
11    Q   Did you look for any other errors that it
12 may have had?
13    A   No.  I kind of felt like once -- I kind
14 of -- well, when you see a document that's obviously
15 an OCR document that hasn't been proofread, I don't
16 think it occurs to you to look for additional errors
17 that might have been, say, in the original
18 manuscript.
19       When you see a certain kind of error
20 that's been introduced, that's probably far more
21 likely to have occurred than errors in the original
22 manuscript since almost all published documents have
23 some errors in them at some point, but I think the
24 OCR process introduces a lot more by comparison.
25    Q   And you additionally did not go back to

227

1 the original document on the NFPA website to
2 evaluate the accuracy of the version you obtained
3 from the Public Resource website?
4       MR. KAPLAN:  Objection; vague.
5       THE WITNESS:  Correct.  That was not part
6 of my evaluation.
7       MR. REHN:  I have no further questions.
8       MS. MERK:  Would you like to take a break
9 or continue?
10       THE WITNESS:  What do you think?
11       MR. KAPLAN:  Why don't we take five
12 minutes.
13       THE WITNESS:  Okay.  Sounds good.
14       THE VIDEOGRAPHER:  We're off the record at
15 4:55.
16       (Recess taken.)
17       THE VIDEOGRAPHER:  We're back on the
18 record at 5:09.
19       EXAMINATION
20 BY MS. MERK:
21    Q   Good afternoon, Mr. Fruchterman.  My name
22 is Katie Merk, and I represent ASHRAE in this
23 matter.
24       As Ms. Rubel explained earlier, if any of
25 my questions are unclear, please just ask me and I

228

1 will clarify.  If you need a break, please let me
2 know.
3    A   Sounds good.
4    Q   Are you prepared to proceed?
5    A   I am.
6    Q   Counsel suggested that you investigate the
7 accessibility of ASHRAE standard 90.1-2010, correct?
8    A   Correct.
9    Q   Do you know why they suggested that
10 standard?
11       MR. KAPLAN:  Objection; calls for
12 privileged communications, and I will instruct the
13 witness not to answer.
14       THE WITNESS:  Can't answer.
15 BY MS. MERK:
16    Q   Do you have any separate understanding
17 outside of what was communicated to you by counsel
18 of why you were to look into Standard 90.1-2010?
19    A   No.
20    Q   Did you have to register on the ASHRAE
21 website to access Standard 90.1-2010?
22    A   Let me check to confirm that I'm
23 remembering which standards body is which.  No, I
24 didn't have to sign up to view the standards in
25 the -- whatever you guys call that, on your website.

229

1    Q   And you were able to navigate to the
2 specific standard on the ASHRAE website?
3    A   Correct.
4    Q   Was there an option on the ASHRAE website
5 to make the text of Standard 90.1-2010 larger?
6    A   Looks like there is.  Yes.
7    Q   Did you test this option?
8    A   No.
9    Q   Why not?
10    A   As I discussed in earlier testimony, I
11 believe that certain low-vision people would find
12 this accessible, and so I didn't test that
13 particular functionality.  I was more focused on
14 screen reader accessibility for the blind.
15    Q   And you tested other ASHRAE standards as
16 well, correct?
17    A   Briefly, yes.
18    Q   Which other standards?
19    A   The five listed in my report.  Would you
20 like me to read their numbers and names, or their
21 numbers?
22    Q   Yes.
23    A   So I also tested five other ASHRAE
24 standards, ASHRAE 62.1-2013, 62.2-2013, 90.1-2013
25 (I-P), 90.2-2007 and 189.1-2014.

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

230

1    Q   How did you select these additional five
2 standards?
3        MR. KAPLAN:  And I will object to the
4 extent that it calls for divulging privileged
5 communications with counsel and instruct you not to
6 answer to that extent.
7        THE WITNESS:  As far as I recall, at
8 random from a list that I saw on the website, but
9 there is some small chance it might have been five
10 in a row, but I think it was at random.
11 BY MS. MERK:
12    Q   Did you test any other ASHRAE standards
13 that are not listed in your report?
14    A   No.
15    Q   Did you test the 2004 version of 90.1?
16    A   No.
17    Q   The 2007 version of 90.1?
18    A   No.
19    Q   Or any version of the ASHRAE handbook?
20    A   No.
21    Q   Are you aware of which ASHRAE works are at
22 issue in this case?
23    A   No.
24    Q   Why did you test only one of the ASHRAE
25 works at issue in this case?

231

1        MR. KAPLAN:  I'll object to the extent it
2 calls for privileged communications.
3        THE WITNESS:  Can't answer, other than
4 what I've stated that I was directed to test that
5 one.
6 BY MS. MERK:
7    Q   You searched for the ASHRAE standard
8 90.1-2010 on Public.Resource.Org, correct?
9    A   Correct.  I'm going to confirm that's
10 what -- yes.  Correct.
11    Q   And you found it in PDF format, correct?
12    A   Correct.
13    Q   You did not find the 90.1-2010 standard in
14 HTML format?
15    A   I don't believe so.
16    Q   Earlier Ms. Rubel asked for which of
17 Plaintiffs' standards you copied the text into a
18 Word document, and you responded that you did this
19 for NFPA 101-2012.
20        Did you also employ this method to test
21 the ASHRAE 90.1-2010 PDF version?
22        MR. KAPLAN:  Objection; misstates
23 testimony.
24        THE WITNESS:  Yes.
25

232

1 BY MS. MERK:
2    Q   So to test accessibility of the ASHRAE
3 90.1-2010 standard, you opened the PDF in Adobe
4 Acrobat, and then you employed a "Select All"
5 command and then a "Copy" command, and then you
6 copied the text into a Word processing program,
7 correct?
8        MR. KAPLAN:  Objection; misstates
9 testimony.
10        THE WITNESS:  Yeah.  I opened it in Adobe
11 Reader, not -- but, yes, that's -- yeah.  That's how
12 I did it.
13 BY MS. MERK:
14    Q   And the text was rendered into a Word
15 processing format using automatic optical character
16 recognition, which we've been referring to as OCR?
17        MR. KAPLAN:  Objection; vague.
18        THE WITNESS:  And that's not quite how it
19 worked.
20 BY MS. MERK:
21    Q   Can you please clarify?
22    A   So I believe that the text that was
23 present in the document had been created through an
24 OCR process by the telltale signs of the errors.  I
25 used Cut and Paste to put that into Microsoft Word

233

1 and then "Read Aloud" or search for specific
2 sections or words.
3    Q   Thank you for the clarification.
4        Do you agree that the use of OCR can lead
5 to errors in the transcription?
6        MR. KAPLAN:  Objection; vague, incomplete
7 hypothetical, asked and answered.
8        THE WITNESS:  Yes.
9 BY MS. MERK:
10    Q   And yet you concluded the accuracy was
11 sufficient to perform the functional tasks of
12 reading the entire standard?
13        MR. KAPLAN:  Objection; misleading, vague.
14        THE WITNESS:  Yes.
15 BY MS. MERK:
16    Q   You were able to successfully read the
17 entire standard using a screen reader?
18        MR. KAPLAN:  Objection; vague.
19        THE WITNESS:  I didn't wait till the end.
20 BY MS. MERK:
21    Q   I'm sorry, I don't understand your answer.
22 "I didn't wait until the end."
23    A   You asked was I able to successfully read
24 the entire standard using a screen reader.  And I
25 actually didn't sit and listen to the screen reader

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

234

1 read the entire standard till the end because in my
2 professional opinion, once you've read the first
3 page, it tends to work the same for the rest of the
4 document.
5      Q   So your conclusion that generally the
6 accuracy was sufficient to perform the functional
7 tasks, reading the entire standard, navigating to a
8 specific place in the standard or searching on key
9 terms, you did not actually read the entire
10 standard?
11     A   Correct.
12     Q   I am going to hand you an excerpt of the
13 first 25 pages of ASHRAE standard 90.1-2010 as they
14 appear in the PDF version available on
15 Public.Resource.Org's website.  And over the break
16 the court reporter marked this as Exhibit 4004.
17         (Plaintiffs' Exhibit 4004 marked
18          for identification.)
19     THE WITNESS:  Okay.
20 BY MS. MERK:
21     Q   I'll represent to you that I've utilized
22 precisely the steps outlined in your report.  I
23 selected all of the text in this PDF, and I copied
24 it into a Word processing program, and this
25 document, which has been marked 4005, is the result

235

1 of that process.
2         (Plaintiffs' Exhibit 4005 marked
3          for identification.)
4     THE WITNESS:  Okay.
5 BY MS. MERK:
6     Q   For purposes of facilitating the
7 deposition, I have added page numbers to the bottom
8 of the Word document.  Those did not appear in the
9 text as it was rendered from the PDF.
10        Please turn to page 7 of Exhibit 4005 and
11 page 24 of Exhibit 4004.
12     A   Page 2- --
13     Q   Oh, sorry --
14     A   -- -4 of 2004.
15     Q   7 of the PDF version?
16     A   Okay.  Great.
17     Q   And 24 of the Word version.
18     A   7.  All right.  And 24.  Okay.  All right.
19     Q   At the bottom of page 7, do you see the
20 words "Design Energy Cost, The Annual Energy Cost
21 Calculated for Proposed Design," and then the number
22 7 at the very base of the page?
23     A   Yes.
24     Q   And on page 24, do you see that same
25 phrase rendered at the base of the second paragraph?

236

1     A   Yes.
2     Q   Are you satisfied that the Word version
3 and PDF version here are expressing the same portion
4 of the 90.1-2010 standard?
5     MR. KAPLAN:  Objection; vague.
6     THE WITNESS:  Seems -- seems logical.
7 BY MS. MERK:
8     Q   Now please turn to page 8 of Exhibit 4004.
9     A   Yep.
10     Q   Do you see Figure 3.2 on page 8 of
11 Exhibit 4004?
12     A   Yep.
13     Q   Do you see how Figure 3.2 was rendered on
14 pages 24 to 25 of Exhibit 4005?
15     A   Yep.
16     Q   Are there any problems with how Figure 3.2
17 is rendered on pages 24 to 25 of Exhibit 4005?
18     A   Yes.  The OCR did not do a great job of
19 pulling the text out of the graphic.
20     Q   Do you believe that a blind person would
21 be able to understand any of what is communicated in
22 Figure 3.2 as Figure 3.2 is rendered?
23     A   Yes.  They would read the caption and know
24 what it was about and know there is a picture there,
25 what it was about, and if they wanted to know the

237

1 information in that picture, they would need a human
2 being to describe it.
3     Q   So as expressed through a screen reader,
4 they would be unable to understand Figure 3.2?
5     A   I think that's correct.
6     Q   Do you have any basis to believe that this
7 standard can be performed without an understanding
8 of the figures utilized in the standard?
9     A   You're asking -- okay.
10     MR. KAPLAN:  Hold on.  Objection; vague.
11     Go ahead.
12     THE WITNESS:  You're asking me for an
13 opinion that has to do with the technical subject
14 matter that I'm not familiar with.  I'm happy to
15 talk about the accessibility issues surrounding this
16 document.
17 BY MS. MERK:
18     Q   If someone needed an accessible form of
19 this standard in order to perform the standard,
20 would this be an accessible form?
21     MR. KAPLAN:  Objection; vague,
22 argumentative.
23     THE WITNESS:  Your question assumes that
24 the information in this graphic is only available in
25 this graphic and isn't redundant in the standard.  I

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

238

1 don't know that. So I can't actually give you a
2 accessibility opinion until I actually sort of
3 assess that because often graphical elements
4 recapture something that's in other parts of the
5 document; that's quite common in technical
6 documents, but I don't know that because I haven't
7 been able to read the detailed content.
8 BY MS. MERK:
9    Q   I'm sorry, I'm going to ask my question
10 again.
11    A   Okay.
12    Q   If someone needed an accessible form of
13 this standard --
14    A   Yes.
15    Q   -- in order to perform this standard,
16 would this be an accessible form?
17       MR. KAPLAN:  Objection; vague,
18 argumentative, asked and answered.
19       THE WITNESS:  If this graphic is the only
20 expression of the information in this graphic and
21 that information is not contained in the textual
22 information of the standard, then a blind person
23 would need the help of a sighted person to look at
24 this graphic and get that information that's not
25 located elsewhere.  So I'm not sure.  I can't give a

239

1 yes/no answer to your question based on my
2 knowledge.
3 BY MS. MERK:
4    Q   I understand your clarification.
5       Assuming that that figure is the only
6 place that that information is conveyed in the
7 standard, is there any way that a blind person would
8 be able to comprehend the entire standard simply
9 using a screen reader?
10       MR. KAPLAN:  Objection; incomplete
11 hypothetical, vague.
12       THE WITNESS:  If they needed the
13 information in an inaccessible graphic, they would
14 need a human being to help them with that unless a
15 detailed textual description of that graphic was
16 available.  It certainly wasn't in the document that
17 you handed me.
18 BY MS. MERK:
19    Q   Is it your opinion that a version of the
20 standard without comprehensible figures is a
21 complete version of the standard?
22       MR. KAPLAN:  Objection; argumentative,
23 vague.
24       THE WITNESS:  Not for a blind person
25 without help.

240

1 BY MS. MERK:
2    Q   Would you please turn to page 20 of
3 Exhibit 4004 and page 67 of Exhibit 4005.
4    A   20 of the PDF and 67.  Okay.
5    Q   Do you agree that these both represent
6 Section 3.3 which lists abbreviations and acronyms
7 utilized in the 90.1-2010 standard?
8    A   Sure.
9       MR. KAPLAN:  Wait.  You're going to give
10 him time to read it, right?
11       MS. MERK:  Certainly.
12       THE WITNESS:  So I'm just looking at this
13 one page.  Do you want me to look at the entirety of
14 the page?
15 BY MS. MERK:
16    Q   At the base of 67, 3.3, "Abbreviations and
17 Acronyms" and then on to the next several pages --
18    A   Okay.
19    Q   -- and page 20 at the top where it says
20 "3.3, Abbreviations and Acronyms" and that complete
21 page.
22    A   Okay.  I'm ready to discuss the document,
23 I think.
24    Q   Do you agree that these both represent
25 Section 3.3, which lists abbreviations and acronyms

241

1 utilized in the 90.1-2010 standard?
2       MR. KAPLAN:  Objection; vague.
3       THE WITNESS:  Page 20 in the PDF looks
4 like an image of that page, and pages 68 through --
5 I don't know -- about 73, look like an OCR version
6 of that same table.
7 BY MS. MERK:
8    Q   Are there any problems with the rendition
9 of Section 3.3 in Exhibit 4005?
10    A   Yes.  There are OCR errors of both content
11 and structure.
12    Q   Would you expect that errors rendering
13 abbreviations and acronyms would propagate
14 throughout the entire standard?
15       MR. KAPLAN:  Objection; incomplete
16 hypothetical.
17       We're just talking about this one?
18       MS. MERK:  I'm asking him generally first.
19       THE WITNESS:  Seems like really overbroad.
20 For example, acronyms that are just letters tend not
21 to have errors.  Acronyms that have specialized
22 symbols, like degree or squared, tend to be wrong.
23 Pretty common OCR error.
24 BY MS. MERK:
25    Q   Is that the only error that you observe?

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

242

1    A    You want me to catalog --
2         MR. KAPLAN:  Objection; misleading.
3         THE WITNESS:  -- OCR errors on the page,
4    or do you have specific kinds of errors that you
5    want to hear about?
6    BY MS. MERK:
7    Q    I would like you to explain to me what is
8    different about 3.3 in Exhibits 4004 and 4005.
9    A    So I'm going to give you --
10        MR. KAPLAN:  Objection; vague.
11        THE WITNESS:  I'm going to give you the
12   top errors that leap out to me.  I'm not
13   representing they are a comprehensive list because I
14   didn't do a line-by-line compare on everything in
15   here.  But things that I noticed on my initial
16   reading was specialized symbols being
17   mis-recognized, as I mentioned, degrees, squared,
18   and then there was structural errors where the OCR
19   grouped some content together that should stay
20   together and broke other content that should stay
21   together apart.
22        I haven't looked to see how it does with
23   superscripts and subscripts.  I could go and look at
24   that if you want me to.  That would be another area
25   I would look for.

243

1         Do you want me to take more time on the
2    document and analyze it further?
3    BY MS. MERK:
4    Q    No.  We can -- we can look at an example
5    of a superscript and subscript issue.
6    A    Okay.
7    Q    On page 71 --
8    A    Okay.
9    Q    -- about two-thirds down, there's TDB and
10   TWB.
11   A    Okay.
12   Q    Which, if you look at the abbreviations
13   and acronyms chart, stands for dry bulb temperature
14   and wet bulb temperature.
15        Given how this text is rendered, do you
16   anticipate that a blind person would know what TDB
17   and TWB mean when utilized throughout the standard?
18   A    Well -- go ahead.
19        MR. KAPLAN:  Object as incomplete
20   hypothetical.
21        THE WITNESS:  So I think this is an
22   example of where the OCR took two things that should
23   be together and broke them apart, but it recognized
24   all the letters correctly.
25

244

1    BY MS. MERK:
2    Q    Do you find that this is a comprehensible
3    rendition of this text?
4         MR. KAPLAN:  Objection; vague.
5         THE WITNESS:  As I've said before, the OCR
6    is making errors, so this is not a perfect,
7    well-structured rendition of the document.  It has
8    many of the words in it, but they don't get paired
9    up, so it is not a publisher-quality rendition of
10   the document in accessible form.  It's an OCR
11   version of the document, which is full of errors,
12   which is what OCR does.
13   BY MS. MERK:
14   Q    And would the errors that you see on
15   Exhibit 4005 affect a blind person's ability to
16   understand a text reader's rendition of other parts
17   of the standard that rely on the abbreviations and
18   acronyms that are defined here?
19        MR. KAPLAN:  Objection; incomplete
20   hypothetical, vague.
21        THE WITNESS:  So I'm kind of --
22        MR. KAPLAN:  Why don't you answer this one
23   and we'll take a break.
24        THE WITNESS:  I'm just trying to --
25   there's a spectrum of accessibility, and if I was a

245

1    blind person trying to understand the contents of
2    this standard and I read all of the content,
3    including the OCR errors, I would walk away with a
4    pretty good idea of what the standard covers, the
5    kind of topics it covers.  And if I didn't know
6    abbreviations from context or from searching on
7    Wikipedia, I might be lost, but most people reading
8    a technical document are lost on their first
9    reading.  Anyway...
10        MR. KAPLAN:  Why don't we take a couple
11   minutes.
12        THE VIDEOGRAPHER:  We're off the record at
13   5:34.
14        (Recess taken.)
15        THE VIDEOGRAPHER:  Back on the record at
16   5:42 p.m.
17   BY MS. MERK:
18   Q    Did you investigate whether
19   Public.Resource.Org offers any of the other ASHRAE
20   standards at issue in this case?
21   A    No.
22   Q    So you did not test any of the other
23   standards at issue in this case on
24   Public.Resource.Org?
25        MR. KAPLAN:  Objection; argumentative.

Case 1:13-cv-01215-TSC   Document 204-45   Filed 11/13/19   Page 64 of 110
Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

246

```
1        THE WITNESS:  I didn't test any other
2  standards from ASHRAE on the Public.Resource.Org
3  website.
4  BY MS. MERK:
5     Q   You answered some questions earlier about
6  paid PDFs on NFPA's site.  Did your testing of
7  ASHRAE's standards focus solely on free access
8  through the website portion?
9        MR. KAPLAN:  Objection; vague.
10       THE WITNESS:  Yes.
11 BY MS. MERK:
12    Q   You did not test any ASHRAE standards
13 provided to customers who purchased electronic
14 copies of the standards from the ASHRAE bookstore?
15    A   Yes.  I'm sorry, I thought you said you
16 did not test.  Okay.
17    Q   So, yes, you did not?
18    A   Yes, I did not test.
19    Q   Why not?
20    A   Privileged conversation.
21       MR. KAPLAN:  Yeah.  If you can answer it
22 without divulging communications.
23       THE WITNESS:  I mean, I already said I was
24 directed to test that one.  Beyond that, I don't
25 want to elaborate.
```

247

```
1  BY MS. MERK:
2     Q   Do you know what format purchased copies
3  of ASHRAE standards are provided in?
4     A   No.
5     Q   Did you ever ask this?
6        MR. KAPLAN:  Objection; vague.
7        THE WITNESS:  Of who?
8  BY MS. MERK:
9     Q   Of counsel.
10    A   Privileged.
11       MR. KAPLAN:  Yeah.  Objection.  That's
12 privileged.
13       MS. MERK:  Communications of fact between
14 counsel and yourself are not privileged.
15       MR. KAPLAN:  If you want to ask him about
16 what facts counsel identified for his consideration,
17 you can do that.
18 BY MS. MERK:
19    Q   I'm asking if you asked either counsel or
20 ASHRAE what format their standards that are made
21 available for sale are provided in?
22       MR. KAPLAN:  And you are permitted to
23 inquire as to communications in which counsel
24 identifies facts that the expert considered in
25 forming the opinions to be expressed.  So if you
```

248

```
1  want to limit your question to that, I have no
2  objection.  But your question is objectionable on
3  the basis of privilege.  So let's see if we can
4  resolve it.
5        THE WITNESS:  Okay.  And on the portion
6  about asking ASHRAE, I did not ask anyone at ASHRAE
7  about anything.
8  BY MS. MERK:
9     Q   Did you ask counsel at all?  If there was
10 no communication, there cannot be a privilege.
11       MR. KAPLAN:  But you can't get at
12 privileged communications by asking the negative.
13       MS. MERK:  Are you instructing him not to
14 answer whether or not you had a conversation that
15 stated the fact of what format ASHRAE's standards
16 are available in?
17       MR. KAPLAN:  A conversation that stated
18 the fact?  And the rule says that if counsel
19 identifies facts or data, so is that going to get at
20 what you want to ask?
21       MS. MERK:  Sure.
22       MR. KAPLAN:  Then please go ahead.
23 BY MS. MERK:
24    Q   Did you ask counsel the fact of what
25 format ASHRAE's standard available for sale is made
```

249

```
1  in?
2        MR. KAPLAN:  We're going in circles here.
3  The rule says that counsel -- that communications
4  where counsel identifies facts or data are not -- do
5  not fall within the privilege.  So if the question
6  is, did counsel identify facts or data relevant to
7  this topic, then that's fine.  But you keep asking
8  him about the communications where he asked things
9  or other things that would fall outside of that
10 exception to the privilege.  So I thought we were
11 simpatico on this, and I want to make sure that we
12 work it out so you can ask the question you want to
13 ask, but --
14       MS. MERK:  Frankly, I don't -- I don't
15 even think it's worth it.
16       MR. KAPLAN:  Okay.
17 BY MS. MERK:
18    Q   Do you offer an opinion regarding any
19 other means besides the public website for accessing
20 the same ASHRAE standards?
21       MR. KAPLAN:  Objection; vague.
22       THE WITNESS:  I didn't evaluate anything
23 beyond the free version of the standard on the
24 ASHRAE site, so I don't offer an opinion on anything
25 else, other than the standard I observed and wrote
```

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

250

1 about in my expert report.
2 BY MS. MERK:
3    Q   Why not?
4    A   Because I performed the task I was
5 assigned to do.
6        THE WITNESS:  Is that okay to say?
7        MR. KAPLAN:  (Nods head.)
8 BY MS. MERK:
9    Q   Do you know what ASHRAE or any other
10 Plaintiffs' policy is regarding providing free
11 access to the ASHRAE standards at issue to
12 vision-impaired people?
13       MR. KAPLAN:  Objection; vague.
14       THE WITNESS:  No.
15 BY MS. MERK:
16   Q   Did you seek out this information?
17   A   No.
18   Q   Did you ask counsel to seek this
19 information in discovery?
20       MR. KAPLAN:  Objection; it calls for
21 privileged communications.
22 BY MS. MERK:
23   Q   When you said you did not seek out this
24 information, why not?
25   A   I answered that question a second ago, I

251

1 thought.  I was asked to evaluate a specific
2 standard and the accessibility around getting to
3 that standard and trying to access that standard; I
4 did that.  So I did what I was asked to do as an
5 expert.  I'm volunteering my time.  I don't make
6 extra work for myself if I don't need to.  I'm
7 sorry; I shouldn't be flippant, but...
8    Q   Do you have any understanding of how
9 ASHRAE or any of the other Plaintiffs might respond
10 if presented with a request for access to one of
11 their standards by a vision-impaired person?
12       MR. KAPLAN:  Objection; vague, compound,
13 incomplete hypothetical.
14       THE WITNESS:  I don't know about those
15 three organizations in particular.
16 BY MS. MERK:
17   Q   Do you have any understanding whether a
18 vision-impaired person has ever requested that
19 ASHRAE or any of the other Plaintiffs provide access
20 to any of their standards?
21       MR. KAPLAN:  Objection; vague.
22       THE WITNESS:  No.
23 BY MS. MERK:
24   Q   Did you seek out this information?
25   A   No.

252

1    Q   Why not?
2    A   Same answer as before.
3    Q   If you found out that in each instance
4 where a visually-impaired person has approached
5 ASHRAE concerning access to standards, ASHRAE
6 provided a copy of the standard in an accessible
7 format, would that change any of the opinions you
8 offered in your report?
9        MR. KAPLAN:  Objection; vague and
10 incomplete hypothetical.
11       THE WITNESS:  Let's see.  So if I knew
12 that the files were available, and I knew they were
13 available for free, and I knew that they were high
14 quality, and I was asked to evaluate the
15 accessibility in that context or it was obvious by
16 looking at the website that this was available, I
17 might have written my report differently.
18 BY MS. MERK:
19   Q   I'm sorry, maybe I'm not understanding the
20 answer to your -- to my question.
21       I'm asking if a vision-impaired -- if you
22 found out that every time when a vision-impaired
23 person has asked ASHRAE for access to one of its
24 standards, ASHRAE provided a copy of the standard in
25 an accessible format to that individual, would that

253

1 change any of the opinions you offered in your
2 report?
3        MR. KAPLAN:  Objection; vague and
4 incomplete hypothetical.
5        THE WITNESS:  With the information you
6 just provided, the answer would be no.
7 BY MS. MERK:
8    Q   Why not?
9    A   Because I don't know enough about the
10 process or about the format or about how accessible
11 it was and --
12   Q   Assuming --
13       MR. KAPLAN:  He has not completed his
14 answer.
15       THE WITNESS:  I'm okay.  Go ahead and keep
16 asking.
17 BY MS. MERK:
18   Q   Sorry.
19       Assuming that it is provided in an
20 accessible format, would it change your -- any of
21 the opinions offered in your report to know that any
22 time ASHRAE has been asked for an accessible version
23 of one of its standards, it has provided that
24 standard in an accessible form to the individual
25 inquiring?

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

254

1       MR. KAPLAN:  Objection; vague, incomplete
2 hypothetical.
3       THE WITNESS:  I have to start looking
4 through some of my conclusions to see what I might
5 change, if anything.  I don't believe so.
6 BY MS. MERK:
7    Q    Why not?
8       MR. KAPLAN:  Objection; vague.
9       THE WITNESS:  Because I believe that the
10 things that I've said in my document continue to be
11 true.
12      MS. MERK:  I have no other questions.
13      Oh, I would, however, like to state on the
14 record that we would like to keep this deposition
15 open until the document issue has been resolved.
16      We received over 5,000 pages of documents
17 which we have still not had access to because they
18 were provided in a load file that is not -- that
19 could not be read on our computers in this sort of
20 context, and we will maintain the right to question
21 Mr. Fruchterman on anything that is raised in those
22 documents provided today.
23      MR. KAPLAN:  So are you keeping the
24 deposition open?
25      MS. MERK:  Yes.

255

1       MR. KAPLAN:  Okay.  So we will continue to
2 sit here until the tape runs out -- seven hours run
3 out.
4       MS. MERK:  No.  We're going off the
5 record.
6       MR. KAPLAN:  Well, I don't want to go off
7 the record.  I mean, you have a full day to depose
8 Mr. Fruchterman.
9       MS. MERK:  You have not provided the
10 documents.
11      MR. KAPLAN:  Yes, we have.
12      MS. RUBEL:  We're working on getting a set
13 of them.  We want to go off the record.
14      MR. KAPLAN:  We'll take a break for a
15 second.
16      THE VIDEOGRAPHER:  We're going off the
17 record at 5:55.
18      (Recess taken.)
19      THE VIDEOGRAPHER:  We're back on the
20 record at 7:04.
21
22
23
24
25

256

1             FURTHER EXAMINATION
2 BY MR. REHN:
3    Q    Good evening, Mr. Fruchterman.
4    A    Hello.
5    Q    And do you understand that you're still
6 under oath?
7    A    Yes.
8    Q    Has anything happened between now and the
9 last time we spoke that would affect your ability to
10 answer my questions fully and truthfully?
11   A    No.
12   Q    So I'd like to direct your attention to an
13 exhibit that we are marking as Exhibit Number 4006.
14   A    Yes.
15      (Plaintiffs' Exhibit 4006 to be
16      marked for identification.)
17 BY MR. REHN:
18   Q    Do you recognize this as an e-mail to
19 yourself from Rob Turner that was sent on April 10th
20 of this year at 10:56 a.m.?
21   A    Yes.
22   Q    And the subject line is "OCR Document"?
23   A    Yes.
24   Q    Do you recall receiving this e-mail?
25   A    Yes.

257

1    Q    And do you know what OCR document
2 Mr. Turner is referring to in the subject line?
3    A    Is there, like, an immediately prior
4 document that actually mentions this?  Sorry.
5 Sorry.  I mean, can I look through the list of
6 produced documents?
7       MR. KAPLAN:  You just got to answer his
8 question.
9 BY MR. REHN:
10   Q    Based on this e-mail, do you know which
11 document he's referring to?
12   A    I don't remember which one of the
13 image-based standards I shared with him, no.  But it
14 was one of the image-based PDFs that I asked him to
15 look at.
16   Q    So the image-based PDFs that you sent
17 Mr. Turner were -- those were PDFs you had taken
18 from Public Resource's website; is that correct?
19      MR. KAPLAN:  Objection; argumentative,
20 misleading and vague.
21      THE WITNESS:  It probably was an
22 image-based PDF from the Public.Resource.Org
23 website, and that's my -- that's my recollection.
24 Yes.
25

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

258

1  BY MR. REHN:
2      Q   Did you make any image-based PDFs of
3  documents from any of Plaintiffs' websites?
4      A   I didn't make any documents from
5  Plaintiffs' websites.  I downloaded whatever
6  document -- no, I downloaded -- I viewed the
7  document, yes.  So, no.
8      Q   After you sent him a document, it would
9  have been one from Public Resource's website?
10     A   That's correct.  Thank you.
11     Q   And if I could direct you to the last
12  sentence of the first paragraph of his e-mail, would
13  you read that sentence, please?
14     A   The one "I don't think..."?
15     Q   Yes.
16     A   Yes.
17         "I don't think this type of
18     document can be considered to be
19     accessible."
20     Q   So based on your prior testimony, is it
21  your understanding that he is saying that the
22  image-based PDF from Public Resource's website that
23  you sent to Mr. Turner, in his opinion, cannot be
24  considered to be accessible?
25         MR. KAPLAN:  Objection; misleading,

259

1  argumentative, vague.
2          THE WITNESS:  I think Rob Turner doesn't
3  believe it meets our accessibility standards, which
4  is what his job is to primarily work on our library
5  for the blind.  We would not post an image-based PDF
6  and call it accessible.
7  BY MR. REHN:
8      Q   And do you agree with Mr. Turner's
9  assessment that this type of document cannot be
10  considered to be accessible?
11     A   I think it's less accessible than many of
12  the other documents and more than others, as I wrote
13  in my expert report.  I can probably quote from the
14  report.
15     Q   There's no question pending.  So...
16     A   Okay.  I would direct you to my last
17  sentence of my report --
18         MR. KAPLAN:  Jim, there's no question
19  pending.
20         THE WITNESS:  All right.
21         MR. REHN:  I have no further questions.
22  And I believe that concludes Plaintiffs' questioning
23  of this witness.
24         MR. KAPLAN:  I have no questions at this
25  time.

260

1          THE VIDEOGRAPHER:  This concludes today's
2  deposition.  We're going off the record at 7:09.
3          (Time noted:  7:09 p m.)
4          (Signature waived.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

261

1          CERTIFICATION OF DEPOSITION OFFICER
2      I, the undersigned, a Certified Shorthand
3  Reporter of the State of California, do hereby certify:
4      That the foregoing proceedings were taken
5  before me at the time and place herein set forth; that
6  any witnesses in the foregoing proceedings, prior to
7  testifying, were administered an oath; that a record of
8  the proceedings was made by me using machine shorthand
9  which was thereafter transcribed under my direction;
10  that the foregoing transcript is a true record of the
11  testimony given.
12      Further, that the foregoing pertains to the
13  original transcript of a deposition in a Federal Case,
14  before completion of the proceedings, a review of the
15  transcript [ ] was [X] was not requested.
16      I further certify I am neither financially
17  interested in the action nor a relative or employee of
18  any attorney or any party to this action.
19
20
21
22
23      _____
        KELLI COMBS
24      CSR No. 7705
25

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015
Page 1

---

**$**

**$30,000** 28:7,13 35:3

---

**1**

**1** 1:11 3:17 6:14 65:3
92:19 98:9 121:14
122:11,17 126:2
137:24 149:5
154:23 162:10,13
182:1 203:15

**1:13-cv-01215-TSC**
1:9

**1:20** 138:4

**10** 4:21 17:16 83:19
99:2 116:15 122:3
126:2 130:19
134:19 135:17
179:2 181:22,23
182:16 198:20
215:24

**10:37** 51:13

**10:55** 51:16

**10:56** 256:20

**100** 53:3 92:8

**100-page** 212:2

**101** 2:9 118:21 126:5
179:16,23 192:25
197:10 214:19
218:17 221:14
222:4

**101-2000** 98:6 214:22

**101-2012** 4:10 219:20
231:19

**107** 181:24

**10th** 256:19

**11** 162:18,21

**11:01** 56:19

**11:04** 56:24

**11:55** 92:19

**1111** 2:4

---

**12** 98:7

**12:09** 92:22

**12:12** 95:10

**12:16** 95:15

**121** 3:14

**14** 161:24 164:9

**15** 28:7,12 35:3
38:16,19 83:19

**16** 192:21,24

**17** 160:6 186:21
192:21

**18** 3:15,22

**189.1-2014** 229:25

**19** 3:14

**192** 3:7

**1981** 21:2

**1996** 62:4,9

**1-page** 212:3

---

**2**

**2** 73:8 92:22 122:15
135:15,20
136:6,11,17,21
137:12,15,17
162:15 175:19
235:12

**2.0** 149:7

**2:42** 138:7

**20** 15:16,18,19 38:19
92:8 135:18 137:4
144:21 240:2,4,19
241:3

**2000** 216:21,22 217:2

**20004** 2:4

**2003** 4:4 65:9

**2004** 230:15 235:14

**2007** 230:17

**2010** 179:17

---

**2012** 98:15 179:21,23
192:25 216:23
219:5

**2015** 1:16 4:21 5:2,6

**202** 3:15

**202.739.5118** 2:5

**203** 3:16

**209** 4:8

**20A** 98:9

**20M** 98:10

**215** 3:17,18

**218** 3:19

**219** 4:10

**227** 3:8

**228** 3:20

**2300** 2:9

**234** 4:13

**235** 4:17

**24** 235:11,17,18,24
236:14,17

**247** 3:21

**24-point** 16:3

**25** 3:19 4:13 234:13
236:14,17

**250** 3:22

**256** 3:7 4:20

**26** 13:17

**264** 1:11

**27th** 2:15

---

**3**

**3** 122:15 135:15,20
136:7,11,17,21
137:12,15,17
172:17 175:23

**3.2** 236:10,13,16,22
237:4

**3.3** 240:6,16,20,25

---

241:9 242:8

**3:37** 175:20

**3:48** 175:23

**30** 181:3

**300** 194:19

**31** 1:16 5:2

**31st** 5:6

**350,000** 157:22,23

---

**4**

**4** 3:13 172:17 235:14

**4:55** 227:15

**40** 92:8

**4000** 4:3 64:22,23
65:3 68:22

**4001** 4:6 97:21,23
192:17

**4002** 4:8 209:14,15

**4003** 4:10 219:9,10

**4004** 4:13 234:16,17
235:11 236:8,11
240:3 242:8

**4005** 4:17 234:25
235:2,10 236:14,17
240:3 241:9 242:8
244:15

**4006** 4:20 256:13,15

**415.318.1263** 2:10

**415.512.4073** 2:16

**415.875.2300** 2:21

**44** 38:14

---

**5**

**5** 3:16,21 75:8 99:8,9
101:17 204:20
216:2

**5,000** 254:16

**5,399** 6:14

---

Case 1:13-cv-01215-TSC   Document 204-45   Filed 11/13/19   Page 69 of 110
Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015
Page 2

**5:09** 227:18

**5:34** 245:13

**5:42** 245:16

**5:55** 255:17

**501(c)3** 12:12,14

**555** 2:20

**560** 2:15

**59** 3:13

_____ 6 _____

**6** 182:16

**62.1-2013** 229:24

**62.2-2013** 229:24

**64** 4:3

**67** 240:3,4,16

**68** 241:4

_____ 7 _____

**7** 3:6 132:17,20 146:9 172:17,22 181:25 235:10,15,18,19,22

**7.2.1.15.6** 221:1

**7:04** 255:20

**7:09** 260:2,3

**700** 1:20

**70-2014** 209:22

**71** 243:7

**72-point** 16:3

**73** 241:5

**7705** 1:24 261:24

_____ 8 _____

**8** 3:18 236:8,10

**80** 13:14

_____ 9 _____

**9** 3:20 215:16

**9:34** 1:18 5:7

**90** 32:9

**90.1** 230:15,17

**90.1-2010** 4:13,17 98:6 228:7,18,21 229:5 231:8,13,21 232:3 234:13 236:4 240:7 241:1

**90.1-2013** 229:24

**90.2-2007** 229:25

**93a** 98:10 166:11

**94104** 2:21

**94105** 2:10,15

**97** 4:6

**99** 32:10

_____ A _____

**a.m** 1:18 5:7 256:20

**A20** 98:9 166:25

**A20/A20M** 166:11

**AA** 148:8

**AAA** 148:9,24

**abbreviations** 240:6,16,20,25 241:13 243:12 244:17 245:6

**abide** 147:22

**abilities** 159:14

**ability** 8:24 19:4 42:9 43:4 103:21 104:25 124:14 140:6 186:24 190:13 244:15 256:9

**able** 15:1 16:25 17:3,9 34:15 43:9 84:9,15 86:9,22 102:3,4 108:14 111:20,21 112:12 113:10,24 115:18,24 116:3,16,25 117:5 124:7 129:8 130:14

132:3 133:11,22 134:4 139:13,14,24 140:1,15 141:20 143:7,13 152:6 158:10 160:17 161:11,22 162:9 163:8 165:14,17,22,25 167:6,25 176:4 178:12,16 186:2 193:8,14 194:7 195:4 196:7,8,22 197:10,13,18,25 223:6 229:1 233:16,23 236:21 238:7 239:8

**Abstract** 149:6

**academics** 33:14

**accept** 79:10 86:18 212:21,23 213:2

**accepted** 31:9

**access** 13:11 14:13 15:1,21 19:1,2 42:4,10,15 43:7 50:8 66:6,17 67:14,22 69:9 71:1,18,25 73:17 77:9 78:12 80:9 84:9,15,16,18,25 85:7,13 86:9,22 99:12 100:19 101:10,12,18 110:18 111:20,21 112:20 113:3,16,22,25 115:12,22 116:4,25 117:2,9 124:7,15,23 127:21 129:2,3,8,11,21 130:15,21 131:5,7,14 133:11,23 138:20 141:25 143:6,21 156:16 157:7,17 158:7 161:19 162:7 163:8 165:14 167:6

168:3 170:14,18 172:15 176:4 178:12,16 179:25 187:13,25 188:5,14 189:8 190:13 205:6,12,16 206:6,12 207:22 215:17 216:17 221:14 222:3 224:15 228:21 246:7 250:11 251:3,10,19 252:5,23 254:17

**accessed** 14:19 98:15 101:3 177:13,19 192:24 214:14

**accessibility** 9:21 12:3 25:4 26:1,2 29:8 30:22 31:9,13 37:9 41:7,21 91:8,23 92:2,13,14 93:14,16,19 102:9 110:23 116:11 122:1 124:11 131:22 139:17,20 140:5 141:11 142:23 143:25 144:2,14 147:2,4,20,22,23,2 5 148:4,7 149:17 151:25 153:4,7,9 154:22 156:3 165:12 173:9,13 187:10 197:5,7 202:19 203:10,21 204:3,17 205:3 208:22 214:19 221:25 223:1,21 228:7 229:14 232:2 237:15 238:2 244:25 251:2 252:15 259:3

**accessible** 13:9,24 14:5 26:13 31:1,23 32:9,13 35:10 40:20 49:9 50:6,9 52:16,20 53:20

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015
Page 3

62:24 77:24
83:21,25 84:5
89:25 90:1 101:25
102:6,11,16,21
110:7 111:10
112:7,21 114:6,11
115:11 127:16
129:14 132:4,24
133:2,15,22 134:9
142:2 148:15,16,19
149:9 153:22
157:12 163:2 170:7
173:9 174:24
175:6,8,13 177:25
178:1 186:2,25
205:10
206:5,14,16,23
207:4,7,8,9,11
208:11,17,20,21
213:15 218:8,12
229:12 237:18,20
238:12,16 244:10
252:6,25
253:10,20,22,24
258:19,24
259:6,10,11

**accessing** 92:2 103:1
115:25 139:12
152:15 177:23
191:4 249:19

**accomplishing**
163:14

**according** 65:9
220:12

**account** 81:23 115:17
143:12
160:17,21,23
161:7,11 189:25

**accuracy** 227:2
233:10 234:6

**accurate** 8:21,24
111:17 207:16
219:22 226:6

**accurately** 180:18
217:10 220:20

225:2

**acquainted** 158:2

**Acrobat** 232:4

**acronyms**
240:6,17,20,25
241:13,20,21
243:13 244:18

**act** 62:12 74:9

**action** 1:9 261:17,18

**active** 35:19

**actively** 25:18 35:18
144:25

**actual** 138:21 145:25
198:10

**actually** 9:9 17:3
18:1 34:10 38:3
39:9 40:9 46:9 48:4
64:18 65:13 68:4
109:24 118:7,15
120:23 140:19
155:18 162:20
163:20,24 182:16
183:7 185:15
206:15 217:22
222:22 225:22
233:25 234:9
238:1,2 257:4

**add** 130:9 173:9

**added** 92:7 97:18
235:7

**addition** 98:15 114:3
166:8 216:16

**additional** 7:22 8:18
94:14 97:12,15
102:15,19 105:21
106:14 129:12
174:4 185:24 186:1
187:16,18 190:1
218:12 224:8,9
225:16 226:16
230:1

**additionally** 226:25

**administered** 261:7

**admitted** 68:1

**Adobe** 180:12
193:7,12,14,20,21
195:19,22
196:3,6,12,14,16,1
7,21 197:1,4
198:7,15,25
199:3,14,24
200:1,5,6,9,11,23,2
5
201:4,5,7,9,13,17,2
3,25 202:1
232:3,10

**Adobe's** 178:6,10
180:15 195:10
198:6

**adoption** 32:11

**adult** 127:10,12
210:16

**advance** 12:16 15:19

**advanced** 186:18,20
187:1

**advice** 22:22
49:5,9,22 57:7
75:24

**advise** 10:2 56:9 57:3
58:8

**advised** 23:15 24:1
57:19

**advocate** 45:14

**affect** 244:15 256:9

**affects** 104:24 109:23

**affiliation** 28:21

**Africa** 210:5,16

**afternoon** 189:4
192:3 227:21

**after-the-fact** 222:21

**against** 94:3 100:11
101:2 189:11

**agencies** 75:13,18

88:10 148:1

**agency** 52:5 55:3

**aggregate** 157:25

**ago** 23:4 93:21
137:20 190:2
198:18,20 250:25

**agreed** 91:1

**agreement** 9:7,10
86:17 213:12

**agreements** 79:10

**ahead** 24:25 77:21
92:16 119:12 143:9
201:16 203:8 204:7
223:18 237:11
243:18 248:22
253:15

**aimed** 16:8

**air** 1:6 6:4 123:3

**airlines** 152:8

**align** 79:19

**alleged** 96:12 99:5

**Allison** 4:4 65:12

**allow** 14:4 38:18
194:2 211:16

**allowed** 13:23 81:10

**allows** 167:10

**Ally** 85:20 86:20

**alongside** 82:22

**aloud** 18:23 69:5
72:16 99:18
103:7,17 113:4
114:4 156:10 178:6
193:15 195:20,21
233:1

**already** 79:7 105:22
107:9,15 155:8
160:12 165:8,14
186:11 189:3
221:11,20 246:23

**Alt** 173:13,16,22

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015

Page 4

174:5,8

**alternate** 163:14
174:19

**alternatives**
151:10,21

**Alto** 1:20,21 5:2,13
12:13 136:18

**Aluminum** 155:16,19

**am** 19:3 21:25 22:12
23:11 29:15 37:22
50:3 51:20 94:7
145:10 157:13
158:9,15 159:5,13
163:18 218:21
219:12 228:5
234:12 261:16

**amazed** 191:24

**Amazon** 30:7 152:7

**amendment** 51:19,22
53:6,13,19,25
54:15,23 55:19,23
56:11
57:4,13,19,21
60:4,10,14 61:6,24
62:5,14,21,22
63:3,7 64:10 69:6
70:13,15 73:15
74:9 76:3 78:6
79:19 80:10,16,20
81:5,11 85:14
86:5,10 110:4
128:19

**American** 1:3,5 5:23
6:3 46:5 85:22 87:3
130:3

**Americans** 137:24

**among** 53:13

**amount** 28:17 189:3

**analysis** 139:4
175:5,25 225:18

**analyze** 174:22 175:5
224:25 226:4 243:2

**analyzing** 170:21

**Annual** 235:20

**answer** 7:23 8:1
10:10 24:6,25 25:2
40:15 57:17 59:2
64:20 77:20 91:14
94:24 111:17
132:11 136:3
149:16,22 150:21
158:19 159:20
160:14 200:18,20
202:14 204:7
206:18
215:5,6,13,14
218:25 219:1
228:13,14 230:6
231:3 233:21 239:1
244:22 246:21
248:14 252:2,20
253:6,14 256:10
257:7

**answered** 3:12 34:3
49:25 150:12
156:18 157:1 164:3
187:19 204:14
222:19 233:7
238:18 246:5
250:25

**answering** 8:3
221:22

**answers** 8:14,18
141:6

**anticipate** 184:21
185:14 243:16

**anybody** 8:7 9:24
10:5 35:5 57:10
131:13 141:3,10
202:10 211:16
213:5 214:14 215:1

**anymore** 200:12,14

**anyone** 31:21 53:8
123:2 124:6,13,14
130:13 158:6 248:6

**anyone's** 159:14

**anything** 10:3 12:5
94:23 120:15
143:16 147:14
150:22 154:6
155:14 168:1 248:7
249:22,24 254:5,21
256:8

**Anyway** 245:9

**anywhere** 119:2

**apart** 182:17 242:21
243:23

**apologies** 25:1 41:17

**appealed** 40:6

**appear** 4:14 81:21
234:14 235:8

**appears** 53:2 56:6

**appellate** 40:2,7

**Apple** 30:7 98:9,10
166:12

**application** 37:23

**applications** 111:3
170:4

**applied** 21:13,20

**applies** 218:22

**apply** 149:1

**applying** 58:25

**appreciate** 18:7

**approached** 131:4
252:4

**approaches** 99:11

**appropriate** 24:10
188:24

**approved** 211:3,9

**approximately** 10:15
13:14 20:25 28:12
179:2

**apps** 111:1

**April** 4:21 90:17
256:19

**architect** 222:3

**architects** 222:13

**Archive** 119:4,10,24
120:6

**area** 50:11 144:14
156:4 182:18
242:24

**areas** 13:4

**aren't** 68:16 134:20
153:8 183:10

**arguing** 191:23

**argument** 188:11

**argumentative** 35:6
37:13 39:16,24
40:22 43:11 45:21
48:6 52:23 53:10
55:10 63:20 65:19
70:4 71:10 72:20
73:19 74:2 81:1
87:18 88:5 91:13
100:17 101:6
113:13 114:1
120:19,25 134:1
140:3 145:16
147:19 151:14
153:2,24 156:18
157:1 159:3 163:4
164:3 173:25
177:15,21 183:9
202:24 204:14
207:15 215:10
221:18 237:22
238:18 239:22
245:25 257:19
259:1

**Arkenstone** 13:19,20
14:2 19:19,23

**A-R-K-E-N-S-T-O-
N-E** 13:19

**array** 102:25 103:16

**arrows** 162:15

**art** 32:19 33:9

**article** 4:3 64:21

Case 1:13-cv-01215-TSC   Document 204-45   Filed 11/13/19   Page 72 of 110
Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015
Page 5

65:6,14 68:21
69:20 70:17 96:3

**articles** 47:1 83:6

**articulating** 67:6

**ASHRAE** 2:7
4:13,17 93:25
98:6,7,21 116:21
205:7,24 227:22
228:7,20
229:2,4,15,23,24
230:12,19,21,24
231:7,21 232:2
234:13 245:19
246:2,12,14
247:3,20 248:6
249:20,24 250:9,11
251:9,19
252:5,23,24 253:22

**ASHRAE's** 246:7
248:15,25

**aside** 85:11 224:14

**aspects** 131:24
138:9,18,19 144:15

**aspersions** 159:14

**assert** 79:14 86:4

**asserted** 66:23

**asserting** 67:2

**assess** 92:2 117:14
218:7 238:3

**assessed** 109:19

**assessing** 139:17

**assessment** 217:24
259:9

**assigned** 250:5

**assignment** 91:24

**assist** 105:2
141:10,13 189:25

**assistance** 113:20,24
142:25 143:13
159:1,16,25

**assisted** 114:17 141:3

**assistive** 99:14,24
133:14,17

**associate** 28:17

**associated** 125:14

**association** 1:5 6:2
80:18

**assume** 8:2 31:18
32:2,3 65:15 96:18
160:9 165:25 202:6

**assumed** 163:15
164:6

**assumes** 34:8,18
237:23

**assuming** 158:20
239:5 253:12,19

**assumption** 121:3
136:13 139:9

**Assurance** 142:20

**ASTM** 1:4 2:2 5:14
92:25 93:3
98:8,9,13
154:21,23
155:1,5,11 156:16
157:7 158:7,11
163:23 164:4
166:8,9,11,25
205:7 206:1

**ASTM's** 154:12,18
156:13 160:18
161:12,15,19,20,25
162:11,22
165:4,18,23 179:25

**attach** 145:22 174:14

**attached** 4:23 145:25

**attempt** 189:3

**attempted** 81:15
130:21 156:9

**attempting** 196:25

**attention** 256:12

**attorney** 261:18

**attorney/client** 82:17

**attorneys** 9:8,15
11:16 22:7 203:3

**attractive** 44:8

**audible** 8:9

**audio** 5:16 14:21
18:10 64:19 103:16
111:1 114:13
170:16

**auspices** 26:6

**author** 55:20

**authored** 4:3

**authoring** 69:20

**authority** 79:23

**authorized** 43:1
51:25 52:1,4 54:15
56:10 57:4,13 59:1
60:4,13,19 61:5

**authors** 39:9
43:1,2,21 82:2
83:16

**automated** 30:6
211:24

**automatic** 232:15

**available** 4:14 27:22
32:11 54:10
55:16,18,25
76:22,24 77:11,12
78:1,2,6 101:3
119:2 124:8 128:18
167:18 170:20
176:1,13,14,17,21,
22 177:6,12 191:1
202:21 203:22
204:3,6 205:15
209:9 213:20
216:18 218:18
219:6 222:11,16
224:5,13 234:14
237:24 239:16
247:21 248:16,25
252:12,13,16

**availing** 53:13

**Avenue** 2:4

**average** 180:19
216:11

**aware** 28:8 29:12
34:4,23,25 35:8
46:20 47:12
49:3,21 50:4,15
61:14,21 76:21
89:23 122:22
123:2,8,17,24
124:13,22
128:11,13
130:12,20 131:18
144:24 145:10
146:17,18 151:24
156:15 157:6
158:5,15 159:5
167:14 186:23
202:3 208:2,4
209:9 230:21

**away** 43:23 44:14,21
245:3

**awful** 222:9

---
### B

**B557** 98:13 166:8

**B557-84** 155:2
156:13,16 157:8
158:7,12 161:20
165:19

**B557-84e** 154:23

**B557-84e1** 155:12

**B57** 98:13

**B57-84e1** 98:8

**bachelor's** 21:19

**background**
16:18,19 21:10
93:2 142:12

**badgering** 206:18

**Baen** 45:23 46:8
47:13,19,23

Case 1:13-cv-01215-TSC   Document 204-45   Filed 11/13/19   Page 73 of 110
Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015
Page 6

**B-A-E-N** 45:23

**balance** 33:10,17
34:7,17

**ballpark** 145:11
150:10 169:16

**bar** 15:19 162:6

**bargain** 62:15,19
63:16 66:4,10 69:7
72:17

**barrier** 35:4

**bars** 162:7

**base** 104:17 133:19
163:15 235:22,25
240:16

**based** 8:3 59:10
95:3,19 130:1
136:10 139:19
140:5 146:13
155:24 169:4
175:25 187:19
193:22 239:1
257:10 258:20

**bases** 60:25

**basically** 118:14
133:16

**basics** 7:20

**basis** 77:24 92:11,12
121:19 133:9
136:19 157:25
187:5 237:6 248:3

**bear** 168:11,22

**became** 82:22

**Becker** 2:20 6:8
188:7 190:5,9,15

**become** 17:4 40:19
58:25 72:2 158:1
224:1

**begin** 8:14

**beginning** 38:4 92:21
99:9 175:22 181:12

**behind** 134:24

**belief** 39:22 48:2
111:19

**believe** 9:7,11 19:14
22:23 26:21 31:21
39:1,18 41:12 49:7
51:4 54:8 55:1,19
60:12 61:15 64:15
79:23 82:8
84:13,18,23 86:4
87:22 94:12 98:12
100:18 111:13
116:14 131:3,12
134:2 136:6 137:23
145:6 152:10,12,19
161:13,17
162:12,17,20,25
169:9 177:1,5
187:11 192:17
195:8 198:19
201:12,19 209:24
217:8 222:20
229:11 231:15
232:22 236:20
237:6 254:5,9
259:3,22

**bell** 154:19

**benefit** 63:24 76:10
105:18

**benefited** 83:19

**benefits** 63:25 103:15
105:17

**Benetech**
12:10,11,15,22
13:5,13,16,21
19:19 28:24 29:18
32:4 34:14 50:1
54:13,21 55:8
68:23 69:14,25
77:8 85:12 86:2
142:18,19
144:6,9,16,22
158:6 210:13,23

**besides** 249:19

**best** 64:20 177:7

**bet** 151:5

**better** 16:19 45:2
134:5

**beyond** 10:5 16:14
22:4 85:5 94:18
95:24 96:4 118:24
224:9 225:17
246:24 249:23

**biggest** 13:4 102:8

**bit** 16:9 30:13 38:2
49:12 131:9 188:18

**black** 16:18,19

**blend** 222:23

**blind** 13:8,23
14:12,20
15:14,17,20 16:10
18:24,25 19:3
22:14 23:23 26:12
48:18 57:21
64:16,18 68:4
76:12,13 79:9
82:20 83:18,21
85:18,21,22 87:4,9
88:3,13 99:17
100:5,21 101:17,20
102:1,7,11,15,22
107:15 109:4,10
110:15,17,22
111:10 113:2,9,24
122:10,18,23
123:4,9,13,18,25
134:12,15 141:20
142:10,14 143:1
152:1 156:15,20
158:10,18,25
159:5,6,10,23,24
160:8,10 161:11,14
165:11
170:4,13,18,22
172:25 174:24
175:8,13 177:14,20
180:3,19 186:7,23
187:2,4 193:8
229:14 236:20

238:22 239:7,24
243:16 244:15
245:1 259:5

**blindness** 35:24

**blog** 46:14

**blow** 193:24
194:11,20

**BOCKIUS** 2:3

**bodies** 34:24 116:15
142:4

**body** 29:22 31:5,9,12
144:4 228:23

**bono** 92:7,11,12

**book** 14:12
18:14,15,18,22
30:1,7 64:17,18
76:12,13 80:18
87:11 108:4,14,22
112:5 130:7 209:22

**books** 13:11,24 14:4
17:13 32:8
45:12,15,16,19,23
46:8 47:13,19,23
64:14 68:6 75:13
76:16 77:24,25
83:19,24
84:4,5,10,15 85:1
89:2 157:23 182:23
210:24 212:19,23
213:2,6,10,15
223:15

**Bookshare** 4:8 13:8
66:22 68:5,23 69:2
77:23 78:13,15
80:9 86:1,19
125:13,24
126:10,13,15,18,19
127:2,20 128:17,18
129:7,13,25 130:12
135:14 136:8,16
209:10,19,25
210:1,10,11 211:11
212:14 213:10,18
214:13

bookstore 246:14

borrow 153:14

bother 64:5

bottom 70:1 220:16 235:7,19

Box 172:17

Braille 14:20 15:1,4,5,8,10,15,16 ,21,24 64:19 85:23 87:10,12,13 88:16,18,22,23 89:2,4 107:1 110:23 111:21 112:2,3 114:12

brain 36:21 108:4 132:23 134:13

break 38:1,5,10,16,18 51:11 56:15 68:18 92:17 95:7 132:15 138:2 175:17 188:13,18 209:1,4 227:8 228:1 234:15 244:23 255:14

breath 175:2

brief 38:1 212:6

briefly 20:14 229:17

broad 94:7 154:2

broader 90:1

broadly 88:18

Brockius 1:20

broke 242:20 243:23

brought 94:3 154:9 190:17

browser 163:10 170:11,12

browsers 170:5

build 23:14

building 171:13

builds 23:11

built 186:13

built-in 16:21 163:10 195:22

bulb 243:13,14

bunch 151:5 170:22

button 81:21,24 143:18 163:13 164:18,20,23 193:7 195:20 202:5

buy 117:13 202:5

C

Calculated 235:21

Calera 19:24,25 20:7,16

California 1:21 2:10,15,20,21 5:2,13 12:13 21:11 261:3

calipers 160:4

Caltech 21:12 41:3

capability 42:10 165:3 186:13

capable 186:22 188:10,14

capacity 144:12

capital 181:22

caption 5:14 65:9 236:23

captioning 151:6

capture 221:8 225:17

capturing 8:7

care 75:16,19

careful 24:17

Carl 11:17 60:2,10 89:22 96:2 214:5

cart 202:6

case 5:14 11:9,16 24:19,20 25:3,6,8

39:15,19,23 40:9 48:8,11 82:3,8,12,22 83:2,7,8,15,22 85:4 89:14,16 90:21 91:12,25 92:24 93:5,24 94:4,8,11,13,15 96:1,4,9,19 97:22 119:7,14 121:5,10 125:18 128:14 155:19 169:19 174:7 176:17 187:18 193:13 198:5 202:11 203:24 208:7,17 230:22,25 245:20,23 261:13

cases 158:1

cassette 111:1

Cast 155:16

casting 159:13

catalog 242:1

categories 107:12,14 109:1,5

categorizing 63:15

category 108:21,24 123:24

cause 130:8 153:5

caution 75:2

CD 188:3,4,14,20,22 190:14,16

cell 172:21 173:2

cellular 5:20

cerebral 108:2

certain 27:20 28:16 29:15 32:10 40:1 41:4 47:16 50:20 53:6 68:16 83:24 84:25 92:3 102:9,10,13 121:4 128:12 147:11

148:2,25 149:1 158:24 161:16 163:18 203:21 204:17 210:10 225:9 226:19 229:11

certainly 11:17 12:24 31:22 32:25 33:6 48:7 68:24 69:1 83:6 191:9 239:16 240:11

certification 80:7 84:24 88:2 89:6 261:1

Certified 1:23 261:2

certify 86:21 109:25 110:1 261:3,16

Chafee 51:18,22 52:15 53:6,13,19,25 54:15,23 55:19,23 56:11 57:4,13,19,20 60:4,10,13 61:6,23 62:4,14,21,22 63:3,7,11 64:10 66:9 68:2 69:6 70:6,13,15 72:16,21,25 73:12,21 74:9,19 75:14 76:2,9 77:4 78:6 79:19 80:10,16,19 81:5,11 85:14 86:5,10 87:24 110:4 128:19

challenge 102:8 197:4

challenges 110:15

chance 8:17 187:16,20 190:22 230:9

change 104:2 153:14 252:7 253:1,20

Case 1:13-cv-01215-TSC   Document 204-45   Filed 11/13/19   Page 75 of 110
Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015
Page 8

254:5

**changed** 192:12

**chapter** 18:14,16,17

**character** 14:16 17:8
20:3 181:1,14
183:18,24 185:15
186:4 198:8,9,10
199:15,16,18
200:5,10 226:2
232:15

**characteristics**
149:25 150:24

**characterize** 27:6
33:6 47:10

**characterizing** 63:16

**characters**
15:16,17,18,19
16:6,18,19,23,24
17:3,5,19 112:3
182:4 193:25 200:7

**charge** 206:16

**chart** 174:17 243:13

**check** 202:7,10,20
203:6 204:5 212:6
215:9 218:11
228:22

**checking** 220:13

**checks** 140:20,21

**Chief** 20:12 22:4,5
27:13

**choke** 182:25

**choose** 166:14

**chooses** 81:4

**chose** 140:4,9

**chunk** 163:7

**circles** 249:2

**circulated** 88:18

**circumstances** 83:15

**cite** 52:3 77:4

**cited** 39:14,19,22
40:2 71:15 85:25

**citing** 70:8,16,21

**citizen** 187:7 213:14

**civil** 1:9 123:13

**claim** 22:1 23:18
78:22

**claims** 94:2

**clarification** 18:8
32:1 89:11 109:22
194:22 201:2
217:15 233:3 239:4

**clarify** 7:25 49:12
188:2 207:17,21
228:1 232:21

**class** 21:22 41:3
107:22 133:14

**classify** 104:10

**clean** 8:15

**clear** 159:13

**click** 162:14

**clicked** 118:25

**clicks** 80:23

**click-through**
160:22,25

**client** 56:16 153:3

**clock** 189:7,11

**closely** 31:18 32:3,4

**co-author** 65:7,10,11

**co-counsel** 187:16

**code** 52:3 209:22
215:21 216:6,12,17
219:5

**co-founder** 20:18

**collection** 125:13,24
126:11,15,19
127:2,15 130:12

**college** 40:24 187:3

**COLUMBIA** 1:1

**column** 171:24,25
172:8,9,22 173:1
220:16

**combination** 109:14

**combined** 134:16

**Combs** 1:23 5:9
261:23

**comes** 15:11 29:9
102:8 103:1

**comfortable** 137:23

**coming** 212:17

**command** 232:5

**commands** 170:9

**comments** 33:3
78:2,3 81:12

**commercial** 29:23,25
201:21

**committed** 74:3

**committees** 33:11,18
34:6,11

**common** 17:8 30:9
32:23 110:22
146:24 148:11
151:20 153:5,8,13
164:5 170:3,5
172:15,24 173:12
174:12,19
181:20,23 238:5
241:23

**commonly** 16:7
121:16,20,23 137:3
148:3

**communicate** 46:12

**communicated** 46:11
228:17 236:21

**communication**
248:10

**communications**
10:1 23:1 58:4
68:17 82:17,18

95:23 97:5 119:16
146:4 155:7
202:13,15 203:12
215:4,12 228:12
230:5 231:2 246:22
247:13,23 248:12
249:3,8 250:21

**communities**
12:19,22,25 37:25

**community** 32:13
33:5 62:16 63:2,5
66:5 69:9 83:18

**company** 19:25
50:15

**comparable** 88:11

**compare** 225:13
242:14

**compared** 205:14

**comparing** 139:23
207:22

**comparison** 226:24

**compensation** 20:20

**competence** 51:2
58:17 60:21

**competent** 79:23

**Complaint** 94:21,23
96:3

**complete** 98:24
132:20 181:11
239:21 240:20

**completed** 253:13

**completely** 16:9
122:10

**completion** 261:14

**complex** 147:10
149:15
183:15,18,25

**compliance** 147:23
148:2

**compliant** 23:15
152:13

**complication** 190:19

**complies** 150:7

**comply** 149:13
150:3,17 151:12

**compound** 197:2
225:6 251:12

**comprehend** 104:22
239:8

**comprehensible**
239:20 244:2

**comprehensive**
242:13

**comprehensively**
166:22

**computer** 11:5
110:19 115:12,22
123:23 124:3
186:18,23 187:1
188:5,8,20 190:15
200:24

**computers** 188:4,20
254:19

**concentration** 21:16

**conceptually** 70:10

**concern** 43:6,25
44:13,19 45:1
66:24 67:2,3,5,10
119:20

**concerned** 71:23
213:14

**concerning** 252:5

**concerns** 42:18 71:13
72:11 153:21 154:7

**concluded** 233:10

**concludes** 259:22
260:1

**conclusion** 23:21
24:8,25 25:11,17
27:19 31:15
36:1,6,13,18,24
37:5,13,20 42:25

52:13,24 53:10,23
54:7,17,25 57:6,15
58:2,17 60:6,22
61:9,20 75:10 76:7
94:6,17 96:15
101:7 120:19 121:1
128:10,24 133:9
145:17 168:7 234:5

**conclusions** 25:4
112:17 254:4

**conditioning** 1:6 6:5
123:3

**conduct** 159:7,10

**conference** 56:21
95:12

**conferences** 46:17

**confidential** 1:25
125:19

**configured** 80:22

**confirm** 120:15
166:23 228:22
231:9

**Congress** 62:8 85:20

**connected** 183:10

**connection** 24:19
39:11 51:1
69:13,18,24 70:12
115:13,23 119:6
167:4

**consensus** 32:15,24
33:9

**consider** 23:24 35:23
36:9,10 37:17
47:22 54:14 111:8
112:11,14 134:14
204:4 224:12

**consideration** 247:16

**considered** 57:12
110:7 214:19
247:24 258:18,24
259:10

**consortium**

26:11,19,25
27:9,12,14,15,21,2
4 28:1,12,15,18,22
29:2,8,14 35:2
83:16,23 84:7
85:11 144:4
145:5,14

**Consortium's** 26:23
144:7

**constituency** 33:22

**constraints** 23:25

**constructed** 185:20

**consult** 10:4 57:19
58:7 75:23 96:4
97:17

**consulted** 95:25

**consumer** 43:22

**consumers** 33:13
44:9,14,20

**contact** 127:23

**contacted** 127:20
128:5

**contained** 238:21

**content** 22:25 26:14
31:1 41:8 104:4
110:18 112:4
113:10,23 133:20
138:15 139:6,10
143:25 147:1,4
149:1,9,12,20
150:2,7,16
151:2,3,8,11,22
152:16 154:8
156:11 158:4
169:24
170:9,13,15,16,23
172:15 173:9
178:20
183:6,15,17,25
184:5 185:15
186:15 203:22
204:3,18 205:4
207:23,25 210:13

216:9 220:11
222:11,22
224:5,6,13,25
225:3,5,14 226:4
238:7 241:10
242:19,20 245:2

**contents** 14:18 82:17
172:10 245:1

**context** 89:21 126:17
181:21,24 182:15
184:8 245:6 252:15
254:20

**continue** 91:3 195:18
227:9 254:10 255:1

**contrast** 16:16
104:1,2

**control** 43:3,5,8
84:16 108:3
178:12,19 194:3,8
198:16 211:19,23
213:19

**controls** 163:11
170:8

**convenes** 26:15,25

**conversation** 93:13
202:25 246:20
248:14,17

**conversations** 5:20
59:11 66:22 83:6
94:19 146:14
197:6,7 203:3

**converse** 177:3

**conversion** 30:6

**convert** 14:17 177:18

**converted** 127:11

**converting** 15:5
177:11 180:5

**converts** 112:8

**convey** 217:10
220:20

**conveyed** 239:6

Case 1:13-cv-01215-TSC   Document 204-45   Filed 11/13/19   Page 77 of 110
Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015
Page 10

cooperated 83:17

cooperative 79:9

copied 4:17 76:22
153:12 178:19
180:20 220:8
231:17 232:6
234:23

copies 42:20,24
43:3,5,9,15,23
44:14,21,24
45:11,19 46:9,23
47:5 52:21 53:7
54:21 55:9,24
67:4,6,11 71:13
72:2 76:3,10
77:8,10 83:24
84:10 85:13 87:13
113:25 120:2,4
167:11 246:14
247:2

copy 31:21 52:16
62:24 87:10,12
88:18 99:13,23
113:22 114:7,11,13
116:16 127:16
128:17 132:2
145:22 149:3
178:22 179:12
188:19 191:18
197:10,16,25
199:15 219:16
223:6 232:5
252:6,24

copying 100:12
101:2,19

copyright
22:10,15,19,23
23:5,9,12,19,24
24:5,22 27:21
31:12 43:4 51:23
55:16,20 62:5,12
64:4 73:4,5 94:12
96:8 100:11 101:1
128:8 153:21
154:6,8 181:8

183:1

copyrighted 55:15
75:15,19 80:20
81:4,10,14 85:14
86:9 128:13

copyrights 96:12

corner 164:10

corporations 22:6

correct 10:21 23:7
39:13 40:8,16
41:17 48:24
49:1,16,19 66:15
70:24 71:3 80:13
82:4 83:23 90:8
96:10 98:14 99:19
104:20 108:23
112:18 113:11
120:10 129:4,14
133:4,5 135:23
136:22 138:11
143:10 146:16,23
149:10 162:16
167:19 168:5 193:3
195:12 197:15
198:24 199:1,16
203:25 205:18,19
208:20 210:2
214:25 220:1
224:18 227:5
228:7,8 229:3,16
231:8,9,10,11,12
232:7 234:11 237:5
257:18 258:10

correctly 142:4
243:24

correlated 125:14

cost 64:3 146:20
235:20

cough 6:11

counsel 5:21 9:3,5,12
10:8,18,22 11:22
22:22 23:1,16 38:9
44:17 56:15,20
59:20 61:10 68:10

69:16 75:23 91:2
95:4,11,20
96:5,17,23,25
116:4,17 119:13
120:8 121:3 145:25
154:24 155:1
189:18,24 190:25
228:6,17 230:5
247:9,14,16,19,23
248:9,18,24
249:3,4,6 250:18

counsel's 24:8
146:1,13

count 98:24 156:14
189:11 190:23

counterclaims 94:25

Counter-Defendants
1:8

Counter-Plaintiff
1:11

country 48:18

couple 93:20 125:11
141:14,17 145:1
153:18 177:22
195:6 245:10

course 73:10

court 1:1 5:9 8:6
39:14,19,23
40:5,10 98:12
234:16

Courtesy 219:16

covered 83:10 107:9

covers 149:7 245:4,5

create 15:7 16:1
18:14 26:13,14
30:5 50:9 62:5
114:14 126:21
173:22 178:25
179:3 185:15

created 70:14
71:13,19 128:12
130:8 174:18

178:23 232:23

creates 15:13 29:22
30:1 201:25

creating 22:13
114:17

creative 78:1,3 81:12

credential 80:6

cross-referenced
98:21

CSR 261:24

cultural 157:11

current 28:8 137:7
144:24 198:25
199:2

currently 137:18
144:22 198:19
205:9 206:5

curriculum 153:11

cursory 177:7

customers 246:13

Cut 232:25

Cyril 2:25 5:8

---

## D

d/b/a 1:4

DAISY
26:1,10,11,19,23,2
5 27:9,11,15,21,24
28:1,11,15,18
29:1,7,13 35:2

Daproim 210:4,15

dash 181:9,12

data 174:17 248:19
249:4,6

database 78:16,17

date 1:16 55:21
128:12 179:16

dated 4:20

day 191:1,16 200:18

Case 1:13-cv-01215-TSC Document 204-45 Filed 11/13/19 Page 78 of 110
Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015
Page 11

255:7

**days** 68:5

**day-to-day** 187:5

**DC** 2:4

**deaf** 109:10 151:7

**deal** 35:9 50:3 63:25
188:12

**dealing** 188:11

**deals** 155:22

**decided** 40:13

**decision** 39:15 40:5,7
146:1

**decisions** 83:8

**declaration** 39:3,6,14
82:4,9,20

**dedicated** 18:20

**deeper** 165:12

**Defendant** 1:11 2:18
6:7,8 83:2 90:22
203:23

**Defendants** 11:7

**Defendant's** 9:8

**define** 136:12

**defined** 244:18

**degree** 21:14,18,21
135:8 241:22

**degrees** 21:11 242:17

**deliberate** 152:25

**deliberately** 152:20

**delighted** 222:10

**deliver** 80:17

**delve** 156:4

**department** 64:6
130:4

**depending** 102:9
149:20 200:13

**depends** 181:21

221:22 223:21

**depose** 255:7

**deposed** 7:10 39:11

**deposition** 1:14
5:7,12 6:15 7:17
9:19 10:9,16,20
12:2,7 189:17
191:2 235:7
254:14,24 260:2
261:1,13

**depth** 97:13 170:24

**Desc** 174:13

**describe** 22:18 30:13
47:18 62:3,14
104:16,18 109:6
147:16 172:10
173:14 177:10
237:2

**described** 14:24
17:23 18:1 19:11
80:13 105:1 107:13
158:11 182:9
186:17 206:23
207:3,5,6,8,9
220:13

**describes** 173:13

**description** 139:7
173:19 174:4,13,14
212:15 219:23
239:15

**descriptions** 224:9

**design** 153:5
235:20,21

**designate** 125:18

**designated** 148:8

**designation** 146:24

**designed** 30:10
139:18

**designer** 153:6

**designers** 152:20

**designing** 152:21

153:3

**desktop** 14:14 15:12

**detail** 175:10

**detailed** 159:9
184:13 212:14
238:7 239:15

**details** 20:23 30:18
84:17 127:9 157:24

**determination** 58:22
59:22

**determine** 57:24
126:14,18 139:11
176:3 193:17

**determined** 58:13
59:5,14

**develop** 13:3 27:17
29:19 33:16

**developed** 26:5,10
32:24 35:16

**developer** 20:2

**developing** 12:18
25:23 27:1 33:11
35:8

**development**
25:14,19 26:16
28:11 34:14 35:20
144:7,17,23 145:4

**develops** 30:14 32:15
145:15

**device** 100:7 160:13

**devices** 16:21

**diagnosed** 137:3

**diagnoses** 104:15

**diagnosis** 104:24

**diagrams**
185:9,10,13

**dictionary** 103:18

**difference** 84:19
106:4 193:4

**different** 14:25 17:16

19:8,12 28:17
33:12 34:22,24
42:17 67:8,9 78:16
87:8 89:24 101:14
106:8,13 109:14
134:21 137:6
147:23 170:22,24
174:12 179:3
199:10 200:13
201:13 202:1
210:14 242:8

**differently** 39:10
252:17

**difficult** 43:22 100:8
103:1 109:15
110:16 173:22
183:19 185:10

**difficulties** 141:20,22
191:3,8

**difficulty** 108:12
115:25 116:7

**digital** 11:20 13:8
15:21 16:10 18:22
29:21,23,24 30:14
64:19 111:4 112:7
113:22 114:11
133:20

**digitally** 160:14
223:24

**direct** 256:12 258:11
259:16

**directed** 96:5,17,25
121:3 231:4 246:24

**direction** 200:13
261:9

**directly** 50:3 163:20

**directories** 176:25

**disabilities** 13:1,2,10
17:9 19:1 36:11
37:3,11,24 40:21
41:8,22 42:5,16
43:7,13 48:23
49:10 50:8,10,17

52:6,18,21
53:15,21
54:2,11,22 55:4,18
56:1 57:25 58:15
59:15 61:18 64:13
66:7,17 67:15,22
69:10
71:1,14,15,18,24
72:3 73:22
76:5,11,16,18,24
77:10,13 78:18,19
82:13 83:3,14,25
84:5,9 85:6 91:9
99:16,25 101:4
102:19,20,25
103:15
104:10,11,14
105:4,24
106:22,23,25
107:6,8,13,16,21
108:12 109:3
115:14 122:19
132:22,23 133:3,11
134:12,14 135:7
140:7,9 152:15,24
157:13,15,16,22
163:3 165:22
167:19,24 168:5
205:12 206:6,24
207:4,12 208:12,18

**disability** 13:6 14:25
16:4 62:16 63:2,4
66:5 69:8
78:8,12,23
79:4,8,10,15,21,25
80:2,5,7,12,19,25
81:10,16,20 84:25
86:8,19,22
88:11,17 89:8 90:1
100:13 104:24
105:13 106:14
107:22 108:1,17
109:7,9,10,19,20
110:2,15 122:13
124:9,14,25
130:8,14,15,21
131:6,15 132:4

135:22 136:12
138:20 139:24,25
140:6,14 156:24
157:3,7 158:6
222:21

**disability-specific**
84:18

**disable** 42:10,15

**disabled** 30:25 32:13
41:5 43:16 62:23
63:13,23 76:14
84:20 85:19 87:12
101:11 109:6 129:3
152:20 153:23
154:5 177:24

**disabling** 42:4 43:14

**disadvantaged**
12:19,22 37:24

**disagree** 189:13

**disclose** 95:22

**discovery** 250:19

**discuss** 10:15 56:15
58:4 60:2 68:18
90:19 91:4 140:25
240:22

**discussed** 41:23
42:22 46:17,18
57:18,20,23 90:9
107:15 163:6 179:1
214:8 223:22
229:10

**discussing** 19:15
68:22

**discussions** 10:13
59:20 60:9 95:3,19

**disease** 108:3

**Disk** 92:18,22
175:19,23

**disparate** 67:7

**display** 111:22
112:2,3 153:4

**displays** 15:15

110:24

**dispute** 83:1

**distinguish** 101:13

**distribute** 53:8 54:1

**district** 1:1 39:23
40:5,10 136:18

**disturbance** 6:12

**divulge** 82:16 202:15

**divulging** 230:4
246:22

**doctor** 37:22 80:3

**document** 14:12,19
15:6,13,25 16:1,6
17:3 74:23 101:23
114:6 124:11
126:12,21 128:12
133:7 177:2,23
178:6,20,22
179:3,13 180:21,22
186:9,10,12,14
193:20 195:4
196:21,22 197:17
198:1,2 206:10
209:12 210:8
211:11,25
212:2,3,4,6 214:12
215:9 220:9,10
222:24 223:24
226:14,15 227:1
231:18 232:23
234:4,25 235:8
237:16 238:5
239:16 240:22
243:2 244:7,10,11
245:8 254:10,15
256:22 257:1,4,11
258:6,7,8,18 259:9

**documented** 180:12

**documents** 6:14
10:19,22,25
11:4,11,19,24 12:6
13:24 14:4 92:3
121:16,20 126:9
131:22 182:24

184:17 185:1,2,5
187:14,20,22
189:8,25 190:4,22
191:4,16 194:7
196:6 201:25 202:1
206:22 210:11
211:16,20
212:9,10,15,16,23
213:6,10,15,17
214:1,6 223:10
226:22 238:6
254:16,22 255:10
257:6 258:3,4
259:12

**domain** 77:25 81:12

**dominated** 31:5

**done** 18:11,12 56:13
58:9 75:18 83:9
89:24 166:6 196:23

**dot** 182:3

**dots** 15:11 194:19

**double** 148:17

**doubt** 162:20

**download**
76:12,13,18 78:9
81:4,10,12,15,21,2
3,25 201:24

**downloaded** 76:17
258:5,6

**draft** 141:7

**drafting** 63:3 65:13
98:5 141:4

**draw** 128:24

**drawing** 173:23

**drawn** 66:9 72:16,18
73:3

**drew** 112:17

**drive** 188:20
190:8,10,16

**drives** 188:4 190:17

**drop** 182:3

Case 1:13-cv-01215-TSC   Document 204-45   Filed 11/13/19   Page 80 of 110
Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015
Page 13

**dry** 243:13

**due** 131:5

**dues** 28:2,4,8

**duly** 7:2

**during** 11:21 30:4
141:15 144:16

**dyslexia** 36:16
103:15,22
104:3,11,23
105:2,15,23 106:10
109:11 132:22
134:13
135:1,5,8,12 137:3

**dyslexic** 13:9,23
22:14 23:23 26:12
48:18 79:9 85:22
103:2,3,9,11,21

———————
E
**e1** 155:2

**earlier** 17:23 55:1
58:6 70:5 82:8
90:18 113:15 121:2
127:5,8 134:3
165:8 187:23 195:9
198:6 209:8,24
210:17 211:4
224:11 227:24
229:10 231:16
246:5

**Early** 90:16

**easier** 30:25 66:6,16
67:14,22 69:9
70:11 71:1,24 72:2
104:3 150:21

**easy** 87:13 116:2
148:22 163:19

**eBook** 29:23,24
30:3,7,8 110:25
133:20 208:2,5,10

**eBooks** 13:9 30:9
41:16,21 42:4,15
43:7 51:1

**e-Commerce** 152:2,5

**economic** 63:8 64:9
66:8,13,18 67:3
69:11 70:16,21
71:2,16

**economically** 48:4

**economics** 63:12
64:16

**ed** 71:13 127:10,13
136:16

**edited** 65:16

**edition** 4:11 219:5,20

**educated** 153:7

**education** 67:12
79:14,16,17,18
88:10 130:4

**educational** 21:10
32:7,8 129:18
130:2 157:12 211:2

**educator** 210:16

**Edward** 98:9 154:23

**effort** 30:16 50:11

**efforts** 25:20 142:8
144:10

**egress** 221:3

**eight** 10:17

**eight-year-old** 187:2

**either** 90:24 131:18
247:19

**elaborate** 246:25

**electrical** 21:6,16
209:22

**electronic** 11:22 81:6
132:2 202:22
246:13

**elements** 26:22
140:10 238:3

**elephant** 173:16,18

**eligible** 53:16

**else** 10:3,5 12:5 79:12
90:23 105:19
113:15,19 119:2
124:14 141:3,7,10
143:16 249:25

**else's** 113:19

**elsewhere** 101:24
238:25

**eluding** 31:4

**e-mail** 2:5,11,16,22
4:20 187:7
256:18,24 257:10
258:12

**embosser** 15:9,10

**employ** 231:20

**employed** 20:7 27:5
142:18,19 187:4
232:4

**employee** 261:17

**employees** 13:13
27:16 143:1

**employment**
19:18,23

**enable** 210:10

**enabled** 81:24

**encountered** 141:15

**encourage** 32:6,11
213:25

**encouraged** 214:5

**encouraging** 31:23
48:21

**endeavor** 48:19

**Energy** 235:20

**engage** 22:6 211:19

**engaged** 116:10

**engagement** 132:8

**engaging** 33:4

**engine** 31:6

**engineer** 21:7 23:11

**37**:22 93:2
123:8,13,18,22
142:14,20 176:3

**engineering** 20:20
21:13,15,17 124:4
160:5

**engineers** 1:6 6:5
123:23 159:6

**engines** 30:25 31:7

**enlarge** 16:13 17:5

**enlarged** 16:22

**enlargement** 15:2,23
103:23 163:13

**enlarger**
112:10,13,15

**enlargers** 110:25

**enlarging** 16:14

**enrolled** 79:13

**ensure** 54:1 213:17

**ensured** 80:24 84:8

**entire** 18:18 162:3,10
182:18,20 183:3
233:12,17,24
234:1,7,9 239:8
241:14

**entirety** 95:2,18
138:22 240:13

**entities** 29:13 32:14
51:25 52:1,2,4 75:3

**entity** 26:5,6,15
54:15 55:24 56:10
57:4,11,13,24
58:13 59:1,14
60:4,13,19 61:5
76:21

**entity's** 58:14

**enumerate** 210:14

**EPUB** 26:2 29:19,22
30:5,6,15

**equivalent** 14:17
15:1,9,12 148:13

CAPITAL REPORTING COMPANY
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015
Page 14

error 98:19
181:18,23 182:13
183:7 226:19
241:23,25

errors 180:21,24,25
181:15,20 183:10
184:25 185:2,6
212:1 213:18
225:10,16,17,22,25
226:9,11,16,21,23
232:24 233:5
241:10,12,21
242:3,4,12,18
244:6,11,14 245:3

especially 13:1,2,11
32:7 99:16
101:17,20 103:3
164:25 173:2 215:9

ESQ 2:3,8,9,14,19,20

essence 66:3

essentially 64:1
210:12

estimate 122:15
150:6 169:16

estimated 135:20
136:25 137:16

ethical 74:4

evaluate 120:10
121:25
140:8,13,18,19
154:21,25 155:1
166:13 175:11
203:9,20 204:2,17
205:20,23 206:1
208:5 214:22,23
217:9 218:22
220:10 221:7 227:2
249:22 251:1
252:14

evaluated 138:10
166:9 207:25
215:21,24 216:2
218:6 220:19

evaluates 142:23

evaluating 60:25
139:20 141:10
156:2 159:10 163:2
175:9

evaluation 141:19
142:9 227:6

evaluator 211:24

evening 191:15 256:3

event 93:16

events 93:15

eventually
116:3,18,25

everybody 78:1,2
149:12

everyone 150:2
201:24

everything 8:7
148:23 242:14

evidence 34:9,19

exact 17:22

exactly 29:17 159:17

examination 3:4 7:5
177:8 192:1 227:19
256:1

examine 121:4

examined 125:25
126:4 169:4,11
208:25

example 16:1,16
18:13 19:3 29:6
43:2 45:10 74:7
87:16 102:3 103:5
107:25 118:3,20,22
132:1 140:12,19
151:17 160:3 171:2
173:24 174:16
182:20 199:21
211:25 220:15,24
224:21 225:8
241:20 243:4,22

examples 152:10
181:2

except 15:13

exception 51:23,24
52:11 62:6 64:5
68:2 249:10

exceptions 52:17
55:17 73:4,5

excerpt 234:12

excerpts 220:3,5

excited 41:5

exclude 152:20

excluded 96:5

excluding 141:6
206:7

exclusion 152:23

exclusively 52:21
53:1 167:18 168:4

excuse 25:24 36:9
37:8 122:21

Executive 20:14 22:5

exhibit
4:3,6,8,10,13,17,20
64:22,23 65:3
68:22 70:2,8 73:7
75:10 97:21,23
145:23 149:2
192:17 209:15
210:4 219:9,10
220:15 234:16,17
235:2,10,11
236:8,11,14,17
240:3 241:9 244:15
256:13,15

Exhibits 4:1,23 242:8

exist 47:1,16

expanded 182:18

expect 27:21 223:3
241:12

experience 34:6
46:10,15 105:12

195:2,3 197:16
208:19

experienced 187:9
197:24

experiences 68:22
69:2

experiencing 191:8

expert 4:6 9:8,20,22
11:6 23:18 24:16
25:5,9,14 35:23
36:10,16,21
37:2,17 38:23,25
39:1 73:2 82:17
89:15 90:2,20
91:4,5,8,12,21
92:1,11,13 95:25
96:16
97:7,10,17,18,21
98:8 101:24 104:14
118:6,19,20 121:10
125:25 126:16
131:21 132:8
140:20 142:7 146:6
167:4 179:18
192:16 203:15
204:16 214:18
215:16 218:22
221:24,25 247:24
250:1 251:5 259:13

expertise 22:1,9
24:5,22 37:8,9,22
144:13 153:12

experts 24:1

explain 14:1 15:4
17:24 29:19 30:23
69:18,24 100:4
101:20 116:6 186:3
242:7

explained 227:24

explaining 100:14

explanation 127:14

express 70:16 208:13

expressed 10:6 46:10

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015
Page 15

67:10 71:6,13,17
72:12 237:3 247:25

**expressing** 25:3
236:3

**expression** 73:20
238:20

**extensive** 85:7
196:24

**extent** 10:1 22:15
23:5 202:14
215:3,11 230:4,6
231:1

**extra** 166:7 170:6
251:6

**extract** 185:25

**extremely** 73:10

**eye** 159:9

---

F

**facilitating** 235:6

**fact** 34:21 90:25
154:19 163:23
166:4 247:13
248:15,18,24

**factors** 138:13,17,25
139:3

**facts** 34:8,18 61:14
247:16,24 248:19
249:4,6

**faculty** 84:13,20,21
85:8

**failed** 153:6

**fair** 10:3 102:13
191:6 207:10

**fairly** 77:21

**fall** 249:5,9

**falls** 223:22

**familiar** 7:16
22:14,18 23:5,25
28:19 29:16 30:18
31:16 32:18

33:5,19,21 34:20
35:14,20 45:22,23
51:18 85:10,12
89:16 92:24
93:5,8,9,24 94:7
145:13 151:2,11
157:24 237:14

**familiarity** 23:8
216:5

**familiarize** 23:13

**fancy** 182:24 183:2

**farther** 125:17

**fatigued** 17:4

**favor** 51:8

**feature** 103:8 162:24
199:19 200:25
201:8,18

**February** 90:17

**Federal** 29:9 261:13

**Federation** 82:20

**feed** 181:12

**feedback** 33:2

**feel** 112:2 163:16
180:13 187:18
222:24

**fees** 145:3,7

**felt** 83:18 133:18
165:13 226:13

**Fenwick** 2:19 9:13

**fiction** 47:24

**field** 46:19 47:21
85:17 88:17 91:23
122:23 123:3
148:11 153:9 181:3
197:5

**fields** 35:19

**fight** 188:1

**figure** 67:17 158:19
182:14 199:10
236:10,13,16,22

237:4 239:5

**figured** 165:13

**figures** 237:8 239:20

**file** 14:19 15:10
18:17 79:15 80:25
81:16 112:7 114:14
254:18

**files** 188:19 190:10
191:18 252:12

**final** 65:17

**Finance** 20:11

**Financial** 20:12 22:5

**financially** 261:16

**finding** 116:7 118:2
180:16

**fine** 38:12 108:3
157:10 188:12
249:7

**finger** 15:17

**finish** 8:13,18 69:21
172:3,5 200:17

**finished** 7:22 72:6
130:25 189:5,19

**fire** 1:4 6:1 93:10
122:23 218:16,21
221:13,21,23,24

**first** 4:13 6:10 7:13
18:7 40:19 51:11
65:22,23,25 66:11
69:22 70:1 116:12
121:15 132:19
143:10 149:5
164:21 166:15
171:3 181:11
190:18 204:24,25
234:2,13 241:18
245:8 258:12

**fit** 108:25 174:5,8

**five** 98:6,25 166:18
227:11 229:19,23
230:1,9

**fixed** 152:11

**flippant** 251:7

**flipped** 98:20

**Floor** 2:15

**fly** 18:11

**focus** 33:16 46:5 68:3
102:7 110:6 139:19
140:9 141:16
142:24 144:14
149:24 186:14
200:19 215:1 246:7

**focused** 68:6 87:8
138:19 142:1,8
165:10 229:13

**focuses** 26:21

**Focusing** 170:11

**follow-ups** 19:9

**font** 181:6

**force** 147:13

**foregoing**
261:4,6,10,12

**foreseeable** 191:9,10

**form** 11:22 15:6,21
30:3 79:22 139:13
144:19 237:18,20
238:12,16 244:10
253:24

**formal** 58:25 155:22

**format** 30:7,8,9
112:7 169:14,20,24
176:2,14,18,21,22
177:6,13 180:1
188:10
212:11,19,20 225:2
231:11,14 232:15
247:2,20 248:15,25
252:7,25 253:10,20

**formats** 13:25 14:5
30:8,10 64:19
114:15 169:6,10
170:3,6 207:7

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015
Page 16

formerly 85:21

forming
205:14,17,21,24
206:2 247:25

for-profit 20:2

forth 261:5

Forum 29:21 30:14

forward 73:16 162:8

foundation 26:17
27:2,18 29:4 31:15
39:17,25 40:14
41:11,24 43:11,19
47:7 50:19 51:3
60:21 61:7,20
63:9,21 64:12
66:19 71:4 76:7
77:1 79:1 81:2,18
84:2,12 86:12,25
87:6,18 88:24
127:4 128:22
158:13 159:3
168:15 169:8
212:12

fraction 158:3

frame 21:1

Francisco 2:10,15,21

Frankly 249:14

free 46:1 99:11
112:19,20 115:17
116:4,16
133:1,12,15,23
143:12 160:17,21
161:11,15 201:24
205:6,16 206:12
207:22 213:17
215:17 216:16
224:14 246:7
249:23 250:10
252:13

freely 27:22
146:18,19 206:16

frequently 157:13
159:7 184:9

fresh 70:18

Friday 1:16 5:2

friends 28:18

Fruchterman 1:14
3:3 4:3,6,20 5:8
6:13 7:1,9,11 192:3
227:21 254:21
255:8 256:3

FTP 189:24

full 7:8 28:16,25 35:3
132:19 155:21
172:10 191:1,16
204:25 244:11
255:7

full-text
140:15,20,24

full-time 19:23

fully 195:7 256:10

function 164:5,16,25
165:18 166:1 178:7
195:22 196:6,21

functional 104:16
138:19 139:4,6
140:5 141:19
147:21 148:24
156:3 220:12
233:11 234:6

functionality 170:20
178:10 195:10
196:23 229:13

functions 139:14

funded 20:19 27:25
28:1 130:3

funders 29:16

funding 29:9 130:1

―――――――
G
―――――――

game 10:3

GCH 21:6

gee 166:16,20

general 30:12

49:16,23 50:16,24
51:6 135:4,21
136:7,11,15
137:1,5,11,17
139:11,21 140:8
154:3,4 158:17
167:6,24 212:16

generalize 17:7 103:2
108:10

generally 14:14
18:7,25 27:4
41:9,22 47:3 48:24
68:15 76:23 77:11
87:23 99:13,21
102:1 105:14
135:13 139:5
147:24 148:8
150:24 152:14
154:5 165:9 166:5
173:14 184:19
185:1 194:16
196:12 197:18
212:10 223:10
224:4,6 234:5
241:18

generated 225:24

Germany's 45:24

gets 15:18 17:1 46:17
109:20 222:21,22

getting 33:2 50:6
51:5,8 71:18
116:11 165:12
190:3 200:18
206:18 223:23
251:2 255:12

give-away 193:25
194:2

given 243:15 261:11

glass 102:5 134:4

goal 18:21 30:24 32:5
56:1,6 67:13,21
92:14

goals 147:21

gone 45:25 51:6
75:14

Google 83:17 118:7,8

gotten 154:1

government 29:10
33:13 52:5 55:3
75:12 148:1

grabbed 155:21

gradations 165:12

grant 29:7

grants 28:2 29:2,3,13

graphic 171:2
173:5,8,10,19
184:13 236:19
237:24,25
238:19,20,24
239:13,15

graphical 217:6
218:3,5,7 238:3

graphics 175:11

great 9:2 38:21 73:21
95:8 107:1,7
133:2,10,13
134:8,23 146:11
184:5 187:5 194:24
235:16 236:18

greater 176:21 185:6

grew 137:20

group 26:21 78:8
154:7

grouped 242:19

groups 13:4 26:20,25
33:12 101:14
134:22

guess 7:19 19:13
31:25 34:20 42:25
50:14 63:18 140:24
146:12 155:2 177:7

guidelines 144:1
147:2,5,8 149:3,13

Guild 39:9 43:2 82:2

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015
Page 17

83:16

**guy** 191:17

**guys** 10:23 188:2
189:4,6 190:20
191:12 202:7
228:25

_____

H

**half** 134:16,17
135:17 136:20
137:1,17,21 181:11

**hand** 18:17 234:12

**handbook** 230:19

**handed** 112:6 113:22
239:17

**handful** 50:4

**happen** 81:16
183:5,11 184:8

**happened** 256:8

**happens** 143:2 184:6
199:2

**happy** 24:13 142:3
188:16 207:17
237:14

**hard** 43:14 77:3
87:12 88:18 106:2
108:10 116:19
131:8 150:25
184:14

**hardest** 102:1

**harm** 71:1

**hassled** 152:8

**HathiTrust** 39:8,10
82:3,23 83:7 85:12

**H-A-T-H-I-T-R-U-
S-T** 39:8

**haven't** 46:25 60:24
90:6 92:7 198:22
208:25 238:6
242:22

**having** 7:2 67:11

72:18 77:2 78:7
95:25 106:2 107:13
113:19 114:3 116:7
131:8 135:21
145:19 146:15
159:8 205:2

**head** 8:10 172:21
250:7

**header** 171:24,25
172:8,9,22

**heading** 204:25

**hear** 242:5

**heard** 34:13 42:21
89:19,21 93:1
104:16 106:24
107:4 135:11
190:18

**heating** 1:6 6:4 123:3

**held** 5:12

**Hello** 256:4

**help** 18:21 27:17
30:20 41:5 68:4
90:20 105:15,22,23
107:8 113:15
163:25 170:18
222:25 238:23
239:14,25

**helped** 107:1 141:7

**helpful** 31:25 91:2
103:24 105:10
106:15

**helping** 62:22
63:12,23 64:18

**helps** 29:18 105:14

**hereby** 261:3

**herein** 261:5

**he's** 142:14,19 143:1
200:20 257:11

**hidden** 166:2

**hierarchy** 129:25
177:24

**high** 252:13

**higher** 67:12 71:12
136:16 224:2,4

**highest** 224:7

**highlight** 180:14

**highlighted** 103:7

**highly** 30:2

**history** 19:18 61:23

**hit** 16:4 178:19

**hits** 15:18

**hold** 20:9 108:3,22
172:2 237:10

**holding** 108:13

**hour** 38:10

**hours** 10:17 92:7
189:7,10 190:23
255:2

**House** 85:22 87:3

**HTML**
169:11,14,20,24
171:12 174:22
175:6,7 176:2,22
177:2 208:21
212:10
217:3,11,13,17
218:9,17 225:2,22
231:14

**human** 13:2,3 150:23
172:18 212:5 237:1
239:14

**Hundreds** 115:9

**hypothetical**
52:13,25 53:10
61:8 71:19 77:15
81:18 100:16 101:6
106:18 109:17
113:6,13 114:20
127:7 128:21
129:16,24 131:17
132:6 152:18
154:10 160:2 170:1
171:11 172:13

173:7 174:1,10
176:8 183:9,21
184:3,11,24
185:8,18 194:15
196:11 197:21
199:7 213:22
221:18 222:8,19
225:20 233:7
239:11 241:16
243:20 244:20
251:13 252:10
253:4 254:2

_____

I

**icon** 164:12,13

**I'd** 12:24 24:16 47:21
50:21 67:9,25
90:16 91:8 97:17
99:22 128:24 153:8
162:5 256:12

**idea** 114:14 165:1
245:4

**identification** 4:1
64:24 88:9 97:24
209:16 219:11
234:18 235:3
256:16

**identified** 91:11,20
247:16

**identifies** 247:24
248:19 249:4

**identify** 5:21 249:6

**IDPF** 30:17

**ignorance** 153:17

**I'll** 6:11 7:19,20,25
8:17 19:9 22:24
33:8 38:17 58:3
60:20 82:16 98:2
140:12 153:14
169:1 172:12 175:3
199:10 204:15
209:2 231:1 234:21

**illegal** 67:4,6

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015
Page 18

**illegible** 164:22

**I'm** 5:9 6:11 7:22 8:1
9:6,25
24:3,4,8,12,13
25:3,5 27:20
28:7,18,19 29:16
30:17 31:3,16
32:9,18 33:5,19,21
34:4,10,20,23,24
35:8,18,19 37:21
38:19,25 40:1
45:22,23 47:16
50:14,20 53:2 57:8
59:17 60:17
61:2,14,21 64:21
67:19 69:13 70:13
73:2 74:12 77:2
87:9 91:22 92:6,13
95:21 97:2,20
98:20 104:14 106:2
116:17,21 123:24
125:18 128:11,13
131:8,18 132:14
135:10,19 136:1
137:10,23 140:24
142:2,7 144:24
146:5,17 147:11
151:24 153:16
157:23 159:14,20
167:14 172:21
178:24 185:1
187:25 191:14,23
192:4,6,23 200:1
201:23 203:2
207:5,6,7,8,17
208:4 217:22 219:8
221:24,25 228:22
231:9 233:21
237:14 238:9,25
240:12,22 241:18
242:9,11,12
244:21,24 246:15
247:19 251:5,6
252:19,21 253:15

**image** 14:17 164:6
178:4,9 193:22
194:1,3 224:8

**image-based** 163:18
164:24 166:17,21
186:24 193:18
194:6
257:13,14,16,22
258:2,22 259:5

**imaged-based**
193:1,5

**images** 186:5,8,11
218:12

**imaginable** 100:9

**imagine** 88:16 100:5
157:15 185:19
188:25

**immediately** 19:22
257:3

**impact** 8:24 67:11
103:20

**impaired** 16:7 17:15
85:19 87:9,22
88:9,14 165:13
213:16 218:16
221:13 222:3
224:14,22

**impairment** 109:12
132:22 134:13

**impairments** 16:17
87:21 109:14
167:11

**implement** 31:22
57:20 75:23 163:12

**implementing** 218:1

**importance** 217:25

**important** 8:8
73:11,15
183:6,12,13 215:9

**impossible**
99:12,14,23,24
100:19 101:9,11

**impression** 73:3

**inability**

104:19,20,21

**inaccessible** 100:21
111:3 153:12 154:5
166:24 239:13

**inaccurate** 207:13
225:4

**inappropriate** 61:11

**Inc** 1:5,10 2:18 6:7,9
13:19 19:24
20:1,20

**inch** 194:19

**include** 110:23

**included** 99:21
125:24 126:10,15
171:5

**includes** 33:9 50:6

**including** 78:17 86:1
103:15 122:17
142:23 245:3

**incomplete** 52:12,24
53:10 61:8 77:14
81:17 100:16 101:5
106:17 109:16
113:5,12 114:19
127:6 128:20
129:15,23 131:16
132:5 152:17 160:1
169:25 171:10
172:13 173:6
174:1,9 176:7
183:8,20
184:2,10,23
185:7,17 194:14
196:10 197:20
199:6 213:21
221:18 222:7,19
225:19 233:6
239:10 241:15
243:19 244:19
251:13 252:10
253:4 254:1

**incomprehensible**
76:25 185:16

**incorporate** 30:10
147:21

**Incorporated** 6:5
21:6

**incorrect** 72:12

**incredibly** 154:7

**incur** 64:2

**independent** 59:13

**independently**
121:5,25 161:12

**index** 11:5

**indicate** 9:9 101:25
164:14

**indicated** 10:18 12:1
55:22 99:10 101:16
124:23 130:14
132:20 180:3
185:23

**indicating** 79:24

**indication** 81:7 160:6

**indicative** 127:12

**indicator** 194:13

**indicators** 194:5

**individual** 16:24
76:18 80:11 86:8
122:22 127:19
129:2,11 131:4
252:25 253:24

**individuals** 78:17

**industry** 17:12
41:9,23 45:14
46:1,11,13,18
50:3,25 63:1,23
67:7,8 71:2 83:10

**information** 19:1
34:16 84:15 139:5
170:18 171:18
174:20 176:3,5
218:15 221:12
222:2 237:1,24
238:20,21,22,24

239:6,13
250:16,19,24
251:24 253:5

**informed** 69:1 124:6

**infringed** 96:13 99:6

**infringement** 94:12
96:8 168:13,25

**initial** 68:5 242:15

**initially** 67:25

**injuries** 36:22

**injury** 108:4,7
132:23 134:13

**in-person** 142:9

**inquire** 247:23

**inquiring** 253:25

**inserted** 198:9

**inside** 194:17

**inspect** 193:20

**inspection** 176:25

**instance** 252:3

**instead** 91:3 100:20
194:6 199:15
214:11

**Institute** 21:12

**institution** 22:16
23:6

**instruct** 10:2 38:4
58:3 82:16 95:22
97:2 215:4,12
228:12 230:5

**instructing** 248:13

**instrument** 160:12

**instruments** 160:7

**intake** 210:13

**integrity** 73:13
74:1,8,20

**intend** 38:9

**intents** 100:21

**interact** 67:13,21
170:23

**interest** 14:15 44:25
45:15 157:18

**interested** 40:19
83:22 118:2 261:17

**interests** 34:22
43:13,15 44:3,6
45:1,7 63:8 64:9
66:8,13,18 67:3
69:11 70:16,21
71:2,16

**interface**
166:17,21,24

**interfere** 107:21
133:16

**interference** 5:20

**interferes** 108:8

**International** 1:4
29:21 30:14

**Internet** 41:8
115:13,23
119:4,10,24 120:6
149:13 150:3,7,16
151:3,6,12 214:13

**interpretation** 45:13
76:9,15

**introduced** 226:20

**introduces** 226:24

**intrudes** 68:17

**invested** 224:7

**investigate** 121:6
131:20,22,23,25
132:10 154:25
228:6 245:18

**investigated** 138:14

**investigation** 141:15

**involve** 26:1 33:4

**involved**
25:19,20,23,25
27:12 28:20 31:18

32:3,4,6 33:1,7
34:21 35:18
82:3,22 83:8 85:4
144:25 145:1 197:6

**involvement** 41:15

**I-P** 229:25

**iPad** 16:11

**Island** 62:4

**isn't** 166:1 180:11
237:25

**issue** 40:20 41:7,9
43:16 96:18 108:22
145:2 151:20 158:2
167:1 169:19
176:17 188:22
195:8 197:7
230:22,25 243:5
245:20,23 250:11
254:15

**issues** 22:2,10,19,23
23:9 25:9 42:3,8,21
43:18 56:16 70:9
82:12 83:7,13
94:15 154:8 181:19
237:15

**it's** 7:22 8:8 12:12
15:12 17:4,15
18:19 19:6 21:19
30:2,3,8 31:18
32:2,4 35:9 38:5
39:9 42:20 43:1
44:2,3,12,19,25
45:15 46:4,18 48:2
51:23 53:19 54:9
62:25 63:12 65:6
73:20 75:9 77:25
78:1,3,4 79:22
88:17 89:1 91:16
94:12 97:6
98:16,25 100:9
101:17 103:1
108:10 111:19
119:22 121:21
124:20 126:3
127:23 128:4 130:2

132:19,20 135:7
137:5,20 139:6
148:22 149:15
150:25 152:24
154:7 164:16,24
166:2 168:16
170:14 171:13,15
172:12 173:23
175:1 179:17
180:11 181:6,25
182:13 183:1,2
184:14 187:8
189:18 191:6
192:17 193:21
194:1,2,3,13
195:21,22 196:23
198:18 200:15
201:1 207:10,16
212:2 222:11,16
223:5,20 244:10
249:15 259:11

**I've** 39:1 42:21 48:7
51:4 92:6 95:24
104:16 121:2 155:8
196:23 197:6
207:5,6,7,8 226:8
231:4 234:21 244:5
254:10

---
J

**jaggies** 194:21,23

**J-A-G-G-I-E-S**
194:23

**James** 1:14 3:3
4:3,6,20 5:8 7:1,9

**Jim** 77:18 259:18

**job** 21:3 22:6 184:5
236:18 259:4

**Jordana** 2:3 5:23

**JOSEPH** 2:9

**journal** 4:3 65:6

**Jr** 7:9

**jrubel@morganlewi**

Case 1:13-cv-01215-TSC   Document 204-45   Filed 11/13/19   Page 87 of 110
Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015
Page 20

**s.com** 2:5

**judgment** 40:13
221:23 222:23

**July** 1:16 5:2,6

**jumping** 25:1

**justifications** 81:6

**jwetzel@kslaw.com**
2:11

―――――――
K
―――――――

**K-12** 136:15

**Kaplan** 2:19 6:6,10
9:25 10:10 14:7,10
17:10
22:3,11,20,24
23:10,20 24:7,24
25:10,16 26:17
27:2,18 28:14 29:4
31:14 32:17 33:20
34:2,8,18
35:6,17,25
36:5,12,17,23
37:4,12,19 38:9
39:16,24 40:14,22
41:10,18,24 42:6
43:10,19
44:1,17,22 45:8,21
46:24 47:6,20
48:5,12,25
49:6,17,24 50:18
51:2 52:12,23
53:9,22 54:6,16,24
55:10 56:3,12,14
57:5,14 58:1,16,23
59:6,16,23
60:5,15,20
61:7,19,25 63:9,20
64:11 65:19 66:19
67:16,23
68:11,15,25
69:16,21 70:3
71:4,10 72:4,9,20
73:19 74:2,10,22
75:4,20 76:6,25
77:14,18 78:14,24

79:1 80:4,14
81:1,17 82:5,14
83:4 84:1,11
85:2,15 86:12,24
87:5,17 88:5,24
89:9,18 91:6,13,16
94:5,16 95:5,7,21
96:14,24 97:2,4,8
98:12 100:1,15
101:5,22 102:23
103:13 104:5
105:6,11,25 106:17
107:18 108:16
109:16 110:21
111:12,23 112:22
113:5,12 114:1,19
115:1,15 116:8
117:3,18 118:11
119:5,11,15,19
120:11,18,25
121:11 122:4,24
123:5,10,14,20
124:18,20 125:1,17
127:3,6,25
128:9,20
129:5,15,23
130:16,23 131:1,16
132:5 133:6,25
135:24 136:4,23
137:13 138:12
139:15 140:2,17
141:5 142:13 143:8
144:8 145:16 146:3
147:9,18 149:14
150:11,19
151:14,23 152:17
153:1,24 155:6
156:1,17,25 157:9
158:13 159:2,17
160:1 163:4 164:2
165:6 167:13,20
168:6,14,18
169:1,8,25 171:10
172:2,5,12
173:6,25 174:9
175:1 176:7,23
177:15,21 179:6,18
180:7 183:8,20

184:2,10,18,23
185:7,17 187:21
188:9,25
189:6,12,17,22,24
190:25 191:14
194:14 195:13,16
196:10 197:2,20
199:6 200:17
201:10 202:12,23
203:7,11 204:7,13
206:9,17,25 207:14
209:1 211:5,12
212:12,25 213:21
214:2,15 215:3,10
216:7,13,20
218:10,20 219:1,16
220:3,22 221:17
222:7,18 223:12,18
224:16 225:6,19
226:7 227:4,11
228:11 230:3
231:1,22 232:8,17
233:6,13,18 236:5
237:10,21 238:17
239:10,22 240:9
241:2,15 242:2,10
243:19 244:4,19,22
245:10,25 246:9,21
247:6,11,15,22
248:11,17,22
249:2,16,21
250:7,13,20
251:12,21 252:9
253:3,13
254:1,8,23
255:1,6,11,14
257:7,19 258:25
259:18,24

**karaoke-style** 103:6
105:14

**Katherine** 2:8 6:3

**Katie** 227:22

**Kelli** 1:23 5:9 261:23

**key** 234:8

**keyword** 138:23

221:3

**keywords** 11:6,14,18

**kids** 187:8

**Kindle** 30:7

**kinds** 103:11 149:1
170:13 181:4 242:4

**KING** 2:8

**kmerk@kslaw.com**
2:11

**knew** 191:4
252:11,12,13

**knowledge** 17:22
121:22 130:17
169:4 239:2

**known** 21:12 85:21
91:22

―――――――
L
―――――――

**label** 32:8 172:23

**labeled** 42:20 78:18

**labels** 171:16

**lack** 153:17

**lacks** 27:2,18 29:4
31:15 39:17,25
40:14 41:10,24
43:10,19 47:7
50:18 51:2 60:20
61:7,20 63:9,21
64:12 66:19 71:4
76:7 77:1 79:1
81:2,18 84:2,11
86:12,24 87:5,18
88:24 127:4 128:21
158:13 159:3
168:14 169:8
212:12

**language** 54:9

**large** 14:21 16:1,8
173:2 194:11,21

**large-print** 16:5
17:13,20 114:13

Case 1:13-cv-01215-TSC   Document 204-45   Filed 11/13/19   Page 88 of 110
Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015
Page 21

**larger** 16:6 17:2
111:5 162:23
163:1,11,13,19,25
165:4 229:5

**largest** 13:7 85:20

**last** 10:14 19:14
65:22 72:15 75:9
99:9 121:14 137:4
145:1 192:5 256:9
258:11 259:16

**late** 191:15 200:18

**later** 30:13 116:17
189:4 191:13 197:9

**law** 22:15,23 23:5,19
24:6,22 51:23
73:14 75:22 147:13

**lawsuits** 151:25

**lawyer** 21:24,25
22:12 24:12,14
57:8,20 58:7
59:8,11

**lead** 112:5 233:4

**leading** 22:13 23:22
29:23 30:17 48:17

**leap** 73:16 242:12

**learning** 36:11 41:3
85:20 86:20
102:18,20,24
103:14 104:9,14,24
105:4,24 106:13,25
107:5,8,16 109:2

**least** 93:21 125:11
126:2 168:16
177:25 178:8 201:7

**leave** 187:15,17

**left-hand** 172:23

**legal** 5:10 21:22
22:1,9,19 23:8,20
24:1,8,12,16,25
25:4,5,10,17 27:19
31:14
36:1,6,13,18,24

37:5,13,20 39:2,4
42:25 52:13,24
53:9,22 54:6,17,24
57:6,7,15
58:2,16,19
60:6,16,22 61:8,19
70:12 73:2 76:6
94:6,17 96:15
101:7 120:19 121:1
128:9 145:17
149:21 168:7

**legally** 82:21 88:13

**legible** 182:21

**length** 19:9 53:14
172:9,16 174:5
212:1

**lengths** 24:11 53:18
75:14

**less** 10:17 30:17 44:8
84:17 92:8 122:11
126:1
134:15,17,18,19
135:17 136:20
137:1,16,21,24
163:18 259:11

**let's** 14:12 18:6 19:18
26:9 31:10 38:15
46:5 95:7 98:22
149:24 158:19
171:3,5,13 179:10
182:12 186:20
191:25 202:5
203:11 207:5
210:15 220:25
248:3 252:11

**letter** 73:14 194:18
198:10 199:3,5

**letters** 98:20 182:16
194:12
198:11,12,14
241:20 243:24

**letting** 43:8

**level** 28:8 40:2,10
147:12 148:2,10

149:24 150:3,8,17
151:4,7 224:1

**levels** 147:23,24
148:6 149:16

**Lewis** 1:20 2:3 5:12

**libraries** 23:23
26:12,14
27:6,10,16 35:9
79:8 83:17,18,24
85:4

**library** 13:8 22:13
48:17 57:21 70:14
85:18,19 86:1
130:9 259:4

**license** 1:24 78:4,5
145:13,19,22
146:2,14,16,19
160:23,25 161:3

**licensed** 78:3 146:17

**licensing** 25:9 31:17

**Life** 215:21 216:6,12
219:5

**likelihood** 185:5

**likely** 30:2,3 127:14
136:7 158:19 170:4
176:24 181:7
226:21

**limit** 248:1

**limitation** 108:7

**limitations** 213:12

**limited** 36:4 37:9
182:14

**line** 3:12 104:20,21
181:12 189:19
256:22 257:2

**line-by-line** 242:14

**Lingane** 4:4 65:12

**link** 116:17 161:17
174:17

**liquid** 38:2

**list** 72:25 98:24

118:23 126:5,6
130:6 134:11 230:8
242:13 257:5

**listed** 11:12 95:25
117:4 127:10
141:21 166:15
229:19 230:13

**listen** 221:2 233:25

**lists** 240:6,25

**literary** 52:16 53:8
54:22

**litigation** 38:24
90:9,14 91:21
95:3,18 99:6
120:17,24 167:1

**little** 16:9 30:13 32:1
38:2 49:12 90:18
112:16 131:9
137:10 206:18

**LLP** 1:20 2:3,14,19

**load** 254:18

**locate** 116:19
165:17,25

**located** 12:12 143:3
161:16 238:25

**LOCATION** 1:20

**locations** 143:3

**lock** 178:1

**logged** 81:3

**logical** 171:22 236:6

**logo** 182:24

**long** 10:15 13:15
20:7 38:12 114:23
115:3 137:20
168:16 174:13,14

**longer** 14:18
174:4,15 215:22

**longest** 115:8

**longstanding** 197:5

**lost** 245:7,8

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015
Page 22

**lot** 30:9 70:9 85:3
106:24 150:16
172:14 193:20
196:24 222:9
226:24

**loud** 66:1 217:23

**low** 102:14 110:25
133:18,21 134:15
165:9

**low-vision** 102:3,4
163:7 229:11

**lunch** 138:2,5 188:18

———— M ————

**Mac** 16:12

**machine** 261:8

**machining** 160:5

**machinists** 159:6

**Magnesium-Alloy**
155:16,20

**magnification**
164:23

**magnifier** 163:10,21

**magnifying** 102:5
134:4 194:18

**main** 144:4

**mainstream** 50:5

**maintain** 11:20
194:12 254:20

**maintaining** 70:25

**major** 31:5 45:24
46:18 47:19 50:4
63:24 79:8 80:1
152:9

**majority** 28:20 107:7
133:3,10,13
134:8,23 187:5

**Malamud** 11:17
60:2,10 89:22
90:3,10 214:5

**mandatory** 147:8

**manner** 167:17

**Manufacturers**
33:13

**manuscript**
226:18,22

**march** 223:25

**mark** 38:10 64:21
97:21 219:8

**marked** 64:23 65:3
68:21 97:23 209:15
219:10
234:16,17,25 235:2
256:16

**Marketing** 20:6,10

**marking** 256:13

**markup** 224:9

**Mary** 98:10 166:11

**mash** 181:7

**mashing** 182:10,19

**master's** 21:18,21

**material** 31:24 32:7
43:9,15 55:9,16
96:4 100:13,25
101:18,25 103:21
104:2,21 111:4,16
157:12 167:12
168:10,12,20,24
217:7,10,13,16,21,
23,25 218:3,5,8
220:14,17,21 221:8

**materials** 1:3 5:24
14:3 37:10 39:18
46:9 50:9 53:20
54:10 75:15,19
76:3,22 77:8 78:12
80:9 86:9,23
102:16,21 157:14
158:24

**math** 134:23

**Matt** 190:2

**matter** 38:24
39:2,4,7,12 135:7
154:19 190:19
192:7 227:23
237:14

**matters** 24:13 25:6

**Matthew** 2:20 6:8

**maximum** 32:11

**may** 7:21 15:1 44:14
52:8 88:2 89:2
90:24 109:13
116:20 132:11
134:5 145:2 153:21
186:1 187:8 196:7
225:16 226:12

**maybe** 21:3 94:22
140:12 183:3
199:9,10 252:19

**MD** 37:21

**mean** 9:7 14:1 29:24
31:20 32:3 34:23
42:23 66:16 68:11
72:18,24 73:18,25
100:4 109:18
141:17 146:20
148:14 149:17
152:9 182:10,23
189:6 194:16
195:15 243:17
246:23 255:7 257:5

**meaning** 32:19
183:11

**meaningful**
187:13,25

**means** 32:22 166:5
187:24 249:19

**meant** 38:3 206:15
207:18,21

**measure** 115:7
160:11

**measurement** 158:24
159:7 160:4,13

**measurements**

159:11,25

**measures** 147:22

**mechanical** 123:8
160:4

**mechanism** 46:1
79:11 110:10,13
167:9 178:3 223:11

**mechanisms** 44:8
45:6,11,12 46:21
47:4,15 48:3,22
50:7 51:1,9 79:3
80:17 113:17
177:23 210:13,14

**media** 45:23 46:7,18
47:13,18

**medical** 37:21 109:8

**medications** 8:23

**meet** 52:4,10 53:6
54:21 110:3 122:16
148:2 192:8

**meeting** 17:14 89:23
147:11

**meets** 259:3

**member** 27:5,10,16
28:24,25 35:3
129:8 167:24

**members** 26:20
28:10,16,17 30:17
34:21 145:7,9
158:3

**membership**
28:2,4,16,21
33:10,17,22 34:17
78:15

**mention** 66:13
107:11 146:7

**mentioned** 26:5
29:1,18 30:21
32:15 33:16 35:2
41:14 42:18 54:13
58:5 65:10 82:2
90:24 92:10 96:7

103:25 105:22
106:8 110:24
113:14,21 127:5,8
134:3 209:8 242:17

**mentions** 140:21
257:4

**Merk** 2:8 3:8 6:3
7:21 227:8,20,22
228:15 230:11
231:6 232:1,13,20
233:9,15,20 234:20
235:5 236:7 237:17
238:8 239:3,18
240:1,11,15
241:7,18,24 242:6
243:3 244:1,13
245:17 246:4,11
247:1,8,13,18
248:8,13,21,23
249:14,17
250:2,8,15,22
251:16,23 252:18
253:7,17
254:6,12,25
255:4,9

**met** 89:22 90:3,5,6

**metadata** 26:3 30:22
31:7,8,13 125:14
218:12

**metal** 155:13,14,22
160:10,11

**method** 17:23 155:25
158:23 186:3
231:20

**methods** 79:6,21
80:12 155:18

**Microphones** 5:18

**Microsoft** 16:2 19:4
170:5 178:13
181:10 194:4,8
197:11 212:18
232:25

**middle** 181:9 198:14

**mild** 135:8,12

**mils** 160:6

**mind** 55:5 70:18
152:4

**minimize** 6:11

**minority** 152:21

**minute** 118:15

**minutes** 38:14,16,20
116:15 161:3
188:16 227:12
245:11

**mirror** 14:21

**mischaracterizes**
118:11

**misleading** 48:25
74:23 101:23 125:2
156:1 179:6 202:23
206:10 207:14
216:20 233:13
242:2 257:20
258:25

**misread** 98:14

**mis-recognized**
242:17

**misrecognizes** 182:2

**missed** 225:25

**missing** 198:13 225:4

**mission** 2:15 12:15
52:6 55:4 59:15
61:18

**missions** 52:8 55:25
57:25 58:14

**misstates** 22:20 35:7
49:17 54:16 56:3
72:4,9 74:22 80:14
82:5 87:17 88:6
100:15 101:22
107:18 111:23
112:22 114:2 116:8
120:11 125:1
133:6,25 135:24
136:23 140:2 146:3

153:1 167:20
195:16 202:24
206:9 211:5 212:25
224:16 231:22
232:8

**misstating** 136:5

**mistakes** 181:4

**modern** 199:23
200:1,6

**moment** 23:4 31:4
154:3

**more-than-10-year-
ago** 199:17

**Morgan** 1:20 2:3
5:12

**morning** 5:5 6:14 7:7
10:19 190:2,3,18
192:12

**motivations** 70:7

**motor** 108:3

**Mountain** 2:20

**mouse** 180:15

**move** 191:25

**movement** 13:3

**moving** 70:11

**MP3** 18:15,17

**multimedia** 170:16

**multiple** 79:2 149:16
157:15 162:6 169:9
170:13

**Munger** 2:14 5:25

**myself** 23:13,24
24:16 25:5 251:6

_____
           N
_____
**narrating** 18:16

**narrow** 154:2,7

**narrowly** 37:15
66:10 72:16,19

73:3 87:8

**national** 1:4 6:1
82:19 85:16,18,23
88:22

**nationally** 91:22

**nature** 24:9

**navigate** 161:14
220:25 229:1

**navigating** 116:19
234:7

**necessarily** 104:23

**necessary** 23:6 176:5
189:9 191:7 203:6

**negative** 248:12

**negotiations** 62:20

**neither** 261:16

**NF** 125:16

**NFPA** 2:13 4:10
93:6,11,15
98:6,16,18 118:21
125:11,23
126:10,14,18
127:1,20,24
128:5,17
129:3,12,22 130:11
142:8 151:16
192:6,25 197:10
202:3 205:7,21
208:2,6,10,16,24
209:9,21 214:19,22
215:18 216:16,22
218:17 219:5,20
221:14 222:4 227:1
231:19

**NFPA's** 128:7 143:7
246:6

**NLS** 85:20
86:7,15,17

**nobody** 124:10 141:7

**nodding** 8:10

**Nods** 250:7

**nondisabled** 84:20 101:10

**none** 157:20

**nonlegal** 57:12

**nonprofit** 12:12,14 13:16,18 26:20 52:5 54:14 55:3 61:15 75:12 86:2 142:15

**nonprofits** 12:19

**non-text** 151:11,21

**Nope** 123:15

**nor** 261:17

**normal** 178:10 181:8 195:10

**normally** 223:2

**notations** 154:16

**note** 5:16

**notebooks** 11:20,21

**noted** 51:4 118:21 260:3

**notes** 126:21

**nothing** 161:8 192:12 194:5

**notice** 34:7 55:12,14,15 168:11,22 183:1 217:6

**noticed** 177:9 242:15

**notices** 55:8

**NPFA** 98:16 179:16,23 214:22

**NW** 2:4

**O**

**o0o** 5:3 7:3

**oath** 192:10 256:6 261:7

**object** 9:25 60:20

95:21 124:18 136:4 172:3,13 187:21 230:3 231:1 243:19

**objected** 88:19

**objecting** 70:10

**objection** 14:7 17:10 22:3,11,20 23:10,20 24:7,24 25:10,16 26:17 27:2,18 28:14 29:4 31:14 32:17 33:20 34:2,8,18 35:6,17,25 36:12,17,23 37:4,12,19 39:16,24 40:14,22 41:10,24 42:6 43:10,19 44:1,22 45:8,21 46:24 47:6,20 48:5,12,25 49:6,17,24 50:18 51:2 52:12,23 53:9,22 54:6,16,24 55:10 56:3,12 57:5,14 58:1,16,23 59:6,16,23 60:5,15 61:7,19,25 63:9,20 64:11 65:19 67:16,23 68:25 70:3 71:4,10,17 72:4,9,20 73:19 74:2,10 75:4,20 76:6,25 77:14 78:14,24 80:4,14 81:1,17 82:5,14 83:4 84:1,11 85:2,15 86:12,24 87:5,17 88:5,24 89:9,18 91:6,13 94:5,16 95:5 96:14,24 100:1,15 101:5,22 102:23 103:13 104:5 105:6,11,25 106:17 107:2,18 108:16 109:16 110:21 111:12,23 112:22

113:5,12 114:1,19 115:1,15 116:8 117:3,18 118:11 119:5,11 120:11,18,25 121:11 122:4,24 123:5,10,14,20 125:1 127:3,25 128:9,20 129:5,15,23 130:16,23 131:16 132:5 133:6,25 136:23 137:13 138:12 139:15 140:2,17 141:5 142:13 143:8 144:8 145:16 146:3 147:9,18 149:14 150:11,19 151:14,23 152:17 153:1,24 155:6 156:1,17,25 157:9 158:13 159:2 160:1 163:4 164:2 165:6 167:13,20 168:6,14 169:8,25 171:10 173:6,25 174:9 176:7,23 177:15,21 179:6 180:7 183:8,20 184:2,10,18,23 185:7,17 194:14 195:13,16 196:10 197:2,20 199:6 201:10 202:12,23 203:7 204:13 206:9,17,25 207:14 211:5,12 212:12,25 213:21 214:2,15 215:3,10 216:7,13,20 218:10,20 220:22 221:17 222:7,18 223:12,18,19 224:16 225:6,19 226:7 227:4 228:11 231:22 232:8,17 233:6,13,18 236:5

237:10,21 238:17 239:10,22 241:2,15 242:2,10 244:4,19 245:25 246:9 247:6,11 248:2 249:21 250:13,20 251:12,21 252:9 253:3 254:1,8 257:19 258:25

**objectionable** 248:2

**objections** 36:5 74:22 169:2

**objective** 148:25

**obligated** 88:13 190:25

**obtain** 80:20 114:7 176:5

**obtained** 179:4 225:1 226:5 227:2

**obvious** 252:15

**obviously** 166:22 187:21 226:14

**occasion** 90:12,13 93:3 200:4

**occasionally** 182:3

**occur** 180:18 202:20 203:5 204:11

**occurred** 203:2 226:21

**occurs** 226:16

**OCR** 4:17 100:7 181:3,4,7,17,20,23, 24 182:2,13,25 183:7,10 184:5,14,22,25 185:2,21 186:7,11,13,16,24 194:19 199:4 200:12,14,24 201:8,18 211:25 223:7,11,16,22,23 225:10,17,25 226:9,15,24

Case 1:13-cv-01215-TSC   Document 204-45   Filed 11/13/19   Page 92 of 110
CAPITAL REPORTING COMPANY
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015
Page 25

232:16,24 233:4 236:18 241:5,10,23 242:3,18 243:22 244:5,10,12 245:3 256:22 257:1

**offer** 249:18,24

**offered** 117:12 206:8 252:8 253:1,21

**offering** 170:22

**offers** 245:19

**office** 2:20 143:2

**Officer** 20:12 22:5 27:13 261:1

**Oh** 152:7 181:25 219:17 235:13 254:13

**okay** 7:15 8:11,16 9:14 10:24 11:25 14:8 15:22 19:10,17 26:8 30:11 38:7,15 40:4 41:18 51:15 56:16 62:10 68:12,13,19 69:4 70:20 72:9,14 74:17,24 77:7 79:20 88:21 91:18 95:8 96:25 97:3,6,9 106:7 107:10 116:24 119:17 124:20 125:21 127:8 132:12,13,16 136:1,6 146:5,11 155:21 171:4 172:14 175:1,3 179:10,20,22 189:21,22 191:24 192:23 195:19 199:17 200:15,21 201:12,15,20 203:13 220:2 227:13 234:19 235:4,16,18 237:9 238:11 240:4,18,22 243:6,8,11 246:16 248:5 249:16 250:6

253:15 255:1 259:16

**Olson** 2:14 6:1

**ones** 45:13 52:9 55:5 97:13 105:10,22 107:15 117:4 181:5 198:12

**online** 37:10 110:18 112:4 186:14 203:21 204:17

**open** 31:18 32:2,4 80:23 145:2 187:17 201:4 254:15,24

**opened** 200:23 232:3,10

**openly** 32:10

**operate** 22:15 23:6,12,22,23,25 74:19 86:5 99:25 111:2

**operates** 53:24 54:14 61:13 86:2 149:21

**operating** 73:12,25 74:8,19 171:17

**operation** 74:4 170:8

**operations** 75:24

**opinion** 39:23 44:2 57:12 60:16,18 61:4 112:18 132:21 161:10 202:18 203:9 205:8,14,18,21,24 206:2,7 208:9,13,15,23 218:14 221:10 223:6,9,15 225:25 234:2 237:13 238:2 239:19 249:18,24 258:23

**opinions** 67:9 204:22 247:25 252:7 253:1,21

**opportunity** 98:2

**opposed** 8:9 26:22 143:2 154:2 156:3 158:20 165:11 166:3 194:18

**optical** 14:16 20:2 181:1 186:4 198:7 199:18 200:10 226:1 232:15

**optimize** 170:3

**option** 14:13 162:22 163:1 200:24 205:10 206:5 229:4,7

**options** 103:16,17,23 114:18 163:24 205:6,17 206:12,15,16 207:22

**order** 1:25 54:21 68:4 99:1 125:20 145:3 160:20 171:22 237:19 238:15

**O'Reilley** 45:22 46:7 47:13,18,22

**organization** 23:15 25:18,22 28:6 29:7 31:7 48:14 53:12 74:3,14 87:21 89:24 109:24 142:15 144:18 213:8 222:12

**organizations** 22:7 29:12,17 33:15 62:22 73:11,22 74:19 77:4 85:13,17,25 86:3,4 91:1 97:12 251:15

**organization's** 41:15

**original** 223:24 224:13 226:17,21 227:1 261:13

**originated** 225:3

**others** 20:13 34:13 105:15 117:19 259:12

**otherwise** 148:16 157:6 186:25

**ours** 29:16

**ourselves** 109:25

**outlined** 92:1 97:9 98:7 110:14 149:19 220:24 234:22

**outlines** 94:8

**outside** 132:7 203:2 228:17 249:9

**overall** 83:15

**overbroad** 241:19

**overkill** 148:23

**overlays** 184:13

**oversee** 25:19

**Overview** 204:21

**owner** 100:11 101:1

**ownership** 31:17

**owns** 27:21

**P**

**p.m** 245:16 260:3

**page** 3:4,12 4:2,8 14:15,18 65:22,23 70:1 73:6,8 75:8,9 81:21 98:7 99:8,9 101:17 108:4 121:14 132:17,20 146:9 149:5 156:14 161:24 162:10,13,15,18,21 164:9 166:2,3,5 170:12,19,21 171:6 181:6 183:3 186:5,21 192:24 203:15 204:20 209:19 210:3

Case 1:13-cv-01215-TSC   Document 204-45   Filed 11/13/19   Page 93 of 110
Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015
Page 26

215:16 220:15
234:3
235:7,10,11,12,19,
22,24 236:8,10
240:2,3,13,14,19,2
1 241:3,4 242:3
243:7

**pages** 1:11 4:10,13
115:7,9 156:13
187:14 192:21
215:20,25 216:3
219:9,15,19 234:13
236:14,17 240:17
241:4 254:16

**paid** 207:6,9 246:6

**paired** 244:8

**Palo** 1:20,21 5:2,13
12:13 136:18

**palsy** 108:2

**paper** 11:19,23 15:11

**paperwork** 70:12
78:22

**paragraph** 65:22
66:12 69:5 70:7
99:9 121:15 182:13
235:25 258:12

**paragraphs** 185:11

**parent** 76:13

**parents** 106:23

**parse** 74:12

**parsing** 106:3 131:8

**participants** 26:16
28:10 145:3

**participate**
144:6,17,22 145:4

**participated** 34:14
63:2 144:10,20

**participation** 35:4

**particular** 16:4 31:8
35:20 45:9 78:9
156:20 158:2

171:19 172:21
173:2 181:17
185:4,13 199:3,21
222:13,15 229:13
251:15

**particularly** 164:5
169:10 178:9

**parties** 5:17

**partner** 209:25

**partners** 127:11

**party** 261:18

**passed** 62:7 70:6,14
213:19

**past** 199:14

**paste** 179:13 194:4,8
197:11,17,25 199:4
232:25

**pasted** 198:16 220:9

**pasting** 178:13

**patterns** 177:8

**pay** 28:16,17 35:12
145:3,7,9

**paying** 28:12

**payment** 117:9

**pays** 28:6 35:3

**PC** 16:12 191:18

**PDF** 4:10,14 169:11
176:14,18,21
177:2,6,12,19,23
178:17 180:1,5
186:2,12,24
193:1,5,6,17,18,20,
21 194:6,11,13
195:3,8 197:17,25
201:4
202:3,8,11,21
204:5 207:3,9
212:21 216:17
219:4,19,24 221:14
222:4 223:7 226:5
231:11,21 232:3
234:14,23 235:9,15

236:3 240:4 241:3
257:22 258:22
259:5

**PDFs** 177:1 185:25
197:1 205:20,23
206:1,8 207:8,10
208:15,19,24
212:10 246:6
257:14,16,17 258:2

**peers** 24:13

**pen** 11:20

**pending** 57:2 95:17
259:15,19

**Pennsylvania** 2:4

**people** 12:25
13:9,10,23
15:15,21 16:8,9
17:4,8,15 18:24,25
24:12 25:20
27:4,11 28:20
30:25 31:23 34:21
36:11,16,21
37:2,10,23 40:21
41:5,8,21 42:4,15
43:7,13,16,23
44:15 45:14
48:18,23 49:9
50:2,8,9,17
52:6,17,21
53:15,21
54:1,10,22 55:4,18
56:1,9 57:3,8,18,25
58:14 59:15 61:18
63:13,23 64:13
66:6,17 67:14,22
68:5 69:10
71:1,18,24 72:2
73:21
76:4,11,16,24
77:9,12
78:3,11,16,18 79:3
80:1 82:12
83:13,21,25 84:5,8
85:6 87:11 88:3
91:9 99:15,17,25

101:3,10,11,17,21
102:1,4,7,10,14,18,
19,21,24
103:2,3,9,12,14,22
105:2,3,14,23
106:15,22,23,25
107:5,8,12,14,16,1
7,20
108:9,11,21,24
109:3,5,7,25
110:1,23,25
111:6,10 122:9,19
123:25 124:22
125:4,6,9 132:21
133:3,10,13,18,21
134:2,8,11,14,25
135:5,8,11,12,13,1
5 137:3,20
139:5,7,10,19
140:7,9 145:6,7
148:23 149:17
152:2,5,12,14,20,2
3 153:8 154:7
157:12,14,16,22
160:8 163:3,7,12
165:8,11,13,21
167:10,18,23 168:4
170:4 174:24
175:8,13 177:20
186:7 206:23
207:11 223:2
224:14 229:11
245:7 250:12

**people/citizens**
205:11 206:6

**per** 28:13 35:3 71:18
194:19

**perceivable** 149:18

**percent** 32:9,10 53:3
122:11,15,17
134:19
135:15,18,20
136:7,11,17,21
137:12,15,17,24

**percentage** 122:9,12
135:5,14 136:14

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015
Page 27

150:7

**percentages** 47:10

**perfect** 244:6

**perfection** 223:2

**perform** 139:14
158:10 159:24
233:11 234:6
237:19 238:15

**performed** 237:7
250:4

**Perhaps** 128:2

**period** 144:16

**periodicals** 13:12

**periods** 11:21

**permission** 62:23
70:11

**permissions** 62:25
64:1,6

**permitted** 52:20 53:7
81:8 247:22

**person** 14:12,20,25
15:17 16:25 18:17
19:3 64:16,18
78:7,8 79:13,24
80:19,23 84:24
86:21 93:11
100:5,22 102:3,15
103:21 104:3 108:4
109:15 110:15,17
112:12
113:2,9,22,24
114:4,5,7
115:12,22 122:2,6
127:16 130:7,20
138:20 139:23,25
140:6,14 141:12,20
143:13
156:15,20,23
157:3,6
158:2,5,10,18,25
159:10,24 160:10
161:11,14
162:12,17 165:1

170:14,18,20,22
172:25 177:14,24
180:4,19 187:4
193:9 222:20,25
236:20 238:22,23
239:7,24 243:16
245:1 251:11,18
252:4,23

**personal** 110:18
121:22 157:18,24

**personally** 122:5
123:24 124:10
156:20 157:3,23
158:1,15

**persons** 115:13
208:11,17 210:10
211:20 224:22

**person's** 105:13
109:19 244:15

**pertains** 261:12

**Phoenix** 20:20

**phrase** 32:22 182:9
235:25

**physical** 37:2 107:20
108:1,7,11 109:3
132:23 134:13

**Physically** 85:19

**physician** 110:2

**physics** 21:13,20

**pick** 5:19 17:13 45:9
171:22

**Picking** 160:3

**picture** 14:15
100:6,20,25
166:3,4 173:15
183:4 184:14
194:18 198:9
199:15 236:24
237:1

**pictures** 170:16
186:15 198:13

**pie** 174:16

**piece** 50:13 160:11

**pieces** 160:10

**pins** 15:16

**piracy** 42:19

**pixelated** 193:25

**places** 19:22 55:8
147:11 222:12

**Plaintiff** 2:2,7,13 6:1
83:1

**Plaintiffs** 1:7 5:11
6:13 11:16 12:4
35:15 64:23 90:25
94:3 96:12
97:11,23 99:5
111:9 112:11,19
113:25 114:25
115:11
117:1,12,17,21
120:2,5 121:8
124:2,8,12,15,24
130:13,22
131:4,6,13,23
132:1 133:1,12,24
138:10 139:13
140:15 141:11
143:22 151:19
167:17 168:4
169:7,13 174:23
175:12,25 177:11
179:2,11 180:5
182:5 184:16,22
189:18 202:11,19
203:23 204:4,6
205:17 206:8
207:11,23
208:6,11,16 209:15
219:10 224:12,20
231:17 234:17
235:2 250:10
251:9,19 256:15
258:3,5 259:22

**Plaintiff's** 176:12

**PLAINTIFFS** 4:2

**planet** 150:24

**plastic** 15:16

**play** 30:17

**players** 111:1

**please** 5:16,21 7:7
8:13 30:19 34:11
66:1 77:21 104:18
227:25 228:1
232:21 235:10
236:8 240:2 248:22
258:13

**plugs** 193:12

**plus** 97:12 98:25
164:13 170:15

**point** 17:14 20:25
30:4 66:21 67:19
89:23 181:9 188:1
220:25 226:23

**policies** 33:22

**policy** 250:10

**pop** 15:15,19

**population** 122:12
134:16 135:15,21
136:7,11
137:2,5,12,18,21
139:12

**populations** 136:15

**portion** 134:25
140:25 162:4,5
215:18 236:3 246:8
248:5

**portions** 133:1,15,23

**position** 20:4,21 21:4
47:9

**positions** 20:9

**possibility** 153:20
204:12

**possible** 17:4 18:19
32:13 42:14 79:22
91:21 100:10,12
102:2 113:2,21
126:23 127:23
128:4 159:8,15

Case 1:13-cv-01215-TSC   Document 204-45   Filed 11/13/19   Page 95 of 110
Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015
Page 28

170:21 206:22

**post** 214:13 259:5

**posted** 117:16,22
119:3,9 120:5
143:22 168:11,21
169:14,19

**posts** 46:14 149:12
150:2

**post-secondary** 67:9
70:22

**potential** 91:12

**potentially** 134:19
207:13

**practical** 17:16

**practice** 27:13 50:24
51:6 100:2

**practitioner** 22:13

**precise** 47:10,17 52:3
122:14 125:10
134:18,20 135:3
158:24 159:25

**precisely** 28:8 115:7
234:22

**precision** 160:4

**predecessor** 13:16,18

**predicate** 221:19

**prefer** 68:3 134:5
190:20 212:16

**preferred** 212:20

**preparation** 12:1,7
119:23 126:16

**prepare** 9:18

**prepared** 191:2
228:4

**present** 2:24 13:7
157:23 232:23

**presentation**
103:6,16,23

**presented** 166:23

251:10

**presenting** 33:1
100:25 166:17,21
170:10

**presents** 100:20

**President**
20:6,10,11,15,22

**press** 83:10 85:23
88:22 89:4 193:6
195:20

**pressed** 15:11

**pressure** 70:16

**presumes** 221:19

**pretty** 7:22 72:21
111:5 165:7 182:14
194:13 241:23
245:4

**prevent** 44:20,24
152:14

**preventing** 191:4

**previously** 82:4
83:20 226:8

**pricing** 28:19

**primarily** 28:1 89:2
90:13 136:14 186:8
259:4

**primary** 11:18 12:25
13:22 15:7 18:21
43:14,18 50:1
52:6,7 55:2,4,25
57:24 58:14 59:15
61:17 84:16 109:7
110:10,12 144:2

**print** 13:2,6 14:21,25
16:1,4,8,13,14 17:8
19:1 37:10 41:8,21
42:5,15 43:7 48:23
50:17 52:17
53:15,21 54:22
55:18 64:14,17
72:3 76:5,11,24
77:10,13 78:23

82:13 83:2,13,25
84:9,25 85:6 86:22
89:7 99:16,25
100:13 101:3
104:10,25
107:13,21
109:6,9,21,24
115:14 122:13,19
124:9,13,25 129:3
130:13,15,20
131:5,15
132:3,4,21 133:11
135:22 136:12
139:24,25 140:14
152:15,24 153:22
156:24
157:3,7,12,14
158:6 163:3 165:21
167:11,18 168:5
205:11 206:6,23
207:4,12 208:11,17

**print-disabled** 78:19
102:10 125:6,9
127:16

**printed** 14:11 114:7

**printer** 15:9,12

**printing** 17:20 85:22
87:3

**printout** 4:8 209:18

**prior** 6:14 10:8,20
20:16 59:20 62:22
70:7 89:14,15
92:24 93:5,24
257:3 258:20 261:6

**prioritize** 34:1

**priority** 130:1

**private** 5:19 21:9

**privilege** 56:16 95:6
248:3,10 249:5,10

**privileged** 10:1 23:1
58:4 59:7 68:17
82:15,18 83:5
94:18 95:23 97:4
119:15,19,22

121:21 141:6
146:4,13 155:7
202:13,15,25
203:11 215:4,11
228:12 230:4 231:2
246:20
247:10,12,14
248:12 250:21

**pro** 92:7,11,12

**probable** 128:24

**probably** 28:3 42:21
53:2 85:24 89:22
91:7,15
93:10,11,15,16
94:22 118:25
128:12 129:19
137:1,19,20,21
139:9 153:18 155:2
160:22 164:6,16,23
171:14,20,21
172:24 180:4
181:25 182:1,14
187:3 191:22
198:21 200:12
202:7 216:4 226:20
257:21 259:13

**problem** 38:20
108:13 109:8 142:4
161:6 188:22 189:1
196:4 198:19,22
200:11 209:6

**problems** 102:25
104:16,18 111:13
141:14,18 184:22
191:23 236:16
241:8

**proceed** 228:4

**proceedings**
261:4,6,8,14

**process** 7:16 15:23
18:12,13 26:16
30:4 32:25 33:1,6
34:22 35:14 58:25
71:23 85:5 88:8
98:5 108:8 116:11

Case 1:13-cv-01215-TSC   Document 204-45   Filed 11/13/19   Page 96 of 110
Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015
Page 29

142:2 143:11
144:7,17,20,23,24
145:4 151:16
177:10,18 180:4
183:12 185:24
186:17 211:23
213:19 226:24
232:24 235:1
253:10

**processes** 19:12
33:4,5 35:21 181:1

**processing** 4:18
232:6,15 234:24

**processor** 186:10

**produce** 17:16
114:10,12 126:9
130:4,7

**produced** 6:13
10:19,22,23 187:15
226:1 257:6

**produces** 17:12

**producing** 187:22

**product** 13:22 44:8
64:15 65:17 153:5
186:8 195:23
198:7,15 199:17
200:2,5,10,12
201:5,9 202:1
207:9

**production** 30:4

**products** 23:14
142:22,24
155:13,14,17,20,23
199:24 200:6
201:13 207:6

**profession** 218:23

**professional** 80:6
109:19 123:24
129:22 157:18
201:22
218:16,19,21
221:13,16 222:6,23
234:2

**professionally** 153:8

**professionals** 109:25
221:22,24 222:10

**professions** 124:1

**program** 4:18 11:5
18:19 112:5 193:11
194:17 232:6
234:24

**programs** 16:20
18:21 19:8

**progress** 49:8

**progressively** 17:1

**prohibit** 50:7

**project** 13:7 21:9
203:4

**projects** 29:8

**promote** 92:14

**promulgated** 144:3

**pronounced** 39:10

**proof** 79:3,7,10,15
80:2,11,24
81:9,15,20 86:8,18
88:11,16

**proofread** 211:10
213:17 223:23
226:15

**proofreading** 127:11
210:24

**propagate** 241:13

**proportion** 137:15

**proposed** 31:8 62:5
235:21

**proposing** 32:6

**proprietary** 30:9

**prospect** 41:6

**protect** 63:7 73:14
100:11 101:1

**protected** 128:8
153:21

**protecting** 66:7,17
69:11

**protection** 1:4 6:1
44:7 45:11,25
46:21 47:4,14
48:3,22 50:7,25
51:9 122:23 178:2

**protections** 45:19
46:8 49:15,23
50:16

**protective** 1:25
125:19

**prove** 87:11

**provide** 7:23 29:13
42:19 51:24 54:21
57:7 60:16 66:6
69:9 77:24 79:3
80:2,7 85:13 86:8
88:15 89:2,3 101:1
151:21 158:7 169:7
251:19

**provided** 11:22
39:3,5,19 52:11
71:14 73:16
76:4,10 81:9,20
131:7 163:24
205:6,17 207:22
246:13 247:3,21
252:6,24
253:6,19,23
254:18,22 255:9

**providers** 42:4,9,14
67:10

**provides** 13:9 29:7
77:23 165:4 174:23
205:9 206:5

**providing** 42:9 43:6
66:16 67:14,22
70:11,25 75:13
77:9 79:16
87:10,15 88:23
151:10 168:3
174:19 250:10

**provision** 58:9

**provisionally** 125:19

**provisions** 31:17
52:14 55:17 72:22
73:23 159:9

**proviso** 88:15

**public** 4:11 5:15
11:17 42:17
49:15,23 50:2,16
60:3,12,18 61:13
76:23 77:11,25
81:12 90:21
94:4,24 95:4,19
96:12 99:5 117:17
118:10,22 132:25
139:21 143:22
154:13
167:3,6,7,9,16,23,25 168:3,10,21
169:6,14,19 174:23
175:7,13
176:1,12,13,18
177:12 179:4,12
180:1 214:14
216:18 217:4,11
218:9,18
219:6,20,24 221:14
222:4,17 225:1
226:6 227:3 249:19
257:18 258:9,22

**Public.Resource.Org**
1:10 2:18 6:7,9
89:17 118:3 203:20
205:5,8 206:4
207:24 216:24
225:23 231:8
245:19,24 246:2
257:22

**Public.Resource.Org
's** 4:15 205:16
216:23 234:15

**publication** 65:16

**publications** 46:2
47:15

**published** 4:4 167:16

Case 1:13-cv-01215-TSC   Document 204-45   Filed 11/13/19   Page 97 of 110
Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015
Page 30

226:22

**publisher** 30:1 45:18
49:3,21 62:23
88:19 223:24
224:5,6,10,13,22
225:4,13

**publisher-quality**
244:9

**publishers** 17:20
32:7 43:22
44:13,20,24
45:10,25 46:6,20
47:3,9,12,19,22,23
48:3,13,19,21
49:8,14 50:4 51:5,7
62:15 63:4,8,19
64:9,14
66:4,9,13,18,23
67:25 68:1
69:8,12,15
70:10,15 71:13

**publishing** 17:12
29:21 30:14
41:9,23 46:11,13
50:3,15,25 63:1,22
67:7,8 70:22 83:10
154:8

**pull** 102:4 134:3

**pulling** 236:19

**purchased** 246:13
247:2

**purpose** 76:23 77:9
111:8 129:18,22
130:3 188:21 216:6

**purposely** 152:14

**purposes** 100:21
218:19 221:16
222:6 235:6

**pursuant** 1:25 80:10
128:19

**push** 164:23

**pushed** 143:18

**pushing** 164:18,20

_____
Q

**quadraplegic** 108:5

**qualification** 10:5

**qualifications**
52:5,8,10 58:6
86:18 122:16

**qualify** 56:10 57:3
60:3,13,18 61:5,14
109:8 135:13,16,21
136:8

**qualifying** 52:17
54:2 78:7,12,18
79:24 80:19 87:24

**quality** 142:20,22
211:19,23,24
213:19 224:2,4,7
252:14

**quantify** 134:10

**quarter** 134:17,19

**question** 7:23,24
8:1,4,19 9:6,22
14:2 24:3,9,10
34:11 44:12,16,17
49:12 57:2,16
58:19,24 59:18
61:11 63:18 67:18
69:16,22 72:7
74:13 77:6,19,20
91:17 95:6,17
106:12 121:21
131:9 132:10 136:5
141:7 143:20
145:18 149:15,22
159:15 168:17,18
172:3,6,12 190:9
199:9,20 206:19
218:25 219:2
237:23 238:9 239:1
248:1,2 249:5,12
250:25 252:20
254:20 257:8
259:15,18

**questioning** 188:15
189:19 259:22

**questions** 3:12
7:21,22 8:14 24:15
30:19 38:18 131:24
132:15 136:3
150:21 154:12
159:19
187:12,17,18
189:16 191:25
192:14 200:20
221:22 227:7,25
246:5 254:12
256:10 259:21,24

**quick** 6:10 118:15

**quite** 19:22 70:18
153:13 158:19
159:8 164:5,24
188:18 199:9 213:2
232:18 238:5

**quote** 195:9 259:13

**Quotes** 217:17

_____
R

**raised** 148:4 254:21

**raises** 119:19

**ran** 141:20,22 175:18
200:10

**random** 230:8,10

**range** 12:24 28:7
122:15,20 136:17
149:8 150:10 216:4

**rare** 158:1

**rather** 68:6
139:17,20 198:10

**raw** 185:1 223:22

**reaction** 127:15

**readable** 164:24

**reader** 17:24 18:2
87:16 110:8,16
111:11,14,20,25
112:4,6 135:9,17

136:22 137:2,22,25
156:10 165:11
169:22,23
170:7,12,17
171:8,14,17 172:18
173:4
193:8,10,13,17
195:3,19,22
196:8,13,14,18,22
197:13,18 198:3
200:23
201:4,5,7,17,23
217:10,20,23 218:8
220:10,20 221:8
229:14 232:11
233:17,24,25 237:3
239:9

**readers** 18:5,24
19:15 110:24 111:1
112:17,21 132:24
133:20 135:2,6
170:2 172:1 186:13
187:5 197:1

**reader's** 244:16

**reading** 13:22
18:20,21 66:2 73:9
96:1 103:17 105:14
107:21 108:8,12
109:23 112:5
115:17 133:1,15,23
139:5 143:12
154:13,17 157:24
160:18
161:12,15,20,25
162:11,22 163:24
165:19,23 178:13
205:1 221:1 233:12
234:7 242:16
245:7,9

**reads** 178:6

**ready** 240:22

**really** 16:8 58:18
61:10 73:5 100:8
106:3 150:13,25
165:10 193:24

Case 1:13-cv-01215-TSC   Document 204-45   Filed 11/13/19   Page 98 of 110
Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015
Page 31

241:19

**reason** 8:20 43:14
119:10 129:21
130:5 131:3,12
152:6

**reasonably** 191:9

**reasons** 153:16

**reassembled** 181:10

**recall** 11:14 12:8
21:4 52:15 65:15
66:20 70:9 89:23
91:7 93:4,12,18
94:23 104:21
114:23 119:1
121:12 145:19
146:15 164:4,18,20
175:9 178:9 182:7
214:16 218:5
220:19 230:7
256:24

**recapture** 238:4

**receive** 29:3

**received** 11:9
69:14,25 254:16

**receives** 29:2

**receiving** 49:22
191:5 256:24

**recent** 179:16

**recess** 51:14 92:20
138:5 175:21
227:16 245:14
255:18

**recognition** 14:16
19:24 20:1,3
181:1,15 183:18,24
185:15 186:4 198:8
199:19 200:10
201:18 226:2
232:16

**recognize** 65:2
199:14,18 200:5,7
209:18 256:18

**recognized** 201:8
243:23

**recollection** 98:4
190:5 257:23

**recommendation**
49:4 151:9,13
152:1

**recommendations**
147:17 149:8
150:4,8,18 151:4
152:13

**recommended** 49:14

**recommending** 74:18

**record** 5:6,18,22 6:12
8:8,15 38:6
51:13,16 56:18,24
78:7 92:19,22
95:9,15 138:4,7
168:19 175:20,23
183:17 187:12,17
190:21,23 191:23
227:14,18
245:12,15 254:14
255:5,7,13,17,20
260:2 261:7,10

**Recording** 85:21

**recordings** 5:17

**records** 78:11 92:9

**recreate** 126:23

**redundant** 237:25

**refer** 115:21 121:15
146:9 206:11

**reference** 146:2

**referenced** 148:3

**referred** 9:20
120:8,16,23 146:22
154:17 164:17

**referring** 137:11
146:7 196:4 232:16
257:2,11

**refers** 154:13

**reflect** 6:13

**reflected** 225:2

**refreshes** 98:3

**Refrigerating** 6:4

**refrigeration** 1:6
123:3

**regarding** 24:9
121:23 249:18
250:10

**regime** 23:13,24
149:21

**register** 228:20

**registration** 87:20

**regular** 84:19 85:7

**regularly** 143:2

**regulators** 33:13

**Rehn** 2:14 3:7 5:25
7:21 98:18 179:21
188:2,17
189:2,10,13
190:1,12
192:2,6,8,18,20
195:1,14 196:1,19
197:8,23 199:12
200:22 201:3,14
202:17 203:1,14
204:9,19 206:13,21
207:2,19
209:4,7,13,17
211:8,15 212:22
213:4,24 214:4,17
215:7,15 216:10,15
217:1,19 218:13,24
219:3,8,14,17
220:5,6 221:4
222:1,14 223:4,14
224:3,19 225:12
226:3,10 227:7
256:2,17 257:9
258:1 259:7,21

**relate** 22:10 124:3
126:9

**related** 11:11 13:10

22:19 23:9 39:23
41:15 70:22 82:12
83:2,13 212:19

**relates** 151:10

**relative** 261:17

**relatively** 29:15 73:1

**relevance** 26:18 27:3
29:5 47:7 119:11

**relevant** 11:6 107:22
121:5 162:25 163:1
199:22 249:6

**rely** 109:25 133:14
218:19 221:15
222:5,16,24 244:17

**remedy** 190:17

**remember** 20:22
31:3,10 93:22 96:2
160:22,24 172:25
181:5,16 192:4
198:5 215:20,22
257:12

**remembering** 228:23

**remind** 22:24 200:19

**remove** 47:4 48:22
49:14

**removed** 46:8,21
47:14 49:22 50:15
72:1

**render** 192:13
202:18

**rendered** 160:14
205:4 207:24
223:7,11 232:14
235:9,25
236:13,17,22
243:15

**rendering** 241:12

**rendition** 241:8
244:3,7,9,16

**repeat** 67:18

**rephrase** 74:16

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015
Page 32

**report** 4:6 9:20,22
12:2 91:4,5 92:1,5
95:25 96:16
97:7,10,17,19,21
98:5,8 99:8 101:25
107:11 110:6,14
111:9 117:5
118:6,19,20 119:23
121:14 126:1,4,16
131:21 132:17
140:21 141:1,4,8
142:7 145:23
146:6,10 149:3
151:17 161:24
167:4 177:10
179:19 180:3
185:23 192:17,22
197:9 203:16
204:16,21 214:18
215:17 217:2
220:13 223:5
229:19 230:13
234:22 250:1
252:8,17 253:2,21
259:13,14,17

**reported** 1:23
46:1,22

**reporter** 1:23 5:9 8:6
89:11 98:13 109:22
191:20 192:19
194:22 201:2
209:14 217:15
234:16 261:3

**represent** 22:7 24:15
33:8 34:22 110:1
192:6 219:14
227:22 234:21
240:5,24

**represented** 9:3
33:12 129:17
198:12

**representing** 5:10
9:10 24:5,21 25:5,8
220:4 242:13

**represents** 65:17

**reproduce** 170:19
191:7

**reproduced**
141:14,17

**reproduction**
168:12,23

**request** 5:11 125:15
127:15,20 129:13
131:5 157:21
211:2,3,9 251:10

**requested** 125:4,5,8
127:13 251:18
261:15

**requests** 62:25
224:21

**require** 87:11 148:23

**required** 84:24

**requirement** 33:10
86:7,21 87:4,7 88:3
89:7 147:12 151:7
153:5

**requirements** 23:14
53:7 54:20 55:2,23
76:2 86:14
148:4,20 158:16

**requires** 53:20 112:3
158:24

**reread** 9:20 12:2
168:17

**research** 50:20 83:16
84:14 85:3

**resemble** 11:23 107:8

**reserve** 188:23

**resident** 213:8,9

**resist** 48:14 189:23

**resistance** 48:10

**resolution** 194:12,20

**resolve** 248:4

**resolved** 254:15

**Resource** 4:11 5:15

11:17 60:3,12,18
61:13 90:21 94:4
96:13 99:5 117:17
167:16,23
168:3,10,21
169:14,19 174:23
217:11 218:9
219:6,20,25 227:3

**Resource.Org**
118:22

**Resource's** 94:24
95:4,20 118:10,23
132:25 143:23
167:3,7,10 169:6
175:7,13
176:1,12,13,18
177:12 179:5,12
180:1 216:18 217:4
218:18 221:15
222:5,17 225:1
226:6 257:18
258:9,22

**respect** 73:23 145:14

**respond** 8:8 10:3
251:9

**responded** 62:25
231:18

**responding** 33:3

**responds** 224:21

**response** 44:15
192:14

**responses** 8:9 48:20

**responsibility** 64:4
191:6

**responsive** 44:16

**rest** 181:13 234:3

**restate** 168:18

**restrictions** 101:18

**result** 126:21 234:25

**resulting** 198:2

**results** 194:4

**retain** 9:5

**retained** 89:15 90:2,7
121:9 203:19 204:2

**return** 188:15

**returned** 56:22 95:13

**returning** 108:5

**revenues** 67:12

**reverse** 16:16

**review** 11:8 12:6
100:13 117:11,15
119:3,9 120:2
126:13,17 156:7
167:3 179:18
187:20 188:23
190:22 191:16
261:14

**reviewed** 12:3
94:21,24 98:5
112:12 114:24,25
115:6,11 120:4
121:9,24 122:3
124:3 130:20
179:1,12 205:2

**reviewing** 154:18
188:21 191:12
217:7

**Rhode** 62:4

**rid** 50:7 51:5,8

**right-hand** 164:10

**rights** 13:2,3 42:18

**rings** 154:19

**roadblock** 143:19

**roads** 112:5

**Rob** 4:20
141:12,13,21,24
142:10,25 143:6,21
256:19 259:2

**Robert** 7:9

**rocket** 21:9

**role** 30:17 50:1

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015
Page 33

142:17,21

**roles** 78:16

**room** 56:21 95:12
154:14,17 160:18
161:12,15,20,25
162:11,23 163:25
165:19,24

**roughly** 144:21

**row** 173:1 230:10

**royalty-free** 64:1

**RTF** 212:18

**Rubel** 2:3 3:6 5:23
7:6 10:7,12 14:23
17:18 22:8,17
23:3,17 24:2,18
25:7,13,21 26:24
27:8,23 28:23
29:11 31:19 32:20
33:23 34:5,12
35:1,11,22
36:3,8,15,20
37:1,7,16
38:3,12,15,21,22
39:21 40:3,18
41:1,13,19 42:2,12
43:17,24 44:4,18
45:4,17 46:3
47:2,11 48:1,9,15
49:2,11,20
50:12,23 51:10,17
52:19 53:4,17
54:3,12,19 55:7,13
56:8,17 57:1,9,22
58:11,20 59:3,9,19
60:1,8,17
61:1,16,22 62:2
63:14 64:7,21
65:1,21 67:1,20
68:20 69:3,17,23
70:19 71:8,21
72:8,13,23 73:24
74:6,15 75:1,7
76:1,20 77:5
78:10,20 79:5
80:8,21 81:13

82:1,10,24 83:11
84:6,22 85:9
86:6,13 87:2,14
88:1,20 89:5,13,20
91:10,19 92:15,23
94:9,20 95:16
96:6,20 97:14,20
98:1 99:3 100:3,23
101:15 102:12
103:10,19 104:8
105:9,20 106:5,20
107:24 108:19
110:5 111:7,18
112:9 113:1,8,18
114:16,22 115:4,20
116:23 117:7,20
118:17 119:8
120:1,14,21
121:7,13 122:8
123:1,7,12,16,21
124:21 125:7,22
127:18 128:3,15
129:1,10,20
130:10,18 131:2,19
132:9 133:8 134:7
136:2,9 137:8
138:1,8,16 139:22
140:11,22 141:9
142:16 143:15
144:11 145:21
146:8 147:7,15
148:5 149:23
150:15 151:1,18
152:3,22 153:19
154:11 155:10
156:6,22 157:5,19
158:22 159:12,22
160:16 163:22
164:8 165:16
167:15 168:2,9
169:5,12 171:1,23
172:7 173:3,21
174:6,21
175:4,17,24 176:10
177:4,17 178:15
179:9,24 180:9
183:14,23
184:7,15,20

185:3,12,22 187:11
189:15 190:20
191:11,19 219:18
227:24 231:16
255:12

**rule** 248:18 249:3

**rules** 75:6

**run** 111:14,15 211:24
255:2

**running** 92:15 98:24

**runs** 15:17 255:2

---

**S**

**safeguards** 71:25
84:8

**safely** 218:18 221:15
222:5,16

**safety** 215:21
216:6,12 218:16
219:5
221:13,21,23,24

**sale** 117:12 207:3
247:21 248:25

**sample** 217:14

**San** 2:10,15,21

**satisfied** 236:2

**save** 178:22

**saw** 162:3 217:13,16
230:8

**scaling** 194:17

**scan** 13:24 14:13
83:17 114:8 162:7
185:2 186:9 194:19
213:16

**scanned** 83:20 84:4
186:12 212:20,24
223:16

**scanner** 14:14 186:9

**scanning** 14:3,4
127:11 185:1
212:18

**scenario** 109:13

**school** 79:14
88:10,12 130:5
136:18 137:4

**science** 47:23

**scientific** 157:13

**scientists** 159:6

**scope** 131:21 132:7

**scores** 211:25

**scratch** 221:11

**screen** 16:10 17:24
18:2,5,24 19:2,5,15
87:16 100:6,8
102:5 108:13,23
110:8,16,24,25
111:11,14,20,25
112:1,4,6,10,13,14,
17,21 132:24
135:1,5,9,17
136:21 137:2,22,25
156:10 162:3,4,10
163:9,20 165:1,11
169:22,23
170:2,7,11,17
171:8,14,17 172:1
173:4 186:12 187:4
193:7,10,13,17
195:3,21
196:7,13,14,17,22
197:1,13,18 198:2
217:9,20,23 218:8
220:10,20 221:7
229:14
233:17,24,25 237:3
239:9

**screenshot** 161:25
164:9 202:6 215:17

**scroll** 162:6,7,9

**se** 71:18

**seal** 66:10 72:17

**search** 11:3,11,19
30:25 31:5,7
126:8,20,22,24

138:23 140:16
165:22 171:19
198:16 221:2 233:1

**searched** 10:25
118:13,21 225:9
231:7

**searches** 11:15
117:23,24 118:8
140:20,23,24

**searching** 118:7
165:17 166:1,5
234:8 245:6

**Sebastian** 2:19 6:6

**second** 2:9 6:12
193:13 210:3
220:15 235:25
250:25 255:15

**secondary** 43:16

**second-to-last**
75:9,11

**section** 75:10 220:25
225:9,10 240:6,25
241:9

**sections** 112:20
224:15 233:2

**seeing** 119:1 174:19
181:16 218:5

**seek** 22:22 142:25
250:16,18,23
251:24

**seeking** 88:11

**seeks** 55:24

**seem** 167:23

**seems** 58:18 61:10
159:8,17 236:6
241:19

**seen** 121:8 198:22

**segment** 17:12

**select** 16:2 110:12
194:1 198:11 230:1
232:4

**selected** 234:23

**selection** 104:22

**self-interest** 48:4

**sell** 30:3 45:16 47:4
202:7,8

**sells** 202:3 208:2

**semantic** 183:11

**Senator** 62:4

**send** 15:10 112:1

**senior** 187:6

**seniors** 137:19

**sense** 28:9 47:8 56:6
90:1 135:4 212:8

**sensitive** 5:19

**sent** 256:19 257:16
258:8,23

**sentence** 65:25 72:15
73:7,18 75:11
101:16 121:15
132:20 149:5
204:16,24,25
206:11 207:12,18
258:12,13 259:17

**sentences** 66:11 70:1

**separate** 18:12,13
184:14 193:11
228:16

**separated** 20:5

**Separating** 83:5

**series** 38:18 132:14

**serve** 12:20,23,24,25
13:6 52:6 55:4
57:25 58:14 87:23
88:13,16 96:2
106:22

**served** 38:23 39:1
45:2 64:9

**serves** 87:22

**service** 53:16 85:18

**services** 12:18 23:12
79:16,17,18 86:19
135:16 210:24

**serving** 56:1 59:15
61:18 78:8
92:7,10,11

**setting** 153:11 161:6

**seven** 20:8 189:7,10
190:23 255:2

**several** 19:11 107:11
130:11 240:17

**shaking** 8:9

**share** 210:11

**shared** 122:6 257:13

**shifted** 47:9

**short** 115:2,5 132:14
147:6 174:13

**shortest** 115:5

**shorthand** 1:23
261:2,8

**showed** 118:22
182:17

**showing** 79:21 160:6
181:16

**shown** 164:11

**shows** 19:1 81:24

**sic** 146:23 179:16,23

**sides** 51:8

**sighted** 114:4,5,6
139:18 143:13
162:12,17 170:20
193:19 222:25
238:23

**sign** 143:12 168:1
213:5,9 228:24

**signature** 181:17
260:4

**signed** 9:7 115:17
136:16,18

**significant** 17:15

20:19 51:7 189:2
224:8

**signify** 148:10,18

**signs** 232:24

**sign-up** 142:2 143:11
151:16

**similar** 13:20,22
15:24 29:16 86:16
111:15 140:7

**simpatico** 249:11

**simple** 7:23 24:6

**simply** 125:4 131:10
159:14 239:8

**single** 17:13

**sip** 38:5

**sit** 190:20 191:12
233:25 255:2

**site** 116:21 131:23
216:22,23 246:6
249:24

**sites** 124:12

**situation** 190:17
196:20 197:24

**size** 16:23,24
17:8,14,19 103:20
134:21 171:25
172:8,16 181:9
194:11

**sizes** 17:16

**skaplan@fenwick.co
m** 2:22

**skimmed** 156:9
161:1

**slice** 17:15

**small** 17:11 137:5
182:3 230:9

**smart** 101:13

**smartphone** 16:12

**smartphones** 111:2

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015
Page 35

social 12:16 62:15,18
63:16 64:4 66:3
69:7

Society 1:3,5 5:24 6:4

software 12:18 13:3
14:16 80:23 111:3
123:23 124:3
170:8,9 193:11

sold 45:11,19 46:9,22
202:11 205:20,23
206:1,22 207:11
208:6,10,16,24

solely 246:7

solution 101:9 134:5
198:8

Solutions 5:11

solve 110:16

somebody 74:7 78:23
113:19 114:17
131:25 159:15
163:25 214:11

somehow 43:8 77:12
121:4

someone 24:22 53:24
80:6 81:9 86:17
100:12 105:17,23
106:9,13 107:25
108:2 109:10 112:7
113:3,15 130:5
132:4 158:17 207:4
237:18 238:12

someone's 110:2

somewhat 134:6

somewhere 28:6
90:16

sorry 6:11 28:25
33:21 65:3 72:6
75:9 85:25 89:10
113:20 119:17
124:19 130:24
133:22 135:10
136:1 140:24 167:8
172:4 174:25 192:4

200:16 214:22
219:17 223:18
233:21 235:13
238:9 246:15 251:7
252:19 253:18
257:4,5

sort 18:11 28:21
34:7,23 84:23 86:7
108:6 117:8 128:13
139:6,19 153:11
182:18 187:8
195:24 201:8 223:7
238:2 254:19

Sounds 132:16
227:13 228:3

source 136:14 213:3
217:14,17,18

sources 213:3

spaced 182:17

SPALDING 2:8

span 183:3

speak 10:8 91:3
196:15

spec 153:17

special 35:9
79:13,15,17,18

specialized 182:4,6
241:21 242:16

specific 12:21 72:21
73:2 96:21 97:10
104:15 120:9
127:17 130:19
138:22 150:20,25
151:3,9 152:4
154:25 155:3,5,14
181:5 208:24
214:24 220:25
229:2 233:1 234:8
242:4 251:1

specifically 19:15
26:1 90:14 91:24
110:8 154:22 164:7
218:23

specified 145:24

specifies 213:12

specify 55:20 148:1
153:4

spectrum 208:22
223:1,21 244:25

speculate 145:12

speculation 35:7
41:25 42:7
43:11,20 47:7 54:7
60:21 61:20
63:10,21 64:12
74:11 75:21 76:7
77:1,15 84:2,12
104:6 105:7 106:1
109:17 127:4
128:1,21 129:6,16
158:14 159:4
167:21 174:2,10
201:11 211:6,13
212:13

speech 14:22 15:2
18:2,3,5,6,9,20
19:12

spend 92:4 161:3
191:12

spent 116:15 188:18
189:2 196:25

spoke 67:24 93:22
256:9

spoken 103:7

spokesman 50:2

spot 116:20 138:22

spotted 226:9

spreadsheet 171:18
174:18

Square 1:20

squared 241:22
242:17

staff 84:14,20,21
85:8 144:9

stakeholder 144:13

stakeholders 42:18

stand 134:24

stand-alone 182:15

standard 4:13,17
17:14 25:23
26:2,3,10,13,22
27:22
29:19,22,23,25
30:15,21,22,24
31:8,13,22
32:6,10,12 33:2,3
93:3 98:8,9,13,21
114:5,7 115:5,8
116:12,13 117:5,25
118:4,23,25
121:16,20
124:7,15,23 126:1
127:1,9,21 128:18
129:3,4,9,14,22
131:5 132:2
138:21,23,24
143:20 144:3
145:4,24,25 147:12
149:19 153:10
154:21,25
155:3,5,11,12,15,1
8
156:8,11,13,16,21
157:4,8,17
158:7,12,16 159:9
161:18,19,22
163:2,9 164:11
165:15,19
166:8,9,10,13,14,2
3,25 167:17 173:12
174:4 176:4,6
178:8 179:15
188:10 192:25
201:17 202:9 209:9
214:24 215:2
218:1,4 221:2
222:16 225:1,3,23
226:5
228:7,10,18,21
229:2,5 231:7,13

Case 1:13-cv-01215-TSC Document 204-45 Filed 11/13/19 Page 103 of 110
Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015
Page 36

232:3 233:12,17,24
234:1,7,8,10,13
236:4
237:7,8,19,25
238:13,15,22
239:7,8,20,21
240:7 241:1,14
243:17 244:17
245:2,4 248:25
249:23,25 251:2,3
252:6,24 253:24

**standards** 9:21,22
12:3,4
25:15,19,20,22,25
26:4 27:1,5,12,16
28:11,20 30:16
31:5,6 32:16,25
33:9,11,16
34:15,22,24
35:15,20 41:15
91:1 92:3 93:10
96:17,18,21
97:11,12,15
98:4,7,16 99:4
110:3,7 111:10
112:11,13,19
113:3,4,11,16,23,2
5 114:24,25
115:10,18 116:1,15
117:1,11,13,15,21
118:9,14
119:3,9,25
120:3,5,9,16,22
121:4,9,16,23
122:3,7 124:2
125:4,5,8,23
126:2,10,14,19
128:8 129:12
130:11,13,19,21
131:14 132:24,25
133:12,23 134:4
138:15
139:12,17,20
140:5,16 141:24
142:3 143:6,22
144:4,7,10,15,17,2
0,23 145:14 146:18

147:10,21,25 148:3
161:16 164:22
165:10,23 166:3,19
167:17,22,25 168:4
169:7,10,14,18
173:10 174:12,24
175:12
176:1,11,13,16
177:11,19
179:2,4,11,25
180:6 182:5
184:16,22 186:2
202:4,11,19,20
205:3,13,15 206:7
208:3,6 215:23
218:6 224:23
228:23,24
229:15,18,24
230:2,12 231:17
245:20,23
246:2,7,12,14
247:3,20 248:15
249:20 250:11
251:11,20 252:5,24
253:23 257:13
259:3

**standard's** 166:16

**stands** 243:13

**start** 10:20 64:22
160:12 171:3
192:16 200:8
210:15 254:3

**started** 221:1

**starting** 7:20 66:22
69:2

**startup** 20:18

**state** 7:7 88:10
180:18 254:13
261:3

**stated** 23:4 55:1
86:15 203:9 231:4
248:15,17

**statement** 121:19
181:8

**statements** 42:17

**States** 1:1 30:2 47:14
59:1 122:10,13
135:1,6 157:16

**statute** 53:2 54:9
55:6 56:6

**stay** 242:19,20

**step** 44:10 45:20
178:4,5 179:10

**steps** 9:18 234:22

**stick** 55:5

**stipulates** 55:19

**stream** 18:10,11

**Street** 2:9,15,20

**stretching** 20:24

**strict** 73:14

**strike** 113:20 183:16

**strong** 194:13

**structural** 242:18

**structure** 130:1
170:15 177:8
241:11

**student** 76:12,13,14
79:16 125:15
127:13 130:3
136:15 187:2,4
210:25 211:1

**students** 13:1,6,11
71:14,15
84:14,20,21 85:8
87:9,20,23 88:9,14
137:7

**studied** 73:5

**stuff** 180:14 221:20

**stylized** 181:6 182:24

**subcontractor**
210:23 211:10

**subcontractors**
211:17,20

**subject** 120:16,23
152:9 237:13
256:22 257:2

**submit** 78:21 79:22
82:20 129:12 130:9
211:16,21
213:6,10,18
214:1,6

**submitted** 79:7
82:4,8 86:17 97:22
210:1,4,7 211:1
212:3,9,15

**submitter** 210:20

**submitting** 214:12

**subpoena** 11:8,12

**subscript** 243:5

**subscripts** 242:23

**subsequent** 70:13

**subsequently** 62:7
196:2

**subset** 134:14,22
155:21

**subsets** 102:9

**substance** 93:12

**successful** 114:10
185:21

**successfully**
233:16,23

**sued** 83:16 152:7

**sufficient** 233:11
234:6

**suggest** 58:7 105:16

**suggested** 154:24
155:1,5 191:11
228:6,9

**suggests** 63:16

**suit** 152:9

**Suite** 1:20 2:9

**summarize** 112:18

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015
Page 37

**Summary** 40:13 204:22

**superscript** 243:5

**superscripts** 242:23

**supply** 224:6

**support** 53:25 78:22

**supported** 63:4

**supports** 103:17

**supposed** 76:4 173:14 212:2 219:12

**sure** 9:6 24:8,14 28:19 38:3 53:3,14 56:17 59:17 67:19 68:14 87:10 90:5 116:17,21 118:18,19 131:11 135:10,19 137:9 142:6 146:9 147:11 151:5 153:16 161:1 175:17 178:24 185:1 188:1 207:5,6,7,8,20 208:4 212:7 217:22 219:14 238:25 240:8 248:21 249:11

**surprised** 182:7

**surrounding** 237:15

**Suszckiewicz** 2:25 5:8

**swear** 212:1

**switch** 17:5 199:23

**sworn** 7:2

**symbols** 182:3,6 241:22 242:16

**syndrome** 109:11

**synthetic** 14:22 18:1,3,4,6,9,15,20 19:12

**system** 15:4 87:20

199:4

**systems** 13:23 19:24 20:1 79:18 88:10,12

———————

T

**table** 34:24 171:3,5,9,13,14,15, 19 172:10,19 173:2 174:15 185:20 241:6

**tables** 175:6,7,9 185:10,14

**tablet** 16:11

**tablets** 111:2

**tabular** 217:6,10,13,16,21, 22,25 220:17,21 221:8

**tactile** 15:13 111:5

**tag** 173:13,23 174:5,8

**tags** 171:12

**taking** 8:23 45:20

**talk** 9:24 18:4,6 68:8,9,12 70:8 82:7 83:7 91:2 111:4 112:1,16 118:6 119:21 143:4 160:15 237:15

**talked** 19:19 90:14 93:11,14,18 109:2

**talking** 24:14 59:8 103:18 106:12 135:14 137:6,14,19 154:3 156:4 160:7,9 195:7 199:22 201:13,23 210:12 241:17

**talks** 63:11 69:6

**tape** 92:16 111:1 175:18 255:2

**Target** 152:8

**task** 158:18 250:4

**tasks** 159:7 220:12 233:11 234:7

**taught** 153:10

**TDB** 243:9,16

**teacher** 76:11

**team** 33:6 50:11

**tech** 191:23

**technical** 38:25 44:7 45:10,18,25 46:8,21 47:14,21 48:2,22 49:15,23 50:7,16,25 51:9 134:5 144:13 156:4 157:14 158:18 160:13 173:23 178:2 180:11 184:8,16 185:5 191:3,8 194:24 223:9,15 237:13 238:5 245:8

**technically** 158:17 170:21 196:15

**technique** 194:9

**technological** 45:6

**technologies** 30:6 45:3 107:9 111:16 137:18

**technologist** 91:23

**technology** 12:16 13:10 14:20,21,22 18:9 20:3 21:12 27:13 37:23 40:20 41:4 42:3,9,14 45:6 99:15,24 100:18 101:9,12 110:17 133:14,17 137:16 144:5 183:24 187:10 223:17

**telltale** 232:24

**temperature** 243:13,14

**temptation** 189:23

**tend** 17:13 48:13 102:7 134:12 170:2 186:14 241:20,22

**tends** 103:8 166:6 182:25 194:19 234:3

**tension** 155:19 158:11,23

**term** 32:19 33:9 38:25 79:23 118:21 186:20

**terms** 63:5 78:5 138:14 160:20,24 161:5,9 194:24 234:9

**test** 155:25 156:3 163:17,20 220:24 229:7,12 230:12,15,24 231:4,20 232:2 245:22 246:1,12,16,18,24

**tested** 166:18,20 220:23 221:6 229:15,23

**testified** 7:2 120:8 195:9 211:4 224:11

**testify** 142:4

**testifying** 261:7

**testimony** 8:21,25 22:21 24:9 35:7 49:18 54:17 56:4 58:7 72:5,10 80:15 82:6 87:18 88:6 100:16 107:19 111:24 112:23 114:2 116:9 118:12 120:12 125:2 134:1 135:25 136:5,24 140:3 146:4 153:2 167:21 192:14 195:17 202:24 206:10 211:6 213:1

224:17 229:10
231:23 232:9
258:20 261:11

**testing** 1:3 5:24
155:19 158:11,23
165:10 196:24
246:6

**tests** 140:5 142:22

**text** 14:17,19,22
15:1,2,6,25 16:2,21
17:16,21 18:10,23
19:5 99:13,17,23
100:7,11,19,20
101:10,12,19
103:1,20,22
104:19,21
108:12,14
114:14,18 141:8
149:18 151:10,21
153:15 156:7
162:23
163:1,11,13,25
165:5,17,23
166:1,4,5 169:23
172:18
173:13,17,23
174:5,8
178:5,6,10,11,17
179:13
180:13,15,20,22
184:13 185:11,25
193:14,21 194:1,3
195:11,21,23
196:2,7
197:1,10,16,19,25
198:1 201:8 220:8
221:1 223:6 229:5
231:17 232:6,14,22
234:23 235:9
236:19 243:15
244:3,16

**text-based** 163:17
193:5,6,18
194:6,13 195:3

**textbook** 67:10 68:1

71:2

**textbooks** 68:2,3,7
70:23

**text-to-speech** 18:23
19:8

**textual** 170:15
238:21 239:15

**Thane** 2:14 5:25
192:4,6 206:17

**Thane.rehn@mto.co
m** 2:16

**Thank** 23:2 38:7
179:22 233:3
258:10

**Thanks** 68:19

**that's** 9:15,17,23
16:16 19:5 28:3
33:25 37:14
38:7,12 39:20
40:11,16 41:18,22
42:25 43:3,25
49:1,19 50:11 54:8
56:6 58:10 59:7
64:20 71:9 73:1
76:17 79:11 83:21
92:14 98:24 100:8
104:22 111:17
122:17 128:13
136:19 137:5
149:11 151:17
153:7,10 154:9
157:10 159:17
164:12 166:1
170:20 171:5
174:15 177:7
178:18 181:8,17,23
182:18 184:6
185:16
188:11,12,22 191:5
193:10,25
194:2,9,20 195:5
196:15 199:8,19
200:7 212:3,20
214:21 220:1,3
222:4 226:14,20

231:9 232:11,18
237:5 238:4,5,24
247:11 249:7
257:23 258:10

**themes** 108:6

**themselves** 76:19
106:24 130:8

**theoretically** 100:10

**thereafter** 261:9

**therefore** 72:1

**there's** 16:14,20 19:7
26:21 33:3 58:25
72:25 81:24 98:19
108:21 113:9
134:11 170:13
171:2,5 174:3
180:13 183:7 243:9
244:25 259:15,18

**they'll** 85:6

**they're** 17:20 61:15
74:9 78:22 79:16
81:7 86:16
87:8,10,11,15
129:7 139:5 144:2
146:22 147:10,12
148:3,8 152:14
160:7 166:21 173:1
182:17 185:4
210:16,23 212:17
213:17 223:10

**they've** 34:16 46:22
79:7 122:6 166:6

**thick** 160:6

**third** 17:23 30:21
66:12 194:9

**thoughts** 57:23 65:18

**thousand-page** 212:3

**thousands** 187:14

**threaten** 68:14

**threatened** 67:25
68:9

**threats** 68:13

69:14,25

**throughout** 241:14
243:17

**thumb** 190:8,10,17

**tiers** 28:16,19

**till** 233:19 234:1

**tiny** 158:3

**tired** 17:6

**title** 30:5 55:20 77:25
78:9 81:21 125:15
127:13,17
155:15,18,22,24
181:6,7
182:10,15,20,25

**titles** 45:11 130:2
157:25

**today** 5:12 8:21,25
9:16 16:7 30:1
50:22 126:11
144:25 187:15,22
188:3 189:3 191:5
223:3 254:22

**today's** 9:19 10:9
12:2,7 260:1

**Tolles** 2:14 5:25

**tools** 16:21 23:12
102:14,19 103:2,11
105:1,3,21
106:9,14,21
107:4,7 110:20,22
111:11

**top** 42:21 47:22,23
73:8 153:18 164:10
171:16 240:19
242:12

**topic** 30:13 41:22
46:18 91:5 153:10
214:8 249:7

**topics** 11:12 57:8
245:5

**total** 10:17 98:4

touch 22:23

towards 190:23

TPM-free 45:14

track 104:19 134:12

tracked 92:6

trade 68:6

tradition 63:23

trained 153:9

training 153:6

transaction 64:3

transcribed 261:9

transcript 4:23
125:18
261:10,13,15

transcription 180:21
183:12 233:5

treat 75:15,18

trees 173:18

trends 51:8

trial 40:9

trick 180:11

tricky 24:3

tried 48:11 117:2
141:25 180:16
188:17 191:19
198:7 199:18 200:9

tries 12:22

trigger 58:9

triple 148:21

true 177:3 254:11
261:10

truthful 8:21,24
192:13

truthfully 256:10

try 6:11 7:25 8:13
23:13 30:19 31:3
38:15,17 44:24
74:4,16 75:23

77:17,22 78:4
105:17,18 106:24
114:8,14
143:6,20,21 146:6
158:19 161:19
175:3 180:12,14
188:14 189:8
194:1,4 199:4
200:6 213:25

trying 13:5 24:3,4
31:10 50:14 67:17
69:13 74:9,12 75:2
100:5,7 152:14
156:3 159:20
170:14,17 173:5
187:7 244:24 245:1
251:3

turn 18:10,22 30:6
73:6 75:8 99:8
108:4 114:15 149:2
186:9 192:21
203:15 204:20
235:10 236:8 240:2

Turner 4:20
141:12,13,24
142:10 256:19
257:2,17 258:23
259:2

Turner's 142:25
259:8

TWB 243:10,17

two-by 171:15

two-by-two 171:14

two-thirds 243:9

type 19:6 21:8,14
28:24 33:17 52:1
106:13 108:1,9
109:13 114:5,8
123:17,22 149:21
156:23 258:17
259:9

typed 11:6 19:6

types 12:21 19:12
104:9 105:1,4,24

106:8 108:11
110:20 133:3,10

typical 164:24
180:25 194:20

typically 159:1

_____

U

U.S 29:9 51:23
128:14 213:7,9

Uh 196:18

Uh-huh 15:3
19:16,20 44:11
74:21 75:17 141:2
149:4 150:1 196:17
204:23 209:11
220:18 223:8

unable 124:9,23
130:22 187:13
188:19 192:13
198:1 237:4

unauthorized
42:20,24 67:4,11

unavailable 166:6

uncertain 198:9

unclear 137:10
227:25

uncommon 88:17

underlying 174:17
178:10,16

undersigned 261:2

underspecified
214:21

understand 7:24 9:6
24:4 39:5 44:15
50:13,14 57:16
59:17 69:13 71:22
77:18,19 88:7,21
99:22 106:4 108:10
137:9 192:9 195:7
196:8 210:7 233:21
236:21 237:4 239:4
244:16 245:1 256:5

understandable
182:22

understanding 8:3
9:17 32:21,23
39:20 40:11,12,17
41:20 42:13 43:4
46:4 48:20 49:13
51:21 53:5,19
58:12,21
59:2,4,10,13,21
62:9,11,21 63:1
65:18 77:3 81:19
82:11,21,25 83:12
84:3 88:4 89:1
94:2,10,14 95:2,18
96:8,11 115:16
128:7 136:10
148:11 155:4,25
209:25 210:19
215:8 217:25
228:16 237:7
251:8,17 252:19
258:21

understood 8:2 71:9
87:23 199:13

unique 105:13

United 1:1 30:2
47:13 59:1
122:9,13 135:1,6
157:16

universities 84:14

university 153:11

unless 5:17 81:23
112:6 166:2,6
224:7 239:14

unusable 183:25
223:10,16

unusual 107:2 184:6

upload 211:11

uploading 100:6

usability 140:8

usable 133:19 134:6
224:1

Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015
Page 40

**usage** 122:1

**useful** 103:4,8 105:3
106:9 107:5 224:1

**user** 81:3 104:17
165:4 186:23 187:1
193:16,19 216:11

**users** 165:11
186:1,18

**usual** 193:25

**usually** 164:21,22
182:12,13 184:25
212:11

**utilize** 70:15 158:16

**utilized** 42:10 234:21
237:8 240:7 241:1
243:17

**utmost** 73:13
74:1,8,20

---

**V**

**vague** 14:7 17:10
22:3,11,21
23:10,21 24:7,24
25:11,16 26:17
27:3,19 28:14
31:15 32:17 33:20
34:3,9,19 35:17,25
36:5,12,17,23
37:4,12,19 40:23
41:10,25 42:6
43:10,20 44:1,22
45:8 46:24 47:7,20
48:5,12,25
49:6,17,24 50:18
51:3 52:12,25
53:11,23
54:7,17,25 55:11
56:12 57:5,14
58:1,17,23
59:6,16,23 60:5,22
61:25 63:10,21
64:11 67:16,23
68:25 70:3 71:5,11
72:10 74:10

75:4,20 76:8 77:14
78:14,24 80:4,15
81:2 82:14 83:4
84:2,11 85:2,15
86:24 87:5,18
88:6,25 89:9,18
91:6 94:5,16
95:5,22 96:14,24
100:1,16 101:6,23
102:23 103:13
105:6,11,25 106:18
107:18 110:21
111:12 112:23
113:13 114:2,20
115:1,15 117:3,18
119:5 120:18
121:1,11 122:4,24
123:5,10,14,20
125:2 127:4
128:10,22
129:16,24
130:16,23 131:17
132:6 134:1 137:13
138:12 139:15
140:3,17 141:5
142:13 143:8 144:8
145:17 147:9,18
149:14 150:19
151:15,23 152:17
153:2,25 156:1,18
157:1,9 158:14
159:2 160:1 163:5
164:3 165:6 167:13
168:6,14 170:1
174:1,10 176:23
179:6 180:7
183:8,20
184:2,10,18,23
185:8,17 197:3
202:24 203:7
206:10,25 207:14
211:12 212:13
213:22 214:2,15
216:7,13 218:10,20
220:22 221:17
222:8,19 223:12,19
225:7,19 226:7
227:4 232:17

233:6,13,18 236:5
237:10,21 238:17
239:11,23 241:2
242:10 244:4,20
246:9 247:6 249:21
250:13 251:12,21
252:9 253:3
254:1,8 257:20
259:1

**vaguely** 128:13

**valid** 43:25
44:13,19,25

**value** 221:23

**variations** 108:6

**varies** 77:25 80:5
108:15,17 148:24
149:22

**variety** 16:20 19:7
113:17

**various** 60:22

**vary** 16:24

**vendors** 31:6 148:1

**Veritext** 5:10

**version** 4:10,14,17
16:5 30:5 98:15
99:1 114:10,18
118:3 155:3 165:18
166:4 177:19 178:5
179:23 192:25
198:6
201:7,21,22,23
202:21,22
216:17,21,22,24
217:2,3,11
218:9,17
219:4,7,19,24
221:14 222:4
224:22 225:14,23
226:5 227:2
230:15,17,19
231:21 234:14
235:15,17 236:2,3
239:19,21 241:5
244:11 249:23

253:22

**versions** 15:13
112:19 160:7
161:15 174:22
180:5 198:25 199:2
202:3,8 204:5
208:3,5,10,21

**versus** 5:14 82:2

**veterans** 108:5

**via** 218:8

**Vice** 20:5,10,11,14,22

**video** 5:6,16 151:7

**Videographer** 2:25
5:5 38:14 51:12,15
56:18,23 92:18,21
95:9,14 138:3,6
175:16,19,22
227:14,17
245:12,15
255:16,19 260:1

**video-recorded** 5:7

**videos** 32:8 151:5
170:16

**Videotaped** 1:14

**view** 2:20 115:18
167:11
217:14,17,18
228:24

**viewed** 139:16 258:6

**viewer** 164:6

**viewing** 115:18 165:2
170:12

**violated** 161:2

**violating** 161:9

**vision** 17:1 36:4
102:14 109:11
110:25 132:22
133:18,21 134:15
165:9

**vision-impaired**
250:12 251:11,18

Case 1:13-cv-01215-TSC   Document 204-45   Filed 11/13/19   Page 108 of 110
Capital Reporting Company
American Society for Testing and Materials, et al. v. Public Resources 07-31-2015
Page 41

252:21,22

**visual** 16:17 87:21
103:16,23 134:12
160:5

**visually** 16:7 17:15
85:18 87:9,22
88:9,13 103:7
104:19 156:11
161:23 165:13
185:20 198:14
213:15 218:16
221:13 222:3
224:13,21

**visually-impaired**
252:4

**visually-presented**
163:8

**voice** 18:15

**voluntary** 32:15,24
33:8

**volunteer**
213:5,11,16

**volunteering** 214:12
251:5

**volunteers** 27:1,7
130:7 212:17,24
213:3,25

**v-screen** 16:10

———————
W
———————

**W3C** 144:10,15,20
145:7,19,24
146:17,24,25

**wait** 188:16 189:5,7
190:21 191:12,15
233:19,22 240:9

**waived** 260:4

**walk** 245:3

**walking** 160:12

**Washington** 2:4

**wasn't** 62:20 63:6
64:16 98:23 116:2

126:6 143:13
165:25 239:16

**water** 38:6 209:3

**ways** 14:24,25
15:7,20,24 18:3
64:8 80:1 99:22
111:5 113:23
170:23 172:15

**WC3** 146:23

**WCAG** 147:1,3,6,8
148:3 149:3,7,13

**W-C-A-G** 147:4,6

**Web** 4:8 96:3
117:23,24 126:21
143:25 144:2,3,4,7
147:1,4 149:9
150:22 152:19
153:13
170:5,11,12,19
171:6 173:12 187:7
209:19

**Web's** 150:13

**website** 4:11,15
86:15 116:7,14,19
117:1,6,16 118:10
126:8,14,18 132:25
140:8 142:1
143:7,23 149:21
152:5,15
153:4,6,13
154:13,18
163:15,17 165:4
166:19
167:3,7,10,12,23
168:11,22 169:7
175:7,14
176:2,12,14,18
177:12 179:5,12
180:1 202:4 205:16
213:20 215:18
216:18,24 217:4,12
218:9,18
219:6,21,25 221:15
222:5,17 224:15
225:2,24 226:6

227:1,3 228:21,25
229:2,4 230:8
234:15 246:3,8
249:19 252:16
257:18,23 258:9,22

**websites** 112:20
115:10
117:12,16,22
124:8,16,24 130:22
133:2,12,24
138:10,14
139:13,18 140:15
141:11 142:23
149:18
151:19,20,25
152:2,21 154:3,4
163:12 203:22
204:3 207:23
258:3,5

**we'd** 187:22

**week** 10:14 126:20

**we'll** 21:3 30:12
112:16 140:25
188:12 189:9,13
244:23 255:14

**well-known** 85:17

**well-structured**
244:7

**we're** 5:5,10 8:7
20:24 31:18,23
32:3 48:17
51:12,15 56:23
64:22 71:19 78:5
80:17 81:4
92:15,19,22 95:14
106:3,12 130:3
135:14 137:14,19
138:3,6 144:25
160:9 175:20,23
188:15 189:5
190:21,25 199:22
201:12 209:14
210:12 227:14,17
241:17 245:12
249:2

255:4,12,16,19
260:2

**West** 2:19 9:13

**wet** 243:14

**WETZEL** 2:9

**we've** 19:19 107:9,15
109:2 145:1
154:1,3 179:1
187:13 190:18
210:25 223:22
232:16

**whatever** 16:3 19:1
173:19 228:25
258:5

**whenever** 209:4

**whereas** 102:11
181:24

**Whereupon** 56:20
95:11

**whether** 28:9 32:9
34:16 43:1 56:9
57:3,12 58:8,13,24
60:3,17,18
61:4,13,17 68:16
98:21 110:6 111:9
112:11,12 120:15
131:25 139:11,23
140:13 141:22
159:10,15 161:10
163:2 165:21
174:22 175:6,11
176:3 193:17,21
202:8,10,20 204:4
208:9,15 217:9
218:7,16 220:19,20
221:7,13
222:3,11,15
224:12,20,25
225:4,25 226:4
245:18 248:14
251:17

**whispers** 5:20

**white** 16:17,19

whole 114:13

whom 49:3

who's 34:23 78:7
81:3 122:23
123:4,13,18 187:7

whose 109:7

wide 12:24 19:7
102:25 103:16
144:3,7 149:7
150:22

widely 83:10 149:22

width 172:9,16

Wikipedia 245:7

willing 186:18

window 115:19
163:18 164:11,25

windows 164:21

wish 130:6

witness 9:8 10:2,4,11
14:8,11 17:11
22:4,12,22,24
23:2,11,22 24:11
25:1,12,18 26:19
27:4,20 28:15 29:6
31:16 32:18 33:21
34:4,10,20 35:8,18
36:2,7,14,19,25
37:6,14,21 38:7,19
39:2,18 40:1,16,24
41:12 42:1,8
43:12,21 44:2,23
45:9,22 46:25
47:8,21 48:7,13
49:1,7,19 50:1,20
51:4 52:14
53:1,12,24 54:8,18
55:1,12 56:5,13,20
57:7,18
58:3,5,18,24
59:7,17,24
60:7,16,24
61:12,21 62:1
63:11,22 64:13

65:20 66:21
67:17,24 68:12,19
69:1 70:5 71:6,12
72:11,21 73:20
74:3,12,24 75:5,22
76:9 77:2,16,23
78:15,25 79:2
80:5,16 81:3,19
82:7,19 83:5
84:3,13 85:3,16
87:1,7,19 88:7
89:1,10,12,19
90:21
91:7,12,15,18
94:7,18
95:6,8,11,22,24
96:16,25 97:3,6,9
98:14,19 100:2,18
101:8,24 102:24
103:14 104:7
105:8,12 106:2,19
107:20 108:17
109:18,23 110:22
111:13,25 112:24
113:7,14 114:3,21
115:2,16 116:10
117:4,19 118:13
119:6,13,17,21
120:13,20 121:2,12
122:5,25
123:6,11,15 124:19
125:3,21 127:5,8
128:2,11,23
129:7,17,25
130:17,24 131:18
132:7 134:2
136:1,6,25 137:14
138:13 139:16
140:4,18 141:6
142:14 143:10
144:9 145:18 146:5
147:10,20 149:15
150:13,20
151:16,24 152:19
153:3 154:1 155:8
156:2,19 157:2,11
158:15 159:5,20
160:3 163:6 164:4

165:7 167:14,22
168:8,16 169:3,9
170:2 171:12
172:4,14 173:8
174:3,11 175:3
176:9,24 177:16,22
179:7,20,22 180:8
183:10,22
184:4,12,19,25
185:9,19 189:21,23
190:7
191:1,7,17,22
194:16,23 195:19
196:12 197:4,22
199:8 200:21
201:12 202:16,25
203:8,13 204:8,15
206:11,20 207:1,16
209:2,6 211:7,14
212:14 213:2,23
214:3,16
215:5,6,12,14
216:8,14,21 217:16
218:11,21 219:12
220:23 221:19
222:9,20 223:13,20
224:18 225:8,21
226:8 227:5,10,13
228:13,14 230:7
231:3,24 232:10,18
233:8,14,19 234:19
235:4 236:6
237:12,23 238:19
239:12,24 240:12
241:3,19 242:3,11
243:21 244:5,21,24
246:1,10,23 247:7
248:5 249:22
250:6,14 251:14,22
252:11 253:5,15
254:3,9 257:21
259:2,20,23

witnesses 261:6

work 11:7 12:9
13:4,20,21 14:5
15:5,23 19:21
20:16,17 21:8

26:23 27:1,9,10,11
29:8 52:16 53:8
70:12 80:20,24
81:4,11,12,14,22
101:2 107:23
127:12 163:16,17
167:23 173:4
183:16 198:17
199:5 234:3 249:12
251:6 259:4

worked 13:15 20:19
21:1,9 180:17
181:3 232:19

working 26:20,21
27:5 50:5 91:23
92:4 255:12

works 15:5 17:25
30:18 32:12 49:9
50:5,6 54:22 55:24
85:7,14 122:22
123:2 153:21 199:9
230:21,25

world 26:13 35:9
144:3,6 150:22

worldwide 147:13

worried 44:13 71:20

worry 69:22

worse 17:2

worth 249:15

worthwhile 48:19

writing 46:14 184:1
191:21

writings 184:9

written 65:8
183:15,17 252:17

wrong 241:22

wrote 207:17 249:25
259:12

Wrought 155:16,19

——————————
Y
——————————

Yep 65:24 147:1

236:9,12,15

**yes/no** 239:1

**yet** 188:21 233:10

**you'll** 75:8 194:21
  209:21 220:14

**yourself** 5:22 22:18
  24:21 25:8 35:23
  36:10 37:17 247:14
  256:19

**you've** 19:11 34:13
  48:10 49:4,13 90:5
  95:3,19 104:22
  105:22 120:8
  166:19 234:2

---

**Z**

---

**zero** 182:1

**zone** 90:17

**zoom** 164:5,16,25
  165:3