# EXHIBIT 50

1

                UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF COLUMBIA

----------------------------:
AMERICAN SOCIETY FOR TESTING :
AND MATERIALS dba ASTM       :
INTERNATIONAL,               :
NATIONAL FIRE PROTECTION     :
ASSOCIATION, INC., and       :
AMERICAN SOCIETY OF HEATING, :
REFRIGERATING AND AIR        :
CONDITIONING ENGINEERS,      :
                             :
     Plaintiffs/             :
     Counter-Defendants,     :
                             :
     v.                      : No. 1:13-cv-01215-EGS
                             :
PUBLIC.RESOURCE.ORG,         :
                             :
     Defendant/              :
     Counter-Plaintiff.      :
----------------------------:
                              Coos Bay, Oregon

                    Thursday, November 13, 2014

39(b)(6) DEPOSITION OF:


               REBECCA MALAMUD,
              PUBLIC.RESOURCE.ORG,


taken pursuant to notice, by counsel for Plaintiffs/

Counter-Defendants at Red Lion Inn, 1313 North

Bayshore Drive, Coos Bay, Oregon, before Jan R.

Duiven, CSR,  FCRR, CCP, Certified Shorthand Reporter

in and for the State of Oregon, beginning at 9:00

a.m., when were  present on behalf of the respective

parties:

**Page 2**

A P P E A R A N C E S

For the Plaintiff/Counter-Defendant
ASTM International

MORGAN LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue NW
Washington, D.C. 20004
202/739-5353
BY  MR. J. KEVIN FEE
jkfee@morganlewis.com

-AND-

MR. EDWIN O. CHILDS
echilds@morganlewis.com

For the Plaintiff/Counter-Defendant National Fire
Protection Association, Inc.

MUNGER TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California 94105
415/512-4073
BY  MR. THANE REHN
thane.rehn@mto.com

For the Plaintiff/Counter-Defendant American Society
of Heating, Refrigerating and Air Conditioning
Engineers

KING & SPALDING LLP
101 Second Street
Suite 2300
San Francisco, California 94105
415/318 1222
BY  MR. ANDREW ZEE
azee@kslaw.com
(Appearing by phone)

(Continued)

**Page 3**

A P P E A R A N C E S

For the Defendant/Counter-Plaintiff
Public.Resource.Org:

ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, California 94109
415/436-9333
BY:  MR. MITCH STOLTZ
mitch@eff.org

The Videographer:
MR. CHARLES WRIGHT

Reported by:

JAN R. DUIVEN, CSR, FCRR, CCP

**Page 4**

I N D E X

WITNESS......................................PAGE
REBECCA MALAMUD
   BY MR. FEE               7
   BY MR. REHN              198
   BY MR. ZEE               228
   BY MR. STOLTZ            232
   BY MR. FEE               236

E X H I B I T S

EXHIBITS....................................PAGE
No. 16   Deposition Subpoena              11
No. 17   Financial Statements and
         Supplementary Information
         December 31, 2012 and 20ll      59
No. 18   Codes of the World Overview      87
No. 19   Emails, 1/28/2014               97
No. 20   The Mother of All To-Do Lists   121
No. 21   Emails, 12/31/13 and 1/04/14    126
No. 22   Emails, 5/7/2012                132
No. 23   Email, 10/4/2011                142
No. 24   Emails, 2013                    147
No. 25   Emails, 10/8/2012               154
No. 26   Email, 10/16/2011               173

(Continued)

**Page 5**

I N D E X

EXHIBITS....................................PAGE
No. 27   Email, 1/16/2014                186
No. 28   Emails, 5/7/2012                193
No. 29   Email, 8/7/2013                 208
No. 30   Emails, 6/7/2011                211
No. 31   Email, 1/4/2014                 220

(Exhibits attached to transcript.)

Capital Reporting Company
Malamud, Rebecca 11-13-2014

6

1 P R O C E E D I N G S
2 THE VIDEOGRAPHER: We're going on
3 the record. The time is nine a.m. Pacific Coast
4 Time. This is disc 1 of the deposition of Rebecca
5 Malamud in the matter of ASTM International, et
6 al. versus Public Resources --
7 Public.Resources.org. Case No. 1:13-CV-01215-EGS.
8 Today is November 13th, 2014. The
9 deposition is taking place at 1313 North Bayshore
10 Drive, Coos Bay, Oregon. I'd like to ask the
11 attorneys to please introduce yourselves for the
12 record starting in the room.
13 MR. FEE: Kevin Fee from Morgan
14 Lewis on behalf of ASTM.
15 MR. CHILDS: Ned Childs from Morgan
16 Lewis on behalf of ASTM.
17 MR. REHN: Thane Rehn, from Munger,
18 Tolles & Olson on behalf of NFPA.
19 MR. STOLTZ: Mitchell Stoltz from
20 the Electronic Frontier Foundation on behalf of
21 Public.Resource.org and Point B Studio.
22 THE VIDEOGRAPHER: And on the phone,
23 please?
24 MR. ZEE: Andrew Zee from King &
25 Spaulding on behalf of the American Society of

7

1 Heating, Refrigerating and Air Conditioning
2 Engineers.
3 THE VIDEOGRAPHER: Thank you. My
4 name's Charles Wright. I'm the videographer. The
5 court reporter is Jan Duiven. We're both
6 representing C&C Reporting from Eugene, Oregon.
7 Madam Court Reporter, would you now
8 swear in the witness.
9
10 REBECCA MALAMUD,
11 having been first duly sworn to testify the truth, the
12 whole truth, and nothing but the truth, was examined
13 and testified as follows:
14 EXAMINATION
15 BY MR. FEE:
16 Q. Good morning.
17 A. Good morning.
18 Q. Would you please state your name for
19 the record?
20 A. My name is Rebecca Malamud.
21 Q. Ms. Malamud, have you ever been
22 deposed before?
23 A. No.
24 Q. Okay. Well, then I'll explain a
25 little bit about what's going to happen here

8

1 today. I'm going to ask you a series of
2 questions, as well as the other counsel on behalf
3 of the plaintiffs, and perhaps your counsel as
4 well. All of our questions and your answers will
5 be recorded by the court reporter, and of course
6 you know you're being videotaped as well.
7 In order to make the court reporter's
8 job easy I'd ask that you respond to all of our
9 questions verbally as opposed to nodding, if
10 that's all right.
11 A. Okay.
12 Q. All right. If I ask you any questions
13 that you don't understand, would you please let me
14 know that?
15 A. Yes.
16 Q. And then if you respond to my
17 questions, that would mean that your answer is
18 responsive to my question and you understood it.
19 Is that fair?
20 A. Okay.
21 Q. Is there any reason you can't testify
22 fully and truthfully today?
23 A. No.
24 Q. Okay. Do you have an attorney
25 representing you today?

9

1 A. Yes.
2 Q. Who is your attorney?
3 A. Mitch Stoltz.
4 Q. How long have you had Mr. Stoltz as
5 your attorney?
6 A. Since -- I don't know the exact date.
7 In mid-summer.
8 Q. Have you met with Mr. Stoltz in
9 connection with your deposition here today?
10 A. Yes.
11 Q. On how many occasions did you meet
12 with him?
13 A. We talked on the phone a couple of
14 times, email correspondence, and we met yesterday.
15 Q. How long was your meeting yesterday?
16 A. A couple of hours.
17 Q. Was anybody present at that meeting
18 other than yourself and Mr. Stoltz?
19 A. My son was downstairs in another room.
20 Q. Okay. Is that it?
21 A. That's it.
22 Q. You mentioned you had at least one
23 phone call with Mr. Stoltz, too.
24 A. Yes.
25 Q. Do you recall how many phone calls you

Capital Reporting Company
Malamud, Rebecca  11-13-2014

---

10

1 had with him regarding this deposition?
2    A.   Two.
3    Q.   Do you recall the length of those
4 phone calls?
5    A.   No.
6    Q.   Did you speak with Carl Malamud in
7 connection with your deposition today?
8    A.   No.
9    Q.   Is Mr. Malamud your husband?
10    A.   Yes.
11    Q.   Okay.  How long have the two of you
12 been married?
13    A.   Since 1990.  Wait.  Yeah.  No.
14        God, 2000.  Sorry.  Internet time.
15 I've known him -- well, it's okay.
16    Q.   Where do you reside?
17    A.   I reside in Sixes, Oregon.
18    Q.   And does Mr. Malamud reside in Sixes,
19 Oregon?
20    A.   No, he does not.
21    Q.   Okay.  Are the two of you separated?
22    A.   Yes.
23    Q.   And how long have the two of you been
24 separated?
25    A.   We haven't lived in the same residence

---

11

1 for ten years.
2    Q.   But you're still married?
3    A.   Yes.
4    Q.   You haven't been divorced?  Okay.
5        Now, you understand that you're here
6 to testify on behalf of Point B Studios today?
7    A.   Yes.
8    Q.   What is Point B studios?
9    A.   Point B Studio is an Internet design
10 studio and art gallery.
11    Q.   Is Point B Studios a separate
12 incorporated entity?
13    A.   No.  I'm -- I'm a dba.
14    Q.   Okay.  Are you the sole owner of
15 Point B Studios?
16    A.   Yes.
17        (Deposition Exhibit No. 16
18        marked for identification.)
19 BY MR. FEE:
20    Q.   I'm going to hand you what's been
21 marked as Exhibit 16.  It's a subpoena directed to
22 Point B Studios.
23        First of all, do you recognize that as
24 a subpoena that was directed to Point B Studios?
25    A.   Yes.

---

12

1    Q.   Have you seen that document before?
2    A.   I have.
3    Q.   Turn towards the back of that
4 document.  It's the third page from the back.  Do
5 you see there's a page with the heading that says,
6 "Topics on Which Examination is Required"?  Do you
7 see that page?
8    A.   Yes.
9    Q.   Have you reviewed the topics on which
10 examination is required in that document?
11    A.   Yes.
12    Q.   Have you reviewed those topics prior
13 to just now?
14    A.   Yes.
15    Q.   Okay.  Are you prepared to testify on
16 behalf of Point B Studios on all of those topics?
17    A.   Yes.
18    Q.   Towards the bottom of that page you'll
19 also see there's some requests for production that
20 carry over to the next two pages.  Do you see
21 that?
22    A.   Yes.
23    Q.   Have you reviewed those requests for
24 production prior to today?
25    A.   Yes.

---

13

1    Q.   Did you conduct a search for documents
2 that were responsive to those requests?
3    A.   Yes.
4    Q.   Can you describe to me how you
5 conducted that search?
6    A.   I turned over to my attorney copies of
7 files that were on the computers where work was
8 conducted.
9    Q.   Did you turn over all the files on
10 each of those computers --
11    A.   Yes.
12    Q.   -- that were transferred?
13    A.   Yes.
14    Q.   Do you know how all those files were
15 winnowed down to what was actually produced in
16 response to the subpoena?
17    A.   No.
18    Q.   How did you transmit those files to
19 your counsel?
20    A.   I sent them on hard drive via FedEx.
21    Q.   So you imaged each of the hard drives?
22    A.   Yes.
23    Q.   Okay.  Did you image all the files on
24 each of the hard drives?
25    A.   You mean a complete backup of the

---

Capital Reporting Company
Malamud, Rebecca  11-13-2014

14

1  computer?
2      Q.   Well, why don't you tell me what you
3  did to try to get all the files off of each
4  computer and send them to your counsel.
5      A.   I -- I replicated the files relating
6  to the subpoena.
7      Q.   Okay.
8      A.   And on one computer I gave -- I sent
9  the entire backup because I had a crash so --
10     Q.   So how did you go about identifying
11 the files that you thought were related to this
12 subpoena that you put on a hard drive to send to
13 your counsel?
14     A.   All files were labeled.  They all have
15 an identifier.  So it was easy to identify which
16 ones were related to the subpoena.
17     Q.   So you searched by file name?
18     A.   Yes.
19     Q.   Okay.  Were there any other mechanisms
20 that you used or search techniques that you used?
21     A.   The folders are -- there are folders
22 labeled for each document set and I just copied
23 those onto the hard drive.
24     Q.   Okay.  And were those folders -- would
25 they contain things like images from an ASTM

16

1      Q.   Can you tell me whose computers they
2  were?  Were they all your computers?
3      A.   They're all property of Point B.
4      Q.   Okay.  Were they all computers that
5  you ordinarily use?
6      A.   Yes, and an employee.
7      Q.   I'm sorry.  Yes and --
8      A.   Yes.
9      Q.   Okay.  And do you also have employees
10 or consultants that use any of these computers?
11     A.   I have -- I have one full-time
12 employee.
13     Q.   What's his or her name?
14     A.   Levi Thompson.
15     Q.   Does Mr. Thompson have a Point B
16 computer that he works on?
17     A.   Yes.
18     Q.   Or is that one of the four computers
19 that was searched?
20     A.   That -- all of those files were turned
21 in.
22     Q.   So there was one computer that
23 Mr. Thompson used primarily.  Is that correct?
24     A.   Yes.
25     Q.   And is there one computer that you use

15

1  standard that you had done some work on?
2      A.   Yes.
3      Q.   Was that primarily what the types of
4  files were that you sent to your counsel?
5      A.   Yes.
6      Q.   Okay.  Did you search any emails to
7  see if you had any responsive emails?
8      A.   Yes.
9      Q.   How did you go about doing that?
10     A.   I was given a list of terms to search
11 on and I conducted the searches in -- in my email
12 program.  And the one computer that was backed up
13 I sent to my counsel and they conducted the
14 search.
15     Q.   Do you recall what any of the search
16 terms were that you searched for?
17     A.   "ASTM," "National Electric Code,"
18 "National Electrical Code," "NFPA," "National Fire
19 Protection" -- whatever the A stands for, and
20 there was a list of about 12.
21     Q.   Now, you mentioned that you had
22 searched more than one computer.  Correct?
23     A.   Correct.
24     Q.   How many computers were searched?
25     A.   Four.

17

1  primarily?
2      A.   Yes.
3      Q.   And then there was a crash computer?
4      A.   My laptop.  I have -- I have a
5  desktop, I have a laptop, and then we had Levi's
6  computer, and we had a web server.
7      Q.   And those are the four computers you
8  searched?
9      A.   Uh-huh.
10     Q.   Do you still have in your possession
11 copies of all the files related to the work you
12 did on ASTM standards in your possession?
13     A.   Yes.
14     Q.   Okay.  And is the same true for NFPA
15 standards?
16     A.   Yes.
17     Q.   And for ASHRAE standards?
18     A.   We did not work on that.
19     Q.   Okay.  So you never did any work on
20 ASHRAE -- on ASHRAE works?
21     A.   Huh-uh.
22     Q.   Okay.
23     A.   No.
24     Q.   Do you know why you did no work for
25 ASHRAE standards?

Capital Reporting Company
Malamud, Rebecca  11-13-2014

---

**18**

1     A.   It just didn't come -- it didn't
2   happen, so --
3     Q.   Do you know how many ASTM standards
4   you did work on?
5     A.   No.
6     Q.   Do you know if it was more or less
7   than 100 standards?
8     A.   No.
9     Q.   Do you know if it was more or less
10   than 25 standards?
11     A.   No.
12     Q.   Do you know if it was more or less
13   than 10 standards?
14     A.   I -- I'm not sure.
15     Q.   Okay.  Do you know if it was more than
16   five standards?
17     A.   Yes.
18     Q.   Okay.  Do you know how many NFPA
19   standards or codes you worked on?
20     A.   No.
21     Q.   Was it more than five?
22     A.   Yes.
23     Q.   Okay.  Do you know if it was more than
24   ten?
25     A.   I don't know.

---

**19**

1     Q.   Okay.  I want to turn back for a
2   second to the subpoena to the topics on which
3   examination is required.  Do you remember that
4   list of six topics?
5     A.   Yes.
6     Q.   Can you describe to me what you did to
7   prepare yourself to testify on behalf of Point B
8   on each of these topics?
9     A.   I talked to my counsel and I did
10   some -- let's see.  I talked to my counsel and I
11   produced everything that was required of me that I
12   was capable of.
13     Q.   Did you review any of those documents
14   that were produced?
15     A.   What do you mean?
16     Q.   In preparing for your deposition
17   today, did you review any documents that you
18   believed to have been produced in response to the
19   subpoena?
20     A.   I spent time reviewing my email when I
21   was doing the searches.
22     Q.   Okay.
23     A.   Which is the bulk of the communication
24   took place in email.
25     Q.   Okay.  Any other documents that you

---

**20**

1   recall reviewing to prepare for your deposition
2   today?
3     A.   No.
4     Q.   Did you speak to Levi Thompson about
5   anything regarding Thompson that are identified in
6   the subpoena in order to prepare for today?
7     A.   No.
8     Q.   What is Mr. Thompson's role at
9   Point B?
10     A.   He's an artist.
11     Q.   Is he involved in Point B's work for
12   Public.Resource in any way?
13     A.   He was a mentee in my mentoring
14   program and began work on vectorizing images.
15     Q.   So Mr. Thompson was vectorizing images
16   for Public.Resource?
17     A.   For --
18     Q.   For Point B, for Public.Resource?
19     A.   For my mentoring program sponsored by
20   Point B Studio.
21     Q.   Was Mr. Thompson vectorizing images
22   that were from any ASTM standards?
23     A.   I'm not sure.
24     Q.   Do you know if Mr. Thompson was
25   vectorizing images from any NFPA standards or

---

**21**

1   codes?
2     A.   I'm not sure.
3     Q.   You didn't ask him those questions?
4     A.   No.
5     Q.   If you had to find out whether or not
6   Mr. Thompson was involved in vectorizing images
7   for ASTM or NFPA, how would you go about doing
8   that?
9     A.   Review the files on his computer.
10     Q.   And what would you look for?
11     A.   ASTM, NFPA.  But he -- but
12   Mr. Thompson would have no knowledge of what he
13   was doing beyond vectorizing images.
14     Q.   What do you mean by that?
15     A.   It's irrelevant what organization.  He
16   was learning skills.
17     Q.   Okay.  Well, did you give him any sort
18   of direction as to how to vectorize these images?
19     A.   I taught him how to use Inkscape.
20     Q.   And is Inkscape a commercial product?
21     A.   It's an open-source product.
22     Q.   Is that the primary tool that Point B
23   uses to vectorize images?
24     A.   We used both Inkscape and Adobe
25   Illustrator.

---

Capital Reporting Company
Malamud, Rebecca  11-13-2014

---

**22**

1    Q.    Do you know if Adobe Illustrator was
2 used to vectorize any images from ASTM or NFPA
3 publications?
4    A.    I don't know.
5    Q.    Do you know if Inkscape was used for
6 that purpose?
7    A.    Most likely.
8    Q.    Why do you say, "most likely"?
9    A.    It's our -- the predominant tool in my
10 studio.
11    Q.    I just want to talk to you for a
12 minute or two about your background.  Can you tell
13 us what your educational background is?
14    A.    I went to fine arts school at Florida
15 School of the Arts, technical college at Nashville
16 Tech, Nashville State Technical Institute.
17    Q.    Did you receive degrees from either of
18 those programs?
19    A.    Associate's degrees.  And I'm
20 primarily self-taught beyond that.
21    Q.    So you received associate's degrees
22 both from the fine arts school and the technical
23 school?
24    A.    Uh-huh.
25    Q.    And you said but beyond that you're

---

**23**

1 self-taught?
2    A.    Uh-huh.
3    Q.    Can you describe to me what skills you
4 believe you taught yourself?
5    A.    Everything germane to working on the
6 Internet, because it didn't exist when I went to
7 school.
8    Q.    Okay.  Do you have any certifications
9 for either technology or other areas?
10    A.    No.
11    Q.    In what years did you receive those
12 associate's degrees?
13    A.    '87, '89.
14    Q.    Did you receive the arts degree in
15 1987 and --
16    A.    Yes.
17    Q.    -- and then you received a degree from
18 the technical college in '89?
19    A.    Yes.
20    Q.    Is there any particular major area of
21 expertise that you studied?
22    A.    Graphic design.
23    Q.    And is that true for both those
24 programs?
25    A.    Printmaking when I was in art school.

---

**24**

1    Q.    Can you describe your work history
2 briefly since 1989?
3    A.    In 1989, I cofounded the first -- one
4 of the first ISPs in Cincinnati, Ohio, called
5 Productivity Online.  It was mostly a -- bulletin
6 board system based at that time.
7        I was one of the first designers on
8 the World Wide Web.  My first commercial site was
9 in 1992 for an advertising agency called Hensley
10 Legal Renschler.  I think it predates O'Reilly by
11 a year.
12    Q.    Okay.  At what time period were you
13 looking on this ISP business that you referenced?
14    A.    1989 to 1991.
15    Q.    Were you an owner of that business?
16    A.    Yes.
17    Q.    Did you --
18    A.    I was the vice president, cofounder.
19    Q.    Did you sell your interest in that
20 company?
21    A.    No.
22    Q.    Do you still own it?
23    A.    No.
24    Q.    Is that company out of business?
25    A.    Out of business.

---

**25**

1    Q.    Okay.
2    A.    The world -- the web happened, so --
3    Q.    So that company went out of business
4 in 1991 approximately?
5    A.    Approximately.
6    Q.    Then you said you made the first
7 commercial -- or one of the first commercial
8 websites?
9    A.    Yep.
10    Q.    Around what time frame was that?
11    A.    '90-'91.
12    Q.    Was that while --
13    A.    It was really early.
14    Q.    Was that while you were still working
15 for the ISP?
16    A.    Yeah.  Yes.
17    Q.    Okay.
18        MR. STOLTZ:  Rebecca, be careful not
19 to talk over Mr. Fee.  Okay?
20        THE WITNESS:  Okay.
21        MR. STOLTZ:  Sort of give him some
22 space.
23        THE WITNESS:  All right.
24 BY MR. FEE:
25    Q.    Can you repeat what the name of that

---

Capital Reporting Company
Malamud, Rebecca  11-13-2014

**26**

1  ISP was again?
2      A.   Productivity Online.
3      Q.   Okay.  After you were employed by
4  Productivity Online, did you take another job?
5      A.   I've always been self-employed.  I
6  have my own -- it morphed into my own web
7  business.
8      Q.   That web business have a name?
9      A.   The Lab Design.
10     Q.   Is that a separate corporate entity or
11 just a dba?
12     A.   Dba.
13     Q.   And you started working using the dba
14 of the Lab Design approximately 1991?
15     A.   Yes.
16     Q.   Are you continuing to use that dba
17 today?
18     A.   No.
19     Q.   When did you stop using that name?
20     A.   1995.
21     Q.   Did you start to use a different name
22 for your self-employed business at that point in
23 time?
24     A.   EnviroMedia.
25     Q.   What was the business of the Lab

**27**

1  Design?
2      A.   Print design and web design.
3      Q.   What was the business of EnviroMedia?
4      A.   Web design primarily.
5      Q.   Why did you adopt a new name around
6  1995?
7      A.   To show that -- to emphasize the
8  website of the studio.
9      Q.   Do you still use the EnviroMedia dba?
10     A.   Nope.
11     Q.   When did you stop using that dba?
12     A.   2000.
13     Q.   Did you adopt a new dba then?
14     A.   Nope.  I had a kid.
15     Q.   So you're not working outside of the
16 house from 2000?
17     A.   I did not work for a while.
18     Q.   From 2000 until when?
19     A.   Two-thousand -- 2004.  I was doing
20 some work out of my house but that's when I -- you
21 know, began being a business entity again.
22     Q.   In 2004 did you adopt a new dba?
23     A.   Point B Studios.
24     Q.   Why did you use the Point B Studios
25 name instead of EnviroMedia at that point?

**28**

1      A.   Just a new business, new location.
2      Q.   Where was EnviroMedia located?
3      A.   Cincinnati, Ohio.
4      Q.   And Point B Studio is located in
5  Oregon?
6      A.   Yes.
7      Q.   Where in Oregon is it?
8      A.   Port Orford, Oregon.
9      Q.   Has Point B Studio always been located
10 there?
11     A.   Yes.
12     Q.   And you've been using the Point B
13 Studio name since 2004?
14     A.   Yes.
15     Q.   Do you have any other dba's?
16     A.   No.
17     Q.   Do you have any other employment?
18     A.   What do you mean?
19     Q.   Do you work for any entity other than
20 Point B Studio at this time?
21     A.   No.
22     Q.   You're the sole owner of Point B
23 Studios?
24     A.   Yes.
25     Q.   Do you have a title at Point B

**29**

1  Studios?
2      A.   Owner.
3      Q.   What are your responsibilities as
4  owner of Point B Studios?
5      A.   Everything.
6      Q.   What is the business of Point B
7  Studios?
8      A.   I'm an art gallery and Internet design
9  studio.
10     Q.   What portion of your business is
11 focused on art gallery?
12     A.   It's 50-50.
13     Q.   Is it approximately 50-50 revenue
14 split as well?
15     A.   It depends.  It's -- some years are
16 better than others.
17     Q.   Well, since 2004, were most of your
18 years better years in the art gallery side of the
19 business or the Internet design side?
20     A.   I haven't really mapped that out, but
21 when I moved to Oregon my intention was to open an
22 art gallery, so I was very focused on that.
23     Q.   Do you know what the split in revenue
24 was in 2013?
25     A.   No.

Capital Reporting Company
Malamud, Rebecca  11-13-2014

30

1    Q.   Do you know if the Internet design
2  studio business made up more than 25 percent of
3  the revenue?
4    A.   Yes.
5    Q.   It did make up more than 25 percent?
6    A.   Yes.
7    Q.   Do you know if the Internet design
8  studio made up more than 50 percent of the revenue
9  in 2013?
10    A.   I don't know.
11    Q.   Can you describe to me what you
12  consider to be Internet design studio services?
13    A.   Web print.  Nowadays just about
14  anything relates to the Internet.  iPad.  You
15  know, I do mobile design.
16    Q.   Who are --
17    A.   And I do print -- print publishing
18  solutions, automated.
19    Q.   Who are Point B's largest Internet
20  design customers?
21    A.   I've had many over the years.
22    Q.   All right.  Well, why don't we focus
23  on since January 1, 2013.
24    A.   Since 2013?
25    Q.   Yes.

31

1    A.   I've done work for -- I do work for
2  Public.Resource.  I've done work for the Internet
3  archive, Avaaz.
4    Q.   Can you spell that, please?
5    A.   A-V-A-A-Z.  The Melkite Eparchy of
6  Newton.
7    Q.   Can you spell that one?
8    A.   It's the Greek Melkite Church.
9    Q.   Okay.
10    A.   I'm still thinking.
11    Q.   Take your time.
12    A.   I work with various Internet startups.
13  I recently worked on the Thing System, which is in
14  the Internet of things space.
15    Q.   Those are the largest customers since
16  2013 in the Internet design space?
17    A.   I'm thinking.  Yes.
18    Q.   Is Public.Resource the largest of
19  those customers?
20    A.   No.
21    Q.   Who's the largest of those customers?
22  And just to be clear, when I say largest, I mean
23  who provides the most revenue to Point B Studios.
24    A.   It's -- it's a tie in there, so --
25    Q.   Okay.  Tie between which entities?

32

1    A.   I don't -- Avaaz and the Thing System.
2  There you go.
3    Q.   Those are the two largest Internet
4  designs?
5    A.   Yes.
6    Q.   Okay.  So they're both larger than
7  Public.Resource as a source of revenue since 2013?
8    A.   I believe so.  It would be nice to be
9  able to review things.  I mean --
10    Q.   Did you produce a document that you
11  think would be helpful for you to answer those
12  questions?
13    A.   Say that again.
14    Q.   Did you produce a document in response
15  to the subpoena --
16    A.   Yes.
17    Q.   -- that you think would be helpful in
18  answering those questions.  What was the document?
19    A.   2012 profit and loss.
20    Q.   Does that identify customers?
21    A.   I don't know if it had customers on
22  there.
23    Q.   What portion of Point B's business is
24  converting or digitizing images into code that you
25  can put it on the internet?

33

1    A.   What portion of my business?
2    Q.   Yes.
3    A.   I -- 25 percent.
4    Q.   For which customers -- well, first of
5  all, do you do that work for Public.Resource?
6    A.   Could you repeat the question?
7    Q.   Do you convert or digitize images for
8  Public.Resource?
9    A.   Yes.
10    Q.   Do you do that service for any other
11  entity other than Public.Resource?
12    A.   No.
13    Q.   Have you ever done that work for any
14  entity other than Public.Resource?
15    A.   No.
16    Q.   When did you start doing that work for
17  Public.Resource?
18    A.   2011.
19    Q.   Can you describe how it came to be
20  that you started converting images for
21  Public.Resource?
22    A.   I was -- I was asked to look at the
23  standards documents.
24    Q.   Who asked you to do that?
25    A.   Public.Resource.

Capital Reporting Company
Malamud, Rebecca  11-13-2014

34

1   Q.   Who at Public.Resource?
2   A.   Carl Malamud.
3   Q.   Okay.  So Mr. Malamud asked you to
4   look at the standards documents.  What happened
5   next?
6   A.   And in my capacity as an Internet
7   consultant, I suggested ways that it could be
8   improved.
9   Q.   At the time had you already been
10  retained by Public.Resource to provide some sort
11  of Internet consulting services?
12  A.   Yes.
13  Q.   What type of Internet consulting
14  services were you providing to Public.Resource
15  prior to doing any conversion of images?
16  A.   Web design, I don't know.  I'd have
17  to -- primarily web-related and design
18  consultation.
19  Q.   When did you start doing that type of
20  work for Public.Resource?
21  A.   2006.
22  Q.   Did you provide web design consulting
23  services to Public.Resource in every year from
24  2006 to 2011?
25  A.   I'm not sure.  I don't know.

35

1   Q.   Do you know how much Public.Resource
2   paid Point B Studios for web design consulting
3   services prior to 2011?
4   A.   I don't know.
5   Q.   Do you know if it was more than
6   $25,000?
7   A.   I don't know.
8   Q.   Do you know if it was more than
9   $10,000?
10  A.   I don't know.
11  Q.   Do you know if it was more than
12  $1,000?
13  A.   Yes.
14  Q.   It was more than $1,000?
15  A.   I don't know, so --
16  Q.   Do you or do you not know whether or
17  not Public.Resource paid Point B more than $1,000
18  for web design consulting services from 2006 to
19  2011?
20  A.   Yes.
21  Q.   You do know how much you were paid?
22  A.   No.
23  Q.   Okay.  But you know that
24  Public.Resource paid you more than $1,000 for web
25  design --

36

1   A.   Yes.
2   Q.   -- consulting services?
3   A.   Yes.
4   Q.   Is Point B's website -- does Point B
5   have a website?
6   A.   Yes.
7   Q.   What is the address for that website?
8   A.   PointBStudio.net.
9   Q.   Do you -- does Point B have any other
10  websites that it operates?
11  A.   The Rural Design Collective, my summer
12  mentoring program.
13  Q.   What's the address for that?
14  A.   RuralDesignCollective.org.
15  Q.   Are there any other websites that
16  Point B runs?
17  A.   No.
18  Q.   Are there any other domain names that
19  Point B Studios owns?
20  A.   Yes.
21  Q.   What other domain names?
22  A.   I own about 30.  I'm not -- I don't
23  know if I'm going to remember them all.
24  Q.   All right.
25  A.   So Rare Bird Arts.  That's a

37

1   photographer that my gallery represents.
2   BillGaetjens.com.  That's an artist that my
3   gallery represents.
4         (Reporter inquiry.)
5         THE WITNESS:  Bill Gaetjens,
6   G-A-E-T-J-E-N-S.
7         Every instantiation of Point B
8   Studio available.  And Webchickbot, every
9   instantiation of that available.
10  BY MR. FEE:
11  Q.   What is Webchickbot?
12  A.   It's my moniker online.
13  Q.   What type of information do you put on
14  that website?
15  A.   Mostly talking about art in my
16  gallery.
17  Q.   All right.  I didn't mean to cut off
18  your list of domain names.  If you have others, go
19  ahead.
20  A.   Heida Photography and the artist
21  represented by my gallery.
22  Q.   Are all the other domain names that
23  you own associated with artists that you
24  represent?
25  A.   Mostly, yeah.

Capital Reporting Company
Malamud, Rebecca  11-13-2014

38

1    Q.   Can you identify any others that are
2 not associated with photographers you represent?
3    A.   Can't think of any.
4    Q.   Now, you had mentioned that Point B
5 Studios had one employee currently other than
6 yourself.  Right?
7    A.   Correct.
8    Q.   Has Point B Studios ever had another
9 employee?
10    A.   I had a part-time contractor.
11    Q.   What was that person's name?
12    A.   Jasper Shoemaker Pruitt (phonetic).
13    Q.   And is Jasper a man or a woman?
14    A.   It's a man.
15    Q.   Okay.  What was his position at
16 Point B Studios?
17    A.   A programmer.  He went through my
18 mentoring program, but I hired him for services
19 outside of that, because he was good.
20    Q.   How old is he?
21    A.   Thirty-five.
22    Q.   How old is Levi Thompson?
23    A.   Thirty-five.
24    Q.   Okay.  So other than Mr. Thompson and
25 Mr. Pruitt, Point B has never had any other

39

1 employees?
2    A.   Nope.  And I need a raise.  No.  I'm
3 just kidding.
4    Q.   Does Point B Studios use independent
5 contractors to do some of its work?
6    A.   No.
7    Q.   Does Point B Studios use volunteers to
8 do any of this work?
9    A.   I've had mentees in my mentoring
10 program.
11    Q.   How many?
12    A.   It's all on my website, most of them,
13 but I would say I've had 20.
14    Q.   Did Mr. Pruitt work on any ASTM or
15 NFPA standards while he was a part-time employee
16 or consultant?
17    A.   Yes.
18    Q.   What type of work did Mr. Pruitt do on
19 ASTM and/or NFPA standards?
20    A.   Coded MathML equations.
21    Q.   Anything else?
22    A.   He -- he worked on an independent
23 project.  He wanted very much to make the coding
24 of MathML equations and the conversion process
25 easier.  So he was working on an app for that, but

40

1 he didn't complete it, because the math is a lot
2 of -- it's a lot of work, so --
3    Q.   Was that app ever used for any of your
4 work at Point B Studios?
5    A.   No.  It wasn't completed.
6    Q.   All right.  I want to talk to you
7 briefly about your mentees as you described them.
8    A.   Okay.
9    Q.   That's -- you said was part of your
10 rural design initiative?
11    A.   Uh-huh.  Collective.
12    Q.   Collective?
13    A.   Yeah.
14    Q.   And can you describe who the
15 participants are in that program generally?
16       MR. STOLTZ:  Objection.  Vague.
17 BY MR. FEE:
18    Q.   For example, do they tend to be 7 to
19 14 years old?
20    A.   Not always.  This year I had a youth
21 group.
22    Q.   Maybe you should start with the oldest
23 of the persons who were in your program.  Who
24 is -- what is the oldest person that ever
25 participated in the Rural Design Collective

41

1 program?
2    A.   Thirty-five is the cap.
3    Q.   What portion of the participants in
4 this program are over the age of 18?
5    A.   Let's see.  15 percent.
6    Q.   So the vast majority of the
7 participants are under 18?
8    A.   Or -- I've had high -- had
9 high-school-age and kids entering college.
10    Q.   Okay.  So at least the vast majority
11 of them are under 21?
12    A.   At this present time.
13    Q.   Have there been persons who have
14 dropped out of this Rural Design Collective
15 program?
16    A.   Yes.  The work is -- the work is
17 difficult.  I mean, if they can't do the work,
18 usually I have another project to put people on.
19 So -- but sometimes it doesn't work out.
20    Q.   Is the target for this initiative high
21 school children or younger?
22    A.   No.
23    Q.   All right.  Well, is the core group of
24 the Rural Design Collective 7 to 14 years of age?
25    A.   This year.

Capital Reporting Company
Malamud, Rebecca  11-13-2014

---

42

1          MR. STOLTZ:  Objection to form.
2  "Core group."
3  BY MR. FEE:
4      Q.   Have you ever used the phrase "core
5  group" in connection with Rural Design Collective
6  before?
7      A.   This year.
8      Q.   Have you used the phrase "core group"?
9      A.   Yes.
10     Q.   Okay.  What does that mean?
11     A.   It just -- most of the people working
12  this summer were that age.
13     Q.   Okay.  You're comfortable using the
14  word "core group" in connection with this business
15  of yours?  Your counsel objected.  He didn't think
16  you could understand "core group."  I just want to
17  make sure you understand the phrase.
18     A.   I'm just using it as a phrase.
19     Q.   Okay.  And just tell me what you meant
20  by "core group."  I want to make sure we're all
21  clear here.  What did core group mean?
22     A.   Most of the mentees this year were in
23  that age group.
24     Q.   Okay.  So the core group as of 2014 at
25  Rural Design Collective was children ages 7 to 14?

---

43

1      A.   Yes.
2      Q.   What was the age range of the core
3  group in 2013?
4      A.   Well, we -- like 7 to 35.
5      Q.   Okay.  Was there one 35-year-old?
6      A.   Yes.
7      Q.   Okay.  Who was the next oldest person
8  in 2013?
9      A.   2013?  Probably 14.  I don't think I
10  had high school in 2013 -- last year, '14.
11     Q.   Who was the 35-year-old mentee of
12  yours that participated in the Rural Design
13  Collective?
14     A.   That was Jasper.
15     Q.   Did persons in the Rural Design
16  Collective program work on any ASTM or NFPA
17  standards?
18     A.   Yes.
19     Q.   Do you know which persons in the
20  program worked on the ASTM or NFPA standards?
21     A.   Jasper and Levi.
22     Q.   So Levi's also part of the Rural
23  Design Collective?
24     A.   Yes, but he has graduated.  He's --
25  he's a mentor.

---

44

1      Q.   Are you telling me that only Jasper
2  and Levi out of the persons in the Rural Design
3  Collective organization worked on ASTM or NFPA
4  standards?
5      A.   Yes.
6      Q.   You're sure?
7      A.   Yes.
8      Q.   How do you know that?
9      A.   I've -- the way that the timelines
10  are, it makes sense.  And I had a couple of
11  mentees that wanted to do the work on the
12  standards, but they -- they could not master the
13  skills.
14     Q.   Can you explain to me how the timeline
15  leads you to believe that only Jasper and Levi
16  worked on the NFPA and ASTM standards?
17     A.   No, because I'm trying to re --
18  reconstruct things in my mind.  So that's where
19  that comment came from.  I asked if I could have
20  notes, but I couldn't have notes today.
21     Q.   Well, you could have brought notes.
22     A.   Okay.
23     Q.   Maybe your counsel didn't want you to,
24  but you're welcome to bring notes or get notes at
25  lunch if you want.

---

45

1      A.   Okay.  I didn't bring any but --
2      Q.   Okay.  So you don't base the answer
3  that only Jasper and Levi were working on the ASTM
4  or NFPA standards based on the timeline at this
5  point?
6      A.   Yeah.  I just mean --
7          MR. STOLTZ:  Objection.
8  Mischaracterizes her testimony.
9          MR. FEE:  She just said yeah, but
10  you can finish.
11     A.   I just -- it was just -- I just -- can
12  you ask it again?
13  BY MR. FEE:
14     Q.   Sure.  First of all, let me make sure
15  I understood this correctly.  It's your testimony
16  that only Jasper and Levi out of all the persons
17  at Rural Design Collective worked on ASTM and --
18  and NFPA standards.  Is that right?
19     A.   Yes, because the level of the work --
20  yes.
21     Q.   Okay.  And the reason that you believe
22  only Jasper and Levi worked on the NFPA and ASTM
23  standards is because of the level of the work, you
24  said?
25          MR. STOLTZ:  Objection.

---

Capital Reporting Company
Malamud, Rebecca  11-13-2014

46

1 Mischaracterizes the testimony.  You can answer if
2 you can.
3      A.   I don't know.
4 BY MR. FEE:
5      Q.   Well, why don't you tell me every
6 reason that you think only Jasper and Levi worked
7 on the NFPA and ASTM standards.
8      A.   The skill level involved.
9      Q.   Anything else?
10     A.   No.
11     Q.   Did Jasper or Levi ever delegate any
12 of their work to persons in the Rural Design
13 Collective other than themselves?
14     A.   No.
15     Q.   Did you instruct them never to
16 delegate any work?
17     A.   No.
18     Q.   But you're not aware of them
19 delegating any work?
20     A.   Correct.
21     Q.   Is part of the Rural Design Collective
22 program something akin to a summer camp or clinic?
23     A.   I've -- I've had people make that
24 comparison, but --
25     Q.   Okay.  Well, there's a summer program

47

1 of some sort.  Correct?
2      A.   Right.
3      Q.   Do the participants pay Point B
4 anything to be in this program?
5      A.   No.  But I -- we have stipends based
6 on performance.
7      Q.   Point B pays stipends to the
8 participants?
9      A.   Awards, scholarship funds.
10     Q.   Did any participants in the Rural
11 Design Collective earn awards or stipends for
12 their work on NFPA or ASTM standards?
13     A.   No.
14     Q.   What is a standard sprint?
15     A.   We pick an area of public concern that
16 we were enthusiastic about and convert the
17 graphics for that topic.
18     Q.   You --
19     A.   It was intended to be motivational.
20 It is.
21     Q.   What graphics are you converting with
22 standard sprint?
23     A.   At the time it was public safety
24 related to theater accessibility.
25     Q.   Was there only one standard sprint

48

1 that was ever held by Point B?
2      A.   It was the focus of the -- 2013.
3      Q.   Besides 2013's standard sprint, were
4 there any others?
5      A.   No.
6      Q.   And you said that the standard sprint
7 involved standards related to a theater?
8      A.   Theater accessibility was a big topic,
9 handicapped.
10     Q.   Were there other standards?
11     A.   No.
12     Q.   Do you know who authored those
13 standards?
14     A.   Is it the British standard?
15     Q.   What did you do with the end product
16 once those graphics were converted?
17     A.   Released them in the public domain on
18 Public.Resource.org's web server.
19     Q.   Was Point B Studios paid for that?
20     A.   I sponsored the mentoring program.
21     Q.   Was Point B Studios paid by
22 Public.Resource for this 2013 release of British
23 standards regarding theater accessibility?
24     A.   As part of my consulting fee, yes.
25     Q.   Were any of the mentees of this Rural

49

1 Design Collective that participated in the
2 standard sprint reimbursed for their work or paid
3 for their work in any way?
4      A.   That year we didn't have awards.
5      Q.   So none of the persons who did the
6 conversions of the graphics for the theater safety
7 standards in 2013 were paid by Public.Resource or
8 Point B?
9      A.   Correct.
10     Q.   Is that the only instance that you're
11 aware of where participants in the Rural Design
12 Collective converted any graphics for which
13 Point B was paid by Public Resource?
14     A.   I don't understand the question
15 exactly.
16     Q.   Are there any other circumstances that
17 you're aware of in which participants in the Rural
18 Design Collective program converted graphics for
19 which Public Resource paid Point B Studios?
20     A.   Say it again.
21         MR. FEE:  Can you read that back,
22 please?
23         THE WITNESS:  I don't know why.  I
24 might be getting tired.
25         MR. FEE:  Actually --

Capital Reporting Company
Malamud, Rebecca  11-13-2014

50

1        THE WITNESS:  So --
2        MR. FEE:  Go ahead.  Read it back,
3 please.
4        (The question was read back
5        as follows:)
6        "QUESTION:  Are there any other
7        circumstances that you're aware of in
8        which participants in the Rural Design
9        Collective program converted graphics
10       for which Public Resource paid Point B
11       Studios?"
12       THE WITNESS:  There -- there are
13 more circumstances.
14 BY MR. FEE:
15   Q.   Can you identify those circumstances?
16   A.   In relation to the mentoring program,
17 California Code of Regulations, and Title 24.
18 That was 2011 and 2012.
19        We also worked on the Eur code,
20 European safety standards.
21        You want me to continue?
22   Q.   Yes.  Please tell me as many as you
23 recall.
24   A.   India, Bulgaria.  I mentioned the
25 British standard.  That seems about right.

51

1   Q.   You can't recall any more at this
2 time?
3   A.   No.  The -- the ASTM and NFPA.
4   Q.   Any others?
5   A.   I can't recall any more at this time.
6   Q.   Do you recall which of the ASTM
7 standards you had participants in the Rural Design
8 Collective convert graphics for?
9   A.   No.  When I'm reviewing the work
10 for -- I'm focusing at a graphic -- at the graphic
11 level, so, you know, which standards they are is
12 kind of -- I don't know.
13   Q.   Okay.  Is the same true for NFPA, you
14 can't identify the specific NFPA standards?
15   A.   No.
16   Q.   I'm sorry.  I asked a bad question
17 there.  Can you identify any specific NFPA
18 standards for which participants in the Rural
19 Design Collective assisted in converting to
20 graphics?
21   A.   I remember lots of ladders and fire
22 extinguishers.
23   Q.   Anything else that you remember about
24 NFPA codes in particular that were converted by
25 Rural Design Collective personnel?

52

1   A.   That we came to that work through our
2 work on -- I believe the CCR.  That there was
3 similar graphics.  It was a Title 24.  One of
4 those.
5   Q.   And the CCR you're referring to is the
6 California Code of Regulations?
7   A.   Correct.
8   Q.   If you needed to figure out which
9 person or persons that were participating in the
10 Rural Design Collective were working on images
11 from ASTM or NFPA standards, how would you go
12 about figuring that out?
13   A.   Search on the computer files, as I
14 mentioned before.
15   Q.   Okay.  And so let's say, for example,
16 we did a search for ASTM and we found a
17 hypothetical ASTM standard called ASTM Standard 1.
18 What information in these computer files would
19 help us figure out which persons in this Rural
20 Design Collective program worked on that image or
21 images?
22   A.   You would not know the person.
23   Q.   Okay.  That's what I'm trying to get
24 the answer to.  Is there a way that you're aware
25 of that you could figure out which person or

53

1 persons worked on the conversion of particular
2 ASTM or NFPA graphics?
3   A.   We didn't put our -- no.  There's no
4 way.
5   Q.   So you have no way of knowing which of
6 the participants did any of those conversions?
7   A.   Right.
8   Q.   You know, I should have mentioned this
9 before, but if you want to take a break at any
10 time -- you mentioned you were tired.  Just speak
11 up.  You'll have to answer whatever question's
12 pending but --
13   A.   Well, I could probably take a break --
14   Q.   Okay.  Why don't we take a break now,
15 then?
16   A.   -- because I get tired.
17        THE VIDEOGRAPHER:  Everyone agrees.
18 We're going off the record.  10:06 a.m.
19        (Recess:  10:06 a.m. to 10:16 a.m.)
20        THE VIDEOGRAPHER:  We're going back
21 on the record.  The time is 10:16 a.m.  Beginning
22 disc No. 2.
23 BY MR. FEE:
24   Q.   Ms. Malamud, can you tell me who
25 Christopher Garcia is?

Capital Reporting Company
Malamud, Rebecca  11-13-2014

54

1      A.   He is a mentee -- he was a mentee in
2  my program, I believe, in 2011 and 2012.
3      Q.   Do you know how old he was
4  approximately at that time?
5      A.   Twenty-six.
6      Q.   Do you know what the educational
7  background of Levi Johnson is?
8      A.   High school.  I don't think he went to
9  college.
10     Q.   Wait.  Is it Johnson or Thompson?
11     A.   Thompson.
12     Q.   I'm sorry.  So Levi Thompson went to
13  high school.  You're not sure about college.  Is
14  that what you said?
15     A.   Correct.
16     Q.   Do you know if he has any other
17  certifications in technical areas?
18     A.   He's an artist.
19     Q.   Are you aware of him having any
20  computer-related training?
21     A.   It all -- it occurred -- he was
22  completely traditional, drew everything by hand.
23  And when he entered my mentoring program, he
24  became a digital artist.
25     Q.   When did he enter the mentoring

55

1  program?
2      A.   He was the first mentee.  I think
3  2006.  He was working graveyard shift at the local
4  convenience store and wanted out.
5      Q.   Can you describe what sort of
6  technical training he went through during this
7  mentee program?
8      A.   He learned how to use Photoshop.  He
9  learned how to use Adobe Photoshop, Wacom Drawing
10  Tablet, Inkscape.
11     Q.   Did you teach him how to use all those
12  tools?
13     A.   Yes, I did.
14     Q.   Was anyone else involved in that
15  teaching?
16     A.   No.
17     Q.   Besides being in your mentor program,
18  are you aware of any other computer-related
19  training that Mr. Johnson has had -- or
20  Mr. Thompson has had?
21     A.   He has a father who was a digital
22  photographer, so he's been around computers.
23     Q.   Is that it?
24     A.   Yeah.
25     Q.   Do you know what educational

56

1  background Jasper Pruitt has?
2      A.   He went to the University of Oregon.
3      Q.   Do you know --
4      A.   Where he majored in mathematics.
5      Q.   Do you know if he received a degree?
6      A.   I'm not sure.  I think he got a
7  bachelor's, but I'm not sure.
8      Q.   Do you know what type of
9  computer-related training he has had?
10     A.   He is self-taught and through -- and
11  through my program, and he said he also took a --
12  online courses, MOOCs, multi-online courses.  I
13  don't know what the O stands for.
14         MR. STOLTZ:  Is that M-O-O-C?
15         THE WITNESS:  Yeah.  Some --
16  Coursera.  That was another one.
17  BY MR. FEE:
18     Q.   Are you aware of any other
19  computer-related training that he had?
20     A.   No.  That's it.
21     Q.   Do you know if he has any scientific
22  background?
23     A.   No.  He's -- he's -- not to my
24  knowledge.
25     Q.   Do you know if Mr. Thompson has any

57

1  scientific background?
2      A.   Not to my knowledge.
3      Q.   Okay.  Do you know the educational
4  background of Christopher Garcia?
5      A.   He went to the Fine Art Academy in San
6  Francisco.
7      Q.   Do you know if he received a degree
8  there?
9      A.   I think he got an associate's degree.
10     Q.   Are you aware of any computer-related
11  training that Mr. Garcia's had?
12     A.   Through -- just through my program.
13     Q.   How often are you in communication
14  with Carl Malamud?
15     A.   It varies.
16     Q.   Do you typically communicate with him
17  one way or another every day?
18     A.   No.
19     Q.   All right.  Is the majority of your
20  communications via email?
21     A.   Yes.
22     Q.   When you send emails to Mr. Malamud,
23  do you typically send them to an email address
24  that is a Public.Resource domain?
25     A.   No.

Capital Reporting Company
Malamud, Rebecca  11-13-2014

58

1    Q.   Do you know what email address you
2 typically use?
3    A.   Carl@media.org.
4    Q.   Are there any other email addresses
5 you use for him?
6    A.   No.
7    Q.   Do you know who Carl Malamud works
8 for?
9    A.   Public.Resource.
10   Q.   Any other entities?
11   A.   None.
12   Q.   Do you know what his role is at
13 Public.Resource?
14   A.   President.
15   Q.   Do you know -- has Public.Resource
16 made any payments to Point B Studios in 2014?
17   A.   Yes.
18   Q.   Do you know how much those payments
19 totalled to?
20   A.   I have a consulting fee, a monthly
21 consulting fee, of 5K.
22   Q.   And that's been in place for all of
23 2014?
24   A.   Yes.
25   Q.   In addition to the monthly consulting

59

1 fee, have you received any other payments from
2 Public.Resource in 2014?
3    A.   Often I've got support for my summer
4 mentoring program.
5    Q.   What sort of support did you receive
6 from Public.Resource?
7    A.   An additional 2.5K.
8    Q.   Per month or total?
9    A.   For three months.
10   Q.   Besides the $5,000 consulting fee and
11 the $2,500 support for the summer program, has
12 Point B received any other monies from
13 Public.Resource in 2014?
14   A.   No.
15   Q.   I just want to go back to the support
16 of the summer program for a second.  In 2014, you
17 were paid $2,500 three times, one per month,
18 during the summer months?
19   A.   Right.
20       (Deposition Exhibit No. 17
21       marked for identification.)
22 BY MR. FEE:
23   Q.   I'm going to hand you what's been
24 marked as Exhibit 17.  It's Public.Resource.org's,
25 Inc.'s, financial statement and supplemental --

60

1 summary information for years ending December 31,
2 2012 and 2011.  Have you ever seen Exhibit 17
3 before?
4    A.   No.  This is financials.  It's online.
5    Q.   I want to draw your attention to
6 page 9 of this document.
7        MR. STOLTZ:  Go ahead and read it
8 over.
9        MR. FEE:  You can take as much time
10 as you need, but I'll tell you I'm going to focus
11 on the second paragraph in note 5.
12       THE WITNESS:  Okay.
13 BY MR. FEE:
14   Q.   Just have a couple quick questions
15 about this topic.  It says in 2012,
16 Public.Resource paid Point B Studios $75,000?
17   A.   Uh-huh.
18   Q.   Can you answer yes or no, please, just
19 for the record?
20   A.   Yes.
21   Q.   Is it true that in 2012
22 Public.Resource paid Point B Studios $75,000?
23   A.   Yes.
24   Q.   Is it true that in 2011,
25 Public.Resource paid Point B Studios $55,000?

61

1    A.   Yes.
2    Q.   What is O'Reilly Media?
3    A.   It's a publisher, a technical
4 publisher, of books based out of Sebastapol,
5 California.
6    Q.   Do you know if Carl Malamud has any
7 ownership interest in that?
8    A.   I would not know.
9    Q.   That's all I have on that document.
10 You can put it away if you'd like.
11       Does Point B Studios receive any money
12 from any other non-profits for which Carl Malamud
13 has any role?
14   A.   No.
15   Q.   Has Point B Studios received any money
16 from any organization in which Carl Malamud plays
17 a role other than Public.Resource?
18   A.   It's a vague question.
19   Q.   Explain to me what part of it you
20 think is vague.
21   A.   Well, being colleagues for 20 years, I
22 mean, you know, we work on -- you know, people --
23 we know people in the business.
24   Q.   Okay.  So well, why don't we start
25 with this.  Besides Public.Resource, are you aware

Capital Reporting Company
Malamud, Rebecca  11-13-2014

62

1  of any other entities that employ Carl Malamud?
2      A.   No.
3      Q.   Besides Public.Resource, are you aware
4  of any entities on which Mr. Malamud sits on the
5  board?
6      A.   No.
7      Q.   Besides Public.Resource, are you aware
8  of any other entities from whom Mr. Malamud has
9  received any compensation in the last three years?
10     A.   No.
11     Q.   Are you on the board of directors of
12  Public.Resource?
13     A.   No.
14     Q.   Are you on the board of directors of
15  any entity?
16     A.   I don't want to be.  No.
17     Q.   All right.  So I want to talk to you
18  now a little bit about the instructions that you
19  received from Mr. Malamud regarding the work that
20  was done for Public.Resource.  Okay?
21     A.   (Nods.)
22     Q.   With respect to the work you did for
23  Public.Resource, you knew that Public.Resource
24  wanted Point B to make exact copies of everything
25  that it provided to Point B Studios.  Correct?

63

1      A.   Correct.
2      Q.   And Mr. Malamud himself asked you to
3  make exact copies of all the images that he
4  provided to you.  Right?
5      A.   Yes.
6      Q.   Did Mr. Malamud ever explain to you
7  why he wanted exact copies made of all the images
8  that were provided to you?
9      A.   To release it in the public domain.
10     Q.   Did he ever tell you anything else
11  about the importance of making the exact copies?
12     A.   He emphasized to be accurate.
13     Q.   And he told you to make exact copies
14  of every image that was provided to you.  Correct?
15     A.   Correct.
16     Q.   And that includes making exact copies
17  of ASTM images.  Correct?
18     A.   Yes.
19     Q.   And Mr. Malamud also instructed you to
20  make exact copies of NFPA images.  Right?
21     A.   Yes.
22     Q.   And you did in fact make exact copies
23  of ASTM images for Public.Resource?
24     A.   To the best of my ability.
25     Q.   And you also made exact copies of NFPA

64

1  images for Public Resources.  Correct?
2      A.   Yes.
3      Q.   Now, in your answer with regard to the
4  ASTM images, you said you made exact copies to the
5  best of your ability.  What do you mean by "to the
6  best of your ability"?
7      A.   When -- as we create the diagrams, we
8  have a proofreading -- you know, quality control
9  work flow, and I try to catch every mistake, so --
10     Q.   Would you describe to me how the
11  process actually worked starting with how you
12  received any images from Public.Resource and then
13  ending with how you delivered your work product to
14  Public.Resource?
15     A.   Well, the standards documents are
16  posted on Public.Resource.org as triple-keyed HTML
17  and CSS with low-resolution JPEGs.
18         And once it's decided what document is
19  set to work on, it's -- I download those to my
20  computer.  And then I separate them into MathML
21  and -- images that need to be coded in MathML and
22  images that need to be vectorized we call it.
23         And also on the diagram side,
24  especially for purposes of learning, I sort them
25  another level as to areas of difficulty, or if

65

1  there's a lot of repetition in an image that would
2  facilitate creating another graphic quickly, I do
3  that so it -- you know, it helps with the
4  production of the work flow.
5          And then the MathML images are coded
6  in MathML, mathematical markup language, and at
7  that point -- do you want me to go on?
8      Q.   Yes, please.
9      A.   It gets pretty technical.  Okay.  At
10  that point we use an open source tool called
11  Amaya.
12     Q.   Can you spell that, please?
13     A.   A-M-A-Y-A.  And so the image --
14  they're coded.  And then we have -- we have to
15  convert them using an open-source tool called
16  SVG/Math.  This is how we get it into the graphic
17  form.  And it was a program by Jacques Distler out
18  of University of Texas.  And we use that program.
19  It can interpret the MathML and produce a
20  scaleable vector graphic.
21          And then once we have that scaleable
22  vector graphic we open it up in Inkscape and we
23  convert it to outlines and save it as SVG1.1 to
24  make sure that it is compatible with the broadest
25  range of platforms.  And that's the math.  And

Capital Reporting Company
Malamud, Rebecca  11-13-2014

66

1  that -- all that is what we wanted to have an app
2  for, to cut out a few steps.
3         Oh -- well, hold on.  One second.
4  Before -- back up.  Before we convert it to
5  outlines there's the proofreading step.  I left
6  that out.  Because you don't -- you want to be
7  able to correct any mistakes before you convert it
8  to outlines.  And when I -- the proofreading
9  process involves bringing up the original JPEG on
10 one side of the screen and the original on the
11 other.
12        Okay.  So that's the work flow for the
13 math.
14        Then with the diagrams and -- as I
15 said, they're sorted by difficulty, usually start
16 with the easiest and move up to the hardest,
17 especially when it's in the context of the
18 mentoring program.
19        The low-resolution JPEG is imported
20 into Inkscape on the root layer and meticulously
21 traced using a Wacom Drawing Tablet at, you know,
22 400 times magnification to ensure that the lines
23 are matched perfectly.
24        And at that point, once the entire
25 diagram is drawn, we use a function in Inkscape

67

1  called Union that makes the entire graphic one --
2  one piece with outline paths just like the Mac,
3  because there is some varying in line weight in
4  some browser displays if you don't do that, and we
5  wanted to be true to the original graphic.
6         Then we add the text.  And once the
7  text is added, then the graphics are proofread in
8  the same manner as the MathML.
9     Q.   Okay.
10    A.   Right.
11    Q.   And at that point is it ready to be
12 delivered to Mr. Malamud?
13    A.   Once we complete all of the graphics
14 that we possibly can in a document set -- and if
15 we can't read it for some reason, you know, if the
16 original scan is poor quality, we don't reproduce
17 it -- then all of the SVGs that can be replaced in
18 the standard are replaced using a batch search and
19 replace.
20        And ultimately we wanted to use the
21 object attribute for SVG, graceful degradation,
22 but we had some problems with some of the browsers
23 because it was our goal to make it as accessible
24 as possible.
25    Q.   What happens with the files at that

68

1  point?
2     A.   They are -- once a document set is
3  completed, they are sent to Public.Resource either
4  by Dropbox or email.
5     Q.   And that's the last that Point B
6  Studios does --
7     A.   Right.
8     Q.   -- anything with that file?
9     A.   Right.
10    Q.   So I have some follow-ups on that.
11 First of all, you said that you started with a
12 triple-keyed file that you received from
13 Public.Resource.
14    A.   Uh-huh.
15 BY MR. FEE:
16    Q.   What leads you to believe that the
17 files are triple keyed?
18        (Reporter inquiry.)
19 BY MR. FEE:
20    Q.   What leads you to believe that the
21 files are triple keyed?
22    A.   Because that's what I am -- I
23 understood that they are to be.  I don't have any
24 involvement in that process.
25    Q.   Can you describe briefly what triple

69

1  keying is?
2     A.   It's going over the document three
3  times in order to make sure that there's no typos.
4     Q.   Are you familiar with a process called
5  double key?
6     A.   Yes.
7     Q.   What is that?
8     A.   That would be that the documents are
9  keyed twice.
10    Q.   Is it your understanding that
11 triple-keyed documents will be more accurately
12 reproducing of the documents than double-keyed
13 documents?
14    A.   That's my understanding.
15    Q.   So if Public.Resource wanted to take
16 every possible step to ensure accuracy, it would
17 triple key rather than double key?
18        MR. STOLTZ:  Objection.  Question
19 lacks foundation.  You can answer if you know.
20    A.   I don't know.
21 BY MR. FEE:
22    Q.   Well, you know that triple key is more
23 accurate.  Right?
24    A.   It's my understanding.
25    Q.   Okay.  So wouldn't it be your

Capital Reporting Company
Malamud, Rebecca  11-13-2014

70

1  understanding that if you wanted the most accurate
2  reproduction you would triple key instead of
3  double key?
4      A.   It's logical.
5      Q.   Now, you said that the files that you
6  received were triple keyed and included
7  low-resolution JPEGs?
8      A.   Right.
9      Q.   Why are they low resolution?
10     A.   Well, some of them are 300 dpi, but
11  they were small.  I mean, anything's low
12  resolution compared to a scaleable vector graphic,
13  because JPEGs -- you can only enlarge them so much
14  before they start getting the jaggies.
15     Q.   Then you said the next step was that
16  you would decide what document set to work on.
17     A.   Yes.
18     Q.   How is that decision made?
19     A.   It varies.
20     Q.   Would you be the decisionmaker or
21  would Carl be the decisionmaker?
22     A.   It varies.
23     Q.   What did it vary based upon?
24     A.   Schedules.  In the case of -- as I
25  mentioned before, if I saw that there was a lot of

71

1  the same graphics, I would suggest that it might
2  be a good idea to work on a set because they'd
3  be -- you know, there'd be a lot of art that we
4  could repurpose.
5      Q.   Did Mr. Malamud ever explain to you
6  why he wanted to do one set before another?
7      A.   Sometimes.
8      Q.   Do you recall explanations for why he
9  decided to pick one set instead of another?
10     A.   I don't recall.
11     Q.   Not a single one?
12     A.   It -- it varies.
13     Q.   Did he ever tell you that he wanted to
14  get a particular set of documents done sooner
15  rather than later to help him in this lawsuit?
16     A.   Yes.
17     Q.   Okay.  On how many occasions did
18  Mr. Malamud tell you that he wanted to work on
19  particular files to help this lawsuit?
20     A.   I don't know.
21     Q.   Was it more than one time?
22     A.   I don't know.
23     Q.   Did he explain to you why he thought
24  working on a particular set of documents would be
25  helpful for this lawsuit?

72

1      A.   I don't know.  Mostly I just
2  remembered to be accurate.
3      Q.   Did Mr. Malamud ever tell you that it
4  was important to get particular documents
5  converted in order to help him with his
6  fund-raising efforts?
7      A.   Yes.  Sometimes that could be the
8  reason why we'd work on one.
9      Q.   And isn't it true that Mr. Malamud
10  told you that it was important to get ASTM
11  standards done because it would help him with
12  fund-raising?
13     A.   I can't remember that particular
14  conversation, but it's possible.
15     Q.   Do you recall Mr. Malamud telling you
16  that it was important to complete NFPA standards
17  in order to get funding?
18     A.   It's possible.
19     Q.   Do you recall specifically that
20  happening?
21     A.   I -- I can't remember if it's NFPA or
22  ASTM, because it's all graphics and math to me.
23     Q.   Okay.  But you recall that Mr. Malamud
24  said it was important to either do the NFPA
25  standards or the ASTM standards promptly to help

73

1  him with funding?
2      A.   Yes.
3      Q.   All right.  Did he explain to you why
4  he thought it would be helpful for his
5  fund-raising efforts to complete the ASTM or NFPA
6  standards promptly?
7      A.   I can't remember.
8      Q.   You don't recall anything about that
9  discussion?
10     A.   I can't remember.
11     Q.   Do you have an understanding as to why
12  it would be helpful?
13          MR. STOLTZ:  Objection.  The
14  question lacks foundation.  Answer if you can.
15     A.   I don't know.
16          MR. STOLTZ:  Is everything all
17  right?
18          MR. CHILDS:  Yeah.  It's fine.
19  BY MR. FEE:
20     Q.   After you decided what document set to
21  work on you said that you would sort the documents
22  or images by level of difficulty.  Correct?
23     A.   Correct.
24     Q.   You sorted them by level of difficulty
25  so that you could start persons in your mentoring

Capital Reporting Company
Malamud, Rebecca  11-13-2014

74

1  program on the easy ones and build their skill
2  level over time?
3      A.  That is correct.
4      Q.  Why was it important -- or strike
5  that.
6          Why was it useful to start with the
7  easier images and then work the people in your
8  mentoring program up through the more difficult
9  images?
10     A.  Because, as with any technical skill,
11 the only way you can gain proficiency is through
12 repetition, practice.
13     Q.  So the idea was to have these
14 participants in the Rural Design Collective first
15 practice on the easier images and then over time
16 work on more difficult ones?
17     A.  Correct.
18     Q.  Did you do that sorting both for
19 MathML conversions and for images?
20     A.  Math is different.  It doesn't -- it
21 didn't work like that.  I tried that, but it
22 didn't work like that.
23     Q.  Now, correct me if I'm wrong on this
24 stuff --
25     A.  Uh-huh.

75

1      Q.  -- because I'm working off my notes
2  here, but I think you said with respect to the
3  math equations the next step would be to convert
4  them to SVG format.
5      A.  Right.
6      Q.  Okay.
7      A.  Correct.
8      Q.  And you used the product by a
9  professor from the University of Texas to do that?
10     A.  Uh-huh.
11     Q.  Yes or no?
12     A.  Yes.  Sorry.
13     Q.  No problem.
14     A.  I just found it on the Internet.
15     Q.  And after that conversion was done you
16 would proofread the math equations?
17     A.  Correct.
18     Q.  Now, who did the proofreading of the
19 equations?
20     A.  I did.
21     Q.  Always it was you?
22     A.  Yes.
23     Q.  That's true for every ASTM standard?
24     A.  Yes.
25     Q.  And it's true for every NFPA standard?

76

1      A.  Yes.
2      Q.  Do you have any mathematics
3  background?
4      A.  No.  But we -- and to clarify, too,
5  the MathML that we mark up -- there's two
6  different kinds of MathML.  There's content and
7  presentation, and we only worked in presentation
8  MathML, which is more to do with aesthetics and
9  typography than math.  So we're just making a
10 copy.
11         MR. STOLTZ:  I'm going to move to
12 strike that answer as nonresponsive.
13         It's okay.  Let's go on.
14     A.  Okay.
15 BY MR. FEE:
16     Q.  So you were -- you had indicated you
17 use one type of MathML for the conversion.
18 Correct?
19     A.  Correct.
20     Q.  And what was the name of that MathML
21 that you were using?
22     A.  Presentation.
23     Q.  Okay.  And you used that MathML
24 Presentation language -- is it a language?
25     A.  It's -- it's a flavor of the MathML

77

1  markup language.
2      Q.  All right.  And you used that flavor
3  of the MathML markup language to copy the
4  equations that were in the ASTM or NFPA standards?
5      A.  Yes.
6          MR. STOLTZ:  Objection to form
7  regarding the word "copy."
8  BY MR. FEE:
9      Q.  Your answer was yes.  Correct?
10         (Reporter inquiry.)
11         MR. FEE:  Okay.  Would you read that
12 question back, then?
13         (The question was read back
14         as follows:)
15         "QUESTION:  All right.  And you
16         used that flavor of the MathML markup
17         language to copy the equations that were
18         in the ASTM or NFPA standards?"
19     A.  Yes.
20 BY MR. FEE:
21     Q.  After that conversion was done, you
22 said you proofread the standard -- or the
23 equations, and it was always you.  Correct?
24     A.  Yes.
25     Q.  And you said you compared the original

Capital Reporting Company
Malamud, Rebecca  11-13-2014

78

1  equation and the output of that MathML code on two
2  separate screens.  Is that how you did it?
3      A.  Same screen split.
4      Q.  Is that a quality assurance technique
5  that you had learned from somewhere in your past
6  dealings?
7      A.  Yes.
8      Q.  Where'd you learn that?
9      A.  I used to work in a digital design
10  photo-type setting environment, so --
11      Q.  Where did you do that work?
12      A.  That was in Cincinnati before I
13  started -- when I was -- before the ISP, so --
14      Q.  So that was 20 years ago or so?
15      A.  Yeah.  Yes.
16      Q.  Do you have any training in quality
17  assurance?
18      A.  I've worked in that environment.
19      Q.  Have you ever taken any courses that
20  touched on quality assurance?
21      A.  It was through learned -- on-site
22  learning.
23      Q.  Okay.  So no courses in quality
24  assurance, though, for you?
25      A.  No official courses.

79

1      Q.  Did you attend any seminars regarding
2  quality assurance during the past 25 years?
3      A.  No.
4      Q.  Do you have written quality assurance
5  procedures that you follow at Point B Studios?
6      A.  Not written.
7      Q.  After the proofreading was done, I
8  think you said you then opened the SVG file in
9  Inkscape?
10      A.  Correct.
11      Q.  And what did Inkscape do at that
12  point?
13      A.  This is the math.  Right?
14      Q.  Yes.
15      A.  Okay.  Opened the math -- opened the
16  converted math equation that was the product of
17  the SVG/Math conversion.  We would open it in
18  Inkscape and select all and create outlines.
19  There's -- this is after the proofreading's
20  done -- create outlines on the text, as well as
21  the -- any line art.  That's what Inkscape would
22  do.  And save it as SVG1.1.
23      Q.  And what do you mean when you say,
24  "create outlines"?
25      A.  Any paths and text are turned into

80

1  outlined shapes, described polygons, instead of a
2  stroke with a line weight applied or a character
3  in a font set, everything is art, line art.
4      Q.  And that is the last step of your
5  conversion process for math equations.  Correct?
6      A.  Correct.
7      Q.  What is the benefit, if any, from
8  taking a math equation in a JPEG and converting it
9  to an SVG1.1 file using MathML?
10      A.  Well, the -- it -- you can scale it to
11  any resolution.  You can reuse parts of it,
12  especially because we -- we include the MathML
13  code.  Everything can be repurposed.
14      Q.  What do you mean by "repurposed"?
15      A.  Just as -- as I described when I look
16  for -- when we're doing graphics and I look for
17  repeating elements, I mean, if you had an equation
18  that was similar, you could work from existing
19  code, save time.
20      Q.  Are there any other examples that you
21  can think of where the equation from one of these
22  standards might be repurposed for some other
23  standard or some other use?
24      A.  Well, like I said, I believe it was
25  the California Code of Regulations had a lot of

81

1  graphics from -- I believe it's the NFPA, so --
2      Q.  Any other benefits that you're aware
3  of of this conversion process through an SVG1.1
4  file?
5      A.  They're lightweight.  Conserves
6  bandwidth.
7      Q.  Anything else?
8      A.  They're forward thinking.  I mean,
9  it's the future.
10      Q.  What do you mean by that?
11      A.  Scaleable vector graphics are
12  specifically targeting mobile devices.  JPEGs look
13  horrible on your iPhone.
14      Q.  Any other benefits to this conversion
15  process that you're aware of?
16      A.  No.  It also supports the scaleable
17  vector graphic web standard, which the inventor of
18  the World Wide Web thinks very highly of, so --
19  because it's a good thing.
20      Q.  All right.  Any other benefits?
21      A.  I think that about covers it.
22      Q.  Let's talk a little bit about the
23  conversion process you described with respect to
24  illustrations or diagrams.  Now, you did say you
25  sorted those from easiest to hardest.  Correct?

Capital Reporting Company
Malamud, Rebecca  11-13-2014

82

1    A.   Uh-huh.
2    Q.   Yes?
3    A.   Correct.
4    Q.   Then you imported the files into
5  Inkscape?
6    A.   Yes.
7    Q.   Then I believe you said that you
8  traced the illustrations or images using a tablet.
9  Is that correct?
10   A.   Correct.
11   Q.   You would just trace those by hand on
12  the tablet?
13   A.   Yes.
14   Q.   Who would be the person or persons at
15  Point B Studios that would do the tracing?
16   A.   Myself, Levi Thompson, and I have had
17  other mentees work, but not get very high in the
18  level of difficulty.
19   Q.   After these images were hand-traced on
20  a tablet what did you do next again?
21   A.   After they're traced on the tablet, we
22  perform a function in Inkscape called Union that
23  makes the entire -- it's like what I said on the
24  math how everything's a described polygon.  So it
25  converts everything to -- to paths.  So line

83

1  weights don't change.
2    Q.   Then you would add text to these
3  illustrations?
4    A.   Correct.
5    Q.   Where did the text come from?
6    A.   They were in the JPEG, represented in
7  the JPEG.
8    Q.   The text that you believe to be triple
9  keyed?
10        MR. STOLTZ:  Objection.
11  Mischaracterizes testimony.
12  BY MR. FEE:
13   Q.   You can answer.
14   A.   It was in a JPEG, so nobody keyed it.
15   Q.   So did you retype the text from the
16  JPEG into this Union program?
17   A.   Yes, we did, because there's no other
18  way to extract it from a JPEG.  It's just pixels.
19   Q.   Who would be the person or persons
20  that would be retyping text that was in the JPEG
21  into what would become the SVG for diagrams?
22   A.   Some -- sometimes mentees, Levi,
23  myself.
24   Q.   And the retyping would take place in
25  Inkscape.  Is that the program that was used?

84

1    A.   Yes.
2    Q.   Does Inkscape have a spell checker?
3    A.   No.
4    Q.   Did you double key the text in the
5  Inkscape program in order to make sure there were
6  no errors?
7    A.   Yes.  With -- I would proofread it.  I
8  would correct any mistakes.  Then I would
9  proofread it again.
10   Q.   But the text was only actually typed
11  in once.  Correct?
12   A.   On the graphics, yes.
13   Q.   Would the same person that typed the
14  graphics sometimes proofread the graphics?
15   A.   No.
16   Q.   Would the same person who typed in the
17  text on the graphics be the person who proofread
18  it?
19   A.   Say that one again?
20   Q.   Would the person who typed in the text
21  on graphics be the same person who would
22  proofread, if ever?
23   A.   I guess sometimes it would be me.
24   Q.   After the text was typed into the --
25  into the graphic, that's when the proofreading

85

1  took place for both the graphic and the text?
2    A.   Yes.
3        MR. STOLTZ:  Objection.
4  Mischaracterizes testimony.  You can answer.
5    A.   Say it again.
6  BY MR. FEE:
7    Q.   Sure.  I just want to understand when
8  the proofreading took place for two different
9  elements.  Right?  You did basically a drawing
10  element.  Correct?
11   A.   Uh-huh.
12   Q.   And then there's a text element also?
13   A.   Uh-huh.
14   Q.   Would you proofread both the drawing
15  and the text at the same time?
16   A.   Yes.
17   Q.   And that would all happen after the
18  text was typed in obviously?
19   A.   Right.
20   Q.   And after that file was proofread, you
21  would save that as an SVG file as well?
22   A.   Correct.
23   Q.   And I believe you said that all SVGs
24  were replaced using a batch search and replace
25  methodology.  Correct?

Capital Reporting Company
Malamud, Rebecca  11-13-2014

86

1    A.   Correct.
2    Q.   What is a batch search and replace
3  methodology?
4    A.   We'd open -- there's a directory
5  filled with HTML files and all JPEG extensions are
6  replaced with SVG.  And then the document is
7  opened in a web browser and any SVGs that were not
8  completed because the text was illegible or it was
9  bad art, we put the JPEG back in.  So if we
10 couldn't do the art, we didn't include it in the
11 document.
12   Q.   Was this batch process something that
13 was written or compiled by Point B Studios?
14   A.   It's just a search and replace with a
15 text editor.
16        (Reporter inquiry.)
17        THE WITNESS:  It's a search and
18 replace with a text editor targeting a directory.
19 BY MR. FEE:
20   Q.   Who at Point B Studios would do the
21 search and replace?
22   A.   I would.
23   Q.   Anyone else?
24   A.   No.
25        (Off-the-record discussion.)

87

1        (Deposition Exhibit No. 18
2        marked for identification.)
3  BY MR. FEE:
4    Q.   Ms. Malamud, I'm going to hand you
5  Exhibit 18, which is a printout of the Rural
6  Design Collective Headquarters Codes of the World
7  Overview and Roadmap.  It's six pages.
8    A.   Okay.
9    Q.   Are you familiar with Exhibit 18?
10   A.   Yes.
11   Q.   Is this a page from the Rural Design
12 Collective website?
13   A.   Yes.
14   Q.   Did you author this page?
15   A.   Yes, I did.
16   Q.   Is everything that's included in this
17 page accurate to the best of your knowledge?
18   A.   Yes.
19   Q.   I have no other questions about that.
20        MR. STOLTZ:  You can put it aside.
21        THE WITNESS:  Okay.
22 BY MR. FEE:
23   Q.   At some point in time do you recall
24 having a series of communications with Carl
25 Malamud regarding whether or not you were

88

1  stylizing any equations or illustrations?
2    A.   Yes.
3    Q.   How did that discussion or
4  conversation come about?
5    A.   I believe that the particular one
6  you're referring to -- and there was
7  hand-lettering in the graphics, and I wanted to
8  know if we should reproduce it completely, the
9  flourishes in the lettering.  I wanted to know if
10 we should do that.
11   Q.   Do you recall what standard that was?
12   A.   I don't recall what standard.
13   Q.   Did you ask Carl Malamud whether or
14 not you should reproduce all those flourishes?
15   A.   Yes.
16   Q.   What did he say?
17   A.   I don't remember exactly.
18   Q.   Do you recall if the general message
19 was to reproduce all the flourishes or not?
20   A.   I don't -- I don't remember.
21   Q.   Are you aware of any other instances
22 where there was discussion between you and Carl
23 Malamud related to whether or not you should use
24 sort of house-style for any conversions that you
25 were working on?

89

1    A.   Yes.
2    Q.   Describe how those discussions came
3  about.
4    A.   Is -- if you look at some of the
5  art -- and we began to file the art as just bad
6  art, because we -- it -- it -- we would have to
7  make assumptions because the scans are so poor,
8  and they were hand-drawn, like in the '50s or
9  something.  I mean, it was ridiculous.
10        And so we would have to make creative
11 decisions.  So we were trying to avoid that.
12   Q.   How did you go about trying to avoid
13 making creative decisions?
14   A.   Oh, I would -- I would ask if -- you
15 know, "Should we do this one?"  And eventually I
16 would just file it away as bad art and we just
17 wouldn't do it.
18   Q.   So what was Point B's house style?
19   A.   Just the line art of the SVG.
20   Q.   Was it more modern than what you were
21 seeing in some of the standards?
22   A.   It's just a cleaner line.
23   Q.   At some point in time, did you tell
24 Mr. Malamud that you were using a house style on
25 some of the standards that you were --

Capital Reporting Company
Malamud, Rebecca  11-13-2014

90

1    A.   I probably -- I used colorful terms of
2    phrase, so I probably did.
3    Q.   Okay.  What did you mean when you were
4    saying that you were using house styles for some
5    of the conversions you were doing on NFPA or ASTM
6    standards?
7    A.   Probably the line art in the -- the
8    crisp line art and the font.
9    Q.   What font in particular would you use
10   as your house style at Point B Studios?
11   A.   Arial.
12   Q.   What font would you typically find in
13   the ASTM or NFPA standards that you were
14   converting?
15   A.   It varied.
16   Q.   Do you recall any of the fonts?
17   A.   No, I don't.  Times Roman.  Sometimes
18   Arial.  Sometimes hand-drawn.  Sometimes monospace
19   computerized font.  I mean, I'm just going through
20   what I've seen.
21   Q.   Sure.  Was there a house style for
22   illustrations as well for Point B Studio?
23   A.   We'd just have -- no.  Just what we'd
24   reproduce, the clean line art of the SVG.
25   Q.   So Point B Studios was trying to

91

1    reproduce or -- strike that.
2        Point B Studios was trying to produce
3    images with clean lines even if the standard was
4    not a particularly clean line?
5    A.   We were improving the art.
6    Q.   Do you recall which standard or
7    standards you improved the art on?
8    A.   Every -- everything that we complete,
9    we've left it in a better form.
10   Q.   Now, when you say you left it in a
11   better form, what exactly do you mean by that?
12   A.   The scaleable vector graphics, all the
13   source code available, editable type.
14   Q.   Did you approve the appearance as it
15   would appear on a printed page?
16   A.   Well, the graphics and the math would
17   print much cleaner, what I'm -- what we did.
18   Q.   Is that because it's in MathML instead
19   of a JPEG file?
20   A.   Scaleable vector graphic.  Correct.
21   Q.   Okay.  Okay.  I think I'm confused
22   about what improvements or what differences there
23   were between the Point B house style for images as
24   opposed to text and the standards that were
25   originally delivered to you by Mr. Malamud.  Can

92

1    you explain what improvements there were, if any,
2    other than the file format that it was converted
3    to?
4        MR. STOLTZ:  Objection.  Asked and
5    answered, but you can answer again.
6    A.   The scaleable vector graphic can be
7    scaled to any size, and it's mathematically
8    described vector lines as opposed to
9    pixel-by-pixel representation of the art.  It's
10   just cleaner.
11   BY MR. FEE:
12   Q.   Okay.  I get that part.  What I'm
13   trying to figure out is if there's anything that
14   constitutes the house style of Point B Studios for
15   drawings that isn't the result of an improved file
16   format.
17   A.   There's -- there's no -- I mean, house
18   style is just a phrase I used.
19   Q.   Well, I'm trying to figure out what
20   you meant by that.  What did you mean by house
21   style?
22   A.   Just --
23       MR. STOLTZ:  Objection.  Asked and
24   answered.
25   BY MR. FEE:

93

1    Q.   You can answer again.
2    A.   I feel like I've answered it.
3    Q.   You can just still answer again.  It's
4    fine.
5    A.   We just improved the art is --
6    Q.   And is the only improvement that you
7    made the file format related to improvements?
8    A.   But that's --
9        MR. STOLTZ:  Objection.  Asked and
10   answered.
11   BY MR. FEE:
12   Q.   What was your answer?
13   A.   That's a gigantic improvement.
14   Q.   I understand that.
15   A.   Okay.
16   Q.   I just want to understand if you think
17   there's anything else other than improvements
18   associated with --
19   A.   Legibility and, as I said, it's
20   forward thinking.  It's in a public domain.
21   Anyone can reuse the work that we did for their
22   purposes.
23   Q.   Anything else?
24   A.   I --
25       MR. STOLTZ:  Okay.  I'm going to

Capital Reporting Company
Malamud, Rebecca  11-13-2014

---

**94**

1  object.  Asked and answered.  Counsel, can we move
2  on?
3  BY MR. FEE:
4      Q.   No.  Answer the question.  Do you have
5  anything else?
6      A.   No.
7      Q.   Okay.  So it was your intention to
8  make sure that this file conversion process led to
9  files that the general public could use and make
10  copies of at their leisure.  Correct?
11      A.   Correct.
12      Q.   And did Mr. Malamud tell you that he
13  intended to make these files available so anybody
14  could copy them whenever they wanted to?
15      A.   He published them on the Internet.
16      Q.   In a way that was easily copyable.
17  Correct?
18      A.   Yes.
19      Q.   And his intention was to make it
20  available for free so people wouldn't have to
21  purchase them?
22          MR. STOLTZ:  Objection.  The
23  question lacks foundation.  You can answer if you
24  know.
25  BY MR. FEE:

---

**95**

1      Q.   Let me re-ask that question.  Did he
2  ever tell you that one of the benefits of his
3  project was that people will be able to get copies
4  of these standards for free and not have to
5  purchase them?
6      A.   That wouldn't be exactly what he would
7  say, so --
8      Q.   Well, what exactly do you recall?
9      A.   I wouldn't want to surmise what he
10  would say or think.
11      Q.   Did you ever have a discussion with
12  him about the benefits of making things such as
13  ASTM and NFPA standards available for free?
14      A.   Publicly accessible.  Right.
15      Q.   Publicly accessible and freely
16  copyable?
17      A.   To increase knowledge.
18      Q.   Did you ever have any discussions with
19  him about persons being able to access and copy
20  these files without having to buy them from the
21  authors?
22      A.   No.  Never had that.
23      Q.   But you knew that the work you were
24  doing was going to be posted in a way that persons
25  could make copies of the files --

---

**96**

1      A.   Yes.
2      Q.   -- without purchasing them from the
3  authors.  Correct?
4      A.   Correct.
5      Q.   Have you ever had any discussions with
6  Mr. Malamud regarding this lawsuit?
7      A.   Not -- no.
8      Q.   Have you ever had any written
9  communications with Mr. Malamud regarding this
10  lawsuit?
11      A.   Quite possible.
12      Q.   Do you recall any written
13  communications with Mr. Malamud regarding this
14  lawsuit?
15      A.   I don't recall any particular
16  conversation.
17          MR. FEE:  Would it be all right if
18  we take a quick break?
19          MR. STOLTZ:  It would.
20          THE VIDEOGRAPHER:  Okay.  Going off
21  the record 11:18 a.m.
22          (Recess:  11:18 a.m. to 11:26 a.m.)
23          THE VIDEOGRAPHER:  We're going back
24  on the record.  The time is 11:26 a.m.  Beginning
25  disc 3.

---

**97**

1          (Deposition Exhibit No. 19
2          marked for identification.)
3  BY MR. FEE:
4      Q.   Ms. Malamud, I'm going to hand you
5  what's been marked as Exhibit 19.  It's an email
6  from Carl Malamud to Rebecca Malamud dated
7  January 28th, 2014, at 2:30 p m., and Bates
8  labeled PRO4234 -- hmm.
9          (Off-the-record discussion.)
10          MR. REHN:  It's 04234.
11          MR. FEE:  Oh, okay.  42340 through
12  41.
13  BY MR. FEE:
14      Q.   Do you recognize that as a series of
15  emails between you and Mr. Malamud?
16      A.   Yes.
17      Q.   We'll just start towards the bottom of
18  that email chain on the second page.  Do you see
19  it appears to be an email from you at 1:07 p.m. on
20  the 28th, just a couple lines?  You see, it says,
21  "Do you want us to redraw illustrations that look
22  like this?"  And there's a file name underneath it
23  that includes ASTM among other things.
24      A.   Right.
25      Q.   First of all, that file reference that

---

Capital Reporting Company
Malamud, Rebecca  11-13-2014

98

1  has ASTM in the title, does that mean that, to the
2  best of your knowledge, it was an image that was
3  featured in an ASTM standard?
4      A.   Correct.
5      Q.   Do you know is there a particular
6  naming methodology or convention that was used?
7      A.   This is done by another group.  I
8  don't -- it comes to me like this.  But I believe
9  it's -- it would be, you know, the document number
10  and the page and whether or not it's the -- the
11  graphic order on the page.
12     Q.   Okay.  So in this particular instance,
13  ASTM refers to the author?
14          First of all, do you know who comes up
15  with this naming convention?
16     A.   I don't.
17     Q.   Okay.  So ASTM refers to the author of
18  the document.  Is that right?
19          MR. STOLTZ:  Objection.  That
20  assumes facts not in evidence.
21     A.   I don't -- I just know that's the
22  document collection.
23  BY MR. FEE:
24     Q.   Okay.  What's C150 refer to?
25     A.   Document number.  C150.1917.  Is that

99

1  the document number?
2      Q.   I'm asking you if you know what they
3  are.  If you don't know --
4      A.   I'm fairly -- fairly certain that the
5  30 is page 30 and 01 is the -- is the graphic
6  order on the page, but I'm only concerned -- I
7  mean, I wish I could see what that graphic is
8  right now because that's what I do.  So --
9      Q.   Okay.  So you asked Carl whether or
10  not he wanted you to redraw illustrations that
11  looked like this ASTM file.  Correct?
12     A.   Correct.
13     Q.   Do you know why you would be asking
14  whether you should redraw an illustration that he
15  sent to you?
16     A.   For the reasons that I mentioned
17  before, because sometimes a graphic -- it's almost
18  like it doesn't have anything to do -- it's just
19  there.  As I said, it's -- it's we would have
20  to do a lot of creative interpretation because the
21  lines are not very well described.  I wish I could
22  show you the graphic.  So -- and sometimes the
23  graphics are just there for decoration so --
24     Q.   Okay.  And he responded by saying,
25  "That looks like an awful lot of work."

100

1          Do you see that?
2      A.   Yes.
3      Q.   Do you know why he said that?
4      A.   They're all a lot of work, so -- I
5  mean, I don't really know why he said that, so --
6      Q.   Okay.  And then if you'd turn to the
7  first page of Exhibit -- to the exhibit, I'm
8  looking now towards the bottom of the page,
9  there's an email that appears to be from you at
10  2:04 p.m.  Do you see that?
11     A.   I'm looking.  2:04.  Yes.
12     Q.   You say, "However, I concede that
13  image reinterpreted in our 'house style,'" and you
14  have parentheses, "i.e., more modern"?
15     A.   Yep.  I'm sure I'm talking about a
16  graphic that looks like it was drawn by hand in
17  the '50s.  I mean, it's just -- it wasn't
18  really --
19          MR. STOLTZ:  For the record, read
20  the entire cut off -- the body of that email
21  there.  It says, "However, I concede that image I
22  sent you" --
23          MR. FEE:  Mitch, Mitch, Mitch, you
24  don't get to ask questions now.  You can instruct
25  her --

101

1          MR. STOLTZ:  I'm not asking
2  questions.
3          MR. FEE:  You can instruct her what
4  you want to do.  You're not reading anything into
5  the record.  You're objecting.  No.
6          MR. STOLTZ:  All right.  Rebecca, if
7  you wouldn't mind, would you read that entire
8  email that starts with "however"?
9      A.   (Reading):  "It starts with plus 1,
10         however, I concede that image I sent you
11         reinterpreted in our house style, i.e.,
12         more modern, but I know our goal is to
13         make an exact copy, hence the one-off
14         question.  Becky."
15  BY MR. FEE:
16     Q.   So what did you wind up doing with
17  images that were old-fashioned?
18     A.   I put them in a folder called "bad
19  art," and we did not redraw them because we
20  couldn't reach a conclusion.  So --
21     Q.   Were any -- did you do that with the
22  first hand-drawn image you encountered?
23     A.   I think we did reproduce some, and --
24  and that would -- that's what begged the question,
25  should we be wasting -- you know, bothering with

Capital Reporting Company
Malamud, Rebecca  11-13-2014

102

1  this, because -- you know, that's why.
2      Q.   When you reproduced some hand-drawn
3  images, did you reproduce them as a hand-drawn
4  image or did you make them more modern?
5      A.   It would be line art.
6      Q.   Is that what you're describing as more
7  modern here?
8      A.   That's more modern.
9      Q.   Okay.
10      A.   But it seems silly to recreate -- you
11  know, to modernize some of them.
12      Q.   Sure.  So you said that there were
13  some that you modernized when there were hand
14  drawings.  Do you recall if those standards were
15  ASTM or NFPA standards?
16      A.   According to this message, I guess
17  there was some in ASTM, so -- but I wouldn't
18  remember.
19      Q.   Then you also say at the end of that
20  sentence, "I know our goal was to make, 'an exact
21  copy.'"  Do you see that?
22      A.   Uh-huh.
23      Q.   How did you come to the understanding
24  that the goal was to make an exact copy?
25      A.   Because that's what Public.Resource

103

1  requested.
2      Q.   Then moving up to the next email in
3  the chain, you see there's an email from
4  Mr. Malamud at 2:17 p.m.?
5      A.   Uh-huh.
6      Q.   The second sentence there, or second
7  paragraph, says -- maybe we need to read the whole
8  thing for context.  You say -- he says, "Have you
9  done any diagrams of house style or modern style
10  as opposed to replica?"
11      Then he says, "This is particularly
12  important for any U.S. standards, especially
13  ASHRAE, ASTM, and NFPA, but also any others in the
14  Pub/US tree, (e.g., building codes, ANSI
15  standards.)"
16      Do you see that?
17      A.   Uh-huh.
18      Q.   Do you have an understanding based on
19  any communications with Mr. Malamud why it was
20  particularly important to not use a house style or
21  modern style for U.S. standards?
22      A.   Not beyond this -- the context of this
23  message.
24      Q.   Okay.  So he never told you why it was
25  important.  He just told you it was important?

104

1      A.   Right.
2      Q.   And the top email in the chain --
3  actually, there's one more, your email right
4  before the last one, at 2:20 p.m.  Do you see that
5  one?
6      A.   Yes.
7      Q.   You say, "No, we make exact copies of
8  everything."
9      A.   Correct.
10      Q.   Was that accurate at the time?
11      A.   Yes.
12      Q.   Then you say, "Somehow I thought the
13  hearing before the House Judiciary was a victory
14  of sorts."
15      Do you see that?
16      A.   Yes.
17      Q.   What are you referring to there?
18      A.   This was after he had had a -- his day
19  before the House Judiciary, and I'm just reacting
20  because he's in a bad mood.
21      Q.   Well, how did you come to an
22  understanding that the House hearing was a victory
23  of sorts?
24      A.   It's just conversation.
25      Q.   Was that your understanding at the

105

1  time?
2      A.   Yes.
3      Q.   Was that understanding based on any
4  communications you had with Mr. Malamud?
5      A.   Not -- just -- just in this thread.
6      Q.   All right.  Then his email at the top,
7  after saying, "Thank you," he says, "No victory in
8  the hearing.  Just a nice platform to talk about
9  the issues, but that didn't change anything as far
10  as the ongoing threats to me and my -- and the
11  nonprofit I run."
12      Do you see that?
13      A.   Uh-huh.
14      Q.   Do you know what he's referring to as
15  the ongoing threats to him?
16      A.   No.
17      Q.   Do you know what he's referring to as
18  the ongoing threats to the nonprofit he runs?
19      A.   No.
20      Q.   Have you ever had any discussions with
21  Mr. Malamud regarding any lawsuit brought on by a
22  person other than ASTM, ASHRAE or NFPA?
23      A.   It's possible.  It -- most likely it
24  comes up in a thread like this so --
25      Q.   Do you recall any discussions with

Capital Reporting Company
Malamud, Rebecca  11-13-2014

106

1 Mr. Malamud regarding a lawsuit involving an
2 entity called SMACNA?
3    A.   Yes.
4    Q.   What do you recall about those
5 discussions?
6    A.   Yes.  I remember the name SMACNA.
7    Q.   Okay.  Besides remembering the name,
8 do you have any other recollection in your
9 communications --
10    A.   No.
11    Q.   -- regarding that lawsuit?
12    A.   No.
13    Q.   Are you aware of any litigation
14 regarding the American Psychiatric Association and
15 Mr. Malamud?
16    A.   No.
17    Q.   Are you aware of any other litigation
18 involving Mr. Malamud other than the SMACNA
19 lawsuit and the lawsuit that brings us here today?
20    A.   We don't discuss it in depth.
21    Q.   Are you aware of any other
22 litigations?
23    A.   No.
24    Q.   Did you receive any written
25 instructions from Public.Resource regarding what

107

1 you were to do with the files they provided to
2 you?
3    A.   Not outside of the context of email
4 conversations.
5    Q.   So at the beginning of the process of
6 converting standards, there wasn't a written
7 statement of work or something like that?
8    A.   No.
9    Q.   Do you have any written procedures for
10 the persons who are involved in the Rural Design
11 Collective as to how they should go about doing
12 any of the conversion work for Public.Resource?
13    A.   It's all on my website.
14    Q.   Is that it?
15    A.   Yes.
16    Q.   So there's no internal, nonpublic
17 instructions?
18    A.   No.
19    Q.   Now, at the time that you were doing
20 this conversion work for Public.Resource, you knew
21 that the documents and the images that were
22 converting were not Mr. Malamud's images and
23 documents.  Correct?
24    A.   I knew that he would obtain them.
25    Q.   Okay.  Well, you knew he wasn't the

108

1 owner of any copyright interest in these works?
2    A.   Yes.
3    Q.   And you also knew that those works
4 were authored by persons other than Mr. Malamud?
5    A.   Yes.
6    Q.   And you realized that many of those
7 documents had copyright notices on them, didn't
8 you?
9    A.   Yes.
10    Q.   Did you ever ask Mr. Malamud why he
11 thought it was okay for you to make copies of
12 documents that were authored by other persons that
13 bore copyright notices?
14    A.   I -- I understood his position.
15    Q.   How did you understand his position?
16    A.   Working with him for 20 years.
17    Q.   Okay.  So you understood his position
18 from communications with Mr. Malamud himself?
19    A.   Yes.  And his historic work.
20    Q.   What did Mr. Malamud tell you about
21 why he thought you were allowed to make these
22 copies?
23    A.   Because it's important, important
24 work.
25    Q.   Did he tell you anything else?

109

1    A.   To increase knowledge, to improve
2 access, to -- important laws that can lead to
3 innovation and safer buildings and public safety.
4    Q.   Anything else?
5    A.   Nothing else.
6    Q.   Did you ever ask ASTM for permission
7 to make copies of their images?
8    A.   No.
9    Q.   Did you ever receive permission from
10 ASTM to make copies of their images?
11    A.   No.
12    Q.   Did Mr. Malamud ever tell you that he
13 received permission to have the copies made?
14    A.   I would not know.
15    Q.   My question was just if he had ever
16 told you that.  Did he ever -- let me ask it
17 again.
18         Did Mr. Malamud ever tell you that he
19 had received permission to make the copies of any
20 of these images?
21    A.   No.
22    Q.   Did Mr. Malamud ever discuss with you
23 whether or not he had sought permission to make
24 copies of any of the images?
25    A.   He never discussed it.

Capital Reporting Company
Malamud, Rebecca  11-13-2014

110

1    Q.   What mechanisms, if any, does Point B
2  have in place to ensure that it doesn't make
3  unauthorized copies of copyrighted works?
4    A.   What do you mean by mechanism?
5    Q.   Is there any procedure or protocol in
6  place at Point B to make sure that Point B doesn't
7  engage in unauthorized copying of copyrighted
8  works?
9    A.   There's no procedure.
10    Q.   Do you have anything in place to
11  ensure that you don't engage in copyright
12  infringement at Point B?
13        MR. STOLTZ:  Objection to form.
14  Ms. Malamud's not a lawyer.
15  BY MR. FEE:
16    Q.   You can answer.
17    A.   Well, I'm not a lawyer.
18    Q.   Okay.  Do you have anything in place
19  to make sure that you don't engage in copyright
20  infringement?
21    A.   No.
22    Q.   And you were paid to make these
23  copies.  Correct?
24    A.   Yes.
25        MR. STOLTZ:  Objection to form

111

1  regarding the word "copy."
2        (Reporter inquiry.)
3        MR. STOLTZ:  Regarding the word
4  "copy."
5  BY MR. FEE:
6    Q.   You make exact copies actually, don't
7  you?
8    A.   According to the email.
9    Q.   And you told me that that was true,
10  didn't you?
11    A.   We make -- replicated, yes.
12    Q.   But you use the word "copy" all the
13  time, don't you?  You don't say "replicate."
14    A.   Well, I -- I don't know that, but --
15    Q.   All right.  Well you say "copy" a lot.
16  You know that.  Right?
17        MR. STOLTZ:  Objection to form.
18  BY MR. FEE:
19    Q.   Look at the exhibit in front of you.
20  You say "copy" in that exhibit several times,
21  don't you?
22        MR. STOLTZ:  Counsel, is there a
23  question?
24        MR. FEE:  Yeah.  That is the
25  question.

112

1    A.   In this email thread I use "copy" a
2  lot.
3  BY MR. FEE:
4    Q.   Yeah.  Is Public.Resource paying for
5  any of the costs associated with your appearance
6  at this deposition today?
7    A.   No.
8    Q.   Is Public.Resource paying for any
9  counsel for you in connection with this matter?
10    A.   No.
11    Q.   Have you asked Public.Resource to
12  indemnify Point B for any losses it incurs as a
13  result of this copying?
14    A.   We haven't had that discussion.
15    Q.   Do you have any written agreements
16  with Public.Resource regarding indemnification for
17  intellectual property claims?
18    A.   No.
19    Q.   Do you make copies of any of the
20  artists' work that you work with at Point B
21  Studios without their permission?
22    A.   No.
23    Q.   Why not?
24    A.   (Pause.)  Well, actually, I know for a
25  fact that any of them would let me use any of --

113

1  anything, so -- but I would just ask.
2    Q.   But you've never made a copy of any of
3  their works without their permission before?
4    A.   It's funny you should ask, because
5  when we first started the gallery, a lot of
6  photographers were concerned about copies on the
7  Internet, you know, because you can't really
8  control when people view a photograph or work of
9  art.  They're making a copy when they download it
10  in a web browser.  So --
11    Q.   Do you understand why they had those
12  concerns?
13    A.   Yes.
14    Q.   Do you think those concerns were
15  reasonable?
16    A.   I think that they're reasonable, but
17  it's also a new age, so --
18    Q.   What does that have to do with
19  anything, that it's a new age?
20        MR. STOLTZ:  Objection to form.  You
21  can answer if you understand.
22    A.   I don't understand.
23  BY MR. FEE:
24    Q.   Okay.  Well, you just testified that
25  you thought that their concern about putting their

114

1 photographs on the Internet was reasonable, but
2 this is a new age. And I'm trying to understand
3 what you meant when you said, "But this is a new
4 age." Can you explain that to me?
5      A.   Well, you're also talking about art as
6 opposed to public safety standards, knowledge that
7 is of benefit to a very broad segment of people.
8      Q.   Is that your answer to the question as
9 to --
10     A.   Yes.
11     Q.   -- what "this is a new age" refers to?
12     A.   Yes.
13     Q.   Are you an artist yourself?
14     A.   I am an artist.
15     Q.   Would it be okay with you if somebody
16 took copies of your works and posted them on the
17 Internet so everyone could copy them for free
18 without your permission?
19     A.   People have.
20     Q.   And that was fine with you?
21     A.   It depends on the situation.
22     Q.   Under what circumstances would that
23 not be okay with you?
24     A.   A line of people -- a line of
25 attribution would be ideal so people know who

115

1 originally created the art.
2      Q.   Okay. So if somebody were to make a
3 print of something you've done, put your name at
4 the bottom of it and sell it, that would be all
5 right with you?
6      A.   It depends. It depends.
7      Q.   Even if they gave you none of the
8 money and didn't get your permission?
9      A.   If I was helping somebody it would
10 probably be all right.
11     Q.   Okay. What if I wanted to do it? Can
12 I do it?
13     A.   Which one?
14     Q.   Any of them. All of them. Can I sell
15 your artwork without your permission?
16     A.   Yeah. But you're -- you're not me,
17 so -- and, I mean, an artist can't be separated
18 from their artwork and their quality.
19     Q.   Does that mean it's okay if I sell
20 your artwork?
21     A.   Artists steal ideas from people all
22 the time.
23     Q.   Is that okay with you?
24     A.   It's the struggle of artists
25 everywhere. You have to come up with a better

116

1 idea.
2      Q.   Okay. On the work that you did for
3 Public.Resource related to the standards for NFPA
4 and ASTM, did you make copies of any logos?
5      A.   It's possible in the beginning.
6      Q.   Why would you have only done that in
7 the beginning?
8      A.   Because we were replicating everything
9 that -- in the document that we could reproduce.
10     Q.   Did you stop doing that at some point
11 in time?
12     A.   Yes.
13     Q.   At what point in time did you stop
14 replicating everything in the document?
15     A.   When Public.Resource said, "Don't make
16 a copy of the logo." But, again, there's copies
17 of logos all over the Internet.
18     Q.   So at some point in time was it
19 Mr. Malamud that told you to stop making copies of
20 the logos?
21     A.   Yes.
22     Q.   Do you recall when he told you that?
23     A.   I won't -- I don't know.
24     Q.   Did he tell you why he wanted you to
25 stop making copies of the logos?

117

1      A.   I don't even know if I know that.
2      Q.   Do you know why he told you to stop
3 making copies of the logos?
4      A.   Probably so he wouldn't hear from
5 trademark lawyers.
6      Q.   Had he told you that he had heard from
7 trademark lawyers regarding the copying of logos?
8      A.   Possibly.
9      Q.   What do you recall about any
10 communications with Mr. Malamud on that subject?
11     A.   I don't recall.
12     Q.   You don't recall anything about those
13 conversations?
14     A.   No.
15     Q.   You just think that you might have had
16 a discussion with him about trademark lawyers?
17          MR. STOLTZ: Objection. Asked and
18 answered.
19 BY MR. FEE:
20     Q.   Correct?
21     A.   It's possible.
22     Q.   And you know that he told you to stop
23 making copies of logos?
24     A.   Yes.
25     Q.   Do you know what's happened with all

Capital Reporting Company
Malamud, Rebecca  11-13-2014

118

1 the logos that you copied in the past?
2     A.   They're probably on computers at
3 Point B.
4     Q.   Do you know if they're still available
5 on the web?
6     A.   If they are, that would not be -- I
7 wouldn't have -- they're on a different server.
8 It would be an oversight if it wasn't deleted.
9     Q.   Did you obtain permission from ASTM or
10 NFPA to make copies of their logos?
11     A.   No.
12     Q.   Did you seek permission to make copies
13 of their logos?
14     A.   No.
15     Q.   To the best of your knowledge, did
16 Public.Resource ever request permission to make
17 copies of ASTM or NFPA's logos?
18     A.   I do not know.
19     Q.   Mr. Malamud certainly never told you
20 that he had permission to do that, did he?
21     A.   No.
22     Q.   Does Point B Studios have any
23 procedures or policies in place to ensure that it
24 doesn't engage in any unauthorized copies of logos
25 of third parties?

119

1     A.   No.
2     Q.   Point B Studios was paid by
3 Public.Resources to make copies of ASTM's logo.
4 Right?
5     A.   Not specifically.
6     Q.   It was part of the work for which
7 Public.Resource paid Point B.  Correct?
8     A.   Yes.
9     Q.   And Public.Resource also paid Point B
10 Studios for work that included making copies of
11 the NFPA logo?
12     A.   Yes.  But it was not a specific
13 request.
14     Q.   Are you aware of there being any
15 employees of Public.Resource other than
16 Mr. Malamud?
17     A.   To my knowledge, he's the sole
18 employee.
19     Q.   Have you -- has Point B ever had
20 communications with any persons on behalf of
21 Public.Resource other than Mr. Malamud?
22     A.   No.
23     Q.   Has Public.Resource -- no.  Strike
24 that.
25          Has Point B had any communications

120

1 with HTC Global Services?
2     A.   No.
3     Q.   Do you know who HTC Global Services
4 is?
5     A.   Yes.
6     Q.   How do you know that?
7     A.   I -- I actually was not sure what the
8 name was until just recently, but yes.
9     Q.   How'd you become aware of that name?
10     A.   When all this started happening.
11     Q.   Okay.  And what is your understanding
12 as to HTC Global's involvement in any of this
13 matters -- these matters?
14     A.   I -- they're the -- don't want to get
15 into double and triple, but they're the triple-key
16 team.
17     Q.   How did you come to learn that?
18     A.   I -- I knew there was a team that
19 worked on that, but I didn't know the company
20 name.
21     Q.   Who told you the company name
22 eventually?
23     A.   Well, it was probably in my document,
24 but I overlooked it, but Mitch mentioned it.  And
25 it could be --

121

1          MR. STOLTZ:  Hang on.  It's
2 important you don't discuss what you and I have
3 talked about.
4          THE WITNESS:  Oh.  I'm sorry.  I'm
5 not good with names so --
6          (Deposition Exhibit No. 20
7          marked for identification.)
8 BY MR. FEE:
9     Q.   Ms. Malamud, I'm going to hand you
10 what's been marked as Exhibit 20.  It is entitled,
11 "The mother of all to-do lists."
12     A.   Yes.
13     Q.   And it's Bates labeled
14 PT_EDD34460_0001 through 44.
15     A.   Okay.
16     Q.   Do you recognize Exhibit 20?
17     A.   Yes.
18     Q.   What is it?
19     A.   It is -- it is a list of all of the
20 work that we were doing this particular year in
21 the mentoring program.  And I generated this page
22 as one long page so I could communicate with my
23 mentees when -- so we could be talking about the
24 same graphic, because otherwise you're on
25 different computers and -- you know, and you don't

Capital Reporting Company
Malamud, Rebecca  11-13-2014

122

1 have a visual unless you open the file.  So it was
2 just a means to communicate with one another.
3     Q.   So this to-do list relates to the
4 Rural Design Collective project?
5     A.   Correct.
6     Q.   For what time period is this to-do
7 list?
8     A.   Gosh.  2012, I think.
9     Q.   Would you have a similar to-do list
10 for other years?
11    A.   Well, one year we had -- when we -- we
12 had a Sandbox and we had it organized in level of
13 difficulty.  A lot of this is as we are forming
14 our methodology how to do this stuff.
15         So another year we had a web interface
16 instead of a list trying to figure out how to make
17 it easier to work together, so -- just so -- this
18 is just so we can mark them off as done so --
19    Q.   Do you know if you produced the
20 equivalent of this "mother of all to-do lists" for
21 other years in whatever --
22    A.   No.
23    Q.   -- format it was?
24    A.   This was the only year I did it in
25 this manner so --

123

1     Q.   Okay.
2     A.   -- I was --
3     Q.   And you said something you had
4 referred to as a Sandbox, I think you said.
5     A.   Uh-huh.
6     Q.   Was that Sandbox produced in this
7 litigation?
8     A.   I provided it to my counsel.
9     Q.   But you don't know if it was produced?
10    A.   I don't know.
11    Q.   Could you turn to the Bates label,
12 which is this number in the bottom corner here,
13 ending with 0029?
14    A.   Okay.
15    Q.   Slightly below the middle of the page
16 you see that there's references to several files
17 that have ASTM in their name.
18    A.   Okay.
19    Q.   Does this mean that these ASTM
20 graphics or files were converted as part of the
21 Rural Design Collective program in 2012?
22    A.   Yes.  This is probably when we were
23 working on California Code Regulations, so it was
24 as part of that.
25    Q.   The -- there's a small image on the

124

1 left-hand side of each of these file names.
2 Correct?
3     A.   Correct.
4     Q.   And this page, it appears to be
5 mostly -- or many of them appear to be errors of
6 some sort.  Is that right?
7     A.   Yes.  Looks like they did not load.
8     Q.   Okay.
9     A.   It's difficult to tell.  And the
10 images are actually on Public.Resource's server,
11 not my server.
12    Q.   So you would just have a link in this
13 list?
14    A.   Right.  So it's possible that a
15 directory was renamed or -- I don't know what
16 happened.
17    Q.   And any file in here that has as part
18 of its file name ASTM would be a file that came
19 from an ASTM publication that was converted by the
20 Rural Design Collective for Public.Resource.  Is
21 that right?
22    A.   Now, if -- if I was on -- this page is
23 actually highlighted, which ones were completed.
24 So there may be some that weren't completed so --
25    Q.   Can you tell --

125

1     A.   I don't know.
2     Q.   -- looking at the hard copy which ones
3 are highlighted or not?
4     A.   No.  You can't tell.  There's no
5 indication.
6     Q.   But your original electronic file
7 would show that?
8     A.   Yeah.
9     Q.   Do you still have that file in your
10 possession?
11    A.   Uh-huh.  It's online.
12    Q.   It's online where?
13    A.   At -- I think it is.  It doesn't have
14 the URL on it.
15    Q.   Do you know?
16    A.   It would be at the Rural Design
17 Collective website.
18    Q.   Okay.  Would the Sandbox, as you
19 described it earlier, also be online at the
20 Rural --
21    A.   Yes.
22    Q.   -- Rural Design website?
23    A.   But it's really old software.
24         MR. STOLTZ:  Are we done with 20?
25         MR. FEE:  Yes.

Capital Reporting Company
Malamud, Rebecca  11-13-2014

126

1          (Deposition Exhibit No. 21
2          marked for identification.)
3  BY MR. FEE:
4      Q.   Ms. Malamud, I'm going to hand you
5  what's been marked as Exhibit 21.  It appears to
6  be a series of emails.  The top one is from
7  Mr. Malamud to you, dated January 4th, 2014, at
8  12:01 p m.  Bates labeled PRO42289-01.  Take your
9  time and look at it, but once you've read it, if
10 you can identify this as a series of emails
11 between you and Mr. Malamud.
12     A.   (Pause.) Okay.
13     Q.   First of all, can you recognize -- do
14 you recognize this as a series of emails between
15 you and Mr. Malamud?
16     A.   Yes.
17     Q.   Why don't we start at the beginning of
18 the email chain, which would be on the last page.
19 There's an email on December 31, 2013, at
20 3:02 p m. from you.  Can you see?  It starts off
21 saying, "All art completed, both diagrams and
22 MathML, with the exception of NFPA.NEC.2011.  We
23 have about 12 more diagrams to complete on that.
24 And we should have that completed by Friday."
25          Do you see that?

127

1      A.   Yes.
2      Q.   Does that mean that you had made
3  copies of many diagrams in the NFPA NEC code for
4  2011?
5          MR. STOLTZ:  Objection.  Form.
6  Misstates testimony.  You can answer.
7      A.   Okay.  Say it again?  Say what you
8  said.
9  BY MR. FEE:
10     Q.   Does that sentence indicate that you
11 made copies of diagrams and math equations that
12 were contained in the 2011 version of the NFPA
13 NEC?
14     A.   We improved the art as I described
15 earlier.
16     Q.   By "improved the art," you mean you
17 made exact copies but in SVG format?
18     A.   Correct.
19     Q.   Would you turn to the second page of
20 the document.  Or, actually, why don't you turn to
21 the first page of the document.  Towards the
22 bottom of the first page, you see there's an email
23 dated January 4th, 2014, at 11:48 a.m.  Towards
24 the bottom of the first page.
25     A.   Okay.  Yeah.  I see it.

128

1      Q.   Correct me if I'm wrong, but it looks
2  like you have some of Mr. Malamud's questions in
3  here and then you type responses below them.  Is
4  that right?
5      A.   Yes.
6      Q.   And it looks like Mr. Malamud asks you
7  what appears to be in the third paragraph, or
8  says, "You didn't answer my previous question,
9  which was how much of the 5K a month that I'm
10 sending you is being turned around as salary for
11 your contractor."
12          First of all, do I understand that
13 correctly to be Mr. Malamud's email to you?
14     A.   Yes.
15     Q.   And he continues by saying, "I'm
16 digging really deep to find money for you
17 post-February.  I need to understand where my
18 money is going if I'm going to keep digging for
19 you."
20          Do you see that?
21     A.   Yes.
22     Q.   Can you -- prior to this email, had
23 you had any discussions with Mr. Malamud about his
24 concerns about finances?
25     A.   No.

129

1      Q.   For -- let me finish.
2      A.   This is usually how I find out about
3  things.
4      Q.   Okay.  So this was the first time
5  you've heard that he had any funding problems or
6  concerns related to your contract going forward?
7      A.   Correct.
8          MR. STOLTZ:  Be sure to let him
9  finish the question.
10     A.   Okay.
11 BY MR. FEE:
12     Q.   Turn to the next page, please.  The
13 first paragraph starts, "I also mentioned that my
14 MathML coder is working on an app."
15          Do you see that?
16     A.   On the other page?
17     Q.   Top of page 2.
18     A.   Yes.
19     Q.   And that's your writing.  Correct?
20     A.   Yes.
21     Q.   At the end of that paragraph, you
22 said, "I found a couple of mistakes that appear to
23 be OCR related like the one below."
24          Do you see that?
25     A.   Uh-huh.

130

1    Q.   First of all, what are OCR-related
2 mistakes?
3    A.   Optical character recognition.
4    Q.   And how are there mistakes that are
5 OCR related?
6         MR. STOLTZ:  Objection.  Vague.
7    A.   Again, I'm talking about something
8 that I really am not involved in, so --
9 BY MR. FEE:
10   Q.   But do you --
11   A.   I wish I could see the screen shot.
12 It was probably typos in the text that I have
13 nothing to do with.
14   Q.   Would that happen from time to time
15 while you were working on Public.Resource files?
16        MR. STOLTZ:  Objection.  Foundation.
17 You can answer if you know.
18   A.   If I came across anything, I would
19 mention it, just like I did here.
20 BY MR. FEE:
21   Q.   Okay.  So it happened at least once.
22 Right?
23   A.   At least once.
24   Q.   Okay.  Do you know if it happened more
25 than one time?

131

1    A.   I would not know.
2         MR. STOLTZ:  How much longer do you
3 think you guys have?  I'm just wondering if we
4 should break for lunch at some time soon.
5         MR. FEE:  We could probably go on a
6 break for lunch would be my guess at some point.
7         MR. REHN:  Yeah.  I probably have a
8 half hour on top.
9         MR. FEE:  Yeah.  And I still have a
10 ways to go.  So if you want to take a lunch break
11 now, that's fine for me.
12        MR. STOLTZ:  Do you want to break
13 now?
14        THE WITNESS:  What time is it?
15        MR. STOLTZ:  It's 12:15.
16        THE WITNESS:  Yeah.  I should
17 probably eat.
18        MR. FEE:  Okay.  We can take a break
19 now then.
20        THE VIDEOGRAPHER:  Okay.  Going off
21 the record.  The time is 12:14 p.m.
22        (Lunch:  12:14 p.m. to 1:22 p.m.)
23        THE VIDEOGRAPHER:  We're going back
24 on the record.  The time is 1:22 p.m.
25        MR. STOLTZ:  Were we done with

132

1 Exhibit 21?
2         MR. FEE:  Yeah.  For now at least.
3         (Deposition Exhibit No. 22
4         marked for identification.)
5 BY MR. FEE:
6    Q.   Ms. Malamud, I'm going to hand you
7 what's been marked as Exhibit 22.  It is a series
8 of emails.  The one at the top of the page is an
9 email from you to Mr. Malamud dated May 7, 2012,
10 7:24 a.m. and Bates labeled PRO24876 through 80.
11        After you've had a chance to look at
12 it, let me know if you recognize this as a series
13 of emails between you and Mr. Malamud?
14   A.   I recognize it.
15   Q.   All right.  Can you tell me generally
16 what's going on in this series of emails?
17        MR. STOLTZ:  Objection.  Vague.
18   A.   Can you clarify?
19 BY MR. FEE:
20   Q.   What is the general subject matter of
21 these emails?
22        MR. STOLTZ:  Same objection.
23   A.   Can you be more specific?
24        MR. FEE:  What part -- Andrew?
25        (Phone cuts out.)

133

1         MR. FEE:  Do you want to go off the
2 record for a second?
3         THE VIDEOGRAPHER:  Going off the
4 record.  1:24 p.m.
5         (Recess for one minute.)
6         THE VIDEOGRAPHER:  We're going back
7 on the record.  The time is 1:25 p.m.
8 BY MR. FEE:
9    Q.   Could you explain to me what you and
10 Mr. Malamud are discussing in Exhibit 22?
11   A.   Discussing working on NFPA graphics
12 and how they related to Title 24.
13   Q.   Can you show me that document for a
14 second?
15   A.   Am I on the wrong page?
16   Q.   No.  I just wanted to make sure we had
17 the same thing.
18   A.   Okay.
19   Q.   All right.  I want to draw your
20 attention towards the bottom of the first page of
21 Exhibit 22.
22   A.   Okay.
23   Q.   There's an email that appears to be
24 written by you at 6:40 a.m.  Do you see that?
25   A.   6:46?

Capital Reporting Company
Malamud, Rebecca  11-13-2014

134

1    Q.   6:46.  I'm sorry.  No.  You're 6:40.
2  I think Mr. Malamud's 6:46.
3    A.   Okay.  I see 6:40.
4    Q.   Okay.  And this is you saying, "We
5  have -- now have 132" --
6    A.   Uh-huh.
7    Q.   -- "SVGs completed in CFR 1," and it
8  continues on from there.  Do you see that?
9    A.   Yes.
10   Q.   What is CFR 1?
11   A.   It was a directory containing CFR
12  documents, so it's just the name of a folder.
13   Q.   Do you know what CFR documents are?
14   A.   It seems like it should be CCR, but --
15   Q.   You're not sure?
16   A.   I'm not sure.
17   Q.   Okay.  And then after that --
18  beginning of the sentence, is there a reference to
19  a series of documents, I assume, that have NFPA or
20  ASTM in them?  Is that what those are?
21   A.   Yes.
22   Q.   Does that mean that you had completed
23  making exact copies of some ASTM standard or
24  standards?
25   A.   Yes.

135

1    Q.   Then next paragraph you say,
2  "Anomalies noted below."
3        Do you see that?
4    A.   Yes.
5    Q.   What are you referring to there?
6    A.   Anywhere where -- this was a while
7  ago, but I'm point -- pointing out where the --
8  sometimes it didn't make sense to vectorize the
9  art because it was poor art.
10        "Missing note."  I am assuming based
11  on the message above that the notes under the
12  graphic change, because they often reference a
13  table or section in the document and they are
14  always different.  This is where there was
15  replication in the images between Title 24 and
16  NFPA.  So "missing note" probably -- that's what
17  that means.
18   Q.   Okay.  And then the last paragraph in
19  that -- your email says the, "'Trace bit map' is
20  definitely proving to be a boon for production."
21   A.   And it wound up not to be as good as I
22  thought --
23   Q.   Okay.
24   A.   -- but --
25   Q.   Well, first of all, why don't we start

136

1  with what's the trace bit map?
2    A.   It's a -- it's a function of Inkscape
3  where if you have a high enough resolution scan --
4  and I think I mentioned earlier that sometimes
5  they were 300 DPI -- if it was one of those
6  hand-drawn drawings that didn't make sense to, you
7  know, create this precision artwork, you can just
8  embed the graphic and use an auto-trace feature
9  and adjust the settings so that it would, you
10  know, follow the line and you'll actually have a
11  vector art without doing any drawing at all.  But
12  it doesn't work in all circumstances so --
13   Q.   Okay.  So as of the time you wrote
14  this email, it looked like it was going to be very
15  helpful for production?
16   A.   It did.
17   Q.   But it didn't turn out?
18   A.   It didn't turn out that way.  It was
19  just a particular batch we were working on.
20   Q.   Okay.  Would you look at the last page
21  of this exhibit?  You see there are two sections
22  that have headers that begin with ASTM?
23   A.   Yes.
24   Q.   And then below that you have -- looks
25  like file names.  Is that right?

137

1    A.   Yes.
2    Q.   Are those file names for ASTM images
3  that were copied?
4    A.   Those are the documents, document
5  names.  Under the line would be the graphics.  And
6  there's the logo.  I guess I -- it was on
7  Wikimedia.  So --
8    Q.   Okay.  So that reference to the
9  Wikimedia Commons means that you pulled the
10  graphic of the ASTM logo from Wikimedia?
11   A.   I did, because I saw it elsewhere.  I
12  remember.  So --
13   Q.   So did -- does the Wikimedia Commons
14  reference means that that's where the actual image
15  came from?
16   A.   It was there.  I believe I saw it
17  there.
18   Q.   Okay.
19   A.   But I don't know what this is.  This
20  might be -- I don't know what this is.  I'd need
21  to see the image.  It might actually be a
22  pictograph.  So, you know, a symbol.  I don't know
23  for sure.  I don't know.
24   Q.   So you don't know why you wrote
25  "Wikimedia Commons" there?

Capital Reporting Company
Malamud, Rebecca  11-13-2014

138

1      A.   Whatever that graphic is was in
2  Wikimedia.  Yeah.
3      Q.   Okay.
4      A.   But it might be -- I probably -- I
5  mean, this is 2012.  I noted it wondering if it
6  was a logo, and that it was -- because it was -- I
7  was being more careful not to reproduce logos.
8  But it could be a pictograph.  That's, you know, a
9  symbol of communication in graphic arts people
10  use.  So I don't know exactly, but --
11      Q.   So is it your belief that as of
12  May 2012, you already knew not to copy any logos
13  anymore?
14      A.   I don't know.  Yes.
15      Q.   Okay.  And is it your belief, then,
16  that after May of 2012, Point B no longer copied
17  any logos of ASTM or NFPA?
18      A.   Yes.
19      Q.   Now, at the top of Exhibit 22 there is
20  an email that appears to be from you to
21  Mr. Malamud.  Do you see that?
22      A.   Yes.
23      Q.   And second paragraph down, it says,
24  "Yes, all these replace prior SVGs for CFR 1.  I
25  went through and checked all the 90 SVGs that were

139

1  done previously to make sure that Levi did not go
2  astray."  In parentheses you say, "He didn't.
3  Just on that one set."
4          Can you explain what you're referring
5  to when you say you were making sure Levi didn't
6  go astray?
7      A.   Because as I've explained before,
8  sometimes the artwork is open to interpretation.
9  I mean, when it's really poor line art.  And I
10  believe we had a discussion before this that, you
11  know -- so I'm just making sure that we're not
12  doing graphics that we shouldn't do.  So --
13  because when creative -- you know, when -- it's --
14  just trying not to apply any creative --
15  creativity to reinterpret -- reinterpreting
16  poor art so --
17      Q.   Do you recall what led you to review
18  Levi's work to determine if he went astray?
19      A.   I cannot recall.
20          (Reporter inquiry.)
21      MR. FEE:  If he went astray.
22  BY MR. FEE:
23      Q.   Then in that parentheses, set of
24  parentheses, you say, "He didn't.  Just on that
25  one set."

140

1      A.   Yeah.
2      Q.   What's that say?
3      A.   I can't recall.  I can't recall.
4      Q.   Do you recall that Levi did go astray
5  with respect to at least some graphics?
6      A.   Yeah.  It was before we decided to not
7  do those particular types of graphics.
8      Q.   Does -- how would you identify the
9  graphics on which Levi went astray?
10      MR. STOLTZ:  Objection.
11  Mischaracterizes her testimony.  You can answer.
12      A.   Okay.  I'm just -- it was probably --
13  just didn't feel like it was in the spirit of the
14  original graphic.  Just -- that's all I can say.
15  So that's when I made the decision to not do those
16  kind of graphics.
17  BY MR. FEE:
18      Q.   Did Mr. Thompson have a written
19  appointment agreement with Point B?
20      A.   No.
21      Q.   How was Mr. Thompson compensated by
22  Point B?
23      A.   I pay him hourly every month.  By the
24  hour.
25      Q.   Were you Mr. Thompson's supervisor

141

1  during that time?
2      A.   Yes.
3      Q.   Would he perform the work for Point B
4  in your studio --
5      A.   Yes.
6      Q.   -- physical space?
7      MR. STOLTZ:  Remember to let him
8  finish.
9      A.   Okay.
10  BY MR. FEE:
11      Q.   Does Point B have or did it ever have
12  a written agreement with Christopher Garcia?
13      A.   No.
14      Q.   Does Point B have a written agreement
15  with -- what's third employee's name again?
16      MR. STOLTZ:  Objection.  Vague.
17  BY MR. FEE:
18      Q.   Jasper.  Do you remember an agreement
19  with Jasper?
20      A.   No.
21      Q.   Did you ever have any engineers review
22  any of the files that you had converted for
23  Public.Resource?
24      A.   No.
25  ///

Capital Reporting Company
Malamud, Rebecca  11-13-2014

142

1        (Deposition Exhibit No. 23
2        marked for identification.)
3  BY MR. FEE:
4     Q.   I'm going to hand you what's been
5  marked as Exhibit 23.  It's a single page Bates
6  labeled PT_EDD34456-00001.
7     A.   Okay.
8     Q.   Do you recognize Plaintiff's -- or
9  Exhibit 23 to be a series of communications
10  between you and Jasper?
11     A.   Yes.
12     Q.   I want to draw your attention towards
13  the bottom of that page.  Do you see there's a
14  paragraph that starts with, "We're in alpha"?
15     A.   Uh-huh.
16     Q.   The second sentence from the end says,
17  "Reaction has been very positive, and I have a
18  couple of engineers lined up to review the
19  documentation when it's complete."
20        Do you see that?
21     A.   It was never completed.
22     Q.   Okay.  Was this referring to NFPA or
23  ASTM illustrations that were converted by Point B?
24     A.   EFC, Title 24, California building
25  codes.  It would be California building codes.

143

1     Q.   Do you know if any of the NFPA or ASTM
2  works were part of the California building code
3  project?
4     A.   It's possible.
5     Q.   But you never had any engineers review
6  any of the work that you was done?
7     A.   No, because Jasper didn't complete his
8  documentation.
9     Q.   Did you have engineers lined up to
10  review this documentation?
11     A.   Some -- if it had been completed, yes.
12     Q.   Who were the engineers?
13     A.   Just technical people in the field.
14     Q.   How did you identify these persons?
15     A.   Just colleagues.
16     Q.   What were their names?
17     A.   Just -- I did not -- I would have them
18  do it if we completed it.  But I didn't bother
19  them because I didn't have it completed.
20     Q.   Who were the persons that you were
21  going to have review these materials?
22     A.   I was going to ask Marshall Rose, but
23  I didn't ask him because I'm not going to bother
24  someone like that if --
25     Q.   Why were you going to have Marshall

144

1  Rose review --
2     A.   Well, he's one of the most
3  respected -- sorry.  I interrupted you.  Sorry.
4     Q.   Why did you plan on having Marshall
5  Rose review the work that was being done by
6  Jasper?
7     A.   He's well respected for his technical
8  documentation.
9     Q.   Is Marshall Rose from Oregon?
10     A.   No.
11     Q.   Where is he located?
12     A.   California.
13     Q.   Do you know him?
14     A.   Yes.  He's a colleague.
15     Q.   Had you ever discussed the possibility
16  of having him review documentation?
17     A.   No.  But we review -- we work
18  together.  We -- you know, that's a very common
19  thing on the Internet.
20     Q.   So all of the drawings or materials
21  that you have converted that were ASTM or
22  NFPA-sourced documents were not reviewed by any
23  engineers before they were posted on the Internet?
24     A.   No.
25     Q.   I asked a bad question.  Let me try

145

1  that one more time.  Is it true that none of the
2  materials that you had converted that were from
3  NFPA or ASTM were reviewed by any engineers before
4  they were posted on the Internet?
5     A.   They were not.  Am I misunderstanding?
6        MR. FEE:  It's my fault if there's a
7  bad question.  No.  We're all set.
8        MR. STOLTZ:  I'm sorry, counsel.
9  Can we take a short break?
10        MR. FEE:  Sure.
11        THE VIDEOGRAPHER:  Going off the
12  record.  1:44 p.m.
13        (Recess:  1:44 p.m. to 1:47 p.m.)
14        THE VIDEOGRAPHER:  We're going back
15  on the record.  The time is 1:47 p.m.
16  BY MR. FEE:
17     Q.   Are you aware of any entities other
18  than Point B and HTC Global that provided any
19  assistance to Public.Resources in digitizing any
20  files?
21     A.   No.
22     Q.   Do you know what the error rate was
23  for any of the work that Point B Studios did for
24  Public.Resource?
25     A.   No.

146

1     Q.   Do you acknowledge that there were
2   errors in the work that was delivered to
3   Public.Resource?
4     A.   There were what?
5     Q.   Errors?
6     A.   Hours?
7     Q.   Errors, E-R-R-O-R-S.
8     A.   Errors.  Oh, I thought you said hours.
9   So could you back up a question?
10    Q.   Do you acknowledge that there were
11  errors in any of the work that was delivered by
12  Point B to Public.Resource?
13    A.   Do I deny?  Is that what you said?
14    Q.   I said do you acknowledge.
15    A.   Do I acknowledge?  I don't know.
16    Q.   You're not ruling out the possibility
17  that there were errors in that work?
18    A.   I'm a human being.
19    Q.   So you're not ruling out that
20  possibility.  Correct?
21    A.   It's possible.
22    Q.   Did you ever have a discussion with
23  Mr. Malamud regarding what would be an appropriate
24  error rate --
25    A.   No.

147

1     Q.   -- for your work?
2         (Off-the-record discussion.)
3         (Deposition Exhibit No. 24
4          marked for identification.)
5   BY MR. FEE:
6     Q.   I'm going to hand you Exhibit 24,
7   which is a series of emails between you and
8   Mr. Malamud.  Top one is dated the 12 -- 26th of
9   December, 2013, at 9:30 p.m.  It's Bates labeled
10  PRO26120 through 21.  Do you recognize Exhibit 24
11  to be a series of emails between you and
12  Mr. Malamud?
13    A.   Yes.
14    Q.   I'm going to start on page 2 of the
15  document.  It appears to be an email from you
16  dated September 30th, 2013.  Do you see that?
17    A.   Yes.
18    Q.   In the second paragraph you make
19  reference to an SVG wizard.  Do you know who you
20  were referencing there?
21    A.   That would be Levi.
22    Q.   Then on the front page there's an
23  email towards the bottom dated September 30th,
24  2013, at 4:30 from Mr. Malamud.  Do you see that?
25    A.   Uh-huh.

148

1     Q.   In the third paragraph, he says, "I've
2   got 200 more HTML docs for India coming up, but I
3   think you guys still have that electrical code to
4   mock up."
5         Do you see that?
6     A.   Uh-huh.
7     Q.   You understand the electrical code to
8   be -- oh.  Sorry.  You need to say yes to --
9     A.   Yes.
10    Q.   -- these questions.
11    A.   Yes.
12    Q.   Do you recognize the electrical code
13  referenced in this document to be a reference to
14  NFPA's NEC code?
15    A.   Yes, because we're talking about NFPA
16  above.  Yes.
17    Q.   Then the next paragraph says, "You can
18  find the new location of the National Electric
19  Code here at the bottom of the manifest."  In
20  parentheses it says, "It is now called SP30, so
21  please make sure to fetch the thing."
22        (Reporter inquiry.)
23        MR. FEE:  Fetch the thing.
24  BY MR. FEE:
25    Q.   Do you see that?

149

1     A.   Yes.
2     Q.   Can you explain what he's telling you
3   here?
4     A.   The identifiers were changed.
5     Q.   Do you know why?
6     A.   No.
7     Q.   If we move up one email, there's an
8   email from you on the 26th of December at
9   9:05 p.m.  Do you see that?
10    A.   Yes.
11    Q.   Where you say, "We completed the
12  National Electric Code."  And then in parentheses
13  you say, "IS.SP.30.2011, 235 new images," end
14  parentheses.  "And the rest is for NFPA,
15  145 images, 71 MathML across seven complete docs."
16        Do you see that?
17    A.   Uh-huh.  Yes.  Sorry.
18    Q.   Does that mean --
19    A.   Yes.
20    Q.   So you converted all of the images in
21  the National Electric Code for Mr. Malamud?
22        MR. STOLTZ:  Objection.  Foundation.
23  BY MR. FEE:
24    Q.   Is that right?
25        MR. STOLTZ:  You can answer if you

Capital Reporting Company
Malamud, Rebecca  11-13-2014

150

1  know.
2      A.   By "completed," it would be whatever
3  we could do based on the quality of the original
4  JPEG.
5  BY MR. FEE:
6      Q.   Okay.  So you made exact copies of all
7  the NEC files that you were able to copy based on
8  the quality of the images provided to you?
9      A.   We improved the art on that many
10  images.  Yes.
11      Q.   What you described as exact copies.
12  Correct?
13      A.   Correct.
14      Q.   Now, on the top page there's another
15  email from Carl Malamud.  It says -- starts off by
16  saying what I think is an abbreviation of -- for
17  "by the way," right?  "BTW"?
18      A.   Yes.
19      Q.   "By the way, it sounds like the
20  diagrams have been sitting in a queue and you
21  might be tempted to throw them over the wall in a
22  last-minute rush."
23          Do you see that?
24      A.   Uh-huh.
25      Q.   Yes?

151

1      A.   Yes.
2      Q.   Do you -- what do you understand that
3  to mean?
4      A.   Well, it's presumptuous, but often
5  the -- we would wait until we have a certain
6  amount completed so we could do the Q and A [sic]
7  in one step.  So that's what it means to me.
8      Q.   Had Mr. Malamud ever accused you of
9  sending him a bunch of files in a last-minute
10  rush?
11      A.   But it wasn't a last-minute rush for
12  my group.
13      Q.   Had Mr. Malamud accused you of doing
14  that in the past?
15      A.   It's possible.
16      Q.   You don't recall whether or not he
17  said that you had sent him work that was done in a
18  last-minute rush prior to today?
19      A.   It's possible.  I don't really recall,
20  but --
21      Q.   Then the next sentence, he says,
22  "Please make sure you have personally checked
23  every single diagram to make sure it is the same
24  as the original before you send it to me."
25          Do you see that?

152

1      A.   Yes.
2      Q.   Did you do that?
3      A.   Yes.
4      Q.   For every file that you delivered to
5  Mr. Malamud?
6      A.   Yes.
7      Q.   And he says, "We're being sued by
8  these folks, and if the diagrams are different or
9  wrong, it will really hurt us.  Make sure you've
10  done the QA."
11          Do you see that?
12      A.   Yes.
13      Q.   Do you have any idea why he was
14  reminding you to do the quality assurance?
15      A.   Because he always does.
16      Q.   Did he ever express any complaints or
17  concerns about the quality assurance that was done
18  for his work before?
19      A.   No.
20      Q.   Had you ever discussed with him the
21  importance of the diagrams being correct in
22  connection with this lawsuit?
23      A.   Yes.  This is 2013.
24      Q.   What did he discuss with you along
25  those lines?

153

1      A.   Just to make sure it matched the
2  originals.
3      Q.   Did you understand why it was
4  important or if it was important for the
5  originals --
6      A.   Not to -- I'm sorry.
7      Q.   Did you understand whether or not it
8  was important to match the originals for the
9  purposes of this lawsuit?
10      A.   Not to introduce errors into the
11  standard.
12      Q.   Did he tell you why that was important
13  to him?
14      A.   I mean, this is -- I can't -- I don't
15  know exactly what he said.
16      Q.   What do you recall about those
17  discussions?
18      A.   Just to be as precise as possible.
19      Q.   Has Mr. Malamud ever identified a
20  mistake in any of the work that you had done for
21  Public.Resource?
22      A.   No.
23      Q.   Never?
24      A.   I can't recall a specific incident.
25      Q.   Do you recall that he identified at

Capital Reporting Company
Malamud, Rebecca  11-13-2014

154

1 least one incident where there was a mistake?
2      A.   It's possible.
3      Q.   Is it possible that it's happened
4 multiple times?
5      A.   No.
6      Q.   So at most Mr. Malamud has identified
7 one mistake in all of the work that Point B
8 Studios has done for Public.Resource?
9      A.   Yes.
10     Q.   So whatever quality assurances that
11 Mr. Malamud goes through only identified one
12 mistake as far as you know?
13     A.   As far as I know.
14          (Deposition Exhibit No. 25
15          marked for identification.)
16 BY MR. FEE:
17     Q.   I'm going to hand you Exhibit 25,
18 which is a series of emails between you and
19 Mr. Malamud.  The top one dated the 8th of
20 October, 2012, at 7:02 p.m.  Bates labeled
21 PRO25947.
22          Can you identify Exhibit 25 as a
23 series of emails between you and Mr. Malamud?
24     A.   Yes.
25     Q.   I want to start at the bottom of the

155

1 exhibit.  You see there's what appear to be an
2 email from you, October 8th, 2012, at 4:16 p.m.
3 Do you see that?
4      A.   Yes.
5      Q.   Does a portion of that email have text
6 that was written by Mr. Malamud below it?
7      A.   He's -- "Please.  I'd like to get that
8 stuff into the file tree.  It lends a lot of
9 credence to a story that we're adding value to the
10 materials by transforming them."
11     Q.   Mr. Malamud wrote that?
12     A.   Yes.
13     Q.   Do you know what -- strike that.
14          Did Mr. Malamud ever explain to you
15 how he thought getting any files in a file tree
16 lended credence to a story --
17     A.   No.
18     Q.   -- that he's adding value?
19     A.   Sorry.  No.
20     Q.   Do you know what that meant?
21     A.   No.
22     Q.   Can you tell based on the rest of this
23 email or based on your experience what files he's
24 referencing there?
25     A.   The art for -- the art that's in

156

1 progress at -- at the time and is India, CFR, and
2 Title 24.
3      Q.   Okay.  And the CFR art included art
4 from ASTM.  Right?
5      A.   Correct.
6      Q.   So Mr. Malamud was asking you to
7 complete the work on ASTM files, among others, to
8 help lend credence to his story that he's adding
9 value.  Is that right?
10     A.   I can't presume that's what he meant.
11     Q.   Is that how you understood this email?
12     A.   I'm responding to the stuff that I
13 have that I -- that we're working on to get it in
14 the file tree, but I can't presume what he -- what
15 he meant.
16     Q.   You have no idea what he meant by
17 that?
18     A.   No.
19          MR. STOLTZ:  Objection.  Asked and
20 answered.
21 BY MR. FEE:
22     Q.   At the top of this email, you see
23 there's a paragraph No. 2.  It says, "The source
24 art for the CFR," in parentheses, "ANSI" -- that's
25 A-N-S-I -- "ASTM/ISO," end parentheses, "is not

157

1 stored in their original directories, so I need to
2 sort that out."
3          Do you see that?
4      A.   Uh-huh.
5      Q.   Yes?
6      A.   Yes.
7      Q.   Did you write that?
8      A.   Yes.
9      Q.   Can you explain to me what that means?
10     A.   When diagrams are created, there's a
11 three-step process I explained earlier, and --
12 where we have the line and the -- the Union
13 step in the editable type.  And so I have them in
14 a holding directory on my laptop and I have to
15 sort everything to get them back into the original
16 directories.  That's what I'm talking about.
17          (Reporter inquiry.)
18          THE WITNESS:  Yeah.  Union.  Yeah.
19 Which is a function of Inkscape.
20 BY MR. FEE:
21     Q.   Then you continue by saying, "The art
22 is all there.  It just lost the link to the
23 original doc."
24          (Reporter inquiry.)
25          MR. FEE:  D-O-C.

Capital Reporting Company
Malamud, Rebecca  11-13-2014

158

1  BY MR. FEE:
2      Q.   Do you see that?  What does that mean?
3      A.   Well, let's see.  I don't know that
4  this -- I just need to put it back in the
5  directory so it's linked with the HTML.
6      Q.   So what lost a link?
7      A.   The final graphics were not linked to
8  the HTML until I put it in the proper directory.
9      Q.   Would you turn back to Exhibit 21?  I
10 want to draw your attention to the top of the
11 first page in an email from you -- or from
12 Mr. Malamud to you at January 4th, 2014, at
13 12:01 p.m.
14     A.   Uh-huh.  Yes.
15     Q.   In the fourth paragraph down,
16 Mr. Malamud says, "All the docs you see are, in
17 theory, double keyed.  Of course they may cheat
18 and do OCR first and then do their -- their QA.
19 In any case, I won't be paying for double-key work
20 for the foreseeable future."
21          Do you see that?
22     A.   Yes.
23     Q.   First of all, does that refresh your
24 recollection as to whether or not the materials
25 you were receiving from HTC Global were double

159

1  keyed or triple keyed?
2      A.   It does.
3      Q.   You know now it was supposed to be
4  double keyed.  Right?
5      A.   Correct.
6      Q.   Secondly, it looks like Mr. Malamud's
7  telling you that those materials may not even be
8  double keyed.  Right?
9          MR. STOLTZ:  Objection.
10 Mischaracterizes.  And the document speaks for
11 itself.  You can answer if you can.
12     A.   I don't have anything to do with that,
13 so --
14 BY MR. FEE:
15     Q.   Okay.  Well, you received Exhibit 21
16 before.  Right?
17     A.   Yes.
18     Q.   When you received Exhibit 21, did you
19 have an understanding that the materials that
20 Mr. Malamud was providing to you may not actually
21 be double keyed?
22          MR. STOLTZ:  Objection.  That
23 mischaracterizes the document and her testimony.
24     A.   What's the question?
25 BY MR. FEE:

160

1      Q.   The question is after you received
2  Exhibit 21, did you have an understanding that the
3  files that you received from Public.Resource with
4  text may in fact not have been double keyed?
5          MR. STOLTZ:  Same objections.
6      A.   It doesn't have anything to do with
7  the work that Point B produced.
8  BY MR. FEE:
9      Q.   Was that your answer to whether or not
10 you understood that the files you were receiving
11 may not have been doubled keyed?
12     A.   It gets -- I understand it was
13 communicated.
14     Q.   What was communicated?
15     A.   That it's double keyed.
16     Q.   Well, he says that, "They may cheat
17 and do ORC first."
18          Do you see that?
19     A.   I see that.
20     Q.   Okay.  And if you do OCR first, then
21 you're not double keying.  Correct?
22          MR. STOLTZ:  Objection.  Lack of
23 foundation.  The witness has already said that she
24 didn't do any of that work.
25          MR. FEE:  Mitch, "Objection, lack of

161

1  foundation," is all you're permitted to say.
2          (Reporter inquiry.)
3          THE WITNESS:  I see this, but I -- I
4  didn't have anything to do with that step.
5  BY MR. FEE:
6      Q.   I understand that.  Do you understand
7  OCR to be part of the double keying process?
8          MR. STOLTZ:  Same objection.
9      A.   Double keyed means double keyed.
10 Typed twice.
11 BY MR. FEE:
12     Q.   And if you do OCR first you're not
13 typing first.  Correct?
14          MR. STOLTZ:  Same objection.
15     A.   But these are not my words so --
16 BY MR. FEE:
17     Q.   I'm not asking you about this document
18 anymore.  Is OCR part of the double-keyed process?
19          MR. STOLTZ:  Same objection.
20     A.   I don't know.
21 BY MR. FEE:
22     Q.   So now you don't know what double
23 keying is?
24          MR. STOLTZ:  Objection.  That's
25 argumentative.

Capital Reporting Company
Malamud, Rebecca  11-13-2014

162

1     A.   I believe I stated earlier that I
2  thought, possibly incorrectly, that OCR was the
3  first step in double and triple keying, but I
4  don't do that kind of work so --
5  BY MR. FEE:
6     Q.   Okay.  That paragraph continues with
7  Mr. Malamud saying, "In any case, I won't be
8  paying for double-key work for the foreseeable
9  future."
10       Do you see that?
11    A.   Yes.
12    Q.   Do you know why Mr. Malamud was not
13 going to be paying for double-key work in the
14 foreseeable future?
15    A.   Not outside of the context that
16 that -- sentence.
17    Q.   So you never had any discussion with
18 Mr. Malamud regarding whether or not he would
19 continue to pay for double-key work other than
20 this email that's Exhibit 21?
21    A.   Correct.
22    Q.   Do you know if Mr. Malamud or
23 Public.Resource is having any double-key work done
24 currently?
25    A.   I don't know.

163

1     Q.   When's the last time you delivered any
2  files to Mr. Malamud?
3     A.   Can you be clearer?
4     Q.   When was the last time you delivered
5  any files that were conversions or translations of
6  another document?
7     A.   After my summer mentoring program.
8     Q.   So Point B has not done any work for
9  Public.Resource since September 5th of 2014?
10    A.   No.  We are continuing work.
11    Q.   You just haven't delivered any files
12 since September?
13    A.   Correct.
14    Q.   Do you know what types of files were
15 delivered this summer?
16    A.   Primarily diagrams, SVG diagrams.
17    Q.   Were they SVG diagrams of works that
18 were contained in ASTM or NFPA publications?
19    A.   No.
20    Q.   What -- where were those diagrams
21 from, if you know?
22    A.   Bulgaria.
23    Q.   Anywhere else?
24    A.   Nowhere else.
25    Q.   Turning back to Exhibit 21, going down

164

1  three paragraphs from where we were just reading,
2  Mr. Malamud says, "Let's also make sure we've done
3  any NFPA docs that are in HTML but not in SVG.
4  Also, we can do any ASTM or ASHRAE docs as well,
5  as those are helpful to me in my suit."  Do you
6  see that?
7        Does this refresh your recollection as
8  to whether or not you had done any work on ASHRAE
9  files?
10    A.   We've never done work on ASHRAE.
11    Q.   Has Mr. Malamud delivered ASHRAE files
12 to you for conversion, they just haven't been done
13 yet?
14    A.   No.
15    Q.   Do you have any idea why he's
16 referencing work that you and he could be doing on
17 ASHRAE docs?
18    A.   At the time that was what we were
19 going to do, but it didn't materialize.
20    Q.   The next paragraph says, "Definitely
21 keep plowing away on that stuff.  That is the kind
22 of output that makes it much easier for me to try
23 and raise money to keep you going for the rest of
24 the year."
25       Do you see that?

165

1     A.   Uh-huh.
2     Q.   Yes?
3     A.   Yes.
4     Q.   First of all, "that stuff" refers to
5  NFPA, ASHRAE, or ASTM files in the paragraph
6  above.  Right?
7     A.   And it's general.  Independent idea.
8     Q.   Do you know if Mr. Malamud was using
9  the work on India files for fundraising?
10    A.   I don't know.
11    Q.   Do you know if Mr. Malamud was using
12 the work that was being done on ASTM, NFPA, and
13 ASHRAE files for fundraising?
14       MR. STOLTZ:  Objection.  Misstates
15 testimony.  She said they didn't do ASHRAE files.
16    A.   We don't discuss fundraising in any
17 detail.
18 BY MR. FEE:
19    Q.   Well, you discussed fundraising in
20 this email.  Right?
21    A.   This is -- this is the level that we
22 discussed it.
23    Q.   The following sentence says, "The
24 bookwork is also very valuable to me, but I can't
25 raise money for that."

Capital Reporting Company
Malamud, Rebecca  11-13-2014

166

1        Do you see that?
2     A.   Yes.
3     Q.   First of all, do you know what the
4  bookwork is?
5     A.   Had a couple of book concepts that we
6  were working on.
7     Q.   You and Mr. Malamud were contemplating
8  writing a book together?
9     A.   Not -- I was doing designs for a book
10  that he was going to write, which he didn't do it.
11     Q.   Do you know what the subject matter of
12  that book or that books -- those books were?
13     A.   Standards.
14     Q.   What in particular about standards?
15     A.   The words are -- I don't know the
16  words.
17     Q.   What were the illustrations going to
18  be?
19     A.   I had photographs of boxes with
20  crinkle pack so --
21     Q.   Any other illustrations or graphics
22  that you remember discussing?
23     A.   No.  We didn't discuss that.
24     Q.   Why, if you know, was the bookwork not
25  helpful for raising money?

167

1     A.   I don't know for sure.
2     Q.   Did you have any discussions with
3  Mr. Malamud on that subject?
4     A.   Not in detail.
5     Q.   What do you recall about those
6  discussions?
7     A.   I don't recall.
8     Q.   So you know that a discussion
9  regarding the subject of whether the bookwork
10  would be helpful to raise money took place, but
11  you have no recollection of any of the substance
12  of that discussion?
13     A.   No.
14     Q.   The next paragraph, first, he says,
15  "The summer thing may or may not happen.  I
16  wouldn't count on it, though."
17        Does that refer to the Rural Design
18  Collective project?
19     A.   Yes.
20     Q.   But that wound up happening.  Right?
21     A.   Yes.
22     Q.   Then he says, "Right now just raising
23  my salary, my overhead, and your 60K is a
24  challenge."
25        Do you see that?

168

1     A.   Yes.
2     Q.   Have you ever discussed that subject
3  matter with him prior to this email?
4     A.   No.
5     Q.   Do you know how he was raising the
6  money for his salary, his overhead, and your
7  $60,000?
8     A.   No.
9     Q.   Do you know -- can you identify any
10  persons or entities that provided any funding to
11  Public.Resource?
12        MR. STOLTZ:  Objection.  Asked and
13  answered.  You can answer again.
14     A.   No.
15  BY MR. FEE:
16     Q.   You have no idea whether or not any
17  person, for example -- strike that.
18        You can't identify a single company or
19  person that provided a dollar to Public.Resource.
20  Is that your testimony?
21     A.   Well, I mean, it's common knowledge --
22  it's funded by Google, with the big awards they
23  had a couple years ago.  There you go.  There's
24  one.
25     Q.   Okay.  Any others?

169

1     A.   Usually he'll tell me when funding is
2  secured, so I'm sure it's in the email.
3     Q.   Can you identify any other persons or
4  entities that provided a single dollar in funding
5  to Public.Resource other than Google?
6     A.   I'm sure it's in the email.
7     Q.   I'm asking you what you can recall
8  right now.
9     A.   I do not recall.
10     Q.   You can't name a single other person
11  or entity.  Is that your story?
12        MR. STOLTZ:  Objection.
13  Argumentative.
14     A.   (Pause.)  I know he gets funds from
15  foundations.
16  BY MR. FEE:
17     Q.   Which foundations?
18     A.   I'm -- I'm really horrible with names.
19     Q.   Okay.
20     A.   So --
21     Q.   Give it your best recollection of the
22  names.
23     A.   It's -- I'm sure it's in the email,
24  but I'm not even going to get it right.
25     Q.   Okay.

Capital Reporting Company
Malamud, Rebecca  11-13-2014

170

1    A.   Akora.
2    Q.   Can you spell that to the best of your
3 knowledge?
4    A.   A-K-O-R-A.
5    Q.   Any others?
6    A.   I -- I can't recall.
7    Q.   Okay.
8    A.   I don't work on funding proposals for
9 Public.Resource.org.
10    Q.   So it's your testimony under oath that
11 you can identify only Google and Akora as funders
12 for Public.Resource?
13       MR. STOLTZ:  Objection.
14 Argumentative.
15    A.   I just don't want to presume, so I
16 don't want to say anything incorrect.
17 BY MR. FEE:
18    Q.   Well, I'm asking to the best of your
19 knowledge.  Can you identify any to the best of
20 your knowledge other than Google and Akora?
21    A.   Yes.
22    Q.   Who?
23    A.   I mean, that's the best of my
24 knowledge.  I don't want to say anything
25 incorrect.

171

1    Q.   All right.  Who else have you ever
2 heard Mr. Malamud identify as a potential funder
3 for Public.Resource?
4    A.   I -- I don't know.
5    Q.   So you can't identify anybody that
6 Mr. Malamud ever said was a potential source of
7 funds other than Google and Akora?
8    A.   I don't remember.
9    Q.   What emails are you referencing when
10 you said that the assurance information is in your
11 emails?
12    A.   If he shares that information with me,
13 it's in -- it's in email.
14    Q.   Has Mr. Malamud provided any funding
15 to Public.Resource?
16    A.   I don't know.
17    Q.   Have you provided any funding to
18 Public.Resource?
19    A.   No.
20    Q.   Have you ever been involved in any
21 discussions with any person or company regarding
22 funding for Public.Resource other than the
23 discussions with Mr. Malamud related to Google and
24 Akora?
25    A.   No.

172

1    Q.   How much money did Google give
2 Public.Resource?
3    A.   I -- it was one of the major grants
4 that -- I forget -- the head of Khan Academy was
5 one.
6    Q.   Sal Khan?
7    A.   I can't --
8       (Reporter inquiry.)
9       MR. FEE:  Sal Khan, S-A-L K-H-A-N.
10    A.   I can't -- yes.  I can't.  There was a
11 name for it.  10 by 100?  It was a big competition
12 for ideas.
13 BY MR. FEE:
14    Q.   Do you know how much money Akora
15 provided to Public.Resource?
16    A.   No.  I don't even know if I have the
17 name right without my computer.
18    Q.   What would you look at in your
19 computer to get that name right?
20    A.   I don't know.  I'd look through my
21 email.
22    Q.   Do you have a file in your file folder
23 in your emails regarding potential donors or
24 donors to Public.Resource?
25    A.   Nope.  No.

173

1    Q.   How would you go about searching your
2 email for that information?
3    A.   Try different variances on Akora.  So,
4 I mean, I'm -- just -- I don't know.
5       (Deposition Exhibit No. 26
6       marked for identification.)
7 BY MR. FEE:
8    Q.   I'm going to hand you Exhibit 26,
9 which is a series of emails between -- at least at
10 the top it says it's between you at your Webchick
11 address to yourself at that same address, dated
12 October 16th, 2011, at 2:38 p.m.  Bates labeled
13 PT_EDD34422-00001 through 2.
14       Can you identify Exhibit 26 as a
15 series of emails involving you and Mr. Malamud?
16    A.   Yes.
17    Q.   I want to start about midway through
18 the first page.  Do you see a paragraph that
19 starts with, "From a purely efficient production
20 standpoint"?
21    A.   Yes.
22    Q.   Okay.  First of all, do you know who
23 wrote that language in that paragraph?
24    A.   Me.
25    Q.   It was you?  It was you, you said?

Capital Reporting Company
Malamud, Rebecca  11-13-2014

174

1  Sorry.
2      A.   Yes.
3      Q.   It says, "From a purely efficient
4  production standpoint, I think it is going to be
5  easier for you to do a batch search and replace on
6  the graphic file extension.  I have gone through
7  both processes now and the SVG replacement is much
8  easier.  There is a slight snafu where I have
9  glyph errors on about 8 percent of the SVGs and
10  the SVG/Math generates an invalid SVG in that
11  scenario."  In parentheses you say, "It involves
12  the same three."
13      A.   Yes.
14      Q.   Can you explain to me what that means?
15      A.   This is really early, because it's
16  2011, so we were just getting into everything, and
17  I'm suggesting that he do the batch search and
18  replace that I ultimately wound up doing at the
19  end of the work flow.  SVG replaced.  I mentioned
20  before that it was just easier to do it -- replace
21  all the SVGs and then review it in a web browser,
22  and if we didn't do the JPEG, put the JPEG back
23  in.
24          Talk about the percent of the SVGs
25  and -- and we went through quite -- some glyphs

175

1  were not supported by SVG/Math, and when we had to
2  work -- there's a step between Amaya and SVG/Math
3  where I had to search and replace the unicode
4  hexadecimal equivalents of the glyphs.  So that
5  SVG/Math would render a valid SVG.
6      Q.   What is a glyph?
7      A.   It's a -- it's a character in a
8  typeface or a symbol.
9      Q.   And -- sorry.  Were you done?
10      A.   Yes.
11      Q.   Okay.  So a glyph error, then, is
12  what?
13      A.   It just wouldn't render the character,
14  so --
15      Q.   And at this point in time that was
16  occurring approximately with 8 percent of the
17  SVGs?
18      A.   Correct.
19      Q.   Has that problem been resolved?
20      A.   Yes.
21      Q.   How so?
22      A.   By mapping the unicode hexadecimal
23  equivalents to the symbol and replacing that in
24  the Amaya -- the equations coded in Amaya.  So
25  there is an interstitial step where we do that so

176

1  that we don't have the glyph errors.
2      Q.   How did you discover this problem?
3      A.   By just doing the work so --
4      Q.   When you would have a glyph error what
5  would appear on the screen when a glyph error
6  takes place if a --
7      A.   It would say, "Invalid."
8      Q.   If it was rendered on a web page?  You
9  can answer now.
10      A.   It would say, "Invalid SVG," and
11  nothing would render.  And if you opened the SVG
12  in Inkscape, you could easily see which symbol was
13  not rendering properly.
14      Q.   Two paragraphs above that paragraph,
15  it says, "I missed that validator link.  It's nice
16  to know that it works."
17          Do you see that?
18      A.   Yes.
19      Q.   Did you write that?
20      A.   Yes.
21      Q.   Can you explain what that means?
22      A.   It's just patting each -- patting each
23  other on the back for figuring it out.  So, yeah,
24  I was just pleased that we came up with the
25  solution.

177

1      Q.   What is the validator link that's
2  referenced there?
3      A.   It's the World Wide Web validator that
4  all people who are concerned with web standards
5  use to make sure that they're writing code that
6  conforms to web standards.
7          (Off-the-record discussion.)
8  BY MR. FEE:
9      Q.   Do you recall having any discussions
10  or communications with Mr. Malamud regarding
11  whether or not you should put a
12  Public.Resource.org seal on any ASTM standards?
13      A.   I do not recall.
14      Q.   Do you recall having any discussions
15  with him regarding whether he should put a
16  Public.Resource or you should put a
17  Public.Resource seal on any works that you were
18  converting?
19          MR. STOLTZ:  Objection to form.
20      A.   I don't remember.
21  BY MR. FEE:
22      Q.   Did you ever have any discussions with
23  Mr. Malamud regarding -- or communications
24  regarding whether the use of a Public Resource
25  seal on a document would make it look like

Capital Reporting Company
Malamud, Rebecca  11-13-2014

---

178

1 Public.Resource was claiming authorship of work?
2     A.   I don't remember.
3     Q.   Have you ever had any communications
4 with any person other than Mr. Malamud regarding
5 whether or not Public.Resource was the author of
6 any of the works that you were converting or
7 copying?
8     A.   No.
9     Q.   Do you retain any evidence of your
10 comparisons of the original illustration in a code
11 or standard and your SVG of the same illustration?
12     A.   No.
13     Q.   Did you ever convert any copyright
14 notices for NFPA or ASTM standards or codes?
15     A.   I don't know.
16     Q.   Did you ever provide any of the copies
17 of the ASTM or NFPA graphics that you did to any
18 persons other than Public.Resource?
19     A.   To my counsel.
20     Q.   Anyone else?
21     A.   No.
22     Q.   Did Point B ever send any invoices to
23 Public.Resources for work that they did?
24     A.   I invoiced monthly.
25     Q.   Do you know if those invoices were

---

179

1 produced in this litigation?
2     A.   It would be on my backup that I
3 provided counsel.
4     Q.   But you don't know if they were
5 produced or not?
6     A.   I didn't consciously make copies of
7 them so --
8     Q.   Do you know what was produced to us
9 and what was not produced to us?
10     A.   Yes.
11     Q.   So do you know if the invoices were
12 produced to us?
13     A.   I don't think so.
14     Q.   You still have them?
15     A.   Yes.
16     Q.   When was the first time that Point B
17 provided any services to Public.Resource?
18     A.   I would imagine 2006.
19     Q.   And I know we went through the revenue
20 that Point B has received from Public.Resources
21 from 2000 -- I think through 2012 to the present.
22 Do you know how much revenue Public.Resources paid
23 Point B from 2006 through 2011?
24     A.   No.
25     Q.   Is it hundreds of thousands of

---

180

1 dollars?
2     A.   No.
3     Q.   So it was nothing like $60,000 a year?
4     A.   Probably not that much.
5     Q.   What was the lowest revenue year from
6 Public.Resources for Point B?
7     A.   I don't -- I don't know.
8     Q.   Was there ever a year that
9 Public.Resources paid Point B less than $25,000?
10     A.   I would think so.
11     Q.   Was there ever a year that
12 Public.Resources paid Point B more than $100,000?
13     A.   Never.
14     Q.   What was Point B's total revenue in
15 2013?
16     A.   I -- I don't know without it in front
17 of me.
18     Q.   Was it more than $100,000?
19     A.   I don't think so.
20     Q.   And I believe you told me that
21 Public.Resource paid Point B $75,000 in 2013.
22 Does that sound correct?
23     A.   Yes.
24     Q.   So Public.Resources is by far the
25 largest customer of Point B, at least in 2013?

---

181

1         MR. STOLTZ:  Objection to form.
2     A.   And by your question, I'm probably
3 confusing gross and net and income, and that's why
4 I have an accountant.  By far, no.
5 BY MR. FEE:
6     Q.   Okay.  Well, let me be more specific.
7 You've said that you didn't think revenue exceeded
8 $100,000 in 2013.  Correct?
9     A.   Correct.  But -- I might be confusing
10 some things, but correct.
11     Q.   Okay.  And you told me that
12 Public.Resource paid $75,000 to Point B in 2013.
13 Right?
14     A.   Yes.
15     Q.   So Public.Resources was at least 75
16 percent of the revenues for Point B in 2013?
17     A.   Maybe 50.
18     Q.   Okay.  It's a simple math here.  If
19 there's $100,000 or less of revenue, $75,000 of
20 which came from Public.Resource, mathematics tells
21 us that at least 75 percent of the revenue was
22 from Public.Resources, doesn't it?
23     A.   Yes.  But I -- if -- I'd want to have
24 my bottom line in front of me before I -- so I'm
25 not answering incorrectly.

---

Capital Reporting Company
Malamud, Rebecca  11-13-2014

182

1    Q.   Well, based on what you recall sitting
2  here right now, you believe Public.Resources, in
3  2013, was the source of at least 75 percent of
4  your revenues?
5    A.   No.  It's 50 percent.
6    Q.   Okay.  So which number is wrong in our
7  equation, then?  Were you paid $75,000 by
8  Public.Resources in 2013?
9    A.   Yes.
10    Q.   Okay.
11    A.   If it's in one of these documents,
12  so --
13    Q.   Yeah.  I believe -- I believe it said
14  $75,000.
15    A.   Okay.
16    Q.   So you think, then, you had greater
17  than $100,000 in revenue?
18    A.   That's probably where I'm wrong.
19    Q.   And it sounds like your estimate is
20  that it was $150,000 in revenue.  Is that right?
21    A.   Yes.
22    Q.   Okay.  Now, in 2012, I think you
23  testified that you were paid $60,000 by
24  Public.Resource.  Correct?
25    A.   Correct.

183

1    Q.   What was Point B's revenues for 2012?
2    A.   I'm -- I'm still not going to know the
3  exact number.
4    Q.   Was it more than $100,000 in 2012?
5    A.   I believe so.
6    Q.   Would you expect Public.Resources to
7  make up approximately 50 percent of the revenue in
8  2012?
9    A.   Yes.
10    Q.   You estimate that Public.Resources has
11  been approximately 50 percent of the revenues for
12  Point B for every year from 2006 to 2013?
13    A.   No.  Not always.
14    Q.   In 2011, was it approximately
15  50 percent?
16    A.   No.
17    Q.   Was it more or less?
18    A.   Less.
19    Q.   How much did Public.Resource pay
20  Point B Studios in 2011?
21    A.   I'm not sure.
22    Q.   Was it more than $50,000?
23    A.   Yes.
24    Q.   Was it more than $75,000?
25    A.   No.

184

1    Q.   Was Point B's total revenues in 2011
2  approximately $125,000?
3    A.   Approximately.
4    Q.   Since 2006, has there ever been a year
5  that Public.Resources has paid Point B less than
6  $25,000?
7    A.   I don't know.
8    Q.   How much did Public.Resources pay
9  Point B Studios in 2010?
10    A.   I don't know.
11    Q.   Was it more than $50,000?
12    A.   I don't think so.
13    Q.   Was it more than $25,000?
14    A.   I think so.
15    Q.   Has there ever been a year since 2006
16  in which Public.Resource paid Point B Studios less
17  than $25,000?
18        MR. STOLTZ:  Objection.  Asked and
19  answered.
20    A.   I don't know.
21  BY MR. FEE:
22    Q.   Has there ever been a year that
23  Public.Resource paid Point B Studios less than
24  $15,000?
25    A.   I don't know.

185

1    Q.   Has there ever been a year that
2  Public.Resources paid Point B Studios less than
3  $5,000?
4    A.   No.
5        MR. STOLTZ:  Counsel, do you mean
6  since 2006?
7        (Reporter inquiry.)
8        MR. STOLTZ:  Do you mean since 2006?
9        MR. FEE:  Yes.
10  BY MR. FEE:
11    Q.   Your -- I assume your answer was only
12  going back to 2006.  Correct?
13    A.   Correct.
14        MR. STOLTZ:  Counsel, it's almost
15  three o'clock.  Should we take a break or are you
16  close to --
17        MR. FEE:  Sure.  We can take a
18  break.
19        MR. STOLTZ:  Or are you close to
20  done?
21        MR. FEE:  I'm probably close to
22  done, but it might go quicker if we take a short
23  break.
24        THE VIDEOGRAPHER:  Okay.  Going off
25  the record.  2:54 p.m.

Capital Reporting Company
Malamud, Rebecca  11-13-2014

186

1      (Recess:  2:54 p.m. to 3:02 p.m.)
2          THE VIDEOGRAPHER:  We're going back
3  on the record.  The time is 3:02 p.m.
4      (Deposition Exhibit No. 27
5      marked for identification.)
6      (Mr. Childs not present.)
7  BY MR. FEE:
8      Q.   I'm going to hand you Exhibit 27,
9  which is a single-page email from Carl to you,
10  dated January 16th, 2014, at 3:48 p.m., and Bates
11  labeled PRO42317.  Can you identify Exhibit 27 as
12  an email from Mr. Malamud to you?
13     A.   Yes.
14     Q.   And the subject is funding.  Correct?
15     A.   Yes.
16     Q.   And it says, you're funded at the
17  5K-per-month level for at least six months from
18  p r.o., as long as you can keep pumping out
19  visible progress on the SVG/MathML front."
20     A.   Yes.
21     Q.   And in parentheses, it says, "Plus, of
22  course, your design health, which I need, but what
23  the funders are going to be looking for is walking
24  through the standards.  They're funding my legal
25  fight so that's the piece they care about."  Do

187

1  you see that?
2      A.   Yes.
3      (Mr. Childs present.)
4  BY MR. FEE:
5      Q.   Do you know what funders he's
6  referring to?
7      A.   I don't know exactly who they are.
8      Q.   Do you have any idea what funders he's
9  referring to?
10     A.   No.
11     Q.   Did you ever ask, "Who are these
12  funders?"
13     A.   I -- I wait for him to supply the
14  information when he wants to.
15     Q.   So you never asked him for
16  information?
17         MR. STOLTZ:  Object to the form.  It
18  mischaracterizes her testimony.
19     A.   There is funders.
20  BY MR. FEE:
21     Q.   You never asked him who they were?
22     A.   No.
23         MR. STOLTZ:  Objection.  Asked and
24  answered.
25  BY MR. FEE:

188

1      Q.   Do you know why he thought the funders
2  cared about visible progress on the SVG/MathML
3  front?
4      A.   No.
5      Q.   Do you know what he meant when he
6  said, "They're funding my legal fight"?
7      A.   No.
8      Q.   Do you know who the "they" is in that?
9      A.   No.
10     Q.   But whoever is funding his legal fight
11  you understood to be -- to care about the
12  SVG/MathML front?
13         MR. STOLTZ:  Objection to form and
14  foundation.
15     A.   Restate the question.
16  BY MR. FEE:
17     Q.   Whoever the funders are that he's
18  referencing in this email, is it true that you
19  understood them to care about the SVG/MathML work?
20         MR. STOLTZ:  Same objections.
21     A.   I understood that to continue the work
22  that I was doing.
23  BY MR. FEE:
24     Q.   That wasn't my question.  My question
25  is did you understand that the funders cared about

189

1  the SVG and MathML work?
2          MR. STOLTZ:  Same objections.
3      A.   All I -- all I know is to keep doing
4  the work that I am doing.
5  BY MR. FEE:
6      Q.   Miss, you have to answer my question.
7  My question has nothing to do with whether or not
8  you were to continue your work.  My question is
9  what you understood to be important to the funders
10  of Public.Resource based on Exhibit 27.
11         MR. STOLTZ:  Same objections.
12     A.   I don't know.
13  BY MR. FEE:
14     Q.   So you didn't know based on this email
15  that the funders considered the SVG and MathML
16  work to be important?
17         MR. STOLTZ:  Objection.  Foundation.
18  Argumentative.
19     A.   I don't know by this message.
20  BY MR. FEE:
21     Q.   Do you have any idea what that first
22  paragraph means?
23         MR. STOLTZ:  Objection.
24  Argumentative.
25     A.   Just to keep doing the work that we're

Capital Reporting Company
Malamud, Rebecca  11-13-2014

190

1 doing.
2 BY MR. FEE:
3    Q.   That's the only information you can
4 derive from that first paragraph?
5        MR. STOLTZ:  Same objection.
6    A.   That's how I read it.
7 BY MR. FEE:
8    Q.   Is there any other information you can
9 take away from that first paragraph other than you
10 should continue your work or is that all you
11 understood that to mean?
12       MR. STOLTZ:  Objection.  Asked and
13 answered.
14   A.   That's all I understood it to mean.
15 BY MR. FEE:
16   Q.   So what did you think, "They're
17 funding my legal fight, so that's the place they
18 care about -- or piece they care about," what did
19 you think that meant when you received this email?
20       MR. STOLTZ:  Objection.  Asked and
21 answered.
22   A.   My -- I don't know.
23   Q.   Did you respond to this email by
24 saying to Carl, "Hey, you said they're funding my

191

1 legal fight, so that's the piece they care about.
2 I have no idea what you're talking about.  Would
3 you please explain that to me?"
4    A.   No.
5    Q.   Do you typically just ignore emails
6 that you receive that contain language that you
7 don't understand?
8        MR. STOLTZ:  Objection.
9 Argumentative.
10   A.   What he's -- I'm being paid to do my
11 piece, so I'm working on my piece of -- so --
12 BY MR. FEE:
13   Q.   Do you have a general practice with
14 respect to how to handle emails directed to you
15 from major sources of your income when you don't
16 understand the email?
17   A.   No.
18   Q.   Is it customary for you to ignore
19 portions of emails from major funders of your
20 business when you don't understand them?
21       MR. STOLTZ:  Objection.  Foundation.
22 Argumentative.
23   A.   No.
24 BY MR. FEE:
25   Q.   So your decision not to seek

192

1 clarification regarding Exhibit 27 was a departure
2 from your customary practice?
3    A.   It's based on --
4        MR. STOLTZ:  Objection.
5 Argumentative.  Lack of foundation.  I'm sorry.
6 You can answer.
7    A.   Based on the long working
8 relationship, I'm -- I know that I will -- I mean,
9 it's -- I don't need to have it clarified.
10 BY MR. FEE:
11   Q.   So you didn't care?
12       MR. STOLTZ:  Objection.
13 Argumentative.  Lacks foundation.
14 Mischaracterizes her testimony.
15   A.   It's not to say that I don't -- I
16 didn't care, but I trusted the source.
17 BY MR. FEE:
18   Q.   Is it correct to say that your SVG and
19 MathML work included the work you were doing on
20 graphics from ASTM and NFPA standards?
21   A.   Based on the next paragraph, yes, but
22 we never did work on ASHRAE.
23   Q.   Okay.  That was the next thing I was
24 going to ask you.  Again, Carl seems to believe
25 that you're going to be working on ASHRAE stuff

193

1 next.  Do you see that?
2    A.   Yes.
3    Q.   But he's wrong.  You weren't going to
4 be working on ASHRAE stuff in the time following
5 January 16th, 2014?
6    A.   Correct.
7        (Deposition Exhibit No. 28
8        marked for identification.)
9 BY MR. FEE:
10   Q.   I'm going to hand you Exhibit 28,
11 which is a series of emails between you and
12 Mr. Malamud.  The first one is dated May 7th,
13 2012, at 12:20 p m., Bates labeled PRO24979
14 through 85.  Can you identify Exhibit 28 as a
15 series of emails between you and Mr. Malamud?
16   A.   Yes.
17   Q.   I want to ask you about the email at
18 the top of the first page.  In the second
19 paragraph you say to Mr. Malamud, "I sent you
20 links to what I was doing on CFR 1, and you said
21 you liked the look header -- look headers but you
22 didn't want the Public.Resource.org seal in
23 position because it looked like claiming
24 authorship."
25   A.   Okay.

194

1    Q.   Can you describe to me what was going
2  on there?
3    A.   This is a long time ago, and it's when
4  we're just still working out how we're going to do
5  things, and now we're getting into that other
6  message anomaly.  (Pause.)
7        (Reporter inquiry.)
8        THE WITNESS:  Yeah.  Okay.  All
9  right.  What's your question?
10  BY MR. FEE:
11    Q.   My question relates back to that
12  language I read regarding Mr. Malamud not wanting
13  the Public.Resource.org seal in position because
14  it looked like claiming authorship, and I want to
15  know what you understood it to mean when you wrote
16  it.
17    A.   There must have been an early layout
18  that had the -- the seal, so --
19    Q.   A layout that had the
20  Public.Resource.org seal on standards written by
21  ASTM and others?
22        MR. STOLTZ:  Objection.
23  Mischaracterizes the document and assumes facts
24  not in evidence.
25    A.   Now, sometimes we had multiple things

195

1  going on at one time, and we did a navigational
2  interface with Title 24, which doesn't have
3  anything to do with the document standards itself.
4  It's just a web wrapper so you could navigate the
5  documents.  And I'm -- I believe that might be
6  where the header is.
7  BY MR. FEE:
8    Q.   So the header had nothing to do with
9  CFR that's mentioned in the sentence earlier?
10    A.   Yeah.
11    Q.   Is that your testimony?
12        MR. STOLTZ:  Objection.  That
13  mischaracterizes her testimony.
14  BY MR. FEE:
15    Q.   I just asked her if it did.  You can
16  answer.
17    A.   It must have been the -- we didn't go
18  with the layout that -- in question, so --
19    Q.   But there was a layout in question
20  that had a Public.Resource.org seal on it that
21  made it look like Public.Resource was claiming
22  authorship of the works?
23    A.   Apparently.
24    Q.   Do you recall any communications with
25  Mr. Malamud regarding that subject matter other

196

1  than this email?
2    A.   No.
3    Q.   Do you recall where that
4  Public.Resource.org seal was located?
5    A.   No.  I would assume it was in the
6  header.
7    Q.   Is the seal that's being referenced
8  here a seal that actually has a picture of a seal
9  inside of it?
10    A.   Yes.
11    Q.   Do you know where that seal came from,
12  that design?
13    A.   I designed the line art seal.  The
14  original color seal was designed by someone else.
15    Q.   Do you know who?
16    A.   No.
17    Q.   Would you turn to the second page of
18  this document?  Towards the bottom of that page,
19  you see there's an email from you on May 7th,
20  2012, at 7:44 a.m.?  Do you see that?
21    A.   7:44.  Yes.
22    Q.   And you wrote, "Okay.  As a rule, I
23  haven't edited the body of the HTML files,
24  although I do add our custom headers -- header."
25        Do you see that?

197

1    A.   Yes.
2    Q.   What was the custom header that you
3  were adding?
4    A.   I -- what -- one that was mentioned
5  before that we decided not to use.
6    Q.   The one with the seal?
7    A.   Yes.
8    Q.   For Public.Resource?
9    A.   Yes.
10    Q.   And you were adding that custom header
11  to the files that are at the back end of this
12  exhibit.  Is that right?
13    A.   Yes.
14    Q.   What is the summer T24 project?
15    A.   Title 24.
16    Q.   What does Title 24 refer to?
17    A.   California building codes.
18    Q.   Would that project, then, include
19  making exact copies of NFPA codes?
20    A.   If it was incorporated into the
21  building codes.
22    Q.   Do you recall whether or not any NFPA
23  codes or standards were incorporated into the
24  building codes?
25    A.   I would -- I would know it by the

Capital Reporting Company
Malamud, Rebecca  11-13-2014

198

1 identifier, and the identifier is page -- you have
2 some -- the document, the document names there.
3 So yes.
4     Q.   Could you turn to the first page of
5 that just so the record's clear as to what exhibit
6 you're referencing?
7     A.   28.
8         MR. FEE:  Still on 28.  Okay.  All
9 right.  I have no other questions at this time.
10        THE WITNESS:  Okay.
11        MR. FEE:  Do you want to sit here
12 and take the microphone?
13        MR. REHN:  Sure.
14        MR. STOLTZ:  Are you okay to keep
15 going or do you need a break?
16        THE WITNESS:  I'm okay.
17        MR. REHN:  There's a microphone
18 here.  I don't think I'll be all that long.
19
20        EXAMINATION
21 BY MR. REHN:
22    Q.   Good afternoon, Ms. Malamud.
23    A.   Good afternoon.
24    Q.   You understand that the same basic
25 ground rules that we went over this morning to you

199

1 apply when I'm asking the questions?
2     A.   Yes.
3     Q.   I'd like to start by going back to a
4 topic you spoke about earlier today where you said
5 that sometimes the artwork in the standards was,
6 to use your words, "open to interpretation."  Do
7 you recall that testimony?
8     A.   Yes.
9     Q.   Now, when you say, "open to
10 interpretation," what exactly did you mean by
11 that?
12    A.   Primarily that it was difficult to
13 make out the lines or how -- a lot of these
14 diagrams use techniques like cross-hatching and
15 fills and you couldn't tell because the art was
16 not -- the scan of the original art wasn't clear
17 enough.
18    Q.   And when you say, "interpretation,"
19 are you referring to your interpretation?
20    A.   Or that of my mentees, so --
21    Q.   So that would be the participants in
22 the mentoring program that we discussed?
23    A.   Correct.
24    Q.   So either you or your mentees were
25 exercising some judgment about how to interpret

200

1 some of these illustrations?
2     A.   We didn't do that very long, so --
3     Q.   And -- but you at least had to decide
4 which artworks were open to interpretation and
5 which ones were not open to interpretation?
6     A.   I make that decision when I sort the
7 graphics.  I take them out of the mix.
8     Q.   When you were making that decision,
9 did you ever consult any fire safety professionals
10 to help you decide whether there was any
11 interpretation necessary?
12    A.   No.
13    Q.   Did you ever consult any engineers or
14 scientists?
15    A.   No.
16    Q.   Did you consult Mr. Malamud?
17    A.   I would ask him questions on occasion,
18 like I did on the email produced earlier about
19 whether I should be creating.
20    Q.   And did Mr. Malamud represent to you
21 that he had some expertise in let's say fire
22 safety so that he could decide what level of
23 interpretation was required for those pieces of
24 art?
25    A.   No.

201

1     Q.   And you also said some pieces were
2 merely for illustrative purposes and, again, that
3 was based on your own interpretation as to which
4 those were?
5     A.   Yes.
6     Q.   And you didn't consult any fire safety
7 professionals with respect to those artworks, did
8 you?
9     A.   No.
10    Q.   Or any engineers or scientists?
11    A.   No.
12    Q.   So you made your own determination
13 along with maybe some people in your mentoring
14 program about whether artwork was merely there for
15 illustrative purposes?
16        MR. STOLTZ:  Objection to form.
17 Foundation.
18    A.   The -- if the decision not to recreate
19 the art, the original scan was used.
20 BY MR. REHN:
21    Q.   Did you ever have discussions with
22 Mr. Malamud about the importance of these
23 standards that you were converting?
24    A.   Not discussions so much, so --
25    Q.   You mentioned that he had told you it

Capital Reporting Company
Malamud, Rebecca  11-13-2014

202

1 was for the spreading of knowledge, I believe.
2 And did you have any discussion about what he
3 meant by that?
4     A.   Much of it is available on the -- on
5 the Internet in the speeches that he gives and the
6 papers that he writes.
7     Q.   And did you specifically have
8 conversations with him over the phone or in person
9 about some of those issues?
10     A.   No.
11     Q.   But you had an understanding based on
12 some of --
13     A.   Yes.
14     Q.   -- his public statements?
15         Did you ever anticipate the
16 possibility of litigation over these standards at
17 the time that you were converting it?
18         MR. STOLTZ:  Objection to form.
19 Foundation.
20 BY MR. REHN:
21     Q.   I'm talking about your personal
22 anticipation when you were doing this work, did
23 you consider the possibility of a lawsuit?
24     A.   I suppose it -- I knew it would be --
25 could be possible.

203

1     Q.   And why did you know that?
2     A.   Because -- just through discussions in
3 email.
4     Q.   And that included discussions with
5 Mr. Malamud?
6     A.   As it progressed.
7     Q.   Did you raise concerns with him, aside
8 from the emails we've seen today, about the fact
9 that these were copyrighted works?
10     A.   No.
11         MR. STOLTZ:  Objection.  Vague.
12 BY MR. REHN:
13     Q.   You were aware that these works had
14 copyright registrations.  Correct?
15         MR. STOLTZ:  Objection.  Vague.
16 Which works?
17 BY MR. REHN:
18     Q.   You were aware that the standards had
19 copyright registrations?
20         MR. STOLTZ:  Same objection.
21         (Reporter inquiry.)
22     A.   Yes.
23 BY MR. REHN:
24     Q.   And if Mr. Malamud had sent you other
25 copyrighted works, would you have converted those

204

1 into a format that could have been published on
2 the web?
3         MR. STOLTZ:  Objection to form.
4 Vague.
5         (Reporter inquiry.)
6         MR. STOLTZ:  Objection to form.
7     A.   I suppose it -- it would depend.
8 BY MR. REHN:
9     Q.   What would it depend upon?
10     A.   It -- that -- in the history, the
11 context of our working together, it made sense.
12         MR. STOLTZ:  I'm sorry.  Could you
13 read back the question?
14         (The question was read back
15         as follows:)
16         "What would it depend upon?"
17         MR. STOLTZ:  The question before it.
18         (The question was read back
19         as follows:)
20         "QUESTION:  And if Mr. Malamud
21 had sent you other copyrighted works,
22 would you have converted those into a
23 format that could have been published on
24 the web?"
25 BY MR. REHN:

205

1     Q.   When you say, "the context of your
2 working relationship," what do you mean by that?
3     A.   If -- if it made sense.
4     Q.   Made sense in terms of what context?
5     A.   If the work should be in the public
6 domain.
7     Q.   And when you say, "if the work should
8 be in the public domain," whose -- in whose
9 opinion are you referring to as to whether a work
10 should be in the public domain?
11         MR. STOLTZ:  Objection to form.
12     A.   In -- in this case, Public.Resource,
13 but I -- I have -- I mean, I have a -- I supported
14 the idea.
15 BY MR. REHN:
16     Q.   You supported the idea that these
17 works should be in the public domain?
18     A.   They should be more broadly accessible
19 than they are.
20     Q.   Did Mr. Malamud ever express to you
21 the view that Public.Resource had the right to
22 determine what works should be in the public
23 domain?
24     A.   No.  I mean --
25     Q.   Was it your understanding that it was

Capital Reporting Company
Malamud, Rebecca  11-13-2014

206

1  Mr. Malamud's view that they could decide what
2  works, in your words, "should be in the public
3  domain"?
4       MR. STOLTZ:  Objection.  Foundation.
5  A.  I supported -- I support the idea.
6       MR. REHN:  I don't believe that was
7  responsive to my question.  Could we read the
8  question back?
9       (The question was read back
10      as follows:)
11      "QUESTION:  Was it your
12      understanding that it was Mr. Malamud's
13      view that they could decide what works,
14      in your words, 'should be in the public
15      domain'?"
16  A.  Could you say it again?
17      (The question was read back
18      as follows:)
19      "QUESTION:  Was it your
20      understanding that it was Mr. Malamud's
21      view that they could decide what works,
22      in your words, 'should be in the public
23      domain'?"
24  A.  Yes.
25  BY MR. REHN:

207

1  Q.  Did you form that understanding based
2  on conversations with Mr. Malamud?
3  A.  No.
4  Q.  Based on your -- the context of your
5  working relationship with Mr. Malamud?
6  A.  Yes.
7  Q.  When you were working on the standards
8  project, did you come to an understanding of how
9  the standards are written?
10      MR. STOLTZ:  Objection.  Vague.
11  "The standards"?
12  BY MR. REHN:
13  Q.  You can answer.
14  A.  I do not -- I am not aware of how
15  ASTM, NFPA, how they conduct their work.
16  Q.  Are you aware of the resources that
17  are required for them to create these standards?
18  A.  No.
19  Q.  How did you first find out about this
20  lawsuit?
21  A.  I would not know the references in
22  email.  I'm sure there are some.  But when I was
23  deposed is when I knew it was real.
24  Q.  You're saying that you first became
25  aware of the lawsuit at the time you received the

208

1  notice of the 30(b)(6) deposition?
2       MR. STOLTZ:  Objection.  That
3  mischaracterizes her testimony.
4  A.  I -- I don't recall the earliest time.
5  BY MR. REHN:
6  Q.  Did you become aware of the lawsuit
7  around the time it was filed?
8  A.  I don't remember.
9  Q.  Do you remember reading the complaint?
10  A.  No.
11      MR. REHN:  Could you mark that?
12  We're up to 29.  Is that right?
13      THE REPORTER:  Yes.
14      (Deposition Exhibit No. 29
15      marked for identification.)
16  BY MR. REHN:
17  Q.  I've just handed you a document that's
18  been marked Exhibit 29.  This is a document Bates
19  stamped PRO00026043.  Do you recognize this as an
20  email chain between you and Mr. Malamud on
21  August 7th, 2013?
22  A.  Yes, I do.
23  Q.  And if you could read the text of the
24  email you sent, the one that's lower down on the
25  page.

209

1  A.  "Hi.  Are you okay?  I just read the
2  NFPA complaint."
3  Q.  Does this refresh your recollection
4  about reading the complaint in this lawsuit around
5  the time it was filed?
6  A.  Apparently I did, and I probably got
7  it through social media.
8  Q.  Do you have any recollections of any
9  of the specific allegations in the complaint?
10  A.  No.
11  Q.  Do you have any recollections of the
12  descriptions in the complaint of how the standards
13  at issue were drafted and written?
14  A.  No.
15  Q.  Was it your understanding when you
16  were working on the standards conversion process
17  that these standards are important to public
18  safety?
19  A.  Yes.
20  Q.  Was it your understanding that
21  Mr. Malamud also believed these standards are
22  important to public safety?
23  A.  Yes.
24  Q.  And that it's important that these
25  standards continue to exist and be updated

Capital Reporting Company
Malamud, Rebecca  11-13-2014

210

1 regularly?
2          MR. STOLTZ: Objection.  Foundation.
3 Objection to form.
4     A.   Yes.
5 BY MR. REHN:
6     Q.   After reading the complaint, did you
7 have any concerns that Public.Resource's actions
8 would impede the ability of these standards to
9 support public safety?
10          MR. STOLTZ:  Objection.  Form.
11    A.   No.  But I would -- is there a copy of
12 the complaint that I can read?
13 BY MR. REHN:
14    Q.   I don't have it with me here.
15          If we could go up to the email from
16 Carl responding to you, Mr. Malamud to you, and if
17 you could read the first two sentences of that
18 email.  The first sentence is one word.
19    A.   "Yeah.  We'll be fine.  Not totally
20 unexpected.  David" --
21    Q.   That's -- that's all.  You can read it
22 further if you would like.
23    A.   Okay.
24    Q.   I was focused on those first two
25 sentences.

211

1          When he says, "not totally
2 unexpected," did you understand him to be saying
3 that it was not totally unexpected that he would
4 be sued?
5     A.   He must have known that it was going
6 to happen.
7     Q.   Was it unexpected for you?
8     A.   Yes.
9          MR. REHN:  (To Mr. Childs:)
10 Actually, hold off.
11 BY MR. REHN:
12    Q.   When you were working on converting
13 the NFPA and ASTM standards, were you -- was it
14 your understanding that NFPA and ASTM were aware
15 of this project?
16    A.   I -- I didn't know.
17    Q.   Were you aware of any communications
18 between Mr. Malamud and ASTM or NFPA?
19    A.   No.
20          MR. REHN:  (To Mr. Childs:)  Okay.
21 We're good.
22          (Deposition Exhibit No. 30
23          marked for identification.)
24 BY MR. REHN:
25    Q.   I'm going to hand you what's been

212

1 marked as Exhibit 30, and this is a document
2 that's Bates stamped PRO00005095, and it's emails
3 between you and Mr. Malamud dated June 7th, 2011.
4 Do you see that?
5     A.   Yes.
6     Q.   And if I could direct your attention
7 to the email on top from Carl Malamud -- from
8 Mr. Malamud to you, and the last paragraph of that
9 email, could you read that?
10    A.   Which line do you want me to read?
11    Q.   Beginning with, "I spent 90 minutes."
12    A.   "I spent 90 minutes with the head of
13 NFPA and his general counsel.  Our work apparently
14 very much on their radar.  The HTML conversion of
15 Title 24 made them really wake up.  They were very
16 impressed and scared."
17    Q.   And when did you begin working on the
18 standards project?
19    A.   2011.
20    Q.   Did you understand at that time that
21 this project was considered scary by NFPA?
22    A.   I --
23          MR. STOLTZ:  Objection.  That
24 mischaracterizes the document.  You can answer.
25    A.   No.  I -- this is the first I had

213

1 heard, but I couldn't even remember two lines in
2 an email 2011.
3 BY MR. REHN:
4     Q.   So at this time you were aware that
5 you were working on standards that had been
6 developed by NFPA?
7     A.   Yes.
8     Q.   And when Mr. Malamud sent you an email
9 saying that he had met with the organization and
10 their general counsel, and they were scared by the
11 project, that -- did that make any impression on
12 you?
13    A.   It's just the way he talks, so I
14 didn't think anything of it.
15    Q.   You're saying this is the way
16 Mr. Malamud talks?
17    A.   Yes.
18    Q.   So Mr. Malamud regularly talks about
19 making organizations scared?
20    A.   I don't know.
21          MR. STOLTZ:  Objection to form.
22 Mischaracterizes the letter and her testimony.
23 You can answer.
24    A.   I -- he has colorful speech.
25 BY MR. REHN:

Capital Reporting Company
Malamud, Rebecca  11-13-2014

214

1    Q.   Did you have any hesitation about
2  continuing to work on a project that was viewed as
3  scary by the organization that --
4    A.   I didn't read it as kind of scary
5  but --
6    Q.   Did you understand that the
7  organization might feel threatened by the fact
8  that their copyrighted works were being
9  distributed in this way?
10       MR. STOLTZ: Objection. Foundation.
11    A.   Repeat the question.
12  BY MR. REHN:
13    Q.   Did you understand that the
14  organization might feel threatened by the fact
15  that their copyrighted works were being
16  distributed in this way?
17    A.   I -- I didn't view it as -- that we
18  were threatening.
19    Q.   So how did you understand this
20  communication to you that the NFPA was scared by
21  the project?
22    A.   Technological progress.
23    Q.   What do you mean by that?
24    A.   Well, it just -- I didn't view it as
25  being scared in that way so --

215

1    Q.   In what way did you view this -- this
2  choice of words by Mr. Malamud?
3    A.   That it was -- that it was quality
4  work.
5    Q.   You felt the NFPA was scared because
6  your work was of high quality?
7    A.   Well, "scared" is prefaced by
8  "impressed."
9    Q.   Did you understand that the project of
10  putting these standards online posed threat to
11  NFPA?
12    A.   I don't really understand why it would
13  threaten them.
14    Q.   Can you think of any reasons?
15       MR. STOLTZ: Objection. Asked and
16  answered.
17    A.   (Pause.) No.
18  BY MR. REHN:
19    Q.   Did Mr. Malamud ever explain to you
20  that ASTM and NFPA sell these standards?
21    A.   Yes.
22    Q.   And did he explain to you that part of
23  the purpose of his project was to enable people to
24  access the standards without paying for them?
25    A.   Yes.

216

1    Q.   So you understood that part of this
2  project would enable people to access standards
3  that NFPA was selling, but now people would be
4  able to access them for free?
5    A.   So that would mean that innovation --
6  the in -- NFPA's product should be superior, that
7  people want to pay for it over the free version.
8  No competition.
9    Q.   I understood you earlier to be saying
10  that your instructions were to make an exact copy
11  of the standards that you were given.
12    A.   To not introduce errors into the
13  standard.
14    Q.   And, in fact, by introducing scaleable
15  vector graphics your goal was to improve on the
16  ability of those standards to be viewed over the
17  Internet?
18    A.   Yes.
19    Q.   So what -- your understanding was that
20  you were creating a product that would be easy for
21  people to access over the Internet and freely
22  available to people?
23       MR. STOLTZ: Objection to form.
24  BY MR. REHN:
25    Q.   And would be -- let's start there.  It

217

1  would be freely available and easier to access
2  than the standards that you were basing it off of?
3       MR. STOLTZ: Objection.  Form.
4    A.   Yes.
5  BY MR. REHN:
6    Q.   And did it raise any concerns to you
7  that Mr. Malamud was telling you that the
8  organization that created this standard was scared
9  by this project?
10       MR. STOLTZ: Objection.  Asked and
11  answered.
12    A.   (Pause.) Say it again.
13       MR. REHN: Can you go ahead and read
14  it?
15       (The question was read back
16       as follows:)
17       "QUESTION:  And did it raise any
18       concerns to you that Mr. Malamud was
19       telling you that the organization that
20       created this standard was scared by this
21       project?"
22    A.   I just didn't read that.
23  BY MR. REHN:
24    Q.   In the years that you have been
25  involved in transferring these standards, have you

Capital Reporting Company
Malamud, Rebecca  11-13-2014

218

1 ever considered what the effects of this project
2 might be on the organizations that create these
3 standards?
4    A.   (Pause.) Yes, but -- I mean, yes.
5    Q.   And what were your thoughts about
6 that?
7    A.   I -- would think that it would lead to
8 a better overall product for all.
9    Q.   Can we go back to Exhibit 21?  And I
10 just wanted to ask a clarifying question about
11 something.  On the bottom of the first page
12 there's an email from you dated January 4th, 2014,
13 at 11:48 a.m.  Do you see that?
14    A.   Yes.
15    Q.   And then in that -- in the bottom
16 paragraph of -- that's on that page, and just the
17 last sentence of that paragraph, if you can go
18 ahead and read that sentence.
19    A.   The last sentence in the last
20 paragraph?
21    Q.   Yeah.
22    A.   "You mentioned not having the 'Codes
23 of the World' summer program this year, and if
24 that is a strain for you, then let's not do the
25 SVG/MathML track."

219

1    Q.   What was the SVG/MathML track?
2    A.   The creation of the diagrams as
3 explained earlier and the coding of the MathML
4 equations.
5    Q.   And this was a project being done
6 through the Codes of the World program in the
7 Rural Design Collective?
8    A.   Correct.
9    Q.   So was Mr. Malamud aware of the
10 involvement of the Rural Design Collective in this
11 project?
12    A.   Yes.
13    Q.   And was he regularly involved in the
14 planning for the Codes of the World summer
15 program?
16    A.   No.
17    Q.   But you would be in touch with him
18 about how the planning was going?
19    A.   Yes.
20    Q.   And he would know that you would be
21 relying to a certain degree on the work that was
22 being done at that summer program for these
23 projects?
24       MR. STOLTZ:  Objection to form.
25    A.   I would give progress reports.

220

1 BY MR. REHN:
2    Q.   Was there a Codes of the World summer
3 program this year, in 2014?
4    A.   We did work on the standards, yes.
5    Q.   With the students at the Codes of the
6 World -- or the mentees at the Codes of the World
7 program?
8    A.   The -- it was -- it was primarily Levi
9 and I this summer.
10    Q.   Was there any involvement from the
11 mentees that were in the program?
12    A.   The core project this summer was an
13 animation -- an animated movie, so --
14    Q.   And did Public.Resource continue to
15 fund the summer programs?
16    A.   Yes.  And work was done.
17    Q.   As they had in previous years as well?
18    A.   Yes.
19       MR. REHN:  I think I just have one
20 more document.  This, I believe, will be
21 Exhibit 31.
22       THE REPORTER:  Correct.
23       (Deposition Exhibit No. 31
24       marked for identification.)
25       (Off-the-record discussion.)

221

1 BY MR. REHN:
2    Q.   So this is an email from Mr. Malamud
3 to you dated January 4th, 2014.  And for the
4 record, I'll note that -- it's at the bottom.  The
5 Bates stamp is PRO00042295.
6    A.   Okay.
7    Q.   And he begins by saying, "Think about
8 it.  Why don't you focus on ASTM and ASHRAE
9 standards for your next big batch."
10       Do you see that?
11       MR. STOLTZ:  Excuse me, counsel.  I
12 think it says "thinking about it."
13       MR. REHN:  Sorry.  Did I not say
14 that?
15       MR. FEE:  You said "think."
16       MR. REHN:  Okay.  I apologize.
17 BY MR. REHN:
18    Q.   "Thinking about it, why don't you
19 focus on ASTM and ASHRAE standards for your next
20 big batch."
21       Do you see that?
22    A.   Yes.
23    Q.   But, again, you testified earlier that
24 you did not work on ASHRAE standards.
25    A.   We did not work on ASHRAE standards.

222

1   Q.   Have you done a batch or standards for
2   Mr. Malamud since this email was written to you in
3   January 2014?
4   A.   Yes.
5   Q.   Did you ever correct his
6   misapprehension that you were going to be working
7   on ASHRAE standards?
8   A.   ASHRAE was never double keyed, so --
9   Q.   It was your understanding that ASHRAE
10  was never double keyed?
11  A.   I didn't -- it never -- there were no
12  files, no JPEGs, no.  It was -- no.
13  Q.   So you never saw any documents that
14  had ASHRAE standards in them or that were labeled
15  with the ASHRAE name?
16  A.   It was in PDF format.
17  Q.   So you said the original PDFs --
18  A.   Yes.  But there was -- it didn't go
19  through the conversion process before it reaches
20  me.
21  Q.   Right.  So when Mr. Malamud sends you
22  several emails, I think we've seen today, asking
23  you to do ASHRAE standards, did you ever correct
24  his misunderstanding?
25  A.   I don't think so.

223

1   Q.   When somebody who's paying you to do a
2   project asks you to do a particular thing, and you
3   don't think that's part of the project, is it your
4   common practice just to ignore that part of their
5   instructions?
6        MR. STOLTZ:  Objection.
7   Argumentative.
8   A.   It's taken out of context, but, I
9   mean, the -- the conversion before it gets to me
10  was never completed and moved on so --
11  BY MR. REHN:
12  Q.   If you go to the second paragraph of
13  this document, it says, "BTW."  Do you understand
14  that to mean "by the way"?
15  A.   Yes.
16  Q.   And then Mr. Malamud writes to you,
17  "You had a couple bad links in the NFPA files.
18  Nothing huge.  Just a few that listed SVGs that
19  weren't in the main directory.  I just changed
20  those to JPEG and moved on."
21       Do you see that?
22  A.   Correct.
23  Q.   Had something like this happened
24  before where you'd failed to realize that you
25  didn't have some SVGs?

224

1   A.   No.  Not very often.  And it's nice to
2   have a backup.
3   Q.   So the backup here is just the JPEG
4   from the original PDF?
5   A.   Right.  Correct.
6   Q.   As published by the standards
7   organization?
8   A.   Correct.
9   Q.   So if you don't do an SVG, then the
10  thing that gets posted to Public.Resource's
11  website is a JPEG just taken directly from the
12  standard received from that?
13  A.   Correct.
14  Q.   And here you had listed that you had
15  done some SVGs that you hadn't done?
16       MR. STOLTZ:  Objection.  Form.
17  A.   I don't see that.
18  BY MR. REHN:
19  Q.   Is that right?
20       MR. STOLTZ:  Same objection.
21  A.   In that second paragraph?
22  BY MR. REHN:
23  Q.   What do you understand him to be
24  telling you in that paragraph?
25  A.   A few that listed SVGs.  I did the

225

1   batch search and replace, and I had the SVG and
2   the HTML document, and I must have missed it so --
3   and there's also --
4   Q.   What do you mean you must have missed
5   it?
6   A.   I must have missed -- when I checked
7   the HTML to make sure that I changed the SVG
8   extension back to JPEG, we didn't complete the
9   graphic.  Or if there were questions -- because
10  sometimes we take a graphic so far and then there
11  will be a question, and we put an asterisk at the
12  end of the name, and that would make it not show
13  up in the HTML document and it would be flagged as
14  not completed, so --
15  Q.   So is it your understanding that's
16  what happened here?
17  A.   Yes.
18  Q.   So does that mean that there was a
19  draft SVG in the directory but --
20  A.   It's possible.
21  Q.   -- it wasn't completed?
22  A.   It's possible.
23  Q.   And so in that case it would be the
24  normal practice just to use the JPEG instead?
25  A.   Correct.

226

1    Q.    And are -- those would be flagged
2  because, as you mentioned earlier, there was some
3  interpretation required?
4    A.    Correct.
5    Q.    And it was your judgment that the
6  interpretation required -- couldn't be done by --
7  by you or by your staff?
8        MR. STOLTZ:  Objection to form.
9  Mischaracterizes her testimony.
10    A.    Correct.  It often involved illegible
11  text.  Couldn't make out --
12  BY MR. REHN:
13    Q.    You couldn't make out what the diagram
14  or chart or illustration was trying to
15  communicate?
16    A.    Yes.
17    Q.    And that's -- you've been working on
18  these standards since 2011.  Is that right?
19    A.    Correct.
20    Q.    So about three years plus?
21    A.    Correct.
22    Q.    And this problem has arisen from time
23  to time over the course of that period?
24    A.    Correct.
25    Q.    And you've never consulted a fire

227

1  safety professional to ascertain whether the
2  interpretation required of those illustrations is
3  something they can perform for you?
4        MR. STOLTZ:  Objection.  Asked and
5  answered.
6    A.    No.
7  BY MR. REHN:
8    Q.    Okay.  One second.  (Pause.)
9        Oh, just to follow up on something
10  that came up earlier.  You had mentioned that
11  Mr. Malamud was planning to write a book about
12  standards.  Is that right?
13    A.    That's an idea he had, but it didn't
14  materialize.
15    Q.    Does that mean -- when you say, "it
16  didn't materialize," do you know if he had made
17  any progress on a manuscript --
18    A.    I don't know.
19    Q.    -- or any textbook?  You never
20  discussed that with him?
21    A.    I did not.
22    Q.    Did you understand that was going to
23  be a book specifically about this standards
24  publication project that you and he were working
25  on over the last few --

228

1    A.    I didn't know for sure, but I'm -- I
2  knew it centered around standards.
3        MR. REHN:  No further questions.
4        MR. FEE:  I think Andrew is probably
5  up next.  Right?  Andrew, do you have any
6  questions?
7        MR. ZEE:  I do just have a few
8  questions that hopefully won't take much time.
9
10        EXAMINATION
11  BY MR. ZEE:
12    Q.    This is Andrew Zee on behalf of
13  plaintiff ASHRAE.  Thank you for your time today,
14  Ms. Malamud.
15    A.    Thank you.
16    Q.    You testified earlier that Point B did
17  not do any work on any ASHRAE standards.  Is that
18  correct?
19    A.    To the best of my knowledge.
20    Q.    Do you know whether Mr. Malamud is
21  aware that Point B never did any work on ASHRAE
22  standards?
23    A.    If -- if -- it would -- we did not
24  have the discussion, but the files were not
25  delivered.

229

1    Q.    When you refer to the files that were
2  not delivered, which files do you mean?
3    A.    Any file -- SVG and MathML.
4    Q.    Did Point B receive any ASHRAE
5  documents from Public.Resource?
6    A.    No.
7    Q.    Did you review the standards that you
8  did receive from Public.Resource to determine from
9  which of the -- which standards development
10  organization they were from?
11    A.    They would -- they're organized in
12  directories on Public.Resource's server.
13    Q.    And do those directories indicate
14  which organization standards those are?
15    A.    Yes.
16    Q.    Did any of those directories indicate
17  an ASHRAE standard?
18    A.    I believe there's -- there's a PDF of
19  ASHRAE standards.
20    Q.    But your testimony is that Point B did
21  not do any work on those ASHRAE -- that ASHRAE
22  PDF?
23    A.    Correct.
24    Q.    Do you know the contents of that
25  ASHRAE PDF?

Capital Reporting Company
Malamud, Rebecca  11-13-2014

230

1    A.    No.
2    Q.    Do you know who made the decision not
3  to do any work on ASHRAE standards?
4    A.    I just -- it just didn't happen.
5  There was no formal decision.
6    Q.    Was there ever any discussion between
7  yourself and Mr. Malamud regarding work on ASHRAE
8  standards?
9    A.    References in email, but other than
10  that, no.
11    Q.    Did Public.Resource ever provide any
12  instructions regarding ASHRAE PDF for standard?
13    A.    No.
14    Q.    If you could, Mrs. Malamud, take a
15  look at what's been marked as Exhibit 31.
16    A.    Okay.
17    Q.    This is an email from Carl Malamud to
18  yourself dated January 4th, 2014, 2:30 p.m.  Do
19  you see that?
20    A.    Correct.
21    Q.    And the first line of that email says,
22  "Thinking about it, why don't you focus on ASTM
23  and ASHRAE standards for your next big batch."
24  Correct?
25    A.    Correct.

231

1    Q.    Do you know why Mr. Malamud is asking
2  you to focus on ASHRAE standards if --
3    A.    Because it was -- we were going to
4  work on it and we worked on ASTM, but did not get
5  into the ASHRAE standards.
6    Q.    Why did you not get into the ASHRAE
7  standards?
8    A.    For -- for me because the files
9  weren't there, the JPEG, the document hadn't been
10  converted to this point.
11    Q.    What was that?
12    A.    The document -- the PDF hadn't been
13  converted to the point where I -- I can begin
14  work.
15    Q.    So was the decision not to work on the
16  ASHRAE PDF your decision?
17    MR. STOLTZ:  Objection.  Asked and
18  answered.
19    A.    In the natural -- in the work flow, it
20  just didn't happen so --
21  BY MR. ZEE:
22    Q.    Are you aware of Point B ever asking
23  for permission from ASHRAE to make copies of its
24  standards?
25    A.    No.

232

1    Q.    Are you aware of Point B ever
2  receiving any permission from ASHRAE to make
3  copies of its standards?
4    A.    No.
5    Q.    And did Public.Resource ever inform
6  you that it had permission from ASHRAE to work on
7  its standards?
8    A.    No.
9    MR. ZEE:  Thank you.  That's all I
10  have.
11    MR. STOLTZ:  I have a few questions,
12  but, first, I think we need to take a break.
13    THE VIDEOGRAPHER:  Okay.  Going off
14  the record.  4:20 p.m.
15    (Recess:  4:20 p.m. to 4:33 p.m.)
16    THE VIDEOGRAPHER:  We're going back
17  on the record.  The time is 4:33 p.m.
18
19    EXAMINATION
20  BY MR. STOLTZ:
21    Q.    Okay.  Thanks, Ms. Malamud, for
22  your -- for coming today.  I just have a few
23  questions.  How often do you talk to Mr. Malamud
24  on the phone, say, in the past three years?
25    A.    Never.

233

1    Q.    Would you say that most of your
2  communication is by email?
3    A.    Yes.
4    Q.    You've testified earlier about the
5  steps that you went through to do quality
6  assurance on SVG images.
7    A.    Correct.
8    Q.    If, in the process of reviewing an SVG
9  image you happened to find a mistake, what would
10  you do?
11    A.    I would correct it.
12    Q.    And is that true for every SU -- SVG
13  image that you reviewed as part of the codes
14  project?
15    A.    Yes.
16    Q.    Can text to speech software read
17  MathML files?
18    A.    Yes.
19    Q.    Can text to speech software read JPEG
20  files?
21    A.    No.  There -- there is an ALT tag in
22  every image in an HTML document and the text is
23  put into this ALT tag, it could read that.  But
24  it's generally very minimal.
25    Q.    So would you say that MathML files are

Capital Reporting Company
Malamud, Rebecca  11-13-2014

234

1 easier to use than JPEG files for people with
2 disabilities?
3         MR. FEE:  Objection.  Lack of
4 foundation.  Leading.
5 BY MR. STOLTZ:
6    Q.   You can answer.
7    A.   Yes.
8    Q.   You testified about text that would
9 appear in diagrams in standards documents.
10 Typically how much text appeared in the diagrams
11 in the standards documents that Point B worked on?
12         MR. FEE:  Objection.  Vague.
13    A.   Usually it would be numbers and
14 captions, call-outs on the graphic, but sometimes
15 there would be notes underneath the graphic.
16 BY MR. STOLTZ:
17    Q.   What's the most number of characters
18 that were in those notes?
19    A.   I would say it's anywhere from 100 to
20 500 characters.  That's just a ballpark figure.
21    Q.   You testified that some older diagrams
22 contained flourishes.  In what part of the diagram
23 were those flourishes?
24    A.   In the -- usually it has hand-lettered
25 text.

235

1    Q.   So was it your practice to where
2 hand-lettered text appeared in an original image,
3 that Point B would replace that text with text
4 rendered in a font?
5         MR. FEE:  Objection.  Form.
6    A.   Correct.
7 BY MR. STOLTZ:
8    Q.   You testified that some images would
9 have required interpretation.  In those cases,
10 what did Point B do with the image?
11    A.   I would file it in a folder called
12 "bad art" while we were working on the diagrams or
13 sometimes label them in red.  That came later
14 because by filing them in a folder called bad art
15 I would have to remove them in order that they
16 were still in the standard document.
17    Q.   So if you had placed a file in the
18 folder labeled bad art or you had marked that file
19 as red, would the file go into the final HTML
20 document that you gave to Public.Resource?
21    A.   The original JPEG --
22    Q.   What --
23    A.   -- would be an HTML document.
24    Q.   The SVG file would not?
25    A.   Right.  We didn't do an SVG file for

236

1 those.
2    Q.   Other than at the very beginning of
3 the product, what did you do when you encountered
4 logos in the documents?
5    A.   I would leave in the original JPEG
6 scan.
7    Q.   If I could direct your attention to
8 the document marked Exhibit 28.  It will be the
9 second-to-the-last page of that document.  The
10 Bates number PRO24984.  At the very bottom of that
11 page, do you see the line that says, page 00201,
12 SVG logo, Wikimedia Commons?
13    A.   Yes.
14    Q.   Do you know what the word logo refers
15 to?
16    A.   I -- when I first saw it I thought it
17 might be a logo, but it could be a symbol.
18 Without seeing the picture, I don't know.
19         MR. STOLTZ:  Thank you.  I have no
20 more questions.
21
22         EXAMINATION
23 BY MR. FEE:
24    Q.   That file that you were just
25 referencing, page 0020.SVG-logo, do you still have

237

1 that file at Point B?
2    A.   I may.
3    Q.   Now, in response to the testimony you
4 gave to your counsel regarding your practice with
5 logos after some initial period, you, I think
6 testified that you would leave the original JPEG
7 scan in the HTML file.  Is that right?
8    A.   Correct.
9    Q.   And the HTML file was not the original
10 file as it was distributed by the standards
11 provider.  Correct?
12         MR. STOLTZ:  Objection to form.
13 Foundation.
14    A.   Correct.
15 BY MR. FEE:
16    Q.   So the files that were created by
17 Public.Resource -- or the files that were created
18 by Point B bore logos of ASTM and NFPA even though
19 those files were not authored by Point B or --
20 strike that question.
21         So the files that were created by
22 Point B bore the logos of ASTM or NFPA even though
23 ASTM and NFPA did not author those files?
24         MR. STOLTZ:  Objection to form.
25 It's asking for a legal conclusion.

Capital Reporting Company
Malamud, Rebecca  11-13-2014

238

1    A.   The -- a JPEG representation of the
2  logo was in the HTML document.
3  BY MR. FEE:
4    Q.   The HTML document was coded by you and
5  not by ASTM or NFPA.  Correct?
6    A.   Coded by Public.Resource.
7    Q.   Okay.  And then the images in the HTML
8  file that were SVG file -- file format were done
9  by you.  Correct?
10   A.   Correct.
11   Q.   And those were in an HTML file that
12 bore an ASTM or NFPA logo.  Correct?
13   A.   Correct.
14   Q.   And you hadn't obtained permission
15 from ASTM or NFPA to put a JPEG version of their
16 logo on any files that were created in part by
17 you?
18        MR. STOLTZ:  Objection.  Asked and
19 answered.
20   A.   No.
21 BY MR. FEE:
22   Q.   Let me ask that question again.  I
23 think it was a bad question.
24        You didn't have permission from ASTM
25 or NFPA to place a JPEG file format of their logo

239

1  on any HTML code that contained SVG file created
2  by you?
3    A.   I did not have permission.
4    Q.   Now, your counsel also asked you about
5  the text that was on some of these images or
6  illustrations.  Do you recall that?
7    A.   Yes.
8    Q.   And you testified that there was
9  somewhere between 100 and 500 characters in some
10 of the files that we have -- that you converted.
11 Correct?
12   A.   Yes.
13   Q.   Now, what I wasn't clear on is were
14 you saying that was the average file or was that
15 the most text that was ever in one of the files
16 that you converted?
17   A.   It -- a ballpark figure.
18   Q.   For an average file?
19   A.   No.  Usually there wasn't, but for --
20 what -- define average file.  I mean, so --
21   Q.   I just want to know what you were
22 referencing when you said it was approximately 100
23 to 500 characters.  What were you describing?
24   A.   Notes in the -- whenever there were --
25 was text that was not a part of the image, part of

240

1  the diagram itself, is usually a brief -- either a
2  legend, you know, explaining the art or sometimes
3  it was text that it's -- it seemed like it should
4  be in the HTML.  So sometimes there was a legend
5  at the bottom of the graphics.
6    Q.   Okay.  So for those files in which
7  Point B had to place some text, your estimate is
8  that they would typically have 100 to 500
9  characters.  Is that right?
10   A.   It's an estimate.
11   Q.   Would you go back to Exhibit 29?  And
12 this was the email that NFPA's counsel asked you
13 about when you said you had just read the NFPA
14 complaint and asked Mr. Malamud if he was okay.
15 Do you recall this?
16   A.   Yes.
17   Q.   And his response was, "Yeah.  We'll be
18 fine."
19        Who do you understand the "we'll" to
20 be referring to or "we"?
21        MR. STOLTZ:  Objection.  This is
22 beyond the scope of the redirect.
23        MR. FEE:  It's not beyond the scope
24 of his question.
25 BY MR. FEE:

241

1    Q.   You can answer.
2    A.   Public.Resource.org.
3    Q.   Okay.  The "we" doesn't refer to both
4  Public.Resource.org and you and/or Point B?
5    A.   Public.Resource.org.
6    Q.   Okay.  Now, during NFPA's questioning,
7  you, I think, said that you understood that a
8  benefit of the work that you and Public.Resource
9  was doing was that the standards would be more
10 easily available and freely available to persons
11 who needed access to that information.  Is that
12 right?
13        MR. STOLTZ:  Same objection.
14 Counsel, you don't get to tag team on each other.
15 BY MR. FEE:
16   Q.   You can answer.
17   A.   Say it again.
18   Q.   Do you recall in response to
19 questioning from NFPA's counsel that you took the
20 position that the work that was being done by
21 Public.Resource and by Point B was beneficial
22 because persons would have access to that
23 information on the Internet for free?
24        MR. STOLTZ:  Objection.
25 Mischaracterizes her testimony.  And it's still

Capital Reporting Company
Malamud, Rebecca  11-13-2014

242

1  beyond the scope of the redirect.
2      A.  It's not exactly my words.
3  BY MR. FEE:
4      Q.  Okay.  What were your exact words, can
5  you say you remember?
6          MR. STOLTZ:  Objection.  Asked and
7  answered.
8  BY MR. FEE:
9      Q.  How is my description wrong?
10     A.  Broader access to public safety
11 standards.
12     Q.  Are you aware that at least ASTM's
13 standards are available for free on the Internet
14 to the extent that they've been incorporated by
15 reference by any federal regulation?
16         MR. STOLTZ:  Objection.  Still
17 beyond the scope of the redirect.
18     A.  I am not a lawyer and it's outside a
19 bit of the scope of my expertise, but eventually
20 it's -- it's not free.
21 BY MR. FEE:
22     Q.  The ASTM standards in its reading room
23 are not free.  Is that your testimony?
24         MR. STOLTZ:  Same objection.
25     A.  I'm not familiar with the reading

243

1  room.
2          MR. FEE:  I have no other questions.
3          MR. REHN:  Nothing for me.
4          THE VIDEOGRAPHER:  Anything further?
5  Anything further on the phone?
6          MR. ZEE:  Nothing further.
7          THE VIDEOGRAPHER:  Okay.  We're
8  going off the record.
9          (The deposition concluded at
10         4:50 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

244

1  State of Oregon      )
2                       )  ss.
   County of Lane       )
3
4          I, Jan R. Duiven, CSR, FCRR, CCP, a
5  Certified Shorthand Reporter for the State of Oregon,
6  certify that the witness was sworn and the transcript
7  is a true record of the testimony given by the witness;
8  that at said time and place I reported all testimony and
9  other oral proceedings in the matter; that the foregoing
10 transcript consisting of 243 pages, contains a full,
11 true and correct transcript of the proceedings reported
12 by me to the best of my ability on said date.
13         If any of the parties or the witness
14 requested review of the transcript at the time of the
15 proceedings, correction pages have been inserted.
16         IN WITNESS WHEREOF, I have set my hand and
17 CSR seal this 24th day of November, 2014, in the City
18 of Eugene, County of Lane, State of Oregon.
19
20
   _____
21         Jan R. Duiven, CSR, FCRR, CCP
22
23 CSR No. 96-0327
24 Expiration Date:  September 14, 2017
25

245

1  A C K N O W L E D G E M E N T  OF  D E P O N E N T
2
3  I, REBECCA MALAMUD, do hereby acknowledge I
4  have read and examined the foregoing pages of
5  testimony, and the same is a true, correct and complete
6  transcription of the testimony given by me, and any
7  changes or corrections, if any, appear in the attached
8  errata sheet signed by me.
9
10
11
12
13
14
15
16
17
   _____
18 Date            REBECCA MALAMUD
19
20
21
22
23
24
25

Capital Reporting Company
Malamud, Rebecca  11-13-2014

246

1  MR. MITCH STOLTZ
   ELECTRONIC FRONTIER FOUNDATION
2  815 Eddy Street
   San Francisco, California 94109
3  415/436-9333
4  In Re: ASTM International. v. Public.Resource.Org
5  Dear Mr. Stoltz,
6      Enclosed please find your copy of the
7  deposition of REBECCA MALAMUD, along with
8  the original signature page.  As agreed, you
9  will be responsible for contacting the witness
10 regarding signature.
11     Within 30 days of December 1, 2014,
12 please forward errata sheet and original signed
13 signature page to counsel present.
14     If you have any questions, please do not
15 hesitate to call.  Thank you.
16
17 Yours,
18 Jan R. Duiven, CSR, FCRR, CCP
   Reporter/Notary
19
20 cc:  Original transcript
       All Counsel
21
22
23
24
25

247

1  Capital Reporting Company
   1821 Jefferson Place, Northwest
2  Third Floor
   Washington, D.C.  20036
3  (202)857-3376
4       E R R A T A  S H E E T
5  Case Name:  ASTM International. v. Public.Resource.Org
6  Witness Name:  REBECCA MALAMUD
7  Deposition Date:  November 13, 2014
8  Page No.   Line No.    Change/Reason for Change
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
   _____   _____
25 Signature                Date

Capital Reporting Company
Malamud, Rebecca  11-13-2014
Page 1

| | | | |
|---|---|---|---|
| **$** | **1/28/2014** 4:16 | **126** 4:18 | **173:**13 |
| **$1,000** 35:12,14,17,24 | **1/4/2014** 5:7 | **13** 1:14 247:7 | **2.5K** 59:7 |
| **$10,000** 35:9 | **1:07** 97:19 | **1313** 1:20 6:9 | **2:04** 100:10,11 |
| **$100,000** 180:12,18 181:8,19 182:17 183:4 | **1:13-cv-01215-EGS** 1:9 6:7 | **132** 4:19 134:5 | **2:17** 103:4 |
| | | **13th** 6:8 | **2:20** 104:4 |
| | **1:22** 131:22,24 | **14** 40:19 41:24 42:25 43:9,10 244:24 | **2:30** 97:7 230:18 |
| **$125,000** 184:2 | **1:24** 133:4 | | **2:38** 173:12 |
| **$15,000** 184:24 | **1:25** 133:7 | **142** 4:20 | **2:54** 185:25 186:1 |
| **$150,000** 182:20 | **1:44** 145:12,13 | **145** 149:15 | **20** 4:17 39:13 61:21 78:14 108:16 121:6,10,16 125:24 |
| **$2,500** 59:11,17 | **1:47** 145:13,15 | **147** 4:21 | |
| **$25,000** 35:6 180:9 184:6,13,17 | **10** 18:13 172:11 | **15** 41:5 | |
| | **10/16/2011** 4:23 | **154** 4:22 | **200** 148:2 |
| **$5,000** 59:10 185:3 | **10/4/2011** 4:20 | **16** 4:12 11:17,21 | **2000** 10:14 27:12,16,18 179:21 |
| **$50,000** 183:22 184:11 | **10/8/2012** 4:22 | **16th** 173:12 186:10 193:5 | |
| **$55,000** 60:25 | **10:06** 53:18,19 | **17** 4:13 59:20,24 60:2 | **20004** 2:4 |
| **$60,000** 168:7 180:3 182:23 | **10:16** 53:19,21 | **173** 4:23 | **20036** 247:2 |
| | **100** 18:7 172:11 234:19 239:9,22 240:8 | **18** 4:15 41:4,7 87:1,5,9 | **2004** 27:19,22 28:13 29:17 |
| **$75,000** 60:16,22 180:21 181:12,19 182:7,14 183:24 | | | **2006** 34:21,24 35:18 55:3 179:18,23 183:12 184:4,15 185:6,8,12 |
| | **101** 2:17 | **1821** 247:1 | |
| | **11** 4:12 | **186** 5:3 | |
| | **11:18** 96:21,22 | **19** 4:16 97:1,5 | |
| **0** | **11:26** 96:22,24 | **193** 5:4 | **2010** 184:9 |
| **0020.SVG-logo** 236:25 | **11:48** 127:23 218:13 | **198** 4:5 | **2011** 33:18 34:24 35:3,19 50:18 54:2 60:2,24 127:4,12 173:12 174:16 179:23 183:14,20 184:1 212:3,19 213:2 226:18 |
| **00201** 236:11 | **1111** 2:4 | **1987** 23:15 | |
| **0029** 123:13 | **12** 15:20 126:23 147:8 | **1989** 24:2,3,14 | |
| **01** 99:5 | | **1990** 10:13 | |
| **04234** 97:10 | **12/31/13** 4:18 | **1991** 24:14 25:4 26:14 | |
| | **12:01** 126:8 158:13 | **1992** 24:9 | **2012** 4:14 32:19 50:18 54:2 60:2,15,21 122:8 123:21 132:9 138:5,12,16 154:20 155:2 |
| **1** | **12:14** 131:21,22 | **1995** 26:20 27:6 | |
| **1** 6:4 30:23 52:17 101:9 134:7,10 138:24 193:20 246:11 | **12:15** 131:15 | | |
| | **12:20** 193:13 | **2** | |
| | **121** 4:17 | **2** 53:22 129:17 147:14 156:23 | |
| **1/04/14** 4:18 | **1222** 2:18 | | |
| **1/16/2014** 5:3 | | | |

Capital Reporting Company
Malamud, Rebecca  11-13-2014
Page 2

179:21 182:22
183:1,4,8 193:13
196:20

**2013** 4:21 29:24
30:9,23,24 31:16
32:7 43:3,8,9,10
48:2,22 49:7
126:19
147:9,16,24
152:23
180:15,21,25
181:8,12,16
182:3,8 183:12
208:21

**2013's** 48:3

**2014** 1:14 6:8
42:24 58:16,23
59:2,13,16 97:7
126:7 127:23
158:12 163:9
186:10 193:5
218:12 220:3
221:3 222:3
230:18 244:17
246:11 247:7

**2017** 244:24

**202)857-3376**
247:3

**202/739-5353** 2:5

**208** 5:5

**20ll** 4:14

**21** 4:18 41:11
126:1,5 132:1
147:10 158:9
159:15,18 160:2
162:20 163:25
218:9

**211** 5:6

**22** 4:19 132:3,7
133:10,21
138:19

**220** 5:7

**228** 4:6

**23** 4:20 142:1,5,9

**2300** 2:17

**232** 4:7

**235** 149:13

**236** 4:8

**24** 4:21 50:17 52:3
133:12 135:15
142:24
147:3,6,10 156:2
195:2 197:15,16
212:15

**243** 244:10

**24th** 244:17

**25** 4:22 18:10
30:2,5 33:3 79:2
154:14,17,22

**26** 4:23 173:5,8,14

**26th** 147:8 149:8

**27** 5:3 186:4,8,11
189:10 192:1

**27th** 2:11

**28** 5:4 193:7,10,14
198:7,8 236:8

**28th** 97:7,20

**29** 5:5
208:12,14,18
240:11

---

**3**

**3** 96:25

**3:02** 126:20
186:1,3

**3:48** 186:10

**30** 5:6 36:22 99:5
211:22 212:1
246:11

**30(b)(6** 208:1

**300** 70:10 136:5

**30th** 147:16,23

**31** 4:14 5:7 60:1
126:19
220:21,23
230:15

**35** 43:4

**35-year-old**
43:5,11

**39(b)(6** 1:15

---

**4**

**4:16** 155:2

**4:20** 232:14,15

**4:30** 147:24

**4:33** 232:15,17

**4:50** 243:10

**400** 66:22

**41** 97:12

**415/318** 2:18

**415/436-9333** 3:6
246:3

**415/512-4073** 2:12

**42340** 97:11

**44** 121:14

**4th** 126:7 127:23
158:12 218:12
221:3 230:18

---

**5**

**5** 60:11

**5/7/2012** 4:19 5:4

**50** 30:8 181:17
182:5
183:7,11,15

**500** 234:20
239:9,23 240:8

**50-50** 29:12,13

**50s** 89:8 100:17

**560** 2:11

**59** 4:14

**5K** 58:21 128:9

**5K-per-month**
186:17

**5th** 163:9

---

**6**

**6/7/2011** 5:6

**6:40** 133:24
134:1,3

**6:46** 133:25
134:1,2

**60K** 167:23

---

**7**

**7** 4:4 40:18 41:24
42:25 43:4 132:9

**7:02** 154:20

**7:24** 132:10

**7:44** 196:20,21

**71** 149:15

**75** 181:15,21 182:3

**7th** 193:12 196:19
208:21 212:3

---

**8**

**8** 174:9 175:16

**8/7/2013** 5:5

**80** 132:10

**815** 3:5 246:2

**85** 193:14

**87** 4:15 23:13

**89** 23:13,18

**8th** 154:19 155:2

---

**9**

**9** 60:6

**9:00** 1:23

Capital Reporting Company
Malamud, Rebecca  11-13-2014
Page 3

**9:05** 149:9

**9:30** 147:9

**90** 138:25
212:11,12

**90-'91** 25:11

**94105** 2:12,18

**94109** 3:5 246:2

**96-0327** 244:23

**97** 4:16

_____
A
_____

**a.m** 1:24 6:3
53:18,19,21
96:21,22,24
127:23 132:10
133:24 196:20
218:13

**abbreviation**
150:16

**ability** 63:24
64:5,6 210:8
216:16 244:12

**able** 32:9 66:7
95:3,19 150:7
216:4

**Academy** 57:5
172:4

**access** 95:19 109:2
215:24
216:2,4,21 217:1
241:11,22
242:10

**accessibility** 47:24
48:8,23

**accessible** 67:23
95:14,15 205:18

**According** 102:16
111:8

**accountant** 181:4

**accuracy** 69:16

**accurate** 63:12

69:23 70:1 72:2
87:17 104:10

**accurately** 69:11

**accused** 151:8,13

**acknowledge**
146:1,10,14,15
245:3

**across** 130:18
149:15

**actions** 210:7

**actual** 137:14

**actually** 13:15
49:25 64:11
84:10 104:3
111:6 112:24
120:7 124:10,23
127:20 136:10
137:21 159:20
196:8 211:10

**add** 67:6 83:2
196:24

**added** 67:7

**adding** 155:9,18
156:8 197:3,10

**addition** 58:25

**additional** 59:7

**address** 36:7,13
57:23 58:1
173:11

**addresses** 58:4

**adjust** 136:9

**Adobe** 21:24 22:1
55:9

**adopt** 27:5,13,22

**advertising** 24:9

**aesthetics** 76:8

**afternoon**
198:22,23

**age** 41:4,24
42:12,23 43:2

113:17,19
114:2,4,11

**agency** 24:9

**ages** 42:25

**ago** 78:14 135:7
168:23 194:3

**agreed** 246:8

**agreement** 140:19
141:12,14,18

**agreements**
112:15

**ahead** 37:19 50:2
60:7 217:13
218:18

**Air** 1:6 2:15 7:1

**akin** 46:22

**Akora** 170:1,11,20
171:7,24 172:14
173:3

**A-K-O-R-A** 170:4

**al** 6:6

**allegations** 209:9

**allowed** 108:21

**alpha** 142:14

**already** 34:9
138:12 160:23

**ALT** 233:21,23

**am** 68:22 114:14
130:8 133:15
135:10 145:5
189:4 207:14
242:18

**Amaya** 65:11
175:2,24

**A-M-A-Y-A** 65:13

**American** 1:3,6
2:14 6:25 106:14

**among** 97:23
156:7

**amount** 151:6

**and/or** 39:19
241:4

**Andrew** 2:19 6:24
132:24
228:4,5,12

**animated** 220:13

**animation** 220:13

**Anomalies** 135:2

**anomaly** 194:6

**ANSI** 103:14
156:24

**A-N-S-I** 156:25

**answer** 8:17 32:11
45:2 46:1 52:24
53:11 60:18 64:3
69:19 73:14
76:12 77:9 83:13
85:4 92:5
93:1,3,12
94:4,23 110:16
113:21 114:8
127:6 128:8
130:17 140:11
149:25 159:11
160:9 168:13
176:9 185:11
189:6 192:6
195:16 207:13
212:24 213:23
234:6 241:1,16

**answered** 92:5,24
93:2,10 94:1
117:18 156:20
168:13 184:19
187:24
190:13,21
215:16 217:11
227:5 231:18
238:19 242:7

**answering** 32:18
181:25

**answers** 8:4

Capital Reporting Company
Malamud, Rebecca  11-13-2014
Page 4

**anticipate** 202:15

**anticipation**
202:22

**anybody** 9:17
94:13 171:5

**anymore** 138:13
161:18

**anyone** 55:14
86:23 93:21
178:20

**anything** 20:5
30:14 39:21 46:9
47:4 51:23 63:10
68:8 73:8 81:7
92:13 93:17,23
94:5 99:18 101:4
105:9 108:25
109:4 110:10,18
113:1,19 117:12
130:18 159:12
160:6 161:4
170:16,24 195:3
213:14 243:4,5

**anything's** 70:11

**anywhere** 135:6
163:23 234:19

**apologize** 221:16

**app** 39:25 40:3
66:1 129:14

**apparently** 195:23
209:6 212:13

**appear** 91:15
124:5 129:22
155:1 176:5
234:9 245:7

**appearance** 91:14
112:5

**appeared** 234:10
235:2

**Appearing** 2:20

**appears** 97:19
100:9 124:4

126:5 128:7
133:23 138:20
147:15

**applied** 80:2

**apply** 139:14
199:1

**appointment**
140:19

**appropriate**
146:23

**approve** 91:14

**approximately**
25:4,5 26:14
29:13 54:4
175:16
183:7,11,14
184:2,3 239:22

**archive** 31:3

**area** 23:20 47:15

**areas** 23:9 54:17
64:25

**argumentative**
161:25 169:13
170:14
189:18,24
191:9,22
192:5,13 223:7

**Arial** 90:11,18

**arisen** 226:22

**art** 11:10 23:25
29:8,11,18,22
37:15 57:5 71:3
79:21 80:3
86:9,10
89:5,6,16,19
90:7,8,24 91:5,7
92:9 93:5 101:19
102:5 113:9
114:5 115:1
126:21
127:14,16 135:9
136:11 139:9,16
150:9 155:25

156:3,24
157:12,21
196:13
199:15,16
200:24 201:19
235:12,14,18
240:2

**artist** 20:10
37:2,20 54:18,24
114:13,14
115:17

**artists** 37:23
112:20
115:21,24

**arts** 22:14,15,22
23:14 36:25
138:9

**artwork**
115:15,18,20
136:7 139:8
199:5 201:14

**artworks** 200:4
201:7

**ascertain** 227:1

**ASHRAE**
17:17,20,25
103:13 105:22
164:4,8,10,11,17
165:5,13,15
192:22,25 193:4
221:8,19,24,25
222:7,8,9,14,15,
23 228:13,17,21
229:4,17,19,21,2
5 230:3,7,12,23
231:2,5,6,16,23
232:2,6

**aside** 87:20 203:7

**assistance** 145:19

**assisted** 51:19

**associated** 37:23
38:2 93:18 112:5

**associate's**

22:19,21 23:12
57:9

**Association** 1:5
2:10 106:14

**assume** 134:19
185:11 196:5

**assumes** 98:20
194:23

**assuming** 135:10

**assumptions** 89:7

**assurance**
78:4,17,20,24
79:2,4 152:14,17
171:10 233:6

**assurances** 154:10

**asterisk** 225:11

**ASTM** 1:4 2:2
6:5,14,16 14:25
15:17 17:12 18:3
20:22 21:7,11
22:2 39:14,19
43:16,20 44:3,16
45:3,17,22 46:7
47:12 51:3,6
52:11,16,17 53:2
63:17,23 64:4
72:10,22,25 73:5
75:23 77:4,18
90:5,13 95:13
97:23
98:1,3,13,17
99:11 102:15,17
103:13 105:22
109:6,10 116:4
118:9,17
123:17,19
124:18,19
134:20,23
136:22 137:2,10
138:17 142:23
143:1 144:21
145:3 156:4,7
163:18 164:4
165:5,12 177:12

Capital Reporting Company
Malamud, Rebecca  11-13-2014

Page 5

178:14,17
192:20 194:21
207:15
211:13,14,18
215:20 221:8,19
230:22 231:4
237:18,22,23
238:5,12,15,24
242:22 246:4
247:5

**ASTM/ISO**
156:25

**ASTM's** 119:3
242:12

**astray**
139:2,6,18,21
140:4,9

**attached** 5:25
245:7

**attend** 79:1

**attention** 60:5
133:20 142:12
158:10 212:6
236:7

**attorney** 8:24
9:2,5 13:6

**attorneys** 6:11

**attribute** 67:21

**attribution** 114:25

**August** 208:21

**author** 87:14
98:13,17 178:5
237:23

**authored** 48:12
108:4,12 237:19

**authors** 95:21 96:3

**authorship** 178:1
193:24 194:14
195:22

**automated** 30:18

**auto-trace** 136:8

**Avaaz** 31:3 32:1

**A-V-A-A-Z** 31:5

**available** 37:8,9
91:13 94:13,20
95:13 118:4
202:4 216:22
217:1 241:10
242:13

**Avenue** 2:4

**average**
239:14,18,20

**avoid** 89:11,12

**awards** 47:9,11
49:4 168:22

**aware** 46:18
49:11,17 50:7
52:24 54:19
55:18 56:18
57:10 61:25
62:3,7 81:2,15
88:21
106:13,17,21
119:14 120:9
145:17
203:13,18
207:14,16,25
208:6 211:14,17
213:4 219:9
228:21 231:22
232:1 242:12

**away** 61:10 89:16
164:21 190:9

**awful** 99:25

**azee@kslaw.com**
2:19

_____

B

**bachelor's** 56:7

**backed** 15:12

**background**
22:12,13 54:7
56:1,22 57:1,4

76:3

**backup** 13:25 14:9
179:2 224:2,3

**bad** 51:16 86:9
89:5,16 101:18
104:20 144:25
145:7 223:17
235:12,14,18
238:23

**ballpark** 234:20
239:17

**bandwidth** 81:6

**base** 45:2

**based** 24:6 45:4
47:5 61:4 70:23
103:18 105:3
135:10 150:3,7
155:22,23 182:1
189:10,14
192:3,7,21 201:3
202:11 207:1,4

**basic** 198:24

**basically** 85:9

**basing** 217:2

**batch** 67:18 85:24
86:2,12 136:19
174:5,17
221:9,20 222:1
225:1 230:23

**Bates** 97:7 121:13
123:11 126:8
132:10 142:5
147:9 154:20
173:12 186:10
193:13 208:18
212:2 221:5
236:10

**Bay** 1:13,21 6:10

**Bayshore** 1:21 6:9

**became** 54:24
207:24

**Becky** 101:14

**become** 83:21
120:9 208:6

**begged** 101:24

**begin** 136:22
212:17 231:13

**beginning** 1:23
53:21 96:24
107:5 116:5,7
126:17 134:18
212:11 236:2

**begins** 221:7

**behalf** 1:24
6:14,16,18,20,25
8:2 11:6 12:16
19:7 119:20
228:12

**belief** 138:11,15

**believe** 23:4 32:8
44:15 45:21 52:2
54:2 68:16,20
80:24 81:1 82:7
83:8 85:23 88:5
98:8 137:16
139:10 162:1
180:20 182:2,13
183:5 192:24
195:5 202:1
206:6 220:20
229:18

**believed** 19:18
209:21

**beneficial** 241:21

**benefit** 80:7 114:7
241:8

**benefits**
81:2,14,20
95:2,12

**Besides** 48:3 55:17
59:10 61:25
62:3,7 106:7

**best** 63:24 64:5,6
87:17 98:2
118:15 169:21

Capital Reporting Company
Malamud, Rebecca  11-13-2014
Page 6

170:2,18,19,23
228:19 244:12

**better** 29:16,18
91:9,11 115:25
218:8

**beyond** 21:13
22:20,25 103:22
240:22,23
242:1,17

**Bill** 37:5

**BillGaetjens.com**
37:2

**Bird** 36:25

**bit** 7:25 62:18
81:22 135:19
136:1 242:19

**board** 24:6
62:5,11,14

**BOCKIUS** 2:3

**body** 100:20
196:23

**book** 166:5,8,9,12
227:11,23

**books** 61:4 166:12

**bookwork** 165:24
166:4,24 167:9

**boon** 135:20

**bore** 108:13
237:18,22
238:12

**bother** 143:18,23

**bothering** 101:25

**bottom** 12:18
97:17 100:8
115:4 123:12
127:22,24
133:20 142:13
147:23 148:19
154:25 181:24
196:18
218:11,15 221:4

236:10 240:5

**boxes** 166:19

**break** 53:9,13,14
96:18
131:4,6,10,12,18
145:9
185:15,18,23
198:15 232:12

**brief** 240:1

**briefly** 24:2 40:7
68:25

**bring** 44:24 45:1

**bringing** 66:9

**brings** 106:19

**British** 48:14,22
50:25

**broad** 114:7

**Broader** 242:10

**broadest** 65:24

**broadly** 205:18

**brought** 44:21
105:21

**browser** 67:4 86:7
113:10 174:21

**browsers** 67:22

**B's** 20:11 30:19
32:23 36:4 89:18
180:14 183:1
184:1

**BTW** 150:17
223:13

**build** 74:1

**building** 103:14
142:24,25 143:2
197:17,21,24

**buildings** 109:3

**Bulgaria** 50:24
163:22

**bulk** 19:23

**bulletin** 24:5

**bunch** 151:9

**business**
24:13,15,24,25
25:3
26:7,8,22,25
27:3,21 28:1
29:6,10,19 30:2
32:23 33:1 42:14
61:23 191:20

**buy** 95:20

———————
C
———————

**C&C** 7:6

**C150** 98:24

**C150.1917** 98:25

**California** 2:12,18
3:5 50:17 52:6
61:5 80:25
123:23
142:24,25 143:2
144:12 197:17
246:2

**call-outs** 234:14

**camp** 46:22

**cap** 41:2

**capable** 19:12

**capacity** 34:6

**Capital** 247:1

**captions** 234:14

**care** 186:25
188:11,19
190:18 191:1
192:11,16

**cared** 188:2,25

**careful** 25:18
138:7

**Carl** 10:6 34:2
57:14 58:7
61:6,12,16 62:1
70:21 87:24

88:13,22 97:6
99:9 150:15
186:9 190:25
192:24 210:16
212:7 230:17

**Carl@media.org**
58:3

**carry** 12:20

**case** 6:7 70:24
158:19 162:7
205:12 225:23
247:5

**cases** 235:9

**catch** 64:9

**cc** 246:20

**CCP** 1:22 3:12
244:4,21 246:18

**CCR** 52:2,5
134:14

**centered** 228:2

**certain** 99:4 151:5
219:21

**certainly** 118:19

**certifications** 23:8
54:17

**Certified** 1:22
244:5

**certify** 244:6

**CFR**
134:7,10,11,13
138:24
156:1,3,24
193:20 195:9

**chain** 97:18 103:3
104:2 126:18
208:20

**challenge** 167:24

**chance** 132:11

**change** 83:1 105:9
135:12 247:8

**Change/Reason**
247:8

**changed** 149:4
223:19 225:7

**changes** 245:7

**character** 80:2
130:3 175:7,13

**characters**
234:17,20
239:9,23 240:9

**Charles** 3:9 7:4

**chart** 226:14

**cheat** 158:17
160:16

**checked** 138:25
151:22 225:6

**checker** 84:2

**children** 41:21
42:25

**Childs** 2:8 6:15
73:18 186:6
187:3 211:9,20

**choice** 215:2

**Christopher** 53:25
57:4 141:12

**Church** 31:8

**Cincinnati** 24:4
28:3 78:12

**circumstances**
49:16 50:7,13,15
114:22 136:12

**City** 244:17

**claiming** 178:1
193:23 194:14
195:21

**claims** 112:17

**clarification** 192:1

**clarified** 192:9

**clarify** 76:4 132:18

**clarifying** 218:10

**clean** 90:24 91:3,4

**cleaner** 89:22
91:17 92:10

**clear** 31:22 42:21
198:5 199:16
239:13

**clearer** 163:3

**clinic** 46:22

**close** 185:16,19,21

**Coast** 6:3

**code** 15:17,18
32:24 50:17,19
52:6 78:1
80:13,19,25
91:13 123:23
127:3 143:2
148:3,7,12,14,19
149:12,21 177:5
178:10 239:1

**coded** 39:20 64:21
65:5,14 175:24
238:4,6

**coder** 129:14

**codes** 4:15 18:19
21:1 51:24 87:6
103:14 142:25
178:14
197:17,19,21,23,
24 218:22
219:6,14
220:2,5,6 233:13

**coding** 39:23
219:3

**cofounded** 24:3

**cofounder** 24:18

**colleague** 144:14

**colleagues** 61:21
143:15

**collection** 98:22

**Collective** 36:11

40:11,12,25
41:14,24 42:5,25
43:13,16,23 44:3
45:17 46:13,21
47:11 49:1,12,18
50:9 51:8,19,25
52:10,20 74:14
87:6,12 107:11
122:4 123:21
124:20 125:17
167:18 219:7,10

**college** 22:15
23:18 41:9
54:9,13

**color** 196:14

**colorful** 90:1
213:24

**COLUMBIA** 1:2

**comes** 98:8,14
105:24

**comfortable** 42:13

**coming** 148:2
232:22

**comment** 44:19

**commercial** 21:20
24:8 25:7

**common** 144:18
168:21 223:4

**Commons**
137:9,13,25
236:12

**communicate**
57:16 121:22
122:2 226:15

**communicated**
160:13,14

**communication**
19:23 57:13
138:9 214:20
233:2

**communications**
57:20 87:24

96:9,13 103:19
105:4 106:9
108:18 117:10
119:20,25 142:9
177:10,23 178:3
195:24 211:17

**company** 24:20,24
25:3 120:19,21
168:18 171:21
247:1

**compared** 70:12
77:25

**comparison** 46:24

**comparisons**
178:10

**compatible** 65:24

**compensated**
140:21

**compensation**
62:9

**competition**
172:11 216:8

**compiled** 86:13

**complaint** 208:9
209:2,4,9,12
210:6,12 240:14

**complaints** 152:16

**complete** 13:25
40:1 67:13 72:16
73:5 91:8 126:23
142:19 143:7
149:15 156:7
225:8 245:5

**completed** 40:5
68:3 86:8
124:23,24
126:21,24
134:7,22 142:21
143:11,18,19
149:11 150:2
151:6 223:10
225:14,21

Capital Reporting Company
Malamud, Rebecca  11-13-2014
Page 8

**completely** 54:22 88:8

**computer** 14:1,4,8 15:12,22 16:16,22,25 17:3,6 21:9 52:13,18 64:20 172:17,19

**computerized** 90:19

**computer-related** 54:20 55:18 56:9,19 57:10

**computers** 13:7,10 15:24 16:1,2,4,10,18 17:7 55:22 118:2 121:25

**concede** 100:12,21 101:10

**concepts** 166:5

**concern** 47:15 113:25

**concerned** 99:6 113:6 177:4

**concerns** 113:12,14 128:24 129:6 152:17 203:7 210:7 217:6,18

**concluded** 243:9

**conclusion** 101:20 237:25

**Conditioning** 1:7 2:15 7:1

**conduct** 13:1 207:15

**conducted** 13:5,8 15:11,13

**conforms** 177:6

**confused** 91:21

**confusing** 181:3,9

**connection** 9:9 10:7 42:5,14 112:9 152:22

**consciously** 179:6

**Conserves** 81:5

**consider** 30:12 202:23

**considered** 189:15 212:21 218:1

**consisting** 244:10

**constitutes** 92:14

**consult** 200:9,13,16 201:6

**consultant** 34:7 39:16

**consultants** 16:10

**consultation** 34:18

**consulted** 226:25

**consulting** 34:11,13,22 35:2,18 36:2 48:24 58:20,21,25 59:10

**contacting** 246:9

**contain** 14:25 191:6

**contained** 127:12 163:18 234:22 239:1

**containing** 134:11

**contains** 244:10

**contemplating** 166:7

**content** 76:6

**contents** 229:24

**context** 66:17 103:8,22 107:3

162:15 204:11 205:1,4 207:4 223:8

**continue** 50:21 157:21 162:19 188:21 189:8 190:10 209:25 220:14

**Continued** 2:25 4:25

**continues** 128:15 134:8 162:6

**continuing** 26:16 163:10 214:2

**contract** 129:6

**contractor** 38:10 128:11

**contractors** 39:5

**control** 64:8 113:8

**convenience** 55:4

**convention** 98:6,15

**conversation** 72:14 88:4 96:16 104:24

**conversations** 107:4 117:13 202:8 207:2

**conversion** 34:15 39:24 53:1 75:15 76:17 77:21 79:17 80:5 81:3,14,23 94:8 107:12,20 164:12 209:16 212:14 222:19 223:9

**conversions** 49:6 53:6 74:19 88:24 90:5 163:5

**convert** 33:7 47:16 51:8 65:15,23

66:4,7 75:3 178:13

**converted** 48:16 49:12,18 50:9 51:24 72:5 79:16 92:2 123:20 124:19 141:22 142:23 144:21 145:2 149:20 203:25 204:22 231:10,13 239:10,16

**converting** 32:24 33:20 47:21 51:19 80:8 90:14 107:6,22 177:18 178:6 201:23 202:17 211:12

**converts** 82:25

**Coos** 1:13,21 6:10

**copied** 14:22 118:1 137:3 138:16

**copies** 13:6 17:11 62:24 63:3,7,11,13,16, 20,22,25 64:4 94:10 95:3,25 104:7 108:11,22 109:7,10,13,19,2 4 110:3,23 111:6 112:19 113:6 114:16 116:4,16,19,25 117:3,23 118:10,12,17,24 119:3,10 127:3,11,17 134:23 150:6,11 178:16 179:6 197:19 231:23 232:3

**copy** 76:10 77:3,7,17 94:14 95:19 101:13 102:21,24

Capital Reporting Company
Malamud, Rebecca 11-13-2014
Page 9

111:1,4,12,15,20
112:1 113:2,9
114:17 116:16
125:2 138:12
150:7 210:11
216:10 246:6

**copyable** 94:16
95:16

**copying** 110:7
112:13 117:7
178:7

**copyright**
108:1,7,13
110:11,19
178:13
203:14,19

**copyrighted**
110:3,7 203:9,25
204:21 214:8,15

**core** 41:23
42:2,4,8,14,16,2
0,21,24 43:2
220:12

**corner** 123:12

**corporate** 26:10

**correct** 15:22,23
16:23 38:7 46:20
47:1 49:9 52:7
54:15 62:25
63:1,14,15,17
64:1 66:7
73:22,23
74:3,17,23
75:7,17 76:18,19
77:9,23 79:10
80:5,6 81:25
82:3,9,10 83:4
84:8,11
85:10,22,25 86:1
91:20
94:10,11,17
96:3,4 98:4
99:11,12 104:9
107:23 110:23
117:20 119:7

122:5 124:2,3
127:18 128:1
129:7,19 146:20
150:12,13
152:21 156:5
159:5 160:21
161:13 162:21
163:13 175:18
180:22
181:8,9,10
182:24,25
185:12,13
186:14 192:18
193:6 199:23
203:14 219:8
220:22 222:5,23
223:22
224:5,8,13
225:25
226:4,10,19,21,2
4 228:18 229:23
230:20,24,25
233:7,11 235:6
237:8,11,14
238:5,9,10,12,13
239:11 244:11
245:5

**correction** 244:15

**corrections** 245:7

**correctly** 45:15
128:13

**correspondence**
9:14

**costs** 112:5

**counsel** 1:19 8:2,3
13:19 14:4,13
15:4,13 19:9,10
42:15 44:23 94:1
111:22 112:9
123:8 145:8
178:19 179:3
185:5,14 212:13
213:10 221:11
237:4 239:4
240:12

241:14,19
246:13,20

**count** 167:16

**Counter-
Defendants**
1:8,20

**Counter-Plaintiff**
1:12

**County** 244:2,18

**couple** 9:13,16
44:10 60:14
97:20 129:22
142:18 166:5
168:23 223:17

**course** 8:5 158:17
186:22 226:23

**Coursera** 56:16

**courses** 56:12
78:19,23,25

**court** 1:1 7:5,7
8:5,7

**covers** 81:21

**crash** 14:9 17:3

**create** 64:7
79:18,20,24
136:7 207:17
218:2

**created** 115:1
157:10 217:8,20
237:16,17,21
238:16 239:1

**creating** 65:2
200:19 216:20

**creation** 219:2

**creative** 89:10,13
99:20 139:13,14

**creativity** 139:15

**credence** 155:9,16
156:8

**crinkle** 166:20

**crisp** 90:8

**cross-hatching**
199:14

**CSR** 1:22 3:12
244:4,17,21,23
246:18

**CSS** 64:17

**currently** 38:5
162:24

**custom** 196:24
197:2,10

**customary** 191:18
192:2

**customer** 180:25

**customers** 30:20
31:15,19,21
32:20,21 33:4

**cut** 37:17 66:2
100:20

**cuts** 132:25

_____ D _____

**D.C** 2:4 247:2

**date** 9:6 244:12,24
245:18 247:7,25

**dated** 97:6 126:7
127:23 132:9
147:8,16,23
154:19 173:11
186:10 193:12
212:3 218:12
221:3 230:18

**David** 210:20

**day** 57:17 104:18
244:17

**days** 246:11

**dba** 1:4 11:13
26:11,12,13,16
27:9,11,13,22

**dba's** 28:15

Capital Reporting Company
Malamud, Rebecca  11-13-2014
Page 10

**dealings** 78:6

**Dear** 246:5

**December** 4:14
60:1 126:19
147:9 149:8
246:11

**decide** 70:16
200:3,10,22
206:1,13,21

**decided** 64:18 71:9
73:20 140:6
197:5

**decision** 70:18
140:15 191:25
200:6,8 201:18
230:2,5
231:15,16

**decisionmaker**
70:20,21

**decisions** 89:11,13

**decoration** 99:23

**deep** 128:16

**Defendant** 1:11

**Defendant/
Counter-
Plaintiff** 3:3

**define** 239:20

**definitely** 135:20
164:20

**degradation** 67:21

**degree** 23:14,17
56:5 57:7,9
219:21

**degrees**
22:17,19,21
23:12

**delegate** 46:11,16

**delegating** 46:19

**deleted** 118:8

**delivered** 64:13

67:12 91:25
146:2,11 152:4
163:1,4,11,15
164:11 228:25
229:2

**deny** 146:13

**departure** 192:1

**depend** 204:7,9,16

**depends** 29:15
114:21 115:6

**deposed** 7:22
207:23

**deposition** 1:15
4:12 6:4,9 9:9
10:1,7 11:17
19:16 20:1 59:20
87:1 97:1 112:6
121:6 126:1
132:3 142:1
147:3 154:14
173:5 186:4
193:7 208:1,14
211:22 220:23
243:9 246:7
247:7

**depth** 106:20

**derive** 190:4

**describe** 13:4 19:6
23:3 24:1 30:11
33:19 40:14 55:5
64:10 68:25 89:2
194:1

**described** 40:7
80:1,15 81:23
82:24 92:8 99:21
125:19 127:14
150:11

**describing** 102:6
239:23

**description** 242:9

**descriptions**
209:12

**design** 11:9 23:22
26:9,14 27:1,2,4
29:8,19
30:1,7,12,15,20
31:16
34:16,17,22
35:2,18,25 36:11
40:10,25
41:14,24 42:5,25
43:12,15,23 44:2
45:17 46:12,21
47:11 49:1,11,18
50:8 51:7,19,25
52:10,20 74:14
78:9 87:6,11
107:10 122:4
123:21 124:20
125:16,22
167:17 186:22
196:12 219:7,10

**designed**
196:13,14

**designers** 24:7

**designs** 32:4 166:9

**desktop** 17:5

**detail** 165:17
167:4

**determination**
201:12

**determine** 139:18
205:22 229:8

**developed** 213:6

**development**
229:9

**devices** 81:12

**diagram** 64:23
66:25 151:23
226:13 234:22
240:1

**diagrams** 64:7
66:14 81:24
83:21 103:9
126:21,23

127:3,11 150:20
152:8,21 157:10
163:16,17,20
199:14 219:2
234:9,10,21
235:12

**differences** 91:22

**different** 26:21
74:20 76:6 85:8
118:7 121:25
135:14 152:8
173:3

**difficult** 41:17
74:8,16 124:9
199:12

**difficulty** 64:25
66:15 73:22,24
82:18 122:13

**digging** 128:16,18

**digital** 54:24 55:21
78:9

**digitize** 33:7

**digitizing** 32:24
145:19

**direct** 212:6 236:7

**directed** 11:21,24
191:14

**direction** 21:18

**directly** 224:11

**directories**
157:1,16
229:12,13,16

**directors** 62:11,14

**directory** 86:4,18
124:15 134:11
157:14 158:5,8
223:19 225:19

**disabilities** 234:2

**disc** 6:4 53:22
96:25

**discover** 176:2

Capital Reporting Company
Malamud, Rebecca  11-13-2014
Page 11

**discuss** 106:20
109:22 121:2
152:24 165:16
166:23

**discussed** 109:25
144:15 152:20
165:19,22 168:2
199:22 227:20

**discussing**
133:10,11
166:22

**discussion** 73:9
86:25 88:3,22
95:11 97:9
112:14 117:16
139:10 146:22
147:2 162:17
167:8,12 177:7
202:2 220:25
228:24 230:6

**discussions** 89:2
95:18 96:5
105:20,25 106:5
128:23 153:17
167:2,6
171:21,23
177:9,14,22
201:21,24
203:2,4

**displays** 67:4

**Distler** 65:17

**distributed**
214:9,16 237:10

**DISTRICT** 1:1,2

**divorced** 11:4

**doc** 157:23

**D-O-C** 157:25

**docs** 148:2 149:15
158:16
164:3,4,17

**document**
12:1,4,10 14:22
32:10,14,18 60:6

61:9 64:18 67:14
68:2 69:2 70:16
73:20 86:6,11
98:9,18,22,25
99:1 116:9,14
120:23
127:20,21
133:13 135:13
137:4 147:15
148:13
159:10,23
161:17 163:6
177:25 194:23
195:3 196:18
198:2 208:17,18
212:1,24 220:20
223:13 225:2,13
231:9,12 233:22
235:16,20,23
236:8,9 238:2,4

**documentation**
142:19 143:8,10
144:8,16

**documents** 13:1
19:13,17,25
33:23 34:4 64:15
69:8,11,12,13
71:14,24 72:4
73:21 107:21,23
108:7,12
134:12,13,19
137:4 144:22
182:11 195:5
222:13 229:5
234:9,11 236:4

**dollar** 168:19
169:4

**dollars** 180:1

**domain** 36:18,21
37:18,22 48:17
57:24 63:9 93:20
205:6,8,10,17,23
206:3,15,23

**done** 15:1 31:1,2
33:13 62:20

71:14 72:11
75:15 77:21
79:7,20 98:7
103:9 115:3
116:6 122:18
125:24 131:25
139:1 143:6
144:5 151:17
152:10,17
153:20 154:8
162:23 163:8
164:2,8,10,12
165:12 175:9
185:20,22
219:5,22 220:16
222:1 224:15
226:6 238:8
241:20

**donors** 172:23,24

**double** 69:5,17
70:3 84:4 120:15
158:17,25
159:4,8,21
160:4,15,21
161:7,9,22 162:3
222:8,10

**doubled** 160:11

**double-key** 158:19
162:8,13,19,23

**double-keyed**
69:12 161:18

**download** 64:19
113:9

**downstairs** 9:19

**dpi** 70:10 136:5

**draft** 225:19

**drafted** 209:13

**draw** 60:5 133:19
142:12 158:10

**drawing** 55:9
66:21 85:9,14
136:11

**drawings** 92:15

102:14 136:6
144:20

**drawn** 66:25
100:16

**drew** 54:22

**drive** 1:21 6:10
13:20 14:12,23

**drives** 13:21,24

**Dropbox** 68:4

**dropped** 41:14

**Duiven** 1:22 3:12
7:5 244:4,21
246:18

**duly** 7:11

**during** 55:6 59:18
79:2 141:1 241:6

_____
E
_____

**e.g** 103:14

**earlier** 125:19
127:15 136:4
157:11 162:1
195:9 199:4
200:18 216:9
219:3 221:23
226:2 227:10
228:16 233:4

**earliest** 208:4

**early** 25:13 174:15
194:17

**earn** 47:11

**easier** 39:25
74:7,15 122:17
164:22
174:5,8,20 217:1
234:1

**easiest** 66:16 81:25

**easily** 94:16
176:12 241:10

**easy** 8:8 14:15
74:1 216:20

Capital Reporting Company
Malamud, Rebecca  11-13-2014
Page 12

eat 131:17

echilds@morganl
    ewis.com 2:8

Eddy 3:5 246:2

editable 91:13
    157:13

edited 196:23

editor 86:15,18

educational 22:13
    54:6 55:25 57:3

EDWIN 2:8

EFC 142:24

effects 218:1

efficient 173:19
    174:3

efforts 72:6 73:5

either 22:17 23:9
    68:3 72:24
    199:24 240:1

Electric 15:17
    148:18
    149:12,21

electrical 15:18
    148:3,7,12

electronic 3:4 6:20
    125:6 246:1

element 85:10,12

elements 80:17
    85:9

else 39:21 46:9
    51:23 55:14
    63:10 81:7 86:23
    93:17,23 94:5
    108:25 109:4,5
    163:23,24 171:1
    178:20 196:14

elsewhere 137:11

email 4:20,23
    5:3,5,7 9:14
    15:11 19:20,24

57:20,23 58:1,4
    68:4 97:5,18,19
    100:9,20 101:8
    103:2,3 104:2,3
    105:6 107:3
    111:8 112:1
    126:18,19
    127:22
    128:13,22 132:9
    133:23 135:19
    136:14 138:20
    147:15,23
    149:7,8 150:15
    155:2,5,23
    156:11,22
    158:11 162:20
    165:20 168:3
    169:2,6,23
    171:13 172:21
    173:2 186:9,12
    188:18 189:14
    190:19,24
    191:16 193:17
    196:1,19 200:18
    203:3 207:22
    208:20,24
    210:15,18
    212:7,9 213:2,8
    218:12 221:2
    222:2
    230:9,17,21
    233:2 240:12

emails
    4:16,18,19,21,22
    5:4,6 15:6,7
    57:22 97:15
    126:6,10,14
    132:8,13,16,21
    147:7,11
    154:18,23
    171:9,11 172:23
    173:9,15
    191:5,14,19
    193:11,15 203:8
    212:2 222:22

embed 136:8

emphasize 27:7

emphasized 63:12

employ 62:1

employed 26:3

employee 16:6,12
    38:5,9 39:15
    119:18

employees 16:9
    39:1 119:15

employee's 141:15

employment 28:17

enable 215:23
    216:2

Enclosed 246:6

encountered
    101:22 236:3

engage
    110:7,11,19
    118:24

engineers 1:7 2:15
    7:2 141:21
    142:18
    143:5,9,12
    144:23 145:3
    200:13 201:10

enlarge 70:13

ensure 66:22
    69:16 110:2,11
    118:23

enter 54:25

entered 54:23

entering 41:9

enthusiastic 47:16

entire 14:9 66:24
    67:1 82:23
    100:20 101:7

entities 31:25
    58:10 62:1,4,8
    145:17 168:10
    169:4

entitled 121:10

entity 11:12 26:10
    27:21 28:19
    33:11,14 62:15
    106:2 169:11

EnviroMedia
    26:24 27:3,9,25
    28:2

environment
    78:10,18

Eparchy 31:5

equation 78:1
    79:16 80:8,17,21
    182:7

equations
    39:20,24
    75:3,16,19
    77:4,17,23 80:5
    88:1 127:11
    175:24 219:4

equivalent 122:20

equivalents
    175:4,23

errata 245:8
    246:12

error 145:22
    146:24 175:11
    176:4,5

errors 84:6 124:5
    146:2,5,7,8,11,1
    7 153:10 174:9
    176:1 216:12

E-R-R-O-R-S
    146:7

especially 64:24
    66:17 80:12
    103:12

estimate 182:19
    183:10 240:7,10

et 6:5

Eugene 7:6 244:18

Capital Reporting Company
Malamud, Rebecca  11-13-2014
Page 13

**Eur** 50:19

**European** 50:20

**eventually** 89:15
120:22 242:19

**everyone** 53:17
114:17

**everything** 19:11
23:5 29:5 54:22
62:24 73:16
80:3,13 82:25
87:16 91:8 104:8
116:8,14 157:15
174:16

**everything's** 82:24

**everywhere**
115:25

**evidence** 98:20
178:9 194:24

**exact** 9:6 62:24
63:3,7,11,13,16,
20,22,25 64:4
101:13
102:20,24 104:7
111:6 127:17
134:23 150:6,11
183:3 197:19
216:10 242:4

**exactly** 49:15
88:17 91:11
95:6,8 138:10
153:15 187:7
199:10 242:2

**examination** 7:14
12:6,10 19:3
198:20 228:10
232:19 236:22

**examined** 7:12
245:4

**example** 40:18
52:15 168:17

**examples** 80:20

**exceeded** 181:7

**exception** 126:22

**Excuse** 221:11

**exercising** 199:25

**exhibit** 11:17,21
59:20,24 60:2
87:1,5,9 97:1,5
100:7 111:19,20
121:6,10,16
126:1,5
132:1,3,7
133:10,21
136:21 138:19
142:1,5,9
147:3,6,10
154:14,17,22
155:1 158:9
159:15,18 160:2
162:20 163:25
173:5,8,14
186:4,8,11
189:10 192:1
193:7,10,14
197:12 198:5
208:14,18
211:22 212:1
218:9 220:21,23
230:15 236:8
240:11

**Exhibits** 5:25

**EXHIBITS**............
.........................

**PAGE** 4:11 5:2

**exist** 23:6 209:25

**existing** 80:18

**expect** 183:6

**experience** 155:23

**expertise** 23:21
200:21 242:19

**Expiration** 244:24

**explain** 7:24 44:14
61:19 63:6
71:5,23 73:3
92:1 114:4 133:9

139:4 149:2
155:14 157:9
174:14 176:21
191:3 215:19,22

**explained** 139:7
157:11 219:3

**explaining** 240:2

**explanations** 71:8

**express** 152:16
205:20

**extension** 174:6
225:8

**extensions** 86:5

**extent** 242:14

**extinguishers**
51:22

**extract** 83:18

_____

F

**facilitate** 65:2

**fact** 63:22 112:25
160:4 203:8
214:7,14 216:14

**facts** 98:20 194:23

**failed** 223:24

**fair** 8:19

**fairly** 99:4

**familiar** 69:4 87:9
242:25

**father** 55:21

**fault** 145:6

**FCRR** 1:22 3:12
244:4,21 246:18

**feature** 136:8

**featured** 98:3

**federal** 242:15

**FedEx** 13:20

**fee** 2:5 4:4,8 6:13
7:15 11:19

25:19,24 37:10
40:17 42:3
45:9,13 46:4
48:24 49:21,25
50:2,14 53:23
56:17 58:20,21
59:1,10,22
60:9,13 68:15,19
69:21 73:19
76:15 77:8,11,20
83:12 85:6 86:19
87:3,22 92:11,25
93:11 94:3,25
96:17 97:3,11,13
98:23 100:23
101:3,15 110:15
111:5,18,24
112:3 113:23
117:19 121:8
125:25 126:3
127:9 129:11
130:9,20
131:5,9,18
132:2,5,19,24
133:1,8
139:21,22
140:17
141:10,17 142:3
145:6,10,16
147:5 148:23,24
149:23 150:5
154:16 156:21
157:20,25 158:1
159:14,25
160:8,25
161:5,11,16,21
162:5 165:18
168:15 169:16
170:17 172:9,13
173:7 177:8,21
181:5 184:21
185:9,10,17,21
186:7
187:4,20,25
188:16,23
189:5,13,20
190:2,7,15,23

Capital Reporting Company
Malamud, Rebecca  11-13-2014
Page 14

191:12,24
192:10,17 193:9
194:10 195:7,14
198:8,11 221:15
228:4 234:3,12
235:5 236:23
237:15 238:3,21
240:23,25
241:15
242:3,8,21 243:2

**feel** 93:2 140:13
214:7,14

**felt** 215:5

**fetch** 148:21,23

**field** 143:13

**fight** 186:25
188:6,10 190:17
191:1

**figure** 52:8,19,25
92:13,19 122:16
234:20 239:17

**figuring** 52:12
176:23

**file** 14:17 68:8,12
79:8 80:9 81:4
85:20,21 89:5,16
91:19 92:2,15
93:7 94:8
97:22,25 99:11
122:1
124:1,17,18
125:6,9 136:25
137:2 152:4
155:8,15 156:14
172:22 174:6
229:3
235:11,17,18,19,
24,25 236:24
237:1,7,9,10
238:8,11,25
239:1,14,18,20

**filed** 208:7 209:5

**files**
13:7,9,14,18,23

14:3,5,11,14
15:4 16:20 17:11
21:9 52:13,18
67:25 68:17,21
70:5 71:19 82:4
86:5 94:9,13
95:20,25 107:1
123:16,20
130:15 141:22
145:20 150:7
151:9 155:15,23
156:7 160:3,10
163:2,5,11,14
164:9,11
165:5,9,13,15
196:23 197:11
222:12 223:17
228:24 229:1,2
231:8
233:17,20,25
234:1
237:16,17,19,21,
23 238:16
239:10,15 240:6

**filing** 235:14

**filled** 86:5

**fills** 199:15

**final** 158:7 235:19

**finances** 128:24

**financial** 4:13
59:25

**financials** 60:4

**fine** 22:14,22 57:5
73:18 93:4
114:20 131:11
210:19 240:18

**finish** 45:10
129:1,9 141:8

**fire** 1:5 2:9 15:18
51:21 200:9,21
201:6 226:25

**first** 7:11 11:23
24:3,4,7,8 25:6,7

33:4 45:14 55:2
68:11 74:14
97:25 98:14
100:7 101:22
113:5 126:13
127:21,22,24
128:12 129:4,13
130:1 133:20
135:25
158:11,18,23
160:17,20
161:12,13 162:3
165:4 166:3
167:14
173:18,22
179:16 189:21
190:4,9
193:12,18 198:4
207:19,24
210:17,18,24
212:25 218:11
230:21 232:12
236:16

**five** 18:16,21

**flagged** 225:13
226:1

**flavor** 76:25
77:2,16

**Floor** 2:11 247:2

**Florida** 22:14

**flourishes**
88:9,14,19
234:22,23

**flow** 64:9 65:4
66:12 174:19
231:19

**focus** 30:22 48:2
60:10 221:8,19
230:22 231:2

**focused** 29:11,22
210:24

**focusing** 51:10

**folder** 101:18

134:12 172:22
235:11,14,18

**folders** 14:21,24

**folks** 152:8

**follow-ups** 68:10

**font** 80:3
90:8,9,12,19
235:4

**fonts** 90:16

**foregoing** 244:9
245:4

**foreseeable** 158:20
162:8,14

**forget** 172:4

**form** 42:1 65:17
77:6 91:9,11
110:13,25
111:17 113:20
127:5 177:19
181:1 187:17
188:13 201:16
202:18 204:3,6
205:11 207:1
210:3,10 213:21
216:23 217:3
219:24 224:16
226:8 235:5
237:12,24

**formal** 230:5

**format** 75:4
92:2,16 93:7
122:23 127:17
204:1,23 222:16
238:8,25

**forming** 122:13

**forward** 81:8
93:20 129:6
246:12

**foundation** 3:4
6:20 69:19 73:14
94:23 130:16
149:22 160:23

Capital Reporting Company
Malamud, Rebecca 11-13-2014
Page 15

161:1 188:14
189:17 191:22
192:5,13 201:17
202:19 206:4
210:2 214:10
234:4 237:13
246:1

**foundations**
169:15,17

**fourth** 158:15

**frame** 25:10

**Francisco** 2:12,18
3:5 57:6 246:2

**free** 94:20 95:4,13
114:17 216:4,7
241:23
242:13,20,23

**freely** 95:15
216:21 217:1
241:10

**Friday** 126:24

**front** 111:19
147:22 180:16
181:24 186:19
188:3,12

**Frontier** 3:4 6:20
246:1

**full** 244:10

**full-time** 16:11

**fully** 8:22

**function** 66:25
82:22 136:2
157:19

**fund** 220:15

**funded** 168:22
186:16

**funder** 171:2

**funders** 170:11
186:23
187:5,8,12,19
188:1,17,25

189:9,15 191:19

**funding** 72:17
73:1 129:5
168:10 169:1,4
170:8
171:14,17,22
186:14,24
188:6,10
190:17,25

**fundraising**
165:9,13,16,19

**fund-raising**
72:6,12 73:5

**funds** 47:9 169:14
171:7

**funny** 113:4

**future** 81:9 158:20
162:9,14

---

### G

**Gaetjens** 37:5

**G-A-E-T-J-E-N-S**
37:6

**gain** 74:11

**gallery** 11:10
29:8,11,18,22
37:1,3,16,21
113:5

**Garcia** 53:25 57:4
141:12

**Garcia's** 57:11

**general** 88:18 94:9
132:20 165:7
191:13 212:13
213:10

**generally** 40:15
132:15 233:24

**generated** 121:21

**generates** 174:10

**germane** 23:5

**gets** 65:9 160:12

169:14 223:9
224:10

**getting** 49:24
70:14 155:15
174:16 194:5

**gigantic** 93:13

**given** 15:10 216:11
244:7 245:6

**gives** 202:5

**Global** 120:1,3
145:18 158:25

**Global's** 120:12

**glyph** 174:9
175:6,11
176:1,4,5

**glyphs** 174:25
175:4

**goal** 67:23 101:12
102:20,24
216:15

**God** 10:14

**gone** 174:6

**Google** 168:22
169:5 170:11,20
171:7,23 172:1

**Gosh** 122:8

**graceful** 67:21

**graduated** 43:24

**grants** 172:3

**graphic** 23:22
51:10
65:2,16,20,22
67:1,5 70:12
81:17 84:25 85:1
91:20 92:6 98:11
99:5,7,17,22
100:16 121:24
135:12 136:8
137:10 138:1,9
140:14 174:6
225:9,10

234:14,15

**graphics** 47:17,21
48:16 49:6,12,18
50:9 51:8,20
52:3 53:2
67:7,13 71:1
72:22 80:16
81:1,11
84:12,14,17,21
88:7 91:12,16
99:23 123:20
133:11 137:5
139:12
140:5,7,9,16
158:7 166:21
178:17 192:20
200:7 216:15
240:5

**graveyard** 55:3

**greater** 182:16

**Greek** 31:8

**gross** 181:3

**ground** 198:25

**group** 40:21 41:23
42:2,5,8,14,16,2
0,21,23,24 43:3
98:7 151:12

**guess** 84:23 102:16
131:6 137:6

**guys** 131:3 148:3

---

### H

**half** 131:8

**hand** 11:20 54:22
59:23 82:11 87:4
97:4 100:16
102:13 121:9
126:4 132:6
142:4 147:6
154:17 173:8
186:8 193:10
211:25 244:16

**hand-drawn** 89:8

Capital Reporting Company
Malamud, Rebecca  11-13-2014
Page 16

90:18 101:22 102:2,3 136:6

**handed** 208:17

**handicapped** 48:9

**handle** 191:14

**hand-lettered** 234:24 235:2

**hand-lettering** 88:7

**hand-traced** 82:19

**Hang** 121:1

**happen** 7:25 18:2 85:17 130:14 167:15 211:6 230:4 231:20

**happened** 25:2 34:4 117:25 124:16 130:21,24 154:3 223:23 225:16 233:9

**happens** 67:25

**hard** 13:20,21,24 14:12,23 125:2

**hardest** 66:16 81:25

**haven't** 10:25 11:4 29:20 112:14 163:11 164:12 196:23

**having** 7:11 54:19 87:24 95:20 144:4,16 162:23 177:9,14 218:22

**head** 172:4 212:12

**header** 193:21 195:6,8 196:6,24 197:2,10

**headers** 136:22 193:21 196:24

**heading** 12:5

**Headquarters** 87:6

**health** 186:22

**hear** 117:4

**heard** 117:6 129:5 171:2 213:1

**hearing** 104:13,22 105:8

**Heating** 1:6 2:15 7:1

**Heida** 37:20

**held** 48:1

**he'll** 169:1

**help** 52:19 71:15,19 72:5,11,25 156:8 200:10

**helpful** 32:11,17 71:25 73:4,12 136:15 164:5 166:25 167:10

**helping** 115:9

**helps** 65:3

**hence** 101:13

**Hensley** 24:9

**hereby** 245:3

**he's** 20:10 43:24,25 54:18 55:22 56:23 104:20 105:14,17 119:17 144:2,7,14 149:2 155:7,18,23 156:8 164:15 187:5,8 188:17 191:10 193:3

**hesitate** 246:15

**hesitation** 214:1

**hexadecimal**

175:4,22

**Hey** 190:25

**Hi** 209:1

**high** 41:8,20 43:10 54:8,13 82:17 136:3 215:6

**highlighted** 124:23 125:3

**highly** 81:18

**high-school-age** 41:9

**hired** 38:18

**historic** 108:19

**history** 24:1 204:10

**hmm** 97:8

**hold** 66:3 211:10

**holding** 157:14

**hopefully** 228:8

**horrible** 81:13 169:18

**hour** 131:8 140:24

**hourly** 140:23

**hours** 9:16 146:6,8

**house** 27:16,20 89:18,24 90:4,10,21 91:23 92:14,17,20 100:13 101:11 103:9,20 104:13,19,22

**house-style** 88:24

**How'd** 120:9

**HTC** 120:1,3,12 145:18 158:25

**HTML** 64:16 86:5 148:2 158:5,8 164:3 196:23 212:14 225:2,7,13

233:22

235:19,23

237:7,9

238:2,4,7,11

239:1 240:4

**huge** 223:18

**Huh-uh** 17:21

**human** 146:18

**hundreds** 179:25

**hurt** 152:9

**husband** 10:9

**hypothetical** 52:17

_____
I
_____

**i.e** 100:14 101:11

**I'd** 6:10 8:8 34:16 137:20 155:7 172:20 181:23 199:3

**idea** 71:2 74:13 116:1 152:13 156:16 164:15 165:7 168:16 187:8 189:21 191:2 205:14,16 206:5 227:13

**ideal** 114:25

**ideas** 115:21 172:12

**identification** 11:18 59:21 87:2 97:2 121:7 126:2 132:4 142:2 147:4 154:15 173:6 186:5 193:8 208:15 211:23 220:24

**identified** 20:5 153:19,25 154:6,11

**identifier** 14:15 198:1

Capital Reporting Company
Malamud, Rebecca  11-13-2014
Page 17

**identifiers** 149:4

**identify** 14:15
32:20 38:1 50:15
51:14,17 126:10
140:8 143:14
154:22 168:9,18
169:3 170:11,19
171:2,5 173:14
186:11 193:14

**identifying** 14:10

**ignore** 191:5,18
223:4

**I'll** 7:24 60:10
198:18 221:4

**illegible** 86:8
226:10

**illustration** 99:14
178:10,11
226:14

**illustrations** 81:24
82:8 83:3 88:1
90:22 97:21
99:10 142:23
166:17,21 200:1
227:2 239:6

**illustrative**
201:2,15

**Illustrator** 21:25
22:1

**I'm** 7:4 8:1
11:13,20 16:7
18:14 20:23 21:2
22:19 29:8
31:10,17 34:25
36:22,23 39:2
42:18 44:17
51:9,10,16 52:23
54:12 56:6,7
59:23 60:10
74:23 75:1 76:11
87:4 90:19
91:17,21
92:12,19 93:25
97:4 99:2,4,6

100:7,11,15
101:1 104:19
110:17 114:2
121:4,9 126:4
128:1,9,15,18
130:7 131:3
132:6 134:1,16
135:7 139:11
140:12 142:4
143:23 145:8
146:18 147:6,14
153:6 154:17
156:12 157:16
161:17
169:2,6,7,18,23,
24 170:18
173:4,8 174:17
181:2,24 182:18
183:2,21 185:21
186:8 191:10,11
192:5,8 193:10
195:5 198:16
199:1 202:21
204:12 207:22
211:25 228:1
242:25

**image** 13:23 52:20
63:14 65:1,13
98:2 100:13,21
101:10,22 102:4
123:25
137:14,21
233:9,13,22
235:2,10 239:25

**imaged** 13:21

**images** 14:25
20:14,15,21,25
21:6,13,18,23
22:2 32:24
33:7,20 34:15
52:10,21
63:3,7,17,20,23
64:1,4,12,21,22
65:5 73:22
74:7,9,15,19
82:8,19 91:3,23

101:17 102:3
107:21,22
109:7,10,20,24
124:10 135:15
137:2
149:13,15,20
150:8,10 233:6
235:8 238:7
239:5

**imagine** 179:18

**impede** 210:8

**importance** 63:11
152:21 201:22

**important**
72:4,10,16,24
74:4
103:12,20,25
108:23 109:2
121:2 153:4,8,12
189:9,16
209:17,22,24

**imported** 66:19
82:4

**impressed** 212:16
215:8

**impression** 213:11

**improve** 109:1
216:15

**improved** 34:8
91:7 92:15 93:5
127:14,16 150:9

**improvement**
93:6,13

**improvements**
91:22 92:1
93:7,17

**improving** 91:5

**Inc** 1:5 2:10

**Inc.'s** 59:25

**incident** 153:24
154:1

**include** 80:12

86:10 197:18

**included** 70:6
87:16 119:10
156:3 192:19
203:4

**includes** 63:16
97:23

**income** 181:3
191:15

**incorporated**
11:12 197:20,23
242:14

**incorrect**
170:16,25

**incorrectly** 162:2
181:25

**increase** 95:17
109:1

**incurs** 112:12

**indemnification**
112:16

**indemnify** 112:12

**independent**
39:4,22 165:7

**India** 50:24 148:2
156:1 165:9

**indicate** 127:10
229:13,16

**indicated** 76:16

**indication** 125:5

**inform** 232:5

**information** 4:13
37:13 52:18 60:1
171:10,12 173:2
187:14,16
190:3,8
241:11,23

**infringement**
110:12,20

**initial** 237:5

Capital Reporting Company
Malamud, Rebecca  11-13-2014
Page 18

initiative 40:10
41:20

Inkscape
21:19,20,24 22:5
55:10 65:22
66:20,25
79:9,11,18,21
82:5,22 83:25
84:2,5 136:2
157:19 176:12

Inn 1:20

innovation 109:3
216:5

inquiry 37:4 68:18
77:10 86:16
111:2 139:20
148:22
157:17,24 161:2
172:8 185:7
194:7 203:21
204:5

inserted 244:15

inside 196:9

instance 49:10
98:12

instances 88:21

instantiation
37:7,9

instead 27:25 70:2
71:9 80:1 91:18
122:16 225:24

Institute 22:16

instruct 46:15
100:24 101:3

instructed 63:19

instructions 62:18
106:25 107:17
216:10 223:5
230:12

intellectual 112:17

intended 47:19

94:13

intention 29:21
94:7,19

interest 24:19 61:7
108:1

interface 122:15
195:2

internal 107:16

International 1:4
2:2 6:5 246:4
247:5

internet 10:14
11:9 23:6
29:8,19
30:1,7,12,14,19
31:2,12,14,16
32:3,25
34:6,11,13 75:14
94:15 113:7
114:1,17 116:17
144:19,23 145:4
202:5 216:17,21
241:23 242:13

interpret 65:19
199:25

interpretation
99:20 139:8
199:6,10,18,19
200:4,5,11,23
201:3 226:3,6
227:2 235:9

interrupted 144:3

interstitial 175:25

introduce 6:11
153:10 216:12

introducing
216:14

invalid 174:10
176:7,10

inventor 81:17

invoiced 178:24

invoices 178:22,25

179:11

involved 20:11
21:6 46:8 48:7
55:14 107:10
130:8 171:20
217:25 219:13
226:10

involvement 68:24
120:12 219:10
220:10

involves 66:9
174:11

involving 106:1,18
173:15

iPad 30:14

iPhone 81:13

irrelevant 21:15

IS.SP.30.2011
149:13

isn't 72:9 92:15

ISP 24:13 25:15
26:1 78:13

ISPs 24:4

issue 209:13

issues 105:9 202:9

it's 10:15 11:21
12:4 21:15,21
22:9 29:12,15
31:8,24 37:12
38:14 39:12 40:2
45:15 59:24 60:4
61:3,18 64:18,19
66:17 69:2,24
70:4
72:14,18,21,22
73:18 75:25
76:13,25
81:1,9,19 82:23
83:18 86:14,17
87:7 89:22 91:18
92:7,9
93:3,19,20

97:5,10 98:9,10
99:17,18,19
100:17 104:24
105:23 107:13
108:23
113:4,17,19
115:19,24 116:5
117:21 121:1,13
124:9,14
125:11,12,23
131:15 134:12
136:2 139:9,13
142:5,19 143:4
145:6 146:21
147:9
151:4,15,19
154:2,3 158:5
160:15 165:7
168:21,22
169:2,6,23
170:10 171:13
173:10 174:15
175:7 176:15,22
177:3 181:18
182:5,11 185:14
192:3,9,15 194:3
195:4 209:24
212:2 213:13
221:4 223:8
224:1 225:20,22
233:24 234:19
237:25
240:3,10,23
241:25
242:2,18,20

I've 10:15 26:5
30:21 31:1,2
39:9,13 41:8
44:9 46:23 59:3
78:18 90:20 93:2
139:7 148:1
208:17

—————— J ——————

Jacques 65:17

jaggies 70:14

Capital Reporting Company
Malamud, Rebecca  11-13-2014
Page 19

**Jan** 1:21 3:12 7:5 244:4,21 246:18

**January** 30:23 97:7 126:7 127:23 158:12 186:10 193:5 218:12 221:3 222:3 230:18

**Jasper** 38:12,13 43:14,21 44:1,15 45:3,16,22 46:6,11 56:1 141:18,19 142:10 143:7 144:6

**Jefferson** 247:1

**jkfee@morganlewis.com** 2:6

**job** 8:8 26:4

**Johnson** 54:7,10 55:19

**JPEG** 66:9,19 80:8 83:6,7,14,16,18, 20 86:5,9 91:19 150:4 174:22 223:20 224:3,11 225:8,24 231:9 233:19 234:1 235:21 236:5 237:6 238:1,15,25

**JPEGs** 64:17 70:7,13 81:12 222:12

**judgment** 199:25 226:5

**Judiciary** 104:13,19

**June** 212:3

———————
K
———————

**Kevin** 2:5 6:13

**key** 69:5,17,22

70:2,3 84:4

**keyed** 68:17,21 69:9 70:6 83:9,14 158:17 159:1,4,8,21 160:4,11,15 161:9 222:8,10

**keying** 69:1 160:21 161:7,23 162:3

**Khan** 172:4,6,9

**K-H-A-N** 172:9

**kid** 27:14

**kidding** 39:3

**kids** 41:9

**kinds** 76:6

**King** 2:16 6:24

**knew** 62:23 95:23 107:20,24,25 108:3 120:18 138:12 202:24 207:23 228:2

**knowledge** 21:12 56:24 57:2 87:17 95:17 98:2 109:1 114:6 118:15 119:17 168:21 170:3,19,20,24 202:1 228:19

**known** 10:15 211:5

———————
L
———————

**Lab** 26:9,14,25

**label** 123:11 235:13

**labeled** 14:14,22 97:8 121:13 126:8 132:10 142:6 147:9 154:20 173:12 186:11 193:13

222:14 235:18

**lack** 160:22,25 192:5 234:3

**lacks** 69:19 73:14 94:23 192:13

**ladders** 51:21

**Lane** 244:2,18

**language** 65:6 76:24 77:1,3,17 173:23 191:6 194:12

**laptop** 17:4,5 157:14

**larger** 32:6

**largest** 30:19 31:15,18,21,22 32:3 180:25

**last** 43:10 62:9 68:5 80:4 104:4 126:18 135:18 136:20 163:1,4 212:8 218:17,19 227:25

**last-minute** 150:22 151:9,11,18

**later** 71:15 235:13

**laws** 109:2

**lawsuit** 71:15,19,25 96:6,10,14 105:21 106:1,11,19 152:22 153:9 202:23 207:20,25 208:6 209:4

**lawyer** 110:14,17 242:18

**lawyers** 117:5,7,16

**layer** 66:20

**layout** 194:17,19

195:18,19

**lead** 109:2 218:7

**Leading** 234:4

**leads** 44:15 68:16,20

**learn** 78:8 120:17

**learned** 55:8,9 78:5,21

**learning** 21:16 64:24 78:22

**least** 9:22 41:10 130:21,23 132:2 140:5 154:1 173:9 180:25 181:15,21 182:3 186:17 200:3 242:12

**leave** 236:5 237:6

**led** 94:8 139:17

**left-hand** 124:1

**legal** 24:10 186:24 188:6,10 190:17 191:1 237:25

**legend** 240:2,4

**Legibility** 93:19

**leisure** 94:10

**lend** 156:8

**lended** 155:16

**lends** 155:8

**length** 10:3

**less** 18:6,9,12 180:9 181:19 183:17,18 184:5,16,23 185:2

**let's** 19:10 41:5 52:15 76:13 81:22 158:3 164:2 200:21 216:25 218:24

Capital Reporting Company
Malamud, Rebecca  11-13-2014
Page 20

**letter** 213:22

**lettering** 88:9

**level** 45:19,23 46:8
51:11 64:25
73:22,24 74:2
82:18 122:12
165:21 186:17
200:22

**Levi** 16:14 20:4
38:22 43:21
44:2,15
45:3,16,22
46:6,11 54:7,12
82:16 83:22
139:1,5 140:4,9
147:21 220:8

**Levi's** 17:5 43:22
139:18

**Lewis** 2:3 6:14,16

**lightweight** 81:5

**likely** 22:7,8
105:23

**line** 67:3 79:21
80:2,3 82:25
89:19,22
90:7,8,24 91:4
102:5 114:24
136:10 137:5
139:9 157:12
181:24 196:13
212:10 230:21
236:11 247:8

**lined** 142:18 143:9

**lines** 66:22 91:3
92:8 97:20 99:21
152:25 199:13
213:1

**link** 124:12 157:22
158:6 176:15
177:1

**linked** 158:5,7

**links** 193:20

223:17

**Lion** 1:20

**list** 15:10,20 19:4
37:18 121:19
122:3,7,9,16
124:13

**listed** 223:18
224:14,25

**lists** 4:17 121:11
122:20

**litigation**
106:13,17 123:7
179:1 202:16

**litigations** 106:22

**little** 7:25 62:18
81:22

**lived** 10:25

**LLP** 2:3,11,16

**load** 124:7

**local** 55:3

**located** 28:2,4,9
144:11 196:4

**location** 28:1
148:18

**logical** 70:4

**logo** 116:16
119:3,11
137:6,10 138:6
236:12,14,17
238:2,12,16,25

**logos**
116:4,17,20,25
117:3,7,23
118:1,10,13,17,2
4 138:7,12,17
236:4
237:5,18,22

**long** 9:4,15
10:11,23 121:22
186:18 192:7
194:3 198:18

200:2

**longer** 131:2
138:16

**loss** 32:19

**losses** 112:12

**lost** 157:22 158:6

**lot** 40:1,2 65:1
70:25 71:3 80:25
99:20,25 100:4
111:15 112:2
113:5 122:13
155:8 199:13

**lots** 51:21

**low** 70:9,11

**lower** 208:24

**lowest** 180:5

**low-resolution**
64:17 66:19 70:7

**lunch** 44:25
131:4,6,10,22

——————

M

**Mac** 67:2

**Madam** 7:7

**magnification**
66:22

**main** 223:19

**major** 23:20 172:3
191:15,19

**majored** 56:4

**majority** 41:6,10
57:19

**Malamud** 1:17 4:3
6:5 7:10,20,21
10:6,9,18 34:2,3
53:24 57:14,22
58:7 61:6,12,16
62:1,4,8,19
63:2,6,19 67:12
71:5,18
72:3,9,15,23

87:4,25 88:13,23
89:24 91:25
94:12 96:6,9,13
97:4,6,15
103:4,19
105:4,21
106:1,15,18
108:4,10,18,20
109:12,18,22
116:19 117:10
118:19
119:16,21 121:9
126:4,7,11,15
128:6,23
132:6,9,13
133:10 138:21
146:23
147:8,12,24
149:21 150:15
151:8,13 152:5
153:19
154:6,11,19,23
155:6,11,14
156:6 158:12,16
159:20
162:7,12,18,22
163:2 164:2,11
165:8,11 166:7
167:3
171:2,6,14,23
173:15
177:10,23 178:4
186:12
193:12,15,19
194:12 195:25
198:22
200:16,20
201:22 203:5,24
204:20 205:20
207:2,5 208:20
209:21 210:16
211:18 212:3,7,8
213:8,16,18
215:2,19
217:7,18 219:9
221:2 222:2,21
223:16 227:11

Capital Reporting Company
Malamud, Rebecca  11-13-2014
Page 21

228:14,20
230:7,14,17
231:1 232:21,23
240:14 245:3,18
246:7 247:6

**Malamud's** 107:22
110:14 128:2,13
134:2 159:6
206:1,12,20

**man** 38:13,14

**manifest** 148:19

**manner** 67:8
122:25

**manuscript**
227:17

**map** 135:19 136:1

**mapped** 29:20

**mapping** 175:22

**mark** 76:5 122:18
208:11

**marked** 11:18,21
59:21,24 87:2
97:2,5 121:7,10
126:2,5 132:4,7
142:2,5 147:4
154:15 173:6
186:5 193:8
208:15,18
211:23 212:1
220:24 230:15
235:18 236:8

**markup** 65:6
77:1,3,16

**married** 10:12
11:2

**Marshall**
143:22,25
144:4,9

**master** 44:12

**match** 153:8

**matched** 66:23

153:1

**materialize** 164:19
227:14,16

**materials** 1:4
143:21 144:20
145:2 155:10
158:24 159:7,19

**math** 40:1 65:25
66:13 72:22
74:20 75:3,16
76:9 79:13,15,16
80:5,8 82:24
91:16 127:11
181:18

**mathematical** 65:6

**mathematically**
92:7

**mathematics** 56:4
76:2 181:20

**MathML** 39:20,24
64:20,21
65:5,6,19 67:8
74:19
76:5,6,8,17,20,2
3,25 77:3,16
78:1 80:9,12
91:18 126:22
129:14 149:15
189:1,15 192:19
219:3 229:3
233:17,25

**matter** 6:5 112:9
132:20 166:11
168:3 195:25
244:9

**matters** 120:13

**may** 124:24 132:9
138:12,16
158:17 159:7,20
160:4,11,16
167:15 193:12
196:19 237:2

**maybe** 40:22

44:23 103:7
181:17 201:13

**mean** 8:17 13:25
19:15 21:14
28:18 31:22 32:9
37:17 41:17
42:10,21 45:6
61:22 64:5 70:11
79:23 80:14,17
81:8,10 89:9
90:3,19 91:11
92:17,20 98:1
99:7 100:5,17
110:4 115:17,19
123:19 127:2,16
134:22 138:5
139:9 149:18
151:3 153:14
158:2 168:21
170:23 173:4
185:5,8
190:11,14 192:8
194:15 199:10
205:2,13,24
214:23 216:5
218:4 223:9,14
225:4,18 227:15
229:2 239:20

**means** 122:2
135:17 137:9,14
151:7 157:9
161:9 174:14
176:21 189:22

**meant** 42:19 92:20
114:3 155:20
156:10,15,16
188:5 190:19
202:3

**mechanism** 110:4

**mechanisms** 14:19
110:1

**media** 61:2 209:7

**meet** 9:11

**meeting** 9:15,17

**Melkite** 31:5,8

**mentee** 20:13
43:11 54:1
55:2,7

**mentees** 39:9 40:7
42:22 44:11
48:25 82:17
83:22 121:23
199:20,24
220:6,11

**mention** 130:19

**mentioned** 9:22
15:21 38:4 50:24
52:14 53:8,10
70:25 99:16
120:24 129:13
136:4 174:19
195:9 197:4
201:25 218:22
226:2 227:10

**mentor** 43:25
55:17

**mentoring**
20:13,19 36:12
38:18 39:9 48:20
50:16 54:23,25
59:4 66:18 73:25
74:8 121:21
163:7 199:22
201:13

**merely** 201:2,14

**message** 88:18
102:16 103:23
135:11 189:19
194:6

**met** 9:8,14 213:9

**methodology**
85:25 86:3 98:6
122:14

**meticulously**
66:20

**microphone**
198:12,17

Capital Reporting Company
Malamud, Rebecca  11-13-2014
Page 22

**middle** 123:15

**mid-summer** 9:7

**midway** 173:17

**mind** 44:18 101:7

**minimal** 233:24

**minute** 22:12
  133:5

**minutes** 212:11,12

**misapprehension**
  222:6

**mischaracterizes**
  45:8 46:1 83:11
  85:4 140:11
  159:10,23
  187:18 192:14
  194:23 195:13
  208:3 212:24
  213:22 226:9
  241:25

**Miss** 189:6

**missed** 176:15
  225:2,4,6

**missing** 135:10,16

**Mission** 2:11

**Misstates** 127:6
  165:14

**mistake** 64:9
  153:20
  154:1,7,12 233:9

**mistakes** 66:7 84:8
  129:22 130:2,4

**misunderstanding**
  145:5 222:24

**Mitch** 3:6 9:3
  100:23 120:24
  160:25 246:1

**mitch@eff.org** 3:7

**Mitchell** 6:19

**mix** 200:7

**mobile** 30:15

81:12

**mock** 148:4

**modern** 89:20
  100:14 101:12
  102:4,7,8
  103:9,21

**modernize** 102:11

**modernized**
  102:13

**money** 61:11,15
  115:8 128:16,18
  164:23 165:25
  166:25 167:10
  168:6 172:1,14

**monies** 59:12

**moniker** 37:12

**monospace** 90:18

**month** 59:8,17
  128:9 140:23

**monthly** 58:20,25
  178:24

**months** 59:9,18
  186:17

**M-O-O-C** 56:14

**MOOCs** 56:12

**mood** 104:20

**Morgan** 2:3
  6:13,15

**morning** 7:16,17
  198:25

**morphed** 26:6

**mostly** 24:5
  37:15,25 72:1
  124:5

**mother** 4:17
  121:11 122:20

**motivational**
  47:19

**move** 66:16 76:11
  94:1 149:7

**moved** 29:21
  223:10,20

**movie** 220:13

**moving** 103:2

**multi-online** 56:12

**multiple** 154:4
  194:25

**Munger** 2:11 6:17

**myself** 82:16 83:23

─────────
**N**

**name's** 7:4

**Nashville** 22:15,16

**National** 1:5 2:9
  15:17,18 148:18
  149:12,21

**natural** 231:19

**navigate** 195:4

**navigational** 195:1

**NEC** 127:3,13
  148:14 150:7

**necessary** 200:11

**Ned** 6:15

**net** 181:3

**Newton** 31:6

**NFPA** 6:18 15:18
  17:14 18:18
  20:25 21:7,11
  22:2 39:15,19
  43:16,20 44:3,16
  45:4,18,22 46:7
  47:12
  51:3,13,14,17,24
  52:11 53:2
  63:20,25
  72:16,21,24 73:5
  75:25 77:4,18
  81:1 90:5,13
  95:13 102:15
  103:13 105:22
  116:3 118:10

119:11 127:3,12
  133:11 134:19
  135:16 138:17
  142:22 143:1
  145:3 148:15
  149:14 163:18
  164:3 165:5,12
  178:14,17
  192:20
  197:19,22
  207:15 209:2
  211:13,14,18
  212:13,21 213:6
  214:20
  215:5,11,20
  216:3 223:17
  237:18,22,23
  238:5,12,15,25
  240:13

**NFPA.NEC.2011**
  126:22

**NFPA's** 118:17
  148:14 216:6
  240:12 241:6,19

**NFPA-sourced**
  144:22

**nice** 32:8 105:8
  176:15 224:1

**nine** 6:3

**nobody** 83:14

**nodding** 8:9

**Nods** 62:21

**none** 49:5 58:11
  115:7 145:1

**nonprofit**
  105:11,18

**non-profits** 61:12

**nonpublic** 107:16

**nonresponsive**
  76:12

**Nope** 27:10,14
  39:2 172:25

Capital Reporting Company
Malamud, Rebecca  11-13-2014
Page 23

**normal** 225:24

**North** 1:20 6:9

**Northwest** 247:1

**note** 60:11
135:10,16 221:4

**noted** 135:2 138:5

**notes** 44:20,21,24
75:1 135:11
234:15,18
239:24

**nothing** 7:12 109:5
130:13 176:11
180:3 189:7
195:8 223:18
243:3,6

**notice** 1:19 208:1

**notices** 108:7,13
178:14

**November** 1:14
6:8 244:17 247:7

**Nowadays** 30:13

**Nowhere** 163:24

**NW** 2:4

_____

O

**oath** 170:10

**object** 67:21 94:1
187:17

**objected** 42:15

**objecting** 101:5

**objection** 40:16
42:1 45:7,25
69:18 73:13 77:6
83:10 85:3
92:4,23 93:9
94:22 98:19
110:13,25
111:17 113:20
117:17 127:5
130:6,16
132:17,22

140:10 141:16
149:22 156:19
159:9,22
160:22,25
161:8,14,19,24
165:14 168:12
169:12 170:13
177:19 181:1
184:18 187:23
188:13
189:17,23
190:5,12,20
191:8,21
192:4,12 194:22
195:12 201:16
202:18
203:11,15,20
204:3,6 205:11
206:4 207:10
208:2 210:2,3,10
212:23 213:21
214:10 215:15
216:23 217:3,10
219:24 223:6
224:16,20 226:8
227:4 231:17
234:3,12 235:5
237:12,24
238:18 240:21
241:13,24
242:6,16,24

**objections** 160:5
188:20 189:2,11

**obtain** 107:24
118:9

**obtained** 238:14

**obviously** 85:18

**occasion** 200:17

**occasions** 9:11
71:17

**occurred** 54:21

**occurring** 175:16

**o'clock** 185:15

**OCR** 129:23 130:5

158:18 160:20
161:7,12,18
162:2

**OCR-related**
130:1

**October** 154:20
155:2 173:12

**official** 78:25

**Off-the-record**
86:25 97:9 147:2
177:7 220:25

**oh** 66:3 89:14
97:11 121:4
146:8 148:8
227:9

**Ohio** 24:4 28:3

**okay** 7:24
8:11,20,24 9:20
10:11,15,21
11:4,14 12:15
13:23 14:7,19,24
15:6 16:4,9
17:14,19,22
18:15,18,23
19:1,22,25 21:17
23:8 24:12
25:1,17,19,20
26:3 31:9,25
32:6 34:3 35:23
38:15,24 40:8
41:10
42:10,13,19,24
43:5,7 44:22
45:1,2,21 46:25
51:13 52:15,23
53:14 57:3 60:12
61:24 62:20 65:9
66:12 67:9 69:25
71:17 72:23 75:6
76:13,14,23
77:11 78:23
79:15 87:8,21
90:3 91:21 92:12
93:15,25 94:7
96:20 97:11

98:12,17,24
99:9,24 100:6
102:9 103:24
106:7 107:25
108:11,17
110:18 113:24
114:15,23
115:2,11,19,23
116:2 120:11
121:15
123:1,14,18
124:8 125:18
126:12 127:7,25
129:4,10
130:21,24
131:18,20
133:18,22
134:3,4,17
135:18,23
136:13,20
137:8,18
138:3,15 140:12
141:9 142:7,22
150:6 156:3
159:15 160:20
162:6 168:25
169:19,25 170:7
173:22 175:11
181:6,11,18
182:6,10,15,22
185:24 192:23
193:25 194:8
196:22
198:8,10,14,16
209:1 210:23
211:20 221:6,16
227:8 230:16
232:13,21 238:7
240:6,14 241:3,6
242:4 243:7

**old** 38:20,22 40:19
54:3 125:23

**older** 234:21

**oldest** 40:22,24
43:7

**old-fashioned**

Capital Reporting Company
Malamud, Rebecca  11-13-2014
Page 24

101:17

**Olson** 2:11 6:18

**one-off** 101:13

**ones** 14:16 74:1,16
124:23 125:2
200:5

**ongoing**
105:10,15,18

**online** 24:5 26:2,4
37:12 56:12 60:4
125:11,12,19
215:10

**on-site** 78:21

**onto** 14:23

**open** 29:21
65:10,22 79:17
86:4 122:1 139:8
199:6,9 200:4,5

**opened** 79:8,15
86:7 176:11

**open-source** 21:21
65:15

**operates** 36:10

**opinion** 205:9

**opposed** 8:9 91:24
92:8 103:10
114:6

**Optical** 130:3

**oral** 244:9

**ORC** 160:17

**order** 8:7 20:6
69:3 72:5,17
84:5 98:11 99:6
235:15

**ordinarily** 16:5

**Oregon** 1:13,21,23
6:10 7:6
10:17,19
28:5,7,8 29:21
56:2 144:9

244:1,5,18

**O'Reilly** 24:10
61:2

**Orford** 28:8

**organization**
21:15 44:3 61:16
213:9 214:3,7,14
217:8,19 224:7
229:10,14

**organizations**
213:19 218:2

**organized** 122:12
229:11

**original** 66:9,10
67:5,16 77:25
125:6 140:14
150:3 151:24
157:1,15,23
178:10 196:14
199:16 201:19
222:17 224:4
235:2,21 236:5
237:6,9
246:8,12,20

**originally** 91:25
115:1

**originals** 153:2,5,8

**others** 29:16 37:18
38:1 48:4 51:4
103:13 156:7
168:25 170:5
194:21

**otherwise** 121:24

**outline** 67:2

**outlined** 80:1

**outlines** 65:23
66:5,8
79:18,20,24

**output** 78:1
164:22

**outside** 27:15
38:19 107:3

162:15 242:18

**overall** 218:8

**overhead** 167:23
168:6

**overlooked** 120:24

**oversight** 118:8

**Overview** 4:15
87:7

**owner** 11:14 24:15
28:22 29:2,4
108:1

**ownership** 61:7

**owns** 36:19

_____

P

**p.m** 97:7,19
100:10 103:4
104:4 126:8,20
131:21,22,24
133:4,7
145:12,13,15
147:9 149:9
154:20 155:2
158:13 173:12
185:25
186:1,3,10
193:13 230:18
232:14,15,17
243:10

**p.r.o** 186:18

**Pacific** 6:3

**pack** 166:20

**page** 12:4,5,7,18
60:6 87:11,14,17
91:15 97:18
98:10,11 99:5,6
100:7,8
121:21,22
123:15 124:4,22
126:18
127:19,21,22,24
129:12,16,17
132:8 133:15,20

136:20 142:5,13
147:14,22
150:14 158:11
173:18 176:8
193:18
196:17,18
198:1,4 208:25
218:11,16
236:9,11,25
246:8,13 247:8

**pages** 12:20 87:7
244:10,15 245:4

**paid** 35:2,17,21,24
48:19,21
49:2,7,13,19
50:10 59:17
60:16,22,25
110:22 119:2,7,9
179:22
180:9,12,21
181:12 182:7,23
184:5,16,23
185:2 191:10

**papers** 202:6

**paragraph** 60:11
103:7 128:7
129:13,21
135:1,18 138:23
142:14 147:18
148:1,17 156:23
158:15 162:6
164:20 165:5
167:14
173:18,23
176:14 189:22
190:4,9 192:21
193:19 212:8
218:16,17,20
223:12
224:21,24

**paragraphs** 164:1
176:14

**parentheses**
100:14
139:2,23,24

Capital Reporting Company
Malamud, Rebecca  11-13-2014
Page 25

148:20
149:12,14
156:24,25
174:11 186:21

**participants** 40:15
41:3,7 47:3,8,10
49:11,17 50:8
51:7,18 53:6
74:14 199:21

**participated** 40:25
43:12 49:1

**participating** 52:9

**particular** 23:20
51:24 53:1
71:14,19,24
72:4,13 88:5
90:9 96:15
98:5,12 121:20
136:19 140:7
166:14 223:2

**particularly** 91:4
103:11,20

**parties** 1:25
118:25 244:13

**part-time** 38:10
39:15

**past** 78:5 79:2
118:1 151:14
232:24

**paths** 67:2 79:25
82:25

**patting** 176:22

**Pause** 112:24
126:12 169:14
194:6 215:17
217:12 218:4
227:8

**pay** 47:3 140:23
162:19 183:19
184:8 216:7

**paying** 112:4,8
158:19 162:8,13

215:24 223:1

**payments**
58:16,18 59:1

**pays** 47:7

**PDF** 222:16 224:4
229:18,22,25
230:12
231:12,16

**PDFs** 222:17

**pending** 53:12

**Pennsylvania** 2:4

**people** 41:18 42:11
46:23 61:22,23
74:7 94:20 95:3
113:8
114:7,19,24,25
115:21 138:9
143:13 177:4
201:13 215:23
216:2,3,7,21,22
234:1

**per** 59:8,17

**percent** 30:2,5,8
33:3 41:5
174:9,24 175:16
181:16,21
182:3,5
183:7,11,15

**perfectly** 66:23

**perform** 82:22
141:3 227:3

**performance** 47:6

**perhaps** 8:3

**period** 24:12 122:6
226:23 237:5

**permission**
109:6,9,13,19,23
112:21 113:3
114:18 115:8,15
118:9,12,16,20
231:23 232:2,6
238:14,24 239:3

**permitted** 161:1

**person** 40:24 43:7
52:9,22,25 82:14
83:19
84:13,16,17,20,2
1 105:22
168:17,19
169:10 171:21
178:4 202:8

**personal** 202:21

**personally** 151:22

**personnel** 51:25

**persons** 40:23
41:13 43:15,19
44:2 45:16 46:12
49:5 52:9,19
53:1 73:25 82:14
83:19 95:19,24
107:10 108:4,12
119:20
143:14,20
168:10 169:3
178:18
241:10,22

**person's** 38:11

**phone** 2:20 6:22
9:13,23,25 10:4
132:25 202:8
232:24 243:5

**phonetic** 38:12

**photograph** 113:8

**photographer**
37:1 55:22

**photographers**
38:2 113:6

**photographs**
114:1 166:19

**Photography**
37:20

**Photoshop** 55:8,9

**photo-type** 78:10

**phrase**

42:4,8,17,18
90:2 92:18

**physical** 141:6

**pick** 47:15 71:9

**pictograph** 137:22
138:8

**picture** 196:8
236:18

**piece** 67:2 186:25
190:18 191:1,11

**pieces** 200:23
201:1

**pixel-by-pixel**
92:9

**pixels** 83:18

**placed** 235:17

**plaintiff** 228:13

**Plaintiff/Counter-
Defendant**
2:2,9,14

**plaintiffs** 1:8,19
8:3

**Plaintiff's** 142:8

**plan** 144:4

**planning**
219:14,18
227:11

**platform** 105:8

**platforms** 65:25

**plays** 61:16

**please** 6:11,23
7:18 8:13 31:4
49:22 50:3,22
60:18 65:8,12
129:12 148:21
151:22 155:7
191:3
246:6,12,14

**pleased** 176:24

**plowing** 164:21

**plus** 101:9 186:21 226:20

**point** 6:21 11:6,8,9,11,15,22,24 12:16 16:3,15 19:7 20:9,11,18,20 21:22 26:22 27:23,24,25 28:4,9,12,20,22,25 29:4,6 30:19 31:23 32:23 35:2,17 36:4,9,16,19 37:7 38:4,8,16,25 39:4,7 40:4 45:5 47:3,7 48:1,19,21 49:8,13,19 50:10 58:16 59:12 60:16,22,25 61:11,15 62:24,25 65:7,10 66:24 67:11 68:1,5 79:5,12 82:15 86:13,20 87:23 89:18,23 90:10,22,25 91:2,23 92:14 110:1,6,12 112:12,20 116:10,13,18 118:3,22 119:2,7,9,19,25 131:6 135:7 138:16 140:19,22 141:3,11,14 142:23 145:18,23 146:12 154:7 160:7 163:8 175:15 178:22 179:16,20,23 180:6,9,12,14,21,25 181:12,16

183:1,12,20 184:1,5,9,16,23 185:2 228:16,21 229:4,20 231:10,13,22 232:1 234:11 235:3,10 237:1,18,19,22 240:7 241:4,21

**PointBStudio.net** 36:8

**pointing** 135:7

**policies** 118:23

**polygon** 82:24

**polygons** 80:1

**poor** 67:16 89:7 135:9 139:9,16

**Port** 28:8

**portion** 29:10 32:23 33:1 41:3 155:5

**portions** 191:19

**posed** 215:10

**position** 38:15 108:14,15,17 193:23 194:13 241:20

**positive** 142:17

**possession** 17:10,12 125:10

**possibility** 144:15 146:16,20 202:16,23

**possible** 67:24 69:16 72:14,18 96:11 105:23 116:5 117:21 124:14 143:4 146:21 151:15,19 153:18 154:2,3 202:25

225:20,22

**possibly** 67:14 117:8 162:2

**posted** 64:16 95:24 114:16 144:23 145:4 224:10

**post-February** 128:17

**potential** 171:2,6 172:23

**practice** 74:12,15 191:13 192:2 223:4 225:24 235:1 237:4

**precise** 153:18

**precision** 136:7

**predates** 24:10

**predominant** 22:9

**prefaced** 215:7

**prepare** 19:7 20:1,6

**prepared** 12:15

**preparing** 19:16

**present** 1:24 9:17 41:12 179:21 186:6 187:3 246:13

**presentation** 76:7,22,24

**president** 24:18 58:14

**presume** 156:10,14 170:15

**presumptuous** 151:4

**pretty** 65:9

**previous** 128:8 220:17

**previously** 139:1

**primarily** 15:3 16:23 17:1 22:20 27:4 34:17 163:16 199:12 220:8

**primary** 21:22

**print** 27:2 30:13,17 91:17 115:3

**printed** 91:15

**Printmaking** 23:25

**printout** 87:5

**prior** 12:12,24 34:15 35:3 128:22 138:24 151:18 168:3

**PRO00005095** 212:2

**PRO00026043** 208:19

**PRO00042295** 221:5

**PRO24876** 132:10

**PRO24979** 193:13

**PRO24984** 236:10

**PRO25947** 154:21

**PRO26120** 147:10

**PRO42289-01** 126:8

**PRO42317** 186:11

**PRO4234** 97:8

**probably** 43:9 53:13 90:1,2,7 115:10 117:4 118:2 120:23 123:22 130:12 131:5,7,17 135:16 138:4 140:12 180:4 181:2 182:18

Capital Reporting Company
Malamud, Rebecca  11-13-2014
Page 27

185:21 209:6 228:4

**problem** 75:13 175:19 176:2 226:22

**problems** 67:22 129:5

**procedure** 110:5,9

**procedures** 79:5 107:9 118:23

**proceedings** 244:9,11,15

**process** 39:24 64:11 66:9 68:24 69:4 80:5 81:3,15,23 86:12 94:8 107:5 157:11 161:7,18 209:16 222:19 233:8

**processes** 174:7

**produce** 32:10,14 65:19 91:2

**produced** 13:15 19:11,14,18 122:19 123:6,9 160:7 179:1,5,8,9,12 200:18

**product** 21:20,21 48:15 64:13 75:8 79:16 216:6,20 218:8 236:3

**production** 12:19,24 65:4 135:20 136:15 173:19 174:4

**Productivity** 24:5 26:2,4

**professional** 227:1

**professionals** 200:9 201:7

**professor** 75:9

**proficiency** 74:11

**profit** 32:19

**program** 15:12 20:14,19 36:12 38:18 39:10 40:15,23 41:1,4,15 43:16,20 46:22,25 47:4 48:20 49:18 50:9,16 52:20 54:2,23 55:1,7,17 56:11 57:12 59:4,11,16 65:17,18 66:18 74:1,8 83:16,25 84:5 121:21 123:21 163:7 199:22 201:14 218:23 219:6,15,22 220:3,7,11

**programmer** 38:17

**programs** 22:18 23:24 220:15

**progress** 156:1 186:19 188:2 214:22 219:25 227:17

**progressed** 203:6

**project** 39:23 41:18 95:3 122:4 143:3 167:18 197:14,18 207:8 211:15 212:18,21 213:11 214:2,21 215:9,23 216:2 217:9,21 218:1 219:5,11 220:12 223:2,3 227:24 233:14

**projects** 219:23

**promptly** 72:25 73:6

**proofread** 67:7 75:16 77:22 84:7,9,14,17,22 85:14,20

**proofreading** 64:8 66:5,8 75:18 79:7 84:25 85:8

**proofreading's** 79:19

**proper** 158:8

**properly** 176:13

**property** 16:3 112:17

**proposals** 170:8

**Protection** 1:5 2:10 15:19

**protocol** 110:5

**provide** 34:10,22 178:16 230:11

**provided** 62:25 63:4,8,14 107:1 123:8 145:18 150:8 168:10,19 169:4 171:14,17 172:15 179:3,17

**provider** 237:11

**provides** 31:23

**providing** 34:14 159:20

**proving** 135:20

**Pruitt** 38:12,25 39:14,18 56:1

**Psychiatric** 106:14

**PT_EDD34422-00 001** 173:13

**PT_EDD34456-00 001** 142:6

**PT_EDD34460_0 001** 121:14

**Pub/US** 103:14

**public** 6:6 47:15,23 48:17 49:13,19 50:10 63:9 64:1 93:20 94:9 109:3 114:6 177:24 202:14 205:5,8,10,17,22 206:2,14,22 209:17,22 210:9 242:10

**Public.Resource** 20:12,16,18 31:2,18 32:7 33:5,8,11,14,17, 21,25 34:1,10,14,20,23 35:1,17,24 48:22 49:7 57:24 58:9,13,15 59:2,6,13 60:16,22,25 61:17,25 62:3,7,12,20,23 63:23 64:12,14 68:3,13 69:15 102:25 106:25 107:12,20 112:4,8,11,16 116:3,15 118:16 119:7,9,15,21,23 124:20 130:15 141:23 145:24 146:3,12 153:21 154:8 160:3 162:23 163:9 168:11,19 169:5 170:12 171:3,15,18,22 172:2,15,24 177:16,17 178:1,5,18 179:17 180:21 181:12,20

182:24 183:19
184:16,23
189:10 195:21
197:8 205:12,21
220:14 229:5,8
230:11 232:5
235:20 237:17
238:6 241:8,21

**public.resource.or**
**g** 1:10,17 3:3
246:4 247:5

**Public.Resource.o**
**rg** 6:21 64:16
170:9 177:12
193:22
194:13,20
195:20 196:4
241:2,4,5

**Public.Resource.o**
**rg's** 48:18 59:24

**Public.Resources**
119:3 145:19
178:23
179:20,22
180:6,9,12,24
181:15,22
182:2,8 183:6,10
184:5,8 185:2

**Public.Resource's**
124:10 210:7
224:10 229:12

**Public.Resources.**
**org** 6:7

**publication**
124:19 227:24

**publications** 22:3
163:18

**Publicly** 95:14,15

**published** 94:15
204:1,23 224:6

**publisher** 61:3,4

**publishing** 30:17

**pulled** 137:9

**pumping** 186:18

**purchase** 94:21
95:5

**purchasing** 96:2

**purely** 173:19
174:3

**purpose** 22:6
215:23

**purposes** 64:24
93:22 153:9
201:2,15

**pursuant** 1:19

**putting** 113:25
215:10

———————
Q
———————
**QA** 152:10 158:18

**quality** 64:8 67:16
78:4,16,20,23
79:2,4 115:18
150:3,8
152:14,17
154:10 215:3,6
233:5

**question** 8:18 33:6
49:14 50:4,6
51:16 61:18
69:18 73:14
77:12,13,15
94:4,23 95:1
101:14,24
109:15
111:23,25 114:8
128:8 129:9
144:25 145:7
146:9 159:24
160:1 181:2
188:15,24
189:6,7,8
194:9,11
195:18,19
204:13,14,17,18,

20
206:7,8,9,11,17,
19 214:11
217:15,17
218:10 225:11
237:20
238:22,23
240:24

**questioning**
241:6,19

**questions**
8:2,4,9,12,17
21:3 32:12,18
60:14 87:19
100:24 101:2
128:2 148:10
198:9 199:1
200:17 225:9
228:3,6,8
232:11,23
236:20 243:2
246:14

**question's** 53:11

**queue** 150:20

**quick** 60:14 96:18

**quicker** 185:22

**quickly** 65:2

**quite** 96:11 174:25

———————
R
———————
**radar** 212:14

**raise** 39:2 164:23
165:25 167:10
203:7 217:6,17

**raising** 166:25
167:22 168:5

**range** 43:2 65:25

**Rare** 36:25

**rate** 145:22 146:24

**rather** 69:17 71:15

**re** 44:17 246:4

**reach** 101:20

**reaches** 222:19

**reacting** 104:19

**Reaction** 142:17

**reading** 101:4,9
164:1 208:9
209:4 210:6
242:22,25

**ready** 67:11

**real** 207:23

**realize** 223:24

**realized** 108:6

**really** 25:13 29:20
100:5,18 113:7
125:23 128:16
130:8 139:9
151:19 152:9
169:18 174:15
212:15 215:12

**re-ask** 95:1

**reason** 8:21 45:21
46:6 67:15 72:8

**reasonable**
113:15,16 114:1

**reasons** 99:16
215:14

**Rebecca** 1:17 4:3
6:4 7:10,20
25:18 97:6 101:6
245:3,18 246:7
247:6

**recall** 9:25 10:3
15:15 20:1 50:23
51:1,5,6 71:8,10
72:15,19,23 73:8
87:23
88:11,12,18
90:16 91:6 95:8
96:12,15 102:14
105:25 106:4
116:22
117:9,11,12

Capital Reporting Company
Malamud, Rebecca  11-13-2014
Page 29

139:17,19
140:3,4
151:16,19
153:16,24,25
167:5,7 169:7,9
170:6
177:9,13,14
182:1 195:24
196:3 197:22
199:7 208:4
239:6 240:15
241:18

**receive** 22:17
23:11,14 59:5
61:11 106:24
109:9 191:6
229:4,8

**received** 22:21
23:17 56:5 57:7
59:1,12 61:15
62:9,19 64:12
68:12 70:6
109:13,19
159:15,18
160:1,3 179:20
190:19 207:25
224:12

**receiving** 158:25
160:10 232:2

**recently** 31:13
120:8

**Recess** 53:19
96:22 133:5
145:13 186:1
232:15

**recognition** 130:3

**recognize** 11:23
97:14 121:16
126:13,14
132:12,14 142:8
147:10 148:12
208:19

**recollection** 106:8
158:24 164:7
167:11 169:21

209:3

**recollections**
209:8,11

**reconstruct** 44:18

**record** 6:3,12 7:19
53:18,21 60:19
96:21,24 100:19
101:5 131:21,24
133:2,4,7
145:12,15
185:25 186:3
221:4 232:14,17
243:8 244:7

**recorded** 8:5

**record's** 198:5

**recreate** 102:10
201:18

**red** 1:20 235:13,19

**redirect** 240:22
242:1,17

**redraw** 97:21
99:10,14 101:19

**refer** 98:24 167:17
197:16 229:1
241:3

**reference** 97:25
134:18 135:12
137:8,14 147:19
148:13 242:15

**referenced** 24:13
148:13 177:2
196:7

**references** 123:16
207:21 230:9

**referencing**
147:20 155:24
164:16 171:9
188:18 198:6
236:25 239:2

**referred** 123:4

**referring** 52:5
88:6 104:17

105:14,17 135:5
139:4 142:22
187:6,9 199:19
205:9 240:20

**refers** 98:13,17
114:11 165:4
236:14

**refresh** 158:23
164:7 209:3

**Refrigerating** 1:6
2:15 7:1

**regard** 64:3

**regarding** 10:1
20:5 48:23 62:19
77:7 79:1 87:25
96:6,9,13 105:21
106:1,11,14,25
111:1,3 112:16
117:7 146:23
162:18 167:9
171:21 172:23
177:10,15,23,24
178:4 192:1
194:12 195:25
230:7,12 237:4
246:10

**registrations**
203:14,19

**regularly** 210:1
213:18 219:13

**regulation** 242:15

**Regulations** 50:17
52:6 80:25
123:23

**Rehn** 2:13 4:5
6:17 97:10 131:7
198:13,17,21
201:20 202:20
203:12,17,23
204:8,25 205:15
206:6,25 207:12
208:5,11,16
210:5,13
211:9,11,20,24

213:3,25 214:12
215:18 216:24
217:5,13,23
220:1,19
221:1,13,16,17
223:11
224:18,22
226:12 227:7
228:3 243:3

**reimbursed** 49:2

**reinterpreted**
100:13 101:11

**reinterpreting**
139:15

**related** 14:11,16
17:11 47:24 48:7
88:23 93:7 116:3
129:6,23 130:5
133:12 171:23

**relates** 30:14
122:3 194:11

**relating** 14:5

**relation** 50:16

**relationship** 192:8
205:2 207:5

**release** 48:22 63:9

**Released** 48:17

**relying** 219:21

**remember** 19:3
36:23 51:21,23
72:13,21 73:7,10
88:17,20 102:18
106:6 137:12
141:7,18 166:22
171:8 177:20
178:2 208:8,9
213:1 242:5

**remembered** 72:2

**remembering**
106:7

**reminding** 152:14

Capital Reporting Company
Malamud, Rebecca  11-13-2014
Page 30

**remove** 235:15

**renamed** 124:15

**render** 175:5,13
176:11

**rendered** 176:8
235:4

**rendering** 176:13

**Renschler** 24:10

**repeat** 25:25 33:6
214:11

**repeating** 80:17

**repetition** 65:1
74:12

**replace** 67:19
85:24
86:2,14,18,21
138:24
174:5,18,20
175:3 225:1
235:3

**replaced** 67:17,18
85:24 86:6
174:19

**replacement** 174:7

**replacing** 175:23

**replica** 103:10

**replicate** 111:13

**replicated** 14:5
111:11

**replicating**
116:8,14

**replication** 135:15

**reported** 3:11
244:8,11

**reporter** 1:22
7:5,7 8:5 37:4
68:18 77:10
86:16 111:2
139:20 148:22
157:17,24 161:2
172:8 185:7

194:7 203:21
204:5 208:13
220:22 244:5

**Reporter/Notary**
246:18

**reporter's** 8:7

**Reporting** 7:6
247:1

**reports** 219:25

**represent** 37:24
38:2 200:20

**representation**
92:9 238:1

**represented** 37:21
83:6

**representing** 7:6
8:25

**represents** 37:1,3

**reproduce** 67:16
88:8,14,19 90:24
91:1 101:23
102:3 116:9
138:7

**reproduced** 102:2

**reproducing** 69:12

**reproduction** 70:2

**repurpose** 71:4

**repurposed**
80:13,14,22

**request** 118:16
119:13

**requested** 103:1
244:14

**requests** 12:19,23
13:2

**required** 12:6,10
19:3,11 200:23
207:17 226:3,6
227:2 235:9

**reside** 10:16,17,18

**residence** 10:25

**resolution** 70:9,12
80:11 136:3

**resolved** 175:19

**Resource** 49:13,19
50:10 177:24

**resources** 6:6 64:1
207:16

**respect** 62:22 75:2
81:23 140:5
191:14 201:7

**respected** 144:3,7

**respective** 1:24

**respond** 8:8,16
190:24

**responded** 99:24

**responding** 156:12
210:16

**response** 13:16
19:18 32:14
237:3 240:17
241:18

**responses** 128:3

**responsibilities**
29:3

**responsible** 246:9

**responsive** 8:18
13:2 15:7 206:7

**rest** 149:14 155:22
164:23

**Restate** 188:15

**result** 92:15
112:13

**retain** 178:9

**retained** 34:10

**retype** 83:15

**retyping** 83:20,24

**reuse** 80:11 93:21

**revenue** 29:13,23

30:3,8 31:23
32:7 179:19,22
180:5,14
181:7,19,21
182:17,20 183:7

**revenues** 181:16
182:4 183:1,11
184:1

**review** 19:13,17
21:9 32:9 139:17
141:21 142:18
143:5,10,21
144:1,5,16,17
174:21 229:7
244:14

**reviewed**
12:9,12,23
144:22 145:3
233:13

**reviewing** 19:20
20:1 51:9 233:8

**ridiculous** 89:9

**Roadmap** 87:7

**role** 20:8 58:12
61:13,17

**Roman** 90:17

**room** 6:12 9:19
242:22 243:1

**root** 66:20

**Rose** 143:22
144:1,5,9

**rule** 196:22

**rules** 198:25

**ruling** 146:16,19

**run** 105:11

**runs** 36:16 105:18

**rural** 36:11
40:10,25
41:14,24 42:5,25
43:12,15,22 44:2
45:17 46:12,21

47:10 48:25
49:11,17 50:8
51:7,18,25
52:10,19 74:14
87:5,11 107:10
122:4 123:21
124:20
125:16,20,22
167:17 219:7,10

**RuralDesignColle
ctive.org** 36:14

**rush** 150:22
151:10,11,18

————————
S
————————

**safer** 109:3

**safety** 47:23 49:6
50:20 109:3
114:6 200:9,22
201:6 209:18,22
210:9 227:1
242:10

**Sal** 172:6,9

**S-A-L** 172:9

**salary** 128:10
167:23 168:6

**San** 2:12,18 3:5
57:5 246:2

**Sandbox** 122:12
123:4,6 125:18

**save** 65:23 79:22
80:19 85:21

**saw** 70:25
137:11,16
222:13 236:16

**scale** 80:10

**scaleable** 65:20,21
70:12 81:11,16
91:12,20 92:6
216:14

**scaled** 92:7

**scan** 67:16 136:3

199:16 201:19
236:6 237:7

**scans** 89:7

**scared** 212:16
213:10,19
214:20,25
215:5,7 217:8,20

**scary** 212:21
214:3,4

**scenario** 174:11

**Schedules** 70:24

**scholarship** 47:9

**school**
22:14,15,22,23
23:7,25 41:21
43:10 54:8,13

**scientific** 56:21
57:1

**scientists** 200:14
201:10

**scope** 240:22,23
242:1,17,19

**screen** 66:10 78:3
130:11 176:5

**screens** 78:2

**seal** 177:12,17,25
193:22
194:13,18,20
195:20
196:4,7,8,11,13,
14 197:6 244:17

**search** 13:1,5
14:20
15:6,10,14,15
52:13,16 67:18
85:24
86:2,14,17,21
174:5,17 175:3
225:1

**searched** 14:17
15:16,22,24
16:19 17:8

**searches** 15:11
19:21

**searching** 173:1

**Sebastapol** 61:4

**second** 2:17 19:2
59:16 60:11 66:3
97:18 103:6
127:19 133:2,14
138:23 142:16
147:18 193:18
196:17 223:12
224:21 227:8

**Secondly** 159:6

**second-to-the-last**
236:9

**section** 135:13

**sections** 136:21

**secured** 169:2

**seeing** 89:21
236:18

**seek** 118:12
191:25

**seemed** 240:3

**seems** 50:25
102:10 134:14
192:24

**seen** 12:1 60:2
90:20 203:8
222:22

**segment** 114:7

**select** 79:18

**self-employed**
26:5,22

**self-taught** 22:20
23:1 56:10

**sell** 24:19
115:4,14,19
215:20

**selling** 216:3

**seminars** 79:1

**send** 14:4,12
57:22,23 151:24
178:22

**sending** 128:10
151:9

**sends** 222:21

**sense** 44:10 135:8
136:6 204:11
205:3,4

**sent** 13:20 14:8
15:4,13 68:3
99:15 100:22
101:10 151:17
193:19 203:24
204:21 208:24
213:8

**sentence** 102:20
103:6 127:10
134:18 142:16
151:21 162:16
165:23 195:9
210:18
218:17,18,19

**sentences**
210:17,25

**separate** 11:11
26:10 64:20 78:2

**separated**
10:21,24 115:17

**September**
147:16,23
163:9,12 244:24

**series** 8:1 87:24
97:14
126:6,10,14
132:7,12,16
134:19 142:9
147:7,11
154:18,23
173:9,15
193:11,15

**server** 17:6 48:18
118:7 124:10,11

Capital Reporting Company
Malamud, Rebecca  11-13-2014
Page 32

229:12

**service** 33:10

**services** 30:12
34:11,14,23
35:3,18 36:2
38:18 120:1,3
179:17

**setting** 78:10

**settings** 136:9

**seven** 149:15

**several** 111:20
123:16 222:22

**shapes** 80:1

**shares** 171:12

**sheet** 245:8 246:12

**shift** 55:3

**Shoemaker** 38:12

**short** 145:9 185:22

**Shorthand** 1:22
244:5

**shot** 130:11

**sic** 151:6

**signature**
246:8,10,13
247:25

**signed** 245:8
246:12

**silly** 102:10

**similar** 52:3 80:18
122:9

**simple** 181:18

**single** 71:11 142:5
151:23 168:18
169:4,10

**single-page** 186:9

**sit** 198:11

**site** 24:8

**sits** 62:4

**sitting** 150:20
182:1

**situation** 114:21

**six** 19:4 87:7
186:17

**Sixes** 10:17,18

**size** 92:7

**skill** 46:8 74:1,10

**skills** 21:16 23:3
44:13

**slight** 174:8

**Slightly** 123:15

**SMACNA**
106:2,6,18

**small** 70:11 123:25

**snafu** 174:8

**social** 209:7

**Society** 1:3,6 2:14
6:25

**software** 125:23
233:16,19

**sole** 11:14 28:22
119:17

**solution** 176:25

**solutions** 30:18

**somebody** 114:15
115:2,9 223:1

**Somehow** 104:12

**someone** 143:24
196:14

**somewhere** 78:5
239:9

**son** 9:19

**sooner** 71:14

**sorry** 10:14 16:7
51:16 54:12
75:12 121:4
134:1 144:3
145:8 148:8

149:17 153:6
155:19 174:1
175:9 192:5
204:12 221:13

**sort** 21:17 25:21
34:10 47:1 55:5
59:5 64:24 73:21
88:24 124:6
157:2,15 200:6

**sorted** 66:15 73:24
81:25

**sorting** 74:18

**sorts** 104:14,23

**sought** 109:23

**sound** 180:22

**sounds** 150:19
182:19

**source** 32:7 65:10
91:13 156:23
171:6 182:3
192:16

**sources** 191:15

**SP30** 148:20

**space** 25:22
31:14,16 141:6

**SPALDING** 2:16

**Spaulding** 6:25

**speak** 10:6 20:4
53:10

**speaks** 159:10

**specific** 51:14,17
119:12 132:23
153:24 181:6
209:9

**specifically** 72:19
81:12 119:5
202:7 227:23

**speech** 213:24
233:16,19

**speeches** 202:5

**spell** 31:4,7 65:12
84:2 170:2

**spent** 19:20
212:11,12

**spirit** 140:13

**split** 29:14,23 78:3

**spoke** 199:4

**sponsored** 20:19
48:20

**spreading** 202:1

**sprint** 47:14,22,25
48:3,6 49:2

**ss** 244:1

**staff** 226:7

**stamp** 221:5

**stamped** 208:19
212:2

**standard** 15:1
47:14,22,25
48:3,6,14 49:2
50:25 52:17
67:18 75:23,25
77:22 80:23
81:17 88:11,12
91:3,6 98:3
134:23 153:11
178:11 216:13
217:8,20 224:12
229:17 230:12
235:16

**standards**
17:12,15,17,25
18:3,7,10,13,16,
19 20:22,25
33:23 34:4
39:15,19
43:17,20
44:4,12,16
45:4,18,23 46:7
47:12
48:7,10,13,23
49:7 50:20
51:7,11,14,18

Capital Reporting Company
Malamud, Rebecca  11-13-2014
Page 33

52:11 64:15
72:11,16,25 73:6
77:4,18 80:22
89:21,25 90:6,13
91:7,24 95:4,13
102:14,15
103:12,15,21
107:6 114:6
116:3 134:24
166:13,14
177:4,6,12
178:14 186:24
192:20 194:20
195:3 197:23
199:5 201:23
202:16 203:18
207:7,9,11,17
209:12,16,17,21,
25 210:8 211:13
212:18 213:5
215:10,20,24
216:2,11,16
217:2,25 218:3
220:4
221:9,19,24,25
222:1,7,14,23
224:6 226:18
227:12,23
228:2,17,22
229:7,9,14,19
230:3,8,23
231:2,5,7,24
232:3,7 234:9,11
237:10 241:9
242:11,13,22

**standpoint** 173:20
174:4

**stands** 15:19 56:13

**start** 26:21 33:16
34:19 40:22
61:24 66:15
70:14 73:25 74:6
97:17 126:17
135:25 147:14
154:25 173:17
199:3 216:25

**started** 26:13
33:20 68:11
78:13 113:5
120:10

**starting** 6:12
64:11

**starts** 101:8,9
126:20 129:13
142:14 150:15
173:19

**startups** 31:12

**state** 1:23 7:18
22:16 244:1,5,18

**stated** 162:1

**statement** 59:25
107:7

**statements** 4:13
202:14

**STATES** 1:1

**steal** 115:21

**step** 66:5 69:16
70:15 75:3 80:4
151:7 157:13
161:4 162:3
175:2,25

**steps** 66:2 233:5

**stipends** 47:5,7,11

**Stoltz** 3:6 4:7 6:19
9:3,4,8,18,23
25:18,21 40:16
42:1 45:7,25
56:14 60:7 69:18
73:13,16 76:11
77:6 83:10 85:3
87:20 92:4,23
93:9,25 94:22
96:19 98:19
100:19 101:1,6
110:13,25
111:3,17,22
113:20 117:17
121:1 125:24
127:5 129:8

130:6,16
131:2,12,15,25
132:17,22
140:10 141:7,16
145:8 149:22,25
156:19 159:9,22
160:5,22
161:8,14,19,24
165:14 168:12
169:12 170:13
177:19 181:1
184:18
185:5,8,14,19
187:17,23
188:13,20
189:2,11,17,23
190:5,12,20
191:8,21
192:4,12 194:22
195:12 198:14
201:16 202:18
203:11,15,20
204:3,6,12,17
205:11 206:4
207:10 208:2
210:2,10 212:23
213:21 214:10
215:15 216:23
217:3,10 219:24
221:11 223:6
224:16,20 226:8
227:4 231:17
232:11,20
234:5,16 235:7
236:19
237:12,24
238:18 240:21
241:13,24
242:6,16,24
246:1,5

**stop** 26:19 27:11
116:10,13,19,25
117:2,22

**store** 55:4

**stored** 157:1

**story** 155:9,16

156:8 169:11

**strain** 218:24

**Street** 2:11,17 3:5
246:2

**strike** 74:4 76:12
91:1 119:23
155:13 168:17
237:20

**stroke** 80:2

**struggle** 115:24

**students** 220:5

**studied** 23:21

**studio** 6:21
11:9,10 20:20
22:10 27:8
28:4,9,13,20
29:9 30:2,8,12
37:8 90:22 141:4

**studios**
11:6,8,11,15,22,
24 12:16
27:23,24 28:23
29:1,4,7 31:23
35:2 36:19
38:5,8,16 39:4,7
40:4 48:19,21
49:19 50:11
58:16
60:16,22,25
61:11,15 62:25
68:6 79:5 82:15
86:13,20
90:10,25 91:2
92:14 112:21
118:22 119:2,10
145:23 154:8
183:20
184:9,16,23
185:2

**stuff** 74:24 122:14
155:8 156:12
164:21 165:4
192:25 193:4

Capital Reporting Company
Malamud, Rebecca  11-13-2014
Page 34

**style** 89:18,24
90:10,21 91:23
92:14,18,21
100:13 101:11
103:9,20,21

**styles** 90:4

**stylizing** 88:1

**SU** 233:12

**subject** 117:10
132:20 166:11
167:3,9 168:2
186:14 195:25

**subpoena** 4:12
11:21,24 13:16
14:6,12,16
19:2,19 20:6
32:15

**substance** 167:11

**sued** 152:7 211:4

**suggest** 71:1

**suggested** 34:7

**suggesting** 174:17

**suit** 164:5

**Suite** 2:17

**summary** 60:1

**summer** 36:11
42:12 46:22,25
59:3,11,16,18
163:7,15 167:15
197:14 218:23
219:14,22
220:2,9,12,15

**superior** 216:6

**supervisor** 140:25

**supplemental**
59:25

**Supplementary**
4:13

**supply** 187:13

**support**

59:3,5,11,15
206:5 210:9

**supported** 175:1
205:13,16 206:5

**supports** 81:16

**suppose** 202:24
204:7

**supposed** 159:3

**sure** 18:14 20:23
21:2 34:25
42:17,20 44:6
45:14 54:13
56:6,7 65:24
69:3 84:5 85:7
90:21 94:8
100:15 102:12
110:6,19 120:7
129:8 133:16
134:15,16
137:23
139:1,5,11
145:10 148:21
151:22,23 152:9
153:1 164:2
167:1 169:2,6,23
177:5 183:21
185:17 198:13
207:22 225:7
228:1

**surmise** 95:9

**SVG** 67:21 75:4
79:8 83:21 85:21
86:6 89:19 90:24
127:17 147:19
163:16,17 164:3
174:7,10,19
175:5 176:10,11
178:11 189:1,15
192:18 224:9
225:1,7,19 229:3
233:6,8,12
235:24,25
236:12 238:8
239:1

**SVG/Math** 65:16

79:17 174:10
175:1,2,5

**SVG/MathML**
186:19
188:2,12,19
218:25 219:1

**SVG1.1** 65:23
79:22 80:9 81:3

**SVGs** 67:17 85:23
86:7 134:7
138:24,25
174:9,21,24
175:17
223:18,25
224:15,25

**swear** 7:8

**sworn** 7:11 244:6

**symbol** 137:22
138:9 175:8,23
176:12 236:17

**system** 24:6 31:13
32:1

—————

T

**T24** 197:14

**table** 135:13

**tablet** 55:10 66:21
82:8,12,20,21

**tag** 233:21,23
241:14

**taking** 6:9 80:8

**talk** 22:11 25:19
40:6 62:17 81:22
105:8 174:24
232:23

**talked** 9:13
19:9,10 121:3

**talking** 37:15
100:15 114:5
121:23 130:7
148:15 157:16
191:2 202:21

**talks** 213:13,16,18

**target** 41:20

**targeting** 81:12
86:18

**taught** 21:19 23:4

**teach** 55:11

**teaching** 55:15

**team** 120:16,18
241:14

**Tech** 22:16

**technical**
22:15,16,22
23:18 54:17 55:6
61:3 65:9 74:10
143:13 144:7

**technique** 78:4

**techniques** 14:20
199:14

**Technological**
214:22

**technology** 23:9

**tempted** 150:21

**ten** 11:1 18:24

**tend** 40:18

**terms** 15:10,16
90:1 205:4

**testified** 7:13
113:24 182:23
221:23 228:16
233:4 234:8,21
235:8 237:6
239:8

**testify** 7:11 8:21
11:6 12:15 19:7

**testimony** 45:8,15
46:1 83:11 85:4
127:6 140:11
159:23 165:15
168:20 170:10
187:18 192:14
195:11,13 199:7

Capital Reporting Company
Malamud, Rebecca  11-13-2014
Page 35

208:3 213:22
226:9 229:20
237:3 241:25
242:23 244:7,8
245:5,6

**TESTING** 1:3

**Texas** 65:18 75:9

**text** 67:6,7
79:20,25
83:2,5,8,15,20
84:4,10,17,20,24
85:1,12,15,18
86:8,15,18 91:24
130:12 155:5
160:4 208:23
226:11
233:16,19,22
234:8,10,25
235:2,3
239:5,15,25
240:3,7

**textbook** 227:19

**Thane** 2:13 6:17

**thane.rehn@mto.com** 2:13

**Thank** 7:3 105:7
228:13,15 232:9
236:19 246:15

**Thanks** 232:21

**that's** 8:10 9:21
27:20 36:25 37:2
40:9 44:18 52:23
56:20 58:22 61:9
65:25 66:12
68:5,22 69:14
75:23 79:21
84:25 87:16
93:8,13 98:21
99:8 101:24
102:1,8,25
129:19 131:11
135:16 137:14
138:8 140:14,15
144:18 151:7

155:25
156:10,24
157:16 161:24
162:20 170:23
177:1 181:3
182:18 186:25
190:3,6,14,17
191:1 195:9
196:7 208:17,24
210:21 212:2
218:16 223:3
225:15 226:17
227:13 232:9
234:20

**theater** 47:24
48:7,8,23 49:6

**themselves** 46:13

**theory** 158:17

**there'd** 71:3

**there's** 12:5,19
46:25 53:3 65:1
66:5 69:3 76:5,6
79:19 83:17
85:12 86:4
92:13,17 93:17
97:22 100:9
103:3 104:3
107:16 110:9
116:16
123:16,25 125:4
126:19 127:22
133:23 137:6
142:13 145:6
147:22 149:7
150:14 155:1
156:23 157:10
168:23 175:2
181:19 196:19
198:17 218:12
225:3 229:18

**they'd** 71:2

**they're** 16:3 32:6
65:14 66:15
81:5,8 82:21
100:4 113:9,16

118:2,4,7
120:14,15 177:5
186:24 188:6
190:16,25
229:11

**they've** 242:14

**third** 12:4 118:25
128:7 141:15
148:1 247:2

**Thirty-five**
38:21,23 41:2

**Thompson**
16:14,15,23
20:4,5,15,21,24
21:6,12 38:22,24
54:10,11,12
55:20 56:25
82:16 140:18,21

**Thompson's** 20:8
140:25

**thoughts** 218:5

**thousands** 179:25

**thread** 105:5,24
112:1

**threat** 215:10

**threaten** 215:13

**threatened**
214:7,14

**threatening**
214:18

**threats**
105:10,15,18

**three-step** 157:11

**throw** 150:21

**Thursday** 1:14

**tie** 31:24,25

**timeline** 44:14
45:4

**timelines** 44:9

**tired** 49:24

53:10,16

**title** 28:25 50:17
52:3 98:1 133:12
135:15 142:24
156:2 195:2
197:15,16
212:15

**today** 6:8
8:1,22,25 9:9
10:7 11:6 12:24
19:17 20:2,6
26:17 44:20
106:19 112:6
151:18 199:4
203:8 222:22
228:13 232:22

**to-do** 4:17 121:11
122:3,6,9,20

**Tolles** 2:11 6:18

**tool** 21:22 22:9
65:10,15

**tools** 55:12

**top** 104:2 105:6
126:6 129:17
131:8 132:8
138:19 147:8
150:14 154:19
156:22 158:10
173:10 193:18
212:7

**topic** 47:17 48:8
60:15 199:4

**topics** 12:6,9,12,16
19:2,4,8

**total** 59:8 180:14
184:1

**totalled** 58:19

**totally** 210:19
211:1,3

**touch** 219:17

**touched** 78:20

**towards** 12:3,18

Capital Reporting Company
Malamud, Rebecca  11-13-2014
Page 36

97:17 100:8
127:21,23
133:20 142:12
147:23 196:18

**trace** 82:11 135:19
136:1

**traced** 66:21
82:8,21

**tracing** 82:15

**track** 218:25 219:1

**trademark**
117:5,7,16

**traditional** 54:22

**training** 54:20
55:6,19 56:9,19
57:11 78:16

**transcript** 5:25
244:6,10,11,14
246:20

**transcription**
245:6

**transferred** 13:12

**transferring**
217:25

**transforming**
155:10

**translations** 163:5

**transmit** 13:18

**tree** 103:14
155:8,15 156:14

**tried** 74:21

**triple** 68:17,21,25
69:17,22 70:2,6
83:8 120:15
159:1 162:3

**triple-key** 120:15

**triple-keyed** 64:16
68:12 69:11

**true** 17:14 23:23
51:13 60:21,24

67:5 72:9
75:23,25 111:9
145:1 188:18
233:12 244:7,11
245:5

**trusted** 192:16

**truth** 7:11,12

**truthfully** 8:22

**try** 14:3 64:9
144:25 164:22
173:3

**trying** 44:17 52:23
89:11,12 90:25
91:2 92:13,19
114:2 122:16
139:14 226:14

**turn** 12:3 13:9
19:1 100:6
123:11
127:19,20
129:12
136:17,18 158:9
196:17 198:4

**turned** 13:6 16:20
79:25 128:10

**Turning** 163:25

**Twenty-six** 54:5

**twice** 69:9 161:10

**Two-thousand**
27:19

**type** 34:13,19
37:13 39:18 56:8
76:17 91:13
128:3 157:13

**typed**
84:10,13,16,20,2
4 85:18 161:10

**typeface** 175:8

**types** 15:3 140:7
163:14

**typically** 57:16,23
58:2 90:12 191:5

234:10 240:8

**typing** 161:13

**typography** 76:9

**typos** 69:3 130:12

———————
U
———————

**U.S** 103:12,21

**Uh-huh** 17:9 22:24
23:2 40:11 60:17
68:14 74:25
75:10 82:1
85:11,13 102:22
103:5,17 105:13
123:5 125:11
129:25 134:6
142:15 147:25
148:6 149:17
150:24 157:4
158:14 165:1

**ultimately** 67:20
174:18

**unauthorized**
110:3,7 118:24

**underneath** 97:22
234:15

**understand** 8:13
11:5 42:16,17
49:14 85:7
93:14,16 108:15
113:11,21,22
114:2 128:12,17
148:7 151:2
153:3,7 160:12
161:6 188:25
191:7,16,20
198:24 211:2
212:20
214:6,13,19
215:9,12 223:13
224:23 227:22
240:19

**understanding**
69:10,14,24 70:1
73:11 102:23

103:18
104:22,25 105:3
120:11 159:19
160:2 202:11
205:25
206:12,20
207:1,8
209:15,20
211:14 216:19
222:9 225:15

**understood** 8:18
45:15 68:23
108:14,17
156:11 160:10
188:11,19,21
189:9 190:11,14
194:15 216:1,9
241:7

**unexpected** 210:20
211:2,3,7

**unicode** 175:3,22

**Union** 67:1 82:22
83:16 157:12,18

**UNITED** 1:1

**University** 56:2
65:18 75:9

**unless** 122:1

**updated** 209:25

**upon** 70:23
204:9,16

**URL** 125:14

**useful** 74:6

**usually** 41:18
66:15 129:2
169:1 234:13,24
239:19 240:1

———————
V
———————

**vague** 40:16
61:18,20 130:6
132:17 141:16
203:11,15 204:4

Capital Reporting Company
Malamud, Rebecca  11-13-2014
Page 37

207:10 234:12

**valid** 175:5

**validator** 176:15
177:1,3

**valuable** 165:24

**value** 155:9,18
156:9

**variances** 173:3

**varied** 90:15

**varies** 57:15
70:19,22 71:12

**various** 31:12

**vary** 70:23

**varying** 67:3

**vast** 41:6,10

**vector** 65:20,22
70:12 81:11,17
91:12,20 92:6,8
136:11 216:15

**vectorize** 21:18,23
22:2 135:8

**vectorized** 64:22

**vectorizing**
20:14,15,21,25
21:6,13

**verbally** 8:9

**version** 127:12
216:7 238:15

**versus** 6:6

**via** 13:20 57:20

**vice** 24:18

**victory** 104:13,22
105:7

**videographer** 3:8
6:2,22 7:3,4
53:17,20
96:20,23
131:20,23
133:3,6
145:11,14

185:24 186:2
232:13,16
243:4,7

**videotaped** 8:6

**view** 113:8 205:21
206:1,13,21
214:17,24 215:1

**viewed** 214:2
216:16

**visible** 186:19
188:2

**visual** 122:1

**volunteers** 39:7

———————————
W
**Wacom** 55:9 66:21

**wait** 10:13 54:10
151:5 187:13

**wake** 212:15

**walking** 186:23

**wall** 150:21

**Washington** 2:4
247:2

**wasn't** 40:5 100:17
107:6,25 118:8
151:11 188:24
199:16 225:21
239:13,19

**wasting** 101:25

**ways** 34:7 131:10

**web** 17:6 24:8 25:2
26:6,8 27:2,4
30:13 34:16,22
35:2,18,24 48:18
81:17,18 86:7
113:10 118:5
122:15 174:21
176:8 177:3,4,6
195:4 204:2,24

**Webchick** 173:10

**Webchickbot**

37:8,11

**web-related** 34:17

**website** 27:8
36:4,5,7 37:14
39:12 87:12
107:13
125:17,22
224:11

**websites** 25:8
36:10,15

**we'd** 72:8 86:4
90:23

**weight** 67:3 80:2

**weights** 83:1

**welcome** 44:24

**we'll** 97:17 210:19
240:17,19

**we're** 6:2 7:5
42:20 53:18,20
76:9 80:16 96:23
131:23 133:6
139:11 142:14
145:7,14 148:15
152:7 155:9
156:13 186:2
189:25 194:4,5
208:12 211:21
232:16 243:7

**we've** 91:9
164:2,10 203:8
222:22

**whatever** 15:19
53:11 122:21
138:1 150:2
154:10

**whenever** 94:14
239:24

**When's** 163:1

**Where'd** 78:8

**WHEREOF**
244:16

**whether** 21:5

35:16 87:25
88:13,23 98:10
99:9,14 109:23
151:16 153:7
158:24 160:9
162:18 164:8
167:9 168:16
177:11,15,24
178:5 189:7
197:22
200:10,19
201:14 205:9
227:1 228:20

**whoever**
188:10,17

**whole** 7:12 103:7

**whom** 62:8

**who's** 31:21 223:1

**whose** 16:1 205:8

**Wide** 24:8 81:18
177:3

**Wikimedia**
137:7,9,10,13,25
138:2 236:12

**wind** 101:16

**winnowed** 13:15

**wish** 99:7,21
130:11

**witness** 7:8
25:20,23 37:5
49:23 50:1,12
56:15 60:12
86:17 87:21
121:4 131:14,16
157:18 160:23
161:3 194:8
198:10,16
244:6,7,13,16
246:9 247:6

**WITNESS.............
..........................
PAGE** 4:2

**wizard** 147:19

**woman** 38:13

**wondering** 131:3
138:5

**work** 13:7 15:1
17:11,18,19,24
18:4 20:11,14
24:1 27:17,20
28:19 31:1,2,12
33:5,13,16 34:20
39:5,8,14,18
40:2,4
41:16,17,19
43:16 44:11
45:19,23
46:12,16,19
47:12 49:2,3
51:9 52:1,2
61:22 62:19,22
64:9,13,19 65:4
66:12 70:16
71:2,18 72:8
73:21
74:7,16,21,22
78:9,11 80:18
82:17 93:21
95:23 99:25
100:4
107:7,12,20
108:19,24
112:20 113:8
116:2 119:6,10
121:20 122:17
136:12 139:18
141:3 143:6
144:5,17 145:23
146:2,11,17
147:1 151:17
152:18 153:20
154:7 156:7
158:19 160:7,24
162:4,8,13,19,23
163:8,10
164:8,10,16
165:9,12 170:8
174:19 175:2

176:3 178:1,23
188:19,21
189:1,4,8,16,25
190:10
192:19,22
202:22 205:5,7,9
207:15 212:13
214:2 215:4,6
219:21 220:4,16
221:24,25
228:17,21
229:21 230:3,7
231:4,14,15,19
232:6 241:8,20

**worked** 18:19
31:13 39:22
43:20 44:3,16
45:17,22 46:6
50:19 52:20 53:1
64:11 76:7 78:18
120:19 231:4
234:11

**working** 23:5
25:14 26:13
27:15 39:25
42:11 45:3 52:10
55:3 71:24 75:1
88:25 108:16
123:23 129:14
130:15 133:11
136:19 156:13
166:6 191:11
192:7,25 193:4
194:4 204:11
205:2 207:5,7
209:16 211:12
212:17 213:5
222:6 226:17
227:24 235:12

**works** 16:16 17:20
58:7 108:1,3
110:3,8 113:3
114:16 143:2
163:17 176:16
177:17 178:6
195:22

203:9,13,16,25
204:21
205:17,22
206:2,13,21
214:8,15

**world** 4:15 24:8
25:2 81:18 87:6
177:3 218:23
219:6,14 220:2,6

**wound** 135:21
167:20 174:18

**wrapper** 195:4

**Wright** 3:9 7:4

**write** 157:7 166:10
176:19 227:11

**writes** 202:6
223:16

**writing** 129:19
166:8 177:5

**written** 79:4,6
86:13 96:8,12
106:24 107:6,9
112:15 133:24
140:18
141:12,14 155:6
194:20 207:9
209:13 222:2

**wrong** 74:23 128:1
133:15 152:9
182:6,18 193:3
242:9

**wrote** 136:13
137:24 155:11
173:23 194:15
196:22

_____
Y
_____

**Yep** 25:9 100:15

**yesterday** 9:14,15

**yet** 164:13

**you'll** 12:18 53:11
136:10

**younger** 41:21

**yours** 42:15 43:12
246:17

**yourself** 9:18 19:7
23:4 38:6 114:13
173:11 230:7,18

**yourselves** 6:11

**youth** 40:20

**you've** 28:12 113:2
115:3 126:9
129:5 132:11
152:9 181:7
226:17,25 233:4

_____
Z
_____

**Zee** 2:19 4:6 6:24
228:7,11,12
231:21 232:9
243:6