# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

AMERICAN SOCIETY FOR TESTING
AND MATERIALS d/b/a/ ASTM
INTERNATIONAL,

NATIONAL FIRE PROTECTION
ASSOCIATION, INC., and

AMERICAN SOCIETY OF HEATING,
REFRIGERATING, AND AIR-CONDITIONING
ENGINEERS, INC.

            Plaintiffs/Counter-Defendants,

        v.

PUBLIC.RESOURCE.ORG, INC.,

            Defendant/Counter-Plaintiff.

Case No. 1:13-cv-01215-TSC

## BRIEF FOR AMICUS CURIAE THE AMERICAN NATIONAL STANDARDS INSTITUTE, INC., INTERNATIONAL ASSOCIATION OF PLUMBING & MECHANICAL OFFICIALS, NATIONAL ELECTRICAL MANUFACTURERS ASSOCIATION, <u>AND NORTH AMERICAN ENERGY STANDARDS BOARD</u>

Dated: December 6, 2019.

## STATEMENT OF INTERESTED PARTIES

The undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case. These representations are made in order that the judgment of this Court may evaluate possible disqualification or recusal.

American National Standards Institute, Incorporated, Amicus Curiae
International Association of Plumbing & Mechanical Officials, Amicus Curiae
National Electrical Manufacturers Association, Amicus Curiae
North American Energy Standards Board, Amicus Curiae

Morris, Manning & Martin, LLP
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005

Carter Ledyard & Milburn LLP
Two Wall Street
New York, NY 10005

Attorneys of Record for Amici Curiae

i

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................... iii

CONCISE STATEMENT OF IDENTITY OF AMICI CURIAE, INTEREST IN THE CASE, AND SOURCE OF AUTHORITY TO FILE ................................................. 1

ARGUMENT ............................................................................. 4

I.   WORDS AND TEXT MATTER TO THE DOCTRINE OF FAIR USE UNDER THE COPYRIGHT ACT AND IN THIS PARTICULAR CASE ................................ 4

II.  UNDERSTANDING THE STANDARDS DEVELOPMENT ECOSYSTEM IS ESSENTIAL TO BALANCING INTERESTS UNDER AN EQUITABLE RULE OF REASON IN FAIR USE ANALYSIS ............................................... 7

   A.   If Defendant's View Of Fair Use Is Accepted, The Loss Of Copyright In Standards Would Profoundly Harm SDOs, Federal, State And Local Governments And The Public ...................................................... 7

      1.   SDOs Would Be Unable To Fund Standards Development If Deprived Of Revenues From Standards Sales ............................... 7

      2.   Governments Would Lose The Ability To Adopt Standards Into Law Or Utilize Standards Themselves .................................. 9

      3.   The Public Would Be Harmed By Lost Efficiencies And Increased Opportunity Costs ......................................... 13

      4.   United States Industry Would Be Diminished .................. 14

   B.   The Federal Government's Current Policies Relative to Incorporation By Reference Reflect A Proper Balancing of Interests With The Standards Ecosystem Consistent With The Fair Use Doctrine ............................... 15

CONCLUSION ............................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*,
2017 U.S. Dist. LEXIS 14623 (D.D.C. 2017) ............................................................ 20

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.,*
896 F.3d 437 (D.C. Cir. 2018) ......................................................................... 5, 7

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ................................. 6, 7, 8

*CCC Information Services v. Maclean Hunter Market Reports, Inc.*,
44 F.3d 61 (2nd Cir. 1994) .............................................................................. 20

*Practice Mgmt. Information Corp. v American Medical Association*,
121 F.3d 516 (9th Cir. 1997) ........................................................................... 21

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ................. 4, 6

**Statutes**

5 U.S.C. Section 552(a)(1) ................................................................................ 14

17 U.S.C. § 107 ........................................................................................... 5, 6

**Regulations**

74 Fed. Reg. 63,287, 63,302 (Dec. 3, 2009) .......................................................... 19

79 Fed. Reg. 66267 (November 7, 2014) ............................................................... 15

10 C.F.R. § 430.3 ........................................................................................... 8

**Other Authorities**

OMB Circular A-119, 63 Fed. Reg. 8546 (1998) ......................................... 12, 14, 16

Revised OMB Circular A-119, 81 Fed. Reg. 4673 (January 27, 2016) ....................... 13

Petition submitted by Peter Strauss et al, February 21, 2012 .................................... 15

Testimony of Mary H. Saunders Before the House Committee on Science,
Space, and Technology, February 29, 2012 ........................................................... 16

**CONCISE STATEMENT OF IDENTITY OF AMICI CURIAE, INTEREST IN THE CASE, AND SOURCE OF AUTHORITY TO FILE**

The standards and codes involved in the present case are part of a large genre of creative works, including standards, model codes and other reference works (collectively referred to as "standards"), that are generally developed by private, not-for-profit organizations and may be selected, when appropriate, for use and adoption, in whole or in part, by government instrumentalities throughout the United States. Amici curiae are all organizations that are involved in the coordination, creation, or use of these socially important works.[1]

American National Standards Institute, Incorporated ("ANSI") is a not-for-profit membership organization that, for more than 100 years, has administered and coordinated the voluntary standardization system in the United States. ANSI facilitates the development of American National Standards ("ANSs") by accrediting the procedures of standards developing organizations ("SDOs"). These SDOs work cooperatively to develop voluntary national consensus standards that are used in virtually every industry sector and in all aspects of daily life, from toys and food safety to IT and the built environment. Accreditation by ANSI signifies that the procedures used by the standards developer in connection with the development of ANSs meet ANSI's essential requirements for openness, balance, consensus and due process. Each of the Plaintiffs and each of the other amici are among the 240 ANSI Accredited SDOs ("ASDs"), and they are representative of ANSI's broader ASD community.

International Association of Plumbing & Mechanical Officials ("IAPMO") coordinates the development of plumbing and mechanical codes and standards to meet the specific needs of

---

[1]   Amici appeared as amicus in the earlier part of this case in connection with Plaintiffs' Motion for Summary Judgment (Document 142, filed January 12, 2016).

individual jurisdictions and industry both in the United States and abroad. IAPMO is a not-for-profit membership organization that was founded in 1926.

National Electrical Manufacturers Association ("NEMA") is the association of electrical equipment manufacturers, founded in 1926. NEMA sponsors the development of and publishes over 500 standards relating to electrical products and their use. NEMA's member companies manufacture a diverse set of products including power transmission and distribution equipment, lighting systems, factory automation and control systems, building controls and electrical systems components, and medical diagnostic imaging systems.

North American Energy Standards Board ("NAESB") was formed in 1994. NAESB maintains a membership of over three hundred corporate members representing the wholesale gas, wholesale electric, retail gas and retail electric markets and has more than two-thousand participants active in standards development.

Amici curiae represent a wide range of SDOs with varied purposes and different audiences that exist to benefit our society. The standards created and administered by SDOs are often later used and adopted by local and state governments and federal authorities throughout the United States who do not otherwise have the necessary facilities and resources to develop them independently. IAPMO, NEMA, and NAESB are just three of the hundreds of private SDOs that support their standards development activities through revenues derived from the publication, sale, and licensing of standards made possible by the protection of the copyright laws.

The copyrighted standards at issue in this case are part of a large and important ecosystem of creative works developed by not-for-profit SDOs. SDOs create and maintain at their own substantial expense their copyrighted standards and make them available to interested parties, government regulators, and the public at large. Loss of copyright protection for these works would

drastically undermine the ability of SDOs to fund the ongoing creation and updating of these important works and would therefore harm the governments and the public who benefit from and rely on the work of these SDOs.

Amici address the Court at this time to present two points they believe are important to the resolution of the fair use question in this case.  First, we disagree with the Defendant's position that the underlying text of a document subject to copyright does not matter.  See *Public Resource's Memorandum of Points and Authorities to Plaintiffs' Second Motion for Summary Judgment* at 5-6 (Document 202-2 filed November 12, 2019) ("Documents are the Objects of Incorporation, Not Their Underlying Text").  Words and text do matter.  And they matter greatly in connection with the fair use doctrine under copyright law.

Second, we describe for the Court the standards ecosystem in which plaintiffs and amici operate, which we believe the Court must consider in connection with its fair use analysis.  Fair use contemplates a balancing of interests and an equitable rule of reason.  In the words of the Supreme Court, the failure of lower courts to apply "an equitable rule of reason" and balance the interests of the parties and other members of the public in connection with fair use analysis is "erroneous."  *Sony Corp. of America v. Universal City Studios, Inc*., 464 U.S. 417, 454-55 & n.40 (1984) ("Congress has plainly instructed us that fair use analysis calls for a sensitive balancing of interests.").

The standards *development* ecosystem serves a vital public interest in the United States and internationally and weighs heavily, in the view of amici, in favor of a conclusion that the balancing of interests does not support the defendant's view of fair use.

## ARGUMENT

I.   **WORDS AND TEXT MATTER TO THE DOCTRINE OF FAIR USE UNDER THE COPYRIGHT ACT AND IN THIS PARTICULAR CASE.**

The defendant's position on fair use is that if an entire document is referenced in a government regulation then defendant is entitled to copy and distribute the entire document without having to consider whether the entire document is relevant to or essential to understanding a legal requirement in that regulation. *Public Resource's Memorandum of Points and Authorities to Plaintiffs' Second Motion for Summary Judgment* at 5-6. In other words, the "underlying text" of a document referenced in a regulation does not matter. Nor does the text of the regulation matter. That view is contrary to the law of the case, as articulated by the D.C. Circuit in this case, and it is contrary to the text of Section 107 of the Copyright Act. 17 U.S.C. §107.

As the Court of Appeals discussed,

> As this language makes clear, this inquiry is ill-suited to wholesale resolution. Rather, PRO's copying must be considered standard by standard in light of its purpose of informing the public about the specific incorporation at issue. *If PRO limits its copying to only what is required to fairly describe the standard's legal import, this factor would weigh strongly in favor of finding fair use here, especially given that precision is ten-tenths of the law.*

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.,* 896 F.3d 437, 452 (D.C. Cir. 2018) (hereinafter "*ASTM*"). The Defendant's position is to ignore "precision," ignore "what is required to fairly describe the standard's legal import," and ignore what "information [is] essential to comprehending one's legal duties." *Id.* at 450, 452. Defendant's argument represents a sledgehammer approach to a legal issue that requires a "sensitive balancing of interests." *Sony Corp.,* 464 U.S. at 455, n.40. If most or a portion of a standard referenced in a regulation does not provide "information that is essential to comprehending one's legal duties" under the specific regulation, it is not "fair use" to copy or distribute the entire document. It is unfair use, and in the

4

vernacular of some courts in discussing fair use analysis it is an "unproductive use" providing information that is not required to comprehend one's legal duties.  See *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994); *Sony Corp,* 464 U.S. 417.

The text of the Copyright Act commands this construction of fair use doctrine:

> . . . In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> (1)  the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2)  the nature of the copyrighted work;
>
> (3)  the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4)  the effect of the use upon the potential market for or value of the copyrighted work**.**

17 U.S.C. §107.  As the Court of Appeals in this case explained,

> The second fair use factor, "the nature of the copyrighted work," 17 U.S.C. § 107(2), also demands an individual appraisal of each standard and its incorporation.
>
> * * *
>
> The third fair use factor asks about "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). The Supreme Court has explained that "the extent of permissible copying varies with the purpose and character of the use" and characterized the relevant inquiry as whether "'the amount and substantiality of the portion used ['] . . . are reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586-87 (quoting 17 U.S.C. § 107(3)). As this language makes clear, this inquiry is ill-suited to wholesale resolution. Rather, PRO's copying must be considered standard by standard in light of its purpose of informing the public about the specific incorporation at issue. If PRO limits its copying to only what is required to fairly describe the standard's legal import, this factor would weigh strongly in favor of finding fair use here, especially given that precision is ten-tenths of the law.

*ASTM,* 896 F.3d at 451-52.

The underlying text matters in this analysis.  That is true not only with respect to the text of a standard, but also the text of the regulation, because the fair use doctrine requires a determination of whether copying and distributing an entire standard is "reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586.  That "reasonable relation" requires a pairing of the text of the Standard copied by the Defendant to the purpose of the regulation as expressed in the text of a regulation to determine whether copying the entire document is "essential to comprehending one's legal duties."  There are obvious portions of standards that are not necessary to comply with legal obligations.  For example, a standard may contain multiple parts dealing with numerous aspects about the performance or features of various attributes of a product, and one part relates to how one should test the product to assess a particular performance specification.  A government regulation pertaining to test procedures that only references the standard with respect to the part about the test procedure but not the rest of the standard is a clear example where copying and distributing the entire document is not necessary to comply with the law.  And there are examples of exactly this sort of thing in federal regulations where the regulation spells out parts of standards, excludes other parts, and the like.  *See, e.g.,* 10 C.F.R. §430.3 (Department of Energy regulations referencing specific portions of standards and generally not the entire standard).  And even then, the reference may be informational and not "required" to comply with the regulation.

The Defendant has the burden of proof[2] in this case to establish --- standard by standard --- that the text and words of an entire standard are "essential to comprehending one's legal duties" before it can claim a right to copy and distribute a document in its entirety.

---

[2]      *Campbell*, 510 U.S. at 590 (proponent of affirmative defense bears burden of proof).

## II.    UNDERSTANDING THE STANDARDS DEVELOPMENT ECOSYSTEM IS ESSENTIAL TO BALANCING INTERESTS UNDER AN EQUITABLE RULE OF REASON IN FAIR USE ANALYSIS.

Defendant's all-or-nothing approach, if accepted by this Court, would have profound implications for the SDOs that develop those works and the standards ecosystem they support. Defendant's argument at this stage is still effectively that because plaintiffs' privately authored standards have been referenced in statutes and regulations, including the Code of Federal Regulations, those works have forever lost their copyright protection.  Defendant's argument has not changed in response to the Court of Appeals decision.  Only now it repackages its argument under the auspices of "fair use." If this sweeping contention were accepted, it would devastate private SDOs, governments – state, local, and federal – who benefit from private standards development, and the public who benefit from standardization's efficiencies in hundreds of industries, including improvements in the way product components interoperate, and the avoided fiscal burden that would result from government authorship of standards.

### A.    If Defendant's View Of Fair Use Is Accepted, The Loss Of Copyright In Standards Would Profoundly Harm SDOs, Federal, State And Local Governments And The Public.

#### 1.    SDOs Would Be Unable To Fund Standards Development If Deprived Of Revenues From Standards Sales.

Defendant's position that creative works such as those developed by the SDOs enter the public domain the moment any government instrumentality adopts them by reference in a law has the largest implications for copyright holders like amici who develop standards that a government may elect to use and reference in law. SDOs rely on copyright protection and the ability it affords to generate revenue from the sale and licensing of the works they create to sustain their ongoing standards creation, refinement, and updating.

The development of useful, high-quality, up-to-date, consensus-based standards is a costly, time consuming process. Drafting standards requires wide-ranging creative input from a variety of concerned constituencies and sources of expertise, including representatives of the consuming public, industry, and the public safety and regulatory community. In addition, the standards drafting process draws heavily on the administrative, technical, and support services provided by the organizations that develop them.

NEMA, for example, arranges for hundreds of standards-related meetings that take place yearly. They provide logistical, administrative, and editorial support to the hundreds of technical committees that draft and regularly update standards, and maintain a permanent staff of engineers, technical program managers, and administrative staff who support their standards activities. These costs are commonly underwritten, in whole or significant part, by the revenues made possible from the copyright-protected sales and licensing of the standards themselves. For its part, NEMA allocates half of the royalties earned from the sale of standards developed by a given technical committee to the committee's next annual budget thereby reducing the participants' cost of supporting the committee's ongoing work. Similarly, IAPMO uses all sales of codes and standards to fund its not-for-profit mission. Amicus ANSI, while not an SDO, similarly funds mission-related activities with revenues derived from the sale of standards under licensing agreements with the SDO copyright holders.

Without copyright protection, others (not just PRO) would be free to expropriate and sell or give away the works created or licensed by SDOs, and the ability of ANSI and these SDOs to sustain their standards coordination and development activities, as well as other mission-related programs, would be seriously compromised.

It is clear that exactly this sort of economic consequence motivated the D.C. Circuit's discriminating "standard-by-standard" approach to fair use analysis in this case. Defendant's copying and free distribution of standards under the guise that the entire document is the law encourages people who would normally purchase the entire standard for purposes other than complying with the law to search out the free copy.

2.     **Governments Would Lose The Ability To Adopt Standards Into Law Or Utilize Standards Themselves.**

The impact of copyright destruction, however, would be felt by more than just the SDOs whose copyrights would be lost. Private standards development provides federal, state, and local governments with valuable and high-quality codes and standards that are created at no cost to taxpayers, and governments at all levels have recognized the importance of privately developed codes and standards by adopting them in great numbers.

In recognition of the benefits of private standards development, the federal government has long made it a policy to adopt such standards unless there is a valid reason for not doing so. That policy is expressed by the Office of Management and Budget ("OMB") in Circular A-119, which directs all federal agencies to incorporate "in whole, in part, or by reference" privately developed standards for regulatory and other activities "whenever practicable and appropriate." OMB Circular A-119, 63 Fed. Reg. 8546, 8554-55. OMB Circular A-119 expressly acknowledges that doing so "[e]liminate[s] the cost to the government of developing its own standards." *Id.* at 8554. For this policy to succeed, private authors must have an incentive to create works useful to the government. OMB thus requires agencies to "observe and protect the rights of the copyright holder and any other similar obligations." *Id.* at 8555. This policy of federal government use of privately developed standards was codified and fortified in the *National Technology Transfer and Advancement Act of 1995* ("NTTAA").

OMB revised Circular A-119 on January 27, 2016, 81 FR 4673 (January 27, 2016), and made clear the government's position on copyright when standards are referenced by federal agencies in agency regulations.  After noting that the Office of Federal Register ("OFR") had, in November 2014, developed a rule to ensure that standards referenced in federal agency regulations were "reasonably available" (see discussion below),  OMB stated that OFR had "balanced its statutory obligations regarding reasonable availability of the standards with: (1) U.S. copyright law, (2) U.S. international trade obligations, and (3) agencies' ability to substantively regulate under their authorizing statutes",[3] and then directed in Circular A-119:

> *If an agency incorporates by reference material that is copyrighted or otherwise subject to legal protection and not freely available*, the agency should work with the relevant standards developer to promote the availability of the materials, consistent with applicable law, such as through the use of technological solutions, low-cost-publication, or other appropriate means, *while respecting the copyright owner's interest in protecting its intellectual property*.[4]

Clearly the federal government has engaged in a "sensitive balancing of interests" in connection with incorporation of standards by reference and explicitly respected and protected "the copyright owner's interest in protecting its intellectual property."

Under defendant's position, however, government use or adoption of a private work as part of its regulatory scheme would, by definition, invalidate the author's copyright in contravention of OMB A-119 and the NTTAA. Importantly, the Freedom of Information Act ("FOIA") provides an effective mechanism to balance the rights of copyright holders in standards incorporated by

---

[3]     OMB Circular A-119 at 7, available at
https://obamawhitehouse.archives.gov/sites/default/files/omb/inforeg/revised_circular_a-119_as_of_1_22.pdf.

[4]     *Id.* at 21 (emphasis supplied). OMB added, "If a standard is used and published in an agency document, your agency must observe and protect the rights of the copyright holder . . ." *Id*. at 22.

reference with the public's right to access the law. Specifically, FOIA expressly authorizes reference by the Code of Federal Regulations ("CFR") to materials incorporated by reference, with the approval of the OFR, that are "reasonably available to the class of persons affected thereby." 5 U.S.C. Section 552(a)(1). In other words, a standard is eligible for incorporation by reference only if the federal agency wishing to include the standard determines it is "reasonably available" to the class of persons affected by the anticipated public law.

The "reasonably available" approach was reaffirmed by the OFR in response to a petition signed by a number of petitioners, including defendant.[5] That petition asked the National Archives and Records Administration ("NARA") to define "reasonably available" in the regulations to require free access to standards incorporated by reference into the CFR. The OFR rejected this request, reaffirming in its Final Rule on November 7, 2014, that "reasonably available" means that the standard is accessible to any potential user but does not require that the standard be available without a fee. 79 Fed. Reg. 66267 (November 7, 2014). Instead, the OFR announced non-confiscatory revisions to its rules, including clarifying that government agencies "should collaborate with the [SDOs] and other publishers of [incorporated by reference] materials, when necessary, to ensure that the public does have reasonable access to the referenced documents." *Id.* at 66268. The government's balancing of interests by requiring reasonable access as a precondition to referencing a standard in a regulation satisfies the Defendant's alleged purpose of making standards available under Factor 1 of the fair use analysis.

As the federal policy reflected in OMB Circular A-119, the NTTAA, and the OFR's rulemaking makes clear, the U.S. government has important interests at stake and the destruction

---

[5]     *See* Petition submitted by Peter Strauss et al, February 21, 2012. http://www.gpo.gov/fdsys/pkg/FR-2012-02-27/pdf/2012-4399.pdf.

of copyright relating to standards incorporated by reference would have a damaging impact on the federal government. Indeed, according to the U.S. National Institute of Standards and Technology ("NIST"), federal government agencies engage in standardization in a wide range of mission specific roles, including contributing to development of standards in the private sector, ensuring that standards are not used as technical barriers to trade by trading partners, using standards for procurement or regulatory actions, and addressing competition-related aspects of standards-setting activities.

The federal government also itself relies heavily on privately developed standards to serve diverse regulatory objectives. For example, the Federal Energy Regulatory Commission ("FERC") uses incorporation by reference to make standards developed by NAESB mandatory for participants in the wholesale energy markets. The use of consensus standards reduces the cost to agencies due to economies of scale resulting from using the same standards for government as are used for the commercial sector, and spurs innovation and greater product choice.[6]

At the state and local level, as is the case at the Federal level, it is fair to say that governments could not effectively function without privately developed standards. Virtually all safety regulation requires expertise and experience that is beyond the resources of such governments alone to marshal. A prime example of this reliance is in the regulation of buildings and their related systems such as heating and cooling, plumbing, and electrical. Virtually all state and local plumbing and mechanical codes are based on a model building code. Amicus IAPMO

---

[6]     *See* Testimony of Mary H. Saunders, Director, Standards Coordination Office National Institute of Standards and Technology U.S. Department of Commerce Before the House Committee on Science, Space, and Technology, Subcommittee on Technology and Innovation, February 29, 2012, available at https://science.house.gov/sites/republicans.science.house.gov/files/documents/hearings/HHRG-112-SY19-WState-MSaunders-20120228.pdf.

has, since its inception in 1926, developed the Uniform Plumbing Code on a three-year cycle. The 2015 edition is a prodigious work exceeding 400 pages and covering the entire plumbing system. The UPC has been adopted, in totality or with amendments, in 17 states and territories, as well as in numerous municipalities.

SDOs like amici, in furtherance of their not-for-profit safety and welfare purposes, make available the use of their works by governmental entities in setting safety and other regulations when those entities deem it in the public interest.  They do so with the understanding that these works will retain their copyright and have to be made reasonably available to anyone who needs them in order to comply with the law or to participate in the government programs that incorporate those works. Indeed, for these works to have any utility for the governments that utilize them, they must be made generally and reasonably available, and it is in the interests of the SDOs to see that they are.

### 3.    The Public Would Be Harmed By Lost Efficiencies And Increased Opportunity Costs.

The destruction of copyrights in standards ultimately would have the greatest negative impact on the very group that the defendant in this case purports to represent – citizens whose access to the law is allegedly compromised because they may have to pay for a standard. Indeed, the public has the most to lose if copyright is lost every time federal, state, or local governments incorporate standards into law.

If SDOs lose copyright in standards, they may be forced to increase stakeholder participation fees in order to offset the loss of revenues from the sale of standards. This would, in turn, disenfranchise consumers, small businesses, and local governments and potentially result in a situation where those with money could have disproportionately increased influence over others. This could also result in fewer and lower quality standards for use by the consuming public. The

lack of industry-wide contributions and fewer participants in the standards development process would result in less transparency, diminished inclusivity, and standards becoming less broad-based.

Equally significant, if SDOs lose copyright in their standards, governments may be compelled to develop more detailed regulations afresh, resulting in increased regulatory costs that would be passed on to consumers. If for example NAESB could no longer afford to stay in the standards-writing space and FERC took over the task of writing standards, it probably would be done through a substantially less efficient and more costly process. FERC has explained that

> "[f]rom our experience, the NAESB process is far more efficient and cost effective method of developing technical standards for the industries involved than the use of a notice and comment rulemaking process involving numerous technical Conferences in Washington that all believe they have to attend," concluding that "the benefits of having a well-established, consensus process outweigh whatever costs non-members may incur in having to obtain copies of the standards."[7]

### 4. United States Industry Would Be Diminished.

Finally, if SDOs were forced to withdraw from standards development because they could no longer fund their operations, some standards for new technologies could go undeveloped in the United States. The United States, as a leader in innovation, would be negatively impacted. This could result in fewer opportunities for U.S. companies and workers in industries driven by standardization activities. The issue extends beyond leadership in standards development work: standards are a tremendous part of market access issues that are being negotiated as part of the United States Mexico Canada Agreement (USMCA) and other trade agreements.

---

[7]      Standards for Business Practices and Communication Protocols for Public Utilities, Final Rule, 74 Fed. Reg. 63,287, 63,302 (Dec. 3, 2009).

**B.**     **The Federal Government's Current Policies Relative to Incorporation By Reference Reflect A Proper Balancing of Interests With The Standards Ecosystem Consistent With The Fair Use Doctrine.**

As the foregoing discussion demonstrates, the interests of governments and standards development are in equipoise under current federal policy that maintains the copyright interests of standards development organizations while providing public policy with informational resources that advance government interests. Current federal policy has reasonably and "sensitively" balanced the private interests of copyright holders and the public. Amici submit that this Court was right when it concluded in connection with granting Plaintiffs first motion for summary judgment, "However, changes to the statutory or regulatory framework that reconsider the balancing of interests underlying modern copyright law and incorporation by reference must be made by Congress, not this court." *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 2017 U.S. Dist. LEXIS 14623 at *47 (D.D.C. 2017).  That conclusion is highly relevant to the balancing of interests contemplated by the fair use doctrine in this case.[8]

## CONCLUSION

For the forgoing reasons, amici respectfully ask this honorable Court to enter judgment for Plaintiffs.

---

[8]     To this point, we reiterate a point that amici raised in their prior brief on Plaintiffs' First Motion for Summary Judgment: the application of the Fifth Amendment's Takings Clause if copyrights are destroyed by adopting Defendant's position in this case.  Indeed, while addressing no actual due process notice problem, a rule that the adoption of a standard by a legislature or administrative body deprived the copyright owner of its property would, as one court observed, "raise very substantial problems under the Takings Clause of the Constitution." *CCC Information Services v. Maclean Hunter Market Reports, Inc.*, 44 F.3d 61, 74 (2nd Cir. 1994), *cert. denied*, 516 U.S. 817 (1995); *Practice Mgmt. Information Corp. v American Medical Association*, 121 F.3d 516, 520 (9th Cir. 1997), *cert. denied*, 524 U.S. 952 (1998) (same concern). When considering the construction of Section 107 of the Copyright Act, this Court should balance the interests in a manner that forecloses a Takings Clause problem.

DATED: December 6, 2019.                    Respectfully submitted,

MORRIS, MANNING & MARTIN, LLP               CARTER LEDYARD & MILBURN, LLP


*/s/ Bonnie Y. Hochman Rothell____*          */s/ Gerald W. Griffin____*
Bonnie Y. Hochman Rothell                    Gerald W. Griffin
D.C. Bar No.: 421606                         *Admitted Pro Hac Vice*
1401 Eye St., NW, Suite 600                  Two Wall Street
Washington, D.C. 20005                       New York, NY 10005
Phone: (202) 216-4801                        Phone: (212) 238-8672
Fax: (202) 408-5146                          Fax: (212) 732-3232
bhrothell@mmmlaw.com                         griffin@clm.com
*Local Counsel for Amicus Curiae*            *Counsel for Amicus Curiae*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY certify that on this 6th day of December 2019, a true and correct copy of the

foregoing document was filed with the Clerk of Court using the Court's CM/ECF system, which

will serve notice of such filing upon all counsel of record.

<i>/s/ Bonnie Y. Hochman Rothell</i>