# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN SOCIETY FOR TESTING AND MATERIALS d/b/a ASTM INTERNATIONAL;<br><br>NATIONAL FIRE PROTECTION ASSOCIATION, INC.; and<br><br>AMERICAN SOCIETY OF HEATING, REFRIGERATING, AND AIR CONDITIONING ENGINEERS,<br><br>    Plaintiffs/<br>    Counter-Defendants,<br><br>v.<br><br>PUBLIC.RESOURCE.ORG, INC.,<br><br>    Defendant/<br>    Counter-Plaintiff. | Case No. 1:13-cv-01215-TSC |

# PLAINTIFFS' COMBINED MEMORANDUM OF LAW IN OPPOSITION TO PRO'S SECOND MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' SECOND MOTION FOR <u>SUMMARY JUDGMENT AND FOR A PERMANENT INJUNCTION</u>

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................1

ADDITIONAL BACKGROUND ........................................................................3

    A.    Congress And The Executive Branch Chose Incorporation By Reference As The Balance Between The Benefits Of Copyright And Public Access..............3

    B.    Despite PRO's Lobbying, Congress Chose Not To Change The Law. ..................6

I.    Plaintiffs Are Entitled To Summary Judgment On Their Copyright Claims......................7

    A.    PRO Fails To Meet Its Burden To Show That Wholesale Copying And Widespread Distribution Of Plaintiffs' Works Is Fair Use.....................................7

        1.    First Factor:  PRO Has Not Raised A Triable Issue As To The Purpose And Character Of Its Wholesale Copying And Distribution. ...........................................................................................7

            a.    The 2018 IBR Handbook does not establish that all the material PRO has copied and distributed is essential to complying with legal obligations.......................................8

            b.    PRO's "purpose" in wholesale copying and disseminating is not meaningfully different from Plaintiffs. ................................14

            c.    PRO's provision of the standards in new formats is not transformative. ...............................................................17

        2.    Second Factor: PRO Has Refused To Engage With The Nature Of The Copyrighted Works, And Accordingly, Has Not Met Its Burden On This Factor................................................................19

        3.    Third Factor:  PRO Has Not Limited Its Copying To Those Portions Of Standards That Are Essential To Complying With Legal Duties. ............................................................................19

        4.    Fourth Factor:  PRO's postings pose a substantial threat to the actual and potential markets for Plaintiffs' standards.................................20

            a.    PRO misconstrues its burden on this factor.................................21

            b.    The answers to the D.C. Circuit's questions for remand on this factor favor Plaintiffs, not PRO. ...............................................23

    B.    The D.C. Circuit Did Not Remand For Reconsideration Of PRO's "Ownership" Arguments, Which Are Meritless In Any Event.............................24

II.    Plaintiffs Are Entitled To Summary Judgment On Their Trademark Infringement Claims. ........................................................................................26

**TABLE OF CONTENTS**
**(continued)**

Page

III.   Plaintiffs Are Entitled To A Permanent Injunction. ..........................................................32

    A.   PRO Fails To Address The Inadequacy Of Other Available Remedies. ...............32

    B.   PRO's Attempt To Address The Other Three *eBay* Factors Fails. ........................33

        1.   Plaintiffs Will Suffer Irreparable Injury. ..................................................33

        2.   Balancing The Hardships Favors Issuing An Injunction. ..........................36

        3.   An Injunction Serves The Public Interest. .................................................37

    C.   PRO's Constitutional Arguments Are Unavailing. ................................................38

        1.   PRO's First Amendment Argument Ignores Well-Settled Case Law. ........................................................................................................38

        2.   PRO's Due Process Argument Is Meritless And Improper. .....................39

CONCLUSION....................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Alaska Stock, LLC v. Houghton Mifflin Harcourt Pub. Co.*,
   747 F.3d 673 (9th Cir. 2014) ................................................................26

*Am. Immigration Lawyers Ass'n v. Reno*,
   199 F.3d 1352 (D.C. Cir. 2000) .............................................................40

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*,
   896 F.3d 437 (D.C. Cir. 2018) ...................................................... *passim*

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*,
   No. 13-cv-1215 (TSC), 2017 WL 473822 (D.D.C. Feb. 2, 2017) ................. *passim*

*Am. Wildlands v. Kempthorne*,
   530 F.3d 991 (D.C. Cir. 2008) ...........................................................9, 11

*Arista Records, LLC v. Doe 3*,
   604 F.3d 110 (2d Cir. 2010) ..................................................................39

*Arista Records LLC v. Lime Wire LLC*,
   No. 06 CIV. 05936 KMW, 2010 WL 10031251 (S.D.N.Y. Aug. 9, 2010) ............35

*Australian Gold, Inc. v. Hatfield*,
   436 F.3d 1228 (10th Cir. 2006) .............................................................31

*Authors Guild v. Google, Inc.*,
   804 F.3d 202 (2d Cir. 2015) .............................................................17, 23

*Aviva United States Corp. v. Vazirani*,
   902 F. Supp. 2d 1246 (D. Ariz. 2012) ...............................................29, 30

*Bell Helicopter Textron, Inc. v. Airbus Helicopters*,
   78 F. Supp. 3d 253 (D.D.C. 2015) ..........................................................34

*Brammer v. Violent Hues Prods., LLC*,
   922 F.3d 255 (4th Cir. 2019) ................................................................16

*Brownmark Films, LLC v. Comedy Partners*,
   682 F.3d 687 (7th Cir. 2012) ................................................................16

*Cairns v. Franklin Mint Co.*,
   292 F.3d 1151 (9th Cir. 2002) ..............................................................26

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994)........................................................................................1, 14, 16, 21

*Cariou v. Prince*,
  714 F.3d 694 (2d Cir. 2013)...............................................................................15

*Century 21 Real Estate Corp. v. Lendingtree, Inc.*,
  425 F.3d 211 (3d Cir. 2005)...........................................................................27, 28, 30

*Cnty. of Suffolk, New York v. First Am. Real Estate Solutions*,
  261 F.3d 179 (2d Cir. 2001)...............................................................................16, 39

*Cooper Notifications, Inc. v. Twitter, Inc.*,
  No. 09-865-LPS, 2010 WL 5149351 (D. Del. Dec. 13, 2010)..............................34

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006)........................................................................32, 33, 35, 38

*Eldred v. Ashcroft*,
  537 U.S. 186 (2003).............................................................................................2, 38, 39

*Fox Television Stations, Inc. v. Filmon X LLC*,
  966 F. Supp. 2d 30 (D.D.C. 2013) ......................................................................37

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) ...............................................................................36

*Golan v. Holder*,
  565 U.S. 302 (2012)................................................................................................38, 39

*Harper & Row Publishers, Inc. v. Nation Enters.*,
  471 U.S. 539 (1985)...............................................................................................2, 38, 39

*Home Box Office, Inc. v. Showtime/The Movie Channel Inc.*,
  832 F.2d 1311 (2d Cir. 1987)...............................................................................31

*Kahle v. Gonzales*,
  487 F.3d 697 (9th Cir. 2007) ...............................................................................39

*Kowalski v. Tesmer*,
  543 U.S. 125 (2004)................................................................................................40

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*LaShawn A. v. Barry*,
   87 F.3d 1389 (D.C. Cir. 1996) ...................................................................................25

*McGregor-Doniger, Inc. v. Drizzle, Inc.*,
   599 F.2d 1126 (2d Cir. 1979)....................................................................................28

*Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*,
   722 F.3d 591 (4th Cir. 2013) ....................................................................................26

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
   518 F. Supp. 2d 1197 (C.D. Cal. 2007) ....................................................................35

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*,
   166 F.3d 65 (2d Cir. 1999)........................................................................................18

*Oriental Fin. Grp., Inc. v. Cooperativa De Ahorro Crédito Oriental*,
   698 F.3d 9 (1st Cir. 2012)..........................................................................................27

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) ...................................................................................16

*Proctor & Gamble Co. v. Team Technologies, Inc.*,
   No. 1:12-cv-552, 2013 WL 4830950 (S.D. Ohio Sept. 10, 2013) ............................34

*R.J. Reynolds Tobacco Co. v. U.S. Food and Drug Admin.*,
   810 F.3d 827 (D.C. Cir. 2015) ..................................................................................40

*Schnapper v. Foley*,
   667 F.2d 102 (D.C. Cir. 1981) ..................................................................................25

*Soc'y of the Holy Transfiguration Monastery, Inc. v. Archbishop Gregory of
   Denver, Colo.*, 685 F. Supp. 2d 217 (D. Mass. 2010),
   *aff'd*, 689 F.3d 29 (1st Cir. 2012) .............................................................................18

*Swatch Group Management Services Ltd. v. Bloomberg L.P.*,
   756 F.3d 73 (2d Cir. 2014).........................................................................................17

*Taylor v. FDIC*,
   132 F.3d 753 (D.C. Cir. 1997) ..................................................................................15

*Texas v. United States*,
   523 U.S. 296 (1998)...................................................................................................40

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*U.S. on Behalf of Dep't of Labor v. Ins. Co. of N. Am.*,
   131 F.3d 1037 (D.C. Cir. 1997) .................................................................24

*Urantia Found. v. Maaherra*,
   114 F.3d 955 (9th Cir. 1997) ....................................................................26

*Wilburn v. Robinson*,
   480 F.3d 1140 (D.C. Cir. 2007) ................................................................12

*WPIX, v. ivi, Inc.*,
   691 F.3d 275 (2d Cir. 2012).......................................................................37

**FEDERAL STATUTES**

5 U.S.C. 552(a)(1) ........................................................................................5

17 U.S.C. § 101 ...........................................................................................25

17 U.S.C. § 105 ...........................................................................................25

17 U.S.C. § 121 ...........................................................................................18

Pub. L. No. 104-113, § 12,
   110 Stat. 775, 782-83 (1996) ................................................................3, 4

**FEDERAL REGULATIONS**

1 C.F.R. § 51.3(b)(4)...................................................................................39

1 C.F.R. § 51.7 ............................................................................................39

29 C.F.R. § 1915.5 .....................................................................................8, 9

29 C.F.R. § 1915.507 ....................................................................................9

29 C.F.R. § 1915.507(d)(5)...........................................................................9

40 C.F.R. Appendix D to pt. 75 ....................................................................9

40 C.F.R. § 60.17(a).....................................................................................39

40 C.F.R. § 75.6 ............................................................................................9

40 C.F.R. § 86.1(b)(2)..................................................................................10

## TABLE OF AUTHORITIES
### (continued)

Page(s)

46 C.F.R. § 39.1005(h)(1)..................................................................................10

46 C.F.R. § 39.2009(a)(1)(iii)(B) § 86.113-04(a)(1) ....................................10

49 C.F.R. § 192.7(h)(4) ......................................................................................12

63 Fed. Reg. 8546, 8554 (Feb. 19, 1998) ....................................................4

79 Fed. Reg. 66,267, 66,268 (Nov. 7, 2014)................................................4

81 Fed. Reg. 4673 (Jan. 27, 2016) ..................................................................4

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. 1 ..........................................................................2, 38, 39

**LEGISLATIVE MATERIALS**

H.R. REP. NO. 94-1476 (1976)..........................................................................25

H.R. REP. NO. 104-390, pt. VII (1995) .............................................................4

**OTHER AUTHORITIES**

Angelo Verzoni, *Ghost Effect*, NFPA JOURNAL (Jan. 2, 2018) .......................6

Angelo Verzoni, *Striving for Excellence: New firewise pilot program tests how far communities can go to protect themselves from wildfire,* NFPA JOURNAL (July 1, 2019) ................................................................................6

Ian Duncan, *A more than decade-long delay in a seat belt warning system shows how car-safety rules get bogged down in bureaucracy*, WASHINGTON POST (Nov. 24, 2019)..............................................................................................5

4 *McCarthy on Trademarks and Unfair Competition* § 23.11 (5th ed.)................................26, 27

2 *Nimmer on Copyright* § 7.20[B][1] ............................................................26

5 *Nimmer on Copyright* § 19E.06 (2017) .....................................................38

Wildland Fire Technical Committees, *available at* https://www.nfpa.org/Public-Education/Fire-causes-and-risks/Wildfire/Codes-and-standards................................6

# INTRODUCTION

PRO seeks to sidestep the D.C. Circuit opinion and that Court's clear directions for remand:

*Copyright fair use:* PRO's brief "poorly serve[s] the court by treating the standards interchangeably," even though the D.C. Circuit directed that PRO's affirmative defense be adjudicated on the basis of "the nature of each of the standards at issue, the way in which they are incorporated, and the manner and extent to which they were copied by PRO." *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc*., 896 F.3d 437, 449 (D.C. Cir. 2018) ("*ASTM II*"). Plaintiffs followed the D.C. Circuit's mandate; PRO ignored it.

First, Plaintiffs identified those standards for which PRO had not even met its threshold burden to establish that there had been an incorporation by reference ("IBR"). *See* Mot. 16-17 (Dkt. No. 200); 2d Supp. SMF ¶ 36 (Dkt. No. 201). PRO concedes this error, Opp. 6 n.3 (Dkt. No. 202-1), but refuses to face the consequences—it has no fair use defense with respect to these standards.

Second, PRO makes the sweeping argument that any federal agency's IBR of a standard (or a nearly identical standard) necessarily means that it is fair use to copy and distribute all of the content between the covers. PRO does not even attempt to respond to Plaintiffs' evidentiary record, Mot. 21-23, demonstrating that significant portions of each of the 217 works are decidedly "not essential to complying with any legal duty" and that fair use thus cannot protect PRO's wholesale copying and distribution. *ASTM II*, 896 F.3d at 450. Fair use is PRO's burden to prove, not Plaintiffs'. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994) (defendant "carr[ies] the burden of demonstrating fair use"). PRO cannot satisfy that burden by ignoring the undisputed facts and the D.C. Circuit's clear directive to examine fair use on a standard-by-standard basis.

Third, PRO argues that its fair use defense requires "special" treatment, because PRO's purpose is to provide access to the "law." Opp. 19. This argument begs a key question the D.C.

1

Circuit said had to be answered on remand:  whether PRO's "reproduc[tion of] part or all of a technical standard" *actually* serves "to inform the public about the law."  *ASTM II*, 896 F.3d at 453.  If PRO's purported interest in publishing the "law" resolved fair use in its favor, there would have been no need for remand.  But the D.C. Circuit rejected such "bright-line" rules, requiring instead that PRO meet its burden to justify "each of PRO's uses" of Plaintiffs' copyrighted works, "standard by standard and use by use."  *Id.* at 451.

Underlying PRO's insistence that it need not do the work that the D.C. Circuit directed is PRO's catch-all defense that its copying and distributing implicates "core" First Amendment interests.  Opp. 21.  But PRO ignores that almost every party asserting fair use will claim the mantle of the First Amendment, and First Amendment safe-guards are already built into fair use analysis.  *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003) (noting fair use serves to balance copyright protections, which are themselves an "engine of free expression," with the public interest in using copyrighted works for "criticism, comment, news reporting, teaching, . . . scholarship, [and] research") (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558, 587 (1985)).  PRO's defense does not warrant any additional deference.

*Trademark fair use:*  PRO implicitly recognizes it cannot prove nominative fair use and attempts to flip the burden on this affirmative defense.  PRO's position boils down to "using Plaintiffs' marks is easier."  That is not the standard and PRO cannot meet its burden to justify its use of Plaintiffs' logos and word marks under any applicable test.

*Plaintiffs' right to a permanent injunction:*  Each of the four-factors the Court must consider when evaluating a permanent injunction weighs in Plaintiffs' favor—on some of the factors PRO is simply silent and concedes the point.  Having no good answers for why an injunction should not issue, PRO resorts to more constitutional arguments, which the D.C. Circuit

set aside, arguing a permanent injunction cannot issue because of "matters of public interest" and a "basic" due process issue of "access to the law." Opp. 41, 42. PRO's assertion that anyone's rights have actually been violated due to inability to access the law is unsubstantiated. Tellingly, PRO tries to make its claim based on two cases involving standards *not* at issue here. Opp. 3. The evidence here establishes that each of the 217 Works are available to the public, either through the government or Plaintiffs, including for free access on their websites. A permanent injunction is the *only* available remedy here and would restore the status quo to before PRO violated Plaintiffs' rights.

Plaintiffs respectfully request that the Court grant their motion for summary judgment and enter a permanent injunction.

## ADDITIONAL BACKGROUND

Nearly half of PRO's opposition brief is framed as a "statement of facts" that attempts to dress up distorted legal arguments as "facts." Plaintiffs briefly respond to set the record straight.

### A.   Congress And The Executive Branch Chose Incorporation By Reference As The Balance Between The Benefits Of Copyright And Public Access.

PRO asserts that IBR serves only to "limit the bulk of the Code of Federal Regulations" and is simply "an alternative to pasting language" into the text of law verbatim. Opp. 4. PRO ignores the purpose and careful design of the public-private partnership the IBR system serves, and the significant public interests at stake.

Congress and the Executive Branch endorse IBR for privately drafted standards *because* it preserves the economic incentives for Plaintiffs and similar organizations, which depend on the revenue derived from their copyrights to fulfill their non-profit missions and generate the standards on which the government and the public rely. As the House Science Committee explained in passing the National Technology Transfer and Advancement Act of 1995—which *requires* federal

agencies to use privately developed standards whenever possible, Pub. L. No. 104-113, § 12, 110 Stat. 775, 782-83 (1996)—reliance "on a decentralized, private sector-based, voluntary consensus standards system . . . . has served us well for over a century and has contributed significantly to United States competitiveness, health, public welfare, and safety," H.R. REP. NO. 104-390, pt. VII, at 23-24 (1995).  As the Office of Management and Budget ("OMB") has explained, incorporation by reference:

> (i) saves government the cost of developing standards on its own;
>
> (ii) provides incentives to establish standards serving national needs;
>
> (iii) promotes efficiency and economic competition through harmonized standards; and
>
> (iv) furthers the federal policy of relying on the private sector to meet government needs for goods and services.

OMB Circular A-119, 63 Fed. Reg. 8546, 8554 (Feb. 19, 1998).[1]  Permitting SDOs to hold copyrights and charge for the use of their works is essential to preserving this system:  "If we required that all materials IBR'd into the CFR be available for free, that requirement would compromise the ability of regulators to rely on voluntary consensus standards, possibly requiring them to create their own standards, which is contrary to the NTTAA and the OMB Circular A-119."[2]  *See* OFR, Final Rule on Incorporation by Reference, 79 Fed. Reg. 66,267, 66,268 (Nov. 7, 2014).

---

[1] That Circular was renewed in 2016.  Final Revision of OMB Circular A-119, 81 Fed. Reg. 4673 (Jan. 27, 2016); Plaintiff's Request for Judicial Notice, Ex. 1 (Dkt. No. 169-1).

[2] PRO's "government edicts" argument, Opp. 7-8, renders these federal policies a nullity. IBR is the decision by the government to preserve copyright incentives, but as PRO would have it, by making a choice to IBR a standard, the federal agency destroys the very copyright it intends to protect.  The Court should reject PRO's irrelevant attempt to invoke the issues it is litigating in *Georgia v. PRO*, No. 18-1150.  *See* Dkt. No. 195 at 3 (PRO arguing that the *Georgia* case "is unlikely to affect the issue that the D.C. Circuit remanded the case for this Court to consider, namely whether PRO's posting of the standards incorporated by reference was fair use").

Further, the IBR process is already designed to balance those protections for copyright with the need for access.  Congress struck a balance between copyright and access by directing agencies to ensure that the IBR'd standards are "reasonably available to the class of persons affected thereby."  5 U.S.C. 552(a)(1).  The federal agencies thereafter execute that balance.  As the National Science and Technology Council suggested, "the text of standards and associated documents should be available to all interested parties on a reasonable basis," but that basis can include "monetary compensation" to the copyright owner.  *See* Subcommittee on Standards, Nat'l Sci. & Tech. Council, Exec. Office of the President, Federal Engagement in Standards Activities to Address National Priorities:  Background and Proposed Recommendations 11 (Oct. 10, 2011).

The benefits from the IBR system are real, not hypothetical.  The *Washington Post* recently highlighted the public health consequences—in terms of lives lost—as a result of slow-moving federal regulation processes:  15 years ago, research highlighted that warning systems regarding seatbelts for back-seat passengers would help save lives; 7-years-ago Congress told regulators to draft a rule within 3 years; and only this fall did the National Highway Traffic Safety Administration say it would think about it.[3]  Compare that to the speed with which NFPA helped Oakland respond to the tragic Ghost Ship fire that killed 36 people in December 2017.[4]  Within less than a year, NFPA provided Oakland with a report containing specific recommendations, many of which were based on NFPA 1730 "Standard on Organization and Deployment of Fire

---

[3] Ian Duncan, *A more than decade-long delay in a seat belt warning system shows how car-safety rules get bogged down in bureaucracy*, WASHINGTON POST (Nov. 24, 2019) *available at* https://www.washingtonpost.com/local/trafficandcommuting/a-more-than-decade-long-delay-in-a-seat-belt-warning-system-shows-how-car-safety-rules-get-bogged-down-in-bureaucracy/2019/11/24/0547c21e-07e4-11ea-8ac0-0810ed197c7e_story.html.

[4] PRO cites the criminal charges arising out of this case as indirect evidence that it serves the public interest—no facts support that attenuated supposition.  In contrast, NFPA's involvement really does save lives.  *See* Amicus Brief of APCIA 8 (Dkt. No. 209-1) (discussing decrease in lives lost to fire as a result of NFPA's work).

Prevention Inspection and Code Enforcement, Plan Review, Investigation, and Public Education Operations"—in other words, a multi-faceted plan for preventing such tragedies in the future.[5]  As these motions are being briefed, NFPA is working directly with communities to address the wildfire crisis, through programs like Firewise USA®[6] and standards like NFPA 1143, Standard for Wildland Fire Management, and others.[7]

### B.    Despite PRO's Lobbying, Congress Chose Not To Change The Law.

PRO offers the "applause" Carl Malamud received from government officials as proof that PRO is serving the public interest.  Opp. 15-16.  This is a non-sequitur; Congress has not changed copyright or federal administrative law as PRO wishes it had.

PRO spent years lobbying Congress and federal agencies to change the law so that IBR'd standards would lose their copyright protection—the same result PRO seeks through this litigation. Dkt. No. 118-12, Ex. 3 (232:14-233:5); Dkt. No. 118-7 ¶ 66.  But the federal government has not changed the law.  Dkt. No. 118-12, Ex. 3 (232:14-234:8).  Instead, federal agencies have repeatedly told PRO that incorporation by reference does not extinguish the incorporated standards' copyright.  *See* Dkt. No. 118-12, Ex. 10 (letters from Department of Interior, Department of Housing and Urban Development, and Consumer Product Safety Commission).  The federal government continues IBR practices because doing so is understood to preserve copyright

---

[5]  Angelo Verzoni, *Ghost Effect*, NFPA JOURNAL (Jan. 2, 2018), *available at* https://www.nfpa.org/News-and-Research/Publications-and-media/NFPA-Journal/2018/January-February-2018/News-and-Analysis/Dispatches.

[6]  Angelo Verzoni, *Striving for Excellence: New firewise pilot program tests how far communities can go to protect themselves from wildfire*, NFPA JOURNAL (July 1, 2019), *available at*  https://www.nfpa.org/News-and-Research/Publications-and-media/NFPA-Journal/2019/July-August-2019/News-and-Analysis/Dispatches/Wildfire.

[7]  *See* Wildfire codes and standards, Wildland Fire Technical Committees, *available at* https://www.nfpa.org/Public-Education/Fire-causes-and-risks/Wildfire/Codes-and-standards.

protection, thus ensuring that SDOs may continue their work and the public can benefit from the original expression they create.

## ARGUMENT

I.   **PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR COPYRIGHT CLAIMS.**

    A.   **PRO Fails To Meet Its Burden To Show That Wholesale Copying And Widespread Distribution Of Plaintiffs' Works Is Fair Use.**

        1.   **First Factor:  PRO Has Not Raised A Triable Issue As To The Purpose And Character Of Its Wholesale Copying And Distribution.**

The D.C. Circuit was clear that "where knowing the content of an incorporated standard might help inform one's understanding of the law *but is not essential to complying with any legal duty*, the nature of PRO's use might be less transformative and its wholesale copying, in turn, less justified." *ASTM II*, 896 F.3d at 450 (emphasis added).  The D.C. Circuit remanded to determine if PRO could prove, on a standard-by-standard basis, whether the material it copied is essential to complying with a legal duty.  Plaintiffs demonstrated PRO could not meet its burden:  PRO has continued to fail to meet its burden, for many of the standards in this suit, to identify a valid IBR regulation, *see* Mot. 17-20, *infra* Part I.A.1.a.; 3d Supp. SMF ¶¶ 2, 4-5, 7; *see generally* Wise Decl. II Exs. 175, 176, 186 (responsive charts); and numerous others include large amounts of material that in no way impose a legal duty given the text of the standard and the nature of its incorporation, *see* Mot. 20-23, *infra* Part I.A.1.a.; 3d Supp. SMF ¶¶ 3, 8; *see generally* Wise Decl. II Exs. 175, 176, 186 (responsive charts).

PRO does not attempt to show on a standard-by-standard basis how its wholesale copying of Plaintiffs' standards provides material essential to complying with a binding legal duty.  PRO instead makes three arguments on the first fair-use factor that are legally and factually baseless.

First, PRO argues, based on a 2018 federal agency *handbook*, that the federal IBR'ing of *any* standard necessarily determines that everything within the standard's covers (unless

specifically excluded) is "necessary to comprehend a legal duty."  Opp. 22.  This handbook did not even exist at the time that nearly all of the standards at issue were IBR'd or at the time PRO initially posted the standards online.  Moreover, this sweeping argument cannot be squared with the D.C. Circuit's decision, with the law of agency action, or with the material upon which PRO bases its argument.

Second, PRO renews its argument that its purported "purpose" obviates the need for a standard-by-standard analysis regarding whether there is a binding legal duty.  This argument, too, tries to end-run the D.C. Circuit's decision.  Fair use does not excuse *PRO's* mass copying and distribution simply because *other parties* might use the infringing copies PRO makes for educational purposes.  In any event, Plaintiffs already perform the purpose PRO claims to serve, and PRO cannot use fair use to compete with Plaintiffs' free-access dissemination of the standards.

Third, PRO repeats its argument—which this Court and the D.C. Circuit rejected—that PRO's use is transformative because it offers Plaintiffs' works in new formats.

> a.    *The 2018 IBR Handbook does not establish that all the material PRO has copied and distributed is essential to complying with legal obligations.*

The D.C. Circuit was clear:  it ordered the parties to analyze "whether PRO's specific use" meets the first factor "standard by standard and use by use."  *ASTM II*, 896 F.3d at 451.  Even though it is not their burden to negate the elements of fair use, Plaintiffs showed that PRO could not meet its burden because each of PRO's postings contains material that is not essential to complying with any binding legal duty.  *See* Mot. 16-24; 2d Supp. SMF ¶¶ 44-76.

PRO has declined to respond to that analysis[8] because it cannot.  It routinely copies and distributes nonessential material.  For example, PRO cites to 30 [sic, should be 29] C.F.R. § 1915.5

---

[8] PRO does not, for example, explain how sections of standards that describe the history and development of the standard, 2d Supp. SMF ¶ 63, or that are expressly "merely informative

(2015) as the regulation IBR'ing NFPA 12 (2005), but does not analyze the *actual* regulation contained in § 1915.507(d)(5), as the D.C. Circuit instructed.  *See* PRO Ex. 91 at 2.  Such analysis would reveal that PRO's citation cannot justify its wholesale copying; 29 C.F.R. § 1915.5 IBRs the standard in connections with § 1915.507(d)(5).  That section, in turn, is within a Subpart P that addresses "Fire Protection in Shipyard Employment," and the section governs only "land-side facilities."  Thus, at a minimum, § 1915.507 plainly does not regulate sea-side (aka marine) operations.  Yet, PRO has posted the entirety of NFPA 12 (2005), even though it contains an entire chapter—Chapter 9—that covers "Marine Systems," defined as "[s]ystems installed on ships, barges, off-shore platforms, motorboats, and pleasure craft," ch. 3.4.1.  *See also* 3d Supp. SMF ¶¶ 3, 8; *see generally* Wise Decl. II Exs. 175, 176, 186 (responsive charts).

Hoping to duck the analysis the D.C. Circuit required, PRO instead makes a two-part argument rooted in the IBR Handbook:  (1) federal agencies incorporate the entire text of a document when they do not specify a particular section[9]; and (2) federal agencies incorporate only

---

and [that] do[] not contain requirements necessary for conformance to the standard," *id.* ¶ 71; *see also id.* ¶¶ 51, 57, 67, 72-74, dictate any legal requirement.  And, while Plaintiffs detailed how certain standards had been incorporated as merely optional reference procedures and therefore did not support fair use under the D.C. Circuit's opinion, *see, e.g.*, Mot. 18 (discussing ASTM D1217-93's use in 40 C.F.R. Appendix D to Part 75), PRO relies on those precise incorporations without responding to Plaintiffs' arguments or grappling with the D.C. Circuit's instructions regarding such incorporations, *see* Becker Supp. Decl. ¶ 57, Ex. 90 at 38 (Dkt. No. 204-96) (citing 40 C.F.R. § 75.6, which incorporates ASTM D1217-93 for Appendix D).  Any attempt by PRO to respond to these arguments in its reply would come too late.  *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008)

[9] That argument contradicts PRO's request that this Court find fair use where PRO has posted standards  that are "not the precise edition listed in the C.F.R. incorporating language" on the basis that the standards it has posted are "very close" with most of the "*text* . . . identical." Opp. 6 n.3, 9 (emphasis added).  If it is "documents . . . not their underlying text" that are the "objects of incorporation," then it would not matter how "close" the text of a posted standard was to one that had not been incorporated.  Put differently, accepting PRO's theory of incorporation by reference requires finding that PRO cannot show fair use for the 69 standards for which it has not identified an incorporating regulation.  *See* Wise Decl. II, Ex. 176 n. 2 (highlighting 69 standards for which PRO posted a different one from the one IBR'd).

material that they determine dictates a legal obligation.  Opp. 5-6.  From these premises, PRO concludes that whenever a federal agency incorporates a standard, the agency has made a conclusive determination that everything between the covers of the standard is essential to complying with a legal obligation.

Neither of these premises is factually correct, as Plaintiffs demonstrate below.  But the argument fails even before analyzing those premises because PRO's argument is inconsistent with the D.C. Circuit's opinion.  The D.C. Circuit did not state, or even imply, that the fair use inquiry would be conclusively resolved as to everything between the covers of standard based solely on an agency's decision to IBR it.  Quite the opposite.  The D.C. Circuit recognized that often "incorporated standard[s]" would *not* dictate legal duties and therefore would not support a fair use defense.  *ASTM II*, 896 F.3d at 450.  Notably, the two examples the D.C. Circuit gave of instances where *only portions* of a standard could be reproduced involved regulations that *did not specify any particular section* of a standard being incorporated.  *See id.* (citing 40 C.F.R. § 86.113-04(a)(1), 46 C.F.R. § 39.2009(a)(1)(iii)(B)); 40 C.F.R. § 86.1(b)(2) (approving incorporation of ASTM D86-12 for § 86.113-04(a)(1)); 46 C.F.R. § 39.1005(h)(1) (approving incorporation of the 2011 NFPA 70 for § 39.2009(a)).  If PRO's argument was correct—which it is not—the court would have said PRO could reproduce the standards in full.

Returning to the premises of PRO's argument, neither one has legal or factual support:

      (i)    *Nothing in the 2018 IBR Handbook, the Federal Register, or other agency guidance supports the assertion that a federal agency's reference to a standard incorporates the entire document, rather than just the relevant portions.*

Mr. Malamud has admitted this point.  *See* Malamud Decl. ¶ 40 (Dkt. No. 204-4), Ex. 34 (Dkt. No. 204-40).  PRO in its brief focuses on a single phrase at the beginning of the Federal Register's Incorporation by Reference Handbook, which says that IBR is appropriate if the agency

needs to reference material "required to understand or comply with the regulations."  IBR Handbook 1-2 (filed at Becker Supp. Decl. Ex. 58, Dkt No. 204-64).[10]

This is a statement in a handbook—which is mere "guidance," *see* IBR Handbook Overview—that does not carry the force of law and that was published *in July 2018*.  In all but three instances, this language *post-dates* by three years or more the incorporating regulation alleged to support PRO's fair use defense.  *See* Becker Supp. Decl. Ex. 89-91 (Dkt. Nos. 204-95, 204-96, and 204-97) (listing incorporating regulations on which PRO relies, all but three of which were first promulgated in 2015 or earlier).  Even if the statement on which PRO relies represented a binding determination by every federal agency as to the necessity of knowing every word between the covers of every IBR'd standard, the statement could not retroactively establish that as a policy every federal agency followed before the Handbook was even published.[11]

What is more, the statement does not mean what PRO says it does.  Neither the statement nor anything else in the Handbook says or implies that an agency must drill down to a level of specificity so as to *only* IBR the particular portions of the material that are required for compliance.  On the contrary, the Handbook directs agencies that the "regulatory text in [their] final rule[s] must . . . [i]dentify the material to be incorporated, by identification designation of the standard, title, date, version, and author, organized by publisher."  IBR Handbook 20.  That is, the Handbook indicates that agencies should identify the standard as a whole, even if the regulation addresses

---

[10] PRO also tries to find support for this theory by noting that agencies sometimes (it has no evidence of how often) have called out specific provisions of standards they incorporate.  That does not establish a government-wide (or even consistent agency) practice, much less create a positive legal principle that anything that is incorporated is in fact necessary to complying with a legal duty.

[11] PRO's IBR Handbook theory further falls apart when applied to states.  PRO offers only that California's adoption process is "rigorous."  Opp. 5.  Whatever PRO's half-baked theory is, its brief does not explain it and PRO has therefore waived any additional argument based on states.  *Am. Wildlands*, 530 F.3d at 1001.

only portions of that standard.  *Id.* at 14-15, 20 (providing two examples of how agencies should draft regulations, both of which reference a whole standard).

PRO argues that even if the IBR Handbook does not say expressly that the agency only IBRs what is essential, an email from an employee of the National Archives and Records Administration ("NARA") to Mr. Malamud shows that is what agencies actually do.  *See* Opp. 5-6.  The email establishes no such practice.  The email is hearsay and cannot be considered on summary judgment.  *See Wilburn v. Robinson*, 480 F.3d 1140, 1143 n.2 (D.C. Cir. 2007).  And, even if the email were considered for the truth of the matters asserted therein, the email does not identify any regulation or other direction to agencies that they follow the practices described.  At most, the email expresses the author-employee's opinion.  But the privately expressed views of one federal employee neither dictate national policy nor guide agency practice.

> (ii)     *PRO is wrong that a federal agency, simply by IBR'ing a standard, has determined that everything within the four corners of the incorporated standard imposes a binding legal duty*.

On this record, the most that can be said when an agency IBRs a standard is that an agency has determined that some elements of the standard will be incorporated into the relevant regulation. For example, 49 C.F.R. § 192.7(h)(4) incorporates the 2011 NFPA 70 for regulations related to compressor stations and vaults used in transporting natural gas.  *See id.* ("IBR approved for §§ 192.163(e); and 192.189(c)"); *id.* § 192.163(e) (compressor stations); *id.* § 192.189(c) (vaults)). Large portions of NEC 70, however, have nothing to do with those kinds of facilities.  Obviously, the Department of Transportation was not mandating compliance with the standard's provisions regarding, for example, aircraft hangars, television studios, or pipe organs.  *See* 2011 NFPA-70 Art. 513, 520, 650.  Nor is it reasonable to suggest that the agency intended to transform sections of the standard that are expressly optional into mandatory requirements—*e.g.*, that the agency's

reference to NFPA-70 was meant to convert the "recommended tightening torque tables" that "*may be used*" into legally binding obligations. 2011 NFPA-70 Annex I (emphasis added). PRO's theory is simply untenable.

Even if the Handbook did say—which it does not—that every act of IBR represents a conclusive determination that every element within the covers of an IBR'd standard is essential to complying with a legal duty, the statement would be wrong. Again, Plaintiffs have demonstrated that large portions of numerous standards in issue do not meet that standard of essentiality. And the Court owes that Handbook no deference.[12]

Finally, even if PRO were right about the import of the IBR Handbook, its argument would still fail as to multiple standards for which PRO has not identified any incorporation by a federal agency.[13] *See* 3d Supp. SMF ¶ 7 (4 NFPA); Wise Decl. II Ex. 176 n.2 (69 ASTM). PRO concedes that it has failed to identify an incorporating regulation with respect to several of the ASTM standards, but attempts to downplay and defend its activities by noting that the standards it has posted are "very close" to standards that have been incorporated, with most of the "text . . . identical." Opp. 6 n.3, 9. PRO suggests the Court should just give it the benefit of the doubt because "[m]atching the published editions of a standard with the regulatory text incorporating that standard is a challenging process." Opp. 9. PRO bears the burden of showing that the manner

---

[12] The Handbook does not constitute an agency interpretation of the meaning of a federal statute or regulation, but instead one agency's recommendation for how other agencies should operate. That is, PRO's argument does not ask this Court to defer to the Handbook as a legally correct interpretation, but instead to accept, as a factual matter, that other agencies actually followed that instruction in promulgating regulations.

[13] Furthermore, for more than 20% of the ASTM Works at issue (41 standards), PRO identified a citation to the C.F.R. that was not promulgated until *after* PRO posted the standards in 2012. 3d. Supp. SMF ¶ 4, Wise Decl. II, Ex. 176 (ASTM); *see also* 3d Supp. SMF ¶ 2, Wise Decl. II, Ex. 186 (ASHRAE). PRO cannot claim a defense to liability for infringement between when it posted the standard and the date of the regulation.

in which each standard is incorporated justifies its use. *See ASTM II*, 896 F.3d at 453. That burden

is not lifted because PRO finds the federal regulatory system complex. And in any event, it is not

just these purportedly "very close" ASTM standards where PRO has failed to make a threshold

demonstration of incorporation: its summary judgment exhibits also fail to point to any federal

regulation incorporating several NFPA standards that are not at all "identical" to standards that

have been incorporated. 3d Supp. SMF ¶ 7. Where PRO cannot make the threshold showing that

a standard even *has* been incorporated, it cannot meet its burden.[14]

> b.  *PRO's "purpose" in wholesale copying and disseminating is not meaningfully different from Plaintiffs.*

PRO's contention that it has a transformative purpose in providing access to "the law" fails

for a second reason: PRO has not "add[ed] something new" beyond what Plaintiffs already do.

*Campbell*, 510 U.S. at 579. *See* Mot. 14-16. PRO's responses to this point are meritless.

First, PRO argues that Plaintiffs' reading rooms "do not fill the [access] need" because,

PRO claims, the reading rooms are not as easy to access or use as PRO's indiscriminate offering.

Opp. 22. But every one of the Works for which PRO has accurately identified an incorporating

regulation[15] is available in Plaintiffs' reading rooms. 2d Supp. SMF ¶ 85. PRO speculates that

some individuals somewhere *might* have difficulty using a reading room. PRO offers no evidence

---

[14] PRO claims that Plaintiffs previously acknowledged that the standards at issue have been incorporated by reference, somehow eliminating PRO's obligation to make this threshold showing. Opp. 8. No Plaintiff conceded that every portion of an IBR'd standard imposed a binding legal duty, much less that every standard was in fact IBR'd. *See* Pls.' Response to PRO's Statement of Disputed Facts (filed concurrently herewith) ¶ 36, *passim* (Dkt. No. 155-2). ASTM stated only that it had "reason to believe" that the standards were incorporated—not that they were. *See id*. PRO has simply misrepresented Plaintiffs' interrogatory responses.

[15] The only Works that are not available in Plaintiffs' reading rooms are 27 ASTM standards, for which PRO has not identified an accurate incorporating regulation and ASTM is not aware of any. 3d Supp. SMF ¶ 9; *see also* Opp. 6 n.3 (admitting that "Public Resource accidentally posted" editions of ASTM standards that had not been incorporated).

that any person has or likely will have such difficulty.  PRO's speculation does not create a triable issue.  *See Taylor v. FDIC*, 132 F.3d 753, 762 (D.C. Cir. 1997) (courts "do not accept bare conclusory allegations as fact" at summary judgment).  The examples PRO cites in its introduction are inapposite, because there is no evidence the courts in those cases tried but were unable to find any relevant material in *Plaintiffs'* reading rooms or that those cases involved any standard in issue here.  *See* Opp. 1-2.

PRO's insistence that regulated parties also must be able to "search, bookmark or copy relevant sections" of legally binding texts, Opp. 20, is fundamentally a policy question about whether the "reasonably available" standard balances respect for copyright with access concerns— that is, it is one best directed to Congress, not this Court, *Am. Soc'y for Testing & Materials, v. Public.Resource.Org, Inc.*, No. 13-cv-1215 (TSC), 2017 WL 473822, at *11 (D.D.C. Feb. 2, 2017) ("*ASTM I*").  Whether "the public requires *greater* access to the standards . . . is a policy judgment best left to Congress".  *Id.*

Second, PRO points to its own and Plaintiffs' stated goals to contend that Plaintiffs do not share PRO's "law-promoting purpose." Opp. 11; *see also id.* at 15-16, 23.  To begin, Plaintiffs *do* view their reading rooms as educational resources that provide the public with authentic, accurate versions of standards, including those incorporated by reference.  2d Supp. SMF ¶ 85.  PRO belittles ASTM's establishment of its reading rooms as a ploy to "take ownership" of the access issue.  Opp. 13 (citation omitted).  But there is nothing nefarious about a copyright holder's desire to respond to a developing issue in a way that provides the public with free online access while at the same time preserving its control over its copyrighted works.  More to the point, the transformative inquiry focuses on "how the work in question appears to the reasonable observer, not simply what an artist might say about a particular piece or body of work."  *Cariou v. Prince*,

714 F.3d 694, 707 (2d Cir. 2013); *see also Campbell*, 510 U.S. at 582 (looking to how work "may reasonably be perceived"); *Brammer v. Violent Hues Prods., LLC*, 922 F.3d 255, 263 & n.3 (4th Cir. 2019) (explaining that "transformation inquiry is largely objective" and rejecting district court's focus "on the subjective intent of the parties").  It does not matter how PRO or Plaintiffs describe their provision of the standards.  What matters is what they actually provide.  *See id.* at 263 ("Often the 'only two pieces of evidence' that are 'needed to decide the question of fair use are the original version and the secondary use at issue.'" (alterations omitted) (quoting *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012))).

And what PRO actually provides is just an inferior duplicate of Plaintiffs' publication and dissemination of the standards.[16]  Anyone who wished to determine legal obligations contained in one of the standards could do so through Plaintiffs' reading rooms—and, indeed, she would find, PRO admits, more accurate information regarding those obligations than PRO offers.  *See* 2d Supp. SMF ¶ 20.[17]  This is thus not a case like *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), where Google displayed a *modified* version of a work for a *new* purpose.  *See id.* at 1155, 1165 (Google displayed "reduced, lower-resolution versions of full-sized images" as part of

---

[16] PRO does not even meet its stated purpose of only posting IBR'd standards that it deems "the law."  As noted above, even using PRO's assessment, 41 of the Works were not IBR'd when PRO posted them in 2012. 3d. Supp. SMF ¶ 4, Wise Decl. II, Ex. 176.  For another 56 Works, PRO identified a citation to the C.F.R. that had been amended to eliminate reference to the Work at issue or to incorporate a different standard before PRO posted the Works.  3d. Supp. SMF ¶ 5, Wise Decl. II, Ex. 176.  Accordingly, for these Works, under the D.C. Circuit's guidance to look to the "direct legal effect on any private party's conduct," *ASTM II*, 896 F.3d at 443, PRO's interest is further diminished because the Works had (and have) no legal effect.

[17] PRO contends that, just as a book review that misquoted the underlying book would still enjoy fair use protection, errors in its postings do not weigh against fair use.  Opp. 25 n.11.  PRO misses that the transformative value of the book review is not purported to be in its direct quotations, but in its commentary on the book.  PRO, by contrast, asserts that it offers the transformative use of providing access to the law.  "[G]iven that precision is ten-tenths of the law," the errors that riddle PRO's standards *do* cut against its alleged transformative purpose.  *ASTM II*, 896 F.3d at 452.

search function); *see also Authors Guild v. Google, Inc.*, 804 F.3d 202, 207 (2d Cir. 2015) (finding transformative use where Google "augment[ed] public knowledge by making available information *about* Plaintiffs' books without providing the public with a substantial substitute").

Nor does *Swatch Group Management Services Ltd. v. Bloomberg L.P.*, 756 F.3d 73 (2d Cir. 2014), aid PRO. There, Bloomberg disseminated a recording of a private call that was open only to 333 invited financial analysts. But *Swatch* is not analogous because Bloomberg provided the call to individuals who would not otherwise have had access to it. Unlike the investors and analysts in *Swatch*, anybody wishing to access Plaintiffs' standards can do so without PRO: Plaintiffs' standards—unlike the call in *Swatch*—are already available to anyone who might want to read them. PRO adds nothing new.[18]

> c.  *PRO's provision of the standards in new formats is not transformative.*

PRO previously argued in this Court and before the D.C. Circuit that its provision of Plaintiffs' standards with different formatting, which, among other things, supposedly allows print-disabled individuals to access the standards, is transformative. *See, e.g.*, 2015 Opp. 37-39 (Dkt. No. 121-1); CADC Opening Br. 46-47 (Case No. 17-7035, Dkt. No. 1718058). This Court and the D.C. Circuit rejected those arguments. *See ASTM I* at *16-17; *ASTM II*, 896 F.3d at 450.[19]

---

[18] PRO states that the D.C. Circuit "recognized that sharing 'information of critical importance' that serves a public purpose . . . can favor fair use." Opp. 23 (citing *ASTM II*, 896 F.3d at 450). It did not: that quote comes (despite PRO's erroneous citation) from *Swatch*, not the D.C. Circuit's decision. *Swatch*, 756 F.3d at 82 (noting that call "information is of critical importance"). The D.C. Circuit emphasized repeatedly that the pertinent question was whether PRO was providing access to *legally binding* materials, not simply "information" of "importance." *See, e.g.*, *ASTM II*, 896 F.3d at 450 (explaining that dissemination of material that merely "help[ed] inform one's understanding of the law" would be "less justified").

[19] To the extent PRO intends to renew its argument that it has a transformative purpose because it seeks "to create a thorough and accurate archive of federal law," Opp. 26, that argument has, similarly, already been rejected at every stage of this litigation, *see ASTM II*, 896 F.3d at 450

Nonetheless, PRO has repeated these arguments verbatim here, *compare* Opp. 23, *with* CADC Opening Br. 46, without any attempt to distinguish either courts' prior rulings.

PRO's arguments are no more compelling this time around.  As courts have routinely held, "[a] simple repackaging of a work in a new format . . . is not transformative when the result is simply a mirror image reflected on a new mirror."  *Soc'y of the Holy Transfiguration Monastery, Inc. v. Archbishop Gregory of Denver, Colo.*, 685 F. Supp. 2d 217, 227 (D. Mass. 2010), *aff'd*, 689 F.3d 29 (1st Cir. 2012); *see also Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 72 (2d Cir. 1999) (translations were "not in the least transformative" (citation omitted) (internal quotation marks omitted)).

As for PRO's supposed interest in serving print-disabled users, there is no evidence that PRO's postings are actually accessible to such users or that any print-disabled individuals could not find accessible standards from Plaintiffs.  *See* Supp. SMF ¶¶ 4-11 (Dkt. No. 155-1).  Moreover, Congress has already provided a mechanism for ensuring visually impaired individuals have access to copyrighted materials: the Chafee Amendment allows organizations serving the visually impaired to copy works without permission from the copyright owner, as long as those copies are available *exclusively* for the use of the visually impaired.  17 U.S.C. § 121.  Notably, an online library for visually impaired users containing at least one of the standards at issue in this litigation already exists, and—if PRO were actually interested in improving access for print-disabled users— PRO could have uploaded accessible standards there.  Supp. SMF ¶ 3.  PRO's approach to fair use would render the Chafee Amendment—and the careful balance between copyright protection and access it struck—a nullity.  PRO's argument about its conversion of the standards to new formats

---

(explaining that this Court "properly rejected . . . PRO's argument[] as to its transformative use . . . that it was producing a centralized database of all incorporated standards").

is thus not only directly controlled by this Court's and the D.C. Circuit's prior holdings, but also meritless.

> **2.    Second Factor: PRO Has Refused To Engage With The Nature Of The Copyrighted Works, And Accordingly, Has Not Met Its Burden On This Factor.**

As with the first factor, the D.C. Circuit emphasized that the second fair use factor would "demand[] an individual appraisal of each standard and its incorporation" inquiring into whether the standard has been incorporated so as to impose a binding legal requirement. *ASTM II*, 896 F.3d at 451. On this factor, too, PRO fails to engage in this particularized inquiry, arguing instead that the second factor always favors fair use for all incorporated standards. *See* Opp. 25-26. PRO's argument neither "var[ies] standard by standard" as the D.C. Circuit anticipated this factor would, nor engages in an "individual appraisal of each standard and its incorporation" as the D.C. Circuit required. *ASTM II*, 896 F.3d at 451.

PRO also argues the standards are "authoritatively factual regarding the substance of the laws." Opp. 26 (emphasis omitted). Again, this simply begs the question whether any parts of the IBR'd standards actually set forth a binding legal duty. PRO thus has not shown that all the material it copied and distributed was, as PRO claims, "authoritatively factual." PRO has failed to meet its burden on this factor.

> **3.    Third Factor:  PRO Has Not Limited Its Copying To Those Portions Of Standards That Are Essential To Complying With Legal Duties.**

As with the first two factors, the D.C. Circuit emphasized that, in assessing the "amount and substantiality" of the copyrighted work used, "PRO's copying must be considered standard by standard in light of its purpose of informing the public about the specific incorporation at issue." *ASTM II*, 896 F.3d at 452. And, again, PRO has not done this analysis.

Notably, the D.C. Circuit provided specific guidance on this factor by comparing three different situations involving incorporated standards, explaining that each situation might justify posting a different amount of a standard.  *See id.*  PRO acknowledges that these examples provide the appropriate test.  Opp. 27.  But then, rather than grappling with how each of the standards' incorporations compares to those three guideposts, PRO simply asserts that "[e]very standard at issue here has been completely incorporated" such that its full posting of each standard is justified. *Id.*  That is non-responsive to the D.C. Circuit's test.

PRO argues that having to limit its copying and distribution to the material that actually imposes a legal duty would put PRO "in an impossible position."  *Id*.  But fair use is an equitable defense.  *See ASTM II*, 896 F.3d at 448.  If PRO wants to copy and distribute large portions of copyrighted works on the grounds that what it publishes imposes a legal duty, then it is only equitable that PRO determine whether the material it copies and posts actually imposes a legal duty.  At bottom, PRO is asking for carte blanche immunity to engage in wholesale copying based solely on the IBR'ing of a standard.  It is manifestly inequitable to allow PRO to copy and distribute large portions of standards that impose no legal duty.  PRO fails to sustain its burden on this factor as well.

> **4.     Fourth Factor:  PRO's postings pose a substantial threat to the actual and potential markets for Plaintiffs' standards.**

Both the traditional market harm analysis, as well as the three questions that the D.C. Circuit urged this Court to consider on remand, demonstrate that, like the others, the fourth fair use factor weighs in Plaintiffs' favor.

a.      *PRO misconstrues its burden on this factor.*

PRO's primary argument is that Plaintiffs have no evidence of specific lost sales they can trace to PRO's copying and distribution.  Opp. 3.  This argument misconstrues both the appropriate legal inquiry and the factual record.

First, PRO's argument ignores that "[i]t is not Plaintiffs' burden to establish that they have been harmed" but instead PRO's "burden to affirmatively establish that such conduct could not even 'potentially' harm the Plaintiffs' market."  *ASTM I*, at *18.  The Supreme Court has made clear that the party claiming fair use "would have difficulty" meeting its burden without "favorable evidence about relevant markets."  *Campbell*, 510 U.S. at 590.  PRO's only "evidence" though is pointing to the fact that Plaintiffs have difficulty quantifying the exact effects of PRO's activities.  *See ASTM I*, at *18 (noting that PRO "did not offer expert evidence on the economic impact on the markets" and instead relied only on "testimony by Plaintiffs' executives that they did not track or know of negative impacts thus far on their revenue from Defendant's conduct").  As explained below, that does not demonstrate that Plaintiffs have not been harmed—nor, more relevantly, does it show that Plaintiffs could not "even potentially" be harmed.  PRO has not met its burden on this factor.

Second, PRO conflates the inability to quantify and pinpoint specific harm with the inability to demonstrate harm.  Throughout its filings, PRO selectively quotes portions of the record in which Plaintiffs noted the entirely unsurprising fact that it is difficult to identify precise sales lost because of PRO's activities.[20]  But the fact that Plaintiffs have not, for example, "heard

---

[20] For example, PRO cites deposition testimony that PRO's postings have "not had a measurable impact on ASTM's finances," PRO SSSMF ¶ 137 (citing, *inter alia*, Grove Depo at 144:22-145:2), but neglects to note the immediately subsequent testimony that PRO's activities *have* "caused a drag on [ASTM's] revenue"—even if not quantifiable, Grove Depo. at 145:7-12.

from any customers that said 'I didn't buy the standard I was planning to buy because I could find it for free on the Internet from Public Resource,'" Grove Depo. 152:19-22 (Becker Decl. ¶ 12, Ex. 45, Dkt. No. 204-51), does not mean that Plaintiffs "ha[ve] no evidence that [they] lost sales" because of PRO's activities, PRO SSSMF ¶ 138 (Dkt. No. 204) (citing Grove Depo. at 152:19-24). And the fact that Plaintiffs may have difficulty quantifying harms does not mean they have not and will not suffer them. *See* Jarosz Rpt. ¶ 7 (Dkt. No. 118-12, Ex. 1) (noting that likely harms from Plaintiffs' loss of copyright protection "are real" but "will be exceedingly difficult to measure"). *Contra* Opp. 30 (focusing only on "measurable impact" of PRO's activities). Why would Plaintiffs continue to litigate this lawsuit and why would amici support their position if they did not face substantial harm?[21] *See* Jarosz Rpt. ¶ 141 (explaining that from a "revealed preference perspective, it does not appear that the Plaintiffs are of the belief that they would be better off without enforcing their copyright" and that, if they were of that belief, they "would not have incurred the substantial costs associated with the initiation and pursuit of this lawsuit").

To the contrary, the unrebutted economic evidence in the record is that PRO's activities pose a substantial threat to the market for Plaintiffs' standards and derivative works. 2d Supp. SMF ¶ 91 (Jarosz Rpt. ¶¶ 85, 92, 100, 130-49). While PRO attempts to attack Mr. Jarosz's report, its arguments mirror those that it made—and that this Court rejected—in its motion to strike the report.[22] *Compare, e.g.*, Opp. 29 (criticizing Mr. Jarosz's report as relying "on self-serving opinions" and "parrot[ing] [Plaintiffs'] legal arguments"), *with* Order Denying Motion to Strike 2,

---

[21]  PRO contends that Plaintiffs somehow delayed reopening of this case (presumably to suggest lack of need for an injunction). Opp. 18. But Plaintiffs contacted PRO on August 3, 2018 (two weeks after the D.C. Circuit's decision), and then after PRO delayed for months were forced to file a motion. *See* Wise Decl. II, Ex. 181.

[22]  This Court's denial of PRO's motion to strike Mr. Jarosz's report was affirmed by the D.C. Circuit. *ASTM II*, 896 F.3d at 453 ("we decline PRO's passing request to reverse the district court's admission of expert testimony on economic harm").

Dkt. No. 172 (rejecting PRO's argument that Mr. Jarosz "act[ed] as a mouthpiece" for Plaintiffs (citation omitted)).[23] Just as in that unsuccessful motion, PRO focuses on additional analyses Mr. Jarosz might have performed. *Compare, e.g.*, Opp. 29 ("He did not compare profitability of the standards posted by Public Resource to that of Plaintiffs' other standards."), *with* Order Denying Motion to Strike 3 (noting that PRO "t[ook] issue with Jarsoz's analysis involving . . . the differences in harms relating to the standards in this case versus all of Plaintiffs' standards generally"). As before, PRO essentially "appears to argue simply that different analyses would have resulted in an expert report more favorable to [its] position." Order Denying Motion to Strike 3. PRO had the opportunity to "offer[] a rebuttal expert in response . . . but chose not to." *Id.* Its attempt to call into question Mr. Jarosz's conclusions through bare assertions in its motion for summary judgment does not substitute for the expert analysis it never provided.

> b.   The answers to the D.C. Circuit's questions for remand on this factor favor Plaintiffs, not PRO.

On the first question—whether PRO's activities harm Plaintiffs given their provision of free access in reading rooms—PRO simply ignores Plaintiffs' argument. Plaintiffs explained how the reading rooms provide standards in read-only format, which prevents them from substituting

---

[23] This Court previously concluded that an inference of market harm was appropriate because PRO had "engage[d] in 'mere duplication for commercial purposes.'" *ASTM I*, 2017 WL 473822 at *18 (internal citations omitted). Concluding that PRO's activities were not commercial, the D.C. Circuit held that the "inference cannot be sustained." *ASTM II*, 896 F.3d at 453. Contrary to PRO's assertion, the D.C. Circuit did not conclude that Plaintiffs had "rel[ied] on . . . speculation" that it "found unconvincing." Opp. 13. In fact, the D.C. Circuit stated that "the SDOs are right to suggest that there may be some adverse impact on the market for the copyrighted works PRO reproduced on its website." *ASTM II*, 986 F.3d at 453. And indeed, the adverse impact is especially acute here given that PRO's copying "is extensive, or encompasses the most important parts of" the Works. *Authors Guild*, 804 F.3d at 221 ("The larger the amount, or the more important the part, of the original that is copied, the greater the likelihood that the secondary work might serve as an effectively competing substitute for the original, and might therefore diminish the original rights holder's sales and profits.").

for the commercial market for standards without such restrictions. *See* Mot. 26-27. PRO's copies do not have these restrictions and accordingly *do* substitute for and cannibalize sales of standards. *Id.* at 27-28. PRO does not present any response to this distinction. Instead, it merely offers *ipse dixit* that "Plaintiffs may continue selling laws by incorporation" and challenges to Mr. Jarosz's report, which—as explained above—are unavailing. Opp. 29.

On the second question, Plaintiffs and PRO agree: PRO has insisted on "wholesale copying" rather than limiting its activities to only those "few select provisions" that dictate legal obligations. *ASTM II*, 896 F.3d at 453; *see* Mot. 29; Opp. 29. It accordingly has no evidence that this factor might tip in its favor if it engaged in more limited copying of Plaintiffs' standards.

On the third question, PRO fails to rebut Plaintiffs' argument regarding derivative markets. As Plaintiffs explained, PRO's activities harm the market for newly developed standards: newly issued standards may be very similar to older versions that PRO posts, such that users may rely on PRO's copies in lieu of buying new standards. *See* Mot. 29-30.

In sum, the fourth factor, like the others, weighs against fair use.

## B.   The D.C. Circuit Did Not Remand For Reconsideration Of PRO's "Ownership" Arguments, Which Are Meritless In Any Event.

As a final attempt to evade summary judgment for Plaintiffs, PRO argues that there are "substantial questions of fact concerning ownership." Opp. 44. There are not. As Plaintiffs explained in their motion, this Court already rejected PRO's ownership arguments, and the D.C. Circuit affirmed. Mot. 10-12. PRO responds that because "this Court's earlier order [has been] vacated" it can raise the issue again. Opp. 45. Much as PRO would have this Court focus on the D.C. Circuit's disposition and ignore the substance of the opinion, "it is entirely appropriate—and, in most cases in this circuit, necessary—to consult the opinion to interpret the mandate." *U.S. on Behalf of Dep't of Labor v. Ins. Co. of N. Am.*, 131 F.3d 1037, 1041 n.7 (D.C. Cir. 1997). The

D.C. Circuit vacated the grant of summary judgment and directed the parties to focus on a specific issue—fair use; it did not declare an all-around do over, or demand that this Court or the parties revisit other issues that had been decided in the case.

And, even if this Court were to reconsider the ownership challenge, there is no basis for reaching a different conclusion than it (and the D.C. Circuit) did last time. *See LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) ("[T]he same issue presented a second time in the same case in the same court should lead to the same result."). PRO argues that government participation in developing the standards might render them uncopyrightable as "work[s] of the United States Government." 17 U.S.C. § 105; Opp. 44. But PRO has "submitted no evidence that specific language in any of the works was 'prepared by an officer or employee of the United States Government as part of that person's official duties.'" *ASTM II*, 896 F.3d at 446. And, as the D.C. Circuit has already held, PRO's failure to submit such evidence dooms the argument. *See id.* (explaining that because PRO had not presented any such evidence, the argument was "meritless"). Even if PRO had pointed to such language, the case law forecloses PRO's argument that such participation would render the entire work non-copyrightable. *See Schnapper v. Foley*, 667 F.2d 102, 106, 108 (D.C. Cir. 1981) (Sections 101 and 105 did not prohibit copyright protection for a television station's works even though the federal government commissioned them and "exercise[d] some supervision over the scripts."); H.R. Rep. No. 94-1476, at 59-60 (1976) (explaining that the Copyright Act "deliberately avoids making any sort of outright, unqualified prohibition against copyright in works prepared under Government contract or grant" and noting that Section 105 defines "work of the United States Government . . . in such a way that privately written works are clearly excluded from the prohibition.") (internal quotation marks omitted).

PRO's final rejoinder is to argue that it is *Plaintiffs'* burden to "establish[] that *no federal government employees* participated in drafting standards." Opp. 44. It reasons that Plaintiffs are not entitled to the rebuttable presumption of ownership from their copyright registrations because these registrations do not list all joint authors. Opp. 45. Courts have repeatedly upheld the validity of copyright registrations that do not list all joint authors. *See, e.g.*, *Alaska Stock, LLC v. Houghton Mifflin Harcourt Pub. Co.*, 747 F.3d 673 (9th Cir. 2014); *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 722 F.3d 591, 593, 596-99 (4th Cir. 2013). And errors in copyright registrations only matter if they are material or fraudulent—and PRO has come forward with no evidence of either. 2 *Nimmer on Copyright* § 7.20[B][1]; *see also id.* ("mention in a registration certificate of only one of two co-authors does not affect the validity of the registration"); *Urantia Found. v. Maaherra*, 114 F.3d 955, 963 (9th Cir. 1997). There are no factual questions as to ownership that would preclude summary judgment.

## II.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR TRADEMARK INFRINGEMENT CLAIMS.

As this Court previously explained in assessing Plaintiffs' trademark claims,

> the facts here present nearly as black-and-white a case as possible. . . . Because Defendant has intentionally created a copy that is meant to appear identical, including use of Plaintiffs' trademarks, then that consumer may download that standard for free from Defendant without knowing that it is not created by the Plaintiffs . . . .

*ASTM I*, 2017 WL 473822, at *23.

This black-and-white case of trademark infringement cannot be defended as nominative fair use. Nominative fair use is uniformly defined as "use of another's trademark *to identify the trademark owner's goods or services*." 4 *McCarthy on Trademarks and Unfair Competition* § 23.11 (5th ed.) (hereinafter "*McCarthy*") (emphasis added); *see also Cairns v. Franklin Mint Co.*, 292 F.3d 1151 (9th Cir. 2002). "Some examples of hypothetical uses that might qualify as a

'nominative fair use' are: comparative advertising (*e.g.*, 'Our ZETA gizmos last longer than ALPHA gizmos.'); independent repair facilities (*e.g.*, 'We repair MERCEDES vehicles'); independent retailers (*e.g.*, 'We sell genuine GLUGMORE plumbing parts.')." *McCarthy* § 23:11. In the present case, PRO is not using Plaintiffs' trademarks to refer to Plaintiffs' publications. PRO is using Plaintiffs' trademarks on *PRO's* substandard publications. This type of trademark use can never qualify as nominative fair use.

PRO's other nominative fair use arguments also fall flat. PRO first accuses Plaintiff of "distorting" the Third Circuit's nominative fair use framework by "ignoring that *Century 21* adopted a two-step approach that begins with a modified likelihood-of-confusion analysis before the burden shifts to the defendant." Opp. 31. PRO is the one distorting the record: Plaintiffs explained that *Century 21* held that nominative fair use requires a plaintiff to "prov[e] that confusion is likely," before "the burden . . . shifts to [the] defendant to show that its nominative use." Mot. 32 (quoting *Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 232 (3d Cir. 2005)). That initial showing of likelihood of confusion is not at issue here; this Court already concluded that Plaintiffs had shown a likelihood of confusion, and PRO failed to contest that holding on appeal. *See ASTM I*, 2017 WL 473822, at *23; *see also ASTM II*, 896 F.3d at 456. That holding is law of the case and PRO cannot challenge it.[24]

---

[24] In any event, the *Century 21* factors favor Plaintiffs. Evidence of actual confusion is not required. *See, e.g.*, *Oriental Fin. Grp., Inc. v. Cooperativa De Ahorro Crédito Oriental*, 698 F.3d 9, 17 (1st Cir. 2012). But as to both actual confusion and intent, as this Court previously ruled, "the facts here present nearly as black-and-white a case as possible. . . . Because Defendant has *intentionally* created a copy that is meant to appear identical, including use of Plaintiffs' trademarks, then that consumer may download that standard for free from Defendant without knowing that it is not created by the Plaintiffs." *ASTM I*, 2017 WL 473822, at *23 (emphasis added). As to consumer care, PRO has no evidence that consumers researching the law are careful in making brand distinctions, especially given that PRO's pirated standards are free. *See McCarthy* at § 23:95 ("Obviously, the price level of the goods or services is an important factor in determining the amount of care the reasonably prudent buyer will use."). And indeed, where, as here, "the

PRO's backup argument—that the nominative fair use factors favor PRO—likewise fails. Its analysis is flawed. Contrary to PRO's assertion, *Plaintiffs' trademarks are not necessary to describe Plaintiffs' Works.* PRO does not argue—let alone proffer evidence—that PRO's identification of Plaintiffs' standards "would be rendered significantly more difficult without use of" Plaintiffs' marks, as the law requires. *Century 21*, 425 F.3d at 229. PRO essentially concedes that it is not necessary for it to use Plaintiffs' logos to describe Plaintiffs' Works. *See* Opp. 34-35 (noting its "willingness to narrow the dispute" by redacting Plaintiffs' logos as "the inclusion or omission of Plaintiffs' logos is simply not important to Public Resource"); 2d Supp. SMF ¶¶ 22-24 (PRO has redacted some logos). The Court accordingly should not hesitate to permanently enjoin at least PRO's excessive use of Plaintiffs' logos.

As to Plaintiffs' word marks, PRO claims that it must use them, arguing that alternatives are "impractical," inferior forms of communication and  that consumers searching for Plaintiffs' standards will not find PRO's postings if PRO cannot *display* Plaintiffs' marks. Opp. 33. But as Plaintiffs have pointed out, PRO could also identify standards by citing the incorporating regulation. PRO protests that such an approach is "impractical" because one regulation may incorporate many standards, or because one standard may be incorporated into many different regulations. Opp. 33. This argument underscores that PRO's purported purpose of disseminating "the law" is hollow—that PRO has not researched the incorporating references thoroughly is a reason to *deny* fair use, not to grant it. If Plaintiff were truly concerned with effectively facilitating

---

products are identical and the marks are identical, the sophistication of buyers cannot be relied on to prevent confusion." *McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1137 (2d Cir. 1979). In short, whether the Court considers all of the traditional likelihood of confusion factors, as it did before, or the subset identified by PRO in its opposition, the result is the same: "there is no genuine dispute on the factual issue of whether consumer confusion is likely." *ASTM I*, 2017 WL 473822, at *23.

access to standards incorporated by reference, PRO could reproduce the current text of a regulation and—copyright issues aside—provide a hyperlink to the relevant standard, all without displaying Plaintiffs' word marks or logos in the linked-to content.  But Plaintiff does not want to do that work.  PRO's preference to instead display Plaintiffs' marks on pirated copies of Plaintiffs' standards does not satisfy PRO's burden on the first fair use factor.

*PRO also uses more of Plaintiffs' marks than is necessary to identify Plaintiffs' works.* PRO argues that it makes "communicative use" of Plaintiffs' logos as a "non-competitor" and is thus entitled to use Plaintiffs' logos and word marks in their entirety.  PRO is wrong on the facts and the law.  PRO is not a "non-competitor," *see* SMF ¶ 225 (Dkt. No. 118-2) (indicating that PRO's goal was to "have more users" than the "SDO-provided websites" and to "be No. 1 in the marketplace"), and its use is not the "communicative use" envisioned by the sole case PRO cites in support this proposition.  *Aviva United States Corp. v. Vazirani*, 902 F. Supp. 2d 1246, 1265 (D. Ariz. 2012), involved a gripe site directed at insurance company Aviva.  The *Aviva* court understandably ruled that no reasonable juror would be confused by the defendant's use of the Aviva logo in the manner depicted below—"Aviva Uncovered The Sad Truth About Aviva's Business Practices"—and in the context of a gripe site whose sole purpose was to criticize Aviva and its business practices.



*Id.* at 1252.  In stark contrast, PRO is not using Plaintiffs' logos to criticize Plaintiffs in a manner that could not reasonably lead to confusion, as this Court previously acknowledged,

> A consumer in the market for one of Plaintiffs' voluntary consensus standards may encounter them on Plaintiffs' websites for purchase, or on Defendant's website for free download.  Because Defendant has intentionally created a copy that is meant to appear identical, including use of Plaintiffs' trademarks, then that consumer may download that standard for free from Defendant without knowing that it is not

created by the Plaintiffs and may contain missing pages or typographical errors leading to inaccurate values for measurements.

*ASTM I*, 2017 WL 473822, at *23.  In light of these vastly different circumstances, PRO's reliance on *Aviva* is misplaced.[25]

Finally, *PRO's use of Plaintiffs' marks suggests that Plaintiffs endorse PRO's posted copies and that those copies are genuine versions of Plaintiffs' Works*.  PRO argues that it satisfies this factor because Plaintiffs have not shown "language or conduct in addition to use of their marks that affirmatively suggests sponsorship or endorsement by Plaintiffs."  Opp. 35.  First, it is *PRO's burden* to show that its use of Plaintiffs' marks is fair.[26]  *Century 21*, 425 F.3d at 228.  Regardless, PRO has done far more than just use Plaintiffs' marks—PRO "intentionally" copied Plaintiffs' standards in their entirety and "meant" for those copies to appear identical to Plaintiffs' Works, "including use of Plaintiffs' trademarks."  *ASTM I*, 2017 WL 473822, at *23.  And PRO represents that its pirated standards are the precise documents that are incorporated by reference (*e.g.*, that they are Plaintiffs' standards), even though they are not.  PRO's conduct was plainly calculated to confuse consumers.  What conduct precludes a fair use finding if not this?

Nor has PRO met its "heavy burden" to "come forward with evidence sufficient to demonstrate that [its disclaimers] would significantly reduce the likelihood of consumer

---

[25] Moreover, the defendant's use in *Aviva* "was undoubtedly a nominative use—that is, the mark was used to refer to Aviva and its products and services rather than Defendants and their products and services," *Aviva*, 902 F. Supp. 2d at 1264, unlike PRO's use.

[26] PRO asserts that "Plaintiffs appear to concede that, if they have the burden of proof on [nominative fair use], they lose on their trademark claim."  Opp. 31.  PRO offers no explanation as to why it (or any other defendant pursuing a nominative fair use defense) should not bear the burden of proof on this issue.  And regardless, Plaintiffs put forth sufficient evidence in their opening brief to demonstrate that PRO's use of Plaintiffs' marks is not fair under any conceivable test.

confusion.'"[27] *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1243 (10th Cir. 2006) (quoting *Home Box Office, Inc. v. Showtime/The Movie Channel Inc.*, 832 F.2d 1311, 1316 (2d Cir. 1987)). In fact, PRO offers no evidence whatsoever to show that its disclaimers are even read, let alone remotely likely to dispel confusion. And as discussed in Plaintiffs' opening brief, PRO's PDF cover page disclaimers—which are obscured by the cover page's other contents—are grossly inadequate. *See* Dkt. No. 200 at 44-45. As to PRO's below-the-fold Internet Archive disclaimers and the disclaimers on its HTML copies, PRO recites the content of those disclaimers without giving context its due. A reader must scroll past the PDF copy of the standard—the material the reader came for—to see the Internet Archive disclaimer. *See* 2d Supp. SMF ¶ 27. There is little practical difference between this location and the last line of a webpage. And PRO's HTML disclaimer—which appears in a section labeled "NOT PART OF THE STANDARD"—is likely to go ignored by anyone who downloads this document *to read the standard*. Simply put, if PRO's failure to put forth any actual evidence regarding its disclaimers is not enough, the Court need only review the disclaimers itself. Common sense dictates that they are insufficient—especially because they are affixed to purportedly exact copies of Plaintiffs' Works—and PRO fails to satisfy the final fair use factor.

Because PRO cannot meet its burden on any—let alone all—of the three required elements of nominative fair use, Plaintiffs are entitled to summary judgment on their claims for trademark infringement and false designation of origin.

---

[27] The D.C. Circuit considered PRO's disclaimers in discussing the third nominative fair use factor. *ASTM II*, 896 F.3d at 457-58

III.    <u>**PLAINTIFFS ARE ENTITLED TO A PERMANENT INJUNCTION.**</u>

A permanent injunction is the appropriate remedy here.  As PRO admits, the correct method to evaluate granting an injunction is the four-factor test laid out in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  But PRO conspicuously fails to address one of the four factors.  For the factors that are addressed, PRO melds three factors together into a variant of the same argument: a false threshold requirement that Plaintiffs must demonstrate a substantial amount of financial damage—sufficient to shut down their businesses or cease creation of new standards—before an injunction may issue.  That is not the standard.  In addition to this false standard, PRO's remaining arguments against an injunction are constitutional challenges re-hashed from its earlier appeal.  Those arguments were unavailing in the D.C. Circuit and are of no moment here.

A.    **PRO Fails To Address The Inadequacy Of Other Available Remedies.**

One of the required factors under *eBay* is that the Court must weigh the availability of alternate remedies—namely money damages.  Here, PRO argues an injunction is improper, but concedes it cannot pay money damages and points to no other available relief.  When asked at the initial summary judgment hearing what would be an appropriate remedy in lieu of an injunction, counsel for PRO responded: "I am not able to say."  2d Supp. SMF ¶ 112.

In its brief, PRO simply ignores this issue altogether, even though it is one of only four *eBay* factors.  Clearly, PRO has neither the ability nor inclination to pay for its infringement.  Statutory damages for PRO's infringement of 217 different works would be massive, and, as explained in Plaintiffs' opening brief, PRO has limited resources.  Mot. 43; *see also* SMF ¶¶ 272-73.  Further, money damages would be incredibly difficult to quantify given the kinds of harm sustained by Plaintiffs, including harm to Plaintiffs' goodwill and existing business models.  If Plaintiffs prevail on the merits, an injunction is the only remedy that makes sense.

32

**B.      PRO's Attempt To Address The Other Three *eBay* Factors Fails.**

For the remaining three *eBay* factors—irreparable harm, balancing of hardships, and public interest—PRO makes variants of the same argument.  It contends that Plaintiffs have not suffered enough harm to justify an injunction because Plaintiffs will likely continue to produce standards even if PRO is allowed to continue its infringement.  This is not the standard.  None of the *eBay* factors requires harm sufficient to put a plaintiff out of business.  And, in any event, Plaintiffs have submitted ample evidence that PRO's conduct is a major threat to their business models and reputations.  An examination of each of the remaining three factors shows exactly why an injunction is needed.

**1.      Plaintiffs Will Suffer Irreparable Injury.**

As explained in Plaintiffs' opening brief, PRO's actions will irreparably harm Plaintiffs' business models, right to exclude others from use of their copyrighted works and trademarks, and reputations.  Each of these is a cognizable injury supported by case law.  Nevertheless, PRO persists in arguing that it is not enough harm to justify an injunction.

Plaintiffs presented unrebutted testimony from an expert witness, Mr. Jarosz, concerning the dire impact PRO's actions will have on their business models because a loss of revenue from selling standards would force Plaintiffs to reduce their activities or switch to a less-desirable model in which standards must be funded prior to their development, which will result in the development of fewer standards by a less balanced group of participants.  SMF ¶¶ 251-54, 257-62.  Further, Plaintiffs have put forth evidence that, if PRO's conduct goes unchecked, it will act as a signal to the market that unauthorized versions of standards are acceptable, which will lead to the proliferation of new versions of the Works on other sites, thus further supplanting sales of Plaintiffs' works. SMF ¶ 254.  Even Mr. Malamud admits that his conduct "potentially poses a challenge to the current business models of the standards development of some standards

development organizations" and has told his supporters that he avoids discussing how his conduct impacts Plaintiffs because he "can't win that discussion."  SMF ¶¶ 255-56; *see also* Dkt. No. 118-13, Ex. 31 at 131 (PRO stating that SDO are "going to have to adjust their business models").

Against this weight of evidence, PRO argues (based on the *ipse dixit* of its attorneys rather than evidence) that Plaintiffs will be just fine because they have "other publications, including annotations, training materials, and non-incorporated standards."  Opp. 38-39.  This attempt to minimize Plaintiffs' harm is unavailing for several reasons.[28]  First, it is a false threshold.  There is no requirement that a plaintiff be harmed so severely as to threaten the plaintiff's very viability; irreparable harm may be found where a likelihood of lost market share or lost sales of a product is demonstrated.  *See Bell Helicopter Textron, Inc. v. Airbus Helicopters*, 78 F. Supp. 3d 253, 272 (D.D.C. 2015).  Second, Plaintiffs have offered plenty of evidence of harm, including expert testimony that PRO has never rebutted, which shows that these standards are of great importance to Plaintiffs.  And Plaintiffs' conduct also bolsters this point.  As Mr. Jarosz observed, Plaintiffs' filing and pursuing this costly lawsuit points to the importance of these standards to Plaintiffs and the threat posed by Defendant's infringement.  Rubel Decl. [Dkt. No. 118-12] Ex. 1 ¶ 141.

---

[28] PRO also seeks to minimize harm to Plaintiffs by claiming Plaintiffs sat on their rights and did not move for a preliminary injunction.  Although PRO suggests that Plaintiffs unnecessarily waited years to bring this suit, PRO did not post Plaintiffs' standards on its website until December 2012, and Plaintiffs responded by filing this suit only eight months later.  SMF ¶ 185; Compl. (Dkt. No. 1).  This is not an undue delay.  Further, courts have found that not moving for a preliminary injunction is immaterial when weighing a permanent injunction.  *See Cooper Notifications, Inc. v. Twitter, Inc.*, No. 09-865-LPS, 2010 WL 5149351, at *4 (D. Del. Dec. 13, 2010) (observing that the plaintiffs decision not to move for a preliminary injunction "tells one nothing . . . about the potential irreparability of any harm from any infringement."); *see also Proctor & Gamble Co. v. Team Technologies, Inc.*, No. 1:12-cv-552, 2013 WL 4830950, at *2 (S.D. Ohio Sept. 10, 2013) ("[t]he fact that Plaintiff did not seek a preliminary injunction does not mean that it would not suffer prejudicial harm.") (alteration in original) (quoting other source).  In the present case, Plaintiffs felt that it would be advantageous to develop an evidentiary record before seeking a merits-based decision.

Plaintiffs' opening brief also explained the harm that could come to Plaintiffs due to losing control of their copyrights and trademarks.  PRO distributes downloadable, printable copies of the standards, which can be taken from the Internet Archive and further shared anonymously, repeatedly, and without any ability to trace the individuals or entities using the Works or their purpose in doing so.  2d Supp. SMF ¶ 104; SMF ¶¶ 247-48.  Courts have explained how such digital spreading of works is "exponential rather than linear, threatening virtually unstoppable infringement of the copyright."  *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd*., 518 F. Supp. 2d 1197, 1218 (C.D. Cal. 2007) (issuing permanent injunction) (quoting other source).  As the *Grokster* court ultimately held, where the digital impact of infringement leads to an immeasurable level of copyright infringement and, therefore, immeasurable economic interference, it amounts to irreparable harm. *Id.* at 1219; *see also Arista Records LLC v. Lime Wire LLC*, No. 06 CIV. 05936 KMW, 2010 WL 10031251, at *4 (S.D.N.Y. Aug. 9, 2010) (entering permanent injunction because "damages cannot address this continued vulnerability" of future dissemination).  PRO's only retort is to claim that there is no right to exclude future uses recognizable after *eBay*.  Opp. 39.  But, each of the cases cited by Plaintiffs post-dates the Supreme Court's 2006 *eBay* decision.  Contrary to PRO's assertion, *eBay* did not do away with a court's ability to weigh the threat of future harm caused by a plaintiff losing control of its intellectual property.

Finally, Plaintiffs have demonstrated that PRO's lax quality control standards when reproducing their standards has led to errors.  Mot. 41.  These errors are damaging to entities that "have spent decades establishing the goodwill associated with their names and logos, which the public associates with their high quality work."  SMF ¶ 245 (citing Jarosz Rpt. ¶ 151).  PRO's response is to claim that its disclaimers are sufficient to prevent this type of harm.  But, as

addressed in Plaintiffs' opening brief and herein, PRO's disclaimers (which came about only as a result of this litigation) have been woefully inadequate; and, PRO's rampant usage of Plaintiffs' marks suggests Plaintiffs endorse PRO's unauthorized copies.  *See* Mot. 34-35; *supra* Part II.  PRO also claims that reputational harm is not cognizable in copyright cases.  For that proposition, PRO points only to *Garcia v. Google, Inc*., 786 F.3d 733 (9th Cir. 2015), a case of no moment here.  In *Garcia*, the court stated that irreparable harm related to a plaintiff's safety (in that case from physical attack by "radical elements of the Muslim community") was not cognizable as a copyright harm because it was too attenuated to copyright law's purpose of providing incentives to authors. *Id*. at 744-46.  Here, Plaintiffs reputations are closely tied to their incentives to create more works—without their reputations for producing detailed, accurate technical works, customers would not seek out Plaintiffs' standards.  The harm to Plaintiffs' reputations is very real and fully justifies an injunction.

### 2. Balancing The Hardships Favors Issuing An Injunction.

PRO's primary argument regarding balance of hardships is a re-hash of its irreparable harm theory.  PRO claims that the financial impact on Plaintiffs will not be so great as to halt creation of new standards, particularly because the standards are largely written by volunteers.  This overlooks that each of the Plaintiffs has to maintain a significant staff to facilitate standards meetings, govern standards creation proceedings, publish copies of the standards, and undertake many other business functions that allow the standards to be created.  And, it wholly overlooks (and fails to refute) the expert testimony of Mr. Jarosz, who explained that loss of revenue from sales of standards is likely to lead to a change in business models that will reduce the quality of Plaintiffs' works, including because Plaintiffs may have to start charging parties that wish to participate in standards creation (which is the practice of some other standards organizations). SMF ¶¶ 251-54, 257-62.

In contrast to the hardship that will befall Plaintiffs as a result of continued infringement, Mr. Malamud has expressly admitted that Defendant will suffer no harm if an injunction issues. SMF ¶ 277.  PRO now argues that there may be harm to its "mission" of posting the standards. But a defendant cannot claim an equitable interest in continuing to infringe a plaintiff's copyrights "and thus cannot complain of the harm it will suffer if ordered to cease doing so." *Fox Television Stations, Inc. v. Filmon X LLC*, 966 F. Supp. 2d 30, 51 (D.D.C. 2013); *see also WPIX, v. ivi, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012) ("[i]t is axiomatic that an infringer of copyright cannot complain about the loss of ability to offer its infringing product" and 'cannot be 'legally harmed by the fact that it cannot continue [infringing] plaintiffs' [copyrighted works], even if this ultimately puts [defendant] out of business.'").  The balance of hardships cannot weigh in PRO's favor where PRO will suffer no legally recognizable harm.

### 3.      An Injunction Serves The Public Interest.

It is undisputed that Plaintiffs' standards serve the public good.  The standards created by Plaintiffs serve an important public function.  They encourage safety, energy efficiency, and other public goods.  In fact, Defendant readily admits the importance of Plaintiffs' standards—even saying that NFPA "saves lives."  SMF ¶¶ 164-67.  And, without the standards created by Plaintiffs and other private SDOs, government agencies would lose important tools that they lean on in fulfilling their regulatory duties, thus shifting the burden to the public sector.  *Id.* ¶ 266.

PRO has no answer to this.  Instead, it yet again re-hashes the argument that the financial harm to Plaintiffs is not so great as to cease creation of standards.  Opp 43.  But, as explained above, Plaintiffs have indeed presented myriad evidence concerning harms that will befall them if PRO's infringement is unchecked, including harms to Plaintiffs' business models that will result in lower quality standards, which would ultimately harm the public.

Moreover, PRO can point to no actual harm to the public that will occur due to a lack of access to these standards.  As Plaintiffs have explained, Plaintiffs already provide free read-only access to the standards on their websites, 2d Supp. SMF ¶ 85, and access to the standards is easily attainable through various other means.  Tellingly, as a result of this litigation, PRO removed standards from its website from late 2015 to July 2018, and PRO can point to no resulting harm to the public.  *Id.* ¶¶ 11-12.  The public interest will be served—and not harmed—by the issuance of an injunction.

### C.     PRO's Constitutional Arguments Are Unavailing.

After failing to carry the day on the *eBay* factors, PRO resorts to arguing that an injunction both violates the First Amendment and raises due process concerns.  Neither argument is valid.

### 1.     PRO's First Amendment Argument Ignores Well-Settled Case Law.

PRO argues that under the First Amendment, it is entitled to make free use of the works at issue because those standards concern "matters of public interest."  Opp. 41.  But, as case law makes clear, the First Amendment does not impose an additional level of scrutiny for copyright above and beyond the Copyright Act's requirements.  To the contrary, the Supreme Court has consistently rejected demands for "heightened judicial review" of copyright law under the First Amendment because the Copyright Act "contains built-in First Amendment accommodations." *Eldred*, 537 U.S. at 218-19; *Golan v. Holder*, 565 U.S. 302, 327-28 (2012).

Those accommodations are the "distinction between copyrightable expression and uncopyrightable facts and ideas, and the latitude for scholarship and comment traditionally afforded by fair use."  *Harper & Row*, 471 U.S. at 560.  Accordingly, in any constitutional challenge to enforcement of a copyright, "the sole focus must . . . be on the idea/expression dichotomy and the fair use defense."  5 *Nimmer on Copyright* § 19E.06 (2017).  If copyright protection is consistent with "those two doctrines," it is "immune from First Amendment scrutiny."

*Id*.; *see Kahle v. Gonzales*, 487 F.3d 697, 699 (9th Cir. 2007) (rejecting the argument that the change from an "opt-in" to an "opt-out" copyright system required First Amendment review); *see also Arista Records, LLC v. Doe 3*, 604 F.3d 110, 118 (2d Cir. 2010) (First Amendment right to anonymity "does not . . . provide a license for copyright infringement").

In *Eldred*, *Golan*, and *Harper & Row*, the Supreme Court firmly established that where, as here, the work is validly copyrightable expression, and the infringement is not excused as a fair use, the First Amendment has nothing else to say.  PRO has no answer for this.  Because its fair use defense fails, its First Amendment argument fails too.

## 2.    PRO's Due Process Argument Is Meritless And Improper.

PRO asserts that this case raises a "basic" due process issue of "access to the law."  Opp. 42.  Not so.  The incorporated standards are available for the public to review, which is more than enough to provide "[t]he 'fair warning' required under the Due Process Clause."  *Cnty. of Suffolk, New York v. First Am. Real Estate Solutions*, 261 F.3d 179, 195 (2d Cir. 2001) (finding no due process violation resulting from copyright of tax maps).  By regulation, standards are eligible to be incorporated by reference only if they are reasonably available.  1 C.F.R. § 51.7.  All standards that are incorporated by reference are available in person at the Office of the Federal Register.  1 C.F.R. § 51.3(b)(4).  They typically also are available from the incorporating agency.  *E.g.*, 40 C.F.R. § 60.17(a) ("All approved material is available for inspection at the EPA Docket Center, Public Reading Room . . . and is available from the sources listed below.").  And Plaintiffs maintain reading rooms that allow for free read-only access to the standards.  Even after years of discovery in this suit, PRO utterly fails to prove that there is a problem with access to the standards.

Additionally, even if it had merit, PRO's due process claim is procedurally improper.  First, PRO purports to speak on behalf of third parties that could be affected by an alleged lack of access to the law.  But PRO does not have standing to raise due process claims on behalf of a third party.

*Kowalski v. Tesmer*, 543 U.S. 125, 131 (2004) (rejecting third-party standing for lawyers on behalf of potential clients); *Am. Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1357 (D.C. Cir. 2000) ("[O]ne of the judicially self-imposed limits on the exercise of federal jurisdiction is the general prohibition on a litigant's raising another person's legal rights.").

Second, there is no ripe dispute. A claim is not "'ripe . . . if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *R.J. Reynolds Tobacco Co. v. U.S. Food and Drug Admin.*, 810 F.3d 827, 830 (D.C. Cir. 2015) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). At least two contingencies must occur before PRO's due process argument would be ripe. First, a regulated person or entity must be prosecuted or sued for violating one of the standards. Second, that person or entity must claim that they were unable to access the standards. Unless and until these contingencies occur, a due process argument based on the standards' availability is too speculative and remote to be adjudicated. *See Texas v. United States*, 523 U.S. 296, 301 (1998) (declining to decide the constitutionality of a statute because "[t]he operation of the statute is better grasped when viewed in light of a particular application"). And if no such action ever occurs (as seems likely, given PRO's inability identify real access problems over the six-year history of this case), then the argument "may not require adjudication at all." *R.J. Reynolds*, 810 F.3d at 831 (internal quotation marks omitted).

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant summary judgment in favor of Plaintiffs on their copyright infringement and trademark infringement claims and should permanently enjoin PRO from infringing Plaintiffs' copyrights and trademarks.

Dated: December 23, 2019                    Respectfully submitted,


                                             /s/ J. Kevin Fee

                                             J. Kevin Fee (D.C. Bar: 494016)
                                             Jane W. Wise (D.C. Bar: 1027769)
                                             Morgan, Lewis & Bockius LLP
                                             1111 Pennsylvania Ave., N.W.
                                             Washington, D.C. 20004
                                             Tel: 202.739.5353
                                             Email: kevin.fee@morganlewis.com
                                                    jane.wise@morganlewis.com

                                             *Counsel for American Society for Testing and Materials
                                             d/b/a ASTM International*



                                             /s/  Kelly M. Klaus

                                             Kelly M. Klaus (*pro hac vice*)
                                             MUNGER, TOLLES & OLSON LLP
                                             560 Mission St., 27th Floor
                                             San Francisco, CA 94105
                                             Tel: 415.512.4000
                                             Email: Kelly.Klaus@mto.com

                                             Rose L. Ehler (*pro hac vice*)
                                             MUNGER, TOLLES & OLSON LLP
                                             350 South Grand Ave., 50th Floor
                                             Los Angeles, CA 90071
                                             Tel: 213.683.9100
                                             Email: Rose.Ehler@mto.com

                                             Rachel G. Miller-Ziegler
                                             MUNGER, TOLLES & OLSON LLP
                                             1155 F St. NW, 7th Floor
                                             Washington, DC 20004
                                             Tel: 202.220.1100
                                             Email: Rachel.Miller-Ziegler@mto.com

                                             *Counsel for National Fire Protection Association, Inc.*


41

*/s/  J. Blake Cunningham*

Jeffrey S. Bucholtz (D.C. Bar: 452385)
David Mattern
King & Spalding LLP
1700 Pennsylvania Avenue, NW, Ste. 200
Washington, DC 20006-4707
Tel: 202.737.0500
Email: jbucholtz@kslaw.com

J. Blake Cunningham
King & Spalding LLP
101 Second Street, Ste. 2300
San Francisco, CA 94105
Tel: 415.318.1211
Email: bcunningham@kslaw.com

*Counsel for American Society of Heating,
Refrigerating, and Air Conditioning Engineers*