# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
INTERNATIONAL CODE COUNCIL, INC.,  :
                                   :
                  Plaintiff,       :
                                   :    17 Civ. 6261 (VM)
       - against -                 :
                                   :    **DECISION AND ORDER**
UPCODES, INC., et al.,             :
                                   :
                  Defendants.      :
-----------------------------------X

**VICTOR MARRERO, United States District Judge.**

## TABLE OF CONTENTS

I. BACKGROUND ........................................... 2

  A. FACTUAL BACKGROUND.................................. 2

    1. ICC and Model Building Codes ...................... 2

    2. UpCodes and the Codes Displayed ................... 7

      a.  Historic UpCodes ............................... 8

      b.  Current UpCodes ................................ 9

  B. PROCEDURAL BACKGROUND.............................. 10

    1. ICC's Motion ..................................... 12

    2. Defendants' Motion ............................... 14

II. LEGAL STANDARDS AND DISCUSSION ...................... 15

  A. MOTIONS FOR SUMMARY JUDGMENT....................... 15

  B. DECLARATORY JUDGMENTS AND COPYRIGHT INFRINGEMENT.... 17

  C. PUBLIC DOMAIN...................................... 18

    1. The Government Edicts Doctrine ................... 20

    2. Model Building Code Cases ........................ 25

    3. Incorporation by Reference ...................... 31

    4. County of Suffolk ............................... 35

    5. Constitutional Considerations ................... 39

      a.  The Takings Clause ............................ 39

      b.  The Supremacy Clause .......................... 44

6.    Statutory Considerations ......................... 46

7.    Analysis ....................................... 48

   a. ICC's Motion.................................. 50

   b. Defendants' Motion ........................... 56

D.  MERGER............................................ 60

E.  FAIR USE.......................................... 72

  1.   First Factor: Purpose and Use ................ 77

  2.   Second Factor: Nature of the Work ............ 82

  3.   Third Factor: Amount and Substantiality ...... 84

  4.   Fourth Factor: Effect of Use upon Market ..... 87

  5.   Overall Analysis ............................. 91

F.  COLLATERAL ESTOPPEL............................... 93

G.  WILLFULNESS....................................... 97

III. ORDER............................................ 101

ii

Plaintiff International Code Council, Inc. ("ICC") filed this action alleging one count of copyright infringement by defendants UpCodes, Inc. ("UpCodes"), Garrett Reynolds, and Scott Reynolds (collectively, "Defendants"). ICC claims that Defendants have infringed its copyrights in forty model building codes (the "I-Codes") by posting the I-Codes and derivative works on their website, UpCodes. (See "Complaint," Dkt. No. 1.) Defendants deny ICC's claims and counterclaim for a declaratory judgment that none of their copying constitutes copyright infringement, because the material they post on UpCodes is either in the public domain or otherwise protected under copyright defenses including merger and fair use.

Now before the Court are the parties' cross-motions for summary judgment. (See "ICC's Motion," Dkt. No. 84; Defendants' Motion," Dkt. No. 85.) For the reasons set forth below, the Court DENIES both motions at this time.

1

# I.   **BACKGROUND**[1]

A.   FACTUAL BACKGROUND

1.   ICC and Model Building Codes

This is a case about model building codes. Model codes are a type of privately-developed standard that provide rules, conditions, and guidelines for various products and processes, and which also delineate various technical specifications, measurements, and testing methods that apply to those products and processes. Federal, state, and local governments frequently incorporate such standards

---

[1] Except as otherwise noted, the following background derives from the undisputed facts as set forth by the parties in their Local Rule 56.1 Statements of Undisputed Material Facts and responses thereto. (See "ICC SUMF," Dkt. Nos. 84-2, 100-1; "Defs. SUMF," Dkt. No. 85-2; "ICC Supp. SUMF," Dkt. No. 90-1; "ICC SDF," Dkt. No. 90-29; "Defs. Resp.," Dkt. No. 92-1; "Defs. Supp. Resp.," Dkt. No. 96-1.) The Court has also considered the full record submitted by the parties, including the following frequently-cited declarations and exhibits: the Declaration of Mark Johnson in support of ICC's Motion, Dkt. No. 84-3 ("Johnson Decl."); the Declaration of Jane Wise in support of ICC's Motion, Dkt. No. 84-18 ("Wise Decl."); Wise Decl. Ex. 65 ("Jarosz Report"); the Declaration of Joseph C. Gratz in support of Defendants' Motion, Dkt. No. 85-3 ("Gratz Decl."); the Declaration of Garrett Reynolds in support of Defendants' Motion, Dkt. No. 85-20 ("G. Reynolds Decl."); the Declaration of Scott Reynolds in support of Defendants' Motion, Dkt. No. 85-23 ("S. Reynolds Decl."); the Declaration of Jane Wise in opposition to Defendants' Motion, Dkt. No. 90-5 ("Wise Opp. Decl."); the Affidavit Declaration of Joseph C. Gratz in Opposition to ICC's Motion, Dkt. No. 92-2 ("Gratz Opp. Decl."); the Affidavit Declaration of Douglas Kidder, Dkt. No. 92-30 ("Kidder Decl."), & Ex. A ("Kidder Report"); the Affidavit Declaration of Garrett Reynolds in Opposition to ICC's Motion, Dkt. No. 92-33 ("G. Reynolds Opp. Decl."); the Affidavit Declaration of Scott Reynolds in Opposition to ICC's Motion, Dkt. No. 92-35 ("S. Reynolds Opp. Decl."); and the Affidavit Declaration of Garrett Reynolds in support of Defendants' Reply, Dkt. No. 96-2 ("G. Reynolds Reply Decl."). No further citations to the record will be made herein except as specifically cited. The Court construes any disputed facts discussed in this section and the justifiable inferences arising therefrom in the light most favorable to the non-movant for each motion, as required under the standard set forth in Section II.A. below.

into their statutes and regulations by reference. Adopting privately-developed model codes saves governments time and money. Adopted model codes also substantially benefit building professionals, engineers, and the public more broadly. For example, because model codes are drafted by groups that are more familiar with the particular subject matter of their codes than governments, governmental adoption of model codes helps align the law with industry best practices. Adoption by reference is also valuable because standards may concern areas of broad relevance to the public, such as the safety of residences and workplaces. Entities dedicated to the development of such standards are called standards development organizations ("SDOs").

ICC is an SDO that develops model codes regulating what it calls the "built environment"; its model codes include building codes, fire safety codes, plumbing codes, and more. ICC was founded in 1994 by three regional SDOs that developed similar codes: the Southern Building Code Congress International, Inc. ("SBCCI"), Building Officials and Code Administrators International, Inc. ("BOCA"), and the International Conference of Building Officials ("ICBO"). These three regional predecessor organizations

3

donated their copyrights in model codes to ICC in 2003 and envisioned that ICC would produce coordinated national building codes. ICC competes with other SDOs to draft model codes addressing the same subject matter; as one example, the National Fire Protection Association ("NFPA") also creates fire safety codes. ICC's codes have been adopted into law by jurisdictions across all fifty states, with many jurisdictions adopting multiple codes authored by ICC.

ICC prepares its model codes for a variety of reasons, including to promote the health and safety of building occupants and construction workers, to lower construction costs, and to promote the uniformity and interoperability of products in the built environment, by, for example, providing minimum requirements for manufacturers of such products to comply with. Model codes can advance these goals in various ways, such as serving as industry best practice benchmarks for designers and builders; voluntary compliance programs for sustainability, energy efficiency, and disaster resistance; and assisting with credentialing and certification of building and construction industry participants and products.

Of particular relevance here, one way that ICC advances its goals is through the adoption of its model

4

codes into law. The record substantially reflects that one
of ICC's foremost reasons for developing model codes is for
governments to enact them as law. For example, ICC's 2015
International Building Code contains sample legislation for
its enactment into law. (See Defs. SUMF ¶ 24; Gratz Decl.
Ex. 1. at ICC00008325; Gratz Opp. Decl. Ex. 27; ICC SDF ¶
24.) ICC also has a dedicated Government Relations
department that helps state and local jurisdictions to
enact its codes, among other purposes. Many employees in
this department are field staff working in the state and
local jurisdictions that have or might adopt ICC's codes.
This department also maintains a chart on its website
cataloging adoptions of its model codes. (Defs. SUMF ¶ 36;
Gratz Decl. Ex. 12; ICC SDF ¶ 36.)

ICC develops its model codes through a multi-step
process that utilizes various technical committees and
allows for public participation and comment at no cost. The
process also involves significant participation by
government representatives, who compose at least one-third
of each committee and vote on important decisions regarding
changes to the model codes. ICC also has dedicated code
development staff. ICC revises its codes pursuant to this
process every three years. ICC currently incurs the up-

5

front costs of its code development process and recoups the relevant costs at least in part from the sale and licensing of its copyrighted codes.[2]

The prices for ICC's model codes are modest compared to those for other technical reference works. ICC also donates hundreds of copies of its model codes to libraries and other jurisdictions throughout the United States. ICC additionally licenses use of its codes to online reference libraries where members of the public can purchase model codes and guidelines. ICC sells a variety of supplemental materials and services apart from the model codes themselves, such as code commentary, study companions, handbooks, user's guides, and training materials incorporating model code text.

ICC also makes its model codes, and some government codes that adopt the model codes, available for free on its website in a digital library called publicACCESS. The publicACCESS reading room makes printing, copying, and downloading of the codes difficult, though it does not necessarily completely prevent such functions. ICC publicizes that the free access it provides to its model codes and the enacted state and local codes is on a read-

---

[2] However, Defendants argue ICC may also recoup such costs through other means such as membership dues and non-code publications.

only basis. ICC relatedly offers a paid service called premiumACCESS, which provides users with access to additional features such as full access to commentaries, and tools to highlight, bookmark, and annotate the codes.

2. <u>UpCodes and the Codes Displayed</u>

UpCodes is a start-up business founded and run by brothers Garrett and Scott Reynolds. Having worked as a professional architect for several years, Scott Reynolds conceived UpCodes as a website providing easy and convenient access to materials of particular importance to members of the architecture, engineering, and construction ("AEC") industries, such as the state and local building codes that governed their projects. He enlisted the services of his brother Garrett, a proficient software engineer, to develop UpCodes for the AEC community and potentially the broader public.

Since its inception in 2016, UpCodes has operated as a "freemium" platform that offers some free services and some additional services only available to paying "premium" users (ICC's publicACCESS and premiumACCESS tools are another example of a freemium model). UpCodes' paid subscription allows users to search, bookmark, highlight,

and comment on code sections. UpCodes offers services to individual users, groups, and institutional clients.

a. <u>Historic UpCodes</u>

The layout of the UpCodes website, and particularly the manner in which it displayed ICC's codes, changed significantly after ICC instituted this suit. "Historic UpCodes" refers to UpCodes as it existed from its creation in 2016 until ICC sued Defendants in August 2017. Historic UpCodes made the forty I-Codes available to the public to view, print, copy, and download. Defendants did not make all of ICC's codes available on Historic UpCodes, though, and they redirected users to ICC's website for at least one (the International Zoning Code 2015). (ICC SUMF ¶ 115; Wise Decl. Ex. 15 at 279-280; Defs. SUMF ¶ 115.) Defendants knew that ICC posted codes for free on publicACCESS, but they felt that UpCodes provided an opportunity to make codes "more friendly, easy to access, and reliable." (ICC ¶¶ SUMF 89-90; Defs. Resp. ¶¶ 89-90.) Defendants did not seek permission or a license to post ICC's codes.

On the free access portion of Historic Upcodes, the forty ICC model codes were posted in a section titled "General Building Codes" and identified by their model code names. However, Historic UpCodes also identified

8

jurisdictions that had adopted the model codes on the same page, at least as to some of the codes. The paid access portion of Historic Upcodes displayed governmentally enacted building codes that adopted ICC's model codes with amendments. On this paid portion of Historic Upcodes, additions by the enacting state or local jurisdiction were displayed in green, while all model code text that a jurisdiction did not adopt was struck-through in red, much like in a redline. The codes displayed on Historic UpCodes frequently included ICC's copyright notices.

      b.   <u>Current UpCodes</u>

After ICC filed suit for copyright infringement in August 2017, Defendants redesigned their website, resulting in "Current UpCodes." Current UpCodes purports to post only enacted state and local building codes, rather than any model codes as such. Whereas only paid users of Historic UpCodes could access state or local laws that adopted ICC's model codes with amendments, Current UpCodes does not charge for access to enacted laws. When displaying state or local codes that adopt ICC's model codes with amendments, Current UpCodes now shows only the titles or headings of the deleted model code provisions in struck-through red text, rather than all portions of the model codes that were

not adopted. Although Current UpCodes allegedly posts only the law as enacted, it still uses the trademarked names of ICC's model codes at various points. For example, Current UpCodes typically identifies a state or local building code and notes on the same page that the enacted code adopts a particular model code with or without amendment. (G. Reynolds Decl. Ex. 1.)

Defendants have continued to update Current UpCodes since the filing of this lawsuit. For example, Defendants have added codes enacted by states including Connecticut, North Carolina, Pennsylvania, and Virginia. (ICC Supp. SUMF ¶ 12; Wise Opp. Decl. Ex. G; Defs. Supp. Resp. ¶ 12.) During the briefing of the motions at issue here, Defendants have also updated the website in response to ICC's observations regarding the posting of model code provisions that were not adopted into law.

B.  PROCEDURAL BACKGROUND

ICC sued Defendants for one count of copyright infringement on August 17, 2017. (See Complaint.) Exhibit A to the Complaint listed forty-one model codes allegedly infringed, though the parties later agreed that Defendants did not infringe ICC's copyright in the International Zoning Code 2015. The remaining forty "I-Codes" are a

combination of 2009, 2012, and 2015 editions of the following substantive codes:

1.  International Building Code ("IBC");
2.  International Residential Code for One and Two-Family Dwellings ("IRC");
3.  International Existing Building Code ("IEBC");
4.  International Fire Code ("IFC");
5.  International Plumbing Code ("IPC")
6.  International Mechanical Code ("IMC")
7.  International Fuel Gas Code ("IFGC")
8.  International Performance Code for Buildings and Facilities ("ICCPC")
9.  International Energy Conservation Code ("IECC")
10. International Private Sewage Disposal Code ("IPSDC")
11. International Wildland-Urban Interface Code ("IWUIC")
12. International Property Maintenance Code ("IPMC")
13. International Swimming Pool and Spa Code ("ISPSC")
14. International Zoning Code ("IZC"); and
15. International Green Construction Code ("IGCC").

(ICC SUMF ¶ 19; Defs. Resp. ¶ 19.) ICC has registered copyrights in the 2009 and 2012 editions of the IECC, the 2012 and 2015 editions of the ISPSC, IZC, and IGCC, and the 2009, 2012, and 2015 editions of all of the other codes listed above. (ICC SUMF ¶¶ 21-22; Johnson Decl. Ex. 5; Defs. Resp. ¶¶ 21-22.)

On October 19, 2017, Defendants answered and counterclaimed for a declaratory judgment stating that UpCodes did not and does not infringe ICC's copyrights. (See Dkt. Nos. 20-21.)

11

1.  <u>ICC's Motion</u>

On May 31, 2019, ICC moved for summary judgment on its claim of copyright infringement and for a permanent injunction restraining Defendants from any future infringement. (<u>See</u> ICC's Motion.) ICC also moved for a judgment that Defendants' infringement was willful, which would entitle ICC to greater statutory damages under the Copyright Act of 1976 (the "Copyright Act"), 17 U.S.C. Section 101 <u>et</u> <u>seq</u>. (<u>See</u> "ICC Memo," Dkt. Nos. 84-1, 100 at 49-50.)

ICC claimed that Defendants infringed its copyrights in three different ways. First and most straightforwardly, it claimed that Defendants posted the I-Codes on UpCodes without ICC's permission. Second, ICC claimed that Defendants infringed its copyrights by posting enacted state and local building codes that incorporated the I-Codes by reference (the "I-Codes as Adopted"). Third, ICC claimed that Defendants infringed the I-Codes by including unadopted model code text in struck-through red print when displaying state or local codes that adopted the I-Codes with amendments (the "I-Code Redlines") on Historic UpCodes. (<u>See</u> <u>id.</u> at 15-16.)

12

Defendants opposed ICC's Motion on June 28, 2019, raising several defenses to the allegations that their copying constituted actionable infringement. (See "Defendants' Opposition," Dkt. No. 92.) Defendants argued that posting government codes that adopt the I-Codes is not infringement because enacted codes are the law, and thus in the public domain. (See id. at 13-27.) They added that posting I-Codes that were also adopted without amendment is protected under the doctrine of merger, because the model code text is identical to the text of the enacted law and thus the only way to accurately express the law. (See id. at 14-15.) Defendants also raised a fair use defense, particularly with respect to the I-Code Redlines. (See id. at 27-29.)

ICC replied in further support of its motion on August 2, 2019, reiterating many of the points raised in the ICC Memo. (See "ICC Reply," Dkt. No. 98.) In particular, it repeated its position that state and local enactment of the I-Codes into law does not place the I-Codes in the public domain, arguing that a holding to the contrary would present multiple constitutional concerns under the Supremacy Clause and Takings Clause. (See id. at 4-7.) ICC

13

also challenged the various defenses raised by Defendants, including merger and fair use. (See id. at 16-24.)

### 2. Defendants' Motion

On May 31, 2019, Defendants filed a cross-motion for partial summary judgment on their counterclaim. (See Defendants' Motion.) They requested a declaratory judgment that Current UpCodes does not infringe ICC's copyrights, deferring their claim as to Historic UpCodes for either a subsequent motion or trial. (See "Defendants' Memo," Dkt. No. 85-1, at 3 n.1.) Defendants primarily argued that Current UpCodes posts only government-enacted building codes, which constitute the law and thus in the public domain. (See id. at 11-33.) They added that to the extent the codes they post are not in the public domain, such posting is otherwise protected as fair use. (See id. at 33-44.) Defendants lastly raised the defense of collateral estoppel, based on a prior suit about model building codes and the public domain involving ICC's predecessor, SBCCI. (See id. at 44-49.)

ICC opposed Defendants' Motion on June 28, 2019. (See "ICC Opposition," Dkt. No. 90.) ICC argued that state and local adoption of the I-Codes does not prevent ICC from enforcing its copyrights in model code text incorporated by

14

reference, citing various statutory and constitutional concerns and claiming that a contrary holding would contravene Second Circuit precedent. (See id. at 7–24.) ICC also took issue with the various defenses raised by Defendants, including merger, fair use, and collateral estoppel. (See id. at 24–50.) ICC further disputed that Current UpCodes reproduces only the law as enacted, noting that Defendants continue to reproduce model code text and appendices even when the enacting states identified did not adopt those portions of the model codes. (See id. at 5–7.)

Defendants replied in further support of their motion on August 2, 2019. (See "Defendants' Reply," Dkt. No. 96.) Defendants argued that ICC's observations regarding the inaccurate posting of enacted codes owed to inadvertent errors and technical glitches, all of which were fixed shortly after ICC notified Defendants. (See id. at 1–3.) Defendants otherwise reiterated their arguments regarding the public domain, merger, fair use, and collateral estoppel.

## II.  LEGAL STANDARDS AND DISCUSSION

A.  MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the evidence shows that "there is no genuine dispute as to any material fact

15

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In this context, a court's role "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. See Celotex, 477 U.S. at 323; Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). If the moving party satisfies its burden, the nonmoving party must provide specific facts showing that there is a genuine issue for trial in order to survive the motion for summary judgment. See Shannon v. N.Y. City Transit Auth., 332 F.3d 95, 98-99 (2d Cir. 2003). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

In determining whether the moving party is entitled to judgment as a matter of law, the court must "resolve all

ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought." Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008). Though a party opposing summary judgment may not "rely on mere conclusory allegations nor speculation," D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998), summary judgment is improper if any evidence in the record allows a reasonable inference to be drawn in favor of the opposing party. See Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996).

B.   DECLARATORY JUDGMENTS AND COPYRIGHT INFRINGEMENT

28 U.S.C. Section 2201 empowers this Court to issue declaratory judgments in a case of actual controversy within its jurisdiction. See Duane Reade, Inc. v. St. Paul Fire and Marine Ins. Co., 411 F.3d 384, 389 (2d Cir. 2005). As the following discussion makes clear, there is certainly an actual controversy in this case.

"In a copyright infringement case, the plaintiff must show: (i) ownership of a valid copyright; and (ii) unauthorized copying of the copyrighted work." Jorgensen v. Epic/Sony Records, 351 F.3d 46, 51 (2d Cir. 2003). It is undisputed that ICC has valid copyrights in the I-Codes, and that Defendants copied the I-Codes in some form without

17

ICC's authorization. (See ICC SUMF ¶¶ 21-22, 92, 173; Defs. Resp. ¶¶ 21-22, 92, 173.) Defendants claim that their unauthorized copying nevertheless does not constitute infringement based on a number of copyright doctrines discussed at length below.

C.    PUBLIC DOMAIN

The main dispute in this case is whether the I-Codes as Adopted are in the public domain. ICC maintains that it can enforce its copyrights in the I-Codes to prevent copying of state and local code text that ICC authored, while Defendants argue that state and local adoption of the I-Codes means that the adopted text has become part of the law and can thus be freely copied. Defendants are more likely to be entitled to a declaratory judgment if the I-Codes as Adopted are in the public domain, while ICC's case for actionable infringement is much stronger if the codes are not in the public domain. No binding precedent or statutes provide a clear answer, and the potentially relevant case law is arguably contradictory. The Court concludes, however, that the case law is ultimately consistent. It compels a holding that the I-Codes as Adopted are in the public domain, because they are in fact

enacted state and local laws binding on the enacting jurisdictions' constituents.

Because this conclusion is not immediately apparent from any one particular case, the Court details at length the relevant cases and considerations that compel its holding in this section. The Court begins with the "Government Edicts" doctrine, which strongly suggests the law as adopted by legislative enactments is in the public domain. The Court then turns to circuit court precedent involving the model building codes of ICC's predecessors, who brought claims remarkably similar to those that ICC advances here. The Court next considers broader in-circuit precedent on government incorporation by reference that ICC argues is contrary to the model building code cases. The Court subsequently addresses various constitutional and statutory concerns raised by ICC and finally summarizes the applicable legal standard.

At bottom, the controlling authorities make clear that a private party cannot exercise its copyrights to restrict the public's access to the law. Applying that principle to the facts of this case, ICC cannot claim actionable infringement based only on Defendants' accurate posting of the I-Codes as Adopted, which are essentially enacted state

and local laws. This conclusion does not preclude the possibility that Defendants infringed ICC's copyrights by posting the I-Codes as model codes or the I-Code Redlines, though. Defendants' other forms of copying must be assessed under different doctrinal frameworks. And while the law of public domain is favorable to Defendants, Defendants' Motion must be denied at this time because the record is ambiguous as to whether what the Defendants actually post constitutes "the law" alone.

1. <u>The Government Edicts Doctrine</u>

Neither the Supreme Court nor Congress has explicitly addressed the public domain implications of government references to privately-authored copyrighted works. Nonetheless, Supreme Court case law explaining that "Government Edicts" are in the public domain reflects important principles that guide the Court's analysis. The Government Edicts doctrine derives from a trio of nineteenth century cases establishing that judicial opinions and related explanatory materials authored by judges could not be copyrighted, though private authors could claim a copyright in the explanatory materials that they authored themselves.

20

The doctrine originates from the Supreme Court's unanimous but unelaborated observation that "no reporter has or can have any copyright in the written opinions delivered by this Court." Wheaton v. Peters, 33 U.S. 591, 668 (1834). The Supreme Court further developed the doctrine over 50 years later, holding that an official state court reporter could not claim copyright in either judges' opinions or nonbinding explanatory materials authored by the judges. See generally Banks v. Manchester, 128 U.S. 244 (1888). In so holding, the Supreme Court stated that "[t]he whole work done by the judges constitutes the authentic exposition and interpretation of the law, which, binding every citizen, is free for publication to all." Id. at 253. But in a companion case the same year, the Supreme Court held that an official reporter could hold a copyright in explanatory materials authored by himself, rather than the judges. See Callaghan v. Myers, 128 U.S. 617 (1888). While these cases established that some government edicts could not be copyrighted, the rationale underlying their holdings was not altogether clear.

The Supreme Court recently clarified the principles animating the Government Edicts doctrine in Georgia v.

<u>Public.Resource.Org, Inc.</u>, 140 S.Ct. 1498 (2020) ("<u>PRO</u>").[3] There, the Court considered whether annotations in the Official Code of Georgia Annotated, which was the authoritative version of Georgia's statutes under Georgia law, were in the public domain along with the statutes themselves. LexisNexis drafted the annotations pursuant to a work-for-hire agreement with a Georgia state commission, such that Georgia was considered the "author" of those annotations for copyright purposes. <u>See</u> <u>id.</u> at 1505. When the nonprofit organization PRO copied the annotated code, Georgia filed suit and argued that the annotations were not in the public domain because they did not carry the "force of law," unlike the statutes. <u>See</u> <u>id.</u> The district court agreed with Georgia, but the Eleventh Circuit reversed, using a three-part test that considered whether the annotations were constructively authored by citizens. <u>See</u> <u>id.</u> at 1505–06.

The Supreme Court affirmed, but it announced a different rule: government officials empowered to speak with the force of law cannot claim copyright in works created in the course of their official duties, whether or

---

[3] On May 19, 2020, both sides to the present dispute submitted letter briefs addressing the <u>PRO</u> decision's potential impact on the parties' cross-motions for summary judgment. (<u>See</u> "Defendants' Letter," Dkt. No. 103; "ICC Letter," Dkt. No. 104.) The Court has considered the parties' letter briefs in reaching its decision.

not the works themselves carry the force of law. See id. at 1504, 1506. The Supreme Court based its rule in significant part on a construction of the term "author," noting that judges and legislators could not be considered authors entitled to copyright in their official works because those officials were "vested with the authority to make and interpret the law." Id. at 1507. As a corollary to its author-focused rule, the Supreme Court added that the Government Edicts rule "does not apply, however, to works created by . . . private parties[] who lack the authority to make or interpret the law." Id. at 1507.

Because ICC is a private party that lacks the authority to make or interpret the law, the Government Edicts doctrine is clearly not dispositive of this case. But the doctrine provides significant guidance that this Court must keep in mind when addressing the parties' arguments regarding the I-Codes as Adopted. Most importantly, the Supreme Court noted that "[t]he animating principle behind [the Government Edicts rule] is that no one can own the law. Every citizen is presumed to know the law, and it needs no argument to show . . . that all should have free access to its contents." Id. (internal quotation marks omitted). Because no one can own or restrict access

to it, the law is clearly in the public domain.[4] PRO's concluding remarks underscore that any rule in the case at hand must respect the public's need for full and unfettered access to the law.[5]

Bearing these concerns in mind, this Court must consider whether the I-Codes as Adopted are "the law." In one sense, the answer to this question seems almost entirely obvious; the I-Codes as Adopted are literally state and local laws. But these laws incorporate significant amounts of material authored by a private entity rather than by government officials empowered to

---

[4] Indeed, the Government Edicts doctrine actually broadens the scope of the public domain beyond the law itself, encompassing even materials that do not have the force of law (such as legislative history and judicial concurrences or dissents).

[5] The following passage specifically emphasizes the point: "Georgia minimizes the [] annotations as non-binding and non-authoritative, but that description undersells their practical significance. Imagine a Georgia citizen interested in learning his legal rights and duties. If he reads the economy-class version of the Georgia Code available online, he will see laws requiring political candidates to pay hefty qualification fees (with no indigency exception), criminalizing broad categories of consensual sexual conduct, and exempting certain key evidence in criminal trials from standard evidentiary limitations -- with no hint that important aspects of those laws have been held unconstitutional by the Georgia Supreme Court. . . . Meanwhile, first-class readers with access to the annotations will be assured that these laws are, in crucial respects, unenforceable relics that the legislature has not bothered to narrow or repeal. . . . If everything short of statutes and opinions were copyrightable, then States would be free to offer a whole range of premium legal works for those who can afford the extra benefit. A State could monetize its entire suite of legislative history. With today's digital tools, States might even launch a subscription or pay-per-law service. . . . And citizens, attorneys, nonprofits, and private research companies would have to cease all copying, distribution, and display of those works or risk severe and potentially criminal penalties. . . . The less bold among us would have to think twice before using official legal works that illuminate the law we are all presumed to know and understand." PRO, 140 S.Ct. at 1512-13.

speak with the force of law, thus presenting an unusual fact pattern that the author-focused Government Edicts doctrine does not directly address.[6] While the principles animating the Government Edicts doctrine suggest the I-Codes as Adopted are in the public domain, the Court considers case law that addresses more analogous fact patterns to confirm that this conclusion is indeed correct.

### 2. Model Building Code Cases

Though the Government Edicts doctrine does not address government adoption of model building codes, two circuit courts have considered the issue. Their holdings are broadly consistent with each other and reaffirm the principle that no one can own the law. Moreover, both cases concern the model codes of ICC's predecessors, SBCCI and BOCA, on which at least some of the I-Codes are based. These cases strongly suggest that Defendants do not infringe ICC's copyrights insofar as they accurately post the I-Codes as Adopted.

---

[6] ICC suggests that because the Government Edicts doctrine does not apply to private authors, it can enforce its copyrights in full as to all forms of copying alleged here. (See generally ICC Letter.) However, the author-focused Government Edicts rule is but one way of effecting the principle that "no one can own the law." As Defendants note, private citizens or lobbyists could not claim a copyright in a state statute merely because they were private authors of a ballot initiative or bill that eventually became law. (See Defendants' Letter at 2.)

The First Circuit first considered the issue in <u>BOCA v. Code Tech., Inc.</u>, 628 F.2d 730 (1st Cir. 1980). <u>BOCA</u> concerned the defendant's publication and sale of the Massachusetts Building Code, which adopted BOCA's building code with minor amendments pursuant to a licensing agreement and was made available for public viewing at state buildings, and which BOCA published and sold at a relatively low price. <u>See</u> <u>id.</u> at 732. Like Defendants here, the defendant argued that the model building code entered the public domain to the extent adopted into Massachusetts law. <u>Id.</u> at 733. Though the First Circuit did not definitively rule on the issue, it suggested at length that it agreed.

The First Circuit began by citing the first three Government Edicts cases for the proposition, much as the Eleventh Circuit stated in <u>PRO</u>, that citizens collectively author the law. <u>See</u> <u>id.</u> at 733–35. However, the First Circuit did not rely on that rationale alone, noting "the very important and practical policy that citizens must have free access to the laws which govern them . . . based on the concept of due process." <u>Id.</u> at 734. It observed that the building codes at issue "[had] the effect of law and carr[ied] sanctions of fine and imprisonment for

26

violations," which heightened the due process concerns. <u>See</u>
<u>id.</u> at 734-35. The court viewed BOCA's normal prerogative
to limit copying of its works as inconsistent with due
process in this context: "We cannot see how this aspect of
copyright protection can be squared with the right of the
public to know the law to which it is subject. We are,
therefore, far from persuaded that BOCA's virtual
authorship of the Massachusetts building code entitles it
to enforce a copyright monopoly over when, where, and how
the Massachusetts building code is to be reproduced and
made publicly available." <u>Id.</u> at 735.

While the First Circuit found it "hard to see how the
public's essential due process right of free access to the
law (including a necessary right freely to copy and
circulate all or part of a given law for various purposes),
can be reconciled with the exclusivity afforded a private
copyright holder" and had "serious doubts as to BOCA's
ability to prevail," it stopped short of explicitly holding
that there had been no actionable infringement because the
controversy had not been fully briefed and the model
building code at issue did not fit neatly into the
Government Edicts doctrine. <u>See</u> <u>id.</u> at 736. The case

settled before returning to the First Circuit for its final say.

The issue was considered as well by the Fifth Circuit in Veeck v. SBCCI, 293 F.3d 791 (5th Cir. 2002). Veeck ran a noncommercial website on which he wished to post the building codes of Anna, Texas and Savoy, Texas. He could not easily locate the codes, but he knew both towns had adopted SBCCI's Standard Building Code 1994 in full; he thus bought a copy of the model code and posted it on his website, identifying it as the building code for Anna and Savoy rather than as SBCCI's copyrighted work. See id. at 793-94. Veeck also posted SBCCI's Standard Plumbing Code, Standard Gas Code, Standard Fire Prevention Code, and Standard Mechanical Code in the same fashion, identifying them as the laws of Anna and Savoy.[7] See id. As was the case here, SBCCI and Veeck filed cross motions for summary judgment, the SDO alleging copyright infringement and the defendant seeking a declaratory judgment stating that what he had posted embodied only laws. See id. at 794. The

---

[7] Mindful that many of ICC's codes derive in part from SBCCI's, the Court notes an apparent parallel with the IBC, IFC, IMC, IPC, and IFGC. While the Court remains cognizant that the I-Codes are not identical to the SBCCI codes, the Veeck court's treatment of the SBCCI codes may nevertheless provide guidance on how the Court should view the potentially analogous I-Codes at issue here.

district court and a panel of the Fifth Circuit granted SBCCI's motion for summary judgment.

The en banc Fifth Circuit reversed and held that Veeck had posted only the law. The court analyzed BOCA at length, agreeing that the Government Edicts doctrine derived from a notion of metaphorical citizen authorship of the law. See id. at 795–799. And like the First Circuit in BOCA, the Fifth Circuit did not rely on that conception alone, again highlighting the concerns implicated by a private party's exercise of copyright with respect to enacted building codes. See id. at 799 (stating that the "'metaphorical concept of citizen authorship' together with the need for citizens to have free access to the laws are the ultimate holding of Banks"). SBCCI argued that the need for free access to the law was satisfied because Anna and Savoy both made their building codes available for public inspection, but the Fifth Circuit was not convinced.[8] Though the Fifth

---

[8] Specifically, the Veeck court rejected SBCCI's arguments with the following observation: "We disagree that the question of public access can be limited to the minimum availability that SBCCI would permit. . . . public ownership of the law means precisely that 'the law' is in the 'public domain' for whatever use the citizens choose to make of it. . . . [T]o say, as Banks does, that the law is 'free for publication to all' is to expand, not factually limit, the extent of its availability. Moreover, as the BOCA decision observed, it is difficult to reconcile the public's right to know the law with the statutory right of a copyright holder to exclude his work from any publication or dissemination. SBCCI responds that due process must be balanced against its proprietary rights and that the fair use doctrine as well as its honorable intentions will prevent abuse. Free availability of the law,

29

Circuit eschewed the term "due process" given the formal doctrines that have developed around that phrase, the court's reasoning detailed in the preceding footnote essentially tracks that of BOCA and remains consistent with the "animating principle" that no one can own or restrict free access to the law.

The Fifth Circuit concluded that "when Veeck copied *only* 'the law' of Anna and Savoy, Texas, which he obtained from SBCCI's publication, and when he reprinted only 'the law' of those municipalities, he did not infringe SBCCI's copyrights in its model building codes." Id. at 800. However, the court noted its holding "might well be the opposite, if Veeck had copied the model codes *as* model codes, or if he had indiscriminately mingled those portions of 'the law' of Anna and Savoy adopted by their town councils with other parts of the model codes not so adopted." Id. at 800 n.14.

BOCA and Veeck are almost directly on point to the controversy at issue here. They strongly suggest that ICC cannot limit accurate posting of the I-Codes as Adopted. However, the cases also suggest that the law of the public domain will not protect the posting of the I-Codes as I-

---

by this logic, has degenerated into availability as long as SBCCI chooses not to file suit." Veeck, 293 F.3d at 799-800.

Codes or the I-Code Redlines, which "mingle" portions of the enacted law with "parts of the model codes not so adopted."[9] The public domain analysis might reasonably end here. However, the Court continues its discussion below because <u>BOCA</u> and <u>Veeck</u> are at least superficially in tension with two binding Second Circuit precedents, addressed in the following two sections.

### 3. Incorporation by Reference

Despite the thrust of the cases above, the Second Circuit has rejected the argument that any legislative or regulatory reference to a copyrighted work is sufficient to place that work in the public domain. In <u>CCC Info. Servs. Inc. v. Maclean Hunter Mkt. Reports</u>, 44 F.3d 61, 74 (2d Cir. 1994), the court stated that it was "not prepared to hold that a state's reference to a copyrighted work as a legal standard for valuation results in loss of the copyright"). More specifically, the court rejected an argument that the public needed free access to a privately-authored compilation of used automobile valuations called the Red Book simply because state statutes and regulations required that insurance loss payments either equal the Red

---

[9] The Court notes that the mingling in the I-Code Redlines is not necessarily indiscriminate, as accurate redlining is a calculated method of comparison between two works. Whether that form of copying is protected, however, must be assessed under the rubric of fair use. <u>See infra</u> Section II.E.

Book's valuations or the average value of the Red Book's valuations and those of a competing compilation. See id. at 63, 73-74. Among other concerns, the Second Circuit observed that if a government's mere reference to a copyrighted work stripped that work of protection, then the establishment of an educational curriculum could strip copyright in countless books referenced as assigned reading. See id. at 74.

The Ninth Circuit raised similar concerns in Practice Mgmt. Info. Corp. v. Am. Med. Ass'n, 121 F.3d 516 (9th Cir. 1997) ("PMIC"). There, the Ninth Circuit refused to find that the American Medical Association lost its copyright in a medical coding system merely because a state statute required private parties to reference the medical codes in that system when applying for benefits. Like the Second Circuit, the court expressed concern that if mere references to copyrighted works sufficed to strip copyright, that could destroy copyrights in countless works including model building codes, various technical reference standards, and the legal Bluebook. See id. at 519, 519 n.5.

ICC argues that Veeck and BOCA cannot be reconciled with CCC, and that this Court must consequently hold that the privately-authored portions of the I-Codes as Adopted

32

do not enter the public domain to the extent embodied in the adopting laws. However, the Veeck court itself explained that there is no necessary contradiction when SBCCI made the same argument. Specifically addressing both CCC and PMIC, the court observed "[t]his case does not involve references to extrinsic standards. Instead, it concerns the wholesale adoption of a model code promoted by its author, SBCCI, precisely for use as legislation." Veeck, 293 F.3d at 803–04. As the Veeck court put it, "[i]f a statute refers to the Red Book or to specific school books, the law requires citizens to consult or use a copyrighted work in the process of fulfilling their obligations. The copyrighted works do not 'become law' merely because a statute refers to them. . . . [N]either [plaintiff] solicited incorporation of their standards by legislators or regulators." Id. at 804–05.[10]

---

[10] The Court notes the CCC court's observation that "Nimmer argues that the adoption of a private work into law . . . should not immunize a competitive commercial publisher from liability since this would 'prove destructive of the copyright interest in encouraging creativity in connection with the increasing trend toward state and federal adoptions of model codes.'" 44 F.3d at 74 n.30. The latest edition of Nimmer's treatise does not actually adopt this position; it simply notes that "one might argue" the same and then adds that cases since BOCA have considered the matter more fully. See 1 Nimmer on Copyright § 5.12. Because Nimmer does not press the proposition cited in CCC as the better view, and because the CCC court was not actually faced with any model codes, the Court declines to infer that the CCC decision compels a holding contrary to Veeck and BOCA based on this footnote alone.

A privately-authored work does not "become law" just because a statute or regulation references it, but that does not mean governmental incorporation of a copyrighted work *never* renders free access to the work necessary. Recommending that the Supreme Court deny certiorari in Veeck, the Solicitor General further explained why CCC and Veeck do not conflict and provided guidance on which case applies to a particular fact pattern. See "Solicitor General's Brief," SBCCI v. Veeck, No. 02-355 (May 30, 2003). Far from conflicting, the cases merely reflect a divide between distinct fact patterns requiring distinct results: "those involving the incorporation of copyrighted codes into laws that directly regulate primary conduct and those involving laws that reference copyrighted materials." Id. at 8.

In explaining why Veeck was correctly decided, the Solicitor General detailed five considerations indicating why SBCCI's model codes became the law upon government incorporation: (1) the codes "were created for the sole purpose of enactment into law, and SBCCI invited the towns of Anna and Savoy to enact them"; (2) the codes "comprehensively govern[ed] a very broad range of . . . everyday conduct by private businesses and ordinary

citizens" such that they resembled "laws of general applicability"; (3) the codes "expressly regulate[d] an entire area of private endeavor"; (4) the codes "carr[ied] criminal penalties for their violation"; and (5) the defendant made the building codes available to the public and "did not identify or publish them as the SBCCI model codes." Id. at 11. While these five observations do not constitute a definitive test and do not perfectly track the facts of this case, the Court will consider them in determining whether Veeck and BOCA or CCC and PMIC should control here.

### 4. County of Suffolk

The Second Circuit has also considered whether otherwise copyrightable works may enter the public domain through association with government in another case. In County Of Suffolk, New York v. First American Real Estate Solutions, 261 F.3d 179 (2d Cir. 2001), the court addressed the question of whether tax maps authored by a Suffolk County agency and referenced in the county's ordinances were in the public domain. Canvassing the Government Edicts cases, the Second Circuit determined two considerations governed whether the Suffolk County tax maps were in the public domain: "(1) whether the entity or individual who

35

created the work needs an economic incentive to create or has a proprietary interest in creating the work and (2) whether the public needs notice of this particular work to have notice of the law." See id. at 194.

As a testament to the unclear state of the law, both sides to the dispute before this Court devote numerous pages to discussion of Suffolk even though neither believes it should control. The Court agrees with ICC that the Suffolk test appears primarily directed to works by government authors, rather than to works by private authors like ICC. (See ICC Reply at 9–10.) However, the Suffolk test is not necessarily inconsistent with the more apposite case law detailed above, either. While the Court does not rely on Suffolk as setting forth the definitive test that controls here, the Court nevertheless considers the decision because it is binding precedent and its discussion remains relevant to this case more broadly.

The Court reads the Suffolk decision to contemplate a weighing of the two enumerated considerations listed above; where due process concerns are particularly high, as where a work is itself "the law," an author's economic incentives play a particularly low role in the analysis, if any. The Suffolk court thus noted that "if the existence and content

36

of Suffolk County's maps are purely dictated by law, it is likely that Suffolk County needed no additional incentive to create them." See id. at 194. The court also observed "[d]ue process requires that before a criminal sanction or significant civil or administrative penalty attaches, an individual must have fair warning of the conduct prohibited by the statute or the regulation that makes such a sanction possible." Id. at 195. The Circuit Court held that due process required only access to the statute establishing the obligation to pay property taxes, because "the tax maps themselves do not create the legal obligation . . . but are merely a means by which the government assesses a pre-existing obligation." Id.

Though acknowledging that due process concerns must be balanced against economic incentives in some circumstances, this Court is not persuaded that the need for economic incentives could meaningfully weigh against the need for free public access to the law in these circumstances. See infra Section II.C.7. Although neither BOCA nor Veeck specifically set forth the balancing test proposed by Suffolk, both courts effectively weighed due process concerns against the incentive arguments pressed by ICC's predecessors. Even though the BOCA court remanded to

37

the district court to consider BOCA's arguments in full, it
nevertheless had "serious doubts as to BOCA's ability to
prevail." See 628 F.2d at 736. And though the Veeck court
disclaimed that public access to the law should hinge on
factual determinations, it nevertheless weighed SBCCI's
incentives-focused arguments against the free access
notions that the Circuit Court had observed. In particular,
the Veeck court noted that organizations like SBCCI had
survived for over 60 years without any enforcement of their
copyright in analogous circumstances, and it added that the
technical complexities of model codes suggested there would
be robust demand for up-to-date codes regardless of the
limited circumstances where a model code's text entered the
public domain. See 293 F.3d at 805–06. Indeed, the court
noted that "it is difficult to imagine an area of creative
endeavor in which the copyright incentive is needed less.
Trade organizations have powerful reasons stemming from
industry standardization, quality control, and self-
regulation to produce these model codes; it is unlikely
that, without copyright, they will cease producing them."
Id. at 806.

The BOCA and Veeck courts effectively indicated that
"the public need[ed] notice of [the adopted codes] to have

38

notice of the law" because those codes had themselves
become the law. See Suffolk, 261 F.3d at 194.[11] While the
need for economic incentives might outweigh due process
concerns as to works that do not carry the force of law,
the Court is persuaded that this outcome will almost
certainly not be the case as to works that do constitute
the law. Accordingly, the Court will consider ICC's need
for economic incentives only insofar as the I-Codes as
Adopted do not, in fact, embody the law.

   5.   Constitutional Considerations

   a.   The Takings Clause

ICC next states that if governmental adoption of model
codes prevents private authors from enforcing their rights
against copiers of the enacted codes, that would effect an

_____

[11] ICC argues due process is satisfied because it makes its codes
available for free in libraries and its controlled publicACCESS site.
However, BOCA and Veeck explicitly rejected the same argument, noting
that ICC's predecessors would effectively control the terms of access
to the law. See supra Section II.C.2. That ICC does not allow members
of the public to freely print or download copies of the enacted laws
for their own use also cuts against the notion that ICC already
provides "free access" to the law. Indeed, over one hundred years ago,
the first Justice Harlan suggested there were no limits on the extent
to which the laws could be shared. See Howell v. Miller, 91 F. 129, 137
(6th Cir. 1898) ("[N]o one can obtain the exclusive right to publish
the laws of a state in a book prepared by him. . . . [A]ny person
desiring to publish the statutes of a state may use any copy of such
statutes to be found in any printed book, whether such book be the
property of the state or the property of an individual."); cf. Sparaco
v. Lawler, Matusky, Skelly, Eng'rs LLP, 303 F.3d 460, 466 (2d Cir.
2002) (noting that "historical, scientific, or factual information
belongs in the public domain, and . . . allowing the first publisher to
prevent others from copying such information would defeat the
objectives of copyright by impeding rather than advancing the progress
of knowledge").

unconstitutional taking. It cites CCC to similar effect. See 44 F.3d at 74 ("[A] rule that the adoption of such a reference by a state legislature or administrative body deprived the copyright owner of its property would raise very substantial problems under the Takings Clause of the Constitution."). ICC adds that such a holding would also contravene the Copyright Act, which states that "[w]hen an individual author's ownership of a copyright . . . has not previously been transferred voluntarily by that individual author, no action by any governmental body or other official or organization purporting to seize, expropriate, transfer, or exercise rights of ownership with respect to the copyright, or any of the exclusive rights under a copyright, shall be given effect under this title." 17 U.S.C. § 201(e).

There is no strict formula for assessing a Takings Clause claim, and each case must be addressed in light of the particular circumstances presented. See Penn. Cent. Transp. Co. v. City of N.Y., 438 U.S. 104, 123–24 (1978). However, the Supreme Court has identified three factors of "particular significance": (1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed

expectations"; and (3) "the character of the governmental action." Id. at 124. Private parties do not have reasonable investment-backed expectations in property or information voluntarily provided to government, beyond what is explicitly provided by the government itself. See Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1005–06 (1984). Put differently, where a private party voluntarily interacts with government regarding its property, governmental actions that might affect that property interest do not constitute a taking unless such action is contrary to a government promise concerning the property. See Meriden Tr. & Safe Dep. Co. v. FDIC, 62 F.3d 449, 455 (2d Cir. 1995) (holding no unconstitutional taking occurred where plaintiff "voluntarily subject[ed] itself to a known obligation"); Garelick v. Sullivan, 987 F.2d 913, 916 (2d Cir. 1993) ("[W]here a service provider voluntarily participates in a price-regulated program or activity, there is no legal compulsion to provide service and thus there can be no taking.").

Again, the most analogous case addressing the Takings Clause concerns is Veeck. The Veeck court found no issues under the Takings Clause and 17 U.S.C. Section 201(e) because "SBCCI urged localities to adopt its model codes,"

41

even though neither Anna nor Savoy signed a licensing agreement with the SDO. 293 F.3d at 794, 803. Thus, the issue in cases involving governmental adoption of model codes "is not the voluntariness of the appropriation but the legal consequences flowing from the permission that [the SDO] gave." Id.

The Solicitor General similarly noted that the concerns raised in CCC would be inapposite in model building code cases "because [the SDO] invited the towns to enact its building code and therefore would presumably not have a valid takings claim." Solicitor General's Brief at 12 n.4. Claims regarding the Copyright Act are equally inapposite, as 17 U.S.C. Section 201(e) applies only to copyrights held by individual rather than corporate authors and more fundamentally "addresses government actions avowedly intended to coerce a copyright holder to part with his copyright, so that the government itself may exercise ownership of the rights." Id. at 16 & n.7. Because Anna and Savoy adopted the model codes into law at SBCCI's invitation, their actions clearly were not the type of coercive seizure contemplated by the statute.

ICC undisputedly encourages the adoption of its model codes into law as a general matter, which counsels against

42

according its Takings Clause concerns particularly great weight. See infra Section II.C.7. A simple comparison of the number of ICC employees dedicated to code development and field staff dedicated to helping state and local governments understand and adopt model codes helps illustrate the point. (ICC SUMF ¶ 62; Defs. Resp. ¶ 62; Defs. SUMF ¶ 28, 31; ICC SDF ¶ 28, 31.) Even if ICC did not expect that its encouragement of government adoption would prevent it from enforcing its copyrights as to the I-Codes as Adopted, that legal consequence flows from the federal law of the public domain rather than from unjust action by the state or local jurisdictions. Far from coercing ICC to give up its copyrights, the jurisdictions are following ICC's advice that the I-Codes would protect their citizens better than would the jurisdictions' trying to draft complex technical codes from scratch.

That many jurisdictions sign licensing agreements respecting ICC's copyrights does not compel a different result. ICC certainly retains its copyrights in its model codes as model codes, and the Court will not construe state or local adoption of the I-Codes to suggest otherwise. But the licensing agreements reflect little about the extent to which the referenced model codes have become part of laws

43

governing the public, and the Court will similarly not
construe the agreements as licenses for ICC to restrict
dissemination of those laws themselves. Even if the states
did intend otherwise, their intent could not affect the
people's right to freely share the laws that govern them.
Cf. PRO, 140 S.Ct. at 1510 n.3 (noting that "inference from
state behavior proves too much" when state claims regarding
copyright protection are clearly contrary to the Government
Edicts doctrine). To the extent that ICC's codes have
actually "become the law," concerns related to the Takings
Clause do not materially alter the analysis here.[12]

    b. <u>The Supremacy Clause</u>

The next constitutional concern raised by ICC involves
the Supremacy Clause. "The Constitution's Supremacy Clause
may compel invalidation of state law in several ways:
First, Congress may in express terms declare its intention
to preclude state regulation in a given area . . . Second,
in the absence of an express declaration, preemption may be
implied when the federal law is sufficiently comprehensive

---

[12] Of course, whether the model codes referenced in the enacted laws
have actually become the law remains a separate question. The Court
also takes no position on whether ICC might have a valid Takings Clause
claim against jurisdictions that did not license use of its content.
(<u>See</u> Declaration of Mark Johnson in support of ICC Reply ("Johnson
Reply Decl."), Dkt. No. 98-1, ¶¶ 2-3.) Because ICC actively encourages
full government enactment of its codes generally, like SBCCI in <u>Veeck</u>,
the Court is not persuaded that the limited possibility of a taking
alone compels a holding that a private party may restrict dissemination
of binding legal obligations.

to make reasonable the inference that Congress left no room for supplementing state regulation. . . . Finally, state law may be preempted to the extent that it actually conflicts with a valid federal statute." Ass'n of Am. Med. Colls. v. Cuomo, 928 F.2d 519, 522 (2d Cir. 1991) (internal quotation marks omitted). "The third type of state law preemption[,] . . . so-called conflict preemption, occurs either when compliance with both federal and state regulations is a physical impossibility, . . . or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Id. at 522–23 (internal quotation marks omitted).

ICC argues that if government adoption of a model code prevents enforcement of copyright in the model code text that was enacted, state action would effectively destroy a federal right and thus violate the Supremacy Clause. The BOCA court rejected essentially the same arguments, denying that state or local adoption of enacted building codes would present any preemption issues. It was not the case "that state adoption of the BOCA Code destroyed BOCA's copyright by operation of state law, but rather that the action triggered application of a doctrine of federal law under which BOCA's material, to the extent embodied in the

45

state regulation, lost its copyright protection and became part of the public domain." BOCA, 628 F.2d at 735. Because *federal* law provides that documents in the public domain are not subject to copyright, state adoptions do not conflict with or present an obstacle to fulfillment of the Copyright Act's goals. State enactments merely change a factual circumstance that in turn governs the extent to which ICC can enforce its copyrights as a matter of federal law. Accordingly, the Court concludes that the Supremacy Clause concerns raised by ICC do not significantly affect its public domain analysis.

### 6. Statutory Considerations

ICC next argues that state references to copyrighted works cannot prevent it from enforcing its copyright as to the I-Codes as Adopted because a contrary holding would conflict with federal policy encouraging incorporation of copyrighted works by reference. Specifically, the National Technology and Transfer Advancement Act, codified in relevant part at 15 U.S.C. Section 272, and Office of Management and Budget Circular A-119 encourage federal agencies to incorporate copyrighted works by reference while nevertheless respecting private authors' statutory copyrights. (See Wise Decl. Exs. 2-3.)

46

SBCCI argued much the same in Veeck. The Solicitor General noted that 15 U.S.C. Section 272 was not probative because federal agency action was not at issue, and "the statute in any event does not address the legal consequences of governmental adoption of a particular code on the ability of members of the public to make copies." Solicitor General's Brief at 17. The Court sees no reason to conclude otherwise here.

Finally, ICC argues that 2014 guidance from the Office of the Federal Register indicates that Veeck was incorrectly decided. (See "2014 OFR Guidance," Wise Decl. Ex. 64.) However, the 2014 OFR Guidance simply states "the Veeck decision . . . [has] not eliminated the availability of copyright protection for privately developed codes and standards referenced in or incorporated into federal regulations. Therefore, we agreed with commenters who said that when the Federal government references copyrighted works, those works should not lose their copyright." Id. at 66268.

Veeck imports that an SDO has no right to restrict distribution of laws incorporating its copyrighted materials, but that does not mean the SDO has lost all copyright protection in the underlying model code. The

principle reflected in <u>Veeck</u> merely affects the terms on which an SDO can enforce its copyright when free access to the copyrighted work is needed to have knowledge of the law adopting it. The 2014 OFR Guidance does not contradict this proposition; in fact, it suggests that federal agencies should work with SDOs to ensure public access to the copyrighted works, such that the "text of the legal obligation and not the standard as such" would be available. <u>See</u> <u>id.</u> at 66274. In any event, the 2014 OFR Guidance again expresses views from a federal regulatory context with no direct relevance to this matter or binding effect upon this Court. In this respect, ICC's broad appeals to copyright policy are better addressed to Congress than the courts. <u>See</u> <u>PRO</u>, 140 S.Ct. at 1511.

    7.   <u>Analysis</u>

    The Court has taken pains to address the many cases and statutes cited by the parties with respect to the I-Codes as Adopted. Despite the apparent contradictions discussed at length above, the principles that guide the Court's analysis seem relatively clear. The law is in the public domain, and the public must be afforded free access to it. <u>See</u> <u>PRO</u>, 140 S.Ct. at 1507. That a law references a privately-authored, copyrighted work does not necessarily

48

make that work "the law," such that the public needs free
access to the work. CCC, 44 F.3d at 74. However, a
privately-authored work may "become the law" upon
substantial government adoption in limited circumstances,
based on considerations including (1) whether the private
author intended or encouraged the work's adoption into law;
(2) whether the work comprehensively governs public
conduct, such that it resembles a "law of general
applicability"; (3) whether the work expressly regulates a
broad area of private endeavor; (4) whether the work
provides penalties or sanctions for violation of its
contents; and (5) whether the alleged infringer has
published and identified the work as part of the law,
rather than the copyrighted material underlying the law.
See generally BOCA, 628 F.2d 730; Veeck, 293 F.3d 791;
Solicitor General's Brief at 11. These considerations may
not all be strictly necessary or exhaustive, but are
guideposts to assess whether notice of the purported
copyrighted work is needed for a person to have notice of
"the law," such that due process concerns would effectively
categorically outweigh the private author's need for
economic incentives. See Suffolk, 261 F.3d at 194. Where
considerations such as these predominate, the text of model

codes that has been adopted enters the public domain, though SDOs may still sue for infringement if a defendant copies their model codes as model codes or indiscriminately mingles the enacted portions of the model codes with portions not so enacted.

a. <u>ICC's Motion</u>

Under the standard articulated above, ICC cannot successfully sue for copyright infringement based only on accurate copying of the I-Codes as Adopted. As to the first of the five enumerated considerations above, there can be no genuine dispute that ICC intends and encourages the adoption of its model codes into law; even if adoption into law is not the *sole* reason ICC produces the I-Codes, it is clearly one of the most significant reasons, if not the most significant reason, that ICC does so. (<u>See, e.g.,</u> Defs. Resp. ¶ 25; Gratz Opp. Decl. Ex. 19 at 123:11-15; <u>id.</u> Ex. 24 at 90:13-18; <u>id.</u> Ex. 12 at 68:18-23, 107:13-16.) In particular, the very first exhibit attached in support of ICC's Motion emphasizes ICC's intent that the I-Codes serve to lessen the burdens of government through adoption of the codes into binding regulations. (<u>See</u> Johnson Decl. Ex. 1 at ICC00082961, -2970.) That ICC prefaces its model codes with sample legislation and ordinances for their adoption into

50

law further underscores the particular significance of the practice to ICC. (See Defs. SUMF ¶ 24; Gratz Decl. Ex. 1. at ICC00008325; ICC SDF ¶ 24; Gratz Opp. Decl. Ex. 18 (reflecting sample legislation and ordinance language for the IBC 2015 and IMC 2009).)

It is not strictly clear from the record that considerations two through four, regarding the broad legal effect of the model codes, apply to all fifteen of the substantive ICC codes at issue here. In their briefing, the parties have (understandably) largely treated the specified standards as interchangeable. However, both BOCA and Veeck as well as the codes evident in the record strongly suggest ICC's codes carry just as much legal force as its predecessors' did. As noted above, Veeck concerned model codes that appear to be analogous to the IBC, IFC, IPC, IMC, and IFGC. See supra Section II.C.2. And the IBC 2015 itself notes that "[t]he building code is intended to be adopted as a legally enforceable document and it cannot be effective without adequate provisions for its administration and enforcement." (Gratz Decl. Ex. 1 at ICC00008316.) It has numerous regulatory provisions, such as a chapter dedicated to special inspections and an appendix dedicated to creating a board of appeals. (See id.

51

at -8320, -8323.) The record suggests that all of the I-
Codes contain not only technical reference or valuation
provisions regarding their specific subject matter, but
also thorough administrative provisions that create
regulatory schemes broadly governing the responsibilities
of the officials in charge and the regulated entities. (See
Wise Decl. Ex. 15.) However, the Court recognizes that the
record may not be altogether clear on this point; if any of
the underlying substantive codes do not contain
administrative provisions or otherwise mirror regulation in
ways that track considerations two through four above, ICC
remains free to bring these distinctions to the Court's
attention at a later point.[13]

As to the last of the five enumerated considerations,
Defendants have not simply identified the model codes as
the enacted laws of the jurisdictions. Even on Current
UpCodes, Defendants note that the enacted laws adopt the I-
Codes with or without amendments, and UpCodes still has a
"general codes" page that identifies which jurisdictions
have adopted the model codes, with or without amendments.

---

[13] The Court also notes that some of the I-Codes may not have become law
if they were referenced only in small part, rather than adopted at
large. (See, e.g., Jarosz Report at ¶ 73 (noting that OSHA regulations
incorporate an IFC provision on means of egress only as an alternative
to compliance with other OSHA standards).) While the record suggests
that each of the I-Codes was adopted to a much greater extent, the
Court again remains open to clarification from ICC if that is not so.

While it would likely be inappropriate for a user to post the model codes without any indication that they have been adopted into law, the Court is not persuaded that it would be improper to identify in such posting both an enacted law and where that law derived from. Whether a state or local jurisdiction has referenced a private work is a matter of fact, and is not equivalent to posting the private work itself. It is admittedly troubling that when Defendants post a state code that adopts an I-Code without amendment, they are effectively signaling to users that the enacted law reproduces the model code text in full. To the extent Defendants have posted model codes as model codes or indiscriminately mingled enacted text with unadopted model text, a reasonable jury might consider whether this practice would support a finding of willful infringement, particularly considering that Historic UpCodes also hid state and local amendments to the I-Codes behind a paywall. But the Court sees no basis for a holding that a member of the public cannot post enacted laws and state the simple fact that those laws are derived from the I-Codes.[14]

---

[14] In a related vein, ICC notes that a number of codes on UpCodes are identified as being adopted (without amendment) only by the town of South Holland, Illinois. (See ICC SUMF ¶ 129; Wise Decl. Ex. 58.) This observation does not change the Court's analysis, however. The town of South Holland comprises a government no less than the towns of Anna and

Finally, the Court is not persuaded that ICC's need for economic incentives can outweigh the due process concerns at issue here, especially knowing that ICC will not stop producing its model codes in the event of a contrary holding. (See ICC Reply 11–12.) Even after considering similar incentives arguments from ICC's predecessors, both the Veeck and BOCA courts strongly suggested that the SDOs could not enforce their copyrights to prevent copying of the model codes as enacted as a matter of law. As noted above, the extensive and comprehensive regulatory nature of the I-Codes heavily implicates the due process concern that the public must know of legally binding obligations that may subject its members to significant administrative or criminal sanctions.

The Court thus concludes that if Defendants are liable for copyright infringement, it will not be for accurate copying of the I-Codes as Adopted. ICC's development of such thorough regulatory codes is useful and beneficial to the public. But the codes set forth broad and comprehensive regulatory frameworks that may subject members of the public to adverse action upon substantial adoption into law

---

Savoy, and the codes it adopts appear to apply to its citizens with all the legal force as did those of Anna and Savoy.

by the governments that ICC encourages. Upon enactment, it is clear that the I-Codes as Adopted function as laws to which the public needs free access. Within this narrow band of substantial adoption by state and local governments, ICC cannot exercise its copyrights in the I-Codes to prevent dissemination of the I-Codes as Adopted.

The Court recognizes that ICC merits incentives in the abstract, and ICC raises several potentially legitimate concerns regarding how a rule that it cannot enforce copyrights in the I-Codes as Adopted might affect its code development process or which codes it prioritizes. But it falls to Congress rather than the courts to vindicate any interests ICC may have with respect to the I-Codes as Adopted. Cf. PRO, 140 S.Ct. at 1511 (dismissing as a matter of law Georgia's arguments that it needed copyright protection in annotations to induce LexisNexis to prepare affordable annotated codes for widespread distribution).

The Court reiterates that ICC retains its copyright in the I-Codes and related derivative works that do not constitute the law. If Defendants have infringed ICC's copyrights in the I-Codes, it must be either because they posted the model codes as model codes or otherwise indiscriminately mingled enacted portions of the model

codes with portions not adopted. As noted below in Section II.C.7.b., this happenstance may be the case as to erroneous intermingling of model code text with enacted text. Beyond those errors, though, analyzing whether Defendants have actually infringed the I-Codes requires consideration of the legal doctrines of merger and fair use.

### b. Defendants' Motion

The preceding test largely tracks Defendants' position, and they would be entitled to partial summary judgment if Current UpCodes actually posts only text of the law. ICC disputes this proposition through various arguments. One contention raised by ICC is that Defendants' posting of the law is underinclusive, because they do not post other statutory provisions that might affect the enacted model code text. As an example, ICC notes that the building laws of South Holland, Illinois include many divisions besides the IBC 2012, but Defendants nevertheless identify the IBC 2012 as the Building Code of South Holland. (ICC SDF ¶ 1; ICC Supp SUMF ¶ 39; Wise Opp. Decl. Ex. U.) In a similar vein, ICC and Defendants dispute whether UpCodes should display definitional statutes that apply to the model codes adopted by Wyoming or integrate

those definitions into the code text, as well as disputing how other statutes that reference or interact with the adopted code provisions should be displayed (ICC Supp. SUMF ¶¶ 16-23; Defs. Supp. Resp. ¶¶ 16-23.)

ICC argues too much here. As Defendants point out, South Holland's enacting ordinance states that "the International Building Code (2012) be and is hereby adopted as the building code of the Village of South Holland in the State of Illinois." (Defs. Supp. Resp. 39; Wise Opp. Decl. Ex. U.) While South Holland undoubtedly has other laws that pertain to building safety, the Court cannot conclude that Defendants' description of the IBC 2012 as the building code of South Holland was inaccurate when South Holland's ordinance states the same. The Veeck court did not fault Veeck for identifying the SBCCI codes as the building codes of Anna and Savoy, even though those towns may well also have had other statutes and regulations governing the same topic. See Solicitor General's Brief, Appendix (City of Anna ordinance declaring the SBCCI code "hereby adopted by reference as though . . . copied herein fully"). Similarly, while the related Wyoming statute's definition of "owner" may impact interpretation of the model codes adopted by Wyoming, it is unclear how Defendants' failure to

57

explicitly identify the interplay between the two statutes renders their posting of the adopted codes inaccurate.

While Defendants certainly must post a government's amendments to the I-Codes in order to accurately portray the enacted law, saying that Current UpCodes does not post "the law" because it does not include additional legal material that may bear on the enacted model text's full meaning presents serious practical problems. Statutes and regulations interact with each other in a variety of ways without explicitly being adopted into each other. If posting other statutory provisions is necessary to make the posting of one provision complete, understanding certain highly regulated fields of private endeavor might require posting significant swathes of the relevant title, if not multiple titles. The Court is not persuaded that such an inquiry into completeness is necessary to understand whether a particular codification carries the force of law.[15]

The Court will nevertheless deny Defendants' Motion at this time. ICC has still raised genuine factual disputes

---

[15] There are many possible examples demonstrating why a contrary rule would be untenable. As one, no one can reasonably deny that Federal Rule of Civil Procedure 12 sets forth "the law" regarding motions to dismiss in federal court, even though Federal Rule of Civil Procedure 9(b), Congressional statutes, and judicial case law all provide important qualifications regarding the application of that rule in securities fraud cases.

suggesting that at least some codes posted on Current UpCodes have "indiscriminately mingled" enacted text with unadopted model text. For example, until the ICC Opposition was filed, Current UpCodes displayed Appendices A and H to the IFC 2015 as part of the Wyoming Fire Code even though Wyoming adopted neither. (ICC Supp. SUMF ¶ 28; Wise Opp. Decl. ¶¶ 20-21, Ex. Q; G. Reynolds Reply Decl. 3; Defs. Supp. Resp. ¶ 28.) Current UpCodes similarly displayed the full IRC 2015 as the law of Wyoming until notified in the ICC Opposition, even though Wyoming incorporated that code only "to the extent that the referenced provisions apply to fire and life safety issues". (ICC Supp. SUMF ¶¶ 28-32, 34-35; Defs. Supp. Resp. ¶¶ 28-32, 34-35.) Wyoming also did not adopt any appendices to the IBC 2015, but UpCodes displayed eleven of those appendices as the Building Code of Wyoming until it saw the ICC Opposition. (ICC Supp. SUMF ¶¶ 36-38; Defs. Supp. Resp. 36-38.) Some of these are rather surprising oversights, such as erroneously indicating that the landlocked state adopted an appendix focusing on tsunami-generated flood hazards. (ICC SDF ¶ 1; ICC Supp. SUMF ¶¶ 37-38; Defs. Supp. Resp. ¶¶ 37-38.)

While Defendants corrected these issues when notified by ICC (see G. Reynolds Reply Decl. ¶¶ 2-3, Exs. A, D), it

remains ambiguous whether UpCodes posts only the law. As
ICC states in its briefs, the current record provides the
Court no way to verify the full contents of Current
UpCodes, which is continually being updated with
potentially erroneous codes in any event. Unless the
parties can establish a static and limited version of
Current UpCodes for future consideration, much as they
already have for Historic UpCodes, it is unclear how
Defendants can demonstrate with sufficient clarity that
what they actually post embodies only the law. Resolving
all factual ambiguities in favor of the non-movant, as the
Court must in this procedural posture, it is clear that
Defendants' Motion must be denied at this time.[16]

D.   MERGER

Though the I-Codes as Adopted are in the public
domain, that fact does not end the inquiry in this case.
ICC claims that Historic UpCodes displayed the I-Codes as

---

[16] The Court also rejects Defendants' argument that the PRO decision
requires finding that the I-Code Redlines are in the public domain
because they "reflect[] the work of lawmakers just as much as the
enacted text of the law." (Defendants' Letter at 3.) Even so, the
redlines are not "the law." While the Government Edicts doctrine does
expand the public domain beyond the law itself, it specifically effects
this expansion through an author-focused framing that does not directly
apply to the I-Code Redlines. While no one can own the law, the Court
is not persuaded that the PRO Court intended its reasoning regarding
legislative history to be extended to privately-created redlines
showing text that is not the law. See PRO, 140 S.Ct. at 1512-13. Rather
than imprudently hold to the contrary, the Court concludes that
Defendants' copying of the I-Code Redlines must be assessed as a matter
of fair use.

model codes in full, including even their copyright pages.
Defendants also oppose ICC's Motion as to this copying,
replying that they also identified jurisdictions that
adopted the model codes by reference, such that the text of
the model codes and the identified jurisdictions' laws were
substantially identical (excepting minor differences such
as the copyright notices). (<u>See</u> Gratz Opp. Decl. Ex. 2.)
Defendants argue that because the law constitutes either a
fact or idea, their posting of the model codes under these
circumstances is protected by the copyright doctrine of
merger. The Court ultimately agrees with Defendants'
framing of the law, and ambiguities in the factual record
again preclude summary judgment on ICC's Motion. However,
these ambiguities similarly prevent the Court from
concluding that Defendants' alleged copying of the I-Codes
as model codes is fully protected by merger with the law.

Section 102(b) of 17 U.S.C. provides that "[i]n no case
does copyright protection . . . extend to any idea,
procedure, process, system, method of operation, concept,
principle, or discovery, regardless of the form in which it
is described, explained, illustrated, or embodied in such
work." Instead, only the expression of the idea or fact is
protectable. <u>See</u> <u>N.Y.</u> <u>Mercantile</u> <u>Exch.,</u> <u>Inc.</u> <u>v.</u>

61

IntercontinentalExchange, Inc., 497 F.3d 109, 116 (2d Cir. 2007). "The fundamental copyright principle that only the expression of an idea and not the idea itself is protectable . . . has produced a corollary maxim that even expression is not protected in those instances where there is only one or so few ways of expressing an idea that protection of the expression would effectively accord protection to the idea itself." Kregos v. Associated Press, 937 F.2d 700, 705 (2d Cir. 1991) (citation omitted); see also CCC, 44 F.3d at 68 ("[I]n order to protect the immunity of ideas from private ownership, when the expression is essential to the statement of the idea, the expression also will be unprotected, so as to insure free public access to the discussion of the idea.").

The Second Circuit considers this doctrine of merger "in determining whether actionable infringement has occurred, rather than whether a copyright is valid . . . [because assessing] merger in the context of alleged infringement will normally provide a more detailed and realistic basis for evaluating the claim that protection of expression would inevitably accord protection to an idea." Kregos, 937 F.2d at 705. Because merger turns significantly on a policy-based balance between enabling the progress of

science and the arts through the free use of ideas and the
reward of authors' labors through protection of their
expression, it may be "withheld" when the ideas implicated
are "of the soft type infused with taste or opinion,"
rather than being hard "building blocks of understanding."
See CCC, 44 F.3d at 71-72. Courts accomplish this
withholding of merger "by assigning to the idea a different
level of abstraction from the expression of it, so that the
merger doctrine would not apply and the copyright owner
would not lose protection." Id. at 71. However,
"[s]urprisingly little has been said by courts or scholars
about how [to] determine the idea behind an expression."
Med. Educ. Dev. Servs., Inc. v. Reed Elsevier Grp., PLC,
No. 05 Civ. 8665, 2008 WL 4449412, at *7 n.13 (S.D.N.Y.
Sept. 30, 2008).

The parties vigorously debate what information a court
may consider when determining the idea and expressions at
issue. Defendants argue that because the Second Circuit
assesses merger in the context of alleged infringement
rather than initial copyrightability, the Court should
consider the relevant facts and circumstances that apply at
the time of the alleged infringement. Defendants thus frame
their idea as the "laws" enacted by the governments that

adopted the I-Codes without amendment, which could not be accurately expressed other than through the full model code text that Defendants later posted on Historic UpCodes. ICC disagrees, arguing that even if merger is assessed as an affirmative defense in the context of infringement, a court should consider only the idea and potential forms of expression that existed at the time of the copyrighted work's initial fixation. ICC thus argues for the idea of a model code, which undoubtedly could have been expressed in many ways when conceived. For example, ICC and the NFPA draft competing fire codes with significantly different provisions. (See Wise Decl. Ex. 71, Dkt. No. 98-7.)

The Second Circuit has not explicitly addressed the dispute raised by the parties regarding this point, adding another ambiguity to the legal analysis. ICC relies on Oracle Am., Inc. v. Google Inc., which held, in the context of software code, that "the district court erred in focusing its merger analysis on the options available to [the defendant] at the time of copying." 750 F.3d 1339, 1361 (Fed. Cir. 2014). The Federal Circuit based its holding on the notion that "copyrightability and the scope of protectable activity are to be evaluated at the time of creation, not at the time of infringement" and that "[t]he

focus is, therefore, on the options that were available to [the plaintiff] at the time it created the [copyrighted work]." Id. Respectfully, the Court declines to rely on Oracle for this particular proposition. The Federal Circuit's discussion is hard to reconcile with its own framing of the Second Circuit's standard. Holding that merger doctrine requires focusing on the options available at the time of copyrightability, rather than infringement, runs counter to the Oracle court's recognition that in the Second Circuit, "the merger doctrine relates to infringement, not copyrightability." Id. at 1358 (describing holding of Kregos, 937 F.2d at 705).[17]

On the contrary, the Second Circuit seems to have implicitly recognized that circumstances intervening between a work's initial fixation and the alleged copying are relevant to merger analysis. For example, in the context of computer programs, the Second Circuit cited with approval a report by an organization called CONTU for the

---

[17] As the Court understands the reasoning of ICC and Oracle, to say that merger relates to infringement rather than copyrightability largely means that merger is an affirmative defense. (See ICC Reply at 16–17.) But if that defense can turn only on considerations that relate to the time of initial copyrightability, rather than the time of the activity that may expose a defendant to liability, it is hard to see how courts are meaningfully considering merger "in the context of alleged infringement" and under the rubric of substantial similarity. Kregos, 937 F.2d at 705. Far from providing courts with "a more detailed and realistic basis for evaluating" defendants' merger claims, see id., such reasoning requires courts to ignore potentially relevant evidence from defendants while shifting a burden of proof to them.

proposition that "copyrighted language may be copied without infringing when there is but a limited number of ways to express a given idea. . . . In the computer context, this means that *when specific instructions, even though previously copyrighted, are the only and essential means of accomplishing a given task, their later use by another will not amount to infringement.*" Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 708 (2d Cir. 1992) (emphasis added). This recognition is not limited to computer programs. The CONTU report cited by the Second Circuit derived the quoted language from a Second Circuit case acknowledging "the use of specific language in forms and documents may be so essential to accomplish a desired result and so integrated with the use of a legal or commercial conception that the proper standard of infringement is one which will protect as far as possible the copyrighted language and yet allow free use of the thought beneath the language." Cont'l Cas. Co. v. Beardsley, 253 F.2d 702, 706 (2d Cir. 1958).

Accordingly, the Court concludes that, when assessing Defendants' alleged infringement, it should consider whether previously copyrighted language has become essential to the expression of, or integrated with, a legal

66

conception. At least in the Second Circuit, courts need not ignore changes that transpire between a work's initial creation and its alleged infringement, particularly because the manner in which people use or rely on that work may fundamentally change in the interval.

While not expressing binding Second Circuit precedent, the most analogous case is yet again Veeck. The Veeck court declared that the enacted building codes of Anna and Savoy were "facts" for the purpose of copyright law, and that they were "the unique, unalterable expression of the 'idea' that constitutes local law." 293 F.3d at 801. Though the model codes themselves could have been drafted in many ways, after Anna and Savoy adopted those codes in full, "Veeck could not express the enacted law in any other way." Id. at 802. Echoing its conclusions that the codes at issue were in the public domain, the Veeck court stated that "in continuing to write and publish model building codes, SBCCI is creating copyrightable works of authorship. When those codes are enacted into law, however, they become to that extent 'the law' of the governmental entities and may be reproduced or distributed as 'the law' of those jurisdictions." Id.

Second Circuit merger law and analogous out-of-circuit precedent both demonstrate that this Court should consider the circumstances that prevailed at the time of Defendants' alleged infringement. Bearing this in mind, Defendants' claim that the text of the I-Codes may have merged with the idea or fact of laws that adopted those I-Codes without amendment carries substantial force. Even though the model codes themselves have not become the law, one would need to use those model codes' precise language to express laws that had adopted the codes by reference in their entirety. Just as accurately identifying a fully-adopted model code as the enacted law amounts to posting that law, which is in the public domain, copying a model code that has been adopted in full would be protected by merger if done for the purpose of expressing the identically-worded law. If the record reflects that Defendants meant only to express the idea of those laws, then Defendants would not be liable for posting identical model codes.

As ICC might rightfully point out, Defendants did not post the identical text of enacted laws because the model codes on Historic UpCodes had copyright pages. However, copying the copyright pages is best considered de minimis under the circumstances. See <u>Warner Bros. Inc. v. Am.</u>

68

<u>Broad. Cos.</u>, 720 F.2d 231, 242 (2d Cir.1983) (noting
that de minimis rule permits "the literal copying of a
small and usually insignificant portion of the plaintiff's
work"). The copyright notices are protected material, but
they form such a small part of the overall codes that they
cannot be considered significant in isolation. <u>See</u> <u>Newton
v. Penguin/Berkley Pub. USA</u>, No. 13 Civ. 1283, 2014 WL
505191, at *2 (S.D.N.Y. Jan. 28, 2014) (applying de minimis
rule where defendants copied only "a tiny fraction of
Plaintiff's work . . . so trivial as to fall below the
quantitative threshold of substantial similarity")
(internal quotation marks omitted).[18] Rather than find
liability based on such minimal copying alone, this Court
would instead conclude that copying of the copyright pages
does "not warrant a finding of infringement given their
relative contribution to the overall" work. <u>Altai</u>, 982 F.2d
at 714-15. Nor would the Court withhold merger under
<u>Kregos</u>. Unlike soft expression infused with taste and
opinion, model regulations that mirror enacted laws more

---

[18] The Court recognizes the apparent irony of holding that virtually
identical works are not "substantially similar" in the merger context.
Though the dissent in <u>Kregos</u> highlighted this very tension, Nimmer
notes that the term "substantial similarity" should be understood to
connote "a legal conclusion that enough copying has taken place to
warrant finding infringement." 4 Nimmer on Copyright § 13.03.

closely resemble the "building blocks of understanding" that merit application of the doctrine.[19]

The Court's legal analysis largely tracks Defendants' position, and ICC's Motion must be denied on this score for reasons explained further below. But the Court notes here that Defendants' merger defense is not necessarily altogether meritorious on the facts of this case, either. The current record is ambiguous as to whether Defendants were expressing the idea of enacted laws, rather than the model codes as such. There are some pages on Historic UpCodes where Defendants appear to have posted model building codes without mentioning adopting jurisdictions. (See Wise Decl. Ex. 15.) On still other pages, the model code is accompanied by a section listing states that adopted the model code, but it is unclear whether those states adopted the code without amendment (such that the model code was the only way to express their laws, even if not explicitly identified as such) or whether those states amended the model codes (such that the model code text was not the only way to express those laws). (See id.) That

---

[19] The Court notes that because Current UpCodes also shows model code headings struck-through in red when displaying enacted codes that amend the model codes, Defendants do not exactly post "the law" in this instance either. (See, e.g., Gratz Opp. Decl. Ex. 5.) However, the Court would similarly hold that this degree of copying is de minimis, bearing in mind the headings' minimal contribution to the overall model codes and the many considerations listed in Section II.C.

Defendants made government amendments to the I-codes available only to paying users may also cut against the notion that they meant only to express the law.

Because the issue of merger arises primarily as a defense in the context of ICC's Motion, these ambiguities in the record must be resolved in Defendants' favor as the non-movants. As noted elsewhere above, the parties have largely treated the forty codes at issue as interchangeable, perhaps because of the various legal ambiguities in this case. They also may not have fully specified the various ways that the I-Codes were displayed on UpCodes. As an example, ICC alleged that Historic UpCodes did not appear to show any states adopting the IZC 2012, IPSDC 2009, and IPSDC 2015. But Defendants replied in their briefs that the cities of Gainesville, Texas and Foristell, Missouri adopted the IPSDC 2009; Cleveland, Texas adopted the IPSDC 2015; and Alton, Texas and Rawlins, Wyoming adopted the IZC 2012. (ICC SUMF ¶ 127; Defs. Resp. ¶ 127.) Similarly, that Defendants redirected users to ICC's website for the IZC 2015 may suggest that they intended to express only the law on UpCodes, even if their methods of displaying the law were not particularly artful. (See Wise Decl. Ex. 15.) Bearing in mind the ambiguities

pervading the record, the Court declines to conclude at this time that Defendants were clearly not expressing the idea of enacted laws. Accordingly, ICC's Motion must be denied as to the issue of merger.

E.   <u>FAIR USE</u>

Defendants further oppose ICC's Motion by arguing that their copying of the I-Code Redlines was a fair use, as was copying of the I-Codes as Adopted (if not already in the public domain). The Copyright Act provides that "the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include --

(1)   the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2)   the nature of the copyrighted work;

(3)   the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4)   the effect of the use upon the potential market for or value of the copyrighted work."

17 U.S.C. § 107.  The purposes listed in the statute are "illustrative and not limitative," and the four factors specified are similarly not exclusive of other considerations. Castle Rock Ent., Inc. v. Carol Pub. Grp., Inc., 150 F.3d 132, 141 (2d Cir. 1998). "The ultimate test of fair use, therefore, is whether the copyright law's goal of 'promot[ing] the Progress of Science and useful Arts,' U.S. Const., art. I, § 8, cl. 8, 'would be better served by allowing the use than by preventing it.'" Id. (citing Arica Inst., Inc. v. Palmer, 970 F.2d 1067, 1077 (2d Cir. 1992)). "The task is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis." Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 577 (1994).

The four enumerated fair use factors should not be considered in isolation but "are to be explored, and the results weighed together, in light of the purposes of copyright." Id. at 578. However, the first and fourth enumerated factors are generally more significant than the second and third. Authors Guild v. Google, Inc., 804 F.3d 202, 213-14 (2d Cir. 2015). "The fact-driven nature of the fair use determination suggests that a district court should be cautious in granting Rule 56 motions in this

area; however, it does not protect the copyright holder from summary disposition of her claims where there are no material factual disputes." <u>Wright v. Warner Books, Inc.</u>, 953 F.2d 731, 735 (2d Cir. 1991).

Throughout the analysis that follows, the Court considers not only the binding precedents of the Second Circuit and Supreme Court, but also the D.C. Circuit's highly germane decision in <u>American Society for Testing and Materials v. Public.Resource.Org, Inc.</u>, 896 F.3d 437 (D.C. Cir. 2018) ("<u>ASTM</u>"). Like <u>Veeck</u> and <u>BOCA</u>, the <u>ASTM</u> decision provides the most factually analogous guidance in the context of fair use. Because the D.C. Circuit faced a wider variety of standards and degrees of incorporation by reference than the model code cases, it declined to rule on the parties' public domain arguments and instead assessed the governmental adoption of standards through the lens of fair use.[20]

---

[20] On this point, the D.C. Circuit stated that "[a]lthough PRO raises a serious constitutional concern with permitting private ownership of standards essential to understanding legal obligations, we think it best at this juncture to address only the statutory fair use issue -- which may provide a full defense to some, if not all, of the SDO's infringement claims in this case -- and leave for another day the question of whether the Constitution permits copyright to persist in works incorporated by reference into law. . . . [I]t is one thing to declare that 'the law' cannot be copyrighted but wholly another to determine whether any one of these incorporated standards . . . actually constitutes 'the law.'" <u>ASTM</u>, 896 F.3d at 447.

Though the Court holds that Defendants' accurate posting of the I-Codes as Adopted is protected as a matter of public domain law, the Court would also reach the same result under the rubric of fair use. The analysis suggested by the D.C. Circuit tracks this Court's public domain analysis relatively closely and is consistent with binding Second Circuit precedent regarding fair use. Indeed, the D.C. Circuit suggested there is "reason to believe 'as a matter of law'" that copying standards like the I-Codes as Adopted would be fair use when intended to educate the public regarding the law. See id. at 448. In particular, the court observed that "[o]ne way in which the incorporated standards vary is how readily they resemble ordinary, binding law. At one end of this spectrum lie incorporated standards that define one's legal obligations just as much as, say, a *local building code* -- except that the specific legal requirements are found outside the two covers of the codebook. . . . At the other end of the spectrum lie standards that serve as mere references but have no direct legal effect on any private party's conduct." Id. at 442-43 (emphasis added). In concurrence, Judge Katsas specifically cited Veeck and BOCA as good law and stated that he joined the D.C. Circuit's opinion

because it "puts a heavy thumb on the scale in favor of an unrestrained ability to say what the law is. Thus, when an incorporated standard sets forth binding legal obligations, and when the defendant does no more and no less than disseminate an exact copy of it, three of the four relevant factors -- purpose and character of the use, nature of the copyrighted work, and amount and substantiality of the copying -- are said to weigh 'heavily' or 'strongly' in favor of fair use." Id. at 458-59 (Katsas, J., concurring).

Here, the Court likewise concludes that if Defendants' accurate posting of the I-Codes as Adopted was not already covered by the law of the public domain, it would be a fair use as a matter of law. The Court nevertheless addresses the I-Codes as Adopted in the following four-factor analysis in order to fully set forth the reasons for its conclusion. The Court also analyzes, not to be forgotten, the I-Code Redlines. Unlike its ruling relating to the I-Codes as Adopted, the Court does not hold that copying of the I-Code Redlines was a fair use as a matter of law. Nevertheless, because the parties raise genuine disputes of

material facts with respect to the I-Code Redlines, the
Court must deny ICC's Motion on this ground as well.[21]

1. <u>First Factor: Purpose and Use</u>

The first fair use factor is "the purpose and
character of the use, including whether such use is of a
commercial nature or is for nonprofit educational
purposes." 17 U.S.C. § 107(1). The "mere fact of a
commercial motivation rarely pushes the first factor
determination against fair use," <u>Capital Records, LLC v.
ReDigi Inc.</u>, 910 F.3d 649, 661 (2d Cir. 2018), as even the
illustrative uses in the statutory preamble are "generally
conducted for profit." <u>Campbell</u>, 510 U.S. at 584. Rather
than turning on commerciality, "this factor favors
secondary uses that are transformative, meaning that the
use 'adds something new, with a further purpose or
different character, altering the first with new
expression, meaning, or message[,]' rather than merely
superseding the original work." <u>ReDigi</u>, 910 F.3d at 660
(quoting <u>Campbell</u>, 510 U.S. at 579); <u>see also</u> <u>Authors
Guild, Inc. v. HathiTrust</u>, 755 F.3d 87, 96 (2d Cir. 2014)

---

[21] To avoid confusion, the Court notes that it does not understand the
I-Codes as Adopted to include Defendants' copying on the premium
portion of Historic UpCodes, even if Defendants might argue such
copying was of "the law." Because those instances of copying clearly
included portions of unadopted model code text in a redline format, the
Court treats them as instances of the I-Code Redlines.

("[A] transformative work is one that serves a new and different function from the original work and is not a substitute for it."). Though it is not strictly necessary for a fair use to be transformative, "the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." Campbell, 510 U.S. at 579. Similarly, where a work is not transformative, the commercial nature of an allegedly infringing use takes on greater significance. TCA Television Corp. v. McCollum, 839 F.3d 168, 183 (2d Cir. 2016).

Defendants claim that they posted the I-Codes as Adopted and I-Code Redlines for the purpose of educating the AEC community and public at large about their legal obligations. (See Defendants' Memo at 35–39; Defendants' Opposition at 27–28.) As an initial matter, this alleged purpose seems consistent with illustrative purposes articulated in the Copyright Act, including teaching, scholarship, and research. Posting enacted laws for the purpose of educating members of the public as to their legal obligations may be transformative, even if the enacted laws are identical to other copyrighted works. See ASTM, 896 F.3d at 450 (suggesting that "in certain

78

circumstances, distributing copies of the law for purposes of facilitating public access could constitute transformative use"); <u>A.V. ex rel. Vanderhye v. iParadigms, LLC</u>, 562 F.3d 630, 639 (4th Cir. 2009) (noting allegedly infringing uses "can be transformative in function or purpose without altering or actually adding to the original work"); <u>see also</u> <u>Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.</u>, 756 F.3d 73, 84 (2d Cir. 2014) (citing <u>Vanderhye</u> for same proposition).

A commercial actor's dissemination of information to the public may be a transformative use. This was the case in <u>Swatch</u>, where Bloomberg L.P. shared an audio recording of a private Swatch earnings call in order to provide the public with material financial information it would have otherwise not known, and which audio recording Swatch would not otherwise have shared or had a market for. <u>See generally</u> <u>Swatch,</u> 756 F.3d 73. The Second Circuit found this use transformative because Bloomberg's purpose was different from Swatch's; whereas Swatch provided the information as something the listeners on the private call should believe, Bloomberg provided the same information more broadly so the public knew what Swatch said. <u>Id.</u> at 84–85.

79

The _ASTM_ court also provided guidance in the most
factually analogous situation, stating that "[w]here an
incorporated standard provides information essential to
comprehending one's legal duties . . . this factor would
weigh heavily in favor of permitting a nonprofit seeking to
inform the public about the law to reproduce in full the
relevant portions of that particular standard." 896 F.3d at
450. While the D.C. Circuit emphasized that this analysis
may vary from standard to standard, the court framed model
codes as one end of a spectrum where the standards
themselves define legal obligations (as noted above). See
id. at 442-43, 450-51.

Based on the above precedents, the Court concludes
that posting the I-Codes as Adopted clearly serves a
transformative purpose: specifically, the dissemination of
enacted laws for public awareness. The underlying I-Codes
drafted by ICC primarily serve the purpose of model codes,
providing recommendations on the standards that governments
should adopt to improve and safeguard their built
environments. By contrast, the I-Codes as Adopted are
actual regulations binding the public and governing its
conduct. Because Current UpCodes provides the I-Codes as
Adopted to the general public for free, it clearly does so

80

with a purpose different from that which ICC has when it creates and distributes the model I-Codes.

Whether the I-Code Redlines serve a transformative purpose is a closer call. Like the I-Codes as Adopted, Defendants claim these redlines help members of the public to better understand their legal obligations. In a sense, the I-Code Redlines are like legislative history showing what the state and local jurisdictions explicitly decided to add or delete when adopting the model codes. At least in the abstract, there is some force to the argument that it is transformative to share materials that help understand the law, even if those materials themselves do not constitute the law. For example, the Supreme Court emphasized in PRO that describing the Georgia state code's annotations as "non-binding and non-authoritative . . . undersells their practical significance." See 140 S.Ct. at 1512. It observed that the annotations would inform readers that certain statutory obligations were in fact unenforceable relics, and it also expressed concern that a state might try to "monetize its entire suite of legislative history." See id. at 1512-13.

However, the Supreme Court's concerns do not necessarily militate in favor of finding use of the I-Code

Redlines is transformative as a matter of law. After all,
the Supreme Court's rule applies to works authored by
judges and legislatures rather than private authors. And
the information in the I-Code Redlines may be less
probative than legislative history or Lexis annotations,
depending on the particular codes and provisions at issue.
As ICC points out, knowing that Wyoming did not adopt an
appendix on tsunami-generated flood hazards probably does
not help Wyoming residents comprehend their legal duties.
Finally, that Defendants made the redlines on Historic
UpCodes available only to paying customers may partially
offset any transformative nature of the use, though Supreme
Court precedent makes clear that the commercial quality of
a use alone should not outweigh convincing transformative
qualities. See Authors Guild, 804 F.3d at 219. In short,
the Court cannot find that posting of the I-Code Redlines
constituted a fair use or was not based on the first factor
alone.

### 2. Second Factor: Nature of the Work

"The second statutory factor, 'the nature of the
copyrighted work,' 17 U.S.C. § 107(2), 'calls for
recognition that some works are closer to the core of
intended copyright protection than others, with the

consequence that fair use is more difficult to establish when the former works are copied.'" Castle Rock, 150 F.3d at 143 (quoting Campbell, 510 U.S. at 586). This factor tends to favor findings of fair use for factual works, which are further from the core of intended copyright protection than fictional ones. Am. Geophysical Union v. Texaco, Inc., 60 F.3d 913, 925 (2d Cir. 1994). But "courts have hardly ever found that the second factor in isolation played a large role in explaining a fair use decision," and the second factor is best assessed in tandem with the first. Authors Guild, 804 F.3d at 220.

The ASTM court stated that standards "fall at the factual end of the fact-fiction spectrum, which counsels in favor of finding fair use." 896 F.3d at 451. "[B]ecause the express text of the law falls plainly outside the realm of copyright protection . . . standards incorporated by reference into law are, at best, at the outer edge of copyright's protective purposes." Id. (internal quotation marks omitted). After emphasizing that this proposition must be considered standard-by-standard, the court summarized that "[w]here the consequence of the incorporation by reference is virtually indistinguishable from a situation in which the standard had been expressly

copied into law, this factor weighs heavily in favor of fair use. But where the incorporation does not lend to such easy substitution, fair use is harder to justify." Id. at 452.

The nature of model building codes plainly puts them at the periphery of copyright protection rather than its core. Bearing in mind that the "express text of the law" falls plainly outside the realm of copyright protection, the Court readily concludes that the second factor heavily favors a finding of fair use as to the I-Codes as Adopted. And though the I-Code Redlines feature model code text that was not incorporated into law, that text is nevertheless factual rather than fictional. Though the second fair use factor proves little in isolation, it weighs in favor of finding Defendants' copying is a fair use.

3.    Third Factor: Amount and Substantiality

"The third factor asks whether the secondary use employs more of the copyrighted work than is necessary, and whether the copying was excessive in relation to any valid purposes asserted under the first factor." HathiTrust, 755 F.3d at 96. "The inquiry must focus upon whether '[t]he extent of . . . copying' is consistent with or more than necessary to further 'the purpose and character of the

use.'" <u>Castle Rock</u>, 150 F.3d at 144 (quoting <u>Campbell</u>, 510 U.S. at 586–87). "[A] finding of fair use is more likely when small amounts, or less important passages, are copied than when the copying is extensive, or encompasses the most important parts of the original." <u>Authors Guild</u>, 804 F.3d at 221. The copying of entire works "does not preclude a finding of fair use, [but] it militates against such a finding." <u>Texaco</u>, 60 F.3d at 926. However, "for some purposes, it may be necessary to copy the entire copyrighted work, in which case Factor Three does not weigh against a finding of fair use." <u>HathiTrust</u>, 755 F.3d at 98. "Complete unchanged copying has repeatedly been found justified as fair use when the copying was reasonably appropriate to achieve the copier's transformative purpose and was done in such a manner that it did not offer a competing substitute for the original." <u>Authors Guild</u>, 804 F.3d at 221. By contrast, "when the purpose of the defendant's use is precisely the same as that of third parties who license the material from the plaintiff, the question of whether the amount used was reasonable in relation to the purpose of the copying must be answered in the negative." <u>Sinclair v. Am. Media, Inc.</u>, No. 18 Civ.

823, 2018 WL 5258583, at *6 (S.D.N.Y. Sept. 7, 2018) (internal quotation marks omitted).

The ASTM court stated that where a defendant "limits its copying to only what is required to fairly describe the standard's legal import, this factor would weigh strongly in favor of finding fair use here, especially given that precision is ten-tenths of the law." 896 F.3d at 452. The third fair use factor thus does not weigh against a finding that accurate copying of the I-Codes as Adopted is a fair use, because the substantial copying of the I-Codes is nonetheless limited to exactly what is contained in the enacted laws themselves.

But the third factor likely weighs against a finding of fair use as to Defendants' copying of the I-Code Redlines. In particular, the I-Code Redlines reproduced literally the entirety of the I-Codes underlying the enacted laws, including whole sections and appendices that were not adopted (again, Wyoming's choice not to adopt a section on tsunami-related flood hazards is an example in ICC's favor). (See Gratz Opp. Decl. Ex. 3.) However, this factor must be weighed against the transformative character of the allegedly infringing use. Defendants' copying would obviously be excessive if posting the I-Code Redlines is

86

not transformative, or Defendants may have been able to achieve their transformative goals with less than complete reproduction of unadopted model code text. As with the second fair use factor, this factor does not carry dispositive weight in isolation.

    4.   <u>Fourth Factor: Effect of Use upon Market</u>

    The fourth fair use factor is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original." <u>Campbell</u>, 510 U.S. at 590 (internal quotation marks omitted). This analysis must also account for the market for derivative works. <u>Id.</u> "The Factor Four analysis is concerned with only one type of economic injury to a copyright holder: the harm that results because the secondary use serves as a substitute for the original work." <u>HathiTrust</u>, 755 F.3d at 99; <u>see also</u> <u>Castle Rock</u>, 150 F.3d at 145 ("In considering the fourth factor, our concern is not whether the secondary use suppresses or even

destroys the market for the original work or its potential derivatives, but whether the secondary use usurps or substitutes for the market of the original work.").

"Factor Four is necessarily intertwined with Factor One; the more the objective of secondary use differs from that of the original, the less likely it will supplant the commercial market for the original." ReDigi, 910 F.3d at 662. However, "[e]ven if the *purpose* of the copying is for a valuably transformative purpose, such copying might nonetheless harm the value of the copyrighted original if done in a manner that results in widespread revelation of sufficiently significant portions of the original as to make available a significantly competing substitute." Authors Guild, 804 F.3d at 223. Where an alleged infringer effectively competes with companies that license the plaintiff's work, that may also tend against a finding of fair use. See Associated Press v. Meltwater U.S. Holdings, Inc., 931 F. Supp. 2d 537, 560-61 (S.D.N.Y. 2013).

The ASTM court suggested district courts consider three questions under this factor. First, considering that SDOs make their standards available for free in controlled reading rooms without hurting sales of their standards, to what extent does the allegedly infringing reproduction

88

cause any additional harm? Second, if the alleged infringer reproduced only the portions of the standards that "became law," to what extent would that affect the markets for the complete standards? Third, how, if at all, does the infringement affect the market for derivative works, particularly considering that the standards are regularly updated and that the private parties most interested in the standards would presumably remain interested in having the most up-to-date ones? See ASTM 896 F.3d at 453. The ASTM court also noted that ICC remains profitable after the ruling in Veeck both through sales of the I-Codes and other services such as consulting, certification, and training, which might suggest that ICC's markets remain resilient despite the copying allowed in Veeck. See id.

The Court notes that, unlike the other factors, the fourth fair use factor could potentially weigh against Defendants' copying of the I-Codes as Adopted. When an enacted law is identical to an I-Code and identified as such on UpCodes, it is fair to say that it is an effective substitute for the model code itself. The parties also genuinely dispute the extent to which the enacted codes could affect ICC's market for derivative works including training and certification. Though the ASTM court's

observations regarding ICC and its controlled reading rooms suggests the impact of posting the I-Codes as Adopted may not be particularly large, the record does not clearly answer how much harm UpCodes really does when it allows the same codes to be printed, copied and pasted, and downloaded, and whether such use actually affects ICC's market for its derivative products. The Court recognizes the potential for a dispute regarding the fourth fair use factor, though it is skeptical that the dispute would be material given the combined weight of the other three factors and the many grounds counseling that the I-Codes as Adopted are in the public domain regardless.

How the fourth factor affects the I-Code Redlines is also unclear. In one respect, the I-Code Redlines appear to have been competing substitutes for ICC's derivative works, as they were only available to paying customers of Historic UpCodes and ICC also utilized its own version of redlining on premiumACCESS.[22] (See Johnson Reply Decl. ¶ 4.) However, there is little clear evidence on whether the I-Code

---

[22] ICC also highlights the potential for UpCodes to serve as a substitute for its works more generally. It notes a number of customer testimonials on UpCodes indicating their satisfaction at having an alternative to bound codebooks and controlled reading rooms that prevent copying and downloading. (ICC Supp. SUMF ¶ 11; Defs. Supp. Resp. ¶ 11.) ICC also notes several statements by Defendants indicating they either view ICC or its online library licensees as competitors, further complicating the Court's ability to rule on the fourth factor as a matter of law. (See, e.g., Wise Decl. Exs. 18–19.)

Redlines actually affected revenues for ICC's derivative works, and the record tends to focus on a variety of derivative works that are not redlines, such as training and certification documents, user's guides, handbooks, and code commentary. Whether the I-Code Redlines affect the markets for these apparently different products presents a genuine dispute of material fact.

5.   Overall Analysis

On balance, the Court is persuaded that accurate posting of the I-Codes as Adopted is a fair use as a matter of law. As noted above, the first and second fair use factors together weigh heavily in Defendants' favor. The I-Codes as Adopted are clearly factual rather than fictional, and Defendants posted the works in their capacity as laws, rather than model codes. The purpose for which the I-Codes as Adopted were copied, displayed, and distributed is thus transformative. The third factor does not weigh against such copying either, as accurate copying would entail posting only "ten-tenths of the law." ASTM, 896 F.3d at 452. Finally, the Court notes that the overall impact of the fourth fair use factor is ambiguous. While there is reason to doubt that holding the I-Codes as Adopted were not infringed would seriously harm ICC, the manner in which

91

Defendants posted the I-Codes as Adopted might effectively allow for substitution of the I-Codes.

Even so, the Court concludes that accurate copying of the I-Codes as Adopted would be a fair use as a matter of law in this context. No one factor is dispositive of the fair use inquiry, and the ultimate inquiry remains whether "promot[ing] the Progress of Science and useful Arts . . . would be better served by allowing the use than by preventing it." Castle Rock, 150 F.3d at 141 (internal quotation marks and citation omitted). Given the clear weight of the first three factors and the numerous considerations detailed above in Section II.C., it is clear that the potential harms to ICC's markets for its works cannot outweigh the benefits and necessity of enabling unfettered access to enacted laws. These considerations necessitate a finding of fair use in the limited context of accurate copying of the I-Codes as Adopted.

However, the Court cannot so conclude with regard to the I-Code Redlines. While the second factor still favors a finding of fair use given the redlines' predominantly factual quality, none of the other factors clearly favors either ICC or Defendants. Whether the I-Code Redlines are transformative is debatable; while there is an argument

that they might help educate members of the public
regarding their legal obligations, the redlines are also
arguably direct substitutes for ICC's derivate works.
Similarly, while the third factor need not weigh against
Defendants if use of the I-Code Redlines is truly
transformative, the significant copying of unadopted model
code text tends to cut against a finding of fair use.
Finally, the numerous factual disputes regarding how much
Defendants' copying harms ICC's markets for the I-Codes and
derivative works are both genuine and material in this
context. While the Court could confidently conclude that
copying of the I-Codes as Adopted is protected given the
strong implications of public domain law, the same cannot
be said of the I-Code Redlines. Again, the parties' genuine
dispute regarding whether copying of the I-Code Redlines
was a fair use requires resolution in favor of the non-
movant. The Court must consequently deny ICC's Motion for
this reason too.

F.  COLLATERAL ESTOPPEL

Defendants finally argue that the doctrine of
collateral estoppel should bar ICC's suit and warrant a
declaratory judgment in Defendants' favor because the Veeck
case is dispositive of Defendants' claim. Because the

Court's public domain analysis largely tracks that of Veeck, Defendants' arguments regarding collateral estoppel appear to be largely moot. The Court will nevertheless address the argument now in order to obviate any potential need for future consideration. That the Court's legal analysis is similar to that of Veeck, however, is not the same as holding that Veeck precludes consideration of ICC's claims here. The Court is not persuaded that collateral estoppel should apply in this case.

"The fundamental notion of the doctrine of collateral estoppel . . . is that an issue of law or fact actually litigated and decided by a court of competent jurisdiction in a prior action may not be relitigated in a subsequent suit between the same parties or their privies." Ali v. Mukasey, 529 F.3d 478, 489 (2d Cir. 2008) (internal quotation marks and emphasis omitted). Collateral estoppel may apply where "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the part[ies] had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." Wyly v. Weiss, 697 F.3d 131, 141 (2d Cir. 2012). "These four factors are

required but not sufficient. In addition, a court must satisfy itself that application of the doctrine is fair." Bear, Stearns & Co. v. 1109580 Ontario, Inc., 409 F.3d 87, 91 (2d Cir. 2005). District courts have broad discretion to determine when this doctrine should be applied. See Frydman v. Akerman, 280 F. Supp. 3d 418, 423 (S.D.N.Y. 2017).

Defendants claim that ICC is SBCCI's privy and that it is effectively relitigating the same issues that SBCCI raised in Veeck. This argument is flawed in multiple ways. First, ICC is not in privity with SBCCI in the specific manner required for collateral estoppel to be appropriate. In the context of collateral estoppel, privity between preceding and succeeding owners of property extends only to the particular property that was the subject of the prior adjudication. See Int'l Nutrition Co. v. Horphag Research, Ltd., 220 F.3d 1325, 1329 (Fed. Cir. 2000) ("[W]hen one party is a successor in interest to another with respect to particular property, the parties are in privity only with respect to an adjudication of rights in the property that was transferred; they are not in privity for other purposes, such as an adjudication of rights in other property that was never transferred between the two."); see also Feldberg v. Quechee Lakes Corp., 196 F. App'x 38, 40

95

(2d Cir. 2006) ("[C]ertain judgments involving real or personal property may bind non-party successors in interest to property *involved* in the action.") (emphasis in original).

Some model codes in this case derive from the model codes at issue in Veeck, and Defendants highlight sections with nearly identical language. (See Defendants' Memo at 45-46; Gratz Decl. Exs. 1, 16.) But the model codes here are distinct works as a matter of copyright, each with its own separate registration. Defendants concede that each of the forty I-Codes comprises a distinct copyrighted work. Hence, similarities between those works and SBCCI's do not make them the same property. Because the model codes in Veeck are not the same as the forty model codes at issue here, many of which may not overlap with the Veeck codes at all, Defendants have failed to show the privity between ICC and SBCCI needed for collateral estoppel to apply.

Apart from privity, Veeck did not raise the identical issue presented here. "When the facts essential to a judgment are distinct in the two cases, the issues in the second case cannot properly be said to be identical to those in the first, and collateral estoppel is inapplicable." Envtl. Def. v. EPA, 369 F.3d 193, 202 (2d

Cir. 2004). In <u>Veeck</u>, the en banc Fifth Circuit addressed only the posting of model codes that were adopted verbatim by local jurisdictions, which the plaintiff identified as the building codes of those specific jurisdictions. The Fifth Circuit made clear that it was not addressing the posting of model codes as model codes, or copying that intermingled adopted code text with unadopted model code text. By contrast, Defendants here may have intermingled state code text with unenacted model code text to various degrees, and they may have posted the I-Codes as model codes rather than expressed substantially identical laws. Because the facts of this case are significantly different from those of <u>Veeck</u> and may compel a different result, the issues raised are not identical. Even if they were, the Court concludes that application of collateral estoppel would not be fair under the circumstances.

G.    <u>WILLFULNESS</u>

Because ICC's Motion must be denied for the many reasons explained above, it is not yet clear that Defendants are actually liable for infringement. Accordingly, the Court need not address ICC's remedy-related requests for a permanent injunction and a finding of willfulness that might entitle ICC to heightened

statutory damages. Nevertheless, the Court addresses the matter of willfulness below in order to narrow the potential issues for subsequent motion practice (if any).

If a defendant has infringed a plaintiff's copyright, the plaintiff may forego actual damages in favor of statutory damages under the Copyright Act. See 17 U.S.C. § 504(c). The amount of statutory damages a court may award will generally range from $750 to $30,000 per work infringed. See 17 U.S.C. § 504(c)(1). However, the upper range of statutory damages may increase to $150,000 per work if a defendant's infringement was willful. 17 U.S.C. § 504(c)(2). "To prove 'willfulness' under the Copyright Act, the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of 'reckless disregard' for, or 'willful blindness' to, the copyright holder's rights." Island Software & Computer Serv., Inc. v. Microsoft Corp., 413 F.3d 257, 263 (2d Cir. 2005). "Although courts are generally reluctant to dispose of a case on summary judgment when mental state is at issue, it is permissible to do so where there are sufficient undisputed material facts on the record to make the

98

question appropriate for summary judgment." <u>Lipton v.</u>
<u>Nature Co.</u>, 71 F.3d 464, 472 (2d Cir. 1995).

ICC puts forth enough evidence to allow a reasonable
jury to find willfulness. Defendants undisputedly copied
the I-Codes without ICC's authorization, and ICC cites
multiple statements suggesting Defendants knew doing so
would displease ICC and possibly harm ICC's business. (<u>See</u>
Wise Decl. Ex. 12 at 196:1-198:16; Wise Decl. Ex. 19; Wise
Decl. Ex. 45 at UPCODES00090698.) ICC also argues that
Defendants were at least reckless insofar as they posted
the I-Codes without seeking the advice of counsel. (ICC
SUMF ¶ 168; Wise Decl. Ex. 12 at 122:1-8.)

However, Defendants have raised contrary arguments,
reflecting the existence of a genuine dispute on this
issue. Even though Defendants copied the I-Codes and may
have known doing so would displease ICC, they may
nevertheless have believed their actions were entirely
legal based on their understanding of the law. (Defs. Resp.
¶ 154; G. Reynolds Opp. Decl. ¶¶ 8, 11-14; S. Reynolds Opp.
Decl. ¶¶ 8-12.) Defendants also argue that they could not
afford to hire a lawyer because they used their savings to
start UpCodes. They add that they still share a studio
apartment to cut their expenses and did not pay themselves

a salary until over a year after founding UpCodes. (Defs. Resp. ¶ 168; G. Reynolds Opp. Decl. ¶¶ 6-7, 12, 15; S. Reynolds Opp. Decl. ¶¶ 6-7, 10.) The record also contains UpCodes talking points reflecting that Defendants at least publicly represented that they believed their actions were legal. (See Gratz Opp. Decl. Ex. 4.) See also Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 112 (2d Cir. 2001) ("Willfulness in this context means that the defendant recklessly disregarded the possibility that its conduct represented infringement.") (internal quotation marks omitted).

Here, conceivably a reasonable jury could find that any infringement by Defendants was willful. "Still, it is not beyond peradventure that a reasonable jury would conclude otherwise. And that is enough to make summary judgment on the issue of willfulness inappropriate." Island Software, 413 F.3d at 264. Given the numerous genuine factual disputes presented throughout the record before the Court, at this stage of the proceedings the Court cannot find purely as a matter of law that any infringement Defendants may have committed was willful.

## III. <u>ORDER</u>

For the reasons discussed above, it is hereby

**ORDERED** that the cross-motions for summary judgment by plaintiff International Code Council, Inc. (Dkt. No. 84) and defendants UpCodes, Inc., Garrett Reynolds, and Scott Reynolds (Dkt. No. 85) are **DENIED**. It is further

**ORDERED** that within twenty days of the entry of this Order the parties submit a timeline for trial.

**SO ORDERED.**

Dated:      New York, New York
            26 May 2020

                                          _____
                                          Victor Marrero
                                          U.S.D.J.

101