**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **AMERICAN SOCIETY FOR TESTING AND MATERIALS, *et al.*,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**PUBLIC.RESOURCE.ORG, INC.,**<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)     Case No. 13-cv-1215 (TSC)<br>)<br>)<br>)<br>)<br>) |

## <u>MEMORANDUM OPINION</u>

Plaintiffs are three non-profit organizations that develop and publish industry standards to guide professionals working in a variety of commercial trades.  They allege that Defendant, a non-profit organization devoted to publicly disseminating legal information, violated copyright and trademark laws by copying and republishing some of Plaintiffs' written works onto its website.  In 2017, the court granted summary judgment to Plaintiffs on their copyright and trademark claims.  In 2018, the D.C. Circuit reversed the court's decision and remanded with instructions to further develop the factual record.  The parties have since supplemented the record, each filing new statements of fact and motions for summary judgment that are now pending before the court.  For the reasons explained below, the court will GRANT IN PART and DENY IN PART Plaintiffs' motion for summary judgment and for a permanent injunction, and GRANT IN PART and DENY IN PART Defendant's cross-motion for summary judgment.

## I.   BACKGROUND

In the United States, a complex public-private partnership has developed over the last century in which private industry groups or associations, rather than government agencies,

develop standards, guidelines, and procedures that set the best practices in particular industries. Plaintiffs—the American Society for Testing and Materials ("ASTM"), National Fire Protection Association, Inc. ("NFPA"), and American Society of Heating, Refrigerating, and Air-Conditioning Engineers ("ASHRAE")—each participate in such a public-private partnership.[1] Each Plaintiff relies on volunteers and association members from numerous sectors with technical expertise to develop private sector codes and standards aimed at advancing public safety, ensuring compatibility across products and services, facilitating training, and spurring innovation.  *See* ECF No. 118-2, Pls.' Statement of Material Facts ("Pls.' SMF") ¶¶ 9, 13, 14, 86, 87, 129, 130.  These standards include technical works, product specifications, installation methods, methods for manufacturing or testing materials, safety practices, and other best practices or guidelines.  *Id.* ¶ 1.  For example, ASTM has developed over 12,000 standards that are used in a wide range of fields, including consumer products, iron and steel products, rubber, paints, plastics, textiles, medical services and devices, electronics, construction, energy, water, and petroleum products, and are a result of the combined efforts of over 23,000 technical members.  *Id.* ¶¶ 13, 28, 41.  NFPA has developed over 300 standards in the areas of fire, electrical, and building safety, including the National Electrical Code, first published in 1897 and most recently in 2020.  *Id.* ¶¶ 86, 87, 92-94.  And ASHRAE has published over 100 standards for

---

[1] In *ASTM I*, the court also considered copyright and trademark claims brought in a related case against Defendant by American Educational Research Association, Inc., American Psychological Association, Inc., and National Council on Measurement in Education, Inc.  *See* A*m. Soc'y for Testing & Materials v. Public.Resource.org, Inc.*, No. 13-CV-1215 (TSC), 2017 WL 473822, at *1-2 (D.D.C. Feb. 2, 2017) (referencing Case No. 14-CV-857-TSC).  On October 14, 2020, the parties in that case entered a joint stipulation whereby the plaintiffs agreed to dismiss all claims and Defendant agreed to dismiss all counterclaims.  *See* ECF No. 149, Stipulation of Dismissal; *see also* Min. Order (Oct. 20, 2020) (dismissing plaintiffs' claims with prejudice and dismissing Defendant's counterclaims as moot).

a variety of construction-related fields, including energy efficiency, indoor air quality, refrigeration, and sustainability. *Id.* ¶ 130.

The standards Plaintiffs develop comprise the technical expertise of many volunteers and association members from numerous sectors, who develop the standards "using procedures whose breadth of reach and interactive characteristics resemble governmental rulemaking, with adoption requiring an elaborate process of development, reaching a monitored consensus among those responsible within the [standard development organizations]." Peter L. Strauss, *Private Standards Organizations and Public Law*, 22 Wm. & Mary Bill Rts. J. 497, 501 (2013). ASTM Plaintiffs develop their standards using technical committees with representatives from industry, government, consumers, and technical experts. Pls.' SMF ¶¶ 7, 28, 29, 109, 114, 135. These committees conduct open proceedings, consider comments and suggestions, provide for appeals, and through subcommittees, draft new standards, which the full committees vote on. *Id.* ¶¶ 31–37, 109, 136, 139.

The standards ordinarily serve as voluntary guidelines for self-regulation. However, federal, state, and local governments have incorporated by reference thousands of these standards into law. Pursuant to 5 U.S.C. § 552, federal agencies may incorporate voluntary consensus standards—as well as, for example, state regulations, government-authored documents, and product service manuals—into federal regulations by reference. *See* Emily S. Bremer, *Incorporation by Reference in an Open-Government Age*, 36 Harv. J.L. & Pub. Pol'y 131, 145–47 (2013) (providing a general overview of the federal government's incorporation of materials by reference). The federal government's practice of incorporating voluntary consensus standards by reference is intended to achieve several goals, including eliminating the cost to the federal government of developing its own standards, encouraging long-term growth for U.S. enterprises,

promoting efficiency, competition, and trade, and furthering the reliance on private sector expertise. *See ASTM*, 2017 WL 473822, at *2-4 (discussing incorporation by reference of industry standards); *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 896 F.3d 437, 442 (D.C. Cir. 2018) (same).

Plaintiffs recoup the cost of creating their standards the way that copyright owners generally do—they sell copies of their work product in both PDF and hard copy form to the public. *See ASTM*, 2017 WL 473822, at *4, *10-11; Pls.' SMF ¶¶ 45-47, 106-08, 153-54. Plaintiffs also maintain "reading rooms" on their websites that allow interested parties to view the standards that have been incorporated by reference into law as images. *Id.* ¶¶ 63–64, 100, 161. Those standards may not, however, be printed or downloaded in that format. *Id.*

Defendant Public.Resource.Org, Inc. ("PRO") is a not-for-profit organization whose mission is to "make the law and other government materials more widely available so that people, businesses, and organizations can easily read and discuss [the] laws and the operations of government." ECF No. 213-20, Pls.' Statement of Disputed Facts ("Pls.' SDF") ¶ 2. For example, Defendant posts government-authored materials on its website, including judicial opinions, Internal Revenue Service records, patent filings, and safety regulations. *Id.* ¶¶ 3–4. It does not charge fees to view or download these materials. *Id.* ¶ 5.

Between 2012 and 2014, Defendant purchased hard copies of each of the standards at issue, scanned them into PDF files, added a cover sheet, and posted them online. *ASTM*, 896 F.3d at 444. In some instances, Defendant modified the files so that the text of the standards could more easily be enlarged, searched, and read with text-to-speech software. *Id.* The copies that Defendant posted to its website all bore Plaintiffs' trademarks. Pls.' SMF ¶ 210. Defendant

also uploaded Plaintiffs' standards to the Internet Archive, a separate independent website.  Pls.'
SDF ¶ 185.

### A. *ASTM I*

In 2013, Plaintiffs sued Defendant for copyright and trademark infringement,
contributory copyright infringement, unfair competition, and false designation of origin as to 257
standards.  *See* ECF No. 1, Compl. ¶¶ 142–195.  Defendant counter-sued, seeking a declaratory
judgment that its conduct does not violate copyright law or trademark law.  *See* ECF No. 21,
Answer ¶¶ 174–205.  Plaintiffs moved for summary judgment on all but their contributory
copyright infringement claim and limited their motion to nine of the 257 standards, contending
that the court's guidance on those nine standards, a "subset of particularly important standards,"
would allow the parties "to resolve any remaining dispute with respect to the other works in
suit."  ECF No. 118-1, Pls.' First Mot. for Summ. J. ("Pls.' First MSJ") at 2 & n.1.[2]  Defendant
responded with its own cross-motion for summary judgment.

The court denied Defendant's motion and granted summary judgment to Plaintiffs on
their direct copyright infringement and trademark infringement claims.  The court found that
Plaintiffs held valid and enforceable copyrights in the incorporated standards that Defendant had
copied and distributed, and that Defendant failed to create a triable issue of fact that its
reproduction qualified as "fair use."  *ASTM*, 2017 WL 473822, at *18.  As to ASTM's trademark
infringement claims, the court held that Defendant had used copies of ASTM's marks in
commerce in a manner "likely to cause confusion," *id.* at *20, *22-23 (citing Restatement

---

[2] In *ASTM I*, the nine standards were:  ASTM D86-07, ASTM D975-07, ASTM D396-98, ASTM
D1217-93 (98), the 2011 and 2014 versions of NFPA's National Electrical Code, and the 2004,
2007 and 2010 versions of ASHRAE's Standard 90.1.  Pls.' First MSJ at 2.

(Third) of Unfair Competition § 21 cmt. j (1995)), and that its reproduction of the marks did not qualify as a nominative fair use, *id.* at *23.

Defendant appealed, challenging the court's ruling as to both copyright and trademark infringement.

The D.C. Circuit first rejected Defendant's arguments as to copyright ownership. Defendant had argued that the participation of federal government employees in the creation of certain standards rendered them noncopyrightable works of the U.S. Government. *ASTM*, 896 F.3d at 446. The Circuit found that Defendant "forfeited" this argument by not adequately presenting it to the district court, and that such a claim was, in any event, "meritless," because Defendant "submitted no evidence that specific language in any of the works was 'prepared by an officer or employee of the United States Government as part of that person's official duties.'" *Id.* (quoting 17 U.S.C. § 101).

Aside from its government-work argument, Defendant primarily advanced two arguments upon which the Circuit focused. First, Defendant argued that incorporation by reference makes the standards "part of the 'law,' and the law can never be copyrighted." *Id.* The Circuit reasoned that Defendant's argument presented a "serious constitutional concern with permitting private ownership of standards essential to understanding legal obligations," but opted to save this "thorn[y]" constitutional question "for another day." *Id.* at 441, 447. It explained that it could resolve the appeal within the confines of the Copyright Act without addressing the constitutional question, a course that was particularly prudent because the record revealed little about how the challenged standards were incorporated. *Id.* at 447. For example, "it is one thing to declare that 'the law' cannot be copyrighted but wholly another to determine whether any one of these incorporated standards—from the legally binding prerequisite to a labeling requirement,

*see* 42 U.S.C. § 17021(b)(1), to the purely discretionary reference procedure, *see* 40 C.F.R. §

86.113-04(a)(1)—actually constitutes 'the law.'" *Id.*  By avoiding the constitutional question,

the Circuit also limited "the economic consequences that might result from [Plaintiffs] losing

copyright . . . by allowing copying only where it serves a public end rather than permitting

competitors to merely sell duplicates at a lower cost." *Id.*  The Circuit explained that its narrow

approach avoided creating "*sui generis* caveats to copyright law for incorporated standards." *Id.*

The Circuit then addressed the second of Defendant's two main arguments: that its use of

Plaintiffs' copyright material was permissible "fair use" because it facilitates public discussion

about the law—a use within the "public domain." *Id.* at 448.  Though the Circuit found reason to

believe "as a matter of law" that Defendant's "reproduction of certain standards 'qualif[ies] as a

fair use of the copyrighted work,'" it reasoned that "the better course is to remand the case for

the district court to further develop the factual record and weigh the [four fair-use] factors as

applied to [Defendant's] use of each standard in the first instance." *Id.* at 448-49 (quoting

*Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985)).  The Circuit found

that the record did not support the conclusion that Defendant distributed copies of the

incorporated standards solely to undermine Plaintiffs' ability to raise revenue. *Id.* at 449 (citing

*ASTM*, 2017 WL 473822, at *18).  Rather, it appeared that Defendant distributed the standards to

educate "the public about the specifics of governing law." *Id.* (citing Def. Br. 43 (explaining that

"[t]here is no better way to teach the law to the public than to *provide the public with the law*"));

ASTM Br. 34 ("[Defendant's] purpose is to enable members of the public to obtain copies of

[the standards].").  The Circuit also faulted the court and parties for "treating the standards

interchangeably" by not considering the variations and legal status of each of the standards. *Id.*

at 448-49.  It therefore directed the court to reconsider Defendant's defense on "a fuller record

regarding the nature of each of the standards at issue, the way in which they are incorporated, and the manner and extent to which they were copied by [Defendant]." *Id.* at 449. At the same time, the court need not consider each standard individually where, as here, the standards are susceptible to groupings relevant to the fair use analysis. *Id.*

On Plaintiffs' trademark infringement claims, the Circuit directed the court to reconsider Defendant's affirmative defense of nominative fair use, reasoning that "it may well be that [Defendant] overstepped when it reproduced both ASTM's logo and its word marks," but that the district court's analysis of that defense would "provide valuable insight both into whether trademark infringement has occurred and, if so, how broad a remedy is needed to address the injury." *Id.* at 457.

### B. <u>Fact Development on Remand and Second Motions for Summary Judgment</u>

Following remand, Defendant reposted its versions of Plaintiffs' standards to the Internet Archive website. ECF No. 199-2, Pls.' Second Statement of Material Facts ("Pls.' 2d SMF") ¶ 11; ECF No. 204-1, Def.'s Statement of Disputed Facts ("Def.'s SDF") ¶ 11. In doing so, it largely redacted Plaintiffs' logos. *See* Pls.' 2d SMF ¶¶ 21-25; Def.'s SDF ¶¶ 21-25. Plaintiffs, however, point to instances where Defendant did not redact the ASTM logo and word mark, and the NEC logo. *See* Pls.' 2d SMF ¶¶ 23-25.

Defendant also changed the disclaimers it includes with each of Plaintiffs' works that it posts. Those disclaimers take three forms. The first appears on the cover page of posted PDF copies of Plaintiffs' works. Pls.' 2d SMF ¶ 26; Def.'s SDF ¶ 26. The second appears on the Internet Archive webpage below the PDF copy. Pls.' 2d SMF ¶ 27; Def.'s SDF ¶ 27. The third appears as a "preamble" to Defendant's HTML-format copies of Plaintiffs' standards available for download on the Internet Archive website. Pls.' 2d SMF ¶ 28; Def.'s SDF ¶ 28.

Plaintiffs and Defendant have since developed (and sought to limit) the factual record by filing statements of fact and evidentiary objections,[3] and each side has again moved for summary judgment.

As to its copyright claims, Plaintiffs move for summary judgment with regard to 217 standards.  *See* ECF No. 199, Pls.' Second Mot. for Summ. J. ("Pls.' 2d MSJ"); *see also* ECF 198-2, Pls.' Appendix A (listing each of the 217 standards).  Plaintiffs argue that they own valid copyrights in the 217 standards, that Defendant "indiscriminately" copied and republished those standards and therefore failed to comport with Circuit guidance on what qualifies as "fair use." *See* Pls.' 2d MSJ at 10-12.  Plaintiffs group the standards into five categories: (1) standards for which Defendant has not correctly identified an incorporating reference; (2) standards containing discretionary portions or reference procedures; (3) standards that have only been partially incorporated by reference into law; (4) standards that do not impose legal duties on any private party; and (5) standards containing non-mandatory aids or supplements, including appendices,

---

[3] *See* Pls.' 2d SMF; ECF No. 203-2, Def.'s Second Statement of Material Facts ("Def. 2d SMF"); Def.'s SDF; ECF No. 204-2, Def.'s Evidentiary Objs.; Pls.' SDF; ECF No. 212-2, Pls.' Resp. to Def. Statement of Disputed Facts; ECF No. 213-1, Pls.' Third Statement of Material Facts ("Pls.' 3d SMF"); ECF No. 213-21, Pls.' Resp. to Evidentiary Objs.; ECF No. 214-1, Def.'s Resp. to Evidentiary Objs.; ECF No. 215-2, Def.'s Evidentiary Objs. in Reply to Pls.' Opp'n; ECF No. 215-10, Def.'s Suppl. Statement of Disputed Facts ("Def.'s Suppl. SDF"); ECF No. 215-12, Def.'s Mot. to Strike Pls.' Resp. to Def.'s Statement of Disputed Facts; ECF No. 217, Pls.' Evidentiary Objs. to Def.'s Reply ISO 2d MSJ; ECF No. 218, Def.'s Resp. to Pls.' Evidentiary Objs. to Def.'s Reply ISO 2d MSJ.  The court does not rely on the disputed evidence in resolving the parties' cross-motions and therefore does not address the evidentiary objections.

Defendant has also asked the court to take judicial notice of certain aspects of the version of the 2002 National Electrical Safety Code (NESC) that the Indiana Supreme Court cited in *Bellwether Properties, LLC v. Duke Energy Indiana, Inc.*, 87 N.E.3d 462, 469 (Ind. 2017), *see* ECF No. 204-3.  The court grants Defendant's request to take judicial notice of certain aspects of the version of the 2002 National Electrical Safety Code (NESC) that the Indiana Supreme Court cited in *Bellwether Properties, LLC v. Duke Energy Indiana, Inc.*, 87 N.E.3d 462, 469 (Ind. 2017); however, the court does not rely on this information to resolve the parties' cross-motions.

summaries of changes, summaries of test methods, significance and use sections, and supplementary requirements. *See* Pls.' 2d SMF at 8-44. Plaintiffs also argue that Defendant's use of each standard undermines the actual and potential markets for Plaintiffs' works. *See* Pls.' 2d MSJ at 25-31.

As to its trademark claims, Plaintiffs argue that Defendant does not need to use Plaintiffs' marks, logos, organizational names, or identify the standards by name to advance its mission of educating the public about binding legal obligations. *Id.* at 33-34. Plaintiffs also contend that Defendant's use of Plaintiffs' logos goes beyond what is reasonably necessary to identify Plaintiffs' works, and that Defendant's disclaimers fail to adequately reduce the likelihood of consumer confusion. *Id.* at 34-37.

Finally, Plaintiffs seek a permanent injunction barring Defendant from reproducing and using Plaintiffs' standards and trademarks because they will otherwise suffer irreparable harm, no other adequate remedy is available to compensate them, the harm to Plaintiffs outweighs any potential harm to Defendant, and the public interest favors an injunction. *Id.* at 38-45.

Defendant responds to Plaintiffs' copyright claims by arguing that its use of the incorporated standards is non-infringing fair use. *See* ECF No. 203-1, Def. Second Mot. for Summ. J. ("Def.'s 2d MSJ"). Specifically, Defendant contends that the federal government has incorporated into law every standard at issue in its entirety, that those standards are not generally and freely accessible, and that Defendant's actions have no effect on Plaintiffs' standard sales. *Id.* at 8-10. Defendant also "reasserts its earlier arguments" made in support of its first motion for summary judgment that Plaintiffs' standards are not entitled to copyright protection because: (1) the standards are binding laws of the United States and at least one state; (2) the standards are not copyrightable subject matter pursuant to 17 U.S.C. § 102(b); (3) the merger doctrine

precludes enforcement of copyright in works which have become government edicts and political

facts as laws by incorporation; and (4) enforcement of the copyrights through the prior restraint

that Plaintiffs seek case would violate the First, Fifth, and Fourteenth Amendments of the United

States Constitution.  *See* ECF No. 202 (citing ECF Nos. 120-126, 146-147, 149, 151, 160-161,

163-168).

 In response to Plaintiffs' trademark claim, Defendant argues that Plaintiffs have not

offered evidence of consumer confusion and that its use of Plaintiffs' marks constitutes

nominative fair use because the standards are not readily identifiable without Plaintiffs' marks,

Defendant has included only what is necessary to identify the standards, and has not suggested

that Plaintiffs sponsor or endorse Defendant's postings.  Def.'s 2d MSJ at 30-37.

### C. <u>Supplemental Briefing: *Georgia v. Public.Resource.Org, Inc.*</u>

 After the parties submitted their summary judgment briefing, the Supreme Court decided

*Georgia v. Public.Resource.Org, Inc.*, 140 S. Ct. 1498 (2020).  At the court's request, the parties

submitted supplemental briefing on the impact of that decision on this case.

 In *Georgia*, the Court considered whether annotations in the Official Code of Georgia

Annotated, which is the authoritative version of Georgia's statutes under Georgia law, were in

the public domain along with the statutes themselves.  *Georgia*, 140 S. Ct. at 1504-05.

LexisNexis drafted the annotations pursuant to a work-for-hire agreement with a Georgia state

commission, such that Georgia was considered the "author" of those annotations for copyright

purposes.  *See id.* at 1505.  When PRO—the same defendant as in this case—copied the

annotated code, Georgia sued, arguing that the annotations were not in the public domain

because, unlike the statutes, they did not carry the "force of law."  *See id.*  The district court

agreed with Georgia, but the Eleventh Circuit reversed, using a three-part test that considered whether the annotations were constructively authored by citizens.  *See id.* at 1505–06.

The Supreme Court affirmed the Eleventh Circuit but announced a different rule: that the government edicts doctrine—under which officials empowered to speak with the force of law cannot be the authors of, and therefore cannot copyright, the works they create in the course of their official duties—applies equally to "non-binding, explanatory legal materials created *by a legislative body* vested with the authority to make law."  *Id.* at 1503 (emphasis in original).   The Court based its rule in significant part on its construction of the term "author," noting that judges and legislators could not be considered authors entitled to copyright in their official works because those officials were "vested with the authority to make and interpret the law."  *Id.* at 1507.  As a corollary to its author-focused rule, the Supreme Court added that the government edicts doctrine "does not apply, however, to works created by . . . private parties[ ] who lack the authority to make or interpret the law."  *Id.*

The Court went on to note: "The animating principle behind [the government edicts doctrine] is that no one can own the law.  Every citizen is presumed to know the law, and it needs no argument to show . . . that all should have free access to its contents."  *Id.* (internal quotation marks and citations omitted).

## II.   LEGAL STANDARD

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine

issue of material fact.") (emphasis in original); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  Summary judgment may be rendered on a "claim or defense . . . or [a] part of each claim or defense."  Fed. R. Civ. P. 56(a).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).  "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination.  An issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Holcomb*, 433 F.3d at 895 (quoting *Liberty Lobby*, 477 U.S. at 248) (citation omitted).  The party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified."  *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 297 (D.C. Cir. 1987).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Liberty Lobby*, 477 U.S. at 255; *see also Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006) ("We view the evidence in the light most favorable to the nonmoving party and draw all inferences in its favor.").  The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials, and must be supported by affidavits, declarations, or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The non-movant "is required to provide evidence that would permit a reasonable jury to find [in his favor]."  *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

Plaintiffs seek to permanently enjoin Defendant from all reproduction, display, or distribution of Plaintiffs' standards and all use of Plaintiffs' trademarks.  *See* Pls.' 2d MSJ at 38. "A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief.'"  *John Doe. Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1131 (D.C. Cir. 2017) (alteration in original) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  A "plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  Specifically, a plaintiff must show that: (1) it has suffered or will suffer an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) weighing the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction.  *Id.  See also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 162 (2010) (finding permanent injunction not warranted because, "[m]ost importantly," respondent failed to show "any present or imminent risk of likely irreparable harm").

### III.    ANALYSIS

#### A.  <u>Copyright Infringement</u>

Article I, Section 8, Clause 8, of the Constitution empowers Congress "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."  U.S. Const. art. I, § 8, cl. 8.  So empowered, the first Congress enacted the Copyright Act of 1790, granting authors of certain works "the sole right and liberty of printing, reprinting, publishing and vending" those works "for the term of fourteen years."  Act of May 31, 1790, § 1, 1 Stat. 124.

Since then, the precise contours of the Copyright Act have changed, but Congress's

purpose has remained constant:

> The enactment of copyright legislation by Congress under the terms of the
> Constitution is not based upon any natural right that the author has in his
> writings . . . but upon the ground that the welfare of the public will be served and
> progress of science and useful arts will be promoted by securing to authors for
> limited periods the exclusive rights to their writings.

H.R. Rep. No. 60-2222, at 7 (1909); *see also Sony Corp. of Am. v. Universal City Studios, Inc.*,

464 U.S. 417, 429 (1984) (This "limited grant" is "intended to motivate the creative activity of

authors and inventors by the provision of a special reward, and to allow the public access to the

products of their genius after the limited period of exclusive control has expired.").  "The

challenge with each iteration of the Act, both for its drafters and its interpreters, has been to

strike the 'difficult balance between the interests of authors and inventors in the control and

exploitation of their writings and discoveries on the one hand, and society's competing interest in

the free flow of ideas, information, and commerce on the other hand.'"  *ASTM*, 896 F.3d at 448

(quoting *Sony Corp.*, 464 U.S. at 429).

Under the current iteration of the Copyright Act, copyright protection subsists "in

original works of authorship fixed in any tangible medium of expression," and vests initially in

the author(s) of that work.  17 U.S.C. §§ 102(a), 201(a).  Ownership can be transferred in whole

or in part, and the exclusive rights of copyright ownership may also be transferred.  *Id.* § 201(d).

An owner of a valid copyright has the "exclusive right[]" to reproduce, distribute, or display the

copyrighted works as well as to prepare derivative works based upon it.  *Id.* § 106(1) – (3), (5).

One who violates the exclusive rights of the copyright owner "is an infringer of the copyright or

right of the author, as the case may be."  *Id.* § 501(a).  The legal or beneficial owner of that

exclusive right may then "institute an action for any infringement."  *Id.* § 501(b).  To succeed on

a copyright infringement claim, a plaintiff must prove both "'(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'"  *Stenograph, LLC v. Bossard Assocs., Inc.*, 144 F.3d 96, 99 (D.C. Cir. 1998) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).

On the other hand, reflecting copyright's balance between private ownership and public welfare, the Act has long recognized that certain "fair use[s]" of a copyrighted work do not constitute infringement.  *ASTM*, 896 F.3d at 446 (citing 17 U.S.C. § 107).  Not all uses of a copyrighted work are "within the exclusive domain of the copyright owner," rather, as the Supreme Court has explained, "some are in the public domain."  *Id.* (quoting *Sony Corp.*, 464 U.S. at 433).

     1.  Ownership of Valid Copyrights

     *a.*  *Ownership*

Plaintiffs move for summary judgment on 217 standards: the 9 standards at issue in *ASTM I*,[4] plus 208 additional standards listed in their Complaint.  While the court previously held that Plaintiffs own copyrights in the 9 standards at issue in *ASTM I*, it must now determine whether Plaintiffs own copyrights in the other 208 standards such that they have standing to challenge Defendant's alleged infringement.  The court finds that they do.

The Copyright Act provides that possession of a certificate of registration from the U.S. Copyright Office "made before or within five years after first publication of the work shall constitute prima facie evidence," creating a rebuttable presumption of ownership of a valid

---

[4] *See* ECF No. 118, Pls.' First Mot. for Summ. J. (moving for summary judgment as to ASTM D86-07, ASTM D975-07, ASTM D396-98, ASTM D1217-93(98), the 2011 and 2014 versions of NFPA's National Electrical Code, and the 2004, 2007 and 2010 versions of ASHRAE's Standard 90.1).

copyright.  17 U.S.C. § 410(c); *see also MOB Music Publ'g v. Zanzibar on the Waterfront, LLC*, 698 F. Supp. 2d 197, 202 (D.D.C. 2010).  If the copyright was registered more than five years after the work was published, the "evidentiary weight to be accorded . . . shall be within the discretion of the court."  17 U.S.C. § 410(c).

When a party offers as prima facie evidence a registration certificate for a compilation of individual works that it authored rather than the registration for a specific individual work, a court may consider this to be similar prima facie evidence of ownership, creating the same rebuttable presumption.  *See Xoom, Inc. v. Imageline, Inc.*, 323 F.3d 279, 283-84 (4th Cir. 2003), *abrogated by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010); *Morris v. Business 12 Concepts, Inc.*, 259 F.3d 65, 68 (2d Cir. 2001), *abrogated on other grounds by Muchnick*, 559 U.S. 154 (2010).  Moreover, the registration certificate is sufficient prima facie evidence for the individual works within the compilation, if the compilation is deemed to be a "single work." Federal regulations provide that "all copyrightable elements that are otherwise recognizable as self-contained works, that are included in the same unit of publication, and in which the copyright claimant is the same" constitute a "single work," and are validly registered under a single registration certificate.  37 C.F.R. § 202.3(b)(4); *Kay Berry, Inc. v. Taylor Gifts, Inc.*, 421 F.3d 199, 205–06 (3d Cir. 2005); *Yurman Studio, Inc. v. Castaneda*, 591 F. Supp. 2d 471, 483 (S.D.N.Y. 2008).

Plaintiffs produced registration certificates for each of the 217 standards at issue, and each certificate lists Plaintiffs as the authors of the works.  *See* Pls.' 2d SMF ¶¶ 1-10. Specifically, ASTM has obtained copyright registration certificates that cover 191 of its standards.  *See* ECF No. 198-5, Declaration of Jane W. Wise ("Wise Decl.") ¶¶ 2, 31-149, Exs. 30-148; ECF No. 118-7, Declaration of Thomas O'Brien ("O'Brien Decl.") ¶¶ 5-12, Exs. 1-4.

The registrations for 187 of ASTM's standards—those whose numbers appear in bold in

Plaintiffs' Annex A, ECF No. 198-4—were effective within five years of the date of first

publication identified in the registration certificate.  *See* Pls.' 2d SMF ¶ 7; Wise Decl. ¶¶ 2-33,

35-57, 59-65, 67-149, Exs. 1-32, 34-56, 58-148; O'Brien Decl. ¶¶ 7-11, Exs. 3-4.  ASTM's other

four standards[5] were registered more than five years after they were published, but the court

accords these the same evidentiary weight as if they had been registered within five years.  *See*

17 U.S.C. § 410(c) (court has discretion over evidentiary weight).

NFPA produced copyright registration certificates for its twenty-three standards at issue,

each obtained within five years of publication.  ECF No. 118-3, Declaration of Dennis J. Berry

("Berry Decl.") ¶¶ 2-3, Exs. A, B; ECF No. 198-50, Supplemental Declaration of James T.

Pauley ("Supp. Pauley Decl.") ¶¶ 6-24, Exs. W-OO (certificates of registration).  Likewise,

ASHRAE produced copyright registration certificates for its three standards at issue, each within

five years of publication.  ECF No. 118-10, Declaration of Stephanie Reiniche ("Reiniche

Decl.") ¶ 15, Exs. 3-5.

Plaintiffs' registration certificates create a presumption of validity and ownership with

respect to both their individually registered works and to the original works that comprise

Plaintiffs' registered compilations.  *ASTM*, 2017 WL 473822, at *6-7 ("Plaintiffs are the owners

of the copyrights at issue and have standing to bring their claims."); 17 U.S.C. § 410(c); *MOB*

*Music Publ'g*, 698 F. Supp. 2d at 202.

Consequently, the burden shifts to Defendant to prove the contrary.  *Hamil Am., Inc. v.*

*GFI, Inc.*, 193 F.3d 92, 98 (2d Cir. 1999) (once a copyright holder has proffered prima facie

evidence of ownership, the alleged infringer "challenging the validity of the copyright has the

---

[5] A106/A108M, C150, D86, D975.

burden to prove the contrary"); *United Fabrics Int'l, Inc. v. C&J Wear, Inc.*, 630 F.3d 1255, 1257 (9th Cir. 2011) (infringer "has the burden of rebutting the facts set forth in the copyright certificate").  Defendant makes three arguments challenging validity, none of which are persuasive.

First, Defendant questions whether the standards at issue were ever validly copyrighted given the Act's prohibition on copyrighting "work[s] of the United States Government."  17 U.S.C. § 105(a).  According to Defendant, "[m]*any federal government employees* were among the volunteers [who collaborated with non-government employees and Plaintiffs to write the standards], so the employees (or the federal government itself) are among the joint authors."  *See* Def.'s 2d MSJ at 44 (emphasis in original).

Defendant made this argument for the first time on appeal, and the Circuit rejected it as untimely and because Defendant "submitted no evidence that specific language in any of the works was 'prepared by an officer or employee of the United States Government as part of that person's official duties.'"  *ASTM*, 896 F.3d at 446.  While Defendant has now raised the argument with this court, *see* Def.'s 2d MSJ at 45 n.20, it has proffered no evidence that an officer or employee of the government prepared specific language in any of Plaintiffs' standards as part of their official duties.  *See id.* at 44.  Without such evidence, Defendant's argument is "meritless."  *ASTM*, 896 F.3d at 446.

For the same reason, Defendant's second and related argument—that the standards are "government edicts"—fails.  The government edicts doctrine applies only to state works and is narrower than the bar on copyright protection for federal works.  *See Georgia*, 140 S. Ct. at 1509–10.  For instance, the doctrine applies only to works of a judge or legislator, *id.* at 1513, whereas the Act's bar on copyrighting "work[s] of the United States Government," in 17 U.S.C.

§ 105, applies to works created by all federal "officer[s] or employee[s]," without regard to the nature of their position or scope of their authority, *id.* at 1509-10.

Defendant does not offer any evidence that a judge or legislator wrote any of Plaintiffs' standards.  Instead, it argues that "once incorporated into law, [Plaintiffs' standards] are recreated as—transformed into—government edicts."  Def. Supp. Br. at 3-4 (citing *Georgia*, 140 S. Ct. at 1504).  For support, Defendant relies on *Georgia v. Public.Resource.Org*, 140 S. Ct. at 1503, in which the works in question were prepared by a private company, Lexis, pursuant to a work-for-hire agreement with Georgia's Code Revision Commission.  *Georgia*, 140 S. Ct. at 1508.  Unlike in *Georgia*, there is no evidence here that that state legislators hired Plaintiffs to draft the standards.  The Copyright Act's use of the term "author[]" "presuppose[s] a degree of originality" and "[o]riginal, as the term is used in copyright, means . . . that the work was independently created by the author (as opposed to copied from other works)."  *Feist*, 499 U.S. at 345-46.  A government body that merely incorporates a standard by reference does not independently create any content, and therefore does not become an "author" of the standard. Defendant points to no authority to the contrary.

Third, Defendant attempts to overcome the presumption that Plaintiffs own copyrights in the standards by arguing that Plaintiffs failed to list all joint authors in their registration applications.  Def.'s 2d MSJ at 45.  The court has already considered and rejected this argument. *See ASTM*, 2017 WL 473822, at *7.  "Beyond showing that Plaintiffs' recordkeeping could perhaps be more thorough, Defendant has not identified any evidence that [Plaintiffs] do not own the copyrights of the standards."  *Id.*; *see also Alaska Stock, LLC v. Houghton Mifflin Harcourt Pub. Co.*, 747 F.3d 673, 685 (9th Cir. 2014) (upholding the validity of copyright registrations that did not list all joint authors); *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*,

722 F.3d 591, 593, 596-99 (4th Cir. 2013) (same); 2 Nimmer on Copyright § 7.20[B][1];

("mention in a registration certificate of only one of two co-authors does not affect the validity of

the registration").  The Circuit did not disturb this holding, and Defendant has not offered any

new evidence or argument that would cause the court to reconsider.

    As in *ASTM I*, Defendant has not presented any "evidence *disproving* Plaintiffs'

authorship."  *ASTM*, 2017 WL 473822, at *7.  Consequently, the court finds that Plaintiffs own

copyrights in each of the 217 standards at issue and therefore have standing to bring their claims.

### b.  *Valid Copyrights*

    In *ASTM I*, the court held that Plaintiffs owned "valid" copyrights, rejecting Defendant's

arguments that the standards either were never copyrightable or lost their copyright protection

upon incorporation by reference into federal regulations.  *See id.* at *8-15.  The Circuit did not

rule on this issue, and instead "left for another day" the "thorn[y] question of whether standards

retain their copyright after they are incorporated by reference into law."  *ASTM*, 896 F.3d at 441.

On remand, Defendant has not presented argument or evidence regarding the validity of

Plaintiffs' copyrights and therefore the court need not reconsider the issue.

### 2.  Copying an Original Work and the Fair Use Defense

    It is undisputed that Defendant reproduced and posted online for display or distribution

the 217 standards at issue.  In *ASTM I*, the court rejected the application of the merger or *scènes*

*à faire* doctrines as affirmative defenses, a holding the Circuit did not disturb and that this court

will not revisit.  Defendant's remaining argument is that its copying and posting of the standards

was "fair use."

    The fair use defense provides that "the fair use of a copyrighted work, including such use

by reproduction in copies . . . for purposes such as criticism, comment, news reporting, teaching

(including multiple copies for classroom use), scholarship, or research, is not an infringement of

copyright." 17 U.S.C. § 107.  When considering whether a particular use is fair, courts must

consider the following factors:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

*Id.*  "The factors enumerated in the section are not meant to be exclusive: '[S]ince the doctrine is

an equitable rule of reason, no generally applicable definition is possible, and each case raising

the question must be decided on its own facts.'"  *Harper & Row Publishers, Inc.*, 471 U.S. at 560

(alteration in original) (quoting H.R. Rep. No. 94-1476, at 65 (1976), as reprinted in 1976

U.S.C.C.A.N. 5659, 5678).  Defendant bears the burden of showing fair use.  *See Campbell*, 510

U.S. at 590.

Following remand, the parties provided additional details regarding the 217 standards at

issue, including:

- A copy of each of Plaintiffs' standards at issue, *see* Wise Decl., Ex. 149, ECF Nos. 198-5, 199-3–11; Pauley Decl., Exs. A–V, ECF Nos. 198-50, 199-12–33; Reiniche Decl., Exs. 1–2, ECF Nos. 198-53, 199-34; Dubay Decl., Ex. A, ECF Nos. 155-6;

- A copy of each of the ASTM standards as republished by Defendant on the Internet Archive, *see* Wise Decl., Ex. 151, ECF Nos. 198-5, 198-30–32;

- A copy of each of the ASTM standards as republished by Defendant in PDF format, *see* Wise Decl., Ex. 152, ECF Nos. 198-5, 198-33–37;

- A copy of some of the ASTM standards as republished b Defendant in HTML format; *see* Wise Decl., Ex. 165, ECF Nos. 198-5, 198-48;

- A copy of some of the NFPA standards as republished by Defendant on the Internet Archive, *see* Wise Decl., Ex. 166–68, ECF Nos. 198-5, 198-48;

- A copy of the cover sheets Defendant attached to the ASHRAE standards it republished on the Internet Archive, *see* Wise Decl., Ex. 169, ECF Nos. 198-5, 198-48; and

- Arguments as to how each standard has (or has not) been incorporated by reference into law, *see* Def.'s 2d MSJ at 9-10; Becker Decl. ¶ 57, Ex. 89-91; Supp. Wise Decl., Exs. 175–176.

Before turning to each of the four factors, and the court's standard-by-standard analysis, the court first distinguishes between standards that have and have not been incorporated by reference into law.

For each of the 217 standards at issue, Defendant provided the court with what it contends is the incorporating-by-reference regulation. *See* Becker Decl. ¶ 57, Ex. 89-91. For 153 of the 217 standards, Defendant provided at least one regulation incorporating into law the standard Defendant published. These are identified in the attached Appendix as "Group 1 Standards." As to the other 64 standards, Defendant cited to a regulation that incorporated a standard bearing a different designation than the one it published.[6]

---

[6] Each ASTM standard has a unique designation. In each serial designation, the number following the dash indicates the year of original adoption as a standard, or the year the standard was last revised. *See* Pls.' 2d SMF ¶ 35 (citing O'Brien Decl. Ex. 3 at 1349). Standards that have been reapproved without change are indicated by the year of last reapproval in parentheses as part of the designation number. For example, ASTM C5-79 (1997) indicates that ASTM C5 was reapproved in 1997. *Id.* A letter following this number indicates more than one revision during that year. For example, ASTM A106-04b indicates the second revision in 2004 to ASTM A106. *Id.* A superscript epsilon indicates an editorial change since the last revision or reapproval, so that ASTM A36-97ae1 indicates the first editorial revision of the 1997 version of

For 32 of those 64 standards, Defendant cites to a regulation that incorporated a version identical in text to the version Defendant published, but which was approved and published in a different year. *See* Pls.' 2d SMF ¶ 35 ("Standards that have been reapproved without change are indicated by the year of last reapproval in parentheses as part of the designation number (e.g., C5-79 (1997) indicates that C5 was reapproved in 1997.") (citing O'Brien Decl. Ex. 3 at 1349); Def.'s SDF at ¶ 35 (no objection); Def.'s 2d MSJ at 10 (contending that the "only difference between what was posted and the document cited in the C.F.R. is that the title adds a second, reissue, date in parentheses. All other text is identical") (citing Def.'s 2d SMF ¶ 84). These standards are identified in the attached Appendix as "Group 2 Standards."

Defendant argues that because the Group 2 Standards are identical to the text incorporated by reference into law, any discrepancy in the standard's reissue date is not material to the fair-use analysis. Def.'s 2d MSJ at 9-10. The court agrees. As to each of these standards, Defendant has "[f]aithfully reproduc[ed] the *relevant text* of a technical standard incorporated by reference for purposes of informing the public about the law," which "obviously has great value." *ASTM*, 896 F.3d at 451 (emphasis added).

For the final 32 standards, identified as "Group 3 Standards," Defendant concedes that these bear editorial and substantive differences from the ones incorporated by reference into law. Def.'s 2d MSJ at 9-10. Defendant does not identify which provisions of its postings are

---

ASTM A36. *Id.* If a standard is written in metric units, the metric version is indicated by the letter M (e.g., A369M-92 indicates that this version of A389 contains metric units). *Id.* When ASTM publishes standards in metric and inch-pound units it identifies the standard with a dual designation (e.g., ASTM A369/A369M-92 identifies a dual standard). *Id.* Regulations like the Code of Federal Regulations typically identify ASTM standards according to this specific designation number. For example, 40 C.F.R. § 114.600 specifies the edition of the ASTM standards incorporated by reference in 46 C.F.R. § 119.440, including B122/B122M95 and B96-93. *See* 40 C.F.R. § 114.600.

substantively different from what has been incorporated into law, or which provisions are the same; instead, it indiscriminately posted its versions in their entirety.  Defendant describes its error as "unfortunate" and contends that its mistake as to these 32 standards should not bear on the court's fair use analysis regarding the other 185 standards.  *Id.* at 10 n.5.  While it may be that Defendant could permissibly repost the text of Group 3 Standards that is identical to text incorporated into law, its fair use defense that it may indiscriminately post standards known to be substantively different than versions incorporated by reference into law is dubious.  *See ASTM*, 896 F.3d at 450 (explaining that incorporation of the 2011 version of a standard would not justify reproducing the 2014 edition that had not been incorporated); *id.* at 452 (explaining that a regulation requiring compliance with the two provisions of the 2011 National Electrical Code "would likely justify posting the specific text of only *those* two provisions of *that* version of the National Electrical Code," but not other versions) (emphasis in original).  "[U]nless a particular provision" of a standard has been incorporated into law, Defendant's "claim that a paraphrase or summary would always be inadequate to serve its purposes seems less persuasive."  *Id.* at 451.  Moreover, while Defendant could make a standard-by-standard argument that its publication of these 32 standards is a transformative use because portions of each provide key information for the public to debate certain public policies, *id.*, it has not done so.

> a. <u>Purpose and Character of the Use</u>

The first fair-use factor asks courts to consider "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1).  Mindful of the statute's stated goal to protect purposes such as criticism and comment, "the Supreme Court has explained that the fact that an infringing 'publication was commercial as opposed to nonprofit . . . tends to weigh against a finding of fair use.'"  *ASTM*,

896 F.3d at 449 (quoting *Harper & Row*, 471 U.S. at 562).  While one consideration of the fair

use inquiry is whether the copy "may serve as a market substitute for the original," *Campbell v.*

*Acuff-Rose Music, Inc.*, 510 U.S. 569, 587 (1994) (discussing the fourth fair use factor, *i.e.*,

market effect), the "crux of the profit/nonprofit distinction is . . . whether the user stands to profit

from exploitation of the copyrighted material without paying the customary price," *Harper &*

*Row*, 471 U.S. at 562.

Defendant's "copies of the technical standards may, in some cases, serve as a [market]

substitute" for Plaintiffs' standards, in that Defendant distributes identical standards online in the

same commercial market.  The more pertinent inquiry, however, is whether Defendant stands to

profit from its reproductions.  *ASTM*, 896 F.3d at 449.

Here, "little, if anything, in the record indicates that [Defendant] stands to profit from its

reproduction" of any of the 217 standards.  *Id.*  Indeed, this finding is consistent with

Defendant's "claimed purpose, reflected in the organization's mission statement and summary-

judgment submissions to the court, that it was distributing the standards to facilitate public

debate."  *Id.*; *see also* Def.'s 2d MSJ at 16 (describing Defendant's mission to promote public

discourse by providing free access to the law, including statutes, judicial opinions, and

professional standards incorporated by reference into law) (citing Def.'s 2d SMF ¶ 68).

Defendant's "attempt to freely distribute standards incorporated by reference into law qualified

as a use that furthered the purposes of the fair use defense."  *ASTM*, 896 F.3d at 449.

A second facet of the "purpose and character" factor is "whether the use 'adds something

new, with a further purpose,' or, put differently, 'whether and to what extent the new work is

transformative.'"  *Id.* (quoting *Campbell*, 510 U.S. at 578–79) (internal quotation marks

omitted).  Although "transformative use is not absolutely necessary for a finding of fair use, the

goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works." *Campbell*, 510 U.S. at 579 (internal citation omitted).

The D.C. Circuit found that this court "properly rejected some of [Defendant's] arguments as to its transformative use—for instance, that [Defendant] was converting the works into a format more accessible for the visually impaired or that it was producing a centralized database of all incorporated standards." *ASTM*, 896 F.3d at 450 (citing *ASTM*, 2017 WL 473822, at *16; *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 923–24 (2d Cir. 1994) (holding that photocopying articles "into a form more easily used in a laboratory" does not constitute transformative use but acknowledging "the benefit of a more usable format")).

The Circuit remanded, though, for this court to consider "whether, in certain circumstances, distributing copies of the law for purposes of facilitating public access could constitute transformative use." *ASTM*, 896 F.3d at 450. Specifically, the Circuit distinguished between an incorporated standard that "provides information essential to comprehending one's legal duties," which "would weigh heavily in favor of permitting a nonprofit seeking to inform the public about the law to reproduce in full the relevant portions of that particular standard," and the incorporation of a standard as a reference procedure, which does not. *Id.*

The court conducts this inquiry on a standard-by-standard basis in the attached Appendix.

### b.   *The Nature of the Copyrighted Work*

The second fair use factor, "the nature of the copyrighted work," 17 U.S.C. § 107(2), also requires an individual appraisal of each standard and its incorporation, *ASTM*, 896 F.3d at 451. "This factor," the Supreme Court has explained, "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586.

"Courts often reduce this inquiry to the question of whether the work is factual or fictional, as '[t]he law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy.'" *ASTM*, 896 F.3d at 451 (quoting *Harper & Row*, 471 U.S. at 563).

One principle relevant to this inquiry is that "the express text of the law falls plainly outside the realm of copyright protection." *See id.* at 450 (citing *Banks v. Manchester*, 128 U.S. 244, 253 (1888) (holding that state court judges may not copyright their judicial opinions because the "exposition and interpretation of the law, which, binding every citizen, is free for publication to all"); *Howell v. Miller*, 91 F. 129, 137 (6th Cir. 1898) (Harlan, J.) ("[A]ny person desiring to publish the statutes of a state may use any copy of such statutes to be found in any printed book, whether such book be the property of the state or the property of an individual.")). Standards incorporated by reference, though, are closer to "the outer edge of 'copyright's protective purposes.'" *ASTM*, 896 F.3d at 451 (quoting *Campbell*, 510 U.S. at 586). As to this "outer edge" of copyright protection, the Circuit distinguishes between text that is incorporated by reference into law in a manner akin to copying all of the standard's text into law, and text that is incorporated into law in a more nuanced way, such that the standard's text is not an easy substitute for what is incorporated into law. *Id.* at 452. The former example would weigh "heavily in favor of fair use," whereas in the latter example "fair use is harder to justify." *Id.* The court considers this factor on a standard-by-standard basis in the attached Appendix.

### c.  *The Amount of the Work Used*

The third fair use factor focuses on "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). The "extent of permissible copying varies with the purpose and character of the use," and courts must consider whether

"'the amount and substantiality of the portion used['] . . . are reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586–87 (quoting 17 U.S.C. § 107(3)).

As with the first two factors, this third inquiry is ill-suited to wholesale resolution. *ASTM*, 896 F.3d at 451. Accordingly, the court considers Defendant's copying on a standard-by-standard basis. *Id.* If Defendant "limits its copying to only what is required to fairly describe the standard's legal import, this factor would weigh strongly in favor of finding fair use here, especially given that precision is ten-tenths of the law." *Id.* at 452.

Here, as detailed in the attached Appendix, most of the standards at issue have been incorporated by reference into regulations that do not specify that only certain provisions of the standards are incorporated by reference into law, nor do the regulations indicate which specific provisions of the standards relate to regulatory compliance, suggesting that "a greater amount of the standard's text might be fairly reproduced." *Id.*

### d.  *Effect on Value or Market*

Under the fourth factor, the court must consider what effect the use has on "the potential market for or value of the copyrighted work." 17 U.S.C. § 107. This requires the court to "consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." *Campbell*, 510 U.S. at 590 (alteration in original) (quoting 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.05[A][4], at 13–102.61 (1993) (footnotes omitted)). The court must also take into account the "harm to the market for derivative works," which the Supreme Court declared to be "undoubtedly the single most important element of fair use." *Harper & Row*, 471 U.S. at 566, 568 (footnote and citation omitted).

The parties disagree about who bears the burden of showing the effect Defendant's republication has on the potential market for or value of Plaintiffs' standards. The Supreme Court has applied the burden differently depending on whether the challenged use is commercial or non-commercial. When a case involves commercial use, there is a presumption that some meaningful "likelihood of future harm . . . exists," and the Court has held that the defendant must rebut that presumption of market effect. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984) ("If the intended use is for commercial gain, that likelihood may be presumed. But if it is for a noncommercial purpose, the likelihood must be demonstrated."); *see also Campbell*, 510 U.S. at 590-91 (holding that, because fair use is an affirmative defense, "its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets," and that a silent record on the fourth factor "disentitled the proponent of the defense" to summary judgment).

On the other hand, when a defendant uses the copyrighted work for noncommercial purposes, the Court has placed the burden on the plaintiff to show "by a preponderance of the evidence that *some* meaningful likelihood of future harm exists." *See Sony Corp.*, 464 U.S. at 451; *see also Fox Broad. Co. v. Dish Network L.L.C.*, 747 F.3d 1060, 1069 (9th Cir. 2014) (finding fourth factor weighed in favor of fair use where challenged use was for noncommercial purpose and the plaintiff failed to show likelihood of market harm); *Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381, 1385 (6th Cir. 1996) ("The burden of proof as to market effect rests with the copyright holder if the challenged use is of a 'noncommercial' nature."); *Ass'n of Am. Med. Colls. v. Cuomo*, 928 F.2d 519, 526 (2d Cir. 1991) (Mahoney, J., concurring) ("Because [plaintiff] is challenging noncommercial use by the state, [plaintiff] has

the burden of proving 'that *some* meaningful likelihood of future harm [to marketability] exists.'") (quoting *Sony Corp.*, 464 U.S. at 451).

As previously explained, Defendant's use is noncommercial, and so Plaintiffs must show "by a preponderance of the evidence that *some* meaningful likelihood of future harm exists." *Sony Corp.*, 464 U.S. at 451.  In *ASTM I*, the Circuit posited that Plaintiffs "are right to suggest that there may be some adverse impact on the market for the copyrighted works [Defendant] reproduced on its website," but found that the record was unclear as to "just how serious that impact is." *ASTM*, 896 F.3d at 453.  The Circuit identified three questions to guide the court's inquiry into the meaningful likelihood of future harm. *Id.* First, because Plaintiffs make copies of many of their standards freely available online in controlled reading rooms, and they "presumably do so without entirely cannibalizing sales of their standards, just how much additional harm does [Defendant's] reproduction cause to the market for these standards?" *Id.* Second, if Defendant "were to reproduce only the incorporated provisions, would there still be a vibrant market for the standards in their entirety?" *Id.* And third, what consequences do Defendant's postings have on the market for derivative works? *Id.*

As to the first question, Plaintiffs' evidence falls well short of showing some meaningful likelihood of future harm.  Plaintiffs begin with the premise that Defendant's postings are "unrestricted" and "widely viewed," and conclude that "[t]his means its users include those individuals and entities who would otherwise purchase or license copies of Plaintiffs standards." *See* Pls.' 2d MSJ at 27.  But Plaintiffs' evidentiary support for this proposition is meager: correspondence from an engineer asking Defendant if the Circuit's decision in *ASTM I* meant Defendant could "update the site," Wise Decl. ¶ 174, Ex. 173 at PRO_00267293, and correspondence from an engineering firm telling Defendant it heard about its organization from a

"colleague" and asking Defendant how it could access Defendant's postings, *id.* ¶ 165, Ex. 164 at Interrog. 22.  Those communications—showing that two entities were interested in accessing Defendant's postings—do not explain whether the entities were interested in accessing Defendant's postings in lieu of purchasing Plaintiffs' standards, as opposed to simply accessing them in Plaintiffs' read-only access rooms.

Plaintiffs also argue that beyond those two engineering entities, there "may also" be "further would-be-infringers" who could repurpose Defendant's postings to turn a profit for themselves.  *See* Pls.' 2d MSJ at 27.  This argument is even more tenuous than the former. Plaintiffs point to a third-party website offering users the ability to pay to access ASTM standards, but they do not assert—or offer any evidence to show—that the third party's offerings are a result of Defendant's actions, or whether the third party, like Defendant, purchased Plaintiffs' standards and then scanned and uploaded them to its website.  *See id.* (citing Pls.' 2d SMF ¶¶ 105-06 (citing Wise Decl. ¶ 154-55)).  In other words, evidence that other websites are also posting Plaintiffs' standards—without any causal connection to Defendant's actions—does not show "market harm caused by the particular actions of the alleged infringer," nor does it show whether Defendant's actions enabled "widespread conduct of the sort engaged in by [Defendant]" that "would result in a substantially adverse impact on the potential market for the original."  *Campbell*, 510 U.S. at 590 (internal quotation marks omitted).

Plaintiffs also contend that entities that regularly use Plaintiffs' standards "are likely to use [Defendant's] versions of the standards," instead of purchasing standards from Plaintiffs or accessing Plaintiffs' read-only rooms.  *See* Pls.' 2d MSJ at 28.  In support, Plaintiffs cite to several declarations and one expert report, none of which are helpful.  *See* Pls.' 2d MSJ at 28 (citing Pls.' 2d SMF ¶¶ 86 (citing Supp. Pauley Decl. ¶¶ 43, 45; Supp. Reiniche Decl. ¶ 3;

Thomas Decl. ¶ 12), 88 (citing Thomas Decl. ¶ 14; Jarosz Rep., ECF No. 119 ¶ 86; Pls.' SMF ¶ 240 (citing Berry Decl. ¶¶ 11-12))).

For example, the relevant portions of the supplemental Pauley, Reiniche, Thomas, and Berry declarations offer only general assertions about Plaintiffs' read-only access rooms. *See* Supp. Pauley Decl. ¶¶ 43, 45 (describing NFPA's "belie[f]" that read-only access rooms offers members of the public adequate access to its standards); Supp. Reiniche Decl. ¶ 3 (explaining that ASHRAE offers online read-only access to many of its standards); Thomas Decl. ¶¶ 12, 14 (stating that ASTM develops consensus standards that are "used by scientists and engineers in their laboratories, by architects and designers in their plans, and by industry in their business contracts"); Berry Decl. ¶¶ 11-12, Exs. J, K (providing email exchange with third-party entity regarding the third-party's ability to sell an NFPA standard on eBay and an email exchange with a second third-party entity regarding a "promotional piece" and the entity's ability to access the 2014 National Electrical Code online). These declarations offer no clarity on whether entities who use the standards are likely to access Defendant's postings instead of buying them from Plaintiffs or accessing them in Plaintiffs' read-only rooms. The relevant portion of the Jarosz Report is mostly conclusory and, in part, undermines Plaintiffs' argument that consumers will switch to using Defendant's postings. *See* Jarosz Rep. ¶ 86 (describing ASTM's standards as reasonably priced and easily accessible in read-only rooms).

With regards to the Circuit's second question, Plaintiffs improperly shift the burden, arguing that Defendant has offered no analysis of what impact partial re-postings, as opposed to full re-postings, would have on the market for the originals. The court recognizes that it is difficult to provide quantifiable data on this issue given that Defendant has only reposted each of

the standards in full.  But that does not excuse Plaintiffs' failure to offer *any* analysis on this question.

Third, the court must consider whether Defendant's copying and distribution of Plaintiffs' standards would harm any markets for derivative works.  For instance, does Defendant's posting of outdated standards harm the market for updated, unincorporated editions of the standards?  *ASTM*, 896 F.3d at 453.  "If, as [Plaintiffs] assert, the primary purpose in developing technical standards is to have them used by private industry and other non-governmental users to address technical issues or problems, . . . there is at least some reason to think that the market demand for the most up-to-date standards would be resilient." *Id.* (internal quotation marks omitted).  Plaintiffs argue that some of the new versions of its standards are perfect substitutes for the older, incorporated versions, and "[a]s a result, for many users, the availability of a free and unrestricted" prior version "will interfere with the market for these derivative Works." Pls.' 2d MSJ at 39-40.  This assertion, though, is unsupported and begs the question it seeks to answer.  Plaintiffs' argument that the sale of derivative training and seminar materials will also be harmed is similarly speculative and does not differentiate between outdated incorporated standards and newer, unincorporated standards.  *See id.* at 40 (citing Jarosz Rep. ¶ 146).

Fourteen years have elapsed since Defendant first began posting Plaintiffs' standards. *See* Def.'s 2d MSJ at 13.  And four years have elapsed since Plaintiffs' expert opined that Defendant's activities "would" threaten the market for Plaintiffs' products.  *See* Jarosz Rep. ¶ 4. Now, aided by the passage of time, the court is less deferential to conclusory opinions that market harm "is real" but "difficult to measure."  *Id.* ¶ 7; *see also id.* ¶¶ 130-155 (arguing without evidence that Defendant's actions are likely to harm the market for Plaintiffs' standards

and downstream products).  One can reasonably expect that if over the last four years market

harm was occurring, or was likely to occur, Plaintiffs could provide economic data and analysis

showing that to be the case.  For example, Plaintiffs could have offered a side-by-side

comparison of sales figures for standards that have and have not been reposted on Defendant's

site to demonstrate the market impact of Defendant's postings.  They could have provided

testimony from former customers who stopped purchasing Plaintiffs' standards because they are

available for download on Defendant's website.  The fact that they do not provide any

quantifiable evidence, and instead rely on conclusory assertions and speculation long after

Defendant first began posting the standards, is telling.

The economic data that Plaintiffs provide—ASTM's and NFPA's overall sales figures—

does not advance their argument.  ASTM's sales have increased despite Defendant's activities.

Def.'s 2d SMF ¶ 153.  NFPA's overall revenue has "in recent years" declined, but it concedes

that "revenue is somewhat cyclical with publications."  *See* Pls.' 2d SMF ¶ 100.  And ASHRAE

has not attempted to determine what, if any, losses were attributable to Defendant's postings, and

was unable to identify any evidence of harm in response to one of Defendant's interrogatories.

*See* Def.'s 2d SMF ¶¶ 150, 154.

Ultimately, the court finds that "the evidence is such that a reasonable jury could not

return a verdict for" Plaintiffs that Defendant's actions have caused, or likely will cause, market

harm with regards to the specific standards at issue.  *See Wash. Post Co. v. U.S. Dep't of Health
& Hum. Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989) (citing *Anderson*, 477 U.S. at

248).  Accordingly, this factor supports Defendant's fair use defense for each of the 217

standards at issue.

e.   _Standard-By-Standard Analysis_

The court has considered each of the 217 standards individually using the four fair-use

factors.  That analysis is included in the attached Appendix.  For ease of reference, the standards

are divided generally into three groups.  _See ASTM_, 896 F.3d at 449 (recognizing that the

standards may be "susceptible to groupings that are relevant to the fair use analysis").  The first

group contains standards which Defendant has shown to be incorporated by reference into law.

The second group comprises standards which are identical in text to standards incorporated by

reference into law.  And the third group comprises standards for which Defendant provided the

court a regulation that incorporates a different substantive version of the standard than the one

Defendant posted.

As shown in the Appendix, the court concludes that Defendant may not copy, reproduce,

or distribute 32 standards that Defendant posted which differ in substantive ways from those

incorporated by reference into law, that Defendant may copy, reproduce, or distribute 184

standards in their entirety, and may copy, reproduce, or distribute only specified portions of 1

standard.  Thus, as to the 32 standards not shown to be incorporated by reference into law, the

court will GRANT Plaintiffs' motion for summary judgment and DENY Defendant's motion for

summary judgment.  As to the 184 standards that Defendant may copy, reproduce, or distribute

in their entirety, the court will DENY Plaintiffs' motion for summary judgment and GRANT

Defendant's motion for summary judgment.  And as to the 1 standard that Defendant may

partially reproduce, the court will GRANT IN PART and DENY IN PART both motions.

**B.  Lanham Act: Nominative Fair Use of Trademarks**

To establish a trademark infringement claim under the Lanham Act, Plaintiffs "must

show that [Defendant] used in commerce, without [Plaintiffs'] consent, a 'reproduction,

counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering

for sale, distribution, or advertising of any goods or services on or in connection with which such

use is likely to cause confusion.'" *ASTM*, 896 F.3d at 455-56 (quoting 15 U.S.C. § 1114(1)(a).

"This inquiry boils down to two questions: (1) does ASTM own 'a valid mark entitled to

protection' and (2) is [Defendant's] use of it . . . likely to cause confusion.'" *Id.* (quoting *Gruner*

*+ Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir. 1993)).

The court previously held that there was no genuine dispute on the factual issue of

whether consumer confusion was likely.  Specifically, the evidence showed that Defendant

intentionally created copies meant to appear identical to Plaintiffs' versions, including the use of

Plaintiffs' word and logo marks.  And Defendant's "disclaimers" were inadequate mitigation

against the likelihood of confusion because they did "not mention Defendant's creation of the

reproductions, Plaintiffs' lack of association or authorization, or that they are even reproductions

or transcriptions," and therefore could "hardly be called disclaimers at all."  *ASTM*, 2017 WL

473822, at *23.

Defendant did not contest either of these holdings on appeal in *ASTM I*, nor does it

contest them now.  Instead, Defendant argues that its use of ASTM's trademarks qualifies as

"nominative" fair use permitted under the Lanham Act.  *See* Def.'s 2d MSJ at 30-37.

Nominative fair use "occurs when 'the defendant uses the plaintiff's trademark to identify

the plaintiff's own goods and makes it clear to consumers that the plaintiff, not the defendant, is

the source of the trademarked product or service.'"  *ASTM*, 896 F.3d at 456 (quoting *Rosetta*

*Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 154 (4th Cir. 2012) (cleaned up)); *accord Century 21*

*Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 220 (3d Cir. 2005).  To qualify as

nominative fair use, "[1] the product or service in question must be one not readily identifiable

without use of the trademark; [2] only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and [3] the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder." *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 306–07 (9th Cir. 1992).

In *ASTM I*, this court rejected Defendant's nominative fair use claim, finding that because it had "already determined that consumer confusion as to the source of the trademarked standards is likely, the nominative fair use defense is inapplicable and the court need not assess each of the [ ] factors." *ASTM*, 2017 WL 473822, at *23. The Circuit rejected this analysis. Though it noted that it has "yet to opine on the precise factors courts should consider when assessing likelihood of confusion," and that "[c]ourts of appeals have disagreed about how exactly to evaluate nominate fair use claims," it clarified that "the likelihood of confusion analysis remains incomplete without at least some discussion of these factors." *ASTM*, 896 F.3d at 456-57.

Just how the court should assess the nominative fair use analysis remains unsettled law. *See id.* at 457 (discussing Circuit split on proper approach and noting that "we need not resolve today, which approach our court should adopt"). For instance, should the court treat nominative fair use as an affirmative defense? *See Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 220 (3d Cir. 2005) (treating nominative fair use "as an affirmative defense to be proven by defendant after likelihood of confusion has been demonstrated by the plaintiff."). Should it consider the three nominative fair use factors as substitutes for the ordinary multi-factor likelihood of confusion test? *See New Kids on the Block*, 971 F.2d at 308 (defining nominative fair use defense without reference to the likelihood of confusion factors). Or should it consider the three nominative fair use factors in addition to the ordinary likelihood of confusion factors? *See Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*

*(IISSC)*, 823 F.3d 153, 168 (2d Cir. 2016) ("Because we believe that the nominative fair use factors will be helpful to a district court's analysis, we hold that, in nominative use cases, district courts are to consider the Ninth Circuit and Third Circuit's nominative fair use factors, in addition to the [likelihood of confusion] factors.").

Having reviewed and considered each of these three approaches, the court believes that the Second Circuit's approach—requiring consideration of the nominative fair use factors in addition to the likelihood of confusion factors—is the most appropriate.

First, the nominative fair use defense is not an affirmative defense. The Supreme Court has interpreted the Lanham Act to distinguish between descriptive fair use and nominative fair use. Descriptive fair use, which falls within section 1115(b)(4)'s definition of affirmative defenses, involves the use of a name, term, or device otherwise than as a mark. Nominative fair use involves a defendant's use of a mark to describe the plaintiff's product, and "cannot fall within § 1115(b)(4)'s language." *See IISSC*, 823 F.3d at 165, 167 ("It is called 'nominative' use because it 'names' the real owner of the mark."). "A prototypical example of nominative fair use would be where 'an automobile repair shop specializing in foreign vehicles runs an advertisement using the trademarked names of various makes and models to highlight the kind of cars it repairs.'" *ASTM*, 896 F.3d at 456 (quoting *Rosetta Stone Ltd.*, 676 F.3d at 154). In that example, the repair shop's use differs from the use defined by section 1115(b)(4) because it uses the trademarked names to identify the automaker's goods. The same is true here because Defendant uses Plaintiffs' marks to describe the Plaintiffs' own products. *See* Def.'s 2d MSJ at 32.

Second, the nominative fair use factors should supplement, rather than supplant, the likelihood of confusion analysis. *See IISSC*, 823 F.3d at 168. This approach offers district

courts additional flexibility where certain factors may be "a bad fit" for the facts presented.  *See id.*

As noted, in *ASTM I* the court found that there was a likelihood of confusion where Defendant intended its reproductions to appear identical to Plaintiffs' works by including Plaintiffs' word and logo marks and disclaimers that did "not mention Defendant's creation of the reproductions, Plaintiffs' lack of association or authorization, or that they are even reproductions or transcriptions."  *See ASTM*, 2017 WL 473822, at *23.  The court now supplements that analysis by considering the three nominative fair use factors, and the steps Defendant has taken to reduce that likelihood of confusion.

As to the first nominative fair use factor, the court finds that Defendant's use of Plaintiffs' trademarks is necessary to describe Plaintiffs' works.  Indeed, "it is hard to see how [Defendant] could fulfill" its goal of informing the public about the law "without identifying the standard by its name—the very name also used in the incorporating law."  *ASTM*, 896 F.3d at 457.  Plaintiffs' alternative suggestion, that Defendant identify standards by their incorporating regulation, *see* Pls.' Opp'n and Reply at 28, is untenable because regulations commonly incorporate multiple standards at a time.  *See generally* Appendix.  Similarly, some standards are incorporated by many provisions.  *See generally id.*

Regarding the second factor, the court finds that Defendant's use of Plaintiffs' *word* marks is reasonably necessary to identify Plaintiffs' works, but that its use of Plaintiffs' *logos* is not.  Perhaps recognizing this, Defendant previously stated it was not committed to using Plaintiffs' logos.  *See* ECF No. 173, Hearing Tr. at 116 (Sept. 12, 2016) ("Public.Resource would take direction from this Court. Logos: yes or no? [Defendant] doesn't care.").  And following remand, Defendant removed Plaintiffs' logos from all its postings, save for two that it

"overlooked." *See* Def.'s 2d MSJ at 34 n.14 (conceding that in two instances, Defendant redacted an ASTM logo in certain postings of a law by reference but overlooked it in the HTML version); Pls.' 2d MSJ at 34 (citing Pls.' 2d SMF ¶ 23 (NFPA's National Electrical Code), 24 (ASTM D86-07)).

Third, the court considers whether Defendant's use of Plaintiffs' marks suggests that Plaintiffs have sponsored or endorsed Defendant's posts.  As an initial matter, there is no evidence to suggest Defendant has taken any action "in conjunction with the mark," to imply "sponsorship or endorsement by the trademark holder."  *New Kids on the Block*, 971 F.2d at 308. Instead, since *ASTM I*, Defendant has taken steps to distance its reproductions from Plaintiffs.

For example, while "the disclaimers initially used by [Defendant] were quite barebones, the record contains examples of more fulsome disclaimers it later appended to at least some standards."  *ASTM*, 896 F.3d at 457-58 (citing O'Brien Decl., Ex. 18 (disclaiming, among other things, that [Defendant] "has transformed this specification into [HTML]," that "[a]ny errors in the transformation of th[e] specification should be reported to [PRO]," and that PRO "is not affiliated in any way with any of the organizations named herein")).  Since remand, Defendant has also distanced its reproductions from Plaintiffs by more extensive use of disclaimers, which now take three forms.  Each standard Defendant posted in PDF format now has a cover page with a disclaimer identifying Defendant as posting the document and disclaiming any affiliation with, or authorization by, Plaintiffs.  *See* Def.'s 2d SMF ¶ 166.  Disclaimers appearing on the Internet Archive website versions state that Defendant posted the document and that Defendant is not affiliated with Plaintiffs, explain Defendant's process for posting the laws by incorporation, note the possibility of errors, and encourage readers to check with Plaintiffs or governmental authorities "for further information and access to definitive versions of these

important laws." *Id.* And finally, Defendant's HTML-format copies—available for download on the Internet Archive website—contain the following disclaimer:

> In order to promote public education and public safety, equal justice for all, a better informed citizenry, the rule of law, world trade and world peace, this legal document is hereby made available on a noncommercial basis, as it is the right of all humans to know and speak the laws that govern them.
>
> This document was prepared and posted by Public.Resource.Org (Public Resource), a U.S.-based charity certified under section 501(c)(3) of the Internal Revenue Code. Public Resource is not affiliated with, nor has it received authorization from, any standards development organization, for the posting of this document. Please note that the posting of this document has been subject to litigation in U.S. federal courts and was done so by Public Resource for the non-commercial purpose of informing our fellow citizens about their rights and obligations under the laws of the United States

Wise Decl., Ex. 165.

Plaintiffs challenge each of the three forms of disclaimers, claiming they are inadequate mitigation against likely association between them and Defendant's posts.

As to the cover pages on Defendant's PDF versions, Plaintiffs take exception to the accompanying "star-spangled" design, patriotic "regalia," and text, which states, "By Authority of the United States of America Legally Binding Document." *See* Pls.' 2d MSJ at 35-36. Plaintiffs argue that this "conveys a clear message" that the document is "By Authority of the United States of America" and a "Legally Binding Document," rather than Defendant's own work. *See id.* But Plaintiffs miss the mark: the pertinent question is not whether Defendant's use is likely to be confused as endorsed by the *U.S. Government*, but whether it is likely to be confused as endorsed by *Plaintiffs*. The court finds the latter mistake unlikely given that the only references to any Plaintiff appear (1) in the name of the standard, which as previously discussed, is necessary to describe the work, and (2) in the disclaimer, which states "Not Affiliated or Authorized by [Plaintiff] or by the United States Government." *See* Pls.' 2d SMF ¶ 26. These

disclaimers sufficiently mitigate against any confusion that Plaintiffs sponsored or endorsed Defendant's PDFs.

The same is true for the other two forms of disclaimers—those appearing on Defendant's Internet Archive and HTML formatted posts.  Plaintiffs argue that users are unlikely to read the disclaimers because they must scroll down the webpage to see the Internet Archive disclaimer and because the HTML disclaimer appears under a heading titled, "PREAMBLE (NOT PART OF THE STANDARD)."  But there is no evidence indicating that users would not scroll down to see a disclaimer, or that they would not read a standard's preamble.  The court instead finds Defendant's disclaimers to be positioned in prominent enough locations to "adequately eliminate the possibility a consumer would assume sponsorship of endorsement by ASTM," *ASTM*, 896 F.3d at 457, given the minimal references to any Plaintiff elsewhere in the posts and Defendant's removal of Plaintiffs' logos, *see Dr. Seuss Enters., L.P. v. ComicMix LLC*, 300 F. Supp. 3d 1073, 1091 (S.D. Cal. 2017) (finding defendant satisfied the third nominative fair use factor where it did "nothing in conjunction with the use of the mark to suggest a sponsorship or endorsement by Plaintiff" and added a disclaimer to the third page of the contested work); *Keurig, Inc. v. Strum Foods, Inc.*, 769 F. Supp. 2d 699, 709 (D. Del. 2011) (finding that although disclaimer was on the bottom of a box, it nonetheless was sufficient where there was no evidence demonstrating that customers would not look to the bottom of the box); *see also Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 803 (9th Cir. 2002) ("In addition to doing nothing in conjunction with her use of the marks to suggest sponsorship or endorsement by [plaintiff], [the defendant] affirmatively disavows any sponsorship or endorsement. Her site contains a clear statement disclaiming any connection to [the plaintiff].")

Ultimately, considering the record on remand, and the nominative fair use factors in conjunction with the likelihood of confusion analysis, the court finds that Defendant's use of Plaintiffs' word marks is nominative fair use, but its use of Plaintiffs' logos is not.

## C. **Remedy**

Having found that Plaintiffs have succeeded on the merits of their copyright claim as to 32 standards that do not qualify for the fair use defense, and its trademark claim as to Defendant's use of Plaintiffs' trademarked logos, the court turns to Plaintiffs' request that it permanently enjoin Defendant from all reproduction, display, or distribution of those standards and logos.  *See* Pls.' 2d MSJ at 38.  A preliminary injunction is "an extraordinary remedy," that is "never awarded as of right."  *Winter*, 555 U.S. at 22, 24.  To obtain a permanent injunction, Plaintiffs must show (1) irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for their injury; (3) that a remedy in equity is warranted after considering the balance of hardships; and (4) that the public interest would not be disserved by a permanent injunction.  *See eBay Inc.*, 547 U.S. at 391.  Failure to satisfy any factor "is grounds for denying relief."  *Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau*, 785 F.3d 684, 694 (D.C. Cir. 2015).  "If a less drastic remedy . . . [is] sufficient to redress [the] injury, no recourse to the additional and extraordinary relief of an injunction [is] warranted."  *Monsanto Co. v. Geertson Seed Farms,* 561 U.S. 139, 165–66 (2010).

### 1.   Irreparable Injury

Plaintiffs claim they will face three separate irreparable injuries if Defendant is permitted to continue distribution of Plaintiffs' standards and logos:  substantial declines in revenue that may cause their business models to change; loss of the exclusive rights under the Copyright Act

to exclude others from distributing, reproducing, or displaying their protected works; and loss of control of the goodwill associated with their trademarks.

First, as previously explained, Plaintiffs have not offered credible evidence of economic harm caused by Defendant's use of those 32 standards or Plaintiffs' logos, which shows that there is little to no "likelihood of substantial and immediate irreparable injury." *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1324–25 (Fed. Cir. 2012) ("A mere showing that Apple might lose some insubstantial market share as a result of Samsung's infringement is not enough.").

Second, though the court previously found that there was no evidence indicating Defendant's conduct would end absent an injunction, *see ASTM*, 2017 WL 473822, at *24, the court notes that the updated record reflects Defendant's intention to only post documents that have been incorporated into law. *See* Def. Statement of Disp. Facts, ECF No. 203-3. The court also notes that Defendant's voluntary removal all of Plaintiffs' trademarked logos from each of the reposted standards, save for two that it "overlooked," *see* Def. 2d MSJ at 34, shows Defendant's willingness to comply with the court's order without the "extraordinary relief" of an injunction, *see Winter*, 555 U.S. at 22.

Third, the court finds that Defendant's use of Plaintiff's trademarked logos in the two "overlooked" standards will result in irreparable harm because the trademark owner will lose control of the goodwill associated with its mark. *See Hanley-Wood LLC v. Hanley Wood LLC*, 783 F. Supp. 2d 147, 151 (D.D.C. 2011); *Breaking the Chain Found. V. Capitol Educ. Support, Inc.*, 589 F. Supp. 2d 25, 30 (D.D.C. 2008). Plaintiffs claim to have spent "decades establishing the goodwill associated with their names and logos, which the public associates with their high-quality work." Pls.' SMF ¶ 245 (citing Jarosz Rep. ¶ 151). Yet, it is undisputed that some of

Defendant's posts have included errors.  *See* Pls.' 2d Supp. SMF ¶¶ 13-14.  While Defendant

claims that it has and will continue to correct any errors brought to its attention, *see id.*, this is

hardly reassuring for Plaintiffs.

### 2.  Adequacy of Monetary Damages

Plaintiffs argue that because damages here are difficult to quantify and Defendant may be

unable to pay damages, legal remedies are inadequate. *See Fox Television Stations, Inc. v.

FilmOn X LLC*, 966 F. Supp. 2d. 30, 50 (D.D.C. 2013).  Neither party has submitted evidence

that would be helpful in calculating damages, such as how many users who access Defendant's

posts actually download them, and whether those downloads were in lieu of purchases.

Moreover, Defendant has not disputed that it has "extremely limited financial resources available

to pay any damages award" and that in 2014 it "generated under $100,000 in operating income

and had $248,000 in total net assets."  *See* ASTM PSMF ¶¶ 272–73.  Given that the Copyright

Act provides for statutory damages ranging from $750 to $30,000 for each of the standards at

issue in the overall case, or even up to $150,000 per infringement if Plaintiffs were to later prove

that infringement was willful, Defendant's potential inability to pay is certainly a factor weighing

towards equitable relief.  *See* 17 U.S.C. § 504(c)(1) – (2)

### 3.  Balance of Hardships & Public Interest

The court must weigh the likely harms to Plaintiffs as described above with any harm to

Defendant if an injunction is imposed.  Defendant's CEO Carl Malamud, when asked in his

ASTM deposition what financial impact an injunction barring posting of the standards would

have on Public Resource, responded, "probably none."  ECF No. 118-12, Rubel Decl., Ex. 3,

Malamud Dep. at 219:22–220:4.  The only harm he identified was that "one hates to have wasted

that [] effort" that went into posting the standards online.  *Id.*  Without evidence of any additional harms, this factor weighs strongly in favor of an injunction.

Moreover, the public interest is served by the policy interests that underlie the Copyright Act itself, namely the protection of financial incentives for the continued creation of valuable works, and the continued value in maintaining the U.S. public-private system in place to ensure continued development of technical standards.  At the same time, the public would be greatly disserved by an injunction barring distribution of any of the 32 standards which may later be incorporated by reference into law.

Considering all the injunction factors, the court finds that while Plaintiffs are entitled to summary judgment on their copyright claim as to the 32 unincorporated standards, the record does not support a permanent bar on Defendant's use of those standards, in light of the meager evidence of irreparable harm and the possibility that these standards will be incorporated into law at a later date.  Injunctive relief is, however, appropriate as to Plaintiffs' trademarked logos, and Defendant will be permanently barred from any use of Plaintiffs' trademarked logos in connection with the posting of these standards online or elsewhere.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiffs' Motion will be GRANTED IN PART and DENIED IN PART, and Defendant's Cross-Motion will be GRANTED IN PART and DENIED IN PART.

Date:  March 31, 2022

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge